Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


IN RE:                                  )
                                        ) No. 04-10981-PBS
NEURONTIN MARKETING, SALES PRACTICES,   ) MDL No. 1629
AND PRODUCTS LIABILITY LITIGATION       )
----------------------------------------)
This document relates to:               )
KAISER FOUNDATION HEALTH PLAN, et al,   )
                                        )
                 Plaintiffs             )
                                        )
        -V-                             )No. 04-10739-PBS
                                        )Pages 1 - 225
PFIZER, INC., et al,                    )
                                        )
                 Defendants             )



              JURY TRIAL - DAY EIGHTEEN

        BEFORE THE HONORABLE PATTI B. SARIS
            UNITED STATES DISTRICT JUDGE




                   United States District Court
                   1 Courthouse Way, Courtroom 19
                   Boston, Massachusetts
                   March 19, 2010, 8:45 a.m.




          LEE A. MARZILLI and DEBRA M. JOYCE
               OFFICIAL COURT REPORTERS
             United States District Court
             1 Courthouse Way, Room 7200
                  Boston, MA  02210
                  (617)345-6787

```
 1    A P P E A R A N C E S

 2    FOR THE PLAINTIFFS:

 3         THOMAS M. GREENE, ESQ. and ILYAS J. RONA, ESQ.,
      Greene, LLP, 33 Broad Street, 5th Floor, Boston,
 4    Massachusetts, 02109.

 5         THOMAS M. SOBOL, ESQ. and KRISTEN JOHNSON PARKER, ESQ.,
      Hagens Berman Sobol Shapiro, LLP, 55 Cambridge Parkway,
 6    Suite 301, Cambridge, Massachusetts, 02142.

 7         LINDA P. NUSSBAUM, ESQ., Kaplan Fox & Kilsheimer, LLP,
      850 Third Avenue, New York, New York, 10022.
 8
           DON BARRETT, ESQ., Barrett Law Office,
 9    404 Court Square North, P.O. Box 987, Lexington, Mississippi,
      39095.
10
           BARRY HIMMELSTEIN, ESQ., Lieff Cabraser Heimann &
11    Bernstein, Embarcadero Center West, 275 Battery Street,
      San Francisco, California, 94111-3339.
12

13    FOR THE DEFENDANTS:

14         KATHERINE ARMSTRONG, ESQ., MARK S. CHEFFO, ESQ., and
      THOMAS E. FOX, ESQ., Skadden Arps Slate Meagher & Flom, LLP,
15    Four Times Square, New York, New York, 10036.

16         RAOUL D. KENNEDY, ESQ., Skadden Arps Slate Meaher & Flom,
      LLP, Four Embarcadero Center, San Francisco, California, 94111.
17
           JAMES E. HOOPER, ESQ. and ANDREW H. MYERS, ESQ.,
18    Wheeler Trigg Kennedy, LLP, 1801 California Street, Suite 3600,
      Denver, Colorado, 80202.
19

20

21

22

23

24

25
```

1                    I N D E X

2

    WITNESS                DIRECT   CROSS   REDIRECT   RECROSS

3

4   SHAWN BIRD, M.D.          15      49       83         85

5   ANDREW SLABY, M.D.        89     121      152        156

6

7   MOTION HEARING, P. 171

8

9   EXHIBITS                          PAGE

10

    1275, 1332, 1379, 2069, 1254,          39
11  1488, 1553, 1546, 1727

12  1906, 1923, 1868, 1695, 1715, 1478     43

13

14

15

16

17

18

19

20

21

22

23

24

25

1                   P R O C E E D I N G S
2          THE COURT:  Good morning to everyone.
3          MR. CHEFFO:  Good morning.
4          MR. GREENE:  Good morning, your Honor.
5          THE COURT:  At some point I am going to want to talk
6    to Mr. Cheffo, and I don't know if there's anyone here from the
7    product liability side, about some scheduling issues there.
8          MR. CHEFFO:  Yes, your Honor.
9          THE COURT:  Have you been following that?
10         MR. CHEFFO:  Are you talking about Judge Young?
11         THE COURT:  Yes.
12         MR. CHEFFO:  Yes.  I know that I talked to Ken Fromson
13   yesterday, and there was a --
14         THE COURT:  So I just will want to do that, which we
15   can apart from here.
16         As we come into the final stretches, I have not yet
17   read the plaintiffs' oppositions, but I do think we should
18   start at least the process of arguing on directed verdicts and
19   jury forms and stuff today and have it be a continuing process
20   into Monday, just get it going.  I can work on it some over the
21   weekend, you all can, and we can just sort of finalize it to
22   get it to the jury on Tuesday.  So I think that's really,
23   unless something surprising happens, where we're ending up.  I
24   don't think I can do it and have it all ready for Monday,
25   unless you think you're going to be done, and it will be a

56911cdc-45d4-450f-a2bd-8ee3ff13fe4d

1  totally empty day.

2       MR. CHEFFO:  Well, and I'm glad you raised it, your

3  Honor.  I think today if we're efficient -- we have three

4  witnesses today.  We think, based on their estimates of the

5  crosses, we think we can actually get all three on and off

6  today.  We've actually continued to ask them because, in

7  fairness, we've told them, and we think we have a few

8  depositions.  They won't tell us whether they're even going to

9  the a rebuttal case or who it is.

10       THE COURT:  You know, as we saw with Mr. Kennedy, I

11  mean, sometimes you can really tell, and sometimes you can't.

12  He went two to three times longer than he originally had

13  estimated, and it only happened once, only in fairness once.

14  But everyone's trying to plan around it, but sometimes you

15  can't get it to an exactitude.

16       MR. CHEFFO:  And that's not even my issue, your Honor.

17  If we don't do it, our witness will come back.  I just want the

18  Court to understand for planning purposes.  Dr. Bird has to

19  be -- he's going to start, so he'll be on and off.  We've said

20  about 30, 35 minutes; they said about 30.  Then Dr. Slaby,

21  about 30, 30 each.  Then Dr. Keeley, we've said about 40, 45;

22  they said about 40, 45.

23       THE COURT:  Good, perfect.

24       MR. CHEFFO:  If it doesn't work, we understand that.

25  But my real issue is, at this point Monday is the final day.

1   We continue to ask them, at least tell us who you're planning

2   to have in the courtroom for rebuttal and how much time and --

3           THE COURT:  Well, we do need to know that for the jury

4   because otherwise I'm going to move heaven and earth to

5   essentially give it to the jury Monday, if we're done with

6   testimony today.  In other words, otherwise Monday would be a

7   completely empty day.

8           MR. CHEFFO:  We have a few depositions, but we could

9   probably do that in less than an hour on Monday.

10          THE COURT:  Actually, being selfish for a minute, I've

11  got Tuesday blocked for the afternoon and Monday is a little

12  free, so actually, for me, for the jury, Monday would be

13  preferable.  And I'd be willing to put in time this weekend.  I

14  gave you a very rough script, especially on the California

15  Unfair Competition Law, but I don't think I have that much to

16  do on the jury instructions, and I really want to hear from you

17  on the jury verdict form.

18          MR. CHEFFO:  So if we could just get some idea today,

19  it would help us --

20          THE COURT:  What do you think on the rebuttal?  Do you

21  know yet?

22          MS. NUSSBAUM:  Your Honor, we are considering, the

23  client is considering a rebuttal witness, and we will know that

24  with more certainty once --

25          THE COURT:  Well, how much time do you have left?  I

1  don't even know.

2          MS. NUSSBAUM:  How much time do we have left in the

3  case?

4          THE COURT:  Yes, roughly.

5          MS. NUSSBAUM:  I think we have about four hours left.

6          THE COURT:  So you have time.

7          MR. CHEFFO:  They have about three and a half now

8  probably based on today --

9          THE COURT:  So here's my problem.  I certainly

10  understand both sides have been a little close to the vest on

11  some of this stuff, but I actually need to tell the jury.  So

12  is this a likely --

13          MR. SOBOL:  In terms of scheduling then, I mean, if we

14  don't know yet on the rebuttal, and Ms. Nussbaum can address

15  that, but --

16          THE COURT:  No, but I need to know because I need to

17  tell them at 1:00 o'clock today whether Monday is a full day or

18  whether Monday is a 9:00-to-1:00 day.  I can't pop it on them.

19          MR. SOBOL:  Yes, I understand that.  All I'm saying

20  is, I don't think we're going to be finishing even the three

21  witnesses that are scheduled today.  I don't think there's any

22  way that those three witnesses are going to be done today.

23          THE COURT:  Well, okay.  Well, we'll visit this, but

24  this is what I need you to do:  By 1:00 o'clock today, I need

25  an answer, okay, I need an answer.

1          MR. CHEFFO:  Fair enough.

2          THE COURT:  So I understand that there is a few

3    documents we need to discuss, is that right?  Or is that not

4    true?

5          MS. NUSSBAUM:  That is true, unfortunately, your

6    Honor.  Since, I guess, last week I've been trying to meet and

7    confer with the defendants about the three documents that when

8    Mr. Carrejo was on direct there was an objection.  We asked for

9    a side bar.

10          THE COURT:  I can deal with that later.  It's not --

11    with today's witnesses?

12          MS. NUSSBAUM:  No, no, not with today's witnesses.

13          THE COURT:  And I understand there's a nascent debate

14    about the depositions.  So I haven't really read the motion and

15    opposition other than skim them, but what I would like to do is

16    actually see the depositions.  I would be inclined to at least

17    allow the depositions in with respect to whatever you designated

18    and whatever is within the scope of the direct.  I was taken

19    with one argument that all they did was identify a document,

20    and you put in tons of pink.  I didn't spend that much time on

21    that particular issue before, but now, if you haven't chosen to

22    bring on any witness, to suddenly put it all in.  But if it's

23    within the scope of the direct, I'm going to allow it.  So I

24    don't know what that means as a practical matter.  Maybe on one

25    witness it's really narrowly construed but in another one it's

1   much broader.  Maybe you can confer and figure that out.  If

2   you want, I'll just have to quarterback it.

3           MR. CHEFFO:  I think that's true.  I don't have it

4   committed to memory, but I think that's probably true.  With

5   respect to one witness, there is more of our designations.

6   With Pande, I think it's an almost equal designation.

7           THE COURT:  And the other one needs to be, if all she

8   did was authenticate a document, I'm not going to let you

9   shovel in all sorts of other stuff.  But otherwise, you know,

10  it did say on their list, you know, they reserve the right to

11  call anyone on your list or something like that.  But I didn't

12  anticipate that it meant, you know, she's going to

13  authenticate, and then you're going to put in everything else.

14  I at that point maybe didn't understand.  No one was coming on

15  from Pfizer.  So I think that's a good compromise on that

16  issue, and if you have any battles on it, just give me a little

17  advanced notice.  So --

18          MR. GREENE:  Can I respond to that because I think I

19  was standing in the court and took the bullet when you were a

20  little bit exasperated about the objections, and I just wanted

21  to point out to you that I wasn't familiar with what had

22  happened then.  And we've looked at it, our team has looked at

23  it over the weekend and found that we narrowed it down, but

24  unfortunately what was given to you didn't have our last sets.

25          THE COURT:  Oh.

1          MR. GREENE:  And through no fault of Mr. Fox at all.

2     It was just inadvertence.  But I wanted to point that out to

3     you because I know you were exasperated.

4          THE COURT:  Well, thank you.  I was because,

5     truthfully -- and I actually have to apologize -- I was so

6     exasperated because I had spent all afternoon doing the

7     depositions, and I spent all night until like 11:00 reading the

8     stuff, and then to come in and have everything objected to.  So

9     I apologize.  I apologize, you apologize.  I did get it; it was

10    every single line.

11         MR. GREENE:  It had been cut.  It had been cut way,

12    way down.  It just didn't get to you.

13         THE COURT:  So, all right, just a miscommunication at

14    trial.  That's fine.  Anyway, we're done, right?  And I'll look

15    at the three documents.  I can look at them when you're --

16         MS. NUSSBAUM:  There's one other thing.  I think about

17    an hour ago the defendants just served a bench memo for an

18    additional, I think, 25 Kaiser documents that they want to put

19    in.

20         THE COURT:  Were they on the exhibit list?

21         MS. NUSSBAUM:  Well, some of these had been in fact on

22    their list for Dr. Daniel and others.  Then they chose not to

23    use them.  Now they want to dump them in --

24         THE COURT:  Can I say --

25         MS. NUSSBAUM:  Your Honor, may I just finish?  No, we

1    would be highly prejudiced because I will not now have the

2    ability to have a witness who I can ask about the document or

3    to clarify the document.  These are not newly discovered or

4    anything else.  We put on four witnesses, unlike the

5    defendants.  These were documents that they had that, as you

6    said, Mr. Kennedy very skillfully used many documents that had

7    nothing to do with the witnesses to put them in.  I would have

8    been able to then examine --

9              THE COURT:  Can I say, I haven't looked at the

10   documents.  I made Mr. Sobol and his team put together some

11   exhaustive memo explaining, which he did quote by quote, why

12   they were relevant.  But then I let you do the documents.  I

13   don't know if such a similar document has been done.

14             MR. CHEFFO:  My understanding is, yes, it has, your

15   Honor.  You asked us to do that, and I'd say at least this is

16   premature, since you probably haven't even had a chance to look

17   at our -- so I think this is not an issue we need to address

18   this morning.  It has nothing to do with the witnesses.

19             THE COURT:  Well, let me just say this, it's my

20   favorite quote from the trial:  What's sauce for the goose is

21   sauce for the gander.  And if in fact something is relevant and

22   admissible and authentic -- those are three -- I'm going to

23   allow it in.  Now, I don't know if that's true.  And it was on

24   the exhibit list, okay?  I guess those would be my four:

25   Relevant, admissible, like under the rules of hearsay, whether

1    a business record, authentic, and on the exhibit list, I'm

2    going to allow it in.  Now, someone has got to prove to me that

3    they're relevant because I can't see it through a witness.  And

4    if in fact a memo like Mr. Sobol did has been submitted -- I

5    don't know, has it?  Have you seen it?

6         MS. NUSSBAUM:  If I might, your Honor, they have two

7    groups of documents.  One is a group of documents responsive to

8    the RICO list, which they say are needed for completeness, and

9    for that, they did file a memo.  This other group of 25 Kaiser

10   documents have nothing to do with that.  These are documents,

11   some of which they had given us when we were putting witnesses

12   on.  They chose then not to use those documents with the

13   witnesses.

14        THE COURT:  I thought you were going to put on a

15   Kaiser rebuttal person.  You'll be able to sort of shoot them

16   down.

17        MS. NUSSBAUM:  No, will not, not for these documents,

18   your Honor, unless we're going to get a broad rebuttal case.

19   If you're going to say that we can then bring in witnesses --

20        THE COURT:  I don't know what they are and -- excuse

21   me, let me just say this:  I don't know.  I haven't seen them.

22   If it's something completely, completely off the beaten path,

23   maybe I'll agree with you, but if it's -- I just don't know.  I

24   haven't seen them.  If there's no memo on them, they don't

25   come.  I mean, so it's --

1        MS. NUSSBAUM:  It's one sentence.  They say that

2   they're authentic and business records, but we would be highly

3   prejudiced --

4        THE COURT:  Excuse me.  I don't think you're going to

5   be highly prejudiced, especially if you're going to put on a

6   rebuttal Kaiser case.  That having been said, if they haven't

7   shown me that they're relevant in a memo, they don't come in.

8   I haven't seen them yet.  I don't know.

9        MR. CHEFFO:  I mean, again, I don't want to take --

10  there's a memo that goes through each and every document --

11       THE COURT:  Well, if it does, I don't know.  I'll

12  look, I'll look.  I'll add it to my reading list.  Have any of

13  you ever clerked for a federal judge?  It's the six-month list

14  is due at the end of March, you're catching me.  So that's sort

15  of like, you know, you stale, overdue barking cases need to be

16  done as well.  So it's a tough week.  We'll get there.  But I

17  think we should see if the jury is here.  She, by the way, gave

18  me back the materials, so I'm going to ask her just if she's

19  read them and leave it at that, unless anybody cares I need --

20  I was going to give her a surprise quiz on Dr. Gibbon's

21  biostatistics.

22       MR. SOBOL:  Does she yellow highlight things?

23       THE COURT:  Huh?

24       MR. SOBOL:  Does she yellow highlight things?

25       THE COURT:  Yeah.  Now, can I just see you.  Is anyone

1    here from the Fromson team?  No.  Anyone here from plaintiffs?

2    Are you from plaintiffs' side at all?

3              THE COURT:  This may be ex parte, but it's benign.

4              (Side-bar discussion off the record.)

5              THE COURT:  Do you have any line-by-line or specific

6    objections in writing to the jury instructions yet so I can

7    give it to my law clerks?

8              MR. CHEFFO:  We actually filed -- again, it was last

9    night, so you obviously didn't see it.  I think we have

10   probably bench memos.  We have comments because -- we didn't

11   file them as objections because we knew you wanted --

12             THE COURT:  Comments like in the margins?

13             MR. CHEFFO:  More specific.  You know, they're not in

14   the margin, but they're in prose, but I think they're

15   relatively specific to sections.

16             THE COURT:  Oh, you've got them?

17             THE LAW CLERK:  I have them here.

18             THE COURT:  All right.  How about you?  How are you

19   going to do it?

20             MS. NUSSBAUM:  We do have revised 17200 instructions

21   I'm trying to contact the person who has them now --

22             THE COURT:  I don't care if they're a thing of beauty.

23   You can give me a thing of beauty for the file.  I don't care

24   if there are typos.  I mean, at this point, especially if

25   Monday is a possibility, we should get to them.

1          THE CLERK:  All rise for the jury.

2          (Jury enters the courtroom.)

3          THE COURT:  Good morning.  So I was in the beautiful

4    city of New Orleans, which I'm sad to report to you actually

5    does a better day of St. Patrick's Day than Boston does.  The

6    place was wild.  But I wanted to ask all of you, did anyone

7    speak about the case, see anything in the press?  I haven't

8    yet, by the way, so my asking doesn't mean there is anything in

9    there.

10          You got a chance to read those materials?

11          A JUROR:  Yes, all of them.

12          THE COURT:  Thank you, and I've got those back, so

13   your homework is done.  Thank you.  And we're going to proceed

14   on another witness right now.

15          MR. HOOPER:  Your Honor, we call Dr. Shawn Bird.

16                    SHAWN BIRD, M.D.

17   having been first duly sworn, was examined and testified as

18   follows:

19          THE CLERK:  Would you please state your name and spell

20   it for the record.

21          THE WITNESS:  Shawn Bird, B-i-r-d.

22   DIRECT EXAMINATION BY MR. HOOPER:

23   Q.   Dr. Bird, what is your profession?

24   A.   I'm a neurologist.

25   Q.   Where are you employed?

56911cdc-45d4-450f-a2bd-8ee3ff13fe4d

1    A.    I'm on the faculty of the University of Pennsylvania in

2    Philadelphia.

3    Q.    Would you please describe your educational background.

4    A.    I went to college at Cornell University, and it was a

5    five-year program where I received two bachelor's degrees, one

6    in biology and one in electrical engineering.  After that I

7    went to medical school at Johns Hopkins School of Medicine,

8    received my M.D.  Following that, I did three years of a

9    neurology residency at the Hospital of the University of

10   Pennsylvania, and following that, I did two years of fellowship

11   training in diseases of peripheral nerve and the test of

12   peripheral nerve, which is EMG testing.

13   Q.    Are you board-certified, sir?

14   A.    Yes.

15   Q.    In what specialty?

16   A.    In neurology and also in the practice of EMG.

17   Q.    Doctor, what are your current professional

18   responsibilities?

19   A.    I'm on the full-time faculty at the University of

20   Pennsylvania.  I'm primarily a clinician.  I see patients there

21   and teach fellows and residents.  I'm program director of the

22   Clinical Neurophysiology Program.  I run the EMG laboratories

23   there, which is an electrical test of nerve and muscle.  I'm

24   director of the MDA clinic, which takes care of patients with

25   nerve and muscle diseases, and I participate in a peripheral

1    neuropathy clinic.

2    Q.   Doctor, have you published articles in peer-reviewed

3    journals in the field of neurology?

4    A.   Yes.

5    Q.   And do you have experience as an investigator in clinical

6    trials of potential new medications?

7    A.   Yes.  I've been a principal investigator in a number of

8    trials in peripheral neuropathy and also helped design some

9    trials.

10   Q.   And, Doctor, do you also have experience reviewing and

11   analyzing clinical trial methods and results?

12   A.   Yes, in a couple of formats.  I'm a reviewer for a number

13   of journals, including Muscle and Nerve, which is one of the

14   main journals that deal with nerve disease, and I get a chance

15   to look at trials and data on nerve diseases and treatments in

16   that format.  I also write for UpToDate, which is an online

17   computer resource for physicians.  Almost a million U.S.

18   physicians use it to look up things on the computer, and as

19   part of that, we write about treatments of various diseases

20   where we're expected to use an evidence-based medicine

21   approach, both clinical experience and formulating and

22   analyzing randomized double-blind clinical controlled trials.

23   Q.   Doctor, could you briefly summarize the subjects that you

24   focused on in this case.

25   A.   I was asked to look at the effectiveness of gabapentin or

1    Neurontin for neuropathic and related forms of chronic pain.

2    Q.   Were you also asked to examine the safety and tolerability

3    of the medication?

4    A.   Yes.

5    Q.   And its comparability to alternative pain medication?

6    A.   Yes.

7    Q.   What kinds of materials did you review and rely on in this

8    case?

9    A.   I looked at much of the material I had on hand, chapters,

10   books, journal articles.  I also did a systematic review

11   through our university database, which involved MEDLINE and

12   PubMed, which are online sources for articles.  I received all

13   of the research reports from Parke-Davis, the original research

14   reports and data, and also my own personal clinical experience.

15   Q.   Did you review results from randomized blinded controlled

16   clinical trials?

17   A.   Yes.

18   Q.   Both published and unpublished?

19   A.   Yes.

20   Q.   What weight do you assign to DBRCTs relative to other

21   forms of evidence?

22   A.   I think they're all important.  I think anybody who

23   practices evidence-based medicine uses --

24            MR. SOBOL:  Objection.

25            THE COURT:  Overruled.

Page 19

1        MR. SOBOL:  He was asked what weight he gives, not

2    anyone.

3    Q.    How do you practice evidence-based medicine?

4        THE COURT:  Yes.

5    A.    The way that I practice it is, we use our clinical

6    experience in conjunction with the best evidence in the

7    literature to try and make thoughtful decisions in each

8    patient's circumstance.  There's a lot of things to consider.

9    You have to consider the quality of the clinical trials and

10   whether they actually show what they're intended to show.  You

11   need to look at the individual patient because patients differ,

12   and the trials may not be applicable to that particular patient

13   because of other medical diseases they have.  So it's a -- I

14   use randomized clinical trials as a tool and an important tool.

15   Q.    And can you just a bit further, can you explain how your

16   clinical experience is important to you along with the clinical

17   trials.

18   A.    Well, in two ways.  Sometimes the clinical trial evidence

19   is not available in certain disease states, so that all you

20   have to go by is your clinical experience and the published

21   experience of others.  When clinical trials are available and

22   there's a mixed thought as to what they're showing, then you

23   use your clinical experience to make sure that the patients are

24   achieving a benefit from the drug and if your personal

25   experience matches what the evidence is telling you it does,

56911cdc-45d4-450f-a2bd-8ee3ff13fe4d

1   and particularly when the evidence is not very solid.

2          THE COURT:  Well, what if the evidence is solid, but

3   your clinical experience goes somewhere else?

4          THE WITNESS:  Well, I think it -- I haven't run across

5   that particular circumstance.  I think that the question is,

6   when is the clinical evidence solid?  And that's always an

7   issue of scientific debate, so --

8   Q.   Doctor, how many patients in total, best estimate, are you

9   treating for a pain condition?

10  A.   A few hundred, almost all of them neuropathic pain.

11  Q.   What kinds of pain problems do you treat?

12  A.   As I said, primarily diabetic neuropathy, patients with

13  other nerve disorders, peripheral neuropathies, injuries to

14  nerve which traumatic nerve jury.

15         THE COURT:  Is that what one would call nociceptive

16  pain?

17         THE WITNESS:  No.  It's trauma to nerves.  So if

18  someone damages their nerves, like they fall from a motorcycle

19  and injure the nerve under their shoulder, that would be

20  neuropathic pain.  If you injure your shoulder itself without

21  any nerve involvement, that would be nociceptive pain, and

22  orthopedists generally would take care of that.

23  Q.   Is it sometimes hard to differentiate between neuropathic

24  and nociceptive pain in a particular patient?

25  A.   Sometimes, and often they're mixed.  So, for example, if

56911cdc-45d4-450f-a2bd-8ee3ff13fe4d

1    someone had back pain and intermittently they have sciatica,

2    they probably have both; the back pain, the nociceptive pain

3    from the disks, and then the neuropathic pain from compression

4    on the nerve root that causes the nerve pain to radiate or

5    shoot down the leg.

6    Q.    Which medications do you tend to prescribe for patients

7    with neuropathic pain?

8    A.    Gabapentin, tricyclic antidepressants are the two

9    first-line agents that I use.

10   Q.    When did you first begin prescribing Neurontin to treat

11   pain?

12   A.    In the mid-1990s.

13   Q.    Why?

14   A.    Well, I started taking care of patients with neuropathic

15   pain in the mid-1980s, and at that time there was only really a

16   couple of drugs available.  Tricyclic antidepressants were the

17   first-line agent.  As with any pain drug, even if you have a

18   good effect, 50 or 60 percent of the patients will have

19   moderate or better pain relief, so close to half your patients

20   won't respond to that drug.

21        Secondly, a lot of patients can't take the drug because

22   they have cardiac problems where they don't tolerate the side

23   effects.  So you're left with a good half of patients who don't

24   get relief.  The only other drug which the data was sort of

25   marginal for was carbamazepine, which is another antiepileptic

Page 22

1  drug, and the problem with that drug is that there are a lot of

2  serious side effects.  You can have fatal hematologic

3  reactions; Stevens-Johnson syndrome where the skin basically

4  comes off and is a very serious condition.  You have to monitor

5  blood counts regularly once a month, so it's hard to use.

6  Q.   And was that the set of tools you had available up until,

7  say, the early '90s?

8  A.   Yes.  So the first ten years of my practice, that's really

9  all you really had to do, so it was very frustrating for the

10  patients and the physicians.  If they didn't respond to

11  tricyclic antidepressants and they couldn't take carbamazepine

12  and didn't respond to it, you were stuck with someone who was

13  just suffering.  And so in the mid-'90s it was known from the

14  epilepsy trials that gabapentin or Neurontin was a well-

15  tolerated drug.  The side effects were low.  There were no

16  serious side effects.  You didn't have to test blood tests.  It

17  didn't affect your kidney, your heart, your liver.  It didn't

18  interact with other medications.  You didn't have to check any

19  blood tests on it.  So it was known that carbamazepine, another

20  anticonvulsant, did have some effects, so people started to try

21  it around the mid-1990s, including me, and I found it very

22  successfully very effective in patients with neuropathic pain.

23  Q.   And how many of your current pain patients are you

24  treating with Neurontin, Doctor?

25  A.   Oh, I'd say about 80 percent.

1   Q.   And now specifically focused on Neurontin, what kinds of

2   pain problems do you treat with Neurontin?

3   A.   Most of the patients I see have, as I said, peripheral

4   neuropathies of various sorts, diabetic neuropathy being the

5   most common and nerve injury.

6   Q.   So in peripheral neuropathy, does that relate to the

7   peripheral nerves out in the legs, hands, feet?

8   A.   Right.  A classic thing for diabetics is, they have

9   burning feet, they're feet are numb, they get electric

10  shock-like sensations, stabbing sensations.  It's a very

11  unusual pain, unlike nociceptive pain, everybody has had that;

12  they fall off a bike and they hurt their elbow.  That's an achy

13  pain.  But neuropathic pain is unusual.  It's burning, it's

14  stabbing, it's electric.  It's very different than most people

15  are used to and very miserable.

16  Q.   So you prescribe Neurontin both on-label and off-label?

17  A.   Yes.

18  Q.   Are you familiar with the terms "first-line, second-line,

19  third-line" as applied to medications?

20  A.   Yes.

21  Q.   In your own clinical practice, where does Neurontin rank?

22  A.   Neurontin is a first-line agent for neuropathic pain.

23  Q.   In your own clinical practice, are there any alternative

24  pain medications that you consider more optimal than gabapentin

25  for neuropathic pain?

Page 24

1    A.    No.

2    Q.    In your clinical experience, Doctor, when you're using

3    Neurontin to treat a neuropathy, are there any ways that you

4    can tell whether a benefit that a patient manifests is placebo

5    effect or not?

6    A.    I think there are clinical clues.

7    Q.    Would you describe what those are.

8    A.    Well, especially when you're taking care of patients for

9    many years, if someone has been on it for years and they still

10   have an effect and it doesn't wear off, that suggests it's a

11   drug effect as opposed to placebo.  Patients always tell me,

12   "Oh, I was busy, I forgot to take my dose until eight hours

13   later, and the pain came back, and, wham, that reminded me I

14   forgot my dose."  Well, if you don't remember you took your

15   dose, you can't have a placebo effect.  Or even years down the

16   road we decide they're doing so well, we try and taper the

17   medication, and the pain comes back, and we have to go back up

18   on the dose.  So there's, I think, a lot of clinical clues that

19   it's not a placebo effect in many patients.

20   Q.    Doctor, let's turn to your opinions on effectiveness of

21   Neurontin in these pain conditions that you described,

22   beginning with the DBRCTs that you cited in your report.

23   Doctor, you cited a study by Dr. Backonja published in 1998; is

24   that right?

25   A.    Yes.

1   Q.   And was that a study in patients with diabetic neuropathy?

2   A.   Yes.

3   Q.   That was a DBRCT?

4   A.   Yes.

5   Q.   In your opinion, positive or negative?

6   A.   It was a positive study.

7   Q.   Okay.  Are you familiar with the unblinding issue that

8   we've heard about --

9   A.   Yes.

10  Q.   -- many times during the course of trial?  What's your

11  take on that?

12  A.   I don't think it was relevant.  I think that if the

13  authors themselves removed the patients who would have been --

14  blinding would have been an issue and still showed a

15  statistical effect, the reviewers from JAMA certainly would

16  have been concerned about that and looked at it.  As a

17  reviewer, I know I would have.  I looked at the article myself,

18  and it's a positive study.

19  Q.   You also cited a study by a Dr. Tamez-Perez published in

20  1998, I believe the Spanish version, and then in 2000 the

21  English version?

22  A.   Yes.

23  Q.   And was that also a DBRCT?

24  A.   Yes.

25  Q.   Also in diabetic neuropathy?

Page 26

1    A.   Yes.

2    Q.   Positive or negative?

3    A.   It was positive.

4    Q.   You also cited a study by Dr. Morello published in 1999;

5    is that right?

6    A.   Yes.

7    Q.   And was this too a study of diabetic neuropathy?

8    A.   Yes.

9    Q.   What was the control in this study?

10   A.   It was a comparator study.  Instead of comparing it with

11   placebo, you compare it with a drug that you know is effective,

12   and amitriptyline or tricyclic antidepressant was the

13   comparator.  So they tried gabapentin versus amitriptyline, and

14   they found they were equivalent.  The trials that show

15   tricyclic antidepressants like amitriptyline are effective, so

16   if gabapentin is equally effective, then that is further

17   support that it's an effective drug in neuropathic pain.

18           THE COURT:  So in diabetic neuropathic or all of

19   neuropathic?

20           THE WITNESS:  No.  These studies are in diabetic

21   neuropathic pain.

22           THE COURT:  So everything you've been talking about

23   has just been diabetic neuropathy?

24           THE WITNESS:  Yes.

25           MR. HOOPER:  So far, your Honor, right.

1   Q.   You also cited in your report the study by Dr. Gorson

2   published in 1999?

3   A.   Yes.

4   Q.   That was also a DBRCT?

5   A.   Yes.

6   Q.   That too was in diabetic neuropathy?

7   A.   Yes.

8   Q.   And how would you describe the results of the Gorson

9   study?

10  A.   They reported it as a negative study saying it was

11  probably ineffective or minimally ineffective at the doses of

12  300 milligrams a day.  I looked at the study.  I disagree with

13  that.  I think it was a positive study.  They reported one

14  positive end point, but if you actually look at their data, the

15  end point that most people are looking at, like the

16  meta-analysis, the Chiu and also the Cochrane report that we

17  might talk about, both looked at what's the percent of patients

18  who had moderate pain relief or better?  And when you're a

19  patient, that's really what you care about:  Do you have

20  moderate pain relief or better compared to placebo?  Because

21  mild pain relief doesn't really matter to you.  And if you look

22  at those two groups, there was more than twice the response

23  rate of getting moderate pain relief or better in the

24  gabapentin group versus the placebo group.

25           MR. HOOPER:  While we're on that, Austin, can you

1    bring up Exhibit 1772.

2            THE COURT:  So just walk us through this again.  So

3    you think that Gorson showed moderate pain relief at

4    300 milligrams?

5            THE WITNESS:  Yes, your Honor.  The data that looks

6    at, as do the meta-analysis by -- most meta-analysis try and

7    look at the same things between trials so they can compare

8    them, and most are looking at, do you get moderate pain relief

9    or very significant pain relief compared to mild pain relief or

10   no pain relief, and try and separate those two groups out

11   because that's really what the patient cares about.

12           THE COURT:  Is moderate one point or two points on the

13   scale?

14           THE WITNESS:  No, they're not looking at that Likert

15   scale.  They're not looking at that point scale.  What they're

16   doing is, it's the patient's global impression of change.

17           THE COURT:  Without points?

18           THE WITNESS:  Right.  So the patients say, "I'm the

19   same, I'm worse, I'm mildly better, I'm moderately better," or

20   "I'm greatly better."  And so moderate improvement of pain or

21   better, taken as a whole, that group, is what's looked at in

22   many of the meta-analyses because a couple of things.  You can

23   pull that out of every trial.  Secondly, it's really what

24   matters to the patient.  Now, the patient doesn't really care

25   if there's a 1-point change on their Likert scale.  What they

1    really care about, is my pain moderately better or markedly

2    better?  And I think that's the value of looking at that data.

3            It's also considered one of the four key elements

4    that -- there's been a consensus statement by the impact group,

5    which is a very large group of people from the FDA, NIH, pain

6    specialists, to try and come up with consensus criteria, what

7    end points you should use in pain clinical trials; and that was

8    one of the four important ones that you should look at, that

9    they suggested you should look at.

10   Q.   While we're on this Gorson issue and going right to

11   Judge Saris' question, let's skip forward to -- bring up

12   Exhibit 1772, the Cochrane review that you just mentioned.

13   First, Doctor, the Cochrane 2000 review of gabapentin in pain

14   is another thing that you cited in your report, correct?

15   A.   Yes.

16   Q.   And could you bring up Figure 1.5 from the Cochrane

17   review.  Dr. Bird, are you familiar with this table?

18   A.   Yes.

19   Q.   The Cochrane meta-analysis?

20   A.   Yes.

21   Q.   And looking at -- this is a forest plot, correct?

22   A.   Yes.

23   Q.   And looking at the second row of data there for Gorson

24   1999, can you explain for the jury what the Cochrane group of

25   reviewers is saying in this chart about the results for

1   Neurontin?

2   A.   Well, what they're saying is, if you look at the -- this

3   is comparing the number of patients who got moderate pain

4   relief or better in gabapentin versus placebo.  So if you look

5   at the numbers, 14 out of 19 got moderate pain relief or better

6   as opposed to only 6 out of 21 who were given placebo.

7        If you look at the statistics on the right where the bar

8   is, anything that's to the right of 1 is positive.  So that's

9   telling you what's the likelihood you're going to have moderate

10  pain relief or better if you're given the drug.  In this case,

11  the midpoint is around 2, and it doesn't cross 1, which would

12  be an insignificant result.  So it means that you were twice as

13  likely to get moderate pain relief or better given the drug

14  than if you weren't given the drug.

15       And all of these groups, all of these studies were looked

16  at the same way, and if you put them together, you'll see that

17  there's about a twice, 2.2 likelihood, you're twice as likely

18  to have moderate or marked pain relief if you're given

19  gabapentin as opposed to placebo.  This is the very similar

20  analysis and virtually identical graphs that are in another

21  meta-analysis that we may talk about later by Chiu from Oregon

22  Health Sciences University.

23  Q.   Let's go back to the slides where we were, back to the

24  Gorson slides.  Doctor, one of the studies that you cited in

25  your report was also the Reckless study; is that right?

Page 31

1    A.    Yes.

2    Q.    And this also was in diabetic neuropathy?

3    A.    Yes.

4    Q.    And results?

5    A.    It was a negative trial.

6    Q.    Okay, next slide.  Doctor, you also cited in your report a

7    study by Parsons from 2005; is that right?

8    A.    Yes.

9    Q.    Was this also in diabetic neuropathy?

10   A.    Yes.

11   Q.    Can you explain for the jury the results of this study.

12   A.    It was a positive trial.  It was a large study of about

13   200 patients in each arm, placebo versus gabapentin, so it was

14   a fairly large study.  And it was positive on the primary end

15   points and also very positive in the other way of looking at

16   it:  What are the percent of patients who had moderate pain

17   relief or better?  And about twice as many people had moderate

18   pain relief or better given gabapentin versus placebo.  That's

19   really what you hope for in a drug because, as everyone has

20   heard, there's a placebo effect.  So whether you quibble and

21   say it's 25 percent or 30 percent, if you get twice the

22   benefit, you're up at the 60 percent range, then that's all you

23   can ever hope for in a effective pain drug.

24   Q.    So let me make sure I understand.  Reckless and Parsons

25   are both diabetic neuropathy studies, correct?

56911cdc-45d4-450f-a2bd-8ee3ff13fe4d

Page 32

1   A.    Yes.

2   Q.    Which one is bigger, Reckless or Parsons?

3   A.    Parsons had about almost 400 patients -- sorry -- Parsons

4   had about 400 patients, which is larger than Reckless.

5   Q.    Reckless is negative; Parsons is positive?

6   A.    Yes.

7   Q.    And both negative Reckless and positive Parsons are

8   unpublished?

9   A.    Yes.

10          MR. HOOPER:  Next slide.

11          THE COURT:  Well, whose study was Parsons?

12          THE WITNESS:  Parsons was a Pfizer study completed in

13   2005, and it was never published.

14          THE COURT:  And Reckless was also a Pfizer study?

15          THE WITNESS:  Yes.

16          THE COURT:  And Gorson was what?

17          THE WITNESS:  Gorson was an investigator-initiated

18   study, which means the investigator did the study, planned the

19   study; and I think Pfizer paid for some of the cost of it, but

20   it was not planned or developed by Pfizer.

21   Q.    Doctor, you also cited a study by Rowbotham published in

22   1998?

23   A.    Yes.

24   Q.    And that was in postherpetic neuralgia?

25   A.    Yes.

1    Q.    This was also a DBRCT?

2    A.    Yes.

3    Q.    Can you describe the results.

4    A.    It was a positive study showing benefit for gabapentin.

5    Q.    And what doses were used in the Rowbotham study?

6    A.    Up to 3,600 milligrams.

7    Q.    Is this one of the studies that was considered a pivotal

8    trial in leading to approval by FDA for a PHN indication?

9    A.    Yes, I understand Rowbotham was, yes.

10   Q.    Is it relevant to you as a neurologist who treats

11   peripheral neuropathies that a study is approved for one type

12   of neuropathic pain in terms of its applicability to other

13   types of neuropathic pain?

14   A.    Uhm, I'm not sure I understand your question, but I'll try

15   and answer it.

16   Q.    Well, let me make sure you understand it before you

17   answer.  If a drug is approved for one type of neuropathic

18   pain, is that significant to you in terms of the drug's

19   applicability to perhaps other forms of neuropathic pain?

20   A.    Yes.  I mean, most forms of neuropathic pain have similar

21   qualities and respond to tricyclic antidepressants similarly,

22   so we usually infer that if the drug works in those, it would

23   be beneficial in other forms of neuropathic pain.  Again,

24   tricyclic antidepressants have only been tested widely in

25   diabetic neuropathic pain.  Yes, they're used in all forms of

Page 34

1    neuropathic pain.  I think people widely, the literature that I

2    read, accept tricyclic antidepressants as effective, and yet

3    most of the big trials have been limited to diabetic

4    neuropathic pain, and there's no FDA approval for that, and --

5              THE COURT:  Is the TCA approved for diabetic

6    neuropathy?

7              THE WITNESS:  It's not approved for any form of

8    neuropathic pain.

9    Q.    Doctor, TCAs are approved for one thing and one thing

10   only, and that is depression?

11   A.    Yes, yes.

12   Q.    And, Doctor, are there also negative studies for TCAs?

13   A.    Yes, I think with any -- pain studies are hard to do.

14   That's why there's this impact group trying to develop

15   consensus statements on how to do it that's ongoing currently

16   from the International Association for the Study of Pain

17   because they're hard to do.  You know, there are placebo

18   effects.  They're very hard to do in measuring pain.  And so

19   any pain drug, even an effective pain drug, have negative

20   trials.

21        If you look at the trials in tricyclic antidepressants, I

22   think three out of the ten that are commonly cited are negative

23   trials.  Well, that doesn't mean tricyclics are ineffective.

24   It just means those trials were not able to demonstrate an

25   effect for various reasons.

1   Q.   You also cited a study by Dr. Rice published in 2001; is

2   that right?

3   A.   Yes.

4   Q.   Was that a DBRCT?

5   A.   Yes.

6   Q.   And could you describe the results.

7   A.   It was effective in postherpetic neuralgia.

8   Q.   And the dosing in that study was?

9   A.   1,800 and 2,400 milligrams.

10  Q.   Doctor, you also cited a study by Dr. Tai published in

11  2002; is that right?

12  A.   Yes.

13  Q.   Okay, was that also a DBRCT?

14  A.   Yes.   I think all of the studies we're talking about are

15  double-blind controlled trials.

16  Q.   And what type of pain did Dr. Tai's study look at?

17  A.   Neuropathic pain after spinal cord injury.

18  Q.   Can you describe the results.

19  A.   It was positive.

20  Q.   You also cited, Doctor, a study by Serpell published in

21  2002?

22  A.   Yes.

23  Q.   Okay, also a DBRCT?

24  A.   Yes.

25  Q.   And what forms of pain did Dr. Serpell and his colleagues

Page 36

1    study?

2    A.   A whole variety of neuropathic pain were involved in that

3    study; and in that broad mix of neuropathic pain syndromes, it

4    was a positive study demonstrating benefit.

5            THE COURT:  I didn't hear that.  What does it

6    demonstrate?

7            THE WITNESS:  I'm sorry, your Honor.  It was a

8    positive study.  It demonstrated benefit in a broad group of

9    mixed kinds of neuropathic pain.

10   Q.   Doctor, you also cited a study by Dr. Bone from 2002?

11   A.   Yes.

12   Q.   Also a DBRCT?

13   A.   Yes.

14   Q.   What kind of pain did this study look at?

15   A.   That was post-amputation phantom limb and stump pain.

16   Obviously, when you have to take off a limb, you cut through

17   the nerves, and that can be quite painful.

18   Q.   Is this type of neuropathic pain where the limb is

19   missing, but it still feels like the foot or the part that's

20   missing is --

21   A.   Yeah, but there's sometimes very intense pain associated

22   with that.  So if someone -- it's really the patients who have

23   pain associated with that that would be appropriate for a

24   trial.

25   Q.   Results?

1    A.    It was positive showing benefit of gabapentin.

2    Q.    Next study.  Doctor, you also cited a study by

3    van de Vusse from 2004?

4    A.    Yes.

5    Q.    And what form of pain did this study look at?

6    A.    Complex regional pain syndrome Type 1.

7    Q.    Can you explain for the jury what that is?

8    A.    It's hard.  It's also known as reflex sympathetic

9    dystrophy.  So when someone has a damage to a limb or some

10   other part of the body, the thought is that the pain fibers in

11   the spinal cord get overactive and basically perpetuate a pain

12   cycle.

13   Q.    That's a difficult condition to treat?

14   A.    Very much.

15   Q.    And results of this study?

16   A.    Their primary end point was negative.  It did not show a

17   beneficial effect of gabapentin.  However, again, if you look

18   at the percent of patients who had moderate or better pain

19   relief, it was significant compared to placebo.

20   Q.    Doctor, you also cited a study by Levendoglu, 2004?

21   A.    Yes.

22   Q.    And was this also in neuropathic pain from spinal cord

23   injury?

24   A.    Yes.

25   Q.    Also a DBRCT?

56911cdc-45d4-450f-a2bd-8ee3ff13fe4d

1  A.   Yes.

2  Q.   Can you describe your results, please.

3  A.   It was beneficial.  It demonstrated a positive effect for

4  gabapentin over placebo.

5  Q.   Doctor, have you heard of a study called by Gordh,

6  G-o-r-d-h, also known as the POPP or postoperative pain study?

7  A.   Yes.

8  Q.   Would that fit in with these studies, or where would that

9  one fit in?

10  A.   Well, Gordh is a mixed group of patients.  It's a

11  postoperative patient, so there's some patients who had chronic

12  postoperative nociceptive pain and some had neuropathic pain

13  following surgery.

14  Q.   It's a mixture of a whole bunch of different kinds of

15  patients?

16  A.   Yes, yes.

17        MR. HOOPER:  Your Honor, I want to move to admit

18  Exhibit 1275, Tamez-Perez; 1332, Morello; 1379, Gorson.  It's a

19  better copy, I think, than the one that's already in.  2069,

20  Parsons; 1254, Rowbotham; 1488, Rice; 1553, Tai; 1552, Serpell;

21  1546, Bone; 1727, van de Vusse; and 1683, Levendoglu.

22        MR. SOBOL:  One of them is not marked as an exhibit.

23  We don't have an objection to the Parsons.

24        THE COURT:  Whoa, hold on a second.  So Parsons was

25  not marked?

1          MR. SOBOL:  Right.

2          THE COURT:  But you have no objection?

3          MR. SOBOL:  But we have no objection to it anyway.

4          THE COURT:  All right, so all the studies come in

5     then.

6          (Exhibits 1275, 1332, 1379, 2069, 1254, 1488, 1553,

7     1552, 1546, 1727, and 1683 received in evidence.)

8     Q.   Doctor, you also cited eight different review articles in

9     your report; is that right?

10    A.   Yes.

11    Q.   Did those include one by a group from Oregon Health

12    Sciences University, lead author Chiu?

13    A.   Yes.

14    Q.   And was that published in 2007?

15    A.   Online, yes.

16    Q.   What was the significance of the Chiu review to you?

17    A.   Well, it was a very extensive meta-analysis of drugs and

18    neuropathic pain.  It was more than 100 pages long.  And I

19    think it -- as they say, they're funded by seventeen

20    noncommercial payors, so fifteen of them are Medicaid payors.

21    So they're paid by payors to try and look objectively at what

22    drugs are effective and to look at their safety profile.  And

23    they themselves give in their disclosures that they have no

24    funding from pharmaceutical or other commercial interests.

25    They looked at all the data in a meta-analysis very similar to

1   the Cochrane report, although they had a couple of more

2   up-to-date studies included in theirs, and they came to the

3   same conclusion.  The numbers are very similar to Cochrane,

4   very close to 2.  They're twice as likely to have moderate or

5   better pain relief given gabapentin as compared to placebo in

6   neuropathic pain.

7   Q.   You also cited a review by a Dr. Moulin and colleagues --

8   A.   Yes.

9   Q.   -- from the Canadian Pain Society?

10  A.   Yes.

11  Q.   Significance of that one to your opinions?

12  A.   I think it was from 2007 as well.  I forgot the exact

13  year, around there.  And that was a consensus statement by the

14  Canadian Pain Society.  I believe it was about sixteen or

15  seventeen -- no, it was more than that.  It was more than

16  twenty Canadian pain experts got together and tried to look at

17  the evidence in randomized clinical trials and the trials done

18  to date to see what evidence there was for using drugs in

19  neuropathic pain, and their conclusion was that gabapentin is a

20  first-line agent for the treatment of neuropathic pain.

21  Q.   Another review, systematic review that you cited, as you

22  mentioned, was Cochrane.

23       MR. HOOPER:  I want to go back to that quickly,

24  Austin, the same place we were, the Chart 1.05 from Cochrane.

25  Q.   Doctor, the jury has heard about the Cochrane review

56911cdc-45d4-450f-a2bd-8ee3ff13fe4d

Page 41

1    several times now, but I wanted to ask you with reference to

2    Table 1.05, we notice there a number of the studies that you

3    just told us about, Backonja, Gorson, Perez, Rice, Rowbotham,

4    and Serpell and so forth; but we don't see the Reckless or the

5    Parsons study, both unpublished, on there.  You have seen those

6    studies right?

7    A.   Yes.

8    Q.   And if you take those two, the negative unpublished study,

9    Reckless, the and the positive unpublished study, Parsons,

10   together, does that affect your takeaway from the published

11   studies at all?

12   A.   No.  They basically cancel each other out, a strong

13   positive effect and no effect.

14   Q.   Doctor, you also cited reviews by Goodman published in

15   2006, Bennett in 2004, Namaca, 2004, and Mellegars, 2001; is

16   that right?

17   A.   Yes.

18   Q.   Can you summarize, in the interest of time, the

19   conclusions of those systematic reviews as regards Neurontin

20   and pain?

21   A.   Every one looked at the data in some fashion in some

22   systematic way and concluded that gabapentin is a first-line

23   drug for neuropathic pain.

24          THE COURT:  Are those double-blinded tests?

25          THE WITNESS:  These are all reviews looking at a

Page 42

1    systematic review of the studies, the double-blinded --

2            THE COURT:  Were they the DBRCTs?

3            THE WITNESS:  That they reviewed?  These authors were

4    reviews.  They all looked at double-blind results, yes.

5            THE COURT:  They looked at the --

6            THE WITNESS:  Yes.  They were all reviews aimed at

7    looking at the available evidence through double-blinded

8    placebo-controlled trials.  They were strictly all evidence-

9    based reviews.  They weren't just "This is my opinion."

10   Q.   And consistent findings across the eight reviews you

11   looked at --

12   A.   Yes.

13   Q.   -- when looking at the controlled data in a systematic

14   way?

15   A.   Yes.  There was also a consensus statement from the

16   American Association for the Study of Pain, a special interest

17   group on neuropathic pain which had about seventeen or eighteen

18   pain specialists, and I think it was published in 2007, that

19   specifically said, I believe, in the title "Evidence-Based

20   Recommendations," and they also listed gabapentin as a

21   first-line agent for neuropathic pain.

22           MR. HOOPER:  Your Honor, I'd like to move to admit

23   1906, Dworken; 1923, Moulin; 1868, Goodman; 1695, Bennett;

24   1715, Namaca; and 1478, Mellegars.  The Cochrane one is already

25   in.

56911cdc-45d4-450f-a2bd-8ee3ff13fe4d

1          MR. SOBOL:  To the extent previously marked, no

2    objection.  I haven't seen the others, though.

3          THE COURT:  If they haven't been marked, they don't

4    come in.

5          MR. SOBOL:  If they were marked, then I have no

6    objection.

7          MR. HOOPER:  They were.

8          THE COURT:  Are they all marked?  Okay, I'll take his

9    proffer on it.

10         (Exhibits 1906, 1923, 1868, 1695, 1715, 1478 received

11   in evidence.)

12   Q.   Dr. Bird, in your report you cited a number of medical

13   textbooks that recommended dosing ranges for Neurontin.  Do you

14   recall that?

15   A.   Yes.

16   Q.   Now, what dosage ranges were reported in the medical

17   textbooks that you cited?

18   A.   I just gave a selection of things that are used by

19   neurologists and other physicians commonly to read about drugs

20   and what dosing is appropriate.  Current Therapy in Neurologic

21   Disease comes out every few years and describe dosing up to

22   3,600 milligrams.  There's a book Neurologic Therapeutics --

23         THE COURT:  When you say dosing up to 3,600, was it

24   proven effective at 3,600 milligrams?

25         THE WITNESS:  Yes, in --

Page 44

1          THE COURT:  In a double-blind random --

2          THE WITNESS:  In these double-blind randomized trials,

3    most of them were -- many of them, not all of them but most of

4    them were up to 3,600-milligram dosing.

5          THE COURT:  And if we looked at these studies, they're

6    proven effective at that high a dosage?

7          THE WITNESS:  Yes, yes.

8    Q.   Doctor, it looks like nearly every one of them has a top

9    end of 3,600 except for Moulin's book, Neurologic Therapeutics,

10   which goes to 4,800?  Is that what we're reading?

11   A.   Yes.

12   Q.   That would be the top end of the recommended range?

13   A.   Yes.  I think most people write 3,600 milligrams.

14   Q.   Okay, Doctor, what dosing range do you use in Neurontin in

15   your own patients?

16   A.   As with tricyclic antidepressants, I start at a low dose,

17   usually 300 milligrams a day, and I work my way up until a

18   patient has a good pain relief or until I get to

19   3,600 milligrams.  And the same way as I start tricyclic

20   antidepressants, we don't start at the dose that's effective

21   because patients won't tolerate that.  We start at a lower dose

22   and slowly work our way up and try and get the lowest dose that

23   works for that patient because patients would prefer to take

24   less medicine than more, obviously.

25   Q.   Is it called "titrating to effect"?

Page 45

1   A.    Yes.

2   Q.    Is that common practice in medicine?

3   A.    Well, that's common practice, yes.

4   Q.    Doctor, are you familiar with the FDA-approved

5   professional package insert for Neurontin, the thing that

6   appears in the Physician's Desk Reference --

7   A.    Yes.

8   Q.    -- and as a package insert that pertains to the

9   medication?

10   A.    Yes.

11   Q.    Have you seen the Dosage and Administration section of the

12   labeling?

13   A.    Yes.

14   Q.    What does the FDA labeling tell you as a practicing

15   neurologist about dosing Neurontin?

16   A.    It tells us what dose it's safe up to.  The reason to us

17   as physicians, the importance of having an FDA approval is not

18   so much that we can't use it effectively in other things, other

19   diseases, just like tricyclics are used in neuropathic pain,

20   but it tells us the safety profile of a drug.  It tells us what

21   doses it's safe to go up to, and that's one of the big

22   advantages of having rigorous FDA analysis of the safety data.

23   Q.    Doctor, let me ask you, do you have an opinion whether

24   Neurontin is effective --

25             THE COURT:  Yes, go ahead.

Page 46

1          A JUROR:  Like you said, these are texts.  Now, the

2     texts are dated 2002 and 2003.  Now, were the previous editions

3     of that the same milligram type of dosing?  Again, I'm just

4     wondering how --

5          THE WITNESS:  Well, the top one I can't answer because

6     I only had the most recent one, and some of these have more

7     updated versions than paper because everyone has gone to

8     online.  So I don't believe there is an updated version of --

9          A JUROR:  I'm not talking about updated.  I'm talking

10    about backdated.  In other words, from previous editions, is

11    this a change from previous editions?

12         THE WITNESS:  No.

13         A JUROR:  Or is that pretty much what the older

14    text --

15         THE WITNESS:  Well, again, it's only available in use

16    seven years prior to that, so that there was a prior one

17    probably, I don't know the exact date but probably three or

18    four years prior to that and probably said the same thing.  I

19    can't tell you that for sure.  The older ones wouldn't have

20    mentioned it because the drug wasn't around until 1993.  The

21    last two at the bottom are a little more updated; and the one

22    that's not up to date, that's the one that's updated every six

23    months.  When I wrote the report, it was 2008, and, to the best

24    of my knowledge, it's no different in 2010.

25    Q.   Doctor, do you have an opinion whether Neurontin is

56911cdc-45d4-450f-a2bd-8ee3ff13fe4d

Page 47

1    effective as a treatment in neuropathic and related forms of

2    chronic pain?

3    A.    Yes.

4    Q.    And what is your opinion?

5    A.    It's an effective drug, and it's very well tolerated by

6    patients.

7    Q.    I just asked you about neuropathic and other related forms

8    of chronic pain.  Dr. Perry testified in this case early and

9    put up some slides from studies that he called "acute pain."

10   Is acute pain the same thing as chronic pain?

11   A.    No, of course not.

12   Q.    Is acute pain the same thing as nociceptive pain, or are

13   all those different concepts?

14   A.    No, they're different.  Nociceptive pain is, as I said, if

15   you hurt your shoulder, you may just twist it, and the pain is

16   gone in a couple of days.  That's acute pain.  If it persists

17   and you've torn your rotator cuff and it's there for months and

18   months and months, that's chronic nociceptive pain.  So acute

19   is brief; chronic is long-standing.

20   Q.    In your clinical experience, have you ever seen gabapentin

21   used for acute pain?

22   A.    No.  That's why as part of my report I didn't look at

23   acute pain.  I wasn't asked to look at that.  I didn't look at

24   the studies in acute pain, and in the twenty years that --

25   let's say it's only been available since -- in the seventeen

56911cdc-45d4-450f-a2bd-8ee3ff13fe4d

Page 48

1    years since it's been available, I've never seen it used once

2    for acute pain.

3    Q.   Doctor, in addition to your opinion on effectiveness that

4    you gave us a moment ago, do you also --

5         THE COURT:  But the opinion on effectiveness is about

6    neuropathic pain?

7         THE WITNESS:  Yes, and all forms of neuropathic pain,

8    chronic neuropathic pain, yes.

9         THE COURT:  Chronic neuropathic pain?

10        THE WITNESS:  Yes.

11   Q.   Doctor, in addition to your opinions on effectiveness that

12   you gave us a moment ago, do you also have an opinion on the

13   safety of gabapentin?

14   A.   Yes.  It's a safe and well tolerated drug by most

15   patients, not all.  Obviously no drug is tolerated well by all

16   patients.

17   Q.   And do you have an opinion as to how gabapentin compares

18   with alternative medications for neuropathic pain?

19   A.   I think, in my opinion, it's as effective as tricyclic

20   antidepressants and is better tolerated.  So even though both

21   are effective first-line agents, I use gabapentin first.

22   Q.   And do you hold each of those opinions to a reasonable

23   degree of scientific certainty?

24   A.   Yes.

25        MR. HOOPER:  Pass the witness.

1          MR. SOBOL:  May I inquire, your Honor?

2          THE COURT:  Yes.

3    CROSS-EXAMINATION BY MR. SOBOL:

4    Q.   Sir, when you are an author of an article, do you disclose

5    any affiliations that might compromise or be perceived to

6    compromise your objectivity?

7    A.   If asked to.  I think not all -- journals ask for

8    different degrees of disclosures.

9    Q.   So sometimes you disclose your affiliations and sometimes

10   you don't, correct?

11   A.   Sometimes -- it depends on what the journal's policy is.

12   So some ask, are you currently being supported by anybody?

13   They don't ask for past --

14   Q.   Just yes or no.  Sometimes you do, sometimes you don't.

15   It depends upon whether or not you're made to or not?

16   A.   It's not whether I'm made to.  It's whether they're asking

17   for it and whether that's their policy.  They don't publish it

18   otherwise.

19   Q.   Have you been fair and accurate to this jury about any

20   affiliations you've had historically with Pfizer?

21   A.   I don't think I've been asked.

22   Q.   You didn't offer it in your first report in 2006, any

23   relationship that you had with Pfizer, did you?

24   A.   I had no ongoing --

25   Q.   Yes or no, did you disclose any relationship that you had

56911cdc-45d4-450f-a2bd-8ee3ff13fe4d

1  with Pfizer when you submitted your 2006 report?

2  A.   Well, in a way, I had no ongoing support at the time.   In

3  my --

4  Q.   Any relationship, yes or no?

5       THE COURT:   Let me him finish the sentence.

6  A.   Yes, I did.   It was in my CV well marked.

7  Q.   And in your 2008 report --

8  A.   The same.

9  Q.   -- did you disclose your historic relationship with

10  Pfizer?

11  A.   In my CV, yes.

12  Q.   With respect to a study that was a non-Neurontin study,

13  correct?

14  A.   It was a diabetic neuropathy study in the 1990s, right.

15  Q.   Right, but it wasn't relating to Neurontin, correct?

16  A.   Correct.

17  Q.   All right, so in your first 2006 report, you disclosed a

18  non-Neurontin relationship with Pfizer, and in your 2008

19  report, you disclosed a non-Neurontin relationship, correct?

20  A.   Well, I wouldn't consider it a relationship.   I was part

21  of a trial in the 1990s, yes.

22  Q.   Okay.

23       THE COURT:   A clinical trial?

24       THE WITNESS:   Yes, randomized --

25       THE COURT:   Around here we actually have two words.

1          THE WITNESS:  I'm sorry.  Randomized double-blind

2    placebo-controlled trial, yes.

3    Q.   But isn't it true, sir, that you were actually a

4    consultant for Pfizer on a Neurontin project?

5    A.   No, I was not.

6    Q.   At no time were you?

7    A.   No.

8    Q.   So in 2001 you were not a consultant for Pfizer on a study

9    that would involve Neurontin?

10   A.   No, not that I'm -- no.

11   Q.   Not that you're aware of?

12   A.   No, I wouldn't -- if people discussed involving me, but I

13   was never a part of a study in Neurontin.

14   Q.   Well, that's not what I'm saying.  You were a consultant

15   for Pfizer in 2001 and in 2002 when they were outlining a

16   potential study for Neurontin, weren't you?

17   A.   Not that I recall, no.

18   Q.   Do you recall an all-day meeting that you attended --

19   excuse me -- a teleconference that you attended on November 1,

20   2001, in which you were a consultant for Pfizer involving

21   gabapentin?

22   A.   No, I don't remember that.

23          MR. SOBOL:  May I approach, your Honor?

24          THE COURT:  Yes.

25          MR. HOOPER:  Copy?

1          (Witness examining document.)

2    Q.   Sir, does this document refresh your recollection as to

3    whether or not you were a consultant for Pfizer?  Yes or no.

4    A.   No.  I know I was a consultant because I was helping them

5    with the nerve conduction studies in a very large diabetic

6    trial.

7    Q.   Okay, so you don't recall being a consultant for Pfizer

8    when they were trying to do some follow-up studies involving

9    peripheral neuropathy and gabapentin in 2001?

10   A.   I don't remember that.

11   Q.   Do you remember attending an all-day meeting the next year

12   on that topic?

13   A.   No.

14   Q.   No memory of that either?

15   A.   No.  I was involved very heavily in the zenarestat

16   project, which is a drug trying to treat diabetic neuropathy,

17   to see if you can slow the progression of it; and I was very

18   involved in the testing techniques, nerve conduction studies

19   and quantitative sensory testing.  So I don't remember me

20   playing any role in any Neurontin trial.

21   Q.   Well, I'm not talking about a lead role or not but --

22   well, let me put it this way:  My understanding is that you're

23   coming before this jury and you're saying that you've looked at

24   a series of studies; some of them are DBRCTs, some of them are

25   not; and as a broad group, you think that Neurontin is

56911cdc-45d4-450f-a2bd-8ee3ff13fe4d

1   effective for neuropathic pain.  Isn't that fair to say?

2   A.   Yes.

3   Q.   Now, sir, don't you understand that that exact same issue

4   was addressed by the Food and Drug Administration in 2001

5   between the FDA and Pfizer?

6         MR. HOOPER:  Objection.

7   A.   No.

8         THE COURT:  Overruled.

9   Q.   You don't understand that?

10  A.   What was your question again?

11  Q.   You don't know that this same issue was addressed by the

12  FDA in 2001?

13  A.   No, I do not.

14  Q.   And we'll get some more details on these documents later,

15  but then don't you also understand that in September of 2001, a

16  group of outside experts met with Pfizer and discussed the

17  precise issue that you're opining on here today?  Did you know

18  that?

19        MR. HOOPER:  Objection.

20        THE COURT:  Overruled.

21  A.   I don't -- I don't know the details of what you're talking

22  about, so I can't comment.

23  Q.   Well, so you don't know about a meeting that occurred in

24  2001, September --

25        THE COURT:  Which meeting is this, the Ann Arbor?

1            MR. SOBOL:  Yes.  This is the Crowne Plaza meeting.

2            THE COURT:  Where?  In Ann Arbor, is there some

3      meeting in Ann Arbor you are familiar with?

4            THE WITNESS:  I'm not sure what he's referring to, but

5      not to my recollection anything that related to Neurontin or

6      gabapentin.

7      Q.   Well, let's go to the Plaintiffs' Exhibit 200 then, and

8      then to take a step back, see if this can reorient you, sir, to

9      your work with Pfizer later this year and in 2002.  I've put up

10     on the screen -- this has previously been admitted in

11     evidence -- Plaintiffs' Exhibit 200, and if we can go to the

12     third page for a moment, were you aware that there was a

13     meeting with the FDA in which about fifteen people from Pfizer

14     showed up, and there were more than a half a dozen or so people

15     from the FDA, in May of 2001, in order to discuss the evidence

16     about Neurontin and its effectiveness for neuropathic pain?

17     A.   No, I was not aware.

18           MR. SOBOL:  Okay, let's go to the next page.  And if

19     you can blow up the first FDA response.  And then if you just

20     yellow highlight the first paragraph.

21     Q.   Let me orient you to this, sir, and then let me ask you

22     whether or not you were aware of this or not.  "The general

23     neuropathic pain indication cannot be granted for Neurontin

24     based on the clinical trials of painful diabetic peripheral

25     neuropathy (DPN) and postherpetic neuralgia (PHN).  These two

1   conditions are distinct pathophysiological states and,

2   therefore, are treated as two indications.  In order for a

3   general neuropathic indication to be granted, the sponsor,"

4   Pfizer, "must provide evidence that the underlying disease

5   process is similar to DPN, PHN, and the pain of other

6   neuropathic disorders and/or that the drug is effective for the

7   neuropathic pain of all (or at least most) etiologies."

8        Now, when you sat down in order to do a thorough review

9   for this jury on your opinion, were you aware that the FDA had

10  made this response to Pfizer nine years earlier?

11  A.   No, but I know that --

12  Q.   You've answered the question.

13  A.   No, I'm not going to answer the question --

14       MR. SOBOL:  If I may, your Honor, the question was a

15  simple yes or no.

16       THE COURT:  Were you familiar with this?

17       THE WITNESS:  I'm familiar with the FDA's policy, not

18  this specific meeting.

19  Q.   And then it also says in the next paragraph, if we can go

20  to that, please, "The sponsor must provide evidence of efficacy

21  replicated in a second study for DPN.  This trial must be

22  twelve weeks in length at fixed doses, as required for a

23  chronically administered drug.  The sponsor must also

24  incorporate electrophysiological measurements in order to show

25  that the improvement in pain is not due to sensory loss.

1   Sensory exams are not easily reproduced and will not reliably

2   detect sensory loss due to nerve death."

3        Were you aware that the FDA in May of 2001 was telling

4   Pfizer, "You cannot get a broad neuropathic pain indication,

5   and if you want an indication for PHN --"

6             THE COURT:  Can we get away from abbreviations as much

7   as possible because we'll all get lost forever.

8   Q.   Right, "If you want the PHN indication, you have to do a

9   follow-up study"?  Are you aware of that?

10            THE COURT:  For the diabetic neuropathy?

11            MR. SOBOL:  Right.

12  A.   No, I'm not.  I'm aware of, again, their policy, but not

13  that specific meeting and statement.

14  Q.   And then you don't remember that when Pfizer set out to do

15  that follow-up study, that you were one of the consultants that

16  they brought in to look into how to do that study?  You don't

17  remember that?

18  A.   No.  If they had asked me, "If you were going to do

19  another study, how would you use nerve conductions to measure

20  neuropathy?" since I was working on a large trial that was

21  ending around that time, they may have asked me about the nerve

22  conduction studies, but nothing more than that.  My involvement

23  in the trial was from about 1998 to 2000, into late 2000,

24  around that time period, and it was involved in measuring how

25  nerve is damaged in diabetic neuropathy.  We had two

1   publications showing how to measure diabetic neuropathy as a

2   result of that, and I really haven't had any relationship with

3   Pfizer now for nine years at all.

4   Q.   I take it one of the reasons people wanted to have

5   conductivity studies is that one of the things, the hypothesis

6   that wanted to be tested was whether or not the gabapentin was

7   actually accelerating nerve damage, therefore causing less pain

8   but by killing the nerves.  Is that one of the hypotheses that

9   was being tested, yes or no?

10          MR. HOOPER:  Objection.

11          THE COURT:  Overruled.

12  A.   I don't know that.  That would be speculating what their

13  thoughts were.

14          MR. SOBOL:  Let's go to Plaintiffs' Exhibit 173.

15  Q.   Now, this is the Crowne Plaza, Ann Arbor, Michigan,

16  meeting.

17          THE COURT:  So back up.  So I take it, in preparing

18  for your opinion, you didn't really have the FDA documents in

19  front of you?

20          THE WITNESS:  No.  I think the FDA documents really --

21  whether the FDA is going to provide an indication, approved

22  indication, is really not important to me looking at whether

23  the trials show if the drug is effective.  In those classes,

24  for example, again, tricyclic antidepressants --

25          THE COURT:  No, no.  I'm just saying, so you didn't

1    look at what the FDA did when you rendered your opinion?

2         THE WITNESS:  No.  I'm sorry, your Honor, no, I did

3    not.

4    Q.   So then let's put aside the FDA for a moment, and then

5    let's talk about non-litigation experts at Pfizer.  You're here

6    in litigation as an expert, correct?

7    A.   Yes.

8    Q.   Okay, let's look instead what happened at Pfizer when

9    there wasn't litigation and they were studying it.  Were you

10   apprised that in September of 2001, a group of experts met and

11   discussed whether or not Neurontin was effective for

12   neuropathic pain as a general matter?  Were you aware of that,

13   yes or no?

14   A.   Not that I remember, no.

15        MR. SOBOL:  Can you highlight the attendees.

16   Q.   Now, some of these pain experts you would agree are indeed

17   pain experts, aren't they?

18   A.   Yes.

19   Q.   Particularly a Robert Dworkin, pretty well recognized,

20   correct?

21   A.   Yes.  He's the one paper I cited that says that gabapentin

22   is a first-line drug for neuropathic pain.

23   Q.   Yeah.  Well, you would consider him an expert?

24   A.   Yes.

25   Q.   Okay.  And other people that are set forth here,

1    non-litigation experts, generally well-respected people?  Yes

2    or no.

3    A.   I don't know the other folks very well, so I can't say

4    that for sure.

5    Q.   Now let's drop down to the "Consultants' Meeting"

6    paragraph, third paragraph down.  Now, the second sentence of

7    this part of the document says that "There was a discussion

8    that focused on broad neuropathic pain indication and its

9    possible defense, experimental and clinical evidence in support

10   of the indication, the Neurontin neuropathic pain package and

11   what indication it may support, and general comments submitted

12   by the NDA."  That's the general topic that you can see here,

13   right?

14   A.   Yes.

15   Q.   And then if we drop down to the "Executive Summary," let

16   me start with yellow highlight from "expert opinion," the

17   second sentence on, "This group of experts," non-litigation,

18   the Executive Summary is that "Expert opinion on the

19   preclinical and clinical data to date is that the evidence is

20   not convincing to support a broad neuropathic pain claim.

21   Opinion on the Neurontin neuropathic pain package is that

22   neither the FDA nor the Advisory Committee is likely to agree

23   that adequate evidence is provided for a broad indication.  New

24   analyses/data not only do not support the broad claim, they

25   provide evidence contrary to a broad indication."

1     Did I read that correctly?

2     A.    Yes.

3     Q.    When you did your thorough review of the evidence and the

4     opinions at Pfizer as to whether or not Neurontin was effective

5     for neuropathic pain, were you made aware of this expert's

6     opinion in September of 2001?  Yes or no.

7     A.    No.

8     Q.    Now, it goes on, the next paragraph, "The experts agree

9     that the package supports PHN," shingles, correct?

10    A.    Yes.

11    Q.    "Evidence for DPN," diabetic peripheral neuropathy, "is

12    confounded by the negative DPN study.  Advice from this panel

13    of experts is to file the shingles indication and to conduct

14    additional studies to support the diabetic peripheral

15    neuropathy claim."  I've read that generally correctly, right?

16    A.    Yes.

17    Q.    And, again, you were not made aware that this was the

18    opinion of the Pfizer experts at this time, correct?  You

19    weren't made aware of it?

20    A.    No.  And what year was this?

21    Q.    This is September of 2001.

22    A.    It's quite early on before many of these studies were

23    done.

24    Q.    Well, we'll actually get there, but we'll have that as a

25    place marker in terms of the evidence that they had or didn't

1    have, okay?  And as of this time, Doctor, let me put it this

2    way, you actually don't know what evidence they had in front of

3    them, do you?

4    A.   Well, I know from all the data that I've seen, both

5    published and unpublished.  Again, this is probably reflecting

6    data available in mid-2001.  There's many studies that I've

7    commented on that have been produced since then.  Then if you

8    held the FDA standards that you're describing for a broad

9    indication of neuropathic pain, tricyclic antidepressants

10   wouldn't meet that bar either.  No drug would.

11   Q.   Now, let's go to the next page.  There are a series of

12   bullets, and if we can blow up the first bullet.  What I quoted

13   from before was the Executive Summary.  Now we're actually

14   doing a little bit of the detail, sir.

15       "There was a clear consensus that a broad claim with any

16   drug is not possible without evidence of sufficient efficacy in

17   a substantial number of clinical models (more than shingles and

18   diabetic peripheral neuropathy)."

19       Did I read that correctly?  Yes or no?

20   A.   I'm trying to figure out what they're saying, but, yes,

21   you read it correctly.

22   Q.   Okay.  And so they aren't rejecting the possibility that

23   the FDA might under some circumstances have a broad neuropathic

24   claim, but instead that what you would have to do is actually

25   have the evidence to support it.  Do you think that's a fair

Page 62

1    reading of this?  Yes or no.

2    A.    I'm not sure what they meant by that.

3    Q.    Okay, let's look at the second bullet.

4          "Clinical evidence to counter FDA's position that PHN and

5    DPN should be separate indications that requires replicate

6    evidence of efficacy does not exist."

7          And then let's go to the third bullet.  "While the

8    Neurontin package (2 studies in PHN --"

9          Do you know what the two studies in PHN they're talking

10   about there?

11   A.    I assume it's Rowbotham and Rice.

12   Q.    Right, two of the studies that you're representing to the

13   jury this morning regarding shingles, correct?

14   A.    Correct.

15   Q.    So they had those two at this time, right?

16   A.    Yes.

17   Q.    Okay.  "While the Neurontin package (2 studies in PHN and

18   1 study in DPN," diabetic peripheral neuralgia -- do you know

19   what study that was?

20   A.    The one study in diabetic painful neuropathy?

21   Q.    Yes.

22   A.    Yes, I assume that's the Backonja study.

23   Q.    Backonja, so they had that one too, right?

24   A.    Yes.

25   Q.    "-- alone was not considered adequate as supporting a

1   broad claim.  New analyses from the 945-306 --" do you know

2   what one that is?

3   A.   No not offhand.

4   Q.   That's Serpell.  Does that refresh your memory?

5   A.   Yes.

6   Q.   Okay, they had Serpell, right?  "-- the Serpell study in

7   the NDA and a recently completed Nordic study (945-271) --"

8   that's probably the POPP, the Gordh study?

9   A.   Gordh, uh-huh.

10  Q.   All right, so they had the Gordh study too, right?

11       "-- add substantial evidence against a broad neuropathic

12  pain claim."  Did I read that correctly?

13  A.   Yes.

14  Q.   Okay.  So it appears that this independent group of

15  experts, non-litigation experts, in September of '01, had in

16  fact the Rowbotham study, had the other shingles study, had

17  Backonja, had Serpell, had POPP, and yet nevertheless came to a

18  conclusion that, in tandem, all of that material adds

19  substantial evidence against a broad neuropathic pain claim?

20  A.   That's what they're saying, although I'm not sure why they

21  add that last phrase because Serpell was a positive study and

22  Gordh was a negative study.

23  Q.   Well, we'll get into the details of that in a minute.

24       A Dr. Max, once these results were discussed -- well,

25  actually, the next bullet actually they describe why it is that

Page 64

1   they have questions about Serpell.  Let me blow that up in

2   terms of Serpell.  "Statistical significance in 945-306 --"

3   that's Serpell, right? "-- is predominantly the result of the

4   PHN, the shingles patients (in addition to a small number of

5   DPN, or diabetic peripheral neuralgia, patients).  Patients

6   with neuropathic pain types other than this, those two, had

7   much less treatment effect."

8       So there was some question they had about what the effect

9   was happening in the mixed Serpell study, fair to say?

10  A.   Yes, although I looked at the study, and the study authors

11  have a different conclusion.

12  Q.   And then they also looked at the POPP study which was

13  negative, and at the end of that a Dr. Max -- you have at least

14  heard of Dr. Max, right?

15  A.   Yes.

16  Q.   And he said "You're done"?

17  A.   I don't know what that means.  Maybe they're done with the

18  meeting and they had to leave.

19  Q.   Oh, you think that's what he meant, that they're done with

20  the meeting?

21  A.   I have no idea.  I have no idea.

22      THE COURT:  Well, maybe he should see the whole

23  document.

24  Q.   Yes, in fairness, Doctor, the document goes on for two

25  more pages.

1    A.    I don't -- I can't -- I can't even tell you what he was

2    meaning.  I would be speculating, and I have no idea.

3    Q.    Okay.  And is it your understanding then, too, that after

4    this meeting in September of 2001, you simply don't know that

5    Pfizer decided to try to explore the possibility of a follow-up

6    diabetic peripheral neuralgia study, and actually called upon

7    you to consult with a piece of it?  You don't remember that?

8    A.    No.  If they had asked me anything, I may have met with

9    them looking at how to measure nerve conduction studies as part

10   of a trial, but I wasn't involved in any pain study per se.

11   Q.    So you don't know that you were actually a part of the

12   follow-up from this September, 2001 meeting to figure out

13   whether or not an indication for diabetic peripheral neuropathy

14   could happen?  You don't know that?

15   A.    No.  As I said, at the time my coworker Mark Brown and

16   another person who specializes in nerve measurement, we were

17   all involved in how to measure nerve in diabetic neuropathy.

18   So if they had asked my opinion on that for any trial, I would

19   have given it.

20   Q.    All right.  Now, you did a report in 2006, correct?

21   A.    Yes.

22   Q.    In this case, right?

23   A.    Not -- I don't think it's this case.

24   Q.    Generally for Pfizer involving Neurontin, right?

25   A.    Yes, and it was out of Philadelphia.  That's how I

1    originally got involved because I'm from Philadelphia.

2    Q.   In your 2006 report, you don't mention at all in any way

3    the Reckless study or the POPP study or the Parsons study,

4    correct?

5    A.   I didn't mention that --

6    Q.   Yes or no.

7    A.   Well, I'm going to answer the question correctly.  The

8    POPP study was published in 2008, so since I wrote the report

9    in 2006, I certainly couldn't have commented on it two years

10   before it was published.  Since that report, I've found the

11   Reckless data, which as you're discussing, it has been

12   published, although not in a stand-alone format.  And I didn't

13   have the data for Parsons until I was able to look at all of

14   the research reports, both published and unpublished, from

15   Pfizer, and that occurred after 2006.  So I couldn't have

16   included those in my report in 2006 if I didn't have the data.

17   Q.   Yes, you didn't have the data because Pfizer didn't give

18   it to you.  Do you know, do you realize that the results of the

19   POPP study, the results of the Parsons study, the results of

20   the Reckless study, were all in the files at Pfizer at the time

21   that they asked you to write your 2006 report?  Do you know

22   that one way or another?

23   A.   I assume they were, yes, because they were dated and I had

24   them, but as I mentioned, I'm not sure it would have changed my

25   report.  The Parsons study and the Reckless study cancel each

Page 67

1    other out.

2          MR. SOBOL:  Your Honor, the witness is going on, and I

3    am under a time clock.

4          THE COURT:  What's the question?

5    Q.   The question is this, okay:  At the time you wrote your

6    first report, no one had given you so you did not know about

7    the Reckless study, the POPP study, or the Parsons study,

8    correct?

9    A.   No.  I had looked at published information at that time.

10   Q.   Exactly.  You like every other doctor in the country

11   couldn't know about POPP or Reckless or Parsons because they

12   weren't published at that time, correct?

13   A.   Well, many studies --

14   Q.   Yes or no.

15   A.   I'm going to say many studies weren't published in 2001.

16   Your knowledge evolves as the studies become published.  POPP

17   was --

18   Q.   It's very simple, sir.

19   A.   I'd like to finish my answer.

20         MR. HOOPER:  Could he finish his answer?

21   Q.   If it wasn't published, you couldn't get it, correct?

22   A.   I couldn't get it before it's published, of course not,

23   but --

24   Q.   Right, but Pfizer could have given it to you if it wanted

25   to, even though it wasn't published in 2006.

1  A.   Well, the only unpublished, ultimately unpublished study

2  was a very positive one, which was Parsons.

3  Q.   Well, we'll talk about whether or not it's ultimately

4  positive or not, sir.  The fact of the matter is, in 2006, you

5  didn't have access to those studies.  Even though Pfizer could

6  have given them to you, they didn't give them to you?

7  A.   No, but they did subsequent to that when I wrote my 2008

8  report for this proceedings.

9  Q.   Right, after the plaintiffs, after Kaiser's lawyers filed

10  documents saying, "These reports are unpublished, they're

11  showing data that's not available to people," then Pfizer gave

12  you the reports, correct?

13  A.   The only one that was not published, as I said, was

14  Parsons, which was a positive study.

15  Q.   What was the difference on the pain score in Parsons that

16  was statistically significant?  Do you recall offhand?

17  A.   Uhm, no, but, again, I can tell you --

18  Q.   If you don't remember, you don't remember.  But if I can

19  refresh your memory, wasn't the difference in the mean pain

20  score less than 1 point on an 11-point scale?  Isn't that true

21  in the Parsons study?

22  A.   Well, if I'm allowed to talk about all the results, then

23  I'll answer your question because it's misleading just to tell

24  you, yes, there was a small but statistical significant change

25  in pain score, but again --

1    Q.   Well, that's very good.  That's what it was.  And that was

2    the primary end point that was looked at in that study?

3    A.   Which was positive, yes.

4    Q.   The primary end point which was positive, according to

5    you, is a less than 1-point difference on an 11-point pain

6    scale, correct?

7    A.   Yes, it was positive.  It's not according just to me.

8    It's also in the published literature that it was reported a

9    positive effect.  It was in the appendix to Dr. Dickersin's

10   article in the New England Journal of Medicine.

11   Q.   Now, are you aware, by the way, that Dr. Backonja in his

12   article actually described that you would need a difference of

13   about 55 to 60 percent difference on a pain score in order for

14   that to be clinically important?  Are you aware of that?  Yes

15   or no.

16   A.   It depends what score you're looking at.

17   Q.   Okay.  In your 2006 report, you cited Gorson early on as

18   an example of a piece of literature that was out there in the

19   marketplace of information for doctors.  Do you recall having

20   cited it for that purpose?

21   A.   Well, I knew it was available, yes.

22   Q.   Right.  But you cited it as something that sort of, here

23   are doctors, they get together, it's independent, it's not drug

24   company sponsored; and we had this piece of information, and

25   one of the things that you cited was the Gorson study in your

56911cdc-45d4-450f-a2bd-8ee3ff13fe4d

Page 70

1    2006 report.

2    A.   Yes.  It was a published report.

3    Q.   Okay.  When you wrote your 2008 report, you took the

4    Gorson citation out.  Do you remember that?

5    A.   No.

6    Q.   Well, can you take my representation that it's out, or do

7    you want to actually go and take a look at it?

8    A.   Well, I know it's in there somewhere, but --

9    Q.   But in this section.  We can compare them.

10   A.   Well, I may have rearranged things in the report because I

11   was also asked to respond to two other experts, so I may have

12   put it in a different section.

13   Q.   Well, let's see if that's the case then.

14        THE COURT:  The one on the left is 2006, and the one

15   on the right is 2008?  Is that it?

16        MR. HOOPER:  Your Honor, may I hand him a copy of the

17   2006 one?  He hasn't been handed it.

18        THE COURT:  Right, you can hand him both.

19   Q.   On the screen, sir, is a copy of your 2008 up top and your

20   2006 at the bottom where you're providing some citations to

21   some early articles that you said were, you know, in the

22   context of independent scientific discussion of some sort.  Do

23   you see that?

24   A.   Yes.

25   Q.   In your 2008 report, you take the citation of Gorson out,

Page  71

1    don't you?

2    A.   Well, the whole report was rewritten.  It's five pages,

3    the original 2006.  The other report is twelve pages.

4    Q.   You know, you're citing this, you're using the same

5    material, it's the same proposition, and we can, you know,

6    highlight the same paragraph generally.  You've just taking the

7    Gorson cite out?

8    A.   Well, it was a positive study.  I wouldn't have taken it

9    out for any reason to hide it.  I don't know why I rearranged

10   it.  The whole report is almost twice as long.

11   Q.   Well, didn't you take the Gorson cite out because you

12   learned between 2006 and 2008 that the characterization and the

13   conclusion had been changed by Pfizer before it got published?

14   A.   No.  That's not why I would have changed it at all.

15   Q.   The citation --

16          THE COURT:  As you sit here -- well, did you write

17   both reports yourself?

18          THE WITNESS:  Yes.

19          THE COURT:  So do you remember as you sit here now why

20   you took the cite out?

21          THE WITNESS:  No.  I rearranged -- as I said, I

22   responded to Dr. Perry's response, so I don't know.  I may have

23   moved it or I didn't feel it was appropriate in that particular

24   section.  I can't tell you why I changed it at this point.

25   It's been a couple of years.

Page 72

1   Q.   Do you recall it being brought to your attention between

2   2006 and 2008 that there were changes in the way that the study

3   results were first reported by Gorson and then changed by

4   Parke-Davis?  Did you learn that?

5   A.   No.

6   Q.   Do you recall also making a change between your 2006 and

7   your 2008 report in terms of your fundamental conclusion about

8   the results that were of the double-blind randomized control

9   trials?

10  A.   No.

11  Q.   Do you recall making a change about that?

12  A.   No.

13  Q.   Now, sir, I've put up on the screen, the 2006 report is up

14  top, and then the 2008 report is at the bottom.  Do you see

15  that?

16  A.   Yes.

17  Q.   And both of them are a discussion regarding the specific

18  studies.  You looked at six RCTs and then two RCTs that compare

19  gabapentin to amitriptyline, correct?

20  A.   Yes.

21  Q.   All right.  Now, the conclusion in the 2006 is, "All of

22  these studies demonstrated a beneficial effect of gabapentin."

23  Do you see what you've concluded there?

24  A.   Yes.

25  Q.   Your conclusion in 2008 is what somewhat different,

Page 73

1    though.  You say "These eight studies --" it's about six lines

2    down?

3    A.   I can't see where we're looking here but -- yes.

4    Q.   "These eight studies considered together provide more than

5    sufficient evidence for a physician to conclude that gabapentin

6    is effective for the treatment of neuropathic pain."

7         That was your conclusion in 2008?

8    A.   Yes.

9    Q.   Right.  Now, when you made your changes in this, were you

10   trying to equivocate about how this might be a physician making

11   a decision like you, rather than just saying as you had

12   previously that all studies demonstrate a beneficial effect of

13   gabapentin?

14   A.   No.  It's just when I rewrite a report, I change the

15   phrasing around and the wording and terminology.  It means the

16   same thing.  If a physician, a pain specialist, a consensus

17   pain panel like two of the ones that I mentioned, the Canadian

18   Pain Society or the International Association for the Study of

19   Pain, they're all physicians, look at the data, there's

20   sufficient evidence for physicians/scientists looking at this

21   data to say it's effective for neuropathic pain.  If I write a

22   report that's five pages and I come back two years later and

23   write a report that's ten or twelve pages, I guarantee you, if

24   I wrote it again now, I would change the phrasing, something

25   doesn't sound quite right, I'd move something from one spot to

Page 74

1    another.  I don't think I could -- I would change week to week

2    just to make something sound better, make it fit together

3    better.

4    Q.   Would you agree with the following statement:  "In

5    assessing general causation, the first question scientists must

6    ask is whether the results of an epidemiologic study reveal an

7    association between an agent and disease"?  Yes or no.

8    A.   I guess.  I'm not sure what that has to do with this,

9    but --

10   Q.   Would you agree with the following sentence:  "Anecdotal

11   evidence, such as case reports and adverse event reports,

12   cannot be used to establish an association because there's no

13   control group"?

14   A.   I don't know what you mean by "association."  If you're

15   talking about effectiveness of a therapy, that's a different

16   question.

17   Q.   Well, are you aware, sir, that Pfizer's position in the

18   Neurontin suicide cases is that clinical experience in terms of

19   the cause and effect of Neurontin to suicide or suicidal

20   ideation is not appropriate, you can't do it that way?

21            MR. HOOPER:  Objection, your Honor.

22   A.   I have no idea what their --

23            THE COURT:  Overruled.  Do you know one way or

24   another?

25            THE WITNESS:  No.

56911cdc-45d4-450f-a2bd-8ee3ff13fe4d

1    Q.   In this case, though, I take it that you think it's okay

2    to use clinical experience in terms of drawing a conclusion

3    about effectiveness?  Fair to say?

4    A.   I think it's -- I think it's absolutely mandatory for

5    physicians to use their clinical experience in conjunction with

6    the evidence-based medicine at hand.  That's how medicine is

7    practiced.

8    Q.   How many of your patients do you treat with a placebo?

9    A.   None.

10   Q.   You don't treat any of your patients with a placebo?

11   A.   No.

12   Q.   So you don't have any experience in treating people with a

13   placebo in order to determine how much of a placebo effect

14   there might be?

15   A.   Well, only from what I read in trial data.

16   Q.   So your entire clinical experience has no control group

17   against a placebo upon which you can make a judgment, does it?

18   A.   No, it doesn't.  Not a practice.

19   Q.   You gave some testimony during direct examination about

20   the Cochrane review, and you anticipated the fact that of

21   course the Cochrane review did not have available the Reckless

22   study or the POPP study, correct?

23   A.   The Reckless study and the Parsons study, yes.

24   Q.   Or the POPP study that was available and being used by the

25   FDA back in 2001?

1    A.    The POPP study is a different entity.  It's not -- it's

2    not the typical classic neuropathic pain.  It's a postoperative

3    pain study.

4    Q.    But the results were being discussed in a neuropathic pain

5    discussion with the FDA in May of 2001 and in September of 2001

6    with the independent non-litigation experts, correct?

7    A.    Yes.

8    Q.    And for some reason, that was not made available to the

9    Cochrane review when it was trying to look at the issue of

10   neuropathic pain, correct, in 2005?

11   A.    Not in 2005.

12   Q.    Right.  I'm not sure whether you gave some testimony

13   during your direct examination about the Dallocchio study?  Did

14   I say that correctly?

15   A.    Yes.

16   Q.    Okay.  Let's go to Plaintiffs' Exhibit 137.  The

17   Dallocchio study was actually an open study, right?  It wasn't

18   a double-blind study, correct?

19   A.    I don't know if we talked about Dallocchio.  I think we

20   talked about Morello, actually, because we only discussed and

21   limited our discussion here this morning to double-blind

22   randomized control trials and not open-label trials.

23   Q.    But you cited to the Dallocchio study in your 2008 report,

24   correct?

25   A.    Yes.

56911cdc-45d4-450f-a2bd-8ee3ff13fe4d

1    Q.   And it was an open study, correct?

2    A.   Yes.

3    Q.   Plaintiffs' Exhibits 137.  Were you aware of why it is

4    that the Dallocchio study came out, how it was planned by

5    Parke-Davis?

6    A.   No.

7         MR. SOBOL:  Let's go to the last paragraph that begins

8    in the middle of the paragraph where it says "When the

9    negative," and then yellow highlight beginning with the word

10   "when" in that sentence.

11   Q.   "When the negative UCSD gabapentin-amitriptyline paper --"

12   that's Dallocchio, correct?

13   A.   Yes.

14   Q.   "When the Dallocchio paper was published, Parke-Davis had

15   a two-pronged approach."  And it continues, "Attack the flaws

16   in the study and sponsor another study which ultimately

17   provided more favorable results (the Dallocchio study)."

18   Correct?

19   A.   Yes.

20   Q.   All right, so I think I actually misspoke on this.  When

21   the negative UCSD study -- that was the Morello study?

22   Remember, it was the VA patients, the 25 VA patients in the

23   Morello study?  Yes or no.

24   A.   I'm not sure what the UCSD study is, so --

25   Q.   Okay.  In any event, don't you understand that what

1    Parke-Davis did is, once the Morello study came out and showed

2    that actually gabapentin was no better than amitriptyline, that

3    then what Parke-Davis did was attack the quality of that study,

4    and then delay things in order to be able to counteract it with

5    the Dallocchio study?

6    A.   Well, that makes no sense because the whole intent of a

7    positive study is to show the drug is equally as effective as

8    amitriptyline.  In fact --

9    Q.   That's not the way it was perceived at Parke-Davis, is it?

10   Or do you not know?

11   A.   I know in the field that you do comparative studies.  If

12   you have an effective drug like amitriptyline, you compare a

13   drug like gabapentin to it, and if they show equal

14   effectiveness, that's a positive study.  That's what you're

15   aiming for.

16   Q.   I take it, sir -- I'm almost done -- I take it, sir, that

17   you have opined in your 2008 report that gabapentin is one of

18   the several first-line treatments for neuropathic pain?

19   A.   Yes.

20   Q.   Correct?  It's a part of the standard of care, right?

21   A.   Yes.

22   Q.   Okay.  You also, though, recognize that TCAs are also

23   first-line, correct?

24   A.   Yes.

25   Q.   Okay.  You prescribe them often, correct?

1    A.   Uhm, much less often than gabapentin because they're not

2    as tolerated as well as gabapentin.

3    Q.   By the way, when you're treating people with pain and

4    you're using either Neurontin or TCAs, whatever, that's a

5    symptom treating, correct?

6    A.   Yes.

7    Q.   That's not treating the cause, right?

8    A.   No.  You're treating the pain.

9    Q.   And are there other treatments --

10        THE COURT:  Wait.  Just let him finish the sentence.

11   You're treating what?

12        THE WITNESS:  Treating pain, you're treating the pain,

13   just not the underlying disease.  We often are treating the

14   underlying disease at the same time trying to make the

15   underlying disease better, but people are suffering, so

16   obviously you treat their symptoms, their pain.

17   Q.   So the gabapentin isn't the only therapy that's being

18   provided to the patient is my point.  It's often the case that

19   there are other therapies being provided to the patient, if not

20   to ameliorate the pain, to ameliorate the cause of the pain,

21   correct?

22   A.   Yes.

23        THE COURT:  So how do you tease out the difference

24   between curing the cause and measuring the effects of the drug?

25        THE WITNESS:  Well, for example, diabetes is a good

1   example.  You try and treat the underlying neuropathy by very

2   good sugar control.  It's been proven that the better your

3   blood sugars are controlled, the slower the neuropathy gets

4   worse.  So you intensify your efforts trying to keep very tight

5   glucose control so the neuropathy doesn't worsen.  At the same

6   time, you're treating their pain that's driving the patient

7   crazy.  They can't sleep at night, their feet are burning,

8   they're like on fire, electric shock-like sensations.  So

9   you're doing both at the same time.  And that's the most common

10  example, but there are other diseases --

11          THE COURT:  But how do you tell what causes the fix

12  and the pain?

13          THE WITNESS:  Well, I don't think that there is any

14  good evidence that treating the blood sugars helps the pain in

15  that case.  So even after you've tightened their blood sugar

16  control and they've got good blood sugar control, you're only

17  trying to keep the neuropathy from getting worse.  It doesn't

18  get better.  So the pain is separate from that entirely.

19          THE COURT:  And there are studies on that?

20          THE WITNESS:  Oh, yes, yes.

21  Q.   And it's not only just diabetic patients that you're

22  treating.  You're also treating, for instance, you gave the

23  example of someone injuring their shoulder and having some

24  cause of the pain there, correct?

25  A.   Right.  I mean, there you're limited --

Page 81

1  Q.   And as a result, you're going to be treating the shoulder

2  and the pain, correct?

3  A.   Well, again, if you damage the nerves under the shoulder,

4  there is no specific treatment other than physical therapy, so

5  you wait for the nerves to try and repair themselves, and you

6  treat the pain at the same time.

7  Q.   And you give them physical therapy?

8  A.   Yes.

9  Q.   In any event, you've opined that you think that a part of

10  the standard of care is to use Neurontin for neuropathic

11  treatment, despite what the Pfizer expert said back in 2001,

12  correct?  That's your view?

13  A.   Well, yes.  I've never seen anybody in the published

14  literature say otherwise.

15  Q.   Are you aware, sir, that back in the same time period of

16  2001, that Pfizer had a Global Operating Plan with respect to

17  Neurontin?

18  A.   No.

19  Q.   Were you aware that a part of its Global Operating Plan

20  was to create a new standard for care for neuropathic

21  treatment?

22       MR. HOOPER:  Objection, your Honor.  This is all

23  beyond the scope.

24       THE COURT:  Overruled.

25  A.   No, but it was --

1  Q.   So you don't know about that then?

2  A.   No.

3  Q.   Okay, let's go to the next slide.  Were you aware that at

4  this time, Pfizer was making Neurontin the standard of

5  treatment in neuropathic pain, that that's what they saw as a

6  part of their global mission for Neurontin?  Are you aware of

7  that?

8  A.   Well, you said two of different statements.  Pfizer was

9  not --

10 Q.   Then I'll strike it, and I'll say it again.  Were you

11 aware that Pfizer had as a part of its 2001 Global Operating

12 Plan to make Neurontin the standard of treatment in neuropathic

13 pain?  Yes or no, were you aware of that?

14 A.   No.

15 Q.   And you also weren't aware that you were a part of

16 Pfizer's plan to perform that DPN, that diabetic peripheral

17 neuropathy study?  You weren't aware of that?

18 A.   No.  I mean, I might have, again, discussed how one might

19 do nerve conduction studies as part of a trial, but I wasn't

20 planning being a participant in their pain trial per se.

21 Q.   Were you aware that Pfizer terminated the plans for that

22 diabetic peripheral neuropathy trial immediately after the

23 shingles indication was granted?

24 A.   No.

25          MR. SOBOL:  Nothing further.

1           MR. HOOPER:  Very quickly, your Honor.

2    REDIRECT EXAMINATION BY MR. HOOPER:

3    Q.   Dr. Bird, Mr. Sobol asked you about these meetings back in

4    2001; is that right?

5    A.   Yes.

6    Q.   And you recall he said they had the Rowbotham, the Rice,

7    the Reckless, the Serpell, and the POPP studies that they were

8    discussing; is that right?

9    A.   Yes, yes.

10   Q.   Five.  Now that we're in 2010, nine years later, you told

11   the jury this morning about thirteen double-blind randomized

12   controlled trials, correct?

13   A.   Yes.

14   Q.   And what's the takeaway from the thirteen studies that

15   exist now as opposed to the five that he chose to ask you

16   about?

17   A.   Well, there was one that was negative, clearly negative if

18   you look at it, and the remainder were positive.

19   Q.   He asked you about the PHN indication versus the DPN

20   indication and that discussion going on back in 2001, and you

21   said you didn't know the document but you knew FDA's policy,

22   and he wouldn't let you answer.  What's the FDA's policy?

23   A.   Well, I think the FDA likes to see drugs developed with a

24   specific neuropathic pain indication, like painful diabetic

25   neuropathy, as opposed to a broad class.  I mean, not everybody

1  agrees with that.  It's approved for broad neuropathic pain in

2  the United Kingdom's equivalent of the FDA.  And FDA approval

3  is a different process than determining whether a drug is

4  effective.  For example, in tricyclic antidepressants,

5  everybody agrees in the literature that I've read that it's an

6  effective drug for a broad class of neuropathic pain, and yet

7  it doesn't have an indication for that.  The trials would not

8  support that.  They would probably support an indication in

9  diabetic painful neuropathy only, if it ever came to the FDA

10  approval process.  So there's a difference between FDA approval

11  and looking at what trials support whether a drug is effective.

12  Those are entirely different processes.

13  Q.   And for FDA approval to get in the label, you need two

14  positive controlled trials; is that right?

15  A.   Yes.

16  Q.   And in 2001, the time period he was asking you about,

17  there was Reckless that was negative and Backonja that was

18  positive, right?

19  A.   Yes.

20  Q.   That's what they were referring to when they said one

21  failed, one positive?

22  A.   Yes.

23  Q.   How many positive studies do they have now?

24  A.   Many more.  There's some that came out even since I wrote

25  my report that were non-Pfizer sponsored studies, so --

1          MR. SOBOL:  Objection.

2          THE COURT:  Sustained.

3   A.   There were --

4          THE COURT:  No, no, you can't.  Because it's not in

5   the report, is that it?

6          MR. SOBOL:  Right.

7          THE COURT:  Sustained.

8   Q.   There are many more studies, positive ones, that you told

9   the jury about this morning in that first section when we went

10  through study by study by study by study this morning, right?

11  A.   Yes.

12  Q.   And do you prescribe this medication for patients with

13  diabetic neuropathy, Dr. Bird?

14  A.   There's not a week goes by either I don't prescribe it

15  myself or I don't see half a dozen patients who come in to see

16  me who have been put on it by their neurologist as a treatment

17  for neuropathic pain.

18  Q.   In your opinion, is there a better, safer medication for

19  patients with diabetic neuropathy than this one?

20  A.   No.

21         MR. HOOPER:  No further questions.

22  RECROSS-EXAMINATION BY MR. SOBOL:

23  Q.   So, sir, I put a graph up that shows what your report says

24  from 2006.  In 2006, do you recall that there was a section

25  where you identified eight double-blind randomized control

1    trials?

2    A.    Yes.

3    Q.    Okay.  So it included Backonja, Gorson, Tamez-Perez,

4    Rowbotham, Rice, Serpell, Dallocchio, and Morello, correct?

5    A.    Yes.

6    Q.    That's what you had in 2006, right?

7    A.    Yes.

8    Q.    All of those, of course, were also available, as you see

9    the time periods, to the FDA in May of 2001 and to the experts

10   in September of 2001, correct?

11   A.    I don't believe so, but -- for example, Serpell was 2002,

12   so that --

13   Q.    But they discussed it.  Remember when I showed you the

14   minute notes, and they discussed the Serpell study at the

15   meeting in September of 2001?

16   A.    Yes.

17   Q.    Okay, so they had that, right?

18   A.    Yes.

19   Q.    They had all eight of these studies, correct?

20   A.    Well, they didn't discuss all eight.  Apparently they only

21   discussed five of them.

22   Q.    Well, the Dallocchio study, as we just talked about,

23   that's an open study, so that wouldn't count.  You didn't even

24   talk about this in your direct, right?

25   A.    Yes.

1    Q.   So that one would be out, right?  The Morello study, we

2    talked about, you know, what the results were there but how

3    Parke-Davis saw them as negative.  Do you recall that?  I'll

4    strike that.

5    A.   No, they were --

6    Q.   I strike that.  There are three additional studies that I

7    put down below the eight.  Those were the studies that you

8    didn't mention in your 2006 report but you do mention in your

9    2008 report, correct?

10   A.   Yes.

11   Q.   Okay.  And, again, the Reckless study and the POPP study

12   were discussed as well in the September time frame also,

13   correct?

14   A.   Uhm, I don't remember which ones, which of the five were

15   discussed, but, yes, some of them were.

16   Q.   And then the 1008, Parsons, that was actually never

17   published, not to this day, correct?

18   A.   Right.  It was completed in 2005.

19   Q.   And not published to this day, correct?

20   A.   Yes, correct.

21   Q.   And that was the study that showed the statistically

22   significant but less than 1-point reduction in the 11-point

23   pain scale, correct?

24   A.   It was significant in several parameters, yes.

25   Q.   Okay.  Between 2006 and 2008, other than the unpublished

1   Parsons study, okay, were there any other double-blind

2   randomized control trials for neuropathic pain that were

3   published and available to you at the time of your 2008 report

4   other than the documents that are here?

5   A.   Yes.  I think I had mentioned Gilron, which we didn't get

6   into, which is a comparator trial that was complicated that

7   showed that gabapentin was effective compared to placebo.

8   Q.   It's not mentioned in your direct testimony, correct?

9   A.   Correct.

10  Q.   So if I understand it, you still believe that Neurontin is

11  effective for neuropathic pain across the board, correct?

12  A.   Yes.

13  Q.   Okay.  And do you think that any of your patients would

14  want you to be mindful of the fact that -- well, let me ask the

15  question this way:  Are you the kind of doctor that wants to

16  make decisions on the basis of only some of the evidence or all

17  of the evidence?

18  A.   I try to make my decision based on all of the evidence,

19  and my primary decision is what's best for the patient.

20  Q.   You want to make your decision on the basis of all the

21  evidence, correct?

22  A.   Sure.

23        MR. SOBOL:  Nothing further.

24        THE COURT:  Thank you very much.

25        (Witness excused.)

1          THE COURT:  Your next witness?

2          MR. HOOPER:  Your Honor, we call Dr. Andrew Slaby.

3          THE WITNESS:  I'm going to stand up and stretch.

4    We'll go to about 11:00.

5          (Discussion off the record.)

6                    ANDREW SLABY

7    having been first duly sworn, was examined and testified as

8    follows:

9          THE CLERK:  Would you please state your name and spell

10   it for the record.

11         THE WITNESS:  Andrew Slaby, S-l-a-b-y.

12   DIRECT EXAMINATION BY MR. HOOPER:

13   Q.   Dr. Slaby, what is your profession?

14   A.   I'm a psychiatrist and epidemiologist.

15   Q.   Sir, could you please describe your educational background

16   for the jury.

17   A.   I went to the University of Wisconsin as an undergraduate,

18   and then I went and spent a year getting a master's degree in

19   neurophysiology at Wisconsin.  I graduated medical school at

20   Columbia University in New York City.  I went and did a medical

21   internship at Boston City Hospital.  I went on to do my

22   psychiatric training at Yale University.  I got a Ph.D. and a

23   master of public health degree at Yale University in

24   epidemiology, and I was a clinical fellow in the Laboratory of

25   Psychopharmacology at the National Institutes of Mental Health.

Page 90

1   Q.   Are you board-certified, Dr. Slaby?

2   A.   Yes, I am.

3   Q.   In what specialty?

4   A.   Psychiatry.

5   Q.   And do you currently have an active clinical practice in

6   psychiatry?

7   A.   Yes, I do.

8   Q.   Have you published articles in psychiatry in both peer-

9   reviewed and other journals of psychiatry?

10  A.   Yes.

11  Q.   About how many all total?

12  A.   More than a hundred.

13  Q.   As an epidemiologist, are you trained in and familiar with

14  the methods used in clinical trials of medications?

15  A.   Yes, I am.

16  Q.   And do you have experience reviewing and analyzing the

17  results of clinical trials?

18  A.   Yes.

19  Q.   Doctor, could you please summarize your opinions in this

20  case.

21  A.   I believe that Neurontin is an effective add-on,

22  adjunctive treatment, and in some instances a primary treatment

23  for some psychiatric disorders and for pain, the psychiatric

24  disorders including various forms of bipolar illness, anxiety

25  disorders.

1    Q.   And do you have an opinion on safety specifically?

2    A.   I think it's a very safe drug because it really, it has

3    very little drug-drug interaction and is much more safe than

4    the other anticonvulsants and lithium that we use in bipolar

5    disorder.

6         THE COURT:  Can I just see you at side bar for one

7    second.

8    SIDE-BAR CONFERENCE:

9         THE COURT:  Okay, so the other experts very safely

10   addressed double-blinded random controlled tests and cited

11   some --

12        MR. HOOPER:  That's all he's going to do, as well as

13   his clinical experience.

14        THE COURT:  I don't want to be in the position of

15   having to strike his opinion on bipolar.  You say there's some

16   out there?

17        MR. HOOPER:  We're about to hear them.

18        MR. GREENE:  He hasn't cited a negative DBRCT in his

19   report.  He didn't look at it.

20        MR. HOOPER:  What did you just say?

21        MR. GREENE:  One of them in his report, Guille --

22        THE COURT:  Well, that goes to the weight.  I just

23   want to make sure that he has taken into account -- I don't

24   want to have to strike -- this isn't a situation where he's

25   going to say, "This is scientifically safe based on my

Page 92

1    day-to-day clinical experience."

2            MR. HOOPER:  They've been telling you that there are

3    none.  You're about to hear about them.

4            THE COURT:  Okay.

5            (End of side-bar conference.)

6    Q.   Doctor, what kinds of materials did you review and rely on

7    in this case?

8    A.   A number of different articles that dealt with various

9    levels of evidence of the efficacy, Levels I, II, and III of

10   Neurontin and various psychiatric disorders.

11   Q.   Did the materials you reviewed and relied on include

12   results from double-blind randomized controlled clinical

13   trials?

14   A.   Yes.

15   Q.   In addition to DBRCTs or Level I evidence, is your own

16   clinical experience important to you in your consideration of

17   Neurontin's efficacy?

18   A.   Yes, it is.

19   Q.   And why is that, sir?

20   A.   Because actually in psychiatry there's less than

21   15 percent that actually have official FDA indications, and in

22   an illness as complex as bipolar illness, there are actually

23   many different phases.  And as was explained by the last

24   witness, is that the FDA really is looking at various different

25   parts, and until recently, after the time of the evidence that

56911cdc-45d4-450f-a2bd-8ee3ff13fe4d

1    is being presented at this trial, we actually had no official

2    FDA --

3              MR. GREENE:  Objection, your Honor.  Beyond the scope

4    of the report, your Honor.

5              THE COURT:  Sustained.

6    Q.   As part of the materials you reviewed in this case,

7    Dr. Slaby, did you also review the reports by Kaiser's expert

8    witness, Dr. Barkin?

9    A.   Yes, I did.

10   Q.   Can you provide a very brief description of what bipolar

11   disorders are.

12   A.   It's where people go from very high energy states, manic

13   and sometimes delusional states of grandiosity and

14   irritability, to low, depressed, retarded states; and then

15   about 53 percent of the time they have a normal mood, or what

16   is sometimes referred to as euthymia.

17   Q.   So if I understand correctly, Doctor, there is an elevated

18   mood state called mania or manic state?

19   A.   Yes.

20   Q.   A stable mood state, sometimes called euthymia, and then a

21   depressed mood state as well?

22   A.   Yes.

23   Q.   And does that cycle and repeat over and over in bipolar

24   patients?

25   A.   Yes, in some people very rapidly and in some people much

1   less frequently with various duration.

2   Q.   Is there only one form of bipolar disorder?  Is that one

3   thing?

4   A.   No.  There's many different forms.  There's a considerable

5   overlap with different other diagnostic states.

6   Q.   Do different patients with -- in fact it should be called

7   bipolar "disorders" plural, shouldn't it?

8   A.   Yes.

9   Q.   And would those include Bipolar I disorder, Bipolar II

10  disorders, cyclothymic disorder, and more?

11  A.   Yes.

12  Q.   And do different bipolar patients have different symptoms

13  and clinical presentations?

14  A.   Yes, they do.

15  Q.   Are there FDA-approved medications to treat all of the

16  types and clinical presentations that make up bipolar

17  disorders?

18  A.   No.  They have very specific indications for various

19  subtypes.

20         THE COURT:  And are those in the widely accepted

21  subtypes?

22         THE WITNESS:  Pardon me?

23         THE COURT:  Are those generally accepted in the

24  psychiatric field, these subtypes?

25         THE WITNESS:  Yes.  Bipolar I, Bipolar II, and

1   cyclothymic.  Sometimes people will throw in borderline

2   personality, but that is not as widely accepted.

3   Q.   Dr. Slaby, in response to Judge Saris' question, let me

4   show you the Diagnostic and Statistical Manual for Mental

5   Disorders and ask you to look at Page 382.  First, this is the

6   basic diagnostic manual used by psychiatrists in this country,

7   correct?

8   A.   Yes.

9   Q.   Generally accepted?

10  A.   Yes.

11  Q.   And widely used, correct?

12  A.   Yes.

13          THE COURT:  Which edition is this?

14          MR. HOOPER:  This is the 4th edition, your Honor, and

15  it's the currently in effect edition.  There's a new one coming

16  out in a couple of years.

17          THE COURT:  I've been hearing about it on NPR.  That's

18  why I was asking.

19  Q.   This is the famous DSM.  And, doctor, does this list among

20  the bipolar disorders Bipolar I disorder?

21  A.   Yes.

22  Q.   And then it goes on to have a separate and distinct

23  chapter on Bipolar II disorder?

24  A.   Yes.

25  Q.   And then it has a separate and distinct chapter, still

1    within the bipolar disorder section, on cyclothymic disorder?

2    A.    Yes.

3    Q.    All of those are different types?

4    A.    Yes.

5    Q.    And then there's also yet a fourth category called

6    "bipolar disorders not otherwise specified"?

7    A.    Yes.

8    Q.    Okay.  And are bipolar disorders part of what are called

9    the "mood disorders"?

10   A.    Yes.

11   Q.    And are bipolar disorders the same thing as or separate

12   from depressive disorders?

13   A.    They're separate from depressive disorders.

14   Q.    Two separate --

15   A.    There's major depression, yes.

16   Q.    Doctor, first, you treat a lot of bipolar patients,

17   correct?

18   A.    Yes.

19   Q.    You have for your entire career?

20   A.    Yes.

21   Q.    Do bipolar patients in your clinical experience typically

22   get full relief of their symptoms from one medication?

23   A.    They typically do not.

24   Q.    Can you explain what the term "treatment refractory"

25   means?

1  A.   Treatment refractory means that they are very unlikely

2  to -- well, that they have not responded to a particular drug,

3  and in many cases more than one drug, and it's very hard to get

4  them to respond to any drug.

5  Q.   Do patients with one of the different bipolar disorders

6  also suffer from other psychiatric conditions?

7  A.   Yes, they do.

8  Q.   Is that common?

9  A.   Yes.

10  Q.   What are some of the other conditions that are recognized

11  in the manual, for example, as comorbid features of bipolar

12  disorder?

13  A.   Anxiety disorders, individuals who have substance abuse,

14  more than 50 percent, and people have such illnesses such as

15  attention deficit hyperactivity disorder.

16  Q.   Doctor, what kinds of problems are you using Neurontin to

17  treat in your own clinical practice?

18  A.   I use it for pain, which is already mentioned, as well as

19  I use it as an adjunctive therapy or a third-line treatment for

20  bipolar illness; and I also use it for some anxiety disorders,

21  especially if a person is addicted to or has liver disease and

22  cannot handle other pharmacological agents through their liver.

23  Q.   Does "adjunctive" mean using a drug in combination with

24  another drug?

25  A.   Yes.

56911cdc-45d4-450f-a2bd-8ee3ff13fe4d

1  Q.   How many patients with bipolar disorders are you using

2  Neurontin to treat?

3  A.   About thirty to forty.

4  Q.   Is that number fairly consistent with the number of

5  bipolar patients that you've treated with Neurontin over, say,

6  the past decade?

7  A.   Yes, it is.

8  Q.   Are most of your patients with bipolar disorder who are

9  being treated with Neurontin also being treated with other

10  psychiatric medications as well?

11  A.   Yes, they are.

12  Q.   And does that tend to be a different treatment regimen for

13  each individual patient?

14  A.   Yes, it is.

15  Q.   In addition to the patients for whom you've prescribed

16  Neurontin, do you also have some patients who come to you, a

17  psychiatrist, having already been prescribed Neurontin by other

18  doctors for other conditions?

19  A.   Yes, I have.

20  Q.   What are they typically taking Neurontin for?

21  A.   Well, classically people who have been given it because of

22  pain conditions, but in addition, when people have such

23  diseases such as hepatitis C or cirrhosis of the liver, and the

24  doctor who had been seeing them in another state or elsewhere

25  in the city have given them Neurontin as a mood stabilizer

1    because they could not tolerate the drug being metabolized by

2    the liver.

3    Q.   Let's turn to some of the DBRCT studies, positive and

4    negative, that you cited in your report and go through those.

5    Doctor, you cited a study by Dr. Frye and colleagues, right?

6    A.   Yes.

7    Q.   And Dr. Frye was a researcher from the National Institutes

8    of Mental Health; is that right?

9    A.   Yes, he was.

10   Q.   Was this a DBRCT?

11   A.   Yes, it was.

12   Q.   And what type of patients were included in this study?

13   A.   This was refractory mood disorders, which is the group

14   which is hardest to treat and the least likely to respond to

15   new intervention.

16   Q.   And what were the results, positive or negative?

17   A.   They were negative.

18   Q.   You also cited, Dr. Slaby, a study published by Dr. Pande

19   in 2000 in bipolar disorder, correct?

20   A.   Yes.

21   Q.   Was this also a DBRCT?

22   A.   Yes, it was.

23   Q.   And what type of patients were included in Dr. Pande's

24   bipolar study?

25   A.   Again, it was a group of patients who were refractory to

56911cdc-45d4-450f-a2bd-8ee3ff13fe4d

1    other drugs, which were patients who were least likely to

2    respond to any drug, but it was seen if in fact there would be

3    some hope in giving them Neurontin.

4    Q.   Results, positive or negative?

5    A.   Negative.

6    Q.   And is there anything in common between the Frye and the

7    Pande studies that is of significance to you as a psychiatrist

8    and an epidemiologist?

9    A.   As an epidemiologist, studying refractory patients means

10   they're least likely to respond to anything because they're on

11   other drugs that were used more commonly that more people

12   responded to, sometimes that have evidence in double-blinded

13   placebo-controlled studies to impact, but they failed to

14   impact, and so one was looking for something else to try to get

15   them to be able to respond.

16   Q.   Were these patients who by definition did not respond to

17   lithium and valproate, the FDA-approved treatments for bipolar?

18   A.   Yes.

19   Q.   And they didn't respond to Neurontin either?

20   A.   Yes.

21   Q.   Four more to go.  Let's look at another study by Pande.

22   There are three Pande studies, correct?

23   A.   Yes.

24   Q.   You cited one published in 1999 in a condition called

25   "social phobia"?

1   A.   Yes.

2   Q.   Is that also a DBRCT?

3   A.   Yes, it was.

4   Q.   And is social phobia -- in the bipolar chapter in the DSM,

5   is social phobia --

6   A.   Yes, it is.  It's mentioned as one of the associated

7   features with it, together with bulimia nervosa, attention

8   deficit disorder which I mentioned, panic disorder, and

9   anorexia nervosa.

10   Q.   And does that mean that those go together in a psychiatric

11   patient's case?

12   A.   Yes, they do.

13   Q.   An associated disorder?

14   A.   Yes, they do.

15   Q.   When you're treating psychiatric patients and they have,

16   say, one of those and a primary diagnosis of bipolar, do you

17   think of that like you would think of somebody with a broken

18   ankle and a rash on their cheek, or do you consider those more

19   closely related?

20   A.   They're more closely related because if we do a Venn

21   diagram, when you look at the overlap of various symptom

22   states, you see that there's some common features that occur in

23   both disorders.

24          THE COURT:  So what is social phobia?  Like what?

25          THE WITNESS:  It's when people get anxious in a room

Page 102

1    like this in front of other people or when they go to a

2    party --

3            THE COURT:  It might be natural.

4            THE WITNESS:  Yes, yes, yes, that actually people feel

5    very, very anxious in many different situations which involve

6    other people.  Sometimes it can be one person, and therefore

7    they cannot date; or sometimes it can be many people, in which

8    they cannot speak or socialize and go to such things such as a

9    cocktail party, and sometimes even go to work.

10   Q.   Doctor, what were the results in the Pande social phobia

11   study?

12   A.   It was a positive study.  Neurontin was helpful.

13   Q.   Doctor, you also --

14           THE COURT:  Excuse me.  That was all people with

15   social phobias or people just with bipolar with social phobias?

16           THE WITNESS:  It was a social phobia study.

17           MR. GREENE:  Not bipolar.

18           THE COURT:  Is that right, not bipolar?

19           THE WITNESS:  Yes.

20   Q.   Doctor, you also cited the third Pande study in panic

21   disorder?

22   A.   Yes.

23   Q.   Was that a DBRCT?

24   A.   Yes, it was.

25   Q.   And that was again in panic disorder patients, right?

1    A.    Yes, it was.

2    Q.    And what were the results there?

3    A.    It was negative when you looked at the total population,

4    but when you look at the sickest populations, those who had the

5    more severe panic disorder, that subpopulation did respond to

6    Neurontin.

7    Q.    And this was something called a post hoc analysis.  As an

8    epidemiologist and psychiatrist, what do you make of the fact

9    that it was a post hoc analysis?  Is the result still

10   significant to you?

11   A.    Yes, the results are significant.  We try to find out what

12   is going to be most important in being able to help our

13   patients.

14         THE COURT:  So "post hoc" is Latin, so you study it

15   afterwards, not with the primary end point in mind but looking

16   to see if there's anything you can glean from it?

17         THE WITNESS:  Yes.  When you look at the data, you

18   actually from the beginning wish to be able to harvest out of

19   it what would be a specific subpopulation, if not the total

20   population, that you'd most be able to impact with

21   intervention, both to be able to save patients who would not

22   respond being exposed to something that they don't really need

23   or wouldn't respond to, and to be able to more rapidly bring

24   relief to the individuals that do suffer a particular symptom.

25         THE COURT:  Maybe you didn't understand.  A narrow

1   point:  When you say "post hoc analysis," you mean, after the

2   study is completed you, you go back to see what the drug may

3   have been helpful for?

4           THE WITNESS:  Well, you don't really do any analysis

5   during the actual study usually anyway.  It's just --

6           THE COURT:  Why did you use the word "post hoc"?

7           THE WITNESS:  Well, actually it's not a word I tend to

8   actually use.  To me, I would say I was looking at a

9   subpopulation that would best respond to it.  It's done after

10  the study.

11          THE COURT:  Afterwards, right?

12          THE WITNESS:  Yes, after the study.

13          THE COURT:  Afterwards, but it doesn't necessarily

14  mean what you were testing for, but you look at it afterwards

15  to see what you can see?

16          THE WITNESS:  Well, I don't -- you are testing for

17  trying to identify a population or a subpopulation that does

18  respond to a drug, but none of the analysis is done during the

19  study.  Many times in a double-blind study, obviously neither

20  the person who gives the medication nor the individual patient

21  who's receiving it, and in some instances the rater, the one

22  who is actually rating scales, is aware of who is getting

23  active drug or placebo.

24          THE COURT:  I need to -- do you have a question?  No,

25  all right.  We'll take our morning break because I need to do

Page 105

1    something right at 11:00.  See you at 11:30.

2              THE CLERK:  All rise for the jury.

3              (Jury excused.)

4              THE COURT:  So I am going to have to tell the jury at

5    1:00 o'clock.  Given how it took longer than expected with

6    Dr. Bird, how long do you think you'll be, Mr. Hooper?

7              MR. HOOPER:  About another fifteen to twenty minutes,

8    your Honor.  It should be under that.

9              THE COURT:  And what do you all think you're going to

10   be?

11             MR. GREENE:  I still say about a half an hour.

12             THE COURT:  Okay, so let's say it's 12:20.

13             MR. GREENE:  It could be a little less, it could be

14   alleges more.

15             THE COURT:  Sure, just ballpark.  So the next witness

16   is whom?

17             MR. CHEFFO:  Well, it's going to be probably

18   Dr. Keeley unless -- it depends if we can get him on and off

19   today.  Otherwise we may show the videos, but I think it's

20   going to be Dr. Keeley today.

21             THE COURT:  I'm just not sure we'll finish him.  I'm

22   still just sort of up in the air.  I think I'm going to be

23   tentative with this jury and say, "There's a chance we might

24   need you in the afternoon, there's a chance we won't, but

25   definitely Tuesday."  Does that sound realistic?

1          MR. SOBOL:  That sounds realistic.

2          THE COURT:  All right, okay, thank you.

3          (A recess was taken, 10:59 a.m.)

4          (Resumed, 11:40 a.m.)

5          (Jury entered the courtroom.)

6          THE COURT:  Okay.

7    BY MR. HOOPER:

8    Q.   Dr. Slaby, before we left for the break we talked about

9    the Pande social phobia and the Pande panic disorder studies.

10   Do you recall that?

11   A.   Yes.

12   Q.   Now, taking the two Pande studies in social phobia and

13   panic disorder together, as a psychiatrist, an epidemiologist,

14   what significance do you put on those two studies in relation

15   to treatment of bipolar disorder patients with Neurontin?

16   A.   They'd be very good for, as indicated in the algorithms of

17   treatment as an intervention in individuals who have bipolar

18   illness who also suffer from anxiety --

19          THE COURT:  You know what, I'm actually having trouble

20   understanding you.  If you wouldn't mind saying that again.

21   A.   Is that taking them together, I think they would be very

22   important as demonstrating the algorithm that the American

23   Psychiatric Association's guidelines to be taken into

24   consideration on a second and third line for patients who have

25   bipolar illness who also have attendant anxiety disorders with

56911cdc-45d4-450f-a2bd-8ee3ff13fe4d

Page 107

1   them, anxiety with it, to bring about a greater remission.

2   Q.   Dr. Slaby, you also cited a study by Dr. Vieta published

3   in 2006?

4   A.   Yes.

5   Q.   Was this a DBRCT?

6   A.   Yes, it was.

7   Q.   This, according to the title, says it was a study, a

8   prophylaxis study for bipolar disorder.  Could you explain to

9   the jury what a prophylaxis study refers to?

10  A.   One is trying to actually avoid the future occurrence of

11  an episode of the illness, and so one gives agents to see

12  whether they can delay the onset or permanently prevent the

13  onset of a future episode.

14  Q.   Would it be useful in psychiatry to have a medication that

15  would prevent or delay the recurrence of these bipolar

16  ailments?

17  A.   Yes, it's the illness that's most associated with

18  suicide --

19  Q.   What were the results of the Vieta study?

20  A.   That in 12 months the Neurontin group actually did much

21  better than the placebo group in a statistically significant

22  level.

23       THE COURT:  It says "adjunctive," is that with

24  something else?

25       THE WITNESS:  Of all the different psychiatric

56911cdc-45d4-450f-a2bd-8ee3ff13fe4d

1   illness, bipolar illness has the highest suicide rate.  In

2   various cites it goes from 10 to 20 percent in those sponsored

3   National Institutes of Mental Healths studies it was one out of

4   five people who died of their own hand with bipolar illness.

5   It's the one that brings most intense suffering since the

6   majority of time when the person is symptomatic, which is 47

7   weeks out of 100 weeks, they are depressed in mixed states.  So

8   one tries to avoid the future episodes, not only to prevent the

9   pain that is attendant with the depression or the dysfunction

10  that occurs with the mania, but also to prevent death that by

11  suicide illness, since it is the illness that has the highest

12  suicide rate.

13          THE COURT:  I asked you a slightly different question.

14  When you say "adjunctive prophylactic," does that mean that it

15  is effective when taken with another medication

16  prophylactically?

17          THE WITNESS:  It can be used that way as well.

18          THE COURT:  No, no, tell me what the study said.

19          THE WITNESS:  I'm sorry, the study.

20          THE COURT:  I'm sorry, maybe you didn't see that thing

21  on the screen.

22          THE WITNESS:  "Adjunctive" meaning mixing with another

23  antidepressant -- I'm sorry, a mood stabilizer.

24          THE COURT:  Thank you.

25  BY MR. HOOPER:

Page 109

1   Q.   Again, you said the results of this study were positive,

2   Doctor?

3   A.   Yes.

4   Q.   And they were positive in terms of measuring the mania

5   scores or the hyperexcited phase of the illness; is that right?

6   A.   Yes.

7   Q.   Next slide.

8        Doctor, as you read the Vieta study, did you become

9   aware of an issue that I think was raised very early in the

10  trial about some exclusion of certain patients from the

11  efficacy analysis in -- reported in the Vieta study?

12  A.   Yes.

13  Q.   And did you have to look hard to find that?

14  A.   No, because it was included in the article.

15  Q.   Can you explain your understanding of what happened?  What

16  this issue is about?

17  A.   The issue was that the researcher wanted to study a group

18  of euthymic patients --

19       MR. GREENE:  Your Honor, objection, beyond the scope

20  of the report, this explanation of --

21       THE COURT:  Excuse me.  Was the Vieta study mentioned

22  in the report?

23       MR. GREENE:  It was --

24       THE COURT:  Excuse me.  Hold on.  Is the Vieta study

25  in the report ?

1        MR. GREENE:  Right, but not what the researcher said.

2   Beyond the article.

3        MR. HOOPER:  Absolutely.  This is the article, it's

4   what he stated in the report.

5        MR. GREENE:  Not beyond what's in the article, your

6   Honor.

7        THE COURT:  It looks like they're highlighting the

8   article.

9        MR. HOOPER:  Easily dealt with, your Honor.

10  BY MR. HOOPER:

11  Q.   Dr. Slaby, confining yourself what you learned from the

12  article itself that you cited in your report, can you say why

13  patients were excluded from the study?

14  A.   People who did meet the research criteria due to from

15  being euthymic at the beginning of the study.

16  Q.   When you say patients in this particular study were

17  supposed to be euthymic, does that mean they when they started

18  the study they were supposed to have a stable mood?

19  A.   They were supposed to have a stable mood to see if, in

20  fact, they were at 12 months able to avoid a future episode.

21  Q.   So we're talking about people who were between episodes of

22  mania and depression?

23  A.   Yes.

24  Q.   That's what you had to be at to get in this study,

25  correct?

1   A.    Yes.

2   Q.    And who was excluded from this study?

3   A.    People who were not at stable mood.

4   Q.    People who were never supposed to have been in the study

5   in the first place?

6   A.    Yes, after review should not have been in the study.

7         Like if you were including a group of young people and

8   you found out later, after the study was begun, that there was

9   supposed to be a study of 18 and below but some turned out to

10  be 23 or 24, they should be excluded, they were not the

11  intention-to-treat group.

12  Q.    I know you know this, I want to go slowly so the jury

13  understands this.  Are you saying this would be like studying a

14  medication for pediatric or adolescent use and finding out that

15  you had some young adults in there as well?

16  A.    Yes.

17  Q.    And so would the correct thing to do, again, based on

18  clinical trial principles in epidemiology, be to go ahead and

19  report a study that had patients that were never supposed to be

20  in in the first place, or should you correct it to make sure

21  that you had the population the study was designed to test?

22  A.    You should only have the population which you were

23  designed to test.

24  Q.    Do you have a criticism as an epidemiologist or

25  psychiatrist of the way Dr. Vieta and the peer-reviewers from

1    the journal handled this in this article?

2    A.   No.

3    Q.   Were there also similar kinds of adjustments for patients

4    who didn't meet criteria in the Frye study that you told us

5    about earlier?

6    A.   Yes, they eliminated some, including euthymic patients,

7    which is another example of eliminating somebody whose mood did

8    not fit its criteria.

9    Q.   This is not an uncommon thing in clinical trials?

10   A.   No, it is not.

11   Q.   The results in Vieta were, again, positive, correct?

12   A.   Yes, they were.

13   Q.   Doctor, you cite in your report a study by Dr. Mokhber and

14   colleagues, correct?

15   A.   Yes.

16   Q.   As published in 2008?

17   A.   Yes.

18   Q.   And the researchers there were from a medical school in

19   Iran and from the University of British Columbia in Canada?

20   A.   Yes, they were.

21   Q.   Is this study a DBRCT?

22   A.   Yes.

23   Q.   And the title says that this was a dysphoric mania.  Could

24   you please explain what dysphoric mania is?

25   A.   When you look at bipolar illness, the time when people are

1   the most likely to die by suicide is when they go from mania

2   into depression or depression into mania, and they're called

3   dysphoric states, mid states, or switch states.

4   Q.   And is dysphoric mania a particularly dangerous form of

5   bipolar disorder?

6   A.   It's the form where you have the highest suicide rate.

7   Q.   Was this study what is called active-controlled?

8   A.   Yes, it was.

9   Q.   And what does "active-controlled" mean?

10  A.   When you compare a drug to other active agents that are

11  shown to have an impact on the disorder.

12  Q.   One of the drugs in the study was gabapentin; is that

13  right?

14  A.   Yes.

15  Q.   The other was lamotrigine, correct?

16  A.   Yes.

17  Q.   And the other was carbamazepine, one of the Pfizer

18  alternatives, correct?

19  A.   Yes.

20  Q.   Both lamotrigine and carbamazepine are FDA approved for at

21  least one type of bipolar disorder, are they not?

22  A.   Yes, they are.

23  Q.   So gabapentin here is being compared to two drugs that

24  have an FDA approval for some form of bipolar disorder,

25  correct?

56911cdc-45d4-450f-a2bd-8ee3ff13fe4d

1   A.   Yes.

2   Q.   Can you explain -- the first chart shown here says

3   "depression subscale of MMP1-2 test."  Is that looking at

4   depressive phase of the illness?

5   A.   Yes, it is.

6   Q.   And what's an MMPI scale?

7   A.   MMPI is the Minnesota Multiphasic Personality Inventory,

8   which is a test that's been used in many different cultures

9   around the world and it has a subscale that deals with

10  depression and that deals with mania, in addition to some other

11  subscales; and it's frequently used by researchers,

12  particularly if there are psychologists involved in the study.

13  Q.   Appropriate scale for this study in Iran?

14  A.   Yes.  It's been studied in all cultures.

15  Q.   By the way, bipolar disorder exists all around the globe,

16  doesn't it?

17  A.   Yes.

18  Q.   It exists in Aboriginal peoples and in Russians and in

19  Africa and in Canada, right?

20  A.   Yes.

21  Q.   And everywhere in between?

22  A.   Yes.

23          THE COURT:  On both poles, right?

24          MR. HOOPER:  And both poles, it's a bipolar disorder.

25  BY MR. HOOPER:

1    Q.   Dr. Slaby, you can take that back to NYU; I know you're

2    going to.

3         There are bars here for carbamazepine, for

4    lamotrigine, and gabapentin.  Can you explain what the baseline

5    to endpoint bars mean?

6    A.   One is looking at the beginning of the study and then to

7    see what impact, in fact, these various drugs had actually on

8    dysphoric mania.

9         Interestingly enough, when you compared the two, they

10   were equally effective in mania, but, actually, fascinating in

11   this particular study, the one that was most effective for

12   depression was gabapentin.

13   Q.   This is the mania score down here, correct?

14   A.   Yes.

15   Q.   And this is the depression score?

16   A.   Yes.

17   Q.   And is the important thing within the drug for the drug,

18   it's the difference in the patient's depressional mania from

19   the baseline, or start, to the end of the study?

20   A.   Yes.

21   Q.   And then is there significance to the difference --

22   comparing this difference -- if I can make it neatly -- between

23   the bars for each drug?

24   A.   Yes.  It shows what happens at the beginning and at the

25   end of the study.

1   Q.   And is there significance to the fact that the difference

2   is greater for the gabapentin group than for the two proven FDA

3   treatments?

4   A.   Yes.  What's remarkable here is the drug with the least

5   side effects, actually, was the most effective in this

6   particular study.

7   Q.   And it looks like on mania, though they still have these

8   differences from baseline to endpoint, but that they look --

9   well, is there comparable effect there across all three

10  treatments, gabapentin and the two approved drugs?

11  A.   Somewhat comparable across all three treatments.

12  Q.   Okay.  Doctor, let me ask you, given that this is an

13  active-controlled DBRCT, are there particular reasons why in

14  dysphoric mania it would be important to use a proven

15  comparator, like carbamazepine, the FDA approved Pfizer

16  alternative, versus an inactive or inert sugar pill?

17  A.   Yes.  From an ethical standpoint when you are actually

18  treating somebody and doing research on them you could never

19  use the group in which a drug would show if it were being study

20  experimentally the best effect and that would be on a virgin

21  group of severely psychiatrically ill patients.  If you gave it

22  to them in an illness such as bipolar, they could probably die

23  by suicide and certainly would suffer much pain.

24        So whenever you're studying an illness in which the

25  person is suffering and which there is no one drug that can

1   impact, what you actually do you is give a drug that is --

2   already works for any study the mild to moderate.  And so that

3   we hope to see the best effect is actually looking at a

4   severely ill patient.

5   Q.   I want to make sure the jury understands that, Doctor.

6        As an epidemiologist, in particular -- first, let me

7   ask you, relative to what kind of control -- when we test

8   cancer drugs in cancer patients, we don't use placebos, do we?

9   A.   No.

10  Q.   And -- because it would be unethical to give someone no

11  treatment, correct?

12  A.   Yes.

13  Q.   Is the same phenomenon going on here because of the

14  lethality of bipolar disorder?

15  A.   Yes, it is.

16  Q.   And as a psychiatrist and epidemiologist, do you consider

17  this a valid DBRCT supporting use of Neurontin in treatment of

18  bipolar disorder?  And I mean not anxiety, the depression and

19  the manic phase?

20  A.   Yes, I do.

21        THE COURT:  Do you know the length this trial

22  involved?

23        THE WITNESS:  It does -- was it -- do you remember the

24  weeks exactly?

25        MR. HOOPER:  Your Honor, this is already in evidence,

1    just so we get this completely accurate.  It's Exhibit 2004.

2         THE WITNESS:  Eight weeks.  That's what I thought it

3    was.  Eight weeks.  Two months.

4    BY MR. HOOPER:

5    Q.   And Vieta, the prevention trial that we looked at just

6    before, was a 12-month --

7    A.   Yes, it was a 12-month period.

8    Q.   Dr. Slaby, based on your professional training, education,

9    and experience in psychiatry and epidemiology and on the

10   studies that you just told us about, including the DBRCTs, do

11   you have an opinion to a reasonable degree of scientific

12   certainty whether Neurontin is an effective medication for some

13   patients with bipolar disorder?

14   A.   Yes.

15   Q.   And is that opinion just about the comorbid anxiety or is

16   it about the bipolar illness itself as well?

17   A.   Yes, it is for both bipolar and anxiety component.

18   Q.   So --

19        THE COURT:  No, no, can you just clarify.  When you

20   said it is for both, based on any double-blinded, randomly

21   controlled test do you find it's effective as a monotherapy for

22   bipolar?

23        THE WITNESS:  Well, you could -- I don't think there's

24   ever been a double-blind as a monotherapy for bipolar.

25        THE COURT:  So what you're saying -- I just want to

1    understand it -- is you have found it effective when bipolar is

2    with some other mood disorder.  Is that what you're saying when

3    you said "both"?

4            THE WITNESS:  No, what I meant is that I've seen it as

5    an effective treatment for anxiety, social anxiety, for

6    instance, all alone with nothing else.

7            THE COURT:  Yes.

8            THE WITNESS:  But I've also seen it as effective with

9    bipolar disorder which has a presenting symptom or a symptom

10   together with it, anxiety.

11           THE COURT:  Okay.  I just wanted to make sure I

12   understand that.

13   BY MR. HOOPER:

14   Q.   And, Doctor, in a patient that didn't have anxiety, would

15   you also find it effective as an adjunctive agent for bipolar

16   symptoms, for example, like we just saw in the Mokhber study?

17   A.    Yes, particularly when they have a drug with

18   contraindications medically, taking other drugs, such as people

19   with hepatitis C or cirrhosis of the liver or individuals who

20   have other drug interactions and should not -- or do not want

21   the other drugs because of the side effects, which is a large

22   group.

23   Q.   In your clinical experience are there some patients who do

24   not want to take lithium or Depakote because of the side

25   effects or the risks associated with those medications?

Page 120

1  A.   Many do not want to take lithium, Depakote, lamotrigine

2  because of a fear of what is called a necrotizing dermatitis,

3  skin breaking down, and albeit a rare symptom or a rare illness

4  with it, it can also be, like with all valproic acid, weight

5  gain, and just like with lithium and with Depakote, need weekly

6  monitoring.

7        Lithium, though, has lots of side effects:  Thyroid

8  problems, kidney problems, hair falling out, acne, weight gain,

9  gastric irritability.

10        THE COURT:  What did you just say there?

11        THE WITNESS:  Lithium.

12        THE COURT:  What was that last -- maybe I don't want

13  to know.

14        THE WITNESS:  Lithium, the reason a lot of patients

15  don't like it, it only works for about 15 percent of the

16  patients, half of them ultimately will relapse on it.  One of

17  the problems with it are many people --

18        THE COURT:  I just didn't hear what you said,

19  gastric --

20        THE WITNESS:  Gastric irritability, they take it, they

21  have irritable bowel -- irritation in their stomach, rather,

22  and/or they have diarrhea.

23  BY MR. HOOPER:

24  Q.   Doctor, do you have an opinion on the safety of gabapentin

25  relative to other medications as used in the treatment of

56911cdc-45d4-450f-a2bd-8ee3ff13fe4d

Page 121

1    bipolar disorder?

2    A.    It's the safest of those four drugs.

3    Q.    And do you hold each of those opinions to a reasonable

4    degree of scientific certainty?

5    A.    Yes.

6              MR. HOOPER:  Pass the witness.

7              MR. GREENE:  May I proceed, your Honor?

8                        CROSS-EXAMINATION

9    BY MR. GREENE:

10   Q.    Good morning, Doctor.

11   A.    Good morning.

12   Q.    We haven't met before, have we?

13   A.    No, we have not.  Not that I remember.

14   Q.    I assure you, we haven't met.

15              I just want to ask you a couple of questions, make

16   sure you understand -- you understand that Kaiser, the

17   plaintiff in this case, is not seeking damages for Neurontin

18   prescriptions that were written for social phobia.  Do you know

19   that?

20   A.    I don't know what specifically Kaiser is seeking damages

21   for.

22   Q.    You understand that Kaiser is not seeking monetary damages

23   for Neurontin prescriptions that were written for panic

24   disorder.  Do you understand that?

25              MR. HOOPER:  Objection, your Honor.

1          THE COURT:  Overruled.

2     A.   I don't know the specifics of what Kaiser is seeking on

3     damages here.

4     Q.   You weren't trying to suggest to the jury on direct

5     examination that social phobia was one of the diagnostic

6     criteria of bipolar disorder, were you?

7     A.   No, I was not.

8     Q.   We've had a lot of testimony over the last three weeks

9     from various experts from both sides here that the gold

10    standard of proof to establish whether a drug is effective is

11    the double-blind, randomized, placebo-controlled trial.  Do you

12    agree with that?

13    A.   Yes.

14    Q.   In fact, you put that in your report, didn't you?

15    A.   Yes, I did.

16    Q.   You specifically said in your report that placebo control

17    was required as part of the double-blind, randomized trial to

18    prove efficacy of a drug, correct?

19    A.   It's not required because you can have a double-blinded

20    study without a placebo, but it's --

21    Q.   You had it in your report, didn't you?

22    A.   I don't know if I used those exact words.  But it

23    certainly is frequently done that way.  It's not when you do a

24    randomized, double-blind study, for instance, with an active

25    comparator.

1    Q.   We'll get to active comparator.

2         I didn't hear any of those -- didn't read any of that

3    phrase, "active comparator," in your report, but we'll get to

4    Mokhber in a few minutes.

5         I'm just asking you, did you set out in your report

6    that double-blind, placebo-controlled trial was required to

7    prove efficacy?

8    A.   I said that it was the gold standard.

9    Q.   All right.  Now, you filed a report, litigation report,

10   dated December 8th; is that correct?

11   A.   Yes.

12   Q.   Do you have a binder in front of you, Doctor?  I think

13   you'll find it at 2.

14        Do you have it?

15   A.   Yes, I do.

16   Q.   Is that the only report you prepared in this case?

17   A.   That I know of.

18   Q.   Take a minute and look at it, Doctor.

19        (Pause.)

20   A.   Yes.

21   Q.   And it's dated December 12 on page 15?

22   A.   Yes, it is.

23   Q.   That's your signature, correct?

24   A.   Yes, that is.

25   Q.   Did you prepare any other report that was submitted to

56911cdc-45d4-450f-a2bd-8ee3ff13fe4d

Page 124

1   this Court aside from that one that you have before you?

2   A.   Not that I know of.

3            (Discussion off the record.)

4   Q.   Direct your attention to tab 1 in your binder, go to page

5   4, number 26.

6            Do you have that?

7            It reads, "Attached is Exhibit 24 is a true and

8   correct copy of the expert report of Dr. Andrew E. Slaby."

9   That's you, correct?

10  A.   Yes.  But this is in a different case, isn't it?

11  Q.   I asked you if you prepared any report.

12           Now, if you turn to the end of it -- turn to Exhibit

13  24.  That's your report, isn't it, Andrew E. Slaby expert

14  report?

15  A.   Exhibit 24?

16           MR. HOOPER:  Your Honor, can he clarify what case,

17  what litigation this is filed in?  This is deliberately

18  misleading the witness.

19           THE COURT:  Well, I strike that comment.

20           What report is it?

21  BY MR. GREENE:

22  Q.   This is your report that addresses Neurontin's use in

23  treating bipolar disorder.

24           THE COURT:  Is he looking at it now?  Is it in this

25  multidistrict litigation?

Page 125

1           MR. GREENE:  It is.

2           THE WITNESS:  I don't think it is.

3           MR. GREENE:  Turn to page 11.

4           THE COURT:  Wait a minute.  There are different

5     aspects of this case, as you've now heard.

6           What -- does it have as the cover page?

7           THE WITNESS:  It says, Declaration of Matthew B.

8     Moreland, and the document relates to all class actions

9     Neurontin marketing sales practices and products liability

10    manufacturing corporation, Louisiana Health Service --

11          THE COURT:  All right.  So that's this case.

12          MR. GREENE:  I apologize, your Honor.  I have a binder

13    for you.

14          THE COURT:  I just didn't have it.

15          This is just huge, okay?  This is one piece of it, but

16    this is this case.  So --

17          THE WITNESS:  Sorry, I didn't know that this is this

18    case.

19          THE COURT:  What?

20          THE WITNESS:  I didn't know this was this case that

21    was being held before you today, Judge.

22    BY MR. GREENE:

23    Q.   Go to the first page of your report which, again, is at

24    tab 1, Exhibit 24.

25          Tell me when you're on the first page of your report.

Page 126

1    A.    I am.

2    Q.    Okay.  That's your name, right, Andrew Slaby, expert

3    report?

4    A.    Yes, yes, expert report of Andrew Slaby.

5    Q.    And you addressed it to whom it may concern, correct?

6    A.    I'm sorry, Exhibit 24?

7          (Pause.)

8    Q.    Do you have it now, Doctor?

9    A.    Yes, I do, thank you.

10   Q.    And that's on your stationery?

11   A.    Yes, it is.

12   Q.    It's your report.  You see the date across the top of it,

13   that's the date it was filed in this court, 12/22/2006?

14   A.    Yes.

15   Q.    Do you see that?

16         And you addressed it to whom it may concern, correct?

17   A.    Yes.

18   Q.    And this report that you prepared -- you prepared this at

19   the request of Pfizer's lawyers, did you not?

20   A.    Pfizer's lawyers, yes, for Davis Polk.

21   Q.    And it's a 13-page report, right?

22   A.    Yes.

23   Q.    And it has a two-page reliance list, correct?

24         Just turn to the end of your report there.  You

25   prepared a two-page reliance list.  Do you see it?

Page 127

1    A.    Yes.

2    Q.    And the reliance list contains the medical literature; is

3    that right?

4    A.    Yes.

5    Q.    And there's 39 numbered items, correct?

6    A.    Yes.

7    Q.    And they're all medical articles, correct?  There's no

8    internal documents that Pfizer provided for you, to you, or

9    Warner-Lambert provided to you listed in that reliance list,

10   correct?

11   A.    Right.  I didn't include any of them.

12   Q.    You say you didn't include any of them.  Did you have them

13   and you just didn't include them, or were they not given to

14   you?

15   A.    I've reviewed a lot of different documents for this.  I

16   don't remember what I reviewed and haven't reviewed, but some

17   were internal documents.

18   Q.    What I would like to do is direct your attention to the

19   time frame that you prepared this report.  You didn't date it,

20   but you can see the date it was filed with this Court, December

21   22, 2006.  It's right across the top of your report.  Do you

22   see that date?  You see where I'm talking about, right at the

23   top, it says PBS --

24   A.    Okay.

25   Q.    Those are her Honor's initials.  That's the way documents

1    get stamped when they're filed with the court.  Okay.  So you

2    see the date 12/22?

3    A.    Yes, I do.

4    Q.    So you prepared it before that date, correct?

5    A.    Yes.

6    Q.    And you have a reliance list there, and you listed 39

7    journal articles, correct?

8    A.    Yes.

9    Q.    And you didn't identify or list any internal Pfizer

10   documents, did you?

11   A.    Not that I can see offhand.

12   Q.    So what I'm asking you, tell the jury what documents,

13   internal documents, Pfizer provided to you for you to review

14   when you were preparing that report?

15   A.    I actually don't remember all the different documents.

16   Q.    Well, you're required to list your reliance documents, and

17   you don't have any on this list, do you, Doctor?

18   A.    No, I don't.  But I didn't use them for this report.

19   Q.    Let's look at the report for a minute.  Page 11.  That's

20   where you address the adjunctive use of gabapentin, you say

21   Neurontin, for bipolar disorder, right?

22   A.    Yes.

23   Q.    And that goes on -- that's double-spaced and it goes on to

24   page 12, right?

25   A.    Yes.

1   Q.   So I'd call that -- I'll call it two pages; is that fair?

2   A.   Yes.

3   Q.   It includes the conclusion, right?

4   A.   Yes.

5   Q.   Now, let's talk about the -- come back to the report in a

6   minute, but for the jury's benefit, let's talk about the

7   double-blind, randomized, control trials, studies that

8   Neurontin used for the condition bipolar disorder and see if we

9   can agree what trials are out there.

10          There was Pande, right?  That's Pfizer's trial,

11  correct?

12  A.   Yes.

13  Q.   That was negative, correct?

14  A.   Yes.

15  Q.   Frye was out there.  That was negative, correct?

16  A.   Yes.

17  Q.   Guille study was out there.  That was negative, correct?

18  A.   Yes.

19  Q.   These were all double-blind, randomized, controlled

20  trials, correct?

21  A.   Yes.

22  Q.   And Vieta was out there, correct?

23  A.   Yes.

24  Q.   Double-blind, randomized, controlled trial.  You told the

25  jury on direct that Vieta is a positive trial, right?

56911cdc-45d4-450f-a2bd-8ee3ff13fe4d

Page 130

1    A.    Yes.

2    Q.    So let's take that one out, we're going to come to it, but

3    we're talking about three double-blind, randomized, controlled

4    trials, they all establish Neurontin is ineffective for

5    treating bipolar disorder, correct?

6    A.    For treating one aspect of bipolar disorder, refractory,

7    the one that does not respond to other drugs.

8    Q.    Well, this --

9    A.    It does not say --

10   Q.    Doctor, please, there's no question pending before you.

11         THE COURT:  No, no.  If you don't agree with his

12   characterization, just say I don't agree with it.

13   A.    I don't agree with what you just said.

14   Q.    All right, fine.  I have a new question for you.

15         This report that we're looking at was being submitted

16   to the Court.  Point out in that report where Dr. Guille's

17   study, double-blind, randomized, controlled trial that shows

18   Neurontin is no better than placebo for the treatment of

19   bipolar disorder, show us where you discuss that in your

20   report.

21   A.    I didn't think --

22         MR. HOOPER:  Objection, compound question.

23         THE COURT:  No, I'll allow that.

24         Do you understand it?

25   A.    No, I didn't include it, I don't think.

1   Q.   Take your time, look at it, but I assure you it's not in

2   there if you want to look.

3        THE COURT:  So just -- so Guille is not in there.

4        THE WITNESS:  Guille was just, what I saw, was simply

5   a report of a lecture that was given at a clinical case -- at a

6   clinical meeting.  It was not in a journal article.

7   BY MR. GREENE:

8   Q.   Did you list it in your reliance materials?

9   A.   No, I did not, but it was not an article.  It was a report

10  of what went on at a meeting of a group of psychiatrists, I

11  assume.

12  Q.   Doctor, wasn't the Guille study a double-blind,

13  randomized, placebo-controlled trial conducted right here at

14  Massachusetts General Hospital?

15  A.   Well, that's what it says in that little review, but it

16  was not an article.

17  Q.   You didn't put it here?

18  A.   No.

19  Q.   Now, the Vieta study that we're going to get to in a few

20  moments, you gave it one line in your first report.  It's on

21  the bottom of page 11.  Let me read it to you.

22       "A study published in March of this year suggested

23  gabapentin used as an adjunct may be a useful prophylactic

24  agent for bipolar disorder.  Vieta 2006."  Right?

25  A.   Yes.

1    Q.    That was the explanation you gave?

2    A.    Yes.

3    Q.    If we look at your -- just, again, for the jury's benefit,

4    Vieta is a Pfizer study, correct?

5    A.    I think that was funded in part by Pfizer, yes.

6    Q.    Conducted by -- and written up in the journal article by a

7    Pfizer employee, among others, correct?

8    A.    Among others.  It was also University of British Columbia.

9    Q.    Now, you found the Vieta study when you did your medical

10   search, I guess, you came across the article that Pfizer wrote

11   up and published in the literature, right?

12   A.    Yes.

13   Q.    Did you ask Pfizer -- because it says right on that

14   article, doesn't it, that it's a Pfizer study, right on the

15   face of the article?

16   A.    Yes.

17   Q.    All right.  Did you ask, Pfizer, Hey, can I see the

18   research report?  Can I see your protocol?

19   A.    No, I didn't.

20   Q.    Did you ask the Pfizer lawyers, Can I see the research

21   report?  Can I see the protocol?

22   A.    No, but I -- I reviewed a whole series of documents that

23   included stuff like that.

24   Q.    So what you did is you relied upon the way the drug

25   company, the way Pfizer wrote it up and published it in the

1    medical literature, didn't you?

2    A.   No, I actually saw even the affidavit that Vieta gave on

3    it.

4    Q.   Did you expect that when Pfizer wrote up the study and it

5    got published in the journal article that you reviewed that

6    Pfizer would tell the truth about that study?

7    A.   Yes.  I think they did tell the truth.

8    Q.   We're going to come to it, Doctor.  We're going to come to

9    it.

10         Now, I want to move on to your second report, that's

11   at tab 2, if you want to find it, Doctor.

12         Let me know when you have it.

13   A.   Yes, I do.

14   Q.   Okay.  This is the one that is dated December 8, 2008.

15   This report is 15 pages, a little bit longer, and now it's

16   single spaced, correct, Doctor?

17   A.   Yes.

18   Q.   And again, if you turn to the last page of your study --

19   excuse me, your report, 15, if you turn it over, here are your

20   reliance materials, right?

21   A.   Yes.

22   Q.   And you have a list of the journal articles again, this

23   time they number 93 journal articles.  So you've added more,

24   right?

25   A.   Yes.

1    Q.   And then entry number 94 reads, "Documents identified in a

2    July 25, 2008 report of Jeffry S. Barkin at, quote, list of

3    documents reviewed, close quote."

4    A.   Yes.

5    Q.   Those are the only things you list on your reliance

6    materials, correct?

7    A.   Yes.

8    Q.   Now, the jury has heard from a plaintiff expert,

9    Dr. Jeffry Barkin, and we provided him with a lot of internal

10   Pfizer documents.

11   A.   Mm-hmm.

12   Q.   So when you wrote there you looked at the documents on

13   Barkin's reliance list, that's what you were referring to at

14   entry 94, right?

15   A.   And when I went -- the preparation of this particular

16   report.

17   Q.   Now, when you read Dr. Barkin's report, you read that he

18   pointed -- he had read your first report and he was critical of

19   it, correct?

20   A.   Yes.

21   Q.   And he pointed out that Guille was a double-blind,

22   randomized, controlled trial right up here at Mass. General and

23   you hadn't even cited it in your report, correct?

24   A.   Yes.

25   Q.   And he pointed out that the Vieta -- your observations

56911cdc-45d4-450f-a2bd-8ee3ff13fe4d

1    about Vieta, which was one sentence in your first report,

2    didn't reference at all Pfizer's internal research report,

3    correct?

4    A.   I didn't mention anything like that in my report.

5    Q.   No, no, maybe I've confused you with my question.

6         This is Dr. Barkin's report.  This is what you

7    reviewed, and then you prepared the second report, correct?

8    A.   Yes.

9    Q.   This report pointed out you hadn't even cited Guille,

10   right?

11   A.   Yes.

12   Q.   And this report criticized you for looking at the Pfizer

13   written up publication of Vieta and not looking at the research

14   report, correct?

15   A.   Yes.

16   Q.   All right.  So now you got a second bite at the apple,

17   right?  You're going to do a new report and you write it up --

18        MR. HOOPER:  Objection.

19   Q.   -- and you still don't mention Guille, do you?

20   A.   No, I did not consider --

21   Q.   I'm just asking you, yes or no, did you mention Guille?

22   A.   No, I did not.

23   Q.   And Dr. Barkin has pointed out to you the Vieta research

24   report, and it was in his reliance materials, so I presume you

25   looked at it.

Page 136

1    A.    Yes, I did look at it.

2    Q.    And you still didn't mention what the actual scientific

3    research report pointed out in your second report, did you?

4    A.    All I saw was a summary that was presented at a clinical

5    case conference.  I never saw an article by Guille.

6    Q.    No, I'm talking about Vieta.

7    A.    I'm sorry.

8    Q.    If I misspoke, I apologize.

9          Let me back up.

10         Dr. Barkin pointed out to you that he -- in his report

11   he pointed out that he had looked at Pfizer's internal Vieta

12   research report, didn't he?

13   A.    Yes.

14   Q.    And he pointed out in his report details what that says

15   what that research report says, right?

16   A.    Yes.

17   Q.    And the research report -- we're going to get to it in a

18   second -- shows it was negative, right?

19   A.    The research report --

20   Q.    Yes or no?

21   A.    I saw the affidavit that he wrote.  It said that he

22   didn't -- the group that he wanted to study --

23         MR. GREENE:  Objection, your Honor, move to strike,

24   nonresponsive.

25         THE COURT:  Yes, I strike it.

Page 137

1  BY MR. GREENE:

2  Q.   Let me try it again.

3        After you read Dr. Barkin's report did you ask the

4  Pfizer lawyers to see the Vieta research report?

5  A.   No, but I've seen a lot of the different internal

6  documents of Pfizer.

7  Q.   Doctor, I'm talking about Pfizer's own internal research

8  report for the Vieta study.

9  A.   Well, I wouldn't remember, sir --

10  Q.   Did you ask Pfizer lawyers if you could see it?

11  A.   Sir, I may have reviewed it but not remember whether I

12  reviewed it.  A reviewed a lot of materials at various stages.

13  Q.   Let's take your answer, you might have reviewed it.

14        Can you tell us when you did your December 8th report,

15  did you write into in that report about the Vieta research

16  report?

17  A.   I wrote about the article that dealt with the group that

18  he wanted to study.  He said it was --

19  Q.   Let me try the question again.  Listen to my question.

20        In your December 8th report did you write anything

21  about the Pfizer Vieta research report, not the article, the

22  internal research report?

23  A.   I did not write a particular dissertation on Dr. Vieta's

24  report.

25  Q.   I'm not asking you about a dissertation.  I'm asking you

Page 138

1    did you even cite the Vieta research report in the December 8th

2    report that you prepared for us?

3    A.   No, I stated the article in which he says very clearly

4    that he eliminated some -- I don't see how it differs from the

5    other.  I'm getting confused here because he said -- he says

6    that, in fact, that people were eliminated from the study

7    because the intent-to-treat group was a group of euthymic

8    patients.  That is a normal thing to do in research.

9         I don't really understand where you're going with

10   this, sir, because he didn't do anything dishonest.  He says it

11   in his paper that he eliminated it.  There would be no reason

12   for me to go back and say he also -- it was elicited earlier,

13   and he told the reason why he eliminated it and subsequently

14   he's presented an affidavit that the intent-to-treat group was

15   a group of euthymic patients.

16        MR. GREENE:  Objection.  Move to strike your Honor, as

17   nonresponsive.

18        THE COURT:  Just waited too long.  Denied.

19   BY MR. GREENE:

20   Q.   Just answer this question yes or no if you can, Doctor.

21        There's no reference to Pfizer's internal Vieta

22   research report in your December 8th report, is there?

23   A.   I saw no need to do so.

24   Q.   Let's take a look at the Vieta Pfizer research report,

25   Exhibit 398.

Page 139

1      MR. GREENE:  It's in evidence, your Honor.  Exhibit

2   398.

3   Q.   Now, I didn't see this on the reliance list for either

4   report, but if you just look at it for a moment -- and it's in

5   your binder, Doctor, if you want to see a hard copy of it, it's

6   at 398.  Do you see that?

7   A.   Yes.

8   Q.   Do you have it in front of you?

9        That's Pfizer's internal research report for the

10  Pfizer study?

11  A.   Mm-hmm.

12  Q.   Let me drop down to study centers.

13       MR. GREENE:  If we could highlight that.

14  Q.   It says there were 14 centers in Spain, correct?

15  A.   Yes.

16  Q.   And then we see the study initiation and completion dates

17  just below that, correct?

18  A.   Yes.

19  Q.   And if you look in the left-hand margin of that page,

20  you'll see the date of September 1, 2005.  Do you see that?

21  A.   Yes, I do.

22  Q.   Now, let's drop down to the number of patients planned and

23  analyzed.  Do you see that?

24  A.   Yes.

25  Q.   It says a total of 42 subjects were randomized.

Page 140

1          MR. GREENE:  Could we highlight that?

2    Q.   So we have 42 subjects in 14 different centers; is that

3    correct?

4    A.   Yes.

5    Q.   All right.  Let's turn to table 1.

6          MR. GREENE:  If we could highlight table 1, just the

7    header for it.

8    Q.   Now, I know the jury has heard that this before, but CGIS,

9    that's clinical global impression of severity, correct?

10   A.   Yes.

11   Q.   Change at month 12, and the jury has heard a lot about ITT

12   population, but that's intention-to-treat population, correct?

13   A.   Yes.

14   Q.   Dr. Gibbons testified for the defendants how important it

15   was to analyze the ITT population.  Were you here for his

16   testimony?

17   A.   No, I was not.

18   Q.   Okay.  And we have the total numbers there, gabapentin 20

19   and placebo 21.  That's 41 patients, correct?

20   A.   Yes.

21   Q.   And we see the P value there, 0.3952.  That's negative, is

22   it not?

23   A.   Yes.

24   Q.   And if we turn to the next page, at the top there we see

25   table 2.  Do you see that?

Page 141

1   A.    Yes.

2   Q.    Now, this is the PP population, right?

3   A.    Yes.

4   Q.    Twenty-five patients, correct, 13 --

5   A.    The group he originally intended to treat, I discussed

6   this earlier when I was being asked --

7              MR. GREENE:  Motion to strike.

8              THE COURT:  Sustained.  I strike it.

9              MR. GREENE:  Doctor, just wait --

10             THE COURT:  You know what, we'll never -- we're trying

11  to get you out of here today, so just yes or no, and then your

12  attorney has a chance to come back and ask a few more

13  questions.

14  BY MR. GREENE:

15  Q.    Doctor, the table we just showed the jury had the intent

16  to treat population of 41 patients.  We're now looking at a

17  table that shows the PP, per protocol, population of 25; isn't

18  that what that says?

19  A.    These are the ones he wanted to demonstrate the impact on.

20  Q.    Let's look at the conclusions, please.

21             MR. GREENE:  And I'd like you to highlight the third

22  sentence.

23  Q.    Follow me here, Doctor.  "The primary efficacy parameter,

24  clinical global impression of severity, did not show

25  statistically significant differences between gabapentin and

1    placebo when the intent-to-treat population was analyzed."

2    Isn't that what that said?

3    A.    That's what it says.

4    Q.    And that sentence was nowhere in your first report that

5    was submitted to this Court, was it?

6    A.    No.

7    Q.    And that sentence was nowhere in your second report that

8    was submitted to us, correct?

9    A.    No, I didn't find --

10   Q.    Dr. Barkin pointed out the research report in his report,

11   which you reviewed, correct?

12   A.    Yes.

13   Q.    This highlighted sentence that we just read to the jury,

14   this is Pfizer's conclusion, correct, in this research report?

15   A.    In this particular research report.

16   Q.    Okay.

17         Now, what you spent a great deal of time with -- on

18   your direct examination was the Vieta article, right?

19   A.    Yes.

20   Q.    I think we have that up on the screen.

21         I think if you turn to 1865 in your binder, Doctor,

22   you should have it right in front of you if you want a hard

23   copy.

24         Do you have that?

25   A.    Yes, I do.

56911cdc-45d4-450f-a2bd-8ee3ff13fe4d

1    Q.   Let's take a look at this.

2         This is what you spent some time discussing with the

3    jury when Mr. Hooper was asking you some questions on direct,

4    correct?

5    A.   Yes, it was.

6    Q.   If we just drop down on the right-hand corner, we see this

7    study was supported by Pfizer S.A., Madrid, Spain.

8         MR. GREENE:  Can we highlight that?

9    Q.   And then just below it says, "Dr. Vieta has served as a

10   consultant to" -- and it lists a number of drug companies,

11   right?

12   A.   Yes.

13   Q.   And if you follow it down, it will say, "and has served on

14   the speakers or advisory boards," again, a number of companies,

15   and then the last one is Pfizer, right?

16   A.   Yes.

17   Q.   And Katia Verger, I'm not sure if I'm pronouncing the name

18   correctly, that individual is an employee of Pfizer, right?

19   A.   I don't know.

20   Q.   Doesn't it say it right here?

21   A.   Dr. Katia Verger?

22   Q.   Yeah, doesn't it say it right there?

23        Just look on your screen, Doctor.

24   A.   Oh, yes.  Whatever you're showing on the screen it says

25   Dr. Verger is an employee of Pfizer S.A.

56911cdc-45d4-450f-a2bd-8ee3ff13fe4d

Page 144

1    Q.   Now, let's turn to the second page of this under "Method."

2         MR. GREENE:  If we could just highlight part of that

3    first sentence or the whole thing if we need it.

4    Q.   Beginning with 25 subjects, and if you drop down it

5    says -- the sentence ends with "were recruited," correct?

6    A.   Yes.

7    Q.   But when we looked at the research report we saw there

8    were 41 subjects, correct?

9    A.   Yes, but some of them didn't fit the research criteria

10   which Dr. Vieta said he wanted to study.

11        MR. GREENE:  Objection, motion to strike, your Honor.

12        THE COURT:  I strike it.

13   BY MR. GREENE:

14   Q.   On this same page, Doctor, if you drop down to the last

15   paragraph that begins with --

16        THE COURT:  I think you need to fold it or readjust it

17   on the screen.

18        MR. GREENE:  If we could highlight this, "All

19   statistical analyses were done by intention to treat and last

20   observation carried forward."

21   Q.   Right?

22   A.   Yes.

23   Q.   When we looked at the research report, we saw that the

24   intention-to-treat population had 41 patients in it, not the 25

25   that it talked about in this article, correct?

1    A.    We had not discovered yet which ones were euthymic or not.

2    Q.    I know that's your explanation in front of this jury.

3    That explanation wasn't given in either of your reports, was

4    it?

5    A.    I didn't find it necessary to do so.

6    Q.    Did you help prepare those slides that were presented to

7    the jury during your direct examination or was it just the

8    lawyers?

9    A.    Just the lawyers.

10         I looked over them, that's probably -- actually, I

11   did -- I saw them, and I could have told them what I thought

12   was correct or incorrect.

13   Q.    Okay.

14         Did you point out to the lawyers that the research

15   report wasn't mentioned?

16   A.    I didn't find it necessary to do so.

17   Q.    Okay.  All right.  So what we've covered is Pande was

18   negative, Frye was negative, Guille you didn't put in any

19   report but you've agreed is double-blind, randomized,

20   controlled trial that was negative, and we've just covered

21   Vieta, correct?

22   A.    Yes.

23   Q.    So the last one you claim is a double-blind, randomized,

24   placebo-controlled trial is the Mokhber --

25   A.    I didn't say it was placebo-controlled, it was

56911cdc-45d4-450f-a2bd-8ee3ff13fe4d

Page 146

1    active-controlled.

2    Q.   Okay.  So that's what we want to focus on, placebo versus

3    active control.

4              Now, this is the Mokhber study, correct?

5    A.   Yes.

6    Q.   And this is at 2004 in your binder -- excuse me.  Do I

7    have the number right?

8    A.   That's 2004.

9    Q.   This is what you're representing to this Court and this

10   jury as level one evidence, right?

11   A.   Yes.

12   Q.   And there was no placebo control in this trial, was there?

13   A.   No, but you wouldn't have a placebo control.

14   Q.   Can you just answer my question?

15             THE COURT:  He's right.  You have to answer his

16   question.

17             So are there placebo controls?

18   A.   No, there are no placebo controls here.

19   Q.   And you went to great lengths with Mr. Hooper to talk

20   about a comparator control, correct?

21   A.   Yes.

22   Q.   What you didn't point out to the jury is what the

23   ex-authors say about the limitations of this study.  And I

24   would like to direct your attention now to page 232 of the

25   study.

Page 147

1          MR. GREENE:  Could you highlight the sentence that

2     begins "Our study has several limitations."

3     Q.   Follow along with me, Doctor.

4          "Our study has several limitations and include lack of

5     a control group."  Correct?

6     A.   Yes, you --

7     Q.   Is that what it says, yes or no?

8     A.   Yes.

9     Q.   Now, you were making a point that one of the comparators,

10    carbamazepine, was used in this trial, correct?

11    A.   Yes.

12    Q.   We heard from the defendant's expert, Dr. Brenner, earlier

13    in the week that when he uses carbamazepine, it's extremely

14    important to draw blood to test the drug levels, correct?

15    A.   Well, carbamazepine, lithium, and valproic acid you must

16    monitor the blood levels of, correct.

17    Q.   And the authors of this study point out that that's

18    another limitation with regard to carbamazepine, and if you go

19    to the end of that same paragraph we were in, it says, "No

20    serum drug levels were obtained."  Right?

21    A.   It's still --

22    Q.   Drop down, you'll see the sentence, I think we've

23    highlighted it, "Finally, we could not monitor the blood levels

24    of the drugs due to local hospital limitations."  Correct?

25    A.   Yes.

1  Q.   And again, I think the jury knows it, but this study was

2  being conducted in Iran; is that right?

3  A.   Yes.

4  Q.   Now, I think I heard you say on direct examination that

5  patients with bipolar disorder, some of those patients have a

6  high rate of suicide?

7  A.   Yes.

8  Q.   Are you aware -- strike that.

9        You reviewed Dr. Barkin's report and his reliance

10 materials, which included Pfizer's marketing material, correct?

11 A.   Yes.

12 Q.   And you knew that from a review of those marketing

13 materials that the defendants were out there marketing

14 Neurontin for bipolar disorder through teleconferences,

15 correct?

16 A.   Yes.

17 Q.   And you knew that they wrote an article, the Dimond

18 article, Pande was an author of that, and they published it in

19 June of 1996 that claimed Neurontin was effective in treating

20 mood, correct?  You read that?

21 A.   Which article?  I'm sorry.

22 Q.   The Dimond article, Dimond and Pande.  It's in

23 Dr. Barkin's reliance material.  As you said you viewed it,

24 right?

25 A.   Yes, yes.

56911cdc-45d4-450f-a2bd-8ee3ff13fe4d

Page 149

1    Q.   And in that Dimond article they never disclose what the

2    FDA had found in the 1992 and 1993 statistical analysis, that

3    Neurontin increased the risk of depression with or without

4    suicidal ideation?

5    A.   I know of no evidence of that.  I've seen a lot of

6    articles on that.  When it comes to Neurontin on the whole --

7         MR. GREENE:  Objection, motion to strike.

8         THE COURT:  I strike it.

9    BY MR. GREENE:

10   Q.   Did you review the May 2008 FDA medical statistical review

11   for all the antiepileptic drugs?

12   A.   I may have.

13   Q.   Did you --

14   A.   In fact, I have.  In fact, I have.

15   Q.   You didn't mention that on your direct examination, did

16   you?

17   A.   No.

18   Q.   You didn't mention the FDA's conclusion which is set forth

19   in their report, Exhibit 401 in this -- Exhibit 401 in this

20   case --

21   A.   It doesn't say that --

22   Q.   Did you mention --

23   A.   It doesn't say it causes suicide.

24   Q.   Doctor --

25        THE COURT:  Excuse me, let him -- what do you think it

Page 150

1   says?

2          THE WITNESS:  The report says that one should be alert

3   because you're treating illnesses with these drugs --

4          THE COURT:  No, no, you need -- what is your

5   understanding as to what the FDA said in, what was it, 1992?

6          THE WITNESS:  It's a cautionary measure to make people

7   alert that it's possible.  Doesn't say that it proves it.

8   There's no evidence that these drugs cause suicide.  But we're

9   treating a group of illnesses in which people die by suicide if

10  the drug (sic.) did or did not respond to the drug, and they

11  frequently don't, and they also have increased suicidal

12  ideation if the drug doesn't work.  People in psychotherapy

13  without any drugs --

14         THE COURT:  No, excuse me.  Listen, listen, you've got

15  to listen to the question.  I just want what your understanding

16  as to what the FDA did in --

17         MR. GREENE:  I was asking about May 2008.

18         THE COURT:  May 2008.  Why don't you show it to him.

19         MR. HOOPER:  Your Honor, we object.  This is beyond

20  the scope --

21         THE COURT:  Overruled.

22  BY MR. GREENE:

23  Q.   Again, I'm referring to Exhibit 401, for the record, and

24  for the jury, and I'd like to direct your attention to -- let

25  me show you the cover.

1            This is the Statistical Review and Evaluation

2      Antiepileptic Drugs and Suicidality issued by our United States

3      Department of Health and Human Services, the Food and Drug

4      Administration.  Correct?  Is that what I'm showing you?

5      A.   Yes.

6      Q.   All right.  Dated May 23, 2008, correct?

7      A.   Yes.

8      Q.   Drug class, antiepileptic drugs, correct?

9      A.   Yes.

10     Q.   Eleven of them listed, correct?

11     A.   Yes.

12     Q.   And gabapentin, Neurontin, is one of them, correct?

13     A.   Yes.

14     Q.   And did the FDA write in the first sentence of their

15     conclusion -- I'd like to read it, but in fairness, you can

16     read along with me -- "In conclusion, antiepileptic drugs are

17     associated with increased risk of suicidality relative to

18     placebo in randomized, placebo-controlled trials, the effect

19     appears consistent among the group of 11 drugs."  Is that what

20     that -- I just read?

21     A.   It says associated, it doesn't say causes.  Correlation

22     does not mean causality.

23     Q.   Doctor, when a drug company markets a drug, do you expect

24     that they will tell the truth in their marketing detail pieces

25     that they hand out to physicians?

Page 152

1          MR. HOOPER:  Objection, outside the scope.

2          THE COURT:  Overruled.

3    A.   Around this, around any serious side effects they're very

4    sensitive to, in my experience, because of the fact --

5          MR. GREENE:  Objection.  Motion to strike.

6          THE COURT:  Sustained.  Just please listen to his

7    question.

8    BY MR. GREENE:

9    Q.   Answer this question yes or no, if you can, Doctor.

10         Would you expect Pfizer, when they're promoting

11   Neurontin for off-label uses, that they would tell the truth,

12   they would disclose all the positive and negative information

13   they have?

14   A.   I would assume that they would for anything in which there

15   would be a risk in which they would be liable for.

16         MR. GREENE:  That's all I have.

17         MR. HOOPER:  Dr. Slaby, I get to ask you a couple of

18   questions now.

19         (Discussion off the record.)

20         MR. HOOPER:  Can you bring up 2004, Austin, the

21   Mokhber study?

22         (Discussion off the record.)

23                         REDIRECT EXAMINATION

24   BY MR. HOOPER:

25   Q.   Doctor, I want to ask you a couple more questions about

Page 153

1    the Mokhber study.  This used an active comparator, correct?

2    A.    Yes.

3    Q.    In scientific parlance that is a control, correct?

4    A.    Yes, it is.

5          MR. HOOPER:  Let's turn to page 231, Austin, right

6    above table 4.  Right above that.  Blow up this upper right

7    paragraph that begins "To our knowledge," about the first half

8    of that paragraph right there.

9    Q.    This is a part that Mr. Greene didn't point out to you,

10   does the Mokhber study say, "To our knowledge, this is the

11   first study to systematically evaluate monotherapy use of the

12   drug by itself with carbamazepine, lamotrigine, and gabapentin

13   in patients with dysphoric mania"?

14   A.    Yes.

15   Q.    Carbamazepine and lamotrigine are FDA approved, effective,

16   and efficacious treatments for bipolar disorder, correct?

17   A.    Yes.

18   Q.    And then it goes on to say, "Indeed, this is one of the

19   first randomized, fixed-dose trials observing the three

20   anticonvulsants in an eight-week trial using validated clinical

21   instruments in Iran."  Correct?

22   A.    Yes.

23   Q.    And it goes on to say, "The study concluded that

24   monotherapy with gabapentin, lamotrigine, and carbamazepine was

25   effective treating mixed states."  Correct?

Page 154

1    A.   Yes.

2    Q.   And results were statistically significant, weren't they?

3    A.   Yes.

4         MR. HOOPER:  You can take that down, Austin.

5    Q.   I want to ask you a little bit about this business of the

6    intent to treat and the 42 versus the 12 and the 13 that was in

7    the publication.

8         There is something in clinical trials called a -- an

9    enrollment phase?

10   A.   Yes.

11   Q.   Where people come sign up?

12   A.   Yes.

13   Q.   And then there's a next phase called a screening phase?

14   A.   Yes.

15   Q.   Where people are tested to see if they should ever go to

16   the next phase, correct?

17   A.   Yes.

18   Q.   And then there's a next phase that's called randomization

19   where they're divided up randomly, correct?

20   A.   Yes.

21        THE COURT:  You're blocking as you're doing the

22   phases.

23        MR. HOOPER:  I'll back up and step again.

24        MR. GREENE:  Can we have non-leading for this

25   examination?

1        MR. HOOPER:  It's redirect.  I'm trying to go fast.

2        THE COURT:  I agree in general; it just doesn't matter

3   for this.

4   BY MR. HOOPER:

5   Q.   There is an intention-to-treat principle that

6   methodologically refers to analyzing patients that go past

7   randomization.

8        MR. GREENE:  Now I object.

9        THE COURT:  Fair enough.

10  BY MR. HOOPER:

11  Q.   What does "intent to treat" mean technically?

12  A.   Intent to treat means the group you want to demonstrate

13  the impact of a particular invention on.  And people who do not

14  fulfill that criteria, even though they may have -- for

15  instance, somebody may have been depressed at the beginning

16  when they were enrolled, and when they were given the first

17  test they are not depressed.  You don't include them in it

18  because if you gave a drug and somebody said these suddenly

19  these people are drug effected.  These people were depressed

20  when they enrolled but they were not depressed at the time the

21  study began.

22  Q.   In this case, in Dr. Vieta's study, was the principle of

23  intention to treat fulfilled?

24  A.   Yes.

25  Q.   You consider it a valid study?

Page 156

1    A.   Yes.

2              MR. HOOPER:  That's all.

3              MR. GREENE:  Just a couple quick questions, your

4    Honor.

5                        RECROSS-EXAMINATION

6    BY MR. GREENE:

7    Q.   Let me ask you if you agree with this statement -- this is

8    day 16 of trial testimony.

9              "Q.  You'd agree with me that the way you test a drug

10   to see if it's effective is you conduct a randomized,

11   controlled, double-blind study of the pharmaceutical agent

12   versus a sugar pill --" that's placebo, right?

13   A.   Yes, placebo.

14   Q.   -- "versus a sugar pill, to use your words; is that

15   correct?

16             "A.  That's right."

17             That was Dr. Rothschild, the defense expert's

18   testimony.  Do you agree with that?

19   A.   Yes.

20   Q.   You were just asked some questions about intent to treat,

21   and I want to read you some -- just a sentence from the trial

22   testimony of day 16, another defense expert, Dr. Gibbons, said,

23   "The intent-to-treat population, the population that's favored

24   by the USFDA, is the most comprehensive population to analyze.

25   It doesn't just involve people who the doctors felt had

1    received enough treatment to show a benefit or patients who had

2    made it to the end of the study.  Anybody who is randomized is

3    included in this analysis, and that's -- and why that's

4    important is it minimizes bias."

5           Do you agree with that statement?

6    A.   It is, but those people have to fulfill the criteria to be

7    in that original group.

8    Q.   You don't have any evidence, none, that Neurontin is more

9    effective than placebo as a treatment for bipolar disorder, do

10   you?

11   A.   We have the Vieta study.

12   Q.   The Vieta study.  And that's the article that excluded the

13   negative results from the population, the ITT population, that

14   Dr. Gibbons, the FDA, Dr. Dickersin, Dr. Barkin, and

15   Dr. Furberg said is the most important?

16   A.   They looked at the group that they said they wanted to

17   study, and that was the euthymic patient.  They eliminated

18   those who did not fit that criteria.

19           MR. GREENE:  Thank you, Doctor.

20           THE COURT:  Thank you.  You may step down.

21           Up to you.  Do you have a little deposition?

22           MR. CHEFFO:  We could finish Dr. McCarberg that we

23   started, remember we ended -- he was one of the Kaiser doctors.

24   I think we have probably less than ten minutes.

25           THE COURT:  Perfect.

1        MR. CHEFFO:  Can I just orient your Honor and the

2   jury?  He is Dr. McCarberg, he's a partnered position with a

3   Southern California Permanent Medical Group, he's board

4   certified in geriatrics and the American Board of Pain

5   Medicine.

6        THE COURT:  Who's asking questions at this point, does

7   anyone remember?  Where are we?

8        MR. CHEFFO:  I'm not sure I can tell you that right

9   now, your Honor.

10        THE COURT:  Austin knows all.

11        MR. CHEFFO:  Exactly, he does.  But I still don't know

12   who's asking the questions.  I'm not sure.

13        THE COURT:  I don't know it's so critical.

14        (Played videotape deposition of Dr. McCarberg.)

15        THE COURT:  All right.  At the risk of losing even six

16   minutes of valuable court time, I think you should go home now.

17   I don't think there's enough of a little snippet of a

18   deposition.

19        So let me tell you what we're going to do.  Monday

20   we're finishing the trial.  There will be another witness, at

21   least one, possibly two, I'm not sure yet, and there may be one

22   or two more depositions.

23        MR. CHEFFO:  That's fair, your Honor.

24        THE COURT:  I think we will finish the evidence

25   Monday.  I think both sides will close.  The current thought

1    process, therefore, the case will go to you on Tuesday.  So

2    Tuesday is the day you should block a full day.

3            My sense is -- and I'm going to have to talk with the

4    attorneys about it today and Monday -- is that the opening

5    (sic.) statements can largely take place in the morning.  We

6    provide lunch.  As you've now learned, there's no such thing as

7    a free lunch; you've worked for it.  In the afternoon we'll do

8    jury instructions, is my guess.  The way most juries are, at

9    that point, you're tired.

10           Let's say we finish jury instructions.  You may want

11   to start talking or you may want to go home.  So I'll leave

12   that up to you, but even if you start, given the size of this

13   case, it's highly unlikely you'll finish.  So my guess is

14   you've got to at least assume that you're going to be going a

15   full day on Wednesday and possibly Thursday.

16           So that's the schedule.  We'll provide lunch, we

17   provide snacks, et cetera.  In general, the day will go from

18   9:00 to 5:00 beginning on Tuesday.

19           So that's just -- there's always a chance, Murphy's

20   Law, some witness gets sick and it bumps up a day, but I

21   believe that's the best prognosis I have right now.

22           So 9:00 to 1:00 on Monday.  Rest of the week just

23   block off the afternoons.  Once we give it to you, it's

24   completely up to you as to how long it takes.  And, as I say, I

25   think I told you at the beginning of the trial, there are no

Page 160

1    alternates in civil trials, you're all going to be getting the

2    case.  And I hope you get a lot of rest this weekend.

3              See you then.

4              THE CLERK:  All rise for the jury.

5              (Jury left the courtroom.)

6              (Discussion off the record.)

7              THE COURT:  I will put this on the record.  My sense

8    is right now, and it's subject to hearing from counsel, but as

9    I've been saying now for over a week, I would like to send in

10   the trial transcripts, and I've asked counsel to put together

11   all deposition transcripts, which essentially were read or were

12   on videotape, to the jury, because you'd need the complete

13   thing.

14             The second thing is I would assume, unless you both

15   agree, that that means not putting in closing arguments.  I'd

16   be open to doing it if you thought it would summarize both of

17   your arguments in a way that would help organize things for the

18   jury, and I would strongly tell them it's not evidence.  I

19   leave that to you, but I will not put them in unless there's

20   agreement on that.

21             I would like a binder, I think would be helpful, of

22   all the journal articles, the bipolar articles, the articles

23   and studies.  When they look at bipolar, they're going to see

24   them all from both sides.

25             MR. HOOPER:  Can we do one in alphabetical order so

Page 161

1    there's no disputes?

2         THE COURT:  I think it would be easier to do it by

3    indication.  I'm happy to do it by alphabetical.

4         MR. HOOPER:  Just so we can do one.

5         THE COURT:  Just to make it easy to find.

6         Similarly, not to call it the enterprise, any

7    documents relating to Cline from both sides in one, and

8    anything relating to MAC in another.  Just to make it easier

9    for them to find.  That might be a little harder to organize

10   and more controversial, but just so they can get into it.

11        I was just thinking about this.  To address today,

12   one -- two of my big questions are whether or not as a matter

13   of law the statute of limitations with respect to off-label

14   ran, because there's so much evidence that Kaiser actually

15   understood it was -- they're the most hands on of these, they

16   knew they were off-label prescriptions, and therefore,

17   regardless of what happened with the undisclosing of the

18   complaint or whatever, as they were doing these monographs knew

19   that they were off-label.

20        However, I think -- so that's your question.

21        The question for you is, so that just bars things

22   going before whatever date it is, 2000 I think is what we

23   all -- but unlike fraud, every time there was a new off-label

24   prescription, why doesn't it trigger a new statute of

25   limitations?

Page 162

1              Those are my questions to both sides.

2              The next one is just the big one just to understand

3      the fraud, as I understand it, is a suppression case.  So with

4      respect to each indication, when was the first suppression?

5      Because I think you seek damages going back to --

6              MR. SOBOL:  '94, '95.

7              THE COURT:  But frequently the first suppression and

8      indication happens later.  So while it may be that there was

9      off-label marketing, because this is a fraud case, you know,

10     when was the first suppression?  That's sort of the -- so

11     just -- I'm going to ask that because at this point I at least

12     am going to need to make certain rulings that way.

13             And the thing would be enormously helpful, we can talk

14     about jury -- I haven't read any of your criticisms or

15     suggested alternatives on the jury charge, I think we should

16     wait until Monday to do that.  I don't think I have time.  But

17     what would be really useful if you think I'm dead wrong in how

18     I've approached the jury verdict form.  They're hard to do,

19     actually, if question two, then this.  They're very hard to do

20     that's clear to a jury and avoid duplicative, conflicting

21     agents.  If you think there's a much better way to do it, I

22     wouldn't mind hearing your thoughts for a few minutes this

23     afternoon so we can play with it for Monday.

24             I don't know if any of you have given me an

25     alternative -- you did early on but it was so early on --

Page 163

1          MR. CHEFFO:  We did another one just yesterday.

2          THE COURT:  You've given it already?

3          Have you?

4          MS. NUSSBAUM:  We have filed the 17200 instruction

5     about an hour ago, and the form by 5:00 today?

6          THE COURT:  Yeah, and then we can play with it.  I may

7     decide -- I'm -- I originally had written it differently.  It

8     is such a mess with respect to the California cause of auction

9     because there are so many prongs, and at first I did one

10    generic statute of limitations question, but I could easily see

11    them coming with different ones given the different --

12    depending on the prong.  So then I had to just tease it out

13    again.  But it's very difficult to write.  So any help you can

14    give me on that line is great.

15         I'll give you an hour today.  I'll make the Crennen

16    people wait for half an hour.  The issue is my big criminal

17    trial explodes on me, but I can't control that.  So I would at

18    least get here at 2:15.

19         MR. SOBOL:  There are a couple of things I wanted to

20    put on the record.

21         First, Kaiser is content to the extent that the Court

22    made some rulings on certain things regarding things going to

23    the jury.  Kaiser is content with everything you said with the

24    exception that we object to the jury getting the trial

25    transcripts.

56911cdc-45d4-450f-a2bd-8ee3ff13fe4d

Page 164

1            THE COURT:  Because?

2            MR. SOBOL:  Because I think it takes -- it unlevels

3    the playing field for jurors that are stronger and might be

4    able to -- are more facile in saying, Wait, look at this piece

5    of evidence, look at that piece of evidence in terms of

6    getting -- quoting back pieces of the transcript.  And I think

7    it gives, frankly, an advantage to some jurors who might be

8    able to do that in a way much better than a juror saying my

9    recollection is this and I think this X, Y, and Z.  That is not

10   usually the case.

11           I understand the Court is thinking, Well, but isn't it

12   better for people to have the transcript to be able to see and

13   to quote it and to recall?  But you have that pretty much in

14   every case, but now this case is a little different because

15   it's gone on for a month, but I think it's important that you

16   have to imagine even these particular jurors, I think we get

17   the sense that there are one or two or three jurors that

18   obviously are more active in terms of asking questions than

19   others.

20           THE COURT:  We got a new one today.

21           MR. SOBOL:  We did, she came through.  So I really

22   think that, in our view, on balance would give an unfair

23   advantage to some jurors, period.

24           THE COURT:  What do you want?

25           MR. HOOPER:  We feel strongly opposite, your Honor.

1   We are more inclined with your Honor's initial instincts.  I

2   mean, essentially -- I don't want to mischaracterize what he's

3   saying, having the actual facts and testimony would be a bad

4   thing because we'd rather rely on evidence.

5         We've heard a lot about let's give them three binders

6   of stuff where there's never been any testimony.  We think at

7   the very least if your Honor is inclined to give the binders,

8   certainly where there is no testimony, the accommodation would

9   be at least have them have the testimony from the case from

10  both sides.

11        THE COURT:  I think I'm leaning towards putting them

12  in, but if you found a case that told me it was a complete

13  abuse of discretion, I certainly don't want this case flipped

14  on appeal with it.

15        As a practical matter, as we've gone with realtime and

16  I've done it with other cases.  I let them take notes, so this

17  is just a more accurate note taking.  I'm inclined to do it,

18  but if you find a case for me that tells me it's reversible

19  error, I will be much more worried.

20        I just want to make sure that everything goes in,

21  because that could be reversible error.  So it's got to be the

22  deposition transcripts as well, not the openings and closings,

23  and I'm happy to take a -- I'm happy to take a consensus, I

24  send in oral arguments at the end if it's a way of outlining

25  both sides' case is helpful to them, but I will not do that

Page 166

1    unless both sides agree.

2         MR. SOBOL:  Before or after the closings?

3         THE COURT:  Well, you're all such talented lawyers,

4    I'm assuming they'll be phenomenal.

5         And the other question is, really, we have so many

6    chalks.  Do we want to send in each side's timelines?

7         I leave it up to you.  I've gone back to them, I've

8    found them useful.  Just think about whether both sides would

9    like to do a chalk on a timeline.  Respective -- no argument,

10   no nothing, what each side's view is on each indication of the

11   timeline.  And that's a possibility.  I actually have so much

12   to do this afternoon.

13        What do I owe you all?  The motion for judgment as a

14   matter of law.  I need to go through your objection to his

15   exhibits --

16        MR. SOBOL:  May I address that, too, because it ties

17   into something, your Honor, just so you're aware.

18        There were 21 new Kaiser exhibits submitted last

19   night, this morning, by the defendants.  Our position is what's

20   sauce for the goose is sauce for the gander.  When the

21   defendant's documents were -- when we were trying to put in

22   Pfizer documents, you always made it clear that if Pfizer

23   wanted to, it could bring somebody in to explain them to deal

24   with them.

25        Now, our position on these new Kaiser documents is, A,

1    they shouldn't be coming in because we did bring our witnesses

2    in to be able to explain them.  And that's a material

3    difference, number one.

4         The second problem is if you do rule that the 21

5    documents come in, then Kaiser should have an opportunity to be

6    able to bring one or two of its witnesses back to explain and

7    put that in context.

8         THE COURT:  Of course.  You did say you were bringing

9    your rebuttal people here.

10        MS. NUSSBAUM:  Well, we said we were contemplating it.

11   And if the exhibits come in, we would probably need to bring

12   two rebuttal witnesses in --

13        THE COURT:  So bring them.

14        MS. NUSSBAUM:  -- or, alternatively, if the exhibits

15   do not come in, I would not bring anybody in.

16        THE COURT:  It's your call.  I can't do anything with

17   it right now.  I have a full afternoon with you and two other

18   cases.  I can't do anything right now.  I can only say that

19   I'll look at whatever the memo is and go through them.

20        My inclination is that if -- there are four criteria:

21   They're on the exhibit list, they're relevant, they're

22   authentic, and they fall into some hearsay exception, then I'm

23   going to let them in because I did it for you all.  And so I

24   understand you think there's a distinction.  Under the doctrine

25   of completeness, I'm going to allow that to happen.

1        They can eat -- I don't even know, you can argue to

2   your heart's content the missing witness argument, for Pfizer,

3   and you can make that point, but it's still -- I need to have a

4   fair and evenhanded approach to documents.

5        MS. NUSSBAUM:  One more tiny point.

6        The exhibits that they've served, these 21 exhibits

7   were previously on their list for the witnesses who were here.

8   They just chose not to use them two weeks ago, and now they're

9   choosing to use them.  And it's really unfair.  These people

10  came all the way from California.  They could have used these

11  exhibits --

12       THE COURT:  Make the point, argue it.  You know -- in

13  any event, I will see you at 2:15.  We need to talk about

14  Monday.

15       MR. RONA:  One fining final point was the depositions.

16       THE COURT:  You were going to confer.  I'm not going

17  through this again until you confer.  There was too much

18  miscommunication last time, and it ended up being sort of

19  unfortunate.  So just confer, talk first among yourselves, and

20  then -- my basic ruling is that they can put on the deposition

21  transcripts to the extent that it is within the scope of the

22  direct.  But to the extent that that woman -- I haven't gone

23  back to check it -- only authenticated a document, you can't

24  then use that to shovel in a lot of stuff that is way beyond

25  it.  So maybe that just means one deposition, Pande, comes in,

1    and not the other.  I don't know.

2            MS. NUSSBAUM:  Just for the record, your Honor,

3    Exhibit 250, 355, and 352 --

4            THE COURT:  I should look at them.

5            MS. NUSSBAUM:  These are the only ones that came in as

6    partial exhibits.  The Court then started applying your

7    four-prong test, and everything was coming in for every

8    purpose.  So it was really those three, and I would like them

9    in.

10           THE COURT:  I admit them in, and if there's something

11   prejudicial or irrelevant, like lithium -- not lithium.

12           MS. NUSSBAUM:  Lyrica.

13           THE COURT:  No, Lyrica is relevant.  Lipitor.

14   Somebody gave an example of a completely different drug that

15   was completely irrelevant.  I'm happy to strike those from any

16   of these exhibits.  So if there's something that's completely

17   different, we don't want to get the juror going on some drug

18   the juror is on.

19           MS. NUSSBAUM:  Your Honor, there may be 25 exhibits

20   in, P&T committee minutes, other minutes where those drugs are

21   in there.

22           THE COURT:  I leave it up to you.  I'm not going

23   through it, I guarantee it.  If anybody wants to strike

24   something in a document that's irrelevant and prejudicial,

25   just -- I'm happy to do that, but I'm not making an effort to

Page 170

1    do that.  And I really encourage you not to spend your time

2    doing it at this point.

3              I think what we should do is follow my approach of the

4    sticky, each side put a yellow sticky or pink sticky on which

5    side you want to highlight for a jury to get it through these

6    documents.  Primarily different things you've quoted, then I

7    don't think they're going to spend time reading other pages, as

8    a practical matter.  I think that's a more efficient way to do

9    it.  I think that's the best way to handle it.

10             MS. NUSSBAUM:  Thank you.

11             THE COURT:  Let me go on one other point.  What's

12   Monday?  You're going to put on who, Keeley?

13             MR. CHEFFO:  Keeley, yes, your Honor.

14             THE COURT:  And he's how long?

15             MR. CHEFFO:  Thirty-five, 40 minutes, give or take

16   five minutes.

17             THE COURT:  All right.  So cross?

18             MR. SOBOL:  Same.

19             THE COURT:  Let's say the break.  How much more on the

20   depositions?

21             MR. CHEFFO:  I think I want to say between 30 to 40

22   minutes of depositions.

23             THE COURT:  Okay.  I'm likely to allow in some of

24   these documents from Kaiser at least, so are you going to put

25   on someone from Kaiser?

Page 171

1           MS. NUSSBAUM:  I have to call the client.

2           MR. CHEFFO:  When can you tell us?  We've been telling

3      them --

4           THE COURT:  Can you let them know by 6:00 today?

5           MS. NUSSBAUM:  Yes.

6           THE COURT:  I'm assuming we will not get that much

7      accomplished today.  I'm assuming a charge conference.  What

8      does Monday look like?

9           (A recess was taken, 1:00 p.m.)

10          (Resumed, 2:34 p.m.)

11          THE COURT:  So I think the best way to proceed is just

12     to give each side fifteen minutes or twenty minutes, and then

13     I'll probably allow some rebuttal and that sort of thing.  Does

14     that make sense from all of your points of view?

15          MR. SOBOL:  That's very unlike you.

16          THE COURT:  Huh?

17          MR. SOBOL:  That's very unlike you.

18          THE COURT:  What?

19          MR. SOBOL:  Letting us just talk without you grilling

20     us.

21          THE COURT:  I almost always swear I'm going to do it,

22     and it's almost like constitutionally impossible.  So I'll try,

23     just because I have limited time.  Mr. Sobol has too many cases

24     here.  All right.

25          MR. SOBOL:  Well, you have the burden, so you go

1    first.

2          MR. CHEFFO:  Well, I'm going to let Katherine kind of

3    address the first two issues, your Honor.

4          MS. ARMSTRONG:  Okay, I understand that there is a

5    couple of issues, and the first one is going to be the issue

6    about whether there's a RICO enterprise here.  Because you are

7    dealing with a corporation, they have to prove two levels of

8    distinctiveness:  They have to prove that the defendant Pfizer

9    is distinct from the enterprise and that it is distinct from

10   the racketeering activity.  They can't just sort of say

11   something wrong happened; therefore, there's a RICO enterprise.

12   It's an important element because otherwise you would just

13   otherwise have a federal fraud statute, which is not the intent

14   of RICO.

15         So the corporation can only act through its agents and

16   employees and vendors and other people.  They have to do more

17   than just show that Pfizer itself had a plan, had a goal, had

18   this idea that it was going to market Neurontin, which

19   obviously we don't concede any of the conduct, but they have to

20   show that Pfizer did more than just go out and hire a couple of

21   marketing firms to do what marketing firms do and to help it

22   market Neurontin.  And they really haven't shown that here.  I

23   mean, you basically have a situation where Pfizer, that they

24   allege that Pfizer hired Cline Davis Mann, worked with Cline

25   Davis Mann for a while.  Warner-Lambert got acquired by Pfizer,

Page 173

1    so Pfizer had some marketing firm that it uses and hired that

2    marketing firm MAC.  Then that relationship terminated in 2003,

3    and they went back to Cline Davis Mann.  I mean, that's

4    essentially what their allegations are.  It doesn't have the

5    continuity, the structure that is required for a separate RICO

6    enterprise.

7         At best what they have alleged is a principal/agent

8    relationship, which is not only insufficient for a RICO

9    enterprise, it's really the antithesis of RICO enterprise

10   because you're still just dealing with Pfizer acting through

11   its agents.  And if you look at the binders of documents that

12   they give to you --

13        THE COURT:  You know, none of your cases -- Mr. Sobol

14   has just proved correct that I can't stand not interrupting,

15   so -- but if you look at the cases, those would be true agents

16   and employees, and you're right, the case law is pretty firm

17   that employees of a corporation can't form an association with

18   the corporation.  But here you have a completely separate

19   marketing firm, and they were involved in these publication

20   teams or these disease -- I forget what you called them --

21   these disease teams, and they would all function as these teams

22   over a period of time.

23        MS. ARMSTRONG:  The teams that they are relying upon

24   are internal Pfizer committees, so that if Pfizer -- Pfizer had

25   these internal committees, and whoever their marketing person

Page 174

1  was at the time, that person would be invited to sit on the

2  committee --

3        THE COURT:  Sure, but that's --

4        MS. ARMSTRONG:  -- and provide input.  But that's not

5  a separate structure that's sort of independent of Pfizer.

6  That's not an enterprise that's sort of this thing unto itself.

7  Cline Davis Mann, MAC, they have no interest in Neurontin

8  whatsoever.  They had no goal in promoting Neurontin whatsoever

9  other than the fact that they were hired, paid a salary.  It's

10  not like they had some sort of financial stake in the financial

11  outcome of this.  They were paid a salary.  Their relationship

12  with Pfizer was no different than their relationship with any

13  other company that could have hired them.  And we cited the

14  case of Meere (Phon) which was decided by Judge Zobel, in which

15  the company was dealing with independent agents who acted as

16  sales agents, but they were independent of the company.

17        THE COURT:  I know that, but while you're quite

18  correct that agents, agents or employees, but this was a whole

19  separate company.

20        MS. ARMSTRONG:  Hired by Pfizer.

21        THE COURT:  But was proactive.  They had their

22  marketing -- what was it called, the marketing ideas or the

23  marketing --

24        MS. ARMSTRONG:  The key messages, they say that they

25  got them from Pfizer, a Pfizer global branding document which

1    was given to the marketing firms.  And the marketing firms, all

2    they basically did was, they went down through this list of key

3    messages, and when an article came out, they said, "Is there a

4    reference in this article that will support this key message

5    that I've been given by Pfizer from the global branding guide?"

6          THE COURT:  It just looked from the documents as if

7    these entities were more proactive than an agent would normally

8    be.  In other words, normally you hire an insurance rep or

9    something that goes out and sells your insurance, so I imagine

10   that the case law might not support an enterprise there; but

11   when you hire a whole separate firm that's proactively helping

12   you in an illegal endeavor, wouldn't that be enough to be an

13   associate?

14         MS. ARMSTRONG:  No.  You have to have the structure,

15   you have to have continuity, you have to have a purpose that is

16   independent in and of itself of the racketeering activity.  And

17   when you say that they hired it to do this and they were

18   proactive in doing this, whenever you say "proactive in doing

19   this," you mean proactive in pursuing what they are alleging

20   was the racketeering activity.  So what they are relying upon,

21   and I understand the evidence can overlap, but essentially what

22   they are relying upon to prove enterprise is the racketeering

23   activity itself with nothing really beyond that, beyond the

24   fact that you have this business relationship.  And if that

25   were enough for a RICO enterprise, you would be able to

1    federalize fraud almost anytime you have a corporation involved

2    and the corporation is acting with an outside vendor.

3              THE COURT:  Well, there are differences between

4    outside vendors, but I understand your point, so but --

5              MS. ARMSTRONG:  Outside vendors, we're held liable on

6    principal/agent law for outside vendors' activities all the

7    time.

8              THE COURT:  Sure.  So if you hire a consultant and you

9    tell them to do this study, maybe that's not it; but if you

10   hire a whole PR firm, or what would you call it, publication

11   firm, and they have a completely separate entity and they're

12   proactively -- I say "proactively" because they've got their

13   own ideas, and primarily they were more about, particularly

14   Cline Davis, marketing off-label than they were actually the

15   fraudulent predicates.  Primarily they were about going out

16   there and detailing off-label, right, these different

17   populations, so --

18             MS. ARMSTRONG:  I'm sorry, I'm not understanding the

19   question.

20             THE COURT:  They may have known about the so-called

21   publication fraud, but their primary purpose was marketing

22   Neurontin off-label and expanding emerging uses.  Is that not

23   right?  Or at least there are lots of documents that say that's

24   one big piece of what they were doing.

25             MR. CHEFFO:  What I would just raise on that is, I

Page 177

1   think that this concept of what they were doing, putting aside

2   the enterprise, I mean, you know, we've talked a little bit in

3   the past about the First Amendment.  I mean, their theory of

4   the case is that there's something nefarious about presenting

5   any kind of off-label information at a CME.  I think you've

6   heard from their own doctors that it's within the First

7   Amendment for people to actually provide information in a

8   certain context that's off-label.

9           THE COURT:  Sure, if it's honest, sure, if it's true.

10          MR. CHEFFO:  Right, right.

11          MS. ARMSTRONG:  But the point I would make is that

12   what you're still doing is, you're still relying upon the

13   racketeering activity itself in order to say there was an

14   enterprise here.

15          THE COURT:  I understand your point of view.  I don't

16   want to spend too much time on it.

17          Did you want to respond to that point before we go on?

18          MR. SOBOL:  I don't think there's any real need to.  I

19   mean, there's a pretty long-term involved relationship between

20   Parke-Davis on the one hand and Cline Davis Mann on the other.

21   It's not a simple isolated individual agent.  It's the

22   principals actually of CDM that do some of the first meetings

23   with Parke-Davis.

24          THE COURT:  But there is that line that it can't just

25   be employees or agents, so where do you draw the --

Page 178

1          MR. SOBOL:  Of course.

2          THE COURT:  I mean, that's her basic point.  Well,

3    maybe this is a jury call, an agent, just hiring an agent isn't

4    going to be enough to be an enterprise, but in some

5    circumstances maybe it is, and so it's a gray area.

6          MR. SOBOL:  So where the line would get drawn is

7    somewhere certainly short of the facts here where you have two

8    separate companies coming into an arrangement, a long-term

9    arrangement to promote off-label.  Now, that's in the heartland

10   of what an enterprise would be.  If that's not an enterprise,

11   then there is no such thing as an enterprise because you've got

12   this isolated agent rule swallowing up the notion of an

13   enterprise.  And that's really, you know, sort of the critical

14   part of it.  And in fact, the more you prove a common purpose,

15   maybe the closer you're proving an agency, and therefore you

16   won't have any enterprises anymore.

17         THE COURT:  Okay, thank you.

18         All right, what's the next issue?  We just don't have

19   so much time here.

20         MR. CHEFFO:  Yes, there's really three issues, and

21   you'll tell me which one you want.  I want to answer your

22   question on the statute of limitations.  I also wanted to very

23   briefly talk about the causation issue, really, which has two

24   points, and then just efficacy, if I could just talk for a

25   minute or two about those.

1          THE COURT:  Okay.

2          MR. CHEFFO:  Can we just set that up?  That's for my

3   causation point, I wanted this diagram.  But on the statute of

4   limitations, I think your Honor had said, you know, that even

5   if we kind of go back in time, essentially would they be able

6   to get damages, as I understood your question, would they be

7   able to get damages afterwards?  And I think the issue here is,

8   once, particularly with fraud, which is at the heart of this,

9   once you knew or should have known or are on notice that you

10  should have started inquiry, which would be the initial statute

11  of limitations, I think it would be incongruous to say, well,

12  that timeline started, but then we looked back to a later

13  point, if that's clear.  So, in other words, once your inquiry

14  notice, once your statute of limitations start that you should

15  have known, you should have started inquiry, it really carries

16  on throughout the rest of the time because it still relates

17  back to the time when, you know, you had the Pink Sheet, you

18  had the information.

19          THE COURT:  But is it every time -- I don't pretend to

20  have an answer here, so this is one of the hard issues that I'm

21  having trouble with.  Is it every time you suppress a study it

22  starts a new fraud inquiry?  And the second issue is, on the

23  off-label, assuming for a minute pure unlawful survives, and I

24  understand there's a preemption argument, but it wouldn't apply

25  for off-label, right?  It would be every time you sold it.

56911cdc-45d4-450f-a2bd-8ee3ff13fe4d

Page 180

1          MS. ARMSTRONG:  On the first question, your Honor, on

2    every time you suppress a study, the Supreme Court has

3    specifically rejected that the statute of limitations starts

4    anew with each predicate act.

5          MR. CHEFFO:  And we're talking about RICO, so with

6    respect to RICO, essentially there is no --

7          THE COURT:  What case is that?

8          MS. ARMSTRONG:  I will find it for you, but I'll let

9    Mr. Cheffo keep going in the meantime, since our time is short.

10         MR. CHEFFO:  And we can find that, but let me just

11   talk for another because they've raised a few issues in their

12   statute of limitations.  They first raised the American Pipe

13   tolling issue, and just to address that, there's a First

14   Circuit case that we think speaks to that in its entirety for

15   essentially the argument that American Pipe tolling doesn't

16   apply.  And the common-sense, I think, holding is essentially

17   it applies in a situation where a party waits until after the

18   class certification ruling has been decided, then there's

19   denial, then you have time to file.  But when you kind of jump

20   out ahead and file a case before the class certification has

21   been filed, as in this case, then you don't get the benefit of

22   American Pipe tolling.

23         THE COURT:  Is it before class cert or before the

24   class complaint is filed?

25         MR. CHEFFO:  No.  The point, as I understand it, the

Page 181

1    tolling argument says, if the complaint is filed and then you

2    have a certified class and it's denied, there's a certain

3    tolling period.  But if you basically jump in between and file

4    a complaint, essentially opt out or file your own complaint,

5    then you shouldn't get the benefit of the class tolling period.

6    And there's a First Circuit case that I can cite to you also in

7    a second on that, your Honor.

8              THE COURT:  So what date was the class complaint

9    filed?

10             MR. CHEFFO:  The class complaint was filed --

11             THE COURT:  May, 2000 something?

12             MR. SOBOL:  Right May 14, 2004, I believe.

13             THE COURT:  So let's say it's filed seeking a class,

14   but I haven't certified it yet.

15             MR. CHEFFO:  Seeking a class, but you haven't

16   certified it, okay.

17             THE COURT:  And indeed haven't certified it yet, I'm

18   thinking, so --

19             MR. CHEFFO:  We're happy with that time period, your

20   Honor.  The noncertification, we can live with that.

21             THE COURT:  So you file it, and then they jump in in

22   2005, right?  Kaiser jumps in in 2005, right?

23             MR. CHEFFO:  Correct.

24             MS. NUSSBAUM:  That's right.

25             THE COURT:  So would American Pipe at least bring it

Page 182

1    back to May 14, 2004?

2           MR. CHEFFO:  Well, that's the issue.  I mean, I think

3    the worst case for us on the statute of limitations is if

4    American Pipe tolling would apply, and it would still go back

5    to the May, 2004.  What I'm addressing for your Honor is that

6    under this Glater V. Eli Lilly, which is 712 F. 2nd 735 -- it's

7    a First Circuit 1983 case -- essentially the point is, you

8    don't get the American Pipe toll, okay.

9           So then the second argument is, even if American Pipe

10   toll does apply, it's not automatic.  So, in other words, they

11   haven't pled it in their complaint --

12          THE COURT:  Well, let's assume it does not apply and

13   they're stuck with 2005.  So what is it they should have known

14   by, when would it be, four years earlier, 2001?  What

15   difference does it make?

16          MR. CHEFFO:  Well, what do you mean?  I'm sorry.

17          THE COURT:  Let's assume you're right and 2005 is the

18   critical date.

19          MR. CHEFFO:  Are you talking about the specific times?

20          THE COURT:  So why does it matter?

21          MR. CHEFFO:  Well, it's just a matter of -- I would

22   say it doesn't really matter.  I think we still -- they're

23   barred under either scenario.  Really what we're talking about

24   here is, there's certain pieces of evidence that might come

25   after that period of time.

1          Now, our argument would be, even if those pieces come

2     after the filing, they still relate back to conduct.  So, in

3     other words, when Dr. Dale Daniel says, you know, "We have to

4     be worried about this off-label promotion" -- he writes that, I

5     think, sometime in October -- we would say, well, the reason

6     why he --

7          THE COURT:  These are the facts I don't know and where

8     I would like to go through --

9          MR. CHEFFO:  They're all in our briefs, your Honor.

10         THE COURT:  But I'm going to go indication by

11    indication, why does it matter?  So let's start off with

12    bipolar.  What do you say Kaiser knew before 2001?

13         MS. ARMSTRONG:  They knew that there was a criminal

14    investigation --

15         THE COURT:  That's not enough.  I don't accept that

16    because the crime here -- I know you have these First Amendment

17    arguments, but the crime here is off-label promotion, not

18    fraud, and so you need to have had notice of the fraud.  So

19    that's why I'm trying to -- just factually just help me.  It's

20    a lot of material.  So what was the notice of the bipolar fraud

21    that would have barred this?

22         MR. CHEFFO:  Well, I mean, again, I think that -- I

23    want to answer your question directly.  I don't know that

24    they're specific to the bipolar fraud.  I think what we have

25    here is, there's knowledge that there was illegal off-label

Page 184

1    promotion, okay?

2              THE COURT:  Sure.

3              MR. CHEFFO:  And there's the unsealing.  And then

4    there's basically information from the Pink Sheet which they

5    read.  And the Pink Sheet isn't just this one word.  It

6    basically has two pages of information about the underlying

7    conduct.

8              THE COURT:  About the crime.

9              MR. CHEFFO:  About the crime.  And that all occurred

10   and they read that, and Ms. Millares said they regularly read

11   that.

12             THE COURT:  Sure.

13             MR. CHEFFO:  And as a result of that, they started

14   making inquiries; in other words, "Tell us the drugs that are

15   being promoted off-label."  So that information, that

16   knowledge --

17             THE COURT:  I saw that.  I mean, I've just skimmed

18   these papers, believe me, at this point, but that's notice of

19   the crime, not of a fraud.

20             MR. CHEFFO:  Well, but -- you mean that they knew,

21   that they have to know that there was some type of

22   specific act?

23             THE COURT:  They knew, in my view -- I asked them

24   about this -- they knew there was off-label marketing.  They

25   were holding whole monographs about off-label marketing.  They

1    knew that there was off-label marketing, but what they say they

2    didn't know is the fraud.

3         MR. CHEFFO:  Well, but I guess where we may differ

4    with plaintiffs on this, I don't think that they have to know

5    that.  In other words, they don't have to know exactly all the

6    details.  This is statute of limitations.  It's when a

7    reasonable person, particularly a sophisticated company like

8    Kaiser, would start to do some inquiry.  And in fact they did

9    do some inquiry because Dale Daniel writes the e-mail to DIS

10   saying, "Hey, what's going on?"  There are other e-mails where

11   people are talking about it.  I think in the Northwest they

12   say, "My gosh, there's this U.S. government investigation of

13   this off-label conduct.  Maybe there's things going on here.

14   We're paying for more of this product than we should have."

15        So they don't know whether it was -- ultimately their

16   complaint is that they paid for the medicine because it was --

17        THE COURT:  All right, so your basic argument is that

18   notice of the crime is tantamount to --

19        MR. CHEFFO:  Crime promotion --

20        THE COURT:  -- as a matter of law notice of the fraud.

21        MR. CHEFFO:  I think that's fair, your Honor.

22        THE COURT:  Okay, that's their position.  All right,

23   thank you.  That's why I'm not sure it matters if I get into

24   the intricacies of American Pipe because I'm not sure, I mean,

25   the basic, I'm not sure it matters.

1    MR. CHEFFO:  I think that's probably right, your

2    Honor.

3    MR. SOBOL:  So as I understand it, the defendant is

4    able to or points to three things that they say occurred at a

5    point in time before a four-year statute of limitations:  the

6    technical unsealing of the Franklin complaint, SEC filings, and

7    a Pink Sheet.  Now, as to the unsealing of the Franklin

8    complaint --

9    THE COURT:  In what year?

10   MR. SOBOL:  And these things occurred in 2000,

11   according to the defendants, okay?

12   (Discussion off the record between plaintiff

13   attorneys.)

14   MR. SOBOL:  What?  Yeah, Ms. Nussbaum points out, in

15   the defendants' opening, they actually said that the unsealing

16   of the Franklin complaint occurred in 2002.  That was a slip,

17   but it's a Freudian slip, because while technically the

18   Franklin complaint was unsealed in early 2000, there's no

19   evidence of any publicity about it.  And in fact the publicity

20   about it, the evidence shows, occurred in 2002, which is when

21   people started finding out about the allegations in the

22   Franklin complaint, not from the technical unsealing, number

23   one.

24   Second, the SEC filings are oblique at best.  They

25   simply refer to the fact that there was a report of an

1    investigation, a grand jury investigation.

2         And then, finally, the Pink Sheet does say that there

3    is an inquiry regarding, quote "potential off-label promotions

4    of Warner-Lambert's antiepileptic drug Neurontin."  That's what

5    it says, but it doesn't say anything else.  So it says there's

6    an inquiry.  And in fact there are no allegations at this

7    stage, let alone then no evidence that's being disclosed about

8    it.

9         THE COURT:  Does anything ride on the difference

10   between the date that Kaiser filed its complaint as opposed to

11   the date of the class action complaint?

12        MR. SOBOL:  From our point of view, no, it ought not

13   because we think that the best evidence from the defendants'

14   point of view, which of course wouldn't be relevant on a

15   directed verdict motion, is really that the Kaiser witnesses

16   testified that they only first started learning things in 2002

17   about the fraud and about there being accusations about

18   off-label marketing, being allegations, not having any evidence

19   about off-label marketing but just having allegations when they

20   learned about that in 2002.  So that wouldn't be relevant.

21        The only time I think it's really relevant to the

22   American Pipe issue is if you were to conclude that as a matter

23   of law, the SEC statements and the Pink Sheet inquiry and the

24   unsealing of the Franklin complaint put Kaiser on notice, in

25   which case, then we would say that American Pipe ought to --

1    there ought to be American Pipe tolling from the class

2    complaint, which is May 14, 2004, which would bring the notice

3    period back to May 14, 2000 -- if I may finish, your Honor?

4              THE COURT:  Yes.

5              MR. SOBOL:  -- which puts it close to and around the

6    time, maybe after the time, right, because the Pink Sheet comes

7    out, I think, April 3, 2000, right?  The SEC statements are

8    around then.  So then the question is, as a matter of law, in

9    other words, are those things saying, putting anybody on --

10             THE COURT:  Is there anything in there that relates to

11   a fraud suppression?

12             MR. SOBOL:  No.  So our point is -- and there might be

13   a difference in terms of the unlawfulness prong under the UCL,

14   okay, which I recognize and you pointed out at side bar

15   earlier -- there's nothing in the SEC statement or the Pink

16   Sheet or the Franklin complaint that's going to be dealing with

17   fraud.  It's all off-label promotion.  The defendants' motion

18   is a motion under RICO, you know, seeking to bar the RICO

19   claims by reason of the expiration of the four-year statute for

20   fraud, and there is no evidence about there being fraud.

21             THE COURT:  Can I ask you both on this issue, just

22   before I get past it, on the UCL claim, we all agreed, I think,

23   that it would be nice to have a jury verdict on whether there

24   was a fraud or --

25             MR. SOBOL:  Or unlawfulness or --

1          THE COURT:  Whatever, the various prongs.  I'm

2    rethinking whether I need to send statute of limitations to the

3    jury under California.  I think I can do that as a matter of

4    law.  I'll be guided by whatever they do in RICO, if they

5    actually have one.  It just got so complicated writing that

6    sheet that I'm inclined to retain that for myself.

7          MS. ARMSTRONG:  Your Honor?

8          MR. SOBOL:  I was just going to say, as to your

9    verdict slip, I made an observation during lunch about it, and

10   I could see how the complexity of the sheet is being driven by

11   the statute of limitations because by the time you get to the

12   third or fourth question, whatever it is, you're having to

13   split them all out because you need separate answers on the

14   SOL, and that's what's driving the complexity of it.  So I

15   would agree completely.

16         THE COURT:  I'm thinking that way.

17         MR. CHEFFO:  We don't disagree, so I think that if

18   that's kind of a sticking point, so, yes, you can do that.  I

19   just want to, because I do disagree with this issue of four.

20   There's three things, and it's on Pages 3 and 4 of our brief,

21   your Honor.  Basically in May of 2000, Colorado region launched

22   its own initiative to reduce off-label prescriptions, stating

23   that "Neurontin does not appear to offer any advantage over

24   TCAs and is more expensive."  So it's not just a matter of

25   off-label.  They're starting to talk about efficacy.

1          Then in the Northwest region, there's a memo, and this

2     is August 24, 2000, it says that "Gabapentin has achieved

3     significant off-label use," that "Neurontin sales grew

4     78 percent in 1999," that "The vast majority of these sales are

5     for off-label uses," and that "Neurontin is purportedly no more

6     effective in uses than much less expensive alternative drugs,"

7     and that "The U.S. Attorney's office is investigating the

8     manufacturer's off-label promotion of the drug."

9          So, you know, to say there's no -- usually when you

10    hear U.S. Attorney's office investigating off-label promotion,

11    you're talking about off-label, you know, we think that that in

12    itself is enough.

13         THE COURT:  Right, that's your position, which is

14    notice of the criminal prosecution.

15         MR. CHEFFO:  And the one thing I would just say, not

16    to complicate this any further, and we're fine, I think, on the

17    UCL, but two things:  If you were to even apply American Pipe

18    tolling, one, it has to be pled, and it hasn't been pled in the

19    complaint.  Two, we believe that the toll would only apply --

20    they basically say there's a definition of the class in the

21    initial complaint, which it would have to cover the class.  And

22    the class basically -- I'm paraphrasing -- says entities who

23    paid for Neurontin.  As I understand the testimony that has

24    come in in this case, the two plaintiffs in this case, Health

25    Systems and Hospitals, only Health Systems actually pays for

1  Neurontin.  So therefore -- again, these multiple steps -- if

2  you got to American Pipe tolling, if you think that they've

3  pled it or somehow they could get past that, the toll would

4  then only apply to Health Systems, not Hospitals, because

5  Hospitals did not pay for it, it was not otherwise defined in

6  the class.

7          THE COURT:  Yes, I'm glad you raised that because as I

8  was trying to write this, I was trying to say who Kaiser was.

9  We've heard a lot about the Plan and how they've been damaged

10 and injured.  I'm not sure I've heard about Hospitals.  This

11 may be a technicality that's meaningless, but I'm just

12 wondering whether I should eliminate them.

13         MS. NUSSBAUM:  Or we can just define it, you know, in

14 brackets as one, but --

15         THE COURT:  I mean, I've heard almost all the

16 evidence, so unless something comes up, I have not heard

17 anything about Hospitals.  I'm not sure this matters, by the

18 way.  Would you think about that --

19         MS. NUSSBAUM:  It's the Health Plan that paid for it.

20         THE COURT:  It's the Health Plan that's paid for

21 everything, right?  So I think I should just make them the

22 plaintiff.  Does anything ride on this?

23         MR. SOBOL:  You know, I just don't know.  I would need

24 to take a look at the transcript.

25         THE COURT:  Would you do that, would you look?

Page 192

1          MR. SOBOL:  Yes.

2          MS. NUSSBAUM:  Yes.

3          MR. CHEFFO:  I mean, to be candid with the Court, I

4    mean, the answer is, I think it may well because, you know,

5    Hospitals is the one who employs DIS.  That's Millares, and

6    it's only Carrejo who works for Health Systems.  So if you have

7    a non-plaintiff who is DIS, which I think is the argument, you

8    haven't heard anything about Hospital Systems, you know, this

9    gets into a causation analysis.  So if I could transition to

10   that?

11         THE COURT:  A born teacher here.

12         MR. CHEFFO:  Well, I have so little opportunity to

13   actually stand up in this trial --

14         THE COURT:  Yeah, what's happened here?

15         MR. CHEFFO:  And if you give me 30 seconds, I promise

16   I can do it.  I want to talk about Hemi Group.  It's the U.S.

17   Supreme Court case.  This goes to the causation issue on the

18   RICO claim, okay?

19         THE COURT:  So we've morphed into causation.  That's

20   fine, that's fine.

21         MR. CHEFFO:  Just trying to move it along, your Honor.

22         THE COURT:  Can I just stop for a second just off the

23   record.

24         (Discussion off the record.)

25         MR. CHEFFO:  Your Honor, so, again, I know this has

Page 193

1    been a lot of paper, but just for 30 seconds.  I mean, Hemi

2    Group, basically the City of New York, New York City sued Hemi

3    Group, and Hemi Group sold cigarettes, okay.  They were kind of

4    an interstate seller.  And basically New York City was saying

5    Hemi Group was responsible because people weren't paying taxes,

6    okay.  So the U.S. Supreme Court basically said that Hemi Group

7    was responsible to give New York State the information; they

8    weren't responsible to collect the taxes, but they were

9    supposed to tell the state who they sold to so the state could

10   then give it to New York City.  And then also you had a

11   situation with smokers, so they said also the folks who

12   actually didn't pay the taxes.  So they found that under this

13   proximate causation analysis, when you had to look at two or

14   three or four different levels, it didn't rise to the level of

15   proximate causation.

16          So here, you know, and this is, frankly, contrary, and

17   I think you indicated this one of the first days of trial, I

18   think you said something to the effect of, "Well, it looks like

19   there was a lot more autonomy here amongst the formularies than

20   I was led to believe."  And I think that's exactly --

21          THE COURT:  I may not have --

22          MR. CHEFFO:  Or that thought or something like that.

23   I don't mean to be pejorative.  But essentially here you have

24   Kaiser suing Pfizer, okay, under a RICO claim.  Now, you know,

25   their claim is that certain information came from Pfizer that

Page 194

1   caused Kaiser harm; but in order to get there, you have to kind

2   of follow the chain, right, because what they're first saying

3   is, DIS got some information from Kaiser, and they wrote

4   certain manuscripts and had some information.  But, again,

5   there's no injury here because until anything happens, there's

6   no injury.

7           But then what happens?  Then you have DIS providing

8   manuscripts to, you know, eight or nine different formularies,

9   all of whom are made up of sixteen or seventeen different P&T

10  folks, all of which are not parties in this case.  We've heard

11  that many times.  There's no such thing as a Kaiser doctor.

12          THE COURT:  Well, the P&T are part of Kaiser

13  Permanente, right?

14          MS. NUSSBAUM:  Right.

15          MR. CHEFFO:  Well no, no.  Let's be very clear on

16  this, your Honor.  The P&T committees are made up of Permanente

17  Medical Group doctors --

18          THE COURT:  Yes.

19          MR. CHEFFO:  -- of which one of their doctors sits on

20  the committee, so --

21          THE COURT:  "Their" meaning Kaiser's?

22          MR. CHEFFO:  Right, one out of sixteen or seventeen.

23  But they've gone to great pains to say, "They're not our

24  doctors, there's no such thing as a Kaiser doctor."  We've

25  heard that ten times.  And the same thing is, there's no such

56911cdc-45d4-450f-a2bd-8ee3ff13fe4d

Page 195

1   thing as a Kaiser formulary.  Instead there is formularies that

2   are made by the P&T committees in the various regions, okay, so

3   by largely nonparties, non-Kaiser doctors.

4        So even when this information, if it was to get

5   distributed to all these people -- and actually this goes to

6   another point.  You know, we haven't heard anything from

7   Hawaii, you know, so that would be an issue we should talk

8   about before we leave today about how --

9        THE COURT:  Suppose DIS saw that there were four

10  negative, four for four negative trials with respect to

11  bipolar, which is their strongest case, even with the testimony

12  today, they're four for four, and they did this scathing drug

13  monograph saying, don't give it out if all these people have is

14  bipolar.  Maybe it will work for social phobia or maybe it will

15  work for anxiety, but it's like a sugar pill for bipolar alone,

16  as a stand-alone.

17       MR. CHEFFO:  Right.  Well, let me address that.  I

18  think that goes --

19       THE COURT:  At least a jury could take that to say

20  that it caused injury.

21       MR. CHEFFO:  Two points to that, your Honor.  I think

22  that, you know, we can't be -- you know, to some extent when we

23  talk about expert reports, we can say you can only talk about

24  what's in your expert report.  But I think kind of in the

25  courtroom now, we can't be divorced from reality, right?  This

56911cdc-45d4-450f-a2bd-8ee3ff13fe4d

1   entire case is somewhat absurd in some regards because they're

2   saying, "My gosh, your Honor, if I only knew then what I know

3   now, I would have done everything different."  But every single

4   witness we've heard in this case, you know, we can go to their

5   website right now, and all this stuff is still up on their

6   website.  So you have to ask yourself how you really can

7   tell --

8               THE COURT:  I can't do that.  A jury can only do that.

9               MR. CHEFFO:  Well, okay, but let me just continue with

10   the proximate cause then for a second.

11               THE COURT:  Yes.

12               MR. CHEFFO:  First of all, there's a period of time

13   when they knew about those studies, right?  So at some point,

14   you know, they could have given the information.  But even if

15   they provide this information, there's still no harm or injury

16   once it goes to the formularies, right, because then it has to

17   go to the doctors, and then it has to go to the patients, okay.

18               So, now, they say their patients are very involved in

19   patient care, but the point here really is, your Honor, if

20   there's any information that goes back and forth to Kaiser, you

21   have to go through DIS, through the various P&T committees made

22   up of sixteen or seventeen people, still no injury because, as

23   we've heard, even if you get on the formulary -- like, they've

24   led you to believe that all of a sudden it's on the formulary,

25   that's the damage, but that's sort of like putting something on

1    a shelf in a supermarket.  Unless someone actually goes and

2    buys it and takes it off the shelf and makes a decision,

3    there's no purchase here, there's no harm.

4            So at the very, very least, it's not until the doctor,

5    who we heard many of them were not detailed for all kinds of

6    reasons, it's not until the doctor actually writes a

7    prescription and the patient fills it that there's arguably

8    even unquestionably injury.  So if you look at this, it's very,

9    very close, if not exactly the same situation, as the Hemi

10   Group case.

11           THE COURT:  Thank you.  Respond.

12           MR. SOBOL:  I think she was going to say something.

13           MS. NUSSBAUM:  Your Honor, and the same issue was

14   raised on summary judgment, and at that time the Court relied

15   on the Bridge V. Phoenix Bond and Indemnity case, which was a

16   unanimous decision of the Supreme Court, which has not in any

17   way been overruled by the Hemi decision, which is a split

18   court.

19           Here we have a situation where we have testimony where

20   the one central Drug Information Services had many direct

21   contacts with Pfizer through these monographs, through material

22   that we showed on the Merlin database, through direct telephone

23   inquiries, through the inquiry service.  They relied on that

24   information in addition to, of course, being defrauded in

25   general because of the suppression of the medical evidence and

Page 198

1    the pollution of the medical literature.  They then provide

2    that information to all of the regions.  There is uncontroverted

3    testimony that Drug Information Services monographs go to

4    everybody.  There's uncontroverted testimony that the

5    formularies in the regions --

6              THE COURT:  Well, can I ask you about that.  So there

7    are monographs in what area?  There's monographs in pain.

8              MS. NUSSBAUM:  Right.

9              THE COURT:  There's monographs in bipolar, right?

10             MS. NUSSBAUM:  Right.

11             THE COURT:  And what's the third one?

12             MS. NUSSBAUM:  There's monographs in bipolar, there's

13   monographs in pain, and there was monographs on RSD.

14             THE COURT:  Which is not an issue here?

15             MS. NUSSBAUM:  Well, no, dose is part of it as well,

16   that's right.

17             THE COURT:  All right, dose.  RSD is not part of it,

18   so --

19             MS. NUSSBAUM:  RSD obviously is in our pain bucket,

20   your Honor.

21             THE COURT:  Let me just ask you this.  Two very

22   compelling cases of no efficacy is migraine and nociceptive,

23   but also those are the ones where there are no monographs, so

24   what do I do with those?

25             MS. NUSSBAUM:  Well, I think RSD was discussed by one

1    of the experts today.  That's complex pain syndrome.

2             THE COURT:  For pain, fine.  Pain is in it.

3             MS. NUSSBAUM:  Right, there's pain.  So we have both

4    types of pain, we have monographs --

5             THE COURT:  No, no, RSD is -- I don't remember what it

6    is actually, but it's --

7             MS. NUSSBAUM:  It's complex pain syndrome.  It's

8    reflex --

9             THE COURT:  It's neuropathic, it's neuropathic.  Yes,

10   you're okay for neuropathic.  The issue is, what do I do with

11   nociceptive and migraine?

12            MS. NUSSBAUM:  Well, I think with respect to those,

13   they have the same misinformation that was out in the

14   marketplace.  And if you look at the DRUG and DUAT initiatives,

15   it is clear that they did research on migraine.  They did

16   research on dosing.  They recognized -- and those both DRUG and

17   DUAT materials have the articles.  They were just as defrauded

18   with those.  They knew that they were --

19            THE COURT:  So you're saying DRUG and DUAT did

20   research on migraine?

21            MS. NUSSBAUM:  Right.

22            THE COURT:  Is there anything on nociceptive?  I don't

23   remember, we've had so much information.  Is there anything on

24   nociceptive?

25            MS. NUSSBAUM:  Well, no, although I think that the

1    monograph that deals with RSD deals with both types of pain,

2    both neuropathic and nociceptive pain.

3            THE COURT:  Well, you better show it to me at some

4    point because nociceptive, I'm not saying there may not be

5    another theory.  I am simply saying, as I was thinking about

6    it, the thing that was most compelling is that Kaiser has a

7    different model than so many other places do, because you do

8    these monographs, you do your research, you have these

9    initiatives.  You're actually more hands-on.  But nociceptive

10   is compelling that there's no evidence to support it.  Not one

11   doctor up here supported it.  But I also need to have some

12   evidence that it caused you damages.

13           MR. RONA:  If I can answer that, your Honor?

14           THE COURT:  Yes.

15           MR. RONA:  I think we heard today that there's

16   confusion.  Not every physician at all times knows what pain

17   they're dealing with.  Part of Parke-Davis' and Pfizer's scheme

18   was to take advantage of that, and as early as October of 1995,

19   they said:  Let's create a drumbeat in the literature, and if

20   we establish some studies and rules -- and you notice, they're

21   always doing the same studies in DPN, migraine -- that if we

22   establish a rational in one pain category, migraine point pain,

23   and all the nociceptive studies, that's a different form of

24   pain, if we get a foothold in any form of pain, doctors are

25   going to use it for all forms of pain for the reasons that we

1    heard even today.  Sometimes they don't know what they're

2    dealing with.  Sometimes they think they're dealing with one

3    thing and it's a different thing.  Sometimes the

4    patient describes their pain --

5            THE COURT:  Is there any evidence that nociceptive was

6    marketed to either DIS or Kaiser or any Kaiser doctors, or that

7    it was marketed period?

8            MR. RONA:  There is evidence that it was marketed.

9    That's certainly the case.

10           THE COURT:  Where, where?

11           MR. RONA:  They would use it in the CMEs and in the

12   publications where they refer to chronic pain and especially

13   low-back pain.

14           THE COURT:  That's not nociceptive.  I mean, this is

15   the issue that I'm worried about and I'd like to hear about on

16   Monday is, can you connect the dots on nociceptive?  You've got

17   compelling evidence; there is not one expert up here and not

18   one study that supports nociceptive.  On the other hand, I need

19   some evidence that it was marketed in a way that hurt Kaiser.

20           MR. RONA:  Well, your Honor, chronic low-back pain

21   very often is nociceptive.

22           THE COURT:  You're testifying.

23           MR. RONA:  Well, that's, I think, what the evidence

24   shows.

25           MR. SOBOL:  Just tell her, yes, you'll get the brief

1    to her on Monday.

2         THE COURT:  Just do a little thing on nociceptive, all

3    right?  Nociceptive, I don't know whether Mr. Sobol is

4    suffering from neuropathic or nociceptive pain in his back, but

5    the real issue really is, is there some evidence that connects

6    it up to CMEs that Kaiser doctors were at, DRUG/DUAT studies,

7    DIS studies, or detailing to Pfizer, or a general nationwide

8    marketing plan that hit the West Coast?  I need something, or

9    it can't go to a jury.  I mean, that's the one connect -- I

10   keep saying I want connect up the dots.  You think that there

11   is nothing.

12        MR. CHEFFO:  Your Honor, I mean, I've sat through this

13   trial too, and all I've heard is about these four low-dose

14   combo therapy tests in dental pain.  You know, that was

15   basically what we heard, that those were somehow suppressed.

16   You know, to basically just have this broad fraud on the

17   market, there may have been something --

18        THE COURT:  I agree.  I'm not disagreeing with you.

19   On the other hand, there is no evidence in this -- I've been

20   listening.  There is, as far as I can tell -- correct me if I'm

21   wrong -- not a shred of evidence scientifically to support the

22   use of Neurontin for nociceptive pain.

23        MR. CHEFFO:  With that we agree, your Honor, and I

24   think that's the point, which is everybody knows.  You know, we

25   heard all these doctors.  They say, "No, I've never prescribed

56911cdc-45d4-450f-a2bd-8ee3ff13fe4d

1    it for sunburn, broken toe, broken arm."

2           THE COURT:  Right.

3           MR. CHEFFO:  And that's the point is that it doesn't

4    work.  And now if I could have the Carrejo chart.

5           THE COURT:  And yet there was for a while marketing of

6    nociceptive because we've seen that in some of the initiatives,

7    and what I don't know, whether those were short-lived truncated

8    initiatives or ones that actually played out, and we just need

9    to look at the evidence on it.

10          MR. CHEFFO:  The only thing I would just say, you

11   know, we've all seen these, and, you know, people can quibble

12   about the right side about the numbers, but this is the Carrejo

13   document.  And I would just point out for your Honor that when

14   they, putting aside the numbers, when they characterized how

15   it's being used by Kaiser, these are, to my understanding,

16   these are all either neuropathic or have some mixed.  So, in

17   other words, there's no stubbed toe, there's no broken arm,

18   there's no rotator cuff, there's no sunburn on there that they

19   were even looking for.  So when they talked about, when they

20   were looking with how to characterize and put these in buckets,

21   they said neuropathic pain or psychiatric issues.

22          THE COURT:  Oh, that's a good point.  So, I mean, this

23   is when I said earlier on that I intended to use this to prune

24   issues.  You'll do a little memo.  You'll see what you come up

25   with, okay?  All right, so I think, just because I do have this

Page 204

1    other case, so are we --

2            MR. CHEFFO:  I can stop, or I can just cover the last

3    thing, if I can move on?

4            THE COURT:  Yes.

5            MR. CHEFFO:  Basically, your Honor --

6            THE COURT:  What are we talking about now, causation?

7            MR. CHEFFO:  Yes, this goes to causation, and I know

8    your Honor just said this may be a jury issue, but I don't

9    think it is, respectfully.  This is a case actually Mr. Sobol

10   may know well, he represented the plaintiff in the case, and it

11   was dismissed by a Federal District Court judge in Florida on

12   the pleadings.  It was a motion to dismiss, dismissed with

13   prejudice.  And there the plaintiff said -- there was a number

14   of plaintiffs, institutional plaintiffs and individual

15   plaintiffs.  And Mrs. Prohais and Ms. Yost said that they used

16   and paid for Lipitor, so kind of giving the indication that

17   even after they were saying this drug doesn't work, it's

18   inefficacious, that they continued to use it.  And basically

19   what the judge said was, you know, "As to these people, the

20   complaint also must be dismissed for failure to allege injury.

21   The problem with these people's claims, however, is not that

22   they fail to allege that they paid for Lipitor, but that they

23   still pay for Lipitor notwithstanding their knowledge of its

24   alleged lack of benefits."

25            So this just goes to the issue, at some point -- and

1    this is not a dispute, this is not a jury question -- if

2    someone says that "I've been injured because of something you

3    told me or I would have changed my position," but you look at

4    it, whether it's an estoppel issue, or whether it's a lack of

5    causation under the consumer fraud statutes, or whether it's a

6    lack of proximate causation under RICO, if you continue to do

7    the activity to which you said you wouldn't have done, you

8    know, but for this fraudulent or deceptive conduct, there is

9    case law.  I think if you flip to the next --

10          THE COURT:  You know what, I wouldn't spend any more

11   time on this.  I need to get through this by 3:30.  Are there

12   any other big issues that you've got?

13          MR. CHEFFO:  I think we've covered the main issues,

14   your Honor.

15          THE COURT:  Can I just ask you this.  My law clerk

16   thought there was a preemption argument with respect to the

17   unlawful UCL.  So that's a huge issue, I think, I'm saying,

18   because if there isn't, it's almost summary judgment that it's

19   a violation of the unlawful.  So if it's preempted, then the

20   cause of action goes away.  So I just -- I think that was one

21   of your arguments, right?

22          MS. ARMSTRONG:  That is one of our arguments, yes.

23          THE COURT:  And you've cited at least one.  Is there

24   any --

25          MS. ARMSTRONG:  It's not an absolute preemption.

1    We're not saying that there is no circumstance in which you

2    could bring a UCL claim based upon a violation of the FDCA; but

3    where all they're showing is that it was off-label and they're

4    not alleging fraudulent in connection with that, they are

5    essentially taking on the role of an enforcement power, and

6    that's the FDA's responsibility.

7            THE COURT:  And is there any case that's directly on

8    point?

9            MS. ARMSTRONG:  It's the In Re: Epogen case in

10   California.

11           THE COURT:  Is it one District Court?

12           MS. ARMSTRONG:  It's a District Court case.

13           MR. CHEFFO:  It's an MDL decision.

14           THE COURT:  It's a --

15           MS. ARMSTRONG:  An MDL decision, an MDL case in

16   California.

17           THE COURT:  So there's a Federal District Court judge

18   who said that off-label marketing could not be -- well, there's

19   no cause of action for off-label marketing under the UCL?

20           MS. ARMSTRONG:  For pure off-label marketing without

21   any additional showing of fraud.

22           THE COURT:  Do you agree with that?

23           MR. SOBOL:  No, we don't, and I've got to check the

24   briefs because I wasn't involved closely on this to make sure

25   that we've addressed the preemption issue here squarely.

1        THE COURT:  Could you do that because, truthfully,

2   whatever else happens here, you know, I'm going to have to make

3   that decision ultimately.  I don't want to send something to a

4   jury to further complicate a form if it's hopeless.

5        MS. ARMSTRONG:  Right, we raised it in connection with

6   the jury instructions.  You don't make Rule 50 motions as to

7   issues that are decided by the bench, so we restricted our

8   Rule 50 motions to --

9        THE COURT:  You don't?

10       MS. ARMSTRONG:  No, you don't, because you can't take

11  the issue away from yourself, your Honor.  You either decide it

12  or you don't, and you can't decide it before the jury.

13       THE COURT:  So that having been said, you reminded me

14  of a thought I had.  I'm assuming this trial is the trial for

15  my rulings on the UCL, right?  No one's expecting to supplement

16  the record, right?

17       MS. ARMSTRONG:  No.  I think we would probably seek

18  leave to file proposed findings of fact and conclusions of law

19  but not an additional trial.

20       THE COURT:  Sure, but not additional evidence?  Is

21  that true for you all?

22       MR. SOBOL:  That actually may not be true.  I wanted

23  to speak to my colleagues about whether or not we would submit

24  the expert reports to the Court so you could have the full

25  expert reports rather than just the testimony, but I haven't

Page 208

1    reviewed that with my counsel.

2         THE COURT:  Maybe, but I'm saying, you're not looking

3    for new witnesses, new evidence, that sort of thing?

4         MR. SOBOL:  No.  And just also, the issue of

5    preemption under the UCL should be briefed.  It hasn't been.

6    You know, there hasn't been a motion put before you from the

7    defendants about it yet.  In our view, there's plenty of case

8    law, particularly the recent Wyeth decision and case law under

9    California which holds that, you know, you can have a cause of

10   action, which functionally is a violation of some of the

11   statutes.

12        THE COURT:  Well, can I ask you both to think about

13   this.  It strikes me as a matter of law, it is as a matter of

14   law unlawful for res judicata purposes because there was a

15   guilty plea, so if you're right, you win.

16        MS. ARMSTRONG:  Well, there's still causation issues.

17        THE COURT:  Fair enough, but I'm not sure I need

18   the -- well, that's a good point.  Maybe I should ask it

19   anyway, and then I can at least get a jury view on causation.

20   Unlike statute of limitations, I think that might be useful.

21   But think about whether I -- on the other hand, if it's

22   preempted, it's gone.  If it's not preempted, it's almost

23   summary judgment on the liability issue, maybe not the

24   causation.  And also, from a statute of limitations point of

25   view, that does strike me as something that they knew about,

1    the off-label promotion and that it was being sold off-label,

2    or they should have at least made an inquiry.

3              MR. SOBOL:  So let me address that because I didn't

4    have an opportunity when Mr. Cheffo was arguing that piece of

5    things.  And, first, to make sure that it's framed correctly,

6    which I think the Court has, the unlawfulness prong only under

7    the UCL raises this particular question.

8              THE COURT:  Right.

9              MR. SOBOL:  Right.  The remarks that are made by some

10   people in either Kaiser or the Permanente Medical Group in 2001

11   are observations about their utilization and not what's causing

12   the high amount of the utilization of the off-label.  In other

13   words, they are reacting to the reality of the increasing

14   script writing for Neurontin, which appears to be, to them,

15   high off-label, but it's not as if they have been able to

16   identify that the cause of that is an unlawful act of off-label

17   promotion.

18             THE COURT:  I agree with that to a point, and then I

19   wonder whether it doesn't put you on inquiry notice.

20             MR. SOBOL:  And that's the question.

21             MR. CHEFFO:  That would be our point.  I mean, if you

22   had to know the injury, the cause and everything else, then you

23   wouldn't need a statute of limitations.

24             THE COURT:  But it doesn't wipe out the whole thing

25   because I think every time you sell it unlawfully, you promote

1    it unlawfully, it starts it again, unlike fraud where it's, you

2    know, once you learn of the fraud, you should stop it.

3         MR. CHEFFO:  And here, once they knew about it, they

4    started taking steps all along the way to deal with it, so --

5         THE COURT:  But you can't expect -- I mean, Pfizer is

6    an unusually nimble corporation.  It markets, it targets.  It

7    changed its strategy when the investigation came down.  It's an

8    effective, quick -- a victim of a fraud that's lethargic rather

9    than nimble in how they implement something doesn't mean they

10   can't collect.

11        MR. CHEFFO:  The only thing I would say to that, your

12   Honor, is we've all heard -- you know, we hear this, we can't

13   turn the ship around, genie out of the bottle --

14        THE COURT:  Yes, it's like the "Queen Elizabeth,"

15   right, that whole metaphor.

16        MR. CHEFFO:  But did we just not here from

17   Dr. McCarberg saying, as soon as somebody writes something

18   off-label, or from Dr. Maizels yesterday saying, if you

19   write -- I think I'm pronouncing it right -- Lamictal for

20   (Inaudible) use in post-infection, you get a screen that pops

21   up, you get this that happens.  So this concept that you can't

22   deal with anything, I mean, they have procedures in place to

23   automatically tell doctors --

24        THE COURT:  You know what, it's an argument for a

25   jury.  I'm just simply saying you can't say because someone

1    doesn't turn it around right away.  On the other hand, you

2    can't play an ostrich.  If you have off-the-chart numbers in

3    off-label, don't you at least ask at that point, are you being

4    detailed, what's happening here?  So that's my question, not

5    that it's going to knock it out altogether, but at some point,

6    what would that be?  And so that's where maybe American Pipe

7    matters, whether I say it's 2000 or 2001?  That's where it

8    might matter?

9            MS. NUSSBAUM:  Your Honor, the evidence is that they

10   don't even start looking at how much utilization of this drug

11   is until late 2001 when they first start looking.  And then

12   within -- they're just looking at it, and then six months later

13   they learn through the Wall Street Journal and the New York

14   Times about the Franklin case, and then they go into action.

15           THE COURT:  But aren't all those monographs in the

16   late '90s, a lot of them?

17           MR. CHEFFO:  Yes.

18           MS. NUSSBAUM:  But the monographs --

19           THE COURT:  So they're looking at the drug.  I mean,

20   they know that's off-label.  They know that those things --

21           MS. NUSSBAUM:  But they don't know, okay, that it's

22   off-label because of the off-label promotion of the defendant,

23   and in fact --

24           THE COURT:  Excuse me.  I agree with that.  The

25   question is whether it puts someone on inquiry notice.  That's

Page 212

1    the only inquiry that I've got.  And it doesn't wipe out your

2    cause of action.  The question is whether it does and whether I

3    do it as a matter of law or whether it should go to a jury, and

4    maybe I take care of it afterwards.

5              Just thinking out loud for a minute, all these moving

6    pieces, American Pipe wouldn't matter for the California claim.

7              MS. NUSSBAUM:  No.

8              THE COURT:  Under any theory, that's when you filed

9    the complaint because was that part of the class complaint?

10             MS. NUSSBAUM:  No.  The 17200 claim is the Kaiser

11   claim.

12             THE COURT:  It's not common to the class complaint?

13             MS. NUSSBAUM:  Well, does the class have a 17200

14   claim?  It probably does.  It has a claim for every state.

15             MR. SOBOL:  I'd have to go back and take a look.

16             THE COURT:  Well, look at it, just look at that.  Do

17   you know?  Does anyone know?

18             MS. ARMSTRONG:  Does it have a 17200 claim?  I'm not

19   sure.  I actually think they tried to avoid state law issues in

20   the class action complaint, but I'd have to go back and check

21   it.

22             THE COURT:  I mean, it's a simple factual question, so

23   we'll wait.

24             All right, so moving right along, can I just get you

25   on the -- let me just find out what the fraud is here, okay.

1    You're claiming the fraud is a publication fraud, which is that

2    they published favorable articles and they suppressed

3    unfavorable articles, as I understand it.

4              MR. SOBOL:  In part.  I mean, that's not the --

5              THE COURT:  I understand.  And part of it is, they

6    said false things to Kaiser, the DIS, right?  So I need to

7    understand.  And let's assume for a minute I think there are

8    enough predicate acts and there's an enterprise and there's

9    enough for causation.  For each of the indications, when I was

10   looking at your timeline, I wasn't sure it dated you back to

11   1995.

12             MR. SOBOL:  On the enterprise or on suppression?

13             THE COURT:  On the first predicate act that could have

14   caused harm.

15             MR. SOBOL:  So I'm not so sure --

16             THE COURT:  The first suppression, in other words.  In

17   other words, the theory of your case is half-truths.  Really,

18   when it comes down to it, they publish some, they don't publish

19   others, they delay, with the exception of DIS which comes much

20   later.

21             So in bipolar, what is the first thing that was

22   suppressed.

23             MR. SOBOL:  Okay, so Mr. Rona is going to address this

24   issue, but just so you know, there's two things that are in

25   play, right?  We have to prove when the enterprise starts and

56911cdc-45d4-450f-a2bd-8ee3ff13fe4d

1    then when the suppression began for the suppression component

2    of the case.  There are also comission pieces of the case as

3    well too, but the enterprise we say starts -- and then I'll

4    turn it over to Mr. Rona on the suppression -- the enterprise

5    for CDM, the testimony of Knapp was that there was a previous

6    advertising agency that took Parke-Davis through 1994, and in

7    1995 there was a new relationship between Parke-Davis and CDM,

8    and that's when things start.

9              THE COURT:  I understand that.

10             MR. SOBOL:  Okay, and Mr. Rona will then address for

11   each indication when the suppression dates are.

12             MS. NUSSBAUM:  But, your Honor, in addition to that, I

13   think it goes back further and is broader than just the

14   suppression of the medical literature; and that is, for

15   example, there was testimony here that they did not know that

16   the FDA by 1995 had launched an inquiry into the illegal

17   off-label promotion.  I mean, for example, in the very first

18   monograph, which is in 1997 --

19             THE COURT:  Can we back up for a minute.

20             MS. NUSSBAUM:  Yes.

21             THE COURT:  Maybe there's something I don't know.  Did

22   the FDA launch an off-label in 1995?

23             MS. NUSSBAUM:  There is the letter, the letter that

24   concerns Dr. Mellick that is Exhibit 87, I believe, that in

25   1995, they do a letter -- '96, I'm sorry, 1996, they do a

1    letter to the company saying that they're looking at off-label

2    promotion, and asking for the financial relationship between

3    Pfizer and a whole host of people.  One of them is this

4    Dr. Gary Mellick --

5              THE COURT:  I understand, but --

6              MS. NUSSBAUM:  -- whose case report, so -- and there's

7    testimony --

8              THE COURT:  When did that happen?

9              MS. NUSSBAUM:  We didn't find out about it --

10             THE COURT:  When did it happen?

11             MR. RONA:  When did the Mellick case reports get

12    published?  They were published in January --

13             THE COURT:  The case is a suppression case.

14             MR. SOBOL:  Right.

15             THE COURT:  So when did it get suppressed?

16             MR. RONA:  Well, let me start with bipolar.

17             THE COURT:  Bipolar, what was suppressed and when?

18             MR. RONA:  The first thing that was suppressed was the

19    FDA's statistical review showing that this drug had no benefit

20    compared to placebo for mood symptoms of the patient population

21    studied, which happened to be epilepsy.  They not only ignored

22    that, but they actually put out an article called the Dimond

23    article to say the exact opposite, that it enhances mood.  And

24    that article is cited in almost --

25             THE COURT:  All right, so when was it done?

Page 216

1          MR. RONA:  That article came out in '96.

2          THE COURT:  I agree with that.  That's what you show

3     on your timeline.  So doesn't the damages, if you win, start in

4     1996, not 1995?  I'm just logically going through it, what I

5     call pruning, so I don't have a messy verdict if it comes back

6     for you that I have to start carving up.

7          MR. SOBOL:  So bipolar, the suppression is the first

8     time they utter anything whatsoever about bipolar because

9     before that, they have the evidence Mr. Rona just mentioned.

10         THE COURT:  But that's Dimond, isn't it?

11         MR. SOBOL:  No.

12         MR. RONA:  There are teleconferences before that.

13         THE COURT:  No, it's got to be what would cause the

14    harm to Kaiser; and unless you have a Kaiser DIS or someone on

15    that teleconference, it's going to be the Dimond study, which

16    is 1996, unless you back me up.

17         So what about migraine.

18         MR. RONA:  On migraine, the first negative study was

19    in the late 1980s, so that was known before Neurontin was even

20    available on the market.

21         THE COURT:  But what did they actually publish?

22         MR. RONA:  What they published was every pain study,

23    every migraine study, any article that says there's favorable

24    anecdotal data, including Mathew did an open-label study.

25         THE COURT:  You know, you know this like you probably

1   count sheep at night.  I don't know the Mathew study.  It

2   wasn't a big one for me.  So back up.  When was the first time

3   that Pfizer spoke?  Remember, I'm going to say to this jury,

4   once you speak, you have to tell the whole truth.  When was the

5   first time Pfizer spoke in a way that could have affected

6   Kaiser?

7           MR. RONA:  Well, I think --

8           THE COURT:  Like the equivalent of the Dimond article.

9           MR. RONA:  Well, the Mellick article, the same thing.

10          THE COURT:  All right, Mellick, what does Mellick talk

11  about?

12          MR. RONA:  Mellick publishes on RSD the same case

13  reports over and over again until people pay attention.  He

14  started in January of '95.  He published two --

15          THE COURT:  On what?  On what indication?

16          MR. RONA:  On RSD.

17          THE COURT:  When is the first time there was a

18  publication on migraine or any kind of national statement on

19  migraine?

20          MR. RONA:  1995.

21          THE COURT:  And what was that?

22          MR. RONA:  That was Mathew presenting open-label

23  results on migraine, even though he had met with the company --

24          THE COURT:  When?  In 1995 where?

25          MR. RONA:  I believe it was San Francisco, but don't

Page 218

1    hold me to that.  I have to check.

2           THE COURT:  But it was in California?

3           MR. RONA:  I believe there was an AAN conference in

4    California, but I can check whether that was '95, '96.

5           THE COURT:  And at that point you're saying they knew

6    about certain negative things?

7           MR. RONA:  They knew since the late '80s, so, yes.

8           THE COURT:  All right, so you're going to give this to

9    me, right?

10          So now we have nociceptive.  You're going to do a memo

11   on that because you didn't know that, right?

12          MR. SOBOL:  Correct.

13          THE COURT:  Neuropathic is probably a little easier.

14   When was the first suppression?

15          MR. RONA:  Well, the first DBRCT that was suppressed

16   is the Gorson study.  By "suppressed," I mean delayed and sort

17   of marginalized.

18          THE COURT:  When was the first time they spoke about

19   neuropathic pain in a way that's public and you could draw an

20   inference was tied to Kaiser?

21          MR. RONA:  Well, certainly at the ADA symposium that

22   was for people who treat patients with diabetic peripheral

23   neuropathy.  That was in Boston in 1997, and that's a national

24   congress.

25          THE COURT:  All right, let's just take it for that.

1   So then the first, the damages begin in 1997, unless you find

2   another way in which they spoke that went into the national --

3          MR. RONA:  And I don't have it all memorized.

4          THE COURT:  And I'm not even sure that counts if there

5   was no one from Kaiser there, so you're going to have to back

6   me into it.

7          MR. RONA:  But as Linda just pointed out, Kaiser

8   certainly did rely on the Mellick case reports that were

9   published.

10          THE COURT:  But not till later.  I'm just simply

11   saying, I'm talking about damages.

12          MS. NUSSBAUM:  1995, your Honor.

13          THE COURT:  Excuse me?  Would you do this for me.  You

14   know, I've got another group of people waiting, it's late on

15   Friday.  Could you get me Monday morning -- and I know this is

16   a killer weekend, I'm sorry, but it's your last one -- just the

17   two key dates are, when did they first speak in a way that

18   connects it to the national marketplace, and when is the first

19   time that triggers your duty to speak the whole truth?  And

20   when does that then, when do they first suppress something so

21   that that's a violation?

22          Now, if we had had any evidence of detailing on what

23   people said or didn't say, it may be broader, but right now

24   what we have is -- unfortunately, the data was destroyed, so

25   the two frauds that I'm focused on is the one you focused on,

1    which is the publication fraud and the fraud allegedly directly

2    to DIS.  Those are the two frauds I'm thinking about.  And by

3    "publication," I include as well CMEs and national

4    teleconferences and the like because we've heard some about

5    that, as long as you can connect it up to the West Coast --

6    well, that's not totally true -- to any of the Kaiser locations,

7    which is all over the country.

8         MR. CHEFFO:  Just two points, your Honor.  I mean, you

9    know, they'll do what they want to do, I guess, but, you know,

10   Ms. Nussbaum keeps raising RSD, this Mellick.  We heard a lot

11   about that, but it's RSD, so --

12        And the second point is, would your Honor entertain --

13   you had mentioned, I think we had talked about it at sidebar,

14   the idea of mitigation.  So, in other words, you know, when you

15   start, we're talking about what they knew or when the first

16   discussions were, but what about, you know, kind of at some

17   point cutting off the damages --

18        THE COURT:  You know, actually, I'm not sure you gave

19   us a jury instruction on mitigation.

20        MS. ARMSTRONG:  This morning we did.

21        THE COURT:  Oh, okay.  I was looking, I was looking.

22   But, fine, I mean, I might give --

23        MR. CHEFFO:  On one side, you know, the point should

24   be, well, if you're going to start here, once they knew and

25   they still took other action, at some point --

Page 221

1          THE COURT:  I think that's a total fair call for the

2     jury.  What I don't want to be at is in a situation where you

3     win, and you appropriately win, but you go back to 1995, and

4     there's no evidence till 1998.  I don't want to be there

5     because you've got a problem.  Your problem is that there's no

6     data about detailing.  I'm not faulting anyone.  There's just

7     no data about detailing.  And so the fraud has to come in terms

8     of the publication fraud and the fraud in CMEs and in

9     teleconferences and in the communications to DIS and DIS's

10    reliance on the publications.

11          MS. NUSSBAUM:  Your Honor, if I might, there was

12    testimony from Dr. Carrejo that this became a detailable

13    product in 1994 when it the went on the formulary.  There also

14    is a P&T Committee minutes that went in that showed that when

15    they became concerned about the over-utilization of the drug,

16    they then tried to limit the detailing by Pfizer of Neurontin,

17    and that that was voted on in late 2001 and became effective in

18    the spring of 2002, so I think that there is information and

19    evidence --

20          THE COURT:  Sure, there's evidence that there was some

21    detailing.  I'm just saying, what we don't know is the extent

22    of it.  We don't know what was said.  We just don't know -- I

23    think they couldn't possibly argue that somehow this national

24    global initiative, somehow they carved off all the districts

25    with Kaiser in it.  I mean, that just would be unreasonable,

Page 222

1    and no one has come up and said that.  So I assume and I think

2    a reasonable inference for the jury is to infer that there was

3    expansive detailing; but what was said and to whom it went and

4    how, Northern versus Southern California, don't know, and you

5    don't know.

6           MR. RONA:  Actually, there is evidence in the record,

7    your Honor, of two different PR blitzes around articles that

8    were published that were then given to sales reps to hand out,

9    300,000 copies.  There aren't that many doctors even in the

10   U.S., 300,000 copies handed out.

11          THE COURT:  Sure, but in what year?  See, I'm just

12   looking now -- what?

13          MR. RONA:  '99.

14          THE COURT:  Sure.  My problem is, you're seeking

15   damages from 1995, and it may be you lose a couple of years in

16   there.  And I think you should, to the extent, rather than

17   having prolonged fights about it, you should just chop it off

18   if you can't prove it back to that period of time.  If not,

19   I'll have to do it because I don't want it messy.  Coming

20   forward, I'm happy to give a mitigation instruction, but I'm

21   not going to do it as a matter of law.

22          So I think that basically -- I need to go -- I'm

23   faltering here a little.  I have another whole hearing right

24   now.  I'm trying to remember if there were any other key issues

25   that we were going to address.

Page 223

1          MR. SOBOL:  I think we're just all going to the

2    Barking Crab, your Honor.

3          THE COURT:  Oh, yes, there was.  You didn't give us

4    jury instructions on the unfairness prong.  Is that because

5    you're dropping it?

6          MR. SOBOL:  No.

7          MS. NUSSBAUM:  They're not included?  I thought that

8    they were included, your Honor.  They were in the draft that

9    we -- this is what was just filed today?

10         THE COURT:  Yes.  You're not dropping the cause of

11   action, are you?

12         MS. NUSSBAUM:  No, we're not.  It must have been a

13   wrong version that was filed.

14         MR. SOBOL:  Thank you for bringing that to our

15   attention.  We'll address it right away.

16         THE COURT:  All right.  And I'm dropping statute of

17   limitations out of UCL.

18         MR. SOBOL:  So when you do that, your Honor, then that

19   enables you to consider whether or not you're able to fold in a

20   couple of those questions with one another or not?  I'm not

21   sure if that's clear, but just I'll be thinking about it too,

22   and you might also.

23         THE COURT:  I've got some selfish agendas here too.

24         MR. SOBOL:  Yes.

25         THE COURT:  Which is the key one being the

56911cdc-45d4-450f-a2bd-8ee3ff13fe4d

1    following -- everyone's looking up -- which is, if they find

2    "no" to all the RICO claims, I'm not going to know whether

3    that's because they didn't find an enterprise, they didn't find

4    fraud, they didn't find causation.  I'm not going to know what

5    that is.  I'm just not going to know.  And so the U.S.

6    Attorney's office has now pretty much abandoned most RICO

7    claims unless it's generally organized crime because it's so

8    difficult to prove an enterprise.  It's hard for a jury to get.

9    So what my ulterior motive is, actually, because there are

10   other cases out there, is to sort of tease out, if they say

11   "no," was it because of the enterprise or the fraud?  Just to

12   understand what they're finding.  I think it will help you all

13   in settling.  It will help me understand things.  We want to

14   hear a voice of the community.  That's why we're doing this.

15   So that's why I'm going to want to have -- I want a separate

16   question on the fraud.  I think unfair and deceptive isn't

17   going to help me resolve other cases.  It's just unique to

18   California -- excuse me, I said that wrong.  Unfair isn't going

19   to help me, unlawful isn't going to help me, unlawful

20   advertising isn't going to help me because it's so broadly

21   stated.

22          The only concern I have is, fraud is so broad under

23   California law, I'm not even sure that will help so much, but

24   it will be better than just not knowing if it was the

25   enterprise issue or the fraud issue.  And, see, I'm hoping at

Page 225

1    some point whatever we do here and whatever happens in Shearer

2    will start facilitating some broader discussions, and I think

3    that's why I'm so eager to have a word of the jury in all this.

4            So thank you very much.  Have a wonderful weekend.

5            MR. SOBOL:  Thank you, your Honor.

6            MS. NUSSBAUM:  Thank you, your Honor.

7            THE COURT:  You will have Easter, you will have

8    Passover.

9            MS. ARMSTRONG:  Can I give the case citation to your

10   law clerk?

11           THE COURT:  Yes, yes.  Thank you.

12           (Adjourned, 3:40 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 226

1

2

3

4

5

6

7

8

9

10                              CERTIFICATION

11

12            We certify that the foregoing is a correct transcript

13      of the record of proceedings in the above-entitled matter to

14      the best of our skill and ability.

15

16

17

18
        /s/Debra M. Joyce              March 20, 2020
19      Debra M. Joyce, RMR, CRR       Date
        Official Court Reporter
20

21      /s/Lee A. Marzilli            March 20, 2010
        Lee A. Marzilli, RPR, CRR      Date
22      Official Court Reporter

23

24

25