Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


IN RE:                               )
                                     ) No. 04-10981-PBS
NEURONTIN MARKETING, SALES PRACTICES, ) MDL No. 1629
AND PRODUCTS LIABILITY LITIGATION    )
---------------------------------------)
This document relates to:            )
KAISER FOUNDATION HEALTH PLAN, et al, )
                                     )
                Plaintiffs           )
                                     )
        -V-                          )No. 04-10739-PBS
                                     )Pages 1 - 129
PFIZER, INC., et al,                 )
                                     )
                Defendants           )



                JURY TRIAL - DAY NINETEEN

        BEFORE THE HONORABLE PATTI B. SARIS
            UNITED STATES DISTRICT JUDGE




                    United States District Court
                    1 Courthouse Way, Courtroom 19
                    Boston, Massachusetts
                    March 22, 2010, 8:50 a.m.




        LEE A. MARZILLI and DEBRA M. JOYCE
            OFFICIAL COURT REPORTERS
          United States District Court
           1 Courthouse Way, Room 7200
                Boston, MA  02210
                 (617)345-6787

Page 2

1    A P P E A R A N C E S

2    FOR THE PLAINTIFFS:

3        THOMAS M. GREENE, ESQ. and ILYAS J. RONA, ESQ.,
     Greene, LLP, 33 Broad Street, 5th Floor, Boston,
4    Massachusetts, 02109.

5        THOMAS M. SOBOL, ESQ. and KRISTEN JOHNSON PARKER, ESQ.,
     Hagens Berman Sobol Shapiro, LLP, 55 Cambridge Parkway,
6    Suite 301, Cambridge, Massachusetts, 02142.

7        LINDA P. NUSSBAUM, ESQ., Kaplan Fox & Kilsheimer, LLP,
     850 Third Avenue, New York, New York, 10022.
8
         DON BARRETT, ESQ., Barrett Law Office,
9    404 Court Square North, P.O. Box 987, Lexington, Mississippi,
     39095.
10
         BARRY HIMMELSTEIN, ESQ., Lieff Cabraser Heimann &
11   Bernstein, Embarcadero Center West, 275 Battery Street,
     San Francisco, California, 94111-3339.
12

13   FOR THE DEFENDANTS:

14       KATHERINE ARMSTRONG, ESQ., MARK S. CHEFFO, ESQ., and
     THOMAS E. FOX, ESQ., Skadden Arps Slate Meagher & Flom, LLP,
15   Four Times Square, New York, New York, 10036.

16       RAOUL D. KENNEDY, ESQ., Skadden Arps Slate Meaher & Flom,
     LLP, Four Embarcadero Center, San Francisco, California, 94111.
17
         JAMES E. HOOPER, ESQ. and ANDREW H. MYERS, ESQ.,
18   Wheeler Trigg Kennedy, LLP, 1801 California Street, Suite 3600,
     Denver, Colorado, 80202.
19

20

21

22

23

24

25

1                       I N D E X

2

   WITNESS                DIRECT   CROSS   REDIRECT   RECROSS

3

4   MICHAEL C. KEELEY        21      63       112       120

5

   BY VIDEOTAPE:

6

   Albert Carver, P. 123

7

   Mitchel Danesh, M.D., P. 125

8

9

10  EXHIBITS                            PAGE

11

   250, 352, 355                          5

12

   1617                                   6

13

   81, 90                                109

14

   863                                   120

15

16

17

18

19

20

21

22

23

24

25

ef89fb21-81da-45d7-8dea-621f898382b0

1                    P R O C E E D I N G S

2          THE COURT:  So good morning.

3          MR. CHEFFO:  Good morning.

4          MR. SOBOL:  Good morning, your Honor.

5          THE COURT:  Are there issues?

6          MS. ARMSTRONG:  Yes, your Honor.

7          MR. CHEFFO:  As I said, there may be a Keeley or two

8   issue, and then we have, I wouldn't call them issues.  They're

9   just things I want to put on the record, which we've agreed.

10  Ms. Nussbaum and I have agreed to a few documents.

11         THE COURT:  Who are the witnesses today, Keeley?

12         MS. ARMSTRONG:  Dr. Keeley and then I think

13  depositions.

14         THE COURT:  So that's the end of it, just Keeley?

15         MS. ARMSTRONG:  Yes, your Honor.

16         THE COURT:  Why did I think there was another one?

17  Maybe I'm wrong.

18         MR. SOBOL:  There was a possibility of a rebuttal.

19         MR. CHEFFO:  Yes, that was one of the things I was

20  going to tell you, your Honor.  There is not going to be a

21  rebuttal.  We've agreed to introduce certain documents into

22  evidence, and in exchange, there's going to be no rebuttal

23  witness.  So basically just so we're clear, Documents 250, 352

24  and 355, those are three documents that Kaiser wanted admitted.

25         THE COURT:  Wait.  Make sure Robert gets them.

ef89fb21-81da-45d7-8dea-621f898382b0

1        MR. CHEFFO:  250, 352, 355, those are documents Kaiser

2  had wanted introduced.  We've now agreed, subject to redaction,

3  I think, of one page of a GM reference.

4        (Exhibits 250, 352, and 355 received in evidence.)

5        MR. CHEFFO:  We also have a binder called

6  "Submission of Exhibits Produced By the Kaiser Plaintiffs"

7  dated today.  These have been agreed to be introduced into

8  evidence.  There is a --

9        THE COURT:  Well, wait a minute.  Wait, wait, he's got

10  to get this.  What numbers are they?

11        MR. CHEFFO:  There's about --

12        THE COURT:  Pfizer wants these or Kaiser wants these?

13        MR. CHEFFO:  Pfizer wants these.  They are Kaiser

14  documents.

15        THE COURT:  These are ones that you gave to me before?

16        MR. CHEFFO:  We took a few out.

17        THE COURT:  So these are agreed-upon documents?

18        MR. CHEFFO:  Correct.

19        THE COURT:  So how am I going to know what's left

20  that's disagreed upon?  Are there any disagreed upon?

21        MR. CHEFFO:  As to the Kaiser, I think we've worked it

22  out.  So, in other words, we've agreed that I'd take out a few

23  and Ms. Nussbaum agreed not to object to a few, and we're also

24  then not going to have a rebuttal.  Is that right, Tom?

25        MR. FOX:  Then we have a few other items remaining

1    with the two other binders, Binders A and B that we proposed

2    that Mr. Sobol and I --

3              MR. SOBOL:  Don't complicate it.  Just say "Kaiser."

4              MR. CHEFFO:  But keeping to Kaiser, the quick answer

5    is, there's no disputes on the documents, okay?

6              THE COURT:  All right.

7              MR. CHEFFO:  So that's it.

8              THE COURT:  Okay, so Robert should just take that

9    binder he was just handed and admit all those documents?

10             MR. CHEFFO:  Correct, your Honor.  And there's an

11   index in there that explains it.

12             The only other housekeeping matter is, there was an

13   article, it's Exhibit 1617 by Spira, that was discussed with

14   Dr. Gibbons that inadvertently was not introduced into

15   evidence.  Plaintiffs have agreed that we can now introduce

16   1617 into evidence.

17             (Exhibit 1617 received in evidence.)

18             MR. CHEFFO:  And I think the only other thing, just as

19   a housekeeping matter as we're starting to get very close, we

20   have the stipulation regarding our favorite exhibit, the big

21   book, 923.  I wasn't clear, your Honor, if you were planning to

22   read that or just give them a hard copy.

23             THE COURT:  No.  I was just going to give it to them.

24             MS. NUSSBAUM:  It's in evidence.  It was given a

25   number by Mr. Alba.

1          THE COURT:  I think we should also pin it to it before

2     they walk into it, let their fingers do the walking through the

3     Kaiser doctors; but they can at least have it, they'll know

4     right there, it will be clipped to it.  They'll know exactly

5     what it is.

6          MR. CHEFFO:  That makes perfect sense.

7          And then the only last thing, your Honor, there's

8     literally four objections, two from them, two for us, on a few

9     of the depositions we'd like to play today.  If your Honor

10    could just take a look, I think you can -- at the break you can

11    deal with that.  I think they're pretty short.

12         MR. GREENE:  I didn't make them, Judge.

13         THE COURT:  No, the last one I fully accept it was

14    just a miscommunication as to what was left.

15         MR. CHEFFO:  There's really four.

16         THE COURT:  As long as you've conferred, I'm sure it's

17    reasonable.  I think that the other one was just an anomaly;

18    we'll leave it there.  But here's my problem.  I know you were

19    all working all weekend, but it actually -- just to read

20    everything plaintiffs submitted took me the weekend and to go

21    through California unfair law.  I have to tell you, I hope none

22    of this -- I'm going to take out everything but the fraudulent

23    practices from the verdict form and do everything else as a

24    matter of law.  I think it's just too complicated to hand to

25    them.  Unlawful has complex issues of preemption that we need

1    to get to.  Unfair I think hooks on unlawful and fraudulent.

2    It's either one or the other, and I'm going to get a verdict on

3    fraudulent.  And I think that the unlawful advertising probably

4    doesn't apply because it's to the public.  I've now sort of

5    rolled up my sleeves on the unfair California law, and I think

6    the only thing that makes sense to send to this jury is the

7    fraudulent piece, and the rest I'll retain for myself.  So I

8    think that's going to shorten a lot of things.

9          I understand you -- I was surprised to find out that

10   there was another set of jury instructions that came in over

11   the weekend from plaintiffs because I was actually working off

12   of defendants' objections and your California law instructions,

13   so I didn't know I was going to get yet another round.  Maybe

14   you can help me with those.  What are those about?  Does anyone

15   know what the new round of plaintiffs' instructions are, jury

16   instructions?  No?

17         MS. NUSSBAUM:  We filed the California ones, your

18   Honor, on Friday.

19         THE COURT:  That's all it is?

20         MS. NUSSBAUM:  That's my understanding.

21         MS. ARMSTRONG:  That's all I've seen.

22         MS. NUSSBAUM:  We filed the California piece a second

23   time because --

24         THE LAW CLERK:  It could be Shearer.

25         MR. CHEFFO:  It could well be Shearer.  We'll try to

1    clear that up.

2           MS. NUSSBAUM:  Our last submission was on Friday.  We

3    filed the California --

4           THE COURT:  Okay, so I've caught up with you then.

5    I'm there, I'm there.  Okay.

6           MS. NUSSBAUM:  There's only one other issue, though,

7    that Mr. Cheffo and I have discussed, and that concerns

8    Dr. McCarberg, whose video was played I think the last thing on

9    Friday.  And through inadvertence or whatever -- as we all

10   know, there's been many back-and-forths with designations,

11   certain designations -- a very small amount, it's less than ten

12   minutes' worth is my understanding, were not in the final set,

13   were not there.  We would like those designations read in,

14   either as part of this case before it rests, or, alternatively,

15   I guess, as a tiny ten-minute rebuttal.

16          THE COURT:  You can do it as rebuttal.

17          MR. CHEFFO:  We talked about this.  I heard about this

18   last night.  I also heard -- you'll recall McCarberg went over

19   a few days.  We actually waited till last.  You know, I don't

20   think this is inadvertent, candidly, your Honor.  I think these

21   are specific things that are targeted to your comments at the

22   Rule 50.  If you allow that, we have cross-designations.  You

23   know, we can't go back and say, well, Dr. Glanzman, we want to

24   put five minutes at the end of it.  McCarberg was integrated.

25   This is not just one or two words.  This is specific

1   information --

2          THE COURT:  McCarberg was when, last thing on Friday?

3          MR. CHEFFO:  Right, but we --

4          THE COURT:  I'm going to let them do it.  Just it's

5   not that tight a thing.  If you have additional things on

6   McCarberg, put McCarberg in.

7          MS. NUSSBAUM:  Thank you.

8          THE COURT:  I haven't seen it.  There may be

9   objections to it.  I don't know, I mean --

10         MR. CHEFFO:  If your Honor would just look at it, the

11  entire testimony was integrated --

12         THE COURT:  We're not going to do it right now.  Show

13  it what it is.  I don't know when I'll get to it.  We'll start

14  with a live witness, and then if you want to do it, I'll have

15  to read it.

16         MS. NUSSBAUM:  Thank you very much.  We will give

17  you --

18         THE COURT:  Where is it?

19         MS. NUSSBAUM:  Mr. Tabb, do you have it?  We'll have

20  it to you within an hour, your Honor.

21         THE COURT:  Just to see what it is.

22         MS. NUSSBAUM:  Okay, we'll have it to you within an

23  hour.  We also have asked the defendants if we can use their

24  cut of the video as ours.  It can no longer be manipulated to

25  do this.  We understand they have it, they have it here in

1    their war room, and we could quickly work with that and get it

2    well within an hour.

3         THE COURT:  Or you'll read it in.

4         MS. NUSSBAUM:  Yes, we'll have it for you within an

5    hour, your Honor.

6         MR. CHEFFO:  I think you know our position.  This is

7    not a -- this is something that we --

8         THE COURT:  I don't know.  I haven't seen it.  Usually

9    if they've forgotten a couple of snippets, I don't care.  If

10   it's a huge thing --

11        MS. NUSSBAUM:  It's not at all, your Honor.

12        MR. CHEFFO:  It's huge.  You'll see it.

13        MS. NUSSBAUM:  We'll have it to you before the break.

14   Thank you so much.

15        THE COURT:  I don't know if the jury is here yet.

16   We're planning on doing our charge conference this afternoon.

17   I'm going to be revamping.  I've accepted a fair number of

18   their objections but not all of them.  I've accepted some

19   requests for a curative instruction on the "no one's been hurt"

20   issue but not as you've worded it.  But there are a few

21   things -- it's going to -- you'll need somebody -- we probably

22   can get it to you somewhere around the break is my sense, and

23   somebody be working on it so --

24        MR. SOBOL:  There's a couple of Keeley slide issues.

25        MS. ARMSTRONG:  And we have some issues with the

1    exhibits as well on Dr. Keeley.

2              MR. SOBOL:  May I approach, your Honor?

3              THE COURT:  Yes, yes.  So what's the issue?  Thank

4    you.

5              MR. SOBOL:  So there are objections to, I think, the

6    first three slides you have.  They're 3, 4, and I believe it's

7    16.  In Dr. Keeley's 2006 and 2008 reports, there's nothing

8    that is Kaiser-specific.  What it appears is, during the trial

9    Dr. Keeley has been here; he's now supplemented his opinions

10   and put slides in that are Kaiser-specific.  You'll note that,

11   for instance, the Carrejo analysis there is Slide 3 or

12   so that's --

13             THE COURT:  Back up.  So this is Keeley, he's the

14   economist?

15             MS. ARMSTRONG:  Yes, your Honor.

16             THE COURT:  All right, he's the economist.  And you

17   say that there are -- I can't go that fast.  Let me just look

18   at the slides.

19             MR. SOBOL:  Sure.  So the first two slides you'll see

20   they are talking about what happens at Kaiser, about its

21   formularies, about DUAT, about this and that.  None of that's

22   in his report.

23             THE COURT:  And none of that's in his expert report?

24             MR. SOBOL:  Correct.

25             MS. ARMSTRONG:  May I respond, your Honor.  I will say

1   that in his December, '06 -- keep in mind that this trial date

2   was set in November of '09 after all the expert reports were

3   in.  In his '06 report, Dr. Keeley did address the differences

4   among third-party payors and why you could not take national

5   data and just apply it to any third-party payors.  Both

6   Dr. Rosenthal and Dr. Hartman, neither of them address the

7   application of nationwide data to Kaiser in their reports.

8   They were allowed to testify to that extensively in their

9   direct examinations, Professor Rosenthal over our objection;

10  and Dr. Keeley is just responding to that testimony.

11          THE COURT:  No, I sustain the objection.  You can't

12  hand it to them the morning right before the trial after we've

13  been here for a month.

14          When did you get these?

15          MR. SOBOL:  Last night.

16          MS. ARMSTRONG:  Does that mean we can't use those

17  slides, or he can't testify about it?

18          THE COURT:  You can't do anything new that you haven't

19  told them about.  If you'd told me about it two weeks ago, that

20  would be one thing.  I understand things aren't perfectly

21  scripted, but you can't do this the night before.  No,

22  sustained.

23          MS. ARMSTRONG:  I understand, your Honor.  Are you

24  saying that Dr. Keeley cannot address the testimony of

25  Dr. Rosenthal and Dr. Hartman that they gave on the direct?

1          THE COURT:  If it's not in the report.

2          MS. ARMSTRONG:  It wasn't in their reports, your

3     Honor.

4          THE COURT:  I don't remember that objection coming in

5     that it wasn't in their report.  I remember you objecting on a

6     hundred other grounds.  You did object that she wasn't

7     competent, that it wasn't based on good evidence, and you

8     objected on a lot of grounds; but whenever anyone objected to

9     me ever throughout this trial that it wasn't in the report, I

10    sustained it.

11         MS. ARMSTRONG:  Will we have an opportunity at some

12    point to make an offer of proof with Dr. Keeley on this?

13         THE COURT:  Fine, but you cannot pop it on them the

14    night before the testimony.  That cannot happen.  Any

15    supplementation, if there had been enough time, but there

16    hasn't been here.

17         Now, what's the next issue?

18         MR. SOBOL:  The next issue, your Honor, was -- I'd

19    also just comment on that, your Honor, that obviously

20    Professor Rosenthal and Dr. Hartman had Kaiser-specific

21    numbers, so it wasn't a surprise that they were talking that

22    their analysis applied directly to Kaiser.

23         There's one other slide that the defendants have given

24    us on Keeley.  I forgot to mention this.  This is Slide 17.

25    Again, I was just provided that.  In Professor Rosenthal's

1  analysis, she looked at other therapeutic branded drugs to run

2  her regression.  In Dr. Hartman --

3          THE COURT:  Is this something he talked about in his

4  expert report?

5          MS. ARMSTRONG:  Yes, it is.

6          THE COURT:  Well, then he's allowed to do it.

7          MR. SOBOL:  If I may, your Honor, I don't think

8  that -- he did not draw an opinion about comparing the numbers

9  one to another in --

10          MS. ARMSTRONG:  He talked about the fact that they use

11  different lists for their comparator drugs.  This is just a

12  graphic demonstration of his report.

13          THE COURT:  Yes, that objection is overruled.

14          So what's the next issue?

15          MS. ARMSTRONG:  We have some objections to some of

16  their exhibits that they propose to use with Dr. Keeley.  One

17  of them is the sentencing memorandum, not the plea, not the

18  information, but the sentencing memorandum which is the --

19          THE COURT:  Why are you using the sentencing

20  memorandum?

21          MR. SOBOL:  The witness is in the room, your Honor.  I

22  don't want to mention it in his presence, but there is a very

23  good reason to mention it.

24          MS. ARMSTRONG:  Well, Dr. Keeley can leave the room

25  while we address these objections, but --

1        THE COURT:  Come up and see me at side bar.  Do you

2    want to do it at side bar?

3        MS. ARMSTRONG:  Sure.

4        MR. SOBOL:  Sure.

5    SIDE-BAR CONFERENCE:

6        MR. SOBOL:  Dr. Keeley states in at least one, if not

7    both, of his reports that the federal government never claimed

8    that there was a misrepresentation; and he opines that the plea

9    and the circumstances surrounding the plea were limited to a

10   very narrow criminal conviction, and that serves as the basis

11   of his opinion that he criticizes Dr. Rosenthal's use of her

12   model.  The truth is that the government's claims were far

13   broader than simply the guilty plea itself and went beyond

14   that.

15       Now, I understand, if the witness does not testify

16   that the government's claim was, you know, narrow, then I won't

17   get into it because I don't want to run into any 403 issues.

18       THE COURT:  No, so you're forewarned, and you'll just

19   stay away from that.

20       MS. ARMSTRONG:  He's not going to do it on direct, but

21   it does not change the fact that the sentencing memorandum is

22   hearsay.

23       THE COURT:  I'm not going to rule on this yet, let me

24   just say.  No, no, no, wait.  That's not fair.  If he says the

25   government never claimed --

1        MS. ARMSTRONG:  I understand.

2        THE COURT:  But if, yeah, it did claim -- it was

3   Judge O'Toole, I think, so it wasn't in front of me, but I

4   think it's still something that's a court filing.  If they

5   claim, that doesn't mean they necessarily have proven that.  It

6   may not have been essential to the plea.  So you'll just be

7   careful on how you ask.

8        MS. ARMSTRONG:  I'm going to ask him if he -- I mean,

9   I would ask that counsel not be allowed to ask a question that

10  tries to trick Dr. Keeley into making that kind of argument,

11  and then using that as a backdoor way of getting in the

12  sentencing memorandum, not that I'm suggesting that Mr. Sobol

13  would do that.

14       MR. SOBOL:  I'd only do it in a way that nobody could

15  notice.

16       (Laughter.)

17       MS. ARMSTRONG:  He's now told me that I'm not supposed

18  to talk to my witness about this issue.

19       THE COURT:  Well, let me put it this way:  It

20  certainly is not going to be an exhibit in this trial.

21       MR. SOBOL:  Sure.  I would also say, your Honor, this,

22  just since we're dealing with this issue now.  In the

23  defendants' opening, they made an argument that the government

24  never claimed --

25       THE COURT:  Maybe.

1          MS. ARMSTRONG:  We're talking about the information.

2          MR. SOBOL:  If I may, I have -- we have stayed away

3    from the fact that that sentencing memorandum, which we think

4    was integral to the guilty plea, went on and on about unlawful

5    and fraudulent bipolar, pain, and dose.  It went on and on

6    about it.  Now, what we will be doing before the closing is

7    making sure that the defendant doesn't say that the government

8    never claimed this.

9          THE COURT:  But here's the issue:  The government may

10   well have claimed it.  They pled guilty to something narrower.

11         MR. SOBOL:  Right.

12         THE COURT:  And I see these sentencing memos all the

13   time, and the government is allowed to do this.

14         MR. SOBOL:  Right.

15         THE COURT:  So, you know, it wasn't true that they

16   haven't claimed it, and it's not true that people didn't claim

17   injury.  That having been said, you're not going to introduce

18   that sentencing memo.  Under 403, we're not putting that into

19   evidence.

20         So what's the next issue?

21         MS. ARMSTRONG:  They've identified the 2004 10K of

22   Pfizer.  I'm not sure why it's relevant.  There's a few

23   references to Neurontin in it, but it obviously concerns a lot

24   of other stuff, has a lot of financial information.

25         THE COURT:  Well, you're not seeking to put the whole

1    thing in.  Are you seeking to put it in, the whole 10K?

2          MR. SOBOL:  We had planned on putting it in, but I

3    think, again, the incentives of Pfizer in this situation to

4    promote off-label and to make money is relevant.

5          THE COURT:  That may be.  It's not a big surprise.  I

6    mean --

7          MR. SOBOL:  Yeah.  I mean, that's like the --

8          THE COURT:  It's a corporation.  It makes money.

9    Kaiser makes money; Pfizer makes money.  What's it, the

10   business of America is business?

11         MS. ARMSTRONG:  There's other products, there's also

12   other litigation described in it.

13         THE COURT:  Yes, we might delete some of it, but they

14   can ask about it.

15         MR. KENNEDY:  I just want to make sure.  3, 4, and 16

16   are the slides they're objecting to?  I just want to make sure

17   I don't pop one up.

18         THE COURT:  Okay, okay.

19         MR. SOBOL:  I think it was 3, 4, and 17.

20         MR. BARRETT:  That's not what you said.  17 was

21   overruled.

22         THE COURT:  Are they all here?  They need to hurry,

23   guys.

24         MS. ARMSTRONG:  I've got one big issue.  They've

25   identified a lot of documents that Dr. Keeley identified among

1  the materials that he considered.  They're all marketing

2  documents.  He's not going to be a marketing expert.  He's not

3  going to testify whether there was or was not off-label

4  promotion, whether it was right or wrong.

5          THE COURT:  I can't micromanage at this level.  Can I

6  ask you a question.  The one thing I haven't done -- so I

7  started reading all the binders of what Pfizer wants to put in

8  now, and I haven't ruled on those yet.  That's like one big

9  remaining thing.  And as I understand it, you've worked out

10 everything but a few documents, is that right?

11         MR. SOBOL:  Yes, and we'll know the result of that at

12 the end of the break.

13         THE COURT:  Perfect, perfect, because that's the one

14 thing I haven't gone document by document through.  Good.

15         (End of side-bar conference.)

16         THE COURT:  Mr. Keeley can come up.  So I'm safe in

17 saying it's our last witness?

18         MS. ARMSTRONG:  Yes, your Honor.

19         THE COURT:  Come on up, sir.

20         (Jury enters the courtroom.)

21         THE COURT:  Good morning.  I'm cleaning up all my

22 binders here to get ready.  Today you'll be hearing from our

23 last witness, Mr. Keeley, who's on the stand.  We'll hear some

24 depositions, finish the evidence today, I hope, or at least

25 really most of it, and tomorrow we'll have closing arguments

Page 21

1    and jury instructions.  So everybody here has been working all

2    weekend.  They look a bit weary.  So we're going to do our last

3    witness.

4            Mr. Kennedy, do you want to call him?

5            MR. KENNEDY:  Thank you, your Honor.

6            THE COURT:  Oh, I forgot to ask, did anybody see

7    anything in the press or speak about the case?  I find the jury

8    has complied.  Thank you.

9                        MICHAEL C. KEELEY

10   having been first duly sworn, was examined and testified as

11   follows:

12           THE CLERK:  Would you please state your name and spell

13   it for the record.

14           THE WITNESS:  Yes.  My name is Michael Clark Keeley,

15   and the last name is spelled K-e-e-l-e-y.

16           MR. KENNEDY:  May I proceed, your Honor?

17           THE COURT:  You may.

18   DIRECT EXAMINATION BY MR. KENNEDY:

19   Q.   Have you prepared a slide summarizing your background?

20   A.   Yes, I have.

21   Q.   Can we see Slide 1, please.  And could you briefly

22   summarize your educational background starting at the college

23   level.

24   A.   Yes.  Well, I attended MIT here in Cambridge where I got a

25   degree in mathematics.  Then I went on to the University of

1   Chicago where I got a master's and Ph.D. degrees.

2   Q.   And where are you employed?

3   A.   I'm employed at Cornerstone Research where I'm an

4   economist and a senior vice president.  I've been there since

5   1989.

6   Q.   And what do you do at Cornerstone?

7   A.   Well, I do a variety of types of consulting.  I do

8   business consulting, public policy consulting, litigation

9   consulting, and providing expert testimony like I'm doing here

10  today.

11  Q.   Does that include consulting in the healthcare or

12  pharmaceutical arena?

13  A.   Yes, it does.

14  Q.   Over the years, have you conducted your own economic

15  research?

16  A.   Yes, I have.

17  Q.   And has any of that research been published?

18  A.   Yes.  I've published about over fifty articles in

19  economics and finance journals, chapters in books, and I have

20  authored a book on the application of econometrics to issues in

21  labor, economics, and edited a book on economic development.

22  Q.   And have you had occasion to serve as a peer reviewer or

23  referee for any economic journals?

24  A.   Yes, I have.  I've served as a peer reviewer for many of

25  the major economic journals.

ef89fb21-81da-45d7-8dea-621f898382b0

1  Q.   And have you received any awards for your work in

2  economics?

3  A.   Yes.  I was selected to be included in "Who's Who in

4  Economics" based on citations of my own, published economic

5  research by other economists, and I was also awarded the Garn

6  Prize for my research on bank risk-taking.

7  Q.   Can you give us just a little fuller description on the

8  work you've done in the pharmaceutical economics arena.

9  A.   Yes.  I've done a number of different types of consulting

10  projects.  I've worked on cases involving allegations of

11  delayed generic entry and studied the effects of the market of

12  that, other cases involving allegations of monopolistic pricing

13  in the sale of drugs, issues involving the wholesale pricing of

14  drugs, and a case involving the role of a pharmacy benefit

15  manager in managing drug benefits.

16  Q.   Are you a healthcare economist?

17  A.   I would say "no," even though I've done a lot of work in

18  the healthcare area, but I don't specialize solely in

19  healthcare.

20  Q.   Are any of the economic principles that you're going to be

21  discussing with us today different depending on whether you're

22  dealing with a pharmaceutical or a computer or an automobile?

23  A.   No, they're not.

24  Q.   Now, what were you asked to do in this case?

25  A.   I was asked to review and assess the work of

Page 24

1   Professor Rosenthal and Dr. Hartman.

2   Q.   What's a TPP?

3   A.   A TPP is a third-party payor.

4   Q.   And is Kaiser a TPP?

5   A.   Yes, it is.

6   Q.   And what are the characteristics generally of a TPP?

7   A.   Well, third-party payors are organizations, often insurers

8   or health maintenance organizations that, and in this case, I

9   think probably the most relevant thing would be that they

10  manage and pay for at least part of the costs of prescription

11  drugs.

12  Q.   Do you have an opinion to a reasonable degree of economic

13  certainty as to whether Professor Rosenthal's analysis can be

14  applied to any particular TPP?

15           MR. SOBOL:  Objection.

16           THE COURT:  Overruled.

17  A.   Yes, I do.

18  Q.   And what is that opinion?

19  A.   My opinion is that it cannot.

20  Q.   And have you prepared a slide summarizing the reasons

21  behind that opinion?

22  A.   Yes, I have.

23           MR. KENNEDY:  Austin, if you can put up Slide 2,

24  please.

25  Q.   And starting with generic substitution, can you tell us

1   briefly how you feel that factor renders Professor Rosenthal's

2   analysis inapplicable to any particular TPP.

3   A.    Well, third-party payors, or TPPs, vary in terms of how

4   they use generics.  Some will have policies to try to use

5   generics whenever possible instead of brand-name drugs.  Others

6   will not have any such restrictions.  It varies quite a bit

7   among TPPs.  So if you're using nationwide data on TPPs that

8   essentially averages across all TPPs, there's no reason to

9   think that would apply to any particular TPP.

10  Q.    Are there also differences among drug utilization reviews?

11  A.    Yes, indeed.

12  Q.    Can you briefly tell us what those are.

13  A.    Yes.  It basically relates to the fact that some TPPs will

14  focus on, you know, trying to understand how their patient

15  populations are using particular drugs, will try to control

16  that, try to have policies regarding that.  Others may have

17  pretty much just let patients and doctors use whatever drugs

18  they are.  So once again, if you were using national data

19  across all TPPs, that wouldn't be reflective, or at least

20  necessarily, of any one particular TPP.

21  Q.    And what about formulary status, how does that vary?

22  A.    Yes, that also varies among TPPs.  Some TPPs would put

23  brand-name drugs on their formularies without restrictions,

24  without guidelines; whereas others might restrict them in some

25  ways, restrict them to particular specialties, restrict them to

ef89fb21-81da-45d7-8dea-621f898382b0

1    particular regions.  Some TPPs might not change formulary

2    status over time, just leave a drug on a formulary.  Others

3    might change formulary status over time.  So, once again, if

4    you were using average data, national data, say, on a drug like

5    Neurontin, that wouldn't account for the formulary practices of

6    any particular TPP.

7    Q.   And how about drug policy enforcement techniques, how do

8    those vary?

9    A.   Yes, they also vary among TPPs.  Some would have

10   essentially none.  They would let, you know, patients and

11   doctors choose whatever they want.  They wouldn't try to

12   enforce any particular utilization policy or any restrictions.

13   Others might be very controlling, may have a base of doctors

14   that follow, say, formulary guidelines very carefully.  So,

15   once again, if you're using national data, that wouldn't take

16   into account the particular drug enforcement policies or

17   techniques of any particular TPP.

18   Q.   And you also found the demographics of the patient

19   population varies among TPPs?

20   A.   Yes, certainly.  Some TPPs are very localized.  They may

21   have most of their patients, say, in California, for example.

22   California has very different demographics than the nation as a

23   whole.  Other TPPs might have more of a nationwide basis.

24   Others might be located on the East Coast.  So, once again, if

25   you're using nationwide data, that wouldn't be reflective of

1    the patient demographics and the illnesses and the types of

2    treatments that they would necessarily get.

3            MR. KENNEDY:  Austin, could you put up Plaintiffs'

4    Exhibits 2093.  I believe it's in evidence.  If not, I would

5    offer it at this time.

6            THE CLERK:  What number is that?

7            MR. KENNEDY:  2093.  It's the bar chart that was used

8    during Professor Rosenthal's examination.  I believe it's in

9    evidence.  Actually, in the interest of time --

10           THE CLERK:  I don't have it.

11           MR. KENNEDY:  I think I can short-circuit this.  My

12   apologies, your Honor.  I'd instead asked to have marked or in

13   evidence Plaintiffs' Exhibits 405-N, which I believe is already

14   in evidence.  If it's not in evidence, I'd offer it at this

15   time.  It's Attachment 1.2 to Professor Rosenthal's report, and

16   I would offer just that page.  I know the jury has seen it

17   before.

18           THE COURT:  All right.

19           MR. KENNEDY:  Any objection?

20           MR. SOBOL:  I'm just waiting to see it.

21           MS. ARMSTRONG:  We're not planning on publishing it,

22   putting it up on the screen.  It's kind of a dense document.

23           THE COURT:  I'm confused as to what you're putting in.

24           MR. SOBOL:  I mean, if it's in her report, that's

25   fine.

1        MR. KENNEDY:  It's Attachment 1.2.  It's a long list.

2   I apologize.

3        THE COURT:  Well, what is it?

4        MR. KENNEDY:  It's the list of the ICD-9 codes that

5   Professor Rosenthal used in her analysis.

6        THE COURT:  All right, just to remind us, those are

7   the bipolar and mood, or is this all of them?

8        MR. KENNEDY:  All of her breakdowns, whether it's for

9   neuropathic, migraine, or whatever, are based on these

10  International Diagnostic Codes, and I want to talk about

11  another aspect other than bipolar.

12       THE COURT:  All right, so that's attached.  You don't

13  have a problem with it?  Fine.

14  Q.   You're familiar with that document?

15  A.   Yes, I am.

16  Q.   Okay.  And, for example, under "Nociceptive pain,"

17  Professor Rosenthal has a column that's labeled "Off-label

18  pain, nociceptive," correct?

19       MS. ARMSTRONG:  Your Honor, may I approach the

20  witness?

21       THE COURT:  Yes.

22       (Witness examining document.)

23  Q.   Do you see the "Off-Label pain, nociceptive"?

24  A.   Yes, I do see that.  Thank you.

25  Q.   And you will see she's checked various ICD-9 codes as

1    supposedly reflecting nociceptive pain?  Do you see that?

2    A.    I do see that.

3    Q.    And if you turn to Page 4, do you find "neuromyelitis

4    optica" checked as a nociceptive category?

5    A.    Yes, I do.

6    Q.    And if you go to Page 8.  Is the last thing checked

7    "Backache unspecified" as being nociceptive pain?

8    A.    Yes.

9    Q.    And how about over on Page 9, do you see "Pain in limb?

10   A.    Yes.

11   Q.    And she has that checked as nociceptive pain; is that

12   correct?

13   A.    That's correct.

14   Q.    And does Professor Rosenthal say in her report how she --

15            MR. SOBOL:  Objection.  Beyond the scope.

16            THE COURT:  Well, if he's just referencing

17   Professor Rosenthal's report --

18            MS. ARMSTRONG:  The answer to the question is written

19   on the document.

20            THE COURT:  Yes, overruled, if it's just her report.

21            MR. SOBOL:  It's beyond the scope of the report.

22            THE COURT:  I'll allow it.  Let's go.

23   Q.    And what does it say on the report was the source of

24   deciding that those conditions were nociceptive pain?

25   A.    It says these conditions were provided by counsel.

1   Q.   Now, changing topics, do you have an opinion to a

2   reasonable degree of economic certainty as to whether

3   Professor Rosenthal's model appropriately accounts for the

4   various factors that could influence off-label prescribing?

5   A.   Yes, I do.

6   Q.   And what is that opinion?

7   A.   My opinion is that her model does not account for many of

8   the factors that would drive off-label prescribing of

9   Neurontin.

10   Q.   And how important is it to make sure that a model controls

11   for the factors that could be influencing prescriptions?

12   A.   Well, it's absolutely crucial for this type of model.  You

13   might remember Professor Rosenthal talked about an analysis of

14   the relationship between smoking and heart disease and why it

15   would be important to control for other factors that might be

16   related to smoking, like diet and exercise, and that if you

17   excluded diet and exercise from your statistical model, you

18   would falsely attribute to smoking the effects of those

19   factors.

20        So here the issue is exactly the same thing.  If you're

21   trying to analyze the effect of promotion on prescriptions and

22   you exclude factors related to promotion, like positive patient

23   and physician experiences with Neurontin, you'll falsely

24   attribute to promotion those left-out factors.

25   Q.   Does Professor Rosenthal's model account for any positive

1    clinical experience that doctors may have found with the drug?

2    A.    No, it does not.

3    Q.    Do economists have a term called a "experience good"?

4    A.    Yes, they do.

5    Q.    And tell the jury what an experience good is.

6    A.    Experience good is a good that you have to experience to

7    know whether or not it's something you like or meet your needs.

8    An example would be a restaurant meal, for example, that, you

9    know, you can read a lot of reviews of a restaurant, but until

10   you'd actually gone to the restaurant, you wouldn't know

11   whether you liked it or not.  Well, it's important in this case

12   because most economists view pharmaceuticals, or at least most

13   pharmaceuticals, as experience goods.  That is --

14   Q.    In what sense?

15   A.    Well, you have to experience the good to know whether it's

16   going to address your symptoms.  This would be especially

17   important, for example, for a drug that treats pain.  You know,

18   if you take the drug, it treats your pain, that would be a

19   positive experience.

20   Q.    And conversely, if it didn't, it would be a negative

21   experience?

22   A.    Exactly.

23   Q.    Now, in your opinion, was Warner-Lambert or Pfizer's

24   promotion experiences the main factor that drove off-label

25   prescriptions for Neurontin?

Page 32

1   A.   No, it wasn't.

2   Q.   And have you prepared a chart demonstrating why?

3   A.   Yes.

4        MR. KENNEDY:  Austin, if we put up Slide 7, please.

5   Q.   And, Doctor, first off, let's talk about the bottom scale.

6   This is covering the time period from January, '94, through the

7   end of 2007?

8   A.   That's correct.

9   Q.   And over on the left-hand side, the vertical scale is

10  measuring prescriptions in millions?

11  A.   That's correct, millions per month.

12  Q.   And over on the right-hand side, that's measuring

13  promotional expenditures, again in millions per month?

14  A.   Correct.  That's just Professor Rosenthal's measure of

15  promotional expenditures.  That's detailing plus journal

16  advertising.

17  Q.   And this is data you got from Professor Rosenthal's

18  report?

19  A.   Yes.  This is the same data that she used.

20  Q.   And what is the red line in Slide 7 showing?

21  A.   Well, the red line shows what economists would view as a

22  normal pattern for the adoption of a new successful product.

23  It shows Neurontin prescriptions, you know, rising a little bit

24  slowly at first, then rising a little faster, and then maybe

25  not -- sort of tailing off.  And that's what is expected for a

ef89fb21-81da-45d7-8dea-621f898382b0

1   new successful good because as people try the good, they find

2   it works.  If they do, they use it more themselves, they tell

3   others about it, and information diffuses through the economy.

4   But eventually everybody learns about the good, and use trails

5   off.  So this is sort of a normal pattern of adoption of a new

6   successful product.

7   Q.   And what is the blue line on Slide 7 showing?

8   A.   The blue line is showing Pfizer's expenditures on

9   detailing and journal advertising.

10  Q.   And those expenditures are data you got from

11  Dr. Rosenthal's report?

12  A.   Right.  They essentially come from the IMS data that she

13  used.

14  Q.   And does that data allow you to know how much of the blue

15  line was due to promotion for on-label uses as opposed to

16  off-label promotion?

17  A.   No, it does not.

18  Q.   Does Professor Rosenthal's model break down promotional

19  expenses between on-label and off-label?

20  A.   No, it doesn't.  She just uses a single promotional

21  variable:  the total promotion on journal advertising and

22  detailing.

23  Q.   Tell us what you conclude from this chart.

24  A.   Well, this chart presents us with a couple of natural

25  experiments in terms of big variations in the amount of

ef89fb21-81da-45d7-8dea-621f898382b0

1    promotion.

2    Q.   Why don't you tell us about the first natural experiment.

3    A.   Well, the first one, you can see after generic entry in

4    2004, promotion on Neurontin falls to, you know, basically

5    zero.  Maybe one other thing just to clarify, I think, is, the

6    red line also includes gabapentin prescriptions in addition to

7    Neurontin.  But it's typical when a drug, when a generic enters

8    the market, that the manufacturer of the branded drug will stop

9    promoting because they don't want to help their generic

10   competitors, and it's really not going to help them make more

11   sales themselves, or at least much.  So but what you see is

12   that rather than starting to decline as Professor Rosenthal's

13   hypothesis would imply, you see Neurontin and gabapentin

14   prescriptions continuing to increase, and they've actually

15   continued this pattern till this day.

16   Q.   And you said there was a second natural experiment?  What

17   do you mean by a natural experiment?

18   A.   Well, economists typically don't have the ability to do

19   controlled experiments like, say, medical researchers do, but

20   sometimes we're lucky in a sense that in the actual world,

21   there are big exogenous changes -- that is, changes that are

22   similar to a controlled experiment -- and from those, one can

23   learn a lot about the cause and effect between a couple of

24   variables.

25   Q.   Are you saying the entry of generic drugs and the decline

1   in promotional sales provided an experiment in terms of what

2   happens when you cut promotion?

3   A.   Exactly, and then there's another sort of natural

4   experiment here.

5   Q.   Tell us about the second natural experiment.

6   A.   Well, the second natural experiment is, after the FDA

7   approved Neurontin for PHN, or postherpetic neuralgia, in May,

8   2002, there was a big increase -- you can see the blue line

9   jumps up -- there's a big increase in promotion, almost three

10  or fourfold increase on a monthly level; but you don't see a

11  corresponding increase in the number of Neurontin

12  prescriptions.  If anything, it seems to tail off over that

13  period.

14          A question from the juror?

15          THE COURT:  Yes.

16          A JUROR:  Would that, what you just pointed out, would

17  that indicate that since you don't see a spike in 2000 when

18  it's approved for P (Inaudible) and you don't see it for PHN

19  two years later, does that tell you that the increase

20  prescriptions were written off-label, since you're not seeing a

21  spike when on-label use expanded?

22          THE WITNESS:  I'm not quite sure I'm following your

23  question.

24          A JUROR:  One would assume that if you expand use

25  on-label in 2000 and 2002, you should see a spike in the red

1    line that you don't see there.  To me, that indicates that

2    you're seeing the increases in off-label?  Am I reading that

3    correctly?

4          THE WITNESS:  I think that's basically that the --

5    these are both on- and off-label Neurontin and gabapentin

6    prescriptions plotted here, and basically I think off-label

7    prescribing was more or less constant over the period, so the

8    increase here is due primarily, at least, to off-label

9    prescribing.

10         A JUROR:  Thank you.

11   Q.   And as far as the actual expenditures that were made

12   during that spike period between 02 and '04, does

13   Dr. Rosenthal's data indicate where those expenditures were

14   concentrated?

15   A.   Yes.  They were primarily among physicians that prescribe

16   for PHN.

17   Q.   Now, Professor Rosenthal testified that the spike was

18   actually related to some other drug, and, as a result, has to

19   be disregarded.  Were you here when she gave that testimony?

20   A.   Yes, I was.

21   Q.   Do you agree that the spike should just be disregarded?

22   A.   No, I don't.

23   Q.   Why not?

24   A.   Well, I think her testimony was that Pfizer had motives

25   for promoting this related to, you know, some other drug, but

ef89fb21-81da-45d7-8dea-621f898382b0

1   whatever Pfizer's motives were really are not relevant because

2   you have to remember, these are data from IMS.  IMS is

3   reporting essentially what drug the doctor was detailed for.

4   They were detailed for Neurontin; they weren't detailed for

5   some other drug.  And regardless of what Pfizer's motives were,

6   if Pfizer is out there promoting Neurontin, at least according

7   to Dr. Rosenthal, one should see a corresponding increase in

8   prescriptions.

9   Q.   How did Professor Rosenthal treat the spike between '02

10  and '04 in her model?

11  A.   Well, she basically created a separate variable she calls

12  "spike promotion variable" in her regression model, which is

13  effectively a way to exclude it from her model so that she

14  wouldn't be faced with this basic contradiction of her theory

15  that promotion really is the only thing driving prescriptions.

16  Q.   Drug companies, we know, spend a lot of money on

17  promotion.  Are you saying it doesn't have any effect on

18  prescriptions?

19  A.   No, not at all.  I mean, I'm just saying it can't be the

20  only thing.  What Professor Rosenthal's models show is that

21  promotion drives one hundred percent, or actually in some cases

22  more than one hundred percent, of prescriptions.  What I'm

23  saying is that it can't be that important.  It might be a

24  factor but not the only factor.

25  Q.   Has Professor Rosenthal ever published a study or an

1    article where she found that detailing of drugs did not have an

2    effect on prescriptions?

3    A.    Yes, she has.

4    Q.    Can you tell us about that study that she did and

5    published.

6    A.    Yes.  There is a 2003 study which she published.  She was

7    looking at the effect of detailing and other types of promotion

8    on prescriptions, and she found no statistically significant

9    effect of promotion on prescriptions in that particular study.

10   Q.    Now, let's go back to Professor Rosenthal's regression

11   analysis.  If you wanted to measure whether there was a

12   positive experience with prescription drugs that were causing

13   doctors to prescribe more of them, is there an econometric way

14   of doing that?

15   A.    Yes, there is.

16   Q.    What's a time trend?

17   A.    Well, a time trend is the way you would do that.  A time

18   trend is a variable that essentially measures the amount of

19   elapsed time since, in this case, since Neurontin was

20   introduced; and it would allow, but not force, the model to

21   account for other factors besides promotion that were driving

22   prescriptions over time.

23   Q.    Would you give us a simple example of that, maybe

24   something involving a plant.

25   A.    Sure.  Well, for example, suppose you were trying to use

ef89fb21-81da-45d7-8dea-621f898382b0

1    statistical analysis to analyze the effect of fertilizer on a

2    plant's growth.  You could include a time trend to account for

3    the fact that a plant would grow anyway, it would have a normal

4    growth even if there had been no fertilizer applied.  And then

5    you could also include a variable for the amount of fertilizer,

6    or maybe, like Professor Rosenthal does, the cumulative amount

7    of fertilizer.  But if you excluded the time trend from such a

8    model because the plant would be growing, the cumulative amount

9    of fertilizer would be growing, you might conclude, at least,

10   that the plant wouldn't have grown at all without fertilizer;

11   but I think we all know that at least most plants will have a

12   normal growth pattern, even absent the application of

13   fertilizer.

14        And so, you know, here the exact same thing applies to the

15   model that Professor Rosenthal is estimating.  If you exclude

16   other factors that are driving prescriptions over time that are

17   correlated with her promotion variable, you could conclude, as

18   she did, that promotion is the only thing driving

19   prescriptions; whereas, in reality, it might be only one of a

20   number of things.

21   Q.   Is a time trend something you can use if you're only

22   studying one plant or one drug, or do you need multiple things

23   that you're studying?

24   A.   No.  You can certainly do it with just one, one plant or

25   one drug.

1  Q.    Now, if you include a time trend, is that going to force

2  the model to find that prescriptions would grow over time

3  regardless of promotion?

4  A.    No, not at all.

5  Q.    Why not?

6  A.    If you include another variable in a regression model, and

7  this is a little bit of a technical issue, but the data will

8  essentially tell you which variables have effects, the

9  magnitude of the effects, and whether they're statistically

10 significant.  So if you include a time trend and it really is

11 the promotion that's the only thing driving prescriptions, the

12 coefficients of the time trend variables won't be significant

13 or may be close to zero.  The promotion ones will be

14 significant.  Conversely, if those other things are important,

15 the data will tell you that, and you'll find an effective time

16 holding constant promotion.  If you exclude time, that's when

17 you're forcing the model to attribute all the effects of the

18 excluded variables to the included variables, in this case, the

19 promotion variable.

20 Q.    Now, is the phrase "result shopping" something that's used

21 in the world of econometrics?

22 A.    Yes.

23 Q.    And what does it refer to when used by an econometrician?

24 A.    It refers to varying the specification of a model to get

25 the results you want.

1   Q.   And what do you mean by a specification?

2   A.   Well, a specification basically means, what variables are

3   you going to include in the model?  And so if you vary the

4   variables, say, adding variables sometimes and subtracting them

5   others to get the results you want, that's an example of result

6   shopping.

7   Q.   As you heard here in court, Dr. Rosenthal initially

8   planned to use a time trend and then later abandoned that idea.

9   Is that an example of result shopping?

10          MR. SOBOL:  Objection.  Mischaracterization.

11          THE COURT:  Overruled.

12   A.   Yes, it is, in this particular case and --

13   Q.   Explain why.

14   A.   Well, the reason is because in one of her early reports,

15   she set out a research protocol or a research design that would

16   include a time trend.  She ran her models, including a time

17   trend, found no statistically significant effect of promotion,

18   and said, "Well, that can't be right, so I'm going to throw the

19   time trends out to get a result I want."  But that's an example

20   of result-oriented or result shopping rather than proper

21   scientific research.

22   Q.   I know we've heard the phrase before, but can you remind

23   us again what "statistically significant" means?

24   A.   It's a little bit of a technical issue, but to

25   oversimplify it perhaps, a statistically significant result is

Page 42

1    one that doesn't occur by chance; and, conversely, one that's

2    not statistically significant is one that could have occurred

3    by chance.  And typically economists and other scientists don't

4    rely on results that are not statistically significant.

5    Q.   So when you're doing a regression analysis, what you're

6    looking for is to see not just if there are results but if

7    there are statistically significant results?

8    A.   Right.  If they're not statistically significant, that

9    means you couldn't rule out the possibility that a particular

10   variable, say, had no effect.

11   Q.   Aside from throwing out the time trend, were there any

12   other things that Professor Rosenthal did that in your opinion

13   constituted result shopping?

14   A.   Yes.

15   Q.   And did you prepare a slide illustrating some of those?

16   A.   Yes, I did.

17          MR. KENNEDY:  If we could put up Slide 8, please,

18   Austin.

19   Q.   And can you start by explaining what the horizontal column

20   at the top refers to and then what the vertical column over on

21   the left-hand side is all about.

22   A.   Right, so the horizontal column, the labels here are

23   "Factors used to explain prescription levels," which include a

24   constant, price, promotion, competitor promotion, and

25   competitor price variables, for example, that was really

1   Professor Rosenthal's, I would say, second research design.

2   She laid out, "This is what my basic model is going to be."

3   And then if you go down these columns these are the various

4   indications, specialty combinations upon which she ran her

5   regressions.  Actually, she had eight different combinations,

6   plus a separate low-dose regression that's really a different

7   type of model so it's not included here.

8   Q.   And, for example, a constant -- which I promise we will

9   explain in a couple minutes, your Honor -- she used a constant

10  for bipolar, psychiatrists, and for neuropathic pain,

11  neurologists, but didn't use a constant in her models for any

12  of the other specialties; is that correct?

13  A.   That's correct.

14  Q.   And, likewise, she used competitor promotions in six of

15  the variables but not in migraine and not in nociceptive pain?

16  A.   Right.

17  Q.   In your opinion, is there any objective reason not to have

18  used all of the same variables in each of the models?

19  A.   No, because generally the basic economics are, if you

20  believe these are the factors that drive promotion, you should

21  use them in all your models.  You shouldn't either exclude

22  variables, like the constant or competitor variables, or add

23  variables, like the spike promotion variable, just to get the

24  results you want.

25  Q.   Is it acceptable in economics to rerun models with

Page 44

1    different specifications until a particular result is reached?

2    A.    No, it's not.

3    Q.    Why not?

4    A.    Because if you run enough different specifications -- and

5    I think Professor Rosenthal testified that she ran for each of

6    these indications maybe ten or fifteen different models -- if

7    you run enough different specifications, almost by chance

8    you're going to get -- you can get almost any result you want.

9    So if you do that, you're not really using the data to test

10   hypotheses or to measure things.  You're not testing whether

11   promotion affects prescriptions or how much it affects

12   prescriptions.  You're really just forcing the model, varying

13   it in certain ways to find an effect that's consistent with

14   your preconceived ideas.

15   Q.    Are there times when it's okay to rerun a model?

16   A.    Well, sure.

17   Q.    Can you give us some examples.

18   A.    Well, for example, if you ran a model and then maybe

19   discovered one of your variables had an error in it, you would

20   want to fix that error and rerun the model.  Or more commonly

21   what you see in the published literature, and you actually see

22   this in some of Professor Rosenthal's published articles,

23   you'll report the results of different specifications to show

24   that your model results are reliable and robust and not

25   dependent on a particular specification, and sometimes you may

ef89fb21-81da-45d7-8dea-621f898382b0

1    not know what the true or the best specification is.

2    Q.   Is that what Professor Rosenthal did here?

3    A.   No, it is not.

4    Q.   Now, you mentioned that the variables that were used in

5    some and not others of the studies included a constant.  Do you

6    see that?

7    A.   I do see that.

8    Q.   And, again, in the simplest possible terms, could you tell

9    us what a constant is.

10   A.   Well, this is also a little bit of a technical econometric

11   issue, but a constant is basically a parameter that you put

12   into a regression model, in this case, essentially to allow for

13   the possibility, but not require the model to do that, but

14   allow for the possibility that prescriptions would continue

15   even if there were no promotion.  If you exclude the constant

16   term, you're essentially forcing the model to find that there

17   would be no prescriptions if promotion went to zero.

18   Q.   In the kind of regression models that Professor Rosenthal

19   was running, was it appropriate to omit the constant?

20   A.   No, it wasn't.  That's really just Econometrics 101

21   because, as I mentioned, if you exclude the constant, that's

22   basically telling the model you have to -- the model has to

23   assume no effect or no prescriptions will be written absent

24   promotion.  Well, if you do that, that's basically forcing the

25   model to find an effect of promotion on prescriptions, even

ef89fb21-81da-45d7-8dea-621f898382b0

Page 46

1   though there may be none or it may not be as strong.  So by

2   excluding the constant, you're really biassing the results of

3   the model.

4   Q.   Now, staying with Slide 8, even if we don't use a time

5   trend, have you evaluated what would happen if you applied all

6   of Professor Rosenthal's factors to all of the indications on

7   the left-hand side of the column?

8   A.   Yes, I have.

9            MR. KENNEDY:  And could we put up Exhibit 405-K on the

10  Elmo, please.  And this is Attachment G-1 to

11  Professor Rosenthal's report.

12           Can I ask the Court if that's in focus where the

13  jurors --

14           THE COURT:  Can you all see it?  We've had slightly

15  better focus, but it's not horrible.

16           MR. KENNEDY:  If we knew where the focus --

17           MR. SOBOL:  Corinne will help you.

18           MR. KENNEDY:  Again can I ask the Court if that's

19  better now, or would the jury would like us to keep trying?

20           MR. SOBOL:  Corinne, make it better, not worse for

21  them.

22           (Laughter.)

23           MR. KENNEDY:  Collegiality in action, your Honor.

24  Q.   Do you have a copy of 405-K up there, or do you just have

25  the one on the screen?

1   A.   No.  I just have it on the screen.

2        MR. KENNEDY:  Katherine, can you give him a paper copy

3   as well.

4        THE WITNESS:  Thank you.

5   Q.   And my question is, if you took, again forgetting about

6   time trend for a moment, just taking the factors that

7   Professor Rosenthal chose to apply, and if you applied them to

8   each of the indication specialties, what happens to

9   Professor Rosenthal's model?

10  A.   Well, for five of the eight indication specialty

11  combinations, she would no longer get a statistically

12  significant effect of promotion on prescriptions.  That is,

13  within her own model, if she'd only run it the way she said she

14  was going to run it and forgetting about time trends, she still

15  wouldn't have found a statistically significant effect of

16  promotion on prescriptions for five of the eight indication

17  specialty combinations.

18  Q.   And can you tell us what those five are.

19       MR. KENNEDY:  And, Katherine, perhaps you could mark

20  them off as he tells us.

21  A.   So is the first would be migraine.  The other would be

22  neuropathic pain for other specialists, neuropathic pain for

23  primary care specialists, nociceptive pain for neurologists,

24  and nociceptive pain for other specialists.

25  Q.   And if you add up the prescriptions that have been

1   allocated in those five categories, what percent are they of

2   the total prescriptions in issue?

3   A.   Forty-nine percent.

4   Q.   And to the extent Dr. Hartman included those 49 percent in

5   his damage calculations, would his calculations be overstated

6   by that amount?

7   A.   Yes, they would.

8   Q.   Now, if in addition to what you just did you included both

9   a time trend and a constant, what would happen to the other

10   three indications that are still statistically significant?

11   A.   Yes, those would no longer be statistically significant

12   either.  So bipolar would go out.  Neuropathic pain for

13   neurologists would go out.  Nociceptive pain for primary care

14   physicians would go out.  And actually the doses over

15   1,800 milligrams would go out also.

16   Q.   Under those assumptions, none of those would yield

17   statistically significant results on Professor Rosenthal's

18   model?

19   A.   That's correct.

20        THE COURT:  What was your conclusion, that there's no

21   effect from promotion?

22        THE WITNESS:  No, that her -- it's basically that her

23   model no longer finds a statistically significant effect of

24   promotion on prescriptions.  That doesn't necessarily mean

25   there's no effect.  It just means that the model essentially is

Page 49

1    unable to find an effect with any degree of statistically

2    reliable --

3              THE COURT:  That's your view?

4              THE WITNESS:  For any of these, that's right, for any

5    of these indications, that's right, that's what her model

6    shows.

7    Q.   When you apply all the factors for each indication and use

8    a time trend and a constant?

9    A.   Correct.

10   Q.   Now, changing topics, did Professor Rosenthal's model end

11   up attributing more prescriptions to improper promotion than

12   were actually written?

13   A.   Yes, it did.

14   Q.   And did you prepare a chart showing that?

15   A.   Yes, I did.  This is just out of my report.

16             MR. KENNEDY:  Can we see Slide 9, Austin.

17   Q.   And this is from your report in this case?

18   A.   Yes, it is.

19   Q.   Okay.  And what does this show?

20   A.   Well, it shows for these five indication/physician

21   combinations that Professor Rosenthal actually forecast from

22   her model more than a hundred percent of actual prescriptions

23   as allegedly lawful, or that is, she forecast more than a

24   hundred percent of prescriptions that were, you know, that were

25   caused by the alleged fraud than there were actual prescriptions.

1    Q.    And you've read Professor Rosenthal's deposition?

2    A.    Yes, I have.

3    Q.    And does she acknowledge there that this is a mistake?

4    A.    Yes, she did.

5    Q.    And did she say she was going to correct it?

6    A.    Well, she said at least she or Dr. Hartman would correct

7    it.

8    Q.    Has it been corrected?

9    A.    No, it has not.

10   Q.    Now, Dr. Rosenthal and Dr. Hartman told us here that it

11   was just a statistical error that resulted in this more than a

12   hundred percent.  Do you agree?

13   A.    No, I don't.

14   Q.    Why not?

15   A.    Well, what they were talking about is, if you looked, say,

16   month per month, in any one month the model might forecast more

17   than a hundred percent due to, say, a statistical error, and in

18   another month less than a hundred percent.  And I would agree

19   with that.  That certainly could have happened on a

20   month-by-month basis and wouldn't be necessarily cause for

21   alarm.  But these numbers are not particular months.  These are

22   summing up the entire period, and so those positive errors and

23   negative errors would presumably cancel out.  And so the fact

24   that you're getting -- your model is forecasting 111 percent of

25   prescriptions is due to the alleged fraud here suggests a

ef89fb21-81da-45d7-8dea-621f898382b0

1    fundamental problem with her model.

2    Q.   Did Professor Hartman correct that error in his damage

3    calculations?

4    A.   No, he did not.

5    Q.   Now, changing topics, Professor Rosenthal indicated that

6    she was measuring the effect of the stock of promotion.  Tell

7    us what stock of promotion refers to here.

8    A.   Well, the stock of promotion is a cumulative number.  It's

9    basically the sum of all prior spending on promotion up to the

10   current time, allowing for past spending on promotion to have

11   depreciated.

12   Q.   And since it's cumulative, even if expenditures are

13   relatively constant, what happens to the stock of promotion?

14   A.   Well, the stock of promotion will grow because it's

15   basically just summing up past spending.  And so I think almost

16   for all her indications, you can see spending is relatively

17   constant, but the stock of promotion is going up, and the only

18   exception maybe being, as we saw on the previous chart, is

19   during the PHN period where there was, you know, a bump-up in

20   spending on promotion.

21   Q.   And why is that important in this case?

22   A.   Well, it's important because that's her key variable in

23   her regression, the stock of promotion.  It's trending up over

24   time.  But as we've seen, Neurontin prescriptions are also

25   trending up over time, as would be perfectly normal for any new

1  successful product.

2      Well, if you do a regression of two trending variables,

3  one on the other, you're generally going to find a positive

4  relationship between the two, not surprisingly.  If you were,

5  say, to regress Neurontin prescriptions on consumption of Ben &

6  Jerry's ice cream, assuming that's trending up over time,

7  you're going to find, you know, likely a positive relationship

8  between consumption of Ben & Jerry's ice cream and Neurontin;

9  but that doesn't mean that the fact that people are eating more

10  ice cream is somehow driving them to take more Neurontin

11  prescriptions.

12  Q.   Now, have you prepared a series of slides to explain stock

13  of promotion and how it was used by Professor Rosenthal in her

14  charts?

15  A.   Yes, I have.

16      MR. KENNEDY:  Austin, can we put up Slide 10, please.

17  Q.   And this is Attachment E-5 from Professor Rosenthal's

18  report, correct?

19  A.   That's correct.

20  Q.   This is right out of her report.  And can you tell us,

21  first, on the horizontal line on the bottom we've got time

22  again, correct?

23  A.   That's correct.

24  Q.   And then over in the left-hand vertical column, what do we

25  have there?

1  A.    There we have the number of prescriptions, and this would

2  be on a quarterly basis.

3  Q.    And over on the right-hand vertical column, what do we

4  have there?

5  A.    There we have Professor Rosenthal's calculation of the

6  promotional stock.  She calls it the depreciated value of the

7  promotional stock.

8  Q.    And over in that right-hand column, is there a

9  computational error?

10  A.    Yes, there is.

11  Q.    What was that?

12  A.    It's basically off by a factor of 100.  She had

13  essentially divided these by 100, so the scale actually should

14  go from zero to 35,000,000 rather than zero to 350,000.

15  Q.    And did Professor Rosenthal agree in her deposition that

16  was a mistake?

17  A.    Yes, she did.

18          THE COURT:  So was it fixed?

19          THE WITNESS:  No, it wasn't.

20  Q.    Going next to Slide 12, and this is a revision that you've

21  made to Professor Rosenthal's Attachment E-5; is that correct?

22  A.    That's correct.

23  Q.    And have you corrected the computational error in the

24  right-hand column so it now goes up to 35,000,000 rather than

25  350,000?

ef89fb21-81da-45d7-8dea-621f898382b0

1    A.    Yes, I have.

2    Q.    Have you left the other two scales the same?

3    A.    Yes.

4    Q.    Now, on this slide, what does the blue line represent?

5    A.    Well, the dark blue line represents once again the

6    promotional stock.  It hasn't really changed its position

7    because they just changed the numbers on the scale to put the

8    correct numbers on.

9    Q.    And, for example, in the third quarter of 2004, Pfizer

10   wasn't spending $30 million on promotion in that quarter?

11   A.    No, it wasn't.  In this particular case, that is the sum

12   of all past spending because if you look down at the bottom,

13   you can see her depreciation rate was zero.  That means she's

14   essentially assuming no depreciation and just literally adding

15   up all prior spending on promotion.

16   Q.    And what does the red line in this slide represent?

17   A.    The same as it did in the previous slide.  It's the number

18   of Neurontin prescriptions written for neuropathic pain use by

19   primary care physicians.

20   Q.    And what does the light blue at the bottom show?

21   A.    The light blue line is the actual quarterly spending on

22   promotion.  As you can see, it's relatively constant over time

23   except for the PHN period.

24   Q.    And how does that compare to Professor Rosenthal's line

25   for stock of promotion?

1    A.    Well, the line in this chart would essentially be -- it's

2    the same, if you go back to the previous chart.  The only

3    difference is, the scale has been fixed.

4    Q.    Now, earlier you mentioned depreciation, and how does

5    depreciation figure into stock of promotion?

6    A.    Well, it's a critical element of the stock of promotion

7    because if you assume non-zero depreciation, what that means is

8    that promotion that occurs, say, in 1994 eventually wears out,

9    falls away, no longer has any effect.  It depreciates.  If you

10   assume zero depreciation, as is done here, it means that, you

11   know, one detailing visit in 1994 will still be having the same

12   effects twenty years later as it did in 1994.

13   Q.    In your opinion, did Professor Rosenthal's model estimate

14   depreciation correctly?

15   A.    No, it did not, and for a couple of reasons.

16   Q.    Can you comment a little bit on that.

17   A.    Yes, really for a couple of reasons.  One is, she just

18   estimates a depreciation rate that makes her model fit the

19   best, but for all of the reasons we talked about, mainly

20   leaving out critical variables from her model.  If you estimate

21   a flawed model and pick a parameter that makes it fit the best,

22   you're going to get a flawed parameter.  And in fact that's

23   what happened here.  She gets zero, which I think is not

24   plausible in this particular case, but for another indication,

25   she gets a 45 percent per quarter depreciation rate, even

1    though we're talking about basically the same type of promotion

2    even, detailing primarily.

3    Q.   So she got depreciation of zero in some phases of the

4    study and up to 45 percent per quarter in another?

5    A.   Right, just depending on which type of physician and type

6    of indication she was looking at.

7    Q.   Let's go back to Slide 10 for a minute, if we can.  This

8    is the one we talked about earlier with the computational error

9    where it goes from zero to 350,000, whereas it really should be

10   going to 35,000,000, correct?

11   A.   Correct.

12   Q.   And let's take a look now at Slide 13, Attachment E-1 to

13   Professor Rosenthal's report, and focusing in particular on the

14   right-hand column, I notice it goes from zero to 45,000.  Was

15   there any reason why Professor Rosenthal had to use different

16   numbers in the right-hand columns on those two charts?

17   A.   No, there's not.  Standard practice would be to keep the

18   scale of the two axes constant relative to one another.

19   Q.   And by using two different scales, what effect was

20   resulting?

21   A.   Well, the effect is, because this is almost just one-tenth

22   as big, it makes that blue line much higher than it otherwise

23   would be.  It makes it look like it's going right through the

24   prescription line; you know, whereas, if you'd used a similar

25   scale or the same scale because, remember, the left-hand scales

1   are the same, the blue line would be down along the bottom of

2   the chart.

3   Q.   And did you prepare a chart where you used a consistent

4   rate of measure on the right-hand side?

5   A.   Yes, I did.

6   Q.   And can we see Slide 15, please.  And in Slide 15 you've

7   corrected on the right for the computational error, so you're

8   up to 35,000,000, correct?

9   A.   Correct.

10  Q.   And what's happened to the dark blue line?  Why is it so

11  far down?

12  A.   It's so far down because now we have consistent scales on

13  the two charts.  Just as I said before, Professor Rosenthal

14  changed the scales and basically all the charts in her reports

15  to make it look like the promotional stock was essentially

16  coinciding with the prescription line; but if she'd use

17  constant scales, that generally would not be the case, as is

18  demonstrated here.

19  Q.   And again we've got a light blue line down at the bottom.

20  Again, what is that?

21  A.   Yes, once again, that's the monthly actually spending on

22  promotion.  You can see it's, you know, at a very low level and

23  relatively constant.

24  Q.   And after correcting for the computational error in the

25  right-hand column, did you then rerun Professor Rosenthal's

1  model with the right-hand computational error corrected?

2  A.   Right.  It's a little bit different than that.  It's not a

3  computational error in the charts, but actually when she ran

4  her regression model, she had the same error in the variables

5  in her regression model.  So that, you know, I reran her

6  regression model, essentially correcting how she had calculated

7  the variable in her regression model.

8  Q.   And what happened when you did that?

9  A.   Well, when I did that, I find for two indications,

10  neuropathic pain written by primary care specialists and other

11  specialists, that her model no longer finds a statistically

12  significant effect.

13  Q.   And what, if any, effect does that have on Dr. Hartman's

14  damage number?

15  A.   It reduces them by about 41 percent.

16  Q.   Forty-one percent of whatever it was, $90 million that he

17  talked about here?

18  A.   That's right.

19  Q.   Now, did Professor Rosenthal's model attempt to measure

20  any impact associated with the allegation in this case that

21  scientific studies were suppressed or altered?

22  A.   No, it did not.

23  Q.   And Professor Rosenthal told us that that was picked up by

24  her promotional variable.  Do you agree?

25  A.   No, I don't.

ef89fb21-81da-45d7-8dea-621f898382b0

1   Q.   Why not?

2   A.   Well, she could have put in variables for scientific

3   publication.  They would be what economists call "indicator

4   variables."  You know, she could have put in variables for

5   publication of favorable studies or unfavorable studies and

6   seen whether that had any effect on prescriptions; but she did

7   not do that, and it seems highly unlikely that those events

8   which would take place in particular points of time would be

9   correlated with her stock of promotion variable, which is just

10  this upward trending variable.

11  Q.   And did she include any factor for continuing medical

12  education programs or CMEs?

13  A.   No, she did not.

14  Q.   And the data that Professor Rosenthal was using, was that

15  from sales efforts that were directed at TPPs or at individual

16  doctors?

17  A.   Those were detailing to individual doctors, not TPPs.

18  Q.   You've reviewed Dr. Hartman's damage analysis, correct?

19  A.   Yes, I have.

20  Q.   Okay.  And aside from the fact that it's based on

21  Professor Rosenthal's work, the problems you have with that,

22  are there any other problems that you believe exist regarding

23  the validity of Dr. Hartman's damage estimates?

24  A.   Well, yes, there are a number of problems with his damage

25  model.

1    Q.   And have you prepared a chart that illustrates those

2    problems?

3    A.   Yes, I have.

4         MR. KENNEDY:   In light of the Court's ruling, I think

5    16 was objected to.

6         MR. SOBOL:   Yes.

7    Q.   Now, you saw that in Dr. Hartman's report he did a first

8    damage analysis which assumes that nothing would have been

9    prescribed in place of Neurontin.   Did you see that?

10   A.   Yes, he did, that's right.

11   Q.   And as an economist, not a doctor, do you believe that's a

12   reasonable assumption?

13   A.   No, I don't.

14   Q.   And why is that?

15   A.   Well, that's because even if Neurontin were ineffective or

16   ineffective maybe for some patients and wouldn't have been

17   prescribed, at least in many instances, physicians would

18   prescribe some other medication; and from a damage point of

19   view, one would have to net that out of the costs to Kaiser of

20   Neurontin because absent the prescribing of Neurontin, they're

21   still going to have costs for the prescribing of some other

22   drug.

23   Q.   And Dr. Hartman had a list of alternative drugs you heard

24   him testify about?

25   A.   That's right.

Page 61

1  Q.   And what was the source of Dr. Hartman's list of

2  alternative drugs?

3  A.   Well, that came from Dr. Millares at Kaiser.

4  Q.   Did Professor Rosenthal in her report also identify a list

5  of competitor drugs for Neurontin?

6  A.   Yes, she did.

7  Q.   And did you prepare a slide comparing the list in

8  Professor Rosenthal's report with the list that Kaiser gave

9  Dr. Hartman?

10  A.   Yes, I did.

11  Q.   And did you prepare a slide summarizing that comparison?

12  A.   Yes, I have.

13       MR. KENNEDY:   Can we see Slide 17, please.

14  Q.   Now, how many drugs were on Professor Rosenthal's list?

15  A.   So there were 24 drugs on Professor Rosenthal's list.

16  Q.   And how many on Dr. Hartman's list?

17  A.   Twenty-two drugs.

18  Q.   And how many drugs appeared on both lists?

19  A.   There were only two drugs that were in common to both

20  lists.

21  Q.   And breaking it down by indication, what was the overlap

22  or difference in the two lists for bipolar?

23  A.   Yes, you can see for bipolar, that's where those two drugs

24  that overlapped were.  For the other indications, there was no

25  overlap at all.

ef89fb21-81da-45d7-8dea-621f898382b0

Page 62

1    Q.   Now, did Dr. Hartman's report contain any data that would

2    allow one to determine the number of patients that some other

3    drug would have been prescribed for?

4    A.   No, it did not.

5    Q.   Did Dr. Hartman's report contain any data that would allow

6    you to know which alternative drug would be prescribed for

7    which patient?

8    A.   No, it did not.

9    Q.   Did it contain any data as to whether any particular

10   patient would be able to tolerate the drug or not?

11   A.   No, it did not.

12   Q.   And without knowing that sort of thing, in your opinion,

13   is there any way for Dr. Hartman to accurately calculate

14   damages?

15   A.   No, there's not.

16   Q.   Have all the opinions you've expressed here today been

17   based on a reasonable degree of economic certainty?

18   A.   Yes, they have.

19            MR. KENNEDY:   Thank you very much.   I have no further

20   questions.

21            MR. SOBOL:   Can we stretch while I put a couple of

22   binders in front of the witness.

23            THE COURT:   Actually, can I see counsel at side bar

24   while you're stretching.

25

1   SIDE-BAR CONFERENCE:

2        THE COURT:  Who needs to see the McCarberg deposition?

3   Was there another one?

4        MR. CHEFFO:  No.  This is it, your Honor.

5        THE COURT:  Okay.  I don't need to see everyone every

6   time.  I just felt like he may want that now rather than --

7        (End of side-bar conference.)

8        MR. SOBOL:  May I start, your Honor?

9        THE COURT:  Yes.

10  CROSS-EXAMINATION BY MR. SOBOL:

11  Q.   Good morning, Doctor.

12  A.   Good morning.

13  Q.   How are you today?

14  A.   Good.  How are you?

15  Q.   Good.  You prepared two reports in this case, one that's

16  dated in 2006 and another that's dated in 2008, correct?

17  A.   That's basically correct.  There's actually, I think, a

18  third report in maybe 2006 or 2007.

19  Q.   Okay.  And in your 2006 report, I believe you identified

20  for the jury a handful of prior drug matters that you had been

21  involved in, four drug antitrust matters, correct?

22  A.   Uhm --

23  Q.   Yes or no, do you remember that?

24  A.   Probably.  I don't have a sharp recollection of exactly

25  what I identified, but --

ef89fb21-81da-45d7-8dea-621f898382b0

1   Q.   I doubt that, but can you take my word for it that I read

2   it last night?  There are three antitrust matters that involved

3   generics, and then there was one that was the monopolization

4   case you identified?

5   A.   I'll take your word for it.

6   Q.   And then you also handled a matter that involved a PBM, as

7   you testified earlier today?

8   A.   Correct.

9   Q.   And then you also were involved in a drug case that

10  involved patent misuse, correct?

11  A.   That's correct, and also I think I mentioned another case

12  involving wholesale pricing issues.

13  Q.   Right, that one may come later, but in 2006, at least, you

14  did not identify in your report having been retained as a

15  consultant or having been involved in a case that involved the

16  issues of looking at the effect of drug promotion on drug

17  sales, correct?

18  A.   I think that's, uhm -- I think that's correct.

19  Q.   Okay.  And then in 2008 you did a report, and you

20  identified and you actually added some language in your

21  background saying that you are involved in matters that look at

22  the issue of the effect of drug promotion on drug sales.  You

23  added that to your 2008 report?

24  A.   I'll take your word for it.

25  Q.   Okay.  And that's because you've been involved in

1  Neurontin matters?

2  A.   That's correct.

3  Q.   Isn't it fair to say, sir, that in none of your reports to

4  date have you identified any specific litigation or consulting

5  experience that you've had that involves the specific issue of

6  looking at drug promotions on drug sales other than your having

7  been hired by Pfizer in Neurontin cases?

8  A.   Yes, I think all of my work on promotion, the effects of

9  promotion on drug sales have been in the Neurontin cases.

10  Q.   Right.   And it's fair to say you've never written a

11  peer-reviewed article on the issue of drug promotion affecting

12  drug sales one way or another, correct?

13  A.   That's correct.

14  Q.   You've never taught a class on the issue of drug promotion

15  affecting drug sales, correct?

16  A.   That's correct.

17  Q.   In fact, you've never taught a class in healthcare

18  economics at all, correct?

19  A.   That's correct, certainly not one that's focused just on

20  healthcare economics.   It might have come up in a topic in some

21  of my more general classes on applied microeconomics.

22  Q.   You have, and I think you fairly indicated to the jury

23  this morning, that you don't generally consider yourself a

24  specialist in healthcare economics, correct?

25  A.   Correct.   I work in a number of different areas in

1  addition to that.

2  Q.   Okay.  Unlike, for instance, Professor Rosenthal, who

3  works at the Harvard School of Public Health and has focused

4  for the past decade on healthcare economics.  You understand

5  that, correct?

6  A.   I understand that, that's right.

7  Q.   And the specific issue that you are involved in in this

8  case, which is to critique the implementation by

9  Professor Rosenthal of a regression model that looks at drug

10  promotion affecting drug sales, you have actually yourself

11  never professionally been engaged, maybe apart from Neurontin

12  which I'll deal with in a moment, but apart from Neurontin,

13  you've never been professionally engaged to actually construct

14  and implement a regression model in order to look at the issue

15  of drug promotion affecting drug sales, correct?

16  A.   Yes.  I think, as we already discussed, my work has been

17  in various Neurontin cases.

18  Q.   Okay.  And then even in the Neurontin cases themselves, if

19  I understand your testimony here today, you were not asked and

20  therefore you did not construct your own model to look at

21  whether or not, and if so, the extent to which, the promotion

22  of Neurontin off-label affected the sales of Neurontin

23  off-label, correct?

24  A.   That's correct.  That wasn't my assignment.

25  Q.   So to this date in your life, you have never constructed a

1   model that looks at and implements looking at the effect of

2   drug promotion on drug sales?  Yourself you've never done it?

3   A.   Well, I'm not quite sure what you mean by that.  I

4   certainly have constructed models, but they've all been

5   variations of Professor Rosenthal's model.

6   Q.   Which I'll get to later.  Now, the one thing that I think

7   you do agree with is that healthcare economics, or economists

8   more generally, in terms of trying to look at the question of

9   the relationship between drug promotion on drug sales, might

10  employ some form of a regression model, of econometrics, so to

11  speak, correct?

12  A.   I certainly would agree with that, sure.

13  Q.   And I actually noticed, Dr. Keeley, although I didn't get

14  a chance to meet you earlier in the trial, you've been here

15  several of the days in the trial, correct?

16  A.   That's correct.

17  Q.   And you were here for the cross-examination of both

18  Professor Rosenthal and Dr. Hartman, correct?

19  A.   Correct.

20  Q.   Okay.  And do you recall Professor Rosenthal and

21  Professor Hartman having been asked a series of questions as to

22  whether or not they had spoken to the physicians that wrote

23  prescriptions that were paid for by Kaiser Permanente?  Do you

24  recall those questions?

25  A.   At least generally, yes.

1    Q.    And if you were to set out as an economist to study the

2    question of promotion on sales, it would not be integral to

3    actually do an interview process of that type, correct?  You

4    would look at objective data instead?

5    A.    No, I wouldn't agree with that.  And I don't agree that

6    that's not objective data.

7    Q.    Now, I do think that you testified earlier in some way,

8    Dr. Keeley, that you do believe that drug promotions can in

9    fact cause drug sales to increase, correct?

10   A.    Correct.  I mean, pharmaceutical companies spend a lot of

11   money on detailing, and you would think, at the very least,

12   they must believe it has some effect.

13   Q.    Right.  What is your understanding as to approximately how

14   much was paid in the United States for prescription drugs in

15   the last year that applies in this case, 2004?

16   A.    You mean for all prescription drugs in the United States?

17   Q.    Yes.

18   A.    I don't know the number.  It would be in the billions, I

19   think.

20   Q.    What would be your best estimate?

21   A.    I really don't know.

22   Q.    Do you know whether it's more or less than $100 billion?

23   A.    I don't know for sure, no.

24   Q.    If I told you that prescription drug costs in the United

25   States in 2004 were, according to IMS, approximately

1   $240 billion, is that consistent with your understanding?

2           MR. KENNEDY:  Objection.  Beyond the scope of direct.

3           THE COURT:  Sustained.

4   Q.   Well, let's talk about promotions then, Dr. Keeley.  Do

5   you understand how much money drug companies spent on

6   promotions in 2004?

7           MR. KENNEDY:  Object.  Beyond the scope.

8           THE COURT:  Overruled.  Promotions.

9   A.   Yes, I've really only looked at that for Neurontin, but

10  certainly my understanding is that there is a lot of

11  expenditure on detailing and sampling and maybe other types of

12  advertising.

13  Q.   Well, I understand that, Dr. Keeley, but you have come

14  before the jury as an expert on the issues of how Dr. Rosenthal

15  applied a model that deals with drug promotion on drug

16  spending, correct?

17  A.   Correct.

18  Q.   And you've indicated that a lot of money is spent on it?

19  In your direct testimony you stated that, correct?

20  A.   I'm not sure I said that in my direct testimony, but

21  certainly I would agree that there certainly is, you know, a

22  significant amount of money that is spent on promotion by drug

23  companies.

24  Q.   Do you know that estimates in 2004 for the amount of money

25  spent on drug promotion range between $27 billion and

1   $57 billion?

2           MR. KENNEDY:  Object.  Lack of foundation.

3           THE COURT:  Do you know one way or another?

4           THE WITNESS:  I don't know.

5           THE COURT:  Let's get to this drug.

6   Q.   Did you perform a calculation as to how much money was

7   spent on promoting this drug?

8   A.   It's in the data.  I don't recall off the top of my head.

9   Q.   Well, again, give the jury your best estimate then as to

10  how much money Parke-Davis and Pfizer spent promoting Neurontin

11  over this ten-year period.

12  A.   Well, if we look back at my chart, there's the chart that

13  plotted promotional spending from 1994 to 2007.  You can see

14  it's generally running at maybe $500,000 per month, say, and

15  then maybe an average of $3 million a month during the period

16  after PHN approval.

17  Q.   Would it be consistent with your understanding that

18  according to IMS information, approximately $275 million was

19  spent by Parke-Davis and Pfizer promoting Neurontin during the

20  time period 1995 to 2004?

21          MR. KENNEDY:  Object.  Lack of evidence.

22          THE COURT:  Overruled.  Do you know?

23          THE WITNESS:  I don't know.  I'd have to add up these

24  numbers to -- I just haven't done that calculation.

25  Q.   In addition to the totality of the dollars that were being

1    spent for promotion during this ten-year period, Dr. Keeley, do

2    you understand that, well, that Parke-Davis was, at least

3    presumably, a rational economic thinker between 1995 and 2000

4    with respect to Neurontin?

5    A.   Well, I guess I don't know whether they were a rational

6    economic thinker or not, but generally economists assume that

7    firms are rational profit-maximizing entities.

8    Q.   And after experiencing one year's effort of promotion and

9    advertising and all the rest of that in 1995, would you expect

10   them as a rational economic thinker to figure out, "How are we

11   doing with our expenditures?" and to make their decisions the

12   next year wisely?

13   A.   Once again, I haven't specifically studied that, but I

14   think economists assume that firms make decisions rationally.

15   That's certainly not always the case.

16   Q.   But also here, I mean, you've spent some time dealing with

17   Parke-Davis and with Pfizer, right?  I mean, let's not talk

18   about just generally.  Don't you think year by year by year by

19   year, for ten years, these two companies made efforts to make

20   rational decisions about whether they were spending their money

21   wisely or not promoting, advertising, marketing, and selling

22   Neurontin?

23          MR. KENNEDY:  Object.  Assuming facts not in evidence

24   that he had any contact with Parke-Davis, also compound.

25          THE COURT:  Sustained as to form.

1    Q.   Well, didn't you in this case review some documents apart

2    from just economic documents?  Weren't you in your 2006 report

3    given documents like marketing plans?

4    A.   Well, I asked for all the documents that Professor Rosenthal

5    reviewed, so I have looked at those.  I haven't really done a

6    systematic review of all the documents, which I think number in

7    the millions in this case.

8    Q.   But you certainly reviewed enough documents to understand

9    that there were conscious efforts, deliberate efforts on the

10   part of Parke-Davis and then Pfizer, to undertake overall plans

11   for marketing, promoting, selling, advertising Neurontin,

12   correct?

13            MR. KENNEDY:  Object.  Beyond the scope.

14            THE COURT:  Overruled.

15   A.   Well, I mean, I think they made -- I don't think they made

16   unconscious decisions.  Certainly they were deciding to

17   undertake these --

18            THE COURT:  You said they made unconscious --

19            THE WITNESS:  I said they certainly did not make

20   unconscious decisions.  How carefully they studied this, I

21   don't know, but I think they did make deliberate decisions to

22   engage in this type of detailing, sure.

23   Q.   Because you had never undertaken a specific effort, either

24   article or class or consulting arrangement or litigation,

25   involving the issue of the promotion of drugs and its effects

1   on sales, I take it that you did a literature search in this

2   case to educate yourself?

3   A.   Well, I certainly did read a number of articles.  I don't

4   know that I would say it was because I hadn't done that, but it

5   would be -- I thought it would be informative to look at the

6   literature on the effects of promotion, and actually other

7   factors that affect prescribing, yes.

8   Q.   And in many of those articles -- in fact some of those

9   articles you found that Professor Rosenthal was one of the

10  authors, correct?

11  A.   That's correct.

12  Q.   And then also Ernst Berndt who is at MIT, correct?

13  A.   That's correct.

14  Q.   With whom you know that she's worked with before, correct?

15  A.   That's right.  She's coauthored some articles with him,

16  that's correct.  I think the 2003 article I was referring to

17  was coauthored with him.

18  Q.   And in many of those articles, there are positive

19  statistically significant results of the effect of drug

20  promotion on drug sales, correct?

21  A.   In many of them there are.  In some there are not.  I

22  think that there's quite a range of findings.

23  Q.   And even in the 2003 report that you referred to about

24  Professor Rosenthal earlier, you recall that the results for

25  the impact of detailing on sales for individual drugs were

1    typically positive and imprecisely estimated?

2    A.   Well, that's exactly what I was saying, that they were not

3    statistically significant.

4    Q.   Right.  So sometimes when Professor Rosenthal does an

5    analysis, she's not, as you would say, being results-oriented?

6    She just lives with the results, as she did in that published

7    study?

8    A.   Right, I would say generally her published results are not

9    results-oriented.  It's only in this case that she seems to be

10   following a results-oriented approach.

11   Q.   Or so that is your opinion, correct?

12   A.   Yes, it's my opinion.

13   Q.   Now, I believe you also gave some testimony -- and see if

14   I can get the right quote of it here -- you gave some testimony

15   on direct examination that with respect to Warner-Lambert and

16   Pfizer and Neurontin, promotional expense was not the, quote,

17   "main thing" that drove Neurontin sales.

18   A.   Correct, certainly not --

19   Q.   And so if it's not, quote, "the main thing," end quote, I

20   take it that you did not set out and try to do a model so that

21   you could actually estimate how main or not main it was?  You

22   did not quantify the impact of promotion on Neurontin sales,

23   did you?

24   A.   That's not quite correct.

25   Q.   So is it your opinion that the modifications or the

1  changes that you made to Professor Rosenthal's model, that's

2  the way you would do things yourself?  Yes or no.

3  A.   No, it's not the way.

4  Q.   Okay.  So if that's not the way you would do it, and since

5  you haven't provided any other effort of your own to quantify

6  the effect of promotion on sales, isn't it fair to say that you

7  don't know, because you haven't done it, how much promotional

8  expense caused sales versus some other issue that you want to

9  address; for instance, experience goods or word of mouth or

10 these other things that you've talked about?  You haven't

11 quantified it?

12 A.   No, I wouldn't agree with that because I have essentially

13 taken Professor Rosenthal's models.  To the extent they have

14 any validity at all, when you add time trends in, you do test

15 the hypothesis:  Is it time or is it promotion?  And in fact

16 you find in all cases that the time trends are statistically

17 significant, which to me is really suggesting that it is this

18 word of mouth, it is the diffusion of information, and it's not

19 just promotion.  And maybe also to clarify, the fact that

20 promotion is not statistically significant, that really just

21 means that the kind of data and model that she's using is

22 really not able to estimate the effect with precision --

23        MR. SOBOL:  Move to strike, your Honor.

24        THE COURT:  Well, just stop it right there.

25 Q.   Dr. Keeley, let me ask you this:  I take it that this

1   notion of a time trend or your view that -- what was it?  You

2   said something about a, quote, "normal new successful product."

3   I think those were your words.

4   A.   That's right.

5   Q.   A normal new successful product.  And so is it your

6   opinion to this jury that the experience with Neurontin was a

7   normal new successful pharmaceutical product?

8   A.   Well, certainly the patterns of prescription are certainly

9   consistent with that.

10   Q.   Is that a "yes"?

11        THE COURT:  You need to answer his question.

12   A.   I think it was a "yes."  Maybe you could repeat the

13   question, but --

14   Q.   I'll ask the question and see if you can answer it yes or

15   no.

16   A.   Yes, sure.

17   Q.   Is it your testimony that the experience of Neurontin from

18   1995 to 2004 is the experience, putting aside promotion, of a

19   normal new successful product?  Is that your testimony?  Yes or

20   no, or you can't say yes or no?

21   A.   Well, it's really not quite so black and white, and that's

22   why I was trying to explain it.

23   Q.   All right, fine.

24   A.   Somewhat "yes" but not exactly.

25   Q.   You gave me a "somewhat."  Thank you, okay?

1    A.    Sure.

2    Q.    Thank you for the "somewhat."

3          THE COURT:  Well, how do you define normal new

4    successful pharmaceutical product?

5          THE WITNESS:  Well, what I was really saying is, this

6    doesn't -- what I just wanted to clarify was that the patterns

7    I have seen here are certainly the type of pattern you would

8    see for a normal new successful product, so it's consistent

9    with that, but it doesn't --

10         THE COURT:  Does it mean FDA approved?

11         THE WITNESS:  No.  I mean, I'm just talking about

12   any -- it could even be a new computer or a micro --

13         THE COURT:  Bring me back to drugs, okay?

14         THE WITNESS:  Sure.

15         THE COURT:  When you said normal new successful

16   product, does that include the concept of approved by the FDA?

17         THE WITNESS:  No.  It had really nothing to do with

18   whether there's FDA approval because most of these indications

19   here are off-label.  It's just consistent with the idea that

20   the drug is meeting patients' and doctors' needs, the

21   information is diffusing, and you see the kind of normal growth

22   pattern you would see for a new drug or other type of new

23   successful product.

24         THE COURT:  Go ahead.  We have a jury question.

25         A JUROR:  This question of time trend that came up

1   before, now, the fact that the time trend becomes statistically

2   significant does not automatically indicate, does it -- I don't

3   know, I'm asking -- that the promotional effect of spending on

4   drug sales becomes insignificant, does it?

5          THE WITNESS:  Well, actually, that is exactly what

6   happens in Professor Rosenthal's model, and that's why she

7   excluded it.  When you run her model with promotion and time

8   trend variable, the coefficient on promotion is no longer

9   statistically significant.  That is to say, you can't tell what

10  the effect of promotion is, or you couldn't even reject the

11  hypothesis, there was no effect.  Is that what you're asking?

12         A JUROR:  You're saying that that means that you can't

13  tell from the analysis that was conducted?

14         THE WITNESS:  Right, that's basically what -- I think

15  that's right, yes, because when a result is not statistically

16  significant, that doesn't prove there's no effect.  It just

17  means you can't tell what the effect is with any degree of

18  statistical reliability, and so you wouldn't use that as an

19  estimate of the effect.

20         THE COURT:  There is some literature on time trends?

21         THE WITNESS:  There is.

22         THE COURT:  Is it only on-label drugs?

23         THE WITNESS:  No.  This is a very general proposition

24  in econometrics that would apply to almost any type of time

25  series analysis and the importance of controlling for time.

ef89fb21-81da-45d7-8dea-621f898382b0

Page  79

1          THE COURT:  Back up.

2          THE WITNESS:  Sorry.

3          THE COURT:  Is there any data specific on time trends

4    that distinguish between on-label and off-label drugs, or

5    you're just referring to a general economic concept?

6          THE WITNESS:  Well, I'm certainly referring to a

7    general economic concept.  The literature in pharmaceuticals

8    that uses this type of time series model, at least many of

9    those articles also include time trends in them for the very --

10         THE COURT:  For on-label or off-label?

11         THE WITNESS:  They are all -- I don't think there are

12   any studies of off-label prescribing that I'm aware of that

13   have these type of econometric models.

14         A JUROR:  You have a time trend.  There is not just

15   one way of expressing that time trend, right?  In other words,

16   you can have it like this, like this, like that.

17         THE WITNESS:  That's a good question.

18         A JUROR:  And if that's the case, then how you model

19   that time trend is going to affect how significant it is,

20   correct?  I'm trying to understand.

21         THE WITNESS:  No, no, I understand.  This is a little

22   bit of a technical econometrics issue.  The time trend variable

23   is just the length of time since the introduction of Neurontin,

24   and there's no prespecified form.  You know, you're not

25   literally putting a trend in the model.  You're letting the

Page 80

1    data determine that trend.

2             So you just put this variable in.  It starts with

3    zero, 1, 2, 3, 4, 5, and you put it in the model, and the data

4    will tell you whether there is a trend or not controlling for

5    the other factors.  So you're not forcing any particular

6    pattern of results in the model.  It's purely the model itself

7    is determining that.  So it could be there is no time trend, in

8    which case the model will show that, or it could be there is --

9    in this case you do find a time trend, but it's not forcing --

10   there's no pre-specification of the actual shape of the time

11   trend.

12            A JUROR:  Right, but there's not just one way to put a

13   time trend in a model, and it's not always the same type of

14   effect?  In other words, there's some discretion in how you

15   define your time trend?

16            THE WITNESS:  Not really.  It's usually just this

17   linear variable.  You can put in a quadratic term also that --

18            A JUROR:  You're just talking a curve versus straight

19   line.

20            THE WITNESS:  Yes, that just allows for more

21   flexibility, and then it's the results of the model that, once

22   you put it in, that determine, you know, whether it has an

23   effect and what its actual shape is.  You're letting the data

24   determine that.  You're not forcing a particular result by

25   putting a time trend in.  There could be actually none, and

1   then the model will just tell you that when you run it.  Even

2   though you put this variable in, it will say, no, the effect is

3   zero; you know, it's just flat.  Or it could say it's this way,

4   or it could be this way, and the data will tell you that.

5   That's the beauty of econometrics.

6            A JUROR:  Thank you.

7            THE WITNESS:  Sure.

8   Q.   Going back to the question, Dr. Keeley, and I will get to

9   time trends in a moment; I think it's better to address it this

10  way.  You have given testimony that a normal new successful

11  product has a shape of sales over time that essentially looks

12  like that of Neurontin?

13  A.   Correct.

14  Q.   Now, when you made that decision, did you have in mind the

15  fact of what the drug company expected would be the natural

16  life of this drug's sales?  Did you have that in mind one way

17  or the other?

18  A.   I don't think so.  I don't think it's related to what I'm

19  talking about.

20  Q.   So the normal new successful product launched by

21  Parke-Davis was that during the life of the drug from 1994

22  through to generic entry was that it would gross $500 million?

23  Do you know that?

24  A.   I --

25  Q.   Yes or no.

1   A.   I don't know that specific number.  I've looked at some

2   initial marketing.

3   Q.   That was actually one of the documents that you did review

4   and that you put as a reliance document in your 2006 report?

5   A.   I think you're mischaracterizing a little bit what the

6   documents were in my report.  Those were -- as I said before, I

7   asked for all of the documents that Professor Rosenthal had

8   looked at and I considered them.  I'm not necessarily saying I

9   relied on them or that they were an element of my actual

10  analysis or opinion.

11  Q.   Didn't you make the observation that the drug company

12  expected the drug to gross $500 million, but it ended up

13  grossing over $10 billion in this decade time period?  Did you

14  make that observation?  Yes or no, yes or no.

15  A.   I'm not sure.  I think -- I'm not sure.  I think I've

16  looked at some initial marketing documents.  I don't remember

17  those particular numbers.

18  Q.   Did you see any marketing documents at Parke-Davis where

19  it projected how much off-label sales it might have if it

20  didn't do anything?  Yes or no.

21  A.   I -- I -- I've looked at marketing documents.  I can't

22  recall specifically.

23  Q.   If you saw marketing documents from Parke-Davis that

24  projected that its sales and market share would be zero percent

25  unless they did something to market the product, would that

1    have any change of your opinions in this case?  Yes or no.

2              MR. KENNEDY:  Inadequate hypothetical.

3              THE COURT:  Overruled.

4    A.   No, not just based on that fact alone.

5    Q.   In your view, the drug company would have been wrong, and

6    all of this word-of-mouth and positive experience as you've

7    laid out in your reports would have happened anyway, right?

8    That's your view, it all would have happened anyway?

9    A.   No, that's not.  That's a mischaracterization of my view.

10   Q.   Well, perhaps I don't understand it.  When you impose a

11   time trend on the data, you come to the conclusion that the

12   promotion didn't have any statistically significant effect at

13   all, right, none?

14             MR. KENNEDY:  Object.  Assuming facts not in evidence

15   that it's imposed.

16             THE COURT:  Overruled.

17   A.   Well --

18   Q.   Yes or no.  I'm not asking for an explanation, sir, with

19   all due respect.

20   A.   Well, your question has --

21             THE COURT:  Can you answer yes or no?

22             THE WITNESS:  Well, his question has a false premise

23   to it.

24             THE COURT:  All right, go ahead.

25             THE WITNESS:  So the false premise -- maybe you could

1    just repeat the question.  It had several false premises, I

2    believe.

3    Q.    When you impose a time trend --

4    A.    Well, one, I don't impose a time trend.

5    Q.    Let me ask you this, by the way, just so that we don't

6    have to get into some kind of bickering:  You do recognize that

7    when econometricians do time series, it is not necessary,

8    absolutely necessary for them to use a time trend?  You

9    understand that, don't you?

10   A.    There could be situations, yes.

11   Q.    Right.  And in fact you even know that there are

12   situations in the published literature by Professor Berndt from

13   MIT, with whom Professor Rosenthal has worked, where he has

14   published peer-reviewed articles that have time series in them

15   and don't have a time trend?

16   A.    That's true, but he's also published articles with time

17   trends.

18   Q.    Where he does have one, correct?

19   A.    Correct.

20   Q.    Right.  And Professor Berndt and Dr. Rosenthal and Ernie

21   Frank, and all the other people at the Harvard School of Public

22   Health and at MIT and at Harvard, when they're doing their

23   analyses, exercise their judgment when looking at a time series

24   and trying to figure out whether or not they're going to impose

25   a time trend or not that's going to come out with the result

ef89fb21-81da-45d7-8dea-621f898382b0

1   that promotion had no effect on sales over ten years --

2          MR. KENNEDY:  Compound, complex.

3          THE COURT:  Yes, sustained.

4          MR. SOBOL:  I'll withdraw the question because it was

5   compound.

6   Q.  This is a trend of Neurontin sales, branded only, over

7   time.  You've seen this before, correct?  It's Plaintiffs'

8   Exhibit 405-A.

9   A.  I've probably seen it before.  Can you move it down a

10  little bit so I can see the top?  Yes, so this is -- yes, this

11  is -- yes, it looks like Neurontin only, not including

12  gabapentin.

13  Q.  Correct.  And there are linear time trends, correct?

14  A.  Correct.

15  Q.  There are quadratic time trends, correct?

16  A.  Correct.

17  Q.  Quadratic time trends can come in different shapes,

18  correct?

19  A.  Well --

20  Q.  Yes or no.

21  A.  That's a mischaracterization.

22  Q.  If I wrote a quadratic time trend that went like that, I

23  mean, it would be possible to draw a quadratic curve that

24  looked like that, correct?

25  A.  Uhm, I --

ef89fb21-81da-45d7-8dea-621f898382b0

1    Q.   Yes or no.

2    A.   I don't think so.

3    Q.   You don't think so?  Okay.  Could you draw a quadratic

4    time trend that looked like this?

5    A.   Yes.

6    Q.   Like this?

7    A.   Well --

8    Q.   Yes or no.

9    A.   What do you mean by "draw"?

10   Q.   Could a quadratic time trend look like that?

11   A.   Could the result be --

12   Q.   Yes.

13   A.   Yes.

14   Q.   Like that?  Or am I getting too linear now?

15   A.   Well, I'm still not quite sure exactly what you're asking.

16   Are you asking, could a time trend have any of these shapes or

17   the results of a regression --

18            THE COURT:  Can time trends differ in their slopes?

19            THE WITNESS:  Well, this is getting back to the

20   juror's question.  The time trends themselves don't.  The data,

21   when you put them in the model, the results of the model could

22   show different slopes.

23   Q.   Can you also start the time trend at a different point in

24   time?

25   A.   You could.

1   Q.   I'm putting up on the screen Plaintiffs' Exhibit 405-B.

2   You might recall this from Professor Rosenthal's charts.  It

3   showed on-label sales down at the bottom and off-label sales up

4   at the top.  Now, going back to your observation about a

5   normal --

6   A.   Well, first, I think that's actually not correct, but --

7   Q.   I thought that the red is off-label sales, correct?

8   A.   No.  It's off-label uses.

9   Q.   Uses, sorry.  Right?

10  A.   Right, and use is different from sales.

11  Q.   Right.  This is the NDTI data these are mentioned, right?

12  A.   Correct.

13  Q.   Okay.  And going back to your notion that a normal new

14  successful product, do you know how much of the sales of

15  Neurontin over this ten-year period were off-label as opposed

16  to on-label?

17  A.   A very large percentage.  I think it's something like

18  90 percent or --

19  Q.   Ninety percent?

20  A.   Or maybe a little bit less than that, but in that order of

21  magnitude.

22  Q.   Right.  So for a drug where the total sales were projected

23  to be $500 million at the launch, there ends up being about

24  $9.5 billion off-label over the ten-year period?

25  A.   I don't know the exact numbers, but there certainly was a

1    lot of off-label prescriptions written, yes.

2    Q.   Have you studied in the healthcare economic literature

3    comparative off-label uses of Neurontin compared to other

4    drugs?  Yes or no.

5    A.   Well --

6    Q.   Yes or no.

7    A.   Well, I think the answer is "yes."  I've looked at other

8    AEDs, for example, off-label uses of other AEDs and have some

9    charts on that.

10   Q.   Right.  And isn't it your understanding that Neurontin has

11   the largest off-label uses of indeed any drug, not just

12   antiepileptic drugs, using the same NDTI data?

13   A.   I'm not sure about that.  That could be the case.

14   Q.   When you were doing your analysis, Dr. Keeley -- this is

15   another chart that's Plaintiffs' Exhibit 405-C -- when you were

16   doing your analysis, Dr. Keeley, did you make the observation

17   which I made with Professor Rosenthal during her direct

18   examination that during the early time period of the launch of

19   Neurontin, there were far less off-label sales than there was

20   later?  Yes or no.  Just did you make the observation, yes or

21   no?

22   A.   Well, first of all, once again, this is not sales and this

23   is not --

24   Q.   Uses, I apologize.

25   A.   -- and this is not the variable Professor Rosenthal is

1   analyzing, but I certainly was aware of this particular chart,

2   yes.

3   Q.   Did you make any observations about something that might

4   have actually started happening in the beginning of 1997 or the

5   third quarter of 1998 that might have influenced the increase

6   of certain off-label sales of Neurontin?  Did you just make

7   those observations one way or another?

8   A.   Well, yes, but I think you have to recognize --

9   Q.   Thank you.  You've answered the question then.

10      Now, you're aware that Professor Rosenthal was mindful of

11  these -- well, let me put this.  I think you gave some

12  testimony during your direct examination about how you were

13  displeased with the legends that Professor Rosenthal used on

14  the right-hand side of some of her graphs.  Do you recall

15  testimony to that effect one way or the other?

16  A.   I don't know about displeased, but I said there was an

17  error in them.

18  Q.   Correct.  And I take it you fault Professor Rosenthal for,

19  depending upon the indication, changing the scale over on the

20  right-hand side in order to be able to show the differences

21  over time in the blue line?  Yes or no, you have an issue with

22  that, right?

23  A.   Well, you're oversimplifying, but I do have an issue with

24  her varying the scales.

25  Q.   There's been some comments during this trial about how

Page 90

1    other antiepileptic drugs might have affected the influence of

2    the use of Neurontin over time.  Did you look at the other

3    antiepileptic drugs that were approved and on the market before

4    2005 in the United States?  Yes or no.  Did you look at --

5    A.   I'm just hesitating.  I think the answer is "yes."  I

6    certainly looked at other antiepileptic drugs and looked at

7    their patterns over time.

8    Q.   Right.  You understand, first, that there's about three or

9    four or five different classes of antiepileptic drugs?

10   A.   Uhm, I'm not an expert on medical issues and antiepileptic

11   drugs.

12   Q.   You understand that within the classes of antiepileptic

13   drugs, that there are different mechanisms of actions of those

14   different chemicals?

15   A.   I'm not an expert on that.  I would take your word for it.

16   Q.   Even looking at the other antiepileptic drugs, you do

17   understand that some of them are in fact approved by the FDA on

18   the basis of at least two double-blind randomized control

19   trials?  Some of them are approved for pain, bipolar, migraine,

20   bipolar, pain, migraine, anxiety disorders, that they have

21   specific approvals for these conditions?  Do you understand

22   that?  Yes or no.

23   A.   I'm not sure.  I haven't specifically studied this.  I

24   know a lot of them are prescribed for off-label indications.

25   Q.   You gave some testimony about this chart during your

ef89fb21-81da-45d7-8dea-621f898382b0

1   direct examination.  I don't have the number off the top of my

2   head right now, but do you recall this chart?

3   A.   Well, somebody's written on this chart.

4   Q.   That's me.  It says "approval for Lyrica."  We'll get

5   there in a minute.  I flagged for you a part of where I'm

6   going, okay?

7   A.   Okay.  Well, it's not the chart.  My chart didn't have

8   "approval of Lyrica "written on it, though.

9   Q.   No, it didn't, did it?

10   A.   No, it did not.

11   Q.   So, first, let's just draw an observation.  Where I'm

12   pointing right here, "generic entry," do you see where I'm

13   pointing there?

14   A.   Yes.

15   Q.   Okay.  And you said that there were two natural

16   experiments that you gave testimony about with respect to this,

17   and one of the natural experiments you said was that, you know,

18   gee, that promotion drops off at generic approval, which of

19   course you'd expect?

20   A.   That's right.

21   Q.   Right?

22   A.   Sure, uh-huh.

23   Q.   Because the drug is being usually paid at, you know,

24   pennies of what it used to be, or here it might be somewhat

25   higher, but still it's far less a revenue gainer than it used

1   to be, and so promotions drop off, correct?

2   A.   Well, it's not only -- promotions drop off, but I wouldn't

3   say -- the reason is is because if you promote a drug -- many

4   states even have mandatory generic substitutions, so if you

5   promote it, you're just going to be helping the generic people

6   out.

7   Q.   So the promotions drop away, right?

8   A.   Right.

9   Q.   Okay.  Now, one of the things, though, you didn't mention

10  to the jury that might influence -- oh, and the blue line, of

11  course, is both gabapentin and Neurontin over time, right?

12  A.   Correct.

13  Q.   Okay.  You didn't tell the jury how the price drops.  It

14  goes through the floor at that point in time.  You didn't

15  mention anything about that during your direct examination, did

16  you?  Yes or no, did you mention the price dropping at generic

17  entry?

18  A.   I don't know.  I don't think I specifically said that.

19  Q.   Right.  Don't you think that the most important effect

20  then at this point in time in terms of the utilization of

21  gabapentin, or maybe even Neurontin at that point in time, or

22  at least one of the things that's relevant to that line

23  continuing where it is, is the fact that the price has dropped

24  through the floor?  Yes or no.

25  A.   Well, I don't think it's driving these factors.  It's --

Page 93

1   Q.   Have you measured it?

2   A.   Well, Professor Rosenthal has in her models and finds it's

3   not an important factor, and there certainly is the literature

4   that suggests that price is not the determinative factor in

5   deciding which prescription drug to take.  Certainly it's the

6   reason people are using the generic rather than the branded

7   drug, but it's not a reason why they're using Neurontin and the

8   generic Neurontin versus some other drug.

9   Q.   Well, I'm not sure if I understand, Dr. Keeley.

10  Professor Rosenthal has been involved in healthcare economics

11  and pharmaceutical matters for a decade, and she testified that

12  she's been involved many, many times in matters just like this,

13  correct?

14  A.   I think --

15  Q.   Yes or no.

16  A.   I think so, yes.

17  Q.   Yes.  And when the price goes through the bottom, when the

18  floor goes to the bottom of the drug, don't you expect that

19  there's going to be economic incentives to use the drug now

20  that it's less expensive?  Yes or no.

21  A.   Yes.

22  Q.   The other natural experiment you testified about was that

23  you said when you see the approval for PHN and you see this

24  increase that goes up here, but you don't see a corresponding

25  increase in the use of Neurontin.  That was your testimony,

1   correct?

2   A.   Correct.

3   Q.   Now, but you also noticed, by the way, that the data of

4   the detailing was to people who would be prescribing PHN,

5   correct?

6   A.   To a large extent, yes, correct.

7   Q.   When was Lyrica launched?

8   A.   I don't recall.

9   Q.   Isn't it your understanding that Professor Rosenthal went

10  deeply into the data about the detailing and the circumstances

11  and observed that the detailing that was going on and being

12  ascribed to Neurontin was really pre-Lyrica marketing to a

13  niche of doctors that were going to be able to take over and

14  prescribe Lyrica?  Do you recall that she made that

15  observation?

16       MR. KENNEDY:  Compound.

17  A.   She said that, but I don't agree with your

18  characterization of what she did.  She didn't have any more

19  information about the detailing of Neurontin than I do.  That

20  comes from IMS.  It's detailing of Neurontin; it's not

21  detailing of Lyrica.

22  Q.   Your alternative explanation, I take it, for this blip is

23  that it was all wasted money.  You have this blip.  You've got

24  an increase of promotion for Neurontin that goes by about

25  900 percent, and it was all a complete waste.  That's your

Page 95

1   explanation?

2   A.   No, not necessarily.

3          THE COURT:  How much longer do you figure you have?

4          MR. SOBOL:  I honestly don't know.  I think it makes

5   sense to take a break so I can reorganize.  It's not going to

6   be long, but I want to be able to go through this to figure it

7   out.

8          THE COURT:  If it's ten minutes, we could do it now,

9   but if you think it's much longer --

10         MR. SOBOL:  My honest answer, your Honor, is that I

11   think it will go longer if we don't have the break.

12         (Laughter.)

13         THE CLERK:  All rise for the jury.

14         (Jury excused.)

15   SIDE-BAR CONFERENCE:

16         THE COURT:  Do I have the thing yet on Dr. McCarberg?

17   This is just the additional?

18         MS. NUSSBAUM:  Right.

19         THE COURT:  Did you see it yet?

20         MS. NUSSBAUM:  It just walked in the door.  No, they

21   got it over the weekend, so they've had it.

22         MR. CHEFFO:  And just for the record, your Honor, I

23   mean, you'll see, I think, this is far more than just a few

24   designations.

25         The other issue here is that this is like essentially

1   a new document off the exhibit list.  This was never designated

2   at all ever.  This wasn't like, you know, they went and it got

3   dropped off.  This is absolutely new designations.  It's after

4   a Kaiser witness, and I think as you'll see, you'll read, it's

5   totally out of context.  We then have to go back and re-put in

6   other stuff that responds.  Again, this is not just one

7   question.

8               THE COURT:  Well, why do you need it?

9               MR. CHEFFO:  This goes on for --

10              THE COURT:  It's not that long.  Let's not exaggerate.

11  But it's not a snippet either.  So why do you need this?

12              MS. NUSSBAUM:  Well, your Honor, unfortunately, and it

13  was inadvertent, it was left out.  This clearly goes -- this is

14  a pain doctor who testifies right to the issue your Honor has

15  always asked for:  Show me the Kaiser doctor who attended a CME

16  who's heard about the off-label use.  It goes right to the

17  heart of --

18              THE COURT:  Well, I'll decide it in the interest of

19  justice, but if I do it, he gets to put in additional things

20  from McCarberg tomorrow.

21              MS. NUSSBAUM:  That's fine, your Honor.  We'll do it

22  tomorrow as one thing.

23              THE COURT:  Well, I don't want to do it right before

24  the -- well, let me just ask this.  I don't know yet.  I

25  haven't read it.  I don't know.  But the issue is, how much

1   longer do you have?

2        MR. SOBOL:  Probably about ten minutes.  Since you've

3   given me the break, I can cut it back.

4        THE COURT:  Sure, slim it down?

5        (Laughter.)

6        MR. SOBOL:  Right, right, absolutely.

7        THE COURT:  Narrowly?  All right, so ten minutes.  And

8   then redirect?

9        MR. KENNEDY:  So far little, if any.

10        THE COURT:  Okay.  And then what do we have?

11        MR. CHEFFO:  We have some videos.

12        THE COURT:  Will it fill the rest of the day?

13        MR. CHEFFO:  Yes.  I think we may be able to be done

14   today too.

15        THE COURT:  Okay.  And then this afternoon we have the

16   charge conference, and I'm hoping to get you something.  I was

17   sort of working on it during your scintillating direct and

18   cross, but, in any event --

19        MS. NUSSBAUM:  Cross wasn't --

20        MR. SOBOL:  I just got that.

21        (Laughter.)

22        THE COURT:  No, no, no, that was done with the most

23   enthusiasm.  So the issue is, I'm trying to get this to you,

24   but then if I have to read this and I get it to you, I don't

25   know what I'm going to get to you, so I'll do what I can do.

1           MS. ARMSTRONG:  Do you know when you want to have the

2    charge conference?

3           THE CLERK:  The sentencing starts at 2:00.

4           THE COURT:  Sentencing is at 2:00?

5           THE CLERK:  Tell them to get here at 2:15?

6           THE COURT:  Maybe 2:30, maybe, but then there's a

7    challenge to something in the sentencing.

8           THE CLERK:  2:30 would be safe, I think.

9           THE COURT:  I think 2:30 to 4:30 is what I'm counting

10   on kind of thing.  But this, I don't know.  We'll see.

11          (End of side-bar conference.)

12          (A recess was taken, 10:02 a.m. )

13          (Resumed, 11:38 a.m.)

14          (At sidebar on the record.)

15          THE COURT:  Let me -- Erin has been working hard, and

16   I have not yet reviewed the draft jury instructions

17   incorporating stuff, but I thought on balance, even though I

18   haven't read them yet, your crew might want to read them.  I

19   was hoping to read them but then have the depositions, so I

20   haven't read them.

21          What I've tried to do is go through defendant's

22   objections, many of which I agreed with; plaintiff, California

23   things rely a lot more on Tobacco II, which is, I think, the

24   most recent statement on the area, and just go with that.

25          So I thought I would give this to all of you, and

Page 99

1    consistent with what I said before, I am eliminating a lot of

2    the causes of action under California and am just going to do

3    that by myself and seek guidance on the fraud, which I think is

4    the best way to handle that at this point.

5            You haven't given me a brief on preemption.  It's a

6    serious issue.

7            MR. SOBOL:  We have somebody working on it.

8            THE COURT:  I'm going to do this all as a matter of

9    law; it's a serious issue.  If it's not preempted, it may be

10   gone as a matter of law; if it is preempted, it's gone.  I

11   don't think I need to deal with that it the next 24 hours.  I'm

12   just going to do it on the fraud.

13           On the deposition.  So trying to be truly Solomonic --

14           MR. SOBOL:  Just to say, on the preemption, when would

15   you like the briefs on that?

16           THE COURT:  You know what, let's just worry about it

17   afterwards.  It's a serious issue.  There is a Southern

18   California case which directly supports the defendant's

19   position.  To my knowledge, there's no appellate decision

20   directly on point yet.  There is some related cases but not

21   directly on point.  It's just a bigger issue.  It's a bigger

22   issue.

23           MR. SOBOL:  Okay.

24           THE COURT:  Who knows what the Supreme Court is doing

25   with preemption these days.  So I need to think about it, and I

1    don't think anybody is in the mood to do it now.

2         Anybody want to do a big constitutional discussion?

3         All right.  So I've knocked out a lot of it.  The part

4    I kept in is what McCarberg himself knew about Neurontin and

5    where he knew it from, where he was on the speakers' bureau.  I

6    thought some of this was just overkill and not necessary given

7    the fact this is cleanup.

8         And I knocked out as unduly prejudicial to come in at

9    the tail end how much money he was paid by Pfizer, but I kept

10   in the fact he was on the speakers' bureau and that he's spoken

11   about Neurontin.  And the part at the end about Fallon Medical

12   was completely confusing.  I didn't get it and it's too late to

13   figure out.

14        MR. CHEFFO:  Can I just ask your Honor this -- and I

15   don't want to reargue this -- but you had ruled on this --

16        THE COURT:  Maybe I did.

17        MR. KENNEDY:  -- you had ruled on it, that's fine.  I

18   wasn't really sure on this, but if you want to sustain it and

19   keep it out, there's follow-up questions that kind of lead --

20   basically this -- which we didn't object to, but just for

21   fairness -- in other words, if we're going to take this out,

22   this is page 90 -- there's a bunch of follow-up.

23        THE COURT:  Take out the counters, too, that seems

24   fair, if I knocked it out.

25        MR. KENNEDY:  Or we can keep it.

1        MS. NUSSBAUM:  Can somebody sit down with Don now and

2   figure it out?

3        THE COURT:  The issue under Federal Rules of Civil

4   Procedure 30(e) you can correct the substance as well -- so he

5   corrected it.  So I allowed that.  Once that's out, then the

6   counterdesignations should be out.

7        MR. BARRETT:  Your Honor, I think my view would be he

8   didn't correct his testimony, he was coached to muddle his

9   testimony.

10        THE COURT:  But he changed it within the 30 days,

11   which is what is required by the rule.  He can change the

12   substance, it says that, I went back and read it.

13        MR. BARRETT:  Our position is the jury should hear all

14   of it.

15        THE COURT:  That's what it says in the rule.  I have

16   no evidence he didn't follow the rule in the time framework or

17   whatever.  But what's sauce for the goose is sauce for the

18   gander.  If that comes out, the counterdesignations come out as

19   well.

20        MR. KENNEDY:  We'll take this out and take the

21   counters out as well.

22        (End of discussion at sidebar.)

23        THE COURT:  So did you slim it down, Mr. Sobol?

24        MR. SOBOL:  (Motioning.)

25        MR. KENNEDY:  I think we'll be no more than five or

Page 102

1   ten minutes.

2           THE COURT:  While he's getting them, somebody gave me

3   very nicely the transcripts of the video depositions.  Was

4   there anything I was supposed to do with them other than we're

5   going to hand them to the jury?

6           Does anyone know?

7           MR. HIMMELSTEIN:  We just understood you wanted one.

8           THE COURT:  So this is just mine.

9           MR. FOX:  And we'll have one tomorrow after we finish.

10          MR. HIMMELSTEIN:  Do you need a second one as an

11  addendum to the transcript?

12          THE COURT:  Yes, we need something.

13          MR. HIMMELSTEIN:  Okay.

14          THE COURT:  Is the press here?  There you are.  Hi.

15  The case is going to the jury tomorrow.

16          I forget, who do you represent?

17          AUDIENCE MEMBER:  Bloomberg.

18          THE COURT:  Will there be anything in the press

19  tomorrow?

20          AUDIENCE MEMBER:  Probably not.

21          THE COURT:  Just to forewarn the jury.

22          (Jury entered the courtroom.)

23          THE COURT:  Okay.

24          MR. SOBOL:  May I inquire, your Honor?

25          THE COURT:  Yes.

ef89fb21-81da-45d7-8dea-621f898382b0

1   BY MR. SOBOL:

2   Q.   Dr. Keeley, during your direct examination you gave some

3   testimony about third-party payors across the country and made

4   some observations about some arguable differences in them.  Do

5   you recall that?  Yes or no?

6   A.   Well, I don't like your characterization of arguable, but

7   I did make some observations about differences among them, yes.

8   Q.   Have you ever sat on a drug utilization review board?

9   A.   No, I have not.

10  Q.   Did you conduct a thorough review of the differences of

11  drug utilization review boards across the United States for

12  your testimony here today?  Yes or no?

13  A.   I have done a thorough review of the testimony regarding

14  Kaiser's drug utilization.

15  Q.   I'm talking about the testimony you gave across the

16  country.  You gave testimony this morning about across the

17  country.  My question is:  Did you do a thorough review of

18  third-party payors across the country regarding similarities or

19  differences in drug utilization review boards?  Yes or no?

20  A.   Yes.  Differences between nationwide data and Kaiser data,

21  yes, I have analyzed that.

22  Q.   You gave some testimony during your direct examination

23  about experienced goods, that Neurontin is an experienced good.

24  Do you recall that?

25  A.   Yes.

1    Q.    Is a placebo an experienced good?

2          THE COURT:  An experienced what?

3          MR. SOBOL:  An experienced good.

4    A.    I'm not quite sure how to answer that.  I guess I would

5    say -- if a drug had a placebo effect, you might experience

6    that.

7    Q.    All right.  So if someone was given a drug which for all

8    intents and purposes has the same properties or nearly the same

9    properties as a placebo, a patient might in reaction to

10   receiving that placebo think that they are experiencing some

11   pain relief or bipolar relief or something like that.  They

12   might experience that, correct?  Yes or no?

13   A.    Yes, they might.

14   Q.    All right.  So a placebo might be an experienced good

15   along with Neurontin being an experienced good.  They wouldn't

16   know until they took it whether or not it was any good or not,

17   right?

18   A.    Well, I don't think you could explain the pattern we see

19   for Neurontin if it were just a placebo.

20   Q.    You do realize that for certain -- well, you do realize

21   that Dr. Rosenthal, Professor Rosenthal, when performing her

22   analysis, looked at each of the indications separately,

23   correct?

24   A.    Correct.

25   Q.    So for her, one size did not fit all.  She did not

1    implement her model exactly the same for each indication, did

2    she?

3    A.   That's correct.  That's one of my criticisms of her.

4    Q.   You indicated on your direct examination that Professor

5    Rosenthal didn't specifically model the effect of scientific

6    studies, correct?

7    A.   Correct.

8    Q.   If she had done so, I assume that it's possible that she

9    might have gotten a greater effect of the marketing by

10   Parke-Davis or Pfizer on off-label sales than she even got;

11   isn't that a possibility?

12   A.   I think almost anything is possible, but I don't think

13   that's the way she explained her analysis.

14          MR. SOBOL:  Can you put on slide 23?

15          Robert, can you switch over, please?

16   BY MR. SOBOL:

17   Q.   Dr. Keeley, although you were here for many of the

18   witnesses in the case, were you here for the testimony of David

19   Franklin?

20   A.   No, I wasn't.

21   Q.   Okay.  David Franklin testified on March 12th that "The

22   way I was trained to influence a physician was that they rely

23   on their education, they rely on the literature, they rely on

24   their peers; and so we needed to influence all of that.

25   Every -- every information source that a physician reaches out

ef89fb21-81da-45d7-8dea-621f898382b0

1   to, we needed to influence."

2          Now, did you take into consideration when reaching

3   your decision in this case that promotion had no effect on

4   sales that the detailers and medical liaisons at Parke-Davis

5   were trained in this way?

6          MR. KENNEDY:  Objection, mischaracterization of the

7   testimony.

8          THE COURT:  Well, it's up to the jury to find it.

9   A.   Well, first of all, I didn't say that promotion had no

10  effect on sales.  What I said was that it couldn't be the only

11  thing driving sales.  So maybe you'd like to rephrase your

12  question without building in a false assumption.

13  Q.   Well, didn't you at least take into consideration when you

14  reached the opinions you did in this case that the detailers,

15  the sales representatives, and the medical liaisons at

16  Parke-Davis were trained nationally to influence every

17  information source that physicians trust in making medical

18  decisions?  Did you take that into consideration?

19  A.   Well, I certainly generally know how detailing worked.  I

20  don't know that I agree with this particular characterization.

21          MR. SOBOL:  Let's go to slide 10.

22  Q.   This slide is from Plaintiff's Exhibit 405-K, which is the

23  summary results of Professor Rosenthal's model.  Do you see

24  that?

25  A.   Yes, I do.

1    Q.    It's fair to say that not in all situations -- I'm going

2    to make a circle here -- not in all situations did Professor

3    Rosenthal conclude that the increase of Neurontin sales was

4    entirely the result of promotions, correct?

5    A.    That's not correct.

6    Q.    You do realize that she found that for, for instance,

7    migraine, less than 30 percent have been caused by the unlawful

8    promotion that she was modeling, yes or no?

9    A.    That's correct, but your first question --

10   Q.    Her results were 30 percent there.  And her results for

11   neuropathic pain, when you combined all indications, were 70

12   percent, not a hundred percent.  You recall that?

13   A.    Yeah.  I think you're mischaracterizing what I said and

14   what Professor Rosenthal said.

15            MR. SOBOL:  Let's go to slide 19.

16   Q.    Dr. Keeley, this is a new slide, the jury hasn't seen this

17   one before.  It depicts the prescriptions, all prescriptions by

18   Kaiser.  That's the overall pie.  Do you see that?

19   A.    Well, I see that's what you say, but what's the source of

20   this data?

21   Q.    Well, do you recall that Dr. Hartman had a total during

22   his direct examination when Mr. Kennedy was asking him

23   questions, and the total prescriptions that were written that

24   Kaiser paid for for Neurontin from 1995 to 2004 was 1,180,000

25   prescriptions?

1    A.    I don't remember the number, but I know generally, yes,

2    what he testified to.

3    Q.    In that ballpark, right?

4          So this pie shows all of the prescriptions paid for by

5    Kaiser during the proximate ten-year time period?

6    A.    No, that's not correct.

7    Q.    Well, don't you also recall that Mr. Kennedy then pointed

8    out to Dr. Rosenthal that the unlawful prescriptions were about

9    half of that or 550,000 unlawful prescriptions.  Do you recall

10   that one way or the other?  You were sitting here in the court.

11   Do you recall that?

12   A.    I think you're asking me a question already based on a

13   mischaracterization of what these data are.

14         I do remember the testimony, though, about Professor

15   Rosenthal.  I could explain why these data are not what you say

16   they are, if you'd like me to.

17   Q.    Do you recall Dr. Hartman's testimony when he said that

18   there were a total of somewhat less than 1.2 million

19   prescriptions of Neurontin paid for by Kaiser during the time

20   period we have here?

21   A.    I generally remember that.  I don't remember the specific

22   number, but I take your word for it.

23         MR. SOBOL:  I'm going to go to plaintiff's 81 -- don't

24   put them on the screen yet -- plaintiff's 81 and 90.

25   Q.    During your direct examination, Dr. Keeley, you gave some

1  testimony about how Dr. Rosenthal's model shows the impact on

2  physicians rather than third-party payors, correct?

3  A.   Correct, it's a model of detailing to physicians.

4  Q.   And in this case did you review documents that show

5  marketing efforts directed by Parke-Davis or Pfizer directly to

6  managed care institutions, third-party payors, and Kaiser?

7  A.   It's possible.  I don't have any sharp recollection of

8  that.

9  Q.   There's a book in front of you that would have Plaintiff's

10  Exhibit 81 and then also Plaintiff's Exhibit 90 in front of

11  you.

12          MR. SOBOL:  Which I offer into evidence at this time.

13          MR. KENNEDY:  Object as beyond the scope, your Honor.

14          THE COURT:  I don't know yet.  I'll allow the exhibit

15  in.  What's the question?

16          (Exhibits 81 and 90 received into evidence.)

17  Q.   Dr. Keeley, when you were making your observations about

18  whether or not Kaiser was impacted by the unlawful promotion in

19  this case, did you consider documents from Parke-Davis or

20  Pfizer regarding marketing to managed care institutions,

21  including Kaiser?

22          MR. KENNEDY:  Objection.

23          THE COURT:  Overruled.

24          MR. KENNEDY:  Kaiser?  Can we approach, your Honor?

25          THE COURT:  Yes.

1          (At sidebar on the record.)

2          THE COURT:  I just don't remember.  Did he -- I

3    thought -- did he mention Kaiser at all?

4          MR. KENNEDY:  No.

5          MR. SOBOL:  He said managed --

6          MR. KENNEDY:  It was TTPs.

7          THE COURT:  Fair enough.

8          MR. SOBOL:  Let me just say, what he was asked, "were

9    third-party payors, like Kaiser," a couple of times during his

10   direct examination.

11         MS. ARMSTRONG:  No, he wasn't.

12         THE COURT:  Then why don't you rephrase it that way.

13         MR. SOBOL:  Okay, I will.

14         (End of discission at sidebar.)

15   BY MR. SOBOL:

16   Q.   So, Dr. Keeley, when you were reaching your opinions in

17   this case, did you consider materials from Parke-Davis or

18   Pfizer that were directed towards third-party payors, like

19   Kaiser?

20   A.   It's possible.  If this particular document was in my

21   documents considered, either I or my staff had probably looked

22   at it.  I don't know for sure.

23   Q.   You don't recall it now?

24   A.   I don't specifically recall this one, no.

25   Q.   Okay.

ef89fb21-81da-45d7-8dea-621f898382b0

1       Well, do you recall, then, Plaintiff's Exhibit 90?  I

2  think it might be next in your book.

3  A.   Once again, not specifically.  I looked at many documents

4  a few years ago, but I could have.  If it's in my docs

5  considered, either I or my staff looked at it.  I don't have

6  any specific recollection.

7  Q.   Now, Dr. Keeley, we started some of this testimony today

8  regarding the incentives of companies to either promote or not

9  promote, depending on whether they might get a return on

10  investment.  Do you recall general questions like that?

11  A.   I do recall that, yes.

12  Q.   And if I understand your testimony correct -- and I'm

13  pretty sure it's not really debated in the area of economics --

14  economists assume that for these large organizations like

15  Parke-Davis or Pfizer act in economically rational ways?

16  A.   I think as a general principle that's true, it's just that

17  it's not -- certainly not always necessarily true of every

18  company at every point in time.

19  Q.   All right.  And I take it, then, also with respect to the

20  incentives to promote off-label and maybe even also for the

21  incentives to promote off-label fraudulently that there might

22  be economic incentives for a company to think about doing that

23  because the company might gross more sales and make more

24  profit?

25  A.   Well, I think you'd have to take into account that as well

1    as the penalties for promoting off-label or promoting

2    fraudulently.

3    Q.   Right.  And if the penalty or the civil fine is going to

4    be less than what the company can profit, then the company is

5    going to have a profit incentive to go forward and market

6    off-label unlawfully anyway, won't it?

7    A.   No, you'd also have to look at any criminal penalties as

8    well.

9    Q.   I'm saying, if you combined all the criminal penalties and

10   all the civil penalties, and if the criminal and the civil

11   penalties are less than what the company stands to benefit, the

12   company is going to have an incentive to go forward and do it

13   anyway, won't it?

14   A.   Well, that would be one element.  I think many companies

15   still would not want to violate the law, so even if it just on

16   a pure monetary basis it turned out that way, but that would be

17   a factor, I suppose, in rational economic behavior.

18           MR. SOBOL:  Nothing further.

19                     REDIRECT EXAMINATION

20   BY MR. KENNEDY:

21   Q.   Dr. Keeley, Mr. Sobol asked you something to the effect

22   whether it was a waste of dollars to expend the money that was

23   expended during that spike in 2002 through 2004.  And I believe

24   you answered no in direct response to the directed yes or no.

25           Can you explain your answer?

1   A.   Yes.  Well, what you have to remember is that companies,

2   like Pfizer, when they're detailing a drug, they're not just

3   detailing one drug usually, they're detailing a number of

4   drugs.

5        So IMS is trying to allocate if a detailer visits a

6   physician and talks about three drugs, IMS is going to allocate

7   that time among the three drugs.  That's what's going to show

8   up in the data Professor Rosenthal analyzed.

9        But from a pharmaceutical manufacturer's point of

10  view, adding one more drug to the detailer's arsenal really may

11  not cost very much more.  The main costs are setting up the

12  appointment, driving there, spending the time there, having a

13  lit bit more literature to hand out about one other drug is not

14  necessarily a huge incremental cost.

15       So you can't really conclude just by looking at, you

16  know, these detailing numbers and the way IMS somewhat

17  arbitrarily allocates costs whether or not something would be

18  profitable.

19       MR. KENNEDY:  Austin, could we see 405-C, one of the

20  exhibits that Mr. Sobol asked you about.

21  Q.   What's the source of the data on 405-C?

22  A.   The source of the data is the NDTI data, the National

23  Therapeutic Disease Index (sic.) data.

24  Q.   How reliable is that data?

25       MR. SOBOL:  Objection, beyond the scope.

ef89fb21-81da-45d7-8dea-621f898382b0

1    A.    It's not very reliable for these particular purposes that

2    Professor Rosenthal used it for.

3    Q.    Why not?

4    A.    Because these data have a large sampling.  You might

5    remember Professor Rosenthal's testimony about opinion polls,

6    and people predict that voters are 55 percent in favor of one

7    candidate plus or minus a two percent sampling error.

8          Well, you have the same thing here.  This is based on

9    a sample of physicians.  The sample error is not two percent

10   here.  It can range as high as plus or minus 60 percent.  You

11   can have from one quarter to the next 120 percent increase that

12   would be just due to sampling error.  That's why we have to be

13   very careful about --

14         THE COURT:  Did you mean beyond the scope of the

15   export report or beyond the scope of --

16         MS. ARMSTRONG:  That was in his report.

17         THE COURT:  It was in his report?  All right, then

18   overruled.

19   A.    Just to finish.  You can see these jagged spikes here.

20   It's unlikely that Neurontin prescriptions were jumping that

21   much month to month.  It was more likely due to a sampling

22   error.  So you have to be very careful about drawing any

23   conclusions on what looks like a trend here based on these

24   data.

25         THE CLERK:  Yes.

1      JUROR:  You've talked a lot, obviously, about

2  Dr. Rosenthal's testimony.  And in economics and statistics I'm

3  sure there's various schools of thought.  Would you say your

4  biggest differences with her testimony and her report and her

5  charts and is method, or would you say you that found her work

6  to be intellectually dishonest?

7      THE WITNESS:  I find her work to be intellectually

8  dishonest.

9      JUROR:  Okay.

10  BY MR. KENNEDY:

11  Q.   Time trends.  Is there a way to manipulate the time trend

12  to achieve a certain result?

13  A.   No, there's not.  It's just you put it in the regression,

14  the data will tell you whether it makes a difference or not,

15  whether -- what the trend is, whether it's flat, whether it's

16  steep.  You're not putting -- you're not putting in any

17  particular trend, you're just allowing the regressions,

18  statistics package to estimate what the trend is.

19  Q.   Now, there are linear time trends; is that correct?

20  A.   Correct.

21  Q.   And there are also quadratic time trends?

22  A.   That's correct.

23  Q.   Which is more flexible?

24  A.   Quadratic is more flexible because it allows for a

25  curvature in the time trend but doesn't require it.  If, in

1  fact, the true trend is linear, the quadratic term will just be

2  zero when you put it in.

3          Often economists use quadratic because it constrains

4  the model less.  The general principle is to not constrain a

5  model, to force it to get particular results, but to let the

6  data get the results that are truly there.

7  Q.   Let me make sure I understand.  If you put in a quadratic

8  and there's a curve, it will pick it up?

9  A.   Correct.

10  Q.   But if you put in a quadratic and it turns out there's

11  actually a linear time trend, the quadratic will pick that up

12  as well?

13  A.   It will pick it up, and the quadratic term will just

14  essentially drop out, it will essentially be zero.

15  Q.   And that's because you have, what, time and time squared?

16          THE COURT:  Excuse me.  You've got to explain this in

17  plain language here.

18          THE WITNESS:  Sure.  Let me try.  It's a little bit of

19  a technical issue for people --

20          THE COURT:  Yes.

21          THE WITNESS:  Regression analysis.

22          THE COURT:  Can we have consensus on this point?

23  We're just trying to understand it.

24          THE WITNESS:  So the variable you put in in a

25  regression is just -- a time trend itself is just a series like

1   zero, one, two, three, four, five.  Just those numbers.  Each

2   quarter would have a number, you know, that was going up.  And

3   you're looking at the -- so let's -- if you draft that, that

4   would just be a line going up.  But you're assessing the

5   relationship between that number and, in this case,

6   prescriptions.  And if there were no relationship, the

7   coefficient, what you estimate, would come back to zero.  So

8   you're not forcing any particular result.

9          So -- and if you put in a quadratic term, that's just

10  -- you're squaring the number, so one, four, nine, whatever.

11  And putting that in, too, that allows a basic principle of

12  mathematics, really, that any function -- and a function is

13  just a relationship between variables -- can be approximated by

14  either a linear term or a quadratic term, or you could put in a

15  cubic term, you could go on and on to make it more general.

16  But it's just allowing the data to determine what the

17  relationship over time is.  And in this case it would be after

18  you've already accounted for it, the pattern of promotion.

19          I don't know if that helped or not.

20          THE COURT:  Anyone brave enough to ask a question?

21          THE WITNESS:  I know this is hard.

22          JUROR:  When you say you input the form, are you

23  inputting it as an expression, or are you putting in actual

24  numbers?

25          THE WITNESS:  They're actual data.

1          JUROR:  So, in other words, one, two, three, four,

2     five that you've talked about, you're putting in one, two,

3     three, four, five, that constant, based on --

4          THE WITNESS:  It's not a constant.  Maybe to back up.

5          What a regression is, you have one observation on the

6     dependent variable, in this case prescriptions, you have an

7     observation on -- during a particular point in time, then you

8     have an observation on, say, promotion during that particular

9     time.  Then you go to the next time period, right?  You have

10    another observation on prescriptions, another one on promotion.

11    You put an additional variable in, which is the variable zero,

12    one, two, three.

13         So the first observation you might put in zero, next

14    one one, next one two, next one three, and the regression wants

15    to make what are called coefficients of those variables, the

16    promotion and the time trend variables; and it will essentially

17    tell you whether there is an effect, in this case of time,

18    which is in there to proxy for all the factors, like good

19    experiences left out of the model will tell you whether those

20    are important even after you've already controlled for

21    promotion.  And if they're not, it will just drop out.  You'll

22    get no coefficient.  Or if promotion is not important, it will

23    drop out.

24         So you're -- essentially the data are -- you're just

25    fitting the model to the data and letting the data tell you

ef89fb21-81da-45d7-8dea-621f898382b0

1    what the parameters of the model are.

2            I see you still look confused --

3            JUROR:  No, no, I'm just having a problem with the

4    idea of a number being what I would consider a constant

5    referring to it as a variable.  That's the only --

6            THE WITNESS:  It's not constant because it changes

7    from zero, one, two, three, four, five --

8            JUROR:  Over time.

9            THE COURT:  What are the one, two, three, four, five,

10   the length of time?

11           THE WITNESS:  The length of time.  So one quarter has

12   passed, two quarters have passed, three-quarters have passed.

13   You're measuring the length of time is the variable.

14           JUROR:  One, two, three, four, five, isn't that

15   expressed X plus 1, X plus 2 -- an expression like that?

16           THE WITNESS:  There's no X.

17           JUROR:  It's a series.

18           THE WITNESS:  You've created a series, that's right, a

19   time series that goes from -- it could be arbitrary as long

20   as -- it could be one, two, three, four, five; it could be

21   five, six, seven, eight, nine, it won't make any difference.

22   You're just putting that series in as another variable in the

23   model.

24           I don't know if that helps or not.

25           And you're letting the data determine, you know, what

Page 120

1   the effect of that variable is.  If there's no effect of it,

2   then the coefficient of that will come back zero.

3            THE COURT:  Any other questions?

4   BY MR. KENNEDY:

5   Q.   In simplest terms, is there a way, depending on which side

6   you're working for, you can jigger a time trend to get a

7   result?

8   A.   No, there's not, because you're just putting in this

9   series, one, two, three, four, five.  There's no discretion

10  involved.

11           (Discussion off the record.)

12           MR. KENNEDY:  Your Honor, I neglected to offer 863 in

13  evidence, the chart comparing some of Dr. Rosenthal's analysis.

14  I offer it at this time.

15           THE COURT:  All right.

16           (Exhibit 863 received into evidence.)

17           MR. KENNEDY:  No further questions.

18           THE COURT:  Thank you.  As the time trend is

19  progressing.

20           MR. SOBOL:  I'll do it from here.

21                        RECROSS-EXAMINATION

22  BY MR. SOBOL:

23  Q.   Dr. Keeley, the NDTI data is widely used in healthcare

24  economics.  You understand that, correct?

25  A.   That's correct.  Although not necessarily for these

Page 121

1  purposes.

2  Q.   And it's also widely used at Pfizer in order to look at

3  whether uses are off-label or on label.  Do you know that?

4  A.   I think that's probably the case.

5  Q.   Right.  And also at Parke-Davis, Parke-Davis used NDTI

6  data to discern the differences between off-label and on label,

7  correct?

8  A.   I'm less sure, but I'll take your word for it.  I wouldn't

9  be surprised.

10 Q.   And the use of a time trend, I think you testified in a

11 different proceeding, it would capture effects such as over

12 time more people sharing their experiences and knowledge and

13 growing knowledge about the effectiveness of Neurontin for

14 off-label indications?

15 A.   Yeah, that sounds like something I would have said.  I

16 might have said it today.

17 Q.   In writing your time trend would you draw a distinction

18 between whether or not the experiences were induced by the

19 companies or whether the experiences were independently

20 induced?

21 A.   Well --

22 Q.   Yes or no?  Would you quantify that?  Yes or no?

23        MR. KENNEDY:  It's a choice question, your Honor.

24 It's got two parts.

25        THE COURT:  So why don't you -- so ask two separate

1   questions.

2   BY MR. SOBOL:

3   Q.   All right.  You understand, Doctor, that in this case

4   there is -- there have been indication expert after indication

5   expert testifying about the placebo effect of drugs generally

6   for each of the indications that we've talked about?

7   A.   Yes, I understand that.

8   Q.   Okay.  And you also understand that there has been a

9   debate between the parties as to whether or not when one doctor

10  perhaps reads a series of journals that might have been

11  inaccurately cast, that that doctor might have an influence and

12  then that doctor might speak to some other doctor or they might

13  go to some CME, that there's a diffusion effect of the

14  unlawfulness that's alleged in this case.  You understand that,

15  correct?

16  A.   I understand that.

17  Q.   And you haven't quantified for time trend purpose or any

18  other purpose how it is you would distinguish in implementing a

19  model here between that diffusion effect and some agnostic,

20  some independent diffusion effect?

21  A.   I don't think that's right.

22       MR. SOBOL:  Nothing further, your Honor.

23       THE COURT:  Thank you very much.

24       MR. KENNEDY:  Just one.

25  Why isn't that right?

ef89fb21-81da-45d7-8dea-621f898382b0

Page 123

1          MR. SOBOL:  Objection.  We're done.

2          THE COURT:  We're done.  Thank you.

3          Now, he was our last live witness.

4          So now we have just some deposition transcripts,

5     which, as I understand it, will fill the remainder of the day,

6     possibly go a little into tomorrow, but that won't change at

7     all the fact the case is going to you tomorrow.

8          So whom are we hearing now?  Ms. Armstrong, are you --

9          MS. ARMSTRONG:  No, I'm going to switch places, if

10    that's all right.

11         MR. CHEFFO:  We're going to hear from Albert Carver.

12    He is a Kaiser pharmacist.

13         (Played videotaped deposition of Albert Carver.)

14         MR. CHEFFO:  Sorry, that was something your Honor had

15    ruled on, we just wanted to make sure --

16         (Discussion off the record.)

17         THE COURT:  As you notice, the unsung heroes of this

18    trial are the two young people here at either poles who

19    actually have to make all this stuff on the screen appear in

20    the right way.  So should all say thank you.

21         MR. CHEFFO:  It's probably my fault if it didn't get

22    to Austin correctly, because he usually doesn't get it wrong.

23         (Continued playing videotape deposition of Albert

24    Carver.)

25         MR. CHEFFO:  Your Honor, the next witness is

Page 124

1    Dr. Danesh, also a Kaiser doctor.  He's the regional chief of

2    neurology for the Southern California region of Kaiser.

3              THE COURT:  How long will it be?  Is this the last

4    deposition for you?

5              MR. CHEFFO:  We're not done yet.  I'm sorry, there's

6    day two, I'm sorry for the confusion.

7              This entire -- Carver was supposed to be 34 minutes,

8    and Danesh is 16 minutes.

9              THE COURT:  When do you want to sneak in these last

10   few snippets?

11             MR. CHEFFO:  We have probably another few, so we may

12   have to do it tomorrow.  Probably 20 or so, 30 minutes tomorrow

13   if we're not going to go past 1:00.

14             THE COURT:  Can I just see you for one second on the

15   timing?

16             (At sidebar on the record.)

17             THE COURT:  I have allowed them some additional

18   snippets.  Are you prepared to do them now or do they need to

19   be edited?

20             MS. NUSSBAUM:  It's fine, they're only a minute and a

21   half.

22             THE COURT:  Do you want it as part of a rebuttal case

23   or put them in with your depositions?

24             MR. CHEFFO:  We would prefer to put them in tomorrow.

25             THE COURT:  You prefer tomorrow.  Can I go until 1:15

Page 125

1    and just finish these?

2            MR. FOX:  Probably not, we have 10 minutes of Danesh

3    and then --

4            THE COURT:  Tomorrow is going to be such a long day.

5            MR. CHEFFO:  We can actually do -- we can finish this

6    one today and then do Danesh, and then we'll have Arness and --

7            THE COURT:  And those will be read.

8            MR. CHEFFO:  Those will be read; they can be done

9    quickly.  We're thinking about dropping the rest for time.

10            MR. BARRETT:  You're going to drop Weider and --

11            MR. CHEFFO:  We're going to drop Weider and Pande for

12    time.

13            THE COURT:  All right.

14            (End of discussion at sidebar.)

15            MR. CHEFFO:  So we'll be finishing Carver, your Honor.

16    Sorry about that.

17            (Continued playing videotape deposition of Albert

18    Carver.)

19            MR. CHEFFO:  Now it's Dr. Danesh, who is the Kaiser

20    regional chief of neurology for the southern region.

21            (Played videotape of Mitchell Danesh, M.D.)

22            THE COURT:  That is it.  Don't forget, tomorrow is a

23    long day, we'll give you lunch and snacks, but remember it is

24    9:00 to 5:00.

25            (Discussion off the record.)

Page 126

1          THE COURT:  4:30.

2          (Jury left the courtroom.)

3          THE COURT:  Just see you for scheduling for one minute

4    on the record.

5          (At sidebar on the record.)

6          THE COURT:  All right.  How long tomorrow?

7          MR. CHEFFO:  Well, the two that we're definitely going

8    to do are Arness and Dhaduk, which have been ruled on.  One 12

9    minutes, the other one is 11 minutes.

10          The only thing we need to talk about amongst ourselves

11   is the Weider transcript, which you haven't seen, tomorrow.

12          THE COURT:  I'm not doing it tomorrow; it's too late.

13   I can't.  Enough.  It's not timely at this point.

14          Let's just -- we have a serious problem which if they

15   need to leave at 4:30 and we have a half an hour of

16   depositions, let's just script what this is going to look like.

17          Do you want me to do the jury instructions first?

18          MR. CHEFFO:  We talked about that, I think we all

19   agree that would be very helpful since it's complicated.

20          THE COURT:  Yes.  So let's assume for a minute

21   everyone's on time, we get -- we start my jury instructions at

22   9:30.  I guess it depends a little what they'll look like, but

23   let's say it takes an hour and a half and we have our break

24   from 11:00 to 11:30 and then defendants go first.  Let's say

25   you go to 1:30, we do lunch, let's say 2:30, even cut it a

1    little short.  Then we give you two hours and then just get

2    them organized and they'll leave.

3            I think that's realistically what it looks like, but

4    it only works they leave at 4:30 if we don't have a lot of

5    depositions in the morning and everything happens smoothly.

6    Just leave enough time in your closings -- I don't want to move

7    over to the next day.  So I can cut back a little on the lunch

8    hour, but there's only so much I have to cut back.  I mean,

9    people can't pass out.  Maybe I could cut it back 15 minutes,

10   but I may have to cut you back a little bit, but I would only

11   do so if I had to get us there to get them done at 4:30.

12           Am I going to get a memo from plaintiffs --

13           MR. SOBOL:  Yes.

14           THE COURT:  -- on the -- I'm primarily interested to

15   make sure all of the indications are proved up.

16           MS. NUSSBAUM:  It just came out.

17           THE COURT:  I don't know what's in there or not, but

18   it will make a huge difference in how I do the verdict form.

19   That's the one thing that matters.  I don't have to discuss it

20   in my jury instructions, but it does make a difference in the

21   jury form.

22           MS. NUSSBAUM:  If you didn't get it a minute ago, you

23   should be getting it momentarily.  I got an e-mail, it's

24   happening right now.  So I will make certain --

25           THE COURT:  The charge conference may not take as much

1    time just simply because we've been doing it as an integral

2    process.  I've been thankful for everything you've given me,

3    I've been folding a lot of it in.  Some things we may have to

4    disagree on.

5              While we're doing it, you're going to have paralegals

6    starting to work through the exhibits?

7              MS. NUSSBAUM:  People this afternoon, yes.

8              THE COURT:  And defendants on the depositions.

9              MR. FOX:  We'll prepare that tonight.

10              (Discussion off the record.)

11              MR. SOBOL:  Are you putting the closings in or not?

12              THE COURT:  Not unless there's agreement?

13              MR. CHEFFO:  Does the closing go to the jury?

14              MS. NUSSBAUM:  Why don't we discuss it, and we'll let

15    your Honor know.  We'll let you know at 2:30.

16              THE COURT:  Can I just say typically it's not done.

17    Unlike testimony, which they're taking notes on.  Typically you

18    wouldn't unless people agree it's so complicated it makes sense

19    to give each side's theory of what are the exhibits and what

20    you're walking through.

21              When are you going to put stickies on the exhibits?

22              MR. SOBOL:  This afternoon.

23              (Discussion off the record.)

24              THE COURT:  Let's all go.  I have this challenging

25    sentencing at 2:00.

1         MS. ARMSTRONG:  I need to make an offer of proof to

2    excluded testimony on Dr. Keeley.  I can do it now, tomorrow

3    morning before we rest.  We have to do it before we rest.

4         MR. BARRETT:  Why don't you to it in writing and make

5    it part of the record?

6         THE COURT:  That's cool.

7         MS. ARMSTRONG:  If the Court is happy with that,

8    that's fine with me.

9         THE COURT:  Let me just say both with respect to

10   Professor Rosenthal and with respect to Dr. Keeley, that time

11   line -- they do not teach to undergraduates.  I don't

12   understand -- I don't know if people will understand other than

13   that there is a methodological dispute, and I don't know what

14   you're all going to do with that.  Anyway --

15        MR. CHEFFO:  So 2:30 we'll be back here.

16        (Court adjourned at 1:11 p.m.)

17                  - - - - - - - - - -

18

19

20

21

22

23

24

25

ef89fb21-81da-45d7-8dea-621f898382b0

Page 130

1                        CERTIFICATION

2          We certify that the foregoing is a correct transcript

3    of the record of proceedings in the above-entitled matter to

4    the best of our skill and ability.

5

6

7    /s/Debra M. Joyce                March 19, 2010
     Debra M. Joyce, RMR, CRR         Date
8    Official Court Reporter

9

10

11

12   /s/Lee A. Marzilli               March 19, 2010
     Lee A. Marzilli, RPR, CRR        Date
13   Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25