IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


IN RE:                                  )
                                        ) No. 04-10981-PBS
NEURONTIN MARKETING, SALES PRACTICES,   ) MDL No. 1629
AND PRODUCTS LIABILITY LITIGATION       )
----------------------------------------)
This document relates to:               )
KAISER FOUNDATION HEALTH PLAN, et al,   )
                                        )
                    Plaintiffs          )
                                        )
        -V-                             )No. 04-10739-PBS
                                        )Pages 1 - 226
PFIZER, INC., et al,                    )
                                        )
                    Defendants          )



JURY TRIAL - DAY TWENTY

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE



United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
March 23, 2010, 9:17 a.m.



LEE A. MARZILLI and DEBRA M. JOYCE
OFFICIAL COURT REPORTERS
United States District Court
1 Courthouse Way, Room 7200
Boston, MA  02210
(617)345-6787

1    A P P E A R A N C E S

2    FOR THE PLAINTIFFS:

3        THOMAS M. GREENE, ESQ. and ILYAS J. RONA, ESQ.,
     Greene, LLP, 33 Broad Street, 5th Floor, Boston,
4    Massachusetts, 02109.

5        THOMAS M. SOBOL, ESQ. and KRISTEN JOHNSON PARKER, ESQ.,
     Hagens Berman Sobol Shapiro, LLP, 55 Cambridge Parkway,
6    Suite 301, Cambridge, Massachusetts, 02142.

7        LINDA P. NUSSBAUM, ESQ., Kaplan Fox & Kilsheimer, LLP,
     850 Third Avenue, New York, New York, 10022.
8
         DON BARRETT, ESQ., Barrett Law Office,
9    404 Court Square North, P.O. Box 987, Lexington, Mississippi,
     39095.
10
         BARRY HIMMELSTEIN, ESQ., Lieff Cabraser Heimann &
11   Bernstein, Embarcadero Center West, 275 Battery Street,
     San Francisco, California, 94111-3339.
12

13   FOR THE DEFENDANTS:

14       KATHERINE ARMSTRONG, ESQ., MARK S. CHEFFO, ESQ., and
     THOMAS E. FOX, ESQ., Skadden Arps Slate Meagher & Flom, LLP,
15   Four Times Square, New York, New York, 10036.

16       RAOUL D. KENNEDY, ESQ., Skadden Arps Slate Meaher & Flom,
     LLP, Four Embarcadero Center, San Francisco, California, 94111.
17
         JAMES E. HOOPER, ESQ. and ANDREW H. MYERS, ESQ.,
18   Wheeler Trigg Kennedy, LLP, 1801 California Street, Suite 3600,
     Denver, Colorado, 80202.
19

20

21

22

23

24

25

1
                        I N D E X

2                                              PAGE

    DEPOSITION OF JOHN ARNESS READ:            12
3
    CHARGE BY THE COURT:                        26
4
    CLOSING ARGUMENT BY MR. SOBOL:             146
5
    CLOSING ARGUMENT BY MS. NUSSBAUM:          185
6
    CLOSING ARGUMENT BY MR. GREENE:            197
7
    CONTINUED CHARGE BY THE COURT:             208
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               P R O C E E D I N G S

2          THE COURT:  So as usual, you've outpaced me overnight.

3     I'm trying to keep up with you, but this is what I'm going to

4     do:  I am going to include in nociceptive.  There was a good

5     memo I wish I'd gotten that first time around, and I think it's

6     close enough to go.  What I do with it afterwards I do with

7     afterwards, but I'm going to keep it in.  That having been

8     said, Backonja talks about neuropathic pain, and specifically

9     in its painful neuropathy indications with diabetes mellitus.

10    However, it was a good memo on the marketing aspect of it, so

11    it brought it to the marketplace.

12          The second thing, I'm reserving all your rights, so I

13    wanted to make sure you knew it before the closings.  It's

14    going to be on the verdict form.  I will deal with it

15    afterwards, but it's at least close enough, whereas before it

16    wasn't.

17          So on the memorandum in response to plaintiffs'

18    opposition providing the jury with trial testimony, I think in

19    a case of this complexity, it's a good thing.  What I can say

20    is, "I've got them for you if you want it."  My guess is

21    they'll take it, and I will give it to them if they want it.

22    So I will offer it to them.  I won't cram it down their

23    throats, but I will tell them it's there for the taking, and if

24    they ask, I will give.  So that's that.

25          I think the new 50(a) motion, supplemental motion for

5a1aa1cf-aed2-4697-ab4f-eeb4358763c1

1   judgment as a matter of law, is untimely with respect to a

2   motion at the close of the plaintiffs' case.  It's not untimely

3   with respect to a motion for the judgment at the close of all

4   the evidence.  Right, isn't that the second stage?

5          MS. ARMSTRONG:  No.  I think there's 50(a), which is

6   anytime prior to it being submitted to the jury, and then

7   50(b), which is anytime up to 28 days after judgment.

8          THE COURT:  All right, so it's not at the close of the

9   plaintiffs' case?  Because it's obviously untimely for that.

10          MS. ARMSTRONG:  You don't have to do it at the close

11   of the plaintiffs' case.  You just have to do it before it goes

12   to the jury.

13          THE COURT:  All right, I just haven't even had time to

14   read that yet, so I'm obviously not going to deal with it.

15   Okay, you've preserved it.  I can't deal with that right now.

16          Offer of proof regarding Dr. Keeley's excluded

17   testimony, just making it clear for the record that my issue

18   here wasn't with what he was going to say; it's that it wasn't

19   in his expert report, and it wasn't supplemented.  But you've

20   made a proffer, so there it is.

21          Motion for inclusion of additional language, I've done

22   something like that.  Erin is upstairs working on it, so there

23   is going to be something like that.  We're probably going to

24   add in some -- I think we've looked up "substantial factor,"

25   which still appears to be the standard, but it also says

1   "but for," so we're going to add some language on "but for,"

2   but we're including "substantial factor."  I do not view them

3   as inconsistent.  So just to make sure we're completely

4   consistent with the Supreme Court's recent Hemi Group case,

5   we're going to add something about "but for" because they do

6   say something about it in there, but no one has ever --

7   "substantial factor" has been the test in Sands, Federal

8   Practice, Second Circuit.  We didn't find, I think, something

9   directly on RICO in the First Circuit.  I mean, it still seems

10  to be good law, I imagine, but I have all the language in there

11  from Hemi Group, Distinct Direct.  You name it, it's there.  So

12  we're only putting in --

13          MR. SOBOL:  Just on the "but for," will there be also

14  an instruction that it doesn't have be to the sole cause?

15          THE COURT:  Yes.  "Substantial factor" stays in there,

16  just so when you're giving your -- you'll hear me give it.

17  We're working on it upstairs.  There's some boilerplate that I

18  hadn't even read going through it that somehow got added in

19  there about charts and summaries that I think got confusing,

20  and I've played with that a little bit.  So the summaries that

21  are just what I'll call the chalks are not evidence unless you

22  all agree they should go in.  I think that there has not been

23  agreement on that.  But there are also summaries that are

24  exhibits, there are only a few, which essentially under 1006

25  actually do qualify as exhibits, and it's just something I

1    caught on the way up there.

2         Offer of proof with respect to the testimony of Albert

3    Carver, I don't know exactly what this does.  I only

4    excluded -- I only said that you had to put in his revised

5    answer, not his -- because he -- but there were another page of

6    stuff that you wanted out, so I don't know what this includes.

7         MR. CHEFFO:  It included what he basically was asked

8    about, whether he believed that there was evidence of -- and

9    you had struck that, and then in light of that, then there was

10   a counter that you also struck.

11        THE COURT:  But I only did that at your request, so

12   I'm not owning that.  I'm not owning the counter.  You wanted

13   it out.

14        MS. ARMSTRONG:  No, your Honor.  Your Honor said that

15   they could only go in, the corrected testimony.  We believe

16   that both the uncorrected and the corrected testimony go in, so

17   this is the uncorrected part of it.

18        THE COURT:  But not all the counters.  You wanted that

19   out.  I'm not owning that.

20        MS. ARMSTRONG:  Right.  Yes, it just should be narrow.

21        MR. CHEFFO:  I think we're actually -- the good news

22   is, I think we'll be on time.

23        THE COURT:  Am I up to you?

24        MR. CHEFFO:  I'm sorry, are you done?  Because I think

25   you are.  I have nothing else on my list except something you

1    don't have.  Well, you may have this.  First of all, just so

2    your Honor knows, we're going to just read one transcript for

3    Dr. Arness.  Then I think we're going to be in a position to

4    close, subject to one or two points.

5         The issue that I don't think your Honor has addressed

6    yet is the issue of the two plaintiffs.  Remember there's the

7    Hospital Systems and Health, and I think that they've submitted

8    something yesterday or the day before which I think just

9    reaffirms the position --

10        THE COURT:  Can I say this?

11        MR. CHEFFO:  Yes.

12        THE COURT:  You never moved to dismiss directly on

13   that ground.  As far as I'm concerned, you can always raise

14   Article 3 standing.  You've not waived it.  It's just too late

15   to do it.  It didn't come up yesterday.  There wasn't a

16   specific motion to dismiss based on it.  You haven't waived it,

17   simply because subject matter jurisdiction is always it.  I

18   think there is a serious problem with respect to Hospital's

19   standing because they didn't pay for anything.  The Plan paid

20   for everything.  On the other hand, they clearly work in

21   tandem, and they have a consolidated financial sheet.  So I

22   don't know what that exactly means.  It's coming up too late in

23   the day, but I don't think it has any legal significance to

24   this trial because it is quite clear that the Plan relies on

25   DIS to do its drug monograph, and they are a joint venture or,

1   you know --

2          MR. CHEFFO:  I would just say, your Honor, they may

3   rely on it, but just our position is that there is no Article 3

4   standing.  There's actually no damages or causation because

5   they've now told us that --

6          THE COURT:  That may be right.  By the way, I was

7   taken with that.  That may be right.

8          MR. CHEFFO:  So I think the jury should --

9          THE COURT:  What do you think?  There's no harm to the

10  hospitals.

11         MS. NUSSBAUM:  There's no harm, your Honor.  We would

12  ask that it be left in.

13         THE COURT:  No, no, no, you weren't hearing what I was

14  saying.  There's no injury to the hospital because the hospital

15  didn't pay for anything.

16         MS. NUSSBAUM:  Your Honor, I think at this late date

17  it's confusing --

18         THE COURT:  I'm not doing it right now, but I am

19  simply saying the following, is that I may be carving out the

20  hospitals later on.  I don't see any prejudice from it.  I may

21  not even just refer to it.

22         MR. CHEFFO:  We would just ask your Honor formally

23  just dismiss them at this point.

24         THE COURT:  No.  It's too late.  You didn't file a

25  motion on it.  It's too late.  But it's never too late for

1   Article 3 standing, and I'm not dealing with it now.  To deal

2   with it on the morning it's going to trial after a month is

3   just -- I'm not doing it now, not doing it.  Maybe you're right

4   at the end of the day, but it's not fair to me to try and deal

5   with it without a formal motion even.  There's nothing.  You

6   filed motions on everything else known to mankind, and this was

7   one I didn't get on.  But you're right, Article 3 standing is

8   never waived, so maybe I'll deal with it afterwards if you

9   lose.  All right?  I don't know why you care because the Plan

10  clearly has standing, clearly.

11          MR. CHEFFO:  Well, the Plan may, but, you know, again,

12  your Honor has ruled, but they just filed this opposition just

13  a day or two ago, so we've been talking about it for the last

14  few days.

15          THE COURT:  I asked about it.  You didn't move.

16          MR. CHEFFO:  I think it was last night.

17          This is our transcripts, your Honor.  You'd asked us

18  for the copies of the transcripts.

19          THE COURT:  Perfect.

20          MR. SOBOL:  Have people figured out what to do with

21  telling the jury who Arness is?

22          MS. NUSSBAUM:  Yes, that's what I was going to just

23  raise.

24          THE COURT:  On who, what?

25          MS. NUSSBAUM:  We raised this last week, your Honor.

1  Dr. Arness is not and has never been a PMG physician, and his

2  patient is not and has never been, to our knowledge, a Kaiser

3  member, so we would like the jury to know that.

4          THE COURT:  Yes, I'll say.  All right, let's bring

5  them in.  I've already lost half an hour, and this is a

6  valuable half an hour today.  The jury wants to leave at 4:30.

7  I've got to charge; you've got to close.  It's just a mess, so

8  let's just get going.

9          (Discussion off the record.)

10         (Jury enters the courtroom.)

11         THE COURT:  Good morning.  Did anyone speak about this

12  case or see anything in the press?  I find you've complied.

13         Now, we've got this giant screen that I don't even

14  know why it's here.

15         (Laughter.)

16         MR. CHEFFO:  Closings, your Honor.

17         THE COURT:  Closings, all right.  But we have this

18  little bit of snippets of depositions left.  It should only

19  take fifteen or twenty minutes.  Then we're going to go right

20  into my jury charge, which is a little unusual here, and then

21  we're going to do closings.  So I'll explain that to you in one

22  minute.

23         I have to apologize to you for getting out of the box

24  late at 9:30.  I try so hard to keep up with these great

25  lawyers, but every time I rule on something, five more motions

Page 12

1   come in.  So there was just a bunch of stuff I just had to rule

2   on before you walked in.  So we're going to finish up the

3   evidence.  They're going to close.  Today is the day, and let's

4   get going.

5              MR. CHEFFO:  Thank you, your Honor.  This is a

6   deposition we're going to read.  It's from the consumer

7   protection case, your Honor.  I can't even see the Court.  No,

8   no, I'll move.

9              THE COURT:  I'm there.

10             MR. CHEFFO:  This is a Dr. Arness, who is a nonparty

11  psychiatrist who prescribed, a prescribing physician.  He's not

12  a Kaiser doctor.  He was not retained as an expert for either

13  party.  And this is from 2/13/2008.

14  DEPOSITION OF JOHN ARNESS READ AS FOLLOWS:

15  Q.   Dr. Arness, are you represented by counsel today?

16  A.   No.

17  Q.   Okay.  Have you been represented by an attorney in

18  connection with this matter at any time?

19  A.   No.

20  Q.   Okay, have you been deposed before?

21  A.   I don't think so.

22  Q.   Okay, I'm going to ask you about your training and

23  background now.  Are you currently working as a psychiatrist?

24  A.   No.  Retired.

25  Q.   Okay, when did you retire?

5a1aa1cf-aed2-4697-ab4f-eeb4358763c1

Page 13

1   A.   1997.

2   Q.   And what was your training beginning with medical school?

3   A.   I have to make a correction.

4   Q.   Go ahead.

5   A.   Retired in 2003.

6   Q.   2003, okay.  I think I had just asked you if you could

7   describe for me your medical training starting with medical

8   school.

9   A.   Oh, I graduated from the George Washington University

10  School of Medicine in 1957.

11  Q.   Were you in the Navy at that time?

12  A.   Yes.  I was a Navy doctor.

13  Q.   And how long were you in the Navy?

14  A.   From 1957 to 1965.

15  Q.   And when did you do your training as a psychiatrist?

16  A.   In 1958 to 1961.

17  Q.   Was that at Bethesda?

18  A.   Bethesda.

19  Q.   Dr. Arness, are you generally familiar with the role of

20  the Food and Drug Administration in approving new medications?

21  A.   Generally.

22  Q.   And if I refer to the Food and Drug Administration as the

23  FDA, that will be clear to you?

24  A.   Yes.

25  Q.   Do you understand that pharmaceutical companies seeking to

1   market a new medication must first seek approval from the FDA?

2   A.   Yes.

3   Q.   And do you understand that when that approval is sought,

4   it can be in connection with one or more specific uses for the

5   drug?

6   A.   Yes.

7   Q.   And is it your understanding that after a drug is

8   approved, doctors can prescribe it legally for other uses than

9   those that were approved by the FDA?

10  A.   Yes.

11  Q.   And do you agree that doctors do prescribe medications for

12  uses that weren't approved by the FDA?

13  A.   Yes.  They call that off-label.

14  Q.   Okay.  That was one of my follow-up questions.  Is

15  off-label use a common practice?

16  A.   Yes.

17  Q.   Among psychiatrists?

18  A.   Yes.

19  Q.   And in order to be a psychiatrist, does that involve board

20  certification?

21  A.   Not necessarily.

22  Q.   In your case, did it?

23  A.   Yeah.  I was board certified by the American Board of

24  Psychiatry and Neurology in 1979.

25  Q.   I'm going to ask you a couple questions about how clinical

5a1aa1cf-aed2-4697-ab4f-eeb4358763c1

1   practice works.  In deciding how to treat a patient, are you

2   required to exercise your independent medical judgment?

3   A.   Of course.

4   Q.   And did you do that when you were practicing?

5   A.   Of course.

6   Q.   And that would include when prescribing medications?

7   A.   Yeah.

8   Q.   And what do you mean by independent medical judgment?

9   A.   Well, based on my experience, what I would know about a

10  particular medication or the pharmacology of a certain drug and

11  what the patient presented with on the spot.  It wasn't a

12  question of looking up something because there is no real

13  reference manual for that.  If you know of a medication and you

14  wanted to read about it, there is something called a

15  Physician's Desk Reference, which is shortened to the PDR, but

16  you don't look to that for advice as to what to prescribe.

17  Q.   What would lead you to prescribe a drug for an off-label

18  use?

19  A.   Well, first, I have to tell you that amongst your

20  colleagues and from the journals, off-label is not a big

21  concern.  If there is a certain indication for it, even though

22  it is not approved by the FDA, you know that the company has

23  simply not sought FDA approval, but amongst your colleagues and

24  in the literature, if medications are found useful for the

25  condition and found to be relatively harmless as to side

1    effects, then it's quite frequent that you would prescribe it

2    and not have any problem prescribing it.  I could give you an

3    example.

4    Q.    Sure.

5    A.    In the matter of bipolar disorder, the anticonvulsants are

6    considered to be beneficial, none of which are approved by

7    their parent company with the FDA for such a condition.

8    They're approved for seizure disorder primarily, but all of

9    them are -- well, several of them, Depakote, Tegretol, and in

10   our case that is under discussion, the gabapentin, are all

11   approved by the medical community for -- have been found to be

12   useful in the treatment of this condition.  So it's not a huge

13   concern.

14   Q.    Okay, I'm going to ask you some questions now about the

15   drug Neurontin, also known as gabapentin.  When did you first

16   learn about the drug Neurontin, if you remember?

17   A.    I have no idea.  It could be ten, fifteen years.

18   Q.    Do you know -- I think you said before you had prescribed

19   Neurontin for bipolar disorder; is that right?

20   A.    Yes.

21   Q.    Was -- were there any other uses that you prescribed

22   Neurontin for?

23   A.    No.

24   Q.    When did you first come to learn that Neurontin might be

25   effective for bipolar disorder?

5a1aa1cf-aed2-4697-ab4f-eeb4358763c1

1   A.   I don't know exactly.  I said ten or fifteen years ago.

2   Q.   Okay.  How did you learn it?

3   A.   Through readings and association with other doctors.

4   Q.   And do you know approximately how many patients you

5   prescribed Neurontin for?

6   A.   No, not really.  It could be dozens, or it could be ten or

7   twenty.

8   Q.   Okay.

9   A.   Can I say something?

10  Q.   Sure.

11  A.   The anticonvulsants are widely known and widely accepted

12  as a treatment for bipolar disorder, and Neurontin is in that

13  category.

14  Q.   And would that have been one of the things you would have

15  considered in deciding whether to prescribe it?

16  A.   Yes.

17  Q.   After the first time you prescribed it to treat bipolar

18  disorder, would your observation of its performance have

19  informed future decisions to prescribe it?

20  A.   Oh, yes.

21  Q.   And it's the case that you were prescribing Neurontin up

22  until you retired from practice; is that right?

23  A.   Yes.

24  Q.   When would you choose to prescribe Neurontin versus, for

25  example, one of the other anticonvulsant drugs?

1  A.   Neurontin is prescribed generally for what's called a

2  Bipolar II disorder as opposed to a Bipolar I.  A Bipolar I is

3  a more serious disorder, and it's usually treated with high--

4  potency medications such as lithium or Thorazine, major

5  tranquilizers.  The Bipolar II disorder refers to the same

6  condition but in a much milder form.  In Mr. V's case, I think

7  it had more to do with mood swings and some depression, and

8  that would be the kind of case that you wouldn't be thinking

9  primarily of prescribing lithium or a major tranquilizer.

10  Actually, I think a major tranquilizer had been prescribed, not

11  by myself but by another doctor, but because of side effects,

12  he rejected it.

13       Neurontin has very few significant side effects and is

14  widely accepted by the patient population, and it's often

15  prescribed in smaller doses than it would be for seizure

16  disorders for which it has FDA approval.

17  Q.   And that would be, -- for example, I think, like, would a

18  typical dose be 300 milligrams a day?

19  A.   A typical dose for a seizure disorder would be much

20  higher.  For bipolar disorder it might be 300 milligrams twice

21  a day or once a day --

22  Q.   Okay.

23  A.   -- and often in combination with other medications to

24  minimize side effects and to maximize the effectiveness.

25  Q.   Would Neurontin typically be prescribed as a monotherapy,

1    or was it usually used in combination?

2    A.    Usually used in combination.

3    Q.    And do you still believe today that Neurontin can be a

4    safe and effective treatment for bipolar disorder?

5    A.    Bipolar II disorder.

6    Q.    Would you consider bipolar disorder to be a condition

7    that's difficult to treat?

8    A.    It can be extremely difficult.

9    Q.    And do you know today why you prescribed Neurontin to him

10   on that date?

11   A.    Well, he had been on Tegretol, which is another

12   anticonvulsant, and that had been prescribed off-label; but he

13   wanted to stop taking it, mostly because of the -- not side

14   effects but the inconvenience of these blood tests all the

15   time.  And so I thought it would be worthwhile to give him a

16   trial of treatment on Neurontin instead which didn't have those

17   aggravating requirements.

18   Q.    And is that the blood level and liver function tests?

19   A.    Right.  I should say it wasn't because of his symptoms.

20   He seemed stable --

21   Q.    So -- sorry, go ahead.

22   A.    -- but he wanted to get off the Tegretol.

23   Q.    So the goal was to see if you could substitute the

24   Neurontin for the Tegretol and maintain his stability?

25   A.    He simply said that he was interested to know if there was

1   any new medication besides the Tegretol which would not involve

2   all of these blood tests, and I said, yes, there was and it was

3   customarily used -- I don't have all of that in the record --

4   but it was customarily used and it would be worthwhile trying.

5   So I think that was the first time.

6   Q.   Do you know if he had ever tried lithium?

7   A.   No, I don't.  I can't imagine anyone prescribing it.

8   Q.   Because of the lack of severity of his --

9   A.   Lack of severity and some terrible side effects.

10  Overdoses of lithium can kill you.  It wouldn't have been

11  appropriate in his case.

12  Q.   What about Depakote?

13  A.   Depakote would have been about the only other one, and,

14  again, you're involved with liver function tests, which I think

15  he would have found unacceptable.  Under the circumstances,

16  Neurontin became the most logical choice of medications.

17  Q.   And you never had any reason to try a higher dose of

18  Neurontin than 300 milligrams?

19  A.   It didn't seem to be necessary.

20  Q.   Because he was doing well at that dose?

21  A.   I only saw him every three months, and he was working.  Do

22  you want me to tell you the side effects of Neurontin --

23  Q.   Sure.

24  A.   -- while we're on the subject?  I did look this up.

25  Dizziness, blurred vision, tremors, and nausea are the four

5a1aa1cf-aed2-4697-ab4f-eeb4358763c1

1   most common side effects of which Mr. V exhibited none.

2   Q.   And he never complained to you about the Neurontin?

3   A.   No.  So all and all, we had a good medication with no

4   liver function tests.

5   Q.   And based on your experience using Neurontin with other

6   patients, can it be an effective treatment for bipolar?

7   A.   It certainly can.  I mean, everyone knows that.  Everyone

8   in the medical profession knows it.  Everyone in your local

9   community, the agency you work for, your colleagues, the state,

10  and the national publication knows it.  It doesn't have to be,

11  and other medications may be just as effective; but this is

12  remarkable because of the paucity of side effects and potential

13  problems such as liver problems.

14  Q.   With other drugs?

15  A.   Yeah.

16  Q.   Can you recall ever being visited by a sales

17  representative from Warner-Lambert or Parke-Davis?

18  A.   No.

19  Q.   Do you recall ever having a sales representative talk to

20  you about Neurontin?

21  A.   No, I didn't.  It was an established medication, and they

22  usually only spoke about new products coming in the market.

23  Q.   Did you ever ask anyone at Warner-Lambert or Parke-Davis

24  or Pfizer for information about the drug Neurontin?

25  A.   Did I ask?

1    Q.    Yes.

2    A.    No.

3    Q.    Did you ever receive any cash payment or other monetary

4    benefit from a pharmaceutical company?

5    A.    No.

6    Q.    Did you ever prescribe a medicine as a result of a

7    financial incentive from any other entity or person to do so?

8    A.    Definitely not.

9    Q.    Did you ever prescribe medicine to a patient when you

10    didn't believe that the medicine would work for that patient?

11    A.    Of course not.

12    Q.    I have a couple of real quick questions for you,

13    Dr. Arness.  In the beginning of the deposition, you said that

14    you believed that you might have learned of Neurontin being

15    useful for Mr. V's condition through journal articles and

16    talking with your colleagues; is that correct?

17    A.    That's correct.

18    Q.    Okay.  Can I ask, why would you put faith in the journal

19    articles?  Did you do, like, additional research or just took

20    the journal articles at face value?

21    A.    I took the journal articles, but they appeared in the

22    Journal of the American Medical Association and the American

23    Psychiatric Association as well as the state publications.

24    Q.    Okay.  Would it change your opinion of the journal

25    articles if you had learned that these articles could have been

5a1aa1cf-aed2-4697-ab4f-eeb4358763c1

1  ghost written by pharmaceutical companies or that these doctors

2  were paid to write these articles?

3  A.   Well, that might be, but as I said, I had information

4  with -- or information besides those publications.  I had

5  contact with my own colleagues where I worked and at different

6  cities in Maine and with the local psychiatric and medical

7  association in Maine.  So it wasn't strictly with these

8  articles; but I can tell what you're getting at, and if I know

9  that they were ghost written, then I would not be -- I would

10 tend not to be influenced.

11         (End of reading of John Arness deposition.)

12         MR. CHEFFO:  Your Honor, thank you.  We rest, your

13 Honor.

14         MS. NUSSBAUM:  We rest, your Honor.

15         THE COURT:  The evidence is closed.  So right now I'm

16 going to hand out to you all a copy of the verdict form that

17 you will be asked to fill in and answer unanimously, so I'm

18 going to ask Mr. Alba to give you all a copy of the verdict

19 form, and when you finish reading it, why don't you look up.

20 I'll walk you through the verdict form, and then we'll get

21 going.  Ironically, today is the start of the MCAS in the

22 Massachusetts schools, so this is like your little form of the

23 standardized test.

24         Okay, so let me just walk you through this for a

25 second just to make sure you follow my jury instructions.  So

Page 24

1    the first question is, "Has Kaiser proven that Pfizer violated

2    RICO with respect to its promotion of Neurontin for --" and

3    then these are the five indications.  You remember I handed you

4    something on the very first day of trial to sort of give you

5    the heads-up that these were at issue:  bipolar, migraine,

6    nociceptive pain, neuropathic pain, and Neurontin in dosages

7    over 1,800 milligrams.

8           So if you say that Kaiser hadn't proven that and you

9    answered "no" to everything, jump, but if you answer "yes" --

10   so answer Question 2 if you've answered "yes" to any subpart of

11   Question 1.  So if you answered, for example, "yes," they've

12   proven it for bipolar, then you've got to answer the causation

13   question.  In other words, did the violation of RICO cause

14   Kaiser injury with respect to bipolar?  So let's say you

15   answered bipolar "no" but some of the other subparts "yes," you

16   just simply say "not applicable."

17          A JUROR:  Can you define RICO?

18          THE COURT:  That will, believe me --

19          (Laughter.)

20          THE COURT:  Believe me, you'll be dreaming RICO.  That

21   was my jury instructions, but I want you to understand the

22   questions that are being asked until we -- all right, so I'm

23   giving you this heads-up because I'm about to give you the

24   charge to explain all of this.

25          But the key is, for every indication you're going to

1   need to ask, was there a violation of RICO, which I'll explain

2   to you, and then did it cause injury to Kaiser?  And then if

3   you've answered "yes" to both, you'll see on the next page

4   Question 3, was the claim timely?  In other words, was the

5   statute of limitations barred?

6           Then we're moving on to the -- RICO is a federal law.

7   I'll talk to you about it in a minute.  Then we're moving to

8   the California Unfair Competition Law, and, again, the law is

9   different than RICO.  You're going to know a lot about the

10  California Unfair Competition Law, once again, with respect to

11  each of the indications, with respect to causation.  And then

12  if you get to the issue of damages, that's in Subpart 3.

13          I'm about to give you my jury instructions which is

14  going to go into this in enormous detail.  Please feel free to

15  mark up this verdict form as much as you want.  You can write

16  little notes on it, you can do what you want, but at the end of

17  it, I'm only going to want one official verdict form which is

18  unanimous, all right?

19          So at this point I am going to give you the jury

20  charge.  This is highly unusual for me.  In fact, I would have

21  to say, I've been a judge since 1986, I have never given the

22  charge before the closing arguments.  And the reason I am doing

23  it now is because the law is complex, and when you listen to

24  closing arguments, what I want you to do is to understand what

25  RICO is and to understand what the California Unfair

1  Competition Law is, so that when they present the closing

2  arguments, each of which will be in the vicinity of two hours,

3  they're going to be presenting you with, from their point of

4  view, the evidence that's been introduced that proves up or

5  doesn't prove up these elements.  So I'm going to give you the

6  charge first.  I encourage you to take notes on it, but at this

7  point what I'm going to do is ask you to rise.  Not you all.

8  CHARGE BY THE COURT:

9          THE COURT:  There is an old tradition in the courts of

10  the Commonwealth of Massachusetts and in the Federal Courts

11  here that at this stage of the proceeding, the judge stands and

12  faces the jury, and the jury faces the judge.  This is the best

13  way that I know how to symbolize the very important role we

14  both play at this trial.  My job has been three-fold.  The

15  first was to impanel a fair and impartial jury.  I want to

16  thank you for serving on behalf of everyone in the room.

17  They've been killing themselves nights, weekends, but you have

18  been coming on time, paying attention, asking great questions,

19  taking notes, and we thank you.

20          My second job was to rule on the evidentiary

21  objections.  We did that before you came in, we did it at

22  side bar, we did it after you left.  We've done it throughout

23  the trial.  But my third and final task is to give you the

24  instructions of law.  You must follow those instructions

25  whether you agree with them or not.

1        Now, I've got the easy job, and you've got the hard

2   job, there's no doubt about it, and I'm sure you would agree at

3   this point, because while I wear the black robes, you're the

4   ones who are truly the judges here.  You judge the facts.  You

5   judge the credibility of the witnesses.  You are the ones who

6   are being asked to render a unanimous verdict.

7        My jury instructions will be divided into three parts.

8   The first part is very general, similar to the charge I gave

9   you so long ago on that first day when I gave you preliminary

10  jury instructions:  What is evidence, what isn't evidence, what

11  is the burden of proof here and a few preliminary matters.

12  Then I'm going to get right into the heart of this case.  I'm

13  going to tell you what RICO is.  I'm going to tell you what the

14  Unfair Competition Law is.  And then the third and final

15  portion of these instructions is the mechanics of getting this

16  to you to deliberate:  How do you choose a jury foreperson?  As

17  I told you before, there are no alternates, but how do you go

18  about the deliberative process?

19        We're then going to hear closing arguments, and I may

20  have a few additional words to say to you at the end of it.  I

21  strongly urge you to take notes on the charge so you don't

22  daydream, and because that way you can organize your thoughts

23  and be very focused on what needs to be proven when you listen

24  to these closing arguments.  However, I will provide you with a

25  transcript of the charge and a tape recording, so, you know,

1    you'll be able to get it again.  I'm not asking you to do speed

2    writing to get every bit of law down.  So why don't we sit down

3    and get going.

4             (Discussion off the record.)

5             THE COURT:  Okay, ready?  All right, so part one,

6    what's the role of the Court?  My job is to give you the

7    instructions about the law that you must apply.  I do not mean

8    any of my instructions to be understood by you as a comment by

9    me on the facts or on the evidence in the case.  You are the

10   judges of the facts and the sole judges of the credibility of

11   the witnesses.  You must consider my instructions as a whole.

12   I will repeat certain portions if I see someone look confused

13   or if I want to make sure that you get it down, but all of the

14   instructions are equally important.

15             Even if you disagree with some of the rules of law or

16   don't understand the reasons for them, you are bound to follow

17   them as jurors in this case.  This is a fundamental part of our

18   system of government by law rather than by the individual views

19   of the judge and jurors who have a responsibility for deciding

20   a specific case.

21             To the extent that I say something differently from

22   what the attorneys say about the law, you must follow my

23   instructions of law.

24             However, I am not the judge of the facts.  I have no

25   opinion as to the appropriate outcome of the case.  You must

5a1aa1cf-aed2-4697-ab4f-eeb4358763c1

Page 29

1    disregard any facial expressions you think I have.  Over the

2    course of the trial I asked many questions -- you asked many

3    questions -- because I sometimes didn't understand things and I

4    would ask it, but you shouldn't infer from any of my questions

5    that I have an opinion about the credibility of that witness or

6    about any of the information provided.

7           If during the course of the instructions I state

8    evidence differently from things as you remember it, you must

9    disregard my memory of the evidence because it's your memory of

10   the evidence that counts.

11          So you're the jury.  What is your job?  You are the

12   sole and exclusive judges of the facts.  You decide the weight,

13   effect, and value of the evidence.  You also decide the

14   credibility or believability of the witnesses.  Once you

15   determine the facts, it is your duty to apply those facts to

16   the law as I explain it.  You must decide whether and what

17   damages Kaiser is entitled to recover.

18          You must determine the facts without prejudice, fear,

19   favor, bias, or sympathy.  You also may not consider any

20   personal feelings you may have about the race, religion,

21   national origin, sex, or age of any witness who testified

22   during the trial.  You must determine the facts solely from a

23   fair consideration of the evidence.  If you were to let fear,

24   favor, prejudice, bias, or sympathy enter into your

25   deliberations, there is a great risk that you will not arrive

1    at a true and just verdict.

2           You are not to decide the case based on what you may

3    have heard or read outside the courtroom.  You cannot speculate

4    or guess as to what might or might not have happened.  Instead,

5    you must confine your deliberations to the evidence and nothing

6    but the evidence.

7           The lawyers are allowed to comment during their

8    closings about the rules of law.  You may hear some of that

9    right now in a few minutes when they give their closing

10   arguments, but if what they have said about the evidence

11   differs from your memory, let your collective memory control.

12   And if what they've said about the law seems to have any

13   different meaning in any way from what I say, you must be

14   guided only by these legal instructions.

15          So what is evidence?  You think you'd know, you've sat

16   here for a month, but let me go through it again.  What is

17   evidence?  Evidence consists of the sworn testimony of the

18   witnesses.  You've heard them on the stand, but you've also

19   heard them through deposition testimony.  All of that is

20   evidence.  All exhibits which have been received into evidence

21   and go with you into the jury room, they'll get a number and

22   they'll go into the jury room with you.  You've also seen

23   various graphics and charts and people on easels.  If it

24   doesn't come with you into the jury room, you cannot use it as

25   evidence.  It's maybe something to help teach you, but it is

1    not evidence unless it receives a number and comes into the

2    jury room with you.  A stipulation of fact is an agreement

3    between the parties that a certain fact is true.

4           The mere number of witnesses or length of the

5    testimony or number of exhibits has no bearing on what weight

6    you give to the evidence or on whether you find that the

7    plaintiffs' burden of proof has been met.  Weight does not mean

8    the amount of the evidence.  Weight means your judgment about

9    the credibility and the importance of the evidence.

10          But over the course of a trial, you can only decide

11   the facts based on evidence, and there are many things that

12   happen that do not constitute evidence.  You heard opening

13   statements.  They're not evidence.  The closing arguments

14   you're about to hear by the lawyers are not evidence in the

15   case.  Questions which were not answered or as to which

16   objections were sustained are not evidence in the case.

17          And you may remember that there are arguments

18   occasionally made.  You heard a little bit of this

19   back-and-forth, you know, the reason why someone thought it was

20   hearsay or whatever.  Those objections and the comments made in

21   connection with them are not evidence in the case.  The

22   function of lawyers in making their arguments in the closing

23   arguments is to point out those things that are most

24   significant or most helpful to their side of the case, and in

25   so doing to call your attention to certain facts or inferences

1    that might otherwise escape your notice; but in the final

2    analysis, it's your own recollection and interpretation of the

3    evidence that controls in the case.

4          As you heard, there were objections.  You shouldn't

5    draw any inferences from my rulings of law as to what -- in

6    other words, that I took one side or the other.  You shouldn't

7    draw any inferences against the party that's made the

8    objection.  That's their job is to make objections as to the

9    evidentiary rulings.  And I apply these thick books, this thick

10   Rules of Evidence as to it in making these rulings.

11         Now, when I sustained an objection to a question, the

12   witness was not allowed to answer it.  Don't try to guess what

13   answer may have been given if I had not sustained the

14   objection.

15         Also, there are several times here I limited the

16   purpose to which something may be put.  I said it was only

17   relevant to someone's state of mind, it was hearsay.  It was

18   relevant about why someone did something or didn't do

19   something, but it wasn't itself evidence for the truth of the

20   matters.  I want you to use the evidence only for the purpose

21   that I permitted it to be entered for.

22         During the trial, again, I made various comments, and

23   don't assume from anything that I said in relationship to

24   objections or questions to witnesses that I have any opinion as

25   to the outcome of this case.

1          Now, you can consider both direct and circumstantial

2     evidence in this case.  Remember we went through this on the

3     very first day.  There are two types of evidence:  direct

4     evidence, circumstantial evidence.  Direct evidence is where a

5     witness testifies directly about the fact that is to be proved,

6     based on what he or she claims to have seen or heard or felt

7     with his or her own senses, and the only question is whether

8     you believe the witness.  Circumstantial evidence is different

9     from direct evidence.  Circumstantial evidence is where no

10    witness can testify directly about the fact that is to be

11    proved, but you are presented with evidence of other facts and

12    then asked to draw reasonable inferences from them about the

13    fact which is to be proved.

14         The law allows either type of proof in a civil trial.

15    While you may rely entirely on circumstantial evidence, any

16    inferences or conclusions which you draw must be reasonable and

17    natural, based on your common sense and experience of life.  In

18    a chain of circumstantial evidence, it is not required that

19    each one of your inferences and conclusions be inevitable, but

20    it is required that each of them be reasonable.

21         Direct and circumstantial evidence have equal standing

22    in the law.  That is, with respect to what weight should be

23    given to evidence before you, the law makes no distinction

24    between direct and circumstantial evidence.  Also, no greater

25    degree of certainty is required of circumstantial evidence than

1    of direct evidence.  You are to consider all the evidence in

2    the case and give each item of evidence the weight you believe

3    it deserves.

4         So now let me move on to the credibility of witnesses,

5    the credibility of witnesses.  As jurors, your function is to

6    evaluate the exhibits that have been introduced and to

7    determine the credibility of a witness's testimony.  Of course,

8    "credibility" is simply another word for believability.  It's

9    your function to determine the believability of the witnesses

10   who testified.  You're free to decide that you believe all of

11   what a witness told you, none of what a witness told you, or

12   some of what a witness told you.  You're free to do that in

13   accordance with your collective judgment as to the

14   believability of what it was that the witness told you while

15   testifying.  In fact, that's one of the great beauties of the

16   jury system is you can use your collective wisdom in deciding

17   which witnesses are credible and which ones aren't.

18        Neither I nor anyone else can tell you all the ways

19   that you go about making this important judgment about

20   credibility.  However, you should consider certain things.  So

21   as you're back there, please consider the conduct and demeanor

22   of the witness while testifying, the frankness or lack of

23   frankness that the witness showed while testifying, the

24   reasonableness or the unreasonableness of the witness's

25   testimony, the probability or improbability of that testimony,

1   the opportunity or lack of opportunity that the witness had to

2   see and know the facts about which he or she was testifying,

3   the accuracy of the witness's recollection, the degree of

4   intelligence shown by the witness, the witness's prior conduct

5   for truthfulness, and whether the witness has attempted to fill

6   in gaps in his or her memory of events with information he or

7   she obtained after the event.  You also may consider whether

8   the witness has a motive for testifying and the interest or

9   lack of interest that the witness may have in the outcome of

10  the case.  You may take into consideration the character and

11  the appearance of the witness at trial and any bias he or she

12  has shown in his or her testimony.  This list is not exhaustive

13  but a list of examples you may take into account.

14         So what do you do with inconsistencies in the

15  evidence?  You may consider inconsistencies or differences as

16  you weigh the evidence, but you do not need to discredit

17  testimony merely because there are inconsistencies or

18  differences in the testimony of a witness, or between the

19  testimony of different witnesses.  Two or more persons

20  witnessing an incident or a transaction may see or hear it

21  differently.  In weighing the effect of any inconsistency or

22  difference, you may consider whether it concerns a matter of

23  importance or an unimportant detail, and whether it results

24  from an innocent error or an intentional falsehood.

25         You are not required to accept testimony, even if it

1    is uncontradicted.  You may decide, because of the witness's

2    bearing and demeanor, or because of inherent improbability, or

3    for other reasons sufficient to you, that the testimony is not

4    worthy of belief.

5           Again, you can accept all the witness's testimony,

6    reject all, accept parts, reject other parts.

7           Now, what do you do?  Many times you heard statements

8    made before trial, sometimes in the form of a deposition or

9    sometimes in the form of a document.  You will recall that

10   during the trial, a witness was sometimes asked to give

11   testimony about a statement made by that witness or by some

12   other witness before trial.  Unless I tell you otherwise, a

13   before-trial statement is brought to your attention only to

14   help you decide whether you believe and credit the testimony at

15   trial of the witness who made the statement before trial.  If

16   you find that a witness knowingly gave a false statement

17   concerning any material matter -- that is, "material" as I use

18   it through these instructions means important or significant --

19   before trial, you may take that into account in deciding

20   whether to distrust the testimony at trial.  You may credit the

21   testimony of that witness at trial, or give it no credit, or

22   whatever credit you think it deserves.  Also, if a witness said

23   something differently about the matter earlier, even though

24   truthfully, and you decide that the two statements are in

25   conflict, then you may consider whether there is reason for you

1    to doubt or discredit the testimony given.

2          Except as I tell you otherwise in these instructions,

3    you cannot treat a statement before trial as evidence in this

4    case for any other purpose than to determine how it bears, if

5    at all, on the credibility of the witness.  The two exceptions

6    to this rule are that statements made under oath at a

7    deposition by a witness and offered at trial, and any

8    statements made by the parties or their representatives and

9    introduced at trial by the opposing party, can be considered as

10   evidence.

11         Now, to go back to charts and summaries, certain

12   charts and summaries have been shown to you in order to help

13   explain facts disclosed by records or other documents that are

14   in evidence in the case.  I fully expect that you'll see

15   additional charts and summaries, whether it's on the screen or

16   on an easel, over the course of the closing arguments.  These

17   charts or summaries are not themselves evidence.  If the charts

18   or summaries do not correctly reflect facts or figures shown by

19   the evidence in the case, you should disregard them or give

20   them whatever weight you think they're entitled to.  In other

21   words, the charts or summaries are only used to teach you or to

22   help make an argument.  To the extent that you find they are

23   not truthful summaries of facts or figures shown by the

24   evidence in the case, you're to disregard them entirely.

25         Now, what about expert testimony?  You have heard a

1    lot of expert testimony.  I have permitted various witnesses,

2    on both sides, to express their opinions about matters that are

3    in issue.  A witness may be permitted to testify to an opinion

4    on those matters about which he or she has special knowledge,

5    skill, experience, and training.  Such testimony is presented

6    to you on the theory that someone who is experienced and

7    knowledgeable in the field can assist you in understanding the

8    evidence or in reaching an independent decision on the facts.

9         You have heard testimony of many witnesses who have

10   been called by both sides to give their opinions on various

11   issues.  The witnesses who testified in this case did so in

12   order to assist you in reaching a decision on the issues.

13        Now, often these expert witnesses disagreed with one

14   another.  The way you resolve the conflict between two expert

15   witnesses is the same way that you decide other fact questions

16   and the same way that you decide whether to believe ordinary

17   witnesses.  In addition, since they've given their opinions,

18   you should consider the soundness of each opinion, reasons for

19   the opinion, and the witness's motive, if any, for testifying.

20        You may give the testimony of each of these expert

21   witnesses such weight, if any, that you think it deserves in

22   light of all the evidence.  You should not permit an expert

23   witness's opinion to be a substitute for your own reason,

24   judgment, and common sense.

25        Again, as with any witness, you may reject the

1    testimony of an expert witness, in whole or in part, if you

2    conclude that the reasons given in support of the opinion are

3    unsound, or if you for other reasons do not believe the

4    witnesses.  The determination of the facts in this case rests

5    solely with you.

6            Now, let me talk to you about the burden of proof.  We

7    talked about this on the first day.  Remember Lady Justice with

8    the scales of justice.  So let's talk about the burden of

9    proof.

10           On each issue submitted to you, except as I tell you

11   otherwise, the plaintiffs have the burden of proof to establish

12   their claims by a preponderance of the evidence.  There are a

13   couple of issues here where that burden shifts to the

14   defendant, and I want you to listen for them, and I'll try and

15   flag them through the instructions.

16           On all the claims that I've given you here, the

17   plaintiffs bear the burden of proof by what we call

18   "preponderance of the evidence."

19           Let me spell "preponderance."  It's not a word we use

20   in daily life.  It's p-r-e-p-o-n-d-e-r-a-n-c-e.

21           Plaintiffs have the burden of proof to establish their

22   claims by a preponderance of the evidence.  To establish by a

23   preponderance of the evidence means to prove that something is

24   more likely true than not true.  You're going to be asking

25   yourself that question throughout these deliberations:  Have

1   plaintiffs proven that their claims are more likely true than

2   not true?

3          In other words, a preponderance of the evidence in the

4   case means such evidence, when considered and compared with

5   that opposed to it, has more convincing force, and produces in

6   your mind the belief that what is sought to be proved is more

7   likely true than not true.

8          In determining whether any fact in issue has been

9   proven by a preponderance of evidence in the case, you, the

10  jury, may consider the testimony of all the witnesses,

11  regardless of who may have called them, and all the exhibits

12  received in evidence, regardless of who may have produced them.

13  The burden of proof has not been carried if, after you have

14  considered all the evidence, you find that you must speculate,

15  guess, or imagine that one or more of the necessary facts is

16  true.

17         Although on each issue the burden is on the plaintiffs

18  to prove their contention on that issue by a preponderance of

19  the evidence in the case, this rule does not, of course,

20  require proof to an absolute certainty.  Proof to an absolute

21  certainty is seldom possible in any case.  You've heard in

22  criminal cases "proof beyond a reasonable doubt."  That is not

23  the standard here.  Nor is clear and convincing evidence

24  required.  A burden of proof by a more stringent standard

25  applies in criminal cases and in other special circumstances;

1   but with respect to all the issues in this case, the standard

2   for defining the burden of proof is the "preponderance of the

3   evidence" standard I just described.

4           In applying the "preponderance of the evidence"

5   standard, you will find the plaintiffs have succeeded in

6   meeting the burden of proof on an issue of fact if, after

7   consideration of all the evidence, and on the basis of the

8   evidence, you find that what is sought to have been proven on

9   that issue is more likely true than not.

10          So, once again, thinking about the scales of justice,

11  if the evidence admitted by the plaintiffs is so much more

12  weighty in probative value than the evidence offered in

13  opposition to it that it tips the scale, however slightly, on

14  the side of the plaintiffs, then the plaintiffs have proven the

15  claim by a preponderance of the evidence.  If, on the other

16  hand, the evidence admitted in opposition to the plaintiffs'

17  claim outweighs or equally balances the evidence produced in

18  support of the plaintiffs' claim, then the plaintiffs have

19  failed to carry their burden of proof.  If the plaintiffs fail

20  to carry their burden of proof on a claim against the

21  defendants, you return a verdict for the defendants on that

22  claim.  And as you see here, there are several sub-claims too,

23  you know, involving the different indications.

24          Now let me talk to you a minute about corporate

25  employees and agents.  Both of the parties in this case are

1    corporations.  A corporation can act only through natural

2    persons who are its agents or employees.  In general, a person

3    who is an agent or employee of a corporation may bind the

4    corporation only by acts and declarations made by that person

5    while acting within the scope of the authority delegated to

6    that person by the corporation, or within that person's duties

7    as an employee or agent of the corporation.

8         When I refer to "Kaiser" while giving these

9    instructions, I am referring to the plaintiffs in this case and

10   not the Permanente Medical Group.  You've heard a lot of

11   evidence about that, which has sometimes been referred to as

12   Kaiser Permanente.

13        The defendants in this case are Pfizer, a pharmaceutical

14   company, and Warner-Lambert and Parke-Davis.  Warner-Lambert

15   and Parke-Davis were purchased by Pfizer in 2000.  When I refer

16   to "Pfizer," which I'm frequently doing -- sometimes I say

17   "plaintiffs," sometimes I say "defendants" -- but when I say

18   "Pfizer," I'm referring collectively to Pfizer, Warner-Lambert,

19   and Parke-Davis.

20        During the opening statement -- you may not even

21   remember, it was a long time ago -- Pfizer's counsel stated

22   that there is no claim that any patient was injured as a result

23   of Pfizer's off-label marketing.  Now, as you've heard by now,

24   you've heard it from many people, this is part of a larger

25   piece of multidistrict litigation that's been consolidated in

1    this district, and it involves various different suits, and

2    some of them are by people who claim that they or their family

3    members were physically injured by Neurontin.  You should not

4    speculate about those suits or the outcome of those suits in

5    arriving at your verdict.

6          So stand up and stretch because I am about to tell you

7    to your heart's content what RICO is.  So let's just move on

8    and stretch.

9          (Discussion off the record.)

10          THE COURT:  Are you all set?  Okay.  I should say,

11   you're taking such diligent notes, as I mentioned to you

12   before, I will give you a transcript of the jury instructions

13   and a tape recording because it will take a while to prepare

14   the transcript.  You have at least, I think, two or three

15   notebooks, some of you, on this.  We also have transcripts, and

16   if you want them, you can ask for them, so of the depositions

17   as well as the trial testimony.

18          All right, let's get going on RICO.  All right,

19   R-I-C-O, it's an acronym, initials.

20          Now I am going to talk to you about the specific

21   claims made by Kaiser against Pfizer.  Kaiser alleges that

22   Pfizer violated the federal statute -- that's why you're in

23   Federal Court -- called the Racketeer Influenced and Corrupt

24   Organizations Act.  And you will notice that that is R-I-C-O,

25   RICO, which is commonly referred to as RICO.  And let me read

1   you the statute, and then I am going to read it to you again:

2          "It shall be unlawful for any person employed by or

3   associated with any enterprise engaged in, or the activities of

4   which affect, interstate or foreign commerce, to conduct or

5   participate, directly or indirectly, in the conduct of such

6   enterprise's affairs through a pattern of racketeering

7   activity."

8          I'm going to just read it again.  This is all in

9   legalese, but, believe me, I'm going to tease it out a lot

10  more.

11         "It shall be unlawful for any person employed by or

12  associated with any enterprise engaged in, or the activities of

13  which affect, interstate or foreign commerce, to conduct or

14  participate, directly or indirectly, in the conduct of such

15  enterprise's affairs through a pattern of racketeering

16  activity."

17         To establish that Pfizer has violated RICO -- this is

18  what I'm going to call it from now on, that statutory

19  section -- Kaiser must prove each of the following elements by

20  a preponderance of the evidence.  Again, that means they have

21  to prove that each of these elements is more likely true than

22  not true.  I am going to read you the elements, and I am going

23  to repeat them so that you can get these down:

24         First, that an enterprise existed.  First, that an

25  enterprise existed.

5a1aa1cf-aed2-4697-ab4f-eeb4358763c1

1        Second, that the enterprise affected interstate or

2   foreign commerce.  Second, that the enterprise affected

3   interstate or foreign commerce.

4        Third, that Pfizer engaged in a pattern of

5   racketeering activity.  Third, that Pfizer engaged in a pattern

6   of racketeering activity.

7        Fourth, that Pfizer conducted or participated in the

8   conduct of that enterprise through that pattern of racketeering

9   activity.  Fourth, that Pfizer conducted or participated in the

10  conduct of that enterprise through that pattern of racketeering

11  activity.

12       Fifth, that the RICO violation -- that's what I'll be

13  calling it -- caused an injury to Kaiser's business or

14  property.  Fifth, that the RICO violation caused an injury to

15  Kaiser's business or property.

16       So let me talk about the word "racketeering."  So the

17  word "racketeering" has certain implications in society if I

18  were to ask generally what you thought it meant, but it has

19  very specific meanings under the statute.  Use of the term in

20  this statute and in this courtroom should not be regarded as

21  having anything to do with your determination of whether the

22  plaintiff has established the elements of the claim.  The term

23  is a term used by Congress, and it has a very specific meaning

24  under the statute, so I am going to go through that with you.

25       What is an enterprise?  What is an enterprise?  The

1   first element that the plaintiff must prove is that an

2   enterprise existed.  The plaintiff has alleged that there are

3   two enterprises in this case.  The plaintiff has alleged that

4   there are two enterprises in this case.  The first is what they

5   call a Publication/Marketing Enterprise, made up of defendants

6   and Cline Davis Mann, made up of defendants and Cline Davis

7   Mann.  The second alleged enterprise is the Medical

8   Education/Marketing Enterprise, made up of defendants and

9   Medical Action Communications.  Sometimes you heard that

10  referred to as MAC.  Plaintiffs allege that these enterprises

11  were formed to promote off-label uses of Neurontin.

12          For purposes of this case, an enterprise, and it's up

13  to you to find whether it's been proven, but an enterprise may

14  include two companies or corporations that are associated

15  together for a common purpose of engaging in a course of

16  conduct over a period of time.  These two companies, in

17  addition to having a common purpose, must have an ongoing

18  organization, either formal or informal, and it must have

19  personnel who function as a continuing unit.  These companies

20  do not have to be a legally recognized entity, such as a

21  partnership or corporation.  This group may be organized for a

22  legitimate and lawful purpose, or it may be organized for an

23  unlawful purpose.

24          Pfizer, the corporate entity, acting through its

25  agents and employees, is not, without more, the enterprise

1   under RICO.  To prevail on its RICO claim, Kaiser must prove

2   that Pfizer as a corporation is sufficiently distinct from

3   Cline Davis Mann and MAC in order to be in an association with

4   them.  You should consider whether Cline Davis Mann and MAC

5   were acting under Pfizer's control or whether they retained

6   autonomy from Pfizer.

7        The enterprise element is different from the

8   racketeering activity elements that I'll be describing for you.

9   Although the proof to establish these elements may overlap,

10  proof of one does not necessarily establish the other.  Rather,

11  the enterprise must be an entity separate and apart from the

12  racketeering activity in which it engages.  Moreover, the

13  common purpose of the enterprise may not be the same as the

14  purpose of the predicate acts that give rise to the plaintiffs'

15  claim.  It doesn't have to be.

16       There are a number of factors that may indicate the

17  existence of an enterprise.  For example, these are the things

18  to think about:  Whether there is a systematic linkage among

19  the alleged associated companies, such as an overlapping

20  leadership, or structured financial ties, or continuing

21  coordination between the companies; whether there is a common

22  communication network for sharing information on a regular

23  basis; whether the associated companies hold meetings and

24  sessions where important discussions takes place; whether the

25  group conducted common training and instruction; whether the

1  group calls itself a specific name; and whether there was a

2  sharing of resources.  This list is not exhaustive.  Rather, it

3  is a list of the factors you should take into consideration in

4  deciding whether an enterprise exists.  However, no one of

5  these factors is dispositive.

6          To prove the existence of an enterprise, Kaiser need

7  not show that the association between Pfizer and Cline Davis

8  Mann and/or Pfizer and MAC had the common purpose of

9  fraudulently marketing Neurontin.  Kaiser can establish common

10  purpose if it proves that the defendants and Cline Davis Mann

11  and/or MAC shared the common purpose of promoting Neurontin for

12  off-label indications.

13          If you find that either the Publication/Marketing

14  Enterprise or the Medical Education/Marketing Enterprise was a

15  group of people characterized by a common purpose, an ongoing

16  formal or informal organization, and by personnel who function

17  as a continuing unit, then you may find that a particular

18  enterprise existed.

19          You must separately determine whether Kaiser proved

20  the existence of each of the two alleged enterprises.  If you

21  find that Kaiser has failed to prove the existence of both

22  enterprises, then there is no liability under RICO.

23          However, if you find that Kaiser has proved the

24  existence of one enterprise but not the other, then there is no

25  liability under RICO for any damages allegedly caused by the

1   unproven enterprise.  And you'll see when you get to the

2   damages piece of it, there may be different damages that flow

3   from the different alleged enterprises, so you have to decide

4   separately with respect to each whether an enterprise has been

5   proven.

6          Now, the second element -- it's a little simpler -- is

7   effect on interstate commerce.  Interstate commerce includes

8   the movement of goods, services, money and individuals between

9   states.  An enterprise that produces, distributes, or acquires

10  goods or services in interstate or foreign commerce is engaged

11  in interstate commerce.

12         Kaiser must prove that the enterprise engaged in

13  interstate commerce or that its activities affected interstate

14  commerce in any way, no matter how minimal.  It is not

15  necessary to prove that Pfizer's acts affected interstate

16  commerce as long as the acts of the enterprise had such an

17  effect.  Finally, Kaiser is not required to prove that Pfizer

18  knew it was affecting interstate commerce.

19         Next element, engaging in a pattern of racketeering

20  activity.  I referenced that earlier.  What is a pattern of

21  racketeering activity?

22         Kaiser must prove that Pfizer engaged in a pattern of

23  racketeering activity.  This element requires that plaintiffs

24  prove that Pfizer committed at least two predicate acts of

25  racketeering activity.  Racketeering activity is defined in the

1   statute to include violations of specified federal or state

2   laws.

3           In this case, the plaintiffs have alleged that

4   defendants committed racketeering acts through the use of the

5   mail and interstate wires.

6           In order to find that this element has been

7   established, you must find that Pfizer committed two of these

8   acts within ten years of each other.

9           To prove that the acts constituted a pattern of

10  racketeering activity, the plaintiff must prove that the acts

11  of racketeering are related to each other and that they

12  amounted to or posed a threat of continued criminal activity.

13  It is not sufficient for the plaintiff to prove only that the

14  defendants committed two of the racketeering acts as I just

15  described.  A series of disconnected acts does not constitute a

16  pattern.

17          Acts are related if they have the same or similar

18  purposes, results, participants, victims, or methods of

19  commission, or that they are otherwise interrelated by

20  distinguishing characteristics and are not isolated events.

21          To prove that the racketeering acts amounted to or

22  posed a threat of continued racketeering activity, the

23  plaintiffs must establish either that the acts extended over a

24  substantial period of time, or that the acts constituted a

25  pattern of more than limited duration that posed a threat of

5a1aa1cf-aed2-4697-ab4f-eeb4358763c1

1    continuing racketeering activity into the future.

2            To establish a pattern of racketeering activity, there

3    must also be a nexus between the predicate acts, which I'll be

4    going into, and the enterprise.  No RICO violation can be shown

5    unless there is proof of a relationship between the

6    racketeering acts and the RICO enterprise.

7            Predicate acts committed for reasons unrelated to the

8    enterprise's affairs and to its common purpose do not satisfy

9    this requirement and cannot form the basis of a pattern of

10   racketeering activity.  Note, though, that the pattern of

11   racketeering activity may not have benefited the enterprise or

12   affected the everyday operations of the enterprise.

13           Now, I've just told you that the plaintiff must prove

14   by a preponderance of the evidence that the defendant committed

15   at least two of the alleged racketeering acts that are

16   sufficiently related to constitute a pattern.

17           However, you may not find that the plaintiff has

18   established this element unless you all agree that at least two

19   particular racketeering acts were committed by the defendants.

20   In other words, as I said to you before, it must be unanimous.

21   It is not enough if some of you think that only certain

22   racketeering acts A and B were committed by the defendants, and

23   the rest of you think, oh, no, but acts C and D were committed

24   by the defendants.  There must be at least two specific

25   racketeering acts that you unanimously find by a preponderance

1  of the evidence were committed by the defendants in order to

2  satisfy this element.

3          The fourth element that Kaiser must prove by a

4  preponderance of the evidence is that Pfizer conducted or

5  participated in the conduct of the enterprise through the

6  pattern of racketeering activity.

7          To conduct or participate in the conduct of the

8  enterprise means that the defendant must have played some part

9  in the operation or management of the enterprise.

10         Plaintiff must prove by a preponderance of the

11 evidence that there is some meaningful connection between

12 defendants' alleged pattern of illegal acts and the affairs of

13 the enterprise.  To satisfy this part of the element, the

14 plaintiff must establish either that the defendants' position

15 in the enterprise facilitated the commission of those alleged

16 illegal acts, and that the racketeering acts had some impact or

17 effect on the enterprise, that the acts were in some way

18 related to the affairs of the enterprise, or that the

19 defendants were able to commit the act by virtue of their

20 position or involvement in the affairs of the enterprise.

21         Alleged acts of wrongdoing that are not shown to bear

22 a requisite relationship to the enterprise are irrelevant to

23 whether there was a pattern of RICO activity.  In other words,

24 the question before you is not whether the defendants engaged

25 in mail or wire fraud, but whether they engaged in a pattern of

1    mail or wire fraud -- those are the alleged predicate

2    racketeering acts, the mail or wire fraud -- through the

3    conduct of the enterprise as found by you to exist.

4         So I've gone through a lot, talked about it.  Let's

5    stand up and stretch because I'm about to go into what is mail

6    and wire fraud, which are the predicate acts that are being

7    charged here.

8         (Pause.)

9         THE COURT:  All right, are you ready for mail and wire

10   fraud?  Let's go.

11        So what are the predicate racketeering acts being

12   charged here?  The predicate racketeering acts alleged by

13   Kaiser are violations of a federal statute that prohibit mail

14   or wire fraud.  In order to prove mail or wire fraud,

15   plaintiffs must prove the following by a preponderance of the

16   evidence, and I am going to read these elements and repeat

17   them:

18        First, plaintiffs must prove by a preponderance of the

19   evidence a scheme to defraud or to obtain money or property by

20   means of false or fraudulent pretenses.  First, a scheme to

21   defraud or to obtain money or property by means of false or

22   fraudulent pretenses.

23        Second, plaintiffs must prove the defendants' knowing

24   and willful participation in this scheme with the intent to

25   defraud or obtain money or property by means of false or

5a1aa1cf-aed2-4697-ab4f-eeb4358763c1

1    fraudulent pretenses.  They must prove, again repeating, the

2    defendants' knowing and willful participation in this scheme

3    with the intent to defraud or obtain money or property by means

4    of false or fraudulent pretenses.

5         And, third, the use of the United States mail or

6    interstate wire communications in furtherance of this scheme.

7    Third, the use of the United States mail or interstate wire

8    communications in furtherance of this scheme.

9         Okay, let me back up and now describe in great detail

10   the elements.

11        A scheme, what's a scheme?  A scheme includes any

12   plan, pattern, or course of action.  The term "defraud" means

13   to deprive another of something of value by means of deception

14   or cheating.  A scheme to defraud is ordinarily accomplished by

15   a desire or purpose to bring about some gain or benefit to

16   oneself or some other person or by a desire or purpose to cause

17   some loss to another person.

18        The term "false or fraudulent pretenses," what does

19   that mean?  It means any false statements or assertions that

20   concern an important or material aspect of the matter in

21   question, that were either known to be untrue when made or were

22   made with reckless indifference to their truth and that were

23   made with the intent to defraud.  False and fraudulent

24   pretenses may include actual, direct false statements as well

25   as half-truths and the knowing concealment of facts when one

1   has a duty to disclose those facts.

2          What's a half-truth?  A half-truth is a statement that

3   is literally true but is made misleading by a significant

4   omission.  Therefore, even in the absence of an absolute duty

5   to disclose a certain fact, a duty to disclose can arise when a

6   defendant makes partial or ambiguous statements that require

7   further disclosure in order to avoid being misleading.

8   Remember, I've defined before "material."  It's got to be a

9   material fact, an important fact.  A material fact or matter is

10  one that has a natural tendency to influence or be capable of

11  influencing the decision-maker to whom it was addressed.

12         So what do I mean by knowing and willful participation

13  in a scheme with intent to defraud?  The defendants acted

14  "knowingly" if they were conscious and aware of their actions,

15  realized what they were doing or what was happening around

16  them, and did not act because of ignorance, mistake, or

17  accident.

18         An act or failure to act is "willful" if done

19  voluntarily and intentionally, and with the specific intent to

20  do something the law forbids, or with the specific intent to

21  fail to do something that the law requires to be done; that is

22  to say, with bad purpose either to disobey or to disregard the

23  law.

24         To act with "intent to defraud" means to act willfully

25  with the specific intent to deceive or cheat or for the purpose

1  of either causing some financial gain to oneself or loss to

2  some person.

3       If you find that the defendants consciously avoided

4  determining the accuracy of statements that they made during

5  participation in a scheme to defraud, then the defendants have

6  violated the mail fraud statutes just as if they were aware of

7  the fraudulent nature of the statements.

8       However, if you find that Pfizer made statements that

9  they believed in good faith to be true, they cannot be guilty

10  of mail or wire fraud.

11       Now, I'm going to now speak to you very directly about

12  this case.  In determining whether Kaiser has proven predicate

13  acts of mail or wire fraud by a preponderance of the evidence,

14  you are cautioned that Kaiser must prove acts of fraud, as I

15  have defined that for you, and not merely off-label marketing.

16  Although the FDA, the Food and Drug Administration, specifically

17  permits doctors to prescribe drugs for off-label use, a drug

18  manufacturer is prohibited by law from promoting the drug

19  off-label.  As you have heard, Warner-Lambert pleaded guilty to

20  this federal crime.  However, the RICO claim here involves

21  claims of mail and wire fraud.  The fact that a drug is

22  marketed for an off-label use does not mean that the marketing

23  was fraudulent if the statements about the drug were truthful

24  or made in good faith.

25       You are also instructed that not all information

5a1aa1cf-aed2-4697-ab4f-eeb4358763c1

1   disseminated about off-label uses of a drug is considered

2   off-label promotion or marketing.  The Food and Drug

3   Administration has recognized the need among healthcare

4   professionals for peer review and dissemination of the latest

5   scientific data and information on drugs in scientific

6   journals.  As a result, information on unlabeled uses may be

7   disseminated through the submission of original research to

8   peer-reviewed publications, so long as it does not contain

9   intentional misrepresentations or omissions.  The FDA also

10  allows pharmaceutical companies to disseminate information on

11  off-label uses to healthcare professionals in response to

12  unsolicited requests, so long as the information does not

13  include intentional misrepresentations or omissions.

14        Although a manufacturer has no obligation to publish

15  negative clinical trial results, once it publicly provides

16  information about a drug, it has a duty not to omit or suppress

17  material information about that drug.  It will be up to you to

18  determine not only whether Pfizer made material

19  misrepresentations in its statements about Neurontin, but also

20  whether there were material omissions by the defendants.

21        Now, I have just instructed you at length about

22  Question 1, and you have to make that decision whether there

23  was a RICO violation with respect to all the indications.  If

24  you've answered "yes" to those, you need to move on to the

25  issue of causation, but if you've answered "no" to all of them,

5a1aa1cf-aed2-4697-ab4f-eeb4358763c1

1   you jump over to the California cause of action.  But it may be

2   that you answer "yes" to some and "no" to some, and if that's

3   the case, obviously, if you found that there's no RICO

4   violation, you don't have to address the causation issue.  You

5   just do "NA," not applicable, just so that I make sure you go

6   through the thought process with respect to each one.  So if

7   you find there was a RICO violation, you have to move on to the

8   causation issue, and I'm about to instruct you on that right

9   now.

10          Okay, what do I mean by causation?  What does "cause"

11   mean?  Kaiser must also prove that the RICO violation caused an

12   injury to its business or property.  Damages caused by the

13   predicate acts themselves or damages caused by the pattern of

14   acts as a whole, or both, will satisfy this requirement.

15          There are two parts of the causation requirement.

16   First, the plaintiff must establish that they would not have

17   suffered their injuries but for the defendants' conduct.

18   Second, you must find that there was some distinct,

19   independent, and direct relationship between the injury the

20   plaintiffs asserted and the alleged fraud.  In the RICO

21   context, the focus is on the directness of the relationship

22   between the alleged fraudulent conduct and the harm.  In

23   considering the question of causation, the defendant is liable

24   if its acts are a substantial factor in causing the plaintiffs'

25   injury.  However, a link that is too remote, purely contingent,

1   or indirect is insufficient.  If the plaintiffs' injuries

2   depend upon the contingent and independent actions of other

3   persons, then the harm is not sufficiently direct and is not

4   the proximate cause -- that's a legal term, we talk about

5   proximate, p-r-o-x-i-m-a-t-e -- proximate cause of the injuries

6   claimed by the plaintiffs.

7        To establish that Pfizer directly caused it injury,

8   Kaiser must prove that it relied on misrepresentations by

9   Pfizer; that is, that its reliance directly caused Kaiser

10  injury, or that reliance on those representations by Kaiser's

11  Drug Information Service or P&T committees directly caused the

12  injury the plaintiffs have alleged.

13       So now I'm moving on to RICO damages.  So if you've

14  answered -- I'm jumping over the statute of limitations for a

15  minute because while I'm on the causation issue, I'm going to

16  get to damages.  Then I'm going to go back to statute of

17  limitations.  So RICO damages.  Well, actually, rephrase it.  I

18  am going to go to statute of limitations next, RICO statute of

19  limitations.

20       So if you've answered "yes" to the RICO claims and

21  "yes" that there was causation, you then need to answer the

22  issue of statute of limitations.  So that's Question 3.  And

23  you've heard some about the timeliness issue.  Maybe you

24  weren't focusing on it at the time.

25       So a plaintiff seeking to recover under RICO must file

5a1aa1cf-aed2-4697-ab4f-eeb4358763c1

Page 60

1    suit within four years of the date when the plaintiff knew or

2    should have known of its injury.  Discovery of the injury is

3    what starts the clock, not discovery of the other elements of

4    the plaintiffs' claim or the incurrence of the last predicate

5    act.

6           In this case, the relevant lawsuit was filed on

7    May 14, 2004.  Accordingly, if the plaintiffs had actual

8    knowledge of their alleged injuries prior to May 14, 2000, or

9    if the information about their alleged injuries that was

10   available to them would have provoked a reasonable person in

11   the plaintiffs' circumstances to inquire or investigate further

12   prior to May 14, 2000, then their claims would be barred by the

13   statute of limitations.

14          A plaintiff must exercise diligence in investigating a

15   claim or risk losing it.  If even diligent investigation would

16   have revealed nothing useful, the time for filing suit may be

17   extended.  If a plaintiff diligently investigated its claims,

18   but the defendant engaged in fraud or deliberate concealment of

19   material facts relating to its wrongdoing, and because of that

20   fraudulent concealment plaintiff failed to discover these facts

21   within the normal limitations period despite due diligence, the

22   time for filing may be extended.

23          In sum, the clock starts for the purposes of statute

24   of limitations when plaintiffs discovered or should have

25   discovered their injury from the alleged fraud.  The clock

1    stops if defendants' deceptive conduct prevented a diligent

2    plaintiff from discovering facts material to its claim.

3            If you've answered "yes," there's liability for, let's

4    say, any of these indications -- "yes," there's causation,

5    "no," the statute of limitations hasn't been barred -- I am

6    going to get to the issue of damages right now, and so I'll

7    come to California Unfair Competition Law later.

8            You should reach the issue of damages only if you find

9    the plaintiffs have established the elements of the claim under

10   the standards I have described.

11           The fact that I charge you on the issue of damages

12   does not mean that the plaintiffs are entitled to prevail.

13   That is for you to decide.  I instruct you on this subject only

14   in the event that you decide that plaintiffs have sustained the

15   burden of proof as to the elements of the claim under the

16   standards I have described.

17           If you find that plaintiffs have established the

18   elements of the RICO claim by a preponderance of the evidence,

19   you should then consider the evidence presented concerning

20   damages to plaintiffs' business or property that are alleged to

21   be caused by the defendants' violation of the RICO statute.

22           Kaiser alleges two alternative measures of damages to

23   compensate it for payments for Neurontin on behalf of its

24   insureds that it would not have made absent defendants'

25   fraudulent acts.  If you find that, for the off-label

1   indications at issue, Neurontin was not effective for the

2   treatment of an indication, Kaiser may recover the full cost of

3   the drug.  However, you may offset -- remember you heard about

4   alleged alternative medications, and those are disputed, but

5   you may offset the price of Neurontin if you find that

6   alternative, cheaper drugs would have been prescribed instead

7   of the Neurontin.  Similarly, if you find that Kaiser would

8   have paid for cheaper alternative medications if Pfizer had

9   been truthful about the drug's effectiveness, you should use as

10  the measure of damages, again, the difference between the cost

11  for Neurontin and the cost for the alternative medication.

12          If you find that Kaiser has only proven -- remember,

13  I'm coming back to enterprise now -- if you find that Kaiser

14  has proven only one RICO enterprise, you can only award damages

15  caused by that enterprise.  You should not speculate or guess

16  about the damages.  However, if plaintiffs prove a fraud, they

17  need not prove damages with mathematical precision.  Plaintiffs

18  are permitted to use estimates and other economic analysis to

19  calculate a reasonable approximation of their damages.

20          All right, now, remember I told you there was one

21  issue here, or two issues actually, where the defendants bear

22  the burden of proof.  On everything else plaintiffs do, but

23  defendants have asserted a concept known as "mitigation of

24  damages."  You've heard evidence about that.

25          You are instructed that any person who claims damages

1    as a result of an alleged wrongful act of another has a duty

2    under the law to use reasonable diligence under the

3    circumstances to "mitigate," or minimize, the damages.  The law

4    imposes on an injured person the duty to take advantage of

5    reasonable opportunities he may have to prevent the aggravation

6    of his injuries, so as to reduce or minimize the loss or

7    damage.  Unlike other elements of this case where plaintiffs

8    have the burden of proof, on the issue of mitigation, it is the

9    defendants' burden of proving that the damages reasonably could

10   have been avoided.

11          If you find that the defendants are liable and that

12   the plaintiffs have suffered damages, the plaintiffs may not

13   recover for any items of damage they could have avoided through

14   such reasonable efforts.  If the plaintiffs unreasonably failed

15   to take advantage of an opportunity to lessen their damages,

16   you should deny recovery for those damages that they would have

17   avoided had they taken advantage of the opportunity.

18          Bear in mind that the question whether the plaintiffs

19   acted "reasonably" with respect to mitigation of damages is one

20   for you to decide as the sole judges of the facts.  Although

21   the law will not allow an injured plaintiff to sit idly by when

22   presented with an opportunity to mitigate, this does not imply

23   that the law requires an injured plaintiff to exert himself

24   unreasonably or incur unreasonable expense in an effort to

25   mitigate.  In deciding whether to reduce Kaiser's damages due

1   to some failure to mitigate, therefore, you must weigh all of

2   the evidence in light of the particular circumstances of the

3   case, using sound discretion in deciding whether the defendants

4   have satisfied their burden of proving that the plaintiffs'

5   conduct was not reasonable.

6          Now I am backing up a bit, and I am talking to you

7   about California Unfair Competition Law, the state law which

8   also applies in this case.

9          In addition to their federal RICO claim, plaintiffs

10  also seek to recover under a California statute, known as the

11  California Unfair Competition Law.  The Unfair Competition Law

12  prohibits fraudulent business acts or practices.  Specifically

13  here, plaintiffs have asserted claims of deceptive

14  representations, omissions and promotional practices about

15  Neurontin.

16         I want you to listen carefully because while there are

17  some similarities, there are many differences too, so let me go

18  through what needs to be proven.

19         Under the California Unfair Competition Law, a

20  business practice is "fraudulent" if reasonable buyers are

21  likely to be deceived by it.  This standard is different than

22  the concept of mail and wire fraud that I described to you

23  earlier.  Under the California law's definition of

24  "fraudulent," the plaintiffs do not need to prove that the

25  defendants acted with an intent to deceive.  However, the

1    plaintiffs must prove by a preponderance of the evidence that

2    the defendants committed acts or practices that were likely to

3    mislead a reasonable buyer.  In this case, what I mean by

4    reasonable buyer is a reasonable health plan and a reasonable

5    physician who treats a health plan's members.

6           To recover on its claim for fraudulent business

7    practices, the plaintiffs must show by a preponderance of the

8    evidence that because of defendants' alleged misrepresentations

9    or nondisclosures, plaintiffs suffered injuries in fact and

10   have lost money or property as a result of such practices.

11   Plaintiffs must prove actual reliance on the material act or

12   omission.  Plaintiffs may meet their burden by showing that in

13   the absence of fraudulent conduct by the defendants, the

14   plaintiffs in all reasonable probability would not have paid

15   for off-label Neurontin prescriptions.

16          However, plaintiffs do not need to show that

17   defendants' actions were the only cause of their injury.  It is

18   enough if the misrepresentations or omissions played a

19   substantial part, and so were a substantial factor in

20   influencing the plaintiffs' decision.

21          In addition, a rebuttable presumption -- now, this is

22   an interesting legal concept, so let me slow down here.  In

23   addition, a rebuttable presumption or inference of reliance

24   exists whenever there is a showing that a misrepresentation or

25   omission was material.  A misrepresentation is material if a

1    reasonable person would attach importance to its existence or

2    nonexistence in determining his or her choice of action in the

3    transaction in question.  If you find that the information was

4    material, there is a presumption that Pfizer's conduct caused

5    Kaiser to make the payments in question.  You must therefore

6    find in favor of Kaiser on the causation issue unless Pfizer

7    carries -- now, here's the second time where Pfizer has the

8    burden of proof because Pfizer can rebut that presumption --

9    unless Pfizer carries the burden of proving by a preponderance

10   of the evidence that its deceptive conduct was not a substantial

11   factor in causing Kaiser's damages.

12        Moreover, an allegation of reliance is not defeated

13   merely because there was alternative information available to

14   the purchaser.

15        In cases where a plaintiff has proven exposure to a

16   long-term fraudulent advertising campaign, the plaintiff is not

17   required to show with an unrealistic degree of specificity that

18   the plaintiff relied on a particular statement or statements.

19        Under the California Unfair Competition Law, a

20   plaintiff seeking to recover upon a defendants' failure to

21   disclose -- remember we've talked about omissions -- a

22   plaintiff seeking to recover based upon a defendants' failure

23   to disclose information must also show that the defendant was

24   under a duty to disclose.

25        Under California law, nondisclosure or concealment may

1  constitute actionable fraud when the defendant had exclusive

2  knowledge of material facts not known to the plaintiff; when

3  the defendant actively concealed a material fact from the

4  plaintiff; and when the defendant made partial representations

5  but also suppressed some material facts.  A duty to disclose

6  may exist when one party to a transaction has sole knowledge or

7  access to material facts and knows that such facts are not

8  known to the other party.  Thus, a duty to disclose may arise

9  from the relationship between a buyer and a seller.

10       Now, going back to the damages issue, so let's say you

11  find that there were no RICO violations, but there were

12  California violations, you need to hit the damages issue.  So

13  don't forget, it's similar.  You have to find whether or not

14  there's a proven claim of unfair competition on Question 4,

15  whether it caused Kaiser damages, as I've explained it to you

16  under Question 5, and you're going to need to hit the damages

17  issue, especially if you haven't hit the -- agreed on the

18  plaintiff met its burden on the RICO side.

19       So what's the measure of damages under California law?

20       If you find that the plaintiffs have proven a

21  violation of California's Unfair Competition Law by a

22  preponderance of the evidence, then you must determine the

23  amount to be awarded to the plaintiffs as restitution.  In this

24  case, restitution means the amount of money necessary to

25  restore to plaintiffs any money acquired by defendants as a

1  result of fraudulent business practices.  The California law of

2  restitution provides to any person in interest any money which

3  may have been acquired by means of the unfair practice.

4       Now, I am done with part two.  I have gone through the

5  verdict form.  As I've mentioned before, your verdict must be

6  unanimous.

7       Now, I am not going to go through the third part of

8  the instruction right now, which is the mechanics of getting

9  this out to deliberate.  After we've done the closing

10 arguments, I am going to come back to you.  There may be a few

11 supplemental instructions that I need to give you, and, in

12 addition, I want to talk to you about the mechanics of

13 deliberation, how to choose a foreperson, how to render a

14 verdict, the need for unanimity in the verdict, and how to go

15 about the process of deliberations, but I think that is better

16 taken after I've heard the closing arguments.  I will come back

17 at the end and give you those final instructions.

18      Now, these are very complicated instructions.  That's

19 why I've given it to you first.  It's fair to say, the

20 attorneys and I have been working on these for at least a week,

21 back and forth and back and forth.  They know what I was going

22 to be saying.  We did this often in the afternoons, multiple

23 memos and the like.  Essentially, they are gearing their

24 closing arguments to the law and what needs to be proven, and I

25 thought you needed to hear that law first before you heard the

Page 69

1    closing arguments, or it may not make as much sense to you.

2         So what we are going to do is take our break right

3    now.  We are going to come back at, let's say, 11:15.  Each of

4    the closing arguments will be about two hours, and then I give

5    them the hook.  They're long, but it's been a huge trial.

6    There are lots of documents to go through.  Some of the

7    documents you haven't even seen yet where there was an

8    agreed-upon introduction, so they need to walk through these

9    with you.

10        So my general thought is, we'll go from, let's say,

11   11:15 to 1:15.  We give you lunch.  We'll do the second one

12   this afternoon.  We'll send you out, you'll start getting

13   organized, and then you'll go home at 4:30.  But you will be

14   done by 4:30.  We've organized it around some of your

15   schedules.  So why don't we stand and --

16             A JUROR:  A question?

17             THE COURT:  No, not yet, okay, because I'm going to

18   tell you about how to ask questions at this point.

19             THE CLERK:  All rise for the jury.

20             (Jury excused.)

21   SIDE-BAR CONFERENCE:

22             THE COURT:  So just to make it clear to protect all of

23   you, you do not need to object now.  You do need to object,

24   even though we did the charge conference on the record, at the

25   end of my instructions.  There may also be an appropriate

1    clarifying or cautionary instruction, depending on what is said

2    in closing argument.  It's my general practice not to permit

3    objections during the closing unless something is mistrial

4    material.  You know, it's not simply that you disagree with

5    them, so --

6              MR. KENNEDY:  On the subject of questions, will the

7    jury be allowed to ask questions during final arguments?

8              THE COURT:  No.

9              MR. KENNEDY:  Well, maybe they should be told that.

10             THE COURT:  Yes, I know, it was surprising.  At this

11   point I'm a little nervous about it.  I will allow them to ask

12   questions, as all judges do, on a piece of paper later on, but

13   I think the answer to that is "no," and I think that's very

14   good to suggest that to them.

15             So is there something you're --

16             MR. CHEFFO:  Just so we're clear, how do you want to

17   handle the objections to the charge?

18             THE COURT:  When I'm done, which I'm not done yet.

19             MS. ARMSTRONG:  After you do part three?

20             THE COURT:  Yes.

21             MS. ARMSTRONG:  And then we'll do them on the record?

22             THE COURT:  Yes, that's exactly.  I've just been

23   preserving it all for you.  So no one has waived any objections

24   by not doing it right now.  I'm protecting you from the Circuit

25   right now, and that's my purpose right now to do that, okay?  I

Page 71

1    am not done with the instructions, so it is not time to object.

2    I thought this was the safest way to proceed on this, and

3    that's the way I'm going to do it.  But I do think -- I don't

4    remember whose suggestion it was, but I think it's a fabulous

5    idea because they clearly wouldn't understand what you were

6    talking about, the enterprise stuff is so hard.

7            So you're going first two hours, do a lunch, two

8    hours, and then get them going.  As I understand it, you've

9    agreed on all the exhibits.  Are they in forms to be able to go

10   in?

11           MS. NUSSBAUM:  Yes, your Honor.

12           THE COURT:  And everybody's put flags on them?

13           MS. NUSSBAUM:  We finished this morning.  They're

14   flagged now.  They'll be flagged by the time the closings are

15   done.

16           THE COURT:  I forgot to mention.  You're yellow and

17   you're blue?  Is that what it is?

18           MS. NUSSBAUM:  We're green, your Honor.

19           THE COURT:  You're green, and you're --

20           MS. ARMSTRONG:  We're blue.

21           THE COURT:  Green and blue?  All right.

22           MR. SOBOL:  Is there also a chron?

23           MS. NUSSBAUM:  The chron should be here within the

24   next hour.

25           THE COURT:  And did you put them in little binders to

1    help, like the articles in one binder?  Remember we talked

2    about that?  Did anyone do that?

3              MR. GREENE:  I don't think the articles got in a

4    binder.

5              THE CLERK:  I think all the exhibits are arranged in

6    sequential order by number.

7              THE COURT:  So no one did that.  All right, fine, I

8    won't mention that.

9              MS. NUSSBAUM:  And there is a chronology which will be

10   here shortly.

11             MR. RONA:  The articles are mostly in numerical order,

12   so they will tend to be in one area.

13             THE COURT:  Okay, all right, thank you.  A little

14   shorter break, like 11:15-ish, I think?  Okay.  Otherwise we'll

15   never finish.

16             (End of side-bar conference.)

17             (A recess was taken, 9:58 a.m.)

18             (Resumed, 11:23 a.m.)

19             THE COURT:  Lee, my reporter, advises me that twice I

20   read something incorrectly, and she's going to fix it on the

21   transcript.  And I once said defendants must prove that

22   defendants, something like that.  One time I think I

23   substituted Kaiser for Pfizer, the other way around.  So she's

24   going to fix it on the transcript that's handed to them, if you

25   want, she can show it to you.

1              MR. CHEFFO:  That's perfectly fine, your Honor.

2              Have you decided -- would it be easier to actually

3      give them the actual document as opposed to transcripts?  It

4      might be easier, it's a little more colloquially --

5              THE COURT:  Say it again?

6              MR. CHEFFO:  I'm sorry?

7              THE COURT:  I'm going to hand them a transcript.

8              MR. CHEFFO:  All I was asking, if you decided to do

9      that or the actual charge you handed to us to give them because

10     it's easier to read than reading the transcript.

11             THE COURT:  I think I'm going to hand them my

12     transcript.  Because there were one or two times that I

13     switched orders, for example.  Somehow I looked on paper, I

14     didn't realize that's dumb to instruct them on statute of

15     limitations after damages.  None of us focused on it because it

16     didn't matter, but as you're reading to them you sort of clue

17     into it.

18             By the way, since I didn't hear back from you, I just

19     sat on the statute of limitations.

20             MR. SOBOL:  Yes.

21             THE COURT:  I can't remember if there was a third

22     issue we didn't resolve.  As I reading it, oops, I forgot to

23     ask them.

24             I have a problem.  Where are you going to be,

25     Mr. Kennedy?

Page 74

1          I don't like this, because I can't see you.

2          I am completely blocked.  We can move this way back

3    there or we can move it to the side.  This way I lose the

4    entire jury and you.

5          MR. KENNEDY:  Any suggestion?

6          (Discussion off the record.)

7          THE COURT:  By the way, other than Janelle, is there

8    anyone here from the press?

9          Where are you from?

10         AUDIENCE MEMBER:  Bob Van Voris from Bloomberg News.

11         THE COURT:  Both from Bloomberg.  I just want to know

12   if I have to tell the jurors not to read certain papers

13   tomorrow.

14         I think we're set.

15         Do you have chalks you'll be able to mark so an

16   appellate court will be able to see what they are at some

17   point?

18         MR. KENNEDY:  I believe so, the exhibits --

19         THE COURT:  But there aren't separate ones, graphics.

20         MR. KENNEDY:  Everything will be on the screen.

21         THE COURT:  I know, but I can't preserve it.

22         Anyway, that's something to think about.  We're not

23   going to hold it up.

24         MR. CHEFFO:  We'll print a copy, your Honor.

25         THE COURT:  All right.  Let's bring this jury in.

5a1aa1cf-aed2-4697-ab4f-eeb4358763c1

1    11:30, 1:30.

2              (Jury entered the courtroom.)

3              THE COURT:  Okay.  So now we're going in the reverse

4    order of the opening statements.  You'll first hear from the

5    defendants.  I forget, is it just you, Mr. Kennedy, or will you

6    be splitting it up?

7              MR. KENNEDY:  We'll be splitting it up, your Honor.

8              THE COURT:  Splitting it up.  I think both sides will

9    be splitting it up.

10             I advise you, once again, to take notes on this.  To

11   the extent something is on the screens that aren't exhibits,

12   you will not be getting them in the jury room.  So if you want

13   to take notes on them, take notes on them.  They won't be

14   coming in.

15             While I said that you will be getting transcripts if

16   you ask for them of the testimony, you won't be getting

17   transcripts of the closing arguments.

18             Remember, it's not evidence, the closing argument,

19   it's the opportunity for each attorney to point to certain

20   aspects of the evidence and to ask you to draw certain

21   conclusions.

22             Two hours.  Five minutes before two hours, 1:20,

23   1:25-ish I'll give you a reminder, and 1:30 a hook.  Maybe

24   Mr. Hooper will get the hook at that point.

25             MR. KENNEDY:  Your Honor, counsel, ladies and

Page 76

1  gentlemen, as you figured out over the last four weeks, there

2  isn't very much that our side of the table and this side of the

3  table agrees on.

4  I know, however, that I speak for all of us when I

5  express our appreciation and gratitude for your attendance and

6  conscientiousness here.

7  Maybe you thought you were going to be here for the

8  Michael Jackson will case or something and find out it's going

9  to be statistics and all the rest of it.  I know it hasn't been

10  the most interesting subject matter.

11  Also, I think all of us have not only been advocates,

12  we've been trying to act as teachers.  A lot of this is tough.

13  I'm sure there's some points where we said it over and over

14  again and you want to say, Stop already, we got it.  So we

15  apologize for that.  For the ones who went too quickly, we were

16  doing our best.

17  For background, as her Honor has already indicated,

18  Jim Hooper and I will be dividing up these arguments, so you

19  won't have to listen to one of us for two hours.

20  Let me tell you what we're going to be doing during

21  that time.

22  First, as you've just learned, because Kaiser has the

23  burden of proof on most things, they've gotten to go first up

24  until now, they also get to go last.  So after we sit down,

25  they get up to talk, we don't get to respond.

5a1aa1cf-aed2-4697-ab4f-eeb4358763c1

1    So in addition to trying to summarize the evidence, he

2   and will be playing mind reader and trying to predict what you

3   may be hearing from them we won't get a chance to respond to.

4    Now, as you've heard from her Honor, we've been sued

5   here for two things.  First, we've been sued for this RICO, or

6   racketeering act, which, as you found was mind numbingly

7   complicated, but at root it comes down to you can't join up

8   with other people in something called an enterprise and go out

9   and cheat people.

10    Then we've got the California unfair competition law,

11   which at heart is you can't go out by yourself and cheat

12   people.  But at the heart of both of them is was somebody

13   cheating?  In particular, her Honor repeatedly used the word

14   were there material misrepresentations or omissions?  Not just

15   was everything said or revealed, but was there anything

16   material?  And I'll be coming back to that word again and

17   again, because this case, in a lot of ways, comes down to what

18   did Kaiser know and when did they know it?

19    I think you've actually heard from some of their

20   witnesses saying, If only I had known then what I know now, I

21   would have done things differently.

22    Well, I'm going to start, before turning over to

23   Mr. Hooper, by going through a quick overview of some of the

24   evidence and showing that far from changing pattern, Kaiser

25   knew exactly what was happening; and, in fact, the more it

5a1aa1cf-aed2-4697-ab4f-eeb4358763c1

Page 78

1    learned about Neurontin and gabapentin, the more it actually

2    made use of them rather than the other way around.

3            Then Mr. Hooper is going to talk about what the

4    science has shown with regard to Neurontin.  I think you're

5    going to find that it's a good drug.  At one time, at least in

6    some parts of the country, may have been marketed by some bad

7    people; but regardless of who's marketing it, it had the same

8    molecular structure, the same components, and the same ability

9    to be effective or not.  And we're going to demonstrate to you

10   that it is a good drug, which has been of considerable help to

11   people with these hard-to-treat conditions.

12           Austin, can we see the first slide?

13           Going back -- the screen doesn't seem to be working.

14   Is it at least on all of the individual monitors?

15           THE COURT:  Do you all have it?

16           JURORS:  Yes.

17           MR. KENNEDY:  You may remember four long weeks ago,

18   when I last had a chance to address you, said, The ultimate

19   issue in this case was going to be whether Kaiser or

20   Permanente, if you prefer, doctors around the country over a

21   ten-year period wrote out prescriptions -- that's according to

22   Dr. Rosenthal and Mr. Hartman -- there were 550,000 supposedly

23   fraudulent prescriptions that were written out, over a half a

24   million of them, as a result of these doctors having somehow

25   been duped into believing that Neurontin or gabapentin was an

1    effective drug, when, in fact, it was not.

2         I told you then the case had been on file for five

3    years, and up to then not one of those doctors that wrote those

4    half a million prescriptions had come forward and said, I was

5    tricked.  I really shouldn't have done that.  My sound medical

6    judgment would have been different.

7         I said, Right now we've got question marks, and I

8    predict four weeks from now, when I get to talk to you again,

9    we're still going to have question marks, and we do.

10        We've heard in this case from five doctors who

11   regularly prescribed Neurontin.  Three pain specialists,

12   Dr. Maizels, Dr. McCarberg, and just yesterday, Dr. Danesh, the

13   other neurologist.  We heard from two psychiatrists,

14   Dr. Chandler and Dr. Dea.  All five of them told you, on

15   videotape, to be sure, they weren't here in the courtroom, that

16   they had used Neurontin, gabapentin, prescribed it in their

17   specialties, because that was an exercise of their sound

18   medical judgment.  None of them said they had even been

19   detailed, even contacted by anybody from Parke-Davis or Pfizer.

20        So at this point the grand total of people who

21   potentially could be one of those question marks are the five

22   you heard from.  None of those five were duped.  Remember, they

23   were all giving statements under oath in 2007, two years after

24   the lawsuit had been filed.  After Kaiser at least knew enough

25   to go make a federal case out of it and file a suit, these

1   doctors then still regularly prescribing Neurontin.  And they

2   made clear that with these hard-to-treat conditions there's

3   nothing that works for everybody.  Dr. Maizels said if you get

4   even a 30 to 50 percent success rate, that's considered a good

5   drug in this area.  And Neurontin met the good drug test.  I

6   think everybody agreed, while it has side effects, all drugs

7   have side effects, Neurontin's are far less than others.

8        We heard this morning a deposition of Dr. Arness

9   describing how he had put a bipolar patient on Neurontin

10  because the other drug his patient was on required periodic

11  blood tests for liver function.  Neurontin doesn't carry that

12  kind of a disability.

13       Turn to the next slide.  2092.

14       Sorry.  It's over there on the table, I won't pick it

15  up again, the big exhibit, Exhibit 923, the list of providers.

16       Remember, you've been told you would get a stipulation

17  as to what was in it, and this is the stipulation.  It's

18  Exhibit 2092, you'll have it in the jury room with you.

19       If you count up, you'll find there are something over

20  25,000 doctors in there, of which approximately 94 percent or

21  something like 24,000 are Permanente doctors who, according to

22  Permanente's records, prescribed Neurontin or gabapentin during

23  the period for which they're seeking damages.

24       As I said, you've heard from a grand total of five of

25  them, and one of the big questions that you want to ask in the

1    jury room is -- these are Permanente doctors.  We found with

2    Dr. Hyatt and Dr. Daniel, they cooperate with Kaiser, Kaiser

3    wants to ask them to come here and testify, they're willing to

4    do so -- why didn't we hear from any other than the ones that

5    we presented?  That I submit is because, what I told you in

6    opening statement, what Kaiser is telling you in this

7    courtroom, there is little, if any, resemblance to what Kaiser

8    does outside this courtroom and what it does with regard to the

9    care and treatment of its patients.

10            Next, please.

11            Think about what Kaiser has not shown in this case

12    where they're asking for, whatever it is, over $100 million.

13    Not one Permanente doctor, nobody out of those 24,000 came in

14    here and said, I was even detailed.  Somebody from Parke-Davis

15    or Pfizer even came and visited my office and tried to hustle

16    me to use Neurontin on an off-label use.

17            Not one doctor testified that he or she attended a CME

18    where Neurontin was hawked for off-label uses.

19            Predicting ahead, I think during Kaiser's final

20    argument they may show you an attendance list from a CME for

21    something like 25 Permanente doctors who were in attendance.  I

22    would hope that's not unexpected, they need to continually get

23    education.

24            I don't think you're going to hear any testimony,

25    though, that any -- that Neurontin was hawked off-label there,

1   or that any of those 25 prescribed for anybody on the basis of

2   being hustled at a CME as opposed to their sound medical

3   judgment.

4          So if any of those 25 really were influenced, why

5   haven't we heard from them during the course of the case?  Why

6   are their names just coming up in final argument?

7          We kept hearing about suppressed studies, withheld

8   information.  Not one doctor came in and said, you know, when I

9   finally learned about the Gorson study or the Pande study, or

10  even reading Dr. Dickersin's article in November of 2009, it

11  had an effect on me and I realized I really had been misled and

12  I no longer a believe in gabapentin.

13         Next.

14         Not one testified that they received any of the

15  hundreds of thousands of reprinted medical articles.  We kept

16  hearing about all the reprints that we were supposedly

17  poisoning the environment by creating this false understanding.

18  Haven't found anybody from Kaiser who even got one, let alone

19  did something as a result of it.

20         Not one Permanente doctor on the provider list, that

21  book big, 923, has said that after eight years of being

22  reeducated he or she had stopped prescribing Neurontin.

23         And what Dr. McCarberg said, he started using TCAs in

24  the first instance because he tries to do what Kaiser asks him

25  to do.  But we didn't hear one -- I guess I should say with one

1  exception, Dr. Daniel, remember the man from the P&T committee

2  in Riverside, the tall, white-haired surgeon who said he once

3  prescribed Neurontin for a surgical patient -- notice he didn't

4  say it didn't work -- but he said he had been reeducated, he is

5  now a convert.  But he was not a regular Neurontin prescriber

6  to start with.

7        We have heard about the importance of formulary

8  status.  As of today, even after four weeks of trial in this

9  case, even after everything they've told you, there's been no

10  evidence that any formulary in any of the nine regions has been

11  changed to eliminate, restrict, in any way tried to curb the

12  use of gabapentin.

13        We're told that there is still a very active

14  Neurontin, gabapentin initiative going, and that they're really

15  worried about costs.  Remember, neither Dr. Carrejo or

16  Dr. Hyatt could tell us within $10 million how much Kaiser

17  spent on gabapentin in 2009 or 2008.  How can you possibly be

18  concerned about the cost of a product and not know within $10

19  million how much you're spending?  And if you're concerned

20  about a product, how can you possibly be spending as much as

21  $10 million on it four years after you filed a lawsuit?

22        The other point -- I won't go through them all -- but

23  most significant one, I think, is there's no evidence that any

24  adviser has been sent to Permanente doctors, even advising of

25  the evidence in this case, or giving them any sort of

1    admonition with regard to gabapentin.

2            Remember, we heard testimony if a doctor tries to

3    prescribe Lyrica, which is even for an FDA-approved purpose,

4    because Lyrica is branded expensive, you get a pop-up on your

5    computer saying, Doctor, are you sure you really need to

6    prescribe Lyrica?  Have you exhausted all of the less expensive

7    alternatives?

8            So Kaiser has a way of communicating with its doctors

9    when it wants to try to reduce use of something.  Why isn't

10   there a pop-up for gabapentin or Neurontin?

11           Next.  And other things we failed to hear that -- why

12   today is it still listed on the patient website as the only

13   suggested drug for pain from a nerve?

14           One of the great ironies of this case is, as my

15   opponents get up this afternoon and tell you how this is just a

16   sugar pill, it's absolutely worthless, it will be Kaiser

17   patients around the country going into their doctors to get

18   refills of their Neurontin prescriptions for the exact

19   off-label uses that we're talking about in this case.

20           So there is simply a disconnect between what you're

21   being told in this courtroom and the undisputed evidence as to

22   what's going on in the rest of the world.

23           As we have shown, it isn't just at Kaiser, it's

24   throughout the country, throughout the world.  There were more

25   prescriptions written for Neurontin in 2009 than in 2008.

1   There were more in 2008 than in 2007.  The drug has been around

2   for something like 18 years.  People learn more and more about

3   it, and what happens?  As we'll show you, it gets used for

4   anything, more and more off-labelled reasons.

5            And finally, not one Permanente doctor got up here and

6   said that he had -- he or she had prescribed gabapentin for any

7   of the expressed conditions in question because of anything

8   that any of our clients did.

9            Next.

10           We heard over and over again, remember, about all the

11  troubles that Kaiser is having getting this big ship turned

12  around.  It's been an eight-year education process.

13           Well, let me show you why I think they're having

14  trouble, because they've got the ship pointed straight ahead

15  toward greater Neurontin usage, rather than try to do any

16  reverse course.

17           Next.

18           What we've tried to do on these slides is up at the

19  top, that is an exhibit number.  So if there are any of these

20  that pique your curiosity and you'd like to look at further in

21  the jury room or to make sure that Kennedy didn't snooker you

22  with an out-of-context quote and want to read the whole thing,

23  I won't repeat that every time, but that's what those numbers

24  up at the top refer to.

25           September 1999.  Remember the Southern California

1    group expanded its formulary and added Neurontin for

2    psychiatric use knowing about the failed Gorson study and the

3    blind -- the unblinded Backonja study.  And that was because --

4    next -- as Jim will be explaining in greater detail -- a failed

5    study does not mean an ineffective drug.  Studies focus in on

6    some particular aspect of a drug, not the entire efficacy.

7         Gorson, for example, studied doses only below 900

8    milligrams.  It would be like studying whether giving somebody

9    a quarter of an aspirin cures their headache.  Quarter of an

10   aspirin doesn't, up the dosage, as people did in later studies,

11   and it works.

12        Pande, the study only the people who could get in this

13   study were people who had not responded to any form of

14   treatment for bipolar.  Obviously we were going to see if we

15   had a really big-time drug, but we did something nobody else

16   had done, it didn't.  But because it isn't better than every

17   other drug, doesn't mean it isn't worthwhile.  As you heard me

18   read this morning Dr. Arness talking about how it's really

19   suited particularly for bipolar 2, the lesser condition.

20        Jumping ahead to January of 2002, at this point, how

21   many times have we heard about Frye and Pande?  We did a quick

22   note check, I think it's 178 references for one and 219

23   references for the other.  So they've been made to sound like,

24   you know, the biggest thing since Columbus discovered America.

25        January of 2002 Kaiser knows the results of both of

1    those studies, and not only don't they change anything, but --

2    next -- in Ohio, with that knowledge, what do they do?  They

3    expand the uses of Neurontin to include psychiatrists, because

4    they understand, as people outside this courtroom do, a failed

5    study doesn't mean the drug doesn't work for any purpose.

6         Next.

7         Now, important date, lawsuit commences, February 1,

8    2005.  At this point, remember, Neurontin has just gone

9    generic.  The less expensive, still not as cheap as TCAs, but

10   less expensive form of exactly the same substance is out there,

11   and look what happens.  September 2005, what, eight months

12   after the lawsuit has been filed, the Kaiser Northwest region,

13   which had previously removed the branded drug Neurontin from

14   its formulary, now that a generic is available, puts that drug

15   back on, actually saying, With the availability of similar but

16   more expensive pregabalin and the decreasing cost of generic

17   gabapentin were added back to the formulary.  And that's

18   supposedly evidence-based medicine.

19        Again, there's nothing wrong with focusing on

20   generics.  I think all of us would agree, anything that can

21   hold down medical costs is a good idea, but don't hold them

22   down and then try to come in here and blame somebody else for

23   your decisions.

24        October of 2005, that Northwest region says gabapentin

25   is now the most commonly used antiepileptic drug for

1    neuropathic pain, and doses up to 3,600 milligrams a day may be

2    needed in some patients.  That's the Northwest region talking

3    to other Kaiser doctors.  Yet, you're told in this courtroom,

4    Oh, the only people who would ever think of going over 1,800 is

5    some crooked drug salesman who is trying to con a doctor.  It

6    just won't work.  What they tell you here isn't what's

7    happening outside.

8             February 2006, case has been on file for a year.  The

9    drug -- DIS, Dr. Millares, who I see is here with us today,

10   operation down in Downey is recommending gabapentin for

11   diabetic peripheral neuropathy, even though it doesn't have FDA

12   approval for that use, over Lyrica, which does have FDA

13   approval and has been the subject of those necessary two

14   DBCRTs.

15            Now gabapentin has gone from, as I said, from being a

16   branded drug, now that it's in generic, Kaiser decides that

17   it's even better than the FDA-approved drug for that purpose,

18   and they're now recommending it for diabetic peripheral

19   neuropathy.

20            Next, 2006, now gabapentin is being recommended for

21   migraine.  Even though gabapentin doesn't have FDA approval,

22   it's being recommended over Topamax, which has FDA approval.

23   But guess what?  Topamax is more expensive.

24            February 2007.  Kaiser's Care Management Institute now

25   is recommending gabapentin in doses up to 2,400 milligrams a

1    day.  I wonder where Kaiser doctors would get the idea that

2    over 1,800 milligrams may work.  Now they're recommending it

3    for fibromyalgia, something we haven't been sued for in this

4    case.  They're thinking of off-label uses we haven't even been

5    accused of proposing, and finding it's effective relief there.

6         Next.

7         May 2007, gabapentin is recommended as the second line

8    agent in the management of neuropathic pain.

9         The point is, it's not just on the formulary, it isn't

10   just a case that Kaiser says, Doctor, if you want to use it,

11   you have that option.  Kaiser is saying we recommend it under

12   these circumstances.

13        And -- next -- this is Exhibit 918-A.  You saw it in

14   opening statement.  It goes with all of the material that was

15   on the Kaiser patient website up until February 9 of this year.

16   And we have the website materials, but this is a summary.

17        If you were to scroll through the summary two weeks

18   before the start of this trial as a Kaiser patient, you would

19   have been told that gabapentin works for cancer pain, chronic

20   pain, cerebral palsy, restless leg syndrome, migraine

21   headaches.  And you're asked to believe that Kaiser discovered

22   just on the eve of this trial that that was all bad medical

23   science and that it had to be taken off.  And they didn't take

24   it down, they didn't bother to tell their doctors why they were

25   doing it.  They didn't even tell the patients who were on those

1    drugs, You might want to visit with your doctor, you may be

2    taking something that really doesn't work.

3         And in terms of purging their website, they overlooked

4    or chose to ignore, but if you go to the website today,

5    Neurontin and gabapentin is listed as the only recommended pain

6    for nerve emanating -- pain emanating from a nerve.

7         So far from having tried to turn the big ship around,

8    they've been heading it -- I don't want to carry the analogy

9    too far -- but to the gabapentin generic port with

10   ever-increasing uses and recommendation.

11        And the reason I've gone through this is because her

12   Honor's instructions say, In order to be tricked, there has got

13   to have been a material omission or statement, material being

14   something that would influence somebody that we would attach

15   importance to.

16        And there's no question there were illegal statements

17   made.  We pled guilty.  We paid a fine.  No dispute about that.

18   There are memos that certainly suggest that people weren't

19   rushing, perhaps, to get unfavorable articles published.

20        So I'm not here to try to whitewash Parke-Davis or

21   Pfizer and say these companies have been perfect.  The question

22   is, though, did they do or not do anything that's had a

23   material effect on Kaiser?  And the way you can answer that

24   question is, fine, when whatever it was that Kaiser didn't

25   know, Kaiser eventually learned, what did Kaiser do

1    differently?  What we find is, even after they have enough

2    information to start a lawsuit, are they decreasing the use?

3    No, they're recommending it for even greater uses, just like

4    the rest of the medical community, and there's been absolutely

5    no indication that that doesn't continue right through today.

6          Next.

7          Again, in terms of old favorites.  I think Dickersin

8    has something like 168 hits on LiveNote.  You'll have the

9    Dickersin article in the jury room with you.  She criticizes

10   methodology.  Dr. Dickersin, she told us, is not a medical

11   doctor.  There isn't a word in her article saying, As a result

12   of my study I have found that gabapentin isn't effective for

13   bipolar or isn't effective for migraine.  What she said is --

14   and she's criticized, interestingly, both negative and positive

15   studies.  In fact, she's even more critical of the studies that

16   found that the drug didn't work than she is of the ones that

17   did work.  If you really want to spend the time looking at it.

18         But the idea that a doctor or anybody else would read

19   Dickersin and become convinced that there was suddenly a lack

20   of effectiveness that didn't exist before.

21         In addition, she's here today, remember Dr. Millares,

22   she was here on March 5th.  At that time we read from a sworn

23   statement she filed in this case that Kaiser learned in

24   mid-2002 that Neurontin's manufacturers had engaged in a

25   misinformation campaign that, among other things, suppressed

Page 92

1    key negative evidence.  Almost eight years ago that

2    Dr. Millares said Kaiser had that knowledge, and she ought to

3    know, she's head of the Drug Information Service.

4            Next, please.

5            We've heard a lot about evidence-based medicine in

6    this case.  I've been keeping track of Kaiser witnesses.

7            We first heard from Dr. Kessler who told us DBRCTs are

8    the gold standard, you need them for everything.  Although he

9    acknowledges he's a pediatrician, he has to work off-label all

10   the time.

11           Then we had Dr. Carrejo here, and we pointed out that

12   we actually had a DBRCT supporting Neurontin for postherpetic

13   neuralgia, but that Kaiser was recommending a cheaper drug that

14   didn't have FDA approval, and what did he tell us?  There

15   haven't been any head-to-head comparisons.  So even if you have

16   DBRCT support, that's not good enough for Kaiser, unless you've

17   got a head-to-head comparison.

18           And then we heard from Dr. Perry, who said even if you

19   have a DBRCT and it shows statistically significant

20   improvement, it's no good unless you've got clinical

21   improvement as well.

22           And then every time we've had a treating doctor and

23   patient say they enjoyed clinical benefit, we're told the

24   result is probably due to placebo effect.

25           As I was listening to this, I was reminded of trying

1    to learn to play poker with an older kid.  You find out three

2    of a kind normally beats two pair, except when there's a face

3    card.  There's a certain sense of learning poker from an older

4    kid in this constantly shifting, you can't make them happy.

5         I think the situation may best be summarized by

6    Dr. Les Zendle, Associate Medical Director down in Southern

7    California.  There's the exhibit he has.  Evidence-based

8    medicine means so many different things to different people.

9    To some it means you only have randomized controlled studies,

10   but if that's all we did, we couldn't do a whole lot.  That's

11   right, you need off-label production.  And finally, he said,

12   It's also used as a reason to withhold certain things or not to

13   do things to cut costs.

14        Again, not criticizing anybody that wants to hold down

15   medical costs, but don't tout that philosophy on the outside

16   and then come into court with an entirely different approach.

17        That's what I submit Kaiser knew, when they knew it,

18   and what they did, or, more accurately, didn't do about it.

19        They were not tricked.  They were not the victim of

20   any material misrepresentations.  They got a good drug that's

21   performed as expected.  In fact, even for fibromyalgia did some

22   things that weren't expected.

23        I'm going to sit down now and give Mr. Hooper a chance

24   to summarize what the science and the evidence in that area has

25   shown with regard to whether Neurontin is or is not a good

Page 94

1    drug.  Then I'll be back to talk a little bit more about the

2    specific verdict form, jury instructions and things of that

3    sort.

4           We want to thank you very much.

5           THE COURT:  If you want to stand up and stretch for a

6    second while we're doing the switch.  There's a lot of

7    listening that's going on today.

8           (Pause.)

9           THE COURT:  Okay.  I would suggest a jog around the

10   courthouse, but I think it's raining.

11          Here we go, Mr. Hooper, go ahead.

12          MR. HOOPER:  I have 15 seconds left to say good

13   morning, because it's going to be afternoon.

14          In Mr. Greene's opening statement in this case, he

15   told you Neurontin was, quote, worth no more than sugar pills.

16          Just seven days after Mr. Greene said Neurontin is

17   worth no more than sugar pills for off-label conditions, like

18   diabetic neuropathy, Kaiser's expert, Dr. McCrory, testified.

19   He told you right here in trial, sitting right over there, that

20   even as he sat there he was treating his own patients with

21   diabetic neuropathy with Neurontin.

22          Last Tuesday, 21 days after Mr. Greene told you that

23   Neurontin is worth no more than sugar pills, Dr. Tony

24   Rothschild, the professor of psychiatry from UMass, told you

25   that he treats 30 to 40 patients with bipolar disorders with

5a1aa1cf-aed2-4697-ab4f-eeb4358763c1

1    Neurontin, including some patients with anxiety and some

2    without.

3           The next day, Dr. Brenner, Harvard Medical School

4    professor and director of the pain program at Mass. General,

5    told you that he treats 40 of his 200 pain patients with this

6    supposed sugar pill, Neurontin.

7           Then last Friday, Dr. Shawn Bird, the neurologist from

8    the University of Pennsylvania, told you that he treats 80

9    percent of his many neuropathic pain patients with Neurontin.

10          You then heard Dr. Slaby, professor of psychiatry at

11   New York University, NYU, tell you that he, too, treats 30 to

12   40 bipolar patients with Neurontin, both as an adjunctive or

13   add-on medication, and as a third line of treatment in some

14   patients after other medications have failed them.

15          And you saw testimony from three Kaiser physicians and

16   heard from another doctor today.  The pain specialist,

17   Dr. McCarberg; headache specialist, Dr. Maizels; and Kaiser

18   chief of neurology, Dr. Danesh, the one we heard just

19   yesterday.  They didn't say ineffective, no better than a sugar

20   pill.  All three testified that Neurontin was effective in

21   neuropathic pain.  And there's no claim that Dr. Danesh was on

22   any speakers' bureau or bias.

23          But here in the courtroom you heard Kaiser's lawyers

24   claim that Neurontin is ineffective, period.  They say it helps

25   no patient with neuropathic pain, no patient with a bipolar

5a1aa1cf-aed2-4697-ab4f-eeb4358763c1

1  disorder, no patient with migraine.  According to them, no dose

2  above 1,800 helps any patient.

3          The reason Mr. Greene took the extreme position is

4  simple:  Their entire case depends on it.

5          There's no drug that works for all people with these

6  problems.  The effective drugs, even the ones that -- like TCAs

7  that Kaiser says are effective, help some, but not all,

8  patients.  And if Neurontin helps some patients, like the other

9  drugs do, then it stands right alongside the other medications

10  that doctors use for those patients.

11          If it's effective for some patients, then Kaiser

12  doctors had good reason to prescribe it, not because they were

13  tricked or duped, but because they found Neurontin helpful for

14  their patients.

15          Remember what Kaiser's Dr. Maizels said about

16  neuropathic pain, for example.

17          "Q.  Have you used antiepileptics in the treatment of

18  neuropathic pain?

19          "Yes.

20          "Which ones?

21          "Carbamazepine, Tegretol; gabapentin and Neurontin,

22  and Clozapine; others very infrequently.

23          "Have you found these antiepileptics effective in

24  treatment of neuropathic pain?

25          "Sometimes.

5a1aa1cf-aed2-4697-ab4f-eeb4358763c1

1    "And roughly what percentage of the time?

2    "About the same as tricyclics, 30 to less than 50

3  percent."

4    He's saying that no drug works for a hundred percent

5  or 75 percent or even 50 percent of patients.  Not the TCAs,

6  not carbamazepine, none of them.  For hard-to-treat conditions,

7  like neuropathic pain, the drugs work for some, but not all.

8    Remember Kaiser's pharmacist, Dr. Millares and her

9  list of the various drugs that she said would have been

10  cheaper, more optimal alternatives to Neurontin.

11    It's Exhibit 365.

12    She listed five different drugs for neuropathic pain,

13  three different drugs for bipolar, seven different drugs for

14  migraine.  Why did she have to list so many?  Again, no one

15  drug works for all.  Doctors often have to try more than one or

16  find a combination that works best for each individual patient.

17    So the question is not whether Neurontin cures every

18  patient with these kinds of problems, nothing does, but why

19  Kaiser doctors have prescribed Neurontin for some patients with

20  those problems for all these years.

21    Is it in their toolbox because they were tricked or

22  because, like the alternatives, it works for at least some

23  patients?  If it works for some, their entire model, worth no

24  more than a sugar pill, falls to pieces.

25    Before we look at some of the evidence supporting use

5a1aa1cf-aed2-4697-ab4f-eeb4358763c1

1   of Neurontin, let's recall what Kaiser and its witnesses told

2   us about how doctors should decide what medications to

3   prescribe.

4          Remember Ms. Nussbaum in her opening statement, and

5   later their witness, Dr. Dickersin, told us about

6   evidence-based medicine.

7          Dr. Dickersin told us that doctors who practice

8   evidence-based medicine consider three kinds of information:

9   Research evidence, clinical knowledge, and patient values.

10         Dr. Dickersin also told us that medical decisions

11  should consider all three kinds of information:  Studies,

12  clinical knowledge, and patient values.

13         One thing that evidence-based medicine does not mean

14  is that doctors should use only FDA-approved medications.

15         Kaiser's second witness, Dr. Abramson, told us there's

16  no FDA-approved medication for neuropathic pain, meaning

17  approved for indication of neuropathic pain, any and all kinds.

18         Other countries do that, they approve them that way.

19  As Dr. Brenner told us, Neurontin is approved for neuropathic

20  pain in that broad sense in more than 50 countries.  But as

21  both he and Dr. Bird told us, FDA hasn't approved any drug for

22  neuropathic pain in that sense.

23         Lack of FDA approval doesn't mean a drug is

24  ineffective for off-label use.  Just think of the TCAs, the

25  drugs that Kaiser encourages its doctors to prescribe for

Page 99

1   neuropathic pain.  TCAs are approved for one thing only:

2   Depression.  The labels that say that are Exhibit 952 A, B, and

3   C.

4        If a person has some type of neuropathic pain other

5   than the few types that have an FDA-approved drug, like

6   Neurontin for postherpetic neuralgia, the patient will get an

7   off-label prescription or none at all.  By the same token, if a

8   person can't take the FDA-approved medication due to its side

9   effects, drug interactions, or because it just doesn't work for

10  them, they will be treated off-label or not at all.

11       One class of medications that doctors have used

12  off-label for decades, long before Neurontin came along in

13  1994, is the AEDs, the antiepileptic drugs.  Dr. Maizels,

14  Kaiser's headache specialist, learned of AEDs for neuropathic

15  pain way back when he was in medical school.

16       Similarly, Dr. Dea, the Kaiser psychiatrist, testified

17  there was a long history of doctors using AEDs in the treatment

18  of bipolar disorder.

19       When Neurontin came along in early 1994, it was an

20  obvious choice for patients that weren't fully responding to

21  existing drugs or patients who couldn't safely use other AEDs

22  or TCAs.  You've heard doctor after doctor testify about

23  Neurontin's relatively mild side effects and ease of use:

24  Dr. Bird, Dr. Brenner, Dr. Rothschild, Dr. Slaby.

25       It made sense for doctors to try Neurontin, the newest

1    AED, in conditions where other AEDs were already used

2    off-label.  And nobody claims doctors were trying Neurontin for

3    conditions like for skin cancer or the common cold.  They tried

4    Neurontin conditions like neuropathic pain and bipolar, where

5    AEDs had long been used.  The evidence, tantamount:  Research,

6    clinical knowledge, and patient's experiences.

7         Let's look at that evidence now for migraine, for

8    bipolar, for pain, and for doses above 1,800.

9         Did Kaiser doctors put this medication in their

10   toolbox and keep using it all these years because they were

11   tricked, or does the evidence that Dr. Dickersin told us to

12   look at, to consider, especially research and doctors' clinical

13   knowledge, show that it is, in fact, an effective medication

14   for some patients with these problems?

15        Let's start with evidence about use in migraine.

16        As for studies in migraine, the witnesses talked about

17   five studies.  Kaiser's Dr. McCrory and our Dr. Gibbons had

18   three studies they were able to combine and analyze together.

19   In just those three studies alone, both experts found this

20   trend in favor of Neurontin in migraine prevention.  But that's

21   not all.  Dr. Gibbons told you about two additional studies,

22   both DBRCTs, both positive, both in favor of Neurontin.  The

23   Trapani study was a DBRCT, independent, not a Pfizer study.

24   Results were positive in migraine prevention, that means

25   Neurontin was better than a sugar pill, with statistically

1    significant results.

2              Dr. Gibbons told you about the Spira study.  It, too,

3    was a non-Pfizer study from a group of researchers in

4    Australia.  DBRCT in another migraine-related condition called

5    chronic daily headache.  Like Trapani, results were positive,

6    Neurontin was better than sugar pill, statistically

7    significant.

8              What about clinical knowledge about migraine?  You

9    heard some about that already.  Let's look at the testimony of

10   Kaiser's headache specialist, Dr. Maizels.  This is their

11   headache specialist.

12             "Have you found Neurontin effective in the treatment

13   of headaches?

14             "Yes."

15             And let's not forget what Kaiser's patients were told

16   on their website, at least up until shortly before this trial

17   when they took down parts of it.

18             Quote, In addition to seizure control, gabapentin is

19   also commonly used to treat chronic pain, migraine headache,

20   panic disorder, and social phobia.

21             So we see in research, clinical knowledge, and what

22   Kaiser told its own patients until a few weeks ago that there's

23   a place in the toolbox for Neurontin when it comes to treating

24   migraine.  For some patients it is effective, and there's good

25   reason to prescribe it.

1            Let's now turn to use of Neurontin in patients with

2    bipolar disorders, starting with the research.

3            You heard over and over again about the studies by

4    Dr. Frye, the government researcher; Dr. Pande, the Parke-Davis

5    doctor; as well as a study by Guille.  These three studies were

6    all negative, and you learned from experts on both sides, like

7    their Dr. McCrory and our Dr. Bird, that negative studies don't

8    prove a drug is ineffective for other patients or at other

9    doses, bigger sample sizes or in different circumstances.

10           There's an old saying in science, you don't prove a

11   negative.

12           But the Pande, Frye, and Guille studies had another

13   important thing in common.  Each of these studies was in those

14   treatment refractory patients that we talked so much about.  If

15   we look at the transcript, we probably said that word 50 times,

16   and it's important.

17           Multiple witnesses from both sides, starting with

18   Dr. Abramson, Kaiser's witness, explained that treatment

19   refractory means patients who don't respond to standard bipolar

20   medications like lithium and Depakote.  And like the standard

21   drugs, Neurontin didn't work in the treatment refractory

22   either.

23           These studies don't tell us anything about how

24   Neurontin might help in other kinds of bipolar patients or in

25   other circumstances.

1              In non-refractory patients, you heard about two

2      DBRCTs.  One of them, Vieta, was a year-long study in bipolar

3      patients, and it found that Neurontin was better than placebo

4      in preventing bipolar episodes from incurring over time.

5              And Kaiser's lawyers did what they do with every study

6      that goes against their position.  They try to persuade you

7      that something is wrong with the way the study was done.  But

8      Vieta is simple.  You will have it with you.  You can read it

9      for yourself.

10             There were some patients who should never have been in

11     the study in the first place.  Dr. Vieta took them out, and the

12     peer-reviewed article, the article that went through the peer

13     review committee, says so.

14             The results for the patients that the study was

15     designed to test were positive.

16             The next study, Mokhber, was the eight-week study that

17     was done by the researchers in Iran and University of British

18     Columbia.  It was a DBRCT that tested three drugs head to head,

19     that phrase that Mr. Carrejo told us about was so important to

20     Kaiser, head to head in the type of bipolar disorder called

21     dysphoric mania.  Bad stuff.

22             The three drugs, gabapentin, carbamazepine, and

23     lamotrigine.  It's important to realize that carbamazepine and

24     lamotrigine, those two, are Kaiser alternatives, and they're

25     both explicitly FDA approved for bipolar.  That's what

1    gabapentin was compared to.  And the results showed that all

2    three drugs worked.  But here's what's really important for

3    this case:  Neurontin worked just as well as the two

4    FDA-approved drugs in the mania phase of the illness, and it

5    worked better than the other two in the depressive phase.

6           And Kaiser's lawyers then pointed out the obvious,

7    that there was no placebo group in addition to the three drug

8    comparator groups in this study.  And that is precisely the

9    point.  Neurontin wasn't compared to a sugar pill here.  It was

10   compared head to head with the very drug that they claim is the

11   better alternative and that is FDA approved in bipolar.

12          Don't know what they're going to say because we have

13   to go first, but if they talk about the Mokhber study and

14   placebo, ask yourself what about the fact that the study

15   compared Neurontin to Kaiser's alternative and beat it?

16          Third, you heard about two studies in anxiety

17   disorders, Pande's 1999 publication, Exhibit 1305 in social

18   phobia; and Pande 2000, Exhibit 590 in panic disorder.

19          The social phobia study was positive, period.  The

20   panic study showed benefit in a subgroup of the most severely

21   ill patients.

22          Why are the anxiety studies important for bipolar?

23   Because, remember, we kept holding up the silver book, the DSM,

24   kept going back to that.  These studies show benefit for

25   Neurontin compared to placebo in two conditions that are common

1    symptoms in bipolar patients and they have to be treated.

2         Heard the old saying, actions speak louder than words.

3    Boy, do they here.

4         Dr. Barkin, Kaiser's expert witness, who I think

5    you'll remember from week one as the doctor with the license

6    issue, testified that six months after he wrote his report he

7    was refilling prescriptions for Neurontin for two bipolar

8    patients.  Not because he thought it worked, he was careful to

9    say, but because the patients liked the medication and wanted

10   to stay on it.

11        Dr. Chandler, Kaiser psychiatrist, testified that

12   anxiety is common in bipolar patients and that Neurontin is

13   often used to treat those patients.

14        What evidence have you seen that proves that some,

15   most, or all of the bipolar prescriptions, so-called bipolar

16   prescriptions, that Kaiser is trying to recover for weren't

17   written for exactly the same purpose under exactly the same

18   circumstances that Dr. Chandler testified about?

19        Dr. Rothschild, our witness, a professor from UMass,

20   testified that he was treating 30 to 40 bipolar patients with

21   Neurontin.  Some of them with anxiety, 10 to 15 solely bipolar.

22        Dr. Slaby from NYU, again, treating 40 patients with

23   Neurontin.  Said he uses Neurontin in some patients for both

24   the bipolar component and the anxiety.  And, as we saw earlier

25   in Kaiser's website, Kaiser was telling its own patients right

1    up until just before this trial that Neurontin's used to treat

2    social phobia and panic, those two conditions that so many

3    bipolar patients have to deal with.

4         Looking at all the evidence, reading it as a whole, we

5    see why Kaiser doctors used Neurontin for some patients with

6    bipolar disorders, not because they were tricked, but because

7    it can help some patients with a very difficult illness that

8    doesn't have any patent remedies.

9         Let's turn to neuropathic pain.  You heard over and

10   over about three studies of neuropathic pain, Backonja,

11   Reckless, and Gorson.  We went back through the trial

12   transcripts, Backonja got mentioned 135 times.  You heard about

13   Reckless from Kaiser's lawyers and Kaiser's witnesses; it would

14   be double that if you counted ours when we stand up.  135

15   mentions of Backonja, 104 of Reckless, and coming in third for

16   the yellow ribbon, Dr. Gorson at 70.

17        And then Dr. Bird, the neurologist from University of

18   Pennsylvania, who came last Friday, told you the rest of the

19   story.  Thirteen DBRCTs in neuropathic pain, ten of them

20   positive.

21        Let's just focus on the positive placebo-controlled

22   studies that Kaiser and its witnesses barely mentioned or did

23   not mention at all.  Tamez-Perez in diabetic neuropathy;

24   Rowbotham and Rice, PHN.  The Tai study in spinal cord injury.

25   The Bone study in phantom limb pain.  The Levendoglu, spinal

5a1aa1cf-aed2-4697-ab4f-eeb4358763c1

1    cord injury.  Parsons, another study in DPN.

2         Just those seven placebo-controlled studies are more

3    than enough evidence to show that Neurontin is far better than

4    any sugar pill in variety of different types of neuropathic

5    pain.

6         They didn't have much to say about Morello, either,

7    curious, because it's a DBRCT study that found Neurontin worked

8    just as well as a TCA, amitriptyline, one of the drugs that

9    Kaiser claims is better than Neurontin.

10        Let me say just a word about Gorson and Backonja, the

11   two studies Kaiser talked about so often.  Remember that Kaiser

12   knew about both of those, both the negative result in Gorson's

13   900 milligram study, and the unblinding issue in Backonja, way

14   back in 1999, shortly after they were both published.  They are

15   both discussed in a Kaiser 1999 drug monograph, Exhibit 559.

16        And a word about Reckless as well.  First thing to

17   remember about Reckless is Parsons.  Reckless, if you got

18   doubts about Reckless, look at Parsons.  Very similar study to

19   Reckless, though it's even bigger, and the Parsons results were

20   clearly positive.  Even Dr. Dickersin's article says Parsons.

21        You'll have to have the research report -- you will

22   have the research report for Parsons, it's Exhibit 2069.

23        Also, don't forget that Reckless was submitted to two

24   different journals and rejected, that's Exhibit 974, and that

25   its results are discussed over two pages in an article on

5a1aa1cf-aed2-4697-ab4f-eeb4358763c1

1   gabapentin that Dr. Backonja published in 2003, that's Exhibit

2   1660.

3          Before we leave the research data on neuropathic pain,

4   remember Dr. Perry, the doctor from Canada who had such a heavy

5   report, the one that Mr. Greene plopped down and talked about

6   how many pages it has.  It's not so much how many pounds it

7   weighs, but what it says.

8          Let's look at what Dr. Perry found when he did his

9   combined analysis of Neurontin pain study.  Remember he looked

10  at three outcomes:  50 percent reduction, average change of

11  pain scores, and moderate or greater improvement in pain.  On

12  every one of the three he found statistically significant

13  positive results in favor of gabapentin.

14         Now, he tried to explain that away, if you recall.

15  Said, Well, it's not clinically meaningful.  Another -- it's

16  all -- everything that is positive, but now, ooh, change the

17  game.  Now it's not clinically meaningful.  Then remember what

18  Dr. Bird, the neurologist from Penn, who came down and

19  testified last Friday said.  It is a big deal for patients with

20  neuropathic pain when they get moderate or greater pain relief,

21  and it is a big deal to them when their pain score gets cut in

22  half.  And that's what Perry's results say.

23         And then you'll remember Dr. Gibbons, our

24  biostatistician, did much the same thing as Dr. Perry and found

25  very similar results.

1          I won't belabor the chart.  You probably remember this

2     one.  The blue bars suggest that study after study show that

3     Neurontin is better than placebo.  On that they seem to be in

4     agreement.

5          Let's look at what prescribing doctors told us about

6     Neurontin in neuropathic pain.  What do the doctors say?

7     First, again, Kaiser's expert, Dr. McCrory, as I mentioned

8     earlier, came here and testified -- was talking about migraine,

9     but he's an internist; he doesn't treat just headache patients,

10    he also treats diabetic neuropathy patients.  Even as he sat

11    across the room from you, he was treating them with Neurontin.

12         Dr. McCarberg, Kaiser's pain specialist, you saw on

13    video.  He testified he had found Neurontin effective for

14    neuropathic pain, and his colleagues, too.

15         We already talked about Dr. Maizels and Dr. Danesh,

16    who testified very similarly.

17         Then there's our witness, Dr. Brenner, the pain

18    specialist here in Boston from Harvard, treats hundreds of pain

19    patients.  He, too, believes Neurontin is effective in treating

20    neuropathic pain.  You see the testimony there.

21         Doctor, based on your overall clinical experience, do

22    you believe Neurontin is an effective pain medication?

23         Yes.  It's effective, improved their pain, can help

24    improve function status and quality of life, so yes.

25         Dr. Bird similarly testified, also treats lots of

5a1aa1cf-aed2-4697-ab4f-eeb4358763c1

1   patients with peripheral neuropathy he said.  And he testified

2   that Neurontin for neuropathic and related forms of chronic

3   pain is an effective drug and very well tolerated.

4         In addition, Dr. Bird told you that Neurontin, in his

5   opinion, is not just something you go to, it is a first-line

6   medication for neuropathic pain.  A medication he turns to

7   first out of all the alternatives.  Some sugar pill.

8         And here's the Kaiser website today.  What you're

9   looking at -- this is material that they have not removed from

10  their website, at least as of about 8:00 this morning.

11        So you're seeing what a Kaiser patient would read on

12  the website right now under "other uses."  Gabapentin may be

13  used to treat other nerve pain conditions, and it lists three

14  off-label neuropathic pain conditions:  Diabetic neuropathy,

15  peripheral neuropathy, and trigeminal neuralgia.  That's as we

16  sit here, folks.

17        What you're hearing in court is not what Kaiser is

18  telling its patients.  Why are they telling their patients

19  about using Neurontin off-label for neuropathic pain?  You just

20  saw the evidence.  All 13 DBRCT studies, ten of them positive,

21  and what the doctors say, theirs and ours.

22        There's no serious question about whether this

23  medication works for neuropathic pain and that's why Kaiser

24  doctors use it and why they tell their patients about it.  It's

25  not because they were tricked.

5a1aa1cf-aed2-4697-ab4f-eeb4358763c1

1        Let's turn, lastly, to the dosing issue, this business

2   about whether Neurontin is effective at doses above 1,800

3   milligrams a day.

4        Again, the question:  Are Kaiser doctors prescribing

5   Neurontin above 1,800 because they've been tricked or because

6   they know higher doses can benefit some patients?

7        These are the same 13 DBRCT studies that we looked at

8   earlier, the set of studies that Dr. Bird told you about.  And

9   you'll have these with you.  If you look at them to see how

10  high the dosage was at each study, this is what you'll find.

11  Notice that eight out of the 13, the two columns on the right,

12  eight out of the 13 studies tested patients at dosages above

13  1,800, 2,400, or 3,600, and all but one of them was positive.

14  Three only went as high as 1,800, and two of those were

15  positive.  The loner down at the low end is Gorson at 900

16  milligrams.

17       If you have any doubt about whether it's appropriate

18  for a doctor to prescribe Neurontin at doses above 1,800, look

19  at the labelling, that professional package insert that the FDA

20  approves for prescription drugs.  If you look toward the end,

21  you'll find the Dosing and Administration section, and this

22  table entitled "Neurontin Dosage Based on Renal Function,"

23  that's kidney function.  It's Exhibit 507, page 67.

24       And remember what Dr. Brenner, the Harvard professor,

25  explained to us last Tuesday when he was here, about this

5a1aa1cf-aed2-4697-ab4f-eeb4358763c1

1   chart.  That top row tells doctors how to dose Neurontin in

2   patients with normal or only moderately impaired kidney

3   function.  And you see the series -- notice it says, "total

4   daily dose range," 900 -- doesn't stop at 1,800 -- "900 to

5   3,600," second column.

6          And going across you see that it tells doctors the

7   steps to follow to take patients up to 1,200 TID.  And as we

8   learned, "1,200 TID" means three times a day.  1,200, three

9   times a day, 3,600 milligrams.

10         So one way that a Kaiser doctor could decide to take a

11  patient above 1,800 is not that they were tricked, but that

12  they simply read the FDA package insert for the medication

13  which tells them exactly how to dose the drug up to and above

14  1,800 safely.

15         You heard a lot more about this, but this is one I

16  think is important for you to look at.

17         Slide 33.

18         What did Kaiser's Dr. Maizels have to say about dosing

19  above 1,800?  Here it is.

20         So you would think --

21         "Q.  So you would think that 2,400 milligrams would be

22  an appropriate level of gabapentin to get -- to treat chronic

23  daily headaches?

24         "If needed, yes."

25         How about Dr. McCarberg, another Kaiser doctor.

1           "Has it been your experience that doses above 1,800

2    milligrams can be effective for the treatment of neuropathic

3    pain?

4           "Yes.

5           "Has it further been your experience that it's

6    often -- often worth trying doses above 1,800 milligrams?

7           "Yes."

8           And our witness, our expert witnesses, both of them,

9    who also treat pain patients all the time, agreed with the

10   Kaiser doctor.

11          For example, Dr. Bird testified that he follows the

12   common practice of what's called titrating to effect.

13   Titrating is taking to dose of it, effect means benefit.  He

14   takes the dose up until the patient gets good benefit or until

15   he gets 3,600, whichever comes first.  That's the way real

16   doctors use this medication, like psychiatrists.  There's

17   nothing wrong with prescribing medication above 1,800.  Some

18   patients need it.

19          We've seen now that AEDs were long used to treat --

20   off-label to treat conditions like neuropathic pain and

21   bipolar, because Neurontin is safe and easy to use compared to

22   the alternatives.  It was a no-brainer for doctors to try it

23   for conditions where other AEDs had traditionally been used.

24          There's good evidence from research, all those

25   positive DBRCTs we just went through, as well as lots of

1   clinical knowledge.  All those doctors from both sides whose

2   testimony we just reviewed that support use of Neurontin.

3           Kaiser doctors weren't tricked.  They prescribed

4   Neurontin year after year, even today, five years after this

5   case was filed, because it helps some of their patients.

6           Thank you very much for your attention.  And

7   Mr. Kennedy will now come back up.

8           THE COURT:  Okay.  Let's stand and stretch again.

9           (Pause.)

10          THE COURT:  All set?

11          MR. KENNEDY:  Thank you, your Honor.

12          You'll note Mr. Hooper covered all the conditions,

13  except nociceptive pain.  That's because neither one of us can

14  figure out what to say about it, since we haven't figured out

15  what it's doing in the case.  So I drew the short straw and

16  have to talk to you about nociceptive.

17          One of the good things about being on this jury, at

18  least you know next time you stub your toe, rather than saying

19  it hurts, you can say, Honey, that nociceptive pain is really

20  killing me.

21          We know nociceptive is when you hit your thumb with a

22  hammer, sunburn, when you break a leg, things of that sort.

23          Other than, I think, Dr. Franklin, the whistleblower

24  who claims that he was told to promote Neurontin for just about

25  everything imaginable that could go wrong with man, I think the

1  record is devoid of any indication that this was ever marketed.

2  The doctors you've heard here said we didn't even think about

3  using it for that purpose.

4          I think it's kind of interesting -- well, if we can

5  look at slide 35.

6          Remember Kaiser did these two chart reviews of uses of

7  Neurontin.  These are the ones that Dr. Carrejo says were

8  garbage, even though they involved 30,000 charts at one time.

9  But what's interesting is, is there a sunburn category on

10 there?  Is a there a stubbed toe category?

11         That's a composite of Exhibit 747 and 760.  You'll

12 have both of them in the jury room with you.  And see if you

13 can find anything on there that involves broken arms or

14 anything else.

15         And most important, there isn't an internal Kaiser

16 memo even saying we've got a real problem with overuse of

17 Neurontin for nociceptive pain.  We don't have a doctor,

18 obviously, from Kaiser who said I tried it for nociceptive pain

19 and it didn't work.

20         I think you may hear from the Kaiser lawyers that

21 Pfizer hid a bunch of studies.  As you recall, we experimented

22 in house with Neurontin combined with other drugs to see if

23 they might work for things like dental pain, and if there might

24 be a market there.  And we found out they didn't.  So something

25 that they never have been found to work before.  We tried again

1    and found out it still didn't work.  Never released the drugs,

2    never went any further.

3          Just a little bit like saying Neurontin doesn't work

4    for skin cancer.  We agree, it doesn't, but whoever was told to

5    use it for that purpose or how much has Kaiser spent on

6    prescriptions for that purpose?  Again, maybe we'll hear more

7    about it when the Kaiser lawyers get to talk.

8          Now, turning to the verdict form.  Her Honor has

9    already provided you with a copy, so you've had a chance to

10   familiarize yourself with it.  And as you'll see, the first

11   thing you're going to be asked to deal with is, has Kaiser

12   proven that we violated this racketeering law with respect to

13   each of those five separate conditions?  And within the

14   instructions you'll be told you've got to find that there was

15   an enterprise that was set up to try to defraud people with

16   regard to each of those conditions.  And then there have to be

17   predicate acts, et cetera.

18         Point is, to prevail on their RICO claim, Kaiser has

19   to establish five separate elements.  And if any one of them

20   isn't established, the claim fails.  You don't have to find

21   that all five are absent.  If any one is missing, that's the

22   end of the story.

23         Now, you can start anywhere you want in the jury

24   instructions, I think they begin with enterprise; but I urge

25   you consider starting with instructions 21 and 24 that deal

1    with the wire or mail fraud requirement.  Again, there are five

2    different things that have to be there.  If there's no wire or

3    mail fraud, there's no need for you to ever try to figure out

4    whether there was an enterprise or whether there was interstate

5    commerce or who were the members of the enterprise.

6            And I think if you look at instruction 24, where the

7    Court explains that the fact that a drug is marketed off-label

8    doesn't mean that the marketing was fraudulent.  If the

9    statements --

10           THE COURT:  The thing I'm a little worried about is

11   it's got the case citations.

12           MR. KENNEDY:  Let me take it down.

13           THE COURT:  You're going to be getting a transcript of

14   what I said, which does not -- this is something I gave the

15   lawyers with my case authority for what I said.  I just think

16   that we're better off not shooting those up right now.

17           MR. KENNEDY:  Okay.

18           Let me back up.

19           This is not the FDA proceeding.  The question here

20   isn't whether there was off-label promotion.  We lost that one.

21   If that case gets tried again, we'll lose it every time.  We

22   will plead guilty before it goes to trial.

23           This isn't the FDA here.  Off-label promotion is not

24   fraud.  For example, one of the things that the government

25   charged in the FDA proceeding was that Parke-Davis had been

1    promoting Neurontin for the post-shingles condition PHN.  As we

2    know, in 2002, the FDA approved Neurontin for PHN as a result

3    of double-blind tests.  The problem was Parke-Davis was making

4    that claim in 1996.  There wasn't FDA approval yet.  If they

5    made the same claim the day before FDA approval came out, that

6    would be illegal off-label promotion since it doesn't have FDA

7    approval.  But it doesn't mean that it was a false claim or

8    that it wasn't true or that it wasn't medically valid.  You

9    just can't represent that it does something the FDA hasn't said

10   it will work for.

11           Meanwhile, doctors, of course, are free to use drugs

12   for whatever off-label purposes they want.

13           So the question in this case is:  Did Pfizer or

14   Parke-Davis do something that caused doctors to prescribe these

15   drugs for off-label purposes where they didn't do any good and

16   Kaiser actually bought sugar pills?

17           And I think if you'll look, based just on what

18   Mr. Hooper has told you, representing that Neurontin is

19   effective for some people with bipolar, some people with

20   neuropathic pain, some people with migraines, and for some

21   people may require doses over 1,800 milligrams, is absolutely

22   truthful and has scientific validity.

23           So my point is, both claims, the RICO claim as well,

24   ultimately rest on was a falsehood told?  Was somebody lied to

25   and things didn't work out the way they did, not were you in

1    compliance with the FDA labelling requirements?

2            If you agree with me and find that there was nothing

3    false about representing that the drug would work for these

4    uses, that's the end of the RICO analysis.  That's also the end

5    of the UCL analysis.  Nobody's been tricked, nobody's been

6    defrauded.

7            Again, though, it's up to you to proceed in whatever

8    way you want.  And I'll talk about if you proceed that way --

9    before I move on, though, I suspect again, playing fortune

10   teller for this afternoon, you're going to be told, Ah, the

11   plea agreement with the government basically resolved

12   everything, all it is a matter of getting out your adding

13   machines and totaling up the damages.

14           You'll see -- you'll have both Exhibit 371 and 366 in

15   the jury room with you -- and can I see slide 39 -- plea

16   agreement, 2004.  Well, it's not this one.

17           In any event, if you find it, put it up.

18           From the two exhibits I mentioned, you will able to

19   see that at no place is there any admission that there was

20   anything untruthful, that these drugs really don't work for the

21   purposes for which they were represented.  The government said

22   you promoted a drug for something that the FDA had not approved

23   it for.  We said -- fine.  Thank you, and apologize to the jury

24   for the confusion.

25           THE COURT:  You're all right?

1          MR. KENNEDY:  Yes.

2          What you'll find when you read through those two

3     exhibits is there's no admission of fraud, no admission any

4     promotional statement was false, no admission Neurontin is

5     unsafe for any off-label use, and certainly no admission that

6     any Kaiser doctor or pharmacist was tricked or misled.

7          So I'm not trying to defend, we aren't happy that

8     happened, we're embarrassed about it, it cost us a lot of

9     money; but Kaiser doesn't get to free ride on that one.

10    They've got to show that somehow they were defrauded and told

11    falsehoods.  And Mr. Hooper has just shown you for the

12    conditions in question those aren't falsehoods.  Those drugs

13    work.

14         And even after the lawsuit is filed, even after Kaiser

15    supposedly learns about everything that was withheld from it,

16    they continued to allow their doctors to do it, and in fact,

17    encouraged promotions.

18         Now, alternatively, if you want to start with -- take

19    the instructions in chronological order, the first RICO element

20    you will get to is there's got to be an enterprise.  You'll

21    find -- I find myself sort of arguing against myself.

22         Regardless of how bad you find Parke-Davis or Pfizer

23    was, that's not a RICO violation.  We can't violate RICO by

24    ourself.  We've got to be part of an enterprise to violate

25    RICO, which means you have to hook up with someone else.

1        For example, you've got three or four people who

2   contract with the government, and they decide, Gee, you know,

3   this killing each other by putting in low bids is really

4   hurting profits.  Let's get together and just agree the next

5   contract will be yours, you tell us what your bid will be, and

6   we'll just arrange to put in higher bids.  The next one will be

7   mine, the other three of you will agree.  That is an example of

8   a RICO enterprise.  You've got people with a common purpose who

9   need each other and are trading off in form -- even though they

10  may not have a name for it or a handshake, there is the

11  separate entity of the four including defense contractors who

12  get together whenever a contract comes out and go through their

13  nefarious scheme and cheat the taxpayers out of money.

14        Here, and again, kind of interesting, we haven't heard

15  from any Kaiser doctors, we also haven't heard very much about

16  the enterprises.

17        I think you're going to hear -- when I sit down,

18  suddenly you're going to be confronted with binders of

19  documents that haven't been discussed for the last four weeks

20  and which are supposedly going to be used to demonstrate that

21  there were enterprises between either Pfizer or Parke-Davis and

22  certain advertising agencies or marketing firms that have been

23  referred to tangentially in some of the depositions.  I think

24  you're going to be told that's the enterprise.

25        In fact, one of the witnesses I think, has referred to

5a1aa1cf-aed2-4697-ab4f-eeb4358763c1

1   the relationship as a partnership.  She wasn't a lawyer, and as

2   we know, a partnership is when two people get together and

3   share losses and profits or that are in a business together.

4   These advertising agencies were not in partnership.

5           The evidence is, it's on the videotapes you've

6   listened to, they were hired on an hourly basis or a flat sum

7   to help Parke-Davis and Pfizer in terms of writing and

8   distributing various articles.

9           And as one of the instructions your Honor has told

10  you, you should consider whether -- these two advertising

11  agencies are Cline, Davis & Mann and MAC, M-A-C, that she

12  mentioned this morning, were acting under Pfizer's control or

13  whether they retained autonomy from Pfizer.  And the answer to

14  both of those questions is no.  They were hired by Pfizer.  MAC

15  was even fired by Pfizer.  You don't get to fire your partner

16  in a partnership.

17          What we have here is a classic manufacturer/vendor

18  relationship.  MAC and Cline Davis were vendors who were hired

19  to perform a function for a set salary who were there at

20  Pfizer's sufferance and permission.  That's -- if you read --

21  take a while to read it, I concede, but if you think about that

22  relationship, if that's an enterprise, what isn't an

23  enterprise?

24          I guess even the secretary who helps her boss correct

25  typos in a fraudulent letter, we've got an enterprise.

1    Couldn't have gotten it done without you.  Clearly more than

2    that, that's why there's a three-page definition on it.

3           Again, if you conclude there's no enterprise, that's

4    also the end of the analysis, because RICO requires all five of

5    these things to come together.  And if you don't have all five

6    of them, you don't have a RICO endeavor.

7           But I submit the most important one is -- that's why I

8    suggested starting with the fraud.  If there's no fraud to

9    begin with, there's no need to find out whether the fraud that

10   wasn't committed wasn't committed by an enterprise or wasn't

11   committed by a non-enterprise.

12          But again, it's your choice, you can proceed however

13   you wish.

14          The other -- after RICO, you will then come to the

15   California unfair competition law.  As I said, it basically

16   says you can't defraud people by yourself.  You don't need an

17   enterprise.  Same exact analysis, though.  Where are the lies

18   that were told to Kaiser that caused Kaiser doctors to

19   prescribe a bum drug for something that didn't work?  That

20   evidence doesn't exist in the case, and without that evidence,

21   neither one of those claims survives.

22          Even if somehow you find a technical violation of one

23   or the other of those statutes, your verdict form then says

24   you've got to reach causation.  Was Kaiser harmed as a result

25   of it?  And if so, in what way?

1           And I asked you there to consider -- I'm sure you're

2     going to be hearing a lot this afternoon about things that

3     happened 10 or 15 years ago that Pfizer isn't proud of and

4     Parke-Davis isn't proud of.  But in terms of whether Kaiser has

5     really been harmed, I urge you to focus on the last five years.

6     This is the time the lawsuit has been on file, after Kaiser's

7     eyes were supposedly opened enough to file a lawsuit; and what

8     has Kaiser done since then to change its approach towards the

9     prescribing or uses of Neurontin?  I don't think you'll find

10    much of anything.  And what you do find, as I detailed earlier,

11    goes towards expanded use of Neurontin, rather than trying to

12    restrict it, because, again, what you're told in this courtroom

13    doesn't track with what's going on outside.

14           And just think about this -- I mean, you're obviously

15    a very deserving, conscientious group of people, but if

16    somebody really had discovered that a drug that sells in the

17    quantities that Neurontin does, is really a sugar pill, you go

18    tell it to nine people on a jury to begin with?  Isn't this

19    Good Morning America stuff?  Don't you tell it to get a grand

20    jury indicted?

21           How would you keep this huge news off the evening

22    news?  Why isn't there -- except for the first day and the last

23    day, you didn't even have press here in the courtroom.

24           If they're right, they've tumbled on a scandal of just

25    enormous proportions for 15 years.  Not just thousands of

5a1aa1cf-aed2-4697-ab4f-eeb4358763c1

1   Kaiser doctors, but hundreds of thousands of other doctors have

2   been defrauded.  And there are people out there who have been

3   popping sugar pills, people with cerebral palsy, people with

4   cancer pain.  How do you keep this from being a giant scandal?

5          And if you're Kaiser, you're either the most callus

6   healthcare provider on earth that simply, Well, as long as we

7   can tell it to a jury and get some money for it, that will

8   square the deal, some day we'll get around to telling our

9   patients.

10         They may be my opponents, but clearly that's not the

11  way they function as a company.  They haven't been around for

12  50 years and don't have eight million members with that kind of

13  an approach.

14         So either Kaiser, the hospital, the way it functions

15  the rest of the time, is pulling a giant con, or what you're

16  being told here in this courtroom doesn't square with reality.

17  I submit both of them can't be right, and I think we know which

18  is the one that's wrong.

19         Now, other things I'm going to talk about, I'm not

20  sure whether you'll necessarily get there, but you're the ones

21  that decide what you're going to get to.  I'm not going to be

22  so presumptuous as not to do it.

23         Her Honor talked about the statute of limitations.

24  Both of these claims that we've been sued for require that suit

25  be filed within four years from whenever Kaiser learned that

5a1aa1cf-aed2-4697-ab4f-eeb4358763c1

1    they had been wronged or had enough information to provoke them

2    to make further inquiry and to check it out.

3            The case was filed in February of 2005.  So the

4    question is what did Kaiser know by February of 2001 that would

5    have put somebody on notice that, Mmm, maybe I better check and

6    see if something's not quite right here?

7            We'll come back to the top bullet point in a second.

8            Remember we asked Kaiser witnesses, including

9    Dr. Millares, about this pink sheet, this trade publication

10   that covers developments in the pharmaceutical industry, and

11   the people at Kaiser are regular readers of, and, in fact, she

12   remembered the April 3, 2000 pink sheet that talked about the

13   fact that Neurontin was the subject of a grand jury

14   investigation in Boston in this courthouse and that they were

15   being investigated for off-label promotion.

16           There are then follow-up memos within Kaiser, the

17   exhibits numbers on here are defendant's 506, defendant's 594,

18   defendant's 599, defendant's 581, and Dr. Millares' trial

19   testimony on March 5 at pages 53 through 55.

20           Undisputed, Kaiser knew that there was this problem

21   that the government was involved in, involved off-label

22   promotion, had a grand jury looking into possible criminal

23   indictment.  In addition, Exhibit 581 is a Colorado Kaiser

24   region, started a Neurontin initiative back in 2000.  They'd

25   become sufficiently concerned about use of Neurontin that they

1   were focusing on it at that point, and the pink sheets should

2   have really been of interest if you've already got your

3   initiative going.

4        Coming back to the top bullet point, that's David

5   Franklin, the man who testified here, the whistleblower.

6   Remember he filed a suit in whatever it was, 1998, and it was

7   sealed originally.  It was unsealed in January of 2000.  So any

8   time after January of 2000, if Kaiser had wanted to go looking,

9   they could have found all of the things that Mr. Franklin told

10  us here in this courtroom.

11       And I submit, regardless of whatever else you find in

12  this case, you're going to find that Kaiser waited far too long

13  to file this suit for the very good reason that this really

14  isn't Kaiser's suit, this is a lawyer's suit.  And it wasn't

15  until 2005 that the lawyers got around to proposing it, hence,

16  the long delay.

17       Let me turn to another topic that her Honor expressly

18  told you you may or may never reach, that's up to you, that's

19  the subject of damages.

20       I, too, hope you don't get there, but, again, that's

21  your job in this case, and you're the ones that are going to

22  decide it.  I'm not going to be so arrogant as to say there's

23  no way you're going to get there.  And with the kind of money

24  we're talking about here, I don't think it can be left unsaid.

25       First issue on damages is, is Kaiser really the right

5a1aa1cf-aed2-4697-ab4f-eeb4358763c1

1   party to be here?  Remember yesterday -- you may not, it was in

2   the midst of some of those boring videotapes -- Albert

3   Carver -- I guess -- that's a redundancy I realize, I

4   apologize.  I can't identify the non-boring tapes, so I

5   overspoke, good point.

6           We were listening to the videotape of Albert Carver,

7   who was an executive with Kaiser, and you may not have focused

8   in, but he was asked:

9           "If the cost of a prescription drug increases, would

10  the premium then increase for the next period?

11          "A.  Yes, that's correct."

12          So to the extent that Kaiser paid more for sugar pills

13  or paid for more Neurontin than it should have, that got passed

14  on to the insureds, presumably years ago.  And you haven't

15  heard anything here that Kaiser even could identify who the

16  people were in 1995 or 1996 that paid increased premiums that

17  may not even be there any longer.  I think before you get too

18  far into damages, I ask you to consider do we really have the

19  right plaintiff in this case, or is Kaiser like those people

20  who come to the academy awards and except on behalf of somebody

21  else who can't be there, except Kaiser would like to keep the

22  statuette for itself.

23          But that's issue number one.

24          Next question is, if you get to damages and conclude

25  that Kaiser is the right plaintiff -- could we see slide 66?

1              Going back to -- 2510204.

2              Drawing your attention back to the first day we were

3    here, opening statement, and it was either Mr. Greene's first

4    or second sentence out of his mouth, "This is a case about

5    fraud.  The reason we're here is because the defendants, Pfizer

6    and Warner-Lambert, lied about the effectiveness of their drug,

7    and Kaiser, my client, paid millions of dollars for Neurontin

8    prescriptions that were worth no more than sugar pills."

9              And the reason Mr. Greene had to stake out that

10   extreme position, that this drug is 100 percent ineffective, no

11   better than a sugar pill, doesn't work for anybody, at least

12   for these off-label purposes, was that's an essential part of

13   Kaiser's damage theory.

14             Unless you subscribe to the idea that the drug is 100

15   percent ineffective, Kaiser's entire damage claim collapses

16   like the proverbial house of cards.

17             Why?  Because Dr. Rosenthal needed to construct a

18   model and needed to make assumptions and the Kaiser lawyers

19   told her we want you to assume that the drug is 100 percent

20   ineffective.  We want you to assume -- and that's what she

21   proceeded, on that direction.

22             So Dr. Rosenthal's report is based on the premise that

23   there were one million -- whatever it was -- 150,000 Neurontin

24   prescriptions, each and every one of which was ineffective, it

25   was nothing but a sugar pill, didn't do any good for anybody.

5a1aa1cf-aed2-4697-ab4f-eeb4358763c1

1    You've got to accept that.

2         There was an old joke that an expert witness is

3    somebody who tells you something can't happen when you know it

4    already has.  I didn't say it was a good joke, but it's one

5    that gets told.

6         We've seen it applied, not as a joke, but as a reality

7    in this case, with Kaiser telling you it's a sugar pill, it's

8    100 percent ineffective, never done any good for anybody for

9    these off-label uses, even though we know that for 15 years

10   thousands and thousands of doctors, including their own, have

11   been prescribing it, and they've been endorsing it.

12        But, in any event, he had to make that claim -- we

13   didn't tell them how to style their case.  That's their theory.

14        If you don't find that every one of those 1,200,000

15   Neurontin prescriptions was for an ineffective drug, then all

16   of Dr. Rosenthal's analysis as to what portion of those

17   worthless prescriptions were due to illegal promotion falls by

18   the wayside.  Because she concludes it's something like

19   550,000, almost half, were fraudulent.

20        Which is kind of interesting.  To accept her theory,

21   you've got to agree the drug is totally ineffective, doesn't do

22   any good for anybody for these three uses.  Because of

23   Parke-Davis and Pfizer's promotion, 550,000 prescriptions got

24   written, but even without that off-label promotion, 550,000

25   other prescriptions for this absolutely worthless drug would

1    have been written by doctors that weren't motivated by

2    off-label marketing.

3            Now, what -- how -- what would drive the other

4    550,000?  I mean, the entire premise, I submit, defies logic.

5            But, in any event, those are the intellectual leaps

6    that you're going to have to make to go to plaintiff's damage

7    theory.

8            If you conclude that, Gee, I found Dr. Maizels was a

9    believable witness.  I found Dr. Rothschild didn't look like a

10   perjurer to me, if you believe any defense witness in this

11   case, that Neurontin really is effective for these conditions,

12   plaintiff's damage theory just went up in smoke, because it's

13   premised on 100 percent ineffectiveness, doesn't work for

14   anybody any time.  And don't be confused by -- sorry, Austin --

15   out of order 2510203, plaintiffs Exhibit 2093.  I have it as

16   slide 74.

17           Remember, this was shown during Dr. Rosenthal or

18   Dr. Hartman's testimony.  You've got the exhibit number there.

19           And what these were, were the bar graphs for the

20   conditions in question with how much of bipolar, how much of

21   neuropathic pain was fraudulent.  Seventy percent of

22   neuropathic was fraudulent, remember 99.4 percent for bipolar

23   was fraudulent.

24           That's not saying ineffective.  Her testimony, her

25   assumption was all of -- everything on all of those columns was

1    ineffective and never did any good for anybody.  And the blue

2    versus yellow is which portion of the ineffective was due to

3    off-label promotion as opposed to what portion of the

4    ineffective was done on the doctor's own initiative.

5          So don't let somebody say, no, no, no, we're not

6    claiming they're all ineffective, we're only claiming 70

7    percent were ineffective.  Not so.  One hundred percent of each

8    of those columns was ineffective, and then the other

9    percentages are what portion were supposedly due to the

10   off-label promotion.

11         As long as we're here, remember initially we were told

12   that that column over there at 12 or 13 percent of the total

13   prescriptions were due to bipolar.  And then we found out on

14   cross-examination that, no, that includes bipolar and a number

15   of other conditions, including depression and various others.

16         Dr. Rosenthal indicated she thought she could go break

17   out the bipolar portion.  She didn't do so.

18         When Mr. Hartman was here, he told us he didn't have a

19   separate number for bipolar.

20         So that chart does not provide any help at all if you

21   wanted to award damages for bipolar.  The only thing you've got

22   in evidence is the two internal Kaiser chart reviews.  But

23   Kaiser tells us those are garbage, so presumably they wouldn't

24   want you to use those as a basis for calculating damages.

25         But, in any event -- thanks, you can take it down.

1          The point is, to close the issue, plaintiff's case is

2     based on this drug being 100 percent ineffective, and then

3     trying to figure out what portion of that ineffective was due

4     to our misconduct as opposed to the ineffective drugs that

5     Kaiser's doctors supposedly would have prescribed on their own.

6          If we can just revisit -- this is that composite slide

7     again, this is of the two chart reviews from Kaiser, the one

8     that was done based on 2001 data, where they reviewed almost

9     21,000 charts, and then in 2004 they did another 9,000 charts.

10         Again, you'll have both those exhibits.

11         Although they're called garbage, as was pointed out to

12    us yesterday by Dr. Keeley, the top five conditions on both

13    charts are the same.  The order varies, the one is three on one

14    chart, and two is four on another.  But the same two end up

15    being the top five.  And what would be the statistical

16    likelihood that you could do garbage analysis and end up with

17    that kind of a coincidence?  And I submit that these show that

18    Kaiser has the ability to track internal Kaiser data when it's

19    in their interest to do so, and they simply didn't like the low

20    numbers that their internal data has, which is why they have

21    Dr. Rosenthal go look at national data.

22         And you're going to have to decide for yourselves

23    whether Kaiser with its resources is really -- is incapable of

24    tracking its own internal patterns as has been claimed.

25         Next, take a look at defendant's 863, slide 59.

1          This is a chart you saw yesterday with Dr. Keeley.

2     Remember, this is using Dr. Rosenthal's data on promotion, and

3     then applying -- using national data on prescriptions for both

4     gabapentin and Neurontin.  And the red line, of course, shows

5     the steady growth, totally uninterrupted, of Neurontin and

6     gabapentin prescriptions.

7          As I think one of the jurors pointed out in a

8     question, this growth, this is almost all for off-label.  No

9     question about that.  There isn't an epidemic of epilepsy

10    that's occurring, or an increase in the number of shingles.

11    That is off-label use.

12         And I think what's of particular significance to this,

13    as each year goes by, more and more information becomes

14    available about gabapentin.

15         This lawsuit even gets filed.  We plead guilty to

16    off-label promotion and pay a $400 million fine.  And what

17    keeps growing?  Gabapentin.  And that's why, while I can't

18    defend off-label promotion, and I'm not trying to weasel out, I

19    really think the net effect of the off-label promotion was to

20    tell more doctors about the potential uses of Neurontin earlier

21    than they would have otherwise, and, to be sure, that resulted

22    in putting money in Parke-Davis' pocket, and that's not right.

23         I think when you think about it, people also derived

24    benefit from the fact that they run a TCA and were having bad

25    side effects, their doctor learned about the potential for

1   Neurontin as a substitute earlier than she otherwise might have

2   done so.

3           But, in any event, the total disconnect between money

4   spent on promotion and what happens with Neurontin

5   prescriptions could not be more dramatic.  That, again, like

6   100 percent ineffectiveness, is a central theme of

7   Dr. Rosenthal's entire analysis and what she set out to prove,

8   and all of her statistics are based on the assumption that

9   there is a connection between them.

10          As you heard, the spike in spending here, pretty hard

11  to explain why that isn't having more of an effect on

12  increasing sales.  Some of her solution was she just pulled it

13  out, said that really shouldn't be considered because Pfizer's

14  motive for spending that money -- as though the people who read

15  the ads would know what the motive was -- just took it out

16  altogether.

17          And similarly, here comes generic, spending

18  disappears.

19          If it really is a cost, why isn't the line shooting up

20  like that?  If this is in any way cost or promotion driven, why

21  does it just keep -- in fact, it sort of levels off a little

22  bit after it becomes generic versus what's been happening

23  before.

24          So -- we've heard that one picture is worth a thousand

25  words.  In terms of is the continued growth of gabapentin

1    prescriptions due to illegal off-label conduct back in 1995 or

2    1996, or is it due to the fact that this is a good drug and the

3    more people use it and the more they try it out on different

4    patients for different reasons, the more successful it becomes?

5              Even P.T. Barnum said, You can't fool all the people

6    all of the time.  How can you keep doing this for that long

7    with a bum drug?

8              A couple other topics.

9              Mitigation.  As her Honor mentioned, that was in the

10   defense that we raised as to which we have the burden of proof.

11             And now if we could see slide 63.

12             A couple of points -- little numbers here, it's

13   Exhibit 408-F.  You'll have it in the jury room.

14             But I want to mention a couple of things.

15             This is a chart that Dr. Hartman used, and over in

16   this column he had interest numbers.  And I think he had

17   something like $50 million in interest.

18             If you look at your verdict form on the damages

19   portion, you'll see her Honor has instructed you not to award

20   interest.  She asks you to come up with a number not including

21   interest.  I think it's elsewhere in the instructions as well,

22   but you'll see it right above the -- over on the page

23   dealing -- page 2, bottom of the page, question 6 under 3,

24   damages, question 6, What amount of damages without interest do

25   you award for?

1          So that's number 1 on this chart.

2          The other thing I'm suggesting here is, assuming you

3     reject everything Jim Hooper and I have said up until now and

4     decide that, yes, we are going to award damages, we urge at a

5     minimum there comes a point where Kaiser can no longer say they

6     were our victim.

7          How, for example, for neuropathic pain can they say

8     after they learn about the failed Gorson study and after they

9     learned that Backonja was unblinded, how can they go along

10    happily prescribing Neurontin and saying let's see what this

11    does to our damages from Pfizer?

12         I submit at a minimum in September of '99, when they

13    learned about Gorson and Backonja, this no longer becomes

14    Parke-Davis' responsibility.

15         Similarly, for bipolar pain, once they learn about

16    Pande and Frye, the ones they claim were withheld from them --

17    and interestingly, you'll see the greatest number of

18    prescriptions occur in the later years, after they were aware

19    of this fact, which I think has a significant bearing other

20    than on damages.  It also bears on what they knew, when they

21    knew it, and what they did about it.

22         You'll see every time they learn about some supposedly

23    suppressed piece of information, prescriptions go up, not down.

24    You're going to have to decide whether that represents material

25    material that was withheld, or whether it had no effect on

Page 138

1    their thinking this wasn't what was driving them to begin with.

2         But, in any event -- but that's what I wanted to say

3    about mitigation.

4         As I told you before, Kaiser gets to go last, those

5    are the rules, not complaining about them, but we don't get a

6    chance to come back.

7         I want to just talk for a few minutes about some

8    things I think they're going to hammer on that I'd like to give

9    you an advance response to.

10        One, I think they're going to get up and say Pfizer

11   complains about where are the Kaiser doctors?  Where are the

12   Pfizer witnesses in this case?  I suspect you're going to hear

13   that like a drumbeat.  Well, a couple of things.  First, you

14   actually heard from some Pfizer witnesses who were on

15   videotape.

16        Secondly, as you heard, the case has been on trial for

17   five years.  Both sides have had a chance to go take

18   depositions and conduct discovery.  And if they wanted -- if

19   they thought they had good testimony from some Pfizer or

20   Parke-Davis person who isn't within subpoena range of the

21   courthouse, they could read their deposition if they wanted to.

22   They've chosen not to.  But most important is this:  Her Honor

23   gave us 28 hours each for this case, direct examination,

24   cross-examination; and we were told to spend it in whatever way

25   we thought best.

1           We said this is a case about were Kaiser doctors

2       tricked by a bum drug?  Now, there's nobody at Pfizer that's

3       going to be able to tell you -- get inside any Kaiser's

4       doctor's mind and tell you about that.

5           We certainly have lots of scientists at Pfizer who

6       could come in here and tell you how good Neurontin is, but I

7       don't think I get a pat on the back from the other side for

8       doing that.  I think we'd be hearing, She works for Pfizer,

9       what do you expect she'd say by coming in here?

10          So Jim and I decided that what would be of most use to

11      you in understanding the case, because we believe if you

12      understand the case, we win, so we were intending to do well by

13      doing good, was to present people like Dr. Brenner, like

14      Dr. Bird, like Dr. Slaby who would be able to tell you, I'm a

15      real-life, very respected physician, and here's what I'm doing

16      with Neurontin today in my life.  Here's how it actually works

17      in my practice.  And that's how we decided to spend our time,

18      and that's why we didn't troop a bunch of people in from Pfizer

19      who could tell you what a great drug that they think this is.

20          Also, I think you're going to be hearing a lot this

21      afternoon about things that happened 10 or 15 years ago; the

22      instructions that Mr. Franklin was given by his boss; I think

23      we're going to be hearing about the video -- or taped

24      conversations about wanting to kick various portions of anatomy

25      and sell more Neurontin, and good stuff, can't blame the lawyer

1   on the other side.  If you've got it, who wouldn't use that?

2   But what's it really got to do with the question of whether

3   Kaiser has been defrauded and is continuing to be defrauded?

4   Because it doesn't show the drug doesn't work.

5          And remember, Mr. Franklin was up in the Northeast

6   part of the United States.  He never called on Kaiser.  Where

7   is the equivalent of Mr. Franklin that called on some Kaiser

8   region or dealt with some Kaiser P&T committee?  We never heard

9   from them.

10          Also, I expect this afternoon you're going to hear a

11  great deal about suicide.  As you're listening to that, I ask

12  you to ask yourself why are they telling you this?  Is this

13  really going to help me decide whether Kaiser doctors were

14  tricked, or is this just an ill-disguised appeal to emotion?

15  We've already got big pharma on the other side, we can throw in

16  suicide and guilty plea as well, that should be enough to get

17  any group of 12 people exercised.

18          So those are things I think you're going to be hearing

19  a lot about, and as I said before, I think you're going to be

20  seeing binders of documents you've never seen before.  They

21  didn't want to present when Mr. Hooper and I might have a

22  chance to cross-examine somebody about them.

23          They're supposedly going to show this RICO enterprise

24  and all the elements that fit in there.  You're going to find,

25  regardless of how many documents they have, these were vendors

1    who were in a contractual relationship at Pfizer's discretion,

2    not an enterprise.  More important, though, not a fraud.

3         Finally, as you're listening -- I hope you keep a

4    couple of questions in mind, and they're really elemental.  You

5    know, if you were talking to somebody in a restaurant or on the

6    bus about the case, they said, What's it about?  Well, it's

7    about this drug that doesn't work for neuropathic pain.  Oh,

8    but the plaintiff does have it on its website and recommends it

9    to all its patients.  You'd say what are you talking about?

10   It's about this drug that really doesn't work for bipolar and

11   migraine, but the complaining party's doctors prescribe it in

12   ever-increasing amounts, and nobody is taking any steps to

13   restrict it.

14        I don't know what it is.  You get in the formality of

15   a courtroom, put a suit on everybody, being presided over a

16   judge with a robe, and stories that you wouldn't accept for ten

17   seconds in real life suddenly take on a dignity of their own

18   with the trappings that have come around them.

19        This case, after four weeks, is about a plaintiff who

20   has 12,000 supposedly defrauded doctors and hasn't been able to

21   bring one in here.  Talk about an exercise in self-levitation.

22        This is a plaintiff who claims they've got 550,000

23   fraudulent prescriptions, and they can't point to one of them.

24   They can't point to who it was that pulled off the fraud.  And,

25   in addition, the fact that Kaiser, the hospital, goes on

Page 142

1    functioning the way it does, says Kaiser, the hospital, doesn't

2    believe its lawyers' own case, or else, I'd say, it's got to be

3    the most callused organization around if they're letting their

4    patients continue to be treated with worthless drugs.

5           Kaiser doesn't believe their lawyers' case.  There's

6    no reason why you should either.

7           Thank you very much for your attention.

8           THE COURT:  Thank you.

9           So what I'd like to do is -- we're going to take our

10   break for lunch, the lunch should be there.  I'd like to make

11   it as close to a half an hour as I can, but you must understand

12   they need to eat.  So while the lunch is being delivered to

13   you, it's hard to figure out how you get through the lunch line

14   and back.  So I'm going to shoot for half an hour, but it could

15   be 45 minutes.  So we'll see you somewhere between quarter of

16   and 2:00.

17          THE CLERK:  All rise for the jury.

18          (Jury excused.)

19          THE COURT:  Okay.  So we don't need this on the

20   record.

21          (Discussion off the record.)

22          (Recess taken.)

23          (Resumed, 2:00 p.m.)

24          THE COURT:  Do you need me?

25          MR. BARRETT:  I do need you, your Honor.  Your Honor,

1   Mr. Kennedy in his closing argument told the jury that one of

2   the government charges was post -- was that they marketed PHN

3   off-label and it was later proved to be okay.  That statement

4   is true.  That statement is not in evidence.  Where Mr. Kennedy

5   got that, the only place he got it was from the sentencing

6   memorandum of the United States.  They have vigorously objected

7   to our --

8          THE COURT:  We're not putting in the sentencing memo

9   at this late date.

10         MR. CHEFFO:  It's in the information.

11         MR. KENNEDY:  I've never seen the sentencing memo.

12   It's in the information.

13         THE COURT:  We're not putting in the sentencing memo

14   I'm sorry, it's just too late at this point.  I did have two

15   concerns about something Mr. Kennedy said which we can address

16   later.  One is, I think he just didn't hear the fact that

17   there's a different date that was given on the statute of

18   limitations.  If you were at the charge conference yesterday

19   where Kaiser objected, I made an American Pipe ruling.  I

20   actually don't think it matters here, actually, because it

21   brings it back to May, 2004, and you were arguing about April's

22   Pink Sheet.  I think that's the timing.  But I think you just

23   missed the fact that I ruled on a different date on the

24   American Pipe issue.

25         MR. CHEFFO:  You did, your Honor.  The only thing I

Page 144

1    would say to that, you know, we had talked about the Hospital

2    Systems, and I think under American Pipe they don't get the

3    benefit of the toll because the class was defined as anyone who

4    paid for it, so there would be two separate statute of

5    limitations.

6            THE COURT:  Excuse me.  I'm not even dealing with

7    American Pipe.  You didn't move on it.  There have been

8    thousands of years we've been on this thing.  No one moved to

9    dismiss American Hospitals.  I am simply saying, I don't think

10   it matters.  I think it was an innocent misstatement, and I'm

11   not sure what to do about it.  The date, I don't know whether

12   it's even worth the dime.

13           MR. CHEFFO:  And my point was, just so we're clear, I

14   know you've ruled on the dismissal.  That wasn't my point.

15           THE COURT:  You didn't even raise American Hospitals

16   as a separate American Pipe issue.

17           MR. CHEFFO:  No, we did.

18           THE COURT:  As a separate American Pipe issue?  No,

19   you didn't.  But you did raise American Pipe, and you did raise

20   the hospital issue.  You just didn't say I needed to instruct

21   separately on one versus the other.  I am treating Kaiser the

22   same.  I don't think that issue was briefed well enough, but I

23   may knock out American Hospital later on.  I don't think it

24   matters.  No one has yet showed me why it matters because I

25   think it backs up to May of 2001.  Is that right?

1        THE LAW CLERK:  May of 2000.

2        THE COURT:  May of 2000.  And when's the Pink Paper?

3   April, 2000.  It doesn't matter, it just doesn't matter.  But I

4   did want to mention that, that you hadn't obviously heard what

5   my ruling was on that, and so I don't know if I should say

6   anything.

7        And the second thing is -- well, we can get into it

8   later -- I'm a little worried about, there's been no evidence

9   about the premiums making a difference here, and I don't know

10  whether I should just leave it alone, whether you're going to

11  flag it or whatever.  I might just say "Don't speculate about

12  premiums" as a cautionary discussion.

13        MR. SOBOL:  I mean, it was something that was objected

14  to in the opening, and you sustained the objection there as

15  well, which is why I was surprised to hear it again in the

16  closing.

17        MR. CHEFFO:  Well, yesterday we heard from Albert

18  Carver, who said specifically if one year -- that's the

19  testimony we heard on video -- he said, if one year the drug

20  prices go up, what happens, you raise premiums.

21        THE COURT:  It would be a rank speculation I'm going

22  to tell them that as to how it would affect it one way or

23  another.  At this point there was one line in the entire trial

24  about it.  That having been said, I did want to flag for you

25  because you probably didn't hear on the American pipe issue,

1  and you probably didn't hear me when I gave the instructions on

2  that that it was a slightly different date, but I don't think

3  it matters, and you might want to think about how you want me

4  to handle that.

5       MR. KENNEDY:  I apologize I'm hearing about it for the

6  first time now but that's my fault not yours.

7       THE COURT:  Well, let me say this, I don't think it

8  matters but if you want me to say something, I'll say

9  something.  If you want me to say something, I'll say

10  something.  It was an innocent mistake.  That's the only issue.

11  So we should bring this jury in.

12       (Discussion off the record.)

13       (Jury enters the courtroom.)

14       MR. SOBOL:  May I begin, your Honor?

15  CLOSING ARGUMENT BY MR. SOBOL:

16       MR. SOBOL:  Guess who's not sitting in that chair.  No

17  one from Pfizer dared come to this court and sit in this chair

18  or over there and talk to you.  No one from the largest

19  pharmaceutical company in the United States dared come here and

20  honor this Court and you with any testimony.  Think about that

21  as I proceed.  Why didn't they come?

22       "Gabapentin is the 'snake oil' of the twentieth

23  century."  How are they going to explain that?  How is anything

24  that you just heard during the closing arguments by the lawyers

25  from Pfizer consistent with that statement that Pfizer made a

Page 147

1    year before it bought Parke-Davis?  It's a statement that it

2    made at a time where it wasn't in its interest to be saying

3    anything other than the truth about Neurontin.  That's why

4    they're not sitting in this chair, because the evidence that

5    I'm about to describe to you they can't even come to a court

6    and sit in the chair and talk to you about, let alone explain.

7    They have to hide from you on it.

8           Now, there are a couple of preliminary things you need

9    to know about this case because in understanding the evidence,

10   this is a little bit different than usual.  The first thing you

11   need to understand is, most of the evidence that you have seen

12   during the past month very few people have ever seen before.

13   Most of the evidence, as you were told, was kept under a

14   confidentiality order during the entire five years that this

15   court proceeding has been under way.  The press hasn't seen it.

16   The doctors at Permanente haven't seen it.  The general public

17   hasn't seen it.  Very few people have seen it other than the

18   people who signed confidentiality orders and were able to

19   participate in the process.  So anything you hear at all about

20   2004 to the present about what Kaiser did or didn't do, they

21   didn't have the information that you have now.

22          The other thing that's really important to understand

23   in this case is that it was only by reason of the judicial

24   process, by reason of the fact that we have courts, that you as

25   jurors now have access to much of the information that you've

5a1aa1cf-aed2-4697-ab4f-eeb4358763c1

1   heard over the past four weeks.  Sometimes, you know, before a

2   lawsuit gets filed, the plaintiff, as we know, you have all the

3   information that you would normally have before you file your

4   lawsuit.  You file your lawsuit, and that's pretty much the

5   information you get.  There might be some discovery afterwards.

6         But in this case what you've heard is, the operative

7   complaint was filed on May 14, 2004, three days after the

8   criminal plea.  And over the following five years, the lawyers

9   for Kaiser acquired information, which, frankly, is a scandal.

10  It's a scandal because I will bet -- I don't know this for a

11  fact, but I will bet on this:  That most of you when you came

12  here at the beginning of this trial thought it was fair for you

13  to believe what you read.  You thought that your physicians

14  when treating your children or your grandchildren or your

15  spouses, that your physicians could trust what they read in a

16  peer-reviewed article.  You believed that.  And I hope, I'll

17  bet, that at the beginning of the trial you had a very healthy

18  skepticism for all the things that Mr. Greene said during his

19  opening statement because it is pretty shocking what you learn

20  about the scientific evidence in this case.

21        So that's the past five years.  What this case is

22  about is about 1994 to 2004, not what's happened since then.

23  We seek no damages since 2004, so anything that Kaiser did or

24  didn't do in the past five years is completely irrelevant

25  because it only seeks damages to 2004.

1        Now, because we don't have Pfizer sitting here in the

2   chair, unfortunately, we had to put in a lot of our case

3   through all these documents, and we had to trouble Judge Saris

4   with reams and reams of paper and briefs and all the rest of

5   that essentially to admit a lot of the evidence in the case

6   because we couldn't put it through anybody from Pfizer.  Who

7   would bother to show up from the largest pharmaceutical company

8   in the world?  So I now get the distinct unpleasure in the next

9   sixty minutes, averaging about four minutes a year, okay, to

10  show you some documents and evidence that's in the case.  And

11  I'm going to rush through lots of it, so if you see me rushing

12  through, it's because we only have so much time.  But there

13  will be, as Mr. Kennedy indicated, we do have exhibit numbers.

14  I will try to reference some of the critical exhibit numbers,

15  okay?

16        So I'll begin.  First, we start with the launch of

17  Neurontin.  Everybody agrees with this.  Neurontin is launched

18  in 1994.  It gets approved in the end of 1993.  It's launched

19  in early 1994, but for what?  Only as an add-on therapy in the

20  treatment of partial seizures.  That's all it's added on for,

21  okay.

22        What does Pfizer, Parke-Davis at the time, think it's

23  going to make off this drug over the next ten years its entire

24  life?  Well, $500 million, okay?

25        Of course, it's a national company.  It's got national

Page 150

1   operations in Ann Arbor, Michigan, and in Morris Plains.  The

2   national medical liaison training is all national from all over

3   the country.  The sales reps are all trained in exactly the

4   same place.  There is nothing that is distinct in any of the

5   evidence that says that doctors were detailed differently

6   anywhere at all in the country, whether the medical liaisons

7   were treated any differently.  This is a national enterprise,

8   it's a national operation.

9          What happens over the ten years?  The $500 million in

10  revenue that Mr. Greene appropriately said in the opening

11  statements, that wasn't enough for them.  They grossed over

12  $10 billion.  At this time, 1994, what's happening at Kaiser?

13  Kaiser, like many institutions, puts gabapentin, Neurontin, on

14  its formularies as an add-on therapy for partial seizures.  It

15  makes sense.  It's a treatment.  It's been approved by the FDA

16  on the basis of at least two DBRCTs, so it does that.

17         And at the time that it does this also, mindful, okay,

18  Parke-Davis is looking towards Kaiser and other HMOs to put

19  them on the formulary, and Pfizer even targets them, Parke-Davis,

20  Pfizer.

21         Now, early on, this is the beginning -- you see I

22  actually did something sort of fun with one of the paralegals

23  in my office.  We took one of the exhibits and we started

24  clipping it, so you'll see this over time.  It took them much

25  longer than it probably should have, but, in any event, early

1    on the drug is sold for its appropriate purpose, and the sales

2    were level.

3           Now, here we begin, RICO.  At the beginning, 1995,

4    Parke-Davis and CDM enter into an agreement.  Parke-Davis is a

5    separate company.  Cline Davis Mann, a separate company.  They

6    enter into an arrangement between the two of them to promote

7    Neurontin off-label.  That's an enterprise; two companies,

8    separate companies, teaming together.  They're still keeping

9    their separate identity.  It's not like CDM is being swallowed

10   up by Parke-Davis or anything, but they go forward.

11          And what do they do?  CDM is actually a member of the

12   Extended Disease Team within Parke-Davis, meaning this big drug

13   company actually invites people from CDM to come in and sit at

14   their meetings to talk about how they're going to promote the

15   drug off-label.  CDM participates in yearly planning meetings.

16   CDM prepares marketing strategy proposals for Parke-Davis and

17   independently proposed tactics, meaning CD is not just carrying

18   out Parke-Davis' orders.  CDM also comes up with its own ideas

19   and shares them back.  That's the partnership, the arrangement

20   that they have:  "Maybe you have some good ideas about how to

21   promote this thing off-label.  Maybe I'll implement other ones

22   that you come up with."  That's the way they run.

23          Early on, 1995, this doctor, Dr. Mellick, starts

24   putting these case reports out in 1995 and saying things like,

25   "Gabapentin was considered acceptable proposal for this

1    patient; patient's relief from panic disorder," if you believe

2    panic disorder, "also experience satisfactory pain control."

3    Not satisfactory neuropathic only pain control, right, but it's

4    great for pain, any kind of pain, right?  And for RSD.  Again,

5    "Experienced dramatic pain relief."

6           But it turns out that this guy Dr. Mellick, he's on

7    the payroll, and he doesn't tell anybody he's on the payroll.

8    "Please prepare a consultant's agreement, pay me some money,

9    give me 1,200 bucks a month for four months.  Over the past few

10   months, I'm in arrears," on and on and on.  This guy is on the

11   payroll; he doesn't tell anybody.

12          And, of course, he publishes the letters.  The letters

13   go out into the public literature.  Again, "Dramatic pain

14   relief in the majority of our patients," not telling anybody

15   he's on the payroll.

16          Now, we start getting into some of the strategy

17   documents.  Early on -- this is -- you see we put this other

18   thing that the paralegal did for me, by the way.  We have this

19   timeline across the top so you can follow the red ball.  A

20   publication strategy document early on, okay, by Pande.  He

21   starts looking into plans about psychiatry, and they talk about

22   a publication strategy would be disseminated.  "Obviously the

23   object of a publication strategy would be to disseminate the

24   information as widely as possible through the world's medical

25   literature."

5a1aa1cf-aed2-4697-ab4f-eeb4358763c1

1          It's exactly what we've been telling you.  They're not

2     just sending sales reps to go in and speak to a doctor in a

3     sort of obvious way.  This enterprise, this continued and

4     repeated pattern of falsehoods, of half-lies, of omissions,

5     continues on and on through things where they want to get out

6     things into the medical literature and make sure that basically

7     Parke-Davis doesn't have any kind of fingerprints on it.

8          A marketing assessment for psychiatric disorders,

9     you've seen this one before.  The goal is to, you know, to

10    drive up about a couple hundred million dollars in revenue for

11    off-label sales in 1999 alone.

12         What kinds of things are they crossing out?  This is

13    their draft.  "Well, let's cross off 'off-label.'  We don't

14    want anybody later on to see what we're doing."  So concealing

15    evidence together is another piece of evidence that no one

16    sitting in a chair here would want to have to explain.

17    Concealing evidence.

18         Another marketing assessment.

19         Now, early on one of the jurors asked a question, "Is

20    there an obligation to disclose all your negative results if

21    something doesn't come out?"  And you know there isn't, right?

22    There isn't.  But as you can see, as the trial goes on and on

23    and you see that there's actually affirmative statements being

24    made by the company about what the drug does, then you should

25    be disclosing all the evidence you have because you can't just

1    say one thing and not the other.  From very early on, May of

2    1995, we're only going to share things if they're positive.

3    They already know before the study is done and completed what

4    they're going to be telling people and what they're not going

5    to be telling people.

6             Of course, at this time that they're doing all this,

7    what do they do?  What do they acknowledge?  "In addition, due

8    to the lack of scientific rationale, since Neurontin has a

9    different mechanism of action than mood-stabilizing

10   antiepileptics, it is recommended to implement only an

11   exploratory study in outpatients with bipolar disorders."  They

12   knew at this time that they were starting these efforts that

13   there wasn't a scientific rationale.

14            And they also acknowledge that what they were going to

15   try and do is mirror the activities of another drug company.

16   "This strategy will mirror Abbott's," between certain years,

17   "when only data from the first pivotal study was available.

18   With these first results, Abbott was able to generate a

19   tremendous interest in the psychiatric community and

20   consequently the use indicated earlier."

21            Now, let me just unpeel one layer of this.  What

22   you're talking about then is very difficult-to-treat

23   conditions, bipolar, other mood disorders, frustrated

24   psychiatric community trying to find the right medications, not

25   really knowing because of the subjective nature of the disease

1   whether something is going to be working or not, right, and

2   exploiting that by just putting some information out there and

3   knowing that people desperately are going to basically pick it

4   up.

5           Their early strategies are very interesting because

6   there's been a point that the defendants have tried to make in

7   this trial.  The defendants have tried to argue that, wait a

8   second -- you even heard it during their closing -- Parke-Davis

9   might have done some nasty things, but they only hastened that

10  which was going to happen anyway.  That's their defense.

11  Nobody from Parke-Davis to say that that's the case, and the

12  reason why is because their own forecasts were that they were

13  going to have zero percent, zero percent, zero percent,

14  zero percent, zero percent, year after year after year of

15  market share unless they did something themselves, because it's

16  not the case that all antiepileptic drugs are the same.  They

17  are not, and they knew themselves that it wasn't going to be

18  picked up unless they did something affirmative.

19          There is no defense here at all that this was

20  something that was going to run its natural course, not when

21  you look at the evidence from the company as opposed to

22  arguments being made by Pfizer nowadays when it's trying to

23  escape a liability judgment.

24          And, again, this is for another area, again, only

25  releasing things if they're positive, okay.  I'm going to rush

1    through some of these things, okay.

2         They also did some early forecasts where they said,

3    "All right, what happens if we do something then?  Let's do a

4    publication strategy, and if we get positive results, then

5    we've got one kind of an answer.  On the other hand, if it

6    comes out with mixed results, we'll have another kind of

7    answer."  And then I was looking for the next page in the

8    document:  Well, okay, what happens if the answer comes up

9    negative?  And there was no next page because they don't plan

10   on having any negative results from their studies.

11        Some of the marketing starts -- some of these exhibits

12   I think you've seen before, you'll have, so I'm going to move

13   along because I do have to watch my time.

14        But they did talk about a drumbeat in the literature.

15   Mr. Kennedy said that he anticipated a drumbeat for me about

16   the fact that I was going to talk about how nobody from Pfizer

17   came, and he was absolutely right.  And where he got that word

18   was actually from his client fifteen years ago when they were

19   saying they were going to start a drumbeat, boom, boom, boom,

20   boom, in the literature, boom, boom, boom, boom, boom,

21   constantly to doctors time and time and time and time again.

22        Now we turn to 1996.  Barely a mention during closing

23   argument about David Franklin.  Why?  Because, frankly, the

24   testimony from that man was shocking.  I've got some quotes

25   here.  I'm not even going to go through with them.  You know

1    why?  Because I know when you go back to the jury room, you're

2    going to want to read them.  But just one thing:  When he

3    testified that Parke-Davis put a screen shot of the

4    Commissioner of the Food and Drug Administration up on a screen

5    for all of the national medical liaisons, and then have some

6    kind of comment made about how he was having marital troubles

7    or something with his mother, or whatever the comment was,

8    that's the kind of organization we're talking about here.

9            I'm sure some of my co-counsel are going to kill me

10   for blowing through all that, but I'm trying to watch my time,

11   and also the people who made the slides.

12           Ladies and gentlemen of the jury, what kind of an

13   organization hands those kinds of things out to people, you

14   recall when Mr. Franklin testified that way?  What kind of an

15   organization writes "Your Honor, I plead"?

16           "Think about what you're saying because we might end

17   up in Judge Saris' courtroom, and then we won't want to show

18   up."

19           They published this article in early 1996 that says

20   that you should be taking Neurontin as a mood stabilizer to

21   help you with your mood, which is the exact opposite result,

22   the exact opposite teaching, the exact opposite conclusion that

23   the FDA had taught from the same studies several years before.

24           Dr. Furberg testified that he was something to the

25   effect of astonished, mind-boggled.  I think his expression

1    actually was "It blows my mind" that they would do something

2    like this, "blows my mind" that you would publish an article

3    having a drug be given to people who are suffering a very

4    disabling psychiatric condition of bipolar and to put that out

5    in the medical literature, with the old "doom, doom, doom,

6    doom" drumbeat.

7           No mention of the FDA's opposite conclusion based upon

8    the same studies in this thing at all.

9           There is some deposition testimony, I believe, in the

10   record from a gentleman by the name of Knoop, and what does he

11   say about the various tactics at Parke-Davis all the time?

12   What's marketing?  Promotion, CMEs, providing grants and

13   publications, advisory boards.  Could they be considered as a

14   tactic?  Yes.

15          Now, the enterprise continues.  What does this

16   enterprise do?  This enterprise between Parke-Davis and CDM

17   conducts in April of 1996 something that they themselves --

18   this is June of 1996, but they refer to something earlier,

19   April of '96.  In April of '96 they conduct what they called

20   "war games."  They had a war games meeting to figure out and

21   strategize the promotion of this drug.  Look who's

22   participating:  people from Parke-Davis and the heads of Cline

23   Davis Mann, Morgan Cline, Clyde Davis, strategizing about what

24   they're going to do.  Their second quarter face-to-face

25   meeting, that's who they are, that's when it occurs.

1          We conducted war games meeting back in March or April,

2     I think it was.  We hired a dedicated account -- a Neurontin

3     account executive, this woman from CDM who's going to be

4     sitting in and participating with the people at Parke-Davis.

5     Conducted the war games meeting, and then they lay out their

6     strategies.  And one of the strategies, by the way, is that the

7     agency, meaning CDM, will develop and submit strategy document

8     and tactical plan in keeping with the Parke-Davis timetable.

9          Later on that month, maybe the next day, again CDM.

10    In June, more minutes, a strategy meeting; an interdisciplinary

11    team meets at Cline Davis to develop the 1997 objectives for

12    Neurontin.

13         Now, again, remember, this is all going on at the same

14    time, roughly, that David Franklin is out in the field doing

15    things that he says, you know, made him chill, what they were

16    doing.  This is what is happening in this organization in this

17    time period in 1996.  They're going to do a SWOT analysis.

18    They're going to look at their strengths.  They're going to get

19    an established group of high-dose thought leaders, meaning find

20    the doctors who like using high doses; we're going to use them

21    as our strategy.  We're going to try to use a positive

22    perception of Neurontin for other uses, and what are our

23    opportunities?  "Neuropathic pain, migraine use, positive

24    results of a monotherapy study."

25         And they also, you know, again pointed to Abbott

1    focusing on bipolar disorders and psychiatrists.

2         The STEPS, which is an acronym, it means high-dose

3    studies.  In other documents you see where they actually cross

4    out "high dose" and they write in "STEPS" as a way to sort of

5    conceal what they're actually doing.

6         What are their strategies?  A publication and

7    education efforts to support the "lifecycle" plan.

8         Now, what does the FDA do in July of 1996?  The FDA is

9    concerned that Parke-Davis may be promoting Neurontin for

10   off-label uses.  "Any use beyond FDA-approved indications, in

11   printed promotional materials, in detail or sales presentations

12   to physicians, and through the use of company-solicited

13   physician participation in a series of teleconferences.  FDA is

14   initiating an inquiry that will focus on these concerns.  These

15   promotions of Neurontin for off-label uses include, but are not

16   limited to, its use in chronic pain, bipolar disorders, and

17   other psychiatric conditions."

18        Your own FDA, not some gaggle of plaintiffs' lawyers

19   who are making this up after the fact, which is sort of the

20   tone of the closing argument by the defendants, but your FDA,

21   they do an assessment about going after migraine in the middle

22   of 1996.  Again, only if the results are positive is anybody

23   going to learn about them.

24        But what's the issue about going after a migraine

25   program, by the way?  Well, I would call this one an issue.

1    "There is no established preclinical rationale that would

2    support the use of Neurontin in migraine prophylaxis."  That's

3    sure one issue that gets in the way of promoting the drug for

4    that purpose.  "The strategy, again, would be to mirror --"

5    this is for migraine now -- "The strategy, again, would be to

6    mirror Abbott's strategy when Abbott discovered an open-label

7    trial for valproic acid that benefited 17 out of 18 patients

8    treated for migraine prophylaxis."  Their strategy in this

9    enterprise, which continues on and on and on having a common

10   purpose, having a structure.

11          Again, what was the Neurontin forecast for migraine?

12   Zero percent without their efforts but increasing over time if

13   they do something.  The numbers are actually low.  They were

14   far more successful than they expected that they would be.

15   But, again, this internal document, maintained

16   contemporaneously at the organization, shows that any argument

17   about how this is something that was going to happen anyway is

18   completely addressed.

19          More CDM.  We're moving on to 1996.  More tactical

20   plans.  And then you get the recommendations.  What are they

21   going to be looking at?  The tactics?  High-dose meetings,

22   third-party education programs, CMEs.  What's the strategy?

23   "Execute a publication and educational plan and clinical trials

24   program to support the product expansion in 'emerging uses.'"

25   Remember David Franklin testified.  What's emerging uses?

1    Off-label uses.  "But don't use that word.  We have to figure

2    out some other word to use in our documents because we have to

3    communicate about our illegal activities, so we'll call it

4    'emerging uses.'"

5            More of the same kind of thing.  "Let's not call it

6    high-dose.  Let's call it STEPS.  We can't get away with

7    calling it high-dose."

8            "Encourage higher titration," even though there's no

9    demonstrated use of it.

10            Look at case studies.

11            As you can see, let's go back here for one second.

12   This is Proworx.  If you see in your documents Proworx or the

13   typed-up word Proworx, Proworx is a subdivision of CDM.

14            More strategies, CMEs.  Let's do some publications,

15   ghost-written articles.  Do I have to say anything about ghost-

16   written articles?  Is ghost writing good?  Did they actually

17   put some witnesses up there trying to explain, "Well, no,

18   nowadays it's okay to have these medical companies hired to be

19   ghost writing for our physicians"?

20            And this document, after the fact, looking back over

21   1996.  Remember how I talked to you about how they were going

22   to go forward, they were hatching their plans going into 1996?

23   They had a great year in 1996, such a great year that CDM went

24   way over budget, and now we're trying to figure out how to deal

25   with the money after that year?  They called themselves, "Well,

Page 163

1    we have a nice partnership, so we're going to shave some of our

2    bill for you because we have such a great working

3    relationship."  I mean, if this isn't a RICO enterprise,

4    there's no such thing as a RICO enterprise; two separate

5    companies in such a great partnership with one another that

6    after they've gone through their off-label marketing and

7    they've spent a ton of money, now they're going to agree to

8    shave it and deal with it.

9         Here was the budget to actual on the document.  This

10   is Exhibit 50 at Page 2.  And what it turned out in that prior

11   year is, they only budget $300,000 for Neurontin, but CDM had

12   gone over double that.  So there was a deficit of $300,000, and

13   CDM was saying, "Well, we have a great partnership with you.

14   This is working out for both of you.  We'll shave some of our

15   bill."

16        Proworx, a subdivision of CDM, recommends a meeting of

17   the American Diabetes Association.

18        What's going on at Kaiser during this time, by the

19   way?  In Kaiser at this time, they prepare a monograph that's

20   looking at RSD.  And they look at the literature and they see

21   the Mellick articles.  They don't see the fact that Mellick is

22   on the dole.  They don't know that Parke-Davis has been working

23   with CDM over the past year and a half doing all this kind of

24   stuff.  They testified they wouldn't have expanded their

25   restrictions, which I agree with you is a completely odd way to

1    say increase the size of the formulary, you know, but they say

2    that they wouldn't have done it if they had known he was on the

3    dole.

4           Now let's go back.  More situation analysis.

5    Recommendations by CDM to Parke-Davis, CMEs.

6           Let me see if I can move along here a little bit.

7           In June of '97, "The advisors suggested that it would

8    take only a minimal amount of information appropriately

9    delivered to the psychiatric community to deliver a significant

10   and rapid increase in Neurontin usage for psychiatric

11   disorders."

12          How exploitive could that possibly be?  You know that

13   this is a dried-up sponge, and you're just going to basically

14   go out and you're going to exploit the situation.

15          Now, Proworx was going to run that symposium.

16   Remember I told you about the symposium.  And they went and

17   they tried to find some good people to do it.  So one of the

18   people they ran into it actually turns out wasn't all that much

19   in favor of Neurontin, they were surprised to find out, and now

20   they had to try to figure out a way to manage the situation.

21   So in order to counteract her potentially negative comments,

22   what do they do?  They plant people in the audience to ask her

23   certain kinds of questions in order to steer her conversation

24   more positive to Neurontin.  And then they say after this,

25   "We're really sorry, guys at Parke-Davis.  We blew it.  We

1   found an independent scientist to come and not say completely

2   positive things about Neurontin.  Don't worry.  It will never

3   happen again."

4         What I'm going to do, actually, I'm just going to say

5   exhibit numbers so you can write them down because I'm flipping

6   through Exhibit 38 right now, and a moment ago I flipped

7   through Exhibit 37.  I'm on Trial Exhibit 3.  More CME

8   marketing plans at Trial Exhibit 68.

9         Now Cline Davis Mann in the middle of 1997 is getting

10  ready for the next year's plans, 1998's Neurontin tactics plans

11  prepared by Cline Davis.  Again you'll see in this document,

12  "maximize opportunities in emerging uses, market through

13  publications, educational activities and clinical trials."

14  that was Exhibit 17.  Further on you'll see other comments in

15  Exhibit 17.

16        Now, in the middle of 1997, there have been some

17  efforts working with Dr. Gorson, who is doing his study on

18  pain.  And Dr. Gorson writes in Trial Exhibit 19, "Here is a

19  draft, Parke-Davis.  Have at it."  So they do.  And although

20  Dr. Gorson had written that gabapentin at a 900-milligram dose

21  is probably no more effective than a placebo, right, the

22  machine shop at Parke-Davis comes up and says:  No, gabapentin

23  may be effective for the treatment of painful neuropathy.

24        And then -- and this is occurring in 1997 -- in 2010,

25  which is right about over here, a lawyer for Pfizer repeatedly

5a1aa1cf-aed2-4697-ab4f-eeb4358763c1

1    stands up in front of you in this courtroom and tells you the

2    Gorson study showed that gabapentin may be effective.  How many

3    times did they do that here?

4           It is true that the Gorson study at some point gets

5    into -- I think it's, like, a letter to the editor or a letter

6    or some kind, right?  And that's another way to bury things, as

7    you heard, because good double-blind RCTs should be published

8    in a full article so that the scientific community can see it

9    and know that it's been peer reviewed.  Instead, Gorson gets

10   buried as a simple letter.

11          The dose studies, I don't need to go into this too

12   much.  The FDA has repeatedly indicated, and if you go to Trial

13   Exhibits 91 and 382 and the FDA label itself, the FDA label

14   says, "Evidence from controlled trials fails to provide

15   evidence that higher doses of Neurontin are more effective than

16   those recommended."  And Dr. Kessler also testified that the

17   "Drug label clearly states that additional benefits of using

18   doses greater than 1,800 milligrams per day were not

19   demonstrated."

20          Now, I think probably the best person for us to take

21   any interpretation of an FDA label is probably the man who ran

22   the FDA for almost a decade in the '90s while this was going

23   on.  Trial Exhibit 91, the FDA explicitly discards the argument

24   made by the defendants on dose.

25          Another 1998 strategic plan.

1          Now we're starting to get into some sort of real

2    numbers.  This is only for the coming year, the 1998 year.

3    We're starting to get into some real numbers in terms of what

4    they're going to spend, $11 million.

5          You're supposed to look at the structure, or part of

6    Judge Saris' comments to you about what an enterprise is or

7    isn't is also looking at the organization.  This is the

8    Extended Disease Team at Parke, Davis, and you see that they've

9    got some senior people from marketing there and some product

10   planning people, some medical affairs people.  And look over

11   here, CDM, they get a seat at the table.  They're at the table.

12         More plans, Trial Exhibit 44.

13         What happens at Kaiser in 1997, the end of 1997?  They

14   make the changes that they did, again, indicating that they did

15   not know that Mellick was on the dole.

16         This was a supplement, Trial Exhibit No. 40,

17   distributed to how many people?  56,000 doctors.  That's an

18   awful lot of doctors.  No mention of Gorson in that study.  And

19   Dr. Perry testified that this isn't even a real journal.  They

20   basically, like, made up a document that looked like it was in

21   a journal, right, and then made 56,000 copies of it, and then

22   gave it to their detailers, and their detailers go door to door

23   and start giving them to doctors, or they get handed out some

24   other way.

25         The enterprise continues in the end of 1997 with more

1    plans.  This is Exhibit 86.  More plans from 86.  Trial

2    Exhibit 85, more plans, maximizing opportunities in emerging

3    uses.  Now the marketing plan has bulged.  Things are going so

4    good that we're going to go up to $40 million a year.  The

5    non-epilepsy business, this segment has grown 658 percent.  I

6    guess Dr. Keeley was wrong, right?  This wasn't just happening

7    on its own?  And you see that now by the beginning of 1998,

8    things are starting to look up for them.

9            Bipolar studies, a brief break on the science, and let

10   me just check where I am here also.

11           Okay, bipolar studies.  Pande is negative, Frye is

12   negative, Guille is negative.  Vieta you've been told is

13   positive, but you weren't told everything about Vieta.  Now

14   with Pande, this is Pande in terms of when it was announced and

15   all the rest of that which I'll get to later.

16           Vieta, in the Vieta study there was one last bit of

17   information that you weren't given about this alleged one year

18   study.  The protocol called for eighty, forty of which would

19   be, of course, for Neurontin, okay.  They were able to enroll a

20   total of twenty-five people who were on Neurontin; but then,

21   because they decided to shift the intention-to-treat basis,

22   they took seven of them out.  And if you have to compare the

23   report as compared to the article, the defendants in their

24   closing just said, look at the final article, don't look at the

25   research reports anymore.  Those people get backed out, and

1    then you have thirteen people who completed within one year and

2    then seven people on Neurontin who completed in one year.

3         The point you didn't get, though, is that at least

4    three of the Neurontin patients dropped out before day 50 in

5    this alleged one-year study.  So what they also did is, they

6    said, well, we only had people around for a couple of months,

7    but now let's do what's called last observation carried

8    forward, meaning we'll say at the end of the last two months,

9    they're there as if they're there another ten months.  So a

10   study that gets pushed off to you, again, in 2010, as being a

11   study that was a one-year study for bipolar is not a one-year

12   study because at least 25 percent of that data was only in the

13   first couple of months.

14        And why is it, by the way, that this kind of

15   information can't be shared with Cochrane review?  Remember

16   when we went through this.  Why was it so easy for Pfizer to

17   give the underlying data to the experts that were going to give

18   you testimony in this courtroom, and I think at least two of

19   their witnesses said, "Yeah, I could get the underlying data

20   for the purposes here," why were those experts trusted and the

21   Cochrane review isn't trusted historically?

22        I'm going to go through some to make up some time here

23   if you just make notes, Trial Exhibit 100, and 212, and to 360,

24   and 83.

25        Backonja, we don't have to go into that in too much

1   detail.  I mean, you know, we know the mistake that they made,

2   and we know that it was intentionally made.  How do we know

3   that?  You force titrated a discrete population, knowing ahead

4   of time that it is very, very common that people who are

5   getting gabapentin are going to get sleepy and are going to get

6   drowsy.  You're maximizing the placebo effect as much as you

7   possibly can.  And then when you find that out, you only take

8   the sleepy people out and leave the dizzy people in, and then

9   you do the reverse.  As Dr. Jewell said, why don't you just put

10  everybody in the elevator in order to figure out whether or not

11  it fits fifteen people or not?  And they knew that this is what

12  was going on.

13          Also remember that even Dr. Backonja when he went into

14  the study expected what a clinically important result would be.

15  It would be a drop of about 55 to 60 percent on an 11-point

16  scale.  And even before you undo the hocus-pocus that was done

17  in the Backonja study and you leave it the way it was, you get

18  a clinically unimportant result.

19          But what happens with this study?  You know what

20  happened with the Backonja study?  We haven't had any testimony

21  about this.  There was what they called the "JAMA blitz."  This

22  article by Backonja was sent all over the United States.

23  Reports were on the Dateline, CBS Evening News, in the Times,

24  the Los Angeles Times, the medical tribunes, on radio tours.

25  There was a twenty-city publication tour over it.  There were

5a1aa1cf-aed2-4697-ab4f-eeb4358763c1

1    in-flight video news releases about this.  Did I hear the

2    defendants say in their closing argument that there wasn't the

3    use of the wires and the mail in this case for this enterprise?

4    Did I hear that?  How was that possible?

5         These are all Trial Exhibit 102, I believe.  Well,

6    that had an effect.  Now we're really starting to get some

7    mileage out of this.  The beginning of 1999, again, more plans

8    by CDM and Parke-Davis, Trial Exhibit 74.  On the pain studies,

9    I'll go through this very briefly.

10        First, I thought I had done enough during the

11   cross-examinations to point out that you should not be

12   smooshing, or not synthesizing, the DPN studies with the PHN

13   studies, but that's exactly again what you got in the closing

14   argument by the defendants today, okay?  Gorson was a negative

15   study, okay?  It just got spun positively and then buried in a

16   letter.

17        The Backonja study, we all know that was negative

18   because it wasn't clinically important and the way that they

19   did the study was biased.

20        The Reckless study we know is a negative study, and it

21   was not published.

22        The Tamez-Perez article, which you probably heard very

23   little about, you know why?  Because if you can find it in

24   there, it's one page.  It's not at all reliable.

25        Rowbotham's PHN.

1          Morello was treated by the company as a negative study

2     because they were trying to show -- the way that the study had

3     been designed was to show that gabapentin was better than

4     amitriptyline, and it didn't show it, so they had to figure out

5     a way to counteract that study by publishing Dallochio, which

6     is an open study.  It's not a double-blind study.  And

7     Dallochio is explicitly done and designed in a way to try to

8     rebut Morello.

9          Rice is PHN.

10         Serpell was a mixed study and had negative findings

11    for anything that wasn't PHN, the shingles.

12         The POPP study, again, not published.  It actually

13    took six to eight years to publish that one, I guess.  That

14    according to one of their witnesses would have been a long

15    enough time frame for it to be published.

16         And the Parsons study, again, the results were

17    insignificant.  It was less than a point on an 11-point scale.

18         Nociceptive pain, well, the defendants finally concede

19    this:  absolutely negative results throughout the entire time

20    period.

21         Draw a comparison, by the way.  You remember

22    Dr. Abramson's testimony; you know, they hyped Backonja and

23    looked at Reckless was a much more robust study, and it had

24    fixed dosing, right?  There was statistically no significant

25    difference.  No JAMA blitz for Reckless.

1        POPP was suppressed, Parsons.  And Bird, you know,

2   even at least the defendants and the plaintiffs' expert agreed

3   on one thing.  The defendants' expert said, "Now, the patient

4   really doesn't care if there is a one-point change on their

5   Likert scale," meaning one-point scale change isn't going to be

6   clinically important.  Perry agreed, our expert.

7        More marketing plans, Trial Exhibit 72, Trial

8   Exhibit 110 and 79.

9        In February of 1999, what's going on back at Kaiser?

10  Now the chiefs of psychiatry are requesting to expand the use.

11  Well, of course they are.  Now that we can understand the whole

12  context in which this is occurring, you can understand that

13  there had been this drumbeat in the literature for several

14  years orchestrated through the CDM/Parke-Davis enterprise, and

15  now you have a reaction at Kaiser by psychiatrists saying,

16  "You've got to change the formulary."

17        This one I thought was funny because they had to come

18  out with an article in a new publication, Volume 1, No. 1.

19  This is Trial Exhibit 80.

20        The migraine studies, again, uniformly negative.  The

21  only issue was the Mathew study which you heard from

22  Dr. Abramson and from Dr. Dickersin that they had messed around

23  with the intent-to-treat population, once again, in order to

24  come up with a different study population.

25        I also remind you, by the way, one of the witnesses

1   also the defendants didn't call was their migraine witness

2   expert Rapoport because it turns out that he was actually the

3   author of one of the negative studies.  You can look at Trial

4   Exhibits 396 and 2082 for that.

5           And then more analyses, Exhibit 213.

6           Once again, for migraine, Pfizer would have no

7   business of letting Cochrane have hold of the real scientific

8   data on it, letting people know.  Only when their expert is

9   going to come into court do they do that.

10          Trial Exhibit 245, now let's market migraine.

11          Trial Exhibit 99.

12          Once again, what's Kaiser doing?  Kaiser actually made

13  an observation that back in 1999 there had been a CME, and we

14  noticed that there was a very significant -- where Neurontin

15  was promoted, and we saw a huge increase in our utilization, a

16  direct reliance.  And in May of 1999, you heard Ms. Millares'

17  testimony about how there were phone calls made directly to

18  Parke-Davis to find out some information, and in response, she

19  was given inaccurate information.

20          The same thing with respect to the bipolar disorder

21  issue.  When they were looking at this, they were not told

22  about the Pande study at that time at all.  And then they

23  prepare a monograph on the basis of that information.

24          Now, you heard some testimony from the defendants and

25  witnesses in an effort to try to say, "Well, wait a second,

1    Pande was disclosed in the middle of 1999," and they played

2    very briefly an audio clip, and they very much selected what

3    that audio clip was, three very brief slides.  Do you know what

4    the title of that alleged disclosure about Neurontin not being

5    effective for bipolar was?  This:  "Combination treatment in

6    bipolar disorder."

7           Pande preached to that audience not about how he had

8    come up with negative results for gabapentin on bipolar but

9    about how not to do a study again.  He did point out all the

10   wonderful clinical evidence that existed out there from the

11   psychiatrists out there in the country, purportedly neutral,

12   coming to these, you know, case report analyses; and he made

13   sure everybody in the audience knew about that.  This, by the

14   way, occurred in Southern California, this presentation.

15          But then what was his final -- what was the teachings

16   that he got out of that study?  "Lessons learned:  Add-on

17   therapy design may not be the most appropriate for proof of

18   concept studies."  Where is "Gabapentin doesn't work for

19   bipolar" in this slide?  These are the lessons learned.  This

20   was the big, huge disclosure that the defendants have been

21   telling you for a month Pande made.

22          Under RICO, would you consider that having a tendency

23   to mislead?

24          More migraine marketing, Exhibit 248.  Exhibit 363.

25   Exhibit 97.  Exhibit 62 for psychiatrists being targeted.

1          Managed healthcares were also targeted, 62.

2          361, just more "Let's do it again."  The meetings that

3     they had the previous year were so good -- this is mine, by the

4     way.  This is not in the document.  I don't want to mislead you

5     right?  That's my comment, "Let's do it again!"  Let's spend

6     $2.5 million for thirty national meetings across the United

7     States.  That's RICO, by the way.  That's RICO.

8          Exhibit 64.  Audience impressions, 32 million,

9     29 million, 12 million, totaling 85 million, Exhibit 64.

10         Exhibit 63, more bipolar meetings.

11         Just give me one moment.

12         You've heard this story briefly before.  I'm going to

13    run through it really quickly.  This is the story about the

14    FDA, what kind of studies were being undertaken in 2000 and

15    then what happened in 2001, okay.  First, this was the Morello

16    thing.  When the negative Morello study came out, Parke-Davis

17    had a two-prong attack:  Attack the flaws in the study and

18    sponsor another study that's Dallochio, which ultimately

19    provided more favorable results, the Dallochio study, because

20    they did an open study instead, remember, to control the

21    information.

22         They suppressed Reckless.  I went into that before.

23    There's multiple documents that show that, by the way:  183,

24    185, 169, 163, 203, 109, 136, 183, and 185.

25         So the FDA said "no" to neuropathic pain in

1   Exhibit 200.  I went into that with you during a

2   cross-examination.  And then the experts for Pfizer got

3   together at the Crowne Plaza meeting in September of '01,

4   Exhibit 173, and decided that you could not have your broad

5   indication of neuropathic pain; the studies didn't prove it;

6   try to avoid Serpell, avoid POPP, et cetera, and with this guy

7   saying at the end "You're done."

8           I'm going to skip through 2000.

9           Corinne, can you jump to Slide 251, please.

10          There's a second enterprise.  Pfizer and MAC begin to

11  partnership in 2001.  It's a publication comprised of a

12  publication subcommittee, and MAC works with Pfizer to develop

13  key messages and to publish manuscripts containing these key

14  messages, and this goes on for a couple of years.  And you'll

15  find that in the Glanzman testimony.  That was that gentleman

16  that looked like he wanted to jump across the table and choke

17  Mr. Greene.

18          What were they going to do?  "Create a new standard of

19  care for neuropathic treatment."  What was the goal?  Making

20  Neurontin the standard of treatment for neuropathic pain,

21  educating primary care physicians, increasing the Neurontin

22  field force in primary care.  They had to align the messages.

23          If you normally have marketing and study data being

24  separate, right, if you have, like, independent science and

25  marketing, the problem is, you might get inconsistent key

5a1aa1cf-aed2-4697-ab4f-eeb4358763c1

1   messages.  So what do they do as a function of this RICO

2   enterprise?  You don't want that.  Instead, you want to do

3   this:  You want to have the marketing messages filter out after

4   the study data in order to get to your abstracts, and then

5   everything will all fit together the right way.  That's

6   intentionally trying to mislead.

7          Medical Action Communications, Trial Exhibit 136.

8   Again, this is two separate organizations.  You've got MAC here

9   and Pfizer here.  This is basically a RICO document, right?

10  "We're combining together.  We are separate entities, but we're

11  going to combine together, and we're going to do a repeated

12  series of activities in commerce" that ends up having a

13  tendency to mislead, if it's not outright lies.  Journal and

14  conference profiling, publications process or time lines, key

15  messages, bibliographies, Neurontin publications.

16         Also look at Trial Exhibit 135 and 210.  Again,

17  "Gabapentin is effective in a wide range of neurologic and

18  psychiatric conditions."

19         Another meeting, Trial Exhibit 169.  Again, Medical

20  Action Communications, another RICO report from the two.

21  Again, "MAC provided the team with the expanded key message

22  list," and you'll see on those documents what they show.

23         Trial Exhibit 255, look who's back?  Miroslav Backonja

24  to the rescue for this.  Why?  Because what they're going to

25  now do is through the MAC enterprise, Pfizer, not the long old

1    Parke-Davis, right, but Pfizer, the people who wouldn't want to

2    come in because these are their slides, Miroslav Backonja,

3    they're going to do a review article, not a real study but a

4    review article.  It's going to be first written at the

5    enterprise level and then published by Backonja.

6           What will the key messages be?  That "Gabapentin is an

7    anticonvulsant that has proven effective in the treatment of

8    neuropathic pain."

9           Now, mind you, at right around the same time their

10   experts are saying, "You can't say this," and yet here is the

11   marketing people through this enterprise saying, "Well, we're

12   going to say it anyway.  We can't get it from the FDA.  Tough

13   luck.  We'll just go and we'll tell people it anyway."

14          Pande comes back.  He says, guess what?  "You know

15   what?  I think we are whistling in the wind to think that we

16   can easily get an indication for bipolar disorder."

17          I agree, so why is the company marketing it?

18          What's going on at Kaiser?  For the first times,

19   Kaiser now is starting to realize, "Wait a second.  We think

20   that Neurontin is currently being used for many off-label

21   indications.  We should start looking at this."

22          Trial Exhibit 138, 164, 166, more MAC reports.

23          Kaiser Northern California, they start getting a

24   little fed up:  "Don't have your detailers around with us."

25   They start seeing what's going on.

1      Neurontin Global Planning Guide:  "A brand is much
2  more than a simple --"  A brand is a promises is the point I
3  wanted to get to.  That's Trial Exhibit 179.
4      Trial Exhibit 130, 122, again denying Cochrane data
5  for migraine.
6      251, more neuropathic plans.
7      When PHN gets approved, the FDA says, yeah, but make
8  sure you don't say anything that makes it look like --  "The
9  agency also wanted to avoid any indication of a broader
10  indication."
11      The review article comes out.  It's all wonderful for
12  Neurontin.  Of course, it's been ginned up through the MAC
13  enterprise.
14      They're going to filter things.  I've shown you that,
15  Trial Exhibit 139.
16      Trial Exhibit 260, "Expanding the resources to address
17  priorities."  I did not make that up.
18      I also didn't make that up.
19      Now I'm going to move to damages.  Corinne, please go
20  to Slide 340.
21      Professor Rosenthal testified that she tried to do an
22  analysis, and she did do an analysis, of the extent to which,
23  if you look at things on a conservative basis, using accepted
24  healthcare economics, what is the percentage of use for bipolar
25  and other mood disorders or migraine, et cetera, et cetera,

5a1aa1cf-aed2-4697-ab4f-eeb4358763c1

Page 181

1  that can be safely considered caused by the patterns of

2  racketeering activity that I just went through with you so very

3  quickly, and these were the results that she came up with.

4  And, of course, it matches, as you would expect it -- this is

5  not, as Dr. Keeley would say, some sort of, you know, natural

6  progression of a drug, right?  This was a planned activity.

7  And you can also see that early on there was no for bipolar --

8  and we went through all the other indications -- there was no

9  real use for bipolar until these plans got hatched and they hit

10  the marketplace.

11       You also see, by the way -- I think we went through

12  this -- that the people at Kaiser, they were diligent.  They

13  started implementing programs around the end of 2001 and early

14  2002.  They were able to drive down somewhat the use of

15  Neurontin.  They did what you'd expect.

16       By the way, they didn't do what apparently Pfizer has

17  been suggesting they should have done, right, which is just

18  clamp down the formulary and tell the psychiatrists and the

19  primary care physicians, "You're not allowed to use this drug."

20  We know that we don't let our health plans do that.  Here in

21  Massachusetts we don't want, you know, Blue Cross-Blue Shield

22  of Massachusetts or any of the health and welfare funds or

23  Harvard Pilgrim to be telling our doctors how to practice

24  medicine.  Once a drug gets on the formulary, we all know that

25  it's there and that we have to have other methods to be able to

1    control it.

2           There are two approaches you'll see in Trial

3    Exhibit 408-F and 408-I, two damage analyses that were provided

4    by Dr. Hartman.  In the first, on a noninterest basis --

5    Mr. Kennedy is right, Judge Saris will address the issue of

6    interest; you won't be addressing the issue of interest.  On a

7    noninterest basis, the damages to Kaiser are $90 million.

8    We've made some small adjustments with respect to the beginning

9    periods on these.  Again, in some discussions we've had with

10   Judge Saris, once we changed those beginning periods, the

11   damages are $90 million.  If you back out the generic damages

12   on the basis that there would have been some lesser expensive,

13   equally effective alternatives used, then the damages come down

14   to $82 million.  That will be in Trial Exhibit 408-I.

15          But there's also, by the way, another way that I think

16   you might be able to look at the damages in this case, and that

17   is this:  Rather than using the conservative approach that

18   Professor Rosenthal outlined saying that, "Well, some of it I

19   can definitely attribute to the defendants' fraud, and other

20   parts of it I can't," you can conclude in this case, and in

21   fact I suggest to you you ought to, that for each one of the

22   indications at issue here, there was no reliable scientific

23   evidence; and that while healthcare economics might not be able

24   to attribute everything to the defendant, that the science can

25   only be explained, the utilizations here can only be explained

1   by the fact of the defendants' fraud.

2        Kaiser spent $200 million on Neurontin from 1994 to

3   2004; and if you gross up Professor Rosenthal's and

4   Professor Hartman's damages, not for their conservative

5   approach, and without adding interest, the total amount of

6   money you would come to would be $122 million.

7        A couple of other small points that I want to raise

8   with you.  You've seen a couple of times the defendants put up

9   these DUAT things and this chart that shows the percentages in

10  it, Exhibits 747 and 692.  And what I sort of made an

11  observation, which is somewhat funny, is that they're pretty

12  much using the same information a year and a half later,

13  meaning they really don't have a basis to be able to

14  disaggregate.  They have their one piece of, as Dr. Carrejo

15  said, "garbage."

16       The other thing that the defendants tried to make an

17  argument about is that they say that there's no evidence of

18  marketing of nociceptive pain in this case.  It's just not

19  true.  If you go to the testimony of Mr. Franklin on March 12

20  at Page 63, he unequivocally says that "We were marketing for

21  everything, including nociceptive pain."  You may hear from

22  either Mr. Greene or from Ms. Nussbaum more information about

23  that topic in terms of what else Mr. Franklin testified and

24  about the tape recordings that you heard from.  But you should

25  also go to Trial Exhibits 105 where they talked about promoting

1    to doctors, even if they treat garden variety pain; or Trial

2    Exhibit 286, where they suggest that Neurontin "may be

3    effective in more than neuropathic pain," and in the Mellick

4    article where it suggests relief of other pain mechanisms.

5    Also look at Trial Exhibits 40 and 18.

6            There is no doubt, by the way, that if you take a step

7    back on the nociceptive pain and look at it this way:  The

8    defendants agree that Neurontin doesn't work for nociceptive

9    pain at all.  The defendants' experts agree that it doesn't

10   work for nociceptive pain at all.  There's nobody in the world

11   who has any interest at all in any doctor ever prescribing

12   Neurontin for nociceptive pain except who?  Kaiser.

13           So are we supposed to just assume that all these

14   doctors are idiots and that they don't get this information

15   from anywhere, they're just all making this up?  Or is there a

16   genuine source of where this information came to these doctors,

17   directly or indirectly, to get in the United States

18   eight million prescriptions of Neurontin written for nociceptive

19   pain from 1994 until 2004?  And why is it that the PMG

20   physicians would have written so many prescriptions that they

21   would have ended up costing Kaiser $17 million in nociceptive

22   prescriptions?  Did that just happen in thin air, or did that

23   happen because of the only entity in the United States

24   motivated them to do it?

25           All right, I'm done.  I got the hook.  Thank you.

Page 185

1          THE COURT:  Actually, let's stand up and stretch for a

2    minute.

3          (Pause.)

4          THE COURT:  Okay?  All right.

5    CLOSING ARGUMENT BY MS. NUSSBAUM:

6          MS. NUSSBAUM:  Thank you, your Honor.  Well, I agree

7    with Mr. Kennedy about one thing that he said this morning, and

8    that is, this is a scandal of enormous proportions.  In fact,

9    when I was thinking what other scandal have I heard about that

10   it all matches this one, the only thing that I could think of

11   was Bernie Madoff and his Ponzi scheme.  Both of those scandals

12   went on for fifteen years, both bilked innocent victims of

13   billions of dollars, both defendants were extremely nimble and

14   able to go with the flow and change their scheme anytime the

15   government was on their trail, they were always just one step

16   ahead, and both wound up pleading guilty and paying a fine, or,

17   in Mr. Madoff's case, going to jail rather than having a public

18   trial, a public airing of what they did.

19          And so what happened here was, when Pfizer ran their

20   line out, when they no longer cared about promoting this drug

21   because, as their own expert told you yesterday, the generic

22   had launched, it was no longer in their interest, their

23   economic interests to promote Neurontin -- they had launched

24   Lyrica, they were moving forward -- they got Warner-Lambert to

25   plead guilty.  They paid over $400 million, a slap on the hand

5a1aa1cf-aed2-4697-ab4f-eeb4358763c1

1  when compared to the billions of dollars in profit, swept

2  everything under the carpet, and moved along.  And so it's

3  taken this case and this Court, and you, this jury, to get this

4  information public, to get the discovery in this case, to get

5  the experts in this case, and to let the world know what

6  happened here.

7          So, first, we want to refocus where this case is

8  because Mr. Kennedy, the cross-examinations throughout the

9  month we were here, his summation today, is blaming the victim.

10  It's always "Kaiser did not do enough."  We didn't put a sign

11  on the freeway.  We didn't send an e-mail to the eight million

12  members saying, "You may be taking a sugar pill."

13          Kaiser, just like doctors and patients throughout the

14  United States, is one of the victims here.

15          Pfizer engineered a huge scheme here to defraud

16  Kaiser, to defraud others.  And as Mr. Sobol pointed out, and

17  as I'm sure you all saw, there was nobody here from Pfizer, no

18  one that denied that.  And their attempts to blame Kaiser,

19  their attempts to pick around the edges, their attempts to say

20  Kaiser didn't do enough, didn't do it quickly enough, doesn't

21  keep their records well enough, those attempts should not be

22  given any weight by you at all.

23          Slide 3.

24          So who is Kaiser?  Kaiser is a non-profit, charitable

25  health maintenance organization.  Their business is the

Page 187

1   healthcare of their members.  You heard from the people who

2   came here who flew across country, most of them twice because

3   of scheduling, that this is a nonprofit.  Any money goes back

4   into the company.  Any money goes for the benefit of their

5   members to buying more equipment, to upgrade their systems,

6   into the communities in which they live.  That's who Kaiser is.

7          Next, Corinne.

8          Now, what was Kaiser to Pfizer?  They were a mark.

9   They were a target.  From the very beginning, from the launch

10  of this drug, there is a document that makes clear Kaiser was

11  the number two target here.  Pfizer was targeting them with

12  their Neurontin plan, and that went all the way through to the

13  2004 marketing plan which Pfizer had specific for Kaiser.  And

14  what did that plan say?  "Continue to support field detailing

15  activities."  So contrary to what Mr. Kennedy told you, no

16  proof of detailing, in fact their own documents show this

17  ten-year period of time, from '94 to 2004, Kaiser was always in

18  the sights of Pfizer.  And if you look at Exhibits 90 and 250,

19  you can look through and see that in much more detail.

20         Next slide, please.

21         Now, we've heard throughout this trial that all Kaiser

22  was doing was trying to save money, that this is all about

23  cost.  And in fact nothing could be further from the truth.

24         Slide 8.

25         When you look at the monographs, you're going to see

5a1aa1cf-aed2-4697-ab4f-eeb4358763c1

1    that although this drug, gabapentin, was hundreds of times,

2    hundreds of times more expensive than other drugs already on

3    the formulary for bipolar, for pain, when the P&T Committee,

4    when the PMG physicians, when the Drug Information Services

5    people, when Dr. Millares believed that that was the best thing

6    for Kaiser members, that drug went on the formulary.

7    Restrictions were expanded.  They did the analysis.  They said,

8    "This is going to cost us millions or tens of millions of

9    dollars a year," and then they said, "But we don't care.  This

10   is the right thing for our members."

11          So I would ask you to look at every monograph, the

12   '97, the two in '99.  The analysis is done on each of these,

13   and you will see this is not at all about cost.

14          Slide 9.

15          Rather, if you look at the other side of the coin

16   here, let's look at Pfizer.  To Pfizer, this was all about

17   money.  To Pfizer, this was all about revenue.  When you

18   listened during Dr. Franklin's testimony to the audiotape of

19   John Ford, what did he say?  He said, "The first reason is it

20   really comes down to the key market issues.  If we are going to

21   market Neurontin effectively, we have to do it for monotherapy

22   for epilepsy, also for pain and bipolar and other psychiatric

23   uses."  And the second reason is profitability.  Neurontin is

24   as vital or probably more vital in terms of profitability for

25   the corporation.  For those two reasons, "I think we have to

5a1aa1cf-aed2-4697-ab4f-eeb4358763c1

1   elevate Neurontin to kind of number one liaison status."

2          So what this was about from the very beginning was

3   corporate profits, nothing more and nothing less.

4          Now, there has been a lot of discussion about

5   detailing and the lack of evidence with respect to Kaiser

6   doctors being detailed.  We've been told no Kaiser doctor has

7   come in here and said that they were detailed, and there are a

8   number of reasons for that.  First, clearly, was this 28-hour

9   rule that Mr. Kennedy referred to, and so we believed bringing

10  in senior people who could talk about policies was much more

11  important than individual doctors.

12         Second, we did learn from Dr. Franklin that there was

13  a nationwide marketing plan here, Exhibit 11.  And we learned

14  from Dr. Carrejo and others, Exhibit 12, that PMG doctors were

15  in fact detailed.  In fact, Dr. Carrejo testified that he

16  personally was detailed, that he personally knew that PMG

17  physicians were detailed, and that that detailing started in

18  1994 when the drug first went on the formulary and continued,

19  and we know from defendants' own marketing plan that that

20  detailing continued until 2004.

21         Now, why was Kaiser detailed?

22         Slide 13.

23         It's very simple.  Kaiser was detailed because

24  detailing works.  It works because it increases prescriptions.

25  We learned from the document of the Northwest that after just

1    one CME lunch in May of 1999 when Neurontin was promoted, the

2    data for new starts the very next month went up 62 percent,

3    62 percent.  So we're not just talking about experts, we're not

4    just talking about Professor Rosenthal's testimony that

5    detailing works well, but this was a very specific example:

6    one lunch at which Neurontin was promoted, a 62 percent

7    increase the following month.

8           Slide 14, please.

9           We also know that PMG physicians did attend CMEs, and

10   they attended CMEs that the experts discussed, Dr. Barkin, for

11   example, testifying about a CME on social phobia at which the

12   drug was fraudulently promoted.

13          Now, unfortunately, many of these events happened

14   many, many years ago, ten years ago, twelve years ago, fourteen

15   years ago, and so some of the documents were not available for

16   us in this litigation.  But this one happened to be available,

17   and if you look at the attendance sheets --

18          Slide 15, please, Corinne.

19          -- and you compare the attendees, you are going to see

20   that almost three dozen PMG physicians from various regions --

21   it's a little small, but I'll tell you it's Northern

22   California, Southern California, Colorado, the Midatlantic

23   region -- those three dozen Kaiser or PMG physicians attended

24   just that one CME.

25          Slide 16.

Page 191

1          In addition, Pfizer also knew that it was critical to

2     influence Kaiser's Drug Information Service, DIS.  They knew,

3     as you've now learned, that the Drug Information Service does

4     the research.  They do the monographs.  They're central.  They

5     provide that information to all of the regions and all of the

6     physicians.  And so Pfizer knew that it was very important to

7     target Drug Information Services as part of their scheme, which

8     was specifically directed to Kaiser.

9          No. 17.

10          And there were many, many misrepresentations between

11     Pfizer and Drug Information Service.  I almost laughed when I

12     heard that there was no proof here of wire fraud or mail fraud

13     because just looking at the testimony about the monographs, we

14     learned that Debbie Kubota for both monographs in 1999 called

15     Pfizer.  Those calls are validated by their own documents.  She

16     then received information back.  That information came back by

17     mail.  We have shown you other documents from the inquiry

18     service.  On each of those documents, there is a notation that

19     says the person from Drug Information Services, the phone

20     number that they called, who they spoke to at Pfizer, what

21     material was sent or faxed to them.  So the evidence here is

22     replete with very specific calls, very specific mail fraud and

23     wire fraud directly from these defendants to Kaiser.

24          Now, Kaiser's case is spelled out in Pfizer's own

25     marketing plan.

1    No. 20.

2         And in that marketing plan Pfizer laid out their

3    strategies for how to promote their drugs at Kaiser, and those

4    strategies included giving information to Drug Information

5    Service, contacting physicians, contacting people in pharmacy.

6    They provided many, many ways of communication.

7         21.

8         And it's clear when you look at that document, and I'd

9    ask you to look very closely -- this is 250 -- that Pfizer knew

10   that much of their strategy was improper, and twice in this

11   corporate document Pfizer warns their own salespeople that they

12   have to be careful about whistleblowers because whistleblowers

13   could be dangerous to the company and could object to their

14   fraud.

15        22.

16        There's no question that Kaiser was misled.  You have

17   the 1997 monograph, which although the title of it is RSD, it

18   includes pain, general pain; and, as testified to by

19   Dr. Millares, that included both nociceptive pain and

20   neuropathic pain.  And so there were misrepresentations to

21   Kaiser in 1997.

22        23.

23        There were then misrepresentations again in 1999 when

24   Kaiser was looking at Neurontin with respect to psychiatric

25   use, and Dr. Daniel, who came to testify and meet with you

5a1aa1cf-aed2-4697-ab4f-eeb4358763c1

1    because he was the chairman of the P&T Committee throughout the

2    entire period of time, so we felt he was an appropriate witness

3    to bring here, he testified, had they known the truth, had

4    information not been suppressed, had they not been misled, he

5    would have voted differently.  Had he known that the government

6    was investigating this company for off-label promotion, that

7    would have been material.

8         Slide 24.

9         And then again Pfizer misled Kaiser with respect to

10   pain.  They failed to disclose the Reckless study.  They lied

11   about the Backonja study.  We've gone through the specifics in

12   detail, but it is clear from the testimony here, from

13   Dr. Millares, from Dr. Daniel, that the P&T Committee not only

14   relied on this, but that the P&T Committee would have voted

15   very differently had they known the truth.

16        Now, contrary to what you've been told this morning by

17   Mr. Kennedy, Kaiser acted very, very quickly when they learned

18   the truth; and when they learned the truth was in 2002 and not

19   in 2000, which is what you were told today during the

20   summation.  In Mr. Kennedy's opening he showed you this

21   timeline, and if you look at the timeline, in his opening

22   statement he took the position that the Franklin suit was

23   unsealed, and a reasonable person would have been on notice in

24   2002.  And that was his demonstrative to you in the opening

25   statement, and in fact all of the testimony, all of the Kaiser

1   documents are totally consistent with that.  In 2002 they

2   learned of the off-label promotion through an article in the

3   New York Times, through an article in the Wall Street Journal.

4   You have testimony from three witnesses, very clear on that

5   point, and they immediately took action.  So the claim this

6   morning that it was 2000 I think is a claim meant to go around

7   some legal issues here and was not at all the position of the

8   defendants a month ago when we started this trial.

9            You've heard about DUAT, you've heard about DRUG,

10  you've heard about education.  You've heard that this is how

11  Kaiser tries to influence physicians; by telling them the

12  truth, by doing research, by showing people and telling people

13  what is the appropriate use of drugs.  And these efforts were

14  in fact successful.

15           26.

16           After a year, by mid-2004, after video conferences,

17  after teleconferences, after paycheck stuffers, after the

18  nortriptyline starter pack, after many sessions and many

19  efforts that Kaiser went to, utilization fell very, very

20  substantially, 34 percent.

21           27.

22           And so if you look at the graph, and this is Kaiser

23  only as opposed to what was going on in the general market,

24  Kaiser successfully bent the curve.  The truth began to emerge.

25  They started their reeducation efforts, and the Neurontin

1    prescriptions very substantially went down.

2         Now, Pfizer is ignoring all of those facts here.  And

3    why?  It's because they've decided to blame Kaiser because

4    there's really no other defense here.  And how do they do that?

5    They do that in a number of ways.  First, they cherry-pick a

6    couple of physicians and play pieces of their videotapes.  Now,

7    first of all, all of those physicians were deposed in 1997.

8    And in 1997 discovery in this case was just ongoing.  It was

9    not --

10        MR. SOBOL:  2007.

11        MS. NUSSBAUM:  I'm sorry, 2007, I'm sorry, discovery

12   in this case was ongoing.  There were no expert reports at that

13   time.  Dr. Dickersin's research and article had not been

14   published.  So, first, when you think about that testimony, I

15   want you to keep in mind where in the continuum of the

16   unpeeling of the onion here, in the letting the truth come out,

17   where were those depositions?  That's when they were.

18        And the two doctors that were repeatedly referred to

19   by Mr. Kennedy this morning, Dr. Maizels and Dr. McCarberg,

20   both were consultants for Pfizer.  Dr. McCarberg you'll

21   remember is the doctor who was also a, quote, "regular

22   Neurontin speaker."  He was a, quote, "pain mentor" for Pfizer

23   to physicians throughout the area, and he is the one that

24   secretly e-mailed with Pfizer to get them to help him change

25   the spin on an article, to change an article from negative to

1    positive with respect to Neurontin.  And those are

2    Exhibits 275, 278, and 279.  And so those are the PMG

3    physicians that Mr. Kennedy played snippets to you for to say

4    that PMG physicians liked this drug.

5            Pfizer also has made much of the website.  We heard

6    about the website at the opening and again today at the

7    summation.

8            Now, Dr. Carrejo told you Kaiser apologized for that

9    website.  They took responsibility for that website, and they

10   took it down.  But they did not create the content.  That was

11   created by third parties.  They simply licensed that material.

12   And, if anything, that website, that material from third

13   parties, who Health Media are vendors that are relied upon by

14   many others, that material is proof of the fraud here.  It's

15   proof of how far-reaching the misinformation, the suppression

16   of the medical literature was.

17           So we would ask that you not let the smokescreen put

18   up by Pfizer hide the truth -- 35 -- but that you put the focus

19   here back on Pfizer and that you send them a very strong

20   message.

21           Kaiser has brought this case for two reasons, as

22   Dr. Millares testified.  First, clearly, they've brought this

23   case for damages.  They've brought this case to recover their

24   payments for this drug.  But the second reason is to correct

25   the public record.  As she said, "We're here at this case,

Page 197

1   Kaiser Permanente is taking this to a public forum before a

2   jury of people so that the truth can get out and that people

3   hopefully will get, you know, a finding of something, and then,

4   you know, the entire United States can know what happened

5   because this is the only way that the information is going to

6   get out."

7            We would appreciate your help in doing that.

8            Thank you very much.

9            THE COURT:  Let's stand and stretch for a second.

10  We're in the final phase.  You're the last person, right?

11           MR. GREENE:  Yes.

12           (Pause.)

13  CLOSING ARGUMENT BY MR. GREENE:

14           MR. GREENE:  I was tempted to keep my own little tally

15  there when I heard Mr. Kennedy.  I heard my name mentioned so

16  much I thought I was going to -- might reach the same number as

17  Pfizer, but --

18           We've been together here for these past four weeks,

19  and I think you know by now that the way a drug company and the

20  way these defendants get approval for a New Drug Application,

21  they submit it to the FDA.  And they did that to get approval

22  for adjunctive therapy for seizures, and years later they get

23  approval for PHN in May of 2002.  And you know that we're not

24  seeking damages for Kaiser prescriptions for those two uses.

25  And you've learned and you've observed that when they submitted

1   for approval for those indications, they had to give all their

2   data.  They couldn't conceal any of the data.  They couldn't

3   misrepresent any of the data.  They couldn't tell half-truths

4   about the data.

5        Off-label promotion can lead to fraud when a drug

6   manufacturer conceals data, when they tell half-truths, when

7   they bury the data, when they suppress it, when they delay it.

8   That's what this case is about, and that's what happened in

9   this case.  And there's no better example than the Crowne Plaza

10  meeting, and you'll have that exhibit when you deliberate.  It

11  occurred in Ann Arbor, Michigan, in 2001, and they were

12  considering whether they'd go back to the FDA for neuropathic

13  pain.  And they brought their internal employees together.

14  You'll see them.  They're listed at the top of the memo.  And

15  they brought their team of experts, non-litigation experts, not

16  the people that they paraded into this courtroom to testify.

17  The memo goes on for pages.  They present all the data to the

18  non-litigation experts.  They pull out the negative studies

19  from the boxes in Kalamazoo, Michigan.  They don't hold

20  anything back.  And what do the experts tell them?  "You're

21  done."  The experts didn't mean the meeting was over.  Remember

22  the expert that said that from the stand, "Maybe they meant the

23  meeting was over."  They didn't mean the meeting was over.

24  They meant the negative data; with that negative data, the FDA

25  would not approve Neurontin for neuropathic pain.

1          So what did they do?  They pulled back the

2    application, and they went directly to the doctors, and they

3    promoted it off-label for neuropathic pain, for pain, and for

4    nociceptive pain.  And they didn't disclose Reckless, and they

5    didn't disclose POPP, and they didn't tell them the true effect

6    of the unblinding of Backonja.

7          And I want you to look at the Backonja article.

8    You'll have it.  Remember, that whole media blitz that

9    Mr. Sobol talked about, the 85 million impressions that

10   occurred around the country, that media blitz started in

11   December of 1998.  They had the Gorson negative trial in their

12   back pocket in their filing cabinet, and if you look at that

13   Backonja article, it never mentions the Reckless article.  It

14   never mentions it at all.  In fact, it says it's the first

15   study of Neurontin's use for DPN.  And they mail it across the

16   country.  Well, there's your fraud.  There's your mail and your

17   wire, your wire fraud.

18          And what else did they do?  They promote it, and they

19   use Serpell, "Spinning Serpell."  You'll see the document.

20   You'll see the MAC memo.  They name it "Spinning Serpell."  Why

21   is it spinning Serpell?  Because when you take out the PHN

22   patients -- it was a group of trials that they put together --

23   when you take out the PHN patients, there's no statistical

24   significance that shows Neurontin is effective for pain.

25          Now, I've been working on this Neurontin litigation

1    between the Franklin case and this case for almost fourteen

2    years.  You heard that the Franklin case was filed under seal

3    in August of 1996, and I have been with you in this courtroom

4    now for four weeks, going on five weeks.  And I've listened to

5    these witnesses, and I've seen these documents, and you'll have

6    an opportunity to see these documents when you deliberate.  I

7    ask the question:  Does Pfizer ever tell the truth?  It's clear

8    that they -- when you review the documents, it's clear that

9    they lied in the literature, to the doctors, to the medical

10   community, about the effectiveness of Neurontin for these four

11   indications.

12          In fact, there was uncontroverted testimony by Dr. Kay

13   Dickersin.  You didn't see an expert from the defendants that

14   could rival her qualifications or her expertise.  She's more

15   qualified than anyone in the world to talk about this subject.

16   She reviewed twenty-one, twenty-one of the research reports in

17   the clinical trials, and she read the papers the way these

18   defendants wrote up the results of those clinical trials.  And

19   what did she say?  She said she was astounded.

20          Now, she wouldn't accept any payment from Kaiser, and

21   she's been asked -- she told you she's been asked many times by

22   lawyers to testify, and she never has.  And why did she do it

23   in this case?  Well, she told you from the stand, she did it in

24   this case because the people should know the truth.

25          She spent her life's work trying to insure that the

1    biomedical literature accurately and truthfully represents the

2    actual clinical research.  She testified, and I quote, "What

3    was published was not what happened."  And what did Pfizer do?

4    They attacked her.  They attacked her conclusions.  But what

5    she found in this litigation was printed in the New England

6    Journal of Medicine in an article that appeared in November.

7            That strategy of attack, that tactic of attack that we

8    saw again and again with the witnesses, Mr. Kennedy said that

9    he and Mr. Hooper strategized -- he said this to you in his

10   closing statement -- they strategized about how this case would

11   be presented to you.  This is the biggest pharmaceutical

12   company in the world.  It was their strategy not to show up

13   here, and it was their tactic to attack all of the witnesses.

14           Now, Pfizer didn't just lie to the medical community.

15   It didn't just lie in the medical literature.  They misled you.

16   They lied to you when they came into this courtroom.  I want to

17   tick off a couple of these points.  Listen to this:  They tried

18   to tell you that the negative results of the Pande study were

19   not available until March of '99.  Remember Mr. Kennedy

20   highlighted the research report.  You'll have it as an exhibit.

21   He highlighted in yellow -- you had it on your screens --

22   March of '99.

23           What he didn't tell you and we had to bring out on

24   redirect with the witness, that Dr. Pande a few pages into the

25   research report had a copy of his July, '98 letter to the

1    investigators informing them that the study results were

2    negative for the bipolar study.

3         Just a few days ago they tried to tell you the Vieta

4    article was positive, and they did it again this morning in

5    their closing statement, when they know that Pfizer's own

6    research report -- and you'll have it, and I'd suggest you take

7    it out and you put it beside the article -- their own research

8    report says that the study is negative.

9         They tried to tell you in 1993 that the FDA didn't

10   find that Neurontin was associated with an increased risk of

11   depression, when the FDA's document that you'll have as an

12   exhibit in the jury room clearly states that Neurontin is

13   associated with a risk of depression.  They tried to tell you

14   that Neurontin is not associated with suicide, when they know

15   in May of 2008 the FDA found that the antiepileptic drugs and

16   Neurontin are associated with suicide.  They try and suggest

17   that panic disorder and social phobia are part of bipolar

18   disorder, when they know they're not.

19        They tried to tell you just recently through one of

20   their experts that Gorson is a positive study, when they know

21   it's negative.  They try and tell you that Gorson -- you'll

22   remember this -- they tried to tell you that Gorson was not a

23   letter to the editor -- we had to pull it up here on the

24   website -- when they know it is a letter to the editor.  And

25   that's because they refused to publish the Gorson manuscript in

Page 203

1    a medical journal, the full manuscript, and Dr. Gorson was left

2    with trying to get it published on his own as a letter to the

3    editor.

4            And they'll try, and they did try, to tell you that

5    Reckless was published in 2003.  The truth is, they buried the

6    results on the ninth page of a nonsystematic review of an

7    article that was ghost written by MAC, a review that concluded

8    not only that Neurontin was effective for neuropathic pain but

9    that it was effective at megadoses.  And that article, Cochrane

10   Collaborative couldn't find it, and even Pfizer's own experts

11   couldn't find it.

12           They misled you about POPP.  They tell you they

13   published it in 2008, but they neglect to tell you that it took

14   seven years, and it was published after the patent expired when

15   there was no longer any commercial ramification to a negative

16   study.

17           Again they tried to tell you Serpell was a positive

18   study for neuropathic pain, but they know there's no

19   statistical significance when you back out the PHN patients.

20           They tell you that the company that conducted the

21   negative migraine study in Europe in the late 1980s was not

22   Parke-Davis, when they know it was purchased by Parke-Davis.

23           Just in closing argument, they tell you that -- they

24   cite the label for the dose, that it's effective above

25   1,800 milligrams.  But they failed to tell you or won't remind

1   you that the FDA twice rejected their request at dosages above

2   1,800 milligrams because there was no greater efficacy

3   demonstrated.

4         They tell you it's not a sugar pill or snake oil, when

5   their own employee called it "the snake oil of the twentieth

6   century."  If they had showed up here, I would have asked them,

7   do they ever tell the truth?  But you may have had some

8   questions.

9         You know, judges have different practices, and we're

10  very fortunate to be in this courtroom where her Honor will

11  allow jurors to ask questions.  You had every opportunity to

12  ask my client questions, and you asked my client questions.  If

13  Pfizer showed up, you may have had some questions.  You may

14  have had questions for the New Product Committee who crafted

15  this fraudulent scheme.  You might have had questions for the

16  Neurontin Publication Subcommittee members who planted the

17  false messages in the literature.

18        You might have had questions for Mr. Allen Rubenstein

19  and Mr. James Parker, the two attorneys that trained the

20  medical liaisons in Ann Arbor.  You remember that testimony

21  from Dr. Franklin.  They ran the video camera, and they

22  instructed them about the law and the prohibition against

23  off-label promotion.  And then they turned the camera off, and

24  then they instructed them how to promote for off-label, how to

25  get around the FDA law, and they ridiculed Dr. Kessler and the

1    FDA when the camera was off.

2          If they showed up here with their employees, you could

3    have asked them about the Crowne Plaza meeting and the finding

4    that Neurontin was ineffective for neuropathic pain and

5    nociceptive pain.  You could have asked the defendants here, if

6    they showed up, about Cline Davis Mann and their relationship

7    with them and with MAC.  You could have asked the employees

8    about the FDA's findings in 1993 that Neurontin was associated

9    with an increased risk of depression.  You could have asked

10   them about the FDA's findings in May of 2008 that Neurontin was

11   associated with risk of suicide.

12         Now, who's been harmed by this fraudulent scheme?

13   Well, the medical community has.  Every doctor that's written a

14   prescription for Neurontin and every patient that's taken that

15   prescription as a result have been harmed.  Kaiser has been

16   harmed.  The 8.6 million American families that belonged to the

17   Kaiser plan have been harmed.

18         So you may ask, what can you do about it?  There's

19   only one thing that these defendants understand.  There's only

20   one thing that motivates them.  There's only one thing that

21   they respect, and that's money, and it was that way from the

22   beginning.  $500 million lifetime sales for Neurontin, that's

23   what they projected.  They weren't satisfied with it.  They

24   averaged over that ten-year period $500 million a quarter,

25   $10 billion.

1          You know, when Mr. Kennedy criticized Dr. Franklin for

2    not giving back some of his reward money to the physicians that

3    were duped, Mr. Kennedy had the right idea, but he had the

4    wrong person.  It's these defendants and Pfizer that should

5    give the money back, the money that they reaped from their

6    fraudulent scheme.

7          Now, you have the power to speak.  You have the power

8    to speak to these defendants.  You have the power to speak in

9    the only language that they understand.  Your verdict, your

10   verdict, which means "to speak the truth," will tell these

11   defendants that you don't want your doctors practicing

12   market-based medicine.  You want them to practice

13   evidence-based medicine.  Your verdict will tell Pfizer that

14   you want your doctors to have access to the complete and

15   accurate scientific record.  That's what they need, that's what

16   they rely on, that's what they trust when they write

17   prescriptions, when they write prescriptions for the

18   8.6 million Kaiser Health Plan members.

19         Your verdict will tell Pfizer, and tell them in the

20   language that they understand, that they don't get to decide

21   what your doctors see, or when they see it, or if they see it.

22   That's what your verdict has to tell these defendants.

23         You know, Pfizer wanted to create a drumbeat in the

24   literature, but it was a drumbeat that was based on lies and

25   misrepresentations.  Now it's your turn.  You can create a

1   drumbeat in the literature, and the sound of your drumbeat can

2   be:  "Tell the truth, tell the truth."

3          You know, there was a time when drug companies could

4   say whatever they wanted to promote their drug.  Some of them

5   did.  Some of them did.  You recall Dr. Kessler's testimony.

6   Back in 1962, that changed.  Congress enacted a law that

7   required drug companies to provide scientific proof that their

8   drugs were effective before they could market them.  So that if

9   they wanted to claim that their drugs were a cure-all, they had

10  to provide scientific proof to the FDA.

11         Dr. Kessler explained that from those laws, and the

12  work at the FDA, gave rise to this concept of evidence-based

13  medicine.  Going forward, doctors could base their

14  prescriptions on the evidence.  They could trust the evidence.

15  The evidence would be scientifically sound and truthful.

16         The premise of evidence-based medicine is that there

17  is a complete, accurate, and truthful scientific base to it.

18  Dr. Dickersin wrote in the New England Journal of Medicine, she

19  said that "Selective outcome reporting," cherry-picking the

20  results, "threatens the validity of the evidence."

21         The heart of evidence-based medicine is the evidence,

22  but the soul of evidence-based medicine, the soul is the

23  validity of that evidence.  And when the validity of the

24  evidence is corrupted by lies and misrepresentations, as was

25  done in this case, then physicians can no longer trust and rely

1    on the validity of the evidence.

2         If your verdict is a verdict you return for the

3    defendants in this case, it will embolden them to continue

4    market-based medicine.  And if market-based medicine continues,

5    physicians won't be able to trust and rely on the validity of

6    the evidence, and evidence-based medicine, as we've come to

7    know it today, will die.  But if you return a verdict for

8    Kaiser, your verdict will be for evidence-based medicine, and

9    the Kaiser Permanente physicians and the Kaiser Health Plan

10   members, when they're prescribed a drug and the physician tells

11   them, "This drug is effective," they can rely that there is

12   scientific evidence to establish that the drug is effective,

13   and the Kaiser Permanente physicians and those family plan

14   members will have you to thank.

15        Thank you.

16   CONTINUED CHARGE BY THE COURT:

17        THE COURT:  As I promised you, I would give you some

18   final instructions after the closing arguments.  So let me talk

19   to you for a minute about the mechanics of deliberation.  The

20   first thing you should do when you go back into that jury room

21   is to choose a foreperson.  The foreperson is not more equal

22   than the rest.  You are all equal in that jury room.  Rather,

23   the foreperson has certain obligations to the Court.  The first

24   is that the foreperson will fill in the official verdict form,

25   make sure that all of the appropriate questions are answered,

1   sign it and date it certifying that each of the answers is

2   unanimous.  I never want to hear a running tally:  "We're

3   running at four-four now, moving on to five-three."  I don't

4   want to know until it's unanimous.  So the first job will be to

5   fill in the verdict slip.

6           The second job will be to ask questions.  We'll have a

7   slip there.  I mean, some of the law is hard here, right?

8   We've spent two days with the lawyers trying to figure out how

9   to best say it to you in a clear way.  You may not understand

10  some of it.  If you don't understand the law, first, look at

11  your notes; second, listen to the tape recording or when the

12  transcript is available.  We may not get you a transcript until

13  tomorrow.  Read the transcript.  But if you have a question,

14  the foreperson should write out the legal question.  It will

15  take me a little while.  I'll gather the troops.  We'll try and

16  figure out the right legal answer.  I'll write you back a note

17  as to what the law is, or I'll bring you back in here.

18          As I mentioned to you before, if you want the

19  transcripts -- I don't want to swamp you with material, there

20  are lots of documents -- if you want the transcripts of either

21  the depositions that were played or of the testimony, just ask.

22  We will have that available for you.  But please don't ask me

23  what my memory of the law is.  I took notes; you took notes.  I

24  will not have any better memory as to what the testimony is.

25          The third thing that the foreperson does will be to

5a1aa1cf-aed2-4697-ab4f-eeb4358763c1

1   announce the verdict in court.  And when you've reached a

2   unanimous verdict, you'll hear Mr. Alba say, "So say you,

3   Mr. Foreperson?  So say you, all members of the jury?"  So

4   you'll all be standing at the time to ratify that the verdict

5   is all of yours on each one of those answers, no matter how

6   you've come out with it.

7           Now, at this point I need to talk to you about, how do

8   you go about the deliberative process, how do you deliberate?

9   I've never served on a jury, although judges can do so.

10  Justice Breyer once served on a jury.  Judges can, just I never

11  get picked.

12          (Laughter.)

13          THE COURT:  So I feel like I always have a little bit

14  of a nerve trying to advise you how to go about this process,

15  but it is really -- I mean, maybe I'm just a true believer --

16  the heart of our justice system here in the United States that

17  people chosen at random from the community, heart of the

18  community, no one knew you before -- you probably didn't know

19  each other before -- get chosen randomly, and you are the ones

20  who are going to render a verdict, which means in Latin "to

21  speak the truth."

22          So everyone here probably has some sense of what you

23  think, an instinct:  This one seemed credible, this one didn't

24  seem credible, this thing is hard to understand, but does it

25  matter?  You all have some sense.  Well, the beauty of this

1    thing is, you go into this jury room with your thoughts and

2    beliefs but with an openness and a willingness to talk to one

3    another and to say, does this make sense?  You have different

4    occupations, you come from different parts of the Commonwealth.

5    So you go in there with your sense of truth and justice, but

6    with an openness to being willing to talk to other people about

7    what they believe.

8         Deliberations don't mean, "I know what I'm going to do

9    and no one's going to change my mind."  That's not what we mean

10   by deliberations.  It means going in there with an open mind

11   and being willing to change your mind if there's a principled

12   basis for doing so.  But no one should change their mind

13   because, "God, am I sick of this place.  I've been here five

14   weeks, and I'm out of here."  Not a good reason.  "Uh, it's

15   Easter, it's Passover, there are finally crocuses outside."

16   Not a good reason.  You came in like a lion; you'll go out like

17   a lamb.  But the reality is, this case is too important.

18   You've seen how much these lawyers have poured into it.  It's

19   just too important.  So when you reach a verdict, it's got to

20   be something when you stand up to ratify at the end, you can

21   say in your heart, "This is my verdict."

22         Now, I don't want you to ask any questions.  There

23   will be a court security officer outside to protect the

24   confidentiality of your deliberations.  Mr. Alba will be in and

25   out just to find out basic things like when do you want to go

1   home, or do you need some Magic Markers and some easels, you

2   know, things to deliberate help you deliberate.  He'll be

3   giving you forms.  Lee, who's terrific is going to be getting

4   you, or Debra -- you've seen there have been two court

5   reporters trying to keep up with this -- will bring you a

6   transcript of the charge tomorrow.  I've already been told I

7   misspoke twice.  I said "plaintiff" when I should have said

8   "defendant" or some such thing.  That will be fixed in the

9   transcript.

10        Now, I want to go and talk to the lawyers here for a

11  minute because they may have certain things that they want me

12  to add to the charge that I already gave you.  You will be

13  getting these massive sets of documents.  I think they're

14  almost in good enough shape to hand to you right now, but you

15  may notice that there are -- I don't know if you can see it

16  from there -- there are green stickies and blue stickies.  I

17  allowed, because there are so many documents, each side -- the

18  green is the plaintiffs' and the blue is defendants', is that

19  how we went? -- to put a sticky on the section of the document

20  which they think it might be useful for you to read, but of

21  course you can read the entire document.  In fact, you can be

22  there for, you know, as long as you want.  We'll feed you.

23        (Laughter.)

24        THE COURT:  We're good on the food.  We'll feed you,

25  we'll treat you with TLC.  That room is yours, that sunny room,

1    as long as you want.  We will never try and rush you to leave.

2    But that is just one way, at least, of trying to go through it.

3    We're giving, I guess, an exhibit list so you'll get a sense of

4    all the exhibits.  If there's something you think you should

5    have received and didn't, ask.  Either we made a mistake, or it

6    was something called a "chalk."  Remember I said those aren't

7    really exhibits.  So if there are questions, the key is to

8    write them down and send them in to me because otherwise it's

9    like a game of telephone -- you know, someone says to someone

10   who says to someone -- I don't get it quite right.  Now, you

11   need to go home at 4:30, but I wanted to quick just see the

12   lawyers here and see if there was some additional thing that I

13   should say to you.  So stand, stretch, reach the ceiling, but

14   don't try and listen, okay?

15   SIDE-BAR CONFERENCE:

16          THE COURT:  Let me just first say, I don't want to go

17   through the list of everything right this second.  Do you have

18   anything that I need -- some things we'll just agree to

19   disagree on, as we went through the charge conference

20   yesterday, but are there any things that I need to address that

21   maybe we haven't addressed before and you think I need to say

22   something?  So I'll start with plaintiffs and go to defendants.

23          MR. SOBOL:  I think you should visit the question

24   about whether you should say something about the date that the

25   statute of limitations starts.

5a1aa1cf-aed2-4697-ab4f-eeb4358763c1

Page 214

1          MS. NUSSBAUM:  I understand was the one question.

2          MR. CHEFFO:  And I don't want to reargue it again, but

3     our position is, even if your Honor was to conclude the later

4     date with respect to Health, that with Hospitals, since they're

5     still in the case, they don't get a toll.  So that should be

6     from the initial, the earlier date.  So we think there's two

7     separate dates, if your Honor is going to give them the benefit

8     of it.

9          THE COURT:  This hasn't been fully briefed, and I'm

10    not about to do that right now.  But, in any event, do you want

11    me to just mention that someone just misspoke on the date?  And

12    so I'm not going to even explain anymore.  "Just please look at

13    my instructions as to what date."

14         Is there anything I need to say on the --

15         MS. ARMSTRONG:  Well, Mr. Sobol brought up an entire

16    new damages theory in which they get everything they've ever

17    paid for Neurontin, regardless of Professor Rosenthal's

18    analysis, in closing argument.

19         THE COURT:  Well, excuse me.  So will you listen to

20    this, please, because she's claiming -- do you have a new

21    theory of damages here?

22         MS. ARMSTRONG:  He said, "You can forget about

23    Rosenthal.  Just pay us everything we've ever paid for

24    Neurontin," and he put up a slide.

25         MR. SOBOL:  I think that's --

1           MS. ARMSTRONG:  $122 million.

2           MR. SOBOL:  What's that?

3           MS. ARMSTRONG:  He said, "Give us $122 million."

4           MR. SOBOL:  If the evidence supports them deciding.

5    If they decide they don't want to take her approach and do

6    something more conservative, they can do something else.

7           MR. CHEFFO:  The whole point of it --

8           THE COURT:  No, I think the whole point of it -- wait

9    a minute, let me just get this because maybe I wasn't focusing.

10   She testified that some stuff was not caused by the fraud,

11   okay, she testified.  So to give everything wouldn't be right.

12          MR. SOBOL:  I think that what she testified was that

13   her model shows that this is the amount that's caused by fraud.

14          THE COURT:  Right, that's what you've been relying on.

15          MR. SOBOL:  In addition to that, though -- well, it's

16   one thing in order to be able to get through certain issues,

17   but I think also the evidence in this case is that for each one

18   of the indications, there's no evidence of efficacy, and that

19   therefore --

20          THE COURT:  No, you can't switch this late date.  I'm

21   going to do two things on damages essentially.  I think you

22   can't count on the premiums.  Just that wasn't well developed

23   enough, but I also think that you can't start with a brand-new

24   damage theory in the closings when everything has been

25   something else.  When you go up last, it's just unfair turkey.

1   So is there anything else?

2          MS. ARMSTRONG:  Ms. Nussbaum told them that the

3   Franklin case was not unsealed until 2002, and that's just not

4   correct.

5          MS. NUSSBAUM:  It was your demonstrative.

6          MR. CHEFFO:  No, it's not true.  It's just not true.

7          MS. NUSSBAUM:  Yes, because we echoed something --

8          THE COURT:  I don't remember that it -- I thought you

9   said it was unsealed in 2000.

10          MS. ARMSTRONG:  She said 2002.

11          MR. CHEFFO:  She used the chart where we said in the

12   initial opening where we said 2002.  She put it up and said,

13   "Now they admitted it."  Well, we know that's just not

14   factually true.

15          THE COURT:  What's factually true?

16          MR. GREENE:  What's factually true is that in 2002,

17   that's when the first publicity really came out in the New York

18   Times.

19          THE COURT:  Is it in the record somewhere in the

20   evidence?

21          MS. NUSSBAUM:  It is in the evidence.

22          MR. GREENE:  The complaint, the Franklin complaint was

23   ordered unsealed in December, '99, but not unsealed until the

24   beginning of, I think, the first week of January, 2000.

25          THE COURT:  Unsealed and then publicity in --

1          MR. GREENE:  Was 2002.

2          MS. NUSSBAUM:  May, 2002.

3          MR. SOBOL:  And what Mr. Kennedy said about 2000 was

4     completely factually false because what he said was that when

5     the complaint was unsealed, anybody could get --

6          MS. NUSSBAUM:  We were on notice.

7          THE COURT:  Yes, but I'm not getting into all that

8     because that you can all argue.  Is there anything else?  No,

9     hold on.  I just need to tell them.  You can object.  I'll let

10    you go through a thousand things later on.

11         MS. ARMSTRONG:  I think they got very close to making

12    punitive damages arguments when they said send a message.

13    (Inaudible).  I'll just reinforce the damages has to be based

14    on the evidence.

15         THE COURT:  Thank you.

16         (End of side-bar conference.)

17         THE COURT:  All right, let me just get you out of

18    here.  Let me say this very briefly.  On the statute of

19    limitations point, I think there was a little bit of a

20    confusion about the exact date you judge the statute of

21    limitations on.  It's clearly set forth in the jury

22    instructions, so when and if you get to that question, please

23    look at my instructions clearly to look at the critical date

24    that you need to talk about.

25              The second thing on damages, remember, the purpose of

1    damages is to compensate the plaintiffs, and you've heard

2    testimony about what fair compensation is.  I've given you some

3    instructions on the plaintiffs' theory, so I want you to follow

4    those instructions on what the various ways of computing it is.

5    But there's nothing in the record about whether or not the

6    payment of premiums or increases might have compensated for

7    that, so that would at this point be speculative.

8            And last but not least, with respect to the issue of

9    the unsealing of the complaint, we had quite a debate here.

10   Actually, since I was the unsealer of the complaint, it was in

11   this courtroom, it happened -- and I think you'll have to

12   follow the evidence of it, and your memory controls and not

13   mine, but I think the way you heard it was, it was technically

14   unsealed, which simply means it goes on the public docket here,

15   at the tail end of 2000, and -- excuse me -- it was unsealed at

16   the end of 2000 by my order.  It went on the public docket in

17   early 2001 -- no, wait, I got it wrong again.  I granted the

18   motion to unseal at the end of '99.  It went on the public

19   docket in early 2000, and then you'll have to rely on your

20   memory of the evidence.  There was some publicity about it at

21   some point in the newspapers, and you'll have to rely on your

22   memory as to when that publicity happened on the issue of when

23   Kaiser should have reasonably known about the issue.  So that's

24   all relevant to the statute of limitations point.

25           So at this point I am going to send you back in there.

1    Remember there are, no such luck, no alternates.  You're all in

2    this together.  And I'm assuming, since you have to leave at

3    4:30, you're just going to start doing some organizational

4    things, and then I'm going to have Mr. Alba just have you leave

5    rather than bring you back in here.  But what my normal

6    practice will be, tomorrow morning at 9:00 I will bring you in

7    here first.  I'll count you, make sure you're all here.  I'll

8    ask if anyone has seen anything.

9          There has been some press, by the way, at these

10   closing arguments, so please don't, if anything looks as if it

11   might be about this case, don't read it.  I don't know when

12   that would be.  I'll ask you if you've seen anything in the

13   press.  I will remind you it's very important not to talk about

14   the case at home or with anyone.  I mean, it almost feels like,

15   I can't even imagine going home bursting with this information

16   and not being able to tell someone what this is about, but you

17   can't.  Just blame me.  After it's over, you can talk to

18   whomever you want as much as you want, but you can't talk to

19   anyone about it.

20         Tomorrow morning, once you're all here, I'll count

21   you.  I'll send you out.  You can deliberate as long as you

22   want.  As I said, that room is yours for as long as you want

23   it.  I think we're going to try and get you the documents --

24         THE CLERK:  Tomorrow morning.

25         THE COURT:  I don't know if it's feasible in the next

Page 220

1    twelve minutes, but if not, they will be there first thing

2    tomorrow morning.  Okay?  Thank you.  Have a lovely evening and

3    sleep well.

4            THE CLERK:  All rise for the jury.

5            (Jury excused.)

6            THE COURT:  Okay, let's now preserve the objections.

7    Do you need two minutes, Lee?

8            (Discussion off the record.)

9            THE COURT:  All right, so say it again.  Plaintiffs,

10   do you have any objections?

11           MS. NUSSBAUM:  No, we do not, your Honor.

12           MS. ARMSTRONG:  On Instruction No. 24, we would ask

13   that the language that we had asked for on sponsorship of

14   continuing medical education be included.  On Instruction

15   No. 28, we renew our objections to the date of May 14, 2000.

16   We think that the correct date should be February 1, 2001, for

17   the reasons that we've previously stated.  For the reasons

18   stated at the charge conference the other day, the language

19   beginning "If the plaintiffs diligently investigated its

20   claims," to the end of that paragraph we believe should be

21   deleted based upon Rakes, and we believe the last sentence

22   should be deleted based upon Rakes.

23           THE COURT:  Well, let me just ask you this.  I pretty

24   much copied Rakes.

25           MS. ARMSTRONG:  I think you added the fraudulent

Page 221

1   concealment part, your Honor, with all due respect.  I really

2   do.  I went back and I looked at Rakes.  I think you added some

3   language to it.

4           THE COURT:  I pretty much copied it, but, anyway,

5   let's go.

6           MS. ARMSTRONG:  On all of the California instructions,

7   we renew our objections as to out-of-state and our

8   choice-of-law arguments.  On the fraudulent conduct defined, we

9   renew our objection to the reference to a reasonable physician

10  who treats the health plan's members for the reasons stated at

11  the charge conference.  On Instruction No. 31, we renew our

12  objections to the last three paragraphs, which we believe are

13  relevant to consumers and not to disputes between sophisticated

14  parties.  On Instruction No. 32, we renew our objection to the

15  last two sentences regarding a duty to disclose, which we don't

16  believe applies in a non-privity transaction such as this.  And

17  we renew our objection to allowing nociceptive pain to go to

18  the jury, and in fact we re-urge all of our motions pursuant to

19  Rule 50 on the grounds of insufficiency of evidence.

20          THE COURT:  Thank you.  The one thing that she gets me

21  worried, she's so certain, and it's still time to fix it, so I

22  would ask you to look at Rakes and fraudulent concealment.  I

23  thought I copied it.  That was at least my intent.  She thinks

24  I didn't.  Would you all look at it because I don't want this

25  case to rise and fall on whether I say that correctly.

5a1aa1cf-aed2-4697-ab4f-eeb4358763c1

MS. NUSSBAUM: Why don't we confer with Ms. Armstrong and --

THE COURT: My intent is to copy Rakes. That's my intent. So if you all think I'm off, it is not a question that will make any difference at all, and I don't want the case retried on that ground because that's what I think it says, and I would urge you to come up with an agreed-upon instruction on it. It's just not worth the risk on it. My intent is to reflect Rakes.

MS. NUSSBAUM: We will do that, your Honor. We'll confer with her now, and should we get back to your chambers by first thing in the morning?

THE COURT: Yes. Just give me an agreed-upon recommendation, or if you think I've sort of miscast it. It was written more in the negative than in the positive, if you will.

MS. NUSSBAUM: Absolutely.

THE COURT: What I meant to convey is, no matter what, you have to do a reasonable investigation. So why don't you all look at it. And let me also say to everyone, are you content, plaintiffs, with the exhibits?

MR. SOBOL: With one exception, your Honor. I want to hand in the lists. One is in exhibit order, and one is a chron order. And then we're content, your Honor. The lists, the exhibit lists.

1          THE COURT:  One is in --

2          MR. SOBOL:  One is in the order of the exhibits,

3     meaning from 1 on.

4          THE COURT:  Yes.

5          MR. SOBOL:  And then the other reorders the exhibits

6     in their chronological order.

7          THE COURT:  Are you all happy with that?  Do you know

8     what he's talking about?  Have you shown that to them?

9          MR. SOBOL:  I was just handed it.  Did anybody give

10    that to the defendants?

11         MS. NUSSBAUM:  No, she did not.  So, you know, let me

12    make a suggestion.  We'll give it to them right now, and,

13    again, if there's an issue with that, we'll let the Court know,

14    and one way or another, should we get here earlier tomorrow,

15    and we'll let the Court know that?

16         THE COURT:  That's fine, but does anyone have a

17    problem with my bringing in the exhibits?  No one's got a

18    problem, right?

19         MR. FOX:  Well, we hadn't finished looking through the

20    tabs.

21         MS. ARMSTRONG:  I apologize, your Honor.  Our legal

22    assistants wanted to be able to watch the closing.  I think

23    they have a few binders left to tab.

24         THE COURT:  Well, you've got to do it now then because

25    first thing tomorrow morning this will be brought in.

5a1aa1cf-aed2-4697-ab4f-eeb4358763c1

Page 224

1        One additional thing I wanted to mention.  It was very

2   difficult or it would be very difficult for the First Circuit,

3   should this case ever get there, to follow your closing

4   arguments without seeing the slides.  And also at some point I

5   may need to make findings, and I really think it's essential

6   not to give to the jury but for both sides because you were

7   frequently flashing up documents.  I couldn't even get it down

8   fast enough, and it would be critical for me from both sides to

9   just give me what it is went up on the screen that the jury

10  saw.

11       MR. FOX:  Your Honor, we have the chalks that were

12  used with the witnesses that we gave to be marked as a court

13  exhibit, we gave to the defendants, so we need to add the

14  closing ones too.

15       THE COURT:  All right, so give that to Robert.  And I

16  will, by the way, if the jury asks for the transcripts, I will

17  be giving it to them, so I'm not going to bring you in to do

18  that.

19       So let me just ask you, how are we going to do this?

20  First thing tomorrow morning, I need you all, or at least one

21  person from each side, here when the jury is here.  I don't

22  need the whole crew, just one a side to say to me, "I am

23  content with the way the documents are going in," and then be

24  here when the jury is here.

25       And the next thing is, Ms. Armstrong just is so

Page 225

1    certain that she's got me nervous on this Rakes thing.  So on

2    the other things we agreed to disagree on, but she's so

3    certain, and that's my intent is to reflect that opinion.  We

4    might as well just take a second look at that, okay?  All

5    right.

6          MR. SOBOL:  An issue, your Honor?  So if I understand

7    it, we still have -- we're going to work on the lists to make

8    sure that the parties are content with them?

9          THE COURT:  Right.

10          MR. SOBOL:  We're going to work on the exhibits,

11    particularly the defendants flagging which needs to be done

12    tonight, make sure we're okay with that.  I was reminded, you

13    remember yesterday we talked about certain dates to cut back

14    the Hartman damage analysis as of certain dates, so I did those

15    modifications per your suggestions.

16          THE COURT:  Sure.

17          MR. SOBOL:  And when I showed those trial exhibits to

18    the jury today, they were actually ratcheted down from the

19    amounts that had gone in to them before, so we have to modify

20    those.

21          THE COURT:  Yes, I think we should just substitute the

22    new charts so that we don't have a mistake here.  Does anyone

23    have a problem with that, the ones that cut out damages?

24          MR. CHEFFO:  You know, I don't think we have a

25    problem.  I just would like to -- I haven't seen any of them.

1          THE COURT:  Sure, yes, since those are the theories of

2     damages that I instructed on --

3          MR. SOBOL:  So subject to that, everybody?  We're

4     okay.

5          MR. CHEFFO:  Less is more on this one, yes.

6          THE COURT:  Less is better?  Okay.  Thank you very

7     much.  Whatever happens here, this was a fabulous trial.  You

8     may not feel that way being away from your families for an

9     entire month, but it's the kind of thing that you become a

10    judge to sit on, so thank you very much.

11         MR. SOBOL:  Thank you, your Honor.

12         MS. ARMSTRONG:  Thank you, your Honor.

13         THE COURT:  Do you want Rakes while we're at it?

14         (Discussion off the record.)

15         (Adjourned, 4:26 p.m.)

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E.

2


3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS     ) ss.
   CITY OF BOSTON                )
5

6

7        We do hereby certify that the foregoing transcript,

8  Pages 1 through 226 inclusive, was recorded by us

9  stenographically at the time and place aforesaid in Civil

10 Action No. 04-10739-PBS, Kaiser Foundation Health Plan, et al,

11 v. Pfizer, Inc., et al, and thereafter by us reduced to

12 typewriting and is a true and accurate record of the

13 proceedings.

14      In witness whereof we have hereunto set our signatures

15 this 24th day of March, 2010.

16

17

                   /s/ LEE A. MARZILLI
18                 LEE A. MARZILLI
                   OFFICIAL FEDERAL COURT REPORTER
19
                   /s/ DEBRA M. JOYCE
20                 DEBRA M. JOYCE
                   OFFICIAL FEDERAL COURT REPORTER
21

22

23

24

25

5a1aa1cf-aed2-4697-ab4f-eeb4358763c1