```
                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF MASSACHUSETTS



IN RE:                               )
                                     ) No. 04-10981-PBS
NEURONTIN MARKETING, SALES PRACTICES, ) MDL No. 1629
AND PRODUCTS LIABILITY LITIGATION    )
-------------------------------------)
This document relates to:            )
KAISER FOUNDATION HEALTH PLAN, et al, )
                                     )
                 Plaintiffs          )
                                     )
         -V-                         )No. 04-10739-PBS
                                     )Pages 1 - 28
PFIZER, INC., et al,                 )
                                     )
                 Defendants          )




                  JURY TRIAL - DAY TWENTY-TWO
                  JURY DELIBERATIONS AND VERDICT

                BEFORE THE HONORABLE PATTI B. SARIS
                   UNITED STATES DISTRICT JUDGE




                       United States District Court
                       1 Courthouse Way, Courtroom 19
                       Boston, Massachusetts
                       March 25, 2010, 9:00 a.m.




                       LEE A. MARZILLI
                    OFFICIAL COURT REPORTER
                  United States District Court
                  1 Courthouse Way, Room 7200
                       Boston, MA  02210
                         (617)345-6787
```

1    A P P E A R A N C E S

2    FOR THE PLAINTIFFS:

3        THOMAS M. GREENE, ESQ. and ILYAS J. RONA, ESQ.,
     Greene, LLP, 33 Broad Street, 5th Floor, Boston,
4    Massachusetts, 02109.

5        THOMAS M. SOBOL, ESQ. and KRISTEN JOHNSON PARKER, ESQ.,
     Hagens Berman Sobol Shapiro, LLP, 55 Cambridge Parkway,
6    Suite 301, Cambridge, Massachusetts, 02142.

7        LINDA P. NUSSBAUM, ESQ., Kaplan Fox & Kilsheimer, LLP,
     850 Third Avenue, New York, New York, 10022.
8
         DON BARRETT, ESQ., Barrett Law Office,
9    404 Court Square North, P.O. Box 987, Lexington, Mississippi,
     39095.
10
         BARRY HIMMELSTEIN, ESQ., Lieff Cabraser Heimann &
11   Bernstein, Embarcadero Center West, 275 Battery Street,
     San Francisco, California, 94111-3339.
12

13   FOR THE DEFENDANTS:

14       KATHERINE ARMSTRONG, ESQ., MARK S. CHEFFO, ESQ., and
     THOMAS E. FOX, ESQ., Skadden Arps Slate Meagher & Flom, LLP,
15   Four Times Square, New York, New York, 10036.

16       RAOUL D. KENNEDY, ESQ., Skadden Arps Slate Meaher & Flom,
     LLP, Four Embarcadero Center, San Francisco, California, 94111.
17
         JAMES E. HOOPER, ESQ. and ANDREW H. MYERS, ESQ.,
18   Wheeler Trigg Kennedy, LLP, 1801 California Street, Suite 3600,
     Denver, Colorado, 80202.
19

20

21

22

23

24

25

1                          I N D E X

2                                                      PAGE

3        JURY QUESTION:                                  4

4        JURY QUESTION:                                 17

5        VERDICT:                                       23

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

e3bc83f4-db5a-4b69-b253-330106f8d0ae

1              P R O C E E D I N G S

2          (Jury enters the courtroom.)

3          THE COURT:  Good morning.  Did anyone speak about the

4   case or see anything in the press?  The jury has always

5   complied.

6          Good-bye.  I'll feed you.  Let us know when you want

7   me there.

8          I should add one thing.  We have a huge sentencing on

9   this afternoon, so that it may be if you came back with a

10  question, or even a verdict, it may take me a while to move one

11  back, another in.

12         A JUROR:  Is that why Channel 7 was outside last

13  night?

14         (Laughter.)

15         (Jury excused.)

16         (A recess was taken, 9:06 a.m.)

17         (Resumed, 10:17 a.m.)

18         THE COURT:  So good morning.  I report that our jury

19  was most cheerful this morning, right on time.  But now we got

20  this letter.  And first they asked for a calculator, which I'm

21  inclined to give them, but the bigger issue is, they want this

22  listing.  Did you read it?  "Could we obtain a listing

23  indicating:  each trial referenced, the study/control, dates if

24  available -- completion, reported, published."

25         Now, both of you have done that somewhat over the

 1    course of the trial, but neither of you had done that in your

 2    closings.  So the question, are there any chalks you want to

 3    give them, or should we just say, "You need to go through the

 4    evidence"?

 5                MR. HOOPER:  I think it's the latter, your Honor.

 6                MS. NUSSBAUM:  Although I think that we can assist

 7    them, your Honor, if we can get the exhibit sheets, the present

 8    sheets that the jury now has, and if we could agree on what the

 9    relevant documents are within those exhibits, I think that that

10    would give them guidance as to --

11                THE COURT:  Well, I had asked everyone to do that,

12    actually, is to put in one binder all the articles and studies,

13    and no one did that.  So maybe you agreed not to, so I let it

14    go.  I thought that we could -- do you want to do that for

15    them?

16                MR. SOBOL:  Yes, along with the list.

17                THE COURT:  No, I know they're on the list, but there

18    are thousands of documents on the list.  The question is, is

19    there a way of giving them a list of the actual studies and the

20    articles?

21                MR. SOBOL:  Beyond that, your Honor, is that there is

22    already a trial exhibit list.  All we need to do is reorganize

23    the list by the studies.

24                THE COURT:  Even put little asterisks of the studies.

25                MS. NUSSBAUM:  As to their last piece of information,

1   when things were reported and published, I think that much of

2   that is contested, and we could certainly tell them which

3   witness testified with respect to that.

4          THE COURT:  What I could say is, "You can have the

5   transcripts."

6          MR. FOX:  Your Honor, I would say that the articles

7   and the research reports I think basically are in like two

8   binders, so they're basically within the list pretty much

9   together.  We had a joint literature list, so they are together

10  in binders.

11         THE COURT:  Well, what I might want to do is just

12  bring in the transcripts.

13         MS. NUSSBAUM:  Well, or I think --

14         THE COURT:  We all agreed, you agreed they'd go in,

15  and it's in there.

16         Here's the problem, is that I sort of expected both

17  sides to do a little of that in their closing, and it's not the

18  approach that you all took.  So it's what I had talked about

19  early on when I encouraged them to draw a timeline.  And

20  actually you gave them a timeline in your openings, you did,

21  and at various points you had that big board.  Just none of

22  that went in and none of you did it.

23         Now, I can't dictate that you bring in the chalks

24  unless -- I forget, was yours in a form or was it just -- I

25  can't remember if yours was even -- defendants' was even in a

1    form you could bring in.  Remember you had that big --

2            MR. HOOPER:  Right, the big timeline over here.

3            THE COURT:  -- timeline?

4            MR. HOOPER:  Couldn't, couldn't.  Your Honor, of

5    course, a lot of what they're asking about, the information is

6    right on the front of the exhibit.  Like, published studies, it

7    will say "Received, accepted, published."

8            THE COURT:  I think what I'm just going to say, "I'm

9    sending in the transcripts, and other than that, you need to

10   rely on your collective memory at this point."

11           MS. NUSSBAUM:  I think it might be an aid, however,

12   for us to very quickly go through the exhibit lists.  I think

13   your Honor is correct.  There are thousands of exhibits, and we

14   could asterisk or in some way just, you know, put a star, this

15   is the exhibit and which indication this is.  And that would

16   certainly be helpful for them.  We could do this very quickly.

17           MR. SOBOL:  I mean, I do think there are numerous

18   exhibits.

19           THE COURT:  Well, I think I'm going to send in at this

20   point the transcripts and the deposition transcripts, which

21   hopefully have been substituted for the correct ones, and I'm

22   going to send in a calculator.  And I'm going to say that "You

23   need to rely on your collective memory, and we can't provide

24   this information, some of which is disputed."

25           MR. GREENE:  Well, that's just it, it is contested,

1   right, and I said that in the closing.  You know, Mr. Kennedy

2   held up the bipolar study and highlighted 3/99 as if it were

3   the completion date, and Pande's letter is right in there dated

4   July, '98.

5              THE COURT:  Right.  You had given them this beautiful

6   chart, in fact, that I relied on sometimes to follow things;

7   but that didn't come in at the end so, that's sometimes why

8   they may not remember that, your view of it, and your giant

9   chalk which was not even in a graphic form that anyone used

10  during the closings, so they don't remember.  I can't fault

11  them for that.  I kept going back to it myself.  I had my own

12  little timeline, but it's hard to remember.  I think we'll send

13  in the transcripts.

14             MR. SOBOL:  What would be the issue, your Honor, with

15  both sides providing the answers to the questions that the jury

16  has provided?  The jury has asked questions.  Both sides

17  provide an answer.

18             MR. HOOPER:  "The evidence is closed" is the answer.

19             THE COURT:  The evidence is closed.  You both made

20  certain strategic judgments on how to do your closings.

21  Neither of you actually focused on what I understood as a

22  fact-finder, because I'll have to do it too, when was it

23  published and when did the marketing materials happen?  You've

24  done that beautifully through Abramson's testimony, but it

25  wasn't reviewed.  And from your point of view, you contested

e3bc83f4-db5a-4b69-b253-330106f8d0ae

1    some of it, and you do that up there.  No one reviewed that.

2    So, you know, you took a different approach, but I can't do

3    anything with that.  So I think what I'm going to do is just

4    send in the transcripts and say hopefully this can be a

5    helpful --

6              MR. SOBOL:  And the calculator.

7              MS. NUSSBAUM:  And the calculator, your Honor.

8              THE COURT:  And the calculator.  Defendants' have

9    another solution here?

10             MR. KENNEDY:  No, your Honor.

11             MR. HOOPER:  No.

12             THE COURT:  All right, and I just can't see sending in

13   each side's version, and just putting a sticky on isn't going

14   to help, I think.  They're looking for a lot more than that.

15             MR. SOBOL:  That's why, if they just got a list of

16   what the medical literature is --

17             MR. HOOPER:  Well, it's in the two binders.  That's

18   deliberations, to go through, look at it.  Generally most of

19   the information where it's available is on the publication.

20             THE COURT:  Which two binders?  Do they have numbers?

21             MR. FOX:  Each of the articles are numbered exhibits.

22             THE COURT:  I know, but I had asked, in fairness to

23   me, I had asked that we put all the studies and the relevant

24   published literature in a binder, just so that they could have

25   it, or in a Redweld, and it didn't happen, and I'm reluctant to

1   reorganize it now for them.

2         MS. NUSSBAUM:  Without reorganizing, your Honor, they

3   were given yesterday lists of all the exhibits in chronological

4   order, and certainly we could very quickly asterisk those

5   lists.

6         THE COURT:  Why don't you go through the list and just

7   put an asterisk next to every study and article, and then I can

8   send that in.

9         THE CLERK:  Whose list?  They both provided

10  chronological lists.

11        THE COURT:  You both provided a chronological list,

12  separate lists?

13        MS. NUSSBAUM:  The final list that came yesterday to

14  you were composite lists, so the list that I believe the jury

15  has are composite lists of all the exhibits, and we would work

16  with that composite list.

17        THE COURT:  Is that not right?

18        THE CLERK:  Well, each side provided a chronological

19  list.  I assume they're identical, right, or are they not?

20        THE COURT:  We sent in wrong lists?

21        THE CLERK:  Well, they had to be revised.  Some things

22  were left off.

23        THE COURT:  You substituted the correct ones, right?

24        THE CLERK:  Yes.

25        THE COURT:  But is there just one list?

1          THE CLERK:  No.  They each provided their own.

2          THE COURT:  You each provided your own?  How could the

3     chronological lists be different?

4          THE CLERK:  Do you want me to get a copy of each of

5     them?  I think there's multiple ones back there.

6          THE COURT:  Is that true, there's separate

7     chronological lists?  You've all approved everything that's

8     gone in, so --

9          MR. SOBOL:  Well, at least advise the Court what the

10    jury got so she understands.

11         MS. NUSSBAUM:  Yes, my understanding is that the jury

12    has one chronological list of plaintiffs' exhibits and one

13    chronological list of defendants' exhibits.

14         THE COURT:  Is that true?  Why don't you say that

15    again so he can hear.

16         MS. NUSSBAUM:  My understanding is, the jury has a

17    list of chronological plaintiffs' exhibits and a list of

18    chronological defendants' exhibits.

19         MR. FOX:  Well, my understanding is that our exhibit

20    list was in chronological order.

21         THE COURT:  Of your exhibits or of all exhibits?

22         MR. FOX:  Well, the defendants' exhibit list was in

23    chronological order.  The plaintiffs' exhibit --

24         THE COURT:  No, no, excuse me.  Of just the

25    defendants' exhibits?

e3bc83f4-db5a-4b69-b253-330106f8d0ae

1            MR. FOX:  Yes.

2            THE COURT:  Yes, and yours is --

3            MR. FOX:  And then there was a combined list that went

4    in in order.  The plaintiffs' exhibit list was never in

5    chronological order, so they put in their exhibit list in

6    exhibit number order, and then they put in a chronological list

7    of their exhibits.

8            THE COURT:  Of just their exhibits?

9            MR. FOX:  Right, and then the combined list is in

10   chronological -- I think it's in number order.

11           MS. NUSSBAUM:  It's in exhibit order.

12           MR. FOX:  Exhibit number or --

13           THE COURT:  The one that the court prepares.

14           THE CLERK:  No, they didn't get that.

15           THE COURT:  What did they get?

16           THE CLERK:  The lists that each side prepared and had

17   sent in.

18           THE COURT:  I had not understood that there were so

19   many lists that went in, okay?  Let me just get this.  I am

20   looking at some of the lawyers, and my sense is that both sides

21   understood that, but not every lawyer on both sides understood

22   that, okay?  So you sent in a list of all plaintiffs' exhibits,

23   is that right?

24           MS. NUSSBAUM:  Yes, your Honor.

25           THE COURT:  And it was in chronological order?

1          MS. NUSSBAUM:  Yes, your Honor.

2          THE COURT:  You sent in a list of all defendants'

3    exhibits, is that right?

4          MR. FOX:  Yes.

5          THE COURT:  And it was in chronological order for

6    defendants, right?

7          MR. FOX:  Which is for us the same as exhibit number

8    order for us.

9          THE COURT:  All right, maybe.  What is the composite

10   list?

11         MR. FOX:  See, I thought they put in two lists.

12         MS. NUSSBAUM:  No.  We originally had two lists

13   complete.  You had not, right?  And so yesterday your office

14   merged the two lists for one composite list.  It was gone

15   through by both sides, and then your office brought it over

16   here late in the day, and that's the list that the jury has.

17         THE COURT:  And what is the composite list?

18         MS. NUSSBAUM:  My understanding is that it's in

19   exhibit order.

20         MR. FOX:  Exhibit order.  I don't know.  It was

21   e-mailed to Mr. Alba.

22         THE CLERK:  No.  That's the court's official list that

23   didn't go back with them.  That's the one that's on the docket.

24   But both sides provided two lists to go in to the jury.

25         THE COURT:  What are they?

1          THE CLERK:  My understanding is, they were

2     chronological lists and by exhibit number, and they both

3     provided each --

4          THE COURT:  I just think at this point it's too

5     confusing to take it out and bring it in again.  If you want to

6     prepare a list now, yet another list so that I'm not confused,

7     of every published article and clinical trial and what the

8     number is, and if you agreed on it, I would allow you to send

9     it in.  It's too at this point confusing to send it all back to

10    them.

11         MS. NUSSBAUM:  So, your Honor, if I understand what

12    you're going to do now is, give them the transcripts and the

13    calculator, and give us some time to very quickly and

14    efficiently put together that list jointly that we can work on

15    right now?

16         THE COURT:  Yes, if you can agree on it.  And at some

17    level, if you can't agree on it, it might not happen.  I have

18    an incredibly contentious sentencing at 2:00 o'clock today.  I

19    will not be available for questions to deal with documents,

20    whatever.  It's the guy who's the largest identity theft in the

21    world in history, a guy named Alberto Gonzalez.  We'll have

22    press here.  It's huge.

23         MR. SOBOL:  Who?  Who?

24         THE COURT:  Albert Gonzalez.

25         (Laughter.)

1        THE COURT:  You know, after you're AG, what can you

2   do?  You know, Albert Gonzalez.  So it's actually an

3   extraordinary case if you want to watch it, but I'm not going

4   to be able to pop in and out is the issue.  So if it can't be

5   done by 2:00, as a practical matter, if you agree on it, I'll

6   tend to send it in.  But it's worth the effort because they're

7   clearly searching for it, but in the meantime I'm just going to

8   say I'm sending you a computer and the transcripts.  That's

9   what I'm going to say.

10        MS. NUSSBAUM:  Thank you, your Honor.

11        MR. SOBOL:  Thank you.

12        (Discussion off the record.)

13        THE COURT:  You know, another way of doing this so you

14   don't have to agree, which is often a very difficult thing, is,

15   each side could take their list and just simply put an asterisk

16   next to the trials and the published reports that you've

17   introduced.  I mean, that way --

18        MR. GREENE:  Just so you know, your Honor, we have to

19   put an asterisk next to some additional documents that show the

20   true date of knowledge.  So you have the research report, you

21   have the --

22        MR. HOOPER:  Here we go.

23        THE COURT:  No, no.  Then it's argument.  No, we can't

24   do that.  I've said something really bare bones here.  I've

25   said, "I am sending you the transcripts and the calculator."

1    So I think that's all I'm saying right now.  I'm not promising

2    anything else.  If you can figure out a way -- I can't have you

3    argue to them.  I think what's happened is, you've all been so

4    diligent in putting in your own lists in your own ways, it may

5    actually be too much back there for them, rather than just a

6    plain old published exhibit list, which may have been a better

7    call.  So if you can come up with each side just simply saying

8    I think what are the key published studies and so-called

9    suppressed studies, in the sense of, not to label them that but

10   what are the key things they need to look at that I would allow

11   to be sent in, just with an asterisk next to it, literally.

12        MR. HOOPER:  Studies like research reports, your

13   Honor?  Or do we get into this, "Oh, by the way, here's the

14   footnote.  Go look at this document as well"?  That's a whole

15   other kettle of fish.

16        MS. NUSSBAUM:  We will meet and confer with the

17   defendants and report back to Mr. Alba within an hour as to

18   whether we can agree on a methodology or not.

19        THE COURT:  Right, but at the end of the day, they've

20   got so many lists that -- Mr. Alba pointed out to me that many

21   of them are in the same location but not all.  So I don't know

22   what to do.  My only suggestion is one big composite list where

23   everybody puts an asterisk next to the reports that you think

24   are relevant.  Anyway, here's this, and then we're bringing in

25   all the transcripts and all the deposition binders.  There's a

1    lot of information in there for them.

2         THE CLERK:  They should probably hang nearby in case

3    they come back with another question.

4         THE COURT:  Yes.  I wouldn't disappear.

5         THE CLERK:  It's possible maybe.

6         MS. NUSSBAUM:  Thank you.

7         THE COURT:  Thank you.  I'm going to also have Robert

8    tell them that I have this very important -- I mentioned it to

9    them this morning that I have a sentencing at 2:00, but to

10   remind them of that so that they don't get frustrated if

11   there's an hour in there where I'm not going to be taking

12   questions, so --

13         (Adjourned, 10:35 a.m.)

14         (Resumed, 1:33 p.m.)

15         THE COURT:  As I mentioned to you before, we're about

16   to have a very large sentencing, and the room is going to start

17   filling up.  So I thought I would read the questions, and then

18   we can talk about what the answers are.  There's so many of

19   you, I don't know that we could all do this around the

20   side bar, but at some point, if there are questions in the

21   middle of the sentencing when everyone is here and the

22   defendant, et cetera --

23         (Discussion off the record.)

24         THE COURT:  So the first question out of the box from

25   the jury, "If we find a RICO violation --"  Have you seen it?

1          MR. SOBOL:  Yes.

2          MR. CHEFFO:  Yes.

3          THE COURT:  Oh, you all have copies, all right.

4          So here's my issue as I was thinking about it:  No one

5     here in their arguments differentiated in a way of calculating

6     it, and it may well be simply because ultimately it's my call

7     what to do.  So I was thinking of just telling them to follow

8     whatever measure of damages was in the jury form, and

9     understanding that it's only advisory and I'm going to do my

10    own thing on the UCL anyway.

11         MR. KENNEDY:  The problem is, your Honor, we've never

12    told them that if they find a RICO violation and find

13    $50 million in damages, and then go and find a UCL violation

14    and also find $50 million, do they write down $50 million, or

15    do they write down $100 million?

16         THE COURT:  I'm a hundred percent with you.  So this

17    is the thing I've just drafted.  I completely agree with you.

18    And I think what we were all thinking, of course, that it's

19    only advisory to the UCL.  And they don't know that, and you

20    didn't give them an alternative restitution number, and in fact

21    never argued in any way that there would be a differentiation

22    in the measure of damages, probably because it doesn't really

23    matter.  What we really wanted was an advisory verdict on the

24    liability.

25         So what I was thinking of, sitting upstairs waiting

1   for you all, was, "I instruct you that you should award the

2   same measure of damages for the claims under RICO and the

3   California Unfair Competition law, if you find that both laws

4   apply.  Do not double the damages, even if you find that the

5   two laws are violated."

6          So do you want to look at this and just see?  I agree

7   with you, I haven't --

8          MR. SOBOL:  If I may, your Honor?

9          THE COURT:  Yes.

10          MR. SOBOL:  So I think that implicit in the question

11   is the possibility that the jury is concluding that there might

12   be a different scope of damages for its RICO determination as

13   opposed to it's UCL determination.

14          THE COURT:  Absolutely that's what they're thinking.

15          MR. SOBOL:  So then the question is, okay, another way

16   to look at the question is, "Are we permitted to award

17   different damages under RICO as opposed to the UCL?"

18          THE COURT:  In the abstract, the answer of course is

19   "yes," if you had put in disgorgement figures, but you didn't.

20   And so right now the only possible measure of damages that they

21   have is the measure of damages under the RICO statute.

22          MR. SOBOL:  No, that's actually -- I would beg to

23   differ with you, your Honor.

24          THE COURT:  Why?

25          MR. SOBOL:  Because what they might conclude, that the

1    violations in the UCL occurred in an earlier point in time than

2    RICO or vice versa, so that the damage estimates might not be

3    driven by the nature of the damage language itself but rather

4    the scope of the unlawfulness that they have found.

5             THE COURT:  Well, so then they'd have to come back and

6    ask us about that.

7             MR. SOBOL:  So what I would suggest --

8             THE COURT:  Can I just say, on the measure of

9    damage -- I would be guessing if that were the case.  They

10   asked about different measures of damages, and so they're

11   obviously asking because I didn't put in a mitigation section

12   under the UCL.  So they are quite correct.  We actually talked

13   about this with my law clerks about whether or not we needed to

14   do this.  I think Mr. Kennedy is correct, we should worry about

15   them doubling it, which we don't want them to do; but also we

16   should have the situation where -- well, I'm going to bring

17   them out and just sort of tell them this, and I'll just say,

18   "If we're not getting your question correctly, then ask us

19   another one."  I don't want to speculate what they're talking

20   about.  So why don't we bring the jury out right now.  Why

21   don't I tell them that and --

22            MR. SOBOL:  And tell them not to say anything in the

23   courtroom, though, about what their question is.

24            THE COURT:  Yes, fair enough, fair enough.

25            MR. SOBOL:  Right?  Because they might do that.

1        (Discussion off the record.)

2        MR. KENNEDY:  Your Honor, could you hold the jury for

3   just one second.  It seems to me we've gotten -- maybe we want

4   to reconsider the whole advisory jury issue.

5        THE COURT:  It's just too late right now.  I'm not

6   sure what I'm going to do with it anyway, certainly not with

7   the damages, if they come back on both.

8        MR. KENNEDY:  But the problem is, if they find

9   $20 million on RICO, $50 million on UCL, then we've got --

10        THE CLERK:  All rise for the jury.

11        (Jury enters the courtroom.)

12        THE COURT:  You asked me a series of questions.  We've

13   been debating them right here.  So let me just say, you've

14   asked, "If we find a RICO violation, do those damage

15   instructions trump the California damage language?"  Second,

16   "If we find a RICO violation and for California Unfair

17   Competition, which damage criteria is primary, and does

18   California Unfair Competition calculation allow for

19   mitigation?"

20        So this is my overall instruction:  I instruct you

21   that you should award the same measure of damages for the

22   claims under RICO as you do under the unfair competition law,

23   if you find that both laws apply.  So, in other words, if you

24   find that both apply, use the RICO measure of damages.  But if

25   you find two separate laws apply, you're not doubling those

Page 22

1    damages, so don't do that.

2         Now, if you find that only the California law

3    applies -- it's hard to guess, right? -- then you still would

4    apply the measure of damages that were given.  If there's some

5    other -- because that's all that essentially you've been

6    presented with.  If, however, you are asking something

7    completely different, like different years or different this,

8    that, or the other thing, and I'm not -- like, in other words,

9    you found some years for one statute and some years for

10   another, how do we go about thinking about that, would you ask

11   me another question?  Because we're just assuming at this point

12   you're talking about measure of damages.  So write me

13   another -- don't ask out loud.  As you've noticed, this

14   courtroom is filling up.  We have a sentencing, you've noticed,

15   right?  No, you cannot sit in the sentencing.

16        (Laughter.)

17        THE COURT:  So what we're going to do is, that's what

18   I'm going to tell you right now; and then if we're catching it

19   wrong, then what I want you to do is come back and ask me

20   another question.  They're going to hang around for another few

21   minutes, all right?

22        All right.  We stand in recess for the jury.

23        THE CLERK:  All rise for the jury.

24        (Jury excused.)

25        THE COURT:  That should take care of your problem, so

Page 23

1    we're just going to wait and we'll see what happens here.  And

2    it's quite clear, no one here focused on an alternative measure

3    for just the UCL, and just based on these questions, I don't

4    think that's what they're talking about here, so --

5              MR. KENNEDY:  I think they really are the same.  Even

6    though it's damages and restitution, in this case, it's the

7    overpayment, so I think they are.

8              THE COURT:  Well, let's put it this way:  I don't know

9    if they're the same, but that's all they'd be able to do

10   without speculating.  That's all they've got.

11             MR. SOBOL:  Thank you, your Honor.

12             THE COURT:  All right, thank you.

13             (Adjourned, 1:41 p.m.)

14             (Resumed, 4:02 p.m.)

15             THE COURT:  Bring the jury in.

16             THE CLERK:  Yes.

17             (Jury enters the courtroom.)

18             THE CLERK:  Members of the jury, please remain

19   standing.  Everybody else, you may be seated.

20             THE COURT:  You may inquire.

21             THE CLERK:  Mr. Foreperson, has the jury reached a

22   unanimous verdict?

23             THE FOREPERSON:  We have.

24             THE CLERK:  Would you please return your verdict to

25   the Court.

1          (Verdict form passed to the Court.)

2          THE COURT:  All right.

3          THE CLERK:  Mr. Foreperson, Part I, RICO claims,

4   Question 1:  Has Kaiser proven that Pfizer violated RICO with

5   respect to its promotion of Neurontin for (a) Bipolar?

6          THE FOREPERSON:  Yes.

7          THE CLERK:  (B) Migraine?

8          THE FOREPERSON:  Yes.

9          THE CLERK:  (C) Nociceptive pain?

10         THE FOREPERSON:  No.

11         THE CLERK:  (D) Neuropathic pain?

12         THE FOREPERSON:  Yes.

13         THE CLERK:  (E) Neurontin in dosages over

14  1,800 milligrams?

15         THE FOREPERSON:  Yes.

16         THE CLERK:  Question 2:  Did the violation of RICO

17  cause Kaiser injury with respect to (a) Bipolar?

18         THE FOREPERSON:  Yes.

19         THE CLERK:  (B) Migraine?

20         THE FOREPERSON:  Yes.

21         THE CLERK:  (C) Nociceptive pain?

22         THE FOREPERSON:  Not applicable.

23         THE CLERK:  (D) Neuropathic pain?

24         THE FOREPERSON:  Yes.

25         THE CLERK:  (E) Neurontin in dosages over

1   1,800 milligrams?

2          THE FOREPERSON:  Yes.

3          THE CLERK:  Question 3, was the claim barred by the

4   statute of limitations with respect to (a) bipolar?

5          THE FOREPERSON:  No.

6          THE CLERK:  (B) Migraine?

7          THE FOREPERSON:  No.

8          THE CLERK:  (C) Nociceptive pain?

9          THE FOREPERSON:  Not applicable.

10         THE CLERK:  (D) Neuropathic pain?

11         THE FOREPERSON:  No.

12         THE CLERK:  (E) Neurontin in dosages over

13  1,800 milligrams?

14         THE FOREPERSON:  No.

15         THE CLERK:  Part II, California Unfair Competition

16  Law, Question 4:  Did Kaiser prove that Pfizer engaged in

17  fraudulent business acts or practices with respect to

18  (a) Bipolar?

19         THE FOREPERSON:  Yes.

20         THE CLERK:  (B) Migraine?

21         THE FOREPERSON:  Yes.

22         THE CLERK:  (C) Nociceptive pain?

23         THE FOREPERSON:  No.

24         THE CLERK:  (D) Neuropathic pain?

25         THE FOREPERSON:  Yes.

1          THE CLERK:  (E) Neurontin in dosages over

2    1,800 milligrams?

3          THE FOREPERSON:  Yes.

4          THE CLERK:  Question 5:  Did those fraudulent business

5    acts or practices cause Kaiser damages with respect to

6    (a) Bipolar?

7          THE FOREPERSON:  Yes.

8          THE CLERK:  (B) Migraine?

9          THE FOREPERSON:  Yes.

10         THE CLERK:  (C) Nociceptive pain?

11         THE FOREPERSON:  Not applicable.

12         THE CLERK:  (D) Neuropathic pain?

13         THE FOREPERSON:  Yes.

14         THE CLERK:  (E) Neurontin in dosages over

15   1,800 milligrams?

16         THE FOREPERSON:  Yes.

17         THE CLERK:  Part III, damages, Question 6:  What

18   amount of damages (without interest) do you award for

19   (a) Bipolar?

20         THE FOREPERSON:  $14,962,055.

21         THE CLERK:  (B) Migraine?

22         THE FOREPERSON:  $893,462.

23         THE CLERK:  (C) Nociceptive pain?

24         THE FOREPERSON:  None.

25         THE CLERK:  (D) Neuropathic pain?

1          THE FOREPERSON:  $28,644,865.

2          THE CLERK:  (E) Neurontin in dosages over

3   1,800 milligrams?

4          THE FOREPERSON:  $2,862,710.

5          THE CLERK:  So say you, Mr. Foreperson, in your

6   verdict?  So say you, all members of the jury?

7          THE FOREPERSON:  Yes.

8          THE JURY:  Yes.

9          THE CLERK:  Thank you.

10         THE COURT:  You may be seated.  On behalf of everyone

11  here, I want to thank you for the time that you spent during

12  these deliberations.  You can now talk to anyone you want to

13  about this case.  You can talk about it at home.  You can talk

14  about it with the press, and you might get press inquiries.

15  You can talk about it with anyone other than the members of the

16  plaintiff or defense team.  For them to talk to you, they need

17  to do so under the auspices of the Court.

18         In discussing it with anyone you want, either friends,

19  family, the press, please respect the confidentiality of the

20  jury room.  Maybe people said things confidentially that they

21  didn't expect to be shared in a public setting.

22         Second, this is now your jury duty for Federal Court

23  for three years, so we don't get you again.

24         And last, but not least, what I wanted to mention to

25  you is, I make it a practice to come back to thank you and to

e3bc83f4-db5a-4b69-b253-330106f8d0ae

1    answer any questions that you have about the system or about

2    the case in general.  You have certainly done your due

3    diligence in staying here.  If you want to split, I sure

4    understand it, but I will come back in a few minutes and talk

5    to you.  Thank you.

6              THE CLERK:  All rise for the jury.

7              (Jury excused.)

8              THE COURT:  Thank you.  We stand in recess.

9              THE CLERK:  Court is in recess.

10             (Adjourned, 4:09 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

e3bc83f4-db5a-4b69-b253-330106f8d0ae

Page 29

1                    C E R T I F I C A T E

2

3

    UNITED STATES DISTRICT COURT )
4   DISTRICT OF MASSACHUSETTS    ) ss.
    CITY OF BOSTON               )

5

6

7          I, Lee A. Marzilli, Official Federal Court Reporter,

8   do hereby certify that the foregoing transcript, Pages 1

9   through 28 inclusive, was recorded by me stenographically at

10  the time and place aforesaid in Civil Action No. 04-10739-PBS,

11  Kaiser Foundation Health Plan, Inc., et al V. Pfizer, Inc., et

12  al, and thereafter by me reduced to typewriting and is a true

13  and accurate record of the proceedings.

14      In witness whereof I have hereunto set my hand this 25th

15  day of March, 2010.

16

17

18

19

20          /s/ Lee A. Marzilli

            _____
21          LEE A. MARZILLI, CRR
            OFFICIAL FEDERAL COURT REPORTER
22

23

24

25