# EXHIBIT E

1               IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MASSACHUSETTS

2

3

4   IN RE:                          )
                               ) CA No. 04-10981-PBS

5   NEURONTIN MARKETING, SALES PRACTICES,) Pages 1 - 124
  AND PRODUCTS LIABILITY LITIGATION   )

6

7

8

9                FINAL PRETRIAL CONFERENCE - DAY TWO
                         AND

10                   DAUBERT HEARING

11            BEFORE THE HONORABLE PATTI B. SARIS
              UNITED STATES DISTRICT JUDGE

12

13

14

15
                           United States District Court

16                        1 Courthouse Way, Courtroom 19
                       Boston, Massachusetts

17                        July 21, 2009, 9:15 a.m.

18

19

20

21

22

23                     LEE A. MARZILLI
               OFFICIAL COURT REPORTER
            United States District Court

24             1 Courthouse Way, Room 7200
              Boston, MA  02210

25                (617)345-6787

Page 2

1  A P P E A R A N C E S :
2
3  FOR THE PLAINTIFFS:
4      ANDREW G. FINKELSTEIN, ESQ., KENNETH B. FROMSON, ESQ.,
   and KEITH L. ALTMAN, ESQ., Finkelstein & Partners, LLP,
   1279 Route 300, P.O. Box 1111, Newburgh, New York, 12550.
5
6  FOR THE DEFENDANTS:
7      DAVID B. CHAFFIN, ESQ., White and Williams, LLP,
   100 Summer Street, Suite 2707, Boston, Massachusetts, 02110.
8
9      MARK S. CHEFFO, ESQ. and STEVE NAPOLITANO, ESQ.,
   Skadden, Arps, Slate, Meagher & Flom, LLP, Four Times
   Square, New York, New York, 10036.
10
11     RICHARD M. BARNES, ESQ. and WARREN HONG, ESQ.,
   Goodell DeVries, Leech & Dann, LLP, One South Street,
   20th Floor, Baltimore, Maryland, 21202.
12
   ALSO PRESENT: Chuck Vaughn, Trial Graphics.
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1                    I N D E X
2
3  WITNESS        DIRECT  CROSS  REDIRECT  RECROSS
4
   Sander Greenland
5
6      BY MR. ALTMAN:      42
       BY MR. BARNES:              72
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1                 P R O C E E D I N G S
2      THE CLERK:  In Re:  Neurontin Marketing, Sales
3  Practices, and Products Liability Litigation, Civil Action
4  No. 04-10981, will now be heard before this Court.  Will
5  counsel please identify themselves for the record.
6      MR. FINKELSTEIN:  Andrew Finkelstein, Finkelstein
7  & Partners, on behalf of Dr. Egilman.  Judge, Dr. Egilman
8  happens to be here today, so I just wanted to introduce you.
9  Yesterday you said you hadn't seen him.
10     MR. FROMSON:  Good morning, Judge.  Kenneth
11 Fromson, Finkelstein & Partners.
12     MR. ALTMAN:  Good morning, your Honor.  Keith
13 Altman, Finkelstein & Partners.
14     MR. CHEFFO:  Your Honor, Mark Cheffo, Skadden
15 Arps.
16     MR. NAPOLITANO:  Good morning, your Honor.  Steve
17 Napolitano from Skadden Arps.
18     MR. BARNES:  Rick Barnes from Goodell DeVries in
19 Baltimore.
20     MR. CHAFFIN:  Good morning, your Honor.  David
21 Chaffin for Pfizer.
22     THE COURT:  The two of you are the hard workers?
23     MR. HONG:  Warren Hong from Goodell DeVries in
24 Baltimore.
25     MR. VAUGHN:  Charles Vaughn from Trial Graphics.

Page 5

1      THE COURT:  Thank you.  So today we're going to
2  begin the hearing on the statistics, and I reject the
3  plaintiffs' proposed jury questionnaire as well as
4  defendants'.  I'm thinking of a question that looks
5  essentially like this:  "This case involves suicide.  Would
6  this topic cause you so much stress and discomfort that you
7  would be unable to listen to the evidence or be fair?"  I'm
8  going to basically give people an out.  If they say "yes,"
9  they don't sit on the jury.  So I'm not going to ask people
10 if they ever thought about suicide.  It's a little
11 intrusive.  And I'll ask people orally some of these other
12 questions, which is, for example, ever taken Neurontin, and
13 some of these other, whether anyone close to you ever tried
14 to commit suicide, et cetera?  So then you can see who they
15 are and use peremptories, if you choose to, but I'm not
16 going to ask people to expose their innermost thoughts and
17 medical conditions.
18     So let's just get on to the Daubert hearing.
19     MR. ALTMAN:  Good morning, your Honor.  Today we
20 are here in an attempt to strike the testimony of Dr. Robert
21 Gibbons under Daubert, Joyner, and progeny and Rule 702.  Is
22 your screen on, your Honor?
23     THE COURT:  Yes.
24     MR. ALTMAN:  And Rule 702.  Rule 702 governs the
25 testimony of experts, and in order for testimony to be

**Page 6**

1  admissible, the testimony must be based upon scientific
2  facts or data; the testimony is the product of reliable
3  principles and methods; and the witness has applied the
4  principles and methods reliably to the facts of this case.
5      The plaintiffs intend to show the Court that
6  Dr. Gibbons has not complied with Point 3, and out of the
7  Manual For Scientific Evidence, it talks about Joyner:
8  "Joyner implies that to find an expert's proffered
9  testimony --"
10      THE COURT:  Rather than just go through the
11  standards, since you've all raised Daubert motions for every
12  single expert in this case, just if you could just help me
13  through the statistics.  What are the big --
14      MR. ALTMAN:  It's one more slide.  This is the
15  only slide, your Honor.  I'm not going through the whole
16  thing.
17      The whole point here is that the conclusions have
18  to follow from the methodologies, and that's where we're
19  having a real problem.
20      THE COURT:  Right, but you both argue the opposite
21  with respect each other's expert, so --
22      MR. ALTMAN:  Okay.
23      THE COURT:  All right, yes, good.
24      MR. ALTMAN:  Gibbons did not apply the principles
25  and methodologies reliably to the data.  Dr. Gibbons has a

**Page 7**

1  litigation-driven conclusion that he was asked to arrive at.
2  And he conducted a study that's a square peg, and the
3  problem here is that he fit the square peg in a round hole.
4      THE COURT:  You know, I'm not a jury.  Let's --
5      MR. ALTMAN:  Okay.
6      THE COURT:  I just want to understand -- you know,
7  this isn't useful.  This is argument.  It's not an opening
8  statement.  I don't understand it.  We're at basics, we're
9  at really basic points.  Maybe it makes just the most sense
10  to do closings if you're going to do this, and let your
11  expert get up and tell me what he knows.  Is he a teacher as
12  well as a statistician?
13      MR. ALTMAN:  He is.
14      THE COURT:  Does he teach statistics?
15      MR. ALTMAN:  He does.
16      THE COURT:  Good.
17      MR. ALTMAN:  He does.  Then I'll just point out
18  where the speculation is.  This is now getting down to the
19  specifics.  Dr. Gibbons' opinions, in his studies, he
20  doesn't know whether any of the people in his studies
21  actually took Neurontin.  He doesn't know how long they took
22  Neurontin for.  He didn't consider what dosage these people
23  were on.  He doesn't know all the other drugs that these
24  people were taking.  He doesn't know what other treatments
25  these people had, like psychotherapy or counseling or social

**Page 8**

1  support.
2      THE COURT:  Can we back up for a minute.
3      MR. ALTMAN:  Sure.
4      THE COURT:  I've read a lot over this weekend, and
5  I just want to understand the basics, the basics.  So as I
6  understand it, there are three kinds -- you need to start me
7  with baby steps about what Gibbons said and what you
8  disagree with.
9      MR. ALTMAN:  Gibbons based --
10      THE COURT:  So he has three parts, as I understand
11  it.  One is, he attacks the FDA.  I'm going to allow him to
12  do that.  I don't want to spend any time on that; you know,
13  why the statistics on lamotrigine and Topiramate skew the
14  results.  That is impeachment.  I've allowed that already.
15  I've looked at it in Daubert.  I'm not going to go behind
16  that.
17      Then he has two other studies, as I understand it,
18  right?
19      MR. ALTMAN:  Correct.
20      THE COURT:  One is the gabapentin, and one is the
21  bipolar.
22      MR. ALTMAN:  Correct.
23      THE COURT:  So are you attacking both of those?
24      MR. ALTMAN:  Yes.
25      THE COURT:  See, I need to understand basics,

**Page 9**

1  okay.  I want to understand it.  And I understand that they
2  were supplemented in March and in May, and there is in
3  addition a paper to be published in the Journal of Archives.
4      MR. ALTMAN:  Would you like me to spend just two
5  minutes talking about the history of the supplemental
6  report?  Would that be helpful?
7      THE COURT:  As I understand it from yesterday, the
8  only difference between the November and the March are two
9  paragraphs on sensitivity analysis.  Is that wrong?
10      MR. ALTMAN:  That is not correct.
11      THE COURT:  All right, see, I just want to start
12  with baby steps.  So what else other than the sensitivity
13  studies showed up in March?
14      MR. ALTMAN:  There were a number of errors that
15  were made in Dr. Gibbons' report that was submitted in
16  November.  Through the deposition process, these errors were
17  discovered.  Dr. Gibbons made several corrections to his
18  expert report and to his paper to try to fix those errors.
19      THE COURT:  And were those fixed?
20      MR. ALTMAN:  They appear to be fixed to the best
21  that we can tell.  Part of the problem here is that --
22      THE COURT:  Excuse me.  And did you get a
23  deposition after the March report?
24      MR. ALTMAN:  Yes, we got a deposition after the
25  March report, but we did not get a deposition -- we talked

1  about this yesterday -- after we saw his final version of
2  his paper that had been accepted for publication.
3          THE COURT: And then we went through, and you
4  didn't ask for it?
5          MR. ALTMAN: We talked about it. We didn't ask
6  for it at the time. It only came out at the end of May.
7          The sensitivity analyses were not part of the
8  original report at all, so what we came to find out in the
9  deposition is that Dr. Gibbons did his original report and
10  his original paper, and then he did a bunch of sensitivity
11  analyses to see the effect of various issues on the results,
12  some of which are the issues that we're raising here. Now,
13  he did some sensitivity analyses on his own.
14          THE COURT: Are you attacking the sensitivity
15  analyses?
16          MR. ALTMAN: We're not necessarily attacking the
17  conduct of his study. What we're attacking is the
18  conclusions that he reaches from his study.
19          THE COURT: So this is useful. It's not so much
20  the added materials that you're challenging. You're just
21  saying that with respect to both the gabapentin and the
22  bipolar, that both of them aren't reliable because of some
23  of these factors you just pointed out.
24          MR. ALTMAN: Dr. Gibbons' conclusions are not
25  reliable. He basically makes two conclusions if you whittle

1  it all down: Number one, that his studies show that
2  Neurontin is protective of suicide, and, number two, that
3  the studies show that there's no increased risk of suicide.
4          THE COURT: From what?
5          MR. ALTMAN: From Neurontin, that Neurontin does
6  not increase the risk of suicide and that it may be
7  protective of suicide or is protective of suicide.
8          THE COURT: Well, there was another thing I
9  thought he said, which is he looked at all the AEDs too,
10  didn't he?
11          MR. ALTMAN: Well, that's in the bipolar study.
12  He says not only Neurontin may be protective and --
13          THE COURT: That's what I want to be very specific
14  on. On the bipolar --
15          MR. ALTMAN: The bipolar study, he looked at all
16  the AEDs that were looked at by the FDA, and then his expert
17  report, he looked just at gabapentin by itself across all
18  the indications.
19          THE COURT: So expert report is just gabapentin,
20  right?
21          MR. ALTMAN: Correct. He essentially --
22          THE COURT: This is why I want to go through baby
23  steps. I just want to understand because I didn't master it
24  the way you have. So that the expert report just talks
25  about gabapentin?

1          MR. ALTMAN: And he talks about the bipolar paper
2  as well in the expert report, which is how we found out
3  about it. So he talks about his study just on gabapentin,
4  and then at the end of his expert report, he says, "I've
5  also done a study on bipolar disorder and all the drugs in
6  the FDA alert, and essentially it confirms my findings here
7  in the gabapentin study."
8          THE COURT: But on the expert report, when he says
9  just gabapentin, is that with respect to just the bipolar
10  cohort?
11          MR. ALTMAN: No.
12          THE COURT: Or all populations?
13          MR. ALTMAN: He looked at all the different
14  indications for gabapentin, but one of the problems that
15  we'll talk about is that --
16          THE COURT: So that's what you're challenging,
17  just his expert report that says that gabapentin does what?
18          MR. ALTMAN: He says that gabapentin is protective
19  of suicide.
20          THE COURT: In all indications?
21          MR. ALTMAN: Not necessarily all indications. In
22  some indications.
23          THE COURT: In what indications?
24          MR. ALTMAN: I believe he says bipolar he says is
25  protective, and I'd have to check one or two of the others.

1          THE COURT: And then?
2          MR. ALTMAN: And then that he doesn't see any
3  evidence of increased risk in any indication, and that he
4  bolsters that with his peer-reviewed paper which
5  specifically just looked at bipolar, and he says that that
6  paper shows that Neurontin is protective of suicide.
7          THE COURT: It doesn't really. It just says
8  "possible" in the peer-reviewed paper.
9          MR. ALTMAN: Well, he says in his expert report --
10  and that's something we're going to talk about -- what he
11  says in his expert report is much stronger for him --
12          THE COURT: I understand. So one of my options,
13  just so you should understand, is just to allow him to
14  testify but in a scaled-back version of the paper because
15  that was what was accepted by the peer review. Would you
16  have an objection to have him just testify about what is in
17  the peer-reviewed paper?
18          MR. ALTMAN: Well, I believe that we still would
19  because we still think that there are issues, issues with
20  the paper itself, and that he can't even reach some of the
21  conclusions that are there. For example, there are many
22  limitations that he didn't adequately disclose in the paper
23  that substantially affects the results in the paper. For
24  example, the fact that he did not get all the drugs that
25  people were taking. Now, I'll explain it very simply. When

Page 14

1 he bought his data sets -- and the data sets he got for both
2 the gabapentin and the bipolar are basically the same data
3 sets. Just one was all bipolar people, and the other one
4 was everybody who took gabapentin. He purchased data saying
5 what drugs these people were prescribed. The problem is, he
6 didn't get all drugs that the people were prescribed. He
7 only got some of the drugs that people were prescribed.
8         THE COURT: Why? Is that because that's what he
9 asked for, or is that because that's what they provided?
10        MR. ALTMAN: That's all he asked for. I can't
11 find any fundamental reason why he couldn't have purchased
12 all the drugs, but he purchased --
13        THE COURT: So he goes to PHARMetrics.
14        MR. ALTMAN: And he says "Give me a data set," and
15 he said --
16        THE COURT: Everyone who took gabapentin?
17        MR. ALTMAN: He said "or bipolar." For
18 simplicity, let's just say gabapentin, but they apply to
19 both. "I want to know everybody who took gabapentin where
20 you have two years' worth of data, and what I want to know
21 for these people, I want some demographic information,"
22 which is their age, their sex --
23        (Discussion off the record.)
24        MR. ALTMAN: One of the data files he got is the
25 demographics, the age, the sex, et cetera, and the first

Page 15

1 data there, gabapentin (Inaudible). The second file that he
2 got are all the drugs or a subset of the drugs that those
3 people got prescriptions for, what date they got their
4 prescriptions.
5        THE COURT: So he did get all the drugs.
6        MR. ALTMAN: No, he didn't get all the drugs. He
7 only purchased anticonvulsants, antidepressants, and
8 atypical antipsychotics.
9        THE COURT: So what does that leave out?
10        MR. ALTMAN: Lots of other drugs that have
11 psychiatric adverse events that are protected. For example,
12 Xanax, Xanax is often used for people who are anxious that
13 can help reduce suicide, or it's often give to people who
14 have bipolar disorder. They get Xanax. Well, no, lithium
15 was purchased. Xanax. So that's one very strong example.
16        THE COURT: If he asked for all the
17 antidepressants, why wouldn't Xanax have come up?
18        MR. ALTMAN: Because Xanax isn't an
19 antidepressant. It's an anti-anxiolytic. He didn't get
20 Xanax. I mean, there's just tons of drugs that potentially
21 could have an impact that he didn't purchase. I can't
22 figure out why.
23        THE COURT: And he got bipolar? Only the bipolar
24 population, right?
25        MR. ALTMAN: Then he got a set of just the

Page 16

1 bipolar, but he got the exact same data.
2        Then what he got is the treatments -- and this is
3 very important -- not the day the people had a suicide
4 attempt, for example. It's the day they got treated for a
5 suicide attempt, which could be very different. It's one of
6 the problems with the data set. For example, there are
7 people in here that showed a suicide attempt treatment for
8 January 1 and January 2 and January 3 and January 4 and
9 January 5. So five consecutive days this person was treated
10 for a suicide attempt. Dr. Gibbons' main analysis counts
11 that as five separate suicide attempts for the same person.
12 And one has to ask themselves, did somebody go out and
13 attempt suicide on the 1st, get treated, go back out and try
14 it again on the 2nd and get treated, and go back again on
15 the 3rd and get treated, et cetera? I think you can
16 understand. And so he didn't even really know or evaluate
17 whether --
18        THE COURT: Do you have any one instance where he
19 did that?
20        MR. ALTMAN: No. He assumed there were five
21 separate suicide attempts. He never went back to the
22 records.
23        THE COURT: How do you know that?
24        MR. ALTMAN: I mean, that's through the testimony
25 he was asked. He said that, no, he counted them as five

Page 17

1 separate attempts. And so that can totally change the
2 numbers.
3        And, for example, in his bipolar paper, he claims
4 that there were twelve suicide attempts before people went
5 on gabapentin and twelve afterwards. And when he does his
6 math the way he does it, that shows that the risk is
7 one-sixth. The problem is, if you look at these people that
8 had attempts on multiple days and then you clean up some
9 other issues, there's only two before they went on
10 gabapentin, so it's actually one to one. So it totally --
11        THE COURT: Did Dr. Greenland actually go into the
12 weeds and show that there were instances where that
13 happened?
14        MR. ALTMAN: He talked about it, and he actually
15 discusses that in his expert report, the issues of multiple
16 attempts on --
17        THE COURT: I understand, but has he actually gone
18 in, has that actually happened?
19        MR. ALTMAN: I'm not sure I understand your
20 question. He cites to a specific exact patient where it
21 actually happens, and I could show --
22        THE COURT: All right, that's what I'm asking.
23        MR. ALTMAN: Oh, I'm sorry. And, yes, I could
24 show the Court --
25        THE COURT: I didn't memorize these reports, okay?

Page 18

1  I had about eight reports I read over the weekend, okay, so
2  that's why I'm doing this tutorial, to learn.  All right.
3          MR. ALTMAN:  So aside from limiting, you know, if
4  you were to just say, "Okay, his expert report is out, his
5  paper comes in," there are substantial limitations that may
6  make the paper completely invalid.  For example, there's
7  that issue there.  There's the fact that he doesn't know all
8  the drugs.  A very important one is that he doesn't know
9  whether these people had treatment other than pharmacologic
10 treatment.  People who have bipolar disorder often receive
11 other support and other treatment: psychotherapy, social
12 counseling, their family pays a lot more attention to them.
13         THE COURT:  So this doesn't provide for
14 psychotherapy?
15         MR. ALTMAN:  It does not consider it.
16         THE COURT:  Can't you assume that everybody who
17 tries to commit suicide gets some sort of counseling, or
18 most people?
19         MR. ALTMAN:  I don't know, but that's the problem.
20 But what he can't say is, is it the psychotherapy that
21 causes the protective effects, or is it the gabapentin?
22 Because he doesn't know who was on psychotherapy and who
23 wasn't.  Maybe everybody who had a protective effect was
24 because they were on psychotherapy, having nothing to do
25 with the drug.  And one of the problems in Dr. Gibbons'

Page 19

1  original study is that if you look at the people who had no
2  drug treatment at all within his data sets, they show the
3  same reductions in suicide attempts as the people who got
4  drugs.
5          Now, Dr. Gibbons does talk about that because he
6  says it could be the natural progression of the disease; you
7  know, people who have psychiatric --
8          THE COURT:  All right, so one of the issues is, he
9  doesn't look at other drugs.
10         MR. ALTMAN:  Right.
11         THE COURT:  One is, he doesn't look at the problem
12 of multiple treatments.  One is, he doesn't look at whether
13 there was psychotherapy provided, and what else?
14         MR. ALTMAN:  He doesn't know whether people
15 actually took the drug.
16         THE COURT:  I thought he did look at that in the
17 sensitivity analysis, that some took it for at least
18 30 days.
19         MR. ALTMAN:  No.  He knows that people got
20 prescriptions for drugs.
21         THE COURT:  Well --
22         MR. ALTMAN:  But, your Honor, you don't know --
23         THE COURT:  If you got a prescription, you can
24 draw a reasonable inference they took it.
25         MR. ALTMAN:  But if want to try to calculate

Page 20

1  exposure rates to try to say that if I look at how much time
2  people were on the drug and the suicide attempts on and off
3  the drug, you have to know whether they're on and off the
4  drug.
5          THE COURT:  So your point isn't -- I think, if you
6  get a prescription, you can reasonably infer that they took
7  it at least for the length of the prescription, but what I
8  understood the attack was, that you don't know if it was for
9  a full year.
10         MR. ALTMAN:  Well, that's the other issue.  When
11 he did his initial study, if somebody, for example, let's
12 say their index date is January 1, and the first time they
13 got a prescription for Neurontin was February 1 --
14         THE COURT:  Right.
15         MR. ALTMAN:  -- he considered that they were on
16 the drug for the next eleven months, regardless of how long
17 they got the prescription.
18         THE COURT:  So the data set doesn't provide how
19 long someone was on the drug?
20         MR. ALTMAN:  It does.  He chose not to consider
21 it.
22         THE COURT:  All right.
23         MR. ALTMAN:  And in Dr. Greenland's report, he
24 actually cites to the transcript testimony there, the
25 transcript testimony where he says, "I just didn't get

Page 21

1  around to it."  And that was, by the way, three months after
2  I had first brought it up in his deposition.  You know, you
3  would have thought -- he did all these other sensitivity
4  analyses, and he was doing all these other kinds of things,
5  he was aware of the issue -- one would have thought he might
6  have taken the time to have seen what the effect was.  He
7  didn't do that.
8          Some of the other things is that he only has
9  suicide attempts.  If somebody completed suicide, they're
10 likely not in the database because they probably didn't get
11 any treatment after the completed suicide.  So we don't know
12 what effect that has on the data.
13         We talked about he didn't consider whether they
14 were on the drug at the time of the suicide attempt.  He
15 overcounts the suicide attempts, five consecutive dates of
16 treatment.
17         And then here's another one that really affects
18 the bipolar study.  There are people who show a treatment
19 code for the first time they got treated for bipolar
20 disorder and a treatment code for a suicide attempt on the
21 very same day.  Dr. Gibbons counts that as happening after
22 the bipolar disorder.
23         Now, if you ask the question, did somebody get
24 diagnosed with bipolar and then go out that day after that
25 and try to commit suicide?  Or is it more likely that they

1 tried to commit suicide, and in getting treatment, they were
2 diagnosed with bipolar disorder?
3        THE COURT:  All right, so these are the kinds of
4 things your expert is going to talk about?
5        MR. ALTMAN:  He's going to talk about these
6 issues, that's correct.
7        And so the real problem here, your Honor, is that
8 Dr. Gibbons' conclusions just don't match up with the study
9 that he did.
10       THE COURT:  Well, why did the peer-reviewed paper
11 accept it?
12       MR. ALTMAN:  Well, because he gives different
13 conclusions in the peer-reviewed paper that he does than he
14 does in his expert report.  And, I mean, here's a great
15 example.  Here's one example of what he says in his
16 peer-reviewed paper: "The natural course of psychiatric
17 illnesses --"
18       THE COURT:  Why do you have Albert Einstein?
19       MR. ALTMAN:  Because just to show that this is, I
20 mean, this is science.
21       THE COURT:  Everything's relevant?
22       MR. BARNES:  That's a good response, your Honor.
23       MR. ALTMAN:  "The natural course of psychiatric
24 illnesses exhibits a decrease in suicide attempts over time
25 from diagnosis."  So, in other words, even if you do

1 nothing, people get better.  "This can make it appear that
2 the suicide attempt rate is higher prior to treatment
3 initiation than after, giving a false appearance of a
4 protective effect."  So, in other words, the protective
5 effect that I think we show for bipolar, it may have nothing
6 to do with the drug.  It just may be -- this is what he puts
7 in his paper: "However, among patients with a psychiatric
8 disorder who are at increased suicidal risk, statistically
9 significant protective effects of gabapentin were clearly
10 demonstrated."
11       THE COURT:  Is that your picture?
12       MR. CHEFFO:  I mean, this is exactly the kind of
13 thing, your Honor, that hopefully you'll be mindful of.
14 That's me and Bill Ohlemeyer who's not actually at Skadden.
15 I mean, this is what we're going to expect at trial, like,
16 pictures of counsel and personal attacks?
17       THE COURT:  They're nice pictures.
18       MR. CHEFFO:  They're nice pictures, thank you,
19 your Honor, but it's --
20       MR. ALTMAN:  But that just shows you the
21 difference, you know, from his litigation opinions,
22 he says it's protective, but from a scientific paper that's
23 peer reviewed, he says something completely different.
24       THE COURT:  Just to remind me, is the paper about
25 gabapentin only?

1       MR. ALTMAN:  No.  It is about bipolar, of which
2 gabapentin is a portion of it.
3       THE COURT:  So --
4       MR. ALTMAN:  It is a bipolar study --
5       THE COURT:  Excuse me.  Is the paper about
6 gabapentin only or about all antiepileptic drugs?
7       MR. ALTMAN:  All antiepileptic drugs, but he makes
8 conclusions specifically --
9       THE COURT:  So his report is only about
10 gabapentin, right?  Or is it about all antiepileptic --
11       MR. ALTMAN:  Well, it's only about gabapentin, but
12 he includes the results of his scientific study, and he uses
13 that to support his final conclusions to show that it's
14 protective.
15       But here's the most telling thing.  I mean, they
16 just asked him straight up: "If another expert were to say
17 Dr. Gibbons' paper proves that gabapentin is protective of
18 suicide, would that expert be wrong?"  And he said, "If they
19 were using the word 'protective' the way I would use the
20 word 'protective,' then I think that might be a
21 misinterpretation."
22       So even Dr. Gibbons' is saying that "It's wrong to
23 conclude my paper shows it's protective of suicide."  That's
24 an expert.  Now, what's the jury going to -- you know, how
25 does the jury disentangle between whether it's protective or

1 it's not protective?
2       THE COURT:  What if you were to limit his study to
3 exactly what it is with all these limitations, not use the
4 word "protective"?
5       MR. ALTMAN:  I'd certainly think that that goes a
6 long way, but we still have concerns that because he ignored
7 the other drugs, the other things make the study completely
8 unreliable.  And your Honor has to consider that the journal
9 could not have known what we know because we had the raw
10 data.  So if you take his paper as submitted to the journal,
11 in the absence of the things that we knew and we told
12 Dr. Gibbons about, well, they couldn't possibly know that he
13 didn't buy all the drugs.
14       THE COURT:  So let me ask you this:  On his more
15 sweeping statement, which is that gabapentin and AEDs show
16 no different risk of suicide if you take out, I guess, the
17 two of them --
18       MR. ALTMAN:  Well, Dr. Greenland --
19       THE COURT:  In other words, this PHARMetrics,
20 didn't he use the PHARMetrics data to look at other AEDs?
21       MR. ALTMAN:  He did, but that issue that he
22 raised, and I know your Honor didn't want to talk about,
23 where he took the FDA alert, and Dr. Greenland actually
24 talks about how inappropriate it is to look at the end
25 result, the outcome, and then say, "Well, let me back some

Page 26

1  things out and see what happens." It's totally wrong to do
2  that. I mean, it's methodologically flawed to do that in
3  the first place. I mean, you would never do that. I think
4  he said it's like, you know, betting on the rate of -- the
5  horse race is running, and then you go back and bet.
6        THE COURT: I know, but I'm getting confused here
7  because people refer to one, the gabapentin study and, two,
8  the bipolar study, so I'm trying to understand what the
9  difference is. What's the gabapentin study?
10       MR. ALTMAN: Okay, the gabapentin study, he went
11 and said to PHARMetrics, "Give me everybody who took
12 gabapentin that I have two years of exposure for." He got
13 about 130,000 people that came out of that. And for those
14 130,000 people, they are for all kinds of different
15 indications. And one of the things that he did is, he
16 looked at the data by indication in the gabapentin study.
17 So he had bipolar people, he had pain people, he had social
18 phobia, he had schizophrenia and other psychiatric
19 disorders. Now, one of the things that's interesting about
20 his gab- --
21       THE COURT: Do you object to that?
22       MR. ALTMAN: Well, that's what he did in his
23 paper. Absolutely.
24       THE COURT: I know, but what you were just talking
25 to me about was just the bipolar, so now you're also

Page 27

1  objecting to the gabapentin. Is it for the same reasons?
2        MR. ALTMAN: For all the same reasons. He did the
3  same things in his gabapentin paper. But another telling
4  problem in his gabapentin paper, I think about 70 or
5  80 percent of the people who got the drug with an indication
6  of bipolar also had an indication of pain. And he doesn't
7  actually know what they got the gabapentin for. All he
8  knows is, this person got a gabapentin prescription, and
9  this person had a diagnosis of bipolar and a diagnosis for
10 pain. He doesn't know that he got the gabapentin for
11 bipolar. Now, the problem is that --
12       THE COURT: In his gabapentin study, does he
13 include Topiramate and lamotrigine?
14       MR. ALTMAN: No. Gabapentin is only gabapentin.
15 Well, to the extent that these people may have also been
16 taking those, yes, but he doesn't analyze that data. He
17 only looks at --
18       THE COURT: And that's where he just says it's
19 equal risk?
20       MR. ALTMAN: He says sometimes it's equal risk,
21 but he also claims that it's protective, you know --
22       THE COURT: But that's only for the bipolar
23 subgroup, right?
24       MR. ALTMAN: That's correct.
25       THE COURT: Okay, so you're challenging the equal

Page 28

1  risk piece of it too?
2        MR. ALTMAN: Well, he's going to say that it
3  doesn't demonstrate any increased risk, that's correct. We
4  believe that either of those conclusions -- that you cannot
5  draw any conclusion from his papers, that there's no
6  increased risk, that there is a protective effect. Either
7  one of those conclusions do not follow from this study.
8  Because of the limitations in the study, they're not
9  reliable conclusions.
10       THE COURT: Did he get all the other drugs they
11 were taking for the more general study?
12       MR. ALTMAN: No. The same problem, the same
13 issues.
14       THE COURT: No, excuse me. In bipolar he got a
15 lot of drugs. He just didn't get every single one you think
16 he should have. Did he get any other drugs in the general
17 study?
18       MR. ALTMAN: No.
19       THE COURT: No other drugs, not even --
20       MR. ALTMAN: No, no, I'm sorry. He got the same
21 set of drugs as he did for bipolar.
22       THE COURT: All right, he got that across the
23 board.
24       MR. ALTMAN: Right, but, you know, like I said, he
25 didn't get all the antipsychotics. I mean, there's a simple

Page 29

1  one. He only purchased -- there's two kinds of
2  antipsychotics. There's the old world anti- --
3        THE COURT: You said he did get antipsychotics.
4        MR. ALTMAN: No. He got atypical antipsychotics.
5  When you read the contract from PHARMetrics --
6        THE COURT: You know, I don't know these things.
7  What's an atypical antipsychotic?
8        MR. ALTMAN: The newer ones, Seroquel, Risperdal
9  Zyprexa, They're the newer antipsychotic drugs. But the
10 older antipsychotics that have been around --
11       THE COURT: Like what?
12       MR. ALTMAN: Haldol, clozapine, various other
13 antipsychotic drugs, he didn't get those. And that's one
14 thing that he misrepresented. In the paper he says he got
15 antipsychotics, but that's not what he bought when you look
16 at the contract from PHARMetrics and they detail, "This is
17 what we're giving you," and it says antidepressants,
18 anticonvulsants, lithium, and atypical antipsychotics.
19       THE COURT: And those would be the more modern
20 ones?
21       MR. ALTMAN: Those would be the more modern ones.
22 But like I said, Xanax is very important. You know, based
23 on discussions with psychiatrists, Xanax is very often used
24 in bipolar disorder and acute mania to help bring these
25 people down.

1     THE COURT: All right, thank you.
2     So did you want to do an opening statement?
3     MR. BARNES: I think I should, your Honor, if you
4  don't mind. There are many things I need to correct here.
5     I guess, first of all, we spent a lot of time on
6  Dr. Gibbons' conclusions. Daubert concerns --
7     THE COURT: Well, we're only doing the reverse
8  order because your guy couldn't make it.
9     MR. BARNES: No, I understand that. Just in terms
10  of Daubert considerations, it's the methodology that is it
11  reliable, and was it properly applied? So that the
12  conclusions -- just because an expert comes in and says
13  something's incorrect, that's not where the Daubert inquiry
14  is. It's on the methods. Dr. Gibbons is the only expert in
15  this entire litigation who has been subjected to peer
16  review, intense peer review by four objective peer-review
17  experts. That is unusual in litigation. So what he has
18  done is put himself out not only to four days of depositions
19  and massive productions of documents --
20     THE COURT: You're talking about the paper for
21  the --
22     MR. BARNES: Yes, so I want to go back to first
23  principles.
24     THE COURT: So why don't we just limit him to the
25  paper.

1     MR. BARNES: If that's where you end up after
2  Thursday, but I think every one of his concerns can be
3  addressed. First of all --
4     THE COURT: Well, what's of huge concern to me
5  personally is that I allowed him to do this in November, and
6  then he did it in March, and then he did it in May, and then
7  there's a paper. So suddenly this one what I thought was
8  fair to Pfizer to allow him to respond to the FDA has turned
9  into this huge new pharmaepidemiologic study that I'm now
10  dealing with three days before trial. That's what's of huge
11  concern to me. So the safe course for me is to just allow
12  the peer-reviewed study to go in.
13     MR. BARNES: With the November report which was
14  agreed to and subject to cross-examination. The November
15  report was subject to the scheduling order. Everything was
16  absolutely done according to time. There were four
17  depositions, so --
18     THE COURT: That's what my concern is that it just
19  kept coming.
20     MR. BARNES: I understand.
21     THE COURT: And so I read the peer-reviewed paper,
22  which was softer and gentler, and seemed to be inconsistent
23  with some of the strong language in the report; and it
24  strikes me that that would be the appropriate set of
25  conclusions to introduce.

1     MR. BARNES: Well, that may be where we end up,
2  but I want to go through it because, number one, they have
3  set up so many straw men which they have set up and they're
4  knocking down. It's not what Dr. Gibbons is saying. So the
5  first slide in the Daubert. Okay, can we switch over to
6  ours, please? I want to walk you through it briefly so you
7  can see some of this, your Honor, because there's really not
8  that much difference, and they're going into the, as you
9  described yesterday, the nitpicks.
10     THE COURT: One thing I didn't think was a nitpick
11  was that you assume, because you get one prescription of
12  Neurontin, that you're on it for a year.
13     MR. BARNES: Well, okay, I can address that, okay.
14     THE COURT: That did seem -- what's it called
15  patient exposure years? -- to be a huge issue.
16     MR. BARNES: Allow me to do that, okay. Here's
17  how Dr. Gibbons' study was designed, okay? In the
18  gabapentin study -- no, let's do the Archive published paper
19  on eleven antiepileptic drugs. It's been called a bipolar
20  study, but it's really, it's the antiepileptic drug study in
21  bipolar patients. That's number one. And that's in direct
22  response to the FDA meta-analysis. It's absolutely
23  understood in that paper. This is in direct response.
24     So what does that paper do? Well, that paper does
25  two things. On the date of bipolar diagnosis, okay, that's

1  called the index date, and what Dr. Gibbons does is compare
2  the rate of suicide before the date of diagnosis, suicide
3  attempt before the date of diagnosis to the rate of suicide
4  attempt --
5     THE COURT: We're talking about the paper now or
6  the report?
7     MR. BARNES: The paper, just the paper. For the
8  next five minutes, it's just going to be the paper. So you
9  have the index date. And if someone would set up the board
10  here, I could draw it for you. So you have the index date
11  and a rate before and a rate after. The index date is the
12  date of diagnosis for bipolar disorder.
13     So what Dr. Gibbons does is, he has a primary
14  conclusion based upon that comparison. Then he does a
15  sensitivity analysis which compares months in which a
16  prescription is filled against months in which a
17  prescription is not filled. And he does a sensitivity
18  analysis, and it confirms the analysis that was done on the
19  primary analysis. So that has been covered on a
20  month-by-month basis.
21     THE COURT: So he only included in patient years
22  the time periods in which somebody filled a prescription?
23     MR. BARNES: Compared to the months they did not
24  on a patient-by-patient basis. So that criticism has been
25  handled.

Page 34

1    THE COURT: So let's say, so it's not included in
2  patient year as part of a patient -- what if somebody gets
3  one prescription of Neurontin and no more? He is not
4  included in the study?
5    MR. BARNES: That person, in the bipolar paper, he
6  or she would be included in the study.
7    THE COURT: Would be?
8    MR. BARNES: Would be.
9    THE COURT: Why? It's only one month.
10   MR. BARNES: Then it's adjusted. In the
11 sensitivity analysis, he adjusts for that and confirms the
12 primary analysis. He will explain that ---
13   THE COURT: Didn't it reduce the number of patient
14 years?
15   MR. BARNES: No, it would not.
16   THE COURT: Why? Why wouldn't it?
17   MR. BARNES: In the primary analysis, as I said,
18 it's before and after. In the sensitivity analysis where
19 it's actual exposure versus months of nonexposure, then that
20 comparison is done explicitly to confirm the primary
21 analysis. So if I can just spend a moment just setting up
22 the tests for you, and then I can speak with the authority
23 of a Dr. Gibbons on the sensitivity analysis --
24   THE COURT: What you're saying, before we get into
25 it because it will take us all morning, that he basically

Page 35

1  did adjust the patient years?
2    MR. BARNES: Yes.
3    THE COURT: All right, and what's the next?
4    MR. BARNES: You correctly recognized this is a
5  pharmacoepidemiologic study where the prescription claim of
6  a drug is a surrogate for actual drug exposure. You said
7  that's entirely reasonable, and indeed that's how
8  pharmacoepidemiology is done. I think Dr. Gibbons --
9    THE COURT: But only for the length of time of the
10 prescription.
11   MR. BARNES: Well, it depends on the study design,
12 and Dr. Gibbons will talk to you about that, but --
13   THE COURT: So if you got one prescription for
14 30 days of pills, that's what it should cover.
15   MR. BARNES: Yes, it is, it's covered and
16 addressed in his study appropriately. That was raised and
17 addressed -- he'll talk to you about that 30-day. It's not
18 an issue. But what I want to focus on is the idea, just so
19 you understand, just generically, before, after, okay?
20   On the antiepileptic study of the eleven drugs in
21 response to the FDA meta-analysis, this date here is the
22 diagnosis of bipolar disorder, okay? He compares this time
23 period for suicide attempts, he compares this time period
24 for suicide attempts, and he is looking at the eleven
25 antiepileptic drugs and sees if there's a protective effect.

Page 36

1  He'll explain the idea, but this is the comparison he sets
2  up.
3    THE COURT: So he doesn't compare them to a
4  placebo ever?
5    MR. BARNES: He does not. This is an exposure.
6  This is a pharmacoepidemiologic study. Dr. Gibbons and
7  Dr. Greenland --
8    THE COURT: So he doesn't flat out refute the FDA
9  because the FDA looks at placebo clinical trials, right?
10   MR. BARNES: The FDA looks at a meta-analysis, a
11 combined pool analysis of eleven drugs. It's a different
12 way of --
13   THE COURT: Excuse me. But as against placebos.
14   MR. BARNES: They are placebo-controlled trials in
15 that study.
16   THE COURT: Right, so this is a complete -- it's
17 not a flat on flat contradiction. It's just a totally
18 different way of thinking about it?
19   MR. BARNES: Can I just restate that a bit?
20   THE COURT: All right.
21   MR. BARNES: It is a different study design to
22 test the same issue. This is a different study design than
23 the meta-analysis. A meta-analysis --
24   THE COURT: I know what a -- so but it's very
25 different --

Page 37

1    MR. BARNES: It is different.
2    THE COURT: -- because it isn't as against a
3  placebo?
4    MR. BARNES: Correct.
5    THE COURT: So you don't know, for example,
6  whether or not psychiatric treatment is the protective
7  effect?
8    MR. BARNES: I think what you'll see is -- and
9  I'll get to that in a moment -- what inferences you can draw
10 from an observational study like this is the subject of
11 many, many books. There are limitations to this study, for
12 sure, and there are advantages. This is a quicker, and it
13 involves hundreds of thousands of patients, okay, the
14 gabapentin cohort. This involved 47,000. So what you get
15 is large numbers, lots of data, and an ability to make
16 judgments based upon study designs.
17   Dr. Gibbons and Dr. Greenland would agree. They
18 may not agree on the same limitations to this study, but
19 what they would agree to is that there are limitations to
20 them, and there are advantages which are all well known.
21 And Dr. Gibbons on the subject of limitations -- and he
22 talks about limitations in his paper. You've pointed it
23 out; counsel has pointed that out.
24   In his deposition the question is asked: "Do the
25 same limitations stated in your paper apply to your

Page 38

1  gabapentin study in your report?" Dr. Gibbons says, "Yes,
2  they do." It's a red herring. He never denied that this
3  design had limitations. We have pages of briefing on it.
4       THE COURT: All right, let me just ask you, will
5  you want to put him on to say that gabapentin is protective
6  with respect to bipolar?
7       MR. BARNES: Let me walk you through that.
8       THE COURT: Yes, but --
9       MR. BARNES: Yes, but I want to make sure -- I can
10  walk you through that. As I understand Dr. Gibbons' opinion
11  on the eleven antiepileptic drugs is that there is no
12  increased risk of suicide attempts associated with
13  antiepileptic therapy.
14       THE COURT: So he's not seeking to say protective.
15       MR. BARNES: Let's go to the gabapentin paper now,
16  the gabapentin study which is a supplemental report after
17  talking about the November report and the March report. In
18  the supplemental paper, he says the following: He says that
19  there are protective effects in the psychiatric population.
20  What Dr. Gibbons has said in pages of transcript and in his
21  report is that he measures a statistically significant
22  decrease in suicide attempts after the index date. It is a
23  significant decrease. He's also --
24       THE COURT: With gabapentin only?
25       MR. BARNES: With gabapentin only. And he says

Page 39

1  that it tends towards protective, it is a protective effect.
2  So what does that mean?
3       THE COURT: Did he redo the gabapentin study with
4  all the criticisms that were launched at the general AED
5  study?
6       MR. BARNES: I believe he made some changes. I
7  have some notes. I don't have them memorized, and
8  Dr. Gibbons can address that.
9       THE COURT: All right, so basically you're just --
10  I think what might make sense is for me to just hear from
11  him, you know.
12       MR. BARNES: Sure. I'm going to have him here.
13  You can ask him any question you want. But I want to go
14  through this protective effect briefly, if I might, your
15  Honor.
16       THE COURT: Yes, but, you know, we're already at
17  10:00 o'clock, so --
18       MR. BARNES: I understand.
19       THE COURT: So hopefully just three minutes and --
20       MR. BARNES: Okay. I want to go to the quote.
21  This is just an example. I want to go to this quote
22  where -- this is what Mr. -- we just pulled this up.
23  Mr. Altman and Dr. Greenland have made a big deal quoting
24  this. The question, your Honor, is -- and this is after
25  pages of discussion on this issue -- the question is, "If

Page 40

1  another expert were to say Dr. Gibbons' paper proves that
2  gabapentin is protective of suicide, would that expert be
3  wrong?" The question is "proves." They show you this, and
4  this is the way they've litigated this issue with
5  Dr. Gibbons. "The expert -- it depends on how the -- how
6  this expert was using the word 'protective.' If they were
7  using the word 'protective' the way I would use the word
8  'protective,' then I think that that might be a
9  misinterpretation." Page break, rest of answer.
10       "If you were using the word 'protective' to show
11  that there was a statistically significant reduction
12  associated with the use of gabapentin in these data, the
13  answer would be, they would be correct. There is a
14  statistically significant reduction in rate.
15       "Is it a causal effect? Is it really because they
16  took the drug, or is it because in part of the time period
17  after taking gabapentin is further away from the index
18  date?"
19       This is a regression towards the mean problem that
20  they've identified, which Dr. Gibbons has adjusted for in
21  his sensitivity analyses.
22       "Then the time point before there is a natural
23  decline. That's another alternative explanation. That's
24  why I did the person-time logistic regression models to try
25  to control for that. The results of that analysis are

Page 41

1  consistent showing a very similar odds ratio, very similar
2  protective effect. So it's kind of the best I can answer
3  your question."
4       So he explains to them that over time there is a
5  natural decay in the rate of suicide. In any event, it
6  normalizes over time statistically. So he's adjusted for
7  that natural tendency in biology for regression to the mean.
8  That is in his March 19 report. This was suggested to
9  Dr. Gibbons at a symposium at Harvard where he was
10  explaining what he was doing. He said, "I should adjust for
11  that," and he did so.
12       So this whole issue he has adjusted for, he has
13  explained. And they went after him, and he couldn't have
14  been any more transparent as to why he did it and what the
15  limitation is.
16       THE COURT: All right, I got the point. I think I
17  need to get to the expert. Thank you for doing that. We
18  should probably take that down. Dr. Greenland should come
19  up here, half an hour each side. Are you Dr. Greenland?
20  Welcome. I haven't met you yet.
21       MR. ALTMAN: Your Honor, I may want to use that
22  exhibit with Dr. Greenland.
23       THE COURT: Well, you can use whatever you want.
24
25

Page 42

1   SANDER GREENLAND
2   having been first duly sworn, was examined and testified as
3   follows:
4           THE CLERK:  Would you please state your name and
5   spell it for the record.
6           THE WITNESS:  Sander Greenland, S-a-n-d-e-r,
7   G-r-e-e-n-l-a-n-d.
8           THE COURT:  Welcome to this courtroom.  You're a
9   professor as well as an expert, right?
10          THE WITNESS:  Yes.
11          THE COURT:  So do you teach undergraduates?
12          THE WITNESS:  Only graduates.
13          THE COURT:  All right.  Well, think of me not as a
14  graduate student but as an undergraduate, all right?  So
15  baby steps as you walk through if there are any complicated
16  statistical issues, all right?  Okay.
17          MR. ALTMAN:  Thank you, your Honor.
18  DIRECT EXAMINATION BY MR. ALTMAN:
19  Q.  Dr. Greenland, thank you for coming today.  I know it
20  was a long trip.
21          THE COURT:  Where are you coming in from?
22          THE WITNESS:  Los Angeles.  Well, Reno yesterday.
23  Q.  Dr. Greenland, I just want to take a few minutes and go
24  through your qualifications.  Can you please tell us where
25  you're currently employed?

Page 43

1   A.  University of California at Los Angeles.
2   Q.  And how long have you been a professor there?
3   A.  About thirty years.
4   Q.  Do you have a specific title there?
5   A.  Professor of epidemiology and professor of statistics.
6   Q.  And how long have you been teaching statistics?
7   A.  About thirty-five years.
8   Q.  Have you -- I'm holding up a book called "Modern
9   Epidemiology."  Have you seen this book before?
10  A.  Yes.
11  Q.  Are you one of the coauthors of this book?
12  A.  Yes.
13  Q.  When was the first edition of this book published?
14  A.  The first edition was in 1986, but I joined the book in
15  1998.
16  Q.  Okay.  And this is the third edition, correct?
17  A.  Correct.
18  Q.  And this is the current edition?
19  A.  Yes.
20  Q.  Is this book used in institutions that teach
21  epidemiology?
22  A.  It is.
23  Q.  Can you tell us some of the institutions that use this
24  book.
25  A.  I believe it's used in Harvard, Columbia, University of

Page 44

1   North Carolina, University of Michigan, and quite a few
2   other places in Europe and the United States.
3   Q.  And have you written peer-reviewed published papers?
4   A.  Yes.
5   Q.  Approximately how many?
6   A.  Over 300.
7   Q.  Have you also written various letters to the editor and
8   things of that nature?
9   A.  Yes.
10  Q.  About how many?
11  A.  I don't know, over a hundred, I'm sure.
12  Q.  Have you been asked to give lectures before?
13  A.  Yes.
14  Q.  Approximately how many lectures --
15          THE COURT:  You know, he's clearly qualified.
16          MR. ALTMAN:  Okay.  The only qualification I do
17  want to talk about that I think is relevant --
18  Q.  Dr. Greenland, I believe as part of your work here, you
19  had an opportunity to review the statistical review that was
20  done by the FDA of the Neurontin data?
21  A.  Yes.
22  Q.  And I'd like to just show you the last page which are
23  the references cited by the FDA.  You see the second one is
24  Greenland, S.  Is that you?
25  A.  Yes.

Page 45

1   Q.  So, in other words, the FDA cites to you?
2   A.  Yes.
3   Q.  And has cited to you specifically with respect to this
4   statistical analysis in this case, correct?
5   A.  Correct.
6   Q.  Let me just read the reference, and it is "Estimation
7   Of a Common Effect Parameter From Sparse Follow-Up Data,"
8   correct?
9   A.  Correct.
10  Q.  And that was kind of an issue with the FDA's analysis,
11  some of the sparsity of the data, correct?
12  A.  Correct.
13  Q.  Okay.  Dr. Greenland, I want to take you through some
14  of the limitations -- strike that.  Sorry.  You've reviewed
15  Dr. Gibbons' expert reports, correct?
16  A.  Correct.
17  Q.  You've also reviewed his peer-reviewed submitted paper,
18  correct?
19  A.  Yes.
20  Q.  And you've read the various reports yourself concerning
21  Dr. Gibbons' reports, correct?
22  A.  Correct.
23  Q.  You have had a chance to read his reports and analyze
24  his conclusions?
25  A.  Correct.

1 Q. Let me start at the end, and then we'll work backwards,
2 but based upon the studies and the work that Dr. Gibbons has
3 done with respect to his gabapentin bipolar studies, do you
4 believe that his conclusions are a natural consequence of
5 the work and studies that he did?
6 A. Not in his expert reports.
7 Q. Okay. And we talked a little bit about some of the
8 limitations of Dr. Gibbons' studies. In general, are there
9 some limitations of pharmacoepidemiologic studies like
10 Dr. Gibbons did here?
11 A. There generally are limitations.
12 Q. And you talked about them in your expert report,
13 correct?
14 A. Correct.
15 Q. Okay, and I think some of them is that these are
16 nonrandomized studies, correct?
17 A. Correct.
18 Q. And so they're not well controlled like a randomized
19 clinical trial, correct?
20 A. Correct.
21 Q. And the FDA's alert and the FDA's study was based upon
22 randomized clinical trial data, correct?
23 A. Correct.
24 Q. And that's very different than the kind of data that
25 we're dealing with here, correct?

1 A. Right.
2 Q. With pharmacoepidemiologic data, is there any specific
3 protocol of how the data is submitted to the insurance
4 companies in advance, or is it just submitted as people go
5 in for claims?
6 A. It's submitted as people go in for claims.
7 THE COURT: I understand there are limitations,
8 but do scientists and statisticians in your field use this
9 data to conduct studies?
10 THE WITNESS: Yes. I do as well.
11 Q. Yes, but you are very careful to make sure that the
12 conclusions that you arrive at based upon these studies
13 follow from the studies, correct?
14 A. Correct.
15 MR. BARNES: Objection.
16 THE COURT: Overruled.
17 Q. And you take those limitations into account when
18 designing your studies --
19 THE COURT: You know what, just help me, okay? So
20 maybe we just jump right into the various -- because I'm
21 still a little confused about the differences between the
22 paper and his expert report.
23 Have you read the paper?
24 THE WITNESS: Yes.
25 THE COURT: And is the journal that accepted it

1 peer reviewed?
2 THE WITNESS: Yes.
3 THE COURT: Is it respected in your field?
4 THE WITNESS: I think the opinions would vary
5 somewhat among psychiatrists, I presume, but I don't know.
6 I'm not a psychiatrist.
7 THE COURT: Do you find that there are any
8 methodological problems with the way the paper was prepared?
9 THE WITNESS: Well --
10 THE COURT: Put aside his report for a second.
11 The paper.
12 THE WITNESS: The paper. There are some things
13 that if I had been peer reviewing I would have objected to
14 and told the editor to have them change before it was
15 published.
16 THE COURT: Because it's not the preferred
17 methodology, or is it fundamentally flawed methodology?
18 THE WITNESS: No. Just the way some of the
19 conclusions were stated.
20 THE COURT: All right, so you've criticized him
21 before in some of the semantics of the way he, you know,
22 something is too conservative or it's confusing, but I'm
23 talking about the core methodology. Was there anything
24 wrong with the methodology that Gibbons used on the
25 published paper?

1 THE WITNESS: Can I elaborate?
2 THE COURT: Yes, yes. That's why we're here.
3 THE WITNESS: Okay. My view is that all studies
4 can be criticized. They're all flawed. They all have
5 problems in the methodology, just as if, you know, we're all
6 human, we all have our flaws. Well, all studies are like
7 that too. And they're not like cars coming off a production
8 line meeting certain specs and so forth. They're -- each
9 one is unique.
10 THE COURT: I understand all that, but was it a
11 reasonable methodology to apply?
12 THE WITNESS: Well, that's where we get into the
13 gray zone about, where experts would have disputes about
14 what would have been the best way to do this and how to
15 present it.
16 THE COURT: I understand that.
17 THE WITNESS: Okay. Let me put it this way: To
18 pass peer review -- there's a colleague of mine I respect
19 very much. He says peer review -- acceptance for
20 publication -- publication -- sorry -- publication is just
21 the beginning of peer review. That's --
22 THE COURT: What do I call you, professor or
23 doctor? What do people call you?
24 THE WITNESS: Professor if you want.
25 THE COURT: All right, Professor, I just need to

Page 50

1  understand whether it's a reliable methodology, not whether
2  other experts could criticize it, not whether there could be
3  a disagreement among experts in the field.  I just want to
4  understand it.  Is the methodology behind the article
5  reasonable, the conclusions in the article?
6         THE WITNESS:  I would say that it passes -- it's
7  reasonable enough, the methodology.  The problem I would
8  have, the primary problem I have with the final form was, I
9  think the conclusions were a bit overdrawn relative to the
10  methodology, but not as extreme as in the expert reports.
11         THE COURT:  I understand you had problems with the
12  expert reports, but I just want to understand.  So is there
13  anything -- what specifically do you feel about the final
14  conclusion that's overstated?
15         THE WITNESS:  If you had -- if I could quote, if
16  there was a copy of the paper, the abstract or the final
17  conclusions of the paper, I could point to where --
18         MR. BARNES:  Could I catch up to you, Doctor?
19         THE WITNESS:  What's that?
20         MR. BARNES:  Just so I know what he's referring
21  to, your Honor.
22         THE COURT:  The paper, the published paper, the
23  one that's to be published.
24         MR. ALTMAN:  May I approach?
25         THE COURT:  Yes.

Page 51

1         MR. ALTMAN:  Do you want it on the Elmo, or do you
2  want it in front of you?  It's also in the binder, your
3  Honor.
4         (Witness examining document.)
5         MR. ALTMAN:  I believe at Tab 9 within the binder
6  we submitted to you this morning.
7         THE COURT:  Great.  Thank you.
8         THE WITNESS:  Yes, the conclusions, my opinion is
9  that the conclusions are overstated despite FDA reports.
10  This is under the abstract under "Conclusions" at the bottom
11  of the first page of the abstract where it begins, "Despite
12  FDA reports regarding increased risk of suicidality
13  associated with AED treatment, the current study reveals
14  that as a class, AEDs do not increase risk of suicide
15  attempts in patients with bipolar disorder relative to
16  patients not treated with an AED or lithium.  AEDs reduce
17  suicide attempt rates, both relative to patients not
18  receiving any psychotropic medication and relative to their
19  own pretreatment levels."
20         I believe those conclusions do not follow from the
21  study, its methodology, and are overdrawn.
22         THE COURT:  All right, so if you look at all the
23  limitations he puts in at the end, if you allow the
24  limitations in the study where he puts in a lot of the
25  things we've been talking about this morning, would that be

Page 52

1  a fair conclusion?  In other words, it's just the way the
2  abstract captures it?
3         THE WITNESS:  I don't believe that that's a good
4  conclusion, no.  I don't believe that's sound.  I don't
5  believe that that's --
6         THE COURT:  What's sound, the abstract?
7         THE WITNESS:  The conclusion in the abstract.
8         THE COURT:  But if you took it in the more
9  holistic, how the article is written with, you know, by the
10  end he puts in all these limitations, would that be a fairer
11  way of discussing it?  Would that be fair?
12         THE WITNESS:  Well, if you properly account for
13  all those limitations, then those conclusions would not
14  follow.
15         THE COURT:  All right.  So you have no problems
16  with the methodology.  You have a problem with the way the
17  conclusions are too strongly stated?
18         THE WITNESS:  Yes.
19         THE COURT:  Subject to limitations, all right.
20  Now, do you have a different feeling about the papers?  Do
21  you think that the methodology -- excuse me, I said that
22  wrong -- the methodology in the expert reports is flawed?
23         THE WITNESS:  The methodology is basically similar
24  between the two.  So, again, that's not the issue.  It's the
25  conclusions.

Page 53

1         THE COURT:  All right, so why don't you -- there
2  are two separate reports, expert reports, so do you need to
3  parse between the two of them?  Does it matter?
4         THE WITNESS:  I don't think so.
5         THE COURT:  All right, so the same criticism
6  against both of the studies?
7         THE WITNESS:  Yes.
8  BY MR. ALTMAN:
9  Q.  Dr. Greenland, not knowing whether people actually took
10  the drug --
11         THE COURT:  Don't do it in a leading way, okay?
12  Have him teach me, okay?
13  Q.  Did Dr. Gibbons' study consider whether people actually
14  took the drug Neurontin when he did his calculations?
15  A.  No.
16         MR. BARNES:  Say that?  I'm sorry.
17  Q.  What's the significance of that?
18  A.  Well, we don't know what the people actually took.  And
19  I give you an example from everyday experience.  If you go
20  into most people's homes, and certainly mine and many
21  others, you'll often see a medicine chest full of
22  prescription bottles, some of which were hardly used at all,
23  old bottles.
24         THE COURT:  Excuse me.  I understand that you
25  can't know what they actually took.

Page 54

1    THE WITNESS: Yes.
2        THE COURT: But since you as well as other experts
3    actually use this database, that's always a limitation in
4    using this database, right?
5        THE WITNESS: Yes.
6        THE COURT: All right, so since everybody uses
7    this database, as I understand it, for some studies, when
8    you use the database, how do you account for that
9    limitation, which is, you can't know if someone actually
10   took their prescription?
11       THE WITNESS: First of all, you recognize that
12   limitation in the discussion and try to take account of it
13   as part of your uncertainty about what the actual effects of
14   the drug are. In a randomized trial, when you have a
15   placebo-controlled trial, you use what they were assigned to
16   take, and that's called a "intent-to-treat analysis." So
17   you say what you're analyzing is intention to treat because
18   even in a randomized trial, you can't be sure what they were
19   taking when they went home. But in an observational study
20   like this, you also can't be sure. And unlike in a
21   randomized trial, even the intention to treat has not been
22   randomly assigned. It's been given on the basis of --
23       THE COURT: I understand. The FDA did the gold
24   standard, right?
25       THE WITNESS: What's that?

Page 55

1        THE COURT: The FDA study is the gold standard,
2    right, because it has a placebo as the comparison, right?
3        THE WITNESS: Yes.
4        THE COURT: This isn't the gold standard?
5        THE WITNESS: Right.
6        THE COURT: Everyone in the field knows that,
7    right?
8        THE WITNESS: Yes.
9        THE COURT: But still people use it?
10       THE WITNESS: Yes.
11       THE COURT: So there are going to be certain
12   limitations every time someone uses this database?
13       THE WITNESS: Yes.
14       THE COURT: So you've used it, Gibbons uses it.
15   So is there ways in which he has not tested for those
16   limitations? In other words, when you use it, the same
17   problem arises for you.
18       THE WITNESS: Yes. I would -- well, in using
19   databases like this, a procedure that my colleagues and I
20   have used is to compare -- is to do a more -- it's a more
21   involved comparison, taking the comparisons of the
22   post-prescription rates of whatever it is, in this case
23   suicide attempts, to the pre-prescription rates, taking that
24   ratio for each drug, and then comparing the ratios across
25   the drugs. So it's taking a ratio of ratios instead of

Page 56

1    taking simply the ratios and using them directly as he did.
2    So you could say it's a more involved, we'd like to think a
3    more sophisticated way of trying to approach these data to
4    try and account for the fact that some of these limitations
5    are present.
6        Now, another important factor is to try and do an
7    analysis that's based on actual real exposure time or closer
8    to it, our best estimate of it, as opposed to simply calling
9    the time after a prescription "exposure time."
10       THE COURT: So that is a concern. As I
11   understand, one of your big criticisms is that once you
12   prescribe Neurontin, the presumption is that the patient
13   took it for a year, right?
14       THE WITNESS: Right.
15       THE COURT: But, now, the other side claims, well,
16   he did a sensitivity analysis to account for that. Did he
17   adequately do it?
18       THE WITNESS: He did a sensitivity analysis that
19   went as far as, I suppose, he thought he could with what he
20   had, but one could do more. And one of the things he just
21   didn't do apparently, according to the -- let me turn to my
22   report where I quote where he says he didn't get around to
23   it, "and I would have liked to have seen to it."
24   Q.  I'm sorry, I believe that's Page 14 you're referring
25   to.

Page 57

1        THE COURT: Of what?
2        MR. ALTMAN: Oh, I'm sorry. It's his expert
3    report, which should be Tab No. 4, Dr. Greenland's May 31
4    report.
5        THE WITNESS: Yes, the part where in Page 14 of my
6    report of May 31 of 2009, Mr. Altman asks, "Did you run any
7    analyses for the gabapentin studies to look at whether a
8    person was on or off the drug at the time of the attempt?"
9    Dr. Gibbons replies "No." Mr. Altman asks, "Why not?"
10   Dr. Gibbons replies, "Didn't get around to it." Mr. Altman
11   replies, "So I think it's safe to say you don't know what
12   effect that has on these numbers if you would have looked at
13   it that way, correct?" And Dr. Gibbons says, "That's
14   correct."
15       So I would have liked to have seen him do that to
16   address my concerns in more depth.
17       THE COURT: So do you view that as creating such a
18   fundamental flaw that the conclusions are unreliable?
19       THE WITNESS: It's one of the contributors. There
20   are other things in my report I list, but there are many
21   things like this.
22       THE COURT: You list a gazillion things, so --
23       THE WITNESS: True.
24       THE COURT: Let me put it this way: My job isn't
25   to say whether there are some different ways different

15 (Pages 54 to 57)

Page 58

1  experts can look at these things. I want to know what you
2  think is so wrong about this that it fundamentally
3  undermines the reliability of the conclusion.
4       MR. ALTMAN: Your Honor, may I ask a couple
5  questions to maybe clarify that point?
6       THE COURT: Yes.
7  Q.  Dr. Greenland, did the data as acquired by Dr. Gibbons
8  indicate the dates of suicide attempts?
9  A.  I believe it did.
10 Q.  Did the data as provided to Dr. Gibbons include data on
11 when prescriptions were issued?
12 A.  I believe it did, yes.
13 Q.  So could Dr. Gibbons have calculated for any given
14 suicide attempt whether that was in the time span of the
15 prescription as identified in the data?
16 A.  Yes.
17 Q.  You've looked at the data, correct?
18 A.  Yes.
19 Q.  Do you believe that would have been a particularly
20 difficult thing to look at?
21 A.  No.
22 Q.  Do you think it would have been important to do that?
23 A.  Yes.
24      MR. BARNES: Objection. Counsel is testifying at
25 this point.

Page 59

1  Q.  Why would it have been important to have looked at that
2  data?
3  A.  For the reasons we just discussed, to properly assign
4  suicide attempts to times when a person was on or off
5  gabapentin.
6       MR. ALTMAN: Mr. Alba, can you flip to the Elmo
7  for a second.
8       THE COURT: Is failure to do that unreasonable?
9       THE WITNESS: What's that?
10      THE COURT: Is failure to make that correlation
11 unreasonable when you do an epidemiological study?
12      THE WITNESS: Let's say that it undermines, it
13 further undermines any conclusions that one might attempt to
14 draw about the effect of gabapentin.
15 Q.  And, Dr. Greenland, this ties in with the whole patient
16 year exposure issue. Under his results for the primary
17 analyses -- and this is out of Dr. Greenland's paper -- it
18 says, "Table 1 presents number of patients at risk, numbers
19 of SAs, or suicide attempts, PY, patient years, of exposure
20 and rate of suicide attempts per 1,000 patient years of
21 exposure before and after initiation of treatment during the
22 year following the index diagnosis."
23      THE COURT: What am I looking at now?
24      MR. ALTMAN: I'm sorry. This is the published
25 paper, and unfortunately it doesn't have page numbers, your

Page 60

1  Honor, but I believe it is probably about --
2       THE COURT: What tab is this now?
3       MR. ALTMAN: I think it's Tab 9, and this is right
4  before the first tables that you see. It's the page before
5  the tables.
6  Q.  Now, Dr. Greenland, when you read that sentence, what
7  does that tell you about what Dr. Gibbons is saying in terms
8  of exposure on the drug?
9  A.  Well, that he's treating the entire year after a
10 prescription as if they were exposed.
11 Q.  And is that a correct statement based upon how he did
12 his study?
13 A.  It's not a correct.
14 Q.  So it's not exposure. It's years of study, correct?
15 A.  Right.
16      THE COURT: It's what?
17      MR. ALTMAN: The attempt -- I'm sorry.
18      THE WITNESS: It's how long the person was being
19 observed for suicide attempts. It's not how long they were
20 on gabapentin.
21      THE COURT: This is the issue that he was
22 criticized on for the first draft, right?
23      THE WITNESS: Yes.
24      THE COURT: And then he says he did sensitivity
25 analyses that then address that concern. So did it?

Page 61

1       THE WITNESS: And, no, not adequately and not in
2  my view.
3       THE COURT: Why?
4       THE WITNESS: For the reasons I was just
5  explaining, that he didn't finish his analysis basically.
6       MR. BARNES: Hold on. Objection. Are we talking
7  about the report? You're mixing -- this is the paper he's
8  on. Now, he showed you the paper, so let's stay on the
9  paper.
10      THE COURT: All right, on the paper. So did he
11 take into account your exposure issue through a sensitivity
12 analysis?
13      THE WITNESS: Not adequately.
14      THE COURT: And that's because he didn't correlate
15 in the paper the actual suicide attempts with when he was on
16 the drug? Is that the former point?
17      THE WITNESS: Right.
18      THE COURT: So that's what you're referring to?
19      THE WITNESS: Yes.
20 Q.  Dr. Greenland, focusing on things that are not inherent
21 limitations of the pharmacoepidemiologic studies, did you
22 review any information about specific patients within the
23 data set that Dr. Gibbons used?
24 A.  Yes.
25 Q.  Did you observe whether there were any patients that

Page 62

1 had suicide attempt codes on multiple dates?
2 A. Yes.
3 Q. Okay. If that person did not actually attempt suicide
4 multiple times on consecutive dates, could that have
5 affected the data and the results that Dr. Gibbons has
6 provided?
7 A. Well, it would affect his analysis and conclusions.
8        THE COURT: So you found one -- did you look at
9 all the patients?
10       THE WITNESS: No.
11       THE COURT: So what happened with that one
12 patient?
13       THE WITNESS: Well, there are multiple suicide
14 attempts recorded, or multiple codes, I should say.
15       THE COURT: Afterwards?
16       THE WITNESS: Right, if I understand you.
17       THE COURT: So it's after the index date?
18       THE WITNESS: Right.
19       THE COURT: So if the person were on the drugs at
20 that time, how would it affect the study? Wouldn't it make
21 it seem as if it was -- it would cut the other way, wouldn't
22 it?
23       THE WITNESS: If they were on the drug. If they
24 were off the drug, it would cut. A lot of the objections
25 that I have, as I try and say in my report --

Page 63

1       THE COURT: Actually it would hurt, it would hurt.
2 It would make it less protective.
3       THE WITNESS: Right, but, I mean, for another
4 patient, that was not -- that was a comparison patient that
5 was not on the drug, okay. And if they were -- the point is
6 that --
7       THE COURT: So this particular patient you looked
8 at was not on the drug?
9       THE WITNESS: What's that?
10      THE COURT: This particular patient that you
11 looked at was not on any of these drugs?
12      THE WITNESS: No. Oh, no, no. They were --
13      THE COURT: They were all on the drug?
14      THE WITNESS: Right.
15      THE COURT: Just by definition, right?
16      THE WITNESS: At certain times.
17      THE COURT: So while this may have been a flaw,
18 it's a flaw that hurts Dr. Gibbons?
19      THE WITNESS: Well, I don't know if it hurt
20 Dr. Gibbons, but it might make gaba- --
21      THE COURT: In other words, if he had counted it
22 correctly, the AED would have been even more protective?
23      THE WITNESS: Yes, in some cases than this case.
24 It depends on how or what you're counting and when you're
25 counting it. My point is a general one, that when these

Page 64

1 events occur, if you're overcounting the events, this could
2 cut in general -- set aside -- just it's that example of
3 simply pointing out that these events do occur where you
4 can't tell how many attempts are actually there. And this,
5 of course, can occur at other points in time as well. So it
6 adds another element of uncertainty to what is going on
7 based on the data.
8        If I could make a general comment by way, I hope,
9 of clarifying things, my position? A lot of the points that
10 I make could cut both ways. My chief argument -- and I
11 published extensively on this and talk extensively about
12 this, and I'll be talking a lot about this at the FDA, or
13 they've asked me, they've been after me for a long time to
14 give a workshop on these methods that I advocate, and
15 they're trying to incorporate -- is that the standard
16 statistical methods such as those Dr. Gibbons is using here
17 do not adequately take account of the uncertainty that one
18 should have in light of the kind of data that we are using,
19 "we" meaning Dr. Gibbons, myself, my colleagues; that when
20 you take into account these sources of uncertainty, such as
21 this one or the one we were talking about before, or the
22 other ones listed in my report, it would in effect -- should
23 expand your interval estimate about what's going on. It
24 would remove the significance that's often asserted as in
25 his report, and it would --

Page 65

1        MR. BARNES: Remove the what? I'm sorry, the
2 significance?
3        THE WITNESS: The significance.
4        MR. BARNES: Thank you. Sorry, your Honor.
5        THE WITNESS: And it would lead you to caution
6 your conclusions tremendously, even to the point of saying,
7 we can't really draw a conclusion here based on these data.
8 We can simply say, here is what these data show, appear to
9 show. But taking into account all the uncertainty we have
10 about why they're showing it -- there are many different
11 reasons that could be showing this association -- we can't
12 really say whether there's an effect, whether the effect is
13 protective or it's causal. It could be causing problems,
14 and yet it appears protective because of some of these or
15 many of these problems accumulating.
16       So if you consider it in the course of -- I think
17 a good analogy would be an investment. If you're investing
18 in the market, nobody -- few people today could claim to be
19 so outstanding in playing the market. Even Berkshire
20 Hathaway, Warren Buffet's company, took big losses last
21 year. And that shows that there's a lot of uncertainty
22 involved, and you can't just point and say, oh, it's this
23 one thing. It's an accumulation of all kinds of things,
24 like, what's going to happen with oil, what's going to
25 happen with this --

Page 66

1      THE COURT: I know, but can we get back on this?
2  I would love investment advice, but going back on this, I'm
3  just trying to understand. So what you're saying, and I'm
4  trying to listen very closely, is that statisticians in
5  general are relying on methodologies which overdraw
6  conclusions based on the databases that you have,
7  particularly this PHARMetrics?
8      THE WITNESS: Yes.
9      THE COURT: So what you're saying is, there's
10  nothing that was wrong with what he did. It's how he's
11  stating the conclusions that he draws from it?
12      THE WITNESS: Yes.
13      THE COURT: So, for example, the one factor he
14  doesn't take into account is whether someone was seeing a
15  psychiatrist or maybe some of these other drugs. So that
16  really means he's got to hedge his statement more than that
17  he can't say anything?
18      THE WITNESS: Right, right. Well, I mean, there
19  are some things I wish -- I think he should have done, and
20  if I had been a referee, I would have said, "Please look at
21  this."
22      THE COURT: This is the correlation between
23  whether you were on -- that makes sense -- whether you were
24  on the drug at the time you were attempting to commit
25  suicide?

Page 67

1      THE WITNESS: Right.
2      THE COURT: Am I right that another big difference
3  is that he only looked at suicide attempts rather than
4  suicide ideation?
5      THE WITNESS: That's another issue.
6      THE COURT: So it's hard to compare apples and
7  apples with the FDA report?
8      THE WITNESS: Yes.
9      THE COURT: So the FDA report may show a lot
10  bigger correlation of problems with these drugs because it
11  includes an extra problem, which is thinking about suicide,
12  whereas his report only gives claims of attempts?
13      THE WITNESS: Right.
14      THE COURT: And not final suicides. So actually
15  the FDA is picking up more kinds of incidents, is that
16  right?
17      THE WITNESS: Right. And, of course, his report
18  also can't deal with completed suicides, the other extreme
19  of the spectrum.
20      THE COURT: Right, he doesn't need to deal with
21  the ideation or the completed suicide. He only deals with
22  attempts, whereas the FDA deals with all three?
23      THE WITNESS: Right.
24      THE COURT: All right, I just want to make sure I
25  understand it correctly.

Page 68

1  Q.  Dr. Greenland, I just want to ask you a question.
2  Counsel did a chart --
3      MR. ALTMAN: May I approach the witness, your
4  Honor?
5  Q.  Counsel did this chart before when he was talking about
6  Dr. Gibbons' paper, and he said that if we took the bipolar
7  diagnosis point here, Dr. Gibbons looked at the time period
8  before the bipolar diagnosis and compared it to the time
9  period after the bipolar diagnosis. Is that what
10  Dr. Gibbons did in his bipolar paper?
11  A.  The before/after, yes, yes, I think.
12  Q.  Did Dr. Gibbons compare the time period between the
13  time of diagnosis and first treatment, to treatment to the
14  end of the year, or before diagnosis and after diagnosis?
15      THE COURT: You just lost me in that question.
16      THE WITNESS: What?
17      THE COURT: Yes, you did too, see. Good, so --
18      THE WITNESS: Wait. I got lost there.
19  Q.  Did Dr. Gibbons when he -- was the comparison that
20  Dr. Gibbons did the time period from the date of bipolar
21  diagnosis through first treatment compared to the rest of
22  the year, or before bipolar diagnosis to after bipolar
23  diagnosis?
24  A.  It was before and after, if I recall correctly. Is
25  that right?

Page 69

1      THE COURT: I have no idea what you -- so help me
2  out on this.
3      MR. ALTMAN: If I can --
4      MR. BARNES: Well, no, you can't testify.
5      THE COURT: No. I'm going to let the expert to
6  say. So what did --
7      THE WITNESS: I'm not sure what the -- what's --
8      MR. ALTMAN: Okay.
9      Can we have the Elmo up.
10  Q.  Dr. Greenland, can you see that first sentence there?
11  It says, "Table 1 presents number of patients at risk,
12  number of SAs, PY of exposure and rate of SAs per 1,000
13  patient years of exposure before and after initiation of
14  treatment during the year following the index diagnosis."
15  A.  Right, okay, that's what it is.
16  Q.  Okay, so did Dr. Gibbons compare the period before the
17  diagnosis to after the diagnosis, or was everything of
18  Dr. Gibbons after the diagnosis?
19  A.  It was all after the diagnosis.
20  Q.  Thank you. What is the significance of that?
21  A.  Well, there are several things, issues that enter. For
22  one thing, the diagnosis as recorded in the database may not
23  reflect the actual beginning of the disease for one thing.
24  It may simply be the first diagnosis that appears in that
25  medical record. And that's indicated by some of these

Page 70

1   records where there's evidence based on prescriptions before
2   that diagnosis that the person already had the condition.
3   Sometimes diagnoses appear in the database not because it's
4   the first time the person has been diagnosed but because
5   they're entering the diagnosis for the purpose of the
6   record.
7          THE COURT: You need to finish.
8          MR. ALTMAN: Okay.
9   Q.  Dr. Greenland, based upon Dr. Gibbons' paper and
10  studies, is it a valid conclusion that Neurontin is
11  protective of suicide?
12         MR. BARNES: Objection.
13         THE COURT: Overruled.
14  A.  I don't think so, no.
15  Q.  Based upon Dr. Gibbons' paper and expert report, is it
16  a valid conclusion that Neurontin does not cause suicidal
17  behavior in any way?
18         MR. BARNES: Objection.
19         THE WITNESS: Did you overrule it?
20         THE COURT: Sustained. He's not a doctor.
21         MR. ALTMAN: What? No, I only asked based upon
22  the studies.
23  Q.  Okay, does Dr. Gibbons make the statement that his
24  study and his paper and his expert report do not demonstrate
25  an increased risk for suicidality?

Page 71

1          MR. BARNES: Objection.
2          THE COURT: Any what?
3   Q.  Does Dr. Gibbons in his conclusions of his expert
4   report and his paper make the statement that the evidence
5   does not show that Neurontin is associated with an increased
6   risk of suicidality?
7          MR. BARNES: Objection.
8          THE COURT: Overruled.
9   A.  Too many multiple negatives there for me to follow
10  exactly. Can I just answer what I think he's --
11         THE COURT: Yes.
12  A.  Again, I don't think any causal, and by that, I mean to
13  include protective as well as causal conclusions follow from
14  the data and the methods that he used to analyze them. In
15  fact, I have no method that could draw those conclusions
16  from the data validly. I don't --
17         THE COURT: So when you use that data, what are
18  you using it for?
19         THE WITNESS: The data?
20         THE COURT: When experts in your field, including
21  yourself, use that PHARMetrics data, what is it, just one
22  piece of a puzzle?
23         THE WITNESS: Yes.
24         THE COURT: So it's one piece you want to look at,
25  but it's not definitive?

Page 72

1          THE WITNESS: Right.
2   A.  Dr. Greenland, I just want to show you and I'm going to
3   end with Dr. Gibbons' conclusion at the end of his March 19
4   report. He says, "Based on all the evidence that I have
5   reviewed and the data that I have personally analyzed, it is
6   my opinion that there is no increased risk of suicidal
7   thinking and behavior for gabapentin overall."
8          Is that statement a natural consequence of
9   Dr. Gibbons' paper and expert report?
10         THE WITNESS: No.
11         MR. ALTMAN: Thank you, Dr. Greenland.
12         MR. BARNES: Thank you, your Honor.
13  CROSS-EXAMINATION BY MR. BARNES:
14  Q.  Good morning, Dr. Greenland. We have to transition,
15  take a short break.
16         THE WITNESS: Are we having a break?
17         THE COURT: Do you need one?
18         THE WITNESS: No, no.
19         THE COURT: I think we'll finish within half an
20  hour, forty-five minutes, but if you want a break, you're
21  welcome to it.
22         THE WITNESS: No. I just thought when he said a
23  break --
24         MR. BARNES: It might be a good time to take a
25  break just to set up because I would like to organize based

Page 73

1   on your dialogue with him.
2          THE COURT: That's fine. Just know that once, as
3   Robert has learned from bitter experience, once you lose me
4   for five minutes, you lose me for fifteen.
5          MR. BARNES: I think it might make my examination
6   more helpful for your Honor.
7          THE COURT: All right, that's fine. We'll take a
8   fifteen-minute break.
9          (A recess was taken, 10:38 a.m.)
10         (Resumed, 11:03 a.m.)
11         MR. BARNES: Thank you, your Honor.
12  BY MR. BARNES:
13  Q.  Dr. Greenland, thank you for bringing the rain over
14  from Los Angeles. We appreciate it.
15         First of all, I want to just go back to some
16  things you said on direct and just clarify a few points
17  before I get into my examination. Did you do any analyses
18  in the PHARMetrics database itself, the claims database?
19  A.  No.
20  Q.  Okay. So you would agree with me that the information
21  that -- that if the PHARMetrics database was produced and
22  other files from Dr. Gibbons was produced between November
23  and March, you did not go through it and actually test what
24  Dr. Gibbons did in the data itself, correct?
25  A.  Correct.

19 (Pages 70 to 73)

Page 74

1  Q.  And you would agree with that data; many of the issues
2  you have raised are in fact testable, and you could have
3  measured whether or not there was a true -- a clinically
4  significant or a statistically significant consequence to
5  your observations, which you admitted could go either way,
6  correct?
7  A.  Some of my observations.
8  Q.  Some of them, yes.
9  A.  Not all of them are testable with that data.
10  Q.  But some of them are?
11  A.  Some are.
12  Q.  Okay, and you did not do that, did you?
13  A.  Correct.
14  Q.  Okay.  You made a comment about Dr. Gibbons did not
15  look at suicide or suicide ideation, and, for sure,
16  Dr. Gibbons' study focuses on suicide attempt, correct?
17  A.  Correct.
18  Q.  And it's likely in a claims database that a suicide
19  attempt will generate a claim as opposed to a completed
20  suicide because the person is dead, so you'll get medical
21  treatment with in fact a suicide attempt.  Wouldn't that be
22  a fair way to describe why you might choose a suicide
23  attempt?
24  A.  Yes.
25  Q.  Okay.  And Dr. Gibbons clearly states the fact that he

Page 75

1  is studying suicide attempts as opposed to suicides, so that
2  was the study design, correct?
3  A.  Correct.
4  Q.  And suicide ideations often would not generate a claim,
5  correct?
6  A.  Correct.
7  Q.  So he picked an event, an important event with regard
8  to suicide that he could actually measure in a health care
9  database with lots of data, correct?
10  A.  Correct.
11  Q.  So that's not a problem, is it?
12  A.  Come again?
13  Q.  That's not a problem, is it?
14  A.  That's not a problem.  Well, it's a problem insofar as
15  if you're looking at the totality of outcomes, what happened
16  to people, it's possible that, for example, there could
17  be some transference of people -- in effect, can be a
18  transference of people from suicide attempts to completed
19  suicide.  So that is a problem in terms of interpreting what
20  any association you see means.
21  Q.  But you have no problem with him picking a very hard
22  end point of suicide attempt to study because it's a hard
23  end point which is likely to generate a claim?
24  A.  Well, I wouldn't call it a hard end point, but it's an
25  end point to study.

Page 76

1  Q.  Yes, okay.  Now, you've worked with the PHARMetrics
2  database, haven't you?
3  A.  Not directly, no.
4  Q.  But similar claims databases?
5  A.  Right.
6  Q.  And you've published in the medical literature on
7  these, right?
8  A.  Correct.
9  Q.  And you describe in your report, you say that the study
10  design focused on prescriptions, correct?
11  A.  Right.
12  Q.  But that's not true.  That's not an accurate statement
13  as to what the study design entails, is it?
14  A.  It's not everything in the study.
15  Q.  Well, but the point is, you're saying that Dr. Gibbons
16  focused on prescriptions when in fact the design of
17  Dr. Gibbons' study focuses on prescription claims where a
18  prescription is actually filled and a claim for payment is
19  made.  So it's much even closer to exposure than just the
20  writing of a prescription.  Would you agree with that?
21  A.  Actually, I'm not sure.  I'd have to, you know, go into
22  more detail, think about more of the details involved and
23  what the relation is and look at the literature on that.
24  Q.  But it's incorrect to say that Dr. Gibbons just studied
25  prescriptions.  He was studying prescription claims, claims

Page 77

1  for which a prescription had been written and filled and a
2  charge for payment had been made, correct?
3  A.  Yes, yes.
4  Q.  So that's much closer.  That's a good -- wouldn't you
5  agree that that sort of data is deemed in the
6  pharmacoepidemiologic community to be a good surrogate for
7  prescription drug exposure?
8  A.  I don't think so, no.
9  Q.  Oh, it's not a good.  So is it better to study
10  prescriptions or actually prescriptions that have been
11  filled and paid for?  I mean, isn't it generally accepted
12  that that's a good surrogate to measure drug exposure in
13  pharmacoepidemiologic literature?
14  A.  No.  Again, I don't think so.
15  Q.  You don't think so.  So is it your belief that claims
16  data are not used to study the effect of drugs in the
17  pharmacoepidemiologic literature?
18  A.  No, no.  They are.
19  Q.  Certainly they are.  The literature is vast on claims
20  databases, isn't it?
21  A.  Yes, and I've contributed to it.
22  Q.  I'm sure you have.  I've read some of the articles and
23  enjoyed them immensely.  So the point is, you would agree
24  that claims data is a source for pharmacoepidemiologic
25  study, correct?

Page 78

1  A.  Yes.
2  Q.  And it's routinely and commonly employed by researchers
3  like yourself to study drug effects, correct?
4  A.  Yes.
5  Q.  And study medical device effects, correct?
6  A.  Yes.
7  Q.  And you've done that yourself?
8  A.  Yes.
9  Q.  And there are limitations to it?
10  A.  Yes.
11  Q.  Which are disclosed in papers?
12  A.  Yes.
13  Q.  Which Dr. Gibbons did?
14  A.  Yes.
15  Q.  Okay.  So, now, I want to talk to you about some of the
16  ideas that you've expressed in the report --
17      THE COURT:  So in the field, once you have a claim
18  for a drug, how long do you assume the patient is exposed to
19  it?
20      THE WITNESS:  Well, it depends on -- first of all,
21  of course, the time of the prescription would be the maximum
22  is usually assumed, but it depends on the drugs and what
23  they're being prescribed for.  Some drugs are much more
24  likely to be neglected to be taken -- the patient may have a
25  side effect and just stop -- than other drugs where they may

Page 79

1  be essential.  They may be a drug like an anti-immunity drug
2  that's given to a transplant patient.  They tell them, "If
3  you stop taking this drug, you're going to die."  Then the
4  person is much more likely to be taking that drug, although
5  even there, some people stop taking it and they die or their
6  organ gets rejected, but as opposed to an antidepressant
7  where they take it and they feel worse, so they say "heck
8  with this," and then they stop taking it.
9      THE COURT:  But for purposes of studies, is it
10  standard in the field to assume that they, with some
11  limitations, that they're taking it for the amount of time
12  that it was prescribed for, 30 pills, 30 days, or whatever?
13      THE WITNESS:  I would say that's common.  I'm not
14  aware of it being a "standard" as such.  People may attempt
15  to adjust for that, and that wouldn't be rejected out of
16  hand.
17      MR. BARNES:  Okay, thank you, your Honor.
18  Q.  Let's talk about that.  There seems to be a concern
19  about the issue of whether or not a patient who has had a
20  prescription filled after the index date, as I've described
21  for Judge Saris, was on drug in a given month -- and when I
22  say "on drug," I mean had a prescription filled -- or did
23  not have a prescription filled in a given month, okay?  Do
24  you understand what I'm talking about?
25  A.  I think so.

Page 80

1  Q.  Okay.  You criticized Dr. Gibbons for misclassifying a
2  considerable amount of person time of unexposed to
3  gabapentin as person time exposed to gabapentin; is that
4  correct?
5  A.  Well, I would say it's a criticism of some of his
6  analyses.
7  Q.  But you understand that Dr. Gibbons did a sensitivity
8  analysis that actually tested the results of his primary
9  analysis to compare months where a patient had a
10  prescription filled versus months where patients did not
11  have a prescription filled, correct?
12  A.  Yes, I understand.
13  Q.  That is called a "person time analysis," correct?
14  A.  Yes.
15  Q.  So what Dr. Gibbons did to account for your concerns in
16  his published paper, and concerns raised to him at Harvard
17  when he gave a lecture, was to actually compare months where
18  the patient was on a drug versus the months where the
19  patient was off the drug, did the analyses to check the
20  robustness of the primary analysis, correct?
21  A.  Well, he did what he referred to -- what you refer to
22  that way, but there are some issues that --
23  Q.  I'm not talking about the history.  I'm talking about
24  what he did.
25      MR. FROMSON:  May the witness finish the answer?

Page 81

1      THE COURT:  Were you done?
2      THE WITNESS:  No.
3      THE COURT:  Go ahead.
4  A.  Yes, the issue is that whether the sensitivity analysis
5  as done took a proper, a full account of concerns that I had
6  and, as you said, were raised at Harvard by other people.
7  And this comes down to this issue about, which we were
8  discussing at one point on Page 14 about, "Did you look if
9  the person was on or off the drug at the time of the suicide
10  attempt?"  And --
11  Q.  Okay --
12  A.  Can I finish?
13  Q.  You may.
14      THE COURT:  Let him.
15  A.  And as he said, he did not do that.  And as I said, if
16  I had been refereeing or editor in charge, I would have
17  said, "Please do that."  And he just said he didn't get
18  around to it, so --
19  Q.  Okay, that's the paper.  Look at your report and tell
20  me if I misread your paper.
21  A.  My paper?
22  Q.  Your report is talking about Dr. Gibbons' paper and his
23  report.  That quote is about Dr. Gibbons' report, correct?
24  A.  Yes, but I think it applies to his paper as well.
25  Q.  No, no.

Page 82

1  A.  It doesn't?
2  Q.  Well, you should read it more carefully.
3        THE COURT:  No, strike that.  Come on.
4        MR. BARNES:  Your Honor, that remark deals with
5  the gabapentin study.  I asked him about his paper.
6        THE COURT:  I am so lost between the different
7  studies and the different dates and the different articles
8  that you have to help me.  Okay, so what remark?
9        MR. BARNES:  Okay, I want to be very precise
10  because he went right to the study.  I asked him about the
11  paper.  I asked him about the paper on the AEDs, and he then
12  went --
13        THE COURT:  That was admitted in some
14  peer-reviewed journal?
15        MR. BARNES:  Yes.
16        THE COURT:  All right.
17        MR. BARNES:  That's what I was talking about, and
18  rather than answer my question, he went, to confuse me and
19  perhaps the Court, was to go to the gabapentin study which
20  is in the supplemental report.  I'm talking about the paper.
21        THE COURT:  All right, so now we're talking about
22  the paper.  What's the question again?
23        MR. BARNES:  And that's why I interrupted
24  him because he was going into the report.
25  Q.  Let's focus on the paper.  I only have 30 minutes.  The

Page 83

1  paper adjusts for the very criticism you made by a person
2  time analysis, which is some kind of regression analysis
3  which you and Dr. Gibbons explained for hours, correct?
4  Isn't that correct?
5        THE COURT:  Limit yourself at this point to the
6  article.
7  A.  Yes.  Yes, well, I'm looking at the article, and he
8  says -- I'm just reading from the article.  That's all I can
9  go by is what he says he did.  "For sensitivity analysis was
10  a person time logistic regression model that related to AED
11  treatment on a monthly basis to the first SA," suicide
12  attempt, "a significant decrease in SA rate associated with
13  AED treatment was found.  Figure 2 presents the estimated
14  hazard function."
15        So, okay, I'm turning the page:  "Overall the SA
16  rate decreases with time.  However, the rates are lower in
17  AED-treated patients throughout."
18        And then he -- okay, so it's not clear to me from
19  reading that exactly the protocol that he used to do that
20  analysis and that adjustment.  If it's not what he describes
21  in more detail elsewhere, then I'm not clear from that
22  passage -- and that's all I could find in the paper, that's
23  all I could find in the paper -- whether he was fully
24  accounting for my concern, okay.
25  Q.  Thank you.  But whether he fully accounted for your

Page 84

1  concern, he did in fact do a sensitivity analysis to at
2  least partially account for the concern that you raised,
3  correct?
4  A.  Yes.
5  Q.  Okay.  And whether or not he did it fully or not is
6  something that you and Dr. Gibbons can debate, but he did
7  adjust for it, correct, in his paper?
8  A.  Yes.  He made a partial adjustment.
9  Q.  Okay.  And, as a matter of fact, he cites references
10  for his person time analysis which are in the published
11  peer-reviewed literature, correct?
12  A.  Yes.
13  Q.  References 9 and 10.  So he's using published
14  peer-reviewed literature on regression analysis in his paper
15  in 2009, correct?
16  A.  Yes.
17        MR. BARNES:  Now, your Honor, I want to talk about
18  the study, okay?  I want to address those separately.
19  Q.  Okay, now we're going to talk about Dr. Gibbons'
20  supplemental report, okay, on the gabapentin cohort, okay?
21  I just want to focus on that.
22  A.  Okay.
23  Q.  Now, you're criticizing Dr. Gibbons because he did not
24  fully account for this issue in the gabapentin paper,
25  correct?

Page 85

1  A.  And many other issues.
2  Q.  Yes.  Well, I spoke about the person time issue, so I
3  want to focus on that.
4  A.  But can I clarify for the Court?  The problem is,
5  there's an overarching problem here is that somebody who
6  works with these kind of databases, and I've also used
7  studies for my own work in meta-analysis that use the
8  PHARMetrics database, and there are some what I would call
9  very good studies that have been done with that database,
10  but they're good in part because they recognize that the
11  data themselves are fundamentally limited.  Then the methods
12  that we apply to these data are themselves going to be
13  fundamentally limited because of that and also because they
14  contain their own limitations.
15        So my points, the points I'm raising are by and
16  large quite general, not just something specific to what he
17  did or didn't do, although sometimes, as I said, on this one
18  issue I would have asked for something more or more
19  explanation, at least.  But there are more general problems
20  which he couldn't address, I couldn't address, nobody I know
21  could address.
22  Q.  They're baked into the pie?
23  A.  Yes.
24  Q.  Okay, we all understand that there are limitations, and
25  there are in fact limitations to randomized controlled

1 clinical trials, which you describe at Page 2 of your May 31
2 report, correct?
3 A. Correct.
4 Q. There is all sorts of issues in taking a randomized
5 controlled trial, in your view, and applying it generally to
6 other populations, correct?
7 A. Correct.
8 Q. And there's all sorts of ascertainment biases, correct,
9 in clinical trials?
10 A. There can be.
11 Q. Sure. And in fact, if you take a meta-analysis of
12 these limited clinical trials, you compound the issues, in
13 your view, correct?
14 A. No.
15 Q. Well, you've written extensively about issues and the
16 abuses and uses of meta-analyses, correct?
17 A. Yes. I mean, you don't have to compound the problems.
18 You can do a meta-analysis carefully and not compound the
19 problems.
20 Q. But it's prone to that in your writings?
21 A. It has happened. People do that.
22 Q. Sure. Let me move on from that. Let me go back to
23 this issue here. So Dr. Gibbons has accounted for the
24 on-and-off issue on his paper. In his report, Dr. Gibbons
25 makes --

1         THE COURT: Well, does he in his paper, in his
2 report?
3         MR. BARNES: No. We're going to go to the report
4 now, okay.
5         THE COURT: All right.
6 Q. Now, Dr. Greenland, we're on the report now.
7 Dr. Gibbons made a judgment that the issue of this person
8 time analysis he would not adjust for in the same manner in
9 which he did with the AED study, correct?
10 A. I don't recall.
11 Q. Okay. Well, I think I will help you. In your report
12 you talk about it being different, okay? And so I guess my
13 point to you, sir, is that your counsel had PHARMetrics data
14 since November, and whether or not this accounting for the
15 person time analysis made a material difference, you did not
16 yourself test this question, did you?
17 A. Correct.
18 Q. And you have the competence and technical expertise to
19 have taken the data from the PHARMetrics database --
20         THE COURT: You have to do baby steps now. So
21 Gibbons did not do the person time analysis, sensitivity
22 analysis for his report?
23         MR. BARNES: Not the one that he used in the
24 bipolar, yes. It's a different study. He did not do that.
25         THE COURT: The gabapentin one that goes across

1 all indications?
2         MR. BARNES: Correct.
3         THE COURT: So there was not the sensitivity
4 analysis done?
5         MR. BARNES: Not the person time logistic
6 regression analysis. He made a choice not to do that, which
7 he'll explain to you on Thursday.
8         THE COURT: And this person time logistic
9 regression analysis is the one that was required by the
10 peer-review journal, is that right?
11         MR. BARNES: I don't know. I think it came from a
12 suggestion from a colleague at Harvard.
13         THE COURT: Do you know?
14         THE WITNESS: I don't recall.
15         THE COURT: In your view, is it critical to do
16 this person time logistic regression analysis?
17         THE WITNESS: I think it helps. I mean, the paper
18 looks better to me than the expert report. That's the way I
19 put it.
20         THE COURT: You know, it's not -- you know, you've
21 got to see where I'm coming from. It's not just a question
22 of "looks better." I have this gatekeeper role. I just
23 want to know, is it junk science if you don't do it?
24         THE WITNESS: Right. Well --
25         THE COURT: I mean, just putting it as bluntly as

1 you can, is it unreliable if you don't do it?
2         THE WITNESS: It reduces -- see, for me, it's a
3 matter, and this is where I always get into trouble with the
4 court to say, look, I operate on matters of degrees. I
5 don't know the law, but I can only say there's matters of
6 degrees. It's less reliable if you don't do it, less
7 reliable.
8         THE COURT: I don't care about less reliable
9 because that you can all fight about in court. Is it
10 unreliable if you don't do it?
11         THE WITNESS: It's unreliable anyway. To draw a
12 causal conclusion, regardless of what he did -- I don't care
13 if he, you know, looked at chicken end trails or whatever he
14 did, it's unreliable to draw a causal conclusion from it,
15 causal or protective, in other words.
16         THE COURT: By which you mean, protective it's
17 unreliable?
18         THE WITNESS: Yes, that's unreliable no matter
19 what he did. There's nothing I could do that could make it
20 reliable.
21         MR. BARNES: I don't want to interrupt, your
22 Honor. I'm sorry.
23 Q. My point to you, Dr. Greenland, is that you've raised
24 an issue. Counsel has data on the PHARMetrics data that's
25 been given to him in November, and whether or not in the

Page 90

1  gabapentin study, this theoretical issue that you've raised
2  could have been tested by yourself to see if it made a
3  difference in that gabapentin cohort, correct?
4  A.  Yes.
5  Q.  And you did not take the time to test whether
6  Dr. Gibbons' judgment as of necessity for a person time
7  analysis meaningfully changed the results?
8  A.  I didn't have the time.  That's a very time-intensive
9  piece of work, as can be witnessed by the size of the
10  invoices that Dr. Gibbons submitted.  And it takes a lot of
11  time to do that, and I would have refused.  I don't have the
12  time to do that.
13  Q.  Okay, let's go to -- you make another claim at page --
14  I'll do one more of these criticisms, and you have many
15  criticisms, so I have time for maybe two or three, so let me
16  go to one more.  At Page 6, sir, of your expert report from
17  May, you state that there are divergences between
18  Dr. Gibbons' report regarding the conclusiveness of the
19  PHARMetrics data.  Remember that?
20  A.  Yes.
21      MR. BARNES:  And down on Page 7, it's in that
22  heading, so I'm going to focus you on Page 7, your Honor.
23  And I gave you a binder, and I believe that would be Tab A,
24  if you want to join me.
25  Q.  And on Page 7 you write -- are you on Page 7, sir?

Page 91

1  A.  Yes.
2      MR. BARNES:  Okay, and, your Honor?
3      THE COURT:  Yes.
4  Q.  You write that "A suicide attempt can lead to the
5  identification of the psychiatric disorder that in turn
6  leads to treatment.  It is not uncommon to find patients who
7  have a suicide attempt --"
8  A.  Excuse me.  Where are you, please?
9  Q.  We're on Page 7.
10  A.  7, okay.
11  Q.  And there's your quote there, okay, it starts with --
12  A.  Oh, my quote of Gibbons.
13  Q.  Yes, yes.
14  A.  So this is Gibbons speaking.
15  Q.  He's talking about, "It's not uncommon to find patients
16  who have a suicide attempt diagnosis of depression or
17  bipolar disorder initiate treatment on the same day.  While
18  this suicide attempt is not the consequence of initiating
19  treatment, it can inflate the rate of suicide attempts
20  observed prior to the initiation of treatment."
21      What you're saying is that the primary analysis
22  might inflate the number of suicide attempts before the
23  index date and deflate the number after the index date.
24  Okay, is that a fair statement, as I understand your
25  criticism?

Page 92

1  A.  Yes.
2  Q.  Did you look at Dr. Gibbons' sensitivity analysis that
3  looked at that precise issue to see if it made a difference?
4  A.  Yes.
5  Q.  Where is that found in Dr. Gibbons' supplemental
6  report?
7  A.  I don't know.  Can you point me to it?
8  Q.  Well, I think I can.  You are aware he looked at that,
9  correct?
10  A.  Yes.  He's discussing it right there.
11  Q.  Okay, let me see if we can find it.  Why don't we go to
12  Table 2.
13  A.  Wait.  Of what?
14  Q.  Of his supplemental report.
15  A.  Which one?  Which tab?
16  Q.  It is the tab in your notebook, B.
17  A.  Yes.
18  Q.  Okay, sir?  And for your convenience, I have Table 2
19  and for your Honor's convenience up on the screen.  All
20  right, have you seen this before?
21  A.  Yes.
22  Q.  Okay.  This table talks about "Suicide attempt rates
23  per 100,000 (Sic) person years before and after treatment of
24  gabapentin by diagnosis," correct?
25  A.  Yes.

Page 93

1  Q.  And I want you to look at the column "Attempts Before,"
2  and I want you to look at the number 456, all right?  Are
3  you aware that the number 456 includes the time before up to
4  the date of the prescription under his methodology, correct?
5  A.  Okay.
6  Q.  Okay.  So these are 456 suicide attempts before date of
7  the prescription -- I'll say RX for prescription --
8  including date, all right, of prescription, all right?  And
9  how many patients were in his study, sir?  There's 131,000?
10  A.  Right.
11  Q.  So there are 456 suicide attempts out of 131,000-plus
12  patients in the cohort, correct?
13  A.  Yes.
14  Q.  The primary analysis was done on this number, correct,
15  in Table 2, right?
16  A.  Okay, yes.
17  Q.  All right, let's go to Table 2C.  This is the
18  sensitivity analysis, correct, sir?
19  A.  Okay.
20  Q.  And let's read what it is, all right?  Table 2 is
21  "Suicide attempt rate per 100,000 person years --"
22      THE COURT:  It's 1,000.  You keep saying --
23      MR. BARNES:  I'm sorry, your Honor.  You did take
24  college stat and I didn't, so let's do it again.
25  Q.  "Suicide attempt rate per 1,000 person years before and

**Page 94**

1 after treatment of gabapentin by diagnosis, before and after
2 by diagnosis," right?
3 A. Yes.
4 Q. And I want you to go down to "Attempts Before," and
5 that's 453, correct?
6 A. Yes.
7 Q. Right?
8 A. Yes.
9 Q. So what he does is, he does an analysis, and this time
10 he excludes the number of suicides on the date of the
11 prescription, correct?
12 A. Yes.
13 Q. And there's a difference of three patients, right?
14 A. Yes.
15 Q. Three patients out of 131,000 patients, correct?
16 A. Yes.
17 Q. And you would agree that three patients out of the
18 number of 131,000 doesn't change the results at all in any
19 significant way, does it?
20 A. No, but I'm surprised you're not looking at the
21 gabapentin row.
22 Q. Look at all. This is the gabapentin study --
23 A. Wait. Can I interject?
24     THE COURT: Yes.
25 A. Yes, I mean, why not look at gabapentin? It goes from

**Page 95**

1 17 to 17, and it doesn't change at all.
2     THE COURT: Say it again. 17 -- it goes 17 to 9.
3 What?
4     THE WITNESS: I thought what was at issue here was
5 gabapentin.
6 Q. We're looking at the "all" column there.
7 A. I know, but I'm just trying to understand why you're
8 focusing there when the issue is gabapentin.
9 Q. It's all gabapentin, sir. Every one of these
10 prescriptions in this gabapentin cohort is gabapentin,
11 correct?
12 A. Yes, but I was just talking about the monotherapy.
13 There isn't even any change there, so I'm surprised you're
14 not focusing on that.
15     THE COURT: Excuse me. Hold it. I don't
16 understand what any of you are talking about. Why isn't
17 there any change? It's 17, and then it says 9.
18     MR. BARNES: It's even better is what he's saying.
19     THE COURT: Right, there's no change from the
20 earlier 2 -- you know, I'm just trying to understand it.
21 I'm not taking sides. I just want to understand it. So
22 you're taking there's no change between Table 2 and
23 Table 2C?
24     THE WITNESS: Yes.
25     THE COURT: So you're saying there's no change one

**Page 96**

1 way or another when you take out whatever suicides happened
2 on the treatment date?
3     THE WITNESS: Yes, according to this table.
4     THE COURT: What significance does that have?
5     THE WITNESS: That would mean that he took account
6 of that problem.
7     THE COURT: All right, so he did an adequate job
8 of taking care of it?
9     THE WITNESS: Right.
10     MR. BARNES: Okay, thank you, your Honor. That's
11 the point, all right?
12 Q. Lastly, I want to talk a little bit about the peer-
13 review issues, okay? We conceded -- I don't want to spend a
14 lot of time -- that like yourself, Dr. Gibbons is a
15 well-qualified expert, correct?
16 A. Yes.
17 Q. And you would agree, unlike yourself, that Dr. Gibbons
18 is not only a well-qualified expert, but he's also a
19 well-qualified expert in the subject of suicide and the
20 measurement of suicide statistics, correct?
21 A. Yes.
22 Q. He's been a member of the Institute of Medicine,
23 correct?
24 A. I don't recall, but I'll take your word for it.
25 Q. And you're a member of the American Statistical

**Page 97**

1 Association, sir?
2 A. Yes.
3 Q. And you're a fellow of that?
4 A. Correct.
5 Q. That's an honor, correct?
6 A. Yes.
7 Q. Dr. Gibbons is one of your peers. He is a fellow of
8 the American Statistical Association, correct?
9 A. Correct.
10 Q. And you are aware that he received a very important --
11     THE COURT: No, enough. I don't need this.
12 Q. Okay, but let me do the peer review now. You've read
13 the peer-review comments, correct, of Dr. Gibbons in his
14 paper?
15 A. Yes, yes.
16 Q. Let's go to Slide 1. When you wrote your report on
17 May 31, were you aware that the reviewer of the No. 1, "The
18 findings provide a useful point of contrast to the FDA
19 advisory and offer empirical support to challenge
20 assumptions that anticonvulsants pose iatrogenic risk for
21 suicidal behavior"? Were you aware of that?
22 A. Yes.
23 Q. So one colleague of yours who is qualified by peer
24 review, who was chosen by the editor -- and you've been an
25 editor before, right?

Page 98

1  A. Yes.
2  Q. These people are objective, and they're picked because
3  of their objectivity and their expertise to evaluate the
4  paper at hand, correct?
5  A. Well, I wouldn't go so far as -- objectivity, that's
6  very debatable.
7  Q. Are you objective, sir, when you do peer review of
8  papers?
9  A. May I explain, since I have the option here at least to
10 explain things, which I may not have in trial?  But I happen
11 to be of the school of thought, belief, that there isn't any
12 such thing as purely objective.  You try and be neutral, you
13 try and be like a judge, but you're going to have a point of
14 view.
15 Q. Oh, that's fair enough.  Sure, everyone comes with
16 their points of view, I agree.  But with that limitation,
17 we're all human, people try their best?
18 A. Yes.
19 Q. As you do?
20 A. Well, we hope.
21 Q. We hope.  And peer review is designed to make sure only
22 reliable evidence gets into the scientific literature so
23 people can read it and consider it, correct?
24 A. It's trying to make the literature more reliable.  A
25 lot of unreliable stuff gets through.  We have many examples

Page 99

1  of that.
2        THE COURT:  What does iatrogenic mean?
3        THE WITNESS:  What's that?
4        THE COURT:  What does iatrogenic mean?
5        THE WITNESS:  Oh, caused by the physician or the
6  medication.
7  Q. So it would be caused by the AED, okay?  Let's go to
8  the second peer-review comment, please.
9        THE COURT:  Well, whose peer-review comment is
10 that?
11       MR. BARNES:  The peer review is anonymous.
12       THE COURT:  I see.
13       MR. BARNES:  Okay?
14 Q. Let's go to Slide No. 2, please.  This is reviewer
15 No. 2.  This peer reviewer says, "As a whole, the present
16 article concerns a very crucial issue in psychiatry.
17 Obtained results are very impressive.  Really this work must
18 be appreciated as excellent."
19       Did you read that before you did your report?
20 A. I did.
21 Q. Okay.  Let's go to the third reviewer.  There were four
22 reviewers.  The third peer reviewer says, "Their study is a
23 direct answer to the Food and Drug Administration warning
24 regarding increased risk of suicidal thoughts and behavior
25 with antiepileptic drugs (AED).  This is a very

Page 100

1  well-performed study with great statistical analysis."
2        Did you know that when you wrote your report?
3  A. Yes, I did.
4  Q. Okay, the next reviewer, please, reviewer No. 4: "This
5  is a very interesting, timely and highly relevant paper
6  based on a well-conducted study using a very large cohort."
7        And you were aware that reviewer No. 4 said that
8  as well, correct?
9  A. Yes.
10 Q. Okay, so there were four reviewers who were neutral who
11 looked at this study and made comments to Dr. Gibbons, and
12 they prefaced each one of their comments with the idea that
13 this is really good science, but you can improve it by
14 taking into account the following issues, correct?
15 A. Correct.
16 Q. And Dr. Gibbons then takes this, accommodates their --
17       THE COURT:  Were there any negative reviews?
18       THE WITNESS:  Well, there were criticisms within
19 these reviews, but not a solid negative review.  I didn't
20 see that.
21       MR. BARNES:  It's true that there were
22 suggestions, just as Dr. Greenland has made suggestions.
23 These people are well-qualified to comment on the paper, and
24 Dr. Gibbons took their comments --
25       THE COURT:  Well, you can't testify.  I just

Page 101

1  wanted to know if there were any negative ones.
2        MR. BARNES:  No, none.
3        THE COURT:  You know, just sort of trashed it.
4        THE WITNESS:  Start to finish?  No.
5        MR. BARNES:  I wouldn't say trashed it.
6        THE WITNESS:  No, there weren't any.
7        MR. BARNES:  Well --
8        THE COURT:  Excuse me.  He said there weren't any.
9        MR. BARNES:  Oh, okay.  I thought he said he
10 trashed it.  All right.
11       I believe that's all I have, your Honor.  Thank
12 you.
13       MR. ALTMAN:  Nothing further, your Honor.
14       THE COURT:  Thank you very much for taking the
15 effort to fly out here.  That was very useful.
16       MR. BARNES:  Thank you, Dr. Greenland.
17       (Witness excused.)
18       THE COURT:  So where does this leave us?
19       MR. CHEFFO:  Well, I don't know if we're finishing
20 today, but I had an issue with, I just wanted to discuss the
21 question, but if your Honor wants to deal with the Daubert
22 issue first --
23       THE COURT:  No.  I think we're done with Daubert
24 today, right?
25       MR. CHEFFO:  I think we are, your Honor.

1    THE COURT:  We're going to see Dr. Gibbons some
2  time on Thursday, is that right?
3    MR. BARNES:  Nine a.m., your Honor.
4    THE COURT:  Is he coming in from somewhere?
5    MR. CHEFFO:  He's traveling, I believe, right?
6    MR. BARNES:  He took his daughter to a grad school
7  visit.  I think he's traveling.  He should be here either
8  tonight or tomorrow morning.
9    THE COURT:  Tomorrow morning?
10   MR. BARNES:  I'm thinking.  I've got to check on
11 his schedule.  He's with his daughter right now.
12   THE COURT:  There's a chance I may have to juggle
13 timing around a little bit that morning.  He'll be here for
14 the morning?
15   MR. BARNES:  Thursday morning, yes.
16   THE COURT:  He'll be here Thursday, if I have to
17 play with the time, because I only need basically an hour
18 and a half or so.  Okay, thank you.
19   MR. BARNES:  Thank you, your Honor.
20   THE COURT:  Now, what is the other issue?
21   MR. CHEFFO:  I just wanted to raise an issue
22 with --
23   THE COURT:  Professor Greenland, you can leave.
24 Are you staying in town?
25   THE WITNESS:  No.  I'm supposed to fly out today.

1    THE COURT:  Are you testifying at the trial?
2    THE WITNESS:  I don't know.
3    THE COURT:  Is he?
4    MR. FROMSON:  He's on our list, Judge, so it's an
5  issue of his availability, of course, but that's nothing I
6  can discuss today.
7    THE COURT:  No, but I just wanted --
8    MR. FROMSON:  Yes, it's our understanding that we
9  hope he will be.
10   MR. BARNES:  Thank you, Dr. Greenland.
11   MR. CHEFFO:  Your Honor, if I could just take a
12 minute, you know, I certainly understand where your Honor,
13 and I think we all share it, are with respect to the issue
14 of jurors and the questionnaire, and you don't want to ask a
15 lot of questions.  We get that.  We're not going to paper
16 you to death.  We also understand the sensitivities of the
17 Court to issues that might be sensitive for them.
18   Just the one concern I just want to bring to the
19 Court's attention is that, you know, obviously the point of
20 jurors is that they bring their personal experiences to be
21 jurors.  And, again, no one wants to put someone in an
22 awkward position, you know, a child abuse type situation
23 that your Honor articulated, but I think kind of a
24 broad-brush, you know, the question as framed essentially,
25 you know --

1    THE COURT:  I'm not going to ask someone if they
2  thought about suicide.  That's just too personal.
3    MR. CHEFFO:  Well, I guess I'm going the other
4  way.  I think the question that's proposed is actually too
5  general in the sense of -- perhaps if the Court would
6  consider either more specific or --
7    THE COURT:  So give me language.
8    MR. CHEFFO:  We could propose something, or maybe
9  if --
10   THE COURT:  No, now.  We've got to do it now.
11   MR. CHEFFO:  Okay.  Well --
12   THE COURT:  So --
13   MR. CHEFFO:  What I prefer is if the Court could
14 ask them some questions.
15   THE COURT:  Like what?  I'm going to ask them all
16 of this stuff orally:  Do you take Neurontin?  Does any
17 member of your family?  That's not so personal.  That's just
18 a drug that you might be taking.  Asking someone about
19 whether they had tried to commit suicide or someone close to
20 them or had suicidal thoughts or attempts, it's personal
21 psychiatric information to disclose in front of eight
22 lawyers.  It's too much.
23   MR. CHEFFO:  I don't disagree at all, your Honor.
24 I'm trying to -- I typed in -- I'm trying to find the exact
25 language.

1    THE COURT:  So give me the language because I'm
2  flexible.  I just wanted to get your juices going.
3    MR. CHEFFO:  Sure.  Would you consider, though, if
4  you asked that question and they said "yes," would you
5  consider doing a, you know, kind of a talk to them?
6    THE COURT:  No.  I was just going to exclude them.
7  I'm just going to flat out, anybody who said that it would
8  prevent them from being fair or viewing the evidence
9  objectively -- I forget how I worded it -- they were out.
10 I'm not going to keep them.
11   MR. CHEFFO:  Let's see, I think the question was,
12 "This case involves suicide.  Would this topic cause you so
13 much stress and discomfort that you would be unable to
14 listen to the evidence to be fair?"
15   THE COURT:  "Or be fair."
16   MR. CHEFFO:  "Or be fair," right.  So "cause you
17 stressor or discomfort," I mean, to the extent that might
18 exclude someone who maybe had a potential religious
19 objection.  I mean, I think what the Court is -- if you have
20 a family or a personal experience of a child or something
21 where someone would be in tears, you know, hearing such
22 evidence, we understand the Court's objective.
23   THE COURT:  Or that would prevent them from being
24 fair because they had a bad experience with the drug.
25   MR. CHEFFO:  Well, I don't think we even ask about

Page 106

1   the drug here.  We just talk about, It says --
2          THE COURT:  Fine.  Give me language that isn't too
3   personal.
4          MR. CHEFFO:  As I stand here right now, I can't do
5   that, your Honor.
6          THE COURT:  We're here, we're here with all these
7   eight brilliant minds in the room.  Make a proposal that I
8   can't refuse.
9          MR. CHEFFO:  But if they said "yes" to this, you
10  wouldn't want to then ask them?´If they say "yes," you're
11  going to automatically exclude them?
12         THE COURT:  Yes.
13         MR. CHEFFO:  Okay.
14         THE COURT:  I have no pride of authorship.  If you
15  can make it better, make it better.
16         Don't forget, I'll be explaining all of this
17  orally.  This is the last thing that comes in the door.  I'm
18  going to ask, "Did anyone have any suicides or attempted
19  suicides in your family or with close family members that
20  would --" I'm just going to ask that.  And then I'm going to
21  ask people to come up to side bar and ask them.  This is the
22  last ditch that someone just is too embarrassed to talk,
23  it's their out.
24         MR. CHEFFO:  Well, I guess just on the fly, your
25  Honor, I guess what I would suggest is maybe rather than say

Page 107

1   "would be unable to listen to the evidence and be fair," you
2   know, "Would you be able to sit through a trial involving
3   suicide?"
4          MR. FROMSON:  I think the issue is whether they
5   could listen and whether they could be fair, and I think
6   those are two real salient points that you have in your
7   question, Judge.
8          THE COURT:  And able to ---I should say "and be
9   fair" instead of "or," I think "and be fair."
10         MR. FROMSON:  I agree.
11         MR. FINKELSTEIN:  We have no objection to your
12  question.
13         MR. CHEFFO:  My concern is, you know, after
14  everything and they hear it's going to be three weeks, this
15  is a question that essentially allows anyone who doesn't
16  want to go sit for jury duty, they just say "yes," and we
17  lose everything that you've done.
18         THE COURT:  There is that risk, so the question
19  is, I could ask them each to explain it, but this is --
20         MR. CHEFFO:  So that's where I'm going.  And I
21  think, obviously, your Honor is in charge of the courtroom
22  and you'll be guided, but I think, you know, you're going to
23  have the questionnaires, and if there's maybe a few, we can
24  all agree.  But if there's a large number, then I think you
25  can ask people and say, you know, we don't want to get too

Page 108

1   personal, but, you know, and maybe once you probe them, they
2   find that it's something that, you know, they think, well, I
3   can't really be fair, they don't understand it; but it's not
4   something that I think your Honor is trying to capture,
5   which is, will this cause them serious stress in their life
6   to sit here for three weeks in a trial?  And that's really
7   what I'm trying to accomplish, your Honor.
8          THE COURT:  Well, how about, "Do you have a
9   personal experience that would cause you?"
10         MR. CHEFFO:  Well, again, personal experiences, we
11  don't want to necessarily exclude people, either side.  I
12  mean, some people may believe it's drug --
13         THE COURT:  You're not being very helpful here to
14  me.
15         MR. CHEFFO:  I know I'm not, but what I'm trying
16  to do is, I think your Honor's suggestion of if they say
17  "yes," consider doing individual questioning of them.
18         THE COURT:  Let me put it this way:  I plan on
19  asking this question orally, and then I plan on asking it in
20  writing, and then I plan on saying, "If you were too embarrassed
21  to raise your hand and come up and talk to me, fill this
22  in."  It's what I do with child abuse.  People don't
23  sometimes want to talk in front of eight strangers about the
24  fact that they were abused as a child or the fact that they
25  are bigoted against black people.  Whatever it happens to

Page 109

1   be, people won't disclose it.  So this is a way that I've
2   used in the past of simply getting at something that people
3   don't want to discuss.
4          MR. CHEFFO:  And I don't have any objection
5   whatsoever to that.
6          THE COURT:  So if I talk to them about it, it's
7   not clear what I'll get because I will have already asked
8   them.  I could limit it a little bit more specifically
9   instead of a topic.  It might be better, actually, as I'm
10  thinking about it, to say "Do you have a personal
11  experience?" so I don't make it too broad, instead of just
12  saying, "Oh, gee, suicide sounds depressing."  I could say,
13  "Do you have a personal experience that would prevent --" I
14  could say instead -- I mean, this is what I'm looking for --
15  "Do you have a personal experience with suicide that would
16  prevent you from being fair or being able to listen to the
17  evidence in an objective way?"  I mean, I'm totally flexible
18  on wording.
19         MR. CHEFFO:  Yes, I think --
20         THE COURT:  In other words, I can make it
21  narrower.
22         MR. CHEFFO:  I think certainly narrower is better,
23  your Honor.
24         THE COURT:  So let's just --
25         MR. CHEFFO:  The reason why I'm -- I don't want to

Page 110

1  take up too much time. The reason why I'm struggling a
2  little bit, your Honor, is that, you know, part of our, I
3  think -- and you've said this many times -- this is a
4  multifactorial issue, right? So someone may say, "Just the
5  fact that I've had a personal experience." You know, they
6  may think that drugs cause suicide, or they may think that
7  they absolutely don't. So their personal experiences are
8  important, so we don't want to necessarily just exclude
9  those people. So I would just urge the Court --
10         THE COURT: So give me language.
11         MR. CHEFFO: Well, I think the language you said,
12  but I would also then ask you to consider questioning them
13  afterwards.
14         THE COURT: Why? I've already excluded them,
15  unless you don't want me to exclude them.
16         MR. CHEFFO: If they say "yes," then I think you
17  would ask them a few questions. And if it looks like
18  something, we're all going to be reasonable people, we
19  agree. But if their view of why they can't be fair -- I
20  mean, you must -- this happens all the time, if you just ask
21  someone, you know, is there any reason why --
22         THE COURT: You're just afraid of losing too many
23  people.
24         MR. CHEFFO: I'm afraid of losing too many people
25  and their personal experiences, your Honor. Yes, I mean,

Page 111

1  right, I want to make sure they have true cause not to sit
2  on the jury.
3         THE COURT: One way of rewriting it that narrows
4  it would be, "This case involves a claim that Neurontin
5  caused plaintiff's suicide. Do you have a personal
6  experience with a suicide that would prevent you from being
7  able to listen to the evidence objectively and to be fair?"
8         MR. CHEFFO: I think that's much improved, your
9  Honor.
10         THE COURT: Fine. And if they say "yes," they're
11  off. You don't want them on. I've limited it to personal.
12  I mean, you want me to find out that their mother committed
13  suicide or that their kid committed suicide or that they've
14  been thinking of it? I mean, that's the concern I have is
15  once I start going down that path -- I've already asked them
16  all these questions, don't forget. I'm going to ask all
17  this orally. Then I'm going to capture somebody who was
18  embarrassed to tell me.
19         MR. CHEFFO: You know, look, eventually your Honor
20  is going to be rule, and I'll be guided by that. I'm just
21  reluctant, you know, frankly, for the record, to say that
22  there should be that automatically,
23  particularly that question --
24         THE COURT: Well, usually I ask, "Are you bigoted
25  against black people?" And if they say "yes," I don't ask

Page 112

1  any further. They're out of the door. Okay, "Have you been
2  abused as a child or you or a family member so that you
3  can't sit on this jury?" If they say "yes," I don't
4  interrogate them about it. I somehow think of suicide the
5  same way. Now, if you really feel strongly about it and
6  want me to ask about their suicidal past --
7         MR. CHEFFO: I think that I would -- and, you
8  know, again, we're not looking to pry into personal issues.
9  I think, as I said, we're reasonable. I do think that --
10         THE COURT: You want me to ask why. You want me
11  to ask, why did they say that? Why don't you think about
12  whether you really want me to do that because it could take
13  us no time at all because no one -- don't forget, I've asked
14  this all orally.
15         MR. CHEFFO: Yes, your Honor.
16         THE COURT: I've asked it all. I've excluded
17  everyone who has orally said it. And what I'm going to
18  couch this with is, "Some of you may have been embarrassed
19  to tell me about it."
20         MR. CHEFFO: Fair enough. If I could have till
21  tomorrow morning, I'll think about it.
22         THE COURT: Think about it and talk to that jury
23  consultant. Is he sitting here, or she?
24         MR. CHEFFO: He's not. Your Honor, my job would
25  be easier right now, and I wouldn't have to be kind of going

Page 113

1  around in circles if that was the case.
2         THE COURT: So I'm thinking now, I think you've
3  made some good things about bringing it in so I'm not just
4  getting every person who's dying to get off this jury, you
5  know, is the topic upsetting? I think that's a good
6  suggestion. So if I narrow it in and I say, "Do you have a
7  personal experience with suicide," and I'll explain that
8  that means you or a family member, "that would prevent you
9  from being able to listen to the evidence objectively and to
10  be fair?"
11         MR. CHEFFO: And you're going to tie it -- you're
12  going to say, "This case involves an allegation of suicide
13  by Neurontin" or --
14         THE COURT: Yes, "a claim that Neurontin caused
15  plaintiff's suicide." Oh, I should add, "Defendant denies
16  this," and then we'll go from there.
17         MR. CHEFFO: And, your Honor, absolutely I'll be
18  able to, you know, get with my group and figure out what --
19         THE COURT: Yes, figure out, brainstorm. But my
20  point is, I'm flexible on the following two issues: One is
21  exactly how to word this thing. I'm totally flexible on
22  exactly how to word it. And I'm not flexible, I have to ask
23  to pry into someone's personal suicidal -- plaintiffs'
24  version has me going down an area which it would be very
25  embarrassing to ask people about. If there's some question

Page 114

1  in between that you think I need to ask them in between,
2  "Why do you say this when you didn't raise your hand
3  before?" maybe I'll let you ask the question.
4          MR. CHEFFO:  Well, either that or the next, which
5  we could, or the next question, we could just put a, "If so,
6  please explain."
7          THE COURT:  No, I'm not doing that.
8          MR. CHEFFO:  You don't want to do that, okay.
9          THE COURT:  So, I mean, it's the "please explain."
10  If you feel strongly about it, let me know.  I don't feel
11  strongly about it.  I'm simply saying that when somebody
12  tells me they're a bigot or they've been abused as a child,
13  I let it go.  So maybe suicide is different, and I'm not
14  sure who you're afraid of losing.
15          MR. CHEFFO:  Well, I'm not really afraid of
16  anything.  I think this cuts both ways, I mean, because, you
17  know, there could be someone who just absolutely just hears
18  something that they don't like --
19          THE COURT:  And the person says to me, "The reason
20  I'm doing this is because my mother tried to commit suicide
21  and the topic is too upsetting to me."  So then what do I
22  say?
23          MR. CHEFFO:  Well, if there's a legitimate issue
24  that they can't talk about, then I agree.  What my concern
25  is if they're hearing different or not or thinking something

Page 115

1  on that page, and they hear it's suicide, and we were to
2  talk to them, and they say, "Well, you know, my neighbor
3  across the street committed suicide.  Well, you know, I'm
4  not really that concerned about it, but, you know, you asked
5  me, and that's what I was thinking of, and it bothered me
6  because he was friends with my kid."
7          THE COURT:  All right, your experience or a close
8  family member.  I can rein it in even more.  Believe me,
9  people are going to be dying to get off this trial.  They're
10  going to tell me about everything.  So I'm not as worried as
11  you are.  I'm just simply worried about, they don't want to
12  be here in August.  They're going to hate me because I'm
13  going to deny efforts to get off for all sorts of things,
14  business inconvenience.
15          So right now I've got it, "Do you have a personal
16  experience," I'm going to say "by which I mean your
17  experience or a close family member --" how did I say it? --
18  "with suicide that would prevent you from being able to
19  listen to the evidence objectively and to be fair?"  That's
20  as close as I can get.  And then you think about whether you
21  want me to probe further.
22          MR. CHEFFO:  Fair enough, and I do very much
23  appreciate your Honor --
24          THE COURT:  No, this is fine, and maybe I'm not
25  wording it correctly.  I'm totally open to it.  What I just

Page 116

1  want is, after I've asked all the gazillion questions you
2  all have put before me, some way for the person who's had
3  closet suicidal attempts and doesn't want to talk about it
4  to get out of here without humiliating basically.
5          MR. CHEFFO:  I get that, your Honor.
6          THE COURT:  That's sort of my basic goal.  And if
7  you want -- and maybe I will have to ask them, but think
8  about it.
9          All right, anything else I need to deal with by
10  Thursday?
11          MR. FROMSON:  I have one issue, Judge, related to
12  your comments yesterday about deposition designation
13  objections and trying to get them to you as soon as
14  possible, or at least within 48 hours.  And I just want to
15  know, if the parties reach an impasse before that time, is
16  there a mechanism by which we can get them to you earlier?
17          THE COURT:  What do you mean by an impasse?
18  Impasse means you underline in yellow, they underline in
19  pink counterdesignations, and whoever objects says
20  "Plaintiffs' objection, hearsay, plaintiffs' objection,
21  foundation."
22          MR. FROMSON:  I just want to know, if we can get
23  them to you earlier than 48 hours, would you want them
24  tomorrow or the next day or the next day?
25          THE COURT:  I would love to have them beforehand.

Page 117

1          MR. FROMSON:  All right, because I know of certain
2  witnesses where we have reached impasse.  I believe we have.
3  I wouldn't want to wait.
4          THE COURT:  How many objections are we talking
5  about?  Because I'm going to send you back to the drawing
6  board if there are fifty.
7          MR. FROMSON:  A lot.
8          THE COURT:  I don't accept it.
9          MR. FROMSON:  Well, we should confer, and I
10  appreciate that as well, and I'm willing to do so.
11          THE COURT:  Well, what are we talking about,
12  leading questions?  What kinds of objections?
13          MR. FROMSON:  What came to mind today is one
14  witness who we deem to be an expert witness, they may deem
15  to be a fact witness.  If they're bringing him as an expert
16  witness, then they need to bring him live, they shouldn't
17  read from a depo.  If it's a fact witness, then all the
18  opinion testimony would have to be struck.
19          THE COURT:  Why?  Fact witnesses can give lay
20  opinions.
21          MR. FROMSON:  Fact witnesses shouldn't be allowed
22  to be giving expert opinions when they're being retained by
23  the defense and they're really experts.  That's the issue on
24  this one witness.  It's Cynthia McCormack.  She did this --
25          THE COURT:  I don't remember who she is.

Page 118

1      MR. FROMSON:  Cynthia McCormack did the clinical
2  review in 1992.  It's the infamous clinical review.
3      THE COURT:  Oh, yes, that's a big one.
4      MR. FROMSON:  Yes, it is.  And defendants retained
5  her, and defendants paid her, and she did an affidavit, and
6  she was paid to provide opinions in the case, and we deposed
7  her in a discovery deposition.  My concern is, we have
8  objections to her so-called opinion testimony.  If she's
9  truly an expert retained by the defense, she should be here
10  live, or else why wouldn't we start playing our experts by
11  video?
12      THE COURT:  So that's not a thousand --
13      MR. FROMSON:  No, that's a real macro issue.  When
14  you asked, do we have lots of objections to designations,
15  yes, overall we have many depositions we have to go over.
16  So the issue that comes to mind was Cynthia McCormack, do
17  they have to bring her life, is she --
18      THE COURT:  She can testify about factually what
19  she did or she didn't do.
20      MR. FROMSON:  I agree.  The issue is, when they
21  ask her an opinion about whether Neurontin causes suicide,
22  she ought to be in the courtroom subject to cross to give
23  that.
24      THE COURT:  She can only do it about what her
25  opinion was at that particular moment in time.

Page 119

1      MR. FROMSON:  I understand that, Judge.  Thank
2  you.  That gives me guidance.
3      THE COURT:  Not now.
4      MR. FROMSON:  That gives me guidance, your Honor,
5  as to how the objections will be ruled upon with the yellow
6  and red.
7      THE COURT:  If she's a fact witness, she comes in
8  that way.  If she's an expert witness -- was she designated
9  as an expert?
10      MR. FROMSON:  No.
11      MR. CHEFFO:  Your Honor, again, this is like, you
12  know, kind of a trial by ambush thing.  He's pulling out
13  something you haven't even seen.  He's asking you to make
14  rulings before you've even seen --
15      MR. FROMSON:  No, I actually asked if there was a
16  mechanism by which to bring it to her attention, if not
17  today.  That's what I asked.
18      THE COURT:  Let me just say this:  What I don't
19  want -- that seems like a completely fair issue to present
20  to me.
21      MR. FROMSON:  Thank you, Judge.
22      THE COURT:  What I don't want is, "We can't agree
23  that this is a leading question," or, "This is --"
24      MR. FROMSON:  We don't have those issues.
25      THE COURT:  You know, that this is, you know,

Page 120

1  repetitive, or just some broad-sweep foundation.
2      MR. CHEFFO:  I think, you know, to that point, we
3  understand.  I think we've gotten some guidance as well from
4  yesterday.  Is it something that you expect your chambers to
5  deal with, or is it something that the magistrate will deal
6  with?
7      THE COURT:  I'll deal with.  This is trial
8  testimony at this point, but just understand that if you get
9  it to me too late, I'm not going to rule on it.
10      MR. FROMSON:  That's why I was concerned.
11      THE COURT:  And if it screws up your timing and
12  editing and all of that, because I have all these other
13  cases in the afternoon, and plus I've got a thousand other
14  obligations.  So if you want me to rule, I am not an ATM
15  machine.  Like, when you started spitting more motions out
16  than I could rule on per minute, I can't keep up.  You have
17  to use some internal filtration device.
18      MR. FROMSON:  So that's why I inquired today,
19  Judge, and I don't want to file a motion when you had a
20  standing order that says "no more motions."  So I'm here
21  Wednesday, I'm here Thursday if you want to address it.
22      THE COURT:  When I say "no more motions," if
23  someone has a stroke or there's like a crisis like we had
24  with this witness who claims she was intimidated, I'm not
25  referring to that.  I'm talking about --

Page 121

1      MR. FROMSON:  Well, may I have leave to file the
2  motion on this issue?
3      THE COURT:  No, no.
4      MR. FROMSON:  Okay.  So I don't know what the
5  mechanism is.
6      THE COURT:  I've allowed you to object to each
7  other's depositions.  It's not just trial -- if there's a
8  real crisis that comes up, "Judge, we're settling the case,"
9  let me know, give us a --
10      MR. FROMSON:  Your Honor, I don't know whether
11  defense counsel is going to claim to you two days before
12  they expect to play her video, "Judge, we didn't get a plane
13  ticket for her to come up here.  No one told us she had to
14  testify live."  Mr. Fromson said --
15      THE COURT:  Excuse me.  You know, at this point
16  I'm saying the only thing I have left, as far as I know, for
17  all of you, the only key thing is hearing from Dr. Gibbons
18  on Thursday.  And there's one thing I might have to do, and
19  I may have to juggle the times a little bit, but other than
20  that, that's all that I view my having to rule on at this
21  point.
22      MR. FROMSON:  Thank you, Judge.
23      THE COURT:  Other than that, I think everything
24  has been ruled on.
25      MR. FROMSON:  Yes, your Honor.

Page 122

1    THE COURT: Maybe not a full-blown opinion, but
2  everything has been ruled on. And the only thing I owe you
3  a full-blown opinion on really is the Maris/Kruszewski
4  issue, and that's all I have in my pipeline for opinions.
5    MR. FINKELSTEIN: That's all we believe there is.
6    THE COURT: All right, but I want to make it
7  clear, when you do the opening, you can't say -- the way I
8  view the psychological autopsy and the differential
9  diagnosis is an objective approach to thinking about the
10 records. It's not science like lab science. It's how --
11 it's almost like the DSM. What does that stand for again?
12 Yes, he's got it, Diagnostic and Statistical Manual. It's
13 like that. It's like, here are the things we're thinking
14 about; as you all put it, rule in, rule out, this is what
15 we're thinking about. But it's not science like lab
16 science, so just in how you introduce it.
17    What I am likely to do, and I haven't heard from
18 Gibbons yet, is, also, as I'm hearing it, he doesn't refute
19 the FDA analysis. It's apples and oranges. They're looking
20 at different things. It's one thing that would give you
21 pause about the scientific analysis. It's not that the
22 scientific analysis of the FDA was wrong, because it looked
23 at different things and different trials. It's just a piece
24 of a puzzle, if I can use it that way, that suggests that
25 the FDA may not have had it right, but not this -- it's not

Page 123

1  like he did his own meta-analysis, now that I understand it,
2  of clinically controlled studies with placebos and looking
3  at suicidal ideation attempts and conclusions. That would
4  be wrong to state it that way.
5    MR. BARNES: He had a completely different data
6  sets of claims data, correct.
7    THE COURT: And it's a much more limited utility.
8  That having been said, it may be viable for him to say,
9  "This is why there's some doubts in my mind. It's just one
10 of the things you look at, one of the many tools
11 statisticians look at to see if someone got something
12 right."
13    MR. BARNES: That's fair. I think it's a way to
14 test the strength of the conclusions of the meta-analysis.
15    THE COURT: Yes, yes, but that's different from
16 saying, "FDA got it wrong."
17    MR. BARNES: It's a different data set that shows
18 a different result.
19    THE COURT: It's a different data set.
20    MR. BARNES: And it's the inferences you draw from
21 each is where the battle goes between the experts.
22    THE COURT: Fair enough, but I wouldn't want in
23 opening statements to have this misrepresented.
24    MR. BARNES: I'll go back and make sure what I say
25 is accurate, but I think that's a fair characterization.

Page 124

1    THE COURT: Okay, thank you.
2    MR. BARNES: Thank you, your Honor.
3    MR. FINKELSTEIN: Thank you, your Honor.
4    THE CLERK: Court is in recess.
5    (Adjourned, 12:00 p.m.)

Page 125

1         C E R T I F I C A T E
2
3
    UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
    CITY OF BOSTON              )
5
6
7      I, Lee A. Marzilli, Official Federal Court
8  Reporter, do hereby certify that the foregoing transcript,
9  Pages 1 through 124 inclusive, was recorded by me
10 stenographically at the time and place aforesaid in Civil
11 Action No. 04-10981-PBS, In Re: Neurontin Marketing, Sales
12 Practices, and Product Liability Litigation, and thereafter
13 by me reduced to typewriting and is a true and accurate
14 record of the proceedings.
15      In witness whereof I have hereunto set my hand
16 this 21st day of July, 2009.
17
18
19
20
21    /s/ Lee A. Marzilli
                                    _____
22    LEE A. MARZILLI, CRR
    OFFICIAL FEDERAL COURT REPORTER
23
24
25

## A

**ability** 37:15
**able** 107:2,8 109:16
    111:7 113:9,18
    115:18
**absence** 25:11
**absolutely** 26:23 31:16
    32:22 110:7 113:17
    114:17
**abstract** 50:16 51:10
    51:11 52:2,6,7
**abuse** 103:22 108:22
**abused** 108:24 112:2
    114:12
**abuses** 86:16
**accept** 22:11 117:8
**acceptance** 49:19
**accepted** 10:2 13:15
    47:25 77:11
**accommodates** 100:16
**accomplish** 108:7
**account** 47:17 52:12
    54:8,12 56:4,16
    61:11 64:17,20 65:9
    66:14 80:15 81:5
    84:2,24 96:5 100:14
**accounted** 83:25 86:23
**accounting** 83:24 87:14
**accumulating** 65:15
**accumulation** 65:23
**accurate** 76:12 123:25
    125:13
**acquired** 58:7
**Action** 4:3 125:11
**actual** 34:19 35:6 54:13
    56:7 61:15 69:23
**acute** 29:24
**add** 113:15
**added** 10:20
**addition** 9:3
**address** 32:13 39:8
    57:16 60:25 84:18
    85:20,20,21 120:21
**addressed** 31:3 35:16
    35:17
**adds** 64:6
**adequate** 96:7
**adequately** 13:22 56:17
    61:1,13 64:17
**Adjourned** 124:5
**adjust** 35:1 41:10
    79:15 84:7 87:8
**adjusted** 34:10 40:20
    41:6,12
**adjustment** 83:20 84:8
**adjusts** 34:11 83:1
**Administration** 99:23
**admissible** 6:1
**admitted** 74:5 82:13
**advance** 47:4
**advantages** 37:12,20

**adverse** 15:11
**advice** 66:2
**advisory** 97:19
**advocate** 64:14
**AED** 39:4 51:13,16
    63:22 83:10,13 87:9
    99:7,25
**AEDs** 11:9,16 25:15,20
    51:14,16 82:11
**AED-treated** 83:17
**affect** 62:7,20
**affidavit** 118:5
**aforesaid** 125:10
**afraid** 110:22,24
    114:14,15
**afternoon** 120:13
**age** 14:22,25
**agree** 37:17,18,19
    73:20 74:1 76:20
    77:5,23 94:17 96:17
    98:16 107:10,24
    110:19 114:24
    118:20 119:22
**agreed** 31:14
**ahead** 81:3
**Alba** 59:6
**Albert** 22:18
**alert** 12:6 25:23 46:21
**allegation** 113:12
**allow** 8:11 13:13 31:8
    31:11 32:16 51:23
**allowed** 8:14 31:5
    117:21 121:6
**allows** 107:15
**alternative** 40:23
**Altman** 2:4 3:5 4:12,13
    5:19,24 6:14,22,24
    7:5,13,15,17 8:3,9,19
    8:22,24 9:4,10,14,20
    9:24 10:5,16,24 11:5
    11:11,15,21 12:1,11
    12:13,18,21,24 13:2
    13:9,18 14:10,14,17
    14:24 15:6,10,18,25
    16:20,24 17:14,19,23
    18:3,15,19 19:10,14
    19:19,22,25 20:10,15
    20:20,23 22:5,12,19
    22:23 23:20 24:1,4,7
    24:11 25:5,18,21
    26:10,22 27:2,14,20
    27:24 28:2,12,18,20
    28:24 29:4,8,12,21
    39:23 41:21 42:17,18
    44:16 50:24 51:1,5
    53:8 57:2,6,9,10 58:4
    59:6,24 60:3,17 68:3
    69:3,8 70:8,21 72:11
    101:13
**ambush** 119:12
**American** 96:25 97:8

**amount** 79:11 80:2
**analogy** 65:17
**analyses** 10:7,11,13,15
    21:4 40:21 57:7
    59:17 60:25 73:17
    80:6,19
**analysis** 9:9 16:10
    19:17 33:15,18,18,19
    34:11,12,17,18,21,23
    36:11 40:25 45:4,10
    54:16 56:7,16,18
    61:5,12 62:7 80:8,9
    80:13,20 81:4 83:2,2
    83:9,20 84:1,10,14
    87:8,15,21,22 88:4,6
    88:9,16 90:7 91:21
    92:2 93:14,18 94:9
    100:1 122:19,21,22
**analyze** 27:16 45:23
    71:14
**analyzed** 72:5
**analyzing** 54:17
**Andrew** 2:3 4:6
**Angeles** 42:22 43:1
    73:14
**anonymous** 99:11
**answer** 40:9,13 41:2
    71:10 80:25 82:18
    99:23
**anti** 29:2
**anticonvulsants** 15:7
    29:18 97:20
**antidepressant** 15:19
    79:6
**antidepressants** 15:7
    15:17 29:17
**antiepileptic** 24:6,7,10
    32:19,20 35:20,25
    38:11,13 99:25
**antipsychotic** 29:7,9,13
**antipsychotics** 15:8
    28:25 29:2,3,4,10,15
    29:18
**anti-anxiolytic** 15:19
**anti-immunity** 79:1
**anxious** 15:12
**anybody** 105:7
**anyway** 89:11
**apparently** 56:21
**appear** 9:20 23:1 65:8
    70:3
**appearance** 23:3
**appears** 65:14 69:24
**apples** 67:6,7 122:19
**applied** 6:3 30:11
**applies** 81:24
**apply** 6:24 14:18 37:25
    49:11 85:12
**applying** 86:5
**appreciate** 73:14
    115:23 117:10

**appreciated** 99:18
**approach** 50:24 56:3
    68:3 122:9
**appropriate** 31:24
**appropriately** 35:16
**Approximately** 44:5,14
**Archive** 32:18
**Archives** 9:3
**area** 113:24
**argue** 6:20
**argument** 7:7 64:10
**arises** 55:17
**Arps** 2:9 4:15,17
**arrive** 7:1 47:12
**article** 50:4,5 52:9 83:6
    83:7,8 99:16
**articles** 77:22 82:7
**articulated** 103:23
**ascertainment** 86:8
**aside** 18:3 48:10 64:2
**asked** 7:1 14:9,10
    15:16 16:25 24:16
    37:24 44:12 64:13
    70:21 82:5,10,11
    85:18 105:4 109:7
    111:15 112:13,16
    115:4 116:1 118:14
    119:15,17
**asking** 17:22 104:18
    108:19,19 119:13
**asks** 57:6,9
**asserted** 64:24
**assign** 59:3
**assigned** 54:15,22
**associated** 38:12 40:12
    51:13 71:5 83:12
**association** 65:11 75:20
    97:1,8
**assume** 18:16 32:11
    78:18 79:10
**assumed** 16:20 78:22
**assumptions** 97:20
**ATM** 120:14
**attack** 20:8
**attacking** 8:23 10:14
    10:16,17
**attacks** 8:11 23:16
**attempt** 5:20 16:4,5,7
    16:10,13 21:14,20
    23:2 33:3,4 51:17
    57:8 58:14 59:13
    60:17 62:1,3 74:16
    74:19,21,23 75:22
    79:14 81:10 83:12
    91:4,7,16,18 92:22
    93:21,25
**attempted** 106:18
**attempting** 66:24
**attempts** 16:11,21 17:1
    17:4,8,16 19:3 20:2
    21:9,15 22:24 35:23

    35:24 38:12,22 51:15
    55:23 58:8 59:4,19
    59:20 60:19 61:15
    62:14 64:4 67:3,12
    67:22 75:1,18 91:19
    91:22 93:1,6,11 94:4
    104:20 116:3 123:3
**attention** 18:12 103:19
    119:16
**atypical** 15:8 29:4,7,18
**August** 115:12
**authority** 34:22
**authorship** 106:14
**automatically** 106:11
    111:22
**autopsy** 122:8
**availability** 103:5
**aware** 21:5 79:14 92:8
    93:3 97:10,17,21
    100:7
**awkward** 103:22
**a.m** 1:17 73:9,10 102:3

## B

**B** 1:11 2:3,7 92:16
**baby** 8:7 9:12 11:22
    42:15 87:20
**back** 8:2 16:13,14,21
    25:25 26:5 30:22
    66:1,2 73:15 86:22
    117:5 123:24
**backwards** 46:1
**bad** 105:24
**baked** 85:22
**Baltimore** 2:11 4:19,24
**bar** 106:21
**Barnes** 2:10 3:6 4:18
    4:18 22:22 30:3,9,22
    31:1,13,20 32:1,13
    32:16 33:7,23 34:5,8
    34:10,15,17 35:2,4
    35:11,15 36:5,10,14
    36:19,21 37:1,4,8
    38:7,9,15,25 39:6,12
    39:18,20 47:15 50:18
    50:20 53:16 58:24
    61:6 65:1,4 69:4
    70:12,18 71:1,7
    72:12,13,24 73:5,11
    73:12 79:17 82:4,9
    82:15,17,23 84:17
    87:3,23 88:2,5,11
    89:21 90:21 91:2
    93:23 95:18 96:10
    99:11,13 100:21
    101:2,5,7,9,16 102:3
    102:6,10,15,19
    103:10 123:5,13,17
    123:20,24 124:2
**based** 6:1 8:9 29:22
    33:14 37:16 46:2,21

Page 2

47:12 56:7 60:11
64:7 65:7 66:6 70:1,9
70:15,21 72:4,25
100:6
**basic** 7:9 116:6
**basically** 5:8 10:25
14:2 34:25 39:9
52:23 61:5 102:17
116:4
**basics** 7:8 8:5,5,25
**basis** 33:20,24 54:22
83:11
**battle** 123:21
**before/after** 68:11
**beginning** 49:21 69:23
**begins** 51:11
**behalf** 4:7
**behavior** 70:17 72:7
97:21 99:24
**belief** 77:15 98:11
**believe** 12:24 13:18
28:4 39:6 43:25
44:18 46:4 51:5,20
52:3,4,5 56:24 58:9
58:12,19 60:1 90:23
101:11 102:5 108:12
115:8 117:2 122:5
**Berkshire** 65:19
**best** 9:20 41:2 49:14
56:8 98:17
**bet** 26:5
**better** 23:1 77:9 88:18
88:22 95:18 106:15
106:15 109:9,22
**betting** 26:4
**biases** 86:8
**big** 6:13 39:23 56:11
65:20 67:2 118:3
**bigger** 67:10
**bigot** 114:12
**bigoted** 108:25 111:24
**Bill** 23:14
**binder** 51:2,5 90:23
**biology** 41:7
**bipolar** 8:21 10:22
11:11,14,15 12:1,5,9
12:24 13:5 14:2,3,17
15:14,23,23 16:1
17:3 18:10 21:18,19
21:22,24 22:2 23:5
24:1,4 26:8,17,25
27:6,9,11,22 28:14
28:21 29:24 32:19,21
32:25 33:12 34:5
35:22 38:6 46:3
51:15 68:6,8,9,10,20
68:22,22 87:24 91:17
**bit** 36:19 46:7 50:9
96:12 102:13 109:8
110:2 121:19
**bitter** 73:3

**black** 108:25 111:25
**bluntly** 88:25
**board** 28:23 33:9 117:6
**bolsters** 13:4
**book** 43:8,9,11,13,14
43:20,24
**books** 37:11
**Boston** 1:16,24 2:7
125:4
**bothered** 115:5
**bottles** 53:22,23
**bottom** 51:10
**bought** 14:1 29:15
**Box** 2:4
**brainstorm** 113:19
**break** 40:9 72:15,16,20
72:23,25 73:8
**briefing** 38:3
**briefly** 32:6 39:14
**brilliant** 106:7
**bring** 29:24 103:18,20
117:16 118:17
119:16
**bringing** 73:13 113:3
117:15
**broad** 109:11
**broad-brush** 103:24
**broad-sweep** 120:1
**brought** 21:2
**Buffet's** 65:20
**bunch** 10:10
**business** 115:14
**buy** 25:13

_____

**C**

**C** 2:1 4:1 125:1,1
**CA** 1:4
**calculate** 19:25
**calculated** 58:13
**calculations** 53:14
**California** 43:1
**call** 49:22,23 75:24
85:8
**called** 32:14,19 33:1
43:8 54:16 80:13
**calling** 56:8
**capture** 108:4 111:17
**captures** 52:2
**care** 75:8 89:8,12 96:8
**careful** 47:11
**carefully** 82:2 86:18
**Carolina** 44:1
**cars** 49:7
**case** 5:5 6:4,12 45:4
55:22 63:23 105:12
111:4 113:1,12 118:6
121:8
**cases** 63:23 120:13
**catch** 50:18
**causal** 40:15 65:13
71:12,13 89:12,14,15

**cause** 5:6 70:16 105:12
105:16 108:5,9 110:6
111:1
**caused** 99:5,7 111:5
113:14
**causes** 18:21 118:21
**causing** 65:13
**caution** 65:5
**certain** 49:8 55:11
63:16 117:1
**certainly** 25:5 53:20
77:19 103:12 109:22
**certify** 125:8
**cetera** 5:14 14:25 16:15
**Chaffin** 2:7 4:20,21
**challenge** 97:19
**challenging** 10:20
12:16 27:25
**chambers** 120:4
**chance** 45:23 102:12
**change** 17:1 48:14
94:18 95:1,13,17,19
95:22,25
**changed** 90:7
**changes** 39:6
**characterization**
123:25
**charge** 77:2 81:16
107:21
**Charles** 4:25
**chart** 68:2,5
**check** 12:25 80:19
102:10
**Cheffo** 2:8 4:14,14
23:12,18 101:19,25
102:5,21 103:11
104:3,8,11,13,23
105:3,11,16,25 106:4
106:9,13,24 107:13
107:20 108:10,15
109:4,19,22,25
110:11,16,24 111:8
111:19 112:7,15,20
112:24 113:11,17
114:4,8,15,23 115:22
116:5 119:11 120:2
**chest** 53:21
**chicken** 89:13
**chief** 64:10
**child** 103:22 105:20
108:22,24 112:2
114:12
**choice** 88:6
**choose** 5:15 74:22
**chose** 20:20
**chosen** 97:24
**Chuck** 2:12
**circles** 113:1
**cited** 44:23 45:3
**cites** 17:20 20:24 45:1
84:9

**CITY** 125:4
**Civil** 4:3 125:10
**claim** 35:5 65:18 74:19
75:4,23 76:18 78:17
90:13 111:4 113:14
121:11
**claims** 17:3 27:21 47:5
47:6 56:15 67:12
73:18 74:18 76:4,17
76:25,25 77:15,19,24
120:24 123:6
**clarify** 58:5 73:16 85:4
**clarifying** 64:9
**class** 51:14
**clean** 17:8
**clear** 83:18,21 109:7
122:7
**clearly** 23:9 44:15
74:25
**CLERK** 4:2 42:4 124:4
**clinical** 36:9 46:19,22
86:1,9,12 118:1,2
**clinically** 74:3 123:2
**close** 5:13 104:19
106:19 115:7,17,20
**closely** 66:4
**closer** 56:7 76:19 77:4
**closet** 116:3
**closings** 7:10
**clozapine** 29:12
**coauthors** 43:11
**code** 21:19,20
**codes** 62:1,14
**cohort** 12:10 37:14
84:20 90:3 93:12
95:10 100:6
**colleague** 49:18 88:12
97:23
**colleagues** 55:19 64:19
**college** 93:24
**Columbia** 43:25
**column** 93:1 95:6
**combined** 36:11
**come** 15:17 41:18
75:12 82:3 106:21
108:21 121:15
**comes** 18:5 30:12 81:7
98:15 106:17 118:16
119:7 121:8
**coming** 31:19 42:19,21
49:7 88:21 102:4
**comment** 64:8 74:14
99:8,9 100:23
**comments** 97:13
100:11,12,24 116:12
**commit** 5:14 18:17
21:25 22:1 66:24
104:19 114:20
**committed** 111:12,13
115:3
**common** 45:7 79:13

**commonly** 78:2
**community** 77:6
**companies** 47:4
**company** 65:20
**compare** 33:1 36:3
55:20 67:6 68:12
69:16 80:9,17
**compared** 33:23 68:8
68:21
**compares** 33:15 35:22
35:23
**comparing** 55:24
**comparison** 33:14
34:20 36:1 55:2,21
63:4 68:19
**comparisons** 55:21
**competence** 87:18
**complete** 36:16
**completed** 21:9,11
67:18,21 74:19 75:18
**completely** 18:6 23:23
25:7 119:19 123:5
**complicated** 42:15
**complied** 6:6
**compound** 86:12,17,18
**conceded** 56:12
**concern** 31:4,11,18
56:10 60:25 79:18
83:24 84:1,2 103:18
107:13 111:14
114:24 118:7
**concerned** 115:4
120:10
**concerning** 45:20
**concerns** 25:6 30:6
31:2 57:16 80:15,16
81:5 99:16
**conclude** 24:23
**conclusion** 7:1 28:5
33:14 50:14 52:1,4,7
58:3 65:7 70:10,16
72:3 89:12,14
**conclusions** 6:17 10:18
10:24,25 13:21 22:8
22:13 24:8,13 28:4,7
28:9 30:6,12 31:25
45:24 46:4 47:12
48:19 50:5,9,17 51:8
51:9,10,20 52:13,17
52:25 57:18 59:13
62:7 65:6 66:6,11
71:3,13,15 123:3,14
**conclusiveness** 90:18
**condition** 70:2
**conditions** 5:17
**conduct** 10:17 47:9
**conducted** 7:2
**confer** 117:9
**CONFERENCE** 1:9
**confirm** 34:20
**confirms** 12:6 33:18

34:11
confuse 82:18
confused 26:6 47:21
confusing 48:22
consecutive 16:9 21:15
  62:4
consequence 46:4 72:8
  74:4 91:18
conservative 48:22
consider 7:22 18:15
  20:20 21:13 25:8
  53:13 65:16 98:23
  104:6 105:3,5 108:17
  110:12
considerable 80:2
considerations 30:10
considered 20:15
consistent 41:1
consultant 112:23
contain 85:14
contract 29:5,16
contradiction 36:17
contrast 97:18
contributed 77:21
contributors 57:19
control 40:25
controlled 46:18 85:25
  86:5 123:2
convenience 92:18,19
copy 50:16
core 48:23
correct 8:19,22 9:10
  11:21 22:6 27:24
  28:3 30:4 37:4 40:13
  43:16,17 45:4,5,8,9
  45:11,12,15,16,18,21
  45:22,25 46:13,14,16
  46:17,19,20,22,23,25
  47:13,14 57:13,14
  58:17 60:11,13,14
  73:24,25 74:6,13,16
  74:17 75:2,3,5,6,9,10
  76:8,10 77:2,25 78:3
  78:5 80:4,11,13,20
  81:23 83:3,4 84:3,7
  84:11,15,25 86:2,3,6
  86:7,8,13,16 87:9,17
  88:2 90:3 92:9,24
  93:4,12,14,18 94:5
  94:11,15 95:11 96:15
  96:20,23 97:4,5,8,9
  97:13 98:4,23 100:8
  100:14,15 123:6
corrections 9:17
correctly 35:4 63:22
  67:25 68:24 115:25
correlate 61:14
correlation 59:10
  66:22 67:10
couch 112:18
counsel 4:5 23:16

37:23 58:24 68:2,5
  87:13 89:24 121:11
counseling 7:25 18:12
  18:17
counted 16:25 63:21
counterdesignations
  116:19
counting 63:24,25
counts 16:10 21:21
couple 58:4
course 22:16,23 31:11
  64:5 65:16 67:17
  78:21 103:5
court 1:1,15,23,23 4:4
  4:22 5:1,23 6:5,10,20
  6:23 7:4,6,14,16 8:2
  8:4,10,20,23,25 9:7
  9:11,19,22 10:3,14
  10:19 11:4,8,13,19
  11:22 12:8,12,16,20
  12:23 13:1,7,12 14:8
  14:13,16 15:5,9,16
  15:23 16:18,23 17:11
  17:17,22,24,25 18:13
  18:16 19:8,11,16,21
  19:23 20:5,14,18,22
  22:3,10,18,21 23:11
  23:17,24 24:3,5,9
  25:2,14,19 26:6,21
  26:24 27:12,18,22,25
  28:10,14,19,22 29:3
  29:6,11,19 30:1,7,20
  30:24 31:4,18,21
  32:10,14 33:5,21
  34:1,7,9,13,16,24
  35:3,9,13 36:3,8,13
  36:16,20,24 37:2,5
  38:4,8,14,24 39:3,9
  39:16,19 41:16,23
  42:8,11,13,21 44:15
  47:7,16,19,25 48:3,7
  48:10,16,20 49:2,10
  49:16,22,25 50:11,22
  50:25 51:7,22 52:6,8
  52:15,19 53:1,5,11
  53:24 54:2,6,23 55:1
  55:4,6,9,11,14 56:10
  56:15 57:1,17,22,24
  58:6 59:8,10,23 60:2
  60:16,21,24 61:3,10
  61:14,18 62:8,11,15
  62:17,19 63:1,7,10
  63:13,15,17,21 66:1
  66:9,13,22 67:2,6,9
  67:14,20,24 68:15,17
  69:1,5 70:7,13,20
  71:2,8,11,17,20,24
  72:17,19 73:2,7
  78:17 79:9 81:1,3,14
  82:3,6,13,16,19,21
  83:5 85:4 87:1,5,20

87:25 88:3,8,13,15
  88:20,25 89:4,8,9,16
  91:3 93:22 94:24
  95:2,15,19,25 96:4,7
  97:11 99:2,4,9,12
  100:17,25 101:3,8,14
  101:18,23 102:1,4,9
  102:12,16,20,23
  103:1,3,7,17 104:1,5
  104:7,10,12,13,15
  105:1,6,15,19,23
  106:2,6,12,14 107:8
  107:18 108:8,13,18
  109:6,20,24 110:9,10
  110:14,22 111:3,10
  111:24 112:10,16,22
  113:2,14,19 114:7,9
  114:19 115:7,24
  116:6,17,25 117:4,8
  117:11,19,25 118:3
  118:12,18,24 119:3,7
  119:18,22,25 120:7
  120:11,22 121:3,6,15
  121:23 122:1,6 123:7
  123:15,19,22 124:1,4
  125:3,7,22
Courthouse 1:16,24
courtroom 1:16 42:8
  107:21 118:22
Court's 103:19 105:22
cover 55:14
covered 33:19 35:15
creating 57:17
crisis 120:23 121:8
critical 88:15
criticism 33:24 53:5
  80:5 83:1 91:25
criticisms 34:11 56:11
  90:14,15 100:18
criticize 50:2
criticized 48:20 49:4
  60:22 80:1
criticizing 84:23
cross 3:3 118:22
cross-examination
  31:14 72:13
CRR 125:22
crucial 99:16
current 43:18 51:13
currently 42:25
cut 62:21,24 64:2,10
cuts 114:16
Cynthia 117:24 118:1
  118:16

_____
         D
_____

D 3:1 4:1
Dann 2:11
data 6:2,25 14:1,1,2,4
  14:14,20,24 15:1
  16:1,6 19:2 20:18

21:12 25:10,20 26:16
  27:16 37:15 40:12
  44:20 45:7,11 46:22
  46:24 47:2,3,9 56:3
  58:7,10,10,15,17
  59:2 61:23 62:5 64:7
  64:18 65:7,8 71:14
  71:16,17,19,21 72:5
  73:24 74:1,9 75:9
  77:5,16,24 85:11,12
  87:13,19 89:24,24
  90:19 123:5,6,17,19
database 21:10 54:3,4
  54:7,8 55:12 69:22
  70:3 73:18,18,21
  74:18 75:9 76:2 85:8
  85:9 87:19
databases 55:19 66:6
  76:4 77:20 85:6
date 15:3 20:12 32:25
  33:1,2,3,9,10,11,12
  35:21 38:22 40:18
  62:17 68:20 79:20
  91:23,23 93:4,6,8
  94:10 96:2
dates 21:15 58:8 62:1,4
  82:7
Daubert 1:10 5:18,21
  6:11 8:15 30:6,10,13
  32:5 101:21,23
daughter 102:6,11
David 2:7 4:20
day 1:9 16:3,4 21:21,24
  91:17 116:24,24
  125:16
days 16:9 17:8 19:18
  30:18 31:10 35:14
  79:12 121:11
dead 74:20
deal 39:23 67:18,20
  101:21 116:9 120:5,5
  120:7
dealing 31:10 46:25
deals 67:21,22 82:4
death 103:16
debatable 98:6
debate 84:6
decay 41:5
decline 40:23
decrease 22:24 38:22
  38:23 83:12
decreases 83:16
deem 117:14,14
deemed 77:5
Defendant 113:15
defendants 2:6 5:4
  118:4,5
defense 117:23 118:9
  121:11
definition 63:15
definitive 71:25

deflate 91:23
degrees 89:4,6
demographic 14:21
demographics 14:25
demonstrate 28:3
  70:24
demonstrated 23:10
denied 38:2
denies 113:15
deny 115:13
depends 35:11 40:5
  63:24 78:20,22
depo 117:17
deposed 118:6
deposition 9:16,23,24
  9:25 10:9 21:2 37:24
  116:12 118:7
depositions 30:18
  31:17 118:15 121:7
depressing 109:12
depression 91:16
depth 57:16
describe 74:22 76:9
  86:1
described 32:9 79:20
describes 83:20
design 35:11 36:21,22
  38:3 75:2 76:10,13
  76:16
designated 119:8
designation 116:12
designations 118:14
designed 32:17 98:21
designing 47:18
designs 37:16
despite 51:9,11
detail 29:16 76:22
  83:21
details 76:22
device 78:5 120:17
DeVries 2:11 4:18,23
diagnosed 21:24 22:2
  70:4
diagnoses 70:3
diagnosis 22:25 27:9,9
  32:25 33:2,3,12
  35:22 59:22 68:7,8,9
  68:13,14,14,21,22,23
  69:14,17,17,18,19,22
  69:24 70:2,5 91:16
  92:24 94:1,2 122:9
Diagnostic 122:12
dialogue 73:1
die 79:3,5
difference 9:8 23:21
  26:9 32:8 67:2 87:15
  90:3 92:3 94:13
differences 47:21
different 12:13 16:5
  22:12 23:23 25:16
  26:14 36:11,18,21,22

Page 4

36:25 37:1 46:24
52:20 57:25,25 65:10
82:6,7,7 87:12,24
114:13,25 122:20,23
122:23 123:5,15,17
123:18,19
**differential** 122:8
**difficult** 58:20
**direct** 3:3 32:21,23
42:18 73:16 99:23
**directly** 56:1 76:3
**disagree** 8:8 104:23
**disagreement** 50:3
**disclose** 13:22 104:21
109:1
**disclosed** 78:11
**discomfort** 5:6 105:13
105:17
**discovered** 9:17
**discovery** 118:7
**discuss** 101:20 103:6
109:3
**discussed** 59:3
**discusses** 17:15
**discussing** 52:11 81:8
92:10
**discussion** 14:23 39:25
54:12
**discussions** 29:23
**disease** 19:6 69:23
**disentangle** 24:25
**disorder** 12:5 15:14
18:10 21:20,22 22:2
23:8 29:24 33:12
35:22 51:15 91:5,17
**disorders** 26:19
**disputes** 49:13
**District** 1:1,1,11,15,23
125:3,4
**ditch** 106:22
**divergences** 90:17
**doctor** 49:23 50:18
70:20
**document** 51:4
**documents** 30:19
**doing** 18:2 21:4 30:7
41:10,17 105:5
108:17 114:7,20
**door** 106:17 112:1
**dosage** 7:22
**doubts** 123:9
**Dr** 4:7,7 5:20 6:6,25
7:19 9:15,17 10:9,24
16:10 17:11 18:25
19:5 20:23 21:21
22:8 24:17,22 25:12
25:18,23 30:6,14
32:4,17 33:1,13
34:23 35:8,12 36:6,7
37:17,17,21 38:1,10
38:20 39:8,23 40:1,5

40:20 41:9,18,19,22
42:19,23 44:18 45:13
45:15,21 46:2,8,10
53:9,13 57:3,9,10,13
58:7,7,10,13 59:15
59:17 60:6,7 61:20
61:23 62:5 63:18,20
64:16,19 68:1,6,7,10
68:12,19,20 69:10,16
69:18 70:9,9,15,23
71:3 72:2,3,9,11,14
73:13,22,24 74:14,16
74:25 76:15,17,24
78:13 80:1,7,15
81:22,23 83:3 84:6
84:19,23 86:23,24
87:6,7 89:23 90:6,10
90:18 92:2,5 96:14
96:17 97:7,13 100:11
100:16,22,24 101:16
102:1 103:10 121:17
**draft** 60:22
**draw** 19:24 28:5 33:10
37:9 59:14 65:7
71:15 89:11,14
123:20
**drawing** 117:5
**draws** 66:11
**drug** 18:25 19:2,15
20:2,3,4,16,19 21:14
23:6 27:5 32:20 35:6
35:6 40:16 53:10,14
54:14 55:24 57:8
60:8 61:16 62:23,24
63:5,8,13 66:24 77:7
77:12 78:3,18 79:1,1
79:3,4,21,22 80:18
80:19 81:9 99:23
104:18 105:24 106:1
108:12
**drugs** 7:23 12:5 13:24
14:5,6,7,12 15:2,2,5
15:6,10,20 18:8 19:4
19:9,20 24:6,7 25:7
25:13 28:10,15,16,19
28:21 29:9,13 32:19
35:20,25 36:11 38:11
55:25 62:19 63:11
66:15 67:10 77:16
78:22,23,25 99:25
110:6
**DSM** 122:11
**duly** 42:2
**duty** 107:12
**dying** 113:4 115:9

**E**

**E** 2:1,1 3:1 4:1,1 125:1
125:1
**earlier** 95:20 116:16,23
**easier** 112:25

**editing** 120:12
**edition** 43:13,14,16,18
**editor** 44:7 48:14 81:16
97:24,25
**effect** 10:11 18:23 21:6
21:12 23:4,5 28:6
35:25 37:7 39:1,14
40:15 41:2 45:7
57:12 59:14 64:22
65:12,12 75:17 77:16
78:25
**effects** 18:21 23:9
38:19 54:13 78:3,5
**effort** 101:15
**efforts** 115:13
**Egilman** 4:7,7
**eight** 18:1 104:21 106:7
108:23
**Einstein** 22:18
**either** 28:4,6 74:5
102:7 104:6 108:11
114:4
**elaborate** 49:1
**element** 64:6
**eleven** 20:16 32:19
35:20,24 36:11 38:11
**Elmo** 51:1 59:6 69:9
**embarrassed** 106:22
108:20 111:18
112:18
**embarrassing** 113:25
**empirical** 97:19
**employed** 42:25 78:2
**enjoyed** 77:23
**entails** 76:13
**enter** 69:21
**entering** 70:5
**entire** 30:15 60:9
**entirely** 35:7
**epidemiological** 59:11
**epidemiology** 43:5,9,21
**equal** 27:19,20,25
**errors** 9:14,16,18
**ESQ** 2:3,3,4,7,8,8,10
2:10
**essential** 79:1
**essentially** 5:5 11:21
12:6 103:24 107:15
**estimate** 56:8 64:23
**estimated** 83:13
**Estimation** 45:6
**et** 5:14 14:25 16:15
**Europe** 44:2
**evaluate** 16:16 98:3
**event** 41:5 75:7,7
**events** 15:11 64:1,1,3
**eventually** 111:19
**everybody** 14:4,19
18:16,23 26:11 54:6
**everyday** 53:19
**Everything's** 22:21

**evidence** 5:7 6:7 13:3
70:1 71:4 72:4 98:22
105:8,14,22 107:1
109:17 111:7 113:9
115:19
**exact** 16:1 17:20
104:24
**exactly** 23:12 25:3
71:10 83:19 113:21
113:22
**examination** 42:18
73:5,17
**examined** 42:2
**examining** 51:4
**example** 5:12 13:21,24
15:11,15 16:4,6 17:3
18:6 20:11 22:15,15
37:5 39:21 53:19
64:2 66:13 75:16
**examples** 98:25
**excellent** 99:18
**exclude** 105:6,18
106:11 108:11 110:8
110:15
**excluded** 110:14
112:16
**excludes** 94:10
**excuse** 9:22 24:5 28:14
36:13 52:21 53:24
91:8 95:15 101:8
121:15
**excused** 101:17
**exhibit** 41:22
**exhibits** 22:24
**expand** 64:23
**expect** 23:15 120:4
121:12
**experience** 53:19 73:3
105:20,24 108:9
109:11,13,15 110:5
111:6 113:7 115:7,16
115:17
**experiences** 103:20
108:10 110:7,25
**expert** 6:12,21 7:11
9:18 11:16,19,24
12:2,4,8,17 13:9,11
17:15 18:4 22:4,14
24:16,18,24 30:12,14
40:1,2,5,6 41:17 42:9
45:15 46:6,12 47:22
50:10,12 52:22 53:2
57:2 69:5 70:15,24
71:3 72:9 88:18
90:16 96:15,18,19
117:14,15,22 118:9
119:8,9

118:10 123:21
**expert's** 6:8
**explain** 13:25 34:12
36:1 88:7 98:9,10
107:19 113:7 114:6,9
**explained** 41:13 83:3
**explaining** 41:10 61:5
106:16
**explains** 41:4
**explanation** 40:23
85:19
**explicitly** 34:20
**expose** 5:16
**exposed** 60:10 78:18
80:3
**exposure** 20:1 26:12
32:15 34:19 35:6
36:5 56:7,9 59:16,19
59:21 60:8,14 61:11
69:12,13 76:19 77:7
77:12
**expressed** 78:16
**extensively** 64:11,11
86:15
**extent** 27:15 105:17
**extra** 67:11
**extreme** 50:10 67:18

**F**

**F** 125:1
**fact** 13:24 18:7 56:4
71:15 74:2,21,25
76:16 84:1,9 85:25
86:11 108:24,24
110:5 117:15,17,19
117:21 119:7
**factor** 56:6 66:13
**factors** 10:23
**facts** 6:2,4
**factually** 118:18
**failure** 59:8,10
**fair** 5:7 31:8 52:1,11
74:22 91:24 98:15
105:8,14,15,16,24
107:1,5,9,9 108:3
109:16 110:19 111:7
112:20 113:10
115:19,22 119:19
123:13,22,25
**fairer** 52:10
**false** 23:3
**family** 18:12 104:17
105:20 106:19,19
112:2 113:8 115:8,17
**far** 56:19 98:5 121:16
**FDA** 8:11 11:16 12:6
25:23 31:8 32:22
35:21 36:8,9,10
44:20,23 45:1 51:9
51:12 54:23 55:1
64:12 67:7,9,15,22

97:18 122:19,22,25
    123:16
**FDA's** 45:10 46:21,21
**February** 20:13
**Federal** 125:7,22
**feel** 50:13 79:7 112:5
    114:10,10
**feeling** 52:20
**fellow** 97:3,7
**field** 47:8 48:3 50:3
    55:6 71:20 78:17
    79:10
**fifteen** 73:4
**fifteen-minute** 73:8
**fifty** 117:6
**fight** 89:9
**figure** 15:22 83:13
    113:18,19
**file** 15:1 120:19 121:1
**files** 14:24 73:22
**fill** 108:21
**filled** 33:16,17,22 76:18
    77:1,11 79:20,22,23
    80:10,11
**filtration** 120:17
**final** 1:9 10:1 24:13
    50:8,13,16 67:14
**find** 6:8 10:8 14:11
    48:7 83:22,23 91:6
    91:15 92:11 104:24
    108:2 111:12
**findings** 12:6 97:18
**fine** 73:2,7 106:2
    111:10 115:24
**finish** 61:5 70:7 72:19
    80:25 81:12 101:4
**finishing** 101:19
**Finkelstein** 2:3,4 4:6,6
    4:6,11,13 107:11
    122:5 124:3
**first** 14:25 20:12 21:2
    21:19 26:3 30:5,22
    31:3 32:5 42:2 43:13
    43:14 51:11 54:11
    60:4,22 68:13,25
    69:10,24 70:4 73:15
    78:20 83:11 101:22
**fit** 7:3
**five** 16:9,11,20,25
    21:15 33:8 73:4
**fix** 9:18
**fixed** 9:19,20
**flat** 36:8,17,17 105:7
**flaw** 57:18 63:17,18
**flawed** 26:2 48:17 49:4
    52:22
**flaws** 49:6
**flexible** 105:2 109:17
    113:20,21,22
**flip** 59:6
**Flom** 2:9

**Floor** 2:11
**fly** 101:15 102:25
    106:24
**focus** 35:18 82:25
    84:21 85:3 90:22
**focused** 76:10,16
**focuses** 74:16 76:17
**focusing** 61:20 95:8,14
**follow** 6:18 28:7 47:13
    51:20 52:14 71:9,13
**following** 38:18 59:22
    69:14 100:14 113:20
**follows** 42:3
**Follow-Up** 45:7
**Food** 99:23
**foregoing** 125:8
**forget** 105:9 106:16
    111:16 112:13
**form** 50:8
**former** 61:16
**forth** 49:8
**forty-five** 72:20
**found** 12:2 62:8 83:13
    92:5
**foundation** 116:21
    120:1
**four** 2:9 30:16,18 31:16
    99:21 100:10
**framed** 103:24
**frankly** 111:21
**friends** 115:6
**Fromson** 2:3 4:10,11
    80:25 103:4,8 107:4
    107:10 116:11,22
    117:1,7,9,13,21
    118:1,4,13,20 119:1
    119:4,10,15,21,24
    120:10,18 121:1,4,10
    121:14,22,25
**front** 51:2 104:21
    108:23
**full** 20:9 53:21 81:5
**fully** 83:23,25 84:5,24
**full-blown** 122:1,3
**function** 83:14
**fundamental** 14:11
    57:18
**fundamentally** 48:17
    58:2 85:11,13
**further** 40:17 59:13
    101:13 112:1 115:21

---

**G**

**G** 2:3 4:1
**gab** 26:20
**gaba** 63:20
**gabapentin** 8:20 10:21
    11:17,19,25 12:3,7,9
    12:14,17,18 14:2,4
    14:16,18,19 15:1
    17:5,10 18:21 23:9

23:25 24:2,6,10,11
    24:17 25:15 26:7,9
    26:10,12,16 27:1,3,4
    27:7,8,10,12,14,14
    32:18 37:14 38:1,5
    38:15,16,24,25 39:3
    40:2,12,17 46:3 57:7
    59:5,14 60:20 72:7
    80:3,3 82:5,19 84:20
    84:24 87:25 90:1,3
    92:24 94:1,21,22,25
    95:5,8,9,10,10
**gatekeeper** 88:22
**gazillion** 57:22 116:1
**gee** 109:12
**general** 28:11,16 39:4
    46:8 63:25 64:2,8
    66:5 85:16,19 104:5
**generally** 46:11 77:11
    86:5
**generate** 74:19 75:4,23
**generically** 35:19
**gentler** 31:22
**getting** 7:18 22:1 26:6
    109:2 113:4
**Gibbons** 5:21 6:6,24,25
    7:19 8:7,9 9:15,17
    10:9,24 16:10 18:25
    19:5 21:21 22:8
    24:17,22 25:12 30:6
    30:14 32:4,17 33:1
    33:13 34:23 35:8,12
    36:6 37:17,21 38:1
    38:10,20 39:8 40:1,5
    40:20 41:9 45:15,21
    46:2,8,10 48:24
    53:13 55:14 57:9,10
    57:13 58:7,10,13
    60:7 61:23 62:5
    63:18,20 64:16,19
    68:6,7,10,12,19,20
    69:16,18 70:9,15,23
    71:3 72:3,9 73:22,24
    74:14,16,25 76:15,17
    76:24 78:13 80:1,7
    80:15 81:22,23 83:3
    84:6,19,23 86:23,24
    87:7,21 90:6,10,18
    91:12,14 92:2,5
    96:14,17 97:7,13
    100:11,16,24 102:1
    121:17 122:18
**give** 5:8 14:14 15:13
    26:11 44:12 53:19
    64:14 104:7 105:1
    106:2 110:10 117:19
    118:22 121:9 122:20
**given** 54:22 58:13 79:2
    79:21,23 89:25
**gives** 22:12 67:12 119:2
    119:4

**giving** 23:3 29:17
    117:22
**go** 6:10 8:15 11:22
    16:12,13,14 17:11
    21:24 26:5 30:22
    31:12 32:2 38:15
    39:13,20,21 44:23
    47:4,6 53:19 73:15
    73:23 74:5 76:21
    81:3 82:19 83:9
    86:22 87:3 90:13,16
    92:11 93:17 94:4
    97:16 98:5 99:7,14
    99:21 107:16 113:16
    114:13 118:15
    123:24
**goal** 116:6
**goes** 14:13 25:5 87:25
    94:25 95:2 123:21
**going** 5:1,8,9,16 6:15
    7:10 8:11,15 13:10
    22:4,5 23:15 24:24
    28:2 32:8 33:8 39:12
    55:11 64:6,23 65:24
    65:24 66:2 69:5 72:2
    79:3 82:24 84:19
    85:12 87:3 90:22
    98:13 102:1 103:15
    104:1,3,15 105:2,6,7
    105:10 106:11,18,20
    106:20 107:14,20,22
    110:18 111:15,16,17
    111:20 112:17,25
    113:11,12,22,24
    115:9,10,12,13,16
    117:5 120:9 121:11
**gold** 54:23 55:1,4
**good** 4:10,12,16,20
    5:19 6:23 7:16 22:22
    52:3 65:17 68:17
    72:14,24 77:4,6,9,12
    85:9,10 100:13 113:3
    113:5
**Goodell** 2:11 4:18,23
**gotten** 120:3
**governs** 5:24
**grad** 102:6
**graduate** 42:14
**graduates** 42:12
**Graphics** 2:12 4:25
**gray** 49:13
**great** 22:14 51:7 100:1
**Greenland** 3:4 17:11
    25:18,23 36:7 37:17
    39:23 41:18,19,22
    42:1,6,19,23 44:18
    44:24 45:13 53:9
    58:7 59:15 60:6
    61:20 68:1 69:10
    70:9 72:2,11,14
    73:13 87:6 89:23

100:22 101:16
    102:23 103:10
**Greenland's** 20:23
    57:3 59:17
**group** 113:18
**guess** 25:16 30:5 87:12
    104:3 106:24,25
**guidance** 119:2,4 120:3
**guided** 107:22 111:20
**guy** 30:8
**G-r-e-e-n-l-a-n-d** 42:7

---

**H**

**Haldol** 29:12
**half** 41:19 72:19
    102:18
**hand** 79:16 98:4
    108:21 114:2 125:15
**handled** 33:25
**happen** 65:24,25 98:10
**happened** 17:13,18
    62:11 75:15 86:21
    96:1
**happening** 21:21
**happens** 4:8 17:21 26:1
    108:25 110:20
**hard** 4:22 67:6 75:21
    75:22,24
**Harvard** 41:9 43:25
    80:16 81:6 88:12
**hate** 115:12
**Hathaway** 65:20
**hazard** 83:14
**heading** 90:22
**health** 75:8
**hear** 39:10 107:14
    115:1
**heard** 4:4 122:17
**hearing** 1:10 5:2,18
    105:21 114:25
    121:17 122:18
**hears** 114:17
**hearsay** 116:20
**heck** 79:7
**hedge** 66:16
**help** 6:12 15:13 29:24
    47:19 69:1 82:8
    87:11
**helpful** 9:6 73:6 108:13
**helps** 88:17
**hereunto** 125:15
**herring** 38:2
**he'll** 35:17 36:1 88:7
    102:13,16
**higher** 23:2
**highly** 100:5
**history** 9:5 80:23
**Hold** 61:6 95:15
**holding** 43:8
**hole** 7:3
**holistic** 52:9

Page 6

home 54:19
homes 53:20
Hong 2:10 4:23,23
honor 4:12,14,16,20
  5:19,22 6:15 19:22
  22:7,22 23:13,19
  25:8,22 30:3 32:7
  39:15,24 41:21 42:17
  50:21 51:3 58:4 60:1
  65:4 68:4 72:12 73:6
  73:11 79:17 82:4
  84:17 89:22 90:22
  91:2 93:23 96:10
  97:5 101:11,13,21,25
  102:3,19 103:11,12
  103:23 104:23 106:5
  106:25 107:21 108:4
  108:7 109:23 110:2
  110:25 111:9,19
  112:15,24 113:17
  115:23 116:5 119:4
  119:11 121:10,25
  124:2,3
HONORABLE 1:11
Honor's 92:19 108:16
hope 64:8 98:20,21
  103:9
hopefully 21:13 39:19
horse 26:5
hour 41:19 72:20
  102:17
hours 83:3 116:14,23
huge 31:4,9,10 32:15
human 49:6 98:17
humiliating 116:4
hundred 44:11
hundreds 37:13
hurt 63:1,1,19
hurts 63:18

_____ I _____

iatrogenic 97:20 99:2,4
idea 35:18 36:1 69:1
  100:12
ideas 78:16
ideation 67:4,21 74:15
  123:3
ideations 75:4
identification 91:5
identified 40:20 58:15
identify 4:5
ignored 25:6
illnesses 22:17,24
immensely 77:23
impact 15:21
impasse 116:15,17,18
  117:2
impeachment 8:14
implies 6:8
important 16:3 18:8
  29:22 56:6 58:22

59:1 75:7 97:10
  110:8
impressive 99:17
improve 100:13
improved 111:8
inappropriate 25:24
Inaudible 15:1
incidents 67:15
include 27:13 58:10
  71:13
included 33:21 34:1,4,6
includes 24:12 67:11
  93:3
including 71:20 93:8
inclusive 125:9
inconsistent 31:22
inconvenience 115:14
incorporate 64:15
incorrect 30:13 76:24
increase 11:6 51:14
increased 11:3 13:3
  23:8 28:3,6 38:12
  51:12 70:25 71:5
  72:6 99:24
index 20:12 33:1,9,10
  33:11 38:22 40:17
  59:22 62:17 69:14
  79:20 91:23,23
indicate 58:8
indicated 69:25
indication 13:3 26:16
  27:5,6
indications 11:18 12:14
  12:20,21,22,23 26:15
  88:1
individual 108:17
infamous 118:2
infer 20:6
inference 19:24
inferences 37:9 123:20
inflate 91:19,22
information 14:21
  61:22 73:20 104:21
inherent 61:20
initial 20:11
initiate 91:17
initiating 91:18
initiation 23:3 59:21
  69:13 91:20
innermost 5:16
inquired 120:18
inquiry 30:13
insofar 5:11
instance 16:18
instances 17:12
Institute 96:22
institutions 43:20,23
insurance 47:3
intend 6:5
intense 30:16
intention 54:17,21

intent-to-treat 54:16
interesting 26:19 100:5
interject 94:23
internal 120:17
interpreting 75:19
interrogate 112:4
interrupt 89:21
interrupted 82:23
interval 64:23
intimidated 120:21
introduce 4:8 31:25
  122:16
intrusive 5:11
invalid 18:6
investing 65:17
investment 65:17 66:2
invoices 90:10
involved 37:14 55:21
  56:2 65:22 76:22
involves 5:5 37:13
  105:12 111:4 113:12
involving 107:2
issue 18:7 20:10 21:5
  25:21 32:15 35:18
  36:22 39:25 40:4
  41:12 45:10 52:24
  59:16 60:21 61:11
  67:5 79:19 81:4,7
  84:24 85:2,18 86:23
  86:24 87:7 89:24
  90:1 92:3 95:4,8
  99:16 101:20,22
  102:20,21 103:5,13
  104:4 110:4 114:23
  116:11 117:23
  118:13,16,20 119:19
  121:2 122:4
issued 58:11
issues 10:11,12 13:19
  13:19 17:9,15 19:8
  22:6 28:13 42:16
  69:21 74:1 80:22
  85:1 86:4,12,15
  96:13 100:14 103:17
  112:8 113:20 119:24

_____ J _____

January 16:8,8,8,8,9
  20:12
job 57:24 96:7 112:24
join 90:24
joined 43:14
journal 9:3 25:8,10
  47:25 82:14 88:10
Joyner 5:21 6:7,8
judge 1:11 4:7,10 79:21
  98:13 103:4 107:7
  116:11 119:1,21
  120:19 121:8,12,22
judgment 87:7 90:6
judgments 37:16

juggle 102:12 121:19
juices 105:2
July 1:17 125:16
jump 47:20
junk 88:23
jurors 103:14,20,21
jury 5:3,9 7:4 24:24,25
  107:16 111:2 112:3
  112:22 113:4

_____ K _____

keep 93:22 105:10
  120:16
Keith 2:4 4:12
Kenneth 2:3 4:10
kept 31:19
key 121:17
kid 111:13 115:6
kind 23:12 41:2 45:10
  46:24 64:18 83:2
  85:6 103:23 105:5
  112:25 119:12
kinds 8:6 21:4 22:3
  26:14 29:1 65:23
  67:15 117:12
knew 25:11
knocking 32:4
know 7:4,6,20,21,23,24
  8:12 14:19,20 16:16
  16:23 18:3,7,8,19,22
  19:7,14,22 20:3,8
  21:2,11 23:21 24:24
  25:9,12,22 26:4,6,24
  27:7,10,21 28:24
  29:6,6,22 36:24 37:5
  39:11,16 42:19 44:11
  44:15 47:19 48:5,21
  49:5 50:20 52:9
  53:18,25 54:9 57:11
  58:1 63:19 66:1 73:2
  76:21 85:20 88:11,13
  88:20,20,23 89:5,13
  92:7 95:7,20 100:2
  101:1,3,19 103:2,12
  103:19,22,24,25
  105:5,21 107:2,13,22
  107:25 108:1,2,15
  110:2,5,21 111:19,21
  112:8 113:5,18
  114:10,17 115:2,3,4
  116:15,22 117:1
  119:12,25,25 120:2
  121:4,9,10,15,16
knowing 53:9
known 25:9 37:20
knows 7:11 19:19 27:8
  55:6

_____ L _____

L 2:4
lab 122:10,15

lamotrigine 8:13 27:13
language 31:23 104:7
  104:25 105:1 106:2
  110:10,11
large 37:15 85:16
  100:6 107:24
Lastly 96:12
late 120:9
launched 39:4
law 89:5
lawyers 104:22
lay 117:19
lead 65:5 91:4
leading 53:11 117:12
  119:23
leads 91:6
learn 18:2
learned 73:3
leave 15:9 101:18
  102:23 121:1
lecture 80:17
lectures 44:12,14
Lee 1:22 125:7,21,22
Leech 2:11
left 121:16
legitimate 114:23
length 20:7 35:9
letters 44:7
let's 5:18 7:4 14:18
  20:11 32:18 34:1
  38:15 59:12 61:8
  79:18 82:25 90:13
  93:17,20,24 97:16
  99:7,14,21 105:11
  109:24
levels 51:19
Liability 1:5 4:3
  125:12
life 108:5 118:17
light 64:18
liked 56:23 57:15
limit 25:2 30:24 83:5
  109:8
limitation 41:15 54:3,9
  54:12 98:16
limitations 13:22 18:5
  25:3 28:8 37:11,18
  37:19,21,22,25 38:3
  45:14 46:8,9,11 47:7
  47:17 51:23,24 52:10
  52:13,19 55:12,16
  56:4 61:21 78:9
  79:11 85:14,24,25
limited 85:11,13 86:12
  111:11 123:7
limiting 18:3
line 49:8
list 57:20,22 103:4
listed 64:22
listen 5:7 66:4 105:14
  107:1,5 109:16 111:7

113:9 115:19
**literature** 76:6,23
  77:13,17,19 84:11,14
  98:22,24
**lithium** 15:14 29:18
  51:16
**litigated** 40:4
**litigation** 1:5 4:3 23:21
  30:15,17 125:12
**litigation-driven** 7:1
**little** 5:10 46:7 47:21
  96:12 102:13 109:8
  110:2 121:19
**live** 117:16 118:10
  121:14
**LLP** 2:4,7,9,11
**logistic** 40:24 83:10
  88:5,8,16
**long** 7:21 20:16,19 25:6
  42:20 43:2,6 60:18
  60:19 64:13 78:18
**look** 17:7 19:1,9,11,12
  19:16 20:1 25:20,24
  29:15 51:22 57:7
  58:1,20 62:8 66:20
  71:24 74:15 76:23
  81:8,19 89:4 92:2
  93:1,2 94:22,25
  111:19 123:10,11
**looked** 8:15 11:9,15,16
  11:17 12:13 13:5
  26:16 57:12 58:17
  59:1 63:7,11 67:3
  68:7 89:13 92:3,8
  100:11 122:22
**looking** 35:24 59:23
  75:15 83:7 94:20
  95:6 109:14 112:8
  122:19 123:2
**looks** 5:4 27:17 36:9,10
  88:18,22 110:17
**Los** 42:22 43:1 73:14
**lose** 73:3,4 107:17
**losing** 110:22,24
  114:14
**losses** 65:20
**lost** 68:15,18 82:6
**lot** 8:4 18:12 28:15
  30:5 51:24 62:24
  64:9,12 65:21 67:9
  90:10 96:14 98:25
  103:15 117:7
**lots** 15:10 37:15 75:9
  118:14
**love** 66:2 116:25
**lower** 83:16

——————————
**M**
——————————

**M** 2:10
**MA** 1:24
**machine** 120:15

**macro** 118:13
**magistrate** 120:5
**main** 16:10
**mania** 29:24
**manner** 87:8
**Manual** 6:7 122:12
**March** 9:2,8,13,23,25
  31:6 38:17 41:8 72:3
  73:23
**Maris/Kruszewski**
  122:3
**Mark** 2:8 4:14
**market** 65:18,19
**Marketing** 1:5 4:2
  125:11
**Maryland** 2:11
**Marzilli** 1:22 125:7,21
  125:22
**Massachusetts** 1:1,16
  2:7 125:4
**massive** 30:19
**master** 11:23
**match** 22:8
**material** 87:15
**materials** 10:20
**math** 17:6
**matter** 53:3 84:9 89:3
  89:18
**matters** 89:4,5
**maximum** 78:21
**McCormack** 117:24
  118:1,16
**Meagher** 2:9
**mean** 15:20 16:24
  22:14,20 23:12,15
  24:15 26:2,3 28:25
  39:2 40:19 41:7 63:3
  66:18 71:12 77:11
  79:22 86:17 88:17,25
  89:16 94:25 96:5
  99:2,4 105:17,19
  108:12 109:14,17
  110:20,25 111:12,14
  114:9,16 115:16
  116:17
**meaning** 64:19
**meaningfully** 90:7
**means** 66:16 75:20
  113:8 116:18
**measure** 75:8 77:12
**measured** 74:3
**measurement** 96:20
**measures** 38:21
**mechanism** 116:16
  119:16 121:5
**medical** 5:17 69:25
  74:20 76:6 78:5
**medication** 51:18 99:6
**medicine** 53:21 96:22
**meeting** 49:8
**member** 96:22,25

104:17 112:2 113:8
  115:8,17
**members** 106:19
**memorize** 17:25
**memorized** 39:7
**men** 32:3
**met** 41:20
**meta-analyses** 86:16
**meta-analysis** 32:22
  35:21 36:10,23,23
  85:7 86:11,18 123:1
  123:14
**method** 71:15
**methodological** 48:8
**methodologically** 26:2
**methodologies** 6:18,25
  66:5
**methodology** 30:10
  48:17,17,23,24 49:5
  49:11 50:1,4,7,10
  51:21 52:16,21,22,23
  93:4
**methods** 6:3,4 30:14
  64:14,16 71:4 85:11
**Michigan** 44:1
**mind** 30:4 117:13
  118:16 123:9
**mindful** 23:13
**minds** 106:7
**mine** 49:18 53:20
**minute** 8:2 103:12
  120:16
**minutes** 9:5 33:8 39:19
  42:23 72:20 73:4
  82:25
**misclassifying** 80:1
**misinterpretation**
  24:21 40:9
**misread** 81:20
**misrepresented** 29:14
  123:23
**mixing** 61:7
**model** 83:10
**models** 40:24
**modern** 29:19,21 43:8
**moment** 34:21 37:9
  118:25
**monotherapy** 95:12
**month** 34:9 79:21,23
**monthly** 83:11
**months** 20:16 21:1
  33:15,16,23 34:19
  80:9,10,17,18
**month-by-month** 33:20
**morning** 4:10,12,16,20
  5:19 34:25 51:6,25
  72:14 102:8,9,13,14
  102:15 112:21
**mother** 111:12 114:20
**motion** 120:19 121:2
**motions** 6:11 120:15,20

120:22
**move** 86:22
**multifactorial** 110:4
**multiple** 17:8,15 19:12
  62:1,4,13,14 71:9

——————————
**N**
——————————

**N** 2:1 3:1 4:1
**name** 42:4
**Napolitano** 2:8 4:16,17
**narrow** 113:6
**narrower** 109:21,22
**narrows** 111:3
**natural** 19:6 22:16,23
  40:22 41:5,7 46:4
  72:8
**nature** 44:8
**necessarily** 10:16 12:21
  108:11 110:8
**necessity** 90:6
**need** 8:6,25 30:4 41:17
  49:25 53:2 67:20
  70:7 72:17 97:11
  102:17 114:1 116:9
  117:16
**negative** 100:17,19
  101:1
**negatives** 71:9
**neglected** 78:24
**neighbor** 115:2
**Neurontin** 1:5 4:2 5:12
  7:21,22 11:2,5,5,12
  13:6 20:13 32:12
  34:3 44:20 53:14
  56:12 70:10,16 71:5
  104:16 111:4 113:13
  113:14 118:21
  125:11
**neutral** 98:12 100:10
**never** 16:21 26:3 38:2
**new** 2:4,9,9 31:9
**Newburgh** 2:4
**newer** 29:8,9
**nice** 23:17,18
**Nine** 102:3
**nitpick** 32:10
**nitpicks** 32:9
**nonexposure** 34:19
**nonrandomized** 46:16
**normalizes** 41:6
**North** 44:1
**notebook** 92:16
**notes** 39:7
**November** 9:8,16 31:5
  31:13,14 38:17 73:22
  87:14 89:25
**number** 9:14 11:1,2
  32:2,21 34:13 59:18
  69:11,12 91:22,23
  93:2,3,14 94:10,18
  107:24

**numbers** 17:2 37:15
  57:12 59:18,25

——————————
**O**
——————————

**O** 4:1
**object** 26:21 121:6
**objected** 48:13
**objecting** 27:1
**objection** 13:16 47:15
  58:24 61:6 70:12,18
  71:1,7 105:19 107:11
  109:4 116:20,20
**objections** 62:24
  116:13 117:4,12
  118:8,14 119:5
**objective** 30:16 98:2,7
  98:12 105:22 109:17
  122:9
**objectively** 105:9 111:7
  113:9 115:19
**objectivity** 98:3,5
**objects** 116:19
**obligations** 120:14
**observational** 37:10
  54:19
**observations** 74:5,7
**observe** 61:25
**observed** 60:19 91:20
**Obtained** 99:17
**obviously** 103:19
  107:21
**occur** 64:1,3,5
**odds** 41:1
**offer** 97:19
**Official** 1:23 125:7,22
**oh** 17:23 57:2 63:12
  65:22 77:9 91:12
  98:15 99:5 101:9
  109:12 113:15 118:3
**Ohlemeyer** 23:14
**oil** 65:24
**okay** 6:22 7:5 9:1 17:25
  18:1,4 26:10 27:25
  32:5,13,13,16,17,25
  35:19,22 37:13 39:20
  42:16 43:16 44:16
  45:13 46:7,15 47:19
  49:3,17 53:11,12
  62:3 63:5 69:8,15,16
  70:8,23 73:20 74:12
  74:14,25 76:1 78:15
  79:17,23 80:1 81:11
  81:19 82:8,9,23
  83:15,18,24 84:5,9
  84:18,19,20,20,22
  85:24 87:4,11,12
  90:13 91:2,10,11,24
  92:11,18,22 93:5,6
  93:16,19 96:10,13
  97:12 99:7,13,21
  100:4,10 101:9

Page 8

102:18 104:11
106:13 112:1 114:8
121:4 124:1
**old** 29:2 53:23
**older** 29:10
**once** 56:11 73:2,3
78:17 108:1 111:15
**ones** 29:8,20,21 64:22
101:1
**one-sixth** 17:7
**on-and-off** 86:24
**open** 115:25
**opening** 7:7 30:2 122:7
123:23
**operate** 89:4
**opinion** 38:10 51:8
72:6 117:18 118:8,21
118:25 122:1,3
**opinions** 7:19 23:21
48:4 117:20,22 118:6
122:4
**opportunity** 44:19
**opposed** 56:8 74:19
75:1 79:6
**opposite** 6:20
**option** 98:9
**options** 13:12
**orally** 5:11 104:16
106:17 108:19
111:17 112:14,17
**oranges** 122:19
**order** 5:25 30:8 31:15
120:20
**organ** 79:6
**organize** 72:25
**original** 10:8,9,10 19:1
**other's** 6:21 121:7
**ought** 118:22
**outcome** 25:25
**outcomes** 75:15
**outstanding** 65:19
**overall** 72:7 83:15
118:15
**overarching** 85:5
**overcounting** 64:1
**overcounts** 21:15
**overdraw** 66:5
**overdrawn** 50:9 51:21
**overrule** 70:19
**Overruled** 47:16 70:13
71:8
**overstated** 50:14 51:9
**owe** 122:2
**o'clock** 39:17

_____
**P**

**P** 2:1,1 4:1
**page** 40:9 44:22 51:11
56:24 57:5 59:25
60:4 81:8 83:15 86:1
90:13,16,21,22,25,25

91:9 115:1
**pages** 1:5 38:3,20 39:25
125:9
**paid** 77:11 118:5,6
**pain** 26:17 27:6,10
**paper** 9:3,18 10:2,10
12:1 13:4,6,8,14,17
13:20,22,23 17:3
18:5,6 22:10,13,16
23:7,22,24 24:5,17
24:23 25:10 26:23
27:3,4 29:14 30:20
30:25 31:7,21 32:18
32:23,24,24 33:5,7,7
33:8 34:5 37:22,25
38:15,18 40:1 45:17
47:22,23 48:8,11,12
48:25 50:16,17,22,22
59:17,25 61:7,8,9,10
61:15 68:6,10 70:9
70:15,24 71:4 72:9
80:16 81:19,20,21,22
81:24 82:5,11,11,20
82:22,25 83:1,22,23
84:7,14,24 86:24
87:1 88:17 97:14
98:4 100:5,23 103:15
**papers** 28:5 44:3 52:20
78:11 98:8
**paragraphs** 9:9
**Parameter** 45:7
**parse** 53:3
**part** 9:21 10:7 34:2
40:16 44:18 54:13
57:5 85:10 110:2
**partial** 84:8
**partially** 84:2
**particular** 63:7,10
118:25
**particularly** 58:19 66:7
111:23
**parties** 116:15
**Partners** 2:4 4:7,11,13
**parts** 8:10
**pass** 49:18
**passage** 83:22
**passes** 50:6
**path** 111:15
**patient** 17:20 32:15
33:21 34:2,2,13 35:1
56:12 59:15,19,20
62:12 63:4,4,7,10
69:13 78:18,24 79:2
79:19 80:9,18,19
**patients** 23:7 32:21
37:13 51:15,16,17
59:18 61:22,25 62:9
69:11 80:10 83:17
91:6,15 93:9,12
94:13,15,15,17
**patient-by-patient**

33:24
**PATTI** 1:11
**pause** 122:21
**payment** 76:18 77:2
**pays** 18:12
**peer** 13:15 23:23 30:15
30:16 48:1,13 49:18
49:19,21 96:12 97:12
97:23 98:7,21 99:11
99:15,22
**peers** 97:7
**peer-review** 30:16
88:10 97:13 99:8,9
**peer-reviewed** 13:4,8
13:17 22:10,13,16
31:12,21 44:3 45:17
82:14 84:11,14
**peg** 7:2,3
**people** 5:8,9,11,16 7:20
7:22,24,25 13:25
14:3,5,6,7,21 15:3,12
15:13 16:3,7 17:4,7
18:9,10,18 19:1,3,7
19:14,19 20:2 21:18
23:1 26:7,13,14,17
26:17 27:5,15 29:25
47:4,6 49:23 53:9,13
53:18 55:9 65:18
75:16,17,18 79:5,14
81:6 86:21 98:2,17
98:23 100:23 106:21
107:25 108:11,12,22
108:25 109:1,2 110:9
110:18,23,24 111:25
113:25 115:9
**people's** 53:20
**percent** 27:5
**peremptories** 5:15
**period** 35:23,23 40:16
68:7,9,12,20 69:16
**periods** 33:22
**person** 16:9,11 27:8,9
34:5 57:8 59:4 60:18
62:3,19 70:2,4 74:20
79:4 80:2,3,13 81:9
83:1,10 84:10 85:2
87:7,15,21 88:5,8,16
90:6 92:23 93:21,25
113:4 114:19 116:2
**personal** 23:16 103:20
104:2,17,20 105:20
106:3 108:1,9,10
109:10,13,15 110:5,7
110:25 111:5,11
112:8 113:7,23
115:15
**personally** 31:5 72:5
**person-time** 40:24
**Pfizer** 4:21 31:8
**pharmacoepidemiolo...**
35:5 36:6 46:9 47:2

61:21 77:6,13,17,24
**pharmacoepidemiolo...**
35:8
**pharmacologic** 18:9
**pharmaepidemiologic**
31:9
**PHARMetrics** 14:13
25:19,20 26:11 29:5
29:16 66:7 71:21
73:18,21 76:1 85:8
87:13,19 89:24 90:19
**phobia** 26:18
**physician** 99:5
**picked** 75:7 98:2
**picking** 67:15 75:21
**picture** 23:11
**pictures** 23:16,17,18
**pie** 85:22
**piece** 28:1 71:22,24
90:9 122:23
**pills** 35:14 79:12
**pink** 116:19
**pipeline** 122:4
**place** 26:3 125:10
**placebo** 36:4,9 37:3
55:2
**placebos** 36:13 123:2
**placebo-controlled**
36:14 54:15
**places** 44:2
**plaintiffs** 2:2 5:3 6:5
113:23 116:20,20
**plaintiff's** 111:5 113:15
**plan** 108:18,19,20
**plane** 121:12
**play** 102:17 121:12
**playing** 65:19 118:10
**please** 4:5 32:6 42:4,24
66:20 81:17 91:8
99:8,14 100:4 114:6
114:9
**plus** 120:13
**point** 6:6,17 7:17 20:5
40:22 41:16 50:17
58:5,25 61:16 63:5
63:25 65:6,22 68:7
75:22,23,24,25 76:15
77:23 81:8 83:5
87:13 89:23 92:7
96:11 97:18 98:13
103:19 113:20 120:2
120:8 121:15,21
**pointed** 10:23 37:22,23
**pointing** 64:3
**points** 7:9 64:5,9 73:16
85:15,19 98:16 107:6
**pool** 36:11
**population** 15:24 38:19
**populations** 12:12 86:6
**portion** 24:2
**pose** 97:20

**position** 64:9 103:22
**possible** 13:8 75:16
116:14
**possibly** 25:12
**post-prescription**
55:22
**potential** 105:18
**potentially** 15:20
**Practices** 1:5 4:3
125:12
**precise** 82:9 92:3
**prefaced** 100:12
**prefer** 104:13
**preferred** 48:16
**prepared** 48:8
**prescribe** 56:12
**prescribed** 14:5,6,7
78:23 79:12
**prescription** 19:23
20:6,7,13,17 27:8
32:11 33:16,17,22
34:3 35:5,10,13
53:22 54:10 56:9
58:15 60:10 76:17,18
76:20,25 77:1,7
78:21 79:20,22,23
80:10,11 93:4,7,7,8
94:11
**prescriptions** 15:3,4
19:20 58:11 70:1
76:10,16,25 77:10,10
95:10
**present** 2:12 49:15
56:5 99:15 119:19
**presents** 59:18 69:11
83:13
**presume** 48:5
**presumption** 56:12
**pretreatment** 51:19
**PRETRIAL** 1:9
**prevent** 105:8,23
109:13,16 111:6
113:8 115:18
**pre-prescription** 55:23
**pride** 106:14
**primary** 33:13,19
34:12,17,20 50:8
59:16 80:8,20 91:21
93:14
**principles** 6:3,4,24
30:23
**prior** 23:2 91:20
**probably** 21:10 41:18
60:1
**probe** 108:1 115:21
**problem** 6:19 7:3 9:21
14:5 17:7 18:19
19:11 22:7 27:4,11
28:12 40:19 50:7,8
52:16 55:17 67:11
75:11,13,14,14,19,21

85:4,5 96:6
**problems** 12:14 16:6
18:25 48:8 49:5
50:11 52:15 65:13,15
67:10 85:19 86:17,19
**procedure** 55:19
**proceedings** 125:14
**process** 9:16
**produced** 73:21,22
**product** 6:2 125:12
**production** 49:7
**productions** 30:19
**Products** 1:5 4:3
**professor** 42:9 43:2,5,5
49:22,24,25 102:23
**proffered** 6:8
**progeny** 5:21
**progression** 19:6
**prone** 86:20
**proper** 81:5
**properly** 30:11 52:12
59:3
**proposal** 106:7
**propose** 104:8
**proposed** 5:3 104:4
**protected** 15:11
**protective** 11:2,7,7,12
12:18,25 13:6 18:21
18:23 23:4,4,9,22
24:14,17,19,20,23,25
25:1,4 27:21 28:6
35:25 37:6 38:5,14
38:19 39:1,1,14 40:2
40:6,7,8,10 41:2 63:2
63:22 65:13,14 70:11
71:13 89:15,16
**protocol** 47:3 83:19
**proves** 24:17 40:1,3
**provide** 18:13 20:18
97:18 118:6
**provided** 14:9 19:13
58:10 62:6
**pry** 112:8 113:23
**psychiatric** 15:11 19:7
22:16,23 23:7 26:18
37:6 38:19 91:5
104:21
**psychiatrist** 48:6 66:15
**psychiatrists** 29:23
48:5
**psychiatry** 99:16
**psychological** 122:8
**psychotherapy** 7:25
18:11,14,20,22,24
19:13
**psychotropic** 51:18
**publication** 10:2 49:20
49:20,20
**published** 9:3 32:18
43:13 44:3 48:15,25
50:22,23 59:24 64:11

76:6 80:16 84:10,13
**pulled** 39:22
**pulling** 119:12
**purchase** 15:21
**purchased** 14:4,11,12
15:7,15 29:1
**purely** 98:12
**purpose** 70:5
**purposes** 79:9
**put** 30:18 38:5 48:10
49:17 57:24 88:19
103:21 108:18 114:5
116:2 122:14
**puts** 23:6 51:23,24
52:10
**putting** 88:25
**puzzle** 71:22 122:24
**PY** 59:19 69:12
**p.m** 124:5
**P.O** 2:4

**Q**

**qualification** 44:16
**qualifications** 42:24
**qualified** 44:15 97:23
**question** 5:4 17:20
21:23 37:24 39:13,24
39:25 40:3 41:3 68:1
68:15 82:18,22 87:16
88:21 101:21 103:24
104:4 105:4,11 107:7
107:12,15,18 108:19
111:22,23 113:25
114:3,5 119:23
**questioning** 108:17
110:12
**questionnaire** 5:3
103:14
**questionnaires** 107:23
**questions** 5:12 58:5
103:15 104:14
110:17 111:16 116:1
117:12
**quicker** 37:12
**quite** 44:1 85:16
**quote** 39:20,21 50:15
56:22 81:23 91:11,12
**quoting** 39:23

**R**

**R** 2:1 4:1 125:1
**race** 26:5
**rain** 73:13
**raise** 102:21 108:21
114:2
**raised** 6:11 25:22 35:16
74:2 80:16 81:6 84:2
89:23 90:1
**raising** 10:12 85:15
**randomized** 46:18,22
54:14,18,21 85:25

86:4
**randomly** 54:22
**rate** 23:2 26:4 33:2,3
33:11,11 40:14 41:5
59:20 69:12 83:12,16
91:19 93:21,25
**rates** 20:1 51:17 55:22
55:23 83:16 92:22
**ratio** 41:1 55:24,25
**ratios** 55:24,25 56:1
**raw** 25:9
**reach** 13:20 116:15
**reached** 117:2
**reaches** 10:18
**read** 8:4 18:1 29:5
31:21 45:6,20,23
47:23 60:6 77:22
82:2 93:20 97:12
98:23 99:19 117:17
**reading** 83:8,19
**real** 6:19 22:7 56:7
107:6 118:13 121:8
**really** 7:9 13:7 16:16
21:17 32:7,20 40:15
65:7,12 66:16 99:17
100:13 108:3,6 112:5
112:12 114:15 115:4
117:23 122:3
**reason** 14:11 109:25
110:1,21 114:19
**reasonable** 19:24 35:7
49:11 50:5,7 110:18
112:9
**reasonably** 20:6
**reasons** 27:1,2 59:3
61:4 65:11
**recall** 68:24 87:10
88:14 96:24
**receive** 18:10
**received** 97:10
**receiving** 51:18
**recess** 73:9 124:4
**recognize** 54:11 85:10
**recognized** 35:4
**record** 4:5 14:23 42:5
69:25 70:6 111:21
125:14
**recorded** 62:14 69:22
125:9
**records** 16:22 70:1
122:10
**RECROSS** 3:3
**red** 38:2 119:6
**REDIRECT** 3:3
**redo** 39:3
**reduce** 15:13 34:13
51:16
**reduced** 125:13
**reduces** 89:2
**reduction** 40:11,14
**reductions** 19:3

**refer** 26:7 80:21
**referee** 66:20
**refereeing** 81:16
**reference** 45:6
**references** 44:23 84:9
84:13
**referred** 80:21
**referring** 50:20 56:24
61:18 120:25
**reflect** 69:23
**refuse** 106:8
**refused** 90:11
**refute** 36:8 122:18
**regard** 75:7
**regarding** 51:12 90:18
99:24
**regardless** 20:16 89:12
**regression** 40:19,24
41:7 83:2,10 84:14
88:6,9,16
**rein** 115:8
**reject** 5:2
**rejected** 79:6,15
**related** 83:10 116:11
**relation** 76:23
**relative** 50:9 51:15,17
51:18
**relevant** 22:21 44:17
100:5
**reliability** 58:3
**reliable** 6:2 10:22,25
28:9 30:11 50:1 89:6
89:7,8,20 98:22,24
**reliably** 6:4,25
**religious** 105:18
**reluctant** 111:21
**relying** 66:5
**remark** 82:4,8
**remember** 90:19
117:25
**remind** 23:24
**remove** 64:24 65:1
**Reno** 42:22
**repetitive** 120:1
**replies** 57:9,10,11
**report** 9:6,15,18,23,25
10:8,9 11:17,19,24
12:2,4,8,17 13:9,11
17:15 18:4 20:23
22:14 24:9 31:13,15
31:23 33:6 38:1,16
38:17,17,21 41:8
46:12 47:22 48:10
56:22 57:3,4,6,20
61:7 62:25 64:22,25
67:7,9,12,17 70:15
70:24 71:4 72:4,9
76:9 78:16 81:19,22
81:23,23 82:20,24
84:20 86:2,24 87:2,3
87:6,11,22 88:18

90:16,18 92:6,14
97:16 99:19 100:2
**Reporter** 1:23 125:8,22
**reports** 17:25 18:1
45:15,20,21,23 46:6
50:10,12 51:9,12
52:22 53:2,2
**required** 88:9
**researchers** 78:2
**respect** 6:21 10:21 12:9
38:6 45:3 46:3 49:18
103:13
**respected** 48:3
**respond** 31:8
**response** 22:22 32:22
32:23 35:21
**rest** 40:9 68:21
**restate** 36:19
**result** 25:25 123:18
**results** 8:14 10:11
13:23 24:12 40:25
59:16 62:5 80:8 90:7
94:18 99:17
**Resumed** 73:10
**retained** 117:22 118:4
118:9
**reveals** 51:13
**reverse** 30:7
**review** 13:15 30:16,16
44:19,19 49:18,19,21
61:22 96:13 97:12,24
98:7,21 99:11 100:19
118:2,2
**reviewed** 23:23 45:14
45:17 48:1 72:5
**reviewer** 97:17 99:14
99:15,21,22 100:4,4
100:7
**reviewers** 99:22 100:10
**reviewing** 48:13
**reviews** 100:17,19
**rewriting** 111:3
**RICHARD** 2:10
**Rick** 4:18
**right** 6:20,23 8:18 9:11
11:20 15:24 17:22
18:2 19:8,10 20:14
20:22 22:3 24:10
27:23 28:22,24 30:1
35:3 36:9,16,20 38:4
39:9 41:16 42:9,13
42:14,16 47:1,20
48:20 49:25 51:22
52:15,19 53:1,5 54:4
54:6,24 55:2,2,5,7
56:13,14 60:3,15,22
61:10,17 62:16,18
63:3,14,15 66:18,18
67:1,2,13,16,17,20
67:23,24 68:25 69:15
72:1 73:7 76:5,7,11

Page 10

82:10,16,21 87:5
88:10,24 92:10,20
93:2,8,8,10,15,17,20
94:2,7,13 95:19 96:7
96:9,11 97:25 101:10
101:24 102:2,5,11
105:16 106:4 110:4
111:1 112:25 115:7
115:15 116:9 117:1
122:6,25 123:12
risk 11:3,6 13:3 17:6
23:8 25:16 27:19,20
28:1,3,6 38:12 51:12
51:14 59:18 69:11
70:25 71:6 72:6
97:20 99:24 107:18
Risperdal 29:8
Robert 5:20 73:3
robustness 80:20
role 88:22
room 1:24 106:7
round 7:3
Route 2:4
routinely 78:2
row 94:21
rule 5:21,24,24 111:20
120:9,14,16 121:20
122:14,24
ruled 119:5 121:24
122:2
rulings 119:14
run 57:6
running 26:5
RX 93:7

_____ S _____

s 2:1,8 4:1 44:24
125:21
SA 83:11,12,15
safe 31:11 57:11
Sales 1:5 4:2 125:11
salient 107:6
Sander 3:4 42:1,6
Saris 1:11 79:21
SAs 59:19 69:12,12
saw 10:1
saying 10:21 14:4
24:22 32:4 34:24
60:7 65:6 66:3,9
76:15 91:21 93:22
95:18,25 108:20
109:12 114:11
121:16 123:16
says 11:12 12:4,8,17,18
12:24,24 13:5,7,9,11
14:14 19:6 20:25
22:15 23:22,23 27:18
27:20 29:14,17 30:12
38:1,18,18,25 49:19
56:22 57:13 59:18
60:24 69:11 72:4

83:8,9 95:17 99:15
99:22 106:1 114:19
116:19 120:20
scaled-back 13:14
schedule 102:11
scheduling 31:15
schizophrenia 26:18
school 98:11 102:6
science 22:20 88:23
100:13 122:10,10,15
122:16
scientific 6:1,7 23:22
24:12 98:22 122:21
122:22
scientists 47:8
screen 5:22 92:19
screws 120:11
second 15:1 44:23
48:10 59:7 99:8
see 5:14 8:25 9:11
10:11 13:2 26:1 32:7
37:8 44:23 53:21
60:4 68:17 69:10
75:20 88:21 89:2
90:2 92:3,11 99:12
100:20 102:1 105:11
123:11
seeing 66:14
seeking 38:14
seen 4:9 21:6 43:9
56:23 57:15 92:20
119:13,14
sees 35:25
semantics 48:21
send 117:5
sense 7:9 39:10 66:23
104:5
sensitive 103:17
sensitivities 103:16
sensitivity 9:9,12 10:7
10:10,13,14 19:17
21:3 33:15,17 34:11
34:18,23 40:21 56:16
56:18 60:24 61:11
80:7 81:4 83:9 84:1
87:21 88:3 92:2
93:18
sentence 60:6 69:10
separate 16:11,21 17:1
53:2
separately 84:18
serious 108:5
Seroquel 29:8
set 14:14 15:25 16:6
20:18 28:21 31:24
32:3,3 33:9 61:23
64:2 72:25 123:17,19
125:15
sets 14:1,1,3 19:2 36:1
123:6
setting 34:21

settling 121:8
sex 14:22,25
share 103:13
short 72:15
show 6:5 11:1,3 17:12
17:21,24 19:2 21:18
22:19 23:5 24:13
25:15 40:3,10 44:22
65:8,9 67:9 71:5 72:2
showed 9:13 16:7 61:8
showing 41:1 65:10,11
shows 13:6 17:6 23:20
24:23 65:21 123:17
Sic 92:23
side 41:19 56:15 78:25
106:21 108:11
sides 95:21
significance 53:17
64:24 65:2,3 69:20
96:4
significant 23:9 38:21
38:23 40:11,14 74:4
74:4 83:12 94:19
similar 41:1,1 52:23
76:4
simple 28:25
simplicity 14:18
simply 13:25 56:1,8
64:3 65:8 69:24
109:2 114:11 115:11
single 6:12 28:15
sir 87:13 90:16,25
92:18 93:9,18 95:9
97:1 98:7
sit 5:9 107:2,16 108:6
111:1 112:3
sitting 112:23
situation 103:22
size 90:9
Skadden 2:9 4:14,17
23:14
skew 8:13
Slate 2:9
slide 6:14,15 32:5
97:16 99:14
social 7:25 18:11 26:17
softer 31:22
solid 100:19
somebody 16:12 20:11
21:9,23 33:22 34:2
85:5 111:17 114:11
someone's 113:23
something's 30:13
somewhat 48:5
soon 116:13
sophisticated 56:3
sorry 17:23 28:20
45:14 49:20 53:16
56:24 57:2 59:24
60:17 65:1,4 89:22
93:23

sort 18:17 77:5 101:3
116:6
sorts 86:4,8 115:13
sound 52:4,6
sounds 109:12
source 77:24
sources 64:20
South 2:11
so-called 118:8
span 52:11
Sparse 45:7
sparsity 45:11
speak 34:22
speaking 91:14
specific 11:13 17:20
43:4 47:2 61:22
85:16 104:6
specifically 13:5 24:8
45:3 50:13 109:8
specifics 7:19
specs 49:8
spectrum 67:19
speculation 7:18
spell 42:5
spend 8:12 9:4 34:21
96:13
spent 30:5
spitting 120:15
spoke 85:2
square 2:9 7:2,3
ss 125:4
stand 106:4 122:11
standard 54:24 55:1,4
64:15 79:10,14
standards 6:11
standing 120:20
start 8:6 9:11 46:1
101:4 111:15 118:10
started 120:15
starts 91:11
stat 93:24
state 42:4 90:17 123:4
stated 37:25 48:19
52:17
statement 7:8 25:15
30:2 60:11 66:16
70:23 71:4 72:8
76:12 91:24
statements 123:23
states 1:1,11,15,23 44:2
74:25 125:3
stating 66:11
statistical 42:16 44:19
45:4 64:16 96:25
97:8 100:1 122:12
statistically 23:8 38:21
40:11,14 41:6 74:4
statistician 7:12
statisticians 47:8 66:4
123:11
statistics 5:2 6:13 7:14

8:13 43:5,6 96:20
stay 61:8
staying 102:24
stenographically
125:10
steps 8:7 9:12 11:23
42:15 87:20
Steve 2:8 4:16
stop 78:25 79:3,5,8
straight 24:16
strangers 108:23
straw 32:3
street 2:7,11 115:3
strength 123:14
stress 5:6 105:13 108:5
stressor 105:17
strike 5:20 45:14 82:3
strikes 31:24
stroke 120:23
strong 15:15 31:23
stronger 13:11
strongly 52:17 112:5
114:10,11
struck 117:18
struggling 110:1
student 42:14
studied 76:24
studies 7:19,20 8:17
9:13 11:1,3 46:2,3,5
46:8,9,16 47:9,12,13
47:18 49:3,6 53:6
54:7 57:7 61:21
70:10,22 79:9 82:7
85:7,9 123:2
study 7:2 10:17,18
11:11,15 12:3,5,7
19:1 20:11 21:18
22:8 24:4,12 25:2,7
26:7,8,9,10,16 27:12
28:7,8,11,17 31:9,12
32:17,18,20,20 34:4
34:6 35:5,11,16,20
36:6,15,21,22 37:10
37:11,16,18 38:1,16
39:3,5 46:21 51:13
51:21,24 53:13 54:19
55:1 59:11 60:12,14
62:20 70:24 74:16
75:2,22,25 76:9,13
76:14,17 77:9,16,25
78:3,5 82:5,10,19
84:18 87:9,24 90:1
93:9 94:22 99:22
100:1,6,11
studying 75:1 76:25
stuff 98:25 104:16
subgroup 27:23
subject 31:14,15 37:10
37:21 52:19 96:19
118:22
subjected 30:15

submitted 9:15 25:10
    45:17 47:3,4,6 51:6
    90:10
subset 15:2
substantial 18:5
substantially 13:23
suddenly 31:7
suggest 106:25
suggested 41:8
suggestion 88:12
    108:16 113:6
suggestions 100:22,22
suggests 122:24
suicidal 23:8 70:16
    72:6 97:21 99:24
    104:20 112:6 113:23
    116:3 123:3
suicidality 51:12 70:25
    71:6
suicide 5:5,10,14 11:2
    11:3,6,7,7 12:19 13:6
    15:13 16:3,5,7,10,11
    16:13,21 17:4 18:17
    19:3 20:2 21:9,9,11
    21:14,15,20,25 22:1
    22:24 23:2 24:18,23
    25:16 33:2,2,3 35:23
    35:24 38:12,22 40:2
    41:5 51:14,17 55:23
    58:8,14 59:4,19,20
    60:19 61:15 62:1,3
    62:13 66:25 67:3,4
    67:11,21 70:11 74:15
    74:15,16,18,20,21,22
    75:1,4,8,18,19,22
    81:9 83:11 91:4,7,16
    91:18,19,22 92:22
    93:6,11,21,25 96:19
    96:20 104:2,19
    105:12 107:3 109:12
    109:15 110:6 111:5,6
    111:13,13 112:4
    113:7,12,15 114:13
    114:20 115:1,3,18
    118:21
suicides 67:14,18 75:1
    94:10 96:1 106:18,19
Suite 2:7
Summer 2:7
supplemental 9:5 38:16
    38:18 82:20 84:20
    92:5,14
supplemented 9:2
support 8:1 18:11
    24:13 97:19
suppose 56:19
supposed 102:25
sure 8:3 17:19 37:12
    38:9 39:12 44:11
    47:11 54:18,20 67:24
    69:7 74:15 76:21

77:22 86:11,22 98:15
    98:21 105:3 111:1
    114:14 123:24
surprised 94:20 95:13
surrogate 35:6 77:6,12
Sustained 70:20
sweeping 25:15
switch 32:5
sworn 42:2
symposium 41:9
S-a-n-d-e-r 42:6
_____

T

T 125:1,1
tab 51:5 57:3 60:2,3
    90:23 92:15,16
table 59:18 69:11 92:12
    92:18,22 93:15,17,20
    95:22,23 96:3
tables 60:4,5
take 25:10,16 34:25
    41:18 42:23 45:13
    47:17 54:12,16 61:11
    64:17,20 66:14 72:15
    72:24 73:7 79:7
    86:11 90:5 93:23
    96:1,24 103:11
    104:16 110:1 112:12
taken 5:12 21:6 73:9
    78:24 87:19
takes 90:10 100:16
talk 12:15 13:10 19:5
    22:4,5 25:22 35:12
    35:17 44:17 64:11
    78:15 79:18 84:17,19
    87:12 96:12 105:5
    106:1,22 108:21,23
    109:6 112:22 114:24
    115:2 116:3
talked 9:25 10:5 17:14
    21:13 46:7,12
talking 9:5 26:24 30:20
    33:5 38:17 48:23
    51:25 61:6 64:12,21
    68:5 79:24 80:23,23
    81:22 82:17,20,21
    91:15 95:12,16 117:4
    117:11 120:25
talks 6:7 11:24 12:1,3
    25:24 37:22 92:22
teach 7:14 42:11 43:20
    53:12
teacher 7:11
teaching 43:6
tears 105:21
technical 87:18
tell 7:11 9:21 42:24
    43:23 60:7 64:4 79:2
    81:19 111:18 112:19
    115:10
telling 24:15 27:3

tells 114:12
tendency 41:7
tends 39:1
terms 30:9 60:7 75:19
test 36:22 73:23 87:16
    90:5 123:14
testable 74:2,9
tested 55:15 80:8 90:2
testified 42:2
testify 13:14,16 69:4
    100:25 118:18
    121:14
testifying 58:24 103:1
testimony 5:20,25,25
    6:1,2,9 16:24 20:24
    20:25 117:18 118:8
    120:8
tests 34:22
thank 5:1 23:18 30:1
    41:17 42:17,19 51:7
    65:4 69:20 72:11,12
    73:11,13 79:17 83:25
    96:10 101:11,14,16
    102:18,19 103:10
    119:1,21 121:22
    124:1,2,3
theoretical 90:1
therapy 38:13
thing 6:16 11:8 23:13
    24:15 29:14 32:10
    58:20 65:23 69:22,23
    98:12 106:17 113:21
    119:12 121:16,17,18
    122:2,20
things 21:4,8 22:4 25:7
    25:11 26:1,15,19
    27:3 29:6 30:4 32:25
    44:8 48:12 51:25
    56:20 57:20,21,22
    58:1 61:20 64:9
    65:23 66:19 69:21
    73:16 98:10 113:3
    115:13 122:13,20,23
    123:10
think 13:19 16:15 20:5
    23:5 24:20 25:5 26:3
    27:4 28:15 30:3 31:2
    32:10 35:8 37:8
    39:10 40:8 41:16
    42:13 44:17 46:15
    48:4 50:9 52:21 53:4
    56:2 57:11 58:2,22
    60:3 65:16 66:19
    68:11 70:14 71:10,12
    72:19 73:5 76:22
    77:8,14,15 79:25
    81:24 87:11 88:11,17
    92:8 101:23,25 102:7
    103:13,23 104:4
    105:11,19,25 107:4,5
    107:9,21,22,24 108:2

108:4,16 109:19,22
    110:3,6,6,11,16
    111:8 112:4,7,9,9,11
    112:21,22 113:2,5
    114:1,16 115:20
    116:7 120:2,3 121:23
    123:13,25
thinking 5:4 36:18
    67:11 72:7 102:10
    109:10 111:14 113:2
    114:25 115:5 122:9
    122:13,15
third 43:16 99:21,22
thirty 43:3
thirty-five 43:7
thought 5:10 11:9
    19:16 21:3,5 31:7
    56:19 72:22 95:4
    98:11 101:9 104:2
thoughts 5:16 99:24
    104:20
thousand 118:12
    120:13
thousands 37:13
three 8:6,10 21:1 31:10
    39:19 67:22 90:15
    94:13,15,17 107:14
    108:6
Thursday 31:2 88:7
    102:2,15,16 116:10
    120:21 121:18
ticket 121:13
tie 113:11
ties 59:15
till 112:20
time 8:12 10:6 20:1,12
    21:6,14,19 22:24
    30:5 31:16 33:22
    35:9,22,23 40:16,22
    41:4,6 55:12 56:7,9,9
    57:8 58:14 62:20
    64:5,13 66:24 68:7,8
    68:12,13,20 70:4
    72:24 78:21 79:11
    80:2,3,13 81:9 83:2
    83:10,16 84:10 85:2
    87:8,15,21 88:5,8,16
    90:5,6,8,11,12,15
    93:3 94:9 96:14
    102:2,17 110:1,20
    112:13 116:15
    118:25 125:10
timely 100:5
times 2:9 59:4 62:4
    63:16 110:3 121:19
time-intensive 90:8
timing 102:13 120:11
title 43:4
today 4:8 5:1,19 42:19
    65:18 101:20,24
    102:25 103:6 117:13

119:17 120:18
told 25:11 48:14
    121:13
tomorrow 102:8,9
    112:21 116:24
tonight 102:8
tons 15:20
tools 123:10
topic 5:6 105:12 109:9
    113:5 114:21
Topiramate 8:13 27:13
totality 75:15
totally 17:1,10 26:1
    36:17 109:17 113:21
    115:25
town 102:24
trails 89:13
transcript 20:24,25
    38:20 125:8
transference 75:17,18
transition 72:14
transparent 41:14
transplant 79:2
trashed 101:3,5,10
traveling 102:5,7
treat 54:17,21
treated 16:4,9,13,14,15
    21:19 51:16
treating 60:9
treatment 16:7 18:9,10
    18:11 19:2 21:11,16
    21:18,20 22:1 23:2
    37:6 51:13 59:21
    68:13,13,21 69:14
    74:21 83:11,13 91:6
    91:17,19,20 92:23
    94:1 96:2
treatments 7:24 16:2
    19:12
tremendously 65:6
trial 2:12 4:25 23:15
    31:10 46:19,22 54:14
    54:15,18,21 86:5
    98:10 103:1 107:2
    108:6 115:9 119:12
    120:7 121:7
trials 36:9,14 86:1,9,12
    122:23
tried 5:13 22:1 104:19
    114:20
tries 18:17
trip 42:20
trouble 89:3
true 57:23 74:3 76:12
    100:21 111:1 125:13
truly 118:9
try 9:18 16:13 19:25
    20:1 21:25 40:24
    54:12 56:4,6 62:25
    98:12,13,17
trying 26:8 56:3 64:15

Page 12

66:3,4 95:7,20 98:24
104:24,24 108:4,7,15
116:13
**turn** 56:21 91:5
**turned** 31:8
**turning** 83:15
**tutorial** 18:2
**twelve** 17:4,5
**two** 1:9 4:22 8:17 9:4,8
10:25 11:2 12:25
14:20 17:9 25:17
26:7,12 29:1 32:25
52:24 53:2,3 90:15
107:6 113:20 121:11
**type** 103:22
**typed** 104:24
**typewriting** 125:13

#### U
**unable** 5:7 105:13
107:1
**uncertainty** 54:13 64:6
64:17,20 65:9,21
**uncommon** 91:6,15
**undergraduate** 42:14
**undergraduates** 42:11
**underline** 116:18,18
**undermines** 58:3 59:12
59:13
**understand** 7:6,8 8:5,6
8:10,17,25 9:1,1,7
11:23 13:12,13 16:16
17:17,19 26:8 30:9
31:20 35:19 38:10
39:18 47:7 49:10,16
50:1,4,11,12 53:24
54:7,23 56:11 62:16
66:3 67:25 79:24
80:7,12 85:24 91:24
95:7,16,20,21 103:12
103:16 105:22 108:3
119:1 120:3,8 123:1
**understanding** 103:8
**understood** 20:8 32:23
**unexposed** 80:2
**unfortunately** 59:25
**unique** 49:9
**United** 1:1,11,15,23
44:2 125:3
**University** 43:1,25
44:1
**unreasonable** 59:8,11
**unreliable** 25:8 57:18
89:1,10,11,14,17,18
98:25
**unusual** 30:17
**upsetting** 113:5 114:21
**urge** 110:9
**use** 5:15 24:19 25:3,20
40:7,12 41:21,23
43:23 47:8 54:3,8,15

55:9,16 71:17,21
85:7 120:17 122:24
**useful** 7:7 10:19 97:18
101:15
**uses** 24:12 54:6 55:12
55:14 86:16
**usually** 78:22 111:24
**utility** 123:7

#### V
**valid** 70:10,16
**validly** 71:16
**various** 10:11 29:12
44:7 45:20 47:20
**vary** 48:4
**vast** 77:19
**Vaughn** 2:12 4:25,25
**version** 10:1 13:14
113:24
**versus** 34:19 80:10,18
**viable** 123:8
**video** 118:11 121:12
**view** 49:3 57:17 61:2
86:5,13 88:15 98:14
98:16 110:19 121:20
122:8
**viewing** 105:8
**visit** 102:7

#### W
**wait** 68:18 92:13 94:23
117:3
**walk** 32:6 38:7,10
42:15
**want** 7:6 8:5,12 9:1,11
11:13,22,23 14:19,20
14:21 19:25 25:22
30:2,22 32:2,6 35:18
38:5,9 39:13,13,20
39:21 41:21,23 42:23
44:17 45:13 49:24
50:3,12 51:1,2 58:1
67:24 68:1 71:24
72:2,20 73:15 78:15
82:9 84:17,18,21
85:3 88:23 89:21
90:24 93:1,2 94:4
95:21 96:12,13
103:14,18 106:10
107:16,25 108:11,23
109:3,25 110:8,15
111:1,11,12 112:6,10
112:10,12 114:8
115:11,21 116:1,3,7
116:14,22,23 117:3
119:19,22 120:14,19
120:21 122:6 123:22
**wanted** 4:8 101:1,20
102:21 103:7 105:2
**wants** 101:21 103:21
**warning** 99:23

**Warren** 2:10 4:23
65:20
**wasn't** 18:23
**way** 1:16,24 11:24 17:6
21:1 24:19 25:6
36:12,18 40:4,7 48:8
48:18,21 49:14,17
52:1,11,16 53:11
56:3 57:13,24 62:21
64:8 70:17 74:5,22
80:22 88:18 94:19
96:1 104:4 108:18
109:1,17 111:3 112:5
116:2 119:8 122:7,24
123:4,13
**ways** 55:15 57:25 64:10
114:16
**Wednesday** 120:21
**weeds** 17:12
**weekend** 8:4 18:1
**weeks** 107:14 108:6
**welcome** 41:20 42:8
72:21
**well-conducted** 100:6
**well-performed** 100:1
**well-qualified** 96:15,18
96:19 100:23
**went** 10:3 16:21 17:4,9
26:10 41:13 54:19
56:19 82:10,12,18
**weren't** 101:6,8
**we'll** 12:15 46:1 72:19
73:7 113:16
**we're** 5:1 6:18 7:8,8
10:12,16,17 13:10
23:15 29:17 30:7
33:5 39:16 46:25
49:2,5 82:21 84:19
87:3,6 91:9 95:6
98:17 101:19,23
102:1 103:15 106:6,6
110:18 112:8,9
119:12 121:8 122:13
122:15
**we've** 51:25 104:10
120:3
**whatsoever** 109:5
**whereof** 125:15
**White** 2:7
**whittle** 10:25
**Williams** 2:7
**willing** 117:10
**wish** 66:19
**witness** 3:3 6:3 42:6,10
42:12,22 47:10,24
48:2,4,9,12,18 49:1,3
49:12,17,24 50:6,15
50:19 51:4,8 52:3,7
52:12,18,23 53:4,7
54:1,5,11,25 55:3,5,8
55:10,13,18 56:14,18

57:5,19,23 59:9,12
60:18,23 61:1,4,13
61:17,19 62:10,13,16
62:18,23 63:3,9,12
63:14,16,19,23 65:3
65:5 66:8,12,18 67:1
67:5,8,13,17,23 68:3
68:16,18 69:7 70:19
71:19,23 72:1,10,16
72:18,22 78:20 79:13
80:25 81:2 88:14,17
88:24 89:2,11,18
95:4,24 96:3,5,9 99:3
99:5 100:18 101:4,6
101:17 102:25 103:2
117:14,14,15,16,17
117:24 119:7,8
120:24 125:15
**witnessed** 90:9
**witnesses** 117:2,19,21
**word** 24:19,20 25:4
40:6,7,7,10 96:24
113:21,22
**worded** 105:9
**wording** 109:18 115:25
**words** 22:25 23:4 25:19
45:1 52:1 55:16
63:21 89:15 109:20
**work** 44:18 46:1,2,5
85:7 90:9 99:17
**worked** 76:1
**workers** 4:22
**works** 85:6
**workshop** 64:14
**world** 29:2
**worried** 115:10,11
**worse** 79:7
**worth** 14:20
**wouldn't** 15:17 34:16
62:20,21 74:21 75:24
77:4 79:15 98:5
101:5 106:10 112:25
117:3 118:10 123:22
**write** 90:25 91:4
**writing** 76:20 108:20
**writings** 86:20
**written** 44:3,7 52:9
77:1 86:15
**wrong** 9:9 24:18,22
26:1 40:3 48:24
52:22 58:2 66:10
122:22 123:4,16
**wrote** 97:16 100:2

#### X
**X** 3:1
**Xanax** 15:12,12,14,15
15:17,18,20 29:22,23

#### Y
**year** 20:9 32:12 34:2

56:13 59:16,22 60:9
65:21 68:14,22 69:14
**years** 14:20 26:12
32:15 33:21 34:14
35:1 43:3,7 59:19,20
60:14 69:13 92:23
93:21,25
**yellow** 116:18 119:5
**yesterday** 4:9 9:7 10:1
32:9 42:22 116:12
120:4
**York** 2:4,9,9

#### Z
**zone** 49:13
**Zyprexa** 29:9

#### 0
**02110** 2:7
**02210** 1:24
**04-10981** 4:4
**04-10981-PBS** 1:4
125:11

#### 1
**1** 1:5,16,24 16:8 20:12
20:13 59:18 69:11
97:16,17 125:9
**1st** 16:13
**1,000** 59:20 69:12
93:22,25
**10** 84:13
**10:00** 39:17
**10:38** 73:9
**100** 2:7
**100,000** 92:23 93:21
**10036** 2:9
**11:03** 73:10
**1111** 2:4
**12:00** 124:5
**124** 1:5 125:9
**12550** 2:4
**1279** 2:4
**130,000** 26:13,14
**131,000** 93:9 94:15,18
**131,000-plus** 93:11
**14** 56:24 57:5 81:8
**17** 95:1,1,2,2,17
**19** 1:16 41:8 72:3
**1986** 43:14
**1992** 118:2
**1998** 43:15

#### 2
**2** 16:8 83:13 86:1 92:12
92:18 93:15,20 95:20
95:22 99:14,15
**2C** 93:17 95:23
**2nd** 16:14
**20th** 2:11
**2009** 1:17 57:6 84:15

125:16
**21** 1:17
**21st** 125:16
**21202** 2:11
**2707** 2:7

---
### 3
**3** 6:6 16:8
**3rd** 16:15
**30** 19:18 35:14 79:12
   79:12 82:25
**30-day** 35:17
**300** 2:4 44:6
**31** 57:3,6 86:1 97:17

---
### 4
**4** 16:8 57:3 100:4,7
**42** 3:5
**453** 94:5
**456** 93:2,3,6,11
**47,000** 37:14
**48** 116:14,23

---
### 5
**5** 16:9

---
### 6
**6** 90:16
**617)345-6787** 1:25

---
### 7
**7** 90:21,22,25,25 91:9
   91:10
**70** 27:4
**702** 5:21,24,24
**72** 3:6
**7200** 1:24

---
### 8
**80** 27:5

---
### 9
**9** 51:5 60:3 84:13 95:2
   95:17
**9:15** 1:17