<pre>
 1                UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MASSACHUSETTS
 2
                                  MDL Docket No. 1629
 3                                Master File No. 04-10981

 4   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
                                                        *
 5   IN RE: NEURONTIN MARKETING                         *
             SALES PRACTICES AND                        *
 6           PRODUCTS LIABILITY LITIGATION              *
     ---------------------------------------------*
 7                                                      *
     THIS DOCUMENT RELATES TO:                          *
 8                                                      *
     Shearer v. Pfizer Inc,  1:07-cv-11428-WGY *
 9                                                      *
     *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
10

11               DAILY TRANSCRIPT OF PRELIMINARY
                 JURY INSTRUCTIONS, OPENING
12               STATEMENTS and THE EVIDENCE
                         (Volume 2)
13
                 BEFORE:  The Honorable William G. Young,
14                         District Judge, and a Jury

15
     APPEARANCES:
16
                 FINKELSTEIN & PARTNERS, LLP (By Ronald
17       Rosenkranz, Esq., Kenneth B. Fromson, and Keith L.
         Altman, Esq.), 1279 Route 300, P.O. Box 1111,
18       Newburgh, New York 12551
                     - and -
19               JACK W. LONDON and ASSOCIATES, P.C. (By
         Jack W. London, Esq.), 3701 Bee Cave Road, Suite
20       200, Austin, Texas 78746
                     - and -
21               THE LANIER LAW FIRM PLLC (By Kenneth S.
         Soh, Esq.), 6810 FM1960 West, Houston, Texas
22       77069, on behalf of the Plaintiffs

23

24                               1 Courthouse Way
                                 Boston, Massachusetts
25
                                 March 31, 2010
</pre>

1         **A P P E A R A N C E S** (Cont'd)

2

3         BOIES, SCHILLER & FLEXNER LLP (By William
    S. Ohlemeyer, Esq.), 333 Main Street, Armonk, New

4     York 10504
        - and -

5         GOODELL, DeVRIES, LEECH & DANN, LLP (By
    Bonnie J. Beavan, Esq.), One South Street, 20th

6     Floor, Baltimore, Maryland 21202
        - and -

7         `SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
    (By Catherine B. Stevens, Esq. and Mark S. Cheffo,

8     Esq.), Four Times Square, New York, New York
    10036, on behalf of the Defendant

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## I N D E X

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| DAVID FRANKLIN | | | | |
| By Mr. London | 46 | | 150 | |
| By Mr. Ohlemeyer | | 120 | | |

| EXHIBITS: | | FOR I.D. | IN EVID. |
|---|---|---|---|
| 2020 | Neurontin Deciles . . . . . . . . . . | | .67 |
| 2020-1 | Neurontin Indications . . . . . . . | | .83 |
| 6000 | Dr. McCormick Regarding Neurontin | | . 100 |
| 5655 | Voice Mail Tape . . . . . . . . . | | 107 |
| 4062 | Memorandum . . . . . . . . . . . | | 113 |
| 5150 | Neurontin Marketing Assessment | | . . 117 |

1         **THE CLERK:**  All rise.  Court is in session, please
2    be seated.
3              Calling Civil Action 07-11428, Shearer v. Pfizer.
4              Oh, sorry, Judge.
5         **MR. ROSENKRANZ:**  Good morning, your Honor.
6         **THE COURT:**  Good morning, counsel.  Would you come
7    over here to the side bar, this doesn't have to be on the
8    record.
9              (Side bar conference off the record.)
10        **THE COURT:**  We'll stand in recess until we have the
11   jurors.  If they're back there we'll start right at nine
12   o'clock.  We'll recess.
13        **THE CLERK:**  11 rise.  Court is in recess.
14             (Recess.)
15        **THE CLERK:**  11 rise for the jury.
16             (Whereupon the jury entered the courtroom.)
17        **THE CLERK:**  Court is in session, please be seated.
18        **THE COURT:**  Good morning, folks.
19        **THE CLERK:**  If you would move down one.  Thank you.
20   In the second row.  Right.  Okay, great.
21        **THE COURT:**  My name is Bill Young.  I'm the judge
22   who is assigned to preside in this session of the Court.
23   You've already met my colleague, Magistrate Judge Bowler,
24   who was gracious enough to conduct the impanelment of the
25   jury, but you're stuck with me for the actual trial of the

1    case.   That's my responsibility.

2          You were sworn as jurors.  Mr. Newman, the Court

3    appoints you foreman of this jury.

4          Let me take a few minutes to explain in detail

5    exactly what's going to happen in this case and to tell you

6    a little bit about what your function is in this case

7    because you are the most important people in the courtroom.

8          At this time, in this courtroom, there are thirteen

9    judges.  You twelve men and women are the judges of the

10   facts.  You are the only judges of the facts.  I'm the judge

11   of the law.

12         Now, let's consider a moment what that means to be

13   judges of the facts.  This is informal, but I want to ask

14   you this:  Do any of come from towns where they have direct

15   town meeting, everyone can get, go to town meeting and vote?

16   Does anyone?  Thank you.  Thank you.

17         When I'm picking a jury that's the first thing I

18   ask of the whole group.  And you see you people who come

19   from towns where they have direct town meeting, you have the

20   experience of direct democracy, the people themselves ruling

21   directly.  I don't come from such a town.  But in those

22   towns everybody can go to town meeting.  Everybody, if

23   you're 18 years of age or older, you can go to town meeting

24   and you 11 can vote.  You vote whether to buy another fire

25   engine, raise the teachers' salaries, close the town dump.

1    You govern directly.

2          Now, in my town, I can go to town meeting.  If the

3    moderator will call on me I can speak.  But I can't vote.

4    Because I've already voted in my precinct, my neighborhood,

5    for my town meeting representatives who are my

6    representatives and 11 my neighbors at town meeting.

7          That's how two branches of our government work.  We

8    use representative democracy 11 through our government.

9    Representative town meeting, electing the board of

10   selectmen, city council, board of 11dermen, mayor, state

11   representative, state senator, governor of the Commonwealth.

12   On the federal level, we've just elected a new United States

13   Senator to serve out the term of Senator Kennedy who passed

14   away.  In another couple of years we will elect the

15   President of the United States.  We'll 11 pick them but

16   they'll do the governing.

17         Except in the judicial branch of government.  In

18   the judicial branch of government there is preserved in the

19   American jury the most vital expression of direct democracy

20   that exists anywhere in the world.  Ninety percent of the

21   jury trials on the planet take place in the United States of

22   America.  And here's why.

23         Think about, think about the constitutional

24   officers.  Have you ever thought of who's named in the

25   constitution, the people named in the constitution?  I mean,

1      you know who.  This is a little like sixth grade civics, but

2      it's all right to take a moment and do this.

3              Article I, that's the congress.  Two houses of

4      congress to check one another.  Representatives.

5      Congressmen and women.  Senators.  They're mentioned in

6      Article I, they're constitutional officers.

7              Article II, that's the executive.  And we have a

8      very, very powerful executive.  I mean, at the top of the

9      executive branch is the President of the United States.  And

10     in Article II, that's the only person mentioned except,

11     given the frailties of the human condition, we have a Vice

12     President should, God forbid, something happen to the

13     President.  But everybody else, all the cabinet officers,

14     everybody else, they're not constitutional officers, though

15     they 11 ultimately work for the President of the United

16     States.  And he checks the congress and they check him.

17             And then here's what it says about the judicial

18     branch of government.  The judicial power of the United

19     States shall be vested in one Supreme Court and such

20     inferior courts as congress from time to time shall ordain

21     and establish.  Then there's a couple of sentences that talk

22     about the Justices of the Supreme Court.  They're 11

23     constitutional officers.  And this is one of those inferior

24     courts, the trial court, the District Court of

25     Massachusetts, and the judges of various courts.  So, I am a

1    constitutional officer.  And then it says this:  11 criminal

2    cases, save for impeachment, shall be tried by jury.

3         Now, this isn't a criminal case so that doesn't

4    apply here.  This is not a criminal case at all.  But you

5    see the people wouldn't accept the constitution.  The people

6    would not accept the Constitution of the United States until

7    it had a Bill of Rights.  The first ten amendments.  And in

8    Article VII of the Bill of Rights, and I'm paraphrasing

9    here, it says you know those cases we're trying to juries

10   now in our state courts, or that we tried to juries when we

11   were colonies?  Those cases we're now trying to juries,

12   we'll always try them to juries.  Guaranteed by the Seventh

13   Amendment.

14        So, make no mistake.  When this case is over and

15   you go back to that jury room to determine the facts in the

16   case, that's your function, this case is going to be tried

17   to you, presented to you, you are the judges of the facts,

18   and when you discharge that fact finding function, when you

19   agree unanimously on your verdict, you are discharging a

20   constitutional, a constitutional role.  You are equal to our

21   representatives and senators, you're equal to the President

22   of the United States, the Chief Justice of the Supreme

23   Court.  Certainly equal to me.  You're constitutional

24   officers, and no one can disturb the justice that you

25   declare through your verdict.

```
 1                    So let's get to the particulars of doing it.  I

 2      stand here because this is where the witnesses are going to

 3      testify.  And you're going to determine your verdict in this

 4      case based solely and entirely on the evidence, evidence,

 5      that you hear and see right in this courtroom and on nothing

 6      else whatsoever.  You're not to go and do your own private

 7      investigations of this case.  That's forbidden.  You can't

 8      go out and Google these people or this company, or you'll

 9      hear about a company here.  You can't do your own

10      investigation.  That's not fair.  Because the fair way is

11      with both sides able to ask questions, present sworn

12      testimony to you here in court.  And you're going to

13      determine the truth of what is at issue in this case fairly

14      and impartially, coolly, reflectively, sifting, sifting the

15      evidence before you and deciding what you believe to the end

16      that in this courtroom, in this trial, true justice may be

17      done.  You're going to do it without any bias.  You're going

18      to do it without any prejudice.  You're going to do it

19      without any sympathy for anyone, coolly, reflectively.

20                    Now, in this case we've got individuals.  They're

21      the plaintiffs.  The Shearings.  They're suing a company.

22      Pfizer.  Pfizer denies any wronging, and that's what the

23      dispute is about.  But they start equal.  The individuals

24      don't get any advantage because they're individuals.  Pfizer

25      doesn't start behind because it's a company, it's a
```

1    corporation.  What are corporations?  They're made up of

2    people.  People doing jobs earning livings.  So everybody in

3    a trial starts equal.  Exactly equal.

4            Now, your verdict has to be unanimous, 11 twelve of

5    you agreeing.  There are no alternates on this jury.  You're

6    11 going to deliberate equally.  So let's talk about the

7    doing of it.

8            As jurors you have the right to take notes.

9    Ms. Smith is going to pass out to you now notebooks and

10   pens.  Nobody tells you you have to take notes.  You may

11   take notes, but you are not required to take notes.  If

12   you're one of these -- it's not a test.  You're going to be

13   the judges here.  I'm trying to empower you to be the best

14   judges you know how to be.  So, if you get your best

15   knowledge about people by watching them very carefully,

16   watch how they testify on the witness stand, and taking

17   notes would interfere with that, distract you, no one says

18   you have to take notes.  But this is going to go on a while.

19   So, if you would get your best knowledge by making note of

20   the names and the dates that things happen, if that's how

21   you learn something, by 11 means feel free to take notes.

22           Your notes are private.  No one's ever going to see

23   them.  When we take the break in the morning you can leave

24   your notebooks right there on your chairs.  Nobody goes in

25   the jury box.  That's your space.  At the end of the day

1    take your notebook out, Ms. Smith will collect it, we lock

2    it up, we'll give it to you the next day.  You better put

3    your names on them.  And I confess they may look a little

4    dog-eared.  If they do it's because we've used them in an

5    earlier trial.  This is, after 11, a tax-supported operation

6    and so we use the notebooks until they're done.  So, put

7    your name on it so you can get it back.

8            You'll have your notebooks with you in the jury

9    room when the trial is over.  Don't pass your notebooks

10   around in the jury room.  That's not evidence of anything.

11   It's just your notes to refresh your recollection so you can

12   talk with your fellow jurors.

13           You may ask questions.  Now, these are very good

14   lawyers.  They know what they're doing.  They know how to

15   present a case.  But if you're -- if you think there's

16   something important and they're just not getting at it, you

17   can ask a question.

18           Now, it has to be a little formal.  You have to

19   write your question out, rip it out of the notebook, pass it

20   down to the foreman.  Ms. Smith and I are watching.  One of

21   us will come and pet it.  Eventually I will see it.

22           So I'll look at the question.  Now, I might not ask

23   your questions, and I'll tell you right now why.  I won't

24   ask it if I wouldn't let the lawyers ask it.  For some legal

25   reason that doesn't make any difference and I wouldn't let

1   them ask the question, so I'm not going to ask it.  Also, I

2   won't ask it, it might be a very good question, I'm very

3   interested in the answer, but if I can't see how this

4   witness, the one who's testifying before you, this witness

5   could know the answer, then I won't ask it.  Witnesses can

6   only testify to what they know, what they saw, touched,

7   tasted, heard, smelled, their own senses.

8           So, I won't ask the question, but on every question

9   I don't ask I give it to Ms. Smith, she puts it on the front

10  of her bench, the lawyers can see it.  And they're very

11  interested.  They want to know what at least one juror has a

12  question about.  And maybe they've got another witness,

13  maybe they've got another way to get at it, and so they may

14  get into it.

15          If I'm going to ask your question, I'll wait until

16  a time that I think is courteous, which means the lawyer has

17  gone to shuffle his papers or he's on to a different topic

18  or he's done with the witness, then I'll ask your question.

19  And I'll ask it open-ended, meaning who, what, where, an

20  open-ended question.  I'm still a lawyer.  I know how to ask

21  questions.  So, I'll ask him a question, and I may ask some

22  follow-up questions, just so we know what the witness has to

23  say about the question that you ask.

24          Now, again, save that for what you think's

25  important because the lawyers do know what they're doing,

1      they'll present the case to you.

2             We're into spring time.  It's been lousy weather.

3      They say now it's going to be beautiful weather.  It may get

4      warmer they say, God willing.  If it gets stuffy in here or

5      if it's cold in here, by 11 means raise your hand, let us

6      know.  Immediately we will call the building management.

7      Nothing will happen, but we will have had the cathartic

8      value of making the call.

9             I say that for the laugh line, but also there's

10     truth to that.  This is tricky.  These are magnificent huge

11     courtrooms.  But the jury rooms and the offices are smaller

12     rooms.  And anyone who knows anything about air conditioning

13     knows that it's a trick to keep them 11 properly managed.

14     They will in fact change the thermostats immediately.  It

15     just takes a long time for this room to heat up or cool

16     down.  So we'll do the best we can.  But I also say it

17     because I want you to feel empowered.  You are truly equal

18     to me.  So, if you don't hear something a witness says,

19     don't wait, raise your hand, say I didn't hear.  And we'll

20     have the witness repeat it.

21            The acoustics are very good in this courtroom.  And

22     obviously you have to listen to what the lawyers ask so

23     you'll understand what the witness is testifying to.  Also,

24     lawyers have a penchant -- see this blue carpet here?  This

25     is the bar enclosure.  This is where the lawyers practice

```
 1   their profession.  The highest calling of the lawyer is in

 2   fact to stand before an American jury and try a case.  Now,

 3   they don't have to just stay right on the blue carpet.  But

 4   the point is they can come up here close to question a

 5   witness.

 6          Now, if they do that, because they're intent on

 7   questioning they may plant themselves between you and the

 8   witness.  If you can't see the witness as the witness

 9   answers a question raise your hand.  Now, I should be alert

10   to that and shoo the lawyers off to one side or the other.

11   But you've got to watch these witnesses, because you're

12   going to evaluate whether they're telling the truth or not,

13   and you want to watch them very carefully.  So just raise

14   your hand, we'll get them out of the way.

15          We sit -- and I try to be very strict about this,

16   and I thank you so much for being prompt this morning.  I

17   know that it was difficult getting in here.  I want to start

18   right at nine o'clock.  I'll run an hour and 45 minutes

19   until quarter to 11:00.  We will take a recess.  You get a

20   half an hour recess.  We've got refreshments back there.

21   Relax.  We've got books and magazines back there.  Those by

22   the way are for you.  If you get into them or want a book or

23   something take them with you.  My wife will bless you if you

24   take them out of there.  So, they're for you.

25          At the end of the half hour we'll go, start in
```

```
1    again, we'll go another hour and 45 minutes, right until

2    one o'clock, I will stop on the dot of 1:00.  You can make

3    your transportation, you can make your plans for the day

4    understanding that.  Now, when the trial is over, I'm going

5    to need you 11 day to be deliberating, but we work from 9:00

6    to 5:00.  No one's kept in the evening.  We're not going to

7    go into any weekends.

8           Now, I tell you the schedule because you're

9    entitled to know it, but I don't want you sitting there at

10   10:30 praying for it to be 10:45 so you can take a rest

11   halt.  If you need a rest halt, raise your hand.  We can

12   always take five, seven minutes, send you out for a rest

13   halt and come back.  We're not so pressed for time.  But

14   I'll be strict with the lawyers about time.

15          If you would like a glass of water, Ms. Smith will

16   bring you a glass of water.  Anything we do for the lawyers

17   we do for you.  And they're going to be using these document

18   presenters, like little TV screens, and you can see exhibits

19   on the TV screens.  Understand anything that's actually an

20   exhibit, and it will have a number if it's an exhibit, that

21   will be with you in the jury room when the trial is over.

22          Now, I'm the judge of the law.  Now, what that

23   means is I'm the law teacher here.  Though you are in fact

24   constitutional officers and you are the judges of the facts

25   in this case, the only judges of the facts this case will
```

1    ever have, you are the judges of the facts, but that does

2    not empower you to make up your own law.  Law is made by our

3    legislative branch, our congress, in this case, for legal

4    reasons, it's made by the Massachusetts legislature.  We're

5    going to be talking about Massachusetts law here.  The judge

6    is the law teacher.  That's what I'm trained to do.  And I

7    do it the best I know how.  You've got to take the law from

8    me.  As I explain it you've got to accept it.  You cannot

9    make up your own law.  That's not fair.  I'm going to tell

10   you what the Shearings have to prove, and what they have to

11   prove by a fair preponderance of the evidence.

12        Now, you can't add to that.  You can't say, well, I

13   want them to show us something else.  I want them to prove

14   this or explain that.  No.  The law tells us what it is they

15   have to prove before they can recover damages, money.

16   Remember, Pfizer disputes these things.  So, I will tell you

17   what it is they have to prove, and at the end of the trial,

18   when I've heard the evidence, I will tell it to you in more

19   detail, but I'm going to tell you right now what it is they

20   have to prove, and that's what they have to prove.

21        But equally, you can't subtract from it.  You can't

22   say, well, oh, I think they were, Pfizer, I think Pfizer did

23   this, for example, but there's no proof that the this had

24   any effect on anyone in the Shearing family.  It didn't do

25   anything, it didn't cause them to lose anything.  Because

1    cause is one of those things that the Shearings are going to

2    have to prove.  And so, the fact that, maybe, well, I think

3    Pfizer did this.  Well, maybe they did.  But if it didn't

4    cause anything then they cannot win here.  They cannot.

5    You've got to follow the law the way I explain it.

6          Now, who are the plaintiffs, these individuals who

7    say they've been injured and bring, they bring the action on

8    behalf of a person who has died.  And so they -- for the

9    value, for that person's pain and suffering, that's one of

10   the things that the lawsuit is about.  They're the

11   plaintiffs.  They brought the action.  And so, they will go

12   first and try to prove whatever it is I'm going to tell you

13   they have to prove.

14         Now, they have to prove their case by a fair

15   preponderance of the evidence.  What that means is they've

16   got to prove their case more likely to be true than not

17   true.  If something else is more likely true they haven't

18   proved it.  If on all the evidence you believe that evidence

19   tends equally to two equal but opposite conclusions, they

20   haven't proved it.  But so long as on the things they have

21   to prove those things are more likely to be true than not

22   true, you can say they have proved that matter by a fair

23   preponderance of the evidence.

24         Now, you'll have in mind while the Pfizer

25   attorneys, they'll get a chance to cross-examine each of the

```
 1      plaintiff's witnesses, they don't get to put on their case

 2      until the plaintiffs are done.  Then we'll hear from them.

 3      So keep your minds suspended.  Don't be making up your mind

 4      based on the first witness.  The last witness is as

 5      important as the first and the first is as important as the

 6      last.  So as we go along keep your minds suspended.

 7            I have a role to play while the trial is going on,

 8      though I will try to keep my mouth shut for most of it.  The

 9      lawyers are teachers, too.  The lawyers have the hardest

10      job.  Because not only, skilled as they are, not only must

11      they teach you about this case, and it's got some

12      interesting and complex aspects to it, they must teach that

13      to you, but also they must teach me the law.

14            Now, I don't want to be overly modest.  I've

15      prepared for the case.  I've tried cases like this.  But

16      every case has little wrinkles.  And they are law teachers

17      so -- though I have the final word.  So, I will try to make

18      this case go along smoothly and use our time from 9:00 in

19      the morning until 1:00 in the afternoon, use that

20      effectively.  So what I will expect is we'll go along like

21      this:  Question, answer, question, answer, question,

22      objection.  Now, there's nothing wrong with an attorney

23      making an objection.  It's part of their job.  And I will

24      try to be quick and I'll say overruled, which means no, you

25      can ask that question, let's see what the answer is.  Or
```

1    I'll say sustained, which means the questioning lawyer has

2    to ask a different question.

3            Now, they don't have to sit still for that.  They,

4    they may say, and I'll try to keep this to a minimum, but

5    they may say, well, may I approach the bench.  And what that

6    means is they want to teach me a little law.  They want to

7    advise me on what it is that, the legal issue about these

8    questions.  And we do that over here at what we call the

9    side bar.  And probably with Judge Bowler they were

10   whispering over here.  And I'll tell you right now what

11   we're doing.  We're deciding whether the 17th or the 23rd

12   exception to the rule against hearsay applies to the

13   question.  Now, we could talk back and forth in front of

14   you, but we don't because it's distracting.  Law's for me,

15   evidence and ultimately fact finding is for you.

16           Now, if we're over there huddling don't think

17   you're chained to those chairs.  You're not.  Stand up.

18   Move around.  Keep the blood flowing.  Walk around in there.

19   These are the biggest jury boxes of any courtroom in the

20   United States.  I'm very proud of this courtroom.  All

21   right?  So, don't talk, because it will distract me over

22   here.

23           I once had a lawyer tell me he always smiled at the

24   end of a bench conference hoping the jury would think he was

25   winning the case.  Wrong.  You decide the case.  We're just

1    talking law over there.

2              Now, let's get to it.  You know the plaintiffs have

3    brought the case.  They've made certain allegations which

4    Pfizer has denied.  What is it that they have to prove.  The

5    plaintiffs have two theories, and I'll go through each one

6    briefly and then it's time to begin.

7              Their first theory is that Pfizer in the

8    manufacturing and the marketing of a certain pharmaceutical

9    composition, a drug, was negligent.  And they claim

10   negligence in two respects.  They claim negligence in the

11   actual manufacture and putting together the stuff, and they

12   claim negligence in the advertising and marketing of the

13   pharmaceutical.

14             Negligence means this.  Negligence means that what

15   Pfizer did fell below the ordinary standard of care to be

16   expected of a pharmaceutical manufacturer.  The ordinary

17   standard of care.  It can be equated with carelessness.  It

18   is that they fell below, that Pfizer failed to do something

19   that the reasonably careful pharmaceutical manufacturer

20   wouldn't have done, or they did things that the reasonably

21   careful pharmaceutical manufacturer would have done.  I said

22   that wrong.  They did things that the reasonably careful

23   pharmaceutical manufacturer would not have done.  That they

24   were negligent.

25             Now, one of the things that you're going to be

1    concerned with in this case is that there is the allegation

2    that Pfizer marketed this drug for what we call off-label

3    uses.  So I need to talk to you a little bit about the law.

4          The federal law, the laws of the United States,

5    carefully regulate 11 pharmaceutical drugs.  The drugs --

6    they regulate over-the-counter drugs, but this is a drug

7    that you get by prescription.  So they regulate those.  And

8    they regulate them carefully through an agency called the

9    FDA, Federal Drug Administration.

10         Now, that Federal Drug Administration requires

11   specific labels and it approves the labels that are given

12   and it requires specific notifications both to doctors and

13   ultimately to patients about the drug, and it approves the

14   notifications that are given.  And also the law requires

15   that that's how the drug is to be used.  And what the

16   Shearings say here is that whatever this drug was for or

17   could have been used for or should have been used for and

18   was approved for, Pfizer in fact was marketing it for other

19   uses, off-label uses.  That's a violation of the law.

20         Now, what difference does that make to us here?

21   Well, if you were to find that Pfizer was in fact marketing

22   this drug off-label then that standing alone is evidence of

23   negligence.  It doesn't mean there was negligence.  It means

24   that's evidence of negligence, and we may get into that.

25         So, the first thing the Shearings have to prove is

1    that Pfizer was negligent.  But as I told you, as I told

2    you, that's not enough.  The second thing they have to

3    prove, and it is equally important, and perhaps it may be

4    more important, is that the negligence, either the

5    negligence in manufacture or the negligence in advertising,

6    marketing, was the proximate cause of injury to the

7    plaintiff.

8             Now, in this case -- don't think I've seen any

9    evidence.  I haven't.  I've just seen a mound of papers to

10   get us ready for trial.  And I don't think this is disputed.

11   In this case, they, the person who died, upon whose the

12   behalf the lawsuit is brought, he committed suicide.  That's

13   not disputed.  He killed himself.  And so what the Shearings

14   have to prove is that it was the drug that was the proximate

15   cause of his death, having in mind the man committed

16   suicide.  And so the definition of proximate cause is very

17   important, here it is, in different aspects.

18             Did the negligence of Pfizer cause a risk to the

19   public that used this drug and was what happened here a

20   result within the foreseeable risk.  Was the drug the

21   substantial producing cause of the death.  Or stated in

22   other words, but for the drug would -- I think it's Mr.

23   Shearing -- Mr. Shearing have killed himself anyway.

24   Because if he would, whatever Pfizer did is not the cause of

25   his death.  So, negligence first, then proximate cause, then

 1    a calculation of damages.

 2          I'm not going to talk about damages.  I'll mention

 3    certain of the elements of damages.  You may never get to

 4    damages, and I will, I need to hear, as you do, the

 5    evidence.  But you may hear things such as his pain and

 6    suffering once he started taking the drug.  Well, that would

 7    be an element.  They'll certainly try to prove that.  You

 8    may hear things about the, what we call the loss of

 9    consortium, what family members lost both in economic sense

10    as he was the provider but also lost in the social

11    interaction with the individuals, who is now dead, and the

12    law will compensate for that.  And there are other things

13    the law will compensate for.  We'll see what the evidence

14    is.  But we'll be taking some time as they present their

15    case to go over, I'm sure, these elements of damages.

16          So that's the first theory.  Negligence, which was

17    the proximate cause of the death, and the injury that, the

18    damages that flowed from that death.  That's the first

19    theory.

20          Now, here's the second theory.  The second theory

21    is what we call a products liability theory.  And the only

22    thing different, the only thing different is the first

23    element.  The law provides on every manufacturer, not just

24    drug manufacturers, on every manufacturer, whether it's in

25    the contract of sale or it's in the print on the can or

```
 1    anything, it doesn't have to be there, the law just imposes
 2    it, the law imposes these two requirements.  The law says
 3    that everything a manufacturer puts into commerce, sells,
 4    puts out there to be sold, even prescription drugs, puts out
 5    there to be prescribed to patients, has to be of
 6    merchantable quality.  And 11 that means is it's got to be
 7    of average standard usage.  It's very important.  It doesn't
 8    have to be the best thing that ever was.  It doesn't have to
 9    be an item which in some people could cause an adverse
10    reaction for pharmaceuticals.  It just has to be of average
11    merchantable quality.  And the manufacturer -- Pfizer's a
12    manufacturer -- who puts something out for sale, the drug's
13    for sale, warrants, that is, it goes with the sale that this
14    stuff is of average merchantable quality.  And there's a
15    second automatic, required warranty, and it's this:  That
16    it's reasonably fit for its intended purpose.  So that, and
17    the words are straightforward, that this particular drug is
18    reasonably good, reasonably fit for the purpose that it was
19    intended to be used for.  Not that it's perfect, not that it
20    guarantees a cure, and again not that there may not be
21    side-effects or adverse reactions, but it's reasonably fit
22    for its intended purpose.  The intended purpose of course is
23    what the FDA has approved it for, what uses it's approved
24    for.
25              Well, the Shearings say, well, they broke those
```

1    warranties.  Now, what's different about this is they don't

2    have to prove negligence on this one, this separate theory.

3    They just say, ask yourselves those questions, of reasonable

4    merchantable quality, reasonably fit for its intended

5    purpose, yes or no, was it.  And you are the judges.  You go

6    back to the time, what we knew at the time this drug was

7    sold, at the time it was prescribed to Mr. Shearing.  I

8    mean, we learn things as we go along here.  We're looking at

9    the state of mind of people back then when it was prescribed

10   to him, if it was.  I don't think that's disputed.  But

11   don't take it from me.  When it was prescribed to him, was

12   it of reasonable merchantable quality based upon what we

13   knew then.  Was it reasonably fit for its intended purpose

14   based on what we knew then.  And if it wasn't those

15   warranties are broken; if it was, you can stop your

16   analysis.  But if it wasn't the warranties are broken and

17   you go again to the second issue, it's the same issue, did

18   the breach of warranty, was that the proximate cause of the

19   death, and then what damages flow from the death.

20            Those are the theories.  Understand it's the

21   plaintiffs, the Shearings, their burden to prove it by a

22   fair preponderance of the evidence, and also understand that

23   Pfizer disputes these matters, disputes them factually, says

24   factually they're wrong.  Well, that's what the evidence is

25   going to be.

1          We're ready to go.  The next step in the case, I've

2     talked generally, now we'll let the lawyers give you a

3     road -- we'll let them make their opening statements.  It's

4     like a road map.  It's like a guidebook of the evidence that

5     you're going to hear as the case comes in.  Each side gets

6     15 minutes, no more, and because it is the plaintiffs that

7     go first, we hear first from plaintiff counsel.

8          Counsel.

9          **MR. ROSENKRANZ:**  Thank you, your Honor.

10          Good morning, ladies and gentlemen.  I'm Ron

11     Rosenkranz and I represent the Shearer family.  Linda

12     Shearer is in the first row over here.  Her son, Ivor

13     Shearer, you'll see later in the trial.  And I believe if

14     you look on your monitors you will see a photograph of

15     Hartley Shearer, who is her deceased husband.  He's in

16     black.  He is on the left of the photo and he has a brace.

17     The brace is from the result of a stroke that he had prior

18     to taking the Neurontin.

19          Hartley Shearer was born October 30th, 1944.  On

20     February 7th, 2002, he had a disagreement with his wife, who

21     was on a business trip in Hawaii.  They were on the phone,

22     he hung up the phone.  A little while later he wrote a note,

23     a little bit after that he took a .357 Magnum and put it to

24     his forehead and killed himself.

25          You're going to see that note later in the trial.

1    You may see it in defendant's opening.  I don't know.  When

2    you read the note, you will realize the irrationality of the

3    suicide.  And when you hear about the suicide itself, if

4    there's such a thing as a rational suicide, and I doubt it,

5    you will come to the conclusion that there was nothing

6    rational about this suicide.

7            A little bit about their marriage.  They were

8    married 35 years.  You may find some of the things about the

9    marriage a little bit different than yours or mine.  People

10   are different.  It wasn't smooth all the time.  There were

11   arguments.  There were disputes.  But they lasted together

12   35 years, and out of that union they had a son, Ivor.

13           Hartley Shearer, just so that you know about him a

14   little bit, and I'm sure you are going to hear a great deal

15   more from defense, was a tough guy.  It was difficult to get

16   to know him well, to get close to him at times.  He was the

17   kind of guy that you either loved or hated.  He had demons.

18           When he was a kid he needed psychiatric help.  And

19   that arose from the fact possibly that his parents had seven

20   divorces between them.  He was well respected as a kid.

21   They loved him.  He was athletic.  But he had psychiatric

22   problems.

23           As he grew up the psychiatric problems continued.

24   He had anger issues.  He had depression issues.  He met

25   Linda and he married her and they lived in the city for a

1    while.  And those problems continued.  They moved to eastern

2    Massachusetts at some point, and there were still

3    psychiatric problems, anger issues, depression.  And you'll

4    hear 11 about it during the course of this trial.

5          He also had physical problems, one of which was a

6    stroke.  He had several physical problems.  Most of them

7    manifested themselves between January of 1999 and the middle

8    of 2001.  And he dealt with them.  He dealt with them.  One

9    thing about Hartley Shearer that you will learn is that he's

10   a gentleman who lived on -- he liked conflict.  He liked

11   arguments.  He liked conflict.  He liked challenges.  And

12   nothing was going to get him down and nothing was going to

13   stop him from doing what he was going to do, whether it was

14   psychiatric or whether it was physical.  He was a guy that

15   was always somewhere near the edge.  But the one thing he

16   never embraced was going over that edge.  The words suicide

17   or anything like that never came out of his mouth.  He was

18   always a fighter.

19         In October of 2000, as a result of one of his

20   physical problems, back problems, he was prescribed

21   Neurontin.  And he stayed on Neurontin until the day he

22   died.  We will submit to you that at the end of this trial

23   you will believe, as we do, that the one thing he couldn't

24   fight, the one thing that finally cast him over the edge was

25   Neurontin, that Neurontin was the substantial factor in

1   bringing about that suicide.

2            A little bit why we believe that.  Suicide --

3   Neurontin is a drug that affects the brain.  It affects the

4   chemicals in the brain.  It affects chemicals that you're

5   familiar with from television.  Serotonin, norepinephrine.

6   You hear that on commercials.

7            A little bit about the history of Neurontin.  It's

8   also known as gabapentin.  Way back in 1992 the defendants,

9   originally Parke-Davis and Warner-Lambert, which were one

10  company back then, in 2005 Pfizer took them over, they

11  sought and received an indication from the federal

12  government, from the Food and Drug Administration, for

13  indication for Neurontin for a very specific purpose to be

14  used as an adjunctive therapy for serious epileptics.  And

15  they got that indication.  But they got that indication with

16  some information.  And the information that they got was

17  during the clinical trials we found some serious increased

18  depression amongst the people, the subjects that were taking

19  this.  In fact, some led to suicide.  So while we're going

20  to give you permission to market it for epilepsy, the label

21  should be very clear and the population should be very

22  specific for that purpose.

23            Warner-Lambert and Parke-Davis took that

24  information and very shortly thereafter that specific

25  population became the world and the specific use became

1    everything under the sun.  Bipolar, psychiatric, pain,

2    restless leg syndrome, you name it.  In fact, they referred

3    to it as snake oil.  If you remember the old westerns, the

4    guy would drive up in the carriage, take out the bottle of

5    whatever it was and go it's good for everything.  They

6    called it snake oil.

7            They decided to market it off-label in violation of

8    the law, the FDA.  And when a pharmaceutical company breaks

9    the rules -- it's not that they're making balloons.  They

10   are making drugs that we ingest.  So when they break the law

11   it's scary.  Because you're taking drugs into your system

12   and you don't really know what they're going to do.

13           So when you market off-label -- and you're going to

14   hear about off-label.  Doctors can prescribe off-label any

15   time they want, because the understanding is that the

16   doctor's doing it for the patient.  The doctor wants to make

17   the patient better so the doctor might experiment a little

18   bit.  If it doesn't work, we'll take them off.  Or she and

19   we'll take them off.

20           When the company markets it off-label the company's

21   doing it for the company.  They're putting profits ahead of

22   people.  And when they market off-label, since they're

23   already breaking the law, they don't have to do anything

24   fair and balanced.  If you watch TV commercials you always

25   hear at the end now about pharmaceuticals, 11 the

```
1    side-effects, and you go, gee, they sound worse than what

2    the drug is good for.  That's fair and balanced.  When you

3    market off-label you can say 11 you want about the drug

4    that's good and you can suppress the bad.  And they made a

5    decision, ladies and gentlemen, to consciously suppress the

6    bad.  They never told doctors about what the FDA found, and

7    beyond that they didn't tell doctors what they knew

8    themselves from their own studies which is that this affects

9    the brain, that it can affect the chemicals in the brain.

10   It can affect the chemicals in the brain.  Good can come out

11   of it or bad can come out of it.  And if the bad is bad it's

12   bad.  It's really bad.  It can cause increased depression,

13   it can cause increased suicidality, it can change behavior,

14   it can change mood, it can do all sorts of things.  And if

15   you don't tell doctors they don't know.  And if you only

16   tell them the good stuff, the sales increase, and if the

17   doctor thinks it's only good, the doctor tells the next

18   doctor and the next doctor, because they don't know what the

19   downsides are.

20        So what happens is that you start to grow the

21   market and one doctor is telling another doctor, even if

22   it's just the tiniest little bit of good, well, hey, it's

23   like drinking water.  It's good and it doesn't hurt.

24   Because they don't know.  And God forbid if something bad

25   happens, the doctor doesn't associate it with the drug so
```

1    nobody finds out about it.  If I'm giving somebody Neurontin

2    and somebody commits suicide and I don't know and I'm not

3    warned that it could possibly do that, I don't associate the

4    drug with the event.  I don't report it to the FDA and I

5    don't tell my colleague.  And that's what they did.  And Dr.

6    Hynes, who prescribed Neurontin for the first time in 2000,

7    never told, never knew of what this drug could do.  And

8    Hartley took it for pain.  And it has a paradoxical effect,

9    ladies and gentlemen.  Because you can actually think it's

10   doing you good for the pain while you don't know what it's

11   doing to your brain.

12        So nobody looked for anything.  His family didn't

13   look for it.  Hartley didn't realize it, and his doctor

14   didn't know it.  Nobody understood what was going on in

15   Hartley.  And Hartley got worse.  But the changes that you

16   see are not -- it's not like Jack Nicholson in "The

17   Shining."  He's not going to start swinging a hatchet.

18   They're subtle changes that if you're not looking for it you

19   don't recognize it, you don't see it, you don't understand

20   it.  And they played on that, ladies and gentlemen.  But

21   they got caught a couple of times.  They got caught.  They

22   were forced to plead guilty.

23        Excuse me, I've got to get some water.

24        **THE COURT:**  Five more minutes, Mr. Rosenkranz.

25        **MR. ROSENKRANZ:**  They pled guilty to off-label

1    marketing.  They paid a fine for that.  But more

2    importantly, the FDA in 2008 did a MADER analysis.  A MADER

3    analysis, they took all the antiepileptic drugs and put them

4    together.  And the reason they did a MADER analysis is

5    because if I had a drug that had affected one person in 200

6    and I did a study in this room, I wouldn't have enough

7    people to make a valid study.  The FDA realized that some of

8    the companies, some of the drugs didn't have enough in the

9    clinical trials.  So they put them 11 together.  And the FDA

10   in 2008 came to the conclusion, six years too late for

11   Hartley, that antiepileptic drugs can in fact increase the

12   risk of suicidality.  Something that they knew since 1992.

13   But they never did anything about it.  And, in fact, at the

14   FDA, when the FDA made their finding they did a

15   presentation.  They had three people.  Lloyd Knapp, who sat

16   in the audience, who's an executive, said nothing.  A Dr.

17   Gibbons, who they close not to present to the FDA.  And a

18   Dr. Wolberg who they did present to the FDA.  And they said

19   basically, hey, we're not part of that group, this is guilt

20   by association, don't, don't, don't include us.  It's not

21   us.  The FDA voted them down 20 to nothing with one

22   abstention.  The experts of the FDA voted them 11 down.

23        What they're going to do now during the course of

24   this trial is bring in the one that they chose not to

25   present to the FDA, Dr. Gibbons, who's going to try to

1    convince you what they couldn't convince the FDA, that their

2    drug does not increase the risk of suicidality.

3         What they do is they take a win-win proposition.

4    Instead of warning people about what might happen if they

5    take the drug, they take the position that, well, look at

6    him, he had 11 these risk factors for committing suicide.

7    He had psychiatric problems.  He had physical problems.  So

8    if something happens to a person who never should have been

9    prescribed that drug, or at least should have been warned

10   about it, instead of taking responsibility, they say don't

11   blame us, look at him, he would have done it anyway.

12        You're the ones that have to tell them that they

13   are responsible, ladies and gentlemen.  You have to tell

14   them.  And just as the FDA voted them down 20 to nothing, at

15   the end of this trial you vote them down 12 nothing.

16        Thank you very much.

17        **THE COURT:**  Defense?  Do you want to open now or

18   reserve?

19        **MR. OHLEMEYER:**  No, I will, your Honor, thank you.

20        **THE COURT:**  You may proceed.

21        **THE CLERK:**  Do you need any of the video equipment

22   or anything?

23        **MR. OHLEMEYER:**  No.

24        **THE CLERK:**  No.

25        **MR. OHLEMEYER:**  May it please the Court, your

1    Honor, three different times during his life Mr. Shearer

2    sought treatment from a psychiatrist because he had medical

3    and psychiatric problems that made his life difficult and

4    challenging and that increased his risk of suicide and are

5    known causes of suicide.  11 of that was part of his life

6    before he ever took a single Neurontin capsule.  Those

7    medical conditions continued to get progressively worse

8    right up until Mr. Shearer's death.  You'll see that because

9    of those medical conditions, Mr. Shearer was taking more

10   than a dozen prescription medicines in the three years

11   before he died, including an antidepressant, Prosac, an

12   antipsychotic, Zyprexa, and mood stabilizers like Valium and

13   Ativan.

14          This is a case about Hartley Shearer and a suicide,

15   and the question people typically ask when they hear about a

16   suicide and that's why.  Why did Hartley Shearer end his

17   life on February 7th, 2002.

18          Now, Mrs. Shearer and her son say the answer is

19   Neurontin.  And that's what they believe and it's not hard

20   to understand why a wife and a son would want to find an

21   answer to that question.  And it's also not hard to feel

22   sympathy for what the Shearers have been through.

23          Good morning again.  My name is Bill Ohlemeyer and

24   with Bonnie Beavan and some help from some other lawyers

25   we're going to present Pfizer's evidence to you.

1              Now, over the course of the trial you'll hear about

2      Pfizer, you'll hear about Neurontin, but mostly what we're

3      going to talk to you about is Hartley Shearer because this

4      is a case about Hartley Shearer.

5              Now, the evidence we're going to present will come

6      from medical records, testimony from doctors, from friends

7      and family, and at times it will be difficult and very

8      personal.  And we're not presenting it to embarrass the

9      Shearers or to judge Mr. Shearer or to blame Mr. Shearer.

10     We're presenting it because you'll hear that to understand

11     and try to understand suicide you need to understand the

12     life of the victim, and that's why we're going to present

13     Mr. Shearer's story to you.

14             Mr. Shearer described himself to doctors even

15     before his stroke as a man who was often controlling, angry

16     and impatient.  And in January of 1999 he had a serious

17     brain injury called a stroke.  He had gone to the hospital

18     for heart surgery and unexpectedly suffered the brain

19     injury.  And it was a very important injury.  It left him

20     paralyzed on his left side.  It created a lot of pain for

21     him, and it made it impossible for him to do the things that

22     were important to him.  It set into motion what his doctors

23     will describe as a horrible course of medical events that

24     continued right up until his death.  And it created nerve

25     problems, neurological problems that affected his thinking

1    and his visual perception.

2           He was an avid cyclist and athlete who could no

3    longer participate in those activities.  Was a lifelong

4    hockey player, who coached hockey, skated with his son and

5    couldn't play hockey anymore.  He was a teacher who couldn't

6    teach by himself.  He was an aspiring social worker who

7    couldn't take the classes or continue to take the classes he

8    needed for his degree.  He was a visual artist who had

9    problems now after the stroke with visual perception.  And

10   you'll see that it made it hard for him to take an active

11   role in his adult son's life, and it created challenges and

12   frustrations that ultimately affected his relationship with

13   Mrs. Shearer.  But most importantly what it took from

14   Mr. Shearer was something that he had a lifelong need for

15   and that's independence.  He hated being dependent on other

16   people.  And after the stroke he couldn't even take a shower

17   or a bath without help from somebody else.

18          Here's how Mrs. Shearer described the effects of

19   her husband's stroke when she was deposed in this case.

20          Question:  Now, can you contrast that individual

21   for me with Mr. Shearer after his stroke?

22          Answer:  I can try.  I think I used the word

23   earlier with you of compromise -- and, and he was very

24   compromised.  This was someone who was very, very active

25   physically, mentally, and his world had changed because of

1    the stroke.  He became -- he was dependent on other people

2    and he was always very, very independent.  So I would say

3    that, in a way, is the, you know, the biggest contrast.

4             Question:  In just the course of a normal day is

5    there really anything he could do the way he used to do it

6    prior to his stroke?

7             Answer:  He -- no.  No.  There was no way.  There

8    was no way.

9

10            Mr. Shearer's psychiatrist will testify that his

11   suicide was consistent with the kinds of issues she was

12   treating him for.  She'll also testify that she was treating

13   him before he took Neurontin and after he started taking

14   Neurontin, and she never observed any changes in his mood or

15   behavior while he was taking Neurontin.  Mrs. Shearer and

16   the psychiatrist will testify that after the stroke

17   Mr. Shearer always struggled with what he had lost.

18            The issues that he was being treated for kept

19   getting worse because his medical conditions kept getting

20   worse right up until his death.  And as Mr. Rosenkranz said

21   you'll see that while he was, that throughout his life he

22   had been treated for things like depression, he had been

23   treated for anxiety and anger-management issues.  He had

24   times where he asked for prescription drugs to help him with

25   these problems.  He had degenerative arthritic conditions

1    that existed before the stroke.  He had attention deficit

2    disorder, obsessive-compulsive disease related to his need

3    to exercise.  He would exercise to the point where he would

4    hurt himself.  And you'll see that before he ever took

5    Neurontin he told a psychiatrist I have problems directing

6    my anger when situations arise that I can't control because

7    they make me depressed.

8           11 of these issues existed before Mr. Shearer ever

9    took Neurontin.  As Mr. Rosenkranz said, on the day of his

10   death Mrs. Shearer was in Hawaii on a business trip.  His

11   caretaker, Sean Wheeler, arrived at the house around noon.

12   He'll testify that he heard them on the phone in a very

13   heated argument.  And after the phone call ended he helped

14   Mr. Shearer get dressed and prepare himself for the day.

15   And he'll testify that Mr. Shearer was still fairly

16   agitated.

17          At a point though that morning Mr. Shearer told the

18   caretaker I need to go take care of some things.  And he

19   left the room and about 25, 30 minutes later Mr. Wheeler

20   heard a noise, he went to investigate, and he promptly

21   called 911.  And Mr. Shearer explained his suicide in a note

22   that he left on his desk in the home and it said:  Linda has

23   left me powerless by hanging up on me for the last time.  I

24   love you both, Ivor and Linda, but this is it.  Hartley

25   Shearer.

1          And you'll hear testimony that the majority of

2     people who commit suicide don't leave notes.  And leaving a

3     note is not evidence as Mr. Rosenkranz said of an irrational

4     or an impulsive act.  It's something the doctors will tell

5     you is a very, very deliberate part of suicide

6     unfortunately.

7          The evidence that I'm going to talk about in this

8     case I'm going to organize this morning very briefly into

9     three issues:  Neurontin, the FDA and Pfizer, and

10    Mr. Shearer.

11         And let me start with Neurontin.  Neurontin is an

12    important medicine that helps people that other medicine

13    doesn't help.  You'll hear that when doctors prescribe

14    medicine to a different group of people for a different

15    reason or in a different dosage than what's described in the

16    FDA label that's called an off-label prescription.

17    Prescribing medicines off-label is legal and the FDA allows

18    doctors to do it because it helps them help patients that

19    aren't being helped by other medicines.  There are strict

20    rules about how you can talk to doctors about off-label

21    prescriptions and you're going to hear those rules were

22    violated.  In 1996 Warner-Lambert violated the rules.  When

23    Pfizer merged with Warner-Lambert in 2000 they admitted

24    those rules had been violated and there was a fine paid.

25    You're going to hear that there was not false or misleading

1    statements made by Neurontin to those doctors, but the rules

2    about when and how you can talk to them were violated.   It

3    was a serious issue and a fine was paid.

4           Companies like Pfizer and Warner-Lambert are in

5    business to help doctors help their patients.   You're going

6    to hear a lot about mistakes they made.   And they made

7    mistakes.   But they do well by doing good.   And you're not

8    going to hear that those mistakes had anything to do with

9    the prescriptions that Mr. Shearer's doctors wrote for him

10   to help him with his pain.

11          You're going to hear that Neurontin is part of a

12   class of drugs called an antiepileptic drug.   And long

13   before Neurontin was introduced, doctors were using

14   antiepileptic drugs to treat pain off-label.   It's

15   relatively common.   Mr. Shearer's doctors were using

16   Neurontin to treat his pain because other medicine wasn't

17   helping him.   He went to the hospital with pain that he

18   described as ten on a scale of ten.   But Vicodin didn't help

19   it.   And when he was taking morphine and Dilaudid it gave

20   him delusions.   Another drug that doctors typically

21   prescribed to people like Mr. Shearer off-label was a

22   tricyclic antidepressant to treat pain.   He couldn't take

23   that because he had a heart condition.   So Neurontin made

24   sense to those doctors.   They had used it with other

25   patients.   They had gotten good results, and it wouldn't

1    interact with the other drugs he was taking, and it was not

2    narcotic.   The testimony you'll hear is that's why the

3    doctors prescribed Neurontin to Mr. Shearer, not because of

4    something a salesman had told them.

5            Now, when the FDA or doctors or scientists want to

6    figure out what a drug does to somebody who takes it they

7    generally try to line up something called a randomized

8    placebo controlled clinical trial.   That's a long name for a

9    controlled experiment that cakes two identical groups of

10   people, one who takes the medicine and one who takes a sugar

11   pill called a placebo --

12           **THE COURT:**  Five more minutes, Mr. Ohlemeyer.

13           **MR. OHLEMEYER:**   -- and doctors watch them and they

14   try to determine whether there are any changes in those

15   people as a result of the medicine.   If you see a big

16   difference in one group over the other, positive or

17   negative, you can assume it has something to do with the

18   drug.

19           There's another kind of evidence you're going to

20   hear a lot about called adverse event reports.   And that's

21   an observation of something that occurs while somebody's

22   taking the drug.   The cause of that event, though, could be

23   something else that's going on in their life or something

24   coincidentally that occurred while they have taking the

25   drug.

1          People like Mr. Shearer have a background break for

2     things like depression and other problems and you have to be

3     sure when you're talking about what happens to those people

4     when they take drugs like this that it's because of the

5     drug, not because of something else that's going on in their

6     life.

7          The FDA reviewed the randomized placebo controlled

8     clinical trial data for Neurontin more than once and they

9     never found that it increased depression or caused suicide

10    or suicidal thinking in people who took it.  They approved

11    Neurontin for the treatment, adjunctive treatment to

12    epileptic seizures in 1993.  They approved it again a few

13    years later to treat the same problem in children.  They

14    approved it again in 2002 to treat the pain associated with

15    post-herpetic neuralgia.

16         Now, they did recently require 11 the makers of

17    antiepileptic drugs to add a warning to their label about

18    suicidal thinking, and they did it after looking at the

19    results of randomized placebo controlled clinical trials of

20    eleven different drugs, only two of which, Lamotrigine and

21    Topiramate, showed an increase in suicidal thinking.  In the

22    Neurontin randomized placebo controlled clinical trials

23    there was no increase.  And you'll see and you'll hear the

24    evidence that when they did the studies people who took

25    Neurontin didn't commit suicide, didn't have suicide

1       attempts, and didn't think about suicide more often than the

2       people taking the placebo.  And the number of people in this

3       study was bigger than the number of people in the two

4       studies that the FDA based their decision on.  But they say

5       that everybody in the group has to put the same warning on

6       the label whether you were part of the study or not.  If you

7       invent an antiepileptic drug today you have to put the same

8       label on it.  That doesn't demonstrate and the evidence the

9       FDA saw did demonstrate that Neurontin does not cause

10      depression, suicide, or suicidal thinking.

11              So, finally, let me talk a little bit about Mr.

12      Shearer.  After the stroke he had a series of medical events

13      that got progressively worse.  He started seeing a

14      psychiatrist to help him with his issues.  He was doing

15      physical therapy but he had setbacks.  The doctor told him

16      in October your condition is permanent, you're not going to

17      get better.  He then went to the hospital with pain so bad

18      he had to go in an ambulance.  And that's when he first

19      started taking Neurontin.  And at the same time he had

20      endocarditis which was an infection that he had to go to

21      Boston to get treatment for.  His spleen ruptured and he had

22      emergency surgery.  And while he was in the hospital taking

23      Neurontin for his pain his doctors said it was helping him.

24      And they said more than once that they thought it was

25      helping him.

 1          After he got out of the hospital, though, he had to

 2     go back to the hospital because he had heart problems.  His

 3     doctors told him he had congestive heart failure and he

 4     needed another heart operation.  And you can understand why

 5     that was something that made him a little anxious.

 6          The evidence you're going to hear in this case does

 7     not suggest that Mr. Shearer's suicide had to be caused by

 8     Neurontin and there's nothing about Mr. Shearer's suicide

 9     that will prove that it will suggest it was caused by

10     Neurontin.

11          Mr. Shearer was taking Neurontin for nearly 16

12     months.  He never complained about it.  His wife, his son,

13     his caretaker, his psychiatrist, who is trained to look at

14     these things, 11 will testify they never saw any changes in

15     his mood or behavior while he was taking Neurontin.  But at

16     the same time you'll hear that 11 of these medical problems

17     he had got progressively worse and progressively worse.  And

18     they had existed in his life long before he ever took

19     Neurontin.  You'll see that even in boarding school there

20     was some discussion about his self-esteem when situations

21     arose and he couldn't control.  He told a psychiatrist in

22     May before he ever took Neurontin, I have problems with my

23     anger when situations arise I can't control.  The suicide

24     note seems to describe one of those situations

25     unfortunately.

```
1              So, I appreciate your time and attention and we
2    look forward to presenting evidence to you and with respect
3    at the end of the trial we'll ask you to return a verdict in
4    favor of Pfizer.
5              Thank you.
6              Thank you, your Honor.
7         THE COURT:  Do you want to take your easel.
8         MR. OHLEMEYER:  Certainly.
9         THE COURT:  You may call your first witness.
10        MR. LONDON:  We would like to call Dr. David
11   Franklin.
12        THE COURT:  He may be called.
13        THE CLERK:  Right this way, sir.  Right up here,
14   sir.
15             And, sir, would you raise your right hand.
16             Do you solemnly swear that the answers you will
17   give to this Court and Jury will be the truth, the whole
18   truth, and nothing but the truth, so help you God?
19        THE WITNESS:  I do.
20        THE CLERK:  Please be seated.
21                  DAVID FRANKLIN
22                DIRECT EXAMINATION
23   BY  MR. LONDON
24   Q    Would you state your name for us, please?
25   A    David Franklin.
```

1   Q    And David Franklin, who are you?

2   A    I'm the whistleblower in the federal and state criminal

3   and civil cases against Pfizer for the off-label marketing

4   of Neurontin.

5   Q    I want to ask you a little bit about how you came to be

6   that whistleblower.

7            To begin with, David, where do you live and where

8   did you live back during the 1990's?

9            **THE COURT:**  Please, please call 11 witnesses by

10  their last name.

11           **MR. LONDON:**  I apologize, your Honor.  I didn't

12  understand that local rule.

13  Q    Dr. Franklin, would you please tell the Court and the

14  Jury where you lived back during the 1990's?

15  A    In Newton, Massachusetts.

16  Q    And in proximity to Boston or where?

17  A    It's a suburb of Boston.

18  Q    And where did you grow up?

19  A    In Rhode Island.

20  Q    Did you go to school in Rhode Island?

21  A    I did.

22  Q    And how far in school did you go, sir?

23  A    I went on for my undergraduate degree and then a

24  graduate degree.

25  Q    And where did you get your undergraduate and your

1    graduate degrees?

2    A    Both at the University of Rhode Island.

3    Q    What degrees do you have, sir?

4    A    I have a bachelor's degree, a bachelor of science degree

5    and a Ph.D. in microbiology.

6              **THE COURT:**  Turn that mic, turn that mic a little

7    bit.

8              **THE WITNESS:**  Thank you.

9              **THE COURT:**  Talk right into it.

10             **THE WITNESS:**  Thank you.

11             **MR. LONDON:**  Can everybody hear Dr. Franklin?

12             **THE WITNESS:**  Yes.  Thank you.

13             **MR. LONDON:**  All right.  Can everybody hear me?

14   I'm the one person in this room that doesn't have the

15   elevated voice.

16             **THE COURT:**  They'll raise their hand if they can't.

17             **MR. LONDON:**  All right.

18   Q    Okay, Dr. Franklin, you were telling us you got your

19   undergraduate and graduate degrees in microbiology?

20   A    That's right.  Yes.

21   Q    And how far in school did you go?

22   A    I got a Ph.D.

23   Q    From the University of Rhode Island?

24   A    From the University of Rhode Island.

25   Q    Where did you spend your young professional career after

1   graduation?

2   A    I left URI and went to Dana Farber Cancer Institute here

3   in Boston.

4   Q    And what did you do at Dana Farber?

5   A    I was a researcher in pediatric oncology.

6   Q    And what kind of research did you do, sir?

7   A    We studied signal transduction in children with

8   leukemia.

9   Q    Did there come a time when you sought a career beyond

10  Dana Farber?

11  A    Yes.

12  Q    And tell us about that, please?

13  A    I took a job with Parke-Davis.

14  Q    Would you tell us who is Parke-Davis?  And what I'm

15  trying to find out is whether they have some relation to

16  Warner-Lambert or some relation to Pfizer?

17  A    Okay.  So, I took a division -- a job with Parke-Davis

18  which was a division of Warner-Lambert which several years

19  after I worked there was acquired by Pfizer.

20  Q    All right, sir.  And what kind of job did you take?

21  A    I took a job as medical, medical liaison responsible for

22  the Boston area.

23  Q    I want to, I want to flesh out just a little bit of

24  this.

25            To begin with, what year or years are we talking

1    about?

2    A    1996.

3    Q    And is that the year you went to work as a medical

4    liaison --

5    A    Yes.

6    Q    -- for Parke-Davis?

7    A    I started beginning in April of '96 and left in, in

8    July.  When I resigned they didn't accept my resignation

9    right away, so my last day on the job was the end of July of

10   '96.

11   Q    All right.  And I want to generally direct your

12   testimony to the period that you worked there and the things

13   that you knew about while you were there.

14   A    Okay.

15   Q    All right.  You said that you were a medical liaison.

16   Would you tell the jury what is a medical liaison for

17   Parke-Davis/Warner-Lambert/Pfizer, please?

18   A    I had two jobs really.  I had an official job

19   description and then I had the actual day-to-day practice,

20   and they were two very different things.

21   Q    Well, let's begin with the official job description of

22   medical liaison.

23   A    My job was to answer physicians' questions in the field.

24   So I was field based.  I worked out of my home in Newton,

25   and I was responsible, if a question, if a physician had a

1  question about any Parke-Davis drug, it was my

2  responsibility to, to answer that question.

3  **Q**   Did you have any drugs in particular for which you had

4  responsibility?

5  A   Officially, I was responsible for 11 of Parke-Davis's

6  drugs, but in day-to-day practice my focus was on Neurontin.

7  **Q**   All right, sir.  Tell us about the ways that you came to

8  be hired to work for Parke-Davis on Neurontin?

9  A   I, I was at Dana Farber Cancer Institute and needed a

10  job that paid better and so I had applied for a sales

11  position at Parke-Davis.

12  **Q**   And what -- you applied for a sales position.  Is

13  medical liaison a sales position?

14  A   So I had applied for a sales position, but when they got

15  my application, I got a call from someone in HR who told me

16  they had another position that they thought was more

17  appropriate for someone with my background, and that was the

18  medical liaison position.

19  **Q**   Is the medical liaison position different than sales?

20  A   Officially it is, but in practice it was very, it was

21  absolutely a sales job, yes.

22  **Q**   Is there something in the company called a CBU?

23  A   Yes.  So that stands for customer business unit.  And

24  so, Parke-Davis and Warner-Lambert carved the country up

25  into five customer business units.  So, there were the

1    Northeast, Southeast, North Central, South Central, and

2    West.  And so it's just a geographic cleaving up of the

3    country and I was assigned to the Northeast CBU.  So I was

4    responsible for the part of the corporation what was

5    responsible for 11 of New England, New York, Pennsylvania,

6    essentially the, most of what is defined in the Northeast.

7    **Q**   Who were your bosses or supervisors in the Northeast

8    CBU.

9    A   So, on the org. chart technically I reported in to

10   Morris Plains through headquarters, a medical affairs

11   organization.  But on a day-to-day basis it was explained to

12   me that I was accountable to the Northeast CBU, I reported

13   to Phil Magistro, who was a medical director responsible for

14   the Northeast CBU and in through the marketing organization

15   of the Northeast.

16   **Q**   Did you have a scientific component to your actual

17   day-to-day duties?

18   A   Yes.  So, I had -- it was explained to me, I was trained

19   how to use the fact that I had a scientific background and a

20   scientific degree, that I could be introduced as

21   Dr. Franklin to, to gain credibility with physicians to help

22   them to increase their sales, their use of Neurontin.

23   **Q**   Did your job responsibilities cover the Boston area?

24   A   Yes.  Yes.

25   **Q**   Were Brigham and Women's Hospital and Tufts Hospital,

1    were they within the Northeast CBU area?

2    A   Yes, absolutely.  Yes.

3    **Q**   In fact, was 11 of Massachusetts within that area?

4    A   11 of Massachusetts, New Hampshire, Maine, Connecticut,

5    Rhode Island, yes.

6    **Q**   A moment ago you told us that there were two job

7    descriptions for medical liaison, the official job

8    description and the not so official description.

9    A   Yes.

10   **Q**   Do you recall that?

11   A   Yes.

12   **Q**   Tell the jury about your not so official job description

13   as medical liaison, please.

14            **MR. OHLEMEYER:**  Objection, your Honor; relevance

15   and foundation.

16            **THE COURT:**  Overruled.  You may have a continuing

17   objection.

18            **MR. OHLEMEYER:**  Thank you, your Honor.

19   A   I'm sorry.

20            **THE COURT:**  You may answer the question.  What

21   other --

22   **Q**   Tell the jury --

23            **THE COURT:**  What other responsibilities did you

24   have beyond what he's referred to as your official job

25   description?

1    A    I see.  I see.  My job was to promote Neurontin

2    off-label.  So, to proactively increase sales of Neurontin

3    for off-label uses, for uses that the FDA had not approved

4    Neurontin for.

5    Q    Let's break this down just a little bit.  First, you

6    said promote.  Tell the jury what you mean by the word

7    promote?

8    A    Okay.  So, we -- promote in the meaning of enable a

9    physician, train a physician -- it's a little different than

10   sales.  In a traditional sales position you talk about the

11   features and benefits of a particular product if you're

12   buying a car, features and benefits of how a sales rep does

13   it.  In the case of, of a promotion, in my responsibility it

14   was to actually teach a physician how to use a drug and who

15   to use it in, and then get them to actually put, actually

16   convince them to write a prescription for the very next

17   patient.  So, it's, it's, in the case of off-label it was

18   for indications that the FDA had not approved.

19   Q    Were you trained in what the FDA approved indications

20   were for the drug Neurontin?

21   A    Yes.

22   Q    And what were the approved FDA indications for Neurontin

23   when you worked there?

24   A    For adjunctive therapy of epilepsy.  So what that

25   actually means is, epilepsy's seizures, and if you have

1    seizures you take a seizure medication and the seizure

2    medication has been approved by the FDA, adjunctive therapy

3    means that a doctor can prescribe, the FDA has determined

4    that it's effective for a doctor to add Neurontin to a

5    patient that's taking another drug.  So not as a

6    stand-alone, not as a first line of treatment, but as an

7    adjunctive, as an add-on therapy, not monotherapy where it's

8    the only drug you take.

9    **Q**   Was there a limit to the amount of daily dose that the

10   FDA approved for Neurontin?

11   A    Yes.  1,800 milligrams a day.

12   **Q**   All right, sir.  You've used the term off-label.  What

13   is on-label, if there is a difference?

14   A    So, FDA requires companies, sponsors of drugs to

15   actually submit evidence that their drug is both safe and

16   efficacious.  Well, when they do that they, the FDA will

17   then approve the drug for a particular use so that you can

18   use the drug in this type of patient with this particular

19   disease and at this particular dose.  When a company sells a

20   drug to a doctor, when a sales rep, medical liaison goes to

21   talk to a physician, they're supposed to limit their sales

22   efforts, their promotion efforts, to what the FDA, what the

23   company has demonstrated to the FDA and the FDA has approved

24   are the patient type, the disease that the patient is

25   actually suffering with, and the dosage.  Off-label

```
 1   promotion is, anything else is, is, off-label promotion is

 2   anything else.  There's a difference between an off-label

 3   prescription and off-label promotion.  But when a sales rep

 4   sells, tries to convince a physician to use a drug for

 5   something other than what the FDA has approved it that's

 6   off-label promotion.

 7            MR. LONDON:  May I have the Elmo, please, for a

 8   moment.

 9            THE COURT:  Of course.

10   Q   Do you see the document in front of you?

11   A   Yes.  Yes, I see it.

12   Q   This was shown to the jury a few moments ago by Pfizer's

13   lawyer.  The top line of it says, and I've got my finger

14   there, off-label prescriptions of Neurontin are safe, legal

15   and important.

16            Do you see that?

17   A   Yes, I see that.

18   Q   If we look at the word prescriptions and change that to

19   the word promotion, is there a difference between the

20   legality as you were trained between off-label prescriptions

21   versus off-label promotions?

22   A   Off-label promotion is illegal.

23   Q   Is that --

24   A   And, I'm sorry, just to clarify.  Off-label

25   prescriptions of Neurontin are --
```

1          **MR. OHLEMEYER:**  Excuse me, your Honor, I think he's

2     answered the question.

3          **THE COURT:**  He has --

4          **MR. OHLEMEYER:**  There's no foundation for --

5          **THE COURT:**  Please.  I don't permit speaking

6     objections.  He has answered the question.

7     **Q**   All right.  And --

8          **THE COURT:**  Now, I'm the judge of the law here and

9     he's telling us what his understanding of the law is.  But I

10    don't know as there will be any dispute about this

11    particular point.

12    **Q**   Who in the company gave you your initial training?

13    **A**   I got -- my training was on the job, so it was Lisa

14    Kellett, Mike Davies, and particularly Phil Magristro, my

15    supervisor.

16    **Q**   And how did that training take place at the initial

17    phase of your career?

18    **A**   On the job.  I actually followed Lisa Kellett and Mike

19    Davies around.

20    **Q**   Earlier you said that your job as medical liaison was to

21    respond to doctors' questions.  Is that how it played out in

22    fact?

23    **A**   No, no, we cold called physicians.  So we would go and

24    sit in the waiting room and wait to go in to see the

25    physician.  It wasn't physician initiated.

1    **Q**   It was not in response to a letter from a doctor or

2    anything like that?

3    A    No.  No.

4    **Q**   Why, if you know, why were you needed in the process if

5    there was already a sales representative?  Why have a

6    medical liaison and why have you?

7    A    Legitimately, you know, in the legal world, a physician

8    has the right to write a prescription for anything that they

9    want.  But when they do that, when a doctor writes a

10   prescription for a drug that the FDA hasn't approved there's

11   a lot of risk in doing that.  Because you, the doctor's

12   using a best judgment and they have to rely on other

13   physicians, their understanding of the patient, and they may

14   take on a heightened responsibility for making sure that

15   this therapy which has not been statistically or

16   scientifically reviewed is safe for this particular patient.

17          So, so, when a doctor writes, has the right to

18   write a prescription for anything that they choose to, they

19   do have to take on extra caution when they do that.  And so,

20   a doctor who's made that decision that he's got a patient

21   that might need or need to write a prescription for

22   off-label, they need to be able to call someone and say give

23   me all the information you have on this so I can make a

24   sound medical judgment.  And that's what the legitimate use

25   of a medical liaison is.  That's why it was supposed to be

1    physician initiated, the physician would start the

2    conversation by asking, hey, I'm thinking of doing this, I

3    need more information.

4    Q    I think I've probably asked a question that in a way

5    didn't make much sense.

6    A    Oh, I'm sorry.  Sorry.

7    Q    Why would the salespeople need you?

8    A    Oh, you greatly increase sales.  The salespeople liked

9    having us around because it got us in the door.  So from a

10   sales -- many sales reps will go see a doctor and they'll

11   just sit in the, in the waiting room, just sit and sit and

12   sit.  The doc doesn't have time to see a sales rep.  But I

13   would be introduced by the sales rep to the receptionist as

14   Dr. Franklin, an expert in, say, neurology, here to talk to

15   Dr. Smith about important new developments in Neurontin.

16   And that would be relayed to the doctor that a Dr. Franklin

17   from Parke-Davis is here to see you and it would get us in.

18   The sales rep would often follow us in.  And so it would get

19   them in to see docs that were very, very difficult to see.

20   And it would greatly increase their sales.  The sales

21   commission would still track back to the sales rep, not to

22   the medical liaison.

23   Q    But the sales rep would introduce you as Dr. Franklin.

24   Was it ever inquired further as to what kind of doctor Dr.

25   Franklin was?

```
 1    A    By the doctor?

 2    Q    Yes.

 3    A    Surprisingly not, no.  In the medical community when

 4    you're introduced as Dr. Franklin it's often presumed that

 5    you're an M.D.  But surprisingly it was rare.  And I don't

 6    recall being challenged as to whether I was an M.D.

 7    Q    Apart from these on-label uses, the adjunctive epilepsy

 8    therapy, up to 1,800 milligrams a day, did you in this first

 9    phase in Boston see doctors and promote Neurontin to them

10    off-label?

11    A    Yes.

12    Q    For what indications?  For what off-label illnesses?

13    A    There was, we had something we called a snake oil list,

14    but there were 13 indications.  You know, there was another

15    slide presentation that had more than 30.  But the one we

16    worked off of for the most part was these 13 indications,

17    neuropathic pain and --

18    Q    We're going to set that up during the break so that

19    you'll have an opportunity to look at it.  But in general

20    what were those 13 indications?

21    A    Pain indications.  Emotional problems.  Bipolar disease.

22    That sort of thing.

23    Q    All right, sir.  Was neuropathic among them?

24    A    It was.

25    Q    And at the time that you were promoting it to these
```

1    doctors were you aware that there was no approval for

2    neuropathic pain or psychiatric conditions?

3    A    There was no approval, yes.

4    Q    Was this something you took on yourself or was this

5    something that Mr. Magistro had a hand in your doing?  That

6    is --

7    A    No, I was trained.  This was my job.

8    Q    All right.

9    A    Yes.  So, no, I was trained in detail how to do this.

10   Q    Did there come times in your career when you went to Ann

11   Arbor, Michigan for further training?

12   A    Yes.

13   Q    Describe that for the jury, please?

14   A    So I went to Ann Arbor.  They took the medical

15   liaison -- well, I was responsible for the Northeast.  There

16   were medical liaisons across the country and they brought 11

17   the medical liaisons together for official training where

18   they trained us on standard operating procedures within the

19   corporation on how the FDA works, FDA regulation, that it

20   was during that training that I learned that what I was

21   actually doing, that my day-to-day training was actually in

22   conflict with what I learned at that point, that I was told

23   there that what I was doing was actually illegal.

24   Q    Did you know before that training in Ann Arbor that what

25   you were doing was in the company's eyes illegal?

```
1    A    It was ambiguous.  Because they did, they did a
2    presentation where they projected up on the screen and had a
3    video camera off to the side that videotaped the audience
4    and the presentation itself.  And the presentation was done
5    in two parts, one that was videotaped where they explained
6    the FDA rules and these like fair and balanced, that
7    anything I said to a physician had to be fair and balanced,
8    that it had to be physician initiated.  And then they shut
9    the camera off and told us not to worry about 11 those
10   regulations, that we were only doing, if we were doing
11   anything wrong, we were only doing 60 in a 55 mile an hour
12   zone and that it was our responsibility to sell the product.
13   Q    Who were these they people that you're talking about?
14   A    There were two attorneys that worked for the company,
15   Parker and Rubenstein.
16   Q    And as to the 60 in a 55 mile an hour zone, what's the
17   context in which that statement came up?
18   A    The then FDA commissioner, David Kessler, his photograph
19   was put up and it was explained that he was a neurotic man
20   who had an issue, it was a big joke about him having issues
21   with his mom and, ah, that he was over regulating, over
22   interpreting the regulations and had created this
23   environment where what we, where he was interpreting what we
24   were doing as illegal but that it was, it wasn't, that we
25   were just, we were well within reason and standard practice.
```

1    Q    Tell me what happened -- you said a moment ago the

2    camera was turned off at this training session.

3    A    At the, at the end of the official training, yes.

4    Q    And what happened during the period when the official

5    camera, official training was over and the camera was turned

6    off?

7    A    They told us to essentially ignore what we were doing,

8    just to use common sense.  Not to document anything.  Don't

9    do -- that we had to be more concerned about competitors

10   turning us in, because we would be taking competitor market

11   share, and that we just needed to be careful about our

12   competitors.

13   Q    How would you be taking competitors market share?

14   A    Well, it was our job, we had this data that would allow

15   us to, before we went in to see a physician we could sit in

16   the car out in the parking lot and actually had data on

17   exactly what prescriptions that physician had written.  So

18   when, when a doctor writes a prescription and gives it to

19   you, you go to, let's say CVS to get it filled.  CVS gives

20   you the medication and then sells their database of

21   prescriptions that they fill to another company called IMS

22   and then the pharmaceutical industry buys that data.  And so

23   we knew exactly what prescriptions the physician had written

24   in the prior period of time on these spreadsheets.  So we

25   could figure out what drugs a doc was using and then go in

1      and downplay those drugs, point out the negatives of those

2      drugs and emphasize the positives of ours.

3      **Q**   Dr. Franklin, while you've been giving that answer we

4      have passed out some binders that contain some proposed

5      exhibits for you.  And I want to ask you to look at an

6      exhibit, and I believe it's called AKB.  Is that correct?

7      AKB.

8                  **THE COURT:**  Just so we can follow here --

9                  **THE CLERK:**  I don't have AKB.

10                 **THE COURT:**  -- they use letters when we say for

11     identification and try to get it in evidence.  That's up to

12     me legally.  If it gets in evidence we'll have a number.

13     Everything with numbers you'll have in the jury room.

14     Letters are so we can keep track of what we're doing here

15     and move along smoothly.  If I don't let you see it, it

16     doesn't mean anything is being kept from you, there's legal

17     reasons for that.

18                 Go ahead.

19     **Q**   Dr. Franklin, can I ask you to open the binder and turn

20     to page 177.  This is Exhibit AKB.

21                 **MR. OHLEMEYER:**  I'm sorry, Mr. London, I've got a

22     binder with tabs on it.

23                 **MR. LONDON:**  If you look at the very beginning, if

24     you turn to page 177.

25                 **MR. OHLEMEYER:**  Which tab?

1          **MR. LONDON:**  Tab 1.  177.

2          (Whereupon counsel conferred.)

3    **Q**   Have you found it, Dr. Franklin?

4    A   Yes.  Yes.

5    **Q**   And a few moments ago you were testifying that you had

6    been given some tools, some decile lists and what have you.

7    To begin with, is the document that begins at page 177 there

8    in front of you of this Exhibit AKB, is that one of the

9    tools that you were given by Pfizer to do your job?

10   A   Yes, it was.

11   **Q**   And without reading the contents who gave these

12   documents to you?

13   A   The marketing staff and my supervisor.

14   **Q**   Mr. Magistro, his staff?

15   A   Yes.

16   **Q**   Were these tools that you used in your daily activities,

17   your day-to-day activities as a medical liaison?

18   A   Yes.

19   **Q**   And how did you use these tools?

20   A   So --

21   **Q**   No, don't -- I'm not ready for you to --

22   A   Okay.

23   **Q**   I'm not ready for you to --

24   A   So what, what I -- medical liaison, our responsibility

25   was to drive market share as rapidly as possible, get

1  doctors to use as much Neurontin as possible quickly.  Out

2  in the world there are doctors that have very large

3  practices and write a lot of prescriptions and then there

4  are doctors who have small practices.  Our responsibility

5  was to, or my responsibility in order to maximize profit was

6  to focus on just the very large practices.  And so, we would

7  use these decile lists to actually understand who were the

8  large practices.

9  **Q**   All right.  And is exhibit, this exhibit that you have,

10  AKB, pages 177 to page 237, are those your actual tools from

11  your job during your time at Parke-Davis/Warner-Lambert?

12  A   Yes, this was one of the documents I gave the

13  government.

14          **MR. LONDON:**  I would like to move the admission of

15  this Exhibit AKB.

16          **THE COURT:**  Any objection?

17          **MR. OHLEMEYER:**  Same objection, your Honor;

18  relevance and foundation.

19          **THE COURT:**  Well, when you say foundation that

20  gives me pause.  Come, come to the side bar.

21  SIDEBAR CONFERENCE, AS FOLLOWS:

22          **THE COURT:**  When you say relevance you mean that

23  his formal extent as to what was going on in 1996 is so

24  remote --

25          **MR. OHLEMEYER:**  Right.

1          **THE COURT:**  -- from the prescriptions in 2001.  All

2     right.

3          **MR. OHLEMEYER:**  Sorry to interrupt.

4          **THE COURT:**  No, no.  I don't want to waste time.

5     I've overruled that.

6          But what's the matter with this foundation?  This

7     is your document, so it's an admission.

8          **MR. OHLEMEYER:**  Foundation; the way it's

9     established its relevance.

10         **THE COURT:**  I understand, it's the same.

11         All right, this will be admitted and we'll take the

12    recess.

13         (Whereupon the sidebar conference concluded.)

14         **THE COURT:**  AKB is admitted in evidence Exhibit

15    No. 2020.

16         I don't know that they've got 2,020 exhibits.  I

17    think that may be a numbering thing, but it's in evidence.

18         (Exhibit marked in evidence.)

19         **THE COURT:**  Time for the break.  So, before I let

20    you -- you may step down, sir --

21         (Whereupon the witness stepped down.)

22         **THE COURT:**  -- before I let you have the break,

23    since this is our first time let me emphasize a few things.

24         Yes, we'll take a break.

25         I've already said keep your minds suspended and

1    I've told you why.

2           Second thing.  When you leave here today and

3    throughout the course of the trial, don't talk to anyone

4    about this case.  Now, it's not secret with all the people

5    we have watching, and they have a constitutional right to be

6    here to see that justice is being done.

7           But you have a very special role.  You are judges.

8    So if you go home or you go back to work this afternoon and

9    you start to say, well, it started, yeah, it's about this

10   and that, whoever you are talking to is going to tell you

11   what they think about it.  You're not interested in what

12   they think about it.  They weren't chosen in the careful

13   fashion you were.

14          Now, none of this is secret.  It's 11 on the

15   record.  So when the trial is over you are free to say

16   anything to anyone about anything.  But while the trial is

17   going on, and you must keep your minds suspended, don't talk

18   to anyone about the substance of this case.  So when you go

19   home today and people say, okay, well, did it actually

20   start?  What's the judge look like?  That would be a silly

21   question.  But people ask questions.  You've got to say he

22   told us we couldn't say anything about it while it's going

23   on.

24          Now, I know I've got some reporters out there.  And

25   I don't know whether we're going to see anything in the

1     press.  But if we do, you've got to turn the page.  You get

2     your information about this case here, in this courtroom,

3     nowhere else.  No going online.  Don't Google any of us.

4     Don't -- we're beyond my competence now -- don't Twitter

5     anyone about what's happening in your life here in court.

6     Same rule.  And it's important.

7          Second.  We'll take a half an hour recess.  There's

8     food back there.  Relax.  Don't talk about this case.

9          Now, that's a little counterintuitive because you

10    are the judges of the case.  But the reason for that is the

11    deliberation of the jury is the deliberation of 11 twelve of

12    you when you've 11 heard the entire case, not what you think

13    about it after an hour and 45 minutes.  And again, the

14    informal setting, you've 11 got to deliberate together.  And

15    if you're going to start talking about it now, inevitably,

16    just from the talking, you're going to take a slant on

17    things.  I will tell you I do not talk with the law clerks

18    or any of the Court's staff about the substance of the case.

19    We talk about the law.  For the same reasons, so that I

20    don't take a slant on things.  Don't talk about the case

21    among yourselves.

22         Now, I'm not saying don't talk.  Once Ms. Smith

23    went in, the jury, instructed, sitting around that lovely

24    table, 11 ready to go, utterly silent.  Wrong.  This is a

25    communitarian effort.  It is truly direct democracy.  You

1    didn't ask to be here, though you're charged with this

2    important constitutional function.  So get to know each

3    other.  Talk.  Just not about what's going on in this room.

4              Now, I don't mean to beat that to death.  But it is

5    very important.  And every time we recess I will remind you

6    of it by saying keep your minds suspended.  Do not discuss

7    the case either among yourselves nor with anyone else.

8              We'll recess for one-half hour until 20 minutes

9    after 10:00.  We'll stand in recess.

10             **THE CLERK:**  11 rise for the jury.

11             **THE COURT:**  I'll remain on the bench.

12             (Whereupon the jury left the courtroom.)

13             **THE COURT:**  Please be seated.

14             I want the recess -- please be seated.

15             I want the recess, too, so I'm only going to take a

16   minute.

17             I've got this plaintiff's motion to preclude the

18   utilization of the deposition of Charles Taylor.  You're

19   going to call Taylor or -- where's Taylor?  Physically?

20             **MR. OHLEMEYER:**  Physically, I think he's in

21   Wisconsin, your Honor.

22             **THE COURT:**  All right.  Why can't he be here?

23             **MR. OHLEMEYER:**  He's in between chemotherapy

24   treatments, which is why we took the preservation deposition

25   last summer that we took to use in cases like this.

1          **THE COURT:**  All right.  You're going to have to

2     supply medical evidence in view of their objection.

3          And with respect to Cynthia McCormick, she's not an

4     expert?

5          **MR. FROMSON:**  That's what the dispute is, your

6     Honor.

7          **MR. OHLEMEYER:**  Correct.  Well, she's a witness who

8     by reason of her position --

9          **THE COURT:**  You're paying her.

10         **MR. OHLEMEYER:**  No, no.  She is a fact witness to

11    events that occurred while she was at the FDA.

12         **THE COURT:**  You're paying her?

13         **MR. OHLEMEYER:**  She was paid for consulting after

14    she left the FDA.

15         **THE COURT:**  Right.  That goes to the weight, not

16    the admissibility.  I won't treat her as an expert.  But I

17    can handle that on the deposition.

18         (Whereupon the Court and the Clerk conferred.)

19         **THE COURT:**  Yes, two other just housekeeping things

20    and let's take the -- Mr. London?

21         **MR. LONDON:**  Yes, sir.

22         **THE COURT:**  The practice in Massachusetts, but I

23    didn't want to correct you, and I'm perfectly comfortable

24    with your demeanor in court, but the practice is that

25    lawyers stand when they inquire.  You don't have to.  I

1   don't insist upon it.  The jury's 11 perfectly comfortable.

2   So you people be comfortable.  I just didn't want everybody

3   else leaping up in case -- and honestly, I don't insist upon

4   it.  The bar enclosure is yours.

5          Now, I've done another one of these depositions.

6   The way they've been submitted to me is fine.  I understand

7   you've got a problem with exhibits.  So, recognizing that,

8   I've said that the plea colloquy, if you've got that, and

9   the judgment in the criminal case, those are admissible.

10  Beyond that, now, when I did Mr. Glanceman, if a foundation

11  appears in the deposition, I have underlined the exhibit and

12  written admitted.  So you don't need anymore.  For example,

13  he was shown an exhibit which from the transcript I am

14  satisfied again is a Pfizer document, ergo an admission, and

15  I'm satisfied that it's relevant.  So if I can figure it out

16  from the deposition, I'll do it because I want things to go

17  smoothly.  But if I can't, I'm not -- if there isn't an

18  underlining and admitted, the exhibit is not in and you'll

19  have to get it in some other way.

20          We'll recess until 20 after 10:00.  We'll recess.

21          **THE CLERK:**  11 rise.  Court is in recess.

22          (Recess.)

23          **THE CLERK:**  11 rise for the jury.

24          (Whereupon the jury entered the courtroom.)

25          **THE CLERK:**  Court is in session, please be seated.

```
1              THE COURT:  Proceed, Mr. London.
2              DIRECT EXAMINATION (Cont'd)
3    BY  MR. LONDON
4    Q   Dr. Franklin, when we recessed you had just begun to
5    tell the jury about one of your tools that you used out in
6    the parking lot.
7              MR. LONDON:  I would ask that Exhibit 2020,
8    page 177, be called up on the screen, please.
9              THE CLERK:  All right, let's see.  You're with the
10   plaintiffs, right?
11             MR. LONDON:  Yes, I'm sorry.
12             THE CLERK:  No, that's okay.  I just have to get
13   acclimated.
14             MR. LONDON:  So do I.
15   Q   All right, 2020 is just a cover page showing the date,
16   and Parke-Davis provided that to you?
17   A   Yes.
18   Q   Now, let's turn to the next page which I believe is
19   page 178 of the exhibit.  Would you just show the jury in
20   sort of a quick form how this document, you used it as a
21   tool.  Start at the territory and --
22   A   Right.  So, so in the far -- you guys can see it?
23   Q   You have a highlighter that will work better.  Maybe if
24   you highlighted where you --
25             THE CLERK:  You can --
```

1              **THE WITNESS:**  Yes, I --

2              **THE CLERK:**  Touch it.  Right.  And you can pick a

3     color.

4              **THE WITNESS:**  Yes.

5     A    So, this first column was the sales rep's territory.

6     So, we, depending on a particular sales rep we were

7     traveling with that was important to him.  And then the

8     doctor's last name, first name and their address.  And so we

9     would be sitting, in this first case you can see we would be

10    sitting in the parking lot of the Central Medical Building

11    and would, and we would talk about the particular doctor.

12             Now, this first doctor, I'm assuming he's our --

13    yes, it is -- this first doctor is a decile 10 physician

14    which means he's got the very largest practice, by far the

15    most profitable practice that I was supposedly calling on.

16             The remaining, the remaining columns then would

17    tell us how much Neurontin he was actually using.  So, in

18    this particular physician's case of the total antiepiletic

19    drug prescriptions that this doctor was using, two percent

20    of them were Neurontin.

21             And this, 11 this information comes from his actual

22    prescriptions that patients get filled at their local

23    pharmacy.

24    Q    Were you trained on how these deciles were calculated

25    and how these percentages and numbers of prescriptions

1    filled, how that information was --

2    A   It's not a linear scale.  So, a decile 10 physician is

3    much, much, had a much, much bigger practice than a decile 7

4    physician, for example.  I think it was six times the size.

5    So it's not a one -- a linear scale.

6    Q   And in your profession, or in your job at that time,

7    what would you do with this decile information?  How would

8    you use it?

9    A   I was trained that we should only call on decile 7, 8, 9

10    and 10 physicians because they, when we convinced a

11    physician to write a prescription, write prescriptions for

12    Neurontin that meant they would, they had the potential of

13    writing many, many more prescriptions.  So if you went to

14    visit a doctor that had a relatively small practice and

15    convinced him to use Neurontin, say for pain, even if he put

16    11 of his patients, his pain patients on Neurontin, it was

17    still a small number of patients.  If you convinced one of

18    these physicians, a high decile physician, to put their

19    patients on Neurontin that meant lots of patients.

20    Q   This page we're looking at, 11 of the doctors appear to

21    be in Pennsylvania.  Did this list go on to cover other

22    parts of your --

23    A   Yes, there are pages and pages of this, and different

24    types of cuts of this.  So you would have a cut by specialty

25    and that sort of thing.  But, but, yeah, they would be

1   specific to Massachusetts.

2   Q   All right.  Let's turn all the way over to page, oh,

3   213.  Have you got 213 in front of you, Dr. Franklin?

4   A   Yes.

5   Q   Now, we're looking at a page that is a different format

6   of this information.  Do you see that?

7   A   Yes.

8   Q   And how is this tool different than the last tool?

9   A   So when this, the first one I was talking about, the

10  fourth line that we count, we now, we still have a territory

11  and the physician name, we have his specialty, and still the

12  deciles, and the zip code.  You notice the zip code might

13  look blank.  That's actually Excel drops the 0's out, so

14  that's actually 01950.  But -- and then across the top you

15  can see Neurontin, what percentage of Neurontin a physician

16  was using in September, October, November and December.  And

17  then you can also see what, what other drugs that doctor was

18  using.

19          So in the parking lot with the sales rep we would

20  determine that the doctor's using a lot of Depakote, a lot

21  of Dilantin, that sort of thing.  And so we would -- or

22  Tegretol.  We would prepare and go in to talk to the

23  physician about the side-effects of those drugs and explain

24  to him that Neurontin had no side-effects.  And then by

25  having the Neurontin split out by a month to month basis we

1     would be able to see how effective we were.  We would

2     actually get to see over time those numbers increasing.

3              THE COURT:  I may have missed this, but maybe

4     you've answered it.  Where do you get this information?

5     Where does the pharmaceutical company get this information

6     about the prescription practices of a specific doctor?

7              THE WITNESS:  Okay.  So when --

8              THE COURT:  Tell the jury.

9              THE WITNESS:  So, when you go to see a doctor they

10    can write a prescription.  A prescription, whether it's

11    on-label or off-label, they write a prescription.  You bring

12    that prescription to CVS, Walgreen's, your local pharmacy,

13    they fill it and you go home with your prescription.  That's

14    the end of the process from your point of view.  But then

15    the pharmacy takes 11 of that prescription data, all the

16    prescriptions that they fill with the doctor's name attached

17    to it and sells it to a company who then turns around and

18    sells it to the pharmaceutical industry.  And this 11

19    happens on a very regular basis.  So you can see how we have

20    month to month data on how -- so when that's done over time,

21    when you call, you detail a physician, if you're being

22    effective you'll actually see those numbers go from 1.6 to

23    1.8 to 1.9 to 2, you keep increasing, showing that the

24    doctor believes what, he's responding to what you've told

25    him.

1   Q   Let's just look across that first line and fill in those

2   pieces of data so we have a working model.

3            The territory is 200206?

4   A   Right.  So that's what tracks the commission back to the

5   sales representative.

6   Q   Is Michael B. Robbins, is that a doctor?

7   A   Yes.

8   Q   What's the next column spec?

9   A   That would be the specialty of the physicians,

10  neurologist, general practitioners, there's a whole --

11  Q   11Can you give us, can you give us some explanations for

12  those codes?  What's a CHN?

13  A   You know, I don't recall what the CHN -- N was

14  neurologist.

15  Q   All right.

16  A   But I don't recall what the CHN was.

17  Q   We have, below CHN we have P?

18  A   Yeah.  P was pediatrician.

19  Q   N is a neurologist?

20  A   Right.

21  Q   Below that is US.  What is that?

22  A   I believe it was a type of surgeon.  I don't recall.

23  Q   All right.  Does urology come to mind?

24  A   Yes.  Yes.

25  Q   All right.  And then throughout the page we have those

1    same specialties.  If you go to other pages you have other

2    specialties like IM.  What's IM?

3    A    Internal medicine.

4    Q    I want to go back to the one that's marked P that's Dr.

5    Fallon.  Dr. Paul Fallon, do you see that?

6    A    It's marked where?

7    Q    It's the fifth line down, Robbins, Oppenheimer, Park

8    Ouellette and Fallon?

9    A    Okay.

10   Q    Do you see that?

11   A    I can see that now.

12   Q    And that's a doctor that's marked with a letter P?

13   A    Yes.

14   Q    At this time was Neurontin approved for any pediatric

15   indication?

16   A    Pediatric indications.  It could also be a psychotic

17   interest.

18   Q    All right.  Well, let me ask then both questions.  At

19   this time was Neurontin approved for any pediatric

20   indication as far as you knew?

21   A    Not that I know of, no.

22   Q    At this time was Neurontin approved for any psychiatric

23   indication that you knew of?

24   A    Not that I know of, no.

25   Q    Then in the next column we have the deciles and you

1    described those.  Like --

2    A   So, using Dr. Fallon, the doctor you just highlighted.

3    Q   All right.

4    A   Using Dr. Fallon as an example you can see that over

5    this period of time, September, October, November and

6    December, Dr. Fallon was not using Neurontin at 11.

7    Q   All right.

8    A   He did use a great deal of other drugs, you can see 40

9    and 45 percent.  So, how I would use this data with the

10   sales rep would be to go in there and talk to them about the

11   side-effects associated with using these particular products

12   and then point out to the physician that Neurontin had no

13   side-effects, side-effect profile, and therefore they should

14   transition these patients to using Neurontin.  And then by

15   tracking them over time, by being able to see this over time

16   we could reward them for actually making that transition.

17   So we would actually see that they went from nothing to,

18   say, one or two percent, and then we could reward them under

19   the consultantships and that sort of thing.

20   Q   Explain what you just said, we could reward them with a

21   consultantship or something?  What does that mean?

22   A   It means that we would, we would engage them in a

23   relationship that provided them with money.

24   Q   And what kind of relationship would that encompass?

25   What's a consultant?

1    A    So we would hire consultants who would, you know, they

2    would attend conference calls, that sort of thing, and get

3    paid for doing that.  So spend an hour on the telephone

4    listening to an off-label promotion sort of event and get

5    paid to do it.

6    Q    The doctors would then become your salesmen?

7         **MR. OHLEMEYER:**  Objection, your Honor.

8         **THE COURT:**  Sustained.  Don't lead the witness.

9         **MR. LONDON:**  I apologize.

10   Q    Was it trained -- was it part of your training that it

11   was a goal of the company to incorporate the doctors into

12   this promotional plan for the off-label purposes, off-label

13   uses of Neurontin?

14   A    So if you look further down on the page -- so, you can

15   see there's a Dr. Bazildarius.  Actually John Mahoney.  Just

16   under that.  I think he's -- right there.  Right.  So,

17   Dr. Mahoney is using a great deal of Neurontin here.  So, in

18   that, in his particular case, he would have been offered a

19   consultantship to be the person who was speaking on the

20   phone.  So he would present to other physicians on the phone

21   who were listening in on the phone his experience, his

22   positive experience with Neurontin.  So we would provide him

23   with materials and prepare him so he could lead the call.

24   He would get paid more for doing that.  But then other

25   individuals who weren't using Neurontin or were using small

1    amounts of Neurontin would then be paid for listening to

2    him.  Does that make sense?  So that's an example of how we

3    would use this.

4    Q   All right.  I want to ask you to turn to your binder to

5    page 253.  Do you find that?

6    A   Yes.  Yes.

7    Q   All right.  I would like to ask you to not read from it

8    but to identify for the Court and Jury what that document

9    is?

10   A   This is one of the slide decks that we would use to

11   convince physicians to use Neurontin off-label.

12   Q   What is a slide deck?

13   A   These are Power Point slides.  And so I would, I would

14   actually carry these with me actually and do a presentation

15   to the physician sitting there right, sitting in his office,

16   oftentimes sitting right beside him with, with, take him

17   through these slides.

18   Q   All right, sir.  Where did you get this document?

19   A   This was provided by the company, by Pfizer.

20   Q   Do you recall who?

21   A   Phil Magistro.

22   Q   Phil Magistro.

23        And did you actually use this as one of your tools?

24   A   Yes.

25   Q   All right.  This is Tab 7, you have it your manila

1    folder.  It's presently AKB, page 253 to --

2              THE COURT:  This is part of the exhibit already

3    admitted?

4              MR. LONDON:  275.  We only offered those limited

5    pages as part of 2020, your Honor.  This would be additional

6    parts of 2020 and I do offer it at this time.

7              THE COURT:  Oh, I see.  Any objection?

8              MR. OHLEMEYER:  Same objection, your Honor.

9              THE COURT:  Same objection.  Noted but overruled.

10   So what number does it get?

11             THE CLERK:  I would say 2020-1.

12             THE COURT:  2020-1 in evidence.

13             (Exhibit marked in evidence.)

14             MR. LONDON:  Okay.  May I ask that the 2020-1 page

15   253 be called up, please.

16   Q   All right.  I want you to tell the gentlemen when to

17   turn the page and take this jury through that slide deck.

18             Is this something that you would actually do in the

19   doctor's office?

20   A   Yes, it is.  Yes.

21   Q   How would you use this person to person with your

22   doctors?

23   A   As it is here, and at least this folder I have, it's

24   slightly out of order.  So if I could ask you to, to scroll

25   through to a few pages, four pages.

1    Q   Do you see the bottom right hand corner, there are page

2    numbers?

3    A   Oh.  I'm sorry.  Yes.  Page 256.

4    Q   Page 256.

5    A   So I would, I would start off using, again, I would have

6    been introduced by the sales rep as a scientist, as a

7    research or a specialist, an expert in neurology, and I

8    would try to use these slides to talk about the, the

9    scientific foundation for using Neurontin for these

10   off-label uses.  So we would talk about how we, how

11   Neurontin had some scientific credibility for its

12   effectiveness.

13   Q   Did you have any particular scientific expertise?

14   A   In neurology?

15   Q   In neurology.

16   A   No, I do not.

17   Q   Or in the serotonin levels in humans?

18   A   No, I do not.

19   Q   Then what were you doing talking about this stuff?

20   A   I was, I was trained to talk about this.  I thought that

21   I had, was getting a legitimate scientific education from

22   the company.

23   Q   Who trained you?

24   A   Phil Magistro.

25   Q   All right.  And how would you use, for example, this

1    page that's on the screen, page 256?

2    A    Yes.  So this slide is where we would talk about the

3    science behind it.  Phil Magistro, I had actually -- if you

4    could go to page 257.

5    Q    Next page.

6    A    So I had asked a question about how to use this

7    particular slide.  When I used it, it looked better than

8    this.  How to actually use this.  And Phil trained me that

9    it did not actually matter how I used this, that 11 I was

10   going to use these scientific slides for was to establish my

11   scientific credibility.  You know, I had, at this point

12   would have already introduced myself as coming from the Dana

13   Farber Cancer Institute, earlier being trained there, and so

14   it did not actually matter how I used this.  This was simply

15   to establish, the physicians believed that we were about to

16   engage in a scientific conversation.

17   Q    What would you actually say?  Dr. London, for example?

18   A    Right.  Right.  So I would use this particular slide to

19   talk about how Neurontin stabilized whole blood serotonin

20   levels and that serotonin obviously, or not so obviously, I

21   guess, but to a neurologist and many physicians serotonin

22   was, had a great deal of effect on a large number of

23   biological systems, particularly those associated with

24   emotions and pain, brain function.

25   Q    That brings us to this next question.  Earlier you had

1    made a comment that there were no side-effects.  Where did

2    you, where did you learn that there were no side-effects?

3    A    The company trained me that there were no side-effects.

4    Q    And did you ever have information presented to you by

5    the company to the effect that there were indeed some

6    side-effects?  In other words, did the company give you

7    scientific materials or research papers, anything of that

8    sort, to show whether there were or were not side-effects?

9    A    No, no, the company did --

10             **THE COURT:**  Now, just so we're clear --

11             **THE WITNESS:**  Yes.

12             **THE COURT:**  -- you worked there four months?

13             **THE WITNESS:**  Right.

14             **THE COURT:**  In 1996?

15             **THE WITNESS:**  Yes.

16             **THE COURT:**  And your answers are 11 what happened

17   during the period of your employment?

18             **THE WITNESS:**  Well, that's why I was struggling

19   with that particular answer.

20             **THE COURT:**  Right.  But that's what we're to

21   understand from your testimony?

22             **THE WITNESS:**  Yes.

23             **THE COURT:**  All right.  All right, go ahead.

24   Q    Going back to the slide deck then, how would you

25   continue to use this beyond those two pages about the graphs

87

```
 1    about the serotonin?

 2    A    If you -- you then flip to -- well, if you go back to

 3    the first slide.  I'm sorry, it's page 253.  So, here I

 4    would point out that this particular slide deck had been

 5    authored by Dr. Stephen Schachter.  He's a full tenured

 6    professor at Harvard Medical School.  So I would use this

 7    particular, as well as other physicians, to point out that

 8    if the doctor had any, any doubts about my scientific

 9    credibility, the fact that Dr. Schachter's name was listed

10    here as an author of this presentation should disspell any

11    of that, that Dr. Schachter was a, was a very well respected

12    physician.

13    Q    May I ask you to turn to, as soon as I find it,

14    page 266.  What does this slide, what did you use this

15    particular page to do?

16    A    So this was the -- there are two, several versions of

17    these slides.  But this was the, as the title indicates, the

18    benefits of Neurontin and other neurological conditions, and

19    this was a summary.  This is where I would introduce or

20    continue to discuss with the physician that Neurontin, that

21    we had a large and growing database of data that showed and

22    demonstrated that Neurontin was safe and effective for

23    treating a number of other conditions, you can see here,

24    restless leg --

25    Q    Let's clear up what may be clear to everyone but just to
```

1    be on the safe side.  This is other neurologic conditions.

2    Is epilepsy itself considered a neurologic condition?

3    A   I'm sorry, yeah, I didn't make that clear.  Other

4    neurological conditions, at this point in time, as the slide

5    we just looked at with Dr. Schachter's name on it, said that

6    it was approved for treatment, adjunctive therapy for

7    epilepsy.  Epilepsy is a neurological condition.  But so is

8    pain.  So is bipolar disease and psychiatric condition and

9    so --

10   Q   Now, you go down to the third line in this, I guess the

11   fourth line, it says Neurontin prescriptions for off-label

12   uses.

13            Do you see that?

14   A   Yes.

15   Q   What was that line doing in this slide or in your

16   presentation?

17   A   This is where I would explain to the physician that

18   physicians around the country were using Neurontin outside,

19   in fact, a majority of physicians using Neurontin were using

20   it for things other than epilepsy treatment, and that as a

21   result of that there was just a huge body of data that

22   showed that it was safe and effective.

23   Q   All right, sir.  And then if I may ask to go to the next

24   page 267.

25            What are these illnesses or conditions or

1    indications that are on this slide?

2    A    So this is a continuation --

3    Q    I'm having a little monitor problem here.  All right.

4    What is ALS?

5    A    Most people know it as Lou Gehrig's disease.

6    Q    All right, sir.  And you were presenting this drug to

7    the doctors for their use in Lou Gehrig's disease?

8    A    We were promoting it for, for everything on this page

9    and more.  But, yes, it was my job to drive -- the, the

10   number of patients who have epilepsy and are not controlled

11   by, by their current medications is actually pretty low.

12   And so the size of the market for Neurontin was, I was

13   trained was actually quite small and therefore the only way

14   to grow the market was to promote it for these other

15   indications.

16   Q    Did you have conversations with the doctors about what

17   they were supposed to be doing with the patients who were

18   taking other drugs?  In other words, were they leaving them

19   on the other drugs and adding Neurontin or what?  What was

20   your presentation?

21   A    Yes.  So it was our job to, to move patients off of

22   existing drugs that they were currently taking and move them

23   to Neurontin.

24   Q    Did at that time Pfizer or Parke-Davis/Warner-Lambert,

25   at that time, did they have for your promotion, anyway, a

1    drug that was approved by the FDA as far as you know for the

2    treatment of neuropathic pain?

3             MR. OHLEMEYER:  Your Honor, I think the question is

4    unfair with the inclusion of Pfizer at this point in time.

5             THE COURT:  Well, aren't we clear as to the --

6    maybe we could do it by way of stipulation.  Do you want to

7    propose one?

8             MR. OHLEMEYER:  Well, I think it's, that Pfizer and

9    Warner-Lambert and Parke-Davis were -- Pfizer and

10   Warner-Lambert were separate companies until the year 2000.

11            THE COURT:  And in the year 2000 what happened?

12            MR. OHLEMEYER:  They had a merger.

13            THE COURT:  All right.  So you accept that?

14            MR. LONDON:  Not quite.  It wasn't precisely a

15   merger, which may have legal significance.

16            THE COURT:  Well, you'll accept merger for now and

17   then you'll --

18            MR. LONDON:  I will.  It was a buyout.  But yes.

19            THE COURT:  Well --

20            MR. LONDON:  That's the --

21            THE COURT:  He gets to propose it.  It's a merger.

22   If you want to refine it, you can let us know.  In any

23   event, we've got separate companies.  So, we've got -- the

24   other one specifically is?

25            MR. LONDON:  It's Parke-Davis/Warner-Lambert --

```
 1            THE COURT:  Warner-Lambert.

 2            MR. LONDON:  -- in 2000.

 3            MR. OHLEMEYER:  Parke-Davis was a division of

 4    Warner-Lambert at the time Mr. Franklin --

 5            THE COURT:  Let's see if we've got this right.

 6            There's Parke-Davis.  It's a division of

 7    Warner-Lambert.  Now, in 2000, Mr. London will accept that

 8    they merged, though he wants to give us some more detail on

 9    that, they merged with Pfizer.  What's undisputed here as a

10    legal matter is that the resulting company now is Pfizer and

11    Pfizer is obligated if Warner-Lambert is obligated for any

12    damages.  So we can call it Pfizer.  But he properly points

13    out, Mr. Ohlemeyer does, that at the time we're talking

14    about, we're talking about another company that was acquired

15    later on by Pfizer.  That's why Pfizer's the defendant here.

16            Go ahead, Mr. London.

17    BY  MR. LONDON

18    Q   At that time, did Warner-Lambert or the Parke-Davis

19    division of Warner-Lambert have approved drugs by the FDA

20    for the treatment of neuropathic pain?

21    A   No.

22    Q   Did it have approved drugs for the treatment of

23    psychiatric and bipolar illnesses for the uses that you were

24    promoting Neurontin?

25    A   No.
```

1    Q    And did it have drugs for the treatment of the

2    condition, psychiatric condition of anxiety or social

3    phobia --

4    A    No.

5    Q    -- for which you were promoting Neurontin to the

6    doctors?

7    A    No.

8    Q    All right.  Did there come a time at which you did learn

9    about there being some adverse events or adverse effects,

10   side-effects reported of patients whose doctors were being

11   promoted the off-label use of Neurontin?

12   A    Yes.

13   Q    And how did that come, how did that come about that you

14   learned about these side-effects?

15   A    I was sitting in my car and I heard a report on NPR on

16   the radio.

17   Q    All right.  Let me --

18            MR. OHLEMEYER:  Excuse me, your Honor.

19            MR. LONDON:  I'm not going to ask the details of

20   the report.

21            THE COURT:  Well, that's not really proof of

22   anything.  Whatever we feel about NPR, he's sitting in a car

23   and he hears something on the radio, and so he then thinks

24   that this exists.  That was your state of mind?

25            THE WITNESS:  Yeah.  Yeah.

1      **THE COURT:**  All right.  So to the extent that we

2   care what he may think back then, I suppose that's evidence

3   of that.  But let me be very clear.  That's not proof

4   because some radio station said so that there were actual

5   reports of adverse reactions.  So with that limitation it

6   may stand.

7   Q   What did you do to follow up on that state of mind that

8   you just acquired?

9   A   I didn't learn that until a while after I had left the

10  company.

11  Q   All right, sir.  Let me ask you, you said earlier in

12  your testimony that as a medical liaison you were asked to

13  respond to doctors' letters.

14  A   Yeah.  So when I was at the company --

15  Q   Yes, I want to try to confine your testimony --

16  A   I'm sorry.

17  Q   -- to things you did and learned at the company --

18  A   I'm sorry.

19  Q   -- not later.

20  A   Okay.  I'm sorry.  I misunderstood.

21  Q   I asked that.

22  A   Okay.  When I -- well, in one particular case, I called

23  on a physician, a sales rep and I called on a physician on

24  the North Shore up here just north of Boston and, and I was

25  presenting to the doctor the slide deck and talking about

1    the fact that Neurontin had no side-effects and he abruptly

2    stopped me during it and --

3    **Q**   Again, I don't want you to testify, I don't want you to

4    say what the doctor said.

5    A   Yes.

6    **Q**   Do you understand what I'm saying?  I don't want you to

7    give us any hearsay testimony.  I just want to ask you

8    whether an experience occurred --

9    A   Yes.

10   **Q**   -- in which any scientific evidence was presented to

11   you?

12   A   So, the doctor presented a case report to me that there

13   had been a side-effect.

14          **MR. OHLEMEYER:**  Same objection, your Honor.

15          **THE COURT:**  Well, not for the fact -- he doesn't

16   want it for the truth, he wants it for the fact that he

17   heard it.  Right?

18          **MR. LONDON:**  Exactly.

19          **THE COURT:**  All right.  Now, you folks can follow

20   this.  We've got this witness on the stand.  You're looking

21   at him.  You're able, our system tells us you're able to

22   decide whether he's telling the truth or not.  That's part

23   of your job, and it's up to you whether you believe him or

24   disbelieve him.  But if you believe him, and I let him now

25   tell us what the doctor said to him, you could believe that

```
 1    a doctor said something to him.  It's not proof that that

 2    something actually happened because we would need the doctor

 3    who actually did it or saw it or touched it.  And we don't

 4    have that.  We have him.

 5            But, this is while you were still working there?

 6            THE WITNESS:  Yes, it was.

 7            THE COURT:  Before you left?

 8            THE WITNESS:  Right.  The NPR was long after I

 9    left.  I'm sorry, your Honor.

10            THE COURT:  Right.  And one imagines contributed to

11    your ultimately turning out to be a whistleblower.

12            THE WITNESS:  It did, yes.

13            THE COURT:  All right.  So we're entitled to know

14    what he was told.  And we're going to hear what he was told,

15    only for the fact, if you believe this witness, that he was

16    told something.

17            What did the doctor say to you?

18            THE WITNESS:  So, he pulled a publication out of a

19    stack of publications on his desk and said that I was lying

20    and pointed out that he had a case report of a patient who

21    did have a negative reaction to Neurontin.

22    Q   And if you recall --

23            THE COURT:  That's the words he used, he said

24    you're lying?

25            THE WITNESS:  Yes, he did.
```

1    **Q**   And what was the nature of the negative reaction in that

2    report?

3              **THE COURT:**  Wait a minute.  There's an objection

4    here, I take it.  I can't allow that.  Sustained.

5    **Q**   All right.  What did you do with regard to this -- well,

6    let's go back.  Are you familiar with the term sea change?

7    **A**   Yes.

8    **Q**   Did this have any sea change effect on your view of what

9    you were doing during your employment?

10   **A**   Yes, it did.

11   **Q**   Describe that for the jury, please?

12   **A**   Well, I eventually talked to my supervisor about this

13   particular incident, and his response was that it, just

14   ignore it, it was an isolated case, just ignore it.  And,

15   and then when I, when as the conversation continued, I said,

16   well, what do I do if other doctors are aware of this also.

17   He pointed out that, gee, with laughter, that it will never

18   get back to us.  You know, besides, he shouldn't have been

19   prescribing off-label anyway.  And there was much laughter

20   about it.  But I realized at that point that caring for the

21   patients wasn't part of our discussion and that, and that in

22   fact I may not, the company may not be providing me with 11

23   of the data to support my claims about the effect of this

24   and particularly the safety of Neurontin.

25   **Q**   During the opening remarks Mr. Ohlemeyer gave he shared

1    with the jury a slide that I would like to show you at this

2    time.

3              MR. LONDON:  And, Mr. Ohlemeyer, it's a slide that

4    says Dr. McCormick FDA.

5              MR. OHLEMEYER:  I'll reserve my objection, your

6    Honor, but I think it's argumentative.

7              MR. LONDON:  I beg your --

8              THE COURT:  Well, wait a minute.  Wait a minute.

9    We'll, we'll go step by step.  You object at the appropriate

10   time.  He's showing him a document.

11   Q   It's a slide that's captioned Dr. McCormick FDA

12   regarding Neurontin.  Do you see that?

13   A   Yes.

14   Q   And it's captioned October 13th, 1999.  Do you see that?

15   A   '93, I believe.

16   Q   I beg your pardon, 1993.

17   A   Yes.

18   Q   All right.  And that would be a couple of years before

19   you were employed by the company?

20   A   Yes.

21   Q   My first question is whether, I don't want you to read

22   it out loud, I want to read this portion that is

23   October 13th, 1993.  Do you see that?

24   A   Yes.

25   Q   Will you read that, please.

```
 1            THE COURT:  To yourself.

 2    A   All right.  Yeah.

 3    Q   All right, sir.  Had that precise piece of information

 4    that is in the slide that was shown to the jury this morning

 5    ever been provided to you or to any of your colleagues as

 6    far as you know by Parke-Davis/Warner-Lambert during your

 7    employment?

 8            MR. OHLEMEYER:  Objection, your Honor.

 9            THE COURT:  Overruled.

10    A   No, it wasn't.

11    Q   All right, sir.  And does the subject of that particular

12    statement, is it consistent with there being no adverse

13    events or is it inconsistent with there being no adverse

14    events?

15            MR. OHLEMEYER:  Same objection, your Honor.

16            THE COURT:  Sustained.  That's sustained.

17            MR. LONDON:  All right, sir.

18            THE COURT:  The document's not in evidence.

19            MR. LONDON:  All right, I would like to offer this

20    as an exhibit, your Honor, it's --

21            THE COURT:  May I see it.

22            MR. LONDON:  I'm only offering it for the limited

23    purpose I just described.  Since it was provided this

24    morning, I don't have an exhibit number on it, your Honor.

25            THE COURT:  I'll hear you.
```

```
1    SIDEBAR CONFERENCE, AS FOLLOWS:

2              THE COURT:  You used this in the opening.

3              MR. OHLEMEYER:  Absolutely.

4              THE COURT:  If he wants to, if he wants it in, what

5    possible objection can you have?

6              MR. OHLEMEYER:  11 of this information is going to

7    be admitted into evidence, but now he's asking this witness

8    an opinion.

9              MR. LONDON:  Oh, no.

10             THE COURT:  No, no, not yet.  We'll just get the

11   document in.  And so the document's in and we'll go from

12   there.

13             MR. OHLEMEYER:  Yes.  But in order -- I mean, I

14   would like -- then let's admit, let's admit each of the

15   underlying exhibits.

16             MR. LONDON:  Well, I would like --

17             THE COURT:  No objection to that?

18             MR. LONDON:  I only wanted to admit this one

19   particular portion at this time, your Honor.

20             THE COURT:  Well, I'm going to allow it but --

21             MR. LONDON:  Yes.

22             THE COURT:  -- it seems to me like these other

23   things are coming in.  We'll see.

24             MR. ALTMAN:  Your Honor, there's an --

25             THE COURT:  Just a moment.
```

1          **MR. ALTMAN:**  I'm sorry, your Honor.

2          **THE COURT:**  One thing I insist on.  You can have

3    all your suits here but only one suit talks.  I'm just not

4    going to be mobbed.  And so, I've made my ruling.  This gets

5    in.  It may have adverse consequences, we'll see.

6          **MR. LONDON:**  All right.

7          (Whereupon the sidebar conference concluded.)

8          **THE COURT:**  I'm beginning to get the code here.

9    This is now going to be called BZD for identification, but

10   I'm admitting it in evidence as Exhibit 6000.  There aren't

11   6,000 exhibits.  It's a code.  But 11 the ones that have

12   numbers you'll have in the jury room.  It's in evidence.

13         **MR. LONDON:**  May I, may I use the exhibit, please.

14         **THE CLERK:**  Yes, let me mark it first.

15         (Exhibit marked in evidence.)

16   **Q**   I want to direct your attention back to the entry that's

17   noted October 13th, 1998.

18         **MR. LONDON:**  May I ask the witness to read that to

19   the jury, your Honor.

20         **THE COURT:**  He may.

21         **THE WITNESS:**  FDA Combined Medical & Statistical.

22   Review.  Less, and in quotes, less common but more serious

23   events may need, may limit drug's widespread usefulness.

24   Depression.  And it looks like there was a correction there.

25   While it may not be an infrequent occurrence in the

1    epileptic population, may become worse or require

2    intervention or lead to suicide, as it has resulted in some

3    suicide attempts.

4    **Q**    Did anyone at Parke-Davis/Warner-Lambert at any time

5    provide information, that information to you or your

6    colleagues during the time you were there?

7              **THE COURT:**  So far as you know.

8    A    No.

9    **Q**    And, again, I really only want to focus on what you saw,

10   heard or participated in yourself during your employment.

11   A    Yes.

12   **Q**    Was any information provided to you about risks to

13   patients such as those with depression or an increased risk

14   of suicide now as reported by the FDA in 1993?

15   A    No.  No.  I was actually promoting it for psychiatric

16   problems and it was never told that there were psychiatric

17   side-effects.

18   **Q**    Did you at any time provide instructions or directions

19   to doctors on how doctors might safely prescribe that drug

20   to patients who would have increased risks of suicidality?

21   A    Not at all.

22   **Q**    Or depression?

23   A    To the contrary.

24   **Q**    Okay.

25   A    No.

1   **Q**   And I want to go back to this sea change.  Did your

2   attitude regarding your employment with Mr. Magistro change

3   after this episode you just related?

4   **A**   With the whole company, yes.

5   **Q**   And describe for the jury how your attitude changed?

6   **A**   I think I realized at that point that we had departed

7   from, from medical ethics, that it did not matter it could

8   get back to us, it was that the matter was that we had a

9   moral/ethical obligation to provide physicians with

10  information that would allow them to at least increase

11  surveillance and watch these patients closely if they were

12  going to try to use a drug off-label.

13  **Q**   There's a term that I had in the Army that you may or

14  may not have heard.  It's called CYA.  Have you heard of

15  CYA?

16  **A**   Yes.

17  **Q**   All right, sir.  I'm going to assume that we know what

18  that means.  Did you do anything yourself for CYA purposes?

19  **A**   Well, at one point my supervisor left a very aggressive

20  voice mail with people that concerned Lisa Kellett, an

21  individual that I traveled with in the field, worked with on

22  a day-to-day basis, and she said she was going to start CYA

23  and start documenting that we were being told to do this.

24  **Q**   Told what?

25  **A**   That -- to break the law.  And that, that afternoon I

1     bought a tape recorder.

2     Q    And what was the purpose of the tape recorder?

3     A    Was to record -- our primary method of communicating

4     with each other, particularly Phil Magistro to us and the

5     sale reps was through voice mail.  We would leave each other

6     voice mails on the company system.  And I would record voice

7     mails.

8     Q    Did you have occasion to record a voice mail of Mr.

9     Magistro talking to you and the other medical liaisons in

10    the Northeast CBU about the off-label uses of Neurontin?

11    A    Yes.

12    Q    All right.  I want to show you what's been marked

13    previously for identification as AKB page 34, and it's in

14    Tab 2 of the large binder.  And Ms. Smith has it in the

15    small binder as well.

16           At the bottom of the page, Ms. Smith, it's

17    page 32 -- I'm sorry, page 34.

18           **THE CLERK:**  I have it.

19           **MR. LONDON:**  All right.

20    Q    Do you see that?

21    A    Yes.

22    Q    Is that a document that -- what is this document?  Don't

23    read from it, just tell us what it is?

24    A    This is the transcript of the voice mail that motivated

25    Lisa to start her CYA.

1    **Q**   All right.  And were you --

2    A    And me.  And me.

3    **Q**   Were you a party to this telephone conversation?  In

4    other words, were you --

5    A    I received this voice mail, yes.

6    **Q**   All right.  Do you recognize the people who were

7    speaking?

8    A    Yes.

9    **Q**   In other words, you know their voice?

10    A    Yes.  Yes.

11    **Q**   Is it an accurate transcript of the voice mail?

12    A    Yes.

13    **Q**   And did you save an audio recording of the voice mail?

14    A    Yes.

15    **Q**   All right.

16         **MR. LONDON:**  Your Honor, I would at this time like

17    to offer the voice mail as an exhibit and offer to play it

18    audibly to the jury with a copy of this document.  The

19    exhibit number for the voice mail is BHT5655.

20         **THE COURT:**  Any objection to playing the voice

21    mail?

22         **MR. OHLEMEYER:**  Same objection, your Honor, and

23    hearsay.

24         **THE COURT:**  But it's undoubted that Mr. Magistro is

25    an employee of the company.  Overruled.

1           **MR. LONDON:**  And then the transcript is AKB --

2           **THE COURT:**  No, you don't get both.

3           **MR. LONDON:**  -- page 34.

4           **THE COURT:**  You don't get both.

5           **MR. LONDON:**  I didn't -- I'm asking whether we play

6      and then show it at the same time because of the quality of

7      the audio or --

8           **THE COURT:**  Oh, that you may do.

9           **MR. LONDON:**  That's what I would propose to do.

10          **THE COURT:**  Yes, that -- you're standing where the

11     jury can't see.

12          **MR. LONDON:**  I apologize.

13          **THE COURT:**  Here we've got a tape.  I'm going to

14     let you hear it.  The best evidence of the tape, the best

15     evidence is the tape and you're going to get the tape and a

16     tape player when the trial is over.  But because things are

17     not always perfect, someone has transcribed this, probably

18     someone on their side, the plaintiff's side, so this is

19     their transcription of what they think it says.  And we'll

20     let that be thrown up as a demonstrative aid so you can

21     better understand the tape.  It's not evidence.  It's what

22     someone thinks this tape says.  Listen to the tape to help

23     you.

24          **MR. LONDON:**  May I --

25          **THE COURT:**  Do you want to volunteer who made this?

1          THE WITNESS:  Yeah.

2          THE COURT:  Yes.  Who made it?

3          THE WITNESS:  That wasn't their side.  That was

4     actually produced in the original whistleblower case.

5          THE COURT:  Okay.

6          THE WITNESS:  It had nothing to do with this --

7          THE COURT:  So you're saying -- and I accept the

8     correction.

9          THE WITNESS:  I'm sorry, I didn't mean to correct

10    you.

11         THE COURT:  No, no.  No, no, correct me any time I

12    say something wrong.

13         THE WITNESS:  Okay.

14         THE COURT:  But in prior proceedings in another, in

15    another case this --

16         THE WITNESS:  Yes.

17         THE COURT:  -- became a document.

18         THE WITNESS:  Yes.

19         THE COURT:  Well, we've got it in this case.  We're

20    going to look at it while you listen to the tape.  The tape

21    may be played.

22         MR. LONDON:  May I cue up both the Elmo and the

23    audio so that we may follow along.

24         THE COURT:  However you want to do it.

25         THE CLERK:  Well, I don't know that it's going to

1    work.  It can't work that way.

2              THE COURT:  AKB is admitted now what number?  I

3    would like to put a number on it for the record.

4              THE CLERK:  Oh, it's BAH -- what was it, BH what?

5              MR. OHLEMEYER:  2022.

6              MR. LONDON:  No, document 2020 dash --

7              MR. ALTMAN:  No, the audio was BHT which would be

8    5655.

9              THE COURT:  Thank you.  BHT is admitted Exhibit

10   5655.  That's admitted.

11             (Exhibit marked in evidence.)

12             THE COURT:  And it may be played, and we can watch

13   it as well as we hear it.

14             THE CLERK:  We can't watch it and may it at the

15   same time.

16             THE COURT:  Oh, we can't?

17             THE CLERK:  No.

18             THE COURT:  Can't be done.

19             THE CLERK:  Yes, I guess you can.

20             (Whereupon the tape was played.)

21   Q   This was dated May the 23rd of 1996; is that correct?

22   A   Yes.

23   Q   And what was your state of mind at that time with regard

24   to your risks of being someone selling Neurontin off-label

25   knowing what you at that time knew?

1    A   My particular concerns at that point in time were the

2    monotherapy.  What he's telling us to do is to go out and

3    take a patient who's currently under control, has, has

4    seizure disorder or epilepsy, but is taking a medication

5    where they're under control and then transitioning them to

6    Neurontin for monotherapy.  So something that hasn't been

7    approved for and there isn't evidence that it's effective

8    for as their own drug.  And my concern was those patients,

9    we didn't, those patients would go from control to not

10   having control.  So, if, if they had, because they have it

11   under control may have started driving, they may be --

12             **MR. OHLEMEYER:**  Objection, your Honor.

13             **THE COURT:**  Yes, I think we'll stop it at that

14   point.

15             **THE WITNESS:**  Okay.  Okay.

16             **THE COURT:**  And let me caution you.  That's what

17   you think he was telling you?  I mean, you're telling us

18   what you got out of that message?

19             **THE WITNESS:**  Well, it's just this message is in

20   isolation and I knew what he was thinking because of my

21   training.

22             **THE COURT:**  Well, candidly, witnesses can't testify

23   to what other people are thinking.  Whatever he --

24             **THE WITNESS:**  I'm sorry.

25             **THE COURT:**  -- may think today, I've got to tell

1    you witnesses can only testify to what they think.  So I put

2    it to you.  You think that's what he meant, that's what he

3    was telling you?  You can certainly tell us what you thought

4    between the lines, what you thought was going on.  You're

5    the witness.  You can do that.  But it's what he thinks.

6    This witness.  He can't get into someone else's head and say

7    this is what he had in mind.  No, no.  You've seen the

8    message.  He's told you what he got from it and we'll ask

9    another question.

10   Q   I have one last brief area to go into, Dr. Franklin.

11          What were you telling doctors, if anything, that

12   Parke-Davis/Warner-Lambert's future plans were for getting

13   approval for other indications, off-label indications?

14   A   The company told me they were aggressively seeking

15   approval for 11 these other indications.

16   Q   All right, sir.  Did you actually see any work underfoot

17   by the company to seek approval for other indications?

18   A   I thought there was, but no, I did not see it.

19   Q   I would like to at this time have you look at

20   Exhibit 4062.

21          MR. LONDON:  Mr. Ohlemeyer, that's under Tab 9.

22   And this was an exhibit to which we received no objection.

23          MR. OHLEMEYER:  I'm sorry?

24          MR. LONDON:  4062.

25          (Whereupon counsel conferred.)

1    Q    Do you see Exhibit -- I'm sorry, you probably don't have

2    that exhibit.  Do you?  Exhibit 9?

3    A    Yes.

4    Q    Tab 9?

5    A    Yes, I do.

6    Q    All right.  Describe for the jury what this document is

7    as you see it?

8    A    It's on Parke-Davis letterhead.  It says -- it's

9    boldfaced.  It says Neurontin Marketing Assessments.

10   Q    All right.  Neurontin is the drug you've been selling?

11   A    Yes.

12   Q    All right, sir.  It's dated what date?

13   A    July 31st, 1995.

14   Q    All right, sir.  And it has a letterhead for Morris

15   Plains, New Jersey?

16   A    That's the headquarters.

17   Q    You told us that's the headquarters.  And it's signed by

18   a gentleman named Mr. Brandicourt?  A person named

19   Brandicourt.  O. Brandicourt?

20   A    Yes.

21   Q    Who is that?

22   A    I don't know.

23   Q    All right, sir.  And at the top it says:  O.

24   Brandicourt, Medical Doctor.  And initials PD, product

25   planning, Morris Plains, New Jersey?

```
 1    A    Yes.  Yes.

 2    Q    And then I want to ask you first to read this text and

 3    then ask you a follow-up question.

 4    A    Okay.

 5    Q    To begin with, have you ever seen this document before

 6    this trial?

 7    A    You showed it to me yesterday.

 8    Q    Yesterday.

 9         But did you see this at any time when you were

10    telling doctors that the company was seeking aggressively an

11    indication for neuropathic pain?

12    A    No.

13    Q    Would you please, would you please read into the record

14    the second full paragraph beginning with the word "The

15    results."

16         MR. OHLEMEYER:  I do have a relevance objection to

17    this, your Honor.

18         MR. LONDON:  I'm sorry, there was no objection

19    listed in our --

20         THE COURT:  Please.  Please.  Don't have any

21    arguments.  This document's admitted in evidence?

22         MR. OHLEMEYER:  No.

23         MR. LONDON:  There was no objection.

24         THE COURT:  Please.

25         MR. LONDON:  I'm sorry.
```

1    **THE CLERK:**  I have it on the screen, sorry.

2    **THE COURT:**  All right, take it down.  May I see it.

3 This has a number?

4    **MR. LONDON:**  It's 4062, your Honor.

5    **THE COURT:**  Well, under our protocol we assumed

6 that it was in evidence.  I'll hear counsel.

7 SIDEBAR CONFERENCE, AS FOLLOWS:

8    **THE COURT:**  Wait a minute, I'm not going to waste

9 time here.  Now, this has a number.  And you people have

10 been very good about this.  How do I sort this out?

11    **MS. STEVENS:**  I can explain, your Honor.  It was an

12 exhibit that got mixed up when we want through the ordering

13 of new numbers yesterday.

14    **THE COURT:**  So you say it's a mistake.

15    **MS. STEVENS:**  It was a mistake.  I corrected it

16 with the Court this morning.  I e-mailed plaintiff's counsel

17 last night.

18    **THE COURT:**  I accept that.

19    **MS. STEVENS:**  I apologize.

20    **THE COURT:**  Let's do the best we can about not

21 having mistakes.

22    Now, it's got a Parke-Davis letterhead so it's an

23 admission, right?

24    **MS. STEVENS:**  The objection is relevance.

25    **MR. OHLEMEYER:**  It's relevance, 403, your Honor.

1          **THE COURT:**  Relevance.

2          **MR. LONDON:**  The document is --

3          **THE COURT:**  It goes back to '95.  I'm looking at

4     it.  Overruled.  Your rights are saved.

5          (Whereupon the sidebar conference concluded.)

6          **THE COURT:**  Apparently there's just been a mistake.

7     It's in with the number that he referred to it as, and the

8     number is?

9          **MR. LONDON:**  4062, your Honor.

10         (Exhibit marked in evidence.)

11         **THE COURT:**  And you may inquire.

12         **MR. LONDON:**  All right.

13    **Q**   And to go back to where we were.  Would you please read

14    to the jury the contents of the second paragraph of this

15    exhibit.

16    A   The results of the recommended exploratory trials in

17    neuropathic pain, if positive, will be publicized in medical

18    congresses and published, but there is no intention to fully

19    develop this indication at this point.  No investment is

20    recommended for spasticity.

21    **Q**   Now, let me --

22         **THE COURT:**  Wait, let me interpose a question.

23    Read the date of that document.

24         **THE WITNESS:**  July 31st, 1995.

25         **THE COURT:**  Go ahead.  And you've never seen that

1    before?

2            **THE WITNESS:**  I did see it yesterday, they showed

3    it to me yesterday.

4            **THE COURT:**  I'm sorry, I misspoke.  You never saw

5    it during the course of your employment?

6            **THE WITNESS:**  No, I did not.

7            **THE COURT:**  Thank you.

8            **MR. LONDON:**  The jurors' screen is off, your Honor.

9            **THE COURT:**  Well, we'll take care of that.

10           Go ahead.

11           **THE CLERK:**  11 set?

12   **Q**   Let me ask you two or three follow-up questions.  First,

13   I want to ask you what -- do you recall a little while ago

14   you talked about showing the doctors articles as part of

15   your promotion?

16   **A**   Yes.

17   **Q**   Was, was there within the company a concept of using

18   publications as a part of the promotion of Neurontin?

19   **A**   Yes.  So, when, when -- as I had mentioned earlier, a

20   physician has the right to, to use a drug any way he sees

21   fit.  Well, what he has to, he has to rely on sources for

22   that, friends, you know, colleagues, and most importantly

23   the medical literature.  So they'll go find the medical

24   journals, that sort of thing, and look into it and

25   investigate whether or not the drug is safe and effective

1    for this and that the FDA has approved it for.  So the

2    publication, what, the publication strategies are to

3    actually get information about Neurontin, Neurontin in this

4    case, into the literature.

5    Q   All right.  And that would be the sort of thing that you

6    would get your hands on to show the doctors in the office?

7    A   Exactly.  Yes.

8    Q   All right.  And were you aware before that time whether

9    the submission to these publication came from the company?

10   A   I didn't realize -- at the time, no, I did not realize

11   how many publications had come from the company.

12   Q   All right, sir.  The next thing I want to ask you about

13   is the phrase indication.  Do you see that?  The sentence

14   says to fully develop this indication at this point.

15   A   Yes.

16   Q   And I may be over speaking, it seems to be referring to

17   neuropathic pain.  Do you see that?

18   A   Yes.

19   Q   What does the term indication mean in the pharmaceutical

20   industry, at that time at least?

21   A   The illness.  So the particular problem that the drug

22   was going to treat.

23   Q   And to develop an indication, what does that mean?

24   A   Would be to proceed through and get FDA approval to

25   expand the label.  So, at this point Neurontin -- so what

1    this, I believe this to be saying is that what, Neurontin

2    had the indication that it was adjunctive therapy for

3    seizures.  What this is, is saying that they want to conduct

4    a, they want to, I think it says will be publicized and

5    published, but do not intend to submit it for regulatory

6    approval, and therefore, so it would be legit so the doctors

7    could use it on-label and therefore confident about its

8    safety and efficacy.

9    Q    How did that square with what the company was telling

10   you to tell the doctors?

11   A    It's, it's the exact opposite.  We were being told that

12   we were, we couldn't process the data fast enough, that we

13   were moving so quickly to get regulatory approval on these

14   indications.

15   Q    May I ask you to turn to Tab 10 of your binder.

16        **MR. LONDON:**  Mr. Ohlemeyer, Tab 10.  Ms. Smith,

17   Tab 10.  And this is a document that is presently marked as

18   BCC, your Honor.

19        **THE CLERK:**  Is it this whole --

20        **MR. LONDON:**  No, ma'am, there should be numbered

21   tabs.

22        **THE CLERK:**  I have it.

23        **MR. LONDON:**  All right.

24   Q    And again I want to ask you first to tell the jury

25   whether you had before yesterday seen this document?

```
 1    A    No, I hadn't.

 2    Q    And does this appear to be a documents that is mailed

 3    out --

 4    A    Yes, it is.

 5    Q    -- by the same gentleman?

 6    A    The same distribution list.

 7    Q    And by the same gentleman, Mr. Brandicourt?

 8    A    Yes.

 9    Q    All right, sir.  And does it address a subject that you

10    had been addressing with these doctors to whom you were

11    promoting Neurontin?

12    A    Yes, bipolar disease, social phobia, panic disorder.

13             MR. LONDON:  All right, may I offer Exhibit BCC in

14    at this time, your Honor, on the same basis.

15             MR. OHLEMEYER:  Same objection, your Honor.

16             THE COURT:  Noted, but overruled.  It may be

17    admitted.

18             (Exhibit marked in evidence.)

19    Q    Would you please read to the jury -- and I'll ask you to

20    put that up -- 5150, page 1.

21             THE CLERK:  5150.

22    Q    I'll ask you the same question about neuropathic pain.

23    Would you please read to the jury the first paragraph.

24    A    Enclosed is the final version of the Marketing

25    Assessment for Neurontin in psychiatric indications.  The
```

1    New Products Committee decisions have been incorporated,

2    i.e., an exploratory study in bipolar and a Phase II study

3    in social phobia and panic disorder.

4    **Q**    Time out.

5           Were you promoting Neurontin to physicians in their

6    offices for them to prescribe this drug to their patients

7    for any of those three conditions, bipolar disorder, social

8    phobia, or panic disorder?

9    A    Yes.

10   **Q**    Up in the first line it says psychiatric indications.

11   A    Yes.

12   **Q**    Were you promoting this drug to physicians in their

13   offices off-label for other psychiatric indications?

14   A    Yes.

15   **Q**    All right.  Please resume and read the second paragraph.

16   A    The results, if positive, will be publicized in medical

17   congresses and published in peer-reviewed journals, but

18   there is no intention to fully develop these indications at

19   this point.

20   **Q**    And I've already asked you what it means in the industry

21   to have an intention to fully develop an indication.

22   A    Yes.

23   **Q**    Get FDA approval?

24   A    Yes.

25   **Q**    And was this consistent or inconsistent with what you

1    were being told to tell doctors about their plans with this

2    drug?

3    A    Inconsistent.

4    Q    All right.  Did you leave the company?

5    A    Yes, I did.

6    Q    When and why?

7    A    I left at the -- I resigned at the end of July 1996.

8    The company refused to accept my resignation for a period of

9    time.  Eventually they did.  And, and I left because I had

10   come to believe my job to be illegal and immoral.

11   Q    At the beginning of your testimony you identified

12   yourself as a whistleblower.  What did you do to blow a

13   whistle?

14   A    I cooperated with the government in a criminal and civil

15   investigation of promotion of Neurontin.

16   Q    Dr. Franklin, on at least some level it needs to be

17   mentioned that you profited from this, did you not?

18   A    I did.  I did.

19   Q    And did you set out to go to work for a drug company in

20   order to become a whistleblower?

21   A    No.  No, not at 11.

22   Q    How did it come to be that you received a proceed from

23   this?

24   A    We filed what's called a qui tam case.  So it's a case

25   where an individual files a case on behalf of the citizens

1     of the United States of America.  And, and, and that is the

2     whistleblowing process as part of that law that allows

3     American citizens to, to sue on behalf of the country

4     itself.  There's a reward for doing it.  And so at the end

5     when the company pled guilty and the government got the

6     reward, got a fine from them, I got a percentage of that

7     which ended up being about $26 million.

8     Q   All right, that was going to be my next question.  It

9     was $26 million?

10    A   Yes.

11    Q   All right, sir.  Last question.  You're here under a

12    subpoena?

13    A   Yes.

14            MR. LONDON:  I'll pass the witness at this time.

15            THE COURT:  Mr. Ohlemeyer.

16                    CROSS-EXAMINATION

17    BY  MR. OHLEMEYER

18    Q   Good morning, Dr. Franklin.

19    A   Hi.

20    Q   Mr. Franklin or Dr. Franklin?

21    A   Mr. Franklin, please.

22    Q   We met in December at your deposition, right?

23    A   Yes.

24    Q   And you are a Ph.D. so you're certainly entitled to call

25    yourself Doctor?

```
 1    A    It confuses people so I choose not to.

 2    Q    But professionally you've used the --

 3    A    Yes.

 4    Q    -- honorific they call it?

 5    A    Yes, that's a good way.

 6    Q    And there's no question what you did during the four

 7    months that you were at Parke-Davis was wrong, right?

 8    A    No question on my part?

 9    Q    Well, there's no question today you know what you did

10    was wrong?

11    A    Oh, yeah.  I'm sorry, I misunderstood you.  I always

12    knew -- Pfizer denied it initially, but I always knew that

13    it was wrong.  It was at least morally wrong.  Whether it

14    was legally wrong, I wasn't sure.

15    Q    Well, there came a point before you left the company

16    that you knew or believed what you were doing was wrong?

17    A    Yes.

18    Q    And you started as you said taping voice mails to CYA?

19    To cover yourself, right?

20    A    I don't think that's why I started taping voice mails.

21    But, but I'll give you, grant you that, yeah.

22    Q    And there's no question that the company in part because

23    of your efforts was investigated and charged?

24    A    Yeah.  Yes.

25    Q    And they eventually admitted that they had done wrong?
```

1    A    Yes.  I believe so.

2    Q    Now, I want to ask you about Exhibit 2020 which

3    Mr. London asked you about.  Do you remember this is the --

4    A    Which page is it?

5    Q    Well, it's just generally the decile, or decile exhibit.

6    2020?

7    A    Yeah.

8    Q    This was dated March 4th, 1996, right?

9    A    Yeah, I'm sure it is.  I don't know where it is, but I

10   believe that it was, yes.

11   Q    It's the one they put up on the screen and you showed

12   how you used it, right?

13   A    Yes.

14   Q    So this was information that somebody compiled before

15   you ever started working at the company?

16   A    Well, it came out routinely.  That particular one he

17   showed me was dated, what was it, March?

18   Q    March 4th, 1996.

19   A    Right.  So I think I got that on March 15th, before I

20   actually started the company.

21   Q    So, doctors in your part of the country were prescribing

22   antiepileptic drugs, including Neurontin, off-label for pain

23   before you ever started working at the company?

24   A    Well -- I'm sorry, I may have confused the situation.

25   That, that thing doesn't say anything about what the

1    doctor's writing those prescriptions for.  So that, that

2    page that we looked at doesn't actually -- it just says that

3    they're using Neurontin.  It doesn't say that they're using

4    Neurontin -- so when you go to the doctor's and get a

5    prescription filled, the doctor rarely writes on your

6    prescription that you're taking Neurontin for pain or you're

7    taking Neurontin for epilepsy.  So that decile data says how

8    much Neurontin they're using, but it doesn't necessarily, it

9    doesn't reveal what they're using it for.

10   Q    Well, then what was the point of Mr. London asking you

11   whether there were psychiatrists --

12            **MR. LONDON:**  Objection.

13            **MR. OHLEMEYER:**  I'll withdraw it.

14            **THE COURT:**  It's withdrawn.

15   Q    This isn't a list of neurologists, or, I'm sorry,

16   epileptic specialists, is it?  It's any doctor who wrote a

17   prescription for Neurontin?

18   A    I don't recall what the heading on that particular one

19   was, but there were some that said psychiatrists, that were

20   just psychiatrists.  I think they might be in here.

21   Q    So they would have been prescribing off-label?

22   A    The psychiatrists?  Yeah, they don't see epilepsy

23   patients.

24   Q    Before you ever got to the company?

25   A    I'm assuming that is true.  Yes.

1    Q    Now, am I correct you worked at Parke-Davis, not Pfizer,

2    right?

3    A    That's true.  That's true.

4    Q    And you were there four months in 1996?

5    A    Yes.

6    Q    And in the four months you were there you never remember

7    speaking with any of Mr. Shearer's doctors, do you?

8    A    I still don't know who Mr. Shearer's doctors are, so --

9    Q    Did you ever --

10   A    So, no, I don't believe that I did.

11   Q    Did you ever speak with a Dr. Angevine?

12   A    No.  Not that I, not that I recall.

13   Q    Did you ever speak with a Dr. Sullivan?

14   A    In Boston that's a popular name.

15   Q    Right.

16   A    But not that I recall.

17   Q    What about Dr. Hynes?

18   A    Again, not that I recall.

19   Q    And did you take a look at this yesterday to see whether

20   those names were contained in this list?

21   A    I did not.  There's a lot of people in there.

22   Q    A lot of people were there yesterday?

23   A    No, a lot of people in there.

24   Q    Now, you were subpoenaed to testify?

25   A    Yes.

1   Q   But you met with the lawyers yesterday to talk about

2   your testimony?

3   A   Yeah.  You know, I have -- I met with you guys for five

4   hours, so --

5   Q   No, no, you didn't meet with us, Doctor.  We had, we

6   took a deposition --

7           MR. LONDON:  Objection.

8           THE COURT:  Wait a minute.

9           MR. OHLEMEYER:  I don't mean to interrupt.

10          THE COURT:  Well, it's not the interrupting.  You

11  can't testify.

12          MR. OHLEMEYER:  All right.

13          THE COURT:  That was an assertion.

14          MR. OHLEMEYER:  All right.

15          THE COURT:  You can't make assertions.

16          MR. OHLEMEYER:  I'll ask a question, your Honor.

17          THE COURT:  Just ask questions.

18  A   I thought it was fair play to give both sides the same

19  amount of time.

20  Q   My question, Doctor, is when we met it wasn't because I

21  called you and said can I come talk to you, it was because

22  we asked for your deposition, right?

23  A   Yes.  Yes.

24  Q   All right.  And you didn't meet with us before the

25  deposition?

1   A    No.  No.

2   Q    Okay.

3   A    I didn't meet with them before the deposition either.

4   Q    But you met with them yesterday?

5   A    They asked for time.

6   Q    Now, Dr. Franklin, Mr. Franklin, the doctors you met

7   with in the four months you were at Parke-Davis seemed to

8   you to be typically hard working, critical thinking doctors,

9   didn't they?

10  A    Yes.

11  Q    They were a cross-section of the kind of doctors that

12  you would find in an area like this, right?

13  A    Yes.

14  Q    Trying their best to help their patients?

15  A    Yes.

16  Q    Right.

17        And at the time that you joined Parke-Davis you

18  knew, didn't you, that Pfizer didn't invent Neurontin,

19  right?

20  A    I think it came from a Japanese company or -- I don't --

21  I don't recall specifically the origins of Neurontin.

22  Q    You learned, though, that it was approved by the FDA for

23  the adjunctive treatment of epileptic seizures in about

24  1993; isn't that right?

25  A    That's when it was approved, yes.

1    **Q**   And you later learned that it was approved by the FDA in

2    2002 to treat pain associated with post-herpetic neurology,

3    right?

4    A   Yeah, that was long after I left the company.

5    **Q**   And referring to Exhibit 6000, do you know --

6    A   What page number is 6000.

7    **Q**   No, it's the time line I showed you.

8    A   All right.

9    **Q**   Do you know what the medical officer's role is at the

10   FDA in reviewing a New Drug Application?

11   A   I think they're the people that, the medical officer at

12   the FDA I believe is the individual who then reviews 11 of

13   the data analysis, gets their expert, sometimes they'll have

14   committees, expert committees, and that sort of stuff, and

15   they review all the data, and that's the person who makes

16   the final set of decisions or group of people that make the

17   final set of decisions.

18   **Q**   Do you know who the medical officer was at the FDA who

19   reviewed the Neurontin application prior to its approval in

20   1993?

21   A   I believe that we saw it earlier, it was something

22   McCormick.

23   **Q**   McCormick, right.

24           And am I correct, let me ask you to read a portion

25   of Exhibit 6000 for us.  The February 14th entry on that.

1     Can you read that for us.

2     A    Yes.  Out loud?

3     Q    Yes, please.

4     A    In the documents that I reviewed, both in my

5     responsibility as a medical officer in epilepsy and also in

6     my review of the Neurontin application for post-herpetic

7     neuralgia, I did not see any -- and this is boldfaced -- I

8     did not see anything that would suggest an increased risk of

9     suicidality.

10    Q    And who is that statement attributed to?

11    A    It's February 14th, 2008, the McCormick deposition.

12    Q    And she to your knowledge was the medical officer who

13    reviewed the Neurontin applications?

14    A    Yes.

15    Q    Thank you.

16    A    Yes.

17    Q    Now, to get a drug approved you have to submit

18    controlled studies, don't you?

19    A    Yes.

20    Q    One of the slides Mr. London showed you had a

21    bullet point about anecdotal studies?

22    A    Yes.

23    Q    Is there a difference between a controlled study and an

24    anecdotal study?

25    A    Yes, absolutely.

1   **Q**   It's a big difference, isn't it?

2   A   Giant difference.   11 the difference.

3   **Q**   Because a controlled study takes two groups of people

4   that seem, that are identical and tries to compare what

5   happens to them when one takes a drug and one takes a

6   placebo or sugar pill, right?

7   A   Not in 11 circumstances is there a placebo.   But in

8   principle, yes.

9   **Q**   An anecdotal report is an observation of something that

10   occurs in somebody at a particular point in time?

11   A   That's right.

12   **Q**   And if you're trying to prove something the more

13   reliable evidence is the controlled study, not the anecdotal

14   report?

15   A   I would argue that the anecdotal report is not evidence.

16   **Q**   Now, I don't want to belabor this --

17   A   It's the lowest form of evidence.

18   **Q**   The anecdotal report?

19   A   Yes.

20   **Q**   And that's because there might be other explanations for

21   what you are observing?

22   A   Exactly.

23   **Q**   Now, Mr. London spent some time with this, I don't want

24   to belabor it, but there's a difference between an off-label

25   prescription and off-label promotion, right?

1   A   Yes.

2   **Q**   And it's a big difference, isn't it?

3   A   Big difference, yes.

4   **Q**   Because companies aren't allowed to promote off-label?

5   A   Yes.

6   **Q**   But doctors are certainly allowed to prescribe

7   off-label?

8   A   Yes.

9   **Q**   And, in fact, sometimes it's what people would consider

10  the standard of care for a doctor to make an off-label

11  prescription?

12          **MR. LONDON:**  Objection.  Objection.

13          **MR. OHLEMEYER:**  I'll rephrase the question.

14          **THE COURT:**  Well, I'm not so sure he -- do you

15  know?  Are you able to give an answer to the standard of

16  care?  Do you think you can?  I mean, you're not a

17  physician.

18          **MR. OHLEMEYER:**  I'll rephrase the question.

19          **THE WITNESS:**  Yeah.

20          **THE COURT:**  All right, it's withdrawn.

21  **Q**   You believe that prescribing medicine off-label can be

22  required by the standard of care that physicians operate

23  under, don't you?

24          **MR. LONDON:**  Objection.

25          **THE COURT:**  Overruled.

1   A    Absolutely, yes, I do.

2   **Q**    Okay.  And, in fact, you would fight, your word, not

3   mine, for a physician's right to prescribe off-label?

4   A    Absolutely.

5   **Q**    All right.  It's a common practice in some situations

6   for physicians to prescribe off-label, isn't it?

7   A    Yes, it is.

8   **Q**    And that's because doctors may, you know, be

9   unsuccessful in using other medicine to treat problems their

10  patients are having; isn't that right?

11  A    That the drugs available, the approved drugs available

12  to them may not actually meet the needs of that particular

13  patient and therefore the doctor needs to be able to rely on

14  credible scientific information, the experience of

15  colleagues is actually in the hippocratic oath, I was trying

16  this out at the company, that they need to be able to reach

17  out to the people that they trust and to the academic

18  literature that they trust and be able to make a judgment

19  because that's the right thing to do for a patient.

20  **Q**    So you would have to know a whole lot more about a

21  prescribing decision before you would suggest there's

22  anything wrong with using medicine off-label if a doctor

23  thinks it's going to help his or her patient?

24  A    No, no, no.  Let me clarify.  There is nothing wrong

25  with a doctor using a drug off-label.  What's wrong is a

1    company providing the doctor with information that's not

2    credible that results in them using a drug off-label.  But

3    the doctor, the doctor has, I think I told you, has a

4    responsibility to his patient to include 11 the options when

5    it comes to treating a patient.

6    Q    In your experience --

7    A    The patient's paramount.

8    Q    In your experience as part of that responsibility does a

9    doctor keep track of his or her patient after they prescribe

10   a medicine to them?

11   A    Yes.  Yes.

12   Q    They want to see if it helps them?

13   A    Yes.

14   Q    And if it helps them they continue to prescribe it,

15   right?

16   A    Yes.

17   Q    And if the doctor or the patient experienced some sort

18   of side-effect or it doesn't seem to help, sometimes the

19   doctor will suggest something else or sometimes the patient

20   will just suggest they will stop taking it, right?

21   A    Well, that's where -- that's what makes it so

22   complicated about off-label promotion and off-label

23   prescribing, particularly for a doc, is that, just as you

24   had talked about, each, we do these big clinical trials, we

25   got thousands and thousands, tens of thousands of patients

```
1    and we can figure out that each one of them, you know, that

2    when we do the statistics we can figure out if the result

3    that we're seeing, like the side-effect that we just

4    referred to, is the result of a medication.  But when, as

5    you had talked about, the anecdotal, from a doctor's point

6    of view, each, each patient is an anecdote, if you would,

7    it's kind of the lowest form.  So when that patient comes in

8    as you had mentioned and says, gee, you know, I feel dizzy,

9    the doc doesn't know if it's that, it's because they just

10   gave the patient a new drug or the patient's dehydrated.  It

11   could be -- so it's -- that's why the data is so important

12   is that if, if my, where my issue with this came up was if I

13   went to the, to the docs and said, hey, you know, one of the

14   problems we might see with this is a patient may have an

15   increased risk of depression, then if the patient comes in

16   and says, well, doc, I'm feeling low, I'm feeling blue, this

17   isn't working for me, the doc can go, well, you know, that

18   just might be life, you're sick and sickness makes people

19   depressed, or if I had given him fair and balanced and knew

20   that information and told him that, gee, the drug, a

21   side-effect might make you depressed, the doc might go okay,

22   you know, it might be the drug and would change the therapy.

23  Q   And every doctor you talked to had something on his or

24   her desk called the Physicians' Desk Reference; isn't that

25   right?
```

1    A    Yeah, more or less.  Yeah.

2    Q    And what is the Physicians' Desk Reference?

3    A    It's this giant book, thick like this, with the labels

4    of 11 the approved medications.

5    Q    The labels that the FDA says have to be provided to the

6    doctors before they can prescribe the medicine?

7    A    Before you can promote the medication, not -- the FDA

8    doesn't say before they prescribe -- I'm sorry, I just want

9    to clarify that.

10   Q    Fair enough.

11   A    The FDA does not tell a doctor what he can and can't

12   prescribe, except if the drug isn't available at 11.  So,

13   what -- I'm sorry.

14   Q    You're right.

15   A    I'm sorry.

16   Q    But what the FDA does tell the maker of the drug --

17   A    Yes.

18   Q    -- is you cannot sell this drug without the label that

19   we approve to be part of it?

20   A    That's right.

21   Q    And that label gets reprinted in the Physicians' Desk

22   Reference?

23   A    Yeah.  Other places, too, but yes.  Back in '96 we

24   didn't have the web, or it wasn't as convenient as it was.

25   But now a lot of that stuff you can find on the web.

1   Q   But doctors, part of their training, if you know, is to

2   know how to read labels and what to look for in those

3   labels, right?

4   A   You know, they're like engineers.  My, my experience was

5   they're like engineers.  You forget 90 percent of what you

6   learned within, you know, a few, within a year or two of --

7   maybe lawyers are like that, too.  But it's not -- in my

8   experience no doctor, very few doctors have experience with

9   clinical trials and with biochemistry associated with

10  reading a label.  When a doc gets a label they look at the

11  indications, the side-effects, and the dosages, not

12  necessarily all the other clinical data.

13  Q   So, I don't know a lot about patent law but I know where

14  to find it in the books.

15  A   Yeah, that's right.

16  Q   Doctors know where to find it?

17  A   Yes, they do.

18  Q   And, in fact, in those labels there's a whole big black

19  heading in every label that says adverse reactions, right?

20  A   No.  No.  I think you're referring to a black box

21  warning?

22  Q   No, I'm not.  I'm referring -- have you seen -- have you

23  ever looked at the label for Neurontin?

24  A   Yes.

25  Q   And it lists -- you said something earlier that I want

1    to ask you about.  You said you were told that Neurontin had

2    no side-effects.  There's no -- aspirin has side-effects,

3    doesn't it?

4    A    Yeah.  Good point.

5    Q    And, in fact, in the Physicians' Desk Reference and in

6    the label for Neurontin there's a long list of adverse

7    reactions, right?  Side-effects?

8    A    Right.

9    Q    And did you know that they include things like

10   depression, suicidal gesture, and suicidal?

11   A    In '96?

12   Q    Yes.

13   A    I don't believe they did in '96.  I was trained that

14   they didn't in '96.

15   Q    So if the label for Neurontin contained 11 of that prior

16   to the time you worked there you don't remember reading it?

17   A    I was trained on the, on the side-effects for Neurontin

18   and was told that there were no side-effects.  In real use

19   of it there were no side-effects.

20   Q    But no doctor that you went to see believed that there

21   was --

22             MR. LONDON:  Objection.

23   Q    -- any medicine -- I'll rephrase it.

24             Was there ever a doctor you talked to who told you

25   that there are medicines that don't have side-effects?

1    A    And that actually gets to your point.  And so --

2    Q    Excuse me, Dr. Franklin.

3    A    Okay.

4    Q    I don't -- maybe I'll ask the question a little clearer.

5         Did a doctor -- when you told the doctor this

6    medicine has no side-effects, did any doctor ever say to

7    you, well, that's ridiculous, 11 medicines have

8    side-effects?

9    A    No.  The doctors recognize that 11 medications have

10   side-effects and that therefore they delete out of their

11   reasoning that base line side-effect.

12   Q    And, in fact, any doctor you talked to who wanted to

13   know what the side-effects were for Neurontin in 1993

14   forward could look at the PDR or look at the label?

15   A    Yes.

16   Q    All right.  Now, Neurontin, the Neurontin that was

17   approved by the FDA in 2002 for the treatment of pain

18   associated with post-herpetic neuralgia was the exact same

19   Neurontin that the FDA approved in 1993 as adjunctive

20   therapy for epilepsy, right?

21   A    Yes.

22   Q    It wasn't a different chemical or different molecule?

23   A    No.  That's right.

24   Q    Right.

25        And so, the FDA made a finding in 2002 that the

1    same medication -- well, let me ask you this.

2         Were doctors prescribing Neurontin off-label to

3    treat pain associated with post-herpetic neuralgia before

4    2002?

5    A    Yes.  Yes.

6    Q    So, doctors who were writing a prescription before 2002

7    for pain associated with post-herpetic neuralgia were

8    operating an off-label prescription?

9    A    Yes.

10   Q    And that was legal?

11   A    Yes.  Yes.

12   Q    But if you went in there in 2001 and said you should

13   write a prescription off-label for post-herpetic neuralgia

14   that would have broken the rules?

15   A    The law.  Yes.

16   Q    Right.

17        So it would have been a true statement though --

18   well, let me put it this way.  If the salesman told a doctor

19   in 2000 that Neurontin was useful for treating the pain

20   associated with post-herpetic neuralgia that would be

21   against the rules, it would be illegal?

22   A    What year?

23   Q    2000.

24   A    Yes.

25   Q    But according to what the FDA did in 2002 it would have

1    been a true statement?

2    A    In 2002 the FDA had completed, the company had submitted

3    data on post-herpetic neuralgia and they had completed their

4    process and determined that it was safe and effective for

5    treating post-herpetic neuralgia.

6    Q    But if I had told the doctor that the day before they

7    approved that indication I would have broken the rules, even

8    though two days later what I said was true and approved by

9    the FDA?

10   A    Yeah.  It's a dangerous world you're living in, but yes.

11   Q    And I'm not making light of this because these are

12   important rules.

13   A    Yes.

14   Q    But what I want to ask you, though, is that was one of

15   the issues that you had to kind of deal with when you got to

16   the company, was the rules were, were described to you as

17   something either odd or at some point your people that you

18   worked with told you the rules were probably going to

19   change, right?

20   A    Yes.

21   Q    So you were working with people who were trying to be

22   very aggressive to get ahead of what they thought was going

23   to be a rule change?

24   A    I don't -- no, I don't believe that's the case.  But,

25   but I, I could, you know, as the judge had said earlier, I

1    can't say what, I know what they were thinking.

2    Q    Now, before, before you started at Parke-Davis --

3    A    Yes.

4    Q    -- you had already left Dana Farber, right?

5    A    Right.

6    Q    There was a period of time where you had left Dana

7    Farber.  It's not like you, you know, Parke-Davis lured you

8    away from Dana Farber?

9    A    No.  No.

10   Q    You left Dana Farber and had worked in something with

11   some of your friends that was a market research firm or

12   something like that?

13   A    We tried to start a business, yes.

14   Q    Right.

15        And that didn't -- either while it was under way

16   you started applying for jobs at pharmaceutical companies?

17   A    Right.

18   Q    You actually applied at Pfizer and didn't get a job?

19   A    Right.

20   Q    And then you wrote to Parke-Davis?

21   A    Yes.  I sent my resume out.  I don't think it was a

22   process quite like that.  I applied to a number of

23   companies.  But yes.

24   Q    And one of the companies you applied to was

25   Warner-Lambert, Parke-Davis division?

1    A    Yes.

2    Q    And you told them that you were interested in a sales

3    position?

4    A    Absolutely.

5    Q    You knew you were applying for a sales job?

6    A    I did.

7    Q    So it wasn't a surprise when you got to Parke-Davis and

8    they said we want you to help sell?

9    A    Not at ll.

10   Q    Right?

11           And, in fact, you told them that your objective

12   throughout the course of your career had been to develop the

13   skills and experience necessary to excel as part of a

14   pharmaceutical marketing team?

15   A    Yes.

16   Q    All right.  And you wrote that your experience had

17   solidified your focus on the value of communication within

18   the industry, right?

19   A    Yes.  Well, yes.

20   Q    And you told them that your experience had demonstrated

21   to you that sales was a driving force within the industry?

22   A    It still is.

23   Q    And that you were confident your scientific training

24   will increase sales?

25   A    Absolutely.

1    **Q**   And more specifically you wrote to them that you're

2    confident that your scientific training would enhance your

3    ability to explain the advantages of Parke-Davis products,

4    critically evaluate competitive products, and increase sales

5    by establishing stable and supportive relationships with

6    clinicians and pharmaceuticals?

7    A   Absolutely.

8    **Q**   So, again, and I'm not making light of the rules,

9    because they're important, but there's nothing wrong with a

10   company wanting doctors to use its product as compared to

11   its competitors' products?

12   A   I would argue that if they've got a better product they

13   have a responsibility to do it.

14   **Q**   Right.

15          And so you would go to see a doctor and on your way

16   out somebody from another company might be going in?

17   A   Yeah.  There are often times where we would be sitting

18   in the, sitting in waiting rooms with Pfizer reps.

19   **Q**   Now, when you took the job you were told that you might

20   be working in a gray area, right?

21   A   Right.

22   **Q**   And that gray area is what I just asked you about, where

23   the rules kind of start and stop, right?

24   A   That's one of them, yes.

25   **Q**   Because one of the things about the rules that was a

1    little, I mean tricky is not the right word, but if a doctor

2    invited you to give them information you were allowed to do

3    that?

4    A    Yes.

5    Q    But if you cold called the doctor or kind of worked your

6    way into his office and volunteered the information that was

7    against the rules?

8    A    Right.

9    Q    And that was something that other people in the company

10   had some strong feelings about, right?

11   A    Yes.

12   Q    Your business unit was, what, Maine, New Hampshire,

13   Vermont, Pennsylvania?

14   A    11 of New England, New York, Pennsylvania.

15   Q    And when you went to this training that you told

16   Mr. London about other people from other parts of the

17   country said you know what, your business unit is too

18   aggressive?

19   A    Yes.

20   Q    You should wait for people to ask you for information,

21   you shouldn't cold call them, right?

22   A    Right.

23   Q    In fact, there was a man out on the West Coast who was a

24   retired military guy, Mr. Ball was his name, right?

25   A    Dr. Ball.

1    **Q**   Dr. Ball.  General Dr. Ball.

2    A   General Dr. Ball, that's right.

3    **Q**   And he believed that the whole medical liaison program

4    had a lot of potential problem for the company, didn't he?

5    A   He had --

6    **Q**   Well, let me back up.

7    A   Just -- yeah.

8    **Q**   Before you got to the company they had another system

9    that they used to get information to doctors; isn't that

10   right?

11   A   Yeah.  A letter based system.

12   **Q**   Right.  And so if a doctor has a question he would write

13   a letter to the company and the company would read it, pull

14   some information and send it back to the doctor, right?

15   A   Uh-huh.

16   **Q**   That created some backlogs at the home office, didn't

17   it?

18   A   I believe so.

19   **Q**   And so one of the ideas that your boss I think had was

20   to have medically trained people travel with the salesmen?

21   A   Yeah.  I don't know where it originated.

22   **Q**   But you know that Dr. Ball thought that was the wrong

23   way to do it, right?

24   A   He thought cold calling was, was across the line.

25   **Q**   And he told you that, didn't he?

1    A    He did.  Brazen criminals.

2    **Q**    Yeah, he was pretty blunt about it, wasn't he?

3    A    Yeah.

4    **Q**    And other people in the company said that it was, what

5    you were doing was against the rules, right?

6    A    Yeah, it was ambiguous because -- but yes.

7    **Q**    And there came a point in time during the four months

8    you were at Parke-Davis that you concluded you were doing

9    something that was wrong?

10   A    Yes.

11   **Q**    And you didn't quit?

12   A    Not right away.

13   **Q**    Yeah.  Why not?

14   A    As you just pointed out it was ambiguous.  I, I had

15   talked to two company lawyers.  The two company lawyers that

16   did some of our training.  I don't have proof what they

17   submitted to the FDA.  And they were okaying what we were

18   doing.  And so it was ambiguous.  There were also doctors

19   that I didn't realize were taking money at the time who

20   seemed to be okay with it also.  So I was getting lots of

21   mixed signals.  It became -- I needed to leave when I

22   realized that for me this was unethical regardless of,

23   whether or not it was illegal or ambiguous, it was immoral.

24   Because if 11 companies did what we were doing none of us

25   would be able to trust any of the drugs on the market.

1    Q    But before you left you started taping voice mails,

2    right?

3    A    Yes.

4    Q    And then you went to see a lawyer?

5    A    Yes.

6    Q    And you were told about, you know, the process by which

7    you could participate in the litigation that followed,

8    right?

9    A    Eventually, yes.

10   Q    All right.  And by the way, when you worked there the

11   company sold medicine 11 over the country, right?

12   A    All over the world.

13   Q    11 over the world.  But you were just working in a small

14   part --

15   A    Yes.

16   Q    -- of he company, right?

17          Now, when you were talking to doctors about

18   off-label prescriptions they knew that you were talking to

19   them about off-label prescriptions, right?

20   A    Yeah, I believe so.  Yes.

21   Q    So, so they, they also knew that you were a

22   representative of Parke-Davis?

23   A    Yes.

24   Q    They knew that you were wanted them to use your product,

25   not somebody else's product?

1    A    Yes.  Safe to assume.  Yeah.

2    Q    And 11 of the doctors you saw were people who were

3    trying to help patients solve problems that needed

4    solutions, right?

5    A    11 the doctors that I called on you mean as opposed to

6    the doctors who were leading consultant groups and --

7    Q    Right.

8    A    Because some of the doctors I dealt with were actually

9    getting paid to also market.  But, yeah, all the doctors

10   that I went out and cold called, every single, without a

11   doubt every single one of them was trying to help their

12   patients.

13   Q    And there's a lot of other places where they could get

14   information about medicine that might help their patients

15   than from you; isn't that right?

16   A    Not -- on off-label promo -- off-label uses, back in '96

17   it wasn't so easy.

18   Q    Well, if you were going to go see -- if I was a doctor

19   in 1996 and you were to come see me and you were going to

20   give me some medical literature to review.

21   A    Yes.

22   Q    What you were giving me is something that had been

23   published in a journal somewhere, right?

24   A    Often times, yes.  Not the presentations that we talked

25   about earlier.  But yes.

1    **Q**    Right.  So it's publicly available?

2    A    Again, the publications are, yes.

3    **Q**    And in 1996 it was a whole lot harder to do legal

4    research and medical research than it is today, right?

5    A    Yes.

6    **Q**    But if I were a doctor in 1996 and I thought, you know,

7    I'm not sure I believe this Franklin guy, I could go look it

8    up myself, couldn't I?

9    A    Yes.  Yes.

10    **Q**    I could go down the hall and I could ask another doctor,

11    hey, have you ever used Neurontin off-label for pain?  And

12    they would tell me yes, no, maybe so, right?

13    A    Right.

14    **Q**    And I could, I could talk with colleagues, you know, at

15    lunch or at whatever meeting I was at and ask them if they

16    had used these kinds of medicines off-label, right?

17    A    Yeah.  That's why we had something we called a movers

18    and shakes list where we would actually help doctors with

19    that.  So we would actually talk to doctors and say, hey,

20    Dr. Jones down the street is using it and Dr. Smith is using

21    it.  And, and we would actually encourage physicians to go

22    talk to these, these individuals that we had already

23    convinced to use Neurontin.

24    **Q**    After you left the company did you ever go back and talk

25    to any of the doctors that you had talked to in the past?

```
 1    A    No, I didn't.  After I left the company --

 2              MR. OHLEMEYER:  I'm sorry, your Honor, I think --

 3              THE WITNESS:  Oh, all right.

 4              MR. OHLEMEYER:  -- I think he's answered the

 5    question.

 6              THE COURT:  He has.

 7              THE WITNESS:  Okay.

 8    Q    Now, Mr. Franklin, when you left the company it got the

 9    attention of the people at Warner-Lambert, didn't it?

10    A    Yes.

11    Q    You were making a very serious allegation, right?

12    A    Yes.

13    Q    Warner-Lambert was the company that owned Parke-Davis?

14    A    Yes.

15    Q    And they wanted your help in investigating it, didn't

16    they?

17    A    Yes.

18    Q    They sent you a couple of letters, more than one, didn't

19    they, where they said would you please help us --

20    A    Yes.

21    Q    -- investigate this because if something is going on

22    that's wrong we want your help to fix it, didn't they?

23              MR. LONDON:  Objection.  Objection.

24              THE COURT:  Well, the document's not in evidence.

25    It is cross-examination.  But the document there speaks for
```

1    itself, so I'll sustain it.

2            **MR. OHLEMEYER:**  All right.

3    **Q**   But the fact is you didn't -- did you ever accept any

4    invitation from the company to help them investigate this

5    after you left the company?

6    A   I close to cooperate with the Department of Justice

7    instead.

8            **MR. OHLEMEYER:**  Can I have just a moment, your

9    Honor?

10            **THE COURT:**  You may.

11            **MR. OHLEMEYER:**  Those are all the questions I have.

12   Thank you, Mr. Franklin.

13            **THE COURT:**  Nothing further for this witness?

14            **MR. LONDON:**  May I redirect on just this

15   small point, please, your Honor.

16            **THE COURT:**  Of course you may.

17            **MR. LONDON:**  I would like to address a question Mr.

18   Ohlemeyer raised.

19                      **REDIRECT EXAMINATION**

20   **BY MR. LONDON**

21   **Q**   Dr. Franklin, talking about this question of what a

22   label consists of, does the entire label appear in the PDA,

23   the Physicians' Desk Reference, or just the abbreviated

24   label?

25   A    PDR.

1    Q    PDR, I'm sorry.

2    A    I'm sorry, could you --

3    Q    Does the entire label as published by the FDA and the

4    company appear in the Physicians' Desk Reference or only the

5    abbreviated summary of the label?

6              **THE COURT:**  Do you know?

7    A    Yeah, I believe it's just the abbreviated summary of it

8    and all the clinical background data is not included in

9    that.

10   Q    And then insofar as informing the doctor of the

11   experience with patients taking the pharmacy, are there

12   categories or a hierarchy of warnings in the label itself?

13   A    Yes.  Yes, there are.

14   Q    What's the highest and most severe warning?

15   A    It's referred to as a black box warning.

16   Q    All right, sir.  And then below the black box what's the

17   next category of warnings?

18   A    They actually start to boldface.

19   Q    All right.

20   A    It's actually -- they have a number of the black box

21   warnings, they could actually move it all the way up to the

22   top of the label so it's the first thing both the patient

23   and the physician see.  It's scary.  And the FDA doesn't

24   like to issue those black box -- oh, I'm sorry.

25   Q    We're going to leave here in five minutes --

1     A     Okay.

2     Q     -- or so, so I want to get you through this.

3     A     All right.

4     Q     Are you familiar with the term contraindication?

5     A     Yes.

6     Q     And is that higher or lower in warnings than a black

7     box?

8     A     It's lower.

9     Q     All right.  And then are you familiar what the term

10    warning?

11    A     Yes.

12    Q     And is that higher or lower than a contraindication?

13    A     Lower.  Yes.

14    Q     Are you familiar with the term precaution?

15    A     Yes.

16    Q     Higher or lower?

17    A     Way down.  Lower.

18    Q     And then adverse events, higher or lower?

19    A     Lower.

20    Q     All right.  And so to begin with, let me just ask you

21    the question about the same label Mr. Ohlemeyer did.  Did

22    the, did the adverse events section of any label consist of

23    those things that are simply observed of the patients during

24    the FDA trials, hangnails, shingles, sunburn?

25    A     Yeah, at that point there's stuff that's observed.

1    Q    All right.  And you appeared to answer Mr. Ohlemeyer, if

2    I recall, you didn't know whether there was any reference to

3    suicidal ideation or gesture of any sort in the Neurontin

4    label.  True?

5    A    Right.

6    Q    But would it matter to a physician in your experience

7    whether such a reference was in the precautions, the black

8    box, the adverse events or wherever?

9    A    Absolutely.

10              **MR. OHLEMEYER:**  Objection, your Honor.

11              **THE COURT:**  Sustained.  It's beyond the scope.  The

12   answer is stricken.

13   Q    This last question, at least this last subject of the

14   question, if I can.

15              If a physician were to look in the Physicians' Desk

16   Reference while you're there in the office or at any other

17   time, would that Physicians' Desk Reference tell the doctor

18   any of the side-effects for an off-label use of the

19   medication?

20   A    Absolutely not.  That's what I couldn't say earlier.

21   But absolutely not.  It does -- see, what makes it

22   off-label, we talked about it earlier, when the FDA approves

23   it they approve it not just for a sickness, they approve it

24   for a particular patient group.  So you can't, using a drug

25   that's approved for an adult in a kid is off-label, because

1    they have only tested it in a particular group of people.

2    So when you start using drugs off-label you're, you're

3    completely departing from any data that's ever been

4    collected before, and so it would not, off-label uses are

5    not reflected at 11, it's what makes it dangerous.

6           MR. OHLEMEYER:  Your Honor, move to strike as

7    nonresponsive.

8           THE COURT:  The motion to strike is denied in the

9    exercise of discretion.  But you're done with this witness?

10          MR. LONDON:  I am done with this witness, your

11   Honor.

12          THE COURT:  Any further questions of this witness?

13          MR. OHLEMEYER:  Nothing further.

14          THE COURT:  You may step down, thank you.  It's one

15   o'clock.  Ladies and gentlemen, we'll recess --  you may

16   step down.

17          We'll recess until 9:00 a.m. tomorrow morning.  And

18   I know I can count on you to do your very, very best to be

19   here at 9:00 a.m.  Remember my instructions.  Keep your

20   minds suspended.  Do not discuss this case either among

21   yourselves nor with anyone else.

22          You may stand in recess until 9:00 a.m. tomorrow

23   morning.  I'll remain on the bench.

24          THE CLERK:  11 rise for the jury.  And I'll collect

25   your notebooks as you go by me.

1          (Whereupon the jury left the courtroom.)

2          **THE COURT:**  Please be seated.  You can't talk

3     privately to me, but you're excused.

4          **THE WITNESS:**  I apologize.

5          **THE COURT:**  No apology is necessary.

6          All right.  Out of the total time, the six hours --

7     six days allotted the plaintiff, plaintiff has used up two

8     hours and 15 minutes; defense has used up one hour -- out of

9     their six days -- and 15 minutes.

10          Now, you people are doing fine in the sense that

11    you're a very quick study on trial in this Court and it's

12    comfortable presiding and I'm fascinated by the case.  I

13    know this is the first witness, but you're going much too

14    slow.  I'm slogging my way through these depositions.  And

15    if anyone thinks we're going a minute over twelve days

16    you're sadly mistaken.  So, you'd best be parsing this down.

17          My colleague, Judge Woodlock, has a great phrase

18    talking about lawyers' instinct for the capillaries.  I'm

19    very big on the instinct for the jugular.

20          We'll recess until 9:00 a.m. tomorrow morning.

21    We'll recess.

22          (Adjournment.)

23

24

25

1                    **C E R T I F I C A T E**

2

3

4          I, Donald E. Womack, Official Court Reporter for

5     the United States District Court for the District of

6     Massachusetts, do hereby certify that the foregoing pages

7     are a true and accurate transcription of my shorthand notes

8     taken in the aforementioned matter to the best of my skill

9     and ability.

10

11

12

13

14                 /S/ DONALD E. WOMACK 4-12-2010
                   _____
15                      DONALD E. WOMACK
                      Official Court Reporter
16                        P.O. Box 51062
                   Boston, Massachusetts 02205-1062
17                      womack@megatran.com

18

19

20

21

22

23

24

25