```
 1                UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
 2
                                    MDL Docket No. 1629
 3                                  Master File No. 04-10981

 4   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
                                                         *
 5   IN RE: NEURONTIN MARKETING                          *
           SALES PRACTICES AND                           *
 6         PRODUCTS LIABILITY LITIGATION                 *
     ---------------------------------------------*
 7                                                       *
     THIS DOCUMENT RELATES TO:                           *
 8                                                       *
     Shearer v. Pfizer Inc,  1:07-cv-11428-WGY           *
 9                                                       *
     *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

10

11                TRANSCRIPT OF THE EVIDENCE
                         (Volume 3)
12
                 BEFORE:  The Honorable William G. Young,
13                          District Judge, and a Jury

14
     APPEARANCES:
15
                  FINKELSTEIN & PARTNERS, LLP (By Ronald
16       Rosenkranz, Esq., Kenneth B. Fromson, and Keith L.
         Altman, Esq.), 1279 Route 300, P.O. Box 1111,
17       Newburgh, New York 12551
                  - and -
18            JACK W. LONDON and ASSOCIATES, P.C. (By
         Jack W. London, Esq.), 3701 Bee Cave Road, Suite
19       200, Austin, Texas 78746
                  - and -
20            THE LANIER LAW FIRM PLLC (By Kenneth S.
         Soh, Esq.), 6810 FM1960 West, Houston, Texas
21       77069, on behalf of the Plaintiffs

22

23
                                    1 Courthouse Way
24                                  Boston, Massachusetts

25                                  April 1, 2010
```

```
1                     A P P E A R A N C E S  (Cont'd)

2


3           BOIES, SCHILLER & FLEXNER LLP (By William
      S. Ohlemeyer, Esq.), 333 Main Street, Armonk, New
4     York 10504
                 - and -
5           GOODELL, DeVRIES, LEECH & DANN, LLP (By
      Bonnie J. Beavan, Esq.), One South Street, 20th
6     Floor, Baltimore, Maryland 21202
                 - and -
7               `SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
      (By Catherine B. Stevens, Esq. and Mark S. Cheffo,
8     Esq.), Four Times Square, New York, New York
      10036, on behalf of the Defendant
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                        **I N D E X**

2

3  **WITNESS:**            **DIRECT   CROSS    REDIRECT    RECROSS**

4

5  Martin Teicher, By Deposition

6                    19

7  Charles King, III

8    By Mr. London    41              146,
                                      151
9    By Mr. Ohlemeyer        114                    150,
                                                    154
10

11  Robert Glanzman, By Deposition

12                    155
                                      **FOR        IN**
13    **EXHIBITS:**                   **I.D.      EVID.**

14      2000 Guilty Plea  . . . . . . . . . . . . 5
        4289 Settlement Agreement . . . . . . . . 6
15      4290 Information  . . . . . . . . . . . . 6
        4292 E-Mail . . . . . . . . . . . . . . .14
16      4295 Memorandum . . . . . . . . . . . . .16
        5669 Plea Agreement . . . . . . . . . . .39
17      5672 Judgment . . . . . . . . . . . . . .40
        4533 Neurontin Northeast CBU 1997 . . . . .74
18      4864 E-Mail . . . . . . . . . . . . . . . 85
        4875 E-Mail . . . . . . . . . . . . . . . 85
19      4876 E-Mail . . . . . . . . . . . . . . . 85
        5768 Memorandum . . . . . . . . . . . . 104
20      2003 Neuropharmacological Review . . . . 155
        3410 Roles and Responsibilities . . . . . 155
21

22

23

24

25

1          THE CLERK:  All rise.  Court is in session, please

2    be seated.

3          THE COURT:  Good morning, counsel.

4          COUNSEL:  Good morning, your Honor.

5          THE COURT:  We're down a juror.  The juror's

6    called.  She's on her way.  We're calling back to find out

7    how close she is.  And in the interim Ms. Smith tells me

8    that you folks have an issue, so I came out to see if I

9    could help.

10         MR. FROMSON:  Your Honor, Kenneth Fromson, good

11   morning.  There are some documents that we would like to

12   move into evidence before the deposition of Marty Teicher,

13   as well as some documents that reflect the judgment and the

14   plea which we think set the foundation for today's

15   testimony, and that's what we have for you to discuss, which

16   we would have asked for a side bar while the jury was here.

17   So we appreciate your coming out this morning.

18         THE COURT:  Fine.  All right.  Well, let's -- and

19   they're in this folder?

20         MR. FROMSON:  Your Honor, they're in a binder that

21   was provided to the Court.

22         THE COURT:  Right.

23         MR. FROMSON:  And then I have the additional three

24   documents that are not in the binder because they were not

25   part of the deposition testimony.

1          **THE COURT:**  Let's, well, let's just see here.

2    AJ -- what I can do swiftly.  AJS is admitted.

3          **MS. STEVENS:**  Your Honor, we have some foundation

4    objections to --

5          **THE COURT:**  Well, you may.  Do you expect to have

6    an oral hearing on this document by document?  I can take

7    judicial notice of this.  This is -- these are records of

8    this particular Court, and the plea in this case I've

9    already ruled is relevant.  So once I've done that, what

10   remains?

11         **MS. STEVENS:**  There are several other documents

12   that --

13         **THE COURT:**  Well, I only said AJS.

14         **MS. STEVENS:**  Thank you, your Honor.

15         **THE COURT:**  Let's go step by step.  AJS is in.

16   What number?

17         **THE CLERK:**  Hold on.  I'll tell you.

18         **THE COURT:**  Okay.

19         **MR. ALTMAN:**  That should be 2000, your Honor.

20         **THE COURT:**  2000?

21         **MR. FROMSON:**  2000.

22         **THE COURT:**  2000.

23         (Exhibit marked in evidence.)

24         **THE COURT:**  ASV I'll skip for a moment.  ASW the

25   same.

```
1                    ASX.  ASX looks like the settlement agreement, and

2          I'm inclined to admit that.  It seems to be admissions and

3          they're relevant.  So, ASX --

4                    THE CLERK:  Is 4289.

5                    THE COURT:  -- is admitted 4289.

6                    (Exhibit marked in evidence.)

7                    THE COURT:  ASY.  I don't know what this is.  An

8          information.  This is the information to which they pleaded

9          guilty?

10                    MR. FROMSON:  Yes, your Honor.  And it's

11         specifically referenced in the testimony that you have

12         allowed.

13                    THE COURT:  All right.  No problem with that.  Then

14         ASY is admitted --

15                    THE CLERK:  4290.

16                    THE COURT:  -- 4290.

17                    (Exhibit marked in evidence.)

18                    THE COURT:  Then there's various other documents.

19         Okay.  So, those are -- that's the easy ones.

20                    Now, let's see where we're going here.  So, do you

21         want to go in order?

22                    MR. FROMSON:  Yes, your Honor, whatever is easier

23         for you, there are objections.

24                    THE COURT:  Whatever's easier for you.

25                    All right.  So the next that I must consider is
```

```
 1    ASV.  It's a letter of the Department of Health and Human
 2    Services addressed to someone in charge of regulatory
 3    affairs at Pfizer, and it's dated -- I don't see a date.
 4         MR. FROMSON:  Your Honor, on the last page of the
 5    document, which would be page 3 of 14, it's dated June 29th
 6    of 2001.  That is the electronic way in which the FDA
 7    submits their information to the defense.
 8         THE COURT:  And what's the basis for admitting
 9    this?
10         MR. FROMSON:  Your Honor, it's in fact a document
11    before the death of Mr. Shearer.  It's a warning letter
12    essentially from the FDA to the defendant during the Pfizer
13    era as opposed to Warner-Lambert, and it reflects their
14    potential off-label marketing or misleading promotion of
15    this drug Neurontin and sets into play their argument that
16    Pfizer does not engage in the practices that plaintiff
17    alleges.
18         THE COURT:  I've made an assumption here that no
19    one challenged when I made it.  I assumed that Pfizer, the
20    defendant here, is liable or picked up the liabilities of
21    Warner-Lambert.  Is that at issue?
22         MS. STEVENS:  It's not at issue, your Honor.
23         THE COURT:  Right.  All right.  So Pfizer's liable
24    for whatever Warner-Lambert did.
25         Now, one, you've made a number of jumps here.  I
```

1    don't know what a Slim Jim is.

2         **MR. FROMSON:**  Your Honor, the Slim Jim file was the

3    page on page 4 of 14 and that is essentially an

4    advertisement which is the basis for the warning letter.  I

5    would also respectfully remind the Court that it's my

6    understanding that the document here was utilized in the

7    deposition and the testimony was allowed and gives, gives --

8         **MS. STEVENS:**  Your Honor --

9         **THE COURT:**  Well --

10        **MS. STEVENS:**  Your Honor, it's --

11        **THE COURT:**  Yes, this is -- you haven't done a very

12   good job of laying a foundation for documents at depositions

13   since now all you want's the deposition.  But we'll try to

14   fairly work through here.

15        So you don't want this for the truth, let's start

16   out with that.  You don't want this for the truth.  You just

17   want, you say it's authentic and you say they received it

18   and this put them on notice that they were to discontinue

19   this promotional material.  But what does this promotional

20   material have to do with Mr. Shearer?

21        **MR. FROMSON:**  Well, your Honor, it's demonstrative

22   of the company's underlying campaign to promote the drug for

23   purposes it was not intended to be used by the FDA and that

24   it had benefits that were not, that were not acknowledged by

25   the FDA.  And this is also going to be discussed by Kip King

```
1    as a way in which physicians, like Dr. Hynes, who will
2    testify on Friday, have been influenced to prescribe the
3    drug.
4              MS. STEVENS:  Your Honor, we have two objections to
5    this document.  First is a relevance objection to
6    Mr. Fromson's argument that --
7              THE COURT:  I understand.  I understand the
8    relevance objection.
9              MS. STEVENS:  The second is a foundation objection.
10             THE COURT:  Yes.  Let's deal with that.
11             MS. STEVENS:  They show the document, they show the
12   document to the witness at the deposition testimony.  They
13   don't ask him what he knows about it, what his knowledge is
14   of it.  They just ask if he was at the company at the time.
15   There's no foundation that's laid through the deposition.
16             THE COURT:  But there's no doubt it's authentic?
17             MS. STEVENS:  There's no question of authenticity,
18   your Honor.
19             THE COURT:  All right, here's what we're going to
20   do.  I'm going to sustain their relevance objection.  But, I
21   know it's an authentic document, and the reason I'm
22   sustaining their relevance objection is I don't yet know
23   what it has to do with anything.
24             Now, the way you've chosen to try this case is to
25   start out with the proposition that Warner-Lambert/Pfizer,
```

1    they're bad, they're bad guys.  That's okay.  And you may

2    think that that's the powerful way to begin.  And the

3    reason, because Mr. Ohlemeyer has properly made his

4    objections here, the reason that I overruled them, because

5    we don't have any case specific, like case specific with

6    respect to Shearer, which is really a big issue in this

7    case, proximate cause, the reason I overruled your general

8    objection is, I'm sitting here looking at these depositions

9    and deciding, because you've given them to me, what to

10   admit.  And I see that there's competent evidence that

11   92 percent of the time, back in '96, this drug is being

12   prescribed, perhaps lawfully by doctors, but 92 percent of

13   the time it's being prescribed by doctors off-label.  And I

14   also know I got a guilty plea here to Pfizer's involvement

15   in all that.  And that under Massachusetts law is evidence

16   of negligence.  So that's enough for relevance.

17          When I couple that with some deposition testimony

18   from someone else which says in 2001 or 2002, 89 percent of

19   the prescriptions are off-label.  One of the things were I

20   the fact finder that I would be looking for here is if

21   Pfizer pleads guilty to crimes which took place prior to the

22   prescription of Neurontin to Shearer is the internal

23   corrections that Pfizer made.

24          I had the Tap Pharmaceutical case.  And part of the

25   plea agreement there was this extraordinary internal cleanup

```
 1    in the corporation which the Probation Department was

 2    supposed to oversee.  It wasn't just pay all these millions

 3    of dollars and go on.  I haven't heard anything about that,

 4    though that, too, will be relevant since the prescription of

 5    this drug is in 2000.  And candidly, they would have struck

 6    out on the relevance business were it not for the deposition

 7    testimony which seemed to me to make sense of

 8    post-prescription 89 percent of this stuff is off label.  So

 9    the impression I'm left with as a neutral fact finder, I'm

10    not the fact finder, but I have to make preliminary findings

11    of fact to decide what's relevant is, I'm not so sure you

12    people cleaned up your act.  And not knowing that, and the

13    standard of relevance is low, they're getting it all in.

14              I worry -- again, it's for you people to try your

15    case.  I'm just fascinated.  Pretty soon now I think those

16    people are going to want to hear about Shearer.

17              MR. FROMSON:  May I comment, your Honor?

18              THE COURT:  Sure.

19              MR. FROMSON:  Yes, I think they will hear about Mr.

20    Shearer as well as from his prescriber.

21              May I make one inquiry based on something you've

22    referenced very quickly.

23              THE COURT:  Sure.

24              MR. FROMSON:  You raise, your raise a very good

25    point, you are looking to see if the Pfizer people did
```

```
 1   something bad in the Pfizer era, and I was under the

 2   impression that this warning letter from the FDA to Pfizer

 3   during the Pfizer era saying they're being misleading would

 4   be evidence of that.

 5          THE COURT:  Well, but there's no tie-in to anything

 6   here.  This -- when I exclude it it's without prejudice.

 7          MR. FROMSON:  Okay.  Because it deals with

 8   Neurontin and it deals with what we're talking about.

 9          THE COURT:  Yes, but just deals with Neurontin --

10          MR. FROMSON:  All right.

11          THE COURT:  -- doesn't seem to be enough.  I'm

12   beginning to look for some more specificity.  Maybe when I

13   hear more Shearer I'll understand that.  You've got a big --

14   a big concession.  I expect them to be utterly candid with

15   the Court, and I have no reason to think they're not.

16   They'll admit it's authentic.  They got it on or about the

17   time that it sets, sets forth there, and at least for the

18   fact that it was received and put them on notice, fine.  I

19   don't yet see the relevance to our man here.  So that's out

20   without prejudice.

21          MR. FROMSON:  I would lastly simply say, your

22   Honor, that the last page says it's safe and it doesn't

23   mention suicidal behavior at all.

24          THE COURT:  Yes.

25          MR. FROMSON:  And I appreciate the ruling.
```

1          THE COURT:  I understand.  That's my ruling for

2     now.

3          MR. FROMSON:  Thank you, your Honor.

4          THE COURT:  Okay.  ASW.  Now, what's it?  This?

5     This is another letter.

6          MR. FROMSON:  Your Honor, this is similarly a

7     warning letter to the Pfizer company in the Pfizer era in

8     this case from the FDA in July of '02 which again would

9     reflect they're not cleaning up their act.

10         THE COURT:  I'm assuming the same framework.  It's

11    authentic.

12         MS. STEVENS:  And foundation, your Honor.  I don't

13    think he's asked questions about this.

14         THE COURT:  Sustained for now.  Once we learn a

15    little more about Mr. Shearer we may come back to this and

16    let it all in.

17         Okay, then I jump up to ATA.  This is an admission

18    by Pfizer.  I'm assuming it's authentic.  So, ATA is some --

19         MR. FROMSON:  We're on ATA, your Honor?

20         THE COURT:  Yes, ATA.  Yes, why shouldn't I admit

21    ATA?

22         MS. STEVENS:  Your Honor, ATA is about a Project

23    Hallelujah.

24         THE COURT:  Yes, indeed it is.

25         MS. STEVENS:  Which deals with an over-the-counter,

```
 1    frankly, an over-the-counter indication for sleep.  It's not

 2    relevant to Mr. Shearer.

 3              THE COURT:  No.  You've seen when you come to the

 4    deposition I've been letting in Hallelujah Team.  And I'm

 5    letting it in here.  So ATA is admitted Exhibit 4292.

 6              (Exhibit marked in evidence.)

 7              THE COURT:  ATB.  Now, this I don't know -- well,

 8    it says Pfizer.  Well, that may be a Bates number.

 9              MS. STEVENS:  Your Honor, this is another Project

10    Hallelujah document, but this one postdates the death of

11    Mr. Shearer.  It's in March of 2003.  So we object on the

12    grounds of relevance of what it has to do with this case.

13              THE COURT:  I think, I think -- that sounds

14    persuasive to me.

15              MR. FROMSON:  I would, your Honor, I would comment

16    that this is a document that's tied directly to the witness

17    in conjunction with his participation on the Hallelujah

18    Team.  I believe there was testimony as to him signing off

19    on information with respect to the Hallelujah Team.  So his

20    name is on page 7 of 7.

21              THE COURT:  Yes.  And I, and I let that testimony

22    in, didn't I?

23              MR. FROMSON:  Yes, your Honor.

24              THE COURT:  It's one of the problems in a sprawling

25    case such as this.  I'm not so sure that was right in
```

1    retrospect.

2           MR. FROMSON:  He did originally deny it.

3           THE COURT:  What?

4           MR. FROMSON:  I thought he originally denied he had

5    no knowledge of the market, so it also goes to impeach him.

6           THE COURT:  Well, yes, but the impeachment is in

7    what I -- I'm not saying I'm taking back the

8    cross-examination.  ATA is excluded.

9           ATB.

10          MR. FROMSON:  ATB.  ATB is --

11          THE COURT:  This is 1997.  And this is minutes of a

12   Neurontin Development Team.  It looks like it's an

13   admission.  Why is it relevant?

14          MR. FROMSON:  Your Honor, it's relevant in the

15   first part because it pertains to the neuropathic pain

16   studies that we're going to argue were ultimately suppressed

17   or put forth inaccurate information about Neurontin.

18   Neuropathic pain is referenced on page 404, so it will tie

19   to Mr. Shearer who ultimately was prescribed the drug for

20   neuropathic pain.

21          THE COURT:  All right.  I'm inclined to -- bring

22   the jury in.

23          MS. STEVENS:  Your Honor, our objection is to the

24   foundation.  The witness is talking about this document as a

25   lawyer for the company who signed the plea, who knew nothing

```
1    about it and --

2              THE COURT:  Fine.  You put him up.  It's admitted

3    4295.  We'll get going.

4              (Exhibit marked in evidence.)

5              MR. ALTMAN:  Your Honor, there's one more exhibit.

6              THE COURT:  There may be.

7              MR. FROMSON:  Okay.

8              THE COURT:  We've got the jury here.

9              MR. FROMSON:  Yes, your Honor.  Thank you.

10             THE CLERK:  All rise for the jury.

11             (Whereupon the jury entered the courtroom at 9:20

12   a.m.)

13             THE CLERK:  Court is in session, please be seated.

14             THE COURT:  Good morning, ladies and gentlemen.

15             THE JURY:  Good morning.

16             THE COURT:  Thank you so much -- I don't say this

17   by rote -- thank you so much for all your efforts to be here

18   on time.  I know there are roads closed everywhere this

19   morning.  We really do depend upon it.  It is a jury of

20   twelve.  We don't say okay, now the twelfth person comes in

21   and you folks tell him or her what happened.  You all have

22   to actually see and hear all the evidence, and we really do

23   appreciate your efforts.

24             We're all ready to go, and the next witness may be

25   called.
```

```
1              MR. FROMSON:  Your Honor, we're going to play a

2    video.

3              THE COURT:  All right.  Now, let me explain.

4    Reference was made to this in the opening to a deposition.

5    One of the ways you get ready for a trial is to take

6    depositions of people to find out what they know about

7    whatever.  Now, a deposition is a formal proceeding but it's

8    not in court.  It usually takes place in a lawyer's office.

9    There's a stenographer, much, much like our official court

10   reporter.  The stenographer swears the witness to tell the

11   truth, and then both sides get a chance to ask questions,

12   and it's typed up into, here's an example of a deposition

13   that I'm going over now.  So then it's typed up and then if

14   objections are made, I have to decide what's admissible in

15   evidence and what's not.  And I'm doing that as we go along

16   so that the trial will go smoothly.

17             So, now they want to play a deposition.  And many

18   times the lawyers anticipating they won't be able to bring

19   the witness before the Court, because the power of subpoena,

20   my power to issue orders to people to come in doesn't extend

21   very far beyond the boundaries of this district, which is

22   Massachusetts, and people may come from lots of different

23   places.  So you take a videotape deposition.  And now

24   they're going to play one.

25             Now, they're only going to play the parts that
```

```
 1    after our discussion and my looking it over they want to put

 2    before you.  So, it may be a little jerky.  Don't think

 3    anyone's hiding anything from you.  What they're trying to

 4    do is shorten it down.  And it's just like the witness

 5    testifying, but we're not going to hear from the lawyers,

 6    because we've taken care of all that ahead of time.  So

 7    we're just going to sit here, a position is going to be

 8    played, we're going to hear a witness testify to something.

 9    Like any other witness -- now, that's, that's just as good

10    as the witness being on the stand, theoretically.  It's just

11    as good.  Just as powerful, just as persuasive.  And also,

12    you don't have to believe it.  Just like you don't have to

13    believe what a witness testifies to on the stand.  That's up

14    to you.  You decide what you believe when any witness

15    testifies.  And I'm telling you you can believe it all, you

16    can disbelieve it and disregard it as though the witness

17    never testified, or you can believe parts and disbelieve

18    other parts.

19          Now, I'm telling you keep your minds suspended

20    because in making that judgment, and that's a basic judgment

21    for the jury, you want to hear all the witnesses so you

22    decide what you believe.

23          The deposition may be played.

24          MR. FROMSON:  Thank you, your Honor.

25          THE CLERK:  Wait, I have to turn the jurors --
```

```
 1              MR. FROMSON:  There's one exhibit, BCK, we would

 2    offer into evidence, your Honor, to which there's been an

 3    objection.

 4              THE COURT:  All right.  It's excluded.

 5              MR. FROMSON:  Thank you, your Honor.

 6              THE COURT:  Let's proceed.

 7              MARTIN TEICHER, By Deposition

 8    Q   Let's start all over again so we can have a clean run at

 9    this, please.  You are Martin Teicher?

10    A   Yes.

11    Q   You are a lawyer, aren't you?

12    A   I am.

13    Q   You went to law school, right?

14    A   I did.

15    Q   You got a degree.

16    A   Yes.

17    Q   You passed a bar exam, that test that they give to make

18    sure that you can practice law; right?

19    A   I did.

20    Q   And you are a practicing lawyer, you do lawyer work day

21    in, day out, don't you?

22    A   I do.

23    Q   But you don't practice in a law firm, you actually work

24    for a company, don't you?

25    A   Correct.
```

1    Q    You work for a company called Pfizer; right?

2    A    Correct.

3    Q    Now, Pfizer has got a bunch of lawyers, I'm assuming.

4    More than you; right?

5    A    Yes.

6    Q    You have one job title at least, I think if I read it

7    right, you are a general counsel for Pfizer Consumer

8    Products, is that right?

9    A    Pfizer Consumer Health Care.

10   Q    Pfizer Consumer Health Care.  By general counsel, that

11   means you are the top lawyer for that outfit, aren't you?

12   A    Yes.

13   Q    You even have another job title, you're a vice

14   president, aren't you?

15   A    I'm a vice president of the legal division.

16   Q    Of Pfizer?

17   A    Of the legal division.

18   Q    Of Pfizer, the legal division of Pfizer; right?

19   A    Yes.

20   Q    Now, Pfizer's got a subsidiary called Warner Lambert, am

21   I correct?

22   A    Yes.

23   Q    Warner Lambert is a subsidiary of Pfizer and has been I

24   guess since at least June of 2000, right?

25   A    Correct.

1    Q    You know what Neurontin is; right?

2    A    I know that it's a prescription drug.

3    Q    Well, you know more than that about it. You know that

4    you all make it and sell it; right?

5    A    Yes.

6    Q    And you know that it's got the name gabapentin as a

7    chemical name for it; right?

8    A    Correct.

9    Q    You know that this is not only a Pfizer drug now, but

10   this has been made by either Pfizer or Warner Lambert or

11   Parke Davis ever since it got its approval; right?

12   A    I believe so, yes.

13   Q    That's not the first oath you have ever taken on

14   Neurontin, isn't it?

15   A    No, it's not.

16   Q    You took an oath in front of a judge when you took a

17   criminal plea on that; didn't you?

18   A    Yes. I was sworn in at that time.

19   Q    Well, I'm assuming when that judge asked you whether or

20   not certain things were true and you said that they were

21   true, that you were telling the truth, weren't you?

22   A    I was telling the truth.

23   Q    Well, the plea that you entered on behalf of the company

24   admitted that you sold the drug illegally?

25   A    It made an admission that certain conduct that we

1    engaged in was illegal.  There was no intent involved in the

2    violations that we pleaded to.

3    **Q**   Okay.  Well, at least you will recognize that you all

4    pleaded guilty to selling a drug, Neurontin, for unapproved

5    uses without FDA approval; right?

6    A   It was, it was a plea to a misdemeanor charge of

7    distributing an unapproved drug. There was no intents

8    involved in that offense.

9    **Q**   Well, sir, the government didn't have to prove intent,

10   that's different than saying there wasn't actually, there

11   was no finding of no intent, intent wasn't an issue in your

12   plea bargain; right?

13   A   Intent wasn't part of the plea that the company made.

14   **Q**   Yes, that is my point. This was a plea bargain, this was

15   not you went to trial and you were convicted. You all agreed

16   to plead guilty to these offenses to avoid the trial, didn't

17   you?

18   A   This was a negotiated plea.

19   **Q**   Your statement here is, "Warner Lambert acknowledges the

20   facts stated by the U.S. Attorney to the extent it's set

21   forth in the information, your Honor"?

22   A   I said I acknowledged the facts stated by the U.S.

23   Attorney to the extent set forth in the information, not

24   everything he said.

25   **Q**   Well, you were asked by the judge the question on line

18, "Does Warner Lambert agree that the recitation is
factually accurate and the responsibilities the prosecutors
pointed to which lead to the suggestion are actually an
inference of a felony nature of guilt in this matter are
accurately stated?" That was the question.

A    And I answered the judge by saying that I acknowledged
the facts to the extent set forth in the information.

Q    Were you playing word games with the judge?

A    No, I was telling him exactly what Warner Lambert agreed
to.

Q    Were you saying that you don't agree to the facts that
were recited here?  In other words -- let me ask you this
the judge said, "Does Warner Lambert agree that that
recitation, these pages that we are about to go through is
factually accurate."

A    I agreed that they were factually accurate to the extent
that Warner Lambert was prepared to admit to them, which was
to the extent that they were set forth in the information.

Q    Well, on page 21, it, the factual recitation that you
agreed to says, "In or about 1993, Warner Lambert submitted
a new drug application for approval of a drug that was
eventually called Neurontin."  Now, you agreed to that,
didn't you?

A    I agreed to what was in the information.

Q    He's reading from the information, sir.

1   A    If that's a quote, and it's in the information, then

2   that's something that Warner Lambert admitted to. If have no

3   personal knowledge of these facts.

4   Q    Well, when you took an oath, you swore this was true?

5   A    I swore that Warner Lambert acknowledged the facts as

6   set forth in the information.

7   Q    Sir, I'm going to hand you Exhibit 7. It's the

8   information. You agree all of this stuff is factually true,

9   didn't you?

10  A    Warner Lambert did, yes.

11  Q    And you made that agreement on behalf of Warner Lambert,

12  you individually are the one who represented it was true;

13  right?

14  A    I was authorized by the company to agree to that.

15  Q    If you will look at page four, paragraph eight, in or

16  about 1993, Warner Lambert submitted an NDA for approval of

17  a drug called Neurontin.  There it is, isn't it?

18  A    Yes. That's what it says.

19  Q    And that's what you agreed was factually accurate on

20  behalf of your company, right?

21  A    Yes.

22  Q    You also agreed it was factually accurate that on or

23  about December 30th the FDA approved Neurontin for a

24  specific use only, right?

25  A    Can you show me that?

1    **Q**   Yes, sir. It's in that middle of that paragraph, "On or

2    about December 30th, 1993, FDA approved Neurontin for that

3    specific use only." Do you see that?

4    A    That's what it says.

5    **Q**   We go to the sentence before to see the specific use,

6    the specific use you got approval for in December 1993, and

7    that was adjunctive therapy in the treatment of partial

8    seizures in adults with epilepsy.

9         Do you see that?

10   A    That's what it says.

11   **Q**   Well, Mr. Teicher, you took an oath before God and a

12   federal judge to tell the truth and to tell the whole truth,

13   and you told that judge that Warner Lambert accepted the

14   accuracy of these facts in this information were true?

15   A    I told them they -- I told the judge and I swore that

16   Warner Lambert accepted the accuracy of these facts.

17   **Q**   Let me ask it to you this way, sir.  Warner Lambert

18   accepts the accuracy of the facts that there were unapproved

19   uses for Neurontin in '95 to '96, isn't that true?

20   A    I don't know that that's an exact quote from the

21   information, but that is the gist of it.

22   **Q**   Warner Lambert accepted as true, admitted, if you will,

23   that while these unapproved -- I'm on paragraph ten of page

24   five -- that Warner Lambert never filed a new NDA to get FDA

25   approval for these unapproved uses, right?

1    A    That's what it says in paragraph ten.

2    Q    And that's what you admitted was factually accurate on

3    behalf of the company, right?

4    A    Yes.

5    Q    And you also admitted on behalf of the company it was

6    factually accurate, paragraph 11, that Warner Lambert

7    actually evaluated the market potential for these unapproved

8    uses; right?

9    A    Yes.

10   Q    And you admitted on behalf of the company that Warner

11   Lambert, paragraph 12, even created a planning document

12   regarding Neurontin, which talked about using Neurontin with

13   pain; right?

14   A    Well, you are not reading the exact language of

15   paragraph 12, but yes.

16   Q    That is the gist of it?

17   A    That's what I was admitting on behalf of Warner Lambert

18   Company.

19   Q    If you look at paragraph 15, you admitted that, "In

20   April and May of '95, Warner Lambert actually performed a

21   marketing assessment of proposed psychiatric indications for

22   Neurontin." Do you see that?

23   A    Yes, you have read it accurately.

24   Q    That's what you admitted, isn't it?

25   A    Yes.

1   Q   Do you know the difference between doing something with

2   FDA approval and doing it without?

3   A   Yes.

4   Q   There is a difference, isn't there?

5   A   Yes.

6   Q   Big difference, one is illegal, it's a crime; right?

7   A   I'm not prepared to give legal advice on that.

8   Q   Didn't know it's illegal to sell a drug without FDA

9   approval?

10  A   It is illegal to sell a drug without FDA approval.

11  Q   You know that your company will put out publications,

12  sponsor publications, urge peer-to-peer interactions, do a

13  number of different things, see that doctors sell drugs for

14  unapproved uses?  Right?

15  A   The company doesn't set out to do that, to my knowledge.

16  Q   You said your company wouldn't do that?

17  A   The company wouldn't do anything illegal.

18  Q   You were around Pfizer when you got those letters I

19  showed you where the FDA is writing you showing you were

20  violating the acts?  Do you see those letters?

21  A   I saw those.

22  Q   Were you around in the 2000s?

23  A   Yes. In the, yes, I was around in.

24  Q   If you look at Exhibits 3 and 4, yeah, there's one, does

25  that have a date on it?

1   A   Not that I can see, no.

2   Q   Go to the last page of the letter.  It's page three, I

3   believe, will have a date on it at the top?

4   A   June 29th, 2001.

5   Q   You were there then, weren't you?

6   A   On June 29, 2001 I was in the consumer health care

7   division.

8   Q   Of Pfizer?

9   A   Of Pfizer.

10  Q   So you were at the company in June of 2001, weren't you?

11  A   Yes, I was.

12  Q   Now go to the front page. You see where it says you all

13  are violating the acts?

14  A   Yes.

15  Q   All right. So when you said the company wouldn't violate

16  it, you were wrong?  Weren't you?

17  A   That's what the FDA said.

18  Q   And while we are on the subject of the truth, let's go

19  back to what you all were pleading guilty to on the criminal

20  conduct as a repeat offender.  Do you have page six of the

21  information in front of you?

22  A   Yes.

23  Q   Paragraph 17, you admitted to the federal judge and in

24  the court that one of the principal factors Warner Lambert

25  considered in determining whether to seek approval for

```
1    Neurontin for other uses was the short patent protection

2    available for Neurontin.  That is something you admitted,

3    didn't you?

4    A    Something Warner Lambert admitted.

5    Q    You made the admission on behalf of Warner Lambert,

6    didn't you?

7    A    I was so authorized, yes.

8    Q    You made the admission on behalf of Warner Lambert that

9    another factor was the negative impact this approval might

10   generate on potential sales of another drug that Warner

11   Lambert had been developing.  Do you remember making that

12   admission?

13   A    That's what it says here, yes.

14   Q    Do you know what drug that was?

15   A    I believe it was Pregabalin.

16   Q    I thought I asked you if had been on the board of Warner

17   Lambert, and you said --

18   A    No, sir. I did say no, and I was not on the board.

19   Q    Just -- it's in your right hand. Why did you tell the

20   judge you were on the board if you weren't?

21   A    What page is that?

22   Q    Page six, line six, Mr. Teicher, quote, "I am on the

23   board of directors of Warner Lambert."

24   A    I believe that is a transcription error.

25   Q    That's the court reporter, you think you would have
```

1    said, "I am not on the board"?

2    A    I don't know what the answer to, what the answer was at

3    that point, but on the date I appeared in court, on June 7th

4    of 2004, I knew that I was a vice president of Warner

5    Lambert Company. I also knew that I was not a member of the

6    board of directors and I don't believe I actually said those

7    words. I think the court reporter made an error.

8    Q    By the way, you all aren't supposed to be trying to kick

9    anybody's tail on selling products off-label, are you?  11

10   You are not supposed be doing that?  Are you?

11   A    We are not supposed to be selling products off-label.

12   Q    What you all would do according to paragraph 26, which

13   you also admitted to, is you would pay for these doctors,

14   their accommodation for their meals for themselves and their

15   spouse or guests and you would give them an honorarium to

16   show up, didn't you?

17   A    That's what it says in paragraph 26.

18   Q    And this wonderful treat that you all would give --

19   wouldn't you agree, that's a wonderful treat, to have kind

20   of an all-expense paid vacation to Florida for a few days

21   for somebody and their spouse, that's a treat, isn't it?

22   A    Some people like to go to Florida, some people don't.

23   Q    Well, that treat went to doctors based upon whether they

24   wrote a large number of prescriptions for Neurontin, didn't

25   it?

1    A    Where are you reading from?

2    Q    Paragraph 26, "Warner Lambert invited certain doctors to

3    this meeting based upon their history of writing a large

4    number of prescriptions for Neurontin or similar drugs"?

5    A    That's what it says.

6    Q    And it was, this event where there were presentations

7    about using Neurontin for unapproved uses, right?

8    A    Where are you reading from?

9    Q    Paragraph 27, "Among the presentations made to the

10   physicians in attendance was one relating to unapproved uses

11   entitled reduction of the pain symptoms during treatment be

12   Neurontin, Gabapentin." Right?

13   A    That's what it says.

14   Q    No, I'm not. It says, "Paid all the expenses for 18

15   consultants and their spouses to attend the Olympics,

16   including tickets to the closing ceremony." That's what it

17   says, doesn't it?

18   A    That's an accurate excerpt from paragraph 31.

19   Q    You all used teleconference, also the telephone to

20   promote off-label your drug, didn't you?

21   A    That's what the heading on page 11 says.

22   Q    Does a reasonably prudent company do these misdemeanor

23   crimes?

24   A    A reasonable company tries to avoid doing the things

25   that Warner Lambert Company pleaded guilty to.

1    **Q**    Okay. And you keep calling them misdemeanors like they

2    were just small things, these weren't small things, they

3    were very important and very major, wasn't it?

4    A    These, obviously they resulted in a plea to a criminal

5    violation.

6    **Q**    Two criminal violations?

7    A    Two criminal violations, that's correct. Obviously they

8    were of consequence.

9    **Q**    You have acted like you don't know anything about

10   Neurontin and its marketing?

11   A    I know nothing about Neurontin and its marketing.

12   **Q**    You do, too, you were on the Hallelujah team?

13   A    I worked on the Hallelujah team, that's true.

14   **Q**    And the Hallelujah team is Neurontin?

15   A    Right, but that happened after 2000.

16   **Q**    Sir, you have been telling this jury, you have been

17   telling this judge -- when were you in front of the judge?

18   A    2004.

19   **Q**    Okay. That you knew nothing about Neurontin, and that's

20   a lie because the truth is you were on the Hallelujah team

21   dealing with Neurontin, weren't you?

22   A    I didn't say to the judge or to you that I knew nothing

23   about Neurontin. I said to the judge and to you that I knew

24   nothing about the facts in the criminal case.

25   **Q**    Quote, "I know nothing about Neurontin and its

1    marketing." That's what you just said before I told you you

2    were on the Hallelujah team, that's what you just said

3    totally --

4    A    I said that in the context.

5    Q    I said to you, you have acted like you don't know

6    anything at all about Neurontin and its marketing. You said

7    I know nothing about Neurontin and its marketing.  You do,

8    too?

9    A    I know.

10   Q    Sir, 2001, you were recommended to go on the Hallelujah

11   team, weren't you?

12   A    I was on the team at some point.

13   Q    Well, 2001, which is when they first recommended you. If

14   you look at the third page of Exhibit Number 10 that I have

15   just given you, the following colleagues were recommended

16   for this team, Marty Teicher, I'm assuming that that's you,

17   Martin Teicher; right?

18   A    Yes.

19   Q    And if you look at some of the documents of the

20   Hallelujah team, let me hand you for example, document

21   Number 11, Exhibit 11, this is a development request for the

22   Hallelujah team, right?  See, "Project name, Hallelujah."

23        Do you see that?  It's at the very top, sir.

24   A    Yes.

25   Q    Okay. If you go down on the front page to, "Project

1    Rationale," do you see that?

2    A    Um-hum.

3    Q    It says, "Neurontin's patent protection is under attack

4    by several generic competitors in the U.S. and is off patent

5    in most markets globally."  Do you see where it says that?

6    A    I see.

7    Q    When you were talking earlier, you said I don't know

8    anything about Neurontin and its patents, and I don't know

9    anything about the patent running out.  Sir, you are on the

10   Hallelujah team, aren't you?

11          The Hallelujah project, excuse me.  Sir, you were

12   on the Hallelujah project, weren't you?

13   A    You have asked me that, yes.

14   Q    And the Hallelujah project dealt with Neurontin, its

15   marketing, and the patent protection, didn't it?

16   A    The project related to a potential off --

17   over-the-counter, over-the-counter --

18   Q    Off-label, that's what it was, sleep use?

19   A    No, it was over-the-counter indication that would have

20   involved the switching of the drug from prescription to an

21   over-the-counter drug.

22   Q    Sir, we have got you on video. You started to say

23   off-label, didn't you, you got the word "off" out, and then

24   you backed away, didn't you?

25   A    Because I was misspeaking.

1   Q   Well, sir, you don't have approval for insomnia use for

2   Neurontin here in the U.S., do you?

3   A   No.

4   Q   And yet that's what was writing about here, sleep

5   difficulties.  A separate use of Neurontin for occasional

6   sleep difficulties has been proposed. That's what it is

7   looking at, isn't it?

8   A   Yes.

9   Q   And that would be an off-label use right now in the

10  U.S., wouldn't it?

11  A   If we were marketing it for that purpose.

12  Q   That's one of the things your Hallelujah project -- by

13  the way, this Exhibit 11 I have shown you, this is not your

14  first time seeing it, is it?

15  A   I probably saw this a long time ago.

16  Q   Not only saw it, sir, you have signed off on it?

17  A   Yes, I probably did.

18  Q   I mean, you can go the back, and you can see this

19  document has been reviewed and approved by?

20  A   Yes.

21  Q   Marty Teicher, you approved the contents of this, didn't

22  you?

23  A   No, I signed off because at the time I was head

24  regulatory lawyer for the consumer health care division and

25  I was signing off on the regulatory parts of it, and I read

1    the whole document though.

2    Q    You approved the contents. Do you see where it says

3    Marty Teicher, content, yes or no, you put yes?

4    A    Right. But each person here is signing off on particular

5    parts of this agreement, this document. I did read the

6    entire thing and I was familiar with the project.

7    Q    So let's be real clear here. When we are talking about

8    Neurontin, you know what the drug is, you know what the

9    label usages are, you have looked at it, you are on the

10   Hallelujah project, dealing with it, trying to consider

11   where you might market the drug, where you might not market

12   the drug, what you might market it for, what you might not

13   market it for. All of that is stuff you have personal

14   knowledge of, in spite of what you have told us, true?

15   A    The purpose of this project in 2003, when this document

16   is dated, was to develop a plan to seek FDA approval for --

17   to evaluate whether we should develop a plan that would lead

18   to seeking FDA approval to marketing Neurontin as an

19   over-the-counter drug for some kind of sleep indication.

20   Q    Yet, sir, in the process of this, in your approval, and

21   you being the Hallelujah project, do we, are we expected to

22   believe that you have absolutely no awareness of what the

23   drug is and how it works?

24        That's what you told me earlier?

25   A    I didn't familiarize myself with the approved

1    prescription indications for this drug.

2    Q   Do you have Exhibit 13 in front of you?

3    A   I do now.

4    Q   It's another confidential document of your company,

5    isn't it?  It says confidential in the top right-hand

6    corner, do you see that?

7    A   That's what it says.

8    Q   Dated May 1997.  Do you see the date on it?

9    A   Yes.

10   Q   If you look to the back, the last page, under

11   development strategy for pain relief, do you see that,

12   Section V, Roman Numeral V, "Development strategy,

13   neuropathic pain study"?

14   A   Yes.

15   Q   It says, "The merits and limitations of filing versus

16   publication strategies for the pain indication was discussed

17   at these meetings." Do you see where it says that?

18   A   I do.

19   Q   And you understand that you could file to try and get

20   approval for off-label uses of a drug. You all can do that,

21   can't you, that's common knowledge?

22   A   Yes.

23   Q   Or instead of filing to get approval -- by the way, when

24   you do that, you have got to show by test results that it

25   works, and that harms have been fully investigated, don't

1   you?

2   A    You have to support the application with evidence of

3   safety and effectiveness.

4   Q    So, when your company did it, it seems to have looked at

5   the merits and limitations of filing to get an approval or

6   just publishing about what might work, publication

7   strategies, do you see that?

8   A    Well, the sentence says that that was discussed.

9   Q    And then the next sentence says, "Management is

10  reluctant to file gabapentin Neurontin for the pain

11  indication because of," what are those two words?

12  A    Commercial factors.

13  Q    "Commercial factors." That's money, isn't it?  That's

14  money, isn't it?

15  A    Commercial factors involve money, not necessarily --

16  yeah.

17  Q    I mean, we are not talking about TV commercials here,

18  are we?

19  A    No.

20  Q    So your company knew, Pfizer knew, in 2002, that what's

21  driving the use of Neurontin in the United States of America

22  is psychiatry and pain, not its approved use of epilepsy,

23  right?

24  A    That's what it says at the top of this page, it says

25  psychiatry and pain are driving the increased use of

```
 1   Neurontin in the U.S.

 2

 3            MR. FROMSON:  Your Honor, I believe that's

 4   obviously the end of the video.

 5            THE COURT:  Very well.  All right, call your next

 6   witness.

 7            MR. FROMSON:  Before we call our next witness, your

 8   Honor, we would like to offer into evidence three

 9   documents --

10            THE COURT:  Go ahead.

11            MR. FROMSON:  -- to which there are objections.

12            THE COURT:  There are no objections?

13            MR. FROMSON:  There are objections.  BIB.

14            THE COURT:  Do I have them in the folder?

15            MR. FROMSON:  Your Honor, they are in the exhibits

16   and I can present them to you.

17            THE COURT:  Why don't you.

18            MR. FROMSON:  They're not in the folder because

19   they weren't part of the deposition.

20            This is BIB.  This is BIE.  This is AJU.  Those are

21   the three.  I'll give a copy to defense counsel, your Honor.

22            THE COURT:  Yes.  BIB is admitted Exhibit 5669.

23            (Exhibit marked in evidence.)

24            THE COURT:  BIU -- is that what you said -- is

25   admitted Exhibit 5672.
```

```
 1              (Exhibit marked in evidence.)

 2         MR. FROMSON:  BIE and BIB, AJU.

 3         THE COURT:  AJU is admitted Exhibit 5672.  And the

 4    third document is what?

 5         MR. FROMSON:  It's BIB, BIE and AJU.  You have

 6    Exhibit 9?  This one, your Honor?

 7         THE COURT:  Yes, 9.  Nine is excluded.

 8         MR. FROMSON:  Okay, that's AJU.

 9         THE COURT:  AJU is excluded; the other two are

10    admitted.

11         Call your next witness.

12         MR. LONDON:  We would like to call Dr. Charles

13    King, please.

14         THE COURT:  He may be called.

15         MR. LONDON:  Dr. King.

16         THE CLERK:  Please raise your right hand.

17         Do you solemnly swear that the answers you will

18    give to this Court and Jury will be the truth, the whole

19    truth, and nothing but the truth, so help you God?

20         THE WITNESS:  I do.

21         THE CLERK:  Please be seated.

22                   CHARLES KING, III

23              DIRECT EXAMINATION

24    BY  MR. LONDON

25    Q   Would you state your name for the Court and for the
```

1    Jury, please?

2    A    My name is Charles King, III.

3    **Q**    And who are you, Dr. King?

4    A    I'm an economist.

5         **THE COURT:**  Pull -- excuse me, sir.  You were

6    answering and of course you may finish.  But pull that mic a

7    little closer to you.

8         **THE WITNESS:**  Is that better?

9         **THE COURT:**  Yes.  Thank you.

10        **THE WITNESS:**  Okay.

11   A    My name is Charles King, III.  I'm an economist, and I'm

12   a marketing expert, and I'm here to talk about the off-label

13   promotion of Neurontin.

14   **Q**    All right, sir.  If you would, just please give the jury

15   the benefit of some of your background, training and

16   education that prepares you to be in a position to testify

17   to the jury about the off-label marketing and promotion of

18   Neurontin?

19   A    Yes.  Well, to begin with, I graduated from college,

20   Harvard University.  I have a Ph.D. in economics from MIT.

21   And for six years I taught at the Harvard Business School

22   where I studied aspects of pharmaceutical marketing.  I

23   taught in the Executive Education Program for pharmaceutical

24   companies, and I taught marketing and economics to both the

25   Master's of Business Administration students and the Ph.D.

1    students.  I've also done academic research on

2    pharmaceutical issues, public health issues, marketing

3    issues.

4         I've written a case at the Harvard Business School,

5    a case study on pharmaceutical promotion.  And as a

6    consultant at Greylock McKinnon, I have done a number of,

7    I've been involved in a number of cases that involve drugs

8    and aspects of marketing.

9    Q   What particular other drugs besides Neurontin have you

10   in the past had an occasion to perform expert studies on?

11   A   Well, I've looked, in an academic context I've looked at

12   pepcid acids, Zantac and Tagamet.  These are anti-ulcer

13   drugs that are now used for heartburn and upset stomach.

14        I've worked in a case, a legal case involving a

15   prescription drug Relafen.  I've worked on cases involving

16   Celebrex and Vioxx.  And I've also worked on a case

17   involving Paxil.

18        I've also consulted, worked as a consultant as

19   opposed to a testifying expert in a number of other cases

20   involving different drugs and different marketing issues.

21   Q   All right, sir.  You've brought a stack of documents

22   with you.  We're not going to offer those as exhibits

23   because there's a very, very small binder to your right that

24   should have the same documents in it.  But tell the jury

25   briefly what it is that you brought to the court with you?

```
 1    A    Today I have here, this is just a copy of my expert

 2    report.   And then I have some, I have copies of information

 3    having to do with Neurontin sales, how much was off-label,

 4    how much was on-label, that is, how much, what percentage of

 5    sales and what dollar amounts were for approved uses of

 6    Neurontin versus what number or percentage of sales were for

 7    unapproved uses of Neurontin.

 8              I brought a copy of the sentencing memorandum in

 9    the Pfizer case where Pfizer for Neurontin pled guilty --

10    sorry.

11         THE COURT:   All right, don't go into what the

12    sentencing memorandum says.

13    A    Okay.   I brought a copy of the plea agreement in that

14    case.   And I have my own copies of some of the exhibits

15    pertaining to marketing materials from the defendants for

16    marketing Neurontin in Boston and in New England, some of

17    the packets and things that they used.

18    Q    That last group of documents, that last group of

19    documents you referred to, are those documents that have

20    Bates numbers or identification numbers showing that they

21    came from the defendants?

22    A    Yes.

23    Q    All right, sir.

24              I want to, in order to make it as easy for you and

25    for the Court and the counsel, we're going to kind of flow
```

1    in the sequence of your report even though the report itself

2    will not be an exhibit.  Will that help you, will that help

3    you in going through your testimony?

4    A    Yeah.

5    **Q**    And will it help you to be able to show the jury from

6    time to time some of the documents that you referred to in

7    composing your report and in doing your study?

8    A    Yes, it would.

9    **Q**    All right, sir.  At the outset, what was it that you

10   were asked to do by way of a study of their off-label

11   marketing and promotion of Neurontin?

12   A    There were four specific questions that I was asked to

13   address in my expert report and give an opinion on.  And

14   those four questions were, one, were the marketing and

15   promotional efforts of Warner-Lambert and Pfizer significant

16   contributing factors to the off-label sales of Neurontin.

17   That was the first issue.  The second issue was would

18   significant off-label sales of Neurontin have continued had

19   Pfizer ceased the off-label promotions.  The third question

20   was did the suppression of information, negative information

21   about serious adverse events, vis-a-vis side-effects or

22   safety risks of the drug, did those enable or facilitate the

23   drug in off-label sales.  And then the final question that I

24   was asked to consider was did Pfizer's off-label marketing

25   for Neurontin indirectly influence prescriptions prescribing

1    the drug Neurontin.

2    **Q**   Sir, did you have for your use the criminal information,

3    which is Exhibit 4290 in this case, did you have that

4    document -- it's not in your binder.

5    A    Oh.

6    **Q**   -- did you have that document available to you as part

7    of the work that you used in your study?

8    A    Yes, I did.

9    **Q**   All right, sir.  And I want to just go to Exhibit 4290

10   and take us to the year 1995-1996.  And in your testimony, I

11   want to ask whether we can, whether you carried this

12   information and studied all the way forward to the time

13   Mr. Shearer died in the year 2002?

14        **MR. OHLEMEYER:**  Your Honor, I think we're at

15   the point where the witness is about to offer opinions.  I

16   would like voir dire --

17        **THE COURT:**  Denied.

18        **MR. OHLEMEYER:**  -- the witness.

19        **THE COURT:**  You'll cross-examine.

20        **MR. OHLEMEYER:**  All right.

21        **MR. LONDON:**  May I complete the question, your

22   Honor?

23        **THE COURT:**  You may.

24   **Q**   Did your study continue from the time of this criminal

25   information, the acts of 1995-1996, through the period when

1    and after Mr. Shearer died in 2002?

2    A   Yes, it did.

3    **Q**   All right.  And did the criminal information, the facts

4    that are recited in that information, serve some foundation

5    or starting point for you and your study?

6    A   Yes, it does.

7              **MR. LONDON:**  May I ask that you queue up on the

8    video Exhibit 4292.  And if you would turn to page 5 of 15.

9              **THE COURT:**  Just to be clear.

10             **MR. LONDON:**  Yes, your Honor.

11             **THE COURT:**  The clerk reminds me that on her list

12   we don't have a 4290 which you referred to.

13             **THE CLERK:**  Or 4292.

14             **MR. LONDON:**  I apologize.  It is 4290.

15             **THE COURT:**  4290 is not on the exhibit list.

16             **MR. LONDON:**  Well, that's what Mr. --

17             **THE COURT:**  What's the document?

18             **MR. LONDON:**  It is the criminal information, your

19   Honor.

20             **THE COURT:**  The information was admitted.  It may

21   be my error.  I recall admitting it.  So, we will now note

22   it.  We need a copy.  I just saw it, it was passed up.  I

23   admitted the --

24             **MR. FROMSON:**  I think I passed up the information,

25   your Honor.  It's the judgment which is in evidence.

1          MR. LONDON:  Page 5 of 15.

2          THE COURT:  And just -- an information is an

3    accusation.  I mean, some things go by way of indictment.

4    Misdemeanors frequently go by way of information.

5          THE CLERK:  Is it in the --

6          THE COURT:  This is the accusation.

7          MR. LONDON:  Your Honor, I believe it's 4290.  Did

8    we --

9          THE COURT:  Fine.  We're just trying to stay on top

10   of it.

11         MR. LONDON:  Okay.

12         THE COURT:  And evidently, I don't think this is

13   disputed so I can say it, this is what they pleaded guilty

14   to that we've been talking about.  The allegation to which

15   they pleaded guilty.

16   Q    Do you have queued up in front of you paragraphs 13 and

17   14, Dr. King?  Can you see it on your monitor?

18   A    I have a blank screen.

19         MR. LONDON:  Bonnie, can we get a screen for the

20   witness?

21         THE CLERK:  We're all set.  Pardon me?

22         MR. LONDON:  Dr. King has a blank screen.

23         THE WITNESS:  I don't have anything on my screen.

24         THE CLERK:  You do now.

25         THE WITNESS:  Okay, thank you.

1    Q   All right.  Did it form a part of your study the

2    information in paragraphs 13 and 14 -- you see paragraph 14

3    that in 1995 Warner-Lambert determined to not seek FDA

4    approval for certain unapproved uses.

5    A   I'm sorry, was that part of my --

6    Q   Did that form -- was that part of the subject that began

7    your study?

8    A   Yes, it was.

9    Q   And when you used the term off-label, is that any

10   different than the term unapproved uses?

11   A   No, they're the same.

12   Q   All right, sir.  And was neuropathic pain -- if you'll

13   turn to page 6 of that same exhibit -- was neuropathic pain

14   one of those off-label subjects, and you see that in

15   paragraph 16.

16   A   Yes, it was.

17   Q   All right.

18          THE COURT:  Let me ask this question just, since

19   I'm not clear on this, and maybe the jury isn't.

20          You understand the law to be that for a

21   pharmaceutical company to promote, to market a drug for a

22   use that's not approved by the Food and Drug Administration

23   is illegal.  Correct?

24          THE WITNESS:  Correct.

25          THE COURT:  All right.  And that is correct.

1          You also understand that for a doctor on his own,

2      in the exercise of his independent medical judgment to use a

3      drug for an off-label use, is not only legal, it may be very

4      good medicine.  Do you understand that?

5              **THE WITNESS:**  Yes, I do.

6              **THE COURT:**  So, we've heard statistics here, and

7      evidently you're privy to them, of the percentage of

8      Neurontin sales that were prescribed by doctors for

9      off-label uses.  Have you?  Or is that part of your

10     calculation?

11             **THE WITNESS:**  Yes, it is.

12             **THE COURT:**  Well, now, now to my question.  How can

13     you tell how much of that percentage is as a result of

14     illegal marketing rather than legal doctor prescription, if

15     you can.

16             **THE WITNESS:**  I think the easiest way to do that is

17     to look at -- we have, we have information on the sales over

18     time of the drug for various indications.  And what the

19     judge says is correct, that a doctor is entitled to

20     prescribe an approved drug for an unapproved use in the

21     exercise of his best clinical judgment.  And what we, what I

22     did was, I looked at what do sales look like of a drug for a

23     particular indication, say bipolar, for instance, which is

24     an off-label use, before the company started marketing for,

25     started marketing for the unapproved uses of the drug.  And

1    what you find is that the sales at that point are quite low.

2    They're consistent with what we know from other evidence.

3    There's an academic study out there that says on average for

4    a drug you would expect typically 15 to 20 percent of the

5    uses of the drug might be for unapproved or off-label uses.

6    And when you look at the Neurontin sales prior to when the

7    defendants started promoting for off-label uses, you find

8    that roughly 15 percent of the sales in some of these

9    off-label uses occurs.  So, that to my mind gave me an

10   indication of what you would expect in the ordinary course

11   of events; what you would expect for doctors who, let's just

12   say hypothetically there was no illegal promotion up to a

13   certain point, what would you expect to see in terms of

14   off-label usage.  And we do see low levels of off-label

15   prescriptions.  So let's just assume that all of those are

16   legitimate and that there's nothing wrong with it.

17         Then what happens is a company starts marketing

18   off-label.  And then if you look at the sales graphs, what

19   happened is there's a very dramatic increase in the

20   off-label uses, which I attribute to the effects of the

21   off-label marketing.

22         So that's -- I have sort of a before and after

23   study, before there's illegal promotion and after there's

24   illegal promotion, that gives me a sense of what's the

25   magnitude, how big is the effect of the off-label marketing.

1    And it's quite substantial.  It goes from 15 percent in 1994

2    when Neurontin is first introduced, roughly 15 percent of

3    the uses are for off-label, unapproved uses of the drug.  So

4    let's just assume that all of those are fine and all of

5    those are perfectly legal.

6         By 2002 what do you see?  You see that 94 percent

7    of Neurontin's uses are for off-label and unapproved uses.

8    So, as a crude measure of what's the effect of the off-label

9    marketing, it would be the difference between the 15 percent

10   and the 94 percent.

11   **Q**   Dr. King, did you prepare a graph that shows Neurontin

12   sales by indication, a bar graph, on-label and off-label

13   during the years between 1995 and 2002?

14   A   Yes, I did.

15        **MR. LONDON:**  I would ask the technician to queue

16   that up for the Court and counsel.

17        **MR. OHLEMEYER:**  Your Honor, I --

18        **THE COURT:**  Wait a minute.  You object to this?

19        **MR. OHLEMEYER:**  I object on foundation.

20        **THE COURT:**  Wait.  All right.  Take it down, come

21   to the side bar.

22   SIDEBAR CONFERENCE, AS FOLLOWS:

23        **THE COURT:**  Where's his report?  He's an expert.  I

24   normally get a copy of the report because that's my anchor.

25   Have you got a copy of the report for me?

```
 1                 MR. LONDON:  We need to get a copy of the report.

 2                 MR. OHLEMEYER:  There's no doubt it's in his

 3     report.

 4                 THE COURT:  All right.  That's fine.  I just want

 5     to start there.  All right.  So it's in his report.  What's

 6     the problem?

 7                 MR. OHLEMEYER:  What's the source of his

 8     information.  Where did it come from?

 9                 THE COURT:  I think that makes sense.  Yes.  Okay.

10     It's without prejudice to you laying a foundation.

11                 MR. LONDON:  May I complete the foundation?

12                 THE COURT:  Of course.

13                 MR. OHLEMEYER:  Sure.

14                 MR. LONDON:  Okay.

15                 THE COURT:  So long as it's in the report.  I mean,

16     I think he's qualified.  I would -- he answered my question

17     very directly, but as part of the foundation I want to go

18     back --

19                 MR. LONDON:  I would like for you to take him over.

20                 THE COURT:  Tell me -- no, no.  No, no.  I would

21     like for him to tell me that this is a sound statistical or

22     marketing analysis --

23                 MR. LONDON:  All right.

24                 THE COURT:  -- to do.  He said it was crude.

25                 MR. OHLEMEYER:  Well, your Honor --
```

```
 1              THE COURT:  I would like to know that this is what

 2       these people do.

 3              MR. OHLEMEYER:  Well, that was part of the point of

 4       my request for a foundation.  I don't think they've set

 5       out -- no matter how exquisite his opinion is, it doesn't

 6       help the jury with any issue in this case based on what he

 7       testified to at his deposition.

 8              THE COURT:  Oh, it's helping me.  And that's -- the

 9       standard of relevance is low.

10              MR. OHLEMEYER:  Well, I will tell you he will

11       connect none of this to Mr. Shearer or his treating

12       physicians.

13              THE COURT:  Well, but that's -- I'm not so sure,

14       I'm not so sure that is significant.  If they can get over

15       causation -- this goes to willful, wanton, knowing,

16       intentional, reckless.  That's why they're allowed, as

17       Admiral Yamamoto said, to run free for the first six months

18       of World War II.  Where they come aproper is on proximate

19       cause, at least the way I see this case.  And again, it's

20       not how I see this case.  I'm only the initial hurdle, and

21       my hurdle is low, is it relevant.  It is.

22              MR. OHLEMEYER:  All right, thank you.

23              (Whereupon the sidebar conference concluded.)

24              MR. OHLEMEYER:  May I have a continuing objection

25       on the foundation and relevance grounds, your Honor.
```

1          THE COURT:  Based, based upon what was stated at

2     the side bar, yes.

3          MR. OHLEMEYER:  Yes.

4          THE COURT:  If there's something new as things

5     develop it needs to be stated.

6          MR. OHLEMEYER:  Right.  Thank you, your Honor.

7   BY  MR. LONDON

8   Q    Dr. King, the first question I have, back to your

9     qualifications, are you an economist?

10  A    Yes, sir.

11  Q    Are you accustomed as an economist to work with both

12    marketing and financial data?

13  A    Yes.

14  Q    And is the bar graph that's on the screen a document

15    that was composed by you for your use in this case?

16  A    It was created for me.  It was created by one of our

17    research associates.  I did not personally create it.

18  Q    Was it created at or under your direction?

19  A    Yes, I asked them to --

20  Q    And what was the source of information, the data, the

21    numbers that -- where did that come from?

22  A    The source of the information comes from the defendants

23    in this case.  We used -- they have standard databases that

24    track sales and uses of information, and those are the data

25    that we used to create this chart.

1    **Q**   Do they create -- do they track sales by on-label and by

2    off-label?  Are you able to break that down?

3    A   They track sales by the actual use of the drug,

4    so-called indications.  So they would track it for, whether

5    it's used for, I'm now getting a little technical here, but

6    they may use it for bipolar, they may use it for pain.

7    These are all unapproved uses.  And so what I did here --

8    and they would also track what percentage of the drugs went

9    for epilepsy.  So what I've done in this chart is during

10   this time period from 1998 to 2001 the only approved use of

11   Neurontin was for epilepsy.  So, the red columns -- I'm

12   sorry, the red segments of the columns on the bottom of the

13   graph, those are the dollar sales for Neurontin for use in

14   epilepsy; the blue bars are Neurontin sales for everything

15   else.

16         **THE COURT:**  And again, excuse me, my question.  You

17   told me how you would correct for what you assume is doctor

18   prescribed and lawful off-sale uses and what you assume are

19   the off-label use is driven by marketing from the

20   pharmaceutical company.  You've told us that, correct?

21         **THE WITNESS:**  Correct.

22         **THE COURT:**  Now, how common is that type of -- is

23   that a proper analysis that economists do, or you're just

24   giving me your answer to my specific question?

25         **THE WITNESS:**  It's a very standard, it's a very

1    standard thing for economists to do and for marketers to do

2    in this context to look at, when you want to understand

3    what's the effect of something, you look at what happens

4    before the event or the effect starts, begins, or is turned

5    on, and you look at it after.  So this before and after

6    comparison is a very standard thing to do.

7              THE COURT:  Does this chart correct for that in any

8    way?

9              THE WITNESS:  This chart doesn't specifically

10   correct for that.  But we can use this chart to understand

11   what the correction might be if you wanted to apply it here.

12             One of the complications in this chart is, as I

13   said, I put in epilepsy, that includes all epilepsies.  Now,

14   one of the things that you should be aware of with epilepsy

15   is that even for epilepsy there are approved and unapproved

16   uses for epilepsy.  The approved use is for adjunctive

17   therapy, which means that Neurontin can be used as a second

18   line drug.  So if your first, whatever your first drug is

19   for treating your epilepsy doesn't work, the FDA said, okay,

20   we will approve the use of Neurontin in addition to the

21   first line treatment.

22             The defendants also promoted the use of Neurontin

23   just by itself as a first line therapy, which is not an

24   approved use of Neurontin, and the FDA denied the company

25   approval for that use of Neurontin.  I have no way of

1    separating out in the epilepsy aspect of this graph the

2    approved from the unapproved uses.  But I'm not going to

3    worry about that because I'm not so much worried about the

4    smaller picture, the little details, as the big picture.

5         So the first thing I would say about this is even

6    my epilepsy indication includes some uses for unapproved

7    indication.  But let's assume that those are all perfectly

8    legitimate.  It's not actually true.

9         So the judge asked me, now, how do I know what

10   percentage might have happened in the ordinary course of

11   events if there weren't the illegal marketing.  And the

12   answer there is, as I said, when we look at 1994, before

13   they really launched these big off-label promotion programs,

14   we find that there's about 15 percent use for off-label.

15   And I'm just going to assume that that's all fine.  And the

16   other thing we know is there's also, there was an article

17   published by Radley and others that looked at for 160, 160

18   of the best selling drugs, what do we expect the average

19   off-label use to be.  And as I said that answer is sort of

20   15 to 20 percent.

21        So, again, these are sort of, these are sort of

22   back of the envelope, I would call them, calculations for us

23   to get a feel of how significant are the off-label sales.

24   So if you wanted to you could take the epilepsy sales, those

25   are the ones for the on-label use, and add about 15 percent

1    to account for what we would expect both on the basis of

2    what we saw with Neurontin before the off-label marketing,

3    the 15 percent, and what we would expect based on studies of

4    other drugs, 15 to 20 percent, you could add those in there

5    to get a reasonable estimate of what, what the off-label

6    sales generated by legitimate off-label uses of Neurontin

7    might be.

8              Now, I haven't done that here.  And the reason is,

9    you know, I'm looking at, you know, I wanted to know

10   basically how big, is the off-label use of Neurontin big or

11   small compared to the on-label use.  And it's quite big.

12   And adding 15 percent of, you know, the little red, the red

13   columns at the bottom isn't going to change the graph very

14   much.

15   **Q**   Dr. King, when the judge first began this line with us

16   as I understood you said in about 1994-1995 the off-label

17   use of Neurontin was on the order of 1 5, 15 percent?

18   A    Yes.  It might be helpful to look at some of the other

19   graphs in my report and we can actually see what I'm talking

20   about, the before and after effect.

21   **Q**   All right.  Which graph would you like us to call up?

22   A    Let's start with my Figure 1 which looks at anxiety

23   disorders.

24   **Q**   All right.

25             **MR. LONDON:**  Show that first to the Court.  Does

1    the Court have Figure 1?

2              **THE COURT:**  Yes, I do.

3              **MR. LONDON:**  May we display that to the jury, your

4    Honor?

5              **THE COURT:**  Yes.

6              **MR. LONDON:**  All right.

7    **Q**   And what --

8              **MR. OHLEMEYER:**  Same objection, your Honor.

9              **THE COURT:**  Oh, yes, you've got a continuing

10   objection on the grounds already asserted.  And now that he

11   reminds me of that the answer is no, ask him where he got

12   this stuff.

13             **MR. LONDON:**  That's what I was about to do.

14             **THE COURT:**  All right.  Well, let's ask him before

15   we display it, that's all.

16   **Q**   Dr. King, as we go through these graphs, I want to ask

17   you whether, this applies to any and all of the graphs that

18   you composed that you may show, first, what is the source

19   data for these bits of information that become this graph?

20   A   The source data for the information in the graphs, there

21   are two sets of graphs, for the first set of graphs that

22   have to do with the use of Neurontin in specific off-label

23   indications or diseases, the ultimate source of that data is

24   a company called Verispan, which is an independent outside

25   company that surveys data on, collects data on prescription

1    usage and sales of particular drugs by their actual uses.

2    These were data that were purchased by the defendants in the

3    case and were turned over to us.  So the ultimate source of

4    this data is Verispan data.  It's the same data that the

5    company uses in all of its marketing and, marketing plans,

6    marketing analysis, and budgets.  It's what they rely on for

7    their own analyses of what the market looks like.

8    Q    And did you say there was a second source?

9    A    Oh, sorry, yes, I did.  For some of the other graphs

10   that we may look at later, the source again is another

11   independent consulting group called NDC Health, and they

12   collect information on things like the quarterly sales for

13   the drug.

14   Q    Is this the sort of information that economists and

15   marketers customarily use in making analyses of sales and

16   growths of sales in studies of the sort that you performed?

17   A    Yes, it is.

18   Q    And --

19        THE COURT:  Excuse me.  Is this second outfit, are

20   they in the business -- what was the first one, Verismart?

21        THE WITNESS:  Verispan.

22        THE COURT:  Verispan.  All right.  So, Verispan is

23   the outfit which gets all the computer data from the various

24   pharmacies and the like and then generates all this

25   information because the pharmaceutical companies want to buy

```
 1    it and make use of it in their, in their work.  Correct?

 2               THE WITNESS:  Correct.  Yes.

 3               THE COURT:  Okay.  What's the second outfit?

 4               THE WITNESS:  A similar sort of thing, it's another

 5    independent consulting.  They're just two different

 6    companies.

 7               THE COURT:  And in essence this is a business

 8    niche, people compete to do this and provide this data to

 9    pharmaceutical companies?

10               THE WITNESS:  That's correct.  Verispan, NDC

11    Health, another company IMS Health, Scott-Levin, these are

12    all data providers that research, collect data, and sell

13    this information to pharmaceutical companies for use in

14    marketing and business planning.

15               THE COURT:  Thank you.

16    Q   Is that considered an ordinary and reliable source of

17    data in the kind of work that you're doing?

18    A   Yes, it is.

19    Q   Was the data in those charts proposed -- composed or

20    prepared at your direction or for you?

21    A   Yes.

22    Q   And we may see that in some of those the word Keith

23    Altman appears.  Do you see that?

24    A   Yes.

25    Q   And did Keith Altman do that work at your direction?
```

```
1    A    Yes, he did.

2    Q    Did you check the accuracy and correctness of it?

3    A    I did.

4    Q    And is it satisfactory for your purposes?

5    A    Yes, it is.

6    Q    And just to make it clear, Keith Altman is the guy who's

7    sitting behind the computer, he's now become a lawyer in the

8    case some years later.  Are you aware of that?

9    A    Yes, I am.

10   Q    Okay.  Independently of whether he has now become a

11   lawyer or not, did you satisfy yourself that his data entry

12   and manipulation at your direction is accurate and correct?

13   A    Yes, I did.  It's also consistent with analyses that I

14   saw in the defendants' company documents when they're doing

15   their own marketing analyses, and it's consistent with

16   published studies by people like Steinman, et al. who have

17   also looked at this market and using a slightly different

18   source of data to see what were the percentages of on-label

19   and off-label sales.

20          MR. LONDON:  I propose the use of those graphs,

21   your Honor.

22          THE COURT:  You may proceed.

23          MR. LONDON:  All right.

24   Q    May we go back to the graph that was pulled up

25   originally.  Tell us what the jury is looking at there,
```

1    please.

2    A    Okay.  So what we're looking at here is a graph of the

3    unapproved or off-label uses of Neurontin for something

4    called anxiety disorder.  And what we have, we have two axes

5    on the graph.  On the vertical axis, we have, which is

6    labeled uses, basically this is the measure of the number of

7    uses or prescriptions of, uses or prescriptions of this

8    drug, of Neurontin, sorry, for anxiety over time.  And on

9    the bottom we have a graph that goes from 1994, which is the

10   date that Neurontin was first introduced, to 2004 when

11   generic competition entered and Neurontin sales essentially

12   plummet.

13           So, the point I wanted to make with this graph is,

14   if you look at the early years of Neurontin, say from about

15   1994 to 1999, and what we see is we see very low levels of

16   sales compared to what happens later.  I'm sorry, I

17   shouldn't say sales.  Uses of Neurontin for anxiety

18   disorder.  And so, it's, it's actually not entirely correct

19   to say that the defendants at this point were not promoting

20   for off-label uses.  They were in other categories.  But, if

21   you wanted the measure of, you know, how much, how many uses

22   or what level of Neurontin would you expect to be used in

23   the absence of off-label promotion, I would say, you know,

24   we could use this as a reasonable estimate.  There's some

25   flaws with it, it's an overestimate, it's conservative, but

1   you see it's relatively low.

2         Then the company starts promoting the Neurontin for

3   use in anxiety disorders in a serious way.  And what happens

4   with sales?  Well, from 1999 to 2000, for example, it goes

5   from something in the order of ten to something on the order

6   of a hundred.  So, that's why I say that, you know,

7   off-label marketing has a substantial effect on the

8   off-label sales.  Before there is off-label marketing for

9   this particular indication the sales are relatively low.

10  And those again are consistent with the idea, as the judge

11  mentioned, that doctors can prescribe drugs for off-label

12  uses on their own.  So in the absence of promotion this is

13  what we see, it's a very low level of usage.  It's

14  consistent with what we see in other drugs.  Then the

15  promotion starts and all of a sudden sales for the off-label

16  usage dramatically increase, in this case by a factor of

17  roughly ten or so, and by the time you get to 2002, as you

18  can see, the uses are over 120,000 per year.

19         So this happens not once, this happens several

20  times.  Figure 1 has to do with the Neurontin uses for

21  anxiety disorder.  We can look at other off-label uses and

22  see if we see a similar pattern.

23  Q   All right.

24  A   So if I could look at Figure 2.

25  Q   In the interest of time let's do these kind of

1    quickly and point out to the jury --

2    A    Okay.

3    **Q**    -- as you go through any distinctions or changes in

4    characteristics as the sales promotions and the uses change

5    over the years from '96 to 2002, would you do that, please.

6    A    Yes.

7    **Q**    And you asked to call up which figure, please?

8    A    I was just going to take a quick look at Figure 2.

9    **Q**    All right.

10   A    So Figure 2, again, we see a similar sort of pattern.

11   So here we're looking at the use of Neurontin for bipolar

12   and mood disorders, both of which are unapproved uses.  And

13   if you look at from '94 to '97, again the usage level is

14   quite low.  After '98 it dramatically increases.  And again

15   that's consistent with the timing of the off-label promotion

16   for Neurontin.

17          We can take a look at other figures and we'll

18   see -- we can look at Figure 3.  So here we have off-label

19   uses for Neurontin for pain.  Now, this was an indication

20   that they went after quite early in their off-label

21   marketing campaigns.  So if you look at '94 and '95, again

22   uses are quite low, and then all of these things increase

23   over time.  Now, there are several subcategories here in the

24   graph.  I'm not going to go into the particulars of the

25   subcategories.  But these are all for pain indication.  So,

1    again, this gives me a sense of how effective is the

2    off-label promotion for Neurontin.

3    **Q**    I would like to go to Figure 6, if I may.  Can you call

4    up Figure 6, please.

5    A    Okay.  So what --

6    **Q**    What does Figure 6 demonstrate, Dr. King?

7    A    Yes.  So, Figure, Figure 6 puts all this together.  I

8    looked separately at each of the different indications and

9    then Figure 6 presents the big picture of all of these, if

10   you will.

11           So, again, what we have here is we have the uses of

12   Neurontin for each of the years from 1994 to 2004, and this

13   graph breaks them down by various categories.  We have

14   migraine, we have uses for pain, we have psychiatric uses,

15   we have other uses.  PHN is post-herpetic neuralgia.  That

16   was an indication that was off-label until 2002 when they

17   received FDA approval to use Neurontin for post-herpetic

18   neuralgia.  And at the very bottom we have epilepsy.

19           So what this graph shows is that if we look at

20   epilepsy and then on the far right at the bottom, the PHN

21   on-label, those are the approved usage sales of Neurontin

22   over time.  And what we find is that again in 1994 the

23   unapproved uses, which would be everything else, so on the

24   far left of this chart it's all the stuff above epilepsy,

25   that's fairly small.  Then the companies launched a series

1    of off-label marketing campaigns, which come at different

2    times, and we see these off-label uses of Neurontin increase

3    dramatically.  So, whereas in 1994 the off-label use of

4    Neurontin is 15 percent, by 2003-2004, the off-label use of

5    Neurontin is roughly 90 percent.

6    **Q**   Dr. King, if I may just have your --

7    A   Yes.

8    **Q**   -- attention for one moment.  Going back to your earlier

9    testimony, you indicated that there were studies that were

10   done of drugs in general to talk about what proportion or

11   what percentage of any particular drug would be off-label.

12            Do you recall that?

13   A   Yes, I do.

14   **Q**   And what in general is the range that people might

15   expect any drug to be prescribed off-label?

16   A   The range typically on average for the 160 most popular

17   drugs is about 20 percent if I remember correctly from the

18   Radley article.  The thing that's unique about Neurontin is

19   its off-label usage is 94 percent, which makes it far and

20   above the, the highest off-label, the highest off-label

21   usage of any of the drugs studied.

22   **Q**   All right.  I would like to shift gears now if we can.

23   And you may drop the screen.

24            At different times you have begun to tell the jury

25   about when the defendants' strategy to market off-label

1    began, words to that effect.  Do you recall that?

2    A   Yes, I do.

3    **Q**   What, what do you mean when you say their strategy to

4    market the drug off-label?  What are you talking about?

5    A   What I'm talking about is an analysis that I did, I

6    looked at the company documents to try and understand how

7    they wanted to sell and promote Neurontin.  And what you

8    find is that in 1994 when the drug is first introduced, the

9    company looks at Neurontin and says, okay, how much money

10   can we expect to make out of this over time.  And the answer

11   was, at that point, given that their only indication was for

12   their only approved use that is for Neurontin was for this

13   adjunctive therapy for epilepsy, that's an add-in drug to

14   treat epilepsy, they thought that over the entire lifetime

15   of the drug that the drug would be worth about $500 million.

16          The next thing that they did is they decided, okay,

17   how could we make more money selling this drug.  And what

18   they decided was that they could make a lot more money if

19   they promoted the drug for unapproved uses, things like

20   pain, things like bipolar, things like anxiety, some of the

21   uses that we saw.  And they instituted, they made a

22   deliberate analysis to look at where could they make the

23   most profit and what should they do, and they decided that

24   rather than seek FDA approval for some of these other

25   indications, what they would do is -- well, I should explain

1    FDA approval takes time and it's very expensive to get the

2    clinical approval for the approved use.  So they decided

3    instead that they would try and sell the drug for the

4    unapproved uses.  And you've seen in the graphs how

5    successful that strategy was.

6         So they took a drug that basically would have sold

7    in their estimation about $500 million over the entire life,

8    over its entire lifetime, if they just stayed with the

9    approved uses of the drug, and they turned it into a drug

10   that sold over $10 billion, that's going from half a

11   billion -- 500 to a half a billion, then it goes to

12   10 billion, so that's an increase of about 20.  So they went

13   to a drug that sells roughly $10 billion over its life span

14   and 90 plus percentage of its uses are off-label.  So that's

15   the strategy they adopted and that's how they took it from

16   being a relatively small drug to a so-called blockbuster

17   drug.

18   Q   Were there any tools that the company implemented to set

19   this strategy in motion?

20   A   Yes, there were.  There are basically two sets of tools,

21   or two things, two ways that I frame, frame this.  The first

22   thing they did is they adopted what is referred to as a

23   publication strategy.  Now, why do they need a publication

24   strategy and what was it.  Well, they had a problem that,

25   you know, as the judge has pointed out, it's illegal to

1    market a drug for an off-label use.  So how would you get

2    around that if you wanted to.

3         Well, one thing that you could do is if you

4    sponsored research and you encourage people to write

5    articles and publications in scientific literature about

6    unapproved uses of Neurontin, these could be an anecdotal

7    reports about, gee, I tried this and it seems to work in my

8    patients, it could be case reports, then that would give

9    them an avenue for talking about it.  They couldn't talk

10   about it in their printed materials they would send to

11   doctors because the FDA doesn't allow you to do that, it's

12   not an approved use.  But they could talk about it in their,

13   in the second part of their strategy, they could talk about

14   it in the educational events.

15        So what they did was they adopted a publication

16   strategy where they tried to develop mentions and discussion

17   about off-label uses of Neurontin in the scientific and

18   academic literature, which then gave them an avenue for

19   talking about it in the continuing medical education events

20   that they sponsored for doctors.  In order to keep doctors

21   abreast of the latest developments in medicine and

22   technology, pharmaceutical companies typically sponsor

23   events where they have speakers come and talk about existing

24   and new potential uses for a drug.  So, that's sort of the

25   overall big picture, that's how they decided to, that's a

1    strategy they adopted for getting around the prohibition on

2    marketing for off-label uses by doing two things.  One was

3    using a publications process, and the other is using their

4    medical education events which are supposed to be neutral

5    and impartial and they're not supposed to be used for

6    marketing and promotion of the drug.  They could use that

7    mechanism for communicating to doctors their key messages

8    about what they wanted to use Neurontin for.

9    **Q**   Dr. King, did this, did you study this not just in the

10   United States generally but right here in Boston?

11   A   Yes, I did.

12   **Q**   The Northeast customer business unit?

13   A   Yes.

14   **Q**   In your binder you have a tab, it may be difficult to

15   find, it's Alpha Uniform Hotel, AUH.

16            Do you see that tab, sir?

17   A   Alpha Uniform Indigo?

18   **Q**   Hotel.

19   A   Hotel.

20   **Q**   AUH.

21   A   Yes.  Yes.

22   **Q**   And first would you find that, and then secondly, would

23   you compare it to your own documents you brought to the

24   deposition.  Did you bring a copy of that document with you?

25   A   I believe I did.  It may take me a minute to find it.

1    Q    And I want to ask the same -- I'm sorry.

2    A    If I might ask a question.  I believe this document is

3    referred to in one of the footnotes of my report.  Do you

4    have the footnote number for me, it would make --

5    Q    Yes, sir, look at Footnote 99.  I believe it's on page

6    31.

7    A    Thank you.  Mine are organized by footnote.

8    Q    I know.  I apologize for that.

9    A    Okay.  Yes.  So, here it is.  Here's my copy of this

10   document.

11   Q    All right.  Is this one of the documents you considered

12   in your analysis?

13   A    Yes, it is.

14   Q    And is it a document that's identified with a Bates

15   number at the bottom, it says X001884 or W L Franklin

16   108236.

17        Do you see those?

18   A    Yes.  There's a series, that X00185 is a sequence.

19   Q    And is this the sort of document that you would consider

20   and rely upon in your study?

21   A    Yes, absolutely.

22   Q    Is this document useful to you in explaining to the jury

23   how this publication strategy worked here in the northeast

24   CBU, or in Boston?

25   A    Yes, it is.

1          MR. LONDON:  I would offer this exhibit, your

2     Honor.  It's Alpha Uniform Hotel, I believe.

3          MR. OHLEMEYER:  Same objection, your Honor.

4          THE COURT:  I haven't got it before me.

5          MR. LONDON:  I beg your pardon?

6          THE COURT:  I do not have it in front of me.

7          MR. LONDON:  I gave it to Bonnie.

8          THE COURT:  I'm sorry.  All right.

9          MR. LONDON:  Oh, you have that giant binder.  It's

10    still up here on the table in front of you, your Honor.

11         THE COURT:  I'm sorry.

12         THE CLERK:  Okay.

13         THE COURT:  He may testify --

14         THE CLERK:  Thank you.  Thank you.

15         THE COURT:  Where does this document come from?

16         MR. LONDON:  From the defendants, your Honor.

17         THE COURT:  No, I'm asking the witness.

18         THE WITNESS:  It came from the company documents I

19    was given.

20         THE COURT:  Oh, this came from the company

21    documents you were given.

22         THE WITNESS:  Yes, this is a company document.

23         THE COURT:  I see.  Yes.  All right.  And you're

24    offering it?

25         MR. LONDON:  I am, your Honor.

1          **THE COURT:**  Yes.  It's admitted Exhibit 4533 in

2    evidence.

3               (Exhibit marked in evidence.)

4          **MR. LONDON:**  May I borrow this copy again, your

5    Honor?

6          **THE COURT:**  Of course.

7    **Q**   Dr. King, would you point out to the videographer the

8    pages of the document that would be helpful to you.  It may

9    be easier to do it from --

10   A   Yes, we're not --

11   **Q**   I'll follow you and then we'll get him on the page.

12   A   I need to go to the top of the document.

13   **Q**   Go to the top of the document.

14   A   Okay.  So what this document is is it was prepared by

15   the Northeast CBU, which is the consumer business unit, and

16   basically this is a subdivision of the marketing team,

17   they're divided up by region.  So this is from the Northeast

18   region.  And what this document describes is, you can see it

19   in the major categories, it talks about the disease, it

20   analyzes the market, it talks about what the product

21   involved is, and then it talks later about, these are

22   technical marketing terms, product positioning, message

23   strategy, promotion strategy.  So, this is the Northeast

24   central business, I'm sorry, consumer business unit, looking

25   at the Northeast market and deciding, okay, what do we want

1    to do, how are we going to promote Neurontin in this area.

2          So the things that I found relevant here, the first

3    thing I think maybe you want to look at -- if I touch this

4    screen will it highlight things?

5          **THE CLERK:**  Yes.

6    A   Okay.  Let me try this out.  Oh.  Okay.  So I just drew

7    a purple, a purple balloon around the first thing I found

8    interesting in this document.  And what it says is

9    historically AEDs -- and those are antiepileptic drugs,

10   drugs like Neurontin -- have been used for many conditions

11   outside the treatment of epilepsy.  Remember, epilepsy at

12   this point is the only approved use of Neurontin.  And it

13   says this is responsible for the growth in the antiepiletic

14   drug market.  The only antiepiletic drug beside Neurontin

15   which gained notable market share in 996 was Depakote due to

16   recent approvals for migraine prophylaxis and bipolar

17   disorders.

18         Now, I found this interesting because they're

19   looking at not just the market in epilepsy but they're

20   looking for potential markets outside of epilepsy.  And

21   that's where all the growth is in the use of this, this

22   class of drug.  And in particular they're looking at one of

23   their competitors and thinking, okay, migraine and bipolar

24   has been used there.

25         So, the next thing that I found that was

```
 1    interesting -- so that suggests that they're looking about
 2    unapproved uses for Neurontin as a source of sales.
 3           The next thing in this document that I found
 4    interesting is in the product profile.  And I'll see if I
 5    can draw a circle around, it's the second sentence that I
 6    was interested in.
 7           So, in the second sentence one of the things that
 8    the company does is -- Neurontin is only approved for
 9    specific dosages.  It's approved for dosages from
10    900 milligrams to 1,800 milligrams.  One of the things the
11    company decides to do in its off-label marketing to increase
12    the sales is to encourage people to use higher doses, doses
13    that exceed the limits that are approved by the FDA.  And
14    so, here it says that its dosage is, its dosage of 900 to
15    1,800 which is approved usage has been found in clinical
16    practice to often be sub-optimal doses especially for
17    refractory -- in other words, difficult to treat --
18    epilepsy.
19           So this suggests that they're thinking of, well,
20    they are here actually arguing that, you know, people should
21    use higher doses because it doesn't work, even though that's
22    unapproved.
23           And then the other product here where they're
24    talking about the product profile, what could the drug be
25    used for, on the bottom here, we have that, they actually
```

```
1    know that as of December 1996, 48 percent of Neurontin
2    prescriptions were for uses outside epilepsy.  That's a
3    large percentage.  Many studies (pilot and multi-center)
4    have been initiated to address Neurontin usage in many
5    disorders including various neuropathic pain syndromes,
6    migraines, psychiatric disorders.  And these are all the
7    indications, I shouldn't say all, all of these indications
8    that they later decide to pursue aggressively in their
9    off-label marketing strategy.
10            So here you see the Northeast looking at ways that
11   they can expand sales in Neurontin that aren't, that have
12   nothing to do with epilepsy, that have to do with using it
13   in other context and using it at a higher dosage.
14            And then to get back to the question that counsel
15   originally posed me, how do I know that this ties into the
16   publication strategy.  And for that I need to go to the next
17   page of the document, which I don't know how to do.  Thank
18   you.  And here, if you look on the bottom where it says
19   promotion strategy, here they're talking about what they're
20   going to do and how they're going to promote things.  So,
21   you know, they're analyzing a strategy, they're trying to
22   figure out what do we do to increase sales.  What's the
23   first thing that they mention, Strategy #1.  Execute
24   publication/educational plan and clinical trials to support
25   product expansion in emerging uses.
```

1    **Q**   What are emerging uses?

2    A   Yes, I was just about to say, emerging uses is a code

3    word or another way of saying unapproved uses.

4         **THE COURT:**  All right.

5    A   Off-label uses.

6         **MR. OHLEMEYER:**  Objection, your Honor; move to

7    strike the answer.

8         **THE COURT:**  The motion to -- that's what you think?

9         **THE WITNESS:**  It's not just what I think.  It's

10   what John Marino said in his deposition, and he was the

11   worldwide --

12        **THE COURT:**  Well, that's where you're getting that.

13   In other words, one of the things you did is you looked at

14   discovery materials in this case, and you're accepting that?

15        **THE WITNESS:**  Yes, I am accepting that.

16        **THE COURT:**  Okay.  You have no individual

17   knowledge, you're taking it from him, and he's a Pfizer

18   employee.

19        **THE WITNESS:**  Well, I'm taking it from a couple

20   of --

21        **THE COURT:**  Try my question.  That's, that's one of

22   the reasons?

23        **THE WITNESS:**  That is one of the reasons.

24        **THE COURT:**  All right.  Now, he'll pick up after

25   the break with any other reasons if any there be.

```
 1              Ladies and gentlemen, we'll take the morning recess
 2       at this time.  Keep your minds suspended.  Do not discuss
 3       the case either among yourselves nor with anyone else.  You
 4       may stand in recess until 11:15.  The jury may recess.
 5              THE CLERK:  All rise for the jury.
 6              (Whereupon the jury left the courtroom.)
 7              THE COURT:  You may step down.
 8              THE WITNESS:  Thank you.
 9              (Whereupon the witness stepped down.)
10              (Recess.)
11              THE CLERK:  All rise for the jury.
12              (Whereupon the jury entered the courtroom.)
13              THE CLERK:  Court is in session, please be seated.
14              THE COURT:  Continue, Mr. London.
15                   DIRECT EXAMINATION (Cont'd)
16    BY MR. LONDON
17    Q   Dr. King, when we recessed you had a document up on the
18    screen and you were going through that document.  The 1997
19    Northeast customer business unit, had you completed that?
20    A   I think, if I remember correctly, we were going to talk
21    about some of the promotion strategies.
22    Q   Okay.  Well, we're not quite there yet.  Are you through
23    with that document that had the Northeast CBU?  Or is the
24    promotion strategy in that document?
25    A   The promotion strategy is Strategy #1.  I guess we did
```

1    discuss that.  We did talk about --

2    Q    Yes, let's go forward with Strategy #1.

3    A    Yeah, as we discussed before the break, Strategy #1,

4    that business unit is identifying executing a

5    publication/educational plan, clinical trials program, to

6    support product expansion in emerging uses, which is the

7    off-label uses.

8    Q    All right.  Does that complete the use of that document?

9    A    Yes, it does.

10   Q    Now, in its bigger picture did you do research to see

11   how large this publication plan or publication strategy was

12   within, at that time, Warner-Lambert, perhaps later Pfizer?

13   A    Yes, I did.

14   Q    And how pervasive or how large was the publication

15   strategy?

16   A    It was a very comprehensive and extensive strategy.

17   They did a number of things to implement their strategy.

18   They would -- bear with me just for a second here.

19          So they did, they did a number of things to

20   facilitate the publication strategy.  This development of

21   articles talking about Neurontin.  They did some things

22   internally.  They also used, they hired outside medical

23   education and communications companies which also typically

24   work for marketing firms.  And they sponsored research.

25   They proposed and prepared medical articles, and they paid,

1    basically paid researchers to put their names on those

2    articles.  And the external companies were hired essentially

3    to write the articles and find the authors to sponsor them.

4    And it's not surprisingly that these articles tended to

5    favor, report favorable information about Neurontin and its

6    usage, and in some cases the company actually suppressed

7    negative information about side-effects and problems with

8    using Neurontin.

9    **Q**   Did you see exactly company documents that refer to what

10   you're calling suppression or delay of publication of

11   negative information?

12   A   Yes, I did.

13          **MR. LONDON:**  All right.  I would like to call the

14   Court and counsel's attention to Exhibit AZG.

15          **THE CLERK:**  Okay.

16          **MR. LONDON:**  Sorry, Bonnie.

17          **THE CLERK:**  That's all right.  It's heavy.  AZG.

18          **MR. LONDON:**  I'm going to give you four documents.

19          **THE CLERK:**  Let me get that one first.

20          **MR. LONDON:**  All right.

21          **THE CLERK:**  Is this it?  No, it's behind the tab,

22   right?

23          **MR. LONDON:**  Yes.  And I believe it's a three page

24   document.

25          **THE CLERK:**  Yes.  Got it.

1              **MR. LONDON:**  And if it's convenient, your Honor,

2      I'll give you all four of these at once.

3              **THE COURT:**  I think that would be.

4              **MR. LONDON:**  All right.  The next one is AZQ,

5      Quebec.

6              **THE CLERK:**  AZQ.

7              **MR. LONDON:**  The next one is AZR, Romeo.

8              **THE CLERK:**  AZR.

9              **MR. LONDON:**  And the last document is AZL, Lima.

10             **THE CLERK:**  AZL.  All set.

11             **THE COURT:**  All right.

12     **Q**   Again, Dr. King --

13             **THE COURT:**  And you're offering these?

14             **MR. LONDON:**  I will offer them.  I haven't quite

15     laid the foundation.

16             **THE COURT:**  You go ahead.

17             **MR. LONDON:**  I don't know if they had an objection

18     to foundation.

19             **THE COURT:**  You go ahead.

20     **Q**   Dr. King, first what is the origin of these particular

21     four documents that we've just identified?

22     **A**   All four of these documents originate with the company.

23     They're e-mails among various executives within the company.

24     **Q**   All right.  And do they take place generally between the

25     years 1996 and 2001-2002 time frame?

1   A    Yes, they do.

2   Q    Are they the sort of documents that you or people who do

3   your kind of work use and rely upon in doing the studies of

4   the kind you've done?

5   A    Yes.

6   Q    And do they contain information germane or relevant to

7   you in determining whether the company suppressed or delayed

8   information in their publications about unfavorable results?

9   A    Yes, they do.

10          **MR. OHLEMEYER:**  I have an objection, your Honor.

11          **THE COURT:**  Yes, the objection is sustained.

12   You're leading the witness.

13          **MR. LONDON:**  I apologize.

14          **THE COURT:**  The answer is stricken; disregard it.

15   Q    Did the documents contain information that was relevant

16   to you in your study?

17   A    Yes, they do.

18   Q    And did you see anything about the documents that cast

19   doubt on their originality or trustworthiness?

20   A    No, I didn't.

21          **MR. LONDON:**  All right.  I do offer those four

22   exhibits, your Honor.

23          **THE COURT:**  All right.

24          **MR. OHLEMEYER:**  May I be heard briefly, your Honor,

25   at side bar?

```
 1              THE COURT:  You may be.

 2      SIDEBAR CONFERENCE, AS FOLLOWS:

 3              MR. OHLEMEYER:  I don't mean to be flip, your

 4      Honor, but my objection is relevance and Rule 702.  We are

 5      now on a tour of the world.  We've got documents about

 6      foreign studies, we've got documents about post-operative

 7      amputation which, we're talking about everything now except

 8      what Mr. Shearer was prescribed Neurontin for.  And I think

 9      that doesn't do anything to help the jury understand the

10      issues they have to decide in this case.

11              THE COURT:  I understand.

12              MR. OHLEMEYER:  This man is just reading documents

13      that the lawyers gave him.

14              MR. LONDON:  I disagree.

15              THE COURT:  Well, wait a minute.  Well, I am rather

16      struck by the conclusory nature of some of this testimony,

17      but you don't object to that.

18              MR. OHLEMEYER:  Well, I have objected, your

19      Honor --

20              THE COURT:  Well, on relevance grounds.  But -- all

21      right.  Let's see here.

22              MR. OHLEMEYER:  Well, under 702 that was, my

23      initial objection was relevance and --

24              THE COURT:  It seems to me that marketers would

25      look at these type of things.  I'm fully satisfied with
```

```
 1      that.  But now let's deal with your objection here.

 2              If I've got them in the right order this --

 3              MR. LONDON:  I'm looking down at the bottom, we

 4      have these little numbers printed if that helps the Court.

 5              THE COURT:  It is.  This first one which has the

 6      numbers 4864 is admitted and that's in evidence.  This one

 7      that is marked 4875 --

 8              MR. LONDON:  I'll need to look at it, your Honor.

 9              THE COURT:  All right.  4875 is likewise admitted.

10              MR. LONDON:  4875 is --

11              THE CLERK:  AZQ.

12              MR. LONDON:  -- AZQ.

13              THE CLERK:  Is that admitted, Judge?

14              THE COURT:  It is.  4876 is admitted.  What bears

15      the numbers 4870 is excluded.

16              (Whereupon the sidebar conference concluded.)

17              (Exhibits marked in evidence.)

18      BY  MR. LONDON

19      Q   Dr. King, I would like for you to first turn to the

20      document that's tabbed AZG.  Have you found that?

21      A   Wait a second.

22              THE COURT:  Now in evidence as?

23              THE CLERK:  4864.

24              THE COURT:  Thank you.  4864 in evidence.

25      A   Yes, I have that.
```

1    Q    What was the -- what, what bearing did this document

2    have on your study?

3    A    This document refers to something called the POPP study.

4    Q    And may I call it up on the screen.

5         And what page do you want the jury to look at, Dr.

6    King?

7    A    If we look at the one, two, the third paragraph which

8    begins "Despite the potential problems in the POPP Study."

9         So the POPP study was the study that the company

10   did on the use of Neurontin for neuropathic pain and it had

11   a negative result.  And what the e-mail says in this

12   paragraph is, "Despite the potential problems in the POPP

13   Study there was a sense among investigators that we had a

14   minimally effective drug."  And then we go --

15        MR. OHLEMEYER:  Your Honor, I, I object to the

16   narrative and the breadth of the, the breadth of the

17   testimony.

18        THE COURT:  We'll stop it at that point; put

19   another question.

20   Q    What, what about this document contributed in any way to

21   your opinion just expressed that the company delayed or

22   suppressed negative information about Neurontin in its

23   off-label marketing plan?

24   A    What the company decides to do is to delay publication

25   of the POPP study until two other successful trials are

1    published, and I believe that's referred to in the, in this

2    document.  Let me just take a look and find it.

3         Okay.  So in the e-mail, in the last paragraph of

4    the e-mail that begins "A better design," they're talking

5    about ways that they might --

6  **Q**    Rather than narrative describe what they're talking

7    about, perhaps it would be better if you read the precise

8    language that drew your attention.

9  A    Okay.  So, in that paragraph, in the first sentence

10   they're looking for another study that would give them a

11   better outcome and what they might do to counter what they

12   refer to as a negative halo created over Neurontin by the

13   study.

14        **MR. OHLEMEYER:**  Your Honor, respectfully, I object.

15   He's been asked to read the document.

16        **THE COURT:**  The objection is -- we'll stop him at

17   that point.

18  **Q**    Dr. King, what I would like you to do is only read

19   sentences directly from the e-mail first.  Would you do

20   that?

21  A    Yes.  Okay.  So it says:  A better design and tighter

22   controls may result in a different outcome and potential

23   counter the negative halo created over both Neurontin and

24   pregabalin by this study.

25        And if you skip down to the sentence that follows

1    it:  Either way we need to be carefully -- we need to

2    carefully evaluate the potential consequences of doing

3    nothing particularly since this is ultimately a Pfizer

4    sponsored study.

5            And the next sentence says:  When the negative UCSD

6    gabapentin-amitriptyline paper was published, Parke-Davis

7    had a two-pronged approach.  Attack the flaws in the study

8    and sponsor another study which ultimately provided more

9    favorable results.  This is a Pfizer Sweden study, so the

10   first approach is not an option.  The choices are to do

11   nothing (and hope that our competitors don't notice the

12   negative 224 study and this study) or to proactively design

13   a study based on our experiences that may provide better

14   results.  Both negative studies will likely be in the public

15   domain in 2002.

16   **Q**   Was there anything else in this particular exhibit that

17   contributed to the opinion you expressed that the company as

18   part of the publication strategy may suppress or delay

19   publication of unfavorable results?

20   A    Those I think were the central points, yes.

21   **Q**   All right.  If I could ask you to turn to your tab AZQ,

22   it's Exhibit 4875.  And did this exhibit play any role in

23   the opinion you expressed?

24   A    Yes, it did.

25   **Q**   Before I ask you to read from it, to what extent did you

1    familiarize yourself with the Reckless study?

2    A   I looked at -- the Reckless study for me was an example

3    of suppression and delay in publication.  It's a clinical

4    study that failed to find positive effect of Neurontin for

5    diabetic peripheral neuropathy.

6    Q   All right.  Just so that the jury isn't mislead by my

7    question, Reckless was actually a Dr. Reckless, that's his

8    name?

9    A   Yes.  I'm sorry, Dr. Reckless.  Yes, he's a physician.

10   Q   And by whom, if you know, was that study commissioned?

11   A   I believe it was sponsored by Pfizer.

12   Q   All right.

13   A   Or Warner-Lambert.

14   Q   And then going directly to Exhibit 4875, I believe it's,

15   you had tab AZQ, was there anything in this particular

16   exhibit that contributed to your opinion?

17   A   Yes.

18   Q   And would you, again, don't narrate, but please ask --

19   is it up on the screen -- ask the videographer to find what

20   you want on the screen and read that precise language to the

21   jury.

22   A   Okay.  I guess it's on the next -- if I could have the

23   next page, please.  Is there some way for me to make this

24   bigger?  I'm interested in the second paragraph -- oh, thank

25   you.

```
 1              So if we look at the second paragraph of Dear

 2    Angela.  The second and third actually.  So the second

 3    paragraph reads:  Overall the study was not positive in

 4    terms of efficacy but there were some positive aspects of

 5    the secondary measures.  The main investigator in the UK

 6    (Dr. Reckless) is keen to publish this but this will have

 7    several ramifications.  The route that we have all agreed to

 8    now is that we will publish the study but not until we have

 9    published the results of NN25 and NN26.  Those are two other

10    studies.  I do not have a copy of the research report.  And

11    skip to the next sentence:  This study is being written by a

12    UK agency, Synergy, which Beale is coordinating.  And

13    then -- okay.

14    Q   Now, just to kind of capsulize this.  We see that the,

15    for some reason it's written in Spanish, the sender appears

16    to have been Angela Crespo and a copy to John Marino.

17              Do you recognize those names?

18    A   I do.

19    Q   And it was sent by a Michael Rowbotham, and he has a

20    Pfizer e-mail address.

21    A   Correct.

22    Q   What's the date of this document if you, if you can tell

23    in Spanish?

24    A   I don't speak Spanish, but I believe it says it was sent

25    on Monday, the 11th of September of 2000.
```

1    **Q**   All right, sir.

2         And then down below that it has the signature of

3    Michael Rowbotham.  Do you see that?

4    A   Yes, I do.

5    **Q**   And how does it identify Michael Rowbotham?

6    A   He's identified as the Neurontin team leader at Pfizer.

7    **Q**   All right.  Are there any other aspects of this

8    particular exhibit that you need to bring to the jury's

9    attention in regard to the opinion you expressed?

10    A   If we turn to the next page.

11    **Q**   Would that be 4875, page 3.

12    A   Page 3.  We have an e-mail from John Marino who I

13    understand was worldwide team leader or director for

14    Neurontin, and he's writing to Angela, and it says:  Angela,

15    Michael has the right idea here.  We must delay publication

16    of 224 -- that's the Reckless study -- as its results were

17    not positive.  Please work closely with him to make sure

18    this happens.

19    **Q**   Was there anything else in this exhibit that drew your

20    attention in support of your opinion?

21    A   Well, the theme is repeated in the subsequent e-mail

22    from Michael Rowbotham.  And let's see, if you look at the,

23    at the second paragraph there, What is critical that, he

24    says:  What is critical is that 224 -- again, that's the

25    Reckless study -- is not submitted to any publication until

1    we know when the two UK studies are going to be published.

2    This will allow us to ensure that 224 is not published

3    before the UK studies.

4    Q   One of the questions that might come up is what

5    difference would it make whether an English or United

6    Kingdom study or publication was published.  We're here in

7    Boston, we're in the United States.  In the world of

8    pharmaceutical marketing what role would an English study

9    play, if any?

10               MR. OHLEMEYER:  Objection, your Honor.

11               THE COURT:  Put the question again, I'm sorry.

12   Q   What role, if any, would a publication on a

13   pharmaceutical study performed in England play in off-label

14   marketing or publication in the United States?

15               THE COURT:  Sustained on this foundation.

16   Q   Do you have -- are you in a position to -- is that the

17   sort of thing that you've been called upon to study in the

18   past and have some expertise in?  If you don't, you don't.

19   A   Yes.

20   Q   And describe your expertise in that regard, please?

21   A   The world of pharmaceutical research and studies is

22   actually an international one.  So in addition to U.S.

23   publications like the New England Journal of Medicine or the

24   Journal of the American Medical Association, which are two

25   of our premiere academic research journals, studies

1    published in UK journals like the, I think the BMJ is

2    referred to here, which is the British Medical Journal,

3    which is basically the journal of equivalent stature to

4    those I mentioned in the United States.  So, just because a

5    study is done in a foreign country doesn't mean that it's

6    not significant to an understanding of how the drug works.

7    So, a study published in a major medical journal in another

8    country would be relevant to doctors and researchers here in

9    the United States who are trying to understand what the

10   effects of drugs are in various patient populations.

11   Q    In your study and in your experience have you observed

12   whether foreign publications, that is, publications in

13   journals published outside the United States, were used to

14   promote the off-label marketing of Neurontin?

15   A    Yes, they were.

16         **MR. LONDON:**  And so I submit to the Court, to your

17   Honor that he is qualified to answer that question.

18         **THE COURT:**  Just proceed.

19   Q    What role, if any, in your opinion did the study in

20   question, the 224 Dr. Reckless study and its publication or

21   suppression from publication have in regard to the

22   publication campaign that you've been describing?

23         **MR. OHLEMEYER:**  I object to that.

24         **THE COURT:**  Sustained.  Come to the side bar.

25

1    SIDEBAR CONFERENCE, AS FOLLOWS:

2            **THE COURT:**  Now, I think he's a fine economist and

3    I think he is an adequate marketer.  But in all seriousness,

4    has he ever, other than litigation, done some sort of

5    analysis about the effect of foreign publications?

6            **MR. LONDON:**  I honestly cannot answer that.

7            **THE COURT:**  Yes.  Well, I don't know either.  You

8    can ask him.

9            **MR. LONDON:**  I thought I did.

10            **THE COURT:**  Oh, you did and he certainly gave you a

11    great answer.  Now we know that it's his view anyway that

12    the New England, that it's as good as the New England

13    Journal of Medicine, so that has some effect on me if I were

14    the fact finder.  Perhaps you ought to stop and move on,

15    because I'm having trouble knowing how he knows this stuff

16    that he says he knows.

17            **MR. LONDON:**  Well, that's certainly not an issue

18    that we need to push at this point, so we'll just move on.

19            **THE COURT:**  I think that's wise.

20            (Whereupon the sidebar conference concluded.)

21            **MR. LONDON:**  Let's move on.

22            **THE COURT:**  Okay.

23    **BY MR. LONDON**

24    **Q**    All right.  I want to, I want to take you back to the

25    Neurontin off-label marketing strategies that you've been

1    discussing earlier today.  For the last segment of your

2    testimony you've been discussing what you called the

3    publication strategy.

4    A    Yes.

5    Q    To what use did you observe the defendants making of the

6    publication strategy in the promotion of Neurontin for

7    off-label purposes?

8    A    The company used the publication strategy in two ways.

9    One was that they would use publications to promote positive

10   messages about Neurontin, and as we've just been discussing,

11   the second aspect of that is they would use, they would

12   suppress negative information, withhold it from the

13   scientific community about its ineffectiveness for

14   neuropathic pain in this instance and other conditions.

15          What they did --

16          **MR. OHLEMEYER:**  Your Honor, I'm sorry to interrupt,

17   but I object and move to strike the -- I object to --

18          **THE COURT:**  The motion to strike is denied; he may

19   complete his answer.

20          **MR. OHLEMEYER:**  All right.

21   A    So once they established the publication strategy and

22   developed a body of publications out in the scientific

23   literature, they then used that in various aspects of their,

24   let me call them tactical aspects of their marketing

25   campaigns, and they used them for, continuing medical

96

```
1    education was the primary use in a number of different ways.
2    And we can, you know, I can walk through some of the aspects
3    and how they actually used, used these for their off-label
4    promotions.  It's something that I think is a dissemination
5    strategy once they have the favorable publications they want
6    to get these messages out to doctors to encourage off-label
7    prescriptions of, of Neurontin.  And there's some standard
8    marketing methods and techniques that companies use to do
9    this sort of thing, and they make good use of all of them.
10               So, if you'll hold on, if you'll forgive me for a
11   second when I'm moving to the section of my report where I
12   actually list these things.
13               Okay.  So what do they actually do.  So, as I've
14   discussed, basically their strategy was primarily to use
15   educational vehicle which should be things that are neutral
16   and impartial and convey new information to doctors about
17   new drugs, new treatments, they're not intended and should
18   not be used for promoting drugs.
19               MR. OHLEMEYER:  Your Honor, I object.
20               THE COURT:  Your objection is sustained.
21   Q   Dr. King, let's --
22   A   Oh.
23   Q   -- do it one at a time.
24   A   Okay.
25   Q   If we may.
```

1          Dr. King, are there -- did you observe specific

2     techniques, specific practices used by Warner-Lambert or

3     perhaps by Pfizer later on by which it would implement its

4     direct to the doctors off-label marketing program?

5     A    Yes.

6     Q    What did you observe?

7     A    So one thing that Warner-Lambert and Pfizer did is they

8     engaged in something called peer-to-peer selling.

9     Q    What is peer-to-peer selling?

10    A    This is where doctors communicate to doctors

11    peer-to-peer about the, in this case, uses and off-label

12    uses of Neurontin.  So Warner-Lambert would recruit

13    influential physicians who were in a position to serve as

14    speakers to others in the medical community who are highly

15    respected to promote their marketing messages about

16    Neurontin.  And they were typically paid for their services.

17    And these would include not just sort of major national

18    thought leaders or opinion leaders on the subject, but also

19    they would look to so-called local champions.  So these

20    would be people local to something like the New England

21    region who were well-respected within that community and

22    would promote positive marketing messages about Neurontin.

23          So that was one thing that they did.  They looked

24    for opinions of thought leaders and they engaged them in

25    programs where, they might be dinners or conferences or

1    something called grand rounds where a doctor, a group of

2    doctors travels through the hospital and talks about

3    specific cases, and they used all of these as mechanisms for

4    promoting off-label use of Neurontin.  So that was one

5    thing.

6            Another thing that they did is that they used the

7    so-called continuing medical education system.  So doctors

8    need to keep up-to-date on things so they often go to these

9    medical education events to learn about new drugs and

10   treatments so the company would sponsor educational meetings

11   and conferences, and again they would, they would pay

12   doctors to come and present speeches and presentations about

13   the off-label uses of marketing.  They also paid for doctors

14   to attend these conferences.  And some of these could be

15   quite lavish.  I mean, there's one example where doctors

16   were recruited to come to a conference, I believe in

17   Atlanta, and as part of the package they were, in addition

18   to being paid an honorarium and having their luxury hotel

19   paid for, I believe they also went to the Olympics for the

20   closing ceremonies.

21   Q    All right.  Is that an example that's actually in the

22   criminal information, Exhibit 4290, paragraph, I believe

23   it's 30.  Is the example you were giving --

24   A    Yes, let me just read from the criminal information.  It

25   says from August 1st through 5th, 1996, Warner-Lambert

1    organized an advisory board meeting in Atlanta, Georgia in

2    conjunction with the 1996 Summer Olympics.  Warner-Lambert

3    expressly instructed several physician speakers to address

4    some of the unapproved uses.

5    Q   Is there a program whereby companies have employees

6    called detail representatives and employees called medical

7    liaisons?

8    A   Yes.

9    Q   Did Pfizer or Warner-Lambert at the appropriate time

10   make use of either of those programs?

11   A   Both Pfizer --

12           **MR. OHLEMEYER:**  Your Honor, I don't -- I object to

13   the -- I don't understand the term appropriate.

14   Q   Well, we established yesterday --

15           **THE COURT:**  I don't either.  Sustained.

16   Q   We established yesterday by stipulation that Pfizer

17   merged, I believe was the word, with Warner-Lambert

18   somewhere in the year 2000.

19           And so my question is did you have evidence whether

20   during the Warner-Lambert period up to and through some of

21   2000 Warner-Lambert used detail employees and medical

22   liaisons?

23   A   Warner-Lambert used both.

24   Q   And what are detail representatives, please?

25   A   Detailers or detail representatives, it's a term of art

1    in pharmaceutical marketing, and it refers to drug

2    companies' sales representatives who visit doctors in their

3    offices and present information and promotional materials

4    about specific drugs.  So these are basically salespeople.

5         The medical liaison is an entirely different

6    category.  The medical liaison is intended to be someone

7    within the company who is typically a doctor or Ph.D. but

8    who's neutral, who's supposed to be neutral and impartial,

9    so that if a doctor calls about a specific use of the drug

10   or information about unapproved uses, for example, they will

11   be able to give a fair and balanced summary of what's known

12   in the literature and elsewhere in terms of the drug.

13        Now, the problem in both these cases, as I said,

14   the, the detailers or drug company sales representatives,

15   those are clearly marketing people and doctors understand

16   them to be marketing people.  The companies use the medical

17   liaison people who are supposed to be impartial/neutral as a

18   vehicle for promoting, basically they use them as

19   salespeople, and they use them to promote off-label uses of

20   Neurontin.

21   Q    Dr. King, as I understand your testimony, this is

22   talking about doctors in their offices.  Were there any

23   programs in place to go in the hospital?

24   A    Yes, there were also programs where they sent both the

25   sales representatives and the liaisons to hospitals.

1   **Q**   And was there a program in the Northeast central

2   business unit here in Boston regarding targeting residents

3   or hospital students for the off-label promotion of

4   Neurontin?

5   A   Yes, there was.

6   **Q**   Would you describe that for the jury based on what you

7   observed from the company's records?

8   A   Based on the company's records, and it will take me a

9   minute to find it, but we have again from the Northeast

10  business unit a document that describes who they wanted to

11  target and included in, included in that are residents, your

12  doctors in training, so that the business unit is looking to

13  promote to these doctors and involve them in preceptorships

14  where they follow, where they receive additional medical

15  education, and also they target specific hospitals.  Brigham

16  and Women's is one of the hospitals that they targeted in

17  the Boston area.  Mass. General and others are also

18  targeted.  So they had programs where they wanted to start

19  early in the physician's career so that they would

20  actually --

21          **MR. OHLEMEYER:**  Objection, your Honor, to what they

22  intended.

23          **THE COURT:**  Yes, so much -- yes, so much of the

24  answer as begins programs where they wanted, he can't

25  testify to what's in their mind.  That's what I've said with

1    respect to every witness.  He can give his opinions based

2    upon data he has looked at which you will look at, or have

3    looked at, and you'll decide whether based upon that data

4    what weight, if any, like any other witness, you can believe

5    all of this, or you can believe none of it, or you can

6    believe some of it.  So you look at the underlying data and

7    then you'll be in a position to evaluate his opinion.  But

8    when he says they wanted to do this that's out, disregard

9    it.

10   Q    Dr. King, do you understand the admonition?

11   A    Yes.

12   Q    You can only testify to what you observed or read,

13   not --

14   A    Right.

15   Q    -- what someone else thought.  You understand that?

16   A    Yes, I do.  Thank you.

17   Q    All right.  And specifically did you read or observe a

18   program or a strategy by the defendants to go into those

19   hospitals you just mentioned?

20   A    Yes, I did.

21   Q    All right.  Now, a moment ago I think I heard you use a

22   term called key opinions or key thought leaders?

23   A    Yes.

24   Q    And what are opinion leaders or thought leaders within

25   pharmaceutical marketing?

1    A    Generally these are people who are recognized in the

2    field either at a national level or at a local level as

3    having expertise or special knowledge or ability in a

4    particular area.  So these would be leading doctors who

5    were, who have some knowledge and expertise of the use of

6    Neurontin for both on-label and off-label uses.  So these

7    are the, generally recognized as sort of senior, senior

8    members in the doctoral hierarchy.

9    Q    All right.  What would be the purpose, if you know, of

10   engaging opinion leaders and thought leaders to become

11   proponents of Neurontin?

12   A    Well, these are people who are highly respected within

13   the medical community, so that's why as a drug company you

14   want to attract and use these people to be spokesmen for

15   your products because they're already respected within the

16   medical community.

17   Q    All right.  I would like to ask you to turn to Exhibit

18   BKX, BK Xray.  That is a contested exhibit.

19           Have you located it?

20   A    Yes, I have.

21   Q    Without reading from the contents, is this an exhibit in

22   which there is identified opinion leaders or thought leaders

23   in the Boston area?

24   A    Yes, it is.

25   Q    And is it one of those documents that you considered in

```
 1    forming your opinion you just expressed?

 2    A   Yes, it is.

 3              MR. LONDON:  I offer Exhibit BKX as Exhibit 5768,

 4    your Honor.

 5              THE COURT:  No objection?

 6              MR. OHLEMEYER:  Foundation and relevance, your

 7    Honor.

 8              THE COURT:  Overruled.  It may be admitted.

 9    Q   Who in the Boston --

10              THE COURT:  Wait a minute.

11              MR. LONDON:  I'm sorry.

12              THE COURT:  Exhibit 5768.

13              (Exhibit marked in evidence.)

14    Q   Who in the Boston area, for example, were the opinion

15    leaders and the thought leaders hired to serve that function

16    for Parke-Davis in 1999?

17    A   Well, of particular relevance to this case I think

18    one --

19              MR. OHLEMEYER:  Your Honor, I'm sorry.

20    Q   No, please.

21              THE COURT:  Sustained.

22    A   Sorry.

23              THE COURT:  Listen to his questions.

24              THE WITNESS:  I'm sorry, sir.

25              MR. OHLEMEYER:  Well, the additional objection I
```

```
 1    have is, I may have missed it, I don't see this in his

 2    report as an opinion.

 3              THE COURT:  Where is it?

 4    Q    Is this document in your report?

 5              THE COURT:  No, no, no.  Where -- yes.  Well, you

 6    can start that way.  Go ahead.  The challenge is it's not in

 7    the report.

 8              MR. LONDON:  The opinion's in the report, the

 9    document itself is not, your Honor.

10              THE COURT:  Well, don't make statements.  My

11    question is where.

12    Q    The opinion is in the report at page what, Dr. King?

13    Regarding thought leaders?  And I'll help you, if I can.

14              MR. OHLEMEYER:  Page, please?

15              MR. LONDON:  It's page 33, your Honor.

16              THE COURT:  Thank you.

17              MR. LONDON:  Paragraph 50.

18              THE COURT:  Yes, he may testify consistent with

19    Paragraph 50.

20              MR. LONDON:  All right.

21    Q    Then going back to Exhibit 5768.  Who are the opinion or

22    thought leaders in the Boston area that you were referring

23    to in this paragraph?

24              MR. OHLEMEYER:  Well, that's --

25              THE COURT:  Sustained.  It's not in the report.
```

1          **MR. LONDON:**  I misunderstood, your Honor.

2    **Q**   Dr. King, for what period of time did the promotion, the

3    program that you're talking about, peer-to-peer, detail,

4    liaison, continuing medical education, thought leaders,

5    trips, during what period of time did that continue based on

6    the documents you read and you observed in your study?

7    A    Essentially these basic marketing techniques were used

8    throughout the life of Neurontin, beginning from 1994 to --

9    **Q**   Through what year?

10         **THE COURT:**  I'm sorry for interrupting.  Well, the

11   truth is I'm not sorry, but to the extent that I

12   interrupted, I apologize.

13         You just referred to them as basic marketing

14   techniques.  Is that your opinion, that these various things

15   are basic marketing techniques?

16         **THE WITNESS:**  In the pharmaceutical industry, yes.

17         **THE COURT:**  All right.  Thank you.

18   A    And they were used from 1994 to 2004.

19   **Q**   Did you observe these examples both before the year 2000

20   when it was Warner-Lambert and after the year 2000 when it

21   was Pfizer?

22   A    Yes.

23   **Q**   And you have shown us the graph earlier in which,

24   several graphs actually, in which products continued to

25   climb in sales and use through 2003 and 2004?

1    A    Yes.

2    Q    And did these programs that you just described continue

3    throughout that period?

4    A    Yes.

5    Q    At the beginning you were asked what the purposes of

6    your study were, and I now want to ask you if you've formed

7    opinions about those four basic purposes.  The first one was

8    whether the marketing and promotional efforts of

9    Warner-Lambert and Pfizer were significant contributing

10   factors to the off-label sales of Neurontin.

11          Have you formed an opinion about that?

12   A    Yes, I have.

13   Q    And what is your opinion?

14          **MR. OHLEMEYER:**  Same objection as previously

15   stated, your Honor.

16          **THE COURT:**  Overruled.  He may give us his opinion.

17   A    My opinion is that the marketing and promotional efforts

18   of Warner-Lambert and Pfizer were significant contributing

19   factors to the off-label sales of Neurontin.

20   Q    And may I ask to subdivide that generally and with

21   respect to the Boston and the north England -- Northeast

22   customer business unit.

23   A    This would apply --

24          **MR. OHLEMEYER:**  I'm sorry, your Honor, may I have a

25   continuing objection?

1          **THE COURT:**  You may.

2          **MR. OHLEMEYER:**  Thank you.

3          **THE COURT:**  Again, I hear relevance, and you may.

4          Go ahead.  You may answer.

5    A    It would apply both to the national and the local level.

6    **Q**    Do you have an opinion whether off-label sales of

7    Neurontin would have continued even if Pfizer had quit

8    off-label promotional activities for Neurontin at any time?

9    A    I do.  And my opinion is that off-label sales of

10   Neurontin would have continued had Pfizer ceased off-label

11   promotions for Neurontin.

12   **Q**    Do you have an opinion whether the suppression of

13   information about serious adverse events enabled the growth

14   in Neurontin's off-label sales?

15         **THE COURT:**  I don't understand the question.  Would

16   you put it again.

17   **Q**    Do you have an opinion whether suppressing information

18   such as the Dr. Reckless and the Dr. Popp studies we talked

19   about a few moments ago enabled or assisted in the growth of

20   off-label sales of Neurontin?

21   A    I do.

22   **Q**    And what is your opinion?

23         **MR. OHLEMEYER:**  Your Honor, the objection to that

24   is foundation and relevance.

25         **THE COURT:**  Noted, but overruled.

1    A    My opinion is that the suppression of negative or

2    adverse information about Neurontin enabled growth in

3    off-label market sales.

4    Q    And then my last opinion that I want to ask you about, I

5    want to focus in on whether -- well, let me just ask you the

6    opinion.

7            Do you have an opinion whether Pfizer's off-label

8    marketing of Neurontin from 1994, '95, '96, certainly all

9    the way through to the time Mr. Shearer died, in 2002, do

10   you have an opinion whether the off-label marketing of

11   Neurontin by the defendants influenced all physicians who

12   prescribed Neurontin?

13           MR. OHLEMEYER:   Foundation, your Honor, and

14   relevance.

15           THE COURT:   Sustained.

16   Q    Do you have an opinion whether it indirectly influenced

17   doctors even if they were not directly detailed?

18           MR. OHLEMEYER:   Same objection.

19           THE COURT:   Same ruling.   Sustained.

20   Q    Do you have an opinion whether doctors who attended CME

21   events and events such as dinner programs and what have you

22   that you described a few moments ago were influenced by

23   those events and the presentations at those events to

24   prescribe Neurontin to their patients for off-label

25   purposes?

1              MR. OHLEMEYER:  Same objection.

2              THE COURT:  Sustained.  You may argue the point.

3              MR. LONDON:  Yes, I'm going to --

4              THE COURT:  That's all.

5      Q    Did you track, did the company track physicians

6      prescribing practices, Dr. King?

7      A    They did.

8      Q    And do they track physicians prescribing practices for

9      physicians who attended these dinner meetings?

10     A    They did.

11     Q    How did they do that?

12     A    They looked at doctors who had attended the meetings,

13     they looked at what they were prescribing before they

14     attended the meeting, and then what they prescribed, how

15     much Neurontin they prescribed subsequent to attending the

16     meetings, and they looked to see if those amounts increased.

17     Q    And did you -- did they track the same type of

18     information with respect to doctors who went on those trips

19     to Florida and to the Olympics?

20             MR. OHLEMEYER:  I object to that as argumentative,

21     your Honor.

22             THE COURT:  No, no.  Their own documents.  Did they

23     track that material from their own documents, to your

24     knowledge?

25             THE WITNESS:  Yes, they did.

1          **THE COURT:**  All right.

2    **Q**   Did they track the prescribing information, the number

3    of prescriptions and frequency of Neurontin prescriptions

4    off-label for doctors who attended CME, continuing medical

5    education events?

6    A   Yes, they did.

7    **Q**   From that information were you able to form an opinion

8    whether attendance at these events at which Neurontin's

9    off-label uses were presented to them influenced those

10   doctors prescribing Neurontin off-label?

11   A   Yes.

12   **Q**   And what is your opinion?

13          **MR. OHLEMEYER:**  Same objection, your Honor.

14          **THE COURT:**  Yes.  Sustained.

15          What do you draw from the documents?  I mean, if

16   you looked at those tracking documents, you looked them

17   over, what do those documents show?  Let's ask it that way.

18   **Q**   What do those documents show?

19   A   The documents show that the company tracks the

20   physicians prescribing practices to see whether following

21   various continuing medical education events whether their

22   prescription and use of Neurontin increased, and they found

23   that it often did.

24   **Q**   I want to ask some housekeeping questions and then I'll

25   pass the witness.

1              Dr. King, in terms of the volume of data that you

2     reviewed for this study, how large a volume of data are we

3     talking about?

4     A    We're talking about thousands and thousands of pages.

5     We're talking about, you know, linear feet of documents.

6     Q    In terms of binders alone, how many binders of company

7     documents do you have and did you review?

8     A    I don't exactly know how many binders.  I know that if

9     you took all the documents that support the footnotes in my

10    report you would probably have at least six or eight linear

11    feet of documents, which is, I'm not sure how many binders.

12    Q    And then in terms of database, electronic information,

13    can you give us an estimate of the size of those, of the

14    volume of that information?

15    A    We had very substantial information.  I don't actually

16    know the size of them, but we had thousands and thousands of

17    internal company documents, e-mails.  We had large databases

18    that would track sales of Neurontin by indication, by

19    doctor.  We had information about sales calls.  We had

20    information about specific doctors who were visited by

21    pharmaceutical representatives.  We had information in our

22    database about communication messages that went out from the

23    company to individual doctors.  We had, we had the data that

24    I mentioned previously from the outside companies from

25    Verispan, from IMS Health, from NDC Health, and these are

1    all large databases that contain information not only about

2    Neurontin but also about some of its competitors in terms of

3    sales, their use by indication, doctors' prescriptions and

4    those sort of things.  So we had a very extensive and very

5    comprehensive compilation of documents.

6    **Q**   Is it customary in your profession to summarize that

7    type of information into charts and graphs of the type

8    you've shown us before?

9    A   Yes, it is.

10   **Q**   Is that what you did?

11   A   I did, yes.

12   **Q**   Is it customary for you and for people who do what you

13   do to rely on those kinds of summaries of large bodies of

14   data?

15   A   Yes.

16   **Q**   All right.  And, Dr. King, finally this question.  You

17   said that the plaintiffs asked you for the study.  Were you

18   paid to do this work?

19   A   Yes, I was.

20   **Q**   And what was your hourly rate?

21   A   Greylock McKinnon, I work as a special consultant for

22   Greylock McKinnon and Greylock McKinnon initially was $450

23   an hour for my time, and from January 1st, 19 -- I'm sorry,

24   2007 to the present it's been $475 an hour.

25        **MR. LONDON:**  Your Honor, at this time I would like

1    to pass the witness.

2              **THE COURT:**  Mr. Ohlemeyer, any questions for this

3    witness?

4              **MR. OHLEMEYER:**  I have a few, your Honor.

5              **THE COURT:**  Proceed.

6              **MR. OHLEMEYER:**  And may I have the podium, Mr.

7    London.

8              **MR. LONDON:**  What would you like to have?

9              **MR. OHLEMEYER:**  The podium.

10             **MR. LONDON:**  The podium.  You may.

11                        **CROSS-EXAMINATION**

12   **BY MR. OHLEMEYER**

13   **Q**    Good afternoon, Professor King.

14   A    Good afternoon.

15   **Q**    We've not met, right?

16   A    No, we haven't.

17   **Q**    My name's Bill Ohlemeyer and I represent the Pfizer

18   defendants.

19             The time you spent doing this work for the

20   plaintiff's lawyers -- and that's who hired you to do it,

21   right?

22   A    Yes.

23   **Q**    -- added up to about what in terms of dollars?

24   A    In terms of dollars, the total amount that was paid to

25   Greylock McKinnon -- are you talking about my time or the

```
 1   whole --
 2   Q   What did your company receive for the work that you and
 3   your associates did on this matter?
 4   A   My company, I don't have the exact number, but my
 5   company through basically our current billing cycle, so
 6   through this month, was paid a little bit over $300,000.
 7   Q   And I don't mean to be cute about this, but this is your
 8   day job, right, consulting with lawyers or anyone else who
 9   wants some information or opinions about a variety of
10   different things?
11   A   Yes.
12   Q   You started out as a lawyer by background, right?
13   A   Before that I was an astrophysicist, but yes.
14   Q   And then you got an economics degree, right?
15   A   Correct.
16   Q   And then you joined this consulting firm about six or
17   seven years ago?
18   A   Yes.
19   Q   All right.  So you're not an academic researcher who
20   researches pharmaceuticals and the medical profession and
21   publishes articles about it, right?
22   A   Actually I would say no, that's not correct.  I have
23   published articles on this.  You have a list of the
24   publications.  I have recently conducted active research,
25   and I still am actually involved in doing academic research
```

1    on public health issues.

2    **Q**  I might not have been clear.  The opinion you've

3    expressed this morning is not something you've published or

4    you prepared to have published separate and apart from your

5    work on this litigation?

6    A  No, that's correct.

7    **Q**  Okay.  Now, Neurontin is not something you can buy

8    without a prescription, right?

9    A  Yes.

10    **Q**  It makes it a little different than a lot of consumer

11    products or things that people market or advertise, doesn't

12    it?

13    A  Yes.

14    **Q**  A doctor has to prescribe Neurontin if I want to go to

15    CVS and buy it, right?

16    A  Yes.

17    **Q**  And so prescription medicines, without belaboring the

18    obvious, a prescription medicine is a medicine you need a

19    prescription to purchase?

20    A  Yes.

21    **Q**  It has to be written by a doctor?

22    A  Correct.

23    **Q**  All right.  It's not like candy or cigarettes or

24    detergent, is it?

25    A  No.

1    **Q**   It's something you referred to in the past as an

2    experience product, right?

3    A   Experience or credence product.  These are technical

4    terms in economics, yes.

5    **Q**   But what that means, though, is it's something that you

6    have to like to buy again, right?

7    A   No, I don't think that's entirely accurate.  That's not

8    what an experience good is.

9    **Q**   Well, let me find -- you were asked that question at

10   your deposition, weren't you?

11   A   I don't recall.

12          **MR. LONDON:**  May I ask that he be given a copy of

13   his deposition if he's going to be presented questions from

14   the deposition.

15          **THE COURT:**  Well, he should indicate the page if

16   he's going to examine from the deposition so you can see it.

17   That's the customary practice.

18   **Q**   Well, maybe let's go at it this way, Doctor.  Tell us

19   what an experience product is?

20   A   So economists generally distinguish between two types of

21   goods.  One is called a search good and one is called an

22   experience good.  Now, the idea for a search good is that

23   you know what the product characteristics are and you know

24   exactly what it is and you know how much you're interested

25   in having such a thing.  And the reason they call it a

1    search good is if you're looking for this type of good all

2    you have to do is find the right product with a given set of

3    characteristics and you know that this is, you know exactly

4    what the product is and you know to what extent you will

5    like it or not like it.

6         They draw the distinction to show the difference

7    between that and another type of good, which they refer to

8    as experience goods.  And what's different about experience

9    goods is that it's something you have to try to see if you

10   like it.  You don't immediately know just from a description

11   of the product itself whether you're going to like it or not

12   or whether it's going to be effective for what you want to

13   use it for.  And so these are two very different types of

14   goods, and they have different properties.  Obviously a

15   search good, you know, it might be something like a stapler.

16   You know, you want a red stapler.  You want it to be a

17   standard staple size.  You go to Staples, you buy the

18   stapler.  That's easy.

19        Something more difficult is you're trying to decide

20   where do I want to go for vacation.  And you have two places

21   you've never been to.  And you don't really know how you

22   feel about going, say, skiing in Vermont versus a nice sunny

23   day in Aruba, but maybe some of you will, until you actually

24   go and try it.  And so --

25        **MR. OHLEMEYER:**  I'm sorry, your Honor, I think he's

1    answered the question.

2              **THE COURT:**  Well, we'll stop it there.

3              **MR. OHLEMEYER:**  Okay.

4    **Q**   And there are aspects of prescription drugs that fall

5    into the experience good category, aren't there?

6    A   Yes.

7    **Q**   All right.  And that's because a doctor has to make a

8    decision before he or she writes a prescription to a

9    patient, don't they?

10   A   No, that's not a correct description of what I mean by

11   experience good in this context.

12   **Q**   I'm sorry, Doctor, that wasn't my question.

13   A   Okay.

14   **Q**   My question is a doctor has to make a decision before

15   they write a prescription for a patient, don't they?

16   A   Yes.

17   **Q**   And that decision is they have to decide based in their

18   judgment, their independent clinical judgment -- because

19   their name goes on the prescription, doesn't it?

20   A   Yes, it does.

21   **Q**   -- that that prescription is going to help their

22   patient, don't they?

23   A   Yes.

24   **Q**   And you don't write prescriptions, right?

25   A   No.

1    Q    You're not a medical doctor?

2    A    No, sir.

3    Q    And in connection with this case you're not really

4    familiar with the claims in this case, are you?

5    A    I'm not familiar with any, with the claims pertaining to

6    this specific plaintiff, no.

7    Q    Do you know the name of the plaintiff in this case?

8    A    I know his last name is Shearer.

9    Q    You don't know his first name?

10   A    No, sir.

11   Q    All right.  You've never spoken -- have you spoken with

12   his wife, the plaintiff in this case?

13   A    No.

14   Q    Have you spoken with any of the doctors who prescribed

15   Neurontin to him?

16   A    No.

17   Q    Do you know when he was first prescribed Neurontin?

18   A    No.

19   Q    Do you know how long he took it?

20   A    No.

21   Q    Do you know why he took it?

22   A    No.

23   Q    If I told you, or if I asked you to assume that he was

24   prescribed Neurontin to treat pain then you would agree with

25   me that that is a different indication or a different use

1   than some of the other things you've talked about this

2   morning in your charts, right?

3   A   No, I actually did talk about pain.

4   Q   You did talk about pain and a lot of other things,

5   right?

6   A   Yes.

7   Q   But you don't know why Mr. Shearer's doctors prescribed

8   Neurontin to him?

9   A   No, I don't.

10  Q   And I'm sorry if I asked this.  Do you know how many

11  months that he took it?

12  A   No, I don't.

13  Q   If I asked you to assume that he took it for 16 months

14  would you agree with me that his doctors had to make a

15  decision that it was actually beneficial to him before they

16  continued to prescribe it to him over those 16 months?

17  A   Well, I don't know why the doctors, his doctors

18  specifically prescribed it.

19  Q   Do you know what benefit it provided to Mr. Shearer?

20  A   No.

21  Q   Now, you got involved in this case at the request of

22  Mrs. Shearer's lawyers, right?

23  A   Yes.

24  Q   And they provided you this mountain of information you

25  described that for the most part came from them, right?

1   A   My understanding is it came from the company.

2   Q   Did you get it from the company, Doctor?

3   A   No.

4   Q   Who did you get it from?

5   A   I got it from the attorneys.

6   Q   And then you were asked to prepare a report?

7   A   Yes.

8   Q   Express some opinions, right?

9   A   Yes.

10  Q   And actually the way the rules work the parties were

11  allowed to ask you questions at the deposition?

12  A   Yes.

13  Q   It's almost like trying to defend your thesis, right?

14  A   Not exactly.

15  Q   I don't have a Ph.D. but I've always -- you have an

16  opinion and people ask you questions about it, right?

17  A   Yes.

18  Q   Because they're trying to test your opinion?

19  A   Yes.

20  Q   There's nothing wrong with testing your opinion, right?

21  A   No.

22  Q   All right.  Now, there are a variety of factors that

23  doctors use to prescribe medicine to their patients, aren't

24  there?

25  A   Yes.

1    Q    For example, one of the things a doctor might use is his

2    or her clinical experience, right?

3    A    Yes.

4    Q    What is clinical experience?

5    A    Clinical experience as I understand it, and again I'm

6    not a doctor, is, you know, their experience with other

7    patients on that drug or similar drugs and how they would

8    respond to it.

9    Q    Respond positively or negatively?

10   A    Yes.

11   Q    You would presume if a doctor had a negative experience

12   with a drug he or she would be a little reluctant or a

13   little careful about prescribing it a second time, right?

14   A    I presume, yes.

15   Q    And by like token, if they had a positive experience

16   with a medicine that might inform their decision about using

17   it again in that or another patient, right?

18   A    Yes.

19   Q    All right.  Now, another source of information doctors

20   use to prescribe, make for prescribing decisions are the

21   clinical experiences of their colleagues, right?

22   A    Yes.

23   Q    And doctors presumably talk to each other?

24   A    Yes, they do.

25   Q    Lawyers talk to each other, economists talk to each

1    other, professors talk to each other.

2    A    I'm sorry, is that a question?

3    Q    There's nothing unusual about getting information from

4    your colleagues, right?

5    A    No.

6    Q    Especially if you're in the same profession, right?

7    A    Right.

8    Q    And some of those conversations are informal, right?

9    A    Yes.

10   Q    Some can occur in more formal settings, right?

11   A    Yes.

12   Q    Symposia, conventions, things like that?

13   A    Yes.

14   Q    Now, you talked about the off-label use of Neurontin.

15   And I just want to make sure we're both clear on something.

16   It's legal for a doctor to prescribe medicine off-label to

17   his or her patient, isn't it?

18   A    Yes.

19   Q    And, in fact, sometimes it's necessary for the doctor to

20   do that, right?

21   A    Again, I'm not a doctor, so I don't know, but

22   presumably, yes.

23   Q    Can you tell me what medicine in the United States is

24   approved by the FDA to treat general pain?

25            MR. LONDON:  Objection.

1          **THE COURT:**  Well, sustained, based upon what I

2     understand his foundation is.

3          **MR. OHLEMEYER:**  Right.

4     Q    Did you make any study in your research that you did for

5     the plaintiff's lawyers to determine whether there are

6     specific medicines approved by the FDA to treat the kind of

7     pain that doctors were prescribing Neurontin for off-label?

8     A    No, I did not.

9     Q    Now, Neurontin's part of a class of medicine called

10    antiepileptic drugs, isn't it?

11    A    Yes.

12    Q    And, in fact, I think you even showed us in one of the

13    exhibits you used that antiepileptic drugs had been used by

14    doctors to treat pain before Neurontin was invented; isn't

15    that right?

16    A    That's true, but I think there's an important, one has

17    to distinguish between different types of antiepileptic

18    drugs.  Neurontin works through a different mechanism of

19    action than some of the other antiepileptic drugs is my

20    understanding.  So, the fact that another member of the

21    antiepiletic drug class is good for a particular unapproved

22    use does not necessarily mean that Neurontin would be,

23    because it works through a different mechanism of action.

24    Q    That's a part I want to talk a little bit about.

25             So within the class of drugs, specifically

1  antiepileptic drugs, they're different kinds of drugs,

2  right?

3  A   Yes.

4  Q   And they're different chemical compounds sometimes,

5  right?

6  A   Yes.

7  Q   And they have different mechanisms of action, don't

8  they?

9  A   Yes, they do.

10  Q   That means they behave differently when they take them,

11  right?

12  A   Correct.

13  Q   And what you're saying, I think, is just because one of

14  those drugs in the class has a certain effect on somebody

15  who takes it doesn't mean another drug will have the same

16  effect, right?

17  A   Correct.

18  Q   So, for example, if I were a doctor and I were going to

19  look at a drug in that class like Lamotrigine or Topiramate,

20  I would have to ask myself whether those drugs were going to

21  behave like Neurontin based on what I knew about their

22  chemical composition and the way they behave in the body?

23  A   I don't have specific knowledge about those particular

24  drugs but --

25  Q   Well, let me rephrase the question.  I think what you

1    are telling me is you shouldn't predict how one drug in a

2    class is going to behave based on clinical data or

3    information about another drug in that class?

4    A   I guess what I would say is that it depends.  It depends

5    upon how significant the differences are and what the

6    differences are you want to use it for.  It's a factor you

7    want to take into consideration.

8    Q   And if I wanted to figure out what those differences are

9    what kind of data would I look for?

10             MR. LONDON:  Objection.  That's not an economic --

11             THE COURT:  Yes, sustained, on what I understand

12   he's qualified to testify about.

13   Q   In your profession, Doctor, if you want to determine

14   significant differences between two different groups of

15   things or groups of people or the behavior of two different

16   groups of people, what kind of data do you use or what kind

17   of experiments do you conduct?

18   A   Well, I guess this is a question about what we call

19   experimental economics.  So, you would get together groups

20   people and you would look at how they behaved under

21   different circumstances.

22   Q   Would you want to control that experiment?

23   A   Yes, you would.

24   Q   What does that mean?

25   A   A controlled experiment involves, it involves a couple

1     of concepts.  So, one thing you want to do in controlling

2     your experiment is you want to make sure that you do a

3     scientific experiment that let me say is just clean.  So you

4     want to make sure that whatever it is the effect you're

5     interested in looking at or understanding that you've

6     removed everything else from consideration and you're just

7     looking at the influence of that one particular thing.

8            The other aspect of a controlled study that's

9     important in the medical context is that you want to, you

10    want to use a randomized clinical trial that's blinded.

11           Now, those are a lot of technical terms.  But

12    basically what the idea is that you want to get a group of

13    people together and randomly separate them into two

14    different groups and then to one group you would apply

15    treatment, you would give them Neurontin, and to the other

16    group you would give a placebo, a sugar pill, something that

17    didn't have an effect, but you wouldn't let either the

18    doctors or the people in those groups know whether they were

19    actually receiving the treatment or the placebo.  And you do

20    that to eliminate bias and then you look at the results of

21    the outcome and you say, okay, the people who basically had

22    the placebo and didn't receive any effective therapy, did

23    they respond to treatment or not compared to the ones who

24    actually actively received the drug of Neurontin.  And

25    that's how you would construct, that's generally speaking

1    how you would construct a clinical trial.

2    Q    Thank you, Doctor.

3         Now, another kind of medicine that is prescribed

4    off-label for pain, or was prescribed off-label for pain

5    during the period in which you were doing your study were

6    tricyclic antidepressants, right?

7         MR. LONDON:  I'm going to object.  That's outside

8    the scope of his expertise and outside the scope of --

9         THE COURT:  Well, please don't argue.  But I'll

10   sustain it on that ground.

11   Q    Do you know, Doctor, whether there were any other

12   medicines being used off-label for pain during the period of

13   time you studied?

14   A    I presume there were.

15   Q    All right.  And do you know whether they were used

16   notwithstanding the absence of any improper off-label

17   promotion?

18   A    You know, I assume based on the academic studies and

19   elsewhere that there were drugs that were being used for

20   pain and other indications that were legitimate off-label

21   uses.

22   Q    And would you agree with me that the best evidence of

23   why a particular doctor chose to prescribe a particular

24   medicine to a particular patient would be testimony from

25   that doctor?

1          **MR. LONDON:**  Objection.

2          **THE COURT:**  Would you put the question again, I'm

3    sorry.  My fault.

4          **MR. OHLEMEYER:**  If I can.

5    **Q**   Would you agree with me, Doctor, that the best evidence

6    of why a particular doctor prescribed a particular medicine

7    to a particular patient, and I should add at any

8    particular point in time, would be testimony or evidence

9    from that doctor?

10         **MR. LONDON:**  Objection.

11         **THE COURT:**  Overruled.

12   A   I guess as a practical matter given human nature, I

13   would not necessarily agree with that.

14   **Q**   All right.  So, you don't think doctors make -- do you

15   think doctors make decisions based on what they think is in

16   the best interest of their patients?

17   A   I would like to think so and that's their ethical

18   responsibility.  I don't think that means that all doctors

19   do that.

20   **Q**   But in connection with your work in this case you

21   actually did not do -- well, strike that.  Let me go back at

22   it this way.

23         You haven't reached any conclusions about the

24   percentage of Neurontin marketing that was improper as

25   opposed to proper, have you?

1    A    I haven't reached a conclusion about a specific number.

2    Q    Right.

3    A    But --

4         **MR. OHLEMEYER:**  Your Honor, I think he's answered

5    the question.

6         **MR. LONDON:**  Objection to the --

7         **THE COURT:**  No, it is -- yes.  Sustained.

8    Mr. London will have a chance to ask you further questions.

9    Q    Now, there are ways to properly promote a product for

10   off-label uses, aren't there?

11   A    Yes.  Oh, sorry, properly -- you cannot promote drugs

12   for off-label uses.

13   Q    There are ways to properly provide doctors information

14   about off-label use, aren't there?

15   A    Yes.

16   Q    So, I used the word promote imprecisely.

17   A    I think that's an important distinction.

18   Q    No, I agree.  I agree.

19         You haven't done any specific analysis of the

20   impact that permissible on-label marketing would have had on

21   off-label sales for a particular drug, specifically

22   Neurontin, have you?

23   A    No, that's not correct.  I mean, I just gave testimony

24   on trying to understand what level of Neurontin use we would

25   expect to occur and we actually saw occur in the data when,

1    before there was the illegal off-label promotion.

2    Q   And you see that's why I asked the question.  Because if

3    you --

4          **MR. OHLEMEYER:**  If I can have page 114, line 7

5    through 10 of his deposition, please, October 28th.

6          **MR. LONDON:**  Well, may I see it?  May the witness

7    see it?

8          **THE COURT:**  Well, no, the witness does not

9    necessarily have to see it now.  And his calling it out to

10   you is enough for you to make reference to it.

11   Q   Do you recall being asked this question -- by the way, a

12   deposition is a proceeding where there's a court reporter --

13   I'm sorry, the judge explained what a deposition is this

14   morning.  I won't belabor it.

15         Do you remember being asked this question and

16   giving this answer at that deposition.

17         Question at line 7:  Have you done a specific

18   analysis of the impact that permissible on-label marketing

19   would have had on off-label sales of Neurontin?

20         Answer:  No, I haven't.

21         Do you recall that question and answer?

22   A   Generally, yes.

23   Q   All right.  Now, you also, Doctor, haven't reached any

24   conclusions about how much time, money or effort was spent

25   on permissible marketing initiatives compared to allegedly

1    or improper impermissible marketing initiatives, right?

2    A   Yes.

3    **Q**   Now, you have no opinions, do you, Doctor, about the

4    number of additional off-label Neurontin prescriptions that

5    resulted from the alleged improper promotion that you've

6    described; isn't that right?

7    A   I don't specifically in terms of a specific qualifiable

8    number.

9    **Q**   All right, thank you, Doctor.

10   A   But --

11   **Q**   You don't have any -- and you haven't done any

12   statistical analysis that would allow you to estimate the

13   number of off-label prescriptions that resulted from the

14   alleged improper promotion of Neurontin, have you?

15   A   No, but other experts in this case have as you know.

16   **Q**   You haven't offered any opinion as to what portion,

17   quantitatively, of those increases, increase in sales or

18   prescriptions are attributable to improper marketing, do

19   you?

20   A   Well again, I described --

21   **Q**   It's a yes or no, Doctor.  Do you or don't you?

22             **MR. LONDON:**  Well, objection.

23             **THE COURT:**  Wait, wait a minute.  As you recognize

24   you need never give a yes or no answer.  But listen to the

25   questions.  Grammatically on cross-examination they're

1    likely to be phrased that you could give a yes or no answer.

2    Now, if yes or no is an accurate and honest answer, the

3    witness is to testify accurately and honestly.  He's sworn

4    to do that.  You can always say I can't give a yes or no

5    answer.  But stop.

6            **THE WITNESS:**  Okay.

7            **THE COURT:**  Then the person asking the question

8    gets the choice whether to follow up or ask another question

9    or whatever.  And always you can say I don't know, I don't

10   remember.

11           Go ahead.

12           **THE WITNESS:**  Thank you.

13   **Q**   Let me, let me withdraw or rephrase.

14           At your deposition, Doctor, you didn't offer any

15   opinion as to what portion quantitatively of the increases

16   in the number of off-label prescriptions that were written

17   for Neurontin were attributable to improper marketing, did

18   you?

19   A    No.

20   **Q**   And at the time you prepared your report and presented

21   yourself for your deposition you hadn't sought to determine

22   whether any particular Neurontin prescription for any

23   particular patient was the result of improper promotion;

24   isn't that right?

25   A    That's correct.

1    Q    So you're not offering an opinion that Mr. Shearer's

2    Neurontin prescriptions resulted from any improper conduct,

3    are you?

4    A    I don't think I could answer that yes or no.

5    Q    Well, let me ask you this.  Do you remember being asked

6    this question at your deposition at page 126, line 17, and

7    giving this answer at line 23.

8              Okay.  And you're not offering an opinion specific

9    to any plaintiff that their particular prescriptions

10   resulted from any alleged improper promotion?

11             Answer:  Yes.

12   A    Yes, that's correct.

13   Q    That was your, that was your answer to that question?

14   A    Yes.

15   Q    Now, you've never done a nationwide survey, have you, of

16   prescription, doctors prescribing habits?

17   A    No.

18   Q    You haven't done a regional survey?

19   A    There's -- I mean, the -- there's information about

20   national and regional prescription behaviors of doctors in

21   the data that were turned over from the company.  I have not

22   done anything in --

23   Q    You haven't done anything?

24   A    No.

25   Q    All right, thank you.

```
 1              MR. OHLEMEYER:  May I have the first chart that you

 2      all used.

 3              MR. LONDON:  Is it on the screen?  I can't see what

 4      you --

 5              MR. OHLEMEYER:  Yes.  Yes.  It's Figure 1.

 6              MR. LONDON:  It's Figure 1.

 7              MR. OHLEMEYER:  Figure 1.  Thank you.

 8              THE CLERK:  Oh, I have to switch it.  Oh, you're

 9      going to --

10      Q   Now, Mr. London asked you about the source data for this

11      chart, right?

12      A   Yes.

13      Q   And by the way, you don't know whether -- do you know

14      whether Mr. Shearer was prescribed Neurontin for anxiety or

15      for something else?

16      A   I do not know.

17      Q   On the bottom there it says source, data provided by

18      Keith Altman, Finkelstein & Partners, right?

19      A   Right.

20      Q   So you told us a couple of other sources, and you did

21      mention Mr. Altman, but when you prepared the chart the

22      primary source of this data was Mr. Altman, right?

23      A   Well, the source of the data is the Verispan data.  Got

24      it through Mr. Altman, yes.

25      Q   But what Mr. Altman did for you is he did data analysis
```

1   that you wanted to use in your report, right?

2   A   Yes.

3   Q   He didn't just provide you information, he actually

4   analyzed it based on whatever background and education and

5   experience he has and gave it to you in a specific form,

6   didn't he?

7   A   Well, I guess it depends on what you mean by analysis.

8   He took the numbers and he turned them into a graph.   If

9   that's data analysis, that's what he did.   Yes.

10   Q   And this chart leaves some information out, doesn't it,

11   about what happens after 2004, right?

12   A   Well, the information only is complete to 2004.

13   Q   And if we had, if you had included information after

14   2004, we would know that in about the fourth quarter or

15   third quarter of 2004 Neurontin went off patent, right?

16            MR. LONDON:   Objection.

17            THE COURT:   No, overruled.

18   A   Yes.

19   Q   You know that, don't you?

20   A   Yes.

21   Q   And you actually know that it was then and continues to

22   this day to be sold as a generic form of the drug, right?

23   A   Correct.

24   Q   And if I was going to take this chart out to yesterday

25   that line would go almost up at a 45 degree angle, wouldn't

1    it?

2    A    I don't know.

3    Q    Doctors continue to write prescriptions for gabapentin

4    after 2004, don't they?

5    A    I assume they do.

6    Q    And, in fact, the most prescriptions ever written for

7    gabapentin since it was introduced as Neurontin in 1993

8    occurred last year, didn't they?

9    A    I don't know.

10   Q    You didn't study that?

11   A    No, I didn't.

12   Q    The lawyers didn't give you that information?

13   A    No.

14   Q    So doctors have continued to prescribe gabapentin and

15   before that Neurontin to their patients even after the

16   information you've described was made public about the

17   improper marketing?

18   A    I don't know.  I haven't looked at that.

19   Q    You didn't look at that?

20   A    No.

21   Q    Why not?

22   A    Because my instructions were to look at the period from

23   1994 to 2004, so that's what I did.

24   Q    Well, that doesn't really tell us the whole story, does

25   it?

```
1    A    I guess it depends upon what questions you want to ask.

2              MR. LONDON:  May we approach?

3              THE COURT:  You may.

4    SIDEBAR CONFERENCE, AS FOLLOWS:

5              MR. LONDON:  The only -- I continue to screw up,

6    your Honor.  I apologize.

7              THE COURT:  Let me -- you're not at all.

8              Let me explain what I'm doing and then I'll hear

9    you very briefly.

10             He gets -- I've cut you off as of the death which

11   seemed to me a fairly good bright line rule.  He starts in

12   things clearly after the death and I begin to wonder about

13   it because it doesn't sound relevant to me and then he makes

14   the point that the total prescription of this generic is

15   great, he asserts it in his questions, the witness is

16   equivocal on the answer, and that does meet the test of

17   relevance that it was the marketing that was driving the

18   drug in the relevant period.  So, for that purpose, and that

19   purpose only, I'm modifying my 2003 rule, and that's why I'm

20   letting him do this.

21             Now, what am I missing?

22             MR. LONDON:  If the source of the data is counsel

23   there's no foundation.

24             THE COURT:  Well, well --

25             MR. LONDON:  And that's my objection.
```

1          THE COURT:  That's true.  But it is

2    cross-examination and I presume counsel's good faith.  We'll

3    see what he says.  But I have restricted you and I think you

4    get the message.

5          MR. OHLEMEYER:  I understand.

6          THE COURT:  He's not going beyond his expertise as

7    an economist marketer.  All right.

8          (Whereupon the sidebar conference concluded.)

9          MR. OHLEMEYER:  I'm sorry, can you read the last

10   question and answer back.

11         THE COURT:  No, you can ask it.

12         MR. OHLEMEYER:  Oh, okay.  I'm sorry.  I just don't

13   remember where we were.

14   Q    Well, Doctor, if you wanted to study the issues we just

15   talked about you know where you could find the information,

16   right?

17   A    Which issues?

18   Q    Well, just the prescribing, what happens to

19   prescriptions for Neurontin and gabapentin after 2004?

20   A    Well, we know as a general matter that what happens with

21   a drug when it meets generic competition is that the sales

22   of the branded drug plummet and the sales of the generic

23   drug increase dramatically typically capturing about 90

24   percent of the market share.  And a big part of the reason

25   for that is because, whereas a branded drug typically costs

1    dollars for prescriptions, as I'm sure we're all familiar,

2    the generic drug typically costs dimes or pennies.  So

3    there's a huge drop in price and the generic basically

4    captures the market from the brand-name drug.

5    **Q**   Let me ask you --

6    A    That's what I know.

7    **Q**   Let me ask you about Exhibit 4864 in evidence that you

8    were asked about.

9            May I have that one on the screen.

10           Can you read the subject line on this for me?

11   A    I'm sorry, I can't read any of it.

12   **Q**   I'm sorry.  I'll have them -- what's this discussion

13   about, if you know.

14           Well, let me ask you this.  Read the subject line

15   for me.

16   A    The subject line says:  Subject Re GBP post amputation

17   pain.

18   **Q**   And you know from your work that GBP is an abbreviation

19   for gabapentin?

20   A    Yes.

21   **Q**   And post amputation pain is something that presumably

22   somebody was thinking about gabapentin in connection with?

23   A    Yes.

24   **Q**   That's different than neuropathic pain?

25           **MR. LONDON:**  Objection.

1    Q    If you know.

2              THE COURT:  Well, he can tell us what he thinks.

3    He's not qualified to answer.

4              What do you think?

5              THE WITNESS:  I'm not sure about that one.

6              THE COURT:  All right, that's your answer.

7    Q    Let me ask you about Exhibit 4875 in evidence.  This is

8    the so-called Reckless study, right?

9    A    Yes.

10   Q    And this was actually published, though, wasn't it, this

11   study?

12   A    Ultimately, yes.

13   Q    When was it published?

14   A    I'd have to look at my report, it was sometime after

15   2000.

16   Q    But you know it was published?

17   A    I believe it was published, yes.

18   Q    So you weren't suggesting earlier that it wasn't

19   published?

20   A    No.  I was suggesting that the publication was delayed.

21   And my understanding also is that the nature of the

22   conclusions were changed.

23             MR. OHLEMEYER:  Your Honor, respectfully move to

24   strike the nonresponsive part of what answer.

25             THE COURT:  No.  Well, actually, yes.  So much of

1    the answer that says that it was published, that will stand.

2    We'll see what happens on redirect.  The rest is out for

3    now.

4    Q   One of the most important things -- well, strike that.

5            In connection with the work you did in this case,

6    you opined that one of the most important things doctors do

7    is to try and find the best drug that has the best benefit

8    and presumably the least side-effects for their patients,

9    right?

10   A   Yes.

11   Q   And in conducting your analysis you had to assume,

12   didn't you, that doctors have an obligation to understand

13   the drugs that they provide, their benefits, their potential

14   weaknesses, problems, liabilities and side-effects; isn't

15   that right?

16   A   I don't think that's what I said, but I agree with it.

17   Q   Okay.  And in connection with your analysis you had to

18   assume or acknowledge that a responsible medical doctor

19   writing a prescription for Neurontin will look at the label

20   for the drug which will indicate contraindications, right?

21   A   Yes.

22   Q   And you don't have any basis or any reason to believe

23   based on anything you've been provided with in connection

24   with your work in this case that any of Mr. Shearer's

25   doctors did anything differently between October of 2000 and

1   February of 2002 when they prescribed Neurontin for him, do

2   you?

3   A   No, I don't.

4   Q   Part of a doctor's professional and ethical obligation

5   is to become aware of the characteristics of the drugs they

6   prescribe, right?

7   A   Yes.

8   Q   And you had to assume and acknowledge that in forming

9   the opinions that you offered this morning?

10  A   Yes.

11  Q   And those characteristics include benefits?

12  A   Yes.

13  Q   Disadvantages?

14  A   Yes.

15  Q   Other alternative medicines that they might use instead

16  of that drug?

17  A   Yes.

18  Q   And they make that -- that's part of what they do to

19  choose the optimal, the best therapy for their patients,

20  right?

21  A   Yes.

22  Q   And then the doctors have an obligation to monitor and

23  to follow their patient, don't they?

24  A   Yes.

25  Q   And what does that mean?

1    A    Well, it means you monitor and follow the condition to

2    see if the patient has improved and how he or she has

3    responded to the medication and presumably form an

4    assessment about whether the treatment is effective or you

5    should do something else.

6    Q    So to be a -- in connection with the work you did and

7    the opinions you offered, you had to acknowledge or assume

8    that a responsible doctor would do more than just take a

9    salesman's word for what a particular medicine did when he

10   or she might prescribe it to their patients, right?

11   A    Yes.

12   Q    And doctors are exposed to information -- we talked

13   earlier about the kind of information doctors are exposed to

14   and use to make decisions.

15   A    Yes.

16   Q    And some of them are exposed on different levels to all

17   of that information, right?

18   A    I don't know that they're exposed to all of that

19   information.  It's a lot of information.

20   Q    But, for example, a doctor --

21   A    They're exposed to certain aspects of it.

22   Q    I'm sorry.  A doctor who's in a more general practice

23   might be exposed to less of it than somebody who's in a more

24   specific practice?

25   A    Yes.

1   Q   And doctors who, you know, are in, who are specialists

2   might know more about a particular medicine than those who

3   are generalists, right?

4   A   Yes.

5   Q   Do you know whether any of Mr. Shearer's doctors were

6   specialists as opposed to generalists?

7   A   No, I don't.

8           MR. OHLEMEYER:  Can I have a moment, your Honor?

9           THE COURT:  You may.

10          MR. OHLEMEYER:  Professor King, I think that's all

11  I have.  Oh, one more, your Honor, I'm sorry.

12  Q   Do you have any idea based on the work you did in this

13  case how a physician, a doctor, would respond if a salesman

14  told him that a medicine didn't have any side-effects?

15  A   I don't know that there is in fact such a medication.

16  Q   Thank you very much for your time.

17          THE COURT:  Any redirect?

18          MR. LONDON:  Two brief areas, if I may, your Honor.

19          THE COURT:  Go ahead.

20                  **REDIRECT EXAMINATION**

21  BY MR. LONDON

22  Q   One of the questions that I recall counsel asking you is

23  whether the best evidence of what a physician's prescribing

24  decision is based on would be the physician telling us and

25  perhaps in court in testimony.

1              Do you recall that?

2    A    Yes, I do.

3    **Q**    Did you in this study or in your professional career

4    study whether marketing tactics other than clinical

5    experience by a doctor affect a doctor's decisions to

6    prescribe medicines?

7    A    Yes.

8    **Q**    And what is that study?

9              **MR. OHLEMEYER:**  Your Honor, I object.

10             **THE COURT:**  Overruled.

11   A    In my report I discuss a number of academic studies that

12   look at ways that marketing influence doctors and whether

13   things like continuing medication are effective, whether

14   gifts to doctors are effective, how doctors, their ability

15   to distinguish false, misleading information from true and

16   accurate information.  And we find that all of these factors

17   play a role in doctors' decisions and have an influence on

18   doctors' decisions.

19   **Q**    Do doctors -- are there studies to indicate whether

20   doctors are even aware perceptually all of the factors that

21   enter into their prescribing practice?  In other words,

22   whether doctors know when they prescribe things that they

23   prescribe in a prescribing practice?

24             **THE COURT:**  I didn't understand the last question.

25   You'll have to try that again.

1           **MR. LONDON:**  I'll do my best, your Honor.

2    **Q**   Are there studies known to you that would form, that

3    were a basis of your study in this case that indicate one

4    way or the other whether doctors themselves know themselves

5    all of the reasons they choose to prescribe a drug?

6    **A**   I'm not sure about that.

7    **Q**   All right, that's fine.

8           You were asked whether you had studied the

9    quantitative number of Neurontin prescriptions that were

10   issued off-label and on label.  Do you recall that?

11   **A**   Yes, I do.

12   **Q**   Is there a difference between quantitative numbers, hard

13   numbers, versus percentages or proportions of prescriptions

14   off-label?

15   **A**   Yes, I guess I would draw a distinction between

16   quantitative information which ends with a specific

17   number -- 13.57 percent -- versus more qualitative

18   information which is what we've been discussing, is

19   something big or large compared to something else and

20   without trying to put an absolutely precise number on it,

21   can we form some sort of rough estimate of the ideas, for

22   example, what percentage of sales would be due to the, what

23   percentage of sales might be due to the illegal off-label

24   promotion.  And those are sort of the things I discussed

25   with you in terms of looking at the graphs and looking to

1    see how much was prescribed off-label before the promotion

2    for off-label uses began versus what happens afterwards.  So

3    I didn't have a specific number in each of those cases, but

4    in each of those cases we could see that the effect of the

5    off-label marketing was to increase the usage of those drugs

6    by multiple factors.

7    Q   What in your opinion is the, during the period in 1996

8    to the period 2002, the most probable percentage of on-label

9    use for Neurontin?

10   A   We know from the company's own studies that in 2003, for

11   example, I think they estimate that the on-label use was

12   about 10 percent and the off-label use was about 90 percent.

13   Q   And are you able to express an opinion to the jury on

14   what proportion of off-label use would be expected under any

15   scenario?

16   A   For Neurontin?

17   Q   Yes.

18   A   I guess what I would say is it's based on two things,

19   based on what we observed in 1994 when the off-label use of

20   Neurontin was at 15 percent, and before the off-label

21   marketing campaigns by the company, the drug company began

22   it was about 15 percent.  So that seems a reasonable --

23   that's 15 percent of the total sales at that point.  Fifteen

24   percent of the -- so that's, we know that.  And we also know

25   from the academic literature that for the 160 drugs that I

1    mentioned that on-label usage is typically sort of 15 to

2    20 percent.  So those are the sorts of numbers I would

3    expect for Neurontin.

4    **Q**    All right, sir, last question.  And you pointed this

5    out, but you answered a number of questions that had a sort

6    of medical/scientific basis for Mr. Ohlemeyer.  Are you a

7    medical scientist, sir?

8    A    No, I'm not a medical scientist.

9              **MR. LONDON:**  I have no further questions, your

10   Honor.

11             **THE COURT:**  Nothing further for this witness?

12             **MR. OHLEMEYER:**  Just two, your Honor.

13             **THE COURT:**  Go ahead.

14             **MR. OHLEMEYER:**  Thank you.

15                         **RECROSS-EXAMINATION**

16   **BY MR. OHLEMEYER**

17   **Q**    As a marketing professor it's not unusual for a

18   product's sales to increase over time as people buy it, try

19   it, like it, and use it again, right?

20   A    That's true.  But I think to give a complete answer in

21   this case, there's something that's very different about the

22   medical market and the market for pharmaceuticals that makes

23   it different from consumer drugs.

24   **Q**    And the difference is the doctor, isn't it?

25   A    The difference is information.

1    **Q**   All right.  And the difference -- well, let me ask it

2    this way.

3            Can you point me to any study that suggests a

4    doctor would prescribe a medicine to a patient for 16 months

5    if that doctor didn't believe in his or her independent

6    clinical judgment that that medicine was helping their

7    patient?

8    A   That's such a specific question, I cannot point to a

9    specific study but --

10           **MR. OHLEMEYER:**  I think he's answered the question,

11   your Honor.

12           **THE COURT:**  Well, he has.

13           **MR. LONDON:**  May he complete that answer?

14           **THE COURT:**  Sustained.

15                        **REDIRECT EXAMINATION**

16   **BY MR. LONDON**

17   **Q**   My question is, Doctor, will you complete that answer.

18           **MR. OHLEMEYER:**  Objection.

19           **THE COURT:**  Overruled.  He may.

20   A   The point I wanted to mention is that what makes

21   prescription drugs in the medical market different and it's

22   what the congress referred to as the question of

23   information.  So a doctor may actually believe that he's

24   doing the best thing for the patient and be wrong.  And how

25   does that happen.  Well, in one case if he doesn't have full

1   and complete information about the characteristics of the

2   drug, the side-effects as well as the benefits, and we saw

3   here the company suppress some side-effect information, he

4   may believe he's doing the best and he can be wrong.

5          The other problem is, we talked a lot about

6   off-label use and how doctors may prescribe things for

7   off-label use, which is something that it's perfectly

8   permissible and serves a useful function at times.  But

9   there are problems with it.  And the problem is that the

10  doctor can never know whether that treatment is actually

11  effective for the patient.  And there are three reasons for

12  that.  The first reason is that the patient may get well

13  just on his or her own.  And to take an extreme example,

14  suppose I'm a doctor and, you know, over the course of the

15  winter people come to me with colds.  What's my

16  prescription.  Well, I give them a box of Kleenex and I say

17  here, use these, come back in two weeks.  And what do I see?

18  I see all of a sudden, gee, most people get better.

19         Now, if I said, oh, Kleenex is the solution to the

20  common cold you would all laugh at me.  And why would you

21  laugh at me?  Because we know that Kleenexes don't cure

22  colds.  The cold got better on its own.

23         So, in a doctor prescribing a drug for off-label

24  use, whether it's Neurontin or something else, you have this

25  Kleenex problem.  You can prescribe it to them and a patient

1    might just get better on his or her own and you wouldn't

2    know whether or not that was the effect of the drug you

3    prescribed.  And that's why we have clinical trials to

4    answer that question.

5            The second problem that occurs in the medical

6    context is that drugs aren't prescribed -- I should say

7    aren't necessarily prescribed in many cases, you're not just

8    taking one drug.  You take Neurontin and you take a series

9    of other drugs.  So, if your patient's taking a number of

10   drugs and you give them Neurontin, and you find that he or

11   she improves, you don't know whether it's Neurontin or it's

12   one of those other drugs.  So that's another reason why we

13   have the clinical trials to isolate those effects.  And

14   that's another example of how a doctor can be fooled into

15   thinking something's working when it's not.

16           And the third example, which is what makes medical

17   prescription decisions and medical markets truly different

18   and is particularly relevant to Neurontin, is that for a lot

19   of the conditions that Neurontin was prescribed for for

20   off-label use, they have what technically is referred to as

21   a large placebo effect.  What does that mean?  That means

22   that, an example for pain, if you go to a doctor's office

23   and they say --

24           **MR. OHLEMEYER:**  Your Honor, I realize I invited

25   some of this, but I think we're way beyond what --

1          THE COURT:  I think you didn't invite all this.

2    Sustained.

3              MR. LONDON:  Dr. King, I have no further questions.

4          THE COURT:  All right.  Nothing further for this

5    witness?

6              MR. OHLEMEYER:  I just want one question.

7                    RECROSS-EXAMINATION

8    BY MR. OHLEMEYER

9    Q    Professor, you're not telling this jury that

10   Mr. Shearer's doctors, none of whom you've talked to and I

11   think none of them you could name, were fooled when they

12   decided that in their professional independent judgment they

13   thought Neurontin made sense for Mr. Shearer?  Are you

14   telling the jury that?

15   A    No.  I don't know what they thought.

16   Q    Thank you.

17             THE COURT:  Yes.  All right, that's it for this

18   witness?

19             MR. LONDON:  It is, your Honor.

20             THE COURT:  You may step down.

21             (Whereupon the witness stepped down.)

22             THE COURT:  Call your next witness.

23             MR. FROMSON:  Your Honor, we would ask to play the

24   video of Robert Glanzman, and there are three exhibits, one

25   of which has already been moved into evidence as

```
1     Exhibit 4397.
2              THE COURT:  It may be played until one o'clock.
3              MR. FROMSON:  Thank you.  The other is AJB for
4     which the objection has been withdrawn, and the number is
5     2003.
6              THE COURT:  AJB --
7              MR. FROMSON:  AJB.
8              THE COURT:  -- admitted in evidence 2003.
9              (Exhibit marked in evidence.)
10             MR. FROMSON:  And lastly, AOU, to which the
11    objection was withdrawn, is now requested into evidence as
12    3410.
13             THE COURT:  A0U is in evidence as 3410.
14             (Exhibit marked in evidence.)
15             THE COURT:  And you may proceed.
16             MR. FROMSON:  Thank you, your Honor.
17             Bonnie, if you would switch.
18             THE CLERK:  I did.
19             MR. FROMSON:  Thank you very much.  The jury
20    presenters aren't on.
21                  ROBERT GLANZMAN, By Deposition
22    Q   Could you state your name and your residential address
23    for the record, please?
24    A   Robert Louis Glanzman, 34 Dutch Hill Drive, Carmel, New
25    York 10512.
```

```
1    Q    And where are you employed today, Dr. Glanzman?

2    A    I'm employed by Novartis Pharmaceuticals.

3    Q    What was your last employment prior to Novartis?

4    A    I worked for Pfizer, Incorporated.

5    Q    What period of time did you work for Pfizer?

6    A    From September 1999 through March of 2007.

7    Q    Well, it's got your name on it.  It says one year at

8    Pfizer. It says you are the medical director for Neurontin.

9    A    Oh, all that is correct.

10   Q    Is that all correct?

11   A    That is all correct.

12   Q    The committee is Neurontin Review Committee,

13   Publications Subcommittee, Independent Medical Grant

14   committee; are all those committees that you sat on at

15   Pfizer?

16   A    Yes.

17   Q    Yes.  During the period of time that you were employed

18   at Pfizer, were there any the other committees that you sat

19   on?

20   A    I only worked on Neurontin until July of 2002.

21   Q    What period of time did you work on Neurontin?

22   A    Between, essentially, January of 2001 and July of 2002.

23   Q    So, about a year-and-a-half?

24   A    Yes.

25   Q    What were your positions, beginning in January '01 when
```

1    you started to work on Neurontin?

2    A    I was a medical director on the Neurontin team.

3    Q    Did you have that entire, did you have that position for

4    the entire period of time that you worked on Neurontin?

5    A    Yes.

6    Q    And as medical director for Neurontin, what were your

7    job responsibilities?

8    A    Well, to serve on the committees that you see here.

9    Q    And when I say "you trained them," was it your job to

10   provide the clinical data concerning Neurontin and how it

11   could be used in promotion?

12   A    It was my job to explain the medical data in the pieces

13   that we were presenting to them so that they had an

14   understanding of how the medical data, what the background

15   of it was, so that they understood the medical data.

16   Q    When you say "pieces," for our record could you define

17   what you mean by that?

18   A    So, at every plan of action meeting there were

19   promotional pieces that were developed so that the

20   representative could educate physicians on the product. And

21   these pieces contained data, medical data. My job was to

22   explain it to them.

23   Q    Were you involved in the development of these

24   promotional pieces?

25   A    I was.

1   **Q**   That's part of your job; right?

2   A   Yes.

3   **Q**   I think it's fair to say and I think you testified that

4   when you trained the field force, you wanted to inform them

5   of both the positive and negative study results concerning

6   Neurontin's use?

7   A   So, again, the purpose of training the field force is so

8   that they can speak in an educated manner when they are

9   educating physicians using the promotional materials that we

10  have developed to the extent that any positive or negative

11  studies impact their activity to speak in an educated manner

12  and to be able to use these materials to educate physicians,

13  then it's important to, you know, educate them on that; to

14  the extent that it's not, then it's not.

15  **Q**   You say you approved a message that reads, "Gabapentin

16  is effective against at a wide range of neurologic and

17  psychiatric conditions"?

18  A   Correct.

19  **Q**   What are the psychiatric conditions that you are

20  referring to?

21  A   Well, frankly, I am not referring to any specific

22  psychiatric conditions.

23  **Q**   You approved a key message that gabapentin was effective

24  as against psychiatric, a wide range of neurologic and

25  psychiatric conditions.

1   **Q**   What psychiatric conditions are we talking about here?

2   A   I would be happy to go back and do a literature review

3   and look at the data for you. I did not do it back then.

4   **Q**   How could you approve a message without looking at the

5   clinical data?

6   A   Obviously this is not -- I approved it. Whether it was

7   correct or not, I can't say at this time.

8   **Q**   Well, that was your job as medical director, wasn't it,

9   to review the clinical data to see if it supported the key

10   message?

11   A   Yes, that was part of my job.

12   **Q**   Is it your testimony that you didn't, you approved a

13   message that was effective against a wide range of

14   psychiatric conditions and you didn't look at this clinical

15   data?

16   A   It is my testimony that I did not do a thorough review

17   of psychiatric conditions, that's correct.

18   **Q**   If you didn't do it, who was going to do it?

19   A   It was my job, so if I didn't do it, nobody would do it.

20   **Q**   How could you approve a key message to market Neurontin

21   for a psychiatric condition if you didn't search the data to

22   see if the data supported the message?

23   A   This notes a key message to market Neurontin. This is a

24   key message that if a clinical study is going to be

25   published, it could be incorporated or could be gleaned from

1    the publication.

2    **Q**   Let's take your definition then.  Wasn't that your job

3    to search the data to see if it supported -- the key

4    messages supported the clinical data that was going to be

5    published in a manuscript?

6    A    It was my job to know whether or not the clinical data

7    supported the key message, that's correct.

8    **Q**   There are key messages for neuropathic pain?

9    A    Yes.

10   **Q**   For gabapentin.  And for our record, when I refer to

11   gabapentin, I'm referring to Neurontin; correct?

12   A    Yes, Neurontin is the trade name for gabapentin.

13   **Q**   "Gabapentin should be considered the first choice of

14   therapy for neuropathic pain."

15   **Q**   Did you approve that key message?

16   A    I did.

17   09 Q

18   **Q**   "Gabapentin is effective against a broad spectrum of

19   neuropathic pain states." Did you approve that?

20   A    I did.

21   **Q**   "And proven efficacy in neuropathic pain."  Did you

22   approve that message?

23   A    I did.

24   **Q**   Let me show you Exhibit 25.  Can you identify this for

25   me?

1    A    It's the Neurontin publications subcommittee current

2    status and 2002 plans.

3    Q    Was the presentation made by Medical Action

4    Communications?

5    A    Yes.

6    Q    And how long did the presentation last, do you recall?

7    A    I don't recall.

8    Q    What was the purpose of the presentation?

9    A    I believe it was to highlight their competency.

10   Q    Competency?

11   A    Yes.

12   Q    Was Pfizer considering hiring another vendor?

13   A    I don't recall the exact specifics at the time.

14   Q    And was this a presentation that was made to the

15   publications subcommittee, to the best of your memory?

16   A    I believe so.

17   Q    And this slide indicates capitalizing of product

18   benefits based upon the published literature Neurontin has

19   demonstrated, efficacy against a broad range of CNS

20   disorders; correct?

21   A    That's what it says.

22   Q    Epilepsy, neuropathic pain, anxiety disorder, migraine,

23   substance abuse and movement disorder, correct?

24   A    Correct.

25   Q    And when you saw this slide on the date it was

1    presented, did you know what the clinical studies were that

2    established Neurontin efficacy for bipolar disorder?

3    A    No.

4    Q    Do you know if there were any?

5    A    I wouldn't know specifically.

6    Q    When you saw this slide on the date it was presented,

7    did you know what published literature supported Neurontin's

8    use for anxiety disorders?

9    A    No.

10    Q    And how about for migraine?

11    A    Yes, the one positive study.

12    Q    The one positive study.

13    Q    And on the date you reviewed this slide, were you aware

14    of the negative migraine studies?

15    A    No.

16    Q    Were you aware of the negative study in restless leg?

17    A    No.

18    Q    Did restless leg fall under the category movement

19    disorder?

20    A    Yes.

21    Q    Were you aware of the negative studies for neuropathic

22    pain?

23    A    I was aware of the 24 study.

24    Q    You were not aware of Dr. Gorson's study on the date

25    this presentation was made?

1    A    No.

2    Q    Were you aware of the POPP study?

3    A    No, that is not a neuropathic, by understanding, that is

4    not a neuropathic pain indication.

5    Q    Were you aware of the negative nociceptive pain studies?

6    A    No.

7    Q    Did you ever become aware of the five negative

8    nociceptive pain studies?

9    A    No, I didn't know there were five negative nociceptive

10   pain studies.

11            THE COURT:  Let's stop.  Let's stop.  It's one

12   o'clock.  All right, we'll pick up here tomorrow.

13            Ladies and gentlemen, you've not heard all the

14   evidence.  Therefore, keep your minds suspended.  Do not

15   discuss the case either among yourselves nor with anyone

16   else.  You may stand in recess until 9:00 a.m. tomorrow

17   morning.  I'll remain on the bench.

18            THE CLERK:  All rise for the jury.

19            (Whereupon the jury left the courtroom.)

20            THE COURT:  Please be seated.

21            Out of the six days allowed for each side, the

22   plaintiff has used up one day, one hour, 40 minutes; the

23   defense has used up one hour, 50 minutes.

24            Again, assuming the plaintiff wants to retain some

25   time to cross-examine the defense presentation, I would

```
1    suggest you focus more precisely and pick up the stroke.

2            One thing has just occurred in this deposition that

3    is the fault of the parties and my fault.  Everything goes

4    online here and so we have various privacy rules, and one of

5    the privacy rules is the home addresses of every witness is

6    not in evidence.  So it's home address, Social Security

7    number, financial account numbers and names of minor

8    children.

9            Now, I reviewed this deposition and I should have

10   caught it but I didn't, and I'm not entertaining any motions

11   to redact the transcript.  So this witness's home address is

12   out there.  I'm sorry.  Be alert to it.  You're doing very

13   well on the editing, so it's a caution more than anything

14   else.  And I don't think it's really significant.

15           Along the same lines and another question, have I

16   returned to you the deposition of Lucy Castro?

17           MR. ALTMAN:  No, your Honor.

18           THE COURT:  My own review suggests I don't have it.

19   I'm going to recess.  The four boxes of motions and

20   depositions are right here behind the bench.  I invite you

21   to look for it because I've jumped now to the deposition of

22   Mr. Tive, and if I haven't given it to you, I don't have it.

23           Thank you.

24           MR. FROMSON:  We'll do that, thank you, your Honor.

25           MR. OHLEMEYER:  Your Honor, very briefly, may I --
```

1          THE COURT:  I normally go to lunch.

2          MR. OHLEMEYER:  Okay.  That's fine.

3          THE COURT:  Do you want to argue this afternoon?

4          MR. OHLEMEYER:  No, I just want to make, I want to

5     make a contemporaneous objection.  I can make it in the

6     morning to make a record.  I just don't want there to be an

7     issue of me not making it contemporaneously.

8          THE COURT:  And what is it?

9          MR. OHLEMEYER:  I would like, based on, based on

10    the cross-examination of Professor King, I would like to

11    move to strike under Rule 702 because his testimony doesn't

12    assist the trier of fact in understanding the facts at

13    issue.

14         THE COURT:  Noted.  Overruled.  Thank you.

15         We'll recess.

16         THE CLERK:  All rise.  Court is in recess.

17         (Adjournment.)

18

19

20

21

22

23

24

25

1                    **C E R T I F I C A T E**

2

3

4          I, Donald E. Womack, Official Court Reporter for

5     the United States District Court for the District of

6     Massachusetts, do hereby certify that the foregoing pages

7     are a true and accurate transcription of my shorthand notes

8     taken in the aforementioned matter to the best of my skill

9     and ability.

10

11

12

13

14               /S/ DONALD E. WOMACK 4-12-2010
                 _____
15                    DONALD E. WOMACK
                    Official Court Reporter
16                      P.O. Box 51062
                 Boston, Massachusetts 02205-1062
17                  womack@megatran.com

18

19

20

21

22

23

24

25