UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                     :

In re:  NEURONTIN MARKETING, SALES       :  MDL Docket No. 1629
         PRACTICES AND PRODUCTS          :
         LIABILITY LITIGATION             :  Master File No. 04-10981

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                     :

THIS DOCUMENT RELATES TO:           :  Judge Patti B. Saris
                     :

*Dorsey v. Pfizer Inc, et al.*              :  Magistrate Judge Leo T.
Case No. 1:05-cv-10639-PBS         :  Sorokin

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT ....................................................................................1

FACTUAL BACKGROUND ........................................................................................2

SUMMARY JUDGMENT STANDARD.......................................................................5

ARGUMENT .................................................................................................................6

I.  PLAINTIFF'S CLAIMS SHOULD BE DISMISSED BECAUSE SHE HAS NO
    ADMISSIBLE EXPERT TESTIMONY AND CANNOT PROVE CAUSE IN
    FACT ...................................................................................................................6

    A.  Plaintiff's Claims Require Her to Proffer Expert Testimony on Causation ...........6

    B.  Plaintiff's Expert Disclosure Should Be Stricken Because the Causation
        Issues in this Case Require Expert Reports, Which Plaintiff Failed to
        Provide .........................................................................................................9

    C.  Even if Plaintiff's Expert Disclosures Were Proper, Her Purported Expert
        Testimony Does Not Satisfy *Daubert* .................................................10

II.  PLAINTIFF'S CLAIMS SHOULD BE DISMISSED BECAUSE SHE CANNOT
     ESTABLISH PROXIMATE CAUSE...............................................................13

III.  PLAINTIFF'S FRAUD ALLEGATIONS CANNOT SAVE HER FAILURE-TO-
      WARN CLAIMS .............................................................................................16

IV.  PLAINTIFF'S IMPLIED WARRANTY, STRICT LIABILITY, AND FRAUD
     CLAIMS SHOULD BE DISMISSED AS DUPLICATIVE OF HER
     NEGLIGENT FAILURE-TO-WARN CLAIM ...............................................17

V.  PLAINTIFF CANNOT PROVE ESSENTIAL ELEMENTS OF HER EXPRESS
    WARRANTY AND CHAPTER 93A CLAIMS.................................................19

CONCLUSION.............................................................................................................20

# TABLE OF AUTHORITIES

## CASES

*Alves v. Mazda Motor of America, Inc.*,
  448 F. Supp. 2d 285 (D. Mass. 2006) ...................................................................9

*Baghdady v. Lubin & Meyer, P.C.*,
  55 Mass. App. Ct. 316 (2002).............................................................................7

*Bardige v. Performance Specialists*,
  No. 0602586, 2007 WL 3012673 (Mass. Super. Ct. Sept. 26, 2007), *aff'd*, 74
  Mass. App. Ct. 99 (2009)....................................................................................8

*Bratton v. CSX Transportation, Inc.*,
  586 F. Supp. 2d 12 (D. Mass. 2008) ...................................................................6

*Campbell v. CSX Transportation, Inc.*,
  No. 08-cv-2045, 2009 WL 1444656 (C.D. Ill. May 21, 2009)........................10

*Canavan's Case*,
  432 Mass. 304 (2000) .........................................................................................7

*Chamian v. Sharplan Lasers, Inc.*,
  No. 2000-00171, 2004 Mass. Super. LEXIS 357 (Sept. 24, 2004) ....................9

*Chamian v. Sharplan Lasers, Inc.*,
  No. 200000171, 2004 WL 2341569 (Mass. Super. Ct. Sept. 24, 2004) .....................14, 15

*Cottam v. CVS Pharmacy*,
  436 Mass. 316 (2002) .......................................................................................14

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993)............................................................................................8

*DeNovellis v. Shalala*,
  124 F.3d 298 (1st Cir. 1997)...............................................................................6

*In re Diet Drugs Products Liability Litigation*,
  No. MDL 1203, 2001 WL 454586 (E.D. Pa. Feb. 1, 2001)..............................12

*Doe v. Senechal*,
  66 Mass. App. Ct. 68 (2006)...............................................................................6

*Eck v. Parke, Davis & Co.*,

256 F.3d 1013 (10th Cir. 2001) ....................................................................................14

*Fisher v. Bristol-Myers Squibb Co.*,
181 F.R.D. 365 (N.D. Ill. 1998)..................................................................................15

*Ford Motor Co. v. General Accident Insurance Co.*,
779 A.2d 362 (Md. 2001) ...........................................................................................17

*Garcia v. City of Springfield Police Department*,
230 F.R.D. 247 (D. Mass. 2005)...............................................................................9, 12

*Garside v. Osco Drug, Inc.*,
895 F.2d 46 (1st Cir. 1990)............................................................................................5

*Garside v. Osco Drug, Inc.*,
976 F.2d 77 (1st Cir. 1992).........................................................................12, 14, 16, 18

*Glastetter v. Novartis Pharmaceuticals Corp.*,
107 F. Supp. 2d 1015 (E.D. Mo. 2000), *aff'd*, 252 F.3d 986 (8th Cir. 2001) ...................12

*Hall v. Baxter Healthcare Corp.*,
947 F. Supp. 1387 (D. Or. 1996) ..................................................................................12

*Hann v. Micron Separations, Inc.*,
107 F.3d 1, 1997 WL 56859 (1st Cir. 1997)....................................................................6

*Haughton v. Hill Laboratories, Inc.*,
No. 06-11217-RGS, 2007 WL 2484889 (D. Mass. Aug. 30, 2007) .........................7, 8, 15

*Hershenow v. Enterprise Rent-a-Car Co. of Boston, Inc.*,
445 Mass. 790 (2006) ..............................................................................................6, 20

*Hochen v. Bobst Group, Inc.*,
290 F.3d 446 (1st Cir. 2002)...........................................................................................7

*Hoffman v. Houghton Chemical Corp.*,
434 Mass. 624 (2001) ..................................................................................................17

*Jones v. Walter Kidde Portable Equipment, Inc.*,
16 F. Supp. 2d 123 (D. Mass. 1998) ............................................................................15

*Kelley v. Eli Lilly & Co.*,
517 F. Supp. 2d 99 (D.D.C. 2007) ...............................................................................17

*Kelly v. Wyeth*,
No. 20033314F, 2007 WL 1302589 (Mass. Super. Ct. Apr. 12, 2007)............................19

iii

*Kuwaiti Danish Computer Co. v. Digital Equipment Corp.*,
    438 Mass. 459 (2003) ...................................................................................................6

*Lareau v. Page*,
    840 F. Supp. 920 (D. Mass. 1993) .................................................................................8

*Laspesa v. Arrow International, Inc.*,
    No. 07cv12370-NG, 2009 U.S. Dist. LEXIS 121576 (D. Mass. Dec. 23, 2009) ........11, 16

*In re Lupron Marketing & Sales Practices Litigation*,
    295 F. Supp. 2d 148 (D. Mass. 2008) ...........................................................................20

*Lynch v. Merrell-National Laboratories Division of Richardson-Merrell, Inc.*,
    646 F. Supp. 856 (D. Mass. 1986), *aff'd*, 830 F.2d 1190 (1st Cir. 1987) ..........................6

*MacDonald v. Ortho Pharmaceutical Corp.*,
    394 Mass. 131 (1985) .................................................................................................18

*Matsuyama v. Birnbaum*,
    452 Mass. 1 (2008) ......................................................................................................7

*Morrisey v. Lieberman*,
    No. 002561, 2005 WL 2009433 (Mass. Super. Ct. July 13, 2005)...................................19

*Mullins v. Pine Manor College*,
    389 Mass. 47 (1983) ....................................................................................................7

*NEC Electronics, Inc. v. New England Circuit Sales, Inc.*,
    722 F. Supp. 861 (D. Mass. 1989) .................................................................................5

*In re Neurontin Marketing, Sales Practices, & Products Liability Litigation*,
    612 F. Supp. 2d 116 (D. Mass. 2009) .......................................................................8, 10

*In re Neurontin Marketing, Sales Practices & Products Liability Litigation*,
    257 F.R.D. 315 (D. Mass. 2009).....................................................................................17

*In re Neurontin Marketing, Sales Practices & Products Liability Litigation*,
    618 F. Supp. 2d 96 (D. Mass. 2009) ...................................................................16, 17, 18

*Nix v. SmithKline Beecham Corp.*,
    No. CV-06-43-PHX-SMM, 2007 WL 2526402 (D. Ariz. Sept. 5, 2007) ........................15

*In re Norplant Contraceptive Products Liability Litigation*,
    955 F. Supp. 700 (E.D. Tex. 1997), *aff'd*, 165 F.3d 374 (5th Cir. 1999)..........................15

iv

*O'Connor v. SmithKline Bio-Science Laboratories, Inc.*,
    36 Mass. App. Ct. 360 (1994) ........................................................................7

*Odom v. G.D. Searle & Co.*,
    979 F.2d 1001 (4th Cir. 1992) ...................................................................15

*Or v. Edwards*,
    62 Mass. App. Ct. 475 (2004) ......................................................................7

*Peña-Crespo v. Puerto Rico*,
    408 F.3d 10 (1st Cir. 2005) ......................................................................9, 12

*Plummer v. Lederle Laboratories*,
    819 F.2d 349 (2d Cir. 1987) .......................................................................15

*Poulis-Minott v. Smith*,
    388 F.3d 354 (1st Cir. 2004) ........................................................................9

*Reinhardt v. Gulf Insurance Co.*,
    489 F.3d 405 (1st Cir. 2007) ......................................................................6, 7

*Roth v. Ray-Stel's Hair Stylists, Inc.*,
    18 Mass. App. Ct. 975 (1984) ......................................................................6

*Sprague v. Upjohn Co.*,
    No. 91-40035-NMG, 1995 WL 376934 (D. Mass. May 10, 1994) ......................17, 19 20

*Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*,
    171 F.3d 912 (3d Cir. 1999) ........................................................................20

*Stuto v. Corning Glass Works*,
    No. 88-1150-WF, 1990 WL 105615 (D. Mass. July 23, 1990) ........................................20

*Sutera v. Perrier Group of America Inc.*,
    986 F. Supp. 655 (D. Mass. 1997) ...........................................................10, 11, 12, 13

*Swartz v. General Motors Corp.*,
    375 Mass. 628 (1978) ................................................................................17

*Swenson v. Yellow Transport, Inc.*,
    317 F. Supp. 2d 51 (D. Mass. 2004) ...............................................................20

*Tayag v. Lahey Clinic Hospital, Inc.*,
    677 F. Supp. 2d 446 (D. Mass. 2010) ..............................................................6

*Thomas v. Digital Equipment Corp.*,

880 F.2d 1486 (1st Cir. 1989) ...........................................................................5

*Thomas v. Hoffman-LaRoche, Inc.*,
   949 F.2d 806 (5th Cir. 1992) ...............................................................14, 15

*Thornton v. United Parcel Service, Inc.*,
   587 F.3d 27 (1st Cir. 2009) ...........................................................................5

*Turner v. Iowa Fire Equipment Co.*,
   229 F.3d 1202 (8th Cir. 2000) ....................................................................10

*United States v. Hicks*,
   389 F.3d 514 (5th Cir. 2004) .......................................................................10

*United States v. Shay*,
   57 F.3d 126 (1st Cir. 1995) .........................................................................12

*Vaughn v. G.D. Searle & Co.*,
   536 P.2d 1247 (Or. 1975) ............................................................................15

*Wheat v. Pfizer, Inc.*,
   31 F.3d 340 (5th Cir. 1994) .........................................................................15

*Windham v. Wyeth Laboratories, Inc.*,
   786 F. Supp. 607 (S.D. Miss. 1992)............................................................15

## STATUTES

Fed. R. Civ. P. 56(c)(2)....................................................................................5

Mass. Gen. Laws Ann. Ch. 93A (West 2006) ...........................................20

Mass. Gen. Laws Ann. ch. 106, § 2-313(1) (West 1999) ..........................19

## MISCELLANEOUS

Restatement (Third) of Torts § 2 cmt. n (1998)........................................17

Defendants Pfizer Inc and Warner-Lambert Company LLC ("Defendants," or "Pfizer") submit this memorandum in support of their Motion for Summary Judgment.

## PRELIMINARY STATEMENT

Plaintiff Mary Dorsey contends that she sustained certain adverse effects as a result of ingesting the prescription medicine Neurontin.  Although Plaintiff has never clearly articulated her alleged injury, it is undisputedly *not* suicide-related.  Instead, she complains, in vague and varying terms, that she felt "lethargic" and experienced "black-outs" and "a year long drug-induced stupor" (Compl. Introduction & ¶ 30) during a period when she was receiving medical treatment for bipolar disorder, anxiety, depression, panic attacks, hypothyroidism, sleep disturbances, syncopal (fainting) episodes, chronic back and leg pain, and chronic obstructive pulmonary disease ("COPD"), and taking, in addition to Neurontin, numerous prescription medications, including multiple anticonvulsant and psychotropic medicines.

Each of Plaintiff's claims requires that she proffer competent expert testimony establishing both general causation (that Neurontin can cause the "stupor," lethargy, and "black-outs" she alleges) and specific causation (that Plaintiff experienced such effects as a result of ingesting Neurontin, rather than as result of another medicine she was taking, a preexisting medical condition, or some other cause).  Plaintiff cannot meet her burden.  Fact and expert discovery has now closed and Plaintiff has no admissible expert testimony on causation. Plaintiff's only "Expert Disclosure" is a three-page submission designating *all* of her treating physicians as experts on both general and specific causation.  (*See* Pl.'s Expert Disclosure [2537].)  Plaintiff has not served a single expert report and has absolutely no basis in the record for proffering any of her treating doctors as experts on general or specific causation.  To the contrary, even if they could properly be offered as causation experts in this case under *Daubert* – and they cannot be – none of the treating physicians deposed in this action has opined that the symptoms Plaintiff alleges were caused by Neurontin, much less by any failure to warn. Because Plaintiff has no admissible expert testimony on causation, there is no genuine issue of material fact for trial, and Pfizer is entitled to summary judgment on all of Plaintiff's claims.

Summary judgment is also warranted for several additional reasons.  First, Plaintiff has no evidence that Pfizer's alleged failure to warn proximately caused any injury.  The learned intermediary doctrine requires Plaintiff to show that an additional warning to Plaintiff's prescribing physicians would have changed the outcome.  Plaintiff has no such evidence because none of her physicians testified that they would not have prescribed Neurontin to Ms. Dorsey if they had been provided any additional warning about the alleged side effects she claims to have experienced.  Second, Plaintiff's implied warranty, strict liability, and fraud claims are subsumed by, and must be dismissed as duplicative of, her negligent failure to warn claim.  Finally, Plaintiff cannot prove essential elements of her express warranty and consumer protection claims.

## FACTUAL BACKGROUND[1]

Plaintiff's medical records, her own testimony, and the testimony of her treating physicians establish that she has a complicated medical and psychiatric history, including symptoms of lethargy, confusion, and involuntary passing out, that began long before her prescription and use of Neurontin from 1999-2003.  For example, Plaintiff had episodes of loss of consciousness in her mid and late teens that may have been "dissociative," which, as one of her treating physicians, Dr. John Alpert, a psychiatrist, testified, is "a kind of psychiatric experience where somebody blanks out."  (Alpert Tr. at 68:4-23.)  Since the 1980s, she has suffered from poor balance.  (Dorsey Tr. at 257:20-258:7.)  She also has a long history of depressive symptoms, panic disorder, and probable obsessive-compulsive symptoms with a possible bipolar tendency, and received psychiatric treatment from her early thirties onward. (Dorsey Medical Record ("DMR") Nos. 20DCR-00004, 20DCR-00007; Alpert Tr. at 71:11-16; 75:1-76:7.)  In 1994, Ms. Dorsey was being treated by Dr. Alpert, taking Xanax and lithium carbonate, and experienced "mild unsteadiness" on multiple occasions.  (DMR No. 20DCR-00017.)  Dr. Alpert tried several different medications during his treatment of Ms. Dorsey.  (*See*

---

[1]  The medical records and deposition testimony cited herein are attached to the accompanying Declaration of Mark S. Cheffo.  The undisputed material facts on which Defendants rely are set forth in their Rule 56.1 Statement of Facts, filed concurrently with this motion.

DMR Nos. 20DCR-00004, 20DCR-00007, 20DCR-00009, 20DCR-00013-14, 20DCR-00017; Alpert Tr. at 70:23-72:9, 75:7-76:7, 87:1-17.)   As of May 13, 1997, Ms. Dorsey was taking Depakote, lithium carbonate, Wellbutrin-SR, Klonopin, and Xanax.  (DMR No. 20DCR-00039.)

In June 1997, at the age of 55, Ms. Dorsey experienced a stroke and subsequently suffered from significant speech and gait problems.  (DMR Nos. 17HFH-00011, 20DCR-00041-43; Dmochowski Tr. at 53:24-54:15.)  She continued to see Dr. Alpert after her stroke, and he continued her treatment for bipolar disorder with Depakote, lithium carbonate, Wellbutrin-SR, Klonopin, and Xanax.   (DMR No. 20DCR-00043.)   Ms. Dorsey also saw Dr. Jeremy Schmahmann, a neurologist who treated her for symptoms resulting from her stroke.  (DMR No. 54MGH-00209-210.)  In addition, Ms. Dorsey received physical therapy for her speech and gait problems.  (Dmochowski Tr. at 48:4-18.)  On October 1, 1998, Ms. Dorsey fell down some stairs, hit her head, and was rushed to the emergency room, where she was treated and sent home. (DMR No. 54MGH-00232-233.)  On December 18, 1998, Ms. Dorsey had a sudden onset of unsteadiness, and a neurologist later opined she may have had ataxia, or a gross lack of coordination of muscle movements, of unclear etiology, but, due to concerns that her symptoms might have been related to Klonopin, it was recommended that she decrease her dosage of that medicine.  (DMR No. 54MGH-00246, -00250.)  These events all preceded her taking Neurontin.

Some time between April 9 and October 1, 1999, Dr. Alpert prescribed Neurontin to Ms. Dorsey.  At that time, her medication regimen included Depakote, lithium carbonate, Klonopin, Xanax, Celexa, Synthroid, Motrin, Priolosec, and aspirin.  (DMR No. 20DCR-00075.)  After starting Neurontin, Ms. Dorsey reported that "she felt somewhat better and somewhat even." (Alpert Tr. at 60:2-4.)  Dr. Alpert observed that Ms. Dorsey felt "Neurontin [was] helping noticeably, evening out her moods with less irritability."  (*Id.* at 124:3-7.)  He did not observe any negative effects from Neurontin.  (*See id.* at 125:4-6.)  Dr. Dmochowski, a psychiatrist who subsequently treated Plaintiff, continued prescribing Neurontin, for what he believed were "epilepsy tendencies" related to her stroke in 1997.  (*See* Dmochowski Tr. at 40:10-41:17.)

3

Over the next couple of years, Ms. Dorsey experienced some episodes during which she fell or possibly blacked out, as well as some incidents for which she received medical attention because she seemed non-responsive.  (*See* DMR Nos. 27FAH-00383, 28CHS-00051-53, -00357; Dmochowski Tr. at 40:15-41:17.)  On April 30, 2003, Ms. Dorsey had an incident while in the office of one of her therapists, Dr. Tina Lambroschino, and was sent to the Falmouth Hospital emergency room, reportedly for an increase in lethargy after a change in the dosing of her Depakote.   (DMR No. 33FAH-00658.)    At this point, Ms. Dorsey's medications included Seroquel, Pepcid, Levoxyl, Depakote, Klonopin, Plavix, Lasix, Neurontin, lithium, Actonel, Toprol XL, Celexa, Xanax, Pulmicort, Skelakin, and Percocet, and her doctors had some concern about her ability to medicate herself.[2]  (*Id.*)  Following this brief hospitalization, on May 7, 2003, Ms. Dorsey visited Dr. Schmahmann, the neurologist who previously treated her following her stroke.   Thinking that her problems may have been connected to polypharmacy,[3] Dr. Schmahmann determined that it might be prudent to "reduce her medications overall." (Schmahmann Tr. at 64:17-19.)   He began by discontinuing clonazepam (Klonopin).  (*Id.* at 63:16-64:7.)  After that, Neurontin was reduced and eliminated as part of an overall strategy of decreasing the number of medications she was taking.  (*Id.* at 63:21-66:16.)

Pursuant to Dr. Schmahmann's instructions, Ms. Dorsey tapered her Neurontin use and had completely discontinued the medicine by the end of July 2003.  (Schmahmann Tr. at 84:12-14.)  She subsequently continued to have issues with dizziness, balance, and falls.  (DMR Nos. 27FAH-00350-00351, 26FAH-00065, 35FAH-01168, 53DGM-00006.)  She was hospitalized in August 2003 after being found non-responsive.   (DMR Nos. 27FAH-00350-00351.)   In November 2004, she suffered a serious fall that resulted in her needing a total hip replacement.

---

[2] At various times throughout her history, Plaintiff's doctors observed that she had problems medicating herself.  (*See, e.g.*, DMR Nos. 20DCR-00033-34, 19MHO-00017, 28CHS-00389, 28CHS-00127, 28CHS-00121, 2PPR-00138; Alpert Tr. at 95:7-22.)  In particular, she displayed an inability to follow instructions with regard to her medications, would mix alcohol with her medications, and on several occasions required supervision to take her medications.  (DMR Nos. 28CHS-00121, 2PPR-00107, 2PPR-00128.)

[3] Dr. Schmahmann defined "polypharmacy" as "[t]he use of multiple medications in the same patient." (Schmahmann Tr. at 64:14-16.)

(DMR No. 26FAH-00065.)   In April 2006, she was again hospitalized after increased communication difficulties, problems with walking, and frequent falls.  (DMR No. 35FAH-01168; Dmochowski Tr. at 104:19-105:3.)  Also in 2006, her license was suspended following a car accident due to concerns about her medications.  (Dorsey Tr. at 72:3-73:16.)  In 2007, she reported to one of her doctors that she had been experiencing episodes of dizziness, spinning sensations, and double vision one or two times per week.  (DMR Nos. 53DGM-00006.)

Ms. Dorsey has never attempted suicide and does not believe Neurontin caused her suicidal ideation.  (Dorsey Tr. at 122:2-6.)  Nor does she believe that Neurontin caused her any "permanent physical injury," and instead contends that the effects were purely "psychological." (*Id.* at 124:19-125:15.)   In addition, Ms. Dorsey alleges that the effects she attributes to Neurontin resolved completely "[w]ithin one month of ceasing . . . Neurontin."  (Compl. ¶ 39.)

## SUMMARY JUDGMENT STANDARD

"Summary judgment is properly granted where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Thornton v. United Parcel Serv., Inc.*, 587 F.3d 27, 31 (1st Cir. 2009); *see also* Fed. R. Civ. P. 56(c)(2).  Where, as here, the non-moving party has the burden of proof to establish her claim, the movant "need not produce evidence negating the claim that there is a material issue in genuine dispute." *NEC Elecs., Inc. v. New Eng. Circuit Sales, Inc.*, 722 F. Supp. 861, 863 (D. Mass. 1989) (citation omitted).  Rather, the "moving party's burden is to point out to the district court 'that there is an absence of evidence to support the nonmoving party's case.'"  *Id.* (quoting *Celotex Corp.*, 477 U.S. at 325). Accordingly, Pfizer is entitled to summary judgment if Plaintiff fails "to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Thomas v. Digital Equip. Corp.*, 880 F.2d 1486, 1489 (1st Cir. 1989).  The First Circuit has, for example, affirmed summary judgment in favor of a drug manufacturer based on the plaintiffs' failure to produce any evidence on the issue of causation.  *See Garside v. Osco Drug, Inc.*, 895 F.2d 46, 49 (1st Cir. 1990) (holding that "plaintiffs defaulted on [their] obligation" to produce

"some evidence, admissible at trial, supporting their allegation that [defendant's medication] caused [their] adverse reaction") ("*Garside I*"); *accord Lynch v. Merrell-National Labs. Div. of Richardson-Merrell, Inc.*, 646 F. Supp. 856, 867 (D. Mass. 1986), *aff'd*, 830 F.2d 1190 (1st Cir. 1987).  Rule 56(c) requires the nonmovant to "'go beyond the pleadings'" and, by admissible evidence, "'designate specific facts showing [that] there is a [genuine] issue for trial.'" *Bratton v. CSX Transp., Inc.*, 586 F. Supp. 2d 12, 16 (D. Mass. 2008) (citation omitted).  If Plaintiff's evidence on any element is "'merely colorable or is not significantly probative, summary judgment may be granted.'" *DeNovellis v. Shalala*, 124 F.3d 298, 306 (1st Cir. 1997) (citations omitted).  Additionally, Plaintiff cannot satisfy her burden through "unsupported allegations, unreasonable inferences, and conclusory speculation," *Hann v. Micron Separations, Inc.*, 107 F.3d 1, 1997 WL 56859, at *1 (1st Cir. 1997) (per curiam) (unpublished table decision), or by pointing to "'some metaphysical doubt as to the material facts.'" *Tayag v. Lahey Clinic Hosp., Inc.*, 677 F. Supp. 2d 446, 450 (D. Mass. 2010) (Saris, J.) (citation omitted).

## ARGUMENT

## I.     PLAINTIFF'S CLAIMS SHOULD BE DISMISSED BECAUSE SHE HAS NO ADMISSIBLE EXPERT TESTIMONY AND CANNOT PROVE CAUSE IN FACT

Pfizer is entitled to summary judgment because Plaintiff has no admissible expert testimony on medical causation, which is an essential element of each of her claims under Massachusetts law.  *See Doe v. Senechal*, 66 Mass. App. Ct. 68, 75-76 (2006) (causation required to maintain negligence claim); *see also Kuwaiti Danish Computer Co. v. Digital Equip. Corp.*, 438 Mass. 459, 469-70 (2003) (same for misrepresentation); *Roth v. Ray-Stel's Hair Stylists, Inc.*, 18 Mass. App. Ct. 975, 976 (1984) (same for breach of express warranty); *Hershenow v. Enter. Rent-a-Car Co. of Boston, Inc.*, 445 Mass. 790, 791-92 (2006) (same for claim under Massachusetts' consumer protection statute).

### A.     Plaintiff's Claims Require Her to Proffer Expert Testimony on Causation

To prove medical causation, Plaintiff must show that Neurontin was a "but-for" cause – not merely a contributing factor – of her alleged harm.  *See, e.g.*, *Reinhardt v. Gulf Ins. Co.*, 489

F.3d 405, 412 (1st Cir. 2007) ("Under Massachusetts law, a plaintiff seeking to establish causation must show that the 'defendant's conduct was a but-for cause of [its] injury, and that [the] defendant's conduct was a 'substantial legal factor' in bringing about the alleged harm to [the] plaintiff.'" (citation omitted) (alterations in original)).  As Massachusetts' highest court recently recognized, where, as here, the conduct of only one defendant or set of related defendants is at issue, "[t]he proper test" for causation is "whether that conduct was the but-for cause." *Matsuyama v. Birnbaum*, 452 Mass. 1, 31 (2008); *see also Or v. Edwards*, 62 Mass. App. Ct. 475, 485 & n.16 (2004) (applying "but-for," rather than "substantial causative factor," formulation of factual cause to negligence claim involving single set of defendants); *Baghdady v. Lubin & Meyer, P.C.*, 55 Mass. App. Ct. 316, 321 (2002) (affirming "but-for" causation instruction in negligence action).

   A causal connection between Neurontin and Plaintiff's alleged injury "'cannot be left to the jury's conjecture or speculation'"; that is, "'it is not enough to show the mere possibility of a causal connection; the probability of such a connection must be shown.'" *Reinhardt*, 489 F.3d at 412 (quoting *Jorgensen*, 905 F.2d at 524); *accord O'Connor v. SmithKline Bio-Science Labs., Inc.*, 36 Mass. App. Ct. 360, 363-64 (1994).  Plaintiff must "'introduce evidence from which reasonable men may conclude that it is more probable that [her alleged injury] was caused by [Neurontin] than that it was not.'"  *Mullins v. Pine Manor Coll.*, 389 Mass. 47, 58 (1983) (quoting *Carey v. Gen. Motors Corp.*, 377 Mass. 736, 738-42 (1979) (citing Restatement (Second) of Torts § 433B cmt. b (1965))).

   Moreover, in a "complex" products liability action like this one, Massachusetts courts require a plaintiff to establish causation through expert testimony.  *Hochen v. Bobst Group, Inc.*, 290 F.3d 446, 451 (1st Cir. 2002); *see also Haughton v. Hill Labs., Inc.*, No. 06-11217-RGS, 2007 WL 2484889, at *3 (D. Mass. Aug. 30, 2007) (expert testimony required to establish defect and causation in action against manufacturer of prescription medication); *Canavan's Case*, 432 Mass. 304, 315-16 (2000) ("Because understanding medical causation is 'beyond the . . .

7

knowledge of the ordinary layman . . . proof of if it must rest upon expert medical testimony.'" (alteration in original) (citation omitted)); *Bardige v. Performance Specialists*, No. 0602586, 2007 WL 3012673, at *1 (Mass. Super. Ct. Sept. 26, 2007) (noting that expert causation testimony is ordinarily required in products liability actions), *aff'd*, 74 Mass. App. Ct. 99 (2009). As this Court has observed, Plaintiff must present expert testimony that satisfies the standard set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Federal Rule of Evidence 702, to "establish two types of causation: general and specific." *In re Neurontin Mktg., Sales Practices, and Prods. Liab. Litig.*, 612 F. Supp. 2d 116, 123 (D. Mass. 2009) ("*Neurontin (Daubert)*").[4]

Plaintiff's conclusory assertion in her Expert Disclosure that, "general causation is not in issue as the affects [sic] she experienced from the drug Neurontin (including somnolence, lethargy, confusion, involuntary passing out) are admitted side affects [sic] of Neurontin by Pfizer – including, in some instances, side affects [sic] that are contained on the drug's labeling" (Pl.'s Expert Disclosure at 3), does not withstand scrutiny.  General causation certainly is at issue in this action.  As Plaintiff's own disclosure demonstrates, the nature of her alleged injury is far from clear, but it cannot be disputed that there has been no admission by Pfizer on general causation with respect to any alleged side effects or injury in this case.

Moreover, to the extent Plaintiff is asserting that the injuries she alleges were warned of in the labeling for Neurontin, her claims should be dismissed under the learned intermediary doctrine.  *See, e.g.*, *Haughton*, 2007 WL 2484889, at *2 (granting summary judgment where plaintiff presented "no evidence suggesting that [defendant] failed to warn [plaintiff's] physicians of the possible complications that might arise from the use (or misuse) of [prescription skin cream] or that the instructions and warnings that were provided would not have placed the average dermatologist on notice of these risks"); *Lareau v. Page*, 840 F. Supp.

---

[4] While this Court has determined that other experts' opinions regarding a connection between Neurontin and suicidal behavior satisfied *Daubert*, *see Neurontin (Daubert)*, 612 F. Supp. 2d at 159, Plaintiff in this case does not rely on those experts and does not allege injuries related to suicide.  (*See* Pl.'s Expert Disclosure at 3 ("Mrs. Dorsey's case is not a suicide or suicidality case so there shall be no expert testimony offered on that issue.").)

920, 932 (D. Mass. 1993) (granting summary judgment on failure to warn claim where nothing in the record suggested "that the warnings actually made were not adequate to put the average neurosurgeon on notice of the risks involved"); *Chamian v. Sharplan Lasers, Inc.*, No. 2000-00171, 2004 Mass. Super. LEXIS 357, at *22 (Sept. 24, 2004) (dismissing failure to warn claim fails "because [plaintiffs] have not identified a warning that should have been given, but was not"); *see also infra* Section II.

**B.     Plaintiff's Expert Disclosure Should Be Stricken Because the Causation Issues in this Case Require Expert Reports, Which Plaintiff Failed to Provide**

Plaintiff has not proffered a report for any expert on causation and instead purports to rely on the testimony of her treating physicians, for whom she has not submitted expert reports. The case law makes clear that, for a treating physician to present causation testimony without first filing an expert report pursuant to Rule 26(a)(2), the plaintiff must establish that the proffered expert testimony is grounded in the physician's "personal knowledge and . . . observations obtained during the course of care and treatment." *Garcia v. City of Springfield Police Dep't*, 230 F.R.D. 247, 249 (D. Mass. 2005).  All testimony based on opinions and observations not within the scope of the plaintiff's care and treatment, and by physicians for whom no expert reports have been filed, must be excluded.  *See, e.g.*, *Peña-Crespo v. Puerto Rico*, 408 F.3d 10, 13-14 (1st Cir. 2005) (upholding the district court's exclusion of the plaintiff's treating physician because, even though he was disclosed as an expert, the plaintiff failed to file an expert report); *Poulis-Minott v. Smith*, 388 F.3d 354, 358 (1st Cir. 2004) (noting that expert testimony that has not been disclosed will be excluded unless "'substantially justified or harmless'" (citation omitted)); *Alves v. Mazda Motor of Am., Inc.*, 448 F. Supp. 2d 285, 288 (D. Mass. 2006) (stating that "exclusion of expert evidence is the required sanction for a violation of Rule 26(a)(2) in the ordinary case").

Here, the issues of general and specific causation on which Plaintiff bears the burden of proof implicate questions of epidemiology, toxicology, and pharmacology, among other areas of science and medicine, and plainly mandate expert testimony that goes beyond the scope of

9

Plaintiff's care and treatment.  For example, to be admissible, expert causation testimony offered to support Plaintiff's allegations that Neurontin can cause, and did in her case cause, a "year long . . . stupor," "black outs," and a debilitating, "zombie"-like condition (Compl. at Introduction & ¶¶ 30-33), would need to identify and address reliable epidemiological and other scientific support outside the confines of Plaintiff's own clinical treatment and experience.  *Cf. Neurontin (Daubert)*, 612 F. Supp. 2d at 125.  Plaintiff's claims thus necessitate expert reports on causation.  Because Plaintiff has not served a single expert report and her time to do so has expired, her Expert Disclosure should be stricken and summary judgment should be granted because she has no expert evidence of causation.

**C.**      **Even if Plaintiff's Expert Disclosures Were Proper, Her Purported Expert Testimony Does Not Satisfy *Daubert***

As this Court and others have recognized, non-retained treating physicians, like all experts, are subject to the threshold reliability requirements articulated in *Daubert* and its progeny.  *Sutera v. Perrier Group of Am. Inc.*, 986 F. Supp. 655, 667 (D. Mass. 1997) (Saris, J.); *see also Turner v. Iowa Fire Equip. Co.*, 229 F.3d 1202, 1207 (8th Cir. 2000) ("A treating physician's expert opinion on causation is subject to the same standards of scientific reliability that govern the expert opinions of physicians hired solely for purposes of litigation."); *Campbell v. CSX Transp., Inc.*, No. 08-cv-2045, 2009 WL 1444656 at *3 (C.D. Ill. May 21, 2009) (stating that "'we do not distinguish the treating physician from other experts when the treating physician is offering expert testimony regarding causation'" (citation omitted)).  The proponent of expert testimony has the burden of establishing that it satisfies *Daubert*.  *United States v. Hicks*, 389 F.3d 514, 525 (5th Cir. 2004).  In the First Circuit, this means that the proponent must show that proposed expert testimony satisfies three tests:  "'first, the expert must be qualified; second, the expert's testimony must be reliable; and third, it must "fit" the facts of the case.'"  *Sutera*, 986 F. Supp. at 661 (citation omitted).  Plaintiff has not designated a single expert whose testimony would satisfy even one of these requirements.

First, Plaintiff has not established that any of the treating physicians she has listed in

summary fashion in her Expert Disclosure have expertise in epidemiology or toxicology or are otherwise qualified to testify as to a purported causal link between Neurontin use and the injuries she alleges.  As this Court previously observed in another case, "[s]imply having a medical degree or training is insufficient expertise to establish causation which hinges on factors such as 'dosage, duration of dosage and latency periods.'"  *Id.* at 667 (citations omitted).  Here, Plaintiff has proffered nothing that would support a finding that her designated treating physicians are qualified to testify as to the issue of general causation, aside from the mere fact that they are medical doctors.

Even assuming that some of the treating physicians listed on Plaintiff's Expert Disclosure list have prescribed Neurontin in their practices, this does not establish that they are experts in pharmacology or qualified to render an epidemiological opinion as to the potential side effects of the medicine.  *See id.* (noting that "the ability to diagnose and to treat a disease is substantially different from the expertise required to assess its genesis to a reasonable degree of scientific certainty").  There is no evidence that any of the proffered treating physician experts have conducted original research or published any papers regarding Neurontin; much less that they ever actually rendered a scientific opinion that Neurontin can or did cause a specific side effect in a patient.  *Id.*  Moreover, Plaintiff has not even attempted to show that any of her physicians are qualified to testify as to the adequacy of the warnings for Neurontin.  *See Laspesa v. Arrow Int'l, Inc.*, No. 07cv12370-NG, 2009 U.S. Dist. LEXIS 121576, at *19-20 (D. Mass. Dec. 23, 2009) (noting that "warnings directed at doctors [such as those accompanying pharmaceutical drugs and medical devices] require expert testimony because they are 'so distinctively related to some science, profession, business or occupation as to be beyond the ken of the average layman'") (citations omitted).

Second, Plaintiff cannot satisfy *Daubert's* requirement of a reliable methodology. Because Plaintiff did not submit a single expert report for any of her purported treating physician "experts," their opinions and testimony are necessarily limited to observations by those

11

physicians made during the course of their individual treatment of Plaintiff.  *See, e.g.*, *Pena-Crespo*, 408 F.3d at 13-14; *Garcia*, 230 F.R.D. at 249.  Courts have made clear that attempts to draw broad conclusions about general medical causation from a single case are unreliable.  *See, e.g.*, *In re Diet Drugs Prods. Liab. Litig.*, No. MDL 1203, 2001 WL 454586, at *15 (E.D. Pa. Feb. 1, 2001) (observing that case reports are "universally recognized as insufficient and unreliable evidence of causation"); *accord Glastetter v. Novartis Pharms. Corp.*, 107 F. Supp. 2d 1015, 1033-34, 1037 & n. 21 (E.D. Mo. 2000), *aff'd*, 252 F.3d 986 (8th Cir. 2001); *Hall v. Baxter Healthcare Corp.*, 947 F. Supp. 1387, 1411 (D. Or. 1996).  Consistent with these authorities, any opinions formed in the course of Plaintiff's treatment are not reliable for the purposes of demonstrating general causation.

Finally, Plaintiff cannot meet the requirement that any expert opinion "fit" the facts of her case.  *See United States v. Shay*, 57 F.3d 126, 133 (1st Cir. 1995).  As this Court has stated, "Rule 702's 'fit' requirement 'refers to the necessity of a connection between the expert's testimony and the facts of the case.'"  *Sutera*, 986 F. Supp. at 661 (citation omitted).  As discussed *supra*, Plaintiff's disclosed experts' testimony is limited, and they cannot testify to a reasonable degree of medical certainly that Neurontin can and did cause her alleged injury.

Plaintiff's only disclosed treating physician who, during the course of Plaintiff's treatment, even arguably formed an opinion with regard to whether Neurontin was somehow connected to Plaintiff's alleged symptoms was Dr. Schmahmann.[5]  Ms. Dorsey visited Dr. Schmahmann, a neurologist, regarding her lethargy episodes on May 7, 2003, shortly after she was hospitalized.  Dr. Schmahmann testified that he believed her symptoms were likely caused by polypharmacy, which he described as "[t]he use of multiple medications in the same patient."

---

[5] Nothing from the depositions of Plaintiff's other prescribing physicians indicate that they formed anything resembling a causation opinion with regard to Neurontin.  (*See* Dmochowski Tr. at 96:13-17 (testifying that taking Plaintiff off Neurontin was Dr. Schmahmann's decision); Alpert Tr. at 147:17-21 (stating that he does not know anything about Plaintiff's care beyond her last visit with him in July 2001).)  Dr. Dmochowski testified that he attributed Plaintiff's balance and falling problems to brain injury related to her stroke in 1997. (Dmochowski Tr. at 54:9-15.) Regardless, testimony by a physician, who actually thought a drug was causing certain side effects while continuing to prescribe it, would only establish that Plaintiff's claims are barred by the learned intermediary rule.  *Garside v. Osco Drug, Inc.*, 976 F.2d 77, 80 (1st Cir. 1992) ("*Garside II*").

12

(Schmahmann Tr. at 64:14-15.)   As such, he recommended that she reduce her medications overall, beginning with clonazepam (Klonopin).   (*Id.* at 63:19-64:19.)   He also decided later to taper her off of Neurontin – as part of the overall reduction in the number of medications she was taking – because he believed it had been prescribed to treat seizures, and he did not find that she had "a strong indication for seizures."   (*Id.* at 64:21-66:8.)   During his deposition, Dr. Schmahmann responded in the negative to questions about whether Neurontin was a substantial contributing cause of Plaintiff's lethargy and related symptoms.   (*Id.* at 73:3-74:14, 78:13-79:11, 84:16-85:3, 86:21-88:12, 90:8-91:23.)   Dr. Schmahmann testified that he had not been asked to provide expert testimony in this case and repeatedly corrected Plaintiff's counsel's characterization of earlier testimony to clarify that he had not singled out Neurontin, and could not single it out, with any degree of certainty, as a substantial contributing cause of those symptoms.   (*See, e.g.*, *id.* at 71:16-73:9, 78:13-79:11, 84:16-85:3, 86:21-88:12, 91:25-92:7, 92:16-93:15.)   When pressed by Plaintiff's counsel to state whether any single medication was a contributing cause of Ms. Dorsey's symptoms, Dr. Schmahmann testified that was not something he had considered during her treatment, but, if forced to form an opinion, he would have to say her reported side effects were connected to clonazepam, not Neurontin.  (*Id.* at 90:8-91:23.)

In short, the testimony of Dr. Schmahmann, the only one of Plaintiff's treating physicians who recommended she discontinue Neurontin, clearly indicates that he has not opined, and, indeed, is unwilling to opine, that Neurontin caused the harm she alleges.  As such, Plaintiff has no expert testimony that "fits" the facts of her case.  Indeed, she has no expert testimony at all to create a genuine issue of material fact as to specific causation, and her claims must be dismissed as a matter of law.  *See, e.g.*, *Sutera*, 986 F. Supp. at 668 (granting summary judgment where plaintiffs failed to offer admissible expert evidence of causation).

## II.   PLAINTIFF'S CLAIMS SHOULD BE DISMISSED BECAUSE SHE CANNOT ESTABLISH PROXIMATE CAUSE

Plaintiff's claims should be dismissed in their entirety on the additional, independent ground that she cannot establish that any purported inadequacy in Neurontin's labeling

13

proximately caused her alleged injury as there is no evidence that her prescribing doctors would not have prescribed Neurontin if Pfizer had included an additional or alternative warning. Because all of Plaintiff's claims are based on an alleged failure to warn of risks she asserts are associated with Neurontin, they are governed by the learned intermediary rule, which provides that "'a prescription drug manufacturer's duty to warn of dangers associated with its product runs only to the physician; it is the physician's duty to warn the ultimate consumer.'"  *Cottam v. CVS Pharmacy*, 436 Mass. 316, 321 (2002) (citation omitted).  The rationale for the rule is that "the prescribing physician, as the 'learned intermediary' standing between the manufacturer and consumer/patient, is generally in the best position to evaluate the potential risks and benefits of ingesting a certain drug and to advise the patient accordingly."  *Garside v. Osco Drug, Inc.*, 976 F.2d 77, 80 (1st Cir. 1992) ("*Garside II*").  Thus, to establish proximate causation, Plaintiff must adduce "evidence that if an additional warning had been given, it would have been heeded and a different result would have obtained."  *Chamian v. Sharplan Lasers, Inc.*, No. 200000171, 2004 WL 2341569, at *6-7 (Mass. Super. Ct. Sept. 24, 2004) (granting summary judgment to defendant under learned intermediary rule for lack of such evidence).  Otherwise, "the physician's conduct acts as an intervening-superseding cause of the plaintiff's injury which vitiates any liability on the part of the manufacturer."  *Garside II*, 976 F.2d at 80.

Although Massachusetts courts apply a presumption that a physician would have heeded an adequate warning if it had been given, *see id.* at 81, "'heed' in this context means only that the learned intermediary would have incorporated the 'additional' risk into his decisional calculus."  *Thomas v. Hoffman-LaRoche, Inc.*, 949 F.2d 806, 814 (5th Cir. 1992) (footnotes omitted).  A prescribing physician only "heed[s]" warnings in the sense of considering them while deciding how to prescribe the product and whether or not to tell the patient about the risk, and it is unrealistic to presume a physician would "heed" a warning in the sense of never using the product or that he would automatically tell every patient about every risk.  *See Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1021 (10th Cir. 2001).

14

Even where a heeding presumption applies, "[t]he burden remains on the plaintiff to demonstrate that the additional non-disclosed risk was sufficiently high that it would have changed the treating physician's decision to prescribe the product for the plaintiff." *Thomas*, 949 F.2d at 814.  In other words, a plaintiff must "offer evidence that would . . . justif[y] the jury in concluding that if the warnings had been given and heeded, the outcome would have been different." *Jones v. Walter Kidde Portable Equip., Inc.*, 16 F. Supp. 2d 123, 125 (D. Mass. 1998). In *Jones*, a failure-to-warn case involving a medical device, the court applied the heeding presumption and inferred that the plaintiff's physicians would have considered additional warnings, but nevertheless granted judgment as a matter of law because the plaintiff had offered no evidence that merely considering the additional warnings would have changed the outcome. *Id.* at 125-26; *see also Haughton*, 2007 WL 2484889, at *2 (granting summary judgment where there was "no evidence that [plaintiff's] doctors were unaware of the risks or that their decision to prescribe [the medication] for [plaintiff] would have been influenced by any additional instructions or warnings"); *Chamian*, 2004 WL 2341569, at *7.[6]  The heeding presumption adds nothing here because none of Plaintiff's doctors testified that an additional warning would have changed their prescription decisions.   Quite to the contrary, Dr. Alpert, Plaintiff's initial prescriber, testified:  "Looking over my notes on the treatment of Mrs. Dorsey, I think what I – the steps that I took in terms of sequential use of medications, including Neurontin, looked to me to be quite appropriate, consistent with my own standard of care . . . ."  (Alpert Tr. at 44:3-8.)

Even with the benefit of hindsight, Dr. Alpert testified that his prescribing behavior with regard to the Plaintiff was entirely appropriate and indicated that he would not have done anything differently.  Furthermore, when asked whether he would have consulted the Physician's

---

[6] *See also, e.g.*, *Thomas*, 949 F.2d at 812 ("[T]he plaintiff must establish that an adequate warning would have convinced the treating physician not to prescribe the product for the plaintiff."); *Wheat v. Pfizer, Inc.*, 31 F.3d 340, 343 (5th Cir. 1994) (same); *Odom v. G.D. Searle & Co.*, 979 F.2d 1001, 1003-04 (4th Cir. 1992) (same); *Plummer v. Lederle Labs.*, 819 F.2d 349, 358-59 (2d Cir. 1987) (same); *Nix v. SmithKline Beecham Corp.*, No. CV-06-43-PHX-SMM, 2007 WL 2526402, at *2-3 (D. Ariz. Sept. 5, 2007) (same); *Fisher v. Bristol-Myers Squibb Co.*, 181 F.R.D. 365, 370 (N.D. Ill. 1998) (same); *In re Norplant Contraceptive Prods. Liab. Litig.*, 955 F. Supp. 700, 711 (E.D. Tex. 1997) (same), *aff'd*, 165 F.3d 374 (5th Cir. 1999); *Windham v. Wyeth Labs., Inc.*, 786 F. Supp. 607, 612 (S.D. Miss. 1992) (same); *Vaughn v. G.D. Searle & Co.*, 536 F.2d 1247, 1250-51 (Or. 1975) (same).

Desk Reference before prescribing Neurontin to Ms. Dorsey, Dr. Alpert responded, "I doubt that it was necessary at that point, because I was already familiar with Neurontin." (*Id.* at 59:4-7.) As such, Plaintiff cannot show that if some alternative warning had been provided, her prescribing physician would have read it, much less heeded it. In addition, it is not even clear what alternative warning Plaintiff alleges should have been provided. It is axiomatic that, to show an injury caused by a failure to warn, a plaintiff must set forth an alternative warning that, if provided, allegedly would have prevented the injury. *See Laspesa*, 2009 U.S. Dist. LEXIS 121576, at *19-20 (stating that jurors cannot be left "to speculate regarding the appropriateness of the warnings provided and any additional dangers that should have been warned against").

## III.   PLAINTIFF'S FRAUD ALLEGATIONS CANNOT SAVE HER FAILURE-TO-WARN CLAIMS

Plaintiff's fraud claims are subject to the same causation requirements as her failure-to-warn claims. This Court previously dismissed identical affirmative fraud claims of other plaintiffs, and Ms. Dorsey's claims fail for the same reasons. *See In re Neurontin Marketing, Sales Practices & Products Liability Litigation*, 618 F. Supp. 2d 96, 114 (D. Mass. 2009) ("*Neurontin III*"). Her Complaint contains no specific allegations, and discovery has not revealed, that any of Plaintiff's prescribing doctors relied on an affirmative misrepresentation from Defendants. (Compl. at ¶¶ 225-228.) She did not plead a claim for fraudulent concealment.[7] (*See id.* at ¶¶ 188-246.) None of Ms. Dorsey's prescribing doctors testified that any particular representation affected their decision to prescribe Neurontin to her. In fact, Dr. Alpert did not recall ever having *any* contact with Defendants' sales representatives about Neurontin. (Alpert Tr. at 52:11-16.) Plaintiff cannot survive summary judgment by claiming that her prescribing doctors were indirectly influenced by statements or omissions to the medical

---

[7] Even if she had pled fraudulent concealment, Plaintiff must prove a "pecuniary loss caused . . . by . . . justifiable reliance upon" Pfizer's alleged failure to disclose. *Id.* at 108 (quoting Restatement (Second) of Torts § 525 (1977)). In other words, Plaintiff must prove that her prescribing physicians relied upon Pfizer's alleged statements or omissions to them, and that such reliance caused her a cognizable harm. *Garside II*, 976 F.2d at 80. This she cannot do.

community at large.   This Court has consistently rejected such impermissible fraud-on-the-market theories of reliance.   *See Neurontin III*, 618 F. Supp. 2d at 111-12; *In re Neurontin Mktg., Sales Practices & Prods. Liab. Litig.*, 257 F.R.D. 315 (D. Mass. 2009) ("*Neurontin II*").

**IV.   PLAINTIFF'S IMPLIED WARRANTY, STRICT LIABILITY, AND FRAUD CLAIMS SHOULD BE DISMISSED AS DUPLICATIVE OF HER NEGLIGENT FAILURE-TO-WARN CLAIM**

Even if Plaintiff could present evidence of causation in support of her failure-to-warn theory (which she cannot), her duplicative claims should still be dismissed.   *See* Restatement (Third) of Torts: Product Liability § 2 cmt. n (1998) ("[T]wo or more factually identical failure-to-warn claims should not be submitted to the trier of fact in the same case under different doctrinal labels.").   Here, well-settled Massachusetts authority recognizes that Plaintiff's claims under theories of implied warranty, strict liability, negligence, and fraud are subsumed by her claim of negligent failure to warn, and they should therefore be dismissed.

The Supreme Judicial Court has "expressly recognize[d] the convergence" of negligent failure-to-warn and implied warranty claims.   *Hoffman v. Houghton Chem. Corp.*, 434 Mass. 624, 637 (2001).   In product liability actions, courts regularly treat claims for breach of implied warranty and negligence under Massachusetts law as a single claim for negligent failure to warn. *See Sprague v. Upjohn Co.*, No. 91-40035-NMG, 1995 WL 376934, at *3 (D. Mass. May 10, 1994) (finding that breach of implied warranty and negligence claims are "a consolidated, single claim of negligent failure to warn" in drug product liability claims); *Kelley v. Eli Lilly & Co.*, 517 F. Supp. 2d 99, 110 (D.D.C. 2007) (same, applying Massachusetts law); *see also Hoffman*, 434 Mass. at 637 (holding that theories of negligent failure to warn and failure to warn as a breach of warranty "are to be judged by the same standard").   Likewise, "there is no 'strict liability in tort' apart from liability for breach of warranty under the Uniform Commercial Code." *Swartz v. Gen. Motors Corp.*, 375 Mass. 628, 629 (1978).   Accordingly, this Court should grant summary judgment on both Plaintiff's implied warranty and strict liability claims. *See Ford Motor Co. v. Gen. Accident Ins. Co.*, 779 A.2d 362, 369-70 (Md. 2001) (observing that

the theories of negligence, breach of warranty, and strict liability converge (citation omitted)).

Fraudulent concealment, to the extent it could be argued Plaintiff has alleged such a claim, would also be subsumed by her negligent failure-to-warn claim because the duty to disclose on which it is predicated is identical to the duty to warn physicians in prescription medication products liability cases. As this Court has recognized, other courts have repeatedly found fraudulent concealment claims duplicative of failure-to-warn claims in actions just like this. *See Neurontin III*, 618 F. Supp. 2d at 113 (citing cases). The Court nevertheless concluded that the fraudulent concealment claims of products liability plaintiffs may be independently actionable under certain circumstances.[8] *See id.* at 110, 112. However, discovery in this action has revealed that there is no causal nexus between Pfizer's alleged off-label promotion and Plaintiff's injury because there is no evidence connecting any marketing by Pfizer to the Neurontin prescriptions that Plaintiff claims caused her harm. Nor can Plaintiff argue for a duty to disclose by virtue of Pfizer's alleged off-label promotion in other Neurontin cases or on a national scale. This Court has previously dismissed fraudulent concealment claims of other plaintiffs "to the extent they are premised on the claim of fraudulent omissions in the national advertising and marketing campaign." *Neurontin III*, 618 F. Supp. 2d at 114. Thus, the Court's postulated legal duty to disclose risks to patients in the context of off-label promotion has not been triggered, and any fraudulent concealment claim may only be predicated on Pfizer's alleged "fail[ure] to disclose the risks of its drugs in the product labeling itself." *Id.* at 112. That duty to disclose risks on the product label is identical to and coextensive with the duty to warn that underpins Plaintiff's negligent failure-to-warn claim. *See Garside II*, 976 F.2d at 80 (holding that manufacturers of prescription medications have a duty to warn prescribing physicians of

---

[8] Although this Court has suggested that Pfizer may also have a duty to disclose Neurontin's risks to patients where it is engaged in off-label promotion and "it knows that the plaintiff and/or his prescriber does not know or cannot reasonably discover the undisclosed facts," the Court was addressing the claims of products liability plaintiffs from several different states. *Id.* at 110. No such duty to warn *patients* exists under Massachusetts law, which only recognizes a duty to warn prescribing *physicians*. *See Garside II*, 976 F.2d at 80. The Supreme Judicial Court has recognized just one exception to the learned intermediary rule, in the inapposite context of oral contraceptives. *MacDonald v. Ortho Pharm. Corp.*, 394 Mass. 131, 135 (1985).

medication's risk).   Because Pfizer's duty is the same under either theory, any fraudulent concealment claim would be duplicative of her negligence claim and should be dismissed.

## V.   PLAINTIFF CANNOT PROVE ESSENTIAL ELEMENTS OF HER EXPRESS WARRANTY AND CHAPTER 93A CLAIMS

To prove her claim for express warranty under Massachusetts law, Plaintiff must show an "affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain."   Mass. Gen. Laws Ann. ch. 106, § 2-313(1) (West 1999).   A claim for breach of express warranty thus "requires proof that the defendant promised the plaintiff a specific result that was not achieved."   *Kelly v. Wyeth*, No. 20033314F, 2007 WL 1302589, at *7 (Mass. Super. Ct. Apr. 12, 2007) (citing *Anthony's Pier Four, Inc. v. Crandall Dry Dock Eng'rs, Inc.*, 396 Mass. 818, 823 (1986)).   Indeed, "[a] claim for breach of express warranty differs from a negligence claim 'because the plaintiff must demonstrate that the defendant promised a specific result.'"   *Morrisey v. Lieberman*, No. 002561, 2005 WL 2009433, at *4 (Mass. Super. Ct. July 13, 2005) (citation omitted).   In this case, there is no evidence that Pfizer ever communicated directly with Ms. Dorsey.   (*See* Pl.'s Resp. To Interrog. No. 17.)   Nor is there any evidence of any affirmative representations about Neurontin to Plaintiff's prescribing physicians.   (*See* Alpert Tr. at 52:11-16.)[9]   Even assuming such warnings for the sake of argument, there is no evidence that her prescribing physicians relied on them, especially given that Dr. Alpert still believes that prescribing Neurontin was "quite appropriate" for Ms. Dorsey and "consistent with [his] own standard of care."   (*Id.* at 44:3-8.)   As a result, Plaintiff's express warranty claim fails as a matter of law.   *See Sprague*, 1995 WL 376934, at *3 (dismissing plaintiff's express warranty claim in a prescription drug case because she established "neither the existence of an express warranty nor any reliance thereon"); *Kelly*, 2007 WL 1302589, at *7 (granting summary judgment on express warranty claim where label did not guarantee that the

_____

[9] Any argument that the Neurontin label served as an express warranty must be rejected.   *See Kelly*, 2007 WL 1302589, at *7 ("While [plaintiff] asserts that these warnings [on the label] do not adequately represent the true dangers, the label does not explicitly or implicitly promise that her symptoms would not occur.").   In any case, Ms. Dorsey testified that she does not normally read the package inserts for her medicines.   (Dorsey Dep. at 46:14-47:7.)

19

medicine would produce a specific result).  Additionally, Plaintiff cannot prove that any reliance on an express warranty given by Pfizer caused Ms. Dorsey harm.  *See Sprague*, 1995 WL 376934, at *3 (to prevail on an express warranty claim, a plaintiff "must show reliance on such warranty" (citation omitted)); *see also Stuto v. Corning Glass Work*s, No. 88-1150-WF, 1990 WL 105615, at *5 (D. Mass. July 23, 1990) ("[S]ome minimum of reliance is a required element of a breach of express warranty claim in this state.").  There is no evidence that Ms. Dorsey or her prescribing physicians relied on any affirmation of fact by Pfizer that later proved false.

Finally, Plaintiff cannot establish a claim under the Massachusetts consumer protection act.  Mass. Gen. Laws Ann. Ch. 93A (West 2006).  The Supreme Judicial Court of Massachusetts has held that "proving a causal connection between a deceptive act and a loss to the consumer is an essential predicate for recovery under our consumer protection statute." *Hershenow*, 445 Mass. at 791.  A plaintiff must "'show that there was a causal connection between the deception and the loss.'"  *Swenson v. Yellow Transp., Inc.*, 317 F. Supp. 2d 51, 54 (D. Mass. 2004) (citation omitted).  Plaintiff has produced no evidence that any deceptive conduct by Defendants caused her any loss.  Also, as discussed *supra*, there is no evidence that Ms. Dorsey's prescribing physicians were ever exposed to any allegedly improper marketing by the Defendants that caused them to prescribe Neurontin.[10]

## CONCLUSION

For the foregoing reasons, this Could should grant Pfizer's motion for summary judgment.

Dated:  April 23, 2010                    Respectfully submitted,

                                          SKADDEN, ARPS, SLATE, MEAGHER & FLOM
                                          LLP

---

[10] Plaintiff's remaining causes of action should also be dismissed for several additional reasons.  Plaintiff's intentional infliction claim fails because there is absolutely no evidence of either intent or "extreme and outrageous" conduct.  *See Jones v. Maloney*, 74 Mass. App. Ct. 745, 750 (2009).  Plaintiff's unjust enrichment claim fails because there is an adequate remedy at law, notwithstanding her failure to carry her burden of proving her legal claims, and her unjust enrichment claim is nothing more than a restatement of her tort claims.  *See, e.g.*, *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 937 (3d Cir. 1999); *In re Lupron Mktg & Sales Practices Litig.*, 295 F. Supp. 2d 148, 182 (D. Mass. 2008).  The loss of consortium claims fail because they "require[] proof of a tortious act that caused the claimant's spouse personal injury."  *Sena v. Commonwealth*, 417 Mass. 250, 264 (1994).

By: /s/ Mark S. Cheffo
     Mark S. Cheffo

Four Times Square
New York, NY 10036
Tel:  (212) 735-3000

-and-

ROPES & GRAY LLP

By: /s/ Ana M. Francisco
     Ana M. Francisco

One International Place
Boston, MA  02110
Tel:  (617) 951-7000
Email:  ana.francisco@ropesgray .com

*Attorneys for Defendants Pfizer Inc and
Warner-Lambert Company LLC*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on April 23, 2010.

/s/ Ana. M. Francisco
Ana M. Francisco