```
 1              UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF MASSACHUSETTS
 3                   MDL Docket No. 1629
 4                   Master File No. 04-10981
 5     ****************************************
 6     IN RE:  NEURONTIN MARKETING, SALES
 7             PRACTICES AND PRODUCTS
 8             LIABILITY LITIGATION
 9     ****************************************
10     THIS DOCUMENT RELATES TO:
11     MARY P. DORSEY, Individually and as
12     Administrator of the Estate of James
13     Dorsey
14     ****************************************
15               VIDEOTAPED DEPOSITION OF
16             JONATHAN E. ALPERT, MD, PhD
17
18                      Held At:
                     Hare & Chaffin
19                  160 Federal Street
                Boston, Massachusetts 02110
20
                     March 28th, 2008
21                      1:13 PM
22
       Reported By:  Maureen O'Connor Pollard, RPR, CLR
23
24     Videographer:  William Slater
```

Page 2

```
 1  APPEARANCES:
 2
    FOR THE PLAINTIFF:
 3
        BY: TIMOTHY J. PERRY, ESQ.
 4          LAUREN BURKE, ESQ.
            PERRY, KRUMSIEK & JACK, LLP
 5          One McKinley Square
            Boston, Massachusetts 02109
 6          617-720-4300
            tperry@perrylegal.com
 7
 8  FOR THE DEFENDANTS:
 9      BY: DAVID B. CHAFFIN, ESQ.
            HARE & CHAFFIN
10          160 Federal Street
            Boston, Massachusetts 02110
11          617-330-5000
            dchaffin@hare-chaffin.com
12
13  FOR THE DEPONENT:
14      BY: HEIDI M. OH, ESQ.
            HAMROCK & TOCCI
15          101 Main Street
            Cambridge, Massachusetts 02142
16          617-496-1707
            hoh@htclaw.com
17
18
19
20
21
22
23
24
```

Page 3

```
 1                  INDEX
 2  EXAMINATION                          PAGE
 3  JONATHAN E. ALPERT, MD, PhD
 4  BY MR. CHAFFIN                          5
 5  BY MR. PERRY                          135
 6
 7              EXHIBITS
 8  NO.         DESCRIPTION                PAGE
 9  Ex. 1   Dr. Alpert's records on Mrs.
10          Dorsey..........................  45
11  Ex. 2   Three page sales call document..  138
12
13
14
...
24
```

Page 4

PROCEEDINGS

THE VIDEOGRAPHER: This is your video operator speaking, Bill Slater of Veritext. Today's date is March 28, 2008. The time on the video screen is 1:13 p.m..

We are here at the offices of Hare & Chaffin located at 160 Federal Street, Boston, Massachusetts to take the videotaped deposition of Dr. Jon Alpert in the matter of Neurontin Marketing, Et Al versus Pfizer, Incorporated, Et Al, United States District Court, District Court of Massachusetts, Number 04-10981, MDL 1629.

Will counsel please voice identify yourselves and state whom you represent?

MR. CHAFFIN: Good afternoon. My name is David Chaffin, I represent the Defendants, Pfizer and affiliates.

MR. PERRY: My name is Timothy Perry, and I'm here with Lauren Burke, we represent Plaintiff, Mary Dorsey.

MS. OH: Good afternoon. My name is Attorney Heidi Oh from the firm of Hamrock & Tocci representing the Deponent, Dr. Alpert.

Page 5

THE VIDEOGRAPHER: Will the court reporter please swear in the witness?

JONATHAN E. ALPERT, MD, PhD, having been satisfactorily identified by photo identification, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION
BY MR. CHAFFIN:

Q. Good afternoon, Dr. Alpert. My name is David Chaffin. As you heard, I represent Pfizer and its affiliates in connection with some litigation involving the drug Neurontin. Are you aware of that?

A. Yes.

Q. This particular case is brought by Mary Dorsey, who I gather is a former patient of yours?

A. That's correct.

Q. Doctor, have you ever had your deposition taken before?

A. Yes, I have.

Q. So just very briefly, if you don't understand any of my questions, please ask me to

Page 42

1  mentioned, does that mean that, to put it in
2  layman's terms, that Neurontin metabolizes
3  quickly? It's out of the system relatively
4  fast?
5      A.  That happens to be the case. You
6  wouldn't necessarily have been able to infer it
7  from the other two properties, but it does have
8  a relatively short half life.
9      Q.  That's what happens when I venture
10 into territory that I don't know.
11     A.  It was a good try, though.
12     Q.  But that's an additional?
13     A.  But it is accurate that it has a short
14 half life, which some people consider an
15 advantage as well.
16     Q.  And why would that be considered an --
17 do you consider it an advantage?
18     A.  It's a mixed blessing in the sense
19 it's an advantage in the sense that if there's a
20 side affect like sedation, it tends to wash out
21 during the course of the day. If you took it in
22 the morning, then six hours later you're less
23 likely to be sedated, or if you took it at
24 bedtime, by the next morning it's somewhat out

Page 43

1  of your system.
2          It's a disadvantage in that for some
3  people it means that if it's going to be
4  effective it needs to be taken in divided doses
5  during the course of the day, that seems to be
6  necessary particularly for pain syndromes or
7  seizures, and that's hard for people to keep up
8  with, to take a medication three times a day, so
9  compliance is sometimes affected adversely
10 because of a short half life.
11         So it's a mixed blessing. But in
12 terms of side effects, it's generally a
13 positive.
14     Q.  In your medical judgment, Doctor, were
15 your prescriptions of Neurontin for the various
16 off-label uses you've mentioned appropriate?
17     A.  To the best that I can -- excuse me.
18 Do you mean in the case of Mrs. Dorsey in
19 particular?
20     Q.  In all your off-label prescriptions.
21     A.  I haven't gone back and systematically
22 reviewed my notes. I wouldn't be surprised if I
23 find some patients where I wished I had done
24 something other than what I did for any

Page 44

1  medication, whether it's Neurontin or any other
2  medication.
3          Looking over my notes on the treatment
4  of Mrs. Dorsey, I think what I -- the steps that
5  I took in terms of sequential use of
6  medications, including Neurontin, looked to me
7  to be quite appropriate, consistent with my own
8  standard of care, which, you know, I hope is at
9  least as high and in some cases higher than the
10 community standard.
11     Q.  As I turn these pages, this is good.
12     A.  Good. That's good.
13     Q.  We go faster.
14         Have you ever prescribed Neurontin for
15 neuropathic pain?
16     A.  I don't recall ever initiating it for
17 neuropathic pain. I certainly have patients who
18 have neuropathic pain who have been treated
19 either by neurologists or pain specialists with
20 Neurontin, and I might have been a prescriber
21 who continued that prescription that was
22 initiated in the pain clinic or by a
23 neurologist, but I don't recall initiating
24 treatment for that purpose.

Page 45

1      Q.  Okay. May I suggest that we take
2  about a two-minute break while I just retrieve
3  your record, and then we'll probably turn to
4  your specific treatment of Mrs. Dorsey, and try
5  to move things along, is that all right?
6          MR. CHAFFIN: All right with you,
7  Counsel.
8          MR. PERRY: Yes.
9          MS. OH: Yes, thank you.
10         THE VIDEOGRAPHER: Time is 1:54.
11 We're off the record.
12         (Whereupon, a recess was taken.)
13         (Whereupon, Alpert Exhibit Number 1
14         was marked for identification.)
15         THE VIDEOGRAPHER: We're back on the
16 record. The time is 1:57.
17         MR. CHAFFIN: Thank you.
18         BY MR. CHAFFIN:
19     Q.  Doctor, before we actually turn to
20 your record, let me ask a couple of initial
21 questions.
22         You first saw Mrs. Dorsey in 1994?
23     A.  Yes.
24     Q.  How did she come to you, do you know?

12 (Pages 42 to 45)

Page 50

1  of bipolar spectrum disorder, we tried a series
2  of mood stabilizers, including some that were
3  FDA approved and some that were not, and
4  anti-depressants. Those included, as I recall,
5  Lithium, Depakote, Risperidone and Tegretol as
6  mood stabilizers, as well as anti-depressants
7  such as Nortriptyline, amoxapine, Wellbutrin and
8  Celexa.
9      And when those multiple treatments in
10 various combinations were not working
11 sufficiently well, we needed to think about what
12 else might be reasonable to treat symptoms which
13 as I recall at the time of starting Neurontin
14 were symptoms such as irritability and mood
15 lability, mood sort of swinging even during the
16 course of a day back and forth, as well as
17 ongoing anxiety symptoms which were chronic for
18 her.
19     So we were -- she was clearly in a lot
20 of distress. We were trying to find a treatment
21 that could be added safely as an adjunct or an
22 add-on treatment to her already relatively
23 complex regimen of medications to try to help
24 her make progress.

Page 51

1   Q. And had you had some experience with
2  Neurontin before you prescribed it for
3  Mrs. Dorsey, if you can recall?
4   A. To the best that I can recall, I
5  probably had had previous patients that I had
6  prescribed Neurontin for probably extending back
7  a year or so at least from that, before
8  prescribing it for Mrs. Dorsey.
9   Q. As you sit here today, do you remember
10 having reviewed any specific literature before
11 the prescription for Mrs. Dorsey of Neurontin?
12  A. In general it was an area that many of
13 us were and remain interested in, which is the
14 development of new mood stabilizers and new
15 treatments for psychiatric disorders. And so in
16 general terms I can say yes, I was very familiar
17 with the fact that in a number of journals there
18 were emerging uncontrolled trials of Neurontin
19 that looked promising, at the same time that
20 there were similar trials for other agents that
21 were looking promising, such as Lamictal.
22  Q. Let me come off Mrs. Dorsey for one
23 moment, if I may.
24     Do you, Doctor, as part of your

Page 52

1  practice receive visits by pharmaceutical
2  company representatives?
3   A. Pharmaceutical representatives visit
4  our practice. I very rarely receive them into
5  my office for discussion, but they do come to
6  our practice fairly regularly.
7   Q. Okay. Leading up to your prescription
8  to Mrs. Dorsey, did you have any contact with
9  any Pfizer representative concerning Neurontin?
10  A. I can't recall any.
11  Q. Okay. Have you at any time had any
12 contact with any Pfizer, Warner-Lambert,
13 Parke-Davis representative concerning Neurontin
14 that you can recall?
15  A. I don't have any recollection of
16 contacts about Neurontin.
17  Q. What role do -- well, in the past
18 you've met with representatives of
19 pharmaceutical companies, is that true?
20  A. From time to time, yes.
21  Q. From time to time?
22  A. That's correct.
23  Q. And what role, if any, did whatever
24 the pharmaceutical companies representatives

Page 53

1  have to say to you about their pharmaceuticals
2  play in your prescription decisions?
3   A. Generally a very minimal role, to the
4  best that I'm aware. I usually will invite
5  pharmaceutical representatives in for an office
6  visit if there's a newly approved product and
7  I'm interested to hear what they have to say
8  about it, but typically also need to review the
9  literature on my own. And, you know, in general
10 the pharmaceutical representatives, with all due
11 respect, know less about pharmacology or about
12 clinical medicine than the residents that I
13 teach, and the medical students that I teach.
14  Q. Thank you for the qualifier.
15     And in addition to relying on the
16 literature in lieu of the pharmaceutical
17 representative presentation, do you also rely on
18 information received from colleagues?
19  A. Yes, I do.
20  Q. Do you recall ever meeting with any
21 medical liaisons from any pharmaceutical
22 company?
23  A. Actually when I answered the question
24 about pharmaceutical representatives, I would

Page 58

1  Q. Have you ever been asked to contribute
2  patients to any study of Neurontin?
3  A. Not that I can recall, no.
4  Q. Have you ever been asked to contribute
5  patients to any study involving an off-label use
6  of any medication?
7  A. Yes.
8  Q. What medications?
9  A. You know, I practice within a research
10 program, and many of our studies involve
11 off-label uses of medications for, particularly
12 for unipolar depression, as well as for side
13 effect management.
14 Q. Have you ever been pressured by other
15 doctors to prescribe a medicine for a particular
16 use?
17 A. No.
18 Q. So that would apply with respect to
19 Neurontin as well?
20 A. That's correct.
21 Q. Do you recall receiving any literature
22 or information directly from Warner-Lambert or
23 Parke-Davis or Pfizer concerning Neurontin?
24 A. I can't recall receiving any.

Page 59

1  Q. Before you prescribed Neurontin for
2  Mrs. Dorsey, did you review the PDR, if you can
3  recall?
4  A. I doubt that it was necessary at that
5  point, because I was already familiar with
6  Neurontin. I'm sure at some previous point I
7  had.
8  Q. Okay. Did you discuss the possible
9  risks or adverse effects of Neurontin with
10 Mrs. Dorsey?
11 A. That's my standard practice, and I
12 assume that I did.
13 Q. And your standard practice is to weigh
14 the risks against the potential benefits on any
15 drug, right?
16 A. I see any medication change as a joint
17 decision between the doctor and the patient, and
18 so that we -- I try to share the information
19 that I have available in order to reach a
20 decision that makes sense between the patient
21 and myself.
22 Q. Did Mrs. Dorsey benefit from taking
23 Neurontin?
24 A. You know, again I needed to consult my

Page 60

1  notes, but I noticed in my notes that the
2  month -- within several weeks or the month of
3  being prescribed Neurontin, she reported that
4  she felt somewhat better and somewhat even.
5  Shortly after that period of time she
6  moved to Cape Cod and was under the care of
7  another psychiatrist, so I didn't have the
8  opportunity to follow her out over a long period
9  of time on Neurontin. But during the time that
10 I saw her, at least her initial report was that
11 she felt she was getting some benefit from it.
12 Q. Do your notes indicate that she
13 reported any side effects?
14 A. I don't recall.
15 Q. I'm sorry, we'll come to it then.
16 Why don't we take a minute to review
17 your notes, and I'll try to be as quick as
18 possible.
19 MR. CHAFFIN: You guys have a copy,
20 right, Counsel?
21 MR. PERRY: Yes.
22 BY MR. CHAFFIN:
23 Q. Doctor, I want to start on 2/25/94, do
24 you have that one, the top page? We'll walk

Page 61

1  through these chronologically if you don't mind.
2  A. By all means.
3  MR. CHAFFIN: Ready, Counsel? Thanks.
4  BY MR. CHAFFIN:
5  Q. Would these be the notes of your first
6  meeting with Mrs. Dorsey?
7  A. Yes.
8  Q. And this would be the meeting at which
9  you took the detailed history?
10 A. Yes.
11 Q. And she was -- I'm just referring you
12 to the first page. What is the writing just
13 below "2/25/94 psychiatry" on the left-hand --
14 the first line on the left?
15 A. It's shorthand for introduction, chief
16 complaint.
17 Q. All right. And then in the next few
18 paragraphs there are basically information that
19 she provided to you?
20 A. That's correct.
21 Q. Okay. Did she report to you, as the
22 second line indicates, that she wasn't able to
23 work well as a real estate agent?
24 A. Yes.

Page 66

1  activities toward her children or anyone else,
2  but she had concerns that are sometimes
3  characteristic of obsessive compulsive disorder
4  that she might underneath have lesbian feelings
5  toward people around her, and those concerns of
6  hers would sometimes be so intense that they
7  would lead her to feel suicidal.
8      Q.  Okay.  And then what comes after that?
9      A.  "Believes she cut her wrists in her
10 early teens without hospitalization, and not
11 since."
12     I think that probably meant that she
13 hasn't been hospitalized -- no, that she hasn't
14 cut her wrists since that time in her early
15 teens.
16     Q.  Okay.  And then on the second half of
17 the page you detail her prior psychiatric
18 history, is that right?
19     A.  That's correct.
20     Q.  And her various treaters, right?
21     A.  That's right.
22     Q.  And medications?
23     A.  That's correct.
24     Q.  Indicating she had not been on Lithium

Page 67

1  before?
2      A.  That's correct.
3      Q.  And no known anti-psychotic, right?
4      A.  That's right.
5      Q.  Turn to the next page, please.
6  There's some more of her history on the top,
7  please, top part of the page?
8      A.  That's correct.  So it says past
9  medical history.  She has an allergy to sulfa
10 medications.  She was using the medication Xanax
11 up to four times a day, and I believe that
12 probably -- I can't tell whether that says
13 four milligrams or one milligram, it probably
14 was one milligram four times a day.  She has a
15 history of a double ureter, which is the tubes
16 leading from the kidney.  She has a history of
17 urinary tract infections.
18     Q.  Okay.  There's something about her
19 kidney?
20     A.  She came close to having her right
21 kidney nephrectomy, having her right kidney
22 removed, but it was ultimately saved in 1970 and
23 it was not removed.
24     She had no known cardiac problems.

Page 68

1  She believes she had a Holter monitor test that
2  was normal in 1991.  She had no known liver
3  problems.
4      She had LOC, stands for loss of
5  consciousness, in her mid teens and late teens,
6  it's a question whether that was dissociative,
7  which is a kind of psychiatric experience where
8  somebody blanks out, or whether it was due to
9  something else.  One of those episodes appear to
10 occur after a motor vehicle accident when her
11 car flipped over, and she was in a convertible.
12 Another occurred when she was diving from a raft
13 and hit a man's head with her chin apparently.
14 So those were other episodes when she had these
15 blackout spells.
16     She also had her head -- she had some
17 minor head trauma when she was age seven.  I
18 think this says "knocked into a pipe without
19 loss of consciousness."  And I believe that
20 meant also that she had no seizures.  Without
21 loss of consciousness, it should have been
22 comma, seizures.  She had basal cell carcinoma
23 four years ago.
24     She had a sleep study at Beth Israel

Page 69

1  hospital several years ago which showed 40
2  awakenings, recalls being told that she had
3  sleep apnea but no additional treatment was
4  needed.
5      Q.  40 awakenings, is that significant?
6      A.  I'm not certain.
7      Q.  Not certain.  I'm sorry, I
8  interrupted.
9      A.  "No known learning disabilities,
10 etcetera," I said.  "Did well in school until
11 high school when she started doing very poorly."
12     She had a past history of using
13 Synthroid, and Dr. Daniels was her
14 endocrinologist.
15     Q.  Synthroid was a what?
16     A.  It's a treatment for hypothyroidism
17 it's a form of thyroid hormone.
18     Q.  Okay.
19     A.  She has generally less than two drinks
20 a day.  No history of alcohol abuse or
21 dependence, but has had urges to drink four or
22 five years ago before that first visit.  No drug
23 abuse.  Otherwise drinking caffeine about three
24 cups a day and smoking one pack a day since she

```
                                                    Page 70
1   was 15.
2       Q.  And then the next page is -- "SH" is?
3       A.  Social history.
4       Q.  Okay. I won't make you go through all
5   that.
6           She did report that her stepfather was
7   cruel, and she feels -- I'll withdraw that.
8       A.  She feels -- okay.
9       Q.  "FH" is family history?
10      A.  Family history.
11      Q.  And she reported some mental disorder
12  or mental illness in her family members
13  apparently?
14      A.  That's correct.
15      Q.  And then down below, APP, that's --
16  what does APP stand for?
17      A.  That means assessment and plan.
18      Q.  Assessment and plan.
19          And that was your assessment of her at
20  that point in time?
21      A.  That's correct.
22      Q.  And then at the bottom you mention,
23  reference "NTP."
24      A.  And that stands for nortriptyline, a
```

```
                                                    Page 71
1   tricyclic anti-depressant.
2       Q.  An anti-depressant?
3       A.  Yes.
4       Q.  Is that the first drug you put her on?
5       A.  Yes, it is.
6       Q.  Anything else at that time?
7       A.  I continued the Alprazolam, which is
8   also called Xanax.
9       Q.  Was that an on-label use of NTP?
10      A.  Yes, it was.
11      Q.  Okay. It was approved for this use?
12      A.  For depression.
13      Q.  For depression?
14      A.  That's correct.
15      Q.  And Xanax was an on-label use?
16      A.  Yes. That was approved for anxiety.
17      Q.  Okay. I'm going to flip through to
18  the one that's dated 3/16/94, and I'll try to do
19  this as fast as possible.
20          Up above, is it true that the
21  subsequent reports on your treatment of her, you
22  start out indicating what drugs she was on --
23      A.  That's correct.
24      Q.  -- at a particular time?
```

```
                                                    Page 72
1           Okay. So this one is -- is this your
2   second meeting with her?
3       A.  That's right.
4       Q.  Second appointment on March 16th of
5   1994, right?
6       A.  That's correct.
7       Q.  All right. And you indicate the drugs
8   up on top, right?
9       A.  Yes.
10      Q.  And again she's reporting guilt
11  feelings, depression; same symptomology
12  basically?
13      A.  That's correct.
14      Q.  But down below in your assessment and
15  plan she says -- you say "partial improvement in
16  --" I'm sorry, I actually can't read that? What
17  does it say?
18      A.  Yes. It says "partial improvement in
19  moderate/major depressive disorder. Will
20  increase nortriptyline by 25 milligrams a day,
21  and then further increase it to 50 milligrams
22  and recheck the level."
23      Q.  So is it fair to say that you were
24  inferring that -- or concluding that the NTP was
```

```
                                                    Page 73
1   having a positive effect --
2       A.  That's correct.
3       Q.  -- in assessing her depression?
4       A.  That's correct.
5       Q.  And you were going to increase the
6   dosage?
7       A.  That's right.
8       Q.  All right. The next page, 3/31/94,
9   and you report there that "overall feels less
10  consistently depressed but periods of --" what
11  is the next word?
12      A.  "Intermittent overwhelming anxiety."
13      Q.  Okay. What's the next?
14      A.  "And dysphoria," which means depressed
15  mood.
16      Q.  Okay. And then?
17      A.  "Made worse by her ex-husband's
18  absence."
19      Q.  "By her ex-husband's"?
20      A.  I believe that weren't formally
21  divorced but probably separated at that time.
22  So it's probably not formally correct to refer
23  to him as an ex-husband, but I believe that they
24  were living separately at that point.
```

Page 74

1   Q. And your first note indicated that
2   she'd reported he was a heavy drinker, or he was
3   drinking heavily, and this one indicates
4   ex-husband or something.
5       Did you have other discussions with
6   her concerning her relationship with her husband
7   that you can recall?
8   A. During the course of years I did, yes.
9   Q. And what did she say to you?
10      MR. PERRY: Objection.
11  A. He -- it was a difficult marriage.
12  There was a great deal of financial strain. Her
13  spouse was somebody who wasn't able to hold a
14  steady job at times, at times drank heavily, so
15  it was a lot, a lot to contend with.
16      BY MR. CHAFFIN:
17  Q. Okay. Let's go to April 8, '94.
18      And she's still on the same two drugs,
19  correct, based on the top?
20  A. That's correct.
21  Q. Would you go to the first large
22  paragraph that begins with the word "moods" in
23  the middle of the page?
24  A. Yes.

Page 75

1   Q. And at the end of that, the very end,
2   actually the fourth line, the end of the fourth
3   line, does it say "less frequent"?
4   A. "Less frequent but still present
5   passive suicidal ideation. Frequent panic
6   symptoms without full attacks."
7   Q. Okay. And down below 4/18/94, this is
8   the last paragraph on that page --
9   A. Yes.
10  Q. -- what does that say, please?
11  A. "Called to report she was diagnosed
12  with pneumonia at her gynecologist's
13  appointment, to be treated with --" I'm not
14  certain what that refers to, it was probably a
15  cephalosporin in those days but I'm not able to
16  read my handwriting, "-- Lithium level is .3
17  milliequivalents per liter," because we had
18  started Lithium at the April 8th appointment,
19  "will increase in one week if no further
20  improvement as respiratory infection clears."
21  Q. You put her on Lithium?
22  A. That's correct.
23  Q. And what was that for?
24  A. That was because she continued to have

Page 76

1   significant depressive symptoms, and Lithium at
2   that point was used for two reasons, one as an
3   FDA indicated mood stabilizer for known bipolar
4   disorder, but also as an adjunct to
5   anti-depressants for people both with bipolar
6   disorder and unipolar depression to help allow
7   the anti-depressant to work better.
8   Q. Turning to the page for May 25th of
9   '94, and at the top again you've listed the
10  medications?
11  A. Yes.
12  Q. Fair to say that while all your
13  treatment was going on, you were --
14  simultaneously there were regular blood tests
15  being done to measure her levels of Lithium and
16  NTP?
17  A. That's correct.
18  Q. So you could assess that she was
19  staying within the therapeutic range?
20  A. Yes, that's exactly right.
21  Q. Okay. In the middle of this page, do
22  you see the word "appetite"? I think it's
23  appetite.
24  A. Yes.

Page 77

1   Q. All right. Does that say "appetite
2   mildly increased"?
3   A. That's correct.
4   Q. What does it say after that, please?
5   A. "Concentration low," meaning poor.
6   Q. Yes?
7   A. "Frequent passive suicidal ideation
8   without active thoughts. Not wanting to
9   socialize. Panic limited attacks. Bizarre
10  thoughts less prominent."
11  Q. And did you change the treatment at
12  that point?
13  A. It looks like the plan was probably to
14  increase the Lithium. Her level was low at that
15  point, at .36. The plan was to maximum the
16  Lithium, meaning to increase the dose and
17  recheck level. And then we talk about other
18  options.
19  Q. Okay. By the way, Doctor, we've never
20  met before, correct?
21  A. That's correct.
22  Q. And never spoken before?
23  A. We never have spoken before.
24  Q. And you've spoken with no one from my

Page 86

1   A.  They're meant to be, yes.
2   Q.  They're meant to be.  All right.
3       Are you on September 20th of '94?
4   A.  Yes.
5   Q.  Okay.  In the middle of the page it
6   indicates, does it not, that Mrs. Dorsey was
7   "still depressed but not as --" I'm sorry,
8   moods, what's the second word, "moods"?
9   A.  "Moods largely down.  They're not as
10  severe as in past."
11  Q.  Okay.  And she's still having some
12  insomnia, correct?
13  A.  That's correct.
14  Q.  And she's still having passive suicide
15  ideation?
16  A.  That's correct.
17  Q.  Okay.  Thank you.
18      And then in your A/P section you
19  indicated that she was still continuing to show
20  moderate depressive symptomology, right?
21  A.  That's correct.
22  Q.  Let's flip a few more pages.  I think
23  this is 6/1/95.
24  A.  Yes.

Page 87

1   Q.  All right.  You've got her on four
2   drugs.
3       Are these all on-label or off-label at
4   this point?
5   A.  Tegretol was, Lithium -- I'm sorry.
6   Lithium is on-label for bipolar disorder.  Xanax
7   is on-label for panic disorder.  Tegretol,
8   although used very frequently for bipolar
9   disorder, was never formally submitted for
10  approval to the FDA.  And Risperidone was
11  subsequently approved by the FDA for bipolar
12  disorder, but I believe was off-label at that
13  point in 1995.
14  Q.  Okay.  And then you write "on
15  Risperidone had developed hypomania SXS," that
16  means?
17  A.  Symptoms, right.
18  Q.  "Apparently with increased
19  talkativeness and irritability and 'fractured
20  thoughts,'" right?
21  A.  That's right.
22  Q.  So she indicated she was having
23  fractured thoughts at the time?
24  A.  That's correct.

Page 88

1   Q.  And you made some adjustment to the
2   treatment?
3   A.  That's right.
4   Q.  All right.  January -- I'm sorry,
5   June 13th of 1995 record.  Did she report to
6   you, as the second paragraph indicates, a
7   concern about her husband's drinking again?  The
8   paragraph that begins "however, on return."
9   A.  Yes, "concern."
10  Q.  Concern about her husband's drinking?
11  A.  Yes.
12  Q.  And down below, two paragraphs below
13  there's something that says "has moved to couch,
14  from couch to bedroom which she has felt is
15  progress"?
16  A.  That's right.
17  Q.  What's that all about, please, do you
18  recall?
19  A.  I don't recall what that refers to.
20  Q.  Okay.  Is this January 17th of '96?
21  I'm not sure, it may not be.  Yes.
22  A.  Yes, I think so.
23  Q.  And I'm going to direct your attention
24  down about three-quarters of the way to the line

Page 89

1   that begins "no active."
2       Do you see that?
3   A.  Yes.
4   Q.  What is that, is that "no active --"
5   A.  "Suicidal ideation, some passive
6   thoughts."
7   Q.  Okay.  So she still had passive
8   thoughts.  Okay.
9       And again, you're still modifying the
10  medications and checking levels to determine
11  whether the pharmacology was appropriate?
12  A.  That's correct.
13  Q.  February 14th of '96, can you tell me,
14  what are the numbers in the right-hand side at
15  the top of the page here?
16  A.  That's a set of blood tests that
17  include a complete blood count, including the
18  white blood cell count and the red blood cell
19  count and platelet count, Lithium level,
20  Tegretol level, and kidney and liver function
21  tests, and a thyroid function test.
22  Q.  And that's all just part of your
23  psychopharmacology treatment, is that right?
24  A.  That's correct.

Page 94

1  Q. And then below that you write "ongoing
2  stressors with possible," what is after that?
3  A. "Impending house foreclosure."
4  Q. Right.
5  She reported to you that the bank was
6  foreclosing on the mortgage on the home, right?
7  A. I believe so.
8  Q. And this is the financial stressors
9  that she reported to you, one of them anyway?
10 A. Yes indeed.
11 Q. And then in the next paragraph, is
12 that "agoraphobia has been quite marked"?
13 A. Yes.
14 Q. Again, the agoraphobia, did that also
15 seem to come and go?
16 A. Yes, it did.
17 Q. I'm going to flip several pages to
18 June 20th of 1996. In the middle of the page,
19 "she has discussed separation with husband in
20 context of husband's," what's the next word,
21 please?
22 A. "Continued drinking."
23 Q. Okay. Thank you.
24 We're going to turn to the next page,

Page 95

1  please, October 12, 1996. Is that a report,
2  just where the narrative begins there below the
3  medications, "had been inadvertently taking
4  Depakote 3,000 milligrams"? Is that what that
5  says?
6  A. That's correct.
7  Q. What happened here?
8  A. She had been prescribed Depakote at
9  2,000 milligrams, which would be four
10 500-milligram strength capsules, and apparently
11 she had inadvertently been taking six of the
12 500-milligram strength capsules, so a total of
13 3,000 milligrams.
14 Q. Was this a concern with Mrs. Dorsey
15 about her ability to medicate herself?
16 A. I don't recall it as being a
17 consistent concern. As I mentioned, there were
18 at times concerns that I had about her thinking
19 being disorganized, so that it's possible there
20 were times when she did get confused about her
21 medications. I don't recall it coming up
22 frequently.
23 Q. Okay. Down at the bottom of the page,
24 fourth line from the bottom, fourth line of text

Page 96

1  there's a reference to Klonopin. What's going
2  on there, please?
3  A. Let's see. The plan was to try to
4  substitute Klonopin one milligram twice a day
5  for Xanax, which was at two milligrams twice a
6  day, and that we'd continue a lower dose of
7  Xanax for some period of time. So it was
8  switching Klonopin to Xanax -- I'm sorry,
9  switching Xanax to Klonopin.
10 Q. Doctor, if you take -- is one of the
11 side effects of taking too many of any of these
12 various drugs that you had prescribed for
13 Mrs. Dorsey blackouts?
14 A. It would be an unusual side effect.
15 Sedation would be a common side effect, but
16 sudden episodes of blackout would be very
17 unusual.
18 Q. But unsteadiness is a side effect of
19 many of these drugs?
20 A. Yes, that's correct.
21 Q. December 10th of '96, the next page.
22 A. Yes.
23 Q. And I'm down below the medicines here.
24 Does that say "inadvertently took," what's the

Page 97

1  next word?
2  A. "Relafen," which is an
3  anti-inflammatory medication, instead of taking
4  Depakote about two weeks ago.
5  Q. All right. So that was another
6  instance where she made an error in medicating
7  herself?
8  A. That's correct.
9  Q. Okay. Let's go to January 21st of
10 '97, please. And a list of medications on the
11 top, correct?
12 A. Yes.
13 Q. And then in the first large paragraph
14 there, a narrative, "reports greater depression
15 one month and less motivation," right?
16 A. "And lacks motivation," right.
17 Q. "Lacks motivation." So again she's
18 cycling, right?
19 A. Apparently.
20 Q. Down below you write "affect subdued."
21 Do you see that?
22 A. Yes.
23 Q. "Neatly dresses, somewhat un --" what
24 is the next word?

25 (Pages 94 to 97)

VERITEXT CORPORATE SERVICES (800) 567-8658

Page 122

1   A.  Yes, I do.
2   Q.  Okay. In the middle of the page you
3   write "she has had some greater irritability and
4   sleep disturbance due to --"
5   A.  "Due to and/or in spite of the Celexa
6   increase."
7   Q.  Okay. And then down below you
8   write -- the words "marital separation" appear,
9   correct?
10  A.  Yes. Correct.
11  Q.  All right. What does the next
12  paragraph say?
13  A.  "Concentration fair to poor. Moods
14  variable, often times. Affect, mildly
15  depressed. Denies suicidal ideation, homicidal
16  ideation or psychosis."
17  Q.  Okay. And next page, please? And I
18  wonder if you know what the date of this one is.
19      By the way, on that prior page she was
20  not yet on Neurontin, correct?
21  A.  That's correct.
22  Q.  And on this page she's not on
23  Neurontin, correct?
24  A.  That's correct.

Page 123

1   Q.  Would you go down to the bottom of the
2   page, please? I'm sorry if you can't see the
3   date right offhand.
4   A.  I can't see the date offhand.
5   Q.  In the A/P section?
6   A.  Yes.
7   Q.  What does it say after "A/P"?
8   A.  "Some mood lability and irritability.
9   No frank hypomania or cycling. Will add
10  Neurontin at 600 milligrams with probable
11  increase from there."
12  Q.  And what's below that?
13  A.  "Return to clinic in two weeks."
14  Q.  I see.
15      Okay. And again you put her on the
16  Neurontin because? What reason, please?
17  A.  She was having significant
18  irritability and mood fluctuations.
19  Q.  All right. The next page, please? Is
20  there anything to indicate on there to you what
21  the date of this appointment was?
22  A.  I believe this is October 1st, 1999.
23  Q.  And on what basis do you say that?
24  A.  Because of the date on the top of the

Page 124

1   page.
2   Q.  Thank you.
3       In the middle of the page could you
4   read, please, beginning with the word "feels"?
5   A.  "Feels Neurontin is helping
6   noticeably, evening out her moods with less
7   irritability. Still some low grade cycling."
8   Q.  And what was your A/P on this?
9   A.  "Doing better with apparent good
10  response to Neurontin. Will increase to
11  900 milligrams for low grade cycling. Return to
12  clinic in three weeks."
13  Q.  Okay. And notice again, you indicate
14  return to the clinic, because you're constantly
15  monitoring the levels of these drugs and her
16  reaction to them, correct?
17  A.  That's correct.
18  Q.  Next page, please? You have the
19  medicines listed up above, and Neurontin
20  included, right?
21  A.  That's correct.
22  Q.  And down below two lines above the
23  A/P, "moods appear reasonably good. Sleep,
24  appetite," what is the next word, please?

Page 125

1   A.  "Sleep, appetite intact. Denies
2   suicidal ideation, homicidal ideation or
3   psychosis."
4   Q.  Okay. So no negative reaction, as far
5   as you can see, to the Neurontin, correct?
6   A.  Correct.
7   Q.  Next page?
8   A.  Okay.
9   Q.  This date on this one, do you know
10  what it is? No?
11  A.  No, I don't.
12  Q.  Let's look at the A/P section. At the
13  end of that you write "Neurontin to 900 which
14  she has not yet enacted."
15      Would that appear to indicate that
16  this post-dates the one we just looked at, your
17  increasing the dosage?
18  A.  Yes. That's correct.
19  Q.  Okay. And the next page, please,
20  let's look at the list of medications. Do you
21  see the reference to Neurontin?
22  A.  Yes, I do.
23  Q.  Is that an indication that you'd
24  increased the dosage to 900?

Page 146

1  University of Cincinnati and Nassir Ghaemi who
2  was at that time, I believe, at Georgetown
3  University.
4      Q.  Okay. Do you remember the articles
5  that they had authored?
6      A.  No. I believe they were both open
7  trials of Neurontin in bipolar disordered
8  patients, but I don't recall the specifics.
9      Q.  And as you sit here today, can you
10 tell us any other specific information that you
11 relied upon prior to your off-label prescription
12 of Neurontin?
13     A.  I can't, no.
14     Q.  Okay. Did you ever take part in any
15 teleconferences regarding Neurontin?
16     A.  No, I did not.
17     Q.  I think that you had discussed earlier
18 something called adverse event reports.
19         Do you recall that?
20     A.  Yes.
21     Q.  And I forget if you answered this, and
22 I apologize if you did, but have you ever seen
23 any adverse event reports regarding Neurontin in
24 particular?

Page 147

1      A.  Well, you know, again it depends what
2  that means. If it means the tables that are
3  presented, for example, in the PDR, I certainly
4  have. If it means individual adverse events
5  that physicians file with the FDA, I wouldn't
6  normally. There wouldn't be a vehicle for me to
7  get those reports directly, unless the FDA
8  issues some form of alert. And offhand I can't
9  recall a specific, you know, adverse event
10 report from the FDA on Neurontin during,
11 particularly during this period of time that
12 we're referring to. I can't recall any.
13     Q.  Do you understand that Dr. Schmahmann
14 and Dr. Dmochowski eventually weaned Mrs. Dorsey
15 off Neurontin?
16         MR. CHAFFIN: Objection.
17     A.  I don't know about her care beyond
18 that last visit that we had.
19         BY MR. PERRY:
20     Q.  Okay. What was that last visit again?
21     A.  In July of 2001. I'm sorry. The next
22 contact that I recall was only maybe about four
23 or five months ago when I had a call from
24 Mrs. Dorsey and Dr. Dmochowski to let me know

Page 148

1  she was moving back to Massachusetts, and asking
2  whether either I could see her again as her
3  treating doctor, or I could help make a
4  referral.
5          Because my schedule was such that I
6  was no longer able to see her, I made a referral
7  to a colleague who works in the same area where
8  I do. To my knowledge, she's being followed by
9  that colleague, but I haven't conferred with him
10 about her care.
11     Q.  Okay. And so is it fair to say that
12 you don't know about the particulars of her
13 treatment from the time that she left you in
14 2001 essentially until today? Is that fair to
15 say?
16     A.  That's accurate.
17     Q.  Okay. And so if Dr. Dmochowski or
18 Dr. Schmahmann weaned Mrs. Dorsey off of
19 Neurontin after that time, you weren't involved
20 in it, and you don't even know about it, is that
21 fair to say?
22     A.  That's correct.
23     Q.  Okay. And it's also fair to say,
24 then, that you wouldn't have known the reasons

Page 149

1  that they decided, either one of them, to wean
2  her off of Neurontin, is that right?
3          MR. CHAFFIN: Objection.
4      A.  I wouldn't know the specifics, no.
5          MR. PERRY: Okay. That's all the
6  questions I have for you.
7          Thank you very much.
8          THE WITNESS: Thank you very much.
9          MR. CHAFFIN: I have nothing further,
10 Doctor. Thank you.
11         THE WITNESS: Thank you.
12         MR. CHAFFIN: 4:05. Not bad.
13         THE WITNESS: Not bad. I appreciate
14 that.
15         THE VIDEOGRAPHER: This is the end of
16 tape number two in the deposition of Dr. Jon
17 Alpert.
18         The time is 4:03. We're off the
19 record.
20         (Whereupon, the deposition was
21 concluded.)