```
 1                                    VOLUME:      I
                                      PAGES:    1-101
 2                                    EXHIBITS:   1-3
 3
              UNITED STATES DISTRICT COURT
 4              DISTRICT OF MASSACHUSETTS
 5
       IN RE:  NEURONTIN            ) MDL DOCKET
 6     MARKETING, SALES PRACTICES   ) NO. 1629
       AND PRODUCTS LIABILITY       ) MASTER FILE
 7     LITIGATION                   ) NO. 04-10981
                                    )
 8                                  )
       THIS DOCUMENT RELATES TO:    ) JUDGE PATTI
 9                                  ) B. SARIS
       DORSEY VS. PFIZER, ET AL.    ) MAGISTRATE
10     1:05-CV-10639-PBS            ) JUDGE LEO T.
                                    ) SOROKIN
11
12
13
14           VIDEOTAPED DEPOSITION OF JEREMY D.
15     SCHMAHMANN, M.D., a witness called on behalf
16     of the Defendant, pursuant to the provisions
17     of the Federal Rules of Civil Procedure,
18     before Jill Shepherd, Registered
19     Professional Reporter, CSR, CLR and Notary
20     Public, in and for the Commonwealth of
21     Massachusetts, at the law offices of Skadden
22     Arps, One Beacon Street, Boston,
23     Massachusetts, on Tuesday, March 2, 2010,
24     commencing at 1:00 p.m.
25   Job No: 241523
```

Page 2

1  APPEARANCES:
2
3
4  PERRY, KRUMSIEK & JACK, LLP
5  By: Timothy Perry
6  101 Arch Street, 19th Floor
7  Boston, Massachusetts 02110
8  Tel: 617.720.4300
9  E-mail: tperry@pkjlaw.com
10 Attorney for the Plaintiff.
11
12
13 SKADDEN ARPS, LLP
14 By:    Catherine B. Stevens, Esquire
15         -- and --
16         Katherine F. Arthur, Esquire
17 Four Times Square
18 New York, New York 10036
19 Tel: 212.735.3353
20 E-mail: catherine.stevens@skadden.com
21         tattin.arthur@skadden.com
22 Attorney for the Defendant, Pfizer.
23
24 Also Present: Marissa Demonte, Videographer
25

Page 3

1              INDEX
2  WITNESS                           PAGE
3  JEREMY D. SCHMAHMANN, M.D.
4  Examination By Ms. Stevens         5
5  Examination by Mr. Perry           75
6
7           EXHIBITS
8  NO    DESCRIPTION                 PAGE
9  1     Folder of Dr. Schmahmann's   22
        Medical Records
10
    2    00345-54MGH-00515            40
11
    3    Plaintiff's Expert           71
12       Disclosure
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1              PROCEEDINGS
2        THE VIDEOGRAPHER: Good afternoon.
3  We are recording and now on the record. My
4  name is Marissa Demonte of Veritext National
5  Deposition and Litigation Services. The
6  date today is March 2nd, 2010, and the time
7  is approximately 1:08 p.m. This deposition
8  is being held in the office of Skadden Arps.
9  Meagher, Flom, located at 1 Beacon Street,
10 Boston, Massachusetts.
11       The caption of this case is Neurontin
12 Marketing Sales Practices and Products
13 Liability Litigation in the United States
14 District Court District of Massachusetts.
15 The name of the witness is Jeremy D.
16 Schmahmann, M.D.
17       At this time, the attorneys will
18 identify themselves and the parties they
19 represent, after which, our court reporter,
20 Jill Shepherd, will swear in the witness,
21 and we can proceed.
22       MS. STEVENS: Catherine Stevens
23 from Skadden Arps for Pfizer.
24       MS. ARTHUR: Katherine Arthur from
25 Skadden Arps for Pfizer.

Page 5

1        MR. PERRY: Timothy Perry for the
2  plaintiff, Mary Dorsey.
3                  * * * * *
4        JEREMY D. SCHMAHMANN, M.D., a
5  witness, called for examination by counsel
6  for Defendants, having been satisfactorily
7  identified by the production of his hospital
8  identification, being first sworn by the
9  Notary Public, was examined and testified as
10 follows:
11                 * * * * *
12       EXAMINATION BY MS. STEVENS
13 Q. Dr. Schmahmann, we introduced ourselves off
14    the record. My name is Catherine Stevens.
15    I'm with Skadden Arps, and I represent
16    Pfizer in a case that's been filed by one of
17    your former patients, Mary Dorsey, against
18    the company.
19       Can you just state your name for the
20    record, please?
21 A. Jeremy Schmahmann.
22 Q. Have you ever had your deposition taken
23    before?
24 A. Yes.
25 Q. And what kind of context have you had your

Page 62

1   A. I didn't put her on it so I'm not sure of
2       the reason for that.
3   Q. Okay.
4       In the third paragraph, it notes that
5       you've received calls from the patient and
6       she was becoming increasingly lethargic.
7   A. Yes, I see that.
8   Q. And she was ultimately hospitalized on
9       May 2nd, and her Klonopin was discontinued.
10  A. Yes.
11  Q. And then the last sentence says, "After
12      stopping the Klonopin at a dose of one
13      milligram three times a day, she came out of
14      this brightened up and was able to go back
15      home again."
16  A. That's what the records indicated.
17  Q. And under your plan, what were you intending
18      to do with Ms. Dorsey's treatment at this
19      time?
20  A. Well, let's back up a second. In my
21      handwritten note from July 2nd, '03, she was
22      feeling shaky, she didn't like the way she
23      was feeling, she wasn't sleeping well.
24      There was some manic --
25  Q. Excuse me, Doctor, I think we're on May 7,

Page 63

1       '03.
2   A. July. Sorry. May or July?
3   Q. I believe that the --
4   A. Hang on.
5   Q. -- typed record is May.
6   A. May or July? Did I see her on May 7th?
7       This says July 2nd, so it's a different day
8       altogether.
9   Q. I believe that's the next time you see her.
10  A. Yeah. Okay.
11  Q. So we're back --
12  A. So we're back on July 2nd, '03. May 7, '03.
13      Sorry. I beg your pardon.
14  Q. That's right.
15  A. So where were we?
16  Q. That plan, your plan on Mrs. Dorsey on
17      May 7, '03.
18  A. Um-hum. Yes.
19  Q. What did you plan to do with her?
20  A. To keep her off of the Clonazepam.
21  Q. Why were you planning to keep her off the
22      Clonazepam?
23  A. I wanted to start decreasing her medication
24      doses. So my assessment was that she has a
25      psychiatric disorder, which was, you know,

Page 64

1       unmistakable. And I thought that the
2       polypharmacy was producing lethargy and
3       disorientation. And so what I decided to do
4       was start with the Clonazepam, because that
5       is what had been apparently responsible for
6       her deterioration according to the Falmouth
7       Hospital records. And then having her off
8       the Clonazepam, we could then move to
9       decreasing the next potential active
10      psychoactive medication that could be
11      causing trouble, that would be Neurontin.
12      But we'd start with the Clonazepam, and go
13      from there.
14  Q. What is polypharmacy?
15  A. The use of multiple medications in the same
16      patient.
17  Q. So your plan with Mrs. Dorsey was to reduce
18      her medications overall?
19  A. That's correct.
20  Q. Okay.
21      In your note, you say that you plan
22      "on decreasing her Neurontin and try to
23      taper this altogether. If there's a
24      suggestion of any further seizure disorder,
25      I will then use Keppra rather than the

Page 65

1       Neurontin."
2       What is Keppra?
3   A. Keppra is levetiracetam, which is a newer
4       anticonvulsant. So the thinking here is
5       fairly straightforward. She comes into
6       Falmouth Hospital, I believe it was,
7       lethargic. The husband finding her
8       unresponsive. They stopped the Clonazepam
9       and she improves. So that's simple enough.
10      Keep her off the Clonazepam.
11      The next thing is, because we don't
12      have a strong indication for seizures, and I
13      don't think she's having seizures in the
14      history, so let's decrease the Neurontin
15      because that's an anticonvulsant, and if
16      that was started for the possibility of
17      seizures, which maybe, but I don't know for
18      sure, then that would be the next medication
19      to taper.
20      If, in fact, I'm wrong, and she has
21      seizures, or these become more clearly
22      evident as seizures, then it's a fairly
23      straightforward matter that we're going to
24      put her back on to an anticonvulsant. I
25      would try something different, because she

Page 66

1  has these decompensations with lethargy on
2  medications that she was on before, so why
3  go back to them?
4  Q. So you're tapering her Neurontin because you
5  don't believe that she has the seizure
6  indication that would require her to take an
7  anticonvulsant?
8  A. That's correct.
9  Q. You are not tapering her off Neurontin
10 because you believe Neurontin had a direct
11 causal impact on her condition at that time?
12     MR. PERRY: Objection.
13 A. My understanding was that the records of
14 Falmouth Hospital were fairly
15 straightforward. When they stopped the
16 Clonazepam, she got better.
17 Q. Okay.
18    The next time you saw Mrs. Dorsey was
19 on July 2nd, 2003?
20 A. Correct.
21 Q. And I believe you have handwritten notes
22 from that visit as well?
23 A. Yes.
24 Q. In the third paragraph, it notes where she's
25 using vodka to help her get some sleep, but

Page 67

1  it's no longer doing this?
2  A. Yeah.
3  Q. Do you recall any conversations with
4  Mrs. Dorsey about her alcohol use?
5  A. I don't recall offhand. I think we would
6  have discussed the fact that that wasn't a
7  good idea in this setting, but I don't think
8  that we would have -- it's not documented
9  here, but, certainly, with a statement that
10 she's using vodka to get to sleep, I would
11 have said no, that that's not a great idea.
12 Q. "In her setting," you are referring to the
13 number of medications that she's on?
14 A. It's not a great idea anyway, but,
15 certainly, on medications, it's not a great
16 idea.
17 Q. Okay.
18    The next time you saw Mrs. Dorsey was
19 February 11, 2004?
20 A. Yes.
21 Q. And you note in your second paragraph that
22 you believe that she was heavily
23 overmedicated during the middle part of last
24 year?
25 A. That's right.

Page 68

1  Q. And the medications she's on currently?
2  A. Yes.
3  Q. She's still off the Klonopin at this time?
4  A. She's off the Klonopin. She's not on
5  lithium at this time, unless you didn't tell
6  me about that. But in my note there,
7  there's no report -- in fact, no, my
8  handwritten note indicates that she's
9  discontinued lithium as well. So she's off
10 lithium and she's not on Clonazepam. And
11 Neurontin is discontinued as well.
12 Q. So as far as you know, she's discontinued
13 the Clonazepam and then tapered the
14 Neurontin and didn't go back on the
15 Clonazepam while she was seeing you; is that
16 correct?
17 A. All I have to go by is the note of February
18 that she's on the medications as listed,
19 which are not including lithium and not
20 taking Clonazepam and not taking Neurontin.
21 Q. In the last paragraph of this note, you note
22 that you are not planning on seeing her
23 again?
24 A. Well, she was pretty stable from my
25 perspective. She had a primary care doc,

Page 69

1  she has a psychiatrist. The acute event of
2  the decompensation at the time of the
3  polypharmacy had subsided. The stroke was a
4  done deal. She was on an aspirin for -- she
5  was on Plavix at that time for stroke
6  prevention, and there wasn't a reason for me
7  to continue seeing her. I did not believe
8  back in 2004 that there was an indication at
9  that time clearly stated from her symptoms
10 to do anything about the PFO. I've seen the
11 record subsequently that they decided to
12 actually go ahead and close that, but
13 Dr. Bonanno's notes makes it clear that the
14 closure of the PFO had no impact on her
15 symptoms at all. So it was -- they were
16 being careful because they didn't have a
17 clear cause for the stroke, but that
18 actually happens a fair amount anyway. And
19 she had not had recurrent strokes. That was
20 a decision taken subsequently. I'm sure
21 it's fine.
22    But when I saw her in February, there
23 was no real reason to have her continue to
24 see me as a consultant neurologist. She was
25 taken care of by her primary care doctors

18 (Pages 66 to 69)

Page 70

1  and a psychiatrist.
2  Q. You noted in that last paragraph, "I express
3     my endorsement of her plan to try and
4     decrease her psychiatric medications slowly
5     with time under your care."
6        So at this time, you are finished with
7     treating her, are you still advising that
8     she decrease the number of medications she's
9     on even though she's off the Klonopin and
10    off the Neurontin at this time?
11 A. That was the impression that I wanted to
12    leave them with so she's on Seroquel for
13    sleep, Depakote for -- at this point -- mood
14    stabilizes, Celexa for the depression, Xanax
15    at night. And so the hope was to try and
16    keep this to a minimum, and hopefully that
17    will be successful.
18 Q. Okay. Doctor, I want to mark this as
19    exhibit -- let me strike that. Let me go
20    back.
21       Did you ever see Mrs. Dorsey again
22    after 2004?
23 A. No.
24 Q. Have you followed her care? Do you know
25    anything about her current situation at all?

Page 71

1  A. I've looked at the records subsequent and
2     seen some of the things that have happened
3     since then, but I haven't seen her
4     personally.
5  Q. And have you -- from looking at the records,
6     have you noticed an increase again in
7     psychiatric medications and issues similar
8     affecting her in 2008/2009?
9  A. I haven't looked at it closely enough to be
10    confident about that.
11 Q. Okay.
12       I'd like to mark this as Exhibit 3.
13       (Exhibit No. 3 marked.)
14       MS. STEVENS: It's your
15    disclosures, Tim.
16 Q. Dr. Schmahmann, have you had any
17    conversations with plaintiff's counsel about
18    giving any sort of expert testimony in this
19    litigation?
20 A. No.
21 Q. If I read you this sentence, I'd like your
22    reaction to it. "Ms. Dorsey shall rely on
23    the testimony of Jeremy D. Schmahmann and
24    Jonathan Alpert, who are expected to
25    testify, to a reasonable degree of medical

Page 72

1     certainty, that consistent with the medical
2     record and/or their deposition testimony,
3     Neurontin was a substantial contributing
4     cause of the side effects that affected
5     Mrs. Dorsey."
6        Did you authorize that statement?
7  A. This is not --
8        MR. PERRY: Objection. This
9     doesn't purport to say that there was any
10    authorization from Dr. Schmahmann. What
11    this says right at the beginning is that
12    it's -- that "Mrs. Dorsey shall only proffer
13    expert testimony of treating physicians
14    based upon what the treatment is."
15       MS. STEVENS: Mr. Perry, I believe
16    the word "objection" is noted and we can
17    move on. There's no reason to --
18       MR. PERRY: You know, you don't
19    have to try to confuse the doctor or try to
20    make it sound like Mrs. Dorsey has done
21    something that she hasn't done.
22       MS. STEVENS: I'm entitled to ask
23    whether he's authorized that statement, and
24    I will follow up.
25       MR. PERRY: We never represented

Page 73

1     that she authorized that statement.
2        MS. STEVENS: I didn't intend that.
3  Q. Did you authorize a statement that, to a
4     reasonable degree of medical certainty, that
5     Neurontin was a substantial contributing
6     cause of the side effects that affected
7     Mrs. Dorsey?
8  A. This is not a conversation that I was
9     engaged in.
10 Q. Do you hold that opinion?
11 A. You know, not specifically. I think that
12    the issue here is that one of a whole bunch
13    of medications that could have had a role?
14    I suppose it's possible, and you'd have to
15    piece through this one by one and see where
16    her symptoms related in a temporal fashion.
17    Was there a time course relationship to the
18    use of the Neurontin to the symptoms that
19    the patient was troubled by? And those are
20    things that you would have to look at so
21    carefully. I haven't done that time course
22    correlation. She certainly was on enough
23    medications to cause trouble. Neurontin was
24    one of them. I suppose there could be part
25    of it that played a role. Was she on it at

**Page 74**

1 the time these events took place? You know,
2 you'd have to look at the record and figure
3 that out.
4 Q. To a reasonable degree of medical certainty,
5   do you have an opinion if Neurontin was a
6   substantial contributing cause of the side
7   effects?
8 A. From what we've just been through here, when
9   she had her trouble at Falmouth Hospital
10   with all that lethargy and the Klonopin was
11   discontinued and she improved, then I would
12   have to think that, based on that evidence,
13   that the medication that caused her the most
14   trouble was Clonazepam.
15 Q. Okay Doctor, I'd like to take about a
16   five-minute break, if I could, and gather my
17   notes and see if we have anything further
18   before I turn it over to Mr. Perry, if it's
19   okay.
20        THE VIDEOGRAPHER: The time is
21   2:46, and we're off the record.
22        (Short recess.)
23        THE VIDEOGRAPHER: The time is
24   2:52, and we're back on the record.
25        MS. STEVENS: Dr. Schmahmann, I

**Page 75**

1 don't have any additional questions for you.
2 I will turn it over to Mr. Perry.
3        * * * * *
4        EXAMINATION BY MR. PERRY
5 Q. Thank you. And, Doctor, my name is Timothy
6   Perry again. We met way back in April
7   of 2008 when you were first deposed in the
8   case, and counsel on the other side of the
9   table was David Chaffin, not the present
10   counsel. But that's the first, I think, and
11   only time we've ever met. I represent
12   Mrs. Dorsey, and I just have a few questions
13   to follow up.
14        And just as I said, Mrs. Dorsey has
15   never represented that she retained you as
16   an expert, or, you know, has paid you for
17   expert testimony. What we've presented to
18   the Court is that we intend to call,
19   perhaps, if this gets to trial, all of her
20   treating physicians for their treatment of
21   her and -- which almost always, as you
22   probably know, include opinions that the
23   Court would consider expert opinions.
24        And so I didn't want you to be misled
25   into having the false understanding that

**Page 76**

1 Mrs. Dorsey was putting you on the spot or
2 saying that you were going to do something
3 for her that we hadn't agreed to.
4 A. Okay.
5 Q. Mrs. Dorsey, by the way, thinks you're one
6   of the best physicians she ever saw.
7 A. Please give her my regards and send her
8   my compliments.
9 Q. It's a long list, as you probably know. I
10   will focus on a couple of things. And if
11   you turn back to that May 7, 2003 note that
12   you have.
13        And I'm not going to go over the
14   details, because we can get that from the
15   record, but by that point in time, she had
16   presented with some serious issues,
17   complications that you note in your second
18   paragraph. And by that point in time, by
19   May 7, 2003, you had come to the medical
20   conclusion after your review of her record
21   and your treatment history with her that
22   those issues that were complained about were
23   the result of overmedication; is that fair
24   to say?
25 A. The record seems to suggest that.

**Page 77**

1 Q. And you came to that medical opinion; is
2   that also fair to say?
3 A. Yes.
4 Q. And you felt that you had come to that
5   medical opinion to a reasonable degree of
6   medical certainty; is that also fair to say?
7 A. Yes, there are a number of factors in her
8   story. She's had the bipolar disorder.
9   She's got the anxiety. She has other
10   medical issues we haven't talked about, all
11   of which can affect her. I mean, she's got
12   the lung COPD for which she takes
13   medications. That can produce sort of an
14   anxiety. The inhalers that she takes, and
15   she's on a beta blocker to try and
16   counteract maybe blood pressure or perhaps
17   some of these symptoms that are responding
18   to other medications. So there's a number
19   of medications she's on which are not all
20   for neurological or psychiatric indication,
21   that in and of themselves can have an impact
22   on tremor, on stability on a sense of
23   anxiety. So there are many issues in this
24   lady, all of which are complicated. And so
25   the management that her primary care doctor

Page 78

1  and her psychiatrist were trying to
2  manipulate were complicated, and between
3  underlying diseases, and the stroke, and the
4  medications that were non-neurologically
5  active, but could have neuroactive side
6  effects. Plus the medications that were
7  specifically for a neurologic psychiatric
8  indication that themselves could have
9  neurological psychiatric side effects. All
10 of that makes for a complicated story, which
11 needs to be dissected through carefully by
12 the physicians taking care of her.
13 Q. Right. And on the second page of that
14 document, in the "Plan" section, at the end
15 of the third-to-last line, it says, "I will
16 then plan on decreasing her Neurontin and
17 try and taper this altogether."
18      Do you see that?
19 A. Yes.
20 Q. And it was your plan to do that, to decrease
21 the Neurontin and to taper it altogether to
22 zero Neurontin, because, at that point in
23 time, on May 7, 2003, you felt that
24 Neurontin was a substantial contributing
25 cause of her complications that were

Page 79

1  discussed earlier in this letter; is that
2  fair to say?
3      MS. STEVENS: Objection to form.
4  A. That's actually not correct.
5  Q. Okay.
6  A. It's a misreading of my note. The reason
7  that I'm stopping Neurontin is because I
8  don't believe she's having seizures.
9  Q. Okay.
10 A. So she doesn't need Neurontin because she is
11 not having seizures.
12 Q. Okay.
13 A. That's the thinking behind this. And it's
14 not just thinking that. I'm reading between
15 the lines. The statement is there. You
16 have the possible seizure disorder, although
17 it is unclear. An EEG has been
18 unremarkable. So I'm not finding evidence
19 here of seizure. And on top of that page,
20 During these episodes -- and suggestive of
21 seizures in September of '02 and February
22 of '03 -- she has some vague movements of
23 the arms, is unresponsive. It has no other
24 findings one sees in seizures sometimes, and
25 tongue biting, foaming at the mouth or

Page 80

1  abnormal breathing. Sorry, they are in the
2  note. So the seizures -- okay. The
3  episodes that raise the possibility of
4  seizures, as they of necessity must be in
5  the mind of the physician hearing the story
6  in September of '02 and February of '03, had
7  some vague movements of arms and was
8  unresponsive, but she did not have -- and
9  this is specifically noted as a negative --
10 the other features that go along with
11 seizures in patients generalized
12 convulsions, incontinence, tongue biting,
13 foaming at the mouth, abnormal breathing,
14 and the other important feature here that
15 goes against seizure, is these episodes
16 lasting for about an hour, including some
17 lethargy. And given that story, and the
18 EEGs that were unremarkable and the
19 constellation as a whole, seizures as a
20 diagnosable entity requiring medications
21 seems to be low likelihood as I looked at
22 the case. For that reason, I thought it was
23 reasonable as we tried to decrease the
24 number of medications she was on, to come
25 off the anticonvulsant, which was Neurontin.

Page 81

1  That's the thinking behind that.
2  Q. Okay.
3      And then we had marked this as
4  Exhibit 5 at your prior deposition, and it's
5  a note from the VNA of Cape Cod, where
6  Mrs. Dorsey had been treated.
7      MR. PERRY: I don't know if I have
8  another copy.
9      MS. STEVENS: Do you have an extra
10 copy, Mr. Perry?
11     MR. PERRY: I might not. Maybe we
12 could go off the record for a minute. If
13 you'd like, I can make a copy. I don't
14 think I have another one.
15     MS. STEVENS: That would be great.
16     THE VIDEOGRAPHER: The time is
17 3:00 o'clock, and we are off the record.
18       (Short recess.)
19     THE VIDEOGRAPHER: The time is the
20 3:02, and we're back on the record.
21 Q. Okay. And just -- I'm going to draw your
22 attention to where it says, "Clinical
23 Findings," and the fifth line down on this
24 May 13, 2003 visit, it says that,
25 "Dr. Sehrnahmann wants her off Neurontin,"

21 (Pages 78 to 81)

Page 82

1   meaning Mrs. Dorsey.
2       Do you recall giving such an
3   instruction to her caregivers?
4   A. Just one second here. Well, this is what we
5   have been discussing. So on May 7, 2003, I
6   plan on keeping her off the temazepam,
7   because I thought she wasn't having
8   seizures, decreasing her Neurontin. So the
9   note here from May 13th, the note with the
10  Visiting Nurses of Cape Cod reported the
11  patient was having a difficult time
12  withdrawing from Klonopin, lots of shaking,
13  feeling of not being in control and then
14  enormous anxiety.
15      So you start to get a sense here of
16  why the doctors were having such a tough
17  time with the management using different
18  kinds of benzodiazepines. You can sense
19  Dr. Alpert's conundrum when you stop the
20  temazepam that had caused this state of
21  shut-down requiring admission to Falmouth
22  Hospital, and when they stop it, now the
23  patient's got all this trouble going on,
24  enormous anxiety. Taking Xanax with anxiety
25  really bad, usually midday. This is a very

Page 83

1   difficult psychiatric management case.
2       And, then, she accurately reports what
3   I had stated in my note that we talked about
4   that I wanted her to come off the Neurontin,
5   but the patient wanted to wait until she had
6   recovered from the Klonopin withdrawal or
7   the discontinuation of the Clonazepam.
8       So I see that, and it reflects my
9   request that the Neurontin be tapered
10  slowly, that's correct.
11  Q. Right.
12      And you understand that Dr. Dmochowski
13  tapered the Neurontin in the following
14  months; is that right?
15  A. That's correct. When I see her back in July
16  of '03, she's no longer taking the
17  Neurontin.
18  Q. And then if we go to your February 11, 2004
19  note -- sorry, it's a -- what would you call
20  that, again? This document? Is that a
21  note?
22  A. It's my note, but written in a letter to
23  Dr. Dmochowski.
24  Q. As we look at that, you understood at that
25  point in time, by February 11, 2004, that

Page 84

1   she was no longer on either the Klonopin or
2   the Neurontin; is that right?
3   A. Or lithium.
4   Q. Okay.
5       And she wasn't suffering from those
6   side effects that she had complained about
7   back in May of 2003; is that right?
8   A. Well, she wasn't suffering from the side
9   effects in May 2003 when I saw her in July
10  of 2003.
11  Q. Okay.
12      And by July of 2003, she had also been
13  off the Neurontin; is that right?
14  A. Right.
15  Q. Okay.
16      And by February 11, 2004, when you had
17  written that note, you had concluded that
18  the panoply of drugs, which included
19  Neurontin, had contributed to cause the
20  symptoms that she complained about in May
21  of 2003; isn't that right?
22      MS. STEVENS: Objection to form.
23  A. My statement is as follows: "She was
24  heavily overmedicated during the middle part
25  of last year and had episodes of partial

Page 85

1   unresponsiveness, which were probably drug
2   effect." That was the extent of my
3   statement.
4   Q. Okay. I wasn't looking at your exact note.
5       And why don't I just show you your
6   deposition from April 8th of 2008.
7       MS. STEVENS: Objection. Under
8   what rules are you doing that? Are you
9   refreshing his recollection? What are you
10  doing?
11      MR. PERRY: It's Rule 26.
12      MS. STEVENS: Excuse me. What are
13  you showing him?
14      MR. PERRY: His deposition.
15      MS. STEVENS: Under what procedure
16  are you doing that?
17      MR. PERRY: The procedure for doing
18  a deposition.
19      MS. STEVENS: I'm going to object
20  to that and --
21      MR. PERRY: You can object all you
22  want.
23      MS. STEVENS: It's not proper to
24  unless you are trying to do something. Can
25  you articulate a reason for showing him the

Page 86

1   deposition?
2       MR. PERRY: I don't have to
3   articulate a reason of asking questions at a
4   deposition to you. If it's objectionable at
5   trial, then you can raise an objection.
6   Q. Do you remember having your deposition taken
7   in April of 2008?
8   A. I remember it being taken. I don't remember
9   the date.
10  Q. Well, I will represent to you that this is
11  your deposition. It's dated April 8th of
12  2008.
13  A. Thank you.
14  Q. On page 47 of your deposition, I ask you the
15  question, it starts here [indicating], and
16  you just gave me the one-word answer rather
17  than reading from the notes, and you don't
18  have to do that, if you want.
19      MS. STEVENS: Objection to form and
20  the colloquy.
21  Q. Okay. My question was: "Had you concluded
22  by February 11, 2004, that the panoply of
23  drugs, which included Neurontin, had
24  contributed to cause those symptoms,"
25  referring to the May symptoms. And your

Page 87

1   answer was, "Yes."
2       Do you remember that testimony?
3   A. No, I don't but I'm reading it.
4   Q. Do you have any doubt that you made that
5   testimony at that time?
6   A. No, I don't.
7   Q. Okay.
8       And so you had concluded again -- it
9   doesn't have to come directly from your
10  notes, but you had concluded in February
11  of 2004 that Neurontin had contributed to
12  the to cause the symptoms that Mrs. Dorsey
13  had experienced in 2003?
14      MS. STEVENS: Objection to form.
15  A. You make your living with words more than I
16  do. You are twisting this in a way that I
17  can't let you get away with. Read the
18  sentence to me that you put to me.
19  Q. Okay. "Had you concluded by February 11,
20  2004, that the panoply of drugs, which
21  included Neurontin, had contributed to cause
22  these symptoms?
23  A. I answered yes, and I'm answering yes again.
24  But the statement is the very clear. The
25  panoply of drugs, comma, that included

Page 88

1   Neurontin, comma, so the panoply of drugs
2   includes all the other stuff. So there's a
3   whole bunch of medications that she was
4   taking. That's, by definition,
5   polypharmacy.
6   Q. Right.
7   A. So in that sense, yes, I'm consistent. The
8   answer remains yes. The polypharmacy did
9   this at that time is what most likely
10  occurred then, and looking at the record
11  subsequently, the answer stands the test of
12  time.
13  Q. Yeah. I'm not trying saying you are being
14  inconsistent or maybe we're -- it's a little
15  bit semantic, and I apologize for that.
16  Because Mrs. Dorsey is not suggesting in
17  this lawsuit that Neurontin was somehow the
18  sole cause of her symptoms.
19      MS. STEVENS: Objection. Are you
20  testifying here? What are we doing?
21  Q. What she has asserted, which I think is
22  consistent with this, is that Neurontin was
23  a contributing cause.
24      And so, again, to allay your concern
25  about that, that you've expressed, I guess,

Page 89

1   my question to you is: Today, as you did at
2   your testimony in 2008, do you have the
3   opinion that Neurontin contributed to cause
4   the symptoms that we discussed earlier
5   today?
6       MS. STEVENS: Objection to form.
7   A. You know, I don't have a side in this. It
8   doesn't matter to me which way this goes.
9   I'm trying to remain as strictly based in
10  the evidence and the medical science as it's
11  possible to be. I suppose if you are to ask
12  me the question, did the pulmonary inhaler
13  contribute? I suppose the answer could be
14  yes. Did the Depakote contribute? The
15  answer could be yes. Would the aspirin
16  contribute? Well, probably not, because it
17  didn't really act on the nervous system like
18  that. Could Toprol have contributed? Could
19  Seroquel have contributed? The answer to
20  all those questions would be yes, because
21  that by definition is what polypharmacy is.
22  You add one and one together, and you get
23  this three, and this is what we're dealing
24  with.
25  Q. Right.

## Page 90

1  A. That's as far I can go with that. I'm not
2     going to answer yes or no and then have that
3     shown to me later as you said this. I'm
4     giving you an answer as clear as I can and
5     as scientifically based and rigorous as I
6     can.
7  Q. Right.
8     So do you have different opinion now
9     or do you believe that Neurontin was a
10    contributing cause of Ms. Dorsey's symptoms?
11        MS. STEVENS: Objection to form.
12 A. So here's what I will preface this with.
13    Given that you are going to keep coming back
14    to ask the same question unless I give you
15    the yes or no, what I've made clear is that
16    the use of multiple medications that
17    included at the time Seroquel, lithium,
18    Depakote, Neurontin, Xanax, Celexa, possibly
19    Flovent, possibly Toprol. Protonix, not
20    likely; Foradil, I'm not sure what Foradil
21    is, all those medications together would
22    have been -- did I include Clonazepam? And
23    Klonopin, of course, importantly, which was
24    not part of the list of May 7th because she
25    had already stopped that. All those

## Page 91

1     medications together constitute polypharmacy
2     that I believe were the proximate cause of
3     the lethargy. The substantiating fact for
4     that is when the Clonazepam was
5     discontinued, the patient improved
6     substantially. So if -- you know, if you
7     pushed me that far, then what you sort of
8     end up actually is that Clonazepam becomes
9     the culprit, which was the, if you will, the
10    straw that broke the camel's back. And I'm
11    not -- you know, I don't care one way or the
12    other, frankly. Neurontin, we know, in high
13    doses can cause a whole variety of symptoms
14    and side effects, and so we use it
15    cautiously knowing that. But the same is
16    true for all the medications, including
17    lithium, which goes back decades.
18        So did Neurontin contribute to this
19    constellation of lethargy? Quite possibly.
20    But in terms of which of these when stopped
21    produced the most dramatic improvement, the
22    answer is Clonazepam, Klonopin. That's
23    about as far as I can take it, I think.
24 Q. Okay.
25 A. I'm a treating doc, so as a treating

## Page 92

1     physician, I'm not as coming in as an
2     independent expert witness. I know this
3     lady. I like this lady. I'm trying to be
4     fair to her, but I'm trying to be fair to my
5     own integrity in terms of the scientific
6     veracity of the science I'm presenting to
7     you.
8         It's what I've just stated. And I
9     will try and put it into a one liner.
10    Polypharmacy, by definition, is the use
11    together of many medications, each of which
12    can cause a side effect, that when used
13    together, produces a combination of
14    lethargy, and confusion, and disorientation,
15    on the day that she experienced.
16 Q. And that polypharmacy, which included
17    Neurontin, in your view, contributed to the
18    symptoms that Mrs. Dorsey exhibited?
19        MS. STEVENS: Objection. Asked and
20    answered. It's the exact same question you
21    just asked him.
22 A. The way you put that, the polypharmacy,
23    which included Neurontin caused, the answer
24    to that is yes. The polypharmacy causes, it
25    did include Neurontin. That's a fact.

## Page 93

1  Q. And you base that opinion upon your
2     experience in your field, and in your
3     treatment of Mrs. Dorsey, in your
4     observations of Mrs. Dorsey, and your
5     treatment and your review of her medical
6     records; is that fair to say?
7  A. Which opinion?
8  Q. The last statement that you gave us.
9  A. No. Careful. I'm not going there, because
10    you're putting me into a place I'm not
11    willing to go. If you're going to use my
12    testimony to say that Neurontin did this,
13    then I'm not going to let you make me do
14    that. That's a not a yes or no, so I'm not
15    going to do that.
16        MR. PERRY: Well, could you read
17    back the question.
18 Q. Well, you need to answer the question during
19    the deposition. And so --
20 A. I think I have. I don't want to be sort
21    of -- I'm not a lawyer. I think I've
22    answered the question.
23 Q. I know that she told you that it was asked
24    and answered, but I'm allowed to ask you
25    questions and --