UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:   NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No.  1629<br><br>Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO:<br><br>THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA v. PFIZER INC., 04 CV 10739 (PBS) and<br><br>AETNA, INC. V. PFIZER INC., 04 CV 10958 (PBS) | Judge Patti B. Saris<br>Mag. Judge Leo T. Sorokin |

## PLAINTIFF KAISER'S PROPOSED FINDINGS OF FACT

On March 25, 2010, an advisory jury found Defendants violated the fraudulent business practices prong of California's Unfair Competition Law ("UCL").   CAL. BUS. & PROF. CODE § 17200.  The Court must now determine whether Defendants' allegedly unlawful, unfair, or fraudulent business acts or practices violate the UCL.  Plaintiffs Kaiser Foundation Health Plan, Inc. and Kaiser Foundation Hospitals (collectively, "Kaiser"),[1] therefore submit the following proposed findings of facts.

---

[1] Kaiser Foundation Health Plan, Inc. is the parent company of the following companies and has brought this lawsuit on behalf of itself and its subsidiaries:  Kaiser Foundation Health Plan of Colorado; Kaiser Foundation Health Plan of Georgia, Inc.; Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc.; Kaiser Foundation Health Plan of the Northwest; and Kaiser Foundation Health Plan of Ohio.

## I.    DEFENDANTS' FRAUDULENT, UNFAIR, AND UNLAWFUL CONDUCT BY INDICATION

1.    Double-blind randomized placebo-controlled clinical trials (DBRCTs) are the gold standard for determining whether a drug is effective to treat a medical condition.[2]  Other types of trials (unblinded, not randomized, or not placebo controlled) or anecdotal evidence (case reports, case series, or clinical experience) are not sufficient to determine whether or not a drug is effective to treat a particular condition.[3]

2.    On December 30, 1993, the FDA found that Neurontin was effective as "adjunctive therapy in the treatment of partial seizures" in adults with epilepsy up to a maximum dose of 1,800 milligrams per day.[4]  Shortly after FDA approval, Defendants adopted a marketing strategy to expand Neurontin's unapproved or "emerging uses" through publication and education programs based upon clinical trials that they funded or conducted.[5]  Defendants' own DBRCTs established that Neurontin was ineffective for treating these off-label uses, yet Defendants continued to promote off-label use of Neurontin with "key messages" of efficacy.[6]  Defendants knew that it was fraudulent, misleading, and unlawful under FDA statutes and regulations to present only favorable study results.  Defendants nonetheless failed to publish or disclose negative study results to the medical community.[7]

3.    Medical journals are the predominant platform for scientific discourse and the dissemination of medical knowledge; Defendants' suppression and manipulation of studies led to publication of inaccurate information, tainted the pool of scientific evidence, and resulted in incomplete and flawed systematic reviews and evidence-based guidelines.[8]

---

[2] 2/22 Tr. (Kessler) 175:13-176:8; 2/23 Tr. (Kessler) 24:12-23; 26:23-27:2; 2/25 Tr. (Barkin) 127:5-9; 3/1 Tr. (McCrory) 17:18-18:2; 3/10 Tr. (Furberg) 79:1-5.
[3] 2/22 Tr. (Kessler) 167:24-168:22; 2/23 Tr. (Kessler) 25:11-15; 26:7-17; 27:3-10; 3/10 Tr. (Furberg) 79:6-10; 3/1 Tr. (McCrory) 18:15-19.
[4] TX 9 at WLC_Franklin_0000151681, 0000151689; 2/23 Tr. (Kessler) 33:8-35:12.
[5] 3/11 Tr. (Crook) 21:23-22:3; 1/23/08-1/24/08 Dep. Tr. (Knoop) 252:22-253:3 (played on 3/11/10); 6/19/08-6/20/08 Dep Tr. (Fannon) 67:20-68:3 (played 3/11/10); 8/1/07-8/2/07 Dep. Tr. (Glanzman) 295:16-25 (played 3/12/10).
[6] 8/1/07-8/2/07 Dep. Tr. (Glanzman) 256:1-21, 345:6-347:21, 475:21-481:10, 483:10-14  (played 3/12/10).
[7] 7/11/07-7/12/07 Dep. Tr. (Tive) 473:18-474:11, 669:12-24, 670:11-671:16 (played 3/11/10).
[8] 2/25 Tr. (Dickersin) 72:12-73:18, TX 2091.

1

### A.   Bipolar and Other Mood Disorders

#### 1.   The Science

4.   Neurontin is ineffective as a treatment for bipolar and other mood disorders.[9]  Four placebo-controlled DBRCTs studied Neurontin's efficacy in treating bipolar disorder.[10]  Each study determined that Neurontin is no more effective than placebo in treating bipolar disorder.[11]  DBRCT evidence from multiple trials consistently demonstrates that Neurontin is no more effective than placebo on depression-rating scales.[12]

5.   The Pande study (Defendants' own protocol 945-209, authored by a Parke-Davis employee) demonstrated that Neurontin was no more effective than placebo in treating bipolar depression and was statistically significantly worse than placebo in treating bipolar mania.[13]  Defendants were aware of the negative results between July 1997 and July 1998.[14]

6.   The Frye study demonstrated that Neurontin was no better than placebo in treating bipolar disorder.  Defendants were aware of these negative results by October 1998.[15]

7.   The Guille study demonstrated that Neurontin was no better than placebo on both the depression and mania scales.[16]  Defendants were aware of these negative results by May 1999.[17]

8.   The Vieta study (Defendants' protocol 945-291) demonstrated that Neurontin was no more effective than placebo for bipolar.[18]  Defendants were aware of these negative results by February 2004.

9.   The suppressed studies would have been material to doctors practicing evidence-based medicine.[19]

---

[9] See Appendix A, Charts titled "Placebo-Controlled DBRCTs by Indication," at Chart 1.

[10] TX 383, 1477, 211, 398. 469; 2/25 Tr. (Barkin) 126:2-13.

[11] 2/25 Tr. (Barkin) 127:23-128:3, 130:3-9, 133:3-6, 136:9-22, 139:24-140:7, 146:18-23, 2/23 Tr. (Abramson) 100:9-25, 102:11-103:11, 104:18-105:14, 105:22-106:12, 107:3-113:9.

[12] 3/15 Tr. (Rothschild) 121:5-124:25.

[13] TX 383; 2/25 Tr. (Barkin) 128:1-131:7; 2/23 Tr. (Abramson) 102:11-103:11; 103:22-15.

[14] TX 383; 2/25 Tr. (Barkin) 128:1-131:7; 2/23 Tr. (Abramson) 102:11-103:11; 103:22-104:15.

[15] TX 1477; 2/25 Tr. (Barkin) 132:10-133:8; 135:2-9; 2/23 Tr. (Abramson) 104:18-105:21.

[16] TX 211; 2/25 Tr. (Barkin) 135:10-136:22; 2/23 Tr. (Abramson) 106:6-106:18.

[17] TX 211; 2/25 Tr. (Barkin) 135:10-136:22; 2/23 Tr. (Abramson) 106:6-106:18.

[18] TX 398, 469; 2/25 Tr. (Barkin) 136:23-140:7.

[19] 2/26 Tr. (Barkin) 33:11-34:17; 2/24 Tr. (Abramson) at 75:18-21.

10.  As part of Defendants' New Drug Application, the FDA conducted a combined medical-statistical review of the submitted trial data.[20]  The review was dated January 31, 1992, signed in May and June 1993, and circulated to Defendants key employees in July 1994.[21]  The review found an increased risk of depression with or without suicidal ideation associated with Neurontin.[22]  The review concluded that "[l]ess common but more serious events may limit the drug's widespread usefulness" and that "depression, while it may be not an infrequent occurrence in an epileptic population, may become worse and require intervention or lead to suicide."[23]  These findings contradicted Defendants' promotional claims that Neurontin was an effective treatment for bipolar.[24]

### 2.    Defendants' Wrongdoing

11.  Defendants' communications to physicians regarding the effectiveness of Neurontin for bipolar disorder were "biased," "incomplete" and "would lead physicians to believe that they were serving their patients' best interests to use Neurontin for bipolar disorder" when Defendants "knew that the drug was not effective for bipolar disorder."[25]

12.  Defendants suppressed the negative results of the Pande Study until October 2000 when they were published in the journal *Bipolar Disorders*, a "fairly narrow" and "small journal" with a circulation of only 455.[26]  The deceptive article did not admit Neurontin's inefficacy, blamed the negative results on poor study design, failed to cite the negative results of Frye and Guilee studies, and cited the misleading Dimond Article (see below).[27]  Similarly, in publishing the Vieta Study, Defendants falsely presented positive results from a cherry-picked subpopulation in place of the negative results of the original study group.[28]

---

[20] TX 207.
[21] *Id.*; 3/10 Tr. (Furberg) 65:10-12.
[22] 3/10 Tr. (Furberg) 71:15-18.
[23] *Id.* at 68:8-69:24; TX 207.
[24] 3/10 Tr. (Furberg) 71:22-5; 72:23-73:11.
[25] 2/23 Tr. (Abramson) 101:7-102:2.
[26] TX 1393; 2/25 Tr. (Barkin) 131:8-132:6; 2/23 Tr. (Abramson) 103:18-21; 2/25 Tr. (Dickersin) 51:15-52:23.
[27] 2/25 (Dickersin) 51:15-52:23.
[28] TX 1865; 2/25 Tr. (Barkin) 143:18-144:12; 2/23 Tr. (Abramson) 112:1-113:5; 113:12-19; 2/24 Tr. (Dickersin) 55:7-15.

13. In May 1995, Defendants issued a Neurontin Marketing Assessment for psychiatric conditions including bipolar and other mood disorders. The assessment called for an "exploratory study in outpatients with bipolar disorders," noting that the "results, if positive, will be publicized in medical congresses and published in peer-reviewed journals." The assessment contained market share projections, noting that Neurontin would hold 0% of the bipolar market unless the positive results of a study were published.[29]

14. In February 1996, Defendants' published an article entitled "Effect of Gabapentin (Neurotonin® [*sic*]) on Mood and Well-Being in Patients with Epilepsy" in the journal *Progress in Neuro-Psychopharmacology and Biological Psychiatry* ("Dimond Article").[30] The article examined the same epilepsy trials that the FDA had examined, yet falsely claimed that Neurontin had beneficial effects on mood and failed to reference the FDA's findings that Neurontin increased the risk of depression with or without suicidal ideation.[31]

15. Parke-Davis medical liaisons were trained to tell physicians that Neurontin was "highly effective" for bipolar disorder, and never disclosed that there was no scientific support or that the FDA had found an associated increased risk of suicide and depression.[32]

16. In 1998, Defendants sponsored a symposium entitled "New Treatment Strategies in Psychiatry: Role of Anticonvulsants," later published as a supplement to *Cleveland Clinic Journal of Medicine.* In the supplement, Defendants stated that "[t]he beneficial effects of gabapentin on mood and quality of life were observed in the original treatment population of patients with epilepsy" and that "[t]he data presented here indicate that gabapentin holds promise for treatment of bipolar disorder." Neither the FDA's findings of an increased risk of depression nor the negative results of the Pande study were disclosed.[33] The supplement was sent to 43,000 psychiatrists throughout the United States.[34]

---

[29] TX 4; 2/26 Tr. (Barkin) at 20:22-23:14.
[30] TX 1158; 3/10 Tr. (Furberg) 74:1-13.
[31] TX 1158; 3/10 Tr. (Furberg) 77:2-14; 3/15 Tr. (Rothschild) 148:13-17.
[32] 3/12 Tr. (Franklin) 55:11-56:11.
[33] TX 110; 2/26 Tr. (Barkin) at 23:18-25:4.
[34] 2/26 Tr. (Barkin) 25:5-7.

4

17. In 1998, Defendants sponsored a Continuing Medical Education ("CME") series entitled "New Frontiers in Social Phobia and Bipolar Disorders." This CME touted Neurontin as one of the "Newer Mood Stabilizers" with "Reports of Benefit" in *inter alia* mania, bipolar depression, bipolar maintenance, and mood instability. Slides encouraged the use of Neurontin at dosages of "3600 mg (sometimes higher)." The negative results of the Pande study were not disclosed. 5,645 attendees in thirty different cities were exposed to this misleading CME between July and October 1998.[35] Thirty-three Permanente Medical Group ("PMG") physicians from four different Kaiser regions attended this CME.[36]

18. In 1999, Defendants authored an article entitled "Nonepileptic uses of Gabapentin" published in *Epilepsia*. The article stated that the "usefulness of gabapentin has been demonstrated in…bipolar disorder" citing three case reports. The article omitted the negative results of the Pande Study. The circulation of *Epilepsia* is 5,000.[37]

19. In 1999, Defendants authored an article entitled "Treatment of Social Phobia With Gabapentin: A Placebo- Controlled Study" published in the *Journal of Clinical Psychopharmacology*. This article, written by Dr. Pande, misleadingly states that "[i]n clinical studies of patients with epilepsy, gabapentin produced improvements in mood and general well-being" and cites the Dimond Article. Dr. Pande fails to disclose the negative results of the Pande study.[38] This misleading article was mailed to 25,150 psychiatrists, 125,850 copies were ordered for the door-to-door sales force, and the journal's circulation is 8,000.[39]

20. In 1999, Defendants sponsored a CME series entitled "New Frontiers in Anxiety, Substance Abuse and Bipolar Disorder." This CME touted Neurontin as one of the "Newer Mood Stabilizers" with "Reports of Benefit" in *inter alia* mania, bipolar depression, bipolar maintenance, and mood instability. Slides encouraged the use of Neurontin at dosages of "3600 mg (sometimes higher)." The negative Pande

---

[35] TX 360; 2/26 (Barkin) 32:9-33:10.
[36] TX 360, 923.
[37] TX 2079; 2/26 Tr. (Barkin) 25:11-27:20.
[38] TX 1324; 2/26 Tr. (Barkin) at 27:24-29:4.
[39] TX 166; 2/26 Tr. (Barkin) 29:22-30:12.

study results were not disclosed.  This CME was presented in the "top 20 U.S. markets and 30 secondary markets.  Estimated attendance was 8,500 [psychiatrists]."[40]

21. According to Defendants' Neurontin 2001 Situation Analysis, "bipolar disorder represents half of all psychiatric drug uses for Neurontin…The increased use comes despite the results of the [Pande study] which showed no significant improvement when compared to placebo."[41]  Despite Defendants' knowledge of Neurontin's inefficacy, Defendants pressed forward with "Psychiatry CME: Meetings & Symposia, Half Day Courses, Dinner Meetings, and Publications."[42]

22. Defendant's 2002 Neurontin Situation Analysis called for the continued marketing of Neurontin for bipolar disorders through key messages disseminated as part of Defendants' publication strategy.[43]

23. The Cochrane Collaboration, a highly respected nonprofit organization that conducts unbiased systematic reviews of the evidence for healthcare interventions, repeatedly requested published and unpublished information from Pfizer regarding Neurontin and its use for treatment of bipolar disorder. Pfizer refused to share its data.  As a result of Defendant's failure to provide its data, the Cochrane Collaboration's review article on Neurontin and bipolar disorder was withdrawn in April 2007.[44]

24. All of the published results of Pfizer's clinical trials relating to Neurontin's efficacy for the treatment of bipolar disorder were biased.[45]

**B.     Migraine**

      **1.     The Science**

25. Neurontin is ineffective as a treatment for migraines.[46]  A review and meta-analysis of the four relevant published and unpublished DBRCTs demonstrates that Neurontin is no more effective than placebo in preventing migraines (i.e. migraine prophylaxis).[47]

---

[40] TX 63, 139; 2/26 Tr. (Barkin) 30:19-32:7.
[41] TX 213; 2/23 Tr. (Abramson) 128:25-130:7.
[42] TX 213; 2/23 Tr. (Abramson) 130:2-24; 131:17-132:4.
[43] 2/23 Tr. (Abramson) 133:21-134:23.
[44] TX 159, 236, 2088; 2/23 Tr. (Abramson) 120:23-124:19.
[45] 2/25 Tr. (Dickersin) 51:21-52:10; 52:10-23; 52:24-53:9; 53:10-20; 55:6-15.
[46] See Appendix A, Charts titled "Placebo-Controlled DBRCTs by Indication," at Chart 2.
[47] 3/1 Tr. (McCrory) 20:6-19; 21:22-22:22; 22:6-22:12;22:20-24; TX 374, 396, 397.

6

26. Defendants conducted three DBRCTs studying Neurontin's effectiveness in treating migraine. Protocol 879-200 demonstrated that Neurontin was ineffective in treating migraine.[48] Defendants were aware of the negative results by 1990.[49] Protocol 945-217 demonstrated that Neurontin was ineffective in treating migraine, stating "no statistically significant differences were seen at any study point between the placebo and the Neurontin groups."[50] Defendants were aware of the negative results by January 1999.[51] Protocol 945-220 ("Matthew") demonstrated that Neurontin was ineffective in treating migraine.[52] Defendants were aware of the negative results by 1998.[53]

27. A fourth DBRCT, the Di Trapani study, reported positive results in migraine treatment in 2000, but contained a discrepancy between the number of patients taking Neurontin reported in the article and abstract and did not define the study population.[54]

28. The suppressed studies would have been material to doctors practicing evidence-based medicine.[55]

### 2.    Defendants' Wrongdoing

29. Defendants suppressed and misrepresented the evidence of Neurontin's effectiveness in treating migraine.[56] Defendants' protocol 879-200 was the first DBRCT investigating Neurontin's use in migraine. Defendants' published interim results in 1987, emphasizing the allegedly positive outcomes.[57] By June 1990, Defendants were aware that the study demonstrated Neurontin was no more effective than placebo for migraine prophylaxis but never published or otherwise disclosed the study's outcome.[58] Yet, in July 1996, Defendants' marketing assessment for migraine called for further clinical trials of

---

[48] TX 374.
[49] 2/24 Tr. (Abramson) at 56:1-57:23
[50] TX 397; 2/24 Tr. (Abramson) 62:25-63:17
[51] TX 397.
[52] TX 396.
[53] TX 396.
[54] TX 1401; 2/24 Tr. (Abramson) at 64:21-24; 3/1 Tr. (McCrory) at 38:25-40:2.
[55] 3/1 Tr. (McCrory) 41:17-42:6.
[56] 2/24 Tr. (Abramson) 68:20-70:4.
[57] 2/24 Tr. (Abramson) at 56:1-57:23; 2/25 Tr. (Dickersin) at 46:7 – 49:8; 3/1 Tr. (McCrory) at 23:1 – 24:14.
[58] TX 374; 3/1 (McCrory) 22:25-24:20; 2/24 (Abramson) 56:15-58:9.

Neurontin: "[t]he results, if positive, will therefore be publicized in medical congresses and published in peer-reviewed journals."[59]

30. Defendants' Mathew study was completed in March 1998 and demonstrated that Neurontin was not effective for migraine.[60]  A 2001 article published in the journal *Headache* falsely reported the study's conclusion as "Gabapentin is an effective prophylactic agent for patients with migraine."[61]  This false conclusion was amplified in many publications[62] and widely used in Defendants' promotional materials.[63]

31. The negative results of protocol 945-217 were never published and were not discussed in Defendants' promotional materials.[64]  Pfizer's 2001 Neurontin Situation Analysis notes that Pfizer "delayed posting or dissemination of [protocol 945-217's] results, which were not presented at any scientific meetings."[65]

32. Parke-Davis medical liaisons routinely informed physicians that Neurontin was effective for migraine, and never disclosed the negative results of Defendants' 879-200.[66]

33. The 2004 Cochrane Collaboration's review of Neurontin for migraine did not include the negative results from Defendants' protocols 879-200, 945-217 or the Mathew study.  Cochrane requested information from Pfizer regarding migraine studies, but Pfizer refused to produce unpublished data.[67]

34. In early 1999, Defendants implemented a multimedia medical education program to convince physicians that Neurontin should be used as first-line therapy for migraine. [68]  Defendants controlled the content of the CME materials and paid Dr. Mathew $20,000 to lend his voice to the CME audiotape; an 800 number containing the "most salient points" was also available to physicians.[69]  Dr. Mathew also

---

[59] TX 216; 3/1 Tr. (McCrory) 25:3-23; 3/10 Tr. (Boris) 143:13-145:1.
[60] TX 396; 2/24 Tr. (Abramson) 57:24-58:9.
[61] TX 396; 2082; 3/1 Tr. (McCrory) 28:18-29:9, 39:15-17; 2/24 Tr. (Abramson) 58:21-59:1; 59:16-24; 60:18-62:8.
[62] 2/24 Tr. (Abramson) 62:9-24.
[63] 3/1 Tr. (McCrory) 29:20-23.
[64] 2/24 Tr. (Abramson) 63:18-64:1; 3/1 Tr. (McCrory) 27:2-15.
[65] TX 213.
[66] 3/12 Tr. (Franklin) 55:5-10.
[67] TX 122; 3/1 Tr. (McCrory) 34:24-38:24.
[68] TX 98, 245.
[69] TX 97, 245, 248.

appeared as the lead author of the CME monograph.[70]  Neither the monograph, the audiotape, nor the 800

number referenced the negative results from protocols 879-200 and 945-217 or the true results from the

Mathew 945-220 study.[71]  Defendants invited 22,000 physicians to participate in this multimedia CME

program.[72]

35. Pfizer successfully planned and executed numerous tactics and strategies to market Neurontin for

migraine despite knowing it was ineffective.[73]  These tactics and strategies included conferences,

symposia, speakers bureaus, and CME events as well as sponsored publications of "seeding trials" to

create a "drumbeat in the literature."[74]

C.      **Neuropathic Pain**

        1.      **The Science**

36. Neurontin is ineffective to neuropathic pain.[75]  Pfizer's own pain experts, convened in 2001 to

review Pfizer's clinical data on neuropathic pain, concluded that Neurontin was not effective for

neuropathic pain.[76]

37. A meta-analysis of the 25 relevant DBRCTs indicates that Neurontin has a less than one-point

effect on an eleven-point pain scale, an effect "most doctors and probably most patients would consider

clinically meaningless."[77]  Removing studies of Neurontin in post-herpetic neuralgia ("PHN," a type of

neuropathic pain the FDA ultimately approved Neurontin to treat) shrinks the effect on pain scores to 0.36

---

[70] TX 98, 99, 363.

[71] TX 97, 99, 245, 363.

[72] TX 99.

[73] 3/1 Tr. (McCrory) 33:16-34:5.

[74] TX 31; 3/1 Tr. (McCrory) 33:1-15.

[75] See Appendix A, Charts titled "Placebo-Controlled DBRCTs by Indication," at Chart 4.  As used herein, "neuropathic pain" means all types of neuropathic pain other than post herpetic neuralgia (PHN).

[76] 2/23 Tr. (Kessler) 44:8-45:6; 2/24 Tr. (Abramson) at 38:6-15, 40:5-40:16; TX 173, 188 ("Upon hearing these results, Dr. Max [one of Pfizer's consultants] commented, 'you're done.'")

[77] 3/2 Tr. (Perry) 21:22-26:9; 26:10-13 (Q.  Based on your analysis, did you reach a conclusion whether Neurontin is effective for treating neuropathic pain?  A.  Yes, I did.  I did not consider it effective for treating neuropathic pain); 3/19 Tr. (Bird) at 28:24-25 ("the patient doesn't really care if there's a 1-point change on their Likert scale.")

001615-13  367448 V1

out of 11.[78]  Multiple DBRCTs conducted by Pfizer indicate that Neurontin is no more effective than placebo for neuropathic pain.[79]

38. Neurontin has been and continues to be widely used to treat neuropathic pain because of the placebo effect and the highly subjective nature of pain.  Defendants estimate the placebo effect ("placebo response rate") to be as high as 40%.[80]  Thus, Defendants consider a response rate of 55% to 60% (i.e. a *majority* of patients) in order to show that Neurontin is superior to placebo.[81]  Even physicians who personally believe Neurontin to be effective in treating pain do not achieve such rates in the uncontrolled setting of their day-to-day practices.  Defendants' pain experts concede that Neurontin is only effective in a "subset" of patients.[82]

39. Defendants conducted eight DBRCTs studying Neurontin's effectiveness in treating neuropathic pain.  Two (Rowbotham, protocol 945-211, and Rice, protocol 945-295) studied PHN.[83]

40. The Gorson study demonstrated that Neurontin was no more effective than placebo in treating Diabetic Peripheral Neuropathy (DPN).[84]  The study was completed by March 1997, and Defendants were aware of the negative results by August 23, 1997. [85]

41. Pfizer's supposedly "best" neuropathic pain trial outside of PHN, the Backonja study (protocol 945-210), once corrected for the occurrence of treatment-related central nervous system side effects that served to unblind the study, demonstrated no difference between Neurontin and placebo.[86]  Defendants knew that the forced titration study design was likely to induce central nervous system ("CNS") side effects, such as dizziness and somnolence, that would alert participants they were taking Neurontin, thus

---

[78] 3/2 Tr. (Perry) at 94:1-95:1.
[79] TX 19, 382, 373, 194.
[80] TX 1250.
[81] TX 1250.
[82] 3/16 Tr. (Brenner) 20:6, 21:7, 28:17, 62:23-24.
[83] TXs 1254, 1488, 195.
[84] 2/23 Tr. (Abramson) 138:14-139:5, 139:17-24.
[85] TX 19 dated August 23, 1997 ("I am sorry [the manuscript] took so long (I was hoping to have it done by early summer) but I got delayed with another time-sensitive project and my data entry person and statistician went on long vacations;") 3/2 Tr. (Perry) 32:16-34:2 ("Q. As of August, 1997, Parke-Davis was aware of the negative results of Dr. Gorson's study, correct?  A. That is correct.")
[86] 3/6 Tr. (Jewell) 118:9-25.

unblinding the study.[87]  Defendants were aware of methods that could remove this bias.[88]  Once the unblinded patients' pain scores were removed from the analysis, the Backonja study demonstrated that Neurontin is no better than placebo for neuropathic pain.[89]

42.  The Reckless study (protocol 945-224) found that "[t]here was no statistically significant difference between any of the gabapentin groups and the placebo group for endpoint mean pain score or at any time throughout the trial…" demonstrating that Neurontin is ineffective at treating painful diabetic neuropathy.[90]  Defendants were aware of the negative results by September 1999.[91]

43.  The POPP study (protocol 945-271, also "Gordh study") demonstrated that Neurontin was no more effective than placebo in treating post-operative neuropathic pain.[92]  Defendants knew these negative results by at least September 2001, when they were discussed with their pain experts at the Crowne Plaza meeting.[93]

44.  The Serpell study (protocol 945-306) investigated Neurontin as a treatment for neuropathic pain.[94]  The majority of the benefit found in the Serpell Study was confined to patients with PHN.[95]  Pfizer's own pain experts agreed that the results did not support a claim of efficacy for the broader category of neuropathic pain.[96]

45.  In 2005, Defendants completed study a9451008, a study of Neurontin in DPN.  This used the same forced titration design as the Backonja study.  Even correcting for unblinding, the study produced a small and clinical insignificant reduction on pain scores for Neurontin compared to placebo.  Defendants never published the results.[97]

---

[87] 2/24 Tr. (Abramson) 21:3-21:13; 3/1 Tr. (Jewell) 103:16-104:20.
[88] 2/24 Tr. (Abramson) 25:15-26:1.
[89] TX 1250; 3/1 Tr. (Jewell) 115:16-18; 118: 9-25.
[90] TX 382.
[91] TX 382.
[92] TX 192.
[93] TX 173, 188.
[94] TX 373.
[95] 2/24 Tr. (Abramson) 36:24-38:15.
[96] 2/24 Tr. (Abramson) 36:24-38:15.
[97] TX 2096.

001615-13  367448 V1

46. In August 2001, Pfizer submitted a supplemental application for the management of neuropathic pain.  Prior to the submission, the FDA and Pfizer met.  The FDA advised Pfizer that a general indication for neuropathic pain would not be approved on the basis of the submitted studies.  The FDA advised (i) that it considered DPN and PHN two "distinct, pathophysiological states," requiring two indications and (ii) that Pfizer needed to replicate its positive DPN result.[98]  In May 2001, the FDA informed Pfizer that it "would not file" an application for a "general neuropathic pain indication."[99]

47. In September 2001, Pfizer convened a panel of pain experts to review their neuropathic pain studies, including the negative results from the Reckless Study and the POPP study, as well as Defendants' internal analysis that indicated that the reported statistical significance in the Serpell Study was "predominantly the result of the PHN patients."  Pfizer's experts concluded: "New analyses/data not only do not support the broad [neuropathic pain] claim, they provided evidence contrary to a broad indication."  Upon hearing the litany of negative evidence, Pfizer's own pain expert, Dr. Mitchell Max, commented, "you're done."[100]

## 2.    Defendants' Wrongdoing

48. Pfizer deliberately suppressed publication of negative studies concerning many types of neuropathic pain, including DPN.[101]  Defendants suppressed the findings of the negative Gorson study by: (i) omitting any reference to the study in marketing materials;[102] (ii) altering the conclusion of theGorson study to suggest that Neurontin "may be effective,"[103] (iii) presenting the misleading abstract at the 1998 American Academy of Neurology annual meeting;[104] (iv) delaying publication of the actual negative

---

[98] TX 200; 2/23 Tr. (Kessler) 39:16-44:7.
[99] TX 200; 2/24 Tr. (Abramson) 38:16-39:22.
[100] TX. 173, 188; 2/24 Tr. (Abramson) 40:1-40:16/ TX 2/23 Tr. (Kessler) 44:8-46:9.
[101] 7/11/07-7/12/07 Dep. Tr. (Tive) 650:14-651:20, 666:14-667:4, 723:15-725:17 (played 3/11/10); TX 136, 175, 183, 203).
[102] 3/2 Tr. (Perry) 34:3-38:8; 51:3-52:17; 2/24 Tr. (Abramson) 32:10-34:25, 35:21-36:5, 37:7-38:15, 41:5-23, 42:5-47:6; TX 40, 80, 82, 263, 1250, 1660.
[103] TX 19, 30; 2/23 Tr. (Abramson) 140:22-141:22, 142:13-145:23.
[104] TX 1271.

results until after other (allegedly) positive Backonja study was published, and (v) publishing the results as a letter to the editor in "hard-to-locate literature," instead of a full article.[105]

49.  In December 1998, Defendants caused a misleading article summarizing the results of the Backonja study to be published in JAMA, one of the country's most widely circulated and respected medical journals.  The article omitted any reference to the negative results of the Gorson study, and falsely stated both that it "was the first trial to evaluate gabapentin's efficacy" for neuropathic pain and that the occurrence of CNS side effects "did not account for the overall efficacy seen in the trial."[106]

50.  Defendants distributed 130,000 copies of the article to physicians throughout the United States.[107] Defendants also executed a campaign, using canned news releases that appeared in TV, radio, print media, the internet, and in-flight entertainment content, suggesting Neurontin was effective for neuropathic pain.[108]  Defendants also created 500 copies of slides to train doctors to give lectures to other doctors in CMEs and at advisory boards where a misleading summary of the Backonja article would be repeated.[109]

51.  Despite the fact that the Reckless study included three times as many patients as the Backonja study, Defendants suppressed the negative results of the Reckless study because of a desire "NOT to publish anything that damages Neurontin's marketing success."[110]  Defendants were "not in a hurry to publish" the Reckless study because by "delaying the publication for as long as possible,"[111]  Even though Dr. Reckless desired to publish his findings, Defendants would not allow him to write up the results

---

[105] 2/25 Tr. (Dickersin) 56:2-58:4.
[106] TX 1250.
[107] 3/2 Tr. (Perry) 46:16-21.
[108] TX 71, 102, 103; 2/24 Tr. (Abramson) 26:24-28:16.
[109] 3/2 Tr. (Perry) 46:10-15; TX 102.
[110] TX 109; 2/24 Tr. (Abramson) 32:10-20.
[111] TX 185.

13

himself.[112]  Pfizer's Neurontin Publication Subcommittee agreed "that this study should not be pushed for publication."[113]

52. Defendants never published the Reckless Study as a full article.[114]  Instead, four years afterwards, Defendants bundled the Reckless Study into a non-systematic review article that misleadingly concluded that Neurontin was not only effective for neuropathic pain, but also that it was more effective at doses above 1800 mg/day.[115]

53. Pfizer suppressed the negative results of the POPP study (protocol 945-271) until 2008.[116]

54. The published article about the Serpell study falsely claimed positive results for neuropathic pain of mixed etiologies and omitted the fact that the majority of the purported benefit was confined to patients with PHN.[117]

55. In July 1995, a company marketing assessment recommended initiation of "exploratory trials"in neuropathic pain, such as the Gorson study.  Results would only be publicized "if positive."[118]  Financial projections forecasted the revenue that would be generated if Neurontin's published only DBRCTs with "positive" or "mixed."[119]

56. In June 1997, Defendants sponsored a symposium in Boston in connection with the 57th Annual Meeting of the American Diabetes Association.  Dr. Gorson, who worked in Boston, was not asked to present the results of his negative study.  Defendants instead selected Dr. Vera Bril as a speaker. When Parke-Davis learned that Dr. Bril would not recommend the use of Neurontin, its marketing partner, Cline

---

[112] TX 183; TX 203 ("The main investigator in the UK (Dr Reckless) is keen to publish but this will have several ramifications.  The route that we have all agreed to now is that we will publish the study but NOT until we have published the results of NN25 and NN26 [two other studies with purportedly positive results]) (emphasis in original); 2/24 Tr. (Abramson) 32:25-33:20.
[113] TX 136; 2/24 Tr. (Abramson) 34:1-35:5.
[114] TX 382; 2/24 Tr. (Abramson) 28:22-30:11.
[115] TX 1660.
[116] 2/24 Tr. (Abramson) 35:6-36:2.
[117] TX 1552; 2/24 Tr. (Abramson) 36:24-38:15.
[118] 3/2 Tr. (Perry) 28:19-30:16; TX 7.
[119] TX 11.

Davis & Mann, planted pre-written questions in the audience to "reverse the message that was delivered."[120]

57. In November 1997, Defendants disseminated a supplement to a non-existent or unknown journal called "Internal Medicine" that claimed Neurontin "can be used as a first-choice anticonvulsant" for treating neuropathic pain. The supplement did not mention the negative Gorson study and was distributed to 56,000 physicians across the United States.[121]

58. In late 1998, Defendants mailed 43,000 copies of a supplement to the Cleveland Clinic Journal of Medicine that falsely claimed that Neurontin was one of several "appropriate treatments for neuropathic pain," but neglected to mention the negative results of the Gorson study. The supplement also touted the supposedly favorable results of the Backonja study without refrencing the unblinding problem.[122]

59. Beginning in March 1999, Defendants mailed journal supplements entitled "Pharmacology of Painful Peripheral Neuropathies" to *all neurologists practicing in the United States*.[123] The supplements cited the Backonja article as supporting Neurontin's use as a "first line therapy for the treatment of painful peripheral neuropathies," without disclosing either the unblinding or the negative results of the Gorson study.[124]

60. In 2000, Defendants disseminated a journal supplement, entitled "Management of Neuropathic Pain Syndromes," that did not disclose the Gorson study, the Reckless study, or the known unblinding of the Backonja study.[125]

61. Despite the conclusions of the FDA and Pfizers' own experts, Pfizer developed "key messages" supporting the continued off-label marketing of Neurontin in treating neuropathic pain conditions and "to sell more Neurontin."[126] Such "key messages" included that "Gabapentin should be considered the first choice therapy for neuropathic pain," Gabapentin is effective against a broad spectrum of neuropathic

---

[120] TX 43.
[121] 3/2 Tr. (Perry) 34:3-38:8; Trial Ex. 40; TX 43.
[122] 3/2 Tr. (Perry) 38:12-42:22; TX 40,107, 108, 110.
[123] TX 92.
[124] 3/2 Tr. (Perry) 51:3-17; TX 80.
[125] 3/2 Tr. (Perry) 51:18-52:17; TX 82.
[126] 2/24 Tr. (Abramson) 41:5-9.

15

states," and "Proven efficacy for neuropathic pain."[127]  Pfizer also issued global branding guides for Neurontin, which called for a "Key Message" that Neurontin has "Proven efficacy in patients with neuropathic pain."[128]

62.  Through medical writing firms, Pfizer ghostwrote journal articles that repeated these deceptive "key messages," while suppressing the negative results of the Gorson, Reckless and POPP studies and the unblinding of the Backonja study, "spinning" the negative Serpell study as positive, and continuing to maintain the claim that Neurontin was an effective treatment despite the evidence to the contrary.[129]

63.  Pfizer's 2001 Global Operating Plan called for a strategy to "Create New Standard of Care for NeP [neuropathic pain] Treatment" through the education of primary care physicians, a group likely to see many patients suffering from neuropathic pain, and an increase in the "field force" of sales representatives detailing physicians.[130]  Pfizer planned on approaching over 28,000 physicians as part of this marketing effort.[131]

64.  A 2003 review article published in the *Journal of Managed Care Pharmacy* indicated that there was "solid research support" for both Neurontin's use in DPN and migraine.  However, the authors did not have access to the Gorson study, the Reckless study, the POPP study, 879-200, 945-217, the negative results of the Mathew study, the critical re-analysis of the Serpell study indicating that statistical significance was confined to PHN patients and the fact that the Backonja study had been unblinded as a result of the occurrence of CNS side-effects.[132]

65.  The Cochrane Collaboration's 2005 review article of Neurontin and neuropathic pain did not include the suppressed negative results of the Reckless or POPP studies, which included 2.4 times as many Neurontin patients as the included studies.[133]

---

[127] TX 169, 210, 255.

[128] TX 178, 228.

[129] 2/24 Tr. (Abramson) 32:10-34:25, 35:21-36:5, 37:7-38:15, 40:17-41:23, 42:5-47:6; TX 141, 165, 209, 262, 263, 1660.

[130] TX 219; 2/24 Tr. (Abramson) 50:7-51:25.

[131] 2/24 Tr. (Abramson) 52:1-4.

[132] TX 349; 2/24 Tr. (Abramson) 65:16-68:19.

[133] 2/24 Tr. (Abramson) 47:18-49:19; TX 1772, 2046.

66. Defendants failed to accurately, timely and completely disclose the results of their negative clinical trials of Neurontin in neuropathic pain.[134] In addition, all of the published results of Defendants' studies on the efficacy of Neurontin for neuropathic pain were biased and misleading.

**D.     Doses Above 1800 mg per Day**

**1.     The Science**

67. Neurontin is no more effective at dosages above 1800 mg/day than at dosages of or below 1800 mg/day as a treatment for any medical condition. The FDA twice rejected Defendants' claims to the contrary. First, as part of Defendants' monotherapy supplemental NDA ("sNDA"), the FDA found that "[t]he evidence from the controlled trials fails to provide evidence that higher doses of Neurontin are more effective than those recommended."[135] Second, as part of Defendants' PHN sNDA, the FDA required that the Neurontin label include the phrase "[a]dditional benefit of using doses greater than 1,800 was not demonstrated."[136] The largest gabapentin pain trial conducted (Reckless study) demonstrated that Neurontin was not more effective at dosages above 1800 mg/day.[137]

**2.     Defendants' Wrongdoing**

68. It was not appropriate for Parke-Davis to promote Neurontin to physicians as effective at dosages above 1,800 mg/day, and any such promotion would be considered false by the FDA.[138] Yet, Defendants consistently disseminated the message that Neurontin was safe and effective at doses greater than 3,600 mg/day and claimed this was supported by clinical studies.[139]

69. By December 30, 1993, Defendants knew that the FDA had determined the effectiveness of Neurontin, as an adjunctive treatment for epilepsy up to a maximum effective dose of 1,800 mg/day.[140] On August 26, 1997, the FDA denied Parke-Davis's NDA seeking to increase the effective dose of

---

[134] 2/23 Tr. (Abramson) 139:17-24; 3/2 Tr. (Perry) 52:18-53:1 ("I don't think that the marketing was supported by the science.").
[135] TX 91; 2/23 Tr. (Kessler) 37:9-38:6.
[136] TX 195 at p.32; 2/23 Tr. (Kessler) 49:13-14 ("there's no increased efficacy above 1,800.")
[137] 3/2 Tr. (Perry) 27:24-28:8; TX 382.
[138] TX 91; 2/23 Tr. (Kessler) 36:24-38:22.
[139] 8/1/07-8/2/07 Dep. Tr (Glanzman) 343:19-344:10 (played 3/12/10).
[140] TX 9; 2/23 Tr. (Kessler) 33:11-25.

001615-13 367448 V1

Neurontin to 3600 mg/day.[141]  In May 2002, the FDA declined Pfizer's sNDA to the extent it sought approval of Neurontin for usage for doses above 1,800 mg/day.[142]

70.  In November 1997, Defendants disseminated copies of a supplement to a non-existent or unknown journal[143] to 56,000 physicians across the country.[144]  The supplement recommended doses up to 3,600 mg/day without disclosing that the maximum effective dose of Neurontin was 1,800 mg/day.

71.  Defendants initiated the STEPS program in May 1995, to get physicians comfortable with prescribing doses of Neurontin greater than 1800 mg/day.[145]  At the time Parke-Davis conducted the STEPS trial it was aware there was no clinical evidence that doses greater than 1800 mg/day were more effective than the FDA-approved dosage.[146]

72.  The 5,645 physicians who attended the 1998 CME series entitled "New Frontiers in Social Phobia and Bipolar Disorders,[147] including 33 PMG physicians,[148] were instructed to titrate Neurontin to "3600 mg (sometimes higher)," without any disclosure of the fact that no additional benefits above 1800 mg/day had ever been demonstrated.

73.  The March 1999 mailing of the Progress in Neurology supplement to all neurologists stated that some patients "require 3600 mg" without disclosing that the FDA had rejected precisely that claim and would have considered it false and misleading.[149]

74.  The March 2000 mailing of the "Management of Neuropathic Pain Syndromes" misleadingly stated that "gabapentin was shown to be effective in the treatment of DN [Diabetic Neuropathy] in a double-blind, placebo-controlled, eight-week dose-titration trial using doses from 900 to 3,600 mg/d."

---

[141] TX 91.
[142] TX 195; 2/23 Tr. (Kessler) 47:14-49:25.
[143] 3/2 Tr. (Perry) 34:3-37:15; TX 40.
[144] TX 58.
[145] 3/10 Tr. (Knoop) 159:3-10.
[146] 3/10 Tr. (Knoop) 159:3-10.
[147] Trial Ex. 360; 2/26/10 (Barkin) at 32:9-33:10.
[148] Trial Exs. 360, 923.
[149] TX 80, 91-92; 2/23 Tr. (Kessler) 36:24-38:22.

The known results of the Reckless study, which failed to show that higher doses were any better than lower doses, were not disclosed.[150]

75. The Backonja/Glanzman dosing article published in early 2003 falsely states, "…from day 14 onward, it is recommended that the dose of gabapentin be increased from 1800 to 3600 mg/d, as tolerated, to achieve better efficacy…In many patients, further dose escalation up to 3600 mg/d may be necessary to reach an individualized effective dose…"[151]  No mention is made that additional benefits of doses above 1800 mg/d had not been demonstrated, despite the fact that the studies reviewed in the article were the very same studies that had prompted the FDA to require the placement of such language in the product labeling.[152]

76. Another 2003 article instructed physicians to "increase to … 3600 mg/day as tolerated to achieve maximal benefits."[153]

## E.   Nociceptive Pain

### 1.   The Science

77. Neurontin is not effective as a treatment for nociceptive pain.[154]  Pfizer conducted five negative DBRCTs investigating Neurontin's use in nociceptive pain, all of which demonstrated that Neurontin was ineffective in treating nociceptic pain.[155]   Defendants knew the results of the first DBRCT studying Neurontin for "an acute nociceptive pain state" by August 1999: Neurontin alone did not outperform placebo.[156]

78. The minutes of Pfizer's Crowne Plaza meeting with their non-litigation pain experts states: "Importantly, gabapentin is not effective for non-neuropathic models of pain."[157]  Pfizer's former medical director, Dr. Robert Glanzman, admitted that, "[i]t wouldn't surprise me, gabapentin is not effective [for

---

[150] TX 382.
[151] TX 1660.
[152] TX 195.
[153] TX 208.
[154] *See* Appendix A, Charts titled "Placebo-Controlled DBRCTs by Indication," at Chart 5; *see also* 3/1 Tr. (Perry) 144:17-145:12.
[155] 2/25 Tr. (Dickersin) 38:7-39:3; TX 384, 385, 386, 387, 388, 389.
[156] TX 384 at 13; 38.
[157] TX 173, 188.

nociceptive pain]."[158]  Defendants' own pain expert agrees that there is little logic to using gabapentin to manage nociceptive pain.[159]

## 2.    Defendants' Wrongdoing[160]

79.  It is difficult to differentiate between neuropathic and nociceptive pain, and the two may be mixed.[161]  The scientific community is not completely clear about what it means by "neuropathic" or "nociceptive" pain.[162]  Defendant's expert agrees that neuropathic pain and nocciceptive pain are overlapping, and patients can experience more than one at a time.[163]

80.  Defendants broadly promoted for Neurontin as effective in treating pain generally, without specifying particular types of pain.[164]  Sales representatives were instructed, "When we get out there we want to kick some ass on Neurontin, we want to sell Neurontin on pain…"[165]  Defendants knew that physicians would respond to these messages by prescribing Neurontin for both nociceptive and neuropathic pain.

81.  At the time Pfizer obtained the results of each of its five clinical trials, it was aware the Neurontin was prescribed extensively for nociceptive pain in the United States, with approximately 13% of all Neurontin prescriptions being used for that purpose.[166]  Defendants were aware that a significant percentage of prescriptions were written to treat nocciceptive pain.  Defendants nonetheless never published the results of any of these nociceptive pain studies.[167]  Under the circumstances of this case, the deliberate refusal to publish or disseminate a study due to its results constitutes both publication bias and misleading, deceptive, and unfair under the UCL.[168]

---

[158] 8/1/07-8/2/07 Dep. Tr. (Glanzman) 353:4-19 (played on 3/12/10).
[159] 3/16 Tr. (Brenner) 74:19-23 ("Q.   The next page under acute pain, 'There is no logic in using anticonvulsants to manage acute nociceptive pain."  Did you put that in your report?  A.   No, and I believe I testified earlier that I agree with that at this point, at least for gabapentin.")
[160] Kaiser previously submitted briefing regarding nociceptive pain at the Court's request.  *See* Docket No. 2739.
[161] 3/19 Tr. (Bird) at 20.
[162] 3/1 Tr. (Perry) at 149.
[163] 3/16 Tr. Brenner) at 29.
[164] TX 105 at 601; TX 31 at 286, 289.
[165] 3/12 Tr. (Frankin) (recording of Phil Magistro).
[166] TX 129, at 16.
[167] 3/25 Tr. (Dickersin) 38:14-39:3, 41:18-42:14.
[168] 3/25 Tr. (Dickersin) 31:7-9.

82. Pfizer medical liaisons nonetheless promoted Neurontin routinely for nociceptive pain.[169] Pfizer funded general pain studies that implied broad utility for Neurontin in pain of all kinds, including nociceptive pain,[170] and pushed these messages to PMG physicians.[171]

## II.    DEFENDANTS' UNLAWFUL CONDUCT AS EVIDENCED BY THE FDA INVESTIGATION, GUILTY PLEA, AND VERDICT

### A.    FDA Investigation

83. On July 19, 1996, the FDA advised Parke-Davis that it was investigating off-label promotion of Neurontin for chronic pain, bipolar disorder, and other indications. The FDA sought information concerning Defendants' financial relationship with certain doctors including Dr. Gary Mellick.[172]

### B.    Criminal Guilty Plea

84. On May 13, 2004, the Department of Justice filed a criminal information charging Warner-Lambert with the off-label promotion of Neurontin.[173] On the same day, Warner-Lambert pled guilty to two felony counts of marketing Neurontin for various unapproved uses, including painful diabetic neuropathy, bipolar disorder, reflex sympathetic dystrophy (RSD), and migraine headaches, and agreed to pay a $240 million criminal fine.[174]

85. "Warner-Lambert expressly and unequivocally admits that it committed the crimes charged in the Information. Warner-Lambert agrees that the facts set forth in the Information are true."[175] Warner-Lambert admitted that it promoted the sale and use of Neurontin for neuropathic pain, bipolar disorder, and other unapproved uses through the national use of sales representatives, medical liaisons, advisory board meetings, consultants meetings, and teleconferences.[176]

---

[169] 3/12 Tr. (Franklin) 63:9-10.

[170] TX 40 at 464 ; TX 105 at 601; TX 31 at 286; TX 31 at 287.

[171] TX 432 (SRL discussing articles where patients took gabapentin for "skeletal," "visceral," "myofascial," and "chronic osteoarthritic" pain – all nociceptive pains); TX 907 at 856 (noting that PMG physicians "may be influenced by drug company promotional efforts for 'off-label' uses of gabapentin, including neuropathic and non-neuropathic pain (including . . . a variety of 'general pain' indications").

[172] TX 87; 2/23 Tr. (Kessler) 55:3-58:5.

[173] TX 366.

[174] TX 371 ¶ 1 (Criminal Information, stating "Warner-Lambert expressly and unequivocally admits that it committed the crimes charged in the Information. Warner-Lambert agrees that the facts set forth in the Information are true."; TX 366 ¶ 9.

[175] TX 371.

[176] TX 366 ¶ 19-40.

C.    **Verdict**

86.  On March 25, 2010, a jury in Boston, Massachusetts found that Defendants had violated RICO

with respect to its fraudulent promotion of Neurontin for bipolar, migraine, neuropathic pain, and for

dosages above 1800 mg/day, and that its violation caused injury to Kaiser.[177]

## III.   DEFENDANTS' UNLAWFUL, FRAUDULENT, AND UNFAIR PRACTICES CAUSED DAMAGES TO KAISER

A.    **Kaiser**

87.  Kaiser Foundation Health Plan provides medical coverage for Kaiser members.  Kaiser

Foundation Hospitals provides hospital services for Kaiser members.  Both are non-profit

organizations.[178] Permanente Medical Groups ("PMG"), not a party to this action, contract with Kaiser to

provide medical services to Kaiser members. [179]

88.  Kaiser has approximately 8.6 million members located in nine states across the United States.[180]

Approximately 38% of Kaiser's members are located in Northern California and 38% are located in

Southern California, percentages that have remained stable since 1994.[181]  Kaiser's remaining members

are located in Hawaii (3%); Oregon and Washington (Northwest Region, 6%); Colorado (6%); Ohio

(2%); Georgia (2%); and Virginia, Maryland, and the District of Columbia (Mid-Atlantic Region, 6%).[182]

89.  Kaiser seeks to practice evidence based medicine.  Evidence-based medicine is dependent upon

the accurate reporting of high quality medical studies.  (2/25 Tr. (Dickersin) 26:7-27:18.)

90.  Kaiser chooses drugs for its formulary that are safe and effective, regardless of cost.  When

clinical evidence shows that two equivalent medications treat a particular condition with the same

efficacy and safety, the lower-cost agent is usually selected for addition to the formulary.[183]  Ninety-five

---

[177] Dkt. No. 2760.
[178] 2/26 Tr. (Carrejo) 82:13-82:21.
[179] 2/26 Tr. (Carrejo) 92:18-93:6; 3/3 Tr. (Hyatt) 99:9-99:15.
[180] 2/26 Tr. (Carrejo) 82:13-21.
[181] 2/26 Tr. (Carrejo) 83:21-84:6; 92:9-93:1; 3/5 Tr. (Millares) 92:9-93:1.
[182] 3/5 Tr. (Millares) 92:9-93:1; 2/26 Tr. (Carrejo) 83:13-83:20.
[183] TX 323 at KAIS-003377; 3/3 Tr. (Hyatt) 110:5-110:20.

percent of prescriptions written by PMG physicians are in compliance with the Kaiser formulary.[184]

However, Kaiser pays for all prescriptions written by physicians for Kaiser members regardless of the

formulary status of the drug.[185]   Once a drug is on formulary, PMG physicians view the formulary status

of the drug as an indication of its utility, and prescribing will not cease if the drug is subsequently

removed from formulary.[186]

91.  Kaiser tracks data concerning prices and quantities of Neurontin.[187]  From 1994 through 2004,

Kaiser spent almost $200 million on Neurontin.[188]  Kaiser could not track Neurontin prescription data by

medical indication at that time.[189]

**B.      Kaiser Relied on Defendants' Fraudulent Statements and Omissions**

**1.      PMG Physicians are Subject to the Same Influences as Other Doctors**

92.  PMG physicians are subject to the same influences as any other physician.  They are recruited

from medical schools and residency programs across the country; they read the same published journals;

they attend the same specialty meetings; they attend drug company sponsored dinners and meetings.[190]

Pfizer detailed PMG physicians and drug information specialists about Neurontin.[191]

**2.      Defendants' Targeted Kaiser with Off-Label Marketing**

93.  Defendants specifically targeted Kaiser with their off-label Neurontin marketing.[192]  As early as

1994, Kaiser was Number 2 on Parke-Davis's list of top ten Neurontin marketing targets.[193]  Defendants'

focus on Kaiser continued throughout the relevant period.[194]  Defendants detailed PMG physicians

throughout the relevant time period.[195]  Pfizer's Kaiser-specific strategies included "[i]dentify[ing] and

build[ing] relationship with the P&T members;" [p]roved[ing] clinical and outcomes information to the

---

[184] 2/26 Tr. (Carrejo) 103:23-104:14, 108:10-109:3; TX 323.
[185] 3/3 Tr. (Hyatt) 100:21-101:15; 3/9 Tr. (Daniel) 94:10-94:15.
[186] 3/3 Tr. (Hyatt) 139:16-141:1; 3/5 Tr. (Millares) 93:19-95:14; 3/9 Tr. (Daniel) 109:9-110:12.
[187] 2/26 Tr. (Carrejo) 88-91; TX 268.
[188] TX 268.
[189] 2/26 Tr. (Carrejo) 92.
[190] 3/3 Tr. (Hyatt) 99:16-100:3.
[191] 2/26 Tr. (Carrejo) 97-98.
[192] TX 81, TX 90, TX 250.
[193] TX 90 at 11.
[194] TX 250 at 16 ("continue to support field detailing activities").
[195] 2/26 Tr. (Carrejo) 97:20-98:9; TX 250 at 16.

23

Drug Information Coordinators on regular basis;" "developing relationships with [P&T members] who are not considered 'whistle blowers;'" and "maintain[ing] and improve[ing] the existing relationships and develop[ing] new relationships with physicians, Drug Education Coordinators (DECs), Drug Information, Kaiser research entities and brokers; and "support[ing] and attend[ing] the Kaiser conferences."[196]

94.  Pfizer also recruited and paid prominent PMG physicians to serve on its Neurontin speakers' bureau.[197]  Dr. William McCarberg secretly worked with Pfizer to dissuade a co-author from writing about the overuse of Neurontin for questionable pain conditions.  Dr. McCarberg did not disclose that he was a regular paid Neurontin speaker, or that he had sought Pfizers' guidance on how to make the article appear positive.[198]

95. Defendants' off-label promotion caused Kaiser to pay for more Neurontin.  In May 1999, after Neurontin was promoted to PMG physicians at a CME, prescriptions of Neurontin increased by 62%. Kaiser's internal analysis showed a continuing effect, with 100% more new starts in early 2003 than in early 1999.[199]

### 3.  Defendants Failed to Disclose Information to Kaiser about Neurontin's Ineffectiveness to Treat Off-Label Indications

96.  Before Kaiser's P&T Committees change a drug's formulary status, pharmacists in Kaiser's Drug Information Service ("DIS") summarize the best available evidence on the drug's safety and efficacy in a monograph.  DIS searches for publicly available evidence and requests unpublished information from pharmaceutical manufacturers.[200]  P&T Committees rely heavily on DIS's monographs.[201]  Monographs are shared with all other Kaiser regions during monthly teleconferences of formulary personnel, chaired by the head of DIS.[202]  Information is also shared at interregional P&T Committee meetings.[203]

---

[196] TX 250 at 24, 25, 28, 29, 30.
[197] 3/3 Tr. (Hyatt) at 120:5-122:22; TX 279, 276, 278, 795.
[198] 3/3 Tr. (Hyatt) 135:1-135:24; TX 279; 3/4 Tr. (Hyatt) 31:3-32:16.
[199] 2/26 Tr. (Carrejo) 99:13-102:19; TX 286.
[200] 3/4 Tr. (Millares) 46:13-46:8:11; 3/5 Tr. (Millares) 80:12-81:8.
[201] 3/9 Tr. (Daniel) 94:1-94:9.
[202] 2/26 Tr. (Carrejo) 110:17-110:23; 3/4 Tr. (Millares) 43:21-44:3, 45:6-46:12.
[203] 3/9 Tr. (Daniel) 93:20-93:25.

97. DIS maintains an inquiry service that responds to inquiries from PMG physicians. DIS regularly contacts pharmaceutical manufacturers when researching inquiries about drugs.[204] DIS made multiple inquiries throughout the relevant period about the proper usage of Neurontin. Defendants' responses failed to disclose DBRCTs that demonstrated Neurontin was ineffective for particular indications and falsely indicated that Neurontin was effective in doses greater than 1800 mg.[205] Defendants also provided misleading information directly to Kaiser healthcare professionals through misleading standard response letters that omitted key studies.[206]

### a.    Bipolar and Other Mood Disorders

98. In June 1999, the Southern California P&T Committee received a request by the Chiefs of Psychiatry to relax the restrictions on Neurontin to allow psychiatrists to prescribe Neurontin for the treatment of mood disorders, including bipolar disorder.[207] The P&T Committee approved the request despite a large predicted cost impact.[208] DIS relied on a "personal communication" with Parke-Davis in making a recommendation to the P&T Committee.[209] The letter from Parke-Davis did not disclose the FDA investigation or the negatice Pande study.[210] Instead, Defendants enclosed a copy of the misleading Dimond Article. Had Defendants disclosed the Pande study, it would have been reflected in the monograph and relied upon by Kaiser as an important piece of evidence: DIS would not have recommended relaxing the restriction, and the Chair of the P&T Committee would not have voted to relax the restriction had he been aware of the negative Pande study.[211]

### b.    Migraine

99. In 2000, Defendants sent Kaiser a letter purportedly summaring the evidence for Neurontin's use in a number of indications, including neuropathic pain and migraine. The letter omitted any reference to

---

[204] 3/4 Tr. (Millares) 89:25-90:20.
[205] 3/4 Tr (Millares) 91:7-97:18; TXs 461, 461-A at 22, 296, 309 at 2-4, 294, 292.
[206] 3/4 Tr. (Millares) 97:19-100:3; TXs 461-A at 5, 432 at 13 (omitting negative migraine studies).
[207] TX 311.
[208] 3/4 Tr. (Millares) 62:6-63:13; TX 311 at KAIS-004646.
[209] TX 311 at KAIS-004650.
[210] 3/4 Tr. (Millares) 67:17-69:24; 3/5 Tr. (Millares) 81:9-83:9, 84:2-84:6; TX 961 at 8.
[211] 3/4 Tr. (Millares) 53:14-67:11; 69:25-71:20; 3/9 Tr. (Daniel) 100:7-101:14.

the negative results from the Gorson Study and the Reckless Study and also failed to mention any of the negative results from Defendants' three migraine DBRCTs (879-200, 945-217 and 945-220).[212]

### c.    Pain

100.    Kaiser added Neurontin to formularies in all regions by 1994.  In Southern California, it was originally restricted to neurologists.[213]  In September 1997, the Southern California P&T Committee approved a request by the Chiefs of Anesthesiology to allow prescribing by anesthesiologists for the treatment of RSD, a pain syndrome.[214]  The 1997 monograph describes RSD as being caused by, *inter alia*, "inflammation following surgery, infection, lacerations with swelling, burns, frostbite and degenerative joint disease[.]"[215]  Though RSD is sometimes considered neuropathic pain, the above presentments are classically associated with nociceptive pain.[216]  The September 1999 monograph also lists RSD separately from neuropathies, showing that RSD (to Kaiser) is not limited to neuropathic pain.[217]  In compiling its monograph, DIS found two letters to the editors from Drs. GA and LB Mellick – the best available evidence at the time.[218]  DIS did not know about the FDA investigation of Parke-Davis's off-label promotion of Neurontin, or the financial relationship between Dr. Gary Mellick and Parke-Davis.[219]  This information would have been highly material to DIS, and members of the P&T Committee would not have voted to relax the restrictions on Neurontin had they known this information.[220]

101.    In September 1999, the Southern California P&T Committee voted to remove the remaining restrictions on Neurontin.[221]  At the time the restrictions were removed, Kaiser had multiple lower cost drug options on its formulary for the treatment of diabetic neuropathy; removing restrictions

---

[212] TX 432; 3/4 Tr. (Millares) 97:19-98:17; 99:23-100:3.
[213] 3/9 Tr. (Daniel) 95:6-95:18.
[214] 3/4 Tr. (Millares) 49:20-51:23; TX 290 at KAIS-044026.
[215] TX 322 at 800.
[216] TX 789 at 994 (noting that nociceptive pain is sometimes caused by "injury or inflammation" and that a common treatment is an anti-inflammatory).
[217] TX 327 at 261.
[218] 3/4 Tr. (Millares) 51:24-52:16.
[219] 3/4 Tr. (Millares) 54:25-56:21.
[220] 3/4 Tr. (Millares) 57:5-61:6, TXs 23-25; 3/9 Tr. (Daniel) 98:11-98:23.
[221] TXs 327, 291.

on Neurontin would have a significant cost impact.[222]  In preparing the monograph and recommending the removal of all restrictions, DIS relied on a personal communication with Parke-Davis.  Defendants' failed to disclose (i) the results of the negative Reckless trial, (ii) complete information about the suppressed negative Gorson trial, and (iii) that the Backonja study was negative when corrected for unblinding.[223]  With this information, DIS would not have recommended lifting the restrictions and the P&T Committee would not have approved the change.[224]  This information would have been highly material to the P&T Committee, and the chair of the committee would not have voted to lift the restrictions.[225]

### d.    Dose

102.     In August 2000, Defendants told DIS it was appropriate to push Neurontin dosages up to 3,600 mg/day.[226]  In December 2000, Defendants suggested that dosages up to 6,000 mg/day were appropriate.[227]  In May 2002, Defendants advised that dosages as high as 9,600 mg/day would be safe.[228]

### 4.    Kaiser's Re-Education Efforts

103.     By September 1999, Kaiser had an essentially open formulary with respect to Neurontin, and prescribing skyrocketed: "The genie was out of the bottle.  It just took off.  It was quarter over quarter utilization growing in 10 percent, quarter over quarter, there was a dramatic increase."[229]  The dramatic increase in utilization caused various Kaiser regions to examine the utilization.[230]  As a result, the Northern California region made Neurontin a nondetailable product and its Drug Utilization Group ("DRUG") began a campaign to promote appropriate use of the drug.[231]  Other regions joined the effort.[232]

---

[222] 3/4 Tr. (Millares) 72:15-76:5; TX 327 at KAIS-003261.
[223] 3/4 Tr. (Millares) 76:15-80:5, 86:8-87:16; 3/5 Tr. (Millares) 84:15-85:25; 3/9 Tr. (Daniel) 102:17-103:8.
[224] 3/4 Tr. (Millares) 88:17-88:6.
[225] 3/4 Tr. (Daniel) 102:17-107:19.
[226] TX 296, 461, 461-A; 3/4 Tr. (Millares) 91:7-92:19.
[227] TX 292; 3/4 Tr. (Millares) 96:13-97:18.
[228] 3/4 Tr (Millares) 91:7-97:18; TXs 461, 461-A at 22, 296, 309 at 2-4, 294, 292.
[229] 2/26 Tr. (Carrejo) 110:24-111:21.
[230] 2/26 Tr. (Carrejo) 111:3-113:14.
[231] 2/26 Tr. (Carrejo) 113:20-115:15; TX 273 at KAIS-001464; 3/3 Tr. (Hyatt) 102:24-105:15.
[232] 2/26 Tr. (Carrejo) 113:20-115:15; TX 273 at KAIS-001464; 3/3 Tr. (Hyatt) 102:24-105:15.

104.     In late 2002, Kaiser learned about the whistleblower suit brought by a former medical

liaison.  Kaiser learned that "exaggerated or false claims about the safety and efficacy" of Neurontin had

been made by its manufacturers.  Kaiser escalated its efforts to promote appropriate prescribing of the

drug.[233]  Those efforts focused on neuropathic pain, bipolar, migraine, and nociceptive pain, the off-label

uses of Neurontin that Defendants had promoted.[234]  The re-education materials produced by DRUG and

its Southern California counterpart DUAT were shared with all Kaiser regions.[235]

105.     The re-education effort involved a "significant number of [PMG] physicians and

pharmacists [and] dedicated a lot of resource[s] to coming up with the appropriate alternatives" to

Neurontin.[236]  Kaiser's efforts were successful, with a 33-34% decrease in new starts of Neurontin and a

similar decrease across all specialties.  Meanwhile, Neurontin use continued to increase nationally.  In

January 8, 2004, DRUG reported a 50% decrease in new starts of Neurontin in Kaiser's Northern

California region.  By June 2004, a 34% decrease in Neurontin utilization was experienced in Kaiser's

Southern California region.[237]

106.     Kaiser only learned the scope of Defendants' fraud through (i) the discovery and

resulting expert reports produced in this litigation and (ii) the publication of Dr. Kay Dickersin's article in

the New England Journal of Medicine in November 2009.[238]  The publication of the Dickersin article

reinvigorated Kaiser's efforts to curb inappropriate usage of Neurontin.[239]  Kaiser took this case to trial in

hopes that "the entire United States can know what happened because this is the only way that the

information is going to get out."[240]

---

[233] 2/26 Tr. (Carrejo) 115:17-117:8; TX 319; 3/3 Tr. (Hyatt) 107:13-109:17; TXs 355, 344.
[234] 2/26 Tr. (Carrejo) 120:14-123:18; TXs 352-353.
[235] 3/3 Tr. (Hyatt) 103:7-104:1; 111:16-112:6; 130:18-132:2.
[236] 2/26 Tr. (Carrejo) 128:1-10.
[237] 2/26 Tr. (Carrejo) 124:8-126:15; 3/3 Tr. (Hyatt) 114:20-115:19; TXs 333 at KAIS-001413; 340 at KAIS-001292,
KAIS-001295; 348 at KAIS-001343; 272 at KAIS-045068.
[238] 2/26 Tr. (Carrejo) 136:22-137:4; 3/2 Tr. (Carrejo) 60:23-62:2; 111:4-111:19; 113:16-113:25; 3/3 Tr. (Carrejo)
16:20-18:6; 3/3 Tr. (Hyatt) 141:2-141:14; 3/4 Tr. (Millares) 126:15-126:25; 3/10 Tr. (Daniel) 55:17-56:9.
[239] 3/3 Tr. (Hyatt) 123:18-124:1; 143:7-144:3; 3/5 Tr. (Millares) 95:15-96:8; 3/9 Tr. (Daniel) 119:11-119:18.
[240] 3/5 Tr. (Millares) 97:24-98:14.

**C.**          **Professor Rosenthal's And Hartman's Causation And Damages Analysis**[241]

107.          Professor Rosenthal quantified the impact of Defendants' misconduct on units of

Neurontin paid for by Kaiser.[242]  Professor Rosenthal concluded, "[i]n my opinion as a healthcare

economist, the percentages [of allegedly unlawful prescriptions] that I have calculated are a fair and

accurate representation of the impact on Kaiser of the alleged misconduct."[243]  Her analysis sufficiently

demonstrates that Defendant's unlawful actions caused Kaiser's injuries.

108.          Professor Rosenthal explained, "the standard practice in these types of analyses is to use

aggregate data and statistical approaches to link patterns in promotional spending to patterns in

prescribing for the drug."[244]  She continued, "the analysis looks at patterns of actual behavior, aggregate

patterns of promotion, and makes the connection between the two, both to assess whether there was

exposure and its impact."[245]  Professor Rosenthal, therefore, "estimate[d] and calculate[d] a time series

model that … quantif[ied] the specific contribution of promotion to sales"[246] and, specifically,

"quantif[ied] the share of prescriptions [for each indication] that were caused by the alleged fraud"[247]

109.          Professor Rosenthal acquired "gold standard" national data on Neurontin and

other AEDs from IMS Health and Verispan.[248]  Professor Rosenthal felt comfortable to a

reasonable degree of certainty in the area of healthcare economics that the promotional spend

data were sufficient for her analysis.[249]  The only reasonable way healthcare economists would

approach Professor Rosenthal's assignment and apply it to Kaiser would be to use national

---

[241] Professor Rosenthal assumed that the allegations set forth in the complaint were true. (3/5 Tr. (Rosenthal) 116:3 – 116:5.)  She did not offer an opinion as to liability. (*Id.* at 116:6 – 116:9.)
[242] 3/5 Tr. (Rosenthal) 104:19 – 104:21.
[243] 3/5 Tr. (Rosenthal) 125:7-125:9.
[244] 3/8 Tr. (Rosenthal) 16:11 – 16:17.
[245] *Id.* 17:4 – 17:9.
[246] 3/5 Tr. (Rosenthal) 144:16 – 144:18
[247] *Id.* 145:17 – 145:19; TC 405-K.
[248] 3/5 Tr. (Rosenthal) 117:7 – 117:23 (quantity of prescriptions); 3/5 Tr. (Rosenthal) 118:12 – 118:18 (price); 3/5 Tr. (Rosenthal) 118:21 – 119:3 (promotional spending); 3/5 Tr. (Rosenthal) 115:13-15 (price and promotional spend for other AEDs; 3/5 Tr. (Rosenthal)  119:9 – 119:20; 120:9 – 121:9. (NDTI data, disgregated by indication) and 3/5 Tr. (Rosenthal) 119:21 – 119:25. (promotional spending for Neurontin disaggregated by prescriber specialty); 3/8 Tr. (Hartman) 135:3-135:6.
[249] 3/5 Tr. (Rosenthal) 138:2 – 140:12.

numbers.[250]  The most reliable to estimate the unlawful prescriptions by indication is to establish the

relationship between promotion and prescriptions at the national level and extrapolate to

Kaiser.[251]  The calculated percentages of unlawful prescriptions are applicable to Kaiser, in part,

because Kaiser's patient population and physician distribution are similar to the national mix.[252]

110.      Dr. Hartman formed an independent opinion that Professor Rosenthal's results were a fair

and accurate depiction of the percentages and numbers of unlawful prescriptions caused by Defendants'

wrongful conduct.[253]  Dr. Hartman took the ratios of allegedly fraudulent prescriptions and "appl[ied] it to

the Kaiser total to come up with numbers that reflect the number of scripts that were induced by the

unlawful promotion at Kaiser," thus determining a quantity of allegedly unlawful prescriptions paid for

by Kaiser.[254]  To determine price, Dr. Hartman took the "Kaiser total dollar amount and total number of

scripts and calculate[d] a weighted average price of a script, an average script of Neurontin."[255]  Dr.

Hartman then multiplied the quantity of allegedly unlawful prescriptions paid for by Kaiser (by quarter)

by the average weighted price per prescription (by quarter) to determine Kaiser's damages.[256]

111.      Dr. Hartman used standard methods in healthcare economics and applied

microeconomics to determine the damages for Kaiser, the very same "standard methods used by the

industry, used by Pfizer to calculate values of different promotional programs, by academics and

academia itself."[257]  Dr. Hartman's results, not including interest or the lost time value of money, are

presented in TX 408-F and total $90,557,356, nominally; $142,551,623, including time vaule of money

or, in the alternative, $141,796,431, including prejudgment interest.[258]

---

[250] 3/8 Tr. (Rosenthal) 26:13 – 26:17.  *See also* 3/8 Tr. (Hartman) 136:12 – 136:19.
[251] 3/8 Tr. (Rosenthal) 26:5 – 26:11.  *See also* 3/8 Tr. (Hartman) 135:12 – 136:2.
[252] 3/8 Tr. (Rosenthal) 50:25 – 51:4; 25:18 – 25:21; 3/8 Tr. (Hartman) 139:6-9.
[253] 3/8 Tr. (Hartman) 141:4-141:15.
[254] *Id.* 145:2-145:13.
[255] *Id.* 146:4-146:7.
[256] *Id.* 146:13 – 146:21.
[257] *Id.* 147:4 – 147:11.
[258] Dr. Hartman testified about interest, including the appropriate interest rate to be applied in this case.  *See* 3/8 Tr. (Hartman); 3/9 Tr. (Hartman).  Tables reflecting interest were displayed and discussed in Court.  At the Court's request, the versions of Exhibits 408-F and 408-I ultimately entered into evidence and submitted to the jury reflected shorter time periods for certain indications than the tables discussed in court by Dr. Hartman and did not reflect

Dated:  April 29, 2010

Respectfully submitted,


By:      */s/ Linda P. Nussbaum*
         Linda P. Nussbaum

KAPLAN FOX & KILSHEIMER LLP
Linda P. Nussbaum, Esq.
850 Third Avenue, 14th Floor
New York, New York 10022

*Attorneys for Plaintiffs Kaiser Foundation
Health Plan, Inc. and Kaiser Foundation
Hospitals*

*Of Counsel*

Thomas Greene
GREENE, LLP
33 Broad Street, 5th Floor
Boston, MA 02109

Barry Himmelstein
LIEFF CABRASER HEIMANN &
  BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339

Thomas M. Sobol
HAGENS BERMAN SOBOL
  SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142

Don Barrett
DON BARRETT, P.A.
P.O. Box 987
404 Court Square North
Lexington, MS 39095

---

interest.  Kaiser therefore attaches as Appendix B charts (based on TX 408-F and 408-I) reflecting 7% simple interest and interest at the prime rate.  Table 1A reflects Kaiser's nominal damages without the time value or money or prejudgment interest.  Table 1B reflects Kaiser's damages including the time value of money (calculated at the prime rate).  Table 1C reflects Kaiser's nominal damages including prejudgment interest (calculated at the 7% statutory rate).  Tables 2A-2C reflect the same information for the alternative "cheaper more optimal drug" damages scenario.  Table 3 reflects interest rates over time.  Kaiser will move the Court to admit these charts into evidence.

31

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to

Case Management Order #3 on March 23, 2010.

/s/ John D. Radice

John D. Radice