UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:   NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No.  1629 Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO: THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA v. PFIZER INC., 04 CV 10739 (PBS) and AETNA, INC. V. PFIZER INC., 04 CV 10958 (PBS) | Judge Patti B. Saris Mag. Judge Leo T. Sorokin |

**PLAINTIFF KAISER'S PROPOSED CONCLUSIONS OF LAW**

## I.  INTRODUCTION

1.      Lawsuits such as the one brought by Kaiser serve to fill an important gap in the regulation of pharmaceuticals.  The FDA prohibits off-label promotion to preserve the integrity of the drug regulatory system that requires marketed usages of a product to be supported by scientific testing.  (2/23 Tr. (Kessler) at 58-59.)  However, physicians are not prohibited from prescribing a drug for an unapproved usage.  (*Id*.)  As Dr. Kessler testified, the FDA has limited tools at its disposal when it is concerned about off-label usage of a particular drug: it can withdraw a drug; issue a warning; or regulate the manufacturer's promotion.  (*Id*. at 71-72.)  The FDA has not issued any press release or statements regarding the off-label usage of gabapentin.  (*Id*. at 72-73.)

2.      Healthcare professionals practicing evidence-based medicine must rely on the integrity of the published literature to determine whether a pharmaceutical is effective.  (2/25 Tr. (Dickersin) 26-27.)  The medical community does not normally have access to a pharmaceutical company's internal research reports or protocols unless a lawsuit such as this one makes those materials available.  (*Id*. 27; 3/5 Tr. (Millares) 96-97.)  Thus, if the published literature is not accurate and transparent, "the doctors can't prescribe good medicine."  (2/25 Tr. (Dickersin) 72-73.)

3.      Discovery conducted over the course of the Neurontin Sales & Marketing Litigation revealed for the first time the extent to which the published medical literature had been tainted by Defendants' fraudulent and unfair practices.  As a result of her review of the material produced, Dr. Kay Dickersin published an article in the New England Journal of Medicine that alerted the wider medical community to the selective outcome reporting and other biases that occurred in the marketing of Neurontin.  (*Id*. 23-24; TX 2091.)

4.      Multiple witnesses from Kaiser testified that but for the discovery taken in this case and the associated work of Dr. Dickersin, even a diligent practitioner of evidence-based medicine such as Kaiser would still be unaware of Neurontin's lack of efficacy for the indications at issue in this suit.  As this Court has previously noted, bringing a case of this scope is an extraordinarily expensive undertaking

that most individuals and smaller third-party payors simply could not do. (Dkt. No. 1780 at 50.) Kaiser

took this case to trial in hopes that "the entire United States can know what happened because this is the

only way that the information is going to get out." (3/5 Tr. (Millares) 97:24-98:14.) For all these reasons,

Kaiser's successful litigation of this action furthered the public interest.

## II.     DEFENDANTS COMMITTED UNLAWFUL, UNFAIR, AND FRAUDULENT BUSINESS ACTS AND PRACTICES IN VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW.

### A.     California Law Applies To The Entirety Of Kaiser's Claims.

5.      Kaiser's action was filed in this District. (*See* Dkt. No. 29.) Accordingly, the Court

applies Massachusetts choice of law rules in order to determine which state's law should govern Kaiser's

state law claims. *See Auto Europe, LLC v. Conn. Indem. Co.*, 321 F. 3d 60, 64 (1st Cir. 2003) ("[a]

federal court sitting in diversity jurisdiction must employ the choice-of-law principles of the forum state")

(*citing Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 491 (1941)); *In re Gen. Am. Life Ins. Co.*

*Sales Practices Litig.*, 391 F. 3d 907, 911 (8th Cir. 2004) ("When considering issues of state law, . . . the

[MDL] transferee court must apply the state law that would have applied had the cases not been

transferred for consolidation.").

6.      In cases alleging statutory consumer fraud, "a Massachusetts court would apply a test not

materially different from that of the Restatement (Second) of Conflict of Laws § 148[(2)] in determining

the law applicable." *Computer Sys. Eng'g, Inc. v. Qantel Corp.*, 740 F. 2d 59, 70 (1st Cir. 1984). Under

§ 148(2), "the place where the plaintiff acted in reliance upon the defendant's representations," and "the

place where the plaintiff received the representations," are the most important factors. *In re Pharm.*

*Indus. Avg. Wholesale Price Litig.*, 230 F.R.D. 61, 82-83 (D. Mass. 2005).

7.      Pfizer argues that California law should apply only to Kaiser's claims based on purchases

made on behalf of its members in California. However, applying the § 148(2) factors here, California law

properly applies to the entirety of Kaiser's claims. Over 75% of Kaiser's members are located in

California, with no more than 6% of its members located in any other single state. Consistent with this

metric, in addition to targeting their fraud at physicians in general, including physicians at Premanente

Medical Groups, Defendants *specifically* targeted their fraud at Kaiser's Drug Information Service

("DIS"), located in California, which in turn greatly influenced the formulary decisions and educational

efforts in all Kaiser regions. Because the misrepresentations and nondisclosures at the heart of this case

were received and acted upon by Kaiser in California, spreading their influence throughout the Kaiser

system, California law may properly be applied to the entirety of Kaiser's claims, including those for

Neurontin purchased for members in other states.

**B.** **The Scope Of The UCL.**

8.      California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*. (the

"UCL"), proscribes "any unlawful, unfair or fraudulent business act or practice," and empowers "any

court of competent jurisdiction" to "make such orders or judgments . . . as may be necessary to restore to

any person in interest any money or property, real or personal, which may have been acquired by means

of such unfair competition." Cal. Bus. & Prof. Code §§ 17200, 17203. The UCL covers "single acts of

misconduct." *Klein v. Earth Elements, Inc*. (1997) 59 Cal. App. 4th 965, 969, 69 Cal. Rptr. 2d 623, 625,

n.3 (1997); *see also Podolsky v. First Healthcare Corp.*, 50 Cal. App. 4th 632, 653–54, 58 Cal. Rptr. 2d

89, 102 (1996). A business "practice" can violate § 17200 even though it does not affect more than a

single "victim." *Allied Grape Growers v. Bronco Wine Co.*, 203 Cal. App. 3d 432, 453, 249 Cal. Rptr.

872, 884 (1988).

9.      "'The scope of the UCL is quite broad. Because the statute is framed in the disjunctive, a

business practice need only meet one of the three criteria to be considered unfair competition.'" *Morgan

v. AT&T Wireless Servs., Inc.*, 177 Cal. App. 4th 1235, 1253, 99 Cal. Rptr. 3d 768, 783 (2009) (quoting

*McKell v. Washington Mut., Inc.*, 142 Cal. App. 4th 1457, 1471, 49 Cal. Rptr. 3d 227 (2006)). As one

court recently summarized:

> The definitions of unlawful and fraudulent business practices are
> straightforward and well established. An unlawful business practice
> under the UCL is anything that can properly be called a business practice
> and that at the same time is forbidden by law. A fraudulent business
> practice is one in which members of the public are likely to be deceived.

The definition of an unfair business practice in the context of a consumer action is less settled.

*Morgan*, 99 Cal. Rptr. 3d at 784 (citations and internal quotations omitted).

10.     In this case, Kaiser has alleged claims under all three prongs of the UCL.  Each is addressed in turn below.

### C.     Kaiser Is A Proper Plaintiff Under The UCL.

11.     The UCL provides that "[a]ctions for relief pursuant to this chapter" may be brought by "*any person* who has suffered injury in fact and has lost money or property as a result of such unfair competition."  Cal. Bus. & Prof. Code § 17204 (emphasis added).  The UCL defines "person" to "mean and include natural persons, corporations, firms, partnerships, joint stock companies, associations and other organizations of persons."  Cal. Bus. & Prof. Code § 17201.  California's Proposition 64, which limited standing in UCL actions to injured persons, expressly reaffirmed that the UCL is "intended to protect California *businesses* and consumers from unlawful, unfair, and fraudulent business practices."  Prop. 64, § 1(a) (emphasis added).  Accordingly, Kaiser is a proper plaintiff under the UCL.  *See In re Webkinz Antitrust Litig.*, No. 08-1987, --- F. Supp. 2d ---, 2010 WL 597990, at *7 (N.D. Cal. Feb. 17, 2010) ("The relative size of the plaintiff companies . . . is secondary to the analysis of whether, as a result of the alleged unfair or fraudulent business practice, consumers are adversely affected.  The California UCL grants standing to companies of varying size, to defend the rights of the general consuming public against unfair and fraudulent business practices.").

### D.     Defendants' Off-Label Promotion Of Neurontin Constitutes "Unlawful Business Acts Or Practices" Under The UCL.

#### 1.     The UCL Reaches Violations Of Federal Statutes, Like The FDCA, As To Which There Is No Private Right of Action.

12.     The UCL is unique among state consumer protection statutes in that it proscribes business acts or practices that violate *any* other law.  In effect, the "unlawful" prong of § 17200 makes a violation of the underlying law a *per se* violation of the UCL.  *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 950, 119 Cal. Rptr. 2d 296, 304 (2002); *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Telephone Co.*, 20

Cal. 4th 163, 180, 83 Cal. Rptr. 2d 548, 561 (1999); *Farmers Ins. Exch. v. Sup. Ct.*, 2 Cal. 4th 377, 383, 6

Cal. Rptr. 2d 487, 491 (1992).

13.     Business practices that violate *federal* statutes and regulations are actionable as unlawful

business practices under the UCL.  *See, e.g., Roskind v. Morgan Stanley Dean Witter & Co.*, 80 Cal. App.

4th 345, 95 Cal. Rptr. 2d 258 (2000) (mail fraud statute); *Citizens for a Better Env't v. Union Oil of Cal.*,

996 F. Supp. 934, 938 (N.D. Cal. 1997) (Clean Water Act); *Chern v. Bank of Am.*, 15 Cal. 3d 866, 127

Cal. Rptr. 110 (1976) (Truth in Lending Act); *Cisneros v. U.D. Registry, Inc.*, 39 Cal. App. 4th 548, 562,

46 Cal. Rptr. 2d 233, 243 (1995) (Fair Credit Reporting Act); *Renick v. Dun & Bradstreet Receivable*

*Mgmt. Serv.*, 290 F.3d 1055, 1057-1058 (9th Cir. 2002) (Fair Debt Collection Practices Act); *Southwest*

*Marine Inc. v. Triple A Mach. Shop Inc.*, 720 F. Supp. 805, 807-08 (N.D. Cal. 1989) (Navy procurement

regulations).

14.     A RICO violation may serve as a predicate act for a violation of the "unlawful" prong of

the UCL. *See Schwartz* v. *Upper Deck Co.,* 967 F. Supp. 405, 416 (S.D. Cal. 1997) (holding that plaintiffs

stated a claim under the unlawful prong of the UCL because they adequately alleged that Defendants

conduct violated RICO), *vacated on other grounds by,* 104 F. Supp. 2d 1228 (S.D. Cal. 2000).

15.     The federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301, *et seq.* ("FDCA") may serve

as a predicate act for a violation of the "unlawful" prong of the UCL.  It is immaterial that the FDCA does

not provide a private right of action:

> the California Supreme Court has interpreted California unfair
> competition law such that a private plaintiff may bring [a UCL] action
> even when the conduct alleged to  constitute unfair competition violates
> a statute for the direct enforcement of which there is no private right of
> action.

*Optivus Tech., Inc.* v. *Ion Beam Applications S.A.,* 469 F.3d 978, 986 (2006) (internal citations omitted).

The UCL reaches unlawful business acts or practices, even where the underlying statute provides no

private right of action.  *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 17 Cal. 4th 553, 561–567, 71 Cal.

Rptr. 2d 731, 735–740 (1998); *Calif. Med. Assn. v. Aetna U.S. Healthcare of Cal., Inc.*, 94 Cal. App. 4th

151, 169, 114 Cal. Rptr. 2d 109, 123 (2001); *Chabner v. United of Omaha Life Ins. Co.*, 225 F.3d 1042,

1048 (9th Cir. 2000); *Matoff v. Brinker Rest. Corp.*, 439 F. Supp. 2d 1035, 1038 (C.D. Cal. 2006). A

"violation of FDA regulations falls squarely within [the] broad proscription" of the UCL. *Watson*

*Laboratories, Inc.* v. *Rhone-Poulenc Rorer, Inc.,* 178 F. Supp. 2d 1099, 1120 (C.D. Cal. 2001). In

*Children's Television*, the California Supreme Court expressly approved the maintenance of a UCL claim

based on alleged violations of California's Food Drug and Cosmetic Law, notwithstanding the absence of

a private right of action, which the Court presumed, based on the fact that "[f]ederal courts have

refused . . . to permit a private right of action under the federal Food, Drug and Cosmetic Act, the

analogous federal statute." 35 Cal. 3d at 211 n.9. In a subsequent decision, the California Supreme Court

expressly held that an unlawful business practices claim may be maintained under the UCL even where

the underlying *federal* statute, by its terms, may only be enforced by government regulators. *See*

*Washington Mut. Bank, FA v. Superior Court*, 75 Cal. App. 4th 773, 783, 89 Cal. Rptr. 2d 565-66 (1999)

(permitting action under UCL for violation of RESPA disclosure requirements only enforceable by

"federal, state and local agencies that have supervisory powers over lenders and other persons covered by

RESPA"). *See also Watson Labs*., 178 F. Supp. 2d at 1120 ("Centeon's violation of FDA regulations

falls squarely within" the UCL's "broad proscription" of unlawful business practices).

16.     The specter of preemption does not bar Kaiser from relying on FDCA violations as

predicate acts. In *In re Epogen and Aranesp Off-Label Marketing & Sales Pracs. Litig.*, the district court,

focused on the RICO claim, dismissed plaintiffs' claims because they failed to prove the alleged fraud.

No. MDL 08-1934, 2009 WL 1703285, at *7 (C.D. Cal. Jun. 17, 2009). The district court expressly

stated that dismissal of plaintiffs' claims did not turn on preemption:

> Plaintiffs also argue that "their claims for violations of FDA regulations
> are not preempted by section 337, and this Court should reverse its
> decision to the contrary." Plaintiffs misunderstand the law and the
> Court's previous order. The Court never held that Plaintiffs' claims were
> preempted by the FDCA. Rather, it found that Plaintiffs could not
> predicate RICO and state consumer fraud claims on what are, in essence,
> misbranding claims, absent allegations that Amgen made false and
> deceptive statements. This is because off-label promotion is not
> inherently fraudulent; truthful off-label promotion of drugs does not
> violate RICO or state consumer protection laws. Rather, it violates the
> FDCA. But the law is very clear in that only the federal government, and

> not a private plaintiff, may enforce the FDCA. In other words, the Court
> dismissed Plaintiff's previous pleading because it failed to state a
> cognizable fraud claim--not because it stated a fraud claim that was
> preempted by the FDCA.

*Id.* at *7. Nowhere in *Epogen* or its predecessor decision does the court even identify, much less discuss, a claim for "unlawful" business practices under the UCL, or the unique features of that claim, which "borrows" violations of other statutes..

17.     Here, as further outlined below, Kaiser asserts that the Defendants' guilty plea to a violation of the FDCA's prescription against off-label promotion constitutes a predicate act that is unlawful per the UCL.  Because Defendants' pleaded guilty to the violation, there is no open question as to whether their conduct violated FDA regulations.  Kaiser's allegation is therefore distinct from those raised in *Summit Tech., Inc.* v. *High-Line Med. Instruments Co., Inc.,* 922 F. Supp. 299 (C.D. Cal. 1996) and *Photomedex, Inc.* v. *RA Med Sys., Inc.,* No. No. 04CV24, 2007 WL 3203039, at *4 (S.D. Cal. Oct. 29, 2007).  In *Summit Tech.*, the plaintiff asserted a Lanham Act false advertising claim alleging that defendant failed to disclose that the FDA had not approved the product in question.  922 F. Supp. at 305.  The court held that the plaintiff could not use the Lanham Act to act as a vehicle whereby a private plaintiff could usurp the role of the FDA. *Id.*  Similarly, in *Photomedex, Inc.* v. *RA Med Sys., Inc.,* No. No. 04CV24, 2007 WL 3203039, at *4 (S.D. Cal. Oct. 29, 2007), the court dismissed plaintiffs Lanham Act and UCL claims because the claims turned on whether design changes to defendant's medical device required defendants to file additional documents with the FDA to obtain further FDA pre-market clearance.  The court held this determination required application of FDA regulations and the FDA's expertise. *Id.* In contrast to both *Summit* and *Photomedex,* Plaintiffs here are relying on an established FDA regulation that bans marketing for off-label uses – *to which Defendants have pleaded guilty*.   Kaiser may therefore proceed with a claim under the "unlawful" prong premised on Defendants' admitted violation of the FDCA

18.     Accordingly, under California law, violations of the FDCA's prohibition on off-label marketing are actionable as unlawful business acts or practices in violation of the UCL.

## 2. Defendants' Off-Label Promotion Of Neurontin Violated The FDCA.

### a. The FDCA Prohibits Off-Label Promotion.

19.     In this case, Defendants engaged in unlawful business practices by violating provisions of

the FDCA. Specifically, Defendants' off-label marketing efforts violated federal statutes that prohibit

off-label marketing. *See* 21 U.S.C. §§ 360aaa, *et seq*. (pharmaceutical manufacturer may not disseminate

written information on off-label uses unless application to approve use is pending and other conditions are

satisfied), 360aaa-6(a) (sole exception permits "disseminating information in response to an *unsolicited*

request from a health care practitioner") (emphasis added). *See also Washington Legal Found. v.

Friedman*, 13 F. Supp. 2d 51, 58 (D.D.C. 1998) (explaining statute), *appeal dismissed, vacated in part on

other grounds*, 202 F.3d 331 (D.C. Cir. 2000).

### b. Warner-Lambert Pled Guilty To Off-Label Promotion Of Neurontin.

20.     On May 13, 2004, Defendant Warner-Lambert Co. pled guilty to violations of the FDCA,

21 U.S.C. §§ 331(a), 331(d), 333(a), 352(f)(1), and 355(a). As part of its guilty plea, Warner-Lambert

"expressly and unequivocally admits that it committed the crimes charged in the Information. Warner-

Lambert agrees that the facts set forth in the Information are true." The Information and guilty plea have

been admitted as TX 371 and 366, respectively. Accordingly, the facts set forth in the Information are

deemed established. *See Emich Motors Corp. v. Gen. Motors Corp.*, 340 U.S. 558, 569 (1951) (estoppel

extends to questions "'distinctly put in issue and directly determined' in the criminal prosecution")

(citation omitted); *United States v. Wight*, 839 F. 2d 193, 196 (4th Cir. 1987) ("[A] defendant is precluded

from retrying issues necessary to his plea agreement in a later civil suit.").

21.     The Information contains pages of detail concerning Warner-Lambert's off-label

promotion of Neurontin for, *inter alia*, pain and bipolar disorder, two of the conditions at issue in this

case. *See* TX 371 at 4-12. The misconduct, which Warner-Lambert has admitted, closely tracks many of

the off-label promotional activities found by the Court above, and begins in the same time frame, April

1995. *Id.* at 5-14. Accordingly, this misconduct, and other similar misconduct by Defendants, constitutes unlawful business practices under the UCL.

### c.      Warner-Lambert Engaged In Off-Label Promotion Of Neurontin In Violation Of The FDCA.

22.     In addition to the facts admitted in its guilty plea, the facts show a pervasive pattern of off-label promotion of Neurontin, in violation of the FDCA, with respect to each of the indications at issue in this case — bipolar and other mood disorders; neuropathic pain; nociceptive pain; migraine and headache — and dosages over 1800 mg/day.  Accordingly, these business acts and practices also violate the UCL.

### E.      Defendants' Off-Label Promotion Of Neurontin Constitutes "Unfair Business Acts Or Practices" Under The UCL.

23.     Defendants' off-label promotion of Neurontin for each of the indications at issue in this case — bipolar and other mood disorders; neuropathic pain; nociceptive pain; migraine and headache — and dosages over 1800 mg/day constitutes "unfair business acts or practices" within the meaning of the UCL under any of the three tests in recent use by California courts. *See Davis v. Ford Motor Credit Co.*, 179 Cal. App. 4th 581, 594-97, 101 Cal. Rptr. 3d 697 (2009) (noting that "[t]he state of the law on what constitutes an unfair business practice in consumer cases is somewhat unsettled in light of *Cel-Tech*," and setting forth "a split of authority" along three lines) (citations and internal quotations omitted).  As the California Supreme Court has yet to determine which of these tests to apply in consumer cases, *id.*, prudence dictates that this Court apply all three.

### 1.      The "Balancing Test"

Prior to *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 163, 83 Cal. Rptr. 2d 548 (1999), the test for "unfairness" in consumer[1] cases — a test still applied by

---

[1] *Cel-Tech* distinguished between "consumer" and "competitor" cases. *See* 20 Cal. 4th at 187 n.12 ("This case involves an action by a competitor alleging anticompetitive practices.  Our discussion and this test are limited to that context. Nothing we say relates to actions by consumers").  As to one another, Defendants and Kaiser stand in the relation of manufacturer and purchaser, not competitor.  Accordingly, a "consumer" test for unfair business practices must be applied. *Id.*

many California courts — "required the court to engage in a balancing test," examining "the impact of the practice or act on its victim, balanced against the reasons, justifications and motives of the alleged wrongdoer.  In brief, the court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim."  *Davis*, 101 Cal. Rptr. 3d at 706-07.  *See, e.g., Ticconi v. Blue Shield of Calif. Life & Health Ins. Co.*, 160 Cal. App. 4th 528, 539 (Cal. App. 2d Dist. 2008) (applying test); *Octopus Prods., Ltd. v. Panterra Engineered Plastics, Inc.*, 09-CV-3772 (CAS), 2009 WL 4894963, at \*5 (C.D. Cal. Dec. 9, 2009) (same).

24.     Applying this test, the first element, "the impact of the practice or act on its victim," weighs heavily in favor of a finding of unfairness.  Specifically, the impact of the challenged practice on Kaiser, in the first instance, is to waste its insureds' premiums on ineffectual treatments that could have been spent on effective treatments.  The collateral impact on Kaiser's insureds is even worse — instead of being prescribed a medication that is effective in treating their condition, they were prescribed a medication that — according to evidence-based medicine — is *in*effective in treating their conditions.  This, in turn, inevitably imposed additional (albeit unquantifiable) costs on Kaiser, even apart from the cost of Neurontin itself.

25.     The countervailing considerations — "the reasons, justifications, and motives of the alleged wrongdoer" — likewise weigh heavily in favor of a finding of unfairness.  As set forth above, Pfizer engaged in a deliberate scheme to end-run the federal prohibition on off-label marketing, not for the purpose of hastening access to a promising new treatment, but in the pursuit of profits.  It not only ignored these prohibitions, but deliberately distorted the scientific record.

F.     **The *Cel-Tech* Test**

26.     The majority of California courts, finding the *Cel-Tech* test applicable in consumer cases, require "that any finding of unfairness . . . be tethered to some legislatively declared policy."  *Cel-Tech*, 20 Cal. 4th at 186-87.  *See Davis*, 101 Cal. Rptr. 3d at 709 (collecting consumer cases adopting *Cel-Tech* test).  A number of cases further hold that this policy "must be 'tethered' to specific constitutional,

statutory, or regulatory provisions." *Id.* (quoting *Gregory v. Albertson's, Inc.*, 104 Cal. App. 4th 845,

854, 128 Cal. Rptr. 2d 389 (2002)). *Accord Scripps Clinic v. Superior Court*, 108 Cal. App. 4th 917, 940,

134 Cal. Rptr. 2d 101 (2003). That policy and the statutes or regulations implementing it may be state or

federal. *See Cel-Tech*, 20 Cal. 4th at 186-87, 189 (federal antitrust law).

27.     As set forth above, Defendants' off-label promotion of Neurontin violates express federal

statutory and regulatory prohibitions. As Dr. David Kessler, a former head of the FDA, testified at trial,

the purpose of those prohibitions is the protection of the public health. (2/23 Tr. (Kessler) 58-59.)

Accordingly, Defendants' off-label promotion of Neurontin contravenes an important, "legislatively

declared policy," and constitutes "unfair business acts or practices" under the *Cel-Tech* test. *Id.*

G.     **The FTC Act Test**

28.     In a third line of cases, California courts have found that "*Cel-Tech* itself holds the key to

the definition of 'unfair' in consumer cases," in its statement "that we may turn for guidance to the

jurisprudence arising under section 5 of the Federal Trade Commission Act." *Davis*, 101 Cal. Rptr. 3d at

709. These courts have held that "the factors that define unfairness under section 5 are: (1) The

consumer injury must be substantial; (2) the injury must not be outweighed by any countervailing benefits

to consumers or competition; and (3) it must be an injury that consumers themselves could not reasonably

have avoided." *Id.*[2] Each of these factors is satisfied here.

29.     The injury to Kaiser resulting from Defendants' off-label promotion of Neurontin is

substantial. As set forth below, the amount of restitution to which Kaiser is entitled is $142,551,623.

30.     While under some circumstances, consumers and competition might conceivably benefit

from learning about a potential treatment for a condition prior to the FDA finding the drug effective to

treat that condition, there can be no such benefits where, as here, the drug is *in*effective to treat the

condition.

---

[2] An earlier variation the test postulates that "[A]n 'unfair' business practice occurs when it offends an established
public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to
consumers.'" *Cel-Tech Communications, supra*, 20 Cal.4th at 184 (quoting *People v. Casa Blanca Convalescent
Homes, Inc.*, 159 Cal.App.3d 509, 530 (1984)).

31.     Finally, through its DIS and Pharmacy & Therapeutics Committees, Kaiser made an effort to determine whether, based on the information then available to it, Neurontin was an effective treatment for the conditions at issue, and adjust its formulary status accordingly.  Defendants frustrated these efforts by suppressing or concealing negative information, and by "spinning" negative information as positive.  As Defendants were in sole possession of unpublished and undisclosed studies demonstrating Neurontin's inefficacy in treating the conditions at issue, Kaiser could not have reasonably avoided the resulting financial injury.  Accordingly, under the FTC Act test, Defendants' off-label promotional efforts constitute "unfair business acts or practices."

### H.     Defendants' Promotional Activities Constitute "Fraudulent Business Acts Or Practices" Under The UCL.

32.     The Court empanelled an advisory jury to render a verdict on Kaiser's claim for fraudulent business acts or practices under the UCL.  On March 25, 2010, the jury returned a verdict on the claim for Kaiser, answering the special verdict questions "Did Kaiser prove that Pfizer engaged in fraudulent business acts or practices" and "Did those fraudulent business acts or practices cause Kaiser damages" "Yes" with respect to "Bipolar," "Migraine," "Neuropathic pain," and "Neurontin in dosages over 1800 mg," and "No" with respect to "Nociceptive pain."  (*See* Dkt. No. 2760.)

33.     This Court agrees with the jury's advisory verdict with respect to "Bipolar," "Migraine," "Neuropathic pain," and "Neurontin in dosages over 1800 mg."  In addition, the Court finds that Kaiser did prove that Pfizer engaged in fraudulent business acts or practices concerning nociceptive pain, and that those business practices caused Kaiser damages.  The Court will enter judgment accordingly.  As the California Supreme Court recently summarized, "To state a claim under either the UCL or the false advertising law, based on false advertising or promotional practices, it is necessary only to show that members of the public are likely to be deceived."  *In re Tobacco II Cases* ("*Tobacco II*"), 46 Cal. 4th 298, 312 (2009).  Amendments to the UCL have imposed "an actual reliance requirement on plaintiffs prosecuting a private enforcement action under the UCL's fraud prong."  *Id*. at 326.  However,

This conclusion . . . is the beginning, not the end, of the analysis of what a plaintiff must plead and prove under the fraud prong of the UCL. . . . Reliance is proved by showing that the defendant's misrepresentation or nondisclosure was an immediate cause of the plaintiff's injury-producing conduct. A plaintiff may establish that the defendant's misrepresentation is an 'immediate cause' of the plaintiff's conduct by showing that in its absence the plaintiff in all reasonable probability would not have engaged in the injury-producing conduct.

While a plaintiff must show that the misrepresentation was an immediate cause of the injury-producing conduct, the plaintiff need not demonstrate it was the only cause. It is not necessary that the plaintiff's reliance upon the truth of the fraudulent misrepresentation be the sole or even the predominant or decisive factor influencing his conduct. It is enough that the representation has played a substantial part, and so had been a substantial factor, in influencing his decision. Moreover, a presumption, or at least an inference, of reliance arises wherever there is a showing that a misrepresentation was material. A misrepresentation is judged to be 'material' if 'a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question. . . .

Nor does a plaintiff need to demonstrate individualized reliance on specific misrepresentations to satisfy the reliance requirement. . . .

[W]hile a plaintiff must allege that the defendant's misrepresentations were an immediate cause of the injury-causing conduct, the plaintiff is not required to allege that those misrepresentations were the sole or even the decisive cause of the injury-producing conduct. Furthermore, where . . . a plaintiff alleges exposure to a long-term advertising campaign, the plaintiff is not required to plead with an unrealistic degree of specificity that the plaintiff relied on particular advertisements or statements. Finally, an allegation of reliance is not defeated merely because there was alternative information available to the consumer-plaintiff, even regarding an issue as prominent as whether cigarette smoking causes cancer. Accordingly, we conclude that a plaintiff . . . is not required to necessarily plead and prove individualized reliance on specific misrepresentations or false statements where, as here, those misrepresentations and false statements were part of an extensive and long-term advertising campaign.

*Tobacco II*, 46 Cal. 4th at 326-28 (citations and internal quotations omitted).

34.     Applying these principles here, and as the jury has already found, Defendants committed "fraudulent business acts and practices" within the meaning of the UCL. Specifically, as set forth in the accompanying Findings of Fact, with respect to bipolar and other mood disorders, neuropathic pain, nociceptive pain, migraine and headache, and dosages over 1800 mg/day, Defendants suppressed negative

information concerning Neurontin's efficacy, rendering Defendants' positive statements about Neurontin's efficacy in treating these conditions misleading. In each case, the omitted or suppressed information concerned negative DBRCTs, the "gold standard" of scientific evidence. This information would have been highly material to a physician deciding whether to prescribe Neurontin or another drug to treat the corresponding condition. Accordingly, Kaiser is entitled to a presumption of reliance.

35.    In addition to a presumption of reliance, Kaiser has demonstrated actual reliance. The head of Kaiser's DIS, Mirta Millares, testified that DIS would not have recommended removing the formulary restrictions on Neurontin, which Kaiser originally only allowed neurologists to prescribe, had Defendants provided Kaiser with truthful and accurate scientific information.

36.    In sum, Kaiser has shown, with respect to bipolar and other mood disorders, neuropathic pain, nociceptive pain, migraine and headache, and dosages over 1800 mg/day, that the information made available to it by Defendants was likely to deceive a reasonable person, and Kaiser has shown both presumed and actual reliance on that information. Accordingly, Defendants' promotional activities constitute "fraudulent business acts or practices" under the UCL.

## III.    KAISER IS ENTITLED TO RESTITUTION ON ITS UCL CLAIMS.

37.    As set forth above, the UCL empowers courts to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition." Cal. Bus. & Prof. Code §§ 17200, 17203. Under the UCL, Kaiser can recover amounts it paid for Neurontin as a result of Defendants' wrongdoing even if Kaiser purchased the drug through a wholesaler or other intermediary instead of directly from Defendants. *Shersher v. Superior Ct.*, 154 Cal. App. 4th 1491, 65 Cal. Rptr. 3d 634 (2007). As one California court explained:

> An order for restitution is one compelling a UCL defendant to return money obtained through an unfair business practice to those persons in interest from whom the property was taken, that is, to persons who had an ownership interest in the property or those claiming through that person. Restitution is broad enough, however, to allow a plaintiff to recover money or property in which he or she was a vested interest. The goal of restitution is to restore the *status quo ante* as nearly as possible.

*Tomlinson v. Indymac Bank, F.S.B.*, 359 F. Supp. 2d 891, 893-94 (N.D. Cal. 2005) (citation and internal quotations omitted).  Here, the status quo ante is prior to the payments made by Kaiser as a result of Defendants' unfair and fraudulent business practices.  An order of restitution is necessary to return those payments to Kaiser.

38.     In determining the appropriate amount of restitution, the principle difference between Kaiser's "unlawful" business practices claim and its "unfair" and "fraudulent" business practices claim is that with respect to the "unfair" and "fraudulent" claims, Kaiser may recover any amounts it expended for Neurontin as a result of Defendants' *fraudulent* off-label promotional efforts, whereas with respect to the "unlawful" claim, Kaiser may recover any amounts expended as a result of Defendants' *off-label promotional efforts, all of which were unlawful*, regardless of whether they were also fraudulent.  The ability of *any* plaintiff to distinguish between the two has been at the heart of this litigation since the Court issued its first decision denying class certification in August 2007.  *See* Dkt. No. 831 at 49-63 (discussing Dr. Rosenthal's methodology for calculating the percentage of Neurontin sales for each indication attributable to Defendants' off-label promotional efforts).  The issue was revisited by the Court in ruling on Defendants' motion for summary judgment as against Kaiser and the other individual (*i.e.*, non-class) third party payor plaintiffs.  *See* Dkt. No. 2309, at 22-27.  After even further briefing, in denying Defendants' Daubert motion to exclude the testimony, the Court made a "find[ing] that Dr. Rosenthal is qualified to render an opinion on the fact of harm, and her methodology is reliable."  Dkt. No. 2520 at 2.

39.     The Court confirms its prior finding that Dr. Rosenthal's estimates of the percentage of Neurontin prescriptions for the indications at issue caused by Defendants' fraudulent off-label marketing efforts constitute reasonably sufficient proof of damages.  Because Dr. Rosenthal only calculates fraudulent prescriptions, and because fraudulent prescriptions are a subset of unlawful prescriptions, the restitution calculated by Dr. Hartman, which are merely the application of Dr. Rosenthal's percentages to

Kaiser's Neurontin purchases, represent a conservative estimate of Kaiser's actual damages, and constitutes more than sufficient proof to support such a restitutionary award.

40.     A recent decision – issued during the trial – further clarifies the relaxed standard of proof applicable to determining the appropriate amount of restitution for violations of the UCL.  In *McAdams v. Monier, Inc.*, 182 Cal. App. 4th 174, 105 Cal. Rptr. 3d 704 (Feb. 24, 2010), the court distinguished between the more stringent requirements for standing imposed by Proposition 64, which amended the UCL to provide that any "person may pursue representative claims or relief on behalf of others only if the claimant meets the standing requirements to Section 17204," *id*. at 188, which, in turn, was amended to require that such actions be brought, as to private parties, by "a person who has suffered injury in fact and has lost money or property as a result of the unfair competition." *Id*. at 189.  While these standing requirements also apply to non-representative UCL actions, *McAdams* further distinguished between these requirements, which were "designed to counter [the] abuse of the UCL" by "some unethical private lawyers who brought 'frivolous [UCL] lawsuits against small businesses even though [the lawyers had] no client or evidence that anyone had been damaged or misled.'" 182 Cal. App. 4th at 188 (quoting Voter Information Guide, Gen. Elec. (Nov. 2, 2004) argument in favor of Prop. 64, p. 40).

> [T]he language of section 17203 with respect to those entitled to [UCL] restitution—"to restore to any person in interest any money or property, real or personal, which may have been acquired" . . . by means of the unfair practice – is patently less stringent than the standing requirement for the [UCL] class representative – "a person who has suffered injury in fact and has lost money or property as a result of the unfair competition." (§ 17204.) This language, construed in light of the "concern that wrongdoers not retain the benefits of their misconduct" (*Fletcher v. Security Pacific National Bank* [(1979)] 23 Cal.3d 442, 452 [153 Cal.Rptr. 28, 591 P.2d 51]) [and in light of the limited nature of relief under the UCL – injunction and restitution, not damages] has led courts repeatedly and consistently to hold that relief [including restitution] under the UCL is available without individualized proof of deception, reliance and injury.

182 Cal. App. 4th at 189.  *McAdams* applied this distinction to hold that absent class members could recover restitution without individualized proof of deception.  Kaiser can utilize the same analysis here. Kaiser has sustained some amount of losses, satisfying the standing requirement, and Kaiser is entitled to restitution of all amounts that may have been lost "as a result of" Defendants' violations of the UCL. *Id*. at 189 (quoting *Tobacco II*, 46 Cal. 4th at 320, 93 Cal. Rptr. 3d at 559).  Dr. Hartman's calculations of

Kaiser's losses, based on the application of Dr. Rosenthal's analysis to Kaiser's net purchases of Neurontin satisfies this "patently less stringent" standard, and the Court awards Kaiser restitution on its "unlawful" business practices claim, as to each indication, in the following amounts: $24,032,366 for bipolar; $1,368,963 for migraine; $43,869,767 for neuropathic pain; $17,242,536 for nociceptive pain; and $4,043,722 for dose. These amounts sum to $90,557,356. Including the time value of money to Kaiser (calculated at the prime rate) "to restore to [Kaiser] any money or property, real or personal, which may have been acquired" by means of the unfair practice, these amounts are $38,705,757 for bipolar; $2,133,406 for migraine; $68,726,858 for neuropathic pain; $26,486,602 for nociceptive pain; and $6,499,000 for dose. (*See* Findings of Fact, Appendix B, Table 1B (Dr. Hartman's calculations of restitutionary amounts claimed by Kaiser including interest at the price rate).) These amounts sum to $142,551,623; Kaiser is awarded this amount.

41.    During the time that, because of Defendants' wrongdoing, Kaiser paid for Neurontin when it otherwise would not have, and until the time that Kaiser will be reimbursed, Kaiser has lost the ability to use that money wrongfully paid. The lost time value of money therefore is a necessary component of the restitution Defendants owe Kaiser. For example, if Kaiser paid $100 for Neurontin in 1996, it has been additionally injured by not having access to that $100 for 14 years *even Kaiser were reimbursed $100 today*. Kaiser cannot be made whole without being compensated for the loss of access to its money that Defendants' wrongfully received.

42.    The Court finds that Kaiser should be awarded total restitution of $142,551,623.

## IV.    IN THE ALTERNATIVE, KAISER IS ENTITLED TO PREJUDGMENT INTEREST ON ITS RESTITUTIONARY AMOUNT.

43.    As indicated in the prior paragraphs, Kaiser is entitled to the time value of the money that it lost because of Defendants' scheme. In the alternative, if this Court decides to instead grant prejudgment interest, that rate, as discussed below, is statutorily set at 7%.

44.    As the First Circuit recently observed:

> It is well established that prejudgment interest is a substantive remedy governed by state law when state-law claims are brought in federal court, while post-judgment interest, even on state-law claims, is governed by federal law. . . .
>
> [A] successful plaintiff's right to a particular remedy under federal law does not trump his right to a more advantageous remedy under state law. . . . We have specifically applied that principle to the award of prejudgment interest in cases involving "wholly symmetrical" claims, holding that a plaintiff in such a case has the option to invoke either "federal or state law, whichever affords her the better interest rate."

*Tobin v. Liberty Mut. Ins. Co.*, 553 F.3d 121, 146 (1st Cir. 2009) (quoting *Conetta v. Nat'l Hair Care Ctrs., Inc.*, 236 F.3d 67, 78 (1st Cir. 2001).

45.     In pertinent part, California Civil Code § 3287(a) provides that "[e]very person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day[.]"[3]  Pursuant to this section, in an action under the UCL, prejudgment interest is a recoverable component of restitution. *Ballard v. Equifax Check Servs.*, 158 F. Supp. 2d 1163, 1176-77 (E.D. Cal. 2001); *Irwin v. Mascott*, 112 F. Supp. 2d 937, 956 (N.D. Cal. 2000).

46.     Prejudgment interest is calculated from the point of injury.  *Id.*  On a UCL claim, the applicable rate of interest is "7 percent per annum."  *See* Cal. Const., Art. XV § 1 ("In the absence of the setting of such rate by the Legislature, the rate of interest on any judgment rendered in any court of the state shall be 7 percent per annum."); *Pro Value Properties, Inc. v. Quality Loan Service Corp.*, 170 Cal. App. 4th 579, 582 (2009) ("the California Constitution provides for prejudgment interest at seven percent per annum").

47.     Accordingly, Kaiser is entitled to prejudgment interest at the rate of 7% per annum on the amounts awarded as restitution on its UCL claims.  Including 7% interest, Kaiser is entitled to restitution of $38,195,311 for bipolar; $2,131,494 for migraine; $68,499,958 for neuropathic pain; $26,571,979 for

---

[3] *See also Bullis v. Security Pac. Nat'l Bank*, 21 Cal. 3d 801, 815 (Cal. 1978) (breach of common law duty led to award of prejudgment interest under section 3288 calculated from the date of each instance of breach).

nociceptive pain; and $6,397,689 for dose.  (*See* Findings of Fact, Appendix B, Table 1C (Dr. Hartman's calculations of restitutionary amounts claimed by Kaiser including interest at the 7% rate).)  These amounts sum to $141,796,431; Kaiser is awarded this amount.

Dated:  April 29, 2010

Respectfully submitted,

By:      */s/ Linda P. Nussbaum*
          Linda P. Nussbaum

KAPLAN FOX & KILSHEIMER LLP
Linda P. Nussbaum, Esq.
850 Third Avenue, 14th Floor
New York, New York 10022

*Attorneys for Plaintiffs Kaiser Foundation
Health Plan, Inc. and Kaiser Foundation
Hospitals*

*Of Counsel*

Thomas Greene
GREENE, LLP
33 Broad Street, 5th Floor
Boston, MA 02109

Barry Himmelstein
LIEFF CABRASER HEIMANN &
  BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339

Thomas M. Sobol
HAGENS BERMAN SOBOL
  SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142

Don Barrett
DON BARRETT, P.A.
P.O. Box 987
404 Court Square North
Lexington, MS 39095

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served

pursuant to Case Management Order #3 on March 23, 2010.

*/s/ John D. Radice*

John D. Radice