## EXHIBIT A:  PROPOSED FINDINGS OF FACT

The Court hereby makes the following findings of fact regarding Plaintiffs' claim under the California Unfair Competition Law, Cal. Bus. & Profs. Code §§ 17200 *et seq.*

## I.      Kaiser Health Plan and the Regional Permanent Medical Group P&T Committees

1.      Kaiser Foundation Health Plan, Inc. ("Kaiser Health Plan") seeks to recover in this lawsuit on behalf of itself and six non-party subsidiaries:  Kaiser Foundation Health Plan of Colorado; Kaiser Foundation Health Plan of Georgia, Inc.; Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc.; Kaiser Foundation Health Plan of the Northwest; and Kaiser Foundation Health Plan of Ohio.  Each of these different Kaiser entities is a separate corporation, incorporated under the laws of its own state, and operates in different regions of the country. (Zatkin Decl. [2724-1] ¶ 1.)  The parent corporation, Kaiser Health Plan, is the only one of these Kaiser entities named as a plaintiff in the complaint.  (3d Am. Compl. [583] ¶ 7.)

2.      Kaiser Health Plan and its subsidiaries enroll their members in individual and group health care plans and arrange for hospital and medical services for their members through separate contracts with eight regional Permanent Medical Groups ("PMG"):  Northern California, Southern California, Northwest, Ohio, Georgia, Colorado, Mid-Atlantic States, and Hawaii.  (Zatkin Decl. [2724-1] ¶ 2; 3/2 Tr. (Carrejo) at 149:3-152:16.)  The PMGs are separate entities and function independently from Kaiser Health Plan and its subsidiaries.  (3/3 Tr. (Hyatt) at 127:18-128:5.)  For example, the Southern California PMG is a separate partnership with its own Board of Directors and its own contract with Kaiser Health Plan.  (*Id.*; *see also* 3/9 Tr. (Daniel) at 111:8-11.)

3.      Each of the eight PMGs has its own commercial formulary independently established by the P&T Committee of that particular regional PMG.  (2/26 Tr. (Carrejo) at 112:13-16; 3/2 Tr. (Carrejo) at 149:3-152:16.) P&T Committees have a wide variety of options in making formulary decisions, including non-approval, approving a drug for general use, approval with restrictions, approval with guidelines, and approval with both restrictions and

guidelines.  (3/4 Tr. (Hyatt) at 9:4-9.)

4.  Kaiser Foundation Hospitals ("Kaiser Hospitals") – the only other plaintiff herein – owns and operates hospitals in California and other states.  (Zatkin Decl. [2724-1] ¶ 4.)  Kaiser Hospitals did not pay for any of the prescriptions at issue in this litigation.  (Plaintiffs' Bench Mem. Clarifying the Relationship Between the Kaiser Plaintiffs [2724] at 3.)

5.  Drug Information Services ("DIS") is a division of Kaiser Hospitals – not Kaiser Health Plan.  DIS monitors literature about pharmaceutical products, prepares drug monographs, and makes formulary and guideline recommendations to the PMG P&T Committees.  (3/4 Tr. (Millares) at 42:24-45:14.)

6.  As of the date this case was tried, Kaiser continued to recommend Neurontin on its website for the treatment of neuropathic pain.  (*See infra* ¶ 54.)

## II.  Pfizer And Neurontin

7.  Parke-Davis was an operating division of Warner-Lambert Company ("Warner-Lambert") which was acquired by Pfizer in 2000.  Pfizer Inc is the sole owner of Warner-Lambert Company LLC, which is a Delaware limited liability company and the successor to Warner-Lambert Company.  (Pre-Trial Memorandum [2500-1], § II ¶ 1.)

8.  Warner-Lambert and Pfizer manufactured and distributed the prescription drug Neurontin, also known as gabapentin, its generic chemical name.  (*Id.* ¶ 2.)

9.  On December 30, 1993, Warner-Lambert received FDA approval to market Neurontin for the adjunctive treatment of partial seizures in adults with epilepsy.  (PX 9.)

10.  In May 2002, the FDA approved Neurontin for the treatment of post-herpetic neuralgia ("PHN"), a type of neuropathic pain associated with shingles, in adults.  (PX 195.)

11.  The FDA recognizes that drugs can be effective in some patients even where evidence sufficient for FDA approval does not exist, and permits physicians to prescribe drugs off-label.  (2/23 Tr. (Kessler) at 28:3-16, 67:3-11; 21 U.S.C. § 396.)

12.  In fact, prescribing off-label is often the standard of care, especially for certain indications, such as neuropathic pain, for which there are few, if any, FDA approved medications.

2

(2/24 Tr. (Abramson) at 72:18-21; 3/16 Tr. (Brenner) at 35:16-19; *see also* 3/19 Tr. (Slaby) at 92:20-21.)

13.    The FDA recognizes the need for health care professionals to have access to scientific information regarding the off-label uses of drugs.  As a result, the FDA has created various safe harbors over the years, permitting manufacturers to distribute such information.  For example, drug manufacturers may sponsor and submit original research to scientific peer-reviewed journals; respond to unsolicited requests from health care professionals, and provide financial, logistical, and technical support for independent scientific or educational activity where off-labeled uses of a drug are discussed, so long as the activity is controlled in content and format by the program provider and characterized by balance, objectivity, scientific rigor, and appropriate disclosure of financial support or conflicts of interests.[1]

## III.    PMG Formulary Decisions Were Not Caused By Any Of The Alleged Wrongful Conduct Attributed To Defendants

### A.    1994-1997:  Initial Formulary Placement By PMGs Was Unrelated To Any Alleged Conduct By Defendants

14.    The Southern California PMG added Neurontin to its formulary in 1994, but restricted Neurontin prescribing to neurologists.  (DX 528; 3/5 Tr. (Millares) at 12:8-17.)

15.    The Northern California PMG added Neurontin to its formulary in 1994 without restriction.  (3/5 Tr. (Millares) at 12:2-4.)

16.    The Northwest PMG added Neurontin to its formulary in April 1994 without restriction.  (DX 840, Villaluz Aff. ¶ 18.)

17.    The Ohio PMG added Neurontin to its formulary in June 1994, but restricted Neurontin prescribing to neurologists or other doctors who had consulted with a neurologist who recommended the drug.  (DX 840, Villaluz Aff. ¶¶ 26-27.)

---

[1] See Citizen Petition Regarding the Food and Drug Administration's Policy on Promotion of Unapproved Uses of Approved Drugs and Devices; Notice; Request for Comments, 59 Fed. Reg. 59820-01, at 59823, 1994 WL 645925 (Nov. 18, 1994); Final Guidance on Industry-Supported Scientific and Educational Activities, 62 Fed. Reg. 64074, 64084-85 (Dec. 3, 1997); Guidance for Industry-Supported Scientific and Educational Activities, 62 Fed. Reg. 64093 (Dec. 3, 1997).

18.    The Colorado PMG added Neurontin to its formulary by 1995 without restriction. (DX 840, Villaluz Aff. ¶ 4.)

19.    The Georgia PMG added Neurontin to its formulary in December 1996 without restriction.  (DX 840, Villaluz Aff. ¶ 8.)[2]

20.    No evidence was presented that the initial decisions of these various PMGs to place Neurontin on formulary, with or without restriction, was based upon communication with the Defendants or otherwise linked to the conduct alleged in this action.

21.    In 1997, the Southern California Chiefs of Anesthesiology requested that the restriction for gabapentin be expanded to include Anesthesiology for the treatment of Reflex Sympathetic Dystrophy (RSD).  DIS agreed with the recommendation, even though double blind, randomized, controlled trials ("DBRCT") could not be found in the literature.  The only evidence cited by DIS to support formulary expansion in the Southern California region were two letters to the editor from Dr. Mellick reporting on efficacy in 14 refractory RSD patients.  (DX 528; 3/3 Tr. (Carrejo) at 23:8-26:8; 3/4 Tr. (Millares) at 111:2-117:22.)  Plaintiffs do not claim that Dr. Mellick misrepresented the results of these case reports in any way.  (3/4 Tr. (Millares) at 115:25-116:19.)

### B.    1998-1999:  The Southern California PMG Removes Restriction And Adopts Guidelines For Neurontin Notwithstanding Knowledge of Negative Gorson Study And Potential Unblinding Of Backonja Study

22.    The Backonja study (945-210) on the use of Neurontin to treat diabetic neuropathy ("DPN"), a form of neuropathic pain, was published in JAMA in December 1998.  (DX 1250.) The possibility that the study was inadvertently unblinded was expressly noted in the published article.  (*Id.*; 2/24 Tr. (Abramson) at 129:17-130:17; 2/25 Tr. (Dickersin) at 57:4-6.

---

[2] The Hawaii PMG added Neurontin to its formulary in June 2000, subject to the following criteria: (i) For use in epilepsy, as an adjunctive therapy in the treatment of partial seizures with and without secondary generalization in adults; (ii) for use in neuropathic pain, with guidelines; and (iii) limited initial dispense quantity to a 14-day supply.  (DX 840, Villaluz Aff. ¶ 11.)  No evidence was presented that DIS prepared any monographs for the Hawaii region or that its decision to place Neurontin on formulary was based on any communications with Defendants.    Plaintiffs did not establish when Neurontin was first added to the Mid-Atlantic States PMG's formulary, or whether prescribing was restricted.  (DX 840, Villaluz Aff. ¶ 15.)

23.    The Gorson study on the use of Neurontin to treat DPN was published in 1999. The publication explicitly noted that the study was a double-blind, randomized, controlled trial ("DBRCT") and that its results "suggest that gabapentin is probably ineffective or only minimally effective for the treatment of painful diabetic neuropathy at a dosage of 900 mg/day." (DX 1379.)

24.    In June 1999, the Chiefs of Neurology of the Southern California Region recommended removing prescribing restrictions and adding guidelines for use. The guidelines provided that gabapentin should be reserved for neuropathic pain patients unresponsive to or intolerant of TCAs and other treatments. For all indications, the initial prescription should be limited to a one month trial. (DX 557.)

25.    In June 1999, DIS prepared a Drug Monograph on the use of Neurontin for various pain syndromes, which was distributed only to the Southern California PMG. The monograph identified only three DBRCTs: one for PHN (later, an approved indication for Neurontin), the Backonja study (which the monograph recognized was potentially inadvertently unblinded), and the Gorson study (which the monograph stated "failed to demonstrate significant pain relief in three of the four efficacy measures"). (DX 544, 557, 559.)

26.    The DIS monograph indicated that Pfizer had "no plans to pursue an FDA approved indication for the treatment of pain, including neuropathies" (DX 557), and, therefore, DIS concluded it seemed "unlikely that further large randomized clinical drug trials to study the efficacy and safety of gabapentin for this indication would be forthcoming." (*Id.*)

27.    Notwithstanding this lack of DBRCT evidence, and expectation that there would not be any DBRCT evidence forthcoming, DIS recommended to the Southern California P&T Committee that "[g]abapentin could be used in patients who have failed or are unable to tolerate other treatment modalities." (DX 557.) 92 percent of the neuropathic pain prescriptions for which Kaiser Health Plan seeks to recover were written after DIS was aware of Gorson and Backonja (3/9 Tr. (Hartman) at 51:12-51:22), and many, if not most of these prescriptions were written in regions other than the Southern California region where this formulary change

5

occurred.  (3/5 Tr. (Millares) 92:9-93:1.)

**C.    1999-2002:  Publication of Negative Bipolar Studies (Pande and Frye) Did Not Cause PMGs To Restrict Psychiatrists' Access To Neurontin**

28.    In February, 1999, DIS prepared a monograph for Neurontin and bipolar disorder for the Southern California PMG, in response to a request for formulary expansion from that region's Chiefs of Psychiatry.  (DX 543.)  The monograph listed just one unpublished DBRCT (the Guille study) and relied primarily on case reports, open-label trials and reviews, which suggested that gabapentin may be effective in some bipolar patients who had failed other conventional treatments.  (*Id.*.)  Addressing these materials, the monograph recognized that "there were no statistically significant trends noted regarding efficacy rates." (*Id.*)

29.    On March 26, 1999, Dr. Atul Pande issued the final report on his study (945-209) on the use of Neurontin to treat refractory (treatment resistant) bipolar patients.  (DX 961.)  In June 1999, Dr. Pande presented the results of his study at the Third International Bipolar Conference, which was attended by several doctors who prescribed Neurontin to Kaiser's insureds.  The negative results of the study were accurately disclosed.  (2/24 Tr. (Abramson) at 90:17-96:2; DX 571, 923, 2092.)

30.    After the Pande final report was issued on March 26, 1999, informational letters sent by Pfizer in response to requests from several Kaiser Permanente physicians in 1999 and 2000 clearly disclosed the negative results of Dr. Pande's study.   (3/5 Tr. (Millares) at 72:6-77:24; DX 433, 433A.)

31.    The Pande bipolar study was published in September 2000, and accurately presented the study's negative results.  (DX 586; 2/24 Tr. (Abramson) at 96:6-15, 99:5-16.)

32.    Another negative bipolar study (Frye) – which was not sponsored by Pfizer – was published in December 2000.  (DX 1477.)

33.    In January 2002, DIS prepared a class-wide anti-epileptic drug ("AED") monograph for the Southern California, Northern California, and Ohio PMGs, discussing the evidence for efficacy of various AEDs, including Neurontin, in treatment of bipolar disorder.

(DX 629, 630.)

34.   The 2002 monograph noted that there were no DBRCTs establishing Neurontin's efficacy in bipolar disorder, and that two DBRCTs (Frye and Pande) were negative.  (DX 630; 2/24 Tr. (Abramson) at 113:1-118:14; 2/26 Tr. (Barkin) at 64:22-66:17.)

35.   Despite knowledge of the negative Frye and Pande studies, the Ohio PMG expanded formulary restrictions to permit use of Neurontin as a third-line agent in bipolar disorder.  (DX 630.)  The same 2002 monograph also was utilized by the Southern California and Northern California PMGs.  (*Id.*)  Neither of these Regional PMGs nor DIS sought to impose restrictions on Neurontin among psychiatrists, notwithstanding the negative results of the Frye and Pande studies.  (3/3 Tr. (Carrejo) at 31:11-25.)

36.   The 2002 drug monograph also addressed the evidence supporting use of another AED, topiramate, in treatment of bipolar disorder.  Even though there were no DBRCTs supporting topiramate's efficacy in bipolar disorder, and there was one negative, unpublished study, DIS recommended and the Southern California PMG adopted a formulary expansion to permit prescriptions of topiramate by psychiatrists.  (DX 629, 630.)

**D.    2002: The DUAT/DRUG Initiative**

37.   In 2002, the Drug Utilization Action Team ("DUAT") of the Southern California PMG and the Drug Utilization Group ("DRUG") of the Northern California PMG undertook an initiative (the "DUAT/DRUG Initiative") to encourage physicians to prescribe generic tricyclic anti-depressants ("TCAs") off-label as first line therapy for neuropathic pain.  (2/26 Tr. (Carrejo) at 114:23-115:8; DX 747.)[3]

38.   The DUAT/DRUG Initiative was targeted only at neuropathic pain.  Although Plaintiffs' witnesses made vague allusions to other indications, they conceded that the primary focus was neuropathic pain, and provided no specifics regarding any initiatives to curtail

---

[3] While Plaintiffs referenced purportedly similar programs in other regions, those programs started at different times and were carried out in a different manner.  (3/3 Tr. (Hyatt) at 131:12-21.)  Plaintiffs have proffered no evidence regarding the purported impact of other regions' initiatives on non-California prescriptions.

prescribing of Neurontin for other conditions. (3/3 Tr. (Hyatt) at 105:7-15, 106:2-12, 107:6-108:15, 112:19-113:2, 129:21-130:3) The exhibits describing the initiative make plain that the initiative was targeted at neuropathic pain. (*E.g.* DX 747.)

39.    The DUAT/DRUG Initiative did not recommend a change in prescribing guidelines, which had previously recommended that TCAs or other treatments be used before Neurontin (DX 557) and acknowledged that Neurontin and TCAs showed comparable efficacy in the treatment of neuropathic pain. (DX 747.)

40.    Plaintiffs claim that the DUAT/DRUG initiative led to a 34 percent reduction in Neurontin prescriptions; however, this claim was supported by only a temporal relationship and not any expert testimony. (*See, e.g.*, 3/8 Tr. (Rosenthal) at 53:16-54:1.) As a result, Kaiser could not exclude other causes (*e.g.*, pressure on physicians to control costs) as the explanation for this reduction. Kaiser's own documents show that the DRUG/DUAT initiative was driven by cost concerns, without regard to the comparative safety or efficacy of Neurontin and alternative drugs. For example, once generic gabapentin entered the market, Kaiser repeatedly recommended that it be used instead of Lyrica and other drugs that were FDA-approved for the conditions at issue. (*See, e.g.*, DX 820; DX 828; 2/26 Tr. (Carrejo) at 148:3-8; 3/2 Tr. (Carrejo) at 125:10-129:15.) Kaiser presented no evidence regarding prescribing trends after generic entry.

41.    In addition, Plaintiffs presented no evidence that would allow (1) disaggregation of the reduction in Neurontin prescriptions across indications, (2) disaggregation of the reduction among regions, or (3) extrapolation to prior years.

**E.    2003-2010: Kaiser Health Plan And The PMGs Continue To Recommend Neurontin For Treatment Of Several Off-Label Conditions and Take No Action To Remove Neurontin From Formulary Or Restrict Prescribing**

42.    In January 2003, the results of the Reckless (945-224) study were published as part of a January 2003 article by Drs. Backonja and Glanzman. (DX 1660; 3/2 Tr. (Perry) at 62:3-63:4.)

43.    Kaiser filed this lawsuit on February 1, 2005. (1st Am. Compl. [29].)

44.    In February 2005, Kaiser Permanente physicians Drs. Maizels and McCarberg

8

published an article in American Family Physician, where they explained that "[o]f the second-generation antiepileptic drugs, gabapentin (Neurontin) has the best documented efficacy in the treatment of neuropathic pain," including off-label neuropathic pain conditions. (DX 795.)

45.    In March 2005, David Campen, Medical Director of Drug Information, Utilization and Technology, Pharmacy Operations for the Northern California PMG, stated that gabapentin should be considered as a second line option for the treatment of DPN (off-label) and PHN. (2/26 Tr. (Carrejo) at 138:14-141:5; DX 798.)

46.    Only one regional PMG, the Northwest, ever took Neurontin off-formulary, in June 2004 (DX 729), but that PMG put gabapentin back on formulary in September 2005 after the medication went generic and after Kaiser filed this lawsuit  (DX 810).  The explicit reason for putting gabapentin back on formulary was "the availability of similar but more expensive pregabalin and . . . the decreasing cost of generic gabapentin tablets." (*Id.*) On October 13, 2005, the Northwest PMG observed that "[g]abapentin is the most commonly used anti-epileptic drug for the management of neuropathic pain, and gradual dosage titration" up to 1600 milligrams per day may be required to "achieve significant neuropathic pain relief."  The Committee further noted that "[d]oses up to 3600 milligrams a day may be needed in some patients."  (2/26 Tr. (Carrejo) at 141:10-142:19; DX 812.)

47.    In March 2006, Kaiser DIS responded to a request from a Kaiser Permanente physician for literature comparing gabapentin to Lyrica for the treatment of DPN.  DIS responded that gabapentin was at least equal, if not superior, to Lyrica, a drug whose effectiveness for the treatment of DPN had, at this time, been established by DBRCTs, and which had FDA approval for this indication.  At the time, gabapentin was a generic drug and, therefore, much cheaper than branded Lyrica. (2/26 Tr. (Carrejo) at 145:16-149:17; Ex. 820.)

48.    In December 2006, DIS stated that generic gabapentin was a preferred treatment for migraine prophylaxis as compared to Topamax, an FDA-approved, branded migraine drug. (3/2 Tr. (Carrejo) at 104:17-107:2; DX 824.)

49.    In February 2007, DIS advised a psychiatrist that gabapentin may be useful in

treating anxiety disorders.  (3/2 Tr. (Carrejo) at 121:11-122:8; DX 829.)

50.     In February 2007, the Pain Management Advisory Group of Kaiser Permanente's Care Management Institute ("CMI") recommended generic gabapentin to treat fibromyalgia over more expensive Lyrica (which was FDA-approved for fibromyalgia in June 2007); and recommended gabapentin doses above 1800 mg/day.  (DX 828; 3/2 Tr. (Carrejo) at 125:10-129:15.)

51.     In May 2007, the CMI Pain Management Advisory Group reiterated the Southern California PMG's September 1999 guideline (DX 557) recommending gabapentin as "the second-line agent in the management of [neuropathic pain]."  (DX 831; 3/2 Tr. (Carrejo) at 133:4-134:25.)

52.     Until February 9, 2010 – five years after Kaiser filed this lawsuit – Kaiser continued to recommend Neurontin to its members as an effective treatment for chronic pain, cancer pain, cluster headaches and other off-label conditions.  Kaiser's website stated that "gabapentin and pregabalin are the only drugs that have proved to help relieve some types of chronic pain," that some anticonvulsants have fewer side effects than TCAs, and that "[t]he anticonvulsant gabapentin may be your best bet for safely treating chronic pain because it is not used by the body in the same way as many other medicines."  Kaiser's website also stated that "gabapentin is also commonly used to treat chronic pain, migraine headache, panic disorder, and social phobia" and that "[i]nitial [study] results have demonstrated gabapentin to be an effective treatment for individuals with cluster headaches."  (DX 918A, 918.)

53.     It was not until a little over ten days before trial that some of the website articles were removed.  (3/2 Tr. (Carrejo) at 117:11-21, 142:5-143:25; 3/3 Tr. (Carrejo) at 13:5-14:22.)

54.     Even as of the time of trial, Neurontin and generic gabapentin were the only drugs listed on Kaiser's online drug encyclopedia under the heading "Drugs for Managing Pain Originating From a Nerve."  (DX 902A.)  Kaiser's website, as of the date of trial, also said that "'[g]abapentin may also be used to treat other [off-label] nerve pain conditions such as diabetic neuropathy, peripheral neuropathy, trigeminal neuralgia),'" and that AEDs, including Neurontin,

are "often used for pain involving the nerves." (DX 902A; 902B; 3/2 Tr. (Carrejo) at 138:6-139:7.)

55.    The PMGs could add a restriction that was removed previously from formularies. (3/4 Tr. (Millares) at 123:4-124:13). They did not do so for Neurontin even after filing this lawsuit because "there's a bunch of patients maybe, potentially, who are on that drug prescribed by a physician would thought it was medically necessary." (*Id.* at 123:9-13.) The PMGs also had the ability to make certain drugs non-detailable, but there was no evidence that any PMG other than Northern California ever took such a step. (*see* PX 273; 2/26 Tr. (Carrejo) at 113:20-114:18; 3/4 Tr. (Hyatt) at 20:25-21:10)

56.    Kaiser Health Plan has the ability to immediately send messages to all members taking any particular drug if it believes there is any serious health risk, but it has not taken any such measures regarding Neurontin. (3/3 Tr. (Hyatt) at 144:4-9.) Kaiser Health Plan has not communicated to its members any of its allegations in this lawsuit or the conclusions of its experts.

## IV.    Pfizer Presented Substantial Evidence Showing that Neurontin Is Effective for the Relevant Conditions

### A.    Neuropathic Pain

57.    Neuropathic pain is a serious, debilitating and difficult condition to treat. When making treatment and prescription decisions, physicians must consider the patient's chief complaint; the primary diagnosis; whether the patient has tried other pain therapies, and if so, whether they have worked and to what degree; the patient's other medical issues; the patient's other medications; whether the patient is likely to take medication as prescribed; and finally, the patient's social history, including any history of substance abuse. (3/16 Tr. (Brenner) at 45:20-47:18.)

58.    It is important for physicians to have numerous treatment options to alleviate the suffering that patients endure with chronic neuropathic pain, patients who cannot tolerate the side effects or risks of addiction of the alternative drugs identified by Kaiser, or for whom Kaiser's

11

alternative drugs provided no relief. (3/16 Tr. (Brenner) at 45:20-47:18.)

59.    Most of the available alternatives for the treatment of neuropathic pain immediately prior to and during the time period relevant to this litigation were not FDA approved, and instead found acceptance in clinical practice through clinical experience, consideration of published literature, including consideration or both positive and negative DBRCTs, where any such trials existed, and through consideration of non-"Level 1" information and clinical investigations supporting their efficacy. (3/16 Tr. (Brenner) at 35:16-19, 37:5-7.)

60.    While controlled clinical trials are entitled to great scientific weight on the specific scientific propositions that each such study is designed to test, physicians can, should, and do consider multiple sources, types, and levels of scientific evidence for purposes of clinical decision-making. (3/16 Tr. (Brenner) at 45:16-19.)

61.    There is no medication that has been approved by the FDA for the broad indication of neuropathic pain. (3/16 Tr. (Brenner) at 35:16-19.)

62.    Neurontin has been approved for the treatment of neuropathic pain in over 50 countries. (3/16 Tr. (Brenner) at 35:2-6.)   At least one of the regional PMGs (Southern California) hires doctors from around he world. (3/4 Tr. (Hyatt) at 7:1-7.)

63.    Defendants presented testimony from Dr. Shawn Bird, a board-certified neurologist and associate professor of neurology at the University of Pennsylvania, and Dr. Gary Brenner, an attending physician at Massachusetts General Hospital and assistant professor at Harvard Medical School who is board certified in anesthesiology and pain medicine.  Both Dr. Bird and Dr. Brenner testified, based upon the totality of the evidence and giving appropriate weight to DBRCTs, that Neurontin is an effective, safe, and well-tolerated treatment for all forms of neuropathic pain. (3/19 Tr. (Bird) at 15:23-17:1, 24:20-42:21, 46:25-48:24; 3/16 Tr. (Brenner) at 13:5-14:9; 19:24-21:10, 28:9-19, 62:5-63:17.)

64.    Out of thirteen DBRCTs studying Neurontin's efficacy in the treatment of neuropathic pain, ten were positive. (3/19 Tr. (Bird) at 24:20-38:4.)

65.    The following DBRCTs support Neurontin's efficacy in treating neuropathic pain:

(a) the 1998 Backonja DPN study; (b) the 2000 Tamez-Perez DPN study; (c) the 1999 Morello DPN comparator study; (d) the unpublished 2005 Parsons DPN study; (e) the 1998 Rowbotham PHN study; (f) the 2001 Rice PHN study, (g) the 2002 Tai study of neuropathic pain from spinal cord injury, (h) the 2004 Levendoglu study of neuropathic pain from spinal cord injury, (i) the 2002 Bone study of post-amputation phantom limb and stump pain; (j) the Serpell study of a broad mix of neuropathic pain syndromes. (3/19 Tr. (Bird) at 24:20-26:17, 31:6-23, 32:21-33:6, 35:1-37:1, 37:20-38:4; DX 1254, 1275, 1332, 1488, 1546, 1552, 1553, 1683, 2069.)

66.    Notwithstanding Plaintiffs' characterization of the Gorson study as being negative, the findings were positive with respect to one end point and showed moderate pain relief over placebo. (3/19 Tr. (Bird) at 27:1-29:9; DX 1379.)

67.    Defendants' expert Dr. Gibbons, a professor of biostatistics and Director for the Center of Health Statistics at the University of Illinois, explained that the potential inadvertent unblinding of the Backonja study did not affect its results because improvements in pain were experienced before the side effects that led to the potential unblinding. (3/15 Tr. (Gibbons) at 35:21-36:1, 62:19-64:20, 69:19-70:6.)

68.    Eight different review articles confirm Neurontin's efficacy in treating neuropathic pain. (3/19 Tr. (Bird) at 39:8-42:21; DX 1906, 1923, 1868, 1695, 1715, 1478.)

69.    Leading medical texts support Neurontin's efficacy in neuropathic pain.   The authors of each of these medical treatises have, like Defendants' experts, considered the totality of available evidence of Neurontin's efficacy in off-label neuropathic pain conditions, and have concluded that Neurontin has demonstrated efficacy, including enhanced effectiveness at doses above 1800 mg/day. (3/19 Tr. (Bird) at 43:12-45:3.)

70.    A meta-analyses published by the Cochrane Collaboration, one of the most respected groups performing this type of analysis, concluded that "[t]here is evidence to show that gabapentin is effective in neuropathic pain" and that two-thirds of patients can expect to achieve good pain relief. (DX 2046; 3/16 Tr. (Brenner) at 42:24-43:14.) The authors recently re-issued their report even though they "are aware of unpublished trial data for Gabapentin which

could affect the results of this review." (DX 2046.)

71.   Other meta-analyses support the efficacy of gabapentin for the control of neuropathic pain, as well as consensus statements from respected medical organizations or groups of individuals. (3/16 Tr. (Brenner) at 43:15-44:14; DX 1858, 1911, 1979, 1933.)

72.   Plaintiffs' efficacy expert, Dr. Perry, conducted a meta-analysis demonstrating that Neurontin showed statistically significant effects in treating neuropathic pain in each of the three different efficacy measures he considered. (3/2 Tr. (Perry) at 82:4-83:22.) Dr. Perry believes these results would not be "clinically meaningful" to the "typical patient" (*Id.* at 83:22-84:16), but concedes that the term "'clinical' refers to doctors and patients," and that "whether something is clinically significant . . . is a matter for the judgment of the [prescribing] doctor." (*Id.* at 3/2 Tr. (Perry) at 85:10-17).

73.   Defendants' expert, Dr. Gibbons, reviewed the same data and primary patient outcomes as Dr. Perry, and explained the errors made by Dr. Perry. Dr. Gibbons found that the data show a "two-and-a-half times greater chance of obtaining moderate or greater improvement on gabapentin relative to placebo." As Dr. Gibbons testified, there are both statistically significant and clinically significant differences that show clearly that gabapentin is efficacious in the treatment of neuropathic pain. (3/15 Tr. (Gibbons) at 48:21-49:6, 50:10-51:14, 55:4-56:13, 60:23-61:4, 69:8-18.)

74.   Neurontin's efficacy is also borne out by the clinical experience of PMG doctors, other physicians, and both parties' experts.

75.   Dr. Brenner has found Neurontin to be effective with patients who had previously tried other medications without success. (3/16 Tr. (Brenner) at 28:4-19.)

76.   Dr. Bird has also found Neurontin to be "an effective drug" that is also "well tolerated by patients." (3/19 Tr. (Bird) at 46:25-47:6.) Indeed, Dr. Bird opines that "Neurontin is a first-line agent for neuropathic pain." (*Id.* at 23:22.)

77.   As of the date he testified at trial, one of Plaintiffs' expert neurologists, Dr. McCrory, was still using Neurontin to treat patients with DPN. (3/1 Tr. (McCrory) at

62:15-18.)

78.    At the time of his deposition in September 2007, Dr. Bill McCarberg, a Kaiser Permanente physician, found Neurontin effective and prescribed it off-label for neuropathic pain based upon his clinical experience and consultations with other physicians.  (McCarberg Dep. at 29:16-30:5, 32:20-25, 54:18-25.)  He testified that he continued to use it as a first line treatment and considered it in every patient with neuropathic pain.  (*Id.* at 92:16-93:12, 97:13-19.)

79.    At the time of his deposition in September 2007, Dr. Morris Maizels, a Kaiser Permanente physician who has served as chair of the Woodland Hills Hospital P&T Committee, found Neurontin to be effective in the treatment of off-label neuropathic pain and headache, including at doses up to 2400 mg/day, and stated that he would continue to prescribe it today. (Maizels Dep. at 71:6-73:17, 107:9-14, 110:25-111:5, 217:11-23.)

80.    At the time of his deposition in November 2007, Dr. Mitchell Danesh, Regional Chief of Neurology for the Southern California PMG since 1999, prescribed Neurontin to treat neuropathic pain (including DPN and idiopathic peripheral neuropathy) and believed that Neurontin has been efficacious for some of these patients.  (Danesh Dep. at 12:6-24, 47:20-48:25, 52:10-55:20, 62:2-5.)

81.    Plaintiffs argue that the clinical experience of thousands of physicians (including PMG physicians) can be explained by the placebo effect.  Plaintiffs offered no evidence that the placebo effect explains the results observed in every patient.  Significantly, Neurontin is often prescribed only after other treatment options have failed.   (3/16 Tr. (Brenner) at 28:4-8.) Plaintiffs offered no explanation why there would so often be a placebo effect for Neurontin, when other drugs did not produce a similar effect for the same patient.  In addition, PMG and CMI guidelines provided that initial prescriptions should be limited to 30 days.  (DX 557, 831.) PMG physicians who followed this guideline would have only continued to prescribe Neurontin if a sustained benefit was seen.

82.    Dr. Bird explained the "clinical clues" from which he concludes that his patients' benefits are due to Neurontin and not the placebo effect, including patients' experiences of:

enduring benefits through years of continued Neurontin use; increased pain after forgetting to take a dose; and increased pain when their dose is gradually reduced. (3/19 Tr. (Bird) 24:2-19.)

83.    Plaintiffs' arguments depend upon inappropriate extrapolations from negative studies to the entire patient population. A "negative" clinical trial does not establish that a drug is not effective in all patients. (3/1 Tr. (McCrory) at 57:8-15; 3/16 Tr. (Brenner) at 44:15-45:10.) A study that concludes that a drug failed to produce an effect greater than placebo in treating a given condition in a particular subpopulation when administered using a specified regimen does not establish that the drug is ineffective for treating the condition in all patients in all other circumstances. (3/16 Tr. (Brenner) at 44:15-45:10; 3/19 Tr. (Bird) at 34:21-25.) For example, a negative study (e.g., Gorson) conducted at one dose does not mean that the drug is ineffective at every dose. And the fact that the drug did not show a statistically significant effect where symptoms were severe does not mean it would not show such an effect in patients with mild or moderate symptoms. It is precisely because of these inherent limits in efficacy studies that off-label prescribing is a widely accepted practice, and a practice well-informed by clinical experience and recognized by the FDA. (3/19 Tr. (Bird) at 18:20-20:7.)

**B.    Bipolar Disorder**

84.    Dr. Andrew Slaby, a board-certified psychiatrist with a Ph.D. in epidemiology, opined that Neurontin is safe and effective as adjunctive therapy, and sometimes as primary therapy, for treating some patients with bipolar disorder, including treating their comorbid conditions and symptoms. Like all of Pfizer's efficacy experts, Dr. Slaby considered and gave appropriate weight to DBRCTs, but did not ignore other relevant evidence. (3/19 Tr. (Slaby) at 90:19-91:5, 92:6-18, 118:8-121:5.)

85.    Two DBRCTs support Neurontin's efficacy in treating bipolar disorder: (a) Vieta (March 2006), a prophylaxis study for bipolar disorder, showed gabapentin's efficacy in a subset of bipolar patients and (b) Mokhber (2008), an active-controlled DBRCT, which compared the efficacy of gabapentin, lamotrigine, and carbamazepine, in treating "dysphoric mania" – a particularly dangerous form of bipolar disorder that has the highest suicide rate. (3/19 Tr. (Slaby)

at 107:2-118:8, 119:14-22; DX 1865, 2004).

86.    Though certain patients were excluded from the efficacy analysis in Vieta, this was because they did not meet the research criteria due to being "euthymic" – *i.e.*, "not at stable mood" – at the beginning of the study.  The exclusion of these patients was disclosed in the 2006 peer-reviewed article reporting the study's results.  (3/19 Tr. (Slaby) at 109:8-112:10.)

87.    Each negative study relied upon by Kaiser's expert psychiatrist carries explicit caveats limiting its findings.  Each study cited by Kaiser examined specifically defined sub-categories of patients; none of them purported to study all, or even a representative cross-section or sample, of the general population of bipolar patients.  And the authors of the studies explicitly warned against generalizing the results of their studies to other bipolar patients.

88.    The negative Frye, Pande, and Guille bipolar studies were studies of treatment-refractory patients who had already tried approved medications without success, and they did not test or reach conclusions about Neurontin's effectiveness in non-refractory bipolar patients.  (3/19 Tr. (Slaby) at 100:6-20.)

89.    The Pande study's research report emphasizes that "[a] lack of patient compliance may have biased the outcome as gabapentin plasma concentrations suggested that several patients had not taken study drug as prescribed."  (DX 961.)

90.    The published Frye article also noted that "a number of limitations are inherent in this study design," and that "[o]ther limitations and caveats relate to the type of patients studied and the generalizability of the findings."  (DX 1477.)

91.    The Guille abstract states that "[m]inor trends support the possibility that gabapentin possesses mood-stabilizing effects."  (PX 211.)

92.    DBRCT studies also support the efficacy of Neurontin in treating anxiety disorders, panic disorders, and social phobia, all psychiatric disorders which commonly occur in patients with bipolar disorder, and which are characterized by symptoms that substantially overlap with the symptoms of bipolar disorder.  (3/19 Tr. (Slaby) at 94:2-5, 97:5-22, 100:21-103:6, 100:21-103:6, 106:12-107:1; DX 590, 1305.)  Plaintiffs offered no reliable evidence that the "bipolar"

prescriptions for which they seek to recover were not prescribed for these co-morbid conditions. (*See infra* ¶ 142.)

93.  Evidence of Neurontin's effectiveness includes a 2003 comprehensive "special review" by Carta, et al., of the medical evidence of Neurontin's effectiveness in treatment of bipolar disorders, including the Pande (2000), Frye (2000) and other RCTs cited by Kaiser, which concluded that "GBP [Neurontin] may have a role only as adjunctive treatment of bipolar patients showing components of depression, anxiety, and impulsiveness. Thus, it may be a valuable tool particularly in patients with comorbid psychiatric disorders." (DX 1610.)

94.  The clinical experience of PMG doctors and both parties' experts confirms that doctors prescribed Neurontin to bipolar patients based on their independent medical judgment.

95.  Plaintiffs' bipolar expert, Dr. Barkin, continued prescribing Neurontin to his own bipolar patients for at least six months after completing his expert report in this case. (2/26 Tr. (Barkin) 39:21-40:10.)

96.  Dr. David Chandler, a Southern California PMG partner physician and Chief of Psychiatry, has prescribed Neurontin as third- or fourth-line therapy for bipolar disorder (Chandler Dep. at 66:9-69:18), which is consistent with the common practice of using AEDs to treat bipolar patients (*id.* at 60:18-65:19). And as of his October 2007 deposition, Dr. Chandler continued to prescribe Neurontin for anxiety disorder, including patients for whom anxiety is a co-morbid condition with bipolar disorder. (*Id.* at 69:20-73:9, 82:24-83:16, 84:21-85:2, 89:8-11.)

97.  Dr. Slaby has found Neurontin to be effective in his patients with bipolar disorder and other comorbid anxiety disorders, and has also found that some patients prefer Neurontin to drugs like lithium and lamotrigine because of their side effects. (3/19 Tr. (Slaby) at 118:8-121:5.)

98.  Defense expert Dr. Rothschild currently prescribes Neurontin to approximately 30 to 40 bipolar patients, including 10 to 15 patients with bipolar disorders who do not suffer from comorbid anxiety disorders. This has been his consistent practice over the past decade. (3/15 Tr. (Rothschild) at 118:17-119:18.)

**C.   Migraine**

99.     Kaiser's migraine expert, Dr. McCrory, performed a meta-analysis of four migraine DBRCTs, which included an admittedly flawed negative study (Wessely). (3/1 Tr. (McCrory) at 22:6-12, 69:14-17, 74:21-75:16.)  Despite including the negative results of this "flawed" study, Dr. McCrory admits that his meta-analysis still shows a trend favoring efficacy. (*Id.* at 83:23-84:2.)

100.    Pfizer's expert, Dr. Gibbons, likewise testified that Dr. McCrory's meta-analysis showed a trend favoring efficacy.  (3/15 Tr. (Gibbons) at 64:25-65:19.)   Moreover, Dr. Gibbons's re-analysis of the same data examined by Dr. McCrory showed a stronger trend that is closer to being statistically significant. (*Id.* at 66:13-18.)

101.    One of the four migraine DBRCTs – the Di Trapani study, an independent study by researchers with no connection to Defendants – showed that gabapentin led to a statistically significant decrease in the frequency of migraine headache pain. (DX 1401; 3/15 Tr. (Gibbons) at 67:12-68:4.)   Dr. McCrory concedes that the Di Trapani study was positive, and that prescribing doctors "could certainly consider that as some evidence for effectiveness." (3/1 Tr. (McCrory) at 76:6-78:4, 76:24-77:2, 89:18-22.)

102.    A fifth DBRCT – the Spira study – found that gabapentin produced a statistically significant reduction in the frequency of chronic daily headache (a condition related to migraine). (3/15 Tr. (Gibbons) at 68:8-69:6.)

103.    As Dr. Gibbons, testified, the data from all four DBRCTs showed "a trend in the direction of increased benefit.  When you add in the Di Trapani study and the Spira study, what you see is that this is a reproducible effect; and in these other two studies, even individually, there are statistically significant improvements." (3/15 Tr. (Gibbons) at 70:7-70:18.)

104.    These positive results are further supported by clinical experience.  For example, Southern California PMG physician Dr. Maizels testified that he has "found Neurontin effective in the treatment of headaches." (Maizels Dep. at 107:12-14.)

**D.     Doses Above 1800 mg/day**

105.    Plaintiffs did not call an expert to testify regarding the enhanced benefits of

Neurontin at doses above 1800 mg/day. The only evidence offered by Plaintiffs on this point was the Neurontin label. However, because the regulatory standards used by the FDA differ from the burden of proof at trial, such evidence is insufficient to meet Plaintiffs' burden. As discussed above, the FDA recognizes that drugs may have efficacy beyond their approved indications and uses. (*See supra* ¶¶ 11, 13.)

106. The 1993 FDA-approved label stated that the effective dose of Neurontin was 900 to 1800 mg/day. However, the 1993 label also noted that doses up to 2400 and 3600 mg/day had been well tolerated by patients. (PX 9.)

107. The 2002 label contained similar language regarding dose with respect to epilepsy. (PX 195). Regarding PHN, the label stated that "therapy may be initiated as a single 300-mg dose . . . and titrated up as needed for pain relief to a daily dose of 1800 mg (divided TID). In clinical studies, efficacy was demonstrated over a range of doses from 1800 mg/day to 3600 mg/day with comparable effects across the dose range." (*Id.*) Although the label states that "[a]dditional benefit of using doses greater than 1800 mg/day was not demonstrated," the label also provides recommended doses based upon renal function that range from 100 mg/day to 3600 mg/day. (*Id.*)

108. Of the 13 DBRCTs that tested Neurontin's efficacy for neuropathic pain, eight tested patients at doses above 1800 mg/day, and seven of those eight were positive. (*See* 3/19 Tr. (Bird) at 24:20-26:3, 31:6-23, 35:1-9, 35:20-37:1, 37:20-38:4; DX 1250, 1275, 1488, 1552, 1546, 1683, 2069.)

109. Defendant's experts, Dr. Bird and Dr. Brenner (whose testimony was unrebutted by any expert from Plaintiff) explained that Neurontin offers enhanced benefits at doses above 1800 mg/day, and that the proper dose for individual patients is determined through the process of "titrating to effect," rather than by clinical studies that examine dose proportional efficacy. (3/19 Tr. (Bird) at 43:12-45:3; 3/16 Tr. (Brenner) at 54:15-55:3.) The practice of titrating to effect is perfectly consistent with the FDA label. (3/16 Tr. (Brenner) at 47:19-54:5)

110. Southern California PMG physician Dr. Maizel testified that 2400 mg would be "an

appropriate level of gabapentin" for treating chronic daily headache. (Maizels Dep. at 110:25-111:5.)

111.   Southern California PMG physician Dr. McCarberg found that "doses above 1800 milligrams" can be effective and are "often worth trying" for the treatment of neuropathic pain. (McCarberg Dep. at 63:24-64:6.)

112.   Leading texts also support the use of Neurontin at doses above 1800 mg/day. (3/19 Tr. (Bird) at 43:12-45:3.)

113.   The Northwest P&T Committee and the national CMI Pain Advisory Group continued to recommend Neurontin doses above 1800 mg/day long after Kaiser filed this lawsuit. (DX 828; 3/2 Tr. (Carrejo) at 125:10-129:15; DX 812; 2/26 Tr. (Carrejo) at 141:10-145:6.)

## V.    Plaintiffs Did Not Prove That Their Alternative Drugs Were More Effective Than And As Well Tolerated As Neurontin In All Patients

114.   Efficacy is very much a patient-specific issue.  For example, while TCAs are generally effective in the treatment of neuropathic pain, they will have already been tried and failed in many of the patients for whom Neurontin was prescribed. (3/16 Tr. (Brenner) at 28:4-8; 3/19 Tr. (Bird) at 21:10-22:22.)

115.   Plaintiffs' expert Dr. Perry concedes that TCAs, which are not approved for neuropathic pain, carry anti-cholinergic and alpha-blocking adverse effects and side effects including sedation, severe dry mouth, urinary retention, and orthostatic hypotension. (*See* 3/16 Tr. (Brenner) at 37:5-7, 47:4-8, 55:8-57:5; *see also, e.g.*, McCarberg Dep. at 49:18-50:11.) TCAs are also contra-indicated in people with ischemic cardiac disease or increased risk of sudden cardiac death. (3/16 Tr. (Brenner) at 55:8-57:5; 3/19 Tr. (Bird) at 21:21-23.)

116.   Kaiser also proposed opioids as alternative medicines, whose use is limited by most physicians due to their addiction and abuse potential. (3/16 Tr. (Brenner) at 47:9-18, 57:6-58:18.)

117.   Neurontin will be better tolerated by many patients.  Neurontin is not metabolized by the liver and is not protein-bound in the blood.  As a result, it does not interact with other drugs.  There is no known case of death due to either unintentional or intentional overdose with

Neurontin.  It does not have anticholinergenic effects, so it can be safely used by people with heart conditions and other problems.  Neurontin has no known addiction potential.  (3/16 Tr. (Brenner) at 58:25-59:24.)

118.  Defense expert Dr. Rothschild testified that there is no reliable scientific evidence that Neurontin causes or worsens depression, with or without suicidal ideation.  (3/15 Tr. (Rothschild) at 118:1-11, 133:6-17.)  In any event, the alternative drugs proposed by Plaintiffs, including anti-depressants and other AEDs, also carry warnings against suicide.  (3/4 Tr. (Millares) at 103:21-104:17, 105:20-22, 107:24-108:4; 3/10 Tr. (Furberg) at 115:10-15.)

119.  Valproic acid, one of Plaintiffs' proposed alternative drugs for the treatment of bipolar disorder, carries a black box warning against the risk of liver failure, pancreatitis and birth defects.  (3/4 Tr. (Millares) at 108:7-109:17.)

## VI.   Physicians Prescribed Neurontin Based Upon Their Independent Medical Judgment And Other Reasons Unrelated To Alleged Off-Label Promotion

120.  The prescribing decisions of physicians are influenced by a wide range of factors – as acknowledged by Plaintiffs' experts – including their own clinical experience with Neurontin, the clinical experience of their colleagues with Neurontin, their clinical experience in prescribing other drugs in the same class (antiepileptic drugs or "AEDs") for the same unlabeled conditions, the approval of a drug for additional conditions in other countries, consensus guidelines supporting unlabeled use of a drug, as well as publication in journals and at conferences of studies, case reports and other evidence supporting the effectiveness of a drug in treating unlabeled conditions.  (3/8 Tr. (Rosenthal) at 27:3-6; 3/16 Tr. (Brenner) at 34:5-35:6, 45:20-47:18.)

121.  Albert Carver, Kaiser Health Plan's Vice President of Pharmacy Strategy and Operations in California, testified that physicians are in the best position to make a decision regarding the appropriate and the necessary treatment of the patients and that their decisions will not be second guessed by the health plan.  (Carver Dep. at 10:3-17, 126:4-127:3, 127:11-16.)  According to Dr. Carver, Kaiser's P&T committees consider the recommendations made by

PMG physicians who specialize in treating specific conditions – recommendations based on their clinical experience. (*Id.* at 133:22-134:2.) Other Kaiser witnesses gave similar testimony. (3/4 Tr. (Millares) at 119:21-23; 3/3 Tr. (Hyatt) at 100:23-101:4; 3/9 Tr. (Daniel) at 94:10-15; 3/10 Tr. (Daniel) at 48:23-49:11.)

122.  No physician testified in this case that he or she prescribed Neurontin as a result of alleged off-label promotion.  Instead, they testified that their prescriptions were based upon their own independent medical judgment, consultations with colleagues or other reasons unrelated to marketing. (*See supra* ¶¶ 74-80, 94-98, 104, 111; *see also* 3/9 Tr. (Daniel) at 114:2-4; 2/26 Tr. (Barkin) at 36:5-14, 39:8-40:10, 53:20-54:4.)

123.  Kaiser Permanente physician Dr. McCarberg testified that his prior experience plays a primary role in his prescribing decisions. (McCarberg Dep. at 13:6-14, 29:16-22, 93:24-25.)  Another Kaiser Permanente physician, Dr. Maizels, testified that his previous medical experience was "[a]rguably the most important factor" in deciding whether to prescribe a medication. (Maizels Dep. at 35:7-13.)

124.  At the time of her deposition in September 2007, Dr. Robin Dea, Regional Director for Mental Health Services for the Northern California region, prescribed Neurontin to treat a patient with bipolar disorder and stated that the patient preferred Neurontin to alternative drugs. (Dea Dep. at 10:21-11:14, 65:24-67:12, 71:22-24, 120:6-121:1.)

125.  Dr. John Arness, who retired in 2003, prescribed Neurontin to treat patients with bipolar disorder based upon its acceptance by the medical community for this use, as well as the recognized practice of prescribing anticonvulsants to treat bipolar disorder. (Arness Dep. at 7:24, 11:8-9, 22:23-23:1, 23:15-26:2, 64:9-22.)

126.  At the time of his deposition in October 2007, Dr. David Chandler, a Southern California PMG psychiatrist, continued to prescribe Neurontin off-label for anxiety disorder, including patients for whom anxiety is a co-morbid condition with bipolar disorder. (Chandler Dep. at 69:20-73:10, 82:24-83:16, 84:21-85:2, 89:8-11.)

127.  AEDs are routinely prescribed for the conditions at issue. (DX 629; DX 630; 3/3

Tr. (Carrejo) at 34:16-36:17.)

128.   Physicians often properly make an off-label prescribing decision for one patient based on what has proved effective for another patient, and they will alter their treatment of their patients as different medications meet with success or failure in treating a given condition.  (3/3 Tr. (Carrejo) at 80:13-24.)

129.   Dr. Millares admitted that a drug's formulary status, guidelines, and restrictions make little difference to prescribing physicians.  Indeed, she testified that Kaiser Health Plan will pay for a prescription drug ordered by its physicians even if the drug is not on its formulary, and that Kaiser Health Plan leaves the ultimate prescribing decision to the physician.  (3/4 Tr. (Millares) at 119:21-23, 120:11-12.   Dr. Hyatt gave similar testimony.   (3/3 Tr. (Hyatt) at 139:16-140:7.)

130.   Dr. Daniel unequivocally admitted that Neurontin's formulary status is irrelevant to physician prescribing decisions:  "[T]he reason that doctors prescribe is not because – at least within our organization – not because it's on or off the formulary, it's because they believe that the drug is effective or not effective, and that's created over years of education and training."  (3/9 Tr. (Daniel) at 110:1-5.)

131.   Dr. Daniel agreed that, "[t]o determine the doctor's reason for, for example, prescribing Neurontin in any individual instance, you'd really have to go talk to that doctor on an individual basis."  (3/10 Tr. (Daniel) at 25:3-7.)

**VII.   The Testimony of Plaintiffs' Experts Prof. Rosenthal And Dr. Hartman Is Not Reliable Or Probative Of Causation Or Damages**

132.   Prof. Rosenthal did not attempt to measure the impact of the alleged publication or peer-to-peer marketing strategies.   Prof. Rosenthal concedes that she is unable to account systematically for the influence of either published literature or alleged off-label marketing events and campaigns on prescribing.  (3/8 Tr. (Rosenthal) at 74:10-18, 79:12, 95:25-96:7; 3/22 Tr. (Keeley) at 58:19-59:13.)

133.   Prof. Rosenthal did not attempt to measure the impact of Kaiser's formulary

decisions on the number or prescriptions written. Similarly, she made no attempt to account for formulary restrictions by regional PMGs. (3/5 Tr. (Rosenthal) at 120:1-5; 3/8 Tr. (Rosenthal) at 76:7-77:5, 82:5-8, 96:14-97:13.)

134. Prof. Rosenthal assumed, at the instruction of counsel, that Defendants' marketing was fraudulent. Her analysis provides no basis for distinguishing between fraudulent and non-fraudulent conduct. (3/5 Tr. (Rosenthal) at 115:20-116:9.)

135. Prof. Rosenthal's calculations included computational and statistical errors. (3/8 Tr. (Rosenthal) at 58:7-60:14; 3/22 Tr. (Keeley) at 49:10-51:4, 53:12-19.) These computational errors resulted in significant overstatement of damages. (3/22 Tr. (Keeley) at 57:24-58:18.)

136. Neither Prof. Rosenthal nor Dr. Hartman excluded from their calculations patients who benefited from Neurontin, patients who had tried other treatments, such as TCAs, unsuccessfully, or patients who were prescribed Neurontin within regional PMGs' formulary guidelines. (3/8 Tr. (Rosenthal) at 50:12-16, 70:19-73:12; 3/9 Tr. (Hartman) at 42:11-22)

137. Prof. Rosenthal's causation analysis fails to account for any of the non-promotional factors that influence physician prescribing decisions. (3/22 Tr. (Keeley) at 30:7-24.)

138. Prof. Rosenthal used a results-oriented methodology that she repeatedly modified (running as many as 40 different models) until she obtained a result that satisfied her pre-existing expectations. For example, Prof. Rosenthal omitted a time trend, which she had originally intended to include, and included a constant inconsistently, based upon results. (3/8 Tr. (Rosenthal) at 100:10-107:14, 111:23-112:7, 122:24-123:4; 3/22 Tr. (Keeley) at 40:20-45:3.) As a result, Prof. Rosenthal failed to account for non-promotional variables affecting prescriptions. (3/22 Tr. (Keeley) at 38:10-40:19, 45:4-46:3.)

139. Neurontin and gabapentin prescriptions continued to increase even after generic entry in 2004, even though promotional expenditure essentially fell to zero. (3/22 Tr. (Keeley) at 34:2-15; DX 863.) Conversely, there was no corresponding increase in Neurontin prescriptions when promotional expenditures increased after PHN approval. (3/22 Tr. (Keeley) at 35:5-36:16.)

140. Prof. Rosenthal's analysis, which is based on national data, cannot be applied to

Kaiser. (3/22 Tr. (Keeley) at 24:12-19.) There are significant differences between TPPs, including generic substitution, drug utilization, and demographics of patient populations. (*Id.* at 24:25-27:2.) Kaiser has previously maintained that it is different than other TPPs in terms of how it manages drug utilization. For example, Kaiser prescribes a significantly greater percentage of generic drugs than the national average. (3/2 Tr. (Carrejo) at 153:9-154:15; 3/9 Tr. (Hartman) at 56:12-57:5.) Dr. Hartman conceded that Kaiser's drug utilization would be different from other TPPs. (3/9 Tr. (Hartman) at 55:4-9.)

141. A chart review of over 20,000 prescriptions conducted by Kaiser of its own drug utilization found that its Neurontin prescriptions for bipolar comprised only approximately 4 percent of Kaiser's total Neurontin prescriptions, (3/3 Tr. (Carrejo) at 54:10-68:20), compared to 16 percent estimated by Dr. Hartman. (PX 408F.)

142. Prof. Rosenthal cannot reliability disaggregate between indications. Plaintiffs offered no medical expert testimony supporting the categorization of ICD-9 codes used by Prof. Rosenthal. (3/22 Tr. (Keeley) at 28:8-29:25; PX 405N.) Prof. Rosenthal admits that her "bipolar" category included prescriptions for conditions like "depression." (3/8 Tr. (Rosenthal) at 84:22-85:24.) In addition, ICD-9 codes are not a reliable indicator of the particular condition for which a drug was prescribed, because patients with a primary diagnosis may have several additional or comorbid conditions. (3/16 Tr. (Brenner) at 59:25-62:3.) The data used by Prof. Rosenthal was also based on survey data with wide margins of error, sometimes as high as 60 percent. (3/22 Tr. (Keeley) at 113:21-114:24.)

143. Dr. Hartman's damages calculations are dependent upon Prof. Rosenthal's analysis. (3/9 Tr. (Hartman) at 31:15-18.)

144. Plaintiffs did not offer any competent expert testimony to support their claim that the list of alternative drugs that they provided to Dr. Hartman to calculate damages would have been as effective for each patient, as well tolerated, with no greater side effects than Neurontin. For example, while TCAs are effective in treating neuropathic pain, they have a much more limiting side effect profile than Neurontin. (3/16 Tr. (Brenner) at 47:4-8, 55:8-57:5.)

145. Kaiser did not present competent evidence that physicians would have actually selected from Kaiser's list of mostly generic drugs rather than a newer branded drug. (3/22 Tr. (Keeley) at 60:7-62:15.)

146. Dr. Hartman attempted to calculate damages to "Kaiser" in the aggregate (PX 408B-408G), and made no attempt to disaggregate between Kaiser Health Plan and the various non-party Kaiser subsidiaries. (*See* 2/22 Tr. (Sobol) at 25:2-3; 2/22 Tr. (Nussbaum) at 27:2-3; 2/22 Tr. (Court) at 26:5-8.)

## VIII.  Pfizer Did Not Engage In Unfair, Unlawful Or Fraudulent Business Practices

147. For the reasons discussed above, Defendants presented substantial evidence of Neurontin's efficacy for neuropathic pain, bipolar disorder, migraine, and doses above 1800 mg/day, undermining Plaintiffs' argument that the efficacy of Neurontin was misrepresented.

148. Plaintiffs presented no evidence of any off-label or fraudulent detailing to PMG physicians, and presented no evidence that any PMG physician prescribed Neurontin off-label due to any fraudulent promotion.

149. The only representation made directly to any Kaiser or PMG entity identified by Plaintiffs was a February 1999 letter, which pre-dated the final research report of Dr. Pande's bipolar study, and which Plaintiffs claim improperly failed to disclose the study's negative results. (3/4 Tr. (Millares) at 67:16-69:5.) However, the evidence showed Pfizer did not attempt to suppress the negative results of Dr. Pande's study, which were timely and accurately disclosed following the date of the final research report at an international conference, in information letters to other PMG physicians; and in a medical journal. (*See supra* ¶¶ 29-31, 34.)

150. The criticisms offered by Plaintiffs' experts do not evidence fraudulent suppression of medical literature. For example, the potential unblinding of the Backonja study may be relevant to its weight, but it was disclosed in the published article and noted in a DIS monograph prepared for Southern California PMG. (*See supra* ¶¶ 22, 25.) Similarly, the exclusion of certain patients from the Vieta study (which, in any event, was not published until after 2004) was disclosed in the published article. (3/19 Tr. (Slaby) at 109:8-112:10.)

151. Plaintiffs claim that the Reckless study was delayed. However, prior to its inclusion in the January 2003 Backonja/Glanzman article, it had been submitted for publication twice, and rejected both times. (DX 974; 3/2 Tr. (Perry) at 54:6-60:8.) And it is undisputed that the results had been provided to the FDA in 2001. (DX 991-A; 3/2 Tr. (Perry) at 63:14-64:22.)

152. Likewise, Plaintiffs claim that the POPP study was delayed. However, prior to its 2008 publication, the POPP study was disclosed to the FDA in 2001 (3/19 Tr. (Bird) at 76:4-7, 83:3-9) and an abstract was presented at the 10th World Congress on Pain in 2002 (DX 992A).

153. The Wessely migraine study (879-200) was conducted by the German firm Goedecke AG, prior to its acquisition by Parke-Davis. (DX 953.) Preliminary data were published in abstract form in 1987. (DX 1056.) Dr. McCrory had no difficulty finding this data, which he cited in a February 1999 document. (3/1 Tr. (McCrory) at 70:1-74:17.)

154. The Dimond article was published in 1996 in *Progressive Neuropsychopharmacology and Biological Psychiatry*. (DX 1158; 3/10 Tr. (Furberg) at 116:3-16.) The article's conclusion merely states that "clinical trial data on gabapentin and placebo in epilepsy suggests *potentially* beneficial effects of gabapentin on mood and well-being," and suggests that "an exploration of the psychiatric uses of gabapentin is warranted." (DX 1158 at 414-15.) Plaintiffs failed to connect the Dimond article to any of their claims.

155. In a bench memorandum regarding "Indication-Specific Suppression Evidence," Plaintiffs cite a single allegedly suppressed study (945-82) regarding Neurontin use at doses above 1800 mg/day. (*See* Dkt. 2728 at 6.) This study was not offered or admitted into evidence.

156. The unpublished nociceptive pain studies Plaintiffs cite (PX 384-89) were not "suppressed" as part of any "publication strategy" for Neurontin. Instead, they were designed to study the efficacy of combination medications (gabapentin-hydrocodone and gabapentin-naproxen) that were never marketed. (2/25 Tr. (Dickersin) at 38:15-19, 107:21-109:24.)

157. While this Court admitted evidence of a criminal plea by Warner-Lambert Company LLC over the objection of Defendants, the Information outlined and described *specific instances* in April 1995 and August 1996 in which Warner-Lambert's marketing activities

28

violated the relevant provisions of the FDCA.  The Information did not charge Warner-Lambert with disseminating any false or misleading information about Neurontin.  (PX 371, Plea Agreement; PX 366, Information at ¶¶ 19-36.)  Plaintiffs did not establish any nexus between the conduct admitted in the plea and their injuries or to California.

158.  Plaintiffs submitted binders of documents purporting to show improper promotion of Neurontin by Defendants under the FDCA.  However, most of the documents were not offered through the testimony of any witness, making it impossible for the Court to determine whether the documents relate to global or domestic marketing (keeping in mind that Neurontin is approved for neuropathic pain in many countries), were prepared in anticipation of FDA approval of neuropathic pain, represent proposals that were not implemented, or concern activities within FDA safe harbors, such as providing unrestricted grants to independent CMEs. Other relevant context for the documents is likewise lacking.  Moreover, Kaiser failed to establish a sufficient nexus between the conduct purportedly described by such documents and any prescriptions paid for by Kaiser.

## IX.     Plaintiffs' Claims Are Barred By The Statute of Limitations

159.  The Franklin *qui tam* complaint was unsealed on December 21, 1999, *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp. 2d 39, 46 (D. Mass. 2001) (Saris, J.), and made public on January 3, 2000.  *See United States ex rel. Franklin v. Parke-Davis*, No. 96-11651 (D. Mass. Jan. 3, 2000) (ECF Dkt. 41).

160.  In addition, the government investigation was disclosed in Warner-Lambert's Form 10-K filed on March 28, 2000.[4]  On May 10, 2000, Warner-Lambert disclosed the *Franklin qui tam* suit in its Form 10-Q public filing, stating that a former employee of the company has commenced a civil lawsuit against the company under the Federal False Claims Act based on certain alleged sales and marketing practices concerning Neurontin.[5]  While Plaintiffs claim that

---

[4] *See* Warner-Lambert Co., Annual Report (Form 10-K), at 10 (Mar. 28, 2000), *available at* http://www.sec.gov/Archives/edgar/data/104669/0000950117-00-000720.txt.

[5] *See* Warner-Lambert Co., Quarterly Report (Form 10-Q), Part II, Item 1 (May 10, 2000), a*vailable at* http://sec.gov/Archives/edgar/data/104669/0000104669-00-000001.txt.

they did not learn of the *Franklin qui tam* until 2002, they concede that it alerted them to their potential claims and the evidence is clear that it was publicly disclosed and discoverable through reasonable diligence prior to February 1, 2001.

161.   Warner-Lambert's Form 10-K disclosures were picked up in the April 3, 2000, edition of *The Pink Sheet* – a pharmaceutical trade journal. Dr. Millares concedes that it would have been her "practice" to read *The Pink Sheet* in April 2000, and that she "remember[s] first hearing about the fact that there was some sort of investigation that was launched around this time." (3/5 Tr. (Millares) at 55:5-24; Exh. DX 506.)

162.   Shortly thereafter, in May 2000, the Colorado PMG launched its own initiative to reduce off-label Neurontin prescriptions, stating that Neurontin "does not appear to offer any advantage over TCAs and it is more expensive." (DX 581; 3/5 Tr. (Millares) at 58:22-62:9.)

163.   An August 24, 2000, memorandum circulated throughout the Kaiser Permanente Northwest Division states that "gabapentin has achieved significant off-label use," that "Neurontin sales grew 78% in 1999," that the vast majority of these sales "are for off-label uses," that Neurontin is purportedly no more effective for these uses than "much less expensive" alternative drugs, and that "the U.S. attorney's office is investigating the manufacturer's off-label promotions of the drug." (DX 594; 3/5 Tr. (Millares) at 56:11-57:7.)

164.   An October 27, 2000 response to an inquiry by Dr. Dale Daniel – the chair of the Southern California P&T Committee – identified Neurontin as an on-formulary, unrestricted drug with "the potential for off-label use and abuse." (DX 599; 3/9 Tr. (Daniel) at 144:21-146:12; 3/5 Tr. (Millares) at 57:8-58:21.)