# EXHIBIT B: PROPOSED CONCLUSIONS OF LAW

The Court hereby makes the following conclusions of law regarding Plaintiffs' claim under the California Unfair Competition Law, Cal. Bus. & Profs. Code §§ 17200 *et seq.*

## I.   Kaiser Hospitals Lacks Standing To Sue

Kaiser Foundation Health Plan ("Kaiser Health Plan") and Kaiser Foundation Hospitals ("Kaiser Hospitals") (sometimes jointly referred to herein as "Kaiser") seek to recover amounts paid for Neurontin prescriptions between 1995 and 1996. However, the evidence at trial shows that Kaiser Hospitals did not pay for any Neurontin prescriptions. (FoF ¶ 4.) Article III standing requires both an "'injury in fact'" and "a 'causal connection between the injury and the conduct complained of.'" *Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 325 (1st Cir. 2009) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). As Kaiser Hospitals did not pay for the prescriptions that form the basis of Plaintiffs' damages claim, it did not sustain the claimed injury, failed to establish a causal connection between any injury to it and the complained-of conduct, lacks standing, and must be dismissed. *See Lujan*, 504 U.S. at 563; *Troyk v. Farmers Group, Inc.*, 90 Cal. Rptr. 3d 589, 622 (Ct. App. 2009).

## II.   Kaiser Health Plan Cannot Recover For Prescriptions Written Outside California

In resolving choice-of-law questions, Massachusetts applies a "functional approach" that "is explicitly guided by the Restatement (Second) of Conflict of Laws (1971)." *Levin v. Dalva Bros., Inc.*, 459 F.3d 68, 74 (1st Cir. 2006) (citation omitted). For fraud and misrepresentation claims, "the law of the state in which a plaintiff took action in reliance on a defendant's representations applies." *S. States Police Benevolent Ass'n, Inc. v. First Choice Armor & Equip., Inc.*, 241 F.R.D. 85, 93 (D. Mass 2007); *see also In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 82-83 (D. Mass. 2005). The "Kaiser Health Plans" are not a single entity; rather, they are seven separate corporate entities. Each of the nine entities operates in a different region in the U.S. Even if the separate subsidiaries were proper parties to this litigation, which

they are not,[1] each was served by a different Pharmacy and Therapeutics ("P&T") Committee of the nine independent non-party Permanente Medical Groups ("PMG"), each of which also functioned autonomously regarding formulary placement. (FoF ¶¶ 2-3.) Thus, to determine which State's law applies to each of the seven separate corporations referred to collectively as the "Kaiser Health Plans," this Court must consider that the relevant actions allegedly taken in reliance on Defendant's alleged misrepresentations occurred in either the states where the different P&T Committees made their decisions or the states where PMG physicians prescribed Neurontin.

In addition, California law prohibits applying the UCL to conduct outside of California. *See Meridian Project Sys., Inc. v. Hardin Constr. Co.*, 404 F. Supp. 2d 1214, 1225 (E.D. Cal. 2005); *Van Slyke v. Capital One Bank*, No. C 07-00671, 2007 WL 3343943, at *14 (N.D. Cal. Nov. 7, 2007). Indeed, to do so would not only offend California's presumption against extraterritoriality, but violate due process. *See Tidenberg v. Bidz.com, Inc.*, No. CV 08-5553, 2009 WL 605249, at *3-5 (C.D. Cal. Mar. 4, 2009). In short, there is no basis for allowing Kaiser Health Plan subsidiaries operating in states other than California to recover amounts paid for Neurontin prescriptions written outside of California based on formulary decisions made by regional PMG P&T Committees outside of California.

### III. Plaintiffs Failed to Establish Causation by a Preponderance of the Evidence

To have standing to bring a UCL claim, a plaintiff must have (1) suffered injury-in-fact and (2) lost money or property "as a result of" unfair, unlawful or fraudulent business practices. *See* Cal. Bus. & Prof. Code § 17204 (West 2008); *see also In re Tobacco II Cases*, 207 P.3d 20, 29-30 (Cal. 2009). Proof of injury and causation is required for standing under each of the three prongs – i.e., unfair, unlawful, or fraudulent. *See, e.g., Troyk*, 90 Cal. Rptr. 3d at 625-28; *Daro v. Superior Ct.*, 61 Cal. Rptr. 3d 716, 729 (Ct. App. 2007).

---

[1] Although each of these entities is a separate subsidiary of Kaiser Health Plan (FoF ¶ 1), none was named as a plaintiff in this lawsuit. Because a parent corporation lacks standing to recover damages sustained by a subsidiary, *see, e.g., PayPhone LLC v. Brooks Fiber Commc'ns of R.I.*, 126 F. Supp. 2d 175, 179 (D.R.I. 2001), Kaiser Health Plan lacks standing to recover any damages sustained by any of its subsidiaries.

Here, regardless of the prong that Plaintiffs assert, their injury theory depends on their allegation that they were injured because Defendants withheld information about Neurontin's efficacy. Kaiser does not seek to recover merely because the prescriptions it paid for were off-label. Kaiser admits that it readily pays for off-label prescriptions and that many alternative drugs it has proposed are also off-label. (FoF ¶¶ 21-54, 59, 61.) Accordingly, absent proof that Pfizer made fraudulent representations or omissions regarding Neurontin's efficacy, Plaintiffs cannot prove the injury and causation required to satisfy the UCL's standing requirements. *See In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, No. 2:06-cv-5774, 2009 WL 2043604, at *10 (D.N.J. July 10, 2009); *cf. Medina v. Safe-Guard Prods. Int'l, Inc.*, 78 Cal. Rptr. 3d 672, 678-79 (Ct. App. 2008) ("He hasn't suffered any loss *because of* Safe-Guard's [(the defendant's)] unlicensed status . . . [and] there is no allegation that . . . Safe-Guard's unlicensed status *caused* him to part with the money he paid for the tire and wheel contract."). Indeed, California courts have repeatedly held that, where the nature of the product or service received was not misrepresented, plaintiffs cannot recover amounts paid for a product or service based on some alleged illegality.[2] And where a plaintiff alleges that it was induced to buy a defendant's product through fraud (even if the plaintiff also alleges that such fraud was unfair or unlawful), the plaintiff must show actual reliance – i.e., that in the absence of the defendant's alleged misrepresentation, the plaintiff would not have engaged in the injury-producing conduct. *See Durell v. Sharp Healthcare*, No. D054261, 2010 WL 1529322, at *6 (Cal. Ct. App. Apr. 19, 2010) (certified for publication); *In re Actimmune Mktg. Litig.*, No. C 08-02376, 2009 WL 3740648, at *8, 14-15 (N.D. Cal. Nov. 6, 2009); *see also In re Tobacco II Cases*, 207 P.3d at 39 ("[T]here is no doubt that reliance is the causal mechanism of fraud.").

Plaintiffs' theory of causation is set out in this Court's order on Defendants' summary judgment motion. Plaintiffs claimed that "Kaiser" added Neurontin to "Kaiser's" formulary in

---

[2] *See Peterson v. Cellco P'ship*, 80 Cal. Rptr. 3d 316, 322 (Ct. App. 2008); *Laster v. T-Mobile USA, Inc.*, No. 05cv1167, 2009 WL 4842801, at *6 (S.D. Cal. Dec. 14, 2009); *Animal Legal Def. Fund v. Mendes*, 72 Cal. Rptr. 3d 553, 561 (Ct. App. 2008).

1994, but restricted Neurontin's use to neurologists, and that "Kaiser" expanded formulary access in 1997 and 1999 based on monographs prepared by the Drug Information Services division ("DIS") of Kaiser Hospitals. *See In re Neurontin Mktg. & Sales Practices Litig.*, 677 F. Supp. 2d 479, 486 (D. Mass. 2010) ("*Neurontin IV*"). Plaintiffs' causation theory required them to prove two prongs. First, their theory required evidence that they either took some action based on a study presented as positive or would have acted differently had they been aware of a study that Defendants' suppressed. Second, Plaintiffs' theory depended on allegations regarding physician compliance with formulary restrictions. *Id.* However, the evidence presented by Plaintiffs at trial not only failed to support that causation theory, but flatly contradicted it.

First, there is no such thing as a single "Kaiser" formulary. Instead, formularies are established each P&T Committee of each of the separate non-party PMGs, which operate independently of each other and independently of Plaintiffs. (FoF ¶ 3.) Plaintiffs presented no evidence that any P&T Committee of any non-party PMG based formulary decisions on any affirmative representation made by Defendants or that any P&T Committee would have made different formulary decisions had any specified scientific evidence been published or made available earlier. Between 1994 and 1996, following FDA approval for epilepsy, several PMGs added Neurontin to their formulary both with and without restrictions. Their separate, respective decisions to do so pre-date the conduct alleged by Plaintiffs to have been wrongful. (FoF ¶¶ 14-20.)

Plaintiffs' evidence applied only to the Southern California PMG, but even as to that region, the alleged suppression of scientific evidence by Defendants was not a "but for" cause of any of its formulary decisions. The only DIS monographs submitted by Plaintiffs concerned neuropathic pain (sometimes abbreviated "NeP") and bipolar disorder. Plaintiffs have not identified any formulary recommendation made by DIS or any decision made by any P&T Committee regarding migraine, nociceptive pain, or dosing that was influenced by the publication of, or failure to publish, any particular study. Evidence of allegedly fraudulent

4

marketing,[3] without evidence of reliance on such marketing by Kaiser Health Plan, amounts to no more than a fraud-on-the-market theory of recovery, which courts (including this Court) have repeatedly rejected. *See In re Neurontin Mktg., Sales Practices & Prods. Liab. Litig.*, 257 F.R.D. 315, 326-27 (D. Mass. 2009) ("Neurontin I"); *Mirkin v. Wasserman*, 858 P.2d 568, 584 (Cal. 1993).

As a result, the only evidence of reliance that was even offered by Kaiser was limited to the Southern California region and the indications of neuropathic pain and bipolar disorder. Even as to this one region and these two indications, the evidence was insufficient.

*Kaiser's failure of proof as to causation for their neuropathic-pain claim*

The Southern California PMG region added Neurontin to its formulary in 1994, restricted to neurologists. (FoF ¶ 14.) In 1997, in response to a recommendation by Southern California's Chiefs of Anesthesiology, DIS conducted a review of the literature and agreed with the recommendation by the Chiefs of Anesthesiology that the restriction be expanded to include anesthesiologists and pain clinic physicians for the treatment of Reflex Sympathetic Dystrophy ("RSD"). (FoF ¶ 21.) Neither the recommendation by DIS nor the decision by the P&T Committee was based on a belief that the efficacy of Neurontin to treat RSD was supported by a double–blind, randomized placebo-controlled trial ("DBRCT"). Instead, DIS's recommendation was based on two letters to the editor that reported the efficacy of gabapentin in relieving symptoms in a total of 14 refractory RSD patients. (FoF ¶ 21.)

Plaintiffs also allege that Defendants delayed publication of a negative NeP study (Gorson) and that the results of a positive NeP study (Backonja) were biased as a result of unblinding. However, in September, 1999, when DIS recommended that the Southern California region remove restrictions and add guidelines, it knew of the negative Gorson study and the

---

[3] In fact, the evidence of marketing regarding migraine, nociceptive pain and dosing was little or non-existent. No witness testified regarding the marketing of these indications. Kaiser instead relied on a few marketing documents that were unsupported by testimony from either fact or expert witnesses and, therefore, lacked supporting context, such as whether and how such marketing plans were implemented. Indeed, the jury, acting in an advisory capacity, found no violation of the UCL with respect to nociceptive pain.

unblinding issue in Backonja. DIS also understood that the manufacturer did not intend to seek approval of Neurontin for NeP, so that additional DBRCTs were unlikely. (FoF ¶¶ 22-27.)

Knowledge of an alleged falsity defeats any claim of reliance and causal connection to the alleged misrepresentation. *See Laster*, 2009 WL 4842801, at *4; *Buckland v. Threshold Enters., Ltd.*, 66 Cal. Rptr. 3d 543, 549-54 (Ct. App. 2007); *Caro v. Procter & Gamble Co.*, 22 Cal. Rptr. 2d 419, 430 (Ct. App. 1993). Likewise, a plaintiff cannot prove actual reliance on misrepresentations where the evidence shows that the alleged misrepresentations were not a factor in their decision-making. *See Princess Cruise Lines, Ltd. v. Superior Court*, 101 Cal. Rptr. 3d 323, 329 (Ct. App. 2009), *review denied*, No. S178842 (Cal. Feb. 3, 2010). Where, as here, the Southern California PMG expanded formulary access in its region with knowledge of the negative Gorson study and the unblinding issue with the Backonja study, believed there was no DBRCT evidence (other than a positive PHN study) supporting Neurontin's efficacy for neuropathic pain, and assumed that no such evidence would be forthcoming, Kaiser's claim that Defendants' alleged manipulation of the scientific evidence caused it to make certain formulary decisions is both unproven and contradicted by the evidence at trial.

Kaiser also claims that Defendants delayed or modified publications of other negative studies (Reckless, POPP and Serpell).[4] But none of these studies was even completed when DIS issued its NeP monograph in September 1999. (2/24 Tr. (Abramson) at 30:7-9.) Further, the evidence showed that even after those studies were published, the Southern California PMG Region made no formulary changes and issued no additional guideline regarding the use of Neurontin for neuropathic pain in its region. Only one PMG region, the Northwest, ever took Neurontin off-formulary (in June 2004), but that region put gabapentin back on formulary after the medication went generic and after Kaiser filed this lawsuit. The explicit reason for putting gabapentin back on formulary was the availability of more expensive pregabalin and the decreasing cost of generic gabapentin. (FoF ¶ 46.) Even after filing this lawsuit, Kaiser

---

[4] Defendants presented substantial evidence that they did not manipulate or delay scientific studies. For example, the Reckless study was twice submitted to journals, which rejected it. (FoF ¶ 151.)

continued to recommend Neurontin as an effective treatment for Neuropathic pain on its website,[5] and DIS recommended gabapentin (generic Neurontin) as a preferred treatment for diabetic peripheral neuropathy ("DPN") over Lyrica, a drug approved by the FDA for the treatment of DPN. (FoF ¶¶ 43-54.)

*Kaiser's failure of proof as to causation for their bipolar disorder claim*

For similar reasons, Kaiser failed to prove causation with respect to bipolar disorder. Kaiser claims that DIS requested information from Pfizer regarding bipolar disorder and received a letter in February 1999 that did not discuss the negative results from the Pande study.[6] Kaiser's assertion that the recommendations of DIS or action of the Southern California P&T Committee would have been different had Kaiser known of the Pande study is belied by their actions taken after publication of the Pande study. The negative results of Dr. Pande's studies were presented in 1999 at an international conference, and the study was published in 2000. (FoF ¶ 29-31.) In 2002, DIS issued a class-wide drug monograph discussing the evidence for efficacy of various AEDs, including Neurontin, in treating bipolar disorder. Despite their knowledge of the negative Pande and Frye studies, and the lack of positive DBRCTs, the Southern California and Northern California PMGs imposed no restrictions on Neurontin among psychiatrists, and the Ohio Region expanded access to include bipolar disorder. (FoF ¶¶ 28-36.)

The foregoing evidence rebuts Kaiser's claims of materiality, reliance and causation based on Pfizer's alleged suppression or manipulation of scientific studies. Evidence that a plaintiff was aware of any alleged fraudulent statements or omissions negates the causal nexus. *See Quezada v. Loan Center of Cal., Inc.*, No. CIV. 2:08-00177, 2009 WL 5113506, at *5 (E.D. Cal. Dec. 18, 2009); *see also Laster*, 2009 WL 4842801, at *8 (holding that plaintiff who

---

[5] Several articles were removed from the website a little over a week prior to trial. Even as of the date of trial; however, Kaiser's website recommended Neurontin and gabapentin as drugs that could be used in the treatment of neuropathic pain. (FoF ¶ 53.)

[6] Dr. Abramson testified that Pfizer was aware of the results of the Pande at least by July 28, 1998, when Dr. Pande wrote to the investigators. (2/23 Tr. (Abramson) at 104:11-104:15.) However, the final report was not issued until March 26, 1999. The evidence showed that, after the report was issued, Pfizer's responses to inquiries from physicians, including Kaiser physicians, in 1999 and 2000 regarding the use of Neurontin to treat bipolar disorder described the negative results of the Pande study. (FoF ¶¶ 30, 149.)

continued to renew cell phone contracts containing allegedly illegal charges even after filing suit could not show reliance); *Kingsbury v. U.S. Greenfiber, LLC*, No. CV 08-00151, 2009 WL 2997389, at *10 (C.D. Cal. Sept. 14, 2009); *Prohias v. Pfizer, Inc.*, 485 F. Supp. 2d 1329, 1336 (S.D. Fla. 2007) (dismissing claims by plaintiffs who continued to take the drug even after filing suit); *Whalen v. Pfizer, Inc.*, No. 600125/05, 2005 WL 2875291, at *4 (Sup. Ct. New York County Sep. 22, 2005) (finding no injury where plaintiff, with knowledge of alleged misrepresentation, continued to use the product).

In response, Kaiser asserts, first, that it believed that Neurontin was effective for Neuropathic pain until an article on publication bias was published in the New England Journal of Medicine ("NEJM"), November 12, 2009. (3/3 Tr. (Carrejo) at 16:20-25.) This theory, however, contradicts the allegations made by Kaiser when it filed suit (1st Coord. Am. Compl. [31] ¶ 31), as well as the testimony of Kaiser witness Mirta Millares in which she confirmed that, by 2002, Kaiser believed that Pfizer had suppressed information regarding the efficacy of Neurontin. (3/5 Tr. (Millares) at 12:24-14:25.) In addition, the NEJM article was authored by and based upon the report of Kaiser expert Kay Dickerson, which Kaiser has had since August 2008. (2/25 Tr. (Dickerson) at 75:21-23; 3/5 Tr. (Millares) at 17:16-19.) Finally, as Kaiser witnesses conceded, the NEJM article does not even address the issue of efficacy. (3/5 Tr. (Millares) at 22:18-23.) In short, absence of publication of the NEJM article until November 12, 2009, cannot establish the causal link that Kaiser's claims require it to prove.

Kaiser also argues that it could not remove an AED from its formulary and that, in any event, formulary access has little impact on physician prescribing behavior. The record belies Kaiser's assertion that it could not remove Neurontin from formulary because it was an AED. Kaiser conceded that Lyrica, an AED, is not on all PMG formularies and other AEDs were not on the formularies of several PMG regions. (3/5 Tr. (Millares) at 26:22-24; DX 630.) The evidence also showed that at least one region did remove Neurontin from formulary, only to re-instate it once a cheaper, generic version was available. (FoF ¶ 46.)

Kaiser's insistence that any changes to Neurontin's formulary status or guidelines would

8

have had no effect on physician prescribing practices is even more astounding. As discussed above, Kaiser's theory of causation had two components. First, Kaiser contended that the different non-party PMGs would have made different formulary decisions in Kaiser's hypothetical "but for" world. Second, Kaiser argued that non-party PMG physicians would have complied with the formularies. Since the law prohibits Kaiser from relying on a fraud-on-the-market theory to prove causation (*see supra* at 4-5), and because formulary placement on its own does not constitute an injury, it was essential that Kaiser prove *both* prongs of its causation theory. The testimony of Kaiser witnesses at trial that formulary placement would not have affected physicians' prescribing behavior breaks an essential link in the causal chain argued by Kaiser, successfully, to survive summary judgment.

Kaiser argues that, instead of removing Neurontin from their respective formularies, or imposing restrictions on the prescribing of Neurontin, the two California PMGs undertook educational initiatives in 2002 that encouraged physicians to prescribe tricyclic antidepressants ("TCAs") before prescribing Neurontin for neuropathic pain. Kaiser claims that, as a result of this effort, Neurontin prescriptions were reduced by 34 percent. That argument is specious. First, the Neurontin initiative was limited to neuropathic pain and, therefore, is not probative of causation with respect to any other indication. (FoF ¶ 38.) Second, it does not explain away the actions of the two separate PMGs in earlier years when they either expanded formulary access or failed to restrict formulary access with knowledge of negative studies. Third, even assuming that the PMGs might have initiated a similar education program earlier, there is no basis for extrapolating the 34 percent to earlier years, when Neurontin usage was less. Nor was Kaiser able to disaggregate the 34 percent figure across indications. As a result, the educational initiatives in 2002 fail to satisfy Kaiser's burden of proof as to causation.

Kaiser also offered testimony from economist Meredith Rosenthal by which it attempted to prove the number of prescriptions caused by off-label promotion for Neurontin. As this Court has previously explained, however, "'[b]ecause of the limits in [her] data, [she is] unable to account systematically' for the influence that the 'manipulation of the published literature to

9

which physicians look for impartial information' had on prescribing." *Neurontin I*, 257 F.R.D. at 329 (alterations in original) (citation omitted). Second, she assumed "at the instruction of plaintiffs' counsel . . . that all detailing to specialists other than neurologists was both off-label and fraudulent." *Id.* at 331. Thus, as this Court stated, "Professor Rosenthal's analysis does not take into account any other factors that may have led doctors' to prescribe Neurontin for off-label indications." *Id.* at 330. Indeed, "the record in this case demonstrates why the use of spending on fraudulent off-label detailing as a means to ascertain the number of prescriptions subject to the fraud is flawed." *Id.* In fact, "despite over a decade of Neurontin-related litigation, which I have presided over as the multi-district litigation judge, no evidence has been presented of any doctor who states that she relied on a misrepresentation or omission in prescribing Neurontin for an off-label indication." *Neurontin IV*, at 495 (footnote omitted). Likewise, no such evidence was presented at this trial. No PMG doctor testified that she prescribed Neurontin for an off-label use based on anything that Defendants said. (FoF ¶¶ 122.) Similarly, while Kaiser argued that Defendants sponsored continuing medical educational ("CME") programs to promote Neurontin for off-label uses, no evidence was presented of a single Kaiser physician who attended a CME, was exposed to a false statement about Neurontin traceable to the Defendants, and changed his prescribing practices as a result.

Further, Prof. Rosenthal used an improper results-oriented method and failed to analyze data that was specific to Kaiser, despite Kaiser's insistence throughout this litigation that it is unique among third-party payors in terms of how its manages drug utilization. (FoF ¶¶ 132-142.) The differences between Kaiser and the national averages used by Plaintiffs' experts were significant. An internal chart review by Kaiser of over 20,000 prescriptions showed that only about four percent of Neurontin prescriptions were written for bipolar disorder, as compared to 16 percent allocated by Plaintiffs' experts to bipolar disorder using non-Kaiser-specific national data. (FoF ¶ 141.) In addition, in an attempt to disaggregate between indications, Prof. Rosenthal used ICD-9 codes provided to her by counsel. Kaiser failed to offer any expert testimony supporting the accuracy of their categorization of ICD-9 codes. Indeed, Prof.

10

Rosenthal conceded that what she characterized as "bipolar disorder" actually included several ICD-9 codes for depression. (FoF ¶ 142.)

Most importantly, Prof. Rosenthal did not attempt to measure anything relevant to Kaiser's claims. She attempted to analyze the relationship between detailing expenditures and off-label prescriptions. However, at the hearing on Defendants' motion for judgment pursuant to Rule 50, this Court made clear that no evidence of fraudulent detailing had been presented and that this case would be submitted to the jury as a suppression case. (3/19 Tr. at 221:5-10.) Prof. Rosenthal did not attempt to measure the impact of any alleged suppression of scientific evidence, CMEs or the PMGs' formulary decisions. (FoF ¶¶ 132-33.) Her opinions are irrelevant to the issue of causation in this case.

## IV. Plaintiffs Failed To Establish Injury By A Preponderance Of The Evidence

### A. Plaintiffs Failed To Meet Their Burden of Proving That Neurontin Was Completely And Categorically Ineffective For The Indications At Issue

Plaintiffs argued that the efficacy of Neurontin for the off-label uses at issue has not been established by DBRCT evidence and that this entitles them to recover the total of all amounts paid by Kasier Health Plan for prescriptions attributable to Defendants' off-label promotion. Defendants presented substantial evidence of efficacy, including Kaiser's own continuing recommendations of Neurontin for treating neuropathic pain and other off-label conditions. (FoF ¶¶ 39, 44-54.) Indeed, one of Kaiser's expert neurologists testified at trial that he continues to prescribe Neurontin to treat neuropathic pain. (FoF ¶ 77.) For this Court to find that there is no evidence supporting gabapentin's efficacy in any treatment of any neuropathic pain, it would essentially have to find and conclude that PMG physicians commit malpractice every time they prescribe it for this condition and that Kaiser has continued to condone and promote malpractice. But the evidence showed that physicians would be *failing* to adhere to the standard of care if they did not consider Neurontin as a possible treatment option for appropriate patients. (FoF ¶¶ 12, 57-83, 114-116.)

In fact, Plaintiffs' injury theory relies on a false premise. The issue here is not whether

11

Neurontin could satisfy regulatory standards for approval, but whether Kaiser Health Plan (and each of the other separate entities) was misled into paying for off-label prescriptions that did not provide a benefit to any patient. As discussed above, the evidence made clear that the PMGs do not require DBRCT evidence when they make formulary decisions, did not require such evidence when they put Neurontin on formulary or expanded access to Neurontin, and approved Neurontin even in the face of negative DBRCT evidence. In short, Kaiser never believed it was paying for a drug whose efficacy was supported by DBRCT evidence; rather, Kaiser was satisfied by Level II and Level III evidence that off-label prescribing of Neurontin would benefit its members.

Plaintiffs' attempt to extrapolate from purportedly "negative" studies to the entire patient population does not satisfy their burden of proof. A "negative" study at most shows that a drug failed to effectively treat a given condition in a particular subpopulation when administered using a specified regimen. *Cf. In re Neurontin Mktg., Sales Practices, & Prods. Liab. Litig.*, 612 F. Supp. 2d 116, 148 (D. Mass. 2009) ("Neurontin II") (observing that a negative study over a three-month period did not conclusively disprove the plaintiffs' theory that an effect would be seen over a longer duration). It does not establish the drug's inefficacy for treating the condition in all other patients and circumstances. (FoF ¶ 83.) As a result, Plaintiffs cannot, by reliance on negative studies, prove that Neurontin was ineffective for the conditions at issue for *all* patients.

For example, the negative bipolar studies on which Plaintiffs' experts rely were limited to refractory (treatment-resistant) patients. They do not prove that Neurontin is ineffective in treating patients with a milder form of the condition, where Neurontin's efficacy is supported by DBRCTs. (FoF ¶¶ 85-91.) DBRCTs also support Neurontin's efficacy in the treatment of comorbid conditions associated with bipolar disorder, including anxiety disorders, panic disorders, and social phobia. (FoF ¶¶ 92.) Plaintiffs offered no evidence supporting their claim that the bipolar prescriptions included in their damages calculations were not, in fact, prescribed for these comorbid conditions.

For similar reasons, the negative studies relied on by Plaintiffs regarding neuropathic

pain failed to meet their burden of proof. (FoF ¶ 83.) In addition, Defendants presented testimony from two pain specialists, Dr. Shawn Bird and Dr. Gary Brenner, who explained that there are no FDA-approved drugs to treat all forms of neuropathic pain, an extremely serious and difficult to treat condition, and testified that Neurontin was an effective, important option for physicians and patients.[7] Their opinions were supported by ten DBRCTs, leading medical texts, a meta-analysis published by the well-respected Cochrane Collaboration and other scientific reviews. (FoF ¶¶ 57-71.) In addition, Defendants' expert Dr. Gibbons conducted a statistical review of the same data as Plaintiffs' expert Dr. Perry had reviewed, and Dr. Gibbons concluded that it supported the efficacy of Neurontin as a treatment for neuropathic pain. (FoF ¶ 73.)

Several PMG physicians admitted at trial that Neurontin's efficacy was supported by their clinical experience and that they continued to prescribe it even after this lawsuit was filed. (FoF ¶¶ 78-80, 96, 104.) While Plaintiffs argue that the clinical success of thousands of physicians, including PMG physicians, can be explained by the placebo effect, Neurontin is often prescribed only after other treatment options have failed. Plaintiffs offered no theory, much less any evidence, of why, in literally every one of the thousands of instances in which Neurontin successfully relieved neuropathic pain after the same patient had unsuccessfully sought relief from one or more other medications prescribed by the same physician, none of the other medications produced a placebo effect. In addition, PMG and CMI guidelines provided that initial prescriptions should be limited to 30 days. PMG physicians who followed this guideline would have only continued to prescribe Neurontin if a sustained benefit was seen. (FoF ¶ 81.)

Finally, Plaintiffs presented no evidence supporting their claim that no additional benefit is obtained from Neurontin at doses above 1800 mg/day,[8] and insufficient evidence that

---

[7] Although the FDA has not granted a broad neuropathic pain indication to any drug, Neurontin has been approved for the treatment of neuropathic pain in over 50 countries. (FoF ¶ 62.)

[8] Plaintiffs relied solely on the Neurontin label with respect to their dosing claim. (FoF ¶ 105.) Due to the different standards employed by the FDA, however, regulatory action or inaction cannot satisfy Plaintiffs' burden of proof. *Neurontin II*, 612 F. Supp. 2d at 136-37. Further, the label also contains recommendations for titrating, based on renal function, to doses over 1800 mg/day. (FoF ¶ 107.) In addition, the testimony of Defendants' experts, supported by several DBRCTs (FoF ¶¶ 105-113), was unrebutted by Plaintiffs.

Neurontin is ineffective in treating migraine. (FoF ¶¶ 99-113.)[9]

### B. Plaintiffs Failed To Prove That Cheaper, Alternative Drugs Would Have Been Prescribed Instead Of Neurontin

Courts have repeatedly rejected claims to recover the cost of a drug that provided a safe and effective treatment for the condition for which it was prescribed.[10] Likewise, California courts have repeatedly rejected claims for restitution under the UCL where the product performed as expected. *See Peterson*, 80 Cal. Rptr. 3d at 322; *Laster*, 2009 WL 4842801, at *6; *Animal Legal Def. Fund*, 72 Cal. Rptr. 3d at 561 (Ct. App. 2008).

Relying on *Desiano v. Warner-Lambert Co.*, 326 F.3d 339 (2d Cir. 2003), a case not decided under the UCL, Plaintiffs argue that, even if Neurontin is effective for the conditions at issue, they are entitled to recover the cost of cheaper alternative medicines. As noted above, however, California law does not support their theory. Moreover, this case bears little resemblance to *Desiano*, where the Second Circuit held only that the plaintiffs had sufficiently *pled* a claim to survive a motion to dismiss. In reaching its conclusion, the court posited a hypothetical involving a drug that was in all respects identical to a cheaper existing drug, but that was marketed as a great advancement over existing treatments. *See id.* at 349-50. In contrast, Kaiser never believed that Neurontin was *superior* to alternative medications. Instead, the DIS monographs recommended that Neurontin be prescribed for neuropathic pain only after other treatments, including TCAs, had failed. (FoF ¶ 24.) Nor did DIS recommend Neurontin as a first-line treatment for bipolar disorder. (FoF ¶ 28.)

Further, Plaintiffs offered no evidence that doctors would have prescribed a drug other than Neurontin, or which drugs physicians would have prescribed, in the absence of the alleged

---

[9] Defendants do not contend that Neurontin is effective in treating nociceptive pain, which is acute pain resulting from trauma. At the same time, there was no evidence that Neurontin was marketed for nociceptive pain or prescribed by PMG physicians for nociceptive pain.

[10] *See Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*, Nos. 06-3044, et al., 2008 WL 5413105, at *8 (D.N.J. Dec. 23, 2008); *Heindel v. Pfizer Inc.*, 381 F. Supp. 2d 364, 380 (D.N.J. 2004); *In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. 61, 68-69 (S.D.N.Y. 2002); *Prohias*, 485 F. Supp. 2d at 1337-38; *Williams v. Purdue Pharma Co.*, 297 F. Supp. 2d 171, 176 (D.D.C. 2003).

14

misrepresentations by Defendants. There is no basis for concluding that in every single case a cheaper drug would have been prescribed. (FoF ¶ 144-145.) In the absence of such evidence, Plaintiffs have simply used the cost of self-selected alternative drugs as a price point for what they contend they should have paid for Neurontin. This is nothing more than a price-inflation theory of recovery (i.e., fraud-on-the-market), which courts have repeatedly rejected (*supra* at 4-5), and which Plaintiffs here expressly disclaimed.[11] Whether proposed alternative drugs were both cheaper than and equally effective as Neurontin requires a complex and individualized determination regarding (1) whether the alternative drugs had already been tried without success in a particular patient, (2) whether the alternative drugs would be as effective for a particular patient, (3) whether the alternative drugs would have been as well tolerated by a particular patient, and (4) what the actual cost (including increased monitoring costs) would have been. *See In re Vioxx Class Cases*, 103 Cal. Rptr. 3d 83, 98-100 (Ct. App. 2009); *In re Zyprexa Prods. Liab. Litig.*, 671 F. Supp. 2d 397, 456-57 (E.D.N.Y. 2009). Plaintiffs did not, and admitted they could not, offer patient-specific evidence, much less plaintiff-specific and indication-specific evidence, on each of these issues. Indeed, Plaintiffs did not attempt to offer even aggregate proof on these issues.

## V.  Plaintiffs Failed To Establish The Amount Of Any Alleged Overpayment With Reasonable Certainty

The only monetary relief available under the UCL is restitution. *See Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 947-48 (Cal. 2003). To determine the amount of restitution, there must be a rational method for assessing the amount that will make the plaintiff whole. *People v. Fortune*, 28 Cal. Rptr. 3d 872, 874 (Ct. App. 2005).[12] Thus, "restitution under the [UCL] must be of a measurable amount to restore to the plaintiff what has been acquired by

---

[11] *See* Dkt. 101, Joint Mem. of Class and Coordinated Pls. in Opp. to Defs. Mot. to Dismiss at 13 Dkt. 1184, Reply Mem. in Supp. of Renewed Mot. for Class Cert. at 20 n.27; *Neurontin II*, 257 F.R.D. at 324, 326 n.7. Since Plaintiffs did not pursue a price-inflation theory, no expert evidence was offered in support of such a claim.

[12] An award of restitution unsupported by a rational method of estimation would also constitute an unconstitutional taking of property without due process of law. *See Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 834 (Ill. 2005).

violations of the statute[]" and "must be supported by substantial evidence." *Colgan v. Leatherman Tool Group, Inc.*, 38 Cal. Rptr. 3d 36, 61, 63 (Ct. App. 2006).[13] For the reasons discussed above, Kaiser failed to prove injury and causation by a preponderance of the evidence. Even if that were not the case, Kaiser nonetheless failed to provide sufficient evidence by which an award of restitution could be calculated.

Even if the Court were to accept Plaintiffs' first theory, that Neurontin was 100% ineffective so that Kaiser Health Plan is entitled to recover the entire aggregate prescription price (which, as discussed above, is unproven), Plaintiffs have provided no basis for calculating the number of prescriptions attributable to Defendants' alleged wrongful conduct. For the reasons discussed above, Prof. Rosenthal's analysis cannot supply this number. And the calculations by Plaintiffs' damages expert, Dr. Raymond Hartman, are wholly dependent on Prof. Rosenthal.

There is also no evidence to support Plaintiffs' second theory of recovery. Plaintiffs simply provided a self-selected list of alternative drugs (primarily low cost generics) to Dr. Hartman, who subtracted the weighted costs of such drugs from his damages estimates. Neither Dr. Hartman nor any medical expert offered by Plaintiffs made any attempt to quantify (1) how many doctors would have continued to prescribe Neurontin in any event, (2) what drugs would have actually been prescribed instead of Neurontin, (3) the cost of any such drugs, (4) how many patients had already tried Plaintiffs' proposed alternative drugs without success, and (5) how many patients would be unable to take Plaintiffs' proposed alternative drugs due to side effects, contraindications or drug-drug interactions. (FoF ¶ 144-45.)[14] Without knowing the answers to these questions, it is impossible to reasonably estimate the amount of any alleged

---

[13] In *Colgan*, the California appellate court reversed the restitution award. Even though the plaintiffs had presented expert testimony that the product was worth less, they presented no expert testimony to support the quantification of any reduction in value. *See id.* Likewise, in *Vioxx*, the California appellate court held that a plaintiff cannot recover the difference between the drug at issue and a comparator drug without competent evidence regarding what comparator drug, if any, would have actually been prescribed. *See In re Vioxx Class Cases*, 103 Cal. Rptr. 3d at 96.

[14] As noted *supra* at 14, PMG prescribing guidelines for neuropathic pain required that Neurontin should not be prescribed until other treatment methods (including the alternative drugs proposed by Kaiser) had been tried and failed. Thus, there is no basis for the assumption that patients could be successfully switched from Neurontin to Plaintiffs' alternative drugs.

overpayment by Kaiser Health Plan.

Finally, Dr. Hartman made no attempt to disaggregate among the different Kaiser subsidiaries. His failure to isolate his calculations to prescriptions written in California renders them substantially overstated and unreliable. (FoF ¶ 146.)

## VI. Plaintiffs' Claim Under The "Unlawful" Prong Of the UCL Is Preempted[15]

The Food, Drug and Cosmetics Act ("FDCA") does not provide a private right of action and expressly mandates that "all such proceedings for the enforcement, or to restrain violations, of [the FDCA] shall be by and in the name of the United States." 21 U.S.C. § 337(a). To the extent that a private plaintiff sues under state law based on FDCA violations alone – unaccompanied by fraud, negligence, product defect, or violation of some other state law duty – that plaintiff is doing nothing more than attempting to "enforce[]" or "restrain violations" of the FDCA. 21 U.S.C. § 337(a). Any such claim is impliedly preempted by Congress' intent that the FDCA "be enforced exclusively by the Federal Government." *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 352 (2001); *see also PhotoMedex, Inc. v. Irwin*, No. 07-56672, 2010 WL 1462377, at *3 (9th Cir. Apr. 14, 2010) ("The Supreme Court made clear in *Buckman* that [28 U.S.C. § 337] . . . limits the ability of a private plaintiff to pursue claims under state law theories where such claims collide with the exclusive enforcement power of the federal government.").

Thus, the right to enforce FDCA provisions lies exclusively with the federal government. For example, the Ninth Circuit recently held that an action for false advertising claims under the federal Lanham Act based on an alleged FDCA violation was precluded by the FDCA's exclusive grant of enforcement power to the FDA. *See PhotoMedex*, 2010 WL 1462377, at *7. Similarly, courts have dismissed UCL claims that were predicated solely on an FDCA violation, without a showing of fraud. *See, e.g., Perez v. Nidek Co.*, 657 F. Supp. 2d 1156, 1166 (S.D. Cal.

---

[15] Plaintiffs' claims under the "unfairness" prong fail for the same reasons. The California Supreme Court has held that the UCL's "unfair" prong does not permit courts to "apply purely subjective notions of fairness" and that "the public policy triggering the violation must be tethered to a constitutional or statutory provision or a regulation carrying out statutory policy." *Cel-Tech Commc'ns, Inc. v. L. A. Cellular Tel. Co.*, 20 Cal. 4th 163, 184-85 (1999). Plaintiffs seek to "tether" their claims to the FDCA, which, as discussed above, preempts enforcement actions based on state law.

17

2009); *In re Epogen & Aranesp Off-Label Mktg. & Sales Practices Litig.*, 590 F. Supp. 2d 1282, 1290-91 (C.D. Cal. 2008) (appeal pending); *Summit Tech., Inc. v. High-Line Med. Instruments Co.*, 922 F. Supp. 299, 306-07, 316-17 (C.D. Cal. 1996).

Manufacturers have a First Amendment right to distribute information about the off-label use of their products.[16] Indeed, the FDA has recognized the need for dissemination of information regarding off-label uses of drugs. Over the years, the FDA has issued various policy statements and guidelines regarding such communications. For example, it is not a violation of the FDCA for a manufacturer to publish research regarding off-label uses, to provide unrestricted grants to independent CMEs where off-label uses will be discussed, to respond to unsolicited inquiries from physicians, or to distribute reprints of articles.[17] Moreover, the FDA has stated that its guidelines constitute only "safe harbors," so that even conduct outside the guidelines may not be a violation of the FDCA.[18] Determining, therefore, whether something constitutes unlawful off-label marketing or legal dissemination of scientific information is a complex issue best left to the FDA.[19]

## VII. Kaiser's UCL Claims Are Barred By The Statute Of Limitations

UCL claims "are subject to a four-year statute of limitations which [begins] to run on the date the cause of action accrued, not on the date of discovery." *Karl Storz Endoscopy-America,*

---

[16] *Washington Legal Found. v. Friedman*, 13 F. Supp. 2d 51, 74 (D.D.C. 1998), *vacated in part on other grounds*, 202 F.3d 331 (D.C. Cir. 2000). Plaintiffs argue that there is no First Amendment right to disseminate untruthful information, but that argument exposes the lack of independence between Plaintiffs' "unlawful" marketing claim and their "fraudulent" marketing claims.

[17] *See, e.g., Citizen Petition Regarding the Food and Drug Administration's Policy on Promotion of Unapproved Uses of Approved Drugs and Devices; Request for Comments*, 59 Fed. Reg. 59820-01 (Nov. 18, 1994); *Final Guidance on Industry-Supported Scientific and Educational Activities*, 62 Fed. Reg. 64074 (Dec. 3, 1997); *Request for Comment on First Amendment Issues*, 67 Fed. Reg. 34942 (May 16, 2002); *Guidance for Industry: Good Reprint Practices for the Distribution of Medical Journal Articles and Medical or Scientific Reference Publications on Unapproved New Uses of Approved Drugs and Approved or Cleared Medical Devices* (Jan. 2009) (available at www.fda.gov/oc/op/goodreprint.html).

[18] *See Washington Legal Found. v. Henney*, 202 F.3d 331, 335-36 (D.C. Cir. 2000).

[19] Warner-Lambert pled guilty to certain specific incidents of off-label marketing that occurred between April 1995 and August 1996. However, Kaiser has not shown a nexus between the incidents that are the subject of Warner-Lambert's plea and any prescriptions paid for by Kaiser or even to California.

18

*Inc. v. Surgical Tech., Inc.*, 285 F.3d 848, 857 (9th Cir. 2002).[20] A claim accrues "'when, under the substantive law, the wrongful act is done,' or the wrongful result occurs, and the consequent 'liability arises.'" *Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 397 (1999) (citation omitted). Furthermore, California recognizes the "single injury rule" whereby "the violation of a single primary right gives rise to but a single cause of action." *Pooshs v. Phillip Morris USA, Inc.*, No. C 04-1221 PJH, 2008 WL 2220422, at *5 (N.D. Cal. May 27, 2008) (citation omitted). Ongoing damages flowing from the same alleged cause of action do not create separate claims or accruals. *Id.*[21] This action was filed on February 1, 2005, more than four years after the events complained of.

Kaiser argues that the statute of limitations was tolled by the filing of a federal class action complaint on May 14, 2004. Although California has recognized class-action tolling under some circumstances,[22] that doctrine does not save Plaintiffs' claims. First, Plaintiffs were required to plead class action tolling, which they did not. *See Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 991 (9th Cir. 2006). Second, as discussed above, Plaintiffs' action accrued no later than 1999, when the Southern PMG removed restrictions on Neurontin, and was barred before the class action complaint was filed.[23]

---

[20] *See also Snapp & Assocs. Ins. Servs., Inc. v. Malcolm Bruce Burlingame Robertson*, 117 Cal. Rptr. 2d 331, 335 (2002); *Keilholtz v. Lennox Hearth Prods. Inc.*, No. C 08-00836 CW, 2009 WL 2905960, at *4 (N.D. Cal. Sept. 8, 2009); *see also Rambus, Inc. v. Samsung Elecs. Co.*, No. C-05-02298 RMW, C-05-00334 RMW, 2007 U.S. Dist. LEXIS 3088, at *11 (N.D. Cal. Jan. 4, 2007).

[21] In addition, throughout this litigation, Kaiser has pursued an aggregate theory of damages. Kaiser cannot now circumvent the statute of limitations by arguing that individual prescriptions reimbursed after February 1, 2001, are distinct transactions giving rise to distinct injuries.

[22] *See Jolly* v. *Eli Lilly & Co.*, 751 P.2d at 933-34. However, it is far from clear that class action tolling is available under California law in this case. First, under *Jolly*, class action tolling does not apply to all class actions and may not be appropriate in mass tort cases. *Id.* at 935-36. Second, the California Supreme Court has not decided whether class action tolling applies to a putative class member who files suit before class certification has been decided. Federal courts of appeals are split on this issue. *Compare Wyser-Pratte Mgmt. Co. v. Telxon Corp.*, 413 F.3d 553, 568-69 (6th Cir. 2005), *Glat\*er v. Eli Lilly & Co.*, 712 F.2d 735 (1st Cir. 1983); *with In re Hanford Nuclear Reservation Litig.*, 534 F.3d 986, 1009 (9th Cir. 2008), *cert. denied*, 129 S. Ct. 762 (2008); *State Farm Mut. Auto. Ins. Co. v. Boellstorff*, 540 F.3d 1223, 1232 (10th Cir. 2008); *In re WorldCom Sec. Litig.*, 496 F.3d 245, 255-56 (2d Cir. 2007). In *Jolly*, the California Supreme Court refused to expand *American Pipe* where to do so would not further the goals of judicial economy. *See* 751 P.2d at 935-36. Accordingly, the Court finds and concludes that the California Supreme Court would not apply class action tolling to a plaintiff who files suit before class certification is decided.

[23] In addition, class action tolling could not apply to Kaiser Foundation Hospitals, as it was not a putative
*(cont'd)*

19

Even if the discovery rule applied to Kaiser's UCL claims, Plaintiffs' claim still would be time-barred because Plaintiffs had both actual and constructive knowledge of their alleged injury well over four years before filing suit. Under the discovery rule, "the limitations period begins when the Plaintiff suspects, *or should suspect*, that she has been wronged." *Jolly* v. *Eli Lilly & Co.*, 751 P.2d 923, 927 (1988) (emphasis added). "'If a person becomes aware of facts which would make a reasonably prudent person suspicious, he or she has a duty to investigate further and is charged with knowledge of matters which would have been revealed by such an investigation.'" *Wilshire Westwood Assocs.* v. *Atl. Richfield Co.*, 20 Cal. App. 4th 732, 740 (Ct. App. 1993) (citation omitted).

The results of the negative Pande bipolar study were made public in 1999. In September, 1999, DIS was aware of the negative Gorson study and the unblinding of Backonja. The *Franklin qui tam* litigation, which Plaintiffs have asserted put them on notice of their alleged injury, was made public on January 3, 2000, and disclosed in Warner-Lambert's SEC filing on May 10, 2000. On April 3, 2000, *The Pink Sheet* – a pharmaceutical trade journal that was regularly read by Kaiser officers, including Dr. Millares, reported that Warner-Lambert was under investigation by the U.S. Attorneys' office for off-label promotion. (FoF ¶¶ 159-164.)[24] Accordingly, as of February 1, 2001, Kaiser knew of, or could have discovered through reasonable investigation, its claims against Defendants.

Accordingly, the Court finds and concludes that Kaiser's UCL claims are barred by the statute of limitations.

## CONCLUSION

For the foregoing reasons, the Court finds that judgment should be entered in favor of the Defendants.

---

*(cont'd from previous page)*
member of the proposed class action, which was limited to persons and entities that paid for Neurontin prescriptions.

[24] That notice of the government investigation was sufficient to put Kaiser on notice of its claims is demonstrated by an August 24, 2000, where the Northwest PMG region expressed concern about its increased expenditures for Neurontin and specifically noted the government investigation. (FoF ¶¶ 163.) On October 27, 2000, DIS noted that Neurontin had the potential for off-label abuse. (FoF ¶ 164.)