UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:  NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1629<br><br>Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO:<br><br>THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA v. PFIZER INC., 04 CV 10739 (PBS) and<br><br>AETNA, INC. V. PFIZER INC., 04 CV 10958 (PBS) | Judge Patti B. Saris<br>Mag. Judge Leo T. Sorokin |

**PLAINTIFF KAISER'S REPLY TO DEFENDANT PFIZER'S PROPOSED CONCLUSIONS OF LAW**

## I.   Kaiser Hospitals Has Standing to Sue

Pfizer's argument, not raised until the close of trial, concerning the standing of Kaiser Foundation Hospitals ("Kaiser Hospitals") and Kaiser Foundation Health Plan, Inc. ("Kaiser Health Plan"), ignores the uncontroverted fact that Kaiser Hospitals and Kaiser Health Plan (collectively "Kaiser") are inextricably entwined entities. They share financial reporting and Boards and management.[1] The head of Kaiser's Drug Information Service ("DIS"), which is part of Kaiser Hospitals and supports both Kaiser Hospitals and Kaiser Health Plan, is a nonvoting member of both the Northern and Southern California Permanent Medical Group ("PMG") Regional P&T Committees,[2] and Albert Carver, a Health Plan employee, was a voting member of both P&T Committees.[3] Kaiser Health Plan recognizes the PMG P&T Committees as the body authorized to make decisions regarding specific drugs.[4] Having taken voluminous discovery and depositions from both Kaiser Health Plans and Kaiser Hospitals, Pfizer knows all of this. Pfizer knows, for example, that during pretrial discovery Kaiser produced contracts between Pfizer-predecessor Parke-Davis and Kaiser Hospitals for the purchase of Neurontin.[5] Given Kaiser Hospitals' direct purchase of Neurontin from Pfizer, and given the close affiliation and intertwined operations of the two plaintiff entities, Pfizer does not explain why, as a legal, practical or pragmatic matter, Kaiser Hospitals should be carved out as a plaintiff at this late stage in the litigation.

---

[1] See Bench Memo. Clarifying the Relationship Between the Kaiser Plaintiffs, Dkt. No. 2724.
[2] 3/4 Tr. (Millares) at 48-49.
[3] Dkt. No. 2724, at 2-3.
[4] Dkt. No. 2724, at 3.
[5] Because this is the first time Pfizer has even suggested that Kaiser Hospitals lacks standing, Kaiser had no prior notice that this would be an issue and thus did not submit at trial additional evidence, including deposition testimony, on the issue of Kaiser Hospitals' standing. To be sure, the evidence introduced at trial plainly and uncontrovertibly establishes that Kaiser Hospitals has standing due to the close affiliation and intertwined operations of the two plaintiff entities. If the Court were to determine that the evidence introduced at trial is insufficient for it to exercise jurisdiction over Kaiser Hospitals' claims, however, Kaiser respectfully requests leave to introduce the ample evidence produced in discovery that further establishes these jurisdictional facts. E.g., KAIS-0044587 (April 7, 1998 letter from Parke-Davis to Richard M. Lieblich, Purchasing Agent at Kaiser Foundation Hospitals, confirming the addition of Neurontin to existing drug purchasing contract). Pfizer should not be allowed to sandbag Kaiser now, relying on a claimed lack of evidence introduced at trial, when it never contested standing before trial and thus gave Kaiser no reason to introduce such evidence that was produced in discovery.

## II.  Kaiser Can Recover For Prescriptions Written Outside of California

Pfizer incorrectly claims that the Unfair Competition Law ("UCL") cannot be applied to "conduct outside of California." In support, it cites two cases in which *neither* the misconduct *nor* the injuries occurred in California. In *Meridian Project Sys., Inc. v. Hardin Constr. Co.*, 404 F. Supp. 2d 1214 (E.D. Cal. 2005), the Court pointed out that the plaintiff was a Canadian corporation and assumed its injuries occurred there, "not in California," and that the specific misconduct alleged occurred in Chicago. *Id.* at 1225. *Van Slyke v. Capital One Bank*, No. 07-00671, 2007 WL 3343943 (N.D. Cal. Nov. 7, 2007) also involved alleged misconduct that did "not affect California residents and did not take place within the state." *Id.* at *14.

Nothing in the text of the UCL precludes its extraterritorial application. To the contrary, § 17500, Cal. Bus. & Prof. Code, expressly proscribes false advertising that harms non-California consumers. Furthermore, the courts have consistently construed the statute as having extraterritorial application in order to remedy deceptive practices that occur within the state. California courts have even recognized that a nationwide class action under the UCL can be maintained if certain conditions are met. First, to satisfy the threshold due process standard, the plaintiff must demonstrate that California has "'significant contact or significant aggregation of contacts'" to the claims of each class member such that [the] application of the forum's law is 'not arbitrary or unfair.'" *Washington Mutual Bank v. Superior Court*, 24 Cal. 4th 906, 919, 103 Cal. Rptr. 2d 320 (2001) (quoting *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821-22 (1985)). Second, if the constitutional test is met, the defendant bears the burden of demonstrating that other states have laws that are "materially different" from the UCL and, if so, that the other states have an interest in having their own laws applied to the dispute. "This means the trial court may properly find California law applicable . . . if the foreign law proponent fails to identify any actual conflict or to establish the other state's interest in having its own law applied." *Id.* at 920. Only if the defendant carries this burden is there a need for the trial court to determine whether California's interest or the other state's interest would be more impaired by application of one law or the other. *Id.*

In accordance with the *Washington Mutual* analysis, a national UCL class claim was upheld in *Wershba v. Apple Computer, Inc.*, 91 Cal. App. 4th 224 (2001). There, the plaintiffs alleged and settled a nation-wide UCL claim based on Apple's discontinuance of its free technical support program for various Apple products. Although most class members were non-California residents, the Court of Appeals held that the class claim had a sufficient constitutional nexus with California. *Id.* at 241-42. Citing *Clothesrigger, Inc. v. GTE Corp.*, 191 Cal. App. 3d 605 (1987), the court also quickly dispatched the choice of law issue by emphasizing the absence of any interest of other states in applying their laws:

> As in our case, even though transactions may have occurred outside California, the representations upon which the causes of action rested in *Clothesrigger* necessarily emanated from California. Furthermore, *Clothesrigger* explicitly held that California courts normally may apply California's pro-consumer laws to consumers from other states: "California's more favorable laws may properly apply to benefit nonresident plaintiffs when their home states have no identifiable interest in denying such persons full recovery."

*Id.* at 243 (quoting *Clothesrigger*, 191 Cal. App. 3d at 616). *Accord, e.g., Diamond Multimedia Systems, Inc. v. Superior Court*, 19 Cal. 4th 1036 (1999) (affirming viability of class claim on behalf of non-California residents who purchased stock of California corporation based on misrepresentations made in California).

Here, Kaiser is a California entity, injury occurred within the state and Pfizer's misconduct was specifically targeted at Kaiser. *See* Kaiser's Proposed Findings of Fact ¶¶93-94. The majority of Kaiser's members and the bulk of Kaiser's operations, including Kaiser's DIS, are located in California. *Id.* ¶88. DIS surveys the best available evidence on a drug and often, as it did for Neurontin, contacts the drug manufacturer to learn more about the drug. *Id.* ¶¶96-97. DIS creates drug monographs summarizing its findings and regional P&T Committees rely heavily on these monographs. *Id.* ¶96. The monographs are shared with all Kaiser regions during monthly teleconferences of formulary personnel and at interregional P&T Committee meetings. *Id.*; 3/4 Tr. (Millares) at 43-46 (describing the interregional formulary subcommittee at which all monographs are shared and evidence is discussed). Given this cross-pollination and information-sharing, the formularies across Kaiser regions are very similar, and certain formularies, like Kaiser's Medicare formulary, are identical across all regions. 2/26 Tr. (Carrejo) at 112-

13. "[A]ll of the P&T committees across Kaiser Permanente rely on the same evidence, rely on the [DIS] review of that evidence, rely on the same literature, and they make decisions on the products." 3/5 Tr. (Millares) at 93. This was specifically true concerning Neurontin, which was on-formulary across all Kaiser regions. Kaiser's Reply Findings of Fact ¶9 n.5.

Pfizer specifically targeted Kaiser and subverted the DIS mechanism. In this way, Pfizer used Kaiser's centralized DIS structure to disseminate the misleading information that Pfizer was touting. As Dr. Millares explained:

> [PMG physicians] depended on, you know, we're an evidence-based organization . . . and they depended upon the literature, what was out in the literature, they depended upon [DIS], and we depended upon the evidence, and so we came to wrong conclusions, and then they depended on the P&T committee and they depended on what we said and we depended on the literature, and so we've had . . . these lies basically that have permeated all this information, and now our physicians are convinced that [Neurontin] . . . has evidence to support it.

3/5 Tr. (Millares) at 94-95.

Pfizer's misrepresentations to Kaiser's California-based inquiry service caused DIS to convey inaccurate advice to the P&T committees and prescribing physicians who serve Kaiser's much smaller affiliated non-California health plans and their members. Because Pfizer's deceptive conduct was focused on and occurred primarily in California, the cases cited by Pfizer are inapposite. *E.g., Tidenberg v. Bidz.com, Inc.*, No. 08-5553, 2009 U.S. Dist. LEXIS 21916 (C.D. Cal. Mar. 4, 2009) (dismissing complaint with leave to amend insofar as it appeared to seek relief for non-California residents based on conduct outside of California); *Meridian*, 404 F. Supp. 2d 1214 (same); *Van Slyke v. Capital One Bank*, No. 07-00671, 2007 U.S. Dist. LEXIS 82690 (summary judgment against UCL claim by Ohio plaintiff based on conduct outside of California). Moreover, there is no presumption under California law against applying the UCL to conduct within California that subsequently harms firms or persons outside the state. *Diamond Multimedia*, 19 Cal. 4th at 1059-60 ("The presumption applied in *North Alaska Salmon* [*Co. v. Pillsbury*, 174 Cal. 1 (1916)] to a workers' compensation statute has never been applied to an injured

person's right to recover damages suffered as a result of an unlawful act or omission committed in California.").

Pfizer has not identified any reason why the states in which Kaiser's much smaller affiliated health plans operate would have any interest in applying their laws instead of the UCL. Not only was the deception centered in California, but most of the purchase transactions occurred in California. In addition, the purchases outside of California were paid or otherwise underwritten by Kaiser nonprofit plan organizations that are controlled by and closely integrated with the parent organization, which is located in California. Colorado, Maryland and Ohio, for example, have nothing to gain from applying their laws under these circumstances, and Pfizer has not carried its burden of demonstrating that other states have laws that are "materially different" from the UCL. Pfizer has "fail[ed] to identify any actual conflict [between the UCL and other states' laws] or to establish the other state's interest in having its own law applied." *Washington Mutual*, 24 Cal. 4th at 920.

### III. Kaiser Established Causation

Pfizer argues that "regardless of the prong [of the UCL] that Plaintiffs assert, their injury theory depends on their allegation that they were injured because Defendants withheld information about Neurontin's efficacy. . . . Accordingly, absent proof that Pfizer made fraudulent representations or omissions regarding Neurontin's efficacy, Plaintiffs cannot prove the injury and causation required to satisfy the UCL's standing requirements." Pfizer's Proposed Conclusions of Law at *3. This argument proceeds from a false premise. As set forth in Kaiser's Proposed Conclusions of Law, Kaiser's "unlawful" business practices claim, unlike its "unfair" or "fraudulent" business practices claims, imposes liability on Pfizer for sales of an ineffective product resulting from unlawful off-label marketing, irrespective of whether that marketing was also fraudulent. As the Court previously found, Dr. Rosenthal's methodology is sufficiently sound to permit the trier of fact to estimate the percentage of Neurontin prescriptions for the indications at issue resulting from Defendants' off-label marketing efforts. *See* Dkt. No. 2520. While Dr. Rosenthal's ability to measure the impact of Defendants' *fraudulent* off-label marketing depends on Kaiser's proving, by a preponderance of the evidence, Dr. Rosenthal's

assumption that all such marketing was necessarily fraudulent (a fact Kaiser has proven to the satisfaction of the jury, as well as the Court), her estimates of the impact of the marketing effort provide a reliable measure of restitution on Kaiser's unlawful business practices claim which is *not* so dependent.

Following the roadmap set out by this Court, Kaiser has also established causation on its claims for "unfair" and "fraudulent" business practices in violation of the UCL. In its denial of Pfizer's motion for summary judgment, the Court explained:

> Kaiser argues that, due to Pfizer's fraudulent misrepresentations about and withholding of certain negative studies for these indications, the recommendations of its Drug Information Service (DIS) were tainted. Because DIS drug monographs for Neurontin, prepared by Kaiser and used by Kaiser's P&T committee, directly influenced Kaiser's decision to expand its formulary, a reasonable inference can be drawn that Kaiser was directly injured by Pfizer's misrepresentations about Neurontin. . . . Kaiser directly relied on the "half truths" put forth by Pfizer through publications, monographs, and other communications to Kaiser and to the general public. . . .
>
> Kaiser alleges that, had Pfizer not made misrepresentations regarding Neurontin's effectiveness for certain off-label indications, DIS's activities would have highlighted problems with Neurontin such that Kaiser could have responded sooner and thereby reduced its payments and reimbursements for Neurontin. These activities represent direct interaction between Kaiser and Pfizer, providing the evidence of causation alluded to by the *Desiano* court. . . .

*Neurontin*, 677 F. Supp. 2d 478, 496-97 (D. Mass. 2010). Kaiser has offered, and this Court has admitted, all of this evidence during trial.

Pfizer's fraud on Kaiser was repeated, widespread, and effective.[6] Kaiser's Proposed Findings of Fact ¶95. As discussed above, DIS materially relied on Pfizer's misinformation, to Kaiser's detriment. DIS monographs are shared throughout all Kaiser regions and the formularies are either identical – in the

---

[6] *E.g.*, 2/26 Tr. (Carrejo) at 97:20-23 (Kaiser was detailed by Defendants concerning Neurontin); 99:13-102:19 ("detailing effort worked dramatically"), Plaintiffs' Exhibit 286; 104:15-107:15 (Defendants "have a concerted effort to work with the physicians that have the ability to put a drug on formulary or deny its access to formulary."), Plaintiffs' Exhibit 250); 3/4 Tr. (Millares) 50:22-59:11 (explaining how Defendants' payments tainted case reports relied on by DIS when creating Neurontin monograph, and how the truth of those payments was not revealed until discovery in this litigation), Plaintiffs' Exhibits 322, 23, 27); 76:6-81:24 & 86:8-88-6 (describing Defendants' suppression of negative results from studies in the beginning of 1999, the materiality of that information which, had it been know, would have caused Kaiser not to recommend Neurontin for additional pain uses in September 1999 monograph); 3/5 Tr. (Millares) 79:15-86:25 (same).

case of the Medicare formulary – or "very, very similar" across the Kaiser regions.[7] As discussed above, Neurontin itself was on-formulary across all Kaiser regions. Kaiser's Reply Findings of Fact ¶3 n.5. Pfizer's attempt to introduce fissures between formularies in different regions to break the chain of causation is unavailing.

Kaiser has proved by a preponderance of the evidence that Pfizer's misrepresentations caused Kaiser to pay for Neurontin prescriptions that it otherwise would not have purchased for each of the indications at issue: bipolar and mood disorders; migraine; neuropathic pain; nociceptive pain; and dose. Kaiser's Proposed Findings of Fact ¶¶96-106. For example, for neuropathic pain and bipolar – the two indications challenged by Pfizer, Pfizer's Proposed Conclusions of Law at *5-8 – Kaiser has proved causation by demonstrating not only that material studies were suppressed, but also that their suppression impacted DIS and, ultimately, P&T Committee decision-making. Kaiser's Proposed Findings of Fact ¶¶98 & 100-101.

The Court has already repeatedly considered and rejected Pfizer's contentions that Kaiser was on notice of the fraud. As previously set forth in Kaiser's opposition to Pfizer's directed verdict motion, Dkt. No. 2695, Pfizer continued to execute its comprehensive, multifaceted, national strategy to trumpet Neurontin's use in treating bipolar disorder well after the Pande study became public. *See* Dkt. No. 2695 at 8-9. Pfizer's fraudulent marketing of Neurontin for neuropathic pain also drowned out whatever

---

[7] *E.g.* 2/26 Tr. (Carrejo) at 99:13-102:19 (NW region); 110:17-23 (the DIS-prepared monographs are shared throughout Kaiser nationally and "there's monthly teleconferences between the formulary committees, the formulary personnel in each of the regions. Also, that monograph is archived and is available on our internal website."); 112:11-113:1 (Kaiser's "Medicare formulary is a [single] national formulary" and Kaiser's non-Medicare formularies are substantially similar between the Kaiser regions which is unsurprising because "specialists review the evidence in a given region and come to the same conclusion for the most part"); 3/3 Tr. (Hyatt) at 103:7-104:1 (explaining how Neurontin P&T committee information developed in one region was disseminated to other regions and his trips to other regions for this purpose; "The pharmacy and therapeutics chairs and staffs from all of the Kaiser regions meet on a regular basis."); 3/4 Tr. (Millares) 43:21-44:3 (Drug Information Services in Downey, California provides information, monographs and other services to "all of our Kaiser Permanente regions across the United States. We have mechanisms for doing that. We have also numerous inter-regional committees that meet over teleconference with the other regions."); 45:6-25 (same); 3/5 Tr. (Millares) 93:2-18 ("all of the P & T committees across Kaiser Permanente rely on the same evidence, rely on the Drug Information Services' review of that evidence, rely on the same literature . . . there's nuances that are different and some differences in the formulary status, but it's very, very similar.")

incomplete awareness Kaiser may have had of the Gorson study or unblinding of the Backonja study. Pfizer's subsequent representations of those studies either did not mention the unblinding or did not mention Gorson at all. *See* Kaiser's Proposed Findings of Fact ¶¶58-60, 62.

The truth about Neurontin began to be exposed in 2002 by major press outlets, especially following a Freedom of Information Act lawsuit. *See United States ex rel. Franklin v. Parke-Davis*, 210 F.R.D. 257 (D. Mass. 2002). Kaiser's corrective conduct, promptly following the publication of those articles – which only began to reveal Pfizer's misconduct concerning Neurontin – amply supports the notion that Pfizer caused Kaiser to pay for more Neurontin prescriptions than Kaiser otherwise would have purchased. In late 2002, Kaiser undertook a major re-education campaign in an attempt to curb inappropriate utilization of Neurontin and to inform PMG physicians about Pfizer's misconduct as reported in the press. Kaiser's Proposed Findings of Fact ¶104. This effort focused on all of the indications at issue in this case, and was not limited, as Pfizer maintains, only to bipolar or neuropathic pain. Re-education efforts were coordinated in Kaiser's California headquarters, but were shared with all Kaiser regions across the country. *Id.*[8] And, Kaiser's efforts were remarkably successful despite: (1) the years of misinformation that Pfizer widely disseminated concerning Neurontin; (2) the fact that in 2002 and 2003 only the first layers of the fraud onion were being peeled back; and (3) that the whole truth would only be revealed much later, in part through this litigation and at trial. *Id.* ¶¶105-06. In a relatively short time, Kaiser achieved a 34% decrease in new starts of Neurontin *while during the same period nationwide Neurontin prescriptions continued to increase. Id.* ¶105. The scope of the re-education effort is evident from the decrease in Kaiser's Neurontin prescriptions across specialties of PMG physicians. *Id.*

---

[8] *See also* 2/26 Tr. (Carrejo) at 99:13-100:3 (describing "inter-regional" effort to curb Neurontin overutilization, and semi-annual meetings and "monthly teleconferences across [all Kaiser regions] for those individuals who were heading up those initiatives"); 117:21-24 (all PMG doctors were invited to attend the re-education teleconferences); 120:19-123:18 (re-education efforts were not limited to neuropathic pain and also focused "specifically [on] bipolar disease and also treatment of migraine headache and generalized pain or nociceptive pain"); TX 353; 124:4-16 (re-education resulted in a 34% decline in new Neurontin prescriptions across specialties at the same time that Neurontin prescriptions outside of Kaiser were increasing); 3/3 Tr. (Hyatt) at 106:2-12 (re-education included pain, bipolar, migraines).

This Court has already noted this clear evidence of causation:

> Kaiser has shown that it was able to reduce its payments for Neurontin through an information campaign with more complete data regarding off-label uses of Neurontin that was initiated in 2002 after news reports of Pfizer's fraudulent activities began to surface. . . . The reduction in Neurontin prescriptions after Kaiser learned the truth about Pfizer's misrepresentations and took action is strong evidence of a causal link between Pfizer's misrepresentations and Kaiser's alleged injuries.

*Neurontin*, 677 F. Supp. 2d at 497. As Dr. Hyatt explained when describing the success of the re-education initiative, the charts showing the change in trend and the decline in Neurontin utilization as the initiative took effect *"represent[] the impact, the effect*, that our educational approach, our communication approach, our peer review approach had in trying to drive appropriate prescribing of Neurontin." 3/3 Tr. (Hyatt) 114:16-116:3 (emphasis added); *see also* TX 338.

Pfizer's complaint that Kaiser failed to remove Neurontin from the formulary does not warrant much attention. Kaiser witnesses explained that removing Neurontin from the Kaiser formulary was not a viable alternative and conflicted with core Kaiser principles and that PMG physicians were free to prescribe off formulary.[9] Kaiser's Reply Findings of Fact ¶¶55-56. This is especially true, where, as here, the truth about Neurontin has continued to leak out over the course of this litigation. 3/3 Tr. (Hyatt) at 107:13-108:15 (explaining that had he known the full extent of the evidence he would not have written that Neurontin is effective for certain forms of neuropathic pain and instead "would have made a statement that Gabapentin, Neurontin, is not effective in neuropathic pain, period"); 115:25-116:3 (not aware of the extent of the taint of the medical literature in 2003 and "only learned that recently").

---

[9] 2/26 Tr. (Carrejo) at 117:25-118:10 (removal from formulary is a draconian approach and "isn't the way we do business at Kaiser"); 127:8-128:10 (re-education is a continuing project because new evidence is still emerging and it is difficult to change prescribing habits); 3/3 Tr. (Hyatt) at 104:2-105:6 (explaining that Kaiser "preferred the [e]ducational approach" of re-education instead of the more severe restrictions approach); 113:13-114:15 (re-education campaign is ongoing and more appropriate than removing from the Kaiser formulary because Neurontin still is FDA-approved for seizures); 3/5 Tr. (Millares) 93:19-95:14 (explaining that formulary removal is not a practical solution because, *inter alia*, "product is also on the national Medicare formulary, so we have to have it available for our Medicare patients which make up, you know, a good portion of our Kaiser membership" and that fundamentally the key Kaiser technique in this type of situation is re-education based on evidenced-based medicine, even if formulary removal appears to be a more "simple" route).

### IV. Kaiser Established Injury

#### A.   Kaiser Proved Ineffectiveness for the Indications at Issue

Pfizer argues for an impossible standard of proof – one far more onerous than the prevailing law – and then argues that, under that standard, Kaiser has failed to prove that Neurontin was ineffective for the indications at issue. Pfizer argues categorically that "Plaintiffs cannot, by reliance on negative studies, prove that Neurontin was ineffective for the conditions at issue for *all* patients." Pfizer's Proposed Conclusions of Law at 12. Pfizer argues that it is impossible to prove this negative, because there will always remain some combination of dose and subset of the patient population that has not yet been studied. While Pfizer may be technically correct that Neurontin's inefficacy in treating the conditions at issue has not been established to an epistemological certainty, Kaiser's burden at trial is merely to establish that it is more likely than not that Neurontin is ineffective for the conditions at issue. Defendants' repeated failure to establish Neurontin's efficacy despite a series of controlled trials is more than sufficient to sustain this burden, notwithstanding the remaining theoretical possibilities.[10]

Kaiser set forth at trial, in its proposed Findings of Fact, and in its response to Pfizer's Proposed Findings of Fact, substantial evidence of Neurontin's inefficacy for the indications at issue in this case.[11] On bipolar disorder, for example, Pfizer continues to argue that the uniformly negative DBRCTs should be discounted because of the patient population studied in each,[12] but, having had two decades to design such studies, Pfizer presents no authority for its argument that it should be entitled to a presumption of efficacy for unstudied populations. On neuropathic pain, Pfizer continues to argue that "there are no

---

[10] In arguing that Kaiser cannot extrapolate from negative studies to a larger patient population to demonstrate inefficacy, Pfizer cites only to one portion of the Court's opinion on *Daubert* motions in the products liability cases, in which the Court described a series of studies and summarized the parties' experts' differing interpretations of them. It made no "observation," as Pfizer contends, that a negative study over a three-month period did not conclusively disprove plaintiffs' theory that an effect would be seen over a longer duration. *See In re Neurontin Marketing, Sales Pracs. & Prods. Liab. Litig.*, 612 F. Supp. 2d 116, 148 (D. Mass. 2009).

[11] *See* Kaiser's Proposed Findings of Fact ¶¶4-8 (bipolar disorder); 25-27 (migraine); 36-37 (neuropathic pain); 67 (dosages above 1800 mg/day); 77-78 (nociceptive pain); Kaiser's Reply Findings of Fact ¶¶57-71 (neuropathic pain); 84-91 (bipolar); 99-104 (migraine); 105-112 (dosage).

[12] Contrary to Pfizer's contentions, the Vieta study included non-refractory patients. (*See* TX 398 and 469.)

FDA-approved drugs to treat all forms of neuropathic pain," but fails to acknowledge that Pfizer abandoned seeking FDA approval for that indication when it realized that Neurontin did not have the evidence to support that indication.[13]

Pfizer's attempt to establish efficacy based on statements found on the website of Kaiser, a victim of Pfizer's fraud, or based on prescriptions written by a single doctor,[14] also fails. The content found on Kaiser's website was provided by a third-party contractor of Kaiser's,[15] and the representations regarding Neurontin, which Kaiser took steps to address once they were discovered,[16] merely reflect the pervasiveness of Pfizer's fraud and the degree to which Defendants succeeded in corrupting the body of scientific knowledge concerning Neurontin. Pfizer's argument is based on the false premise that Kaiser must prove that there is "*no* evidence supporting gabapentin's efficacy in any treatment of any neuropathic pain." Pfizer's Proposed Conclusions of Law at 11 (emphasis added). Kaiser must prove, and, as found by the jury, has proven, with scientifically valid evidence that it is more likely than not that Neurontin is ineffective for neuropathic pain and other indications and that Pfizer misrepresented the scientific evidence when promoting Neurontin.

> B. **Kaiser Proved That Cheaper And More Optimal Drugs Were Available And Would Have Been Used** [17]

Pfizer argues that Kaiser did not introduce "complex and individualized" patient-by-patient evidence concerning cheaper and more optimal drugs. Pfizer Conclusions of Law at 14-15. Pfizer later concedes that Kaiser "could not" have offered such individualized evidence, but still seeks to hold Kaiser to that standard. However, that is not the applicable legal standard. As the Court previously noted, *Desiano v. Warner-Lambert Co.*, 326 F.3d 339 (2d Cir. 2003) sets forth a workable standard. *See In re Neurontin Mktg. &, Sales Practices Litig.*, 433 F. Supp. 2d 172, 185-86 (D. Mass. 2006) (citing *Desiano*

---

[13] *See* Kaiser's Reply Findings of Fact ¶61.
[14] Dr. McCrory's prescriptions, like those of other doctors, reflect the continued impact of Defendants' fraud. *See* Kaiser's Reply Findings of Fact ¶77.
[15] 2/26 (Carrejo) 131:6-132:7.
[16] 2/26 (Carrejo) 132:8-133:9; 3/2 (Carrejo) 137:15-138:5; 143:2-143:25.
[17] This section is presented in the alternative and is relevant only if the Court were to find that Kaiser failed to demonstrate inefficacy by a preponderance of the evidence.

*v. Warner-Lambert Co.*, 326 F.3d 339, 349-50 (2d Cir. 2003)). In *Desiano*, the Second Circuit allowed "insurance companies . . . to claim -- precisely as they do here – that the defendants engaged in a scheme to defraud it, and that the company suffered direct economic losses as a result." *Desiano*, 326 F.3d at 350. The Court agreed and denied Pfizer's motion to dismiss with an electronic notation to the docket on September 27, 2006.

Kaiser offered evidence that Neurontin did *not* perform as expected, rendering *Peterson* and the other cases cited by Pfizer inapposite. *See* Pfizer's Conclusions of Law at 14. In addition, Kaiser identified a list of cheaper and more optimal drugs that would have been prescribed instead of Neurontin but for Pfizer's misrepresentations. 3/4 Tr. (Millares) at 88-90. Dr. Millares testified that she "develop[ed] a list of drugs that would be considered more optimal than Neurontin for these various indications, taking in various factors, including their safety, their efficacy, their cost, the whole picture for the pharmaceutical drugs." *Id.* Given PMG physicians' high degree of formulary adherence, *see* Kaiser's Proposed Findings of Fact ¶90, Dr. Millares' testimony concerning the availability of the cheaper and more optimal alternatives and the contemporaneous evidence in each of the monographs of alternatives to Neurontin, Kaiser has proved that cheaper and more optimal drugs would have been prescribed instead of Neurontin but for Pfizer's misrepresentations.

## V. Kaiser Established the Amount of Damages with Requisite Certainty [18]

As set forth in Kaiser's Proposed Conclusions of Law, *see* Kaiser's Proposed Conclusions of Law ¶40, in *McAdams v. Monier, Inc.*, 182 Cal. App. 4th 174, 105 Cal. Rptr. 3d 704 (Cal. Feb. 24, 2010) the California Supreme Court recently clarified the relaxed standard of proof applicable to determining the amount of restitution for violations of the UCL. *McAdams* distinguished between the UCL's standing requirement, which was made more stringent through Proposition 64, and the relaxed standard for determining the precise amount of restitution to which absent class members are entitled, finding that

---

[18] Kaiser previously responded to Pfizer's damages arguments in Kaiser's Opposition to Defendants' Motion for Judgment As a Matter of Law Based Upon Lack of Sufficient Evidence to Prove Damages, Docket No. 2693, and hereby incorporate by reference that opposition.

restitution can be recovered without individualized proof of deception. *McAdams*, 182 Cal. App. 4th at 189; *accord In re Tobacco II Cases*, 46 Cal.4th 298, 311-24. *McAdams* applied this distinction to hold that absent class members could recover restitution without individualized proof of deception, affirming the "broader relief" available under Section 17203 of the UCL. *McAdams*, 182 Cal. App. 4th at 191-92.

Kaiser is entitled to restitution of all amounts that Pfizer "'*may have been acquired*' . . . by means of" Defendants' violations of the UCL. *Id.* at 189 (emphasis added in *Tobacco II*, 46 Cal. 4th at 320, 93 Cal. Rptr. 3d 559). Dr. Hartman's calculations of Kaiser's losses, based on the application of Dr. Rosenthal's analysis to Kaiser's net purchases of Neurontin, satisfy the UCL's "patently less stringent" standard. *See* Kaiser's Proposed Findings of Fact, Appendix B, Table 1B (Dr. Hartman's calculations of restitutionary amounts claimed by Kaiser including interest at the prime rate). As Kaiser explained in its Proposed Findings of Fact, and as Dr. Hartman testified at trial, these calculations are based on this case's extensive record, distinguishing this case from the cases cited by Pfizer in its Proposed Conclusions of Law which merely hold that an award of restitution must not be arbitrary or capricious. *See People v. Fortune*, 28 Cal. Rptr. 3d 872 (Ct. App. 1st Dist. 2005) (addressing method of calculation in welfare fraud prosecution), and that there must be some support in the record for a restitution award. *See Colgan v. Leatherman Tool Group, Inc.*, 38 Cal. Rptr. 3d 36, 63 (Cal. App. 2d Dist. 2006) (stating that the record "contains *no* evidence concerning the amount of restitution necessary to restore purchasers to the *status quo ante*") (emphasis in original). Dr. Hartman's calculations are neither arbitrary nor capricious, and are well-supported by the record.

Kaiser has established the amount of appropriate restitution with reasonable certainty. *See* Kaiser's Proposed Conclusions of Law ¶¶37-42. Dr. Rosenthal calculated the percentages of Neurontin prescriptions, by indication, that would not have been written but for Defendants' wrongful conduct. Dr. Hartman used those percentages to monetize the amount of Kaiser's loss.[19] Dr. Rosenthal's and

---

[19] Pfizer asserts that the alternative damages theory monetized by Dr. Hartman fails to take into account factors specific to each physician's decision to prescribe and each patient's experience with Neurontin. Dr. Hartman and Dr. Rosenthal testified at length that their analysis focuses on aggregate patterns of
*Footnote continued on next page*

Hartman's analyses sufficiently constitute the "substantial evidence" of a "measurable amount" necessary to "restore to [Kaiser] what has been acquired by violations of the statute." *Colgan*, 38 Cal. Rptr. 3d at 61 (Ct. App. 2006). The Court previously made a "find[ing] that Dr. Rosenthal is qualified to render an opinion on the fact of harm, and her methodology is reliable." Docket No. 2520 at 2. The Court confirmed this ruling by allowing Dr. Rosenthal and Hartman's analysis and conclusions to go to the jury.[20]

### VI. Kaiser's Claim Under the Unlawful Prong of the UCL Is Not Preempted

Kaiser addressed Pfizer's previously asserted preemption claims in its proposed Conclusions of Law ¶¶16-18. As explained in that submission, the UCL "borrows" violations of other statutes, including those, like the FDCA, that do not provide a private right action, and makes them actionable. This "borrowing" provision has been applied to several federal statutes, including the FDCA. In *Watson Laboratories, Inc. v. Rhone-Poulenc Rorer, Inc.*, 178 F. Supp. 2d 1099, 1120 (C.D. Cal. 2001) – an order issued two months after *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001), cited by Pfizer as contrary authority – the court found that "violation of FDA regulations falls squarely within [the] broad proscription" of the UCL.

*Buckman*'s holding itself is far more limited than Pfizer argues. In *Buckman*, plaintiffs complained about a fraud on a federal agency, the FDA. The Supreme Court held that a state law claim of fraud on the FDA conflicted with, and was therefore preempted by, the FDCA. *See Buckman*, 531 U.S. at 353. The *Buckman* court explicitly contrasted "situations implicating 'federalism concerns and the historic primacy of state regulation of matters of health and safety,'" where a presumption *against* pre-emption applies, with the situation in *Buckman*. *Id.* at 348 (quoting *Medtronic, Inc. v. Lohr*, 518 U.S.

---

*Footnote continued from previous page*
promotion and prescribing, and that such individual considerations are not relevant in assessing causation or damages on an aggregate basis. Moreover, Dr. Millares testified and provided an affidavit concerning the cheaper and more optimal drugs. *See* 3/4 Tr. (Millares) at 89:6-24.

[20] Dr. Hartman did not need to disaggregate damages among the different Kaiser subsidiaries. Kaiser contracts with PMG physicians to provide medical care, but Kaiser, specifically through its contracts and material services departments, purchases the drugs. *See* 2/26 Tr. (Carrejo) at 87; 3/3 Tr. (Hyatt) at 130.

470, 485 (1996)). Unlike *Buckman*, this case involves no conflict between state and federal laws or policies. Rather, the "unlawful" prong of the UCL in this case is based on a violation of a clear *federal* prohibition on unlawful off-label marketing. Moreover, the claims here directly implicate "matters of health and safety," leading to a presumption *against* pre-emption. *Buckman*, 531 U.S. at 348, 353 (explicitly recognizing that "*Medtronic* can be read to allow certain state-law causes of actions that parallel federal safety requirements").

None of the cases cited by Pfizer in which § 17200 claims were found to be barred involved, as here, a criminal guilty plea for violations of the FDCA. Instead, they arose out of claims based on alleged violations of the FDCA where it was not clear whether the FDA regulations actually had been violated, a determination the courts found to be better left to the FDA in the first instance. *See Perez v. Nidek Co.*, 657 F. Supp. 2d 1156, 1166 (S.D. Cal. 2009); *PhotoMedex, Inc. v. Irwin*, No. 07-56672, 2010 WL 1462377, at *7 (9th Cir. Apr. 14, 2010) ("PhotoMedex is not permitted to circumvent the FDA's exclusive enforcement authority by seeking to prove that Defendants violated the FDCA, when the FDA did not reach that conclusion.").[21] [22] In this case, Pfizer's violation of the FDCA is beyond doubt.

### VII. Kaiser's UCL Claims Are Not Barred by the Statute of Limitations

Pfizer makes the same statute of limitations arguments it made in its motions to dismiss the Class and Coordinated Complaints over four years ago.[23] At that time, the Court acknowledged that "the statute of limitations runs when plaintiffs are on notice that they may have been defrauded" and declined to

---

[21] Kaiser addressed Pfizer's other two citations – *In re Epogen & Aranesp Off-Label Marketing & Sales Practices Litigation*, 590 F. Supp. 2d 1282 (C.D. Cal. 2008) (appeal pending) and *Summit-Tech., Inc. v. High-Line Med. Instruments Co.*, 922 F. Supp. 299 (C.D. Cal. 1996) – in its proposed Conclusions of Law.

[22] Magistrate Judge Sorokin succinctly dealt with Defendants' First Amendment argument four years ago on motions to dismiss: "This argument has no application to this case because '[T]he First Amendment does not shield fraud . . . the intentional lie is no essential part of any exposition of ideas.'" (Dkt. No. 269 at 55 (quoting *Illinois, ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 612 (2003) (internal quotations omitted).

[23] Kaiser previously responded to Defendants' statute of limitations arguments in Kaiser's Opposition to Defendants' Motion for Judgment as a Matter of Law Based Upon RICO Statute of Limitations, Dkt. No. 2695, and hereby incorporates by reference that opposition. The brief addresses in turn the *Franklin* case unsealing, Defendants' SEC reports, and the PINK SHEET snippet, and establishes that none of these alleged "disclosures" in fact disclosed Defendants' unfair, unlawful, and deceptive acts and practices.

dismiss the Complaints. Dkt. No. 269 at 56; Dkt. No. 356, at 25. The jury has now determined Kaiser's claims under both RICO and the UCL were not barred by the statute of limitations. Special Verdict Form, March 25, 2010, Docket No. 2760, at Q3.

California courts routinely apply the discovery rule to the UCL's four-year statute of limitations. In *Broberg v. The Guardian Life Ins. Co.*, 171 Cal. App. 4th 912 (2009), the court held:

> At least in the context of unfair competition claims based on a defendant's allegedly deceptive marketing materials and sales practices, which is simply a different legal theory for challenging fraudulent conduct and where the harm from the unfair conduct will not reasonably be discovered until a future date, we believe the better view is that the time to file a section 17200 cause of action starts to run only when a reasonable person would have discovered the factual basis for a claim.

*Id.* at 920-21 (citation omitted). Even where the discovery rule may not apply, fraudulent concealment, which was proven here, works to toll the statute of limitations. In *Snapp & Assocs Ins. Svcs., Inc. v. Malcolm Bruce Burlingame Robertson*, 96 Cal. App. 4th 884, 890 (Cal. App. 4th Dist. 2002), cited by Pfizer, the court acknowledged that the statute of limitations may be tolled if plaintiff "can successfully invoke the equitable tolling doctrine." *Id.* at 891.

California courts also apply *American Pipe* tolling. *See In re Hanford Nuclear Reservation Litig.*, 534 F.3d 986, 1009 (9th Cir. 2008) (explaining that statutes of limitations are intended to provide notice of a claim to defendants before the evidence supporting the claim grows stale and that a class action provides that notice, and so follow-on individual suits "cannot surprise defendants;" plaintiffs have the right to file at a time of their choosing within the limitations period; "and denying tolling would diminish that right"). In *San Francisco Unified School District v. W.R. Grace & Co.*, 37 Cal. App. 4th 1318, 1337-39 (Cal. App. 1st Dist. 1995), the Court held that *American Pipe* tolling was appropriate where federal class member school districts raised the same asbestos-remediation claims as the plaintiff did. Kaiser was a potential class member in the first proposed class action filed on May 14, 2004, tolling the statute of limitations to at least May 14, 2000, even without fraudulent concealment tolling.

Kaiser's claim is not time barred. As Kaiser's prior briefing outlines, and trial testimony confirmed, "the whole story . . . start[ed] to unfold" in 2002. 2/26 Tr. (Carrejo) 115:17-24; TX 319

(referencing 2002 THE WALL STREET JOURNAL and THE NEW YORK TIMES articles).[24] *See also* Kaiser's Reply Findings of Fact ¶¶159-164. Pfizer's opening statement admitted as much. Kaiser's Reply Findings of Fact ¶159 (Mr. Kennedy: "[I]n 2002 . . . [the *Franklin*] suit became public [and] was attendant with widespread publicity[.]"). Kaiser's claim accrued in 2002, when it became aware, through the press reports about the *Franklin* whistleblower suit, of the "exaggerated or false claims about the safety and efficacy" of Neurontin made by its manufacturers. Kaiser's Proposed Findings of Fact ¶ 104. Pfizer's fraudulent marketing continued into that year and later, *id.* ¶ 22, as Pfizer never published certain negative studies involving Neurontin, and their suppression only came to light in discovery and at or near trial in this case. Kaiser's claim is well within the UCL's four-year statute of limitations.

Dated: May 14, 2010                                Respectfully submitted,

                                                   By:    /s/ Linda P. Nussbaum
                                                          Linda P. Nussbaum

                                                   KAPLAN FOX & KILSHEIMER LLP
                                                   Linda P. Nussbaum
                                                   John D. Radice
                                                   Elana Katcher
                                                   850 Third Avenue, 14th Floor
                                                   New York, New York 10022

                                                   *Attorneys for Plaintiffs Kaiser Foundation
                                                   Health Plan, Inc. and Kaiser Foundation
                                                   Hospitals*

---

[24] Pfizer continues to mischaracterize the chronology of the *Franklin* case. As this Court is aware, and as Pfizer's *own* opening demonstrative shows, the details of the *Franklin* case only received publicity in 2002 following an intervention motion by third party media entities and an accompanying Order by this Court. *See United States ex rel. Franklin v. Parke-Davis*, 210 F.R.D. 257 (D. Mass. 2002). Similarly, the single statement in an SEC filing that the United States Attorney's Office was investigating Warner-Lambert's "promotion of NEURONTIN" and a single article in THE PINK SHEET that revealed no additional relevant information except Neurontin sales figures did not provide Kaiser with notice of the fraud, let alone its scope.

*Of Counsel*

Thomas Greene
GREENE, LLP
33 Broad Street, 5th Floor
Boston, MA 02109

Barry Himmelstein
Daniel Seltz
LIEFF CABRASER HEIMANN &
 BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339

Thomas M. Sobol
Kristen Johnson Parker
HAGENS BERMAN SOBOL
 SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142

Don Barrett
DON BARRETT, P.A.
P.O. Box 987
404 Court Square North
Lexington, MS 39095

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on May 14, 2010.

/s/ *John D. Radice*

John D. Radice