UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:  NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No.  1629<br><br>Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO:<br><br>THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA v. PFIZER INC., 04 CV 10739 (PBS) and<br><br>AETNA, INC. V. PFIZER INC., 04 CV 10958 (PBS) | Judge Patti B. Saris<br>Mag. Judge Leo T. Sorokin |

**PLAINTIFF KAISER'S RESPONSE TO DEFENDANTS'
PROPOSED FINDINGS OF FACT**

Plaintiffs Kaiser Foundation Health Plan, Inc.[1] and Kaiser Foundation Hospitals (collectively, "Kaiser") respectfully submit the following responses to Defendants' proposed findings of fact:[2]

## I.   Health Plan and the Regional Permanente Medical Group ("PMG") P&T Committees

1.  The Complaint provides notice that Health Plan brought suit on behalf of both parent and subsidiaries.[3]

2.  The Kaiser Plaintiffs and the PMGs have an exclusive contractual relationship and form an integrated medical care services program under the trade name "Kaiser Permanente" ("KP").[4]

3.  If Drug Information Services ("DIS") had known of the suppression of negative Neurontin studies or of biases in the literature, that information would have been disseminated throughout KP.  Each P&T Committee relies upon DIS prior to making formulary decisions, thus resulting in similar formularies.[5] Monographs and other information are shared with all regions through inter-regional teleconferences and committees.[6]  DIS was a key target for Defendants' promotion of pharmaceuticals.[7]  Once the truth about Defendants' off-label promotion began to emerge, an inter-regional effort to address inappropriate usage commenced at KP, and prescribing decreased throughout KP despite increasing usage nationwide.[8]

4.  The Kaiser Plaintiffs are closely intertwined entities with identical boards of directors and senior management and collectively reported finances.[9]

---

[1] Kaiser Foundation Health Plan, Inc. ("Health Plan") is the parent company of the following companies: Kaiser Foundation Health Plan of Colorado; Kaiser Foundation Health Plan of Georgia, Inc.; Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc.; Kaiser Foundation Health Plan of the Northwest; and Kaiser Foundation Health Plan of Ohio.

[2] Paragraph numbers respond to corresponding paragraphs in Pfizer's Proposed Findings of Fact.

[3] 3d Am. Compl. [583] ¶ 7 ("As of December 2004, Kaiser Foundation Health Plan, Inc. had over 8.2 million members in nine states and the District of Columbia, with over 6 million members in California. The remaining members are in Colorado, Georgia, Maryland, Virginia, Oregon, Washington, Hawaii, Ohio and the District of Columbia.  . . . . From 1994 to the present, Kaiser Foundation Health Plan, Inc. has paid tens of millions of dollars for excessive prescriptions of Neurontin. . . .")

[4] *See generally* 3/3 Tr. (Hyatt) 99:9-102:7; 126:1-126:8; 127:18-23.

[5] 2/26 Tr. (Carrejo) 109:4-113:1; 3/5 Tr. (Millares) 93:2-93:18. All regions have identical Medicare formularies.  Their non-Medicare formularies are substantially similar.  Neurontin was on formulary in all regions. 2/26 Tr. (Carrejo) 112:11-113:1; 3/5 Tr. (Millares) 93:2-18; TX 840; 3/9 Tr. (Daniel) 95:6-18.

[6] 3/4 Tr. (Millares) 43:21-46:12.

[7] TX 240.

[8] 2/26 Tr. (Carrejo) 99:13-100:3; 124:4-16; 3/3 Tr. (Hyatt) 101:24-104:1; 111:16-112:6; 131:12-132:2.

[9] Bench Mem. Clarifying the Relationship Between the Kaiser Plaintiffs [2724] at 2 (citing http://xnet.kp.org/newscenter/pressreleases/nat/2009/021309q4yefinancials.html;

5.   Both Kaiser Foundation Hospitals ("Hospitals") and Health Plan are integrally involved in Kaiser's formulary process.  Health Plan collaborates with the PMGs to "develop, maintain, and implement" the KP regional drug formularies, and recognizes the P&T Committees as the bodies authorized to make decisions regarding specific drugs.[10]   The head of DIS, and Health Plan's Vice-President of Pharmacy Strategy & Operations are members of both California Regional P&T Committees.[11]

6.   Kaiser contracts with third-party vendors to provide website content.[12]  Prior to trial, Kaiser discovered that some of this content included information about Neurontin and off-label conditions, causing Kaiser to remove much of that content and to alert the responsible third-party vendor to the issue.[13]

## II.    Pfizer and Neurontin

7.   Undisputed.

8.   Gabapentin is Neurontin's generic name, not its chemical name.[14]

9.   On December 30, 1993, the FDA notified Warner-Lambert that it had approved Neurontin for the indication: "adjunctive therapy in the treatment of partial seizures with and without secondary generalization in adults with epilepsy" to a maximum effective dose of 1800 mg/day.[15]

10.    In May 2002, the FDA notified Pfizer that it had approved Neurontin for the indication: "management of postherpetic neuralgia in adults." The FDA rejected (a) Pfizer's proposed indication: "management of neuropathic pain associated with post-herpetic neuralgia" to avoid the inference that Neurontin was useful in other types of neuropathic pain; and (b) Pfizer's request to raise the maximum effective dose above 1800 mg/day, because there was no increased efficacy above 1800 mg/day.[16]

11.   The FDA determines that drugs are safe and effective for their intended purpose through adequate

---

http://xnet.kp.org/newscenter/pressreleases/nat/2002/043002q1financials.html); 3/19/10 Zatkin Dec. [2724-1] ¶5.

[10]  *See, e.g.* Exhs. A and B to 3/22 Katcher Dec. [2724-3, 4] (TPMG and SCPMG Regional P&T Committee Policy and Pharmacy Policy References); 7/12/07 Tr. (Carver) 49:25-50:24 (played 3/22).

[11]  3/4 Tr. (Millares) 48:21-49:19; Exhs. A & B to 3/22 Katcher Dec. [2724-3 at 2, 2724-4 at 2]; 7/12/07 Tr. (Carver) 9:24-10:08; 49:25-50:24 (played 3/22).

[12]  2/26 (Carrejo) 131:6-132:7.

[13]  2/26 (Carrejo) 132:8-133:9; 3/2 (Carrejo) 137:15-138:5;143:2-143:25

[14]  TX 382 at 13 (the chemical name of gabapentin is 1-(aminomethyl) cyclohexane acetic acid).

[15]  TX 9; 2/23 Tr. (Kessler) 33:8-25.

[16]  TX 195; 2/23 Tr. (Kessler) 47:14-49:14.

and well-controlled clinical trials.[17]

12.   This irrelevant proposition is not supported by the trial record.   Nowhere in the testimony cited by Pfizer is the phrase "standard of care" mentioned.

13.   Defendants (a) misrepresented their research to scientific peer-reviewed and other journals;[18] (b) gave materially misleading information directly to Kaiser;[19] and (c) controlled the content of CMEs in which they promoted Neurontin in a misleading manner while suppressing negative data.[20]

### III.   Kaiser's Formulary Decisions Were Caused By Defendants' Wrongful Conduct

14-20.   As early as 1994, Kaiser was Defendants' Number 2 HMO market target.[21]   Soon after Neurontin's launch, Parke-Davis conducted evaluations of its market potential for off-label uses, including PHN, DPN, and bipolar disorder, and created strategic plans and marketing documents for increasing its off-label sales.[22]   Unrestricted formulary access and Defendants' aggressive off-label marketing resulted in increased prescribing by PMG physicians.[23]   Kaiser, in addition to its formulary process, would have learned about negative studies but for their suppression through its research activities and an "inquiry service" that made regular contact with Defendants to request information on Neurontin.[24]

21.   Dr. Mellick was retained by Parke-Davis to investigate Neurontin's "potential role outside epilepsy."[25]   Drs. Millares and Daniel testified that this financial relationship was a source of bias that, if disclosed, would have caused them to discount the only evidence supporting Neurontin's efficacy for RSD and for the P&T Committee to reject the expansion of formulary restrictions in 1997.[26]

22.   The December 1998 JAMA article publicizing the Backonja study failed to reveal that once the

---

[17] 2/22 Tr. (Kessler) 166:11-167:5.

[18] *See e.g.,* Pl. Kaiser's Proposed Findings of Fact [Dkt. No. 2808-1] ("Kaiser's FoF"), ¶¶ 12, 14, 18-19, 30, 48, 49, 54.

[19] *See e.g.,* TX 301; 3/4 Tr. (Millares) 66:17-21; 68:5-13; 69:12-17; 76:15-77:10; 3/9 Tr. (Daniel) 100:18-101:14; Kaiser's FoF ¶¶ 99, 101, 102.

[20] *See e.g.,* Kaiser's FoF ¶¶ 12, 16-17, 20, 29, 31, 34, 51-53, 56, 57-60, 72

[21] TX 90 at 2, 11.

[22] TX 366 ¶¶ 11-13.

[23] *See* Kaiser's FoF ¶ 92 (PMG physicians subject to same influences as other doctors).

[24] *See* Kaiser's FoF ¶ 97.

[25] TX 25.

[26] 3/4 Tr. (Millares) 57:5-61:6; 116:11-116:19; TXs 23-25; 3/9 Tr. (Daniel) 97:15-98:23.

unblinded patients' pain scores were removed, the results were negative.[27]  In fact, the article made the opposite claim.[28]  Defendants chose not to implement the methods that could have removed this bias.[29]

23.  Defendants went to great lengths to minimize the impact of the negative Gorson study, the results of which were known to Defendants by at least August 1997.  The study was not made public until 1999 when it was published as a letter to the editor in a little-known publication.  This was despite the author's desire to publish the results as a full article in a more established journal.[30]

24-27.  DIS gave disproportionate weight to Backonja because it was presented as a positive DBRCT in a full article published in a major, peer-reviewed journal.[31]  DIS did not give weight to Gorson because it was published as a letter-to-the-editor in a journal that was not peer-reviewed.[32]  But for Defendants' manipulation of these studies, Kaiser's 1999 review would have revealed that Neurontin was ineffective for neuropathic pain.[33]  That information would have been disseminated throughout Kaiser.[34]

28.  Defendants misquote DIS's monograph which states that "[t]en other case reports, open-label trials and reviews involving over 200 patients suggest that gabapentin may be effective as monotherapy or adjunctive therapy in some patients . . . who have failed conventional treatment" and "*[w]hile* there were no statistically significant trends noted regarding efficacy rates *by diagnostic subtypes or symptoms, several authors suggested gabapentin may work better in mild, as opposed to severe, mania.*"[35]

29-32.  Defendants were aware of the negative results of both Pande and Frye before DIS compiled its February 1999 monograph, but these studies were not disclosed when DIS contacted Defendants for information as part of its preparation.[36]  There is no evidence that Pande was disclosed to any PMG

---

[27] TX 1250; 3/1 Tr. (Jewell) 115:16-18; 118: 9-25; *See also* Kaiser's FoF ¶ 41.

[28] 2/24 Tr. (Abramson) 129:17-130:17.

[29] 2/24 Tr. (Abramson) 25:15-26:1; *See also* Kaiser's FoF ¶ 41.

[30] Kaiser's FoF ¶¶ 40, 48; 3/4 Millares Tr. 86:23-87:8

[31] 3/4 Tr. (Millares) 77:11-78:22.

[32] 3/4 Tr. (Millares) 78:25-79:18; 3/5 (Millares) 85:7-85:25.

[33] *See* Kaiser's FoF ¶ 101.

[34] *See* Kaiser's FoF ¶ 96.

[35] TX 543 at KAIS-004646 (italicized portion omitted from defendants' quote).

[36]  *See* Kaiser's FOF ¶ 98; TX 383; 2/25 Tr. (Barkin) 128:1-131:7;  132:10-133:8; 135:2-9;  2/23 Tr. (Abramson) 102:11-103:11; 103:22-104:15; 104:18-105:21; TX 1477.

physician prior to December 28, 1999, and no such disclosure was ever made to DIS.[37]   Defendants belatedly published the Pande study in October 2000 in an article that, *inter alia*, did not admit Neurontin's inefficacy and blamed the negative results on poor study design.[38]

33-36.   In the 2002 monograph, DIS recommended rejecting requests to prescribing restrictions for tiagabine and to add levetiracetam for the treatment of bipolar due to lack of evidence of efficacy.[39]

37-38.   Kaiser's initiatives began in its Northern California region when a DRUG review of the skyrocketing Neurontin usage revealed that many indications for which it was being utilized were off-label.[40] The initiative was joined by Southern California's DUAT months later, after news reports about Defendant's illegal promotion of Neurontin was made public. The effort then expanded to other regions, including the Northwest region, which reported a 38% drop in usage due to the initiative.[41]   In addition to neuropathic pain, the initiatives focused on bipolar, nociceptive and general pain, and migraine.[42]

39-41.   In late 2003 and 2004, initiatives across Kaiser reported dramatic decreases in utilization of Neurontin.[43]   Defendants' attempt to dismiss these results as cost containment measures is belied by the evidence:  when Kaiser lifted restrictions to allow prescribing for bipolar and neuropathic pain, there was the expectation of a significant cost impact, and the monographs noted that Neurontin was far more expensive than alternative drugs on the formulary.[44]   Kaiser does not penalize physicians for overutilizing expensive medications.[45]   Kaiser's initiatives are still ongoing, and now encompass both generic gabapentin and Lyrica.[46]   That Kaiser successfully took steps to curb inappropriate usage once evidence

---

[37] TX 461-A; 3/5 Tr. (Millares) 75:4-77:12.

[38] 2/25 Tr. (Dickersin) 51:15-52:23; *see also* Kaiser's FoF ¶ 12.

[39] TX 629 at KAIS-036780-1. Because there was some evidence of efficacy for topiramate, DIS expanded restrictions to allow psychiatrists to prescribe topiramate but only with guidelines for use and with the caution that "topiramate be used judiciously pending further study." *Id.*

[40] 2/26 Tr. (Carrejo) 111:3-111:25; TX 357 at KAIS-000138. TX 355 at KAIS-000358.

[41] *See* 2/26 Tr. (Carrejo) 114:23-117:8; TX 286; 3/3 Tr. (Hyatt) Tr. 104.

[42] *See, e.g.* 2/26 Tr. (Carrejo) 120:19-123:20; TX 344 (no evidence for non-neuropathic pain, some evidence of efficacy for certain forms of neuropathic pain but emphasize that it is not a first-line treatment); TX 353 (gabapentin not effective for bipolar, only more effective than placebo for migraine).

[43] *See* 2/26 Tr. (Carrejo) at 124; TX 272, TX 286, TX 333, TX 340, TX 338.

[44] TX 311 (cost impact for bipolar disorder); TX 327 (cost impact for neuropathic pain).

[45] 3/3 Tr. (Hyatt) 101:8-101:15.

[46] 3/3 Tr. (Hyatt) 111:2-111:11

of Defendants' unlawful conduct began to emerge makes it likely that Kaiser would have disseminated evidence of inefficacy, had it not been suppressed, before Neurontin's use had the chance to skyrocket.

42-51.  Defendants' fraud continued after 2002.  In 2005, Defendants completed but never published a9451008, a negative DPN study.[47]  Reckless was only published in a review article that misleadingly concluded that Neurontin was effective for neuropathic pain and more effective at doses above 1800 mg/day.[48]  Pfizer suppressed the POPP study until 2008.[49]  Defendants have never published the results of two negative migraine studies.[50]  Pfizer paid PMG's Dr. McCarberg to speak regularly about Neurontin, and secretly worked with him to prevent the publication of negative information about Neurontin.[51]

52-54.  *See* Response to ¶ 6.

55-56.  Removing Neurontin from Kaiser's formularies or adding restrictions would not have been an effective counter to inappropriate usage.  PMG physicians may prescribe any drug regardless of formulary status.[52]  "[T]he reason that doctors prescribe is not because . . . it's on or off the formulary, it's because they believe that the drug is effective or not effective, and that's created over years of education and training. . . . So the real thing is you need to educate the physicians, give them the information."[53]

## IV.  Neurontin is Ineffective for the Relevant Conditions

### A.  Neuropathic Pain

57.  PMG physicians first consider whether or not the drug is effective for the patient's chief complaint.[54]

58.  An ineffective drug is not a valid treatment option, especially where there are effective options.[55]

59.  Dr. Brenner did not testify that "most of the available alternatives for the treatment of neuropathic pain" lacked FDA approval, nor did he testify that alternatives to Neurontin tautologically "found acceptance" in clinical practice through clinical experience.  Dr. Brenner was not qualified to offer an

---

[47] Kaiser's FoF ¶ 45; TX 2096.
[48] Kaiser's FoF ¶ 52; TX 382; 2/24 Tr. (Abramson) 28:22-30:11; TX 1660.
[49] 2/24 Tr. (Abramson) 35:6-36:2.
[50] Kaiser's FoF ¶¶ 31-33.
[51] 3/3 Tr. (Hyatt) 120:5-122:22; TX 795; TX 279; TX 276; TX 278.
[52] 2/26 Tr. (Carrejo) 108:10-109:3.
[53] 3/9 Tr. (Daniel) 109:9-110:12; 3/3 Tr. (Hyatt) 136:12-137:18; 3/5 Tr. (Millares) 93:19-95:14.
[54] 3/3 Tr. (Hyatt) 110:5-20.
[55] *See* Responses to ¶¶ 115-19.

opinion as to why other physicians prescribed specific drugs for neuropathic pain.

60.   The gold-standard for determining efficacy is the DBRCT.   Lower-tier evidence is insufficient, especially in place of existing DBRCTs.[56]  In conditions with a high placebo rate, such as pain states and mood disorders, DBRCTs are especially useful to discern treatment from placebo effect.[57]

61.  Pfizer misleadingly implies that the FDA does not recognize a broad indication for neuropathic pain. An FDA Advisory Committee meeting was scheduled to *specifically address* whether Neurontin *could* be approved for a broad indication.[58]  But Pfizer was determined to "avoid" this review altogether.[59]

62.  The FDA standard for safety and efficacy is the global standard.[60]  Pfizer's non-litigation pain experts determined that Neurontin was ineffective for neuropathic pain.[61] Defendants presented no evidence that foreign regulatory approvals had a significant impact on U.S. prescribing.

63.  Dr. Brenner based his testimony on his clinical experience and an understanding of the published medical literature.[62]  He admitted he did not review all available studies because that would have been too "cumbersome."[63]  He did not conduct a meta-analysis.[64]  Instead, he relied on review articles (such as Cochrane) that he knew lacked the Reckless and POPP studies.[65]   Thus, Brenner did not consider the totality of the evidence[66] or weigh *all* available DBRCTs.   Dr. Bird's testimony was based on clinical experience and a selective analysis of studies, including non-DBRCTs.[67]  Bird relied on incomplete meta-analyses, and was unaware of Reckless or POPP prior to reading Kaiser's experts' reports.[68]

64-65.   There is no reliable evidence that Neurontin is effective for any neuropathic pain other than

[56] Kaiser's FoF ¶1.
[57] 2/23 Tr. (Kessler) 22:10-23:10; 23:18-24.
[58] TX 188.
[59] TX 168.
[60] 2/22 Tr. (Kessler) 169:23-170:3.
[61] Kaiser's FoF ¶36.
[62] 3/16 Tr. (Brenner) 62:14-24.
[63] 3/16 Tr. (Brenner) 68:1-69:13.
[64] 3/16 Tr. (Brenner) 70:3-6.
[65] 3/16 Tr. (Brenner) 69:17-19; 71:1-12.
[66] 3/16 Tr. (Brenner) 72:11-18; 73:2-4.
[67] 3/19 Tr. (Bird) 52:21-53:2.
[68] 3/19 Tr. (Bird) 75:19-76:11; 3/19 Tr. (Bird) 57:25-58:3; 67:5-9; 68:3-14..

PHN.[69]   None of the nine so-called studies cited by Defendants are actually positive for non-PHN pain: (a) Backonja, once corrected for unblinding, demonstrates that Neurontin is no better than placebo;[70] (b) Tamez-Perez is a one-page letter-to-the-editor, bereft of data or detailed methodology;[71] (c) Morello lacked a placebo control and was described by Pfizer as negative;[72] (d) results of the forced-titration Parsons study were clinically insignificant;[73] (e) and (f) Rowbotham and Rice were limited to PHN;[74] (g) Tai lacked a clearly defined endpoint—of ten possible primary outcomes, nine were negative;[75] (h) Levendoğlu—published in 2004—used the same forced titration design as Backonja;[76] (i) the results of Bone are unclear, as there is no clearly defined primary outcome or intention-to-treat (ITT) analysis;[77] and (j) there was no statistical significance in Serpell outside of PHN.[78]   Defendants also ignore POPP, which they concede is a negative study,[79] as well as more than 10 other studies relied upon by Dr. Perry, who in his meta-analysis found that any effect of Neurontin on neuropathic pain is clinically insignificant.[80]

66.   Defendants concede that the Gorson study was negative.[81]

67.   Removing data from potentially unblinded Backonja patients causes an 80% drop in the treatment effect without using sophisticated modeling techniques and methods.[82]

68.   All of these reviews omitted Reckless and POPP, as well as the true results of Backonja and Serpell.

69.   All of these texts omit the Reckless or POPP studies, thus compromising their conclusions.

70.   The Cochrane Review did not contain the negative results from the Reckless or POPP studies, or the

---

[69] Kaiser's FoF ¶ 37; 2/23 Tr. (Abramson) 138:5-9; *See* Response to ¶ 65.
[70] Kaiser's FoF ¶ 41.
[71] TX 1275.
[72] TX 137, 1332.
[73] 2/25 Tr. (Dickersin) 70:1-20.
[74] TX 1254, 1488.
[75] TX 1553.
[76] TX 1683.
[77] TX 1546.
[78] Kaiser's FoF ¶44.
[79] 3/19 Tr. (Bird) 63:14-63:22.
[80] Kaiser's FoF ¶37. Meta-analysis—a statistical technique reviewers such as the Cochrane Collaboration use to combine individual studies in order to determine an aggregate conclusion – is preferable to individual studies in determining the efficacy of Neurontin.  3/1 Tr. (McCrory) at 22:13-19.
[81] Kaiser's FoF ¶40; Pfizer's Proposed FoF [Dkt No. 2808-1] ¶ 83 ("a negative study (e.g., Gorson)").
[82] 3/1 Tr. (Jewell) 121:13-133:21.

underlying data from the Gorson, Serpell or Backonja studies.[83]

71.  These reviewers are unreliable for the same reasons as the Cochrane review discussed above.

72.  Dr. Perry's meta-analysis demonstrates a drop of 0.36 on an 11-point pain scale in non-PHN studies. No patient could discern such a difference.[84]  Dr. Bird admits that a 1-point drop is meaningless.[85]

73.  Dr. Gibbons, who is not a physician, testified that physicians understand the clinical significance of pain scores better than he.[86]  He admitted that he "synthesized" studies in PHN with studies for other forms of neuropathic pain in order to conclude that Neurontin was effective for all neuropathic pain.[87]

74.  Clinical experience cannot reliably determine whether or not a drug is effective.[88]  Without DBRCTs, treatment effect cannot be discerned from placebo response or other explanation for a perceived benefit (*e.g.*, observer or patient expectation, regression to the mean, natural fluctuation of disease).[89]

75-76.  *See* Response to ¶ 74.

77.  Dr. McCrory's Neurontin prescriptions are inextricably linked to Pfizer's fraud.[90]

78.  *See* Response to ¶ 74.

79.  *See* Response to ¶ 74. Defendants quantify the placebo response rate in pain to be as high as 40%.[91]  Dr. Maizels estimates that the Neurontin response rate in his practice is between 30% and less than 50%—well within the realm of the placebo response rate.[92]  He has prescribed Neurontin for neuropathic pain on less than a dozen occasions.[93]

80.  *See* Response to ¶ 74.

---

[83] 3/1 Tr. (Perry) 147:17-25; 149:15-150:8; 3/16 Tr. (Brenner) 71:1-4; 3/19 Tr. (Bird) 75:19-76:11.
[84] 3/2 Tr. (Perry) 94:9-95:1.
[85] 3/19 Tr. (Bird) 28:24-25 ("Now, the patient doesn't really care if there's a 1-point change on their Likert scale.").  Dr. Maizels stated that a good Neurontin response would be a 30% drop on an 11-point pain scale. 9/26/07 Tr. (Maizels) 57:10-12 (as played 3/16/10) (Defendants' designation).
[86] 3/15 Tr. (Gibbons) 75:4-13; 81:23-82:3.
[87] 3/15 Tr. (Gibbons) 90:23-91:14.
[88] Kaiser's FoF ¶1.
[89] 2/23 Tr. (Kessler) 22:25-23:10; 23:18-24.
[90] 3/1 Tr. (McCrory) 94:6-13; 3/2 Tr. (Perry) 89:10-13 ("[Dr. McCrory] too was duped just the same way I was because he didn't have access to the real data in this case.  He was falsely led to believe that gabapentin was a highly effective drug when it was not.").
[91] TX 1250 at 1833.
[92] 9/26/07 Dep. Tr. (Maizels) 73:10-13 (played on 3/16/10).
[93] *Id.* at 72:06-72:10.

81.  Clinical experience and patient observation cannot discern treatment effect from placebo effect and thus are not reliable evidence of efficacy.[94]  Meta-analysis is necessary to determine efficacy for patients as a whole, where trial results appear inconsistent.[95]  Only Dr. Perry's meta-analysis included *all* data, while Pfizer's suppression caused the other meta-analyses to be incomplete.[96]  *See also* Response to ¶79.

82.  *See* Response to ¶ 74.

83.  Kaiser's experts applied their findings of inefficacy to all patients categorically.[97]

### B.  Bipolar Disorder

84.  Dr. Slaby's testimony was based upon his clinical experience and a selective analysis of studies; it is not reliable scientific evidence of efficacy.[98]  First, anxiety disorders are irrelevant.[99]  Second, Slaby did not consider the negative Guille study.[100]  Slaby agreed that the placebo-controlled trial is the only method for determining efficacy.[101]  Slaby conceded that three of the four bipolar trials (Pande, Frye, Guille) were negative and that he never considered Pfizer's internal report of Vieta, which he admitted was negative.[102]  Slaby also relied on Mokhber, a 2008 Iranian study that lacked a placebo, and failed to monitor carbamazepine levels as required.[103]  Thus, Mokhber is unreliable.

85.  For the reasons above, neither Vieta nor Mokhber supports Neurontin's efficacy in treating bipolar.[104]

86.  Vieta falsely presented results from a *post hoc* cherry-picked subpopulation as if it were the results of the pre-specified intention-to-treat (ITT) analysis.[105]

---

[94] For example, Dr. Brenner testified, based on his clinical experience, that Neurontin is effective "for a subset [not a majority] of patients with neuropathic pain."  3/16 Tr. (Brenner) 20:6-7; *see also* 9/26/07 Dep. Tr. (Maizels) 73:10-13 (played on 3/16/10).

[95] 2/25 Tr. (Dickersin) 25:14-25; 3/1 Tr. (McCrory) 22:13-19.

[96] *See e.g.,* Response to ¶ 70; Kaiser's FoF ¶65.

[97] *See* Kaiser's FOF ¶¶ 4, 25, 36-37, 67.

[98] 3/19 Tr. (Slaby) 92:6-18.

[99] 3/19 Tr. (Slaby) 118:19-119:10; 121:15-122:3; 122:4-7.

[100] 3/19 Tr. (Slaby) 129:17-21; 130:15-25; 135:21-22.

[101] 3/19 Tr. (Slaby) 156:7-19.

[102] 3/19 Tr. (Slaby) 137:3-6; 138:20-23; 141:23-142:9; 145:14-16; *see also* Kaiser's FoF ¶¶8, 12.

[103] TX 2004 at ("Our study has several limitations and include: lack of a control group."); 3/19 Tr. (Slaby) 146:12-18; 147:3-8; 147:12-16; 3/16 Tr. (Brenner) 56:6-7 ("you absolutely have to measure blood levels of [carbamazepine]"); 3/19 Tr. (Bird) 22:4-5.

[104] Kaiser's FoF ¶¶8, 12; *see also* Response to ¶ 84.

[105] FOF ¶12.

87.  Dr. Barkin based his expert testimony upon the available placebo-controlled evidence.[106]  All four

such studies demonstrated that Neurontin was no more effective than placebo for bipolar disorder.[107]

88.  Defendants had two decades to design trials for as many bipolar subpopulations as they wanted, yet

the results of all trials were negative.[108]  Defendants are not entitled to a presumption of efficacy in

unstudied subpopulations.

89.  The Pande study's research report states: "Neither [measured] scale favored gabapentin.  To the

contrary, placebo patients showed a greater decrease in the total YMRS score than gabapentin patients."

Defendants blamed the negative results on poor trial design in an effort to minimize their impact.[109]

90.  In the Frye study, gabapentin performed no better than placebo.[110]

91.  In the Guille study, Neurontin failed to outperform placebo.[111]

92.  Neurontin's efficacy in treating disorders for which Kaiser does not seek damages is irrelevant.[112]

The diagnostic criteria for bipolar disorders include none of these conditions.[113]

93.  The Carta review is not reliable evidence of Neurontin's efficacy.  The authors incorrectly cited the

Guille study as positive, included an open-label study in their analysis of trials, and focused on non-

DBRCT evidence in reaching their conclusion.[114]

94.  *See* Response to ¶ 74.

95.  Dr. Barkin inherited two patients whom he convinced to discontinue their ineffective Neurontin.[115]

96.  As of his 2007 deposition, Dr. Chandler prescribed Neurontin only for anxiety disorders.[116]

97-98.  Clinical experience cannot reliably determine whether a drug is effective.  Response to ¶¶ 74-78.

---

[106] 2/25 Tr. (Barkin) 126:6-13.
[107] FOF ¶¶4-8.
[108] FOF ¶¶5-7.
[109] TX 383; FOF ¶12.
[110] FOF ¶6.
[111] TX 211; FOF ¶7.
[112] TX 405-N (excluding 300.0 "Anxiety States" and 300.2 "Phobic States").
[113] 3/19 Tr. (Slaby) 122:4-7.
[114] 2/24 Tr. (Abramson) 123:6-24.
[115] 2/26 Tr. (Barkin) 35:20-36:4; 39:3-7-20; 40:1-6.
[116] Chandler Dep. 66:9-13; 70:4-12; *see* Response to ¶ 92.

## C. Migraine

99.  A benefit of meta-analysis is the ability to overcome individual methodological deficiencies, such as the small sample size of the Wessely study (879-200).   Exclusion of Wessely would have been inconsistent with standard procedures for performing a meta-analysis.[117]   The phrase "trend" refers to a p-value between 0.05 and 0.1, which is a finding that is statistically insignificant by the scientific standards under which drugs are evaluated.[118]   Pfizer did not present a single migraine expert.

100.  Dr. Gibbons agreed with Dr. McCrory's meta-analysis: Neurontin was not statistically significantly different than placebo.[119]   Even under his own analysis, Neurontin failed to outperform placebo.[120]

101.   The Di Trapani study underscores the importance of conducting "a systematic review where you look at all of the evidence that's available."[121]   The two systematic reviews presented by Dr. McCrory and Dr. Gibbons both conclude that Neurontin is not statistically significantly better than placebo.[122]

102.  Pfizer presented no expert evidence that chronic daily headache is a condition related to migraine. [123]

103.  Dr. Gibbons' analysis shows that Neurontin is not statistically significantly superior to placebo.[124]

104.  *See* Response to ¶ 74.

### D. Doses Above 1800 mg/day

105.   The FDA twice rejected Defendants' claims that Neurontin had enhanced benefits above 1800 mg/day.[125]   Dr. Perry testified that the largest and "single most significant of all trials in scientific terms" (referring to the Reckless study) demonstrated no difference at higher doses.[126]   Dr. Abramson testified that Reckless's fixed-dose, parallel-group design is the "best research design" to measure effects at a

---

[117] 3/1 Tr. (McCrory) 74:25-75:20.
[118] 3/1 Tr. (McCrory) 82:22-84:2.
[119] 3/15 Tr. (Gibbons) 64:25-66:2. Dr. Gibbons is neither a physician nor an expert in migraine. 3/15 Tr. (Gibbons) 69:1-3; 75:4-9.
[120] 3/15 Tr. (Gibbons) 66:11-18.
[121] Kaiser's FoF ¶27; 3/1 Tr. (McCrory) 89:18-24 (discussing flaws of Di Tripani study).
[122] Kaiser's FoF ¶25; *see also* Response to ¶ 100.
[123] Dr. Gibbons expressly disclaimed any expertise on the subject.  3/15 Tr. (Gibbons) 69:1-3; 75:4-9.
[124] *See* Response to ¶ 100.
[125] Kaiser's FoF ¶67; 2/23 Tr. (Kessler) 48:14-49:14.
[126] 3/2 Tr. (Perry) 27:24-28:8; TX 382.

given dose and that Backonja's forced titration design cannot assess dose-proportional efficacy.[127]

106. Reports that a given dose is "well-tolerated" do not constitute evidence of efficacy at that dose.  In 1993, the FDA concluded that "the effective dose of Neurontin® [as an adjuvant therapy for epilepsy] is 900 to 1800 mg/day."[128]

107. In 2002, the FDA concluded that there were no additional benefits of Neurontin for PHN above 1800 mg/day.  Dr. Kessler testified that "there's no *increased* efficacy above 1800" mg/day.[129]

108. The seven studies Defendants cite are not reliable scientific evidence that Neurontin is more effective at dosages above 1800 mg/day.  The Rice study, like Reckless, used fixed dose groups and failed to show superiority of doses above 1800 mg.[130,131]  Backonja, Serpell, Parsons and Levendoğlu used a forced titration design, which cannot determine whether one dose offers enhanced benefits over another dose.[132]  Tamez-Perez is not reliable, and Bone's results are unclear.[133]

109-11. *See* Response to ¶ 74.

112. The texts cited by Dr. Bird are not reliable evidence, as they do not contain the results of the most significant dosing study (Reckless) and rely on corrupted forced-titration studies (*e.g.*, Backonja.)[134]

113. Defendants' continued to suppress key evidence long after this lawsuit was filed.[135]

## V.  Cheaper and More Optimal Medications

114. The generally accepted meaning of an "effective drug" is one which is more effective than a placebo.[136]  Efficacy is tested by comparing patients who have taken a drug to patients who have taken a

---

[127] 2/24 Tr. (Abramson) 28:22-29:8; 20:4-22.
[128] TX 9.
[129] TX 195; 2/23 Tr. (Kessler) 48:14-49:14 (emphasis added); Kaiser's FoF ¶67.
[130] *See* Response to ¶ 105; TX 1552.
[131] Rice was part of the sNDA in which the FDA found that "[a]dditional benefit" above 1800 mg/day "was not demonstrated." Kaiser's FoF ¶¶44, 67.
[132] *See* Response to ¶ 105. At least one of these studies (Backonja) was corrupted due to unblinding, another flaw of the forced titration design. Kaiser's FoF ¶41.
[133] *See* Response to ¶ 65.
[134] Kaiser's FoF ¶¶ 42, 51.
[135] *See* Responses to ¶¶ 42-51 above.
[136] 3/1 Tr. (McCrory) 86:7-86:17.

placebo.[137]  The jury found that Neurontin is ineffective for the indications at issue in this case.

115-117.  Dr. Millares, in her role as head of Kaiser's DIS, compiled a list of medications that Kaiser considers cheaper and more optimal than Neurontin, based on demonstrated safety and efficacy, and thus would have served as appropriate alternative medications for Kaiser members but for defendants fraud.[138]  Dr. Millares' opinion is bolstered by Kaiser's monographs, formulary, DUAT materials, and experts.[139]

118-19.  Boxed warnings and potential side effects do not limit the appropriateness of an alternative medication; rather they are information that physicians should be aware of when determining which of the effective alternatives to prescribe for a given patient.[140]  Defendants suppressed the FDA's finding of an increased risk of depression with or without suicidal ideation associated with Neurontin.[141]

**VI.    Pfizer's Unlawful Promotion Caused PMG Physicians to Prescribe Neurontin.**

120.  Physicians rely on various sources for information about drugs, including published articles of original research, review articles, continuing medical education, advertisements in journals, and sales representatives.[142]  However, DBRCTs provide the only evidence of a drug's effectiveness to treat a particular condition.[143]  Physicians' experiences are insufficient to support a finding of effectiveness.[144]

121.  PMG physicians practice evidence-based medicine.[145]  DBRCT's are the best evidence.[146]  Physicians and Kaiser's P&T Committees rely on DBRCTs.[147]  The evidence shows that PMG

---

[137] 3/1 Tr. (McCrory) 87:23-89:7.

[138] TX 365; 3/4 Tr. (Millares) 88:7-90:20.

[139] *See, e.g.* TX 311 (comparing cost of Neurontin and alternative bipolar medications); TX 327 (comparing   cost of Neurontin and alternative neuropathic medications); TX 344 (cost comparison of neuropathic medications);  2/25 Tr. (Barkin) 125:1-125:8; 3/1 Tr. (McCrory) 51:20-55:1; 3/1 Tr. (Perry) 142:20-143:12; 3/3 Tr. (Carrejo) 40:18-41:2; 3/4 Tr. (Millares) 72:22-75:10.

[140] 3/4 Tr. (Millares) 101:23-102:13; 109:22-110:21; 3/5 Tr. (Millares) 91:24-92.

[141] Kaiser's FoF ¶ 10.

[142] 2/23 Tr. (Abramson) 94:2-21.

[143] 2/22 Tr. (Kessler) 175:13-176:8; 2/23 Tr. (Kessler) 24:12-23; 26:23-27:2; 2/25 Tr. (Barkin) 127:5-9; 3/1 Tr. (McCrory) 17:18-18:2; 3/10 Tr. (Furberg) 79:1-5

[144] 2/23 Tr. (Kessler) 26:7 – 27:10.

[145] 2/23 Tr. (Kessler) 76:11-12; 3/3 Tr. (Hyatt) 110:5-110:12.   Evidence-based medicine is making clinical decisions based on scientific evidence." 2/23 Tr. (Kessler) 24:10-11.

[146] 2/23/Tr. (Kessler) 25:1-6.

[147] Kaiser's FoF at ¶¶ 94 – 104.

physicians write prescriptions for drugs that are on Kaiser's formulary over 95% of the time.[148]

122. Physician self-reporting is biased and deserves little weight.[149] Defendants' misrepresentations compromised PMG physicians and DIS's medical judgment.[150] New Neurontin prescriptions increased by 62% in Kaiser's Northwest region after a 1999 CME in which Neurontin was promoted.[151]

123. Dr. McCarberg is not a credible witness.[152] Dr. Maizels testified that suppression of evidence would influence physicians' interpretation of evidence and prescribing of Neurontin.[153]

124. Dr. Dea testified that she has a single patient taking Neurontin but that patient is also on Lithium and is using Neurontin because he believes it helps with anxiety and sleep.[154] Even if a patient reported that Neurontin was effective in treating a condition, there is no way to tell whether that perceived benefit is a result of Neurontin or the placebo effect.[155] Dr. Dea also testified that the published literature affects prescribing practices, and that some journals have more credibility than others.[156]

125. Dr. Arness testified that he was influenced by journal articles, and would not have been so influenced had he known they were ghost-written.[157]

126. *See* Response to ¶ 96.

127. Defendants possessed DBRCT results that unequivocally demonstrated that Neurontin was ineffective for particular conditions and either suppressed or distorted those results.[158]

128. *See* Response to ¶ 121.

129. Once a drug is on formulary, PMG physicians view that status as an indication of its utility, and

---

[148] (2/26 Tr. (Carrejo) 103:23-104:14, 108:10-109:3; TX 323.)

[149] 3/8 Tr. (Rosenthal) 63:24-64:11. Off-label promotion by pharmaceutical manufacturers undermines evidence-based medicine: "if you allow a drug company to promote for off-label uses, you're basically getting around the requirement that all drugs be scientifically tested," 2/23 Tr. (Kessler) 59:15-22.

[150] *See* Kaiser's FoF at ¶¶ 11-24 (bipolar); 29-35 (migraine); 48-66 (neuropathic pain); 68-76 (high doses); 79-82 (nociceptive pain).

[151] TX 286.

[152] Response to ¶¶42-51; 3/3 Tr. (Hyatt) 135:1-135:24; TX 279; 3/4 Tr. (Hyatt) 31:3-32:16.

[153] 9/26/07 Dep. Tr. (Maizels) 201:23-25; 203:12-15; 203:23-25; 204:05-09; 204:14-17; 204:20.

[154] 9/28/07 Tr. (Dea) (played on 3/16/10) 66:11-66:14; 71:22-72:9.

[155] 2/23 Tr. (Kessler) 75:24 – 76:12.

[156] 9/28/07 Tr. (Dea) (played on 3/16/10) 184:11-187:03.

[157] 3/23 Tr. (Arness) 22:12-23:10.

[158] *See* Kaiser's FoF at Appendix A.

prescribing will not cease simply because the drug is later removed from formulary.[159]

130.  Dr. Daniel did not testify that formularies are irrelevant.[160]  Rather, he testified that the ultimate reason physicians prescribe a drug is because they believe it is effective, a belief that is created by years of education, training, and (in this case) misinformation by Defendants.[161]

131.  Kaiser has proven causation in the aggregate: "the standard practice in these types of analyses is to use aggregate data and to use statistical approaches to link patterns in promotional spending to patterns in prescribing for the drug."[162]  In addition, the dramatic drop in prescribing as a result of Kaiser's Neurontin initiatives demonstrates that Defendants' misinformation campaign caused Kaiser harm.[163]

**VII.  Testimony of Rosenthal and Hartman Is Reliable and Probative of Causation or Damages[164]**

132.  Professor Rosenthal acknowledged that she did not have a data source for "a systematic measure of publications or suppression of publications" or CME expenditures, but had a reasonable degree of certainty in the area of healthcare economics that the data she had on promotional spending were sufficient to perform her analysis.[165]  She explained, "detailing and the use of the sales force is widely understood both in the industry and in academia to be a central piece of the marketing strategy of pharmaceutical companies, and when I say central, you can imagine a detailing representative bring journal articles with them.  This is a vehicle for inviting people to medical education events…."[166]  Professor Rosenthal also stated  "the mechanism for calculating the relationship between promotion and sales is about the changes over time and not the [spending] levels, and so if the changes are occurring in concert, the analysis will pick up the right magnitude of effect anyhow."[167]

133.  It was proper to exclude formulary restrictions as an explanatory variable in the regression.[168]

---

[159] 3/3 Tr. (Hyatt) 139:16-141:1; 3/5 Tr. (Millares) 93:19-95:14; 3/9 Tr. (Daniel) 109:9-110:12.
[160] *See* Response to ¶ 129.
[161] 3/9 Tr. (Daniel) at 125:3-7.
[162] 3/8 Tr. (Rosenthal) 16:11-16:17.
[163] Kaiser's FoF ¶ 105; Response to ¶¶ 37-38.
[164] *See generally* Dkt. No. 2693.
[165] 3/8 Tr. (Rosenthal) 74:13-74:14; 77:20-77:21; 3/5 Tr. (Rosenthal) 137:25 – 140:12.
[166] 3/5 Tr. (Rosenthal) 138:5 – 138:13.
[167] 3/5 Tr. (Rosenthal) 138:22-139: 6.
[168] 3/8 Tr. (Rosenthal) 27:16-29:6.

134.  Professor Rosenthal assumed that the allegations set forth in the complaint were true, and has not offered an opinion as to liability.[169]

135.  The alleged computational and statistical "errors" identified by Defendants were either not errors or did not require Professor Rosenthal to adjust her model.[170]

136.  Undisputed.

137.  Professor Rosenthal set out to correlate the effect of promotion on Neurontin sales and assess whether there was exposure and impact.[171]  Professor Rosenthal's model therefore includes the most important variables that drive trends in prescriptions and sales of Neurontin: price of Neurontin, promotional stock of Neurontin, price of other AEDs, and promotional stock of other AEDs.[172]  As she explained, "when we talk about what is called 'omitted variable bias' -- that is, a problem in calculating the effect here of promotion on sales that is caused by not having a variable in the regression -- we worry about those variables that are correlated with the variable of interest; i.e., promotion here."[173]

138.  Professor Rosenthal relied on her experience and background in generating her models, and her analysis is not results oriented.[174]

139.  Undisputed.

140.  Professor Rosenthal's analysis appropriately relied on national promotional expenditure data and accounts for any difference between Kaiser and other TPPs.[175]  Application of a time trend yields nonsensical results.[176]

141.  Dr. Carrejo, who performed the cited analysis, described the chart as garbage, as Kaiser did not then have a reliable method to analyze its data by indication.[177]

142.  Professor Rosenthal disaggregated by indication according to NDTI data, the single data source

---

[169] 3/5 Tr. (Rosenthal) 116:3–9; 3/5 Tr. (Rosenthal) 104:19-21.
[170] 3/8 Tr. (Rosenthal) 48:8-112:12.
[171] 3/8 Tr. (Rosenthal) at 17:4-9.
[172] 3/8 Tr. (Rosenthal) at 27:3-11; 24:5-10.
[173] 3/8 Tr. (Rosenthal) at 27:19-23.
[174] *See* Dkt. No. 2693, at p. 11.
[175] *See* Dkt. No. 2693, at p. 3-8 (application of national data to Kaiser is appropriate).
[176] *Id.* at p. 11- 13.
[177] 3/3 Tr. (Carrejo) 58:13 – 60:21; 82:6-82:25.

most commonly used in the healthcare industry to disaggregate pharmaceutical sales by indication.[178]

143.  Dr. Hartman formed an independent opinion that Professor Rosenthal's results were a fair and accurate depiction of the percentages and numbers of unlawful prescriptions by which the unlawful marketing by Pfizer caused increased prescriptions of Neurontin.[179]

144.  *See* Responses to ¶¶ 114-119.

145.  *See* Responses to ¶¶ 114-119.  Dr. Hyatt has testified that PMG physicians will take cost into account when faced with equally effective alternatives.[180]

146. Kaiser employees testified as to the percentage of its members that reside in each region.[181]

## VIII.  Pfizer's Wrongful Conduct

147.  For the above-stated reasons, Pfizer has not presented reliable evidence that Neurontin is effective for the indications at issue.

148.  *See* Response to ¶ 131. Pfizer detailed PMG physicians, DIS and others about Neurontin.[182]

149.  *See* Response to ¶¶ 29-32.   Defendants' February 1999 letter to Kaiser, responding to Kaiser's "request for information regarding Neurontin…and treatment of bipolar depression and mood disorder," contains no reference to the negative Pande results, which Defendants already knew.  Defendants clearly suppressed Pande's negative results.[183]

150.  The Backonja article improperly rejected the possibility of unblinding, and without access to Defendants' underlying data, Kaiser could not have determined that the study was negative.[184] Defendants were aware, but chose not to pursue, analyses that Neurontin fared no better than placebo.[185] The 2004 Vieta research report describes negative results for the FDA-preferred ITT analysis but the

---

[178]  3/5  Tr.  (Rosenthal)  122:11-122:14;  *see also*  3/8  Tr.  (Hartman)  135:3–135:6 (calling Professor Rosenthal's data "the gold standard of data for this industry.").
[179]  3/8 Tr. (Hartman) 141:4-15.
[180]  3/3 Tr. (Hyatt) 110:5-20.
[181]  3/5 Tr. (Millares) 92:9-93:1; 2/26 Tr. (Carrejo) 83:13-83:20.
[182]  2/26 Tr. (Carrejo) 97-98; TX 250 at 16 ("continue to support field detailing activities"); TX 286.
[183]  TX 301; 3/4 Tr. (Millares) 68:5-13; 66:17-21; 69:12-17; 3/9 Tr. (Daniel) 100:18-101:14; Kaiser's FoF ¶¶5, 12, 14.
[184]  3/1 Tr. (Jewell) 123:2-6.
[185]  2/24 Tr. (Abramson) 25:15-26:1; TX 108.

published article ignores these findings.[186]  Dr. Slaby conceded that data from nearly 40% of trial participants was not disclosed,[187] and his justification for ignoring the ITT analysis contradicts testimony from Drs. Dickersin, Abramson, Barkin, and Gibbons as to the importance of the ITT analysis.[188]

151.  Peer-review comments about Pfizer's submission of Reckless reveal that it was ghostwritten to minimize negative results.[189]  The Cochrane Review did not have access to Reckless and POPP .[190]

152.  Pfizer was aware of the POPP study's negative results by September 2001, yet it did not publish its results until 2008.  Dr. Bird was unable to find reference to either the POPP or Reckless studies.[191]

153.  Dr. McCrory only reviewed *positive preliminary* data from 879-200 (Wessely) in 1999.  The final negative results of the study were never published.[192]

154.  In the Dimond article, Defendants falsely claimed that Neurontin had beneficial effects on mood while suppressing evidence from the same data set that Neurontin increased the risk of depression with or without suicidal ideation.[193]  Kaiser showed at trial that Defendants promoted Neurontin based on anecdotal evidence, while suppressing contradictory evidence.

155.  Pfizer does not dispute that 945-82 failed to show efficacy of higher doses.  These negative results were admitted through a letter from the FDA which states that 945-82 "failed to yield evidence of effectiveness," and that the results from all of Neurontin studies ever conducted, including 945-82, "fails to provide evidence that higher doses of Neurontin are more effective than those recommended."[194]

156. Each of the nociceptive pain studies compared Neurontin alone and against a placebo, and often Neurontin in combination with another drug against the other drug alone.  The results demonstrated that

---

[186] Kaiser's FoF ¶¶ 8, 12.

[187] 3/19 Tr. (Slaby) 144:4-145:5.

[188] Kaiser's FoF ¶12; 3/15 Tr. (Gibbons) 53:9-19.

[189] TX 974 at 20842 ("My concern that this is a pharmaceutical house prepared paper seems to be confirmed by my observation that Reference 6 is even listed as a Parke-Davis study!"); 3/2 Tr. (Perry) 92:7-93:25.

[190] Kaiser's FoF ¶65; 3/16 Tr. (Brenner) 71:1-4; 3/19 Tr. (Bird) 75:19-76:11; 3/9 Tr. (Daniel) 132:19-24.

[191] Kaiser's FoF ¶¶ 43,53; 3/19 Tr. (Bird) 67:5-9.

[192] 3/1 Tr. (McCrory) 70:5-9; Kaiser's FoF ¶29.

[193] Kaiser's FoF ¶¶10,14.

[194] TX 91.

Neurontin provided no benefit.  None of the results were published.[195]

157.  Kaiser presented evidence that Parke-Davis medical liaisons distributed misleading information about Neurontin while suppressing negative information about the drug.[196]  Dr. Franklin testified that such fraudulent conduct was conducted nationally at the behest of Parke-Davis's upper management.[197]

158.  Defendants offer speculative arguments without any factual citation.

## IX.     Kaiser's Claims Are Not Barred By the Statute of Limitations

159.     As Mr. Kennedy argued: "*in 2002* . . . [the *Franklin*] suit became public [and] was attendant with widespread publicity[.]"[198]  A December 21, 1999 docket entry notes "court states the case should be unsealed; Govt. to file appropriate motion."[199]  The docket does not indicate that the complaint was made public on January 3, 2000, but merely states "sealed document placed in vault."[200]

160.  Neither the 10-K nor the 10-Q constitute "disclosure" as both fail to reference allegations of fraud or off-label marketing, or to provide sufficient notice that evidence of inefficacy for the indications at issue had been suppressed or tainted.  Neither was admitted into evidence.  Plaintiffs do not concede that the *qui tam* "alerted them to their potential claims" or that the complaint was publicly disclosed and discoverable through reasonable diligence prior to February 1, 2001.[201]

161.  The Pink Sheet references "an inquiry" into the "potential off label promotion" of Neurontin.[202]  It does not provide notice of fraudulent misrepresentations of Neurontin's efficacy, or that Defendants were specifically targeting Kaiser with misinformation, or the extent or impact of their scheme.

162-64.  The internal inquiries cited are evidence of Kaiser's due diligence not proof that Kaiser should have or could have uncovered the wide-scale wrongdoing pertaining to the off-label usages at issue here.

---

[195] 2/25 Tr. (Dickersin) 44:5-12; 42:12-14. 39:5-17; Kaiser's FoF ¶ ¶ 77, 81.
[196] 3/12 Tr. (Franklin) 55:11-56:11.
[197] 3/12 Tr. (Franklin) 54:18-56:4, 88:19-89:18.
[198] 2/22 Tr. (Kennedy) 134:22-135:4 (emphasis added).
[199] Dkt. No. 39, *United States ex rel. Franklin v. Parke-Davis*, No. 96-11651 (D. Mass. Dec. 21, 1999).
[200] Dkt. Nos. 41-42, *United States ex rel. Franklin v. Parke-Davis*, No. 96-11651 (D. Mass. Jan. 3, 2000).
[201] *See* Kaiser's Opposition to Defendants' Proposed Conclusions of Law at § VII.
[202] Tx. 506 at 3.

Dated:  May 14, 2010

Respectfully submitted,


By:     */s/ Linda P. Nussbaum*
       Linda P. Nussbaum

KAPLAN FOX & KILSHEIMER LLP
Linda P. Nussbaum, Esq.
850 Third Avenue, 14th Floor
New York, New York 10022

*Attorneys for Plaintiffs Kaiser Foundation*
*Health Plan, Inc. and Kaiser Foundation*
*Hospitals*

*Of Counsel*

Thomas Greene
GREENE, LLP
33 Broad Street, 5th Floor
Boston, MA 02109

Barry Himmelstein
LIEFF CABRASER HEIMANN &
  BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339

Thomas M. Sobol
HAGENS BERMAN SOBOL
  SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142


Don Barrett
DON BARRETT, P.A.
P.O. Box 987
404 Court Square North
Lexington, MS 39095

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on May 14, 2010.

/s/ Elana Katcher_____
ELANA KATCHER