UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:  NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1629 |
| | Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO: | Judge Patti B. Saris |
| THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA v. PFIZER INC., 04 CV 10739 (PBS) | Magistrate Judge Leo T. Sorokin |

## **DEFENDANTS' RESPONSE TO PLAINTIFFS' PROPOSED FINDINGS OF FACT**

Defendants Pfizer Inc and Warner-Lambert Company LLC (collectively, "Pfizer" or "Defendants"), hereby respond to Plaintiffs' proposed findings of fact.  Defendants incorporate all of their evidentiary objections and motions in limine.  While Defendants have attempted to respond within the Court-ordered page limits,[1] Defendants do so without waiving any additional objections to the evidence or to Plaintiffs' characterizations of the evidence.

1.     Plaintiffs' contention that non-DBRCT evidence is "not sufficient to determine whether or not a drug is effective to treat a particular condition" is irrelevant to their burden of proving that Neurontin is categorically ineffective – or no more effective than cheaper and equally well-tolerated alternatives – in every patient.  Physicians consider multiple sources, types, and levels of scientific evidence for purposes of clinical decision-making.  (Defendants' Proposed Findings of Fact [2808-1] ("FoF") ¶ 60.)  Neither DIS nor the regional PMGs require DBRCTs when making formulary recommendations and decisions.  (FoF ¶¶ 21, 35, 36; *see also* 3/4 Tr. (Millares) at 113:22-25 ("We don't have a requirement [for DBRCTs].").)

2.     The evidence does not support Plaintiffs' contention that Defendants "knew" their conduct "was fraudulent, misleading, and unlawful under FDA statutes and regulations."  (*See, e.g.*, Tive Dep. at 882:5-11, 886:4-24, 902:18-903:9, 916:19-919:5.)

The 1993 FDA-approved label did not state that 1800 mg/day is the "maximum" dose of

---

[1] Plaintiffs ignored these page limits and filed a 12-page "Appendix" [2805-1] to their Proposed Findings.

Neurontin.  It stated that the approved effective dose was 900 to 1800 mg/day, but also noted that doses up to 2400 and 3600 mg/day had been well tolerated by patients.  (FoF ¶ 106.)

Defendants' DBRCTs did not "establish[] that Neurontin was ineffective for treating these off-label uses."  A "negative" clinical trial does not establish that a drug is ineffective in all patients.  (FoF ¶ 83.)  Pfizer presented substantial evidence – including DBRCT and non-DBRCT evidence – showing that Neurontin use is effective for the relevant conditions in at least some percentage of patients.  (FoF ¶¶ 57-113.)

Defendants did not "present only favorable study results."  The evidence showed that numerous negative studies – including the Pande, Reckless, POPP, and Wessley studies – were disclosed during at least a portion of the period for which Plaintiffs seek recovery, and that none were improperly suppressed.  (FoF ¶¶ 149-56.)

3.      Defendants did not engage in "suppression and manipulation of studies."  (FoF ¶¶ 149-56.)  The published version of Dr. Dickersin's analysis concedes that "we cannot be certain that selective reporting was a decision made by employees of Pfizer and Parke-Davis."  (DX 2091; 2/25 Tr. (Dickersin) at 111:19-112:2.)  While Dr. Dickersin speculates regarding Defendants' intent based on the timing of various publications or the non-publication of certain studies, she concedes that these purported biases are prevalent throughout the literature "no matter who funds the study."  (2/25 Tr. (Dickersin) at 91:4-5; *see also id.* at 87:11-91:10, 94:3-98:23.)  Dr. Dickersin's testimony does not show that the studies in question "tainted the pool of scientific evidence," especially since she reviewed only 21 studies, representing only a small subset of the relevant "pool of scientific evidence."  (*See, e.g.*, *id.* at 84:8-15.)

4.      The four DBRCTs Plaintiffs cite do not show that Neurontin is ineffective for "bipolar and other mood disorders."  Each purportedly negative bipolar study carries explicit caveats limiting its findings.  (FoF ¶ 87.)  In particular, the negative Frye, Pande, and Guille bipolar trials studied treatment-refractory patients for whom approved medications had already failed to produce any benefit.  (FoF ¶ 88.)  The Vieta and Mokhber DBRCTs support Neurontin's efficacy in treating bipolar disorder.  (FoF ¶ 85.)  Plaintiffs presented no evidence of

2

inefficacy for "other mood disorders." Defendants presented evidence that Neurontin is effective in treating psychiatric disorders co-morbid with bipolar. (FoF ¶ 92.)

5.     The final research report for the Pande bipolar study was not complete until March 26, 1999. (FoF ¶ 29.)

6.     Defendants did not conduct the Frye study. (2/25 Tr. (Barkin) at 132:25-133:2.) Dr. Abramson had no personal knowledge of when Defendants learned of the results.

7.     Defendants did not conduct the Guille study. (2/23 Tr. (Abramson) at 106:8-9.) Dr. Abramson had no personal knowledge of when Defendants learned of the results.

8.     The evidence showed that the Vieta study was positive. (FoF ¶¶ 85-86).

9.     These studies were not suppressed (FoF ¶¶ 149-50), and Plaintiffs' experts have no personal knowledge regarding what information would be "material" to unidentified doctors. The Ohio PMG expressly permitted doctors to prescribe Neurontin for bipolar disorder after it already knew about the negative Pande and Frye studies. (FoF ¶ 35.)

10.    Several months after this FDA report was executed (PX 207), one of the FDA reviewers stated in another report, which Dr. Furberg had never seen, that "[o]ne cannot determine based on the available data, largely uncontrolled, whether the reports here represent an increase in incidence or intensity of depression compared to what is expected." (3/10 Tr. (Furberg) at 90:5-92:24; DX 1113.) There is no reliable scientific evidence that Neurontin causes or worsens depression, with or without suicidal ideation. (FoF ¶ 118.) Plaintiffs' proposed alternative drugs also carry suicide warnings. (*Id.*) The issue of suicidality is irrelevant to whether Neurontin is effective in treating some patients with bipolar disorder.

11.    Dr. Abramson has no personal knowledge regarding "Defendants' communications to physicians," what those communications "would leave physicians to believe," or what Defendants "knew." Dr. Abramson did not speak with any prescribing doctor, study researcher, article author, CME participant, or CME attendee. (2/24 Tr. (Abramson) at 78:11-79:13, 84:22-85:3.) Dr. Abramson failed to show that Defendants controlled the content of the CME events or journal articles he criticized. (*See, e.g.*, *id.* at 126:20-25, 137:13-20.)

12.   Defendants did not "suppress[]" the Pande bipolar study.  (FoF ¶ 29, 149.)  Dr. Abramson concedes that the study results were accurately reported in a published article and at the Third International Bipolar Conference.  (2/24 Tr. (Abramson) at 90:17-96:2.)  The Vieta study was positive, and the exclusion of certain patients who did not meet the research criteria was appropriate and fully disclosed in the published peer-reviewed article.  (FoF ¶¶ 85-86.)

13.   A May 1995 marketing assessment cannot account for what market share would have been over the next decade if facts had unfolded differently.  (*See, e.g.*, 3/22 Tr. (Keeley) at 82:18-83:4.)

14.   The Dimond article concluded that "clinical trial data . . . suggests *potentially* beneficial effects of gabapentin on mood and well-being," and that "an exploration of the psychiatric uses of gabapentin is warranted."  (FoF ¶ 154.)

15.   Dr. Franklin worked for Parke-Davis's Northeast CBU for four months in 1996 (3/12 Tr. (Franklin) at 79:11-24, 81:16-19) and has no personal knowledge regarding the activities of medical liaisons at other times or in states where Plaintiffs operate.  The manager of Parke-Davis's Western CBU, where most members of Kaiser Foundation Health Plan, Inc. ("KFHP") and its subsidiaries reside, was openly critical of the medical liaison program in Dr. Franklin's region.  (*Id.* at 90:8-91:19.)

16.   Defendants sponsored the "New Treatment Strategies in Psychiatry: Role of Anticonvulsants" symposium and journal supplement through an unrestricted educational grant. (PX 110.)  Plaintiffs presented no evidence that Defendants controlled the content.

17.   Plaintiffs' only evidence regarding the "New Frontiers in Social Phobia and Bipolar Disorders" CME is a list of venues and attendees.  (PX 360.)  Plaintiffs presented no evidence regarding what slides were shown, what statements were made, whether Neurontin was even discussed, or whether Defendants controlled the content.

18.   "Nonepileptic Uses of Gabapentin" accurately describes case reports regarding Neurontin use in treating bipolar patients.  (DX 2079.)  The article was published shortly after, and presumably submitted before, the Pande study's final research report was complete.  DIS did

not rely on this article, which was published after its February 1999 monograph (DX 543) and is not cited in its 2002 class-wide AED monograph. (DX 630; 2/26 Tr. (Barkin) at 66:22-67:13.)

19. Dr. Pande's article "Social Phobia With Gabapentin: A Placebo-Controlled Study" was not "misleading." Plaintiffs' experts concede that Dr. Pande's social phobia study is positive Level I evidence supporting Neurontin's use for treating social phobia, a mood disorder. (2/26 Tr. (Barkin) at 70:24-71:4.) The article makes no representations regarding effectiveness for bipolar disorder, so there was no reason or need to discuss Dr. Pande's bipolar study.

20. Defendants sponsored the "New Frontiers in Anxiety, Substance Abuse and Bipolar Disorder" CME through an unrestricted educational grant. (PX 63; 2/26 Tr. (Barkin) at 67:19-24.) Plaintiffs presented no evidence that Defendants controlled its content. While Plaintiffs presented program slides, they presented no evidence regarding what statements were made. (2/26 Tr. (Barkin) at 68:20-24.)

21. The Pande bipolar study does not demonstrate "inefficacy" or "Defendants' knowledge" thereof, and did not require Defendants to cease sponsoring CME activity regarding psychiatric uses. The Situational Analysis Plaintiffs cite explains that, "[a]mong psychiatric thought leaders, trial design shortcomings were responsible for the outcome [in Pande.]" (PX 213.) Neurontin's efficacy for bipolar disorder is supported by other DBRCTs (FoF ¶ 85), and Neurontin is also effective for co-morbid mood disorders (FoF ¶ 92).

22. *See* ¶ 21, *supra*.

23. The Cochrane Collaboration's requests in 2003 for unpublished data regarding Neurontin use for bipolar disorder are irrelevant to Plaintiffs' claims. These requests were made well after the negative results of Dr. Pande's bipolar study were accurately published (FoF ¶ 31), and well after DIS issued its 2002 class-wide AED monograph explicitly noting the negative results of the Pande and Frye studies. (FoF ¶ 34.) Dr. Abramson concedes that manufacturers are not required to disclose unpublished data to Cochrane. (2/23 Tr. (Abramson) at 125:3-7.)

24. *See* ¶ 3, *supra*.

25. Plaintiffs' migraine expert concedes that his meta-analysis shows a trend favoring

efficacy. (FoF ¶ 99.) Dr. Gibbons's re-analysis of the same data showed a stronger trend closer to statistical significance. (FoF ¶ 100.) Neurontin's effectiveness in treating migraine is further supported by the Di Trapani migraine study, the Spira chronic daily headache study, and clinical experience. (FoF ¶¶ 101-104.)

26.    Particularly in light of this positive evidence, the studies Plaintiffs cite establish neither inefficacy for migraine nor Defendants' "aware[ness]" thereof. Dr. McCrory concedes that a negative DBRCT does not prove that a drug is ineffective for all patients. (FoF ¶ 83.)

27.    Dr. McCrory concedes that, despite the "discrepancy" Plaintiffs allude to in the published Di Trapani study, "altogether the data they presented supported the conclusion that Neurontin is effective." (3/1 Tr. (McCrory) at 39:4-11.) For his part, Dr. McCrory relies on the negative Wessely study despite conceding that it is flawed in four significant respects. (3/1 Tr. (McCrory) at 69:14-17, 74:21-75:16.)

28.    *See* ¶ 9, *supra*.

29.    The evidence showed that numerous negative studies, including the Wessely study, were disclosed, and that none was improperly suppressed. (FoF ¶¶ 149-56.)

30.    The Mathew article accurately reports that Neurontin may be effective in migraine prevention at 2400 mg/day. (DX 2082.) This is consistent with the positive Di Trapani migraine study, the positive Spira chronic daily headache study, the favorable trend acknowledged by Dr. McCrory, and clinical experience. *See* ¶ 25, *supra*.

31.    The non-publication of protocol 945-217 is not evidence of improper suppression. The evidence showed that numerous negative studies, including the Wessely study, were disclosed, and that none was improperly suppressed. (FoF ¶¶ 149-56.)

32.    Dr. Franklin has no personal knowledge regarding medical liaisons' activities in states where Plaintiffs operate. *See* ¶ 15, *supra*. Dr. Franklin did not testify that medical liaisons "routinely informed physicians that Neurontin was effective for migraine." He merely stated that he was not told about a particular migraine study. (3/12 Tr. (Franklin) at 55:5-10.) He claimed to have "observed other medical liaisons" in the northeast promote Neurontin for migraine

treatment (*id.* at 63:24-64:4), but gave no specifics and did not say this was "routine."

33.   Cochrane "did not seek unpublished data" from Pfizer regarding migraine studies. (3/1 Tr. (McCrory) at 43:15-45:1.)  Manufacturers are not required to disclose unpublished data to Cochrane.  (2/23 Tr. (Abramson) at 125:3-7.)

34.   Plaintiffs presented no evidence that Defendants "controlled the content of the CME materials" they cite.  Plaintiffs' exhibits do not support any such inference.  Instead, one of Plaintiffs' exhibits states that the CME was "jointly sponsored by the Annenberg Center for Health Sciences at Eisenhower and Proworx, and is supported by an unrestricted educational grant from Parke-Davis."  (PX 248.)  These documents were admitted over objection as part of Plaintiffs' document dump, and were not discussed by any witness.  (PX 97, 98, 245, 248.)

35.   Plaintiffs' proposed finding regarding "tactics and strategies" is based solely on Dr. McCrory's interpretation of a single marketing document – a subject on which he has neither personal knowledge nor expertise.  (3/1 Tr. (McCrory) at 90:25-92:15.)  This 1995 memo (PX 31) pre-dates two of the purportedly negative studies: protocol 945-217 and Mathews.  The positive Di Trapani study (DX 1401) occurred years later, confirming that the question of efficacy was hardly settled as of 1995.  The current science supports efficacy.  *See* ¶ 25, *supra*.

36.   The evidence showed that Neurontin is effective for neuropathic pain, including conditions other than PHN.  (FoF ¶¶ 57-83.)  Dr. Abramson concedes that, at the 2001 meeting Plaintiffs reference, Dr. Max merely indicated that the FDA would likely not approve "a broad indication for neuropathic pain."  (2/24 Tr. (Abramson) at 40:13-16.)  No medication, including Plaintiffs' proposed alternative drugs, has been approved by the FDA for the broad indication of neuropathic pain.  (FoF ¶ 61; *see also* 2/24 Tr. (Abramson) at 72:18-21.)

37.   Dr. Perry's own meta-analysis found that Neurontin showed statistically significant effects in treating neuropathic pain; his opinion that these results would not be "clinically meaningful" to some hypothetical patient is not evidence of the total inefficacy Plaintiffs claim. (FoF ¶ 72.)  Dr. Gibbons reviewed the same data and found a "two-and-a-half times greater chance of obtaining moderate or greater improvement on gabapentin relative to placebo," which

is statistically and clinically significant. (FoF ¶ 73.) Ten out of thirteen DBRCTs studying Neurontin's efficacy in treating neuropathic pain were positive. (FoF ¶¶ 64-65.)

38. Neurontin's efficacy in a "subset of patients" is sufficient to defeat Plaintiffs' aggregate theories of causation and damages. No drug is effective for every patient, which is why Neurontin is often used only after other treatment options have failed. (FoF ¶ 81.) Plaintiffs offered no evidence that the placebo effect explains every positive result, and offered no explanation why so many patients would experience a placebo effect from Neurontin after being treated with other drugs without experiencing any therapeutic *or* placebo effect. Dr. Bird explained the "clinical clues" from which he concludes that his patients' benefits are due to Neurontin and not the placebo effect. (FoF ¶ 82.) Plaintiffs presented no contrary evidence.

39. Defendants sponsored DBRCTs studying Neurontin's effectiveness for neuropathic pain, but there is no competent evidence that Defendants controlled their content or publication.

40. The Gorson study was positive with respect to one end point and showed moderate pain relief over placebo. (FoF ¶ 66.) DIS and the Southern California PMG ("SCPMG") had actual knowledge of the Gorson study results when SCPMG expanded formulary restrictions to permit Neurontin use for neuropathic pain in 1999. (FoF ¶¶ 24-27.)

41. The potential inadvertent unblinding of the Backonja study did not affect its results, because improvements in pain were experienced before the side effects that led to the potential unblinding. (FoF ¶ 67.) The potential unblinding was expressly noted in the published JAMA article and the June 1999 drug monograph that DIS issued to SCPMG. (FoF ¶¶ 22, 25.)

42. Defendants do not contend that the Reckless study supports efficacy, but this study does not establish total inefficacy in all patients, particularly when Neurontin's effectiveness for neuropathic pain is supported by DBRCTs, clinical experience, and Plaintiffs' admissions.

43. Defendants do not contend that the POPP study supports efficacy, but this study does not establish total inefficacy in all patients, particularly when Neurontin's effectiveness for neuropathic pain is supported by DBRCTs, clinical experience, and Plaintiffs' own admissions.

44. The Serpell study was positive, "demonstrat[ing] benefit in a broad group of mixed

kinds of neuropathic pain."  (3/19 Tr. (Bird) at 35:20-36:9.)  That Serpell would likely not lead to a broad neuropathic pain indication does not change this outcome.  *See* ¶ 36, *supra*.

45.   The Parsons DPN study (945-1008) was positive, showing a small but statistically significant reduction in pain scores.  (3/19 Tr. (Bird) at 31:6-32:9; DX 2069.)  Plaintiffs cite no contrary expert testimony.  Plaintiffs' suggestion that these results would not be clinically meaningful is not evidence of the total inefficacy they claim and must prove.  *See* ¶ 37, *supra*.

46.   Defendants agree that the FDA did not approve Neurontin for a broad neuropathic pain indication.  The FDA has never approved any drug for a broad neuropathic pain indication.  *See* ¶ 36, *supra*.

47.   Defendants agree that Dr. Max concluded that the FDA was unlikely to approve Neurontin for a broad neuropathic pain indication.  The FDA has never approved any drug for a broad neuropathic pain indication.  *See* ¶ 36, *supra*.

48.   Defendants did not suppress or manipulate studies.  (FoF ¶¶ 149-56.)  The Gorson study was published in 1999, and the publication explicitly noted that the results "suggest that gabapentin is probably ineffective or only minimally effective for the treatment of painful diabetic neuropathy at a dosage of 900 mg/day."  (DX 1379.)  This article was not "hard-to-locate."  DIS located it and listed it as a negative DBRCT in its 1999 monograph recommending that SCPMG expand its formulary restrictions for neuropathic pain.  (FoF ¶¶ 24-27.)  Plaintiffs failed to connect the 1998 abstract (DX 1271) to any of their claims.  The abstract correctly noted that Gorson was positive with respect to one end point (FoF ¶ 66), and merely concluded that gabapentin "may be effective" and that "further studies . . . are warranted."  (DX 1271.)

49.   The peer-reviewed JAMA article regarding the Backonja study disclosed the possibility of inadvertent unblinding and accurately reported the study's results.  At all relevant times, DIS and SCPMG knew of the possible inadvertent unblinding. (FoF ¶¶ 22, 25.)  Plaintiffs' partial quotation is misleading; the article states that "this was the first trial to evaluate gabapentin's efficacy [for DPN] ***in this patient population***."  (DX 1250 (emphasis added).)

50.   The documents Plaintiffs cite (PX 71, 102, 103), admitted over objection, address

protected conduct under the FDA regulations, do not describe the content of any proposed or actual statements, and do not show that Defendants controlled the content of any such statements.

51.    Prior to its inclusion in the January 2003 Backonja/Glanzman article, the Reckless study had been submitted for publication twice and rejected both times, and its results had been provided to the FDA in 2001.  (FoF ¶ 151.)

52.    *See* ¶¶ 49, 51.

53.    Prior to its 2008 publication, the POPP study was discussed with the FDA in 2001 and an abstract was presented at the 10th World Congress on Pain in 2002.  (FoF ¶ 152.)

54.    The Serpell study "demonstrated benefit in a broad group of mixed kinds of neuropathic pain."  (3/19 Tr. (Bird) at 35:20-36:9.)  Even Plaintiffs' proposed finding asserts only that "the majority" (not all) of the benefit was for PHN.

55.    The market forecasts Plaintiffs cite are accompanied by a note simply stating that the forecasts "take into account the results of the advisory board," and requesting "comments." (PX 11.)  These forecasts addressed hypothetical scenarios involving "Positive Results" and "Mixed Results."  (*Id.*)  Plaintiffs identify nothing improper in this analysis.  These forecasts, admitted over objection as part of Plaintiffs' document dump, are irrelevant and do not support the prejudicial and speculative inferences Plaintiffs attempt to draw.

56.    Plaintiffs' only cited exhibit (PX 43) was admitted over objection as part of Plaintiffs' document dump.  The document does not state or imply that "Defendants" selected the speaker at this presentation, as opposed to, at most, recommending possible speakers.  The document shows that Defendants did not control the presentation's content.  It states that Cline Davis "present[ed] questions at the Q&A session" following the presentation, but makes clear that the speaker was given no prior notice of those questions, and her answers were her own.

57.    Plaintiffs presented no evidence that Defendants controlled the content of this publication, which simply states that it was "[s]upported by an educational grant from Parke-Davis."  (PX 40.)  That Dr. Perry is personally not familiar with a journal does not mean the journal is "non-existent or unknown."  Neither of the exhibits Plaintiffs cite (PX 40, 43) state that

this publication was distributed to 56,000 physicians.

58.   Defendants sponsored the "Anticonvulsants for neuropathic pain and detoxification" journal supplement through an unrestricted educational grant.   (PX 110.) Plaintiffs presented no evidence that Defendants controlled its content.   None of Plaintiffs' exhibits (PX 40, 107, 108, 110) state that Defendants "mailed 43,000 copies" of the supplement. PX 107 and 108 were introduced over objections as part of Plaintiffs' document dump.

59.   Plaintiffs presented no evidence that Defendants mailed the journal supplement "Pharmacology of Painful Peripheral Neuropathies" (PX 80) to "all neurologists practicing in the United States."   Plaintiffs' exhibit (PX 92) does not even reference this supplement, and was introduced over objections as part of Plaintiffs' document dump.   It states that reprints of "studies" from "December 1998 JAMA Publications" were distributed.   (DX 92.)   JAMA published a PHN study (Rowbotham) and a DPN study (Backonja) in December 1998.   (*Id.*)   The supplement Plaintiffs cite includes abstracts of these studies, among others, but it is not a JAMA publication.   (PX 80.)   Plaintiffs failed to establish that reprints of this supplement or the Backonja study were distributed to *any*, let alone "all," neurologists who prescribed Neurontin to KFHP members.   Plaintiffs' proposed finding is based on a lawyer's argument (3/19 Tr. (Rona) 222:6-10), not evidence.

60.   Defendants sponsored the journal supplement "Management of Neuropathic Pain Syndromes" through an unrestricted educational grant.   (PX 82.)   Plaintiffs presented no evidence that Defendants controlled its content, and no evidence regarding its "disseminat[ion]."

61.   Neither Dr. Abramson nor any other witness testified about Plaintiffs' exhibits (PX 169, 178, 210, 255), which were admitted over objection as part of Plaintiffs' document dump. These exhibits reveal that "key messages" for Neurontin come from a "Global Branding Guide" (PX 178) and were discussed in connection with "international" marketing issues (PX 169). Neurontin is and was approved for neuropathic pain in over 50 countries.   (FoF ¶ 62).   One exhibit indicates that the "key messages" had been proposed as "possible and desirable messages to develop for the future," but had not yet been approved.   (PX 169.)   There is no evidence that

11

Defendants' third-party vendors injected "key messages" into publications or CME events, as opposed to simply reviewing articles and noting whether they supported any such messages.

62.    Plaintiffs presented no evidence that Defendants or their third-party vendors "ghostwrote" journal articles.   Plaintiffs' experts did not speak with any study researcher or article author (2/24 Tr. (Abramson) at 78:11-25), and have no personal knowledge regarding the articles' preparation or publication.   Professional medical writers frequently assist study authors in presenting their results because medical researchers frequently lack the time or writing skills to produce publication-ready manuscripts.   (Tive Dep. at 896:14-22, 898:22-899:7.)   Plaintiffs presented no evidence that the named authors did not control the content of the published articles.

63.    Plaintiffs and Dr. Abramson misleadingly portray a 2001 **Global** Operating Plan (PX 219) as evidence of misconduct, while ignoring the fact that more than 50 countries have approved Neurontin for neuropathic pain.   (FoF ¶ 62.)

64.    Plaintiffs concede that a 2003 review article with no demonstrated connection to Defendants found "solid research support" for Neurontin's use in DPN and migraine.   (PX 349.) Dr. Abramson's speculation regarding what studies the author "had access to" is unfounded. DIS had no trouble finding the Gorson study or noting the potential unblinding in Backonja in 1999.   (FoF ¶¶ 22, 23, 25.)   Dr. McCrory had no trouble locating the negative results of the Wessely migraine study in 1999.   (FoF ¶ 153.)   None of these studies undermine the "solid research support" noted in the review article.

65.    The Cochrane Collaboration recently republished its report concluding that "[t]here is evidence to show that gabapentin is effective in neuropathic pain" even though Cochrane "[is] aware of unpublished trial data for Gabapentin which could affect the results of this review." (FoF ¶ 70.)   *See also* ¶¶ 23, 33, *supra*.

66.    *See* ¶ 3, *supra*.

67.    Plaintiffs proffered no expert testimony in response to Dr. Bird's testimony that Neurontin offers enhanced benefits at doses above 1800 mg/day, and that the proper dose for individual patients is determined by "titrating to effect," rather than by clinical studies.   (FoF ¶

109.)  The FDA-approved label is not evidence of inefficacy.  (FoF ¶¶ 105-06.)  The Court sustained Defendants' objection to Dr. Kessler's testimony regarding efficacy at higher doses. (2/23 Tr. (Kessler) at 38:7-14.)  The Reckless study was negative for all doses, and is thus irrelevant to the question of whether Neurontin offers *enhanced* benefits at doses above 1800 mg/day in patient populations that experience benefits beyond placebo at lower doses.  In addition, Reckless studied only DPN, and is thus irrelevant to the question of whether higher doses of Neurontin offer enhanced benefits in treating other conditions.

68.    Dr. Glanzman testified only that he "approved" the message that Neurontin is safe and effective at doses above 1800 mg/day.  (Glanzman Dep. at 343:19-344:5.)  Plaintiffs presented no evidence regarding "disseminat[ion]" of this message.  Evidence cited by Plaintiffs shows that Defendants "don't have recommendations for specific dose titration."  (PX 461-A.)

69.    *See* ¶ 67, *supra*.

70.    *See* ¶ 57, *supra*.

71.    Mr. Knoop testified only that STEPS investigators' comfort with higher doses was an "outcome," not a "goal," of the STEPS program.  (3/10 Tr. (Knoop) at 159:3-10.)

72.    Plaintiffs presented no evidence regarding the content of the "New Frontiers in Social Phobia and Bipolar Disorders" CME.  *See* ¶ 17, *supra*.  Plaintiffs cite no evidence that attendees "were instructed to titrate Neurontin" to doses above 1800 mg/day.

73.    *See* ¶ 59, *supra*.

74.    *See* ¶ 60, *supra*.  Accurately reporting the fact that a particular study "use[d] doses from 900 to 3,600 mg/d" (PX 82) is not a recommendation of dose titration.

75.    The Backonja/Glanzman article accurately states that "[t]he effective dose should be individualized according to patient response and tolerability."  (DX 1660; FoF ¶ 109.)

76.    PX 208 is an email admitted over objection as part of Plaintiffs' document dump, which contains a summary and discussion of the article "Gabapentin dosing in the Treatment of Epilepsy."  Plaintiffs presented no evidence that Defendants controlled the article's content.  The article summary simply states that "[d]oses up to 3600 mg/day as tolerated may provide

incremental improvements of efficacy for some patients." (*Id.*)  The language Plaintiffs quote comes from the internal discussion of the article, not the article itself.

77.     The unpublished nociceptive pain trials Plaintiffs cite studied combination medications that were never marketed.  (FoF ¶ 156.)

78.     Defendants agree that these statements were made.

79.     That it is sometimes difficult to differentiate between neuropathic and nociceptive pain does not support Plaintiffs' claim that Defendants marketed Neurontin specifically for nociceptive pain.   Plaintiffs' argument negates the reliability of Prof. Rosenthal's and Dr. Hartman's analysis by conceding that they cannot reliably disaggregate between indications.

80.     That a document occasionally refers to "pain" without specifying a type is not evidence of promotion specifically for nociceptive pain.  Moreover, Plaintiffs rely on instructions allegedly given to sales representatives (PX 105), but presented no evidence of fraudulent or off-label Neurontin detailing to PMG doctors.  *See* ¶ 92, *infra*.  Plaintiffs cite no evidence for their conclusory assertion that "Defendants knew that physicians would respond to these messages by prescribing Neurontin for both nociceptive and neuropathic pain."

81.     *See* ¶¶ 77, 79, *supra*.

82.     *See* ¶ 15, *supra*, regarding Dr. Franklin's lack of relevant personal knowledge.  PX 40 specifically addresses DPN, and Plaintiffs presented no evidence that Defendants controlled its content or disseminated it.  *See* ¶ 57, *supra*.  PX 31 and 105 do not support Plaintiffs' contentions.  *See* ¶ 80, *supra*.  PX 432 references studies by non-parties of various pain conditions, some of which Plaintiffs' lawyers now describe as "nociceptive," thought at trial they said the exhibit "concerns peripheral neuropathies."   (3/4 Tr. (Nussbaum) at 97:22-23.) Regardless of whether non-parties studied supposedly "nociceptive" pain conditions, Plaintiffs presented no evidence that Defendants ever represented Neurontin as being effective for those conditions.  DX 709 (which Plaintiffs mis-cite as TX 907) is an SCPMG document stating that certain providers "may be influenced by drug company promotional efforts for off-label uses of gabapentin, including . . . non-neuropathic pain."   SCPMG's hypothetical statement is not

evidence that Defendants ever engaged in any such efforts.

83.     Defendants agree that the FDA advised Parke-Davis that it was investigating off-label promotion of Neurontin, and add that Plaintiffs had constructive knowledge of the investigation by early 2000, and actual knowledge no later than April 3, 2000.  (FoF ¶¶ 159-61.)

84.     Warner-Lambert's criminal plea, admitted over Defendants' objection, is irrelevant and has no demonstrated nexus to Plaintiffs' alleged injuries.  (FoF ¶ 157.)

85.     The Information did not allege that these activities were "national" in scope, and did not allege any activity in California.  (FoF ¶ 157.)  The Information charged strict liability violations of the Food, Drug Cosmetic Act, not fraud, and is limited to specific instances in April 1995 and August 1996.  (*Id.*)

86.     The jury's verdict regarding Plaintiffs' RICO claims is not evidence.

87.     KFHP provides medical coverage only for California and Hawaii residents. KFHP's non-party subsidiaries provide medical coverage to members in other states.  Only SCPMG and the Northern California and Hawaii PMGs have contracts with KFHP.  The other regional PMGs – each of which is a distinct entity – contract with KFHP's non-party subsidiaries. (FoF ¶ 1-2.)

88.     *See* ¶ 87, *supra*.

89.     Dr. Dickersin did not testify about Plaintiffs' understanding of evidence-based medicine.  On Plaintiffs' website (DX 902E), SCPMG's Associate Medical Director states:

> Evidence-based medicine means so many different things to different people.  To some people, it means you don't do something unless you have double-blind randomized control studies that prove that something works.  Of course, if we only did things when we had double-blind randomized control studies, we wouldn't do a whole lot.  It is also used as a reason to withhold certain things or not to do things or to cut costs.

(*Id.*)  Dr. Millares agreed "absolutely" with that statement.  (3/5 Tr. (Millares) at 78:7-79:10.)

90.     Plaintiffs' citations do not state that "Kaiser" has a formulary.  Instead, each regional PMG maintains its own formulary.  (FoF ¶ 3.)  DIS makes recommendations, but does not control the content of regional PMGs' formularies.  (FoF ¶ 3.)  No prescribing doctor

testified as to how they "view" a drug's formulary status.  Plaintiffs' witnesses admit that formulary status makes little, if any, difference to prescribing doctors.  (FoF ¶¶ 129-31.)  Dr. Millares speculated that restricting Neurontin's formulary access would have had no impact on PMG doctors' prescribing habits.  (3/5 Tr. (Millares) at 95:7-14).  Yet, no competent evidence supports the contradictory claim that PMG doctors strictly adhere to PMG formularies 95% of the time, but would ignore those same formularies if restrictions or guidelines were added.

91.     Plaintiffs could have used chart reviews "at any time" to track prescription rates by indication.  (3/5 Tr. (Millares) at 60:20-61:17; *see also* DX 747, 760.)  Kaiser Hospitals facilities and DUAT had the ability to track individual doctors' prescribing patterns during the relevant time period.  (3/4 Tr. (Hyatt) at 38:2-40:17; 3/10 Tr. (Daniel) at 38:24-39:2; DX 690, 711.)

92.     Dr. Hyatt has no personal knowledge regarding what journals "PMG physicians" read or what events they attend.  PMGs employ doctors in nine states and the District of Columbia, with at least 75% of insureds located in California.  (2/26 Tr. (Carrejo) at 83:13-25.)  The "culture of how the health environment is" varies from one state to the next.  (3/5 Tr. (Millares) at 93:11-16.)  And PMGs do not recruit doctors only from "around the country," but from around the world.  (FoF ¶ 62.)  Neurontin has been approved for the treatment of neuropathic pain in over 50 countries.  (*Id.*)

Plaintiffs presented no evidence of fraudulent or off-label Neurontin detailing to PMG doctors, as the Court has already recognized.  (3/19 Tr. (Court) at 221:1-222:5.)  Plaintiffs presented no evidence from any physician who stated that she prescribed Neurontin as the result of detailing or marketing, rather than her own medical judgment.  Dr. Carrejo's hearsay testimony regarding a single Kaiser Hospitals facility in Oakland (2/26 Tr. (Carrejo) at 98:6-9) provided no information regarding what statements were made or whether they concerned off-label uses.  PX 250 is a 2004 Operating Plan that deals almost entirely with other drugs.  With respect to Neurontin, PX 250 merely states "[c]ontinue to support field detailing activities," but gives no information regarding what detailing occurred and whether off-label uses were discussed.  Moreover, the Northern California PMG, where 38% of KFHP's and its subsidiaries'

members reside, made Neurontin non-detailable in 2001.  (FoF ¶ 55.)

93.   *See* ¶ 92, *supra*.   PX 81 discussed HMOs generally, and merely identified "[increased awareness of emerging uses via appropriate channels" as one objective.   PX 90 identified KFHP as one of ten HMOs targeted for "aggressive *contracts* and individualized programs."  PX 250 is discussed in ¶ 92, *supra*.  Plaintiffs presented no evidence of fraudulent or off-label Neurontin detailing to PMG doctors.  *See* ¶ 92, *supra*.

94.   Plaintiffs identified no misconduct by Drs. McCarberg or Maizel, both of whom still worked for SCPMG at the time of their depositions.   Their article disclosed that both doctors were on Pfizer speaker bureaus.  (PX 275.)   Dr. Hyatt admits that Dr. McCarberg had no obligation to tell him about his communications with Defendants, and does not claim that Dr. McCarberg violated any rules or regulations.  (3/3 Tr. (Hyatt) at 133:7-136:4.)  Plaintiffs' expert Dr. Barkin has served on Pfizer speakers bureaus and admits that Pfizer did not control or even review the content of his presentations.  (2/26 Tr. (Barkin) at 73:9-75:6.)

95.   PX 286 is a 1-page memo stating that Neurontin prescriptions in the Northwest region increased after May 1999.  PX 286 does not state that a May 1999 CME caused increased prescribing, and provides no basis for any such conclusion.  No expert analyzed the statistics addressed in this memo.  Plaintiffs presented no evidence regarding the content of the May 1999 CME, whether Defendants controlled the content, or how many PMG doctors (if any) attended.

96.   Dr. Daniel admits that different regional PMGs have "very different ways of doing things," and that he cannot testify about the actions taken by other PMGs.  (3/10 Tr. (Daniel) at 33:17-22, 45:23-25.)  Dr. Millares likewise concedes the various PMGs interpreted and acted on DIS monographs "in various different ways."   (3/5 Tr. (Millares) at 12:11-12; *see also id.* at 27:23-24; 2/26 Tr. (Carrejo) at 144:3-11; 3/2 Tr. (Carrejo) at 152:17-20.)  Plaintiffs presented no evidence that any PMG other than SCPMG made any formulary decisions in reliance upon the DIS monographs that Plaintiffs claim were influenced by Defendants.  (FoF ¶¶ 15-20.)

97.   Defendants did not suppress purportedly negative studies (FoF ¶¶ 149-56), and those studies did not demonstrate inefficacy (FoF ¶ 83).

98. Defendants' letter to DIS was sent prior to the final research report regarding the Pande bipolar study. Once the final research report was complete, Defendants disclosed the study's results in information letters to PMG physicians and in a medical journal. (FOF ¶ 149.) There is no evidence that knowledge of the Pande study would have been material to DIS or SCPMG. DIS and SCPMG had actual knowledge the Pande and Frye studies when DIS issued its 2002 class-wide AED monograph citing both studies as negative. (FOF ¶¶ 33-34.) DIS has never recommended any changes to Neurontin's formulary status based on these studies, and SCPMG has never made any such changes.

99. Gorson and Reckless were not migraine studies. The Gorson study and Reckless results were published (FoF ¶¶ 23, 42, 151.) DIS and SCPMG had actual knowledge of the Gorson study when SCPMG expanded formulary restrictions in 1999. (FoF ¶¶ 25-27.) The Wessely migraine study was disclosed, and no studies were suppressed. (FoF ¶¶ 149-56.)

100. Plaintiffs presented no evidence that Neurontin is ineffective for RSD or that RSD is not a neuropathic pain condition. Plaintiffs rely on their lawyers' interpretation of two exhibits, but no witness interpreted these exhibits in this way, nor did any witness testify that RSD is a type of nociceptive pain. Dr. Millares stated that "I think it's been classified as nociceptive in some places and neuropathic in another" (3/4 Tr. (Millares) at 51:11-12), but she admits that "I'm not a pain specialist, I'm not sure I could tell you exactly what type it is" (*id.* at 51:13-15). The Court has already recognized that RSD is "neuropathic." (3/19 Tr. (Court) at 199:5-11.) That RSD purportedly has some of the same symptoms and presentations as *different conditions* categorized as "nociceptive" pain does not mean that statements specifically addressing RSD can be construed as marketing for nociceptive pain. *See* ¶¶ 79-80, *supra*. The "financial relationship" between Defendants and Dr. Mellick merely consisted of payments made in 1995 totaling approximately $5,750. (PX 23, 25, 27.) Plaintiffs identify no misconduct and do not claim that Dr. Mellick misrepresented his RSD case reports. (FoF ¶ 21.)

101. DIS and SCPMG had actual knowledge of the Gorson study and the potential unblinding in Backonja when SCPMG lifted Neurontin's formulary restrictions. (FoF ¶¶ 22-27.)

18

102.  According to PX 292, Defendants simply stated that titration above 1800 mg/day was "relatively safe."  According to PX 294, Defendants simply stated that "the maximum dose they have seen is for 6000 mg/day in non-Parke-Davis studies."  According to PX 296, Defendants simply stated that "the dose for [a particular] study was titrated to tolerability up to 3600 mg/day."  According to PX 461A, p. 22, Defendants stated that "*[W]e don't have recommendations for specific dose titration regimen.  Dose is titrated generally based on patient's clinical response*. . . . [U]p to 6000 mg/day was used in one published study."

103.  "Kaiser" does not have a formulary, nor is there a single "formulary" for all regions.  Each regional PMG maintains its own formulary.  DIS makes recommendations, but does not control the content of regional PMGs' formularies.  (FoF ¶ 3.)

The DUAT/DRUG Initiative was targeted only at neuropathic pain, did not change SCPMG prescribing guidelines recommending that TCAs or other treatments be used before Neurontin, and acknowledged that Neurontin and TCAs showed comparable efficacy for neuropathic pain.  Plaintiffs' own documents show that the DRUG/DUAT initiative was driven by cost concerns, not efficacy concerns.  (FoF ¶¶ 37-41.)

104.  The Franklin *qui tam* complaint was unsealed on December 21, 1999, made public on January 3, 2000, and disclosed in Warner-Lambert Form 10-Q on May 10, 2000.  (FoF ¶¶ 159-60.)  In May 2000, the Colorado PMG launched its own initiative to reduce off-label Neurontin prescriptions, stating that Neurontin "does not appear to offer any advantage over TCAs and it is more expensive."  (FoF ¶ 162.)

PX 352 and 353 merely purport to show that uses other than neuropathic pain were *discussed* during two teleconferences.  The actual DRUG/DUAT *initiatives* – *e.g.*, providing "Neuropathic Pain pocket cards, CMI Pain Management Guidelines, Physician Paycheck Stuffers" – targeted neuropathic pain.  (*E.g.* DX 747.)  Plaintiffs presented no evidence of comparable initiatives targeting other off-label conditions.

105.  Plaintiffs presented no statistics regarding purported results of initiatives in non-California regions.  PX 272, 338, and 340 are SCPMG documents.  PX 333 is a Northern

California PMG document stating: "[N]ew starts cut in half!"  The source of this non-specific statement is not identified, and the underlying data are not presented.  This is hearsay-within-hearsay.  Plaintiffs' claim that the DUAT/DRUG initiative led to these alleged reductions is supported by only a temporal relationship and not by any expert testimony.

106.   Plaintiffs' proposed finding regarding what they purportedly "learned," and when, impermissibly seeks to disavow positions they have taken throughout this litigation.  (*See* Defs' Mem. Supp. M. Jury Instr. Binding Kaiser to Litig. Positions [2709].)  Plaintiffs did not "[take] this case to trial" based on the November 2009 Dickersin article – which is completely silent regarding efficacy – or any other post-suit documents.  Plaintiffs filed suit in February 2005, "demand[ing] a trial by jury on all issues so triable." (First Coord. Am. Compl. [31] at 112.)

107.   Prof. Rosenthal did not do a KFHP-specific analysis and did not address Plaintiffs' theory of direct causation.  (FoF ¶ 133)  She "believe[s her] estimates apply to Kaiser" but she "did not do a separate analysis to test that." (3/8 Tr. (Rosenthal) at 51:5-11.)  Her analysis is based on national data that cannot be applied to Plaintiffs.  (FoF ¶ 140.)  Prof. Rosenthal's conclusions are refuted by her admissions and other evidence showing that her analysis does not account for: any non-promotional factors that influence prescribing decisions; any formulary decisions or recommendations; any differences between TPPs; or regional demographics.  (FoF ¶¶ 132-140.)  Nor can Prof. Rosenthal reliably disaggregate between indications.  (FoF ¶ 142.) The evidence also showed that Prof. Rosenthal's analysis contained computational and statistical errors, and that Prof. Rosenthal used a flawed, results-oriented methodology.  (FoF ¶¶ 135, 138.)

108.   *See* ¶ 107, *supra*.

109.   *See* ¶ 107, *supra*.

110.   Dr. Hartman's damages calculations are dependent on Prof. Rosenthal's analysis and are unsupported by the evidence.  (FoF ¶¶ 143-46.)

111.   *See* ¶ 110, *supra*.  Plaintiffs improperly seek to supplement the record with new charts that were not offered or admitted at trial.  (*See* Dkt. 2805 at ¶ 111 & n.258.)  This Court's March 29, 2010, Procedural Order provides that "No additional evidence shall be submitted."

Dated:   May 14, 2010

Respectfully submitted,

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP

By:  /s/ Mark S. Cheffo
      Mark S. Cheffo

Four Times Square
New York, NY 10036
Tel:  (212) 735-3000
Email:  Mark.Cheffo@skadden.com

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP

By:  /s/ Raoul D. Kennedy
      Raoul D. Kennedy

Four Embarcadero Center
San Francisco CA 94111
Tel:  (415) 984-6400
Email:  Raoul.Kennedy@skadden.com

WHEELER TRIGG O'DONNELL LLP

By:  /s/ James E. Hooper
      James E. Hooper

1801 California Street
Suite 3600
Denver, CO 80202-2617
Tel:  (303) 244-1800
Email:  hooper@wtotrial.com

*Attorneys for Defendants Pfizer Inc and
Warner-Lambert Company LLC*

---

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on May 14, 2010.

/s/ Mark S. Cheffo
Mark S. Cheffo

---