UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:  NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1629 |
| | Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO: | Judge Patti B. Saris |
| THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA v. PFIZER INC., 04 CV 10739 (PBS) | Magistrate Judge Leo T. Sorokin |

**DEFENDANTS' RESPONSE TO PLAINTIFFS' PROPOSED CONCLUSIONS OF LAW**

Defendants Pfizer Inc and Warner-Lambert Company LLC (collectively, "Pfizer" or "Defendants"), hereby respond to Plaintiffs' proposed conclusions of law.

## INTRODUCTION

Beyond asking this Court to make, purportedly as conclusions of law, statements that actually constitute argument and irrelevant rhetoric, Plaintiffs' introductory section (Doc. 2806 ¶¶ 1-4) exposes the fundamental flaw in their claims. The relevant inquiry for this Court is whether Plaintiffs have met their burden to prove that Defendants violated California's Unfair Competition Law ("UCL");[1] that the violations proximately caused injuries to Plaintiffs; and that Plaintiffs are entitled to restitution in an amount that is reasonably quantifiable on the evidence admitted. Plaintiffs' proposed conclusions of law confirm that they have not met that burden.

Plaintiffs seek to have this Court attribute to them lofty purposes beyond the mere recovery of money and to invoke generalities to obscure the dearth of evidence supporting the most basic elements of their UCL claim. Indeed, the lion's share of Plaintiffs' proposed conclusions of law argues that Plaintiffs should be held only to a relaxed burden of proof on every aspect of their claim. Not only are Plaintiffs wrong as a matter of law, their effort to avoid their real burden reflects their awareness of the deficiencies in the evidence they presented. Although they ask this Court to grant them relief based on a finding that every Neurontin prescription for which they seek to recover failed to provide any benefit to the patient, they have

---

[1] Cal. Bus. & Profs. Code §§ 17200 *et seq*.

failed to prove such fact.  Plaintiffs also have not proven that the conduct they attribute to Defendants caused Plaintiffs to pay for prescriptions for which they otherwise would not have paid.  Finally, Plaintiffs propose a measure of restitution that is utterly unsupported by the evidence and wholly arbitrary.

## ARGUMENT

### I. Plaintiffs' Proposed Findings Of Fact And Conclusions Of Law Do Not Even Properly And Consistently Identify The Plaintiffs In This Action

Glaringly absent from Plaintiffs' proposed conclusions of law is any definition of who "Kaiser" is, a term they used in an ambiguous and inconsistent manner in an attempt to obscure Plaintiffs' multiple failures of proof.  Although defined in Plaintiffs' proposed findings of fact as the Plaintiffs themselves – Kaiser Foundation Health Plan, Inc. ("KFHP") and Kaiser Foundation Hospitals ("KH"); they then use the term "Kaiser" to refer to multiple distinct entities, most of which are not even parties to this lawsuit and provided no testimony at trial.  For example, as used by Plaintiffs in their proposed findings of fact and conclusions of law, "Kaiser" could mean:

1) KFHP, one of the only two plaintiffs in this lawsuit;

2) KH, the only other plaintiff in this lawsuit;

3) Drug Information Services ("DIS"), a division of KH;

*or* the following, non-party, separately incorporated subsidiaries of KFHP, each of which provides group health care coverage to insureds outside of California:

4) Kaiser Foundation Health Plan of Colorado;

5) Kaiser Foundation Health Plan of Georgia, Inc.;

6) Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc. (Maryland, Virginia and the District of Columbia);

7) Kaiser Foundation Health Plan of the Northwest (Oregon and Washington);

8) Kaiser Foundation Health Plan of Ohio;[2]

---

[2] The various subsidiary health plan corporations have never been named as plaintiffs in the complaint. Instead, shortly before trial, Plaintiffs began including the following footnote in their pre-trial filings: "Kaiser Foundation Health Plan, Inc. is the parent company of the following companies and has brought this lawsuit *on behalf of itself and its subsidiaries*: Kaiser Foundation Health Plan of Colorado; Kaiser Foundation Health Plan of

2

*or* the following Permanente Medical Groups ("PMGs"), non-party corporations or partnerships of physicians who separately contract to provide medical services to individual patients enrolled with one of the separate health plan entities listed above:

9) The Permanente Medical Group (Northern California);

10) The Southern California Permanente Medical Group;

11) The Hawaii Permanente Medical Group;

12) The Colorado Permanente Medical Group;

13) The Southeast Permanente Medical Group (Georgia);

14) The Mid-Atlantic Permanente Medical Group (Maryland, Virginia and the District of Columbia);

15) Northwest Permanente (Oregon and Washington); or

16) The Ohio Permanente Medical Group;

*or* the Pharmaceutical and Therapeutics ("P&T") Committees of each of the above PMGs, each of which made its own independent formulary decisions about Neurontin.  (Defendants' Proposed Findings of Fact [2808-1] ("FoF") FoF ¶¶ 1-5.)

The distinctions between and among these entities are important, as Plaintiffs themselves were quick to point out when it was in their perceived self-interest to do so.[3]  For example:

- KH did not pay for any Neurontin prescription (FoF ¶ 4) and lacks standing to recover in this lawsuit.

- KFHP has no standing to recover restitution on behalf of its non-party, separately incorporated subsidiaries.[4]

---

Georgia, Inc.; Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc.; Kaiser Foundation Health Plan of the Northwest; and Kaiser Foundation Health Plan of Ohio."  (*See, e.g.*, 2805 at 1 n.1 (emphasis added).)  None of those entities is mentioned anywhere in the Third Amended Complaint, and nothing in the Federal Rules of Civil Procedure authorizes a parent corporation to sue as a "representative" of its subsidiaries.  Nor did Plaintiffs allege, must less prove, that those entities assigned to Plaintiffs any claim that any of them might have against the Defendants.  Nor did any representative of those entities appear at trial to provide evidence of the existence of any claim the entity might have, much less the amount of any such claim.

[3]  *See, e.g.*, 2/26 Tr. (Carrejo) at 92:18-93:1 (denying that there is any such thing as a "Kaiser" doctor).

[4]  *See, e.g.*, *PayPhone LLC v. Brooks Fiber Commc'ns of R.I.*, 126 F. Supp. 2d 175, 179 (D.R.I. 2001) ("The First Circuit has adopted the rule that a corporation may not pierce its own veil . . . ."); *Resolution Trust Corp. v. Fleischer*, 848 F. Supp. 917, 923 (D. Kan. 1994) (holding that parent corporation who is sole shareholder does not have a right to sue for losses suffered by a subsidiary; direct injury must be shown).  A corporation cannot, on the

- Neither KFHP nor any of its non-party subsidiaries made any formulary decision. Formulary decisions were made separately by each of the eight P&T Committees of the separate regional Permanente Medical Groups, none of which is a party to this lawsuit. As a result, neither KFHP nor any of its non-party subsidiaries can show direct reliance on any statement by Defendants or on any suppression of scientific evidence that caused it any harm. (FoF ¶¶ 3, 14-21, 24-27, 33-36.)

- DIS, which developed the monographs on which some P&T Committees for the non-party PMG Committees may have relied when making formulary decisions, is part of KH, which, although a named Plaintiff, lacks standing to recover. DIS is not part of KFHP. (FoF ¶ 5.)

- The physicians who wrote the Neurontin prescriptions for which KFHP seeks to recover were not employees of any party to this lawsuit, but of the several independent, separately organized PMGs. (FoF ¶ 2.)

Through the deft deployment of the word "Kaiser" to refer variously, but tacitly, to numerous distinct entities (most of which are not even parties to this lawsuit) – Plaintiffs gloss over the very real distinctions between these entities in an attempt to obscure the many gaps in the chain of evidence they have attempted to construct. Plaintiffs cannot, however, thereby create standing for non-parties. Having chosen to obtain the many benefits of separately incorporating separate entities in different states, Plaintiffs cannot now, for this one purpose, extend the application of California law to those multiple entities formed and operating outside of California so as to avoid California obligations. And Plaintiffs cannot establish injury and causation for all based on evidence that is narrowly specific to the Southern California PMG.

Plaintiffs' failure to distinguish between, and offer proof regarding, the different entities dooms their entire claim. As discussed in Defendants' proposed conclusions of law, the evidence of injury and causation offered by Plaintiffs was limited to the Southern California PMG. Even assuming *arguendo* the sufficiency of evidence as to that region (which is denied), any restitution to KFHP would be limited to Southern California prescriptions, which Plaintiffs cannot (and certainly did not) quantify. Plaintiffs have conceded, and this Court has recognized, that Plaintiffs cannot prove the damages allegedly sustained by each of the different Kaiser

---

one hand, insist that corporate structure be respected when it is a defendant, but pierce the corporate veil when it is a plaintiff. *See United Cont'l Tuna Corp. v. United States*, 550 F.2d 569, 573 (9th Cir. 1977).

companies.[5] If, for example, Kaiser Health Plan of Georgia cannot recover, whether because it is a non-party or because it has no standing to recover under California's UCL or because Plaintiffs offered no evidence of injury and causation as to that entity, Plaintiffs' entire claim fails. Plaintiffs' admitted inability to disaggregate the different Kaiser entities precludes them from proving the amount of restitution that KFHP, as opposed to one or more of its subsidiaries, could recover.

II.   **The California UCL Cannot Be Applied To Permit Non-Party Kaiser Subsidiaries Operating In States Other Than California To Recover For Prescriptions Written By PMG Physicians Outside Of California Based On Formulary Decisions Made By Non-California P&T Committees**

A crucial instance of Plaintiffs' improper commingling of the different Kaiser entities is Plaintiffs' contention that "California law properly applies to the entirety of Kaiser's claim." (2806 ¶ 7.) As discussed above, there is no single Kaiser entity. Plaintiffs distort the record by saying that over 75 percent of "Kaiser's members are located in California, with no more than 6% if its members located in any other single state." (*Id.*) For example, Kaiser Health Plan of Georgia is a separate legal entity, the vast majority of its members are located in Georgia, and the vast majority of the Neurontin prescriptions for such members were written in Georgia by physicians practicing in Georgia. To the extent that the prescribing decisions of those physicians were influenced by some formulary status of Neurontin, as Plaintiffs claim, the relevant formulary decisions were made by the P&T Committee of the Southeast PMG in Georgia.

Indeed, had the Georgia entity sued in its own right – as it should have, if it believed it had a right to recover from Defendants – no court would have seriously entertained an argument that it could recover under the California UCL against non-California defendants for prescriptions written and medications sold in Georgia. To do so would contravene California's presumption against the extra-territorial application of its laws. *See Nw. Mortgage, Inc. v. Super. Ct.*, 85 Cal. Rptr. 2d 18, 23 (Ct. App. 1999). California courts "have specifically held that

---

[5] *See* 2/22 Tr. (Sobol) at 25:2-3; 2/22 Tr. (Nussbaum) at 27:2-3; 2/22 Tr. (Court) at 26:5-8 ("To suddenly now have to figure out, well, how much goes to this entity and how much goes to that entity, is a problem for us because you haven't done discovery that way if you've done it in the aggregate.").

California's UCL does not support claims by non-California residents where none of the alleged misconduct or injuries occurred in California." *Meridian Project Sys., Inc. v. Hardin Constr. Co.*, 404 F. Supp. 2d 1214, 1225 (E.D. Cal. 2005). Applying the UCL to conduct outside California not only would offend California's presumption against extraterritoriality, but would also violate due process. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 822 (1985); *Tidenberg v. Bidz.com, Inc.*, No. CV08-5553, 2009 WL 605249, at *3-5 (C.D. Cal. Mar. 4, 2009).

Application of California law to claims by unnamed parties for prescriptions written in states other than California is also inconsistent with Massachusetts choice of law principles. As Plaintiffs concede, Massachusetts courts, in actions for fraud and misrepresentation, apply the law of the state where the plaintiff acted in reliance on the misrepresentation. *See In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 82-83 (D. Mass. 2005). Plaintiffs' argument for application of California law once again depends on the shell game that Plaintiffs play with the different Kaiser entities. The subsidiaries "on behalf" of whom KFHP seeks to recover are separate corporate entities operating in states other than California. The relevant acts of reliance are either the decisions separately made by each of the separate regional PMG P&T Committees regarding formulary access to Neurontin or decisions, separately made by individual physicians, to prescribe Neurontin. As to the non-party subsidiaries of KFHP, those actions took place outside of California. Plaintiffs cannot obscure the absence of a California nexus simply by failing to name the real parties in interest as plaintiffs and purporting to bring an impermissible representative action on their behalf.

Nor is the location of "Kaiser's Drug Information Service" (2806 ¶ 7) in California relevant. Again, reference to "Kaiser" is misleading. DIS was not part of KFHP, but part of KH, a plaintiff in name only since it lacks standing.[6] Suppose, for example, that the Ohio Permanente

---

[6] Plaintiffs argue that Defendants "targeted" DIS (2806 ¶ 7); however, as discussed above, the location of DIS is irrelevant. Moreover, Plaintiffs have, at most, identified a single direct communication from Defendants to DIS that they claim influenced a DIS monograph. (TX301, *see also* FoF ¶¶ 28-30.) A single letter sent from an out-of-state defendant to an entity without standing to sue cannot supply the aggregation of contacts required for California law to be constitutionally applied to out-of-state transactions. *See Tidenberg*, 2009 WL 605249, at *5.

6

Medical Group had relied on a review of scientific literature written by Pfizer, sent to an independent publication house in Montana, and mailed to it from Ohio. No one would argue that because the Montana publishing house was a conduit for the information written by Pfizer in New York and received and acted on in Ohio by the Ohio Permanente Medical Group, Kaiser Foundation Health Plan of Ohio could recover against Pfizer under Montana law for prescriptions written in Ohio. Similarly, none of the P&T Committees of the different PMGs were bound by any monograph prepared by DIS; rather, they made their own formulary decisions, and all except two of them made those decisions in states other than California.[7]

In short, California law cannot lawfully or constitutionally be applied to prescriptions written outside of California, and Plaintiffs have provided no basis for reasonably quantifying the prescriptions written in California for which they seek restitution. Accordingly, judgment must be entered in Defendants' favor on Plaintiffs' UCL claims in their entirety.

## III. Plaintiffs Have Failed To Meet Their Burden Of Proof As To Injury And Causation

### A. Plaintiffs Must Prove Injury And Causation Under Each Prong Of The UCL

California law requires Plaintiffs to prove injury and causation regardless of which UCL prong they assert. *See* Cal. Bus. & Prof. Code § 17204 (West 2008); *In re Tobacco II Cases*, 207 P.3d 20, 29-30 (Cal. 2009); *Troyk v. Farmers Group, Inc.*, 90 Cal. Rptr. 3d 589, 625-28 (Ct. App. 2009). KFHP's alleged injury does not result from the fact that prescriptions were off-label. KFHP readily pays for off-label prescriptions, and many alternative drugs that Plaintiffs have proposed are also off-label. (FoF ¶¶ 21-54, 59, 61, 128-29.) On the facts of this case, therefore, proof of injury requires proof of fraud and reliance.

To show injury and causation, KFHP must prove that it relied on fraudulent representations by Defendants regarding the efficacy of Neurontin and, as a result, paid for Neurontin prescriptions that did not provide a benefit to KFHP members. *See Durell v. Sharp Healthcare*, No. D054261, 2010 WL 1529322, at *6 (Cal. Ct. App. Apr. 19, 2010) (to be

---

[7] The evidence also showed that some P&T Committees, such as Ohio and the Northwest, relied on information from a *regional* DIS. (DX 773, 810, 812).

published in Cal. Rptr. 3d).  Because the different PMG P&T Committees independently decided when to add Neurontin to formulary, whether to restrict it, whether to issue guidelines, whether to keep Neurontin on formulary and made such decisions at different points in time between 1994 and 2004, injury and causation must be proven for each of the separately incorporated health plan subsidiaries (to the extent their claims can be included at all).

### B.     Plaintiffs Failed To Establish Injury By A Preponderance Of The Evidence

Plaintiffs' injury theory rests on their assertion that Neurontin is utterly ineffective in *every* patient when prescribed for one of the off-label conditions at issue – an assertion that flies in the face of years of clinical experience of tens of thousands of physicians and the judgment of regulatory agencies for 50 countries that have approved Neurontin as safe and effective for some of those conditions.  In the more than three years between February 2005 and August 2008, while this lawsuit was pending, Plaintiffs, despite their access to a vast network of physicians, were unable to find a migraine expert who was not prescribing Neurontin off-label to treat neuropathic pain.  Plaintiffs' expert Dr. McCrory continued to prescribe Neurontin for diabetic peripheral neuropathy even as of the date he testified at trial.  (FoF ¶ 77.)  If the Court accepts Plaintiffs' theory, the Court must also implicitly find that Plaintiffs' own expert witness committed malpractice every time he prescribed Neurontin for an off-label neuropathic pain and continued to commit malpractice through the time he testified at trial.  Likewise, the Court would have to implicitly find that Dr. Mitchell Danesh, Regional Chief of Neurology for the Southern California PMG committed malpractice when he prescribed Neurontin in November 2007, over two and a half years after this lawsuit was filed, to treat neuropathic pain (including DPN and idiopathic peripheral neuropathy).  (FoF ¶ 80.)

The Court would have to find that KFHP made knowing and intentional misrepresentations to its members when, up until a little over a week before trial, it advised them on its website that "gabapentin and pregabalin are the only drugs that have proved to help relieve some types of chronic pain," and that "[t]he anticonvulsant gabapentin may be your best bet for safely treating chronic pain."  (FoF ¶ 52.)  The Court would have to find that KFHP continues to

mislead its members on its website even today, when the only drugs identified by its "Drug Encyclopedia" for "Pain Originating from a Nerve" are Neurontin and gabapentin[8] and an article reviewed by PMG physicians in December 2009 states that "anti-seizure medications [including Neurontin] are often used for pain involving the nerves."[9] The Court would have to find that the PMGs' continued failure to restrict formulary access to gabapentin (or KFHP's failure to refuse to pay for prescriptions absent such restrictions) constitutes a complete abdication of their responsibilities to their members and patients.

The Court would also have to find that the thousands of doctors who continue to prescribe Neurontin and gabapentin for their patients are utterly unable to see that it is providing no benefit to their patients. The Court would have to find that tens of thousands of patients who have reported improvement in their symptoms over the past decade were deluded.

The clinical experience of thousands of physicians and patients over such a lengthy period of time cannot be brushed aside as a placebo effect. Many of the patients for whom Neurontin was prescribed had already failed to improve on one or more other drugs. Plaintiffs cannot explain how these patients can have experienced a placebo effect on Neurontin, but not on any of the previous drugs. Plaintiffs cannot explain why patients experienced a sustained improvement on Neurontin over a course of months or years. Indeed, no expert in this case testified that *every single* patient who improved on Neurontin did so as a result of the placebo effect.

It is Kafkaesque to permit KFHP to recover amounts paid by it for Neurontin prescriptions, when simultaneously it willingly continues to pay for gabapentin prescribed by PMG physicians for the very same off-label conditions at issue. To advance that position, Plaintiffs insist on a paradigm divorced from their own practices outside the courtroom. While Plaintiffs insist inside the courtroom that only double-blind, randomized, controlled clinical trials

---

[8]https://members.kaiserpermanente.org/kpweb/drugency/conditiondrugsearch.do?conditionId=5425&name=Pain+Originating+From+a+Nerve&type=condition (last visited May 13, 2010).

[9]https://members.kaiserpermanente.org/kpweb/internalPage.do?cfe=226&element_Id=htmlapp/feature/226pain/nat_pain_medications.html.xml (last visited May 13, 2010).

("DBRCTs") are relevant, the evidence shows that when DIS made recommendations to the various P&T Committees, it did not require DBRCTs, relied on case reports and open label studies, recommended formulary expansion even in the face of negative DBRCTs and, most importantly, valued the clinical experience of PMG physicians. (FoF ¶¶ 21, 24-36, 121, 129.)

As detailed in Defendants' proposed findings of fact and responses to Plaintiffs' proposed findings of fact, there is substantial evidence (including DBRCTs, level II evidence, and clinical experience) supporting the efficacy of Neurontin for neuropathic pain, migraine, bipolar disorder and associated comorbid conditions, as well as the incremental benefit of doses above 1800 mg/day in at least some patients. And it was not even Defendants' burden to prove efficacy. It was Plaintiffs' burden to prove that Neurontin is utterly ineffective in all patients for the conditions at issue. They have not done so.

Absent such evidence, KFHP cannot recover under the UCL. KFHP cannot recover for prescriptions that provided a benefit to patients, and it has provided no evidence of a way to exclude such prescriptions from its restitution claims.[10] As KFHP itself has argued: "Restitution is not available to consumers who obtain the full value of what was paid for, and therefore have not given up anything, regardless of whether they were properly induced to purchase the product in the first place."[11] Further, there is no drug that is a hundred percent effective in all patients and the fact that Neurontin benefits some patients – as also testified to by numerous PMG physicians at trial – completely negates Plaintiffs' claims for fraud.

Nor can KFHP recover under its "cheaper, alternative" theory. As noted above, there can

---

[10] Courts have repeatedly rejected claims to recover the cost of a drug that provided a safe and effective treatment for the condition for which it was prescribed. *See Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*, Nos. 06-3044, et al., 2008 WL 5413105, at *8 (D.N.J. Dec. 23, 2008); *Heindel v. Pfizer Inc.*, 381 F. Supp. 2d 364, 380 (D.N.J. 2004); *In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. 61, 68-69 (S.D.N.Y. 2002); *Prohias v. Pfizer, Inc.*, 485 F. Supp. 2d 1329, 1337-38 (S.D. Fla. 2007), *subsequent determination*, 490 F. Supp. 2d 1228 (S.D. Fla. 2007); *Williams v. Purdue Pharma Co.*, 297 F. Supp. 2d 171, 176 (D.D.C. 2003). Likewise, California courts have repeatedly rejected claims for restitution under the UCL where the product performed as expected. *See Peterson v. Cellco P'ship*, 80 Cal. Rptr. 3d 316, 322 (Ct. App. 2008); *Laster v. T-Mobile USA, Inc.*, No. 05cv1167, 2009 WL 4842801, at *6 (S.D. Cal. Dec. 14, 2009); *Animal Legal Def. Fund v. Mendes*, 72 Cal. Rptr. 3d 553, 561 (Ct. App. 2008).

[11] *See* Memorandum of Points and Authorities in Support of Defendants' Motion for Summary Judgment at 24, *Timmis v. Kaiser Permanente*, 2002 WL 34093566, No. 833971-7 (Cal. Super. Ct. Sept. 27, 2002).

be no recovery for a drug that safely provided the intended benefit.  Indeed, in other litigation, KFHP has argued that such a "diminished value" theory of recovery represents a damages theory that is neither recognized by California law nor available as restitution under the UCL.[12]  In any event, the factual record is devoid of evidence that would support such a recovery in this case.  Just as KFHP cannot prove that every prescription for which it seeks a complete refund was ineffective, it cannot prove that, in every case, another cheaper drug would have been as well tolerated by the patient and provided the same benefit.  Indeed, Plaintiffs have produced no evidence that a cheaper drug would have even been prescribed in each such case.

### C.   Plaintiffs Failed To Prove Reliance And Causation

Plaintiffs argue that they are entitled to a presumption of reliance, but fail they to address the substantial evidence that negates their claims of materiality and reliance.  Plaintiffs' attempt to portray themselves as ordinary consumers like the plaintiffs *In re Tobacco II* is specious.  Plaintiffs are sophisticated businesses with substantial resources at their disposal.  They survived summary judgment by alleging a very specific theory of reliance; *i.e.*, that the P&T Committees of the various PMGs relied on monographs prepared by DIS, which conducted its own literature searches and independently evaluated the relevant scientific evidence.  Whereas the individual consumers in *In re Tobacco II* alleged that they had been exposed to a pervasive advertising campaign over many years, Plaintiffs here argue that DIS created monographs at discrete moments in time that led to formulary expansion.  That is, Plaintiffs rely on specific instances where they claim scientific evidence was either suppressed or delayed.  Plaintiffs bear no resemblance to the individual consumers in *In re Tobacco II.  Cf. In re Actimmune Mktg. Litig.*, No. C 08-02376, 2009 WL 3740648, at *13 (N.D. Cal. Nov. 6, 2009).

As detailed in Defendants' proposed findings of fact and conclusions of law, the only evidence that Plaintiffs offered in support of such a theory was restricted to Southern California.

---

[12] *See id.* at 25 n.20 (noting that a California appellate court had rejected a similar diminished value claim in *American Suzuki Motor Corp. v. Superior Court*, 37 Cal. App. 4th 1291 (Ct. App. 1995)); *see also id.* at 26 (equating diminished value with "benefit-of-the-bargain," a form of legal damages not available under the UCL).

11

(FoF ¶¶ 14-21, 24-28; *see also* Defendants' Proposed Conclusions of Law [2808-2] at 4-5.) Moreover, Plaintiffs' claims of materiality and reliance were thoroughly negated by evidence that showed, *inter alia*: (1) The Southern California PMG expanded formulary access to anesthesiologists and pain clinic physicians based on only two letters reporting the experience of 14 patients (FoF ¶ 21); (2) the Southern California PMG removed restrictions for Neurontin and added guidelines with knowledge of the negative Gorson study and the unblinding issue in Backonja (FoF ¶¶ 24-27); (3) the Ohio PMG expanded formulary access to include bipolar disorder with knowledge of the negative Pande and Frye studies and, based on the same monograph, both California PMGs failed to restrict psychiatrist access to Neurontin (FoF ¶¶ 33-35); (4) the Northwest PMG put gabapentin back on formulary after a generic was available and after this lawsuit was filed (FoF ¶ 46); (5) even after this lawsuit was filed, DIS and Kaiser Permanente's Care Management Institute ("CMI") recommended generic gabapentin for off-label conditions over more expensive, branded drugs that were FDA-approved for such conditions (FoF ¶¶ 47-50); and (6) KFHP continued to recommend Neurontin as a treatment for off-label conditions, including neuropathic pain, after this lawsuit was filed. (FoF ¶¶ 52-54.)

The various entities within the Kaiser Permanente group had at their disposal numerous tools that they regularly used to manage drug utilization, including removing drugs from formulary, restricting drugs to certain specialties, and issuing guidelines. (FoF ¶¶ 3, 14-21, 24, 46, 55.) Plaintiffs had the ability to immediately communicate such restrictions or guidelines, as well as other information about the safety and efficacy of drugs, to both patients and physicians. (FoF ¶ 56.)[13] But, even after this lawsuit was filed, and even after Plaintiffs received their expert reports in August 2008, they took no action to restrict the ability of PMG physicians to prescribe Neurontin or gabapentin for the off-label conditions at issue. Notwithstanding their claimed concern about the "integrity of the published literature," (2806 ¶ 2), Plaintiffs did not send e-mails to PMG physicians advising them of the conclusions reached by Dr. Dickersin in her

---

[13] *See also* 2/26 Tr. (Carrejo) at 88:10-89:9; McCarberg Dep. at 105:15-17, 105:21-106:3.

August 2008 report. Plaintiffs never sent emails to PMG psychiatrists telling them that, if they prescribe Neurontin for bipolar disorder, they would be committing malpractice, as their expert Dr. Barkin opined. And Plaintiffs never sent letters or emails to KFHP members telling them that PMG physicians were prescribing ineffective medicine to treat their chronic, debilitating, and life-threatening conditions. (FoF ¶ 56.)[14] Plaintiffs offer feeble excuses for their failure to take such actions, but their excuses are unpersuasive in light of Plaintiffs' claim that Neurontin is *wholly* ineffective for the conditions at issue and the ease with which any of these measures, all of which are regularly used by Plaintiffs, could have been undertaken. Plaintiffs' failure to take any such steps after they became aware of information they claim was suppressed belies their assertion that Neurontin is completely ineffective for the conditions at issue and defeats causation.[15]

## IV. KFHP Cannot Recover Under The "Unlawful" or "Unfair" Prong Of The UCL

### A. Claims For Non-Fraudulent Promotion Are Preempted By The FDCA

To the extent that Plaintiffs predicate their UCL claim solely on an alleged violation of the FDCA, unaccompanied by a breach of any independent state law duty, Plaintiff's claim infringes on the FDA's exclusive authority to enforce the FDCA. *See Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 352 (2001); *see also* 21 U.S.C. § 337(a) *PhotoMedex, Inc. v. Irwin*, No. 07-56672, 2010 WL 1462377, at *3 (9th Cir. Apr. 14, 2010) (to be published in F.3d). To withstand preemption, Plaintiffs' claims must be based on some "traditional state tort law which . . . predated" the FDCA. *See Buckman*, 531 U.S. at 353. As one court recently explained:

> If a plaintiff's claim is premised on conduct that would give rise to liability under state law – and would give rise to such liability "even if the FDCA had never been

---

[14] Even the educational initiative undertaken by the California PMGs in 2002 was restricted to neuropathic pain and only reiterated existing guidelines that TCAs be tried first. (FoF ¶¶ 38-39.)

[15] *See Laster*, 2009 WL 4842801, at *4, *8; *Buckland v. Threshold Enters., Ltd.*, 66 Cal. Rptr. 3d 543, 549-54 (Ct. App. 2007); *Caro v. Procter & Gamble Co.*, 22 Cal. Rptr. 2d 419, 430 (Ct. App. 1993); *Princess Cruise Lines, Ltd. v. Superior Court*, 101 Cal. Rptr. 3d 323, 329 (Ct. App. 2009), *review denied*, No. S178842 (Cal. Feb. 3, 2010); *Quezada v. Loan Center of Cal., Inc.*, No. CIV. 2:08-00177, 2009 WL 5113506, at *5 (E.D. Cal. Dec. 18, 2009); *Kingsbury v. U.S. Greenfiber*, LLC, No. CV 08-00151, 2009 WL 2997389, at *10 (C.D. Cal. Sept. 14, 2009); *Prohias*, 485 F. Supp. 2d at 1336; *Whalen v. Pfizer, Inc.*, No. 600125/05, 2005 WL 2875291, at *4 (N.Y. Sup. Ct. Sept. 22, 2005).

enacted" – the plaintiff may pursue the claim. However, "[i]f the defendant's conduct is not of this type, then the plaintiff is effectively suing for a violation of the FDCA (no matter how the plaintiff labels the claim), and the plaintiff's claim is thus impliedly preempted under *Buckman*."

*Lefaivre v. KV Pharm. Co.*, No. 4:09CV00588SNLJ, 2010 WL 59125, at *3 (E.D. Mo. Jan. 5, 2010) (quoting *Riley v. Cordis Corp.*, 625 F. Supp. 2d 769, 777 (D. Minn. 2009)); *see also Riley*, 625 F. Supp. 2d at 783 (holding that a claim based on off-label promotion is impliedly preempted under *Buckman*).

The court in *In re Epogen & Aranesp Off-Label Mktg. & Sales Practices Litig.*, No. MDL 08-1934 PSG, 2009 WL 1703285 (C.D. Cal. June 17, 2009), recognized this distinction in the very passage quoted by Plaintiffs (2806 ¶ 16). While stating that state law claims based on "allegations that [the defendant] made false or deceptive statements" were not preempted, the court held that the plaintiffs could not bring a claim under the UCL for off-label promotion that was not deceptive.[16] As the court stated: "[T]he law is very clear . . . that only the federal government, and not a private plaintiff, may enforce the FDCA." *See id.*

None of the cases cited by Plaintiffs regarding the UCL's "unlawful" prong address the implied preemption doctrine recognized by the Supreme Court in *Buckman*. Many of Plaintiffs' cases address violations of state statutes, which do not involve issues of federal preemption.[17] In other cases, the federal statute at issue authorized a private cause of action or citizen enforcement suit.[18] In the others, the plaintiffs alleged that the defendants engaged in fraudulent or

---

[16] Plaintiffs' arguments misconstrue the relevant principles of federal preemption at issue. It is not Defendants' contention that the FDCA preempts **all** state law claims and, therefore, that a violation of the FDCA can never be the subject of a UCL claim. For example, Defendants do not contend that the FDCA preempts state law claims for fraud merely because the FDCA also regulates fraud. A claim for fraud, however, is based on an independent, state law duty that pre-dates the FDCA.

[17] *See Chabner v. United of Omaha Life Ins. Co.*, 225 F.3d 1042, 1047-48 (9th Cir. 2000); *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527, 544-45 (Cal. 1999); *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 950 P.2d 1086, 1091 (Cal. 1998); *Farmers Ins. Exch. v. Super. Ct.*, 826 P.2d 730, 733-34 (Cal. 1992); *Comm. on Children's Television, Inc. v. Gen. Foods Corp.*, 673 P.2d 660, 668 (Cal. 1983); *Cal. Med. Ass'n, Inc. v. Aetna U.S. Healthcare of Cal., Inc.*, 114 Cal. Rptr. 2d 109, 112 (Ct. App. 2001). Plaintiffs misstate the holding of *Renick v. Dun & Bradstreet Receivable Mgmt. Servs.*, 290 F.3d 1055 (9th Cir. 2002) (per curiam), where the court affirmed summary judgment **dismissing** the UCL claims. *Id.* at 1058.

[18] *See Citizens for a Better Env't-Cal. v. Union Oil of Cal.*, 996 F. Supp. 934, 937-38 (N.D. Cal. 1997) (seeking to enforce discharge limits under the federal Clean Water Act, which expressly permits citizen suits to enforce effluent limits (33 U.S.C. 1365)); *Cisneros v. U.D. Registry, Inc.*, 46 Cal. Rptr. 2d 233, 248-50 (Ct. App.

misleading practices or a breach of some other traditional state law duty.[19]

Plaintiffs rely on only two cases addressing violations of the FDCA. Neither case discusses *Buckman*, and both are inapposite. In *Optivus Technology, Inc. v. Ion Beam Applications S.A.*, No. CV 03-2052, 2004 WL 5530838 (C.D. Cal. Dec. 29, 2004), *rev'd in part on other grounds*, 69 F.3d 978 (Fed. Cir. 2006), the district court held that the plaintiff could pursue a UCL claim, "so long as the [UCL] claim is not related to the requirements of the medical device, but is instead related to, for example, false advertising about the device." *Id.* at *16. The Federal Circuit did not criticize this finding, only the district court's holding that the plaintiff was required to first exhaust administrative exhaustion. *See Optivus Tech., Inc. v. Ion Beam Applications S.A.*, 469 F.3d 978, 985-86 (Fed. Cir. 2006).

In *Watson Laboratories, Inc. v. Rhone-Poulenc Rorer, Inc.*, 178 F. Supp. 2d 1099 (C.D. Cal. 2001), FDA found that the alleged agent of the defendant had violated good manufacturing practices in violation of a consent decree. But the plaintiffs were not suing merely to enforce the FDCA regulations. Rather, as a result of the plant shut down, the defendant could not fulfill a supply contract to plaintiffs and allegedly impaired the plaintiff's ability to compete with another company with whom the defendant was negotiating a merger. *Id.* at 1117-20.

Finally, Plaintiffs' attempt to distinguish *PhotoMedex, Inc. v. Irwin*, No. 07-56672, 2010 WL 1462377 (9th Cir. Apr. 14, 2010) (to be published in F.3d) and *Summit Technology, Inc. v. High-Line Medical Instruments Co.*, 922 F. Supp. 299 (C.D. Cal. 1996), based on the Warner Lambert criminal plea misconstrues the reasoning of these cases. In both *PhotoMedex* and *Summit*, the courts left open the possibility, without deciding, that an FDA determination that a

---

1995) (alleging violations of the Fair Credit Reporting Act, which permits private causes of action (15 U.S.C. 1681n-1681p)); *Schwartz v. Upper Deck Co.*, 967 F. Supp. 405 (S.D. Cal. 1997) (RICO), *vacated*, 104 F. Supp. 2d 1228 (S.D. Cal. 2000). Significantly, *Schwartz* was vacated on the grounds that a non-fraudulent violation of gambling laws could not support a RICO claim. *See* 104 F. Supp. 2d at 1231, *aff'd sub nom. Chaset v. Fleer/Skybox Int'l*, LP, 300 F.3d 1083 (9th Cir. 2002).

[19] *See Sw. Marine, Inc. v. Triple A Mach. Shop, Inc.*, 720 F. Supp. 805, 808 (N.D. Cal. 1989); *Kasky v. Nike, Inc.*, 45 P.3d 243, 248 (Cal. 2003); *Comm. on Children's Television*, 673 P.2d at 668; *Chern v. Bank of Am.*, 544 P.2d 1310, 1316 (Cal. 1976); *Roskind v. Morgan Stanley Dean Witter & Co.*, 95 Cal. Rptr. 2d 258, 259, 264 (Ct. App. 2000); *Wash. Mut. Bank v. Super. Ct.*, 89 Cal. Rptr. 2d 560, 570-71 (Ct. App. 1999).

medical device manufacturer *falsely* represented that it had FDA approval which it did not might escape preemption. *See PhotoMedex*, 2010 WL 1462377, at *9 & n.6; *Summit Tech.*, 922 F. Supp. at 305-06.

Here, however, Plaintiffs do not allege that Defendants ever represented that Neurontin had FDA approval that it did not have and it is undisputed that the plea did not result in any determinations regarding the efficacy of Neurontin or the truth or falsity of any statements made by Warner Lambert to any physician. Second, in both *PhotoMedex* and *Summit*, the plaintiffs claimed a direct competitive injury from the defendants' allegedly fraudulent claims that their products had FDA approval. Here, KFHP has not established any causal nexus between any of the incidents that are the subject of the plea and the prescriptions for which its seeks restitution under the UCL.[20] Indeed, KFHP has not even established a nexus between the incidents described in the plea and California. In short, KFHP's reliance on the criminal plea to support its claims under the UCL not only is misplaced, but highlights the prejudicial and irrelevant nature of such evidence that was admitted over Defendants' objection.

### B. Plaintiff Cannot Recover For Non-Fraudulent Promotion Under The "Unfair" Prong Of The UCL

Plaintiffs' proposed conclusions of law devote considerable attention to the three possible tests of "unfairness" developed by California courts, while conceding that the majority of California courts have applied the test stated by the California Supreme Court in *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 973 P.2d 527 (Cal. 1999), even in consumer cases. (*See* 2806 ¶ 26.)[21] In addition, while Plaintiffs seek to distinguish themselves on the ground that they are not competitors of Defendants, the rationale of *Cel-Tech* is applicable to Plaintiffs as sophisticated business entities alleging a commercial injury. As the California

---

[20] It is also undisputed that Plaintiffs were on notice of the government investigation that led to the plea more than four years before this lawsuit was filed. Accordingly, any claims based on the plea would be barred by the statute of limitations.

[21] The *Cel-Tech* test has been applied in at least one case brought by consumers against KFHP, KH and PMG. *See Timmis v. Kaiser Permanente*, No. A102962, 2004 WL 2943993, at *8 (Cal. Ct. App. Dec. 21, 2004), *aff'd sub nom. Cal. Consumer Health Care Council v. Kaiser Found. Health Plan, Inc.*, 47 Cal. Rptr. 3d 593 (Ct. App. 2006).

Supreme Court explained:

> In [determining whether the challenged conduct is unfair within the meaning of the unfair competition law], courts may not apply purely subjective notions of fairness. "The appellate courts have 'neither the power nor the duty to determine the wisdom of any economic policy; that function rests solely with the legislature . . . .'"
>
> . . . Vague references to "public policy," for example, provide little real guidance. "'[P]ublic policy' as a concept is notoriously resistant to precise definition, and . . . courts should venture into this area, if at all, with great care and due deference to the judgment of the legislative branch, 'lest they mistake their own predilections for public policy which deserves recognition at law.'"

*Cel-Tech*, 973 P.2d at 542-43 (citations omitted) (first and third alterations in original). The *Cel-Tech* test articulated by the California Supreme Court, therefore, requires Plaintiffs to demonstrate that "the public policy triggering the violation [is] tethered to a constitutional or statutory provision or a regulation carrying out statutory policy." *Id.* at 543 (citation omitted).

Regardless of which test is applied, however, the result is the same. Plaintiffs do not argue that lawful, non-fraudulent promotion would be unfair. To the extent that Plaintiffs seek to recover for off-label promotion, without a showing that such promotion was fraudulent, their claims are preempted for the reasons stated above.[22] It is not the label that is determinative, but the fact that Plaintiffs seek to usurp the FDA's exclusive regulatory authority.

To the extent that Plaintiffs assert that Defendants' conduct was "unfair" because it was fraudulent, their claims are merged with their claims under the "fraudulent" prong of the UCL and subject to the same requirements. *See Durell v. Sharp Healthcare*, No. D054261, 2010 WL 1529322, at *6 (Cal. Ct. App. Apr. 19, 2010) (to be published in Cal. Rptr. 3d); *In re Actimmune Mktg. Litig.*, No. C 08-02376, 2009 WL 3740648, at *8, *14-15 (N.D. Cal. Nov. 6, 2009).

## V.  Plaintiffs Have Failed To Prove A Violation Of The UCL

Defendants have separately responded to Plaintiffs' proposed findings of fact and

---

[22] *See also Timmis*, 2004 WL 2943993, at *9 ("[T]he UCL may not be used as a means of transferring to a court regulatory powers that have been legislatively bestowed on an agency."); *Samura v. Kaiser Found. Health Plan, Inc.*, 22 Cal. Rptr. 2d 20, 31 (Ct. App. 1993) ("[C]ourts cannot assume general regulatory powers over health maintenance organizations through the guise of enforcing [the UCL].").

identified in that response the numerous inaccuracies in Plaintiffs' description of the record and the irrelevant and other objectionable material included in Plaintiffs' proposed findings of fact. Plaintiffs' proposed findings are not a fair and accurate recitation of the record, but attorney argument that relies largely on numerous documents introduced over the objection of Defendants, unsupported by the testimony of a percipient witness. Plaintiffs' non-factual argument and distortions include the following: (1) Characterizing legitimate scientific disagreements over methodology or interpretation of data as fraud; (2) relying on global marketing documents notwithstanding that Neurontin was approved for other indications, including neuropathic pain, in approximately 50 countries; (3) treating CMEs supported by unrestricted grants as "Defendant-sponsored" events without any evidence that Defendants controlled the content of such CMEs; (4) failing to distinguish between mere proposals and plans that were actually implemented; (5) describing delays in publication as fraudulent even when earlier submissions were rejected by the journals, and (6) including conduct permitted by FDA safe harbors or protected by the First Amendment, such as distribution of article reprints.

Moreover, Plaintiffs fail to connect the alleged conduct to KFHP. In the absence of such a connection, Plaintiffs' claim amounts to no more than a fraud-on-the-market theory of recovery, which courts (including this Court and the California Supreme Court) have repeatedly rejected. *See In re Neurontin Mktg., Sales Practices & Prods. Liab. Litig.*, 257 F.R.D. 315, 326-27 (D. Mass. 2009); *Mirkin v. Wasserman*, 858 P.2d 568, 583-84 (Cal. 1993).

## VI. Plaintiffs Failed To Establish The Amount Of Any Alleged Overpayment With Reasonable Certainty

"[R]estitution under the [UCL] must be of a measurable amount to restore to the plaintiff what has been acquired by violations of the statute[]" and "must be supported by substantial evidence." *Colgan v. Leatherman Tool Group, Inc.*, 38 Cal. Rptr. 3d 36, 61, 63 (Ct. App. 2006). Recognizing the deficiency in the evidence offered by them in support of their claims for restitution, Plaintiffs rely on the inapposite case of *McAdams v. Monier, Inc.*, 105 Cal. Rptr. 3d 704 (Ct. App. 2010), which addresses the claims of absent class members. Plaintiffs have cited

18

no authority for the proposition that a so-called "relaxed standard of proof" applies to the claims of a named plaintiff seeking to recover tens of millions of dollars.

In addition, Plaintiffs completely mischaracterize Prof. Rosenthal's testimony in their proposed conclusions of law. Plaintiffs state that "Dr. Rosenthal only calculates fraudulent prescriptions," which Plaintiffs describe as "a subset of unlawful prescriptions." However, as this Court has found and Prof. Rosenthal admitted, she had no way of determining which prescriptions were *fraudulent*; that was an **assumption** she made. (9/18/09 Hr'g Tr. at 79:10-12; FoF ¶ 134.) Moreover, as this Court found, Prof. Rosenthal's aggregate analysis fails to provide a model "that segregates damages caused by unlawful conduct from damages caused by lawful conduct." *In re Neurontin Mktg. & Sales Practices Litig.*, 677 F. Supp. 2d 479, 495 (D. Mass. 2010). The evidence at trial revealed more deficiencies in Prof. Rosenthal's methodology. For example, no medical evidence was introduced to support the ICD-9 codes used by Prof. Rosenthal, who admitted that she included as "bipolar disorder" other conditions such as depression (FoF ¶ 142), leading to a gross overestimate by Dr. Hartman of the prescriptions subject to restitution. For the reasons set forth in Defendants' proposed conclusions of law, neither Prof. Rosenthal's nor Dr. Hartman's testimony provides a reliable basis for the restitution award sought by Plaintiffs.

## VII.  Plaintiffs Are Not Entitled To Prejudgment Interest

Under California law, and therefore under the UCL, "prejudgment interest is authorized only if the damages were 'certain, or capable or becoming made certain by calculation.'" *Jamison v. Jamison*, 79 Cal. Rptr. 3d 561, 567 (Ct. App. 2008) (citing Cal. Civ. Code § 3287). Damages are deemed "certain, or capable of becoming made certain by calculation" only when there is "no dispute between the parties concerning the basis of computation of damages." *Duale v. Mercedes-Benz USA, LLC*, 56 Cal. Rptr. 3d 19, 26 (Ct. App. 2007). Where damages can be arrived only by judicial determination based on conflicting evidence, the plaintiff is not entitled to prejudgment interest. *Block v. Lab. Procedures, Inc.*, 87 Cal. Rptr. 778, 780 (Ct. App. 1970). In this case, the amount of restitution sought by Plaintiffs was not certain or capable of being

determined without resolving conflicting expert testimony.  Under California law, Plaintiffs cannot recover prejudgment interest.

Dated: May 14, 2010

Respectfully submitted,

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP

By:     /s/ Mark S. Cheffo
        Mark S. Cheffo

Four Times Square
New York, NY 10036
Tel:  (212) 735-3000
Email:  Mark.Cheffo@skadden.com

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP

By:     /s/ Raoul D. Kennedy
        Raoul D. Kennedy

Four Embarcadero Center
San Francisco CA 94111
Tel:  (415) 984-6400
Email:  Raoul.Kennedy@skadden.com

WHEELER TRIGG O'DONNELL LLP

By:     /s/ James E. Hooper
        James E. Hooper

1801 California Street
Suite 3600
Denver, CO 80202-2617
Tel:  (303) 244-1800
Email:  hooper@wtotrial.com

*Attorneys for Defendants Pfizer Inc and Warner-Lambert Company LLC*

---

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on May 14, 2010.

/s/ Mark S. Cheffo
Mark S. Cheffo