1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
2


3


4       IN RE:


5         NEURONTIN MARKETING, SALES PRACTICES,
          and PRODUCTS LIABILITY LITIGATION
6


7                               CIVIL ACTION No. 04-10981-PBS


8


9


10              BEFORE THE HONORABLE LEO SOROKIN
                 UNITED STATES MAGISTRATE JUDGE
11                 HEARING/STATUS CONFERENCE
                        April 30, 2010
12


13


14


15


16                              Courtroom No. 24
                                1 Courthouse Way
17                              Boston, Massachusetts 02109
                                11:30 a.m.


18


19


20


21


22                      JAMES P. GIBBONS, RPR/RMR
23                        Official Court Reporter
                       1 Courthouse Way, Suite 7205
24                      Boston, Massachusetts  02210
                           jmsgibbons@yahoo.com
25

```
 1    APPEARANCES:

 2

 3            FINKELSTEIN & PARTNERS, LLP, (By Kenneth B.
        Fromson, Esq.), 436 Robinson Avenue, Newburgh, New York
 4      12550, on behalf of Plaintiffs

 5            LAW FIRM OF NEWTON B. SCHWARTZ, (By Trey Stegoll,
        Esq.), 1911 Southwest Freeway, Houston, Texas 77098, on
 6      behalf of Plaintiffs

 7            BOONE LAW FIRM, PA, (By Levi Boone, III, Esq.), 401
        West Sunflower Avenue, Cleveland, Mississippi
 8      38732-1771, on behalf of Plaintiffs

 9            PERRY, KRUMSIEK & JACK, LLP, (By Lauren M. Burke,
        Esq.), 101 Arch Street, 19th Floor, Boston,
10      Massachusetts 02110, on behalf of Plaintiff Dorsey

11      via telephone:

12            SKADDEN, ARPS, SLATE, MEAGHER & FLOM, (By Mark S.
        Cheffo, Esq., Katherine Stevens, Esq., and Stephen
13      Napolitano, Esq.), Four Times Square, New York, New York
        1o036, on behalf of Defendants

14            ROPES & GRAY, LLP, (By Ana Maria Francisco, Esq.),
        One International Place, Boston, Massachusetts 02110, on
15      behalf of Defendants

16

17

18

19

20

21

22

23

24

25
```

```
1                    P R O C E E D I N G S
2          THE CLERK:  Today is April 30.  This is the case of
3    In re: Neurontin, Civil Action 04-10981.
4        Counsel, please identify yourselves for the record.
5          MR. FROMSON:  Good morning, your Honor.  Kenneth
6    Fromson on behalf of the plaintiffs' Steering Committee from
7    Finkelstein & Partners.
8          MR. STEGOLL:  Trey Stegoll.  I'm with the Law
9    Offices of Newton Schwartz.
10         MR. BOONE:  Levi Boone.  I'm with the law office of
11   Boone Law Firm.
12         THE COURT:  All right.  Welcome.
13         MS. BURKE:  Your Honor, Lauren Burke.  I'm standing
14   in for Attorney Timothy Perry, who represents one of the
15   plaintiffs, Mary Dorsey.
16         THE COURT:  All right.
17       And then on the line we have Mr. Cheffo.
18         MR. CHEFFO:  Yes, your Honor.
19       And just so you know who else, I'm here in Nashville
20   with one or my colleagues, Katherine Stevens [ph], and Ana
21   Maria Francisco is on the line from Ropes & Gray, who is
22   also representing Pfizer, and my colleague Steve Napolitano
23   is on as well, I think in New York, dialing in.
24         THE COURT:  All right, fine.  Welcome to all of
25   you.
```

```
 1          I think there are four matters to discuss today.
 2          There is a scheduling question about the products
 3     liability cases; that is, in part, that issue that the last
 4     time I saw you, Mr. Cheffo and Mr. Fromson, you reminded me
 5     that I had never addressed from the fall about how to pick
 6     the 130-odd cases.
 7          There is a motion on the trust fund that's been filed
 8     by the Products Liability Steering Committee.
 9          And then, Mr. Fromson, I've got two motions to compel.
10     I am not quite sure if they're different.
11             MR. FROMSON:  My understanding is that they are the
12     same.  One may have been under seal.
13             THE COURT:  So they're just --
14             MR. FROMSON:  Essentially the same motion.
15             THE COURT:  -- the same motion both with respect to
16     Dr. Gibbons' manuscript and accompanying disclosures?
17             MR. FROMSON:  That's correct.
18             THE COURT:  All right.  So there's really just one.
19          Mr. Cheffo, have you responded to the trust fund
20     motion.
21             MR. CHEFFO:  We have not responded to that motion.
22          I think --
23             THE COURT:  Are you intending to?
24             MR. CHEFFO:  No.
25          Basically -- this is why, your Honor.  I think your
```

1    Honor has already ruled on the more global issue with

2    respect to the fee, and we don't really take a position on

3    this trust fund issue.  We will be guided by your Honor's

4    ruling on that.

5              THE COURT:  Okay, fine.

6         So I don't need to wait.

7              MR. CHEFFO:  That's correct, your Honor.

8              THE COURT:  All right.  So we'll come to that.

9         Let's talk about first the motion to compel.  So I will

10    hear you, Mr. Fromson, on that.

11             MR. FROMSON:  Your Honor, quite briefly -- and you

12    know much about the saga which is Dr. Gibbons.

13        He is the defendants' expert.  He drafts his expert

14    reports.  And in the chronology of events, he had drafted a

15    gabapentin paper, a litigation report, for this litigation,

16    obviously, and he drafted a bipolar manuscript, overall

17    dealing with anticonvulsants and the association with

18    suicidality of bipolar patients.

19        He sought to have that article published last year.  It

20    was published.

21        Quite frankly, Judge Saris -- and I am paraphrasing,

22    was impressed by the fact that an article had been published

23    in a peer-review paper as part of the Daubert process and

24    asked, inquisitively, well, what are you doing with the

25    gabapentin paper that had not been published, that had not

1    been submitted?

2        So I give them credit for the strategy of going out and

3    trying to get the gabapentin paper published while her

4    Daubert decision is still pending, and during the pendency

5    of the Daubert motion, they sent notice to the Court, Judge

6    Saris, indicating, hey, the gabapentin paper is now being

7    submitted for publication.

8        So we came into Court for oral argument, and --

9            THE COURT:  On the?

10           MR. FROMSON:  On the Daubert again, for

11    basically --

12           THE COURT:  In which case now are we talking,

13    global or --

14           MR. FROMSON:  Global.

15           THE COURT:  So the global Daubert motion applying

16    to all the products cases?

17           MR. FROMSON:  Correct.

18       In fairness to defense counsel, it was a very concise

19    hearing because she had already heard everything in the

20    context of the earlier trial from 2009.

21       So this was a --

22           THE COURT:  The Bulger trial or from the Daubert

23    hearing in Bulger?

24           MR. FROMSON:  Bulger.  You are absolutely correct.

25       She brought everyone back for a concise hearing on very

PDF created with pdfFactory trial version www.pdffactory.com

1    limited issues, at which time defense counsel reminded the

2    Court, by the way, the gabapentin paper is pending

3    peer-review process, and we're not aware of any criticisms.

4         That wasn't entirely true, or it simply wasn't a

5    complete response, because we did later learn that there

6    were peer-review criticisms, the article was rejected, and

7    we were not provided with a copy of the article.  That's, in

8    other words, called the "manuscript."

9         Remember, earlier we were given the bipolar manuscript.

10   We did cross-examine Dr. Gibbons at depositions on it.  Of

11   course, there were inconsistencies between his -- what --

12   there were inconsistencies from what he gives to the

13   journals and what he gives in litigation.

14        So, clearly, we are looking to pursue the same line of

15   cross-examination.  We want his manuscript that he has

16   submitted for publication.

17             THE COURT:  Where does the Daubert matter stand now

18   before Judge Saris?

19             MR. FROMSON:  As far as I know, it's still pending.

20             THE COURT:  Since that February 17 hearing, she has

21   not issued a ruling?

22             MR. FROMSON:  That's correct.

23        And we're not asking for depositions.  We want the

24   manuscript, and we want copies of his disclosure, because

25   the argument with the bipolar paper was, he didn't give full

1   disclosure.  He didn't describe the amount he was paid in --

2          THE COURT:  So are you anticipating that she's

3   going to have an evidentiary hearing?

4          MR. FROMSON:  I do not anticipate she will have

5   further hearings on the Gibbons Daubert matter at all.  I

6   think she is simply pending decision, and this happens to be

7   a discovery dispute which is tangential.

8      We want the manuscript.  We want the disclosures so

9   that we can cross-examine him at trial, as we did already

10  with the bipolar manuscript which was given to us.

11         THE COURT:  I see.

12     So when -- this is really -- if today if Mr. Cheffo

13  said, Great, I'll FedEx to you right now all those things

14  you're asking for, then you put it in your trial folder for

15  the next case going to trial --

16         MR. FROMSON:  That's correct.

17         THE COURT:  -- which Dr. Gibbons is testifying?

18         MR. FROMSON:  You betcha.

19         THE COURT:  And you're not going to be coming back

20  and saying, Well, given the issues that are presented here,

21  we need to redepose him about this because we are then going

22  to make a supplemental filing on the Daubert issue before

23  Judge Saris?

24         MR. FROMSON:  The global answer to your question,

25  if I can adopt that term you've been using this morning, is

```
1    you are correct.
2         I must say that the Judge did allow plaintiffs to file
3    a supplemental response after that February 2010 Daubert
4    hearing.  I believe it was already provided by
5    Dr. Greenland, plaintiffs' expert.
6         So I do not have any anticipation of filing anything
7    further for the Daubert hearing.  This is really purely for
8    cross.
9              THE COURT:  So this is really -- you just think you
10   are entitled to it, and, as a result --
11             MR. FROMSON:  Absolutely.
12        And from a practical perspective, when he is on stand
13   touting his litigation-driven published article, I want to
14   be able to say, This is what you wrote for litigation; this
15   is the manuscript you wrote --
16             THE COURT:  When's the next trial?
17             MR. FROMSON:  The trial starts May 11.
18             THE COURT:  Which one is that?
19             MR. FROMSON:  This is the Smith [ph.] case, for
20   which Mr. Cheffo is presently appearing.
21             THE COURT:  In Tennessee?
22             MR. FROMSON:  In Tennessee.
23             THE COURT:  And what -- are there any more trials
24   in Massachusetts?
25             MR. FROMSON:  I believe there is a Dorsey case.  I
```

```
 1    don't know the scheduling events of that matter.
 2          MS. BURKE:  I don't believe we have any scheduling
 3    moving forward.  There may be a summary judgment motion
 4    pending which we intend to respond to, and we're looking for
 5    a trial date.
 6          THE COURT:  The defendants filed a summary judgment
 7    motion.  That was in Dorsey.  You're going to oppose the
 8    summary judgment motion and say, Set it down for trial, but
 9    Judge -- it's before Judge Saris?
10          MS. BURKE:  Yes.
11          THE COURT:  But she hasn't set a trial date on that
12    one, has she?
13          MS. BURKE:  No, as far as I know.
14          THE COURT:  Is that the last Massachusetts case?
15          MR. FROMSON:  That's my understanding of the last
16    Massachusetts case on the docket that would be ripe for
17    trial.
18       If one gets filed from now until then, I don't know.
19          THE COURT:  Okay.  All right.
20       Anything else on that issue?
21          MR. FROMSON:  No.  That's the issue.
22          THE COURT:  So what do you exactly want?
23          MR. FROMSON:  We want to see the disclosures in
24    written or e-mail form to the journal articles that
25    indicated or was absent to the issues of:  Who paid him,
```

1    where he got his information.

2        I mean, I can't paraphrase --

3            THE COURT:  So you want what he told the journals?

4            MR. FROMSON:  Correct.

5            THE COURT:  As to all the things he told the

6    journals or what it is he told the journals about certain

7    topics?

8            MR. FROMSON:  That's a very good question, your

9    Honor.

10       I have to presume that his manuscript will outline the

11   basis of his opinions and where he received his data; but,

12   frankly, as a more general disclosure issue, I'd like to

13   know what he gave to the journals, everything in toto,

14   regarding his disclosures, how much he was paid, where he

15   got his materials, who assisted him, if anyone, because that

16   could be very much inconsistent with what's in his

17   manuscript, what he has disclosed thus far to this Court,

18   without going back and retracing --

19           THE COURT:  What do you want from what the journals

20   sent to him?

21           MR. FROMSON:  I believe we already have.

22           THE COURT:  So you're not looking for anything the

23   journals sent to him?

24           MR. FROMSON:   I am not looking for anything other

25   than, as Judge Saris has already indicated, that they have

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    an obligation to disclose.  And I don't want to paraphrase
 2    what she said.  She said, You have to give them something.
 3              THE COURT:  So you're satisfied with what she said,
 4    and you're not here arguing that as to that part that they
 5    didn't comply?
 6              MR. FROMSON:  Right.
 7         First and foremost, most important, the manuscript.
 8         And, second, if he sent a letter, if he sent any type
 9    of disclosure regarding his conflicts, or lack of conflicts;
10    payment or lack of payment, that is what we are truly
11    interested in.
12         Obviously, I would like to know the basis of his
13    opinions, and I am assuming they are in the manuscript, what
14    his data was and what database he used.
15              THE COURT:  Okay.
16              MR. FROMSON:  And we received this with respect to
17    the bipolar paper leading up to his bipolar journal article,
18    which we now, and then, used to cross-examine him at his
19    depositions.
20              THE COURT:  Okay.
21         Mr. Cheffo?
22              MR. CHEFFO:  Thanks, your Honor.
23         With your Honor's indulgence, the reason why I asked
24    Steve Napolitano to join us is he's actually -- I'm going to
25    ask him to address this.
```

1            THE COURT:  Sure.  That's fine.

2        Go ahead.

3            MR. NAPOLITANO:  With respect to what Mr. Fromson

4    said about the logistics of the Daubert and all that, I

5    guess we're completely in accord that the Daubert motion --

6    that the Judge is ready to rule on it.

7        As you said, this is really just a sort of ancillary

8    discovery dispute that's related to Dr. Gibbons.

9        You know, our position in our papers is that we have

10   complied above and beyond with what Judge Saris has asked us

11   to disclose with respect to this most-recent round of

12   Gibbons-related discovery.

13       We did inform the Court last September that Dr. Gibbons

14   had submitted his most recent article to the peer-review

15   process.  He is trying to get it published.  Defense counsel

16   did not tell him to submit it or anything of that sort.  He

17   decided to submit it on his own accord.  That motion is

18   presently under consideration at a peer-review journal, and

19   they're looking at it, they're considering it, and we'll

20   wait and see what happens with that peer-review process.

21       When we appeared before the Court in February, Judge

22   Saris had instructed us to do a number of things.  One was

23   we were told we needed to produce for the plaintiffs the

24   data that Dr. Gibbons had generated with respect to the

25   particular sensitively analysis that he had added to his

1     report.  I don't think we need to go into the fine details,

2     but she instructed us to give the plaintiffs the data, which

3     we did.  She also indicated very clearly that we needed to

4     produce any criticisms of the article that was in the

5     peer-review process.

6          Following the hearing, as indicated by some of the

7     attachments to our motions, we produced to the plaintiffs

8     the correspondence that Dr. Gibbons had received back from a

9     number of journals with respect to his article.

10         A number of the journals declined to publish it,

11    basically indicating they had, you know, more articles than

12    they can publish, and they returned it to him.

13         One of the journals, the American Journal of

14    Psychiatry, I believe, had two peer reviewers review the

15    article, and they declined it as well; but they sent it back

16    to him with some fairly detailed peer-review comments from

17    at least one of the reviewers, and we've produced all of

18    this now to the plaintiff.  We've filed it all with the

19    Court.

20         We categorically deny the idea that his article was

21    criticized by the peer reviewers, and the peer-review notes

22    speak for themselves.  They talk about it as being a very

23    strong article, that it's a valuable contribution.  They

24    thought it was a very good article.  They just decided not

25    to publish it.

1      Only after the hearing we produced -- so we produced

2    the data.  We've produced the peer-review comments.  Nothing

3    else was discussed at the February conference before Judge

4    Saris.

5      As soon as we got back, basically, to the office, there

6    was a request for some follow-up with respect to

7    Dr. Gibbons.  Mr. -- one of the plaintiffs' attorneys asked

8    for an explanation about what the data was, Could you help

9    us understand what this data was?

10     The data that was being produced was specifically so

11   that the plaintiffs' expert, Dr. Greenland, could respond to

12   what Dr. Gibbons had done.  We produced the data.  We

13   voluntarily produced explanations of what all these files

14   were.  And we also produced what the peer-review comments

15   note, that we don't think any of this is a criticism, but in

16   order to avoid sort of any -- of what we're going through

17   right now, hey, we'll give you all the correspondence that

18   Dr. Gibbons received back from the journals.  And included

19   in that packet of materials are correspondence from

20   Dr. Gibbons to the journals explaining why he thinks his

21   article should be published.

22     So we gave them basically everything that Dr. Gibbons

23   gave us; regardless of which direction the communication was

24   running in, and only then did we got a follow-up saying,

25   well, when are you guys going to give us the article?

PDF created with pdfFactory trial version www.pdffactory.com

1      We have set forth in our papers precisely why we have

2  an objection to producing a draft article at this time that

3  is in the peer-review process.  As everybody on this call

4  who has dealt with experts knows, the peer-review process is

5  a very sacrosanct, behind-closed-doors process, and any

6  disclosure of any sort about --

7          THE COURT:  Pfizer would never seek to disturb the

8  peer-review process in discovery?

9          MR. NAPOLITANO:  Say that again, your Honor.

10          THE COURT:  Pfizer would never seek to probe into

11  the peer-review process in the course of discovery?

12          MR. NAPOLITANO:  I believe there's a motion

13  practice of other cases seeking peer-review comments, but we

14  have no problem giving them the peer-review comments however

15  the article shapes out, whether it's produced or not

16  produced, but right now it's being considered.

17      And we have a track record in this case, your Honor,

18  which we've set forth in our papers.  Mr. Fromson mentioned

19  that Dr. Gibbons' article was published last year, and

20  within, I believe, a week or two of it being published, one

21  of the plaintiffs' lawyer in this case, Mr. London, goes on

22  to a public website and responds to the Gibbons article

23  basically saying to the authors in not too many words, You

24  guys don't understand his article, it's not as good as it

25  looks, and there's problems.  I have personal knowledge,

PDF created with pdfFactory trial version www.pdffactory.com

```
 1      and, by the way, Dr. Gibbons has got all this money he's

 2      been paid, which we really thought was really an unnecessary

 3      public shot at Dr. Gibbons, and it's not the kind of thing

 4      that's gone on in this case with respect to any other

 5      expert.

 6          So we have really serious concerns about giving a copy

 7      of a draft article out right now that is still in the

 8      peer-review process, and a lot of those concerns are based

 9      on what has, unfortunately, already transpired in this case.

10          THE COURT:  I have to tell you, I read that blog

11      posting by Mr. London.  And compared to the kind of

12      criticisms that I see leveled against other academics' works

13      by academics, which sometimes can, in the course of the fray

14      of academic inquiry and discussion, be pretty heated -- I'm

15      not taking a position on whether Mr. London's comments were

16      correct or incorrect, or whether they were appropriate or

17      not; and I can understand why Dr. Gibbons might not have

18      been happy about those comments, but, in the fray of

19      discussions, they were, I thought, perhaps more measured

20      than you've described them to be.

21          But I understand why a confidentiality order with

22      respect to a manuscript, a manuscript that's in the

23      peer-review process, it seems to me, if it were to be

24      disclosed, it should be subject to a protective order that

25      controlled its -- for example, I don't think it should be
```

```
 1    permitted to be used on a blog or referenced in a blog,
 2    because that sort of preemptively undermines Dr. Gibbons'
 3    ability to publish it.  It undermines the process.  It
 4    affects the publication, whatever publication this is, its
 5    ability to publish whatever it is it wants to publish, and
 6    that purpose doesn't relate to what this is about.
 7         But I don't know that that's a particular risk.  I
 8    mean, once it's in the public domain and it gets published,
 9    it's in the public domain and people can criticize it,
10    right?
11              MR. CHEFFO:  Yes, your Honor.  Mark Cheffo here.
12    Absolutely, your Honor.
13         I think there's really -- the core, I mean, concern we
14    have is, you know, we can all characterize whether we think
15    Mr. London's comments were appropriate or not, but the real
16    issue is, you know, even -- sometimes the journal, as your
17    Honor is likely aware, even the fact that the title or
18    something that gets leaked out in any context will be
19    enough, because a lot of the journals, as you might image,
20    are competing for cutting-edge information.  So that's why
21    they keep this very, very, kind of close to the vest.  You
22    know, a few days before the journal decides to publish it,
23    they will give it to a few people with certain agreements.
24         The fact -- we are facing a situation where you can
25    essentially have kind of a self-fulfilling prophecy.  All of
```

```
 1    a sudden we give the manuscript, and it gets leak in regard,

 2    or the editors find out there's other people who now know

 3    about this, so they deny it; and, you know, they deny to

 4    publish it, and then the plaintiffs come back and say, well,

 5    you see, no one would ever want to publish this.  So the

 6    issue is not so much ultimately --

 7              THE COURT:  But this is not an article -- this

 8    article in some way relates to, or is similar to, the expert

 9    opinion he already gave in this case, right?

10              MR. NAPOLITANO:  That is correct, your Honor.

11         Dr. Gibbons has a life outside this litigation --

12              THE COURT:  Right.

13              MR. NAPOLITANO:  -- and he, on his own volition,

14    chooses to publish articles --

15              THE COURT:  Sure.

16         But what I mean is it's not as if -- if you told me, We

17    respect a researcher.  He has been in the lab for the last

18    three years.  He is writing this article.  It's not seen the

19    light of day.  His research assistant and he are the only

20    ones who know anything about it, and handing it over to

21    plaintiffs for some ancillary use -- okay, there's a lot of

22    equities weighing on the confidentiality side.

23         But here he wrote an expert opinion.  How many pages

24    was that expert opinion on gabapentin?

25              MR. NAPOLITANO:  I don't have it in front of me.  I
```

1       assume it was a 30-page paper, 25-page paper.

2              THE COURT:  Right.

3          Single-spaced, pretty thoughtful, a lot of effort went

4       into it.  I haven't read it recently, but I recall it's

5       certainly a serious piece of work.

6          So that's already, in some form, out there, right?  I

7       mean, I am not saying that means he automatically has to

8       turn it over, but it weighs in the equities of the secrecy

9       issue.

10         I understand the -- the concern you have fundamentally

11      is if you turn the manuscript over in one form or another,

12      some of it leaks out, that prejudices Dr. Gibbons' chances

13      to have it published, which then has two-fold ramifications.

14      It collaterally impacts his income and his career, and it

15      directly impacts Pfizer, in that it then -- what otherwise

16      might have been published, but for a sort of media issue

17      that, perhaps, they don't want to publish it anymore if it's

18      out there, doesn't get published, and then you don't get the

19      benefit of the publication.  And not that you would suggest

20      an untoward motive to counsel, but there is always the risk

21      that somebody would do that because they would see a

22      potential collateral benefit to themself or their position.

23         Is that what you're saying?

24             MR. CHEFFO:  I think that very accurately

25      characterizes it.  You know, what we just heard right now is

PDF created with pdfFactory trial version www.pdffactory.com

1    -- and, again, I'm not necessarily even impugning bad

2    motives to plaintiffs' counsel by any stretch, but even what

3    they said, taking that to word, they want it so they can

4    cross-examine.

5         Well, the trial is, like, in two weeks.  I mean, what

6    happens if it's still under peer review?  They're going to

7    want to say, well, here's this information, and, you know,

8    use it for cross-examination.

9         The only one point I would raise is, as your Honor well

10   knows, Dr. Gibbons is a real expert, and people may take

11   issues on both sides about whether they agree with his

12   opinions or not.  But, just to be clear, no journal would

13   publish essentially the same thing that's been published.

14   They're not looking to republish information.  Obviously, it

15   has to be -- as Mr. Napolitano said, this is clearly

16   related.  I'm not suggesting that this is off on a

17   frolicking detour of these issues, but there has to be a

18   reason why this is new, novel, and advances the science.

19   And the journals may decide to publish it, they may not; but

20   it's not -- you know, I don't think we can say that because

21   he wrote a detailed 25-page manuscript or expert report of

22   which he has testified, that this is, necessarily, the same

23   precise, medical, scientific advancement that he is seeking

24   to publish.

25            THE COURT:  If you got it, Mr. Fromson, who would

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    want to see it?
 2            MR. FROMSON:  Dr. Greenland, and the attorneys, and
 3    the experts in our case.
 4            THE COURT:  The experts are the people who've
 5    already issued reports?
 6            MR. FROMSON:  Yes, your Honor.
 7            THE COURT:  Okay.
 8        I will think about that.  Anything else about that
 9    before we move on to the next issue?
10            MR. CHEFFO:  I just want to make one comment.
11        The follow-up is they asked for correspondence going
12    from Dr. Gibbons.
13        As I mentioned, we've already produced the
14    correspondence coming from Gibbons to the journal.  I'm not
15    aware of any others.  We could certainly inquire for that,
16    but, again, that really runs the risk of this unlimited
17    discovery of Dr. Gibbons.  He has relationships with these
18    people.  He knows people in his field.
19            THE COURT:  I understand.
20            MR. FROMSON:  May I make one comment, your Honor?
21            THE COURT:  One last comment from Mr. Fromson.
22            MR. FROMSON:  I think it would be inappropriate and
23    misleading to imply to the Court that Judge Saris
24    specifically addressed this issue of the manuscript versus
25    criticism.
```

1          At page 28 and 29 of her hearing from February, it

2     clearly sets forth the context of the discussion was merely

3     as to criticisms.  No one asked about a manuscript.  No one

4     denied providing a manuscript.  It really wasn't at issue in

5     this hearing.  So I wouldn't want you to think it was

6     debated and deliberated by the Court.

7          MR. CHEFFO:  That's exactly what I said, and

8     somehow if you thought I was suggesting otherwise --

9          THE COURT:  No.  I didn't.  I thought that's what

10    you were saying.

11         All right.  Thank you.  So we'll move on.

12         That takes care of the two pending motions to compel

13    because they're both the same.

14         On the trust fund issue, I already a year ago, or more,

15    I issued a ruling that created a trust fund, right?

16         MR. FROMSON:  Yes, your Honor.

17         THE COURT:  So what is the issue or question now?

18    Is that why you're here, Ms. Burke?

19         MS. BURKE:  No, your Honor.

20         MR. FROMSON:  Your Honor, this is simply the next

21    part of the process.

22         At the time of the order, the motion was simply for the

23    establishment of the fund.  However, it left open --

24    actually opening up a trust account.

25         THE COURT:  All right.

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. FROMSON:  So now it's ripe.  A trust account

2    has to be opened at a bank with a trustee, and so the motion

3    is, again, quite a simple one.  I understand why it was not

4    opposed by defense counsel.

5          THE COURT:  When did you file it?

6          MR. FROMSON:  It was filed on or about April 8,

7    2010, Document 2783.

8          THE COURT:  Well, then, since it's unopposed and

9    the time has run, I'll allow the motion as "unopposed."

10          MR. FROMSON:  Thank you, Judge.

11          THE COURT:  All right.  That takes care of that.

12       That brings us to scheduling.

13       I've set this up to explain it for two reasons.  One,

14    you had a disagreement.  If I recall correctly from the

15    filings that you directed me to after our last hearing, the

16    Steering Committee and the defendants agreed on, during this

17    period of time, doing 130 cases.

18       When I say "doing 130 cases," what I mean is the

19    template paper discovery, the plaintiffs' or executor-type

20    person's deposition, the doctor deposition or depositions

21    and the sales rep deposition or depositions, that core

22    discovery; and that at that point the cases would likely

23    be -- any further discovery might be individual and might

24    occur in the home districts, and we would probably send them

25    back at that point.  And you had a disagreement over

```
 1   whether -- how to -- within each category of law firm how to
 2   decide which cases to be done.
 3        If I recall correctly, we were planning to do all of
 4   the Finkelstein cases --
 5             MR. FROMSON:  Yes, your Honor.
 6             THE COURT:  -- and then a prorated portion of cases
 7   from all the other law firms.
 8        And the question was -- plaintiff said, Let each of the
 9   plaintiffs' lawyers pick whatever cases that they're going
10   to have go forward first.
11        And, Mr. Cheffo, if I remember right, for the
12   defendants, your proposal was, Have the Court -- or the
13   parties do it randomly as to those other law firms.
14        So I brought you here, first, just to hear you very
15   briefly about that question, but also to address the fact
16   that there are also a lot of cases from Mr. Boone and
17   Mr. Schwartz.  And that's why I asked you to make that
18   filing, Mr. Fromson, which you did yesterday, which I found
19   very helpful.
20        So if I do the math correctly, there are approximately
21   136 cases and 136 plaintiffs, not including the Boone and
22   Schwartz cases.
23        Mr. Cheffo and Mr. Fromson, do you agree with me on
24   that?  Does that sound right?
25             MR. FROMSON:  That sounds approximately right, your
```

1    Honor.

2              MR. CHEFFO:  Yes, your Honor.

3         And the only other -- and, as always, you've very

4    accurately and succinctly characterized it.

5         The only thing I would add, and maybe you know this,

6    but we've actually had -- your characterization of all the

7    parties' position was correct.  I think we ultimately agree

8    with respect to the Schwartz cases that we actually did

9    random -- we agreed --

10        Mr. Schwartz agreed to randomize his cases.  We picked

11   ten of those.  The only issue that, frankly, I think, where

12   there was a dispute is with respect to the Boone cases, and

13   Mr. Boone has gone ahead and started certain discovery in

14   cases that he has, essentially, self-selected.

15             THE COURT:  Mr. Fromson has one comment.

16             MR. FROMSON:  Just one response.

17        It was my understanding that the plaintiffs didn't

18   originally just say, We want to picks ours.  We were willing

19   to pick a group of cases that were reflective of the whole,

20   meaning some cases of attempt; some case of suicide; cases

21   regarding all dealing with pain, all dealing with

22   psychiatric treatment.  It wasn't like we just said, We're

23   picking the ones we picked because we're saying so.

24        The defendants' argument has been, and always has been,

25   consistent --

```
 1              THE COURT:  Well, let me tell both of you something
 2      from my perspective that may put a little bit of a wrinkle
 3      in all of this.
 4          The Court wants to get all the cases done.  I
 5      recognize, reluctantly, but I recognize it, that there is a
 6      limit to how many cases you can do in any given period of
 7      time, and I know that you're all both working hard, and I
 8      imagine you might have some cases other than the ones before
 9      Judge Saris and I here in the Neurontin matter.
10          What I see is sort of -- here, Mr. Boone, frankly, and
11      the reason I wanted you to be here, is, not including you,
12      there's -- well, not including you and Mr. Schwartz, there's
13      something in the neighborhood of 136 plaintiffs, which is a
14      group that's doable in the one year.
15          Mr. Schwartz has something in the neighborhood of 15,
16      20.
17              MR. STEGOLL:  If I may?
18              THE COURT:  Yes.
19              MR. STEGOLL:  The filing with respect to the
20      Schwartz cases is incorrect.  We have approximately 131
21      cases.  I am going to file a list specific to us later
22      today.
23              THE COURT:  All right.  So, thank you, that's
24      helpful.
25          So, in fact, not including the two of you, there are
```

```
1    136 cases.

2         Mr. Boone has, by this filing, 307 clients that are

3    active.

4         Does that sound right, Mr. Boone?

5              MR. BOONE:  That's correct, your Honor.

6              THE COURT:  And, Mr. Stegoll, how many does

7    Mr. Schwartz' law firm --

8              MR. STEGOLL:  Approximately 131, I believe.

9              THE COURT:  So, frankly, those two numbers dwarf

10   the rest of the MDL individual products liability cases.

11   And it's not the Court's wish to return those 438 cases to

12   the handful of district judges that they are assigned in

13   their home districts with no discovery having occurred in

14   most of those cases.

15        So far, while waiting for the Court to resolve this

16   random- or not-random question, you all have been going

17   forward with about 130 cases; is that right?

18             MR. FROMSON:  When you use the word "going

19   forward," I would have to say it's been, from both parties,

20   at a snail's pace.  Without getting into stone throwing, we

21   are awaiting discovery from the sales reps' discovery files.

22   Both parties have been busy.  It has been going very slowly.

23             THE COURT:  As to 130 cases, so you selected ten of

24   Mr. Schwartz' cases?

25             MR. STEGOLL:  Yes, your Honor.
```

```
1              THE COURT:  So that's within the 130?

2              MR. FROMSON:  I believe so, your Honor.

3              THE COURT:  And what about Mr. Boone?

4              MR. FROMSON:  Approximately 15, I believe, were

5     selected.

6              THE COURT:  Okay.

7              MR. CHEFFO:  That's not -- I mean, they might have

8     been selected, but they were not selected by us.  I don't

9     even know what those cases are.

10             THE COURT:  All right.

11         So those 15 haven't moved forward yet, whatever they

12     are?

13             MR. BOONE:  Well --

14             MR. FROMSON:  There have been requests for

15     depositions.

16             THE COURT:  But no depositions have occurred.

17             MR. BOONE:  No deposition has occurred, your Honor,

18     but we have provided Mr. Cheffo depo data describing the

19     positions.  We also submitted discovery to Mr. Cheffo --

20             THE COURT:  Okay.

21         As to the 130, okay -- or as to the 100 -- does the

22     130, in your view, Mr. Fromson, include 15 of Mr. Boone's?

23             MR. FROMSON:  Yes.

24             THE COURT:  It's 115 plus 15 of Mr. Boone's?

25             MR. FROMSON:  Right.
```

```
 1        My recollection is the plaintiff Finkelstein firm has
 2   approximately 73 in the mix.
 3             THE COURT:  What is the chance, Mr. Fromson -- are
 4   we going to finish in September the 130 or the 115?
 5             MR. FROMSON:  I don't believe so, Judge.
 6             THE COURT:  How close will we be?
 7             MR. FROMSON:  Not close, Judge.
 8        But I must say I think that Mr. Cheffo would echo that.
 9             THE COURT:  I'm assuming -- you're silent,
10   Mr. Cheffo, so I am assuming you agree?
11             MR. CHEFFO:  Well, I do agree.
12        I mean, it's hard to say we're not close.  Frankly, as
13   to Mr. Fromson's point, I don't know that I want to
14   necessarily get into the weeds, unless you do, at this point
15   on all the details.  I certainly don't want to throw stones.
16   I think there has probably been -- things have not been
17   hugely quick right now, but I will say, as often happens,
18   we're going to proceed a lot faster in the next few months
19   than we certainly have --
20             THE COURT:  Let me tell you two things, okay?
21             MR. CHEFFO:  -- so I would expect we are going to
22   start producing a lot more information with respect to the
23   sales reps.  We have scheduled 30, 40 depositions, I think,
24   of the plaintiffs over the next two to three months, is my
25   understanding.  We're producing cold notes today.
```

PDF created with pdfFactory trial version www.pdffactory.com

1       So he is right that there has been some -- we are

2   trying to --

3         THE COURT:  At the moment, I am not getting into

4   the weeds, okay.  And at the moment I'm not interested in

5   what the plaintiffs haven't done that they should have done

6   and what the defendants haven't done that they should have

7   done.

8       I will tell you that I assume in these things usually

9   that it takes two, both, to go forward, and there is

10   probably -- and I recognize there's a lot of issues, and

11   there's also a lot that's been going on since September of

12   last year in this Neurontin litigation.  It's not as if all

13   you've been doing in this litigation was these individual

14   products cases.

15       That said, One, not only would I like to see this case

16   wrap up, but perhaps more of greater interest to you is

17   Judge Saris also wants to see this wrap up, and very much

18   would like to see those 130 that she and I have discussed be

19   done by September.

20       We recognize that the 400-odd cases of Boone and

21   Schwartz aren't going to be done in September, and I

22   recognize that you're not going to have made a meaningful

23   start on most of them by September.  But if we did the 130

24   by September, great, all right.

25       I brought you here for two reasons:  One, to highlight

the Court's interest in moving the products cases and
sticking to that schedule of the 130; and, two, to talk
about the rest, which, in my view, is largely the Boone and
Schwartz cases.  Because the way you've divided up --
however I resolve this random - not-random issue,
essentially you're done with the 130, you're done with
everybody, except there are going to be a handful of
plaintiffs who aren't Boone or Schwartz who are left after
the 130 is done.  It's really going to be 25 or, maybe, 31
because there may be six more, right?

       So the question then is, What's the plan for how to
resolve the Boone and Schwartz cases?  Because I will tell
you one thing that's not likely to be an option for the
Court is let's suppose on October 1 we came back here and,
Mr. Cheffo and Mr. Fromson, you both reported to me that you
were done with the 130, and brought a big smile to my face,
and that the other individual cases that weren't Boone and
Schwartz were -- if they weren't done because you did an
extra lap, you had -- they were going to get -- We're going
to move right onto them.  I will tell you that, as soon as
we're done with the 130, and they won't take that long
because there's a lot less of them and you've now ironed out
all the big issues and you've got your procedures down, and
so we can bang those out pretty fast.  But that still leaves
420 cases, which is more than you'll have already done, that

1 are Boone and Schwartz cases.

2   And so -- and we're not -- the one thing that's

3 unlikely to happen is an order issues:  Send the 130 off,

4 send those 20 off when they're done, and send the 400-odd

5 plaintiffs back to wherever they came from without anything

6 being done in the cases except the 15 and the 10.  I don't

7 think that's going to happen.

8   So what I want to do is have a plan for that, and I

9 have a thought.  It's subject to a caveat, which is I

10 haven't consulted with -- this is an off-the-top-of-my-head

11 thought.  It's not something that Judge Saris and I have

12 reviewed and carefully considered, and I haven't given any

13 of you the opportunity to weigh in.  So it's something for

14 you think about.

15   But that thought is when we're done with the 130, okay,

16 or when we are done with 130 and a handful of others, why

17 not have a schedule encompassing the Boone and Schwartz

18 cases that says, all right, we're just going to do them on

19 an expedited basis.  Mr. Schwartz and Mr. Boone, you brought

20 the cases.  You have been fortunate to date.  Given the

21 nature of an MDL litigation, the Steering Committee has

22 carried the laboring oar, but, as you well know, you're

23 carrying the oar on your cases for this kind of discovery.

24   So why not, once we're done with the 130, or maybe

25 starting in October, we say, all right, we're going to do 10

PDF created with pdfFactory trial version www.pdffactory.com

1    or 20 cases a month; 30 or 60 depositions a month.  These

2    aren't long depositions.  You can coordinate that.  The

3    coordination of the lawyers' schedule will be easier because

4    it's one lawyer, Mr. Boone and whoever he has, and

5    Mr. Schwartz, or whoever he has; and then, Mr. Cheffo, you

6    and your people, and bang them out at that rate and we'll

7    send them back.

8         You know, I'm not sure what the other alternative is,

9    but it's going to -- I will tell you -- I'm open if there's

10   another alternative, but I will tell you that the tentative

11   view is they're not going back without any of that discovery

12   being done, and, then, it seems to me, that the only way to

13   do it is to just say we're going to do this many a month,

14   and if it's 10, that's 30 or 50 depos a month, or whatever

15   it is.

16        What about that?

17             MR. FROMSON:  I think that's a good idea, although,

18   obviously, the Finkelstein cases will be gone.  So I think

19   Trey and Levi certainly should chime in.

20        But I think you made one comment that the depositions

21   are not long depositions, and I would just like to remind

22   the Court that the current CMO indicates these depositions

23   can take as much as two days.  So I think in the future the

24   parties may come to you for additional guidance to limit

25   that back to the traditional eight-hour deposition.

PDF created with pdfFactory trial version www.pdffactory.com

1          The parties have been getting along very well thus far

2     since the Skadden firm has come on board.  The depositions

3     have not been taking two days, but it is in the CMO still

4     that it can take as much as, and that's a scheduling issue.

5          THE COURT:  Is there any reason as to these

6     individual depositions in individual cases that the

7     depositions ordinarily would be more than a day?

8          MR. FROMSON:  If I may, and Mark can speak for

9     himself, I would compliment the Skadden firm, that they have

10    been very efficient in the depositions since they have come

11    on board; whereas, previous law firms took full advantage of

12    the billable hour and went for two full days on depositions

13    that I didn't think needed to go that long.

14         MR. CHEFFO:  Whenever Ken compliments me, I'm

15    concerned that maybe we're not covering everything that we

16    should.

17         That was a joke, your Honor.

18         THE COURT:  I understand.

19         MR. CHEFFO:  We are trying to be efficient.  I

20    think at this point -- well, again, I don't want to get too

21    much into the weeds.  My view is probably better because I

22    think here --

23         THE COURT:  If it's not broken, I'm not going to

24    fix it?

25         MR. CHEFFO:  That's what I'm saying, and if we

1    start to be abusive, I'm sure you will hear about it from

2    them.

3              THE COURT:  So in terms of -- I ask, one, in terms

4    of keeping the cases moving toward that target goal of 130

5    in September, would it be sensible for me to see people or

6    have -- I don't want to -- you guys have been doing this, by

7    and large, without a lot of motion practice, which has

8    been -- I am pleased with.  So I don't want -- I'm not -- I

9    don't want to create hearings that invite people to file

10   motions that they otherwise wouldn't feel the need to file.

11        On the other hand, sometimes deadlines and quarter

12   status reviews keeps everybody focused and motivated.

13        So if it's useful, I am happy to see you once a month,

14   every six weeks, every other month, whatever it is, because

15   there is a strong interest in moving the cases forward.

16              MR. CHEFFO:  Can I suggest that, your Honor?

17        I think that's a good idea for two things.  One, I

18   don't want to make any promises that I can't live up to, but

19   I think if you were set a status compliance conference in

20   six weeks, I think I would be able to come back probably

21   with a little more detail and really put some meat on the

22   bones about where we are and where the problem issues are,

23   at least to the 130.

24              THE COURT:  All right.

25              MR. CHEFFO:  I also think -- just to backtrack on

 1     the others.

 2          You know, we are in agreement, whether it's 60

 3     depositions or 30 a month, we can probably -- maybe

 4     Mr. Boone and Mr. Schwartz and I can talk and make a

 5     proposal.  But I strongly agree with you that it really

 6     makes no sense to have an MDL -- send these cases all back

 7     with no discovery.  So we should work to get to the point

 8     where you and Judge Saris are comfortable.  We'll get a

 9     schedule and take two weeks to try to have some proposal for

10     you.

11               THE COURT:  Mr. Boone, do you have something you

12     want to say?

13               MR. BOONE:  Yes, your Honor.

14          I want to speak to the 10 or 20 cases you want to get

15     done per month after you finish with the 130 cases.

16          The written discovery would need to be responded to,

17     particularly from defense side, because the plaintiff

18     already answered the defendants' discovery.

19               THE COURT:  You mean before you do the depositions,

20     you'll need them to do the template discovery?

21               MR. BOONE:  Exactly, yes.

22               THE COURT:  No problem.

23               MR. CHEFFO:  We, I don't think, received very many

24     authorizations.  So it's a two-way street.  I think we have

25     zero authorizations, so --

 1              THE COURT:  Here's what we'll do.

 2         Do you want the status the beginning of June or earlier

 3    as to the general products liability cases?

 4              MR. CHEFFO:  Well, if I could by phone, I can do it

 5    anytime.  I am probably going to be down here for three to

 6    four weeks.

 7              THE COURT:  Tell me -- in terms of the rhythm of

 8    these products liability cases, it makes sense to have it,

 9    and I'll let you come by phone if you want.

10         In other words, if you think the time to have them --

11    there's two separate questions.  One is what to do about the

12    Boone and Schwartz cases.  As to that, what I suggest

13    happen -- as to the Boone and Schwartz cases that aren't

14    part of the 130.  So what you're going to do about that is

15    you'll talk to each other and come up with a proposal.

16         What I'm thinking about is what is the -- I'm looking

17    for the maximum possible rate of turning cases per month,

18    frankly, and then that will make it the shortest amount of

19    time.  I understand there is only one --

20         I don't know, Mr. Boone, if your law firm is yourself

21    or you and 500 people.  I assume it's yourself.

22              MR. BOONE:  It's myself, yes, your Honor.

23              THE COURT:  So Mr. Boone can only be in one place

24    at one time.  So there's going to be a limit as to how many

25    depositions he can do in a month; but, nonetheless, you

PDF created with pdfFactory trial version www.pdffactory.com

```
 1     brought 400 cases, and you've got them, and so ten

 2     depositions a month isn't going to do it.  It's going to

 3     have to be a faster pace than that.

 4            MR. BOONE:  Yes.  I understand.  We're prepared to

 5     do that.

 6            THE COURT:  All right.

 7        So come up with a -- and I think you're right,

 8     Mr. Cheffo.  What ought to happen is you can set a schedule

 9     that says between now and September, you know, benchmarks

10     for Mr. Boone and Mr. Schwartz, if Mr. Schwartz' firm hasn't

11     done it, producing the authorizations, so that you're

12     getting those authorizations.

13        And what I would suggest you guys do is decide what

14     order you want to do those cases in.  You're going to do

15     them all.  So it doesn't really matter to me what order you

16     do them in, but the order -- but the one thing that ought to

17     happen is before the depositions is -- the first case that's

18     deposed ought to be the one you got the authorizations from

19     earlier and ought to be the one that he got the template

20     discovery from you earlier and, likewise, his discovery to

21     you.

22        So there is no reason that the authorizations can't

23     be -- frankly, the authorizations ought to have been

24     produced already.  So you should do the authorizations

25     pronto, if you haven't done the medical authorizations.
```

1      And, likewise, the template discovery on both sides in

2    theory was done a long time ago, and I'm not getting into

3    the weeds about that at this moment at all; but,

4    nonetheless, that ought to be taken care of because what I

5    want to do is jump to depositions as soon as -- and no later

6    than when we are done with the 130, and possibly as early as

7    October in the Boone and Schwartz cases.  And so you can't

8    jump to that unless the template discovery has been done.

9      And you don't have to do -- I know there is a lot, and

10   you don't have to do all 457 cases' template discovery in

11   order to take depositions in the first case in October, but

12   you've got to be ahead of the curve in terms of the template

13   date.  You understand that, Mr. Cheffo, I know, and I'm not

14   criticizing you.  I am simply suggesting -- where I don't

15   want to be on October 1 is then turning to that prepatory

16   stuff for those cases.

17     So talk to each other.  Come up with a proposal about

18   how to do it, if you disagree.  If you can't come to an

19   agreement, come up with a joint schedule, but I think you

20   should have some benchmarks -- not involving depos, but

21   involving these other things -- between now and October 1,

22   so that in the fall when you start hitting depositions,

23   you're ready.  And also so that you can all do your --

24   prioritize your -- once you get those authorizations, you

25   know, prioritize getting the medical records and getting the

```
 1     template discovery and the ones you're doing first, sort of
 2     agree upon an order to them.
 3          So that's between Mr. Schwartz, Mr. Boone, and
 4     defendants.  Put together a proposal.
 5          Do you want to come -- do you want to do that in two
 6     weeks, or do you want to do that by -- maybe it makes sense
 7     to come back in early June.
 8              MR. CHEFFO:  That sounds good, your Honor.
 9          (Whereupon, the Court and deputy clerk conferred.)
10              THE COURT:  How about the week of June 7?
11          Will that trial be over by then, Mr. Cheffo, or do you
12     think it will still be going on?
13              MR. CHEFFO:  For when?
14              THE COURT:  The week of June 7.
15              MR. CHEFFO:  It's supposed to go three to four
16     weeks.
17          Either way, your Honor, I will make it work.  Either I
18     will have someone there who's fully up to speed, or I will
19     participate by phone.
20              THE COURT:  Is the trial all day or just in the
21     mornings?
22              MR. CHEFFO:  My understanding is she actually does
23     full days.  But we are an hour behind here, so I guess if
24     that's any guidance --
25              THE COURT:  So you would rather have the late
```

 1   afternoon?

 2             MR. CHEFFO:  Yeah, that would be better.

 3             THE COURT:  How about Tuesday, June 8, at

 4   three o'clock, or maybe -- is that late enough for you?

 5             MR. CHEFFO:  Yes, your Honor, that's perfect.

 6   Thanks for accommodating me.

 7             THE COURT:  So Tuesday, June 8, at three o'clock we

 8   will have a status on the products liability cases.

 9        By Wednesday, June 2nd, the defendants and Mr. Boone

10   and the Schwartz Law Firm will file a proposal about how to

11   deal with a schedule for all of the remaining Boone and

12   Schwartz cases, all those that aren't included in the 130.

13        If it's all agreed to -- well, I'll look at that

14   proposal, and then I'll issue a notice as to whether or not

15   I think Mr. Boone or someone from the Schwartz Law Firm

16   needs to come.  In other words, if it's a simple "agreed,"

17   and you've got a schedule and you're satisfied with it and

18   have no issues with it, I'm not going to make you show up

19   from where you're coming from just to hear me say in court

20   that it's fine.

21        Right now you're coming.  So plan on coming.

22        But if I look at it and everything's all set, and

23   there's no problems, and I'm comfortable with the timing,

24   and you've all agreed to everything and there's no issues to

25   discuss, I'll issue an order.

1          In fact -- so maybe I'll make you do it a little bit
2    earlier.
3          Why don't I make you do it the Friday before that.
4    What is that, the 29th of May?
5          (Pause in proceedings.)
6          THE COURT:  Friday, May 28.  That will give me
7    enough time to be sure I can look at it, and, if it's all
8    agreed to, issue a notice so that you don't have to come.
9    So Friday, May 28, for that report.
10         As to the other cases, I'll just see you on Tuesday,
11   June 8, at three o'clock for sort of a progress report on
12   the status of how they're going.
13         If everything's -- I want an update because I want to
14   keep this moving.  So if you want to come via phone, that's
15   fine.  If there's real issues come in; somebody come in
16   person.
17         Mr. Cheffo, you're down there.  If you want to come via
18   phone, that's fine, and we'll just see where we are.
19         If you want to file a report the Friday before to
20   update me, you can, but I'm not going to order an extra
21   filing.  If you think it's useful, I'll leave to all of you
22   to decide.
23         Yes?
24         MR. FROMSON:  Just to review.
25         Is it the Court's understanding and my understanding

1    now that the proposal that was submitted, the joint proposal

2    that was submitted to the Court several months ago, is now

3    essentially moot?  And the 130 or so cases, are those on the

4    parties' submission from yesterday?

5         In other words --

6         THE COURT:  Where are -- are the Boone and the

7    Schwartz -- are the 10 and 15 Boone and Schwartz within the

8    130 or outside; is that your question?

9         MR. FROMSON:  Well, they were on the inside of the

10   130 in the three- or four-month-old proposal from September

11   or October, which the Court didn't rule on.

12        THE COURT:  Yes?

13        MR. STEGOLL:  Your Honor, if I may clarify?

14        The cases that the Schwartz firm agreed with with

15   Mr. Cheffo's office, as to those ten, were not the same

16   cases that were submitted as our part of the 130.

17        THE COURT:  So they're in addition to the 130?

18        MR. STEGOLL:  Right.

19        THE COURT:  So what are you asking?

20        MR. FROMSON:  I'm asking, when I walk out of court

21   today and I have to send an email to the Garcia and Karam

22   firm and the Stephen Leutchman firm and Heninger and

23   Garrison firm, who might not otherwise have had any cases in

24   the proposal three or four months ago, they're on the list

25   from yesterday --

PDF created with pdfFactory trial version www.pdffactory.com

1           THE COURT:  Yesterday just listed everybody.

2           MR. FROMSON:  Exactly, but you've been referencing

3      this number of approximately 130, which is tantamount to the

4      list from yesterday.

5           THE COURT:  Yes.

6           MR. FROMSON:  So I just want to make sure Mark and

7      I, Mr. Cheffo and I, know who is in the pool of cases as of

8      today, for which they have a September deadline, and that's

9      either the pool of cases that were submitted to the Court,

10     which the Court never ruled upon last --

11          THE COURT:  The difference between that and the 136

12     is 15 of Mr. Boone's cases and 10 of Mr. Schwartz' cases.

13          MR. FROMSON:  I think that's correct.

14          THE COURT:  Is there any efficiency to -- you

15     agreed, Mr. Cheffo, to do ten of Mr. Schwartz' cases on top

16     of the 130?

17          MR. CHEFFO:  Yes, and those we have notice of

18     clearly, and I think there -- I guess -- I don't have a

19     strong objection, but I think, frankly, some of the cases

20     that we're now talking about adding in, really nothing has

21     been done.  I mean, the main work has been done.  I

22     understood the ten Schwartz cases.  We certainly understood

23     all of Mr. Fromson's case.

24          THE COURT:  I'm not going to -- this is what I am

25     going to do.

```
 1          I'm not going to disturb the pool you did last time,
 2     okay, because it is what was settled upon, and I don't
 3     want -- I think it will just slow things down.
 4          So the pool of 130 is the pool that you both agreed
 5     upon back in the fall, and the only question is, as to some
 6     groups of the pool, random or plaintiff-select; is that
 7     correct?
 8               MR. FROMSON:  That's correct.  The ones agreed upon
 9     by Mr. Cheffo.
10               THE COURT:  And what that's going to leave come
11     October 1, if you're done with 130, is the rest of the
12     Boone and Schwartz cases and something in the neighborhood
13     of 31 cases that are not Boone and Schwartz cases.
14               MR. CHEFFO:  That's my understanding.
15               THE COURT:  All right.
16               MR. FROMSON:  I think what I'm saying, your Honor,
17     is if you sign off on the plaintiffs' proposal from several
18     months ago, that gives the most clarity.  If you don't sign
19     off on it one way or the other, then Mr. Cheffo and I don't
20     know --
21               THE COURT:  I'm going to resolve that question
22     today.  Don't worry about that.  I'm still thinking about
23     the number, okay.
24          Is it possible to jam into the 130, expand it to
25     include the rest of the non-Boone and Schwartz cases?
```

1           MR. CHEFFO:  I don't want to promise that, your

2    Honor, because there really has been little, if anything,

3    that's done.  You know, we can maybe --

4           THE COURT:  How have you guys all proceeded -- all

5    right.  I get it.

6        Sorry to cut you off.

7        How have you proceeded so far without knowing whether,

8    as to some of these groups of law firms, which case you're

9    going to do?

10           MR. CHEFFO:  We have been mainly focusing on the

11    Fromson cases.

12        We also know the Schwartz cases, and we've, kind of

13    under protest, been dealing with the discovery requests that

14    we've gotten from Mr. Boone.  We're going to work with him

15    on that.

16        I actually think it's pretty easy.  I think we can

17    fairly adopt what we're calling the "plaintiffs' list."  The

18    only real issue is whether you can give us some guidance on

19    who gets to pick the Boone cases.

20           THE COURT:  So this is what we're going to do.

21        We're going to do the plaintiffs' proposal of 130 as to

22    everything other than the Boone cases, all right?  We're

23    going to have a status conference Tuesday, June 8, at three

24    o'clock to review how the products cases are going.  And

25    Friday, May 28, you will have a proposal about how to do the

1    rest of the Boone and Schwartz cases along the lines that

2    we've discussed.  As to within the 130, you're going to have

3    15 Boone cases.  And so what -- nothing's happened on any of

4    those 15, on any of them, right, so far?  You served some

5    discovery requests.

6              MR. BOONE:  And I provided depo dates.

7              THE COURT:  But in terms of -- have you done the

8    medical authorizations?

9              MR. BOONE:  Your Honor, I thought we did the

10   medical authorizations a long time ago.  I thought it was

11   part of the template discovery.

12             MR. CHEFFO:  We don't have a single authorization,

13   is my understanding, and that's the problem.

14             MR. BOONE:  If they'll give me --

15        (Counsel conferred.)

16             MR. BOONE:  We'll do new authorizations, but we

17   followed the procedure.

18             THE COURT:  So you want -- how do you want to pick

19   your 15, Mr. Boone?

20             MR. BOONE:  Well, your Honor, what we did was the

21   15 that I have is it's a representative of the type of cases

22   that we have.  We have a suicide-attempt case.  Then we have

23   some of the depression and the ineffectiveness of the

24   medication, that type of thing.

25             So we just took a broad section, basically, of all of

PDF created with pdfFactory trial version www.pdffactory.com

1  our cases and said, okay, we'll take these 15, but we've got

2  300 cases left.

3          THE COURT:  So I picked them.  You want to pick by

4  representation.

5      Mr. Cheffo, how want to pick the Boone cames,

6  understanding that you're going to do all of them anyway?

7          MR. CHEFFO:  Absolutely.

8      I think the fairest way to do Mr. Schwartz [sic] is we

9  put them in this randomized program.  You put the numbers,

10 you know, one through, whatever it is, 300-something.  Each

11 has a name, and it spits out 15 cases.

12         Alternatively, if we are going to do 15, you know --

13         THE COURT:  How are you going to pick the order of

14 the rest of the Boone cases?

15         MR. CHEFFO:  I'm sorry, your Honor?

16         THE COURT:  How will you pick the order of -- the

17 order in which you do the rest of the Boone cases?

18         MR. CHEFFO:  Again, I think the only fair way,

19 frankly, is randomizing.  Just in a word, here's why.

20     You know, again, I don't take issue necessarily with --

21 Mr. Boone thinks he has a representative sample, but I know

22 nothing about these people.  So I can't intelligently pick a

23 case.  And it's not fair, if we have 300 cases, for him to

24 pick the cases he thinks are strongest, or whatever.  So I

25 think the way it is best done is just random.  If he

```
 1        believes in all his cases, then it shouldn't be an issue.
 2                THE COURT:  The one other alternative is
 3        alphabetical.
 4                MR. CHEFFO:  Yes.  That's -- we could do that, too.
 5        I just don't want a situation where, you know, one side --
 6        it's his clients.  He can talk to them.  He has all the
 7        medical records.  He gets to pick out of 300 cases, and I
 8        have to wait until the very end.
 9                THE COURT:  Is there any reason not to do them in
10        the order -- the alphabetical order?
11                MR. CHEFFO:  Not by me there is not.
12                THE COURT:  How about you, Mr. Boone, and do them
13        all?
14                MR. BOONE:  Well, your Honor, I don't know if
15        alphabetical or random, I don't know if that will actually
16        make a difference, but, you know, I don't think we're going
17        to get a cross -- we're not going to get a representative
18        sample of what the cases are; not that it necessarily has to
19        be a representative sample, but we may get only
20        suicide-ideation cases, which I guess we can proceed like
21        that.  But Mr. Cheffo, he won't know --
22                THE COURT:  What's your hope?  Your hope is to do
23        some random, do some smattering of a cross-section, and then
24        see if there's a settlement, or, if not, try them all?
25                MR. BOONE:  We'll, I'm hoping there is a way that
```

```
 1    we can at least proceed forward with one of each category of
 2    cases from the injury perspective.  One -- at least some
 3    cases that deal with the suicide attempt, some cases that
 4    deal with the suicide ideation, some cases that deal with
 5    the ineffectiveness of the drug and the depression.
 6        If there were some way to do that.
 7            THE COURT:  This is what I'm going to do on that.
 8        The 15 -- I'm going to do what I did before.  Five,
 9    Mr. Boone, you get to pick.  You pick them within a week,
10    and send Mr. Cheffo a letter, any five you want.
11        Mr. Cheffo, five you're going to put in your randomizer
12    program.  I'm going to let you do that, rather than me, and
13    it comes out of the randomizer program.
14        All right?
15            MR. CHEFFO:  Yes.
16            THE COURT:  And five, Mr. Cheffo, you get your
17    choice on.  So five are random, and five -- the third five,
18    here's the option.  You can put them in your randomizer
19    program if you want, or you can pick them.  It's up to you.
20            MR. FROMSON:  If I may just add, your Honor, the
21    randomizer program should be done jointly.  There are
22    software applications on --
23            THE COURT:  Yes, on the Internet.
24        So you should do it together.  In other words, there
25    are these websites you can go to.  You just punch in and get
```

1    a random number.  You've got a list here.  This is the list
2    to use, Docket No. 2809-2.
3         So if you do the randomizer for five and number -- and
4    you get the numbers between one and whatever that is, 306,
5    and pick out those five, and do that in some process
6    together so that you know, but it's random.
7              MR. CHEFFO:  We've done that before.  We'll
8    certainly do that.
9              THE COURT:  So five are random.  Five Mr. Boone
10   picks.
11        The last five, Mr. Cheffo, is your choice, all right?
12   You can pick them, or you can put them in the randomizer
13   together with the five that are going in the randomizer.
14             MR. CHEFFO:  Got it.
15             THE COURT:  Mr. Boone will pick his five by a week
16   from today.  And do the randomizer, and the random five you
17   will do by two weeks from today.  And three weeks from
18   today, Mr. Cheffo, you will either pick your third five or
19   do them random.
20             MR. CHEFFO:  Understood, your Honor.
21             THE COURT:  All right.  And so that takes care of
22   those 15.
23        You can talk about the order you're going to do the
24   other Boone cases in the proposal you make, but, one way or
25   another, we're going to have a schedule that does them all.

```
 1              MR. FROMSON:  Shouldn't randomization, your Honor,

 2     come last?  Shouldn't it be:  Plaintiffs select, then

 3     defendant selects, then the random selects?  This way

 4     everyone is in an equal footing?

 5          I'm sorry to speak on behalf of Mr. Boone, but from a

 6     strategic standpoint, which there is here, plaintiff should

 7     select, then defendant should select, then the randomization

 8     should be counted, or else the defendant gets the benefit of

 9     looking and seeing --

10              THE COURT:  I guess, actually, we'll do it this

11     way.  That's not a bad suggestion, but I'm going to change

12     it a little bit.

13          You do the random first.  The random do first.  Then

14     do -- Mr. Boone picks his five.  Then, Mr. Cheffo, you pick

15     your five, or you do five random more; okay?

16              MR. CHEFFO:  That's fine.  That works for me.

17              THE COURT:  So in that case you can do the random,

18     get it all done.

19          All right, I'll leave it three weeks.  One week, one

20     week and one week.  Random by next Friday.  Boone by the

21     following Friday.  Mr. Cheffo, you by three weeks from

22     today.

23              MR. STEGOLL:  Your Honor, for clarity sake, as to

24     Mr. Schwartz' cases, just that so I am clear.  The cases

25     that now fall under the September 1 deadline are, for the
```

1    purpose of our office, are the cases that were submitted

2    along with the plaintiffs' group of 130 and the additional

3    ten that we agreed to with Mr. Cheffo.

4              THE COURT:  Yes.

5              MR. STEGOLL:  Because initially the initial ten

6    were going to be in substitute for the ones that we proposed

7    as part of the 130.

8              THE COURT:  I think you're doing them in addition;

9    right, Mr. Cheffo?

10             MR. CHEFFO:  I don't think so, actually.  I thought

11   that Mr. Schwartz and I had decided the best thing to do was

12   to pick the ten cases, is my recollection, and that was

13   supposed to be Mr. Schwartz' constellation of cases for this

14   first round.

15         I mean, we can revisit that if you would like us to.

16             THE COURT:  No.  I'm fine with it.

17         So the 130 is going to be the ten of Mr. Schwartz'

18   cases you already agreed upon with Mr. Schwartz.  And that's

19   the ten Schwartz cases within the 130.

20         The deadline is actually the end of September, not

21   September 1st.

22             MR. STEGOLL:  Okay.

23             THE COURT:  So that takes care of everybody except

24   the 26 or 31 cases that are not Boone, not Schwartz, and not

25   in the 130.

```
 1          So why don't you, Mr. Cheffo and Mr. Fromson, talk
 2    about those cases -- those include, I suppose, the pro se
 3    cases -- but include a schedule.  Come up with a proposal
 4    for them and file it by May 28.  And I'm thinking along the
 5    same lines as what I'm thinking about for Boone and Schwartz
 6    cases, which is have a schedule, and just, boom, divide them
 7    up.  We ought to be able to bang those out really fast.
 8          And the schedule should have two parts, between now and
 9    October 1 taking care of authorizations, taking care of
10    medical releases, taking care of template discovery, and
11    then the depositions.  And there you have a coordination
12    issue, but you have more lawyers.  But, on the other hand,
13    on the plaintiffs' side you have more lawyers, so you can do
14    them at a faster rate.
15          My sense is, Mr. Cheffo, there is an
16    almost-inexhaustible supply of young lawyers looking for
17    jobs, so you can probably always expand.
18              MR. CHEFFO:  As long as they're willing to do it
19    pro bono, my client would have no problem, Judge.
20          (Laughter.)
21              THE COURT:  Anything else to address in the
22    schedule?
23              MR. FROMSON:  No, your Honor.
24              THE COURT:  I am going to issue an order on the
25    motion to compel.  I will do that promptly.
```

```
 1            I have allowed the trust fund motion, and that will be
 2     in the notes, and I'll probably issue one line in whatever
 3     order I issue just so you have a document.
 4            Maria will issue a scheduling notice of Tuesday, June
 5     8, and the clerk's notes will have these dates.
 6            Anything else?
 7               MR. FROMSON:  No, Judge.  Thank you.
 8               THE COURT:  Anything else, Mr. Cheffo?
 9               MR. CHEFFO:  No.  This has been very helpful.
10     Thank you, your Honor.
11               THE COURT:  All right.  I will see or hear from you
12     all on Tuesday, June 8.
13            Actually, there's one last thing, which is, I know this
14     will warm all of your ears, global resolution, whether at
15     some point in the fall it wouldn't make sense to have some
16     process to try to resolve a lot of these cases.  At that
17     point, you will have had the ones that are already under the
18     water and done.  You will have had this trial in Tennessee.
19     I don't know whether you will have had any trials in New
20     York or elsewhere, but it's at least something to think
21     about.  You don't have to report back to me about it, but I
22     am bringing it up because it's a thought on the Court's
23     side.  So you might want to think about it.
24            All right.  We are done.  We are adjourned.
25            Thank you very much.
```

1          MR. FROMSON:  Thank you, your Honor.

2          MR. CHEFFO:  Thank you, your Honor.

3          THE CLERK:  All rise.  This matter is adjourned.

4      (Proceedings adjourned.)

5

6                    **C E R T I F I C A T E**

7

8      I, James P. Gibbons, Official Court Reporter for the

9  United States District Court for the District of

10  Massachusetts, do hereby certify that the foregoing pages

11  are a true and accurate transcription of my shorthand notes

12  taken in the aforementioned matter to the best of my skill

13  and ability.

14

15  /s/James P. Gibbons                  May 10, 2010

16

17

18  James P. Gibbons

19

20

21              JAMES P. GIBBONS, CSR, RPR, RMR
                 Official Court Reporter
22              1 Courthouse Way, Suite 7205
                 Boston, Massachusetts 02210
23                  jmsgibbons@yahoo.com

24

25

PDF created with pdfFactory trial version www.pdffactory.com