# EXHIBIT I

1                          Volume 1
                           Pages 1-90
2                          Exhibits:  1-7

3

                  UNITED STATES DISTRICT COURT
4            FOR THE DISTRICT OF MASSACHUSETTS

5            CIVIL ACTION NO. 05CV10639-PBS
                   MDL DOCKET NO. 1629
6              MASTER FILE NO. 04-10981

7     - - - - - - - - - - - - - - - - - -
      IN RE:  NEURONTIN MARKETING, SALES
8     PRACTICE AND PRODUCTS LIABILITY
      LITIGATION,
9     - - - - - - - - - - - - - - - - - -
      MARY P. DORSEY, INDIVIDUALLY AND AS
10    ADMINISTRATRIX OF THE ESTATE OF
      JAMES DORSEY,
11                   Plaintiff
                v.
12    PFIZER, INC., WARNER-LAMBERT COMPANY,
      AND PARKE-DAVIS, A DIVISION OF
13    WARNER-LAMBERT COMPANY,
                   Defendants
14    - - - - - - - - - - - - - - - - - -

15

          DEPOSITION OF JEREMY D. SCHMAHMANN,
16    M.D., a witness called by counsel for the
      Plaintiff, pursuant to the applicable
17    provisions of the Federal Rules of Civil
      Procedure, before Carol A. Fierimonte,
18    Certified Shorthand Reporter and Notary
      Public within and for the Commonwealth of
19    Massachusetts, (#134693), at the Offices of
      Perry, Krumsiek & Jack, LLP, One McKinley
20    Square, Boston, Massachusetts, on Tuesday,
      April 8, 2008, commencing at 10:15 a.m.
21

22

23               LORREEN HOLLINGSWORTH
              CERTIFIED COURT REPORTERS
24

Page 2

1  APPEARANCES:
2  PERRY, KRUMSIEK & JACK, LLP
   By: Timothy J. Perry, Esquire
3  and Lauren M. Burke, Esquire
   One McKinley Square
4  Boston, Massachusetts 02109
   tperry@perrylegal.com
5  (617) 720-4300
   On behalf of the Plaintiff, Mary Dorsey
6
   HARE & CHAFFIN
7  By: David B. Chaffin, Esquire
   160 Federal Street
8  Boston, Massachusetts 02110-1701
   dchaffin@hare-chaffin.com
9  (617) 330-5000
   On behalf of the Defendant, Pfizer, Inc.
10
   HAMROCK & TOCCI
11 By: Heidi M. Oh, Esquire
   101 Main Street
12 Cambridge, Massachusetts 02142
   hoh@htclaw.com
13 (617) 496-5370
   On behalf of the Deponent
14
15
16
17
18
19
20
21
22
23
24

Page 3

1              INDEX
2  WITNESS      DIRECT CROSS REDIRECT RECROSS
3  JEREMY D. SCHMAHMANN, M.D.
4  By Mr. Perry   4
5  By Ms. Burke           80,86
6  By Mr. Chaffin     48          84
7
8
9          EXHIBITS
10 NO.                    PAGE
11 1  Certified MRC Records        7
12 2  Doctor's Report             13
13 3  Curriculum Vitae            14
14 4  Doctor's notes              25
15 5  Progress notes              39
16 6  VNA notes                   61
17 7  Medical records             76
18
19
20
21
22
23
24

Page 4

1              P R O C E E D I N G S
2                  April 8, 2008
3
4        JEREMY D. SCHMAHMANN, M.D.,
5  having first shown proper identification
6  and having been duly sworn, was examined
7  and testified as follows:
8          DIRECT EXAMINATION
9  BY MR. PERRY:
10 Q.  Doctor Schmahmann, I think you know may
11     name is Timothy Perry.  I represent Mary
12     Dorsey in the case where you were
13     subpoenaed to come here today and I
14     appreciate your appearing here.
15          MR. CHAFFIN: Tim, before you
16     start.
17          MR. PERRY: Sure.
18          MR. CHAFFIN: I am sorry.  I
19     promise I will be very quiet while you are
20     asking questions.  Do you want to talk
21     about stipulations?
22          MR. PERRY: Yes.
23          MR. CHAFFIN: I would like to
24     propose that all objections except as to

Page 5

1     the form of the question be reserved until
2     the time of trial, as with motions to
3     strike.  And I have, obviously, no issue
4     with respect to the execution of the
5     transcript.  That, I suppose, will be
6     Heidi's, Heidi's call.  So that is what I
7     propose.
8          MR. PERRY: Okay, great.  Thank
9     you.  And that is accepted by us.
10          MR. CHAFFIN: And with counsel for
11     the witness, okay?
12          MS. OH: Yes.
13          MR. CHAFFIN: Thank you.
14 Q.  Well, Doctor, could you please state your
15     full name and spell your last name for the
16     record.
17 A.  Jeremy Dan Schmahmann, S-C-H-M-A-H-M-A-N-N.
18 Q.  Okay.  And just briefly, could you give me
19     your educational background?
20 A.  I completed my medical education at the
21     University of Capetown in South Africa.  I
22     completed an internship at the major
23     teaching hospital of that university.  I
24     then relocated to Boston.  I completed a

Page 26
1    right.
2         If you could, Doctor Schmahmann,
3    look at the Exhibit No. 1 again.  And we
4    are going to, if you could look at actually
5    the last page of that document, please.
6         (Witness perusing document.)
7  A. Okay.  February 11, 2004.
8  Q. Sorry.  You know what, if you could hand --
9  A. What date is the note that you are looking
10    at?
11 Q. The note is February 11, 2004.
12 A. I have that note.
13 Q. All right.  Let's look at Exhibit No. 4
14    then.  It is one of our overlapping notes,
15    I guess.  All right.  So let's look at
16    Exhibit No. 4.  Tell me what that document
17    is.
18 A. This is my office note written in the form
19    of a letter of February 11, 2004.
20 Q. Okay.  And could you tell me who Doctor
21    Dmochowski is, who you have addressed that
22    letter to?
23         (Witness perusing document.)
24 A. According to my handwritten notes of the

Page 27
1    same date, this is her psychiatrist in East
2    Falmouth.
3  Q. Okay.  And were you, what was the purpose
4    of this writing this note to Doctor
5    Dmochowski?
6  A. Well, this is my written report of my
7    consultation with her that date and so the
8    note was generated.  And because we need to
9    remain in contact with the treating
10    physicians, my note was written to him in
11    the form of a letter.
12 Q. Okay.  If you will look at, just focus on
13    that letter, please, for a moment, this one
14    right here.
15 A. Okay.
16 Q. If you look at the second or the first full
17    paragraph, I guess, that starts with, "She
18    is seven-year status."  If you look at the
19    third sentence, it starts with, "She was
20    heavily overmedicated."
21         Do you see that sentence?
22 A. Yes.
23 Q. As of that date, February 11, 2004, as a
24    result of your treatment and consultation

Page 28
1    with Mrs. Dorsey and your examination of
2    her, you had felt that she had been
3    overmedicated during 2003 or a portion of
4    that year.  Is that right?
5         MS. OH: Objection.
6  A. I will look back on some previous notes.
7  Q. Yes.
8         (Witness perusing document.)
9  A. The clinical course that I felt was
10    consistent with polypharmacy took place in
11    the end of 2002, early 2003.
12 Q. Okay.  And is it fair to say that during
13    that time it was your observation that she
14    had been overmedicated during that time?
15         (Witness perusing document.)
16 A. The short answer is yes.  The longer answer
17    is that the combination of the medications
18    that she was on and perhaps the doses at
19    the time that she was taking contributed to
20    the lethargy and the confusion that she had
21    reported in the 2002, 2003 time period.
22 Q. Okay.  And if you go back to, and I think
23    you have -- well, actually, I have an
24    e-mail dated July 2, 2003, which I would

Page 29
1    like to take a look at.  At the bottom it
2    is 345-19 MHO00003.  It looks like this.
3         (Witness perusing document.)
4  A. Okay.
5  Q. Actually, I have it in Exhibit No. 1.
6  A. I've got it.
7  Q. You've got it.  Okay.  And is that, tell me
8    what that document is that you are looking
9    at.
10 A. This is a printout of my letter to Doctor
11    Dmochowski based on my examination of the
12    patient on the date July 2, 2003.
13 Q. Okay.  And had you seen Mrs. Dorsey on that
14    date?
15 A. Yes.
16 Q. Okay.  And if you look in this document, in
17    the second paragraph starting right here
18    where it says, "She has also had episodes."
19    Do you see that sentence?
20 A. Yes.
21 Q. Is this what you were talking about earlier
22    where you had observed that she had had
23    episodes suggestive of seizures that may
24    have simply been drug overdose?

Page 30

1        MS. OH: Objection.
2   Q.   Is that what you wrote there?
3        MS. OH: Objection.
4   A.   This statement reads, "She has also had
5        episodes suggestive of seizures that may
6        have been simply drug overdose and this
7        occurred on the fall of last year and early
8        part of the winter of this year."
9   Q.   Okay.
10  A.   End of sentence. What I am stating there
11       is that the thought that these were
12       seizures may not have been accurate, and
13       the episodes of transient unresponsiveness
14       may have been in fact a consequence of the
15       combination of medications and the doses.
16  Q.   Okay. What was it about your treatment or
17       consultations or observations of Mrs.
18       Dorsey that led you to make that
19       conclusion?
20       MS. OH: Objection. You may
21       answer.
22  A.   The story from the previous visit of May 7,
23       2003, was that she had, was increasingly
24       lethargic and she had actually had an

Page 31

1        exacerbation of these symptoms to the point
2        that she had been unresponsive for a
3        prolonged period of time, and that prompted
4        the admission to the Falmouth Hospital.
5        That would be unlikely to be a seizure
6        disorder and is more consistent with a
7        medication effect in the absence of any
8        other medical or neurological condition.
9        The fact that she improved after the
10       Klonopin had been discontinued at that time
11       provided some level of support for my
12       thought that this was in fact a medication
13       effect that was producing her overall sense
14       of lethargy, confusion and general feeling
15       of ill health.
16  Q.   Okay. And you mentioned Klonopin, but Mrs.
17       Dorsey was also on Neurontin at the time.
18       Is that right?
19  A.   That is right.
20  Q.   And you also felt that Neurontin could have
21       been contributing to some of these symptoms
22       that she was exhibiting. Is that fair to
23       say?
24       MR. CHAFFIN: Objection.

Page 32

1        MS. OH: Objection.
2   A.   She was on a number of medications as I
3        listed them on my May 7, 2003 note. And
4        the approach to this kind of situation
5        where a patient is having a difficulty with
6        concentration, a worsening of speech in the
7        setting of preexistent stroke,
8        tremulousness, lethargy, and cloudiness of
9        thinking, all of those may be precipitated,
10       exacerbated, and in some circumstances
11       caused by a combination of neurologically
12       active medications.
13       She had been on a number of
14       medications, as I understood the record,
15       for at least a few years, if not a number
16       of years. And my general approach to this
17       story for Mrs. Dorsey, as with other
18       patients, is that one would like to have a
19       woman who is now in her late 50's, having
20       had a previous neurological event such as a
21       stroke as she had in 1997, to be on as few
22       medications as possible to try and minimize
23       the adverse effects that many of these
24       neurologically active medications have.

Page 33

1        And so my recommendation was that, given
2        her improvement on the removal of the
3        Klonopin or Clonazepam from her regimen in
4        the Falmouth Hospital, it would be prudent
5        also to try to maximize her overall level
6        of function by pruning down the number of
7        medications and the doses of medications
8        she was taking.
9        The reason I would suggest, as I
10       did in the circumstance, that Neurontin
11       would be the next one to go was because I
12       had become unconvinced that she was having
13       seizures; and therefore, Neurontin may be a
14       reasonable medication to remove from her
15       list of medications.
16  Q.   Right. Okay. Well, if you look at that
17       same note from May 7, 2003, in the second
18       to last sentence it says, "If there is a
19       suggestion of any further seizure disorder,
20       I will then use Keppra rather than
21       Neurontin."
22       Could you tell me what you meant
23       by that statement?
24       (Witness perusing document.)