# EXHIBIT K

```
 1              UNITED STATES DISTRICT COURT

 2            FOR THE DISTRICT OF MASSACHUSETTS

 3                  MDL Docket No. 1629

 4                  Master File No. 04-10981

 5      ***********************************

 6   IN RE:  NEURONTIN MARKETING, SALES

 7           PRACTICES AND PRODUCTS

 8           LIABILITY LITIGATION

 9      ***********************************

10   THIS DOCUMENT RELATES TO:

11   MARY P. DORSEY, Individually and as

12   Administrator of the Estate of James

13   Dorsey

14      ***********************************

15             VIDEOTAPED DEPOSITION OF

16         JONATHAN E. ALPERT, MD, PhD

17

18                  Held At:
                Hare & Chaffin
19              160 Federal Street
            Boston, Massachusetts 02110
20
                March 28th, 2008
21                   1:13 PM

22
     Reported By:  Maureen O'Connor Pollard, RPR, CLR
23

24   Videographer:  William Slater
```

**Page 2**

1  APPEARANCES:
2
   FOR THE PLAINTIFF:
3
      BY: TIMOTHY J. PERRY, ESQ.
4         LAUREN BURKE, ESQ.
          PERRY, KRUMSIEK & JACK, LLP
5         One McKinley Square
          Boston, Massachusetts 02109
6         617-720-4300
          tperry@perrylegal.com
7
8  FOR THE DEFENDANTS:
9     BY: DAVID B. CHAFFIN, ESQ.
          HARE & CHAFFIN
10        160 Federal Street
          Boston, Massachusetts 02110
11        617-330-5000
          dchaffin@hare-chaffin.com
12
13 FOR THE DEPONENT:
14    BY: HEIDI M. OH, ESQ.
          HAMROCK & TOCCI
15        101 Main Street
          Cambridge, Massachusetts 02142
16        617-496-1707
          hoh@htclaw.com

**Page 3**

```
            INDEX
EXAMINATION                         PAGE
JONATHAN E. ALPERT, MD, PhD
BY MR. CHAFFIN                        5
BY MR. PERRY                        135

            EXHIBITS
NO.      DESCRIPTION              PAGE
Ex. 1    Dr. Alpert's records on Mrs.
         Dorsey..........................  45
Ex. 2    Three page sales call document..  138
```

**Page 4**

PROCEEDINGS

THE VIDEOGRAPHER: This is your video operator speaking, Bill Slater of Veritext. Today's date is March 28, 2008. The time on the video screen is 1:13 p.m..

We are here at the offices of Hare & Chaffin located at 160 Federal Street, Boston, Massachusetts to take the videotaped deposition of Dr. Jon Alpert in the matter of Neurontin Marketing, Et Al versus Pfizer, Incorporated, Et Al, United States District Court, District Court of Massachusetts, Number 04-10981, MDL 1629.

Will counsel please voice identify yourselves and state whom you represent?

MR. CHAFFIN: Good afternoon. My name is David Chaffin, I represent the Defendants, Pfizer and affiliates.

MR. PERRY: My name is Timothy Perry, and I'm here with Lauren Burke, we represent Plaintiff, Mary Dorsey.

MS. OH: Good afternoon. My name is Attorney Heidi Oh from the firm of Hamrock & Tocci representing the Deponent, Dr. Alpert.

**Page 5**

THE VIDEOGRAPHER: Will the court reporter please swear in the witness?

JONATHAN E. ALPERT, MD, PhD, having been satisfactorily identified by photo identification, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION
BY MR. CHAFFIN:

Q. Good afternoon, Dr. Alpert. My name is David Chaffin. As you heard, I represent Pfizer and its affiliates in connection with some litigation involving the drug Neurontin. Are you aware of that?

A. Yes.

Q. This particular case is brought by Mary Dorsey, who I gather is a former patient of yours?

A. That's correct.

Q. Doctor, have you ever had your deposition taken before?

A. Yes, I have.

Q. So just very briefly, if you don't understand any of my questions, please ask me to

Page 138

1 companies about the continuing medical education
2 seminars?
3   A.  You mean like invitations to talks and
4 so on?
5   Q.  I mean more substantive information
6 about what was discussed at medical education
7 seminars?
8   A.  Offhand I can't recall any.
9       (Whereupon, Alpert Exhibit Number 2
10        was marked for identification.)
11       BY MR. PERRY:
12   Q.  You can take a look at it, but I'm
13 probably going to need to tell you what it is
14 because it's not from your office, so I'll let
15 you know that. And if you could hand it back to
16 me, actually there might be --
17       MR. CHAFFIN:  Use my copy.
18       MR. PERRY:  Do you have a --
19       MR. CHAFFIN:  What do you need, a
20 stapler?
21       MR. PERRY:  A staple remover.
22       MR. CHAFFIN:  A what?
23       MR. PERRY:  A remover.
24       MR. CHAFFIN:  A staple remover?

Page 139

1       MR. PERRY:  Yes.
2       MR. CHAFFIN:  Sure.
3       MR. PERRY:  We can go off the record
4 for a second.
5       THE VIDEOGRAPHER:  The time is 3:46.
6 We're off the record.
7       (Whereupon, a recess was taken.)
8       THE VIDEOGRAPHER:  We're back on the
9 record. The time is 3:46.
10       BY MR. PERRY:
11   Q.  All right. As I was just saying, this
12 is actually a document that we received from the
13 Defendants, the company in this matter, and I
14 had Mr. Gamer who is identified in the document
15 at a deposition this week, and what I understand
16 the document to be is that when it comes up on a
17 computer it spreads out like this (indicating).
18 When we printed it out it came in three separate
19 pages.
20       And what my understanding from
21 Mr. Gamer's testimony was is that this
22 represents the times that the sales
23 representatives from either Pfizer or their
24 predecessors like Warner-Lambert and Parke-Davis

Page 140

1 came to your office for visits about Neurontin.
2   A.  I see.
3   Q.  And if we see over in this column on
4 the third page it will tell what was done at the
5 visit, some say call, presentation and samples,
6 other say just call and presentation.
7       Do you see that?
8   A.  Yes.
9   Q.  Okay. And my understanding from
10 Mr. Gamer's testimony is that that was an
11 indication of what they did at the visit to your
12 office. And for instance, on this top one where
13 he said he made the call, he gave some sort of
14 presentation about the drug and left a sample of
15 the drug.
16       Do you see that?
17   A.  Yes, I do.
18   Q.  Okay. Would that, sir, at all, to
19 kind of jog your memory, I know that this is
20 like almost ten years ago now that some of these
21 dates --
22   A.  Not only, sir, does it not --
23       MR. CHAFFIN:  Objection to the form.
24 Excuse me one second. I object to the form.

Page 141

1   A.  Not only doesn't it jog my memory, but
2 I really have to question the accuracy of these
3 data. If I saw drug representatives with
4 anything like this frequency, I wouldn't have
5 time to see patients. This is one drug company
6 with one drug. We probably use about 40 or 50
7 different medications in psychiatry routinely.
8 And they're alleging that they were visiting
9 with me every couple of weeks basically to make
10 a presentation about Neurontin. It's, on its
11 face it's impossible, it's not possibly
12 accurate.
13       That they might have dropped off
14 samples at our office, and we have a collective
15 medication cabinet in our Depression Program,
16 seems quite plausible, and, you know, the
17 frequency with which they did that I don't
18 really know. But if they said they did that
19 every couple of weeks, dropping off samples,
20 getting a signature, I can imagine.
21       But if by calling a presentation this
22 indicates that they actually spent time face to
23 face talking with me, there's no possibility
24 that this is even barely accurate, even close to

Page 142

1  being accurate.
2       So no, it doesn't, it doesn't jog my
3  memory that I might have met them. It's
4  certainly possible, but what's noted here, which
5  I assume, you know, is part of their
6  responsibility for logging visits, certainly
7  didn't pertain to actual visits with me.
8  There's no possibility of that.
9       BY MR. PERRY:
10      Q.   Okay. And if at these visits where
11 there's a notation for "presentation," would it
12 be possible, in your recollection, that they
13 would have at those times when they may have
14 dropped off drugs also left information about
15 the drugs that represented a presentation about
16 the drug?
17      MR. CHAFFIN: Objection.
18      A.   You know, I have a mailbox on my door.
19 You know, I typically throw out all, you know,
20 all advertising that's left on the door before
21 reading it typically, but so I can't -- it's
22 difficult for me to know whether they did on
23 some of those occasions or not. But certainly
24 not -- they could not have possibly spoken to me

Page 143

1  on those occasions.
2       BY MR. PERRY:
3       Q.   Okay. If these folks had left you
4  medical journals with the information that they
5  had about their drug Neurontin, would that have
6  been something that you would have entertained
7  in your evaluation of off-label uses of the
8  drug?
9       MR. CHAFFIN: Objection.
10      A.   You know, again typically when packets
11 are left by -- you know, with all due respect to
12 drug reps, I understand that their role is
13 really marketing and that's not my role in
14 taking care of patients, and I typically wind up
15 discarding it. So, you know, I don't think so.
16      BY MR. PERRY:
17      Q.   Okay. Do you remember, as you sit
18 here today, whether any of the sales
19 representatives who were leaving you information
20 about Neurontin ever left you any articles that
21 you read about Neurontin?
22      A.   I don't recall any.
23      Q.   Okay. As you sit here today, do you
24 remember any of the journal articles that you

Page 144

1  read back in the nineties before you started
2  prescribing Neurontin off-label that you deemed
3  that were helpful to you?
4       MR. CHAFFIN: Objection.
5       A.   I don't recall the specific citations,
6  if that's what you mean. You know, again, I
7  remember there being sort of a handful of
8  papers, you know, including by people who are
9  well thought of in the bipolar disorder
10 community and that I think well of, but I don't
11 recall specific journals or citations.
12      BY MR. PERRY:
13      Q.   Okay. You don't need to mark this,
14 but I'm going to show you our complaint in this
15 case, and I'm going to direct you to
16 Paragraph 121 of that complaint (handing).
17      (Witness reviewing document.)
18      A.   Okay. I believe I've read that.
19      BY MR. PERRY:
20      Q.   Okay. Do you recognize any of the
21 studies that you see in that paragraph?
22      A.   I don't in this paragraph, no.
23      Q.   If you could turn to, three pages down
24 to Paragraph 140.

Page 145

1       (Witness reviewing document.)
2       A.   Yes. I see that.
3       BY MR. PERRY:
4       Q.   The article that they talk about in
5  there, gabapentin and lamo --
6       A.   Lamotrigine.
7       Q.   Do you recognize that article?
8       A.   I don't.
9       Q.   Do you recall medical liaisons at
10 Pfizer or Warner-Lambert or Parke-Davis by the
11 name of Karen Core or David Platt?
12      A.   I don't recall their names, no.
13      Q.   Okay. Can you tell me as you sit here
14 today any authors that --
15      A.   Excuse me one second.
16      That's okay.
17      Q.   -- any authors that you relied upon in
18 the 1990s prior to your initial off-label
19 prescriptions of Neurontin, any of those authors
20 that you did rely on?
21      A.   You know, the only two names that I
22 remember only because they're also former
23 colleagues and, you know, people I meet with
24 from time to time would be Susan McElroy at the