# EXHIBIT A

1

1
    IN THE COURT OF COMMON PLEAS
2
 FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
      CIVIL TRIAL DIVISION
3
       - - -
4
5
6  COMMONWEALTH        : JANUARY TERM, 2008
          :
7  - vs -      :
          :
8  JANSSEN PHARMACEUTICA, INC., :
   trading as "JANSSEN, LP."   : NO. 2181
9
10
11       - - -
12      June 14, 2010
      Courtroom 654, City Hall
13     Philadelphia, Pennsylvania
14       - - -
15
16
17  BEFORE:    HONORABLE FREDERICA MASSIAH-JACKSON, J.
18       - - -
19
20
21
22
23      ARGUMENT AND
     NONSUIT MOTION RULING
24
25

        ROBIN G. BOBBIE, RMR, CRR
        OFFICIAL COURT REPORTER

2

1  APPEARANCES:
2
3          BAILEY, PERRIN, BAILEY, LLP
           BY:  FLETCH TRAMMELL, ESQUIRE
4              ROBERT W. COWAN, ESQUIRE
           The Lyric Centre
5           440 Louisiana, Suite 2100
           Houston, TX  77002
6           Attorneys for Plaintiff
7
           COHEN, PLACITELLA & ROTH, P.C.
8           BY:  MICHAEL COREN, ESQUIRE
           Two Commerce Square
9           2001 Market Street, Suite 2900
           Philadelphia, PA  19103
10          Attorneys for Plaintiff
11          DRINKER, BIDDLE & REATH, LLP
           BY:  THOMAS F. CAMPION, JR., ESQUIRE
12              EDWARD M. POSNER, ESQUIRE
               KENNETH A. MURPHY, ESQUIRE
13              GREGG W. MACKUSE, ESQUIRE
           One Logan Square
14          18th and Cherry Streets
           Philadelphia, PA  19103-6966
15          Attorneys for Defendant
16              - - -
17
18
19
20
21
22
23
24
25


           ROBIN G. BOBBIE, RMR, CRR
           OFFICIAL COURT REPORTER

3

```
 1              I N D E X
 2
 3  By Mr. Posner:  7, 48
 4  By Mr. Cowan:  26, 54
 5
 6              - - -
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

4

```
 1              - - -
 2         (In the courtroom as follows:)
 3         THE COURT:  Larry says you have
 4    something you want to put on the record?
 5         MR. POSNER:  I do, Your Honor.  It's a
 6    matter involving one of the jurors.
 7         THE COURT:  Okay.  Go ahead.
 8         MR. POSNER:  I don't think it's a big
 9    deal, but one of the jurors --
10         THE COURT:  Well, we'll let the
11    plaintiffs decide.
12         MR. POSNER:  One of the jurors, who's
13    been excused, Mr. Spoerl, turns out to be the
14    nephew of the late husband of a secretary of
15    Drinker, Biddle & Reath.  We didn't know.
16         THE COURT:  Nephew of a late husband.
17    Fair enough.
18         MR. POSNER:  The only reason I tell
19    Your Honor that, we hadn't made the connection
20    and he didn't respond to the voir dire
21    questions about Drinker, Biddle & Reath is that
22    last Monday evening the secretary ran into him
23    at a train platform.  Why are you in the city?
24    He doesn't work in the city.  I'm on a jury.
25    It involves a pharmaceutical company.  It's
```

5

1    going to take three weeks.  And she said, I
2    don't know, that could be one of our cases.
3         That's the extent of the contact.
4    There was no substantive discussion of any
5    sort.
6         THE COURT:  Okay.  Well, plaintiffs'
7    comment?
8         MR. TRAMMELL:  Good morning.  Again,
9    Your Honor, Fletch Trammell for the
10   Commonwealth.
11        Assuming that was the extent of the
12   conversation and assuming nothing was shared
13   with the other jurors about that, Mr. Spoerl
14   has been released.  We have no comment on that
15   other than we hope that that was what happened
16   and that nothing was discussed with the other
17   jurors.  But if that's the case, then I don't
18   see any harm in that.
19        THE COURT:  I will say, as you know,
20   Mr. Spoerl fell off his bike one day.  I spoke
21   to his wife that day.  The next day when we
22   found out that he broke his shoulder, clavicle,
23   I spoke to both him and his wife and neither of
24   them indicated that they had any outside
25   knowledge of the case other than this, Mr.

ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

6

1    Spoerl was very disappointed that he was not
2    continuing his participation.  And he told me
3    how he had served on our juries in the past and
4    he gets paid for his jury service, so he really
5    enjoyed the process and there was absolutely no
6    indication that he had any knowledge or
7    whatever.
8         MR. TRAMMELL:  I would assume that if
9    he had discussed it with the other jurors, we'd
10    know about it by now.
11         THE COURT:  I think so.  I think so.
12         All right.  Last week on Friday we set
13    up a time schedule for today.
14         Who's going to argue for each side just
15    so I know?
16         MR. POSNER:  I'm going to argue for
17    Janssen, Your Honor.
18         THE COURT:  Okay.
19         MR. COWAN:  And I'll be arguing for the
20    Commonwealth, Your Honor.
21         THE COURT:  Fair enough.
22         Now, I'm not very strict on time
23    limits, but in this case, we are trying to
24    accommodate everybody's schedule.  So whoever
25    is sitting next to the person doing the

ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

7

```
 1     argument, sort of pull their shirt tail as I
 2     say after 30 minutes, okay?
 3            So we'll start with Mr. Posner.
 4            MR. POSNER:  Your Honor, I don't know
 5     if you'd like me to argue from here or --
 6            THE COURT:  Wherever you're
 7     comfortable.  As long as you use your
 8     microphone, that's fine with me.
 9            MR. POSNER:  Let me go over here then
10     because we're going to put some things up as I
11     argue.
12            THE COURT:  That's fine.
13            MR. POSNER:  Your Honor, in our briefs,
14     we addressed the evidence of fraud element by
15     element, but I want to start today by looking
16     at the proof a different way.  Put up the time
17     lines.
18            This is the damages period, January of
19     1994 through June 30, 2008.  Now, the
20     Commonwealth presented two Medicaid witnesses,
21     Dr. Diamond and Dr. Cathers.  Dr. Diamond was
22     employed as chief psychiatrist in 2005.  Dr.
23     Cathers was employed as the chief pharmacist in
24     November of 2004.  Now, we will talk more about
25     the testimony of Dr. Diamond and Dr. Cathers,
```

8

1    but for now the important point, or at least my
2    initial point, is that neither Dr. Diamond nor
3    Dr. Cathers testified to any misrepresentation
4    to the Commonwealth or any reliance by the
5    Commonwealth before they arrived.  There's just
6    no proof of misrepresentation or reliance or
7    causation from the period from January, 1994 to
8    November of 2004.  There's no basis for an
9    award of damages for that entire 11-year
10   period, and all of that from that first line
11   back should be out of the case.
12           Second point has to do with
13   prescribers.  The Court granted our motion in
14   limine and it precluded the Commonwealth from
15   introducing evidence that Janssen
16   misrepresented superiority or anything else to
17   Pennsylvania prescribers, to doctors treating
18   Pennsylvania Medicaid participants, and there's
19   no evidence in the record, accordingly, of any
20   such misrepresentation.  Certainly there's no
21   clear, precise and convincing evidence of any
22   such misrepresentation.  Dr. Cathers testified
23   that she has no proof whatsoever that any
24   representation of superiority was made to any
25   Pennsylvania physician.  That's at page 115 on

ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

9

1       June 10th, lines 12 to 16.
2            "And you've already told me you have no
3       proof whatsoever that any representation was
4       made to a physician in the Commonwealth that
5       was inconsistent with what the FDA said in
6       1993, correct?
7            "Correct."
8            And, again, at page 125, line 15.  15
9       to 18.  "Right.  And just so we're clear --
10      just so that we're clear, Janssen as far as you
11      know, has never told anybody that it,
12      indeed" -- it meaning Risperdal -- "it indeed
13      is better than haloperidol, correct?"
14           Answer from Dr. Cathers:  "I don't have
15      proof of that."
16           Dr. Diamond also had no proof that
17      Janssen made a superiority representation.  She
18      testified on June 9 in the morning at page 104,
19      lines 11 to 25:  "Are you aware of any
20      representation made by Janssen to the
21      Commonwealth, to Commonwealth physicians
22      regarding superiority?"
23           There was an objection.  Mr. Murphy
24      repeated the question.
25           "Answer:  No.


ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

10

1          "In your capacity as a state entity
2     representative, are you aware of such?
3          "Answer:  The fact that the information
4     was not --
5          "Question:  Are you aware of such --
6          "Answer:  I don't have individual
7     people that provide that -- can testify to
8     that."
9          Now, the Commonwealth did introduce
10     evidence of business plans and other internal
11     marketing materials and I think it introduced
12     one sales aid.  We may talk later, if we have
13     time, about what they say and why they are not
14     false or misleading, but the bottom line, the
15     most important point for these purposes is that
16     there is no clear, precise and convincing
17     evidence that Janssen distributed those
18     materials to any physician treating
19     Pennsylvania Medicaid participants.  There's no
20     clear, precise and convincing evidence that
21     Janssen told any Pennsylvania prescriber or for
22     that matter anyone else outside of Janssen that
23     Risperdal was superior to Haldol.  To the
24     extent that this is a case about
25     misrepresentations to prescribers, then it

ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

11

1    fails for lack of proof of misrepresentation.
2         In addition, the Commonwealth has not
3    proved that any Pennsylvania physician, any
4    doctor treating a Medicaid participant relied
5    on a misrepresentation that anything that was
6    said by Janssen actually made a difference to
7    the doctors' prescribing decisions.  The
8    Commonwealth simply hasn't found a way around
9    the learned intermediary bar to causation
10    proof.  It hasn't shown that any Janssen
11    misrepresentation to a Pennsylvania prescriber
12    led the doctor to prescribe a medicine which
13    she would not otherwise prescribe it.  If no
14    prescriber relied, if no prescriber would have
15    done anything differently had she been told the
16    truth, the Commonwealth cannot recover.  The
17    alleged misrepresentations cannot have caused
18    its loss.
19         Doctors do not, as the Court knows,
20    simply follow the recommendations of
21    pharmaceutical representatives when deciding
22    what medicines to prescribe.  They are not, as
23    the Pennsylvania Supreme Court has said, dupes,
24    although perhaps there's an exception to that,
25    a single one.  When prescribing for an

ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

12

1        individual patient, the doctor looks for the
2        medicine that will work best for the patient.
3        She considers the patient's medical history,
4        she considers the nature of the patient's
5        illness, its manifestations in the individual
6        patient.  She takes into account the various
7        treatments that might work and the possible
8        benefits and the risks of each and she makes a
9        choice that's specific to that patient.  She
10       exercises her informed medical judgment as to
11       the best treatment for that individual patient.
12           Doctors have information about risks
13       and benefits of a medicine from many sources.
14       They read the labels.  They have information
15       from academic journals, from continuing medical
16       education courses, from the state, itself,
17       which engages in academic detail.  They have
18       information from conferences and from
19       presentations and they typically have their own
20       experience with the medicine.  It may have
21       worked in the past for their patients who have
22       certain kinds of illnesses or maybe it didn't
23       and, of course, they have information from
24       pharmaceutical manufacturers.  But before a
25       pharmaceutical manufacturer can be held liable


ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

13

1    for a misstatement or an omission to a
2    prescriber, the plaintiff must show that what
3    the manufacturer said or did not say made a
4    difference; that but for the misstatement the
5    doctor would not have made the same judgment
6    and would not have prescribed the
7    manufacturer's medicine.  That is the learned
8    intermediary doctrine.  That's what must be
9    proved to show causation when a prescriber's
10    decision is at issue.  And in this case, the
11   Commonwealth has no evidence that any
12   prescriber would have done anything differently
13   had there been no representation of
14   superiority.  If a prescriber would have
15   prescribed Risperdal, representation or no
16   representation, the Commonwealth cannot
17   recover.
18        Because the Commonwealth cannot prove
19   that prescribers would have acted differently
20   if there had been no misrepresentations, it
21   cannot recover on the claims that Janssen
22   defrauded prescribers, that Janssen used
23   misleading marketing materials and so forth,
24   and it cannot recover on claims, any claims,
25   that misrepresentations somehow allowed Janssen

ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

14

1      to, their words, sustain an inflated price.
2      What plaintiff must mean by sustaining an
3      inflated price is that doctors kept prescribing
4      Risperdal at the price that Janssen said
5      because Janssen misled them about the safety
6      and efficacy of the medicine.
7              But remember Mr. Cowan told the Court
8      on June 2nd that Janssen could set the price of
9      Risperdal wherever it chose.  His words were it
10      certainly could set a very high price, market
11      the drug truthfully and sell none of it or very
12      little of it.  Instead, he said Janssen chose
13      to create this aura about the drug that simply
14      was not true and the crux of our claim, he went
15      on, is his words, that they were -- they were
16      able to sustain a false price by this aura of
17      misrepresentation about the safety and efficacy
18      of the medicine.  That's in the transcript at
19      page 61.  Well, if that's the crux of the
20      claim, the claim fails in its entirety for the
21      Commonwealth has not shown that doctors would
22      not have prescribed Risperdal in the same
23      circumstances in the same amounts if there had
24      been no misrepresentations.
25              Your Honor, all of the claims fail


ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

15

1    because there's no proof of reliance by
2    prescribers and no proof of causation.
3         Let me turn to the claim which is not
4    in the complaint which wasn't in the precise
5    statement of claim which wasn't even in the
6    openings that Janssen said something directly
7    to the Commonwealth or, rather, did not say
8    something directly to the Commonwealth that was
9    fraudulent that caused the Commonwealth to
10   suffer a loss.  The Commonwealth has not shown
11   that Janssen ever told the Commonwealth, this
12   is the affirmative misrepresentation part, it's
13   not shown that Janssen ever told the
14   Commonwealth that Risperdal was better than
15   Haldol.  Dr. Cathers admitted she has no proof
16   that Janssen told Risperdal is better than
17   Haldol and neither did Dr. Diamond, because
18   there's no proof of an affirmative
19   misrepresentation.  The Commonwealth switched
20   its theories.
21        Now the complaint is, as I understand
22   it, that Janssen did not stop by Dr. Cathers's
23   office in August of 2005 and tell her that
24   Janssen had been advised 12 years earlier not
25   to make superiority claims in promotional

ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

16

1     materials until and unless there was sufficient
2     evidence to support them, that is, the
3     Commonwealth is now taking the position that
4     Janssen should have told the Commonwealth that
5     it was not supposed to make claims in its sales
6     materials, even though there is no evidence
7     that Janssen ever did make such superiority
8     claims to the Commonwealth or to any
9     Pennsylvania physician.
10          Well, there's sometimes a duty to
11     disclose material information.  This is not
12     material information.  There's a duty like
13     that, for example, when the parties are in a
14     fiduciary or confidential relationship.  And if
15     I understood the arguments ten days ago, the
16     argument was, well, that's what we have here, a
17     confidential relationship.  But this isn't a
18     confidential relationship of the sort that
19     could give rise to a duty to disclose, to make
20     disclosures.  There's a case known as eToll,
21     E-T-O-L-L at 811 A.2d 10, and in that case, in
22     that opinion, the Superior Court said, "A
23     confidential relationship is marked by such a
24     disparity and position that the inferior party
25     places complete trust in the superior party's

ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

17

```
1     advice and seeks no other counsel so as to give
2     rise to a potential abuse of power."
3              That's not the situation here.  This
4     was an arms-length commercial relationship in
5     which the Commonwealth and Janssen negotiated
6     rebates and negotiated price.  The argument
7     that the rebate agreement -- and this is the
8     argument that I understood was being made --
9     the argument that the rebate agreement is
10     indicative of a confidential relationship
11     because it has a clause that says confidential
12     information is simply frivolous.  That's a
13     nondisclosure clause.  It has nothing to do
14     with the confidential information or
15     confidential relationship that would give rise
16     to a duty of the sort that fiduciary has to
17     make disclosures.
18              But let's assume for a moment that
19     Janssen did have an obligation to knock on Dr.
20     Cathers's door back in 2005.  What difference
21     would it have made?  What is the Commonwealth's
22     evidence of reliance and causation?  Dr.
23     Diamond, who also wanted a knock on the door,
24     was not clear as to what she might have done.
25     She said that she would have shared memorandum,
```

18

1    the letter with the Pharmacy and Therapeutics
2    Committee.  Now, as I understand the testimony,
3    all that the Pharmacy and Therapeutics
4    Committee might do, all that it could do if it
5    thought that Risperdal was overpriced is to
6    impose a prior authorization requirement.  It
7    might require doctors who choose to prescribe
8    Risperdal first to pick up the telephone, to
9    call the Department of Welfare's phone call
10    center and to get approval when they put a
11    patient on Risperdal for the first time.  But
12    there's no evidence whatsoever that the
13    committee would have imposed a prior
14    authorization requirement.  Dr. Diamond said
15    that her office was adamantly opposed, her
16    words, to fail first requirements.  And,
17    secondly, there's -- we have the fact that the
18    Commonwealth did not impose a prior
19    authorization requirement in 1997 when it filed
20    this lawsuit or at any time since.  And there's
21    no evidence that imposition of a prior
22    authorization requirement would have made, and
23    this is the most important part, would have
24    made the slightest difference in the number of
25    prescriptions written or in the amount paid by

ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

19

1   the Commonwealth because, again, we don't have
2   any evidence from Pennsylvania prescribers.
3       Dr. Cathers said she would have asked
4   Provider Synergies to review both first and
5   second-generation antipsychotics if she had
6   known.  Indeed, she testified she had made such
7   a request the night before her testimony or
8   maybe the day of her testimony there's a
9   statement in the brief that refers to her
10   deposition, which is not consistent with the
11   record, she said she learned about it the day
12   before.  As best I can tell, that's exactly
13   what Provider Synergies has been doing for the
14   last five years.  In any event, there's no
15   testimony and no evidence that that kind of
16   review would lead to prior authorization and,
17   again, there's no reason to believe that prior
18   authorization would lead to fewer prescriptions
19   or less money spent.  How would the
20   Commonwealth prove that without presenting
21   evidence from prescribers?  There simply is no
22   clear, precise and convincing evidence of
23   reliance or causation.  Indeed, there's no
24   proof at all of reliance and causation.  Simply
25   speculation.


ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

20

1          Let me turn to the Commonwealth's
2    damages model, and we've briefed this and I'm
3    not going to repeat what's in the brief.  I'm
4    simply going to highlight some points.  We rely
5    on our brief for the arguments that we're not
6    discussing today.  The Commonwealth's damages
7    model uses the price of haloperidol, the
8    generic form of Haldol, as a benchmark price.
9    It assumes that Risperdal was worth no more and
10    should have cost no more than haloperidol and
11    it applies the difference between Risperdal's
12    price and benchmark price to the actual number
13    of Risperdal tablets that were prescribed.  So
14    what I'd like to focus on today is the use of
15    generic haloperidol as a benchmark for pricing
16    for setting the value of Risperdal, if you
17    will.
18          For the benchmark to make any sense,
19    the Commonwealth must establish that Haldol
20    (haloperidol) is a safe and effective
21    substitute for Risperdal, but we know from the
22    testimony already that for several significant
23    categories of patients that is not the case.
24    We know that Risperdal has been approved by the
25    FDA for the treatment of certain conditions for

ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

21

1      which haloperidol is not approved.  We know
2      that some patients do not respond or do not
3      react well to first-generation antipsychotics
4      and they are switched to Risperdal and other
5      second-generation antipsychotics.  We know that
6      some group of patients have, in Dr. Wirshing's
7      words, better subjective experiences using
8      Risperdal than Haldol.  They like it better.
9      And as Dr. Wirshing has also acknowledged, some
10       doctors have concluded based on their own
11       experience and exercising their own independent
12       judgment that Risperdal works better.
13            So Dr. Cathers, when she testified last
14      week, posed a rhetorical question.  She said,
15      why shouldn't Risperdal be priced the same as
16      generic haloperidol?  When one considers all of
17      these categories of patients for whom
18      haloperidol is not a better treatment, not even
19      a substitute treatment, the question becomes
20      not why shouldn't, but why should Risperdal be
21      priced the same as generic haloperidol?
22            Let's look for, if we can, at
23      plaintiff's damages numbers.  I'm looking right
24      now at Plaintiff's Exhibit 2140 at -- it
25      doesn't have a page number, it has the page

ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

22

1    that has 2005 on it.  Do you have it?  Got it?
2    If you could highlight the line for four
3    milligram tablets, 2005.  Okay.
4          According to this spreadsheet, this is
5    Exhibit 2140, as an example, there were 244,230
6    four milligram tablets of Risperdal prescribed
7    within the Medicaid Fee For Service Program in
8    2005.  It's the last number.  Now, these
9    prescriptions represent, of course, actual
10    treatments for people suffering from a variety
11    of mental health conditions.  We don't know
12    anything more about these people.  We don't
13    know how many of the people taking these
14    244,000 tablets could have been prescribed
15    haloperidol instead.  We don't know how many
16    tried first-generation antipsychotic and had it
17    fail.  We don't know how many were suffering
18    from a condition that fell outside of
19    haloperidol's list of approved indications.  We
20    don't know how many went to see a Pennsylvania
21    doctor who thinks that haloperidol may be
22    unsafe or ineffective.  The answer is we just
23    don't know.  There's nothing in the record even
24    to make an estimate of that number.  And if the
25    jury were asked how many of these 244,230


ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

23

1     tablets of Risperdal could have been safely and
2     effectively switched in 2005 to haloperidol or
3     some other first generation, they'd be guessing
4     as much as we are today.
5          Now, what about the remainder of the
6     population?  We talked about certain groups,
7     but the unknown number who do not fall into one
8     of the categories we've talked about.  Is it
9     possible that if we went back to Pennsylvania
10    doctors and we asked them to look at the
11    patient's medical records, some of the doctors
12    would say that certain of their patients could
13    have been prescribed haloperidol instead of
14    Risperdal?  Sure.  That's possible.  But
15    plaintiff didn't do that survey.  It didn't
16    even present that sort of proof on an anecdotal
17    basis.  Plaintiff did not ask a single
18    Pennsylvania doctor why he or she prescribed
19    Risperdal and whether haloperidol could have
20    been prescribed instead.  So even as to the
21    balance of the mental health patients in the
22    Medicaid program where haloperidol might
23    conceivably be an option, we simply don't know
24    how many would have been safely and effectively
25    switched to the cheaper first-generation

ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

24

1    antipsychotic.  Without that information, Your
2    Honor, plaintiff cannot possibly make the case
3    that haloperidol is an appropriate benchmark
4    for its damages proof, even if it had a
5    fraud-on-the-market theory.
6          Finally, unjust enrichment.  We argued
7    earlier that the unjust enrichment claim is
8    duplicative of a fraud claim and now the
9    Commonwealth has effectively admitted that it
10   is.  Page 6 of its brief on unjust enrichment,
11   it says, both claims are based on same conduct.
12   Well, the Commonwealth has put in all its proof
13   about that conduct and it's not sufficient.
14   For that reason, Your Honor, the Court should
15   enter an nonsuit on unjust enrichment claim.
16   All the predicate fraud proof is in. There's no
17   reason not to rule on its sufficiency, but
18   there's a second reason as well, which we
19   raised in our brief.  Janssen and the
20   Commonwealth entered into supplemental rebate
21   agreements for the Medicaid program.  As the
22   Commonwealth has acknowledged, these agreements
23   governed the price that Janssen could charge
24   the Commonwealth for Risperdal.  The
25   Commonwealth's unjust enrichment claim

ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

25

1    asserting that the price for Risperdal is
2    inflated necessarily seeks to avoid payment of
3    the contract price, which the Commonwealth now
4    says was too high, it was unfair.  Under
5    Pennsylvania law, as we say in our brief, the
6    existence of these written contractual
7    agreements that govern price precludes the
8    Commonwealth's unjust enrichment claim.  That's
9    the Lackner case.  Lackner explains by its
10    nature the doctrine of quasi contract.  Unjust
11    enrichment is a quasi contract theory, is
12    inapplicable where a written or expressed
13    contract exists.
14        So, Your Honor, for all of these
15    reasons and for all the other reasons set forth
16    in our briefs, Janssen respectfully respects
17    the entry of a compulsory nonsuit on all of the
18    Commonwealth's claims.
19        THE COURT:  Thank you, Mr. Posner.
20        MR. COWAN:  Good morning, Your Honor.
21        THE COURT:  Good morning, Mr. Cowan.
22        MR. COWAN:  If it's all right, I'm
23    going to come back to my place where I was last
24    time.  That's where I feel most comfortable.
25        THE COURT:  That's fine.


ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

26

1          MR. COWAN:  Good morning, Your Honor,
2     Robert Cowan for the Commonwealth.  May it
3     please the Court, first and very briefly, the
4     Commonwealth desires to address kind of a
5     lingering issue that has been resurfacing and
6     resurfaced again in Janssen's brief, and that
7     is this notion that its nondisclosure claim is,
8     as Janssen has written in its brief, a
9     belatedly maintained or the latest iteration of
10     an evolving claim when it had wrote at pages 20
11     and 5 of its brief, respectfully, and I'd like
12     the Court to consider these allegations,
13     "Defendant deceived physicians, consumers, the
14     Commonwealth and others regarding the
15     comparative efficacy of Risperdal to other
16     atypicals and traditional antipsychotics.
17     Defendant failed to warn and affirmatively
18     misled physicians, consumers, the Commonwealth
19     and others in the medical community regarding
20     Risperdal's association with diabetes,
21     diabetes-related conditions, movement
22     disorders, EMS and other side effects.
23     Anecdotal evidence of Risperdal's usefulness
24     for a given condition could not be presented as
25     the equivalent of the findings of a

ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

27

1   well-designed clinical trial.  Failure to
2   comply with these standards violated the
3   defendant's legal duty to provide accurate and
4   non-misleading information."
5          These are excerpts not from the live
6   complaint, but from the original complaint in
7   this lawsuit that was served on Janssen in
8   January of 2008, and I can promise you the very
9   same allegations were in the original complaint
10   before the cases were severed.  And so this
11   idea that the nondisclosure claim is something
12   that's a new -- generated a new or a recent
13   conception of the Commonwealth simply is just
14   not the case.  It has become an increased focus
15   of the Commonwealth as our case has developed
16   but, you know, the narrowing of the claims and
17   the fine-tuning of the claims is certainly to
18   be expected.  I, in fact, I think it's demanded
19   at trial very often times and so I simply
20   wanted to raise that issue as a very
21   preliminary matter.
22          In short, the Commonwealth has from day
23   one asserted that Janssen failed to inform and
24   falsely misled Pennsylvania doctors and
25   Medicaid program, itself, regarding the true

ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

28

1      safety and efficacy of Risperdal, and that is
2      what the evidence has proven here and our brief
3      shows and I'll discuss.
4            I'd like to address the two concerns
5      that Your Honor raised with counsel last
6      Friday, and those specifically are the learned
7      intermediary doctrine and the reliance and
8      causation issues.  As far as learned
9      intermediary is concerned, it's the
10     Commonwealth's view that instead of addressing
11     the Commonwealth's claims directly, Janssen has
12     premised most of its defense on attempting to
13     confuse the jury over hypothetical Pennsylvania
14     doctors' testimony that is not part of the
15     record.  The issue from Janssen's point of view
16     seems to be whether or not the Commonwealth can
17     show that the misrepresentations made to
18     Pennsylvania doctors by Janssen's sales
19     representatives either caused themselves to
20     write Risperdal prescriptions when they
21     otherwise would have written Haldol
22     prescriptions, or more generally caused those
23     doctors to write more Risperdal's prescriptions
24     than they otherwise would have.  But both are
25     red herrings and have been disclaimed by the

ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

29

1        Commonwealth, and I'll explain why.
2              At the risk of sounding like a broken
3        record, the Commonwealth does not allege that
4        Janssen's conduct caused Pennsylvania doctors
5        to write more Risperdal prescriptions than they
6        otherwise would have, nor is it our contention
7        that Risperdal prescriptions should not have
8        been written for those patients who need it.
9        Again, Janssen's familiar learned intermediary
10        refrain goes something like this:  The
11        fraudulent misrepresentations and omissions the
12        Commonwealth has alleged cannot be the cause of
13        its damages because the learned intermediary
14        doctrine breaks the causal chain, that is,
15        doctors' independent decisions to prescribe
16        medicine and to prescribe Risperdal, or not to
17        prescribe Risperdal, trumps any influence,
18        misleading information, failure to deprive
19        complete information, etcetera, concerning
20        Risperdal.
21              In effect, Janssen is trying to turn
22        this case, and it's not, but they are trying to
23        turn this case into a personal injury
24        failure-to-warn claim in which we would be
25        required to show that the doctor would have


ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

30

1     done something different.  But the reason
2     Janssen's contingent is misguided is it
3     addresses the quantity of Risperdal
4     prescriptions written, which is irrelevant to
5     the Commonwealth's case and the Commonwealth's
6     damages calculation, and the reasons for which
7     the prescriptions were written which, again,
8     does not matter.  The Commonwealth's claims do
9     not involve whether Janssen did or did not
10    cause a particular patient to take Risperdal or
11    a particular doctor to prescribe it versus
12    another drug.  The Commonwealth's actual
13    claims, as pled directly, undermine Janssen's
14    contention, pursuant to the learned
15    intermediary doctrine, that, quote, plaintiff
16    must provide evidence that had purported,
17    accurate and complete information had been
18    provided prescribing physicians would not have
19    prescribed, end quote, Risperdal to their
20    patient's, and that's paragraph 21 of their
21    brief.
22         The question, as I said, is not whether
23    any Commonwealth physician would have done
24    anything different had they been fully informed
25    about the truth about Risperdal, which is the

ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

31

1   foundation of the learned intermediary
2   doctrine.  So let me tell you what the
3   Commonwealth's claim is.
4        Again, the Commonwealth believed and
5   relied on the representations about Risperdal
6   in, for example, reimbursing for the drug at
7   the price set by Janssen, which was based on
8   fraudulent misrepresentations about the drug;
9   calculating and receiving rebates from Janssen,
10   which were based on that fraudulent price;
11   reimbursing for the drug without prior
12   authorization or other coverage limits in
13   place, and adding the drug to its preferred
14   drug list without comparative analysis against
15   first-generation drugs.
16        The Commonwealth is not a learned
17   intermediary.  It doesn't write prescriptions.
18   It does pay for them however.  The focus is on
19   Janssen's misrepresentations and nondisclosures
20   about Risperdal to Pennsylvania physicians in
21   the Commonwealth itself and the fact that
22   Commonwealth Medicaid was entirely unaware of
23   the way that Janssen was portraying and
24   marketing the drug in direct contravention of
25   explicit instruction from the FDA not to do so,


ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

32

1  which was material to the Commonwealth.  The
2  evidence shows that Janssen set out to
3  establish a, quote, premium price for Risperdal
4  and to maintain it by distinguishing it from a
5  crowded field of first-generation
6  antipsychotics that had been on the market for
7  decades.  They primarily determined to do that
8  by claiming Risperdal to be a new and improved
9  safer version of their older drug Haldol.  Then
10  the FDA threw a wrench in that plan by saying
11  you can't compare yourself to Haldol because
12  the test you designed don't show that you're
13  better or safer than Risperdal and they never
14  did a test that did show it, and the FDA never
15  changed its position over the next 14 years.
16  Janssen reacted to that by proceeding anyway
17  for the next 14 years to market the drug in
18  contravention of what the FDA had told them to
19  do, and it worked.  And no one was the wiser
20  until this lawsuit and others like it were
21  filed.
22        The FDA never changed its position on
23  the issue of Risperdal's comparative claims
24  during the entire relevant time at issue.
25  Janssen never informed the Commonwealth, who

ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

33

1    had to pay for the drug, of the truth about
2    Risperdal and the false and misleading manner
3    in which it was marketing the drug.  It's true
4    that Janssen never ever informed the
5    Commonwealth of those misrepresentations when
6    it was afforded a platform for doing so on an
7    annual or semiannual basis beginning in 2005
8    with Medicaid's chief pharmacist and chief
9    psychiatrist in attendance.
10           Thus, as Judge Weinstein finds in the
11    parallel Mississippi vs. Eli Lilly litigation
12    rejecting the identical argument that the
13    learned intermediary doctrine cuts off in this
14    instance.  He said the total fraud resulted in
15    an increased price.  So the fact that some
16    doctors, patients or others were aware of the
17    fraud is irrelevant.  Without the fraud, the
18    price would have been lower to all payers.
19    I'll add for the record that Judge Abramson
20    denied Janssen's learned intermediary defense
21    when it was raised in Janssen's motion for the
22    judgment on the pleadings.
23           THE COURT:  You agree nonsuit is a
24    different stage of the proceeding?
25           MR. COWAN:  I understand.  Janssen is

ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

34

1   free --
2        THE COURT:  Do you understand that to
3   reject that at summary judgment stage, you
4   understand that's where we are now?
5        MR. COWAN:  Yes, I understand.
6        THE COURT:  Fair enough.
7        MR. COWAN:  I simply wanted to remind
8   the Court.
9        THE COURT:  I apologize.  All right.
10       MR. COWAN:  In terms of the reliance
11   and causation issues, which I know the Court is
12   interested in, I've touched on aspects of the
13   Commonwealth's reliance just now and I'll
14   expand further on that.  The Commonwealth has
15   demonstrated evidence of reliance regardless of
16   whether the Court adopts a presumption of
17   reliance and instructs the jury on the same, as
18   it should.
19       First, Dr. Cathers testified that the
20   Medicaid program necessarily relies on drug
21   manufacturers to provide fair pricing
22   information for the determination of the
23   Commonwealth's rebate that is not based on
24   fraud, and that was Cathers's testimony at page
25   27, 28 and 57.


ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

35

1          The net price paid by the Commonwealth
2    takes into account the price set by Janssen
3    less the rebate amount provided under federal
4    law.  Therefore, this case, like the case in
5    Commonwealth vs. Tap Pharmaceuticals, the
6    Commonwealth necessarily here relies on the
7    price published by the manufacturer to be a
8    true and accurate price that is not based on
9    fraud, misrepresentations or nondisclosure.  In
10    both this case and that one, the inflated price
11    was not based on any real superior performance
12    of the drugs at issue, but instead on a
13    misrepresentation about the drug by the company
14    that sold it.
15          So the misrepresentation in the Tap
16    case was that the price did not reflect
17    kickbacks and other financial incentives that
18    were provided -- actually provided by the
19    company.  And here the misrepresentation is
20    based on the drug safety and performance which
21    did not reflect the true clinical data about
22    Risperdal which Janssen misrepresented, despite
23    FDA admonitions not to do so and besides a
24    legal duty to only provide fair and balanced
25    information under the very regulations that

ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

36

```
 1      govern Janssen's conduct.  Thus, the
 2      Commonwealth relied on Janssen's disclosures
 3      about Risperdal in absence of information to
 4      the contrary which only Janssen possessed in
 5      reimbursing for the drug at price set by
 6      Janssen, which was based on the fraudulent
 7      misrepresentations about the drug and in
 8      calculating and receiving rebates from Janssen,
 9      which were based on the fraudulent price.
10          Dr. Cathers further testified that
11      based on the disclosure of the comparative
12      studies discussed in the FDA memos and letters,
13      Medicaid was undertaking a comparative
14      re-review of all the antipsychotics in one
15      class, first generation -- first and
16      second-generation antipsychotics, so there will
17      be a full comparison between the drugs in the
18      future.  That was at page 98 and 99 of
19      Cathers's testimony.
20          Dr. Diamond testified that she believed
21      the FDA memos and letters she was shown at
22      trial would have been integral to determining
23      whether the benefits of Risperdal warranted the
24      cost to the Commonwealth as well as other
25      considerations, and the other considerations
```

ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

37

1      are whether the drug is included or excluded
2      from the PDL or whether it's referred to the
3      DUR Board for prior authorization or
4      consideration of safety and efficacy.  Dr.
5      Diamond testified to that at pages 15 through
6      18.  Medicaid was able to do none of that by
7      virtue of Janssen's failures to disclose all
8      material information about Risperdal.
9           Second, the Commonwealth's reliance is
10     also grounded in Dr. Cathers's testimony that
11     the information shared with Medicaid concerning
12     the unit rebate amount is confidential and may
13     not be disclosed to anyone.  As noted, that
14     unit rebate amount factored with the price of
15     the drug set by the manufacturer, the
16     fraudulent price, is integral to the
17     calculation that determines the net price that
18     the Commonwealth has to pay for Risperdal and
19     other drugs.  Therefore, even aside from actual
20     reliance, the Commonwealth is entitled to a
21     presumption of reliance based on the
22     confidential or fiduciary relationship that
23     exists between the state and Janssen and we
24     cite the relevant cases in our brief for that
25     proposition.


ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

38

1        Excuse me, Your Honor, I'm going to
2    take a drink of water.  (Pause.)
3        THE COURT:  Off the record.
4        (Discussion off the record.)
5        MR. COWAN:  Third, as we have again
6    argued in our brief, Pennsylvania law supports
7    a presumption of reliance based on the fact of
8    misrepresentations -- the occurrence of
9    misrepresentations themselves, and that's the
10    argument we made at summary judgment and that
11    relevant case law is also cited in our brief.
12    Therefore, Janssen's argument at page 25 of its
13    brief that Pennsylvania law does not recognize
14    a presumption of reliance is plainly mistaken.
15        Importantly, the Clark vs. Pfizer case,
16    in which Janssen relies, is entirely inapposite
17    here.  In that case, individual class members
18    were attempting to show through aggregate
19    evidence that each class and specific doctor
20    relied upon the defendant's off-label promotion
21    of the drug at issue causing -- they wanted to
22    rely on aggregate evidence to show that the
23    doctor relied on off-label promotion by the
24    manufacturer in prescribing the drug.  The
25    Superior Court decertified the class holding

ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

39

1      that the typicality and commonality aspects of
2      the class action, the certification
3      requirements could not be met, unsurprisingly.
4      Basically, that the doctor's individual
5      reliance could not be shown through statistics.
6      But far from rejecting the concept of a
7      presumption of reliance, the Superior Court
8      actually observed in part that because the
9      case, quote, does not involve price inflation,
10      reliance could not be shown in the aggregate.
11              Further here as explained, this is not
12      a class action.  Individual doctor's testimony
13      is not relevant and the misrepresentations made
14      affected and were material only to one claimant
15      in the lawsuit and that is Pennsylvania
16      Medicaid.
17              Finally, there can be no serious
18      contention that the Commonwealth has adduced
19      insufficient evidence of proximate causation as
20      Janssen --
21              THE COURT:  Say that sentence again.
22              MR. COWAN:  Sure.
23              THE COURT:  Finally what?
24              MR. COWAN:  There can be no serious
25      contention that the Commonwealth has adduced

ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

40

1    insufficient evidence of proximate causation as
2    Janssen alleges.
3         THE COURT:  Okay.
4         MR. COWAN:  As Janssen observes in its
5    own brief, and I'm quoting, "To the extent
6    there was any concern about the cost of
7    therapeutic benefit or value of Risperdal,
8    Medicaid could address that concern by
9    restricting use of the medicine."  And as I've
10    already stated, Drs. Cathers and Diamond
11    concurred with that assessment, but the point
12    is that Medicaid was not given the opportunity
13    to make those decisions based on complete
14    information, full disclosures about the drug
15    because of the information that Janssen failed
16    to disclose and the information that an
17    independent body determined about what Janssen
18    was permitted to say and not say about the
19    safety and efficacy of its drug.
20         I want to address very briefly some
21    other mischaracterizations or misapprehensions
22    that Janssen has about the state's evidence,
23    just some general loose ends.  First, Janssen
24    consents that Risperdal, the Risperdal-Haldol
25    comparison claims and other affirmative

ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

41

1    misrepresentations, were never made to
2    Pennsylvania prescribers or anyone at the
3    Commonwealth, and that in any case
4    Commonwealth's witnesses had no proof that they
5    were made.  But that is simply false.  As an
6    initial matter, Janssen's defense counsel is
7    engaging in a sleight of hand by asking the
8    Commonwealth's witnesses to testify about
9    evidence that both parties know exists on the
10   record, but that particular witness has not
11   been privy to, although it's been presented to
12   the jury.
13          An example of this is cited in
14   Janssen's brief at page 9 and 10 where the
15   excerpt shows Mr. Murphy questioning Dr.
16   Plunkett where she personally has evidence or
17   knowledge of whether misrepresentations were
18   made by Janssen to Pennsylvania doctors.  Of
19   course Dr. Plunkett is not offered as a fact
20   witness and was not engaged to give an opinion
21   as to whether Janssen's marketing plans and
22   materials actually reached Pennsylvania
23   doctors.  In fact, she was expressly precluded
24   from giving testimony of the nature Mr. Murphy
25   questioned her about.  The same line of

ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

42

1    questioning was deployed on Dr. Cathers and
2    Diamond, and when they were unable to identify,
3    based on their own personal knowledge,
4    affirmative representations made directly to
5    the Commonwealth or prescribers, Mr. Murphy
6    repeatedly declared for the jury that there was
7    no evidence of any fraud, but there is valuable
8    evidence of nondisclosure to the Commonwealth
9    itself, which I discussed a few minutes ago, in
10    the context of learned intermediary and
11    reliance and which is set forth in our brief.
12    There is also direct and unequivocal testimony
13    by Janssen's employees regarding the
14    comprehensive national scope of Janssen's
15    marketing and promotional plans and materials.
16        But all that aside, the Janssen sales
17    aids and business and marketing plans
18    themselves that the Commonwealth's witnesses
19    testified about constitute jury evidence that
20    Janssen subsequently acted in accordance
21    therewith in accordance with the sales aids and
22    business plans.  And applicable legal doctrine
23    is called the Hillmon doctrine from Mutual Life
24    Insurance Company vs. Hillmon, 145 U.S. 285,
25    and it's been cited repeatedly in the

ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

43

1    Commonwealth cases, for example, by the
2    Pennsylvania Supreme Court at Commonwealth vs.
3    Begley, 566 Pa. 239 with a pinpoint of 270 to
4    271.  Those cases stand for the proposition
5    that not only are such out-of-court statements
6    admissible, and Janssen doesn't challenge the
7    admissibility here, they are circumstantial
8    evidence that an intended plan was actually
9    carried out.  I've also cited -- I will also
10    cite for the Court Commonwealth vs. Lowenberg,
11    481 Pa. 244, 254 to 255.  Hillmon is, of
12    course, the seminal law school book case where
13    one person, Walters, had written that he was
14    leaving Wichita on a trip with a man named
15    Hillmon, and that writing was admitted as
16    principal proof that Hillmon had actually
17    traveled with Walters.
18         Under Pennsylvania law, the jury is
19    perfectly entitled to consider this evidence
20    as, at a minimum, circumstantial proof that
21    Janssen's marketing plans were, in fact,
22    carried out.
23         Janssen next argues that the -- that
24    Commonwealth has neither pled nor proven
25    materiality, but as the Commonwealth notes in

ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

44

1    its brief at paragraph ten, a fact is material
2    if it is one that would be of importance to a
3    reasonable person in determining a choice of
4    action.  The amended complaint is replete with
5    that, allegations that Janssen's deceptive and
6    false allegations including Risperdal safety
7    and efficacy profile, quote, impacted and
8    falsely inflated the cost of Risperdal
9    prescriptions.  That's at paragraph 77.  And
10    that, quote, the price the Commonwealth paid
11    for Risperdal was falsely inflated and
12    sustained through defendant's false
13    misrepresentations as compared to the value
14    that would have attached to Risperdal had its
15    true safety and efficacy profile been
16    disclosed.  That's paragraph 75.
17         Plainly, those are pleadings setting
18    forth material facts that would have been
19    important to a reasonable person in determining
20    a choice of action.  The case on which Janssen
21    relies did not involve the frequency with which
22    claimants invoked the word "material" in their
23    complaint.  Instead, the McShay case involved
24    an attempt by the plaintiff to shoehorn a
25    breach of contract claim into what was clearly

ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

45

1     a gross negligence claim.  And the Court saw
2     through that measure, that attempt.  That is
3     not what we have here.
4            Moreover, the Commonwealth has adduced
5     evidence of materiality.  I've already
6     described in our response of paragraph 3
7     incorporates the response -- the importance or
8     significant upon which Dr. Cathers or Diamond
9     placed the nondisclosed information they
10     testified about at trial, but for the record,
11     I'll additionally identify Dr. Cathers's
12     testimony discussed at paragraph 5 of our
13     response as well as the evidence and testimony
14     I have argued earlier this morning relative to
15     reliance.
16            A very brief word on unjust enrichment.
17     The primary complaint about this claim, it's
18     the same claim as the Commonwealth's fraud
19     case.  While it's certainly true that the two
20     claims are based on the same conduct, the
21     Commonwealth has satisfied the very different
22     elements of both claims.  For unjust
23     enrichment, the Commonwealth has shown it has
24     confirmed a benefit on Janssen, that Janssen
25     appreciated those benefits through increased

ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

46

1     sales and market share and that retention of
2     those benefits would be unjust because the
3     Commonwealth did not receive what it paid for.
4     The proof of those elements is set forth in our
5     brief.
6            Janssen also argues that the conduct
7     that the parties is governed by a written
8     contract and, therefore, the claim in equity
9     for unjust enrichment cannot be had, but there
10     is no agreement between the Commonwealth and
11    Janssen concerning Pennsylvania Medicaid.
12    Instead, that agreement is with the federal
13    government as Janssen's brief acknowledges at
14    page 8.
15            Indeed, Janssen should be judicially
16    estopped from arguing that it had a written
17    agreement with the Commonwealth as it has
18    already successfully argued to the Court that
19    it is not a provider under the Medicaid laws
20    and a provider agreement is the only type of
21    agreement that the applicable law contemplates
22    that Janssen could have had with the
23    Commonwealth.
24            In summary, the evidence demonstrates
25    that Janssen was actively marketing Risperdal


ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

47

1     in Pennsylvania in a false and misleading
2     manner about which the Commonwealth and its
3     Medicaid department were unaware, and when
4     Janssen had the opportunity to tell the truth
5     about what it knew about Risperdal's lack of
6     comparative efficacy and safety to either
7     doctors or to the Commonwealth itself, it chose
8     not to do so, but instead opted to keep the
9     Commonwealth uninformed about the drug's
10    equivalency to much cheaper antipsychotic drugs
11    like Haldol.
12          Given the extremely high standard for
13    establishing a compulsory nonsuit in a clear
14    case where the facts and evidence may lead only
15    to the conclusion that there is a lack of
16    evidence, the Court should deny Janssen's
17    motion.  Commonwealth is entitled to every
18    inference and advantage that may be drawn from
19    the evidence.  It is not enough that there is
20    discrepant evidence, but it must be
21    inconceivable on any reasonable hypothesis that
22    the collective mind of the jury could find in
23    favor of the Commonwealth in order to grant
24    Janssen's nonsuit.  Janssen has simply not
25    carried that burden.


ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

48

1          The Commonwealth incorporates by
2    reference to its arguments and the evidence set
3    forth in its brief submitted to the Court last
4    Friday morning.
5          Thank you.
6          THE COURT:  Okay.  Before we go
7    forward, does anyone know the control number of
8    the nonsuit motions?  Were they E-filed last
9    week?
10          MR. POSNER:  They were, Your Honor.
11          THE COURT:  Okay.  Then I'll find them.
12          Do you want to make a response?
13          MR. POSNER:  I do.
14          THE COURT:  All right.  And if either
15    side needs a break before we go forward, let me
16    know.
17          15 minutes.
18          MR. POSNER:  Yes, Your Honor.  The
19    first point in the response is that I started
20    my presentation by pointing out to Your Honor
21    that there was no proof from the Commonwealth
22    of anything that was done or any reliance
23    before November of 2004.  There was no response
24    to that.
25          Secondly, a minor point, perhaps, but

ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

49

1     maybe not, Mr. Cowan's statement that there is
2     no supplemental rebate agreement with the
3     Commonwealth, literally true.  Since Risperdal
4     became a generic in 2008, it does not pay
5     supplemental rebates to the Commonwealth.  It
6     has not been a preferred drug since 2009.
7     That's the tie between being a preferred drug,
8     paying supplemental rebates.
9            During the period in question, there
10    was a supplemental rebate agreement, and when
11    Mr. Cowan stood here before you on the 2nd of
12    June, he told you that.  He said there's
13    actually a rebate agreement that is entered
14    into between the Commonwealth and the company
15    that sets forth these provisions as applicable
16    to an individual drug company.  There were
17    supplemental rebate agreements.
18           Third point, Your Honor precluded
19    evidence of misrepresentations to Pennsylvania
20    physicians.  You entered an Order saying no
21    proof of such representations and no proof that
22    such representations caused any loss to the
23    Commonwealth.  There is no such proof, and to
24    stand here today and say, well, first of all,
25    that doesn't matter is just inconsistent with,

ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

50

1  for example, how the damages are computed.
2  Damages are computed by multiplying the
3  difference in price times the number of tablets
4  of Risperdal that were actually prescribed.  If
5  the argument is that prescribers were defrauded
6  and they, therefore, prescribed Risperdal when
7  Haldol was just as good, then the question of
8  why they prescribed Risperdal is at issue.
9  That is where the learned intermediary doctrine
10  fits in and it fits in in the unjust enrichment
11  claim.
12      I just heard Mr. Cowan say to you that
13  they got increased market share.  Well, how do
14  you get increased market share unless
15  prescribers are relying on these supposed
16  misrepresentations, unless prescribers are
17  making decisions because they have
18  misinformation from Janssen.  That is the
19  learned intermediary issue.
20      Third point, circumstantial evidence.
21  Well, we could go through the documents, the
22  marketing plans and so forth and we could see
23  what they say really, but I don't think we need
24  to do that.  I think the bottom line on this
25  issue of circumstantial evidence is, of course,

ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

51

```
 1     you can prove things by circumstantial
 2     evidence, but you still have to prove them by
 3     circumstantial evidence and that circumstantial
 4     evidence and that proof, just like direct
 5     evidence, must be clear, precise and
 6     convincing.
 7            So there is no clear, precise and
 8     convincing proof in this case that a
 9     positioning statement in a marketing plan
10     translated into an improper statement to a
11     physician anywhere in the United States much
12     less in Pennsylvania.  Dr. Cathers's testimony
13     about fair pricing information, and she was
14     relying on the fact that the pricing
15     information given to the Commonwealth wasn't,
16     quote, based on fraud.  Mr. Murphy
17     cross-examined her on that.  He asked her
18     whether what we were talking about was whether
19     Janssen provided accurate information to the
20     Commonwealth.  She agreed that Janssen provided
21     accurate pricing information to the
22     Commonwealth.  The Tap case involved
23     allegations of something quite different.  The
24     Tap case involved allegations that
25     pharmaceutical manufacturers reported to state
```

ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

52

1    entities or governmental entities prices that
2    they weren't actually charging.
3         As for the reliance of Dr. Cathers and
4    Dr. Diamond back at 2005 on Dr. Cathers said
5    she'd do a full review, okay?  Dr. Diamond
6    said -- I can't remember what the argument was
7    that Dr. Diamond was going to do.  I think she
8    was going to go to the DUR Committee.  Here's
9    what Dr. Diamond said on -- I'm not sure what
10   -- she testified at page 53.  She said if she
11   had known that the FDA had said something
12   shouldn't be included in promotional materials,
13   quote, then I certainly might have made the
14   same decision, but I would have wanted to know
15   that.  That's not reliance.  That's not
16   materiality.  That is maybe I would have done
17   something different.
18        Finally, Clark against Pfizer.  Now
19   that I'm confused by, because Clark vs. Pfizer
20   wasn't initially cited by us, it was cited by
21   them in the precise statement of claim, and
22   they referred to note 4, and note 4 is dictum
23   and it characterizes the Zyprexa case and
24   references to the Zyprexa case in the Neurontin
25   decision.  The Zyprexa case, the Mississippi

ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

53

1       case, is a case that was decided by Judge
2       Weinstein in the Eastern District in the
3       multi-district litigation, and we've talked
4       about it in our brief.  It's an interesting
5       decision.  It's a very long decision.  It's an
6       interesting decision because Judge Weinstein
7       says, I think I'm likely to be reversed on
8       this.  There's another Second Circuit decision
9       that goes the other way where they reversed me
10       before, and written a brief for the Second
11       Circuit and maybe he'll have some luck this
12       time, but maybe not.  In any event, he stayed
13       the case to see what would happen.
14            But more important, the case involved
15       statistical proof, economic proof.  The
16       plaintiffs brought in an economist of sorts
17       from Harvard who did a study and purported to
18       show by this elaborate econometric analysis
19       that, in fact, there was this connection.  And
20       he said, okay, I looked at that proof, I see
21       that proof and I see some evidence that
22       confirms that that proof might apply in a
23       particular case of Zyprexa.  There's a drop in
24       demand and, therefore, I'm going to allow the
25       proof.  That's what he said.  We don't have

ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

54

1      proof like that in this case, none at all.
2      That case has absolutely no application.  You
3      don't have to read the 117 pages, they don't
4      bear on what we're facing here.
5           So, Your Honor, we stand on our
6      arguments.  There is no proof of a
7      representation to anyone.  There is no proof of
8      reliance by any prescriber anywhere and they
9      need that sort of proof to prevail.
10          THE COURT:  Thank you.
11          Mr. Cowan?
12          MR. COWAN:  I really have just two
13     brief points, Your Honor.
14          I did respond to Janssen's timeline
15     argument relative to reliance, and I explained
16     to the Court the different ways that the Court
17     can find reliance.  And I pointed to the Court
18     that there is evidence of direct reliance in
19     the testimony by Dr. Cathers and Dr. Diamond.
20     And while it's true that those doctors were not
21     at Medicaid, at Pennsylvania Medicaid before
22     2004-2005, that time frame, there are other --
23     there is other means, other legal doctrine by
24     which the Court may determine that there was
25     reliance.  And I'll specifically point to the

ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

55

1    confidential fiduciary special relationship
2    that exists between the state, the Commonwealth
3    Medicaid system and the drug companies as proof
4    of reliance under Pennsylvania law as one
5    example.
6           There was also a comment about
7    supplemental rebates, just to clear this up,
8    and my intention certainly is not to mislead
9    the Court in any way.  My understanding is that
10   the supplemental rebate agreement that was
11   entered into with respect to the Commonwealth
12   and Janssen had to do with the PACE program.
13   There was, and those are directly controlled by
14   Pennsylvania law, but my understanding from
15   information that I've been given from Medicaid
16   personnel, including Dr. Cathers and Dr.
17   Diamond, is that there is not or was not a
18   direct supplemental rebate agreement between
19   Janssen and the Commonwealth.  The rebate
20   agreement that was entered into was entered
21   into with the federal government and the
22   Commonwealth is a beneficiary of that agreement
23   as a part of the federal state Medicaid
24   program.
25          And unless Your Honor has any further

ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

56

1     questions...
2             THE COURT:  No.  Thank you very much.
3             MR. COWAN:  Thank you, Your Honor.
4             THE COURT:  We can take a short break,
5     stand up and stretch, and then I'll come back,
6     okay?
7             (Whereupon, a short recess was taken.)
8             THE COURT:  Have a seat, everyone.
9     Thank you.  All right.
10            Well, as you know, this is, I believe,
11    the first opportunity for me to make a ruling
12    in a dispositive way on this case.  When we
13    were back on our day of hearings pretrial,
14    although Janssen felt those were dispositive, I
15    didn't agree because of the summary judgment
16    related to the first complaint, and the
17    preliminary objections I don't consider
18    dispositive, and I think that's why I'm not
19    really as focused on that Commonwealth vs. Tap
20    case as I've been hearing throughout the trial
21    because that's preliminary objections also.  I
22    just don't think that that's as dispositive as
23    where we are today.  So I do want to thank both
24    teams, the plaintiff's team and the defense
25    team, for your memos, your copies of cases and


ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

57

1      your cooperation.
2            The Janssen motion for nonsuit is
3      granted.  I'm going to file an Order today, but
4      I ask if you'd give me a little time to get my
5      memo typed up.  My secretary has got her son
6      who's graduating the end of the week, Larry is
7      gone; I just won't have anybody to type this.
8      So if you could give me, at least, until the
9      end of the month, but as far as your date for
10      calculating any post-trial matters, today is
11      the day.  I'll file the Order today.  I'll
12      probably call one person from each side.  Mr.
13      Coren, I'll get you next time.  I'll call one
14      person from each side and let you know when I'm
15      going to actually file the memo, but I wanted
16      to give you some comments from the bench so
17      that both sides would have an opportunity to
18      have an idea where I'm thinking and what my
19      thoughts are, so bear with me, please.
20            The procedural history of this case, I
21      think, we know, but I'll state it, is that in
22      February 2007, the Commonwealth of Pennsylvania
23      commenced litigation against three
24      pharmaceutical companies, Eli Lilly, Janssen
25      and AstraZeneca.  The Commonwealth claimed at


ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

58

1    that time that it was seeking to recover inter
2    alia expenses incurred and reimbursing
3    pharmacies for the purchase of Risperdal and
4    other antipsychotic drugs manufactured by those
5    three defendants.  At that time, the plaintiff
6    alleged that the defendant pharmaceutical
7    companies promoted their respective
8    antipsychotic drugs for non-medically-accepted
9    and non-medically-necessary uses.  The
10   Commonwealth also asserted at that time that
11   defendants misrepresented the risks associated
12   with those medicines.  The defendants filed
13   preliminary objections seeking to sever the
14   actions and to drop mis-joined parties.
15       In December 2007, the Court severed the
16   claims filed by the Commonwealth and directed
17   the plaintiff to file separate complaints
18   against each of those defendants.  This action
19   was filed against Janssen in January, 2008, and
20   there were six causes of action, six counts.
21       On January 5th, 2010, Judge Abramson
22   granted in part Janssen's motion for judgment
23   on the pleadings pursuant to Rule 1034 point
24   something or other and dismissed counts 1, 2
25   and 3 and count 5 of the complaint.  That was

ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

59

```
 1      January 17th of '08.  But on January 8th -- I'm
 2      sorry, January 17th of '08, right.
 3              January 5th of 2010 was the judgment on
 4      the pleadings.  January 8th of 2010, the
 5      Commonwealth advised Janssen that it was
 6      abandoning certain theories and would proceed
 7      on more narrow theories, and that's this letter
 8      that we all know that the Commonwealth still
 9      seeks to recover the difference between the
10       price of Risperdal's prescriptions and the cost
11      of a cheaper, safer, generic alternative.
12              Then on April 12th, 2010, Janssen filed
13       their motion for summary judgment urging
14       dismissal of the newly -- well, at least, of
15      the first complaint of counts 4 and counts 6.
16      The next day, the Commonwealth filed a motion
17       for leave to file an amended complaint April
18      13th, 2010.  That leave was granted by the
19      Court and the first amended complaint was filed
20      on May 17th, 2010 asserting count 1, the fraud
21      and misrepresentation and, count 2, the unjust
22      enrichment.  Janssen filed the preliminary
23      objections to the first amended complaint on
24      May 24th, and in anticipation of our jury
25      selection on May 28th and after reviewing what
```

ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

60

```
1        I call the evolution of the litigation, this
2    Court requested each party to submit a precise
3    statement of claims and defenses.
4            On May 27th, 2010, counsel and the
5    Court participated in a pretrial telephone
6    conference to discuss trial logistics.  Jury
7    selection took place May 28th, June 1st and
8    June 3rd.  On June 2nd, 2010, this Court
9    convened a full day of hearings for oral
10    argument to consider the defendant's motion for
11    summary judgment on the initial complaint and
12    preliminary objections to the first amended
13    complaint and multiple motions in limine filed
14    by both parties.
15            After opening statements on June 3rd,
16    2010, and for the next week we've heard from
17    the Commonwealth witnesses.  The Commonwealth
18    rested on June 10th, and on June 10th, 2010, we
19    saw a revised claim from the plaintiff that had
20    been further narrowed and was based on
21    allegations solely involving Medicaid damages.
22    The PACE had been withdrawn.
23            So we're here today to consider the
24    motions for nonsuit.  I'm just going to address
25    bullet points.  I'm not going to mention too
```

ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

61

1      many case names.  I think all of you can fill
2      in the case names at this juncture.  I'll put
3      it all in a memo.
4            First of all, my conclusion is that the
5      absence of expert testimony on the damage issue
6      was extraordinary and possibly, in fact, fatal
7      to this litigation.  As attorneys, we all know
8      that all of the federal entitlement legislation
9      is complex, Social Security, Medicare,
10      Medicaid, and now we have this new health care
11      plan.  And then in our case we have the second
12      layer of the state entitlement legislation, the
13      PACE, the PACENET that we heard about.  The
14      jury heard about discounts, rebates, take-backs
15      and an assortment of formulas overlapping the
16      state and federal requirements.  The
17      Commonwealth requires vendors to sort through
18      some of the numbers and the state employees who
19      testified did not the basis of all the computer
20      printouts, they were not familiar with certain
21      extraction specifications, the fields used or
22      whether there were certain take-backs,
23      something called a TPL, and other things.  So I
24      conclude that it was too simplistic, T-O-O
25      simplistic, and not reasonable for the


ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

62

1    Commonwealth to suggest that simply adding or
2    subtracting computer tallies is sufficient to
3    avoid jury confusion and speculation.
4        In the memoranda, simply writing the
5    word, quote, "simply" as the introductory word
6    to set forth damage theories does not render
7    the damage calculation simple.  For example,
8    simply put, the damage theory is X, Y or Z or
9    the measure of damages is simply X, Y or Z.
10   Well, it's not simple.  It's very complex.
11       Equally important to and a concern to
12   the jury confusion and speculation is the
13   necessity that the defendant have an
14   opportunity to see a report, written report,
15   written understanding prior to trial which sets
16   forth the facts and the data which form the
17   basis of a plaintiff's claims.  So the damage
18   calculations in this case are such a magnitude
19   and complexity, are beyond the realm of a
20   juror's ordinary understanding and expertise
21   and experience, and the damage calculations in
22   a case of this magnitude and complexity should
23   have been presented to the defendants prior to
24   trial to enable any defendant to analyze the
25   damage theories because the damage theories

ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

63

1    here evolved just as the liability theories.
2        Now, the liability focusing, of course,
3    on reliance and causation, the linchpin of a
4    fraudulent misrepresentation and/or
5    nondisclosure case involves reliance,
6    justifiable reliance and/or detrimental
7    reliance.  At one point, the Commonwealth
8    appeared to be basing its reliance claim on a
9    fraud in the market theory.  And if you look at
10    the complaint, if you look at pages 4 of 7 and
11    5 of 7 of that letter of May 28th, there
12    appears to be an assertion that the
13    Commonwealth was injured directly and causing
14    economic loss, and reliance was presumed.  And
15    if you look at the text, you'll see that the
16    text of that letter is at odds, I'll put it
17    that way, with the response to the motion for
18    compulsory nonsuit.  The problem, of course,
19    with the fraud on the market theory is that
20    it's been permitted only in limited
21    circumstances, usually in the securities fraud
22    actions, to establish that reliance needed.
23    Fraud in the market has been rejected in common
24    law cases and specifically rejected by Clark
25    vs. Pfizer.  Today I hear that Clark vs. Pfizer

ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

64

1      is not applicable, but if we go back to May
2      28th, Commonwealth thought it was applicable.
3      Certainly no one can claim that in our
4      litigation we had any expert testimony about
5      statistical proof or analysis about anything.
6              Now, when I, over the weekend, of
7      course, when I read the memo in opposition to
8      the nonsuit, we have a different theory which
9      was mentioned briefly during trial that the
10      reliance should be presumed because there was a
11      special or confidential or fiduciary
12      relationship between Janssen and the
13      Commonwealth.  The few cases which permit this
14      newest theory are distinguishable.  The Basile
15      vs. H & R Block involve the statute
16      Pennsylvania Consumers Protection Law, and
17      there was a clear fiduciary relationship, the
18      nature of the parties were not equal.  In
19      Catalan vs. Trimagli, it was a doctor/patient
20      relationship, although the doctor was a false
21      doctor, and but there was certainly a
22      difference in relationship there.  A couple of
23      footnotes that we saw in the Clark case, Weiner
24      vs. Dannon Yogurt permitted an inference of
25      reliance for a class action which, again,


ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

65

1    involved the statutory interpretation of unfair
2    competition law in California.  Kelly vs.
3    Microsoft, which was another footnote in the
4    Clark, did not permit a presumption of reliance
5    in that case and that was also a statutory
6    Consumer Protection Act case.  That Court noted
7    that when plaintiffs complain of both
8    misrepresentations and omissions, Courts will
9    decline to permit a presumption of reliance.
10    Then the Commonwealth cited Affiliated UTE,
11    U-T-E, Citizens vs. United States in the
12    weekend memorandum, but that's not on point.
13    It's a securities action filed pursuant to Rule
14    10(b)(5) and there the Supreme Court commented
15    that where the legislative and statutory
16    fundamental purpose is to substitute a
17    philosophy of full disclosure for a philosophy
18    of caveat emptor in the securities industry,
19    reliance may be presumed in certain
20    circumstances.  Well, that's certainly not the
21    case that we have here.
22        In our case, simply -- and I use the
23    word respectfully -- simply prepping a witness
24    to use the word "confidential" repeatedly does
25    not create a special relationship or a

ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

66

1     fiduciary relationship or a confidential
2     relationship.  Those special relationships
3     generally are not applicable to business
4     entities where both parties are sophisticated,
5     and there's no question under the circumstances
6     of this litigation both sides are
7     sophisticated.
8          The only reason that the Commonwealth
9     has been forced to go through these exercises
10     of shifting theories and evolving concepts is
11     an attempt to avoid the unavoidable, that is,
12     the learned intermediary rule which has been
13     the law in Pennsylvania since, at least, the
14     early 1970's.  That rule says that a plaintiff
15     in an action against a drug manufacturer for
16     prescription drugs must establish causation by
17     showing that if the defendant manufacturer had
18     issued the proper warning or a different
19     warning then the prescribing physician would
20     change his or her prescription habits.  We
21     heard every Commonwealth witness agree that the
22     ultimate decision as to whether or not to
23     prescribe Risperdal or another SGA or FGA was
24     ultimately up to the physician.  That medical
25     professional would assess the risks and the

ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

67

1    benefits and the tolerance of particular
2    patients.
3         And then finally just a comment about
4    causation, which I had another concern about
5    the causal nexus, and as a surprise -- I guess
6    I shouldn't be surprised -- but Mr. Posner sort
7    of mentioned this, but there was no showing
8    that if either the 1993 letter or any of the
9    internal Janssen marketing materials had been
10    provided to the Drug Utilization Committee or
11    the Pharmacy and Therapeutic Committee or any
12    other Medicaid or PACE committees that there
13    would have been any actions taken that were
14    different.  There was no record of whether any
15    recommendations which those committees might
16    have made or could have made or would have made
17    would have been accepted or rejected.  There
18    was no evidence of what would have caused a
19    different course of conduct by either DPW,
20    Department of Aging or Medicaid or the PACE
21    departments, so that's an internal causal nexus
22    concern that I have about this whole causation
23    business.
24         So for those reasons, that would be
25    count 1 where nonsuit is granted.  As to unjust

ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

68

```
 1    enrichment, which is at count 2, I would simply
 2    say that the Commonwealth failed to present a
 3    claim for which equitable relief can be
 4    granted, and I'll just leave it at that because
 5    we didn't go through a lot of unjust
 6    enrichment.  But the Commonwealth did
 7    acknowledge in the memo that it's the same
 8    evidence which would have been presented for
 9    both the fraud as well as the unjust
10    enrichment.
11         For so for all of those reasons, and
12    whatever I can write and get typed up in the
13    next few days or so, the motion for nonsuit is
14    granted.
15         All right.  Now, at this point, I'd
16    like to just talk to two lawyers, whoever the
17    two are, to talk about our jury issues for
18    tomorrow over here on this side.  Thank you.
19         (Discussion at sidebar off the record.)
20         THE COURT:  As you know, tomorrow,
21    Tuesday, I believe we have 12 jurors who are
22    due to be here in City Hall.  And what we'll do
23    is once they gather in the jury room, Larry and
24    I will thank them for their service.  Larry
25    will get the paperwork together to escort them
```

ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

69

1    across the street.  They can pick up their
2    checks for their time of service.  Some of
3    them, most of them, started that first week,
4    but some of them started different days along
5    those three days of jury selection.  And then I
6    do send all jurors a thank you note from the
7    Courts, and like the last line says something
8    to the effect if you have any comments, feel
9    free to write back.  If they write back
10    something about the case, I share it with
11    counsel.  Usually it's just to say thank you to
12    Larry, if I ever hear from them, you know, but
13    most of them don't write anything.
14         I have a standard rule in my courtroom
15    that I ask both sides, the lawyers, and any of
16    your team members and consultants or whatever,
17    do not have any contact with the jurors after
18    they are excused tomorrow.  They will be
19    excused tomorrow morning.  Because from the
20    Court's perspective we need these ladies and
21    gentlemen when they get subpoenaed in another
22    two or three years.  We need them to come back,
23    hopefully, with an open mind, and if any of you
24    are lawyers in this room, you want clear,
25    unbiased jurors to be part of your panel, so I


ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

70

1    find it's helpful for the Courts as well as
2    helpful for counsel.
3           But I, again, want to thank both sides
4    for all of the work that you've put into this
5    case.  I really do appreciate it.  Thank you.
6           (Whereupon, case concluded.)
7               - - -
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25


ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER

71

```
1        C E R T I F I C A T I O N
2
3
4
5
6        I hereby certify that the proceedings and
7    evidence are contained fully and accurately in the
8    notes taken by me on the trial of the above cause,
9    and that this copy is a correct transcript of the
10    same.
11
12
13
14
15
16
17
18               Robin G. Bobbie, RMR, CRR
19               Official Court Reporter
20
21
22               June 14, 2010
23
24
25
```

ROBIN G. BOBBIE, RMR, CRR
OFFICIAL COURT REPORTER