```
                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF MASSACHUSETTS


       IN RE:                         )
                                      ) CA No. 04-10981-PBS
       NEURONTIN MARKETING, SALES PRACTICES,) Pages 1 - 36
       AND PRODUCTS LIABILITY LITIGATION    )



                            STATUS CONFERENCE

                   BEFORE THE HONORABLE PATTI B. SARIS
                       UNITED STATES DISTRICT JUDGE




                           United States District Court
                           1 Courthouse Way, Courtroom 19
                           Boston, Massachusetts
                           June 8, 2010, 2:22 p.m.





                          LEE A. MARZILLI
                       OFFICIAL COURT REPORTER
                     United States District Court
                     1 Courthouse Way, Room 7200
                         Boston, MA  02210
                          (617)345-6787
```

1   A P P E A R A N C E S:

2

    FOR THE PLAINTIFFS:
3
         ANDREW G. FINKELSTEIN, ESQ. and KENNETH B. FROMSON, ESQ.,
4   Finkelstein & Partners, LLP, 1279 Route 300, P.O. Box 1111,
    Newburgh, New York, 12550.
5
         LEVI BOONE, III, ESQ., Boone Law Firm,
6   401 West Sunflower Avenue, Cleveland, Ohio, 1772.

7        JACK W. HARANG, ESQ., Law Offices of Newton B. Schwartz,
    Sr., 1911 Southwest Freeway, Houston, Texas, 77098.
8

9   FOR THE DEFENDANTS:

10       MARK S. CHEFFO, ESQ. and CATHERINE B. STEVENS, ESQ.,
    Skadden, Arps, Slate, Meagher & Flom, LLP, Four Times Square,
11  New York, New York, 10036.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2         THE CLERK:  In Re:  Neurontin Marketing, Sales

3    Practices, and Products Liability Litigation, Civil Action

4    No. 04-10981, will now be heard before this Court.  Will

5    counsel please identify themselves for the record.

6         MR. FINKELSTEIN:  Andrew Finkelstein, Finkelstein &

7    Partners.  Good afternoon, your Honor.

8         MR. FROMSON:  Kenneth Fromson, Finkelstein & Partners.

9    Good afternoon, Judge.

10        MR. BOONE:  Levi Boone, Boone Law Firm.

11        MR. HARANG:  Jack Harang.  I'm an attorney with Newton

12   Schwartz.

13        THE COURT:  All right, thank you.  Where are you all

14   from?  You're from?

15        MR. HARANG:  I'm from New Orleans and Houston, and

16   Newton is from Houston.

17        MR. BOONE:  I'm from Cleveland, Mississippi.

18        THE COURT:  Okay, I think we met early in this

19   process.  I understand that I have the sales and marketing

20   still sort of on my shelf, but I'm trying to figure out where

21   this case is and what I should be doing.  Are you meeting with

22   Judge Sorokin too?

23        MR. CHEFFO:  At 3:00 o'clock, your Honor.

24        THE COURT:  At 3:00 o'clock, so we tried to squeeze it

25   in at one side or the other so that once you were up here, no

30c0540d-85bd-4576-830f-d61b34303d63

1    one had to come back for a second one.

2          Let me just ask you, on the sales and marketing,

3    that's not really your hunt, but I've got a big opinion I've

4    got to write, and then I've got at least one motion for

5    reconsideration.

6          MR. CHEFFO:  Well, that's in the class issue.  They

7    moved to reconsider the bipolar class issue.

8          THE COURT:  Right.  I didn't -- unless there's a

9    reason that you felt I needed to address something, I was

10   really going to focus today on the products liability case,

11   although the one case left in Massachusetts, actually there's a

12   little bit of an overlap between the two.

13         MR. CHEFFO:  The Dorsey case?

14         THE COURT:  Yes.

15         MR. CHEFFO:  Yes, and, in fairness, I think that the

16   expectation -- and, you know, I can answer any questions on the

17   sales and marketing -- I don't think the sales and marketing

18   folks expected this hearing to focus on that, but --

19         THE COURT:  That's right, so I'm not, I'm not talking

20   about it.  I'm really going to focus, because I have all of you

21   here, on product liability.  And I know you're going to meet

22   with Judge Sorokin to work out some of the discovery issues,

23   but I am just about ready to send these cases back.  We were

24   looking, and why I'm focused on Dorsey, because it's the one

25   that's left in Massachusetts.

1      MR. CHEFFO:  Right.  Well, Dorsey, as your Honor

2  knows, it's a personal injury case.  It's not the Finkelstein,

3  it's not the same case.  So there is a summary judgment

4  motion --

5      THE COURT:  Yes.

6      MR. CHEFFO:  -- that's fully briefed in Dorsey, so

7  obviously your Honor will rule on that.  I think just as a --

8  we've actually been working with Judge Sorokin for obviously

9  over a year or so, but probably within the last four or five

10  months more intensively.  And what we have done is, we have a

11  proposed plan in place, both to deal with what's been the first

12  wave of cases, and there was about a hundred or so cases, they

13  have been whittled down, and Mr. Finkelstein will perhaps

14  address, which will essentially be in a position as of

15  September or October-ish, the majority of them will have done

16  the Tier 1/Track One discovery that your Honor is familiar

17  with.  Then he's asked for a proposal for the rest of the

18  cases, and it's largely Mr. Boone's and Mr. Schwartz's cases.

19  Collectively, there's I want to say about 400 or so plaintiffs,

20  though there's a smaller number of cases.  And we've made joint

21  proposals which I suspect Judge Sorokin will have a view on.

22      THE COURT:  Yes.

23      MR. CHEFFO:  So, I mean, if you're aware of this, I

24  don't mean to belabor.  I'm just trying to --

25      THE COURT:  No, no, no, and I'm assuming he'll take

30c0540d-85bd-4576-830f-d61b34303d63

1    care of it, but of the hundred, let's just start with the

2    hundred, come September -- now, I understand my first case got

3    dismissed out without any dollar figure that would make any

4    sense in trying to settle these cases; in my view, probably no

5    guidepost at all.  But subsequent to that, you've had the

6    opportunity to settle two cases, one in Tennessee and one

7    midway with Judge Young, right?

8            MR. FINKELSTEIN:  Yes.

9            THE COURT:  Well, maybe not even midway, maybe --

10           MR. CHEFFO:  Two days.

11           THE COURT:  Two days.  All right, they loved the case,

12   they want more.

13           (Laughter.)

14           THE COURT:  So I don't know what the dollar figures

15   were -- and we'll get to that maybe in a minute -- but are

16   those two guideposts enough to take the hundred cases and have

17   me send you to a mediator?

18           MR. FINKELSTEIN:  Well, that's why we came here, your

19   Honor.  Two years ago we had all said that we'd see what

20   happened with Daubert, and then we said we needed these three

21   cases to see what, if anything, we could do with respect to

22   resolution.  Pfizer said:  We'll never pay a dime, we'll never

23   pay a dime.  We said, okay, well, let's two juries, three

24   juries price these, and then we'll come back and report to you.

25   That's why we're back and reporting to you.  That many --

1          THE COURT:  Who's sitting back here now?

2          MR. CHEFFO:  These are actually summer associates.

3          THE COURT:  That's fine.

4          MR. CHEFFO:  And I think she's from Bloomberg, so --

5          THE COURT:  Oh, I see.

6          MR. FINKELSTEIN:  Yes, there's confidentiality, so

7     I'm --

8          THE COURT:  That's why I was going to -- well, let me

9     just, without getting to actual dollar figures because that

10    might be confidential, the question is, are you prepared to go

11    to a mediation process now?  You've never actually had a jury

12    verdict, which is what we were sort of hoping for; you know,

13    like, well, how would a jury see these cases, one which was a

14    terrific case for defendant which was dismissed out, in my

15    view, the Bulger case?  Another, which was probably one of the

16    better cases, right, for the plaintiff was settled, right, the

17    one in Tennessee?

18          MR. FINKELSTEIN:  Yes.

19          THE COURT:  I don't know where you put the Judge Young

20    one in that spectrum, the one that --

21          MR. FINKELSTEIN:  The Shearer matter.

22          THE COURT:  Shearer, I don't know where that fell in.

23          MR. CHEFFO:  Probably somewhere in between.

24          THE COURT:  All right, somewhere in between.  Do you

25    have enough information to actually go to a mediator now?

1          MR. FINKELSTEIN:  We believe we do.

2          MR. CHEFFO:  Well, let me answer your question

3    directly, your Honor.  If your Honor thinks that it would be

4    helpful, certainly we're not going to violently oppose it, but

5    here's why I think we have just some issues on kind of where we

6    are.  I don't want to steal their thunder, but after the

7    Smith and the --

8          THE COURT:  Do you want to --

9          MR. CHEFFO:  Well, we can.  If you want to hear more

10   details, I'd be happy, but I can't do it here.

11         THE COURT:  Maybe we'll go up to side bar later.   Why

12   don't you --

13         MR. CHEFFO:  Absolutely.  But there was about, I think

14   about 80 what I'll call Finkelstein cases in the MDL, okay.

15   Forty of them they have now told us there's no resolution, but

16   forty of them -- and, you know, for reasons that good lawyers

17   look at the cases, no one's suggesting that they're frivolous

18   or they couldn't be prosecuted, but understanding how the cases

19   were brought and what they now entail and theories and

20   whatever, they've told us that they are going to dismiss or

21   withdraw from forty cases, leaving the Finkelstein folks in the

22   MDL with about forty cases.

23         THE COURT:  When will you make a decision as to when

24   to do that?

25         MR. FINKELSTEIN:  Oh, we have.  We have, and we've

1  communicated with them.

2         THE COURT:  Have you dismissed them already?

3         MR. FINKELSTEIN:  Well, we're in the process.  We're

4  communicating with our clients.  We've advised them of the

5  communication with our clients.  We need authority from our

6  clients, and that whole process is well under way.  We'll be

7  making applications.

8         Judge, what I'd like to highlight here is, there's

9  merit to these cases, but the stance that Pfizer has taken, and

10 they're entitled to, has rendered it such that it's

11 economically inefficient for our clients to pursue this because

12 ultimately, after going forward and hearing that "We'll never

13 pay a dime, we'll never pay a dime," and bringing in experts

14 from all across the world, then they're rendering offers where

15 the majority of these moneys are going to pay these expenses.

16 So unfortunately, while there are merit to these cases, their

17 approach is that these individuals are not going to receive

18 anything, so --

19        THE COURT:  I'm just actually at this point not even

20 getting into merits.  I'm trying to figure out how I can

21 either, A, settle them, or, B, send them back to the districts

22 and when to do that in this what I'll call -- what do you call

23 them, Track One?

24        MR. CHEFFO:  Tier 1/Track One.

25        THE COURT:  Okay.

1          MR. CHEFFO:  And the reason why I didn't jump up and

2    say, you know, "yes, mediation," I just wanted your Honor to

3    understand that in addition, because we're now in a situation,

4    we also have the New York cases where they, and I don't want to

5    pick on Mr. Finkelstein, but they're going to go through their

6    kind of inventory cases.  But then we have --

7          THE COURT:  When is Judge Freedman trying?  I could

8    call her.  I haven't talked to her in a while.

9          MR. CHEFFO:  Well, I can tell.  You know, the same

10   lawyers are dealing.  We have five cases that have been,

11   essentially Tier 1/Track One, we can call it the same thing,

12   but fully worked up by the end of June.  One or two of them may

13   be dismissed, so there's going to be three cases that there's

14   going -- you know, to the extent they don't get resolved or

15   dismissed on dispositive motions, I would suspect by the first

16   quarter or so of 2011, she's going to set one of those cases

17   for trial, so we are going to have a trial.

18         THE COURT:  Would it make sense to try to mediate

19   these first forty this fall, and then, if not, I'm going to

20   send them back?

21         MR. CHEFFO:  The only reason I would say "no" is

22   because, you know, from Pfizer's perspective, and this is, you

23   know, in an MDL, you know, Mr. Boone has 307 cases, plaintiffs,

24   of which he's not --

25         THE COURT:  I'll deal with him in a minute.

30c0540d-85bd-4576-830f-d61b34303d63

1        MR. CHEFFO:  Well, again, from our perspective, you

2   know, there's not a benefit, you know, there's not a benefit

3   from Pfizer's perspective of looking at, you know, these twenty

4   cases and looking at those and --

5        THE COURT:  But here's your choice:  I don't want

6   them.  I've got these two massive multidistrict litigation

7   cases, and I need to start tying a bow in either resolving

8   them -- I think I've done -- well, let me ask you, are there

9   any dispositive crosscutting motions I haven't dealt with yet?

10        MR. FINKELSTEIN:  There's two, we believe.  Well, one

11   specific and one more general.  If you'd like me to address it

12   now --

13        THE COURT:  Well, yes, or forever hold your peace.  I

14   don't know --

15        MR. FINKELSTEIN:  The one specific is related to

16   Dr. Gibbons.  We don't believe that the Court --

17        THE COURT:  I thought Judge Young must have dealt with

18   that, right?

19        MR. FINKELSTEIN:  Well, no, he really didn't.  He just

20   summarily said "all motions dismissed."  He didn't --

21        MR. CHEFFO:  That's not accurate at all.

22        THE COURT:  Did he have a Daubert hearing?

23        MR. FINKELSTEIN:  No.

24        MR. FROMSON:  No.

25        MR. FINKELSTEIN:  No Daubert hearing, no written

1    decision, no analysis.  It was basically in chambers, summarily

2    denied all motions, so --

3            THE COURT:  So what is your view?  Did you have a

4    hearing on it?

5            MR. CHEFFO:  There was no hearing, but there was a

6    situation where -- and they raised this with Judge Young.

7    Basically there was a motion filed.  It was docketed under the

8    general MDL number.  It then went to Judge Young.  He ruled on

9    it.  They came back, and my recollection is, it was then sent

10   under the Shearer case to Judge Young, of which he ruled.  He

11   made a number of rulings, some for us, some against us.  So,

12   you know, the fact that he didn't issue a 50-page decision --

13           THE COURT:  Let me say this:  I view it as one of my

14   responsibilities as an MDL judge not to dump this on some poor

15   unsuspecting court so all these judges will hate me.  Just if

16   there's something that -- it is not currently pending on my

17   docket because, if you remember, you settled the case, so it's

18   never been posed to me as a crosscutting, and then I never --

19   you sort of -- someone mentioned it during Shearer, but then I

20   transferred it.  So if I should do it before I send it -- I'm

21   planning on sending this back as soon as the discovery is over

22   in September.  I'm sending them all the way back.  And so if by

23   then I need a dispositive something, you should just send me a

24   letter and tell me what docket numbers I should be reading, and

25   I'll do it.  And I'm likely not to -- a lot of it really was

30c0540d-85bd-4576-830f-d61b34303d63

1   this tit-for-tat on "Is it is timely?  No, it isn't."  That's

2   all gone.  I mean, this is just not so old.  It's going to

3   be -- whatever is there on the merits is what I'm going to get

4   to, and if I don't remember it, I'll, I'm sorry, ask you to

5   come back and help me with it.  But I think you should just tee

6   it up for me so I have what it is that I need to be doing if

7   it's currently pending.  If it's a brand-new motion, I'm not

8   taking it at this point.  Is there a second one that's

9   brand-new?

10      MR. FROMSON:  When Mr. Finkelstein mentioned two, it's

11  really more of a general approach, in that we believe you

12  should be addressing what you call crosscutting issues so that

13  the same motions are not being brought in limine in District

14  Courts all over the country, simply --

15      THE COURT:  Like what other than Gibbons?

16      MR. FROMSON:  Well, for example, the guilty plea and

17  admissibility of it, the revised labeling change, the

18  admissibility of evidence in terms of the FDA Advisory

19  Committee.  Essentially what's happening is, you made all those

20  decisions under the Bulger caption, some in our favor, some not

21  in our favor, but clearly what's happening is, the parties are

22  seeking second bites at the apple when they go to Judge Young

23  with those motions --

24      THE COURT:  Oh, sure.

25      MR. FROMSON:  -- and when they go to Judge Trager with

1    those issues.

2              THE COURT:  Both sides are, right?

3              MR. FROMSON:  But it's the same issue.  And as an

4    MDL --

5              THE COURT:  All right, let's put it right out there.

6    I don't have time between now and September to write -- there

7    were innumerable motions in limine.  You must have had between

8    the two of you forty?

9              MR. FROMSON:  Your Honor, that may be true.

10             MR. CHEFFO:  Summary facts specific also --

11             MR. FROMSON:  Well, if I may finish, your Honor.  As

12   an MDL judge --

13             THE COURT:  I'm not doing it.  I'm not ruling on forty

14   motions in limine.

15             MR. FROMSON:  Understood, but you've already ruled on

16   them.

17             THE COURT:  Then argue it to your heart's content.

18   I'm not writing forty opinions.  I do think when it's

19   complicated and scientific, not that some other judge wouldn't

20   be better at it than I am, but I've at least rolled up my

21   sleeves so far.  Like Gibbons, I think I did -- I don't

22   remember it now, or maybe I'm getting old, but, I mean, I did

23   at least have some sense of that debate.  That's different.

24   Any judge could deal with these, you know.

25             MR. FROMSON:  Well, with respect -- I'm sorry, may I

30c0540d-85bd-4576-830f-d61b34303d63

Page 15

1  continue, Judge?

2          THE COURT:  Oh, yes, yes.

3          MR. FROMSON:  At least with respect to the Gibbons

4  motion, and whether you come down favorable to the plaintiff or

5  favorable to the defendants, you'll do whatever you choose is

6  right, but that decision was summarily made by Judge Young

7  without the process of a hearing.

8          THE COURT:  Sure.  We have different styles, and I

9  write the mega opinion.  But by writing the mega opinion, it

10  means just a huge amount of work, and it means I'm not going to

11  do forty of them.  To the extent I've ruled -- and I think I

12  ruled summarily on a fair number of those motions in limine,

13  didn't I?

14          MR. FROMSON:  I didn't think it was your intention to

15  do so with Dr. Gibbons, considering you were --

16          THE COURT:  No, not with Gibbons, not with Gibbons.

17  On all these things, do you consider the conviction, I think we

18  have -- right?  My style, my business method is essentially

19  what we do is, we had a little argument, and I said "thumbs up"

20  or "thumbs down," and we went through them, right?

21          MR. FROMSON:  And then it's your intention and your

22  expectation, your Honor, that judges all over the country will

23  readdress those again and come up with ups or downs, and that

24  just doesn't --

25          THE COURT:  That's what happens in all these cases.

1          MR. FROMSON:  I don't think it does with common

2    issues.  The guilty plea is a common issue to all cases, the

3    issue of which an MDL judge can handle once and for all.  It

4    doesn't change whether we go to another district.

5          THE COURT:  Well, since I did handle it, I've handled

6    it, and if a judge wants to rule on it that way, they can.

7    There is a transcript of the thing.  You all are outstanding

8    lawyers, you're all excellent lawyers.  And if I remember

9    correctly, before Bulger, I had a pile, and I sort of said

10   "yes, no, yes, no" after oral argument.  I did have oral

11   argument.  I think I stated reasons on the record, but I didn't

12   write an opinion.

13         MR. FROMSON:  And you had the benefit of being the

14   most experienced judge on the issue, whereas other district

15   judges are being given these for the very first time without

16   having gone through any of --

17         THE COURT:  Right, so you can argue that when I

18   summarily ruled on it, but at this point I will write Gibbons.

19         MR. FROMSON:  Thank you, Judge.

20         THE COURT:  But then, once I'm done with Gibbons,

21   you'll write me a letter, both of you, like, what documents I

22   think -- or maybe what you could even do is -- I hate, we kill

23   so many trees --

24         MR. FROMSON:  Well, the motion, the ECF docket number

25   was 2121.  So if you look at that ECF number, that's when the

1   parties resubmitted the Gibbons motion for purposes of the MDL.

2           THE COURT:  2121?  With all the stuff?

3           MR. FROMSON:  Correct.  That's your guidepost for the

4   Gibbons motion.

5           THE COURT:  We will get to that.

6           MR. CHEFFO:  The only thing I would say, your Honor,

7   and I'm not faulting him, but I didn't really know that that

8   was on the agenda today, so I haven't looked at 2121, when it

9   was filed, so I would just like --

10          MR. FROMSON:  October, 2009.

11          MR. CHEFFO:  Right, I would just like the opportunity

12  to maybe look at it if there's something that I think you've

13  since -- in the last eight months, you know, we might want to

14  supplement, I'd like your Honor to have that.

15          THE COURT:  Sure.  And for that matter, I may need

16  another hearing if a lot has flowed in since.  I don't remember

17  it very well, but I do think it's within my hunt.  And I'm not

18  ruling on the motions in limine.  But once I do that and once

19  the discovery is done -- what's it, the end of September?

20          MR. CHEFFO:  There will be cases done the end of

21  September, I think, you know, where doctors and everything

22  else, so --

23          THE COURT:  What I'm going to do is send you to

24  mediation in October, and then, if that works, that works.  And

25  if it doesn't, after you've given it a good-faith effort -- now

1    that I know that Pfizer is actually settling for money, it is

2    worth an effort -- before there was not a penny on the table --

3    if it doesn't work, fine.  I mean, I've done my job as an MDL

4    judge.  I will send this out.

5              MR. FROMSON:  May I make another comment, your Honor,

6    on management of the --

7              THE COURT:  Yes.  Who do you want?

8              MR. FROMSON:  I'm sorry?

9              THE COURT:  What mediator do you want because you need

10   to start lining --

11             MR. FROMSON:  I think the parties should probably

12   confer on it.

13             THE COURT:  -- him or her?  Do you want a magistrate

14   judge or do you want -- I think somebody who's experienced with

15   these big product liability cases.

16             MR. FROMSON:  I agree.  I think the parties are also

17   privy to a number of judges retired or still on the job that

18   could probably entertain a mediation.  I don't think that's not

19   out of the realm of possibility.

20             THE COURT:  Who did the big case?  Did anyone mediate

21   that so they understand the Neurontin issue?

22             MR. CHEFFO:  I mean, again, we can talk off the

23   record, your Honor, but these were done very informally lawyer

24   to lawyer.  That's why, you know --

25             THE COURT:  Sure.  So why don't we do this:  Why don't

30c0540d-85bd-4576-830f-d61b34303d63

1  you both within a week -- you'll work out all the important

2  discovery issues with Magistrate Judge Sorokin, but within a

3  week, tell me who you've agreed upon for a mediator for

4  October, because basically you'll either be done or virtually

5  be done with everything by then.  I don't know -- before I send

6  this back to the hinterlands, I will have ruled on Dr. Gibbons.

7  I'm not sure if that's going to be a deal breaker one way or

8  another.

9          MR. FROMSON:  I don't think so, Judge.  May I also

10 comment on another issue of management of the cases going

11 forward?

12         THE COURT:  Can I just say, give me a drop-dead date,

13 if you will, of dismissing whatever cases you're going to

14 dismiss so we know which forty they are.

15         MR. FROMSON:  I believe that within the next 30 days,

16 we'll be able to get all the responses back from clients or get

17 responses back from plaintiffs who do not agree to dismiss, and

18 then we would ask to make an application to be relieved as

19 counsel from those cases, so within --

20         THE COURT:  So within 30 days, you create a list for

21 me of, "Yes, I'm dropping --"  Well, actually, Judge Sorokin

22 did this last time, so it can be for him, "Yes --"

23         MR. FROMSON:  He can handle it like he did the

24 certification.

25         THE COURT:  Yes, exactly right.  "Yes, I'm dropping."

30c0540d-85bd-4576-830f-d61b34303d63

1    And he could set a different date, but my anticipation, it

2    would be something on the line of 30 days:  "Yes, I'm dropping,

3    Yes, I'm keeping," or, "We're going to move to withdraw."  I

4    think that would be useful.

5              MR. FROMSON:  Thank you, Judge.

6              THE COURT:  So at the very least, we'll have forty

7    cases going to a mediator or something in that ballpark.  We'll

8    see if there's a dollar figure that makes sense, and if not, at

9    the end of that process, whatever hasn't settled -- am I wrong,

10   maybe settle as a group rather than one by one, or not

11   necessarily?

12             MR. FROMSON:  It could be either.

13             MR. FINKELSTEIN:  It could be either.

14             THE COURT:  I'll send back what's left.

15             All right, so now I've got the second issue which is,

16   I've got hundreds --

17             MR. FROMSON:  I have one more you offered that I could

18   talk about after you --

19             THE COURT:  Yes, go ahead.

20             MR. FROMSON:  In terms of managing the cases forward,

21   the Manual For Complex Litigation afforded the parties the

22   right to come to you and find a way to efficiently go forward

23   with these cases, and there are hundreds.  We can't expect the

24   general causation experts to come back forty, fifty, sixty

25   times at trials, and we would ask to make an application in

1    writing --

2           THE COURT:  There are different kinds of causation.

3           MR. FROMSON:  I'm sorry?

4           THE COURT:  There are different kinds of causation.

5           MR. FROMSON:  Oh, just the generic experts, your

6    Honor, Drs. Blume, Dr. Trimble, Dr. Kruszewski, we would want

7    to do their preservation depositions for trial purposes so that

8    they don't have to come into court time and time again and say

9    the same thing.  We're not talking about case-specific experts.

10          THE COURT:  Well, you haven't filed any motions.

11          MR. FROMSON:  No, but we just came today because as

12   far as this status conference was concerned --

13          THE COURT:  Yes, but I'm giving you the guillotine in

14   the fall.  In other words, it's either got to settle or I'm

15   transferring it.  I don't want to start with a whole new round

16   of motions.  I have never done something like that, which is

17   ordered that a video trial deposition has to be admissible in

18   someone else's courtroom.  I can order that it be made and then

19   leave it up to the discretion of each trial judge as to whether

20   or not to accept it.

21          MR. FROMSON:  Well, your Honor will make -- in the

22   past you've said no emergency motions.  So if it's okay, we'll

23   make it not by emergency but we'll make the application in

24   writing for that purpose.

25          THE COURT:  Well, it was just when everything was

1    called an emergency motion.  You know, it's just like the boy

2    who cried wolf, so --

3            MR. CHEFFO:  And I'll address that, I guess, when they

4    file it.  I think that I've never heard of anything like that

5    either.  I mean, what they're trying to do is basically put a

6    case in a box for all time, and these cases can go on for

7    years.

8            THE COURT:  I know, but it is unfair to expect --

9            MR. FROMSON:  His own client does it now in the

10   Prempro hormone therapy litigation MDL.  So maybe he hasn't

11   heard of it, but they do it right now.

12           MR. CHEFFO:  Well, from what I understand -- okay, I

13   haven't seen their motion.

14           THE COURT:  I am inclined, without hearing the

15   briefing, to be open to a motion that asks me to do that, which

16   should be filed when?

17           MR. FROMSON:  Your Honor, we could probably file it

18   within twenty-one days.

19           THE COURT:  Fine, with an opposition period that comes

20   in.  I would be receptive to requiring that one be made but not

21   receptive to ordering any other judge to decide whether it's

22   admissible or not.  It would save both sides a huge amount of

23   money, and it would make these cases triable.  There are

24   hundreds of them.  However, I've seen some of these cases.

25   These cases often don't ride on the general causation issue,

1    although I know Pfizer and you have big battles over that.  A

2    lot of it is, why did someone commit suicide?  That's just a

3    very difficult individual causation issue, and that's what I

4    can't do anything about.  That goes person by person, and the

5    guy who gave the autopsy is going to have to be done

6    individually in someone's courtroom.  If you have these

7    Gibbons-type people who are giving the same testimony every

8    time about what the --

9           MR. FINKELSTEIN:  The frequency rate.

10          THE COURT:  -- the frequency rate, all the statistical

11   stuff, I don't know even know if listen anyway.  I mean, you

12   know, it's very dry scientific stuff that's more for an

13   appellate court than it is somewhere else.  I would be very

14   sympathetic to having that preserved, up to the discretion of

15   any judge as to whether or not to use it.  And it would be in

16   your interest at some point too.

17          MR. CHEFFO:  Again, and maybe I did speak too soon.  I

18   thought they were trying to have something a little broader

19   than that.  Again, I haven't seen their papers, but as your

20   Honor articulated it, to the extent that there are kind of

21   cut-specific issues that can be done, I think it's something

22   I'd like to think about, and we probably would entertain

23   because we both have the same cause.  But I think, you know, it

24   has to be -- the devil's in the details, if you will,

25   sometimes, you know, what's general causation, if it morphs.

1    But there may be some parameters --

2         THE COURT:  So why don't you talk first.  It may just

3    be -- I'm talking more about the general scientific issues.

4         MR. FROMSON:  That was our concern as well, Judge.

5         THE COURT:  You know, the doctor who is so learned

6    from England; Dr. Gibbons, the statistician that you have.  I

7    mean, that makes a lot of sense.  But not the guy who does the

8    suicide autopsy, that kind of thing, very specific to the

9    individual person.

10        Okay, so I've now cleaned up this little package, and

11   now you all have been ignored for a long time but no longer.  I

12   want the case done.  What have you all -- and I'm going to

13   leave it to Judge Sorokin to figure out what the discovery

14   schedule will be, but you're going to start spending time and

15   money.  Have you started focusing on whether you're going to

16   proceed with every single case?

17        MR. HARANG:  On our behalf, your Honor, we have

18   already eliminated probably two-thirds of the original people

19   that applied.  We're going back through that process --

20        THE COURT:  So you've actually dismissed out those

21   people?  They're looking physically.  See, I get to see a span.

22   Have you actually dismissed out those cases?

23        MR. HARANG:  Yes, ma'am.  Before they even came up

24   here, we cleaned that whole --

25        THE COURT:  Oh, before you came up here.

30c0540d-85bd-4576-830f-d61b34303d63

1          MR. HARANG:  Yes, ma'am.  We have 130, I believe, left

2     out of an initial group of probably 500.  So they have been

3     reviewed and weaned down, and we're going back through that

4     process again.

5          THE COURT:  Be ready to -- I mean, I'm pretty sure

6     that Judge Sorokin is going to kick start --

7          MR. HARANG:  I'm sorry?

8          THE COURT:  You need to start spending real money on

9     these cases.

10         MR. HARANG:  We have.

11         THE COURT:  Have you been just doing the discovery --

12         MR. HARANG:  Yes, ma'am.

13         THE COURT:  -- in any of them?

14         MR. HARANG:  Have we taken any discovery?  That's part

15    of what this order was.  There was a delay in doing that, your

16    Honor.

17         THE COURT:  Yes, but no more.

18         MR. HARANG:  I understand.

19         THE COURT:  So if you've got 130 cases you have to do,

20    like, in like six months, I mean, you -- the big issue I have

21    is whether or not I -- how many do you have, Mr. Boone?

22         MR. BOONE:  Your Honor, at the present time we have

23    307 cases.  There was actually over 400 cases.  We did not

24    certify over a hundred of those cases.  Per Judge Sorokin's

25    order, we have to meet certain requirements in order to certify

1  it, so we have, by not certifying them, as a practical matter,

2  dismissed over a hundred cases.

3       THE COURT:  Well, so let me just ask you this.  He's

4  going to set discovery schedules, so the big question is, for

5  both of you and for Pfizer -- you're now not Tier 2/Track Two.

6  I'm almost done with the rest, with almost everything else in

7  this case except you.  I can see the light at the end of this

8  tunnel, okay?  They can all go up on appeal.  We can have a

9  grand time, go out to the transferee courts, but I'm done with

10  everyone except you, where I'm just beginning.  And that was by

11  agreement, I understand it, but it's over.  So do you want to

12  mediate?  Do you want to simply have me send you all back for

13  discovery in your home states?  Do you want Judge Sorokin to be

14  supervising the discovery as we have in Tier 1?

15       MR. CHEFFO:  I mean, again, I think certainly your

16  Honor has ultimate jurisdiction --

17       THE COURT:  No, no, I'm leaving everything to him.

18       MR. CHEFFO:  Yes, but just so you know, we basically

19  submitted a plan.  So Pfizer's position was, we knew, you know,

20  because he said basically to us, there was no surprise, that by

21  the end of 2011, if not before, you know, you want to be done.

22  And he didn't give that out, that deadline.  But so we

23  basically said, you know, here's how we get up to November with

24  authorizations; there's still not authorizations that we

25  haven't gotten, but starting in November, Pfizer's position was

1   we should do thirty cases a month, not just depositions but

2   thirty cases a month Tier 1/Track One.  And then at that point

3   they'd be in the same or similar situation as the other cases;

4   they can then be remanded, you know, or something --

5           THE COURT:  Do you feel as if you have enough

6   information now to even do a mediation?  Let's suppose you --

7   you're all pretty far along, you're very sophisticated lawyers,

8   you've work together, you seem to get along, which is not

9   always the case in these trials.  I mean, let's assume you were

10  able to settle the forty, a guidepost.  I know how this

11  happens:  If this, then it's worth this.  If this -- do you

12  know enough to even apply that kind of a formula?

13          MR. CHEFFO:  I mean, the answer is, I don't even have

14  authorizations for the vast majority.  And, again, I don't want

15  to throw stone, but the answer is "absolutely not."  I mean, I

16  think that, you know, whereas -- and I think this is in the

17  fact sheets -- whereas, Mr. Finkelstein and Mr. Fromson's cases

18  are largely, they gear themselves to attempted suicide or

19  completed suicide cases, I don't think that's the case for the

20  vast majority of Mr. Boone's.

21          THE COURT:  Is that true?  Are yours suicide cases, or

22  are they other kinds of cases?

23          MR. BOONE:  We have attempted suicide cases.  Then we

24  have ideation cases.

25          THE COURT:  I'm learning about your cases for the

1    first time.  An attempted suicide, I understand most certainly

2    flows medical expenses and emotional distress.  So how do you

3    value -- how are you thinking of valuing an ideation case?

4           MR. BOONE:  An ideation case?

5           THE COURT:  An ideation case.  So, in other words,

6    you're saying that someone took Neurontin and then had suicide

7    thoughts basically, right?  Didn't do anything but had thoughts

8    about it, how does one value that case?

9           MR. BOONE:  Well, your Honor, our cases are not

10   premised just on the suicide ideation, but they're also

11   premised on the ineffectiveness of the drug.  In other words,

12   while they was taking Neurontin for back pain, they were

13   continuing to have the back pain because Neurontin wasn't

14   working, and they could have been taking a medication that was

15   not off-label that was more suitable for their problem.  And

16   also there's the mental and emotional distress associated

17   with --

18          THE COURT:  Well, how many are in each category?

19          MR. BOONE:  Well, I don't have them -- I can't tell

20   you from memory right now exactly how they break down, but the

21   majority of -- but, in fairness, your Honor, I would say that

22   at least 50 percent of the 300 represent ideation, ineffective

23   treatment -- in other words, the drug didn't work for them, and

24   they had to continue paying for the underlying condition -- and

25   the mental and emotional distress of learning that they were

1    taking an epileptic seizure drug for back pain or neck pain or

2    hip pain, or whatever off-label purpose they were given the

3    medication.

4        THE COURT:  Do you have doctors who say they wouldn't

5    have prescribed if they had known about the science for the

6    back pain?

7        MR. BOONE:  Well, the doctors -- we have not gotten to

8    the depositions, but the few doctors that I have talked to is

9    promising that, first of all, they didn't even know about this,

10   and certainly they would have shared it with the patient, and

11   the doctor and the patient would have made an informed decision

12   as to whether or not they should prescribe and whether or not

13   they should ingest that medication.

14       THE COURT:  Well, do you all agree that you want

15   Judge Sorokin to be managing the discovery in all of your

16   cases, what did you say through 2011?

17       MR. CHEFFO:  Well, whatever the number is, but I think

18   absolutely because otherwise, you know, there's four cases that

19   are -- I guess in certain states you're allowed to or you were

20   allowed to file a case number, and so of the 300 cases, I think

21   there's actually four cases, if you will.  I mean, the point is

22   that while your Honor has admittedly and undeniably done a huge

23   amount in the case, I think what we've all agreed going forward

24   is, to basically send back 300 people to one district or two

25   districts with no discovery being done, I mean, that would be

1    just kind of really inefficient.

2         THE COURT:  So I've got basically 437 cases where, as

3    I understand it, minimal, if any, discovery has been done.

4         MR. CHEFFO:  I think that's fair.  I mean, again,

5    there was fact --

6         THE COURT:  I understood this.  I mean, Judge Sorokin

7    and I have been talking all along.  This was clearly back

8    burner, but it is now moving front burner.

9         MR. CHEFFO:  Sure.

10         THE COURT:  So do you want to do the discovery in a

11    coordinated way here?  And then I would put you all to a

12    settlement process at the end of it, just as I'm doing here,

13    and then if it doesn't work, I'm going to spin you all out.

14         MR. BOONE:  Your Honor, may I say that the plaintiffs

15    have actually responded to defendant discovery as to all 307.

16    Now, there may be some supplements that need to be done, but

17    we've responded.  Now, the defendant --

18         THE COURT:  That response means what, you've given

19    them all the medical records per person?

20         MR. BOONE:  Well, we've given them all of the -- I

21    wouldn't say all, your Honor, but, you know, we were required

22    by interrogatory responses and also by certification to submit

23    medical records.  And we had to actually submit medical records

24    to establish that actual injection, off-label use, and an

25    injury; and if those three requirements were not met, we could

1    not certify the cases.  So we have submitted all of those

2    records to establish that already.

3              THE COURT:  You haven't seen anything yet.

4              MR. BOONE:  Oh, I understand.  Oh, I understand.  I

5    understand.

6              THE COURT:  You've seen nothing yet.  So I'm going to

7    leave that to Judge Sorokin, but what I am planning to do is, I

8    am going to hold you to a firm deadline.  We are going to get

9    most of the discovery -- well, all the discovery done that we

10   did in Track One/Tier 1.  We're going to hopefully preserve

11   some of this testimony for the judges for the general causation

12   issues, if you will.  And then I'm going to have you mediate,

13   and then I'm going to spin you out.  But I'm not doing all the

14   motions for summary judgment on the individual cases.  It's

15   just too much.  Did the judge in Tennessee do her own under

16   Tennessee law?

17             MR. CHEFFO:  Yes, she did.

18             THE COURT:  Because it turns out that every

19   jurisdiction is really different in how they do it, and it's a

20   huge burden on the case.  Are all of these people all from

21   Mississippi, 307?

22             MR. BOONE:  Yes, your Honor.

23             THE COURT:  My goodness.  And the 130 are from

24   New Orleans?

25             MR. HARANG:  No, no, your Honor.  They've been

30c0540d-85bd-4576-830f-d61b34303d63

1   referred in from, I think, seven different districts.

2          THE COURT:  Seven different districts.  Are they all

3   part of the same case number?

4          MR. HARANG:  I believe so, your Honor.

5          THE COURT:  How did that happen?

6          MR. HARANG:  They came before you whether or not they

7   were filed in different districts.

8          THE COURT:  But in different Federal District Courts?

9          MR. HARANG:  Yes.

10         THE COURT:  It's not just Louisiana.  It's also -- oh,

11  I see.  So I'll be sending them out to -- so it's not as big a

12  problem for you as it is for some poor Mississippi judge who

13  gets 307, right?  How many judges -- I'm sorry, I should know

14  this -- how many federal judges are there in Mississippi?

15         MR. BOONE:  Five?

16         MR. HARANG:  I believe five, maybe six.

17         THE COURT:  They're each going to get 60?  We have to

18  think about this.

19         MR. CHEFFO:  Again, and I don't want to speak, but

20  that's where I think -- you know, I can't sit here today and

21  kind of project to the future.  If histories guides itself, I

22  think, you know, we will hopefully come to a point when we get

23  to some discovery, some documents, you know, that people look

24  at the cases and there is information that sheds light on, you

25  know, why we have sophisticated lawyers here who have been

1   incredibly zealous advocates, and they come to a conclusion for

2   whatever they do.  And I think that we can all benefit by the

3   process once Mr. Boone and Mr. Schwartz have an opportunity to

4   see what the cases are about.

5          THE COURT:  Maybe I'd talk to Judge Sorokin or maybe

6   you could suggest it to him.  What if we did something like

7   this.  I mean, 437 cases are a lot of cases left, and they have

8   just been lying dormant to work out all these other issues.  I

9   want all of the discovery done on all of them, but should you

10  fast-track five of them and get them to Mississippi early so

11  that there could be a reality check here for both sides?

12         MR. CHEFFO:  We are doing that because in the first,

13  this wave, not in the initial Tier 1 but the 40 cases, there

14  was 80 cases from Ken, Ken's cases, but they also included, I

15  think, 10 cases from Mr. Schwartz and 15 now from Mr. Boone, so

16  there are about 20, 25 cases plus a few others.

17         THE COURT:  Okay, that I can just send back to

18  Mississippi or wherever, Louisiana.  All right, so I don't have

19  to worry about that.  There will be hopefully some quick trials

20  on some of these if they're not settled.  All right, but if

21  they all do settle, I would suggest you think about that for

22  your cases at all.  I can't flood the -- I shouldn't use that

23  word these days -- I can't overwhelm the Mississippi and

24  Louisiana courts this way.  I think we need to do it now.  And,

25  frankly, you have a little law firm, right, Mr. Boone?

1          MR. BOONE:  Yes, your Honor.

2          THE COURT:  How many people in your law firm?

3          MR. BOONE:  Well, I'm the only attorney at this time,

4   your Honor.

5          THE COURT:  How --

6          MR. BOONE:  Your Honor, we're up to date on

7   everything.

8          THE COURT:  Okay.  How big is your firm?

9          MR. HARANG:  We've got six, seven lawyers, your Honor,

10  and a fair number of paralegals.

11         THE COURT:  So I know you go see Judge Sorokin now,

12  but he's going to handle discovery on your cases.  And, ideally

13  speaking, he and I will touch base at the end of this.  And in

14  the interim, I will probably set up a motion hearing on the one

15  Massachusetts case that's left, and either grant summary

16  judgment or deny it and set a trial date.  Is that one of your

17  cases, Dorsey?

18         MR. FINKELSTEIN:  No, your Honor.

19         MR. CHEFFO:  Mr. Perry, Tim Perry, I think he only has

20  one case, or I think it's his only case.

21         THE COURT:  I just don't know.  I haven't even looked

22  at it.  So that isn't part of this whole cluster here, as I

23  understand it.

24         MR. CHEFFO:  I think it's separate and apart from

25  that, your Honor.

30c0540d-85bd-4576-830f-d61b34303d63

1    THE COURT:  Okay.  So I'm not even sure I got it under

2    the rubric of the MDL.  It may have just been deemed a related

3    case under our local rules.  I'm not sure.

4    And you're going to be getting me the name of the

5    mediator?

6    MR. FINKELSTEIN:  We will, your Honor.

7    THE COURT:  I will be looking at 2121, and you can let

8    me know if there's something else that I need, right?

9    MR. FINKELSTEIN:  Does your Honor have any preference

10   in a mediator or you'd leave it right to the parties?  We're

11   fine.  I just while we're here thought I'd ask.  I'm sure we'll

12   be able to work it out.  We've never had this conversation, but

13   based on our history, we should be able to work it out.

14   MR. CHEFFO:  Yes, I don't see a problem.  I know your

15   Honor has indicated, you know, Eric Green in the past; and by

16   full disclosure, he's my evidence professor, so I know Eric,

17   but, you know, I don't --

18   THE COURT:  He can call you on it if you get it wrong:

19   "I didn't teach you that."

20   MR. CHEFFO:  And he will, I'm sure.  But I don't think

21   there will be a problem with us, you know, agreeing with it.

22   Again, you know our position on mediation, but we're not -- you

23   know, you've asked us to go --

24   THE COURT:  But the truth is, you've moved.  There was

25   not one penny on the table for the longest time, and you've

Page 36

1   started settling some of these, so it's worth the effort.

2            MR. CHEFFO:  We will absolutely do it, and we will

3   come up with a name.  I don't think that there will be a

4   problem with us talking about that.

5            THE COURT:  Terrific.  And Eric Green has done a great

6   job by me on what I'll call the Average Wholesale Pricing

7   Multidistrict Litigation, but, I mean, you know, he's not the

8   only person.  He's been terrific, but if there's someone else

9   you want, I don't have a preference.  But if you can't agree on

10  someone, maybe you each give me two or three names, and I'll

11  pull it out of a hat.  Or maybe what you do is, you say who's

12  the one on the other side who's least objectionable, and I'll

13  pull a hat out of, you know, the two of them because you've got

14  to basically --

15           MR. CHEFFO:  -- my partners I'd like to suggest.

16           THE COURT:  Huh?

17           MR. CHEFFO:  Just joking.

18           THE COURT:  Okay, so I should let you go because

19  Judge Sorokin is probably waiting for you.

20           MR. FINKELSTEIN:  Thank you, your Honor.

21           MR. CHEFFO:  Thank you, your Honor.

22           THE COURT:  Good to see you all again in our little

23  reunion here.

24           (Adjourned, 3:01 p.m.)

25

1                    C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )
5

6

7         I, Lee A. Marzilli, Official Federal Court Reporter,

8  do hereby certify that the foregoing transcript, Pages 1

9  through 36 inclusive, was recorded by me stenographically at

10 the time and place aforesaid in Civil Action No. 04-10981-PBS,

11 In Re:  Neurontin Marketing, Sales Practices, and Product

12 Liability Litigation, and thereafter by me reduced to

13 typewriting and is a true and accurate record of the

14 proceedings.

15      In witness whereof I have hereunto set my hand this 21st

16 day of June, 2010.

17

18

19

20

21              /s/ Lee A. Marzilli
                _____
22              LEE A. MARZILLI, CRR
                OFFICIAL FEDERAL COURT REPORTER
23

24

25

30c0540d-85bd-4576-830f-d61b34303d63