**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

HARDEN MANUFACTURING CORPORATION . CIVIL ACTION NO. 04-10981-PBS
    Plaintiff            .
                            . BOSTON, MASSACHUSETTS
        v.             . MARCH 22, 2010
                            .
PFIZER, INC., et al         .
    Defendants          .
. . . . . . . . . . . . . . . . .

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE LEO T. SOROKIN
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:  Jack W. London, Esquire
               Jack W. London & Associates P.C.
               3701 Bee Cave Road
               Suite 200
               Austin, TX 78746
               512-478-5858
               ecf@jackwlondon.com

               Archie Carl Pierce, Esquire
               Wright & Greenhill
               221 W. 6th Street
               Austin, TX 78701
               512-476-4600
               cpierce@w-g.com

               Kenneth B. Fromson, Esquire
               Keith Altman, Esquire
               Finkelstein & Partners, LLP
               436 Robinson Avenue
               Newburgh, NY 12550
               800-634-1212

               Mark S. Cheffo, Esquire
               Skadden, Arps, Slate, Meagher & Flom, LLP
               Four Times Square
               New York, NY 10036
               212-735-3000
               mark.cheffo@skadden.com
    Court Reporter:


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

*MARYANN V. YOUNG*
**Certified Court Transcriber**
**Wrentham, MA 02093**
**(508) 384-2003**

2

1                                    **I N D E X**

2    **WITNESSES**              **DIRECT**    **CROSS**      **REDIRECT**   **RECROSS**

3    **Defendant's:**

4    Dina Coffmin                            61           71

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                    <u>P R O C E E D I N G S</u>

2        CASE CALLED INTO SESSION

3            THE CLERK:  The Honorable Leo T. Sorokin presiding.

4    Today is March 22nd In re Neurontin 04-10981 will now be heard

5    before this Court.  Counsel please identify themselves for the

6    record.

7            MR. PIERCE:  May it please the Court, Your Honor, my

8    name is Archie Carl Pierce.  I'm from Austin, Texas and along

9    with Jack London I represent plaintiff Irene Barlow.

10           THE COURT:  All right, welcome.

11           MR. PIERCE:  Thank you, Your Honor.

12           MR. FROMSON:  Good afternoon, Judge.  Excuse my

13   hoarse throat, Kenneth Fromson, Finkelstein & Partners, on

14   behalf of the Steering Committee.  With me today is Keith

15   Altman of the Finkelstein law firm as well.

16           MR. LONDON:  And I'm Jack London.  And I'm with the

17   Barlow case--

18           THE COURT:  All right.

19           MR. LONDON:  --and I'm on the MDL Steering Committee-

20           THE COURT:  All right.  Nice to meet you--

21           MR. LONDON:  --so I'm the bipolar lawyer.

22           THE COURT:  --Mr. London.

23           MR. LONDON:  Thank you, sir.

24           THE COURT:  All right, be seated.

25           MR. CHEFFO:  Hello, Your Honor, Mark Cheffo.

*MARYANN V. YOUNG*
**Certified Court Transcriber**
**(508) 384-2003**

4

1          THE COURT:  Yep.

2          MR. CHEFFO:  And I'm here with my colleague Catherine

3  Arthur.

4          THE COURT:  All right.

5          MR. CHEFFO:  We actually, just to the extent that

6  Your Honor has any questions, Ms. Dina Coffmin, who you have

7  received an affidavit from, is also--

8          THE COURT:  Oh, okay.

9          MR. CHEFFO:  --here today.  She's not a lawyer but

10  she is an expert.  And--

11          THE COURT:  I'll believe her that people who aren't

12  lawyers also have many helpful things to say.

13          MR. CHEFFO:  More helpful I think.  And not to

14  preempt anything but we did just, I don't know if - we filed by

15  ECF a corrected version and I can talk to Your Honor--

16          THE COURT:  Why don't you give it to me.  I'm not

17  sure - was that today you filed it?

18          MR. CHEFFO:  Earlier today but it basically is--

19          THE COURT:  You've been busy.

20          MR. CHEFFO:  Yes, Your Honor, it's been a full day.

21          THE COURT:  Which paragraphs?

22          MR. CHEFFO:  Basically, Your Honor, the main issue

23  here is No. 3 and through inadvertence we basically, it talks

24  about the reviewing for relevancy was inadvertently stated as

25  it was part of the $23,000 number.

1          THE COURT:  Oh, I see.

2          MR. CHEFFO:  It really should've been part of the

3    $90,000 and we apologize for that, that inadvertent error.

4          THE COURT:  Okay.  All right, I got it.  Okay.

5          So let me just go over, before we get started.  So

6    let me just go over before we get started, so there's two sets

7    of motions, one that's ripe and one set that's not.  The ripe

8    motions are the, essentially there's two motions, motions to

9    compel one by plaintiff Barlow and one by the Steering

10   Committee and Mr. Cheffo you are, opposition and cross motion,

11   and essentially those three motions are all one issue really.

12   And then there's a motion – I was not unsympathetic by the way

13   Mr. Cheffo to your emergency motion to continue, but I didn't

14   really, truth be told I didn't come across it in the opposition

15   until last night and at the point it just seemed impractical.

16          The – you filed a motion, Mr. Fromson, in the

17   Shearer, applies to all products liability cases but the relief

18   you sought is with respect to the Shearer case--

19          MR. FROMSON:  Your Honor--

20          THE COURT:  --in terms of an adverse jury instruction

21   and a continuance in that trial.

22          MR. FROMSON:  Correct, in the imminence of that

23   case--

24          THE COURT:  Right.

25          MR. FROMSON:  --that's true.

6

1        THE COURT:  And so those, it seems to me that those

2   two questions since they're questions that really go to the

3   heart of the question of trial, either is it going to go

4   forward on Monday and if it does go forward what is it going to

5   be at the trial really for Judge Young to resolve.  And so at

6   least as it applies to the Shearer case whether that relief is

7   appropriate in the Shearer case.  I've already contacted Judge

8   Young's session.  I've alerted them to the motion so they know

9   about it and it seems to me that that's for him to address,

10   whether that relief is appropriate.

11        If there's, once the motions ripe I'm sensing from

12   your jumping up and down that, and the fact that you labeled it

13   as applying to all products liability actions you may see it as

14   applying not just to the Shearer action, that whatever Judge

15   Young does, whether he gives you everything you want or nothing

16   you may see it as an alive issue with respect to the other

17   products liability cases, is that--

18        MR. FROMSON:  Yes, I completely understand why you

19   would refer those two issues to Judge Young.  I think that

20   overall the motion needs to be addressed by yourself because of

21   your knowledge and experience in the overall litigation and

22   orders about which the order was drafted.

23        THE COURT:  Right.  So I'll wait.  I'm not going to

24   hear that, any part of that today.  I'll wait first to give

25   Judge Young a chance and also because the defendants haven't

7

1   had the opportunity yet to respond and so once that happens

2   then we'll see where we are.

3          All right, so I'll hear, I guess I'll hear from the

4   plaintiffs first cause they sort of began this issue.  And one

5   thing I'll tell you that will be helpful to me is I'm a little

6   unclear, notwithstanding all the briefing, exactly what things

7   we're talking about.  I understand what cost shifting is and I

8   know that essentially it's a dispute over who pays for this

9   whole process, but exactly which things this is applying to and

10  not applying to and the like and what we're talking about would

11  be one thing to pay attention to.  It would be helpful to me.

12          MR. PIERCE:  May I please the Court--

13          THE COURT:  Go ahead.

14          MR. PIERCE:  --I'll address that directly, Your

15  Honor.

16          THE COURT:  All right.

17          MR. PIERCE:  The discovery we're seeking in this case

18  is the core discovery as I understood that was ordered by this

19  Court.  The core discovery that relates to the treating

20  physicians of my client, plaintiff Barlow, and those Pfizer

21  representatives, particularly sales representatives that called

22  upon those treating physicians.  And--

23          THE COURT:  So essentially it's the discovery that's

24  the centerpiece of this dispute in your view, the template

25  interog, we'll call them interrogatory responses but the

1   template interrogatory responses and document requests that

2   each side is going to do with respect to each products

3   liability plaintiff and then the core depositions of the

4   plaintiff or administrator depending on the circumstances, the

5   doctor or doctors that prescribed the Neurontin and the sales

6   reps that detailed the doctor or doctors.

7           MR. PIERCE:  That's correct, Your Honor.  That's my

8   understanding.

9           THE COURT:  Okay.

10          MR. PIERCE:  And that's--

11          THE COURT:  So we're not talking about--

12          MR. PIERCE:  --what we have solved--

13          THE COURT:  From your perspective we're not talking

14  about discovery above and beyond that that you're looking for?

15          MR. PIERCE:  No, Your Honor.

16          THE COURT:  And whatever this dispute pertains to

17  from your perspective it pertains to just those things?

18          MR. PIERCE:  That's right.  We're focusing in on the

19  treating physicians for my client and the people who called

20  upon those treating physicians and the communications that were

21  given or received by the drug company from those treating

22  physicians, very specific--

23          THE COURT:  The ones that prescribed Neurontin?

24          MR. PIERCE:  That's right.  It has to do with

25  Neurontin.  It's limited to Neurontin.

9

1          THE COURT:  Right.

2          MR. PIERCE:  That's what we're seeking but what we

3    got recently was a spreadsheet that identified some individuals

4    that called upon the treating physicians.  I assume they're

5    detailed men and women.  I don't know if they're medical

6    liaisons.  And we also got what I refer to as call notes,

7    screen shots of a visit by a particular representative to my

8    doctor, to my client's doctor.  And that's all we have received

9    to date in my opinion.  We know there's other information out

10   there.  For example, we have not received the articles,

11   publication and medical literature, if any, that were given to

12   those doctors.  We have not received the nature and extent of

13   any offers for or acceptances of preceptorships, which is a

14   term of art that Pfizer used where their salespeople or medical

15   liaisons would go with the doctor actually in an office visit

16   with one of their patients.  We don't have any information with

17   regard to Barlow's treating doctors of slide dex (ph), that's a

18   term we learned from Dr. Franklin that were presented to

19   treating doctors.  We don't have any information regarding the

20   nature and extent--

21          THE COURT:  So let me cut to the chase.  So as to

22   these various different things, these are things that at least

23   in other cases, I'm sure you all talk to each other, you've

24   seen produced with respect to, I don't remember now was it

25   Huberman that went to trial last summer briefly or--

10

1          MR. FROMSON:  Bulger.

2          MR. CHEFFO:  Bulger.

3          THE COURT:  Bulger.  Bulger that went to trial last

4    summer.  Are those are the kind of things that you saw in that

5    case - and this is really a fight over cost shifting, right--

6          MR. PIERCE:  Well there's--

7          THE COURT:  --and production.

8          MR. PIERCE:  To answer your question about other

9    things in other cases from the call notes that they gave us we

10   know that some of this stuff it exists it the Barlow case.  For

11   example, one of our treating doctors is Dr. Flowers.  And one

12   of the call notes said he was given an invite to the Gelblum,

13   G-E-L-B-L-U-M, program for August 31st.  Another call note says

14   set him up for dinner.  He was set up for dinner for September

15   17th.  Another call note says he was given a Crested Butte ski

16   information.  And another call note says he had committed to

17   doing a preceptorship.  So we don't know, we don't have any of

18   the information that we know things happened with this

19   particular doctor and the other three or four doctors--

20         THE COURT:  So what did they tell you about that?

21         MR. PIERCE:  We don't have anything.  They tell us,

22   they tell us they've given us all they can give us.  And their

23   position is it's minimally relevant and you need to pay for it.

24   And our position is it's not minimally relevant.  It goes to

25   the core of our case.

1          THE COURT:  So they told you they had it and they'll

2     give it to you if you pay for it?

3          MR. PIERCE:  Exactly, Your Honor.  And we don't think

4     it's appropriate under the *Zablocki* case factors we've cited to

5     you.  That that cost be shift to us and we go against the

6     traditional rule especially in this case where their conduct is

7     criminal, and we're looking for the evidence that we know they

8     have of their criminal conduct that caused my client to get

9     their drug.  And they're saying we have it but we want you to

10    pay for it.

11          THE COURT:  So the response, just let me see if

12    understand correctly.  So you've got the answers to the

13    template discovery.  You've received answers, whether or not

14    they're satisfactory in your view you've received answer for

15    the template discovery.

16          MR. PIERCE:  That's correct.

17          THE COURT:  And--

18          MR. PIERCE:  I've received a lot of objections and

19    very limited information.

20          THE COURT:  All right.  And so in those, and one of

21    the things you received as part of that was the call notes

22    which are the notes, the screenshots of the call notes which

23    are the phone calls between the reps and the treating

24    physicians who prescribed Neurontin to your client.

25          MR. PIERCE:  That's what I call the call notes.  I'm

12

1  not sure we agree.  They may define call notes as a little

2  more broadly but that's what I call them.

3          THE COURT:  All right, but at least for our

4  discussion that's what you call them.  You received some

5  document that seems to reflect conversation, notes of

6  conversations by a sales rep with a Neurontin prescribing

7  physician for your client.

8          MR. PIERCE:  That's correct, Your Honor.

9          THE COURT:  All right.  And in those notes those

10  notes indicate or suggest that various other things we're going

11  to happen between Pfizer and the doctor including for example,

12  a preceptorship or a presentation of a slide show to the doctor

13  or something else.  And based upon those notes therefore you

14  reason that there are these, there's information about these

15  other things there.

16          MR. PIERCE:  Correct.

17          THE COURT:  And they, and you think those are

18  particularly important to your case.  They think they're less

19  important and they say we'll give them to you if you pay for

20  them.

21          MR. PIERCE:  That's correct, Your Honor.  I believe

22  that summarizes one of the issues.

23          THE COURT:  All right.  So that's one issue.  What's

24  the next issue?

25          MR. PIERCE:  Well with regard to the nature of the

13

1    information sought that is direct communications by sales

2    representatives.  And again I don't know if that includes

3    medical liaisons.  Maybe they can represent to me what they

4    gave us was not only detailed men and women but medical

5    liaisons.

6            The second thing is we're looking for direct

7    communications other than through the sales reps.  In

8    particular, we know that these doctors many times they may ask

9    for it or the company may generate what is called a doctor's

10   request form for medical information and that's their claim

11   basis for these medical liaisons to go off label market

12   Neurontin because it's a request from the doctor.  This may go

13   outside the sales reps direct company communications,

14   continuing medical programs that might be outside the sales

15   reps but are communications between the drug company and my

16   treating physicians.  What continuing medical education

17   programs did they attend if they were presented with this

18   Neurontin information?  So basically it's the same issue but

19   it's communications from the company to my doctors or vice

20   versa.

21           THE COURT:  So it's not sales rep, it's company

22   communications to doctor.  And again it's their position you

23   can have it, you have to pay for it.

24           MR. PIERCE:  That's correct.

25           THE COURT:  All right.  Okay.

14

1    MR. PIERCE:  And just to make a final argument, we

2    don't think we should have to pay for it because they made $10

3    billion off of Neurontin.  My client is a homemaker who lives

4    off the retirement of her husband and for that reason alone

5    even if the money is what they claim it is, which I think Mr.

6    Fromson is going to dispute, they still should pay for it under

7    those circumstances.

8    THE COURT:  Okay.

9    MR. PIERCE:  Otherwise we're not going to get the

10   discovery.

11   THE COURT:  All right.

12   Sure, Mr. Fromson, I'll hear you now.

13   MR. FROMSON:  I think--

14   THE COURT:  And then I'll give you, Mr. Cheffo--

15   MR. CHEFFO:  I'm not sure I'll need to.  Apparently

16   they've stated all of my opinions for me.  Obviously I disagree

17   but--

18   THE COURT:  I understand.

19   MR. CHEFFO:  --we'll wait a few minutes till I get a

20   chance to talk.

21   MR. FROMSON:  Obviously Mr. Pierce is here and he

22   represents a microcosm of what I have to deal with, and then I

23   get the 30,000 quick view of the entire litigation as part of

24   the Steering Committee and so what we tried to do for you is

25   limit our motion, although we adopt his arguments, to request

15

1  No. 4, request for production No. 4 and the template request.

2  It's basically saying give us the custodial file of the sales

3  rep.  We want nothing more and nothing less--

4          THE COURT:  Uh-huh.

5          MR. FROMSON:  --than what the Track I plaintiffs had

6  the benefit of receiving.  And in fact as our motion

7  demonstrated there wasn't much given to us.  The three points I

8  simply want to make is that the discovery sought, just the

9  sales rep custodial files which include all the materials that

10  you and Carl discussed--

11          THE COURT:  So in your view Mr., Pierce, right?

12          MR. PIERCE:  That's correct, Your Honor.

13          THE COURT:  Mr. Pierce got some portion of the

14  custodial files.  That--

15          MR. FROMSON:  Actually--

16          THE COURT:  But not--

17          MR. FROMSON:  --he got none of it.

18          THE COURT:  None of it.

19          MR. FROMSON:  None of it.  What he got, what he

20  received were entries from a database which reflected the call

21  notes.  A call is a visit--

22          THE COURT:  Right.

23          MR. FROMSON:  So that's all he got.  And so the Track

24  I plaintiffs were able to receive--

25          THE COURT:  What would be in the custodial file?

16

1          MR. FROMSON:  Oh, a great question.  Email to and

2    from the company by the sales rep., journal articles, you know,

3    what journal articles is the sales rep. giving to doctors,

4    reprints of those journal articles, advertisements, souvenirs,

5    training materials.  Training materials, and granted we have

6    received training materials throughout the course of the

7    litigation generically but I don't know what John Doe sales rep

8    in Ohio or Texas had as a training material.  I need to know

9    what that sales rep had and, but I want to get to the, my

10   points are that the discovery we're seeking under the – he

11   mentioned *Zablocki*.  The discovery we're seeking is relevant.

12   I don't think there's any dispute to that.  They have

13   reasonable access to it.  They've had a litigation hold since

14   at least 1999 or 2000.  So they have the documents or they

15   should have preserved the documents and they haven't

16   demonstrated a burden sufficient enough to shift the cost upon

17   our shoulder which we're ready, willing and available to have

18   the expert or representative him on the stand today and

19   question her about it about the numbers that she crunched and

20   come up with her affidavit cause I think they're speculative if

21   not spurious.

22          The types of documents include as I said, the emails,

23   the advertisements.  But what's really important is also the

24   presence or absence of suicidal behavior information.  You see

25   if they have a 900 page custodial file, I think the largest

17

1   custodial file they gave to us in the Track I cases was

2   approximately 900 something pages, okay, of materials from a

3   sales rep.  It's really not incredibly big.  Sales reps don't

4   have much.  They have some training materials, some journals,

5   some email.  That's really about it.  I frankly don't know

6   about the need to redact in terms of a burden.  It's a journal

7   of the – it's advertising.  So there's really just not much of

8   a burden here.  Now there may be one or two sales reps for each

9   case in a litigation.  I understand that.  But overall you're

10  not talking about a burden that they can justify as shifting

11  the cost to us.

12          But the absence of suicidal behavior in those

13  custodial files or the presence of suicidal behavior

14  information in those custodial files goes to our claims of a

15  failure to warn the doctor.  Can you imagine if a sales rep has

16  information about suicidal behavior in his or her custodial

17  file and didn't share it with the doctor?  Similarly, can you

18  imagine if the sales rep has nothing about suicidal behavior

19  because our argument is that it's been suppressed, suppressed

20  since `92.  So the absence--

21          THE COURT:  It's a win-win argument--

22          MR. FROMSON:  I believe so.

23          MR. CHEFFO:  Yes, so no need to do the search.

24          MR. FROMSON:  And well the absence of evidence in

25  this case will show they failed to warn the doctor.  They can

18

1   make their defense in front of the jury.  But what's important

2   here is they have agreed to this method since 2004, all right,

3   with Davis, Polk & Wardwell.  He would have a stipulation in

4   writing; we're not looking to change the status quo.  And

5   essentially they're looking to change the rules of the game in

6   the fourth quarter.

7            I would like to let Mr. Altman lastly on our behalf

8   address the, what we believe are the problems or deficiencies

9   with Ms. Coleman's affidavit if I may, Your Honor.

10           MR. CHEFFO:  Can I--

11           MR. FROMSON:  And then we'll be complete.

12           MR. CHEFFO: I'll be glad to be more helpful for Your

13  Honor but I mean there's only one of me and there's four of

14  them so but I mean if you want him to talk, that's fine, or I

15  can address those.

16           THE COURT:  Why don't I let him but then you can--

17           MR. CHEFFO:  Sure.

18           MR. FROMSON:  You can--

19           THE COURT:  I think you're up to the task for

20  responding to all them notwithstanding a long day.

21           MR. ALTMAN:  Thank you, Your Honor.  Looking at the

22  defendant's claim of burden in this case I think they say it

23  cost $92,000 for the collection and production of information

24  and review for relevance and $24,000 for review for privilege.

25  And they produced an affidavit from Ms. Coffmin here which I

1   reviewed very carefully to see what was the basis of those

2   claims.  First of all just as a general proposition, the

3   thought of it costing $114,000 to produce a thousand pieces of

4   paper just doesn't seem to make much logical sense.  But I

5   looked at her declaration to see where she comes up with that

6   number.

7          THE COURT:  But wouldn't that depend on how many

8   documents you had to review and find the 114 pages?

9          MR. ALTMAN:  I agree.  And that would be interesting.

10  And so I took a look at Ms. Coffmin's declaration and she says

11  she would give a detailed explanation of how she came up with

12  these numbers.  The only problem is there's no detailed

13  explanation in here of how she came up with these numbers.  She

14  says she did these numbers by reviewing 32 custodian files to

15  come up with these numbers.  What 32 files did she review?

16  They haven't produced 32 sales rep files in this case so I

17  don't know which 32 people to date did she consider?  Did she

18  pick people that they produced a large custodial file on?  I

19  don't even know which 32 files that come up.  There's no way to

20  come and take her numbers here and figure out how you get to

21  $91,000.  But even taking here numbers actually put in here the

22  biggest custodial file they produced, and the only produced

23  custodial files for half the sales reps--

24          MR. FROMSON:  In the Track I case.

25          MR. ALTMAN:  --in the Track I cases.  You know we

20

1    looked at what we got.  Only about half of them had custodial

2    files.  The biggest one was 900 pages and the average was about

3    400 pages.  But I took the biggest one that they had and I took

4    her numbers here and she says – Your Honor asked a great

5    question, how much did they have to get through to produce the

6    900 pages.  Well Ms. Coffmin represented they produced 62% of

7    what they collect at point eight in her declaration.  So if

8    they produced 62% of what they collect and they gave me 922

9    pages, that means they collected about 1400 pages for the sales

10   rep which makes, which kind of makes sense when you think about

11   it.  That's about expected.  So following her numbers that she

12   prints here if it's 1,400 pages she says at the bottom here--

13          THE COURT:  What page are you looking at?

14          MR. ALTMAN:  --at the bottom of paragraph six.  I'm

15   sorry, at – she says at paragraph nine that it's 65,000 pages

16   of gigabyte.  Well 1,400 pages is about a fortieth of a

17   gigabyte.  She says at page six, at point six, $650 a gigabyte.

18   That's about $16.  She says it's $.04 a page to produce.  Well

19   they produced 900 pages, about $30.  That's about $50.  And

20   then even if you take the review time there we're talking a few

21   hundred dollars.  So I don't see how – the only part of this

22   puzzle that we don't have here is what did it cost for them to

23   collect the, get the 1,400 pages?  And according to what she's

24   saying here that's about 90 something thousand dollars to

25   collect 1,400 pages of files that they had an obligation to

1 | preserve since at least 1999. I just don't see where the math

2 | comes into play here. It just doesn't fit.

3 | And then even if you were to look at the burden here,

4 | they're trying to aggregate the burden and look at it all

5 | across all of the plaintiffs. When you're doing individual

6 | plaintiff cases here, and it's kind of unfair to say they

7 | shouldn't get the stuff because there's a lot of cases involved

8 | and there's a lot of plaintiffs involved, theses are one

9 | individual plaintiff cases. Each plaintiff is entitled to

10 | litigate the case on their own. So when you think about if the

11 | number is 500 and let's say you get five reps per plaintiff,

12 | which is more than what's been produced, you're talking about

13 | $2,500. They go out and they take 10 depositions, you know, 10

14 | case specific depositions of the neighbor and the next door

15 | neighbor. I mean you're talking about – and the medical

16 | records they order possibly--

17 | THE COURT: I got it.

18 | MR. ALTMAN: Okay.

19 | THE COURT: Okay.

20 | MR. CHEFFO: I'm going to--

21 | THE COURT: Mr. Cheffo?

22 | MR. CHEFFO: I'm going to address Mr. Altman's

23 | questions last because I--

24 | THE COURT: That's fine.

25 | MR. CHEFFO: I think he's actually, you know, he

22

1  knows better.  I'll say, Your Honor, I think he's, what he

2  just said is actually just gamesmanship.  He holds himself as

3  an expert on the discovery, and I think he's just

4  misrepresented absolutely to the core.  But let's start with

5  the more substantive issues.

6          You know, and I also disagree with counsel.  You know

7  you would think upon hearing this, and I'm, you know, just

8  trying to kind of bite my tongue here, you would think that all

9  of a sudden these guys know nothing about this litigation.

10  That this is one case and that there's never been discovery in

11  this case and, oh my gosh, this is the most critical

12  information in the entire world.  Well, you know, let's talk

13  about reality because you asked all the right questions which

14  are what do they have, what is this information.

15          We produced first of all something called the Merlin

16  database.  Not the documents but they have it.  Mr. Fromson has

17  the database.  They can - and so does Mr. Altman.  So literally

18  if you want to find out Cheffo sales rep you type it in and it

19  basically gives you a printout of where I went and all the

20  doctors I called with the call notes.  Now I understand, you

21  know, to be candid there may be some time parameters, you know,

22  occasionally you have to go back and - I'm not an expert on all

23  that issues, but the bottom line is for the vast majority they

24  first have the database.

25          So let's talk about, you know, what the case is

23

1   about.

2           THE COURT:  So those documents that Mr. Pierce refers

3   to about the notes of phone calls, those come out of the Merlin

4   database or they come from elsewhere?

5           MR. CHEFFO:  Well, Ken, I mean don't you have the

6   Merlin database?

7           MR. FROMSON:  Actually the database is simply visits

8   and annotations of visits that the sales rep made to the doctor

9   and they don't agree that what they gave me is authentic.  So I

10  can't even give it to Carl.  Because if I give it to Carl and

11  Carl says here it is.  They're going to go where did you get it

12  from?  Got it from Fromson.  Well we can't authenticate what

13  Fromson gave you so having a database with call notes is

14  useless for him.

15          MR. CHEFFO:  Okay, that's not true.  But the point

16  is--

17          MR. FROMSON:  No, I--

18          THE COURT:  Whoa, whoa, whoa, whoa, whoa.

19          MR. FROMSON:  But that's not--

20          MR. CHEFFO:  Let me - I think--

21          THE COURT:  Whoa, whoa, whoa, whoa—

22          MR. CHEFFO:  I gave you my--

23          THE COURT:  Wait.  Wait, wait, wait, wait.

24  Mr. Fromson, hold on.

25          MR. FROMSON:  All right.  Thank you, Judge.

24

1          THE COURT:  So in your view, Mr. Cheffo?

2          MR. CHEFFO:  Here's in my view, Your Honor, I just –

3    we need to understand where we're starting from.  Because I

4    mean again, if this was like there was no information, there

5    was no documents, this was a single plaintiff case, you know,

6    the equation would be totally different.  We probably wouldn't

7    be here for this.  But we both have to look at, just spend a

8    few minutes about what these folks have information to, what

9    we've produced and really how this critical information – you

10   would think that, you know, my gosh they could never try a

11   case.  In the Bulger case I don't even think any of this

12   information was even on their witness list.  So let's take a

13   step back for a second.

14          You basically have, they have access either through

15   us which we've produced or through the database to the call

16   notes and information.  Certainly they have all of the medical

17   records of their own clients.  Certainly they have the ability

18   to get the files of the treating physicians, whatever he or she

19   had.  Certainly they have an ability to depose the doctors.

20   Okay, that's one thing.

21          The second is, as part of this massive, there's

22   millions and millions, as Your Honor knows, of documents that

23   have been produced here so to say we have no idea about

24   marketing or promotion, all of it has been produced.  There's

25   been information that was produced, marketing materials across

1    the spectrum.  Now what I've heard is, well maybe there's some

2    email about a district manager that may have X, Y, and Z.  So

3    what we're really talking about is the needle in the haystack.

4    And we can talk about the $100,000 because it is a real number.

5    But I just want Your Honor to understand that, that this kind

6    of core information, this – and if somebody has a journal, if

7    you find out that a sales rep has a journal article in his or

8    her files, I mean I'm kind of at a lost, like what, you know,

9    why couldn't you ask the doctors?  At least first take the

10   deposition and find out, you know, were you called on, did the

11   sales rep ever provide any information to you, did you rely on

12   X, did you rely on Y?  I mean there can be accommodations in

13   all of this.  I mean I'm not here to basically say, Your Honor,

14   that there can be no compromise on some of these issues.

15       What I'm really here to say, Your Honor, is that we

16   have, you know, they're essentially trying to bludgeon Pfizer.

17   Yeah, Pfizer's a big company but at some point, you know, $10

18   million or more is a very big number that can certainly be

19   spent on things other than wastes of time because I think, you

20   know, what we put in our papers is the reason I think it's very

21   telling that the, virtually all of the productions I think Mr.

22   Altman, I take him at his word, the largest was 900 but most of

23   the pages are, you know, minimal productions, if any

24   productions.  And that's because what we have to do is collect,

25   in order to collect this information, the entire sales reps

26

1   database.  And then you have to look at it and review it based

2   on the search terms that are used.  So the fact that the output

3   is very small is telling.

4              THE COURT:  What's the sales person's database?

5              MR. CHEFFO:  Did I say database?  I meant--

6              THE COURT:  I thought you did.

7              MR. CHEFFO:  Maybe I did, Your Honor.  Many of these

8   folks are former, you know, employees or they go back and, you

9   know, I agree with them there's, you know, again I'm not a

10  computer expert here, but basically the real issue or the real

11  cost is email, you know, their email systems in archive.  So in

12  order to go get again Cheffo's, you know, they have to

13  basically collect the information.  Then you have to look at

14  certain search terms.  You have to go through it and review it,

15  you know, and that's really the cost.  And I think the most

16  telling point, I would not be here if we had collected, you

17  know, 50,000 pages of documents and we're producing 10,000,

18  20,000.  The point here is that it's largely duplicative.  You

19  certainly don't need this on every--

20             THE COURT:  When you say duplicative what do you

21  mean?

22             MR. CHEFFO:  Well it's going to be, you know the

23  information that they might have would be stuff that would have

24  been produced.  If they have sales training information, we've

25  given them in discovery broad sales training.  In other words

1    it's not created for one person, right.  If you're a sales rep

2    at Pfizer you go through the sales training.  If there's going

3    to be – they have these things called POAs, plan of action,

4    right, so – and they'll put out a whole new, you know, plan of

5    marketing.  They don't do it for Cheffo, you know, they do it

6    case wide.  So again, if there's individual or specific--

7         THE COURT:  So what you're saying is that say for

8    example somebody created a plan of marketing for the sales

9    reps, it may be the whole country, maybe it's for this region

10   or zone, the general discovery in the case does encompass

11   training materials and they would have the general plan.  It

12   may be that each sales rep received a copy of the plan.  So for

13   example sales rep No. 1 let's say who called up Mr. Pierce's

14   client may have a copy, may or may not still have a copy in his

15   or her custodial files and his copy there may not have

16   notations on it or they might have annotated it, they might

17   not.  But what you're saying is it's, the documents the same

18   document although it might or might not have their notes on it

19   if they put any notes on it.

20        MR. CHEFFO:  And that's a very good question too,

21   Your Honor, because what we're talking about here, and I think

22   that's kind of a harder, you know, argument for the defense,

23   you know, the notes.  But here what we're talking about is

24   electronic documents.  So the paper documents we're actually

25   giving them.  There's not really an issue to that.  So it's

28

1   electronic.  Now, you know, can someone theoretically write

2   notes to themselves and, you know--

3           THE COURT:  So what's the, the search to be done I

4   mean it's a search essentially for their email and for

5   documents they created in their word processing, in the folders

6   in which they save their word processing documents?

7           MR. CHEFFO:  Yeah, at home.  So it's basically

8   electronic media.  They look for, you know, hard drive,

9   personal computers, home drive locations, shared drives.  Now,

10  again as I said before, I am, you know, we think this is really

11  kind of not even dotting the Is and crossing the Ts.  This is

12  so far removed from the kind of discovery they need--

13          THE COURT:  Suppose the sales rep had email

14  communication with the doctor.  That would be – that would come

15  out of this, correct?

16          MR. CHEFFO:  I mean I suppose it arguably might but

17  I'm not aware, you know--

18          THE COURT:  Well arguably might.  Where else does it

19  come from?  Arguably, if not arguably from their email if he

20  had an email with the doctor, arguably where else would it come

21  from?

22          MR. CHEFFO:  Oh no, if there was a communication.

23  But again, my understanding and I can't speak for all documents

24  but, you know, remember we're talking about most of these cases

25  go back to 2000, you know, and prior and the information back

29

1    and forth is minimal.  I have not seen lots of communications

2    by emails between sales reps and doctors.

3              THE COURT:  Okay.

4              MR. CHEFFO:  That's just not the way it typically

5    works.  I can't tell you as an officer to the Court there's

6    never been an email with a doctor but typically they go--

7              THE COURT:  So if there's an email it would be in

8    their email files, but in your sense of the cases there are not

9    that many emails?

10             MR. CHEFFO:  Yeah.  I mean that's the thing you know,

11   we heard this giant, oh my gosh, we can't try the case.  And

12   I'm kind of arguing a negative, right, because you would think,

13   Your Honor, if this was so critical they would come in with a

14   stack of documents and say in those 10 cases this is the way it

15   should be done.  Here's what we absolutely could not have found

16   if we didn't try our case.  Here's what we used at the

17   depositions.  Here's what we're going to use at trial.  And the

18   point is they; you know what they asked - these sales rep

19   depositions are, Ken, and correct me if I'm wrong, 15 minutes,

20   30 minute phone depositions, okay.  And if you go back and we

21   did look at the 10 deposition transcripts or so that were taken

22   and all they talked about is basically they asked them a few

23   questions and then they asked them on the call note

24   information.

25             So what we're talking about here is doing these

1  unbelievably broad searches to get virtually no relevant

2  information in the cases.  They can tell you well it may be

3  here, it may be there, it may be over here but that hasn't

4  happened and yet and then they say well you did it before so

5  therefore you should go forever and, you know, the point is,

6  yeah, we went through.  You kind of live and learn.  Now we

7  have the benefit of looking back and say here's the incredibly

8  arduous task that we need to go through.  And we have hundreds

9  of sales reps, you know, that are scheduled to deal with this.

10 And they're not even willing to say let's take the depositions

11 first, let's ask the doctors and the sales reps, you know, did

12 you have communications with emails, did you do X, did you do

13 Y?  And then if that, I don't think again I would be here if a

14 sales rep said, oh, I regularly communicated with X, Y, and Z

15 and it was my practice to do, you know, all these different

16 things or the doctor said oh, yeah, every two days I got

17 electric, you know, emails from this person.  Really the point

18 here is just it's kind of a rule of reason.  We're saying

19 before - they're saying we won't even go in and take this 15 or

20 20 minute phone deposition unless you spend $100,000 per sales

21 rep to go and get the information.  I can go more specifically

22 but, you know I really want to be helpful to Your Honor, you

23 know and--

24          THE COURT:  So, just so I'm clear this isn't the

25 case, I wasn't sure when I read the papers, but this isn't the

31

1   case where the information that they're seeking, the

2   information that you're prepared to produce if they pay for it,

3   that's your position, is information that has already been

4   produced somewhere in the case.  It's not been produced in the

5   case.  It's not as if there's a Bates number that someone could

6   go look at or it's not as if there's a database.  There's some,

7   some discovery might be in a sense duplicative and there might

8   be a training material or a training plan or what have you

9   that's in someone else's file and if you produce the document

10  the documents the same.  The issue that's really being

11  produced, that they're, at least that they're interested in or

12  so they say is the fact that it is or isn't in this person's

13  file.  But we're not talking about things that are in a

14  warehouse or in a database or in a collection of documents that

15  have already been produced?

16          MR. CHEFFO:  That's correct.  In other words there's

17  no, we're not talking about any document that, you know, I

18  think there was, I think perhaps you just misstated that we

19  know exists.  In other words the fact that something might be

20  there, there's nothing that I know of.  In other words I'm

21  saying well I know it's over here but it's going to cost me X

22  dollars to go and get it.  My point is, you know, based on the

23  history of looking at--

24          THE COURT:  Your position is you just don't think

25  there's that much there and it's not worth all that it's going

32

1    to cost you.

2          MR. CHEFFO:  If anything.  And there's so many other

3    ways of getting at it, and even if you were to order us to do

4    it let's at least have a factual, you know, basis to say okay

5    Cheffo, I'll go back and now do it based on a few questions

6    that might establish it.  Because the other issue, and again I

7    don't want to take up too much of the Court's time, but, you

8    know, we've seen over time through no fault of counsel or

9    anybody else but, you know, just recently in the New York case

10   20% of the cases were dismissed and so--

11         MR. FROMSON:  Judge, I'm going to object to that

12   characterization.  They weren't done by motion.  They were done

13   by stipulation of the party.

14         MR. CHEFFO:  Okay, but you withdrew as counsel to

15   about 20% of the cases--

16         MR. FROMSON:  There were certain--

17         MR. CHEFFO:   --because you could not certify that

18   you were going to proceed.

19         MR. FROMSON:  That's correct.

20         MR. CHEFFO:  Is that more accurate?

21         MR. FROMSON:  I'd agree with that.  Thank you.

22         MR. CHEFFO:  Okay.  So they are now people who have

23   no lawyers because they moved.  Other cases have been

24   dismissed.  The point again is that in any mass tort, I'm not

25   being pejorative here, but, you know, if we were talking about

33

1   20,000 but we're talking, you do the math, Your Honor, we're

2   talking upwards of $10 million.  You know, that's money and,

3   you know, they want to talk about evil drug companies and

4   failings but we all know that drug companies spend that money

5   to do other things.  And there's a certain cost of litigation

6   that we have to bear.  There's no question about it.  But there

7   does come a point where you say is this $10 million really what

8   we should be doing in this litigation?

9          THE COURT:  So, I have a question about the numbers.

10  With respect to what Mr. Altman says, if it is correct and it

11  seems that as a general matter everyone agrees on this, that

12  there's somewhere between 22 and 1,000 pages that are produced

13  out of each of these custodians, at least that's what was

14  produced out of the custodians in the Track I cases, right?  I

15  mean this isn't the case where you have any reason to believe,

16  Mr. Cheffo, to the contrary, you don't have any reason to

17  believe that if you do these searches you're going to come up

18  with 40,000 pages or – in fact that's why you're here?

19         MR. CHEFFO:  That's exactly right.  And I – I'm

20  sorry.

21         THE COURT:  So if that's the case then run me through

22  Mr. Altman's ex., what's wrong with Mr. Altman's ex--

23         MR. CHEFFO:  Sure.

24         THE COURT:  As I understand Mr. Altman's explanation

25  he's saying look, 61% of the documents, 62% of the documents

34

1   rounding that were collected were produced, then you can work

2   backwards and so let's just call it 1,000 pages to round up it

3   may be.  And then so, you know, that means there's less than

4   call it 2,000, double it; there's 2,000 pages that were

5   collected, and 2,000 pages even in my limited experience with

6   my personal computer doesn't sound like lots of gigabytes.

7          MR. CHEFFO:  Sure.  And I think this is where I, you

8   know, I take issue.  And I know Mr. Altman has some, you know,

9   some experience with these, and I think that's where he's

10  played extremely fast and loose with the Court.  Let me tell

11  why.  Now here's the issue is, you know, and if you don't mind

12  I'm going--

13         THE COURT:  No.

14         MR. CHEFFO:  --to allow Ms. Coffmin to tell me if I'm

15  getting this wrong--

16         MR. FROMSON:  Your Honor, I would ask that if she's

17  not counsel of record and she's a witness--

18         THE COURT:  Is Mr. Altman counsel, I forget?

19         MR. FROMSON:  Yes, he is.

20         THE COURT:  Oh, I see.

21         MR. FROMSON:  That she would be sworn under oath and

22  take the stand.  It's not fair if we don't get to question her.

23  It's a--

24         THE COURT:  Well, first let me have Mr. Cheffo - he

25  can consult with her.

1          MR. FROMSON:  I agree, Your Honor, of course.

2          THE COURT:  Yes.

3          MR. CHEFFO:  I'm not - I'll do the talking.

4          THE COURT:  Right.  Yeah, you need a minute and you

5   want to talk to her, that's fine.

6          MR. CHEFFO:  No, I think I can give Your Honor, I

7   mean basically what we tried to do because, you know, we tried

8   to give the Court, you know, the best information that we had,

9   okay.  So we actually went out and hired, you know, an expert.

10  And I will tell you they cited something, I think it was a

11  hearing before Justice Friedman where, you know, I might have

12  said 10 to $40,000.  That's what I believed at the time.

13  That's what I was told.  And then in fact I mean they I think

14  kind of thrown some stones at me, but the fact is they were

15  better off with that number because when we actually hired an

16  expert we found out that that was, you know, there was more

17  basis for it.

18          So basically let's talk about there's, the big issue

19  is the amount that has to be collected, the gigabyte number,

20  okay.  And then that has to be, you know, harvested.  There's

21  certain costs that are not a lot of money.  But the really cost

22  is there's about I think $70,000 to review those documents.  We

23  went and looked just so--

24          THE COURT:  So of the $90,000 number, $70,000 is a

25  review--

36

```
1                    MR. CHEFFO:  It's--

2                    THE COURT:  It's probably review for relevance.

3                    MR. CHEFFO:  Relevance, that's correct, Your Honor.

4                    THE COURT:  Is that by some sort of lawyers,

5    paralegals or is that simply the cost of somebody doing the

6    searches that spits out the possibly relevant documents?

7                    MR. CHEFFO:  Well--

8                    MR. FROMSON:  Is that the, 2000--

9                    MR. CHEFFO:  It's a form but I--

10                   MR. FROMSON:  Your Honor, can I just--

11                   MR. CHEFFO:  Well can I just finish?

12                   THE COURT:  No, let Mr. Cheffo go ahead.

13                   MR. CHEFFO:  I think a few things, Your Honor.  One

14   is this was done under seal so there's no one in the courtroom

15   right now but I would just--

16                   THE COURT:  Well you have one person.  I don't know

17   who he is.

18                   MR. CHEFFO:  No, he's with us, Your Honor.

19                   THE COURT:  Oh.  All right.

20                   MR. CHEFFO:  But just this is--

21                   THE COURT:  You want me to seal this portion of the

22   transcript?

23                   MR. CHEFFO:  If we could when we talk about the

24   vendor so I can speak freely and the dollar amounts.

25                   THE COURT:  Yeah.  You don't, do you object?
```

37

1          MR. FROMSON:  Yeah, I do object, Your Honor.

2          THE COURT:  What's the basis for sealing?

3          MR. CHEFFO:  Well because I mean the basis for

4    sealing is Pfizer has proprietary accounts and information,

5    contractual information with its vendors and if I want to be

6    candid with the Court I don't--

7          THE COURT:  Oh, you mean like the numbers in here are

8    based upon inside contracts with other people who--

9          MR. CHEFFO:  Who may not want other people to know

10   about what their numbers--

11         THE COURT:  --what kind of deal they struck with

12   Pfizer.

13         MR. CHEFFO:  Sure.

14         THE COURT:  I see.  Why shouldn't it be, shouldn't, I

15   mean not sealed from you, but why shouldn't, should they have

16   to disclose that publicly?

17         MR. FROMSON:  I didn't really believe that their

18   contractual negotiations are of such public, you know, of such

19   serious import that the public can't, at least seen these in a

20   public courtroom like this.  I've just never heard of such a

21   thing.  Their contractual negotiation is so private.

22         MR. CHEFFO:  It's a - if you were the person giving

23   this information you don't want that, your competitors to know

24   the information.

25         THE COURT:  Why don't you just - the only thing

38

1    that's the competitive information is the price--

2              MR. CHEFFO:  Sure.

3              THE COURT:  --for whatever.  It's already in the

4    document.  I have the document.  You can point me to the--

5              MR. CHEFFO:  Okay.

6              THE COURT:  --document without mentioning the number.

7    Then we don't have to seal the transcript which is a little bit

8    awkward.

9              MR. CHEFFO:  Fair enough.

10             So basically you see the number that's for relevance.

11   There's a privilege review.  That's really, you know, the

12   biggest amount here.  So it's the collection.  And there's a

13   vendor, there's actually--

14             THE COURT:  No, the privilege review - I understand

15   the privilege review.  That's, essentially that's the law firms

16   or the contract lawyers or whomever does it, right?

17             MR. CHEFFO:  That's correct, Your Honor.  So the

18   first one - basically there's really two vendors before you

19   even get to the privilege review broadly.  They basically do

20   some of the collection and processing and that's the first two?

21             MS. COFFMIN:  Right.  So collection occurs.

22             MR. CHEFFO:  Collection occurs by one and then

23   basically processing.  And then there's another vendor that,

24   this is like the actual cost.  So in other words in order to do

25   the processing they send it to this particular vendor and they

1   go through all the documents and they send a bill.

2          THE COURT:  So start from here.  You have a sales

3   rep--

4          MR. CHEFFO:  Sure.

5          THE COURT:  --right, cause – and so the sales rep has

6   a, presumably was given a laptop by Pfizer, all right.  And so

7   that sales rep called upon Ms., is it Mr. or Ms. Barlow?

8   Ms. Barlow?

9          MR. PIERCE:  Ms.

10         THE COURT:  Ms. Barlow.

11         MR. FROMSON:  Ms.

12         THE COURT:  Ms. Barlow.

13         MR. FROMSON:  Mrs.

14         MR. PIERCE:  Mrs.

15         THE COURT:  Mrs. Barlow's doctor.  So, and either –

16   in one way or another it's getting produced.  Maybe I ordered

17   it, maybe they said they're willing to pay it and they wrote

18   you the certified check.

19         MR. CHEFFO:  Right.

20         THE COURT:  And so then the first thing – so what

21   happens?

22         MR. CHEFFO:  Okay.  They, that's the collection

23   process, right.

24         THE COURT:  So that somebody's got to get the laptop,

25   right?

40

1          MR. CHEFFO:  Yeah, and it's not just a laptop.

2    They, you know,--

3          THE COURT:  It's on the server.

4          MR. CHEFFO:  Broadly, but broadly electronic

5    information.  There's a collection--

6          THE COURT:  So somebody collects all those databases

7    which maybe is the outlook database from the laptop and

8    whatever equivalent on the server and ships them off to the

9    first vendor?

10          MR. CHEFFO:  Yes.  That's the collection.  And then

11   there's processing.

12          THE COURT:  So that's a price per gigabyte?

13          MR. CHEFFO:  Yes.  Yes, that's right.  And then

14   there's--

15          THE COURT:  And that price is in which paragraph?

16          MR. CHEFFO:  That's the processing.  That's the

17   second – do you have this chart, this one page, Your Honor?

18          THE COURT:  No.

19          MR. CHEFFO:  It says single custodian discovery cost.

20          THE COURT:  That wasn't in the Steele docket that was

21   filed.

22          MR. CHEFFO:  Oh, we don't have this, okay.  Do we

23   have--

24      PAUSE

25          MR. CHEFFO:  Do we have a copy?  Let me give one to

1  counsel and one to you.  I think this actually will be able to

2  save some time.

3          THE COURT:  All right.  So collection.  So the first

4  number there in this chalk that's the number for collection.

5  That's gathering all the - and that's a per gigabyte charge and

6  based on an estimate of how many gigabytes there might be.

7          MR. CHEFFO:  Yeah, the collection is an hourly--

8          THE COURT:  I see.

9          MR. CHEFFO:  An hourly--

10         THE COURT:  For someone to gather it up.

11         MR. CHEFFO:  Right.  And they basically I think put a

12 five hour number by a $125 or something.  Then there's the

13 processing--

14         THE COURT:  So that's literally just copying files or

15 extracting portions of databases?

16         MR. CHEFFO:  The human being goes and gets the

17 information.

18         THE COURT:  All right.

19         MR. CHEFFO:  Processing, okay, and this is strictly

20 a, this is $650 a gigabyte now, you know, again in the grand

21 scheme of life, Your Honor, I want you to understand all of

22 this but these are the smaller, these are the--

23         THE COURT:  I get it.

24         MR. CHEFFO:  -small costs.

25         THE COURT:  (Inaudible - #4:09:23).

42

1    MR. CHEFFO:  The volume is expanded by degree tiff

2  images.  This is what--

3       PAUSE

4    MR. CHEFFO:  It's .884 plus 2.4 per gigabyte.  So

5  this is .884 gigabytes per email and then 2.4 gigabytes for

6  ESI.  Then this is where it gets a little confusing, basically

7  collect the information then it gets expanded.  So what

8  happens--

9    THE COURT:  And then when you convert it to tiff, I

10  understand, it gets bigger.

11    MR. CHEFFO:  Okay, you're--

12    THE COURT:  All right.  I read that.

13    MR. CHEFFO:  Okay.  And then we go to the loading and

14  hosting which is basically--

15    THE COURT:  So that's processing.  Processing is

16  taking what you got, what somebody collected, and copy it onto

17  a DVD drive or a hard disc or what have you, wherever they put

18  it, and they convert it all into tiff files and that's the

19  processing charge?

20    MR. CHEFFO:  Yeah, that's generally after they do a

21  few more steps and then they, in order to prepare it for the

22  database.

23    THE COURT:  All right.  And that's the 600 - that

24  costs a price per gigabyte?

25    MR. CHEFFO:  Yes.

43

1          THE COURT:  All right.  And then you got to load it

2   into some system where you're going to be able to search it.

3          MR. CHEFFO:  That's correct.

4          THE COURT:  And then you also pay to host it.  That's

5   basically paying for them to keep it.  I have to tell you that

6   I negotiated a better deal for hosting than Pfizer from my one

7   personal computer at home to store data in the cloud then

8   Pfizer did.  They might want to--

9          MR. CHEFFO:  Well--

10         THE COURT:  That's a little business tip you can take

11  back.  I'm willing to give it to your clients too but that

12  seems like a, it's $30 a month per gigabyte seems like a steep

13  volume price.

14         MR. FROMSON:  Judge, by the way we've never seen this

15  before and we have some comments about it as well.

16         THE COURT:  I'm sure.  You'll have a chance.

17         MR. FROMSON:  All right.  Thank you.

18         MR. CHEFFO:  This is a chalk as I've learned they say

19  up here, and then the review is as I said these are, you know,

20  I think – these are estimates, Your Honor.

21         THE COURT:  I understand.

22         MR. CHEFFO:  We just don't stand – I mean--

23         THE COURT:  So that's, so basically the next number

24  on this is sort of the, is paragraph six.  It's the data you

25  collected.  It's been converted into TIFF file.  It's loaded

44

1    onto the database system which is going to be searched.

2    That's a separate vendor, the vendor who hosts it and searches

3    it.  And that includes the monthly charge to hold onto it

4    during the time period that, the life of the litigation.  And

5    that isn't too much longer the life of the litigation, is it?

6         MR. FROMSON:  You'd have to ask them.

7       PAUSE

8         THE COURT:  Now how does the relevance review happen?

9         MR. CHEFFO:  Yeah.

10         THE COURT:  So now you've got, I get it.  The first

11   three numbers I get.  That's the collecting it, putting it

12   together, putting it in a place to search it.  Now you have

13   all, you have the sales rep who called on Ms. Barlow's doctor.

14   You have all of his or her emails and word processing documents

15   and other pdf files that he or she might have had that got

16   swept up in the collection process in some place that is not

17   only stored somewhere but is also, electronically, but also in

18   some way can be searched, right.  That's then when you get to

19   the relevance review?

20         MR. CHEFFO:  That's right.

21         THE COURT:  And how does that happen?

22         MR. CHEFFO:  And then, and again I just want Your

23   Honor to understand a lot of these numbers are based on we went

24   to Pfizer and basically said, because there was a larger pool

25   of sales rep information not in the Neurontin litigation but

45

1   just, you know, it was other, it was sales rep typically

2   information.  So I think there was – it was a product liability

3   case.  That was the 32 custodians.

4          THE COURT:  All right, so 31 custodians, all right 32

5   custodians in a products liability case involving Pfizer but

6   not Neurontin?

7          MR. FROMSON:  A totally different drug.

8          MR. CHEFFO:  Well, yeah.  I don't – that's exactly

9   what I just said.

10         THE COURT:  You'll have your chance, Mr. Fromson.

11         MR. CHEFFO:  I mean, this is, there's no--

12         THE COURT:  Go ahead.

13         MR. CHEFFO:  There's no--

14         THE COURT:  He's not hiding the ball.

15         MR. CHEFFO:  I'm not trying to hide the ball at all.

16         MR. FROMSON:  You did until now.

17         MR. CHEFFO:  But no.

18     PAUSE

19         MR. CHEFFO:  Because it's the most recent

20   information.  In the Tier I/Track I cases we're back, you know,

21   this actually would've--

22         THE COURT:  All right.

23         MR. CHEFFO:  --been more – that's what you have to

24   understand.

25         THE COURT:  Yeah.  No, I understand.

46

1          MR. CHEFFO:  This is current.  This is the most

2   current information what it would cost right now.  So it's the

3   typical sales rep type of data, similar litigation, this is

4   what it cost.  That's why I'm saying it's estimates.

5          So basically--

6          THE COURT:  So just so I'm clear, those 32 - you

7   looked at 32 sales reps from Pfizer in some other products

8   liability pharmaceutical litigation and you looked at what, how

9   much data was collected from those 32 people and then took an

10  average I take it of those 32 to figure out.  And so if the

11  average was we'll just call it X gigabytes, if the average is X

12  gigabytes, then that's how you in a way figured the collection

13  costs, approximate costs and the loading and hosting costs

14  based on that X?

15         MR. CHEFFO:  That's right.  Yeah, because - that's

16  exactly right, Your Honor.  We tried to--

17         THE COURT:  All right.

18         MR. CHEFFO:  We tried to get sales reps at current

19  times with similar information in a products liability case.

20         THE COURT:  Okay.  So now you have it all in the

21  database.  How does the review happen?

22     PAUSE

23         MR. CHEFFO:  I don't have a problem with putting

24  Ms. Coffmin on the stand.

25         THE COURT:  Fine.  Get on the witness stand.

47

1        MR. CHEFFO:  I mean that might be easier rather than

2  having her whisper in my ear.

3        THE COURT:  Yeah.

4      DEFENSE WITNESS, DINA COFFMIN, SWORN

5        THE COURT:  All right.  Pull the microphone over just

6  a little bit cause that's actually what records it all, since

7  when you all want a transcript of this you'll have to call

8  Maria tomorrow or the next day and order it off the tape cause

9  I didn't arrange a reporter.

10        MR. CHEFFO:  That's fine, Your Honor.

11        THE COURT:  And so this way for the record you need

12  to state your name.

13        THE WITNESS:  My name is Dina Coffmin.

14        THE COURT:  And spell your last name.

15        THE WITNESS:  C-O-F as in French, F as in Frank, M-I-

16  N.

17        THE COURT:  And for whom do you work?

18        THE WITNESS:  I work for Deloitte (ph) Financial

19  Advisory Services in the analytic and forensic technology

20  practice.

21        THE COURT:  All right.  And you were hired in this

22  case by Mr. Cheffo and his law firm to render advice and that's

23  the basis of the affidavit that you submitted, right?

24        THE WITNESS:  Right.

25        THE COURT:  All right.  So go ahead.

48

1          MR. CHEFFO:  I mean that's fine.  I'm happy to do

2    this but do you have specific questions, Your Honor?

3          THE COURT:  Sure.  So let me ask you this, so the 32

4    cases that you looked at, these are 32 sales reps who were in

5    another litigation.  And so you looked at those 32 and you

6    looked at how much data was collected from them in terms of

7    email and electronically stored information; is that right?

8          THE WITNESS:  Correct.  We asked Pfizer's product

9    managers in their discovery operations group to get a similar

10   matter that was current, using current processing, current

11   technologies and current content.

12         THE COURT:  Okay.  And so then essentially you took

13   an average from those 32?

14         THE WITNESS:  Correct.

15         THE COURT:  Okay.  So back to the collection for a

16   moment.  How does the collection work?  In other words how does

17   the collector decide what to collect?

18         THE WITNESS:  The collector doesn't decide.  The

19   collector has a script that goes out and captures all of the

20   human generated files that exist on the sales person's

21   computer.  So it gathers them all--

22         THE COURT:  What constitutes a human generated file?

23         THE WITNESS:  It's something like a word file, a pdf,

24   something that you made as opposed to--

25         THE COURT:  So it could be--

49

1            THE WITNESS:  --a program.

2            THE COURT:  --an attachment that was saved from an

3   email on the hard disc.

4            THE WITNESS:  Absolutely.

5            THE COURT:  Or it's a spreadsheet or it's a word

6   processing document or an email.

7            THE WITNESS:  Right.

8            THE COURT:  It's other than the software?

9            THE WITNESS:  Exactly.

10           THE COURT:  And it's not the databases that are

11  system databases maintained elsewhere.

12           THE WITNESS:  Those are kept at the server.

13           THE COURT:  Right.

14           THE WITNESS:  Correct.

15           THE COURT:  Okay.  So the script tells the person

16  what?

17           THE WITNESS:  The script actually goes in and

18  captures the information and then it's collected and sent--

19           THE COURT:  And the script would have parameters, for

20  example for time.

21           THE WITNESS:  It may or may not actually.

22           THE COURT:  Might or might not depending.

23           THE WITNESS:  Yes.

24           THE COURT:  So it might be going all the way back or

25  you might not be going all the way back.

50

1          THE WITNESS:  Right.  You can always have date

2     ranges--

3          THE COURT:  What did the scripts in those 32 cases

4     have?

5          THE WITNESS:  The scripts were, no date ranges.  They

6     captured all of them.

7          THE COURT:  No date range.  So the entire period,

8     okay.  All right.  So then the processing, I understand.  So

9     then how does – you have all of what has been collected.

10         THE WITNESS:  It also captures, oh, well I'm sorry.

11    The script doesn't.  Aside from the script Pfizer also looks at

12    the email archive database, captures from a couple different

13    sources, the shared port database, the server shared files to

14    the extent that files are there.  And they also keep an index

15    of previously collected materials that they check.

16         THE COURT:  So shared, those are essentially human

17    created files that they might have been saving on the central

18    servers--

19         THE WITNESS:  Correct.

20         THE COURT:  --or to, and to collaboratively work on

21    or what have you.

22         THE WITNESS:  Correct.

23         THE COURT:  I see.  All right.  So it's not only

24    looking at their laptop so to speak but it's looking at the

25    central servers as well.  Is this including, now the email, is

1  the email maintained forever typically forever on these

2  peoples laptops?

3          THE WITNESS:  No actually.  That's maintained in an

4  email, an archive database.

5          THE COURT:  An archive database online on the

6  servers?

7          THE WITNESS:  Yes, on the servers.

8          THE COURT:  Goes back all the way?

9          THE WITNESS:  No, not all the way.  I'm not sure

10  whether the email archive database was instituted and has

11  change that over time so--

12          THE COURT:  So none of its backup tapes?

13          THE WITNESS:  It's not backup tapes.

14          THE COURT:  So all the, wherever the email is

15  archived, it's archived on the system as opposed to on backup.

16          THE WITNESS:  Correct.

17          THE COURT:  Okay.  And so that's all extracted.  Is

18  the script actually automated or is it actually somebody's

19  doing it manually?

20          THE WITNESS:  The script is automated for the laptop

21  collection but not necessarily for the email archive or the

22  shared – (inaudible - #4:18:19).

23          THE COURT:  So on the laptops it's just a program you

24  run on the laptop and it sends it off somewhere and on the

25  server it might be more manual labor.

52

1          THE WITNESS:  Easy automated.  Removes ambiguity.

2    Removes--

3          THE COURT:  Okay.  So then how does the relevant –

4    you have all the data you collected.  How does the relevance

5    review work?

6          THE WITNESS:  So well after you collect it you have

7    to send it to processing as we mentioned earlier to, for all

8    the information to be accepted by the database.  They have to

9    expand the files that were compressed for storage and different

10   things.  And then they load them up onto the hosting database.

11   So the processing occurs, the fee that was mentioned earlier,

12   the loading incurs a fee for the one time load and then the

13   monthly annuity fee and then the, all of the data that was

14   collected goes in the first pass review to be reviewed for

15   whether or not it's relevant.  And the population that's not

16   relevant is set aside.  The population that is relevant goes

17   on--

18          THE COURT:  Now how does that distinction occur?

19          THE WITNESS:  Human review.

20          THE COURT:  Human being meaning--

21          THE WITNESS:  Human being.

22          THE COURT:  --person reading each document?

23          THE WITNESS:  Correct.

24          THE COURT:  Okay.  Not a search term.  So far we

25   haven't done anything with search terms.  We're just, now we

53

1   have all the documents and we basically collected them all up.

2   So this is basically just what or what used to happen, you went

3   off to somebody's office, you went through, you figured out

4   which files you were going to xerox, you xeroxed the whole

5   file.  Now at this point you have all the xeroxed files and you

6   just read the files and decide those aren't relevant, we're

7   done with them, they go in a different pile, preserved but a

8   different pile and these are the potentially relevant.  Now is

9   that the pass that costs the 72 or is there more to that pass?

10          THE WITNESS:  The relevance costs 72.  I need to back

11   up a little bit.  We, I didn't get into search term negotiation

12   cause I didn't know what had been done in the previous case or

13   what was negotiated in this one so that wasn't factored in.

14          THE COURT:  Okay.

15          THE WITNESS:  But then the population goes to first

16   pass reviewer, relevance review.  They also set aside the

17   documents that are potentially privileged and the documents

18   that are in need of redaction and those goes on to a set of

19   reviewers that specialize in those two areas.

20          THE COURT:  But then that cost comes under the

21   privilege review cost, doesn't it?

22          THE WITNESS:  Correct.  That's--

23          THE COURT:  So they make one pass of relevant/not

24   relevant and when they're doing the relevance it's a letter to

25   Mr. Cheffo, presumably that person's available to go out,

54

1    that's probably privileged and put it in the potentially

2    privileged pile or there's a reference to a conversation we

3    think in an otherwise producible document.  That might go in

4    the redaction pile.  And then it goes off to the privilege.

5              THE WITNESS:  Yeah.  Correct.

6              THE COURT:  All right.

7              THE WITNESS:  The calculation for that is actually

8    based upon just a contractual rate that Pfizer has that's per

9    gig multiplied by the--

10             THE COURT:  Right, per gig, per person, per--

11             THE WITNESS:  65,000 per page.  It's just a

12   negotiated rate--

13             THE COURT:  Right.

14             THE WITNESS:  --of what they've seen.

15             THE COURT:  All right.  Do you have anything else,

16   Mr. Cheffo, you want to ask her before.

17             MR. CHEFFO:  No, I think, you know, the only thing I

18   would just say, Your Honor, and that, you know, counsel may

19   have some questions is, you know, I think--

20             THE COURT:  Well--

21             MR. CHEFFO:  --I made this point – I'm sorry.

22             THE COURT:  No, good ahead.

23             MR. CHEFFO:  I just want to, you know, impress upon

24   the Court, I think you understand, is that, you know, as I've

25   said a few times here, you know, we're here to present the

55

1  general picture.  You know I'm not saying that this is

2  specifically the exact science in all this.  I think what

3  you're hearing is that, you know, I want, you know, to leave

4  the Court with the understanding that the ultimate out appears

5  very, very small.  This is a huge process.  And to the extent

6  that, you know, there's multiple ways we can accommodate trying

7  to reduce this cost or, you know, if, or share the cost with

8  them, I think, you know, those are discussions that we can have

9  but I wanted the Court and counsel to--

10        THE COURT:  They can.  I will tell all of you if I've

11  never said this before, that I think it's great for all of you

12  to talk to each other and I regularly encourage you all to talk

13  to each other and to resolve these disputes among yourselves.

14  But when it gets to me I just can decide the motions and--

15        MR. CHEFFO:  That's fine.

16        THE COURT:  --so – not necessarily without regard to

17  what might be potentially practical in between resolutions

18  between all or nothing of the all or nothing, some are all or

19  nothing positions that you all have.  But I don't view the

20  motions as the extension of the negotiations between all of

21  you.  I recognize in some sense they are in that you're all

22  negotiating in light of what the Court might do.  That's true

23  in every case on every motion.  But I'm likely to look at it

24  and just--

25        MR. CHEFFO:  Sure.

56

1          THE COURT:  --supplement.

2          MR. CHEFFO:  And that's fair.  I guess really all,

3    and you said it more artfully then I did, really what I was

4    suggesting, you know, what I think we've heard is, you know,

5    this is Ms. Barlow v. you know, Pfizer and I think that

6    obviously we think for the reasons we've articulated we're not

7    going to belabor the Court, you know, that this is a cost they

8    should bear.  But--

9          THE COURT:  Yes.

10         MR. CHEFFO:  --if the Court determines not the other

11   option's, you know, certainly you can share the costs.  You

12   could determine that you limit the number of custodians to some

13   regional or some certain number of them, or you could

14   basically, you know, direct us to have very targeted or

15   specific search terms.  The problem we always have as

16   defendants as I think Your Honor is aware is, you know, it's

17   kind of a Hobson's choice.  On one hand we'd like to limit the

18   terms but if we limit it to something then we hear well, we

19   won't agree to that because we don't know what's out there and

20   things like that.  So we're worried about the sanctions issues

21   and spoliation, failing to produce so, you know, just Your

22   Honor has multiple different I think as you, you know, kind of

23   ways short of, you know, black or white to necessarily resolve

24   this issue.

25         THE COURT:  I do although you have all framed it in a

1  fairly black or white way in that in general those who come

2  before the Court having said, you know, there's a potential

3  disaster but here's the following 10 reasons I think we've

4  offered that they wouldn't take and we stand by that.  Often

5  that, it's the reverse of you can all leave it to me to make up

6  what ought to happen but that's often a perilous thing to leave

7  it to the Judge to--

8          MR. CHEFFO:  And we're here today so we are doing

9  that so I'm not, you know, this is not a sign of, you know--

10         THE COURT:  Right.

11         MR. CHEFFO:  I just want Your Honor to know,

12  understand our position.

13         THE COURT:  Yes.  I understand.

14         So one last question, Ms. Coffmin, before I see if

15  the plaintiffs have any questions for you.  In the 32 you

16  looked at, so how much on average, how many gigabytes in the

17  first round in the collection was collected?

18         THE WITNESS:  To the .884 gigabytes of email was

19  typical and 2.406 was ESI.

20         MR. FROMSON:  Say that last number again, please?

21         THE WITNESS:  2.4 gigabytes of ESI.

22         THE COURT:  So--

23         THE WITNESS:  That was the raw collection.

24         THE COURT:  88, .88 gigabytes about and then was it

25  just over two gigabytes of the non-email data.  So about a hair

58

1    under three gigabytes in total?

2              THE WITNESS:  Correct.

3              THE COURT:  Okay.  And then that expands to some

4    degree.  And then out of that in the collection what, in the

5    end about--

6         PAUSE

7              THE COURT:  When you talk about documents and say 62%

8    of the documents are produced in that context what's a

9    document?

10             THE WITNESS:  Let's see.  In paragraph--

11             THE COURT:  In paragraph eight of your affidavit you

12   say that measurements of the data that I was collecting

13   provided by Pfizer's review vendor were used to determine, I

14   call it 62, it's a hair under, that 62% of the documents

15   collected were produced.  So what's a document?

16             THE WITNESS:  It would have been more accurate to say

17   pages.

18             THE COURT:  Okay.

19             THE WITNESS:  We actually looked at the number of

20   pages collected because they're priced per page so they have

21   that data with their review--

22             THE COURT:  So in that example of just a hair under

23   three gigabytes, if they had a one gigabyte pdf it was 50,000

24   or however many pages that would be and it was produced that's

25   not one document.  That might have been a third of all the

1   pages that were reviewed.

2            THE WITNESS:  Correct.

3            THE COURT:  And so pages may or may not equally

4   always correspond to the percentages of their gigabytes?

5            THE WITNESS:  Yes.

6            THE COURT:  That may be one-third of the gigabytes

7   but two-thirds of the pages?

8            THE WITNESS:  As far as costing there's just a

9   negotiated factor as far as taking the gigabytes, translating

10  it into pages for pricing concerns, but as far as in actuality-

11  -

12           THE COURT:  So about how many pages were produced on

13  average out of those 32 people?

14           THE WITNESS:  I would have to – (inaudible –

15  #4:26:40).

16           THE COURT:  You can.  Go right ahead.

17           THE WITNESS:  Well of the, we took six recent matters

18  that reviewed in 2009 and looked at the number of pages

19  reviewed and the number of pages produced and that's where

20  those numbers were calculated, those averages were calculated.

21  So we wanted something again relevant, product liability

22  matters that happened just recently under current conditions.

23  But that would have been, that actually would've been about

24  289,2 – yeah, just over 289,000 pages would have been the

25  conversion factor and that was our estimate.

60

1          THE COURT:  When you say so – at 200, call it

2    290,000--

3          THE WITNESS:  Oh, I'm sorry, no, that's what would

4    have gone in.

5          THE COURT:  So 62% of that would have been produced?

6          THE WITNESS:  Correct.

7          MR. FROMSON:  That's one person's file, 289,000

8    pages?

9          THE WITNESS:  No.  Based upon the number of gigabytes

10   collected and then translating that number to cost factor

11   because that's what this is about.

12         MR. FROMSON:  One custodian, you say a single

13   custodian?

14         THE WITNESS:  Uh-huh, one custodian.

15         THE COURT:  That's a single – so about 290,000 pages

16   of that about 62% was produced.  And that's based on not by

17   counting the pages but by doing the mathematical conversion

18   based on the pricing.

19         THE WITNESS:  Right.  And we didn't use again the

20   Neurontin claims because that was under old processes, old

21   technology.

22         MR. CHEFFO:  Your Honor--

23         THE WITNESS:  We used a current set.

24         THE COURT:  I got it.

25         MR. CHEFFO:  I just want, I mean – because I know

1   this is important, I mean we know that we have to be true to

2   the information there.  We know that production in this case

3   there's no dispute about it--

4           THE COURT:  Right.

5           MR. CHEFFO:  --it's certainly not – that's what my

6   point was before.  Mr. Altman knows from the very limited

7   information that it's not 61%.  It's far, you know, when we

8   actually go through the reviews and produce, you know, the

9   information it's far less in, at least in the Neurontin

10  litigation based on the relevance of the information that we

11  found.

12          THE COURT:  Okay.

13          One of you and only one of you.

14          MR. FROMSON:  All right.  Go ahead.

15          MR. ALTMAN:  Thank you.

16                        CROSS EXAMINATION

17  BY MR. ALTMAN:

18  Q.  Ms. Coffmin, this is the first time we've seen this

19  document.  Did you provide this as part of your affidavit?

20  A.  No, not as part of the affidavit, no.

21  Q.  This was the details though that would have explained your

22  affidavit into those numbers, right?

23  A.  Yes.

24  Q.  Okay.

25          MR. ALTMAN:  Your Honor, just as a point we never saw

62

1    this document until--

2              THE COURT:  I understand you never saw it.

3              MR. ALTMAN:  Okay.

4    BY MR. ALTMAN:

5    Q.  Now, just to make sure--

6              THE COURT:  My suggestion just for all of you is I

7    get it that you didn't have it before.  It is what it is.

8    Focus on--

9              MR. ALTMAN:  Yeah.

10   BY MR. ALTMAN:

11   Q.  Now just to make sure--

12             THE COURT:  I'm not sanctioning them for not

13   producing it before and I'm not holding it against them and I

14   know you're not going there but so – we don't have a lot of

15   time.

16   BY MR. ALTMAN:

17   Q.  Yeah, I just want to make sure I understand the relevance

18   of these estimates to here.  Were you aware that the average

19   file produced in the Neurontin case was 400 pages?

20   A.  No.

21   Q.  Counsel never told you that?

22   A.  Well it's, well' counsel asked me to do is focus on what

23   would be relevant today, if we're going to do this production,

24   this discovery today.

25   Q.  How--

63

1    A.   That was our focus as to the volumes that are in effect

2    today, the technology that's in effect today, the processes and

3    the pricing models that are in effect today.

4    Q.   Just to make sure I understand, the 6,400 for production

5    means this is about 150,000 pages actually produced, correct?

6    A.   I don't have that math in front of me but--

7    Q.   And you're also--

8    A.   --if you took 64% of the 289,000 X $.04 per page or,

9    right?

10          MR. CHEFFO:  Your Honor, I believe it's about 150,000

11   pages if you do the math.

12   BY MR. ALTMAN:

13   Q.   Are you aware that I guess the cut off date for any of the

14   discovery in this case would be--

15          MR. ALTMAN:  What's the last date?

16          MR. CHEFFO:  It's 2004 for generic but sales reps go

17   up to the date of the suicide attempt, the last suicide

18   attempt.

19          MR. ALTMAN:  What's our last suicide attempt?

20          MR. CHEFFO:  I don't know off the top of my head but

21   each plaintiff is different.

22   BY MR. ALTMAN:

23   Q.   Did counsel ever tell you that the cutoff date is maybe

24   sometime in 2006?

25   A.   No.

64

1  Q.   Okay.  Did--

2          THE COURT:  When's Ms. Barlow's suicide attempt?

3          MR. LONDON:  Say that again please, Your Honor.

4          THE COURT:  When's Ms. Barlow's suicide attempt?

5          MR. LONDON:  Interesting, we, the short answer is

6   that she attempted suicide twice within three months on

7   Neurontin.  The first in October 2000.  The second in January

8   2001.  And why I said that's interesting, it might help

9   Ms. Coffmin, in the discovery that was sent Barlow was specific

10  template discovery, we restricted the search to the three

11  doctors who prescribed Neurontin and to the dates ending in her

12  suicide.  So we only asked for a two year search, 1999 to 2001,

13  the three doctors.

14          THE COURT:  Okay.  I understand.

15          MR. LONDON:  All right.

16          THE COURT:  Go ahead.

17  BY MR. ALTMAN:

18  Q.   Ms. Barlow did you even look at a single, Ms. Barlow –

19  Ms. Coffmin, did you even look at a single actual Neurontin

20  sales rep file to see what the volumes were?

21  A.   I did not.

22  Q.   Did counsel tell you how many pages they collected for any

23  of the sales reps that have been produced to date?

24          MR. CHEFFO:  Objection, just asked and answered.

25          THE COURT:  I'm sorry, what's the question?

65

1      MR. ALTMAN:  I'll ask another question.

2      MR. CHEFFO:  Well--

3      THE COURT:  Just ask another one.

4      THE WITNESS:  Apples and oranges--

5  BY MR. ALTMAN:

6  Q.  Oh, did counsel tell you how many pages were collected for

7  any of the sales reps produced to date?

8  A.   That wasn't the scope of the occasion.  It was to

9  calculate what the cost would be if we did it today, not what

10  was done previously.

11  Q.   How do you know that any of these numbers have any bearing

12  or any relevance to any Neurontin sales rep file if you didn't

13  look at a single Neurontin sales rep file?

14  A.   We took the average of applications that are happening in

15  current, under current conditions, under current technology,

16  current processes and we took product liability matters that

17  are right now as opposed to several years back.

18  Q.   Don't you think it would have been more relevant to have

19  used actual, at least a couple of actual Neurontin sales rep

20  files to show what it had cost to produce documents that

21  existed of sales reps from several years ago?

22  A.   No, actually this is more relevant because it's about

23  current processes, current technology and current cost models.

24  So without actually doing the collection which seemed to be--

25  Q.   Well, Pfizer already collected for certain sales reps

66

1    because they produced certain sales rep files, didn't they?

2    A.    But when that collection was done wouldn't matter.  You'd

3    have to redo it today to understand how it would impact current

4    pricing models and current volumes.

5    Q.    Well they produced some of these sales rep files in the

6    last six or eight months, maybe a year, for some of these sales

7    rep files.  I mean these weren't produced years ago.  They were

8    produced less than a year ago.

9              THE COURT:  Is that a question?

10   BY MR. ALTMAN:

11   Q.    Well I'm just asking, when you say that current – were

12   they using the same procedures a year ago as they are today?

13   A.    I don't know that.

14   Q.    Now, the $72,000 for review, are you saying that somebody

15   sat and reviewed and read every single page of the 300,000

16   pages?

17             MR. CHEFFO:  Objection.

18             THE COURT:  I'm sorry, did you object?

19             MR. CHEFFO:  I did object.  That's not what she said

20   but--

21             MR. ALTMAN:  I'm asking--

22             MR. CHEFFO:  It's cross, he can cross examine.

23             THE WITNESS:  No, that's not--

24             THE COURT:  All right, so the objection is withdrawn.

25   Go ahead.

1    A.   It's not what I said.  Actually what I said is that

2    Pfizer has a review vendor that pay per cost of, for every

3    gigabyte that they deliver to this review vendor, there's a

4    conversion factor of 65,000 pages and the cost is then assigned

5    as $.25 per page based upon that.

6    BY MR. ALTMAN:

7    Q.   Now--

8              THE COURT:  So just, in fact that gigabyte that's

9    turned over might be 65,000 pages--

10             THE WITNESS:  It might be more, it might be less.

11             THE COURT:  It might be more, it might be less, and

12   that's just part of the bargain.  They deal with, but that's,

13   it presumably worked out over time for them and their

14   relationship.

15             MR. ALTMAN:  Right.

16             THE COURT:  And that's where the 65,000 page estimate

17   comes.  And depending on what it is it might be more, it might

18   be less.

19             THE WITNESS:  Right, but at the end of the day this

20   is about what the cost is.

21             THE COURT:  Okay.

22   BY MR. ALTMAN:

23   Q.   But we're searches run of the material before you sent it

24   out to the review vendor?

25   A.   This is a hypothetical so we haven't done these searches

68

1   on this, but--

2   Q.   So what you're saying is after you collect from--

3            THE COURT:  She already testified in her estimate

4   that this calculation did not involve a whim of the data at any

5   stage of the process by doing electronic searches.

6   BY MR. ALTMAN:

7   Q.   And that's what I thought.  You could substantially win-o

8   (ph) data byte, for example taking a sales rep file and

9   searching for the word Neurontin could substantially win-o that

10  file would go to review, correct?

11  A.   And I think that was Mr. Cheffo's point is that, you know,

12  going forward this there are ways to be able to do it.

13  Q.   Did they take, did they ask you or did anybody take an

14  actual Neurontin sales rep file and run a Neurontin word search

15  on it to see how many pages would be left over?

16  A.   We'd have to actually have gone through the collection and

17  processing and hosting exercise to have done that so, no, we

18  chose not, we did not do that.

19  Q.   And you already, and you didn't do it with the four, five

20  or six sales rep files that were already produced, correct?

21  A.   I did not.  That's not what, within the scope of the

22  engagement.  The engagement was to calculate the cost of what

23  it would be if we went the whole way based on the averages.

24           THE COURT:  Now you have me curious about something

25  else, Ms. Coffmin, and then let's move forward unless you have

69

1    a follow-up question, over time, that is how long – you've

2    been doing this for a while, right?

3              THE WITNESS:  I have.

4              THE COURT:  Okay.

5              THE WITNESS:  Since about 2003 on the corporate side.

6              THE COURT:  Okay.  So do you find over time that the

7    amount of electronically stored data and emails people have

8    today – so if you took somebody who'd been a Pfizer employee

9    for 20 years and somebody said to you we need to collect and

10   produce out of all of this electronically stored information

11   and emails data from 2009, 1/1/09 to 12/31/09, would you

12   anticipate substantially more data than if they said we

13   actually want the 12 month slice of, you know, 1/1/2005 beyond

14   a year, 2000 beyond a year, 1995 beyond a year.  Would you

15   expect to see a trend that there's more data in each year as

16   you got closer and closer to the present?

17             THE WITNESS:  I would expect to see a greater trend

18   later in time.

19             THE COURT:  Okay.  All right.

20             MR. ALTMAN:  Your Honor, I do have one last question

21   to ask about.

22   BY MR. ALTMAN:

23   Q.   Are you familiar with Rule 502(d)?

24   A.   I don't think so.

25   Q.   Okay.  Have you ever heard of Federal Rule of Evidence

70

1    502(d)?

2    A.   Yes, I've heard of it.

3    Q.   Okay.

4    A.   I'm not aware of it.

5    Q.   I understand.  But have you, Federal Rule of Evidence

6    502(d) was as much implemented because of electronic discovery

7    issues, correct?

8              THE COURT:  She does not know.  Sustained.

9    A.   I don't know that.  I'm not a lawyer.

10             MR. ALTMAN:  Well just that--

11             THE COURT:  She doesn't know why it was implemented.

12   She's not a lawyer.

13             MR. ALTMAN:  Okay.

14             THE COURT:  I'm not sure I know why it was

15   implemented exactly.

16   BY MR. ALTMAN:

17   Q.   Have you ever worked on a project that used a 502(d) order

18   to help lessen the costs associated with privilege review?

19   A.   I don't know - I work on the operational and cost side of

20   it, so if indeed that were the case the lawyer would have

21   explained it to me and did not.

22             THE COURT:  I don't think you need the witness to

23   make that argument.  I think I know what that arguments going

24   to be.

25             Anymore questions, Mr. Cheffo?

71

1          MR. CHEFFO:  I think--

2          THE COURT:  First of the witness?

3          MR. CHEFFO:  Yeah, just two.  I mean I think Your

4   Honor--

5          THE COURT:  Sure.

6          MR. CHEFFO:  --may know this but.

7                    REDIRECT EXAMINATION

8   BY MR. CHEFFO:

9   Q.   You were, is it fair to say you were trying to give the

10  Court a fair assessment of what the collection would be today,

11  right?

12  A.   Yes.

13  Q.   If you had looked at data and information from a year or

14  two ago that wouldn't have told you how much things cost today,

15  right?

16  A.   Correct.

17  Q.   And have things gotten cheaper over time?

18  A.   Discovery is definitely quantifies with market and so the

19  cost of processing is decreasing.  The cost of hosting is

20  increasing, yes.

21  Q.   So in fact if you had gone back and looked at things two

22  years ago would the number have been higher or lower?

23  A.   Volumes of information get greater but pricing gets lower

24  so it's a very dynamic area.  You have to really consider the

25  current point in time.

72

1    Q.    The last question is, irrespective of when, you know, a

2    suicide or a particular point or a personal injury case may

3    have occurred, the cost is set at the time today when you do

4    it?

5    A.    Yes.

6    Q.    In other words, when you look back it's going to be the

7    same cost, right?

8    A.    Can you repeat that, I'm sorry?

9    Q.    Sure.  Basically when you go back in time and look at

10   information, electronic information databases you pay for it

11   based on the cost of today, right, how much it cost?

12   A.    Correct, today or the date that you negotiated the

13   contract for discovery service but, yes, you pay for it when

14   the contracts are placed today.

15              MR. CHEFFO:  Thank you.

16              THE COURT:  All right.  You don't have any other

17   questions for her, right?

18              MR. ALTMAN:  No, Your Honor, not for her at this

19   time.

20              THE COURT:  All right.  You can step down.  Thank you

21   very much for your testimony.

22       WITNESS EXCUSED

23              THE COURT:  All right, one to two minutes if you have

24   something else?

25              MR. LONDON:  Say that again, please?

73

1          THE COURT:  One minute if you have anything else?

2          MR. PIERCE:  Thirty second rebuttal.

3          THE COURT:  All right.

4          MR. PIERCE:  It's not a mass tort for me and my

5   client.  I've got one client.  They're not going to stipulate--

6          THE COURT:  Let me ask you this question.

7          MR. PIERCE:  Yes, Your Honor.

8          THE COURT:  Okay.  Out of the ESI information that

9   we've all discussed, what you want is the documents that relate

10  to Neurontin?

11         MR. PIERCE:  Definitely.  That's – it's limited to

12  Neurontin.

13         THE COURT:  Right.

14         MR. PIERCE:  And all the databases they say they have

15  produced and all these millions of documents we've searched

16  them--

17         THE COURT:  I understand.

18         MR. PIERCE:  --Your Honor--

19         THE COURT:  Okay.

20         MR. PIERCE:  --and all we got is the name of sales

21  reps.  We don't even know if they're medical liaisons.  And we

22  got those call notes, that's it.  And we know that I have the

23  burden to prove that it was their criminal off-label marketing

24  that caused my client to get that drug.  And there's stuff out

25  there like preceptorship, CME--

74

1          THE COURT:  I understand.

2          MR. PIERCE:  --those meetings and information.  I

3    don't have any of it.

4          MR. FROMSON:  Can I get my 30 seconds, Judge?

5          THE COURT:  Thirty.

6          MR. FROMSON:  I appreciate her presence in court

7    today and I thank you for your candor, but this has absolutely

8    no relevance to Neurontin to take a single custodial file over

9    250,000 pages and say what today's prices are when what they

10   should have done was taken the average of sales or custodial

11   files for the Neurontin litigation and gave today's costs.  I

12   understand the presence and the emphasis on today's costs,

13   fine.  Do it for the page limits in this litigation.  There's

14   been no custodial file that's been 250,000 pages for sales

15   reps.  922 pages is the most.  And as to the authentication of

16   the call notes, I just want to leave the Court with that

17   remark, they refused to authenticate the call notes database so

18   I cannot give it to plaintiffs throughout the country because

19   the plaintiffs throughout the country won't be able to

20   authenticate it when they use it at depositions.  Unless they

21   admit to the authenticity of what they give to me, it means

22   nothing to the plaintiffs if I give it to them.

23          THE COURT:  Now is that an issue before me now?

24          MR. FROMSON:  He said that we have everything and I

25   can give it to Carl which is fine.

75

1          THE COURT:  But in terms of whether or not you have

2   everything is it before me?

3          MR. FROMSON:  Right, I have – yeah, I think it's part

4   of the motion is he's saying they can get it from me.  And what

5   I give to them he won't admit it's authentic.

6          THE COURT:  And what is that again, that's the--

7          MR. FROMSON:  The call notes database.  You know the,

8   this thing here.

9          MR. CHEFFO:  Well we produced it though, Ken.

10         MR. FROMSON:  They produced the database.  We

11  pulled---

12         THE COURT:  I understand.

13         MR. FROMSON:  --the line which they printed.

14         MR. CHEFFO:  But we--

15         MR. FROMSON:  We print them.

16         THE COURT:  I got it.

17         MR. FROMSON:  Your Honor, but here's--

18         MR. CHEFFO:  But we've given--

19         THE COURT:  It's what they gave, it's the superset of

20  what they gave him?

21         MR. CHEFFO:  But - yeah, and we actually have given

22  him this, the call letter so--

23         MR. PIERCE:  And I've searched it--

24         MR. FROMSON:  Your Honor--

25         MR. PIERCE:  --and this is all I have.

*MARYANN V. YOUNG*
**Certified Court Transcriber**
**(508) 384-2003**

76

1        THE COURT:  All right, you're all past your 30

2   seconds.

3        MR. ALTMAN:  Well, I just wanted to show you this is

4   the example of what we created that we used as an exhibit in

5   the upcoming Shearer trial.  So we did exactly what they said.

6   We went to the database.  We printed stuff off and they object

7   to the authenticity of it.  So how are we supposed to use it?

8   Go to the database, get the stuff out.  We did exactly what

9   they said.  We provided it to them in advance--

10       THE COURT:  Well how do you want to use it, is for

11  you guys all to figure out—

12       MR PIERCE:  That's right.

13       THE COURT:  --and for Judge Young to rule on it.  I'm

14  not going to answer that question.

15       Did you have anything else, Mr. Cheffo, you wanted to

16  say?

17       MR. CHEFFO:  Your Honor, you've been very patient.  I

18  would – unless you have any questions I think--

19       THE COURT:  I have one other, just one other.  So is

20  it – so let's say you had, now I understand why it's different

21  in this case for you cause it's a mass tort but are you, is it

22  realistic to think that let's say I have another products

23  liability case unrelated to this and the plaintiff says we want

24  to get the information out of the sales reps custodial files of

25  all the things related to the drug that my client took that the

77

1  plaintiff alleges cause the suicide.  It's just one, it's not

2  a mass case.  So there's one sales rep called upon one doctor

3  or whatever the typical period of time that might be at issue

4  in this case.  It would, you would expect that it would be, you

5  would not be surprised if the cost just to produce that

6  electronic sort information would be 100 to $120,000.

7      MR. CHEFFO:  Here's my answer to that and in all

8  candor, Your Honor, I, you know, I was not involved as I think

9  you know early on.  I will tell you, you know, that I

10  absolutely would not produce that, I mean absent an order of

11  the Court, obviously I'd follow it.  But in the normal course I

12  think this is, this is like using a bazooka.  I mean I haven't

13  been doing this 100 years but I've been doing this, you know, a

14  fair number of years, and in all of the cases that I've been

15  involved in I've never, ever gotten into this level of sales

16  rep, 100,000 – it's never been an issue because this is

17  something that's so absolutely beyond the normal scope of

18  discovery particularly, you know, in a case where you produce

19  millions of pages.  You know, you usually negotiate it.  you

20  usually never get to that point because if you had a one off

21  case they wouldn't be saying, you know, I don't really care

22  about the sales reps, the medical records or the doctors.  What

23  I really want is like the sales rep who called on--

24      THE COURT:  You're defending Pfizer in a lawsuit in

25  which the conduct of an employee of Pfizer is at issue in their

78

1    negotiation of a contract with another vendor for example,

2    right?  Those might be done by in-house counsel rather than

3    Skadden but presumably they have those kinds of cases.

4            MR. CHEFFO:  Sure.

5            THE COURT:  And the discovery in that case is really

6    going to be quite similar to the discovery.  There's going to

7    be some employee, all of the same things that Ms. Coffmin

8    testified are going to need to be looked at and potentially you

9    are looking at everything in terms of just as she hypothesized

10   timeframe and potentially you're not doing any searches to

11   produce it, 100 to $125,000 is potentially what it would be.  I

12   mean obviously it depends on what the--

13           MR. CHEFFO:  Sure.

14           THE COURT:  --pull is on the collection.  If you have

15   a pull it's three gigabytes and that to some extent, but that's

16   really just because the sales reps you made a judgment about

17   how the pull went in the other cases and so that was the

18   average.  And so that would, I mean in my mind that should be

19   something I'd think about is what it cost to get data,

20   electronically stored information out of one employee.

21           MR. CHEFFO:  And there's no dispute about that.  I

22   think really again if I had to crystallize where we are in this

23   case it's, you know, it's looking at who this one employee is.

24   Again, if it's, you know, it's the case of a let's say a sexual

25   harassment case, someone suing and, you know, they're saying

79

1    their employer sent them emails.  Really the point here is

2    that, you know, we have taken there's probably been 50 or 100

3    depositions in the case, you know where there's been custodial

4    files and the people who--

5              THE COURT:  I thought it 50 in the Bulger case.

6              MR. CHEFFO:  At least.  I mean there's probably 20

7    depositions.  But that was more non-party.  I'm talking about,

8    you know, Pfizer witnesses, former employees--

9              THE COURT:  Right.

10             MR. CHEFFO:  --people who were kind of involved in

11   Neurontin.  The file, you know, we have this issue with

12   Wahlberg (ph)--

13             THE COURT:  People with less occasion to complain

14   then non-parties for being deposed – (inaudible - #4:45:38).

15             MR. CHEFFO:  Yeah.  And I guess the point here really

16   is that, our real bottom line issue is that if, you know, again

17   we wouldn't be here if these were central or we had seen from

18   these 10 cases that we're really getting a lot of relevant

19   information.  You know, now all of a sudden it's on the witness

20   list, you know, after this motion gets filed.  But I don't

21   think any of these documents were on the Bulger witness list.

22   I mean there maybe one or, you know, one or two documents, a

23   call note.  I could be wrong.  Maybe he'll tell me I'm wrong.

24             MR. FROMSON:  It's tough to say things when you don't

25   know if you're right.  You're making representations to the

1   Court--

2          MR. CHEFFO:  I asked.  I said I don't believe that

3   these--

4          MR. FROMSON:  I know but first you make the statement

5   and in this case it's one-fortieth of a gigabyte.  The fact

6   that there's three gigabytes in a new drug where they're being

7   sued means nothing when in Neurontin the biggest one is

8   one-fortieth a gigabyte.

9          THE COURT:  I understand.  All right, I'm going to

10  take it under advisement and I'll issue an order shortly.  I

11  want to think about it a little bit, look back over the papers.

12  You've been very helpful.

13         MR. FROMSON:  Thank you, Judge.

14         MR. CHEFFO:  Thank you, Your Honor.

15         THE COURT:  Yep.

16         MR. LONDON:  May I ask just, do I understand the

17  Court intends to submit two orders, sort of one order in the

18  Barlow case is whether or not they will produce the documents

19  that were referred to that we came here on a motion to compel

20  for, and then the bigger order in the MDL of cost shifting.  It

21  seems like--

22         THE COURT:  I understand that your, isn't in one case

23  that' your case your motion a microcosm in that you're asking

24  for the documents without having to pay for them, and they're

25  saying in your case they're willing to give you the documents

81

1    but only if you pay for them.  And in the larger, maybe I'm

2    wrong about this--

3         MR. LONDON:  I think I'm hearing two things from

4    Mr. Cheffo, not perhaps intentionally, but I think what I'm

5    hearing him say is we don't want to give anyone anywhere a

6    custodial file without them paying for it.

7         THE COURT:  Yeah, I believe that's what he said.

8         MR. LONDON:  What we've been saying on our microcosm

9    is we want the specific documents that their own documents show

10   exists and are relevant.

11        THE COURT:  Oh, you want two things.  Then you want

12   the custodial files which as I understand it and think about it

13   Mr. Cheffo, you're willing to give them, if they pay for them

14   but you don't want to give the custodial files if they don't

15   pay for them.

16        MR. CHEFFO:  That's right.

17        THE COURT:  And then--

18        MR. CHEFFO:  There might be other documents that we,

19   you know, I do--

20        THE COURT:  And then the second point I think you're

21   raising, Mr. London, is there are some things that are

22   specifically identified in those notes of conversation and as

23   to those you want those and you're unclear whether they will

24   give them or won't or if they will only give them if you pay

25   for them.

82

1    MR. LONDON:  Well, the reason I'm unclear is because

2  they wouldn't even give us those pages until after, not only

3  after we filed the motion but after they filed their reply.

4    THE COURT:  Well--

5    MR. LONDON:  They floated through the transom one day

6  as you--

7    THE COURT:  But they're a subset of the larger issue,

8  if you will, depending on the resolution of the larger issue

9  there might or might not be an issue there with respect to

10  those.

11    MR. LONDON:  Well ,and the reason we don't know is

12  because we don't know whether those are in custodial files,

13  whether they're in Pfizer records.

14    THE COURT:  Oh, I see.

15    MR. LONDON:  See that's the problem, we don't know

16  what custodian--

17    THE COURT:  The company communications if you will.

18    MR. CHEFFO:  And I just want to respond to that.  I

19  mean one thing is I think it's accurately stated with respect

20  to the custodial files.  That applies across the board.  I

21  think as Mr. London just said that there were some documents

22  that were provided after the reply.  I mean the point is as you

23  know we were very tight.  There's 110 cases of which we're

24  working on Tier I/Track I discovery and it doesn't all happen

25  overnight.  So there is a number of documents that we're

83

1   working on to give everyone.

2          THE COURT:  The Boone and Schwartz cases are not in

3   those 110, right?

4          MR. FROMSON:  There's no ruling.  You haven't ruled

5   yet on the parties' submission to you of the selection of

6   cases.

7          MR. CHEFFO:  We've been proceeding.

8          MR. FROMSON:  We've been proceeding but you haven't--

9          THE COURT:  Is there something you're waiting for me

10  to rule on?

11         MR. FROMSON:  I believe so.  Essentially we

12  submitted--

13         THE COURT:  You guys don't have to be so shy.

14         MR. FROMSON:  Well, we've been working to get as much

15  done as possible but it's true that there--

16         THE COURT:  What is waiting to be decided?

17         MR. FROMSON:  Essentially there was the plaintiffs'

18  submission as to which cases should be the 110 and there's the

19  defendants' submission as to which should be the 110.  That's

20  what's before you.  That's putting it as broadly as possible,

21  that's it.  You haven't decided so we're working - all of them

22  are Finkelstein cases.  They're included.  But there are some

23  other firms out there who have said well we only want one of

24  our five cases in for example and Mark's position will be all

25  of their cases should be in.  So I'm not making argument for or

84

1   against – I'm saying that motion, that submission is still

2   pending before you.

3           THE COURT:  You know what would be helpful to me if

4   in the next day, two days, or something somebody calls Maria

5   and tells me what the docket numbers are--

6           MR. CHEFFO:  Sure.

7           THE COURT:  --of the papers that pertain to that--

8           MR. FROMSON:  That's fine.

9           THE COURT:  --because I'm sorry that, I missed that.

10          MR. FROMSON:  We'll arrange for a phone call, leave a

11  message on your legal, your law clerk's voicemail.

12          THE COURT:  Maria's, you can just leave it on her

13  voicemail that it's these docket numbers of what you're

14  referring to.

15          MR. FROMSON:  Okay.

16          THE COURT:  You know that's fine.  If that's--

17          MR. CHEFFO:  You haven't held us up, Your Honor,

18  because we've actually been assuming that you would grant one

19  or the other.

20          MR. FROMSON:  Right.

21          MR. CHEFFO:  So we're--

22          THE COURT:  Right.  Well, I'm likely to do one or the

23  other.

24          MR. FROMSON:  50/50 shot.

25          THE COURT:  Okay.  All right.

85

1          MR. FROMSON:  Thank you.

2          THE COURT:  Thank you very much.  We're adjourned.

3          MR. CHEFFO:  Thank you, Judge.

4   //

5   //

6   //

7   //

8   //

9   //

10  //

11  //

12  //

13  //

14  //

15  //

16  //

17  //

18  //

19  //

20                      CERTIFICATION

21      I, Maryann V. Young, court approved transcriber, certify

22  that the foregoing is a correct transcript from the official

23  digital sound recording of the proceedings in the

24  above-entitled matter.

25

                        *MARYANN V. YOUNG*
                    **Certified Court Transcriber**
                        **(508) 384-2003**

86

1   /s/ Maryann V. Young                June 21, 2010

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19