UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

------------------------------------------x

In re: NEURONTIN MARKETING, SALES
PRACTICES AND PRODUCTS
LIABILITY LITIGATION

MDL Docket No. 1629

Master File No. 04-10981

------------------------------------------x

THIS DOCUMENT RELATES TO:

Judge Patti B. Saris

*Barlow v. Pfizer Inc, et al.*
Case No. 1:05-cv-11501-PBS

Magistrate Judge Leo T. Sorokin

------------------------------------------x

## MEMORANDUM IN OPPOSITION TO
## PLAINTIFF BARLOW'S MOTION FOR SANCTIONS

Defendants Pfizer Inc and Warner-Lambert Company LLC (together, "Pfizer" or "Defendants") respectfully submit this reply memorandum in opposition to Plaintiff Barlow's motion for sanctions. Plaintiff's motion for sanctions should be denied because Defendants have fully complied with this Court's March 24, 2010, Order.

### PRELIMINARY STATEMENT

From the advent of this litigation, Plaintiff's counsel has engaged in an ongoing strategy of manufacturing discovery disputes, refusing to confer and cooperate with opposing counsel in good faith, and then filing unnecessary discovery motions.[1] Continuing with these tactics, Plaintiff's most recent motion for sanctions is essentially a baseless accusation that Defendants somehow violated the Court's March 24, 2010, Order regarding discovery costs associated with searching for, retrieving, and producing the custodial files of sales representatives ("Cost-allocation Order"). (Order [2751].) Plaintiff takes the unreasonable position that the Court's Cost-allocation Order somehow overruled all of Defendants' objections to Plaintiff's requests for production ("RFPs") and interrogatories, despite the fact that the Court addressed neither of these documents in its written order or at the hearing itself. Plaintiff's stated interpretation contradicts

---

[1] In this litigation, Plaintiff's counsel has one case subject to this Court's September discovery deadlines.

the plain language of the written Order itself, the transcript of the hearing, and the procedural background.

Contrary to Plaintiff's contentions, Defendants have fully complied with the Court's Cost-allocation Order by undertaking comprehensive and appropriate efforts to search for and produce responsive materials from the relevant sales representatives' custodial files. In fact, Defendants conducted an extensive review of potentially responsive documents in both paper and electronic format well before the September core discovery deadline operative in this case. Defendants engaged multiple attorneys in Kalamazoo, Michigan, specifically to review hard copy documents in Mrs. Barlow's case alone. After review, it was determined that these paper documents did not include custodial files of the sales representatives in Mrs. Barlow's case. Rather, some custodial files of the sales representatives at issue were found in electronic format only. Defendants conducted an extensive examination of these electronically-stored files but again found no responsive documents. In addition to searching for custodial files, Defendants also searched for, among other things, case-specific materials, including adverse event reports, Dear Doctor letters, medical information letters, accounts payable records, speaker operations records, information related to attendees at speaker programs, grants, continuing medical education ("CME") information, and information relating to key opinion leaders and medical liaisons as they relate to the prescribing doctors in this action.

Defendants, despite vigilant efforts and compliance with this Court's order and the scope of discovery, simply have not found many documents specifically relevant to the *Barlow* case. Defendants have, of course, produced hundreds of thousands of pages of documents and several databases in response to general discovery in this MDL and, the fact that there are not many case-specific documents is not surprising, given the fact that Mr. Barlow was last prescribed Neurontin in 2001 and most of the relevant sales representatives were not working for Defendants at the time Plaintiff filed her action in 2004. In fact, this Court anticipated that a search might result in no responsive documents. (*See* Order [2751] at 2 (stating that the responsive documents would be "*most likely either zero* pages or perhaps 250 pages of

discovery") (emphasis added).) However, as noted at the March 22, 2010, hearing, the number of responsive documents produced do not reflect the effort and expense behind a search for and review of potentially responsive documents – a fact which Plaintiff's counsel seems to ignore, despite numerous efforts to confer on this issue.

Additionally, Plaintiff's "kitchen sink" discovery complaints should be viewed in light of the fact that hers is one case within a larger coordinated MDL. Discovery in this case is on-going and should be permitted to run its course. Depositions of critical witnesses including Plaintiff and the prescribing physicians have not yet occurred. It is entirely possible that additional responsive documents may be identified as discovery continues to progress. For example, information could be obtained from deposing the prescribing physicians that may lead to more targeted searches for responsive documents, for example, if the physicians identify what CMEs they attended. Defendants are working cooperatively with other plaintiffs' counsel to meet this Court's September core-discovery deadline.[2] However, Mr. London continues to file unnecessary motions rather than engage in cooperative efforts to complete discovery.[3] Through their efforts, Defendants have complied with the Court's Cost-allocation Order.

## PROCEDURAL BACKGROUND

**A.  Discovery Cost-allocation Order**

In early 2010, Pfizer agreed to produce case-specific custodial files of sales representatives,[4] but a dispute arose as to which party would bear the costs associated with

---

[2] In fact, despite ample grounds to file motions for sanctions in several of plaintiffs' cases, including those filed by Boone and Schwartz, Defendants recognize the goals of this MDL Court and are attempting to work cooperatively.

[3] Mr. London's conduct is particularly troubling in light of the fact that he petitioned to be and is a member of the Plaintiff's Steering Committee, yet he is unilaterally resorting to oppressive tactics in an attempt to get special treatment for his only case to the detriment of other plaintiffs who are patiently cooperating in discovery. Also, his request to have his only case prematurely remanded to the transferor court is curious in light of his membership in the Steering Committee. (Pl.'s Memo. at 8-9.)

[4] Plaintiff's repeated assertion that Defendants "[o]pposed discovery of custodial files" is demonstrably false, (Pl's Memo [2849], at 6), especially considering that even the Court's Cost-allocation Order recognized that "Defendant has agreed to produce the documents." (Order [2751].)

3

searching for, retrieving, and producing responsive documents, if any existed.  As a result of this discovery dispute, Plaintiff Barlow and the Plaintiffs' Steering Committee filed separate motions to compel, and Pfizer filed a motion for cost-shifting.

At the hearing, Magistrate Judge Sorokin recognized that the motions that had been filed by Mrs. Barlow, the Plaintiffs' Steering Committee, and Defendants essentially were "all one issue really," which was "whether the Court should impose cost-shifting."  (Ex. A, 3/22/10 Hearing Tr. at 5:5-15; 7:3-11; Order [2751] at 1.)  The parties argued their respective positions as to cost-shifting, and Defendants offered an expert witness to estimate what it would cost to search for responsive documents in the sales representatives' custodial files and then, if any were found, to retrieve, review, and produce them.

Following this hearing, the Court determined that Pfizer should bear the costs associated with case-specific searching for and production of responsive documents, if any, from the sales representatives' custodial files, which the Court estimated would involve "most likely either zero pages or perhaps 250 pages of discovery."  (Order [2751] at 2.)  With regard to Plaintiff Barlow, the Court provided that discovery of the custodial files would occur in 14 days.  (*Id.*)

Immediately upon entry of Judge Sorokin's order, Defendants reviewed the call notes**,** and six sales representatives were identified.[5]  Pfizer searched its emails, network, and desktops for potential custodial files of these representatives.  The data found was transferred to a vendor that uploaded it and then applied search terms and date restrictions.  Attorneys then reviewed the documents.  None of the documents were responsive.  Simultaneously, Pfizer conducted a search of its warehouse for potential paper custodial files.  A team of reviewers went to the warehouse in Kalamazoo, Michigan solely for the *Barlow* case in an attempt to identify additional custodial files.  Attorneys reviewed an index of over 600 boxes, isolated approximately 25 boxes for

---

[5] Generally, these representatives have not been employed by Defendants for some time.  Only one of these sales representatives was still working with the company at the time Plaintiff commenced this action on July 13, 2004.  In most cases, the sales representatives had left the company two to four years prior to the filing of this action.

examination, and, after a thorough review, determined that none of the materials were relevant. These efforts, which were entirely paid for by Defendants, satisfied the clear terms of the Court's Cost-allocation Order.

Concurrently, Pfizer conducted an internal investigation of its records to search for adverse event reports, Dear Doctor letters, medical information letters, accounts payable records, speaker operations records, information related to attendees at speaker programs, grants, CME information, and information relating to key opinion leaders and medical liaisons as they relate to the prescribing doctors in this action. Defendants timely produced any responsive documents obtained from these searches.

**B.     Overview Of The Present Discovery Dispute**

On May 3, 2010, Mrs. Barlow's counsel, Mr. Carl Pierce, sent a letter to Defendants acknowledging receipt of case-specific documents (Bates stamped numbers 0000001-992) in response to Plaintiff's requests for discovery, as well as a disc producing all medical records and bills related to Mrs. Barlow in Defendants' possession. (Ex. B, May 3 Pierce letter.) In this letter, Mr. Pierce requested that – in addition to the discovery responses that had already been provided – Pfizer immediately supplement the discovery responses, declare whether additional responsive documents were forthcoming, specifically describe why there were no responsive documents as to certain categories of requests, and provide a privilege log with regard to documents with Bates stamps 0000482-499.

On May 13, 2010, Pfizer responded to Mr. Pierce, explaining that "Pfizer conducted extensive searches for responsive materials within the tight deadline set forth by Judge Sorokin." (Ex. C, May 13 Pfizer letter at 1.) Pfizer also explained to Mr. Pierce the following points:

> The bulk of the prescriber-specific material produced to you were identified in connection with your request for MedWatch and adverse event reports.
>
> Defendants conducted a review of both the paper and electronic custodial files for the sales representatives identified in this action. Pfizer has not identified any responsive materials from these files.

> Pfizer's search for medical liaisons that may have interacted with plaintiff's prescribers produced no responsive data.
>
> Pfizer's investigation indicates that none of the prescribers identified in this matter appear in any grant request, clinical trial information and/or received any payments from Pfizer. Despite the mention in document 130 of a possible participation in a preceptorship, after a reasonable, good faith search, Pfizer has been unable to locate records of any payment which would indicate that this prescriber actually participated in this program.
>
> As noted in our discovery responses, Pfizer is currently unaware of any databases or other centralized files that identify physicians who attended meetings or events related to Neurontin.
>
> In addition to the marketing materials previously produced in these cases, Pfizer was able to identify medical information letters that were provided to prescribers, which – along with a complete set of any medical records in Pfizer's possession regarding Plaintiff – constitute the remainder of the current production. For example, your [May 3] letter references document 204 which indicates that Dr. Atwal wanted to know if it was common for patients on Neurontin after a few months to become agitated. In the recent production, Pfizer produced information which was provided to prescribers in response to such an inquiry.
>
> Pfizer has been unable to identify whether any additional correspondence or "Dear Doctor" letter were sent to Plaintiff's prescribers at this time.

(*Id.* at 1-2.) Pfizer further assured that it would continue its search for responsive documents and supplement its production if and when such documents were located. (*Id.* at 2.) With regard to Mr. Pierce's request for a privilege log, Pfizer explained that the documents he referenced were not redacted because of privilege, but rather because of non-responsiveness and because they referenced the adverse event report for another individual. (*Id.*) Pfizer's response concluded by affirming its ongoing commitment to resolving any outstanding discovery concerns without the need for judicial intervention. (*Id.*)

Despite Pfizer's previous letter explaining its supplemental discovery responses and good faith efforts to locate responsive materials, on June 3, 2010, Mr. Jack London sent an email accusing Pfizer of violating the Court's March 24 Cost-allocation Order. (Ex. D, June 3 London email.) Many of Mr. London's accusations were both unrelated to the Court's March 24 Order, and inaccurate. For example, Mr. London's letter alleged that Pfizer had not provided answers to Plaintiff's interrogatories, despite the fact that his co-counsel had represented to the Court at the

6

hearing regarding cost-shifting that they had already "got[ten] the answers to the template discovery." (Ex. A, 3/22/10 Hearing Tr. at 11:11-16.) It further alleged that Pfizer had not provided documents responsive to certain requests for production, even though Pfizer had produced a large volume of documents and explained its continuing good faith and diligent efforts to locate responsive materials. (June 3 London email.) Mr. London's letter demanded that Pfizer provide "a responsive document to identify to which, if any, of the request for production any of the documents on the disks are responsive" as well as a "written pleading response to the requests that affirmatively states whether documents do or do not exist in response to every item described in such a request." (*Id.*) As discussed above, Pfizer explained to Mr. London its reasonable, case-specific document searches and the results of those searches. It was explained what categories of documents were not found, what were found, and those that were found were produced.

Notwithstanding Pfizer's response to Mr. London's email, confirming that it had complied with Plaintiff's discovery demands, Mr. London replied with another email restating his previous complaints and suggesting a telephone conference. (Ex. E, June 4 Pfizer email; Ex. F, June 4 London email.) On June 10, 2010, Mr. London again accused Pfizer via email of violating the Court's Cost-allocation Order, indicating that this Order had somehow broadly overruled all of Pfizer's objections to Plaintiff's discovery requests. (*See* Ex. H, June 10 London email (alleging that all of Defendants' objections to Plaintiff's RFPs and Interrogatories "were not granted, they were denied").) In reality, however, the Court never addressed and certainly never ruled upon any of these objections either at the hearing or in the written Cost-allocation Order. (Order [2751].) At that point in time, the only objections to written discovery that had been ruled upon were the template discovery requests, which were substantively different from the discovery requests Mr. London's letter referenced. (*See* Discovery Order No. 2 [372]; *see also* Template Discovery: RFPs [335]; Template Discovery: Interrogatories [336].) Also in his June 10 email, Mr. London stated his client's position as follows: "Mrs. Barlow does not believe that Pfizer's failure to produce a document means that there is no such document and, in the

7

absence of a pleading categorically stating that documents corresponding to numbered and categorized requests do not exist within Pfizer's custody, access, or control, Mrs. Barlow believes that such documents do exist and have not been produced."[6]  (June 10 London email.) Mr. London likewise expressed displeasure with the documents that had been produced, accusing Pfizer of performing a "non-sorted document dump by sending CD roms with TIFF images of certain records" that he claimed "were not disclosed as kept in the usual course of business." (*Id.*)

On June 14, 2010, Pfizer's counsel reminded Mr. London that Pfizer had "conducted extensive searches for responsive materials within the tight deadline" set by the Court and had produced certain case-specific materials, included Medwatch/adverse event reports, and call notes relevant to the sales representatives at issue.  (Ex. I, June 14 Pfizer email.)  Pfizer conducted a review of the electronically-stored custodial files it was able to local for the sales representatives at issue and engaged multiple lawyers to review paper documents in Kalamazoo, Michigan to search for custodial files in Mrs. Barlow's case alone.[7]  (*Id.*)  In its responding email, Pfizer reviewed several other case-specific categories of documents that had been searched in response to Plaintiff's discovery requests.  Some of those searches had located responsive documents, while others did not. (*Id.*)  Finally, Pfizer stated that it would continue to supplement its production if additional responsive materials are located and as discovery progresses toward the cut-off for phase-I discovery, and it invited continued discussion of these disputed issues. (*Id.*)  Plaintiff filed a motion for sanctions on the following day.[8]

---

[6] With this email, he attached a copy of Plaintiff's Requests for Productions and Interrogatories with certain portions highlighted in yellow.

[7] Plaintiff's memorandum falsely claims that Defendants' suggested that "there were no sales representatives custodial files." (Pl.'s Memo. [2849] at 4.) Rather, as Plaintiff's counsel is well-aware, Defendants' counsel explained that, despite diligent searches, Defendants were not able to locate custodial files *stored in paper format*. Some custodial files of the sales representatives at issue were found in electronic format, but no responsive documents were identified within these files. (*See, e.g.*, May 13, 2010, Pfizer letter at 1.)

[8] To understand Plaintiff's counsel's motivations in filing the present motion, it helps to consider the context of their history of discovery tactics and unwillingness to compromise or cooperate. For

## ARGUMENT

**I.      Defendants Have Complied With The Court's Order**

Defendants have fully complied with this Court's March 24 Cost-allocation Order as it applies to the *Barlow* case. The Order directed that Defendants bear the expense of reviewing the custodial files of the sales representatives at issue and, if any responsive documents are located, pay to retrieve and produce them. (*See* Order [2751].) Within the fourteen day timeframe applicable to this case, Defendants did just that. (*See, e.g.*, June 14 Pfizer email.) Even though no responsive documents were identified, Defendants' exceptional efforts to conduct document discovery as to the custodial files in Plaintiff's case fully satisfied the Court's Cost-allocation Order as it applies to the *Barlow* case. In fact, the Court indicated in its written order that it expected Defendants to locate no responsive documents in some cases. (*See* Order [2751] at 2 (stating that the responsive documents would be "*most likely either zero* pages or perhaps 250 pages of discovery") (emphasis added).)

Plaintiff's argument – that the Court's March 24 order addressed anything other than costs associated with discovery of the sales representatives' custodial files – is unsupported by the plain language of the written Order, the transcript of the hearing, and the procedural background. Nowhere in its Order did the Court compel Pfizer to supplement the answers to interrogatories or responses to requests for production that had already been sent to Plaintiff. Furthermore, the Court never addressed and certainly never overruled Defendants' objections to Plaintiff's RFPs or interrogatories.[9] Plaintiff's counsel's attempt to add such language into the

---

example, at the outset of this litigation, Plaintiff's attorneys refused to sign a protective order to protect confidentiality of Defendants' proprietary and sensitive documents. (Ex. J, June 30, 2005, Lilly Decl.) At the same time they opposed any confidentiality protection for Defendants' sensitive documents, Plaintiff's counsel were obstructing even the most basic discovery of Plaintiff by refusing to provide the standard medical authorizations requested by Defendants. (*Id.*) Within the first year of litigation alone, Plaintiff filed no less than five motions to compel and/or for sanctions. Plaintiff's counsel have held to this improper strategy throughout this lawsuit, and their current motion for sanctions is only the most recent example. In fact, this pattern of uncooperativeness prompted Defendants to oppose the appointment of Plaintiff's counsel, Mr. London, to the Plaintiffs' Steering Committee. [168.]

[9] Similarly, the sufficiency of Defendants' interrogatory answers were not addressed at the earlier hearing. While Plaintiff now alleges that Defendants "[f]ailed to answer any interrogatories" and

9

four corners of the Court's unambiguous Order constitutes an objectively unreasonable interpretation.

Because Defendants have fully complied with the Court's March 24 Cost-allocation Order, Plaintiff's motion should be denied on this basis alone.[10]

## II. Plaintiff's Motion Is Premature And Disrupts MDL Discovery

Phase-I discovery for the group of cases to which Plaintiff Barlow belongs does not end until September 14, 2010. The parties have not even taken the depositions of critical witnesses in this case –Plaintiff and the prescribing physicians. Many of these discovery requests concern Plaintiff's prescribing physicians. When these physicians are deposed, it is possible that they may possess information that Pfizer's reasonable searches have not uncovered, or they may confirm that no such documents exist, or they may provide information that will permit more targeted discovery. For example, the physicians may confirm that they did not receive grant payments from Pfizer or they may provide specific details about CMEs that they attended, and then Defendants may narrow and amend their search, which will then lead to responsive documents. As Pfizer explained to Plaintiff's counsel, it will "continue to supplement [its] production if additional responsive materials are located and as discovery progresses . . . ." (June 14 Pfizer email.)

Filing this motion at this juncture is premature, disrupts the MDL proceedings, and detracts resources from other plaintiffs in this litigation. Plaintiff is merely trying to cut to the

---

"[f]ailed to file a responsive pleading to Requests for Production" (Pl.'s Memo. [2849] at 6-7), Plaintiffs told the court at the March 22 hearing that they had received answers to the template discovery. (Hearing Tr. at 11:11-16; *see also id.* at 7:23-8:18 (Plaintiff's counsel agreed that the parties' dispute was limited to the "the template interrogatory responses and document requests.").)

[10] Plaintiff's citations to *Afreedi v. Bennett*, 517 F. Supp. 2d 521 (D. Mass. 2007), and *Blake Assoc., Inc., v. Omni Spectra, Inc.*, 118 F.R.D. 283 (D. Mass. 1988) are inapposite. In *Blake Assoc.*, sanctions were imposed on plaintiff under Federal Rule of Civil Procedure 37(b)(2)(D), which explicitly applies only to violations of a court order. Likewise, *Afreedi* dealt with conduct of a party that violated two court orders. In this case, however, even if some aspect of Defendants' discovery responses are somehow found inadequate, which they are not, this still would not violate the plain terms of the Court's Cost-allocation Order, which Plaintiff invokes.

front of the line before hundreds of cases by bombarding Defendants' counsel with numerous letters and emails, never being satisfied with reasonable and good faith searches and efforts to confer, and by the filing of motions based on artificial discovery disputes of her lawyers' own making.[11]  By her own admission, the sole basis for many of Plaintiff's objections with regard to these documents is that "Plaintiff believes [they] exist" without any additional discovery to validate this claim.  (Pl.'s Memo. [2849] at 6-7.)  Plaintiffs' only basis for challenging Pfizer's repeated explanation of the results of its searches is to assert that such explanations are "in stark contrast to the representations Defendants made to the Court in both the motion and memorandum" regarding allocations of cost.  (*Id.* at 4.)  But there is no contradiction.  The point of Pfizer's prior motion was that substantial expense would be required to conduct searches *unlikely to find* significant relevant documents.  For Plaintiff to bring this motion for sanctions with no other basis for challenging the sufficiency of Pfizer's response is unreasonable.  Equally unreasonable is Plaintiff's demand that Defendants affirmatively declare that certain categories of documents conclusively do not exist – as opposed to the representations already made by Defendants that reasonable investigation did not find documents responsive to certain requests, especially given Defendants' ongoing efforts to search for responsive materials and their demonstrated willingness to supplement their responses when such materials are identified based upon new developments.  Defendants' counsel have repeatedly explained this to Plaintiff in their correspondence.

**III.     Defendants Have Responded Appropriately To Plaintiff's Discovery Requests**

Although not within the scope of the Court's March 24 Cost-allocation Order, Plaintiff complains about the adequacy Defendants' responses to several of her RFPs and interrogatories. Even though Plaintiff has not framed her filings as motions to compel and most of these RFPs

---

[11] Plaintiff's counsel's motivation in attempting to thwart the normal MDL procedure is apparent in the unusual request that this Court remand Barlow's case "to the Western District of Texas at this time so that any ongoing or future misconduct could be dealt with swiftly at the local level . . . ." (Pl.'s Memo. at 8-9.)

and interrogatories are unrelated to the Court's Cost-allocation Order, Defendants will respond to Plaintiff's accusations for the sake of completeness.

With regard to requests made by Plaintiff that were within the proper scope of discovery, her complaints are baseless because Defendants have diligently searched for (and continue to search for) documents responsive to her requests and have produced them and will continue to produce them when found. Plaintiff alleges that Defendants "failed to produce" documents from 28 of her 48 requests for production and all of her interrogatories. (*See* Pl.'s Mot. Re: RFPs [2848] at 2-4.) For the reasons explained below, however, these accusations are unfounded.

First, Plaintiff complains that Defendants have not produced *her own* medical bills. (*Id.* at 2.) Even though these documents are clearly within the control of Plaintiff, Defendants have produced all of Plaintiff's medical records in their possession. Even Plaintiff's counsel acknowledged that Defendants actually have already produced the medical records in their possession. (*See* May 3 Pierce letter.)

Second, Plaintiff seeks "[a]ll the names, last known addresses, and telephone numbers of Defendant's sales representatives who called on plaintiff's prescribers." (Pl.'s Mot. Re: RFPs at 2; *see also* Pl's Inter. #1.) Defendants reviewed the call notes, and six sales representatives were identified. All of these sales representatives are former Pfizer employees. Defendants have reached out to all of these sales representatives and have already offered deposition dates for four of them, three of which have already been accepted. One former sales representative has independent counsel, and plaintiff has this contact information. Only one sales representative has not yet been located.[12] For the one sales representative that Defendants have not been able to contact, last known contact information has been provided to Plaintiff. This procedure has been the custom and the practice throughout this litigation.

Third, Plaintiff mentions several requests related to the sales representatives' custodial

---

[12] Therefore, Plaintiff's complaints about the scheduling of sales representatives in her memorandum are rendered moot.

12

files.  For one, she claims entitlement to "[t]he sales representatives *entire* custodial file." (*Id.* at 2 (emphasis added).)  This contradicts what Plaintiff's counsel previously said to the Court:

> THE COURT: Okay.  Out of the ESI information that we've all discussed, what you want is the documents that relate to Neurontin?
> MR. PIERCE: Definitely.  That's – it's limited to Neurontin.

(Hearing Tr. at 73:8-12.)  Furthermore, the parties agreed that production from the sales representatives' custodial files would be subject to limitations.  (Template Discovery: RFPs [335] at 16.)  Of course, as demonstrated by the number of responsive documents in previous productions, the vast majority of all sales representatives' custodial files are totally unrelated to Neurontin.  Defendants have already explained this to Plaintiff's counsel multiple times in previous correspondence.  Also related to the sales representatives custodial files, Plaintiff levels inadequacy allegations as to the following RFPs:  "Training manuals for sales representatives who called on Plaintiff's prescribing physicians"; "Scripts of all sales representatives 'voice mails'"; "Comparison sheets provided to each of Defendant's sales representatives"; "'Q&A' responses to published studies provided to each of Defendants' sales representatives."  (Pl.'s Mot. Re: RFPs  at 3-4.)  To the extent Plaintiff is seeking documents beyond what could be found in the custodial files, Defendants have already responded to generic discovery and produced hundreds of thousands of pages of documents, including marketing materials, dear doctor letters, databases, and other materials.   The scope of case-specific discovery is appropriately limited to custodial files of sales representatives who called on the decedent's physicians, and that was what was searched.  As explained *supra*, no responsive materials were located during Defendants' diligent searches and reviews with regard to the custodial files of the sales representatives at issue in Mrs. Barlow's case.   Plaintiff also requests "[t]hird party materials provided to each of Defendant's sales representatives," but, on its face, this request is unreasonably overbroad, unduly burdensome, and unlimited in time and scope.

Fourth, Plaintiff seeks "[a]ll sales call notes and sample data in an electronic and paper format" and "[p]romotional information distributed to or discussed with Plaintiff's prescribing

13

physicians." (*Id.* at 2-3.) Defendants have made their call notes and sample information available by providing Plaintiff access to its various call notes databases, such as CMMS and Sherlock. Defendants also produced case-specific call notes limited by Plaintiff's date of injury and their relevance to Neurontin. This was in accord with the agreement reached by the parties with regard to call notes.[13] (Template Discovery: RFPs at 18-19.) The information contained in these call notes include the nature of the call and whether samples were left behind. Furthermore, Pfizer was able to identify medical information letters sent to the prescribing physicians in this action, and these were produced to Plaintiff. For example, Defendants produced a document sent in response to an inquiry by Dr. Atwal, who wanted to know if it was common for patients on Neurontin after a few months to become agitated. This has already been explained to Plaintiff's counsel in previous correspondence. (*See* May 13 Pfizer letter.)

Fifth, Plaintiff seeks private information in the sales representatives' personnel files that is neither relevant nor reasonably calculated to lead to the discovery of relevant information in this case, including "[t]he entire employment file for each of Defendant's sales representatives." (Pl.'s Mot. Re: RFPs at 3.) Plaintiff also seeks "[r]ecords of sales representatives investigations and reprimands." (*Id.* at 2; *see also* Pl's Inter. #2.) In their agreements regarding template RFPs, however, the parties did not agree that documents regarding investigations and reprimands would be automatically produced, but rather provided that a discussion would follow as to the appropriate course of action if such responsive documents were found. (Template Discovery: RFPs at 22.)

Sixth, Plaintiff complains about the adequacy of certain RFPs concerning her prescribing physicians. She refers to "[r]ecords of health care providers as an 'opinion leader,' Visiting Speakers Bureau, or consultant in any other capacity." (Pl.'s Mot. Re: RFPs at 3; *see also* Pl's

---

[13] Even though Plaintiff's memorandum alleges that "documents titled 'CMMS' and 'CMMS notes'" were not "produced as kept in the usual course of business," (Pl.'s Memo. at 7), Plaintiff has access to the full databases in which the documents appear as they are stored in the ordinary course of business. Furthermore, the documents Plaintiff complains of were produced in accordance with the parties' agreement as to template discovery. (*See* Template Discovery: RFPs at 18-19.)

Inert. #3.) In response to this request, Defendants searched their accounts payable records, particularly with regard to Speaker Operations. None of Plaintiff's prescribing physicians were identified as receiving payment from Defendants, and therefore the records indicate that they were never paid in any of the capacities mentioned in Plaintiff's request. She also requested "[r]ecords of Plaintiff's health care providers invited to attend conferences or events." (Pl.'s Mot. re: RFPs at 3; *see also* Pl's Inert. #4.) Defendants have tried but have found no systematic way of capturing attendees at speaker programs during the relevant time period. Defendants have produced call notes regarding these doctors and medical inquiry letters, as well as given Plaintiff access to its "Merlin/Pfoenix" database. Plaintiff also broadly seeks "[d]ocument[s] received from any of Plaintiff's prescribing physicians" and "[c]ommunications with Plaintiff's prescribing physicians concerning the risk and benefits of Neurontin." (Pl.'s Mot. re: RFPs at 3; *see also* Pl's Inert. #7.) During its searches of the available custodial files of the sales representatives at issue in this case, Defendants searched for and found no documents that were responsive to these two requests. To the extent Plaintiff is seeking documents beyond what could be found in the custodial files, Defendants have already responded to generic discovery. She also requests documents concerning "[i]ndemnification for Plaintiff's prescribing physicians related to Neurontin litigation," but no such indemnification agreement has been entered between Defendants and Mrs. Barlow's prescribing physicians.

Seventh, Plaintiff seeks documentation about the prescribing practices of the prescribing physicians with the following requests: "[d]atabase or information to track Plaintiff's prescribing health care providers prescribing practices," "[e]very document that purports to describe the prescribing practices of any of Plaintiff's prescribing physicians," and "[d]ata that purports to track Plaintiff's providers prescribing practices." (*Id.* at 2-3.) While this information has not yet been located with regard to Plaintiff's physicians, Defendants are continuing to look for this information and will provide it if and when it becomes available.

Eighth, Plaintiff points to her request regarding "[i]nvestigations of Plaintiff or her family." (Pl.'s Mot. Re: RFPs at 2.) Defendants produced Plaintiff's Medwatch (adverse event)

15

report, as well as Plaintiff's medical records in Defendants' possession.

Ninth, Plaintiff refers to her request for "[a]ll leave-behind materials." In addition to the myriad of marketing materials that were already produced in this case, Defendants produced its medical information letters in response to this request. Redundantly, Plaintiff also requested "[l]eave-behind materials directed to patients." To the extent such materials exist and could be relevant to this case, they would already be in Plaintiff's possession as a result of generic discovery.

Tenth, with regard to the request about "Defendants' gross and net sales of Neurontin for each year," Plaintiff's attorney Mr. London stated in an email to Defendants' counsel that he was not presently pursuing that request. Furthermore, this request is not within the scope of initial core discovery.

Finally, most of Plaintiff's interrogatories are substantially the same as her RFPs, and responsive information, to the extent available at all, could only be ascertained from responsive documents.[14] Accordingly, with regard to the portions of Plaintiff's interrogatories that were not objectionable, Defendants referred Plaintiff to various documents and databases responsive to her interrogatories, as provided for in Federal Rule of Civil Procedure 33(d). This is because the information sought by Plaintiff's interrogatories, particularly with regard to her prescribing healthcare providers, could only be obtained by referencing documents. This practice is consistent with the parties' course of dealing in this litigation, and Plaintiff's interrogatory responses follow a similar practice.[15] Furthermore, most of the information Plaintiff sought could be found by searching the databases, which Plaintiff can do as easily as Defendants, or by reviewing a relatively small set of case-specific materials that have been produced.

---

[14] The interrogatories are cross-referenced above with the corresponding RFPs. With regard to interrogatories 5 and 6, these were answered through references to the materials and databases already produced. Interrogatory 9 is objectionable in its entirety and need not be answered.

[15] For example, in response to Defendants' interrogatory number 11 about Plaintiff's history of mental illness, she generally referred Defendants to her medical records.

## IV.  Defendants Need Not Have Conducted A Search For Documents Prior To Filing A Cost-shifting Motion As To Searching For Those Very Same Documents

At various sections of her memorandum, Plaintiff makes a nonsensical argument about how Defendants did not first search the custodial files before moving to shift the costs "required to *search for*, retrieve, and produce" potentially responsive documents from the custodial files of sales representatives.  (Defs.' Cost-Shifting Mot. [2578] at 8 (emphasis added).)  Plaintiff alleges that:  "[g]iven that Defense counsel has written a letter to say that there are no custodial files, as surprising as that is, Plaintiffs believe the more likely truth is that Defendants made no effort to determine whether such files existed before filing the cost-shifting opposition . . . ."[16]  (Pl.'s Memo. [2849] at 6.)

It is wholly reasonable and proper that Defendants did not perform a search for responsive documents prior to filing a motion seeking relief, in part, for the cost of *searching* for responsive documents.[17]  That would be putting the cart before the horse.  There was nothing nefarious or misleading about waiting until after the Court ruled on the motion regarding cost-shifting to perform the document searches.  To have done otherwise would have been illogical.  In fact, the Court was well aware that the review had not yet been conducted as of the date of the

---

[16] Plaintiff also makes allegations about Rule 11 violations involving Defendants' cost-shifting motion.  Not only is this argument substantively baseless, even if she intended to bring some sort of Rule 11 challenge, she failed to follow the necessary procedure.  *See* Fed. R. Civ. P. 11(c)(2) ("The motion must be served under Rule 5, but it must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets.").  Furthermore, considering that the Court ruled on this motion months ago, Plaintiff would be too late in bringing any Rule 11 challenge.

[17] In fact, to the extent the Court had ruled in Defendants' favor on the issue of cost-shifting, the parties may have agreed to a limited or more targeted search for these files in order to save costs, making any preemptive searching potentially wasteful.  *See, e.g.*, *In re Fosamax Prods. Liab. Litig.*, No. 1:06-md-1789, 2008 WL 2345877, at *11 (S.D.N.Y. June 5, 2008) (observing that one of the main reasons for imposing cost-shifting is "to create an incentive for plaintiffs to narrow their requests to focus on the documents they really want."); *Laethem Equip. Co. v. Deere & Co.*, 261 F.R.D. 127, 145 (E.D. Mich. 2009) ("[I]t is apparent that by bearing the cost of production, each party will have an incentive to tailor its ESI request to that which is genuinely relevant to the issues that remain."); Manual for Complex Litigation (Fourth) § 11.433 (2009) (observing that "the court's authority to shift costs will give the parties an incentive to use cost-effective means of obtaining information and a disincentive to engage in wasteful and costly discovery activity.").

17

hearing.  (*See, e.g.*, Hearing Tr. at 28:3-6 (asking Defense counsel "[s]o what's the, the search *to be done*"); *id.* at 33:16-18 (asking Defense counsel "you don't have any reason to believe that *if you do these searches* you're going to come up with 40,000 pages") (emphasis added).)  Plaintiff's argument is, at best, vexatious and, at worst, motivated by bad faith.

## V.     Plaintiff's Baseless And Harassing Motions Are Sanctionable

Finally, this Court should impose sanctions against Plaintiff or her counsel for filing this motion, which is objectively unreasonable, in bad faith, and serves no other purpose than to "multipl[y] the proceedings . . . unreasonably and vexatiously."  28 U.S.C. § 1927; *see also United States v. Nesglo, Inc.*, 744 F.2d 887, 891 (1st Cir. 1984).

## CONCLUSION

For all the foregoing reasons, Defendants respectfully request that the Court deny Plaintiff Barlow's motion for sanctions against Defendants.

Dated: June 29, 2010

Respectfully submitted,

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP

By:    /s/ Mark S. Cheffo
       Mark S. Cheffo

Four Times Square
New York, NY 10036
Tel:  (212) 735-3000
Mark.Cheffo@skadden.com

|  |  |
|---|---|
| | ROPES & GRAY LLP |
| CERTIFICATE OF SERVICE | By:   /s/ Ana M. Francisco<br>       Ana M. Francisco<br>       BBO # 564346 |
| I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on June 29, 2010.<br><br>       /s/ Ana M. Francisco<br>       Ana M. Francisco | One International Place<br>Boston, MA  02110<br>Tel:  (617) 951-7000<br>Ana.Francisco@ropesgray.com<br><br>*Attorney for Defendants Pfizer Inc and Warner-Lambert Company LLC* |

19