1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
2

3    _____

4    IN RE:  NEURONTIN MARKETING,
     SALES PRACTICES AND PRODUCTS
5    LIABILITY LITIGATION,              Civil Action
                                        No. 04-10981-PBS
6
                                        August 17, 2010, 3:55 p.m.
7    _____

8

9

10                   TRANSCRIPT of MOTION HEARING

11             BEFORE THE HONORABLE LEO T. SOROKIN

12         UNITED STATES MAGISTRATE DISTRICT JUDGE

13                    1 COURTHOUSE WAY

14                   BOSTON, MA   02210

15

16

17

18

19

20

21                   DEBRA M. JOYCE, RMR, CRR
                       Official Court Reporter
22                 John J. Moakley U.S. Courthouse
                    1 Courthouse Way, Room 5204
23                      Boston, MA   02210
                          617-737-4410
24

25

1    APPEARANCES:

2    FOR THE PLAINTIFFS:

3    KEITH L. ALTMAN, ESQ.
     KENNETH B. FROMSON, ESQ.
4    Finkelstein & Partners, LLP.
     436 Robinson Avenue
5    Newburgh, New York  12550

6
     FOR THE DEFENDANTS:
7
     MARK S. CHEFFO, ESQ.
8    KATHERINE ARMSTRONG, ESQ.
     Skadden, Arps, Slate, Meagher & Flom LLP
9    Four Times Square
     New York, NY 10036
10   212-735-3000

11

12   BY TELEPHONE:

13   NEWTON B. SCHWARTZ, SR., ESQ.
     JAMES STEGALL, ESQ.
14   JACK HARANG, ESQ.
     1911 Southwest Freeway
15   Houston, TX 77098
     713-630-0708

16

17

18

19

20

21

22

23

24

25

```
 1                  P R O C E E D I N G S

 2              (The following proceedings were held in open

 3   court before the Honorable Leo T. Sorokin, United States

 4   Magistrate Judge, United States District Court, District of

 5   Massachusetts, at the John J. Moakley United States Courthouse,

 6   1 Courthouse Way, Boston, Massachusetts, on August 17, 2010.)

 7              THE CLERK:  Today is August 17th, the case of In Re:

 8   Neurontin, civil action 04-10981.

 9              Counsel please identify themselves for the record.

10              MR. FROMSON:  Kenneth Fromson for the plaintiffs,

11   Finkelstein & Partners.  Good afternoon, Judge.

12              THE COURT:  Good afternoon.

13              MR. FROMSON:  Keith Altman for the plaintiffs,

14   Finkelstein & Partners.  Good afternoon, Judge.

15              MR. CHEFFO:  Your Honor, Mark Cheffo for Pfizer.

16              MS. ARMSTRONG:  Katherine Armstrong for Pfizer.

17              THE COURT:  Good afternoon.  I'm sorry I'm so late.

18              MR. STEGALL:  Your Honor, by phone, Newton Schwartz,

19   James Stegall, and Jack Harang for the plaintiff.

20              THE COURT:  Good afternoon.

21              All three of you are with Mr. Schwartz' law firm?

22              MR. STEGALL:  Yes, your Honor.

23              THE COURT:  Sorry I'm so late.  I'm just in the middle

24   of another matter that just finished.

25              So I have three things on for today.  One is the
```

1    plaintiffs' assented to motion to continue the September

2    discovery deadline.  One is the motion for trial preservation

3    depositions, or so to speak.  And one is the Steering

4    Committee's motion for sanctions regarding follow-up to my

5    October 2009 thereabouts discovery order.

6         MR. CHEFFO:  I think that's true.  Though I think we

7    maybe can start off on telling you I think we resolved at least

8    some of them.  If I can kind of you give you a little bit of

9    update.

03:56 10        THE COURT:  Okay.

11        MR. CHEFFO:  This was the plaintiffs' motion, but

12   prior to -- prior to even coming here today we worked out --

13   and they were going to withdraw their motion as to the

14   sanctions portion, just kind of focus on the motion to compel.

15   As luck would have it, we wound up having an opportunity to

16   meet on the second floor over a cup of coffee, and we were able

17   to resolve our -- the motion to compel.

18        But there are some caveats that I want to -- and

19   Mr. Fromson and Mr. Altman will make sure I got it right

03:57 20   because it is their motion, but if I can articulate what we

21   agreed to --

22        THE COURT:  Sure.

23        MR. CHEFFO:  -- we could put it on the record and then

24   make sure they're in agreement with that.

25        Basically -- so if your Honor would endorse this and

1    plaintiffs agree, they would withdraw their motion rather than

2    having motions on and entering.  So they'll withdraw with leave

3    to file it if we ultimately can't come to agreement.

4              There's been a collection of material --

5              THE COURT:  This is the motion that concerned Wohlberg

6    labeling and the efficacy and side effects not previously

7    produced.

8              MR. CHEFFO:  Exactly, safety and efficacy, Wohlberg

9    labeling.  I can give you more details --

03:57 10          THE COURT:  No, no.

11             MR. CHEFFO:  There's a lot that we've done that I

12   think there was no disagreement.  There were certain areas,

13   there were large areas, but they were targeted.  What we've

14   agreed to do is what we've called this Kibbe collection of

15   documents.  Not exactly clear what they are, but there is a

16   collection of materials that are in electronic form.

17             What we've agreed to do is within 30 days is to go and

18   actually try to provide them the identification of those

19   custodians who would be encompassed within the Kibbe

03:58 20   collection, to the extent that -- reasonable efforts who these

21   people are, are they marketing, are they regulatory.  Also,

22   again, this is one we need to make sure we can do, but if it's

23   something that's readily kind of ascertainable, give them an

24   idea of the volume for each of those people.

25             And the idea then would be we would all reserve our

1   rights but hopefully in the spirit of cooperation, if it got to

2   a number that was reasonable and a scope that was reasonable,

3   they'd have the names, identification and scope and volume of

4   materials.  We might then, to avoid a motion before the Court,

5   agree to conduct searches.

6          But what we're going to do right now is basically take

7   30 days and provide that information.

8          Is that accurate, Ken?

9          MR. FROMSON:  Yes.

03:59 10          MR. CHEFFO:  We've also agreed -- there's another

11   aspect of their motion where we just fundamentally disagree,

12   but I don't want to argue both sides, as to 2007 to 2009

13   documents, whether we should have produce them, we shouldn't,

14   or what it is.  We've agreed at least at this point is we're

15   going to make efforts to identify the people who would be most

16   involved in kind of the safety issues regarding suicide during

17   that period of time.

18          Again, candidly, my hope is that they will be the same

19   people that we've already produced, whether it's Lloyd Knapp or

03:59 20   Wohlberg or Melandro (phon.) or -- you know, but I don't know

21   that right now.

22          So we've basically agreed to, you know -- we've made

23   progress, but I think this really -- I'll stop giving you too

24   many details you may not need -- but the idea is we're going to

25   do this, we're going to provide it.  They have an opportunity.

1   We can try to work it out.  If we can't ultimately work it out,

2   we do think we'll ultimately have narrowed the issues

3   substantially so your Honor can make a more targeted decision.

4           THE COURT:  All right.

5           MR. CHEFFO:  Did I get that right?

6           MR. FROMSON:  Yes, you did get it right, and that

7   essentially the same terms as with the Kibbe collection --

8   which is K-i-b-b-e -- in that they're going to try to identify

9   people with substantive knowledge and identify their area of

04:00 10  responsibility.  And they don't have the ability to tell us the

11  size of the file because -- with the likelihood there's no file

12  collected.  It's the essentially same principle as applied to

13  the Kibbe collection.

14          THE COURT:  So essentially what they're going to do is

15  tell you who are the people in the Kibbe collection, and if

16  they can reasonably ascertain it the volume that each such

17  person has of documents that have already been collected.  And

18  who are the people most involved in safety or suicide, but they

19  won't be able to tell you the volume for those people because

04:00 20  they won't have collected it yet.  And then you'll have all

21  that information and talk about -- if the people are mostly

22  involved in safety and suicide, they have already been all

23  produced, it's one thing; if there's a whole new set of people,

24  it's another thing.  And then you'll talk to each other and

25  maybe you'll resolve it.  If you haven't resolved it, then

| | |
|---|---|
| 1 | you'll bring it back but it will be a little bit more focused. |
| 2 | MR. FROMSON:  Right.  Excuse me for sitting. |
| 3 | So it's clear, the motion is simply being withdrawn. |
| 4 | There's still discovery that's being produced pursuant to the |
| 5 | order from October of '09.  It's not as though this is the only |
| 6 | issue.  It's just that we don't have a dispute over the way in |
| 7 | which the process is going at this point. |
| 8 | THE COURT:  So you're withdrawing it without prejudice |
| 9 | to refile it in revised form in light of whatever transpires. |
| 04:01 10 | MR. FROMSON:  That's correct. |
| 11 | THE COURT:  All right. |
| 12 | MR. CHEFFO:  You accurately, your Honor, articulated |
| 13 | the other two issues with extension of time.  We can give you |
| 14 | details -- |
| 15 | THE COURT:  I have a couple of questions on the |
| 16 | extension of time.  You want a September 14th deadline for the |
| 17 | 130 cases. |
| 18 | MR. CHEFFO:  That's correct, your Honor. |
| 19 | THE COURT:  And you want 60 days? |
| 04:02 20 | MR. FROMSON:  Yes, your Honor. |
| 21 | THE COURT:  To be honest with you, unlike some charts, |
| 22 | it wasn't a chart that I found difficult to read. |
| 23 | MR. FROMSON:  Good.  We tried. |
| 24 | THE COURT:  It was just that -- |
| 25 | MR. FROMSON:  And obviously this pertains -- we only |

 1    had access at time to the Finkelstein & Partners cases.

 2            THE COURT:  That's out of the 130.

 3            MR. FROMSON:  Correct.

 4            THE COURT:  I assumed that from looking at it.  But

 5    just going across, say, the first line.  So whatever some

 6    internal number you have, the District of Mass. case number,

 7    the plaintiff.  What's the PEBT date?

 8            MR. FROMSON:  Plaintiff examination before trial was

 9    held July 29, 2010.

04:02 10            THE COURT:  I got it.

11            MR. FROMSON:  And the prescribers you see are listed

12    there.  This is a good example because it lists Michael A. Cuff

13    who was deposed on July 28th, but there are a number of other

14    prescribers whose depositions are still outstanding.

15    Therefore, the prescriber EBT date --

16            MR. CHEFFO:  Speaking of New York, EBT, the only place

17    is in New York they call depositions are EBTs.

18            THE COURT:  I remember now.  It's been a long time

19    since I practiced.  I actually was in New York.  Now that you

04:03 20    remind me of that, I remember that EBT is a New York term.

21            Thank you.

22            So the Walton is a sales rep, his deposition hasn't

23    been taken, the custodial file has been received.

24            MR. FROMSON:  Yes, your Honor.

25            THE COURT:  So everywhere there's a blank date, that

1    means there's been neither a deposition that's occurred nor a

2    deposition scheduled, as opposed to looking further down

3    Dr. Jerome Yokiel, Y-o-k-i-e-l, 9/7, that means he's scheduled

4    for that date.

5           MR. FROMSON:  Yes, your Honor.

6           THE COURT:  All right.

7           So what percentage of the depositions do you think are

8    done from the Finkelstein cases?

9           MR. FROMSON:  I think if you broke it down by

04:04 10   plaintiff, in other words, I think that -- I would say -- I'm

11   guesstimating that over 90 percent of the plaintiffs have been

12   deposed.  I would say that over 85 percent of the prescribers

13   have been deposed.  I'd say that the sales representatives for

14   the most part have the lowest percentage of being deposed.  And

15   that's why you see the majority of blanks there.

16          THE COURT:  I see.

17          And then the multiple -- when there are multiple

18   doctors, that's where they've not all been deposed mostly.  In

19   other words, most -- it looks like an awful lot of these cases

04:04 20   have one doctor deposition.

21          MR. FROMSON:  Yes, your Honor.  The majority have one

22   or two prescribers.

23          THE COURT:  Okay.

24          MR. CHEFFO:  This goes both ways, your Honor.  So it's

25   certainly not throwing stones, but as has happened, we found a

1   lot is we thought we were actually done.  We take the

2   plaintiff, we find another prescriber and then we deal with it.

3   So it's just human nature.

4        THE COURT:  This doesn't affect all the other

5   deadlines that I've previously established if I allow this.

6        MR. FROMSON:  We're not -- we haven't sought --

7        THE COURT:  It affects you less, Mr. Fromson, really,

8   because you don't have any other --

9        MR. FROMSON:  That's correct.  We're not -- but for

04:05 10   the original 130, any cases that were in that listing there are

11   a few cases, so they would get the benefit, we hope, as well --

12        THE COURT:  Yes, I'm doing it for all 130.

13        MR. FROMSON:  Anyone governed by the 9/14 deadline we

14   would hope you would give us the benefit --

15        THE COURT:  Yes, I'm treating them all the same way.

16        MR. FROMSON:  Thank you.

17        THE COURT:  What I mean -- it's really for you,

18   Mr. Cheffo, since you have -- and even the other lawyers who

19   are in the 130, with the exception of Mr. Schwartz and

04:05 20   Mr. Boone, most of the lawyers don't have that many cases in

21   the other categories.

22        The question is:  If I continue this 130 cases and

23   give them 60 more days, thereby pushing out further discovery

24   in those cases during periods of time where other things are

25   happening with respect to other categories of cases, what does

1    that do to the deadlines I've set elsewhere from your side?

2         MR. CHEFFO:  From our side I don't think -- we're not

3    joining them at all.  We're going to proceed independently.

4    And obviously, if we hit a speed bump on a bunch of cases --

5    but we're prepared.  We made this -- it wasn't this was going

6    to move everything.

7         THE COURT:  I won't hear from you in three weeks we've

8    got to push back these other deadlines because now we're busy

9    with --

04:06 10        MR. CHEFFO:  No.  This I would view more as kind of

11   cleanup efforts on the first group.

12        THE COURT:  All right.  I will allow the motion,

13   assented to motion to extend the September 4, 2010 discovery

14   deadline, which is docket number 3029.

15        Is an electronic note in the clerk's office sufficient

16   for all of you or is it more helpful to have a written order

17   you can distribute?

18        MR. FROMSON:  An electronic order is fine, your Honor.

19        THE COURT:  So, Maria, just put that on the clerk's

04:06 20   notes.  You can allow 3029.

21        On September -- I have a hearing on September 17th.

22   You have to refresh me.  Are there any other motions on for

23   that day right now that either of you recall?

24        MR. CHEFFO:  I don't think so.

25        MR. FROMSON:  I don't have any, but I can't speak --

1          MR. CHEFFO:  We have a control date that your Honor

2     set.

3          THE COURT:  I set it originally on September 14th.  So

4     I'm going to do this.  I'll change that September 17th as to --

5     I'm going to add a status conference on -- Maria, do you have

6     the calendar there?

7          (Discussion off the record.)

8          THE COURT:  How about 2:00 on Thursday, the 18th.  I'm

9     not going to cancel the September date right now.  What I'd say

04:08 10    is do this --

11         MR. FROMSON:  Did you say Thursday the 18th?

12         THE COURT:  Of November.

13         MR. FROMSON:  Of November, okay.

14         THE COURT:  Yes.  Because now the deadline is really

15    the 15th of November.

16         MR. FROMSON:  Okay.

17         THE COURT:  I'm not now going to cancel the September

18    date.  After -- if either of you -- as you get further along,

19    either of you see no reason to have the date in September, file

04:08 20    an agreed to motion to cancel the date.  But there are other

21    categories of cases out there, and it may be that with respect

22    to the pro se cases or Mr. Boone's cases or Mr. Schwartz' cases

23    or -- I think those are the other categories.  There may be

24    something, and I'm going to leave the date for now.

25         That leaves the motion to -- let me summarize what I

1    think the -- there is not an agreement on that motion or is

2    there?

3              MR. FROMSON:  No, your Honor, there's opposition.

4              THE COURT:  So let me just summarize this motion, make

5    sure you all understand what I understand the motion to be, and

6    then I'll hear first from you, Mr. Fromson, because it's your

7    motion.

8              Essentially, there are expert witnesses in all of

9    these products liability cases.  You plan to use them in all of

04:09 10    your 80 or so products liability cases when they go to trial

11    around the country, inferring that there's a strong chance that

12    other plaintiffs who are represented by other counsel may use

13    the same experts.

14              MR. FROMSON:  Yes, your Honor.

15              THE COURT:  And there are ten or so, and in your view

16    their expert testimony is the same in every case.  And what you

17    want to do is preserve their testimony but preserve trial

18    testimony, have their testimony taken in a courtroom,

19    videotaped with ideally Judge Saris presiding, I take it, and

04:10 20    the opportunity for each side to make objections, her to rule

21    contemporaneously on the objections, and then the depositions

22    would be available for each of the trials.

23              In addition, you want to do the same with Mr. Franklin

24    because his testimony is essentially not case specific.

25              That's what I understand you want, and they oppose it.

```
 1              MR. FROMSON:  That's correct, Judge.

 2              I think from our perspective it's six witnesses, all

 3    of whom have general testimony that transcends every case:

 4    Dr. Trimble, Dr. Kruszewski, Dr. Blume, Dr. King,

 5    Dr. Greenland, and Dr. Franklin, given his fact testimony

 6    doesn't change.

 7              And in terms of the presiding justice or referee,

 8    court-appointed judge, you know, or JHO, we would have no

 9    hesitancy in requesting your presence to rule over the

04:11 10   deposition either.  You know, essentially you or Judge Saris

11    are the most knowledgeable on the case.  Whoever can do it we

12    welcome the opportunity.

13              THE COURT:  I can't imagine -- is there anyone else

14    who would do it?

15              MR. FROMSON:  Who would do it or could do it?  I think

16    that would be the difference.

17              THE COURT:  Would, Mr. Cheffo is ready.

18              MR. FROMSON:  Would is a different issue.  It takes

19    time, obviously, there's a lot of preparation that goes into

04:11 20   it.  You have to obviously know the case.

21              THE COURT:  So realistically you're proposing one or

22    two of us.

23              MR. FROMSON:  Realistically, yes.  At the very least

24    to be able to rule upon the objections soon there afterwards if

25    they're done as a deposition so it can be complete.
```

1           THE COURT:  So let me ask you this question:  So --

2    two things that strike me about it.  One is that all of these

3    cases, if they go to trial, are going to trial in other federal

4    courts around the country, and the whole premise of the MDL is

5    we at the MDL take care of all the common discovery and rule on

6    the major motions to dismiss, summary judgment issues, but then

7    they all go back.  And I would imagine that with respect to

8    these witnesses there may be disputes about scope of the

9    testimony.  We're not talking about leading or non-leading

04:12 10   questions, we're talking about substantive questions about the

11   scope of the testimony, and those are essentially trial

12   rulings.

13           So the question, number one, is that really sensible

14   in the division of authority within the MDL?  Does that really

15   make sense?  Number one.

16           And number two, given that if we -- if Judge Saris or

17   I allow the testimony, it leaves open, presumably, the door for

18   the trial judge to say I want to exclude that testimony upon an

19   objection from either one of you.  But -- so in that sense it's

04:13 20   not finally determinative.  But, on the other hand, if we

21   exclude the testimony, if there's an objection by Mr. Cheffo to

22   some line of questioning and we sustain the objection and,

23   therefore, you don't elicit it, therefore, it's not in the

24   videotape, then you go off to Kentucky or wherever and try that

25   case and you want that, the only recourse is to bring in the

1    witness, if that would be allowed, but that has all the

2    problems you want to avoid.

3        So I'm wondering about those two issues.

4        MR. FROMSON:  I think -- let me try to address them in

5    the way in which you presented them, in the order.

6        On June 8th I brought this to Judge Saris' attention,

7    and what she had said essentially from the bench was that

8    she -- at page 22 of her transcript, line 20, she states, "I

9    would be receptive to requiring that one be made but not

04:14 10  receptive to ordering any other judge to decide whether it's

11   admissible or not.  It would save both sides a huge amount of

12   money and it would make these cases triable."

13       She states at page 23, line 13, "I would be very

14   sympathetic to having that preserved up to the discretion of

15   any judge as to whether or not to use it."

16       And so she addressed the very same issue you've just

17   addressed, and the plaintiffs accept and would be willing to

18   accept --

19       THE COURT:  So you're willing to do it knowing that it

04:14 20  may be that every trial judge around the country says I'm not

21   in my courtroom sitting through videotape depositions of

22   witnesses, I don't want to watch TV, or I'd rather have my

23   jurors see live testimony.  You're willing to -- that's just a

24   chance -- given the possible benefits that accrue from

25   efficiency of doing it this way, you're willing do it and the

1    chips fall where they may.  You're not asking us to order

2    anything other than the deposition be taken.

3           MR. FROMSON:  When it comes right down to it, that is

4    correct.  And we think it's consistent with Manual For Complex

5    Litigation and the references that were cited in our moving

6    papers.  That in litigation that is dispersed you can avoid

7    multiple live appearances by the same witnesses and that video

8    recording which is digital can be easily edited to eliminate

9    objectionable and irrelevant material.  You obviously are aware

04:15 10  of that.  Essentially, it's a fantastic, efficient way to bring

11   these cases to a court.  And if the court adopts this Court's

12   rulings, then it would be proven, the benefit.  It saves time,

13   it saves money, and it's efficient.

14          Most of the judges, at least thus far, we've only had

15   three cases, but they've been timed trials, so it would make

16   sense to have these witnesses come in--

17          THE COURT:  Two here and one in Kentucky?

18          MR. FROMSON:  Two here and one in Tennessee.

19          THE COURT:  Tennessee.

04:15 20        MR. FROMSON:  Never went to trial, but --

21          THE COURT:  But the Judge in Tennessee imposed time

22   limits.

23          MR. FROMSON:  I think she was going to take it on a

24   day-by-day circumstance.  But in terms of the testimony, it was

25   certainly confined to what was a predetermined direct exam

1    submitted by the parties before trial.

2         Nevertheless, my point is all three judges appear to

3    have limited the amount of time it was going to take to try the

4    case.  This is consistent with that.

5         THE COURT:  So mechanically suppose it occurred.  You

6    call the -- you want to do it in the courtroom, videotape it,

7    call the witness up, just start examining the witness on you

8    propose -- what is it a day for each witness?  And do a certain

9    amount of time, certain amount for cross.  Ask the questions,

04:16 10   if there are objections, rule on the objections, and then we're

11   done.

12        MR. FROMSON:  Exactly.  And it would not have to be

13   done on consecutive days.  Meaning I wouldn't expect --

14        THE COURT:  I understand.

15        MR. FROMSON:  We have six experts.  They can come in

16   over the course of two months arguably because there's no rush.

17   We don't even have a trial date scheduled yet for the next

18   case.

19        THE COURT:  All right.  There are no more cases to try

04:17 20   here.

21        MR. FROMSON:  There are no more that I'm aware of that

22   are presently before the Court.  And another positive -- is

23   that true?

24        MR. CHEFFO:  Well, Mr. Huberman dismissed his case,

25   and then Judge Saris just dismissed the Dorsey case last week.

1    So that was the last of the Mass. cases.

2            THE COURT:  So there's none here.

3            MR. FROMSON:  Sorry for sounding somewhat gratuitous.

4    But I'm reasonably confident that district judges in other

5    venues are going to take very seriously the decisions made by

6    the magistrate and district judge who handled the Daubert

7    hearings and the MDL.  And this Court can ensure compliance

8    with its Daubert rulings by handling these very general

9    causation and liability experts.

04:17 10            THE COURT:  Okay.  Mr. Cheffo?

11            MR. CHEFFO:  Your Honor, just a few things.  One is I

12   think Mr. Fromson accurately read from Judge Saris' statements,

13   but --

14            THE COURT:  What day was that?  Do you have that whole

15   transcript?

16            MR. FROMSON:  I don't have the whole transcript.  June

17   8, 2010.  I do have relevant portions.

18            THE COURT:  Is it on the docket?

19            MR. FROMSON:  I don't know.  I can certainly e-mail a

04:18 20   copy if you would allow permission to e-mail it to you.

21            THE COURT:  Yes, e-mail.

22            MR. CHEFFO:  Really the one point -- I don't doubt he

23   accurately read that, I was there, I think it sounds

24   consistent.  I would point out it was a hearing, not that Judge

25   Saris every says anything flippant, but the point was she then

1    said I'll allow you to brief it.

2        THE COURT:  Sure.

3        MR. CHEFFO:  So it was impressions, we didn't have the

4    benefit of briefing.  I didn't really argue the motion at that

5    point.  I think she wanted to see -- she wasn't prepared to

6    rule at that point because she said I'll set a briefing

7    schedule.

8        For the reasons I'm going to just touch briefly on, I

9    think this is the type of thing that's best done, if at all, by

04:18 10   agreement of the parties.  In other words, I think the three or

11   so examples are pretty scant that they've cited in their papers

12   and for really good reason.  One, there was a cite of Phen Pro,

13   and there was this one particular expert the parties agreed to.

14   The other one was in the Fen-Phen litigation where there was

15   18,000 cases literally trial set.  We have nothing like that

16   whatsoever here.

17       I think the reasons -- while definitely I have to be

18   candid, has some facial appeal.  Well, why not just do this

19   because people can talk about issues that are kind of set in

04:19 20   time and you just put the video up why you should have to do

21   that.  But that's so far removed from actually what happens in

22   these cases.  Because one is -- and I'm a pragmatist on this.

23   I think really -- I'll tell you why.  I think the only thing

24   that this would do would absolutely increase the costs for both

25   sides because we would do this and then in any case where they

1    believe it was a very viable case or a case that had potential

2    viability, they'd never use this because you'd have a video of

3    their person who would go up and then if we brought a live

4    person, they'd say, well, here's all the things that person

5    didn't talk about because they gave this video six months ago.

6    So as a practical matter it would be unworkable to use.

7         Conversely, what it would have the danger of doing is

8    if you have these cases and someone otherwise has a case that's

9    not viable but they think, hey, I have a bunch of videotapes

04:20 10   that I can just walk into court, no harm, no foul, just throw

11   them up there, take my chances, you end up having cases that

12   otherwise shouldn't be prosecuted.  This litigation, as we've

13   seen even though --

14        THE COURT:  You mean because there's no burden in that

15   sense of going forward?

16        MR. CHEFFO:  Right.  But a case -- it shouldn't be

17   determined either way on -- in other words, in cases --

18   everyone should have their opportunity to have a day in court,

19   but I think people should have to make a determination whether

04:20 20   it's a serious effort and a case worthy of trial.  In other

21   words, you shouldn't have it so that a case you really wouldn't

22   call an expert live and be vested in a particular case if you

23   can't find that expert to deal with it, it shouldn't be just

24   because it's in a box that you can throw the video up.

25        As a practical matter even in the general causation --

1           THE COURT:  Have any cases been advanced in this

2    litigation by any lawyers that they didn't think were viable

3    beyond the point of viability?

4           MR. CHEFFO:  I hope not, but I think that's what we'd

5    want to avoid kind of going forward frankly.

6           I think more practically, even in the general

7    causation, you know, one is, you know, as your Honor has

8    followed this, a medicine that's been off the market for a long

9    time, there's still been very significant developments that

04:21 10   probably both sides would argue over the course of years,

11   whether it's a study or an alert --

12          THE COURT:  It's off the market now, Neurontin?

13          MR. CHEFFO:  I'm sorry, off label -- off patent, I'm

14   sorry.

15          THE COURT:  Off patent.

16          MR. CHEFFO:  In other words, so even without the

17   marketing aspects that we've seen in the cases of 2004, the

18   point is, science is still developed, there's been reports,

19   studies, a whole host of things that in these types of cases

04:21 20   experts on both sides need to be able to address.

21          The other thing is even if you have a general

22   causation expert, you know, imagine in a case -- where would

23   you draw the line?  Could you ask the person, well, are you

24   familiar with Mrs. Smith's case?  Well, no -- you know, all the

25   lines of cross-examination that you might be able to have, you

```
 1    really couldn't have or would be kind of lost on these

 2    particular issues -- on these particular plaintiffs.

 3            I also think that the issue that we have a fundamental

 4    legal issue is unavailability.  Now, they're talking about

 5    making this easy, but in order to show a videotape of an

 6    expert, at least as I understand the law, it's pretty clear

 7    that the expert has to be unavailable unless there's an

 8    agreement by the parties or there's legitimate unavailability

 9    under the rules at the time of trial.  That would not kind of

10    abrogate those rules by just having a video available.

11            Again, I think we're going to be in the situation

12    where we go, we spend 20 days of back and forth preparing of

13    experts and tons of time and the utility of this by the time

14    that we ultimately would even consider using it at trial would

15    be basically nil.

16            You know, the other thing is, this is, frankly, and

17    absolutely, in my view at least, a premature motion.  We

18    have -- at this point there are no trials set, not in the

19    federal courts; there's not cases been remanded.  There's been,

20    you know, to credit of counsel, they've looked at their cases

21    again, even Mr. Finkelstein went from 80 cases to 40 cases.  So

22    this is a litigation that is still developing in terms of

23    numbers of cases, what's trial ready, what's not trial ready.

24    So I think it's premature to basically assume we're going to

25    need to have all these experts for future trials when at this
```

```
  1   point we don't know what the landscape of the trials are going
  2   to look like.
  3           THE COURT:  So -- do you have anything about all of
  4   that, Mr. Fromson?
  5           MR. FROMSON:  Of course.  I'll try to be brief.
  6           Judge, we've culled down the cases --
  7           THE COURT:  Not about that --
  8           MR. FROMSON:  This is completely consistent with the
  9   complex manual of litigation in disperse litigation where
 10   you're going to have multiple live appearances.  You want to
 11   avoid that.  That's exactly what we're trying to do.  While
 12   there's no individual trial looming, there's remand.  This is
 13   about to become dispersed litigation in the next few months.
 14   We're dealing with six experts from all over the country, one
 15   in England, one in California, one in Florida, one in
 16   Pennsylvania.  We simply shouldn't have to move forward at our
 17   own peril with these experts who want to retire, may not want
 18   to be involved in the litigation anymore in order to prove
 19   unavailability.  That's not why this Court should order it.
 20           THE COURT:  We wouldn't have to rule on
 21   unavailability.
 22           MR. FROMSON:  You wouldn't have to --
 23           THE COURT:  I understand the argument is that it's a
 24   futile endeavor because it won't satisfy unavailability.  If it
 25   won't be admissible, why bother?  Again, I don't have to rule
```

1    on -- that goes to whether or not to allow it, but we don't

2    have to rule on whether or not, in fact, it's unavailable --

3    they're unavailable or whether or not it's admissible.

4         MR. FROMSON:  The more meritorious argument is that in

5    dispersed litigation the parties want to avoid multiple

6    appearances by the same expert in 40, 50 or 80 cases, which is

7    what we're confronted with here between our case in the MDL and

8    our cases in New York, not to mention the other cases which are

9    brought by other law firms who may simply not be able to

04:25 10   afford, all right, the six-figure fee of bringing in six

11   experts.  And that would ultimately deprive a plaintiff who has

12   a meritorious case but may not outweigh the costs of a

13   litigation.  And that's just not fair.  All right?

14        As far as the experts and the evidence changing, we

15   don't have a crystal ball, but disclosure is done.  All right?

16   And so I don't anticipate any expert is going to take the stand

17   live and say what you didn't hear on that video was A, B, and C

18   by the defense expert.  Because I will have received an expert

19   disclosure well in advance if they're going to supplement their

04:26 20   expert disclosure again.  I'll deal with it, and it will be at

21   my own peril if I have my expert in a videotape and they seek

22   leave to supplement disclosure, I'll have to supplement

23   disclosure.  But it really is at my peril.  As you say, we do

24   it and I take it to the federal judges and the state judges and

25   they evaluate it and see if they want to follow it or not.

```
 1              MR. CHEFFO:  Just two quick things.  This is not a

 2     common unilateral exercise.  We have a lot of work with

 3     Mr. Fromson's cases going on.  As you would of might imagine,

 4     to the extent that someone would have to prepare for a

 5     four-hour trial deposition of experts, this is not an effort

 6     that's not without substantial work on our side.  And I

 7     suppose, though I think it's -- again, from our position, we've

 8     opposed this and I continue to oppose it, but if the Court were

 9     to say, you know, yes, we're going to allow this, then there's

04:27 10     the prospect we might say if they're going to do that, then

11     there may be some experts or some witnesses we want.  I don't

12     think that's the favored choice.

13              And the only thing -- because I think most of what

14     I've said is either in the papers or what your Honor will --

15     I'd just like to draw a distinction between Dr. Franklin and

16     these other experts because I really -- I just think for the

17     Court they're not lumped together.  There's really two points.

18     One, he's not --

19              THE COURT:  He's a fact witness.

04:27 20              MR. CHEFFO:  He's a fact witness.  His point's

21     limited.  Geographically, I think by his own testimony and

22     admission he worked four months for Parke-Davis in 1996 only in

23     the Northeast region.  So to the extent that cases are

24     around --

25              THE COURT:  He only worked for Parke-Davis for four
```

1    months?

2          MR. CHEFFO:  Four months.  And it was -- yes, four

3    months, 1996.

4          And putting aside just the kind of scope issues, the

5    fact of the matter, as your Honor may recall this, we went

6    through this.  We asked for a deposition, they opposed it, I

7    don't know if it was Mr. Lanier, Mr. Fromson's firm, or both.

8    You said, no, you can have it.  They said we want to take a

9    preservation trial deposition.  We said, okay, we'll do a

04:28 10   discovery dep, you can do that.  And then a day or so before

11   the deposition was to occur, they said, no, we decided not to

12   deal with it.  We had prepared, we actually have a discovery

13   deposition, it's taken, full and fair opportunity based on your

14   ruling a year ago to take it, which we didn't do at the time

15   object to it.  They decided to withdraw it without any reason

16   at the last minute.  I think at this point, a year later, to

17   come back and say, oh, now we want a redo, at least as to that

18   one on the procedural waiver issue, I think that should be a

19   dead issue.

04:28 20         THE COURT:  Any comment about that, Mr. Fromson?  Just

21   on that point, nano question.

22         MR. FROMSON:  I don't think there is a procedural

23   waiver.  I don't know what federal rule that would be under and

24   there's a procedural waiver he can quote.  I believe there was

25   an issue of timing and lack of availability of the trial

1      attorney assigned at that time.  He wasn't available to do the

2      trial preservation deposition for Dr. Franklin and we were not

3      envisioning remand in all the cases having the need for

4      Dr. Franklin's common testimony.  It was only to with respect

5      to the Tennessee case about which we were going to consider

6      that preservation deposition, but Dr. Franklin made himself

7      available to come to Tennessee, where, by the way, the Court

8      was going to allow him to testify, despite the fact that he

9      worked at Parke-Davis for only four months and was limited to

04:29 10     the Northeast business unit.

11          Lastly, somewhat tangential, as far as scheduling

12     depositions which was requested for September and October of

13     2010.  I withdraw those dates of September and October of 2010,

14     and simply ask if the Court does allow this, that the parties

15     coordinate --

16          THE COURT:  If I allow it, I'm going to tell all of

17     you to work out the dates between yourselves and the witnesses

18     first and then propose a schedule.

19          I'm going to take that motion under advisement.  I

04:30 20     want to think about it a little bit.  I want to look -- to the

21     extent that it's helpful, I want to look at that transcript.  I

22     may talk to Judge Saris about it.

23          I have one question.  So if I were to decide that some

24     or all of these witnesses that such a procedure were

25     appropriate for, I just want to be clear -- I know it's in the

```
 1   papers, I want to be clear on this.  One, you're talking about
 2   one day for each witness.
 3        MR. FROMSON:  That's our proposal, direct and cross
 4   over one business day.
 5        THE COURT:  And your proposal is to divide the day in
 6   what fashion?  You're saying, suggesting you want to talk to
 7   them first to decide how to divide it up or do you want me to
 8   decide with Judge Saris?
 9        MR. FROMSON:  I honestly don't know the answer.  Equal
10   time is what we've usually done in this litigation whenever
11   we've dealt with depositions.
12        THE COURT:  So your proposal would be split.  I'm not
13   holding you to decide that question now, Mr. Cheffo.  I
14   understand, and I am going to think about that.
15        My question is this -- I'm not sure what I'm going to
16   do, to be perfectly honest with you.  I see significant
17   competing concerns.  But if I were to allow it, is that -- if
18   I'm -- if we're going to have some process like this, I only
19   want one such process that would encompass all that would be.
20   If I were to allow it for them, are you going to want to do it
21   for certain witnesses?
22        MR. CHEFFO:  You know, I think I probably have to
23   reserve on that because, to be candid with your Honor, if you
24   said kind of all or nothing, like even if I thought it would be
25   good for one or two of our witnesses, I still think this is a
```

 1    bad idea.  My view would be none, but would I reserve the right

 2    to kind of reconsider this as to one or more of the experts who

 3    might be appropriate.  I think we'd have the same problems,

 4    which is why it's -- it would be -- I'd have to find the right

 5    expert.  I wouldn't envision having six or seven or all of our

 6    experts.  It might be one or two persons.

 7          THE COURT:  You would envision if you wanted to so to

 8    speak jump on the bandwagon, you would be jumping on with one,

 9    two, maybe three but probably not more than that.

04:32 10          MR. CHEFFO:  And frankly, there's a very good chance I

11    would say no, it's not worth it for just cost, time, efforts

12    subjecting someone to this.

13          The one thing I would just say if you are -- I know

14    you're thinking through this.  If this is going to be a kind of

15    trial type deposition, preservation deposition, part of timing

16    in the rules that should be governed is what would happen at

17    trial.  In other words, not a kind of regular ambush

18    deposition.  They'd have to basically give us all the exhibits

19    they would use prior as we would have at trial so that we can

04:32 20    see them, so you could make rulings on them, if they need to be

21    redacted.  So, in other words, we would then be able to do a

22    trial cross consistent with how things would actually play out

23    at trial.

24          THE COURT:  Makes sense.  Any issue with that,

25    Mr. Fromson?

1          MR. FROMSON:  Generally speaking we've generally been

2     able to reach agreement on providing exhibits that would be

3     used for direct examination, but the parties would never

4     exchange the exhibits they're going to use on cross-exam.

5          THE COURT:  Right, but you agree on the procedure.

6          MR. FROMSON:  I agree.  That's generally the

7     procedure, I think it makes for a much more efficient day.

8          THE COURT:  Then we probably have to have some

9     procedure for providing either Judge Saris or myself some

04:33 10     other -- obviously the exhibits in advance and the reports, but

11     if there were other -- I'm not sure there would be other

12     relevant information but -- what might be so that -- because

13     we're not walking into it the way you are preparing for the

14     trial, haven't prepared the jury instructions, haven't read the

15     pretrial memos.  There won't be any such things.  Judge Saris

16     would have reviewed some of those in the one or two trials she

17     began.

18          I'm going to think about this.  Your basic view is if

19     it's done, you want it done before the cases get remanded?

04:34 20          MR. FROMSON:  Not necessarily.  If the remand is

21     happening in October or November --

22          THE COURT:  You want it done before they're ready to

23     go it trial on the cases.

24          MR. FROMSON:  That's correct.  In fact, if it gets

25     done in January or February of 2011, I'm open to whatever the

```
 1    Court is willing to do so that it can be done in the event

 2    these cases truly go to trial around the country over the next

 3    year.

 4             THE COURT:  What do you all envision occurring in

 5    these cases, these 130 cases, when they get remanded?

 6             MR. FROMSON:  I think that -- may I, Judge?

 7             THE COURT:  Yes.

 8             MR. FROMSON:  Presuming initial discovery

 9    gets completed --

10             THE COURT:  Presuming everything on the chart is done,

11    the prescriber, the sales rep, the plaintiff, the template

12    discovery on both sides.

13             MR. FROMSON:  The history of the cases thus far has

14    been that the defendants generally go out and do approximately

15    eight to 12 more depositions of family, friends, co-workers,

16    police, ambulance personnel.  That's generally what happens as

17    far as the deposition phase.  They may also seek to depose

18    treating physicians after the fact in an attempt case,

19    obviously not in a completed suicide case.  I think that would

20    accurately describe the further depositions that take place,

21    and discovery continues in terms of their requests for medical

22    authorizations or employment authorizations where providers may

23    request additional authentication of such things.  That's what

24    happens.

25             THE COURT:  And then it's ready for trial.
```

1           MR. FROMSON:  Then they're MSJ.  Thank you, Keith.

2     Then they make their dispositive motion to dismiss.

3           THE COURT:  Another motion for summary judgement.  So

4     it's really up to the judge.  The trial judge may decide no

5     more discovery, they may decide a full panoply of discovery.

6     And if it is the full panoply, that's the picture of what it

7     might look like.  Then there might be in-case specific motions

8     for summary judgment.

9           MR. CHEFFO:  Right.  Obviously trial judges can do

04:35 10    whatever they want.  I think it would be -- I don't think it

11    would be contemplated that anyone would say there's no

12    discovery, because the whole point is the plaintiffs -- but,

13    yeah, they could limit and set their own parameters.

14          THE COURT:  Do either of you contemplate any global

15    effort to try to resolve cases, or is it we finish this

16    discovery here and we send these 130 cases on their way?

17          MR. FROMSON:  There's mediation scheduled for October.

18          THE COURT:  There is.  With whom?

19          MR. FROMSON:  With Judge Mollen in New York City.

04:36 20    THE COURT:  Who?

21          MR. FROMSON:  Milton Mollen in New York City.

22          MR. CHEFFO:  He's a former trial judge who does

23    mediation.

24          One of our -- I don't know, maybe a few months ago

25    Judge Saris had basically encouraged us to consider that and

1   said, you know -- she triggered the date off the September date

2   being done, and it was only as to the 40 or so cases,

3   Mr. Fromson's cases.  So we are going to meet at some point in

4   October, I believe, with Judge Mollen and talk about them.  And

5   if they resolve, they resolve.  If not, they will get remanded

6   back, I suppose.

7               THE COURT:  All right.

8               Anything else?

9               MR. FROMSON:  No, your Honor.

04:37 10        THE COURT:  Anything else those of you on the phone?

11              MR. STEGALL:  No, your Honor.  Thank you.

12              THE COURT:  All right.  Oh, I have a question for

13  those of you on the phone and Mr. Cheffo.  In looking at the

14  chart that you filed, Mr. Schwartz, or somebody from your firm,

15  how do I tell which case's template discovery has been

16  completed as compared to the last time I see the chart?

17              From my memory, the June order I issued, each month

18  plaintiffs and defendants are supposed to complete a certain

19  number of cases and template discovery.  And looking through

04:37 20  it -- I don't fault you, you did -- I think you did exactly

21  what I told you to do.  But is there any way for me to tell the

22  number of cases that these template discovery to be completed

23  have been completed other than do I need to go back and compare

24  it to the chart form the last month?

25              MR. STEGALL:  Your Honor, I'm having difficulty

1    hearing you.  From what I understand, you're asking if there's

2    a way that we can -- I guess we could modify the spreadsheet so

3    that we could show you each month what additional discovery has

4    been completed so that you don't have to compare the two.

5              THE COURT:  That's really my question.  How do I look

6    at the chart and know, what is it, 20 I think I said a month

7    should -- template discovery should be completed in.  How do I

8    look at the chart -- you know what would be helpful, if you put

9    at the bottom how many cases, just a sum total, how many cases

04:38 10    template discovery has been completed in.

11             MR. STEGALL:  Yes, your Honor.

12             THE COURT:  Then I can look at that from last month

13    and see if it's gone up by the appropriate amount.  That would

14    be helpful to me.

15             MR. STEGALL:  I can do that your Honor.

16             THE COURT:  Great.  Absent anything else, thanks a

17    lot.  We're adjourned.

18             THE CLERK:  All rise.  This matter is adjourned.

19             (Court adjourned at 4:48 p.m.)

20                       - - - - - - - - - - - -

21

22

23

24

25

1                           CERTIFICATION

2            I certify that the foregoing is a correct transcript

3     of the record of proceedings in the above-entitled matter to

4     the best of my skill and ability.

5

6

7

8     /s/Debra M. Joyce                 August 31, 2010
      Debra M. Joyce, RMR, CRR          Date
9     Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25