UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | |
| THIS DOCUMENT RELATES TO: | MDL Docket No. 1629 |
| HARDEN MANUFACTURING CORPORATION; LOUISIANA HEALTH SERVICE INDEMNITY COMPANY, dba BLUECROSS/BLUESHIELD OF LOUISIANA; INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL NO. 68 WELFARE FUND; ASEA/AFSCME LOCAL 52 HEALTH BENEFITS TRUST; GERALD SMITH; and LORRAINE KOPA, on behalf of themselves and all others similarly situated, v. PFIZER INC. and WARNER-LAMBERT COMPANY. | Master File No. 04-10981 Judge Patti B. Saris Magistrate Judge Leo T. Sorokin |
| THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA v. PFIZER INC., 04 CV 10739 (PBS) | |

**DEFENDANTS' NOTICE OF SUPPLEMENTAL AUTHORITY**

Defendants Pfizer Inc and Warner-Lambert Company LLC (collectively, "Pfizer" or "Defendants"), respectfully submit this notice of supplemental authorities to inform the Court of two recent rulings.

**(1)** *UFCW Local 1776 v. Eli Lilly & Co.*, **No. 09-0222, 2010 WL 3516183 (2d Cir. Sept. 10, 2010) ("*Zyprexa*") (to be published in F.3d).** In this case, the Second Circuit reversed Judge Weinstein's certification of a class of third-party payors ("TPPs") who asserted RICO claims based on the defendant's alleged unlawful promotion of the drug Zyprexa. The Second Circuit also vacated Judge Weinstein's denial of summary judgment under one of the plaintiffs' theories of recovery. The *Zyprexa* plaintiffs were represented by the same counsel as Plaintiffs herein, and they also proffered Professor Rosenthal as their causation expert.

The *Zyprexa* plaintiffs asserted two theories of recovery. Under the first, described as the "quantity effect" theory, the plaintiffs claimed that the defendant's promotion caused them to pay for Zyprexa prescriptions that would otherwise not have been written. *See id.* at *7, 9. Under the second, described as the "excess price" theory, the plaintiffs claimed that the defendant's

promotion caused them to pay for Zyprexa prescriptions at a higher price.  *See id.*  Judge Weinstein denied class certification under the first theory, but granted certification under the second.  *See id.* at *8.  The Second Circuit reversed, holding that certification could not be upheld under either theory.  *See id.* at *11-14.  The Second Circuit also vacated the denial of summary judgment under the "excess price" theory, and remanded to allow the district court to consider, in the first instance, whether individual TPPs' claims could survive summary judgment under the "quantity effect" theory.  *Id.* at *14.  The Second Circuit's opinion primarily addresses class certification, but as discussed below, the opinion goes to the heart of the plaintiffs' claims in *Zyprexa* and in this case by making clear that causation cannot be shown through generalized proof.  The decisions of individual prescribing doctors break the chain of causation between a pharmaceutical manufacturer's alleged unlawful promotion and harm allegedly incurred by TPPs that claim to have paid more in reimbursements for that manufacturer's medication bought pursuant to prescriptions written by individual prescribing doctors.

In holding that "plaintiffs' excess price theory is not susceptible to generalized proof with respect to either but-for or proximate causation," *id.* at *11, the Second Circuit eliminated the only exception to what this Court previously described as the "almost uniform[]" line of authority requiring individualized evidence of causation in pharmaceutical marketing cases.  *In re Neurontin Mktg. & Sales Practices Litig.*, 677 F. Supp. 2d 479, 494 (D. Mass. 2010); *see also In re Neurontin Mktg., Sales Practices & Prods. Liab. Litig.*, 257 F.R.D. 315, 327 n.7 (D. Mass. 2009) (citing *In re Zyprexa Prods. Liab. Litig.*, 253 F.R.D. 69, 195 (E.D.N.Y. 2008)).

With respect to the "quantity effect" theory, the Second Circuit held:

> The nature of prescriptions, however, means that this theory of causation is interrupted by the independent actions of prescribing physicians, which thwarts any attempt to show proximate cause through generalized proof.  Plaintiffs argue that "the ultimate source for the information on which doctors based their prescribing decisions was Lilly and its consistent, pervasive marketing plan."  Lilly was not, however, the only source of information on which doctors based prescribing decisions.  An individual patient's diagnosis, past and current medications being taken by the patient, the physician's own experience with prescribing Zyprexa, and the physician's knowledge regarding the side effects of

> Zyprexa are all considerations that would have been taken into account in addition to the alleged misrepresentations distributed by Lilly.
>
> Furthermore, additional variables interfere further with plaintiffs' theory of causation. As the district court noted, the evidence showed that at least some doctors were not misled by Lilly's alleged misrepresentations, and thus would not have written "excess" prescriptions as identified by the plaintiffs. This makes general proof of but-for causation impossible.
>
> . . . .
>
> Plaintiffs cannot use generalized proof when individual physicians prescribing Zyprexa may have relied on Lilly's alleged misrepresentations to different degrees, or not at all . . . .

*Zyprexa*, 2010 WL 3516183, at *13-14. This holding directly supports Defendants' arguments in support of their proposed conclusions of law[1] and in opposition to the "Class Plaintiffs'" motion for reconsideration of this Court's denial of class certification.[2] As Defendants discussed therein, the evidence in this case showed that physicians relied on their own experience, discussions with colleagues, experience with other AEDs and patient feedback, among other factors, when deciding to prescribe Neurontin.[3] In fact, Plaintiffs did not offer testimony from a single physician who stated that she prescribed Neurontin as a result of Defendants' marketing.[4]

The Second Circuit's holding also supports Defendants' argument that Dr. Hartman's damages theories here are fatally flawed because he made no attempt to determine which drugs doctors would have actually prescribed, and at what cost, had they not prescribed Neurontin. As the Second Circuit explained:

> [S]howing injury by general proof is precluded by uncertainty about what the alternatives to an "excess" prescription would have been, and how they would have been distributed among the plaintiffs.

*Id.* at *13. Thus, generalized proof was insufficient given that "some excess prescriptions may

---

[1] *See* Defendants' Proposed Conclusions of Law [2808-2] ("CoL") at § III.

[2] *See* Defendants' Opposition to Class Plaintiffs' Motion for Reconsideration [1928-2] §§ II-III.

[3] *See* Defendants' Proposed Findings of Fact [2808-1] ("FoF") ¶¶ 120-31.

[4] *See id.* ¶ 122.

not have actually caused loss, given the likelihood of substitute prescriptions for other drugs." *Id.* at *14. Likewise, while Plaintiffs in this case produced a self-selected list of so-called "alternative" drugs, they produced no evidence capable of demonstrating what drugs doctors would actually have prescribed to their patients in the but-for world had they not prescribed Neurontin. Instead, the evidence made clear that the selection of alternative drugs to Neurontin, if any, would be highly individualized.[5] Nor did Plaintiffs produce evidence that their insureds were even candidates for these so-called "alternative" drugs, or that they had not already tried them without success.

The Second Circuit also described the attenuated chain of causation presented by the plaintiffs' "excess price" theory as follows:

> The TPP plaintiffs draw a chain of causation in which Lilly distributes misinformation about Zyprexa, physicians rely upon that information and prescribe Zyprexa for their patients, and then the TPPs overpay. This narrative skips several steps and obscures the more attenuated link between the alleged misrepresentations made to doctors and the ultimate injury to the TPPs. In fact, if plaintiffs' factual allegations are correct, the chain of causation runs as follows: Lilly distributes misinformation about Zyprexa, physicians rely upon the misinformation and prescribe Zyprexa, TPPs relying on the advice of PBMs and their Pharmacy and Therapeutics Committees place Zyprexa on their formularies as approved drugs, TPPs fail to negotiate the price of Zyprexa below the level set by Lilly, and TPPs overpay for Zyprexa.

*Id.* at *12. Therefore, "Plaintiffs' 'theory of liability rests on the independent actions of third and even fourth parties,' as physicians, PBMs, and PBM Pharmacy and Therapeutics Committees all play a role in the chain between Lilly and the TPPs." *Id.* (quoting *Hemi Group, LLC v. City of New York*, 130 S. Ct. 983, 990 (2010)). The Second Circuit found the plaintiffs' "quantity effect" theory to be "in one sense simpler," but nevertheless held that "this theory of causation is interrupted by the independent actions of prescribing physicians." *Id.* at *13.

Likewise, in this case, Plaintiffs' theory of causation depends on the actions of third, fourth, and even fifth parties, including: eight regional P&T Committees, all of which are non-

---

[5] *See* CoL § IV.B.

parties that are free to make their own formulary decisions and issue their own prescription guidelines; individual prescribing doctors, who exercise independent medical judgment in selecting medications; and individual patients, whom Plaintiffs encourage to be active participants in their own medical treatment, and whose positive experiences with Neurontin is an important consideration for their prescribing doctors.

The Second Circuit also emphasized that, as in this case, "[e]ven now, TPPs pay for Zyprexa and for the most part have not implemented close control or review of Zyprexa prescriptions." *Id.*; *see also id.* at *12 ("Even after the side effects of Zyprexa became publicly known, however, most TPPs continued to pay the full price when Zyprexa was prescribed to treat symptoms of schizophrenia, even as payment for other indications were limited."). So, too, in this case, the evidence showed that even after this lawsuit was filed and through trial, the Plaintiffs took no steps to restrict formulary access to Neurontin and continued to recommend Neurontin for off-label uses, including neuropathic pain, on their website.[6]

In addition, the Second Circuit's opinion confirms that this Court properly denied certification of the "Class Plaintiffs'" claims, and that the "Class Plaintiffs'" motion for reconsideration of that decision should be denied. For example, the Second Circuit noted significant variations among different TPPs' formulary policies, price negotiation practices, and patient populations that raised individualized issues precluding class certification. *See id.* at *13-14.

The *Kaiser* Plaintiffs may attempt to distinguish *Zyprexa* on two grounds, neither of which is availing. First, the *Kaiser* Plaintiffs may note the Second Circuit's statement that, "[c]rucially, the TPPs do not allege that they relied on Lilly's misrepresentations." *Id.* at *12. But the Second Circuit was discussing the *Zyprexa* plaintiffs excess price theory. Had the *Zyprexa* plaintiffs relied on misrepresentations in negotiating the price they would pay for prescriptions – without regard for the reasons for those prescriptions – this could arguably

---

[6] *See* FoF ¶¶ 42-56

5

constitute a direct injury.

But the *Kaiser* Plaintiffs merely claim that the Drug Information Services of Kaiser Permanente Hospitals relied on alleged misrepresentations when making recommendations to the P&T Committees of independent, regional Permanente Medical Groups ("PMGs") regarding formulary decisions with respect to Neurontin – decisions which are not binding on PMG doctors.[7]  This, in and of itself, is not an "injury," direct or otherwise.  The inclusion of a medicine on a PMG formulary, with or without restrictions, does not constitute any injury because it is essentially "free" to Plaintiffs.  No funds are expended, and no alleged "injury" occurs, unless and until a doctor prescribes Neurontin to one of the *Kaiser* Plaintiffs' insureds – a chain of causation that is "interrupted by the independent actions of prescribing physicians," *id.* at \*13, and that "'rests on the independent actions of third and even fourth parties,'" *id.* at \*12 (quoting *Hemi Group, LLC*, 130 S. Ct. at 992).

Second, the *Kaiser* Plaintiffs may note that the Second Circuit did not reverse the district court's denial of summary judgment with respect to the plaintiffs' "quantity effect" theory, noting that "it is not clear that the theory is not viable with respect to individual claims by some TPPs."  *Id.* at \*14.  But the Second Circuit merely declined to rule on this issue "in the first instance" because Judge Weinstein "did not consider individual claims under the quantity effect theory" when he denied summary judgment.  *Id.*  In a different decision, Judge Weinstein recognized that an "individual" claim by a TPP in cases like this one is the functional equivalent of a class action, and that if aggregate proof could not be used to establish the claims of individual consumers, then it could not be used to support the aggregation of such claims by a single TPP.  *See Hood, ex rel. Mississippi v. Eli Lilly & Co.* (In re Zyprexa Prods. Liab. Litig.), 671 F. Supp. 2d 397, 433 (E.D.N.Y. 2009) (Weinstein, J.).  Thus, there is every reason to believe

---

[7] In fact, the evidence that any PMG P&T Committee relied on recommendations by Drug Information Services when expanding access to Neurontin was limited to the Southern California PMG. Plaintiffs presented no evidence of any such reliance by other regional PMGs. (*See* FoF ¶¶ 14-21, 27, 28.)

that Judge Weinstein will, and must, grant judgment as a matter of law in *Zyprexa*.

**(2)  *Loreto v. Proctor & Gamble Co.*, No. 1:09-cv-815, 2010 WL 3471752 (S.D. Ohio Sept. 3, 2010).**  In *Loreto*, the court dismissed with prejudice the plaintiffs' consumer fraud and unjust enrichment claims regarding the defendant's over-the-counter products utilizing vitamin C.  The plaintiffs claimed that the defendant had made misrepresentations regarding the products' effectiveness in treating the common cold and flu.  The *Loreto* court's opinion supports Defendants' proposed conclusions of law in the following respects.

First, the court held that, in the absence of fraud or misrepresentation, plaintiffs cannot sue under state consumer protection statutes for purported violations of the FDCA.  *See id.* at *7-10.  As the court explained,

> [t]he absence of a private right of action to enforce the FDCA means that not only is a private party precluded from bringing suit to enforce the provisions of the FDCA, they also "may not use other federal statutes or state unfair competition laws as a vehicle to bring a private cause of action that is based on violations of the FDCA."  A purported state-law claim does not exist where the "claim is in substance (even if not in form) a claim for violating the FDCA – that is, when the state claim would not exist if the FDCA did not exist."

*Id.* at *7 (quoting *In re Epogen & Aranesp Off-Label Mktg. & Sales Practices Litig.*, 590 F. Supp. 2d 1282, 1290-91 (C.D. Cal. 2008); second citation omitted).  This holding directly supports Defendants' argument that Plaintiffs' claims under the UCL's "unlawful" and "unfairness" prongs are preempted because those claims explicitly seek to recover for alleged FDCA violations without regard to whether Defendants' conduct was fraudulent.[8]

Second, the court held that plaintiffs in cases like this one cannot establish a cognizable injury unless they plead, and ultimately prove, that the defendant's product is ineffective in treating the relevant conditions.  In *Loreto*, the plaintiffs alleged that the scientific evidence of effectiveness was insufficient to satisfy the FDA, but this did not state a claim.  *See Loreto*, 2010 WL 3471752, at *9-10.  For example, the FDA had found that the scientific evidence did not establish vitamin C's effectiveness in treating the common cold.  *See id.* at *9.  But the FDA had

---

[8] *See* CoL § VI.

not specifically found that vitamin C was ineffective and, to the contrary, had noted that "'some data tended to favor [vitamin C's] effectiveness for treatment of cold symptoms.'" *Id.* (citation omitted). Under these circumstances, the plaintiffs had not alleged a cognizable injury and were instead improperly "seek[ing] damages as a result of [defendant's] failure to seek and obtain the FDA's approval before selling the Products in interstate commerce." *Id.* at *10. Likewise, in this case, Defendants presented substantial evidence of Neurontin's effectiveness for the relevant off-label conditions.[9] That Plaintiffs' experts do not consider this evidence sufficiently definitive does not satisfy Plaintiffs' burden of proving that Neurontin is completely and categorically ineffective for the conditions at issue.[10]

Third, the court held that the plaintiffs did not sustain an ascertainable loss if they received an effective drug, *i.e.*, if they "received exactly what they bargained for in purchasing the Products." *Id.* at *10-12. Here, Plaintiffs have failed to establish Neurontin's inefficacy for any, let alone all, insureds who took the drug for the relevant conditions. In addition, the evidence clearly showed that Plaintiffs have always been aware that Neurontin is not FDA-approved for these conditions and have long been aware of the purportedly negative studies they claim were suppressed. Yet, as discussed above, Plaintiffs took no steps to restrict formulary access to Neurontin and continued to recommend Neurontin for off-label uses.[11] Thus, there is no evidence of any ascertainable loss.

---

[9] *See* FoF § IV.

[10] *See* CoL § IV.A.

[11] *See* FoF ¶¶ 42-56

## CONCLUSION

Defendants respectfully submit that the decisions discussed herein provide additional support for the Proposed Conclusions of Law they have submitted regarding Plaintiffs' UCL claims and for Defendants' opposition to the "Class Plaintiffs'" motion for reconsideration of this Court's denial of class certification.

Dated: September 13, 2010

Respectfully submitted,

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP

By:   /s/ Mark S. Cheffo
       Mark S. Cheffo

Four Times Square
New York, NY 10036
Tel: (212) 735-3000
Email: Mark.Cheffo@skadden.com

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP

By:   /s/ Raoul D. Kennedy
       Raoul D. Kennedy

Four Embarcadero Center
San Francisco CA 94111
Tel: (415) 984-6400
Email: Raoul.Kennedy@skadden.com

WHEELER TRIGG O'DONNELL LLP

By:   /s/ James E. Hooper
       James E. Hooper

1801 California Street
Suite 3600
Denver, CO 80202-2617
Tel: (303) 244-1800
Email: hooper@wtotrial.com
*Attorneys for Defendants Pfizer Inc and Warner-Lambert Company LLC*

---

CERTIFICATE OF SERVICE

    I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on September 13, 2010.

        /s/ Mark S. Cheffo
        Mark S. Cheffo