# EXHIBIT C

```
 1    SUPREME COURT
      STATE OF NEW YORK
 2    COUNTY OF NEW YORK
 3     SHANAN FEYER,          )   INDEX # 04/116616
       Individually and as    )   Plaintiff
 4     Widow for the Use      )   designates New
       and Benefit of         )   York County as
 5     Herself and the        )   the place of
       Next of Kin of         )   trial.
 6     CAYCE FEYER,           )
       deceased,              )
 7                            )
           Plaintiffs,        )
 8                            )
                              )
 9                            )
       VS.                    )
10                            )
                              )
11                            )
       PFIZER INC.            )
12     PARKE-DAVIS, a         )
       division of            )
13     Warner-Lambert         )
       Company and            )
14     WARNER-LAMBERT         )
       COMPANY and            )
15     WARNER-LAMBERT         )
       COMPANY, LLC,          )
16                            )
           Defendants.        )
17                            )
                              )
18
19
20                 DEPOSITION OF
21                 SHANAN FEYER
22        Taken on behalf of the Defendants
23                August 20, 2010
24
25     Job No. CS268246
```

Page 2

1  A P P E A R A N C E S
2
3  FOR THE PLAINTIFFS:
4  Mr. Antonio Grillo
   Of Counsel
5  Finkelstein & Partners LLP
   1279 Route 300
6  P.O. Box 1111
   Newburgh, New York 12551
7
8  FOR THE DEFENDANTS:
9  Mr. Sean G. Saxon
   Mr. Matthew E. Johnson
10 Wheeler Trigg O'Donnell LLP
   1801 California Street, Suite 3600
11 Denver, Colorado 80202-2617
   303-244-1800
12 saxon@wtotrial.com
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1       The deposition of SHANAN FEYER,
2  taken on behalf of the Defendants, on August
3  20, 2010, at the DoubleTree Hotel, 1850 Old
4  Fort Parkway, Murfreesboro, Tennessee, for
5  all purposes under the New York Rules of
6  Civil Procedure.
7       The formalities as to caption,
8  certificate, et cetera, are waived.  All
9  objections, except as to the form of the
10 questions, are reserved to the hearing.
11      It is agreed that Lise S.
12 Matthews, being a Notary Public and Certified
13 Court Reporter for the State of Tennessee,
14 may swear the witness, and that the reading
15 and signing of the completed deposition by
16 the witness is not waived.
17
18
19              * * *
20
21
22
23
24
25

Page 3

1
       E X A M I N A T I O N
2
3              PAGE
   Examination by Mr. Saxon................  6
4
5
       E X H I B I T S
6
7              PAGE
   Exhibit No. 1  Amended Notice of      5
8        Videotaped Deposition.....
   Exhibit No. 2  Offense Report........... 198
9  Exhibit No. 3  Incident Report.......... 204
   Exhibit No. 4  Petition.................. 210
10 Exhibit No. 5  Affidavit................. 216
   Exhibit No. 6  Handwritten Note - Bates  220
11        stamped 11PRD-0006........
   Exhibit No. 7  Handwritten Note.......... 225
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1       (Whereupon Exhibit No. 1, an
2  Amended Notice of Videotaped Deposition, was
3  marked as an exhibit and attached hereto.)
4
5       VIDEOGRAPHER:  My name is Nathan
6  Smith.  Today's date is August 20th, 2010.
7  The time is approximately 7:51 a.m.  The
8  caption of this case is Neurontin Marketing
9  and Sales Practices versus Pfizer,
10 Incorporated.  The name of the witness is
11 Shanan Feyer.
12      At this time the attorneys will
13 identify themselves and the parties they
14 represent, after which our court reporter
15 Lise Matthews will swear in the witness and
16 we can proceed.
17      MR. GRILLO:  Okay.  Antonio
18 Grillo, Of Counsel, Finkelstein & Partners,
19 for the plaintiffs in this action.
20      MR. SAXON:  Sean Saxon of Wheeler
21 Trigg O'Donnell in Denver, for the defendants
22 Pfizer and related corporate entities, and
23 with me is Matt Johnson from my office.
24
25

2 (Pages 2 to 5)

Page 6

1          SHANAN FEYER
2   was called as a witness, and after having
3   been first duly sworn, testified as follows:
4
5   EXAMINATION BY MR. SAXON:
6      Q.   Good morning.
7      A.   Good morning.
8      Q.   Would you please state your name.
9      A.   Shanan Marie Feyer.
10     Q.   And, Ms. Feyer, we just met.  But
11  my name is Sean Saxon, and I represent Pfizer
12  in the lawsuit you brought relating to the
13  death -- suicide of your husband Cacey Feyer.
14        You understand that you're here
15  today to answer questions on your behalf as
16  well as on behalf of the estate of Cacey
17  Feyer?
18     A.   Yes, sir.
19     Q.   Okay.  And your relationship to
20  Cayce Feyer?
21     A.   Wife.
22     Q.   And when were you married?
23     A.   November 23rd, 2001.
24     Q.   I'm sorry.  Could you speak up
25  just a little bit?

Page 7

1      A.   November 23rd, 2001.
2      Q.   And because the court reporter is
3   here taking things down, we have to use
4   verbal responses and not nods of the head or
5   shakes.  And uh-huhs and huh-uhs don't turn
6   out on the transcript as well.  And we use
7   those in normal conversation, but today we
8   need to be sure to get verbal responses,
9   okay?
10     A.   Yes, sir.
11     Q.   And we also -- in normal
12  conversation you can tell what I'm going to
13  ask before I'm finished and I can tell what
14  you're going to answer before you're
15  finished.  And so normally we might talk over
16  each other a bit, but that doesn't turn out
17  on the transcript.  So we need to give a
18  little pause after I finish and after you
19  answer so that the transcript is clean, okay?
20     A.   Yes, sir.
21     Q.   And if you need to take a break at
22  any time, as long as there's not a question
23  pending, we're happy to accommodate you if
24  you -- if you need to take a break for any
25  reason, okay?

Page 8

1      A.   Yes, sir.
2      Q.   And you understand that you're
3   under oath here today just as if you were in
4   court and that this deposition may be shown
5   to the jury?
6      A.   Yes, sir.
7      Q.   And is there any reason why you
8   can't be deposed today?
9      A.   No, sir.
10     Q.   No reason you can't give truthful
11  and complete testimony today?
12     A.   No, sir.
13     Q.   Okay.  And please understand that
14  we're all aware that some of the things that
15  we'll have to discuss are very personal in
16  nature, but it's because of the -- the nature
17  of the claims and the issues involved here.
18  And so I apologize for that at the outset.
19  It's not my intention to be intrusive, but
20  we're going to have to inquire into some --
21  into some more intimate details of your life
22  with your husband.  Do you understand?
23     A.   Yes, sir.
24     Q.   Okay.  And I would like to hand
25  you what the court reporter has marked as

Page 9

1   Exhibit 1, which is an Amended Notice of
2   Video deposi -- Videotaped Deposition for the
3   plaintiff Shanan Feyer.  Have you seen this
4   before, or a previous version of this?
5      A.   Yes, sir.
6      Q.   And if you turn to the third page,
7   listed as Exhibit A are a list of things that
8   you were asked to bring.  Did you bring
9   anything with you this morning?
10     A.   I don't have any of those things
11  any longer, sir.
12     Q.   Where are they?
13     A.   Any kind of diaries or notes was
14  taken by the sheriff's department when they
15  came to the house.
16     Q.   Did they leave -- did they give
17  you copies of anything?
18     A.   No, sir.
19     Q.   So what -- what kind of diaries or
20  notes did they take?
21     A.   A suicide note.
22     Q.   Okay.  They have the original?
23     A.   I believe so.
24     Q.   Okay.  But they gave you a copy?
25     A.   Yes, sir.

Veritext Corporate Services

800-567-8658                                                                973-410-4040

Page 10

1    Q.    Okay.  Do you still have your copy
2    or --
3    A.    No, sir.  It was sent when -- with
4    a list of all the stuff that I was asked to
5    send way back when.
6    Q.    Sent where?
7    A.    To the attorney's office.
8    Q.    Okay.  So you -- you gave -- you
9    took the copy of -- and what else did the
10   sheriff -- did the sheriff give you back, if
11   you remember?
12   A.    It was a little manila envelope.
13   It had his autopsy in it, his handgun,
14   suicide note.
15   Q.    Were there any other diaries or
16   journals that were --
17   A.    Not that I recall at all.
18   Q.    Okay.  But if there was anything
19   in there you had --
20   A.    Yes, sir.
21   Q.    -- you -- you sent all of that up
22   to -- to Finkelstein & Partners?
23   A.    Yes, sir.
24   Q.    Okay.  And did you have any
25   documents -- or do you have any documents

Page 11

1    relating to your husband's use of Neurontin?
2    A.    No, sir.  Everything was sent.
3    Anything that I had was sent.
4    Q.    Were there any pill bottles?
5    A.    Yes, sir.  And the sheriff's
6    department kept those.  They were not
7    returned to me.
8    Q.    Okay.  So you don't have any -- if
9    the Sheriff's Department didn't have any
10   Neurontin, you don't have any Neurontin?
11   A.    No, sir.
12   Q.    Okay.  And they took all the
13   medicine that your husband --
14   A.    Yes, sir.
15   Q.    Okay.  And do you have any -- have
16   you conducted any -- any research, internet
17   research, about Neurontin independent of your
18   discussions with your attorney?
19   A.    No, sir.
20   Q.    Okay.  And what did you do to
21   prepare for today's deposition?  Did you meet
22   with your counsel?
23   A.    Yes, sir.
24   Q.    I don't need to know anything that
25   you said obviously, but when -- when was that

Page 12

1    meeting?
2    A.    The 17th.
3    Q.    Okay.  And approximately how long
4    did you meet?
5    A.    An hour and-a-half, somewhere
6    around there.
7    Q.    Okay.  Did your husband have a
8    will?
9    A.    No, sir.
10   Q.    And were you appointed the
11   administrator of -- or executor of his
12   estate?
13   A.    Yes, sir.
14   Q.    And so you're here on -- on the
15   behalf of his estate and on your own behalf,
16   correct?
17   A.    Yes, sir.
18   Q.    Anyone else that has an interest
19   in the -- in his estate?
20   A.    Nobody has spoken of it.
21   Q.    How about -- are his parents still
22   alive?
23   A.    His mother is still alive.
24   Q.    What's her name?
25   A.    Diane Schread.

Page 13

1    Q.    And where does she live?
2    A.    Stone Mountain, Georgia.
3    Q.    And is she aware of -- of the
4    litigation?
5    A.    Yes.  She is the one that actually
6    told me about it in the beginning.
7    Q.    Okay.  What did she tell you?
8    A.    She gave me the number to
9    Finkelstein & Partners to call.
10   Q.    Okay.  And approximately when was
11   this?
12   A.    I'm not sure.
13   Q.    A couple of years ago?
14   A.    Yes, sir.
15   Q.    Okay.  And Mr. Feyer's father is
16   deceased; is that correct?
17   A.    Yes.  His -- he passed away before
18   we were ever married.
19   Q.    What was his name?
20   A.    Cayc -- I'm sorry.  Paul Feyer.
21   Q.    Paul Feyer.  Did he have a
22   stepfather that he was close to?
23   A.    He passed away a couple of years
24   ago.
25   Q.    What was his name?

4 (Pages 10 to 13)

Page 162

1    Q.    Oh, to have the payments made to
2  him?
3    A.    Yes, sir.
4    Q.    Okay.
5    A.    Yes, sir.
6    Q.    Why did he think you didn't
7  deserve to get the --
8    A.    I have no clue.
9    Q.    -- assets?  No?
10    A.    He said that Cayce was -- his
11  story was that Cayce was planning on
12  divorcing me.  And, you know, if he's
13  planning on divorcing me, why did we go pick
14  out a house together, why were we painting a
15  house together?  You know, his story just
16  never flew over right.
17    Q.    Okay.  Did he think you were about
18  to divorce him?
19    A.    No.  I -- there's -- I would --
20  huh-uh.
21    Q.    What did you say?
22    A.    I would not have divorced Cayce.
23    Q.    Okay.
24    A.    Cayce was the best thing that ever
25  happened to me.  He put me together pretty

Page 163

1  much.  I was a mess.
2    Q.    And so he didn't think -- so
3  his -- his position that you weren't entitled
4  to your husband's assets was not the result
5  of Cayce wanting to leave you or you wanting
6  to leave Cayce; is that correct?
7    A.    No.  I was unaware of any kind of
8  divorce proceedings that were going to
9  happen.
10    Q.    Okay.  You would --
11    A.    Period.
12    Q.    You would be aware of them if
13  there were.  Okay.  I understand.
14    A.    And, you know, like I said, his
15  whole story of that doesn't even fly because
16  Cayce was trying to adopt my children.  We
17  had just picked out a house.  It makes no
18  sense.
19    Q.    Okay.  And you had no plans of --
20  either --
21    A.    No.
22    Q.    -- on the flip side?
23          Okay.  So what happened with the
24  lawyer and the claim on the Toyota truck?
25    A.    Ended up -- never did find a paper

Page 164

1  trail on the money.  But I want to say -- my
2  lawyer advised me to go ahead and settle out.
3  Mr. Geiger was willing to drop everything and
4  give me the title to my truck back if I
5  dropped everything.  That's what it was.  If
6  I dropped the -- because I was bringing up
7  the money issue.  Where's this money?  You
8  know, you had no right to this money.
9          And, you know, commonsense tells
10  you who worked throughout the marriage and,
11  you know, who was paying the rent and the
12  electric and everything and -- I just -- I
13  don't know.
14    Q.    What do you mean?  The money was
15  all yours, not Cayce's?
16    A.    No.  It was ours.
17    Q.    Okay.
18    A.    It wasn't Mr. Geiger's.  It wasn't
19  anybody's.  It was mine and Cayce's, just
20  like, you know, every paycheck I ever got
21  went to our account.
22    Q.    And every paycheck he got went
23  into your account?
24    A.    Yeah.
25    Q.    Okay.  And so the money that he

Page 165

1  was taking out at the end and putting back in
2  and then taking out and then finally
3  disappeared, this was what was remaining from
4  his down payment on the settlement --
5    A.    It was everything.  You know,
6  whatever we had left in the bank before,
7  after.  I mean, you know, like I said, I
8  never went to the bank.  I just signed my
9  paycheck and handed it to him.  He did all
10  the financing on everything.
11    Q.    Okay.  But you testified that you
12  thought he got about $50,000 at the -- two
13  weeks or so before his suicide, correct?
14    A.    Yes, sir.
15    Q.    And he used that -- part of that
16  money to pay off the minivan, correct?
17    A.    Yes, sir.
18    Q.    And you were going to use part of
19  that money to buy your mother's truck?
20    A.    Yes, sir.
21    Q.    What other plans did you have for
22  it?
23    A.    You know, the house.  You know,
24  getting it fixed up and repainted and buying
25  a bigger boat and then getting to go back to

42 (Pages 162 to 165)

Page 166

1   school.
2       Q.    Did you ever buy a bigger boat?
3       A.    No, sir.
4       Q.    And so the result of the -- was
5   there a lawsuit filed against Mr. Geiger?
6       A.    Yes, sir.
7       Q.    So you filed the lawsuit?
8       A.    Yes, sir.  But we never, like, did
9   court or anything like that.
10      Q.    You just resolved it?
11      A.    Yes, sir.
12      Q.    Did people tell you they were
13  surprised that Mr. Feyer had taken his life?
14      A.    Yes, sir.
15      Q.    Who told you that?
16      A.    Chris and Charles.  Of course mom
17  was shocked.  I mean, it just -- it shocked
18  everybody.  And -- it was unexpected.
19      Q.    Did he ever -- did he ever tell
20  you that he was thinking about ending his
21  life?
22      A.    No, sir.
23      Q.    He never threatened to do -- to
24  kill himself?
25      A.    No, sir.

Page 167

1       Q.    And you don't think he was
2   becoming depressed except -- well, you said
3   he had acted strangely in the weeks before
4   but you didn't say he was depressed, correct?
5       A.    No.  There was no moping or
6   anything like that that was, you know. . .
7       Q.    And the behavior we've identified
8   is the leaving the cupboards open and
9   thinking that something was outside and then
10  shooting the gun out the window?
11      A.    (Witness moves head up and down.)
12      Q.    Correct?
13      A.    Yes, sir.
14      Q.    And then taking the money out of
15  the account and putting it back in and then
16  it disappearing?
17      A.    Yes, sir.
18      Q.    Okay.  Anything else that sticks
19  out in your mind as just --
20      A.    You know, just all of the sudden,
21  like I said, him going down there.  You know,
22  we hadn't had anything to do with that man
23  and then he's going to go down there and --
24  you know, take the boat down there and sell
25  it and we're going to get a -- you know --

Page 168

1       Q.    Did you want to get a bigger boat?
2       A.    We had talked about it.
3       Q.    So you agreed with that decision
4   as a couple to buy a bigger boat?
5       A.    Yes, sir.
6       Q.    But you didn't agree to have his
7   father involved in the transaction?
8       A.    No, sir.
9       Q.    Okay.
10            VIDEOGRAPHER:  Five minutes.
11            MR. SAXON:  Okay.  We'll take it
12  now.
13            VIDEOGRAPHER:  Okay.  We are now
14  off the record.
15            (Brief recess.)
16            VIDEOGRAPHER:  This is the
17  beginning of tape number 3 in the videotaped
18  deposition of Shanan Feyer.  We are now back
19  on the record.
20  BY MR. SAXON:
21      Q.    Since the resolution of litigation
22  with Mr. Geiger -- well, first, when did
23  it -- that get resolved?
24      A.    Probably in 2004.  I'm not sure.
25      Q.    But pretty soon after?  It didn't

Page 169

1   drag on for years?
2       A.    No, sir.
3       Q.    And did he ever have custody of
4   the truck?
5       A.    No, sir.
6       Q.    Did he ever get it?  Okay.  Do you
7   know how he got the title?
8       A.    He said Cayce gave it to him.
9       Q.    And as far as you know, the only
10  time that Cayce saw him was the trip that you
11  had made a few weeks before to bring the boat
12  back?
13      A.    Yes, sir.
14      Q.    And at that point you had already
15  made the arrangements with your mother to buy
16  the truck?
17      A.    Yes, sir.  We were actually -- we
18  already were buying it.
19      Q.    Okay.  And so he had the title and
20  he took it -- he may have taken it down there
21  to him?
22      A.    That's possible.
23      Q.    Do you think he -- could he have
24  mailed it to him?
25      A.    It's possible.

43 (Pages 166 to 169)

Page 170

1    Q.    Possible.  But he didn't tell you
2  how he got it, Mr. Geiger?
3    A.    No, sir.
4    Q.    Okay.  But he told you that Cayce
5  wanted him to have it?
6    A.    Yes, sir.
7    Q.    Okay.  Did he -- do you know if he
8  talked -- if Cayce talked to his biological
9  father, Ken Geiger, the day of his suicide?
10   A.    I do not know.
11   Q.    Did you ask Mr. Geiger?
12   A.    No.
13   Q.    And other than his mother and his
14  two biological children, are you aware of
15  anyone else that he talked to after you left
16  around noon that day?
17   A.    He talked to my mom.  He talked to
18  my aunt.  Because I had told them that he
19  wasn't feeling well.  And so they called to
20  check on him.  And he said he was just
21  feeling a little under the weather.
22   Q.    Okay.  So your mother, your aunt,
23  his mother and his two children?
24   A.    Yes, sir.
25   Q.    Okay.  And you said there was a

Page 171

1  note.  And I think we have a copy of that.
2  Did you -- did you see the note at the -- at
3  the scene?
4    A.    No, sir.
5    Q.    Where was it?
6    A.    I don't know.  I didn't ask where
7  they found it.
8    Q.    Well, when did they give it to
9  you?
10   A.    In the manila envelope.
11   Q.    So you didn't read it for almost a
12  week?  They didn't let you see it beforehand
13  and then --
14   A.    Yes, sir.
15   Q.    Yes what?
16   A.    That's correct.
17   Q.    That's the first time you saw it,
18  is when they sent it back to you?
19   A.    Yes, sir.
20   Q.    Okay.  And they sent you a copy or
21  the original?
22   A.    I'm not even sure if it was the
23  original or the copy.  I want to say they
24  gave me the original, but I don't know for
25  sure.

Page 172

1    Q.    Okay.  And was it just one note?
2    A.    Yes, sir.
3    Q.    Okay.  And do you still have a
4  copy of it?
5    A.    No, sir.
6    Q.    Do you remember it?
7    A.    No, sir.
8    Q.    Was it long or do you remember if
9  it was --
10   A.    I want to say it was half a page,
11  three-quarters of a page, somewhere
12  thereabouts.  I could be wrong on that.
13   Q.    We'll get it out later.  It's
14  not. . .
15          When the Sheriff was called the
16  day before because of shooting out the window
17  and then the Friday on the report of his
18  suicide, did Mr. Pence come to the house
19  either time?
20   A.    (Witness moves head from side to
21  side.)
22   Q.    No?
23   A.    No.  He didn't even work in the
24  same county.
25   Q.    Not even the same jurisdiction?

Page 173

1    A.    No.
2    Q.    Who -- who did investigate it?
3  What was the name of the agency?
4    A.    Oh, Coffee County, where we lived.
5    Q.    And so there wasn't an insurance
6  company investigation because you had no
7  insurance, correct?
8    A.    To my knowledge there was --
9    Q.    There was no life insurance?
10   A.    Huh-uh.  Huh-uh.
11   Q.    Okay.  And do you know who the
12  Coffee County Sheriff's Department
13  interviewed in connection with their
14  investigation?
15   A.    Me.
16   Q.    When did they interview you?
17   A.    I don't know when it was, but they
18  questioned me.  I want to say they talked to
19  Brandi as well.  My mom --
20   Q.    That Friday or later?
21   A.    Oh, I don't know when it was.
22  Like I said, my time lines on that are
23  just -- I kind of -- you know, went a little
24  off kilter.
25   Q.    Do you remember going into the

44 (Pages 170 to 173)

Page 198

1    Q.   Okay. And so if he -- did your
2  husband make a habit of coming back and
3  telling you about his medication changes, or
4  would he just occasionally remark if he was
5  taking something?
6    A.   Probably just an occasional, you
7  know, hey, they changed my meds today. Let's
8  see if it's going to work better or worse or,
9  you know.
10    Q.   So as far as what he was told
11  prior to receiving Neurontin at anesthesia --
12  at the Murfreesboro Anesthesia Group, you
13  have no way of knowing what they told him?
14    A.   Well, if I was there, I would, and
15  if I wasn't -- I mean I don't know. I don't
16  remember.
17      MR. SAXON: We'll mark this as
18  Exhibit 2.
19      (Whereupon Exhibit No. 2, an
20  Offense Report, was marked as an exhibit and
21  attached hereto.)
22  BY MR. SAXON:
23    Q.   The court reporter has marked as
24  Exhibit 2 a three-page document from the
25  Coffee County Sheriff's Department entitled

Page 199

1  Offense Report. And the Bates stamps numbers
2  are 40COFCS-003 through 005.
3      Have you ever seen this document
4  before?
5    A.   I don't think so.
6    Q.   Okay. And so this is a report of
7  a -- of a call from Patsy Randolph on
8  11/28/03, correct?
9    A.   Yes, sir.
10    Q.   And Patsy Randolph is your mother,
11  right?
12    A.   Yes, sir.
13    Q.   All right. And if we follow this
14  down, it's got -- and I'm reading the section
15  that says Narrative -- and it's all caps --
16  responded to a DOA call at 2647 Murfreesboro
17  Highway. Upon arrival I spoke with Ms. Patsy
18  Randolph. She stated she had come to the
19  residence and found the back door open. When
20  she checked the residence for her son-in-law,
21  Mr. Cayce Feyer, she found him in the rear
22  back bedroom. Was that your bedroom?
23    A.   Yes, sir.
24    Q.   Okay. There was no sign of life.
25  So she called 911 on her cell phone. Coffee

Page 200

1  County EMS -- I guess that's emergency
2  medical services -- arrived on the scene and
3  found no signs of life. Upon examination
4  Mr. Feyer appeared to be deceased for several
5  hours. Shanan Feyer, Mr. Feyer's wife,
6  arrived on the scene a short time later.
7  Upon speaking with her she stated her and a
8  friend, Ms. Brandi Foster, had been at the
9  residence.
10      Do you know what that was
11  referring to?
12    A.   That I -- the night before or the
13  day before when I took him the food --
14    Q.   Okay.
15    A.   -- is what I can assume.
16    Q.   If you turn the page. It has a
17  call type -- complainant, halfway down, is
18  Patsy Randolph. The responding officer has
19  -- the officer numbers. And it appears that
20  there were a number of officers there.
21  That's consistent with what you testified to
22  earlier, correct, that there were a lot of
23  people there?
24    A.   Yes.
25    Q.   Yes. And the paramedics on the

Page 201

1  scene -- we have these two gentlemen, Dennis
2  Teal and Frank Green. Do you know either of
3  them?
4    A.   I'm sorry. Could you repeat that,
5  please?
6    Q.   The paramedics on the scene,
7  Dennis Teal or Frank Green, do you know
8  either of them?
9    A.   No, sir.
10    Q.   In your work since then at the
11  hospital have you had occasion to meet either
12  of them?
13    A.   I may have seen them in passing,
14  but --
15    Q.   You've never made the
16  connection --
17    A.   No, sir.
18    Q.   Okay. Items found, one
19  handwritten note on the stand, four empty
20  bottles of medication, Phenergan. Do you
21  know what Phenergan is?
22    A.   It's an anti-nausea medication.
23    Q.   Ramadol. Do you know what that
24  is?
25    A.   I can't think straight right now.

51 (Pages 198 to 201)

Page 202

1    Q.    Okay.  There were four bottles of
2  empty medication found.  Do you -- do you
3  know why they didn't find any Neurontin at
4  the scene?
5        MR. GRILLO:  Objection.
6        THE WITNESS:  I do not know.
7  BY MR. SAXON:
8    Q.    But you testified earlier that he
9  had -- that the officers had taken all the
10  medication, correct?
11    A.    Yes, sir.
12    Q.    Was it possible that he had
13  stopped taking his Neurontin?
14    A.    No, sir.
15        MR. GRILLO:  Objection.
16  BY MR. SAXON:
17    Q.    Why is that not possible?
18        MR. GRILLO:  Objection.
19        THE WITNESS:  I --
20        MR. GRILLO:  If you know.
21  BY MR. SAXON:
22    Q.    If you know.
23    A.    Because he was, you know, fairly
24  well about following doctor's orders.  You
25  know, when they said not to lift over ten

Page 203

1  pound, he didn't lift over ten pounds.  When
2  they said do these exercises, he did these
3  exercises.  He listened.  Because he wanted
4  to get better.
5        MR. GRILLO:  Let me staple this.
6  BY MR. SAXON:
7    Q.    Do you know why there's no record
8  of him refilling his last two Neurontin
9  prescriptions?
10    A.    No, I do not.
11    Q.    Do you know why there was no
12  Neurontin found in his blood on autopsy?
13    A.    No, I do not.
14    Q.    Look at the last page.
15  Investigation revealed that victim apparently
16  had threatened suicide on 12/27/03.  I guess
17  that's a typo.  11/27/03.  And all weapons
18  had been removed from the home and held at
19  the Coffee County Sheriff's Office by
20  responding officers.
21        And that's the incident you were
22  referring to the day before where he had shot
23  a gun out the window?
24    A.    Yes, sir.
25    Q.    But -- do you know where they're

Page 204

1  getting this "threatened suicide?"
2    A.    I'm assuming because there was a
3  gunshot.
4    Q.    Okay.
5        MR. SAXON:  Mark this as Exhibit
6  3.
7        (Whereupon Exhibit No. 3, an
8  Incident Report, was marked and attached
9  hereto.)
10        MR. GRILLO:  Let me staple that.
11  Do you need yours stapled?
12        MR. SAXON:  That's full service.
13  BY MR. SAXON:
14    Q.    Ms. Feyer, the court reporter has
15  marked as Exhibit 3 a two-page incident
16  report from Coffee County Sheriff's
17  Department.  The date occurred, and it says
18  on there 11/27 at 1:00 in the afternoon.  And
19  it says that the complainant was -- that you
20  had called the -- 911.
21    A.    Uh-huh.
22    Q.    And this is -- this is in the
23  middle of the afternoon, not at the end of
24  the day.  Do you know why?
25    A.    Like I said -- like I said before,

Page 205

1  sometimes I would get off at 3, 4, 5.  It
2  just depended on when I got done what I had
3  to do that day.
4    Q.    Okay.  And then there it appears:
5  Mrs. Feyer stated that her husband called her
6  from home and stated that he was going to
7  kill himself.  Ms. Feyer then stated that she
8  heard a gunshot and Mr. Feyer was not talking
9  on the phone anymore.
10    A.    Like I said, I didn't know what he
11  was going to do, if he was killing hisself,
12  shooting the gun.  All I know is I heard a
13  gunshot.  And that's why I said maybe he's
14  killed hisself.  I don't know.  When they got
15  there, they said -- he --
16    Q.    No.  This says that she stated
17  that her husband called her from home and
18  stated that he was going to kill himself.
19  But you said he had never told you he was
20  going to kill himself.
21    A.    I don't know what I said.  And --
22  I mean honestly.  I heard a gunshot.  I
23  honestly don't think he said I'm going to
24  kill myself.
25    Q.    Would he have any reason to say he

52 (Pages 202 to 205)

Page 206

1   was going to kill himself?
2       MR. GRILLO: Objection. If you
3   know.
4       THE WITNESS: Not that I'm aware
5   of.
6   BY MR. SAXON:
7       Q.   So you don't know why you called
8   and told them that --
9       A.   I called them because I heard a
10  gunshot.
11      Q.   Oh, I understand --
12      A.   And I said hello, hello.
13      Q.   I understand.
14      A.   And so I told them, I said, you
15  know, I think he's going to kill hisself. I
16  don't think I said he said he's going to kill
17  hisself. I could have. I don't know.
18      Q.   Okay.
19      A.   I just know I was in panic mode.
20  I mean, you hear a gunshot, you go in panic
21  mode.
22      Q.   But you don't remember him telling
23  you that he was going to kill himself?
24      A.   I don't remember -- the only thing
25  I remember about that phone call is exactly

Page 207

1   what I said earlier. The only -- I don't
2   remember what we were talking about. I just
3   remember hearing the gunshot.
4       Q.   You said that you were calling
5   just a normal on your way home from work
6   call?
7       A.   I called him every -- you know,
8   all the time before I left work.
9       Q.   Okay. And this says that he
10  called you from home and told you that he was
11  going to kill himself and then shot a
12  window -- shot out the window and then didn't
13  respond to any of your other attempts to
14  con -- or to talk to him.
15      A.   Like I said, I don't know what I
16  said to them. I was in panic mode.
17      Q.   And you can't think of a reason
18  why he would want to kill himself?
19      A.   (No response.)
20      Q.   Or why you would have thought
21  that?
22      A.   A gunshot.
23      Q.   Well, there's a lot of things that
24  a gunshot could mean, that -- but not killed
25  himself. I mean, is that the first thing

Page 208

1   that jumped to your mind?
2       A.   I can't tell you what he was
3   thinking.
4       Q.   I'm interested in what you were
5   thinking.
6       A.   I was scared. I heard a gunshot.
7       Q.   I know you were scared. And I
8   know you heard a gunshot. But I'm trying to
9   explore why you thought that he was going to
10  kill himself and why you thought to tell the
11  officers when you called 911 and you were
12  desperate and panicked that he told you he
13  was going to kill himself.
14      A.   I honestly don't know. I don't --
15  I don't know.
16      Q.   Okay. Was Teresa's maiden name
17  Seagers?
18      A.   I do not know.
19      Q.   And while your stepson Andrew was
20  living at the home in 2002, did you and your
21  husband have to call the police to come out?
22      A.   Yes.
23      Q.   For what types of things?
24      A.   Once he had barricaded himself in
25  his room. And -- I don't remember, but I

Page 209

1   know that we did have to call the police out
2   because of Andrew.
3       Q.   Okay. When you heard your husband
4   shoot out the window and reportedly say that
5   he was going to kill himself, did your
6   friend -- did you call anyone else on the way
7   to the house?
8       A.   I don't know.
9       Q.   Could you have called Brandi?
10      A.   I don't know.
11      Q.   Do you know if she called 911?
12      A.   I don't know.
13      Q.   It's possible that you could have
14  called her?
15      A.   Anything's possible.
16      Q.   Is it likely that you called her?
17  Were you talking to her frequently?
18      MR. GRILLO: Objection.
19      THE WITNESS: I honestly don't
20  remember a lot. You know. . .
21      MR. GRILLO: You've answered the
22  question.
23  BY MR. SAXON:
24      Q.   Why do you think your husband
25  would have purposefully given away the truck

Page 210

1  and money and -- and handguns to -- so you
2  couldn't have them?
3      A.    I have no clue.
4      Q.    But you think he did it so you
5  wouldn't get them?
6      A.    No.  I honestly did not see it
7  coming.  It blind sided me.
8      Q.    But looking back on it, you know
9  that he was doing it so you wouldn't have the
10  stuff?
11          MR. GRILLO:  Objection.
12          THE WITNESS:  I don't know.  I
13  don't know if he was talked into it.  I don't
14  know.  I need some water.
15          MR. GRILLO:  You need water?
16          THE WITNESS:  Please.
17          MR. SAXON:  Would you mark that as
18  Exhibit 4, please.
19          (Whereupon Exhibit No. 4, a
20  Petition, was marked and attached hereto.)
21  BY MR. SAXON:
22      Q.    Do you recognize this document?
23      A.    Give me just a minute.  (Reviews
24  document.)  Yes, sir.
25      Q.    Is this your signature under

Page 211

1  petitioner?
2      A.    Yes, sir.
3      Q.    Okay.  And paragraph 4, Shanan
4  Feyer has discovered that shortly before his
5  death that Cayce Feyer gave away large sums
6  of money, vehicles and a handgun in order to
7  defeat the surviving spouse's share of the
8  estate.  The statute precluding this is
9  TCA 31-105.
10          So again, why did you think that
11  he was trying to defeat your share of the
12  estate?
13      A.    Those were not my words.  Those
14  were the words of the attorney.
15      Q.    Well, this is something that you
16  read and signed, correct?
17      A.    Yes, sir.
18      Q.    So you thought he was trying to do
19  this so that --
20      A.    The way it was explained to me was
21  under the TC -- whatever code it is -- is
22  that -- I'm trying to think how did he put
23  it.  Something about marital or spousal
24  something or other and that -- you know, that
25  he could not do that.  I'm -- I don't know.

Page 212

1  But those -- those were not my words.  Those
2  were the attorney's words.
3      Q.    Okay.
4      A.    I mean, obviously, yes, he did
5  give them away.
6      Q.    Well -- I understand.  And this
7  was not a petition because he gave them away.
8  This was a petition because he gave them away
9  so you couldn't have them.  Do you understand
10  the difference between the two?
11      A.    No, I really don't.
12      Q.    Well, did you think he wanted you
13  to have them, or did you think he gave them
14  away so you couldn't have them?
15      A.    I didn't know.  I still don't know
16  why.
17      Q.    Well, this is something you signed
18  for the Court saying he gave them away so you
19  -- to defeat your rights to get them.
20      A.    Well, that's not the way that I
21  took it.
22      Q.    So you don't think -- you think
23  maybe he wanted to have those -- these people
24  to have these assets for other reasons?
25      A.    I don't know.

Page 213

1      Q.    And how about the -- the van that
2  was given to Brenda Greer?  Who is that?
3      A.    A lady that worked at the
4  restaurant that we worked at.  My mom's
5  restaurant.
6      Q.    What's that called?
7      A.    It was Granny's Country Kitchen.
8      Q.    And that's a restaurant that your
9  mother owned or worked at?
10      A.    She was like a co-owner.
11      Q.    And what was the relationship?  I
12  mean, what did Miss Greer do with the
13  restaurant?
14      A.    She worked for -- for my mom.
15      Q.    Why would your husband give her a
16  van before he died?
17      A.    Because that was -- the van wasn't
18  supposed to be just given to Brenda.  It was
19  in -- in -- that was the original down
20  payment for my mother's truck because she was
21  selling us the truck.  The van was supposed
22  to be for the restaurant use.  And Ms. Greer
23  ended up just putting it in her name instead.
24      Q.    Okay.  I'm trying to understand
25  how that is consistent with your saying that

Veritext Corporate Services
800-567-8658                                                                          973-410-4040

Page 214

1  he gave items away to defeat your share,
2  including a van given to Brenda Greer, when
3  you told me that the Toyota truck transaction
4  had happened weeks before and didn't mention
5  anything about Brenda Greer.  I'm -- why was
6  she important enough for your husband to give
7  her a van?
8      A.    Like I said, I -- I -- I don't
9  know.  Yes, I did sign this.  Yes, it's
10  worded that way.  But I -- I guess the reason
11  that was put in there was because that was
12  the down payment to the truck which
13  Mr. Geiger was trying to say was his.  I
14  don't -- I don't know.
15      Q.    Okay.
16      A.    I was very confused.
17      Q.    This was in 2005.  This was over a
18  year later, correct?
19      A.    And I still have a hard time
20  thinking about it and talking about it.
21      Q.    Okay.  And so your testimony is
22  that you were confused when you wrote this or
23  signed it?
24      A.    I don't know.  I'm sure I signed
25  it and agreed to it, and, you know, I'm

Page 215

1  just -- I'm --
2      Q.    Did you get the van back?
3      A.    No.  It wasn't meant in that -- by
4  me in that context.
5      Q.    It says specific items given away
6  are Toyota Tundra truck.  But it's your
7  testimony that he didn't actually give it
8  away.  He just gave a copy of the title to
9  his father?
10      A.    Yes, sir.
11      Q.    So he never actually gave him the
12  truck?
13      A.    No, sir.
14      Q.    Okay.  How about the Glock Model
15  19 handgun?
16      A.    I've never seen it.  So -- since.
17  So I -- Mr. Geiger did say that he had it at
18  some point in time.
19      Q.    And approximately $12,000 in cash.
20  Is that the amount that he took out of the
21  account?
22      A.    I want to say there was more than
23  that.  But I could be mistaken.  Like I say,
24  I don't know the specific dollar amount.
25      Q.    And so he took that out.  And the

Page 216

1  title and the cash and the pistol he gave --
2  he drove down and gave to his father when you
3  took the fishing boat down for sale?
4      A.    I -- I don't know when it
5  happened.  I did not physically see any of
6  that take place.
7      Q.    Are you aware of a separate trip
8  that he made up to his father's?
9      A.    No, sir.
10      Q.    Okay.  So either he sent it there
11  or he snuck off and made another trip or he
12  did it when you weren't looking?
13      A.    I don't know when it happened.
14          MR. SAXON:  Okay.  Can I borrow
15  your stapler again?
16          MR. GRILLO:  Yeah.
17          (Whereupon Exhibit No. 5, an
18  Affidavit, was marked and attached hereto.)
19  BY MR. SAXON:
20      Q.    Marked as Exhibit 5 is a copy of
21  an affidavit that was filled out for your
22  husband's estate.  And if you could look on
23  page 3 of this.  Is that your signature as
24  the executor?
25      A.    Yes, sir.

Page 217

1      Q.    Okay.  And here you identify the
2  creditors and the assets and property of --
3  of your husband, correct?
4      A.    Yes, sir.
5      Q.    Okay.  And you had told us about
6  the Sears and -- a credit card.  But you told
7  us there weren't any debts to family members.
8  And this note says $7,000 loan --
9      A.    I told you that we were buying the
10  truck from my mother.
11      Q.    Yes.
12      A.    And when Mr. Geiger said that the
13  truck was his, I told him we did not have it
14  paid for yet.
15      Q.    So this is a debt that --
16      A.    That's for the Toyota Tundra.
17  That's for the Toyota.
18      Q.    And then what are the -- what are
19  assets here?
20      A.    Is that this bottom?
21      Q.    Yes, ma'am.  The following
22  property -- list all personal property and
23  now -- who now has possession.
24      A.    The Dodge Caravan that we paid off
25  and then that -- the '92 Chevy truck that was

Page 218

1 the -- the -- it was a Chevy Cheyenne.
2 Q. And you put the value here as
3 $1,000 and say it's broke down.
4 A. Yes. The transmission was out.
5 Q. Okay. And so where is the -- do
6 you know why you didn't list the Toyota
7 Tundra if this was an asset of his?
8 A. Because it wasn't paid for.
9 Q. Okay. So you thought you only
10 listed things that were paid for?
11 A. That's why I listed these two
12 things.
13 Q. And the other van that he had
14 given to Miss Greer, is this the same as the
15 Dodge 2000?
16 A. No, sir.
17 Q. Okay. So you had four vehicles:
18 two vans and two trucks?
19 A. No, sir. When we got rid of the
20 van that Brenda had, we bought the 2000. And
21 then we had that blue Chevy truck and then
22 the Toyota Tundra.
23 Q. Okay. So the -- the Dodge Caravan
24 from 2000 is one that you bought after the
25 worker's comp settlement?

Page 219

1 A. And we bought it before but we
2 paid it off, the rest of it -- paid -- we got
3 it during our visit trip because the -- the
4 one that we ended up selling to Brenda broke
5 down in the middle of our trip. So we ended
6 up having to buy another one. And then we
7 got the old one fixed and then was trading
8 mom for the Tundra.
9 Q. Okay. But it was your position
10 that -- at this point when you're filling out
11 the estate in -- March 16th of 2004 that you
12 didn't own the Toyota van that was given to
13 Ms. Greer or the truck that was given to the
14 father because they were -- they were still
15 not paid for?
16 A. The reason the -- the other
17 Caravan was not listed here is because it was
18 already, you know, in -- out of our
19 possession. It was -- like -- like I said,
20 traded to my mother for a down payment on the
21 Tundra.
22 Q. And then somehow Ms. Greer got --
23 got ahold of the --
24 A. Yeah. She worked for my mother.
25 She was supposed to go down there and title

Page 220

1 it in the restaurant's name. She titled it
2 in her name instead.
3 Q. Did you call the police?
4 A. I don't know what action my mother
5 took.
6 Q. But the action you took was to try
7 to get it back from her with this proceeding?
8 A. I honestly don't know. I was just
9 told to list everything.
10 Q. Everything that was gone or
11 that --
12 A. That was just kind of messed up.
13 And that was messed up.
14 MR. SAXON: Okay. Do you want to
15 take a lunch break?
16 MR. GRILLO: It's up to you. It's
17 up to the witness. It's up --
18 THE WITNESS: It's whatever you
19 guys want to do.
20 MR. GRILLO: -- to the court
21 reporter.
22 MR. SAXON: Let's mark this as
23 Exhibit 6.
24 (Whereupon Exhibit No. 6, a
25 Handwritten Note - Bates stamped 11PRD-0006,

Page 221

1 was marked and attached hereto.)
2 BY MR. SAXON:
3 Q. Marked as Exhibit 6 is a copy of a
4 handwritten note addressed to you, signed
5 from Cayce Feyer. And it's Bates stamped
6 11PRD-0006. I'd ask you if you can identify
7 this as the suicide note.
8 A. Yes.
9 Q. And I understand it's a bad --
10 it's a bad copy. But it's the best -- it's
11 the best that we have. And I just wanted to
12 ask you a few questions about it. "I'm sorry
13 I hurt you." Do you know what that's
14 referring to?
15 A. I'm assuming when he hit me.
16 Q. Okay. "I never meant to hurt
17 you." Is that referring to when he hit you?
18 A. I mean --
19 Q. When he hit you a few weeks
20 before?
21 A. It was the -- when he hit Chance
22 and drug him facedown.
23 Q. And that was a few weeks before?
24 A. I want to say that's right
25 around -- yeah. I'm not exact on the dates.

Page 222

1    Q.    Okay.  And "I've died inside every
2  day."  What does that refer to?
3    A.    I don't know.
4    Q.    Did you think about it?  I mean --
5    A.    I'm assuming it hurt him because
6  he did that.
7    Q.    Okay.  So he's apologizing
8  basically for that incident here?
9        MR. GRILLO:  If you know.  Okay?
10  BY MR. SAXON:
11    Q.    If you know.  Of course.
12    A.    (No response.)
13    Q.    I mean "I've died inside every
14  day --"  I don't know if that's a reference
15  to --
16    A.    My assumption --
17        MR. GRILLO:  I don't want you to
18  assume.
19        THE WITNESS:  Okay.  Well, I
20  can't -- I don't know.  I mean, I know what
21  my assumptions are but --
22  BY MR. SAXON:
23    Q.    I don't want you to guess.  Do you
24  have -- if you have a good faith estimate
25  based on the fact --

Page 223

1    A.    No, I don't have --
2    Q.    -- that you lived with him and you
3  were his wife and you know what he's saying
4  in the suicide note --
5    A.    My assumption had been because he
6  hit me.
7    Q.    Okay.
8    A.    And he hurt hisself by hitting me.
9    Q.    Okay.  Have you thought about this
10  note in the years since?
11    A.    I don't have a copy of it at the
12  house for a reason.
13    Q.    And then it says, "Your name is on
14  the deed to the house in Tullahoma so because
15  I'm dead it becomes yours."  That's the new
16  house on Kaywood Lane?
17    A.    Yes, sir.
18    Q.    Okay.  "You're still the
19  beneficiary of my settlement so you will get
20  the money, $1,160, every month until 2008."
21  And did you get that money?
22    A.    Yes, sir.
23    Q.    Okay.  "Use it wisely.  Take care
24  of yourself.  And I wish you the very best of
25  luck in life.  I hope you find happiness some

Page 224

1  day.  With all of my eternal love."
2        And so reading this note
3  there's -- it's -- could you tell why he
4  chose to end his life.
5    A.    I don't think there's ever a
6  reasonable answer to -- to why somebody would
7  end their own life.  My assumption was
8  because he had hit me and he regretted it and
9  could -- you know -- that played into part of
10  it.  But, you know -- that was something that
11  he had never done before, never.
12    Q.    And so as you look back on this,
13  you've -- you've -- believe that it was the
14  incident where he struck you and felt such
15  remorse for it that he ended up taking --
16    A.    No.  Because he knew that I
17  forgave him for that.
18    Q.    Okay.  So this -- in a lot of ways
19  this note doesn't make sense?
20    A.    (No response.)
21    Q.    Does it?
22    A.    Him killing hisself doesn't make
23  sense.
24    Q.    Okay.  Well, how about the rest of
25  the note that's missing?

Page 225

1    A.    What do you mean that's missing?
2        MR. SAXON:  If you could mark this
3  as Exhibit 7.
4        (Whereupon Exhibit No. 7, a
5  Handwritten Note, was marked as an exhibit
6  and attached hereto.)
7  BY MR. SAXON:
8    Q.    Why did you take those lines out?
9    A.    I don't know.  My mom could have
10  done it.  I honestly don't know.
11    Q.    Your mother did it?
12    A.    Possibly.  I don't know who did
13  it.  This was what I was given (indicating).
14  That's what I saw.  Okay.
15    Q.    So it's your testimony that your
16  mother cut these three lines out --
17    A.    I don't know who did.
18    Q.    -- of the note?
19    A.    I don't -- I don't know.
20    Q.    Is this how you sent it to your
21  attorneys?
22    A.    Probably.
23    Q.    Which one?
24    A.    Probably this one (indicating).  I
25  don't know.

57 (Pages 222 to 225)

Page 226

1    Q.    Okay.  Why would your mother cut
2  these lines out --
3        MR. GRILLO:  Is that one marked?
4  I'm sorry.
5        MR. SAXON:  We just had her mark
6  it.
7  BY MR. SAXON:
8    Q.    Marked as Exhibit 7 is another
9  copy of the suicide note in the same
10  handwriting except it says, "I've died inside
11  every day since you told me you wanted to
12  leave me.  And because you want me out of
13  your life I'm finally going to give you your
14  wish."  And then it picks back up where the
15  initial note was:  "Your name is on the deed
16  to the house in Tullahoma."
17        And I'm asking the witness why
18  these three lines have been excised from the
19  copy that was produced to us in this
20  litigation.
21    A.    I don't know.
22    Q.    This is a copy we got from the
23  police department.
24    A.    Right.
25    Q.    And it doesn't have these lines

Page 227

1  missing.
2    A.    Right.
3    Q.    Why did you take them out?
4    A.    I don't know.
5    Q.    You're saying that your mother did
6  it?
7    A.    I would say so.  Because I didn't.
8    Q.    You didn't cut these lines out?
9    A.    No, sir.  I didn't even see -- I
10  don't even remember see -- I don't even
11  remember seeing that worded like that.  And I
12  could have read it.  I don't know.
13    Q.    And you think your mother took
14  them out while --
15    A.    I don't know.  I would assume so
16  because she was who was with me when I went
17  and picked stuff up.
18    Q.    And so she cut these out so you
19  wouldn't --
20    A.    I guess so.
21    Q.    -- you wouldn't see them?
22    A.    I don't know.
23    Q.    Was she trying to prevent the jury
24  or anyone from learning the real reason why
25  your husband took his life?

Page 228

1    A.    I don't know.
2    Q.    Do you think this was done because
3  you wanted to improve your lawsuit?  I mean,
4  why would you take -- why would you take the
5  suicide note and cut three lines of it out
6  that explain why you husband --
7        MR. GRILLO:  Objection.
8        THE WITNESS:  I don't know --
9        MR. GRILLO:  Objection.  I don't
10  -- I don't think -- she's testified she
11  didn't do it --
12        MR. SAXON:  She says she doesn't
13  remember who did it.  And she's --
14        THE WITNESS:  No, I said I don't
15  know who did it.  I don't -- I don't even --
16  and what I was saying was I don't remember
17  reading this.  I could have read it.  I don't
18  know.
19  BY MR. SAXON:
20    Q.    But it's your testimony you
21  didn't --
22    A.    No, sir.
23    Q.    -- doctor the note?
24    A.    No, sir.
25    Q.    Your mother doctored it?

Page 229

1    A.    I don't know who doctored it.
2    Q.    But you think it may have been
3  your mother?
4    A.    I don't know.
5    Q.    You don't know.
6    A.    She was the one that went with me
7  when I picked everything up.
8    Q.    Well, you said that you had
9  everything in the envelope and you sent the
10  envelope to your attorneys.
11    A.    I said they gave me a manila
12  envelope.
13    Q.    Right.
14    A.    And to the best of my knowledge
15  everything that was in there was sent to
16  them.
17    Q.    And your mother at some point got
18  ahold of the note and took it out?
19    A.    I didn't even send this to them.
20  I think my mother-in-law did.  Or I'm not
21  sure who sent it.  I want to say that I got a
22  copy of this for my mother-in-law.
23    Q.    Okay.
24    A.    Because I didn't have a copy of
25  it.  I think that's right.

58 (Pages 226 to 229)

Page 230

1       Is that --
2           MR. GRILLO:  Just what you
3   remember.  That's all.
4           THE WITNESS:  I want to say --
5           MR. GRILLO:  I don't want you to
6   guess.  I just want you to -- what you
7   remember.
8           THE WITNESS:  I honestly want to
9   say that I had to get a copy of this from my
10  mother-in-law to send to the attorney's
11  office.
12  BY MR. SAXON:
13      Q.   So it was your mother-in-law that
14  may have doctored it?
15      A.   No.  I'm sure she didn't do that.
16  Well, I'm not sure but. . .
17      Q.   But the person you're -- you're
18  blaming for -- for doctoring the evidence is
19  -- is your dead mother?
20          MR. GRILLO:  I believe she said
21  she doesn't know.
22          THE WITNESS:  I don't know.
23  BY MR. SAXON:
24      Q.   Okay.  Is there anyone else that
25  could have done it?

Page 231

1       A.   I don't know.
2       Q.   Anyone else have access to it?
3       A.   There were a lot of people in and
4   out of -- of mom's house.
5       Q.   And that's where it was?
6       A.   Yes, sir.
7       Q.   And so who -- who would have had a
8   motive to come in and excise these three
9   lines that explain --
10      A.   I don't know.
11      Q.   Was there any -- as we talked
12  earlier, there's not much explanation for
13  what happened -- didn't really make sense --
14  until you read the lines that are missing.
15      A.   Right.
16      Q.   Okay.  And when did you tell him
17  you wanted to leave him?
18      A.   Gosh, we had had a discussion
19  about it probably two or three months before
20  this ever happened.  I mean, that's why it
21  doesn't make sense.
22      Q.   And you told him that you wanted
23  him out of your life?
24      A.   No.  Like way back when.  But not
25  at this point.

Page 232

1       Q.   And "I'm finally going to give you
2   your wish."
3       A.   It was in a heated argument.  You
4   know, we sat down.  We had discussed and
5   discussed and discussed.  And I said I'm done
6   discussing it.  We're done.  You know, let's
7   just -- let's just quit.  And it --
8       Q.   What were you discussing?
9       A.   -- was over I wanted Andrew out of
10  my house.
11      Q.   Well, Andrew had been gone from
12  your house --
13      A.   Exactly.  That's what I'm saying.
14  It had been a long time.  The only time I
15  told him I was leaving him, it had been a
16  long time before this -- before it happened.
17      Q.   Well, if Andrew left your house in
18  March -- or February of 2003 --
19      A.   That's the only time I said I
20  wanted to leave him.  And that was because
21  when I found -- when I found Chelsy's panties
22  in Andrew's bed.  No.
23      Q.   No what?
24      A.   He wasn't going to stay there.
25      Q.   Okay.

Page 233

1       A.   You know, my daughter, I wasn't
2   going to take any chances.
3       Q.   Well, that happened eight months
4   ago.
5       A.   I know.  That's what I'm saying.
6   That's the only time I had ever told him that
7   I was going to leave.  Other than that, it
8   wasn't an issue.  And Andrew went home --
9       Q.   Okay.
10      A.   -- to his mother.
11      Q.   "I'm finally going to give you
12  your wish."  Why did he think that was your
13  wish on Thanksgiving night 2003?
14      A.   I don't know.
15      Q.   So it's your testimony under oath
16  that this is all just a big mystery to you?
17      A.   I honestly don't know.
18      Q.   And you don't know how this note
19  got doctored and why we got the part with
20  the -- with the critical lines missing?
21          MR. GRILLO:  Objection.
22          THE WITNESS:  Only thing I can
23  assume --
24          MR. GRILLO:  Asked and you
25  answered it to the best of her ability.  And

59 (Pages 230 to 233)

Page 254

1      Q.     Okay.  So if the insurance company
2   doesn't have any records that he didn't fill
3   the prescriptions, you don't have --
4      A.     It would be either through that
5   mail order company or Marcrom's.
6      Q.     Right.  And if those places don't
7   have any records that he filled the
8   prescription, you don't have anything to
9   dispute that?
10      A.     Unless the doctor gave him
11   samples.
12      Q.     And if the doctor says he didn't
13   give him samples, you don't have any reason
14   to dispute that?
15      A.     No.
16      Q.     Okay.  So absent one of those
17   three ways of getting the medication, you
18   have no reason -- or no evidence or basis to
19   say that he was, in fact, in possession of
20   Neurontin passed his first prescription?
21      A.     No.
22      Q.     Correct?
23      A.     Correct.
24      Q.     So in your own words, why do you
25   believe Neurontin caused his suicide?

Page 255

1      A.     Just because of the behavioral
2   changes and -- and -- you know, he just --
3   right there at the last few weeks he was not
4   acting right.
5      Q.     And you don't know if he was
6   taking Neurontin at the time, though?
7      A.     I believe he was, yes.
8      Q.     But your basis for believing that
9   is -- we just established you don't have a
10   basis for that, didn't we?
11      A.     There was, you know, the pill
12   bottles that were in the filing cabinet.
13      Q.     I asked you if you had seen any
14   Neurontin pill bottles, and you said that you
15   didn't remember seeing any Neurontin pill
16   bottles and then when the pill bottles were
17   collected they didn't include a Neurontin
18   pill bottle.  We just discussed --
19      A.     Those were the ones that were
20   beside the bedside table.  The bottles
21   themselves were in the filing cabinet.
22      Q.     And they didn't include Neurontin
23   pill bottles?
24      A.     I'm sure they did.  I didn't, you
25   know, sit there and just stare at every one

Page 256

1   of them, no.
2      Q.     So they -- I'm not -- I'm not
3   clear on your -- on your testimony, I guess.
4         You said you don't recall ever
5   seeing any Neurontin bottles at the house.
6   The pill bottles that were taken were not
7   Neurontin bottles.  You don't have any basis
8   for saying he filled his prescription past
9   the one record that we have that he filled
10   the first prescription.  And -- which would
11   have taken him up through -- assume if he had
12   taken it as prescribed, as you say he was
13   very adamant about taking his medications as
14   prescribed, that prescription would have
15   lasted him until the end of September.
16         MR. GRILLO:  I'm going to
17   object -- I'm going to object to the
18   question.  Can you break it down a little
19   bit?
20         MR. SAXON:  Sure.
21         Mr. GRILLO:  I think it was a
22   little compound there.
23   BY MR. SAXON:
24      Q.     So if he -- he takes his
25   medication as prescribed, correct?

Page 257

1      A.     Uh-huh.  Yes, sir.
2      Q.     Yes.  And that takes him -- the
3   record that we have of the prescription that
4   he filled takes him to September 28th.  Okay?
5   Let's assume that.  And let's assume that the
6   records say that --
7      A.     Okay.
8      Q.     -- okay?  Do you have any evidence
9   that he took it past then?
10      A.     No, sir.
11      Q.     Okay.  And you don't remember
12   seeing a Neurontin bottle in your house?
13      A.     I don't know if there was or was
14   not.  Like I said, there were, you know, four
15   or five of the pill bottles in the filing
16   cabinet.  And I just put them in a bag and --
17      Q.     And did what with them?
18      A.     Everything got flushed.  And I
19   didn't pay attention to what, you know, was
20   or wasn't.
21      Q.     Okay.  So you flushed everything.
22   And then -- well, you don't know if you saw
23   anything -- or you if you saw a Neurontin
24   pill bottle, correct?
25      A.     At that point I couldn't tell you

65 (Pages 254 to 257)

Page 258

1 what was what.
2    Q.    Okay.  Well, if you don't have any
3 evidence of it, you don't.  I'm not saying
4 that you -- you know, disputing you.  I'm
5 just asking you to point me to any -- to any
6 evidence.
7    A.    I just didn't want any pills
8 laying around for the children to get ahold
9 of.  So. . .
10    Q.    Okay.  And it was your testimony
11 earlier that you had seen strange behavior
12 out of your husband the last few weeks
13 while -- before his death.  And if we assume
14 that the evidence that -- is correct that he
15 stopped taking it in -- September 28th, what
16 do you -- what do you attribute the strange
17 behavior to, if that's true?
18        MR. GRILLO:  If you know.
19 BY MR. SAXON:
20    Q.    If you know.
21    A.    I don't know.
22    Q.    Okay.  Has any medical
23 professional ever told you that Neurontin
24 caused your husband to take his life?
25    A.    No, sir.

Page 259

1    Q.    Have you ever asked any medical
2 professional?
3    A.    No, sir.
4    Q.    And you said you haven't done any
5 of your own research?
6    A.    At that point, no, I had not.
7    Q.    Have you since done research?
8    A.    Yes, sir.
9    Q.    What have you done?
10    A.    Just, you know, trying to find out
11 the side effects and, you know, everything.
12 I was trying to find out, you know, what
13 possibly could have caused the way things
14 happened.  And, you know, the -- from the way
15 it sounded, you know, the paranoia, the --
16 you know, behavior changes, I don't remember
17 what they were, but it just fit right in line
18 with how he was behaving.
19    Q.    What fit right in line?
20    A.    The -- the behavior and the
21 adverse or side effects of the Neurontin.
22    Q.    What -- how was he acting
23 paranoid?
24    A.    Something's in the cupboard.  You
25 know, there was something in the cupboard,

Page 260

1 stuff like that.
2    Q.    Okay.  And you took that to mean
3 that he was being paranoid?
4    A.    It was very strange, yes.
5    Q.    Strange or paranoid?
6    A.    I'd say paranoid because all the
7 cupboard doors were open.
8    Q.    Okay.  And you thought he was
9 concerned that something was in the cupboard?
10    A.    That's what he said, there was
11 something in the cupboard.
12    Q.    And did you think he meant an
13 animal or some spirit or what?
14    A.    I honestly did not know.  I
15 assumed he meant some kind of an animal, but
16 there was nothing.  I looked myself.
17    Q.    Okay.
18    A.    And, you know, there wasn't
19 anything.
20    Q.    Okay.  And then the times when he
21 felt like he heard something outside --
22    A.    Yes, sir.
23    Q.    -- correct?  And then the instance
24 when he took money out of the account and put
25 it back in and then took it out and then

Page 261

1 apparently took it to his father's house --
2    A.    Yes, sir.
3    Q.    -- correct?
4        Okay.  Was there any other strange
5 behavior that you felt like you said went
6 straight down the line with what you read?
7    A.    Not that I can think of.
8    Q.    And where did you -- where did you
9 read this?
10    A.    I don't remember.
11    Q.    This in a book or on the internet
12 or -- or where?
13    A.    I want to say -- I want to say on
14 the internet.  But I'm not positive.  I
15 honestly don't remember.
16    Q.    Did you print anything out from --
17    A.    No, sir.
18    Q.    -- that you read?
19    A.    No, sir.
20    Q.    Do you have any documents -- I
21 guess we've already established you don't
22 actually have any documents.
23    A.    No, sir.
24    Q.    Okay.  So they were things you
25 must have read on the internet; is that

66 (Pages 258 to 261)