UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
-------------------------------------------------------x
                                          :   MDL Docket No. 1629
In re:  NEURONTIN MARKETING,              :
        SALES PRACTICES AND               :   Master File No. 04-10981
        PRODUCTS LIABILITY LITIGATION     :
                                          :   Judge Patti B. Saris
-------------------------------------------------------x
                                          :   Magistrate Judge Leo T. Sorokin
THIS DOCUMENT RELATES TO:                 :
                                          :
        Feyer v. Pfizer Inc., et al.      :
        Case No. 1:05-cv-11035-PBS        :
-------------------------------------------------------x
```

## PLAINTIFF'S MEMORANDUM OPPOSITION TO DEFENDANTS' MOTION TO DISMISS CLAIMS OF PLAINTIFF SHANAN FEYER AND FOR OTHER RELIEF

Plaintiff Shanan Feyer hereby opposes the motion by Defendants Pfizer Inc. and Warner-Lambert Company to dismiss her claims and for other relief on several grounds: (1) the time is not ripe for this motion as Defendants' counsel was fully apprised by Plaintiff's counsel that there are at least two other witnesses who may possess knowledge of the facts and circumstances regarding a second version of the decedent Cayce Feyer's suicide note; (2) contrary to Defendants' insinuations, Shanan Feyer did not admit to either altering the note or even having knowledge, prior to being shown the note, that it had been altered; (3) Defendants' allegations that Plaintiff altered the suicide note are nothing more than sheer speculation and Defendants have not met their burden to provide clear and convincing evidence in support of their assertions; (4) Defendants have not demonstrated that the altered note will interfere with their ability to defend against this case; and (5) the testimony of the two other witnesses will serve to corroborate Shanan Feyer's testimony that she did not tamper with, or have knowledge that someone altered the suicide note.

## FACTUAL BACKGROUND

Shanan Feyer was deposed in this action on August 10, 2010.  During the deposition, Plaintiff was shown two different versions of her husband Cayce Feyer's suicide note:  one version (an evidently altered version) was produced by Plaintiff's counsel to Defendants on April 11, 2005, and the other version was obtained by Defendants from the Coffee County Sheriff's Department.  ECF Doc. ## 3072-1, 3072-2.  The note, which the parties are now aware was altered, was sent to Plaintiff's counsel on October 8, 2004, by Diane Schread, who is the decedent's mother.  Plaintiff's decedent's mother provided the note to Plaintiff's counsel more than a month before Plaintiff filed a Complaint in the United States District Court for the Southern District of New York to commence this action on November 23, 2004.  D. Mass Docket Case No. 1:04-cv-10739 PBS, ECF Doc. # 6.  (*See* Affidavit of Diane Schread, Exhibit A.)  Further, Diane Schread states that the note was given to her by Shanan Feyer either in late December 2003 or early January 2004 (Schread Aff. at ¶ 4), quite possibly before Plaintiff Shanan Feyer first contacted Plaintiff's counsel on December 16, 2003, to ascertain whether she had a legal action in connection with her husband's suicide, and definitely before Plaintiff's counsel agreed to accept the case and a retainer was signed by Shanan Feyer on October 20, 2004. (Declaration of Andrew G. Finkelstein at ¶ 3.)  Plaintiff not only produced a copy of a suicide note but on October 30, 2006, Plaintiff also served Defendants with fully executed authorizations with which Defendants' document retrieval service, MRC of Houston, could obtain numerous documents, including a copy of the suicide note directly from the Coffee County Sheriff's Department.  (Finkelstein Decl., Ex. A.)

Plaintiff Shanan Feyer made clear at her deposition that prior to being shown the two versions of the suicide note, she had not known that the note was altered:

Q.     Why did you take those lines out?

A.     I don't know.  My mom could have done it.  I honestly don't know.

Q.     Your mother did it?

A.     Possibly.  I don't know who did it.  This was what I was given (indicating).  That's what I saw.  Okay.

Q.     So it's your testimony that your mother cut these three lines out --

A.     I don't know who did.

Q.     -- of the note?

A.     I don't -- I don't know.

(Finkelstein Decl., Ex. B at 225:8-19.)

Plaintiff testified to having to call her mother-in-law to obtain a copy of the suicide note for her attorneys, and that she did not know that the unaltered note had included the additional lines:

THE WITNESS: Well, like I said, this is the copy that I got from my mother-in-law. And I had to get a copy of it from her to send to you guys.

MR. GRILLO: Referring to Exhibit 6.

THE WITNESS: Because I had to call my mother-in-law to get a copy of it.

BY MR. SAXON:

Q.     And the copy that she has and the copy that she sent you is the copy with the lines missing?

A.     Whatever I sent to them was what she had because that's where I got it from, was from her.

MR. SAXON:  Okay. Let's take a -- just a second.

THE WITNESS: I honestly didn't know it said that.  Oh, God.

BY MR. SAXON:

3

> Q.      Well, you can understand why we need an explanation for this?
>
> A.      I can't explain it honestly. So he -- he -- oh, God.

(Finkelstein Decl., Ex. B at 234:2-25.)

Plaintiff testified that her mother accompanied her to the police station to pick up a manila envelope which contained, *inter alia*, the suicide note:

> Q.      What happened -- and who gave it back to you?
>
> A.      Somebody at the -- the Sheriff's Department. One of the detectives.
>
> Q.      Did he come to your house and bring it to you?
>
> A.      No.   My mother and I went up there and they handed us the envelope.
>
> Q.      Did they call you before and ask you to come up?
>
> A.      Probably.   I want to say yes that's how I knew to go up there.
>
> Q.      Do you remember who called you?
>
> A.      No, sir.
>
> Q.      How long before they called you until you made it up there?
>
> A.      I don't know.
>
> Q.      Your mother was with you?
>
> A.      Yes, sir.

(Finkelstein Decl., Ex. B at 236:8-237:1.)

Plaintiff testified that she did not look at the suicide note when they first obtained it and that instead, her mother read the suicide note to her out loud – without the lines that are missing from the altered copy:

> Q      When did you first look through it?

4

> A.    I want to say it was back at mom's house, and she looked through everything first.
>
> Q.    Okay.   And then she gave it to you to look through or what happened?
>
> A.    No.  She put it up. I mean I was very upset.
>
> Q.    Okay.
>
> A.    I didn't want to look at any of it.
>
> Q.    And so -- at what time -- at what point did you look at it?
>
> A.    I don't know.
>
> Q.    Where -- do you remember looking at it?
>
> A.    She read it out loud first.
>
> Q.    Okay.
>
> A.    And that part that was in this one was not read out loud.
>
> Q.    It wasn't in the note or it just wasn't read out loud?
>
> A.    I didn't see it. I mean she read it.  And that was not verbalized out loud.  It was not -- that part was not read out loud.  That's why it was a shock to see that.

(Finkelstein Decl., Ex. B at 237:10-238:11.)

Plaintiff further testified that her mother, Pat Randolph, who is now deceased, retained possession of the manila envelope, which contained the suicide note, from that day forth:

> Q.    So you had never seen the note until -- when was the first time you actually saw the note?
>
> A.    I don't know.
>
> Q.    And where did the note stay from the time you picked it up from the police officer until you got a copy of it to send to your attorney?
>
> A.    In the envelope at my mom's house.

> Q.      So it stayed at your mother's house?
>
> A.      Yes, sir.
>
> Q.      Where was it?
>
> A.      I don't know where she had it.

(Finkelstein Decl.., Ex. B at 238:12-25.)

Plaintiff testified that at some point her mother-in-law, Diane Schread, wanted to read Cayce Feyer's suicide note.  The suicide note that was produced from Defendants was obtained by Plaintiff's counsel from the mother-in-law:

> Q.      And when did you ask for a copy of  it? Where did you actually pick it up again?
>
> A.      At her house. But I don't know when it was.
>
> Q.      When did you start collecting documents to send to your attorney?
>
> A.      I don't know.  I've not written down all these times and dates. I don't know.
>
> Q.      Was it years later or months?
>
> A.      I don't know.
>
> Q.      Okay.  And how did -- you said that you actually may have gotten a copy -- this copy from your mother-in-law?
>
> A.      Yes, sir.
>
> Q.      How did that happen?  How did she get a copy of it?
>
> A.      When we went and picked the stuff up, we went to her house.
>
> Q.      Your mother-in-law's house?
>
> A.      No.  My mother's house.
>
> Q.      Okay.
>
> A.      I sent a copy -- the copy that I had to my mother-in-law.

6

> Q.     You sent -- you made a copy of the note that you got from the police --
>
> A.     Yes.  Because she wanted to read it.
>
> Q.     Okay.  And then this is the copy that she got -- that you got from her?
>
> A.     I assume so.
>
> Q.     So when did you make the copy to send to her?
>
> A.     I don't know.  Whenever she asked for it.
>
> Q.     Was it soon after you picked it up?
>
> A.     I don't know. I -- I don't know.
>
> Q.     Was it -- were these lines removed to protect her?
>
> A.     I don't know.  I don't know why somebody would do that.
>
> Q.     When your mother mailed – your mother-in-law mailed you back a copy of it?
>
> A.     I think she sent it to them or --and, see, there again, I don't know if she sent it to me and I sent it to them or how -- but I know that I had to call her for it.  She may have sent it.  I'm not sure.

(Finkelstein Decl.,  Ex. B at 239:1-240:24.)

Although defense counsel certified that he conferred with Plaintiff's counsel prior to filing the motion, Plaintiff's counsel, Kenneth B. Fromson, Esq., had advised defense counsel that there were individuals, Kristin Hill and Diane Schread, who possessed information concerning the issue of the altered suicide note that would potentially obviate the need for the within motion to be interposed prematurely.

Kristin Hill has known Plaintiff Shanan Feyer and her mother Patsy Randolph for approximately the past nine years, and considers herself a close friend of the family and specifically of Patsy Randolph, who is now deceased.  (Affidavit of Kristin Hill at ¶ 2.)  Shanan

Feyer told Kristin Hill that she has been accused of altering her deceased husband, Cayce Feyer's suicide note. (Hill Aff., at ¶ 3.)  Kristin Hill states that within weeks of Cayce's suicide, she spoke with Patsy Randolph who advised her that Patsy had removed information from Cayce Feyer's suicide note to protect her daughter from learning some of the comments that Cayce had made in the note. (Hill Aff., at ¶ 4.)  Although Kristin Hill could not specifically recall all of the comments Patsy removed, she recalls that one comment was "now Shanan had her wish come true that he was dead." (Hill Aff., at ¶ 4.)  Ms. Hill states that the comments would have been hurtful to Shanan. (Hill Aff., at ¶ 4.)  Further, Ms. Hill had promised Patsy Randolph that she would not let her daughter know that Mrs. Randolph had altered the note. (Hill Aff., at ¶ 4.)

Moreover, Kristin Hill states that sometime in August 2010, Shanan Feyer telephoned and asked whether Ms. Hill had any private conversations with her mother Patsy Randolph concerning Cayce's suicide note, and whether she knew if the suicide note had been altered. (Hill Aff., at ¶ 5.)  She told Shanan that Patsy Randolph had changed the suicide note. (Hill Aff., at ¶ 5.)

## ARGUMENT

The First Circuit has stated that a determination of fraud on the court requires severe conduct that involves "an unconscionable scheme" or "'the most egregious conduct' designed to corrupt the judicial process.'" *Edwards, LLC v. Fiddes & Son,* 427 F.3d 129, 133 (1st Cir. 2005). In *Edwards*, the plaintiff sought relief from an original judgment claiming the defendant had committed fraud on the court when the defendant failed to disclose that it had mislabeled and "fraudulently certified" products sold to plaintiff and for "misrepresentations made. . . during the course of litigation—misrepresentations made. . . to further conceal Fiddes' fraudulent labeling certifications practices." *Id.* at 133.  In regard to the plaintiff's allegations of misrepresentations

made during the litigation to conceal conduct, the First Circuit stated that the standard for fraud on the court is "'clear and convincing evidence' that the claimed fraud . . . occurred" and that the alleged fraud "'substantially interfered with [the litigant's] ability fully and fairly to prepare for, and proceed at, trial.'"  *Id.* (citations omitted).  The First Circuit agreed with the trial's court's decision that some of the allegedly false statements of compliance that were detailed in the defendant's court papers had no impact upon the litigation.  That the defendants assertion that the "false statements deterred it from asserting other possible claims or defenses," and that the case would have "proceeded differently but for the statements at issue," was "general speculation".  Moreover, the court noted that the plaintiff has made "no plausible argument that either statement, even if 'fraudulent,' 'substantially interfered with [its] ability fully litigate and prepare for, and proceed at, trial."  *Id.* at 136.

In *United States v. 6 Fox Street*, the defendant claimed that the Government committed fraud on the court where they produced affidavits from law enforcement agents which swore "that there was no contact between them and federal agents" about the plaintiff's drug activities before 2001.  480 F.3d 38, 46 (1st Cir. 2007).  The First Circuit, in affirming the trial court's grant of summary judgment, held that even if the defendant were able to prove that the government affidavits contained false information concerning their actions, that would not suffice under the standards for fraud on the court, and noted that:  "even such an offense as perjury may not suffice—instead the conduct that would qualify as 'fraud on the court' must be something on the order of bribing a judge."  *Id.* at 47.  The First Circuit stated that "there must exist 'exceptional circumstances'" that justifies providing relief from a judgment and that the bar is set high for such relief.  *Id.* at 46-47.

In *Reynolds v. The University of Pennsylvania*, the defendants requested a new trial on

the grounds that, *inter alia,* the court had excluded from evidence any reference to altered documents because the plaintiff's counsel had stated that they did not intend to refer to same and that there were questions whether the plaintiff had altered the documents or had knowledge that the documents were altered.  684 F. Supp. 2d 621, 631 (E.D. Pa. 2010).  The District Court had based its decision for excluding such references on the reasoning that the documents would distract and confuse the jury and create a side issue which would harm plaintiff's case.  *Id.* at 631-32.  The court subsequently reversed its initial ruling and found that evidence of the altered documents "is directly relevant to the jury's determination of Reynold's credibility, which is no way collateral to the overall issue of liability."  *Id.* at 632.

*Aoude v. Mobile Oil Corp.*, to which Defendants refer in their Memorandum (ECF Doc. # 3071 at 5-6), is distinguishable in that in this case Plaintiff has denied altering the document, whereas in *Aoude*, the First Circuit based its determination in part upon the material facts that were undisputed and that the trial court findings were based "largely on plaintiff's own admissions."  892 F.2d 1115, 1120 (1st Cir. 1989).

Here, Defendants' assertions that Plaintiff altered the note are purely speculative, and Plaintiff has denied altering the suicide note.  Plaintiff has also advised Defendants through her counsel that there are other individuals who may have information and factual knowledge as to the altered suicide note, namely, Diane Schread and Kristin Hill.  Moreover, Plaintiff served Defendants with an authorization to obtain the records concerning the suicide of Plaintiff's decedent, which would include the suicide note, directly from the Coffee County Sheriff's Department.  Plaintiff submits that the fact that this authorization was provided to Defendants serves as evidence that Plaintiff was operating in good faith, had nothing to conceal, and was not aware that the document was altered prior to time that she was shown the two versions of the

suicide note during her deposition testimony.   Further, it is clear that Plaintiff was not in possession of the altered suicide note at the time that it was provided to Plaintiff's counsel by Diane Schread in October 2004, prior to filing the complaint in this action.

Defendants provided the Coffee County Sheriff's Department with Shanan Feyer's authorization, and the Sheriff's Department provided a copy of the suicide note that they retrieved from the scene of the suicide.   Plaintiff testified that she did not have knowledge that the suicide note was altered, that the suicide note was in the possession of her mother from the inception, and that the first time that she had knowledge the note was altered was during the deposition.   There is no evidence in the record demonstrating that Shanan Feyer altered the suicide note or participated in some "scheme" to commit fraud on the Court.   In fact, the altered version of the note was evidently retrieved by Shanan Feyer from her mother and provided to her mother-in-law in late December 2003 or early January 2004, possibly before Shanan Feyer ever contacted Plaintiff's counsel on December 16, 2003, to ascertain whether she even had a potential action, and definitely before Plaintiff's counsel agreed to accept the case and a retainer was signed by Shanan Feyer on October 20, 2004.

As noted in detail above, Kristin Hill has submitted an affidavit in which she states that Plaintiff Shanan Feyer's mother, Patsy Randolph, confided in her that she had altered Cayce Feyer's suicide note.   Hill Aff., at ¶ 4.   The Hill Affidavit may be utilized to show that Patsy Randolph had motive to protect her daughter, the opportunity to alter the note, and more importantly that Shanan Feyer did not defraud any party or this Court.   Moreover, the testimony of Kristin Hill indicates that the suicide note was altered within weeks of Cayce Feyer's death — before any contact between Plaintiff and her attorneys was initiated.   Moreover, Kristin Hill's Affidavit demonstrates that Plaintiff was not aware of who altered the suicide note.

Plaintiff's counsel advised defense counsel that Diane Schread and Kristin Hill had information pertaining to the alteration of the note, but defense counsel failed to perform the requisite discovery, failed to apprise this Court of this information, and instead prematurely filed this motion.

Plaintiff submits that Defendants' assertion that Shanan Feyer altered the note is not substantiated by any facts and is pure speculation.  Defendants have not provided any "clear and convincing evidence" that Shanan Feyer was the individual who altered the note.  The fact that Plaintiff provided Defendants with an authorization to obtain the suicide note from the Sheriff's Department clearly militates against that speculation and demonstrates no intent for any type of concealment or any type of scheme to perpetuate fraud on the Court.

Further, Defendants' case has not been "substantially interfered with [its] ability to fully litigate and prepare for trial" by the discovery of the altered note — the parties will have the opportunity to test the credibility of all of the witnesses regarding the altered note at trial.  The fact that the altered suicide note was in all probability first provided by Plaintiff's mother to Plaintiff, who passed it on to Diane Schread possibly prior to her first contact with Plaintiff's counsel, demonstrates that it is highly likely that anyone, including Pat Randolph, who Plaintiff submits probably altered the note, intended to defraud any court at that juncture.  Defendants have failed to meet their burden of proof in this case and have besmirched the reputation of Plaintiff without appropriate corroborative evidence that she altered the note.  Dismissal of a case without sufficient evidence would be a drastic and uncalled for remedy.  The issue of the altered note can be resolved at trial with the jury accessing the credibility of all of the witnesses.

Plaintiff requests that this Court deny Defendants' motion in its entirety as Defendants have failed to meet their high burden of clear and convincing evidence that Plaintiff has

committed any fraud upon this Court, or in the alternative, deny the motion until further discovery on the issue may be had.

Dated:  September 30, 2010                                Respectfully submitted,

                                                         FINKELSTEIN & PARTNERS, LLP


                                          By:    /s/ Andrew G. Finkelstein
                                                Andrew G. Finkelstein, Esquire
                                                1279 Route 300, P.O. Box 1111
                                                Newburgh, NY  12551
                                                (800) 634-1212
                                                (845) 562-3492 (fax)
                                                email:  afinkelstein@lawampm.com

                                                *Attorneys for Plaintiff Shanan Feyer*


                                 **CERTIFICATE OF SERVICE**

       I certify that this document filed through the ECF system has been served pursuant to Case Management Order No. 3 on September 30, 2010.

Dated:  September 30, 2010


                                          /s/ Andrew G. Finkelstein
                                        Andrew G. Finkelstein