# Exhibit A

# No. 09-0222

# United States Court of Appeals for the Second Circuit

UFCW LOCAL 1776 AND PARTICIPATING EMPLOYERS HEALTH AND WELFARE FUND, ERIC TAYAG and MID-WEST NATIONAL LIFE INSURANCE COMPANY OF TENNESSEE, on behalf of themselves and others similarly situated, LOCAL 28 SHEETMETAL WORKERS, on behalf of themselves and others similarly situated, and SERGEANTS BENEVOLENT ASSOCIATION HEALTH AND WELFARE FUND, on behalf of themselves and others similarly situated,

**Plaintiffs-Appellees**

**v.**

ELI LILLY AND COMPANY,

**Defendant-Appellant,**

TEXAS DEPARTMENT OF STATE HEALTH SERVICES,

**Defendant.**

*On Appeal from the United States District Court for the Eastern District of New York, Docket Numbers: 04-MD-1596, 05-CV-2948, 06 CV-0021 & 06-CV-6322*

## PETITION FOR PANEL REHEARING AND REHEARING *EN BANC*

Thomas M. Sobol
Lauren Guth Barnes
Kristen Johnson Parker
HAGENS BERMAN SOBOL SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
Tel: (617) 482-3700

Andrea Bierstein
HANLY CONROY BIERSTEIN SHERIDAN FISHER & HAYES LLP
112 Madison Avenue, 7th Floor
New York, NY 10016
Tel: (212) 784-6400

James R. Dugan
Stephen Murray, Jr.
Douglas R. Plymale
MURRAY LAW FIRM
650 Poydras Street, Suite 1100
New Orleans, LA 70130
Tel: (504) 525-8100

Samuel Issacharoff
40 Washington Square South
New York, NY 10012
Tel: (212) 998-6580

September 24, 2010

# TABLE OF CONTENTS

Preliminary Statement...........................................................................................1

Statement of Facts ...............................................................................................3

Argument ..............................................................................................................8

I.    The Panel's Decision Conflicts with Supreme Court Precedent
      and Warrants Rehearing En Banc ..............................................................8

      A.    For RICO Cases, Controlling Supreme Court Precedent
            Requires A Showing Of Direct Harm, But Not Direct
            Reliance. .........................................................................................8

            1.    *Holmes v. Securities Inv. Prot. Corp.* ...................................9

            2.    *Anza v. Ideal Steel Supply Corp.* .........................................10

            3.    *Bridge v. Phoenix Bond & Indem. Co.* ...............................10

            4.    *Hemi Group LLC v. City of New York* ................................11

      B.    The TPPs Satisfied Supreme Court Precedence by
            Establishing Injury and Reliance ...................................................12

      C.    In Ruling on But-For Causation, the Panel Improperly
            Required Direct Reliance. ..............................................................13

      D.    In Ruling on Proximate Cause, the Panel Improperly
            Adds A Direct Reliance Requirement On Top Of The
            Direct Injury Requirement. ............................................................15

II.   The Panel's Decision Conflicts with Second Circuit Precedent and
      Warrants Rehearing En Banc ...................................................................17

III.  The Panel's Decision Involves Questions of Exceptional
      Importance and Warrants Rehearing En Banc ..........................................17

IV.   The Panel's Decision Misapprehended Points of Law and Fact
      and Warrants Rehearing ...........................................................................17

Conclusion...........................................................................................................19

# ATTACHMENTS

Panel Decision................................................................... Attachment A

Petitioner-Appellee's Brief ..................................................Attachment B

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006).......................................9, 10

*Bridge v. Phoenix Bond & Indem. Co.*
    553 U.S. 639, 128 S. Ct. 2131 (2008)...........................................................passim

*City of New York v. Smokes-Spirits.com, Inc.,* 541 F3d 425, 444
    n. 24 (2d Cir. 2008)............................................................................................14

*Desiano v. Warner-Lambert Co.*, 326 F.3d 339 (2d Cir. 2003) ...............1, 2, 17, 18

*Hemi Group LLC v. City of New York,* 130 S. Ct. 983 (2010) ........................passim

*Holmes v. Securities Inv. Prot. Corp.*, 503 U.S. 258 (1992) .................................8, 9

*In re Zyprexa Prods. Liab. Litig.* (*UFCW Local 1776 v. Eli Lilly
    and Co.*), 493 F.Supp.2d 571, 576 (E.D.N.Y. 2007) ...........................................7

*In re Zyprexa Prods. Liab. Litig.* (*UFCW Local 1776 v. Eli Lilly
    and Co.*), 253 F.R.D. 69, 248-49 (E.D.N.Y. 2008) ....................................passim

*In re Zyprexa Prods. Liab. Litig.* (*UFCW Local 1776 v. Eli Lilly
    and Co.),* 2010 U.S. App. LEXIS 18959 (2d Cir. Sept. 10
    2010) .....................................................................................................................1

*McLaughlin v. Am. Tobacco Co.,* 522 F 3d 215 (2d Cir. 2008) .............................13

**FEDERAL RULES**

FED. R. APP. P. 35................................................................................................1, 2

FED. R. APP. P. 40...........................................................................................1, 2, 18

FED. R. CIV. P. 23 .................................................................................................2

## PRELIMINARY STATEMENT

Pursuant to FED. R. APP. P. 35 and 40, Plaintiff-Appellee TPPs request an order vacating the September 10, 2010 decision of this Court (Katzmann, Livingston, and Lynch, J.), and petition for rehearing en banc and rehearing before the Panel.  *In re Zyprexa Prods. Liab. Litig. (UFCW Local 1776 v. Eli Lilly and Co.),* 2010 U.S. App. LEXIS 18959, (Slip Op. attached, "Op.").

Rehearing en banc is warranted because the Panel's decision disregards controlling Supreme Court precedent regarding RICO causation, *sub silentio* ruling (i) that *Bridge v. Phoenix Bond & Indem. Co.,* 553 U.S. 639, 128 S. Ct. 2131 (2008) (*"Bridge"*), has no force of law, and (ii) that *Hemi Group LLC v. City of New York,* 130 S. Ct. 983 (2010) (*"Hemi"*), despite explicit direction to the contrary, effectively overrules *Bridge.*  Controlling RICO precedent requires a showing of direct injury, but not direct reliance, i.e., factual causation.  The Panel conflates these two distinct concepts, taking the position at one point that all actors in the causal chain must share the same motivations in reacting to the RICO misconduct, while later taking an even more radical position that no other persons may be in the causal chain at all.  As a result, the Panel's decision abrogates *Bridge* by requiring direct, first-party causation for all RICO cases.

The Panel's decision disregards controlling Second Circuit law.  *Desiano v. Warner-Lambert Co*., 326 F.3d 339 (2d Cir. 2003), held that "this and other courts

1

have long recognized the right of HBPs [health benefit providers] to recover from drug companies amounts that were overpaid due to illegal or deceptive marketing practices."  326 F. 3d 350.  *Desiano* explicitly decided, in favor of TPPs, the very same RICO causation issues presented in this case.  Although discussed prominently in the district court's ruling and the parties' arguments, the Panel does not even cite to the decision.

Rehearing en banc is also warranted because the proceeding raises four "questions of exceptional importance." See FED. R. APP. P. 35.  First, the decision contorts RICO substantive law, making RICO inapplicable to any market where one party is legally obligated to pay for a product chosen by another. Second, the decision makes it nigh impossible to certify a marketing claim under Rule 23, even where every class member pays the same percentage damage for each transaction at issue.  Third, the viability of judicial remedies for health care fraud, waste, and abuse is an exceptionally important public policy matter, particularly where modern health care is increasingly mediated through private health benefit providers who do not make health care decisions but must pay for health care decisions.  Fourth, this case by itself is exceptionally important.  The record shows that, due to Lilly's fraud, billions of dollars were unnecessarily spent for a mediocre psychotropic drug.  By ignoring controlling Supreme Court and

Second Circuit precedent, the Panel's decision denies TPPs a RICO remedy and

works an unjust result.  Rehearing en banc rests well within these four bedposts.

Finally, rehearing by the Panel is generally warranted when the Panel has

overlooked or misapprehended points of law or fact.  FED. R. APP. P. 40.  Here, the

Panel's decision is controlled by misinterpretations of *Hemi*, a case decided after

the briefing and oral argument of this matter.  The Panel did not have the benefit of

either a district court ruling or advocacy by the parties applying the facts of this

case to *Hemi's* legal constructs.  The Panel also misapprehended the evidentiary

record which in fact shows that TPPs directly and indirectly relied on Lilly's

misapprehensions.

## STATEMENT OF FACTS

Prescription drug decision-making involves prescribers and payors.[1]

Prescribers choose the drug, but do not pay.  Payors pay for the drug, but do not

choose the drug.  These actors have different roles and motivations, but rely on the

same sources of information.

For more than a decade, payors and prescribers did exactly what they were

supposed to do.  TPPs relied on Lilly's clinical trials and health outcomes data that

---

[1] *See generally, In re Zyprexa Prods. Liab. Litig.* (*UFCW Local 1776 v. Eli Lilly and Co.*), 253 F.R.D. 69, 248-49 (E.D.N.Y. 2008) (discussing participants in the market for pharmaceuticals).

said Zyprexa was a premium drug worth a premium price;[2] put Zyprexa on their formularies in a parity position with other branded antipsychotic drugs;[3] allowed physicians to prescribe Zyprexa and patients to receive it without restrictions;[4] and paid for countless Zyprexa prescriptions.[5]  Physicians relied on the same trusted sources of information and prescribed Zyprexa millions of times.[6]

Except, Lilly lied.[7]  Lilly marketed Zyprexa as a "superior, highly effective, virtually free of side effects, easy to use product" while knowing it was about as effective as other atypicals and presented dangerous health risks.[8]  Lilly paid scientists to conduct studies that supported pre-determined favorable conclusions.[9] Lilly dominated the sources of information TPPs, prescribers and PBMs rely on, disseminating its misrepresentations far and wide.[10]

---

[2] *See infra,* n. 16-19.

[3] *See, e.g.*, A-833, -1537.

[4] 253 F.R.D. at 34, 37, 40, 41, 44, 46, 228, 231, 245 (none of the large PBMs placed restrictions on Zyprexa during the class period), 247-48 ("restrictions are minimal").  The Panel decision claims there is evidence that some TPPs began to request rebates after learning some of Lilly's fraud.  Op. at 28.  The record reflects that during the class period, there were "relatively few rebates available" for Zyprexa.  253 F.R.D. at 69.

[5] 253 F.R.D. at 398 ("most, if not all, TPPs have paid or reimbursed the cost of Zyprexa prescriptions").

[6] 253 F.R.D. at 193, 250-51. A-1758.

[7] *See infra*, n. 14.

[8] 253 F.R.D. at 117.

[9] A-1748.

[10] *See*, *e.g.*, 253 F.R.D. at 106, 144, 147, 238 (PBMs), 174-76, 250 (physicians); A-583, -831 (at n.389-92), -252-96 (describing Lilly's role in research and review

Lilly launched Zyprexa at a price point well above every other antipsychotic.[11]  Lilly knew it could not charge a premium price for Zyprexa – or sell massive quantities of the drug – unless it convinced TPPs and prescribers that Zyprexa was safer and more effective than any other atypical antipsychotic.[12]  This is precisely the same conduct that led Lilly to plead guilty to federal criminal charges for defrauding governmental health insurance programs.

Lilly knew TPPs had to provide some coverage for Zyprexa given that it was approved to treat serious mental illnesses.  But Lilly also knew that limits existed: Zyprexa could not "command a premium price" and would have faced "therapeutic substitution among atypical antipsychotics" or formulary restrictions if Lilly had been truthful about its actual health risks and effectiveness.[13]  Lilly also knew that if the price of Zyprexa did not reflect its value, TPPs would not pay for it.[14]

---

articles, CMEs, detailing, marketing, and public service organizations and guidelines); A-853-1037 (same).

[11] A-311 ("Zyprexa was consistently priced higher" having a "price differential" from $77 in 1996 to $150 in 2006."), -310 (Figure 4), -193.

[12] 253 F.R.D. at 159-60, *quoting* Defs-Appellants' expert Kolassa.  *See also*, *e.g.*, A-1283 (Rosenthal), -1365-66 (Harris), -1508, -1526 (Kolassa), -1634 (Defs-Appellants' expert I. Cockburn); A-1910-11.

[13] A-1910; A-1696; s*ee*, *e.g.*, 253 F.R.D. at 84, 142-43.

[14] A-1283, 1288 (Plfs-Appellees' expert M. Rosenthal); -1365-66 (Plfs-Appellees' expert J. Harris), -1508, -1526 (Kolassa), -1634 (Defs-Appellants' expert I. Cockburn); -1910-11253; F.R.D. at 159-60, *quoting* Defs-Appellants' expert E.M. Kolassa.

The district court found class-wide evidence of Lilly's intentional deceptive conduct regarding claims of Zyprexa's superiority.[15]  It also found that

> [e]vidence could be relied upon by a jury to determine that, but for Lilly's misconduct, the launch price of Zyprexa would have been set at markedly lower levels than its major competitors.[16]

The district court similarly found ample evidence that TPPs relied on Lilly's misrepresentations, both directly and indirectly.  TPPs directly relied by placing Zyprexa in the same formulary position as other atypical antipsychotics and paying for millions of prescriptions.[17]  TPPs contract with PBMs, and relied fully on

---

[15] *See*, *e.g.*, 253 F.R.D. at 117-43 (outlining Lilly's representations about Zyprexa over time); 253 F.R.D. at 152-53 (summarizing sales representative depositions and call notes reflecting Lilly's misrepresentations to the healthcare community); 253 F.R.D. at 155-56 (recognizing Lilly's clinical trials failed to demonstrate Zyprexa's superiority while its publications stated the opposite); 253 F.R.D. at 166-70 (crediting testimony of Plfs-Appellees' expert W. Wirshing as "suppl[ing] strong evidence supporting the plaintiffs' position", *id*. at 166 , and that "prior to Zyprexa's launch… 'there [was] no credible evidence that [Zyprexa] is more efficacious than typical or atypical psychotic medications," *id*. at 169); 253 F.R.D. at 175-76 (citing Abramson testimony regarding Lilly's claims of superiority being proven false); 253 F.R.D. at 193 (summarizing "the evidence showed misrepresentation lending to uniform overcharge per prescription paid for by plaintiffs.").

[16] 253 F.R.D. at 370; s*ee also* 253 F.R.D. at 194 (holding "here the evidence supports a finding of an overcharge based on the fraud…" and that "the total fraud resulted in an increased price…  Without the fraud the price would have been lower."), 390.

[17] *See*, *e.g.*, A-833, -1537, 253 F.R.D. at 244 ("Most P&T committees added [Zyprexa] to their PBM's drug formularies…based solely upon the drug's classification and the information provided by Lilly.")

6

PBMs formulary decisions.[18]  PBMs in turn rely on clinical information from drug manufacturers in setting formularies.[19]  Payors also indirectly relied because physicians believed Lilly's misrepresentations and consequently wrote millions of Zyprexa prescriptions, thereby placing further pressure on TPPs to maintain open formulary access to Zyprexa despite its premium price.[20]

Finally, the court found that TPPs were the only entities that had suffered a direct injury: "institutional plaintiffs have laid out their own money for Zyprexa"[21] and "have demonstrated a sufficient causal nexus between Lilly's alleged fraud and their own claimed economic injuries."[22]  The Panel did not disturb these findings.

---

[18] 253 F.R.D. at 235 (TPPs "rely fully on the PBM and its formulary decisions"), 236 ("TPPs rely on their PBMs for guidance"), 242 (TPPs "completely rely[ing] on the expertise of PBMs to create their formularies and operate the P&T committees.").

[19] 253 F.R.D. at 238 (PBMs rely on clinical information, "this clinical information primarily provided by drug manufacturers, sets the foundation for formulary development.").

[20] *See*, *e.g.*, 253 F.R.D. at 193 (finding "there is ample evidence that fraud was directed… at doctors who relied, causing damages in overpayments by plaintiffs");

[21] 253 F.R.D. at 379.

[22] *In re Zyprexa Prods. Liab. Litig.* (*UFCW Local 1776 v. Eli Lilly and Co.*), 493 F.Supp.2d 571, 576 (E.D.N.Y. 2007).

**ARGUMENT**

## I.     The Panel's Decision Conflicts with Supreme Court Precedent and Warrants Rehearing En Banc

### A.     For RICO Cases, Controlling Supreme Court Precedent Requires A Showing Of Direct Harm, But Not Direct Reliance.

Controlling Supreme Court precedent draws a sharp distinction between actionable RICO *conduct*, and recoverable RICO *injury*.  RICO injury must be direct.  It cannot be derivative of harm to another, nor unconnected to the RICO scheme.  *Holmes,* 503 U.S. at 271-272.

Actionable RICO conduct, however, need not be directed at the plaintiff. The sequelae from RICO causation may be mediated through other persons or events.  *Bridge,* 128 S. Ct. at 2134 (under RICO, "a showing of first-party reliance is not required").

This distinction balances the scope of RICO.  Since "a person can be injured 'by reason of' a pattern of mail fraud even if he has not relied on any misrepresentations," and since there is "[n]othing on the face of the relevant statutory provisions imposing . . . a [first-party] requirement," RICO extends 'but for' causation to cases where the RICO conduct causes non-parties to take actions that lead to the plaintiff's injury.  *Bridge* 128 S. Ct. at 2139.  Proximate cause, however, is a "judicial tool used to limit a person's responsibilities for the consequences of that person's own acts," *Holmes,* 503 U.S. at 268.  "[D]irectly injured victims can generally be counted on to vindicate the law as private

attorneys general, without any of the problems attendant by plaintiffs injured more remotely." *Holmes* 503 U.S. at 269-270.

By failing to grasp this fundamental distinction – that RICO requires direct inury but not direct factual causation – the Panel's decision conflicts with *Holmes, Anza, Bridge,* and *Hemi.*  Indeed, without explicitly saying so, the Panel decision treats *Bridge* as having no force of law at all.

### 1.    *Holmes v. Securities Inv. Prot. Corp.*

In *Holmes*, the Court held that a RICO plaintiff must show that the predicate acts were both 'but for' and proximate causes of his injury.  503 U.S. 258, 268 (1992).  Proximate cause requires "some direct relation between the injury asserted and the injurious conduct alleged," and factors to be considered in determining the scope of RICO proximate cause are (i) the ease of measuring the injury, (ii) the risk of multiple recoveries in apportioning injuries, and (iii) the potential existence of more directly injured plaintiffs.  *Id.*

In *Holmes*, the RICO misconduct caused stock prices to collapse, thereby arguably making broker-dealers less able to meet their obligations to customers, in turn triggering an obligation of SIPC (the plaintiff) to cover the broker-dealers' loss.  *Id.* at 261.  The parties directly injured by the stock manipulation were broker-dealers, not SIPC.  The claimed RICO injury to SIPC was indirect because

it was "purely contingent" on the harm suffered by broker-dealers.  *Id.* at 271.

Direct injury cannot be derivative of another's injury.

### 2.    *Anza v. Ideal Steel Supply Corp.*

In *Anza*, the plaintiff alleged that a competitor engaged in RICO misconduct

by cheating New York State (a non-party) out of sales taxes, thereby reducing the

competitor's overhead and enabling it to undercut the plaintiff's prices.  *Id.* at 454.

*Anza* ruled "[t]he direct victim of this conduct … [was] the State of New York, not

[the plaintiff]."  *Id.* at 458.  Plaintiff's injury was "a set of actions (offering lower

prices) entirely distinct from the alleged RICO violation (defrauding the State)."

*Id.* at 458.  Thus, the plaintiff did not suffer a direct injury because the RICO

violation directly caused non-payment of taxes, not plaintiffs' derivative injury due

to a competitor's lower overhead.  *Id.*

### 3.    *Bridge v. Phoenix Bond & Indem. Co.*

In *Bridge*, the Supreme Court explicitly held that a RICO plaintiff need

not be the person who relied on the defendant's fraud; that is, actionable RICO

conduct does not require first-party causation.  128 S.Ct. at 2144.  Although direct

injury is required, the plaintiff itself need not rely on the defendant's fraud to show

but-for causation or proximate cause leading to that injury.  *Id.*  *Bridge* recognized

that "it may well be that a RICO plaintiff alleging injury by reason of a pattern of

mail fraud must establish at least *third-party* reliance in order to prove causation,"

but it explicitly recognized that "a person can be injured by reason of a pattern of mail fraud *even if he has not relied on any misrepresentations*." *Bridge*, 128 S.Ct. at 2139, 2144 (emphasis added).  While the RICO injury must be direct, (i.e., the injured party must be first in line and the injury unshared with others to avoid apportionment), the causal chain of events leading to it need not.  *Id*. at 2143.

### 4.     *Hemi Group LLC v. City of New York*

In *Hemi,* the RICO misconduct by the cigarette seller Hemi was failure to report online cigarette sales to the state of New York, which reporting, if given to the city of New York, might enable the city to chase customers who had not paid sales taxes. 130 S. Ct. at 986-987.  The actions of customers paying, or not paying, cigarette taxes had nothing whatsoever to do with the claimed fraud of Hemi (the defendant) in failing to report to the state the customer identities. *Id.*  The Court concluded that "the conduct directly causing the harm [the residents' failure to pay taxes to the City] was distinct from the conduct giving rise to the fraud [the defendants' failure to file the reports with the State]," and thus the city had not suffered a direct injury.  *Id*. at  990.

The *Hemi* Court took pains to confirm that *Hemi* did not overturn or otherwise conflict with the Court's prior holding in *Bridge*.  *Id.* at 992.  Chief Justice Roberts distinguished the "straightforward" theory of causation in *Bridge* from the convoluted theory in *Hemi*.  The Court stated:

> The losing bidders [in *Bridge*]…were the *only* parties injured
> by petitioners' misrepresentations.  The county was not,
> it received the same revenue regardless of which bidder
> prevailed.

*Id.* at 922.  Although in *Bridge*, the misrepresentations were made to an intermediate, third-party, *that party suffered no injury*; the harm flowed through to the plaintiff, so that the plaintiffs "were the only parties injured by petitioners' misrepresentations."  *Id.* (*citing Bridge*, 128 S. Ct. at 2144).

**B.      The TPPs Satisfied Supreme Court Precedence by Establishing Injury and Reliance**

This case presents a case of direct injury to TPPs.  Here, TPPs are the first, the only, and the intended victim.  Only TPPs paid for Zyprexa and were harmed by the excess premium enabled by the RICO scheme.  There are no other parties that are in the chain of causation who suffered harm or are in a position to recover.

So long as the injury is direct, the involvement of agents or intermediaries does not render an injury too remote where defendants' misrepresentations are aimed at, made to, and relied on by those intermediaries.  The Supreme Court is clear that neither the split between prescriber and payor, nor the presence of PBMs, insulates Lilly from liability for its scheme to defraud.

In this case, Lilly's RICO misconduct – misrepresenting Zyprexa as having superior efficacy and failing to disclose serious health risks – affected each spoke in the decision-making wheel leading to over-payments for Zyprexa.  TPPs relied

on the misrepresentations in (i) deciding to place Zyprexa in parity formulary

placement despite the large price premium, (ii) not obtaining rebates during the

2001-2005 class period, and (iii) paying billions of dollars of unnecessary

premiums.  Formulary decision-makers from P&T committees (whether housed

within TPP organizations, or in PBM organizations used by TPPs to make

formulary decisions) relied on the scheme in providing Zyprexa on formularies

without restrictions.  Physicians relied on the false representations of superior

efficacy and lack of serious health risks and prescribed enormous numbers of

Zyprexa prescriptions causing the TPPs to pay for those prescriptions, thereby

placing further pressures on TPPs to maintain open formulary access for a

premium priced drug.  In this case, there is both direct reliance by TPPs, and

indirect reliance through physicians and non-TPP formulary decision makers.

**C.      In Ruling on But-For Causation, the Panel Improperly Required Direct Reliance.**

The Panel's analysis that TPPs have not shown RICO cause-in-fact appears

in two sentences.  Op. at 26.[23]  The Panel writes

---

[23] Although the analysis is preceded by a page discussion of *McLaughlin*'s
treatment of aggregate evidence, the Panel does not decide any issue on that topic.
Instead it abruptly moves to RICO cause-in-fact.  *McLaughlin v. Am. Tobacco Co.,*
522 F 3d 215 (2d Cir. 2008) *(*overruled in part by *Bridge)*.  *McLaughlin* was
decided by the Second Circuit before *Bridge*, and held that first person reliance
was required in order to establish a RICO violation.  To the extent that *McLaughlin*
stood for the proposition that first party reliance was required to prove a RICO
violation, *McLaughlin* is no longer good law. *See Bridge v.* 128 S. Ct. at 2144; *see*

> the evidence in the record, as discussed above, supports the conclusion that prescribing doctors do not generally consider the price of a medication when deciding what to prescribe for an individual patient.  Any reliance by doctors on misrepresentations as to the efficacy and side effects of a drug, therefore, was not a but-for cause of the price that TPPs ultimately paid for each prescription.

Op. at 26.  The Panel's statement suggests that because doctors' reliance on the false marketing scheme is not motivated by drug costs, but the TPPs' injury from the false marketing scheme is measured by drug overpayment, the TPPs' overpayments are not caused by the physicians' reliance.  But whatever the motivation, and contrary to the Panel's reasoning, the physicians' reliance is on the scheme that causes the harm.  The Panel requires that all participants in the causal chain share the same motivation.  In effect, it reinstates a first-party reliance requirement and immunizes misconduct in the health care market from RICO liability.

This is precisely the opposite of the Supreme Court's holding in *Bridge*:  "*a person can be injured 'by reason of' a pattern of mail fraud even if he has not relied on any misrepresentations*."  *Bridge*, 128 S. Ct. at 2139 (emphasis added).  The *Bridge* Court required only that someone rely on the fraudulent predicate act and that the RICO plaintiffs be first line victims of the fraud.  *Id.*  Here, in two

---

*also City of v. New York v. Smokes-Spirits.com, Inc.,* 541 F3d 425, 444 n. 24 (2nd Cir. 2008). (overruled on other grounds by *Hemi*).

short sentences, the Panel requires first-party reliance or causation in contravention of *Bridge*.

**D.     In Ruling on Proximate Cause, the Panel Improperly Adds A Direct Reliance Requirement On Top Of The Direct Injury Requirement.**

The Panel's analysis of why the TPPs cannot satisfy RICO proximate cause standard (Op., 26-28), relies on an erroneous "crucial" requirement for the TPPs to allege that they themselves directly relied on Lilly's misrepresentations:[24] "Because only the TPPs were in a position to negotiate the price paid for Zyprexa, however, the only reliance that might show proximate causation with respect to price is reliance by the TPPs, not reliance by the doctors."  Op. at 27.

Neither *Bridge* nor *Hemi* requires this. Significantly, according to the Panel's "shared motivation" requirement, the *Bridge* plaintiffs could not have recovered under RICO, thereby overturning the holding of the Supreme Court. Here, as in *Bridge*, while both payors and prescribers were affected by (and relied on) Lilly's scheme to defraud, only the payors were injured.  The payors' injury is directly related to the fraudulent predicate acts and satisfies *Hemi*.  *See Hemi*, 130 Ct. at 992.

---

[24] The Panel states that the TPPs do not allege that they relied on Lilly's misrepresentations.  Op. at 27.  This is factually incorrect.  The TPPs and their PBMs relied on Lilly's misrepresentations in placing Zyprexa on their formularies in a parity position with other atypical antipsychotics despite the premium price. *See* Statement of Facts. Prescribers also relied on Lilly's misrepresentations that Zyprexa was safer and more effective than its competitors and wrote more Zyprexa prescriptions.  *Id.*

The Panel's causation analysis is based on misreading *Hemi*.  The Panel cites *Hemi* in support of its conclusion that

> Plaintiffs' theory of liability rests on the 'independent
> actions of third and even fourth parties,' [*Hemi*] at 992,
> as physicians, PBMs, and PBM Pharmacy and
> Therapeutic Committees all play a role in the chain
> between Lilly and TPPs.

Op. at 27 (internally citation omitted).  In *Hemi*, the city's injury was caused by consumers deciding not to pay sales taxes – consumer decisions having nothing whatsoever to do with the RICO scheme of not reporting information to the state. When the Court wrote in *Hemi* "the conduct directly causing the harm was distinct from the conduct giving rise to the fraud," *Hemi* 130 S.Ct. at 990, it meant just that – the causal chain depended on conduct by non-parties whose actions were *wholly unrelated to the RICO* scheme.  The Court in *Hemi* left explicitly intact, however, the holding of *Bridge* that conduct by non-parties *in response to the RICO scheme* satisfies RICO causation (i.e., no first party causation required).

The Panel's decision ignores this vital difference.  It simply identifies that third and fourth parties (physicians, PBMs) are in the causal loop, as if the mere existence of third of fourth parties defeats RICO causation.  Op. at 24. [25]  But this cannot be so.  *Hemi* holds there is no proximate cause when those non-party

---

[25] We note the causal chain set out by the Panel is inconsistent with the record evidence and the district court's findings.  *Compare* Op. 26-7 with the Statement of Facts, *supra*.

actions are "independent" of the RICO scheme. *Hemi* at 992. Here, as in *Bridge*, the conduct of the physicians and PBMs in this case was in response to the RICO fraud, and thus under *Bridge* appropriate for use in the causal chain.[26]

## II.    The Panel's Decision Conflicts with Second Circuit Precedent and Warrants Rehearing En Banc

The Panel's decision directly conflicts with the Second Circuit's holding in *Desiano v. Warner-Lambert Co.*, 326 F.3d 339 (2d Cir. 2003). In *Desiano*, this Court's RICO causation analysis allowed recovery by TPPs against drug manufacturers for false marketing. The issues were fully briefed to the Panel and are not repeated here. (Appellees brief is appended to this petition.) The Panel's decision makes no mention of *Desiano*.

## III.    The Panel's Decision Involves Questions of Exceptional Importance and Warrants Rehearing En Banc

As outlined in the Preliminary Statement, the Panel's decision raises a number of issues of exceptional importance that warrant en banc consideration.

## IV.    The Panel's Decision Misapprehended Points of Law and Fact and Warrants Rehearing

First, the Panel's opinion rests on an incorrect and untenable interpretation of the United States Supreme Court's decision in *Hemi*. *See supra*, Section I.D.

---

[26] *Hemi*'s use of the word "independent" cannot mean that the parties are simply separate from the plaintiff. *Hemi* at 992. If that were so, *Bridge* would be overruled. Instead, the only proper construction of *Hemi*, consistent with its declared intention of keeping *Bridge* in tact, is that *Hemi*'s use of the word "independent" means actions wholly unrelated to the RICO misconduct.

The Supreme Court decided *Hemi* after oral argument in this case. *Hemi*'s impact was not considered by the district court nor briefed or argued by the parties here. Second, the Panel's decision completely ignores binding Second Circuit precedent in *Desiano*. *See supra*, Section II. Third, the Panel's opinion fundamentally misunderstands the factual record regarding direct and indirect reliance by the TPPs. *See supra*, Statement of Facts; p. 23; Section I.B. Rehearing is warranted to address these issues of law and fact. FED. R. APP. P. 40.[27]

---

[27] The Panel addressed the quantity theory rejected by the district court. The parties had neither briefed nor argued the issue to the Panel. Op. at 29-32. To the extent the Second Circuit wishes to address the viability of a quantity theory, further briefing or argument by the parties is warranted.

## CONCLUSION

For the foregoing reasons, the Panel should grant rehearing en banc or

rehearing.

Respectfully submitted,

Thomas M. Sobol
Lauren Guth Barnes
Kristen Johnson Parker
HAGENS BERMAN SOBOL
SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
Tel: (617) 482-3700

James R. Dugan
Stephen Murray, Jr.
Douglas R. Plymale
MURRAY LAW FIRM
650 Poydras Street, Suite 1100
New Orleans, LA 70130
Tel: (504) 525-8100

Andrea Bierstein
HANLY CONROY BIERSTEIN
SHERIDAN FISHER & HAYES LLP
112 Madison Avenue, 7th Floor
New York, NY 10016
Tel: (212) 784-6400

Samuel Issacharoff
40 Washington Square South
New York, NY 10012
Tel: (212) 998-6580