UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---------------------------------------------------x
In re:  NEURONTIN MARKETING, SALES
          PRACTICES AND PRODUCTS
          LIABILITY LITIGATION

MDL Docket No. 1629

Master File No. 04-10981
---------------------------------------------------x
THIS DOCUMENT RELATES TO:

Judge Patti B. Saris

*Barlow v. Pfizer Inc, et al.*
*Case No. 1:05-cv-11501-PBS*

Magistrate Judge Leo T. Sorokin

---------------------------------------------------x

**MEMORANDUM IN SUPPORT OF DEFENDANTS'
EMERGENCY MOTION FOR AN ORDER PROHIBITING IMPROPER
TACTICS DURING FACT WITNESS DEPOSITIONS AND IMPOSING SANCTIONS**

Defendants Pfizer Inc and Warner-Lambert Company LLC (collectively "Pfizer" or "Defendants") respectfully move, on an emergency basis, for an order directing Plaintiff's counsel to cease engaging in improper tactics during, and in advance of, the depositions of prescribing physicians and other fact witnesses. This Court should also impose sanctions for Counsel's willful misconduct pursuant to its inherent power and Federal Rule of Civil Procedure 30(d)(2).

**PRELIMINARY STATEMENT**

By order dated November 18, 2009, this Court expressed concern over attempts by the parties to taint neutral third-party witness testimony by improper tactics. (Order [2175].) On that occasion, the Court expressed concern over an effort by Dr. David Egilman to bias a treating physician against Pfizer by sending her a "materially misleading" email chain that included portions "that favored plaintiff's case while omitting the sections favorable to Pfizer's position." (*Id.* at 2.) The Court further noted that there was no basis for providing the physician with a copy of Warner-Lambert Company LLC's criminal conviction other than to "poison the well." (*Id.*) The Court put in place procedures intended to prevent such tactics. Of course, the parties

should not view the orders of this Court as invitations to devise creative methods to avoid direct violations, but should be expected to honor their clear intent.

The conduct of Plaintiff's counsel during, and leading up to, the deposition of a non-party prescribing physician is nothing short of outrageous. Contrary to the explicit admonitions of this Court's November 18, 2009 Order regarding parties' interactions with fact witnesses, not to mention the Court's implicit expectation about how counsel should comport themselves, Plaintiff's counsel is attempting to improperly influence and corrupt the testimony of treating physicians. During the deposition of Irene Barlow's prescribing physician, Dr. Larry Flowers, Plaintiff's counsel sought to alter the witness's testimony with a barrage of cherry-picked, inappropriate materials that were totally unrelated to any matter potentially within the witness's personal knowledge. Most notably, Plaintiff's counsel insisted on showing Dr. Flowers a misleadingly edited clip from the two-day deposition of a former medical director at Pfizer. This out-of-context video testimony painted a skewed and incomplete picture and, as he likely expected, the procedure by which Plaintiff's counsel presented this video at the deposition deprived Pfizer of an opportunity to respond.

Plaintiff's counsel also showed Dr. Flowers internal company documents and a copy of the *criminal information* filed against Warner-Lambert Company LLC with regard to Neurontin, none of which had any bearing on Plaintiff's treatment and were meant only to alter the doctor's testimony and portray Defendants in a bad light. Compounding the prejudice caused by this conduct, Plaintiff's counsel asked Dr. Flowers several patently improper questions with no possible other purpose than to advocate Plaintiff's litigation themes and prejudice this fact witness against Pfizer. In addition to this misconduct at the deposition, Pfizer also learned that Plaintiff's counsel had sent Dr. Flowers an inappropriate letter that contained argumentative assertions about the Neurontin guilty plea, conclusory allegations as to Pfizer's marketing activities, copies of the plea agreement, and other prejudicial statements calculated solely to bias

this fact witness against Pfizer.[1]  This type of conduct not only prejudices Pfizer, but it negatively colors non-parties' views of the judicial system, wastes time of physicians, and is utterly divorced form the primary goal of a deposition – obtaining truthful, unvarnished testimony.

Plaintiff's counsel's unrelenting "poison the well" strategy has, and will continue to, unfairly prejudice Pfizer's ability to mount a full and fair defense.  This incident is only the latest in a series of inequitable discovery tactics employed by this Plaintiff's counsel throughout this litigation.  Thus, Pfizer requests that this Court preclude counsel from engaging in such unfair tactics in the future, impose sanctions, and fashion any other relief deemed appropriate.

## BACKGROUND

Dr. Flowers, a psychiatrist practicing in Houston, Texas, treated Mrs. Barlow for mental health problems, particularly bipolar disorder with anxiety.  He did not originally prescribe her Neurontin, but he continued and increased her prescription to treat Mrs. Barlow's bipolar disorder and comorbid anxiety.  (Ex. A, Flowers Dep. at 15:1-16:5; 19:1-6.)[2]  Mrs. Barlow was not under his care at the time of her reported suicide attempt in January 2001.  (*Id.* at 37:7-13.)

Mrs. Barlow initiated this lawsuit against Pfizer on July 13, 2004, alleging that a failure to warn of risks of Neurontin caused her to attempt suicide.  On August 31, 2004, Mr. London's co-counsel, Carl Pierce, sent a letter to Dr. Flowers that stated, in part, as follows:

> I represent Irene Barlow with regards to claims she has against the drug manufacturer of Neurontin.  The drug manufacturer promoted Neurontin for off-label uses, including for bipolar disorder, without appropriate scientific support for its efficacy.  *They have now judicially admitted that their scheme was in fact criminal.  In that regard, I enclose a copy of the lawsuit filed on Mrs. Barlow's*

---

[1] This letter was provided to Pfizer's attorneys by Dr. Flowers at his deposition.  (Ex. A, Flowers Dep. at 100:3-6; 107:17-108:20.)  While this letter predated and, therefore, was not a direct violation of the Court's November 18, 2009 Order, it was nonetheless inherently improper on its own terms – for the same reasons Dr. Egilman's conduct at issue in that Order was improper – and constitutes another piece in Plaintiff's counsel's ongoing pattern of misconduct.

[2] All exhibits are attached to the accompanying declaration of Mark S. Cheffo.

3

> *behalf which includes a copy of the plea agreement and a copy of the charges the drug manufacturer plead guilty to.*
>
> *It is clear that the scheme the drug manufacturers created made the prescribing physicians victims as much as their patients.*

(Ex. B, Aug. 31, 2004 letter (emphasis added).)  This letter then requested that Dr. Flowers meet with Plaintiff's counsel.  (*Id.*)  Mr. Pierce also sent Dr. Flowers a letter on July 18, 2005, instructing him *not* to release any of Mrs. Barlow's medical records to Defendants, and he called Dr. Flowers at least couple of times regarding this lawsuit.  (Flowers Dep. at 105:21-107:9; Ex. C, Flowers Ex. 15.)  Dr. Flowers met with Plaintiff's counsel twice – once several years ago and once just days before his deposition – to discuss the case and review documents selected by counsel.  (Flowers Dep. at 111:4-112:14.)

The parties deposed Dr. Flowers on August 28, 2010, at his office.  Jack London conducted the direct examination for Plaintiff.  After discussing the treatment of Mrs. Barlow, Mr. London launched into a line of questioning that he could not reasonably have expected to be within the scope of Dr. Flowers' knowledge as a fact witness.  Mr. London showed Dr. Flowers an internal company email between Lloyd Knapp and Atul Pande, in which Dr. Pande discussed the possibility of obtaining FDA approval for Neurontin as a treatment option for mania associated with bipolar disorder.  (*Id.* at 65:1-25; Ex. D, Flowers Ex. 8.)  He also presented a copy of a letter from Dr. Pande to David Dunner discussing the results of a gabapentin-bipolar study.  (Flowers Dep. at 71:11-73:15; Ex. E, Flowers Ex. 9.)  After presenting these company documents, Mr. London showed Dr. Flowers a copy of the criminal information filed against Warner-Lambert Company LLC with regard to Neurontin and informed him of the guilty plea that was later entered.  (Flowers Dep. at 88:3-91:20; Ex. F, Flowers Ex. 10; Ex. G, Flowers Ex. 11.)  As if that was not enough, Mr. London then mischaracterized the nature of the plea with accusatory questions, such as:

> Would you like to have known, when you were treating Mrs. Barlow with Neurontin for bipolar disorder, that Parke-Davis and Warner-Lambert were going to eventually admit that it was unequivocally true that it had distributed Neurontin

4

for the treatment of bipolar disorder without adequate directions to doctors to treat that condition in violation of the law?

(Flowers Dep. at 91:12-18.)

Mr. London's motivations could not be clearer.  In addition to these company documents, and information about the Neurontin plea, Mr. London – over Pfizer's objection – actually played edited clips from the video testimony of Robert Glanzman, a former medical director for Pfizer.  (*See id.* at 75:4-81:25.)  The way in which this video was edited and presented out-of-context was materially misleading.  For instance, Mr. London took up the doctor's time to play the following clip of testimony:

> Q: Well, you approved a key message that gabapentin was effective against psychiatric – a wide range of neurological and psychiatric conditions. What psychiatric conditions are we talking about here?
>
> A: I mean, I would be happy to go back and do a literature review for you and look at the data for you.  I did not do it back then.
>
> Q: Well, how could you approve a message without looking at the clinical data?
>
> A: Well, I mean, obviously, there – this is not – I approved it. Whether it was correct or not I can't say at this time.
>
> Q: Well, that – that was your job as medical director, wasn't it, to review the clinical data to see if it supported a key message?
>
> A: Yes.  That was a part of my job.

(*Id.* at 78:8-79:4.)  Additional testimony by Dr. Glanzman, which Mr. London did not play for Dr. Flowers, makes clear that Dr. Glanzman did not approve publication of messages unsupported by clinical data, as counsel intended the witness to infer:[3]

> A: [A] publication key message is a message that, *if possible*, should be – could be incorporated into a publication *when appropriate, when the publication and the data from that publication support it.*

---

[3] Although he knows that there is another side to the story, Mr. London fostered the misimpression he created by asking Dr. Flowers if he would like to have "known that the company medical director who approved the message that it works for a broad range of psychiatric applications had never read the clinical studies[.]"  (Flowers Dep. at 93:6-9.)

5

> Q: And what is the criteria which will determine whether or not one or more of those messages actually finds its way into a Pfizer sponsored study?
>
> A: You mean into a manuscript for a publication?
>
> Q: Yes, into a manuscript.
>
> A: Well, first of all, the medical team would have to agree that the data supports it.
>
> Second of all, the authors of the study, who are not Pfizer employees, would have to agree that the data supports it because they are the author; and, third of all, the reviewers would have to agree that the data supports it or else they would not allow the manuscript to be published.
>
> . . . .
>
> Q: And if the data doesn't support it what happens?
>
> A: Well, if the data doesn't support it, first of all, the medical team would not allow it to be put in. If they did, authors are not going to allow their academic reputation to be smeared by a journal article that includes false information, so they would take it out; and even if it made it past that level, peer reviewers are certainly not going to allow a misleading article to be published, so, the article would never be accepted for publication.

(Ex. H, Glanzman Dep. at 715:17-718:8 (emphasis added).) Mr. London intentionally fostered confusion by failing to play all of Dr. Glanzman's testimony on this issue, which explains the term "key message" as a possibility (essentially, a hypothesis) that *may* be incorporated into a publication *only* if the scientific data supports it. This is just one example of where Mr. London's editing would have materially misled Dr. Flowers; yet the procedure with which Mr. London presented this edited video without notice did not allow Pfizer an opportunity to respond or clear up some of the misimpressions.

In addition to these irrelevant materials, Mr. London propounded several improper questions, which were not aimed at discovering relevant information and served no other purpose than to stoke animus against Pfizer. For example, Plaintiff's counsel engaged in the following diatribe:

> Q: Well, do you believe it's right for a pharmaceutical company to promote a drug for bipolar condition, and that pharmaceutical company's own clinical research and research scientists know that it does not work effectively for bipolar patients?

6

>    . . . .
>
>    A:   No, that's not appropriate.
>
>    Q:   Okay.  Do you think it's right for a pharmaceutical company to not tell doctors like you the things that we looked at today, where their medical director has not read their own clinical research before approving a message that it's useful for a wide range of psychiatric conditions?  Do you believe that's right?
>
>    . . . .
>
>    A:   No.
>
>    Q:   Do you believe it's right for them to not disclose to doctors just like you that it's known to increase depression, as seen in their own clinical trials?
>
>    . . . .
>
>    A:   No.
>
>    Q:   Do you believe that it's right for them to withhold information from you that is not in the label when it's known that doctors just like you are using this off-label to treat patients like Mrs. Barlow for a condition that's not approved?
>
>    . . . .
>
>    A:   No.

(Flowers' Dep. at 181:12-182:15.)  Mr. London's argumentative "do you believe it's right" questions constituted yet another blatant attempt to impart to this witness that Pfizer was a "bad actor."  Indeed, at several points, Mr. London's compound questions sounded much more like a closing argument, such as the following:

> All right, sir.  If you had known in 1999, 2000, when you were treating Mrs. Barlow, that the Food and Drug Administration had found that Neurontin increased the risk of suicide, that Warner-Lambert had known from random controlled placebo trials that it was not effective for the treatment of bipolar, if you had known that it had been observed in clinical trials that Neurontin had a higher risk of depression in patients who took it at and above 1800 milligrams a day relative to placebo, if you had known that the company medical director who approved the message that it works for a broad range of psychiatric applications had never read the clinical studies, and if you had known that Warner-Lambert had not disclosed to doctors that – that directions were safe use for off-label – that they did not provide adequate direction for the safe use of Neurontin in bipolar patients, as they admitted in the guilty plea, would that have affected your choice as to whether or not to prescribe Neurontin to Mrs. Barlow?

7

(*Id.* at 92:22-93:16.)  Mr. London could not have reasonably thought that this line of questioning would uncover information relevant to this lawsuit.  Instead, the questions could only have been posed for an improper purpose – to prejudice an important factual witness in an attempt to distort his testimony.  Such bad faith discovery tactics, when viewed *in toto*, should not be countenanced.

## ARGUMENT

### PLAINTIFF'S COUNSEL'S TRANSPARENT ATTEMPTS TO IMPROPERLY INFLUENCE DR. FLOWERS' TESTIMONY WARRANT JUDICIAL INTERVENTION AND SANCTIONS

The conduct of Plaintiff's counsel has no conceivable purpose other than to create a bias against Pfizer in the mind of Dr. Flowers and to alter his testimony.  Further, the materials used to implement this improper strategy were incomplete, speculative, misleading, and totally irrelevant to the matters on which this witness may testify.

The treating and prescribing physicians of Plaintiffs and their decedents possess information that is vital to both Plaintiffs' claims and Pfizer's defenses.  Proper areas of inquiry include (1) what factors the physician considered when prescribing Neurontin, including information on the label and from other sources, (2) what information, if any, the physician received from Pfizer, (3) whether a different warning have changed the physician's prescribing decision, (4) whether the patient benefited from Neurontin, and (5) what factors may have contributed to the patient's suicide or attempted suicide.  Significantly, while Plaintiffs' counsel is able to speak with physicians prior to depositions, the deposition represents Defendants' first opportunity to pose these questions to the doctor.  Plaintiffs' counsel should not be permitted to engage in tactics that deny the Defendants their opportunity do obtain the witness's unvarnished testimony on key facts within the witness's knowledge.  Indeed, as numerous courts have held, when a treating doctor is not specially designated as an expert, his testimony must be limited to

his diagnosis and treatment of his patient. *See Garcia v. City of Springfield Police Dep't*, 230 F.R.D. 247, 249 (D. Mass. 2005).[4]

Here, the materials shown to Dr. Flowers and questions propounded by Mr. London have no bearing whatsoever on the care and treatment of Mrs. Barlow. For instance, Dr. Flowers did not know Dr. Glanzman or have any familiarity with the company's internal business matters, and Dr. Flowers even acknowledged that he does not consider testimony of pharmaceutical company employees or internal company documents when making prescribing decisions. (Flowers Dep. at 170:21-171:18.) Accordingly, Plaintiff's counsel lacked any legitimate discovery-related purpose for playing the edited and misleading video of Dr. Glanzman's testimony. The internal company documents shown to Dr. Flowers likewise go beyond the scope of his personal knowledge and only serve as fodder for Plaintiff's counsel's strategy of portraying Pfizer in a bad light. Plaintiff's counsel's introduction of and improper questioning about the Neurontin plea likewise served only to "poison the well." (Order [2175], at 2; Flowers Dep. at 88:3-91:20; Flowers Ex. 10, 11.) Moreover, Pfizer was not given a fair opportunity to respond by, for example, presenting evidence that might have added context to or explained the misimpression created by the edited portion of Dr. Glanzman's testimony or the documents. In any event, forcing parties to engage in mini-trials on the merits of the litigation in the midst of a deposition is not a solution to these types of abusive discovery tactics.

Plaintiff's counsel's conduct amounts to the type of "poison the well" strategy previously proscribed by this Court in its November 18, 2009 Order. (Order [2175].) In another case in this MDL, David Egilman, an expert for Plaintiff Shearer, sent Shearer's treating physician an unsolicited letter portraying Pfizer in a negative light. While the Court declined to impose sanctions against Egilman, it issued an Order that prospectively governs contact between non-party witnesses and all parties in this multidistrict litigation. This Order warned the parties

---

[4] *See also Indem. Ins. Co. of N. Am. v. Am. Eurocopter LLC*, 227 F.R.D. 421, 423 (M.D.N.C. 2005) ("A treating physician is a participant or fact witness when it comes to describing the diagnosis and treatment of a party's condition.").

against any future attempts to taint the testimony of fact witnesses, who should remain neutral, and observed that such tactics are "troubling." (*Id.* at 2.) The Court also explained that it is "materially misleading" to present evidence that has been edited – in a way that is favorable one party's case – to a fact witness. (*Id.*) Mr. London's attempt to taint the witness's testimony clearly violates the spirit of the Court's Order. This misconduct cannot be rationalized simply because it was engaged in during a deposition, rather than before it.

It is well settled that "[a] district court has the inherent power to manage its own proceedings and to control the conduct of litigants who appear before it through orders or the issuance of monetary sanctions for bad-faith, vexatious, wanton or oppressive behavior." *Strahan v. Simon Property Group, Inc.*, No. 08-cv-10764, 2008 WL 5273684, at *1 (D. Mass. Dec. 11, 2008) (citing *United States v. Kouri-Perez*, 187 F.3d 1, 6-8 (1st Cir. 1999)). Pursuant to this inherent power, courts may restrict or sanction communications that are designed to frustrate an adverse party's legitimate efforts to conduct a fair examination of a plaintiff's treating physicians. *See Parker v. Upsher-Smith Labs, Inc.*, No. 3:06-cv-0518, 2009 WL 418596, at *4 (D. Nev. Feb. 18, 2009); *see also In re Currency Conversion Fee Antitrust Litig.*, 361 F. Supp. 2d 237, 252 (S.D.N.Y. 2005) (finding that courts have supervisory authority to prevent parties from engaging in "'misleading communications'" with putative class members, including biased, one-sided accounts that "omit[] critical information") (citation omitted). Moreover, Federal Rule of Civil Procedure 30(d)(2) provides that a court may impose appropriate sanctions on a party who "frustrates the fair examination of the deponent."

In *Parker*, for example, after the court entered an order permitting the defendant to interview the plaintiff's treating doctors, the plaintiff's counsel sent letters to those doctors informing them that they were not required to speak with defense counsel. 2009 WL 418596, at *2. While the plaintiff argued that his letters to the treating physicians contained only accurate information and that he had a right to communicate with the doctors, the court found that plaintiff's communications were made "for the improper purpose of influencing these witnesses not to cooperate with defendant's counsel in *ex parte* interviews, and it was done to gain a

tactical advantage." *Id.* at *4, *8. In so doing, the plaintiff's counsel "acted in bad faith or [engaged in] conduct tantamount to bad faith." *Id.* at *8. Accordingly, the court sanctioned the plaintiff's counsel pursuant to its inherent authority. *See id.* at *9. Likewise, in this case, while Plaintiff's counsel did not explicitly discourage Dr. Flowers from speaking to defense counsel, the transparent purpose of Mr. Pierce's pre-deposition letter and Mr. London's deposition conduct was to "influence[]" the treating physician's testimony by impugning and maligning Pfizer, and to thereby "gain a tactical advantage." *Id.* at *8. Plaintiff's counsel's actions both before and during Dr. Flowers' deposition reflect these improper motives.

Here, Mr. Pierce's pre-deposition letter to Dr. Flowers and the attached materials were clearly designed with the improper purpose of alienating the treating physician from Pfizer. The very first paragraph of this letter contained a reference to the plea regarding Neurontin, and copies of the charges and plea agreement were attached. Commenting on a similar tactic employed by Dr. Egilman in *Shearer*, this Court correctly observed that "there was ***no basis*** for producing the conviction ***other than to poison the well***." (Order [2175], at 2 (emphasis added).) In this case, the letter by Mr. Pierce went even further than Dr. Egilman by adding the following inflammatory – yet baseless – assertion: "It is clear that the scheme the drug manufacturers created made the prescribing physicians victims as much as their patients." (Aug. 31, 2004 letter.)

As described above, Plaintiff's counsel continued to advance his "poison the well" strategy at Dr. Flowers' deposition, showing the witness irrelevant documents and misleadingly edited deposition testimony beyond the witness's knowledge and unrelated to his treatment of Mrs. Barlow. Ignoring the very purpose of a deposition, which is to obtain relevant information, Mr. London likewise asked Dr. Flowers a series of "do you think it's right" questions that amounted to bald accusations that Pfizer had supposedly committed "bad acts." (Flowers' Dep. at 181:12-182:15.) Whether Dr. Flowers thinks that something is "right" or not has no bearing on any claim or defense in this lawsuit. Mr. London would not be permitted to ask purely argumentative questions at trial, and he should not be allowed to do so at a deposition. *See*

11

*Silbergleit v. First Interstate Bank of Fargo, N.A.*, 37 F.3d 394, 398 (8th Cir. 1994) (noting that counsel cannot "emphasize[] irrelevant information having no bearing on the issues of the case" that would only serve to "distract the jury from considering the evidence on the material issues before it"). This was not fact-gathering; it was pure advocacy. Plaintiff's counsel's willingness to violate the decorum of the deposition – in order to promote prejudice against Pfizer – further highlights the impropriety of counsel's agenda and tactics.

In totality, Plaintiff's counsel's misconduct reveals an ongoing strategy to instill prejudice in key witnesses for the sake of gaining a tactical advantage. This improper influence has frustrated Pfizer's ability to conduct a *fair* deposition. Fed. R. Civ. P. 30(d)(2). Once the well has been poisoned it cannot be unpoisoned, but the Court should still take remedial steps to deter and prevent similar conduct in the future. Indeed, experience indicates that efforts to unfairly prejudice witnesses against Pfizer are becoming a not uncommon tactic of Plaintiffs in this MDL.[5] Because it is necessary to send the message that this conduct will not be tolerated, the Court should impose sanctions on the attorneys responsible.

## **CONCLUSION**

For all the foregoing reasons, Pfizer requests that this Court issue an order precluding all Plaintiffs' counsel in this MDL from engaging in such unfair tactics as described herein. In particular, the Court's order should preclude Plaintiffs from sending unsolicited *ex parte* information about the guilty plea and other prejudicial materials to non-party fact witnesses, playing video or reading testimony during depositions, and questioning non-expert treating physicians about matters not within their personal knowledge. It should also require Mrs. Barlow's counsel to disclose the identity of any other fact witnesses they have contacted with regard to this litigation. Furthermore, the Court should impose sanctions against Mrs. Barlow's

---

[5] Recently, in the *Morrow* case, Pfizer discovered at a treating physician's deposition that Plaintiff in that case had sent, on the night before the deposition, a draft affidavit to the deponent's attorney. This draft affidavit contained several factual assertions that, if read, could have influenced the witness's deposition testimony. (*See* Ex. I, Draft Aff.)

counsel, pursuant to its inherent authority and Rule 30(d)(2), to deter further inequitable conduct and fashion any other relief deemed appropriate.

Dated: October 15, 2010

Respectfully submitted,

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP

By:    /s/ Mark S. Cheffo
          Mark S. Cheffo

Four Times Square
New York, NY 10036
Tel:  (212) 735-3000
Mark.Cheffo@skadden.com

-and-

ROPES & GRAY LLP

By:    /s/ Ana M. Francisco
          Ana M. Francisco
          BBO # 564346

One International Place
Boston, MA  02110
Tel:  (617) 951-7000
Ana.Francisco@ropesgray.com

*Attorneys for Defendants Pfizer Inc and Warner-Lambert Company LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on October 15, 2010.

/s/ Ana. M. Francisco
Ana M. Francisco