# EXHIBIT A

Irene Barlow v.                                    Larry Flowers, M.D.
Pfizer, Inc., et al                                August 28, 2010

1 (Pages 1-4)

---

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
 2  ............................:
 3  In Re:                      :
    NEURONTIN MARKETING,        :MDL Docket No. 1629
 4  SALES PRACTICES AND PRODUCTS,:
    LIABILITY LITIGATION        :Master File No. 04-10981
 5                              :
    ............................:
 6                              :
    THIS DOCUMENT RELATES TO:   :Judge Patti B. Saris
 7                              :
    IRENE BARLOW                :Magistrate Judge Leo T.
 8                              :Sorokin
                                :
 9  ............................:..............................
10            IN THE UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF TEXAS
11                      AUSTIN DIVISION
12  ............................:
                                :
13  IRENE BARLOW                :
                                : CIVIL ACTION NO.
14  vs.                         :
                                : 1:05CV175-SS
15  PFIZER, INC.; WARNER-LAMBERT:
    COMPANY, L.L.C., formerly known :
16  as WARNER-LAMBERT COMPANY,  :
    including its division PARKE-DAVIS :
17  and DR. JAY SEASTRUNK, M.D.,:
    REHABILITATION STAFFING SERVICES, :
18  LTD., AND GERO-PSYCHIATRIC  :
    SERVICE OPPORTUNITY         :
19                              :
    ............................:..............................
20
21      ORAL AND VIDEOTAPED DEPOSITION OF LARRY FLOWERS, M.D.
22                       AUGUST 28, 2010
23
24  ..............................................................
25
```

---

Page 2

```
 4     ORAL AND VIDEOTAPED DEPOSITION OF LARRY FLOWERS, M.D.
 5                     AUGUST 28, 2010

 8     ORAL AND VIDEOTAPED DEPOSITION OF LARRY FLOWERS,
 9  M.D., produced as a witness at the instance of the
10  Plaintiff, and duly sworn, was taken in the above-styled
11  and numbered cause on Saturday, August 28, 2010, from
12  9:55 a.m. to 2:08 p.m., before Mary C. Dopico, Certified
13  Shorthand Reporter No. 463 and Notary Public in and for
14  the State of Texas, reported by machine shorthand and
15  audio/video recording at the offices of 1125 Cypress
16  Station Drive, Suite B1, Houston, Texas, pursuant to
17  Notice and the Federal Rules of Civil Procedure and the
18  provisions stated on the record or attached hereto.
```

---

Page 3

```
 1  A P P E A R A N C E S
 2  COUNSEL FOR PLAINTIFF:
 3      Mr. Archie Carl Pierce
        Wright & Greenhill, P.C.
 4      221 W. 6th Street, Suite 1800
        Austin, Texas  78701
 5      Telephone: 512/476-4600  Fax: 512/476-5382
        E-mail: cpierce@w-g.com
 6
    and
 7
        Mr. Jack London
 8      Law Offices of Jack London, P.C.
        3701 Bee Caves Road, Suite 200
 9      Austin, Texas  78746
        Telephone: 512/478-5858  Fax: 512/478-1120
10      E-mail: jack@jackwlondon.com
11
    COUNSEL FOR DEFENDANT, PFIZER, INC. AND WARNER-LAMBERT
12  COMPANY:
13      Mr. Jeffrey R. Lilly
        Clark, Thomas & Winters, P.C.
14      3000 Weslayan, Suite 350
        Houston, Texas  77027-3708
15      Telephone: 713/621-1017  Fax: 713/583-1221
        E-mail: jrl@ctw.com
16
    and
17
        Mr. Kenneth J. Ferguson
18      Clark, Thomas & Winters, P.C.
        300 West 6th Street, Suite 1500
19      Austin, Texas  78701
        Telephone: 512/472-8800  Fax: 512/682-5495
20      E-mail: kjf@ctw.com
21  REPORTED BY:               VIDEO BY:
    Mary C. Dopico, CSR, RPR, CRR   Joseph (Chip) Tait
22  Independent Contractor To:
    Wright, Watson & Associates
23  Firm Registration No. 225
    Expires 12-31-2011
24  3307 Northland Drive, Suite 185
    Austin, Texas  78731
25  512/474-4363  Fax 512/474-8802
```

---

Page 4

```
 1                         INDEX
        ORAL AND VIDEOTAPED DEPOSITION OF LARRY FLOWERS, M.D.
 2                     AUGUST 28, 2010
                                                     PAGE
 3  Appearances........................   2
 4  Proceedings/Stipulations...........   9
 5  Changes and Signature Page.........  194
 6  Reporter's Certification...........  196
 7
    LARRY FLOWERS, M.D.
 8     Examination, by Mr. London......   9
       Examination, by Mr. Ferguson....  98
 9     Further Examination, by Mr. London.  173
       Further Examination, by Mr. Ferguson.  190
10     Further Examination, by Mr. London.  193
11
    FLOWERS EXHIBITS
12
    Exhibit 1..........................  13
13
       Dr. Flower's clinical records of Irene Barlow
14     (13 pages)
15
    Exhibit 2..........................  13
16
       Cypress Creek Hospital chart of Irene Barlow
17     (69 pages)
18
    Exhibit 3..........................  41
19
       Pfizer records of sales rep visit call dates
20     made to Dr. Flowers (CONFIDENTIAL)
       (Pfizer_MDL_Barlow_0000107 - 0000132, 0000208 -
21     0000213, 0000082 - 0000106)
22
    Exhibit 4..........................  53
23
       Psychiatric Times and CME, Inc. sponsored
24     Complimentary Educational Symposium flier
       "New Frontiers in Social Phobia and Bipolar
25     Disorders" (CME/NEU 01416)
```

---

## 13

1  Q. All right. I want to begin by offering for
2  you Exhibits 1 and 2, which the court reporter has
3  marked -- actually I put the court reporter's stickers
4  on -- but they will have exhibit stickers on them.
5  Well, maybe they won't. This is always the best laid
6  plan deals. See what well-oiled machine we're running
7  here.
8          I'm going to show you Exhibit 1 and ask
9  you whether that's a copy of your clinical records of
10 Mrs. Barlow and show you Exhibit 2 and ask you whether
11 that's a copy of Mrs. Barlow's chart from the Cypress
12 Creek Hospital.
13         MR. LONDON: And, Counsel, here's 1
14 and here's 2, unfortunately without a binder clip any
15 more.
16         MR. FERGUSON: Okay.
17 **A. This is a copy of the clinical records from my**
18 **office.**
19 Q. (By Mr. London) Exhibit 1? Referring to the
20 sticker.
21 **A. Uh-huh. Exhibit 1.**
22         **And Exhibit 2 is a copy of the chart from**
23 **Cypress Creek Hospital.**
24 Q. When did Mrs. Barlow become your patient?
25 **A. On August 25th of 2000.**

## 14

1  Q. And for how long was she your patient?
2  **A. From a period of August 25th of 2000 through**
3  **December, if I am not mistaken, the 8th of 2000.**
4  Q. Okay. It's a little hard for us to read, but
5  is it possible that it's December 8th or December 18th?
6  **A. I can actually --**
7  Q. I say that because the mark on the --
8  **A. I can actually look and --**
9  Q. All right.
10 **A. -- and try to be more specific --**
11 Q. I don't know that it makes any difference
12 but --
13 **A. It appears to be the 8th.**
14 Q. All right, sir. And are you looking at what I
15 would call page 10 of Exhibit 1? I'm just going to show
16 you page 10. And I'm looking over in this margin.
17 **A. Right. Yes, I am.**
18 Q. All right, sir. And so you saw her between
19 August the 25th of 2000 for the first time and December
20 of 2000 for the last time.
21 **A. Correct.**
22 Q. For what condition did you see Mrs. Barlow as
23 primary treating condition?
24 **A. The primary treating condition was bipolar**
25 **disorder.**

## 15

1  Q. Was that a diagnosis that she came to you with
2  or was it a diagnosis that you rendered for the first
3  time?
4  **A. She already had the diagnosis upon**
5  **presentation to my office.**
6  Q. Did you examine her yourself to determine
7  whether that was really the condition that you found her
8  to have?
9  **A. Yes. I did an examination and I concurred**
10 **with the diagnosis of bipolar.**
11 Q. All right, sir. And what medications did she
12 have when she came to see you as a patient?
13 **A. She had a host of medications upon her**
14 **original presentation, inclusive of Effexor XR 150**
15 **milligrams twice a day; Eskalith 450 milligrams two at**
16 **night; Trazodone 50 milligrams one to two at night;**
17 **Neurontin 300 milligrams, one twice a day; Klonopin 0.5**
18 **milligrams, two in the morning and three at night;**
19 **Duradrin p.r.n. for a headache; Hydrocodone 5/500 every**
20 **six hours; Claritin twice a day; Atenolol 25 milligrams**
21 **twice a day; Pravachol 40 milligrams in the morning; and**
22 **Zomig 5 milligrams as needed for migraine headaches.**
23 Q. All right, sir. Did you continue her on those
24 medications at that time.
25 **A. Specifically I addressed only the psychiatric**

## 16

1  **medications, and the psychiatric medications I**
2  **continued; but I also increased Neurontin on her first**
3  **visit from 300 b.i.d. to initially starting her to 400**
4  **3 ID -- three times a day, t.i.d for four days, then to**
5  **four times a day.**
6  Q. If you would help the ladies and gentlemen of
7  the jury and the judge understand what those terms mean,
8  beginning with the times she came to see you, she was on
9  Neurontin -- I believe you used the number 300.
10 **A. Yes.**
11 Q. And what did that mean?
12 **A. 300 -- Neurontin comes in certain milligram**
13 **strengths or tablets. It can come in 100, 300, also**
14 **comes in 400. On her presentation, she was on 300**
15 **milligrams twice a day. After my assessment, I did**
16 **increase the Neurontin to a stronger tablet, 400**
17 **milligram tablet, to have her take it three times a day**
18 **for a four-day period; then increase it to up to four**
19 **times a day.**
20 Q. Did there come a time when you increased her
21 Neurontin to five times a day?
22 **A. Yes, I did.**
23 Q. And when was that?
24 **A. If I am not mistaken, I -- on 9-20 I**
25 **re-evaluated her and I did increase Neurontin to five**

**17**

1  tablets per day in the form of giving her one in the
2  morning, one at 2:00 p.m, and three at night.
3     Q.  Is this a matter -- matter of simple
4  multiplication, 400 times five times a day equals 2,000?
5     A.  Correct.  Total dosage.
6     Q.  What was her daily patient dosage then of
7  Neurontin after the second increase?
8     A.  I --
9     Q.  In other words, on --  As I understood your
10  testimony, on September 20th, you increased it to one in
11  the morning, one at 2:00 in the afternoon, and three at
12  bedtime.
13     A.  Right.  That's her total dosage, is 2,000
14  milligrams.
15     Q.  Per day.
16     A.  Per day.
17     Q.  All right, sir.  Was Mrs. Barlow a -- an
18  epileptic at that time?
19     A.  No.
20     Q.  And you were not treating her for epilepsy;
21  were you?
22     A.  No.
23     Q.  Did she present to you with a neuropathic pain
24  condition?
25     A.  No, not a neuropathic pain condition.

**18**

1     Q.  All right.  What does the term "off-label"
2  mean in the medical profession?
3     A.  It means that F -- certain medications are
4  approved by the FDA and have had studies to support why
5  we use them; and there are other meds that, for a
6  better -- lack of word -- by accident or whatever
7  reasons, we find out that they work.
8     Q.  All right.
9     A.  And so we then start using those meds for
10  reasons other than approved by FDA.
11     Q.  All right.  Does --  Does "off-label" mean, as
12  I understand your testimony, that doctors prescribe a
13  medication for a condition even though it has not been
14  approved for that particular condition by the FDA?
15     A.  Correct.
16     Q.  All right.  And is that how you meant the term
17  "off-label"?
18     A.  Correct.
19     Q.  Was Mrs. Barlow's prescription by you for
20  Neurontin on-label or off-label for her condition?
21     A.  Off-label.
22     Q.  And was it for her bipolar condition?
23     A.  Yes.
24     Q.  What --  What were you hoping to achieve by
25  prescribing Neurontin to her for her bipolar condition?

**19**

1     A.  In her case she has high anxiety, she has
2  bipolar disorder, her presentation is mostly that of
3  irritability and some mania with the anxiety; and with a
4  history of benzodiazepine, specifically volume
5  dependence, the attempt is to use Neurontin so that it
6  can both control the mania and decrease the anxiety.
7     Q.  Are --  Okay.  Let me ask a different
8  question.
9          When you say "bipolar," does that mean
10  that there are two poles to the condition?
11          MR. FERGUSON:  Object to form.
12     Q.  (By Mr. London)  What does "bipolar" means?
13     A.  "Bipolar" is a disorder that originally, in
14  simple terms, means two polar opposites, ups and downs;
15  but it's a mood disorder that has periods of manias or
16  highs, which can come in the form of euphoria, elation
17  excessive spending, sexual acting-out; and it has lows
18  which can come in the form of depression and including
19  suicidality with anergia, which is no energy, anhedonia,
20  the inability to enjoy things.  And it can be anywhere
21  along that spectrum depending on where you are in your
22  illness state.
23     Q.  Was it --  Did you have an intention, whether
24  the prescribing of Neurontin for her would be for the
25  purpose of helping one or the other of those two

**20**

1  conditions -- that is the high or the low?
2     A.  In my situation, I was attempting to help the
3  highs and the anxiety.  That was my intent.
4     Q.  And is the high what you referred to as the
5  mania?
6     A.  Yes.  The irritable mania.
7     Q.  All right, sir.  And how did you come to
8  select Neurontin as a medicine off-label for prescribing
9  or continuing the prescription for Mrs. Barlow for her
10  bipolar condition?
11     A.  One of the reasons is she came here on -- I
12  inherited her on Neurontin.  The other is I had heard
13  anecdotal reports of Neurontin, you know, working with
14  anxiety and bipolar disorder.
15     Q.  All right, sir.
16     A.  And that's why.
17     Q.  All right, sir.  What was the course of her
18  bipolar condition during the time you were her treating
19  doctor?
20     A.  Essentially, on original presentation, a large
21  part of her con --  She was relatively stable, but
22  there -- there still was some irritability; and the
23  major concern was there had been some significant weight
24  gain, and that presentation was on 8-25.  That's when I
25  originally -- when I increased her Neurontin.  And then

Irene Barlow v.  
Pfizer, Inc., et al

Larry Flowers, M.D.  
August 28, 2010

---

Page 37

Q. And how did you become aware of it much later?
A. I believe because of the lawsuit --
Q. All right.
A. -- is my --
Q. All right.
A. -- my understanding.
Q. All right. Were you not her treating doctor for the second suicide attempt admission of Mrs. Barlow in January 2001?
A. No, I wasn't.
Q. Have you seen Mrs. Barlow since December of 2000?
A. No, I haven't.
Q. All right. Have -- I believe we discussed on the -- off the record, before we began, you've seen the records of Dr. Atwal who was the doctor before you treated Mrs. Barlow.
A. Yes.
Q. Have you seen any of the records of either her hospitalizations or her medical care after December 2000?
A. Not that I'm aware of, no.
Q. All right. And apart from anecdotal reports, do you have any information about the course of her medical care or condition from the last time you saw her

Page 38

to the present?
A. No, I don't.
Q. I want to shift gears with you if we can. Oops! That involves fountain pen work. Did you discuss with Mrs. Barlow the Neurontin that she was taking?
A. Yes.
Q. What -- It's now been some approximately 10 years. I would be afraid to ask you if you remember precisely what you discussed; but in your opinion what is -- what is it that you most likely discussed with her about taking Neurontin?
    MR. FERGUSON: Object to form. Go ahead, Doctor.
Q. (By Mr. London) Did you discuss with her what taking Neurontin might involve for her?
A. Yes.
Q. And in your best estimate, recall for us what you most likely discussed.
A. I prob -- probably discussed that there is no weight gain associated with Neurontin, that it would also help with her anxiety, with her not having to increase the benzodiazepine at the time, which was the Klonopin; and discussed that it would probably assist her, as well, with her mania or irritability, that it could possibly assist with that, as well.

Page 39

Q. Did you use the word "suicide" with Mrs. Barlow in discussing her taking Neurontin?
A. No, not with -- not specifically in relationship to her Neurontin.
Q. Was the word "suicide" in the warnings or in the contraindications of the Neurontin FDA-approved label at the time that Mrs. Barlow was your patient?
A. No.
Q. Did the word "suicide" become part of the warnings or contraindications in the FDA-approved label for Neurontin at some other time?
A. Yes.
Q. And do you recall when that was?
A. No. Approximately a couple of years ago. I'm not sure exactly when.
Q. All right. And you mean a couple of years ago from today, back in 2008, 2009, 2010?
A. Correct.
Q. All right, sir. If Neurontin had been in -- Let me strike that.
    If suicide precautions had been in the warnings or in the contraindications in the Neurontin label in 2000, would you have most likely have discussed suicide as such with Mrs. Barlow at that time?
    MR. FERGUSON: Object to form. Go ahead,

Page 40

Doctor.
A. In relationship to Neurontin, yes.
Q. (By Mr. London) All right, sir. I want to ask you whether there have been occasions in the past for Parke-Davis Warner-Lambert sales representatives to come to your office?
A. Yes, there has.
Q. Did Parke-Davis Warner-Lambert sales representatives promote Neurontin to you?
A. Yes.
Q. Tell me what you recall of that?
A. My best recollection is I think they had another drug -- I can't remember specifically what it was -- and at the time there were some experimentation with AEs, anti-epileptics, in the treatments of bipolar disorder. Historically Depakote and Tegretol had worked; and I recall asking them about -- There were already anecdotal reports about Neurontin and anxiety. So I can recall asking them about off-label use of AEs and whether or not Neurontin could potentially work with bipolar disorder and them reporting, my best recollection is, their -- they might be able to get me some material regarding it.
Q. All right, sir. Did you know the name of any of the material?

| Irene Barlow v. | Larry Flowers, M.D. |
|---|---|
| Pfizer, Inc., et al | August 28, 2010 |

**Page 65**

1    Q.  (By Mr. London) I would like to show you what
2 has been marked as Exhibit 8 and ask if you would take a
3 moment to study this document, please.
4    A.  (Reading.)
5    Q.  Have you been able to read it all the way to
6 the second page?
7    A.  No, not yet.
8    Q.  Does this appear to be an e-mail between
9 people who have some interest in the use of gabapentin
10 in bipolar disorder?
11        MR. FERGUSON: Object to form.
12    A.  Yes. It appears to.
13    Q.  (By Mr. London) All right, sir. And do you
14 see down in the lower right-hand corner there is a
15 document number that says Pfizer_LKnapp and then numbers
16 22176? Do you see that?
17    A.  Yes.
18    Q.  Have you seen this document before?
19    A.  No.
20    Q.  Did the Parke-Davis Warner-Lambert Pfizer
21 representatives ever provide this document to you during
22 any time when you were treating bipolar patients with
23 gabapentin?
24        MR. FERGUSON: Object to form.
25    A.  No.

**Page 66**

1    Q.  (By Mr. London) All right, sir. If -- As an
2 e-mail, do you recognize that the -- the message on the
3 bottom precedes the message on the top?
4        MR. FERGUSON: Object to form.
5    A.  (Nods head affirmatively.) Yes.
6    Q.  (By Mr. London) Okay. Let's look at that.
7 In the middle of the page, it says "Original Message."
8 Do you see that?
9    A.  Yes.
10    Q.  And what is the "Sent" date on that original
11 message?
12    A.  Wednesday, September 12, 2001.
13    Q.  At 6:00 o'clock in the evening -- 6:01 p.m.,
14 is that what it says?
15    A.  Correct.
16    Q.  All right, sir. And then if you would, please
17 go down to the one, two, three, fourth paragraph below
18 that and read to the jury what Angela Crespo wrote on
19 that date in that e-mail?
20    A.  I know --
21        MR. FERGUSON: I'm sorry. Excuse me,
22 Doctor. I object to form.
23    Q.  (By Mr. London) All right.
24        MR. FERGUSON: Go ahead.
25    A.  -- the best clinical trial we have is negative

**Page 67**

1 but wonder if we can do something more. I'm aware that
2 it's difficult to have good results on that kind of
3 studies and if I'm not wrong, there are some concerns
4 about design, etcetera, on the Pande one.
5    Q.  (By Mr. London) All right. And is Pande the
6 same person whose name is on that original article that
7 is your Exhibit 7 right there in front of us?
8        MR. FERGUSON: Object to form.
9    A.  Yes.
10    Q.  (By Mr. London) All right. Now, if you'll go
11 to the top of this Exhibit 8, does that also show that
12 it's from Atul Pande?
13    A.  Yes.
14    Q.  What's the date on that?
15    A.  Thursday, September 13, 2001, 1:33 p.m.
16    Q.  All right. And is that later than the message
17 sent by Angela Crespo, as shown in the middle of the
18 page?
19    A.  Yes.
20    Q.  All right, sir. Was -- Would you please read
21 into the record what Atul Pande wrote to Lloyd Knapp and
22 others on September 13th, 2001, according to this
23 exhibit?
24        MR. FERGUSON: Object to form.
25    A.  "I think we are whistling in the wind to think

**Page 68**

1 we can easily get an indication in bipolar disorder.
2 The disease is complicated, the studies are difficult
3 and prolonged, and gabapentin has a weak, if any,
4 anti-manic effect. All approved drugs have used
5 short-term treatment of acute mania to gain registration
6 because that is the design with the greatest power to
7 discriminate drug from placebo. Unfortunately,
8 gabapentin (and pregabalin) have shown negligible
9 evidence of anti-manic effect. There is a good --
10 pretty good consensus among experts in the area that
11 gabapentin is not a good anti-manic treatment. Almost
12 all the published reports of 'good' effect concern
13 adjunctive use in patients receiving multiple
14 medications. That is exactly the situation in which it
15 is very difficult to separate the effect of the active
16 drug from placebo."
17    Q.  I would love...
18    A.  "I would love to be proven wrong, but I am not
19 optimistic in this area."
20    Q.  Did you know at the time that you were
21 treating Mrs. Barlow that "gabapentin has a weak, if
22 any, anti-manic effect" according to Dr. Pande?
23        MR. FERGUSON: Object to form.
24    A.  No.
25    Q.  (By Mr. London) Would you have liked to have

## 69

1  known that?
2      MR. FERGUSON: Object to form.
3  **A. Yes.**
4  Q. (By Mr. London) Did you know that "gabapentin
5  (and pregabalin) have shown negligible evidence of
6  anti-manic effect"?
7      MR. FERGUSON: Object to form.
8  **A. No.**
9  Q. (By Mr. London) Would you like to have known
10 that?
11     MR. FERGUSON: Object to form.
12 **A. Yes.**
13 Q. (By Mr. London) Did you know that there was
14 pretty good "consensus among experts in the area that
15 gabapentin is not a good anti-manic treatment"?
16     MR. FERGUSON: Object to form.
17 **A. No.**
18 Q. (By Mr. London) Would you like to have known
19 that?
20     MR. FERGUSON: Object to form.
21 **A. Yes.**
22 Q. (By Mr. London) Is that the kind of
23 information that doctors, like you, in the clinics with
24 the patients in their offices, need to know to make
25 treatment choices?

## 70

1      MR. FERGUSON: Object to form.
2  **A. Yes.**
3  Q. (By Mr. London) All right. Have you in the
4  past -- Do you -- Do you know what a random-controlled
5  placebo-blinded trial is?
6  **A. Yes. I'm familiar with it.**
7  Q. What is that?
8  **A. It's basically where you're randomly giving --**
9  **you're giving placebo to some patients, you're giving a**
10 **drug to other patients, and then you assess the effect**
11 **of the drug with the patient.**
12 Q. And do -- pardon me -- do drug companies
13 sometimes ask doctors to enroll patients in those kinds
14 of trials?
15 **A. They do.**
16 Q. Have you had patients in random-controlled
17 trials before?
18 **A. I've had patients not -- Yes. In random-**
19 **controlled trials, yes.**
20 Q. All right, sir. Did you have any patients in
21 the gabapentin trials or the Neurontin trials?
22 **A. Not that I am aware of.**
23 Q. All right, sir.
24 **A. No, I don't believe so.**
25 Q. Are you familiar with the term called

## 71

1  "breaking the code"?
2  **A. Some --**
3      MR. FERGUSON: Object to form.
4  **A. Somewhat.**
5  Q. (By Mr. London) What does that term mean to
6  you in regard to random-controlled trials?
7  **A. Whether or not there is a -- an effect if the**
8  **drug can be proven effective or ineffective; and if it's**
9  **ineffective, that's one of the issues with breaking the**
10 **code.**
11     MR. LONDON: I think my crackerjack staff
12 have misstapled some of these, but we'll find out. Let
13 me ask you to mark what I believe is Exhibit 9, please.
14     (Flowers Exb. No. 9 was marked.)
15 Q. (By Mr. London) If you would look at
16 Exhibit 9, please. And, Doctor, and, Counsel, for the
17 record, let me explain to you what Exhibit 9 is. The
18 first page of Exhibit 9 is as it appears to be a small
19 copy of a letter dated July 28th. The second page is,
20 of course, the second page of the same letter. The
21 third and fourth pages are attempts to enlarge it by a
22 copier that our office made; and when you enlarge it,
23 it's not quite as legible, but you may find it useful.
24 They're the same letter. Having said that, could I ask
25 you to take a look at Exhibit 9, please, Doctor.

## 72

1  **A. Okay.**
2  Q. All right, sir. Had you seen Exhibit 9 before
3  today, please?
4  **A. No.**
5  Q. And is it fair to say that you had no
6  recollection -- Do you have a recollection of
7  Parke-Davis Warner-Lambert Pfizer or any of their sales
8  representatives ever providing this letter to you during
9  the time you were treating patients with gabapentin for
10 bipolar disorder?
11     MR. FERGUSON: Object to form.
12 **A. No.**
13 Q. (By Mr. London) All right, sir. What is the
14 date of this letter?
15 **A. July 28 of 1998.**
16 Q. All right, sir. Who is the author of this
17 letter?
18 **A. It looks to be David L. Dunner.**
19 Q. That's the person to whom it's sent.
20 **A. I can't see who -- Let me look on here. It**
21 **says Parke-Davis.**
22 Q. All right. Look at the bottom of the second
23 page. It's signed by someone.
24 **A. I see a -- At the bottom of the second page?**
25 Q. I hope that worked out right.

Case 1:04-cv-10981-PBS   Document 3097-1   Filed 10/15/10   Page 8 of 18

19 (Pages 73-76)

Irene Barlow v.
Pfizer, Inc., et al

Larry Flowers, M.D.
August 28, 2010

73

1  A. Okay. It's -- Mine doesn't have all that.
2  Q. Did we successfully --
3  A. Wait a minute. Maybe I can look at it over
4  here and see --
5  Q. There it is. Bottom of the last page.
6  A. It's from Dr. Atul C. Pande.
7  Q. And does that appear to be the same name as
8  the gentleman who wrote that earlier study that we
9  looked at, the random-controlled placebo trial article
10 that you looked at as Exhibit 7?
11 A. Yes.
12 Q. All right, sir. It's written on Parke-Davis
13 letterhead?
14     MR. FERGUSON: Object to form.
15 A. Yes.
16 Q. (By Mr. London) On the front page, does it
17 reflect two tables, a Table 1, but one is a YMRS and one
18 is a HAM-D. Do you see that?
19 A. Yes.
20 Q. And are those -- What are YMRS and HAM-Ds?
21 A. YMRS is a Young Mania Rating Scale and the
22 HAM-D is the Hamilton Rating Stale for Depression.
23 Q. All right, sir. And then at the end of that
24 first paragraph on that first page, what does that last
25 sentence say?

74

1     MR. FERGUSON: Object to form.
2  A. To the contrary placebo patients showed a
3  greater decrease in total YMRS score than the gabapentin
4  patients.
5  Q. (By Mr. London) All right. And is a decrease
6  in the YMSRS (sic) score an improvement?
7  A. No.
8  Q. Okay. Then what does it mean for the patient
9  to have had a change in the YMRS scale relative to the
10 gabapentin patients?
11     MR. FERGUSON: Object to form.
12 Q. (By Mr. London) If you know.
13     MR. FERGUSON: Object to form.
14 A. That's just stating that the placebo patients
15 did better and specifically it did not decrease the
16 mania. Gabapentin didn't increase mania in any
17 significant fashion.
18 Q. (By Mr. London) Would you have liked to have
19 known that when you were treating Mrs. Barlow?
20     MR. FERGUSON: Object to form.
21 A. Yes.
22 Q. (By Mr. London) All right, sir. Did any
23 Parke-Davis sales representative ever disclose to you in
24 1998, 1999, 2000, 2001 or at any other time that placebo
25 patients did better than gabapentin patients in the

75

1  bipolar trials?
2     MR. FERGUSON: Object to form.
3  A. No.
4  Q. (By Mr. London) All right. Do you know who
5  is Dr. Richard Glanzman?
6  A. No.
7  Q. Have you ever heard that name before today?
8  A. I'm not sure.
9  Q. All right, sir. I want you to assume that
10 Dr. Richard Glanzman is the medical director associated
11 with the Pfizer Corporation. Just assume that for me,
12 would you please?
13 A. Yes.
14 Q. At this time I'm going to ask my technology
15 operator to play for you certain portions of
16 Dr. Glanzman's testimony that were presented in federal
17 court in Boston just a few months ago. Would you watch
18 that video for us, please, listen to his testimony and
19 then I'll ask you some questions about it.
20 A. Okay.
21    MR. FERGUSON: And I'll object to the
22 form and the procedure of just showing the videotape of
23 another witness testifying to our current witness at the
24 deposition. We're asking the witness questions
25 regarding his knowledge, not getting his comments on

76

1  someone else's testimony or a videotape.
2     MR. LONDON: Understood. That -- The
3  objections are -- are noted and I respect your
4  objections. We're going to proceed.
5     MR. FERGUSON: Fine. I'm not preventing
6  you.
7     MR. LONDON: I know.
8     (Dr. Glanzman's video played as follows:
9  Q. Could you state your name and your
10 residential address for the record, please?
11 A. Robert Louis Glanzman, 34 Dutch Hill
12 Drive, Carmel, New York 10512.
13 Q. What was your last employment prior
14 to Novartis?
15 A. I worked for Pfizer, Incorporated.
16 Q. What period of time did you work for
17 Pfizer?
18 A. From September of 1999 through March
19 of 2007. I was a medical director on the
20 Neurontin Team.
21 Q. Did you have that entire -- Did you
22 have that position for the entire period of
23 time that you worked on Neurontin?
24 A. Yes.
25 Q. And as medical director for

| Irene Barlow v. | Larry Flowers, M.D. |
|---|---|
| Pfizer, Inc., et al | August 28, 2010 |

**77**

1  Neurontin, what were your job
2  responsibilities?
3      A. Well, to serve on the committees
4  that you see here.
5      Q. When you -- when you work on
6  Neurontin --
7      A. Yes.
8      Q. -- or even before working on Neurontin
9  or after working on Neurontin, but for that
10  period of time that you worked here at Pfizer,
11  do you -- can you tell me, did Pfizer ever go
12  out at any point in time and inform physicians
13  that not -- Neurontin was not effective for a
14  particular indication?
15      A. Did Pfizer ever go out and tell
16  physicians that Neurontin was not effective
17  for a particular indication? Not that I'm
18  aware of.
19      Q. In the -- in the psychiatric
20  conditions, did you read any studies of
21  Neurontin's use in treating bipolar?
22      A. No, I didn't really review the
23  psychiatric literature.
24      Q. well, you say you approved a message
25  that reads, "gabapentin is effective against

**78**

1  a wide range of neurologic and psychiatric
2  conditions."
3      A. Correct.
4      Q. What are the psychiatric
5  conditions that you're referring to?
6      A. Well, frankly, I'm not referring
7  to any specific psychiatric conditions.
8      Q. Well, you approved a key message
9  that gabapentin was effective against
10  psychiatric -- a wide range of neurologic
11  and psychiatric conditions. What
12  psychiatric conditions are we talking
13  about here?
14      A. I mean, I would be happy to go
15  back and do a literature review for you
16  and look at the data for you. I did not
17  do it back then.
18      Q. Well, how could you approve a
19  message without looking at the clinical
20  data?
21      A. Well, I mean, obviously, there --
22  this is not -- I approved it. Whether
23  it was correct or not, I can't say at
24  this time.
25      Q. Well, that -- that was your job

**79**

1  as medical director, wasn't it, to review
2  the clinical data to see if it supported
3  a key message?
4      A. Yes. That was a part of my job.
5      Q. And is it your testimony that you
6  didn't, you approved a message that it
7  was effective against a wide range of
8  psychiatric conditions and you didn't
9  look at any clinical data?
10      A. It is my testimony that I did
11  not do a thorough review of psychiatric
12  conditions.
13      Q. Well --
14      A. That's correct.
15      Q. -- if you didn't do it, who was
16  going to do it?
17      A. Well, it was my job; so if I
18  didn't do it, nobody would do it.
19      Q. And it was your responsibility
20  to communicate to the regional medical
21  directors the safety information related
22  to Neurontin --
23      A. That's correct.
24      Q. -- between January of 2001 and
25  July of 2002?

**80**

1      A. That's correct.
2      Q. And it was also your
3  responsibility to communicate to the
4  sales force of Pfizer between January
5  of 2001 and February of 2002 any safety
6  information related to Neurontin?
7      A. That's correct.
8      Q. And that's --
9      A. Well, relevant -- relavant safety
10  information.
11      Q. Relevant safety information.
12      A. Correct. I would not have
13  done an exhaustive safety review.
14      Q. You would not have done an
15  exhaustive safety review?
16      A. No, not with the field --
17  Well, they wouldn't have understood it.
18  And not only that, they wouldn't have
19  had time to absorb it.
20      Q. Did you ever personally do
21  an exhaustive safety review personally?
22      A. I had a copy of the integrated
23  safety -- summary of safety report, which
24  I -- it's a tome, which no one, I don't
25  think, has ever read in its entirety. I

Case 1:04-cv-10981-PBS   Document 3097-1   Filed 10/15/10   Page 10 of 18

21 (Pages 81-84)

Irene Barlow v.  
Pfizer, Inc., et al

Larry Flowers, M.D.  
August 28, 2010

**Page 81**

1  certainly have never read it in its
2  entirety.
3      Q.  Does the label contain all of
4  the information that the company knows
5  regarding the safety of a drug?
6      A.  No.
7      Q.  And are there safety concerns
8  that may exist that the company has
9  knowledge about that are not within the
10 label at any given time?
11     A.  Yes.
12     Q.  And did you undertake any
13 effort whatsoever to examine whether or
14 not there were any safety concerns or
15 issues with Neurontin in psychiatric
16 adverse events in the Warner-Lambert
17 Parke-Davis era when you began as
18 medical director for Neurontin and
19 Pfizer?
20     A.  No, that wasn't my function.
21     Q.  And in January of 2001, you
22 did not know the safety profile as it
23 affected the bipolar community; did you?
24     A.  Did I personally?  No.
25         (End of Dr. Glanzman's video replay.)

**Page 82**

1      Q.  (By Mr. London) Let me ask you a few
2  questions about this testimony that you have just seen,
3  Doctor.  Were you aware before just now that the medical
4  director on the Neurontin team had approved a key
5  message that Neurontin was effective for a wide range of
6  psychiatric conditions even though he had never read any
7  of the underlying clinical studies on Neurontin?
8          MR. FERGUSON:  Let me object to form and
9  just renew my objections --
10         MR. LONDON:  Yes.
11         MR. FERGUSON:  -- on the process and
12 procedure of showing the -- a doctor testimony from
13 someone else and then quizzing him about it.
14         MR. LONDON:  All right.
15         MR. FERGUSON:  You may proceed.
16     A.  No.
17     Q.  (By Mr. London) Let me just ask you this
18 question, would you have liked to have known everything
19 that you have just now heard Dr. Glanzman testify to
20 before prescribing Neurontin to your patients for
21 bipolar conditions?
22         MR. FERGUSON:  Object to form.
23     A.  Yes.
24     Q.  (By Mr. London) Why would you like to have
25 known that?

**Page 83**

1          MR. FERGUSON:  Object to form.
2      A.  Because it clearly gives me other choices to
3  make.
4      Q.  (By Mr. London) All right.
5      A.  That might have been proven to work.
6      Q.  Were you aware that not all of the relevant
7  safety information pertaining to Neurontin's risks were
8  contained within the label?
9          MR. FERGUSON:  Object to form.
10     A.  No.
11     Q.  (By Mr. London) Were you aware that the
12 manufacturer -- that is, Parke-Davis Warner-Lambert
13 Pfizer -- had information about relevant safety concerns
14 that was not on the label back at the time you were
15 prescribing Neurontin to Mrs. Barlow?
16         MR. FERGUSON:  Object to form.
17     A.  Could you restate the question?
18     Q.  (By Mr. London) I'll do my best.  Were you
19 aware that, as I understood Dr. Glanzman's testimony,
20 that the manufacturer of Neurontin had knowledge about
21 safety matters to do with Neurontin that were not in the
22 label and not known to doctors --
23     A.  No.
24         MR. FERGUSON:  Object to form.
25     Q.  (By Mr. London) -- at the time you were

**Page 84**

1  prescribing Neurontin to Mrs. Barlow?
2      A.  No.
3          MR. FERGUSON:  Same objection.
4      Q.  (By Mr. London) And he made an objection, and
5  I don't think he was intending to do it, but he
6  overspoke you.  If you would just give your answer.
7      A.  No.  I wasn't aware.
8      Q.  All right, sir.  What is the label?  What is a
9  drug's label as you, a psychiatrist, consider a drug's
10 label?
11         MR. FERGUSON:  Object to form.
12     A.  Well, I guess you have to clarify.  What I'm
13 thinking about label, I'm thinking about a list of how a
14 medication works, what is it used for, its indications
15 what are the side effects, what other drugs can it be
16 administered with, what are its contraindications,
17 followed by as well as use in pregnancy; and then
18 with -- it gives the dosage, dosages that you can use
19 and how it should be prescribed.
20     Q.  (By Mr. London) All right.  Do you have an
21 understanding, one way or the other, whether a label is
22 approved by the FDA for the illnesses or medical
23 conditions for which the FDA has approved the drug to be
24 used?
25         MR. FERGUSON:  Object to form.

| Irene Barlow v. | Larry Flowers, M.D. |
|---|---|
| Pfizer, Inc., et al | August 28, 2010 |

**85**

1 A. Yes, it is.
2 Q. (By Mr. London) All right. Do you -- What
3 is a PHYSICIANS' DESK REFERENCE or a PDR?
4 A. PDR is just a reference book that we use which
5 lists the labeling of most of the drugs that we use.
6 Q. All right, sir.
7 A. Yes.
8 Q. You told us -- I'm sorry. You told us earlier
9 that the risk of suicide was not in the warnings or in
10 the contraindications of the Neurontin label during the
11 year 2000. Do you recall whether it was in the
12 PHYSICIANS' DESK REFERENCE at that time?
13          MR. FERGUSON: Object to form.
14 A. No, it wasn't.
15 Q. (By Mr. London) All right, sir. Did anyone
16 with Parke-Davis, Warner-Lambert or Pfizer ever disclose
17 to you that the laboratory studies had been seen to
18 reduce the release of -- that the laboratory studies of
19 gabapentin had been observed to reduce the release of
20 monoamines?
21          MR. FERGUSON: Object to form.
22 A. No.
23 Q. (By Mr. London) Is -- What is serotonin?
24 A. That's one of the neurochemicals or
25 neurohormones that's located in multiple spots in the

**86**

1 human body that's been associated with lack of
2 depression, a lack of serotonin and other areas.
3 Q. Is it a monoamine?
4 A. Serotonin -- Specifically, I don't know
5 whether it's a monoamine or not.
6 Q. Was it ever disclosed to you whether it had
7 been observed that the administration of gabapentin was
8 associated with the reduced release of serotonin?
9          MR. FERGUSON: Object to form.
10 A. No.
11 Q. (By Mr. London) Would you like to have known
12 whether a drug you were using in bipolar patients did or
13 did not inhibit the release of serotonin in patients?
14          MR. FERGUSON: Object to form.
15 A. Yes.
16 Q. (By Mr. London) Why?
17 A. Because it -- The association, a net increase
18 in serotonin, is associated with successful treatment of
19 depression. A decrease, a net decrease in serotonin,
20 has been associated with a worsening of depression.
21 Q. Was it ever disclosed to you by anyone at
22 Parke-Davis Warner-Lambert whether clinical trials of
23 gabapentin had been observed to have an increase in
24 treatment emergent depression compared to placebo at
25 amounts equal to or greater than 1800 milligrams per

**87**

1 day?
2          MR. FERGUSON: Object to form.
3 A. No.
4 Q. (By Mr. London) Would you like to have known
5 that?
6          MR. FERGUSON: Object to form.
7 A. Yes.
8 Q. (By Mr. London) Why?
9 A. Because it gives me the alternative to use
10 other choices.
11 Q. A few moments ago you watched some video
12 testimony by Dr. Richard Glanzman in which he stated,
13 among other things, that not all the safety concerns --
14 not all of the safety information known to the
15 manufacturer about Neurontin was in the label. Do you
16 recall that?
17          MR. FERGUSON: Object to form.
18 A. Yes.
19 Q. (By Mr. London) All right. Were you aware
20 during the time that you were treating Mrs. Barlow that
21 Parke-Davis Warner-Lambert was being investigated by a
22 grand jury for off-label marketing of gabapentin to
23 bipolar patients?
24 A. No.
25          MR. LONDON: Where are we? 10?

**88**

1          THE REPORTER: Uh-huh.
2          (Flowers Exb. No. 10 was marked.)
3 Q. (By Mr. London) I want to show you what has
4 been marked as Exhibit 10 and I want you to assume with
5 me that it is a copy of the Information in the case
6 called the United States of America versus
7 Warner-Lambert Company, Criminal Number -- and I don't
8 see it on there -- but various violations of the United
9 States Code. That's what it states on the cover. Do
10 you see that?
11          MR. FERGUSON: Object to form.
12 A. Yes.
13 Q. (By Mr. London) And even though this may have
14 been in your file, because I sent it to you once before,
15 have you ever actually read this document?
16 A. No.
17 Q. I want you to turn to page 14 of that exhibit.
18 A. Okay.
19 Q. On my page that says Count Two at the top of
20 the page. Is that what yours says?
21 A. Yes.
22 Q. All right, sir. Would you read into the
23 record that paragraph 40, please?
24          MR. FERGUSON: Object to form.
25 A. "Beginning as early as April 1995, and

## 89

1 **continuing thereafter until at least in or about August**
2 **20th of 1996, in the District of Massachusetts and**
3 **elsewhere Warner-Lambert, after previously having been**
4 **convicted of violating the Federal Food, Drug and**
5 **Cosmetic Act, 21 U.S.C. statute 331 and 333, did**
6 **introduce and cause the introduction into interstate**
7 **commerce from Puerto Rico and elsewhere, directly and**
8 **indirectly, into Massachusetts and elsewhere, quantities**
9 **of Neurontin, a drug within the meaning of the Federal**
10 **Food, Drug and Cosmetic Act, 21 U.S.C. 321, which drug**
11 **was intended for the use for the treatment of**
12 **neuropathic pain, bipolar disorder, as monotherapy for**
13 **epilepsy, and other Unapproved Usages -- Uses, and which**
14 **was misbranded within the meaning of 21 U.S.C. 352, in**
15 **that Neurontin's labeling lacked adequate directions for**
16 **such uses.  All in violation of 21 U.S.C. 331(a),**
17 **333(a)(2) and 352(f)(1)."**
18     Q.  Were you aware that Parke-Davis Warner-Lambert
19 was charged with the crime of introducing Neurontin into
20 the stream of commerce for the use for bipolar disorder
21 at a time when its labeling lacked adequate directions
22 for such uses as set out in the paragraph you just read
23 to me?
24         MR. FERGUSON:  Object to form.
25     **A.  No, I wasn't aware.**

## 90

1     Q.  (By Mr. London)  All right.  Were you aware
2 that Parke-Davis Warner-Lambert pleaded guilty to that
3 crime?
4         MR. FERGUSON:  Object to form.
5     **A.  No, I wasn't aware.**
6     Q.  (By Mr. London)  Were you aware that
7 Parke-Davis Warner-Lambert admitted that it was
8 unequivocally true that that happened?
9         MR. FERGUSON:  Object to form.
10    **A.  No.**
11        MR. LONDON:  All right.  Let's mark
12 Exhibit 11 I think we are.
13        (Flowers Exb. No. 11 was marked.)
14    Q.  (By Mr. London)  Will you look at Exhibit 11,
15 please.
16    **A.  Yes.**
17    Q.  Does this appear to be a letter from the
18 United States Department of Justice dated May 13th, 2004
19 to a Mr. Robert Fiske and a Mr. James Rouhandeh --
20        MR. FERGUSON:  Object to form.
21    Q.  (By Mr. London)  -- regarding Warner-Lambert
22 Company L.L.C.?
23    **A.  Yes.**
24    Q.  All right, sir.  Without reading this entire
25 letter -- and you're certainly welcome to do that.  I

## 91

1 have no quarrel with your doing that.  I would like for
2 you to read that first paragraph that says "Change of
3 Plea," and then just read that last two sentences of
4 that one paragraph, please.
5        MR. FERGUSON:  Object to form.
6    **A.  Starting with "Warner-Lambert expressly waives**
7 **any statute of limitations defense that it may have in**
8 **connection with these crimes.  Warner-Lambert expressly**
9 **and unequivocally admits that it's committed the crimes**
10 **charged in the Information.  Warner-Lambert agrees that**
11 **the facts set forth in the Information are true."**
12    Q.  Would you like to have known, when you were
13 treating Mrs. Barlow with Neurontin for bipolar
14 disorder, that Parke-Davis and Warner-Lambert were going
15 to eventually admit that it was unequivocally true that
16 it had distributed Neurontin for the treatment of
17 bipolar disorder without adequate directions to doctors
18 to treat that condition in violation of the law?
19        MR. FERGUSON:  Object to form.
20    **A.  Yes.**
21    Q.  (By Mr. London)  Again, why?
22    **A.  Because it gives me alternative choices.**
23    Q.  Okay.  If you had known back in 2000, when you
24 were treating Mrs. Barlow with Neurontin, did you --
25 Let me -- Strike that.  Let me ask you another

## 92

1 question.
2        Earlier you told us that you knew that
3 within the last couple of years the risk of suicide had
4 been moved into the warning or contraindication section
5 of the Neurontin label.  Do you recall that?
6        MR. FERGUSON:  Object to form.
7    **A.  Yes.**
8    Q.  (By Mr. London)  All right.  Do you -- Do you
9 know why or how it came to be moved into that section?
10   **A.  No.**
11   Q.  Just that it was now known to be associated
12 with suicidality.
13       MR. FERGUSON:  Object to form.
14   **A.  Yes.**
15   Q.  (By Mr. London)  Do you now know that
16 Neurontin is known by the FDA to be associated
17 with suicidality in the off-label --  Strike that.
18       Do you now on know that Neurontin is now
19 known to be associated with suicidality over placebo?
20       MR. FERGUSON:  Object to form.
21   **A.  Yes.**
22   Q.  (By Mr. London)  All right, sir.  If you had
23 known in 1999, 2000, when you were treating Mrs. Barlow,
24 that the Food and Drug Administration had found that
25 Neurontin increased the risk of suicide, that

Case 1:04-cv-10981-PBS   Document 3097-1   Filed 10/15/10   Page 13 of 18

24 (Pages 93-96)

Irene Barlow v.  
Pfizer, Inc., et al

Larry Flowers, M.D.  
August 28, 2010

93

1  Warner-Lambert had known from random controlled placebo
2  trials that it was not effective for the treatment of
3  bipolar, if you had known that it had been observed in
4  clinical trials that Neurontin had a higher risk of
5  depression in patients who took it at and above 1800
6  milligrams a day relative to placebo, if you had known
7  that the company medical director who approved the
8  message that it works for a broad range of psychiatric
9  applications had never read the clinical studies, and if
10 you had known that Warner-Lambert had not disclosed to
11 doctors that -- that directions were safe use for
12 off-label -- that they did not provide adequate
13 directions for the safe use of Neurontin in bipolar
14 patients, as they admitted in the guilty plea, would
15 that have affected your choice as to whether or not to
16 prescribe Neurontin to Mrs. Barlow?
17         MR. FERGUSON:  Object to form.
18     A.  Yes.
19     Q.  (By Mr. London) How so?
20         MR. FERGUSON:  Object to form.
21     A.  Again, it would lead me to use other
22 alternatives that would have been proven.
23     Q.  (By Mr. London) Would it have affected your
24 choice whether to raise her dose level from the 900
25 milligrams a day that she was taking when Dr. Atwal

94

1  referred her to you to the 2000 milligram per day level
2  that she was taking as of December 2000?
3         MR. FERGUSON:  Object to form.
4     A.  Yes.
5     Q.  (By Mr. London) How would it have affected
6  that choice?
7     A.  I would certainly have made sure that if I got
8  up to 1800 milligrams that she would get a warning
9  specifically about increased suicidality.
10    Q.  All right.  Would you have used the word
11 "suicide" in talking with her about taking Neurontin?
12        MR. FERGUSON:  Object to form.
13    A.  Yes.
14    Q.  (By Mr. London) Why?
15    A.  Well, today, because we know that it has a
16 warning regarding suicide, it is important to warn the
17 patient that the medication may increase the risk for
18 suicide; so the patient or family members or those that
19 are around her can ensure that she gets adequate safe
20 treatment.
21    Q.  (By Mr. London) All right, sir.  As you told
22 us before, you did not follow her from the time she was
23 admitted to the hospital in January 2001 of an actual
24 bullet wound to her body from a suicide attempt.  Is
25 that true?

95

1     A.  Yes.
2     Q.  Or since that time, you have not followed her
3  since that time?
4     A.  I haven't.
5     Q.  You are a treating psychiatrist as opposed to
6  one who does your work in the laboratory; is that true?
7     A.  Yes.
8     Q.  All right, sir.  Are you a biological
9  psychopharmacologist?
10    A.  I have to know what you mean by that, because
11 they -- they would say that what we do every day is
12 practice psychopharmacology; and some people would
13 describe that as biological psychopharmacology.  But I
14 don't know --  What do you specifically mean by that?
15    Q.  Do you know the mechanism of Neurontin in the
16 molecular level?
17    A.  No, I don't.
18    Q.  Down to the level that the laboratory
19 scientists know?
20    A.  No.
21    Q.  Are you aware one way or the other whether it
22 says on the -- on the approved label for Neurontin that
23 the mechanism of its action is not known?
24    A.  Yes.  I'm aware that it's unknown.
25    Q.  All right, sir.  Given all of that, are you --

96

1  Do you believe you're in the best position to form an
2  opinion and express an opinion about whether Neurontin
3  caused or contributed to Mrs. Barlow's two suicide
4  attempts in November 2000 and January 2001; or would you
5  rather defer to others?
6         MR. FERGUSON:  Object to form.
7     A.  I would certainly defer that to others who are
8  studying that specifically.
9     Q.  (By Mr. London) Doctor, I'm going to pass the
10 witness at this time.  Thank you very much for your
11 patience in letting me go through these documents with
12 you.  One last --  Two last questions.
13        Before we began, you presented us with a
14 file that has some items in it that are not part of your
15 treatment record.  We'd like to have a copy of your
16 file.  If you will let us have that as copy, we'll give
17 it to the court reporter from us to copy and return to
18 us and return to you.  Is that how you would like to do
19 it?
20    A.  Certainly, we can do that.
21    Q.  We want to be sure that everybody, defense
22 counsel and our side, both have everything that you
23 have.  All right, sir?
24    A.  Yes.
25    Q.  And then secondly, we met with you before the

| Irene Barlow v. | Larry Flowers, M.D. |
|---|---|
| Pfizer, Inc., et al | August 28, 2010 |

**97**

1  deposition began; did we not?
2  **A. Yes.**
3  Q. All right, sir. And gave you a copy of
4  Dr. Pande's article and that sort of thing.
5  **A. Yes.**
6  Q. All right, sir. And we're paying you for your
7  time; are we not?
8  **A. Yes.**
9  Q. All right, sir. Given those, I'm sure that
10 defense counsel has some questions. He's promised me
11 it's going to be five minutes. That's -- Strike that.
12       Defense counsel has some questions. I'll
13 pass the witness. I may have more questions depending
14 on his, but we'll see. Thank you again.
15       MR. LONDON: Time out?
16       THE VIDEOGRAPHER: We're off the record
17 at 11:45.
18       (Off the record from 11:45 - 12:04.)
19       THE VIDEOGRAPHER: We're back on the
20 record at 12:04 p.m.
21
22
23
24
25

**98**

1              EXAMINATION
2
3  BY MR. FERGUSON:
4  Q. Doctor, my name is Ken Ferguson, and I
5  represent Parke-Davis Warner-Lambert Pfizer. Do you
6  understand that?
7  **A. Yes.**
8  Q. Along with my colleague, Jeff Lilly, here to
9  my left. Do you understand that?
10 **A. Yes.**
11 Q. And we haven't met before, just right before
12 your deposition started this morning; correct?
13 **A. Yes.**
14 Q. And haven't spoken; have we?
15 **A. No.**
16 Q. Doctor, I want to come back to this in more
17 detail in a minute, but can you tell me, when you first
18 started seeing Mrs. Barlow, do you know whether she had
19 had a history of suicide attempts prior to seeing you?
20 **A. Yes, she had.**
21 Q. Okay. Do you know how many?
22 **A. I think I know of at least two.**
23 Q. Okay.
24 **A. According to my records, I had written -- done**
25 **an initial evaluation that it said she had had -- one**

**99**

1  **year ago she took pills and she tried pills again, so at**
2  **least two to three previous attempts.**
3  Q. And do you know whether she had attempted
4  suicide before she ever took Neurontin in her life?
5  **A. Specifically, I don't know, because I don't**
6  **know specifically when she started Neurontin.**
7  Q. Okay. Do you know whether she had a history
8  of prescription drug abuse?
9  **A. Yes.**
10 Q. So was that an issue in your treatment of her
11 in trying to deal with -- with potential drugs of abuse?
12 **A. It became an issue.**
13 Q. Were you aware that she had been diagnosed
14 with bipolar disease sometime prior to having seen you?
15       MR. LONDON: Objection, form.
16 **A. Yes.**
17 Q. (By Mr. Ferguson) Do you know how long before
18 you had seen her?
19 **A. There was some mention about seeing doctors**
20 **for eight years, but I don't know whether she was**
21 **originally diagnosed with bipolar disorder at that time**
22 **or not.**
23 Q. So in any event, before she came to see you,
24 she had had a history of suicide attempts, of
25 prescription drug abuse, and of having been diagnosed

**100**

1  with bipolar disease.
2  **A. Yes.**
3  Q. Let's talk about your file that you've
4  brought, which I don't believe has been marked. There
5  are a number of documents in front of you. Can you,
6  first of all, hand me your chart on Ms. Barlow?
7  **A. This was the same one that's in Exhibit --**
8  Q. Right.
9  **A. -- A.**
10 Q. Okay. But it's -- What I'm trying to clarify
11 is they're not always exactly the same, because there
12 are always things we see in the charts that we don't
13 have in the production that we've gotten.
14       MR. LONDON: Objection to the comment.
15 Q. (By Mr. Ferguson) For example, Doctor, let
16 me -- let me first just identify the -- you gave us some
17 loose sheets here, two -- I'm just counting the pages --
18 **A. This goes along with that, if you want to**
19 **count all of them, to get the rest of them.**
20 Q. Okay. You've first of all given -- given me
21 nine pages, and some are front and back, I believe --
22 **A. (Nods head affirmatively.)**
23 Q. -- of handwritten notes; correct?
24 **A. Correct.**
25 Q. And I'm going to mark those as Exhibit 12 to

Case 1:04-cv-10981-PBS   Document 3097-1   Filed 10/15/10   Page 15 of 18

27 (Pages 105-108)

Irene Barlow v.
Pfizer, Inc., et al

Larry Flowers, M.D.
August 28, 2010

105

1  doesn't even apply to the patient.
2       MR. LONDON:  Is that on another patient?
3       THE WITNESS:  Yes.
4       MR. LONDON:  Okay.
5    A.  It doesn't -- Apparently it's like a refill,
6  medication refill, that doesn't apply to this patient.
7    Q.  (By Mr. Ferguson)  Okay, Doctor.  You can set
8  that down.  Let me -- Let me now turn to the documents
9  that were -- that were not stapled to but were loose in
10 the manila folder that's now marked as Exhibit 14.  I'm
11 going to mark these separately, just for ease of
12 reference.
13      (Flowers Exb. 15 was marked.)
14   Q.  (By Mr. Ferguson)  The first document I've
15 marked as Exhibit 15 appears to be a letter from -- from
16 Carl Pierce; correct?
17   A.  Correct.
18   Q.  And that's a letter to you, Dr. Flowers?
19   A.  Yes, it is.
20      (Flowers Exb. No. 16 was marked.)
21   Q.  (By Mr. Ferguson)  Okay. then Exhibit 16,
22 looks like maybe it's a -- looks like a phone message.
23 Can you -- Can you tell us who that phone message is
24 from, if it is in fact a phone message?
25   A.  From --  It's a phone message from Attorney

106

1  Carl Pierce.
2    Q.  And what's the substance of the phone message?
3       MR. LONDON:  Objection.
4    A.  Says there's a lawsuit suing the Pfizer --
5  well, they misspelled it -- Visor Pharmaceutical
6  Company.
7    Q.  (By Mr. Ferguson)  All right.  And it says
8  suing the -- it says "Visor Pharmaceutical Company/
9  please, Dr. Flowers, call my attorney and speak with
10 him.  Nothing against the doctor/just ND" or need "his
11 help."
12      Does that appear to be from your patient
13 or, again, do you know?
14   A.  I don't know, just --  It says from --  It
15 actually says "From: Patient Irene Barlow," and it gives
16 your phone number -- Austin -- 512-733 -- and then it --
17 the reason is to call attorney Carl Pierce regarding
18 suing Pfizer Pharmaceutical.
19   Q.  Okay.
20   A.  And speak with him.
21      (Flowers Exb. No. 17 was marked.)
22   Q.  (By Mr. Ferguson)  And then Exhibit 17 appears
23 to be another phone message sheet; correct?
24   A.  Correct.
25   Q.  And can you tell us what the substance of that

107

1  phone message is?
2    A.  The caller, Carl Pierce, attorney.  Litigation
3  in 2007, you may be asked to give a deposition.  They
4  need one hour of your time for a conference.
5    Q.  Did that conference ever take place?
6    A.  I believe it -- Yes, possibly this conference
7  took place.  Yes,
8    Q.  What's the date of that phone message?
9    A.  12-21 of '06.
10   Q.  Just for completeness, I'll mark this; but it
11 appears to be a --
12      (Flowers Exb. No. 18 was marked.)
13   Q.  (By Mr. Ferguson)  Exhibit 18 appears to be a
14 medical records request; correct?
15   A.  Yes, it is a medical records request.
16      (Flowers Exb. No. 19 was marked.)
17   Q.  (By Mr. Ferguson)  What is Exhibit 19?
18   A.  It's a Wright & --  It says from Wright &
19 Greenhill, P.C, Attorneys at Law, August 31st, 2004
20 notifying me that they represent Irene Barlow.  And I am
21 scheduled to be in Houston on Friday, September --  The
22 date of this is August 31st of 2004.  He stated "I'm
23 scheduled to be in Houston on Friday, September 17.  I
24 have an appointment with Dr. Alan Lloyd, another of
25 Mrs. Barlow's treating physicians.  Would it be possible

108

1  to meet with me the same day?"  From Carl Pierce.
2    Q.  Do you know whether that happened or not?
3    A.  I know I met with Mr. Pierce.  I just don't
4  know exactly when.
5    Q.  And in the -- in the first sentence of
6  Mr. Pierce's letter, he says that he represents "Irene
7  Barlow with regards to the claims she has against the
8  drug manufacturer of Neurontin."  And then she says the
9  drug -- the letter says, "The drug manufacturer promoted
10 Neurontin for off-label uses, including for bipolar
11 disorder, without appropriate scientific support for its
12 efficacy."
13   A.  Yes.
14   Q.  Is that --  Did I read that correctly?
15   A.  Yes, it does state this, uh-huh.
16   Q.  Okay.  So Mr. Pierce is writing you telling
17 them what their claims are.
18   A.  Right.
19   Q.  And then wanted to meet with you.
20   A.  Yes.
21      (Flowers Exb. No. 20 was marked.)
22   Q.  (By Mr. Ferguson)  Then Number 20 is just an
23 authorization, a HIPPA authorization?
24   A.  Correct.
25      (Flowers Exb. No. 21 was marked.)

109

1  Q. (By Mr. Ferguson) Number 21 is actually the
2  Original Petition filed by Ms. Barlow in Travis County
3  in this case; correct?
4      MR. LONDON: If you know.
5  A. That's what it appears to be.
6  Q. (By Mr. Ferguson) And do you know when you
7  received that?
8  A. I don't know when I received it specifically.
9  Q. Sometime before today.
10 A. Yes. Sometime before today.
11 Q. And did you read that?
12 A. Not in its entirety, I'm almost sure.
13 Q. Did you read part of it?
14 A. Probably part of it.
15     (Flowers Exb. No. 22 was marked.)
16 Q. (By Mr. Ferguson) Exhibit 22 is another
17 document that is -- appears to be a letter to Robert
18 Fiske and James P. Rouhandeh. Do you know when you
19 received that document?
20 A. I have no idea.
21     (Flowers Exb. No. 23 was marked.)
22 Q. (By Mr. Ferguson) Exhibit 23 is again a
23 letter from Mr. London, including a Scheduling Order?
24 A. Yes.
25     (Flowers Exb. No. 24 was marked.)

110

1  Q. (By Mr. Ferguson) And the last document is
2  Exhibit 24, just an Authorization for Release of
3  Information signed by Ms. Barlow.
4  A. Yes.
5  Q. Okay. So have we covered all of the documents
6  that you brought with you today?
7  A. Yes, we have.
8  Q. All right. Do you have any other documents
9  relating to Ms. Barlow?
10 A. None that I'm aware of.
11 Q. And you indicated that at some point in the
12 past -- you can't remember when -- you met with -- with
13 the lawyers for Ms. Barlow; correct?
14 A. Yes.
15 Q. And what was -- What was discussed? I'm not
16 talking about each question; but in generalities, what
17 was discussed at that meeting?
18 A. I guess a general summary is something to the
19 regards of whether or not it's a possibility gabapentin
20 plays a role in the demise and whether or not I knew, is
21 my best recollection, that gabapentin -- since -- in
22 some regards does not work in bipolar disorder.
23 Q. Did they tell you gabapentin didn't work in
24 bipolar disorder?
25 A. No. I think they -- The original thing was

111

1  more a feel-me-out sort of thing, more than telling me
2  anything, more feeling me out, what my views were, and
3  kind of letting me know where they were coming from.
4  Q. Okay. Was there one meeting with counsel with
5  the lawyers for Ms. Barlow or was there more than one
6  meeting?
7  A. One meeting way back when and then another
8  meeting a couple of days ago.
9  Q. Okay. And how long did the meeting a couple
10 days ago last?
11 A. About an hour, hour and a half, I would say.
12 Q. And was that with both Mr. Pierce and
13 Mr. London?
14 A. Yes, it was.
15 Q. Was the prior meeting with Mr. Pierce and
16 Mr. London?
17 A. I can't remember that far back --
18 Q. Fair enough.
19 A. -- to tell you.
20 Q. All right. What was the subject matter of the
21 discussion two days ago for an hour and a half?
22 A. That basically there was going to be a
23 deposition and that he wanted to ask questions
24 concerning my thoughts now regarding this Irene Barlow
25 case and what my thoughts and feelings were regarding

112

1  the use of Neurontin and the bipolar overall subject
2  area.
3  Q. Did you meet with them any today regarding
4  your deposition?
5  A. No.
6  Q. So there were two meetings total.
7  A. Yes.
8  Q. And did they essentially preview the questions
9  they were going to ask you today?
10 A. They talked about some of the questions they
11 were going to ask me.
12 Q. Did they show you some of the documents that
13 we've marked to the deposition?
14 A. Some of them, yes.
15 Q. Are there any other documents they showed you
16 that we haven't attached to the deposition?
17 A. No.
18 Q. Doctor, there was some discussion about
19 some -- some literature that I think they showed you.
20 Let me ask you this. In general, what journals do you
21 regularly review?
22 A. "American Psychiatric Journal" would probably
23 be the top journal, "Journal of Clinical
24 Psychopharmacology" and occasionally "Clinical
25 Neurology" -- Neurology.

Case 1:04-cv-10981-PBS   Document 3097-1   Filed 10/15/10   Page 17 of 18

43 (Pages 169-172)

Irene Barlow v.
Pfizer, Inc., et al

Larry Flowers, M.D.
August 28, 2010

169

1  Q. Including medications you still use today.
2 Correct?
3  **A. Correct. Yes.**
4  Q. Doctor, there was some discussion about
5 contacts that -- that you had with sales staff or
6 pharmaceutical representatives; correct?
7  **A. Correct.**
8  Q. Did you sometimes ask these pharmaceutical
9 representatives for information regarding off-label uses
10 of Neurontin?
11  **A. Yes.**
12  Q. And when you would ask them about information
13 regarding off-label uses, in -- in response to that
14 would they sometimes at a later date have someone
15 provide literature for you?
16      MR. LONDON: Objection, form.
17  **A. Generally, the way it goes, is they will plug**
18 **into their computers that you wrote a question and then**
19 **they tell you that they will mail an article back to**
20 **you.**
21  Q. (By Mr. Ferguson) So they weren't handing
22 literature to you regarding off-label uses at the
23 meetings.
24  **A. No.**
25  Q. Okay. And they entered it as you saw -- When

170

1 you raised a question, they entered it into their
2 computer; correct?
3  **A. Correct.**
4  Q. And then at a later time, you would get
5 something in the mail.
6  **A. Correct.**
7  Q. So at -- at times you would initiate a
8 discussion about off-label uses that you had heard
9 about; correct?
10  **A. Generally what will happen is, when you are**
11 **talking AEs, the first thing that's going to come up:**
12 **Is this new AE going to work in bipolar disorder? The**
13 **buzz is going to be over at your continuing medical**
14 **education. Somebody's already -- guarantee you -- tried**
15 **it. And you may want more -- some information about it.**
16 **They are aware that there's a buzz about it, so then you**
17 **ask a question, they'll give you an article.**
18  Q. You ask a question and then they can give you
19 a response.
20  **A. Yes.**
21  Q. Mr. London showed you a portion of a -- of a
22 deposition of a Pfizer person or what he represented to
23 be a Pfizer person; correct?
24  **A. Yes. I believe. Yes.**
25  Q. You've never seen that before.

171

1  **A. No.**
2  Q. With regard to all the medications that you
3 prescribe, many of which we've talked about today, have
4 you ever seen testimony or deposition testimony from
5 employees of that company before prescribing their
6 medications?
7  **A. No.**
8  Q. Normally you don't review testimony of
9 employees of the company before you prescribe
10 medications; correct?
11  **A. Correct.**
12  Q. When you prescribe medications, do you
13 typically review internal documents of the company
14 regarding their -- that particular medication?
15  **A. No.**
16  Q. That's not one of your normal sources of
17 information; is it?
18  **A. No.**
19  Q. Mr. London pointed out to you an article, I
20 believe, authored by a Dr. Patel (sic). Do you recall
21 that?
22      MR. LONDON: Pande.
23  Q. (By Mr. Ferguson) Pande. I'm sorry.
24      MR. LONDON: That's all right. I know
25 him well.

172

1  Q. (By Mr. Ferguson) Right, Doctor?
2  **A. Yes.**
3      MR. FERGUSON: I should, too.
4  Q. (By Mr. Ferguson) Doctor, Mr. London showed
5 you an article by Dr. Pande; correct?
6  **A. Correct.**
7  Q. Have you done a literature search to determine
8 what other information, if any, there is regarding the
9 efficacy of Neurontin in bipolar -- bipolar disease?
10  **A. No, not a -- not a literature search, but**
11 **there are papers that exist.**
12  Q. You have seen papers on that?
13  **A. I have -- I've attended seminars where -- I**
14 **won't say it's a paper. I'll say that they will discuss**
15 **the use of Neurontin in a range of things, anxiety,**
16 **bipolar, just the whole gamut, pain, all that it's used**
17 **for.**
18  Q. And have you seen any information regarding
19 Neurontin and bipolar, other than this one article
20 that -- by Dr. Pande that Mr. London pointed out to you?
21  **A. The other article, the Rayback (sic) article,**
22 **those were the two articles.**
23  Q. Okay. Other than those --
24  **A. The Ryback.**
25  Q. -- two articles, anything else?

**Page 181**

1  A. -- the norm.
2  Q. Would it be fair to characterize bipolar
3  patients as being known within the medical community as
4  patients who are kind of walking along on the edge of
5  the cliff and it's your job to keep them from falling
6  off that cliff?
7       MR. FERGUSON: Object to form.
8  A. Certainly those who suffer from moderate and
9  severe symptoms of bipolar disorder --
10 Q. (By Mr. London) All right, sir.
11 A. -- that as opposed to mild, yes, certainly.
12 Q. Well, do you believe it's right for a
13 pharmaceutical company to promote a drug for bipolar
14 condition, and that pharmaceutical company's own
15 clinical research and research scientists know that it
16 does not work effectively for bipolar patients?
17      MR. FERGUSON: Object to form.
18 A. No, that's not appropriate.
19 Q. (By Mr. London) Okay. Do you think it's
20 right for a pharmaceutical company to not tell doctors
21 like you the things that we looked at today, where their
22 medical director has not read their own clinical
23 research before approving a message that it's useful for
24 a wide range of psychiatric conditions? Do you believe
25 that's right?

**Page 182**

1       MR. FERGUSON: Object to form.
2  A. No.
3  Q. (By Mr. London) Do you believe it's right for
4  them to not disclose to doctors just like you that it's
5  known to increase depression, as seen in their own
6  clinical trials?
7       MR. FERGUSON: Object to form.
8  A. No.
9  Q. (By Mr. London) Do you believe that it's
10 right for them to withhold information from you that is
11 not in the label when it's known that doctors just like
12 you are using this off-label to treat patients like
13 Mrs. Barlow for a condition that's not approved?
14      MR. FERGUSON: Object to form.
15 A. No.
16 Q. (By Mr. London) All right, sir. Mr. Ferguson
17 asked you to read the adverse effect in the 2000 label.
18 Do you regard -- recall that?
19 A. Yes.
20 Q. Just for the judge, jury, and our sake, where
21 in the hierarchy of severity do doctors like you regard
22 conditions in the label to be the most important?
23 Warnings? Contraindications? Or adverse events?
24 A. Certainly adverse events are the least in our
25 hierarchy in terms of what can happen, because adverse

**Page 183**

1  events is almost anything under the sun.
2  Q. All right, sir. If we just look at the
3  exhibit that Mr. Ferguson gave us before, that's
4  Exhibit 25; and I'm just going to give you my copy.
5  What are the very first adverse events that are listed
6  under Neurontin in the PHYSICIANS' DESK REFERENCE in
7  2000?
8  A. It has musculoskeletal system with adverse
9  events under 2000 --
10 Q. That's the 2000 PHYSICIANS' DESK REFERENCE, if
11 I understood Mr. Ferguson correctly. And I believe it.
12 And I have highlighted --
13 A. After the --
14 Q. I've highlighted it.
15 A. The highlighted section has "Other events in
16 more than 1 percent of patients but equally or more
17 frequent in the placebo group included: headache, viral
18 infection, fever, nausea and/or vomiting, abdominal
19 pain, diarrhea, convulsions, confusion, insomnia,
20 emotional lability, rash," and "acne."
21 Q. All right, sir. Now, if you'll just do this
22 one favor for me, do you see where I marked, as you were
23 answering Mr. Ferguson's questions, the center of the
24 right-hand page with three underlines, "Frequent,"
25 "Infrequent," "Rare," and the two words "suicide." Do

**Page 184**

1  you see that?
2  A. Yes.
3  Q. Okay. If you would just turn and hold that up
4  to the camera, and I need the camera operator to focus
5  in on that for a second.
6       MR. LONDON: Tell me when you've got it.
7       THE VIDEOGRAPHER: The highlighted
8  portion?
9       MR. LONDON: The whole page.
10      THE VIDEOGRAPHER: All right.
11      MR. LONDON: And I'm going to point my
12 pen at this in just a second.
13      THE VIDEOGRAPHER: Got it, sir.
14 Q. (By Mr. London) Here, in the yellow, we have
15 the first part that you read off about headaches and
16 diarrhea and dizziness. How far beyond that would a
17 doctor like you have to read and read and read and read
18 before he ever got to the word "suicidal"?
19      MR. FERGUSON: Object to form.
20 A. You would have to read a pretty far way down.
21 Q. (By Mr. London) And would you ordinarily read
22 that in the adverse events?
23 A. I would say ordinarily what we do is we look
24 at the -- what they highlight as the most frequent side
25 effects and symptoms. We rarely will go through a