UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

| | |
|---|---|
| In re: NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1629<br><br>Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO:<br><br>HARDEN MANUFACTURING CORPORATION; LOUISIANA HEALTH SERVICE INDEMNITY COMPANY, dba BLUECROSS/BLUESHIELD OF LOUISIANA; INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL NO. 68 WELFARE FUND; ASEA/AFSCME LOCAL 52 HEALTH BENEFITS TRUST; GERALD SMITH; and LORRAINE KOPA, on behalf of themselves and all others similarly situated, v. PFIZER INC. and WARNER-LAMBERT COMPANY. | Judge Patti B. Saris<br><br>Magistrate Judge Leo T. Sorokin |

## DEFENDANTS' RESPONSE TO PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY

Defendants Pfizer Inc and Warner-Lambert Company LLC (collectively, "Pfizer" or "Defendants"), respectfully respond to the Notice of Supplemental Authority [3090] ("Notice") submitted by Plaintiffs[1] on October 6, 2010. As discussed below, *Lee v. Carter-Reed Co.*, No. A-38 SEPT. TERM 2009, 2010 WL 3781595 (N.J. Sept. 30, 2010), is both legally and factually distinguishable and has no bearing on this case.

### I. The *Lee* Court Applied a Procedural Standard that Is Fundamentally at Odds with Federal Jurisprudence

In *Lee*, the New Jersey Supreme Court allowed certification of a statewide consumer class alleging that the defendant's marketing of the over-the-counter diet supplement Relacore violated the New Jersey Consumer Fraud Act ("NJCFA"). The court addressed the issue of class certification under a procedural standard specific to New Jersey state courts, which is directly

---

[1] As used herein, "Plaintiffs" and "Class Plaintiffs" refer collectively to Louisiana Health Service Indemnity Company dba BlueCross/BlueShield of Louisiana, ASEA/AFSCME Local 52 Health Benefits Trust, Harden Manufacturing Corporation, Gary L. Varnam, and Jan Frank Wityk.

contrary to the governing standard in the First Circuit. The *Lee* court held that, "at the class-certification stage, a court must 'accept as true all of the allegations in the complaint, and consider the remaining pleadings, discovery . . . , and any other pertinent evidence in a light most favorable to plaintiff.'" *Lee*, 2010 WL 3781595, at *1 (citations omitted). Only by assuming the truth of the plaintiffs' allegations was the court able to find that common issues predominated. *See id.* at *13 ("[Causation] is not so problematic from a class-wide perspective if the allegations in plaintiff's complaint are accepted as true.").

In stark contrast, federal courts within the First Circuit must "'probe behind the pleadings,'" "'evaluate the plaintiff's evidence . . . critically,'" and "'test disputed premises [at the certification stage] if and when the class action would be proper on one premise but not another.'" *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 17 (1st Cir. 2008) (citations omitted) (alterations in original); *accord In re Neurontin Mktg. & Sales Practices Litig.*, 244 F.R.D. 89, 104 (D. Mass. 2007). As the First Circuit has explained,

> [i]t would be contrary to the "rigorous analysis of the prerequisites established by Rule 23 before certifying a class" to put blinders on as to an issue simply because it implicates the merits of the case.

*In re New Motor Vehicles*, 522 F.3d at 17 (citation omitted).

Other federal circuits have likewise rejected the notion that district courts should accept plaintiffs' allegations as true when determining whether plaintiffs have satisfied the prerequisites to class certification. For example, the Seventh Circuit has held that this notion "cannot be found in Rule 23 and has nothing to recommend it." *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 675 (7th Cir. 2001). The Second Circuit explained that the prior reluctance of certain federal courts to consider merits issues at the class certification stage was based on a misreading of *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974). *See In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 33 (2d Cir. 2006). Properly construed, *Eisen* provides "no basis for thinking that a specific Rule 23 requirement need not be fully considered just because it concerns, or even overlaps with, an aspect of the merits." 471 F.3d at 33. To the contrary, federal district courts

must make a "definitive assessment of Rule 23 requirements, notwithstanding their overlap with merits issues." *Id.* at 41; *see also Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815 (7th Cir. 2010) ("[A] district court must make whatever factual and legal inquiries are necessary to ensure that requirements for class certification are satisfied before deciding whether a class should be certified, even if those considerations overlap the merits of the case.").

In short, the procedural standard applied in *Lee* is completely at odds with modern federal jurisprudence. Even though Plaintiffs' NJCFA claim arises under state law, the federal procedural standard for evaluating class certification still applies. *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 130 S. Ct. 1431, 1444 (2010).

## II. *Lee* Is Distinguishable Because It Did Not Involve Prescription Drugs and Causation Did Not Depend on the Decisions of Unidentified Non-Party Doctors

Plaintiffs' Notice only addresses their NJCFA claim, and does not argue that *Lee* supports certification under any legal theory. Plaintiffs' suggestion that their NJCFA claim does not suffer from the same deficiencies as their other claims must be rejected. While the *Lee* court emphasized that reliance is not an element of a NJCFA claim, the court acknowledged that the plaintiffs must still prove causation, *i.e.*, that each class member "suffered an ascertainable loss 'as a result of' the unlawful practice." *Lee*, 2010 WL 3781595, at *11 (citation omitted).

Whatever distinction the *Lee* court seeks to draw between reliance and causation in the context of an over-the-counter diet supplement, no such meaningful distinction can be made here. Because Neurontin is a prescription drug, causation depends on the prescription decisions of unidentified non-party doctors. This Court has already recognized that, "as a practical matter, plaintiffs cannot prove causation in this case without demonstrating reliance" by these prescribing doctors. *In re Neurontin Mktg. Sales Practices & Prods. Liab. Litig.*, 257 F.R.D. 315, 326 n.6 (D. Mass. 2009) ("*Neurontin II*"). Likewise, the Second Circuit recently reversed certification of a pharmaceutical marketing class action because "[t]he nature of prescriptions . . . means that [plaintiffs'] theory of causation is interrupted by the independent actions of prescribing physicians, which thwarts any attempt to show proximate cause through generalized

proof." *UFCW Local 1776 v. Eli Lilly & Co.*, No. 09-0222-cv, 2010 WL 3516183, at *13 (2d Cir. Sept. 10, 2010) ("*Zyprexa*") (to be published in F.3d).[2]

Even putting aside the procedural issues discussed above, *Lee* is easily distinguishable from this matter. The *Lee* court did not hold that "where the product is alleged to be worthless, reliance on the defendants' misrepresentations may be presumed." (Notice at 2.) The court instead suggested that a jury could infer causation in very narrow circumstances not present here, namely, where consumers' only source of information about the product is defendant's alleged false advertising and where all of the product's claimed benefits are "fictional." *Lee*, 2010 WL 3781595, at *13-14. Only by granting plaintiffs the benefit of these assumptions under New Jersey procedural standards was the *Lee* court able to suggest that the jury could infer causation without individualized inquiries.

Here, the relevant purchase decisions were made by prescribing doctors, not consumers. Prescribing doctors' sources of information about Neurontin include "a wide variety of influences unrelated to the three components of defendants' alleged fraud," such as "information . . . about Neurontin from fellow doctors," "personal experience in successfully using the drug with other patients," and "[Neurontin's] relatively benign set of side effects." *Neurontin II*, 257 F.R.D. at 330; *see also Zyprexa*, 2010 WL 3516183, at *13 ("[Defendant] was not, however, the *only* source of information on which doctors based prescribing decisions."). And unlike Relacore, which allegedly offered no benefits of any kind, Neurontin is an FDA-approved anti-epileptic drug ("AED"). Plaintiff Wityk's doctor prescribed Neurontin to bipolar patients because, as an AED, it belongs to a class of drugs "'widely known and widely accepted as a

---

[2] Class Plaintiffs have conspicuously failed to respond to Defendants' Notice of Supplemental Authority regarding the *Zyprexa* decision [3067], filed nearly a month ago. The *Kaiser* plaintiffs did file a response in which they unsuccessfully attempt to distinguish *Zyprexa* by claiming to have "[d]irectly [r]elied" on the alleged misrepresentations. (Kaiser Resp. to Defs' Notice of Supp. Auth. [3088] at 2.) But Class Plaintiffs, who are represented by the same counsel, have failed to address *Zyprexa* or its implications to the issue of class certification. As discussed below, the Class Plaintiffs have already unequivocally admitted that they did not rely on the alleged fraudulent marketing and thus cannot satisfy the *Zyprexa* standard.

treatment for bipolar disorder.'" *Neurontin II*, 257 F.R.D. at 330 (citation omitted). Doctors could also have based their prescription decisions on scientific evidence supporting Neurontin's use in treating some subpopulations of patients with bipolar and comorbid mood disorders.[3] At a minimum, determining whether each bipolar patient was prescribed Neurontin based on scientific evidence of its effectiveness in treating comorbid mood disorders would present individualized causation issues.[4] In short, doctors could have prescribed Neurontin to bipolar patients for any number of reasons unrelated to the allegedly fraudulent marketing. The FDA and the NJCFA do not regulate such prescription decisions and Plaintiffs' disagreement with such decisions does not negate the individualized causation issues.

The more applicable New Jersey authority is not *Lee*, but *International Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co.*, 929 A.2d 1076 (N.J. 2007) ("*Vioxx*"), in which the New Jersey Supreme Court reversed class certification of pharmaceutical marketing claims under the NJCFA. Despite noting that reliance is not an element under the

---

[3] For example, while the results of the Frye bipolar study published in 2000 were negative, Dr. Frye, of the National Institute of Mental Health, presented interim data to the American Psychiatric Association in 1997, reporting that gabapentin "hold[s] promise as adjunctive or alternative therap[y] for patients with mood disorder" and "may ultimately become [an] important addition[] to the mood disorder pharmacopeia." (2/24/10 Kaiser Tr. (Abramson) at 81:3-85:8.) There is also Level I evidence supporting Neurontin use for bipolar disorder, although these studies were published after the proposed class period. For example, one randomized controlled trial ("RCT") showed gabapentin's efficacy in a subset of bipolar patients. *See* Eduard Vieta et al., *A Double-Blind, Randomized, Placebo-Controlled, Prophylaxis Study of Adjunctive Gabapentin for Bipolar Disorder*, 67 J. Clinical Psychiatry 473 (2006). Another RCT conducted independently of Defendants concluded that gabapentin is effective in treating "dysphoric mania" – a particularly dangerous form of bipolar disorder that has the highest suicide rate. *See* Naghmeh Mokhber et al., *Anticonvulsant treatments of dysphoric mania: a trial of gabapentin, lamotrigine and carbamazepine in Iran*, Neuropsychiatric Disease & Treatment, Feb. 2008, at 227.

[4] There is legitimate scientific evidence, including Level I evidence, supporting Neurontin's effectiveness in treating anxiety disorders, panic disorders, and social phobia – psychiatric disorders that commonly occur in patients with bipolar disorder and that are characterized by symptoms that substantially overlap with the symptoms of bipolar disorder. *See, e.g.*, Atul C. Pande et al., *Treatment of Social Phobia with Gabapentin: A Placebo Controlled Study*, 19 J. Clinical Psychopharmacology 341 (1999); Atul C. Pande et al., *Placebo-Controlled Study of Gabapentin Treatment of Panic Disorder*, 20 J. Clinical Psychopharmacology 467 (2000). Even Plaintiffs' generic efficacy experts in this litigation have not contended that the efficacy of Neurontin to treat anxiety lacks Level I evidence. (*See* 2/26/10 Kaiser Tr. (Barkin) at 52:12-53:4, 70:17-71:4, 75:7-14; *see also* 2/24/10 Kaiser Tr. (Abramson) at 100:13-106:2.)

NJCFA, the court held that the alleged "commonality of defendant's behavior is but a small piece of the required proofs." *Id.* at 1087. The court further held that plaintiffs could not establish an ascertainable loss on a class-wide basis "through use of a single expert." *Id.* at 1088. As this Court has already recognized, "*Vioxx* . . . forecloses the instant plaintiffs' motion to certify indication-specific Consumer subclasses under the New Jersey Consumer Fraud Act." *Neurontin II*, 257 F.R.D. at 324.

In *Lee*, the New Jersey Supreme Court distinguished *Vioxx* by emphasizing that the proposed *Vioxx* class comprised "diverse entities, which the plaintiff did not suggest 'reacted in a uniform or even similar manner' to the same information broadcast by [defendant]." *Lee*, 2010 WL 3781595, at *16 (citation omitted). Here, the third-party payor Plaintiffs ("Class TPPs") have conceded that they did not rely in any manner on the alleged fraudulent marketing. (*See* Class Pls. Mot. Recons. Order Denying Renewed Mot. Class Cert. [1796] at 18.) But individualized evidence regarding each TPP's policies and procedures is still necessary to determine what (if anything) each TPP would have done differently in the but-for world had allegedly suppressed Neurontin studies been made public. Moreover, the Class TPPs cannot avoid *Vioxx* by attempting to shift the causation inquiry from their own decisions to the prescribing decisions of non-party doctors. As this Court has recognized, the "immediately apparent" "ramification[]" of *Vioxx* is that, "[w]here . . . doctors . . . react differently to a misrepresentation, a presumption of reliance cannot be utilized to satisfy the predominance requirement under the NJCFA." *Neurontin II*, 257 F.R.D. at 324. Accordingly, this Court correctly denied class certification.

### III. The NJCFA Does Not Apply to Plaintiffs' Claims or to the Vast Majority of Putative Class Members' Claims

#### A. The NJCFA Cannot Be Applied to Claims and Transactions that Occurred Outside of New Jersey

Plaintiffs' supplemental authority addressed only claims by "New Jersey consumers," and clearly noted that it does not support "certification of a ***nationwide*** class-action Consumer

Fraud Act lawsuit." *Lee*, 2010 WL 3781595, at *1, *16. Here, only one of the named Plaintiffs – International Union of Operating Engineers, Local No. 68 Welfare Fund ("Local 68") – is domiciled in New Jersey. (*See* Third Amended Class Action Complaint ("TACAC") [580] ¶ 6.)[5]

The NJCFA cannot be applied to non-residents' pharmaceutical marketing claims. *See In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 82-83 (D. Mass. 2005) ("*A.W.P.*") (Saris, J.) (holding that class members' marketing claims are governed by the consumer protection laws of each class member's home state); *Cooper v. Samsung Elecs. Am., Inc.*, 374 F. App'x 250, 255 (3d Cir. 2010) (plaintiff who purchased defendant's product in another state "is not entitled to sue under the [NJCFA]"); *Agostino v. Quest Diagnostics Inc.*, 256 F.R.D. 437, 461-63 (D.N.J. 2009). In *Agostino*, the District of New Jersey denied certification of a nationwide NJCFA class, "finding that each state has an overwhelming interest in seeing its own consumer protection statute govern in cases where residents were victims of fraud perpetrated within the state's borders." 256 F.R.D. at 463. The Third Circuit has indicated that it agrees with *Agostino*. *See Nafar v. Hollywood Tanning Sys., Inc.*, 339 F. App'x 216, 220-21 (3d Cir. 2009) (vacating certification of nationwide NJCFA class and directing trial court to "conduct a choice of law analysis . . . looking to the Restatement and *Agostino*"). And this Court has already adopted the same reasoning applied in *Agostino*. *See A.W.P.*, 230 F.R.D. at 82-83.

### B. The Class TPPs Cannot Recover Under the NJCFA Because They Are Not Consumers

Two recent decisions confirm that Local 68 and any New Jersey-based members of the proposed TPP class "are not 'consumers' entitled to sue under the NJCFA." *In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, No. 2:06-cv-5774, 2009 WL 2043604, at *31 (D.N.J. July 10, 2009), *cited with approval in In re Neurontin Mktg. & Sales Practices Litig.*, 677 F. Supp. 2d 479, 495, 498 (D. Mass. 2010) ("*Neurontin III*"); *accord Cent. Reg'l Employees Benefit Fund v. Cephalon, Inc.*, No. 09-3418, 2009 WL 3245485, at *3 (D.N.J. Oct.

---

[5] As discussed below, Local 68 cannot recover under the NJCFA because it is not a "consumer" of Neurontin. *See* Section III.B, *infra*.

7

7, 2009). To be a "'consumer . . ., the business entity must "be one who uses [economic] goods and so diminishes or destroys their utilities."'" *Schering-Plough*, 2009 WL 2043604, at *32 (alteration in original) (citation omitted). The Class TPPs do not qualify because they

> do not purchase drugs for their own use or consumption. Rather, they contract with beneficiaries to receive a stream of payments which, in turn, obligates them to pay for all or part of the cost of drugs prescribed to and purchased by their beneficiaries.

*Id.* at *31; *see also Cephalon, Inc.*, 2009 WL 3245485, at *3 ("Because third-party payors do not use or consume prescription medications themselves, they are not 'consumers' within the meaning of the NJCFA . . . .").

## IV. The Issue of Class Certification Is Moot Because the Class TPPs Cannot Survive Summary Judgment

Class certification is moot because the Class TPPs' concession that they did not make any formulary or repayment decisions as a result of Defendants' alleged representations is fatal to their claims. (*See* Mem. Opp. Class Pls' Mot. Re: "Guardian" Ruling [2539] at § I.) In granting summary judgment against Coordinated TPPs Aetna and Guardian, this Court recognized the "almost uniform[]" rule that "a plaintiff TPP or class must prove through individualized evidence that the misrepresentation caused specific physicians, TPPs, or consumers to rely on the fraud, and cannot rely on aggregate or statistical proof." *Neurontin III*, 677 F. Supp. at 494, 496. The Second Circuit recently strengthened this Court's holding by eliminating the only exception to this "almost uniform[]" line of authority. *See Zyprexa*, 2010 WL 3516183, at *11 (holding that "plaintiffs' excess price theory is not susceptible to generalized proof with respect to either but-for or proximate causation").

This Court granted summary judgment as to Aetna and Guardian because they did not present evidence that they "directly relied" on any purported misrepresentation or omission made to them. *Neurontin III*, 677 F. Supp. 2d at 497. The Class TPPs have not only failed to present evidence of direct reliance, they have expressly disavowed any such claim. (*See* Class Pls. Mot. Recons. Order Denying Renewed Mot. Class Cert. [1796] at 18.) The Class TPPs' certification

arguments ignore the fact that their claims cannot survive summary judgment.

## CONCLUSION

For all the reasons set forth above, Defendants respectfully submit that *Lee v. Carter-Reed Co.*, No. A-38 SEPT. TERM 2009, 2010 WL 3781595 (N.J. Sept. 30, 2010), is inapposite to the issues currently under consideration by the Court.

Dated: October 20, 2010

Respectfully submitted,

SKADDEN, ARPS, SLATE, MEAGHER
 & FLOM LLP

By:  /s/ Mark S. Cheffo
     Mark S. Cheffo

Four Times Square
New York, NY 10036
Tel: (212) 735-3000
Mark.Cheffo@skadden.com

-and-
ROPES & GRAY LLP

By:  /s/ Ana M. Francisco
     Ana M. Francisco
     BBO # 564346

Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
Tel: (617) 951-7000
Ana.Francisco@ropesgray.com

*Attorneys for Defendants Pfizer Inc and Warner-Lambert Company LLC*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on October 20, 2010.

/s/ Ana. M. Francisco
Ana M. Francisco