UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE NEURONTIN MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | ) ) ) ) ) | MDL Docket No. 1629<br><br>Mast File No. 04-10981<br>Judge Patti B. Saris<br>Magistrate Judge Leo T. Sorokin |
| THIS DOCUMENT RELATES TO:<br>*Barlow v. Pfizer Inc, et al.*<br>*Case No. 1:05-cv-11501-PBS* | ) ) ) ) | |

**PLAINTIFF IRENE BARLOW'S REPLY MEMORANDUM IN OPPOSITION TO
DEFENDANT'S EMERGENCY MOTION FOR AN ORDER PROHIBITING IMPROPER
TACTICS DURING FACT WITNESS DEPOSITIONS AND IMPOSING SANCTIONS
(DOCUMENT 3095 – 3096)**

## INTRODUCTION

By statute and case authority, a plaintiff who sues a pharmaceutical company in Texas and charges that the label was not adequate to warn the prescribing doctor must prove that if the doctor had been adequately warned of the risks he would have changed his treatment.   V.A.T.S. Civil Practices and Remedies Code, §82.007, (a), (b) (3).

Plaintiff's counsel asked in deposition of Dr. Flowers, the doctor who prescribed Neurontin to Mrs. Barlow at the time of her two suicide attempts, whether he knew at the time he prescribed it that (1) Warner-Lambert had conducted random controlled studies that showed that Neurontin does not work for mania; (2) that the medical director, Dr. Glanzman, admitted to having not read the studies or the FDA safety studies despite knowing that there was safety information not disclosed in the drug label, and (3) that the company admitted that while it had promoted Neurontin to doctors off label, its label did not adequately inform doctors how to treat bipolar patients with Neurontin, facts contained only in the misbranding paragraph of the criminal information and plea.  He also was asked whether he knew that Neurontin increased the risk of suicide and whether he had specifically discussed suicide with Mrs. Barlow when he

prescribed it. His testimony was that he did not know any of those facts at the time he prescribed Neurontin and that, if he had known those facts, he would have chosen other treatment for Mrs. Barlow.

This line of questioning to a prescribing doctor is required under Texas law. Laying a foundation by making facts known to a witness during a proceeding is expressly authorized by Fed.R.Evid.703. Defendant's claim that doing so with the misbranding plea and Dr. Glanzman's testimony was an improper deposition tactic is frivolous. Both Dr. Glanzman's testimony and the criminal plea have been deemed relevant and admissible by Judge Saris, Judge Young, and Judge Trauger in the Track One cases. (Exhibit A). Thus, there was a legitimate basis for the foundation questions and whether Dr. Flowers would have changed his choice of treatment if he had known those foundation facts at the time, evidence that Mrs. Barlow must prove or lose her case by summary judgment. Dr. Flowers' testimony is based on his treatment of Mrs. Barlow and should be heard by the jury.

Mrs. Barlow's counsel did indeed send two letters to Dr. Flowers six years before the deposition, and five years before Judge Saris's order of November 18, 2009. There is more to the story, however. During that exact time, Pfizer sent its entire field force directly into doctors' offices for *ex parte* contacts on Pfizer's 'talking points' about the Neurontin criminal plea, loaded with misleading information. These "DO NOT LEAVE BEHIND" talking points were orchestrated by Pfizer's legal department. (Exhibit C).

Defendant's motion regarding deposition tactics and those letters is frivolous. This reply memorandum will address, first, the matter of Dr. Flowers' deposition and, second, the matter of the letters.

## I.    DR. FLOWERS' DEPOSITION

A.     Plaintiffs had a duty under Texas law to ask Dr. Flowers about the subjects that defense counsel claim to have been irrelevant and improper tactics.

This is a failure to warn / learned intermediary case in which Mrs. Barlow has the burden of proof under Texas law to overcome a statutory rebuttable presumption that the drug label warnings were adequate. By law, she must show that Neurontin was promoted off-label to her doctor without adequate warnings. V.T.C.A., Civil Practice & Remedies Code § 82.007 (2003).

Mrs. Barlow also has the affirmative burden of proof, under Texas law, to demonstrate that her doctor did not know of the risks or inadequate warnings and would have chosen other drugs or warned her specifically about suicide risks if he had known. See *McNeil v Wyeth*, 462 F.3d 364, (5th Cir. Texas 2006*); Ebel v Eli Lilly & Co.,* 321 Fed.Appx. 350 (5th Cir. Texas 2009).

B.     The deposition questions were directed to whether Dr. Flowers would have chosen different treatment if he had known facts he did not know.

Dr. Flowers took over Mrs. Barlow's care from Dr. Atwal in August 2000. He raised her Neurontin from 600 mg per day to 2000 mg per day to control the mania of her bipolar condition. (Flowers deposition: 16:12 - 17:16) [1]. This was by far the highest dose she ever had. Soon, in November 2000, she attempted suicide. He hospitalized her and reduced her dose to 400 mg day. (Flowers deposition: 27: 19-23). He released her from the hospital after a few days, finding her to be no longer suicidal. Then, in December 2000, he again increased her dose to 2000 mg per day (Flowers deposition: 35:25 -- 36:13). It was while on Dr. Flowers's increased prescription that Mrs. Barlow again attempted suicide, shooting herself through the chest in January, 2001. (Exhibit D)[2].

---

[1] All Flowers deposition excerpts are in Exhibit K.
[2] The defense memorandum says incorrectly that Dr. Flowers was not her doctor 'at the time of her suicide attempt.' As a psychiatrist, he did not perform surgery on her gunshot wound, lacerated hepatic vein, tracheostomy, or thoracostomy. The hospital records, Exhibit D, pps. 124-125, state to call Dr. Flowers and lists his phone number.

It is in this context that questions were asked to Dr. Flowers about the company records dated July 1998 -- September 2001.  These documents proved that Neurontin does not work for mania and that, long before and during Dr. Flowers' treatment of Mrs. Barlow, the Defendants knew from their own placebo random controlled trial on bipolar patients that Neurontin was not efficacious and was actually worse than a placebo.

Exhibit E is an email among the Warner-Lambert scientists in charge of Neurontin which says that bipolar random controlled trial was the best they had and it was negative.  Dr. Pande, in charge of defendants' Neurontin clinical trials, went on to say "There is pretty good consensus among experts in the area that gabapentin is not a good anti-manic treatment."

Exhibit F is a letter Dr. Pande wrote a full year before Dr. Flowers treated Mrs. Barlow to tell one of Warner-Lambert's clinical investigators that the bipolar trial was a failure.  "To the contrary, placebo patients showed a greater decrease in the YMRS score than the gabapentin patients."[3]

Dr. Flowers did not know these facts.  He was asked, (Flowers deposition 63:14 - 64:3):

Q:    All right, sir. When you administer a medication for a bipolar patient, do you want it to be effective?
A:    Yes

Q:    Would you like to have known that the company that manufactured this drug had studied it and found that it was not effective?

A:    Yes.

Q:    Why would you like to have known that?

A:    Because it would give me other choices that I could potentially use.

It continued:  (Flowers deposition 64:11 – 64:22):

Q:    If you had known that the company had conducted a random-controlled placebo-blinded study that indicated it did not benefit bipolar patients mania condition, would you have liked to have known that at that time?

---

[3] YMRS is the Young Mania Rating Scale.  A decrease in the scale is an improvement in the patient.

A:     Yes

Q:     Why?

A:     Because, again, it could give me other choices that I could use … of meds.

(Flowers deposition, 74:22- 75:3)

Q:     All right, Sir.  Did any Parke Davis sales representative ever disclose to you in 1998, 1999, 2000, 2001 or at any other time that placebo patients did better than gabapentin patients in the bipolar trials?

A: No.

Rather than alert the Court to this testimony the defense memorandum says "*after presenting these company documents, Mr. London then showed the witness a copy of the criminal information… and informed him of the guilty plea,*" strongly suggesting to the Court that this was some sort of atomic bomb that was designed to shock and prejudice the witness. On the contrary, after the questions concerning the failed placebo bipolar trial, counsel next presented to Dr. Flowers the testimony of Dr. Glanzman that Judge Young admitted in evidence to the jury during the trial of *Shearer v Pfizer*  (contained within Exhibit A).

Dr. Glanzman was the defendants' medical director for Neurontin during the exact period that Mrs. Barlow was taking high doses of Neurontin and attempting to kill herself in November 2000 – January 2001.  He testified that he did not review the psychiatric literature of Neurontin's uses in treating bipolar disorder but did approve a company message that it was effective against a wide range of neurologic and psychiatric conditions.  (Flowers deposition 76:9 - 78:17).  Dr. Glanzman testified that he could not say if his approval was correct or not and that he did not do a thorough review of psychiatric conditions.  He also testified that it was his job to do that and if he didn't do it, no one did.  (Flowers deposition, 78:18 - 79:18).  Dr. Glanzman testified that he never read the FDA's integrated summary of safety on Neurontin but did know the label did not contain all the relevant safety information about Neurontin, safety concerns that the company

knew at the time.  (Flowers deposition, 80:20 - 81:11).  The Glanzman testimony was made known to Dr. Flowers on the record before any questions were asked about the plea.

Dr. Flowers testified that he did not know the facts testified to by Dr. Glanzman but he would have liked to have known those facts.  (Flowers deposition 82:24 - 83: 5):

Q:     Why would you have liked to have known that?

A:     Because it clearly gives me other choices to make…. That might have been proven to work.

To further put in context the questions regarding the defendants' failure to warn Dr. Flowers about the risks of Neurontin, he was next asked about his use of the product label and of the Physicians' Desk Reference.  His testimony was that he did not know that the defendants' trials showed that patients taking 1800 mg per day of Neurontin were observed to have an increase in depression over patients on placebo.  Counsel then asked Dr. Flowers (Flowers deposition, 87:4 - 10):

Q: Would you like to have known that?

A: Yes

Q: Why?

A: Because it gives me the alternative to use other choices.

Defendant also overlooks at least two other significant facts about the deposition.  Dr. Flowers testified that the risk of suicide from Neurontin was not in the warnings or contraindication portions of the product label for doctors during the period he prescribed it to Mrs. Barlow.  He did not use the word 'suicide' in telling Mrs. Barlow about the risks of taking Neurontin for bipolar disorder when he prescribed it in an increased dose for her mania.   He testified that he would have discussed suicide as such with Mrs. Barlow if the suicide precautions

had been in the warnings or contraindications section of the label.  (Flowers deposition 38:14 -
40:1).

It was after laying the foundation (1) about the absence of suicide precautions in the
label, (2) about the company having known from its own placebo controlled trial that Neurontin
doesn't work for mania, and (3) that the company's medical director for Neurontin had not done
his job regarding Neurontin safety concerns that counsel most certainly did ask Dr. Flowers to
read from that portion of the misbranding charge in the plea that bears directly on the issue in
this case – did the defendants fail to adequately warn Dr. Flowers about the use of Neurontin for
bipolar patients?  He read specifically:

> "…. which drug was intended for the use for the treatment of
> neuropathic pain, *bipolar disorder*, as monotherapy for epilepsy,
> and other Unapproved Uses- Uses, and which was misbranded
> within the meaning of 21 USC 352, *in that Neurontin's labeling*
> *lacked adequate directions for such uses."*  (Flowers deposition,
> 88:22 – 89:25)

This was no atomic bomb ambush.  It was the next step in a thorough, brick- by- brick
building of testimony that not only is relevant but which Mrs. Barlow must prove to meet her
statutory burden of proof under Texas law.   Defendants' memorandum says, without any
support, that the question and answer it quoted in some way mischaracterized the nature of the
criminal plea.   How?   The defendants admitted as a part of the criminal plea that it was
unequivocally true that the label lacked adequate directions for off label use for bipolar disorder.

At the conclusion of this exchange, Plaintiff's counsel asked more questions to show that
the plea was specifically relevant to the core issue, the question that Defendant now claims in
some way to be unfair: 'Would you liked to have known?' (Flowers deposition, 91:12 – 22).

A: Yes

Q: Again, why?

A: Because it gives me alternative choices.

And, continuing with the same line of questions (Flowers deposition 91:22 – 92:22):

Q: How so?

A: Again, it would lead me to use other alternatives that would have been proven.

Dr. Flowers testified that if he had known the facts he would have made other choices. There was nothing improper about laying the foundation under Texas law and then asking the doctor how knowing the facts would have affected his choice of treatment.

C.    Texas authorities place the burden of proof on the plaintiff to ask the doctor
      what his treatment choices would have been if he had known the facts.

In *Ebel v Eli Lilly & Co.*, 321 F.Appx. 350 (5th Cir. Texas, 2009), the court affirmed summary judgment because the plaintiff presented no evidence that the prescribing doctor was unaware of the risks engendered by Zyprexa's use at the time he prescribed the drug or that an adequate warning would have changed his prescription choice. The Court also said "Furthermore, placing the burden on the plaintiff to produce evidence of causation is not, as Ebel avers, 'completely inimical to Texas products liability law;' indeed, it is required by Texas law…." 321 F. Appx. at 357.

To the same effect is *Ackerman v Wyeth Pharmaceuticals*, 526 F. 3d 203 (5th Cir. Texas, 2008), affirming summary judgment. The doctor in that case testified that he would have prescribed Effexor regardless of the warning and, hence, there was no evidence that the inadequate warning caused the injury.

A plaintiff who demonstrates that the prescribing doctor did not know the risk and would have made other choices about the prescription has met the burden of proof. *McNeil v Wyeth*, 462 F. 3d 364 (5th Cir., Texas, 2006). "Even Dr. Wilkerson, who initially indicated that he would not have changed his long-term prescription of Reglan even if he had read the studies now

cited by McNeil, acknowledged that he would not have prescribed Reglan for more than twelve weeks had Wyeth provided a contraindication on Reglan's label." 462 F.3d at 470.

Accordingly, Mrs. Barlow's lawyers had the absolute duty to ask Dr. Flowers if his prescribing decision would have changed if he had known that as to Neurontin:  (1) the company knew that there was safety-related information regarding Neurontin that the doctors did not know and that was not in the label; (2) the company promoted the drug to doctors for bipolar patients without adequate directions to treat bipolar conditions (misbranding); (3) the drug did not work for the condition for which it was promoted and prescribed, the mania component of bipolar illness; (4) that suicide was not in the warnings or contraindications section of the label at the time it was promoted and prescribed; and (5) that he would have made a different choice of treatment if any of those things had been known to him.

D.    The method of laying a foundation for Dr. Flowers was proper.

Rule 703 says verbatim:  "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing."    During the meet and confer Mr. Cheffo adamantly denied that a witness could express an opinion based on facts made known to him at a hearing, despite having Rule 703 brought expressly to his attention.  His position was that there simply was no such rule in which a witness could testify based on something made known to him at a hearing.

A treating doctor may give an expert opinion about his treatment choices under Rules 701-703 without filing a Rule 26 report.  *Wreath v. United States,* 161 F.R.D. 448, 449 (D. Kansas 1995).  Dr. Flowers was an expert within the treating doctor exception to Rule 702 for testimony of his treatment of Mrs. Barlow.  He was asked to express his perception on a fact in issue, whether he would have changed his treatment choice of Neurontin for Mrs. Barlow if he

had known the truth about Neurontin for bipolar patients. It was not a question of his having to study and parse out conflicting scientific or technical data to separate the wheat from the chaff; it was only a treatment question: whether, upon learning that Neurontin increases the suicide risk and was not efficacious for his bipolar patient despite the defendant's inadequate label, he would have changed his treatment choices.

It is normal to lay a foundation for opinion questions. Moreover, there is no rule that requires a party to soft-pedal facts, including criminal facts.

As for counsel making the facts known to Dr. Flowers in the deposition, i.e., "at the hearing", Rule 703 is a bridge between current practices and historical practices. Witnesses in the Pan AM 103 litigation were permitted to read trial testimony of other witnesses and form opinions based on doing so. *In re Air Disaster at Lockerbie Scotland on Dec. 21, 1988*, 37 F.3d 804 (2d Cir. New York 1994).

> Wallis' and Vincent's testimonies were not improper simply because they were based on the testimony of others. Precedent has long acknowledged the acceptability of expert testimony based on the trial record. See, e.g., *United States v Johnson*, 319 U.S. 503, 519-20, 63 S.Ct. 1233, 1231, 87 L.Ed. 1546 (1943). No doubt remains under the federal rules that an expert may testify based on the facts elicited at trial. See Fed.R.Evid. 703.

*U.S. v. Johnson*, 319 U.S. 503 [63 S.Ct. 1233], (1943) is an early version of that practice decided by the United States Supreme Court. It approved asking a witness to make computations based on the actual trial record of Johnson's income rather than the historic practice of making facts known to the witness at a trial by attempting to give a witness a hypothetical question that details as assumptions the facts that the jury had heard.

Because of the difficulty in asking such hypothetical questions in a form that would overcome objections as to completeness, the practice became unworkable as a general rule. See

Federal Practice and Procedure, Wright & Gold, (1997), §6272.   The product of this history is Rule 703, by which the facts are made known to the witness at or before the proceeding.

Defendant has utterly failed to bring to the Court's attention any authority that says a treating doctor in a Texas pharmaceutical failure to warn case may not be asked questions about facts regarding the risk, the warning, or information withheld by the pharmaceutical company and how knowing such facts would have affected his choice of treatment.

*Garcia v. City of Springfield Police Dept.,* 230 F.R.D. 247, (D.Mass.,2005), relied on by defendant, is inapposite.  It contains no hint that the treating doctor was asked to testify whether his treatment choices would have changed if he had known different facts at the time.  The court did hold that a treating doctor may testify without an expert report, as is the usual rule, to the course of treatment and his prognosis based on his treatment.  For the same reason, *Indemnity Insurance Company of North America v American Eurocopter LLC*, 227 F.R.D. 421 (M.D.N.C. 2005) is not in point.

*Silbergleit v First Interstate Bank of Fargo, N.A.,* 37 F. 3d 394 (8th Cir. North Dakota, 1994) not only fails to support Defendants' claim that the questions to Dr. Flowers were improper as 'emphasizing irrelevant information having no bearing on the issues of the case,' it underscores the proper procedure.  No one in *Silbergleit* contended that the anti-Semitic questions biased the *witness*; they contended that the questions improperly influenced the jury. *Silbergleit* was resolved by application of the rule that it is the Court's role, not the parties' counsel, to rule on objections to questions to witnesses.

Finally, *Mansoor v MV Zaandam*, 2006 WL 2222322 (W.D.Wash.2006), urged by the defendant, actually holds that a treating physician's testimony regarding treatment is not a matter beyond the ability of the average juror to understand and, accordingly Rule 702 and Rule 26 (a)

Case 1:04-cv-10981-PBS   Document 3103   Filed 10/22/10   Page 12 of 20

(2) (A) disclosure obligations are not triggered.   It is not outside a doctor's ordinary treatment of the patient to form an opinion based on a drug's actual risks and benefits and whether his treatment would have been different if the doctor had known that the drug promoted to him actually did not work for the patient, raised the risk of suicide, and that the product information in the label's safety and contraindications section was inadequate.  Even the defendant concedes that whether a different warning would have changed the doctor's choice is a proper subject for the prescribing doctor (Defendant's Memorandum, Page 8).  How could the doctor answer such questions without a foundation?

      E.     Not one case or rule holds that what the defendant complains about is an improper deposition 'tactic.'

The cases on improper deposition tactics refer to (1) interrupting the witness or the lawyer repeatedly, *State Farm Mut. Auto. Ins. Co. v. Dowdy ex rel. Dowdy, 445   F. Supp 2d. 1289, (N.D.Oklahoma, 2006);* (2) instructing a witness to not answer a question, *Boyd v University of Maryland Medical System,* 173 F.R.D. 143 (D. Maryland, 1997); (3) coaching and speaking objections, *McDonough v. Keniston,* 188 F.R.D. 22 (D. N.H. 1998), and conduct of that nature.

In a *Report on the Conduct of Depositions,* 131 F.R.D. 613 (1990), the Federal Bar Council for the Second Circuit studied improper deposition tactics and proposed remedies.  Not one of the improper tactics considered was that a lawyer deposing a witness had shown the witness a document or testimony that had been ruled to be admissible and relevant and then asked if the witness's course of conduct would have been different if he had known such facts.  This motion seeks sanctions for something that has not been found anywhere in the history of depositions to be an improper tactic, much less one that has been the subject of a previous ruling, order, or decision.

12

F.   Judge Saris' November 2009 Order, Exhibit B, does not prohibit deposition questions.

Judge Saris did not say, imply, suggest, or in any other manner order that showing the guilty plea or Dr. Glanzman's testimony to witnesses in deposition, or asking deposition questions about them, was an improper tactic, much less a prohibited procedure.   The facts underlying her Order are materially different, involving an *ex parte* and misleading contact by an investigator who had no reason to bring the criminal plea to the doctor's attention.

Dr. Flowers' deposition was not *ex parte*.   It was on the record with all parties present. Defense counsel had the right to ask the witness questions, and did ask questions, about the same plea, particularly the mislabeling facts.   A transcript was made so that a trial judge could review the questions and answers and rule on them during ordinary pre-trial procedures.

Understandably, defendant has cited no authority for the proposition that this plaintiff obstructed defense counsel from asking Dr. Flowers what they otherwise would have asked. *Strahan v Simon Property Group, Inc.,* 2008 WL 5273684 (D.Mass, 2008) did not involve a deposition, a communication, or a disclosure of a fact to a witness in any form, much less a question of *ex parte* contact with a witness or influencing a witness. Instead, it enjoined the plaintiff from filing a fourth frivolous lawsuit to litigate claims that had been resolved in a state court judgment nine years previously.

*Parker v. Upsher-Smith Laboratories, Inc.,* 2009 WL 418596 (D.Nev.,2009) does not stand for the proposition that the Court should pre-screen deposition questions or exhibits or punish a lawyer for asking them.   It doesn't even involve tactics in a deposition, holding as it does that knowingly obstructing opposing counsel's *ex parte* access to a treating doctor in direct violation of a court order is sanctionable conduct.   There is not even a colorable argument that Mrs. Barlow's lawyers violated a court order or obstructed Mr. Cheffo or anyone else from

asking Dr. Flowers questions in the deposition. Furthermore, Pfizer was represented by counsel at Dr. Glanzman's deposition. The failure of Pfizer's lawyers to ask Dr. Flowers the questions about Dr. Glanzman that they put in their brief at pages 5-6 is their failure to prepare for the deposition and their failure to ask their questions to the doctor during the deposition, not obstruction by Plaintiffs' counsel to prevent them asking the questions.   Dr. Glanzman's deposition, both video and text, was right there on the table and available to them to use. No one halted the deposition, limited their questions, or otherwise stopped anyone from doing anything. They just weren't prepared. Indeed, a review of the transcript does not reveal a single hint of Dr. Flowers skewing his testimony, being uncooperative, parsing words, failing to answer questions, or displaying the slightest degree of having become partisan.

There is no basis for the claim that deposing Dr. Flowers about Dr. Glanzman's testimony, the misbranding plea, or anything else was an improper tactic.

## II.     THE 2004 – 2005 LETTERS AND THE POISONED WELL

The defense claim, that Dr. Flowers' well was poisoned by two letters sent by Mrs. Barlow's attorneys asking to meet with him in 2004 and 2005, is frivolous.   Defense counsel had the letters during the deposition and could have asked Dr. Flowers about them, whether he read them, remembered them, was influenced by them or anything else. They chose not to do so. The deposition transcript is devoid of any suggestion that he even remembered the letters; they were in his file and hadn't been looked at in years. He had very little memory of his meeting with Mr. Pierce and described it as a 'feeling me out, asking my views' kind of meeting. He also testified that he didn't read the entirety of the documents Mr. Pierce had sent. (Flowers deposition 108:5 - 111:3).

Unlike *Parker v Upshur-Smith Laboratories, supra*, Mr. Pierce did not obstruct opposing counsel's ex parte contact with Dr. Flowers or violate a court order. He did try to preserve Mrs. Barlow's right to review her records for privilege under HIPAA after defense counsel reneged on an existing agreement that he could screen her records before the defense read them. (Discussed hereafter at page 16 and Exhibit J).

A party seeking sanctions needs much cleaner hands than Pfizer's. By 2004, when Mr. Pierce sent the first letter, Pfizer and Warner-Lambert already had done everything imaginable to sway Dr. Flowers themselves. His testimony and Exhibit G reflect that they had sent sales representatives into his office to talk about Neurontin off-label 49 times before and during his treatment of Mrs. Barlow. They gave him samples 40 of those times. (Flowers deposition, 46: 7 - 48:10). They invited him to ski trips, dinners, and a free CME meeting at which Neurontin for bipolar patients was promoted a full year after Warner-Lambert knew it had failed the clinical trial for efficacy for mania. And that was only the beginning.

The very worst attempt to poison Dr. Flowers' well was Pfizer conduct, not Barlow conduct. On September 14, 2004, Pfizer's 'Powerhouse' team sent a document coordinated with 'our legal colleagues' that contained a pitch for sales representatives to go into doctors' offices to give false and misleading question and answer talking points about Neurontin's federal (criminal) and state (Medicaid) settlements. (Exhibit C). The talking points falsely represented that the federal and state investigations did not implicate safety, contrary to the actual language of the misbranding plea. It sought to inflame the doctors against the civil suits, particularly naming Finkelstein and Partners. Pfizer told the doctors that if they got sued, they were on their own, because prescribing Neurontin was a medical decision based on the doctor's knowledge. The document, marked 'Confidential' in this suit, was boldly stamped "DO NOT LEAVE

BEHIND" with the prescriber.  If what Pfizer was telling doctors in these *ex parte* secret meetings was true, why would Pfizer try to wipe off its fingerprints?   Pfizer has no business complaining about a lawyer trying to meet with a witness to see if there is a case.

Pfizer also ignores the setting.   When Mr. Pierce sent the 2004 letter to Dr. Flowers, Texas doctors were in the throes of a highly public series of legislative efforts on malpractice reform.  See (Exhibit H)[4].  These political battles caused a radical change in the Texas law of medical malpractice and led directly to the enactment of the pharmaceutical liability statute set out at the beginning of this brief.  Given the highly-charged atmosphere with Texas doctors, Mr. Pierce reasonably believed that Dr. Flowers might well not want to talk with him.  His August 2004 letter to Dr. Flowers was nothing more than an attempt to notify Dr. Flowers that his former patient had filed suit against Pfizer, the nature of the suit, including the off-label marketing practices, and that Mrs. Barlow's 'trial lawyer' had a good faith basis for bringing the lawsuit.  The letter was a reasonable effort both to encourage Dr. Flowers to agree to meet and to assure Dr. Flowers that Mrs. Barlow wasn't going to sue him.

Mr. Pierce's 2005 letter to Dr. Flowers is the direct result of Pfizer counsel breaking an agreement regarding Mrs. Barlow's medical records.   Counsel had conferred on April 7, 2005, and agreed that Pfizer counsel could proceed to obtain all of Mrs. Barlow's records but would deliver them unopened to Mr. Pierce for him to review for objections and to file a privilege log. (Exhibit J).  In May 2005 Mr. Pierce learned that Pfizer had gotten Mrs. Barlow's records but had not turned them over to Mr. Pierce pursuant to the agreement.   He wrote Dr. Flowers to inform him that the medical authorization which Pfizer counsel had gotten by this ruse would no longer be valid.   Her case was removed to this MDL afterward.

---

[4] This exhibit is from the current Texas Medical Association website. It references the TMA tort reform program that led to the 2004 legislative changes and illustrates how the 'trial lawyers' were considered the physicians' adversaries, then and now.

There is no basis, in the record or out of it, to suggest that these letters played a tainted role in Dr. Flowers' testimony.  If defense counsel believed that these letters in some way made the well water more undrinkable than Pfizer had left it after all of its own illegal promotions and secret meetings, it should have asked Dr. Flowers questions that would prove it. They did not.

### III.    CONDUCT OF DEFENSE COUNSEL IN FILING THE MOTION

A.    This motion is not an emergency.

Dr. Glanzman was not the Neurontin medical director until after Mrs. Barlow's other prescribers (Dr. Cantu and Dr. Atwal) had transferred her care forward to Dr. Flowers.  They were not on the prescription when she shot herself, as was Dr. Flowers.   Accordingly, it is unlikely that what Dr. Glanzman did not do or know will come up in their depositions.  Defense counsel knows that.

No irreparable harm will befall Pfizer if those two doctors are asked in depositions whether they knew when they prescribed Neurontin that the company had marketed it for bipolar treatment while knowing that it did not work for mania and that the company did so without providing adequate instructions to doctors, *inter alia*.  Indeed, Dr. Cantu's deposition has already been conducted.   Dr. Atwal, the only remaining prescribing doctor, is represented by counsel who will bear the burden of assuring that Dr. Atwal does not fall victim to improper deposition tactics.

B.    Defense counsel told Judge Saris in *Bulger v. Pfizer* that deposing the prescribing doctors about the criminal plea would be the very crux of its relevance.

Mr. Cheffo moves to hold Mr. London in some form of judicial contempt for asking Dr. Flowers about the criminal plea.  This is a complete about-face from what Mr. Cheffo earlier told Judge Saris plaintiffs' lawyers in this case should do.  His first position was taken when she ruled

that the criminal plea was admissible and relevant in the pre-trial conference of *Bulger v. Pfizer*.
(Exhibit I, at page 15):

> Judge Saris:   " —the motion with respect to the guilty plea, that's admissible."
>
> Mr. Cheffo: "Well, your Honor, the issue here is not whether there was – well, *first of all,
> we look at the doctors who were deposed in this specific case, and none of them talked about it,
> but they had an opportunity to depose the doctors,* and Crognale and Goldman (Mrs. Bulger's
> prescribing doctors) testified.  There was no testimony that they relied on marketing, advertising,
> CME."

Now, when Dr. Flowers was asked about the guilty plea, after a foundation that included
proof that the defendants promoted Neurontin to him, including advertising and CME promotion,
Mr. Cheffo claims foul.  It is not foul, of course.  What is foul is that he seeks sanctions in Mrs.
Barlow's case for Mr. London asking the questions that Mr. Cheffo said should have been asked
in the *Bulger* case.

Pfizer's real goal is to bully Mrs. Barlow and to block her and, indeed all MDL plaintiffs,
from making known to treating doctors that the company knew their drug did not work, that it
had suicide risks, and that the label was inadequate for off-label uses as admitted by Pfizer in the
guilty plea. They contend that these facts cannot be made known to the doctor *ex parte*, asserting
Judge Saris's order, and also cannot be made known to the doctor in a proceeding in which the
two parties are present and able to question the doctor about the evidence on those points.

This clever scheme would have the effect of preventing every case from going forward
because the doctors could never be made aware of the facts.   The depositions, as the defense
would have them, would never get to the questions of what the treating doctors would do if they
knew the truth.  The depositions would be farces, limited to reading the patients' chart and

prescription records and hypothesizing whether the doctors would do the same thing again if nothing changed.

## CONCLUSION

Rule 11 imposes a duty to make a good faith investigation into the law and the facts. This is the second time Pfizer has filed a monetary motion against Mrs. Barlow without investigating the law or the facts. It moved this Court to shift to her the cost of producing sales representatives' custodial files that it had never looked for and that did not exist, (Document 2577), triggering briefs, travel, hearings, and delay, a motion that was denied. (Document 2751).

The instant motion doesn't even set out a recognized or specific form of relief for the supposed grievance, smacking instead of a demand for sanctions against undersigned counsel for violating no rule or order and a plea to impose a novel pre-deposition *order in limine* under which counsel would have to provide their questions and exhibits to the defense in advance so that it could burden the court to get advance rulings. There is no such rule. There is no such procedure. There is no precedent for ordering a party to give the other side their questions before a deposition. The Defendants' memorandum certainly does not cite such authority.

There is a strong urge to seek sanctions by counter- motion. Plaintiffs have chosen to not do so this time. Mrs. Barlow is just one Neurontin patient who is trying to get her day in court on the merits. It is not her fault if the merits are completely entangled in the evidence of Defendants' crimes and profiteering at the expense of patient safety.

The Motion should be denied in its entirety.

Respectfully submitted,

LAW OFFICES OF JACK W LONDON
3701 Bee Cave Rd., Suite 200
Austin, TX 78746
512-478-5858 (telephone)
512-479-5934 (facsimile)

By: _____
    Jack W. London
    State Bar No. 12512500

WRIGHT & GREENHILL, P.C.
    Archie Carl Pierce
    State Bar No. 15991500
221 West 6th Street, Suite 1800
Austin, TX 78701
512-476-4600 (telephone)
512-476-5382 (facisimile)
ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document has been served as required by Case Management Order Number 3 on October 22, 2010.
Dated: October 22, 2010

LAW OFFICES OF JACK W LONDON
3701 Bee Cave Rd., Suite 20
Austin, TX 78746
512-478-5858 (telephone)
512-479-5934 (facsimile)

By: _____
    Jack W. London, Esq.