# Exhibit A

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| RUTH SMITH, Individually and as Widow for the Use and Benefit of Herself and the Next of Kin of RICHARD SMITH, Deceased,<br><br>Plaintiff,<br><br>v.<br><br>PFIZER INC., *et al.*,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)   Case No. 3:05-0444<br>)   Judge Trauger<br>)<br>)<br>) |

### ORDER

For the reasons expressed in the accompanying Memorandum, the defendants' Motion to Exclude Evidence of and References to Warner-Lambert Co. LLC's Guilty Plea or any Related Government Investigations or Agreements (Docket No. 124) is **DENIED**; the defendants' Motion to Exclude Evidence of Post-Incident Regulatory Actions, Labeling, and Patient Information Guides (Docket No. 101) is **DENIED**; the defendants' Motion to Exclude the Testimony of David Franklin and Evidence of the *Franklin* litigation (Docket No. 121) is **GRANTED IN PART** and **DENIED IN PART**; the defendants' Motion to Exclude Evidence of Anecdotal Adverse Event Reports (Docket No. 109) is **GRANTED**; and the defendants' Motion to Exclude Evidence of Loss of Consortium Damages Suffered by the Decedent's Children (Docket No. 104) is **DENIED**.

It is so Ordered.

Entered this 30th day of April 2010.

*signature*
ALETA A. TRAUGER
United States District Judge



| | |
|---|---|
| ECFnotice@mad.uscourts.gov | To CourtCopy@mad.uscourts.gov |
| 07/24/2009 04:29 PM | cc |
| | bcc |
| | Subject Activity in Case 1:04-cv-10981-PBS Harden Manufacturing Corporation v. Pfizer, Inc. et al Order on Motion in Limine |

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.
***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

United States District Court

District of Massachusetts

## Notice of Electronic Filing

The following transaction was entered on 7/24/2009 at 4:29 PM EDT and filed on 7/24/2009

Case Name: Harden Manufacturing Corporation v. Pfizer, Inc. et al
Case Number: 1:04-cv-10981
Filer:
Document Number: No document attached

Docket Text:
Judge Patti B. Saris: Electronic ORDER entered granting in part and denying in part [1864] Motion in Limine; denying without prejudice [1867] Motion in Limine; denying [1869] Motion in Limine; granting in part and denying in part [1872] Motion in Limine; denying [1878] Motion in Limine; granting [1881] Motion in Limine; denying [1884] Motion in Limine; denying [1887] Motion in Limine; granting in part [1893] Motion in Limine; denying [1896] Motion in Limine; denying [1897] Motion in Limine; denying [1903] Motion to Bifurcate; denying [1912] Motion in Limine; granting in part [1915] Motion in Limine; granting [1983] Motion ; denying [1986] Motion for Clarification ; denying [1992] Motion Objecting to MJ Sorokin's 7/1/09 Order, and Requesting the Court to Set Aside the Order and Issue an Order Striking Dr. Gibbons as a Witness. "AS STATED IN COURT AT DAY 1 OF THE FINAL PRETRIAL CONFERENCE ON JULY 20, 2009." (Patch, Christine)

1:04-cv-10981 Notice has been electronically mailed to:

```
                                1
 1  UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF MASSACHUSETTS
 2              MDL Docket No. 1629
 3              Master File No. 04-10981
 4  * * * * * * * * * * * * * * * * * * * *
                                           *
 5  IN RE: NEURONTIN MARKETING             *
        SALES PRACTICES AND                *
 6      PRODUCTS LIABILITY LITIGATION      *
    ---------------------------------------*
 7                                         *
    THIS DOCUMENT RELATES TO:              *
 8                                         *
    Shearer v. Pfizer Inc, 1:07-cv-11428-WGY *
 9                     *
    * * * * * * * * * * * * * * * * * * * *
10
11          DAILY TRANSCRIPT OF PRELIMINARY
            JURY INSTRUCTIONS, OPENING
12          STATEMENTS and THE EVIDENCE
                   (Volume 2)
13
            BEFORE: The Honorable William G. Young,
14                  District Judge, and a Jury
15
```

```
                                72
 5  Now, I've done another one of these depositions.
 6  The way they've been submitted to me is fine. I understand
 7  you've got a problem with exhibits. So, recognizing that,
 8  I've said that the plea colloquy, if you've got that, and
 9  the judgment in the criminal case, those are admissible.
10  Beyond that, now, when I did Mr. Glanceman, if a foundation
11  appears in the deposition, I have underlined the exhibit and
12  written admitted. So you don't need anymore. For example,
13  he was shown an exhibit which from the transcript I am
14  satisfied again is a Pfizer document, ergo an admission, and
15  I'm satisfied that it's relevant. So if I can figure it out
16  from the deposition, I'll do it because I want things to go
17  smoothly. But if I can't, I'm not -- if there isn't an
18  underlining and admitted, the exhibit is not in and you'll
19  have to get it in some other way.
20       We'll recess until 20 after 10:00. We'll recess.
```

```
                            1
 1  UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF MASSACHUSETTS
 2
                MDL Docket No. 1629
 3              Master File No. 04-10981
 4  * * * * * * * * * * * * * * * * * * * *
                                          *
 5  IN RE: NEURONTIN MARKETING             *
        SALES PRACTICES AND                *
 6      PRODUCTS LIABILITY LITIGATION      *
    -----------------------------------    *
 7                                         *
    THIS DOCUMENT RELATES TO:              *
 8                                         *
    Shearer v. Pfizer Inc, 1:07-cv-11428-WGY *
 9                                         *
    * * * * * * * * * * * * * * * * * * * *
10
11          TRANSCRIPT OF THE EVIDENCE
                   (Volume 3)
12
            BEFORE: The Honorable William G. Young,
13                  District Judge, and a Jury
14
```

```
                            3
11  Robert Glanzman, By Deposition
12         155
                        FOR    IN
13  EXHIBITS:           I.D.   EVID.
14    2000 Guilty Plea .............5
      4289 Settlement Agreement ..........6
15    4290 Information ..............6
      4292 E-Mail .................14
16    4295 Memorandum ..............16
      5669 Plea Agreement ............39
17    5672 Judgment ...............40
      4533 Neurontin Northeast CBU 1997 ......74
18    4864 E-Mail ...............  85
      4875 E-Mail ...............  85
19    4876 E-Mail ...............  85
      5768 Memorandum ..............104
20    2003 Neuropharmacological Review .....155
      3410 Roles and Responsibilities ......155
```

```
                           154
20  THE COURT: You may step down.
21      (Whereupon the witness stepped down.)
22      THE COURT: Call your next witness
```

23     MR. FROMSON: Your Honor, we would ask to play the
24  video of Robert Glanzman, and there are three exhibits, one
25  of which has already been moved into evidence as

155

1   Exhibit 4397.
2      THE COURT: It may be played until one o'clock.
3      MR. FROMSON: Thank you. The other is AJB for
4   which the objection has been withdrawn, and the number is
5   2003.
6      THE COURT: AJB --
7      MR. FROMSON: AJB.
8      THE COURT: -- admitted in evidence 2003.
9      (Exhibit marked in evidence.)
10     MR. FROMSON: And lastly, AOU, to which the
11  objection was withdrawn, is now requested into evidence as
12  3410.
13     THE COURT: AOU is in evidence as 3410.
14     (Exhibit marked in evidence.)
15     THE COURT: And you may proceed.
16     MR. FROMSON: Thank you, your Honor.
17     Bonnie, if you would switch.
18     THE CLERK: I did.
19     MR. FROMSON: Thank you very much. The jury
20  presenters aren't on.
21        ROBERT GLANZMAN, By Deposition
22  Q  Could you state your name and your residential address
23  for the record, please?
24  A  Robert Louis Glanzman, 34 Dutch Hill Drive, Carmel, New
25  York 10512.

156

1   Q  And where are you employed today, Dr. Glanzman?
2   A  I'm employed by Novartis Pharmaceuticals.
3   Q  What was your last employment prior to Novartis?
4   A  I worked for Pfizer, Incorporated.
5   Q  What period of time did you work for Pfizer?
6   A  From September 1999 through March of 2007.
7   Q  Well, it's got your name on it. It says one year at
8   Pfizer. It says you are the medical director for Neurontin.
9   A  Oh, all that is correct.
10  Q  Is that all correct?
11  A  That is all correct.
12  Q  The committee is Neurontin Review Committee,
13  Publications Subcommittee, Independent Medical Grant
14  committee; are all those committees that you sat on at
15  Pfizer?
16  A  Yes.
17  Q  Yes. During the period of time that you were employed
18  at Pfizer, were there any the other committees that you sat

19  on?
20  A  I only worked on Neurontin until July of 2002.
21  Q  What period of time did you work on Neurontin?
22  A  Between, essentially, January of 2001 and July of 2002.
23  Q  So, about a year-and-a-half?
24  A  Yes.
25  Q  What were your positions, beginning in January '01 when

157

1  you started to work on Neurontin?
2  A  I was a medical director on the Neurontin team.
3  Q  Did you have that entire, did you have that position for
4  the entire period of time that you worked on Neurontin?
5  A  Yes.
6  Q  And as medical director for Neurontin, what were your
7  job responsibilities?
8  A  Well, to serve on the committees that you see here.
9  Q  And when I say "you trained them," was it your job to
10  provide the clinical data concerning Neurontin and how it
11  could be used in promotion?
12  A  It was my job to explain the medical data in the pieces
13  that we were presenting to them so that they had an
14  understanding of how the medical data, what the background
15  of it was, so that they understood the medical data.
16  Q  When you say "pieces," for our record could you define
17  what you mean by that?
18  A  So, at every plan of action meeting there were
19  promotional pieces that were developed so that the
20  representative could educate physicians on the product. And
21  these pieces contained data, medical data. My job was to
22  explain it to them.
23  Q  Were you involved in the development of these
24  promotional pieces?
25  A  I was.

158

1  Q  That's part of your job; right?
2  A  Yes.
3  Q  I think it's fair to say and I think you testified that
4  when you trained the field force, you wanted to inform them
5  of both the positive and negative study results concerning
6  Neurontin's use?
7  A  So, again, the purpose of training the field force is so
8  that they can speak in an educated manner when they are
9  educating physicians using the promotional materials that we
10  have developed to the extent that any positive or negative
11  studies impact their activity to speak in an educated manner
12  and to be able to use these materials to educate physicians,
13  then it's important to, you know, educate them on that; to

14  the extent that it's not, then it's not.
15  Q  You say you approved a message that reads, "Gabapentin
16  is effective against at a wide range of neurologic and
17  psychiatric conditions"?
18  A  Correct.
19  Q  What are the psychiatric conditions that you are
20  referring to?
21  A  Well, frankly, I am not referring to any specific
22  psychiatric conditions.
23  Q  You approved a key message that gabapentin was effective
24  as against psychiatric, a wide range of neurologic and
25  psychiatric conditions.

159

1   Q  What psychiatric conditions are we talking about here?
2   A  I would be happy to go back and do a literature review
3   and look at the data for you. I did not do it back then.
4   Q  How could you approve a message without looking at the
5   clinical data?
6   A  Obviously this is not -- I approved it. Whether it was
7   correct or not, I can't say at this time.
8   Q  Well, that was your job as medical director, wasn't it,
9   to review the clinical data to see if it supported the key
10  message?
11  A  Yes, that was part of my job.
12  Q  Is it your testimony that you didn't, you approved a
13  message that was effective against a wide range of
14  psychiatric conditions and you didn't look at this clinical
15  data?
16  A  It is my testimony that I did not do a thorough review
17  of psychiatric conditions, that's correct.
18  Q  If you didn't do it, who was going to do it?
19  A  It was my job, so if I didn't do it, nobody would do it.
20  Q  How could you approve a key message to market Neurontin
21  for a psychiatric condition if you didn't search the data to
22  see if the data supported the message?
23  A  This notes a key message to market Neurontin. This is a
24  key message that if a clinical study is going to be
25  published, it could be incorporated or could be gleaned from

160

1   the publication.
2   Q  Let's take your definition then. Wasn't that your job
3   to search the data to see if it supported -- the key
4   messages supported the clinical data that was going to be
5   published in a manuscript?
6   A  It was my job to know whether or not the clinical data
7   supported the key message, that's correct.

8  Q  There are key messages for neuropathic pain?
9  A  Yes.
10  Q  For gabapentin. And for our record, when I refer to
11  gabapentin, I'm referring to Neurontin; correct?
12  A  Yes, Neurontin is the trade name for gabapentin.
13  Q  "Gabapentin should be considered the first choice of
14  therapy for neuropathic pain."
15  Q  Did you approve that key message?
16  A  I did.
17  09 Q
18  Q  "Gabapentin is effective against a broad spectrum of
19  neuropathic pain states." Did you approve that?
20  A  I did.
21  Q  "And proven efficacy in neuropathic pain." Did you
22  approve that message?
23  A  I did.
24  Q  Let me show you Exhibit 25. Can you identify this for
25  me?

161
1  A  It's the Neurontin publications subcommittee current
2  status and 2002 plans.
3  Q  Was the presentation made by Medical Action
4  Communications?
5  A  Yes.
6  Q  And how long did the presentation last, do you recall?
7  A  I don't recall.
8  Q  What was the purpose of the presentation?
9  A  I believe it was to highlight their competency.
10  Q  Competency?
11  A  Yes.
12  Q  Was Pfizer considering hiring another vendor?
13  A  I don't recall the exact specifics at the time.
14  Q  And was this a presentation that was made to the
15  publications subcommittee, to the best of your memory?
16  A  I believe so.
17  Q  And this slide indicates capitalizing of product
18  benefits based upon the published literature Neurontin has
19  demonstrated, efficacy against a broad range of CNS
20  disorders; correct?
21  A  That's what it says.
22  Q  Epilepsy, neuropathic pain, anxiety disorder, migraine,
23  substance abuse and movement disorder, correct?
24  A  Correct.
25  Q  And when you saw this slide on the date it was
162
1  presented, did you know what the clinical studies were that
2  established Neurontin efficacy for bipolar disorder?

3  A  No.
4  Q  Do you know if there were any?
5  A  I wouldn't know specifically.
6  Q  When you saw this slide on the date it was presented,
7  did you know what published literature supported Neurontin's
8  use for anxiety disorders?
9  A  No.
10  Q  And how about for migraine?
11  A  Yes, the one positive study.
12  Q  The one positive study.
13  Q  And on the date you reviewed this slide, were you aware
14  of the negative migraine studies?
15  A  No.
16  Q  Were you aware of the negative study in restless leg?
17  A  No.
18  Q  Did restless leg fall under the category movement
19  disorder?
20  A  Yes.
21  Q  Were you aware of the negative studies for neuropathic
22  pain?
23  A  I was aware of the 24 study.
24  Q  You were not aware of Dr. Gorson's study on the date
25  this presentation was made?

163

1  A  No.
2  Q  Were you aware of the POPP study?
3  A  No, that is not a neuropathic, by understanding, that is
4  not a neuropathic pain indication.
5  Q  Were you aware of the negative nociceptive pain studies?
6  A  No.
7  Q  Did you ever become aware of the five negative
8  nociceptive pain studies?
9  A  No, I didn't know there were five negative nociceptive
10  pain studies.
11       THE COURT:  Let's stop.  Let's stop.  It's one
12  o'clock.  All right, we'll pick up here tomorrow.
13       Ladies and gentlemen, you've not heard all the
14  evidence.  Therefore, keep your minds suspended.  Do not
15  discuss the case either among yourselves nor with anyone
16  else.  You may stand in recess until 9:00 a.m. tomorrow
17  morning.  I'll remain on the bench.
18       THE CLERK:  All rise for the jury.