# Exhibit K

## Page 9

1         PROCEEDINGS
2
3       (Flowers Exb. No. 1 and 2 premarked.)
4       THE VIDEOGRAPHER: This is the videotaped
5 deposition of Dr. Larry Flowers taken in the matter of
6 Barlow v. Pfizer, et al. Today's date is August 28,
7 2010. We're on the record at 9:55 a.m. Please swear in
8 the witness.
9       (The witness was sworn.)
10      THE REPORTER: Any stipulations?
11      (No response.)
12
13       LARRY FLOWERS, M.D.
14 having first been duly sworn, testified as follows:
15
16        EXAMINATION
17
18 BY MR. LONDON:
19   Q. Would you state your name for us, please?
20   A. Larry Flowers.
21   Q. And your profession?
22   A. Psychiatrist.
23   Q. All right, sir. We're here today to take your
24 deposition in the case of one of your patients, Irene
25 Barlow that she has brought against Parke-Davis,

## Page 10

1 Warner-Lambert and Pfizer. Do you understand that?
2   A. Yes.
3   Q. And just for the record, where are we today?
4   A. We're in my office in Houston, Texas.
5   Q. All right, sir. And was it here in your
6 office in Houston that Mrs. Barlow was your patient?
7   A. Yes, in my office -- I had a previous office;
8 but, yes, it was here in Houston.
9   Q. All right.
10   A. Actually on the same street.
11   Q. All right. I want to begin by asking some
12 background questions. Would you just state for us where
13 you grew up and where you went through school and
14 medical training?
15   A. I grew up in Jackson, Mississippi. I attended
16 Jackson State University, went to Maharry Medical
17 College, completed it, and went to Baylor College of
18 Medicine and residency in psychiatry.
19   Q. Can you tell us, are you licensed in the State
20 of Texas?
21   A. I am licensed to practice in the State of
22 Texas and board certified in psychiatry.
23   Q. Those are questions that often startle a
24 doctor during a deposition, but I think the lawyers, I
25 believe, are supposed to ask, "Are you licensed in the

## Page 11

1 State of Texas to practice medicine?"
2   A. Yes.
3   Q. What year were you licensed?
4   A. I believe --
5   Q. Sorry.
6   A. -- I completed residency at Baylor in 1982, so
7 I wasn't licensed -- if I am not mistaken -- probably in
8 around 1980, '81.
9   Q. In the State of Texas?
10   A. In the State of Texas.
11   Q. All right, sir. And have you practiced
12 psychiatry since that time?
13   A. I practiced psychiatry since 1986.
14   Q. And where have you practiced psychiatry?
15   A. In 1986 to 1990, in the Texas Department of
16 Criminal Justice; from 1990 through present, in private
17 practice in the Houston, Texas vicinity.
18   Q. All right, sir. Have you had Irene Barlow as
19 one of your patients?
20   A. Yes.
21   Q. In the practice of psychiatry?
22   A. Yes.
23   Q. Before I ask you very many questions about
24 her, I want to ask you is there a concept in the medical
25 practice known as inheriting patients?

## Page 12

1   A. Yes.
2   Q. What does that mean?
3   A. That means that someone has been treated by a
4 previous physician and you are inherit -- getting that
5 patient from another physician.
6   Q. All right. And is there a practice known as
7 inheriting prescriptions?
8      MR. FERGUSON: Object to form. You can
9 go ahead if you --
10   A. I -- Yes. There is a practice known as --
11 When you're inheriting a patient, you're getting the
12 patient on the medications that the previous doctor has
13 prescribed.
14   Q. (By Mr. London) Let me ask it a different way
15 because of his objection.
16     When you inherit a patient, what becomes
17 of the patient's prescriptions from the previous doctor?
18   A. Well, it really depends on the clinical state
19 of -- of the patient. If the patient generally is
20 stable, in most situations, unless there's something
21 that sticks out, we generally keep patients on the meds
22 that they presented on.
23   Q. All right. Was that the case with
24 Mrs. Barlow?
25   A. Yes.

**13**

1  Q. All right. I want to begin by offering for
2  you Exhibits 1 and 2, which the court reporter has
3  marked -- actually I put the court reporter's stickers
4  on -- but they will have exhibit stickers on them.
5  Well, maybe they won't. This is always the best laid
6  plan deals. See what well-oiled machine we're running
7  here.
8      I'm going to show you Exhibit 1 and ask
9  you whether that's a copy of your clinical records of
10 Mrs. Barlow and show you Exhibit 2 and ask you whether
11 that's a copy of Mrs. Barlow's chart from the Cypress
12 Creek Hospital.
13     MR. LONDON: And, Counsel, here's 1
14 and here's 2, unfortunately without a binder clip any
15 more.
16     MR. FERGUSON: Okay.
17  A. This is a copy of the clinical records from my
18 office.
19  Q. (By Mr. London) Exhibit 1? Referring to the
20 sticker.
21  A. Uh-huh. Exhibit 1.
22     And Exhibit 2 is a copy of the chart from
23 Cypress Creek Hospital.
24  Q. When did Mrs. Barlow become your patient?
25  A. On August 25th of 2000.

**14**

1  Q. And for how long was she your patient?
2  A. From a period of August 25th of 2000 through
3  December, if I am not mistaken, the 8th of 2000.
4  Q. Okay. It's a little hard for us to read, but
5  is it possible that it's December 8th or December 18th?
6  A. I can actually --
7  Q. I say that because the mark on the --
8  A. I can actually look and --
9  Q. All right.
10 A. -- and try to be more specific --
11 Q. I don't know that it makes any difference
12 but --
13 A. It appears to be the 8th.
14 Q. All right, sir. And are you looking at what I
15 would call page 10 of Exhibit 1? I'm just going to show
16 you page 10. And I'm looking over in this margin.
17 A. Right. Yes, I am.
18 Q. All right, sir. And so you saw her between
19 August the 25th of 2000 for the first time and December
20 of 2000 for the last time.
21 A. Correct.
22 Q. For what condition did you see Mrs. Barlow as
23 primary treating condition?
24 A. The primary treating condition was bipolar
25 disorder.

**15**

1  Q. Was that a diagnosis that she came to you with
2  or was it a diagnosis that you rendered for the first
3  time?
4  A. She already had the diagnosis upon
5  presentation to my office.
6  Q. Did you examine her yourself to determine
7  whether that was really the condition that you found her
8  to have?
9  A. Yes. I did an examination and I concurred
10 with the diagnosis of bipolar.
11 Q. All right, sir. And what medications did she
12 have when she came to see you as a patient?
13 A. She had a host of medications upon her
14 original presentation, inclusive of Effexor XR 150
15 milligrams twice a day; Eskalith 450 milligrams two at
16 night; Trazodone 50 milligrams one to two at night;
17 Neurontin 300 milligrams, one twice a day; Klonopin 0.5
18 milligrams, two in the morning and three at night;
19 Duradrin p.r.n. for a headache; Hydrocodone 5/500 every
20 six hours; Claritin twice a day; Atenolol 25 milligrams
21 twice a day; Pravachol 40 milligrams in the morning; and
22 Zomig 5 milligrams as needed for migraine headaches.
23 Q. All right, sir. Did you continue her on those
24 medications at that time.
25 A. Specifically I addressed only the psychiatric

**16**

1  medications, and the psychiatric medications I
2  continued; but I also increased Neurontin on her first
3  visit from 300 b.i.d. to initially starting her to 400
4  3 ID -- three times a day, t.i.d for four days, then to
5  four times a day.
6  Q. If you would help the ladies and gentlemen of
7  the jury and the judge understand what those terms mean,
8  beginning with the times she came to see you, she was on
9  Neurontin -- I believe you used the number 300.
10 A. Yes.
11 Q. And what did that mean?
12 A. 300 -- Neurontin comes in certain milligram
13 strengths or tablets. It can come in 100, 300, also
14 comes in 400. On her presentation, she was on 300
15 milligrams twice a day. After my assessment, I did
16 increase the Neurontin to a stronger tablet, 400
17 milligram tablet, to have her take it three times a day
18 for a four-day period; then increase it to up to four
19 times a day.
20 Q. Did there come a time when you increased her
21 Neurontin to five times a day?
22 A. Yes, I did.
23 Q. And when was that?
24 A. If I am not mistaken, I -- on 9-20 I
25 re-evaluated her and I did increase Neurontin to five

**17**

1  tablets per day in the form of giving her one in the
2  morning, one at 2:00 p.m, and three at night.
3  Q. Is this a matter -- matter of simple
4  multiplication, 400 times five times a day equals 2,000?
5  A. Correct. Total dosage.
6  Q. What was her daily patient dosage then of
7  Neurontin after the second increase?
8  A. I --
9  Q. In other words, on -- As I understood your
10 testimony, on September 20th, you increased it to one in
11 the morning, one at 2:00 in the afternoon, and three at
12 bedtime.
13 A. Right. That's her total dosage, is 2,000
14 milligrams.
15 Q. Per day.
16 A. Per day.
17 Q. All right, sir. Was Mrs. Barlow a -- an
18 epileptic at that time?
19 A. No.
20 Q. And you were not treating her for epilepsy;
21 were you?
22 A. No.
23 Q. Did she present to you with a neuropathic pain
24 condition?
25 A. No, not a neuropathic pain condition.

**18**

1  Q. All right. What does the term "off-label"
2  mean in the medical profession?
3  A. It means that F-- certain medications are
4  approved by the FDA and have had studies to support why
5  we use them; and there are other meds that, for a
6  better -- lack of word -- by accident or whatever
7  reasons, we find out that they work.
8  Q. All right.
9  A. And so we then start using those meds for
10 reasons other than approved by FDA.
11 Q. All right. Does -- Does "off-label" mean, as
12 I understand your testimony, that doctors prescribe a
13 medication for a condition even though it has not been
14 approved for that particular condition by the FDA?
15 A. Correct.
16 Q. All right. And is that how you meant the term
17 "off-label"?
18 A. Correct.
19 Q. Was Mrs. Barlow's prescription by you for
20 Neurontin on-label or off-label for her condition?
21 A. Off-label.
22 Q. And was it for her bipolar condition?
23 A. Yes.
24 Q. What -- What were you hoping to achieve by
25 prescribing Neurontin to her for her bipolar condition?

**19**

1  A. In her case she has high anxiety, she has
2  bipolar disorder, her presentation is mostly that of
3  irritability and some mania with the anxiety; and with a
4  history of benzodiazepine, specifically volume
5  dependence, the attempt is to use Neurontin so that it
6  can both control the mania and decrease the anxiety.
7  Q. Are -- Okay. Let me ask a different
8  question.
9      When you say "bipolar," does that mean
10 that there are two poles to the condition?
11     MR. FERGUSON: Object to form.
12 Q. (By Mr. London) What does "bipolar" means?
13 A. "Bipolar" is a disorder that originally, in
14 simple terms, means two polar opposites, ups and downs;
15 but it's a mood disorder that has periods of manias or
16 highs, which can come in the form of euphoria, elation
17 excessive spending, sexual acting-out; and it has lows
18 which can come in the form of depression and including
19 suicidality with anergia, which is no energy, anhedonia,
20 the inability to enjoy things. And it can be anywhere
21 along that spectrum depending on where you are in your
22 illness state.
23 Q. Was it -- Did you have an intention, whether
24 the prescribing of Neurontin for her would be for the
25 purpose of helping one or the other of those two

**20**

1  conditions -- that is the high or the low?
2  A. In my situation, I was attempting to help the
3  highs and the anxiety. That was my intent.
4  Q. And is the high what you referred to as the
5  mania?
6  A. Yes. The irritable mania.
7  Q. All right, sir. And how did you come to
8  select Neurontin as a medicine off-label for prescribing
9  or continuing the prescription for Mrs. Barlow for her
10 bipolar condition?
11 A. One of the reasons is she came here on -- I
12 inherited her on Neurontin. The other is I had heard
13 anecdotal reports of Neurontin, you know, working with
14 anxiety and bipolar disorder.
15 Q. All right, sir.
16 A. And that's why.
17 Q. All right, sir. What was the course of her
18 bipolar condition during the time you were her treating
19 doctor?
20 A. Essentially, on original presentation, a large
21 part of her con -- She was relatively stable, but
22 there -- there still was some irritability; and the
23 major concern was there had been some significant weight
24 gain, and that presentation was on 8-25. That's when I
25 originally -- when I increased her Neurontin. And then

Case 1:04-cv-10981-PBS   Document 3104-11   Filed 10/22/10   Page 5 of 16

7 (Pages 25-28)

Irene Barlow v.
Pfizer, Inc., et al

Larry Flowers, M.D.
August 28, 2010

25

1  are impaired. The impression is bipolar disorder,
2  depressed. The plan is to continue meds and
3  psychotherapy, individual therapy, family therapy, and
4  group therapy. Increase Effexor to 150 twice a day,
5  Increase Neurontin to 800 b.i.d, increase Topamax to 100
6  b.i.d."
7     Q. All right, sir. If I could ask you just to
8  tell us how did you come to make those notes?
9     A. After an evaluation of her in the hospital
10 setting, I write notes after I evaluate the patient.
11    Q. And one of the comments that you read earlier
12 was that this was -- I hope I've got this right --
13 secondary to severe mood swing. Is that what you said?
14    A. That she had severe mood swings and that
15 was -- Not that the suicide -- Are you asking -- The
16 question is -- is whether or not she's had suicidal
17 ideas secondary to mood swings? She told me she had
18 severe mood swings as a part of her bipolar condition.
19    Q. Okay. I asked the question badly. You
20 answered it better than my question deserved. On the
21 one, two, three, four, five, six, seven, eighth line of
22 that entry, I see the words "mood swing."
23    A. (Nods head affirmatively.) Yes. She states
24 after her husband left, for her secondary to her having
25 severe mood swings.

26

1     Q. All right, sir. Were mood swings one of the
2  conditions of her bipolar condition?
3     A. Yes, it is.
4     Q. And what does it mean to have a mood swing?
5     A. A mood swing really is described as a
6  significant change in mood without necessarily having a
7  precipitating event or the mood shifts or swings
8  significantly compared to the stimuli that's causing
9  this mood swing.
10    Q. All right, sir. Does the mood swing have
11 anything to do with the conditions of the high and the
12 low, the mania and the depression of the bipolar
13 condition?
14    A. Bipolar is described primarily as a mood
15 disorder, so one of the top symptoms are mood swings
16 related to the bipolar condition.
17    Q. Does it relate either to the mania or to the
18 depression?
19    A. A mood swing can shift you from mania. You
20 have such things such as different types of bipolar.
21 You have rapid cycling or you can shift in minutes from
22 high to low, you can go from happy to sad, happy to mad,
23 from mania to -- manic-like state to a -- to depression.
24 All those are part of what can happen with a mood swing.
25    Q. At the bottom of the page, you made the note

27

1  that you increased her Neurontin to 800 and then this
2  says b.i.d. Is that what it says?
3     A. Correct.
4     Q. What does that mean?
5     A. I increased it to 800 twice a day.
6     Q. All right, sir. And why did you change her
7  prescription or note her prescription, I should say, to
8  800 twice a day?
9     A. When the -- When the patient came in and at
10 the time was suis -- had came in from being suicidal,
11 the medications I generally gave that morning were
12 lower -- If you look back on the actual meds that I
13 prescribed at 5:20 a.m., at 5:20 a.m., I only gave her
14 Neurontin 200 twice a day.
15    Q. Can you give us a page number so we can follow
16 you?
17    A. Page 23.
18    Q. Thank you. I'm sorry.
19    A. So under her med orders, I only gave her
20 Topamax 50 twice a day, Neurontin 200 twice a day; and
21 so what I was doing was increasing it from the 5:20 of
22 med orders that I had given.
23    Q. Would this -- And forgive me if I don't
24 understand, because I don't. Would this get her back up
25 to the 2000 a day then? That is 200 times two and 800

28

1  times two?
2     A. No.
3     Q. Okay.
4     A. The intent is when a person comes in the
5  hospital, you don't have their -- at 5:20 a.m -- you
6  don't have the medical record in front of you.
7     Q. Sure.
8     A. So consequently the patient may not know their
9  dosage of medication. What happens is they know that
10 they are on the Neurontin, they don't know the dosage.
11 So then what we -- what I did was gave her a low dose of
12 Neurontin without knowing what dosage she was on; and
13 then as I found out what dosage she was on, then
14 increased it in the hospital setting.
15    Q. All right, sir. And how would you get to 800
16 times two? What formulation of the pills or the tablets
17 would that be?
18    A. I can give her two 400 milligram tablets twice
19 a day.
20    Q. All right, sir. Could I ask you to turn to
21 numbered page 29 of those records, please.
22    A. Yes.
23    Q. And is that your handwriting, as well?
24    A. Yes.
25    Q. And for what date is that, please?

Irene Barlow v.
Pfizer, Inc., et al

Larry Flowers, M.D.
August 28, 2010

### 33

1  medications were when she was discharged?
2  A. I would say that every -- everything except
3  the Neurontin, the Neurontin says 200 twice a day,
4  but -- which she had been prescribed 800 twice a day, as
5  noted before from the Physician Orders.
6  Q. All right. So on page 3, just, if you would,
7  quickly give us what her current medications were at
8  discharge as reflected on that page?
9  A. As reflected on that page, it is Effexor 150
10 once a day; Topamax 100 b.i.d; Neurontin 200 b.i.d;
11 Trazodone 50 milligrams HS; Tenormin 10 milligrams --
12     THE REPORTER: I need you to slow down.
13 A. -- Trazodone 50 milligrams QHS; Tenormin 10
14 milligrams twice a day; Zomig every six hours;
15 Hydrocodone every six hours.
16 Q. (By Mr. London) Are those correct with the
17 exception of the Neurontin, as best you know?
18 A. As the best I know.
19 Q. And then on the Neurontin was 200 milligrams
20 b.i.d, but you said actually it was Neurontin 800 --
21 A. 800.
22 Q. -- two times a day.
23 A. Right. It had been increased to 800 twice a
24 day during the hospital stay.
25 Q. And was that the level that you sent her home

### 34

1  with?
2  A. Yes.
3  Q. What date did she discharge from the hospital?
4  A. According to the records 11-11.
5  Q. And where --
6  A. Of 2000.
7  Q. Did you have an opinion about what her
8  condition was on the day she discharged insofar as her
9  suicide prospects were concerned?
10 A. Yeah. She was -- At that point she described
11 herself as having no suicidal intent or ideation.
12 Q. When did you see her again?
13     MR. LONDON: Sorry?
14     MR. FERGUSON: I just cleared my throat.
15     MR. LONDON: Okay. Sorry.
16     MR. FERGUSON: I apologize.
17     MR. LONDON: No, no. We'll edit that out
18 of the record.
19 A. The next report I see is 12-8 of 2000.
20 Q. (By Mr. London) All right, sir. I'm using
21 Exhibit 1, just so that we'll have page numbers on it,
22 and is Exhibit 1 the same record that you were looking
23 at that said 12-8-2000?
24 A. Yes, it is.
25 Q. Can I ask you to read into the record your

### 35

1  handwritten notes of December the 8th, 2000 for
2  Mrs. Barlow, please?
3  A. At the top it has Cypress Creek times one
4  week. I'm so happy to be alive. Went back to being
5  blah. Blah since release from hospital. Went to mom
6  for Thanksgiving in Laredo. She's in end-stage
7  Alzheimer's and it was kind of sad. Christmas can be
8  bad. Daughter mad at us and won't let us see
9  grandchild. She's mad because Fred, my husband, said
10 her husband wasn't helping enough with the baby. She's
11 turned everyone against me. Sleep pretty good from
12 10:00 to 6:00. Appetite pretty good. Energy not too
13 good. Mood pretty down. Just has a few -- Suicide, a
14 few fleeting -- few fleeting, which means few fleeting
15 ideas. Mental status exam - oriented times three.
16 Dressed appropriately. Activity, normal. Active
17 behavior, appropriate. Affect with some manic thought.
18 Non-delusional. No auditory or visual hallucinations.
19 Positive of fleeting suicide idea. Judgment insight are
20 fair. Assessment, bipolar disorder, depressed.
21 Cephalgia - taking Zomig, it used to work. Continue
22 meds and psychotherapy. No social life. Friends in
23 Bear Creek. I'm in The Woodlands, takes her 15 minutes,
24 and I'm panicked about driving.
25 Q. Can I ask you to go back to the page that

### 36

1  begins on December 8, 2000 that you first read to us.
2  Do you have medication notes in the left-hand margin of
3  that page?
4  A. Yes, I do.
5  Q. Would you read those medication notes to us,
6  please?
7  A. Neurontin 400 milligrams, one in the morning
8  and 2:00 p.m, three at night; Effexor XR 150 milligrams
9  twice a day; Topamax 100 milligrams, twice a day;
10 Klonopin 0.5 milligrams, two three times a day.
11 Q. Addressing the Neurontin medication, would
12 that be back at the 2,000 milligram per day level?
13 A. Yes, it is.
14 Q. All right, sir. And then would you interpret
15 for us your assessment of her suicide ideas or ideations
16 on that occasion, please?
17 A. Okay. Yes. When I say "fleeting suicide
18 ideas," it means it's not -- she's not preoccupied with
19 suicide. It means that a thought can race through her
20 head, but it doesn't stick with her. She's able to get
21 beyond it.
22 Q. All right. Were you aware, one way or the
23 other, that Mrs. Barlow was admitted to the hospital
24 with a further suicide attempt in January of 2001?
25 A. Not -- Not then, only much later.

**37**

1  Q. And how did you become aware of it much later?
2  A. I believe because of the lawsuit --
3  Q. All right.
4  A. -- is my --
5  Q. All right.
6  A. -- my understanding.
7  Q. All right. Were you not her treating doctor
8  for the second suicide attempt admission of Mrs. Barlow
9  in January 2001?
10  A. No, I wasn't.
11  Q. Have you seen Mrs. Barlow since December of
12  2000?
13  A. No, I haven't.
14  Q. All right. Have -- I believe we discussed on
15  the -- off the record, before we began, you've seen the
16  records of Dr. Atwal who was the doctor before you
17  treated Mrs. Barlow.
18  A. Yes.
19  Q. Have you seen any of the records of either her
20  hospitalizations or her medical care after December
21  2000?
22  A. Not that I'm aware of, no.
23  Q. All right. And apart from anecdotal reports,
24  do you have any information about the course of her
25  medical care or condition from the last time you saw her

**38**

1  to the present?
2  A. No, I don't.
3  Q. I want to shift gears with you if we can.
4  Oops! That involves fountain pen work. Did you discuss
5  with Mrs. Barlow the Neurontin that she was taking?
6  A. Yes.
7  Q. What -- it's now been some approximately 10
8  years. I would be afraid to ask you if you remember
9  precisely what you discussed; but in your opinion what
10  is -- what is it that you most likely discussed with her
11  about taking Neurontin?
12      MR. FERGUSON: Object to form. Go ahead,
13  Doctor.
14  Q. (By Mr. London) Did you discuss with her what
15  taking Neurontin might involve for her?
16  A. Yes.
17  Q. And in your best estimate, recall for us what
18  you most likely discussed.
19  A. I prob -- probably discussed that there is no
20  weight gain associated with Neurontin, that it would
21  also help with her anxiety, with her not having to
22  increase the benzodiazepine at the time, which was the
23  Klonopin; and discussed that it would probably assist
24  her, as well, with her mania or irritability, that it
25  could possibly assist with that, as well.

**39**

1  Q. Did you use the word "suicide" with
2  Mrs. Barlow in discussing her taking Neurontin?
3  A. No, not with -- not specifically in
4  relationship to her Neurontin.
5  Q. Was the word "suicide" in the warnings or in
6  the contraindications of the Neurontin FDA-approved
7  label at the time that Mrs. Barlow was your patient?
8  A. No.
9  Q. Did the word "suicide" become part of the
10  warnings or contraindications in the FDA-approved label
11  for Neurontin at some other time?
12  A. Yes.
13  Q. And do you recall when that was?
14  A. No. Approximately a couple of years ago. I'm
15  not sure exactly when.
16  Q. All right. And you mean a couple of years ago
17  from today, back in 2008, 2009, 2010?
18  A. Correct.
19  Q. All right, sir. If Neurontin had been in --
20  Let me strike that.
21      If suicide precautions had been in the
22  warnings or in the contraindications in the Neurontin
23  label in 2000, would you have most likely have discussed
24  suicide as such with Mrs. Barlow at that time?
25      MR. FERGUSON: Object to form. Go ahead,

**40**

1  Doctor.
2  A. In relationship to Neurontin, yes.
3  Q. (By Mr. London) All right, sir. I want to
4  ask you whether there have been occasions in the past
5  for Parke-Davis Warner-Lambert sales representatives to
6  come to your office?
7  A. Yes, there has.
8  Q. Did Parke-Davis Warner-Lambert sales
9  representatives promote Neurontin to you?
10  A. Yes.
11  Q. Tell me what you recall of that?
12  A. My best recollection is I think they had
13  another drug -- I can't remember specifically what it
14  was -- and at the time there were some experimentation
15  with AEs, anti-epileptics, in the treatments of bipolar
16  disorder. Historically Depakote and Tegretol had
17  worked; and I recall asking them about -- There were
18  already anecdotal reports about Neurontin and anxiety.
19  So I can recall asking them about off-label use of AEs
20  and whether or not Neurontin could potentially work with
21  bipolar disorder and them reporting, my best
22  recollection is, their -- they might be able to get me
23  some material regarding it.
24  Q. All right, sir. Did you know the name of any
25  of the material?

Case 1:04-cv-10981-PBS   Document 3104-11   Filed 10/22/10   Page 8 of 16

16 (Pages 61-64)

Irene Barlow v.
Pfizer, Inc., et al

Larry Flowers, M.D.
August 28, 2010

### Page 61

1 for this study?
2  A. This was --
3   MR. FERGUSON: Object to form.
4  A. This was --
5  Q. (By Mr. London) According to -- I'm sorry. 
6 Let me -- Based on this document, what does it set out
7 that the methods of this study were reported to be?
8   MR. FERGUSON: Same objection.
9  A. This was a double-blind, placebo-controlled
10 trial of adjunctive gabapentin (dosed flexibility
11 between 900 and 3600 milligrams a day). Patients with a
12 lifetime diagnosis of bipolar disorder (type I), who
13 were currently suffering from the symptoms or either
14 mania, hypomania or a mixed state despite ongoing
15 therapy with lithium, valproate, or lithium and
16 valproate in combination were eligible for inclusion.
17 The primary efficacy measures were the baseline to
18 endpoint changes in total score of the Young Mania
19 Rating Scale and the Hamilton Depression Rating Scale.
20  Q. All right, sir. Just -- If you can tell us,
21 what is a Young Mania Rating Scale?
22  A. This is just a scale for rating manic -- the
23 manic phase of bipolar disorder.
24  Q. And is -- is that the condition -- one of the
25 conditions that Mrs. Barlow had, the manic condition of

### Page 62

1 bipolar disorder?
2  A. Yes.
3  Q. All right, sir. And then if you would, I just
4 want to go down to the part that says "Conclusions,"
5 what are the conclusions of this study according to this
6 document?
7  A. The findings of this study did not demonstrate
8 the gabapentin as an effective adjunctive treatment when
9 administered to outpatients with bipolar disorder.
10  Q. Would you have liked to have known, when you
11 were administering Neurontin to Mrs. Barlow in the year
12 2000, that there was a study by Parke-Davis
13 Warner-Lambert's research scientists that was a
14 double-blinded random placebo-controlled trial that
15 reflected that it did not demonstrate that gabapentin
16 was an effective adjunctive treatment for patients with
17 bipolar disorder?
18   MR. FERGUSON: Object to form.
19  A. Yes, I would.
20  Q. (By Mr. London) I would like for you to look
21 over in the right-hand margin and do you see where it
22 says key words in the right-hand margin?
23  A. Yes.
24  Q. And then below that, the next paragraph, what
25 does the next paragraph say?

### Page 63

1   MR. FERGUSON: Object to form.
2  Q. (By Mr. London) Received --
3  A. Received 2 -- 22nd July of 1999, revised and
4 accepted by publication 22 November 1999.
5  Q. All right, sir. Now, based on these records
6 in Exhibit No. 3 that we looked at before, does that
7 appear to be during the same time period that the
8 Parke-Davis Warner-Lambert representatives were calling
9 on you; that is, between July of 1999 and September of
10 2000, the dates that are referred to in this original
11 article of the random control trial?
12   MR. FERGUSON: Object to form.
13  A. Yes.
14  Q. (By Mr. London) All right, sir. When you
15 administer a medication for a bipolar patient, do you
16 want it to be effective?
17  A. Yes.
18   MR. FERGUSON: Object to form.
19  Q. (By Mr. London) Would you have like to have
20 known that the company that manufactured this drug had
21 studied it and found that it was not effective?
22   MR. FERGUSON: Object to form.
23  A. Yes.
24  Q. (By Mr. London) Why would you like to have
25 known that?

### Page 64

1   MR. FERGUSON: Object to form.
2  A. Because it would give me other choices that I
3 could potentially use.
4  Q. (By Mr. London) If you were administering it
5 for -- Let me strike that and ask it a different way.
6   As I recall your earlier testimony, one
7 of your objectives in giving Neurontin to Mrs. Barlow
8 was to see if it might benefit her mania component of
9 her bipolar condition.
10  A. Yes.
11  Q. If you had known that the company had
12 conducted a random-controlled placebo-blinded study that
13 indicated that it did not benefit bipolar patients'
14 mania condition, would you have liked to have known that
15 at that time?
16   MR. FERGUSON: Object -- Object to form.
17  A. Yes.
18  Q. (By Mr. London) Why?
19  A. Because, again, it could give me other choices
20 that I could use --
21  Q. All right, sir.
22  A. -- of meds.
23   MR. LONDON: This is going to be
24 Number 8.
25   (Flowers Exb. No. 8 was marked.)

Case 1:04-cv-10981-PBS   Document 3104-11   Filed 10/22/10   Page 9 of 16

19 (Pages 73-76)

Irene Barlow v.
Pfizer, Inc., et al

Larry Flowers, M.D.
August 28, 2010

**Page 73**

1  A. Okay. It's -- Mine doesn't have all that.
2  Q. Did we successfully --
3  A. Wait a minute. Maybe I can look at it over
4  here and see --
5  Q. There it is. Bottom of the last page.
6  A. It's from Dr. Atul C. Pande.
7  Q. And does that appear to be the same name as
8  the gentleman who wrote that earlier study that we
9  looked at, the random-controlled placebo trial article
10 that you looked at as Exhibit 7?
11 A. Yes.
12 Q. All right, sir. It's written on Parke-Davis
13 letterhead?
14     MR. FERGUSON: Object to form.
15 A. Yes.
16 Q. (By Mr. London) On the front page, does it
17 reflect two tables, a Table 1, but one is a YMRS and one
18 is a HAM-D. Do you see that?
19 A. Yes.
20 Q. And are those -- What are YMRS and HAM-Ds?
21 A. YMRS is a Young Mania Rating Scale and the
22 HAM-D is the Hamilton Rating State for Depression.
23 Q. All right, sir. And then at the end of that
24 first paragraph on that first page, what does that last
25 sentence say?

**Page 74**

1      MR. FERGUSON: Object to form.
2  A. To the contrary placebo patients showed a
3  greater decrease in total YMRS score than the gabapentin
4  patients.
5  Q. (By Mr. London) All right. And is a decrease
6  in the YMSRS (sic) score an improvement?
7  A. No.
8  Q. Okay. Then what does it mean for the patient
9  to have had a change in the YMRS scale relative to the
10 gabapentin patients?
11     MR. FERGUSON: Object to form.
12 Q. (By Mr. London) If you know.
13     MR. FERGUSON: Object to form.
14 A. That's just stating that the placebo patients
15 did better and specifically it did not decrease the
16 mania. Gabapentin didn't increase mania in any
17 significant fashion.
18 Q. (By Mr. London) Would you have liked to have
19 known that when you were treating Mrs. Barlow?
20     MR. FERGUSON: Object to form.
21 A. Yes.
22 Q. (By Mr. London) All right, sir. Did any
23 Parke-Davis sales representative ever disclose to you in
24 1998, 1999, 2000, 2001 or at any other time that placebo
25 patients did better than gabapentin patients in the

**Page 75**

1  bipolar trials?
2      MR. FERGUSON: Object to form.
3  A. No.
4  Q. (By Mr. London) All right. Do you know who
5  is Dr. Richard Glanzman?
6  A. No.
7  Q. Have you ever heard that name before today?
8  A. I'm not sure.
9  Q. All right, sir. I want you to assume that
10 Dr. Richard Glanzman is the medical director associated
11 with the Pfizer Corporation. Just assume that for me,
12 would you please?
13 A. Yes.
14 Q. At this time I'm going to ask my technology
15 operator to play for you certain portions of
16 Dr. Glanzman's testimony that were presented in federal
17 court in Boston just a few months ago. Would you watch
18 that video for us, please, listen to his testimony and
19 then I'll ask you some questions about it.
20 A. Okay.
21     MR. FERGUSON: And I'll object to the
22 form and the procedure of just showing the videotape of
23 another witness testifying to our current witness at the
24 deposition. We're asking the witness questions
25 regarding his knowledge, not getting his comments on

**Page 76**

1  someone else's testimony or a videotape.
2      MR. LONDON: Understood. That -- The
3  objections are -- are noted and I respect your
4  objections. We're going to proceed.
5      MR. FERGUSON: Fine. I'm not preventing
6  you.
7      MR. LONDON: I know.
8      (Dr. Glanzman's video played as follows:
9  Q. Could you state your name and your
10 residential address for the record, please?
11 A. Robert Louis Glanzman, 34 Dutch Hill
12 Drive, Carmel, New York 10512.
13 Q. What was your last employment prior
14 to Novartis?
15 A. I worked for Pfizer, Incorporated.
16 Q. What period of time did you work for
17 Pfizer?
18 A. From September of 1999 through March
19 of 2007. I was a medical director on the
20 Neurontin Team.
21 Q. Did you have that entire -- Did you
22 have that position for the entire period of
23 time that you worked on Neurontin?
24 A. Yes.
25 Q. And as medical director for

**Page 77**

1  Neurontin, what were your job
2  responsibilities?
3    A. Well, to serve on the committees
4  that you see here.
5    Q. When you -- when you work on
6  Neurontin --
7    A. Yes.
8    Q. -- or even before working on Neurontin
9  or after working on Neurontin, but for that
10 period of time that you worked here at Pfizer,
11 do you -- can you tell me, did Pfizer ever go
12 out at any point in time and inform physicians
13 that not -- Neurontin was not effective for a
14 particular indication?
15   A. Did Pfizer ever go out and tell
16 physicians that Neurontin was not effective
17 for a particular indication? Not that I'm
18 aware of.
19   Q. In the -- in the psychiatric
20 conditions, did you read any studies of
21 Neurontin's use in treating bipolar?
22   A. No, I didn't really review the
23 psychiatric literature.
24   Q. Well, you say you approved a message
25 that reads, "gabapentin is effective against

**Page 78**

1  a wide range of neurologic and psychiatric
2  conditions."
3    A. Correct.
4    Q. What are the psychiatric
5  conditions that you're referring to?
6    A. Well, frankly, I'm not referring
7  to any specific psychiatric conditions.
8    Q. Well, you approved a key message
9  that gabapentin was effective against
10 psychiatric -- a wide range of neurologic
11 and psychiatric conditions. What
12 psychiatric conditions are we talking
13 about here?
14   A. I mean, I would be happy to go
15 back and do a literature review for you
16 and look at the data for you. I did not
17 do it back then.
18   Q. Well, how could you approve a
19 message without looking at the clinical
20 data?
21   A. Well, I mean, obviously, there --
22 this is not -- I approved it. Whether
23 it was correct or not, I can't say at
24 this time.
25   Q. Well, that -- that was your job

**Page 79**

1  as medical director, wasn't it, to review
2  the clinical data to see if it supported
3  a key message?
4    A. Yes. That was a part of my job.
5    Q. And is it your testimony that you
6  didn't, you approved a message that it
7  was effective against a wide range of
8  psychiatric conditions and you didn't
9  look at any clinical data?
10   A. It is my testimony that I did
11 not do a thorough review of psychiatric
12 conditions.
13   Q. Well --
14   A. That's correct.
15   Q. -- if you didn't do it, who was
16 going to do it?
17   A. Well, it was my job; so if I
18 didn't do it, nobody would do it.
19   Q. And it was your responsibility
20 to communicate to the regional medical
21 directors the safety information related
22 to Neurontin --
23   A. That's correct.
24   Q. -- between January of 2001 and
25 July of 2002?

**Page 80**

1    A. That's correct.
2    Q. And it was also your
3  responsibility to communicate to the
4  sales force of Pfizer between January
5  of 2001 and February of 2002 any safety
6  information related to Neurontin?
7    A. That's correct.
8    Q. And that's --
9    A. Well, relevant -- relevant safety
10 information.
11   Q. Relevant safety information.
12   A. Correct. I would not have
13 done an exhaustive safety review.
14   Q. You would not have done an
15 exhaustive safety review?
16   A. No, not with the field --
17 Well, they wouldn't have understood it.
18 And not only that, they wouldn't have
19 had time to absorb it.
20   Q. Did you ever personally do
21 an exhaustive safety review personally?
22   A. I had a copy of the integrated
23 safety -- summary of safety report, which
24 I -- it's a tome, which no one, I don't
25 think, has ever read in its entirety. I

Case 1:04-cv-10981-PBS   Document 3104-11   Filed 10/22/10   Page 11 of 16

21 (Pages 81-84)

Irene Barlow v.
Pfizer, Inc., et al

Larry Flowers, M.D.
August 28, 2010

**Page 81**

1 certainly have never read it in its
2 entirety.
3     Q. Does the label contain all of
4 the information that the company knows
5 regarding the safety of a drug?
6     A. No.
7     Q. And are there safety concerns
8 that may exist that the company has
9 knowledge about that are not within the
10 label at any given time?
11     A. Yes.
12     Q. And did you undertake any
13 effort whatsoever to examine whether or
14 not there were any safety concerns or
15 issues with Neurontin in psychiatric
16 adverse events in the Warner-Lambert
17 Parke-Davis era when you began as
18 medical director for Neurontin and
19 Pfizer?
20     A. No, that wasn't my function.
21     Q. And in January of 2001, you
22 did not know the safety profile as it
23 affected the bipolar community; did you?
24     A. Did I personally? No.
25         (End of Dr. Glanzman's video replay.)

**Page 82**

1     Q. (By Mr. London) Let me ask you a few
2 questions about this testimony that you have just seen,
3 Doctor. Were you aware before just now that the medical
4 director on the Neurontin team had approved a key
5 message that Neurontin was effective for a wide range of
6 psychiatric conditions even though he had never read any
7 of the underlying clinical studies on Neurontin?
8         MR. FERGUSON: Let me object to form and
9 just renew my objections --
10        MR. LONDON: Yes.
11        MR. FERGUSON: -- on the process and
12 procedure of showing the -- a doctor testimony from
13 someone else and then quizzing him about it.
14        MR. LONDON: All right.
15        MR. FERGUSON: You may proceed.
16    A. No.
17    Q. (By Mr. London) Let me just ask you this
18 question, would you have liked to have known everything
19 that you have just now heard Dr. Glanzman testify to
20 before prescribing Neurontin to your patients for
21 bipolar conditions?
22        MR. FERGUSON: Object to form.
23    A. Yes.
24    Q. (By Mr. London) Why would you like to have
25 known that?

**Page 83**

1         MR. FERGUSON: Object to form.
2     A. Because it clearly gives me other choices to
3 make.
4     Q. (By Mr. London) All right.
5     A. That might have been proven to work.
6     Q. Were you aware that not all of the relevant
7 safety information pertaining to Neurontin's risks were
8 contained within the label?
9         MR. FERGUSON: Object to form.
10    A. No.
11    Q. (By Mr. London) Were you aware that the
12 manufacturer -- that is, Parke-Davis Warner-Lambert
13 Pfizer -- had information about relevant safety concerns
14 that was not on the label back at the time you were
15 prescribing Neurontin to Mrs. Barlow?
16        MR. FERGUSON: Object to form.
17    A. Could you restate the question?
18    Q. (By Mr. London) I'll do my best. Were you
19 aware that, as I understood Dr. Glanzman's testimony,
20 that the manufacturer of Neurontin had knowledge about
21 safety matters to do with Neurontin that were not in the
22 label and not known to doctors --
23    A. No.
24        MR. FERGUSON: Object to form.
25    Q. (By Mr. London) -- at the time you were

**Page 84**

1 prescribing Neurontin to Mrs. Barlow?
2     A. No.
3         MR. FERGUSON: Same objection.
4     Q. (By Mr. London) And he made an objection, and
5 I don't think he was intending to do it, but he
6 overspoke you. If you would just give your answer.
7     A. No. I wasn't aware.
8     Q. All right, sir. What is the label? What is a
9 drug's label as you, a psychiatrist, consider a drug's
10 label?
11        MR. FERGUSON: Object to form.
12    A. Well, I guess you have to clarify. What I'm
13 thinking about label, I'm thinking about a list of how a
14 medication works, what is it used for, its indications
15 what are the side effects, what other drugs can it be
16 administered with, what are its contraindications,
17 followed by as well as use in pregnancy; and then
18 with -- it gives the dosage, dosages that you can use
19 and how it should be prescribed.
20    Q. (By Mr. London) All right. Do you have an
21 understanding, one way or the other, whether a label is
22 approved by the FDA for the illnesses or medical
23 conditions for which the FDA has approved the drug to be
24 used?
25        MR. FERGUSON: Object to form.

Case 1:04-cv-10981-PBS   Document 3104-11   Filed 10/22/10   Page 12 of 16

22 (Pages 85-88)

Irene Barlow v.
Pfizer, Inc., et al

Larry Flowers, M.D.
August 28, 2010

**Page 85**

1  A. Yes, it is.
2  Q. (By Mr. London) All right. Do you -- What
3  is a PHYSICIANS' DESK REFERENCE or a PDR?
4  A. PDR is just a reference book that we use which
5  lists the labeling of most of the drugs that we use.
6  Q. All right, sir.
7  A. Yes.
8  Q. You told us -- I'm sorry. You told us earlier
9  that the risk of suicide was not in the warnings or in
10 the contraindications of the Neurontin label during the
11 year 2000. Do you recall whether it was in the
12 PHYSICIANS' DESK REFERENCE at that time?
13     MR. FERGUSON: Object to form.
14 A. No, it wasn't.
15 Q. (By Mr. London) All right, sir. Did anyone
16 with Parke-Davis, Warner-Lambert or Pfizer ever disclose
17 to you that the laboratory studies had been seen to
18 reduce the release of -- that the laboratory studies of
19 gabapentin had been observed to reduce the release of
20 monoamines?
21     MR. FERGUSON: Object to form.
22 A. No.
23 Q. (By Mr. London) Is -- What is serotonin?
24 A. That's one of the neurochemicals or
25 neurohormones that's located in multiple spots in the

**Page 86**

1  human body that's been associated with lack of
2  depression, a lack of serotonin and other areas.
3  Q. Is it a monoamine?
4  A. Serotonin -- Specifically, I don't know
5  whether it's a monoamine or not.
6  Q. Was it ever disclosed to you whether it had
7  been observed that the administration of gabapentin was
8  associated with the reduced release of serotonin?
9     MR. FERGUSON: Object to form.
10 A. No.
11 Q. (By Mr. London) Would you like to have known
12 whether a drug you were using in bipolar patients did or
13 did not inhibit the release of serotonin in patients?
14     MR. FERGUSON: Object to form.
15 A. Yes.
16 Q. (By Mr. London) Why?
17 A. Because it -- The association, a net increase
18 in serotonin, is associated with successful treatment of
19 depression. A decrease, a net decrease in serotonin,
20 has been associated with a worsening of depression.
21 Q. Was it ever disclosed to you by anyone at
22 Parke-Davis Warner-Lambert whether clinical trials of
23 gabapentin had been observed to have an increase in
24 treatment emergent depression compared to placebo at
25 amounts equal to or greater than 1800 milligrams per

**Page 87**

1  day?
2     MR. FERGUSON: Object to form.
3  A. No.
4  Q. (By Mr. London) Would you like to have known
5  that?
6     MR. FERGUSON: Object to form.
7  A. Yes.
8  Q. (By Mr. London) Why?
9  A. Because it gives me the alternative to use
10 other choices.
11 Q. A few moments ago you watched some video
12 testimony by Dr. Richard Glanzman in which he stated,
13 among other things, that not all the safety concerns --
14 not all of the safety information known to the
15 manufacturer about Neurontin was in the label. Do you
16 recall that?
17     MR. FERGUSON: Object to form.
18 A. Yes.
19 Q. (By Mr. London) All right. Were you aware
20 during the time that you were treating Mrs. Barlow that
21 Parke-Davis Warner-Lambert was being investigated by a
22 grand jury for off-label marketing of gabapentin to
23 bipolar patients?
24 A. No.
25     MR. LONDON: Where are we? 10?

**Page 88**

1     THE REPORTER: Uh-huh.
2     (Flowers Exh. No. 10 was marked.)
3  Q. (By Mr. London) I want to show you what has
4  been marked as Exhibit 10 and I want you to assume with
5  me that it is a copy of the information in the case
6  called the United States of America versus
7  Warner-Lambert Company, Criminal Number -- and I don't
8  see it on there -- but various violations of the United
9  States Code. That's what it states on the cover. Do
10 you see that?
11     MR. FERGUSON: Object to form.
12 A. Yes.
13 Q. (By Mr. London) And even though this may have
14 been in your file, because I sent it to you once before,
15 have you ever actually read this document?
16 A. No.
17 Q. I want you to turn to page 14 of that exhibit.
18 A. Okay.
19 Q. On my page that says Count Two at the top of
20 the page, is that what yours says?
21 A. Yes.
22 Q. All right, sir. Would you read into the
23 record that paragraph 40, please?
24     MR. FERGUSON: Object to form.
25 A. "Beginning as early as April 1995, and

**Page 89**

1 continuing thereafter until at least in or about August
2 20th of 1996, in the District of Massachusetts and
3 elsewhere Warner-Lambert, after previously having been
4 convicted of violating the Federal Food, Drug and
5 Cosmetic Act, 21 U.S.C. statute 331 and 333, did
6 introduce and cause the introduction into interstate
7 commerce from Puerto Rico and elsewhere, directly and
8 indirectly, into Massachusetts and elsewhere, quantities
9 of Neurontin, a drug within the meaning of the Federal
10 Food, Drug and Cosmetic Act, 21 U.S.C. 321, which drug
11 was intended for the use for the treatment of
12 neuropathic pain, bipolar disorder, as monotherapy for
13 epilepsy, and other Unapproved Usages -- Uses, and which
14 was misbranded within the meaning of 21 U.S.C. 352, in
15 that Neurontin's labeling lacked adequate directions for
16 such uses. All in violation of 21 U.S.C. 331(a),
17 333(a)(2) and 352(f)(1)."
18     Q. Were you aware that Parke-Davis Warner-Lambert
19 was charged with the crime of introducing Neurontin into
20 the stream of commerce for the use for bipolar disorder
21 at a time when its labeling lacked adequate directions
22 for such uses as set out in the paragraph you just read
23 to me?
24     MR. FERGUSON: Object to form.
25     A. No, I wasn't aware.

**Page 90**

1     Q. (By Mr. London) All right. Were you aware
2 that Parke-Davis Warner-Lambert pleaded guilty to that
3 crime?
4     MR. FERGUSON: Object to form.
5     A. No, I wasn't aware.
6     Q. (By Mr. London) Were you aware that
7 Parke-Davis Warner-Lambert admitted that it was
8 unequivocally true that that happened?
9     MR. FERGUSON: Object to form.
10     A. No.
11     MR. LONDON: All right. Let's mark
12 Exhibit 11 I think we are.
13     (Flowers Exb. No. 11 was marked.)
14     Q. (By Mr. London) Will you look at Exhibit 11,
15 please.
16     A. Yes.
17     Q. Does this appear to be a letter from the
18 United States Department of Justice dated May 13th, 2004
19 to a Mr. Robert Fiske and a Mr. James Rouhandeh --
20     MR. FERGUSON: Object to form.
21     Q. (By Mr. London) -- regarding Warner-Lambert
22 Company L.L.C.?
23     A. Yes.
24     Q. All right, sir. Without reading this entire
25 letter -- and you're certainly welcome to do that. I

**Page 91**

1 have no quarrel with your doing that. I would like for
2 you to read that first paragraph that says "Change of
3 Plea," and then just read that last two sentences of
4 that one paragraph, please.
5     MR. FERGUSON: Object to form.
6     A. Starting with "Warner-Lambert expressly waives
7 any statute of limitations defense that it may have in
8 connection with these crimes. Warner-Lambert expressly
9 and unequivocally admits that it's committed the crimes
10 charged in the Information. Warner-Lambert agrees that
11 the facts set forth in the Information are true."
12     Q. Would you like to have known, when you were
13 treating Mrs. Barlow with Neurontin for bipolar
14 disorder, that Parke-Davis and Warner-Lambert were going
15 to eventually admit that it was unequivocally true that
16 it had distributed Neurontin for the treatment of
17 bipolar disorder without adequate directions to doctors
18 to treat that condition in violation of the law?
19     MR. FERGUSON: Object to form.
20     A. Yes.
21     Q. (By Mr. London) Again, why?
22     A. Because it gives me alternative choices.
23     Q. Okay. If you had known back in 2000, when you
24 were treating Mrs. Barlow with Neurontin, did you --
25 Let me -- Strike that. Let me ask you another

**Page 92**

1 question.
2     Earlier you told us that you knew that
3 within the last couple of years the risk of suicide had
4 been moved into the warning or contraindication section
5 of the Neurontin label. Do you recall that?
6     MR. FERGUSON: Object to form.
7     A. Yes.
8     Q. (By Mr. London) All right. Do you -- Do you
9 know why or how it came to be moved into that section?
10     A. No.
11     Q. Just that it was now known to be associated
12 with suicidality.
13     MR. FERGUSON: Object to form.
14     A. Yes.
15     Q. (By Mr. London) Do you now know that
16 Neurontin is known by the FDA to be associated
17 with suicidality in the off-label -- Strike that.
18     Do you now on know that Neurontin is now
19 known to be associated with suicidality over placebo?
20     MR. FERGUSON: Object to form.
21     A. Yes.
22     Q. (By Mr. London) All right, sir. If you had
23 known in 1999, 2000, when you were treating Mrs. Barlow,
24 that the Food and Drug Administration had found that
25 Neurontin increased the risk of suicide, that

Irene Barlow v.  
Pfizer, Inc., et al

Larry Flowers, M.D.  
August 28, 2010

---

**93**

1 Warner-Lambert had known from random controlled placebo
2 trials that it was not effective for the treatment of
3 bipolar, if you had known that it had been observed in
4 clinical trials that Neurontin had a higher risk of
5 depression in patients who took it at and above 1800
6 milligrams a day relative to placebo, if you had known
7 that the company medical director who approved the
8 message that it works for a broad range of psychiatric
9 applications had never read the clinical studies, and if
10 you had known that Warner-Lambert had not disclosed to
11 doctors that -- that directions were safe use for
12 off-label -- that they did not provide adequate
13 directions for the safe use of Neurontin in bipolar
14 patients, as they admitted in the guilty plea, would
15 that have affected your choice as to whether or not to
16 prescribe Neurontin to Mrs. Barlow?
17         MR. FERGUSON: Object to form.
18    A. Yes.
19    Q. (By Mr. London) How so?
20         MR. FERGUSON: Object to form.
21    A. Again, it would lead me to use other
22 alternatives that would have been proven.
23    Q. (By Mr. London) Would it have affected your
24 choice whether to raise her dose level from the 900
25 milligrams a day that she was taking when Dr. Atwal

**94**

1 referred her to you to the 2000 milligram per day level
2 that she was taking as of December 2000?
3         MR. FERGUSON: Object to form.
4    A. Yes.
5    Q. (By Mr. London) How would it have affected
6 that choice?
7    A. I would certainly have made sure that if I got
8 up to 1800 milligrams that she would get a warning
9 specifically about increased suicidality.
10   Q. All right. Would you have used the word
11 "suicide" in talking with her about taking Neurontin?
12        MR. FERGUSON: Object to form.
13   A. Yes.
14   Q. (By Mr. London) Why?
15   A. Well, today, because we know that it has a
16 warning regarding suicide, it is important to warn the
17 patient that the medication may increase the risk for
18 suicide; so the patient or family members or those that
19 are around her can ensure that she gets adequate safe
20 treatment.
21   Q. (By Mr. London) All right, sir. As you told
22 us before, you did not follow her from the time she was
23 admitted to the hospital in January 2001 of an actual
24 bullet wound to her body from a suicide attempt. Is
25 that true?

**95**

1    A. Yes.
2    Q. Or since that time, you have not followed her
3 since that time?
4    A. I haven't.
5    Q. You are a treating psychiatrist as opposed to
6 one who does your work in the laboratory; is that true?
7    A. Yes.
8    Q. All right, sir. Are you a biological
9 psychopharmacologist?
10   A. I have to know what you mean by that, because
11 they -- they would say that what we do every day is
12 practice psychopharmacology; and some people would
13 describe that as biological psychopharmacology. But I
14 don't know -- What do you specifically mean by that?
15   Q. Do you know the mechanism of Neurontin in the
16 molecular level?
17   A. No, I don't.
18   Q. Down to the level that the laboratory
19 scientists know?
20   A. No.
21   Q. Are you aware one way or the other whether it
22 says on the -- on the approved label for Neurontin that
23 the mechanism of its action is not known?
24   A. Yes. I'm aware that it's unknown.
25   Q. All right, sir. Given all of that, are you --

**96**

1 Do you believe you're in the best position to form an
2 opinion and express an opinion about whether Neurontin
3 caused or contributed to Mrs. Barlow's two suicide
4 attempts in November 2000 and January 2001; or would you
5 rather defer to others?
6         MR. FERGUSON: Object to form.
7    A. I would certainly defer that to others who are
8 studying that specifically.
9    Q. (By Mr. London) Doctor, I'm going to pass the
10 witness at this time. Thank you very much for your
11 patience in letting me go through these documents with
12 you. One last -- Two last questions.
13        Before we began, you presented us with a
14 file that has some items in it that are not part of your
15 treatment record. We'd like to have a copy of your
16 file. If you will let us have that as copy, we'll give
17 it to the court reporter from us to copy and return to
18 us and return to you. Is that how you would like to do
19 it?
20   A. Certainly, we can do that.
21   Q. We want to be sure that everybody, defense
22 counsel and our side, both have everything that you
23 have. All right, sir?
24   A. Yes.
25   Q. And then secondly, we met with you before the

**Page 105**

1  doesn't even apply to the patient.
2       MR. LONDON: Is that on another patient?
3       THE WITNESS: Yes.
4       MR. LONDON: Okay.
5  A. It doesn't -- Apparently it's like a refill,
6  medication refill, that doesn't apply to this patient.
7  Q. (By Mr. Ferguson) Okay, Doctor. You can set
8  that down. Let me -- Let me now turn to the documents
9  that were -- that were not stapled to but were loose in
10 the manila folder that's now marked as Exhibit 14. I'm
11 going to mark these separately, just for ease of
12 reference.
13      (Flowers Exb. 15 was marked.)
14 Q. (By Mr. Ferguson) The first document I've
15 marked as Exhibit 15 appears to be a letter from -- from
16 Carl Pierce; correct?
17 A. Correct.
18 Q. And that's a letter to you, Dr. Flowers?
19 A. Yes, it is.
20      (Flowers Exb. No. 16 was marked.)
21 Q. (By Mr. Ferguson) Okay, then Exhibit 16,
22 looks like maybe it's a -- looks like a phone message.
23 Can you -- Can you tell us who that phone message is
24 from, if it is in fact a phone message?
25 A. From -- It's a phone message from Attorney

**Page 106**

1  Carl Pierce.
2  Q. And what's the substance of the phone message?
3       MR. LONDON: Objection.
4  A. Says there's a lawsuit suing the Pfizer --
5  well, they misspelled it -- Visor Pharmaceutical
6  Company.
7  Q. (By Mr. Ferguson) All right. And it says
8  suing the -- It says "Visor Pharmaceutical Company/
9  please, Dr. Flowers, call my attorney and speak with
10 him. Nothing against the doctor/just ND" or need "his
11 help."
12      Does that appear to be from your patient
13 or, again, do you know?
14 A. I don't know, just -- It says from -- It
15 actually says "From: Patient Irene Barlow," and it gives
16 your phone number -- Austin -- 512-733 -- and then it --
17 the reason is to call attorney Carl Pierce regarding
18 suing Pfizer Pharmaceutical.
19 Q. Okay.
20 A. And speak with him.
21      (Flowers Exb. No. 17 was marked.)
22 Q. (By Mr. Ferguson) And then Exhibit 17 appears
23 to be another phone message sheet; correct?
24 A. Correct.
25 Q. And can you tell us what the substance of that

**Page 107**

1  phone message is?
2  A. The caller, Carl Pierce, attorney. Litigation
3  in 2007, you may be asked to give a deposition. They
4  need one hour of your time for a conference.
5  Q. Did that conference ever take place?
6  A. I believe it -- Yes, possibly this conference
7  took place. Yes,
8  Q. What's the date of that phone message?
9  A. 12-21 of '06.
10 Q. Just for completeness, I'll mark this; but it
11 appears to be a --
12      (Flowers Exb. No. 18 was marked.)
13 Q. (By Mr. Ferguson) Exhibit 18 appears to be a
14 medical records request; correct?
15 A. Yes, it is a medical records request.
16      (Flowers Exb. No. 19 was marked.)
17 Q. (By Mr. Ferguson) What is Exhibit 19?
18 A. It's a Wright & -- It says from Wright &
19 Greenhill, P.C, Attorneys at Law, August 31st, 2004
20 notifying me that they represent Irene Barlow. And I am
21 scheduled to be in Houston on Friday, September -- The
22 date of this is August 31st of 2004. He stated "I'm
23 scheduled to be in Houston on Friday, September 17. I
24 have an appointment with Dr. Alan Lloyd, another of
25 Mrs. Barlow's treating physicians. Would it be possible

**Page 108**

1  to meet with me the same day?" From Carl Pierce.
2  Q. Do you know whether that happened or not?
3  A. I know I met with Mr. Pierce. I just don't
4  know exactly when.
5  Q. And in the -- In the first sentence of
6  Mr. Pierce's letter, he says that he represents "Irene
7  Barlow with regards to the claims she has against the
8  drug manufacturer of Neurontin." And then she says the
9  drug -- the letter says, "The drug manufacturer promoted
10 Neurontin for off-label uses, including for bipolar
11 disorder, without appropriate scientific support for its
12 efficacy."
13 A. Yes.
14 Q. Is that -- Did I read that correctly?
15 A. Yes, it does state this, uh-huh.
16 Q. Okay. So Mr. Pierce is writing you telling
17 them what their claims are.
18 A. Right.
19 Q. And then wanted to meet with you.
20 A. Yes.
21      (Flowers Exb. No. 20 was marked.)
22 Q. (By Mr. Ferguson) Then Number 20 is just an
23 authorization, a HIPPA authorization?
24 A. Correct.
25      (Flowers Exb. No. 21 was marked.)

Case 1:04-cv-10981-PBS   Document 3104-11   Filed 10/22/10   Page 16 of 16

28 (Pages 109-112)

Irene Barlow v.  
Pfizer, Inc., et al

Larry Flowers, M.D.  
August 28, 2010

**Page 109**

1  Q. (By Mr. Ferguson) Number 21 is actually the  
2  Original Petition filed by Ms. Barlow in Travis County  
3  in this case; correct?  
4         MR. LONDON: If you know.  
5  A. That's what it appears to be.  
6  Q. (By Mr. Ferguson) And do you know when you  
7  received that?  
8  A. I don't know when I received it specifically.  
9  Q. Sometime before today.  
10 A. Yes. Sometime before today.  
11 Q. And did you read that?  
12 A. Not in its entirety, I'm almost sure.  
13 Q. Did you read part of it?  
14 A. Probably part of it.  
15        (Flowers Exb. No. 22 was marked.)  
16 Q. (By Mr. Ferguson) Exhibit 22 is another  
17 document that is -- appears to be a letter to Robert  
18 Fiske and James P. Rouhandeh. Do you know when you  
19 received that document?  
20 A. I have no idea.  
21        (Flowers Exb. No. 23 was marked.)  
22 Q. (By Mr. Ferguson) Exhibit 23 is again a  
23 letter from Mr. London, including a Scheduling Order?  
24 A. Yes.  
25        (Flowers Exb. No. 24 was marked.)  

**Page 110**

1  Q. (By Mr. Ferguson) And the last document is  
2  Exhibit 24, just an Authorization for Release of  
3  Information signed by Ms. Barlow.  
4  A. Yes.  
5  Q. Okay. So have we covered all of the documents  
6  that you brought with you today?  
7  A. Yes, we have.  
8  Q. All right. Do you have any other documents  
9  relating to Ms. Barlow?  
10 A. None that I'm aware of.  
11 Q. And you indicated that at some point in the  
12 past -- you can't remember when -- you met with -- with  
13 the lawyers for Ms. Barlow; correct?  
14 A. Yes.  
15 Q. And what was -- What was discussed? I'm not  
16 talking about each question; but in generalities, what  
17 was discussed at that meeting?  
18 A. I guess a general summary is something to the  
19 regards of whether or not it's a possibility gabapentin  
20 plays a role in the demise and whether or not I know, is  
21 my best recollection, that gabapentin -- since -- in  
22 some regards does not work in bipolar disorder.  
23 Q. Did they tell you gabapentin didn't work in  
24 bipolar disorder?  
25 A. No. I think they -- The original thing was  

**Page 111**

1  more a feel-me-out sort of thing, more than telling me  
2  anything, more feeling me out, what my views were, and  
3  kind of letting me know where they were coming from.  
4  Q. Okay. Was there one meeting with counsel with  
5  the lawyers for Ms. Barlow or was there more than one  
6  meeting?  
7  A. One meeting way back when and then another  
8  meeting a couple of days ago.  
9  Q. Okay. And how long did the meeting a couple  
10 days ago last?  
11 A. About an hour, hour and a half, I would say.  
12 Q. And was that with both Mr. Pierce and  
13 Mr. London?  
14 A. Yes, it was.  
15 Q. Was the prior meeting with Mr. Pierce and  
16 Mr. London?  
17 A. I can't remember that far back --  
18 Q. Fair enough.  
19 A. -- to tell you.  
20 Q. All right. What was the subject matter of the  
21 discussion two days ago for an hour and a half?  
22 A. That basically there was going to be a  
23 deposition and that he wanted to ask questions  
24 concerning my thoughts now regarding this Irene Barlow  
25 case and what my thoughts and feelings were regarding  

**Page 112**

1  the use of Neurontin and the bipolar overall subject  
2  area.  
3  Q. Did you meet with them any today regarding  
4  your deposition?  
5  A. No.  
6  Q. So there were two meetings total.  
7  A. Yes.  
8  Q. And did they essentially preview the questions  
9  they were going to ask you today?  
10 A. They talked about some of the questions they  
11 were going to ask me.  
12 Q. Did they show you some of the documents that  
13 we've marked to the deposition?  
14 A. Some of them, yes.  
15 Q. Are there any other documents they showed you  
16 that we haven't attached to the deposition?  
17 A. No.  
18 Q. Doctor, there was some discussion about  
19 some -- some literature that I think they showed you.  
20 Let me ask you this. In general, what journals do you  
21 regularly review?  
22 A. "American Psychiatric Journal" would probably  
23 be the top journal, "Journal of Clinical  
24 Psychopharmacology" and occasionally "Clinical  
25 Neurology" -- Neurology.