UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

------------------------------------------------------------x
: MDL Docket No. 1629
In re: NEURONTIN MARKETING, :
SALES PRACTICES AND : Master File No. 04-10981
PRODUCTS LIABILITY LITIGATION :
: Judge Patti B. Saris
------------------------------------------------------------x
: Magistrate Judge Leo T. Sorokin
THIS DOCUMENT RELATES TO: :
:
*Barlow v. Pfizer Inc., et al.* :
Case No. 1:05-cv-11501-PBS :
:
------------------------------------------------------------x

**PRODUCTS LIABILITY PLAINTIFFS' MEMORANDUM
IN OPPOSITION TO DEFENDANTS' EMERGENCY MOTION
FOR AN ORDER PROHIBITING IMPROPER TACTICS DURING
<u>FACT WITNESS DEPOSITIONS AND IMPOSING SANCTIONS</u>**

Products Liability Plaintiffs hereby oppose the emergency motion by Defendants Pfizer Inc. and Warner-Lambert Company LLC for an order prohibiting improper tactics during fact witness depositions and imposing sanctions in *Barlow v. Pfizer Inc.,* D. Mass. Case No. 05-11501.

**PRELIMINARY STATEMENT**

The Court should deny Defendants' broadsweeping and cleverly ambiguous request that all Plaintiffs' counsel in the multidistrict litigation should be precluded from "**sending unsolicited *ex parte* information about the guilty plea and other prejudicial materials to non-party fact witnesses, playing video or reading testimony during depositions, and questioning non-expert treating physicians about matters not within their personal knowledge.**" ECF Doc. # 3096 at 12 (emphasis added). The evidence that Defendants seek to preclude is directly relevant to a physician's decision-making process as to whether to prescribe

Neurontin.  Indeed, Defendants' admitted guilt in promoting Neurontin without adequate directions for use could affect a physician's decision to prescribe Neurontin.  Even more compelling is testimony from a prescriber that Defendants' knowledge as to risks of suicidal behavior or lack of efficacy with Neurontin, if known by the prescriber, would have affected his or her prescribing practices with Neurontin.  Consequently, Plaintiffs' counsel are well within their right to inquire of a prescriber about such evidence.  The evidence is probative to Plaintiffs' causes of action and particularly to opposing Defendants' learned intermediary defense.

Plaintiffs' counsel have a right to conduct *ex-parte* communications, authorized by their client, with the client's treating physicians concerning issues that are relevant to the litigation, such as the publicly known fact that Pfizer Defendants pleaded guilty to off-label marketing and may have illegally marketed Neurontin to Plaintiffs' prescribing physicians.  Moreover, heretofore, Pfizer Defendants have argued in affirmative motions and before this Court that a Plaintiff should speak with the Plaintiff's or Plaintiff's decedent's treating physicians directly, not just with regard to treatment, but also concerning off-label marketing/fraud issues.  It cannot be disputed that Pfizer Defendants and their subsidiaries have been found guilty of marketing Neurontin and other drugs off-label; and therefore it is appropriate for Plaintiffs' counsel to inquire whether Plaintiffs' prescribing physicians, who indeed may have been detailed by Pfizer Defendants for Neurontin, were aware that Pfizer Defendants and their subsidiaries illegally marketed Neurontin and other drugs off-label.

Next, Plaintiffs submit that Defendants' statement at page 12, footnote 5, of Defendants' memorandum, ECF Doc. # 3096, misleads the Court to believe that Plaintiff's attorneys in a different case, *Morrow v. Pfizer Inc.,* D. Mass. Case No. 08-11706, engaged in tactics that violate an earlier Order of this Court.  *See* ECF Doc. # 2175.  Although Defendants have not

2

brought an application specifically claiming a violation by Plaintiff's counsel in the *Morrow* case, the mere reference to it requires a response by Plaintiffs. There is nothing inappropriate about Plaintiffs' counsel submitting information to the attorney representing a prescribing physician to provide the counsel with information concerning the issues involved in the litigation, as was done in the *Morrow* case, or in other cases to provide a form declaration to such counsel even to ascertain whether the prescribing physician would be amenable to signing same (albeit this was not the purpose that said declaration was provided in the *Morrow* case). Certainly, the prescribing physician's able counsel would understand and be able to present and explain all of the ramifications of signing the declaration to his client. Defendants' motion is a veiled attempt to foreclose critical information from Plaintiffs' counsel which they require to present a defense to the learned intermediary rule and on other issues in this litigation.

## ARGUMENT

**I.  PLAINTIFFS HAVE A RIGHT TO PERMIT THEIR COUNSEL TO COMMUNICATE WITH PLAINTIFFS' TREATING PHYSICIANS CONCERNING SALIENT ISSUES IN THE CASE, AND TO DENY PLAINTIFFS THIS RIGHT WOULD BE CONTRARY TO THE PURPOSE OF THE HEALTH INSURANCE PORTABILTY AND ACCOUNTABIKLITY ACT AND WOULD PREVENT PLAINTIFFS FROM EFFECTIVELY PROSECUTING THEIR CAUSES OF ACTION.**

In *In re: Vioxx Prods. Liab. Litig.*, U.S. District Judge Eldon E. Fallon modified and reversed his previous decision that had restricted the plaintiffs' counsel from *ex parte* communications with treating physicians who were not named as defendants in the actions because "the practical effect has created unintended consequences that can cause more problems than it sought to solve." 230 F.R.D. 473, 475 (E.D. La. 2005). Judge Fallon noted that there were "other MDLs as well as Vioxx litigation in various states in which courts have allowed plaintiffs' counsel to contact treating physicians." *Id.* at 474. The Court noted that plaintiffs' counsel's ability to interview their plaintiff's treating physician is important for several reasons

including their determination of whether to take or retain a case. *Id.* at 475. Moreover, Judge Fallon stated that "the just option in this case is to protect the relationship between a doctor and patient by restricting defendants from conducting *ex parte* communications with Plaintiff's treating physicians but allowing Plaintiff's counsel to engage in *ex parte* interviews with those doctors who have not been named as defendants." *Id.* at 477.

In *In re Kugel Mesh Hernia Repair Patch Litig.*, Magistrate Judge Lincoln D. Almond denied the defendants' motion for an order that would allow defendants to "engage in substantive *ex parte* contacts" with the plaintiffs' treating physicians. MDL No. 07-1842ML, 2008 U.S. Dist. LEXIS 63475, at *10 (D.R.I. Jan. 22, 2008). Magistrate Judge Almond essentially concluded that it would follow Judge Fallon's lead in the *Vioxx* litigation by permitting the plaintiffs' counsel to conduct *ex parte* interviews with treating physicians and noted that there were various "mechanisms for defendant to access treatment information." *Id.* at *11-12.

In *In re Vioxx Litig.,* the Superior Court of New Jersey granted the plaintiffs' motion to prohibit *ex parte* interviews of the plaintiffs' treating doctors by counsel for the defense. Declaration of Andrew G. Finkelstein, Exhibit A, Memorandum of Decision on Motion. Judge Carol E. Higbee responded to the defendants' assertions that it would be unfair for the plaintiffs to conduct interviews with the treating physicians and not provide the defendants with the same opportunity by clearly stating that "[t]here is no decision known to this court where a Judge has restrained counsel from talking to their client's own doctors." *Id.* at 8.

### A. Plaintiffs Are Entitled to Communicate With a Plaintiff's Healthcare Providers

The Health Insurance Portability and Accountability Act (HIPAA) establishes that the patient is the gatekeeper of his own health information. 45 C.F.R. § 164.508(a)(1). It logically follows that Plaintiffs have the right to authorize their attorneys and treating physicians to speak

4

privately, and that such communications may be as restrictive or expansive as Plaintiffs desire. Plaintiffs' counsel have a formal, fiduciary and professional relationship with Plaintiffs and act on their behalf. Plaintiffs' counsel have the right to communicate and interview Plaintiffs' treating physicians to the extent permissible via HIPAA or a valid deposition subpoena. One of the purposes of HIPAA is "[t]o protect and enhance the rights of consumers by providing them access to their health information and controlling the inappropriate use of that information." 65 Fed. Reg. at 82463. To limit or order that a Plaintiff be provided with anything less than their unfettered right to access Plaintiff's prescribing physicians would be contrary to the stated purpose of HIPAA and would seriously impede a Plaintiff's right to have their experts research and evaluate facts in anticipation of expert opinions in a case.

### B. Defendants Have Questioned Non-Neurontin Prescribers Regarding Off-Label Use of Neurontin and Risks and Benefits, and Defendants Have Previously Argued That Plaintiffs Have a Duty to Speak with Plaintiffs' Physicians.

Ironically, Pfizer Defendants try to impede Plaintiffs' right to communicate with non-Neurontin healthcare providers about the risks of Neurontin and off-label use, yet Pfizer Defendants have repeatedly inquired about the risks/benefits of Neurontin and off-label usage when deposing non-Neurontin prescribers. For example, in *Egilman v. Pfizer Inc.*, D. Mass. No. 07-11426, defense counsel deposed non-Neurontin prescriber Dr. Mark Mengel and inquired about a litany of issues regarding Neurontin benefits and off-label uses of drugs, despite the fact that Dr. Mengel testified he had not prescribed Neurontin to Mrs. Bulger:

> Q. Did you ever prescribe the medication Neurontin or it's generic form gabapentin to Susan Bulger?
>
> A. **I did not**. [Finkelstein Decl., Ex. C, Mark Mendel, M.D. Dep. at 100:5-7 (emphasis added).]

\* \* \* \*

> Q. Doctor, have you during your years of experience had the opportunity to prescribe medications for off-label uses? [*Id.* at 35:1-2.]

\* \* \* \*

> Q. Okay. Would you agree that it can be a proper exercise of a doctor's professional judgment to prescribe a drug off-label to a particular patient? [*Id.* at 35:12-14.]

\* \* \* \*

> Q Doctor, do you believe there are some benefits of Neurontin? [*Id.* at 41:7-8.]

\* \* \* \*

> Q. What are some of the benefits of Neurontin? [*Id.* at 41:10.]

\* \* \* \*

> Q. What about with respect to Neurontin's interactions or non-interactions with other medications? [*Id.* at 41:14-15.]

\* \* \* \*

> Q. (BY MR. GUNTER) So the fact is that when prescribing Neurontin for a particular condition, you believe that in the exercise of your medical judgment Neurontin was the appropriate treatment? [*Id.* at 41:23--42:1.]

\* \* \* \*

> Q. What has been your experience in using Neurontin to treat patients with neuropathic pain? [*Id.* at 48:1-2.]

Additionally, in line with Judge Fallon's decision in *In re: Vioxx Prods. Liab. Litig.,* it is axiomatic that a plaintiff may be required to speak with treating physicians at certain points in the litigation to ascertain whether there is a viable action or whether the action should be continued at any point in the litigation. In fact, although Defendants now argue to the contrary to suit their needs, in the past, defense counsel repeatedly remarked during this multidistrict litigation that the parties may have a need to communicate with a Plaintiff's doctor. For

example, in support of their motion to dismiss Plaintiffs' complaints for failure to adequately plead fraud claims, Defendants counsel had argued to Judge Patti B. Saris and New York Supreme Court Justice Marcy S. Friedman that Plaintiffs had a duty to speak with providers:

> MR. ROUHANDEH: . . . I think the circuits that have looked at that, at least the Fifth, Sixth, and Seventh, have said, where it's in the hands of a third party, there's no relaxation of any pleading requirement, **the plaintiffs should have to go out and get those facts**." [Finkelstein Decl., Ex. D at 9:19-25) (hearing transcript, 12/11/06) (emphasis added).]

Similarly, defense counsel themselves have represented to this Court their own intention to talk to doctors regarding marketing issues:

> MR. ROUHANDEH: . . . However, to really adequately prepare for trial, I think we're going to want to go see who spoke at those meetings. **We're going to want to talk to those doctors. We may want to depose those doctors.** There's a whole bunch of other discovery that's going to go down the road." [*Id*. at 17:12-17 (emphasis added).]

\* \* \* \*

> JUSTICE FRIEDMAN: Mr. Rouhandeh, they say that the doctors aren't within their control. What do you say about that?
>
> MR. ROUHANDEH: Well, I think, as a legal matter, that's essentially been resolved already in these cases and in many other cases, which is, they use that argument to say that where the facts are within the defendant's control, some relaxed pleading standard is required. **Here the facts are not within the control of the defendant. They're within the control of the doctor. The doctor is within the control of the plaintiff."** [*Id.* at 8:13-21 (emphasis added).]

### D. Plaintiff Is Not Obligated to Depose a Treating Physician Who Is Willing and Available to Communicate Directly With Plaintiff's Counsel or Their Expert.

Defendants' request that Plaintiffs refrain from substantive communications with Plaintiffs' treating physicians, *see* ECF Doc. # 3096 at 12, simply fails to account for the circumstance where Plaintiffs may not intend to depose a given witness. The practical effect of Defendants' request is to prevent Plaintiffs from speaking to a doctor unless or until a doctor is deposed. Realistically, Plaintiffs may choose not to depose every witness whom Plaintiffs may

7

call to testify in a case. Indeed, there are many witnesses on Plaintiffs' Rule 26 disclosures who have never been deposed. Common sense dictates that Plaintiffs' counsel or agents acting on Plaintiffs' behalf will have "substantive communications" with such witnesses in preparation for trial. Plaintiffs may seek affidavits from non-party witnesses, in lieu of deposition testimony.

Under such circumstances, Plaintiffs will seek to communicate with such witnesses to understand the substance and bases for their statements.

## II. THE EVIDENCE THAT DEFENDANTS SEEK TO PROHIBIT PLAINTIFFS FROM OBTAINING IS RELEVANT TO A PHYSICIAN'S DECISION WHETHER TO PRESCRIBE NEURONTIN AND IS CRITICAL TO PLAINTIFFS' REBUTTAL TO DEFENDANTS' LEARNED INTERMEDIARY DEFENSE.

The Court should deny Defendants' broadsweeping request to preclude at depositions the use of documentary exhibits or use of previously taken deposition testimony. Under Fed. R. Civ. P. 30(c), "the conduct of the examination of the deposition witness is to proceed under the Federal Rules of Evidence just as it would at trial, except that Evidence rules 103 and 615 are inapplicable." 7 MOORE'S FEDERAL PRACTICE, § 30.42 (Matthew Bender 3d ed.). The scope of discovery is "governed by Rule 26(b)(1), which is limited to information that is 'relevant to any party's claim or defense.'" MOORE'S FEDERAL RULES PAMPHLET, § 30.5 (Matthew Bender 2009). Pursuant to Fed. R. Evid. 703, "[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing." MOORE'S FEDERAL RULES PAMPHLET, Rule 703 (Matthew Bender 2009). "To the extent that the **treating physician** testifies only as to the care and treatment of his/her patient, the **physician** is not to be considered a specially retained expert notwithstanding that the witness may offer opinion testimony under Fed. R. Evid. 702, 703 and 705." *Wreath v. United States,* 161 F.R.D. 448, 449 (D. Kansas 1995).

8

In addition to Plaintiffs' right to obtain critical information to counter a learned intermediary defense, Plaintiffs require information from the treating physicians in order to support their fraudulent concealment claims. It is the law of the case that Defendants as pharmaceutical manufacturers have a heightened duty to warn physicians and patients because they engaged in off-label marketing of a drug:

> Based on the reasoning of this caselaw, the Court concludes that a manufacturer of a pharmaceutical has a duty to disclose to **physicians and patients** material facts about the risks of the drug, <u>particularly when it is engaged in off-label marketing</u> for uses not approved by the FDA, if it knows that the plaintiff and/or his prescriber does not know or cannot reasonably discover the undisclosed facts.

*See In re Neurontin Mktg., Sales Practices & Prods. Liab. Litig.*, 618 F. Supp. 2d 96, 110 (D. Mass. 2009) (emphasis added). Defendants' Guilty Plea that has been admitted into evidence in this Court (Electronic Order of this Court resolving Motions in Limine on 7/24/2009), and the fact that Defendants admitted to illegally promoting neurontin to physicians is relevant to Plaintiffs' fraudulent suppression claim. Plaintiffs have every right to provide a prescribing physician with the Guilty Plea and Information in order to ascertain whether Defendants used the same illegal tactics to promote Neurontin for an off-label indication to the physician, while at the same time suppressing information concerning the risks from the prescribing physician that is being deposed. Moreover, demonstrative evidence, whether it be in the form of documentary evidence such as the FDA 1992 Clinical Review by Cynthia McCormick, which stated concerns relating to the increased risk for suicide from the ingestion of Neurontin; or the FDA Alert; or video testimony by Defendants' employees related to Neurontin's risks and lack of efficacy; or warning letters from FDA to Defendants advising that their actions are false and misleading, are appropriate as this is relevant to Defendants' learned intermediary defense or Plaintiffs' claim of fraudulent suppression. The Federal Rules do not authorize any blanket restrictions or

prohibitions on the use of such evidence as long as the evidence is "relevant to any party's claims or defense."

The evidence that Defendants seek to preclude is directly relevant to a physician's decision-making process of whether to prescribe Neurontin. Indeed, Defendants' guilt in promoting Neurontin without adequate directions for use could affect a physician's decision to prescribe Neurontin. Even more compelling is testimony from a prescriber that Defendants' knowledge as to risks of suicidal behavior or lack of efficacy with Neurontin, if known by the prescriber, would have affected his or her prescribing practices with Neurontin. Consequently, Plaintiffs' counsel is well within their right to inquire of a prescriber about such evidence. The evidence is probative to Plaintiffs' causes of action and particularly to opposing Defendants' learned intermediary defense.

Moreover, a physician may consider, <u>as part of the decision-making process to prescribe a drug</u>, the reputation and/or safety track-record of the sponsoring pharmaceutical company for the drug at issue. A physician who is not confident in the sponsoring company's truth, veracity and safety record may clearly choose to alter his or her prescribing practices for Defendants' drug and opt for a different drug as an alternative. Plaintiffs' counsel are well deserving of discovery as to whether a doctor would have changed his or her prescribing practices with Neurontin if the physician knew the sponsoring drug company (a) violated the Code of Federal Regulations on safety issues relating to adverse events associated with Neurontin; (b) admitted to criminal acts of promoting Neurontin for unapproved uses, with inadequate directions for use, and placing profits over safety; (c) employed scientists with knowledge as to Neurontin's lack of efficacy who did not disclose such information, but have since acknowledged same during depositions (e.g., Robert Glanzman testimony, which is the subject of Defendants' motion for

sanctions against counsel in *Barlow*); or (d) received warning letters from FDA regarding their improper advertising. Such salient issues, individually or collectively, affect a prescriber's decision-making process. Consequently, Plaintiffs' counsel have a right to inquire of a Plaintiff's prescribing physician about such evidence in order to pursue Plaintiff's claims, and the use of exhibits or testimony of Defendants' employees serve as appropriate foundational material, particularly at depositions.

It is undisputed that Defendants pride themselves on purported transparency and disclosure of information to physicians. Even Defendants' current website sets forth in Defendants' mission statement an emphasis on disclosure and integrity, and an acknowledgement that such disclosure is key to a physician's prescribing practice:

> "As your partner in ensuring quality health care for patients, Pfizer works to provide you with the information and resources you need to help optimize your patient care. We offer detailed information about Pfizer prescription medicines and the conditions they treat as well access to patient support programs, materials, and other resources." [*See* Finkelstein Decl., Ex. E http://www.pfizer.com/products/hcp/healthcare.jsp.]
>
> * * * *
>
> "**Pfizer provides doctors with the latest information on our medicines:** To help ensure that they can make the best recommendations to their patients, Pfizer provides doctors with the latest information about our medicines. We also help set up discussions, meetings and conferences about diseases and treatments for health care professionals so they can share their knowledge and experience." [*See* Finkelstein Decl., Ex. F www.pfizer.com/responsibility/working_with_hcp/working_with_hcp_benefits_patients.jsp.]

Additionally, Defendants publicly set forth their mission to provide full disclosure of clinical study results to the medical profession, another acknowledgement that physicians' prescribing practices depend on this information. Again, Pfizer's website states in pertinent part:

> Pfizer recognizes the importance of making clinical studies and clinical study results available to the medical profession, to potential study subjects, and to the

11

public. This policy reflects federal and state requirements as well as international standards and Pfizer policies regarding public disclosure of clinical studies." [*See* Finkelstein Decl., Ex. G www.pfizer.com/research/research_clinical_trials/registration_disclosure_authorship.jsp.]

In summary, Defendants tried each and every day to gain the trust of the public and the medical profession so that these individuals would purchase and utilize their products, like Neurontin. As quoted above, Defendants claim to provide "the latest information," and that they want to "help ensure that [doctors] can make the best recommendations to their patients." Common sense dictates that Plaintiffs' prescribers would therefore have considered prescribing an alternative product if they did not trust Defendants to make good on their promises, or if they knew that Defendants were **in fact** breaking their promises as reflected in the very exhibits and testimony excerpts that Defendants seek to preclude.

Noteworthy, for years Defendants' own sales representatives (under the guise of providing "medical information") were trained to bias or otherwise influence physicians towards Pfizer's litigation defenses. Sales representatives were prepared to speak with prescribers and say to them that Plaintiffs' lawyers have promoted a "false impression" that there is a link between Neurontin and suicide. Even more egregious is that the purported document used as a foundational piece by the sales representatives was not allowed to be left behind with the doctor; in fact the document was marked in all capitals: "DO NOT LEAVE BEHIND." Finkelstein Decl., Ex. H. Indeed, if Defendants were forthright, they should have been willing to leave the documents behind. Defendants cry foul over the conduct of Plaintiff's attorney in *Barlow*, who raised these issues inside the lines of the proverbial playing field during a deposition; yet Defendants employed surreptitious actions and acted outside the lines of the litigation with the

stealth of their well trained detailers, already known for their illegal conduct in promoting drugs for unapproved uses and without adequate directions for use.

Moreover, a Plaintiff's counsel has the right to investigate a Plaintiff's claims prior to bringing suit, or during the suit as is the case here, as part of the pursuit of information relevant to Plaintiff's causes of action. Defendants essentially seek to prevent Plaintiff's counsel or experts from discussing with witnesses the very facts that form the allegations in Plaintiff's complaint. Such a request is patently absurd and interferes with Plaintiffs' prosecution of their cases. Common sense dictates that Plaintiff's counsel or agents/experts acting on behalf of Plaintiff need to discuss with witnesses the facts related to Plaintiff's causes of action. Unfortunately for Defendants, these facts include their fraudulent, illegal actions, and negligent failure to warn patients and doctors of Neurontin's association with depression and suicidality.

### III.  PLAINTIFF COUNSEL'S COMMUNICATION WITH THE PRESCRIBING PHYSICIAN'S COUNSEL IN THE *MORROW* CASE WAS APPROPRIATE.

Although Defendants have not brought an application specifically claiming a violation by Plaintiff's counsel in the *Morrow* case, the mere reference to potential impropriety requires a response by Plaintiffs. In support of their motion in the *Barlow* case, Defendants state as follows:

> Recently, in the *Morrow* case, Pfizer discovered at a treating physician's deposition that Plaintiff in that case had sent, on the night before the deposition, a draft affidavit to the deponent's attorney. This draft affidavit contained several factual assertions that, if read, could have influenced the witness's deposition testimony. (*See* Ex. I, Draft Aff.)

ECF Doc. # 3096 at 12 n.5; *see* ECF Doc. # 3097-9. Defendants mislead the Court to believe that a "draft affidavit" was sent by Plaintiff's counsel in the *Morrow* case to influence the witness's deposition testimony or to have the witness-prescriber sign an affidavit. To the contrary, the document was never utilized for this purpose. Declaration of Kenneth B. Fromson at ¶ 3.

In the *Morrow* case, Plaintiff's counsel coordinated with the witness-prescriber's attorney, Steven Kruger, on the scheduling of the prescriber's deposition, the fees, as well as the limited time afforded by the prescriber for the deposition. Fromson Decl. at ¶ 4. Plaintiff's counsel sought to confer over issues in the case and emailed the subject document to the prescriber's counsel's law office prior to the deposition. Fromson Decl. at ¶ 5. As set forth in the email, Plaintiff's counsel's intentions were in good faith as it pertains to the purported draft "Declaration":

> Dr. Lawin does not have to sign this document. I merely wanted you and the doctor to know specifically the issues/items I will be covering at today's deposition. This will help save time so that I can focus Dr. Lawin on the relevant issues and not spend a lot of time on irrelevant material. [Fromson Decl., Ex. A.]

Plaintiff's counsel never asked for the document to be signed or considered for signature by the witness and trusted that the witness-prescriber's attorney would use appropriate due diligence in providing representation to the witness. Fromson Decl. at ¶ 5. Additionally, Plaintiff's counsel in *Morrow,* in the spirit of full disclosure, marked the document as an exhibit during the witness-prescriber's deposition and confirmed that the document had been provided directly to the witness-prescriber's attorney. Fromson Decl. at ¶6. In this regard, the Court's attention is brought to the testimony of witness Penny Lawin, M.D.:

> Q. Doctor, I'm going to show you what's been marked as Plaintiff's Exhibit 12. Is that the declaration that you reviewed?
>
> A. It looks the same, yes, ma'am.
>
> Q. Okay. And at that time, I had sent it yesterday to your attorneys so that you would have the opportunity to see the items that I would be addressing at today's deposition. Did you understand that?
>
> A. Yes, ma'am.

> Q. Okay. And at no time did I ask you to sign that deposition or did I ask your attorney to have you sign that document, correct? No one asked you to sign it, correct?
>
> A. No, ma'am."

Finkelstein Decl., Ex. B, Penny Lawin, M.D. Dep. at 26:20--27:9.

There is simply no factual basis for Defendants' implication that Plaintiff's counsel in the *Morrow* case engaged in improper tactics. The exhibit was sent to the witness's attorney, with whom Plaintiff's counsel had been communicating, and not to the witness. Plaintiff's counsel provided the prescriber's counsel with the document for the purposes of providing the prescriber's attorney with information concerning the issues Plaintiff sought to inquire about at the deposition, and the document was offered as a professional courtesy so that the prescriber's attorney would be apprised of the issues to be addressed, if time permitted at the deposition. Fromson Decl. at ¶ 5.

Plaintiff's counsel, Kenneth B. Fromson, on behalf of the Products Liability Plaintiffs, conferred with the prescriber's counsel, Mr. Kruger, about using the exhibit at the deposition, and at no time did Mr. Kruger indicate there was any specter of impropriety or that witness testimony was influenced by the document. Fromson Decl. at ¶ 7.

As a practical matter, Plaintiff's counsel has a right to communicate with prescribers and to secure an affidavit as a matter of due diligence in pursuing Plaintiff's claims against Defendants and opposing Defendants' learned intermediary defense. While the subject "draft affidavit" in the *Morrow* case was not utilized in conjunction with an earlier conference with the prescriber, it was properly utilized to confer with the prescriber's attorney to inform him of the Plaintiff's case and opposition to such a defense.

## CONCLUSION

For the reasons delineated above, the Court should deny Defendants' motion in its entirety.

Dated:  October 22, 2010                              Respectfully submitted,

*Members of Products Liability
Plaintiffs' Steering Committee*


By:      **/s/ Andrew G. Finkelstein**
         Andrew G. Finkelstein, Esquire
         Finkelstein & Partners, LLP
         1279 Route 300, P.O. Box 1111
         Newburgh, NY  12551


By:      **/s/ Jack W. London**
         Jack W. London, Esquire
         Law Offices of Jack W. London
            & Associates
         3701 Bee Cave Rd., Suite 200
         Austin, TX  78746


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order No. 3 on October 22, 2010.

         **/s/ Andrew G. Finkelstein**
         Andrew G. Finkelstein, Esquire