# EXHIBIT D

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

IN RE:                                         )
NEURONTIN MARKETING, SALES PRACTICES ) CA No. 04-10981-PBS
AND PRODUCTS LIABILITY LITIGATION    ) Pages 1 - 59
SALES PRACTICES LITIGATION )

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE
-and-
JUSTICE HELEN E. FREEDMAN
NEW YORK SUPREME COURT JUSTICE

United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
December 11, 2006, 3:10 p.m.

LEE A. MARZILLI
CERTIFIED REALTIME REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

Page 6

1  but in terms of these complaints, they're the garden variety
2  product liability claims. And then there are a host of what
3  we call the marketing-based claims, which are in essence
4  common law fraud, negligent misrepresentation, breach of
5  express warranty, and consumer protection/consumer fraud
6  claims in the Federal Court. And in the state court, they
7  are common law fraud, the consumer fraud claims, and the
8  breach of express warranty. I don't believe they bring the
9  negligent misrepresentation claim there.
10      But, in essence, in both courts we have essentially
11 the same problem, which is these are cookie-cutter,
12 word-processed complaints that are essentially identical in
13 virtually every respect other than the name of the plaintiff
14 who is bringing the case. Under the particularity
15 requirements, both in the Federal Court and in the state
16 court, the plaintiffs must have facts first before they bring
17 these types of claims. In essence, the common law fraud and
18 the consumer fraud certainly explicitly require this higher
19 particularity, and we think also even plain vanilla pleading
20 requirements in both courts would require dismissal of the
21 other claims brought here.
22      But you look through the hundreds of complaints
23 that have been brought, and there isn't a single allegation
24 of a false statement being made, either to the plaintiff or
25 to the plaintiff's physician, not a one. There is no

Page 7

1  allegation as to why Neurontin was prescribed to any of these
2  plaintiffs. There is no allegation that a statement or some
3  other conduct specifically caused a physician to prescribe
4  the medication to one of these plaintiffs.
5      THE COURT: What you produced so far -- at least in
6  the Federal Court, there are certain automatic disclosure
7  requirements. Have you disclosed whether or not you made
8  visits to these particular doctors or whether these doctors
9  attended conferences or received materials, that sort of
10 thing?
11      MR. ROUHANDEH: To some extent, yes, with respect
12 to some plaintiffs. But they're going to be getting on
13 January 15 a database that essentially has the calls to
14 physicians, and presumably there will be many contacts with
15 those physicians, with many of them. Some there won't be any
16 contacts with, I assume. But since pharmaceutical companies
17 sell their products by communicating with doctors, in this
18 this particular product, there was no direct-to-consumer
19 advertising whatsoever.
20      THE COURT: Well, I understand that, there wasn't
21 what you see in the playbills or on TV. But with respect to
22 the nexus to the doctor, why wouldn't we just wait to see
23 whether they see what the individual doctor received --
24 they've just basically pled on an information and belief --
25 and then deal with this at summary judgment?

Page 8

1      MR. ROUHANDEH: Well, two reasons. There's a legal
2  reason and a practical reason. The legal reason is, with
3  respect to fraud, I believe the law is pretty clear they have
4  to have the facts first. And I think even beyond the 9(b)
5  type of rule, really, to establish their obligation to come
6  forward and assert their claim in good faith, they should
7  have some factual basis for asserting that. They've now
8  admitted in their briefs that they have no factual basis for
9  believing that any statement was made to these doctors. They
10 say they can't plead it. And so I think, as a legal matter,
11 they have to say the who, what, when, where, why, and they
12 have to plead those facts before they get the discovery.
13      JUSTICE FREEDMAN: Mr. Rouhandeh, they say that the
14 doctors aren't within their control. What do you say about
15 that?
16      MR. ROUHANDEH: Well, I think, as a legal matter,
17 that's essentially been resolved already in these cases and
18 in many other cases, which is, they use that argument to say
19 that where the facts are within the defendant's control, some
20 relaxed pleading standard is required. Here the facts are
21 not within the control of the defendant. They're within the
22 control of the doctor. The doctor is within the control of
23 the plaintiff. We are legally prohibited, the company is
24 legally prohibited from going to contact that doctor to ask
25 the question, "Why did you prescribe this medication to this

Page 9

1  particular plaintiff?"
2      The plaintiffs, however, can do that and should
3  have done that. They should not have put the burden --
4      THE COURT: Well, the doctors aren't in control of
5  anyone really.
6      MR. ROUHANDEH: Well, with respect to the medical
7  records, I think they certainly have control and access to
8  those.
9      THE COURT: Right, let's say you called up your
10 doctor after your kid has committed suicide and said, "Why
11 did you prescribe Neurontin?" They might be afraid of a
12 malpractice claim, right?
13      MR. ROUHANDEH: Sure, they may, but I think they
14 probably would answer the question of why it was prescribed
15 to them. But even if not, even if the facts are within -- so
16 here's, I think, what your Honor is pointing out is, if the
17 facts aren't within our control and they're not within the
18 plaintiff's control, maybe they're in the control of a third
19 party. I think the circuits that have looked at that, at
20 least the Fifth, Sixth, and Seventh, have said, where it's in
21 the hands of a third party, there's no relaxation of any
22 pleading requirement, the plaintiffs should have to go out
23 and get those facts.
24      THE COURT: But what do you do when you have --
25 maybe I've been living with this case too long -- you have a

Page 14

courthouse with the papers on summary judgment. That's exactly what the plaintiffs want. They want to overwhelm this Court with summary judgment motions that go to all of these issues and put in massive amounts of documents with respect to each of these cases, and it's really not a practical way to do it.

If there are some plaintiffs among their group who got Neurontin as a result of some unlawful conduct, some fraudulent conduct by the company, those are the cases that the parties ought to be focusing on, we would like to focus on and focus intense discovery on, because otherwise we can't sit back here and hope that we'll win for summary judgment. We think that we should, we think that we will, but we're going to have to do the discovery. If one of these doctors was visiting --

THE COURT: Suppose we allowed this and said there's not enough under New York law to prove a fraud, and then in the plain old run-of-the-mill negligence case, they do the deposition and the doctor creates a nexus, isn't it without prejudice for them to come back and plead the fraud?

MR. ROUHANDEH: Well, I think the dismissal could be with prejudice because they haven't done that. But even if the Court does that, I assume that they'll come back and try to replead with respect to those claims. That's what they should have been doing. My point is, they should have

Page 15

been doing it during the years that this litigation has been going and haven't been doing it. And they haven't been doing it in the considerable period since we filed these motions and put them on notice that we think there's a real problem with their complaints. Instead, they came back and they said, "We can't do it. We can't do it, and we don't have the facts." And I think in a situation where they don't have the facts and they concede they don't have the facts, then those ought to be dismissed with prejudice.

But if they come back, they're not going to come back in every case. I think it's highly, highly, highly unlikely they'll come back with any more than a few cases and say, "Well, here was a statement to a doctor." And those are the cases that we'll focus on and we'll do intense discovery on. Otherwise we have to go to every contact that the doctor had with the company, and we've got to run that down. We can't just wait and be surprised at trial that maybe some meeting that a doctor went to ten years ago, they're going to come in with an affidavit from somebody. We're going to have to go to every contact. We're going to have to go to former sales reps and ask them, "What did you say to the doctor?" The amount of discovery that would have to be taken in these cases if they don't have to specify what is the fraud, what is the misstatement, is enormous with respect to each of these cases.

Page 16

THE COURT: The question, regardless of whether I allow the motion to dismiss without prejudice or deny it subject to a motion for summary judgment, the odds are the doctors are going to be deposed, right?

MR. ROUHANDEH: Yes.

THE COURT: Because there's some outstanding claims?

MR. ROUHANDEH: Yes.

THE COURT: So how much work is -- either way you're going to have the depositions of these doctors. So how much is at stake here in terms of, should we stage it so that the doctors come first and so that any motion to amend comes within three months? How much work is there?

MR. ROUHANDEH: Well, I think that there's more than just the doctor. First, with respect to the doctor, the doctors may have to be there for a very long time if these claims are in there --

THE COURT: Why? They're in there anyway.

MR. ROUHANDEH: -- without any specificity. If they're in there with specificity, where they're essentially saying, "Look, the doctor relied on such and such misstatement," that's the issue that we'll focus on. If they're in there as, "There's a fraud claim. You, the defendants, go figure it out where the statement was," we're going to have to go through a long history of communications

Page 17

that the company might have had with various sales reps, if they've gone to meetings, everything where they might have come into contact with something involving the defendants. So there's that one issue.

But then beyond that, there's a whole bunch of other discovery that we would have to undertake, and that discovery would be, you know, we've got to go to: Here is a meeting, here's a meeting where the doctor attended it. The doctor probably says, "I don't recall what happened eight years ago at some meeting." We could just come in on summary judgment and say the doctor doesn't recall, they can't carry their burden. However, to really adequately prepare for trial, I think we're going to want to go see who spoke at those meetings. We're going to want to talk to those doctors. We may want to depose those doctors. There's a whole bunch of other discovery that's going to go down the road.

But I think if what the Court is saying is it's not inclined to dismiss with prejudice but if it dismissed without prejudice, they have some period of time after they take the deposition of the doctor to try to see if they can replead, I certainly believe that that's consistent with the law in terms of those claims should be dismissed now. I think that they should have had to do this before today. But if the Court allows them to do that, then presumably they'll