UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re: NEURONTIN MARKETING, SALES
PRACTICES AND PRODUCTS
LIABILITY LITIGATION
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THIS DOCUMENT RELATES TO:

*Barlow v. Pfizer Inc, et al.*
Case No. 1:05-cv-11501-PBS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

: MDL Docket No. 1629
:
: Master File No. 04-10981
:
: Judge Patti B. Saris
:
: Magistrate Judge Leo T.
: Sorokin
:
:
:

**DEFENDANTS' OBJECTION TO MAGISTRATE JUDGE'S
DENIAL OF MOTION FOR AN ORDER PROHIBITING IMPROPER
TACTICS DURING FACT WITNESS DEPOSITIONS AND IMPOSING SANCTIONS**

Pursuant to 28 U.S.C. § 636(b)(1)(A) and Fed. R. Civ. P. 72(a), Defendants Pfizer Inc and Warner-Lambert Company LLC (together, "Pfizer"), by counsel, hereby object to Magistrate Judge Sorokin's October 29, 2010 Order denying Pfizer's motion [3095] to direct Plaintiff's counsel to cease engaging in improper tactics during, and in advance of, the depositions of prescribing physicians and other fact witnesses, as well as to impose sanctions for the misconduct of Plaintiff's counsel. For the reasons discussed below, Pfizer respectfully asks that the Court set aside the Magistrate Judge's Order and grant the requested relief.

**PRELIMINARY STATEMENT**

Plaintiff's counsel is attempting to unfairly influence the deposition testimony of fact witnesses with misleadingly incomplete materials and improper questions that are unrelated to their testimony as non-party fact witnesses. By order dated November 18, 2009, this Court denounced such unfair tactics to taint neutral third-party witness testimony. (Nov. 18 Order [2175].) On that occasion, the Court admonished efforts by Dr. David Egilman to bias a treating physician against Pfizer by sending her a "materially misleading" email chain that included portions "that favored plaintiff's case while omitting the sections favorable to Pfizer's position,"

and the Court further noted that there was no basis for providing the physician with a copy of Warner-Lambert Company LLC's criminal plea other than to "poison the well." (*Id.* at 2.)

Particularly in light of the Court's previous ruling, the conduct of Plaintiff's counsel during, and leading up to, the deposition of Plaintiff's prescribing physician was highly improper. Contrary to the explicit admonitions of this Court's November 18, 2009 Order regarding parties' interactions with fact witnesses and its implicit expectation of how counsel should comport themselves, Plaintiff's counsel is attempting to improperly influence and corrupt the testimony of treating physicians. During the deposition of Irene Barlow's prescribing physician, Dr. Larry Flowers, Plaintiff's counsel sought to alter the witness's testimony with a barrage of cherry-picked, inappropriate materials that were totally unrelated to any matter potentially within the witness's personal knowledge. Notably, Plaintiff's counsel insisted on showing Dr. Flowers a misleadingly edited clip from the two-day deposition of a former medical director at Pfizer. This out-of-context video testimony painted a skewed and incomplete picture. While Mrs. Barlow's counsel has argued that this conduct was technically not a violation of the Court's Order because it "does not address deposition questions," (Pl.'s Sur-Reply [3114-1] at 2), the parties should not view the orders of this Court as invitations to devise creative methods to avoid direct violations of court orders, but should be expected to honor their clear intent. Also, as he likely expected, the procedure by which Plaintiff's counsel presented this video at the deposition deprived Pfizer of an opportunity to respond. Regardless, Pfizer should not have to waste its limited time with these key fact witnesses countering the misleading tactics of Plaintiff's counsel; depositions should not devolve into mini-trials about issues tangential to the witness's potential testimony.

Plaintiff's counsel also showed Dr. Flowers internal company documents and a copy of the criminal information filed against Warner-Lambert Company LLC, none of which had any bearing on Plaintiff's treatment and were meant only to alter the doctor's testimony and portray Defendants in a bad light. Compounding the prejudice caused by this conduct, Plaintiff's counsel asked Dr. Flowers several patently improper questions with no possible other purpose than to advocate Plaintiff's litigation themes and improperly prejudice this fact witness against

Pfizer. In addition to this misconduct at the deposition, Pfizer also learned that Plaintiff's counsel had sent Dr. Flowers an inappropriate letter that contained argumentative assertions about Warner-Lambert Company LLC's plea, conclusory allegations as to Pfizer's marketing activities, copies of the plea agreement, and other prejudicial statements calculated solely to bias this fact witness against Pfizer.[1] This type of conduct not only prejudices Pfizer, but it negatively colors non-parties' views of the judicial system, wastes time of physicians, and is divorced form the primary goal of a deposition – obtaining truthful, unvarnished testimony.

Plaintiff's counsel's unrelenting "poison the well" strategy has unfairly prejudiced Pfizer's ability to mount a full and fair defense. Underscoring the need for judicial intervention, Plaintiff has indicted that her counsel will continue to engage in this inappropriate conduct. As such, Pfizer filed a motion to preclude counsel from engaging in such unfair tactics in the future, impose sanctions, and fashion any other relief deemed appropriate. The Magistrate Judge denied Pfizer's motion without rendering any factual findings or any determination as to whether the conduct of Mrs. Barlow's counsel was improper. Instead, the Magistrate Judge seemed to indicate that any prejudice caused by Plaintiff's counsel's inequitable discovery tactics could be cured by exclusion of evidence at trial. Contrary to this assumption, however, mere exclusion of this testimony would not undo the bias Plaintiff's counsel attempted to instill during these depositions or restore Pfizer's opportunity to obtain untainted testimony from these fact witnesses. As such, the Magistrate Judge's decision to allow Plaintiff's improper discovery conduct to continue undeterred is clearly erroneous and should be set aside by this Court.

## BACKGROUND

Dr. Flowers, a psychiatrist practicing in Houston, Texas, treated Mrs. Barlow for mental health problems, particularly bipolar disorder with anxiety. He was not the physician who

---

[1] This letter was provided to Pfizer's attorneys by Dr. Flowers at his deposition. (Flowers Dep. [3097-1] at 100:3-6; 107:17-108:20.) While this letter predated and, therefore, was not a direct violation of the Court's November 18, 2009 Order, it was nonetheless inherently improper on its own terms – for the same reasons Dr. Egilman's conduct at issue in that Order was improper.

3

originally prescribed her Neurontin, but he continued and increased her prescription to treat Mrs. Barlow's bipolar disorder and comorbid anxiety. (Flowers Dep. [3097-1] at 15:1-16:5; 19:1-6.)[2] Dr. Flowers did not treat Mrs. Barlow after her reported suicide attempt in January 2001; the last time he saw her was in December 2000. (*See id.* at 37:7-13.)

Mrs. Barlow initiated this lawsuit against Pfizer on July 13, 2004, alleging that a failure to warn of risks of Neurontin caused her to attempt suicide. On August 31, 2004, Carl Pierce, one of Plaintiff's counsel, sent a letter to Dr. Flowers that stated, in part, as follows:

> I represent Irene Barlow with regards to claims she has against the drug manufacturer of Neurontin. The drug manufacturer promoted Neurontin for off-label uses, including for bipolar disorder, without appropriate scientific support for its efficacy. *They have now judicially admitted that their scheme was in fact criminal. In that regard, I enclose a copy of the lawsuit filed on Mrs. Barlow's behalf which includes a copy of the plea agreement and a copy of the charges the drug manufacturer plead guilty to.*
>
> *It is clear that the scheme the drug manufacturers created made the prescribing physicians victims as much as their patients.*

(Aug. 31, 2004 letter [3097-2] (emphasis added).) This letter then requested that Dr. Flowers meet with Plaintiff's counsel. (*Id.*) Mr. Pierce also sent Dr. Flowers a letter on July 18, 2005, instructing him *not* to release any of Mrs. Barlow's medical records to Defendants, and he called Dr. Flowers at least couple of times regarding this lawsuit. (Flowers Dep. at 105:21-107:9; Flowers Ex. 15 [3097-3].) Dr. Flowers met with Plaintiff's counsel twice – once several years ago and once just days before his deposition – to discuss the case and review documents selected by counsel. (Flowers Dep. at 111:4-112:14.)

The parties deposed Dr. Flowers on August 28, 2010, at his office. Mr. London conducted the direct examination for Plaintiff. After discussing the treatment of Mrs. Barlow, Mr. London launched into a line of questioning that he could not reasonably have expected to be within the scope of Dr. Flowers' knowledge as a fact witness. Mr. London showed Dr. Flowers an internal company email between Lloyd Knapp and Atul Pande, in which Dr. Pande discussed

---

[2] All exhibits were attached to the accompanying declaration of Mark S. Cheffo [3097].

4

the possibility of obtaining FDA approval for Neurontin as a treatment option for mania associated with bipolar disorder. (*Id.* at 65:1-25; Flowers Ex. 8 [3097-4].) He also presented a copy of a letter from Dr. Pande to David Dunner discussing the results of a gabapentin-bipolar study. (Flowers Dep. at 71:11-73:15; Flowers Ex. 9 [3097-5].) After presenting these company documents, Mr. London showed Dr. Flowers a copy of the criminal information filed against Warner-Lambert Company LLC with regard to Neurontin and informed him of the guilty plea that was later entered. (Flowers Dep. at 88:3-91:20; Flowers Ex. 10 [3097-6]; Flowers Ex. 11 [3097-7].) As if that was not enough, Mr. London then mischaracterized the nature of the plea with accusatory questions, such as:

> Would you like to have known, when you were treating Mrs. Barlow with Neurontin for bipolar disorder, that Parke-Davis and Warner-Lambert were going to eventually admit that it was unequivocally true that it had distributed Neurontin for the treatment of bipolar disorder without adequate directions to doctors to treat that condition in violation of the law?

(Flowers Dep. at 91:12-18.)

Mr. London's motivations could not be clearer. In addition to these company documents, and information about the Neurontin plea, Mr. London – over Pfizer's objection – actually played edited clips from the video testimony of Robert Glanzman, a former medical director for Pfizer. (*See id.* at 75:4-81:25.) The way in which this video was edited and presented out-of-context was materially misleading. For instance, Mr. London took up the doctor's time to play the following clip:

> Q: Well, you approved a key message that gabapentin was effective against psychiatric – a wide range of neurological and psychiatric conditions. What psychiatric conditions are we talking about here?
>
> A: I mean, I would be happy to go back and do a literature review for you and look at the data for you. I did not do it back then.
>
> Q: Well, how could you approve a message without looking at the clinical data?
>
> A: Well, I mean, obviously, there – this is not – I approved it. Whether it was correct or not I can't say at this time.

5

> Q: Well, that – that was your job as medical director, wasn't it, to review the clinical data to see if it supported a key message?
>
> A: Yes. That was a part of my job.

(*Id.* at 78:8-79:4.) Additional testimony by Dr. Glanzman, which Mr. London did not play for Dr. Flowers, makes clear that Dr. Glanzman did not approve publication of messages unsupported by clinical data, as counsel intended the witness to infer:[3]

> A: [A] publication key message is a message that, *if possible*, should be – could be incorporated into a publication *when appropriate, when the publication and the data from that publication support it.*
>
> Q: And what is the criteria which will determine whether or not one or more of those messages actually finds its way into a Pfizer sponsored study?
>
> A: You mean into a manuscript for a publication?
>
> Q: Yes, into a manuscript.
>
> A: Well, first of all, the medical team would have to agree that the data supports it.
>
> Second of all, the authors of the study, who are not Pfizer employees, would have to agree that the data supports it because they are the author; and, third of all, the reviewers would have to agree that the data supports it or else they would not allow the manuscript to be published.
>
> . . . .
>
> Q: And if the data doesn't support it what happens?
>
> A: Well, if the data doesn't support it, first of all, the medical team would not allow it to be put in. If they did, authors are not going to allow their academic reputation to be smeared by a journal article that includes false information, so they would take it out; and even if it made it past that level, peer reviewers are certainly not going to allow a misleading article to be published, so, the article would never be accepted for publication.

(Glanzman Dep. [3097-8] at 715:17-718:8 (emphasis added).) Mr. London intentionally fostered confusion by failing to play all of Dr. Glanzman's testimony on this issue, which explains the

---

[3] Although he knows that there is another side to the story, Mr. London fostered the misimpression he created by asking Dr. Flowers if he would like to have "known that the company medical director who approved the message that it works for a broad range of psychiatric applications had never read the clinical studies[.]" (Flowers Dep. at 93:6-9.)

6

term "key message" as a possibility (essentially, a hypothesis) that *may* be incorporated into a publication *only* if the scientific data supports it.  This is just one example of where Mr. London's editing would have materially misled Dr. Flowers; yet the procedure with which Mr. London presented this edited video without notice did not allow Pfizer an opportunity to respond or clear up some of the misimpressions.

In addition to these irrelevant materials, Mr. London propounded several improper questions, which were not aimed at discovering relevant information and served no other purpose than to stoke animus against Pfizer.  For example, Plaintiff's counsel engaged in the following diatribe:

> Q: Well, do you believe it's right for a pharmaceutical company to promote a drug for bipolar condition, and that pharmaceutical company's own clinical research and research scientists know that it does not work effectively for bipolar patients?
>
> . . . .
>
> A: No, that's not appropriate.
>
> Q: Okay.  Do you think it's right for a pharmaceutical company to not tell doctors like you the things that we looked at today, where their medical director has not read their own clinical research before approving a message that it's useful for a wide range of psychiatric conditions?  Do you believe that's right?
>
> . . . .
>
> A: No.
>
> Q: Do you believe it's right for them to not disclose to doctors just like you that it's known to increase depression, as seen in their own clinical trials?
>
> . . . .
>
> A: No.
>
> Q: Do you believe that it's right for them to withhold information from you that is not in the label when it's known that doctors just like you are using this off-label to treat patients like Mrs. Barlow for a condition that's not approved?
>
> . . . .
>
> A: No.

7

(Flowers' Dep. at 181:12-182:15.)  Mr. London's argumentative "do you believe it's right" questions constituted yet another blatant attempt to impart to this witness that Pfizer was a "bad actor."  Indeed, at several points, Mr. London's compound questions sounded much more like a closing argument, such as the following:

> All right, sir.  If you had known in 1999, 2000, when you were treating Mrs. Barlow, that the Food and Drug Administration had found that Neurontin increased the risk of suicide, that Warner-Lambert had known from random controlled placebo trials that it was not effective for the treatment of bipolar, if you had known that it had been observed in clinical trials that Neurontin had a higher risk of depression in patients who took it at and above 1800 milligrams a day relative to placebo, if you had known that the company medical director who approved the message that it works for a broad range of psychiatric applications had never read the clinical studies, and if you had known that Warner-Lambert had not disclosed to doctors that – that directions were safe use for off-label – that they did not provide adequate direction for the safe use of Neurontin in bipolar patients, as they admitted in the guilty plea, would that have affected your choice as to whether or not to prescribe Neurontin to Mrs. Barlow?

(*Id.* at 92:22-93:16.)  Mr. London could not have reasonably thought that this line of questioning would uncover information relevant to this lawsuit.  Instead, the questions could only have been posed for an improper purpose – to prejudice an important factual witness in an attempt to distort his testimony.

## **ARGUMENT**

### **MAGISTRATE JUDGE SOROKIN'S ORDER DENYING PFIZER'S MOTION IS CLEARLY ERRONEOUS AND CONTRARY TO LAW**

A district court may reconsider a non-dispositive ruling of a magistrate judge "'where it has been shown that the . . . order is clearly erroneous or contrary to law.'"  *United States v. Bruck*, 152 F.3d 40, 43 (1st Cir. 1998) (quoting 28 U.S.C. § 636(b)(1)(A)); *accord United States v. Garcia*, 983 F.2d 1160, 1166 (1st Cir. 1993).  "The 'clearly erroneous' standard" applies to factual findings, whereas "the more lenient 'contrary to law' standard" applies to legal conclusions.  *Jochims v. Isuzu Motors, Ltd.*, 151 F.R.D. 338, 340 (S.D. Iowa 1993) (citation omitted); *accord Williamson v. Horizon Lines LLC*, 248 F.R.D. 79, 82 (D. Me. 2008).

The Court "should not be hamstrung by the clearly erroneous standard." 12 Charles Alan Wright et al., *Federal Practice and Procedure* § 3069, at 355 (2d ed. 1997). "[I]t would turn the jurisprudential system on its head to ascribe irrevocable finality (akin to that of a final judgment) to any unreviewed discovery or evidentiary rulings by a Magistrate Judge." *Phillips v. Raymond Corp.*, 213 F.R.D. 521, 525 (N.D. Ill. 2003). Where a magistrate judge declines to make factual findings, courts grant less deference to its rulings. For example, in *VLT, Inc. v. Lucent Techs., Inc.*, No. Civ. A. 00-11049-PBS, 2003 WL 151399 (D. Mass. Jan. 21, 2003) (Saris, J.), this Court determined that, because the magistrate judge "did not make fact-findings" it would review the "full record before [it]," and the Court ultimately found that the magistrate's ruling was "clearly erroneous." *VLT, Inc.*, 2003 WL 151399, at *1-2, *4. The record in this case supports the same result.

In ruling on Pfizer's motion, the Magistrate Judge made no factual findings, but simply denied without prejudice Pfizer's motion as to Mrs. Barlow's counsel without explanation. This ruling seems to be grounded in the Magistrate Judge's assumption that improper discovery conduct engaged in by Mrs. Barlow's counsel can be cured by future evidentiary rulings. That assumption is incorrect because once the well has been poisoned with regard to a particular fact witness, it cannot be unpoisoned.

Pfizer agrees that Plaintiff may ask her prescribing physician about certain matters regarding her treatment, such as whether he would have still prescribed Neurontin *if a different warning had been provided in the label*. Plaintiff's counsel, however, asked about unrelated alleged "bad conduct" that had no bearing whatsoever on Mrs. Barlow's treatment and only served to establish a bias against Pfizer. As if that was not enough, they presented Dr. Flowers with prejudicial materials that had no bearing on Plaintiff's treatment or anything conceivably within the physician's personal knowledge. Mere exclusion of the testimony would not cure the harm done in this or future cases. The purpose of the underlying motion was not to challenge the admissibility of the testimony, but rather to prevent Plaintiff's counsel from unfairly biasing fact witnesses with misleading and irrelevant materials and questions. Pfizer's ability to make

9

contemporaneous objections at the depositions is likewise inadequate to ensure a fair deposition because the untainted testimony that Dr. Flowers or other physicians might have provided could have been – and might be – helpful in supporting Pfizer's defense.  Regardless of whether these improper tactics can be conclusively shown to have affected Dr. Flowers' testimony, discovery in this and other cases is ongoing, and Plaintiff's counsel have indicated that they will continue to engage in this improper conduct going forward.  Also, the Magistrate Judge's Order may embolden other plaintiffs' attorneys to push the envelope with similarly unfair discovery tactics.  Accordingly, the Court should consider the "full record" to find that Magistrate Judge's denial of Pfizer's motion was clearly erroneous.

I. **Mrs. Barlow's Counsel's Transparent Attempts to Improperly Influence Dr. Flowers' Testimony Warrant Judicial Intervention and Sanctions**

The conduct of Plaintiff's counsel has no purpose other than to create a bias against Pfizer in the mind of Dr. Flowers and to alter his testimony.  Further, the materials used to implement this improper strategy were incomplete, speculative, misleading, and totally irrelevant to the matters on which this witness may testify.

The treating and prescribing physicians in this litigation possess information that is vital to both Plaintiffs' claims and Pfizer's defenses.  Proper areas of inquiry include: (1) what factors the physician considered when prescribing Neurontin, including information on the label and from other sources, (2) what information, if any, the physician received from Pfizer, (3) whether a different warning would have changed the physician's prescribing decision, (4) whether the patient benefited from Neurontin, and (5) what factors may have contributed to the patient's suicide or attempted suicide.  While Plaintiffs' counsel may speak with physicians prior to depositions, the deposition represents Defendants' first opportunity to pose these questions to the doctor.  Plaintiffs' counsel should not be permitted to engage in tactics that frustrate Defendants ability to obtain the witness's unvarnished testimony on key facts within the witness's knowledge.  Indeed, as numerous courts have held, when a treating doctor is not specially

designated as an expert, his testimony must be limited to his diagnosis and treatment of his patient. *See Garcia v. City of Springfield Police Dep't*, 230 F.R.D. 247, 249 (D. Mass. 2005).[4]

Here, the materials shown and questions propounded to Dr. Flowers have no bearing whatsoever on the care and treatment of Mrs. Barlow. For instance, Dr. Flowers did not have any familiarity with the company's internal business matters, and he explicitly testified that he does not consider testimony of pharmaceutical company employees or internal company documents when making prescribing decisions. (Flowers Dep. at 170:21-171:18.) Accordingly, Plaintiff's counsel lacked any legitimate discovery-related purpose for playing the edited and misleading video of Dr. Glanzman's testimony. The internal company documents shown to Dr. Flowers likewise went beyond the scope of his personal knowledge and only served to portray Pfizer in a bad light. Plaintiff's counsel's introduction of and improper questioning about Warner-Lambert Company LLC's plea likewise served only to "poison the well." (Nov. 18 Order, at 2; Flowers Dep. at 88:3-91:20; Flowers Ex. 10, 11.) Moreover, Pfizer did not have a fair opportunity to respond by, for example, presenting evidence that might have added context to or explained the misimpression created by the edited video or the documents. In any event, forcing parties to engage in mini-trials as to tangential issues in the midst of a deposition is not a solution to these types of abusive discovery tactics.

Plaintiff's counsel's conduct amounts to the type of "poison the well" strategy previously proscribed by this Court in its November 18, 2009 Order. (Nov. 18 Order.) In another case in this MDL, Dr. Egilman sent an unsolicited letter to a treating physician that was manipulated to portray Pfizer in a negative light. While the Court declined to impose sanctions against Dr. Egilman, it warned the parties against any future attempts to taint the testimony of fact witnesses, who should remain neutral, and observed that such tactics are "troubling." (*Id.* at 2.)

---

[4] *See also Davoll v. Webb*, 194 F.3d 1116, 1138 (10th Cir. 1999) ("A treating physician is not considered an expert witness if he or she testifies about observations based on personal knowledge, including the treatment of the party."); *Indem. Ins. Co. of N. Am. v. Am. Eurocopter LLC*, 227 F.R.D. 421, 423 (M.D.N.C. 2005) ("A treating physician is a participant or fact witness when it comes to describing the diagnosis and treatment of a party's condition.").

11

The Court also explained that it is "materially misleading" to present evidence that has been edited – in a way that is favorable to one party's case – to a fact witness. (*Id.*)  Plaintiff's counsel's attempt to taint the witness's testimony violates the spirit of the Court's Order.  This misconduct cannot be justified simply because it was engaged in during a deposition, rather than before a deposition.

It is well settled that "[a] district court has the inherent power to manage its own proceedings and to control the conduct of litigants who appear before it through orders or the issuance of monetary sanctions for bad-faith, vexatious, wanton or oppressive behavior." *Strahan v. Simon Property Group, Inc.*, No. 08-cv-10764, 2008 WL 5273684, at *1 (D. Mass. Dec. 11, 2008) (citing *United States v. Kouri-Perez*, 187 F.3d 1, 6-8 (1st Cir. 1999)).  Pursuant to this inherent power, courts may restrict or sanction communications that are designed to frustrate an adverse party's legitimate efforts to conduct a fair examination of a plaintiff's treating physicians.  *See Parker v. Upsher-Smith Labs, Inc.*, No. 3:06-cv-0518, 2009 WL 418596, at *4 (D. Nev. Feb. 18, 2009); *see also In re Currency Conversion Fee Antitrust Litig.*, 361 F. Supp. 2d 237, 252 (S.D.N.Y. 2005) (finding that courts have supervisory authority to prevent parties from engaging in "'misleading communications'" with putative class members, including biased, one-sided accounts that "omit[] critical information") (citation omitted).  Moreover, Federal Rule of Civil Procedure 30(d)(2) provides that a court may impose appropriate sanctions on a party who "frustrates the fair examination of the deponent."

In *Parker*, for example, after the court entered an order permitting the defendant to interview the plaintiff's treating doctors, the plaintiff's counsel sent letters to those doctors informing them that they were not required to speak with defense counsel.  2009 WL 418596, at *2.  While the plaintiff argued that his letters to the treating physicians contained only accurate information and that he had a right to communicate with the doctors, the court found that plaintiff's communications were made "for the improper purpose of influencing these witnesses not to cooperate with defendant's counsel in *ex parte* interviews, and it was done to gain a tactical advantage." *Id.* at *4, *8.  In so doing, the plaintiff's counsel "acted in bad faith or

[engaged in] conduct tantamount to bad faith." *Id.* at *8. Accordingly, the court sanctioned the plaintiff's counsel pursuant to its inherent authority. *See id.* at *9. Likewise, in this case, while Plaintiff's counsel did not explicitly discourage Dr. Flowers from speaking to defense counsel, the transparent purpose of Mr. Pierce's pre-deposition letter and Mr. London's deposition conduct was to "influence[]" the treating physician's testimony by impugning and maligning Pfizer, and to thereby "gain a tactical advantage." *Id.* at *8. Plaintiff's counsel's actions both before and during Dr. Flowers' deposition reflect these improper motives.

Here, Mr. Pierce's pre-deposition letter to Dr. Flowers and the attached materials were clearly designed with the improper purpose of biasing the treating physician. The first paragraph of this letter contained a reference to the plea regarding Neurontin, and copies of the charges and plea agreement were attached. Commenting on a similar tactic employed by Dr. Egilman in *Shearer*, this Court correctly observed that "there was **no basis** for producing the conviction **other than to poison the well**." (Nov. 18 Order, at 2 (emphasis added).) In this case, the letter by Mr. Pierce went even further than Dr. Egilman's letter by adding the following inflammatory – yet baseless – assertion: "It is clear that the scheme the drug manufacturers created made the prescribing physicians victims as much as their patients." (Aug. 31, 2004 letter.)

As described above, Plaintiff's counsel continued to advance his "poison the well" strategy at Dr. Flowers' deposition, ignoring the very purpose of a deposition, which is to obtain relevant information. Not only did Plaintiff's counsel play misleadingly edited deposition testimony and show irrelevant documents, he also asked a series of "do you think it's right" questions that amounted to bald accusations that Pfizer had supposedly committed "bad acts." (Flowers' Dep. at 181:12-182:15.) Whether Dr. Flowers thinks that something is "right" or not obviously has no bearing on any claim or defense in this lawsuit. Mr. London would not be permitted to ask purely argumentative questions at trial, and he should not be allowed to do so at a deposition. *See Silbergleit v. First Interstate Bank of Fargo, N.A.*, 37 F.3d 394, 398 (8th Cir. 1994) (noting that counsel cannot "emphasize[] irrelevant information having no bearing on the issues of the case" that would only serve to "distract the jury from considering the evidence on

the material issues before it"). This was not fact-gathering; it was pure advocacy. Plaintiff's counsel's willingness to violate the decorum of the deposition – in order to promote prejudice against Pfizer – further highlights the impropriety of counsel's agenda and tactics.

In totality, this pattern of misconduct reveals an ongoing strategy to instill prejudice in key witnesses for the sake of gaining a tactical advantage. This improper influence has frustrated Pfizer's ability to conduct a *fair* deposition. Fed. R. Civ. P. 30(d)(2). The Magistrate Judge's Order that will allow this improper conduct to continue unabated was clear error, and this Court should take remedial steps to deter and prevent abusive discovery tactics.

## II. Plaintiff Provided No Legitimate, Discovery-Related Justification for Her Counsel's Improper Conduct

Plaintiff's response to Pfizer's motion provides no valid excuse for her counsel's conduct before and during Dr. Flowers' deposition. Instead, she indicates that her counsel will continue to employ these improper tactics going forward. In her opposition, Plaintiff first argues Mr. London's entire conduct during the deposition should be excused because *some* of the questions he asked were relevant; yet she does not explain how the conduct that was the subject of Pfizer's motion was related to obtaining relevant information about her treatment. While Plaintiff characterizes Dr. Flowers as an expert witness, he has not been designated as an expert in this litigation. As such, the "hypothetical" questions asked during the deposition were nothing more than arguments and were totally unrelated to the treatment of Mrs. Barlow. Plaintiff's after-the-fact justifications do not alter the fact that Plaintiff's counsel clearly exceeded the scope of discovery and frustrated Pfizer's ability to fairly depose this fact witness. Finally, Plaintiff provided no justification for her counsel's letter to Dr. Flowers that misrepresented the substance of Warner-Lambert Company LLC's plea and claimed that he had been "victim[ized]" by "the scheme the drug manufacturers created." (Aug. 31, 2004 letter.)

Pfizer agrees with Plaintiff's assertions that "[t]his is a failure to warn/learned intermediary case in which Mrs. Barlow has the burden of proof under Texas law to overcome a statutory rebuttable presumption that the drug label warnings were adequate" and that she bears

14

the burden of proof to establish that, if a different warning had been provided, Dr. Flowers would not have prescribed Neurontin.  (Pl.'s Opp. [3103], at 3.)  Pfizer also agrees that whether Dr. Flowers would have changed his prescribing decision or treatment of Mrs. Barlow had the warnings section of the FDA-approved Neurontin label in 1999 or 2000 contained a statement regarding suicidal behavior or ideation is an appropriate area of inquiry.  It should also be a simple and straightforward area of inquiry.  Plaintiff's counsel needed to ask only: "Dr. Flowers, had the Neurontin label in 1999 or 2000 contained a warning that Neurontin might increase the risk of suicidal behavior or ideation in certain patients (or other proposed warning language Plaintiff contends should have been given), would you have prescribed Neurontin to Mrs. Barlow?  Why or why not?  Would your treatment of Mrs. Barlow have changed?  In what way?"  Such questioning would have been relevant and appropriate, and it would have required no elaborate foundation.  Given the importance of this area of inquiry in this case, Pfizer – not to mention this Court and the jury – is entitled to hear Dr. Flowers' unvarnished answers to such questions, regarding his care of Mrs. Barlow and how he would have factored in changes to the product label, without the taint of counsel's efforts to improperly influence his answers.

Evidence such as the misleadingly edited clip from Dr. Glanzman, however, has *nothing* to do with the treatment of Mrs. Barlow or how the alleged warning defect might have affected that treatment.  The presentation of this out-of-context video testimony that paints a skewed and incomplete picture is not only irrelevant, it is fundamentally unfair.  This Court has cautioned the parties that it is "materially misleading" to present evidence – that has been edited in a way favorable to one party's case – to a fact witness.  (Nov. 18 Order at 2.)  Plaintiff suggests that Pfizer's only recourse is to respond with additional evidence that would put the testimony in context.  (Pl.'s Opp. at 14).  Plaintiff's suggestion, however, would force Pfizer to expend substantial time and resources showing counter-designations and rebuttal evidence as to matters not even relevant to the merits, and it would result in every deposition of these key fact witnesses devolving into a hotly-contested mini-trial on issues tangential to the patient's treatment.

Like Dr. Glanzman's deposition, internal company documents and a copy of the criminal information filed against Warner-Lambert Company LLC at the deposition have no conceivable bearing on Dr. Flowers' treatment of Mrs. Barlow, his use of the product label, or anything else within his personal knowledge. These documents were presented solely to preemptively influence the doctor's testimony and portray Pfizer in a bad light. Unsurprisingly, Dr. Flowers explicitly testified that he does *not* consider internal company documents or the testimony of pharmaceutical company employees when making prescribing decisions. (Flowers Dep. at 170:21-171:18.) Plaintiff's claim that her attorney was using these documents to lay a foundation is nothing more than a ruse. Plaintiff's counsel cannot present materials – for the ulterior purpose of creating bias – concealed under the guise of "laying a foundation" for a line of questioning that is totally irrelevant to the issues in this lawsuit.[5]

Plaintiff also attempts to justify her counsel's conduct by arguing that Dr. Flowers is an expert witness, but he has not been designated as such in this case. The law is clear that the testimony of a non-expert treating physician must be "based on personal knowledge and on observations obtained during the course of care and treatment." *Garcia*, 230 F.R.D. at 249. Where any opinions offered by a physician are based upon information supplied by an attorney instead of his or her observations during treatment, the physician must be designated as an expert and supply an expert report. *See id.* Thus, there was no basis to elicit opinions from Dr. Flowers based upon hypotheticals (aside from asking how his treatment of Mrs. Barlow might have changed if an alternative warning appeared in the label)[6] and certainly no basis for Plaintiff's

---

[5] Plaintiff distorts the argument of Pfizer's counsel when she suggests that Pfizer has argued that plaintiffs are required to lay the foundation for introduction of the criminal plea through the testimony of treating physicians. (Pl.'s Opp. at 17-18.) Defendants have objected to – and continue to object to – the introduction of the criminal plea in this litigation. In support of their relevancy objection, Defendants have argued, *inter alia*, that treating physicians in the cases at issue had denied that they were detailed on off-label uses. Plaintiff's counsel obviously was able to ask Dr. Flowers about his communications with Pfizer sales representatives without showing Dr. Flowers the criminal plea.

[6] Indeed, Plaintiff undermines her own argument. As Plaintiff herself explained, in order to opine whether he would have changed his treatment choices, Dr. Flowers did not "hav[e] to study and parse out conflicting scientific or technical data to separate the wheat from the chaff; *it was only a treatment question*." (Pl.'s Opp., at 10 (emphasis added).)

16

counsel's series of "do you think it's right" questions.  These highly improper tactics were not aimed at discovering relevant information and had no purpose other than advocating Plaintiff's position and improperly influencing Dr. Flowers.  (*See* Flowers' Dep. at 181:12-182:15.)

Finally, Plaintiff fails to justify the inflammatory letter sent to Dr. Flowers shortly after she initiated this lawsuit.  She claims that her counsel had simply sought to inform Dr. Flowers that she had filed suit against Pfizer.[7]  (Pl.'s Opp. at 16.)  However, not only did this letter contain information that was wholly unrelated to Dr. Flowers' potential testimony, it mischaracterized Warner-Lambert Company LLC's plea and levied the baseless allegation that Dr. Flowers was a "victim[]" of a "scheme the drug manufacturers created."  (Aug. 31, 2004 letter.)  Even though this letter predated the November 18, 2009 Order, it is precisely the sort of improper and misleading communication that this Court previously found "troubling."  While Pfizer recognizes that counsel may engage in legitimate *ex parte* contacts with treating physicians to discuss Plaintiff's treatment, this is not a license to deluge these key fact witnesses with biased and misleading information.  The communications Pfizer seeks to preclude had no conceivable purpose other than to unfairly influence Dr. Flowers' testimony.  *See Parker*, 2009 WL 418596, at *8 (holding that plaintiffs should not use otherwise permissible *ex parte* contact to "influence[]" a fact witness's testimony in an attempt to "gain a tactical advantage").

Plaintiff has not shown that her counsel's communications with Dr. Flowers, both during and before his deposition, had any bearing whatsoever on his treatment of Mrs. Barlow or how a different warning might have affected that treatment.  As such, rather than engage in appropriate

---

[7] In her response, she attempts to divert the Court's attention by discussing Pfizer's alleged communications with Dr. Flowers prior to this litigation, (Pl. Opp.'s at 15-16.), but she does not allege that Pfizer has communicated with Dr. Flowers about the substance of this litigation after Mrs. Barlow filed suit.  Instead, she discusses a document containing potential questions and answers that had been provided to Pfizer's sales force with background information on the litigation and government settlement, *in the event that they were questioned by physicians*.  Not only was the information only to be used *in response* to questions from physicians, the tone is moderate and factual, in contrast to the inflammatory, unsolicited communications from Plaintiff's counsel.  The document also makes clear that any response to physicians must be consistent with the FDA-approved label.  In any event, Plaintiff has offered no evidence that communications between sales representatives and Dr. Flowers regarding information on the litigation and government settlement took place.

17

*ex parte* communications or ask questions aimed at soliciting relevant information at the deposition, Plaintiff's counsel went to extraordinary efforts to mislead and bias Dr. Flowers. In doing so, they unfairly frustrated Pfizer's efforts to obtain untainted testimony of a prescribing doctor, a key fact witness in this case. Fed. R. Civ. P. 30(d)(2). It was clearly erroneous for the Magistrate Judge to validate this improper conduct by allowing it to continue undeterred.

## CONCLUSION

For all the foregoing reasons, the Court should set aside Magistrate Judge Sorokin's Order denying Pfizer's motion and issue an Order precluding Plaintiff's counsel from engaging in such unfair tactics as described herein. In particular, the Court's order should preclude Plaintiff from sending unsolicited *ex parte* information about the guilty plea and other prejudicial materials to non-party fact witnesses, playing video or reading testimony during depositions, and questioning non-expert treating physicians about matters not within their personal knowledge. It should also require Mrs. Barlow's counsel to disclose the identity of any other fact witnesses they have contacted with regard to this litigation. Furthermore, the Court should impose sanctions against Mrs. Barlow's counsel, pursuant to its inherent authority and Rule 30(d)(2), to deter further inequitable conduct and fashion any other relief deemed appropriate.

Dated: November 12, 2010

Respectfully submitted,

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP

By:   /s/ Mark S. Cheffo
        Mark S. Cheffo

Four Times Square
New York, NY 10036
Tel:  (212) 735-3000
Mark.Cheffo@skadden.com

-and-

ROPES & GRAY LLP

By:   /s/ Ana M. Francisco
        Ana M. Francisco
        BBO # 564346

Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
Tel:  (617) 951-7000
Ana.Francisco@ropesgray.com

*Attorneys for Defendants Pfizer Inc and Warner-Lambert Company LLC*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on November 12, 2010.

                                    /s/ Ana M. Francisco
                                    Ana M. Francisco