# EXHIBIT C



**U.S. Department of Justice**

*Michael K. Loucks*
*Acting United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*

*John Joseph Moakley United States Courthouse*
*Suite 9200*
*1 Courthouse Way*
*Boston, Massachusetts 02210*

August 31, 2009

Brien T. O'Connor
Ropes & Gray LLP
One International Place
Boston, MA 02110

      Re:     <u>United States v. Pharmacia & Upjohn Company, Inc.</u>

Dear Mr. O'Connor:

      This letter sets forth the Agreement between the United States Attorney for the District of Massachusetts ("the U.S. Attorney") and the United States Department of Justice (collectively, the United States Attorney and the United States Department of Justice will be referred to as the "United States") and your client, Pharmacia & Upjohn Company, Inc. (hereinafter "Pharmacia"), in the above-captioned case. The Agreement is as follows:

      1.    <u>Change of Plea</u>

      At the earliest practicable date, Pharmacia shall waive indictment and plead guilty to the one-count Information attached hereto as Exhibit A, charging Pharmacia with a violation of the Food, Drug and Cosmetic Act, Title 21, U.S.C. Sections 331(a), 333(a)(2) and 352(f)(1). Pharmacia expressly and unequivocally admits that it knowingly, intentionally and willfully committed the crime charged in the attached Information and is in fact guilty of the offense, and agrees that it will not make any statements inconsistent with this explicit admission. Pharmacia agrees to waive venue, any applicable statutes of limitations, and any legal or procedural defects in the Information.

      2.    <u>Penalties</u>

Pharmacia faces the following maximum penalties on the count of conviction:

      (1)    a maximum possible fine of $500,000, twice the gross gain derived from the offense, or twice the gross loss to a person other than Pharmacia, whichever is greatest. *See* 18 U.S.C. §§ 3571(c), (d). The gross gain resulting from the offense

is $664,000,000 and thus the maximum possible fine is $1,328,000,000.

    (2)    a term of probation of not less than one (1) year and not more than five (5) years. *See* 18 U.S.C. § 3561(c)(1).

    (3)    a special assessment in the amount of $400. *See* 18 U.S.C. § 3013(a)(2)(B).

    3.    <u>Sentencing Guidelines</u>

The parties agree to take the following positions at sentencing under the United States Sentencing Guidelines:

    a.    The parties agree that the Guideline Manual in effect as of the date of sentencing should be used in determining Pharmacia's sentence. *See* U.S.S.G. § 1B1.11(a);

    b.    The parties agree that the base fine is $664,000,000, which is the pecuniary gain to the organization from the offense. *See* U.S.S.G. §§ 8C2.3 and 8C2.4(a);

    c.    Pursuant to U.S.S.G. § 8C2.5, the culpability score is eight (8) determined as follows:

        (1)    Base culpability score is five (5) pursuant to U.S.S.G. § 8C2.5(a);

        (2)    Add five (5) points pursuant to U.S.S.G. § 8C2.5(b)(1)(A), in that the organization had 5,000 or more employees, and an individual within the high-level personnel of the unit participated in or condoned the offense and/or tolerance of the offense by substantial authority personnel was pervasive throughout the organization;

        (3)    Deduct two (2) points for Pharmacia's full cooperation pursuant to U.S.S.G. § 8C2.5(g)(2).

    d.    Pursuant to U.S.S.G. § 8C2.6, the appropriate multiplier range associated with a culpability score of eight (8) is 1.6 to 3.2;

    e.    Thus, the Guideline Fine Range is $1,062,400,000 to $1,328,000,000. *See* U.S.S.G. §§ 8C2.7(a), (b); 18 U.S.C. §§ 3571(c) and (d); and,

    f.    The parties agree that (1) disgorgement pursuant to U.S.S.G. § 8C2.9 is not necessary, (2) there is no basis for a downward departure or deviation under the

United States Sentencing Guidelines and (3) a fine within the guideline range will result in a reasonable sentence taking into consideration all of the factors set forth in 18 U.S.C. §§ 3553(a), 3572.

4.      Agreed Disposition

The United States and Pharmacia agree pursuant to Fed. R. Crim. P. 11(c)(1)(C) that the following sentence is the appropriate disposition of the Information:

> a.      a criminal fine in the amount of one billion one hundred ninety-five million dollars ($1,195,000,000) to be paid within one week of the date of sentencing;
>
> b.      a mandatory special assessment of $400 pursuant to 18 U.S.C. § 3013, which shall be paid to the Clerk of Court on or before the date of sentencing; and
>
> c.      criminal forfeiture in the amount of $105,000,000;
>
> d.      In light of the pending civil action, *United States ex rel. Kopchinski v Pfizer, et. al.,* C.A. No. 05-CV-12115 (D. Mass.) (the "Civil Action"), and the Civil Settlement Agreement between Pfizer Inc and the United States relating to the Civil Action which is being signed contemporaneously with this plea agreement, and attached hereto as Exhibit B, which requires the payment of $1,000,000,000, plus interest, and in light of the October 17, 2008 agreements in principle reached by Pfizer Inc resolving substantially all personal injury and class action cases alleging that Pfizer's pain medication Bextra was the cause of injury, it appears that a process is in place under which all identifiable victims will have the opportunity to be fully recompensed.  The private payor victims will have been recompensed from the agreements in principle reached by Pfizer Inc with the personal injury plaintiffs, and the loss suffered by the federal program victims will be recompensed through the Federal Settlement Amount as defined in the Civil Settlement Agreement.  Therefore, the United States agrees that it will not seek a separate restitution order as to Pharmacia as part of the resolution of the Information and the parties agree that the appropriate disposition of this case does not include a restitution order.  The parties further agree that any attempt to further effect restitution would unduly complicate and prolong the sentencing to the degree that the benefit to any further victims would outweigh the burden on the sentencing process under 18 U.S.C. § 3663(a)(1)(B)(ii).

The United States specifically may, at its sole option, be released from its commitments under this Agreement, including, but not limited to, its agreement that this paragraph constitutes the appropriate disposition of this case, if at any time between its execution of this Agreement and sentencing, Pharmacia:

3

(a)     Fails to admit a complete factual basis for the plea;

(b)     Fails to truthfully admit its conduct in the offense of conviction;

(c)     Falsely denies, or frivolously contests, relevant conduct for which Pharmacia is accountable under U.S.S.G. § 1B1.3;

(d)     Gives false or misleading testimony in any proceeding relating to the criminal conduct charged in this case and any relevant conduct for which Pharmacia is accountable under U.S.S.G. § 1B1.3;

(e)     Engages in acts which form a basis for finding that Pharmacia has obstructed or impeded the administration of justice under U.S.S.G. § 3C1.1;

(f)     Attempts to withdraw its plea.

Pharmacia expressly understands that it may not withdraw its plea of guilty, unless the Court rejects this Agreement under Fed. R. Crim. P. 11(c)(5).

5.     <u>No Further Prosecution of Pharmacia</u>

Pursuant to Fed. R. Crim. P. 11(c)(1)(A), the United States agrees that, other than the charges in the attached Information, it shall not further prosecute Pharmacia for conduct relating to the drug Bextra which (a) falls within the scope of the Information; (b) was a subject of the investigation by the grand jury; or (c) was known to the U.S. Attorney prior to January 23, 2009. This declination is expressly contingent on:

(1)     the guilty plea of Pharmacia being accepted by the Court and not withdrawn; and

(2)     Pharmacia's performance of all of its material obligations as set forth in this Agreement and Pfizer's performance of all of its material obligations set forth in the attached Civil Settlement Agreement.  If Pharmacia's guilty plea is not accepted by the Court or is withdrawn for any reason, or if Pharmacia should fail to perform a material obligation under this Agreement, or if Pfizer should fail to perform a material obligation under the Civil Settlement Agreement, this declination of prosecution shall be null and void.

The United States expressly reserves the right to prosecute any individual, including but not limited to present and former officers, directors, employees, and agents of Pharmacia, in connection with the conduct encompassed by this plea agreement, within the scope of the grand jury investigation, or known to the U.S. Attorney.

4

6.    Payment of Mandatory Special Assessment

Pharmacia agrees to pay the mandatory special assessment to the Clerk of the Court on or before the date of sentencing.

7.    Waiver of Rights to Appeal and to Bring Collateral Challenge

Pharmacia is aware that it has the right to challenge its sentence and guilty plea on direct appeal.  Pharmacia is also aware that it may, in some circumstances, be able to argue that its plea should be set aside, or its sentence set aside or reduced, in a collateral challenge such as pursuant to a motion under 28 U.S.C. § 2255.

In consideration of the concessions made by the United States in this Agreement, Pharmacia knowingly and voluntarily waives its right to appeal or collaterally challenge:

(a)    Pharmacia's guilty plea and any other aspect of Pharmacia's conviction, including, but not limited to, any rulings on pretrial suppression motions or any other pretrial dispositions of motions and issues; and

(b)    The imposition by the District Court of the sentence agreed to by the parties, as set out in paragraph 4, even if the Court rejects one or more positions advocated by the parties with regard to the application of the U.S. Sentencing Guidelines.

Pharmacia's waiver of rights to appeal and to bring collateral challenges shall not apply to appeals or challenges based on new legal principles in First Circuit or Supreme Court cases decided after the date of this Agreement which are held by the First Circuit or Supreme Court to have retroactive effect.

This Agreement does not affect the rights or obligations of the United States as set forth in 18 U.S.C. § 3742(b), and the U.S. Attorney therefore retains his appeal rights.

8.    Fed. R. Crim. P. 11(c)(1)(C) Agreement

Pharmacia's plea will be tendered pursuant to Fed. R. Crim. P. 11(c)(1)(C).  Pharmacia cannot withdraw its plea of guilty unless the sentencing judge rejects this Agreement or fails to impose a sentence consistent herewith.  If the sentencing judge rejects this Agreement or fails to impose a sentence consistent herewith, this Agreement shall be null and void at the option of either the United States or Pharmacia.

Pharmacia may seek sentencing by the Court immediately following the Rule 11 plea hearing.  The United States does not object to the Court sentencing Pharmacia immediately following the Rule 11 plea hearing or prior to the completion of a Presentence Report. Pharmacia understands that the decision whether to proceed immediately following the plea

5

hearing with the sentencing proceeding, and to do so without a Presentence Report, is exclusively that of the United States District Court.

9.     Cooperation

Pharmacia shall cooperate completely and truthfully in any trial or other proceeding arising out of any ongoing civil, criminal or administrative investigation of its current and former officers, agents, employees and customers in connection with matters described in the Information. Pharmacia shall make reasonable efforts to facilitate access to, and to encourage the cooperation of, its current and former officers, agents, and employees for interviews sought by law enforcement agents, upon request and reasonable notice in connection with matters described in the Information. Pharmacia shall also take reasonable measures to encourage its current and former officers, agents, and employees to testify truthfully and completely before any grand jury, and at any trial or other hearing, at which they are requested to do so by any government entity in connection with matters described in the Information.

In addition, Pharmacia shall promptly furnish to law enforcement agents, upon request, all documents and records in its possession, custody or control relating to the conduct that is within the scope of any such ongoing federal investigation, trial or other proceeding in connection with matters described in the Information, and that are not covered by the attorney-client privilege or work product doctrine.

Provided, however, notwithstanding any provision of this Agreement, that: (1) Pharmacia is not required to request of its current or former officers, agents, or employees that they forego seeking the advice of an attorney or that they act contrary to that advice; (2) Pharmacia is not required to take any action against its officers, agents, or employees for following their attorney's advice; and (3) Pharmacia is not required to waive any privilege or claim of work product protection.

10.     Probation Department Not Bound By Agreement

The sentencing disposition agreed upon by the parties and their respective calculations under the Sentencing Guidelines are not binding upon the United States Probation Office.

11.     Forfeiture

Pharmacia will forfeit to the United States assets subject to forfeiture pursuant to 21 U.S.C. § 334 and 28 U.S.C. § 2461(c) as a result of its guilty plea. Pharmacia admits that the value of the quantities of Bextra which were misbranded in violation of 21 U.S.C. § 331 totaled at least $105,000,000.00 in United States currency. Pharmacia acknowledges and agrees that the quantities of Bextra which were misbranded in violation of 21 U.S.C. § 331 cannot be located upon exercise of due diligence, or have been transferred or sold to, or deposited with, a third party, placed beyond the jurisdiction of the Court, substantially diminished in value, or commingled with other property which cannot be divided without difficulty. Accordingly,

6

Pharmacia agrees that the United States is entitled to forfeit as "substitute assets" any other assets of Pharmacia up to the value of the now missing directly forfeitable assets.

Pharmacia agrees that, no later than one week after sentencing, it shall remit the amount of $105,000,000 in United States currency to the United States Marshals Service pursuant to the wire instructions provided by the United States Attorney's Office. Pharmacia and the United States agree that this payment shall satisfy any and all forfeiture obligations that Pharmacia may have as a result of its guilty plea.

Forfeiture of substitute assets shall not be deemed an alteration of Pharmacia's sentence. The forfeitures set forth herein shall not satisfy or offset any fine, restitution, cost of imprisonment, or other penalty imposed upon Pharmacia, nor shall the forfeitures be used to offset Pharmacia's tax liability or any other debt owed to the United States.

Pharmacia agrees to consent to the entry of orders of forfeiture for the $105,000,000.00 in United States currency, and waives the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, entry of a preliminary order of forfeiture, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. Pharmacia acknowledges that it understands that the forfeiture of assets is part of the sentence that may be imposed in this case and waives any failure by the court to advise it of this, pursuant to Rule 11(b)(1)(J), at the time the guilty plea is accepted.

In addition to all other waivers or releases set forth in this Agreement, Pharmacia hereby waives any and all claims arising from or relating to the forfeitures set forth in this section, including, without limitation, any claims arising under the Double Jeopardy Clause of the Fifth Amendment, or the Excessive Fines Clause of the Eighth Amendment, to the United States Constitution, or any other provision of state or federal law.

The United States District Court for the District of Massachusetts shall retain jurisdiction to enforce the provisions of this section.

12.    Civil and Administrative Liability

By entering into this Agreement, the United States does not compromise any civil liability, including but not limited to any False Claims Act or tax liability, which Pharmacia may have incurred or may incur as a result of its conduct and its plea of guilty to the attached Information.

Pharmacia's civil liability to the United States in connection with certain matters under investigation by the United States is resolved in the Civil Settlement Agreement with Pfizer Inc, attached as Exhibit B, according to the terms set forth in that Agreement.

13.     Waiver of Defenses

If Pharmacia's guilty plea is not accepted by the Court for whatever reason, or is later withdrawn for whatever reason, Pharmacia hereby waives, and agrees it will not interpose, if charges are filed within six months of the date on which such guilty plea is rejected or withdrawn, any defense to any charges brought against it which it might otherwise have for pre-indictment delay, any statute of limitations, or the Speedy Trial Act, except any such defense that Pharmacia may have for conduct occurring prior to November 15, 2000.

14.     Breach of Agreement

If the United States determines that Pharmacia has failed to comply with any provision of this Agreement, or has committed any crime following its execution of this Agreement, the United States may, at its sole option, be released from its commitments under this Agreement in its entirety by notifying Pharmacia, through counsel or otherwise, in writing.  The United States may also pursue all remedies available to it under the law, even if it elects not to be released from its commitments under this Agreement.  Pharmacia recognizes that no such breach by it of an obligation under this Agreement shall give rise to grounds for withdrawal of its guilty plea. Pharmacia understands that, should it breach any provision of this agreement, the United States will have the right to use against Pharmacia before any grand jury, at any trial or hearing, or for sentencing purposes, any statements which may be made by it, and any information, materials, documents or objects which may be provided by it to the government subsequent to this Agreement, without any limitation.

Pharmacia understands and agrees that this 11(c)(1)(C) plea agreement and its agreed upon criminal disposition:

  a.      are wholly dependent upon Pfizer's timely compliance with the material provisions of the attached Civil Settlement Agreement; and that

  b.      failure by Pharmacia  to comply fully with the material terms of this Agreement or by Pfizer to comply fully with the material terms of the attached Civil Settlement Agreement, including the payments required therein, will constitute a breach of this Agreement, provided however, that a breach of the Corporate Integrity Agreement (the "CIA"), referred to in the Civil Settlement Agreement, does not constitute a breach of this Plea Agreement, and any disputes arising under the CIA shall be resolved exclusively through the dispute resolution provisions of the CIA.

In the event Pharmacia at any time hereafter breaches any material provision of this Agreement, Pharmacia understands that (1) the United States will as of the date of that breach be relieved of any obligations it may have in this Agreement and the attached Civil Settlement Agreement, including but not limited to the promise not to further prosecute Pharmacia as set forth in paragraph 5 of this Agreement; and (2) Pharmacia will not be relieved of its obligation to make the payments set forth in this Agreement and Pfizer will not be relieved of its obligation to

make the payments set forth in the attached Civil Settlement Agreement, nor will it be entitled to return of any monies already paid.  Moreover, in the event of a material breach, Pharmacia, with respect to any charges which could have been brought as of the date of this letter, and are brought within six months of the declaration of a breach, hereby waives, and agrees it will not interpose, any defense to any charges brought against it which it might otherwise have for pre-indictment delay, any statute of limitations, or the Speedy Trial Act, except any such defense that Pharmacia may already have for conduct occurring before November 15, 2000.

15.   Who Is Bound By Agreement

With respect to matters set forth in Paragraph 5, this Agreement is binding among Pharmacia and the Office of the United States Attorney for the District of Massachusetts, the United States Attorney's Offices for each of the other 93 judicial districts of the United States, and the Office of Consumer Litigation of the Department of Justice. The non-prosecution provisions in Paragraph 5 are also binding on the Criminal Division of the United States Department of Justice, with the exception of the investigation of Pharmacia being conducted by the Fraud Section of the Criminal Division regarding possible violations of the Foreign Corrupt Practices Act and related offenses in connection with the sales and marketing of Pharmacia's products to foreign customers, which investigation is specifically excluded from the release in Paragraph 5.  A copy of the letter to Acting United States Attorney Michael K. Loucks from the Deputy Assistant Attorney General, Criminal Division, U.S. Department of Justice, authorizing this Agreement is attached as Exhibit C.  Pharmacia understands that this Agreement does not bind any state or local prosecutorial authorities, the Tax Division of the U.S. Department of Justice, or the Internal Revenue Service of the U.S. Department of the Treasury.

16.   Corporate Authorization

Pharmacia's acknowledgment of this Agreement and execution of this Agreement on behalf of the corporation is attached as Exhibit D.  Pharmacia shall provide to the U.S. Attorney and the Court a certified copy of a resolution of the Board of Directors of Pharmacia Corporation, affirming that the Board of Directors has authority to enter into the Plea Agreement and has (1) reviewed the Information in this case and the proposed Plea Agreement or has been advised of the contents thereof; (2) consulted with legal counsel in connection with the matter; (3) voted to enter into the proposed Plea Agreement; (4) voted to authorize Pharmacia to plead guilty to the charge specified in the Information; and (5) voted to authorize the corporate officer identified below to execute the Plea Agreement and all other documents necessary to carry out the provisions of the Plea Agreement.   A copy of the resolution is attached as Exhibit E. Pharmacia agrees that either a duly authorized corporate officer or a duly authorized attorney for Pharmacia, at the discretion of the Court, shall appear on behalf of Pharmacia and enter the guilty plea and will also appear for the imposition of sentence.

17.   Complete Agreement

This Agreement, together with the Civil Settlement Agreement, set forth the complete and only agreement between the parties relating to the disposition of this matter.  No promises,

9

representations or agreements have been made other than those set forth in this letter and its attachments A through E. This Agreement supersedes prior understandings, if any, of the parties, whether written or oral. This Agreement can be modified or supplemented only in a written memorandum signed by the parties or on the record in court.

If this letter accurately reflects the Agreement between the U.S. Attorney and your client, Pharmacia, please have the authorized representative of Pharmacia sign the Acknowledgment of Agreement below. Please also sign below as Witness. Return the original of this letter to Assistant U.S. Attorneys Sara M. Bloom and Susan M. Poswistilo.

Very truly yours,

8/31/9

MICHAEL K. LOUCKS
Acting United States Attorney

## ACKNOWLEDGMENT OF PLEA AGREEMENT

The Board of Directors has authorized me to execute this Plea Agreement on behalf of Pharmacia & Upjohn Company, Inc. The Board has read this Plea Agreement, the attached criminal Information, and the Civil Settlement Agreement including its attachment in their entirety, or has been advised of the contents thereof, and has discussed them fully in consultation with Pharmacia & Upjohn Company, Inc.'s attorneys. I am further authorized to acknowledge on behalf of Pharmacia & Upjohn Company, Inc. that these documents fully set forth Pharmacia & Upjohn Company, Inc.'s agreement with the United States, and that no additional promises or representations have been made to Pharmacia & Upjohn Company, Inc. by any officials of the United States in connection with the disposition of this matter, other than those set forth in these documents.

Dated: _Aug 28th, 2009_

_____
Vice President and Secretary
Pharmacia & Upjohn Company, Inc.

Dated: _____

_____
BRIEN T. O'CONNOR
Ropes & Gray LLP
Counsel for Pharmacia & Upjohn Company, Inc.

11

## ACKNOWLEDGMENT OF PLEA AGREEMENT

The Board of Directors has authorized me to execute this Plea Agreement on behalf of Pharmacia & Upjohn Company, Inc. The Board has read this Plea Agreement, the attached criminal Information, and the Civil Settlement Agreement including its attachment in their entirety, or has been advised of the contents thereof, and has discussed them fully in consultation with Pharmacia & Upjohn Company, Inc.'s attorneys. I am further authorized to acknowledge on behalf of Pharmacia & Upjohn Company, Inc. that these documents fully set forth Pharmacia & Upjohn Company, Inc.'s agreement with the United States, and that no additional promises or representations have been made to Pharmacia & Upjohn Company, Inc. by any officials of the United States in connection with the disposition of this matter, other than those set forth in these documents.

Dated: _____

James Gibney
Vice President and Secretary
Pharmacia & Upjohn Company, Inc.

Dated: 8/31/09

BRIEN T. O'CONNOR
Ropes & Gray LLP
Counsel for Pharmacia & Upjohn Company, Inc.

11

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **Criminal No.** |
| | ) | |
| v. | ) | 21 U.S.C. §§ 331(a), 333(a)(2) |
| | ) | and 352 (Introduction into |
| PHARMACIA & UPJOHN COMPANY, INC. | ) | Interstate Commerce of a |
| Defendant. | ) | Misbranded Drug) |
| | ) | |

### INFORMATION

The United States Attorney charges that:

### GENERAL ALLEGATIONS

At all times material to this Information, unless otherwise alleged:

1.      **PHARMACIA & UPJOHN COMPANY, INC.** (hereinafter "**PHARMACIA**

**INC.**") was a Delaware corporation with a principal place of business in Kalamazoo, Michigan.

**PHARMACIA INC.** was a wholly owned subsidiary of Pharmacia & Upjohn LLC, the

successor to Pharmacia & Upjohn Company, which was a successor of Pharmacia Corporation,

all of which were acquired in April 2003 by Pfizer Inc (all of these entities and their subsidiaries

hereinafter collectively "**PHARMACIA**").  During the relevant time frame,  **PHARMACIA**

developed, manufactured, distributed and sold pharmaceutical products nationwide and in the

District of Massachusetts.

2.      Prior to the April 2003 acquisition, Pharmacia Corporation and its subsidiaries,

including **PHARMACIA INC.**, jointly promoted the drug Bextra with Pfizer Inc.  Since April

2003, Pharmacia Corporation and Pharmacia Inc. have been wholly owned subsidiaries of Pfizer

Inc.

EXHIBIT A

3.      **PHARMACIA INC.** holds the United States trademarks and patents for the drug Bextra, which was distributed from Puerto Rico into interstate commerce throughout the United States, including specifically into Massachusetts, from in or about February 2002 until approximately April 2005.

### The FDA and the FDCA

4.      The United States Food and Drug Administration ("FDA") was the federal agency of the United States responsible for protecting the health and safety of the public by enforcing the Federal Food, Drug and Cosmetic Act, ("FDCA"), 21 United States Code, Section 301, *et seq.*, and ensuring, among other things, that drugs intended for use in humans were safe and effective for each of their intended uses and that the labeling of such drugs bore true and accurate information.

5.      The FDCA, and its implementing regulations, required that, with certain exceptions not relevant here, before a new drug could legally be introduced into interstate commerce, a sponsor of a new drug submit and obtain approval of a New Drug Application ("NDA") from the FDA.

6.      The FDCA required that the NDA include proposed labeling for the proposed intended uses of the drug which included, among other things, the conditions for therapeutic use. The NDA was also required to contain, to the satisfaction of FDA, data generated in adequate and well-controlled clinical trials that demonstrated that the drug would be safe and effective when used in accordance with the proposed labeling.

7.      An NDA sponsor was not permitted to promote and market a new drug until it had an approved NDA, including approval for the proposed labeling. Moreover, if approved, the

2

sponsor was permitted to promote and market the drug only for the medical conditions of use and dosages specified in the approved labeling.  Uses not approved by the FDA, including dosages not approved in the drug's approved labeling, were known as "unapproved" or "off-label" uses.

8.      The FDCA, and its implementing regulations, required the sponsor to file a Supplemental NDA ("sNDA"), in order to label or promote a drug for uses and dosages different from the conditions for use and dosage specified in the approved labeling.  The sNDA was required to include a description of the newly proposed indications for use, and evidence consisting of well-controlled clinical studies, sufficient to demonstrate that the drug was safe and effective for the new use or uses.  Only upon FDA approval of the sNDA could the sponsor promote the drug for the new intended use.

9.      The FDCA provided that, unless otherwise exempted, a drug was misbranded if, among other things, the labeling did not contain adequate directions for use.  21 U.S.C. § 352(f)(1).  Adequate directions for use could not be written for medical indications or uses for which the drug had not been approved and proven to be safe and effective through well-controlled clinical studies because unapproved uses could not be included in the labeling. Drugs that were promoted for uses that had not been approved by the FDA were deemed to be misbranded under Section 352(f)(1).

10.      The FDCA prohibited the delivery for introduction and causing the delivery for introduction into interstate commerce of a misbranded drug.

### The Bextra Approval Process

11.      Bextra was **PHARMACIA's** trade name for the drug valdecoxib that was a so-called "Cox-2 Inhibitor."  At the time Bextra first came on the market in February 2002, the

"Cox-2" class of drugs included the previously released drug Celebrex, also marketed by

**PHARMACIA**, and Vioxx, manufactured and marketed by a competitor.

12.     The Cox-2 class of drugs was designed to relieve various forms of pain and

inflammation and was intended to offer pain relief equal to the predecessor pain relievers, but

without the negative gastrointestinal side effects often associated with those drugs.  Thus, for

many patients, the justification for switching to a Cox-2 drug over the other available pain

relievers was greater gastrointestinal safety, not better efficacy.

13.     Because many of the other pain relievers, such as ibuprofen or naproxen, were

available as generic and over-the-counter drugs at the time Bextra was launched, Bextra was

much more expensive than the competitor drugs.

14.     On or about January 15, 2001, **PHARMACIA** submitted an NDA seeking

approval of Bextra, which was a new drug within the meaning of 21 U.S.C. § 321(p) and 21

C.F.R. §§ 310.3 (h)(4) and (5).  In that NDA,  **PHARMACIA** sought approval to market Bextra

at dosages of 10 mg, 20 mg and 40 mg for the following uses:

(1)     For the prevention and treatment of acute pain in adults.  Preoperative
        administration of [Bextra] prevents or reduces post-operative pain.
        [Bextra] has an opioid sparing effect when used concomitantly with
        opioids;

(2)     For the treatment of primary dysmenorrhea; and

(3)     For relief of signs and symptoms of osteoarthritis and adult rheumatoid arthritis.

### The FDA Approval and Non-Approval of Bextra

15.     On or about November 16, 2001, the FDA approved Bextra to treat the signs and

symptoms of osteoarthritis ("OA"), adult rheumatoid arthritis ("RA") and for the treatment of

primary dysmenorrhea ("PD").  **PHARMACIA** sought approval of Bextra for general acute pain,

4

for the preemption of the pain of surgery, and for opioid sparing, but the FDA declined to grant such approvals.

16.     Moreover, although **PHARMACIA** had sought approval for the 10 mg, 20 mg and 40 mg doses for all uses, the FDA only approved the 20 mg dose twice a day as needed for PD, and the FDA only approved the 10 mg dose once a day for OA and RA (hereinafter these uses for Bextra will be referred to throughout this Information as the "Approved Uses and Dosages").

17.     The FDA never approved Bextra for any use or dosage other than the Approved Uses and Dosages.

18.     The FDA informed **PHARMACIA** that it was not approving Bextra for acute pain at least in part because of a safety concern about Bextra.   The safety concern cited by the FDA was the results of a study of Bextra following the administration of its injectable form, parecoxib, used in patients undergoing coronary artery bypass graft surgery (the "CABG I" trial), in which the FDA noted that there was an excess of serious cardiovascular thromboembolic events in the Bextra (after parecoxib) arm of the trial.

19.     In its comments to the proposed label for Bextra, the FDA also informed **PHARMACIA** that the FDA recommended against the use of 20 mg for treatment of arthritis based upon an increased potential for adverse events at higher dosages.

20.     In or about October 2004, the results of a second study of Bextra and parecoxib in coronary artery bypass graft surgery ("CABG II") became public.  This study showed a statistically significant increase in thromboembolic cardiovascular events in CABG patients taking Bextra following the administration of parecoxib.

21.     As a result of this study, in or about November 2004, a warning was added to Bextra's product label which stated that Bextra was contraindicated for treatment of post-operative pain following CABG surgery.  At the same time, the FDA required a black box warning on Bextra's label about reports of serious skin reactions, including Stevens-Johnson syndrome, in patients receiving Bextra.

22.     From in or about February 2002 through April 2005, **PHARMACIA** promoted the sale of Bextra, as set forth below, for uses and dosages other than the Approved Uses and Dosages and/or with false and misleading claims of safety and efficacy and without disclosing the FDA's safety concerns.

A.     **PHARMACIA's Promotion of Bextra for General Acute Pain**

23.     **PHARMACIA** marketed Bextra for acute pain, including surgical pain, and at unapproved doses, despite the FDA's specific refusal to approve Bextra for those uses, and without disclosing to physicians, customers and others that the FDA specifically declined to approve Bextra for those uses and doses, and that the FDA's refusal was due in part to a safety concern about potential serious adverse events including cardiovascular events in some surgeries based upon the results of the CABG I study.

24.     From in or about November 2001 to in or about April 2005, **PHARMACIA's** marketing team positioned Bextra for *acute* pain to differentiate Bextra's use from that of **PHARMACIA's** existing drug Celebrex, which was often used for *chronic* conditions, and to take sales from its competitor's drug Vioxx, which was used by many physicians for acute pain, among other indications.  In doing so, **PHARMACIA** sought to maximize Bextra sales while avoiding cannibalizing sales of **PHARMACIA's** existing Cox-2 drug, Celebrex.

6

25.     **PHARMACIA's** headquarters marketing team created marketing messages and materials for the **PHARMACIA** sales force that promoted Bextra for unapproved uses and dosages, including materials that directed **PHARMACIA's** sales force to aggressively pursue written surgical and pain management standing orders for Bextra, including for uses for which Bextra was unapproved.

26.     From in or about October 2002 to January 2003, and at other times, **PHARMACIA** marketing managers commissioned market research to test new promotional visual aids for Bextra to determine, among other things, whether the visual aids delivered the "intended message" of Bextra for "acute pain."

27.     For example, on or about December 5, 2002, a **PHARMACIA** marketing manager for Bextra forwarded to senior **PHARMACIA** marketing managers a market research report that concluded that "almost all physicians clearly understood the intended use of Celebrex (for chronic pain) and Bextra (for acute pain)" and noted in the cover email that the visual aid clearly communicated the "intended message" that "Celebrex is for chronic pain; Bextra is for acute or tough to treat pain."

28.     On or about March 24, 2003 and thereafter, **PHARMACIA** continued to promote Bextra for such unapproved uses and dosages despite the fact that a senior **PHARMACIA** manager of market analytics notified marketing managers that "the majority" of **PHARMACIA** sales representatives surveyed were using a "chronic/acute" or "persistent/acute" distinction to describe how the physician can use Celebrex and Bextra and noted that some of the representatives surveyed voiced "discomfort" in delivering this positioning of Celebrex for chronic and Bextra for acute pain, in light of the fact that Bextra had no acute pain indication.

7

29.     In or about March 2003, **PHARMACIA** marketing managers, in a presentation to

other **PHARMACIA** marketing managers, highlighted as a success factor the fact that

**PHARMACIA** had promoted Bextra for acute pain and Celebrex for chronic pain and set forth

as an opportunity for improvement the "Need to Emphasize Chronic Use of Celebrex, Acute use

of Bextra."

30.     In or about August 2003, **PHARMACIA** commissioned a market research report

to confirm that a visual aid it was preparing for sales representatives to promote Celebrex and

Bextra.  The report confirmed that the visual aid conveyed the message to physicians that

**PHARMACIA** intended Bextra to be used for acute pain, and concluded that "[a]fter seeing the

positioning statement for Bextra, virtually all physicians concluded that **PHARMACIA** was

trying to differentiate Bextra as a product for acute pain."

31.     In or about September 2003, **PHARMACIA** again commissioned market research

to be performed to confirm that the final version of the new visual aid conveyed

**PHARMACIA's** intended message for the use of Bextra.  The report stated:

> More so than in other research conducted by this moderator for this team to date,
> physicians are starting to extract a "chronic/long-term" message for Celebrex and
> an "acute" message for Bextra from the visual aid materials, which will likely
> become more apparent over time through continued exposure to the new visual
> aid.

32.     **PHARMACIA** continued to promote Bextra for such unapproved uses and

dosages  even after senior marketing managers received this market research and internal reports

that indicated that the sales force was promoting Bextra for unapproved uses and dosages.

8

**B.**    **PHARMACIA's Promotion of Bextra for Unapproved Uses Through Remuneration to Physicians and Purported Physician Consulting Arrangements**

33.    **PHARMACIA** also promoted Bextra for unapproved use and dosages by convening so-called advisory boards, consultant meetings and other fora. **PHARMACIA** targeted physicians to participate in these meetings, as part of what **PHARMACIA** termed a "cascade of influence" in order to turn high prescribing physicians into **PHARMACIA** Cox-2 "advocates."

34.    As part of this process, **PHARMACIA** conducted what it terms "Influence Mapping" in which it conducted market research to identify "influential specialists in the areas of arthritis and pain" and to provide an "Advocate Concierge" or a "High level service to aid key Advocates in managing their interaction" with **PHARMACIA**. As part of this process, **PHARMACIA** ranked key physicians in terms of their ability to influence key professional societies, regulatory agencies, guideline committees, and specialty journals.

35.    For example, **PHARMACIA's** 2002 planning documents described the 2002 activities that it planned to use to disseminate its Bextra messages, including National Advisory Boards, National Steering Committee Meetings, National Consultant Meetings and Regional Consultant Meetings, all in order to "Deliver Product Messages with Data Support for Both Brands" and "Maximize Cost Synergies & ROI [Return on Investment]."

36.    As part of this process, **PHARMACIA** paid targeted physicians both airfare and two to three days' accommodations at lavish resorts in the Bahamas, Virgin Islands and across the United States, and further entertained these physicians with golf, massages and other recreational activities, and also paid them an honoraria in the range of $1,000 to $2,000 for their

9

attendance.  The number of attendees at this event often ranged from 50 to 100 health care professionals.

37.     Between late 2001 and late 2003, **PHARMACIA** held almost 100 of these so-called consultant meetings and thus promoted unapproved uses and dosages of Bextra to and entertained over 5,000 health care professionals.

38.     In furtherance of these plans, **PHARMACIA** paid these physicians whom it had identified as these advocates to present at lunches, dinners, and other entertainment venues, where in many instances **PHARMACIA** thereby further spread its messages about unapproved uses and dosages of Bextra.

C.     **PHARMACIA's Promotion of Bextra for Surgical Pain**

39.     **PHARMACIA** managers instructed their sales teams to promote Bextra for the acute pain of surgery, both pre- and post-operatively, even though they knew that Bextra was not FDA- approved for these uses, and without disclosing to physicians, customers and others that the FDA specifically declined to approve Bextra for those uses and doses, and that the FDA's refusal was due in part to a safety concern about potential serious adverse events, including cardiovascular events, in some surgeries based upon the results of the CABG I study.

40.     **PHARMACIA** managers trained and directed their sales teams to seek written surgical and pain management protocols, standing orders and pathways from physicians, hospitals, and other customers for use in pre- and post-operative surgical situations.

41.     **PHARMACIA** managers circulated an electronic template of a hospital-wide pain management pathway that provided for administration of Bextra for unapproved uses and at unapproved dosages and gave instructions on how to get such pathways printed on laminated

color paper and distributed in hospitals and other institutions.

42.     **PHARMACIA** managers encouraged their sales representatives to promote Bextra for unapproved uses and dosages by circulating examples of written protocols obtained by other representatives that called for unapproved uses and dosages of Bextra in certain surgical and pain management settings.

43.     **PHARMACIA** managers held contests to encourage the preparation and promotion of such protocols and praised and rewarded representatives who obtained such surgical and pain management protocols for unapproved uses and dosages of Bextra.

44.     Consistent with these instructions and incentives, **PHARMACIA's** sales team promoted, drafted and distributed to physicians written protocols, pain management pathways and standing orders for Bextra for uses and dosages that they knew were not FDA-approved.

45.     For example, in or about June or July 2002, a **PHARMACIA** sales representative in Massachusetts drafted and recommended a written protocol to an OB/GYN physician in Massachusetts calling for the unapproved use of Bextra to control pain in OB/GYN surgeries, including at unapproved dosages.

46.     On or about July 19, 2002, a **PHARMACIA** Regional Manager sent an email to sales representatives in the Northeast region praising the sales representative for a "fantastic protocol" in six areas of OB/GYN surgery, each an unapproved use for Bextra.

47.     On or about February 19, 2003, a **PHARMACIA** District Manager sent an email to the sales representatives in the district, with a copy to a Regional Manager that instructed the representatives to sell Bextra for pre- and post-operative pain to orthopedic surgeons, podiatrists, oral surgeons, and "anyone that uses a scalpel for a living."

48.     On or about June 19, 2003, a **PHARMACIA** District Manager emailed a sample pre-operative briefing sheet to sales representatives to use, with a copy to the Regional Manager, which provided for the use of 10 mg and 20 mg of Bextra once or twice a day as part of the pre-operative surgery instructions, without any limit to Bextra's Approved Uses or Dosages.

49.     In the June 19, 2003 email, a **PHARMACIA** District Manager praised the efforts of the sales representative who drafted, promoted and persuaded a physician to adopt the above briefing sheet and awarded the representative "ACE" points, which are points that could be used to select prizes such as trips, gift certificates and appliances from a **PHARMACIA** awards catalog.

50.     On or about July 25, 2003, a **PHARMACIA** District Manager circulated to the Regional Manager in his district and district managers in other districts an "OPERATE FOR CASH" contest, in which sales representatives could earn ACE points by implementing Bextra written standing orders and protocols with individual orthopedic surgeons, hospital-wide, or in surgical departments.

51.     On or about August 26, 2003, a **PHARMACIA** District Manager sent an email, with a copy to the Regional Manager, that instructed sales representatives to promote Bextra and Celebrex for pre- and post-operative pain, reminded them about the Operate for Cash contest, and suggested the representatives focus on "low hanging fruit," such as oral surgeons, periodontists and dentists, none of whom would have an FDA-approved use for Bextra.

12

**D.**   **PHARMACIA's Off-Label Promotion of Bextra for Prevention of Deep Vein Thrombosis ("DVTs")**

52.   **PHARMACIA** caused members of its sales force to promote Bextra with the claim that Bextra was effective in the surgical setting to reduce the risk of blood clots known as DVTs that can form during or after surgery.  In promoting Bextra to reduce the risk of DVTs, **PHARMACIA** representatives did not disclose that the FDA specifically refused to approve Bextra for the treatment of pre- and post-operative surgical pain, and that the FDA had concluded that the safety and efficacy of Bextra for such use had not been established, including specifically that a reduction of side effects (such as DVT's) had not been shown in the studies.  As **PHARMACIA** knew, there were no scientific studies showing that Bextra was safe or effective to reduce the risk of DVTs.

53.   Thus, on or about April 24, 2002, a **PHARMACIA** Regional Manager sent an email to sales representatives and managers in the division, including numerous representatives and managers, and instructed them (with an attached script) to promote the use of Bextra to reduce the risk of DVTs to surgeons, even though the Regional Manager knew that Bextra had not been approved by the FDA to reduce the risk of DVTs.

54.   In at least one region, **PHARMACIA** sales representatives and managers implemented this instruction and promoted Bextra to physicians to reduce the risk of DVTs during and after surgery, without disclosing to these physicians the safety concern that the FDA has raised concerning the use of Bextra in surgery, or the fact that the FDA had concluded that no decrease in the side effects of surgery such as DVTs had been shown from the use of Bextra.

13

E.     **PHARMACIA's Promotion of Bextra with False and Misleading Safety and Comparative Claims**

55.     **PHARMACIA** sales representatives promoted Bextra by telling physicians to replace Vioxx with Bextra even though Vioxx had an FDA-approved acute pain indication and Bextra did not; and by telling physicians that Bextra was safer and more effective than Vioxx, despite the fact that **PHARMACIA** knew there were no head-to-head studies of Bextra and Vioxx for the approved uses of Bextra that showed that Bextra was safer or more effective.

56.     **PHARMACIA** sales representatives promoted Bextra with false and misleading claims of safety, including that Bextra had no dose proportional increase in hypertension and edema, that "there is not one shred of evidence showing a CV concern with Bextra," that Bextra had no cardiovascular risks unlike Vioxx, and that Bextra had placebo-like side effects.

57.     For example, on or about January 16, 2004, a **PHARMACIA** Regional Manager circulated to other **PHARMACIA** managers in the Northeast a Product Action Guide that listed as core messages for the promotion of Bextra that "Vioxx's problems are not a class effect. [. . . With] Bextra there is no dose proportional response with hypertension and edema."

58.     **PHARMACIA** sales representatives implemented this instruction and promoted Bextra to physicians with the claims that "Vioxx' problems are not a class effect" and "there is no dose proportional response with hypertension and edema" with Bextra, even though these claims were not proven nor supported by Bextra's label.  In fact, the evidence in Bextra's label demonstrates that it does cause a dose proportional increase of hypertension and edema.

F.    **PHARMACIA's Promotion of Bextra Through Falsely Claiming that Physicians Had Asked for Information About Unapproved Uses**

59.     **PHARMACIA's** sales representatives also created sham physician requests for medical information about unapproved uses in order to send unsolicited information to physicians about unapproved uses and dosages of Bextra.

60.     In or about June 2002, in or about November 2003, and at other times, **PHARMACIA** managers instructed members of the sales force to send out unsolicited letters known as Medical Inquiry Letters (also known as the "Medical Letter" or "Medical Inquiry Response") to, among others, groups of physicians who prescribed a lot of Vioxx.  These letters were issued by **PHARMACIA** as if they were responses to physicians' unsolicited inquiries and contained medical information relating to unapproved uses and dosages of Bextra.

61.     **PHARMACIA** managers instructed their sales teams to send the Medical Inquiry Letters to top Vioxx prescription writers who had not made requests for the letters, including by instructing their teams to send them to "Every Vioxx Loyalist," even though they knew it was improper to send these letters unsolicited and knew that the letters, which appeared to be a response to an unsolicited inquiry, were a disguise for improper promotion.

62.     At the direction of their managers, **PHARMACIA** sales representatives sent unsolicited Medical Letters with information to support the use of Bextra for unapproved uses and dosages to physicians.

63.     In the Medical Letters, **PHARMACIA** did not disclose the FDA's safety concern with the use of Bextra for unapproved uses, such as acute pain, and unapproved dosages.  Nor did **PHARMACIA** disclose that the FDA raised a concern about the use of Bextra in surgery

15

based upon the CABG I study and the excess of serious cardiovascular thromboembolic events in the Bextra (after parecoxib) arm of the study.

### G. PHARMACIA's Off-Label Promotion of Bextra By Distribution of Samples for Unapproved Uses/Doses

64. **PHARMACIA's** sales force provided promotional samples of Bextra to surgeons and other medical prescribers who had no FDA-approved use for the Bextra samples, including by providing dosages that were unapproved for the uses for which the physicians were expected to use the samples.

65. **PHARMACIA** distributed samples of Bextra, including 20 mg samples, to physicians whom **PHARMACIA** knew would not prescribe it for approved uses or dosages, such as oral surgeons, dentists and other surgeons.

66. **PHARMACIA** allocated approximately 25% of all Bextra samples to 20 mg samples, even though **PHARMACIA** knew that the primary dysmenorrhea market (the only market for which Bextra at 20 mg was FDA-approved) was only a tiny percentage of the total potential sales (approximately 1-3%).

67. **PHARMACIA** allocated 20 mg samples to sales representatives who did not call on any type of doctor who treated primary dysmenorrhea and thus who had no FDA-approved use for 20 mg doses of Bextra.

68. **PHARMACIA** used a national computer program to direct the sales force on how to utilize these free samples, which instructed sales representatives to increase use of 20 mg samples for certain physicians, such as rheumatologists and orthopaedic surgeons, even though these physicians had no approved use for such samples.

16

**H.**   **Use of Purportedly Independent Continuing Medical Education to Promote Bextra for Unapproved Uses and Dosages**

69.   **PHARMACIA** also funded purportedly independent continuing medical education programs ("CME") with the stated purpose of disseminating messages promoting Bextra for unapproved uses, including specifically for acute pain and surgical pain.

70.   **PHARMACIA** accomplished this by incorporating CME planning into its marketing messaging strategy for Bextra.  Among the practices **PHARMACIA** employed was to hire advertising agencies to prepare standard promotional slides for Bextra, and then had these slides certified by other vendors as "CME."  It then caused these Bextra slide sets to be distributed to the "advocates" it had trained so that they could use the slides for CME events as well.

71.   **PHARMACIA's** headquarters-based marketing teams also created annual medical education plans in which they reflected the intention to "leverage CME" to provide data beyond the approved label.  The plans listed the specific messages for Bextra to be relayed, including messages such as  Bextra power for "Acute pain, Opiod-sparing."

72.   In 2002 alone, **PHARMACIA** funded CME programs for Bextra designed to reach 30,000 physicians, including in many instances with the unapproved messages.

**I.**   **Promotion of Bextra for Unapproved Uses and Dosages by Supporting and Drafting Publications**

73.   **PHARMACIA** also promoted Bextra for unapproved uses and dosages through a "publication strategy" whereby **PHARMACIA** initiated, funded, sponsored and sometimes drafted or hired medical writer vendors to draft articles about Bextra for unapproved uses and dosages in order to promote these uses and dosages, without always appropriately disclosing

17

**PHARMACIA's** role in the process.

74.     **PHARMACIA** implemented a "manuscript development" process whereby a core team at **PHARMACIA** would plan potential publications and recruit authors for them.   Some of those listed in the publication plans were listed with authors as "TBD" (to be determined) or "TBC" (to be chosen).

75.     **PHARMACIA** also created an overall list of its goals for this process, which included relaying unapproved messages for Bextra such as "Acute Pain: BEXTRA Provides Rapid, Powerful Pain Relief in surgical pain."

## COUNT ONE

### (Introduction into Interstate Commerce of a Misbranded Drug: 21 U.S.C. §§ 331(a), 333(a)(2) & 352(f))

76.     The allegations contained in paragraphs 1 through 75 are realleged and incorporated herein as if set forth in full.

77.     Between February 2002 and April 2005, in the District of Massachusetts and elsewhere, the defendant,

### PHARMACIA & UPJOHN COMPANY, INC.

with intent to defraud and mislead, did introduce, deliver for introduction, and cause the introduction into interstate commerce, into Massachusetts and elsewhere, quantities of Bextra, a drug within the meaning of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 321(g), which was intended for use for the treatment of acute pain, surgical pain, other unapproved uses, and at unapproved dosages, which was misbranded within the meaning of 21 U.S.C. § 352(f)(1), in that it lacked adequate directions for such uses.

All in violation of 21 U.S.C. §§ 331(a), 333(a)(2), and 352(f)(1).

## FORFEITURE ALLEGATIONS

1.      As a result of the violation of Title 21, United States Code, Sections 331(a), 333(a)(2), and 352(f)(l) set forth in this information, defendant,

### PHARMACIA & UPJOHN COMPANY, INC.

shall forfeit to the United States of America any quantities of Bextra, which between February, 2002, and April 5, 2005, were misbranded when introduced into or while in interstate commerce, or while held for sale (whether or not the first sale) after shipment in interstate commerce, or which may not, under the provisions of Title 21, United States Code, Section 331, be introduced into interstate commerce.

2.      If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

   (a)      cannot be located upon the exercise of due diligence;

   (b)      has been transferred or sold to, or deposited with, a third party;

   (c)      has been placed beyond the jurisdiction of the Court;

   (d)      has been substantially diminished in value; or

   (e)      has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property subject to forfeiture, that is $105,000,000.

All pursuant to Title 21, United States Code, Sections 334 and 853 and Title 28, United Stales Code, Section 246l(c).

MICHAEL K. LOUCKS
ACTING UNITED STATES ATTORNEY
DISTRICT OF MASSACHUSETTS


EUGENE THIROLF
DIRECTOR
OFFICE OF CONSUMER LITIGATION
CIVIL DIVISION
U.S. DEPARTMENT OF JUSTICE

SARA MIRON BLOOM
Assistant U.S. Attorney
District of Massachusetts


SUSAN M. POSWISTILO
Assistant U.S. Attorney
District of Massachusetts

21

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered into by and among the United States of America, acting through the United States Department of Justice on behalf of the Office of Inspector General of the United States Department of Health and Human Services ("OIG-HHS"), the TRICARE Management Activity ("TMA"), and the United States Office of Personnel Management ("OPM") (collectively the "United States"), Relators identified in the cases listed in Paragraph B of the Preamble to this Agreement ("Relators"), and Pfizer Inc ("Pfizer"), through their authorized representatives.  Collectively, all of the above will be referred to as "the Parties."

## PREAMBLE

As a preamble to this Agreement, the Parties agree to the following:

A.       Pfizer is a Delaware corporation with its principal place of business in New York. At all relevant times, Pfizer developed, manufactured, distributed, marketed and sold pharmaceutical products in the United States, including drugs sold under the trade names of: Bextra, Geodon, Zyvox, Lyrica, Aricept, Celebrex, Lipitor, Norvasc, Relpax, Viagra, Zithromax, Zoloft, and Zyrtec (collectively the "Covered Drugs").

B.       The Relators listed herein have filed the following qui tam actions against Pfizer (collectively the "Civil Actions"):

(1)       United States et al. ex rel. Blair Collins v. Pfizer, Inc.,
          Civ. No. 04-11780-DPW (D. Mass.);

(2)       United States et al. ex rel. John Kopchinski v. Pfizer, Inc. et al.,
          Civ. No. 05-CV-12115 (D. Mass.);

## EXHIBIT B

    (3)    <u>United States ex rel. Dana Spencer v. Pfizer, Inc.</u>,
Civ. No. 05-12326 (D. Mass.);

    (4)    <u>United States et al. ex rel. Glenn DeMott v. Pfizer</u>,
Civ. No. 05-12040 (D. Mass.);

    (5)    <u>United States et al. ex rel. David Farber and Casey Schildhauer v.
Pfizer</u>, Civ. No. 07-10304 (D. Mass.);

    (6)    <u>United States et al. ex rel. Ronald Rainero v. Pfizer</u>,
Civ. No. 07-11728 (D. Mass.);

    (7)    <u>United States et al. ex rel. Mark Westlock v. Pfizer, Inc. et al.</u>,
Civ. No. 08-11318 (D. Mass.);

    (8)    <u>United States ex rel. Robert A. Liter v. Pfizer</u>,
Civ. No. 06-00176 (E.D. Ky.); and

    (9)    <u>United States et al. ex rel. Stefan Kruszewski v. Pfizer, Inc.</u>,
Civ. No. 07-4106 (E.D. Pa.).

C.    On such date as may be determined by the Court, Pfizer subsidiary Pharmacia &
Upjohn Company, Inc. ("Pharmacia") will enter a plea of guilty pursuant to Fed. R. Crim. P.
11(c)(1)(C) (the "Plea Agreement") to an Information to be filed in <u>United States of America v.
Pharmacia & Upjohn Company, Inc.</u>, Criminal Action No. [to be assigned] (District of
Massachusetts) (the "Criminal Action") that will allege a violation of Title 21, United States
Code, Sections 331(a), and 333(a), namely, the introduction into interstate commerce of a
misbranded drug, Bextra, in violation of the Food, Drug and Cosmetic Act ("FDCA").

D.    Pfizer has entered into or will be entering into separate settlement agreements,
described in Paragraph 1(b) below (hereinafter referred to as the "Medicaid State Settlement
Agreements") with certain states and the District of Columbia in settlement of the Covered

Conduct. States with which Pfizer executes a Medicaid State Settlement Agreement in the form to which Pfizer and the National Association of Medicaid Fraud Control Units ("NAMFCU") Negotiating Team have agreed, or in a form otherwise agreed to by Pfizer and an individual State, shall be defined as "Medicaid Participating States."

      E.     The United States alleges that Pfizer caused to be submitted claims for payment for the Covered Drugs to the Medicaid Program, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v. The United States further alleges that Pfizer caused claims for payment for the Covered Drugs to be submitted to the TRICARE program, 10 U.S.C. §§ 1071-1109; the Federal Employees Health Benefits Program ("FEHBP"), 5 U.S.C. §§ 8901-8914; the Federal Employees Compensation Act Program, 5 U.S.C. § 8101, et seq; and caused purchases of the Covered Drugs by the Department of Veterans' Affairs ("DVA") and the Bureau of Prisons ("BOP") (collectively, the "other Federal Health Care Programs"). The United States further alleges that Pfizer caused certain claims for payment for certain of the Covered Drugs to be submitted to the Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395hhh.

      F.     The United States contends that it and the Medicaid Participating States have certain civil claims, as specified in Paragraph 2, below, against Pfizer for engaging in the following conduct (hereinafter referred to as the "Covered Conduct"):

          (1)    **Bextra**: During the period February 1, 2002, through April 30, 2005, Pfizer: (a) illegally promoted the sale and use of Bextra for a variety of conditions (including acute pain and various types of surgical pain) and at dosages other than those for which its use was approved by the Food and Drug Administration ("FDA") (i.e., "off-label" uses), in violation of the FDCA, 21 U.S.C. § 331, et seq., and which were not medically-accepted indications as defined by 42 U.S.C. § 1396r-8(k)(6) for which the United States and state

3

Medicaid programs provided coverage for Bextra; (b) offered and paid illegal remuneration to health care professionals to induce them to promote and prescribe Bextra, in violation of the Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b); and (c) made and/or disseminated unsubstantiated and/or false representations or statements about the safety and efficacy of Bextra. As a result of the foregoing conduct, Pfizer knowingly caused false or fraudulent claims for Bextra to be submitted to, or caused purchases by, Medicaid and the other Federal Health Care Programs.

(2)     **Geodon**: During the period from January 1, 2001, through December 31, 2007, Pfizer: (a) illegally promoted the sale and use of Geodon for a variety of off-label conditions (including depression, bipolar maintenance, mood disorder, anxiety, aggression, dementia, attention deficit hyperactivity disorder, obsessive compulsive disorder, autism and post-traumatic stress disorder), and for patients (including pediatric and adolescent patients) and dosages that were off-label, in violation of the FDCA, 21 U.S.C. § 331, et seq., and which were not medically-accepted indications as defined by 42 U.S.C. § 1396r-8(k)(6) for which the United States and state Medicaid programs provided coverage for Geodon; (b) offered and paid illegal remuneration to health care professionals to induce them to promote and prescribe Geodon, in violation of the Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b); and (c) made and/or disseminated unsubstantiated and/or false representations or statements about the safety and efficacy of Geodon. As a result of the foregoing conduct, Pfizer knowingly caused false or fraudulent claims for Geodon to be submitted to, or caused purchases by, Medicaid, Medicare and the other Federal Health Care Programs.

(3)     **Zyvox**: During the period January 1, 2001, through February 28, 2008, Pfizer: (a) illegally promoted the sale and use of Zyvox for a variety of off-label conditions (including infections caused by methicillin-resistant *Staphylococcus aureus* ("MRSA") generally, rather than only those types of MRSA infections for which Zyvox was FDA-approved), in violation of the FDCA, 21 U.S.C. § 331, et seq., and which were not medically-accepted indications as defined by 42 U.S.C. § 1396r-8(k)(6) for which the United States and state Medicaid programs provided coverage for Zyvox; (b) made and/or disseminated unsubstantiated and/or false representations or statements about the safety and efficacy of Zyvox (including that Zyvox was superior to vancomycin, its primary competitor drug for these indications); and (c) offered and paid illegal remuneration to health care professionals to induce them to promote and prescribe

4

Zyvox, in violation of the Federal Anti-Kickback Statute, 42 U.S.C. §
1320-7b(b).  As a result of the foregoing conduct, Pfizer knowingly
caused false or fraudulent claims for Zyvox to be submitted to, or caused
purchases by, Medicaid, Medicare and the other Federal Health Care
Programs.

(4)    **Lyrica**:  During the period September 1, 2005, through October 31, 2008,
Pfizer: (a) illegally promoted the sale and use of Lyrica for a variety of
off-label conditions (including chronic pain, neuropathic pain,
perioperative pain, and migraine), in violation of the FDCA, 21 U.S.C. §
331, et seq., and which were not medically-accepted indications as defined
by 42 U.S.C. § 1396r-8(k)(6) for which the United States and state
Medicaid programs provided coverage for Lyrica; (b) made and/or
disseminated unsubstantiated and/or false representations or statements
about the safety and efficacy of Lyrica, including claims that it was
superior to Neurontin and its generic equivalent, gabapentin; and (c)
offered and paid illegal remuneration to health care professionals to
induce them to promote and prescribe Lyrica, in violation of the Federal
Anti-Kickback Statute, 42 U.S.C. § 1320-7b(b).  As a result of the
foregoing conduct, Pfizer knowingly caused false or fraudulent claims for
Lyrica to be submitted to, or caused purchases by, Medicaid, Medicare
and the other Federal Health Care Programs.

(5)    **Kickbacks**: From January 2001, through December 2004, Pfizer paid
illegal remuneration for speaker programs, mentorships, preceptorships,
journal clubs, and gifts (including entertainment, cash, travel and meals)
to health care professionals to induce them to promote and prescribe the
drugs Aricept, Celebrex, Lipitor, Norvasc, Relpax, Viagra, Zithromax,
Zoloft, and Zyrtec, in violation of the Federal Anti-Kickback Statute, 42
U.S.C. § 1320a-7b(b).  As a result of the foregoing conduct, Pfizer caused
false claims to be submitted to Medicaid and TRICARE.

G.     The United States also contends that it has certain administrative claims against

Pfizer as specified in Paragraphs 4 through 6, below, for engaging in the Covered Conduct.

H.     This Agreement is made in compromise of disputed claims.  This Agreement is

not an admission of facts or liability by Pfizer, and Pfizer expressly denies the allegations of the

United States and the Relators as set forth herein and in the Civil Actions and denies that it

engaged in any wrongful conduct in connection with the Covered Conduct except as to: 1) such admissions as Pharmacia makes in connection with any guilty plea and as provided herein; and 2) the facts set forth in Attachment A as to Zyvox. This Agreement is not a concession by the United States that its claims are not well-founded. Neither this Agreement, nor the performance of any obligation arising under it, including any payment, nor the fact of settlement is intended to be, or shall be understood as, an admission of liability or wrongdoing, or other expression reflecting on the merits of the dispute by Pfizer, except as set forth in this Paragraph.

I.     To avoid the delay, expense, inconvenience and uncertainty of protracted litigation of these claims, the Parties mutually desire to reach a final settlement as set forth below.

## TERMS AND CONDITIONS

NOW, THEREFORE, in reliance on the representations contained herein and in consideration of the mutual promises, covenants, and obligations in this Agreement, and for good and valuable consideration, receipt of which is hereby acknowledged, the Parties agree as follows:

1.     Pfizer agrees to pay to the United States and the Medicaid Participating States, collectively, the sum of one billion dollars ($1,000,000,000), plus (a) interest at the rate of 3.75% per annum on $502,524,316 from May 15, 2008, and continuing until and including the day before payment is made under this Agreement and, (b) interest at the rate of rate of 2.125% per annum on the remaining $497,475,684 from January 23, 2009, and continuing until and including the day before payment is made (collectively, the "Settlement Amount"). The Settlement Amount shall constitute a debt immediately due and owing to the United States and

6

the Medicaid Participating States on the Effective Date of this Agreement. This debt shall be discharged by payments to the United States and the Medicaid Participating States, under the following terms and conditions:

(a)     Pfizer shall pay to the United States the sum of $668,514,830 plus accrued interest ("Federal Settlement Amount"). The Federal Settlement Amount shall consist of: (1) $343,339,991, plus interest accrued on this amount at the rate of 3.75% per annum from May 15, 2008, continuing until and including the day before payment is made; and, (2) $325,174,839 plus interest accrued on this amount at the rate of 2.125% per annum from January 23, 2009, continuing until and including the day before payment is made. The Federal Settlement Amount shall be paid by electronic funds transfer pursuant to written instructions from the United States no later than seven (7) business days after (i) this Agreement is fully executed by the Parties and delivered to Pfizer's attorneys; or (ii) the Court accepts a Fed. R. Crim. P. 11(c)(1)(C) guilty plea as described in Preamble Paragraph C in connection with the Criminal Action and imposes the agreed upon sentence, whichever occurs later.

(b)     Pfizer shall pay to the Medicaid Participating States the sum of $331,485,170, plus accrued interest ("Medicaid State Settlement Amount"). The Medicaid State Settlement Amount shall consist of: (1) the sum of $159,184,326, plus interest accrued thereon at the rate of 3.75% per annum from May 15, 2008, continuing until and including the day before payment is made; and, (2) the remaining $172,300,844, plus interest accrued thereon from January 23, 2009, at the rate of 2.125% per annum until and including the day before payment is made. The Medicaid State Settlement Amount shall be paid no later than seven (7) business days after (i)

7

this Agreement is fully executed by the Parties and delivered to Pfizer's attorneys; or (ii) the

Court accepts a Fed. R. Crim. P. 11(c)(1)(C) guilty plea as described in Preamble Paragraph C in

connection with the Criminal Action and imposes the agreed upon sentence, whichever occurs

later.  The Medicaid State Settlement Amount shall be paid by electronic funds transfer to an

interest bearing account pursuant to written instructions from the NAMFCU Negotiating Team

and under the terms and conditions of the Medicaid State Settlement Agreements that Pfizer will

enter into with the Medicaid Participating States.

      (c)     Contingent upon the United States receiving the Federal Settlement Amount from

Pfizer, the United States agrees to pay, as soon as feasible after receipt, the following Relators

the following amounts plus their proportionate share of the interest accrued on the Federal

Settlement Amount described in (a) above as Relators' share of the proceeds pursuant to 31

U.S.C. §3730(d):

      (1)     John Kopchinski: $51,500,999

      (2)     Dana Spencer: $2,743,637

      (3)     Blair Collins: $2,354,582

      (4)     Glenn DeMott: $7,431,505

      (5)     Stefan Kruszewski: $29,013,420

      (6)     Ronald Rainero: $9,321,369

No other relator payments shall be made by the United States with respect to the matters covered

by this Agreement.  All Relators in the Civil Actions listed in Preamble Paragraph B, above,

represent that they will abide by the terms of any written and executed separate agreements that

they may have entered into with one or more of the other Relators concerning the allocation of the Relators' share among themselves.

(d)     If Pharmacia's agreed-upon guilty plea pursuant to Fed. R. Crim. P. 11(c)(1)(C) in the Criminal Action described in Preamble Paragraph C is not accepted by the Court or the Court does not impose the agreed-upon sentence for whatever reason, this Agreement shall be null and void at the option of either the United States or Pfizer. If either the United States or Pfizer exercises this option, which option shall be exercised by notifying all Parties, through counsel, in writing within five (5) business days of the Court's decision, the Parties will not object and this Agreement will be rescinded. If this Agreement is rescinded, Pfizer will not plead, argue or otherwise raise any defenses under the theories of statute of limitations, laches, estoppel or similar theories, to any civil or administrative claims, actions or proceedings arising from the Covered Conduct that are brought by the United States within 90 calendar days of rescission, except to the extent such defenses were available on the day on which the qui tam complaints listed in Preamble Paragraph B, above, were filed.

2.     Subject to the exceptions in Paragraph 7 below (concerning excluded claims), in consideration of the obligations of Pfizer set forth in this Agreement, conditioned upon Pfizer's payment in full of the Settlement Amount, the United States (on behalf of itself, its officers, agencies, and departments) agrees to release Pfizer, its predecessors, and its current and former divisions, parents, subsidiaries, successors and assigns and their current and former directors, officers, and employees from any civil or administrative monetary claim that the United States has or may have for the Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729-3733;

the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; the Civil Monetary Penalties

Law, 42 U.S.C. § 1320a-7a; any statutory provision creating a cause of action for civil damages

or civil penalties for which the Civil Division of the Department of Justice has actual and present

authority to assert and compromise pursuant to 28 C.F.R. Part O, Subpart I, 0.45(d) and common

law claims for fraud, payment by mistake, breach of contract, disgorgement and unjust

enrichment.

      3.     Subject to the exceptions in Paragraph 7 (concerning excluded claims), below, in

consideration of the obligations of Pfizer in this Agreement, conditioned upon Pfizer's full

payment of the Settlement Amount, Relators, for themselves and for their heirs, successors,

attorneys, agents, and assigns, agree to release Pfizer and its predecessors, and its current and

former divisions, parents, subsidiaries, successors and assigns and their current and former

directors, officers, and employees from any civil monetary claim the United States has or may

have under the False Claims Act, 31 U.S.C. §§ 3729-3733, for the Covered Conduct; provided,

however, that Relators do not release Pfizer for any claims under 31 U.S.C. §§ 3730(d) and (h),

nor from any other claims that Relators have or may have, whether asserted in their Civil

Actions or not asserted therein.

      4.     In consideration of the obligations of Pfizer set forth in this Agreement and the

Corporate Integrity Agreement ("CIA") entered into between OIG-HHS and Pfizer, conditioned

upon Pfizer's full payment of the Settlement Amount, OIG-HHS agrees to release and refrain

from instituting, directing, or maintaining any administrative action seeking exclusion from the

Medicare, Medicaid and other Federal health care programs (as defined in 42 U.S.C. § 1320a-

7b(f)) against Pfizer under 42 U.S.C. § 1320a-7a (Civil Monetary Penalties Law) or 42 U.S.C. §

1320a-7(b)(7) (permissive exclusion for fraud, kickbacks, and other prohibited activities) for the

Covered Conduct, except as reserved in Paragraph 7 (concerning excluded claims), below, and

as reserved in this Paragraph.  The OIG-HHS expressly reserves all rights to comply with any

statutory obligations to exclude Pfizer from the Medicare, Medicaid and other Federal health

care programs under 42 U.S.C. § 1320a-7(a) (mandatory exclusion) based upon the Covered

Conduct.  Nothing in this Paragraph precludes the OIG-HHS from taking action against entities

or persons, or for conduct and practices, for which claims have been reserved in Paragraph 7,

below.

　　　　5.　　　In consideration of the obligations of Pfizer set forth in this Agreement and,

conditioned upon Pfizer's payment in full of the Settlement Amount, TMA agrees to release and

refrain from instituting, directing, or maintaining any administrative action seeking exclusion

from the TRICARE Program against Pfizer, under 32 C.F.R. § 199.9 for the Covered Conduct,

except as reserved in Paragraph 7 below (concerning excluded claims), and as reserved in this

Paragraph.  TMA expressly reserves authority to exclude Pfizer under 32 C.F.R. §§

199.9(f)(1)(i)(A), (f)(1)(i)(B), and (f)(1)(iii), based upon the Covered Conduct.  Nothing in this

Paragraph precludes TMA or the TRICARE Program from taking action against entities or

persons, or for conduct and practices, for which claims have been reserved in Paragraph 7,

below.

　　　　6.　　　In consideration of the obligations of Pfizer set forth in this Agreement and

conditioned upon Pfizer's full payment of the Settlement Amount, OPM agrees to release and

11

refrain from instituting, directing, or maintaining any administrative action against Pfizer under

5 U.S.C. § 8902a or 5 C.F.R. Part 970 for the Covered Conduct, except as reserved in Paragraph

7 below (concerning excluded claims), except if required by 5 U.S.C. § 8902a(b).  Nothing in

this Paragraph precludes OPM from taking action against entities or persons, or for conduct and

practices, for which claims have been reserved in Paragraph 7 below.

      7.    Notwithstanding any term of this Agreement, specifically reserved and excluded

from the scope and terms of this Agreement as to any entity or person (including Pfizer and the

Relators) are the following claims of the United States:

      (a)    Any civil, criminal, or administrative liability arising under Title 26, U.S. Code (Internal Revenue Code);

      (b)    Any criminal liability;

      (c)    Except as explicitly stated in this Agreement, any administrative liability, including mandatory exclusion from Federal health care programs;

      (d)    Any liability to the United States (or its agencies) for any conduct other than the Covered Conduct;

      (e)    Any liability based upon such obligations as are created by this Agreement;

      (f)    Any liability for express or implied warranty claims or other claims for defective or deficient products and services, including quality of goods and services;

(g)     Any liability for personal injury or property damage or for other

consequential damages arising from the Covered Conduct;

(h)     Any liability for failure to deliver items or services due; or

(i)     Any liability of individuals (including current or former directors, officers,

employees, or agents of Pfizer) who receive written notification that they

are the target of a criminal investigation, are criminally indicted or

charged, or are convicted, or who enter into a criminal plea agreement.

8.      Each Relator, and his/her respective heirs, successors, attorneys, agents, and

assigns agree not to object to this Agreement and agree and confirm that this Agreement and the

allocation of amounts to their respective claims as set forth in Paragraph 12 are fair, adequate

and reasonable under all the circumstances, pursuant to 31 U.S.C. § 3730(c)(2)(B), and expressly

waive the opportunity for a hearing on any objection to this Agreement pursuant to 31 U.S.C. §

3730(c)(2)(B).  Conditioned upon payment by the United States of the amounts set forth in

Paragraph 1(c), above, Relators for themselves individually, and for their heirs, successors,

agents, and assigns, fully and finally release, waive, and forever discharge the United States, its

officers, agents, and employees, from any claims arising from or related to 31 U.S.C. § 3730 for

any claims arising from the Covered Conduct and/or for any claims in the Civil Actions; and

from any other claims for a share of the Settlement Amount, and in full settlement of any claims

Relators may have against the United States under this Agreement.  This Agreement does not

resolve or in any manner affect any claims the United States has or may have against the

13

Relators arising under Title 26, U.S. Code (Internal Revenue Code), or any claims arising under this Agreement.

9.      Conditioned upon the United States' receipt of the payments described in Paragraph 1(a), above, Relators, for themselves, and for their respective heirs, successors, attorneys, agents, and assigns, agree to release Pfizer, its predecessors, subsidiaries, successors and assigns and its current and former directors, officers, agents, and employees, from any liability to Relators arising from the allegations in Relators' Civil Actions that are being resolved pursuant to this Agreement by payment by Pfizer of the Federal Settlement Amount for the Covered Conduct.  Relators' release of Pfizer does not extend to allegations in their Civil Actions that are not within the Covered Conduct, including Relators' claims for reasonable attorneys' fees, expenses and costs pursuant to 31 U.S.C. § 3730(d), Relators' claims under 31 U.S.C. § 3730(h), Relators claims for a Relator's Share under the Medicaid State Settlement Agreements, nor to any other claims Relators may have or had against Pifzer that are not expressly resolved herein.

10.      Pfizer waives and shall not assert any defenses it may have to any criminal prosecution or administrative action relating to the Covered Conduct that may be based in whole or in part on a contention that under the Double Jeopardy Clause in the Fifth Amendment of the Constitution, or under the Excessive Fines Clause in the Eighth Amendment of the Constitution, this Agreement bars a remedy sought in such criminal prosecution or administrative action. Nothing in this paragraph or any other provision of this Agreement constitutes an agreement by

14

the United States concerning the characterization of the Settlement Amount for purposes of the Internal Revenue laws, Title 26 of the United States Code.

11.     Pfizer fully and finally releases the United States, its agencies, employees, servants, and agents from any claims (including attorneys' fees, costs, and expenses of every kind and however denominated) which Pfizer has asserted, could have asserted, or may assert in the future against the United States, its agencies, employees, servants, and agents, related to the Covered Conduct or arising from the United States' investigation and prosecution of the Civil Actions and the Criminal Action.

12.     Should this Agreement be challenged by any person as not fair, adequate or reasonable pursuant to 31 U.S.C. § 3730(c)(2)(B), Pfizer agrees that it will take all reasonable and necessary steps to defend this Agreement.  Pfizer and the United States agree that the following allocation of the Settlement Amount to the Covered Conduct identified in Preamble Paragraph (F) is fair, adequate and reasonable under the circumstances:

    (1)    For the Covered Conduct referenced in Preamble paragraph F(1) regarding Bextra:  $502,524,316;

    (2)    For the Covered Conduct referenced in Preamble paragraph F(2) regarding Geodon: $301,462,065;

    (3)    For the Covered Conduct referenced in Preamble paragraph F(3) regarding Zyvox:  $97,945,019;

    (4)    For the Covered Conduct referenced in Preamble paragraph F(4) regarding Lyrica:  $48,223,886

    (5)    For the Covered Conduct referenced in Preamble paragraph F(5) regarding other specified kickbacks:  $49,844,714.

15

13.     In consideration of the obligations of the Relators set forth in this Agreement, Pfizer, on behalf of itself, its predecessors, and its current and former divisions, parents, subsidiaries, agents, successors, assigns, and their current and former directors, officers and employees, fully and finally release, waive, and forever discharge the Relators and their respective heirs, successors, assigns, agents, and attorneys from any claims or allegations Pfizer has asserted or could have asserted, arising from the Covered Conduct, except as they relate to a statutory claim by Relators for reasonable attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d) and as to any claims Relators may have under 31 U.S.C. § 3730(h).

14.     The Settlement Amount shall not be decreased as a result of the denial of claims for payment now being withheld from payment by any Medicare carrier or intermediary or any state payer, related to the Covered Conduct; and Pfizer agrees not to resubmit to any Medicare carrier or intermediary or any state payer any previously denied claims related to the Covered Conduct, and agrees not to appeal any such denials of claims.

15.     Pfizer agrees to the following:

(a)     <u>Unallowable Costs Defined</u>:  that all costs (as defined in the Federal Acquisition Regulations (FAR) 48 C.F.R. § 31.205-47 and in Titles XVIII and XIX of the Social Security Act, 42 U.S.C. §§ 1395-1395ggg and 1396-1396v, and the regulations and official program directives promulgated thereunder) incurred by or on behalf of Pfizer, its present or former officers, directors, employees, shareholders, and agents in connection with the following shall be "Unallowable Costs" on government contracts and under the Medicare Program, Medicaid Program, TRICARE Program, and FEHBP:

16

(1)    the matters covered by this Agreement and the related plea agreement;

(2)    the United States' audit and civil and criminal investigation of the matters

covered by this Agreement;

(3)    Pfizer's investigation, defense, and any corrective actions undertaken in

response to the United States' audit and civil and criminal investigation in

connection with the matters covered by this Agreement (including

attorneys' fees);

(4)    the negotiation and performance of this Agreement, the plea agreement,

and the Medicaid State Settlement Agreements;

(5)    the payments Pfizer makes to the United States or any State pursuant to

this Agreement, the plea agreement, or the Medicaid State Settlement

Agreements and any payments that Pfizer may make to Relators

(including costs and attorneys' fees);

(6)    the negotiation of, and the obligations undertaken pursuant to the CIA to:

(i)     retain an independent review organization and outside reviewer to

perform annual reviews as described in Section III of the CIA; and

(ii)    prepare and submit reports to the OIG-HHS.  However, nothing in

this paragraph 15(a)(6) that may apply to the obligations

undertaken pursuant to the CIA affects the status of costs that are

not allowable based on any other authority applicable to Pfizer.

17

(All costs described or set forth in this paragraph 15(a) are
hereafter "Unallowable Costs")

(b)      Future Treatment of Unallowable Costs:  These Unallowable Costs shall
be separately determined and accounted for by Pfizer, and Pfizer shall not charge such
Unallowable Costs directly or indirectly to any contracts with the United States or any State
Medicaid Program, or seek payment for such Unallowable Costs through any cost report, cost
statement, information statement, or payment request submitted by Pfizer or any of its
subsidiaries or affiliates to the Medicare, Medicaid, TRICARE, or FEHBP Programs.

(c)      Treatment of Unallowable Costs Previously Submitted for Payment:
Pfizer further agrees that within 90 days of the Effective Date of this Agreement, it shall identify
to applicable Medicare and TRICARE fiscal intermediaries, carriers, and/or contractors, and
Medicaid, and FEHBP fiscal agents, any Unallowable Costs (as defined in this Paragraph)
included in payments previously sought from the United States, or any State Medicaid Program,
including, but not limited to, payments sought in any cost reports, cost statements, information
reports, or payment requests already submitted by Pfizer or any of its subsidiaries or affiliates,
and shall request, and agree, that such cost reports, cost statements, information reports, or
payment requests, even if already settled, be adjusted to account for the effect of the inclusion of
the Unallowable Costs.  Pfizer agrees that the United States, at a minimum, shall be entitled to
recoup from Pfizer any overpayment plus applicable interest and penalties as a result of the
inclusion of such Unallowable Costs on previously-submitted cost reports, information reports,
cost statements, or requests for payment.

18

Any payments due after the adjustments have been made shall be paid to the United States pursuant to the direction of the Department of Justice, and/or the affected agencies. The United States reserves its rights to disagree with any calculations submitted by Pfizer or any of its subsidiaries or affiliates on the effect of inclusion of Unallowable Costs (as defined in this Paragraph) on Pfizer's or any of its subsidiaries' or affiliates' cost reports, cost statements, or information reports.

(d)     Nothing in this Agreement shall constitute a waiver of the rights of the United States to examine or reexamine Pfizer's books and records to determine that no Unallowable Costs have been claimed in accordance with the provisions of this Paragraph.

16.     Pfizer agrees to cooperate fully and truthfully with the United States' investigation relating to the Covered Conduct of individuals and entities not released in this Agreement. Upon reasonable notice, Pfizer shall encourage, and agrees not to impair, the cooperation of its directors, officers, and employees, and shall use its best efforts to make available, and encourage the cooperation of former directors, officers, and employees for interviews and testimony, consistent with the rights and privileges of such individuals. Pfizer agrees to furnish to the United States, upon request, complete and unredacted copies of all non-privileged documents and records in its possession, custody, or control concerning any investigation of the Covered Conduct that it has undertaken, or that has been performed by its counsel or other agent.

19

17.    This Agreement is intended to be for the benefit of the Parties only.  The Parties do not release any claims against any other person or entity, except to the extent provided for in Paragraph 18 below (waiver for beneficiaries paragraph).

18.    Pfizer agrees that it waives and shall not seek payment for any of the health care billings covered by this Agreement from any health care beneficiaries or their parents, sponsors, legally responsible individuals, or third party payors based upon the claims defined as Covered Conduct.

19.    Pfizer expressly warrants that it has reviewed its financial situation and that it is currently solvent within the meaning of 11 U.S.C. §§ 547(b)(3) and 548(a)(1)(B)(ii)(I), and will remain solvent following payment of the Settlement Amount.  Further, the Parties warrant that, in evaluating whether to execute this Agreement, they (a) have intended that the mutual promises, covenants and obligations set forth herein constitute a contemporaneous exchange for new value given to Pfizer, within the meaning of 11 U.S.C. § 547(c)(1); and (b) conclude that these mutual promises, covenants and obligations do, in fact, constitute such a contemporaneous exchange.  Further, the Parties warrant that the mutual promises, covenants, and obligations set forth herein are intended to and do, in fact, represent a reasonably equivalent exchange of value that is not intended to hinder, delay, or defraud any entity to which Pfizer was or became indebted to on or after the date of this transfer, within the meaning of 11 U.S.C. § 548(a)(1).

20.    On the Effective Date of this Agreement or any date thereafter:

(a)     The United States shall intervene in the Civil Actions as to the Covered Conduct and decline or consent to the voluntary dismissal as to all other defendants and all other allegations set forth in the Civil Actions.

(b)     Following payment of the Settlement Amount, the Parties shall file a stipulation of dismissal in each of the Civil Actions as follows:

(1)     each stipulation of dismissal shall be with prejudice as to the United States' and Relators' claims as to Pfizer as to the Covered Conduct in each Civil Action pursuant to and consistent with the terms and conditions of this Agreement;

(2)     each stipulation of dismissal shall be without prejudice as to the United States and with prejudice as to Relators as to all other entities and individuals and as to all other claims, or without prejudice to Relators if agreed to by Relators and Pfizer in any separate written agreement(s) entered into by Relators and Pfizer;

(3)     provided, however, that the following claims against Pfizer shall not be dismissed, unless they are settled, adjudicated, or otherwise resolved, and any required consent by the United States is obtained, and the Court is so informed: (a) all claims against Pfizer reserved by any Relator for claims not resolved herein, including for allegations in their Civil Actions that are not within the Covered Conduct; (b) Relators' claims for reasonable attorneys' fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d); (c) Relators' claims under § 3730(h); (d) Relators' claims for a Relator's Share under the Medicaid State Settlement Agreements; and (e) any other claims Relators may have or had against Pfizer that are not expressly resolved herein.

21

21.     Except as provided in Paragraph 20, each party shall bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement, except Relators reserve their rights against Pfizer to seek attorneys' fees, costs and expenses under § 3730(d).

22.     The Parties each represent that this Agreement is freely and voluntarily entered into without any degree of duress or compulsion whatsoever.

23.     This Agreement is governed by the laws of the United States.  The Parties agree that the exclusive jurisdiction and venue for any dispute arising between and among the Parties under this Agreement, including any dispute regarding payment of Relator's attorneys' fees, expenses and costs, shall be the district court in which the Civil Action was pending on the Effective Date of this Agreement, except as otherwise agreed by the parties to the dispute, and except that any disputes arising under the CIA shall be resolved exclusively through the dispute resolution provisions set forth in the CIA.

24.     For purposes of construction, this Agreement shall be deemed to have been drafted by all Parties to this Agreement and shall not, therefore, be construed against any party for that reason in any dispute.

25.     This Agreement constitutes the complete agreement between the Parties with respect to the issues covered by the Agreement.  This Agreement may not be amended except by written consent of all the Parties.

26.     The individuals signing this Agreement on behalf of Pfizer represent and warrant that they are authorized by Pfizer to execute this Agreement.  The individuals signing this

Agreement on behalf of each Relator represent and warrant that they are authorized by that Relator to execute this Agreement.  The United States' signatories represent that they are signing this Agreement in their official capacities and they are authorized to execute this Agreement.

27.     This Agreement may be executed in counterparts, each of which constitutes an original and all of which shall constitute one and the same Agreement.

28.     This Agreement is binding on Pfizer's successors, transferees, heirs and assigns.

29.     This Agreement is binding on Relators' successors, transferees, heirs, attorneys and assigns.

30.     All parties consent to the disclosure of this Agreement, and information about this Agreement, to the public after it has been finally executed.

31.     This Agreement is effective on the date of signature of the last signatory to the Agreement (Effective Date of this Agreement).  Facsimiles of signatures shall constitute acceptable, binding signatures for purposes of this Agreement.

UNITED STATES OF AMERICA

MICHAEL K. LOUCKS
Acting United States Attorney

By: _~Sara Bloom~_____          Dated: _8/31/09_____
SARA MIRON BLOOM
SUSAN M. POSWISTILO
ZACHARY A. CUNHA
Assistant United States Attorneys
District of Massachusetts

24

By: _____ Dated: 8/28/08
MICHAEL L. LEVY
United States Attorney
United States Attorney's Office
Eastern District of Pennsylvania

By: _____ Dated: 8/28/08
MARGARET L. HUTCHINSON
Chief, Civil Division
United States Attorney's Office
Eastern District of Pennsylvania

By: _____ Dated: 8/28/08
MARILYN MAY
Assistant U.S. Attorney
United States Attorney's Office
Eastern District of Pennsylvania

By: _____ Dated: 8/28/08
CHARLENE KELLER FULLMER
Assistant U.S. Attorney
United States Attorney's Office
Eastern District of Pennsylvania

JAMES A. ZERHUSEN
United States Attorney

By: _____Robin Gwinn_____          Dated: _8/28/09_____
ROBIN GWINN
CHERYL MORGAN
Assistant United States Attorneys
Eastern District of Kentucky

26

TONY WEST
Assistant Attorney General

By: _Sanjay M. Bhambhani_                Dated: _8/31/2009_

JOYCE R. BRANDA
Director
JAMIE ANN YAVELBERG
SANJAY BHAMBHANI
PATRICIA L. HANOWER
COLIN M. HUNTLEY
Trial Attorneys
Civil Division
United States Department of Justice

27

By: _____       Dated: ___8/31/09_____

GREGORY E. DEMSKE
Assistant Inspector General for Legal Affairs
Office of Counsel to the Inspector General
Office of Inspector General
U.S. Department of Health and Human Services

Civil Settlement – Pfizer

By: ~~signature~~ (Acting Deputy General Counsel) Dated: 28. Aug 2009

for  LAUREL C. GILLESPIE
     Deputy General Counsel
     TRICARE Management Activity
     United States Department of Defense

By: _____        Dated: 8/31/09
LORRAINE E. DETTMAN
Assistant Director
for Insurance Services Programs
Center for Retirement & Insurance Services
United States Office of Personnel Management

By: _____        Dated: 8/31/09
J. DAVID COPE
Assistant Inspector General for Legal Affairs
United States Office of Personnel Management

30

**PFIZER INC**

By: _(signature)_        Dated: _31 August 2009_

[Its Officer]
Pfizer Inc

By: _(signature)_        Dated: _8 | 31 | 09_

BRIEN O'CONNOR
JOSHUA LEVY
Ropes & Gray LLP
Counsel to Pfizer Inc and Pharmacia & Upjohn Company, Inc.

31

01/03/2002  07:48     2107574757                    J KOPCHINSKI                              PAGE  02

RELATOR JOHN KOPCHINSKI

By: _____          Dated: _____
JOHN KOPCHINSKI

By: _____          Dated: 8/28/09
ERIKA KELTON
Phillips & Cohen LLP
Counsel to Relator John Kopchinski

32

**RELATOR DANA SPENCER**

By: _____     Dated: _____
DANA SPENCER

By: _____     Dated: _____
WILLIAM V. HOYLE, Jr.
The Law Offices of William V. Hoyle, Jr., PC
Counsel to Relator Dana Spencer

33

**RELATOR BLAIR COLLINS**

By: _Blair M Collins_                    Dated: _8/28/2009_
BLAIR COLLINS

_Suzanne E. Durrell /RMT_
By: _Robert M Thomas L._          Dated: _8/28/09_
SUZANNE E. DURRELL
Durrell Law Office
ROBERT M. THOMAS, JR
ROYSTON H. DELANEY.
Thomas & Associates
Counsel to Relator Blair Collins

34

08/28/2009  15:20   614--325-6050          FEDEX OFFICE    0148              PAGE  02

**RELATOR GLENN DEMOTT**

By: _Glenn DeMott_                    Dated: _08/28/2009_
    GLENN DEMOTT


By: _____          Dated: _____
    ANN LUGBILL
    Murphy Anderson PLLC
    Counsel to Relator Glenn DeMott


By: _____          Dated: _____
    JOHN C. KAIRIS
    Grant & Eisenhofer, PA
    Counsel to Relator Glenn DeMott


By: _____          Dated: _____
    REUBEN GUTTMAN
    Grant & Eisenhofer, PA
    Counsel to Relator Glenn DeMott

35

**RELATOR GLENN DEMOTT**

By: _____          Dated: _____

    GLENN DEMOTT


By: *Ann Lugbill (MY)*                          Dated: 7/23/09

    ANN LUGBILL
    Murphy Anderson PLLC
    Counsel to Relator Glenn DeMott


By: _____          Dated: _____

    JOHN C. KAIRIS
    Grant & Eisenhofer, PA
    Counsel to Relator Glenn DeMott


By: _____          Dated: _____

    REUBEN GUTTMAN
    Grant & Eisenhofer, PA
    Counsel to Relator Glenn DeMott

**RELATOR GLENN DEMOTT**

By: _____     Dated: _____
   GLENN DEMOTT


By: _____     Dated: _____
   ANN LUGBILL
   Murphy Anderson PLLC
   Counsel to Relator Glenn DeMott


By: _J0hn C (KAIRIS CAJ)_____     Dated: _8/28/2005_____
   JOHN C. KAIRIS
   Grant & Eisenhofer, PA
   Counsel to Relator Glenn DeMott


By: _Reube G Gumm_____     Dated: _8/28/005_____
   REUBEN GUTTMAN
   Grant & Eisenhofer, PA
   Counsel to Relator Glenn DeMott

35

**RELATOR ROBERT LITER**

By: _____     Dated: 8/28/09
ROBERT LITER

By: _____     Dated: Aug. 28th, 2009
BARBARA BONAR
The Law Offices of B. Dahlenburg Bonar
Counsel to Relator Robert Liter

36

**RELATOR CASEY SCHILDHAUER**

By: _____          Dated: _____
   CASEY SCHILDHAUER


**RELATOR DAVID FARBER**

By: _____          Dated: _____
   DAVID FARBER

By: _____          Dated: 8/28/2009
   W. SCOTT SIMMER
   Blank Rome LLP
   Counsel to Relators Casey Schildhauer and David Farber

37

**RELATOR CASEY SCHILDHAUER**

By: _____                   Dated: _____
CASEY SCHILDHAUER


**RELATOR DAVID FARBER**

By: _____                   Dated: 8/28/2009
DAVID FARBER


By: _____                   Dated: _____
W. SCOTT SIMMER
Blank Rome LLP
Counsel to Relators Casey Schildhauer and David Farber

**RELATOR CASEY SCHILDHAUER**

By: _____        Dated: 8/28/2009
CASEY SCHILDHAUER


**RELATOR DAVID FARBER**

By: _____        Dated:_____
DAVID FARBER


By: _____        Dated:_____
W. SCOTT SIMMER
Blank Rome LLP
Counsel to Relators Casey Schildhauer and David Farber

37

**RELATOR STEFAN KRUSZEWSKI**

By: _____     Dated: _8/31/200 9_

STEFAN KRUSZEWSKI

By: _____     Dated: _8/31/2009_

BRIAN KENNEY
M. TAVY DEMING
Kenney Egan McCafferty & Young
Counsel to Relator Stefan Kruszewski

38

**RELATOR MARK WESTLOCK**

By: _____          Dated: _____
MARK WESTLOCK

By: _____          Dated: 8/28/2009
W. SCOTT SIMMER
Blank Rome LLP
Counsel to Relator Mark Westlock

39

**RELATOR MARK WESTLOCK**

By: _____       Dated: _8/20/09_____

MARK WESTLOCK

By: _____ . _____       Dated: _____

W. SCOTT SIMMER
Blank Rome LLP
Counsel to Relator Mark Westlock

**RELATOR RONALD RAINERO**

By: _____          Dated: ___8/28/09___

RONALD RANEIRO

By: _____          Dated: _____

JAMES PEPPER
Sheller, PC
Counsel to Relator Ronald Rainero

40

**RELATOR RONALD RAINERO**

By: _____         Dated: _____

RONALD RANEIRO


By: _____         Dated: 8/28/09

JAMES PEPPER

Shelter, PC

Counsel to Relator Ronald Rainero

40

ATTACHMENT A

This statement reflects facts as to which Pfizer and the United States agree are true and accurate. It does not contain all of the United States' factually-based contentions regarding Pfizer's marketing of Zyvox, nor does it contain all of Pfizer's responses to those allegations:

1.   Zyvox (linezolid) is an antibacterial agent that is approved by the FDA to treat certain types of infections including, among other approved indications, nosocomial pneumonia caused by methicillin-resistant *Staphylococcus aureus* ("MRSA") and complicated skin and skin structure infections ("CSSSIs") due to MRSA.

2.   Although Zyvox is approved to treat these indications, it has not been demonstrated by substantial evidence to be superior to the primary competitor drug for those indications: vancomycin, an antibiotic that has been on the market for nearly fifty years.

3.   On July 20, 2005, the FDA sent Pfizer a Warning Letter ("Warning Letter") regarding a journal advertisement for Zyvox. In this Warning Letter, the FDA stated that Pfizer's advertisement misbranded Zyvox by making misleading and unsubstantiated implied superiority claims, claims that broadened the indications of Zyvox, and omitted important safety information.

4.   The FDA stated in the Warning Letter that the journal advertisement implied that Zyvox is superior to vancomycin for the treatment of nosocomial pneumonia caused by MRSA. Specifically, the FDA Warning Letter objected to the advertisement's use of certain retrospective analyses of head-to-head clinical trials of linezolid and vancomycin. The FDA stated that these analyses were not prospectively designed or sufficiently powered to demonstrate statistically significant differences in treatment groups. Thus, the FDA stated that the superiority of Zyvox for the treatment of nosocomial pneumonia caused by MRSA had not been demonstrated by substantial evidence and that the advertisement was therefore misleading.

5.   The FDA stated that Pfizer's advertisement misbranded Zyvox in violation of 21 U.S.C. 352(n) & 321(n) and FDA implementing regulations and requested that Pfizer cease dissemination of the journal advertisement and other promotional materials containing similar statements.

6.   After receiving the Warning Letter, Pfizer responded to the FDA, taking the position that it did not believe that the journal advertisement made an improper superiority claim. However, Pfizer informed the FDA that, in response to the FDA's concerns, Pfizer would cease use of the journal advertisement in question. Further, Pfizer informed the FDA that all other Zyvox promotional materials had been reviewed to identify other items that could raise similar concerns, and that steps had been taken to discontinue or appropriately revise any promotional materials that could potentially be misinterpreted in a similar manner. Pfizer also

1

informed the FDA that it was instructing its sales force that materials containing information that the FDA stated constituted an implied superiority claim could no longer be used. Pfizer also advised its sales force to discontinue using certain identified promotional materials and that sales representatives would be provided with replacement pieces.

7.      In addition, at the FDA's request, Pfizer agreed to publish a corrective advertisement in February 2006, which was entitled "IMPORTANT CORRECTION OF DRUG INFORMATION ZYVOX." In this corrective advertisement, Pfizer noted that the FDA had objected to the presentation, in its previous advertisement, of clinical data that showed a more favorable comparison of Zyvox to vancomycin than was shown in the data included in the the Zyvox label, which states that 57% of Zyvox patients and 60% of vancomycin patients in the clinically evaluable population were cured of MRSA. Further, the label reflects that 59% (13/22) of Zyvox patients and 70% (7/10) of vancomycin patients with microbiologically-confirmed MRSA at baseline were clinically cured.

8.      Despite notifying its sales force that it should cease using promotional materials that raised concerns of the type identified in the FDA Warning Letter, Pfizer did not provide adequate guidance to its sales force regarding what statements were permissible concerning data from head-to-head trials and retrospective analyses and what promotional statements were not permitted.

9.      As a result, Pfizer's sales personnel thereafter continued to make claims to physicians that Zyvox was superior to vancomycin for certain patients with MRSA, which included the claim that Zyvox would have a higher cure rate, and would save more lives, despite the fact that these claims were inconsistent with the FDA's Warning Letter and Zyvox's FDA approved label, and which were inconsistent with the manner in which Pfizer, after the receipt of the Warning Letter, agreed to present the clinical data cited by the FDA.

10.     Moreover, certain Pfizer sales managers, including a regional manager and a headquarters-based vice president, were aware of and, in certain cases, encouraged a sales message that Zyvox was superior to vancomycin for certain patients, despite their knowledge of the FDA Warning Letter and the issues it raised.



**U.S. Department of Justice**

Criminal Division

_Office of the Assistant Attorney General_                    _Washington, D.C. 20530_

JUL 28 2009

The Honorable Michael K. Loucks
Acting United States Attorney
District of Massachusetts
Boston, Massachusetts 02210

Attention:    Susan Winkler
              Assistant United States Attorney

    Re:    <u>Global Non-prosecution Agreement for Pharmacia & Upjohn Company, Inc.</u>

Dear Mr. Loucks:

    This is in response to your request for authorization to enter into a global case disposition agreement with the business entity known as Pharmacia & Upjohn Company, Inc.

    I hereby approve the terms of the Plea Agreement, including Paragraphs 5 and 15, in which the United States Attorney's Offices and, with the exception of the Fraud Section, the Criminal Division of the Department of Justice agree not to initiate further criminal prosecutions as set out therein.

    You are authorized to make this approval a matter of record in this proceeding.

                         Sincerely,

                         John C. Keeney
                         Deputy Assistant Attorney General

<u>EXHIBIT C</u>

## ACKNOWLEDGMENT OF PLEA AGREEMENT

      The Board of Directors has authorized me to execute this Plea Agreement on behalf of Pharmacia & Upjohn Company, Inc.  The Board has read this Plea Agreement, the attached criminal Information, and the Civil Settlement Agreement including its attachment in their entirety, or has been advised of the contents thereof, and has discussed them fully in consultation with Pharmacia & Upjohn Company, Inc.'s attorneys.  I am further authorized to acknowledge on behalf of Pharmacia & Upjohn Company, Inc. that these documents fully set forth Pharmacia & Upjohn Company, Inc.'s agreement with the United States, and that no additional promises or representations have been made to Pharmacia & Upjohn Company, Inc. by any officials of the United States in connection with the disposition of this matter, other than those set forth in these documents.

Dated:  *Aug 28th, 2009*

                                        Vice President and Secretary
                                        Pharmacia & Upjohn Company, Inc.

Dated:

                                        _____
                                        BRIEN T. O'CONNOR
                                        Ropes & Gray LLP
                                        Counsel for Pharmacia & Upjohn Company, Inc.

EXHIBIT D

## ACKNOWLEDGMENT OF PLEA AGREEMENT

The Board of Directors has authorized me to execute this Plea Agreement on behalf of Pharmacia & Upjohn Company, Inc. The Board has read this Plea Agreement, the attached criminal Information, and the Civil Settlement Agreement including its attachment in their entirety, or has been advised of the contents thereof, and has discussed them fully in consultation with Pharmacia & Upjohn Company, Inc.'s attorneys. I am further authorized to acknowledge on behalf of Pharmacia & Upjohn Company, Inc. that these documents fully set forth Pharmacia & Upjohn Company, Inc.'s agreement with the United States, and that no additional promises or representations have been made to Pharmacia & Upjohn Company, Inc. by any officials of the United States in connection with the disposition of this matter, other than those set forth in these documents.

Dated:

James Gibney
Vice President and Secretary
Pharmacia & Upjohn Company, Inc.

Dated: 8/31/09

BRIEN T. O'CONNOR
Ropes & Gray LLP
Counsel for Pharmacia & Upjohn Company, Inc.

11

<u>EXHIBIT E</u>

PHARMACIA & UPJOHN COMPANY, INC.

SECRETARY'S CERTIFICATE

I, James Gibney, do hereby certify that I am Vice President and Secretary of Pharmacia & Upjohn Company, Inc., a corporation organized under the laws of Delaware (the "Company"), and do hereby further certify that:

The persons named below have been duly elected and qualified as an officer of the Company:

| NAME | TITLE |
|------|-------|
| Thomas R. Kelly | President & Treasurer |
| James Gibney | Vice President and Secretary |

Attached hereto is a true, correct, and complete copy of the resolutions of the Board of Directors of the Company adopted on August 24, 2009. Such resolutions have not been modified, amended or rescinded and remain in full force and effect as of the date hereof.

IN WITNESS WHEREOF, I have executed this Certificate on behalf of the Company on this 26 day of August 2009.

PHARMACIA & UPJOHN COMPANY, INC.

By: _____
Name:  James Gibney
Title:   Vice President & Secretary

# PHARMACIA & UPJOHN COMPANY, INC.

## UNANIMOUS WRITTEN CONSENT OF THE
## BOARD OF DIRECTORS

The undersigned, being all the directors of Pharmacia & Upjohn Company, Inc.(the "Company"), a wholly-owned subsidiary of Pharmacia & Upjohn Company LLC, hereby waive all notice of the time, place or purpose of a meeting and consent to, approve and adopt the following resolution without a meeting:

WHEREAS, the United States Attorney's Office for the District of Massachusetts has been conducting an investigation into the Company's conduct relating to the drug Bextra;

WHEREAS, the Board of Directors has consulted with legal counsel in connection with this matter;

WHEREAS, the Company's legal counsel has been negotiating a resolution of this matter;

WHEREAS, the Company's legal counsel has reported to the board the terms and conditions of a proposed resolution of this matter;

WHEREAS, the Board of Directors has been advised of the contents of the Information and proposed Plea Agreement in this matter;

NOW THEREFORE, BE IT:

RESOLVED; that the Company is hereby authorized to enter into the Plea Agreement dated August 24, 2009, between the United States Attorney for the District of Massachusetts and Pharmacia & Upjohn Company, Inc., the "Agreement."

FURTHER RESOLVED, that the Company is authorized to plead guilty to the charge specified in the Information.

FURTHER RESOLVED, that James Gibney, Vice President and Secretary, or any other Officer of the Company, are hereby authorized and directed to take all actions and deliver any agreements, certificates and documents and instruments with respect to or contemplated by the Agreement and matters set forth above, including, without limitation, the payment of all amounts, fees, costs and other expenses, necessary or appropriate to effectuate the purpose and intent of the foregoing resolutions and to effectuate and implement the resolutions contemplated hereby.

FURTHER RESOLVED, that any actions taken by the Officers of the Company prior to the adoption of these resolutions, that are within the authority conferred hereby, are hereby fully ratified, confirmed and approved as the act and deed of the Company.

This Written Consent may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the undersigned Directors of the Company have executed this consent as of the 24th of August, 2009.

Thomas R. Kelly

James Gibney

Pharmacia Upjohn Co Inc  Board Consent 08 09 DOC