EXHIBIT I

NOT FOR PUBLICATION WITHOUT THE APPROVAL OF
THE COMMITTEE ON OPINIONS

|  |  |  |
|---|---|---|
| VIRGINIA PALAZZOLO, et al., | : | SUPERIOR COURT OF NEW JERSEY |
|  | : | LAW DIVISION - ESSEX COUNTY |
| Plaintiffs, | : | DOCKET NO. ESX-L-5498-00 |
|  | : |  |
| vs. | : | OPINION |
|  | : |  |
| HOFFMANN LA ROCHE, INC., and | : |  |
| ROCHE LABORATORIES, | : |  |
|  | : |  |
| Defendants. | : |  |
|  | : |  |

EDITH K. PAYNE, J.S.C.

In this matter, plaintiffs claim that the ingestion of Accutane, an isotretinoin-containing product prescribed principally for the treatment of severe recalcitrant nodular acne, has led to successful and unsuccessful attempts at suicide by a number of teenagers, including those represented in this action.  Plaintiffs claim further that an association between the use of Accutane or similar retinoid products and incidents of suicide was known or should have been known to defendants at the time that the teenagers represented here took the drug, and that defendants failed to provide proper warnings of that association.  In large measure, plaintiffs' proofs on their failure to warn claim depend upon facts that plaintiffs argue were known to European entities which, like the American companies that are defendants in this action, were members of "The Roche Group."  In particular, plaintiffs note that, as the result of an investigation conducted between 1992 and 1994 in France, on March 3, 1997, the French product label was modified to include "suicide attempts" as associated with isotretinoin therapy, stating:

1

"In rare occasions, neuropsychological problems have been recorded (behavioral difficulties,

depression, convulsions and suicide attempts)."  A similar change did not occur in the United

States until February 25,1998 -- a date after the teenagers represented in this action had

concluded their treatment.[1]  In February 1998, the FDA required Roche-New Jersey to change its

label to include the following:

> WARNINGS
>
> *Psychiatric Disorders:*  Accutane may cause depression, psychosis and rarely, suicidal
> ideation, suicide attempts, and suicide.  Discontinuation of Accutane therapy may be
> insufficient; further evaluation may be necessary.  No mechanism of action has been
> established for these events (see ADVERSE REACTIONS).
>
> ADVERSE REACTIONS
>
> In the post-marketing period, a number of patients treated with Accutane have reported
> depression, psychosis and, rarely, suicidal ideation, suicide attempts and suicide.  Of the
> patients reporting depression, some reported that the depression subsided with
> discontinuation of therapy and recurred with reinstitution of therapy (see WARNINGS).[2]
>
> Those persons offered by defendants as knowledgeable claim that defendants had no

---

[1]  Despite the labeling change, Roche-New Jersey continued to market Accutane in a
fashion that suggested "it was safe and effective in the treatment of what Roche describes as the
'psychosocial trauma' and 'emotional suffering' associated with acne, including 'negative
psychosocial effects such as depression and poor self-image.'"  This practice, which the FDA
found to be scientifically unfounded and contrary to incidental reports, led to issuance of a FDA
Warning Letter dated March 5, 1998 against dissemination of false and misleading advertising
and a request for curative action.

[2]  Previously, no relevant warning existed.  Under "Adverse Reactions," Roche stated:

The following CNS reactions have been reported and may bear no relationship to therapy
– seizures, emotional instability, dizziness, nervousness, drowsiness, malaise, weakness,
insomnia, lethargy and parethesias.

Depression has been reported in some patients on Accutane therapy.  In some of these
patients, this has subsided with discontinuation of therapy and recurred with reinstitution
of therapy.

2

knowledge of the French labeling change, of the studies leading to it, or of any other information existing in Europe that would support an association between the ingestion of Accutane or others of Roche's isotretinoin-containing products and the risk of suicide.  Indeed, defendants profess to have known nothing about occurrences in France until they were questioned about the timing of label changes in France and the United States by the FDA in August 1998.  See, e.g., deposition of Michael Bailey T.54.17 to 56.9.  Further, defendants claim that relevant knowledge did not exist at Roche facilities in Basel, Switzerland.  Bailey Dep. T.57.10-14.  As stated by Mr. Bailey: "[E]ach of the countries are their own separate company, with their own rules and regulations. It's not – it would not have been a necessity that they make anyone aware of such a change." Id. T.59.5-14.[3]

    In this motion, plaintiffs seek discovery of information known to the European entities within The Roche Group without resort to the discovery mechanisms provided by the Hague

---

[3]  Nonetheless, it is significant to note that on January 5, 1998, the FDA issued a Warning Letter to Roche-New Jersey, noting that in inspections conducted in the Spring and Summer of 1997, inspectors determined that the company was not in compliance with the Postmarketing Adverse Drug Experience reporting requirements of Section 505 (k) of the Federal Food, Drug, and Cosmetic Act and Title 21 Code of Federal Regulations Part 314.80.  Included by example were two instances in which reporting of Adverse Drug Experience ("ADE") with respect to Roaccutane, required to be submitted within 15 working days, had been delayed six years from 1991 to 1997.  As stated by the FDA:

These are only limited examples, and as we observed by the widespread origin of these reports, i.e., domestic and foreign, including France, Japan, and Australia, appear to be indicative of systems deficiencies in handling ADE reporting.

The FDA's letter went on to note Roche's assurance that  "all French reports are now processed in a timely manner."

3

Evidence Convention.[4]  In support of their right to that relief, plaintiffs claim that information

was freely exchanged by and among the members of The Roche Group, and as a consequence,

control of that information can be found to exist within the United States, thereby justifying a

requirement that the information be produced by the defendants located here.  Plaintiffs'

arguments are supported by numerous extracts from periodic reports, news releases, and

informational materials published on the Internet by The Roche Group that imply the existence of

a worldwide entity consisting of multiple affiliates, whose sales, marketing, product development

and regulatory activities, mergers and acquisitions, and business goals have been reported on a

unified basis at least since 1994.

Defendants have taken the position that the American companies that have been sued in

this action are distinct from any entities existing in Europe, that defendants lack knowledge or

the means in the ordinary course of business to obtain knowledge with respect to the information

sought by plaintiffs, and that any relevant information possessed by the European non-parties can

be obtained only through plaintiffs' use of the Hague Evidence Convention.

After oral argument of plaintiffs' motion had occurred, defendants were ordered to set

forth the corporate relationships between them, The Roche Group, and other Roche entities.

Only then, did defendants disclose the fact that The Roche Group, despite its massive electronic

presence, exists for its bankers but not for its lawyers.  As stated in the affidavit of Gerald Bohm:

"The Roche Group" is a descriptive term, or a term of art that refers to those companies that are

wholly owned by Roche-Switzerland, or in which it has a majority interest. . . .  Because it is not

---

[4]  The Hague Convention on the Taking of Evidence Abroad in Civil or Commercial
Matters, March 18, 1970, 23 U.S.T. 2555, T.I.A.S. No. 7444.

4

a legal or corporate entity, however, "The Roche Group" does not have corporate functions or operations." Id. ¶ 4.

The principal issue raised by this motion then becomes: If a company consisting of independent entities holds itself out to the world for purposes of marketing and other economically beneficial activities as a unified whole, and if information is gathered and disseminated in a manner that furthers the illusion, can the company then disavow the fiction and reassert the separate nature of its corporate constituents in order to avoid discovery of facts that are supplied in the ordinary course of business for use and dissemination by the fictional entity. I hold that it cannot.

A.    Actual corporate structure of the entities

Defendants have been notably unwilling to disclose the actual corporate relationships that exist between various Roche entities, and to date, have failed to explain, for instance, how Roche's French affiliate is related to the entities that have been sued in this case. However, defendants have disclosed that defendant Hoffmann-La Roche Inc. ("Roche-New Jersey"), a New Jersey corporation with its principal place of business in Nutley, New Jersey, is a wholly-owned subsidiary of Roche Holdings, Inc., a Delaware corporation. Roche Holdings, Inc. is a wholly-owned subsidiary of Roche Finance Ltd, a Swiss company, which in turn is a wholly-owned subsidiary of Roche Holding Ltd (Roche-Switzerland). Another company of significance here, F. Hoffmann-La Roche Ltd, the Swiss manufacturer of isotretinoin-containing Roaccutane, like Roche Finance Ltd, is also a wholly-owned subsidiary of Roche Switzerland. Bohm affidavit ¶ 3. Roche-Switzerland is a company organized and existing under the laws of Switzerland, having

its headquarters and principal place of business in Basel. The principal object of Roche-Switzerland is said to be to "hold shares in companies that manufacture and sell pharmaceutical and diagnostic and vitamin and fine chemical products of all kinds." Id. According to Mr. Bohm, "Hoffmann-La Roche Inc. does not . . . have in its possession an organizational chart that would reflect all of the pharmaceutical holdings of Roche-Switzerland." Id.

Defendant Roche Laboratories is a Delaware corporation with its principal place of business in Nutley, New Jersey. It is a wholly-owned subsidiary of Roche-New Jersey. Hoffmann-La Roche, Inc. (Roche-New Jersey) is a "research-intensive pharmaceutical company that discovers, develops, manufactures and markets prescription drugs"; Roche Laboratories, Inc. is its marketing and sales subsidiary. For purposes of this opinion, no distinction will be made between the two entities. Both claim to be "members of the Basel, Switzerland-based Roche Group, a global leader in health care with principal businesses in pharmaceuticals, diagnostics, vitamins, and fragrances and flavors." See description of Hoffmann-La Roche, 2000.

B.     The Roche Group

In connection with this motion, plaintiffs have supplied various documents, obtained from the Internet, which suggest that F. Hoffmann-La Roche Ltd, a sister to Roche-New Jersey's penultimate parent, Roche Finance Ltd, is the generator of materials allegedly from The Roche Group, since F. Hoffmann-La Roche Ltd is listed as holding the copyright to those materials.

Some of those documents, appearing as either annual and semi-annual reports or media releases, track the development of The Roche Group's total sales and profits on a worldwide basis, reporting those sales by "Divisions," denominated Pharmaceuticals, Vitamins & Fine

6

Chemicals, Diagnostics, Fragrances & Flavors, and "Others."   All sales and profits, including those generated in the United States, are reported in consolidated form in Swiss Francs.   In addition to sales and profit figures, the documents also contain entries that further describe each Division. As stated in one publication: "The Pharmaceuticals Division forms the core of all Roche's operations, accounting for over 50 per cent of the Roche Group's sales and employing over 30 thousand people worldwide." See About Roche Pharmaceuticals, "Roche Pharmaceuticals Division," September 12, 2000.  And in another: "The Pharmaceuticals Division achieved additional sales gains in all important market regions, notably Europe, the Americas, Asia and Australia." See, Roche Media Release, Basel, January 17, 1996 "Roche Group Sales in 1995."   Six pharmaceutical research locations, including Nutley, are described as Roche research sites.  See Roche Media Release, Basel, 5 December 2000 "Inauguration of new Roche Pharma Research building in Basel."  Divisional headquarters are stated to be in Basel, Switzerland, described as "being the home of the corporate administrative centre," with corporate "affiliates in 50 countries and business activities in more than one hundred." Id.  See also About Roche Pharmaceuticals, "Roche Pharmaceuticals Division," September 12, 2000.[5]

---

[5]  Another Internet publication provides:

**Group Headquarters**
The Roche Group incorporates all those companies wholly owned by Roche Holding Ltd, Basel, or in which it has a majority interest.  Group management - Group Headquarters - is based in Basel, Switzerland.

Contact opportunity

F. Hoffmann-La Roche Ltd.
Group Headquarters . . . .

**Divisional Headquarters**

In each financial report, The Roche Group's "Pharma Division" is mentioned first, and in each of the documents supplied, the sales growth in isotretinoin-containing products, reported as "Roaccutane" or "Roaccutane/Accutane," is prominently featured as one of The Roche Group's principal top sellers.

Purchases and sales of corporate entities are attributed to The Roche Group, with analyses presented regarding the effect of those transactions on The Roche Group's global position as a pharmaceutical giant and on Roche's bottom line. As stated in one publication describing the acquisition of a majority holding in California-based Genentech and "the integration of Boehringer Mannheim's Therapeutics Division into the Roche Pharmaceuticals Division": "The resulting distribution of sales across a broader product base makes it possible to sustain research and development on innovative products that offer real improvements to doctors, hospitals and patients." <u>See</u> About Roche Pharmaceuticals "Roche Pharmaceuticals Division" September 12, 2000. <u>See</u> <u>also</u>, Half-Year Report 1998, August 17, 1998, describing Roche's pharmaceutical products throughout the world, and the strengthening of Roche's position with respect to some categories of drugs.

The unity of Roche as a corporate entity is fostered by statements such as:

Roche, headquartered in Basel, Switzerland, is a world leader in research-based healthcare with its principal business in pharmaceuticals, diagnostics, vitamins, and fragrances and flavours. Roche discovers and develops new compounds for marketing as prescription drugs in key therapeutic areas such as diseases of the nervous system, virology, infectious diseases, oncology, cardiovascular diseases, inflammatory and autoimmune diseases, dermatology, metabolic disorders and respiratory diseases.

---

Roche's three divisions- Pharmaceuticals Division, Diagnostics Division, Vitamins and Fine Chemicals Division are run by separate organisational units with headquarters in the Basel area.

8

> [Roche Media Release, Basel, August 27, 1998 "Fortovase receives approval in the European Union"]

Roche-New Jersey, likewise, portrays itself as a "unit" of the Roche Group:

> Hoffmann-La Roche Inc., headquartered in Nutley, N.J., is the U.S. prescription drug unit of the Roche Group, a leading international health care company with principal businesses in pharmaceuticals, diagnostics and vitamins.  The company is active in more than 100 countries and employs approximately 66,000 people worldwide.  In 1999, Roche worldwide sales were approximately 27.6 billion Swiss francs (about $18.4 billion), with global pharmaceuticals sales accounting for about 60 percent of that total.

> [About Us, "Roche: Focused on Growth for the New Millennium"]

The close relationship existing between F. Hoffmann-La Roche Ltd., the entity housing the "Global Headquarters" of The Roche Group and the United States is illustrated in a U.S. Department of Justice Press Release dated May 20, 1999 and titled "F. Hoffmann-La Roche and BASF agree to pay record Criminal Fines."  The Release describes F. Hoffmann-La Roche Ltd as leading a worldwide conspiracy lasting from 1990 to 1999 to raise and fix prices, allocate market shares, and eliminate competition in the United States for certain vitamins sold in the United States and elsewhere.  Under the terms of a guilty plea entered by the company, significant fines were to be paid.  Additionally, the former Director of Worldwide Marketing for the Vitamins and Fine Chemicals Division, a Swiss citizen, "agreed to submit to the jurisdiction of the U.S. District Court in Dallas, plead guilty to [participating in the vitamin cartel and lying to Department of Justice investigators], serve a four-month prison term, and pay a $100,000 fine.  Id.

Other Roche Media Releases, datelined Basel, Switzerland, cover scientific data, clinical testing, regulatory approvals of new drugs, and other regulatory action with respect to Roche pharmaceutical products worldwide, including activities of the FDA, and provide evidence of

coordinated, worldwide monitoring of post-marketing adverse drug events, leading to changes in

labeling.  Significantly, some of those releases, dating at least as far back as 1998, disclose the

analysis of reports of adverse drug reactions and the use of that information, in conjunction with

drug regulatory agencies, in the modification of warning labels.  For instance, one release relating

to the drug Tasmar states:

> Evolving safety information about the anti-parkinson drug Tasmar (tolcapone) has led
> Roche to revise the recommendations to physicians on the appropriate use of the drug.
> These changes reflect additional information obtained through post-marketing experience
> in approximately 100'000 patients worldwide.
>
> * * *
>
> In consultation with the Food and Drug Administration FDA, Roche is issuing in the
> United States a revised label, indicating that the drug should be used as an adjunctive
> therapy in patients with Parkinson's Disease who do not respond satisfactorily to other
> therapies. . . .
>
> In the European Union, the Commission has initiated the procedure asking member states
> to suspend the use of Tasmar as of Tuesday, 17[th] November 1998.  Roche's principal
> concern is to implement the Commission's decision with the patients' interest in mind.
> Roche and regulatory authorities in other countries are working closely to ensure that the
> revised recommendations for the appropriate use of Tasmar are implemented.
>
> [Roche Media Release, Basel, November 17, 1998 "Tasmar label change in the US -
> Suspension in the European Union"]

Michael Bailey, the person at Roche-New Jersey presently responsible for its overall

strategy with the FDA (dep. T.8.20-22) has acknowledged that a global medical science and

safety team has been in place at least since 1999 to monitor the safety of Roaccutane.  Dep.

T.41.7-21, T.42.10 to 43.19.  Further, Mr. Bailey has testified that he presently communicates on

a daily basis with Switzerland with regard to Accutane, with most frequent contact being with the

drug regulatory affairs department in Basel.  Dep. T.17.6-17.  The corporate entity that he

10

communicates with is known to Mr. Bailey as "Roche Basel."  Dep. T.18.1-8.  As global

regulatory leader, Mr. Bailey's role with respect to the labeling of Accutane is to ensure

compliance, within the constraints of a country's regulatory requirements, with Roche's core data

sheet on the product.  Dep. T.26.20 to 27.8.  That function requires him to communicate with

various persons in different countries where Roche produces Accutane to determine whether

their labeling meets certain criteria.  Dep. T. 27.15 to 29.4.[6]  Manufacture of Accutane, Mr.

Bailey stated, occurs in the United States, Switzerland and France.


C.     The Product

Accutane has been on the market in the United States since 1985.  It has been found to be

exceedingly effective in the treatment of severe, recalcitrant nodular acne.  Its active ingredient is

the substance isotretinoin.  Throughout this litigation, defendants have taken the position that

information regarding isotretinoin-containing products sold in Europe is irrelevant to the present

litigation because of differences in formulation that defendants imply are critical.  However,

defendants' position is belied by an Annual Report for Accutane, produced by defendants, which

states:

> Accutane (isotretinoin) is approved and marketed in over 50 countries, including the
> United States.  In these countries, Accutane has been introduced under the alternate
> trademarks Roaccutane, Roacutane, Roacutan and Roacnetan.

---

[6] Mr. Bailey has testified that to his knowledge, his position did not exist in 1995.  Dep.
T.30.13-17.

11

D.      The Teenagers who are Subjects of this Suit

The initial three teenagers in this case are Jessica Boers, Amanda Callais, and Christopher Tremain. Ms. Boers was treated with Accutane commencing in November 1996. Within two weeks, she was hospitalized for attempted suicide, and thereafter was diagnosed as suffering from major depression, recurrent, and bipolar disorder. Her Accutane therapy was discontinued in July 1997. Ms. Callais was prescribed Accutane on September 22, 1997. On November 15, 1997, she was hospitalized for attempted suicide. Her last prescription of Accutane was given on January 23, 1998. Mr. Tremain is the son of lead plaintiff Virginia Palazzolo. On May 1, 1997 Accutane was prescribed for him. He committed suicide on June 30, 1997.


E.      Relevance of the Information Sought

As the histories just set forth demonstrate, each of the three persons who were initially named in connection with plaintiffs' action was prescribed Accutane prior to the change in labeling in the United States. Investigations in France allegedly leading to its change in labeling to include the risk of suicide preceded the administration of the drug to each of the three. The French labeling change itself occurred prior to the commencement of Accutane use by both Ms. Callais and Mr. Tremain.

New Jersey's Product Liability Act provides:

An adequate product warning or instruction is one that a reasonably prudent person in the same or similar circumstances would have provided with respect to the danger and that communicates adequate information on the dangers and safe use of the product, taking into account the characteristics of, and the ordinary knowledge common to, the persons by whom the product is intended to be used, or in the case of prescription drugs, taking into account the characteristics of, and the ordinary knowledge common to, the prescribing physician. If the warning or instruction given in connection with a drug or

12

device or food or food additive has been approved or prescribed by the federal Food and Drug Administration under the "Federal Food, Drug, and Cosmetic Act." 52 Stat. 1040, 21 U.S.C. § 301 et seq., . . . a rebuttable presumption shall arise that the warning or instruction is adequate . . . .

[N.J.S.A. 2A:58C-4.]

Despite the presumption just set forth,[7] proof of approval of a warning by the FDA does not conclusively establish its adequacy. See, e.g., Feldman v. Lederle Labs., Inc., 125 N.J. 117, 156-57 (1991). In that case, which concerned the adequacy of Lederle's warnings of the danger of tooth discoloration in children taking the antibiotic Declomycin, Lederle argued that the obligation imposed by the New Jersey Supreme Court under the first Feldman decision to communicate a warning based on subsequently-acquired "actual or constructive knowledge" of a danger as soon as reasonably feasible (Feldman v. Lederle Laboratories, 97 N.J. 429, 456 (1984) conflicted with Lederle's obligations under FDA law. The Court rejected Lederle's argument, holding that, since federal law did not clearly require that a drug manufacturer obtain FDA approval before warning of a "known or knowable danger," federal law did not preempt state law

---

[7] As noted by the Perez Court in the context of its adoption of a similar presumption applicable to direct consumer advertising of prescription drugs:

[A] rebuttable presumption that the duty to consumers is met by compliance with FDA regulations helps to ensure that manufacturers are not made guarantors against remotely possible, but not scientifically-verifiable, side-effects of prescription drugs, a result that could have a "significant anti-utilitarian effect." See Feldman, supra, 125 N.J. at 162, 592 A.2d 1176 (Garibaldi, J., dissenting); see also Michael D. Green, Statutory Compliance and Tort Liability: Examining the Strongest Case, 30 U.Mich. J.L. Ref. 461, 466-67 (1997) (noting that over deterrence in drug advertising context could impede and delay manufacturers from research and development of new and effective drugs, force beneficial drugs from market, lead to shortages in supplies and suppliers of pharmaceuticals, and create unnecessary administrative costs).

[Perez, supra, 161 N.J. at 25.]

13

liability of a manufacturer for failure to warn that Declomycin could cause tooth staining. Id at

147. Further, Lederle argued that remand of the Feldman case for retrial would be futile in light

of the presumption established by the New Jersey Product Liability Act. Again, the Court

disagreed, finding that the Act's "plain language defies the conclusion that the presumption

cannot be overborne." Id. at 157. Moreover, the Court noted:

> Once the determination goes to the jurors, irrespective of an instruction from the court,
> they are free to disregard evidence of "approval" by the FDA. Cf. McCormick on
> Evidence § 344, at 978-79 (E. Cleary 3rd ed. 1984) (discussing instructions to jury when
> there is a presumption).
>
> [Id.]

As a consequence, an argument can be made, as plaintiffs have in connection with their

discovery application, that Roche-New Jersey can be charged with knowledge of an association

between ingestion of Accutane and the risk of suicide so long as that association was recognized

within the pharmaceutical industry. See Coffman v. Keene Corp. 133 N.J. 581, 599 (1993) ("[I]n

a failure-to-warn context, we impose on the plaintiff a very low threshold of proof in order to

impute to a manufacturer sufficient knowledge to trigger the duty to provide a warning of the

harmful effects of its product. The plaintiff need not prove that the defendant manufacturer was

cognizant of a defect, but rather that knowledge of the defect existed within the relevant

industry").[8] See also, Feldman, supra, 97 N.J. at 453.

It should also be noted that the FDA presently requires that "labeling shall be revised to

_____

[8] Defendants argue that since plaintiff need not prove knowledge on the part of Roche-
New Jersey, discovery of information possessed by the French manufacturer of Roaccutane is
irrelevant. In making this argument, defendants fail to consider the strength that would be added
to plaintiffs' case by more specific evidence of the French experience and by any documents
existing in France that establish knowledge in the United States of French investigations and
label changes.

14

include a warning as soon as there is reasonable evidence of an association of a serious hazard

with a drug: a causal relationship need not have been proved." 21 C.F.R. § 201.57(e).[9] As a

consequence, plaintiffs may argue that the warning accompanying Accutane was not in

compliance with the FDA's requirements.

G.   Case Law Applicable to Plaintiffs' Discovery Motion

Defendants have repeatedly noted that the discovery sought by plaintiffs is from entities

that are not parties to this suit.  However, evidence suggests that there may be no jurisdictional

impediment to suing at least some of the European parties in this country.  A basis for a finding

of jurisdiction in the United States over Roche-Switzerland arguably can be found as the result of

its use of The Roche Group as its worldwide communications medium, with effects extending

into this country.  Cf. Jacobs v. Walt Disney World, Co., 309 N.J. Super. 443 (App. Div. 1998).

Similarly, jurisdiction in the United States may exist over F. Hoffmann La Roche, since existing

evidence supports a finding that it is the entity that acts as The Roche Group, holding copyrights

to its materials, providing Headquarters to the Group, and assuming the duties of Group

Contact.[10]  Plaintiffs may therefore seek to minimize their discovery difficulties[11] by naming

---

[9] Prior versions of the regulation required warning of possible adverse side effects as soon as reasonably feasible and based on "reasonable evidence."  See Feldman, supra, 125 N.J. at 157, quoting 21 C.F.R. § 201.57(e) (1990).

[10] Since the jurisdictional issue has not been raised, and no opportunity to counter plaintiffs' evidence has been presented, the issue will not be resolved definitively herein.

[11] An argument could be made, however, that if information were sought directly from the European Roche entities, utilization of the discovery procedures mandated by the Hague Evidence Convention would be required, since, despite the finding of the United States Supreme Court in Societe Nationale Industrielle Aerospatiale v. United States District Court, 482 U.S.

15

those parties as defendants for purposes of discovery only. See, e.g. Arcell v. Ashland Chemical

Co., Inc., 152 N.J. Super. 471, 507 (Law Div. 1977) ("Several cases have allowed the equitable

bill of discovery where the party from whom discovery was sought had a pecuniary interest in the

outcome of the action at law or was in possession of information vital to the prosecution or

defense of the legal action which information could not be obtained from any other source.")

Plaintiffs, however, do not argue in this motion that they should be permitted to name the

European entities as parties and to obtain discovery on that basis. Rather, plaintiffs argue that

they are entitled to discovery of European documents through Roche-New Jersey as the result of

that entity's access to or control over the European discovery materials. Structurally, plaintiffs

claim access or control by a subsidiary over documents in the possession of a parent (or a parent-

like non-entity) and of sister entities.

N.J. Court R. 4:18-1, like its federal counterpart, Fed.R.Civ.P. 34, provides for discovery

of documents in the "possession" or "control" of the entity from which discovery is sought.

Similarly, New Jersey case law provides for discovery of that breadth in a variety of contexts.

See, e.g., Gross v. Kennedy, 15 N.J. Super. 118 (Law Div. 1951) (ordering examination of the

books and records of a non-party corporation and its affiliates on a finding that good cause had

---

522, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987) that use of the Convention's procedures was not
necessarily either mandatory nor a prerequisite to utilization of other means of discovery, the
most recent case in New Jersey addressing the issue has taken a more restrictive view, requiring
use of the Convention "unless it is demonstrated that its use will substantially impair the search
for truth . . . or will cause unduly prejudicial delay." See Husa v. Laboratoires Servier SA, 326
N.J. Super. 150, 156 (App. Div.1999). But see Moake v. Source Intern. Corp., 263 N.J. Super.
455 (App. Div.1993). The difference between the two decisions appears to be based upon the
interests that the court sought to protect. In Moake, the court focused on protecting American
consumers from defective products (263 N.J. Super. at 460), whereas in Husa, the court focused
on achieving "a cosmopolitan approach to litigation arising out of the global economy" and
"sensitivity to the concerns of our trading partners." 326 N.J. Super. at 157.

been shown for the relief, that neither the corporation nor its affiliates had demonstrated that it would be unduly affected by the disclosure, and that the books and records were in the control of the corporate owner named as an individual defendant in the case); D'Agostino v. Johnson & Johnson, 242 N.J. Super. 267 (App. Div. 1990) (requiring that defendant J & J produce executives of European subsidiaries for their depositions, finding those executives to be under J & J's control because of J & J's ownership of the subsidiaries, a common identity between officers of the subsidiaries and J & J, and evidence that the subsidiaries shared in financial arrangements and reported back to J & J headquarters in New Jersey).  Nonetheless, no New Jersey case has addressed the issue of control in a context similar to that presented in this case.

Federal precedent is more closely on point.  In a number of cases, the federal courts have permitted discovery of documents maintained by foreign non-party parents, finding control of those documents by subsidiaries, and courts have permitted discovery of documents maintained by sister corporations under similar reasoning.  See e.g., Alimenta (U.S.A.), Inc. v. Anheuser-Busch Companies, Inc., 99 F.R.D. 309 (N.D.Ga. 1983) (sister); Cooper Industries, Inc. v. British Aerospace, Inc., 102 F.R.D. 918 (S.D.N.Y. 1984) (parent); Camden Iron and Metal, Inc. v. Marubeni America Corporation, 138 F.R.D. 438 (D.N.J. 1991) (parent); Alcan International Limited v. S.A. Day Manufacturing Co., Inc., 176 F.R.D. 75 (W.D.N.Y. 1996) (sister); Uniden American Corporation v. Ericsson Inc., 181 F.R.D. 302 (M.D.N.C. 1998) (sister).

Control has been defined "not only as possession, but as the legal right to obtain the documents requested on demand."  In re Folding Carton Antitrust Litigation, 76 F.R.D. 420, 423 (N.D.Ill. 1977), cited in a discussion of control in Gerling International Insurance Co. v. Commissioner of Internal Revenue, 839 F.2d 131, 140 (3d Cir. 1988).  See also, Securities and

Exchange Commission v. Credit Bancorp, Ltd., 194 F.R.D. 469, 471 (S.D.N.Y. 2000) (noting

that "control" has been broadly construed by the courts "as the legal right, authority, or practical

ability" to obtain the requested materials); Camden Iron, supra 138 F.R.D. at 441-42. "The

location of the documents, whether within the territorial jurisdiction of the court or not, is

irrelevant." Gerling, supra, 839 F.2d at 140.

What a review of the cases analyzing the issue of control makes clear is that the issue is

an intensely fact-sensitive one that requires close examination not only of the structural

relationships between corporations but also of their business dealings and the practical effects of

the acts of one upon the other.  As stated by the court in Alcan:

> When considering whether information sought from a corporate party's foreign
> affiliate is in the party's "custody and control" so as to be discoverable under the Federal
> rules, the focus is on the nature of the relationship between the two corporations.
> Addamax Corp.[v. Open Software Foundation, Inc., 148 F.R.D. 462, 465 (D. Mass.
> 1993)]; Afros S.P.A. v. Krauss-Maffei Corp., 113 F.R.D. 127, 129-30 (D.Del. 1986).  In
> each case, "it is the nature of the transactional relationship between the [corporate
> entities] that is pivotal.  The court must examine the facts of the case before it in order to
> determine if the relationship is such that [discovery] is to be compelled.  Addamax Corp.,
> supra at 467.

[Alcan, supra, 176 F.R.D. at 78.]

When that examination is undertaken in this case, it becomes clear that channels of

communication extend and for a considerable time have extended upward from the various

Roche pharmaceutical subsidiaries worldwide to The Roche Group in Basel. Without that

communication, it would have been impossible for Roche to create the consolidated reports that

have been described at the beginning of this opinion.  It can also be inferred that The Roche

Group (or Roche-Switzerland) and its constituent companies derive enormous economic benefit

from their portrayal as a monolithic entity, since by these means Roche can aggregate sales,

18

profits, employees, holdings, products, and scientific advances and can broadcast that aggregate information to world financial markets, investors, competitors, and consumers. Roche-New Jersey acts for the benefit of The Roche Group in this regard by supplying to The Roche Group the information that constitutes a foundation for its unified reporting. Undoubtedly, Roche-France operates similarly. Compare, Gerling, supra, 839 F.2d at 141 (denying discovery of sister corporation in part because there was no evidence that one corporation had acted for the benefit of the other).

Indeed, documents generated on behalf of The Roche Group would lead one to believe that Roche, and its Pharmaceuticals Division, operate as a single functioning unit. In Alcan, a similar, but actual rather than virtual relationship was found to be a ground for compelling discovery from Solvay Fluor, the German affiliate of SPC, a corporate plaintiff in the case.

> Both SPC and Solvay Fluor are corporate members of a unified worldwide business entity known as the "Solvay Group" . . . under the common control of Solvay, S.A. (Belgium). The Solvay Group issues a consolidated annual financial report . . . . Both SPC and Solvay Fluor use the same corporate logo in their promotional materials . . . . Mr Oetterer, SPC's President and Mr. Lamprect, SPC's product manager for [the product at issue], each testified that he has regular contact with Solvay Fluor regarding product sales and marketing . . . .
>
> [Alcan, supra, 176 F.R.D. at 79.]

Cf. also, In re Uranium Antitrust Litigation, 480 F. Supp. 1138 (N.D.Ill. 1979) (ordering discovery from a non-party affiliate when the corporations operated as a single functional unit.) Although it appears that each of the entities involved in this litigation maintains a separate corporate existence, in its promotional materials, Roche has ignored that legal fact, thereby opening itself to discovery requests such as that herein.

Finally, it is clear from the discovery conducted to date that The Roche Group possesses,

or has the ability to possess, detailed current and historical scientific and regulatory data regarding its pharmaceutical products, worldwide.

The question then becomes: what right of access does Roche-New Jersey have to this pool of information? As plaintiffs suggest, a principal source of power arises from the obligation of Roche-New Jersey, imposed by the Federal Food and Drug Administration, to conduct worldwide post-marketing surveillance, evaluation and reporting of adverse events related to its pharmaceutical products, including Roaccutane/Accutane. See 21 C.F.R. § 314.80 (Postmarketing reporting of adverse drug experiences). Thus there must be access to the documents when the need arises in the ordinary course of business. Gerling, supra, 839 F.2d at 140-41; Camden Iron, supra, 138 F.R.D. at 441-42. Indeed, discovery has demonstrated that when the FDA was finally apprised of the 1997 French labeling change for Roaccutane, the FDA demanded information regarding it from Roche-New Jersey. As in Alcan and in Cooper Industries, it is "inconceivable" that Roche-New Jersey would not have access to the information that plaintiffs seek and the ability to obtain it, not only for the purpose of defending plaintiffs' claims in this litigation, but also for the purpose of conducting its pharmaceutical business and complying with governing federal regulations. Alcan, supra, 176 F.R.D. at 79, Cooper Industries, supra, 102 F.R.D. at 919-20; Credit Bancorp, supra, 194 F.R.D. at 472; Gerling, supra, 839 F.2d at 141, citing First National City Bank v. Internal Revenue Service, 271 F. 2d 616, 618 (2d Cir. 1959), cert. denied 361 U.S. 948, 80 S.Ct. 402, 4 L.Ed.2d 381 (1960) "(Where there is access to the documents when the need arises in the ordinary course of business, there is sufficient control when the need arises because of governmental requirements)".

Moreover, as the deposition of Michael Bailey discloses, these types of documents are

ones with which he presently works on a daily basis in his role as a global regulatory leader in

charge of Roaccutane/Accutane.  See Cooper Industries, supra, 102 F.R.D. at 919-20.

Further, an argument can be made that, by portraying itself in advertising and promotional

materials as a worldwide entity comprised of "divisions" and "units" within those divisions, and

not as an agglomeration of separate, independently-controlled corporations located in various

spots around the globe, Roche opened itself up to discovery that transcends national boundaries.

As noted in another context by the New Jersey Supreme Court:

> In the development of products liability law, the role of advertising has been a significant factor in defining the duties of sellers.
>
> An early, but important, example is Henningsen v. Bloomfield Motors Inc. [32 N.J. 358, 161 A.2d 69 (1960)] the seminal case marking "the date of the fall of the citadel of privity," in which the Court recognized the "advent of large scale advertising by manufacturers" as a basis for reconsidering the long-standing privity rule in warranty cases.  The general principle recognized in Henningsen – that a manufacturer's duty runs directly to the consumer when it markets its products directly to the consumer – is as applicable today to prescription drug manufacturers who advertise their products as it was to automobile manufacturers three decades ago in Henningsen.
>
> [Perez v. Wyeth Laboratories Inc. 161 N.J. 1, 21 (1999) quoting Schwartz, "Consumer-Directed Prescription Drug Advertising and the Learned Intermediary Rule," 46 Food Drug Cosm. L.J. [829] at 840-41 (1991)(footnotes omitted).]

Although the Perez Court spoke of the effect of advertising on notions of privity in a warranty

context, the rationale behind its observations is equally pertinent to a consideration of the effect

of advertising and promotion on the concomitant obligation to produce discovery.  As a

consequence, I find a right of access to documents maintained or available to The Roche Group

through Roche-Switzerland and/or F. Hoffman-La Roche Ltd. to exist in this case.

As a final matter, the cases that have been discussed establish that a right of access exists

to written or electronic communications[12] between the defendant Roche entities and Roche-France and to shared information that relates to investigation of the effects of Roaccutane and the determination to add suicide to the list of the drug's enumerated risks. See Uniden, supra, 181 F.R.D. at 308. Representatives of Roche-New Jersey have professed to have no knowledge of the information that plaintiffs seek. Yet, if Roche-New Jersey is incorrect, and if the information were once in its possession but has been lost or destroyed, it cannot avoid discovery by such means. As stated in a related context in Cooper Industries:

> Defendant cannot be allowed to shield crucial documents from discovery by parties with whom it has dealt in the United States merely by storing them with its affiliate abroad. Nor can it shield documents by destroying its own copies and relying on customary access to copies maintained by its affiliate abroad. If defendant could so easily evade discovery, every United States company would have a foreign affiliate for storing sensitive documents.

[Id., 102 F.R.D. at 920.]

At present, plaintiffs have been unable to verify whether a collaboration existed between the French and American entities, based on their shared interest in governmental approval and marketing of isotretinoin-containing products. The witnesses provided by Roche have been too recently hired to have actual knowledge of any such relationships, and corporate recollection has been poor. Nonetheless, plaintiffs are entitled to the discovery that would substantiate or defeat their contention that such a collaboration existed.

_____

[12] There is no doubt that electronic mail, or documents that have been stored electronically, are discoverable in hard copy or electronic form. See e.g., McPeek v. Ashcroft, 202 F.R.D. 31 (D.D.C. 2001); In re Brand Name Prescription Drugs Antitrust Litigation, 1995 WL 360526 (N.D.Ill. 1995); Anti-Monopoly, Inc. v. Hasbro, Inc., 1995 WL 649934 (S.D.N.Y. 1995); Linnen v. A. H. Robins Company, Inc., 1999 WL 462015 (Mass. Super. Ct. 1999).

22

G.    Applicability of the Hague Evidence Convention

Defendants claim in this case that, because the documents that are being sought are in the

possession of European entities that are not parties to the litigation, any discovery of those

materials can proceed only by use of the Hague Evidence Convention.  If plaintiffs were to

proceed directly against the European entities, defendants would be correct.  See, e.g., Knight v.

Ford Motor Company, 260 N.J. Super. 110, 119 n.11 (Law Div. 1992) ("If jurisdiction does not

exist over a foreign party, obviously there can be no merits discovery under the rules of a court

that lacks jurisdiction, and the Convention may provide the only recourse for obtaining

evidence."); In re Honda Motors Co. Dealership Relations Litig., 168 F.R.D. 535, 540 (D. Md.

1996); Triple Crown American Inc. v. Biosynth AG, 1998 WL 227886 (E.D. Pa. 1998); Cooper

Industries, supra, 102 F.R.D. at 919, 920.

However, when the discovery is sought from companies located in the United States

because of their access to or control over foreign materials, the Hague Convention need not be

employed. As stated in the context of the Federal Rules in Alcan:

> The ordinary discovery provisions of the Federal Rules of Civil Procedure, rather
> than the more complicated procedures of the Hague Convention, generally apply to the
> discovery of information in the custody or control of a party's foreign affiliate.  See, e.g.,
> Societe Nationale Industrielle Aerospatiale v. United States District Court for the
> Southern District of Iowa, 482 U.S. 522, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987); see also
> International Society for Krishna Consciousness v. Lee, 105 F.R.D. 435, 445 (S.D.N.Y.
> 1984); Cooper Industries, Inc. v. British Aerospace, 102 F.R.D. 918, 919-20 (S.D.N.Y.
> 1984).

[Alcan, supra, 176 F.R.D. at 78]

Cf. also,  D'Agostino, supra, 242 N.J. Super. at 279 (although deponents will lose the protection

of Swiss laws precluding depositions, unfair prejudice will not result because defendants are

23

"merely being made subject to the same discovery procedures as all other litigants in New Jersey.")

H.     Conclusion

For the reasons set forth above, I find that plaintiffs have met their burden of demonstrating that the types of documents that they seek are relevant to the within matter, and that they lie within the access or control of defendants Hoffmann La Roche, Inc. and Roche Laboratories. See Credit Bancorp, supra, 194 F.R.D. at 472; Camden Iron, supra, 138 F.R.D. 442 (discussing burden of proof). For that reason, plaintiffs' discovery motion, insofar as it relates in principle to discovery from foreign Roche entities is granted, and defendants' cross-motion for a protective order is denied.

Although I have found the right to discovery to exist, the details of that discovery remain unexamined. Plaintiffs are therefore directed to consult with defendants with a view toward reaching agreement with respect to the scope of the discovery to be ordered. Any remaining disputes will be resolved by the court in conformity with the principles established above.

_____
Edith K. Payne, J.S.C.

DATED:     January 19, 2002

24