UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x<br>In re:  NEURONTIN MARKETING, SALES PRACTICES,<br>         AND PRODUCTS LIABILITY LITIGATION<br><br>- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x<br>THIS DOCUMENT RELATES TO:<br><br>HARDEN MANUFACTURING CORPORATION;<br>LOUISIANA HEALTH SERVICE INDEMNITY COMPANY,<br>dba BLUECROSS/BLUESHIELD OF LOUISIANA;<br>INTERNATIONAL UNION OF OPERATING ENGINEERS,<br>LOCAL NO. 68 WELFARE FUND; ASEA/AFSCME LOCAL<br>52 HEALTH BENEFITS TRUST; GERALD SMITH; and<br>LORRAINE KOPA, on behalf of themselves and all others<br>similarly situated, v. PFIZER INC. and WARNER-LAMBERT<br>COMPANY.<br><br>- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x | MDL Docket No. 1629<br><br>Master File No. 04-10981<br><br>Judge Patti B. Saris<br><br>Magistrate Judge Leo T. Sorokin |

**DEFENDANTS' RESPONSE TO PLAINTIFF BCBSLA'S MOTION FOR
RECONSIDERATION OF ORDER GRANTING SUMMARY JUDGMENT**

Defendants Pfizer Inc and Warner-Lambert Company LLC (collectively, "Pfizer" or "Defendants"), respectfully respond to the Motion for Reconsideration [3178] ("Reconsid. Mot.") submitted by Plaintiff Louisiana Health Service Indemnity Company d/b/a BlueCross/BlueShield of Louisiana ("BCBSLA").

**INTRODUCTION**

This Court granted summary judgment against all of the Class Third-Party Payor Plaintiffs, including BCBSLA, because they "cannot establish causation." *In re Neurontin Mktg. & Sales Practices Litig.*, No. 04-cv-10981, 2010 WL 5037005, at *11 (D. Mass. Dec. 10, 2010).

> Because the Class TPP Plaintiffs have not directly relied on misrepresentations by defendants, and because they have presented no evidence as to how many or which physicians who prescribed Neurontin to their members relied on fraud, they cannot establish causation.

*Id.* BCBSLA now moves for reconsideration. Without identifying any change in the controlling

law or newly-discovered evidence,[1] BCBSLA simply asks for a do-over of its entire case. In support of this extraordinary request, BCBSLA offers nothing more than four pages of revisionist history and fails to candidly address, much less distinguish, the prior positions it took and inconsistent statements it made.

BCBSLA now insists it presented evidence that it directly received and relied on misrepresentations by Pfizer when making formulary decisions regarding Neurontin. (*See* Reconsid. Mot. at Section II.) BCBSLA also speculates that its non-party pharmacy benefit managers ("PBMs") may have received and relied on such misrepresentations. (*See id.* at 2-3.) Pfizer addresses these contentions in greater detail below. But details are academic because BCBSLA categorically disavowed any such theories in the strongest possible terms while Pfizer's summary judgment motion was pending. In their motion for reconsideration of this Court's class certification denial, the Class TPPs – including BCBSLA – made the following binding and unequivocal admissions:

> ***[F]ormulary placement is entirely irrelevant to the Class TPPs' claims***. Defendants admitted as much in their recently-filed Reply Memorandum of Law in Support of Defendants' Motion for Summary Judgment (Dkt. No. 1785): "Three of the named TPPs – BCBSLA, ASEA, and Harden [i.e., the TPP class representatives] – do not even argue that Defendants made misrepresentations directly to them or that they based their formulary decisions on any such misrepresentations. ***Instead, their claims are based entirely on the purported effect of marketing statements on 'physicians***.'"
>
> As Defendants point out, Class Plaintiffs do not rely on a ***different*** causation theory for the TPP Class. Unlike the Coordinated Plaintiffs, Class Plaintiffs have ***never*** alleged or argued that Defendants misled the TPP Class Representatives or (absent class members) into giving Neurontin preferential treatment on their formularies, or of causing them to pay for the drug when they otherwise would not have.

---

[1] As the First Circuit has explained, "reconsideration is 'an extraordinary remedy which should be used sparingly.'" *Palmer v. Champion Mortgage*, 465 F.3d 24, 30 (1st Cir. 2006) (citation omitted). Reconsideration should not be granted unless the movant "demonstrate[s] either that newly discovered evidence (not previously available) has come to light or that the rendering court committed a manifest error of law." *Id.* BCBSLA does neither. Its motion for reconsideration does not identify any newly discovered evidence or argue that this Court's legal reasoning was manifestly erroneous.

(Class Pls. Mot. Recons. Order Denying Renewed Mot. Class Cert. [1796] at 16 (second emphasis added, footnote omitted).)  It is far too late for BCBSLA to assert a formulary placement theory of causation.  As the First Circuit has made clear:

> Litigation is not a game of hopscotch. . . .  Litigants normally must frame the issues in a case before the trial court rules.  After that point, a litigant should not be allowed to switch from theory to theory like a bee in search of honey.

*Cochran v. Quest Software, Inc.*, 328 F.3d 1, 11 (1st Cir. 2003) (affirming denial of reconsideration).

BCBSLA's remaining arguments fare no better.  BCBSLA argues that discovery should be reopened so that it can depose non-party prescribing doctors, and take additional depositions of its non-party PBMs, to see whether they relied on any allegedly fraudulent marketing.  Notably, BCBSLA does not claim to have ever sought or been denied such depositions before fact discovery closed on October 15, 2007.  (Discovery Order No. 13 [801].)  Nor did BCBSLA ever argue, under Federal Rule of Civil Procedure 56(f), that it needed such discovery in order to respond to Pfizer's summary judgment motion.

Moreover, both of these untimely discovery requests relate to causation theories and litigation strategies that BCBSLA never pursued – and expressly disavowed – prior to summary judgment.  BCBSLA did not seek depositions of its PBMs regarding their formulary decisions because, as discussed above, "*formulary placement is entirely irrelevant to [its] claims*."  (Class Pls. Mot. Recons. Order Denying Renewed Mot. Class Cert. [1796] at 16 (emphasis in original).)  And far from seeking discovery from individual prescribing doctors, BCBSLA successfully ***opposed Pfizer's request*** for such discovery and elected instead to rely exclusively on aggregate causation evidence.[2]  The Court noted on the record that BCBSLA had "waived an individualized approach to the doctors,"[3] and specifically warned that "[i]f you're going to rely on the industrywide data, just understand that if [Defendants] attack it and you don't have

---

[2] *See* Pls.' Objs. Disc. Order No. 4 [462] at 2.

[3] Dkt. 745, 5/4/07 Hearing Tr. at 26:7-10, 31:8-10.

3

anything to counter it with, you may lose."[4]  This is precisely what occurred.  BCBSLA's effort to avoid the legal consequences of its own class action litigation strategy is not grounds for reconsideration.

Finally, BCBSLA argues that its unjust enrichment claim should be allowed to proceed despite its failure to present evidence of causation.  But as discussed below, this Court's causation analysis applies with equal force to BCBSLA's unjust enrichment claim.

## ARGUMENT

### I. BCBSLA Never Asserted, And Expressly Disavowed, Any Claim Of Direct Reliance

#### A. BCBSLA Never Identified Any Representations Made To It And Admitted That It Never Made Any Formulary Decisions Regarding Neurontin

Previously, in order to avoid individual issues of reliance that would undermine its motion for class certification, BCBSLA unequivocally disavowed any direct-reliance or formulary-placement theory of causation.  (*See supra* at 2; *see also* Oct. 15, 2009 Tr. [2190] at 7:14-16 (Proposed class counsel:  "[W]e're not relying on any false and misleading representations that the defendants made that affected placement on the formulary.").)  Faced with the consequences of its strategic decision, BCBSLA now claims that it "did offer evidence that members of its internal pharmacy and therapeutics committee had direct contact with defendants' representatives who delivered fraudulent messages regarding off-label uses of Neurontin," and that "BCBSLA relied on that information."  (Reconsid. Mot. at 2.)  BCBSLA attempts to support this blatant mischaracterization of the record by citing its statements of fact in opposition to summary judgment.  (Reconsid. Mot. at 2 (citing Class Pls' State't of Disputed & Undisputed Material Facts [1760] ("Class SOF") ¶¶ 754-766).)  There, BCBSLA generically asserted that it has "always been directly marketed to" by pharmaceutical companies including Pfizer and that it "relies on all information it receives from drug manufacturers."  (Class SOF

---

[4] Dkt. 503, 9/27/06 Hearing Tr. at 54:3-6.

¶¶ 754-55.)[5]  Far from overlooking these assertions, the Court quoted them in its opinion.  *See Neurontin*, 2010 WL 5037005, at *6 (quoting Class SOF ¶ 755).  But BCBSLA did not identify a single representation made to it by Pfizer.  And as the Court observed, BCBSLA did not claim to have "relied on any specific fraudulent representations or omissions from Pfizer in choosing to keep Neurontin on the preferred tier of its formulary."  *Id.*

In any event, BCBSLA cannot claim to have relied on any "fraudulent messages" when making formulary decisions because BCBSLA never made any formulary decisions regarding Neurontin.  When Neurontin was added to its formulary, BCBSLA did not even have its own P&T Committee.  Instead, "BCBSLA adopted the Medco formulary, which was entirely controlled by Medco and Medco's P&T committee."  (Class SOF ¶ 720.)  Later, "[i]n 1999, BCBSLA formed its P&T committee."  (*Id.* ¶ 718.)  But between then and February 2002, "the P&T Committee at BCBSLA *made no decisions* on drugs, but was a *token committee*, existing to comply with Blue Cross regulations."  (*Id.* ¶ 730 (emphasis added).)  At some point thereafter, BCBSLA's P&T committee began to "review *new drugs* to determine at which tier a drug would be placed, *e.g.* whether it would be a preferred brand or a nonpreferred brand."  (*Id.* ¶ 736 (emphasis added).)  But "BCBSLA's P&T committee *did not review Neurontin* because it was already included on the Medco formulary."  (*Id.* ¶ 738 (emphasis added).)

### B. BCBSLA Always Maintained An Open Formulary And Never Used Formulary Controls To Restrict Off-Label Prescribing Or To Control Cost

BCBSLA now claims that its "formularies . . . could have been used to restrict off-label uses of Neurontin, and/or reduce the amounts paid for Neurontin by changing Neurontin's status on those formularies."  (Reconsid. Mot. at 2.)  This flatly contradicts BCBSLA's statements of

---

[5] BCBSLA also claimed that one of its clinical pharmacists, Imelda Coleman, was detailed regarding off-label Neurontin use "*prior to her joining BCBSLA*." (Class SOF ¶ 756 (emphasis added).) But BCBSLA did not claim to have relied on any statements purportedly made to Ms. Coleman before her employment there. In claiming that it "relies on all information it receives from drug manufacturers" (*id.* ¶ 755), BCBSLA was explicitly referring to its prior contention that "BCBSLA has always been directly marketed to by [drug companies]" (*see id.* ¶ 754), not to its subsequent contentions regarding Ms. Coleman (*see id.* ¶¶ 756-66).

5

fact in opposition to summary judgment.  There, BCBSLA judicially admitted that "[its] formulary was always an open formulary under Medco, and BCBSLA still maintains an open formulary, in which all drugs are covered, unless they are specifically excluded in the member contract."  (Class SOF ¶ 741.)  Maintaining an open formulary means that BCBSLA "pay[s] for all FDA approved drugs regardless of the formulary status of the drug."  (*Id.* ¶ 719.)  "BCBSLA considered implementing a closed formulary when implementing Medicare Part D in January 2006," but determined that "[a] closed formulary created too many complications operationally and was not competitive in the Louisiana marketplace."  (*Id.* ¶¶ 748-49.)  "BCBSLA has never considered excluding any drugs based on efficacy because it presumes that a drug is efficacious for its FDA approved indication."  (*Id.* ¶ 752.)  In short, BCBSLA's formulary "was not used to prevent or limit the payment of drugs prescribed for off-label uses."  (*Id.* ¶ 722.)

### C. BCBSLA Has No Basis For Suggesting That Its PBMs Received Or Relied On Any Fraudulent Representations

BCBSLA cites deposition testimony stating that a Parke-Davis national account manager was assigned to one or more of its PBMs.  (*See* Reconsid. Mot. at 2 & n.1.)  Based solely on this testimony, BCBSLA speculates that the account manager may have "provided information and materials to the PBM and their P&T committee, including information and materials regarding fraudulent off-label uses of Neurontin."  (*Id.*)  In reality, BCBSLA has no idea what information or materials its PBMs received, nor did BCBSLA pursue any such evidence before discovery closed.  Admitting this, BCBSLA argues that it

> should be allowed to take the fact depositions of each of its PBM's P&T committee members to determine what information and materials they received from Defendants regarding off-label uses of Neurontin, and whether or not those committee members relied upon any fraudulent information [in making formulary decisions or recommendations].

(Reconsid. Mot. at 2-3.)  Of course, BCBSLA never sought such discovery before the fact discovery deadline or even before Defendants' motion for summary judgment was filed.  And it never argued that it needed such discovery in order to respond to Defendants' motion for summary judgment.  Indeed, BCBSLA has not shown that it could not have obtained affidavits

6

from its PBMs without the need for formal discovery. BCBSLA's desire to go on a fishing expedition in hopes of finding evidence more than three years after the close of discovery to support a new causation theory that it previously disavowed is not grounds for reconsideration.

### D. BCBSLA Admitted That Its PBMs Never Made Any Recommendations To It Regarding Neurontin

BCBSLA belatedly seeks discovery to determine whether its PBMs relied on any fraudulent marketing "in making any recommendations to BCBSLA about instituting and [*sic.*] cost control mechanisms for Neurontin." (Reconsid. Mot. at 2-3.) But it is undisputed that the PBMs made no such recommendations. Instead, "changes were *unilaterally* made to the formulary by Medco. BCBSLA offered opinions and if it objected to changes, Medco exercised its right under the contract to make changes notwithstanding BCBS's opinions." (Class SOF ¶ 734 (emphasis added).) In 2004, BCBSLA switched control over its formulary from Medco to another third-party PBM called Express Scripts. (*Id.* ¶ 742.) But "[t]he only communication about Neurontin between Express Scripts and BCBSLA that directly affected client benefits was a request to make Neurontin nonformulary when the generic became available." (*Id.* ¶ 745.)

### II. The Class TPPs Blocked Discovery Of Prescribing Doctors And Chose To Rely Exclusively On Aggregate Causation Evidence

BCBSLA claims to have presented evidence that several physicians who prescribed Neurontin off-label to BCBSLA's insureds "were detailed by Pfizer and received materials containing and were told fraudulent messages regarding off-label uses of Neurontin." (Reconsid. Mot. at 3.) In reality, BCBSLA merely cited "call notes" that purportedly referenced detailing visits to various doctors. (Class SOF ¶¶ 779-805.) Far from overlooking these assertions, the Court cited and discussed them in its opinion. *See Neurontin*, 2010 WL 5037005, at *7. But these call notes do not show that any fraudulent statements were made or that any fraudulent materials were provided to these doctors, nor do they show what these doctors relied on such statements or materials in making prescription decisions. At most, BCBSLA presented evidence of "run-of-the-mill off-label detailing." *Id.* at *10. As the Court correctly held, BCBSLA

"presented no evidence as to how many or which physicians who prescribed Neurontin to their members relied on fraud." *Id.* at *11.

Having speciously argued that context-free call notes are sufficient proof of causation, BCBSLA immediately contradicts itself by conceding that each prescribing doctors' testimony would be necessary to "determine whether or not those physicians indeed relied upon" any purported fraudulent statements. (Reconsid. Mot. at 3.) But as BCBSLA points out, "***[t]hese prescribers have not been deposed.***" (*Id.* (emphasis added).) BCBSLA appears to believe that the Court and Pfizer will somehow forget that it was **BCBSLA** and the other TPP Plaintiffs who vigorously and successfully opposed individual-doctor discovery and agreed instead to live or die based on aggregate causation evidence.

In July 2006, Pfizer filed a motion to compel discovery from BCBSLA and the other TPP Plaintiffs, seeking the production of medical records, including handwritten notes of prescribing decisions, that Pfizer explained would show "whether defendants' alleged misrepresentations . . . or something else caused the prescription[s]" at issue. (Def. Mem. Supp. Mot. to Compel [403] at 2.) Magistrate Judge Sorokin granted Pfizer's motion in part, but BCBSLA and the other TPP Plaintiffs objected, characterizing the Magistrate Judge's order as an "unprecedented intrusion into the private medical and psychiatric records of thousands of non-parties to this litigation." (Pls.' Objs. Disc. Order No. 4 [462] at 2.) During the hearing on Pfizer's motion, BCBSLA's counsel repeatedly represented that it would rely exclusively on aggregate data to prove causation.

> THE COURT: And you intend to prove that doctors relied on this information, and they wrote prescriptions they would not otherwise have written based on aggregate market data?
>
> MR. HIMMELSTEIN: Yes, your Honor.
>
> THE COURT: Not based on physician by physician?
>
> MR. HIMMELSTEIN: No, your Honor, we don't intend to prove the case that way. That would be, I think, a fairly hopeless endeavor, given the number of physicians who have written these prescriptions.

8

(9/27/06 Hearing Tr. [503] at 9:15-24; *see also, e.g.*, *id.* at 30:1-15.)

The Court sustained BCBSLA's objections, but advised BCBSLA in no uncertain terms of the possible consequences: "If you're going to rely on the industrywide data, just understand that if [defendants] attack it and you don't have anything to counter it with, you may lose." (*Id.* at 54:3-6.)

Having been duly warned, BCBSLA re-affirmed its willingness "to give up . . . [p]roving the case up on a doctor-by-doctor basis" at the May 2007 hearing on the Class Plaintiffs' first motion for class certification. (5/4/07 Hearing Tr. [745] at 26:7-10.) BCBSLA's counsel repeatedly acknowledged that, if BCBSLA's aggregate causation evidence was insufficient to withstand summary judgment, it could not "prove up a case based just on the doctors who individually got the message." (*Id.* at 24:6-11; *see also id.* at 25:7-13.) As BCBSLA's counsel explained, "[y]ou can't prove it up that way, even if you wanted to, because you'd have to cross-examine . . . the treating physicians." (*Id.* at 26:25-27:2.) Based on this exchange, the Court noted that BCBSLA and the other Class TPPs had "waived an individualized approach to the doctors." (*Id.* at 31:9-10.)

### III.    Summary Judgment Was Properly Granted As To BCBSLA's Unjust Enrichment Claim

BCBSLA argues that its unjust enrichment claim should survive even after its other claims have been dismissed. In support of this argument, BCBSLA simply lists the elements of an unjust enrichment claim and then makes the conclusory assertion that "[a]ll of these elements are satisfied." (Reconsid. Mot. at 3-4.) As an initial matter, this argument is untimely. BCBSLA's summary judgment briefing did not even mention its unjust enrichment claim, let alone argue that unjust enrichment is subject to a different causation analysis than its other claims. Thus, Plaintiffs are improperly seeking reconsideration based on "a new argument that could (and should) have been presented prior to the district court's original ruling." *Cochran*, 328 F.3d at 11.

But even if timely made, any such argument would have been meritless. As this Court

previously held, "[f]or *all of their claims*, plaintiffs will be required to prove that defendants' fraudulent promotion caused physicians to prescribe Neurontin to the plaintiffs for an off-label condition and that they were injured (*i.e.*, suffered economic loss) by virtue of Neurontin's inefficacy for that condition." *In re Neurontin Mktg. & Sales Practices Litig.*, 244 F.R.D. 89, 104 (D. Mass. 2007) (emphasis added).

Courts routinely dismiss unjust enrichment claims based on the same causation analysis applicable to RICO and consumer fraud claims. For example, in *Hood, ex rel. Mississippi v. Eli Lilly & Co.* (In re Zyprexa Prods. Liab. Litig.), 671 F. Supp. 2d 397 (E.D.N.Y. 2009), Judge Weinstein dismissed most claims asserted by the State of Mississippi in its capacity as a TPP. The State had asserted consumer fraud and unjust enrichment claims through which it sought to recover the cost of prescriptions allegedly written as a result of fraudulent marketing. *See id.* at 453. The court held that both of these claims were subject to the "Individualized Proof rule" and, because the plaintiff relied on aggregate evidence, they "d[id] not survive summary judgment." *Id. See also, e.g.*, *In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, No. 2:06-cv-5774, 2010 WL 2346624, at *7, 13 (D.N.J. June 9, 2010) (dismissing plaintiffs' RICO and unjust enrichment claims with prejudice because plaintiffs "fail[ed] to link their off-label purchases to the wrongdoing charged in the Amended Complaint, specifically to misrepresentations about the Subject Drugs"); *Southern Illinois Laborers' & Employers Health & Welfare Fund v. Pfizer Inc.*, No. 08-cv-5175, 2009 WL 3151807, at *3, 7 (S.D.N.Y. Sept. 30, 2009) (dismissing RICO, consumer fraud, and unjust enrichment claims because plaintiffs failed to adequately plead causation); *Pennsylvania Employees Benefit Trust Fund v. Astrazeneca Pharm. LP*, No. 6:09-cv-5003-Orl-22DAB, 2009 WL 2231686, at *6 (M.D. Fla. July 20, 2009) (dismissing TPP's unjust enrichment claim based on same causation grounds as consumer fraud claims).

## **CONCLUSION**

For all the reasons set forth above, BCBSLA's motion for reconsideration is wholly without merit and should be denied. BCBSLA does not even attempt to meet the standards for

reconsideration under Rule 59(e).  Moreover, in light of the clear and absolute positions previously taken by BCBSLA in this litigation − conscious, strategic positions that cannot be reconciled with BCBSLA's current motion − BCBSLA should be ordered to reimburse the Defendants for their reasonable attorneys' fees incurred to respond to this frivolous motion.

Dated: December 30, 2010

Respectfully submitted,

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP

By:    /s/ Mark S. Cheffo
       Mark S. Cheffo

Four Times Square
New York, NY 10036
Tel:  (212) 735-3000
Mark.Cheffo@skadden.com

-and-
ROPES & GRAY LLP

By:    /s/ Ana M. Francisco
       Ana M. Francisco
       BBO # 564346

Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
Tel:  (617) 951-7000
Ana.Francisco@ropesgray.com

*Attorneys for Defendants Pfizer Inc and Warner-Lambert Company LLC*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on December 30, 2010.

/s/ Ana. M. Francisco
Ana M. Francisco