# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| PAULETTE HAMILTON, as Administratrix and Personal Representative of the Estate of DERRICK HAMILTON, Deceased, | § § § § | |
| Plaintiff, | § § | CIVIL ACTION NO. |
| v. | § § § | |
| PFIZER INC., PARKE-DAVIS, a division of·Warner-Lambert Company and Warner-Lambert Company LLC, WARNER-LAMBERT COMPANY, WARNER-LAMBERT COMPANY LLC, IVAX PHARMACEUTICALS, INC., JANSSEN ORTHO LLC, ORTHO-MCNEIL- JANSSEN PHARMACEUTICALS, INC., JOHNSON & JOHNSON PHARMACEUTICAL RESEARCH & DEVELOPMENT, L.L.C., JOHNSON & JOHNSON, ELAN PHARMACEUTICALS, INC., DAINIPPON PHARMACEUTICALS USA CORPORATION and GLENMARK GENERICS INC., USA, | § § § § § § § § § § § § § § § § § | Plaintiff Demands Trial By Jury |
| Defendants. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff, by and through the undersigned attorneys of record, as and for the Verified

Complaint herein allege upon information and belief the following:

### STATEMENT OF THE CASE

1.     This is an action to recover damages for personal injuries sustained by, and the

wrongful death of plaintiff's decedent, DERRICK HAMILTON, as the direct and proximate

result of defendants' wrongful conduct in connection with the designing, developing,

manufacturing, distributing, labeling, advertising, marketing, promoting, and selling of the

prescription drug Neurontin, which was marketed and sold by the defendants, PFIZER INC.,

PARKE-DAVIS, a Division of Warner-Lambert Company and Warner-Lambert Company LLC,

(hereinafter referred to as "PARKE-DAVIS"), WARNER-LAMBERT COMPANY and

WARNER-LAMBERT COMPANY LLC, (hereinafter collectively referred to as "Pfizer

defendants"), and the prescription drug gabapentin, the generic form of Neurontin, which was

marketed and sold by the defendant, IVAX PHARMACEUTICALS, INC., (hereinafter referred

to as "defendant Ivax"),especially for such "off-label" uses as the treatment of trigeminal

neuralgia, even though Neurontin and gabapentin had not received FDA approval for such use,

and at dosages higher than had been approved by the FDA and had been properly tested on

humans, even though the drug had not been tested and studied for such use and had not been

found to be safe and effective at any dosage for the trigeminal neuralgia.

      2.     Plaintiff also seeks to recover damages for personal injuries sustained by, and the

wrongful death of plaintiff's decedent while under the influence of Topamax , which was

designed, developed, manufactured, distributed, labeled, advertised, marketed, promoted, and

sold by the defendants, JANSSEN ORTHO LLC, ORTHO-McNEIL-JANSSEN

PHARMACEUTICALS, INC., JOHNSON & JOHNSON PHARMACEUTICAL RESEARCH

& DEVELOPMENT, L.L.C., and JOHNSON & JOHNSON (hereinafter collectively referred to

as "Janssen defendants").

      3.     Plaintiff also seeks to recover damages for personal injuries sustained by, and the

wrongful death of plaintiff's decedent arising out of the ingestion of the prescription drug

Zonegran, which was marketed and sold by the defendants, ELAN PHARMACEUTICALS,

INC. and DAINIPPON PHARMACEUTICALS USA CORPORATION (hereinafter collectively

referred to as "Elan defendants"), and the prescription drug zonisamide, the generic form of

Zonegran, which was marketed and sold by the defendant, GLENMARK GENERICS INC., USA (hereinafter referred to as "defendant Glenmark").

4      This products liability case arises out of the suicide death of plaintiff's decedent, DERRICK HAMILTON, on May 10, 2008, in Huntsville, Texas.

5.      At the time of his death, plaintiff's decedent was under the influence of a powerful drug which is generally produced and marketed under the brand name "Neurontin," produced and marketed by Pfizer defendants, and under the generic version "Gabapentin," produced and marketed by defendant Ivax. Neurontin and gabapentin are indicated as adjunctive therapy in the treatment of partial seizures with and without secondary generalization, and for the management of postherpetic neuralgia.

6.      At the time of his death, plaintiff's decedent was also under the influence of a powerful drug called "Topamax," also known as "topiramate," produced and marketed by the Janssen defendants. Topamax is an antiepileptic agent indicated for initial monotherapy in patients with partial onset or primary generalized tonic-clonic seizures, adjunctive therapy for patients with partial onset seizures or primary generalized tonic-clonic seizures, and for prophylaxis of migraine headache.

7.      At the time of his death, plaintiff's decedent was also under the influence of a powerful drug which is generally produced and marketed under the brand name "Zonegran," and in the generic version "Zonisamide," produced and marketed by defendant Glenmark. Zonegran and zonisamide are indicated for adjunctive therapeutic use in the treatment of partial seizures.

## PARTIES AND JURISDICTION

8.      Jurisdiction exists as against the defendants, PFIZER INC., PARKE-DAVIS, a division of Warner-Lambert Company and Warner-Lambert Company LLC, WARNER-

3

LAMBERT COMPANY and WARNER-LAMBERT COMPANY LLC, IVAX

PHARMACEUTICALS , INC., JANSSEN ORTHO LLC, ORTHO-MCNEIL-JANSSEN

PHARMACEUTICALS, INC., JOHNSON & JOHNSON PHARMACEUTICAL RESEARCH

& DEVELOPMENT, L.L.C., and JOHNSON & JOHNSON, ELAN PHARMACEUTICALS,

INC., DAINIPPON PHARMACEUTICALS USA CORPORATION and GLENMARK

GENERICS INC., USA pursuant to:

   (a)  28 U.S.C. Section 1332, in that the plaintiff, PAULETTE HAMILTON, is

a citizen and resident of the State of Texas, the plaintiff's decedent, DERRICK HAMILTON,

was a citizen and resident of the State of Texas at the time of his death, the defendant, PFIZER

INC., is incorporated in business in the State of Delaware and maintains its principal place of

business in the State of New York, the defendant, PARKE-DAVIS, is incorporated in the State

of Michigan, and maintains its principal place of business in the State of New Jersey, the

defendant, WARNER-LAMBERT COMPANY, is incorporated in the State of Delaware and

maintains its principal place of business in the State of New Jersey, the defendant, WARNER-

LAMBERT COMPANY LLC, is a limited liability company organized under the laws of the

State of Delaware, whose sole shareholder and member is the defendant, PFIZER INC., the

defendant, IVAX PHARMACEUTICALS, INC., is incorporated in the State of Florida and

maintains its principal place of business in the State of Florida, the defendant, JANSSEN

ORTHO LLC, is a limited liability company organized under the laws of the State of Delaware

and maintains its principal place of business in the State of New Jersey, the defendant, ORTHO-

MCNEIL-JANSSEN PHARMACEUTICALS, INC., is incorporated in the State of Pennsylvania

and maintains its principal place of business in the State of New Jersey, the defendant,

JOHNSON & JOHNSON PHARMACEUTICAL RESEARCH & DEVELOPMENT, L.L.C., is

a limited liability company organized under the laws of the State of New Jersey and maintains its principal place of business in the State of New Jersey, the defendant, JOHNSON & JOHNSON, is a corporation organized under the laws of the State of New Jersey, and maintains its principal place of business in the State of New Jersey, is 100% shareholder of the defendant, JANSSEN ORTHO LLC, which is a wholly owned subsidiary of the defendant, JOHNSON & JOHNSON, and is 100% shareholder of the defendant, JOHNSON & JOHNSON PHARMACEUTICAL RESEARCH & DEVELOPMENT, L.L.C., which is a wholly owned subsidiary of the defendant, JOHNSON & JOHNSON, the defendant, ELAN PHARMACEUTICAL, INC., is a foreign business corporation organized under the laws of the State of Delaware and maintains its principal place of business in the State of California, the defendant, DAINIPPON PHARMACEUTICALS USA CORPORATION, is a corporation organized under the laws of the State of New Jersey and maintains its principal place of business in the State of New Jersey, the defendant, GLENMARK GENERICS INC., USA, is a corporation organized under the State of Delaware, and maintains its principal place of business in the State of New Jersey, and the amount in controversy exceeds the sum of $75,000.00 exclusive of interest and costs.

        (b)    28 U.S.C. Section 1391, in that jurisdiction is founded only on diversity of citizenship, and all defendants are subject to personal jurisdiction in the Judicial District of the County of Walker, State of Texas and may be deemed to reside in the District of Texas.

       9.    That the above-named plaintiff's decedent, DERRICK HAMILTON, was the Husband of the Administratrix above-named, PAULETTE HAMILTON, and on and prior to the 10th May, 2008, plaintiff's decedent resided in Walker County, State of Texas, and the Administratrix resided in Walker County, State of Texas.

10.     That prior to the commencement of this action, by Order of the County Court at Law of Walker County, State of Texas, the plaintiff, PAULETTE HAMILTON, was granted Letters of Administration with respect to the estate of the deceased, DERRICK HAMILTON, on the 6th day of April, 2009, and at all times hereinafter mentioned, duly qualified and entered upon her duties as such Administratrix and is now acting in such capacity. A copy of said Order is attached hereto as Exhibit "A".

11.     That at the time of death on May 10, 2008, plaintiff's decedent was then of the age of 61 years and prior thereto, was generally in good health, industrious and possessed all faculties.

12.     That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., was and still is a foreign corporation organized under the laws of the State of Delaware.

13.     That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., was and still is a foreign corporation authorized to do business in the State of Texas.

14.     That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., was and still is a business entity actually doing business in the State of Texas.

15.     That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, a division of Warner-Lambert Company and Warner-Lambert Company LLC (hereinafter "PARKE-DAVIS"), was and still is a foreign corporation organized under the laws of the State of Michigan.

6

16.     That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, was and still is a foreign corporation authorized to do business in the State of Texas.

17.     That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, was and still is a business entity actually doing business in the State of Texas.

18.     That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY was and still is a foreign corporation organized under the laws of the State of Delaware.

19.     That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, was and still is a foreign corporation authorized to do business in the State of Texas.

20.     That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, was and still is a business entity actually doing business in the State of Texas.

21.     That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, is a division of the defendant, WARNER-LAMBERT COMPANY.

22.     That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, is a subsidiary of the defendant, WARNER-LAMBERT COMPANY.

23.     That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, was and still is a foreign limited liability company organized under the laws of the State of Delaware.

24.     That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, was and still is a foreign limited liability company authorized to do business in the State of Texas.

25.     That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, was and still is a business entity actually doing business in the State of Texas.

26.     That at all times hereinafter mentioned, upon information and belief, the defendant, IVAX PHARMACEUTICALS, INC., was and still is a foreign corporation organized under the laws of the State of Florida.

27.     That at all times hereinafter mentioned, upon information and belief, the defendant, IVAX PHARMACEUTICALS, INC., was and still is a foreign corporation authorized to do business in the State of Texas.

28.     That at all times hereinafter mentioned, upon information and belief, the defendant, IVAX PHARMACEUTICALS, INC., was and still is a business entity actually doing business in the State of Texas.

29.     That at all times hereinafter mentioned, upon information and belief, the defendant, IVAX PHARMACEUTICALS, INC., has its headquarters and principal place of business in the County of Miami-Dade, State of Florida.

30.     That at all times hereinafter mentioned, upon information and belief, the defendant, JANSSEN ORTHO LLC, was and still is a foreign limited liability company organized under the laws of the State of Delaware, and has a place of business at One Johnson & Johnson Plaza, New Brunswick, New Jersey.

8

31.     That at all times hereinafter mentioned, upon information and belief, the defendant, JANSSEN ORTHO LLC, was and still is engaged in the business of designing, developing, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and/or selling Topamax.

32.     That at all times hereinafter mentioned, upon information and belief, the defendant, JOHNSON & JOHNSON, is the 100% shareholder of the defendant, JANSSEN ORTHO LLC., which is a wholly owned subsidiary of the defendant, JOHNSON & JOHNSON.

33.     That at all times hereinafter mentioned, upon information and belief, the defendant, JANSSEN ORTHO LLC, was and still is a business entity actually doing business in the State of New Jersey.

34.     That at all times hereinafter mentioned, upon information and belief, the defendant, ORTHO-McNEIL-JANSSEN PHARMACEUTICALS, INC., was and still is a foreign corporation organized under the laws of the State of Pennsylvania, and has its principal place of business at 1125 Trenton-Harbourton Road, Titusville, New Jersey.

35.     That at all times hereinafter mentioned, upon information and belief, the defendant, ORTHO-McNEIL- JANSSEN PHARMACEUTICALS, INC., was and still is engaged in the business of designing, developing, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and/or selling Topamax.

36.     That at all times hereinafter mentioned, upon information and belief, the defendant, ORTHO-McNEIL- JANSSEN PHARMACEUTICALS, INC., was and still is a business entity actually doing business in the State of New Jersey.

37.     That at all times hereinafter mentioned, upon information and belief, the defendant, JOHNSON & JOHNSON PHARMACEUTICAL RESEARCH & DEVELOPMENT,

9

L.L.C., was and still is a foreign limited liability company organized under the laws of the State of New Jersey and has a principal place of business at 920 US Route 202, Raritan, New Jersey.

38.    That at all times hereinafter mentioned, upon information and belief, the defendant, JOHNSON & JOHNSON PHARMACEUTICAL RESEARCH & DEVELOPMENT, L.L.C., was and still is engaged in the business of designing, developing, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and/or selling Topamax.

39.    That at all times hereinafter mentioned, upon information and belief, the defendant, JOHNSON & JOHNSON PHARMACEUTICAL RESEARCH & DEVELOPMENT, L.L.C., was and still is a business entity actually doing business in the State of New Jersey.

40.    That at all times hereinafter mentioned, upon information and belief, the defendant, JOHNSON & JOHNSON, was and still is a corporation organized under the laws of the State of New Jersey, and has its principal place of business at One Johnson & Johnson Plaza, New Brunswick, New Jersey.

41.    That at all times hereinafter mentioned, upon information and belief, the defendant, JOHNSON & JOHNSON, was and still is engaged in the business of designing, developing, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and/or selling Topamax.

42.    That at all times hereinafter mentioned, upon information and belief, the defendant, JOHNSON & JOHNSON, was and still is a business entity actually doing business in the State of New Jersey.

43.    That at all times hereinafter mentioned, upon information and belief, the defendant, ELAN PHARMACEUTICALS, INC., was and still is a was and still is a foreign corporation organized under the laws of the State of Delaware.

10

44.     That at all times hereinafter mentioned, upon information and belief, the defendant, ELAN PHARMACEUTICALS, INC., was and still is a foreign corporation authorized to do business in the State of Texas.

45.     That at all times hereinafter mentioned, upon information and belief, the defendant, ELAN PHARMACEUTICALS, INC., was and still is a business entity actually doing business in the State of Texas.

46.     That at all times hereinafter mentioned, upon information and belief, the defendant, ELAN PHARMACEUTICALS, INC., has its headquarters and principal place of business in the State of California.

47.     That at all times hereinafter mentioned, upon information and belief, the defendant, DAINIPPON PHARMACEUTICALS USA CORPORATION, was and still is a foreign corporation organized under the laws of the State of New Jersey.

48.     That at all times hereinafter mentioned, upon information and belief, the defendant, DAINIPPON PHARMACEUTICALS USA CORPORATION, was and still is a business entity actually doing business in the State of Texas.

49.     That at all times hereinafter mentioned, upon information and belief, the defendant, DAINIPPON PHARMACEUTICALS USA CORPORATION, has its headquarters and principal place of business in the State of New Jersey.

50.     That at all times hereinafter mentioned, upon information and belief, the defendant, GLENMARK GENERICS INC., USA, was and still is a foreign corporation organized under the laws of the State of Delaware.

11

51.     That at all times hereinafter mentioned, upon information and belief, the defendant, GLENMARK GENERICS INC., USA, was and still is a business entity actually doing business in the State of Texas.

52.     That at all times hereinafter mentioned, upon information and belief, the defendant, GLENMARK GENERICS INC., USA, has its headquarters and principal place of business in the State of New Jersey.

53.     That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., is the sole shareholder and member of the defendant, WARNER-LAMBERT COMPANY LLC.

54.     That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, is a division of the defendant, WARNER-LAMBERT COMPANY LLC.

55.     That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, is a subsidiary of the defendant, WARNER-LAMBERT COMPANY LLC.

56.     That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, is a division of the defendant, PFIZER INC.

57.     That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, is a subsidiary of the defendant, PFIZER INC.

58.     That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, is a successor in interest to the defendant, PARKE-DAVIS.

59.     That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, is a division of the defendant, PFIZER INC.

60.     That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, is a subsidiary of the defendant, PFIZER INC.

61.     That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, is a successor in interest to the defendant, PARKE-DAVIS.

62.     That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, is a successor in interest to the defendant, PARKE-DAVIS.

63.     That on a date prior to May 10, 2008, the defendant, WARNER-LAMBERT COMPANY, assumed the assets and liabilities of the defendant, PARKE-DAVIS.

64.     That on a date prior to May 10, 2008, the defendant, WARNER-LAMBERT COMPANY, expressly assumed all liabilities and obligations of the defendant, PARKE-DAVIS.

65.     That on a date prior to May 10, 2008, the defendant, WARNER-LAMBERT COMPANY, impliedly assumed all liabilities and obligations of the defendant, PARKE-DAVIS.

66.     That on a date prior to May 10, 2008, the defendant, PARKE-DAVIS, and the defendant, WARNER-LAMBERT COMPANY, merged with each other.

67.     That on a date prior to May 10, 2008, the defendant, PARKE-DAVIS, merged with the defendant, WARNER-LAMBERT COMPANY, and the defendant, PARKE-DAVIS, became a part of the defendant, WARNER-LAMBERT COMPANY.

13

68.     That on a date prior to May 10, 2008, the defendant, PARKE-DAVIS, and the defendant, WARNER-LAMBERT COMPANY, consolidated with each other.

69.     That on or about December 31, 2002, the defendant, WARNER-LAMBERT COMPANY LLC, assumed the assets and liabilities of the defendant, PARKE-DAVIS.

70.     That on or about December 31, 2002, the defendant, WARNER-LAMBERT COMPANY LLC, expressly assumed all liabilities and obligations of the defendant, PARKE-DAVIS.

71.     That on or about December 31, 2002, the defendant, WARNER-LAMBERT COMPANY LLC, impliedly assumed all liabilities and obligations of the defendant, PARKE-DAVIS.

72.     That on or about December 31, 2002, the defendant, PARKE-DAVIS, and the defendant, WARNER-LAMBERT COMPANY LLC, merged with each other.

73.     That on or about December 31, 2002, the defendant, PARKE-DAVIS, merged with the defendant, WARNER-LAMBERT COMPANY LLC, and the defendant, PARKE-DAVIS, became a part of the defendant, WARNER-LAMBERT COMPANY LLC.

74.     That on or prior to December 31, 2002, the defendant, PARKE-DAVIS, and the defendant, WARNER-LAMBERT COMPANY LLC, consolidated with each other.

75.     That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, is a successor in interest to the defendant, WARNER-LAMBERT COMPANY.

76.     That on or prior to December 31, 2002, the defendant, WARNER-LAMBERT COMPANY LLC, assumed the assets and liabilities of the defendant, WARNER-LAMBERT COMPANY.

14

77.     That on or prior to December 31, 2002, the defendant, WARNER-LAMBERT
COMPANY LLC, expressly assumed all liabilities and obligations of the defendant, WARNER-
LAMBERT COMPANY.

78.     That on or prior to December 31, 2002, the defendant, WARNER-LAMBERT
COMPANY LLC, impliedly assumed all liabilities and obligations of the defendant, WARNER-
LAMBERT COMPANY.

79.     That on or prior to December 31, 2002, the defendant, WARNER-LAMBERT
COMPANY, and the defendant, WARNER-LAMBERT COMPANY LLC, merged with each
other.

80.     That on or prior to December 31, 2002, the defendant, WARNER-LAMBERT
COMPANY, merged with the defendant, WARNER-LAMBERT COMPANY LLC, and the
defendant, WARNER-LAMBERT COMPANY, became a part of the defendant, WARNER-
LAMBERT COMPANY LLC.

81.     That on or prior to December 31, 2002, the defendant, WARNER-LAMBERT
COMPANY, and the defendant, WARNER-LAMBERT COMPANY LLC, consolidated with
each other.

82.     That at all times hereinafter mentioned, upon information and belief, the
defendant, PFIZER INC., is a successor in interest to the defendant, PARKE-DAVIS.

83.     That at all times hereinafter mentioned, upon information and belief, the
defendant, PFIZER INC., is a successor in interest to the defendant, WARNER-LAMBERT
COMPANY.

84.     That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., is a successor in interest to the defendant, WARNER-LAMBERT COMPANY LLC.

85.     That on a date prior to May 10, 2008, the defendant, PFIZER INC., assumed the assets and liabilities of the defendant, PARKE-DAVIS.

86.     That on a date prior to May 10, 2008, the defendant, PFIZER INC., assumed the assets and liabilities of the defendant, WARNER-LAMBERT COMPANY.

87.     That on a date prior to May 10, 2008, the defendant, PFIZER INC., expressly assumed all liabilities and obligations of the defendant, PARKE-DAVIS.

88.     That on a date prior to May 10, 2008, the defendant, PFIZER INC., impliedly assumed all liabilities and obligations of the defendant, PARKE-DAVIS.

89.     That on a date prior to May 10, 2008, the defendant, PFIZER INC., expressly assumed all liabilities and obligations of the defendant, WARNER-LAMBERT COMPANY.

90.     That on a date prior to May 10, 2008, the defendant, PFIZER INC., impliedly assumed all liabilities and obligations of the defendant, WARNER-LAMBERT COMPANY.

91.     That on or prior to December 31, 2002, the defendant, PFIZER INC., assumed the assets and liabilities of the defendant, WARNER-LAMBERT COMPANY LLC.

92.     That on or prior to December 31, 2002, the defendant, PFIZER INC., expressly assumed all liabilities and obligations of the defendant, WARNER-LAMBERT COMPANY LLC.

93.     That on or prior to December 31, 2002, the defendant, PFIZER INC., impliedly assumed all liabilities and obligations of the defendant WARNER-LAMBERT COMPANY LLC.

94.     That on a date prior to May 10, 2008, the defendant, PFIZER INC., and the
defendant, PARKE-DAVIS, merged with each other.

95.     That on a date prior to May 10, 2008, the defendant, PFIZER INC., and the
defendant, WARNER-LAMBERT COMPANY, merged with each other.

96.     That on or before May 10, 2008, the defendant, PFIZER INC., and the defendant,
WARNER-LAMBERT COMPANY LLC, merged with each other.

97.     That on a date prior to May 10, 2008, the defendant, PFIZER INC., and the
defendant, PARKE-DAVIS, merged with each other and the defendant, PARKE-DAVIS,
became a part of the defendant, PFIZER INC.

98.     That on a date prior to May 10, 2008, the defendant, PFIZER INC., and the
defendant, WARNER-LAMBERT COMPANY, merged with each other and the defendant,
WARNER-LAMBERT COMPANY, became a part of the defendant, PFIZER INC.

99.     That on or prior to December 31, 2002, the defendant, PFIZER INC., and the
defendant, WARNER-LAMBERT COMPANY LLC, merged with each other and the defendant,
WARNER-LAMBERT COMPANY LLC, became a part of the defendant, PFIZER INC.

100.    That on a date prior to May 10, 2008, the defendant, PFIZER INC., and the
defendant, PARKE-DAVIS, consolidated with each other.

101.    That on a date prior to May 10, 2008, the defendant, PFIZER INC., and the
defendant, WARNER-LAMBERT COMPANY, consolidated with each other.

102.    That at all times hereinafter mentioned, upon information and belief, the
defendant, PFIZER INC., has its principal place of business in the State of New York.

103.    In the year 2000, the defendant, PFIZER INC., acquired the defendant,
WARNER-LAMBERT COMPANY, and as the result of that acquisition, the defendant, PFIZER

17

INC., is responsible for all liabilities resulting from the acts or omissions of the defendant, WARNER-LAMBERT COMPANY, which occurred prior to such acquisition.

104.    In the year 2000, the defendant, PFIZER INC., acquired the defendant, PARKE-DAVIS, a division of Warner-Lambert Company, and as the result of that acquisition, the defendant, PFIZER INC., is responsible for all liabilities resulting from the acts or omissions of the defendant, PARKE-DAVIS, which occurred prior to such acquisition.

105.    On or prior to December 31, 2002, defendant, PFIZER INC., acquired the defendant, WARNER-LAMBERT COMPANY LLC, and pursuant to the terms of and conditions of that acquisition, the defendant, PFIZER INC., is responsible for all acts or omissions of the defendant, WARNER LAMBERT-COMPANY, LLC, occurring prior to such acquisition.

106.    That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., presently markets and sells the drug Neurontin.

107.    That on a date prior to May 10, 2008, the defendant, PFIZER INC., marketed and sold the drug Neurontin.

108.    That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., is engaged in the business of designing, manufacturing, advertising, marketing, and selling pharmaceutical drugs, including Neurontin, and in pursuance of this business, transacts business within the Texas and contracts to provide goods and services in the State of Texas.

109.    That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., committed a tortious act inside the State of Texas, which caused injury to plaintiff's decedent inside the State of Texas.

18

110.    That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., committed a tortious act outside the State of Texas, which caused injury to plaintiff's decedent inside the State of Texas.

111.    That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., regularly does and solicits business and engages in a persistent course of conduct in the State of Texas, deriving substantial revenue from goods and products consumed in the State of Texas.

112.    That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., expects or should reasonably expect its acts to have consequences in the State of Texas, and derives substantial revenue from interstate or international commerce.

113.    That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, presently markets and sells the drug Neurontin.

114.    That on a date prior to May 10, 2008, the defendant, PARKE-DAVIS, marketed and sold the drug Neurontin.

115.    That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, is engaged in the business of designing, manufacturing, advertising, marketing, and selling pharmaceutical drugs, including Neurontin, and in pursuance of this business, transacts business within the State of Texas and contracts to provide goods and services in the State of Texas.

116.    That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, committed a tortious act inside the State of Texas, which caused injury to plaintiff's decedent inside the State of Texas.

117.    That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, committed a tortious act outside the State of Texas, which caused injury to plaintiff's decedent inside the State of Texas.

118.    That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, regularly does and solicits business and engages in a persistent course of conduct in the State of Texas, deriving substantial revenue from goods and products consumed in the State of Texas.

119.    That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, expects or should reasonably expect its acts to have consequences in the State of Texas, and derives substantial revenue from interstate or international commerce.

120.    That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, presently markets and sells the drug Neurontin.

121.    That on a date prior to May 10, 2008, the defendant, WARNER-LAMBERT COMPANY, marketed and sold the drug Neurontin.

122.    That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, is engaged in the business of designing, manufacturing, advertising, marketing, and selling pharmaceutical drugs, including Neurontin, and in pursuance of this business, transacts business within the State of Texas and contracts to provide goods and services in the State of Texas.

123.    That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, committed a tortious act inside the State of Texas, which caused injury to plaintiff's decedent inside the State of Texas.

124.    That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, committed a tortious act outside the State of Texas, which caused injury to plaintiff's decedent inside the State of Texas.

125.    That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, regularly does and solicits business and engages in a persistent course of conduct in the State of Texas, deriving substantial revenue from goods and products consumed in State of Texas.

126.    That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, expects or should reasonably expect its acts to have consequences in the State of Texas, and derives substantial revenue from interstate or international commerce.

127.    That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, presently markets and sells the drug Neurontin.

128.    That on a date prior to May 10, 2008, the defendant, WARNER-LAMBERT COMPANY LLC, marketed and sold the drug Neurontin.

129.    That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, is engaged in the business of designing, manufacturing, advertising, marketing, and selling pharmaceutical drugs, including Neurontin, and in pursuance of this business, transacts business within the State of Texas.

130.    That at all times hereinafter mentioned, upon information and belief, the defendant WARNER-LAMBERT COMPANY LLC, committed a tortious act inside the State of Texas, which caused injury to plaintiff's decedent inside the State of Texas.

131. That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, committed a tortious act outside the State of Texas, which caused injury to plaintiff's decedent inside the State of Texas.

132. That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, regularly does and solicits business and engages in a persistent course of conduct in the State of Texas, deriving substantial revenue from good and products consumed in the State of Texas.

133. That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, regularly does and solicits business and engages in a persistent course of conduct in the State of Texas, deriving substantial revenue from interstate commerce.

134. That at all times hereinafter mentioned, upon information and belief, the defendant, IVAX PHARMACEUTICALS, INC., presently markets and sells the drug gabapentin.

135. That on a date prior to May 10, 2008, the defendant, IVAX PHARMACEUTICALS, INC., marketed and sold the drug gabapentin.

136. That at all times hereinafter mentioned, upon information and belief, the defendant, IVAX PHARMACEUTICALS, INC., is engaged in the business of designing, manufacturing, advertising, marketing, and selling pharmaceutical drugs, including the drug gabapentin, and in pursuance of this business, transacts business within the State of Texas.

137. That at all times hereinafter mentioned, upon information and belief, the defendant, IVAX PHARMACEUTICALS, INC., committed a tortious act inside the State of Texas, which caused injury to plaintiff's decedent inside the State of Texas.

138.    That at all times hereinafter mentioned, upon information and belief, the

defendant, IVAX PHARMACEUTICALS, INC., committed a tortious act outside the State of

Texas, which caused injury to plaintiff's decedent inside the State of Texas.

139.    That at all times hereinafter mentioned, upon information and belief, the

defendant, IVAX PHARMACEUTICALS, INC., regularly does and solicits business and

engages in a persistent course of conduct in the State of Texas, deriving substantial revenue from

goods and products consumed in the State of Texas.

140.    That at all times hereinafter mentioned, upon information and belief, the

defendant, IVAX PHARMACEUTICALS, INC., expects or should reasonably expects its acts to

have consequences in the State of Texas, and derives substantial revenue from interstate or

international commerce.

141.    That at all times hereinafter mentioned, upon information and belief, the

defendant, JANSSEN ORTHO LLC, presently markets and sells the drug Topamax.

142.    That on a date prior to May 10, 2008, the defendant, JANSSEN ORTHO LLC,

marketed and sold the drug Topamax.

143.    That at all times hereinafter mentioned, upon information and belief, the

defendant, JANSSEN ORTHO LLC, is engaged in the business of designing, manufacturing,

advertising, marketing, and selling pharmaceutical drugs, including the drug Topamax, and in

pursuance of this business, transacts business within the State of Texas.

144.    That at all times hereinafter mentioned, upon information and belief, the

defendant, JANSSEN ORTHO LLC, committed a tortious act inside the State of Texas, which

caused injury to plaintiff's decedent inside the State of Texas.

23

145.    That at all times hereinafter mentioned, upon information and belief, the defendant, JANSSEN ORTHO LLC, committed a tortious act outside the State of Texas, which caused injury to plaintiff's decedent inside the State of Texas.

146.    That at all times hereinafter mentioned, upon information and belief, the defendant, JANSSEN ORTHO LLC, regularly does and solicits business and engages in a persistent course of conduct in the State of Texas, deriving substantial revenue from goods and products consumed in the State of Texas.

147.    That at all times hereinafter mentioned, upon information and belief, the defendant, JANSSEN ORTHO LLC, expects or should reasonably expects its acts to have consequences in the State of Texas, and derives substantial revenue from interstate or international commerce.

148.    That at all times hereinafter mentioned, upon information and belief, the defendant, ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., presently markets and sells the drug Topamax.

149.    That on a date prior to May 10, 2008, the defendant, ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., marketed and sold the drug Topamax.

150.    That at all times hereinafter mentioned, upon information and belief, the defendant, ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., is engaged in the business of designing, manufacturing, advertising, marketing, and selling pharmaceutical drugs, including the drug Topamax, and in pursuance of this business, transacts business within the State of Texas.

151.    That at all times hereinafter mentioned, upon information and belief, the defendant, ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., committed a tortious

24

act inside the State of Texas, which caused injury to plaintiff's decedent inside the State of Texas.

152. That at all times hereinafter mentioned, upon information and belief, the defendant, ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., committed a tortious act outside the State of Texas, which caused injury to plaintiff's decedent inside the State of Texas.

153. That at all times hereinafter mentioned, upon information and belief, the defendant, ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., regularly does and solicits business and engages in a persistent course of conduct in the State of Texas, deriving substantial revenue from goods and products consumed in the State of Texas.

154. That at all times hereinafter mentioned, upon information and belief, the defendant, ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., expects or should reasonably expects its acts to have consequences in the State of Texas, and derives substantial revenue from interstate or international commerce.

155. That at all times hereinafter mentioned, upon information and belief, the defendant, JOHNSON & JOHNSON PHARMACEUTICAL RESEARCH & DEVELOPMENT, L.L.C., presently markets and sells the drug Topamax.

156. That on a date prior to May 10, 2008, the defendant, JOHNSON & JOHNSON PHARMACEUTICAL RESEARCH & DEVELOPMENT, L.L.C., marketed and sold the drug Topamax.

157. That at all times hereinafter mentioned, upon information and belief, the defendant, JOHNSON & JOHNSON PHARMACEUTICAL RESEARCH & DEVELOPMENT, L.L.C., is engaged in the business of designing, manufacturing, advertising, marketing, and

25

selling pharmaceutical drugs, including the drug Topamax, and in pursuance of this business, transacts business within the State of Texas.

158.    That at all times hereinafter mentioned, upon information and belief, the defendant, JOHNSON & JOHNSON PHARMACEUTICAL RESEARCH & DEVELOPMENT, L.L.C., committed a tortious act inside the State of Texas, which caused injury to plaintiff's decedent inside the State of Texas.

159.    That at all times hereinafter mentioned, upon information and belief, the defendant, JOHNSON & JOHNSON PHARMACEUTICAL RESEARCH & DEVELOPMENT, L.L.C., committed a tortious act outside the State of Texas, which caused injury to plaintiff's decedent inside the State of Texas.

160.    That at all times hereinafter mentioned, upon information and belief, the defendant, JOHNSON & JOHNSON PHARMACEUTICAL RESEARCH & DEVELOPMENT, L.L.C., regularly does and solicits business and engages in a persistent course of conduct in the State of Texas, deriving substantial revenue from goods and products consumed in the State of Texas.

161.    That at all times hereinafter mentioned, upon information and belief, the defendant, JOHNSON & JOHNSON PHARMACEUTICAL RESEARCH & DEVELOPMENT, L.L.C., expects or should reasonably expects its acts to have consequences in the State of Texas, and derives substantial revenue from interstate or international commerce.

162.    That at all times hereinafter mentioned, upon information and belief, the defendant, JOHNSON & JOHNSON , presently markets and sells the drug Topamax.

163.    That on a date prior to May 10, 2008, the defendant, JOHNSON & JOHNSON, marketed and sold the drug Topamax.

164.    That at all times hereinafter mentioned, upon information and belief, the defendant, JOHNSON & JOHNSON, is engaged in the business of designing, manufacturing, advertising, marketing, and selling pharmaceutical drugs, including the drug Topamax, and in pursuance of this business, transacts business within the State of Texas.

165.    That at all times hereinafter mentioned, upon information and belief, the defendant, JOHNSON & JOHNSON, committed a tortious act inside the State of Texas, which caused injury to plaintiff's decedent inside the State of Texas.

166.    That at all times hereinafter mentioned, upon information and belief, the defendant, JOHNSON & JOHNSON, committed a tortious act outside the State of Texas, which caused injury to plaintiff's decedent inside the State of Texas.

167.    That at all times hereinafter mentioned, upon information and belief, the defendant, JOHNSON & JOHNSON, regularly does and solicits business and engages in a persistent course of conduct in the State of Texas, deriving substantial revenue from goods and products consumed in the State of Texas.

168.    That at all times hereinafter mentioned, upon information and belief, the defendant, JOHNSON & JOHNSON, expects or should reasonably expects its acts to have consequences in the State of Texas, and derives substantial revenue from interstate or international commerce.

169.    That at all times hereinafter mentioned, upon information and belief, the defendant, ELAN PHARMACEUTICALS, INC., presently markets and sells the drug Zonegran.

170.    That on a date prior to May 10, 2008, the defendant, ELAN PHARMACEUTICALS, INC., marketed and sold the drug Zonegran.

171.    That at all times hereinafter mentioned, upon information and belief, the

defendant, ELAN PHARMACEUTICALS, INC., is engaged in the business of designing,

manufacturing, advertising, marketing, and selling pharmaceutical drugs, including the drug

Zonegran, and in pursuance of this business, transacts business within the State of Texas.

172.    That at all times hereinafter mentioned, upon information and belief, the

defendant, ELAN PHARMACEUTICALS, INC., committed a tortious act inside the State of

Texas, which caused injury to plaintiff's decedent inside the State of Texas.

173.    That at all times hereinafter mentioned, upon information and belief, the

defendant, ELAN PHARMACEUTICALS, INC., committed a tortious act outside the State of

Texas, which caused injury to plaintiff's decedent inside the State of Texas.

174.    That at all times hereinafter mentioned, upon information and belief, the

defendant, ELAN PHARMACEUTICALS, INC., regularly does and solicits business and

engages in a persistent course of conduct in the State of Texas, deriving substantial revenue from

goods and products consumed in the State of Texas.

175.    That at all times hereinafter mentioned, upon information and belief, the

defendant, ELAN PHARMACEUTICALS, INC., expects or should reasonably expects its acts to

have consequences in the State of Texas, and derives substantial revenue from interstate or

international commerce.

176.    That at all times hereinafter mentioned, upon information and belief, the

defendant, DAINIPPON PHARMACEUTICALS USA CORPORATION, presently markets and

sells the drug Zonegran.

177.    That on a date prior to May 10, 2008, the defendant, DAINIPPON

PHARMACEUTICALS USA CORPORATION, marketed and sold the drug Zonegran.

178.    That at all times hereinafter mentioned, upon information and belief, the

defendant, DAINIPPON PHARMACEUTICALS USA CORPORATION, is engaged in the

business of designing, manufacturing, advertising, marketing, and selling pharmaceutical drugs,

including the drug Zonegran, and in pursuance of this business, transacts business within the

State of Texas.

179.    That at all times hereinafter mentioned, upon information and belief, the

defendant, DAINIPPON PHARMACEUTICALS USA CORPORATION, committed a tortious

act inside the State of Texas, which caused injury to plaintiff's decedent inside the State of

Texas.

180.    That at all times hereinafter mentioned, upon information and belief, the

defendant, DAINIPPON PHARMACEUTICALS USA CORPORATION, committed a tortious

act outside the State of Texas, which caused injury to plaintiff's decedent inside the State of

Texas.

181.    That at all times hereinafter mentioned, upon information and belief, the

defendant, DAINIPPON PHARMACEUTICALS USA CORPORATION, regularly does and

solicits business and engages in a persistent course of conduct in the State of Texas, deriving

substantial revenue from goods and products consumed in the State of Texas.

182.    That at all times hereinafter mentioned, upon information and belief, the

defendant, DAINIPPON PHARMACEUTICALS USA CORPORATION, expects or should

reasonably expects its acts to have consequences in the State of Texas, and derives substantial

revenue from interstate or international commerce.

183.   That at all times hereinafter mentioned, upon information and belief, the defendant, GLENMARK GENERICS INC., USA, presently markets and sells the prescription drug zonisamide, the generic form of Zonegran.

184.   That on a date prior to May 10, 2008, the defendant, GLENMARK GENERICS INC., USA, marketed and sold the drug zonisamide.

185.   That at all times hereinafter mentioned, upon information and belief, the defendant, GLENMARK GENERICS INC., USA, is engaged in the business of designing, manufacturing, advertising, marketing, and selling pharmaceutical drugs, including the drug zonisamide, and in pursuance of this business, transacts business within the State of Texas.

186.   That at all times hereinafter mentioned, upon information and belief, the defendant, GLENMARK GENERICS INC., USA, committed a tortious act inside the State of Texas, which caused injury to plaintiff's decedent inside the State of Texas.

187.   That at all times hereinafter mentioned, upon information and belief, the defendant, GLENMARK GENERICS INC., USA, committed a tortious act outside the State of Texas, which caused injury to plaintiff's decedent inside the State of Texas.

188.   That at all times hereinafter mentioned, upon information and belief, the defendant, GLENMARK GENERICS INC., USA, regularly does and solicits business and engages in a persistent course of conduct in the State of Texas, deriving substantial revenue from goods and products consumed in the State of Texas.

189.   That at all times hereinafter mentioned, upon information and belief, the defendant, GLENMARK GENERICS INC., USA, expects or should reasonably expects its acts to have consequences in the State of Texas, and derives substantial revenue from interstate or international commerce.

## BACKGROUND REGARDING ALL DEFENDANTS

190.    Pursuant to the Food, Drug, and Cosmetic Act ("FDCA") 21 U.S.C. §§ 301 et
seq., new pharmaceutical drugs cannot be distributed in interstate commerce unless the sponsor
of the drug demonstrates to the satisfaction of the Food and Drug Administration ("FDA") that
the drug is safe and effective for each of its intended uses. 21 U.S.C. § 355(a) and (d).

191.    However, the FDCA does not prevent doctors from prescribing a drug approved
for a particular use for other uses that are different than those approved by the FDA ("off-label"
usage).

192.    Nonetheless, even though physicians may prescribe drugs for "off-label" usage,
the FDCA prohibits drug manufacturers themselves from marketing and promoting a drug for a
use that the FDA has not approved. 21 U.S.C. § 331(d).

193.    A manufacturer illegally "misbrands" a drug if the drug's labeling includes
information about unapproved uses or if the manufacturer engages directly or indirectly in
marketing or promoting the drug for unapproved uses.

194.    Instead, if a manufacturer desires to market and promote the drug for new uses in
addition to those already approved, the materials on "off-label" usage must meet certain stringent
requirements and the manufacturer must resubmit the drug to the FDA testing and approval
process for the proposed new use.

195.    The above-described statutory and regulatory system and process is designed to
protect the public, including plaintiff's decedent, from the dangers arising from drugs which,
although approved for a certain specific condition, disease or purpose, could cause injury and
harm if used for an "off-label" purpose without adequate study and testing of the drug for such
"off-label" usage, and to protect the public, including plaintiff's decedent, from the dangers

31

arising from deceptive, misleading, and inaccurate advertising, marketing, and promotional materials issued directly or indirectly by the manufacturer to encourage the "off-label" usage of the drug without adequate testing and study of that drug for such "off-label" usage.

196.    Prior to plaintiff's decedent's death on May 10, 2008, on January 31, 2008, the FDA issued an Alert advising that the FDA had analyzed reports of suicidality (suicidal behavior or ideation) from placebo-controlled clinical studies of eleven drugs (including gabapentin, Topamax and zonisamide) used to treat epilepsy as well as psychiatric disorders, and other conditions, and found that in the FDA's analysis, patients receiving antiepileptic drugs had approximately twice the risk of suicidal behavior or suicidal ideation (0.43%) compared to patients receiving placebo (0.22%), and advised that all patients who are currently taking or stating on any antiepileptic drug should be closely monitored for notable changes in behavior that could indicate the emergence or worsening of suicidal thoughts or behavior or depression.

197.    That on May 11, 2006, June 10, 2006, July 13, 2006, August 17, 2006, September 18, 2006, October 17, 2006, November 17, 2006, December 13, 2006, January 17, 2007, February 17, 2007, March 18, 2007, April 19, 2007, and May 19, 2007, plaintiff's decedent purchased 90 800-milligram gabapentin tablets, and on June 14, 2007, July 16, 2007, August 14, 2007, September 7, 2007, October 13, 2007, November 12, 2007, December 14, 2007, January 14, 2008, February 15, 2008, March 17, 2008, and April 14, 2008, plaintiff's decedent purchased 120 800-milligram gabapentin tablets, which were manufactured and distributed by defendant Ivax, as recommended and prescribed by plaintiff's decedent's physician.

198.    That on March 3, 2008, plaintiff's decedent purchased 42 25-milligram Topamax tablets, and on April 11, 2008, and May 10, 2008, plaintiff's decedent purchased 120 25-

32

milligram Topamax tablets, which were manufactured and distributed by Janssen defendants, as recommended and prescribed by plaintiff's decedent's physician.

199. That on October 13, 2006, plaintiff's decedent purchased 120 100-milligram zonisamide capsules, and on September 20, 2007, October 23, 2007, January 14, 2008, February 29, 2008, and April 14, 2008, plaintiff's decedent purchased 180 100-milligram zonisamide capsules, which were manufactured and distributed by defendant Glenmark as recommended and prescribed by plaintiff's decedent's physician.

200. That at all times hereinafter mentioned, plaintiff's decedent purchased and consumed gabapentin, Topamax and zonisamide as recommended and prescribed by plaintiff's decedent's physician and in the dosages prescribed, in an effort to control the effects of trigeminal neuralgia.

201. The drugs gabapentin, Topamax and zonisamide were not safe and effective for the treatment of plaintiff's decedent's trigeminal neuralgia, and plaintiff's decedent sustained injury by reason of plaintiff's decedent's consumption of gabapentin, Topamax and zonisamide as prescribed by plaintiff's decedent's physician in an effort to treat plaintiff's decedent's trigeminal neuralgia.

202. The drugs gabapentin, Topamax and zonisamide were ineffective in the treatment of the causes and symptoms of plaintiff's decedent's trigeminal neuralgia and plaintiff's decedent sustained injury and harm by reason of this reliance upon gabapentin, Topamax and zonisamide to be effective in the treatment as prescribed by plaintiff's decedent's physician of such trigeminal neuralgia.

203. By reason of plaintiff's decedent's consumption of gabapentin, Topamax and zonisamide in a manner and at dosages prescribed by plaintiff's decedent's physician in an effort

to treat plaintiff's decedent's trigeminal neuralgia, on May 10, 2008,  plaintiff's decedent

committed suicide, thereby sustaining severe personal injuries and death.

204.    The injuries sustained by plaintiff's decedent were caused by or were contributed

to by plaintiff's decedent's consumption of gabapentin, Topamax and zonisamide at dosages

prescribed by plaintiff's decedent's physician for the treatment of trigeminal neuralgia in a

manner consistent with the direct and indirect advertising, marketing and promoting of these

drugs for such "off-label" use by the defendants.

205.    The drugs gabapentin, Topamax and zonisamide were ineffective in the treatment

of the causes and symptoms of plaintiff's decedent's trigeminal neuralgia and plaintiff's

decedent sustained injury by reason of this reliance upon gabapentin, Topamax and zonisamide

to be effective in the treatment as prescribed by plaintiff's decedent's physician of such

trigeminal neuralgia.

206.    That at all times hereinafter mentioned, plaintiff's decedent was diagnosed by

plaintiff's decedent's physician as suffering from trigeminal neuralgia and was being treated by

plaintiff's decedent's physician for such trigeminal neuralgia.

207.    That at all times hereinafter mentioned, upon information and belief, in reliance

upon defendants' direct and indirect advertising, marketing and promoting of gabapentin,

Topamax and zonisamide as being safe and effective for the treatment of trigeminal neuralgia,

plaintiff's decedent's physician prescribed gabapentin, Topamax and zonisamide to treat

plaintiff's decedent's trigeminal neuralgia.

208.    Moreover, defendants have an ongoing duty of pharmacovigilance. As part of

this duty, defendants are required to continually monitor, test, and analyze data regarding the

safety, efficacy, and prescribing practices of their marketed drugs, including Neurontin,

34

gabapentin, Topamax, Zonegran and zonisamide. Defendants continually receive reports from their own clinical trials, practicing physicians, individual patients and regulatory authorities concerning adverse events that occur in patients taking Neurontin, gabapentin, Topamax, Zonegran and zonisamide and defendants' other marketed drugs. Furthermore, defendants continue to conduct clinical trials for their marketed drugs long after the drug is approved for use. Defendants have a continuing duty to inform doctors, regulatory agencies, and the public of new safety and efficacy information they learn, or should have learned, about their marketed drugs once that information becomes available to defendants, whether through defendants' clinical trials, other outside sources or pharmacovigilance activities. Specifically, when defendants learn, or should have learned, of new safety information associated with their marketed drugs, they have a duty to promptly disseminate that data to the public. Defendants also have a continuing duty to monitor epidemiology and pharmacovigilance data regarding their marketed drugs and promptly report any safety concerns that arise through epidemiologic study or data.

209.    Defendants were further negligent and breached this continuing duty of pharmacovigilance with respect to plaintiff. Defendants, through clinical trials and other adverse event reports, learned that there was a serious problem of suicidality associated with Neurontin, gabapentin, Topamax, Zonegran and zonisamide use and failed to inform doctors, regulatory agencies and the public of this risk. Defendants had the means and the resources to perform their pharmacovigilance duties for the entire time Neurontin, gabapentin, Topamax, Zonegran and zonisamide have been on the market in the United States.

210.    Defendants failed to comply with the FDA postmarketing reporting requirements under 21 C.F.R. § 314.80(c) by, inter alia, failing to report each adverse drug experience

concerning Neurontin, gabapentin, Topamax, Zonegran and zonisamide that is both serious and unexpected, whether foreign or domestic, as soon as possible but in no case later than 15 calendar days after initial receipt of the information by defendants, failing to promptly investigate all adverse drug experiences concerning Neurontin, gabapentin, Topamax, Zonegran and zonisamide that are the subject of these postmarketing 15-day Alert reports, failing to submit follow up reports within 15 calendar days of receipt of new information or as requested by FDA, and, if additional information was not obtainable, failing to maintain records of the unsuccessful steps taken to seek additional information.

211. Defendants failed to develop and act upon written procedures for the surveillance, receipt, evaluation, and reporting of postmarketing adverse drug experiences to FDA.

212. Defendants' failure to perform adequate pharmacovigilance and failure to comply with the postmarketing requirements of FDA regulations is evidence of defendants' negligence and constitutes negligence per se.

## BACKGROUND REGARDING PFIZER DEFENDANTS AND DEFENDANT IVAX

213. PARKE-DAVIS, now owned by PFIZER INC., applied for, and in December, 1993, received FDA approval to market and sell Neurontin solely for "adjunctive therapy" in the treatment of certain types of seizures in adult patients suffering from epilepsy, and the FDA approved labeling of Neurontin for that purpose and stated that the drug is only effective at 900 to 1800 milligrams per day.

214. At no time prior to plaintiff's decedent being prescribed gabapentin, did Pfizer defendants or defendant Ivax receive FDA approval for any other use of gabapentin except for the above-described adjunctive therapy in the treatment of partial seizures with and without secondary generalization, and for management of postherpetic neuralgia, or for higher dosages or

for any purpose, and the FDA never approved the usage of Neurontin and gabapentin at any dosage for the treatment of trigeminal neuralgia.

215.    Commencing in 1995, Pfizer defendants, as the manufacturer of Neurontin, began to directly and indirectly advertise, market and promote Neurontin for additional "off-label" uses for which FDA approval had not been obtained, including treatment for trigeminal neuralgia and at higher dosages than had been tested and approved, in violation of the above-described statutory and regulatory system and process, including the FDCA, which prohibits manufacturers from directly or indirectly advertising, marketing and promoting a drug for "off-label" usage, and instead requires that the manufacturer resubmit the drug to the FDA testing and approval process for the proposed new use and that the materials issued by the manufacturer relating to the proposed new use meet certain stringent requirements.

216.    Pfizer defendants and defendant Ivax, as the manufacturers of Neurontin and gabapentin, directly and indirectly advertised, marketed and promoted Neurontin and gabapentin for the treatment of trigeminal neuralgia and encouraged that higher dosages than those tested be prescribed, even though Pfizer defendants and defendant Ivax knew or should have known that there were not adequate tests and studies establishing and confirming that Neurontin or gabapentin was safe and effective for the treatment of trigeminal neuralgia, and even though Pfizer defendants and defendant Ivax  knew or should have known that there were no adequate studies showing that Neurontin or gabapentin was safe when prescribed at dosages higher than those approved by the FDA.

217.    At all times hereinafter mentioned, upon information and belief, Pfizer defendants and defendant Ivax marketed and promoted Neurontin and gabapentin for the treatment of trigeminal neuralgia even though Pfizer defendants and defendant Ivax knew or should have

37

known that Neurontin and gabapentin caused many symptoms or related risk factors associated with suicidal behavior by persons suffering from trigeminal neuralgia.

218.   At all times hereinafter mentioned, upon information and belief, Pfizer defendants and defendant Ivax marketed and promoted Neurontin and gabapentin for the treatment of trigeminal neuralgia even though Pfizer defendants and defendant Ivax knew or should have known that Neurontin and gabapentin had no effect in relieving or correcting the symptoms or causes of trigeminal neuralgia.

219.   Pfizer defendants' and defendant Ivax's conduct in promoting "off-label" uses of Neurontin and gabapentin for treatment of trigeminal neuralgia constituted a wanton, callous and reckless disregard of the safety of the public and, in particular of persons suffering from trigeminal neuralgia.

220.   In promoting "off-label" uses of Neurontin and gabapentin, and at higher dosages than approved by the FDA, including treatment of trigeminal neuralgia, Pfizer defendants and defendant Ivax acted without regard to the potential danger and harm to persons for whom the drug was prescribed for the treatment of trigeminal neuralgia.

221.   Pfizer defendants and defendant Ivax actively distributed, sold and placed Neurontin and gabapentin into the stream of commerce and directly and indirectly advertised, marketed and promoted Neurontin and gabapentin as being safe and effective for the treatment of trigeminal neuralgia, other than those approved by the FDA, even though the only approved uses of Neurontin and gabapentin at that time was as adjunctive therapy in the treatment of partial seizures with and without secondary generalization, and for the management of postherpetic neuralgia, and even though the FDA had specified a maximum recommended dosage.

38

222.    Neurontin and gabapentin are not reasonably safe and effective for the treatment of persons suffering from trigeminal neuralgia, and are not reasonably safe when consumed in higher dosages than those approved by the FDA, and Pfizer defendants' and defendant Ivax's conduct of illegally advertising, marketing and promoting Neurontin for this "off-label" use was unlawful, deceptive and misleading and was in violation of the FDCA.

223.    By reason of Pfizer defendants' and defendant Ivax's conduct of directly and indirectly advertising, marketing and promoting Neurontin and gabapentin for the treatment of trigeminal neuralgia in an unlawful manner, physicians commenced prescribing Neurontin and gabapentin to their patients diagnosed as suffering from trigeminal neuralgia, frequently at dosages higher than those approved by the FDA.

224.    Upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, was indicted in the United States District Court for the District of Massachusetts for violations of 21 U.S.C. §§ 331(a), 331(d), 333(a), 352(f)(1) and 355, and a copy of such criminal Information is annexed hereto as Exhibit "B" and incorporated into this complaint by reference.

225.    Upon information and belief, on or about the 7th day of June, 2004, the defendant, WARNER-LAMBERT COMPANY LLC, formally pled guilty to all charges contained in the Information.

226.    The drugs Neurontin and gabapentin were ineffective in the treatment of the causes and symptoms of plaintiff's decedent's trigeminal neuralgia, and plaintiff's decedent sustained injury and harm by reason of this reliance upon Neurontin and gabapentin to be effective in the treatment as prescribed by plaintiff's decedent's physicians of such trigeminal neuralgia.

227.    On November 24, 2003, defendant Ivax received tentative approval, and on March 23, 2005, defendant Ivax received final approval, from the Food and Drug Administration for its Abbreviated New Drug Application ("ANDA") to distribute gabapentin in capsule form.

228.    Defendant Ivax was able to obtain approval to manufacture gabapentin, the generic version of the brand name drug Neurontin, without performing their own safety and effectiveness studies by submitting an ANDA to the FDA.  21 U.S.C. § 355 et seq.

229.    The ANDA process allowed defendant Ivax to submit data which demonstrated that the generic drug gabapentin is the same as the previously approved brand name drug Neurontin in regard to:  active ingredients; method of administration and dosage; prescribed usage recommended in the labeling; and that the proposed drug is "bioequivalent" to the prior approved drug.  21 U.S.C. § 355(j)(2)(A).

230.    In essence, in view of the regulatory scheme enacted by Congress and the FDA, the generic manufacturer adopts the studies, labeling, warnings and representations of the brand name manufacturer, without independent investigation in order to gain approval of the generic drug through an expedited process.

231.    Pursuant to 21 C.F.R. § 314.70, manufacturers, such as defendant Ivax, who have received approval for a generic drug pursuant to the ANDA process, are allowed to amend a drug's labeling without receiving FDA prior approval in order to, inter alia, add or strengthen a contraindication, warning, precaution, or adverse reaction; add or strengthen an instruction about dosage and administration that is intended to increase the safe use of the drug product; and delete false, misleading, or unsupported indications for use or claims for effectiveness.  Moreover, manufacturers such as defendant Ivax, may apply to the FDA for approval to amend a drug's

labeling, subsequent to receiving the initial ANDA approval, to strengthen a contradiction, warning, precaution, etc.

232. A Press Release posted on the internet site of defendant Ivax's parent, Ivax Corporation, on March 23, 2005, stated that Ivax launched its AB-rated gabapentin capsules in 100 mg, 300 mg and 400 mg dosage strengths. The March 23, 2005 Press Release further stated that, "Gabapentin is the generic equivalent of Neurontin® a drug used to treat epileptic seizures which is marketed by Warner-Lambert, a unit of Pfizer Inc. According to IMS data, for the fourth quarter 2004, U.S. sales of Neurontin® and gabapentin in 100, 300 and 400 mg dosage strengths were $337 million." The Press Release demonstrates that defendant Ivax was well aware that Neurontin was a $1.7 billion dollar drug for just the twelve-month period ending in June 2004. It is reasonable to assume that a sophisticated manufacturer such as defendant Ivax also was well aware that the due to the sheer volume of recorded sales of Neurontin, and that the brand name drug was being promoted and prescribed for off-label uses and for uses other than the sole uses that was approved by the FDA, namely, as adjunctive therapy in the treatment of partial seizures with and without secondary generalization, and for the management of postherpetic neuralgia.

233. That defendant Ivax was aware of the studies, off-label usage, etc., and did not change the label, and/or failed to apply to the FDA to change the label subsequent to receiving approval of the ANDA for gabapentin, to caution against same demonstrates that defendant Ivax was a willing beneficiary of, and indirectly participated in, and continued to perpetuate the fraudulent, negligent and reckless conduct as alleged herein.

41

## BACKGROUND REGARDING JANSSEN DEFENDANTS

234.    In December 24, 1996, Janssen defendants received Food and Drug Administration (FDA) approval of their New Drug Application No. 20-505 for 25-milligram, 100-milligram, and 200-milligram round tablets of Topamax (topiramate) as an adjunctive treatment for partial onset seizures in adults. On October 1, 1999, the FDA approved Topamax tablets as an adjunctive therapy for the treatment of primary generalized tonic-colonic seizures.

235.    Prior to the approval by the FDA of New Drug Application No. 20-505 and at least prior to plaintiff's decedent's death, Janssen defendants knew or should have known of a "Review and Evaluation of Pharmacology and Toxicology" regarding Topamax, dated August 1, 1995, by Ed Fisher, Ph.D., of the FDA, in which Dr. Fisher explained that Topamax had effects on the excitability of cultured fetal rat hippocampal (brain) neurons; that Topamax "exerted a direct inhibitory effect on neuronal excitability, reducing burst duration and frequency of action potentials during spontaneous neuronal firing"; that Topamax had effects on GABA-A receptor channels; and that electrophysiological patch-clamp studies with cultured mouse cerebral cortical neurons indicated that topiramate $(1 - 100$ uM$)$ enhanced GABA-evoked Cl currents."

236.    Prior to the approval by the FDA of New Drug Application No. 20-505 and at least prior to plaintiff's decedent's death, Janssen defendants knew or should have known of a "Review and Evaluation of Clinical Data", prepared by Cynthia McCormick, M.D. of the FDA, in 1995, regarding Topamax and which reported the following:

**Psychiatric Adverse Events**
Psychiatric adverse events that were reported as serious were numerous and were of three types-depression (with or without suicidal ideation), psychosis, and behavioral changes.

**Depression**
Depression is not an unexpected occurrence in the population under study – the patients with refractory partial epilepsy. The question that arises when one views

42

a an occurrence rate of 12% in placebo controlled trials or 16% overall, that of a drug-disease interaction, that is, is whether the rate is expected or exceeds that which is expected.

\* \* \* \*

The sponsor would do well to perform further analyses to determine the incidence of depression, particularly depression severe enough to require treatment and compare it to the background incidence in the relevant population, that is the refractory patients with partial epilepsy, to determine whether the incidence is higher than expected with this drug.

\* \* \* \*

A comparison of the crude rate for depression against the background rate in the relevant population can be obtained for the short-term in the placebo controlled data. Here the rate of depression in the placebo group is 5% (11 reports) and 12% in the topiramate group (61 reports).

\* \* \* \*

**Psychosis**
Psychosis occurred in one (0.4%) of the 216 placebo-treated epileptic subjects and in fifteen (2.8%) of the 527 epileptic subjects who received topiramate in double-blind studies. Psychosis, hallucination or paranoid reaction was reported as an adverse event in 75 patients (5% of the topiramate-exposed epilepsy population), and as a severe adverse event in 15 (see section 8.7) and a reason for discontinuing form (sic) topiramate therapy in 4 (there may be some overlap between these two groups). This probably represents a significant underestimate of the true incidence of psychosis, since there was obvious miscoding of some of these adverse events and the true numbers were dispersed over several terms.

\* \* \* \*

The sponsor asserts that diverse psychoses are reported to occur in about 7% of subjects with epilepsy. Thus, topiramate administered as adjunctive therapy in subjects with epilepsy does not appear to increase the risk of psychosis. Again, the rates on which the sponsor bases its conclusions are thought to be an underrepresentation. A more careful examination of the psychiatric adverse events should be undertaken by the sponsor. This was requested and is expected.

**Personality Change**
Personality change is cited as an adverse event frequently in this NDA. While it may appear benign on its face, it is often seen in company with irritability, agitation, aggressiveness or personality disorder. The coding is diffuse and thus it

43

is difficult to define much less quantify this entity. It has not been really been acknowledged by the sponsor.

237. Prior to the approval by the FDA of New Drug Application No. 20-505 and at least prior to plaintiff's decedent's death, Janssen defendants knew or should have known of a "Review and Evaluation of Clinical Data, by Cynthia McCormick, M.D. of the FDA , dated November 18, 1996, regarding Topamax and which set forth:

> The sponsor has made an effort to reevaluate the topiramate clinical safety database to better characterize and describe the neuropsychiatric adverse effects associated with topiramate, to provide follow-up on abnormal laboratory data and to provide a better correlation between adverse events and actual doses received by patients.

\* \* \* \*

> [W]hile there remains some ambiguity, this is closer to the ideal than the original NDA achieved.

\* \* \* \*

> In large part investigators tried to "explain away" adverse events rather than simply describe them. In many cases the adverse events were not even described.

238. Prior to the approval by the FDA of New Drug Application No. 20-505 and at least prior to plaintiff's decedent's death, defendants knew or should have known of a "Review and Evaluation of Clinical Data, by Cynthia McCormick, M.D. of the FDA , dated November 18, 1996, regarding Topamax, which set forth a review of Janssen defendants' "Prospective Assessment of the Cognitive Effects of Topiramate," where Dr. McCormick describes protocol as "quick and dirty".

239. Pursuant to 21 C.F.R. § 314.70, manufacturers, such as Janssen defendants, who have received approval for a drug pursuant to the NDA process, are allowed to amend a drug's labeling without receiving FDA prior approval in order to, *inter alia,* add or strengthen a contraindication, warning, precaution, or adverse reaction; add or strengthen an instruction about

44

dosage and administration that is intended to increase the safe use of the drug product; and delete false, misleading, or unsupported indications for use or claims for effectiveness. Moreover, manufacturers such as Janssen defendants , may apply to the for approval FDA to amend a drug's labeling, subsequent to receiving the initial NDA approval, to strengthen a contradiction, warning, precaution, etc.

240.    On March 6, 1997, Janssen defendants prepared a product monograph covering Topamax tablets and sprinkle capsules for Antiepileptic/Migraine Prophylaxis, submission control number: 106795-1 for Janssen-Ortho Inc., of Toronto, Canada. The 2007 revised product monograph lists suicide or "hurting yourself" as an uncommon symptom/ effect and indications that one ingesting the product should "Talk with your doctor or pharmacist right away...In all cases".

241.    Prior to plaintiff's decedent's death on August 1, 2008, Janssen defendants' own clinical trials with Topamax demonstrated a statistically significant increased risk of suicidality.

242.    Prior to plaintiff's decedent's death, Janssen defendants were well aware, or reasonably should have been aware, that ingestion of their drug Topamax caused negative adverse effects on the mood and behavior of individuals which could lead to suicide attempts or completed suicide.

243.    Janssen defendants breached their duty of care (pharmacovigilance) to plaintiff's decedent in failing to adequately warn plaintiff's decedent and his prescribing physician that ingestion of Topamax may cause negative mood and behavior changes which may lead to suicide attempts or completed suicide.

244.    Janssen defendants should have provided appropriate warnings such as obtaining psychological assessments or careful monitoring of patients who are prescribed Topamax in

45

reference to potential negative mood and behavioral changes which may lead to suicide attempts or completed suicide.

245.    That at all times hereinafter mentioned, plaintiff's decedent was diagnosed by his physician as suffering symptoms of trigeminal neuralgia and was being treated by his physician for such condition.

246.    That at all times hereinafter mentioned, upon information and belief, in reliance upon Janssen defendants' direct and indirect advertising, marketing and promoting of Topamax as being safe and effective, plaintiff's decedent's physician prescribed Topamax to treat or otherwise prevent plaintiff's decedent's symptoms of trigeminal neuralgia.

247.    The drug Topamax was not safe and effective for the treatment of plaintiff's decedent's trigeminal neuralgia, and plaintiff's decedent sustained injury, harm and death by reason of his consumption of Topamax as prescribed by his physician in an effort to treat or otherwise prevent trigeminal neuralgia.

248.    By reason of plaintiff's decedent's consumption of Topamax in a manner and at a dosage prescribed by his physician in an effort to treat or otherwise prevent trigeminal neuralgia, on May 10, 2008, at age sixty-one, plaintiff's decedent committed suicide.

249.    The injuries and death sustained by plaintiff's decedent were caused by or were contributed to by plaintiff's decedent's consumption of Topamax at a dosage prescribed by his physician for the treatment or prevention of trigeminal neuralgia, in a manner consistent with the direct and indirect advertising, marketing and promoting of this drug for such use by Janssen defendants.

## AS AND FOR A FIRST CAUSE OF ACTION AGAINST
## PFIZER DEFENDANTS FOR NEGLIGENCE

250.    Plaintiff repeats and reiterates the allegations previously set forth herein.

251.    That at all times hereinafter mentioned, Pfizer defendants were under a duty to exercise reasonable care in the design and development of Neurontin, in particular, in the advertising, marketing and promoting of Neurontin, both directly and indirectly, to ensure that Neurontin was not used in the treatment of conditions such trigeminal neuralgia, for which it was not effective and to ensure that Neurontin was not used in a manner or to treat conditions where Pfizer defendants knew or should have known that the user could sustain injuries and harm from the drug.

252.    That Pfizer defendants negligently, recklessly, grossly negligently, wantonly and willfully displayed a morally culpable and conscious disregard of the rights of others in that they failed to exercise reasonable care and failed to fulfill the above-stated duty by the manner that Pfizer defendants, directly and indirectly, advertised, marketed and promoted Neurontin for the treatment of trigeminal neuralgia, even though Neurontin had not been scientifically determined to be safe for such use and even though Neurontin was, in fact, not reasonably safe for such use, and furthermore, Pfizer defendants failed to adequately warn of the risk of suicide or aggressive, self-destructive behavior of which Pfizer defendants knew or should have known about.

253.    That Pfizer defendants were further negligent, reckless, grossly negligent, wanton and willfully displayed a morally culpable and conscious disregard of the rights of others by manufacturing, distributing, selling, advertising, marketing and promoting Neurontin even though such drug was not safe or effective for any purpose because it caused or influenced persons using the drug for any purpose to engage in self-destructive behavior including attempting to commit suicide and committing suicide and by failing to adequately warn the public of such risks.

254.   The aforesaid incident and the injuries sustained by plaintiff were caused by or were contributed to by the negligence, recklessness, gross negligence, wantonness, willfulness, and conscious and callous disregard of the safety of the public, including plaintiff's decedent, on the part of Pfizer defendants in the design, manufacture, distribution, advertising, marketing and promoting of Neurontin as being safe and effective in the treatment of trigeminal neuralgia, and by inducing the public, including plaintiff's decedent, to believe that Neurontin was effective in the treatment of the causes and symptoms of trigeminal neuralgia.

255.   That at all times hereinafter mentioned, upon information and belief, the above-described culpable conduct by Pfizer defendants was a proximate cause of injuries sustained by plaintiff's decedent.

256.   That at all times hereinafter mentioned, plaintiff's decedent did not contribute to plaintiff's decedent's injuries by reason of any negligence or culpable conduct on plaintiff's decedent's part.

257.   That as a result of the aforesaid occurrence, the injuries sustained and the death of plaintiff's decedent resulting therefrom, as aforesaid, the beneficiaries of plaintiff's decedent suffered extensive monetary and pecuniary losses and other compensatory damages, and there was also incurred and paid out necessary medical, hospital, funeral and concomitant expenses.

258.   That by reason of the facts and premises aforesaid, plaintiff's decedent's beneficiaries sustained damages in a sum which exceeds the jurisdictional limits of all lower courts which would have jurisdiction of this matter, and in addition thereto, plaintiff seeks punitive and exemplary damages against Pfizer defendants in an amount to be determined upon the trial of this matter.

## AS AND FOR A SECOND CAUSE OF ACTION AGAINST
## PFIZER DEFENDANTS FOR BREACH OF WARRANTY

259.    Plaintiff repeats and reiterates the allegations previously set forth herein.

260.    That at all times hereinafter mentioned, upon information and belief, Pfizer
defendants, by directly and indirectly advertising, marketing and promoting Neurontin for the
treatment of trigeminal neuralgia, and by placing this drug in the stream of commerce knowing
that Neurontin would be prescribed for the treatment of trigeminal neuralgia, in reliance upon the
representations of Pfizer defendants, expressly warranted to all foreseeable users of this drug,
including plaintiff, that Neurontin was safe and effective for the treatment of trigeminal
neuralgia.

261.    That Pfizer defendants impliedly warranted in manufacturing, distributing,
selling, advertising, marketing and promoting Neurontin to all foreseeable users, including
plaintiff, that Neurontin was safe and effective for the purposes for which it had been placed in
the stream of commerce by Pfizer defendants, including for the treatment of trigeminal neuralgia,
and that Neurontin was reasonably safe, proper, merchantable and fit for the intended purposes,
including for the treatment of trigeminal neuralgia.

262.    That at all times hereinafter mentioned, plaintiff relied upon the aforesaid express
and implied warranties by Pfizer defendants.

263.    That at all times hereinafter mentioned, plaintiff's use of Neurontin prior to and
up to the time of the above-described incident was consistent with the purposes for which Pfizer
defendants directly and indirectly advertised, marketed and promoted Neurontin, and plaintiff's
use of Neurontin was reasonably contemplated, intended and foreseen by Pfizer defendants at the
time of the distribution and sale of Neurontin by Pfizer defendants, and, therefore, plaintiff's use
of Neurontin was within the scope of the above-described express and implied warranties.

264. Pfizer defendants breached the aforesaid express and implied warranties because Neurontin was not safe and effective for the treatment of trigeminal neuralgia, and because plaintiff's use of Neurontin for the treatment of trigeminal neuralgia, caused or contributed to the incident described herein.

265. Plaintiff gave appropriate notice to Pfizer defendants of the breach of the aforesaid express and implied warranties or such notice was otherwise excused.

266. By reason of the foregoing, plaintiff's decedent' beneficiaries sustained damages in a sum which exceeds the jurisdictional limits of all lower courts which would have jurisdiction of this matter, and in addition, plaintiff seeks punitive and exemplary damages against Pfizer defendants in an amount to be determined upon the trial of this matter.

## AS AND FOR A THIRD CAUSE OF ACTION AGAINST
## PFIZER DEFENDANTS FOR PRODUCTS LIABILITY

267. Plaintiff repeats and reiterates the allegations previously set forth herein.

268. That at all times hereinafter mentioned, the drug Neurontin was not suited for the treatment of trigeminal neuralgia, and was not safe and effective for the treatment of trigeminal neuralgia, even though Pfizer defendants directly and indirectly advertised, marketed and promoted Neurontin for such use.

269. That at all times hereinafter mentioned, the drug Neurontin was not safe and was not suited for the purposes for which Pfizer defendants, directly and indirectly, advertised, marketed and promoted the drug at the time Pfizer defendants designed, manufactured, distributed and sold the drug and placed the drug in the stream of commerce.

270. That at all times hereinafter mentioned, upon information and belief, Pfizer defendants assumed a strict products liability to users and to persons using Neurontin, including plaintiff, who sustained injuries, harm, damages by reason of the use of Neurontin for purposes

50

directly and indirectly advertised, marketed, and promoted by Pfizer defendants, including for
the treatment of trigeminal neuralgia.

271.    By reason of the foregoing, plaintiff's decedent's beneficiaries sustained damages
in a sum which exceeds the jurisdictional limits of all lower courts which would have jurisdiction
of this matter, and in addition thereto, plaintiff seeks punitive and exemplary damages against
Pfizer defendants in an amount to be determined upon the trial of this matter.

### AS AND FOR A FOURTH CAUSE OF ACTION AGAINST
### PFIZER DEFENDANTS FOR FRAUDULENT MISREPRESENTATION

272.    Plaintiff repeats and reiterates the allegations previously set forth herein.

273.    Pfizer defendants materially misrepresented material facts concerning the safety
and effectiveness of Neurontin in the treatment of trigeminal neuralgia.

274.    Pfizer defendants' affirmative misrepresentations include but are not limited to
the acts set forth in the following paragraphs.

275.    In or about 1993, Pfizer defendants submitted a new drug application (NDA) for
approval of a drug called Neurontin (also known by the chemical name "gabapentin"), which
was a new drug within the meaning of 21 U.S.C. § 321(p) and 21 C.F.R. § 310.3(h)(4) and (5).
In that application, Pfizer defendants sought to demonstrate the drug's safety and efficacy for,
and sought approval for, use only as adjunctive therapy in the treatment of partial seizures with
and without secondary generalization in adults with epilepsy.  On or about December 30, 1993,
the FDA approved Neurontin for that specific use only.  Because Pfizer defendants had not
sought approval of any other uses nor submitted information in its NDA which demonstrated the
safety and efficacy of Neurontin for any such uses, Neurontin was not approved for any use or
condition other than that approved use.

276. Commencing in at least June of 1995 and continuing through at least the date of this incident, unapproved uses for Neurontin included post-herpetic neuralgia, painful diabetic neuralgia, anxiety disorder, social phobias, bipolar disorder, alcohol withdrawal syndrome, amyotrophic lateral sclerosis (ALS), spinal cord injury, essential tremor, pain, reflex sympathetic dystrophy (RSD), and migraine headaches, among other uses.

277. Pfizer defendants did not file a new NDA seeking FDA approval for any of these unapproved uses at any time prior to the date of this incident.

278. Pfizer defendants conducted evaluations of the market potential for certain of the unapproved uses for Neurontin, including but not limited to: post-herpetic neuralgia, painful diabetic neuralgia, anxiety disorder, social phobias, and bipolar disorder.

279. In or about the fall of 1995, Pfizer defendants' Southeast Customer Business Unit ("SECBU") created a planning document regarding Neurontin, which included a page titled: "SECBU RIGHT ON THE MARK WITH NEURONTIN AND PAIN" over a picture of a target and listed "Neurontin for Pain Strategies" including plans for conference calls on pain and a pain consultant meeting.

280. Certain of Pfizer defendants' annual strategic plans and other marketing planning documents for Neurontin included quarterly and annual goals, objectives, strategies and tactics for increasing sales of the unapproved uses of the drug. The marketing plans budgeted for and funded these tactics.

281. Commencing in early 1995 and continuing at least through the date of this incident, Pfizer defendants determined not to seek FDA approval for certain unapproved uses.

282. In or about April and May of 1995, Pfizer defendants performed a marketing assessment of proposed psychiatric indications for Neurontin. In that marketing assessment,

Pfizer defendants forecast potential revenue from Neurontin for bipolar disorder and anxiety treatment under two scenarios: with and without FDA approval. Pfizer defendants' Neurontin Development Team and New Product Committee reviewed the potential psychiatric uses and concluded that Pfizer defendants would not seek approval to promote and sell the drug for these unapproved uses.

283. In or about July of 1995, Pfizer defendants' assessment of Neurontin's market potential for neuropathic pain was distributed to Pfizer defendants' Neurontin Development Team and to Pfizer defendants' Vice President for marketing. That assessment stated that "there is no intention to fully develop the indication at this point." Full development would have required submission of an NDA to the FDA for approval.

284. One of the principal factors Pfizer defendants considered in determining whether to seek approval for Neurontin for other uses was the short patent protection available for Neurontin. Another factor was the negative impact such approval might generate on potential sales of another drug that Pfizer defendants were developing. Pfizer defendants expected this new drug would be approved by the FDA not only for epilepsy but also for a variety of uses beyond Neurontin's approved use.

285. Once Neurontin's patent expired, other companies could seek approval to distribute generic equivalents of Neurontin. Such approval, however, would be limited to the approved therapeutic use for Neurontin set forth in Pfizer defendants' original NDA approval for Neurontin. If Pfizer defendants sought and obtained approval for any of the unapproved uses, then upon expiration of the patent, generic equivalents of Neurontin could also be sold for those unapproved uses. Pfizer defendants were concerned that under those circumstances the generic equivalents would undermine sales of the new drug that was under development.

286.    Commencing about June of 1995 until at least the date of this incident, by certain conduct described in greater detail below, Pfizer defendants promoted the sale and use of Neurontin for certain conditions other than the approved use.

287.    In October 1995, a member of Pfizer defendants' Epilepsy Disease Team circulated a memorandum to a group including other senior members of Pfizer defendants' Epilepsy Disease Team noting that data purchased from an outside vendor showed that doctors had reported that the main message of certain sales pitches (known as "details"), given by 10 of 50 of Pfizer defendants' sales representatives for whom data was available in a two-month period, was for off-label use of Neurontin. Nine were for pain and one was for reflex sympathetic dystrophy, a painful nerve damage syndrome.

288.    On or about July 10, 1996, Pfizer defendants' sales representative met with a doctor in Monroe, Louisiana, and detailed a doctor on Neurontin for the treatment of pain.

289.    Also in 1996, a sales representative created a document that stated that sales representatives could ask doctors during a Neurontin detail if they ever used other anti-epileptic drugs for painful neuropathies and could mention that approximately 35% of all Neurontin use is non-seizure. This same document, entitled "Neurontin Can Do/Can't Do," stated that sales representatives could present lunch programs on Neurontin and pain. The document indicated that it was to be forwarded to the Northcentral Customer Business Unit.

290.    Pfizer defendants employed "medical liaisons" who were presented to physicians as employees of the company's Medical and Scientific Affairs Department. On the following occasions, which are not all-inclusive, Pfizer defendants' medical liaisons promoted Neurontin for unapproved uses:

     (a)     In or about June of 1996, Pfizer defendants' sales representative requested that Pfizer defendants' medical liaison make a presentation at Longwood Gardens in Kennett Square, Pennsylvania, to a group of physicians who were members of a local medical society.

     (b)     The sales representative and the medical liaison selected the topic for the presentation to the local medical society. After deciding in consultation with the sales representative that Neurontin would be the topic of the presentation, the medical liaison prepared the presentation.

     (c)     Among the topics of the presentation was the use of Neurontin for unapproved uses.

     (d)     During the presentation, in the presence of the sales representative, the medical liaison promoted the use of Neurontin in the treatment of a number of unapproved uses.

     (e)     After the presentation, Pfizer defendants' Medical Director praised the event as "another great example of use of the medical liaisons" and an area business manager called it an "outstanding utilization of . . . one of the medical affairs liaisons."

291.     Pfizer defendants organized a consultant meeting at the Jupiter Beach Resort in Palm Beach, Florida, on April 19-21, 1996. Approximately 42 physicians attended the meeting, including nine physicians who made presentations relating to unapproved uses of Neurontin.

292.     Pfizer defendants invited certain doctors to this meeting based upon their history of writing a large number of prescriptions for Neurontin or similar drugs. As part of this event, Pfizer defendants paid for accommodations and meals for the invited doctors and their spouse or guest, and paid an honorarium to each of the doctor attendees.

293.     Among the presentations made to the physicians in attendance was one relating to unapproved uses entitled "Reduction of Pain Symptoms During Treatment with gabapentin." In

the meeting's agenda, this presentation was listed as "Anticonvulsant Advances." During this presentation, Neurontin was promoted for use in the treatment of pain.

294.    Another presentation made at the Jupiter Beach conference was entitled "Anticonvulsant Advances: Nonepileptic Uses of Anti Epileptic Drugs." During this presentation, Neurontin was promoted for use in the treatment of essential tremor, episodic dyscontrol and pain.

295.    On or about May 8, 1996, following the Jupiter Beach conference, Pfizer defendants circulated to employees in the Northeast region the agenda to the meeting, specifying the off-label topics, the faculty list, the attendee list and presentation abstracts discussing the off-label content of the presentations.

296.    From August 1-5, 1996, Pfizer defendants organized an "advisory board meeting," in Atlanta, Georgia, in conjunction with the 1996 Summer Olympics. Pfizer defendants expressly instructed several of the physician speakers to address some of the unapproved uses.

297.    During that meeting, Pfizer defendants hosted doctors at the Chateau Elan Winery and Resort, in Atlanta, Georgia, and paid all the expenses for eighteen "consultants" and their spouses to attend the Olympics, including tickets to the closing ceremonies. Pfizer defendants already had numerous opportunities to consult with the doctors and, in fact, many of them had spoken on Pfizer defendants' behalf at prior meetings.

298.    Certain of the physician speakers promoted Neurontin for unapproved uses in their presentations.

299.    On or about March 1, 1996, Pfizer defendants sponsored a teleconference moderated by Pfizer defendants' employee with a pain specialist as a speaker on Neurontin. The

56

speaker promoted Neurontin for the treatment of pain to doctors participating in the
teleconference.

300.   In or about May, 1996, Pfizer defendants' Medical Director held such a
teleconference entitled "Neurontin, A Clinical Update" in which the Medical Director promoted
off-label uses of Neurontin to the doctors participating in the teleconference.

301.   Pfizer defendants hosted dozens of "consultants" meetings between late 1995 and
1997 in which the "consultants" received payments and gratuities as well as presentations on
"off-label" Neurontin use designed to change the physicians' prescription writing habits. Such
consultants' meetings included, but were not limited to the following:

| Topic | Location | Dates |
|-------|----------|-------|
| Mastering Epilepsy | La Costa Resort, CA | July 20-23, 1995 |
| Mastering Epilepsy | Santa Fe, NM | Nov. 16-19, 1995 |
| Neurontin Consultants Conference | Marco Island, FL | Feb. 2-4, 1996 |
| Pediatric Epilepsy | Hutchinson Island, FL | Feb. 9-11, 1996 |
| Mastering Epilepsy Science | Walt Disney World, FL | Feb. 22-25, 1996 |
| Pediatric Epilepsy | Hutchinson Island, FL | Mar. 8-10, 1996 |
| Mastering Epilepsy | Ritz Carlton, Aspen CO | Apr. 18-21, 1996 |
| Affective Disorders in Psychiatry | Marco Island, FL | Apr. 20, 1996 |
| Neurological Consultants (discussed previously) | Jupiter Beach, FL | Apr. 19-21, 1996 |
| Affective Disorder Consultants Conference | Southern Pines, NC | Apr. 27, 1996 |
| Neuropathic Pain Conference | Palm Beach, FL | May 11, 1996 |
| Regional Consultants Conference | Ritz Carlton, Boston, MA | May 10-11, 1996 |

| | | |
|---|---|---|
| Epilepsy Management Advisors Meeting | Sheraton Grande, Torrey Pines, La Jolla, CA | June 21-23, 1996 |
| Epilepsy Management Use of Anti-Convulsants in Psychiatric Disorders | Rancho Bernardo, CA Short Hills, NJ | June 28-30, 1996 Oct. 18-19, 1996 |
| Non-epileptic Uses of Neurontin | Longboat Key, FL | Nov. 6, 1996 |
| Neurological Conditions Conference | Ritz Carlton, Atlanta, GA | Sep. 27-28, 1997 |

Other "consultants" meetings took place at Charleston, SC, Coconut Grove, FL, Naples, FL, Memphis, TN, Louisville, KY, Washington, DC, Aspen, CO, and other places. Hundreds, if not thousands, of physicians received kickbacks to attend these events.

302.    Pfizer defendants rewarded doctors for their advocacy of Neurontin by paying them honoraria for lending their names to scientific articles which were actually prepared and written by third parties retained by Pfizer defendants. In 1996, Pfizer defendants retained AMM/ADELPHI, Ltd. and Medical Education Systems, Inc., to prepare no less than twenty (20) articles for publication in various neurology and psychiatry journals. Most of these articles concerned "off-label" usage of Neurontin and were generated so that Pfizer defendants could completely control the publications distributed pursuant to its "publications strategy." The content of these articles were actually written by non-physician technical writers retained by Pfizer defendants and Pfizer defendants had the right to control the content of all the articles. Pfizer defendants paid all expenses in connection with the creation of these publications.

303.    Pfizer defendants also founded a speakers' bureau, another method of making large and numerous payments to physicians who recommended Neurontin for "off-label" uses, together with teleconferences, dinner meetings, consultants meetings, educational seminars, and other events.

304.    Pfizer defendants utilized medical liaisons who were provided with new company slides that detailed methods to increase "off-label" use of Neurontin, including the following:

Reflex sympathetic dystrophy (RSD)

Peripheral neuropathy

Diabetic neuropathy

Trigeminal neuralgia

Post-herpetic neuralgia

Essential tremor

Restless leg syndrome (RLS)

Attention deficit disorder (ADD)

Periodic limb movement disorder

Migraine

Bipolar disorder

Amyotrophic lateral sclerosis (ALS/Lou Gehrig's Disease)

Drug or alcohol withdrawal seizures

305.    The following enumerated misrepresentations, which are not intended to be all-inclusive, relating to "off-label" usage of Neurontin were routinely made to physicians with the knowledge and consent of marketing personnel of Pfizer defendants:

a.      *Bipolar Disorder.* Medical liaisons informed psychiatrists that early results from clinical trials evaluating Neurontin for the treatment of bipolar disorder indicated ninety percent (90%) response rate when Neurontin was started at 900 mg/day dosage and increased to a dosage of 4800 mg/day. No such results existed.

b.     *Peripheral Neuropathy, Diabetic Neuropathy, and Other Pain Syndromes.*
Medical liaisons stated that clinical trials demonstrated that Neurontin was highly effective in the
treatment of various pain syndromes and that a ninety percent (90%) response rate in the
treatment of pain was being reported. No such body of evidence existed. Pfizer defendants
continued to claim that physicians should use Neurontin at substantially higher doses than
indicated by the labeling. Indeed, although medical liaisons routinely claimed Neurontin to be
effective as monotherapy, in 1997 the FDA refused to find Neurontin as a safe and effective
monotherapy.

c.     *Reflex Sympathetic Dystrophy ("RSD").* Medical liaisons informed
physicians that extensive evidence demonstrated the efficacy of Neurontin in the treatment of
RSD. The only such evidence that existed was anecdotal reports of nominal scientific value.

d.     *Attention Deficit Disorder ("ADD").* Medical liaisons were instructed to
inform pediatricians that Neurontin was effective for the treatment of ADD. No data, other than
occasional anecdotal evidence, supported this claim.

e.     *Restless Leg Syndrome ("RLS").* RLS was another condition where Pfizer
defendants' medical liaisons were trained to refer to a growing body of data relating to the
condition, when no scientific data existed.

f.     *Trigeminal Neuralgia.* Although medical liaisons represented that
Neurontin could treat trigeminal neuralgia, again no scientific data supported this claim with the
exception of occasional anecdotal reports. No data demonstrated that Neurontin was as effective
as currently available pain killers, most of which were inexpensive.

g.      *Post-Herpetic Neuralgia ("PHN")*. Medical liaisons were trained to tell physicians that seventy-five percent (75%) to eighty percent (80%) of all PHN patients were successfully treated with Neurontin. Once again, no clinical trial data supported such a claim.

h.      *Essential Tremor Periodic Limb Movement Disorder ("ETPLMD")*. Medical liaisons were trained to allege that Neurontin was effective in the treatment of these conditions. No scientific data supported such claims with the exception of anecdotal reports of nominal scientific value.

i.      *Migraine*. Claims that Neurontin was effective in the treatment of migraine headaches were made by the medical liaisons and were supposedly based on early results from clinical trials. Although pilot studies had been such suggested and undertaken, no early results of clinical trials existed to support these claims. Once again, any data relating to treatment of migraines was purely anecdotal and of nominal scientific value. Most of the case reports were either created or sponsored by Pfizer defendants.

j.      *Drug and Alcohol Withdrawal Seizures*. Medical liaisons suggested that Neurontin be used in the treatment of drug and alcohol withdrawals despite the lack of any data supporting Neurontin as an effective treatment for these conditions.

306.    Pfizer defendants sponsored a 1998 study, which was scientifically valid, conducted at the Harvard Bipolar Research Program, which concluded that patients receiving Neurontin did worse than those on sugar pills, but even though Pfizer defendants were fully aware of these results from the tests which they sponsored, Pfizer defendants did not publish the results until two years later after a substantial number of physicians had already been induced to prescribe Neurontin and a substantial number of patients had already been induced to take Neurontin.

61

307.    At each of the presentations known to the plaintiff concerning Neurontin on pain,

at least one of the presenters expressly stated or implied that Neurontin was effective for the

treatment of pain. A representative statement was made by Dr. David Longmire, a participating

physician, at the Jupiter Beach Consultants Meeting in April 1996 when he stated that Neurontin

was effective for the treatment of pain. Dr. Longmire repeated that statement at a May 1996

Consultants Meeting at the Ritz Carlton in Boston. Another physician participant, Dr. Steven

Schacter, made a similar statement at the May 1996 meeting when he stated that "pain specialists

are finding that low dosages of Neurontin are effective." Comparable statements were made by

another physician participant, Dr. Bruce Nicholson, in April 1996 at the Jupiter Beach

Consultants Meeting, in May 1996 at the Boston Ritz Carlton Consultants Meeting, and in June

1996 at a Philadelphia Consultants Meeting. Upon information and belief, similar statements

were made at all events presented by Pfizer defendants that discussed Neurontin's use for pain

indications. These events include, but are not limited to the following events:

| Topic | Date | Location |
|---|---|---|
| Neurontin Consultants Meeting | Apr. 19-21, 1996 | Jupiter Beach, FL |
| Neurontin Consultants Meeting | May 3-4, 1996 | Philadelphia, PA |
| Neurontin Consultants Meeting | May 10-11, 1996 | Boston, MA |
| Advisory Board Meeting | Apr. 14-16, 2000 | Grand Wailea Resort Hotel & Spa, Maui, HI |
| Merritt-Putnam Speakers Training Advanced Perspectives in the Management of Neurological and Mood Disorders | Apr. 28-30, 2000 | Enchantment Resort Sedona, AZ |
| New Treatment Options for the Management of Pain: The Role of Anticonvulsants | Apr. 2000 | Four Seasons Irving, TX |

| | | |
|---|---|---|
| Advisory Board Meeting | May 26, 2000 | Disney Yacht Club<br>Orlando, FL |
| New Directions in the Understanding and Treatment of Pain | Mar. 24, 2001 | Plaza Hotel<br>New York, NY |
| New Directions in the Understanding and Treatment of Pain | Mar. 2-3, 2001 | Hilton Novi<br>Detroit, MI |
| New Directions in the Understanding and Treatment of Pain | May 4-5, 2001 | Westin Galleria<br>Houston, TX |
| New Directions in the Understanding and Treatment of Pain | Feb. 9-10, 2001 | Harbor Court Hotel<br>Baltimore, MD |
| New Directions in the Understanding and Treatment of Pain | Mar. 9-10, 2001 | Fairmont Kansas City<br>Kansas City, MO |
| New Directions in the Understanding and Treatment of Pain | May 11-12, 2001 | Peabody Memphis<br>Memphis, TN |
| New Directions in the Understanding and Treatment of Pain | Mar. 16-17, 2001 | Fairmont San Francisco<br>San Francisco, CA |
| Advisory Board Meeting | June 16-18, 2000 | Westin Resort<br>Hilton Head, SC |
| New Directions in the Understanding and Treatment of Pain | May 18-19, 2001 | Sheraton Universal City<br>Universal City, CA |
| New Directions in the Understanding and Treatment of Pain | May 18-19, 2001 | Miami Biltmore<br>Miami, FL |
| New Directions in the Understanding and Treatment of Pain | Mar. 23-24, 2001 | Ritz Carlton New Orleans<br>New Orleans, LA |
| New Directions in the Understanding and Treatment of Pain | Mar. 23-24, 2001 | Sheraton Music City<br>Nashville, TN |
| New Directions in the Understanding and Treatment of Pain | Mar. 30-31, 2001 | Ritz Carlton St. Louis<br>St. Louis, MO |
| New Directions in the Treatment of Neuropathic Pain | Oct. 9-11, 1998 | Madeira, Portugal |

308. At events produced by Pfizer defendants, physician participants routinely stated that Neurontin was effective for the treatment of restless leg syndrome or RSD. Events presented by Pfizer defendants that discussed Neurontin's use as a treatment for restless leg syndrome or RSD include, but are not limited to, the following event:

| Topic | Date | Location |
|---|---|---|
| Advisory Board Meeting | Mar. 29, 2000 | Hyatt Regency Hotel San Antonio, TX |

309. At events produced by Pfizer defendants, physician participants routinely stated that Neurontin was effective for the treatment of bipolar disorder. Events presented by Pfizer defendants that discussed Neurontin's use as a treatment for bipolar disorder include, but are not limited to, the following events:

| Topic | Date | Location |
|---|---|---|
| Advisory Board Meeting | Mar. 29, 2000 | Hyatt Regency Hotel San Antonio, TX |
| Parke-Davis Speakers Bureau Meeting | Jan. 21-23, 2000 | Fairmont Scottsdale Princess Scottsdale, AZ |
| Merritt-Putnam Speakers Bureau Current Perspectives in the Understanding of Neurobehavioral Disorders | Mar. 24-26, 2000 | Four Seasons Regent Beverly Wilshire, Beverly Hills, CA |
| Merritt-Putnam Speakers Bureau | Apr. 7-9, 2000 | Wyndham New Orleans at Canal Place,New Orleans,LA |
| Merritt-Putnam Speakers Training Advanced Perspectives in the Management of Neurological and Mood Disorders | Apr. 28-30, 2000 | Enchantment Resort Sedona, AZ |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 16, 1998 | Maison Robert Boston, MA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 16, 1998 | Sunset Grill Nashville, TN |

| | | |
|---|---|---|
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 16, 1998 | Pescatore Fish Cafe Seattle, WA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 17, 1998 | Patrick's Bayside Bistro St. Pete's Beach, FL |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 17, 1998 | Heathman Hotel Portland, OR |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 18, 1998 | Downtown Club Philadelphia, PA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 18, 1998 | Morton's of Chicago Buckhead, Atlanta, GA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 18, 1998 | Huntington Hotel San Francisco, CA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 19, 1998 | Brass Elephant Baltimore, MD |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 19, 1998 | Ristorante DeGrezia New York, NY |
| The Use of Anticonvulsants in Psychiatry | Oct. 23-25, 1998 | Barcelona, Spain |

310.   At events produced by Pfizer defendants, physician participants routinely stated that Neurontin was effective for the treatment of social phobia. Events presented by Pfizer defendants that discussed Neurontin's use as a treatment for social phobia include, but are not limited to, the following events:

| Topic | Date | Location |
|---|---|---|
| Advisory Board Meeting | Mar. 29, 2000 | Hyatt Regency Hotel San Antonio, TX |
| Parke-Davis Speakers Bureau Meeting | Jan. 21-23, 2000 | Fairmont Scottsdale Princess Scottsdale, AZ |
| Merritt-Putnam Speakers Bureau Current Perspectives in the Understanding of Neurobehavioral Disorders | Mar. 24-26, 2000 | Four Seasons Regent Beverly Wilshire, Beverly Hills, CA |

65

| | | |
|---|---|---|
| Merritt-Putnam Speakers Bureau | Apr. 7-9, 2000 | Wyndham New Orleans at Canal Place,New Orleans,LA |
| Merritt-Putnam Speakers Training Advanced Perspectives in the Management of Neurological and Mood Disorders | Apr. 28-30, 2000 | Enchantment Resort Sedona, AZ |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 16, 1998 | Maison Robert Boston, MA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 16, 1998 | Sunset Grill Nashville, TN |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 16, 1998 | Pescatore Fish Cafe Seattle, WA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 17, 1998 | Patrick's Bayside Bistro St. Pete's Beach, FL |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 17, 1998 | Heathman Hotel Portland, OR |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 18, 1998 | Downtown Club Philadelphia, PA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 18, 1998 | Morton's of Chicago Buckhead, Atlanta, GA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 18, 1998 | Huntington Hotel San Francisco, CA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 19, 1998 | Brass Elephant Baltimore, MD |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 19, 1998 | Ristorante DeGrezia New York, NY |
| The Use of Anticonvulsants in Psychiatry | Oct. 23-25, 1998 | Barcelona, Spain |

311.    Without favorable results from a well-designed panic disorder clinical trial that established Neurontin's efficacy for that condition, Parke-Davis had no reasonable scientific basis for claiming that Neurontin was effective in treating panic disorder. Nonetheless, at events

produced by Pfizer defendants, physician participants routinely stated that Neurontin was

effective for the treatment of panic disorder. Events presented by Pfizer defendants that

discussed Neurontin's use as a treatment for panic disorder include, but are not limited to, the

following events:

| Topic | Date | Location |
|---|---|---|
| Advisory Board Meeting | Mar. 29, 2000 | Hyatt Regency Hotel<br>San Antonio, TX |
| Parke-Davis Speakers Bureau Meeting | Jan. 21-23, 2000 | Fairmont Scottsdale Princess<br>Scottsdale, AZ |
| Merritt-Putnam Speakers Bureau Current<br>Perspectives in the Understanding of<br>Neurobehavioral Disorders | Mar. 24-26, 2000 | Four Seasons Regent Beverly<br>Wilshire, Beverly Hills, CA |
| Merritt-Putnam Speakers Bureau | Apr. 7-9, 2000 | Wyndham New Orleans at<br>Canal Place, New Orleans, LA |
| Merritt-Putnam Speakers Training<br>Advanced Perspectives in the Management<br>of Neurological and Mood Disorders | Apr. 28-30, 2000 | Enchantment Resort<br>Sedona, AZ |
| 1998 CME Psychiatry Dinner<br>Meeting and Teleconference Series | Mar. 16, 1998 | Maison Robert<br>Boston, MA |
| 1998 CME Psychiatry Dinner<br>Meeting and Teleconference Series | Mar. 16, 1998 | Sunset Grill<br>Nashville, TN |
| 1998 CME Psychiatry Dinner<br>Meeting and Teleconference Series | Mar. 16, 1998 | Pescatore Fish Cafe<br>Seattle, WA |
| 1998 CME Psychiatry Dinner<br>Meeting and Teleconference Series | Mar. 17, 1998 | Patrick's Bayside Bistro<br>St. Pete's Beach, FL |
| 1998 CME Psychiatry Dinner<br>Meeting and Teleconference Series | Mar. 17, 1998 | Heathman Hotel<br>Portland, OR |
| 1998 CME Psychiatry Dinner<br>Meeting and Teleconference Series | Mar. 18, 1998 | Downtown Club<br>Philadelphia, PA |

| | | |
|---|---|---|
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 18, 1998 | Morton's of Chicago Buckhead, Atlanta, GA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 18, 1998 | Huntington Hotel San Francisco, CA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 19, 1998 | Brass Elephant Baltimore, MD |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 19, 1998 | Ristorante DeGrezia New York, NY |
| The Use of Anticonvulsants in Psychiatry | Oct. 23-25, 1998 | Barcelona, Spain |

312.    On September 13, 1996, Parke-Davis submitted a supplemental NDA to approve Neurontin as monotherapy for partial seizures. The FDA determined the application to be non-approvable on August 26, 1997, because of insufficiency of evidence of Neurontin's effectiveness. The FDA noted that Clinical Study 945-82 failed to yield evidence of effectiveness. Parke-Davis did not make public that its application for monotherapy had been denied. Representative events at which Pfizer defendants continued to make presentations that Neurontin was effective for monotherapy without disclosing that the FDA had denied its application for a monotherapy indication include, but are not limited to, the following events:

| Topic | Date | Location |
|---|---|---|
| Advisory Board Meeting | Mar. 29, 2000 | Hyatt Regency Hotel San Antonio, TX |
| Monotherapy Speakers Bureau Meeting | September 1997 | La Quinta Resort Palm Springs, CA |

313.    Thereafter, pursuant to marketing strategies and tactics developed by Parke-Davis and Pfizer defendants, Pfizer defendants regularly presented programs in which physician participants touted Neurontin as being effective for the treatment of migraine. Events where such presentations were made include, but are not limited to, the following events:

68

| Topic | Date | Location |
|-------|------|----------|
| Advisory Board Meeting | Mar. 29, 2000 | Hyatt Regency Hotel San Antonio, TX |
| Gabapentin in the Management of Migraine | May 25, 1996 | Short Hills, NJ |

314. Notwithstanding the FDA's refusal to increase the maximum approved dosage of Neurontin and its finding that no clinical evidence supported Neurontin's efficacy at dosages greater than 1800 mg per day, Pfizer defendants presented numerous programs where physician participants asserted that Neurontin was effective and safe at dosages above 1800 mg. All such representations were false and misleading. Additionally, at these presentations the physician participants did not disclose the clinical trial evidence that demonstrated that there was no dose response above 1800 mg per day. Pfizer defendants' failure to provide this information was a violation of Pfizer defendants' duties to provide fair and balanced information, and made any prior representations about use of Neurontin at dosages greater than 1800 mg per day false and misleading. In addition to the events identified above, other events where these false and misleading statements were made include, but are not limited to, the following events:

| Topic | Date | Location |
|-------|------|----------|
| Advisory Board Meeting on Neurontin | Feb. 4-6, 2000 | Royal Sonesta New Orleans, LA |
| Merritt-Putnam Speakers Bureau Current Perspectives in the Understanding of Neurobehavioral Disorders | Mar. 24-26, 2000 | Four Seasons Regent Beverly Wilshire, Beverly Hills, CA |
| Advisory Board Meeting | Mar. 29, 2000 | Hyatt Regency Hotel San Antonio, TX |

315. On or about June 29, 2001, the FDA Division of Drug Marketing, Advertising and Communications (DDMAC) advised Pfizer defendants that through routine monitoring and

surveillance, the DDMAC has identified a slim jim (ID #NSJ5095A1) for Neurontin that is misleading and in violation of the FDCA and applicable regulations, in that this slim jim misleadingly claims improvement in quality of life (QOL) parameters based on the Neurontin Evaluation of Outcomes in Neurological Practice (NEON) study, that among other QOL parameters, the misleading presentation includes improvement in social limitations, memory difficulties, energy level, and work limitations, and that the NEON study is not considered to be substantial evidence for claims of QOL improvements because it is not a controlled study.

316.    On or about July 1, 2002, the DDMAC advised Pfizer defendants that through routine monitoring and surveillance, the DDMAC has identified a model (#NE 102254) for Neurontin (gabapentin) that is in violation of the FDCA and applicable regulations because it makes representations about Neurontin which are false or misleading, in that this suggestion of proof of the mechanism of action is false and contrary to the language in the approved product labeling that states "[t]he mechanism by which gabapentin [Neurontin] exerts its anticonvulsant action is unknown," and that, furthermore, the full presentation of the areas of the human brain accompanied by purported "Mechanism of Action" and the prominent display of the name "Neurontin" is misleading because it suggests that Neurontin is useful for a broader range of central nervous system conditions than has been demonstrated by substantial evidence.

317.    From July 1995 through at least August 5, 2002, Pfizer defendants engaged in a marketing program to promote the use of Neurontin, and to induce physicians to prescribe Neurontin, for medical conditions for which the FDA had not approved Neurontin to be used (i.e., "unapproved" or "off-label" uses). That program included:  (a) illegally promoting the sale and use of Neurontin for a variety of conditions other than the one condition for which its use was approved by the FDA and for which Pfizer defendants had not performed the required FDA

70

testing or established safety and efficacy, in violation of the Federal Food Drug and Cosmetic Act, 21 U.S.C. § 331, et seq.; (b) offering and paying illegal remuneration to doctors, either directly or through third parties, to induce them to promote and prescribe Neurontin for off-label uses, in violation of the federal Anti-kickback Statute, 42 U.S.C. § 1320a-7b(b); and (c) making and/or disseminating false statements in presentations and marketing literature sales personnel provided to doctors concerning, among other things, the uses for which the FDA had approved Neurontin, the conditions for which the use of Neurontin was otherwise medically accepted and/or the existence of adequate evidence of the safety and efficacy for such use.

318.    In order to avoid sanction and regulation by the FDA, Pfizer defendants' off-label marketing scheme depended on their concealment of their involvement in off-label promotion of Neurontin, and to make it appear to the public that Pfizer defendants did not have any hand in any discussions of off-label use. In addition, Pfizer defendants performed off-label promotion in the semblance of legitimate consultants' meetings, continuing education seminars, journal articles and medical education events. Also, Pfizer defendants' involvement was hidden because Pfizer defendants hid their financial connections between the participating physicians and used the vendor participants as payment intermediaries. These activities and others described herein concealed Pfizer defendants' off-label promotional activities, and plaintiff could not have discovered the scheme alleged herein earlier in the exercise of reasonable diligence. Much of the scheme to this day remains concealed by Pfizer defendants.

319.    In May 2003, details of Pfizer defendants' interactions with the other participants were disclosed through the filing by a former medical liaison, Dr. David Franklin, of previously sealed materials in opposition to Pfizer defendants' motion for summary judgment in the qui tam action. This "off-label" promotion scheme remained hidden until, the United States District

71

Court for the District of Massachusetts Court unsealed Dr. Franklin's Amended Complaint in the qui tam case by in April or May 2002.

320.   In addition, Pfizer defendants fraudulently concealed information and documents concerning the safety and efficacy of Neurontin, in particular, information and documents indicating that the ingestion of Neurontin for off-label uses and/or at high dosages, may cause suicidal ideations, gestures and acts.

321.   Any applicable statutes of limitation have been tolled by Pfizer defendants' knowing and active concealment and denial of the facts alleged herein. Plaintiff and other members of the public who were prescribed and ingested Neurontin for off-label uses have been kept in ignorance of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part, and could not reasonably have discovered the fraudulent nature of Pfizer defendants' conduct, and information and documents concerning the safety and efficacy of Neurontin, in particular, information and documents indicating that the ingestion of Neurontin for off-label uses and/or at high dosages, may cause suicidal ideations, gestures and acts. Accordingly, Pfizer defendants are estopped from relying on any statute of limitations to defeat any of plaintiff's claims.

322.   Similarly, due to Pfizer defendants' fraudulent concealment of the aforesaid documents and/or information, the scientific and/or medical community was not apprised of vital information concerning safety and efficacy of the drug Neurontin. Furthermore, due to the aforesaid allegations, plaintiff may rely on the discovery rule in pursuit of this claim.

323.   On information and belief, Pfizer defendants' "off-label" promotion scheme continued after the filing of Dr. Franklin's whistleblower complaint and still continues. For example, through the third quarter of 2002, there were no published scientific studies to support

72

Neurontin's use for a wide variety of diseases that it is being prescribed for including anxiety disorder, attention deficit disorder, bipolar disorder, cluster headache, depression, dosages in excess of 1800 mg per day and many other disorders that physicians are now prescribing Neurontin for that are "off-label." Despite this lack of scientific evidence, Neurontin sales for these and other "off-label" uses have steadily increased, to the point that, according to an article published in the December 1, 2003 issue of Medical Marketing & Media, 90% of Neurontin sales are for "off-label" use. No other drug in the United States has such a high percentage of "off-label" use. The same article estimates that $1.8 billion worth of Neurontin has been sold for "off-label" uses. This increase in sales, and the repeated and increased prescription of Neurontin for "off-label" uses, without any supporting scientific studies that would be prompting such use, cannot be a random event and could not occur without continuing "off-label" promotion by Pfizer defendants' sales force.

324.   As a result of the activities described above, many of which continue to occur after Dr. Franklin filed his whistleblower suit, physicians were inundated with false information about Neurontin. As a result, they continue to prescribe Neurontin for "off-label" uses for which there is no reliable scientific support.

325.   On information and belief, Pfizer has a company-wide practice of marketing "off-label" indications. "Off-label" marketing plans exist for Cox 2 inhibitors and, on information and belief, also exist for Neurontin.

326.   This continuing course of conduct is evidenced in part by the staggering growth of Neurontin sales for "off-label" uses. Because there are no valid scientific studies supporting such use, a reasonable inference is that the use results from past and continuing promotional

efforts by Pfizer defendants. This clear and unavoidable conclusion follows from observations regarding the ongoing extent of prescriptions written for "off-label" Neurontin use.

327. First, from the perspective of overall Neurontin sales, "off-label" usage of Neurontin has actually increased during the years since 1999; in recent years, "off-label" prescriptions for Neurontin have exceeded 90% of all sales and, in some months, it appears that approved indication usage is negligible.

328. Second, although Neurontin is prescribed for scores of "off-label" indications, since 1999 the types of "off-label" usage continue to be weighted in the precise areas where Pfizer defendants focused their illegal marketing efforts: bipolar disorder, peripheral neuropathy, migraine, etc.

329. Third, these focus treatment areas of continuing unapproved usage are subject to very intense competition between therapeutic substitutes (other drugs or treatments). Indeed, because manufacturers' incremental cost for drugs in these areas is very small (e.g., only pennies to manufacture an additional pill), manufacturers compete aggressively for market share by spending huge amounts of money for marketing, promotional and sales activities. If any company were to simply pack its tent and discontinue programmatic promotional effort in any therapeutic arena, significant loss of overall sales within that diagnosis regime would certainly occur. For Neurontin, no such dip in overall sales, let alone any significant drop, has occurred.

330. Fourth, Pfizer, like most branded drug companies, monitors the relationship of its sales to its promotional efforts in very short timeframe; Pfizer would be concerned about a drop in sales within a certain therapeutic regime not after a year look-back, or even a quarterly look-back, but over just weeks. The persistent maintenance of high Neurontin sales within multiple, targeted areas for "off-label" promotion over a period of years defies the conclusion that any

significant backing away on the marketing, sales or promotion of Neurontin to each of those approved therapeutic areas.

331. For example, sales of Neurontin for the treatment of bipolar disorder have steadily increased since its introduction. This increase is a direct result of Pfizer defendants' sales representatives recommending to doctors its use for this purpose and their distribution of unapproved promotional materials. These promotional efforts did not stop in 1999, but continued thereafter. There are no valid scientific studies that support Neurontin's use for bipolar disorders. Dr. C. Seth Landefeld has submitted an expert opinion in the Franklin litigation that a review of Drugdex for Neurontin, as of the end of August 2002, reveals "no published scientific studies to support Neurontin's use for . . . bipolar disorder." As a result, tens of thousands of patients who need help and could use other drugs whose effectiveness has been established, were given and are being given Neurontin. These prescriptions for this purpose are still being written and as a direct result of Pfizer defendants' pre-2000 illegal promotional activities and post-2000 illegal promotional activities.

332. Likewise, sales of Neurontin for pain, ALS, attention deficit disorder, depression and dosages in excess of 1800 mg per day, are also increasing without any scientific evidence supporting use of Neurontin for such indications. Again, as noted by Dr. Landefeld, as of the end of the third quarter of 2002 "there were no published scientific studies to support Neurontin's use for" any of these indications or in an increased dose.

333. Overall, "off-label" sales of Neurontin have steadily increased since 1998, and from 2000 to the present have consistently remained at 93% to 94% of all sales. Actual sales for approved uses have declined. Given the absence of scientific support for such uses, the genesis

for those sales can only be past and continuing efforts by Pfizer defendants to promote "off-label" use.

334. Pfizer defendants suppressed, concealed and failed to disclose to prescribing physicians and Plaintiff's decedent that Neurontin may contribute to mood and behavioral disturbances, including depression and suicidality.

336. Pfizer defendants suppressed, concealed and failed to disclose to prescribing physicians and Plaintiff's decedent that Neurontin may worsen existing mood and behavioral disturbances, including depression and suicidal behavior.

337. Pfizer defendants suppressed, concealed and failed to disclose to prescribing physicians and Plaintiff's decedent that Neurontin may worsen depression and may lead to suicide.

338. Pfizer defendants suppressed, concealed and failed to disclose to prescribing physicians and Plaintiff's decedent that Neurontin use has been associated with depression.

339. Pfizer defendants suppressed, concealed and failed to disclose to prescribing physicians and Plaintiff's decedent that Neurontin use has been associated with psychobiologic adverse events.

340. Pfizer defendants suppressed, concealed and failed to disclose to prescribing physicians and Plaintiff's decedent that Neurontin use has been associated with suicidality (i.e., ideation, attempted and completed suicide).

341. Refractory epilepsy is a condition in which patients with epilepsy cannot control their seizures with existing anti-seizure medication. Refractory Epilepsy is a serious medical condition. Parke-Davis submitted on January 15, 1992, the New Drug Application (NDA 20-235, Gabapentin with a trade name of Neurontin), seeking approval for treatment as adjunctive

76

treatment for refractory epilepsy. FDA risk benefit analysis for Neurontin was limited to refractory epileptic patients. FDA conducted no safety analysis prior to approval of Neurontin in people suffering from a psychiatric disorder or pain disorder.

342.    Epilepsy clinical trials performed as part of Pfizer defendants' New Drug Application for Neurontin reflected safety information on 2048 people who received Neurontin. Of the 2048 people, 19.7% discontinued treatment due to adverse reactions. Depression and Suicidal Ideation was the ninth most common adverse reaction resulting in discontinuation of Neurontin.

343.    Epilepsy clinical trials performed as part of Pfizer defendants' New Drug Application for Neurontin reflected safety information on 2048 people who received Neurontin. In the total exposed population of said New Drug Application, 78 patients reported depression as an adverse event (i.e., 5.3% of the population of patients). There were seven reports of depression as serious adverse events, and nine patients who withdrew from studies because of depression.

344.    During Epilepsy clinical trials, performed as part of Pfizer defendants' New Drug Application for Neurontin, there was observed at least seven cases of "Depression" adverse events considered possibly or probably related to Neurontin by Pfizer defendants' Investigator; there was observed at least two cases of "Drug Overdose" adverse events considered possibly or probably related to Neurontin by Pfizer defendants' Investigator.

345.    During Pfizer defendants' Clinical Pharmacology Studies, performed as part of Pfizer defendants' New Drug Application for Neurontin, there were mood and behavioral disturbances or "psychobiologic" adverse events, including the following: Abnormal Thinking

77

(16), Depersonalization (11), Euphoria (6), Confusion (5), Nervousness (4), Hyperkinesia (3), Agitation (2), Personality Disorder (2), Abnormal Dreams (2), Emotional Lability (1).

346.    During Pfizer defendants' Clinical Epilepsy Studies, performed as part of Pfizer defendants' New Drug Application for Neurontin, there were the following mood and behavioral disturbances or "psychobiologic" adverse events: Nervousness (58), Thinking Abnormal (37), Confusion (29), Depression (27), Emotional Lability (26), Anxiety (24), Agitation (8), Hostility (7), Doped Feeling (6), Euphoria (5), Hallucinations (4), Psychosis (4), Suicide Attempt (2), Personality Disorder (2), Apathy (1), Depersonalization (1), Overdose (1), Abnormal Dreams (1), Feeling High (1), Feeling Abnormal (1), Frustration (1), Hypomania (1), Paranoia (1), Psychiatric Disorder (1), Schizophrenic (1), Suicidal (1), Withdrawal Syndrome (1).

347.    During Pfizer defendants' Add-on Therapy Studies, performed as part of Pfizer defendants' New Drug Application for Neurontin, there were the following mood and behavioral disturbances or "psychobiologic" adverse events: Confusion (57), Nervousness (56), Depression (38), Thinking Abnormal (32), Emotional Lability (20), Anxiety (18), Hostility (12), Overdose (12), Personality Disorder (12), Agitation (10), Euphoria (10), Forgetfulness (8), Depersonalization (7), Hallucinations (5), Psychosis (3), Suicide Attempt (3), Delirium (2), Neurosis (2), Paranoia (2), Aggression (1), Apathy (2), Manic Reaction (1), Mood Swings (1), Suicidal (1), Suicide Attempt (1), Suicide (1).

348.    During the Epilepsy Clinical Trials, performed as part of Pfizer defendants' New Drug Application for Neurontin, Pfizer defendants' medical investigators assessed the following Serious Adverse Events to be possibly or probably related to Neurontin:

    a.    Depression with attempted suicide by a seventeen year old male on 1,200 mg of Neurontin;

    b.    Depression with suicide ideation of a thirty six year old male on 1,200 mg of Neurontin. Suicide ideation improved on tapering and discontinuance.

    c.    Depression with suicide ideation recurred when Neurontin was reintroduced at 1,500 mg of Neurontin;

    d.    Depression and attempted suicide by a seventeen year old female on 2,000 mg of Neurontin;

    e.    Depression which resolved with dose reduction of a twenty three year old female on 1,200 mg of Neurontin;

    f.    Drug overdose by a thirty one year old female on 1,800 mg of Neurontin;

    g.    Drug overdose by an eighteen year old male on 1,800 mg of Neurontin.

349.    Epilepsy clinical trials performed as part of Pfizer defendants' New Drug Application for Neurontin reflected safety information including the presence of positive dechallenge/rechallenge adverse events. Dechallenge events included suicidal ideation, depression and hostility. A positive rechallenge was documented in one patient for the adverse event of depression with suicide ideation, and Pfizer defendants' Investigator acknowledged the adverse event to be possibly or probably related to Neurontin.

350.    The FDA, in its 1992 pre-approval, Combined Medical-Statistical Review (hereinafter, "1992 FDA Review"), which was done to evaluate the limited sought-after indication of Adjunctive Medication in Refractory Partial Epilepsy, observed at least 369 treatment emergent "psychobiologic" adverse drug events in the total population of 2048 participants given Neurontin. These adverse events, when considered individually and classified using a modified COSTART-preferred terminology, occurred at a frequency of at least 1% or more among gabapentin treated patients who participated in placebo controlled studies. These individual mood and behavioral disturbances or "psychobiologic" adverse events are as follows: Thinking Abnormal 96/2048 (4.69%), Nervousness 92/2048 (4.49%), Depression 82/2048

(4.0%), Emotional Lability 38/2048 (1.86%), Anxiety 36/2048 (1.76%), Hostility 25/2048

(1.22%).

351.    Although FDA's 1992 Review was done to evaluate the limited sought-after

indication of Adjunctive Medication in Refractory Partial Epilepsy, FDA medical reviewer,

Cynthia McCormick, M.D., raised important concerns about the relationship between Neurontin

and adverse events of depression and suicide. Specifically, the FDA 1992 Review sets forth the

following:

> Less common but more serious events may limit the drugs [Neurontin's]
> widespread usefulness…[D]epression, while it may not be an infrequent
> occurrence in the epileptic population, may become worse and require
> intervention or lead to suicide, as it has resulted in some suicidal attempts.

* * *

> In its clinical database of 2048 patients, gabapentin has a risk profile that is
> uncertain, with five groups of important adverse events that have not been
> fully characterized, [including] clinically important depression ….
> Accumulated long range safety data are limited by the excessive attrition
> due to apparent lack of sustained efficacy.

* * *

> In conclusion, NDA 20-235 is approvable with appropriate and prominent
> labeling *for use in a specific population.*" [Emphasis added.]

352.    On or about December 15, 1992, the Peripheral and Central Nervous System

Drugs Advisory Committee to the Department of Health and Human Services, Food and Drug

Administration, had a public hearing and voted to recommend Neurontin for a very specific use

in a very limited population (e.g., adjunctive treatment for refractory epilepsy). The Advisory

Committee did not consider the safety of Neurontin's use in any patient group other than

sufferers of refractory epilepsy. Defendant employees Dr. Spivey, Ms. Turner, Dr. Pierce, Dr.

Fletcher, Mr. Parker, Ms. LaMoreaux and Dr. Charles Taylor were in attendance at said hearing

80

where the following question and answer was posed regarding the limited expected use and indication for Neurontin:

> Has the sponsor provided evidence that gabapentin is safe when used in the treatment of epilepsy? And again I would modify it to be used as an add-on in adult patients with intractable partial seizures.

\* \* \*

We have a 10-to-0 vote in favor of that question.

353.     The FDA has consistently reaffirmed its findings from the FDA 1992 Review that its concern that depression while it may not be an infrequent occurrence in the epileptic population, may become worse and require intervention or lead to suicide. In a subsequent review dated May 12, 1992, and signed by FDA clinical reviewer on September 27, 1993, the FDA stated "there is no new data in Safety Update #3 which alter the safety profile of this drug as presented the initial NDA and Safety Update #1 and 2." In another subsequent safety update dated December 15, 1993, the FDA again stated "there are no new data in Safety Update #4 which alter the safety profile of this drug as presented in the initial NDA and Safety updates #1, 2, and 3."

354.     Parke Davis and Warner Lambert had specific knowledge on or about December 7, 1992, via FDA's 1992 Review, that Neurontin's widespread usefulness was limited because of the occurrence of depression and suicide attempts during clinical trials; Parke Davis and Warner Lambert had knowledge of Neurontin's capacity to contribute to mood and behavioral disturbances, including depression and suicidality. Dr. Richard Spivey, then Senior Director of Regulatory Affairs at Parke Davis, obtained the FDA 1992 Review from the FDA. On or about December 7, 1992, Dr. Spivey provided the January 31, 1992 Review to the Neurontin Director of Regulatory Affairs at Parke Davis: Janeth Turner. On December 7, 1992, Ms. Turner

81

provided the FDA 1992 Review to Dr. Mark Pierce, Parke Davis Vice President of Clinical

Research, and Mr. Mickey Fletcher, who reported directly to the Parke Davis Vice President of

Drug Development. Between December 7, 1992 and December 9, 1992, Dr. Spivey, Ms. Turner,

Dr. Pierce and Mr. Fletcher read and became aware of the 1992 FDA Review, including the

following FDA findings regarding Neurontin:

> Less common but more serious events may limit the drugs [Neurontin's]
> widespread usefulness...depression, while it may not be an infrequent occurrence
> in the epileptic population, may become worse and require intervention or lead to
> suicide, as it has resulted in some suicidal attempts.

* * *

> In its clinical database of 2048 patients, gabapentin has a risk profile that is
> uncertain, with five groups of important adverse events that have not been fully
> characterized, [including] clinically important depression .... Accumulated long
> range safety data are limited by the excessive attrition due to apparent lack of
> sustained efficacy.

* * *

> In conclusion, NDA 20-235 is approvable with appropriate and prominent
> labeling for use in a specific population."

355.    On or about December 9, 1992, Dr. Spivey, Ms. Turner, Dr. Pierce, and Mr.

Fletcher had a discussion via telephone with Dr. Russell Katz, the FDA Supervising Medical

Officer, regarding the Neurontin New Drug Application, and with Ms. Nancy Chamberlain, the

FDA Consumer Safety Officer regarding the Neurontin New Drug Application. Said discussion

included the substance of the aforementioned FDA 1992 Review. As a consequence of this

discussion, on or about December 9, 1992, upon information and belief, Dr. Spivey, Ms. Turner,

Dr. Pierce and Mr. Fletcher, learned that the widespread usefulness of Neurontin was limited

because it was shown to be associated with depression and may lead to suicide, as it had led to

several suicide attempts during clinical trials.

82

356.    On December 15, 1992, the Peripheral and Central nervous System Drugs

Advisory Committee to the Department of Health and Human Services, Food and Drug

Administration, conducted a public hearing that was attended by, *inter alia,* several employees of

Parke Davis, including Dr. Spivey, Ms. Turner, Dr. Pierce, Mr. Fletcher, Mr. James Parker, Ms.

Linda LaMoreaux, and Dr. Charles Taylor. At said hearing, FDA presented the following

information:

> In the total exposed population of the NDA, 78, or 5.3 percent of patients,
> reported depression as an adverse event. This included one subject in Phase I
> study. There were seven reports of depression as serious adverse events and nine
> patients who withdrew from studies because of depression, some with suicidal
> ideation.
>
>                                  * * *
>
> There may be some underrepresentation of certain categories; for example, in
> some cases, depression was reported as a serious adverse event, particularly if it
> resulted in hospitalization or was associated with suicidal ideation... The actual
> incidence of treatment-emergent depression in which pharmacological
> intervention was begun and maintained throughout the course of the study is not
> known. The firm has provided the FDA with a breakdown of patients who
> reported depression as an adverse event, and it's found that...of 78 patients who
> reported depression as an adverse event, 19 had no prior history and 22 patients
> required treatment for their symptoms.

357.    Pfizer defendants' employees Ms. Turner, Mr. James Parker, Ms. LaMoreaux and

Dr. Taylor were members of the Drug Development Team and New Product Committee whose

stated purpose was to explore new uses for Neurontin beyond the epileptic population.

358.    At no time did Pfizer defendants' employees Ms. Turner, Mr. Parker, Ms.

Lamoreaux or Dr. Taylor communicate to any other member of Pfizer defendants' Development

Team, or New Product Committee, the FDA's concern that "[l]ess common but more serious

events may limit the drugs [Neurontin's] widespread usefulness...depression, while it may not

be an infrequent occurrence in the epileptic population, may become worse and require

intervention or lead to suicide, as it has resulted in some suicidal attempts."

359.     Pfizer defendants undertook a plan to disseminate false and misleading information about Neurontin by suppressing or otherwise intentionally failing to disclose to Plaintiff's decedent's prescribing physician(s) and Plaintiff's decedent information about Neurontin's capacity to contribute to mood and behavioral disturbances or "psychobiologic" adverse events, including depression and suicidality.

360.     Pfizer defendants suppressed, concealed and failed to disclose to Plaintiff's decedent and Plaintiff's decedent's prescribing physician(s) the FDA's concerns regarding Neurontin's association with depression, suicidality, psychobiologic adverse events, including FDA's statement that "[l]ess common but more serious events may limit the drugs [Neurontin's] widespread usefulness…depression, while it may not be an infrequent occurrence in the epileptic population, may become worse and require intervention or lead to suicide, as it has resulted in some suicidal attempts." Suppressing, concealing and failing to disclose the FDA's concern that Neurontin may worsen depression and may lead to suicide contributed to Plaintiff's decedent's physician(s) prescribing Neurontin to Plaintiff's decedent for off-label uses.

361.     Pfizer defendants' actions in suppressing, concealing or otherwise failing to disclose Neurontin's association with suicidality, depression, and psychobiologic events were done with a strategic purpose to increase sales of Neurontin, including sales related to off-label uses. Pfizer defendants knew that disclosure of such an association with Neurontin would decrease sales; Pfizer defendants knew there was a financial, strategic advantage in not disclosing Neurontin's association with suicidality, depression, and psychobiologic adverse events.

362.     In or about April and May of 1995, Pfizer defendants performed a marketing assessment of proposed psychiatric indications for Neurontin. In that marketing assessment,

Pfizer defendants forecasted potential revenue from Neurontin for bipolar disorder and anxiety treatment under two scenarios: with and without FDA approval. Pfizer defendants' Neurontin Development Team and New Product Committee reviewed the potential psychiatric uses and concluded that Pfizer defendants would not seek approval to promote and sell the drug for these unapproved uses.

363.    In or about July of 1995, Pfizer defendants' assessment of Neurontin's market potential for neuropathic pain was distributed to Pfizer defendants' Neurontin Development Team and to Pfizer defendants' Vice President for marketing. That assessment stated that "there is no intention to fully develop the indication at this point." Full development would have required submission of an NDA to the FDA for approval.

364.    As previously set forth above and incorporated by reference herein, commencing about June of 1995 until at least the date of this incident, by certain conduct described in greater detail above, Pfizer defendants promoted the sale and use of Neurontin for certain conditions other than the approved use.

365.    Upon information and belief, at all times during promotion of the sale and use of Neurontin for conditions other than the approved use (e.g., "off-label" uses), Pfizer defendants always suppressed, concealed, and failed to disclose Neurontin's association with mood and behavior disturbances or psychobiologic adverse events, including depression and suicidality.

366.    To increase sales of Neurontin, Pfizer defendants affirmatively applied strategies to compare Neurontin with other competing pharmaceutical drugs that had warnings or otherwise greater disclosure of suicide related events.

367. To increase sales of Neurontin, Pfizer defendants trained its sales force to minimize Neurontin's association with mood and behavioral disturbances or psychobiologic adverse events, including depression and suicidality.

368. To increase sales of Neurontin, Pfizer defendants applied strategies to compare Neurontin with other competing pharmaceutical drugs, such as Keppra, which already had a specific warning related to suicide: "Neurontin Backgrounder", "Competitive Information", and "Compare and Win" strategies were implemented. Neurontin was portrayed as "Safe and Easy" compared to Keppra that had a "Suicide Warning".

369. Pfizer defendants' comparison strategy wherein they suppressed, concealed and failed to disclose Neurontin's association with mood and behavior disturbances or psychobiologic adverse events, including depression and suicidality, while at the same time emphasizing competing drugs that had a "Suicide Warning", increased sales of Neurontin, including sales for off-label uses.

370. Pfizer defendants' application of such comparison strategies directly or indirectly resulted in Plaintiff's decedent's prescribing physician(s) prescribing Neurontin and Plaintiff's decedent ingesting Neurontin.

371. Most doctors likely would never have heard of Neurontin but for the off-labeling marketing efforts of Warner-Lambert and allegedly Pfizer. The inability to prove that Warner-Lambert or Pfizer contacted a doctor directly does not mean that that doctor was not influenced by Warner-Lambert and Pfizer marketing efforts. Pfizer's off-label marketing of Neurontin indirectly influenced all, or substantially all, doctors prescribing Neurontin in one of two ways. First, a doctor who did not have direct contact with Pfizer most likely was influenced in his prescribing habits by one who did. Second, all, or substantially all, doctors were indirectly

86

affected by Pfizer's suppression of negative or adverse information about Neurontin that would have affected their prescribing habits.

372. It seems unlikely that a responsible doctor who has never heard of Neurontin would prescribe Neurontin for an off-label use without first consulting the medical and scientific literature, a colleague, or a medical reference work. To do so would be part of the doctor's professional and ethical responsibility.

373. Doctors work in an environment where informal communications among fellow doctors, or "word-of-mouth," play an important role in the dissemination of information about drugs and treatments. Colleagues are generally perceived as credible, independent, and reliable sources of information. Studies have shown that doctors learn extensively from and draw upon their colleagues' clinical experience. Indeed, academic research has found that the source most influential and encouraging first prescribing a new drug is colleagues.

374. The academic literature has shown that social interactions among doctors can influence their prescribing behavior. For example, brand-level network effects affect the rate at which a drug diffuses into the market. Widespread use of a drug implicitly conveys important information about its safety and efficacy, which increases word-of-mouth communications and accelerates the rate at which others become aware of and adopt the drug.

375. Even doctors who did not receive visits from Neurontin sales representatives were more likely to prescribe Neurontin off-label because of indirect influences of Neurontin's extensive promotional efforts. The reason is that Neurontin promotional plans targeted the two areas physicians rely on most for a physician to not have heard about the product. The makers of Neurontin were well aware of these social networks and hoped to exploit them through their marketing efforts.

376.    The widespread use of Neurontin would further encourage doctors who may not have had direct contact with the drug company to prescribe the drug, because widespread use of a drug may convey information about its safety and efficacy, and, for physicians, may imply "accepted practice" and hence greater immunity to malpractice lawsuits. This could lead to the dominance of one drug - not necessarily the most efficacious or safest - despite the availability of close substitutes. This idea of high prescription volume signaling safety may have been especially relevant for Neurontin. More important, as Neurontin sales increased year-over-year, the indirect influences would have become stronger, encouraging physicians to prescribe Neurontin, regardless of whether or not they had direct contact with the company or received sales calls from Neurontin sales representatives.

377.    Given the high levels of detailing proposed by Pfizer in 2002, it is unlikely that a doctor would be completely unaware of Neurontin, especially in the specialties where Pfizer most heavily promoted Neurontin. Pfizer's Neurontin sales representatives visited the majority of primary care physicians, neurologists, rheumatologists, and orthopedists. Since doctors share information and rely on each other for new information, any doctor who did not receive a personal visit would likely learn about Neurontin through a colleague who was visited.

378.    Because it was perceived as "safe and efficacious", Neurontin was listed on nearly all formularies. Neurontin's formulary status would have also created indirect influences encouraging prescriptions. If a doctor had a patient in need of treatment for one of the numerous off-label conditions for which Warner-Lambert and Pfizer promoted Neurontin, the physician may have prescribed Neurontin simply because it was on formulary, without ever having been personally contacted by the company or its sales representatives promoting Neurontin.

379.    Pfizer defendants unlawfully manipulated scientific "truth"" to convince by misrepresentation the entire medical community of the proposition that Neurontin could be therapeutically used for indications never approved by the FDA.

380.    Pfizer defendants' suppression, concealment and lack of disclosure, to Plaintiff's decedent and Plaintiff's decedent's prescribing physician(s), directly or indirectly resulted in Plaintiff's decedent's prescribing physician(s) to prescribe Neurontin and for Plaintiff's decedent to ingest Neurontin.

381.    Pfizer defendants' suppression, concealment and lack of disclosure about Neurontin's association with mood and behavior disturbances or psychobiologic adverse events, including depression and suicidality, directly or indirectly resulted in Plaintiff's decedent's prescribing physician(s) not warning of the risks of depression and suicide associated with Neurontin.

382.    Pfizer defendants' suppression, concealment and lack of disclosure about Neurontin's association with mood and behavior disturbances or psychobiologic adverse events, including depression and suicidality directly or indirectly resulted in Plaintiff's decedent's prescribing physician(s) failing to adequately monitor changes in mood and behavior caused by Neurontin.

383.    Pfizer defendants' suppression, concealment and lack of disclosure about Neurontin's association with mood and behavior disturbances or psychobiologic adverse events, including depression and suicidality directly or indirectly prevented Plaintiff's decedent's prescribing physician(s) from being able to fully assess the risk-benefit analysis for the underlying condition Neurontin was prescribed to Plaintiff's decedent.

384.    On January 16, 2003, via National Public Radio, Pfizer defendants, through their
Senior Medical Director Dr. Catherine Clarey, suppressed, fraudulently misrepresented,
concealed and failed to disclose Pfizer defendants' knowledge that Neurontin use has been
associated with mood and behavioral disturbances or psychobiologic adverse events, including
depression and suicidality. Specifically, Dr. Clarey stated, "[t]here is absolutely no evidence that
Neurontin in --- in --- with all these prescriptions that it has been associated with suicidal
behavior or that it can cause suicidal behavior."

385.    Upon information and belief, Plaintiff's decedent's prescriber of Neurontin heard
directly or otherwise learned indirectly of the statements by Pfizer defendants' employee,
Catherine Clarey, wherein she stated, "[t]here is absolutely no evidence that Neurontin in --- in --
- with all these prescriptions that it has been associated with suicidal behavior or that it can cause
suicidal behavior."

386.    Pfizer defendants' suppression, fraudulent misrepresentation, concealment and
lack of disclosure as to Neurontin's association with mood and behavioral disturbances or
psychobiologic adverse events, including depression and suicidality, via statements by Catherine
Clarey, directly or indirectly resulted in Plaintiff's decedent's prescribing physician(s)
prescribing Neurontin and in Plaintiff's decedent ingesting Neurontin.

387.    Pfizer defendants' suppression, fraudulent misrepresentation, concealment and
lack of disclosure as to Neurontin's association with mood and behavioral disturbances or
psychobiologic adverse events, including depression and suicidality, via statements by Catherine
Clarey, directly or indirectly resulted in Plaintiff's decedent's prescribing physician(s) not
warning Plaintiff's decedent of the risks of depression and suicide caused by Neurontin.

388.    Pfizer defendants' suppression, fraudulent misrepresentation, concealment and lack of disclosure as to Neurontin's association with mood and behavioral disturbances or psychobiologic adverse events, including depression and suicidality, via statements by Catherine Clarey, directly or indirectly resulted in Plaintiff's decedent's prescribing physician(s) failing to adequately monitor changes in Plaintiff's decedent's mood and behavior caused by Neurontin.

389.    Pfizer defendants' suppression, fraudulent misrepresentation, concealment and lack of disclosure as to Neurontin's association with mood and behavioral disturbances or psychobiologic adverse events, including depression and suicidality, via statements by Catherine Clarey, directly or indirectly resulted in preventing Plaintiff's decedent's prescribing physician from being able to fully assess the risk-benefit analysis for the underlying condition Neurontin was prescribed to Plaintiff's decedent.

390.    Pfizer defendants suppressed, concealed, misrepresented or otherwise failed to disclose Neurontin's mechanism of action to Plaintiff's decedent and Plaintiff's decedent's prescribing physician(s) in failing to inform the prescriber(s) that Neurontin increases Gaba and thereby reduces the release of neurotransmitters in the human brain, including serotonin and norepinephrine.

391.    Pfizer defendants suppressed, concealed, misrepresented or otherwise failed to disclose Neurontin's mechanism of action to Plaintiff's decedent and Plaintiff's decedent's prescriber in failing to inform Plaintiff's decedent and the prescriber(s) that Neurontin's mechanism of action, in particular Neurontin's effects on monoamine neurotransmitter release, may contribute to mood and behavior disturbances or psychobiologic adverse events, including depression and suicidality.

392.    Pfizer defendants suppressed, concealed, misrepresented or otherwise failed to
disclose Neurontin's mechanism of action to Plaintiff's decedent and Plaintiff's decedent's
prescriber(s) in failing to inform the prescriber(s) that Neurontin increases Gaba and thereby
reduces the release of neurotransmitters in the human brain, including serotonin and
norepinephrine, and that the reduction of such neurotransmitters was associated with mood and
behavioral disturbances or psychobiologic adverse events, including depression and suicidality.

393.    Pfizer defendants knew or should have known that there is a need to define
Neurontin's mechanism of action so that a proper warning regarding monitoring patients for
these mood and behavioral disturbances or psychobiologic adverse events would be presented in
product labeling in a form that is understandable for prescribing physicians.

394.    Pfizer defendants knew or should have known that Neurontin would be used for
off-label indications, such as those for which Plaintiff's decedent herein was prescribed
Neurontin, and with such knowledge Pfizer defendants should have taken action to inform
prescribers and Plaintiff's decedent that careful monitoring of patients ingesting Neurontin was
required due to Neurontin's capacity to increase Gaba and thereby reduce the release of
monoamine neurotransmitters and consequently Neurontin's capacity to contribute to mood and
behavioral disturbances or psychobiologic adverse events, including depression and suicidality.

395.    Pfizer defendants' intentional suppression, misrepresentation, concealment and
lack of disclosure as to Neurontin's mechanism of action directly or indirectly resulted in
preventing Plaintiff's decedent's prescribing physician, from being able to fully assess the risk-
benefit analysis for the underlying condition Neurontin was prescribed to Plaintiff's decedent.

396.    Pfizer defendants' intentional suppression, misrepresentation, concealment and
lack of disclosure as to Neurontin's mechanism of action directly or indirectly resulted in

preventing Plaintiff's decedent's prescribing physician from being able to fully monitor changes in Plaintiff's decedent's mood and behavior caused by Neurontin.

397.     Pfizer defendants intentionally suppressed, concealed or otherwise misrepresented the utility of Neurontin in uses outside of its approved indications in failing to inform Plaintiff's decedent and Plaintiff's decedent's prescriber(s) that it would be unethical to prescribe Neurontin to depressed individuals.

398.     On or about June 18, 1999, Pfizer defendants' employed Atul C. Pande, M.D., F.R.C.P.C. as a Senior Director, Psychiatrist, and Dr. Pande stated the following, on June 18, 1999, at the Third Annual Conference on Bipolar Disorder, regarding the exclusion of purely depressed patients from clinical trials wherein patients would be ingesting Neurontin: "[W]e had absolutely no evidence whatsoever that [Neurontin] was likely to be antidepressant and therefore, we felt it ethically unjustified to include depressed patients."

399.     Pfizer defendants' intentional suppression, misrepresentation, concealment and lack of disclosure that Pfizer defendants had no evidence that Neurontin was likely to be antidepressant directly or indirectly resulted in preventing Plaintiff's decedent's prescribing physician(s) from being able to fully monitor changes in Plaintiff's decedent's mood and behavior caused by Neurontin.

400.     Pfizer defendants' intentional suppression, misrepresentation, concealment and lack of disclosure that Pfizer defendants had no evidence that Neurontin was likely to be antidepressant directly or indirectly resulted in the prevention of Plaintiff's decedent's prescriber(s) from being able to fully assess the risk-benefit analysis for the underlying condition Neurontin was prescribed to Plaintiff's decedent.

93

401.    Pfizer defendants were well aware that Plaintiff's decedent's prescribing physician(s) and Plaintiff's decedent would rely on the information concerning Neurontin (which suppressed, omitted, concealed and otherwise misrepresented the safety and efficacy of Neurontin), that Pfizer defendants provided to the Plaintiff's decedent's prescribing physicians and Plaintiff's decedent.

402.    Pfizer defendants provided this information which suppressed, omitted, concealed and otherwise misrepresented the safety and efficacy of Neurontin to induce Plaintiff's decedent's prescribing physician(s) to induce the physicians to prescribe Neurontin to their patients, including Plaintiff's decedent for either refractory epilepsy or off-label uses.

403.    Plaintiff's decedent's prescribing physician(s) and Plaintiff's decedent relied on the information provided by Pfizer defendants, which suppressed, omitted, concealed and other wise misrepresented the safety and efficacy of Neurontin, and to their detriment as Plaintiff's decedent sustained serious injury.

404.    Pfizer defendants made additional fraudulent misrepresentations as to the safety and effectiveness of Neurontin, which are not detailed herein but will be determined in discovery.

405.    Pfizer defendants affirmatively and fraudulently misrepresented that Neurontin was safe and effective in the treatment of unipolar disorder (mania), bipolar disorder and attention deficit disorder, when, in actuality, Neurontin was ineffective in treating such conditions and instead influenced users to engage in self-destructive behavior.

406.    Pfizer defendants affirmatively and fraudulently misrepresented that Neurontin was safe for human consumption in general, when in actuality, Neurontin influenced users to engage in self-destructive behavior.

94

407.    Pfizer defendants knew that Neurontin was not safe and effective in the treatment
of pain, and that Neurontin was not safe for human consumption in general because such drug
influenced users to engage in self-destructive behavior.

408.    Pfizer defendants knew that physicians, health care providers, and mental health
care providers would justifiably rely upon Pfizer defendants' misrepresentations in prescribing
Neurontin in the treatment of trigeminal neuralgia, and in prescribing Neurontin for human
consumption in general for the treatment of illnesses and medical and mental conditions and that
the public, including persons such as plaintiff would justifiably rely upon Pfizer defendants'
misrepresentations in using Neurontin as prescribed by physicians, health care providers and
mental health care providers in the treatment of unipolar disorder (mania), bipolar disorder and
attention deficit disorder, and for other prescribed uses.

409.    Plaintiff justifiably relied upon Pfizer defendants' misrepresentations and,
accordingly, consumed Neurontin as prescribed by plaintiff's physician in the treatment of
trigeminal neuralgia.

410.    By reason of plaintiff's consumption of Neurontin in justifiable reliance upon
Pfizer defendants' fraudulent misrepresentations, plaintiff sustained injuries and was caused to
commit suicide.

411.    By reason of the foregoing, plaintiff's decedent's beneficiaries sustained damages
in a sum which exceeds the jurisdictional limits of all lower courts which would have jurisdiction
of this matter, and in addition, plaintiff seeks punitive and exemplary damages against Pfizer
defendants in an amount to be determined upon the trial of this matter.

## AS AND FOR A FIFTH CAUSE OF ACTION
## AGAINST PFIZER DEFENDANTS FOR
## VIOLATION OF TEXAS CONSUMER PROTECTION STATUTES

412.    Plaintiff repeats and reiterates the allegations previously set forth herein.

413.    Pfizer defendants knowingly, willfully and intentionally engaged in unlawful,

unfair, unconscionable, false, misleading, deceptive and fraudulent acts and practices injurious to

the public interest, in violation of Tex. Bus. & Com. Code § 17.41 *et seq.*, including representing

that Neurontin has uses and benefits which the drug does not have, and failing to disclose

information concerning Neurontin which was known at the time of the transaction, which failure

was ultimately intended to induce the patient/consumer into a transaction into which the

patient/consumer would not have entered had the information been disclosed, for the purpose of

influencing and inducing physicians and medical providers to prescribe Neurontin, at excessively

high dosages, for unapproved "off-label" uses, including treatment for trigeminal neuropathy, to

patients/consumers such as plaintiff's decedent, and taking advantage of the lack of knowledge,

ability, experience or capacity of such patients/consumers to a grossly unfair degree, and causing

such patients/consumers to purchase, acquire and use Neurontin, at high dosages, for unapproved

"off-label" uses, including treatment for peripheral neuropathy, as prescribed by their physicians

and medical providers.

414.    By reason of Pfizer defendants' unlawful, unfair, unconscionable, false,

misleading, deceptive and fraudulent acts and practices, reasonable patients/consumers acting

reasonably, such as plaintiff's decedent, were caused to commit suicide and to sustain economic

damages and to suffer extreme mental anguish.

415.    By reason of the facts and premises aforesaid, plaintiff's decedent's beneficiaries

were damaged in a sum which exceeds the jurisdictional limits of all lower courts which would

have jurisdictional limits of this matter, which sum is equal to three times the amount of damages for mental anguish and economic damages.

## AS AND FOR A SIXTH CAUSE OF ACTION
## AGAINST DEFENDANT IVAX FOR NEGLIGENCE

416.    Plaintiff repeats and reiterates the allegations previously set forth herein.

417.    That at all times hereinafter mentioned, defendant Ivax was under a duty to exercise reasonable care in the design and development of gabapentin, in particular, by adopting the statements, studies, labeling and representations of the brand name manufacturer of Neurontin, in the advertising, marketing and promoting of gabapentin, both directly and indirectly, to ensure that gabapentin was not used in the treatment of conditions such as trigeminal neuralgia, for which it was not effective and to ensure that gabapentin was not used in a manner or to treat conditions where defendant Ivax knew or should have known that the user could sustain injuries and harm from the drug.

418.    That defendant Ivax negligently, recklessly, grossly negligently, wantonly and willfully displayed a morally culpable and conscious disregard of the rights of others in that it failed to exercise reasonable care and failed to fulfill the above-stated duty by the manner that defendant Ivax, by adopting the statements, studies, labeling and representations of the brand name manufacturers of Neurontin, directly and indirectly, advertised, marketed and promoted gabapentin for the treatment of trigeminal neuralgia, even though gabapentin had not been scientifically determined to be safe for such use and even though gabapentin was, in fact, not reasonably safe for such use, and furthermore, defendant Ivax failed to adequately warn of the risk of suicide or aggressive, self-destructive behavior of which defendant Ivax knew or should have known about.

419.    That defendant Ivax was further negligent, reckless, grossly negligent, wanton and willfully displayed a morally culpable and conscious disregard of the rights of others by manufacturing, distributing, selling, advertising, marketing and promoting gabapentin even though such drug was not safe or effective for any purpose because it caused or influenced persons using the drug for any purpose to engage in self-destructive behavior including committing suicide and by failing to adequately warn the public of such risks.

420.    The aforesaid incident and the injuries sustained by plaintiff's decedent were caused by or were contributed to by the negligence, recklessness, gross negligence, wantonness, willfulness, and conscious and callous disregard of the safety of the public, including plaintiff's decedent, on the part of defendant Ivax, by adopting the statements, studies, labeling and representations of the brand name manufacturers of Neurontin, in the design, manufacture, distribution, advertising, marketing and promoting of gabapentin as being safe and effective in the treatment of trigeminal neuralgia, and by inducing the public, including plaintiff's decedent, to believe that gabapentin was effective in the treatment of the causes and symptoms of trigeminal neuralgia.

421.    That at all times hereinafter mentioned, upon information and belief, the above-described culpable conduct by defendant Ivax was a proximate cause of plaintiff's decedent's committing suicide.

422.    That at all times hereinafter mentioned, plaintiff's decedent did not contribute to plaintiff's decedent's injuries by reason of any negligence or culpable conduct on plaintiff's decedent's part.

423.    By reason of the foregoing, plaintiff's decedent's beneficiaries sustained damages in a sum which exceeds the jurisdictional limits of all lower courts which would have jurisdiction

98

of this matter, and in addition, plaintiff seeks punitive and exemplary damages against defendant Ivax in an amount to be determined upon the trial of this matter.

## AS AND FOR A SEVENTH CAUSE OF ACTION
## AGAINST DEFENDANT IVAX FOR BREACH OF WARRANTY

424. Plaintiff repeats and reiterates the allegations previously set forth herein.

425. That at all times hereinafter mentioned, upon information and belief, defendant Ivax, by adopting the statements, studies, labeling and representations of the brand name manufacturers of Neurontin, by directly and indirectly advertising, marketing and promoting gabapentin for the treatment of trigeminal neuralgia, and by placing this drug in the stream of commerce knowing that gabapentin would be prescribed for the treatment of trigeminal neuralgia, in reliance upon the representations of the brand name manufacturer of Neurontin, expressly warranted to all foreseeable users of this drug, including plaintiff's decedent, that gabapentin was safe and effective for the treatment of trigeminal neuralgia.

426. That defendant Ivax, by adopting the statements, studies, labeling and representations of the brand name manufacturer of Neurontin, impliedly warranted in manufacturing, distributing, selling, advertising, marketing and promoting gabapentin to all foreseeable users, including plaintiff's decedent, that gabapentin was safe and effective for the purposes for which it had been placed in the stream of commerce by defendant Ivax, including for the treatment of trigeminal neuralgia, and that gabapentin was reasonably safe, proper, merchantable and fit for the intended purposes, including for the treatment of trigeminal neuralgia.

427. That at all times hereinafter mentioned, plaintiff's decedent relied upon the aforesaid express and implied warranties by defendant Ivax.

99

428. That at all times hereinafter mentioned, plaintiff's decedent's use of gabapentin prior to and up to the time of the above-described incident was consistent with the purposes for which defendant Ivax directly and indirectly advertised, marketed and promoted gabapentin, and plaintiff's decedent's use of gabapentin was reasonably contemplated, intended and foreseen by defendant Ivax at the time of the distribution and sale of gabapentin by defendant Ivax, and, therefore, plaintiff's decedent's use of gabapentin was within the scope of the above-described express and implied warranties.

429. Defendant Ivax breached the aforesaid express and implied warranties because gabapentin was not safe and effective for the treatment of trigeminal neuralgia, and because plaintiff's decedent's use of gabapentin for the treatment of trigeminal neuralgia caused or contributed to the incident described herein.

430. Plaintiff's decedent gave appropriate notice to defendant Ivax of the breach of the aforesaid express and implied warranties or such notice was otherwise excused.

431. By reason of the foregoing, plaintiff's decedent's beneficiaries sustained damages in a sum which exceeds the jurisdictional limits of all lower courts which would have jurisdiction of this matter, and in addition, plaintiff seeks punitive and exemplary damages against defendant Ivax in an amount to be determined upon the trial of this matter.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
## AGAINST DEFENDANT IVAX FOR PRODUCTS LIABILITY

432. Plaintiff repeats and reiterates the allegations previously set forth herein.

433. That at all times hereinafter mentioned, the drug gabapentin was not suited for the treatment of trigeminal neuralgia, and was not safe and effective for the treatment of trigeminal neuralgia, even though defendant Ivax directly and indirectly advertised, marketed and promoted gabapentin for this purpose.

100

434.     That at all times hereinafter mentioned, the drug gabapentin was not safe and was not suited for the purposes for which defendant Ivax, directly and indirectly, advertised, marketed and promoted the drug at the time defendant Ivax designed, manufactured, distributed and sold the drug and placed the drug in the stream of commerce.

435.     That at all times hereinafter mentioned, upon information and belief, defendant Ivax assumed a strict products liability to users and to persons using gabapentin, including plaintiff's decedent, who sustained injuries, harm and damages by reason of the use of gabapentin for purposes directly and indirectly advertised, marketed, and promoted by defendant Ivax, including for the treatment of trigeminal neuralgia.

436.     By reason of the foregoing, plaintiff's decedent's beneficiaries sustained damages in a sum which exceeds the jurisdictional limits of all lower courts which would have jurisdiction of this matter, and in addition, plaintiff seeks punitive and exemplary damages against defendant Ivax in an amount to be determined upon the trial of this matter.

## AS AND FOR A NINTH CAUSE OF ACTION
## AGAINST JANSSEN DEFENDANTS FOR NEGLIGENCE

437.     Plaintiff repeats and reiterates the allegations previously set forth herein.

438.     At all times hereinafter mentioned, Janssen defendants had a duty to exercise reasonable care to consumers, including plaintiff's decedent, in the design, development, manufacture, testing, inspection, packaging, promotion, marketing, distribution, labeling and/or sale of Topamax.

439.     Janssen defendants breached their duty of reasonable care to plaintiff's decedent in that they negligently designed, developed, manufactured, tested, inspected, packaged, promoted, marketed, distributed, labeled, and/or sold Topamax.

101

440.    Plaintiff's decedent's injuries and damages which resulted in death were and are the direct and proximate result of the carelessness and negligence of Janssen defendants as follows:

a.    In the design, development, research, manufacture, testing, packaging, promotion, marketing, sale and/or distribution of the product;

b.    In the failure to warn or instruct, and/or adequately warn or adequately instruct, users of the product, including plaintiff's decedent, of the product's dangerous and defective characteristics;

c.    In the design, development, implementation, administration, supervision and/or monitoring of clinical trials for the product;

d.    In the promotion of the product in an overly aggressive, deceitful and fraudulent manner, despite evidence as to the product's defective and dangerous characteristics due to its propensity to cause users to attempt suicide and/or death;

e.    In representing that the product was safe for its intended use when, in fact, the product was unsafe for its intended use;

f.    In failing to perform appropriate pre-market testing of the product;

g.    In failing to perform appropriate post-market testing of the product, and

h.    In failing to perform appropriate post-market surveillance of the product.

441.    Janssen defendants knew or should have known that consumers such as plaintiff's decedent would foreseeably suffer injury, even death, as a result of Janssen defendants' failure to exercise reasonable and ordinary care.

442.    As a direct and proximate result of the product's defective design, plaintiff's decedent suffered severe and permanent injuries, resulting in death.

443.    That by reason of the facts and premises aforesaid, plaintiff's decedent's beneficiaries sustained damages in a sum which exceeds the jurisdictional limits of all lower courts which would have jurisdiction of this matter, and in addition thereto, plaintiff seeks punitive and exemplary damages against Janssen defendants in an amount to be determined upon the trial of this matter.

## AS AND FOR A TENTH CAUSE OF ACTION
## AGAINST JANSSEN DEFENDANTS FOR
## PRODUCT LIABILITY – DEFECTIVE DESIGN

444.    Plaintiff repeat and reiterates the allegations previously set forth herein.

445.    At all times hereinafter mentioned, upon information and belief, Janssen defendants were responsible for designing, developing, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and/or selling Topamax.

446.    Topamax is defective and unreasonably dangerous to consumers.

447.    Topamax is defective in its design or formulation in that it is not reasonably fit, suitable, or safe for its intended purpose and/or its foreseeable risks exceed the benefits associated with its design and formulation.

448.    At all times hereinafter mentioned, upon information and belief, Topamax was expected to reach, and did reach, consumers in the State of Texas and throughout the United States, including plaintiff's decedent in the State of Texas, without substantial change in the condition in which it was sold.

449.    At all times hereinafter mentioned, upon information and belief, Topamax was designed, developed, manufactured, tested, packaged, promoted, marketed, distributed, labeled, and/or sold by Janssen defendants in a defective and unreasonably dangerous condition at the

103

time it was placed in the stream of commerce in ways which include, but are not limited to, one or more of the following particulars:

      a.      When placed in the stream of commerce, Topamax contained unreasonably dangerous design defects and was not reasonably safe as intended to be used, subjecting plaintiff's decedent to risks that exceed the benefits of the subject product, including but not limited to the risks of attempted suicide and even death in an unacceptably high number of its users;

      b.      When placed in the stream of commerce, Topamax was defective in design and formulation, making the use of Topamax more dangerous than an ordinary consumer would expect, and more dangerous than other risks associated with other anti-epileptic medications and similar drugs on the market;

      c.      Topamax's design defects existed before it left the control of Janssen defendants;

      d.      Topamax was insufficiently tested;

      e.      Topamax caused harmful side effects that outweighed any potential utility; and

      f.      Topamax was not accompanied by adequate instructions and/or warnings to fully apprise consumers, including plaintiff's decedent, of the full nature and extent of the risks and side effects associated with its use, thereby rendering Janssen defendants liable to plaintiff.

450.     In addition, at the time Topamax left the control of Janssen defendants, there were practical and feasible alternative designs that would have prevented and/or significantly reduced the risk of plaintiff's decedent's injuries without impairing the reasonably anticipated or intended

function of the product. These safer alternative designs were economically and technologically feasible, and would have prevented or significantly reduced the risk of plaintiff's decedent's injuries without substantially impairing the product's utility.

451.    As a direct and proximate result of the subject product's defective design, plaintiff's decedent suffered severe and permanent injuries, resulting in death.

452.    That by reason of the facts and premises aforesaid, plaintiff's decedent's beneficiaries sustained damages in a sum which exceeds the jurisdictional limits of all lower courts which would have jurisdiction of this matter, and in addition thereto, plaintiff seeks punitive and exemplary damages against Janssen defendants in an amount to be determined upon the trial of this matter.

## AS AND FOR A ELEVENTH CAUSE OF ACTION AGAINST JANSSEN DEFENDANTS FOR PRODUCT LIABILITY – MANUFACTURING DEFECT

453.    Plaintiff repeats and reiterates the allegations previously set forth herein.

454.    At all times hereinafter mentioned, upon information and belief, Janssen defendants were engaged in the business of designing, developing, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and/or selling Topamax.

455.    At all times hereinafter mentioned, upon information and belief, Topamax was expected to reach, and did reach, consumers in the State of Texas and throughout the United States, including plaintiffs' decedent in the State of Texas, without substantial change in the condition in which it was sold.

456.    At all times hereinafter mentioned, upon information and belief, Topamax was designed, developed, manufactured, tested, packaged, promoted, marketed, distributed, labeled and/or sold by Janssen defendants in a defective and unreasonably dangerous condition at the

105

time it was placed in the stream of commerce in ways which include, but are not limited to, one or more of the following particulars:

a. When placed in the stream of commerce, Topamax contained manufacturing defects which rendered the product unreasonably dangerous;

b. Topamax's manufacturing defects occurred while the product was in the possession and control of Janssen defendants.

c. Topamax product was not made in accordance with Janssen defendants' specifications or performance standards; and

d. Topamax's manufacturing defects existed before it left the control of Janssen defendants.

457. As a direct and proximate result of the product's defective design, plaintiff's decedent suffered severe and permanent injuries, resulting in death.

458. That by reason of the facts and premises aforesaid, plaintiff's decedent's beneficiaries sustained damages in a sum which exceeds the jurisdictional limits of all lower courts which would have jurisdiction of this matter, and in addition thereto, plaintiff seeks punitive and exemplary damages against Janssen defendants in an amount to be determined upon the trial of this matter.

## AS AND FOR A TWELFTH CAUSE OF ACTION AGAINST JANSSEN DEFENDANTS FOR FAILURE TO WARN

459. Plaintiff repeats and reiterates the allegations previously set forth herein.

460. Topamax was defective and unreasonably dangerous when it left the possession of Janssen defendants in that it contained warnings insufficient to alert consumers, including plaintiff's decedent, of the dangerous risks and reactions associated with the subject product, including but not limited to its propensity to cause users thereof to attempt suicide, even death.

106

461.    Plaintiff's decedent was prescribed Topamax and used the product for its intended purposes.

462.    Plaintiff's decedent could not have discovered any defect in the product through the exercise of reasonable care.

463.    Janssen defendants, as manufacturers and/or distributors of Topamax, are held to the level of knowledge of an expert in the field.

464.    The warnings that were given by Janssen defendants were not accurate, clear and/or were ambiguous.

465.    The warnings that were given by Janssen defendants failed to properly warn physicians of the increased risks of suicidal ideation, suicidal acts and suicide, and other serious injuries and side effects, including death.

466.    The warnings that were given by Janssen defendants failed to properly warn consumers of the increased risks of suicidal ideation, suicidal acts and suicide, and other serious injuries and side effects, including death.

467.    Plaintiff's decedent reasonably relied upon the skill, superior knowledge and judgment of Janssen defendants.

468.    Janssen defendants had a continuing duty to warn plaintiff's decedent of the dangers associated with Topamax.

469.    If plaintiff's decedent had received adequate warnings regarding the risks of ingesting Topamax, he would not have used it.

470.    As a direct and proximate result of the product's defective design, plaintiff's decedent suffered severe and permanent injuries, resulting in death.

107

471.    That by reason of the facts and premises aforesaid, plaintiff's decedent's beneficiaries sustained damages in a sum which exceeds the jurisdictional limits of all lower courts which would have jurisdiction of this matter, and in addition thereto, plaintiff seeks punitive and exemplary damages against Janssen defendants in an amount to be determined upon the trial of this matter.

### AS AND FOR A THIRTEENTH CAUSE OF ACTION AGAINST JANSSEN DEFENDANTS FOR BREACH OF IMPLIED WARRANTY

472.    Plaintiff repeats and reiterates the allegations previously set forth herein.

473.    Janssen defendants designed, manufactured, marketed, distributed, supplied and sold Topamax for the prevention of seizures.

474.    At the time Janssen defendants manufactured, marketed, distributed, supplied and/or sold Topamax, they knew of the use for which the product was intended and impliedly warranted it to be of merchantable quality and safe and fit for such use.

475.    Plaintiff's decedent reasonably relied upon the skill, superior knowledge and judgment of Janssen defendants.

476.    Plaintiff's decedent was prescribed, purchased and used Topamax for its intended purpose.

477.    Due to Janssen defendants' wrongful conduct as alleged herein, plaintiff's decedent could not have known about the nature of the risks and side effects associated with the product until after he ingested it.

478.    Contrary to the implied warranty for the product, Topamax was not of merchantable quality, and was not safe or fit for its intended uses and purposes, as alleged herein.

479. As a direct and proximate result of the product's defective design, plaintiff's decedent suffered severe and permanent injuries, resulting in death.

480. That by reason of the facts and premises aforesaid, plaintiff's decedent's beneficiaries sustained damages in a sum which exceeds the jurisdictional limits of all lower courts which would have jurisdiction of this matter, and in addition thereto, plaintiff seeks punitive and exemplary damages against Janssen defendants in an amount to be determined upon the trial of this matter.

### AS AND FOR A FOURTEENTH CAUSE OF ACTION AGAINST JANSSEN DEFENDANTS FOR BREACH OF EXPRESS WARRANTY

481. Plaintiff repeats and reiterates the allegations previously set forth herein.

482. Janssen defendants expressly warranted that Topamax was safe and fit for use by consumers and users, including plaintiff's decedent, for its intended purpose, that it was of merchantable quality, that it did not produce any dangerous side effects, and that it was adequately tested and fit for its intended use.

483. At the time of the making of the express warranties, Janssen defendants knew or should have known of the purpose for which Topamax was to be used and warranted the same to be, in all respects, fit, safe and effective and proper for such purpose.

484. At the time of the making of the express warranties, Janssen defendants knew or should have known that, in fact, said representations and warranties were false, misleading, and untrue in that Topamax was not safe and fit for its intended use and, in fact, produces serious injuries, even death, to the user.

485.   Members of the medical community, including, not limited to, plaintiff's decedent's physicians, reasonably relied upon the skill and judgment of Janssen defendants, and upon said express warranties, in prescribing, recommending and/or dispensing Topamax.

486.   Plaintiff's decedent relied on Janssen defendants' express warranties.

487.   Janssen defendants breached said express warranties in that Topamax was not safe and fit for its intended use and, in fact, causes serious side effects.

488.   As a direct and proximate result of the product's defective design, plaintiff's decedent suffered severe and permanent injuries, resulting in death.

489.   That by reason of the facts and premises aforesaid, plaintiff's decedent's beneficiaries sustained damages in a sum which exceeds the jurisdictional limits of all lower courts which would have jurisdiction of this matter, and in addition thereto, plaintiff seeks punitive and exemplary damages against Janssen defendants in an amount to be determined upon the trial of this matter.

## AS AND FOR A FIFTEENTH CAUSE OF ACTION
## AGAINST ELAN DEFENDANTS FOR NEGLIGENCE

490.   Plaintiff repeats and reiterates the allegations previously set forth herein.

491.   At all times hereinafter mentioned, Elan defendants had a duty to exercise reasonable care to consumers, including plaintiff's decedent, in the design, development, manufacture, testing, inspection, packaging, promotion, marketing, distribution, labeling and/or sale of Zonegran.

492.   Elan defendants breached their duty of reasonable care to plaintiff's decedent in that they negligently designed, developed, manufactured, tested, inspected, packaged, promoted, marketed, distributed, labeled, and/or sold Zonegran.

493.    Plaintiff's decedent's injuries and damages which resulted in death were and are
the direct and proximate result of the carelessness and negligence of Elan defendants as follows:

a.    In the design, development, research, manufacture, testing, packaging,
promotion, marketing, sale and/or distribution of the product;

b.    In the failure to warn or instruct, and/or adequately warn or adequately
instruct, users of the product, including plaintiff's decedent, of the product's dangerous
and defective characteristics;

c.    In the design, development, implementation, administration, supervision
and/or monitoring of clinical trials for the product;

d.    In the promotion of the product in an overly aggressive, deceitful and
fraudulent manner, despite evidence as to the product's defective and dangerous
characteristics due to its propensity to cause users to attempt suicide and/or death;

e.    In representing that the product was safe for its intended use when, in fact,
the product was unsafe for its intended use;

f.    In failing to perform appropriate pre-market testing of the product;

g.    In failing to perform appropriate post-market testing of the product, and

h.    In failing to perform appropriate post-market surveillance of the product.

494.    Elan defendants knew or should have known that consumers such as plaintiff's
decedent would foreseeably suffer injury, even death, as a result of Elan defendants' failure to
exercise reasonable and ordinary care.

495.    As a direct and proximate result of the product's defective design, plaintiff's
decedent suffered severe and permanent injuries, resulting in death.

496. That by reason of the facts and premises aforesaid, plaintiff's decedent's beneficiaries sustained damages in a sum which exceeds the jurisdictional limits of all lower courts which would have jurisdiction of this matter, and in addition thereto, plaintiff seeks punitive and exemplary damages against Elan defendants in an amount to be determined upon the trial of this matter.

## AS AND FOR A SIXTEENTH CAUSE OF ACTION
## AGAINST ELAN DEFENDANTS FOR
## PRODUCT LIABILITY – DEFECTIVE DESIGN

497. Plaintiff repeat and reiterates the allegations previously set forth herein.

498. At all times hereinafter mentioned, upon information and belief, Elan defendants were responsible for designing, developing, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and/or selling Zonegran.

499. Zonegran is defective and unreasonably dangerous to consumers.

500. Zonegran is defective in its design or formulation in that it is not reasonably fit, suitable, or safe for its intended purpose and/or its foreseeable risks exceed the benefits associated with its design and formulation.

501. At all times hereinafter mentioned, upon information and belief, Zonegran was expected to reach, and did reach, consumers in the State of Texas and throughout the United States, including plaintiff's decedent in the State of Texas, without substantial change in the condition in which it was sold.

502. At all times hereinafter mentioned, upon information and belief, Zonegran was designed, developed, manufactured, tested, packaged, promoted, marketed, distributed, labeled, and/or sold by Elan defendants in a defective and unreasonably dangerous condition at the time it

112

was placed in the stream of commerce in ways which include, but are not limited to, one or more of the following particulars:

    a.    When placed in the stream of commerce, Topamax contained unreasonably dangerous design defects and was not reasonably safe as intended to be used, subjecting plaintiffs' decedent to risks that exceed the benefits of the subject product, including but not limited to the risks of attempted suicide and even death in an unacceptably high number of its users;

    b.    When placed in the stream of commerce, Topamax was defective in design and formulation, making the use of Topamax more dangerous than an ordinary consumer would expect, and more dangerous than other risks associated with other anti-epileptic medications and similar drugs on the market;

    c.    Topamax's design defects existed before it left the control of Elan defendants;

    d.    Topamax was insufficiently tested;

    e.    Topamax caused harmful side effects that outweighed any potential utility; and

    f.    Topamax was not accompanied by adequate instructions and/or warnings to fully apprise consumers, including plaintiff's decedent, of the full nature and extent of the risks and side effects associated with its use, thereby rendering Elan defendants liable to plaintiff.

503.    In addition, at the time Topamax left the control of Elan defendants, there were practical and feasible alternative designs that would have prevented and/or significantly reduced the risk of plaintiffs' decedent's injuries without impairing the reasonably anticipated or intended

113

function of the product. These safer alternative designs were economically and technologically

feasible, and would have prevented or significantly reduced the risk of plaintiff's decedent's

injuries without substantially impairing the product's utility.

504.    As a direct and proximate result of the subject product's defective design,

plaintiff's decedent suffered severe and permanent injuries, resulting in death.

505.    That by reason of the facts and premises aforesaid, plaintiff's decedent's

beneficiaries sustained damages in a sum which exceeds the jurisdictional limits of all lower

courts which would have jurisdiction of this matter, and in addition thereto, plaintiff seeks

punitive and exemplary damages against Elan defendants in an amount to be determined upon

the trial of this matter.

### AS AND FOR A SEVENTEENTH CAUSE OF ACTION
### AGAINST ELAN DEFENDANTS FOR
### PRODUCT LIABILITY – MANUFACTURING DEFECT

506.    Plaintiff repeats and reiterates the allegations previously set forth herein.

507.    At all times hereinafter mentioned, upon information and belief, Elan defendants

were engaged in the business of designing, developing, manufacturing, testing, packaging,

promoting, marketing, distributing, labeling, and/or selling Topamax.

508.    At all times hereinafter mentioned, upon information and belief, Topamax was

expected to reach, and did reach, consumers in the State of Texas and throughout the United

States, including plaintiff's decedent in the State of Texas, without substantial change in the

condition in which it was sold.

509.    At all times hereinafter mentioned, upon information and belief, Topamax was

designed, developed, manufactured, tested, packaged, promoted, marketed, distributed, labeled

and/or sold by Elan defendants in a defective and unreasonably dangerous condition at the time it

114

was placed in the stream of commerce in ways which include, but are not limited to, one or more

of the following particulars:

     a.     When placed in the stream of commerce, Topamax contained

manufacturing defects which rendered the product unreasonably dangerous;

     b.     Topamax's manufacturing defects occurred while the product was in the

possession and control of Elan defendants.

     c.     Topamax product was not made in accordance with Elan defendants'

specifications or performance standards; and

     d.     Topamax's manufacturing defects existed before it left the control of Elan

defendants.

510.     As a direct and proximate result of the product's defective design, plaintiff's

decedent suffered severe and permanent injuries, resulting in death.

511.     That by reason of the facts and premises aforesaid, plaintiff's decedent's

beneficiaries sustained damages in a sum which exceeds the jurisdictional limits of all lower

courts which would have jurisdiction of this matter, and in addition thereto, plaintiff seeks

punitive and exemplary damages against Elan defendants in an amount to be determined upon

the trial of this matter.

## AS AND FOR A EIGHTEENTH CAUSE OF ACTION FOR
## FAILURE TO WARN-AS AGAINST ELAN DEFENDANTS

512.     Plaintiff repeats and reiterates the allegations previously set forth herein.

513.     Topamax was defective and unreasonably dangerous when it left the possession

of Elan defendants in that it contained warnings insufficient to alert consumers, including

plaintiff's decedent, of the dangerous risks and reactions associated with the subject product,

including but not limited to its propensity to cause users thereof to attempt suicide, even death.

115

514.    Plaintiff's decedent was prescribed Topamax and used the product for its intended purposes.

515.    Plaintiff's decedent could not have discovered any defect in the product through the exercise of reasonable care.

516.    Elan defendants, as manufacturers and/or distributors of Topamax, are held to the level of knowledge of an expert in the field.

517.    The warnings that were given by Elan defendants were not accurate, clear and/or were ambiguous.

518.    The warnings that were given by Elan defendants failed to properly warn physicians of the increased risks of suicidal ideation, suicidal acts and suicide, and other serious injuries and side effects, including death.

519.    The warnings that were given by Elan defendants failed to properly warn consumers of the increased risks of suicidal ideation, suicidal acts and suicide, and other serious injuries and side effects, including death.

520.    Plaintiff's decedent reasonably relied upon the skill, superior knowledge and judgment of Elan defendants.

521.    Elan defendants had a continuing duty to warn plaintiff's decedent of the dangers associated with Topamax.

522.    If plaintiff's decedent had received adequate warnings regarding the risks of ingesting Topamax, he would not have used it.

523.    As a direct and proximate result of the product's defective design, plaintiff's decedent suffered severe and permanent injuries, resulting in death.

116

524.    That by reason of the facts and premises aforesaid, plaintiff's decedent's beneficiaries sustained damages in a sum which exceeds the jurisdictional limits of all lower courts which would have jurisdiction of this matter, and in addition thereto, plaintiff seeks punitive and exemplary damages against Elan defendants in an amount to be determined upon the trial of this matter.

**AS AND FOR A NINETEENTH CAUSE OF ACTION
AGAINST ELAN DEFENDANTS FOR
BREACH OF IMPLIED WARRANTY**

525.    Plaintiff repeats and reiterates the allegations previously set forth herein.

526.    Elan defendants designed, manufactured, marketed, distributed, supplied and sold Topamax for the prevention of seizures.

527.    At the time Elan defendants manufactured, marketed, distributed, supplied and/or sold Topamax, they knew of the use for which the product was intended and impliedly warranted it to be of merchantable quality and safe and fit for such use.

528.    Plaintiff's decedent reasonably relied upon the skill, superior knowledge and judgment of Elan defendants.

529.    Plaintiff's decedent was prescribed, purchased and used Topamax for its intended purpose.

530.    Due to Elan defendants' wrongful conduct as alleged herein, plaintiff's decedent could not have known about the nature of the risks and side effects associated with the product until after he ingested it.

531.    Contrary to the implied warranty for the product, Topamax was not of merchantable quality, and was not safe or fit for its intended uses and purposes, as alleged herein.

117

532.    As a direct and proximate result of the product's defective design, plaintiff's decedent suffered severe and permanent injuries, resulting in death.

533.    That by reason of the facts and premises aforesaid, plaintiff's decedent's beneficiaries sustained damages in a sum which exceeds the jurisdictional limits of all lower courts which would have jurisdiction of this matter, and in addition thereto, plaintiff seeks punitive and exemplary damages against Elan defendants in an amount to be determined upon the trial of this matter.

### AS AND FOR A TWENTIETH CAUSE OF ACTION AGAINST ELAN DEFENDANTS FOR BREACH OF EXPRESS WARRANTY

534.    Plaintiff repeats and reiterates the allegations previously set forth herein.

535.    Elan defendants expressly warranted that Topamax was safe and fit for use by consumers and users, including plaintiff's decedent, for its intended purpose, that it was of merchantable quality, that it did not produce any dangerous side effects, and that it was adequately tested and fit for its intended use.

536.    At the time of the making of the express warranties, Elan defendants knew or should have known of the purpose for which Topamax was to be used and warranted the same to be, in all respects, fit, safe and effective and proper for such purpose.

537.    At the time of the making of the express warranties, Elan defendants knew or should have known that, in fact, said representations and warranties were false, misleading, and untrue in that Topamax was not safe and fit for its intended use and, in fact, produces serious injuries, even death, to the user.

118

538.   Members of the medical community, including, not limited to, plaintiff's decedent's physicians, reasonably relied upon the skill and judgment of Elan defendants, and upon said express warranties, in prescribing, recommending and/or dispensing Topamax.

539.   Plaintiff's decedent relied on Elan defendants' express warranties.

540.   Elan defendants breached said express warranties in that Topamax was not safe and fit for its intended use and, in fact, causes serious side effects.

541.   As a direct and proximate result of the product's defective design, plaintiff's decedent suffered severe and permanent injuries, resulting in death.

542.   That by reason of the facts and premises aforesaid, plaintiff's decedent's beneficiaries sustained damages in a sum which exceeds the jurisdictional limits of all lower courts which would have jurisdiction of this matter, and in addition thereto, plaintiff seeks punitive and exemplary damages against Elan defendants in an amount to be determined upon the trial of this matter.

### AS AND FOR A TWENTY-FIRST CAUSE OF ACTION AGAINST DEFENDANT GLENMARK FOR NEGLIGENCE

543.   Plaintiff repeats and reiterates the allegations previously set forth herein.

544.   That at all times hereinafter mentioned, defendant Glenmark was under a duty to exercise reasonable care in the design and development of zonisamide, in particular, by adopting the statements, studies, labeling and representations of the brand name manufacturer of Zonegran, in the advertising, marketing and promoting of zonisamide, both directly and indirectly, to ensure that zonisamide was not used in the treatment of conditions such as trigeminal neuralgia, for which it was not effective and to ensure that zonisamide was not used in a manner or to treat conditions where defendant Glenmark knew or should have known that the user could sustain injuries and harm from the drug.

119

545.    That defendant Glenmark negligently, recklessly, grossly negligently, wantonly
and willfully displayed a morally culpable and conscious disregard of the rights of others in that
it failed to exercise reasonable care and failed to fulfill the above-stated duty by the manner that
defendant Glenmark, by adopting the statements, studies, labeling and representations of the
brand name manufacturers of Zonegran, directly and indirectly, advertised, marketed and
promoted zonisamide for the treatment of trigeminal neuralgia, even though zonisamide had not
been scientifically determined to be safe for such use and even though zonisamide was, in fact,
not reasonably safe for such use, and furthermore, defendant Glenmark failed to adequately warn
of the risk of suicide or aggressive, self-destructive behavior of which defendant Glenmark knew
or should have known about.

546.    That defendant Glenmark was further negligent, reckless, grossly negligent,
wanton and willfully displayed a morally culpable and conscious disregard of the rights of others
by manufacturing, distributing, selling, advertising, marketing and promoting zonisamide even
though such drug was not safe or effective for any purpose because it caused or influenced
persons using the drug for any purpose to engage in self-destructive behavior including
committing suicide and by failing to adequately warn the public of such risks.

547.    The aforesaid incident and the injuries sustained by plaintiff's decedent were
caused by or were contributed to by the negligence, recklessness, gross negligence, wantonness,
willfulness, and conscious and callous disregard of the safety of the public, including plaintiff's
decedent, on the part of defendant Glenmark, by adopting the statements, studies, labeling and
representations of the brand name manufacturers of Zonegran, in the design, manufacture,
distribution, advertising, marketing and promoting of zonisamide as being safe and effective in
the treatment of trigeminal neuralgia, and by inducing the public, including plaintiff's decedent,

120

to believe that zonisamide was effective in the treatment of the causes and symptoms of trigeminal neuralgia.

548. That at all times hereinafter mentioned, upon information and belief, the above-described culpable conduct by defendant Glenmark was a proximate cause of plaintiff's decedent's committing suicide.

549. That at all times hereinafter mentioned, plaintiff's decedent did not contribute to plaintiff's decedent's injuries by reason of any negligence or culpable conduct on plaintiff's decedent's part.

550. By reason of the foregoing, plaintiff's decedent's beneficiaries sustained damages in a sum which exceeds the jurisdictional limits of all lower courts which would have jurisdiction of this matter, and in addition, plaintiff seeks punitive and exemplary damages against defendant Glenmark in an amount to be determined upon the trial of this matter.

## AS AND FOR A TWENTY-SECOND CAUSE OF ACTION
## AGAINST DEFENDANT GLENMARK FOR BREACH OF WARRANTY

551. Plaintiff repeats and reiterates the allegations previously set forth herein.

552. That at all times hereinafter mentioned, upon information and belief, defendant Glenmark, by adopting the statements, studies, labeling and representations of the brand name manufacturers of Zonegran, by directly and indirectly advertising, marketing and promoting zonisamide for the treatment of trigeminal neuralgia, and by placing this drug in the stream of commerce knowing that zonisamide would be prescribed for the treatment of trigeminal neuralgia, in reliance upon the representations of the brand name manufacturer of Zonegran, expressly warranted to all foreseeable users of this drug, including plaintiff's decedent, that zonisamide was safe and effective for the treatment of trigeminal neuralgia.

121

553. That defendant Glenmark, by adopting the statements, studies, labeling and representations of the brand name manufacturers of Zonegran, impliedly warranted in manufacturing, distributing, selling, advertising, marketing and promoting zonisamide to all foreseeable users, including plaintiff's decedent, that zonisamide was safe and effective for the purposes for which it had been placed in the stream of commerce by defendant Glenmark, including for the treatment of trigeminal neuralgia, and that zonisamide was reasonably safe, proper, merchantable and fit for the intended purposes, including for the treatment of trigeminal neuralgia.

554. That at all times hereinafter mentioned, plaintiff's decedent relied upon the aforesaid express and implied warranties by defendant Glenmark.

555. That at all times hereinafter mentioned, plaintiff's decedent's use of zonisamide prior to and up to the time of the above-described incident was consistent with the purposes for which defendant Glenmark directly and indirectly advertised, marketed and promoted zonisamide, and plaintiff's decedent's use of zonisamide was reasonably contemplated, intended and foreseen by defendant Glenmark at the time of the distribution and sale of zonisamide by defendant Glenmark, and, therefore, plaintiff's decedent's use of zonisamide was within the scope of the above-described express and implied warranties.

556. Defendant Glenmark breached the aforesaid express and implied warranties because zonisamide was not safe and effective for the treatment of trigeminal neuralgia, and because plaintiff's decedent's use of zonisamide for the treatment of trigeminal neuralgia caused or contributed to the incident described herein.

557. Plaintiff's decedent gave appropriate notice to defendant Glenmark of the breach of the aforesaid express and implied warranties or such notice was otherwise excused.

122

558.   By reason of the foregoing, plaintiff's decedent's beneficiaries sustained damages

in a sum which exceeds the jurisdictional limits of all lower courts which would have jurisdiction

of this matter, and in addition, plaintiff seeks punitive and exemplary damages against defendant

Glenmark in an amount to be determined upon the trial of this matter.

## AS AND FOR A TWENTY-THIRD CAUSE OF ACTION
## AGAINST DEFENDANT GLENMARK FOR PRODUCTS LIABILITY

559.   Plaintiff repeats and reiterates the allegations previously set forth herein.

560.   That at all times hereinafter mentioned, the drug zonisamide was not suited for the

treatment of trigeminal neuralgia, and was not safe and effective for the treatment of trigeminal

neuralgia, even though defendant Glenmark directly and indirectly advertised, marketed and

promoted zonisamide for this purpose.

561.   That at all times hereinafter mentioned, the drug zonisamide was not safe and was

not suited for the purposes for which defendant Glenmark, directly and indirectly, advertised,

marketed and promoted the drug at the time defendant Glenmark designed, manufactured,

distributed and sold the drug and placed the drug in the stream of commerce.

562.   That at all times hereinafter mentioned, upon information and belief, defendant

Glenmark assumed a strict products liability to users and to persons using zonisamide, including

plaintiff's decedent, who sustained injuries, harm and damages by reason of the use of

zonisamide for purposes directly and indirectly advertised, marketed, and promoted by defendant

Glenmark, including for the treatment of trigeminal neuralgia.

563.   By reason of the foregoing, plaintiff's decedent's beneficiaries sustained damages

in a sum which exceeds the jurisdictional limits of all lower courts which would have jurisdiction

of this matter, and in addition, plaintiff seeks punitive and exemplary damages against defendant

Glenmark in an amount to be determined upon the trial of this matter.

123

## **PRAYER**

Accordingly, plaintiff prays upon final trial of this cause she have judgment against

defendants for damages as set forth above for:

a.  Compensatory damages in an amount in excess of the jurisdictional limits
of this Court;

b.  Pre- and post-judgment interest at the maximum rate allowed by law;

c.  Reasonable and necessary attorney's fees;

d.  All costs of Court; and

e.  Such other and further relief, both general and special, at law and in
equity, to which plaintiff may show herself justly entitled.

Dated: May    , 2010                      Respectfully submitted,

LAW OFFICES OF JACK W. LONDON
& ASSOCIATES

By: _____

State Bar No. 12512500
Jack W. London, Esquire
3701 Bee Cave Road, Suite 200
Austin, TX 78746
Tel.: (512) 478-5858
Fax: (512) 478-1120
jack@jackwlondon.com

**OF COUNSEL:**
Andrew G. Finkelstein, Esquire
FINKELSTEIN & PARTNERS, LLP
1279 Route 300, P.O. Box 1111
Newburgh, New York 12551
Tel.: (845) 562-0203
Fax: (845) 562-3492
afinkelstein@lawampm.com

*Attorneys for Plaintiff*

124

TO: PFIZER INC.
   Defendant
   235 East 42nd Street
   New York, New York

   PARKE-DAVIS, a division of
   Warner-Lambert Company and
   Warner-Lambert Company LLC
   Defendant
   c/o Pfizer Inc.
   235 East 42nd Street
   New York, New York

   WARNER-LAMBERT COMPANY
   Defendant
   c/o Pfizer Inc.
   235 East 42nd Street
   New York, New York

   WARNER-LAMBERT COMPANY LLC
   Defendant
   c/o Pfizer Inc.
   235 East 42nd Street
   New York, New York

   IVAX PHARMACEUTICALS, INC.
   Defendant
   4400 Biscayne Boulevard
   Miami, Florida 33137

   JANSSEN ORTHO LLC,
   One Johnson & Johnson Plaza
   New Brunswick, New Jersey 08933

   ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC.
   1125 Trenton-Harbourton Road
   Titusville, New Jersey 08560

   JOHNSON & JOHNSON PHARMACEUTICAL
    RESEARCH & DEVELOPMENT, L.L.C.
   920 US Route 202
   Raritan, New Jersey 08869

   JOHNSON & JOHNSON
   One Johnson & Johnson Plaza
   New Brunswick, New Jersey 08933

ELAN PHARMACEUTICALS, INC.
800 Gateway Boulevard
South San Francisco, CA 04080

DAINIPPON PHARMACEUTICALS USA CORPORATION
One Bridge Plaza
Suite 510
Fort Lee, NJ 07024

GLENMARK GENERICS INC., USA
750 Corporate Drive
Mahwah, NJ 07430-2009