# EXHIBIT B

No. 09-_____

In The

# Supreme Court of the United States

PLIVA, INC.; TEVA PHARMACEUTICALS USA, INC.;
UDL LABORATORIES, INC.,

*Petitioners,*

v.

GLADYS MENSING,

*Respondent.*

On Petition for Writ of Certiorari to the United
States Court of Appeals for the Eighth Circuit

## PETITION FOR WRIT OF CERTIORARI

JONATHAN I. PRICE
GOODWIN PROCTER LLP
THE NEW YORK TIMES BLDG.
620 EIGHTH AVENUE
New York, NY 10018
(212) 459-7439
jprice@goodwinprocter.com

WILLIAM F. SHEEHAN
GOODWIN PROCTER LLP
901 NEW YORK AVE., N.W.
WASHINGTON, DC 20001
(202) 346-4303
wsheehan@goodwinprocter.com
*Attorneys for Petitioners
Teva Pharmaceuticals USA,
Inc. and UDL Laboratories, Inc.*

JOSEPH P. THOMAS
*Counsel of Record*
LINDA E. MAICHL
ULMER & BERNE LLP
600 VINE STREET
SUITE 2800
CINCINNATI, OH 45202
(513) 698-5000
jthomas@ulmer.com
lmaichl@ulmer.com
*Attorneys for Petitioner
PLIVA, Inc.*

February 19, 2010

Becker Gallagher · Cincinnati, OH · Washington, D.C. · 800.890.5001

i

## QUESTION PRESENTED

The Drug Price Competition and Patent Term Restoration Act (the "Hatch-Waxman Amendments"), which amended the federal Food, Drug, and Cosmetic Act ("FDCA") allow for the approval of low-cost generic versions of previously approved drug products through an abbreviated application process.

The question presented is:

Whether the Eighth Circuit abrogated the Hatch-Waxman Amendments by allowing state tort liability for failure to warn in direct contravention of the Act's requirement that a generic drug's labeling be the same as the FDA-approved labeling for the listed (or branded) drug.

ii

## LIST OF PARTIES

Pursuant to Rule 14.1(b), the following list identifies all the parties to the appellate proceeding in the Eighth Circuit Court of Appeals, whose judgment is sought to be reviewed:

A.   **Defendants-Appellees**

PLIVA, Inc.
Teva Pharmaceuticals USA, Inc.
UDL Laboratories, Inc.
Actavis Elizabeth, LLC
Wyeth, LLC

B.   **Plaintiff-Appellant**

Gladys Mensing

iii

## CORPORATE DISCLOSURE STATEMENTS

As required by the Court's Rule 29.6:

Petitioner Pliva, Inc., hereby discloses that (1) its parent companies are: Property Asset Management USA, Incorporated, Barr Laboratories, Inc., Barr Pharmaceuticals, LLC, Teva Pharmaceuticals USA, Inc., Orvet UK, Teva Pharmaceutical Holdings Cooperatieve U.A., Teva Pharmaceuticals Europe B.V., and Teva Pharmaceutical Industries Ltd.; and (2) Teva Pharmaceutical Industries Ltd., an Israeli corporation, is the only publicly-traded company that owns – through the aforementioned chain – 10% or more of Pliva, Inc.

Petitioner Teva Pharmaceuticals USA, Inc. hereby discloses that (1) its parent companies are: Orvet UK, Teva Pharmaceutical Holdings Cooperatieve U.A., Teva Pharmaceuticals Europe B.V., and Teva Pharmaceutical Industries Ltd.; and (2) Teva Pharmaceutical Industries Ltd., an Israeli corporation, is the only publicly-traded company that owns – through the aforementioned chain – 10% or more of Teva Pharmaceuticals USA, Inc.

Petitioner UDL Laboratories, Inc. hereby discloses that it is a wholly owned subsidiary of Mylan Inc., which is a publicly-traded company. Mylan Inc. is the only publicly-traded company that owns 10% or more of UDL Laboratories, Inc.

iv

# TABLE OF CONTENTS

QUESTION PRESENTED ............................ i

LIST OF PARTIES ..................................... ii

CORPORATE DISCLOSURE STATEMENTS ........................... iii

TABLE OF CONTENTS ............................ iv

TABLE OF AUTHORITIES ................. viii

OPINIONS BELOW .................................. 1

JURISDICTION ......................................... 1

STATUTORY PROVISIONS INVOLVED ......... 1

INTRODUCTION ...................................... 1

STATEMENT OF THE CASE .................... 4

A. Regulatory Background ................. 4

   1. The Hatch-Waxman Amendments ..................... 4

   2. Labeling and Warnings for ANDA Drugs ......................... 6

   3. Procedures for Changes to Label Warnings ................................ 12

B. Proceedings Below ........................ 16

   1. The District Court Proceedings ........ 16

v

   2. The Appeal to the Eighth Circuit Court of Appeals ...................... 18

REASONS FOR GRANTING THE PETITION ......................................... 19

A. The Decision Below Is Unrealistic and Defeats the Purpose of the Hatch-Waxman Amendments ...... 19

B. The Court Should Grant Review Because the Eighth Circuit's Application of this Court's Decision in *Wyeth V. Levine* Is Overly-Broad ...... 22

CONCLUSION ......................................... 25

TABLE OF APPENDICES

Appendix A    Opinion of the Eighth Circuit Court of Appeals Filed November 27, 2009 ................ 1a

Appendix B    Memorandum Opinion and Order of the U.S. District Court, District of Minnesota, Filed June 17, 2008 .................... 24a

Appendix C    Amended Memorandum Opinion and Order of the U.S. District Court, District of Minnesota, Filed October 30, 2008 ............. 49a

vi

Appendix D    Constitutional Provision
              Involved, United States
              Constitution, Article VI,
              Clause 2 ....................64a

Appendix E    21 U.S.C. §355...........65a

Appendix F    21 C.F.R. §314.3...........72a

Appendix G    21 C.F.R. §314.70...........73a

Appendix H    21 C.F.R. §314.80...........81a

Appendix I    21 C.F.R. §314.92...........83a

Appendix J    21 C.F.R. §314.94...........84a

Appendix K    21 C.F.R. §314.97...........89a

Appendix L    21 C.F.R. §314.98...........90a

Appendix M    21 C.F.R. §314.127...........91a

Appendix N    21 C.F.R. §314.150...........92a

Appendix O    Abbreviated New Drug
              Application Regulations — Final
              Rule, 57 Fed. Reg. 17950, 17961
              (April 28, 1992) ....................94a

vii

Appendix P    New Drug Application: Hearings
              on H.R. 3605 Before the
              Subcomm. On Health and the
              Environment of the House
              Comm. on Energy and
              Commerce, 98th Cong, 1st Sess.
              (1983) ....................114a

Appendix Q    P.L. 98-417, Drug Price
              Competition and Patent Term
              Restoration Act, H.R. Rep. No.
              857(I), 98th Cong., 2d Sess.
              (June 21, 1984), *reprinted in*
              1984 U.S.C.C.A.N. 2647 ...........122a

Appendix R.   Drug Price Competition and
              Patent Term Restoration Act of
              1984, Committee Notes, 130
              Cong. Rec. 24416, H.R. 3605
              (Sept. 6, 1984) ....................136a

Appendix S    Guidance for Industry —
              Revising ANDA Labeling
              Following Revision of the RLD
              Labeling, U.S. Department of
              Health and Human Services,
              Food and Drug Administration,
              Center for Drug Evaluation and
              Research, May 2000 ...........147a

viii

ix

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Demahy v. Actavis, Inc.,*
-- F.3d ---, 2010 U.S. Dist. LEXIS 430
(5th Cir. 2010) ........................ 4, 24

*Gaeta v. Perrigo Pharms. Co.,*
2009 U.S. Dist. LEXIS 115752 (N.D.
Cal., Nov. 24, 2009) ........................ 24

*Kellogg v. Wyeth,*
612 F. Supp. 2d 421 (D. Vt., 2009) ........................ 24

*Morris v. Wyeth, Inc.,*
582 F. Supp. 2d 861 (W.D. Ky, Oct. 24,
2008) ........................ 24

*Schrock v. Wyeth, Inc.,*
601 F. Supp. 2d 1262 (W.D. Okla.,
2009) ........................ 24

*Stacel v. Teva Pharms., USA,*
2009 U.S. Dist. LEXIS 21079 (N.D. Ill.,
Mar. 16, 2009) ........................ 24

*Wyeth v. Levine,*
555 U.S. ---, 129 S. Ct. 1187 (2009) ... 3, 4, 23, 24

### FEDERAL STATUTES

21 U.S.C. §301 *et seq.* ........................ 12

21 U.S.C. §355(j) ........................ 2, 5, 6, 20

28 U.S.C. §1254 ........................ 1

### FEDERAL REGULATIONS

21 C.F.R. §314.70 ........................ 12, 13, 15

21 C.F.R. §314.80 ........................ 22

21 C.F.R. §314.92 ........................ 5

21 C.F.R. §314.94 ........................ 5, 6, 7, 15

21 C.F.R. §314.97 ........................ 13

21 C.F.R. §314.98 ........................ 22

21 C.F.R. §314.127 ........................ 9

21 C.F.R. §314.150 ........................ 8

Abbreviated New Drug Application
Regulations – Final Rule,
57 Fed. Reg. 17950 (April 28, 1992)
(codified at 21 C.F.R. Part 314) ........ 7, 8, 9, 14

Abbreviated New Drug Application
Regulations – Proposed Rule,
54 Fed. Reg. 28872 (July 10, 1989) ........................ 7

Drugs; Statement of Ingredients;
Prescription-Drug Advertisements,
28 Fed. Reg. 6375 (June 20, 1963) ........................ 12

New Drug and Antibiotic Regulation –
Final Rule,
50 Fed. Reg. 7452 (Feb. 22, 1985) .............. 13

New Drug and Antibiotic Regulation –
Proposed Rule,
47 Fed. Reg. 46622 (Oct. 19, 1982) .............. 13

Requirements on Content and Format of
Labeling for Human Prescription Drug
and Biological Products – Final Rule,
71 Fed. Reg. 3922 (Jan. 24, 2006) .............. 9

Requirements on Content and Format of
Labeling for Human Prescription
Drugs and Biologics; Requirements for
Prescription Drug Product Labels –
Proposed Rule,
65 Fed. Reg. 81082 (Dec. 22, 2000) .............. 11

Supplemental Applications Proposing
Labeling Changes for Approved Drugs,
Biologics, and Medical Devices – Final
Rule,
73 Fed. Reg. 49603 (Aug. 22, 2008) .............. 15

Supplemental Applications Proposing
Labeling Changes for Approved Drugs,
Biologics, and Medical Devices –
Proposed Rule,
73 Fed. Reg. 2848 (Jan. 16, 2008) ....... 13, 14, 15

Supplemental New-Drug Applications,
30 Fed. Reg. 993 (Jan. 30, 1965) .............. 12

## LEGISLATIVE MATERIALS

"P.L. 98-417, Drug Price Competition
and Patent Term Restoration Act,"
H.R. Rep. No. 857(I), 98th Cong., 2d
Sess. (1984), reprinted in 1984
U.S.C.C.A.N. 2647 .............. 5

Drug Price Competition and Patent Term
Restoration Act of 1984, Committee
Notes, 130 Cong. Rec. 24416, H.R.
3605 (Sept. 6, 1984) .............. 5

Drug Price Competition and Patent Term
Restoration Act, Committee Notes, 130
Cong. Rec. 24970, S. 1538 (Sept. 12,
1984) .............. 5

New Drug Application: Hearings on H.R.
3605 Before the Subcomm. On Health
and the Environment of the House
Comm. on Energy and Commerce, 98th
Cong., 1st Sess. (1983) .............. 5

## MISCELLANEOUS

Guidance for Industry, Changes to an
Approved NDA or ANDA, U.S.
Department of Health and Human
Services, Food and Drug
Administration, Center for Drug
Evaluation and Research, April 2004 .............. 11

xii

Guidance for Industry, Providing
Regulatory Submissions in Electronic
Format — ANDAs, Center for Drug
Evaluation and Research, June 2002.........15

Guidance for Industry, Revising ANDA
Labeling Following Revision of the
RLD Labeling, U.S. Department of
Health and Human Services, Food and
Drug Administration, Center for Drug
Evaluation and Research, May 2000.........11

---

1

## OPINIONS BELOW

The decision of the Eighth Circuit Court of Appeals is reported at 588 F.3d 603 (8th Cir. 2009) and reprinted in the Appendix ("App.") at 1a-23a. The district court's decisions finding that the claims against the generic drug manufacturers were preempted are reprinted at App. 24a-48a and 49a-63a.

## JURISDICTION

The Eighth Circuit Court of Appeals rendered its decision on November 27, 2009, App. 1a-23a. This Court has jurisdiction under 28 U.S.C. §1254.

## STATUTORY PROVISIONS INVOLVED

The pertinent constitutional, statutory, and regulatory provisions are set forth in the Appendix, App. 64a-113a.

## INTRODUCTION

In 1984, as the cost of prescription drugs was spiraling out of control and many individuals were faced with choosing between their medications and the basic necessities of life, Congress enacted the Hatch-Waxman Amendments to allow the federal Food and Drug Administration ("FDA") to approve generic versions of approved drugs under an abbreviated application process. Before Congress passed the Hatch-Waxman Amendments, the approval and post-marketing requirements of the FDCA and FDA's implementing regulations

2

applied equally to all drugs – branded and generic. The Hatch-Waxman Amendments, however, exempt generic drug manufacturers from the requirement of conducting the clinical trials previously necessary for approval of their drug products. Instead, FDA is permitted to approve an abbreviated new drug application ("ANDA") showing that the generic product is bioequivalent to a previously approved branded drug (the "listed drug"). *See* 21 U.S.C. §355(j). App. 65a. Before FDA may approve an ANDA, a generic drug manufacturer also must demonstrate that the labeling proposed for the generic drug is the same as the labeling approved for the listed drug. *See* 21 U.S.C. §355(j)(2)(A)(v), App. 67a.

As a result, virtually all data regarding the safety and efficacy of drug products, including pre-approval study data and post-approval adverse event data, lies in the hands of the listed drug manufacturer and FDA. At the time of approval, generic drug manufacturers possess only the data from the bioequivalence studies they must conduct to obtain approval for their products. Generic drug manufacturers do not have the clinical safety and efficacy data upon which FDA relies in approving the generic drug or the detailed post-marketing adverse event data received by the listed drug manufacturer and FDA before the drug's eligibility for generic versions.

While recognizing that generic drug manufacturers are not required to undertake expensive, time-consuming clinical studies to obtain approval to market their drugs, the Eighth Circuit's decision requires them to obtain the data,

3

post-approval, necessary to provide the scientific substantiation to support changes in the risk-benefit analysis reflected in a drug's labeling. That decision, if allowed to stand, strips the Hatch-Waxman Amendments of their salutary purpose of providing American consumers and state and federal governments with low-cost generic drugs, for it essentially requires generic drug manufacturers to generate the scientific data necessary to craft their own labeling. It also subjects generic drug manufacturers with products already on the market to absolute liability under state law for complying with the federal law that governs them.

The Eighth Circuit's solution to the dilemma faced by generic drug manufacturers – to simply stop selling the products – highlights the conflict between state-law tort duties and federal-law requirements governing generic drug manufacturers. If the impact of imposing liability under state law is the withdrawal of generic drugs from the market, Congress's principal goal in enacting Hatch-Waxman will be thwarted.

The Court of Appeals' heavy reliance on this Court's decision in *Wyeth v. Levine*, 555 U.S. ---, 129 S. Ct. 1187 (2009), was misplaced. That decision, holding that the FDCA does not preempt state law failure-to-warn claims against brand manufacturers, did not address the Hatch-Waxman Amendments or the critical legal and factual differences between generic drug manufacturers and manufacturers of listed drugs.

In partially abrogating provisions of the Hatch-Waxman Amendments and FDA regulations, the Eighth Circuit Court of Appeals has created a question of first impression for this Court. The Court should grant review here to remove the obstacle created by the decision below to the accomplishment of Congress's objective of making low-cost generic drugs available to the consuming public and to clarify the scope of its decision in *Wyeth v. Levine.*[1]

## STATEMENT OF THE CASE

### A. REGULATORY BACKGROUND

#### 1. The Hatch-Waxman Amendments

In 1984, Congress enacted the Hatch-Waxman Amendments to the FDCA to address the ever-increasing need of the American people and

[1] The Fifth Circuit Court of Appeals also has held that claims against generic drug manufacturers are not preempted. *See Demahy v. Actavis, Inc.,* --- F.3d ---, 2010 U.S. Dist. LEXIS 430 (5th Cir. 2010). In addition, three cases raising the issue are pending in the Sixth Circuit Court of Appeals, *Morris v. Wyeth, Inc., et al.,* 6th Cir. Case No. 09-5509; *Smith v. Wyeth, Inc., et al.,* 6th Cir. Case No. 09-5460; and *Wilson v. Pliva, Inc., et al.,* 6th Cir. Case No. 09-5466; another is pending in the Fifth Circuit, *Fustejousky v. Pliva, Inc.,* 5th Cir. Case No. 09-10983, and yet another is pending in the Ninth Circuit, *Gaeta v. Perrigo Pharmaceuticals Company,* 9th Cir. Case No. 09-15001. To Petitioners' knowledge no case has reached the highest court of any state.

state and federal governments for low-cost drugs.[2] The Amendments codified the procedures FDA used to approve duplicate versions of pre-1962 drugs, for application to duplicate (generic) versions of post-1962 drugs.

Under the Amendments, a generic drug manufacturer is exempt from the requirement of conducting the onerous testing and reporting requirements imposed on branded drug manufacturers. Instead, a generic drug manufacturer may submit an ANDA, showing (with exceptions not pertinent here) that the generic drug is the same as a listed drug with respect to active ingredient(s), route of administration, dosage form, strength, and conditions of use recommended in the labeling. *See* 21 U.S.C. §355(j)(2), App. 65a-67a; 21 C.F.R. §314.92(a)(1), App. 83a. The generic drug manufacturer also must show that, with certain exceptions, the labeling of the generic drug is the same as the listed drug's label. *See* 21 U.S.C. §355(j)(2)(A)(v), App. 67a; 21 C.F.R. §314.94(a)(8), App. 86a-87a.

[2] The overriding purpose of the Amendments was to increase the availability of low-cost generic drugs. *See* "P.L. 98-417, Drug Price Competition and Patent Term Restoration Act," H.R. Rep. No. 857(I), 98th Cong., 2d Sess. (1984), *reprinted in* 1984 U.S.C.C.A.N. 2647, App. 122a; New Drug Application: Hearings on H.R. 3605 Before the Subcomm. On Health and the Environment of the House Comm. on Energy and Commerce, 98th Cong., 1st Sess. (1983), App. 114a; Drug Price Competition and Patent Term Restoration Act of 1984, Committee Notes, 130 Cong. Rec. 24416, H.R. 3605 (Sept. 6, 1984), App. 136a; Drug Price Competition and Patent Term Restoration Act, Committee Notes, 130 Cong. Rec. 24970, S. 1538 (Sept. 12, 1984).

## 2. Labeling and Warnings for ANDA Drugs

Because generic drugs are approved based on the safety and efficacy data of the listed drug, the FDCA and FDA's regulations are specific as to the differences between the listed drug and the generic drug that are acceptable. See 21 U.S.C. §355(j), App. 65a; 21 C.F.R. §314.94, App. 84a. As part of an ANDA, a generic drug manufacturer must submit "information to show that the labeling proposed for the new drug is the same as the labeling approved for the listed drug ...except for changes required because of differences approved under a petition filed under subparagraph (C) or because the new drug and the listed drug are produced or distributed by different manufacturers ...." 21 U.S.C. §355(j)(2)(A)(v), App. 67a. FDA's implementing regulations require the generic drug manufacturer to submit copies of the proposed label, as well as "[a] statement that the applicant's proposed labeling ...is the same as the labeling of the reference listed drug except for differences annotated and explained under paragraph (a)(8)(iv) of this section." 21 C.F.R. §314.94(a)(8)(iii), App. 86a. Paragraph (a)(8)(iv) of §314.94 identifies as acceptable:

[D]ifferences in expiration date, formulation, bioavailability, or pharmacokinetics, labeling revisions made to comply with current FDA labeling guidelines or other guidance, or omission of an indication or other aspect of labeling protected by patent

or accorded exclusivity under section 505(j)(4)(D) of the act.

21 C.F.R. §314.94(a)(8)(iv), App. 86a-87a. Additional warnings are not included in that list. In fact, additional or heightened warnings are specifically excluded. See Abbreviated New Drug Application Regulations – Proposed Rule, 54 Fed. Reg. 28872, 28884 (July 10, 1989).

More than one comment to FDA's proposed regulations implementing the labeling requirements of the Hatch-Waxman Amendments addressed whether an ANDA manufacturer could include warnings or precautions in addition to those on the listed drug's label. FDA rejected each suggestion. One comment, addressed specifically to the labeling requirements of 21 C.F.R. §314.94(a)(8), proposed that the labeling provisions be "revised to permit ANDA applicants to deviate from the labeling for the reference listed drug to add contraindications, warnings, precautions, adverse reactions and other safety-related information." FDA flatly disagreed stating that the generic drug's labeling "must be the same as the listed drug product's labeling because the listed drug product is the basis for ANDA approval." Abbreviated New Drug Application Regulations – Final Rule ("ANDA Regs"), 57 Fed. Reg. 17950, 17961 (April 28, 1992) (codified at 21 C.F.R. Part 314). App. 108a-109a. FDA noted that "[c]onsistent labeling will assure physicians, health professionals, and consumers that a generic drug is as safe and effective as its brand-name counterpart." Id., App. 109a.

8

Another comment recommended that "FDA accept ANDA's with warnings or precautions in addition to those on the reference listed drug's label, provided that such information was not indicative of diminished safety or effectiveness of the generic drug product." *Id.* at 17953, App. 103a-104a. FDA again disagreed and admonished that "section 505(j)(2)(A)(v) and (j)(3)(G) of the act requires that the applicant's proposed labeling be the same as that of the reference listed drug" and that "the exceptions in section 505(j)(2)(A)(v) and (j)(3)(G) of the act are limited." *Id.*

FDA also disagreed with a suggestion that FDA accept petitions under section 355(j)(2)(C) to submit an ANDA for a product whose labeling differs from the listed drug by being "more clear or offer better directions regarding how the drug should be taken." *Id.* at 17957, App. 105a-106a. FDA unequivocally advised that "[l]abeling differences [] are not proper subjects for a suitability petition" and reminded "applicants that the labeling for an ANDA product must be the same as the labeling for the listed drug product except for differences due to different manufacturers, exclusivity, etc. (*See* 21 U.S.C. 355(j)(3)(G).)" *Id.*

FDA regulations also demonstrate that generic drug manufacturers may not change labeling language pre- or post-approval where there has been no change to the labeling of the listed drug. In fact, FDA's approval of an ANDA may be withdrawn if FDA finds that the labeling for the generic drug "is no longer consistent with that for the listed drug referred to in the [ANDA]." 21

9

C.F.R. §314.150(b)(10), App. 92a. *See also* ANDA Regs, 57 Fed. Reg. at 17970 (agreeing with comment that provision should be added to withdraw ANDA where ANDA holder fails to modify label to match changes to listed drug's labeling), App. 110a-111a; 21 C.F.R. §314.127 (providing that ANDA will not be approved if information submitted is insufficient to show labeling proposed is same as labeling approved for listed drug), App. 91a.

In addition, an FDA rule regarding the content and format of drug labeling, published in January 2006, specifically recognized that generic drug labeling, both before and after approval, must remain the same as the labeling of the listed drug. *See* Requirements on Content and Format of Labeling for Human Prescription Drug and Biological Products – Final Rule, 71 Fed. Reg. 3922, 3928 (Jan. 24, 2006) (advising that implementation plan for revised labeling for products approved or submitted for approval under an ANDA depends on the labeling of the listed drug referenced in the ANDA). *See also id.* at 3961 ("Revised labeling for ANDA products depends on the labeling for the reference listed drug"). In responding to comments that a generic manufacturer be permitted to use the new format even though the listed drug used the old format, FDA reiterated that, under the Act and its regulations, "the labeling of a drug product submitted for approval under an ANDA must be the same as the labeling of the listed drug referenced in the ANDA." *Id.* at 3963.

A similar discussion appeared in connection with FDA's proposed rule in 2000 to revise the

11

required to have labeling that complies with the final rule.

Requirements on Content and Format of Labeling for Human Prescription Drugs and Biologics; Requirements for Prescription Drug Product Labels – Proposed Rule, 65 Fed. Reg. 81082, 81098 (Dec. 22, 2000).

Similarly, in its Guidance for Industry regarding Changes to an Approved NDA or ANDA, FDA expressly cautions that "[a]ll labeling changes for ANDA drug products must be consistent with section 505(j) of the Act," i.e., the labeling changes must be the "same as" that of the listed drug. See Guidance for Industry, Changes to an Approved NDA or ANDA, U.S. Department of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research, April 2004 ("ANDA Guidance"), p. 24. See also Guidance for Industry, Revising ANDA Labeling Following Revision of the RLD Labeling, U.S. Department of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research, May 2000 (stating that generic drug products "must have the same labeling as the [listed drug]"), App. 149a.

In short, the requirement that a generic drug's labeling must be the "same as" that of the listed drug, both before and after approval, is repeated again and again throughout every document – the Hatch-Waxman provision, FDA regulations, FDA Federal Register documents, FDA guidance documents – that addresses the issue since the ANDA provisions were enacted. By

10

content and format of prescription drug labeling. Discussing the application of the new rule to generic drugs, FDA noted that and format of drug labeling regarding the implementation of the proposed regulations to products approved under an ANDA. Specifically, FDA stated that

the labeling of a drug product submitted for approval under an ANDA must be the same as the labeling of the listed drug referenced in the ANDA .... Thus, whether a prescription drug product that was approved under an ANDA before the effective date of the final rule, or that is submitted for approval under an ANDA after the effective date of the final rule, will be required to have labeling that complies with the final rule will depend on the status of the labeling of the listed drug referenced in the ANDA. Where a reference listed product's labeling conforms to the requirements of the final rule ...the generic product that references the listed drug in its ANDA would be required to have labeling that is the same as the listed product and would therefore be required to comply with the final rule. On the other hand, where a reference listed product's labeling does not conform to the requirements of the final rule ... a generic product that references the product in its ANDA would not be

12

contrast, no statutory or regulatory provision authorizes a generic manufacturer to change label language where there has been no change to the labeling of the listed drug.

### 3. Procedures for Changes to Label Warnings

Once an application is approved, the drug can be marketed only under the provisions of the application as approved – including the approved labeling language. As a result, if the manufacturer wants to make any change to an approved application, it is required to submit a supplemental application that is subject to the same review and approval process as the initial application. See 21 U.S.C. § 301 et seq.; Drugs; Statement of Ingredients; Prescription-Drug Advertisements, 28 Fed. Reg. 6375, 6380 (June 20, 1963) (regulation regarding submission of supplemental applications for NDAs "for any change beyond the variations provided for in the application ... that may alter the conditions of use, the labeling ....").

Since 1965, FDA, using its enforcement authority, has permitted branded drug manufacturers to revise product labeling to "add" or "strengthen" a "contraindication, warning, precaution, or adverse reaction" without prior FDA approval under the "changes being effected" ("CBE") provision of FDA's regulations. See Supplemental New-Drug Applications ("1965 Regulation"), 30 Fed. Reg. 993, 993-94 (Jan. 30, 1965); see also 21 C.F.R. §314.70(c)(6)(iii)(A). CBE supplements to "add" or "strengthen" warnings are permitted only where the NDA holder becomes

13

aware of newly discovered safety information and there is sufficient evidence of a causal association with the drug. See New Drug and Antibiotic Regulation – Proposed Rule ("1982 Proposed Rule"), 47 Fed. Reg. 46622 (Oct. 19, 1982); Supplemental Applications Proposing Labeling Changes for Approved Drugs, Biologics, and Medical Devices – Proposed Rule ("2008 Proposed Rule"), 73 Fed. Reg. 2848, 2849 (Jan. 16, 2008). FDA explained that "some information, although still the subject of a supplement, would no longer require agency preclearance. These supplements would describe changes placed into effect to correct concerns about newly discovered risks from the use of the drug." 1982 Proposed Rule, 47 Fed. Reg. at 46623. However, FDA stated, in both the proposed and final rule, that the CBE procedure was a limited exception to the requirement of prior approval for labeling changes. Id. at 46635; New Drug and Antibiotic Regulation – Final Rule, 50 Fed. Reg. 7452 (Feb. 22, 1985). CBE supplements must be submitted to FDA for ultimate approval. See 21 C.F.R. §314.70(c), App. 73a. FDA can accept, modify, or reject any change made via a CBE supplement and may order the manufacturer to cease distribution of the drug. Id., App. 80a.

When FDA adopted the regulations implementing Hatch-Waxman, FDA included a provision that requires generic drug manufacturers to "comply with the requirements of §§314.70 and 314.71 regarding the submission of supplemental applications and other changes to an approved abbreviated application." 21 C.F.R. §314.97, App. 89a. However, in doing so, FDA made clear that generic manufacturers could not use the CBE

14

provisions to alter labeling that would make the generic drug's labeling different from or inconsistent with the branded drug's labeling.

Section 314.70 -- Supplements and Other Changes to an Approved Application

FDA received no comments on this provision, but has amended the provision to adopt references to statutory, rather than regulatory, provisions or to explain what information should be provided. However, the agency wishes to remind ANDA applicants that, as noted in paragraph 4 above, the labeling for an ANDA product must, with few exceptions, correspond to that for the reference listed drug.

ANDA Regs, 57 Fed. Reg. 17955, App. 105a. "Paragraph 4" referred to by FDA specifically rejected the suggestion that ANDA manufacturers be permitted to alter warnings. See id. at 17953, App.103a.

FDA reaffirmed in a proposed rule issued on January 16, 2008, that §314.70 does not permit generic drug manufacturers to change their labeling where there has been no change to the branded drug's labeling. See 2008 Proposed Rule, 73 Fed. Reg. 2848. Section 314.70 was amended to codify FDA's longstanding view on when the labeling of a drug approved under an NDA may be changed in advance of agency approval. Id. at 2849. FDA explained that the amendment applies

15

only to supplemental NDAs because "CBE changes are not available for generic drugs approved under an abbreviated new drug application under 21 U.S.C. 355(j). To the contrary, a generic manufacturer is required to conform to the approved labeling for the listed drug." Id., n.1.[3]

FDA's regulations also permit changes in approved applications through a prior approval supplement. See 21 C.F.R. §314.70(b), Appx. 73a. However, the prior approval supplement provision also does not provide a mechanism for a generic drug manufacturer to change its labeling where there has been no change to the listed drug's labeling. See 21 C.F.R. §314.94, Appx. 84a. See also Guidance for Industry, Providing Regulatory Submissions in Electronic Format — ANDAs, Center for Drug Evaluation and Research, June 2002, ("Electronic Format Guidance"), p. 6 (applying to "electronic submission of abbreviated new drug applications (ANDAs) and supplements and amendments to those applications" and advising ANDA holders that "you must provide a statement that your proposed labeling is the same as the labeling of the reference listed drug except for differences explained in the annotated comparison of labeling (21 C.F.R. §314.94(a)(8)(iii))". Under FDA's regulations, every supplemental ANDA a generic manufacturer submits involving a labeling must include a statement that the labeling being submitted for the

[3]FDA issued its Final Rule on August 22, 2008. See Supplemental Applications Proposing Labeling Changes for Approved Drugs, Biologics, and Medical Devices – Final Rule, 73 Fed. Reg. 49603 (Aug. 22, 2008).

genetic drug "is the same as" the then-current approved labeling for the branded drug.

## B. PROCEEDINGS BELOW

### 1. The District Court Proceedings

Respondent's state-law claims against Petitioners were premised on an alleged failure to adequately warn of the purported risks of long-term metoclopramide use. The district court had jurisdiction under 28 U.S.C. §1332.

PLIVA and Actavis sought dismissal of Respondent's claims on the ground that the Hatch-Waxman Amendments preempted them. After reviewing the FDCA, the Hatch-Waxman Amendments, the legislative history, and FDA's regulations, documents, and responses to comments during rulemaking, the district court concluded that "a generic drug manufacturer cannot unilaterally change its label without prior FDA approval." App. 45a. The court held that a unilateral change would directly conflict with the federal law requiring that their labels be the same as those of the listed drugs and that, "under these circumstances, it would be impossible for [the generic manufacturers] to abide by both state and federal laws." App. 45a. The court ruled that

[i]f Plaintiff's claims were not preempted, [the generic defendants] would be forced to choose between complying with the federal law while being exposed to state tort liability, or

unilaterally adding a heightened warning to their labels at the risk of exposing themselves to federal liability. This conflict would stand as an obstacle to the accomplishment and full purposes and objectives of the Hatch-Waxman Act, a key purpose of which is to increase the availability of low-cost generic drugs and to relax the generic approval and labeling process.

App. 45-46a.

The district court also rejected the argument that the generic defendants could have sought to strengthen their warnings through the prior approval supplement process. App. 46a. The district court noted that a generic drug manufacturer may seek to add safety information to drug labeling only by providing information scientifically substantiating the change, which generic manufacturers do not possess. The court concluded that the outcome of any such request would be mere speculation. App. 46a.

Finally, the district court recognized that generic drug manufacturers are not permitted to send "Dear Doctor" letters as a means of providing additional or different warnings. App. 47a. Again, the district court concluded that enforcing a state-law duty that would require generic drug manufacturers to send "Dear Doctor" letters would directly conflict with the statutory scheme. App. 47a. Further, the court concluded that "speculation over what the FDA might have done if [the generic defendants] had requested such a letter would

18

stand as an obstacle to the accomplishment and execution of the full purposes of the Act." App. 47a.

Adhering to its ruling, the District Court subsequently granted motions to dismiss filed by the other generic drug manufacturers named in the suit. App. 49a.

### 2. The Appeal to the Eighth Circuit Court of Appeals

The Eighth Circuit reversed. The court concluded that generic drug manufacturers are subject to the requirement in 21 C.F.R. §201.57(e) that their labeling "shall be revised as soon as there is reasonable evidence of an association of a serious hazard with a drug." App. 11a. According to the court, "§201.57(e) does not permit generic manufacturers passively to accept the inadequacy of their drug's label as they market and profit from it." App. 12a.

Relying on FDA's responses to comments during the rulemaking stage, the court determined that, at a minimum, generic drug manufacturers should alert FDA to any new safety hazard associated with their products. App. 12a. As a result, the court ruled that it was not impossible for generic drug manufacturers to comply with both federal and state law because no provision in the FDCA or the Hatch-Waxman Amendments forbids them from "proposing a label change through the prior approval process," App. 13a, or suggesting FDA send out warning letters to healthcare professionals, App. 14a.

19

The court also held that allowing state-law failure-to-warn claims to proceed will not obstruct Congress's purposes in enacting Hatch-Waxman. App. 18a. Although acknowledging the primary purpose of the Amendments was to provide for low-cost generic drugs and acknowledging that labeling changes must be scientifically substantiated, the court concluded that generic drug manufacturers need not acquire information to support label changes through their own clinical studies, but, instead, could merely reference studies published elsewhere or rely on reports of adverse drug experiences they received. App. 18a.

## REASONS FOR GRANTING THE PETITION

### A. THE DECISION BELOW IS UNREALISTIC AND DEFEATS THE PURPOSE OF THE HATCH-WAXMAN AMENDMENTS

Due to the overwhelming evidence in the legislative history, FDA regulations, Federal Register documents, and other FDA documents, the Eighth Circuit acknowledged that "generic labels must be substantively identical to the name brand label even after they enter the market." App. 10a. However, the court then skirted the preemptive effect of the requirement that generic drug labeling be the "same as" the labeling of the listed drug by concluding that generic drug manufacturers can comply with both federal and state law by "proposing a label change through the prior approval process," or proposing that FDA send a "Dear Doctor" letter to provide additional or different warnings. App. 14a. That conclusion is

inadequate as a matter of law, is based on view of real-world facts that is wrong, and threatens to frustrate the fundamental purpose of the Hatch-Waxman Amendments.

The conclusion is inadequate as a matter of law because the court gave no support for the idea that "proposing a label change" would satisfy any state-imposed duty of providing adequate warnings for the product. A plaintiff claiming to have been harmed due to inadequate warnings will contend (with obvious force) that a manufacturer who had proposed a label change to clarify or enhance warnings should have stopped selling the product pending FDA's review of the proposal – a result that would take the generic drug off the market, which in some instances may be on the day after the generic drug was first approved.

Furthermore, the Eighth Circuit's theoretical mechanism of "proposing a label change" directly implicates the obstruction prong of implied preemption. The Eighth Circuit acknowledged that the primary purpose of Hatch-Waxman was to provide for low-cost generic drugs and that labeling changes must be scientifically substantiated. The reality is that, to obtain the scientific substantiation required to support a proposed label change, a generic manufacturer would essentially be required, post-approval, to conduct the clinical studies that Congress exempted them from conducting.[4]   The Eighth Circuit thought that

generic drug manufacturers could merely reference studies published elsewhere or rely on adverse event reports they received to support a label change, but that conclusion obviously was based on the court's assumption that FDA did no more than rely on a few studies published elsewhere when it mandated a change to metoclopramide labeling, the product at issue in this case, in early 2009. The court did not consider the fact that FDA has in its possession all the original clinical data, all the world literature regarding metoclopramide, and 29 years of data from the adverse events reported to it from all sources since the listed drug was approved. Nor did the Eighth Circuit have before it certain facts regarding FDA's review of metoclopramide that took place in the years before FDA issued the required label change. In addition, the court's conclusion did not acknowledge that, even after generic versions of products enter the market, the majority of adverse events continue to be reported directly to FDA or the branded drug manufacturer.

Unlike the branded manufacturer and FDA, generic manufacturers never accumulate the universe of data regarding a particular drug product. They cannot merely review literature or a handful of adverse event reports and discern a need for strengthened warnings. That would require a knowledge base equal to that of the branded drug manufacturer and FDA – a knowledge base that can be acquired only at a cost that would bring the generic drug price up to the listed drug's price.

FDA has acknowledged the fundamental differences in the knowledge base of the branded manufacturer and the generic manufacturer by

---

[4] Generic companies are actually required only to establish that the generic drug is bioequivalent to its branded counterpart. *See* 21 U.S.C. §356(j).

imposing different post-marketing surveillance responsibilities on them. Following a branded drug's introduction to market, its manufacturer must conduct post-marketing surveillance that encompasses review and analysis of all reported adverse events – an analysis that is conducted against the backdrop of knowledge obtained through the clinical trials conducted to obtain approval in the first place. *See* 21 C.F.R. §314.80, App. 81a. In contrast, generic manufacturers, who do not have the underlying scientific data to perform a meaningful analysis of reported adverse events, are required only to report to FDA those adverse events reported to them. *See* 21 C.F.R. §314.98, App. 90a.

Finally, the decision below places generic drug manufacturers in the untenable position of having to amass that knowledge base by the day after their drugs are approved. Under the Court of Appeals' view, the day after its ANDA is approved, a generic drug manufacturer becomes responsible under state law for information Congress exempted it from acquiring the day before. That cannot possibly be what Congress intended in the Hatch-Waxman Amendments.

B.   THE COURT SHOULD GRANT REVIEW BECAUSE THE EIGHTH CIRCUIT'S APPLICATION OF THIS COURT'S DECISION IN *WYETH V. LEVINE* IS OVERLY-BROAD

The Eighth Circuit relied heavily for its result on this Court's decision in *Wyeth v. Levine.* That case, however, did not involve the statutory provisions applicable to generic drugs and thus the Court did not consider the congressional objectives of the Hatch-Waxman Amendments or decide whether state-law claims against generic drug manufacturers are preempted. *Levine* stressed a branded drug manufacturer's ability to change labeling prior to obtaining FDA approval through the CBE provisions, but the district court in this case held that those provisions are not available to a generic manufacturer and the Court of Appeals pretermitted that issue by holding that a generic manufacturer could, in any case, propose a label change to the FDA.

The Court of Appeals found it significant that the Court in *Levine* ruled that "manufacturers, not the FDA, bear primary responsibility for their drug labeling." *Levine,* 129 S. Ct. at 1202. But this Court was not considering the statutes and regulations governing generic drugs, under which manufacturers are required only to assure that their drugs are bioequivalent to the branded drugs and to adopt the labeling, verbatim (with exceptions not applicable here), of the branded drug. Under those statutes and regulations, the generic manufacturer fulfills its responsibility for its drug labeling by ensuring that it remains the same as the labeling of the branded drug.

Moreover, in *Levine* the branded manufacturer argued that state tort claims "interfere with 'Congress's purpose to entrust an expert agency to make drug labeling decisions that strike a balance between competing objectives.'" *Id.* at 1199. Here, however, the question is whether state tort law interferes with Congress's

24

purpose of making low-cost generic drugs available to the public – a question not raised or addressed in *Levine*.

In short, both the "impossibility preemption" and the "obstacle preemption" issues in *Levine* and in this case are markedly different, and the court below erred in giving *Levine* virtually controlling effect here.[5] If *Levine* was dispositive of the issue, preemption in pharmaceutical litigation would have been laid to rest – fully and completely. Yet, this Court recognized that its decision in *Levine* did not completely foreclose preemption of claims even against manufacturers of branded pharmaceutical products. As Justice Stevens stated, "we recognize that some state-law claims might well frustrate the achievement of congressional objectives…." *Levine, Id.* at 1204. Accordingly, review is warranted to clarify the breadth of *Levine* and to guide the lower courts in cases against generic drug manufacturers.

---

[5] Other courts also have read *Levine* broadly. *See, e.g. Demahy v. Wyeth*, 2010 U.S. App. LEXIS 430 (5th Cir., Jan. 8, 2010); *Kellogg v. Wyeth*, 612 F. Supp. 2d 421 (D. Vt., 2009); *Schrock v. Wyeth, Inc.*, 601 F. Supp. 2d 1262 (W.D. Okla., 2009); and *Stacel v. Teva Pharms., USA*, 2009 U.S. Dist. LEXIS 21079 (N.D. Ill., Mar. 16, 2009).

Two other courts, however, have concluded that *Levine* does not govern in cases involving generic drug manufacturers. *See Gaeta v. Perrigo Pharms. Co.*, 2009 U.S. Dist. LEXIS 115752 (N.D. Cal., Nov. 24, 2009) (holding state law preempted); *Morris v. Wyeth, Inc.*, 582 F. Supp. 2d 861 (W.D. Ky., Oct. 24, 2008) (same), motion for reconsideration denied Order, Case No. 3:07-CV-378-R, Feb. 20, 2009, Notice regarding *Levine* March 5, 2009 (ruling that *Levine* did not alter the conclusion).

25

## CONCLUSION

The Eighth Circuit's decision essentially returns the regulation of generic drugs to that which existed before Hatch-Waxman was enacted. The Court should grant this petition for a writ of certiorari to correct the Eighth Circuit's error.

Respectfully submitted,

JOSEPH P. THOMAS
*Counsel of Record*
LINDA E. MAICHL
ULMER & BERNE LLP
600 VINE STREET, SUITE 2800
CINCINNATI, OH 45202
(513) 698-5000
jthomas@ulmer.com
lmaichl@ulmer.com

*Attorneys for Petitioner PLIVA, Inc.*

JONATHAN I. PRICE
GOODWIN PROCTER LLP
THE NEW YORK TIMES BLDG.
620 EIGHTH AVENUE
NEW YORK, NY 10018
(212) 459-7439
jprice@goodwinprocter.com

# APPENDIX

WILLIAM F. SHEEHAN
GOODWIN PROCTER LLP
901 NEW YORK AVE., N.W.
WASHINGTON, DC 20001
(202) 346-4303
wsheehan@goodwinprocter.com

*Attorneys for Petitioners*
*Teva Pharmaceuticals USA,*
*Inc. and UDL Laboratories, Inc.*

zb

# TABLE OF APPENDICES

Appendix A   Opinion of the Eighth Circuit
Court of Appeals Filed
November 27, 2009 .......... 1a

Appendix B   Memorandum Opinion and
Order of the U.S. District Court,
District of Minnesota, Filed
June 17, 2008 .......... 24a

Appendix C   Amended Memorandum Opinion
and Order of the U.S. District
Court, District of Minnesota,
Filed October 30, 2008 .......... 49a

Appendix D   Constitutional Provision
Involved, United States
Constitution, Article VI,
Clause 2 .......... 64a

Appendix E   21 U.S.C. §355.......... 65a

Appendix F   21 C.F.R. §314.3.......... 72a

Appendix G   21 C.F.R. §314.70.......... 73a

Appendix H   21 C.F.R. §314.80.......... 81a

Appendix I   21 C.F.R. §314.92.......... 83a

Appendix J   21 C.F.R. §314.94.......... 84a

Appendix K   21 C.F.R. §314.97.......... 89a

Appendix L   21 C.F.R. §314.98.......... 90a

## APPENDIX A

## UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

[Filed Nov. 27, 2009]

No. 08-3850

Gladys Mensing,

*Plaintiff - Appellant,*

v.

Wyeth, Inc., doing business as Wyeth; Pliva, Inc.; Teva Pharmaceuticals, USA, Inc.; Alpharma, Inc., doing business as Alpharma Pharmaceuticals; UDL Laboratories, Inc.; Actavis Elizabeth, LLC; Schwarz Pharma, Inc.; Purepac Pharmaceutical Company, and the following fictitious party defendants (whether singular or plural, individual or corporate): No. 1, that entity which originally obtained permission from the U.S. Food and Drug Administration to market the drug branded Reglan No. 2, that entity which obtained permission from the FDA to market the Reglan, metoclopramide and/or metoclopramide HCl ingested by Gladys Mensing No. 3, that entity which originally manufactured and sold any Reglan which was ultimately ingested by Gladys Mensing No. 4, that entity which originally manufactured and sold any Reglan, metoclopramide and/or metoclopramide HCl which was ultimately ingested by Gladys Mensing No. 5, that entity which marketed Reglan

Appendix M   21 C.F.R. §314.127 .................91a

Appendix N   21 C.F.R. §314.150 .................92a

Appendix O   Abbreviated New Drug Application Regulations – Final Rule, 57 Fed. Reg. 17950, 17961 (April 28, 1992) .................94a

Appendix P   New Drug Application: Hearings on H.R. 3605 Before the Subcomm. On Health and the Environment of the House Comm. on Energy and Commerce, 98th Cong., 1st Sess. (1983) .................114a

Appendix Q   P.L. 98-417, Drug Price Competition and Patent Term Restoration Act, H.R. Rep. No. 857(I), 98th Cong, 2d Sess. (June 21, 1984), *reprinted in* 1984 U.S.C.C.A.N. 2647 .................122a

Appendix R   Drug Price Competition and Patent Term Restoration Act of 1984, Committee Notes, 130 Cong. Rec. 24416, H.R. 3605 (Sept. 6, 1984) .................136a

2a

or generic metoclopramide and/or metoclopramide HCl, jointly and individually, *Defendants - Appellees.*

Appeal from the United States District Court for the District of Minnesota

Submitted October 20, 2009

Before: WOLLMAN, MURPHY, and BYE, *Circuit Judges.*

MURPHY, Circuit Judge

Gladys Mensing brought this failure to warn and misrepresentation case against a number of manufacturers of Reglan and its generic form, alleging that the medication she had taken caused her to develop tardive dyskinesia, a severe neurological movement disorder. The manufacturers moved for summary judgment and dismissal. The district court dismissed her claims against the generic defendants on the basis of federal preemption and against the name brand manufacturers on the basis that she had not taken their products. Mensing appeals, and we affirm the judgment in favor of the name brand manufacturers but reverse as to the generic manufacturers.

3a

I.

In March 2001 Gladys Mensing's doctor prescribed Reglan to treat her diabetic gastroparesis, and her pharmacist filled her prescription with its generic bioequivalent, metoclopramide. Minn. Stat. § 151.21. After four years of ingesting metoclopramide, Mensing developed tardive dyskinesia. Mensing sued the manufacturers and/or distributors of generic metoclopramide (generic defendants). Mensing's complaint includes a variety of claims, but she has not challenged the district court's characterization that "at the core" they all assert failure to warn. *Mensing v. Wyeth, Inc.*, 562 F.Supp.2d 1056, 1058 (D.Minn. 2008). Mensing argues that despite mounting evidence that long term metoclopramide use carries a risk of tardive dyskinesia far greater than indicated on the label, no metoclopramide manufacturer took steps to change the label warnings. According to her allegations, metoclopramide manufacturers in fact promoted the drug for long term use. Although she never ingested the name brand drug, Mensing also sued the manufacturers of Reglan (name brand defendants) for fraud and negligent misrepresentation on the theory that her doctor relied on Reglan's label when assessing the risks and proper use of metoclopramide.

All defendants filed motions to dismiss or for summary judgment. The district court granted the motions to dismiss by generic defendants Actavis Elizabeth and Pliva and motions for summary judgment by generic defendants Teva, Wyeth, and UDL Laboratories on the ground of federal preemption. The court concluded that Mensing's

failure to warn claims created an impermissible conflict with federal law because they would require generic manufacturers to deviate from the name brand drug label; they were therefore preempted. The court also granted summary judgment to name brand defendants Schwarz and Wyeth,[1] holding that they owed Mensing no duty of care under Minnesota law because she never ingested their product.

Grants of motions to dismiss and for summary judgment are subject to de novo review. We affirm a dismissal if, taking all the plaintiff's allegations as true, they "state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). On review of summary judgment, we "view the evidence in the light most favorable to the nonmoving party" and affirm only when "there are no genuine issues of material fact[.]" Takele v. Mayo Clinic, 576 F.3d 834, 838 (8th Cir. 2009) (quotations omitted).

## II.

We first address the generic defendants' argument that federal law preempts their failure to warn claims against them. Since a purely legal issue of statutory interpretation is raised, the generic defendants' motions for summary judgment and dismissal will be considered together.

---

1 Wyeth manufactured both Reglan and generic metoclopramide. It joined in the summary judgment motions of both the generic and name brand defendants.

## A.

All prescription drugs require approval by the Food and Drug Administration (FDA) before they may be marketed. Manufacturers of new drugs submit a new drug application (NDA) to the FDA. 21 U.S.C. § 355(a)-(b). An NDA must include information about the drug's safety and efficiency gleaned from clinical trials. Id. at §§ 355(b), (d). It must also propose a label reflecting appropriate use, warnings, precautions, and adverse reactions. 21 C.F.R. § 201.56.

Recognizing a need to bring more affordable generic drugs to market as quickly as possible after the patents of name brand drugs expire, Congress passed the Drug Price Competition and Patent Term Restoration Act in 1984. This statute amended the Food, Drug, and Cosmetic Act (FDCA) and is therefore referred to as the Hatch-Waxman Amendments to the FDCA. The Hatch-Waxman Amendments provided an abbreviated new drug application (ANDA) procedure for generic manufacturers. 21 U.S.C. § 355(j). Generic manufacturers do not need to repeat the clinical trials conducted by name brand manufacturers. ANDA's are approved based on the initial safety profile of the name brand drug, as well as any postmarketing surveillance. See Bartlett v. Mutual Pharmaceutical Co., Inc., --- F.Supp.2d ---, 2009 WL 3126305, at *2-*6 (D.N.H. Sept. 30, 2009) (detailing requirements and history of ANDA procedure). As a result, ANDA applicants must show the FDA that their drug is essentially the same as the name brand drug and that their proposed label is in relevant part identical to the name brand drug label. 21 C.F.R. § 314.94(a)(8).

6a

Drug labels are subject to change. New risks may become apparent only after the drug has been used more widely and for longer periods. When a manufacturer has "reasonable evidence of an association of a serious hazard with a drug[,]" the drug's label must be revised; "a causal relationship need not have been proved." 21 C.F.R. § 201.57(e) (redesignated as 21 C.F.R. § 201.80(e) in 2006, after the conduct at issue here). Manufacturers cannot distribute a "misbranded" drug, 21 U.S.C. §§ 331(a)-(b), including a drug whose "labeling is false or misleading in any particular." Id. at § 352(a). The FDA has several enforcement mechanisms to ensure that drugs with misleading labels are taken off the market. See, e.g., id. at § 333, 355(e).

There are several procedures in 21 C.F.R. § 314.70 by which a manufacturer may supplement its application and propose changes to the drug or its label. "Major changes" require the FDA's prior approval through a prior approval supplement. 21 C.F.R. § 314.70(b). Manufacturers may implement "moderate changes," including changing a label to strengthen a warning based on newly acquired information, through a Changes Being Effected (CBE) supplement. 21 C.F.R. § 314.70(c)(6)(iii)(A)-(D). Manufacturers may implement CBE changes before the FDA formally approves them.

The FDA approved Reglan in 1980. Manufacturers began seeking approval for generic versions of metoclopramide five years later. The relevant part the same as the Reglan label. The label warnings about tardive dyskinesia, and other similar but less severe extrapyramidal symptoms,

7a

did not change from 1985 through the time Mensing stopped ingesting the drug in 2005. Mensing alleges that despite mounting evidence that long term metoclopramide users were at a much greater risk of movement disorders than indicated by the drug's label, no manufacturer took any step to enhance the warnings.[2] Moreover, Mensing asserts that defendants promoted metoclopramide for long term use even though the FDA had approved the drug only for use up to 12 weeks.

Acting on its own initiative pursuant to the Food and Drug Administration Amendments Act of 2007, Pub. L. No. 110-85, 121 Stat. 823 (FDAAA), the FDA ordered manufacturers of Reglan and generic metoclopramide on February 26, 2009 to add a boxed warning to their labels about the increased risks of tardive dyskinesia from long term metoclopramide usage.

### B.

In considering a preemption defense we must be attuned to Congressional intent and the presumption against preemption. Wyeth v. Levine, 129 S.Ct. 1187, 1194-95 (2009) (quotation omitted) (courts must assume "that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."). In Wyeth, the Supreme Court ruled that failure to warn claims against name brand manufacturers are not

---

[2] Mensing notes that in July 2004 the FDA approved Schwarz's request to add a sentence to the Reglan label: "Therapy should not exceed 12 weeks in duration."

8a

preempted by the FDCA. The Court noted the historic coexistence of state tort remedies and federal regulation of prescription drugs:

> If Congress thought state-law suits posed an obstacle to its objectives, it surely would have enacted an express pre-emption provision at some point during the FDCA's 70-year history. But despite its 1976 enactment of an express pre-emption provision for medical devices, . . . Congress has not enacted such a provision for prescription drugs. . . . Its silence on the issue, coupled with its certain awareness of the prevalence of state tort litigation, is powerful evidence that Congress did not intend FDA oversight to be the exclusive means of ensuring drug safety and effectiveness.

Id.

The Hatch-Waxman Amendments are part of this 70 year history and they do not explicitly preempt suits against generic manufacturers. Congress could have crafted a preemption provision for generic drugs in its 1984 amendments, having done so for medical devices less than 10 years earlier. It chose not to do that. Seven in ten prescriptions filled in this country are now for generic drugs. Susan Okie, Multinational Medicines-Ensuring Drug Quality in an Era of Global Manufacturing, 361 New Eng. J. Med. 737, 738 (2009). After Wyeth, we must view with a questioning mind the generic defendants' argument

9a

that Congress silently intended to grant the manufacturers of most prescription drugs blanket immunity from state tort liability when they market inadequately labeled products.

The generic defendants distinguish Wyeth on the ground that it concerned claims against brand name manufacturers, but the decision carries important implications for their situation as well. See, e.g., Wyeth, 129 S. Ct. at 1197-98 ("[I]t has remained a central premise of federal drug regulation that the manufacturer bears responsibility for the content of its label at all times. It is charged both with crafting an adequate label and with ensuring that its warnings remain adequate[.]"). The district court did not have the teachings of Wyeth available when it rendered its decision, but courts which have subsequently considered this issue have almost uniformly ruled that tort claims against generic manufacturers are not preempted. See, e.g., Stacel v. Teva Pharmaceuticals, USA, 620 F.Supp.2d 899, 906-907 (N.D. Ill. 2009); Schrock v. Wyeth, 601 F.Supp.2d 1262, 1265-66 (W.D. Okla. 2009). The Fourth Circuit reached the same conclusion much earlier in considering whether a plaintiff injured by a generic drug can hold a name brand manufacturer liable. Foster v. American Home Products Corp., 29 F.3d 165, 170 (4th Cir. 1994) ("The statutory scheme governing premarketing approval for drugs simply does not evidence Congressional intent to insulate generic drug manufacturers from liability for misrepresentations made regarding their products, or to otherwise alter state products liability law.").

10a

Even when a federal law does not expressly preempt state law claims, a court may find that Congress impliedly preempted such claims by "conflict" if 1) compliance with both federal and state law is impossible, or 2) the claims would "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 372-73 (2000) (quotation omitted). The district court concluded that each basis for conflict preemption was present. We disagree.

C.

The Supreme Court characterized "[I]mpossibility pre-emption [as] a demanding defense." Wyeth, 129 S.Ct. at 1199. To prevail on that defense, the generic defendants must show that compliance with both federal law and the state laws Mensing seeks to enforce is not merely difficult, but "a physical impossibility." Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 153 (1982) (quotation omitted). The parties agree that generic labels must be substantially identical to the name brand label even after they enter the market. See, e.g., 21 C.F.R. § 314.150(b)(10) (FDA may withdraw approval of a generic drug if its label is "no longer consistent" with the name brand label); 57 Fed. Reg. at 17961, cmt. 39 (1992). Because of this requirement, the generic manufacturers argue they are prohibited from implementing a unilateral label change without prior FDA approval through the CBE process. Yet, 21 C.F.R. § 314.97 compels generic manufacturers to "comply with the requirements of § [] 314.70[.]" Section 314.70 includes the CBE process *and* the

11a

prior approval supplement process.[3] In this case we need not decide whether generic manufacturers may unilaterally enhance a label warning through the CBE procedure[4] because the generic defendants could have at least *proposed* a label change that the FDA could receive and impose uniformly on all metoclopramide manufacturers if approved.

The regulatory framework makes clear that a generic manufacturer must take steps to warn its customers when it learns it may be marketing an unsafe drug. Generic manufacturers are subject to the requirement that their labeling "shall be revised as soon as there is reasonable evidence of an association of a serious hazard with a drug[.]" 21 C.F.R. § 201.57(e). The generic defendants argue

---

[3] See supra sec. II-A for a discussion of these regulatory processes. If the defendants were correct that generic manufacturers can use the CBE process only to copy label changes initiated by the name brand manufacturer, it is curious that § 314.70(c) was never revised to distinguish between name brand and generic manufacturers.

[4] The district court relied heavily on two FDA statements that no longer carry the same weight after Wyeth. In light of Wyeth, the FDA formally withdrew its amicus briefs in Colacicco v. Apotex, Inc., 432 F.Supp.2d 514 (E.D.Pa. 2006); aff'd in part and rev'd in part, 521 F.3d 253 (3d Cir. 2008); vacated, 129 S. Ct. 1578 (2009). The other FDA statement appears in a footnote in the "Supplementary Information" section of a notice of proposed rule making for a regulation *not pertaining to generic drugs.* 73 Fed. Reg. 2848, 2849 n.1 (Jan. 16, 2008) ("CBE changes are not available for generic drugs."). Even the defendants admit that generic manufacturers can use the CBE process, § 314.97, to copy an updated name brand label. See also Demahy v. Wyeth, Inc., 586 F.Supp.2d 642, 655 (E.D.La. 2008), appeal docketed, No. 08-31204 (5th Cir. Dec. 16, 2008); Wyeth, 129 S.Ct. at 1201.

12a

that they comply with this statute by simply ensuring that their labels match the name brand label. Mensing alleges that the Reglan manufacturers did nothing to strengthen the label despite reasonable evidence of the drug's association with a serious hazard. In these circumstances, § 201.57(e) does not permit generic manufacturers passively to accept the inadequacy of their drug's label as they market and profit from it. See Wyeth, 129 S.Ct. at 1202 ("The FDA has limited resources to monitor the 11,000 drugs on the market[.] . . . [M]anufacturers, not the FDA, bear primary responsibility for their drug labeling[.]"). The statute itself empowers the FDA to withdraw approval for a drug that is "misbranded" due to an insufficient label. 21 U.S.C. §§ 331(a)-(b), 352(a).

Interpretive commentary outside the regulations supports the requirement that at a minimum a generic manufacturer should alert the agency to any new safety hazard associated with its product. In commentary published contemporaneously to the adoption of the Hatch-Waxman Amendments, the FDA stated: "After approval of an ANDA, if an ANDA holder [a generic manufacturer] believes that new safety information should be added, *it should provide adequate supporting information to FDA*, and FDA will determine whether the labeling for the generic and listed drugs should be revised." 57 Fed. Reg. 17950, 17961 cmt. 40 (Apr. 28, 1992) (emphasis supplied).

Further, 21 C.F.R. § 314.98 requires that generic manufacturers follow the same record keeping and reporting of adverse drug experiences

13a

post marketing that name brand manufacturers must undertake. In discussing this provision, the FDA noted that "ANDA applicants [must] submit a periodic report of adverse drug experiences even if the ANDA applicant has not received any adverse drug experience reports *or initiated any labeling changes*." 57 Fed. Reg. 17950, 17965 cmt 53 (Apr. 28, 1992) (emphasis supplied). See also CDER, Guidance for Industry, Major, Minor, and Telephone Amendments to Abbreviated New Drug Applications 1-3 (Dec. 2001) (describing ANDA amendments addressing "labeling deficiencies" as "minor amendments" that the FDA will attempt to review within 60 days).

Implicit in these comments is the FDA's expectation that generic manufacturers will initiate label changes other than those made to mirror changes to the name brand label and that the agency will attempt to approve such proposals quickly. The availability of one particular procedure (the CBE process, on which the district court expended the majority of its discussion) is immaterial to the preemption analysis in light of this clear directive to generic manufacturers and the availability of the prior approval process.

Because there is nothing in the FDCA or Hatch-Waxman Amendments that explicitly forbids them from proposing a label change through the prior approval process, the generic defendants cite regulatory language in § 314.70 to the effect that the prior approval procedure is for "major changes" while changes to enhance warnings are subject to the CBE procedure. Defendants' reading of § 314.70 is too restrictive. The section they cite establishes various methods of proposing changes to approved

## 14a

drugs. The more significant the change, the more notice the FDA needs prior to its implementation. The section repeatedly uses the nonrestrictive phrase "[t]hese changes include, but are not limited to" in order to describe the changes manufacturers can propose through each kind of supplement. §§ 314.70(b)(2), (c)(2), (d)(2). Section 314.70 does not evidence an FDA policy, let alone Congressional intent, to prevent generic manufacturers from proposing changes to a label's warning through the prior approval process. Indeed, manufacturers are *required* to use the prior approval process for "labeling changes" (with a few exceptions including permissive use of the CBE process for warning enhancements), § 314.70(b)(2)(v)(A)).

In addition to proposing a label change, the generic manufacturers could have suggested that the FDA send out a warning letter to health care professionals. When the FDA first adopted its labeling regulations, well before the Hatch-Waxman Amendments, it stated that the requirements "do not prohibit a manufacturer . . . from warning health care professionals whenever possibly harmful adverse effects associated with the use of the drug are discovered." 44 Fed. Reg. 37434, 37447 (June 26, 1979); see also CDER, Manual of Policies and Procedures (MAPP) 6020.10, NDAs: "Dear Health Care Professional" Letters (July 2, 2003) (guidance document to name brand manufacturers stating that the letters may be ordered by the FDA or sent by manufacturers without FDA involvement).[5]

[5] Mensing argues that the generic defendants themselves could have warned their customers of the risk of tardive dyskinesia through such letters. The letters are considered regulated labeling, 21 C.F.R. §§ 202.1(l)(1), (2), and under the FDAAA, the FDA sends the letters out on behalf of ANDA holders if it determines that such a letter is a necessary part of a risk evaluation and mitigation strategy. 21 U.S.C. § 355-1(o)(2). Although the FDAAA was not in effect when Mensing took metoclopramide, it provides support for the defendants' contention that Congress did not intend that generic manufacturers send out "Dear Healthcare Provider" letters uncoordinated with other manufacturers of the drug.

## 15a

The generic defendants argue that they have no duty under the FDCA to propose stronger warnings, but the issue here is whether they have such a duty under state law. The question before this court is whether generic defendants can both fulfill a state law duty to warn and comply with the FDCA. Does federal law forbid them from taking steps to warn their customers? The district court concluded that generic drug manufacturers "may" seek to add safety information to a drug label" through the prior approval process or by requesting that the FDA send "Dear Health Care Professional" letters, but it remained uncertain what the FDA might have done had they proposed a label change. It therefore hesitated to impose liability based on speculation.

Subsequently, the Supreme Court made it clear in Wyeth that uncertainty about the FDA's response to such measures makes federal preemption less likely. "[A]bsent clear evidence that the FDA would not have approved a change to [the drug's] label, we will not conclude that it was impossible for [the manufacturer] to comply with both federal and state law requirements." Wyeth, 129 S.Ct. at 1198; see also Grand River Enterprises Six Nations, Ltd. v. Beebe, 574 F.3d 929, 936 (8th Cir.

16a

2009) ("[A] hypothetical or potential conflict is insufficient to warrant the pre-emption of the state statute."), citing Rice v. Norman Williams Co., 458 U.S. 654, 659 (1982).[6] To support preemption the generic defendants must show the likelihood of FDA inaction. The record contains nothing, let alone "clear evidence," to suggest the FDA would have rejected a labeling proposal from any of them. In fact, earlier this year the FDA mandated that metoclopramide manufacturers enhance the label's warning of the risks of tardive dyskinesia. See Letter from Joyce Korvick, CDER (Feb. 26, 2009), available at http://www.fda.gov/downloads/Drugs/DrugSafety/.../UCM111876.pdf.

[6] The generic defendants argue that they would risk rescindment of their ANDA by implementing a unilateral label change through the CBE procedure without prior FDA approval. 21 C.F.R. § 314.150(b)(10). FDA commentary to § 314.150 makes clear that the section's purpose is to enforce the undisputed requirement that generic manufacturers change their label to match a name brand change. 57 Fed. Reg. 17950, 17970 cmt. 78 (Apr. 28, 1992). The issue of preemption does not rest on the availability of the CBE procedure, and hypothetical conflicts are not favored.

In Wyeth, the Supreme Court found it "difficult to accept" that "the FDA would bring an enforcement action against a manufacturer for strengthening a warning pursuant to the CBE regulation." Wyeth, 129 S.Ct. at 1197. The defendants have not cited a single instance in which the FDA even threatened an enforcement action against a generic manufacturer for unilaterally enhancing its label warnings. Moreover, "[t]he FDCA does not provide that a drug is misbranded simply because the manufacturer has altered an FDA-approved label," the misbranding provisions focus on the accuracy of the label's substance, including the adequacy of its warnings. Id.; see also 21 U.S.C. §§ 355(e); id. at 352.

17a

The generic defendants attempt to minimize the significance of Wyeth by focusing on Justice Breyer's one paragraph concurring opinion, in which he emphasized the majority's point that an agency could preempt state law through "lawful specific regulations[.]" Wyeth, 129 S.Ct. at 1204 (Breyer, J. concurring). The defendants cite no regulations specifically mandating preemption like those posed as examples in Wyeth, however. Id. at 1201, n.9. On the face of the regulations in effect, generic manufacturers must comply with the CBE procedure and maintain adequate warnings. 21 C.F.R. §§ 314.97, 201.57(e). As Judge William K. Sessions III has observed, Justice Breyer's concurrence "does not come close to a hint that an unofficial FDA interpretation at odds with the plain language of a regulation will have preemptive effect." Kellogg v. Wyeth, 612 F.Supp.2d 437, 442 (D.Vt. 2009) (concluding that Wyeth undermines preemption claims of generic manufacturers).

The generic defendants were not compelled to market metoclopramide. If they realized their label was insufficient but did not believe they could even propose a label change, they could have simply stopped selling the product. Instead, they are alleged to have placed a drug with inadequate labeling on the market and profited from its sales. If Mensing's injuries resulted from their failure to take steps to warn their customers sufficiently of the risks from taking their drugs, they may be held liable.

D.

Even if compliance with state and federal law is not impossible, state claims could still be

18a

preempted if they would obstruct the purposes and objectives of federal law. The generic defendants argue that proposing a label change would necessitate expensive clinical studies, thwarting the goal of the Hatch-Waxman Amendments to bring low cost generic drugs to market quickly. Yet the FDA did not conduct its own studies when it mandated an enhanced warning for metoclopramide. It simply referenced studies published elsewhere. Requests for label changes must be supported by scientific substantiation,[7] but there is nothing to indicate that the information must be acquired through a manufacturer's own clinical tests. As a matter of fact, the Supreme Court concluded in Wyeth that multiple reports of an adverse experience with a drug provided the scientific substantiation to justify a manufacturer's request to change a label. Wyeth, 129 S.Ct. at 1197. Generic manufacturers are already required to collect and report adverse drug experiences with their products. 21 C.F.R. § 814.98, referencing 21 C.F.R. § 314.80. Mensing alleges that if the generic manufacturers had merely taken note of the accumulation of adverse drug experiences about metoclopramide, they would have had sufficient substantiation to warrant a label change.

The obligation Mensing seeks to impose upon generic manufacturers does not obstruct the purposes and objectives of the Hatch-Waxman

[7] Section 314.70(c)(6)(iii)(A) addresses CBE labeling changes to strengthen warnings; the applicable version during the period when Mensing took metoclopramide did not specify an evidentiary standard.

19a

Amendments in any way. On the contrary, "[f]ailure-to-warn actions," like Mensing's, "lend force to the FDCA's premise that manufacturers, not the FDA, bear primary responsibility for their drug labeling at all times." Wyeth, 129 S.Ct. at 1202. The generic defendants argue that the Hatch-Waxman Amendments supply the relevant statutory framework, rather than the whole FDCA. Yet additions to the statute like the Hatch-Waxman Amendments must be considered part and parcel of the FDCA. These amendments provided for cheaper, expedited approval of generic drugs, not relief from the fundamental requirement of the FDCA that all marketed drugs remain safe. Congress and the FDA have long viewed state tort law as complementing, not obstructing, the goals of the FDCA. Wyeth, 129 S.Ct. at 1199-1200 (Congress "determined that widely available state rights of action provided appropriate relief for injured [drug] consumers" and that "state-law remedies further consumer protection by motivating manufacturers . . . to give adequate warnings."); id. at 1197 ("[T]he statute contemplates that federal juries will resolve most misbranding claims[.]").

"If Congress had intended to deprive injured parties of a long available form of compensation, it surely would have expressed that intent more clearly." Bates v. Dow Agrosciences LLC, 544 U.S. 431, 449 (2005). Like the Fourth Circuit in Foster, 29 F.3d at 170, we decline to assume that Congress intended to shield from tort liability the manufacturers of the majority of the prescription drugs consumed in this country and leave injured parties like Mensing no legal remedy.

### III.

We turn next to Mensing's claims against the name brand manufacturers. Traditional products liability requires a plaintiff to show that she actually consumed the defendant's product. See e.g. Bixler by Bixler v. Avondale Mills, 405 N.W.2d 428 (Minn. App. 1987). Although she never ingested name brand Reglan, Mensing claims that the name brand manufacturers are liable for various common law torts including negligent representation and fraud for misrepresenting the risks of tardive dyskinesia associated with metoclopramide.

Mensing's theory was rejected in Foster. There, the plaintiffs argued that "because generic drugs are required by federal law to be equivalent to their name brand counterparts," the name brand defendant should be responsible for representations or omissions on the generic manufacturer's label. Foster 29 F.3d at 169. The Fourth Circuit's response was that the plaintiffs were reframing products liability claims which they could not prove. Id. at 168. Presuming that generic manufacturers were responsible for altering their own labels when postapproval safety concerns arose, the court found no legal precedent to hold the name brand manufacturers liable for injuries caused by their competitors. Id. at 170. Subsequently, the overwhelming majority of courts considering this issue has reached the same conclusion.[8]

---

[8] Thirty two courts applying the laws of at least seventeen states, according to the defendants.

The Minnesota Court of Appeals is one of these courts. In Flynn v. American Home Products Corp., 627 N.W.2d 342 (Minn. App. 2001), a plaintiff like Mensing sought to hold name brand manufacturers liable for the harm caused by ingesting a generic equivalent. The court declined to recognize the "fraud on the FDA" claim essentially based on the name brand defendant's misrepresentations to the FDA about the drug's safety, and it also rejected an alternative argument based on Minnesota tort law. Id. at 350-52. Mensing argues that, unlike the Flynn plaintiffs, she did allege that the name brand defendants' representations "were relied upon by her physician when issuing the prescription." Id. at 349-50. Mensing cites only one court since Foster to have found such a factor determinative. Conte v. Wyeth, 85 Cal. Rptr. 3d 299 (Cal. Ct. App. 2008).

Whatever the merits of Conte under California law, the Flynn court concluded that "central" to a fraudulent misrepresentation claim under Minnesota law is "a suppression of facts which one party is under a legal or equitable obligation to communicate to the other, and which the other party is entitled to have communicated to him." Flynn, 627 N.W.2d at 350 (quotations omitted). In other words, regardless of whether her doctor relied upon the Reglan label, Mensing must show that the name brand manufacturers owed her a duty of care. Duty is a threshold requirement for all of the tort claims Mensing asserts.[9] See e.g. Noble Systems

---

[9] Mensing's attempt to characterize her fraud claim as a type requiring no proof of a duty of care is unavailing. A plaintiff claiming fraud in Minnesota must show that the defendant intended to induce another to act in reliance on its fraudulent statement. Specialized Tours, Inc. v. Hagen, 392

22a

Corp. v. Alorica Central LLC, 543 F.3d 978, 985 (8th Cir. 2008) (finding that under Minnesota law negligent misrepresentation requires the plaintiff to "prove some relationship that is sufficient to create a duty owed by the defendant to the plaintiff").

Such a duty of care does not extend to all potential Reglan consumers. "Minnesota common law . . . requires a stronger relationship and a direct communication." Flynn, 627 N.W.2d at 350. Since Mensing "did not purchase or use [the name brand defendants'] product, . . . there was no direct relationship between them, let alone a fiduciary relationship that gave rise to a duty." Id. at 350. Mensing focuses on the foreseeability of harm from the defendants' action. Like the Fourth Circuit, we conclude that holding name brand manufacturers liable for harm caused by generic manufacturers "stretch[es] the concept of foreseeability too far." Foster, 29 F.3d at 171. As for Mensing's negligent misrepresentation claim, "the Minnesota Supreme Court has recognized negligent misrepresentation involving damages only for pecuniary loss[.]" Flynn, 627 N.W.2d at 350, citing Smith v. Brutger Cos., 569 N.W.2d 408, 414 (Minn. 1997). We find it unlikely the Minnesota Supreme Court would extend the doctrine to misrepresentation involving the risk of physical harm in these circumstances.

N.W.2d 520, 532 (Minn. 1986). Mensing's relationship with the Reglan manufacturers is too attenuated, and she has cited no Minnesota case in which the court imposed liability for fraud on a defendant who did not intend to communicate with the plaintiff. The Reglan manufacturers intended to communicate with their customers, not the customers of their competitors.

23a

We conclude that under Minnesota law Mensing has not shown that the name brand manufacturers owed her a duty of care necessary to trigger liability.

IV.

In sum, we conclude that Mensing has stated a viable claim against the generic metoclopramide manufacturers. Far from prohibiting them from taking steps to warn their customers of new safety hazards, federal law requires such action. For the reasons stated we reverse the judgment in favor of the generic manufacturers but affirm the judgment as to the name brand manufacturers.

24a

APPENDIX B

## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA
[Filed June 17, 2008]

MEMORANDUM OPINION AND ORDER
Civil No. 07-3919 (DWF/SRN)

Gladys Mensing,

    *Plaintiff,*

v.

WYETH, INC. (d/b/a WYETH); SCHWARZ PHARMA, INC.; PLIVA, Inc.; TEVA PHARMACEUTICALS USA, INC.; ALPHARMA, INC., d/b/a ALPHARMA PHARMACEUTICALS; UDL LABORATORIES, INC.; ACTAVIS ELIZABETH, LLC; and PUREPAC PHARMACEUTICAL CO.; and the following fictitious party defendants (whether singular or lural, individual or corporate): No. 1, that entity which originally obtained permission from the U.S. Food and Drug Administration to market the drug branded Reglan; No. 2, that entity which obtained permission from the FDA to market the Reglan, metoclopramide and/or metoclopramide HCl ingested by Gladys Mensing; No. 3, that entity which originally manufactured and sold any Reglan which was ultimately ingested by Gladys Mensing; No. 4, that entity which originally manufactured and sold any Reglan, metoclopramide and/or metoclopramide HCl which was ultimately ingested by Gladys Mensing; No. 5, that entity which marketed

25a

Reglan or generic metoclopramide and/or metoclopramide HCl, jointly and individually,

    *Defendants.*

Daniel J. McGlynn, Esq., and Patty F. Trantham, Esq., McGlynn, Glisson & Koch, APLC; and Lucia J. W. McLaren, Esq., and Michael K. Johnson, Esq., Goldenberg & Johnson, PLLC, counsel for Plaintiffs.

Bridget M. Ahmann, Esq., and Erin M. Verneris, Esq., Faegre & Benson LLP; and Jeffrey R. Pilkington, Esq., and Tom Wagner, Esq., Davis, Graham & Stubbs, LLP, counsel for Defendant Wyeth, Inc.

Andrew J. Calica, Esq., and Henninger S. Bullock, Esq., Mayer Brown, LLP; and Erin M. Verneris, Esq., and Bridget M. Ahmann, Esq., Faegre & Benson LLP, counsel for Defendant Schwartz Pharma, Inc.

Joseph P. Thomas, Esq., Matthew V. Brammer, Esq., Rex A. Littrell , Esq., and Tiffany Reece Clark, Esq., Ulmer & Berne LLP; and Jan R. McLean, Esq ., Tracy J. Van Steenburgh, Esq., and Dana M. Lenahan, Esq., Halleland Lewis Nilan & Johnson PA, counsel for Defendants PLIVA, Inc.

David L. Hashmall, Esq., Fellhaber Larson Fenlon & Vogt, PA, counsel for Defendants Teva Pharmaceuticals USA, Inc. and UDL Laboratories, Inc.

Bradley J. Linderman, Esq., and Michael D.

26a

Hutchens, Esq., Meagher & Geer, PLLP; and Richard A. Dean, Esq., Tucker Ellis & West, counsel for Defendants Alpharma Inc., Actavis Elizabeth, LLC, and Purepac Pharmaceutical Co.

## INTRODUCTION

This matter is before the Court on a Motion to Dismiss brought by Actavis Elizabeth, LLC ("Actavis"); a Motion to Dismiss or for Summary Judgment brought by Pliva, Inc. ("Pliva"); and a Motion for Relief Under Fed. R. Civ. P. 56(f) brought by Plaintiff Gladys Mensing. For the reasons stated below, the Court grants Actavis's and Pliva's motions and denies Plaintiff's motion.[1]

## BACKGROUND

In her Amended Complaint, Plaintiff alleges that on or about March 23, 2001, her physician prescribed the drug Reglan to her to treat diabetic gastroparesis. (Am. Compl. ¶ 27.) The active ingredient in Reglan is metoclopramide ("MCP"). MCP, which is available in brand (Reglan) or generic form, is used to treat certain gastrointestinal disorders. Plaintiff alleges that she ingested Reglan/MCP from March 23, 2001, until March 2005, and that her long-term ingestion of Reglan/MCP

[1] The question presented by both Actavis's and Pliva's motions to dismiss is purely legal in nature. Accordingly, further factual discovery is unnecessary and Plaintiff's motion under Fed. R. Civ. P. 56(f) is denied.

27a

caused her to develop tardive dyskinesia, a neurological movement disorder. (Id. ¶¶ 27, 32, 34, 37, 38.)

Both Actavis and Pliva manufacture MCP, a generic version bioequivalent of Reglan.[2] Reglan, the reference listed drug for MCP, was approved by the FDA in 1980. In March 1985, the FDA required that Reglan's label be updated to include a warning regarding the risk of developing tardive dyskinesia. Actavis and Pliva revised their insert labeling to comport to approved changes to the Reglan label. There is no dispute that the labels for both Actavis's and Pliva's MCP were at all relevant times the same as Wyeth's Reglan label.

Plaintiff asserts state-law tort claims against both Wyeth and the manufacturers of generic MCP. Although Plaintiff has asserted a variety of claims against Actavis and Pliva, at the core of all of Plaintiff's claims is the basic assertion that Actavis and Pliva failed to adequately warn about the association between long-term ingestion of MCP and movement disorders. For example, Plaintiff alleges that Actavis and Pliva ignored scientific and medical literature establishing a higher risk of developing tardive dyskinesia, failed to request a labeling revision to the FDA, and failed to report safety information directly to the medical community.

[2] Defendant Wyeth, Inc., is the name brand manufacturer of Reglan.

28a

Actavis and Pliva move separately to dismiss Plaintiffs claims against them, arguing that Plaintiff's claims are preempted by federal law.

## DISCUSSION

### I. Motions to Dismiss

#### A. Standard of Review

In deciding a motion to dismiss, a court assumes all facts in the complaint to be true and construes all reasonable inferences from those facts in the light most favorable to the complainant. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986). In doing so, however, a court need not accept as true wholly conclusory allegations, *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions drawn by the pleader from the facts alleged. *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990). A court may consider the complaint, matters of public record, orders, materials embraced by the complaint, and exhibits attached to the complaint in deciding a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).

To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007). Although a complaint need not contain

29a

"detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 1964-65. This standard "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]." *Id.* at 1965. The Court evaluates a motion brought under Rule 12(c) under the same standard as a motion brought under Rule 12(b)(6). Fed. R. Civ. P. 12(c) and (h)(2).

#### B. Federal Preemption

A state law that conflicts with a federal law is preempted under the Supremacy Clause of the Constitution, U.S. Const. art. VI, cl. 2. *Hillsborough County, Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 712-13 (1985). Congressional intent to preempt state law can either be expressed in statutory language or implied in the structure and purpose of federal law. *Id.* Implied preemption has two types—field and conflict preemption. Field preemption is inferred where Congress legislates so pervasively in a particular field that no room remains for supplementary state legislation. *Id.* Even if Congress has not completely displaced state regulation, preemption may occur when state law actually conflicts with federal law. *Id.* Conflict preemption arises when compliance with both federal and state regulations is a physical impossibility, or when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. *Id.* (citing *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43

30a

(1963) and *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). State laws can be pre-empted by both federal statutes and federal regulations. *Id.* at 713.

Both Actavis and Pliva assert that Plaintiff's claims are conflict preempted. First, they argue that as generic drug manufacturers, they cannot comply with both federal law that requires their generic drug labels to be the "same as" the Reglan® label and with a state-imposed duty to heighten warning labels. In particular, Actavis and Pliva contend that it would be impossible for it to comply with both the Abbreviated New Drug Application ("ANDA") provisions of the Food, Drug & Cosmetic Act ("FDCA") and the labeling requirements Plaintiff seeks to impose pursuant to state law. In addition, both Actavis and Pliva maintain that Plaintiff's claims are conflict preempted because the state laws pose an obstacle to Congressional objectives in enacting federal law applicable to generic drug manufacturers and vesting exclusive authority to regulate prescription drug labeling with the Food and Drug Administration ("FDA").

In support of their preemption arguments, both Actavis and Pliva point to the Drug Price Competition and Patent Term Restoration Act of 1984 (the "Hatch-Waxman Act" or the "Act") (codified at 21 U.S.A. § 355(j)). The Hatch-Waxman Act codified the ANDA procedures being used by the FDA. Actavis and Pliva assert that under the ANDA procedures, a generic manufacturer is required to put exactly the

31a

same language on its warning labels as the listed drug.[3]

## 1. Regulatory Framework

To determine whether or not Plaintiff's claims are preempted, the Court must first understand the relevant regulatory framework. The FDA is the federal agency charged by Congress in the FDCA with regulating the manufacture, sale, and labeling of new prescription drug products that are marketed for human consumption and, in particular, to ensure the safety and efficacy of new drugs. 21 U.S.C. § 393. In this capacity, the FDA regulates the introduction of all new drugs. 21 U.S.C. § 355(b). Under 21 U.S.C. § 355(a) "[n]o person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application filed pursuant to subsection (b) or (j)of this section is effective with respect to such drug. Section 355(b) applies to "pioneer" or "innovator" drugs. A manufacturer seeking approval to market a pioneer drug must submit a New Drug Application ("NDA"). 21 U.S.C. § 355(b). As part of the NDA, the manufacturer must submit, among other things, "full reports of investigations" on the drug's safety and effectiveness and "specimens of the labeling proposed to be used" for the new drug. 21 U.S.C. § 355(b)(1)(A)-(F). The FDA may refuse

---

[3] Despite the fact that the bases for Actavis's and Pliva's preemption arguments vary to some degree, the Court analyzes their motions to dismiss together.

32a

an application if it finds that the investigations "do not include adequate tests ... to show whether or not such drug is safe for use under the conditions prescribed, recommended, or suggested in the proposed labeling thereof." 21 U.S.C. § 355(d)(1).

In 1984, Congress amended the FDCA by passing the Hatch-Waxman Act. The legislative history of the Hatch-Waxman Act reveals that the primary purpose of amending the FDCA to implement the ANDA procedure was to increase the availability of low cost generic drugs by establishing a generic drug approval procedure. (See Aff. of Tiffany Reece Clark ("Clark Aff.") ¶¶ 2 & 3, Exs. A & B.) The FDCA, as amended, provides for an ANDA procedure that allows for the expedited FDA approval of a generic version of a drug previously approved under the FDA (a "listed drug").[4] See 21 U.S.C. § 355(j); see also Bayer AG v. Elan Pharm. Research Corp., 212 F.3d 1241 (Fed. Cir. 2000) (explaining the ANDA process).[5] 21 U.S.C. § 355(j) applies to generic drugs, or drugs that are based on another previously FDA approved or "listed" drug. When a drug for which approval is sought is the "same as a listed drug," then an applicant

---

[4] A "listed drug" refers to a drug previously approved that serves as the basis for a generic drug. 21 C.F.R. § 314.3.

[5] Prior to the Hatch-Waxman Act, the FDA created an ANDA procedure for the approval of "duplicate" drug products. Those procedures were codified by the Hatch-Waxman Act. See 57 Fed. Reg. at 17951 (Apr. 28, 1992) (explaining that the Act adopted, with few modifications, the FDA's ANDA procedure for pre-1962 drugs).

33a

may submit an abbreviated application complying with the ANDA provisions of 21 C.F.R. § 314.94. 21 U.S.C. § 355(j)(1); 21 C.F.R.§ 314.92(a). The manufacturer of a generic drug must show that the generic drug has the same active ingredients and is the "bioequivalent" of the listed drug. 21 U.S.C. § 355(j)(2)(A)(ii) and (iv). In addition, an applicant filing an ANDA must submit:

> information to show that the labeling proposed for the new drug is the same as the labeling approved for the listed drug . . . except for changes required because of differences approved under a petition filed under subparagraph (C) or because the new drug and the listed drug are produced or distributed by different manufacturers.

21 U.S.C. § 355(j)(2)(A)(v) (emphasis added). To this effect, an ANDA applicant must submit a side-by-side comparison of the applicant's proposed labeling. 21 C.F.R. § 314.94(a)(8)(iv). The labeling for the proposed drug "must be the same as the labeling approved for the reference listed drug," with the exception of certain allowable changes. Id. Those allowable changes may include:

> ... differences in expiration date, formulation, bioavailability, or pharmacokinetics, labeling revisions made to comply with

34a

current FDA labeling guidelines or other guidance, or omission of an indication or other aspect of labeling protected by patent or accorded exclusivity under section 505(j)(4)(D) of the act.

*Id.*

The FDA will not approve an ANDA if information submitted by the applicant is "insufficient to show that the labeling proposed for the drug is the same as the labeling approved for the listed drug." 21 C.F.R. § 314.127(a)(7). Moreover, the FDA may withdraw approval of a generic drug if the labeling for the generic product varies from that of the listed drug. 21 C.F.R. § 314.150(b)(10).

2.    Plaintiff's Claims

With this framework in mind, the Court must determine whether Plaintiff's claims against Actavis and Pliva conflict with the FDCA or the FDA regulations, so as to be preempted by the federal law. As a threshold matter, Plaintiff argues that there is a strong presumption against preemption. The Supreme Court has stated:

In all pre-emption cases, and particularly in those in which Congress has legislated in a field which the States have traditionally occupied, we start with the assumption that the historic police

35a

powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.

*Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (quotations omitted). Although commonly acknowledged, the presumption against preemption is not always appropriate. *See Buckman Co. v. Plaintiff's Legal Comm.*, 531 U.S. 341, 347-48 (2001). In the context of conflict preemption, which analyzes preemption in the absence of explicit Congressional intent, "the lack of a Congressional directive expressly approving or rejecting preemption in the context of drug labeling regulations is not determinative." *See Colacicco v. Apotex Inc.*, 521 F.3d 253, 265 & n.11 (3d Cir. 2008). Thus, the Court must analyze the propriety of preemption where Congress has not explicitly expressed its intent.

Plaintiff alleges that Actavis and Pliva's MCP labels failed to adequately warn of the risk or prevalence of tardive dyskinesia. In particular, Plaintiff claims that the risk ratio of developing tardive dyskinesia was significantly higher than the ratio listed on the Reglan and MCP labels.[6] Actavis and Pliva argue that these failure to warn claims are preempted because they, as generic manufacturers, could not unilaterally alter their labels to include a

---

[6] This allegation is at the heart of all of Plaintiff's claims against Actavis and Pliva. Thus, all of Plaintiff's claims are essentially "failure to warn" claims and are encompassed by the Court's preemption analysis.

36a

warning that varied from that of the listed drug, Reglan. In addition, Actavis and Pliva argue that Plaintiff's failure to warn claims are preempted because they stand as an obstacle to the accomplishment of the full purposes and objectives of the FDCA, the Hatch-Waxman Act, and the corresponding regulatory scheme.

Plaintiff asserts that her state law claims do not present a conflict because compliance with both state and federal regulations is possible and that Actavis and Pliva could have provided stronger warnings about the risks posed by prolonged exposure to MCP without conflicting with FDA regulations. In particular, Plaintiff argues that Actavis and Pliva could have altered their labeling to strengthen warnings without prior approval of the FDA; sought FDA approval for such a change; or provided health care professionals with stronger warnings by other means, such as a "Dear Doctor" letter. The Court addresses each argument in turn.

The Court first turns to Plaintiff's argument that Actavis and Pliva can, and are required to, strengthen their product warnings without prior FDA approval. After reviewing the statutory provisions of the Act, the legislative history of the Act, the Act's governing regulations, and comments made by the FDA[7],

---

[7] When Congress has not unambiguously expressed its intent as to a particular question of statutory interpretation, the Court will defer to the agency's answer on the issue if it is based on a permissible construction of the statute. *Chevron, U.S.A., Inc. v. Natural Re-*

37a

the Court concludes that a generic drug manufacturer may not unilaterally strengthen a label without prior approval of the FDA.

Under the statutory provisions of the Act, there is no dispute that Actavis's and Pliva's MCP labels were required to be "the same as the labeling approved" for Reglan when the initial ANDA applications were submitted. 21 U.S.C. § 355(j)(2)(A)(v). Plaintiff argues, however, that 21 U.S.C. § 355 (j)(2)(A)(v) does *not* apply to post-approval labeling. Instead, Plaintiff argues that the FDA regulations require both name brand and generic manufacturers to strengthen warning labels post-approval. The Court disagrees.

The FDA's own comments in implementing the Hatch-Waxman Act support the conclusion that a generic manufacturer is not free to unilaterally alter the labeling from that of the name brand drug. In particular, in a proposed rule implementing the Act, the FDA described various types of labeling differences that the FDA might consider acceptable under the statute's permitted exceptions. *See* 54 Fed. Reg. 28872 at 28884 (July 10, 1989). Notably, the FDA emphasized limited exceptions to the requirement that a generic drug label be the "same as" that of the listed drug. *Id.* The FDA

---

*sources Defense Council, Inc.,* 467 U.S. 837, 842-43 (1984). Here, the FDA's position on the ability of a generic manufacturer to unilaterally alter its label is based on a permissible construction of the relevant federal statutes and promulgating regulations. Accordingly, that position is entitled to deference.

38a

stated that "[t]he agency will not accept ANDA's for products with significant changes in labeling (such as new warnings or precautions) intended to address newly introduced safety or effectiveness problems not presented by the listed drug." *Id.*

In addition, under the statutory scheme, the FDA may withdraw an ANDA if the ANDA drug labeling "is no longer consistent with that for the listed drug." 21 C.F.R. § 314.150(b)(10). In this regard, the FDA has explained:

Because an ANDA must have labeling that is the same as the reference listed drug ..., FDA believes that a generic drug product approved on the basis of studies conducted on the listed drug and whose labeling is inconsistent with the listed drug's labeling might not be considered safe and effective for use under the conditions prescribed, suggested, or recommended in the listed drug's labeling. FDA therefore has revised § 314.150 to permit the agency to withdraw approval of an ANDA if the applicant fails to maintain labeling in compliance with the requirements of the act.

57 Fed. Reg. 17950 at 17961 (Apr. 28, 1992) (emphasis added).

39a

Several FDA responses to comments submitted in connection with proposed ANDA regulations underscore the notion that the ANDA drug's label must remain the same as that of the listed drug. For example, in response to a comment proposing that ANDA labeling provisions be "revised to permit ANDA applicants to deviate from the labeling for the reference listed drug to add contraindications, warnings, precautions, adverse reactions and other safety-related information," the FDA stated:

FDA disagrees with the comment[]. Except for labeling differences due to exclusivity of a patent and differences under section 505(j)(2)(v) of the act, the ANDA's product labeling must be the same as the listed drug product's labeling because the listed drug product is the basis for ANDA approval. Consistent labeling will assure physicians, health professionals, and consumers that a generic drug is as safe and effective as its brand-name counterpart. (See 54 FR 28872 at 28884.) If an ANDA applicant believes new safety information should be added to a product's labeling, it should contact FDA, and FDA will determine whether the labeling for the generic and listed drugs should be revised. After approval of an ANDA, if an ANDA holder believes that new safety information should be added, it

40a

should provide adequate supporting information to FDA, and FDA will determine whether the labeling for the generic and listed drugs should be revised.

*Id.* at 17961 (emphasis added). In addition, in response to a comment recommending that the "FDA accept ANDAs with warnings or precautions in addition to those on the reference listed drug's label, provided that such information was not indicative of diminished safety or effectiveness of the generic product," the FDA stated:

As for accepting ANDA's with additional warnings or precautions, section 505(j)(2)(A)(v) and (j)(3)(G) of the act requires that the applicant's proposed labeling be the same as that of the reference listed drug unless: (1) The labeling differences are due to an approved petition under section 505(j)(2)(C) of the act (otherwise referred to as a "suitability petition"); or (2) the drug product and the reference listed drug are produced or distributed by different manufacturers. Thus, the exceptions in section 505(j)(2)(A)(v) of the act are limited. In addition, under the patent and exclusivity provisions of the act, the ANDA labeling may be required to carry fewer indications than the reference

41a

listed product's labeling or to have other labeling differences. In the preamble to the proposed rule, the agency described various types of labeling differences that might fall within the permitted exceptions.

*Id.* at 17953 (citations omitted).

Further, in industry guidance documents, the FDA reiterates the ANDA labeling requirements. For example, in its Guidance for Industry regarding Changes to an Approved NDA or ANDA, the FDA states:

A drug product labeling change includes changes in the package insert, package labeling, or container label. An applicant should promptly revise all promotional labeling and drug advertising to make it consistent with any labeling change implemented in accordance with the regulations. All labeling changes for ANDA products must be consistent with section 505(i) of the Act [codified at 21 U.S.C. § 355(i)].

(Clark Aff. ¶ 15, Ex. N. at 20 (emphasis added).) Again, section 505(j) (codified at 21 U.S.C. § 355(j)) requires that the labeling be the "same as" the listed drug.

That a generic drug manufacturer cannot unilaterally change the label is also supported by the positions of the FDA provided in recent

42a

amicus briefs. For example, in an *amicus brief* filed in *Colacicco v. Apotex, Inc.*, 521 F.3d 253 (3d Cir. 2008), the FDA asserted the following:

> For a generic drug manufacturer, there is no statutory or regulatory provision permitting a labeling change to be made without prior FDA approval. To the contrary, a generic drug manufacturer is required to conform to the approved labeling for the listed drug. If a generic drug manufacturer believes that new safety information should be added to the label for its drug, it is directed to contact FDA with "adequate supporting information." 57 Fed. Reg. at 17,961. The agency will consider this information and determine whether the labeling for both the generic drug and the innovator drug should be revised. *Id.*

(Clark Aff. ¶ 19, Ex. Q at 7-8.)[8]

Plaintiff relies primarily on 21 C.F.R. § 314.70(c), the "Changes Being Effected" ("CBE") regulation, for the proposition that generic drug manufacturers can change their

---

[8] The Third Circuit recognized that the "FDA states that generic drug manufacturers may not add new warnings to the approved labeling for the listed drug." *Colacicco*, 521 F.3d at 260 n.5.

43a

product labels without waiting for FDA approval.[9] Section 314.70(c) allows NDA manufacturers, under certain limited circumstances, to strengthen warnings prior to FDA approval. The FDA has explained, however, that the CBE provision does *not* permit ANDA manufacturers to make unilateral changes. In particular, the FDA explained:

> The plaintiff asserts that 21 C.F.R. § 314.70(c) empowers a generic drug manufacturer to add a new warning to the label for its drug without prior FDA approval. That regulatory provision, however—like the other provisions of Title 21, Part 314, Subpart B of the Code of Federal Regulations—applies to applications involving drug products for which a full application has been submitted, *i.e.*, innovator drug products. Drug manufacturers that submit abbreviated applications to market generic drugs are subject to the requirements set forth in Title 21,

---

[9] With the Court's permission, Pliva submitted a copy of an *amicus brief* filed by the United States in a case currently before the United States Supreme Court. Pliva contends that portions of the argument therein would be helpful to the Court, particularly with respect to the interpretation of § 314.70(c). Plaintiff has moved to strike Pliva's submission. The Court denies Plaintiff's motion. While the Court reviewed Pliva's submission and the attached *amicus brief*, this review did not alter the Court's analysis or the outcome of the dispositive motions before the Court.

44a

Part 314, Subpart C. Although Subpart C contains a provision requiring applicants to "comply with the requirements of §§ 314.70 and 314.71 regarding the submission of supplemental applications and other changes to an approved abbreviated application," 21 C.F.R. § 314.97, that provision does not modify the requirement that the drug label for a generic drug must be the same as the label for the approved innovator drug (with limited exceptions not relevant here). Any ambiguity in the regulatory text has been clarified by FDA, which explained that the regulations do not authorize drug manufacturers to add new warnings to the approved labeling for the innovator drug. See 57 Fed. Reg. at 17,961, 17,953, 17,955.

(Clark Aff. ¶ 18, Ex. Q at 8 n.4 (emphasis added).) In addition, in a rule proposed on January 2008, the FDA confirmed that § 314.70 does not permit unilateral label changes by ANDA manufacturers. See 73 Fed. Reg. 2848 at 2848-49 (Jan. 16, 2008). In particular, the FDA stated: "FDA is proposing to amend its regulations regarding changes to an approved NDA, BLA, or PMA to codify the agency's longstanding view on when a change to the labeling of an approved drug, biologic, or medical device may be made in advance of the agency's review." Id. at 2849. In the

45a

Supplementary Information section of the proposed rule, the FDA explains: "CBE changes are not available for generic drugs approved under an [ANDA] application under 21 U.S.C. 355(j). To the contrary, a generic drug manufacturer is required to conform to the approved labeling for the listed drug." Id. at 2849 n.1 (citations omitted).

The Court concludes that under the federal statutory scheme, the labeling for generic drugs must always remain the "same as" that of the name brand drug and that a generic drug manufacturer cannot unilaterally change its label without prior FDA approval. Here, it is undisputed that at all relevant times, Actavis's and Pliva's MCP drug labels were the same as that of the listed drug Reglan. Plaintiffs' failure to warn claims against Actavis and Pliva rely on state law imposing a duty on the generic drug manufacturers to provide adequate warnings that Actavis and Pliva allegedly did not provide. Any such duty to unilaterally heighten their warning labels, however, would directly conflict with the federal law requiring that their labels be the "same as" those of the listed drug, Reglan. Indeed, under these circumstances, it would be impossible for Actavis and Pliva to abide by both state and federal laws. If Plaintiffs' claims were not preempted, Actavis and Pliva would be forced to choose between complying with the federal law while being exposed to state tort liability, or unilaterally adding a heightened warning to their labels at the risk of exposing themselves to federal liability. This conflict would stand as

47a

employ other means to warn health care professionals, such as submitting a "Dear Doctor" letter. The regulatory scheme, however, does not allow for ANDA manufacturers to send "Dear Doctor" letters. Instead, for drugs approved through the ANDA procedures, "the Secretary shall undertake any communication plan to health care providers required under [the risk evaluation and mitigation strategies]10 for the applicable drug." 21 U.S.C. § 355-1(i)(2)(A). The imposition of an independent duty on the part of the generic manufacture to send "Dear Doctor" letters would directly conflict with the statutory scheme of the Hatch-Waxman Act. In addition, this Court's speculation over what the FDA might have done if Actavis or Pliva had requested such a letter would stand as an obstacle to the accomplishment and execution of the full purposes and objectives of the Act.

## CONCLUSION

Accordingly, IT IS HEREBY ORDERED that:

1. Actavis's Motion to Dismiss (Doc. No. 39) is GRANTED.

2. Pliva's Motion to Dismiss (Doc. No. 64) is GRANTED.

3. Plaintiffs Rule 56(f) Motion is DENIED.

10 This includes sending letters to health care providers. 21 U.S.C. § 355-1(e)(3)(A).

46a

an obstacle to the accomplishment and full purposes and objectives of the Hatch-Waxman Act, a key purpose of which is to increase the availability of low-cost generic drugs and to relax the generic approval and labeling process.

The Court turns next to Plaintiff's argument that Actavis and Pliva could have sought to strengthen their warnings through the prior approval supplemental process under 21 C.F.R. § 314.70. Based on the statutory scheme discussed above, the Court discerns no legal duty requiring a generic drug manufacturer to propose revised labeling. While the manufacturer of a generic drug may seek to add safety information to a drug label, in order to do so, it must first provide certain information to the FDA; the FDA then in turn determines whether the labeling for both the generic and listed drug should be revised. See 57 Fed. Reg. 17950 at 17961 cmt. 40. The outcome of any such request to make a revision is uncertain and would require speculation as to what the FDA might have done. In light of the statutory scheme discussed in detail above, the Court determines that Plaintiff's failure to warn claims, insofar as they assert that Actavis and Pliva had an independent duty to seek to add safety information to MCP's label, again would directly conflict with the statutory scheme of the Hatch-Waxman Act and would stand as an obstacle to the accomplishment and execution of the full purposes and objectives of the Act.

Finally, the Court turns to Plaintiff's argument that Actavis and Pliva were free to

48a

4.  Plaintiff's Motion to Strike (Doc. No. 85) is DENIED.

5.  This action is dismissed as to Defendants Actavis and Pliva.

Dated: June 17, 2008

s/Donovan W. Frank
DONOVAN W. FRANK
Judge of United States
District Court

49a

## APPENDIX C

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
[Filed October 30, 2008]

AMENDED MEMORANDUM
OPINION AND ORDER
Civil No. 07-3919 (DWF/SRN)

Gladys Mensing,
*Plaintiff*,

v.

WYETH, INC. d/b/a WYETH; SCHWARZ PHARMA, INC.; TEVA PHARMACEUTICALS USA, INC.; UDL LABORATORIES, INC.; and the following fictitious party defendants (whether singular or plural, individual or corporate): No. 1, that entity which originally obtained permission from the U.S. Food and Drug Administration to market the drug branded Reglan; No. 2, that entity which obtained permission from the FDA to market the Reglan, metoclopramide and/or metoclopramide HCI ingested by Gladys Mensing; No. 3, that entity which originally manufactured and sold any Reglan which was ultimately ingested by Gladys Mensing; No. 4, that entity which originally manufactured and sold any Reglan, metoclopramide and/or metoclopramide HCI which was ultimately ingested by Gladys Mensing; No. 5, that entity which marketed Reglan or generic metoclopramide and/or metoclopramide HCI, jointly and individually,

*Defendants*.

51a

## INTRODUCTION

This matter is before the Court on a Motion for Summary Judgment brought by Schwarz Pharma, Inc. ("Schwarz"); a Motion for Summary Judgment brought by Teva Pharmaceuticals USA, Inc. ("Teva") and UDL Laboratories, Inc. ("UDL"); and a Motion for Summary Judgment brought by Wyeth, Inc. ("Wyeth"). For the reasons stated below, the Court grants the pending motions.

## BACKGROUND

In her Amended Complaint, Plaintiff[1] alleges that her physician prescribed the drug Reglan to her to treat diabetic gastroparesis. The active ingredient in Reglan is metoclopramide ("MCP"). MCP, which is available in name-brand form (Reglan) or generic form ("generic MCP"), is used to treat certain gastrointestinal disorders. Plaintiff alleges that the long-term ingestion of MCP caused her to develop tardive dyskinesia, a neurological movement disorder.

Plaintiff asserts state-law tort claims against Defendants as the manufacturers and distributors of Reglan and generic MCP. At the

---

[1] The Court notes and respects that Plaintiff personally attended the recent hearings in this matter.

---

Daniel J. McGlynn, Esq., and Patty F. Trantham, Esq., McGlynn, Glisson & Koch, APLC; and Lucia J. W. McLaren, Esq., and Michael K. Johnson, Esq., Goldenberg & Johnson, PLLC, counsel for Plaintiffs.

Bridget M. Ahmann, Esq., and Erin M. Verneris, Esq., Faegre & Benson LLP; and Jeffrey R. Pilkington, Esq., and Tom Wagner, Esq., Davis, Graham & Stubbs, LLP, counsel for Defendant Wyeth, Inc.

Andrew J. Calica, Esq., and Henninger S. Bullock, Esq., Mayer Brown, LLP; and Erin M. Verneris, Esq., and Bridget M. Ahmann, Esq., Faegre & Benson LLP, counsel for Defendant Schwartz Pharma, Inc.

David L. Hashmall, Esq., and Donald G. Heeman, Esq., Feihaber Larson Fenton & Vogt, PA, counsel for Defendants Teva Pharmaceuticals USA, Inc. and UDL Laboratories, Inc.

The Court amends the Memorandum, Opinion and Order dated October 24, 2008, so as to make a correction in footnote 8. The footnote is amended to indicate that Schwartz, not Wyeth, cited to the cases listed in footnote 8.

52a

core of all of Plaintiff's claims is the basic assertion that Defendants failed to adequately warn about the association between long-term ingestion of MCP and movement disorders. In an Order dated June 17, 2008 (the "June 2008 Order"), the Court held that Plaintiff's claims against manufacturers of generic MCP, Actavis Elizabeth, LLC ("Actavis") and Pliva, Inc. ("Pliva"), were preempted by federal law. In the June 2008 Order, the Court concluded that under the federal statutory scheme, the labeling for generic drugs must always remain the same as that of the name brand drug (in this case Reglan), and that a generic drug manufacturer cannot unilaterally change its label without prior approval from the Food and Drug Administration ("FDA"). The Court held that because Plaintiff's failure to warn claims relied on state law imposing a duty on the generic drug manufacturers, these claims directly conflicted with, and stood as an obstacle to the execution of, federal law.

Wyeth manufactured and distributed name-brand Reglan from approximately 1989 through 2001. (Aff. of Paul Minicozzi, Ph.D. ("Minicozzi Aff.") ¶ 3.) From approximately 1995 through 2001, Wyeth also manufactured and sold generic MCP through its subsidiaries. (Minicozzi Aff. ¶ 4.) In December 2001, Wyeth sold to Schwarz the rights to manufacture and distribute name-brand Reglan tablets. (Decl. of Jeff. Siefert ("Siefert Decl.") ¶¶ 1-2; Minicozzi Aff. ¶ 3.) Schwarz thereafter manufactured and distributed name-brand Reglan through 2005. At no time did Schwarz manufacture or distribute

53a

generic MCP. (Siefert Decl. ¶ 3.) Teva has manufactured and sold only generic MCP. (Aff. of Philip Erickson in Supp. of Mot. for Summ. J.("Erickson Aff.") ¶ 2.) At times relevant to this matter, Teva and UDL were parties to a Supply and Distribution Agreement under which UDL distributed generic MCP manufactured by Teva. (Erickson Aff. ¶ 4; Affidavit of Timothy G. Wait in Supp. of Mot. for Summ. J. ("Wait Aff.") ¶ 2.)

Plaintiff's counsel provided pharmacy records reflecting Plaintiff's MCP purchases from November 15, 2001, through the present. (Decl. of Erin Verneris ("Verneris Decl.") ¶ 2, Ex. A.) Those records demonstrate that from November 2001 until the time Plaintiff stopped taking MCP, Plaintiff was dispensed only generic MCP products; none of the generic MCP was manufactured or distributed by Schwarz; and Plaintiff never purchased or used any name-brand Reglan manufactured by Wyeth.[2]

Here, in three separate motions, Teva,

---

[2] The record reflects that the pharmacy records prior to November 2001 are not available due to the pharmacy's record-keeping policy. On July 10, 2008, Plaintiff sought and was granted leave to seek specific discovery to identify the manufacturers of MCP that supplied Plaintiff's pharmacy prior to 2001. (Doc. No. 94.) The additional discovery sought by Plaintiff would not affect the outcome of Schwarz's current motion, as Schwarz did not acquire the rights associated with name-brand Reglan until December 2001. In addition, even though the discovery sought could show that Wyeth supplied the pharmacy with name-brand Reglan, the discovery would be unable to provide evidence of what drugs were actually dispensed to Plaintiff.

54a

UDL, Wyeth, and Schwarz have moved for summary judgment on Plaintiff's claims against them.

## DISCUSSION

### I. Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The Court must view the evidence, and the inferences that may be reasonably drawn from the evidence, in the light most favorable to the nonmoving party, *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials but must set forth specific

55a

facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

### II. Generic Manufacturer Liability

Teva, UDL, and Wyeth (collectively, the "Generic MCP Defendants")[3] move to dismiss Plaintiff's claims against them. The Generic MCP Defendants assert that because they are manufacturers of generic MCP, Plaintiff's claims are preempted by federal law for the reasons set forth in the Court's June 2008 Order. Specifically, the Generic MCP Defendants contend that Plaintiff's claims against them are identical to the claims asserted against Actavis and Pliva that were determined to be preempted by federal law in the June 2008 Order. Plaintiff does not dispute that only generic MCP was dispensed to her. Further, Plaintiff does not attempt to distinguish between Actavis and Pliva and the Generic MCP Defendants with respect to the issue of federal preemption. At the time of the hearing, Plaintiff's only arguments in opposition to the Generic MCP Defendants' motions were those previously made in opposition to Actavis and Pliva's prior motions to dismiss. The Court has

[3] Despite the fact that there is no evidence that Plaintiff ingested any name-brand Reglan manufactured by Wyeth, Plaintiff claims that because Wyeth manufactures the name-brand drug, it, along with Schwarz, is liable for allegedly misstating the true risks associated with ingesting generic MCP. The Court discusses this assertion of "name-brand manufacturer liability" in Section III below.

56a

already heard, considered, and rejected these arguments. (Doc. No. 86.)

Moreover, because the issue of federal preemption as it relates to generic manufacturers of MCP has already been decided in this case, Plaintiff's opposition to the Generic MCP Defendants' present motions is akin to a request to file a motion to reconsider the June 2008 Order. Pursuant to Local Rule 7.1(g), a request for leave to file a motion for reconsideration will only be granted upon a showing of "compelling circumstances." A motion to reconsider should not be employed to relitigate old issues but to "afford an opportunity for relief in extraordinary circumstances." *Dale & Selby Superette & Deli v. U.S. Dept. of Agric.*, 838 F. Supp. 1346, 1348 (D. Minn. 1993).

After the hearing on this motion, Plaintiff submitted supplemental authority to the Court, in particular a recently filed opinion in *McKenney v. Purepac Pharmaceutical Co.*, F052606 Super. Ct. No. 349927 (Cal. 5th Dist. Ct. App. Sept. 25, 2008) (Aff. of Michael K. Johnson ("Johnson Aff.") ¶ 2, Ex. 1). In *McKenney*, a California Court of Appeal reversed the decision of a California Superior Court, wherein the lower court sustained the demurrer of a generic MCP manufacturer on preemption grounds. The California Court of Appeal held "that the federal requirement that a generic drug have the same labeling as a reference listed drug does not necessarily result in federal preemption of a state tort action against the generic manufacturer for failure to adequately warn of

57a

the dangers of the drug." (*Id.* at 2.) The Court has reviewed the *McKenney* opinion and determines that it would not alter the Court's analysis and conclusions set forth in the June 2008 Order. First, the decision is not binding on the Court. Second, the Court disagrees with the *McKenney* court's brief discussion of the FDA's regulatory scheme and its bearing on the preemption analysis. This Court previously considered and discussed the same regulatory scheme and came to the opposite conclusion on the issue of preemption. Because the issue of preemption was already considered and the *McKenney* case does not alter this Court's conclusions, the Court finds that no compelling circumstances exist to warrant a motion to reconsider the June 2008 Order.

Accordingly, Teva's and UDL's motion is granted; Wyeth's motion is granted on the issue of Wyeth's liability as a manufacturer of generic MCP.

III.   **Name-Brand Manufacturer Liability[4]**

In December 2001, Schwarz acquired from Wyeth the rights to manufacture and distribute name-brand Reglan. (Siefert Decl. ¶¶ 1-3.) At no time did Schwarz manufacture or distribute generic MCP. (Siefert Decl. ¶ 3.) Plaintiff concedes that "it appears" that she never ingested name-brand Reglan manufactured by

---

[4] Wyeth did not move separately on the issue of "name-brand liability," but joined Schwarz's motion at the hearing.

58a

Schwarz or Wyeth. (Pl.'s Mem. in Opp. to Def. Schwarz Pharma Inc.'s Mot. for Summ. J. at 3.) Even so, Plaintiff maintains that Schwarz and Wyeth are liable for negligent misrepresentation, misrepresentation by omission, fraud by concealment, and constructive fraud for misstating the true risks associated with ingesting MCP.[5] Plaintiff asserts that she is pursuing only the above-mentioned claims and states that all of those claims are essentially contained within the elements of negligent misrepresentation.

The elements of negligent misrepresentation are: (1) a duty of reasonable care in conveying information; (2) breach of that duty by negligently giving false information; (3) reasonable reliance on the misrepresentations, which reliance is the proximate cause of physical injury; and (4) damages.[6] See Smith v. Brutger Cos., 569 N.W.2d 408, 414 (Minn. 1997). Here, the Court's focus is on whether Wyeth and Schwarz, as name-brand manufacturers, have a legal duty to warn so as to give rise to a claim by a consumer for injuries caused by the ingestion of another manufacturer's generic product.

[5] In Count Ten of her Amended Complaint, Plaintiff asserts a claim for intentional infliction of emotional distress. Schwarz argues that this claim was time-barred. Plaintiff does not object to the entry of summary judgment based on the statute of limitations. Accordingly, Count Ten is dismissed.

[6] The tort of negligent misrepresentation involving the risk of physical harm has not been specifically adopted or rejected in Minnesota. Smith, 569 N.W.2d at 414.

59a

Schwarz and Wyeth argue that they are entitled to summary judgment on Plaintiff's claims against them because they cannot be liable for injuries allegedly caused by another manufacturer's generic product. Plaintiff, on the other hand, asserts that Schwarz and Wyeth were under a legal duty to be truthful in their representations to the public about its name-brand products even if the aggrieved member of the public is not injured by those products.

The leading case on whether a name-brand manufacturer can be held liable for injuries caused by a generic equivalent is Foster v. American Home Products Corp., 29 F.3d 165, 171 (4th Cir. 1994). In Foster, the parents of a child who died after being given the generic equivalent of one of Wyeth's brand name prescription drugs sued Wyeth for negligent misrepresentation.[7] 29 F.3d 165, 166-67. The plaintiffs in the Foster case argued that the fact that Wyeth did not manufacture the drug their child ingested did not shield Wyeth from a negligent misrepresentation claim. Id. at 169. With respect to the plaintiffs' negligent misrepresentation claim, the United States Court of Appeals for the Fourth Circuit held that a name-brand manufacturer was under no duty to

[7] The Foster plaintiffs also sued Wyeth for negligence, strict liability, and breach of warranty. These causes of action were dismissed on summary judgment because Wyeth did not manufacture the drug ingested by the plaintiffs' child. Foster, 165 F.3d at 167. At that time, the district court allowed plaintiffs' negligent misrepresentation claim to stand. Id.

60a

the consumers of another company's product and could not be held liable for injuries stemming from the ingestion of another generic manufacturer's product. *Id.* at 171. In so holding, the Fourth Circuit noted that "[t]here is no legal precedent for using a name brand manufacturer's statements about its own product as a basis for liability for injuries caused by other manufacturers' products, over whose production the name brand manufacturer had no control." *Id.* at 170. The Fourth Circuit also rejected the plaintiffs' arguments that it was foreseeable to Wyeth that misrepresentations as to its product could result in the injury to users of generic equivalents. *Id.* at 171. The Fourth Circuit explained that to impose such a duty in that case "would be to stretch the concept of foreseeability too far." *Id. Foster* has been adopted or cited with approval by numerous federal and state courts. *See, e.g., Colacicco v. Apotex, Inc.*, 432 F. Supp. 2d 514, 538-39, 540 (E.D. Pa. 2006), *aff'd* 521 F.3d 253 (3d Cir. 2008) (holding that "a name brand drug manufacturer does not owe a legal duty to consumers of a generic equivalent of its drug"; noting that *Foster* has wide-spread acceptance).[8] The Court finds *Foster* persuasive.

---

[8] Indeed, Schwarz has cited to numerous cases involving generic MCP wherein the *Foster* case has been accepted and applied. *See, e.g., Sharp v. Leichus*, Case No. 2004-CA-0643, 2006 WL 515532, at *4 (Fla. Cir. Ct. Feb. 17, 2006), *aff'd* 925 So.2d 555 (Fla. App. 1 Dist. Jan. 22, 2006); *Smith v. Wyeth, Inc.*, No. 5:07-CV-18-R, 2008 WL 2677051, at *4 (W.D. Ky. June 30, 2008); *Pustejovsky v. Wyeth, Inc.*, No. 4:07-CV-103-Y, 2008 WL 1314902, at *2 (N.D. Tex. April 3, 2008); *Block v. Wyeth*, No. Civ. A 3-02-CV-1077, 2003 WL 203067, at *2 (N.D. Tex. Jan. 28, 2003).

61a

More importantly, the law in Minnesota similarly provides that a party does not have a duty to warn about another manufacturer's product. *See Flynn v. Am. Home Prods. Corp.*, 627 N.W.2d 342, 350 (Minn. Ct. App. 2001). In *Flynn*, plaintiff brought an action against American Home Products Corporation ("AHPC"), the manufacturer of the name-brand version of "fen-phen," alleging that misrepresentations made by AHPC to the FDA caused her to ingest the generic equivalent of fen-phen, which then injured her.[9] *Id.* The plaintiff asserted claims for fraud, negligent misrepresentation, and violation of Minnesota consumer fraud statutes. *Id.* at 346. The Minnesota Court of Appeals affirmed the district court's grant of summary judgment in favor of AHPC, rejecting the plaintiff's theory of recovery.[10] As to whether AHPC had a duty to warn about the generic manufacturer's drug, the court explained that "[a]lthough federal regulations required respondents to disclose product safety information to the FDA, respondents did not owe appellant, who did not purchase their product and with whom they had no relationship, the same obligation." *Id.* at 350 (citing *In re Minn. Breast Implant Litig.*, 36 F. Supp. 2d 863, 880 (D. Minn. 1998)).

---

[9] The court in *Flynn* analyzed plaintiffs claims under a "fraud-on-the-FDA" theory and under Minnesota common law. *Id.* at 350-51.

[10] The court in *Flynn* also held alternatively that the plaintiff's claims were preempted by federal law. *Id.* at 849.

While *Flynn, Foster,* and numerous other cases have answered "no" to the question of duty under these circumstances, Plaintiff nonetheless asserts that the question deserves examination and that alleged inaccuracies in Wyeth's and Schwarz's warnings can form the basis of a claim for negligent misrepresentation to the extent that a generic drug manufacturer must or will foreseeably rely on those disclosures in formulating their own warnings. Plaintiff asserts that there are sound justifications for imposing such a duty--namely because the issuance of a name-brand manufacturer's label is analogous to a product endorsement and the Restatement (Second) Torts forms a basis for exacting such a duty. The Court disagrees. As a federal court sitting in diversity, the Court must apply Minnesota state law. *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78 (1938). Under Minnesota law, as set forth in *Flynn,* Schwarz and Wyeth did not have a legal duty to warn Plaintiff so as to give rise to Plaintiff's claim for injuries caused by the ingestion of another manufacturer's generic MCP. *See Flynn,* 627 N.W.2d 342 at 350. The Court discerns no support under Minnesota law for the recognition of a cause of action against a manufacturer for representations concerning its own product based on an injury caused by another manufacturer's product. Accordingly, Plaintiff's negligent misrepresentation claim is dismissed.

The Court is sympathetic to the fact that Plaintiff may lack a legal remedy due to the fact that she did not ingest name-brand Reglan and that her claims against the generic manufacturers are

preempted by federal law. However, such sympathy does not warrant a departure from clear Minnesota law. That Plaintiff is left without a remedy is an issue for the legislature, not this Court.

## CONCLUSION

Accordingly, IT IS HEREBY ORDERED that:

1. Wyeth's Motion for Summary Judgment (Doc. No. 110) is GRANTED.

2. Teva and UDL's Motion for Summary Judgment (Doc. No. 87) is GRANTED.

3. Schwarz's Motion for Summary Judgment (Doc. No. 96) is GRANTED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: October 30, 2008   s/Donovan W. Frank
DONOVAN W. FRANK
Judge of United States
District Court

64a

## APPENDIX D

### CONSTITUTIONAL PROVISION INVOLVED

UNITED STATES CONSTITUTION
Article VI, Clause 2

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

65a

## APPENDIX E

### 21 U.S.C. §355

TITLE 21 — FOOD AND DRUGS

CHAPTER 9 — FEDERAL FOOD, DRUG, AND COSMETIC ACT

Subchapter V — DRUGS AND DEVICES

§355. New drugs

(a) **Necessity of effective approval of application.** No person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application filed pursuant to subsection (b) or (j) is effective with respect to such drug.

* * *

(j) **Abbreviated new drug applications.** (1) Any person may file with the Secretary an abbreviated application for the approval of a new drug.

(2) (A) An abbreviated application for a new drug shall contain—

(i) information to show that the conditions of use prescribed, recommended, or suggested in the labeling proposed for the new drug have been previously approved for a drug listed under paragraph (7) (hereinafter in this subsection referred to as a "listed drug");

(ii) (I) if the listed drug referred to in clause (i) has only one active ingredient, information to show that the active ingredient of the new drug is the

66a

same as that of the listed drug;

(II) if the listed drug referred to in clause (i) has more than one active ingredient, information to show that the other active ingredients of the new drug are the same as those of the listed drug, or

(III) if the listed drug referred to in clause (i) has more than one active ingredient and if one of the active ingredients of the new drug is different and the application is filed pursuant to the approval of a petition filed under subparagraph (C), information to show that the other active ingredients of the new drug are the same as the active ingredients of the listed drug, information to show that the different active ingredient is an active ingredient of a listed drug or of a drug which does not meet the requirements of section 201(p) [21 USCS §321(p)], and such other information respecting the different active ingredient with respect to which the petition was filed as the Secretary may require;

(iii) information to show that the route of administration, the dosage form, and the strength of the new drug are the same as those of the listed drug referred to in clause (i) or, if the route of administration, the dosage form, or the strength of the new drug is different and the application is filed pursuant to the approval of a petition filed under subparagraph (C), such information respecting the route of administration, dosage form, or strength with respect to which the petition was filed as the Secretary may require;

(iv) information to show that the new drug is bioequivalent to the listed drug referred to in clause (i), except that if the application is filed pursuant to the approval of a petition filed under subparagraph (C), information to show that the

67a

active ingredients of the new drug are of the same pharmacological or therapeutic class as those of the listed drug referred to in clause (i) and the new drug can be expected to have the same therapeutic effect as the listed drug when administered to patients for a condition of use referred to in clause (i);

(v) information to show that the labeling proposed for the new drug is the same as the labeling approved for the listed drug referred to in clause (i) except for changes required because of differences approved under a petition filed under subparagraph (C) or because the new drug and the listed drug are produced or distributed by different manufacturers;

(vi) the items specified in clauses (B) through (F) of subsection (b)(1);

*  *  *

The Secretary may not require that an abbreviated application contain information in addition to that required by clauses (i) through (viii).

*  *  *

(C) If a person wants to submit an abbreviated application for a new drug which has a different active ingredient or whose route of administration, dosage form, or strength differ from that of a listed drug, such person shall submit a petition to the Secretary seeking permission to file such an application. The Secretary shall approve or disapprove a petition submitted under this subparagraph within ninety days of the date the petition is submitted. The Secretary shall approve

such a petition unless the Secretary finds--

(i) that investigations must be conducted to show the safety and effectiveness of the drug or of any of its active ingredients, the route of administration, the dosage form, or strength which differ from the listed drug; or

(ii) that any drug with a different active ingredient may not be adequately evaluated for approval as safe and effective on the basis of the information required to be submitted in an abbreviated application.

\* \* \*

(4) Subject to paragraph (6), the Secretary shall approve an application for a drug unless the Secretary finds--

(A) the methods used in, or the facilities and controls used for, the manufacture, processing, and packing of the drug are inadequate to assure and preserve its identity, strength, quality, and purity;

(B) information submitted with the application is insufficient to show that each of the proposed conditions of use have been previously approved for the listed drug referred to in the application;

(C) (i) if the listed drug has only one active ingredient, information submitted with the application is insufficient to show that the active ingredient is the same as that of the listed drug;

(ii) if the listed drug has more than one active ingredient, information submitted with the application is insufficient to show that the active ingredients are the same as the active ingredients of the listed drug, or

(iii) if the listed drug has more than one active ingredient and if the application is for a drug which has an active ingredient different from the listed

drug, information submitted with the application is insufficient to show--

(I) that the other active ingredients are the same as the active ingredients of the listed drug, or

(II) that the different active ingredient is an active ingredient of a listed drug or a drug which does not meet the requirements of section 201(p) [21 USCS §321(p)], or no petition to file an application for the drug with the different ingredient was approved under paragraph (2)(C);

(D) (i) if the application is for a drug whose route of administration, dosage form, or strength of the drug is the same as the route of administration, dosage form, or strength of the listed drug referred to in the application, information submitted in the application is insufficient to show that the route of administration, dosage form, or strength is the same as that of the listed drug, or

(ii) if the application is for a drug whose route of administration, dosage form, or strength of the drug is different from that of the listed drug referred to in the application, no petition to file an application for the drug with the different route of administration, dosage form, or strength was approved under paragraph (2)(C);

(E) if the application was filed pursuant to the approval of a petition under paragraph (2)(C), the application did not contain the information required by the Secretary respecting the active ingredient, route of administration, dosage form, or strength which is not the same;

(F) information submitted in the application is insufficient to show that the drug is bioequivalent to the listed drug referred to in the application or, if the application was filed pursuant to a petition approved under paragraph (2)(C), information

70a

submitted in the application is insufficient to show that the active ingredients of the new drug are of the same pharmacological or therapeutic class as those of the listed drug referred to in paragraph (2)(A)(i) and that the new drug can be expected to have the same therapeutic effect as the listed drug when administered to patients for a condition of use referred to in such paragraph;

(G) information submitted in the application is insufficient to show that the labeling proposed for the drug is the same as the labeling approved for the listed drug referred to in the application except for changes required because of differences approved under a petition filed under paragraph (2)(C) or because the drug and the listed drug are produced or distributed by different manufacturers;

(H) information submitted in the application or any other information available to the Secretary shows that (i) the inactive ingredients of the drug are unsafe for use under the conditions prescribed, recommended, or suggested in the labeling proposed for the drug, or (ii) the composition of the drug is unsafe under such conditions because of the type or quantity of inactive ingredients included or the manner in which the inactive ingredients are included;

(I) the approval under subsection (c) of the listed drug referred to in the application under this subsection has been withdrawn or suspended for grounds described in the first sentence of subsection (e), the Secretary has published a notice of opportunity for hearing to withdraw approval of the listed drug under subsection (c) for grounds described in the first sentence of subsection (e), the approval under this subsection of the listed drug referred to in the application under this subsection

71a

has been withdrawn or suspended under paragraph (6), or the Secretary has determined that the listed drug has been withdrawn from sale for safety or effectiveness reasons;

(J) the application does not meet any other requirement of paragraph (2)(A); or

(K) the application contains an untrue statement of material fact.

* * *

73a

# APPENDIX G

## 21 C.F.R. §314.70

§314.70 Supplements and other changes to an approved application.

(a) *Changes to an approved application.*

(1)(i) Except as provided in paragraph (a)(1)(ii) of this section, the applicant must notify FDA about each change in each condition established in an approved application beyond the variations already provided for in the application. The notice is required to describe the change fully. Depending on the type of change, the applicant must notify FDA about the change in a supplement under paragraph (b) or (c) of this section or by inclusion of the information in the annual report to the application under paragraph (d) of this section.

* * *

(b) *Changes requiring supplement submission and approval prior to distribution of the product made using the change (major changes).* (1) A supplement must be submitted for any change in the drug substance, drug product, production process, quality controls, equipment, or facilities that has a substantial potential to have an adverse effect on the identity, strength, quality, purity, or potency of the drug product as these factors may relate to the safety or effectiveness of the drug product.

(2) These changes include, but are not limited to:

72a

# APPENDIX F

## 21 C.F.R. §314.3

§314.3 Definitions.   * * *

(a) The definitions and interpretations contained in section 201 of the act apply to those terms when used in this part.

(b) The following definitions of terms apply to this part:

*Abbreviated application* means the application described under §314.94, including all amendments and supplements to the application. "Abbreviated application" applies to both an abbreviated new drug application and an abbreviated antibiotic application.

* * *

*Applicant* means any person who submits an application or abbreviated application or an amendment or supplement to them under this part to obtain FDA approval of a new drug or an antibiotic drug and any person who owns an approved application or abbreviated application.

*Application* means the application described under §314.50, including all amendements [sic] and supplements to the application.

* * *

74a

(i) Except those described in paragraphs (c) and (d) of this section, changes in the qualitative or quantitative formulation of the drug product, including inactive ingredients, or in the specifications provided in the approved application;

(ii) Changes requiring completion of studies in accordance with part 320 of this chapter to demonstrate the equivalence of the drug product to the drug product as manufactured without the change or to the reference listed drug;

(iii) Changes that may affect drug substance or drug product sterility assurance, such as changes in drug substance, drug product, or component sterilization method(s) or an addition, deletion, or substitution of steps in an aseptic processing operation;

(iv) Changes in the synthesis or manufacture of the drug substance that may affect the impurity profile and/or the physical, chemical, or biological properties of the drug substance;

(v) The following labeling changes:

(A) Changes in labeling, except those described in paragraphs (c)(6)(iii), (d)(2)(ix), or (d)(2)(x) of this section;

(B) If applicable, any change to a Medication Guide required under part 208 of this chapter, except for changes in the information specified in §208.20(b)(8)(iii) and (b)(8)(iv) of this chapter; and

(C) Any change to the information required by §201.57(a) of this chapter, with the following exceptions that may be reported in an annual report under paragraph (d)(2)(x) of this section:

75a

(1) Removal of a listed section(s) specified in §201.57(a)(5) of this chapter; and

(2) Changes to the most recent revision date of the labeling as specified in §201.57(a)(15) of this chapter.

(vi) Changes in a drug product container closure system that controls the drug product delivered to a patient or changes in the type (e.g., glass to high density polyethylene (HDPE), HDPE to polyvinyl chloride, vial to syringe) or composition (e.g., one HDPE resin to another HDPE resin) of a packaging component that may affect the impurity profile of the drug product.

(vii) Changes solely affecting a natural product, a recombinant DNA-derived protein/polypeptide, or a complex or conjugate of a drug substance with a monoclonal antibody for the following:

(A) Changes in the virus or adventitious agent removal or inactivation method(s);

(B) Changes in the source material or cell line; and

(C) Establishment of a new master cell bank or seed.

(viii) Changes to a drug product under an application that is subject to a validity assessment because of significant questions regarding the integrity of the data supporting that application.

(3) The applicant must obtain approval of a supplement from FDA prior to distribution of a drug product made using a change under paragraph (b) of this section. Except for submissions under paragraph (e) of this section, the

following information must be contained in the supplement:

(i) A detailed description of the proposed change;

(ii) The drug product(s) involved;

(iii) The manufacturing site(s) or area(s) affected;

(iv) A description of the methods used and studies performed to assess the effects of the change;

(v) The data derived from such studies;

(vi) For a natural product, a recombinant DNA-derived protein/polypeptide, or a complex or conjugate of a drug substance with a monoclonal antibody, relevant validation protocols and a list of relevant standard operating procedures must be provided in addition to the requirements in paragraphs (b)(3)(iv) and (b)(3)(v) of this section; and

(vii) For sterilization process and test methodologies related to sterilization process validation, relevant validation protocols and a list of relevant standard operating procedures must be provided in addition to the requirements in paragraphs (b)(3)(iv) and (b)(3)(v) of this section.

(4) An applicant may ask FDA to expedite its review of a supplement for public health reasons or if a delay in making the change described in it would impose an extraordinary hardship on the applicant. Such a supplement and its mailing cover should be plainly marked: "Prior Approval Supplement-Expedited Review Requested."

(c) *Changes requiring supplement submission at least 30 days prior to distribution of the drug product made using the change (moderate changes).*
(1) A supplement must be submitted for any change in the drug substance, drug product, production process, quality controls, equipment, or facilities that has a moderate potential to have an adverse effect on the identity, strength, quality, purity, or potency of the drug product as these factors may relate to the safety or effectiveness of the drug product. If the supplement provides for a labeling change under paragraph (c)(6)(iii) of this section, 12 copies of the final printed labeling must be included.

(2) These changes include, but are not limited to:

(i) A change in the container closure system that does not affect the quality of the drug product, except those described in paragraphs (b) and (d) of this section;

(ii) Changes solely affecting a natural protein, a recombinant DNA-derived protein/polypeptide or a complex or conjugate of a drug substance with a monoclonal antibody, including:

(A) An increase or decrease in production scale during finishing steps that involves different equipment; and

(B) Replacement of equipment with that of a different design that does not affect the process methodology or process operating parameters.

(iii) Relaxation of an acceptance criterion or deletion of a test to comply with an official compendium that is consistent with FDA statutory

and regulatory requirements.

(3) A supplement submitted under paragraph (c)(1) of this section is required to give a full explanation of the basis for the change and identify the date on which the change is to be made. The supplement must be labeled "Supplement -- Changes Being Effected in 30 Days" or, if applicable under paragraph (c)(6) of this section, "Supplement -- Changes Being Effected."

(4) Pending approval of the supplement by FDA, except as provided in paragraph (c)(6) of this section, distribution of the drug product made using the change may begin not less than 30 days after receipt of the supplement by FDA. The information listed in paragraphs (b)(3)(i) through (b)(3)(vii) of this section must be contained in the supplement.

(5) The applicant must not distribute the drug product made using the change if within 30 days following FDA's receipt of the supplement, FDA informs the applicant that either:

(i) The change requires approval prior to distribution of the drug product in accordance with paragraph (b) of this section; or

(ii) Any of the information required under paragraph (c)(4) of this section is missing; the applicant must not distribute the drug product made using the change until the supplement has been amended to provide the missing information.

(6) The agency may designate a category of changes for the purpose of providing that, in the case of a change in such category, the holder of an approved application may commence distribution of

the drug product involved upon receipt by the agency of a supplement for the change. These changes include, but are not limited to:

(i) Addition to a specification or changes in the methods or controls to provide increased assurance that the drug substance or drug product will have the characteristics of identity, strength, quality, purity, or potency that it purports or is represented to possess;

(ii) A change in the size and/or shape of a container for a nonsterile drug product, except for solid dosage forms, without a change in the labeled amount of drug product or from one container closure system to another;

(iii) Changes in the labeling to reflect newly acquired information, except for changes to the information required in §201.57(a) of this chapter (which must be made under paragraph (b)(2)(v)(C) of this section), to accomplish any of the following:

(A) To add or strengthen a contraindication, warning, precaution, or adverse reaction for which the evidence of a causal association satisfies the standard for inclusion in the labeling under §201.57(c) of this chapter;

(B) To add or strengthen a statement about drug abuse, dependence, psychological effect, or overdosage;

(C) To add or strengthen an instruction about dosage and administration that is intended to increase the safe use of the drug product;

(D) To delete false, misleading, or unsupported indications for use or claims for effectiveness; or

80a

(E) Any labeling change normally requiring a supplement submission and approval prior to distribution of the drug product that FDA specifically requests be submitted under this provision.

(7) If the agency disapproves the supplemental application, it may order the manufacturer to cease distribution of the drug product(s) made with the manufacturing change.

* * *

81a

# APPENDIX H

## 21 C.F.R. §314.80

§314.80 Postmarketing reporting of adverse drug experiences.

* * *

(b) *Review of adverse drug experiences.* Each applicant having an approved application under §314.50 or, in the case of a 505(b)(2) application, an effective approved application, shall promptly review all adverse drug experience information obtained or otherwise received by the applicant from any source, foreign or domestic, including information derived from commercial marketing experience, postmarketing clinical investigations, postmarketing epidemiological/surveillance studies, reports in the scientific literature, and unpublished scientific papers. Applicants are not required to resubmit to FDA adverse drug experience reports forwarded to the applicant by FDA; however, applicants must submit all followup information on such reports to FDA. Any person subject to the reporting requirements under paragraph (c) of this section shall also develop written procedures for the surveillance, receipt, evaluation, and reporting of postmarketing adverse drug experiences to FDA.

(c) *Reporting requirements.* The applicant shall report to FDA adverse drug experience information, as described in this section. . . .

(1)(i) Postmarketing 15-day "Alert reports". The

83a

# APPENDIX I

## 21 C.F.R. §314.92

**§314.92 Drug products for which abbreviated applications may be submitted.**

(a) Abbreviated applications are suitable for the following drug products within the limits set forth under §314.93:

(1) Drug products that are the same as a listed drug. A "listed drug" is defined in §314.3. For determining the suitability of an abbreviated new drug application, the term "same as" means identical in active ingredient(s), dosage form, strength, route of administration, and conditions of use, except that conditions of use for which approval cannot be granted because of exclusivity or an existing patent may be omitted. . . .

* * *

82a

applicant shall report each adverse drug experience that is both serious and unexpected, whether foreign or domestic, as soon as possible but in no case later than 15 calendar days of initial receipt of the information by the applicant.

(ii) Postmarketing 15-day "Alert reports" -- followup. The applicant shall promptly investigate all adverse drug experiences that are the subject of these postmarketing 15-day Alert reports and shall submit followup reports within 15 calendar days of receipt of new information or as requested by FDA. If additional information is not obtainable, records should be maintained of the unsuccessful steps taken to seek additional information. Postmarketing 15-day Alert reports and followups to them shall be submitted under separate cover.

* * *

(2) Periodic adverse drug experience reports. (i) The applicant shall report each adverse drug experience not reported under paragraph (c)(1)(i) of this section at quarterly intervals, for 3 years from the date of approval of the application, and then at annual intervals. . . .

* * *

84a

# APPENDIX J

## 21 C.F.R. §314.94

**§314.94 Content and format of an abbreviated application.**

Abbreviated applications are required to be submitted in the form and contain the information required under this section. . . .

(a) *Abbreviated new drug applications.* Except as provided in paragraph (b) of this section, the applicant shall submit a complete archival copy of the abbreviated new drug application that includes the following:

(1) *Application form.* The applicant shall submit a completed and signed application form that contains the information described under §314.50(a)(1), (a)(3), (a)(4), and (a)(5). The applicant shall state whether the submission is an abbreviated application under this section or a supplement to an abbreviated application under §314.97.

* * *

(3) *Basis for abbreviated new drug application submission.* An abbreviated new drug application must refer to a listed drug. . . . The application shall contain:

(i) The name of the reference listed drug, including its dosage form and strength. . . .

* * *

85a

(4) *Conditions of use.* (i) A statement that the conditions of use prescribed, recommended, or suggested in the labeling proposed for the drug product have been previously approved for the reference listed drug.

(ii) A reference to the applicant's annotated proposed labeling and to the currently approved labeling for the reference listed drug provided under paragraph (a)(8) of this section.

(5) *Active ingredients.* . . .

(A) A statement that the active ingredient of the proposed drug product is the same as that of the reference listed drug.

(B) A reference to the applicant's annotated proposed labeling and to the currently approved labeling for the reference listed drug provided under paragraph (a)(8) of this section.

* * *

(6) *Route of administration, dosage form, and strength.* . . .

(A) A statement that the route of administration, dosage form, and strength of the proposed drug product are the same as those of the reference listed drug.

(B) A reference to the applicant's annotated proposed labeling and to the currently approved labeling for the reference listed drug provided under paragraph (a)(8) of this section.

* * *

(7) *Bioequivalence.* (i) Information that shows that the drug product is bioequivalent to the

reference listed drug upon which the applicant relies....

* * *

(8) *Labeling*—(i) *Listed drug labeling.* A copy of the currently approved labeling (including, if applicable, any Medication Guide required under part 208 of this chapter) for the listed drug referred to in the abbreviated new drug application, if the abbreviated new drug application relies on a reference listed drug.

(ii) *Copies of proposed labeling.* Copies of the label and all labeling for the drug product including, if applicable, any Medication Guide required under part 208 of this chapter (4 copies of draft labeling or 12 copies of final printed labeling).

(iii) *Statement on proposed labeling.* A statement that the applicant's proposed labeling including, if applicable, any Medication Guide required under part 208 of this chapter is the same as the labeling of the reference listed drug except for differences annotated and explained under paragraph (a)(8)(iv) of this section.

(iv) *Comparison of approved and proposed labeling.* A side-by-side comparison of the applicant's proposed labeling including, if applicable, any Medication Guide required under part 208 of this chapter with the approved labeling for the reference listed drug with all differences annotated and explained. Labeling (including the container label, package insert, and, if applicable, Medication Guide) proposed for the drug product must be the same as the labeling approved for the reference listed drug, except for changes required

because of differences approved under a petition filed under §314.93 or because the drug product and the reference listed drug are produced or distributed by different manufacturers. Such differences between the applicant's proposed labeling and labeling approved for the reference listed drug may include differences in expiration date, formulation, bioavailability, or pharmacokinetics, labeling revisions made to comply with current FDA labeling guidelines or other guidance, or omission of an indication or other aspect of labeling protected by patent or accorded exclusivity under section 505(j)(4)(D) of the act.

* * *

(d) *Format of an abbreviated application.*

* * *

(ii) *Labeling.* The content of labeling required under §201.100(d)(3) of this chapter (commonly referred to as the package insert or professional labeling), including all text, tables, and figures, must be submitted to the agency in electronic format as described in paragraph (d)(1)(iii) of this section. This requirement applies to the content of labeling for the proposed drug product only and is in addition to the requirements of paragraph (a)(8)(ii) of this section that copies of the formatted label and all proposed labeling be submitted. Submissions under this paragraph must be made in accordance with part 11 of this chapter, except for the requirements of §11.10(a), (c) through (h), and (k), and the corresponding requirements of §11.30.

(iii) *Electronic format submissions.* Electronic format submissions must be in a form that FDA

88a

can process, review, and archive. FDA will periodically issue guidance on how to provide the electronic submission (e.g., method of transmission, media, file formats, preparation and organization of files).

* * *

89a

# APPENDIX K

## 21 C.F.R. §314.97

**§314.97 Supplements and other changes to an approved abbreviated application.**

The applicant shall comply with the requirements of §§314.70 and 814.71 regarding the submission of supplemental applications and other changes to an approved abbreviated application.

91a

**APPENDIX M**

**21 C.F.R. §314.127**

**§314.127 Refusal to approve an abbreviated new drug application.**

(a) FDA will refuse to approve an abbreviated application for a new drug under section 505(j) of the act for any of the following reasons:

* * *

(7) Information submitted in the abbreviated new drug application is insufficient to show that the labeling proposed for the drug is the same as the labeling approved for the listed drug referred to in the abbreviated new drug application except for changes required because of differences approved in a petition under §314.93 or because the drug product and the reference listed drug are produced or distributed by different manufacturers or because aspects of the listed drug's labeling are protected by patent, or by exclusivity, and such differences do not render the proposed drug product less safe or effective than the listed drug for all remaining, nonprotected conditions of use.

* * *

90a

**APPENDIX L**

**21 C.F.R. §314.98**

**§314.98 Postmarketing reports.**

(a) Except as provided in paragraph (b) of this section, each applicant having an approved abbreviated new drug application under §314.94 that is effective shall comply with the requirements of §314.80 regarding the reporting and recordkeeping of adverse drug experiences.

* * *

effective than the listed drug for any remaining, nonprotected condition(s) of use.

* * *

93a

# APPENDIX N

## 21 C.F.R. §314.150

§314.150 Withdrawal of approval of an application or abbreviated application.

* * *

(b FDA may notify the applicant, and, if appropriate, all other persons who manufacture or distribute identical, related, or similar drug products as defined in §310.6, and for a new drug afford an opportunity for a hearing on a proposal to withdraw approval of the application or abbreviated new drug application under section 505(e) of the act and under the procedure in §314.200, if the agency finds:

* * *

(10) That the labeling for the drug product that is the subject of the abbreviated new drug application is no longer consistent with that for the listed drug referred to in the abbreviated new drug application, except for differences approved in the abbreviated new drug application or those differences resulting from:

(i) A patent on the listed drug issued after approval of the abbreviated new drug application; or

(ii) Exclusivity accorded to the listed drug after approval of the abbreviated new drug application that do not render the drug product less safe or

94a

# APPENDIX O

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Food and Drug Administration

21 CFR Parts 2, 5, 10, 310, 314, 320, and 433

[Docket No. 85N-0214]
RIN 0905-AB63

### Abbreviated New Drug Application Regulations

Agency: Food and Drug Administration, HHS

57 Fed. Reg. 17950

April 28, 1992

ACTION: Final rule.

SUMMARY: The Food and Drug Administration (FDA) is issuing final regulations for most of its requirements for abbreviated new drug applications (ANDA's). FDA published a proposed rule for ANDA's in the Federal Register of July 10, 1989 (54 FR 28872). These regulations implement title I of the Drug Price Competition and Patent Term Restoration Act of 1984 (Pub. L. 98-417) (the 1984 amendments). This final rule covers subjects such as ANDA content and format, approval and nonapproval of an application, and suitability petitions. This rule does not finalize the provisions

95a

of the proposed rule on patent certification and market exclusivity; FDA is still examining the issues pertaining to those provisions and will finalize them in a future edition of the Federal Register.

EFFECTIVE DATE: The regulations will become effective on June 29, 1992.

\* \* \*

## I. Background

### A. New Drug Approval: 1938 to 1962

In 1938, Congress passed the Federal Food, Drug, and Cosmetic Act (the act). The act created a premarket approval system for drug products that required applicants seeking drug product approval to submit a new drug application (NDA) to FDA. The NDA would contain information demonstrating, among other things, that the drug product was safe. The act also provided that an NDA would automatically become effective (i.e., the product could be lawfully marketed) within a fixed period unless the agency affirmatively refused to approve the application.

In addition to drug products that had an effective NDA, many products were marketed without effective applications. These products were identical, similar, or related to products with effective NDA's. The manufacturers of these products had concluded that their drug products were generally recognized as safe, or had received advisory opinions from FDA that an NDA was not required because the products were generally recognized as safe.

96a

In 1962, Congress amended the drug approval provisions of the act to require affirmative approval to NDA's before marketing. The amendments required applicants to show that their products were both safe and effective (Pub. L. 87-781 (October 10, 1962)). Thus, on or after October 10, 1962, a person could not market a new drug without an approved NDA that contained sufficient safety information as well as substantial evidence establishing the drug's effectiveness for its intended uses.

The 1962 amendments also deemed NDA's that had become effective before October 10, 1962, to be approved. As with postenactment drugs, the 1962 amendments required these "pre-1962" drugs to be shown to be effective for their intended uses. Consequently, FDA began a program to evaluate the drugs that had been deemed approved to determine whether there was substantial evidence of their effectiveness. This systematic evaluation and the implementation of FDA's findings became known as the Drug Efficacy Study Implementation (DESI). Under DESI, FDA contracted with the National Academy of Sciences/National Research Council (NAS/NRC), which established expert panels to review available evidence of effectiveness and to provide recommendations to FDA. FDA considered the NAS/NRC panels' recommendations about the effectiveness of these DESI drugs, and announced its conclusions through Federal Register notices. These notices, known as DESI notices, contain the acceptable marketing conditions for the class of drug products covered by the notice.

97a

B. The ANDA Procedure for Pre-1962 Drugs

If a manufacturer had a pre-1962 NDA in effect for a drug product, FDA continued its approval if the manufacturer submitted a supplemental new drug application to conform the product's indications for use to those determined to be effective in the DESI review. Yet, as stated above, many drug products had active ingredients and indications that were identical or very similar to the drug products found to be effective in the DESI review but lacked NDA's themselves. In implementing the DESI program with respect to these duplicate products, FDA concluded that each such drug product was a "new drug" that required its own approved NDA before it could be legally marketed (United States v. Generix Drug Corp., 460 U.S. 453 (1989)). Additionally, FDA issued a policy statement in the Federal Register of May 28, 1968 (33 FR 7758) that revoked the earlier advisory opinions that drugs could be marketed without prior FDA clearance. This rule was codified at 21 CFR 310.100.

Shortly thereafter, FDA created the ANDA procedure for the approval of duplicate products in reliance on the DESI evaluation. In brief, after the DESI program had found a particular drug product to be effective and suitable for ANDA's, FDA published a Federal Register notice announcing its conclusions. Any manufacturer of a duplicate drug product that did not have an approved NDA was then required to submit an ANDA to obtain approval to market the duplicate version of the approved drug. (See 34 FR 2673, February 27, 1969; 35 FR 6574, April 24, 1970; and 35 FR 11273, July 14, 1970.)

98a

Before 1984, FDA based these ANDA approvals on the theory that the evidence of effectiveness necessary for approval of an NDA had been provided, reviewed, and accepted during the DESI process. Evidence of the drug's safety had been determined on the basis of information contained in the pioneer NDA and by the subsequent marketing experience with the drug. FDA required ANDA applicants to submit information that showed the applicant's ability to manufacture a product of acceptable quality whose safety and effectiveness were equivalent to the drug product whose safety and effectiveness had been established. Thus, ANDA applicants provided information on the drug product's formulation, manufacture, quality control procedures, and labeling. DESI notices specified additional information, such as bioavailability/bioequivalence data, for the ANDA.

C. Procedures for Duplicates of Post-1962 Drugs ("Paper NDA" Policy)

FDA never extended its ANDA policy for pre-1962 drugs to duplicates of drugs first approved for marketing on or after October 10, 1962, although it did consider the possibility of such an extension either by regulation or through legislation. (See 54 FR 28872 at 28873 and citations therein.) As patents began to expire for many post-1962 drugs, including some high volume, therapeutically important drug products, many manufacturers became interested in changing the NDA system to permit ANDA's for post-1962 drug products.

FDA did allow some duplicate drug products of drugs first approved after 1962 to be marketed

99a

under its "paper NDA" policy. (See 46 FR 27396, May 19, 1981.) This policy permitted FDA to approve NDA's for post-1962 drug products on the basis of safety and effectiveness information derived primarily from published reports based on well-controlled studies. This meant that manufacturers did not have to conduct their own tests, but adequate literature, including detailed reports of adequate and well-controlled studies, was available for only a fraction of the post-1962 drugs. Moreover, the staff effort involved in reviewing paper NDA's ultimately proved to be a substantial and inefficient use of agency resources.

D. The Drug Price Competition and Patent Term Restoration Act of 1984

From 1978 to 1984, Congress considered various bills that would have authorized an ANDA procedure for duplicate versions of post-1962 drug products. Other bills under consideration during this period sought to restore patent life lost while awaiting Federal marketing approval. Congress combined the ANDA procedure for post-1962 drug products and patent term restoration in the Drug Price Competition and Patent Term Restoration Act of 1984 (Pub. L. 98-417).

The law consisted of two different titles. Title I authorized the approval of duplicate versions of drug products, approved under section 505 of the act, under an ANDA procedure. Title II authorized the extension of patent terms for approved new drug products (including antibiotics and biological drug products), some medical devices, food additives, and color additives. Congress intended

100a

the two titles to provide a careful balance between promoting competition among brand-name and duplicate or "generic" drugs and encouraging research and innovation.

Title I amended section 505 of the act by establishing a statutory ANDA procedure for duplicate and related versions of human drugs approved under section 505(b) of the act. These procedures are inapplicable to antibiotics (which are approved under section 507 of the act) and biological drug products licensed under 42 U.S.C. 262. The statute adopted, with few modifications, the agency's ANDA procedure for pre-1962 drugs. It required all applicants to provide certain patent information; provided for the submission and approval of applications for which the investigations relied on by the applicant to satisfy the "full reports" of safety and effectiveness requirement were not conducted by or for which the applicant had not obtained a right of reference or use from the person who conducted the investigations; established rules for disclosure of safety and effectiveness data submitted as part of an NDA; and provided specific time periods during which ANDA's and NDA's for certain drug products may not be submitted or approved. The act also required FDA to promulgate new regulations implementing the statute. In the Federal Register of July 10, 1989 (54 FR 28872), FDA published a proposed rule on ANDA's. This final rule contains must [sic] of the provisions contained in that proposal.

FDA published a final rule implementing Title II in the Federal Register of March 7, 1988 (53 FR 7298). This rule is codified at 21 CFR Part 60.

101a

## II. Highlights of this Final Rule

This final rule amends 21 CFR Part 314 to establish new requirements and procedures for NDA and ANDA applicants under the 1984 amendments. The rule also revises the bioavailability and bioequivalence requirements at 21 CFR part 320 to conform to the 1984 amendments and current agency policy. Minor conforming amendments are made to 21 CFR parts 2, 5, 10, 310, 314, and 433. Additionally, because the agency will issue final regulations governing patent certification and marketing exclusivity requirements at a future date, FDA has revised or deleted cross-references to those provisions and, where possible, replaced them with statutory citations.

The final rule's major provisions are as follows:

### A. Abbreviated Applications

The statutory provisions governing ANDA requirements and procedures are at section 505(j) of the act (21 U.S.C. 355(j)).

The statute permits ANDA's for: (1) A drug product that is the "same" as a drug product listed in the approved drug product list published by FDA (the "listed drug") with respect to active ingredient(s), route of administration, dosage form, strength, and conditions of use recommended in the labeling; and (2) a drug product with certain changes from a listed drug if FDA has approved a petition from a prospective applicant permitting the submission of an ANDA for the changed drug product.

Subpart C of part 314 addresses an ANDA applicant's requirements and responsibilities. The final rule is substantially similar to the proposal, although FDA has made some minor changes, such as requiring applicants to include a table of contents in the review copies of an ANDA (21 CFR 314.94(a)(2)), and other minor changes regarding periodic reports from ANDA holders (21 CFR 314.98). One noteworthy change concerns the chemistry, manufacturing, and controls section of an ANDA. Under the proposed rule, applicants would have been required to identify and characterize inactive ingredient differences between their products and those in the reference listed drug. FDA received numerous comments stating that, for many drug products, applicants would be unable to discover which inactive ingredients were used in the reference listed drug. Consequently, the final rule requires applicants to identify and describe such differences regarding inactive ingredients only for topical drug products, drug products intended for parenteral use, and drug products intended for ophthalmic or otic use. The inactive ingredients for these products are listed on the products' labels. For other drug products, the final rule requires applicants to identify and characterize only the inactive ingredients in their own products.

* * *

### B. ANDA Suitability Petitions

Under section 505(j)(2)(C) of the act, an ANDA applicant may petition FDA for permission to file an ANDA for a drug product that has one different active ingredient in a combination product, or

whose route of administration, dosage form, or strength differs from that of the listed drug. These are the only types of changes permitted in an ANDA.

* * *

## III. Comments on the Proposed Rule

* * *

### Section 314.1 -- Scope

4. FDA received no comments on the proposed changes to 21 CFR 314.1, but did receive two general comments regarding the proposed rule's scope. One comment asked FDA to permit ANDA's for duplicates of "drug substances for which the specifications are very tightly drawn for both potency and purity," such as insulin preparations, and for copies of biotechnology-derived drug products. The second comment recommended that FDA accept ANDA's with warnings or precautions in addition to those on the reference listed drug's label, provided that such information was not indicative of diminished safety or effectiveness of the generic drug product.

Section 505(j) of the act permits ANDA's only for duplicate and related versions of previously approved drug products. The ANDA applicant relies on a prior agency finding of safety and effectiveness based on the evidence presented in a previously approved new drug application. If investigations on a drug's safety or effectiveness are necessary for approval, an ANDA is not permitted. Thus, under the statute, an ANDA would only be permitted for a drug product with

104a

"tight specifications" or a biotechnology-derived drug product only if such a product is the same as a product previously approved under section 505 of the act or if FDA has approved submission of an ANDA under a petition filed under section 505(j)(2)(C) of the act.

As for accepting ANDA's with additional warnings or precautions, section 505 (j)(2)(A)(v) and (j)(3)(G) of the act requires that the applicant's proposed labeling be the same as that of the reference listed drug unless: (1) The labeling differences are due to an approved petition under section 505(j)(2)(C) of the act (otherwise referred to as a "suitability petition"); or (2) the drug product and the reference listed drug are produced or distributed by different manufacturers. (See 21 U.S.C. 355 (j)(2)(A)(v) and (j)(3)(G).) Thus, the exceptions in section 505 (j)(2)(A)(v) and (j)(3)(G) of the act are limited. In addition, under the patent and exclusivity provisions of the act, the ANDA labeling may be required to carry fewer indications than the reference listed product's labeling or to have other labeling differences. In the preamble to the proposed rule, the agency described various types of labeling differences that might fall within the permitted exceptions. An ANDA applicant is required to include in its ANDA a side-by-side comparison of the applicant's proposed labeling with the currently approved labeling for the reference listed drug. The agency will carefully review all differences annotated by the applicant in determining if such differences fall within the limited exceptions permitted by the act.

* * *

105a

## Section 314.70 -- Supplements and Other Changes to an Approved Application

FDA received no comments on this provision, but has amended the provision to adopt references to statutory, rather than regulatory, provisions or to explain what information should be provided. However, the agency wishes to remind ANDA applicants that, as noted in paragraph 4 above, the labeling for an ANDA product must, with few exceptions, correspond to that for the reference listed drug.

* * *

## Section 314.93 -- Petition To Request a Change from a Listed Drug

Proposed § 314.93(b) stated that a person who wants to submit an ANDA for a drug product "which is not identical to a listed drug product in route of administration, dosage form, and strength, or in which one active ingredient is substituted for one of the active ingredients in a listed combination drug, must first obtain permission from FDA to submit such an abbreviated application."

* * *

20. One comment asked FDA to accept petitions to submit an ANDA for a product whose labeling differs from the reference listed drug by being "more clear or offer better directions regarding how the drug should be taken."

FDA declines to accept the comment. Suitability petitions are for drugs that have a different active ingredient, route of administration, dosage form, or strength. (See 21 U.S.C. 355(j)(2)(C).) Labeling

107a

proposed labeling with the approved labeling for the reference listed drug. ...

* * *

39. Two comments opposed the requirement for a side-by-side comparison between the proposed ANDA drug product's labeling and the reference listed drug product's labeling under proposed § 314.94(a)(8)(iv). The comments said the comparison would be cumbersome and impractical, and suggested annotated changes or highlighted changes instead of comparisons.

In contrast, three comments supported side-by-side labeling but asked that ANDA holders be required to complete labeling revisions within 30 days of any change in the listed drug's labeling or to provide labeling comparisons every 6 months to ensure that the ANDA drug's labeling matched that of the listed drug. One comment said FDA should create a mechanism to compel ANDA holders to revise their labeling to conform to the listed drug product once the ANDA is approved.

The final rule retains the requirement for side-by-side labeling comparisons. Side-by-side comparisons enable FDA reviewers to readily identify differences between the ANDA applicant's and the innovator's product labeling. FDA does not believe that this requirement will impose a significant burden on ANDA applicants.

As for creating a mechanism to compel labeling revisions, section 505(e)(2) of the act authorizes the withdrawal of approval of an application if "there is a lack of substantial evidence that the drug will have the effect it purports or is represented to have

106a

differences, therefore, are not proper subjects for a suitability petition.

FDA reminds applicants that the labeling for an ANDA product must be the same as the labeling for the listed drug product except for differences due to different manufacturers, exclusivity, etc. (See 21 U.S.C. 355(j)(3)(G).) An ANDA applicant who believes that the labeling for a proposed drug product should differ from that approved for the reference listed drug should contact FDA to discuss whether labeling for both generic and listed drugs should be revised.

* * *

*Section 314.94 -- Content and Format of an Abbreviated Application*

FDA received over 100 comments pertaining to ANDA format and content. Most recommended revisions or clarification while several expressed general agreement with specific provisions.

* * *

Labeling

Proposed § 314.94(a)(8) set forth labeling requirements for ANDA's. The proposal would require applicants to provide copies of the currently approved labeling for the reference listed drug, labels and labeling for the proposed drug product, and a statement that the applicant's proposed labeling is the same as that for the reference listed drug except for certain differences, including, but not limited to, differences due to exclusivity or patent protection. The proposal, at § 314.94(a)(8)(iv), would also require applicants to provide a side-by-side comparison of the applicant's

108a

under the conditions of use prescribed, recommended, or suggested in the labeling thereof." This provision applies to both ANDA and NDA drug products. Because an ANDA must have labeling that is the same as the reference listed drug under section 505(j)(2)(A)(v) of the act, FDA believes that a generic drug product approved on the basis of studies conducted on the listed drug and whose labeling is inconsistent with the listed drug's labeling might not be considered safe and effective for use under the conditions prescribed, suggested, or recommended in the listed drug's labeling. FDA, therefore, has revised § 314.150 to permit the agency to withdraw approval of an ANDA if the applicant fails to maintain labeling in compliance with the requirements of the act.

As for requiring ANDA holders to submit drug labeling at periodic intervals, FDA believes that the existing reporting requirements at 21 CFR 314.70 and 314.81 ensure that labeling changes are brought to FDA's attention in an appropriate and timely fashion. The agency will advise ANDA holders of changes to be made after approval, but postapproval changes resulting from the expiration of exclusivity or patent protection are the responsibility of the ANDA holder.

40. Two comments said the labeling provisions should be revised to permit ANDA applicants to deviate from the labeling for the reference listed drug to add contraindications, warnings, precautions, adverse reactions, and other safety-related information. One comment added that ANDA applicants should be allowed to delete some of the indications contained in the labeling for the reference listed drug.

109a

FDA disagrees with the comments. Except for labeling differences due to exclusivity or a patent and differences under section 505(j)(2)(v) of the act, the ANDA product's labeling must be the same as the listed drug product's labeling because the listed drug product is the basis for ANDA approval. Consistent labeling will assure physicians, health professionals, and consumers that a generic drug is as safe and effective as its brand-name counterpart. (See 54 FR 28872 at 28884.) If an ANDA applicant believes new safety information should be added to a product's labeling, it should contact FDA, and FDA will determine whether the labeling for the generic and listed drugs should be revised. After approval of an ANDA, if an ANDA holder believes that new safety information should be added, it should provide adequate supporting information to FDA, and FDA will determine whether the labeling for the generic and listed drugs should be revised.

* * *

*Section 314.127 -- Refusal to Approve an Abbreviated New Drug Application*

Proposed § 314.127 provided a list of reasons for refusing to approve an ANDA. In general, these reasons corresponded to those listed at section 505(j)(3) of the act.

* * *

72. Proposed § 314.127(g) (now § 314.127(a)(7)) would permit FDA to refuse to approve an abbreviated application if information in the ANDA "is insufficient to show that the labeling proposed for the drug is the same as the labeling approved for the listed drug . . . except for changes required

110a

because of differences approved in a petition under § 314.93 or because the drug product and the reference listed drug are produced or distributed by different manufacturers." One comment said FDA should also require ANDA holders to obtain current labeling for the listed drug every 6 months and update their own labeling accordingly.

FDA has revised § 314.150 to require ANDA holders to maintain current labeling. Failure to do so may result in withdrawal of approval. FDA will not, however, require ANDA holders to obtain current labeling or to update their own labeling every 6 months because drug labeling does not change on a regularly scheduled basis.

* * *

*Section 314.150 -- Withdrawal of Approval of an Application or Abbreviated Application.*

Proposed § 314.150 concerned withdrawals of approvals of an application or abbreviated application under section 505(e) of the act. The proposed rule would permit FDA to withdraw approval of an application or abbreviated application under certain enumerated conditions, such as a finding that an imminent hazard to the public health exists (§ 314.150(a)(1)), or a finding that clinical data or other experience, tests, or scientific data show the drug is safe for use under the conditions of use approved in the application or abbreviated application (§ 314.150(a)(2)(i)).

78. Two comments said FDA should create a new provision authorizing the agency to withdraw an abbreviated application if the abbreviated

111a

application holder failed to modify its labeling to match labeling changes in the reference listed drug.

FDA agrees and has revised the rule accordingly. New § 314.150(b)(10) states that the ANDA applicant's failure to maintain drug labeling that is consistent with that of the listed drug may be grounds for withdrawing approval of the abbreviated application. The only exceptions to this withdrawal provision are labeling differences approved in the original ANDA or resulting from a patent issued on the listed drug after approval of the ANDA or from exclusivity accorded to the listed drug after approval. However, as noted in paragraph 89 above, if the agency concludes that a labeling difference resulting from patent protection or exclusivity compromises the safety or effectiveness of the generic drug product for any remaining conditions of use, FDA may withdraw approval of the ANDA under this provision.

* * *

IV. Economic Assessment

FDA has considered the economic impact of this regulation which clarifies and facilitates the implementation of Public Law 98-417. Title I of Public Law 98-417 eliminated unnecessary regulatory barriers for generic drug products and has resulted in generic competition on many important post-1962 drugs. Generic drug sales account for a significant portion of total prescription drug sales, and many of these sales would not have occurred in the absence of Public Law 98-417.

112a

Prior to the implementation of title I of Public Law 98-417, in order to market a generic post-1962 drug product, drug sponsors were required to duplicate the innovator's safety and efficacy testing and to submit a "duplicate" NDA. Under title I, sponsors no longer incur duplicate testing costs and are able to market generic products after submitting and gaining approval for an ANDA which does not include the duplicate testing requirement. The costs associated with preparing and submitting an ANDA are significantly lower than the costs for submitting duplicate NDA's for the same products.

The benefits of these implementing regulations for title I are twofold: (1) Savings to consumers who purchase generic post-1962 prescription drug products, and (2) savings to sponsors of generic drug products who submit ANDA's to the agency in order to gain approval to market their products. The consumer savings are the result of the increased availability of lower-priced generic drug products. As new generic products are made available annually (as their patents expire and generic drug products enter the marketplace) the savings to consumers should reach several billion dollars annually over the next 5 to 10 years. The savings to sponsors will vary depending on the number of applications submitted annually. Small businesses will also be favorably affected because the barriers to market entry have been lowered thereby allowing these firms to enter the generic drug market without incurring duplicate safety and efficacy testing costs. Consequently, FDA concludes the benefits of these regulations implementing title I far exceed the costs. FDA also believes it has

113a

streamlined the ANDA process as much as possible thus minimizing the costs and maximizing the net benefits.

* * *

114a

APPENDIX P

**HEARINGS**
**BEFORE THE SUBCOMMITTEE ON**
**HEALTH AND THE ENVIRONMENT OF THE**
**COMMITTEE ON ENERGY AND COMMERCE**
**HOUSE OF REPRESENTATIVES**
**NINETY-EIGHTH CONGRESS**
**FIRST SESSION**
**ON**

* * *

NEW DRUG APPLICATION
H.R. 3605
July 25, 1983

* * *

This morning the subcommittee is considering two bills which amend the Federal Food, Drug, and Cosmetic Act, H.R. 3605. The Drug Price Competition Act will make available more low cost generic equivalent drugs by allowing the FDA to approve generic versions of drugs approved after 1962. Under current law, FDA generally approves generic versions only if the original drug was approved before 1962. This bill applies the same procedures used by FDA to approve generic versions of drugs originally approved before 1962 to drugs originally approved after 1962.

Approximately 84 percent of our citizens pay their drug bill without any form of Government subsidy. By providing competition in pricing of drugs approved after 1962, all consumers will benefit from lower drug prices.

115a

This is because the only real difference between a brand name and generic version is price. Generic drugs are between 300 and 1,500 percent cheaper than the brand name version. The lower cost drugs that become available as a result of this legislation are particularly important to the elderly. Senior citizens require more medication than any other segment of our society. Tragically they are often those least able to afford the high cost of medicine.

For these older Americans this bill will ease the Hobson's choice between spending fixed incomes on pharmaceuticals or other necessities.

The bill will also save the Federal Government money. For example, the Department of Defense buys hundreds of drugs each year from the lowest bidder. However, for most drugs approved after 1962, there is only one bidder. That company is not only the lowest bidder but also the highest. By introducing competition, both brand name and generic drugmakers can bid for these Department contracts. This assures the Federal Government is getting the best possible price for drugs.

* * *

STATEMENT OF MARK NOVITCH, M.D., DEPUTY COMMISSIONER, FOOD AND DRUG ADMINISTRATION, OFFICE OF ASSISTANT SECRETARY FOR HEALTH, DEPARTMENT OF HEALTH AND HUMAN SERVICES, ACCOMPANIED BY MARVIN SEIFE, M.D., DIRECTOR, DIVISION OF GENERIC DRUG MONOGRAPHS, NATIONAL

116a

CENTER FOR DRUGS AND BIOLOGICS; AND TOM SCARLET, CHIEF COUNSEL, FOOD AND DRUG DIVISION, OFFICE OF GENERAL COUNSEL

* * *

You have proposed legislation that would authorize ANDA's for post-1962 drugs. As you know, ANDA's were first used by the Food and Drug Administration [FDA] under the Drug Efficacy Study Implementation [DESI] program for the approval of generic versions of drugs first approved only for safety between 1938 and 1962, the year in which Congress amended the Federal Food, Drug, and Cosmetic Act to require that drugs be shown to be effective as well as safe.

A similar procedure has not been established for post-1962 drugs. In recent years, however, patents have begun to expire for many post-1962 drugs. As a result, generic drug manufacturers have become increasingly interested in changing FDA's drug approval system to eliminate the current requirement for the submission of full reports of safety and effectiveness studies for duplicate versions of drugs already approved in accordance with a full new drug approval [NDA] submitted by the pioneer manufacturer.

FDA, too, is interested in streamlining its approval system for post-1962 drugs so as to reduce requirements for duplicative testing, which wastes resources and causes unnecessary human testing. For this reason, FDA is actively engaged in developing a proposal for an ANDA system for post-

117a

1962 drugs and to establish such a system through rulemaking.

A post-1962 ANDA procedure would be consistent with a number of FDA programs that have aided the marketing of generic drugs. In addition to the pre-1962 ANDA procedure, FDA has permitted generic applicants for post-1962 drug products to rely on reports of studies published in the open scientific literature. This has become known as the paper NDA policy. It eliminates the need to duplicate the expensive clinical and animal testing for safety and effectiveness, but it is limited by the availability of published literature.

* * *

... I can, however, identify and discuss some of the issues that must be dealt with before a post-1962 ANDA system can be instituted.

First, should there be a minimum preeligibility period to assure maximum protection of the public health? When a new drug is first approved for marketing, that does not mean that there is nothing further to be learned about its safety or effectiveness. Approval is based on carefully evaluated evidence in numbers of patients sufficient for us to conclude that the risk of unanticipated side effects is small and justified in comparison to the drug's benefits.

What makes the initial marketing period so important is that it gives us an opportunity for the first time to look for reactions of low incidence, especially serious ones, that could not reasonably

118a

be expected to appear in clinical trials. In most cases, due to patent protection, the innovator's drug is the only one on the market for the first several years after FDA approval.

For this reason, any adverse drug effects will be used only by that manufacturer's drug and will be reported only to that manufacturer. Because the innovator manufacturer is familiar with the preapproval testing, it is in a good position to evaluate the adverse reactions.

There will, however, be drugs that have no patent protection after FDA approval, and which may therefore be immediately marketed by both the innovator firm and by generic manufacturers. We therefore believe that it is important to consider whether there should be a preeligibility period, on the order of a few years, during which ANDA's would not be permitted. One may argue that generic drug firms are required to report adverse drug reactions to FDA, and that FDA can therefore evaluate their significance.

But most adverse drug reaction reports are to some extent evaluated by the firm receiving them, and the quality and timeliness of that review is important to the process.

FDA regulations require that only unexpected adverse reactions or clinical failures be reported by the firm to FDA within 15 working days. The others are submitted quarterly during the first year. If adverse reaction reports were received by firms unfamiliar with the clinical trials, and, because of the nature of their business, lacking ties

119a

with the research community, we are concerned about the adequacy of the reports we would receive. The holder of the pioneer NDA is frequently of considerable help to FDA in identifying adverse reaction trends and other drug effects bearing on the safe and effective use of a newly developed drug therapy.

* * *

Mr. WAXMAN: You suggest that an eligibility period is necessary because "most adverse drug reaction reports are to some extent evaluated" by the NDA holder. ...

* * *

Dr. NOVITCH. I was talking about an early period after marketing during which we are trying to learn about reactions of low incidence that can only be found when the population at exposure is larger than in the clinical trials. By the time a paper NDA has been submitted, at least it has been our experience, that brief period is well over. Most of the paper NDA's occur on drugs that are outside of patent protection. The patent protection has expired.

That early period we are talking about is over, that concern is over.

* * *

Mr. WAXMAN. . . . When FDA receives an adverse drug reaction report does FDA evaluate it?

120a

Dr. NOVITCH. Yes.

\* \* \*

Mr. WAXMAN. What does the NDA holder contribute to the evaluation of adverse drug reactions that FDA cannot do itself if a generic company reports adverse reactions?

Dr. NOVITCH. I think the difference between the handling of adverse reactions by a generic company and a major research-based company—I think you have to understand and you do understand that the nature of the business is different. The generic companies are production oriented, the research-based companies are research oriented and if I were in a generic firm collecting adverse experience I would bundle it all together and send it in. I would send everything for fear of not wanting to omit anything.

I would send all those reactions and in those early phases of marketing where you are trying to learn what you can about the drug, what we could get is everything with no initial separation, no attempt by the firm who is getting the reactions in the first place to say, hey, that is one we didn't see before, we ought to really pay closer attention to that one.

A generic firm wanting to obey the law and our regulations, lacking the research base that an innovator firm has, would send everything in. Our concern is that we would be inundated with reports with no attempt to self-sort them. It would impose a burden on us to sort them out.

121a

\* \* \*

Mr. WAXMAN. Your major argument is that there ought to be an eligibility period to be sure we get all the adverse reactions that go to the NDA holder?

Dr. NOVITCH. On that we feel quite strongly. On a period of preeligibility so that we can learn what needs to be learned about the drugs. . . .

\* \* \*

Mr. WAXMAN. According to a March 1983 preliminary regulatory impact analysis on ANDA policy, H.R. 3605 would result in consumer savings of $920 million over the next 12 years, . . .

\* \* \*

122a

# APPENDIX Q

## P.L. 98-417, Drug Price Competition and Patent Term Restoration Act

98th Cong., 2nd Sess. 1984
1984 U.S.C.C.A.N. 2647
See Page 98 Stat. 1585

House Report No. 98-857(I)
June 21, 1984

The committee on energy and commerce, to whom was referred the bill (H.R. 3605) to amend the federal Food, Drug, and Cosmetic Act to authorize an abbreviated new drug application under Section 505 of that act for generic new drugs equivalent to approved new drugs, having considered the same, report favorably thereon with amendments and recommend that the bill as amended do pass.

## PURPOSE AND SUMMARY

## TITLE I

The purpose of Title I of the bill is to make available more low cost generic drugs by establishing a generic drug approval procedure for pioneer drugs first approved after 1962. Under current law, there is a generic drug approval procedure for pioneer drugs approved before 1962, but not for pioneer drugs approved after 1962.

Title I of the bill generally extends the procedures used to approve generic copies of pre-62

123a

drugs to post-62 drugs. Generic copies of any drugs may be approved if the generic is the same as the original drug or so similar that FDA has determined the differences do not require safety and effectiveness testing.

\* \* \*

In addition, Title I affords four years of exclusive market life to drugs which may not be patented and which are approved for the first time after enactment of the bill. Further, drugs which were approved for the first time between 1982 and the date of enactment received ten years of exclusive market life.

## TITLE II

The purpose of Title II of the bill is to create a new incentive for increased expenditures for research and development of certain products which are subject to premarket government approval. The incentive is the restoration of some of the time lost on patent life while the product is awaiting pre-market approval. Under current law, a patent continues to run while the maker of the product is testing and awaiting approval to market it.

\* \* \*

## BACKGROUND AND NEED FOR THE LEGISLATION

## TITLE I.- ABBREVIATED NEW DRUG APPLICATIONS

124a

Prior to 1962, the federal Food, Drug and Cosmetic Act (FFDCA) required that all drugs be approved as safe before they could be marketed. The 1962 amendments required that all new drugs, generic and pioneer, must be approved as safe and effective prior to marketing.

As a result of the 1962 amendments, FDA did two things regarding pre-1962 drugs First, the agency created the Drug Efficacy Study (DESI) to determine if all pre-1962 drugs were effective. Second, FDA established a policy permitting the approval of a generic drug equivalent to a safe and effective pre-1962 pioneer drug.

As a result of the 1962 amendments, the manufacturer of a pioneer drug must conduct tests on humans that show the product to be safe and effective and submit the results in a new drug application (NDA). A manufacturer of a generic drug must conduct tests that show the generic drug is the same as the pioneer drug and that it will be properly manufactured and labeled. This information is submitted in an abbreviated new drug application (ANDA).

The only difference between a NDA and an ANDA is that the generic manufacturer is not required to conduct human clinical trials. FDA considers such retesting to be unnecessary and wasteful because the drug has already been determined to be safe and effective. Moreover, such retesting is unethical because it requires that some sick patients take placebos and be denied treatment known to be effective.

125a

The FDA allows this ANDA procedure only for pioneer drugs approved before 1962. There is no ANDA procedure for approving generic equivalents of pioneer drugs approved after 1962. While the FDA has been considering since 1978 an extension of the pre-1962 ANDA policy to post-1962 drugs, it has not extended the regulation. Because of the agency's failure to act, Title I of H.R. 3605 is necessary to establish a post-1962 ANDA policy.

Some have suggested that 'Paper NDAs' be used to approve generic equivalents of pioneer drugs approved after 1962. Under the Paper NDA procedure, the generic manufacturer may submit scientific reports, instead of clinical trials, to support findings of safety and efficacy. This procedure is inadequate, however, because FDA estimates that satisfactory reports are not available for 85 percent of all post-1962 drugs.

Currently, there are approximately 150 drugs approved after 1962 that are off patent and for which there is no generic equivalent. All of these drugs could be approved in generic form if there was a procedure. Each year, more pioneer drugs go off patent and become available for approval as generics.

*  *  *

The availability of generic versions of pioneer drugs approved after 1962 would save American consumers $920 million over the next 12 years. Older Americans, in particular, would benefit because they use almost 25 percent of all prescription drugs.

126a

Moreover, the lack of generics for post-1962 pioneer drugs will cost federal and state governments millions of dollars. For the drug metronidazole, purchased by the Department of Defense, the taxpayers saved approximately $1.2 million in one year as a result of the availability of a lower priced generic version. Federal and state governments will be denied comparable savings on drugs approved after 1962 because of the lack of an approval procedure.

## TITLE II.-- PATENT TERM RESTORATION

Patents are designed to promote innovation by providing the right to exclude others from making, using, or selling an invention. They enable innovators to obtain greater profits than could have been obtained if direct competition existed. These profits act as incentives for innovative activities.

Although the patent term in the United States is 17 years, the period during the patent term in which products are marketed (the effective patent term) is usually less than 17 years because patents often are obtained before products are ready to be marketed.

Effective patent terms are influenced by many factors, including federal premarketing and premanufacturing regulations. The products covered by these regulations include pharmaceuticals, medical devices, food additives, and color additives. Pharmaceuticals for instance cannot be marketed in the United States until they have been approved by the Food and Drug Administration (FDA). To obtain such approval,

127a

drugs must undergo extensive testing to prove they are both safe and effective. All these products are subject to different regulations that have had varying impacts on effective patent terms.

## COMMITTEE COST ESTIMATE

In compliance with clause 7(a) of Rule XIII of the Rules of the House of Representatives, the committee believes that the costs, if any, incurred in carrying out H.R. 3605 will be offset by savings to the federal government.

Enactment of the legislation, however, will result in significant cost savings to the federal government. Unlike the costs of H.R. 3605, these savings are certain. The federal government spent about $2.4 billion for drugs in 1983. Many of these drugs will be available as low cost generic after enactment of H.R. 3605. For example, the Department of Defense saved approximately $1.2 million in one year when a lower priced generic version of metronidazole became available.

## CONGRESSIONAL BUDGET OFFICE ESTIMATE

Pursuant to clauses 2(1)(3)(b) and (c) of Rule XI of the Rules of the House of Representatives, the committee sets forth the following letter and cost estimate prepared by the Congressional Budget Office with respect to the reported bill:

U.S. Congress,
Congressional Budget Office,
Washington, DC, June 19, 1984
Hon. John D. Dingell,

128a

Chairman, Committee on Energy and Commerce, House of Representatives, Washington, DC.

Dear Mr. Chairman:

The Congressional Budget Office has reviewed H.R. 3605, the Drug Price Competition and Patent Term Restoration Act of 1984, as ordered reported by the House Committee on Energy and Commerce on June 12, 1984.

Title I of this bill would allow drug manufacturers to use an abbreviated new drug application (ANDA) when seeking approval by the food and drug administration (FDA) after 1962. An estimated 150 drug products approved after 1962 are currently off patent and would become available for generic copy using the ANDA procedure proposed in this bill.

* * *

Enactment of this legislation could also result in savings to both the federal and state and local governments. In fiscal year 1983, the federal government spent approximately $2.4 billion for drugs in the Medicaid program, and in veteran and military hospitals. Data on drug costs in the Medicare program are unavailable. If the federal government is currently purchasing these 150 copiable drug products at higher, brand name prices, savings may result if lower priced, generic copies of these drugs are substituted.

It is difficult to know in advance which of the available 150 drug products manufacturers would

129a

choose to copy. It is also difficult to estimate the price at which these generic copies would be sold. Generic versions of ten popular drug products show their price to be on average 50 percent less than their brand name equivalent. The dollar amount of the federal government currently spent on these 150 brand name drug products is unknown.

. . . This bill may also result in savings if cheaper, generic drugs are made available for purchase by the federal government. These savings would occur in various programs throughout the budget such as Medicare, Medicaid, and the Veterans Administration. However, the magnitude of these savings is unknown.

Sincerely,
Eric Hanushek
(for Rudolph G. Penner, Director).

INFLATIONARY IMPACT STATEMENT

Pursuant to clause 2(1)(4) of Rule XI of the Rules of the House of Representatives, the committee makes the following statement with regard to the inflationary impact of the reported bill:

The committee believes that enactment of H.R. 3605 will not have an inflationary impact upon the economy. In fact, Title I of the bill will have a deflationary effect because it makes available lower priced generic versions of drugs. Such generic drugs are three to fifteen times less costly than their brand name counter-parts. The estimated $1 billion cost savings to consumers as a result of Title

130a

I's generic drug approval procedure will have a deflationary effect upon the national economy. While Title II of the bill provides for a limited extension of the patents on certain products, the committee believes that the additional patent term will act as a spur to develop innovative and, ultimately, less costly treatments for diseases.

## SECTION-BY-SECTION ANALYSIS

## TITLE I—DRUG PRICE COMPETITION ACT

## SECTION 101

Section 101 amends Section 505 of the Federal Food, Drug and Cosmetic Act (FFDCA)[1] to establish a new subsection (j) providing for the approval of abbreviated new drug applications (ANDA). Paragraph (1) of Section (j) sets forth the information which must be included in an ANDA.

## ANDA'S FOR DRUGS WHICH ARE THE SAME

In the case of drugs which are the same as the listed drug, the focus of the bill is to provide the food and drug administration (FDA) with sufficient information to assure that the generic drug is the same as the listed drug[2] that has previously been determined to be safe and effective. Some have suggested that a generic drug must be identical in all respects to the listed drug instead of the same. The regulations that permit ANDA's for pre-1962 pioneer drugs make no such distinction.[3] In rejecting the use of the term identical, the FDA regulation comments that 'identical means a product that is the same in dosage form, strength,

131a

and route of administration, contains the same active ingredient, and is recommended for use under the same conditions of use.'[4] The committee has adopted the FDA's policy of utilizing the term 'same' except that the bill permits an ANDA to be approved for less than all of the indications for which the listed drug has been approved as explained below.

First, an ANDA must include sufficient information to show that the conditions of use for which the applicant is seeking approval are the same as those that have been previously approved for the listed drug. The applicant need not seek approval for all of the indications for which the listed drug has been approved. For example, if the listed drug has been approved for hypertension and angina pectoris, and if the indication for hypertension is protected by patent, then the applicant could seek approval for only the angina pectoris indication.

While the FDA's current regulations for considering ANDA's for pioneer drugs approved before 1962 permit an applicant to petition for approval for an indication other than that which has been approved for the pioneer drug, Section 101 of the bill overturns that policy.[5] Thus, an ANDA may not be considered for a condition of use that has not been previously approved for the listed drug.

An ANDA must also contain sufficient information to show that the active ingredients of the generic drug are the same as those of the listed drug. If the listed drug has one active ingredient, then the active ingredient of the generic must be

the same. If the listed drug has more than one active ingredient, then sufficient information must be included to show that all of the active ingredients in the generic drug are the same.

In addition, an ANDA must contain sufficient information to show that the route of administration, the dosage form and the strength of the generic drug are the same as those of the listed drug.

Further, an ANDA must include sufficient information to show that the generic drug is bioequivalent to the listed drug.

Fifth, an ANDA must contain adequate information to show that the proposed labeling for the generic drug is the same as that of the listed drug. The committee recognizes that the proposed labeling for the generic drug may not be exactly the same. For example, the name and address of the manufacturers would vary as might the expiration dates for the two products. Another example is that one color is used in the coating of the listed drug and another color is used in that of the generic drug. The FDA might require the listed drug maker to specify the color in its label. The generic manufacturer, which has used a different color, would have to specify a different color in its label.

* * *

Finally, the committee intends that an ANDA contain any information available to the applicant regarding reports of adverse effects not reflected in the labeling....6

## ANDA'S FOR DRUGS WHICH ARE DIFFERENT

Paragraph (2)(c) prohibits any person from submitting an ANDA for a generic drug which differs from the listed drug unless the change is permitted by the statute and the FDA has granted a petition requesting the change.

If an applicant wishes to vary the route of administration, dosage form or strength of the generic drug from the listed drug, it must first petition the FDA for permission to file an ANDA for the differing generic drug. In addition, an applicant may request to vary one of the active ingredients in the generic drug from the listed drug when the listed drug is a combination product. The remaining active ingredients of the generic drug must be the same as the other active ingredients of the listed drug.

These are the only changes from the listed drug for which an applicant may petition. As is explained in the ANDA regulations for pre-1962 drugs, the committee generally expects that approval of petitions will ordinarily be limited to dosage forms for the same route of administration or to closely related ingredients.7 If the FDA grants a petition for a change from the listed drug, the FDA may require such additional information in the ANDA regarding the change as it deems necessary.

* * *

## GROUNDS FOR DISAPPROVAL OF AN ANDA

* * *

Paragraph (3) provides that the FDA shall approve an ANDA except in one of the following circumstances.

Second, an ANDA shall not be approved if it does not contain adequate information to show that each of the conditions for use for the generic drug have been previously approved for the listed drug. If an ANDA includes a condition for use for which the listed drug has not been approved, then the generic drug may not be approved.

Third, an ANDA must be disapproved if the active ingredient of the generic drug is not the same as that of the listed drug . . .

* * *

Fourth, an ANDA for a drug which is the same must be disapproved if it does not show that the route of administration, dosage form, or strength of the generic drug are all the same as those of the listed drug. If the route of administration, dosage form, or strength of the generic drug differs from that of the listed drug, an ANDA must be disapproved if no petition regarding the change was granted.

* * *

A sixth ground requiring disapproval of an ANDA for a generic drug whose active ingredients are the same as those of the listed drug is that there is unsufficient information to show that the generic drug is bioequivalent to the listed drug . . . .

Seventh, an ANDA must also be disapproved if it fails to show that the proposed labeling for the generic drug is the same as that of the listed drug. Changes in the proposed labeling due to the fact

that the generic drug is produced or distributed by a different manufacturer are not a grounds for disapproval. Similarly, changes in the proposed labeling of the generic drug because a petition regarding a change has been granted is not a grounds for disapproval.

* * *

SECTION 105

Section 105(a) of the bill requires the FDA to promulgate such regulations as are necessary to implement new subsection (i). . . .

---

1 21 U.S.C. 355.

2 The term "listed drug" is explained in paragraph (6) of new Section 505(j) of the FFDCA. Generally, a listed drug includes any drug that has been approved for safety and effectiveness or that has been approved under new subsection (j).

3 48 FED. REG. 2751(1983).

4 Id. at 2753.

5 Id. at 2755. 21 C.F.R. 314.2(C) provides in part: 'a' prospective applicant may seek a determination of the suitability of an abbreviated new drug application for a product that the applicant believes similar or related to a drug product that has been declared to be suitable for an abbreviated new drug application . . .'

6 Id. at 2756. See 21 CFR 314.2(F)(4), (5), (6), (7), AND (8).

7 Id. at 2755. See 21 CFR 314.2(C).

## APPENDIX R

## DRUG PRICE COMPETITION AND PATENT TERM RESTORATION ACT OF 1984

Committee Notes
130 Cong. Rec. 24416
H.R. 3605 (Sept. 6, 1984)

* * *

### IN THE COMMITTEE OF THE WHOLE

Accordingly the House resolved itself into the Committee of the Whole House on the State of the Union for the further consideration of the bill (H.R. 3605) to amend the Federal Food, Drug, and Cosmetic Act to authorize an abbreviated new drug application under section 505 of that act for generic new drugs equivalent to approved new drugs, with Mr. DANIEL in the chair.

* * *

* * *

Mr. WAXMAN. . . .

But on balance, what we have is a total bill that I think is very good. It provides low-cost, generic drugs for millions of Americans, saving maybe a billion dollars over a several-year period. There is going to be a significant savings to people who purchase drugs. Twenty percent of the people who buy drugs in this country are elderly. Medicare does not pay for drugs. Many people are under the

misapprehension that medicare does. So that is coming out of the pockets of the elderly and obviously the sick.

* * *

Mr. SHAW. . . .

* * *

The gentleman brought up the question of medicare and medicaid. This is also an opportunity for us as Members of this Congress to do some cost containment within the medicare program. This is an extraordinarily important program to the elderly citizens of this country, and this is an opportunity for us to do something constructive which is going to send the message out to the elderly people that we are on their side and in this particular instance we are for lower cost on drugs. And also this is going to have a direct effect on our own budget, which we are very painfully aware of, but it does not in any way take anything away from anybody except perhaps some profits by the big name drug companies, and I think they have plenty of that.

* * *

Mr. WAXMAN: . . . This legislation will do more to contain the cost of elderly care than perhaps anything else this Congress has passed, because it will bring about lower priced generic alternatives to brand-name drugs once the patent has expired or if there is no valid patent and the courts decide that there is no valid patent in order to give that

monopoly protection.

Mr. FISH: . . .

\* \* \*

The compromise has two admirable goals: First, to provide renewed incentives for pharmaceutical innovation by restoring some of the patent life lost during periods of Federal premarket regulatory review; and second, give the generic drug industry the ability to bring generic copies of off-patent drugs to market as soon as the patent expires. The consumer is the ultimate benefactor of this legislation because they will receive cheaper drugs today and better drugs tomorrow.

This is important legislation, it is important to the consumer, especially the elderly. It has the support of the pharmaceutical industry, the generic drug industry, the AFL-CIO and a number of individual unions, the American Association of Retired Persons and the National Council of Senior Citizens, and I urge a favorable vote for its enactment.

\* \* \*

Mr. MOOREHEAD: . . .

\* \* \*

But this bill as it is being amended will provide for the generic drug manufacturers and provide

senior citizens their drugs more rapidly than they would otherwise get them except for those instances in which a patent is expiring before the drug ever gets on the market. We give them 5 years in which to recover their investment. But for most drugs that are manufactured, the generics will be able to get them and get them on the market and be able to provide drugs for the senior citizens that are reasonably priced for the American people.

\* \* \*

Mr. GORE: . . .

\* \* \*

This entire effort to rewrite the new drug approval procedures and this whole law has been a very difficult and complex effort to strike a balance between the interests of consumers and generic drug companies, on the one hand, which is in the interest of having more competition from generic drugs in order to drive drug prices down. That is one interest that is involved here.

The second interest is that we give enough compensation and incentive to the innovators of new drugs to invest the money and develop new drugs.

\* \* \*

Mr. SKELTON: . . .

\* \* \*

140a

. . . increasing the availability of generic drugs through expedited approval process embodied in the bill is a logical means of showing the rate of increase in the cost of health care. Most importantly, making generic drugs more available offers some relief to the millions of older Americans whose budgets are strained because medicare does not cover the cost of outpatient drugs. Currently, 17 percent of the out-of-pocket payments made by the elderly for health care are devoted to paying for drugs. Giving seniors the option of purchasing lower-priced generic drugs is imperative.

The approval process included in H.R. 3065 [sic] assures that, while generic drugs will be made more quickly available, the quality and effectiveness of those drugs will not be reduced. Moreover, H.R. 3065 [sic] offers incentives to drug manufacturers to continue to develop new drugs by extending the period in which the developing manufacturer can enjoy exclusive marketing rights.

* * *

Mr. ROWLAND. . . .

* * *

. . . The greater presence of generic drugs, will provide needed relief, especially to the elderly. Our senior citizens, many of whom are on fixed incomes, are the major users of prescription drugs, and few receive any assistance to help pay for this medication. As a former family physician and one who is extremely interested in containing health care costs, I believe this compromise is an

141a

important step in addressing the skyrocketing cost of health care.

* * *

Mr. MINISH. . . .

* * *

. . . this bill would make more low-cost generic drugs available by establishing a generic drug approval procedure for pioneer drugs first approved after 1962. Under our current law, this approval method is available for pioneer drugs approved before 1962. A lengthy and expensive application procedure is required for generic copies of drugs approved after 1962. Consequently, it has been difficult for generic manufacturers to submit such applications and the buying public are the losers.

Many patents have already expired for some frequently prescribed medications first approved after 1962 and many other important ones will be expiring in the next few years. It is estimated that availability of generic copies of drugs approved after 1962 would save consumers $920 million over the next 12 years. The Congressional Budget Office has observed that 10 generic versions of popular drugs now on the market cost half as much as their brand-name equivalents.

Generic drugs are a valuable resource for combating the high costs of health care. Everyone in this country will benefit by enactment of this legislation, but I feel it is particularly important that our senior citizens who fill more prescriptions

than other segments of our population, can save money on their medical bills. Moreover, it is reported that the Federal Government spent $2.4 billion for drugs in the medicaid program for the poor, and in veteran and military hospitals in 1983. Therefore, this bill is not just a matter of assistance to individuals, but an important savings for our Federal budget as well.

This bill also extends the patent life for brand-name, pioneer drugs. This extension was included to help protect the investment in research and development that manufacturers undertake to develop pioneer drugs.

\* \* \*

Mr. WALGREN. . . . This bill will accomplish two objectives. First, it will make available almost immediately nearly twice as many low-cost, generic drugs as are now available. Second, it will create new incentives for research and development by restoring the patent time lost by a development of a new drug while waiting for approval by the Federal Food and Drug Administration.

H.R. 3605 will make hundreds of new low-cost, generic drugs available by speeding up the approval process for these drugs. As the current law stands, all drugs approved after 1962 can only be made available in generic form through a long and involved testing process. This process is unnecessary because the active ingredient in the generic drug is identical to that in the name-brand drug. Under H.R. 3605, this testing process would be speeded up tremendously without endangering

the safety to the consumer. As well as making more generic drugs available to the public, this bill will create new incentives for R&D in the pharmaceutical industry. As the current law stands, a newly discovered drug will receive a patent for 17 years. During that period no one except the patent holder can produce the drug. This 17-year period is considered to be fair by most people. Often, however, the drug approval process takes between 5 and 10 years. As a result, the pharmaceutical companies lose much of the time during which they would not have to compete with other firms. The result is that the patent period is inadvertently cut short and R&D becomes much less profitable, and the public loses out on the opportunity to use new drugs that would otherwise be developed.

Under H.R. 3605 this inequity would be redressed because the pharmaceutical companies will have an opportunity to extend their patents once their product is approved. This will encourage more research, a goal we should favor in an effort to relieve pain and cure diseases that still plague mankind.

The consumers of this country should welcome this bill because it could save $1 billion over the next 10 years. In my own district in Pittsburgh this is especially important to many people whose budgets are still feeling the pinch of the lagging recession.

This bill should also help the elderly who live on a fixed income, but who must spend 31 1/2 times more than the rest of the population on health care.

144a

People over 65 average six doctor visits a year compared to only four for people in the 25 to 44 age group. And the elderly spend substantially more on drugs than the rest of the population.

H.R. 3605 addresses several needs and carefully balances the needs of the industry with the health needs of the people in our society. . . .

Mr. COLEMAN . . .

. . . this is a good bill that the House should pass. American senior citizens and consumers can save an estimated $920 million over the next 12 years as a result of this legislation that could dramatically increase the availability of low-cost, generic drugs. The bill represents another step toward free-market economics in the pharmaceutical industry, and it provides easier entry into the marketplace for generic substitutes of brand-name drugs, which often enjoy long periods of market exclusivity.

All of us complain about the rising costs of goods and services, and nowhere is inflation more evident than in health-care costs. Consequently, nowhere is the rising cost of health care felt more than by our elderly. Two factors create a "misery index" for the elderly in health care costs: One, living on a fixed income; and two, rising costs. Mr. Chairman, this bill begins to ease the terrible burden carried by our senior citizens by allowing them to participate in the lower prices a free-market economy can produce. Rather than being forced to pay higher prices because of bureaucratic [sic] redtape, the elderly of this Nation will have the opportunity to

145a

shop around for the best, most equitable prices. Rather than having to sacrifice other needs for life-sustaining drugs, the elderly will be given the opportunity to fulfill all their needs. This bill is fair and it is needed, and there is no reason it should not become law.

Mr. WEISS. . . .

* * *

Such an abbreviated approval process is already in place for drugs originally approved before 1962. But the lengthy and expensive application procedure required for generic copies of drugs approved after 1962 has made it economically impossible for many generic manufacturers to submit such applications. As a result, there are now about 150 drugs which are no longer protected by patents, but for which no generic equivalent exists.

By providing rapid approval of generic drugs already proven to be safe, H.R. 3605 promised to save consumers about $1 billion over the next decade in drug costs. However, it quickly became apparent that passage of H.R. 3605 was unlikely unless a compromise could be reached with major drug manufacturers. Therefore, Chairman WAXMAN engaged in extensive negotiations with representatives of the brand-name [and] generic drug companies in order to craft a workable compromise that would satisfy all interested parties.

The compromise that was fashioned provided for

146a

both faster approval of generic drugs along with extended patent terms for companies that develop pioneer drugs. The drug companies have long promoted patent term extensions as a method of encouraging research and development into new drugs. They have argued that the extension of patent protection will compensate for the period of patent protection lost while the new product is awaiting approval.

\* \* \*

147a

## APPENDIX S

## Guidance for Industry

## Revising ANDA Labeling Following Revision of the RLD Labeling

U.S. Department of Health and Human Services
Food and Drug Administration
Center for Drug Evaluation and Research (CDER)

May 2000
OGD

\* \* \*

## Guidance for Industry[1]

### Revising ANDA Labeling Following Revision of the RLD Labeling

### I. INTRODUCTION

This guidance is intended to assist sponsors of abbreviated new drug applications (ANDAs) in deciding when and how to submit labeling supplements following labeling revisions to their reference listed drugs (RLDs).

### II. BACKGROUND

During the marketing life of a drug product approved under a new drug application (NDA), the package insert labeling is frequently revised. When an NDA serves as an RLD for an ANDA, approved changes in the RLD labeling generally necessitate changes in the labeling of one or more ANDAs using the RLD. Under the Federal Food, Drug, and

[1] This guidance has been prepared by the Office of Generic Drugs in the Office of Pharmaceutical Science, Center for Drug Evaluation and Research (CDER), at the Food and Drug Administration. This guidance document represents the Agency's current thinking on changes in labeling of approved abbreviated new drug applications (ANDAs) following revisions in the RLD's labeling. It does not create or confer any rights for or on any person and does not operate to bind FDA or the public. An alternative approach may be used if such approach satisfies the requirements of the applicable statutes, regulations, or both.

Cosmetic Act and Agency regulations, an ANDA product must have the same labeling as the RLD. Section 505(j)(2)(A)(v) of the Act states that an abbreviated application for a new drug must contain

information to show that the labeling proposed for the new drug is the same as the labeling approved for the listed drug...except for changes required because of differences approved under a petition...or because the new drug and the listed drug are produced or distributed by different manufacturers.

Similar statements are also found in the regulations at 21 CFR 314.94(a)(8)(iv).

Previously, OGD notified the appropriate ANDA sponsors when the approved labeling of their RLD changed. This was usually done using a formal supplement request letter. In cases where an NDA served as the RLD for multiple generic products, the preparation of a large number of request letters took a significant amount of review staff time. With the increase in the numbers of approved NDAs and ANDAs, this approach was using an increasingly disproportionate share of OGD's resources. Because of the time it took, the approach sometimes even delayed the notification of ANDA sponsors. With the exception of a few special situations (noted below), *OGD is no longer providing this type of notification*. The sponsor of an ANDA is now responsible for ensuring that the labeling contained in its application is *the same as* the currently

150a

approved labeling of the RLD. OGD has determined that this change in responsibility is necessary to minimize the implementation time for the introduction of revised labeling into the market place. OGD believes that prompt revision, submission to the Agency, and implementation of revised labeling are important to ensure the continued safe and effective use of generic drug products. Because the regulations state that the labeling of the generic must be the same as the innovator, the revision should be made at the very earliest time possible. If there is any potential delay in the revision of a generic drug labeling, the sponsor should contact OGD.

III.   HOW TO OBTAIN INFORMATION ON A CHANGE IN RLD LABELING

The sponsor of an ANDA should routinely monitor the Labeling Review Branch Homepage (see below) for information on changes in labeling. OGD's Labeling Review Branch will:

- Place monthly updates of approved labeling changes for RLDs with approved ANDAs on the Labeling Review Branch Homepage at:

  http://www.fda.gov/cder/ogd/rld/labeling_review_branch.html

Continue to notify ANDA applicants by facsimile, telephone, and/or letter for any labeling revision approved for the RLD that warrants *immediate* widespread professional notification, such as those changes connected to issuing a *Dear Doctor Letter* or similar significant changes.

151a

All approved labeling for RLDs is still available from Freedom of Information Staff. Sponsors who wish to obtain labeling using this mechanism should send a written or facsimile request to:

Food and Drug Administration
Freedom of Information Staff (HFI-35)
5600 Fishers Lane
Rockville, MD 20857
Phone: 301-827-6500; FAX: 301-443-1726

When a labeling revision is needed, the ANDA sponsor should take appropriate action to revise the ANDA labeling and submit the revised labeling to the FDA.

IV.   HOW TO SUBMIT REVISED LABELING

All ANDA labeling changes needed because of approved changes to the labeling of the RLD may be submitted as a *Special Supplement - Changes Being Effected.* Such supplements should include:

- 12 copies of final printed labeling

- the date the revised labeling will be used (go into effect)

- a side-by-side comparison of the ANDA labeling with the approved labeling of the RLD with all differences annotated and explained, as described in 21 CFR 314.94 (a)(8)(iv)

152a

Sponsors should contact the OGD Labeling Review Branch at 301-827-5846 if there are any questions about the information in this guidance.