IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF MASSACHUSETTS


IN RE:                            )
                                  ) CA No. 04-10981-PBS
NEURONTIN MARKETING, SALES PRACTICES,) Pages 1 - 33
AND PRODUCTS LIABILITY LITIGATION     )



                        STATUS CONFERENCE

             BEFORE THE HONORABLE PATTI B. SARIS
                 UNITED STATES DISTRICT JUDGE

                           -and-

                    LEO T. SOROKIN
             UNITED STATES MAGISTRATE JUDGE




                        United States District Court
                        1 Courthouse Way, Courtroom 19
                        Boston, Massachusetts
                        February 11, 2011, 2:07 p.m.




                    LEE A. MARZILLI
                 OFFICIAL COURT REPORTER
              United States District Court
              1 Courthouse Way, Room 7200
                   Boston, MA  02210
                    (617)345-6787

1    A P P E A R A N C E S:

2

     FOR THE PLAINTIFFS:
3
          KENNETH B. FROMSON, ESQ., Finkelstein & Partners, LLP,
4    785 Broadway, 3rd Floor, Kingston, New York, 12401.

5         JAMES A. STEGALL, III, ESQ., Law Offices of Newton &
     Schwartz, Sr., 1911 Southwest Freeway, Houston, Texas, 77098.
6

7    FOR THE DEFENDANT:

8         CATHERINE B. STEVENS, ESQ. and KATHERINE F. ARTHUR, ESQ.,
     Skadden, Arps, Slate, Meagher & Flom, LLP, Four Times Square,
9    New York, New York, 10036.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          P R O C E E D I N G S

2          THE CLERK:  In Re:  Neurontin Marketing, Sales

3     Practices, and Products Liability Litigation, Civil Action

4     No. 04-10981, will now be heard before this Court.  Will

5     counsel please identify themselves for the record.

6          MR. FROMSON:  Good afternoon, your Honors.  Kenneth

7     Fromson for the Plaintiff Steering Committee.

8          MR. STEGALL:  I'm James Stegall.  I'm with the law

9     offices of Newton Schwartz in Houston.

10         MS. STEVENS:  Good afternoon, your Honors.  Catherine

11    Stevens on behalf of Pfizer.

12         MS. ARTHUR:  Good afternoon.  Katherine Arthur on

13    behalf of Pfizer.

14         THE COURT:  Thank you.  So of course Judge Sorokin and

15    I are most eager to hear about the status of all these cases,

16    so why don't we begin with plaintiffs' side, Mr. Fromson.

17         MR. FROMSON:  Your Honor, with respect to the Court's

18    order of February 4, 2011, I would like to bring to the Court's

19    attention that with respect to the application, Docket

20    No. 3164, which was within Paragraph 1 of the order, this

21    particular plaintiff, for whom my law firm had moved for

22    withdrawal, was ordered to be in court today or to have an

23    attorney present or to send a letter.  Long story short, that

24    plaintiff's name is Mr. Belbruno.  He contacted me yesterday

25    evening.  He received the Court's order only on this week.  He

1    asked me to relate to the Court his intention of going forward

2    pro se at this time.  He is also blind and unable to ambulate

3    very well, and so he was not able, based upon his hardships, to

4    get here.  I would respectfully request that you would accept

5    my representation that he intends to move forward pro se.

6            THE COURT:  Is he getting his own lawyer, did he

7    mention?

8            MR. FROMSON:  He did not mention it, but I would hope

9    that he would, but he did want to at least make sure that my

10   message was brought to the Court today to be somewhat, as best

11   possible, compliant with the Court's order.

12           THE COURT:  Did he claim that the Neurontin

13   contributed to any of these conditions?

14           MR. FROMSON:  Your Honor, yes.  I was familiar with

15   the case, obviously, before we withdrew from the action, and

16   the injury would in fact be alleged to have been the blindness

17   from which he suffers as related to the suicide attempt that he

18   had done.

19           THE COURT:  It's interesting because I've heard of

20   several side effects, but that's not one I'd heard about.

21           MR. FROMSON:  Blindness isn't the side effect.  It was

22   the result of the suicide attempt that left him blind.

23           THE COURT:  I see, I understand.

24           MR. FROMSON:  Other than that, I don't have a specific

25   housekeeping matter or --

1            THE COURT:  Where is he from?

2            MR. FROMSON:  He resides in New Jersey, and the case

3      was originally filed in New Jersey.

4            THE COURT:  So perhaps the thing that would make that

5      the easiest to do would be to send that back to New Jersey

6      where he's from, and where you're from, right?

7            MS. STEVENS:  New York, your Honor.

8            THE COURT:  New York, New Jersey.  So what do you

9      recommend?

10           MR. FROMSON:  I think that goes towards a more global

11     picture of what the Court intends to do with the group of

12     pro se plaintiffs and defense counsel's plan of action to most

13     diligently and efficiently manage those cases.  I for one would

14     suggest that the Court maintain some control over those cases

15     because of the efficiency with which this Court has managed the

16     case thus far, but that's between yourself, obviously, your

17     Honor, and Pfizer.

18           THE COURT:  Okay, did you have anything on him?

19           JUDGE SOROKIN:  No.  I'm just wondering how many

20     pro se people there are?

21           MS. STEVENS:  There are approximately thirty pro se

22     plaintiffs right now that we have, and, as your Honors are

23     aware, we filed a motion to get some guidance on where we're

24     going with the pro ses.  You had initially suggested that we

25     send them back immediately.  We had hoped, after we looked at

3bd97782-476f-4d13-98da-b09c9b14bde3

1   the numbers and realizing that they were all spread across the

2   country, that we could maybe submit a proposal to you that we

3   do one more round of discovery, and, in that discovery, that we

4   ask specifically for a case-specific causation expert and a

5   report in whatever time frame is agreeable to your Honors,

6   45 days, 60 days, and maybe that way we could figure out which

7   plaintiffs are really intending to proceed and move forward.

8           THE COURT:  Essentially, though, you're dooming all

9   those cases because they're pro se and it's here in Boston and

10  they're from all over the country.  As a practical matter,

11  wouldn't it be easier for them to litigate in their home areas?

12  I mean, in other words, how are they going to do it?  They're

13  pro se, blind, disabled.  How is that possible?

14          MS. STEVENS:  Ultimately I think they would need to go

15  back to their home areas, but I think right now, as a matter of

16  judicial efficiency and our efficiency in traveling around the

17  country and dealing with each of these cases, that if we could

18  figure out which cases actually have case-specific causation

19  experts and really intend to move forward, it would eliminate a

20  substantial number of those cases.

21          THE COURT:  Well, let me ask you this:  Do you have a

22  list of those thirty for us?

23          MS. STEVENS:  I have a list.  I'm not sure that it's

24  in a form that I can submit, but we can certainly get you one.

25          THE COURT:  Could you send us the list of the thirty?

1          MS. STEVENS:  Absolutely.

2          THE COURT:  Have you filed for summary judgment on

3     them?

4          MS. STEVENS:  We have not.  That's where we were

5     hoping to find out whether they had case-specific experts and

6     were intending to proceed, and then we would quickly file a

7     summary judgment motion if they didn't produce such experts.

8          THE COURT:  Well, why not do it the other way around?

9          MS. STEVENS:  We haven't done any discovery in the

10    pro se cases.

11         THE COURT:  You've done nothing?

12         MS. STEVENS:  We have not.

13         JUDGE SOROKIN:  Just the template?

14         MS. STEVENS:  That's correct.

15         THE COURT:  So there's the template discovery, right?

16         MS. STEVENS:  That's correct, just the written

17    discovery.

18         JUDGE SOROKIN:  Are there any of those thirty odd

19    pro se plaintiffs who have not completed the template

20    discovery?

21         MS. STEVENS:  Yes.

22         JUDGE SOROKIN:  There's several that you made a motion

23    and I said "allowed," and I gave them a little bit of time to

24    supplement, maybe four or five.  Where do the rest of them

25    stand?

1      MS. STEVENS:  There are eight plaintiffs that are

2  pro se that did not respond to template discovery by the

3  January 31 deadline.

4      THE COURT:  So could you flag those?

5      MS. STEVENS:  We can.

6      THE COURT:  Okay.

7      JUDGE SOROKIN:  And the rest have some discovery done

8  because they were represented by counsel --

9      MS. STEVENS:  That's correct.

10     JUDGE SOROKIN:  -- prior to a withdrawal from one of

11  the lawyers, and the discovery or some portion of it was done

12  then?

13     MS. STEVENS:  That's correct.

14     THE COURT:  Okay, so what's the next cluster of

15  people?

16     MS. STEVENS:  The next cluster is probably the

17  Schwartz plaintiffs, I believe.

18     JUDGE SOROKIN:  Mr. Fromson, are all your cases done?

19     MR. FROMSON:  No, your Honor.  We have actions against

20  the generic defendant manufacturers of gabapentin.

21     JUDGE SOROKIN:  But all the five --

22     MS. STEVENS:  Your Honor, could we approach and maybe

23  go off the record and discuss Mr. Fromson's cases at side bar?

24     THE COURT:  Well, who's sitting back there?

25     MS. STEVENS:  I believe she's with Bloomberg, your

1  Honor.

2          THE COURT:  I see.  All right.

3          (Side-bar conference off the record.)

4          THE COURT:  So with respect to the Finkelstein cases,

5  I'm going to issue a 60-day order of dismissal.  And what about

6  the generic cases?

7          MR. FROMSON:  Your Honor, the discovery on the generic

8  cases is stayed.

9          THE COURT:  Can you, by the way, make sure we have the

10 right docket numbers for each one of those?

11         MR. FROMSON:  Absolutely, your Honor.  I will make

12 sure that that gets relayed to your court.  Do you want that

13 filed on ECF, or can I provide that through your court?

14         THE COURT:  I don't care.  We've just got to make sure

15 we don't do a 60-day order on something that we shouldn't.

16         So the generics?

17         MR. FROMSON:  Based upon the United States Supreme

18 Court's pending decision in the Mensing case, which may have

19 influence on this Court, obviously, in terms of how it will go

20 forward with the generic cases, this Court stayed the pending

21 cases.

22         THE COURT:  Right, and that was by agreement of all

23 the parties.

24         MR. FROMSON:  Yes, your Honor.

25         THE COURT:  So play that out for me generically.

1          MR. FROMSON:  Generically, and as a plaintiff, when

2     the Supreme Court rules that our actions can go forward, we

3     will ask that the stay be lifted and that discovery can go

4     forward against the generics, for which there was previously a

5     discovery order in place, and we were on the eve of expert

6     disclosure from January 23 or 24 where the expert disclosure

7     was --

8          THE COURT:  Who manufactures the generics?

9          MR. FROMSON:  I'm sorry, your Honor?

10          THE COURT:  Does Pfizer represent it?

11          MR. FROMSON:  No, your Honor.

12          THE COURT:  So it's not against Pfizer?

13          MR. FROMSON:  It's not.  It's against makers such as

14     IVAX, Activa.

15          THE COURT:  Why should I keep it?

16          MR. FROMSON:  Well, because at the time Pfizer was in

17     each of those cases, and so therefore you didn't transfer them

18     out.  Also --

19          THE COURT:  But I'm thinking of transferring them out

20     now, let me tell you.  I've, for better or for worse, had the

21     Neurontin case involving Pfizer since 1996 on and off, but I

22     don't know why I'm picking up every -- shouldn't it just be

23     sent back as another MDL?

24          MR. FROMSON:  Your Honor, given the fact that the

25     cases have been here and that you had a discovery schedule in

1   place for five to seven cases --

2          THE COURT:  But I'd be starting all over again with

3   these generics, right?

4          MR. FROMSON:  Not necessarily.  Discovery is done.

5   You had dispositive motion practice ready to resolve the issue

6   by June or July of 2011, so there was no --

7          THE COURT:  So remind me.  I mean, I don't remember

8   having all those generics.

9          MR. FROMSON:  Envision, if you will, approximately

10  five to eight cases involving a generic manufacturer of

11  gabapentin.  The science is exactly the same.

12         THE COURT:  I've written about the science.

13         MR. FROMSON:  Yes, you have, your Honor.

14         THE COURT:  So somebody else can use it.

15         MR. FROMSON:  That's true, your Honor.  And,

16  nevertheless, this Court entertained the fact discovery with

17  those underlying defendants --

18         THE COURT:  Right.

19         MR. FROMSON:  -- and set a discovery schedule for the

20  dispositive motion practice, and the parties were moving

21  forward so that they would have had one summary judgment motion

22  in front of you instead of possibly five or six in front of

23  five or six different judges around the country.  You being the

24  most knowledgeable on the issues would have probably been

25  able --

1          THE COURT:  I don't know if I'm going to keep them.

2          MR. FROMSON:  That's fine, your Honor.  I understand.

3          THE COURT:  So let me say that because it's a

4    brand-new defendant.  And are these individual cases?  Is that

5    it?

6          MR. FROMSON:  They're individual cases, and I believe

7    that the Court kept it for efficiency purposes, and that you'd

8    be able to resolve it in one motion practice come this June or

9    July.  That's what was originally scheduled.

10         THE COURT:  I'm not sure I'm going to stick with that,

11   but, anyway, let's leave that as a question mark.  You're going

12   to send me the list.  How many cases are there that I'm going

13   to do the dismissal order on?

14         MR. FROMSON:  Now you're referencing what we discussed

15   off the record, Judge?

16         THE COURT:  Yes.

17         MR. FROMSON:  And so I --

18         THE COURT:  You don't know how many, all right, or at

19   least it's not certain yet.

20         So now we deal with -- is anyone here for Mr. Boone?

21         MR. FROMSON:  No.

22         THE COURT:  No, okay.  We have not yet heard back from

23   him?

24         MR. FROMSON:  He did call me, your Honor, last week in

25   response to the recent court order, and he asked whether he

3bd97782-476f-4d13-98da-b09c9b14bde3

1    needed to be at this conference.  We reviewed the Court's

2    order --

3              JUDGE SOROKIN:  -- excused his claims.

4              MR. FROMSON:  Thank you, Judge, and that was my

5    understanding.

6              THE COURT:  Did he mention whether he was going to be

7    writing an opposition, an objection?

8              MR. FROMSON:  He was equivocal.

9              THE COURT:  Okay.  So then what about the Schwartz

10    cases?

11              MR. STEGALL:  Yes, ma'am.  At present we have

12    approximately eighty cases remaining.  These are all cases

13    where template discovery has been completed.  We have been

14    taking depositions.  We've not been up to the speed that the

15    Court had required earlier, but we are getting there.  We have

16    fifteen depositions, for example, scheduled in the next three

17    weeks, so we're moving.  However, there are many remaining

18    depositions to be taken before the required sales rep,

19    plaintiff, and treating depos are completed.

20              MS. STEVENS:  Your Honor, the reason that we lagged a

21    little bit behind was because of correspondence we had from the

22    Schwartz law firm that indicated they were going to be

23    dismissing a substantial number of these cases, and we were

24    trying to figure out exactly which cases were proceeding and

25    which cases were not.

1        THE COURT:  Well, which ones are?

2        MS. STEVENS:  We have a list of 32 cases from the

3   Schwartz law firm of which they intend to proceed.  I

4   understand that that may not be a concrete number, but --

5        THE COURT:  When can you dismiss or allow people to go

6   pro se for the others?

7        MR. STEGALL:  We would ask for anywhere from 30 to 60

8   days to finalize that list.  She's correct, and that we have

9   made representations and intend to stick to them that we will

10   be reducing our number from eighty anywhere down to thirty-five

11   to forty cases.

12        THE COURT:  Well, do you know some for sure that

13   you're dismissing?

14        MR. STEGALL:  Yes, ma'am.

15        THE COURT:  Well, why don't you do that instantly.

16        MR. STEGALL:  Yes, ma'am.

17        THE COURT:  How many are in that category?

18        MR. STEGALL:  I don't have a hard number for you, but

19   it would probably be ten to fifteen cases.

20        THE COURT:  Do those instantly, instantly, like

21   Monday.

22        MR. STEGALL:  Yes, ma'am.

23        THE COURT:  And maybe another 30 days to finalize the

24   remaining ones so we're just not wasting.  Do you know a

25   certain number that are definitely going forward?

1          MR. STEGALL:  Yes, ma'am.  At this point the

2     thirty-two she identified are going forward.

3          THE COURT:  And those are the ones that you think you

4     still are a little bit behind on on discovery or just with

5     respect to those cases that you're --

6          MR. STEGALL:  With respect to the depositions, yes,

7     ma'am, but we are moving along at a pretty good pace.

8          THE COURT:  And when are you going to be done with --

9     I forget, do you know when we were supposed to be done with

10    those?

11         JUDGE SOROKIN:  February depositions, I think.  On the

12    original schedule, we would have had all the depositions in

13    theory done in February, if I remember right.

14         In any event, when do you think you'll be done with

15    the depositions of those cases that you're going to proceed

16    with?

17         MR. STEGALL:  Being a conservative estimate, I would

18    say anywhere still from six to nine months from now because if

19    we get -- there are -- you know, we identified -- we'll do a

20    sales rep, we'll do the prescribing doctor, and the plaintiff

21    obviously.  Well, in many instances there's more than one

22    prescribing doctor, and getting those depositions scheduled

23    is -- getting a doctor scheduled in and of itself is a hassle.

24         THE COURT:  Six to nine is too far out there.

25         MS. STEVENS:  Your Honor, we're moving at the fifteen

3bd97782-476f-4d13-98da-b09c9b14bde3

1    days of deposition pace, which was the last scheduling order.

2         MR. STEGALL:  And -- I'm sorry, I didn't mean to

3    interrupt.  I apologize.

4         THE COURT:  But given that schedule, six to nine

5    months is usually a full cycle.  Can you add more -- how big a

6    firm is your firm?

7         MR. STEGALL:  It's not particularly big.  There's

8    about seven lawyers in total, and there's three of us working

9    these depositions.

10        THE COURT:  Well, I don't know that I'm going to give

11   you six to nine.  You've been on notice for a while.  If you

12   don't take all discovery, you don't, because I'm not going to

13   try them all here is the thing.  We've got to get this case

14   moving forward.  And I think Schwartz has taken, you know, a

15   backseat, not as backseat as Mr. Boone did, but, still, you've

16   got to get this thing ready, and Judge Sorokin and I are going

17   to consult about how much time makes sense here.

18        JUDGE SOROKIN:  So let me just ask, you've got eighty

19   cases, is that right?

20        MR. STEGALL:  Yes, sir.

21        JUDGE SOROKIN:  And thirty-two you know you're going

22   forward on?

23        MR. STEGALL:  Yes, sir.

24        JUDGE SOROKIN:  And the other forty-eight, the

25   question is, are you going to go forward on any of those, some

1   of those, and of the ones you're not going forward on, you're

2   either going to dismiss or withdraw?

3        MR. STEGALL:  Yes, your Honor.

4        JUDGE SOROKIN:  So the forty-eight is the universe of

5   cases you're making a decision about in the next 30 days?

6        MR. STEGALL:  And, as I said before, we anticipated

7   the number that might be added to the thirty-two to be a small

8   number, three to five.

9        JUDGE SOROKIN:  So if you end up with thirty-five, how

10  many of those thirty-five cases at fifteen days of depositions

11  a month, even if you lagged a little bit, how many

12  depositions -- I'm just trying to figure out how many

13  depositions there are for those people.  Six to nine months

14  would be 60 to 90, 90 to 120 more depositions, I think.

15       MR. STEGALL:  If we can stay at the fifteen days for

16  depositions, I mean, in theory we're talking about 60

17  depositions maybe, additional depositions, so even at 15 a

18  month, that's at least four months.

19       JUDGE SOROKIN:  Are these plaintiffs from the same

20  geographic area, or are they all spread out?

21       MR. STEGALL:  They're spread out, your Honor.

22       JUDGE SOROKIN:  So they're not all from where your law

23  firm is located?

24       MR. STEGALL:  None of them are, your Honor.

25       JUDGE SOROKIN:  I see, all right.  So there's no

1  overlap in the prescribing physicians, for example, like there

2  might have been --

3           MS. STEVENS:  In the Boone cases, there's not, your

4  Honor.

5           JUDGE SOROKIN:  I see.

6           THE COURT:  So we have the clusters.  We have the

7  Finkelstein cases.  We have the pro se cases.

8           Now, when you decide within 30 days, we'll know by

9  then how many are pro se, so whatever our pro se order is

10  basically would apply to them as well.  I think it would be

11  anybody going pro se, and then we have the Schwartz cases that

12  are going forward.

13          MR. STEGALL:  Yes, ma'am.

14          JUDGE SOROKIN:  That's really it, isn't it?

15          THE COURT:  Is there anything else that I don't know

16  about?

17          MS. STEVENS:  There are still a cluster of remaining

18  cases by other law firms.  There's about thirty cases by

19  miscellaneous firms that are still pending.  Actually, the

20  number is thirty-eight.

21          THE COURT:  Yes, but nobody here has shown up from

22  them.  Could you give us a list of those?

23          MS. STEVENS:  I can, your Honor.  I can't hand it up,

24  but we can certainly submit one.

25          THE COURT:  So they're not here, so we can dismiss for

1    lack of prosecution?

2         MR. FROMSON:  Oh, no, your Honor.  If I may, the Court

3    has set forth discovery schedules in terms of, I believe, a

4    remand process for those cases.  It's not my understanding that

5    they have been remiss in their obligations.

6         THE COURT:  Have they done the template discovery

7    and -- oh, well, then we can't.  I mean, no.  Oh, it's not like

8    they're no-shows all along.

9         MR. FROMSON:  Correct, your Honor.  That's why I'm

10   supposed to be here.

11        THE COURT:  Oh, oh, oh.

12        MR. FROMSON:  And you have a remand schedule that you

13   were developing to remand those cases.

14        THE COURT:  So all those people have completed

15   discovery, everything is done, I should just remand them?

16        MS. STEVENS:  They have not completed depositions.

17   They've completed initial discovery, template discovery.

18        JUDGE SOROKIN:  The template discovery is settled for

19   all those thirty-eight cases?

20        MS. STEVENS:  For the majority of them.

21        THE COURT:  And when are all those depositions

22   supposed to be done?

23        MR. FROMSON:  I don't know whether they were on a

24   schedule to be done as opposed to we had filed a suggestion of

25   remand earlier in late 2011 so that they would be sent out to

1    their courts of original jurisdiction to complete their

2    discovery; and if the Court wants us to, I can send to Mr. Alba

3    a previous court order that lays that out in chronological

4    fashion.  I'm happy to do that.

5             THE COURT:  No, but it would be really unfair of me

6    after all these years to suddenly ship it off to the transferor

7    court without basic discovery being done.

8             MS. STEVENS:  And, your Honor, if I can, I think we

9    could do this discovery at the same time when we're doing the

10   Schwartz discovery, on the same kind of schedule.  I don't see

11   any reason why we can't do that with these remaining cases.

12            JUDGE SOROKIN:  So what remains for those cases is the

13   doctor, the prescribing physician, the sales rep, and the

14   plaintiff and the plaintiff's representative?

15            MS. STEVENS:  That's correct.

16            THE COURT:  So three per case essentially?

17            MS. STEVENS:  Sometimes there's more prescribers.

18            THE COURT:  Fair enough, fair enough.

19            MS. STEVENS:  It can vary but an average of about

20   three.

21            JUDGE SOROKIN:  Three categories.  There may be three

22   depos; there may be more.

23            MS. STEVENS:  That's right.

24            THE COURT:  And have you all engaged in a settlement

25   process with the Schwartz people?

1    MS. STEVENS:  Your Honor, we have not.

2    THE COURT:  Well, when do you want that to happen on

3  these miscellaneous firms, if you will?

4    MS. STEVENS:  It's my understanding that we're not

5  moving in that direction and that we intend to defend these

6  cases right now.

7    THE COURT:  Okay.  I mean, just have you talked

8  privately and that's the mutual agreement?

9    MR. STEGALL:  No.

10    THE COURT:  Well, talk.  I can introduce you.  Talk.

11  I don't know enough about the -- have you gone to a mediator?

12    MS. STEVENS:  We have not.  As your Honor is aware,

13  the relationship with the Finkelstein firm was a long

14  relationship, and there were cases that we knew very well.

15  We're just now beginning to --

16    THE COURT:  So let's say I said four months or, you

17  know, some months, not nine months, you know, whatever we

18  figure out is reasonable given the number of depositions,

19  should we build in a mediation schedule afterwards?

20    MR. STEGALL:  It would be my suggestion, your Honor.

21    MS. STEVENS:  We'd have no objection to that.

22    THE COURT:  Who has been helping you all in the other

23  cases?

24    MR. FROMSON:  When you say "helping," do you mean

25  the --

1          THE COURT:  Banging heads.

2          MR. FROMSON:  You, your Honor.

3          THE COURT:  Just me?

4          MS. STEVENS:  We banged heads together.

5          THE COURT:  So there has not been a mediator?

6          MR. FROMSON:  We went to mediation in October, all

7     right?  It was fruitful, and following the October mediation, I

8     believe we came back in December, and the Steering Committee

9     provided a global proposal for resolution, meaning for the

10    entire litigation.  You were here, and you asked Mr. Cheffo

11    some questions about potential resolution and where we were

12    going.  Since then, certain things have happened that we've

13    discussed off the record, and another mediation process --

14         THE COURT:  Well, who was the mediator on those, do

15    you remember?  Was it Eric Green?  Was it one of the magistrate

16    judges?

17         MR. FROMSON:  No, your Honor.  It was a mediator in

18    New York.

19         THE COURT:  Well, do you want to go back to that

20    person?

21         MR. FROMSON:  I can't speak for Pfizer, Judge.  I

22    don't know that Catherine --

23         THE COURT:  I'm looking at you.

24         MR. STEGALL:  I'm not familiar with the mediator.  We

25    weren't involved.

1      THE COURT:  Yes, but you are now, so what do you want

2  to do because we're going to try the mediation thing?  I mean,

3  I can go with a magistrate judge who would not be

4  Judge Sorokin.  We can go through Eric Green.  We can go

5  through -- there's a great guy in California who's done some of

6  this stuff, whose name for the moment is escaping me, or we can

7  just do this person in New York.  I have no vested stake in who

8  does it, but I do have a vested stake in making an effort

9  before I farm this out to everybody.

10      MS. STEVENS:  Could we confer and get back to your

11  Honor with a suggested mediator?

12      THE COURT:  Absolutely.  So when, Monday?

13      MS. STEVENS:  Wednesday maybe?

14      THE COURT:  Wednesday, deal.

15      MS. STEVENS:  Thank you, your Honor.

16      THE COURT:  I was looking for a little valentine

17  there, so -- so my selfishness is, do you estimate at the end

18  of this rainbow there are going to be a few cases for trial?

19      MS. STEVENS:  Your Honor, I do, and that's certainly

20  how we are proceeding with the remaining cases.

21      THE COURT:  Have you yet had a trial in New York or

22  here?

23      MS. STEVENS:  We have not had a trial in New York or

24  here.  We started the trial here in front of your Honor, the --

25      THE COURT:  There have been two that didn't go --

1   well, actually three that started.  I haven't had my dream of

2   one trial that we just see how one of these cases plays to a

3   jury.  We've not had one.  Has Judge Freedman had one in

4   New York?

5            MS. STEVENS:  She has not had one in New York.

6            THE COURT:  Has she resolved all the Daubert issues in

7   New York?

8            MR. FROMSON:  Your Honor, the general causation has

9   been resolved in New York and in this venue, and in light of

10  the fact that our cases were the ones first before her, she

11  does not have a trial set.

12           THE COURT:  So basically -- obviously, I don't believe

13  any of these are Massachusetts cases, right?

14           MS. STEVENS:  That's correct, your Honor.

15           MR. STEGALL:  That's correct, your Honor.

16           THE COURT:  So basically, if you think some of these

17  cases are going to actually go to trial, I need -- well, let me

18  ask you this:  Is the Gibbons issue going to be applicable to

19  whatever cases go to trial?

20           MR. FROMSON:  I believe that's a general issue, and,

21  so, yes, it's a motion that was made by the Steering Committee,

22  so that is still a pending matter --

23           THE COURT:  It's a Steering Committee motion?

24           MR. FROMSON:  Yes.

25           THE COURT:  And Judge Freedman hasn't addressed that

1    statistic issue?

2          MR. FROMSON:  That's correct, because she has been

3    coordinating with your decisions.

4          MS. STEVENS:  Your Honor, we're still, as you know

5    from the discovery schedule, we're still quite a ways away from

6    an ultimate trial.

7          THE COURT:  But playing this out by ear on the pro se,

8    because now I'm thinking we'll get the Schwartz cases going --

9    generics I'm not positive I'm going to keep, et cetera --

10         JUDGE SOROKIN:  The thirty-eight cases of the other

11   lawyers.

12         THE COURT:  Oh, yes, the thirty-eight cases of the

13   other lawyers, which will probably just be remanded out once

14   the depositions are done, but the pro ses are the ones I'm sort

15   of struggling with a little bit because they're disabled people

16   and they don't have lawyers, so how can I make them come in

17   here?  I'm just trying to figure out whether it makes some

18   sense for you to file motions for summary judgment on each one

19   of them.

20         MS. STEVENS:  Your Honor, that's what I was hoping we

21   could get to with the proposal of having them submit discovery,

22   identify --

23         THE COURT:  No, you're trying to put the burden on

24   them; I'm trying to put the burden on you.  In other words, if

25   you took each -- which firm are you with?

1        MS. STEVENS:  Skadden Arps.

2        THE COURT:  A big firm.  So I'm sort of thinking that

3   if you moved on each one of them, we would see who responded

4   and whether or not they came up with something, and then I'd

5   only send back to the courts somebody who actually came up with

6   something.  I'm playing with it.  I don't know what to do.

7        MS. STEVENS:  I'm thinking about it, your Honor, too.

8   Just if we --

9        JUDGE SOROKIN:  How many of them have in their

10  template discovery identified injuries that are the types of

11  injuries that have proceeded past the Daubert analysis as

12  opposed to injuries or claims that don't?

13       MS. STEVENS:  There's a handful that are not suicide

14  or suicide-related issues, I'd say probably five or six cases

15  that spring to mind.  The majority of the cases that remain as

16  pro se are cases that the Finkelstein firm had originally, and

17  so they are suicide-related injuries and have since been

18  withdrawn by the Finkelstein firm.

19       THE COURT:  Are most of them people who attempted

20  suicide who are now alive, or are they the families of people

21  who killed themselves?

22       MS. STEVENS:  I believe most are attempts, but that's

23  just from --

24       THE COURT:  Because that is the one area where there

25  was some science to support it, and I don't really know what to

1    do with them.  Can I just ask you bluntly -- I'm not sure even

2    if I can ask you this:  You were most of their attorneys,

3    right?

4            MR. FROMSON:  I know that there's a number of

5    withdrawals from the Finkelstein law firm, and then Mr. Boone

6    was withdrawing from cases, and I think the Schwartz firm may

7    trickle in as well; but I think that's fair that right now,

8    formally, the most withdrawals were finalized by our firm.  So

9    your question is, are they mostly suicide-related claims?  The

10   answer is "yes."  We didn't take on cases involving individuals

11   who were alleging lack of efficacy or weight gain.  We brought

12   cases that involved suicide-related claims, and we withdrew

13   from those cases based upon case-specific factual matters

14   within each case, sometimes after their depositions where we

15   learned of new information.

16           THE COURT:  All right.

17           JUDGE SOROKIN:  If they weren't pro se, the next step

18   would be to take depositions in all the cases but for the

19   handful that were in my order last week or so, right?

20           MS. STEVENS:  That's correct.

21           JUDGE SOROKIN:  And then you'd be taking depositions

22   of the three categories of people.  And then after those

23   depositions were done, you'd go back to their home court, and

24   you'd either proceed with more individualized discovery or

25   you'd go to summary judgment.

1          MS. STEVENS:  That's correct.  I think we have

2     discovery in an awful lot of these cases because it was

3     discovery that was filed by the Finkelstein law firm.  It's

4     been our experience that if we'd serve additional discovery, we

5     may find out that some of these plaintiffs don't really want to

6     proceed pro se.  We just don't know that at this point.

7          THE COURT:  Well, that's what I'm thinking.  If it's

8     based on the science that I've already found, that there's

9     enough science to support in some group of people an increase

10    in depression, all right, we did those hearings, which could

11    contribute to suicidality.  Now, so you might not win if you

12    don't know anything about these people, just because I've got

13    enough there; but if you noticed depositions and found out

14    something about these people, or they just didn't show, we

15    could sort them out.  And maybe if whatever's left at the end

16    of the rainbow, they'd be able to find a lawyer.

17         JUDGE SOROKIN:  Why not take their deposition?

18    Because if you take their deposition and they don't show, you

19    can move to dismiss for lack of prosecution if either because

20    they've moved or they haven't kept up with the court.  If they

21    do appear, you'll get the discovery you need, and you have to

22    take the deposition anyway, and then you might have the

23    information that you need.

24         MS. STEVENS:  I understand.  I think that showing up

25    at a deposition is a relatively simple thing for a person to

1    do.  At the end of the day, though, I'm not sure that

2    progresses the --

3              THE COURT:  Well, actually I don't find that.  I find

4    that the people who are really just hoping they'd get a quick

5    settlement and aren't willing to put in any work won't show,

6    and the people who really feel aggrieved because they're taking

7    this stuff and, you know, tried to kill themselves, if they

8    care enough, they're going to show.  Caring enough is part of

9    what I care about.

10             MS. STEVENS:  Right, yes, your Honor.

11             THE COURT:  It's what I care about because then we can

12   make a decision as to how to go from there.

13             So this has been very useful.  We're going to talk now

14   about how to go forward because we are in the twilight of this

15   litigation.

16             On the generics, were there all individual cases that

17   came all over the country and then were transferred here by

18   MDL?

19             MR. FROMSON:  Yes, your Honor.  Again I would say,

20   it's certainly more efficient to have such a small amount of

21   cases before you where you've already addressed the issue.

22             THE COURT:  You've got to understand, my life has

23   changed.

24             MR. FROMSON:  I understand.

25             THE COURT:  And for me to pick up six motions for

1    summary judgment, each of which have come with crates and

2    crates of documents --

3            MR. FROMSON:  I don't think that would be the case

4    here because you would just deal with the dispositive motion

5    practice on the general issues which are identical, and then

6    you'd remand them out, assuming that they would --

7            THE COURT:  Because I've already done the general

8    issues.

9            MR. FROMSON:  Correct.

10           THE COURT:  So let me think about that and then go

11   from there.

12           JUDGE SOROKIN:  I have one last question.  With

13   respect to the cases of the thirty-eight lawyers, the

14   thirty-eight other cases with other lawyers, I can't recall at

15   the moment if I ever set or if the Court ever set a schedule

16   governing beyond template discovery for them, or did I think of

17   them as within the hundred and something cases that were going

18   to be done last fall?

19           MR. FROMSON:  Your Honor, I do believe you set forth

20   an order towards the end of 2010.  I think what's best is if we

21   pull that order and submit it to you, but I was under the

22   impression you were going to remand them after template

23   discovery was done.

24           JUDGE SOROKIN:  Without the deposition.

25           MR. FROMSON:  Without the deposition, but I certainly

1   have no objection either way.  I do know that some law firms

2   were interested in having their cases remanded, and I think

3   they were relying on your previous order, so I --

4          THE COURT:  But I'm worried that they haven't even

5   tried to settle.

6          MR. FROMSON:  Well, that's a different issue.  If the

7   parties haven't engaged in resolution, that's because there's a

8   defense and they haven't been interested in resolution.

9          THE COURT:  Well, when you come up with a mediation

10  schedule with Schwartz, his firm, those people, whatever is

11  left at the end of the day, the thirty-two cases, reach out to

12  those other law firms and involve them in that discussion.

13         MR. FROMSON:  And I'd like just again to remind the

14  Court, we as a Steering Committee did bring a global proposal

15  for resolution, and just so you know, we did meet an obligation

16  to do that in December.

17         THE COURT:  And the other firms weren't interested?

18         MR. FROMSON:  The other firms were.  We brought a

19  global proposal for resolution.

20         THE COURT:  You weren't?

21         MS. STEVENS:  We were not, your Honor.

22         MR. FROMSON:  Right, your Honor.

23         JUDGE SOROKIN:  If we did depositions in those

24  thirty-eight cases, since you've said that you can do them

25  parallel with the Schwartz law firm cases and you don't have

1    the seven-lawyer limitation, how many days of depositions a

2    month can we do?

3            MS. STEVENS:  I think we could do them on the same

4    track.  I think we could do --

5            JUDGE SOROKIN:  Could we do more than 15 days a month?

6            MS. STEVENS:  I suspect we could, your Honor, if you

7    want to move them along.

8            JUDGE SOROKIN:  Whatever pace we thought we could do

9    you could do.

10           MS. STEVENS:  Maybe not whatever pace but --

11           THE COURT:  Do you have your bed in your office?  I've

12   heard tales of how hard you all work in that firm.

13           So do you have any questions for us?  At this point,

14   have we taken care of everything?  Are there any loose ends?

15           MS. STEVENS:  I don't believe there are any other

16   loose ends, your Honor.

17           MR. FROMSON:  Can I approach the Court one more time

18   at side bar on a matter we discussed earlier, only because it

19   relates to the 60-day order of dismissal, and I think it would

20   be informative.

21           THE COURT:  Yes, yes.

22           (Side-bar conference off the record.)

23           THE COURT:  All right, so is there anything else you

24   want?  All right, so I think we can stand in recess.  Thank

25   you.

1          MR. STEGALL:  Thank you, your Honor.

2          MR. FROMSON:  Thank you, your Honor.

3          MS. STEVENS:  Thank you, your Honor.

4          THE COURT:  Thank you for coming to frigid Boston.

5          MS. STEVENS:  Have a good weekend, your Honor.

6          THE COURT:  Thank you.

7          (Adjourned, 2:43 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                   C E R T I F I C A T E

2


3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS     ) ss.
   CITY OF BOSTON                )
5

6


7          I, Lee A. Marzilli, Official Federal Court Reporter,

8  do hereby certify that the foregoing transcript, Pages 1

9  through 33 inclusive, was recorded by me stenographically at

10 the time and place aforesaid in Civil Action No. 04-10981-PBS,

11 In Re:  Neurontin Marketing, Sales Practices, and Product

12 Liability Litigation, and thereafter by me reduced to

13 typewriting and is a true and accurate record of the

14 proceedings.

15     In witness whereof I have hereunto set my hand this 17th

16 day of February, 2011.

17

18

19

20

21              /s/ Lee A. Marzilli
               _____
22              LEE A. MARZILLI, CRR
               OFFICIAL FEDERAL COURT REPORTER
23

24

25