UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---------------------------------------------------------------------- x
    )
IN RE NEURONTIN MARKETING AND SALES    )
PRACTICES LITIGATION    )   MDL Docket No. 1629
    )
---------------------------------------------------------------------- x
    )   Master File No. 04-10981
THIS DOCUMENT RELATES TO:    )
    )   Honorable Patti B. Saris
---------------------------------------------------------------------- x   Honorable Leo T. Sorokin
    )
AETNA, INC. v. PFIZER INC., et al.,    )
04 CV 10958 (PBS)    )
    )
---------------------------------------------------------------------- x

**PLAINTIFF AETNA, INC.'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION TO ALTER OF AMEND THE JUDGMENT
PURSUANT TO FED. R. CIV. P. 59(e)**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................... ii

I.  FACTUAL BACKGROUND ............................................................................ 1

II.  ARGUMENT ..................................................................................................... 3

    A.  LEGAL STANDARD ............................................................................. 3

    B.  THE COURT'S DISTINCTION BETWEEN AETNA'S AND
          KAISER'S CLAIMS WAS BASED UPON ERRORS OF FACT
          AND LAW REGARDING THE FORMULARY PROCESSES OF
          KAISER AND AETNA AND HOW DEFENDANTS'
          MANIPULATIONS CAUSED THEM BOTH INJURY
          IN THE SAME WAYS ............................................................................. 4

    C.  THE RECORD SHOWS DEFENDANTS DEFRAUDED AETNA ................. 7

    D.  AT TRIAL THE COURT FOUND DR. ROSENTHAL'S
          ANALYSIS RELIABLE TO PROVE CAUSATION ...................................... 10

    E.  THE COURT'S DISTINCTION BETWEEN THE VIABILITY
          OF AETNA'S CLAIMS AND KAISER'S CLAIMS BASED
          UPON WHETHER AETNA HAD "DIRECT COMMUNICATIONS"
          WITH DEFENDANTS OVERLOOKED CONTRARY
          CONTROLLING LAW ........................................................................... 12

CONCLUSION ..................................................................................................... 18

# TABLE OF AUTHORITIES

## Cases

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007)......................................................................................... 14

*Dist. 1199P Health & Welfare Plan v. Janssen, L.P.,*
    No. Civ. A. 07-2608, 2008 WL 5413105 (D.N.J. Dec. 23, 2008) ........................................... 13

*Farley Transp. Co., Inc. v. Santa Fe Trail Transp. Co.,*
    786 F.2d 1342 (9th Cir. 1985) ........................................................................ 16, 17

*In re Actimmune Mktg. Litig.,*
    614 F. Supp. 2d 1037 (N.D. Cal. 2009) ............................................................. 13, 14

*In re Cardizem CD Antitrust Litig.,*
    200 F.R.D. 326 (E.D. Mich. 2001) ..................................................................... 13

*In re Neurontin Mktg. & Sale Practices Litig.,*
    244 F.R.D. 89 (D. Mass. 2007)............................................................................. 14

*In re Neurontin Mktg., Sales Practices & Products Liab. Litig.,*
    257 F.R.D. 315 (D. Mass. 2009)....................................................................... 4, 14

*In re Pharm. Indus. Average Wholesale Price Litig.,*
    582 F.3d 156 (1st Cir. 2009) *cert. dismissed,* 131 S. Ct. 60 (2010) .................................... 6, 12

*In re Schering-Plough Corp. Intron/Temodar Consumer Class Action,*
    2:06-CV-5774(SRC), 2009 WL 2043604 (D.N.J. July 10, 2009) ........................................... 15

*In re Terazosin Hydrochloride Antitrust Litig.,*
    220 F.R.D. 672 (S.D. Fla. 2004).......................................................................... 13

*In re Zyprexa Products Liab. Litig.,*
    671 F. Supp. 2d 397 (E.D.N.Y. 2009) .................................................................. 13

*Ironworkers Local Union No. 68 v. AstraZeneca Pharmaceuticals LP,*
    585 F. Supp. 2d 1339 (M.D. Fla. 2008)................................................................ 13

*MCI Communications Corp. v. Am. Tel. & Tel. Co.,*
    708 F.2d 1081 (7th Cir. 1983) .................................................................. 16, 17, 18

*Pagan-Colon v. Walgreens of Puerto Rico, Inc.,*
    Civil No. 08-2398 (GAG), 2010 WL 5072555 (D.P.R. Dec 7, 2010)......................................... 4

*Southern Illinois Laborers' & Emplrs Health & Welfare Fund v. Pfizer Inc.*,
  08 CV 5175KMW, 2009 WL 3151807 (S.D.N.Y. Sept. 30, 2009) ......................................... 15

*U.S. Football League v. Nat'l Football League*,
  842 F.2d 1335 (2d Cir. 1988) ...................................................................................... 16, 18

*UFCW Local 1776 v. Eli Lilly & Co.*,
  620 F.3d 121 (2d Cir. 2010) ............................................................................................. 12

*Venegas-Hernandez v. Sonolux Records*,
  370 F.3d 183, 190 (1st Cir. 2004) ..................................................................................... 3

## **Statutes**

18 Pa. Cons. Stat. Ann. § 4117(a)(2) (West) ................................................................................ 1

18 U.S.C. § 1962(c) .......................................................................................................................... 1

Cal. Bus. & Prof. Code § 17200 (West) ......................................................................................... 1

## **Rules**

Fed. R. Civ. P. 41(a)(1)(A)(ii) ......................................................................................................... 1

Fed. R. Civ. P. 59(e) ......................................................................................................................... 3

Plaintiff Aetna, Inc. ("Aetna") files this motion and respectfully requests the Court to reconsider, alter or amend its February 9, 2011 Entry of Judgment (Docket No. 3285) against Aetna and in favor of the defendants Pfizer Inc. and Warner-Lambert Company LLC ("Defendants").  Judgment followed the Court's Memorandum and Order dated January 8, 2010 ("Mem.") (Docket No. 2309), which granted summary judgment.

## I.     FACTUAL BACKGROUND

Aetna's co-plaintiffs, Kaiser Foundation Health Plan, Inc. and Kaiser Foundation Hospitals (collectively "Kaiser"), and Guardian Life Insurance Company ("Guardian") [1] (collectively the "Coordinated Plaintiffs"), brought this case against Defendants alleging claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) (Counts I-X); the California Unfair Competition Law, Cal. Bus. & Prof.Code § 17200 (Count XI); the unfair competition statutes of other states (Count XII); the Pennsylvania Insurance Fraud Statute, 18 Pa.C.S. § 4117(a)(2) (Count XIII); and common law unjust enrichment (Count XIV), to recover payments made for the prescription drug Neurontin.  *See* Third Coordinated Amended Complaint ("Coordinated Complaint") (Docket No. 530).

Plaintiffs alleged that Defendants fraudulently promoted Neurontin for "off-label" conditions for which Defendants knew it was not effective.  Defendants gained access to the Coordinated Plaintiffs' prescription drug formularies in 1994 when they received FDA approval for Neurontin's use as an anti-seizure medication.  In 1997, Defendants began a secretive fraudulent scheme to promote Neurontin for off-label use, designed to cause Coordinated Plaintiffs (and fellow third party payers) to pay for it.  As this Court found:

---

[1] Guardian was a Coordinated Plaintiff and, with Kaiser and Aetna, filed three coordinated complaints and also opposed Defendants' motion for summary judgment.  Guardian is no longer a party to these proceedings having filed a Stipulation of Dismissal pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) on October 21, 2010.  (Docket No. 3102).

> Dubbed "snake oil" by Pfizer's own sales team, Neurontin was promoted through a publication strategy that suppressed negative clinical trials and showcased positive ones.  Pfizer also sponsored continuing medical education programs and detailed doctors to promote off label uses of the drug.

*See* the Court's Findings of Fact and Conclusions of Law at 1 ("Findings").  (Docket No. 3120).

Defendants moved for summary judgment in this action with respect to all the Coordinated Plaintiffs.  (Docket No. 1689).  On January 8, 2010, based in large part on the Court's acceptance of Defendants' misrepresentation of the Coordinated Plaintiffs' formulary process, the Court split the Coordinated Plaintiffs, allowing Kaiser to proceed to trial, while dismissing all claims of Aetna and Guardian.  The Court distinguished their claims on the basis that Aetna and Guardian did not rely upon direct communications with Pfizer when they covered Neurontin on their formularies.  Mem. at 30. (Docket No. 2309).

Trial proceeded on Kaiser's virtually identical claims, and on March 25, 2010, the jury returned a RICO verdict of $47 million (trebled by the Court to $141 million).  (Docket No. 2760).  On November 3, 2010, the Court again found against Defendants on the Coordinated Complaint's non-jury claims, and entered judgment for Kaiser for an additional $95 million as restitution.  (Docket No. 3120).  The Court's judgment for Kaiser was based on the trial record, from which the Court made extensive findings of fact which closely parallel allegations in the Coordinated Complaint, concluding: "there is no reliable scientific evidence that Neurontin is effective for bipolar disorder, migraine or high doses" and that "there is no reliable scientific evidence to support a broad indication of Neuropathic pain."  Findings at 80.[2]  The Court concluded in a section appropriately titled "The Bottom Line":

---

[2] The Court's findings specifically confirmed key allegations of Aetna's Coordinated Complaint, including:
> To sum up, as part of its publication strategy, Pfizer published half-truths and intentionally misleading information, submitted the April 1998 abstract about the Gorson trial that was published in *Neurology,* published the November 1997 supplement to

(iv) The Bottom Line

Beginning in November 1997 with the publication of the Internal Medicine supplement, defendants engaged in the fraudulent marketing of Neurontin for the treatment of neuropathic pain through the sponsorship of fraudulent publications.

*Id*. at 53-54.  And:

I find that Pfizer designed the national strategy of off-label marketing (by promotional spending on detailing doctors and sponsorship of CME conferences) to implement its fraudulent publication strategy.

*Id*. at 77.

The trial record has revealed how Defendants' scheme for off-label promotion of Neurontin worked, demonstrating that Aetna was injured by Defendants in the same ways as Kaiser.  Accordingly, the Court should reconsider its Judgment against Aetna and grant Aetna relief permitting it, like Kaiser, to have its day in Court.

II.    **ARGUMENT**

A.    **LEGAL STANDARD**

Under Fed. R. Civ. P. Rule 59(e), district courts have considerable discretion in deciding whether to grant or deny a motion to alter or amend a judgment, to correct a clear error of law or fact, based on newly discovered or previously unavailable evidence, or to prevent manifest

---

*Internal Medicine,* mailed the March 1999 supplement to all neurologists in the United States, sponsored a 2000 supplement to *Neurology Reviews,* and sponsored an article in the journal *Clinical Therapeutics* in 2003.  During the years at issue in this case, Pfizer deliberately suppressed publication of negative studies concerning many types of neuropathic pain, including DPN. (Tive Dep. Tr., 650-51, 666-67, 723-25 (played 3/11/10); *see also* TXs 136, 175, 183, 203.)  Those trials suppressed included negative studies referred to as the Gorson, Reckless, and POPP studies. In addition, defendants published a positive study by Dr. Miroslav Backonja, but failed to disclose the unblinding problems with the trial design in promotional activities and advertisements related to the Backonja JAMA article. Pfizer also published a trial called the Serpell study without acknowledging that its positive results were attributable to patients suffering from post-heuretic neuralgia ("PHN"), a condition for which Neurontin had been approved by the FDA.
Findings at 52-53.

injustice.  *Venegas-Hernandez v. Sonolux Records*, 370 F.3d 183, 190 (1st Cir. 2004); s*ee also,*

*Pagan-Colon v. Walgreens of Puerto Rico, Inc.*, Civil No. 08-2398 (GAG)., 2010 WL 5072555

(D.P.R. Dec 7, 2010).  All three rationales apply here, warranting relief from the February 9,

2011 Judgment.

> **B.   THE COURT'S DISTINCTION BETWEEN AETNA'S AND KAISER'S CLAIMS WAS BASED UPON ERRORS OF FACT AND LAW REGARDING THE FORMULARY PROCESSES OF KAISER AND AETNA AND HOW DEFENDANTS' MANIPULATIONS CAUSED THEM BOTH INJURY IN THE SAME WAYS**

In their Opposition Brief ("Opp.") (Docket No. 1744), Rule 56.1 Counterstatement

("Counter.") (Docket No. 1745), and Sur-Reply (Docket No. 1843) to Defendants' Motion for

Summary Judgment (Docket No. 1689), the Coordinated Plaintiffs jointly presented ample

evidence of (i) causation; (ii) cheaper, more optimal drugs their formularies would have used but

for Defendants' fraud; (iii) Defendants' scienter; and (iv) Plaintiffs' standing to pursue their

claims.  The Coordinated Plaintiffs jointly argued that a reasonable jury could conclude that

Defendants' "blatantly illegal off-label promotion activities" (citing *In re Neurontin Mktg, Sales*

*Practices & Prods. Liab. Litig*, 257 F.R.D. 315, 333 (D. Mass. 2009), caused all of the

Coordinated Plaintiffs to overpay for Neurontin in the same ways, and that viewing the facts in

the light most favorable to the Coordinated Plaintiffs, Defendants were not entitled to summary

judgment.

In its split-decision Memorandum and Order deciding the summary judgment motion, the

Court concluded that "to prevail, a TPP must demonstrate that it relied on a misrepresentation or

omission, or provide a reliable methodology to calculate the percentage of the doctors who

prescribed Neurontin based on the Defendants' alleged fraud."  (Mem. at 27).  The Court

correctly found that "Aetna has a P&T committee that reviews drug classes and makes decisions

concerning what is covered on the formulary.  The committee examines the safety efficacy and labeled indications for a drug, and also looks at available information about a drug's off label uses." [3] Mem. at 8.  The Court made a similar finding regarding Kaiser's P&T committee's activities putting the drug on formulary.  However, the Court then distinguished Kaiser's claims from Aetna's claims on the basis that "Because DIS drug monographs for Neurontin, prepared by Kaiser and used by Kaiser's P&T committee, directly influenced Kaiser's decision to expand its formulary, a reasonable inference can be drawn that Kaiser was directly injured by Pfizer's misrepresentations about Neurontin." *Id*. at 29.  The Court then dismissed Aetna's claims on the grounds that it "had not submitted evidence suggesting that it had direct communications with Pfizer or relied on fraudulent representations in any of its off label marketing campaigns." *Id.* at 30.

The Court erred in drawing its distinction about how the Coordinated Plaintiffs' respective formulary processes worked.  The Court drew a mistaken legal assumption concerning Aetna's and Kaiser's relative abilities to prove damages, based upon this "direct communications" distinction.  As was shown at trial, it was initial formulary placement, not whether subsequent communications occurred directly or indirectly, that Defendants used as their pipeline into health insurers' pockets.  For Aetna, as for Kaiser, Neurontin was added to their respective formularies prior to Defendants' promotion of Neurontin for off-label uses.  This was an essential part of Defendants' scheme, which affected Aetna and Kaiser (and other TPPs) in the same way.  Once Neurontin was legitimately placed on their formularies, Defendants

---

[3]  Aetna has a Pharmacy and Therapeutics Committee ("P&T Committee") which reviews drug classes and makes decisions concerning what is covered on formulary.  April 15, 2009 Nussbaum Decl. Exh. 9, Deposition of Micheal Brodeur on 7/26/2007 at 11:8-17 (Docket No. 1852).  As part of the normal formulary process, Aetna will look at the safety, efficacy and labeled indications for a drug and will also look at available information relating to a drug's off label uses.  *Id.* at 76:25-77:9, 78:5-1.

abused Neurontin's formulary placement to multiply Neurontin sales exponentially via off-label promotion.

Whether or not Defendants' representations were made directly to Aetna cannot be the tipping point on whether Aetna's claims survive.  Holding so, rejects well-established principles of healthcare economics, and is inconsistent with the First Circuit's well-reasoned conclusions concerning the roles third party payers and their formularies play in the prescription drug marketplace.  *See In re Pharmaceutical Industry Average Wholesale Price Litigation, Blue Cross Blue Shield of Massachusetts v. AstraZeneca Pharmaceuticals LP*, 582 F.3d 156 (1st Cir. 2009)*, cert. dismissed,* 131 S. Ct. 160 (2010) ("*In re AWP*").

The Court held that aggregate damages via aggregate evidence supported by expert testimony could not suffice for Aetna's proof of damages at trial:

> Because the Court has concluded that the evidence presented in support of this theory, namely the aggregate evidence presented in Dr. Meredith Rosenthal's report is legally insufficient to effectively segregate damages caused by Defendants' misrepresentations from damages caused by other sources Guardian and Aetna cannot rely solely on the aggregate evidence to prove causation.

Mem. at 31.

After Neurontin was approved by the FDA for epilepsy on December 30, 1993, Kaiser added Neurontin to the formularies in all its regions by 1994.  Findings at 8.  Similarly, in 1994, Aetna placed Neurontin on its formulary in the anti-convoluscent drug class.  Mem. at 8.  The Court has found that Defendants' fraudulent off label marketing activities did not begin until 1997.  Findings at 53.  Accordingly, neither Aetna nor Kaiser could have relied on Defendants' fraudulent marketing in deciding to place Neurontin on their respective formularies.  Moreover, it was specifically Defendants' strategy to conceal their off label marketing from the Coordinated Plaintiffs.  Opp. at 3-4; Counter. at ¶¶ 116-126.

After the Kaiser trial, the Court acknowledged that it previously misunderstood the

formulary process:

> It's clear that in my first motion, <u>I misunderstood a key thing</u>, which is every drug
> got – <u>every formulary put Neurontin on because it was approved for epilepsy.</u>
> That was something that I misunderstood from your expert's brief, or either that or
> he was deliberately not clear. But then the issue is what people did to manage
> afterwards for off-label uses. That's what the clear difference is. I had thought the
> management happened before they put it on the formulary and it turns out it went
> on -- <u>this is what I learned at trial</u> -- everywhere, and it was a question of how
> many managed it afterwards. <u>So that's something I have to rethink</u>.
>
> \*      \*      \*
>
> . . . I also, though, know that <u>I didn't understand the formulary situation with
> respect to Neurontin, that the management came or didn't come after it was put on
> the formulary.</u> Maybe your expert when he kept saying it took forever to -- oh,
> everyone made individualized distinctions in putting it on the formulary and he
> gave all these examples, as I understand it now, <u>people made individualized
> decisions after it was on the formulary typically</u>.

Transcript of February 2, 2011 hearing at 27-29 (emphasis added).  As described *infra*, once

Aetna became aware of Defendants' fraud, it began formulary management of access to

Neurontin.

## C.      THE RECORD SHOWS DEFENDANTS DEFRAUDED AETNA

As the jury did in the Kaiser trial, a reasonable jury could find that Defendants' off-label

promotion resulted in Aetna, which like Kaiser had included Neurontin on its formulary without

restriction following FDA approval of its use as an anti-epileptic drug, overpaid for off-label

Neurontin prescribed as a result of Defendants' fraud.  Similarly, a reasonable jury could find

that had Defendants honestly represented Neurontin's off-label use, then doctors would not have

prescribed Neurontin, or prescribed less Neurontin for off-label uses, or that Aetna would have

taken steps to limit its payment for off-label Neurontin.[4]

---

[4]  Defendants attempted to make much out of the fact that Aetna in 2004 moved Neurontin to a non-
preferred status as being the result of AEDs being "adjunct therapy."  In doing so, Defendants ignored the direct

Aetna, like Kaiser, has a Pharmacy and Therapeutics Committee ("P&T Committee") which reviews drug classes and makes decisions concerning which drugs are covered on formulary.  April 15, 2009 Nussbaum Decl. Exh. 9, Brodeur at 11:8-17.  As part of the normal formulary process, Aetna, like Kaiser, looks at the safety, efficacy and labeled indications for a drug as well as available information relating to a drug's off label uses.  *Id.* at 76:25-77:9, 78:5-1.  Like Kaiser, Aetna's managed care focus is cost-effective therapy.  *Id.* at 44:4-13.

Due to the practical difficulties in managing the class and the relative drug spend on this class compared to other classes, Aetna for many years focused its resources elsewhere.  June 18, 2009 Nussbaum Decl. Exh. 3 at Scheid 141:1-142:8 (Docket No. 1843).  However, in 2003, Aetna reviewed the anti-convulsant drug class and did move Neurontin to the formulary exclusions list effective January 1, 2004, (April 15, 2009 Nussbaum Decl. Exh. 9, Brodeur at 119:6-20), for various reasons which specifically included Neurontin's "excessive off-label indications."  *Id.* at 120:18.  At that time, Aetna also imposed quantity controls to restrict the high dosages of Neurontin called for by off-label use.  *Id.* at 148:9-16.  The head of Aetna's formulary program testified that had Aetna been earlier aware of the facts concerning the Defendants' misleading marketing campaign, Aetna would have promptly intervened at an

---

testimony of Michael Brodeur, Aetna's 30(b)(6) witness and a member of Aetna's P&T Committee, which specifically sets forth factors that went into Aetna's decision to move Neurontin to a non-preferred status in 2004 which was not solely based on its position as adjunct therapy:

> Q:    Any other reasons why Neurontin was moved to the non-preferred status at that time? . . . .
>
> A:    (Mr. Brodeur) In the formulary process . . . there [are] lots of factors that go into making . . . a formulary coverage decision.  And lots of them for alternatives of indication a drug is used for, for excessive off-label indications, for high utilization, more cost-effective therapy; there's a variety of reasons that all factor into it.
>
> Q:    (By Mr. Mizell) Were any of those particular factors you just listed the basis for moving Neurontin to non-preferred status?
>
> A:    As part of that formulary review at that time, yes, that was some, probably along with a few others….

April 15, 2009 Nussbaum Decl. Exh. 9 Brodeur at 120:8-121:3.

earlier date to curtail inappropriate usage and used cheaper, more optimal alternatives.  June 16, 2009 Brodeur Affidavit at ¶ 6 (Docket No. 1852).

TPPs and PBMs universally have used similar procedures for the evaluation of drug products during formulary deliberations.  Declaration of Kimberly McDonough ("McDonough Decl.") at ¶ 10.  (Docket No. 1853).  Standards for formulary review processes are published by national organizations and are the basis of formulary decision processes in both health plans and PBMs.  *Id.* at ¶ 10.  The operation and decision-making of P&T committees in the United States are largely homogeneous.  *Id.*

The record shows that Aetna (like Kaiser and other TPPs) did adopt managed care tools to control off-label use.  *See, e.g.,* Counter. ¶¶ 73-86; 111-115.  But Defendants knew and took advantage of the fact that virtually all TPPs were reluctant to remove medications from their formularies, particularly for drugs like Neurontin that are used for maintenance therapy of difficult-to-treat illnesses like epilepsy.  Counter. ¶¶ 116-126.  Defendants further knew that virtually no managed care plans were placing limits on the use of Neurontin.  Counter. ¶¶ 80-86.  For many difficult-to-treat chronic illnesses, control of the patient's illness is critical and is dependent on consistent drug therapy without interruption.  McDonough Declaration ¶ 12.  Likewise, P&T committees generally, at Aetna or elsewhere, had very limited ability to uncover Defendants' fraud, Counter. ¶¶ 74-76, the keys to which were misleading clinical studies or unfavorable studies that had been suppressed.  McDonough Decl. ¶ 15.

Aetna, Kaiser and TPPs generally, were the targets of Defendants' scheme to increase sales of Neurontin by influencing doctors to prescribe Neurontin for off-label uses.  Defendants consciously kept their off-label marketing plans "off the radar screen" of Aetna and the other TPPs.  Opp. at 3-4; Counter. at ¶¶ 116-126.  Defendants knew that Aetna, like the other TPPs

which Defendants studied with their advisory boards and corporate intelligence gathering, selected which classes of drugs to manage based on whether a class was more difficult to manage because the measure of a patient's need for treatment may be based on subjective criteria and "because it's hard to get our hands around off-labeled use…."  April 15, 2009 Nussbaum Decl. Exh. 9, Brodeur at 15:13-16:5; 32:16-23.  Aetna did not effectively manage the anticonvulsant drug class, which includes Neurontin, until 2004.  *Id.* at 22:6, 32:24 -33:6, 35.  Defendants used this fact to argue, in essence, that since Aetna and other TPPs had insufficient security to prevent the success of their fraud, that Defendants are legally entitled to keep what they stole.  By analogy, bank robbers would be held entitled to rob banks which did not employ adequate security guards.

Because of the effectiveness of Defendants' "off the radar" strategy, it was not until shortly before this lawsuit was filed in 2004 that Aetna moved Neurontin to a non-preferred status under which Neurontin use was limited by either a higher co-pay or was not covered at all, depending on plan design.  *Id.* at 34:19-35:3.  Neurontin was moved to non-preferred status for a number of reasons, including alternatives for its particular approved indication, and excessive off-label use.  *Id.* at 120.

### D.   AT TRIAL THE COURT FOUND DR. ROSENTHAL'S ANALYSIS RELIABLE TO PROVE CAUSATION

In its January 10, 2008 Memorandum granting summary judgment against Aetna, but not Kaiser, the Court held:

> To prevail, a TPP must demonstrate that it relied on a misrepresentation or omission, **or provide a reliable methodology to calculate the percentage of the doctors who prescribed Neurontin based on Defendants' alleged fraud.**  Accordingly, the Coordinated Plaintiffs cannot rely solely on Dr. Rosenthal's report as the silver bullet to establish causation.

Mem. at 27 (emphasis added).  However, at Kaiser's trial, "[t]o meet its burden of proving causation, plaintiff offered the testimony of Professor Meredith Rosenthal, who gave an expert opinion quantifying the impact of defendants' conduct in promoting Neurontin on units of Neurontin paid for by Kaiser."  Findings at 75.  The Court reviewed and accepted Dr. Rosenthal's testimony:

> The easy part of the analysis was linking national data on Pfizer's promotional spending with sales. Dr. Rosenthal explained that "the standard practice in these types of analyses is to use aggregate data and statistical approaches to link patterns in promotional spending to patterns in prescribing for the drug."

*Id.*  To perform her analysis, Dr. Rosenthal used "gold standard" national data on Neurontin and other antiepileptic drugs from IMS Health and Verispan.  She then calculated percentages of affected prescriptions applicable to Kaiser, based on the reasonable assumptions that Kaiser's patient population and physician distribution were similar to the national mix for TPPs, including Aetna.  *Id.* at 76.  The Court accepted Dr. Rosenthal's methodology despite the Defendants' objections:

> Defendants criticize Professor Rosenthal's analysis because it assumes that the promotional spending on off-label marketing was the same as the promotional spending on fraudulent off-label marketing.  This leap is less obvious because, in some circumstances, off-label marketing can be truthful.  However, based on the compelling evidence in this case, I conclude that the <u>assumption is reasonable, given the pervasive nature of the publication fraud that infected the nationwide sources of information available to all physicians</u>, including PMG physicians, and to Kaiser's DIS. I find that Pfizer designed the national strategy of off-label marketing (by promotional spending on detailing doctors and sponsorship of CME conferences) to implement its fraudulent publication strategy.

*Id.* at 77 (emphasis added).

Aetna respectfully contends that Dr. Rosenthal's analysis, which was acceptable for Kaiser to meet its "burden of proving causation" at trial, must likewise be considered a "reliable

methodology to calculate the percentage of the doctors who prescribed Neurontin based on Defendants' alleged fraud" for Aetna to prove causation and damages to a jury under the alternative causation requirement set forth in the Court's memorandum granting summary judgment.  Findings at 75, Mem. at 27.

E.     **THE COURT'S DISTINCTION BETWEEN THE VIABILITY OF AETNA'S CLAIMS AND KAISER'S CLAIMS BASED UPON WHETHER AETNA HAD "DIRECT COMMUNICATIONS" WITH DEFENDANTS OVERLOOKED CONTRARY CONTROLLING LAW**

The Court's holding that Aetna's claims could not proceed to trial because it did not present its evidence of <u>direct</u> communications with Defendants concerning off-label Neurontin is contrary to law.  In particular, Aetna's claims of payment for Neurontin for bipolar conditions is clearly outside the ambit of the direct communication theory.  This issue is currently being revisited by the Court in connection with the class plaintiffs' motion for reconsideration of the Court's denial of class certifications.  *See Motion For Reconsideration of Memorandum & Order Denying Renewed Motion For Class Certification.* (Docket no. 1796).  That motion has been set for hearing on March 31, 2011, and Aetna's instant reconsideration motion should be considered alongside that motion.

In dismissing Aetna's claims, the Court concluded that it was constrained (or persuaded) to follow a short line of cases from outside this circuit purportedly holding that in pharmaceutical marketing cases, courts cannot accept aggregate evidence to show the impact of a defendant's marketing on a drug's sales.  However, this is not the law of this circuit.

The First Circuit does permit such use of aggregate evidence.  *See In re AWP*, 582 F.3d at 160.  The First Circuit endorsed the use of aggregate proof – that is, a statistical damages

model.  Moreover, courts routinely rely on aggregate statistical data to prove causation and damages in pharmaceutical litigation.[5]

The four contrary district court decisions cited by this Court were all <u>pleading</u> decisions by trial courts outside the First Circuit and have no persuasive force.  In *Ironworkers Local Union No. 68 v. AstraZeneca Pharms. LP*, 585 F. Supp. 2d 1339 (M.D. Fla. 2008) ("*Seroquel*") the court dismissed on Rule 12(b)(6) grounds RICO claims regarding misrepresentations of the comparative safety, efficacy and superiority of the atypical antipsychotic Seroquel.  Basing its ruling on the sole ground that the plaintiffs failed to adequately allege the first of the three *Holmes* factors for RICO proximate cause, the court, without citing any authority, *simply assumed* that the only way to prove the impact of pharmaceutical marketing on a discernable level of drug sales is by asking each doctor, one doctor at a time.  *Seroquel* contains no discussion, let alone ruling, regarding the appropriate use of statistical, econometric or other forms of aggregate proof.  The *Seroquel* ruling is simply *an assumption* about what might happen, unaided by legal citation, description of appropriate methods of proof, or any solution regarding widespread use of healthcare economics to discern the impacts of pharmaceutical marketing.[6]

In *In re Actimmune Mktg. Litig.*, 614 F. Supp. 2d 1037 (N.D. Cal. 2009) ("*Actimmune*"), appeal docketed, *Government Employees Health, et al v. InterMune Inc., et al.*, 10-17237 (9th

---

[5] *See In re Zyprexa Prod. Liab. Litig.*, 671 F. Supp. 2d 397, 413 (E.D.N.Y. 2009), *rev'd on other grounds*, *UFCW Local 1776 v. Eli Lilly and Co.*, 620 F.3d 121 (2d. Cir. 2010)  (acknowledging experts reliance on IMS data); *In re: Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 342 (E.D. Mich. 2001) (discussing IMS prescription drug data); *In re: Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 685 n.20 (S.D. Fla. 2004) (relying on statistical model and IMS data).

[6] Although this Court did not cite it for this proposition, the District of New Jersey issued a similarly perplexing and groundless decision in *District 1199P Health & Plan v. Janssen, L.P.*, No. Civ. A 07-2608, 2008 WL 5413105 (D.N.J. Dec. 23, 2008) ("*Risperdal*").  There, the same lawyers pursuing the *Seroquel* case, involving one atypical antipsychotic, brought similar claims against Janssen for another atypical antipsychotic: Risperdal.  The court ruled that the allegations failed to plead injury with the result that the court recognized it "need not address causation more fully," cited *Seroquel* and made the observation that it "has a substantial question" as to whether *Holmes* proximate causation could be satisfied or that "individualized decision-making of physicians prescribing Risperdal breaks any chain of causation…"  *Risperdal*, 2008 WL 5413105, at *9.

Cir. Oct. 6, 2010), the court in dismissing the RICO and state law claims under Rule 12(b)(6) for failure to allege causation, relied on the *Seroquel* decision and the new Rule 12(b)(6) standard outlined in the Supreme Court's decision in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).  The *Actimmune* decision does not elucidate why doctor-by-doctor proof is necessary if, as the plaintiffs argued, they can allege, prove, and quantify a significant and measurable impact on Actimmune sales in the aggregate.  But for third party payer claims, the *Actimmune* court gave no citation to any examples of why such specific doctor-by-doctor proof was necessary and relied on no cases in holding doctor-by-doctor proof necessary save *Seroquel*.

The *Actimmune* ruling cannot be said to be a rejection of proof by statistical, econometric or other aggregate means, since it contains is no discussion of such proof.  It is also inconsistent with the rulings of this Court in prior *Neurontin* decisions.  *See, e.g.*, *Neurontin 2009*, 257 F.R.D. at 331 (noting the evidence and aggregate model "could support a conclusion that a fraud had been perpetrated on the entire prescription market"); *In re Neurontin Mktg. & Sale Practices Litig.*, 244 F.R.D. 89, 111 (D. Mass. 2007) ("*Neurontin 2007*") (*holding* "Professor Rosenthal's proposed methodology is a plausible way of determining aggregate class-wide liability, and defendants have identified no fundamental flaws now appearing in her proposal to calculate aggregate damages."); *Id*. at 114 (*writing* "This case is troublesome because defendants allegedly used a national marketing scheme to promote a fraud.  If true, they should not get off scot-free if there is a practical statistical way to address the difficult causation issues.  Plaintiffs claim that Dr. Rosenthal's model can prove what the effect of any fraudulent promotional campaign for an off-label indication was.  If only a *de minimis* number of doctors prescribed Neurontin for an off-label condition, and then off-label prescriptions skyrocketed after a fraudulent campaign for that

indication (*i.e.*, migraines or bipolar), the Court will consider statistical proof as sufficient to demonstrate that most purchasers in that period were injured.").

In *Southern Illinois Laborers' & Emplrs. Health & Welfare Fund v. Pfizer Inc.*, No. 08 CV 5175, 2009 WL 3151807 (S.D.N.Y. Sept. 30, 2009) ("*Lipitor*") plaintiffs posited several theories of causation, including one of flawed physician decisions.  The full presentation of the court's rejection of this theory follows:

> The first theory of causation is that the alleged overpayment for patients' cholesterol treatment was caused by Defendant's fraudulent misrepresentations to physicians regarding the efficacy and safety of Lipitor as compared to alternative cholesterol therapies.  Plaintiffs contend that Defendant made these misrepresentations to physicians in general, and as a result of these misrepresentations, Plaintiffs had to pay for Lipitor rather than cheaper statins or non-drug therapies for treating high cholesterol.
>
> Implicit in Plaintiffs' theory of causation is the claim that physicians relied upon Defendant's misrepresentations when they decided to prescribe Lipitor instead of other cholesterol-lowering treatments.  However, Plaintiffs do not explicitly allege that physicians in fact relied on Defendant's misrepresentations.
>
> Plaintiffs do not cite a single instance in which a physician received the fraudulent information and decided to prescribe Lipitor based on the information she received.  <u>Plaintiffs do not even explicitly allege the more general claim that physicians in general relied on Defendant's misrepresentations.</u>  Accordingly, this causation argument fails as currently pled.

2009 WL 3151807, at *5-6 (emphasis added).  Like the *Actimmune* court, the *Lipitor* court engaged in no discussion of aggregate evidence at all, simply dismissing the case on a Rule 12(b)(6) motion for a failure to plead a required element of the claim correctly.

Finally, this Court looked to *In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, 2:06-CV-5774(SRC), 2009 WL 2043604 (D.N.J. July 10, 2009) ("*Intron/Temodar*"), in which the District of New Jersey dismissed a complaint for failure to allege both injury and causation.  In *Intron/Temodar*, as to injury, the court ruled plaintiffs "failed to plead that the Subject Drugs were ineffective."  2009 WL 2043604, at *12.  In so

ruling, the court specifically noted that the case before it differed substantially from that faced by this Court in the *Neurontin* litigation, and it approved of this Court's *Neurontin* approach to requiring proof of inefficacy.  *Id.*

Of the four cases cited by this Court regarding causation, only *Intron/Temodar* addresses the issue of the use of statistical modeling.  In concluding on a 12(b)(6) ruling that plaintiffs "may not prove causation by way of generalized proof . . . ", *id.* at *25, the court cited *Seroquel* and *Risperdal*.  *See supra* n.1 for discussion of *Risperdal*.  But, as we have seen, neither *Seroquel* nor *Risperdal* presented any legal authority or analysis of the use of statistical or other aggregate evidence by which plaintiffs might compellingly demonstrate with accuracy the extent of pharmaceutical marketing on drug sales.  The *Intron/Temodar* decision failed to explain why the use of statistical and econometric modeling may not work in the factual circumstances presented, let alone why such modeling should be rejected for all drug cases regardless of the facts.

None of the pleadings decisions cited by this Court in support of its holding that Aetna needed to show individualized evidence of reliance through direct communications with Defendants explained why the use of statistical and econometric modeling or aggregate evidence would have been insufficient to prove the impact of drug marketing on drug sales.  Neither RICO nor any rule of civil procedure or evidence bars the use of such evidence.

This Court cited a trio of circuit court cases for the proposition that Plaintiffs must be able to "segregate[] damages caused by unlawful conduct from damages caused by lawful conduct."  Mem. at 27 (citing *U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1378-79 (2d Cir. 1988), *Farley Transp. Co., Inc. v. Santa Fe Trail Transp. Co.*, 786 F.2d 1342, 1352 (9th Cir. 1985), and *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1162-63 (7th Cir. 1982)).  No one contests this simple proposition of law.  However, none of these

decisions held that aggregate evidence may be used to segregate lawful, from unlawful, consequences and they suggest the opposite.

In *Farley*, the court commented upon the plaintiff's "utter failure to make any segregation between damages attributable to lawful competition and that attributable to the unlawful scheme." 786 F.2d at 1352. There is nothing to suggest that, in so noting, the Ninth Circuit required Farley to trudge every shipping customer into court in order to explain why it was attracted to the Santa Fe Trail Transportation Company rather than Farley. Instead, the court described generally that the plaintiff would need "an initial showing that material savings were in fact provided to those customers," and that "the next step, then, would be presentation of evidence that those savings, attributable to the unlawful scheme, were the impetus for the diversion of customer business…" *Id*. In *Farley*, the plaintiff failed to produce any form of aggregate evidence. The Ninth Circuit did not opine that aggregate evidence is inappropriate in order to discern damages attributable to defendant's conduct and that which was not. *Id*.

Similarly, in *MCI*, the plaintiff's damages preparation had assumed that all twenty-two alleged claims against AT&T were illegal. In fact, only seven of the twenty-two were so proven, 708 F.2d at 1092, and so MCI's lost profits blended lost profits proof was unacceptable. *Id*. at 1162-63. But nothing in the Seventh Circuit's opinion suggests the court required MCI to prove its lost profits through customer-by-customer inquiries into the impact of the pricing policies of AT&T. Rather, the Seventh Circuit noted that because the damages calculation that assumed all twenty-two acts were illegal, "the jury was left with no way to adjust the amount of damages to reflect lawful competition from AT&T." *Id*. at 1163. Again, the court's analysis suggests that aggregate evidence of lost profits, so long as it is reasonably attributable to the particular illegal pricing policies, would be appropriate to prove lost profits or other form of damages reasonably

attributed to the defendants' conduct as opposed to other activities.  There is nothing in *MCI* to support the notion that aggregate evidence cannot be used to prove damages for drug cases, telephone cases, or any other kind of case.

*U.S. Football* leads to the same result.  842 F.2d at 1378-79.  There, the Second Circuit upheld a jury charge that permitted the jury to award no damages or $1 if they found that they could not "separate out the amount of losses caused by [NFL misconduct] from the amount caused by other factors…" 842 F.2d at 1378.  The United States Football League, which alleged unlawful monopolization through a variety of activities by the NFL, presented damages evidence based upon all of the alleged misconduct, but failed to disaggregate its evidence within the different buckets of alleged wrongdoing by the NFL.  *Id.*  Again, nothing in the Second Circuit's opinion suggests it required United States Football League to prove its damages one football fan at a time.

Here, these problems were not present and Dr. Rosenthal's methodology was accepted by the Court in its findings from the Kaiser trial.

## **CONCLUSION**

The claims of Aetna were not legally or factually different in any material way from those of its co-Plaintiff Kaiser such that Kaiser's claims were allowed to proceed to trial and Aetna's claims were dismissed.  The Court should reconsider and grant Aetna relief from judgment so that Aetna may have the same opportunity as Kaiser did to prove its claims at trial.

Dated:  March 9, 2011

LOWEY DANNENBERG COHEN
&  HART, P.C.


BY:   **/s/ Gerald Lawrence**
          Richard W. Cohen
          Gerald Lawrence
          One North Broadway
          White Plains, NY  10601
          (914) 997-0500 – Telephone
          (914) 997-0035 – Facsimile

**_Attorneys for Aetna, Inc._**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management #3 on March 9, 2011.

/s/ Gerald Lawrence