UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| **IN RE NEURONTIN MARKETING,** ) | |
| **SALES PRACTICES, & PRODUCTS** ) | |
| **LIABILITY LITIGATION** ) | MDL NO. 1629 |
| ) | |
| ) | |
| **THIS DOCUMENT RELATES TO:** ) | CIVIL ACTION NO. 04-10981-PBS |
| ALL PRODUCTS LIABILITY ACTIONS ) | |
| ) | |

**MEMORANDUM AND ORDER**

March 18, 2011

Saris, U.S.D.J.

In these products liability cases, plaintiffs allege that
they, or their decedents, suffered suicide-related injuries when
their doctors prescribed the drug Neurontin, manufactured by
defendants Pfizer and Warner-Lambert Company.[1] Specifically,
they allege that Neurontin caused suicidal behavior. The generic
name for Neurontin is gabapentin.

Plaintiffs have filed a motion to partially exclude the
testimony of defendants' expert, Dr. Robert Gibbons, regarding
his study of gabapentin's effect on the risk of suicide attempts
(Docket No. 2121). They previously challenged Dr. Gibbons's
proposed testimony more broadly, but in <u>Daubert</u> hearings on July
21, July 23, and August 28, 2009, the Court denied the motion to

---

[1] Pfizer acquired Warner-Lambert in 2000. Defendants will be
referred to collectively as Pfizer.

exclude Dr. Gibbons's testimony regarding his opinions related to the FDA Safety Alert and Statistical Analysis of eleven anti-epileptic drugs (including gabapentin) and his opinions put forth in his peer-reviewed, published article regarding those eleven drugs and bipolar disorder. Accordingly, this opinion addresses only those issues raised in Dr. Gibbons's March 19, 2009 and January 5, 2010 supplemental reports.

After a hearing and a review of the voluminous record and briefing, plaintiffs' motion is **DENIED**.

## I. BACKGROUND

This Court has written extensively on various issues related to this large multi-district litigation, including an extensive opinion denying defendants' Daubert motion to exclude plaintiffs' causation experts. See In re Neurontin Mktg., Sales Practices & Prods. Liab. Litig., 612 F. Supp. 2d 116 (D. Mass. 2009). The Court assumes the parties' familiarity with the scientific background and facts of this case.

## A. FDA Alert and Statistical Analysis

In support of their products liability claims, plaintiffs trumpet a study conducted by the FDA that contains epidemiological data supporting their experts' theories of general causation. In early 2005, the FDA initiated an inquiry into whether the use of antiepileptic drugs ("AEDs") led to an elevated risk of suicidality, defined as suicidal behavior or

-2-

ideation. After collecting data from manufacturers, the FDA
conducted a meta-analysis, analyzing reports of suicidality from
199 placebo-controlled clinical studies covering eleven different
AEDs, including Neurontin (gabapentin). The meta-analysis
included 27,863 patients treated with an AED and 16,029 patients
in placebo groups.

On January 31, 2008, the FDA issued an Alert entitled
"Information for Healthcare Professionals - Suicidality and
Antiepileptic Drugs" ("FDA Alert"), stating: "[P]atients
receiving antiepileptic drugs had approximately twice the risk of
suicidal behavior or ideation . . . compared to patients
receiving placebo." See 612 F. Supp. 2d at 134. The Alert
reported that the increased risk of suicidal behavior or ideation
was "statistically significant," and noted that "[f]our of the
patients who were taking one of the antiepileptic drugs committed
suicide, whereas none of the patients in the placebo group did."
Id. The Alert also reported that patients treated for epilepsy,
psychiatric disorders, and other conditions "were all at
increased risk for suicidality when compared to placebo," stating
that there "did not appear to be a specific demographic subgroup
of patients to which the increased risk could be attributed" and
that the "results were generally consistent among the eleven
drugs." Id. The Alert advised that all patients treated with
AEDs should be monitored closely for depression and suicidality

and other unusual changes in behavior, explaining that "[s]ymptoms such as anxiety, agitation, hostility, mania and hypomania may be precursors to emerging suicidality." Id.

In May 2008, the FDA released a "Statistical Review and Evaluation" describing the methodology and analysis it used in evaluating the collected data. The Statistical Review's Executive Summary states: "[A]ntiepileptic drugs are associated with increased risk of suicidality relative to placebo in randomized placebo-controlled trials. The effect appears consistent among the group of 11 drugs." The review also revealed that the eleven drugs had been divided into three subgroups chosen by the medical officers from the FDA's Division of Neurology. Gabapentin, along with four other drugs, was placed within the GABAergic and GABAmimetic drug group. Id. at 135. When tested by drug group, the GABAergic/GABAmimetic group[2] demonstrated a statistically significant association with increased risk of suicidal behavior or ideation. Id.

On December 16, 2008, the FDA announced that it had completed its analysis and, based on the outcome of its review, would require all manufacturers of antiepileptic/anticonvulsant drugs to include a warning in their labeling and to inform

---

[2] GABA refers to gamma-aminobutyric acid, which is a neurotransmitter in the human body. Neurons that produce GABA are called "GABAergic" neurons. Accordingly, drugs that have the effect of increasing the amount of GABA in the body are known as GABAergic or GABAmimetic drugs. Neurontin, or gabapentin, is a GABAergic/GABAmimetic drug.

-4-

patients of the risks of suicidal thoughts and actions. The FDA stated that the general consistency of results among drugs with "varying mechanisms of action and across a range of indications suggests that the risk applies to all antiepileptic drugs used for any indication."

After these findings were issued, Neurontin's label was revised and now contains an extensive seven paragraph warning, detailing the results of the meta-analysis and stating, inter alia:

> **Suicidal Behavior and Ideation**
> Antiepileptic drugs, including Neurontin, increase the risk of suicidal thoughts or behavior in patients taking these drugs for any indication. Patients treated with any AED for any indication should be monitored for the emergence or worsening of depression, suicidal thoughts or behavior, and/or any unusual changes in mood or behavior . . . . The risk of suicidal thoughts or behavior was generally consistent among drugs in the data analyzed.

(Neurontin Label, April 23, 2009, at 10.) The label also contains a section discussing information that should be provided to patients:

> Patients, their caregivers, and families should be counseled that AEDs, including Neurontin, may increase the risk of suicidal thoughts and behavior and should be advised of the need to be alert for the emergence or worsening of symptoms of depression, any unusual changes in mood or behavior, or the emergence of suicidal thoughts, behavior, or thoughts about self-harm . . . . Patients should be advised that Neurontin may cause dizziness, somnolence and other signs of [central nervous system] depression.

(Id. at 13.)

## B.   Dr. Gibbons's Research

Robert D. Gibbons, Ph.D. is the Director of the Center for Health Statistics and Professor of Biostatistics and Psychiatry at the University of Illinois at Chicago. Dr. Gibbons is one of a handful of statisticians worldwide who have been elected to the Institutes of Medicine of the National Academy of Sciences, and he is the recipient of numerous awards, including the Harvard Award for lifetime contributions to the field of Psychiatric Epidemiology and Biostatistics. He has served as a member on the Institute of Medicine Committee on the Prevention of Suicide and on the FDA Scientific Advisory Committee on Suicide and Antidepressants in Children. He has authored hundreds of peer-reviewed papers and several books.

Dr. Gibbons was originally designated by defendants as an expert to provide testimony on the FDA Safety Alert and Statistical Analysis. He has subsequently performed two pharmacoepidemiological studies that were disclosed to plaintiffs in November 2008. Pharmacoepidemiology is the study of the use and effects of drugs on large groups of people. The first study, which is referred to as the "bipolar study," was published in the Archives of General Psychiatry in 2009. See Robert D. Gibbons et al., "Relationship Between Antiepileptic Drugs and Suicide Attempts in Patients with Bipolar Disorder," 66 Archives Gen. Psychiatry 1354 (2009). The second study, referred to as

the "gabapentin study," was recently published in the journal
Pharmacoepidemiology and Drug Safety in December 2010. Robert D.
Gibbons et al., "Gabapentin and Suicide Attempts," 19
Pharmacoepidemiology & Drug Safety 1241 (2010) (filed with the
Court at Docket No. 3113, Ex. O). Both journals are peer-
reviewed.

Both studies were derived from a patient claims database
purchased from PHARMetrics covering 131,178 gabapentin patients,
including 47,918 bipolar patients.[3]

The bipolar study compared suicide attempts by bipolar
patients during one year before and one year after they first
took one of the eleven AEDs. The broader gabapentin study

_____

[3] While double-blind randomized controlled trials (DBRCT) are the
"gold standard" in assessing the effects of drugs, scientists do
not use DBRCTs to directly study suicidality caused by drugs due
to obvious moral and ethical issues. Instead, suicidality is
usually assessed through observational studies, like the
pharmacoepidemiological studies used by Dr. Gibbons or through
meta-analyses of DBRCTs designed to study drug effects other than
suicidality. See In re Neurontin, 612 F. Supp. 2d at 125-26
("[DBRCTs] are often used to evaluate new drugs or medical
treatments, but because ethical constraints preclude exposing
human subjects to agents believed to cause adverse effects, these
experimental studies cannot be undertaken to investigate a
suspicion that a drug increases the risk of suicide.") (citing
Giles v. Wyeth, 500 F. Supp. 2d 1048, 1058 (S.D. Ill. 2007)); see
also Tucker v. SmithKline Beecham Corp., 701 F. Supp. 2d 1040,
1060-61 (S.D. Ind. 2010) ("For practical and ethical reasons,
suicidality itself has rarely if ever been studied in large,
randomised placebo-controlled double-blind epidemiological
studies. The trials upon which the FDA based its 2006 meta-
analysis were not designed to specifically detect suicidality.")
(internal quotation marks and citations omitted); Giles, 500 F.
Supp. 2d at 1058 ("Suicide presents researchers seeking to study
it with both ethical and practical difficulties.").

-7-

compared suicide attempts by patients diagnosed with any of
several psychiatric or pain conditions during one year before and
one year after first taking Neurontin. The data does not include
suicidal ideation. The database included suicide attempts by
poisoning, hanging, drowning, firearms, cutting, jumping and
other self-inflicted injuries. (Jan. 2010 Gibbons Report ¶ 12.)
In contrast, the FDA addressed an increased risk of suicidal
thoughts or behavior. In Dr. Gibbons' view, "Suicide attempts
are a far more serious form of suicidality than suicidal
ideation, which forms the majority of events in FDA's analysis."
(Id. ¶ 25.)

## 1. The Published Bipolar Study

The bipolar study was a pharmacoepidemiological study in
which suicide attempt rates in patients with bipolar disorder
were compared before and after monotherapy treatment with AEDs or
lithium and with a medication-free control group.

The study found that the rate of suicide attempts was lower
for the bipolar patient group that received AED treatment (or
lithium) as compared to the patient group receiving no treatment.
The study also noted that those bipolar patients who were treated
with an AED exhibited lower rates of suicide attempts after they
began treatment when compared to their pretreatment phase. The
published paper cautioned that

> [d]rawing causal inference from observational data is
> complicated in general, but even more complicated for

-8-

the study of suicide. First, suicide and [suicide
attempts] are rare events, and their determinants are
difficult to estimate precisely in all but the largest
samples. Second, suicide is related to the indication
for treatment (ie, a psychiatric disorder) and is
therefore difficult to separate from the possible
effects of treatment. Third, [a suicide attempt] can
lead to identification of the psychiatric disorder,
which can, in turn lead to treatment. . . . Fourth,
the natural course of psychiatric illnesses exhibits a
decrease in [suicide attempts] over time from
diagnosis. This can make it appear that the [suicide
attempt] rate is higher prior to treatment initiation
than after, giving the false appearance of a protective
effect.

Gibbons, et al. 2009 at 1358. Despite this caveat, the paper

goes on to state, "This study reveals that AEDs do not increase

the risk of [suicide attempts] relative to patients not treated

with an AED or lithium."

Dr. Gibbons performed various "sensitivity" analyses on his

primary model to test the robustness of his results. In his

paper, he wrote that these sensitivity analyses "revealed that

our findings were robust to duration of treatment, defined as

duration of 30 days or more, or defined on a monthly basis."

## 2. The Published Gabapentin Study

The purpose of Dr. Gibbons's gabapentin study was to

determine if gabapentin increases risk of suicide attempts across

various medical diagnoses. The study compared suicide attempt

rates one year before and one year after gabapentin was

prescribed to patients. The study included patients with

diagnoses of epilepsy, pain disorders, bipolar disorder, major

-9-

depressive disorder, schizophrenia, and other psychiatric illnesses.

The version of Dr. Gibbons's study published in December 2010[4] in the journal Pharmacoepidemiology and Drug Safety found that there was no significant difference in suicide attempt rates before versus after patients received gabapentin prescriptions.

Because pre-treatment suicide attempt rates were five times higher in psychiatric populations compared with non-psychiatric populations, Dr. Gibbons analyzed the two groups separately. In the non-psychiatric patient population, no drug effect (either harmful or protective) was found. "However, among patients with a psychiatric disorder, who are at increased suicidal risk, statistically significant decreases in the rate of [suicide attempts] were observed following gabapentin prescription. . . . These findings suggest that among those patients at increased risk of [suicide attempts], gabapentin may have a protective effect." (Emphasis added.) The study concluded that its findings "reveal that in this cohort of over 130,000 patients treated with gabapentin, there is no overall increased risk of [suicide

---

[4] While the print issue of the journal in which the article was published came out in December 2010, the article was available online by October 3, 2010. (See Docket No. 3113.)

attempt] associated with gabapentin."    (<u>See</u> Docket No. 3113, Ex.
O.)

## 3. March 2009 Supplemental Expert Report[5]

In March 2009, Dr. Gibbons provided the litigants in this
case with a report supplementing his previous opinions about
gabapentin, and describing his second pharmacoepidemiologic
study, the gabapentin study. At the time he issued this
supplemental report, the gabapentin study had not been accepted
for publication by a peer-reviewed journal.

The March 2009 expert report describes the results of the
gabapentin study in similar language to that used in the above-
described paper eventually published in the peer-reviewed journal
Pharmacoepidemiology and Drug Safety in 2010. In the report, Dr.
Gibbons states that

> These findings clearly reveal that in this cohort of
> over 130,000 patients treated with gabapentin, there is
> no overall increased risk of suicide attempt associated
> with gabapentin treatment. Gabapentin does not
> increase the likelihood of suicide attempts, and the
> suicide attempts considered here were of sufficient
> severity to make it into the medical record. However,
> among patients with a psychiatric disorder, who are at
> increased suicidal risk, statistically significant
> protective effects of gabapentin were clearly
> demonstrated.

(Mar. 2009 Gibbons Report ¶ 17.) He does mention one critical
caveat to these assertions: "Whether this protective effect is
based on reducing the symptoms of the psychiatric disorder or by

---

[5] By agreement of the parties, Dr. Gibbons was deposed about his
March 2009 supplemental report on April 27, 2009. (See Docket
No. 2121, Ex. 1D.)

-12-

treating the concomitant pain disorder that is present in many of these patients remains an open question."  (Id.)

In addition, while the gabapentin study was limited to suicide attempts, Dr. Gibbons expanded his conclusion to encompass suicidal ideation as well, stating "that there is no increased risk of suicidal thinking and behavior overall."  (Mar. 2009 Gibbons Report ¶ 21.)

## 4.   January 2010 Supplemental Report[6]

On January 5, 2010, Dr. Gibbons provided the Court with another supplemental report describing additional sensitivity analyses performed to test the results of his gabapentin study.

The thrust of the supplemental report was the description of a series of sensitivity analyses that were "conducted to determine the robustness of the findings of the primary analysis to changes in model specifications and assumptions underlying the analysis."  (Jan. 2010 Gibbons Report ¶ 19.)  Of particular interest to this case are those sensitivity analyses that purported to address concerns raised by plaintiffs' expert, Dr. Sander Greenland, about the gabapentin study.  Dr. Greenland had raised a concern earlier in this case that Dr. Gibbons's study did not address the question of whether or not a patient was

---

[6]   Because of the pending trial in Shearer v. Pfizer, the Court did not allow further depositions in connection with this supplemental report, although defendants were ordered to provide plaintiffs with the raw data underlying this new report so that their expert could respond to the supplementation on the merits. (See Hr'g Tr. 6-7, Feb. 17, 2010.)

-13-

actually taking gabapentin during the entire year for which data was collected. The new sensitivity analysis adjusted the original data for the months that a patient filled a gabapentin prescription and the months that the patient did not fill the gabapentin prescription, as opposed to assuming a patient was using gabapentin for twelve months if she filled one prescription during that year. The supplemental report stated that this new sensitivity analysis corroborated the study's initial conclusions.

### 5. Criticisms by Dr. Sander Greenland

Plaintiffs' expert, Dr. Sander Greenland, is equally impressive. He is a Professor of Epidemiology at the UCLA School of Public Health and Professor of Statistics at the UCLA College of Letters and Science. He co-authored the textbook Modern Epidemiology, which is used in numerous schools of public health and medicine and has been cited in peer-reviewed journals along with the Federal Judicial Center's Reference Manual on Scientific Evidence. Dr. Greenland has authored hundreds of peer-reviewed articles and has served in leadership positions on both the Society for Epidemiologic Research and the American Statistical Association, both the largest societies in the world in their fields. He is also a member of the FDA's Drug Safety and Risk Management Advisory Committee.

Dr. Greenland challenges the conclusions about causation

that Dr. Gibbons draws from the PharMetrics data disclosed in the

January 2010 report. Dr. Greenland's primary attack turns on the

difference between the terms "association" and "causation."

Scientists recognize that

> an association is not equivalent to causation. . . .
> The term [association] is used to describe the
> relationship between two events . . . that occur more
> frequently together than one would expect by chance.
> Association does not necessarily imply a causal effect.
> Causation is used to describe the association between
> two events when one event is a necessary link in a
> chain of events that results in effect. Of course,
> alternative causal chains may exist that . . . result
> in the same effect.

Michael D. Green et al., "Reference Guide on Epidemiology," in

Reference Manual on Scientific Evidence 333, 336, 336 n.8 (Fed.

Judicial Ctr. 2d ed. 2000). Noting this important difference

between association and causation, Dr. Greenland writes that

> Dr. Gibbons relies entirely on conventional statistical
> methods to support his causal conclusions from his
> nonrandomized, observational database studies. While
> these methods sometimes suffice to summarize possibly
> noncausal associations seen in such studies, they do
> not and cannot address the uncertainties arising from
> the methodologic problems in those studies and the
> logical gaps between association and causation
> (especially when dealing with potential causes that are
> neither necessary nor sufficient for the outcome).

(Mar. 2010 Greenland Report at 1.) In other words, Dr. Greenland

believes that Dr. Gibbons's findings should be characterized in

terms of "associations" between gabapentin and risk of suicide

attempt, as opposed to causal inferences.

Second, Dr. Greenland criticizes the gabapentin study for

failing to adjust the data for all other medications that might

have been taken by patients in conjunction with gabapentin. While the gabapentin study did account for many concomitant medications, including other AEDs and antidepressants, the data did not control for "most tranquilizers (anxiolytics) such as Xanax, Ambien, and most benzodiazepines; Ritalin, Adderal, and other stimulants; appetite suppressants; most hypnotics; and Oxycontin, Vycodin, and other strong analgesics." Dr. Greenland also pointed out that the study did not account for "the use of nonprescription psychoactive agents such as alcohol." (Id.) It also did not control for psychotherapy treatment after a suicide attempt.

Dr. Greenland also criticizes Dr. Gibbons' new sensitivity analysis because he claims that the new report does not

provide analyses with an exact determination of whether an individual was on or off a drug at the time of a suicide attempt referenced in his analysis. Rather, the analyses presented by Dr. Gibbons determine whether the individual was on or off the drug within the month of the suicide attempt listed in the data. If the individual was taking the drug for even one day during the month, or never used the prescription, Dr. Gibbons considers that person to be on the drug for the entire month at issue.

(Mar. 2010 Greenland Report at 2.) Indeed, Dr. Greenland claims that "there is no way to determine from the data he actually presents whether his failure inflated or deflated his estimates of gabapentin effect." (Id.)

## II. DISCUSSION

### A. The Court's Gatekeeping Role

The admission of expert evidence is governed by Federal Rule of Evidence 702, which codified the Supreme Court's holding in Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993), and its progeny. See United States v. Diaz, 300 F.3d 66, 73 (1st Cir. 2002); see also Fed. R. Evid. 702 advisory committee's note. Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

The trial court must determine whether the expert's testimony "both rests on a reliable foundation and is relevant to the task at hand" and whether the expert is qualified. Daubert, 509 U.S. at 597; Diaz, 300 F.3d at 73 ("[A] proposed expert witness must be sufficiently qualified to assist the trier of fact, and . . . his or her expert testimony must be relevant to the task at hand and rest on a reliable basis . . . ."). An expert's methodology is the "central focus of a Daubert inquiry," but a court "may evaluate the data offered to support an expert's bottom-line opinions to determine if that data provides adequate support to mark the expert's testimony as reliable." Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co., 161 F.3d 77, 81 (1st Cir.

1998); see Bonner v. ISP Techs., Inc., 259 F.3d 924, 929 (8th Cir. 2001) (deeming it clear that "it is the expert witnesses' methodology, rather than their conclusions, that is the primary concern of Rule 702" and stating that a court cannot exclude testimony asserting a "novel" conclusion if the methodology and its application are reliable).

Because "the admissibility of all expert testimony is governed by the principles of Rule 104(a)," the proponents of the expert testimony must establish these matters by a preponderance of the evidence. Fed. R. Evid. 702 advisory committee's note (citing Bourjaily v. United States, 483 U.S. 171 (1987)). "The proponent need not prove to the judge that the expert's testimony is correct, but she must prove by a preponderance of the evidence that the testimony is reliable." Moore v. Ashland Chem. Inc., 151 F.3d 269, 276 (5th Cir. 1998).

Daubert itself listed four factors that should guide judges in this determination: (1) whether the theory or technique can be and has been tested; (2) whether the technique has been subject to peer review and publication; (3) the technique's known or potential rate of error; (4) the level of the theory's or technique's acceptance within the relevant discipline. United States v. Mooney, 315 F.3d 54, 62 (1st Cir. 2002) (citing Daubert, 509 U.S. at 593-94). "These factors, however, are not definitive or exhaustive, and the trial judge enjoys broad latitude to use other factors to evaluate reliability." Mooney,

315 F.3d at 62 (citing Kumho Tire, 526 U.S. at 153); see United States v. Vargas, 471 F.3d 255, 261 (1st Cir. 2006) ("The trial court enjoys broad latitude in executing its gate-keeping function; there is no particular procedure it is required to follow."); Hollander v. Sandoz Pharm. Corp., 289 F.3d 1193, 1206 (10th Cir. 2002) (noting that "different courts relying on essentially the same science may reach different results" when evaluating evidence under Daubert).

In Kumho Tire, the Supreme Court was careful to emphasize that the trial judge must exercise her gatekeeping role with respect to all expert evidence, but that how she might exercise that role would necessarily vary depending on the type of testimony at issue. See Kumho Tire, 526 U.S. at 150; United States v. Frazier, 387 F.3d 1244, 1262 (11th Cir. 2004) ("Exactly how reliability is evaluated may vary from case to case, but what remains constant is the requirement that the trial judge evaluate the reliability of the testimony before allowing its admission at trial."); Amorgianos v. Amtrak, 303 F.3d 256, 266 (2d Cir. 2002) (recognizing that "the Daubert inquiry is fluid and will necessarily vary from case to case").

Under Kumho Tire, the critical inquiry is whether the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." 526 U.S. at 152; Rider v. Sandoz Pharm. Corp., 295 F.3d 1194, 1197 (11th Cir. 2002). When, for example, "the factual

-19-

basis of an expert's testimony is called into question, the
district court must determine whether the testimony has 'a
reliable basis' in light of the knowledge and experience of the
relevant discipline." Crowe v. Marchand, 506 F.3d 13, 17 (1st
Cir. 2007) (quoting Kumho Tire, 526 U.S. at 148).

The Court's vigilant exercise of this gatekeeping role is
critical because of the latitude given to expert witnesses to
express their opinions on matters about which they have no
firsthand knowledge, and because an expert's testimony may be
given substantial weight by the jury due to the expert's
background and approach. See Daubert, 509 U.S. at 595; Kumho
Tire, 526 U.S. at 148 (noting that experts enjoy "testimonial
latitude unavailable to other witnesses"); United States v.
Hines, 55 F. Supp. 2d 62, 64 (D. Mass. 1999) ("[A] certain patina
attaches to an expert's testimony unlike any other witness; this
is 'science,' a professional's judgment, the jury may think, and
give more credence to the testimony than it may deserve.").

The Court must, however, keep in mind the Supreme Court's
admonition that, "[v]igorous cross-examination, presentation of
contrary evidence, and careful instruction on the burden of proof
are the traditional and appropriate means of attacking shaky but
admissible evidence." Daubert, 509 U.S. at 596. If an expert's
testimony is within "the range where experts might reasonably
differ," the jury, not the trial court, should be the one to
"decide among the conflicting views of different experts." Kumho

-20-

<u>Tire</u>, 526 U.S. at 153. "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." <u>In re Viagra Prods. Liab. Litig.</u>, 572 F. Supp. 2d 1071, 1078 (D. Minn. 2008) (quoting <u>Bonner</u>, 259 F.3d at 929-30). As the First Circuit has stated:

> <u>Daubert</u> does not require that a party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct. As long as an expert's scientific testimony rests upon "good grounds, based on what is known," <u>Daubert</u>, 509 U.S. at 590 (internal quotation marks omitted), it should be tested by the adversary process - competing expert testimony and active cross-examination - rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies, <u>see id.</u> at 596. In short, <u>Daubert</u> neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance. It demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion.

<u>Ruiz-Troche</u>, 161 F.3d at 85. It is with these principles in mind that the Court assesses plaintiffs' motion to exclude.

## B.   Reliability of the Methodology

Plaintiffs do not challenge the general methodology used by Dr. Gibbons in his pharmacoepidemiological study examining the effect of gabapentin, if any, on suicidality in patients. Plaintiffs assert two specific challenges regarding concomitant medications that may have biased the results of the study, and an ambiguity in the data as to whether a patient was actually taking gabapentin at the time of the suicide attempt.

The publication of Dr. Gibbons's gabapentin study in a peer-reviewed journal is not a silver bullet for admissibility, but it does present a significant obstacle for plaintiffs' contention that the methodology is unreliable. While peer review does not necessarily establish admissibility, it does create a strong suggestion of admissibility in defendants' favor. See, e.g., Lauzon v. Senco Prods., Inc., 270 F.3d 681, 693 (8th Cir. 2001) ("Scientific reliability can also be shown 'by proof that the research and analysis supporting the proffered conclusions have been subjected to normal scientific scrutiny through peer review and publication.'") (quoting Daubert, 43 F.3d at 1318).

Dr. Greenland has testified that Dr Gibbons's methodology itself is "reasonable enough." (Hr'g Tr. 50, July 21, 2009.) He contends, however, that causal inferences should not be drawn from the associations found in the observated studies. In his published bipolar paper, Dr. Gibbons himself noted the difficulty and complexity in drawing causal inferences from observational studies like the one he conducted, particularly with respect to psychiatric disorders.

Plaintiffs highlight the different language used in Dr. Gibbons's expert reports and in his published paper. While Dr. Gibbons claims in his report that his "findings clearly reveal that . . . there is no overall increased risk of suicide attempt associated with gabapentin treatment" and that "statistically significant protective effects of gabapentin were clearly

-22-

demonstrated," the version of the study published in December 2010 only suggests an association between gabapentin use and reduction in suicide attempt risk in patients with psychiatric disorders. His litigation statement that "significant protective effects" were "clearly" demonstrated apparently did not pass peer-review scrutiny. Pfizer has not submitted any evidence explaining why the stronger language did not pass muster, or why the stronger wording is warranted.

Dr. Greenland's next criticism focuses on the list of concomitant medications adjusted for in Dr. Gibbons's analysis. In order to determine whether a patient's risk of suicide attempt was affected by another medication being taken in conjunction with gabapentin, Dr. Gibbons adjusted his analysis for "concomitant pharmacologic treatment" including other AEDs, antidepressants, antipsychotics, and lithium. This list included 79 possible concomitant medications, which Dr. Gibbons claims includes "more drugs than anyone has ever included in any study in this area by a large number." (Hr'g Tr. 44-45, July 23, 2009.) The list of medications was developed in conjunction with Dr. Robert Valuck at the University of Colorado, who is a leading pharmacoepidemiologist, Dr. John Mann at Columbia University, and with pharmacists from the Department of Veterans Affairs. (Id. at 46-47.) In addition, the list has been scrutinized through the peer review process of the American Journal of Psychiatry,

-23-

the Archives of General Psychiatry, and Pharmacoepidemiology & Drug Safety. (Id.)

Dr. Greenland, however, claims that the list does not include important categories of drugs that can affect suicidality in patients. He testified that the list used

was a relatively short list, and there are thousands of medications out there literally. In fact, you can find some database studies that come out of some pharmacoepidemiology groups where they have lists that exceed a thousand medications from their databases, and they attempt to adjust for all of them in some fashion.

(Greenland Dep. 93, July 21, 2009.) The categories of medications that Dr. Greenland claims should have been included are "most tranquilizers (anxiolytics) such as Xanax, Ambien, and most benzodiazepines; Ritalin, Adderal, and other stimulants; appetite suppressants; most hypnotics; and Oxycontin, Vycodin, and other strong analgesics," in addition to alcohol abuse and psychotherapy treatment. (May 2009 Greenland Report.) He states: "With respect to Dr. Gibbons' Gabapentin cohort, the majority of the individuals were being treated for pain. The failure to obtain and account for pain medications (analgesics) in the gabapentin cohort is especially egregious." (Mar. 2010 Greenland Report at 5.)

As the Supreme Court explained in Kumho Tire, if an expert's testimony is within "the range where experts might reasonably differ," the jury, not the trial court, should be the one to "decide among the conflicting views of different experts." Kumho

Tire, 526 U.S. at 153. "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." In re Viagra Prods. Liab. Litig., 572 F. Supp. 2d 1071, 1078 (D. Minn. 2008) (quoting Bonner, 259 F.3d at 929-30).

In this case, Dr. Gibbons's list of concomitant medications adjusted for in the gabapentin study was developed in conjunction with experts in pharmacoepidemiology, and has passed muster in multiple peer review processes of well-regarded scientific journals. While Dr. Greenland may believe that additional medications should have been included, that opinion alone cannot overcome the fact that Dr. Gibbons developed the list of concomitant medications in a reasoned and scientifically supportable fashion. Dr. Greenland's criticism does, however, undermine Dr. Gibbons's expert report regarding causation in the general gabapentin pain population because concomitant analgesics were not considered. However, the experts' "conflicting views" should be explored through cross-examination and submitted for a jury's consideration.

Finally, Dr. Greenland challenges Dr. Gibbons's gabapentin study on the basis of an alleged disconnect in the data as to whether a patient was actually taking gabapentin at the time of a suicide attempt. In the original study, Dr. Gibbons assumed that a patient used gabapentin for the entire year if that patient filled even one prescription for a 30-month supply. Dr.

Greenland appropriately criticized this tactic, and Dr. Gibbons
performed a sensitivity analysis to determine whether his
original assumption biased his results. In the sensitivity
analysis, Dr. Gibbons adjusted the data for whether a patient
filled a gabapentin prescription each month, and excluded those
months where the patient did not fill a prescription. The
results of the sensitivity analysis did not change Dr. Gibbons's
original conclusions. Nonetheless, Dr. Greenland claims that
this sensitivity analysis did not go far enough because it did
not ascertain whether a not a patient was taking the drug each
day of the month in question. While Dr. Greenland's criticism is
appropriate for cross-examination at trial, it does not call into
question the methodology's reliability to such an extent that Dr.
Gibbons's testimony should be excluded.

For the foregoing reasons, Pfizer has demonstrated that the
opinions expressed in the peer-reviewed, published version of his
gabapentin study are reliable. Dr. Greenland's criticisms may
affect the weight to be given to the opinion, but do not preclude
admissibility. However, Dr. Gibbons has not produced reliable
scientific evidence to support a conclusion that "statistically
significant protective effects of gabapentin were clearly
demonstrated" among patients with a psychiatric disorder, who are
at increased suicidal risk. As Dr. Gibbons himself enunciated in
the published paper, "drawing causal inference from observational
data is complicated in the study of suicide" because of the

factors he enumerated. Moreover, as this Court has previously suggested to the parties, Dr. Gibbons will not be permitted to testify that his pharmacoepidemiologic studies support any conclusions related to suicidal ideation, as he limited his studies to suicide attempts.

### III. ORDER

Plaintiffs' motion to exclude (Docket No. 2121) is **DENIED**, but Dr. Gibbons' testimony shall be limited as described in this opinion. No further supplemental reports shall be submitted.

/s/ PATTI B. SARIS
PATTI B. SARIS
United States District Judge