UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:  NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | : MDL Docket No. 1629<br><br>: Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO: | : Judge Patti B. Saris |
| KAISER FOUNDATION HEALTH PLAN, et al. v. PFIZER INC., 04 CV 10739 (PBS) | : Magistrate Judge Leo T. Sorokin<br><br>: **REDACTED COPY** |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION FOR NEW TRIAL AND TO RE-OPEN
## EVIDENCE OR, ALTERNATIVELY, TO ALTER OR AMEND JUDGMENT

Mark S. Cheffo
SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
Four Times Square
New York, NY 10036
Tel:  (212) 735-3000

Raoul D. Kennedy
SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
Four Embarcadero Center
San Francisco CA 94111
Tel:  (415) 984-6400

James E. Hooper
WHEELER TRIGG O'DONNELL LLP
1801 California Street
Suite 3600
Denver, CO 80202-2617
Tel:  (303) 244-1800

*Attorneys for Defendants Pfizer Inc and
Warner-Lambert Company LLC*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................................... iii

PRELIMINARY STATEMENT ...................................................................................................1

ARGUMENT ..................................................................................................................................2

I.  Plaintiffs' Document Dump Lacked The Required Foundation And Should Have Been Excluded Under Rule Of Evidence 403 ......................................................................2

    A.  Plaintiffs' Document Dump Exhibits Are Not Self-Explanatory ...........................3

    B.  The CME And Publications Activities Plaintiffs Describe Have No Nexus To Plaintiffs ..............................................................................................................5

    C.  The Only Direct Contacts Plaintiffs Describe Have No Nexus To Any Pattern Of Racketeering Activity Or To Any Enterprise ........................................7

    D.  Plaintiffs' Document Dump Does Not Establish That Defendants' Mere Sponsorship Of Scientific Studies And CMES Was Improper ...............................9

    E.  Plaintiffs Improperly Rely on Evidence Regarding Irrelevant Conditions ...........11

    F.  Plaintiffs Improperly Rely On Evidence Regarding The Activities Of Companies Not Claimed To Be Part Of Any Enterprise.......................................12

II.  The Erroneous Admission Of Documents Regarding A Purported MAC Enterprise Requires A New Trial .............................................................................................................13

III.  Other Prejudicial Evidentiary Rulings Require A New Trial ...........................................13

    A.  Warner-Lambert's Guilty Plea And Related Government Investigations Or Agreements .............................................................................................................13

    B.  July 21, 1999, Email From Christopher Wohlberg ...............................................14

    C.  Excluded Impeachment Testimony From Dr. Hartman ........................................14

    D.  Testimony Of David Franklin And Related Evidence............................................15

    E.  Testimony From Dr. Curt Furberg, Dr. John Abramson And Related Evidence .................................................................................................................16

    F.  Evidence And Argument Regarding Premiums Collected By Kaiser ..................16

IV.  Failure To Transfer Venue And Preclude Plaintiffs From Presenting Live Testimony By PMG Doctors .............................................................................................................17

V.     Motion To Re-Open Evidence And Admit 2011 Cochrane Review .................................. 18

VI.    Alternative Or Additional Relief ....................................................................................... 19

CONCLUSION ............................................................................................................................ 20

# TABLE OF AUTHORITIES

## CASES

*Adams v. United States*, Civ. No. 03-0049, 2009 WL 2207690
(D. Idaho July 15, 2009) ................................................................................................. 2

*Adams v. United States*, Civ. No. 03-0049, 2009 WL 2590426
(D. Idaho Aug. 18, 2009) ................................................................................................ 3

*Blinzler v. Marriott Int'l, Inc.*, 81 F.3d 1148 (1st Cir. 1996) ...................................... 18

*Committee to Defend the United States Constitution v. Moon,*
776 F. Supp. 568 (D.D.C. 1991) .................................................................................... 5

*Department of Economic Development v. Arthur Andersen & Co. (U.S.A.),*
924 F. Supp. 449 (S.D.N.Y. 1996) ................................................................................ 8

*Ironworkers Local Union 68 v. AstraZeneca Pharmaceuticals, LP*, No. 08 16851,
2011 WL 833222 (11th Cir. Mar. 11, 2011) ................................................................ 17

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998) ............ 18

*Nodine v. Textron, Inc.*, 819 F.2d 347 (1st Cir. 1987) ................................................... 9

*Player v. Motiva Enterprises, LLC*, 240 F. App'x 513 (3d Cir. 2007) ........................... 3

*Poppell v. City of San Diego*, 149 F.3d 951 (9th Cir. 1998) .......................................... 3

*Ray Larsen Associates v. Nikko America, Inc.*, No. 89 Civ. 2809,
1996 WL 442799 (S.D.N.Y. Aug. 6, 1996) .................................................................. 8

*Sunward Corp. v. Dun & Bradstreet, Inc.*, 811 F.2d 511 (10th Cir. 1987) .................... 2

*United States v. Meserve*, 271 F.3d 314 (1st Cir. 2001) ................................................ 3

*United States v. Minicone*, 960 F.2d 1099 (2d Cir. 1992) ......................................... 7, 8

*Vild v. Visconsi*, 956 F.2d 560 (6th Cir. 1992) .............................................................. 8

*Washington Legal Foundation v. Friedman*, 13 F. Supp. 2d 51 (D.D.C. 1998) ............ 9

*Washington Legal Foundation v. Henney*, 202 F.3d 331 (D.C. Cir. 2000),
*amended by Wash. Legal Found. v. Henney*, 56 F. Supp. 2d 81 (D.D.C. 1999) ............. 9

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321 (1971) ......................... 18

## OTHER AUTHORITIES

Final Guidance on Industry-Supported Scientific and Educational Activities,
62 Fed. Reg. 64,074 (Dec. 3, 1997)....................................................................................9

Guidance for Industry-Supported Scientific and Educational Activities,
62 Fed. Reg. 64,093 (Dec. 3, 1997)....................................................................................9

Defendants Pfizer Inc and Warner-Lambert Company LLC (collectively, "Pfizer" OR "Defendants"), respectfully submit this Memorandum of Law in Support of their Motion for New Trial and to Re-Open Evidence or, Alternatively, to Alter or Amend Judgment pursuant to Rule 59 of the Federal Rules of Civil Procedure.[1]

## PRELIMINARY STATEMENT

On the eleventh day of trial, the Court recognized that Plaintiffs had failed to present any evidence – let alone legally sufficient evidence – that Defendants conducted the affairs of a RICO enterprise through a pattern of racketeering activity or that Plaintiffs' alleged injuries occurred as the result of such conduct. (3/8 Tr. (Court) at 173:1-5, 174:4-11.) Plaintiffs sought to belatedly plug this hole in their RICO case by means of a massive document dump – proffering several large binders filled with scores of cherry-picked documents that, for the most part, were not accompanied by any competent witness testimony, context, or opportunity for cross-examination. Of the 111 document dump exhibits Plaintiffs cite, most were not discussed by any witnesses. And what little testimony was presented largely came from Plaintiffs' experts, who had no personal knowledge of the documents and were not competent to testify regarding their context or meaning.

The Court initially, and correctly, ruled that the documents could not be introduced in this fashion. *See, e.g.* 2/23 Tr. (Court) at 14:2-4.) Subsequently, the Court allowed Plaintiffs to submit a 51-page narrative brief [2660 ("Pl. RICO Br.")] to explain the documents. (*See* 3/8 Tr. (Court) at 166:1-22, 167:7-20, 179:1-7, 186:12-15.) After reviewing Plaintiffs' brief, but not each of the documents cited therein, the Court overruled Pfizer's objections. (*See* 3/15 Tr. (Court) at 7:11-12, 8:11-12.) In lieu of testimony from knowledgeable witnesses, the jury was required to speculate regarding the significance of binders of documents, with only the aid of sticky notes. (3/15 Tr. at 10:15-20.) Presenting these documents to the jury without testimony

---

[1] Defendants hereby incorporate the arguments set forth in support of their concurrently-filed Renewed Motion for Judgment as a Matter of Law and Motion for New Trial, made pursuant to Federal Rule of Civil Procedure 50(b) and their Motion for Amended and Additional Findings pursuant to Rule 52(b), and supporting memoranda.

from a knowledgeable witness ensured that any probative value these exhibits may otherwise possess was substantially outweighed by the risk of jury confusion and undue prejudice to Defendants.   At a minimum, the admission of Plaintiffs' document dump was an abuse of discretion requiring a new trial.[2]   And, as discussed below, several other evidentiary errors, including admission of the Warner-Lambert Plea, necessitate a new trial.

## **ARGUMENT**

**I.      Plaintiffs' Document Dump Lacked The Required Foundation And Should Have Been Excluded Under Rule Of Evidence 403[3]**

Plaintiffs' document dump should have been rejected under Federal Rule of Evidence 403 because its prejudicial value substantially outweighed any probative value.   Presented without foundational testimony from knowledgeable witnesses, Plaintiffs' document dump deprived Defendants of a meaningful opportunity "to cross-examine, test the evidence, and develop its own case." *Sunward Corp. v. Dun & Bradstreet, Inc.*, 811 F.2d 511, 522 (10th Cir. 1987); *see also Adams v. United States*, Civ. No. 03-0049, 2009 WL 2207690, at *1 (D. Idaho July 15, 2009) (hereinafter "*Adams I*").

For example, in *Sunward Corp.*, the plaintiff attempted to prove defamation based on inferences drawn from documentary evidence without any testimony from the knowledgeable witnesses. *See Sunward Corp.*, 811 F.2d at 518.   The Tenth Circuit explained that the de-contextualized documents did not support these inferences or sustain the plaintiff's burden of proof, and instead invited the jury to rely upon "speculation and conjecture." *Id.* at 521.   The Tenth Circuit further held that the plaintiff's "chronological rendition of events" did not provide a basis for the inferences sought to be drawn from the documents. *Id.* at 521.

Likewise, the Third Circuit rejected plaintiffs' attempt to prove through stand-alone

---

[2] Defendants have separately moved for judgment as a matter of law based upon the insufficiency of Plaintiffs' evidence, absent the impermissible document dump, to support their RICO claims.

[3] Defendants hereby incorporate the arguments previously set forth in support of their Motion for Judgment as a Matter of Law Based Upon Lack of Sufficient Evidence to Prove Conduct of a RICO Enterprise Through a Pattern of Racketeering Activity [2669], Objection to Plaintiffs' Proffer of "Free-Standing" Exhibits [2604], Memorandum in Opposition to Plaintiffs' Motion for Admission of Summary Evidence [2631], and Memorandum in Opposition to Plaintiffs' Second Amended Motion for Admission of Summary Evidence [2658].

exhibits that hazardous substances caused their properties to diminish in value. "[I]f a jury were to consider those documents without any context, which is how Plaintiffs have presented them, the jury would have to rely on assumptions and speculation to conclude that Plaintiffs have proven an injury." *Player v. Motiva Enters., LLC*, 240 F. App'x 513, 521 (3d Cir. 2007).[4]

This Court erroneously relieved Plaintiffs of their burden to provide foundational context by blaming Defendants for not voluntarily producing knowledgeable witnesses to assist Plaintiffs' presentation of evidence and by placing the onus on Defendants to produce witnesses during their own case in chief to challenge Plaintiffs' counsel's characterizations of the documents.[5] Initially, the suggestion that Defendants could rebut hundreds of documents by calling witnesses in their own case ignores the fact that this was a timed trial. Defendants could not have done so within the time provided and certainly not without sacrificing time devoted to more relevant issues. Further, the First Circuit has roundly rejected such attempts to shift the burden to the objecting party to demonstrate that evidence is inadmissible. *See, e.g., United States v. Meserve*, 271 F.3d 314, 327-28 (1st Cir. 2001).

A.    **Plaintiffs' Document Dump Exhibits Are Not Self-Explanatory**

Plaintiffs' characterizations of the document dump exhibits are rife with distortions. A brief sample of these distortions confirms that the documents are not self-explanatory and should not have been admitted without foundational testimony.

For example, Plaintiffs cite four exhibits for the proposition that Pfizer "began evaluating unlawful marketing tactics in 1994 and that pattern escalated upon the hiring of CDM." (Pl. RICO Br. at 2 n.3 (citing PX12, 13, 28, 29).) None of these documents has anything to do with "unlawful marketing tactics." The first exhibit discusses conducting and publishing scientific studies regarding "psychiatry" generally, not bipolar specifically. (*See* PX12.) These activities are protected by the First Amendment and FDA safe harbors. And it is undisputed that there is

---

[4] *See also Poppell v. City of San Diego*, 149 F.3d 951, 968 (9th Cir. 1998); *Adams v. United States*, Civ. No. 03-0049, 2009 WL 2590426, at *1 (D. Idaho Aug. 18, 2009) (hereinafter "*Adams II*").

[5] *See* 3/3 Tr. at 5:11-13, 6:1-7, 6:10-14; 3/5 Tr. at 151:16-24; 3/12 Tr. at 13:11-21.

Level I evidence supporting Neurontin's efficacy for psychiatric disorders, including anxiety and social phobia. The second exhibit merely shows that Defendants estimated the cost of conducting certain studies, and discussed the possibilities of publishing a manuscript and seeking regulatory approval for psychiatric indications. (*See* PX13.) The third exhibit merely addresses Neurontin's "market potential" for bipolar and other psychiatric disorders. (PX28.) This 1995 document pre-dates the Pande and Frye bipolar studies, and thus cannot support any inference that Defendants marketed Neurontin for uses for which they purportedly knew it was ineffective. In the fourth exhibit, Plaintiffs emphasize language "discuss[ing] whether a 'strategic swerve' is necessary." (Pl. RICO Br. at 2 n.3 (quoting PX29).) But this "strategic swerve" had nothing to do with "unlawful marketing tactics." (PX29.)

Plaintiffs also rely heavily on marketing plans that were unsupported by testimony from either fact or expert witnesses and, therefore, lacked supporting context, such as whether and how such marketing plans were implemented. For example, Plaintiffs cite a document prepared by CDM entitled "1998 Neurontin Tactics" (Pl. RICO Br. at 12 (citing PX17)), but the only two witnesses familiar with the document could not say whether the plans were implemented. (3/11 Tr. (Knoop) at 17:22-23; 3/11 Tr. (Crook) at 31:16-22.)

Plaintiffs also mischaracterize the tactics proposed in CDM marketing plans. For example, Plaintiffs argue that CDM's proposal for "'1998 Neurontin Tactics' . . . listed 11 separate tactics to be directed at psychiatrists." (Pl. RICO Br. at 12 (citing PX17).) Two of those proposed tactics concerned educational activities protected by the First Amendment and FDA safe harbors. The other nine had nothing to do with relevant off-label uses. (*See* PX12.)

Plaintiffs also emphasize CDM's proposal to have CBUs recruit speakers locally to take part in "High dose meetings." (Pl. RICO Br. at 9-10 (citing PX75).) But this proposed tactic is not evidence of promotion at doses above 1800 mg/day. Rather, this tactic was proposed in response to an analysis showing that the average daily dose at that time was 1200 mg/day. (PX75.) Plaintiffs presented no evidence that CBUs recruited speakers for CME events or advisory bureaus addressing any of the relevant off-label uses.

4

Plaintiffs also argue that Defendants and MAC worked together to develop "'key messages' to be used in Neurontin publications." (Pl. RICO Br. at 34.) But Plaintiffs' document dump does not support their enterprise allegations. Instead, Plaintiffs' exhibits reveal that "key messages" for Neurontin come from a "Global Branding Guide" (PX178) and were discussed in connection with "international" marketing issues (PX169). Neurontin is and was approved for neuropathic pain in over 50 countries. (3/16 Tr. (Brenner) at 35:2-6.) There is no evidence that Defendants' third-party vendors injected "key messages" into publications or CME events, as opposed to simply reviewing articles and noting whether they supported any such messages.

### B.     The CME And Publications Activities Plaintiffs Describe Have No Nexus To Plaintiffs

Plaintiffs devote the vast majority of their RICO evidence brief to describing CME programs and publications that have no demonstrated nexus to their claims. Beyond Plaintiffs' mischaracterizations of these documents and their failure to properly introduce them through a knowledgeable witness, this evidence does not show a ***relevant*** pattern of racketeering activity. *See Comm. to Defend the U.S. Constitution v. Moon*, 776 F. Supp. 568, 571 (D.D.C. 1991). In *Moon*, the court held that "a 94 page complaint, consisting of 305 paragraphs and alleging 31 racketeering acts . . . fail[ed] to state an adequate pattern under RICO" because most of the alleged acts "ha[d] nothing whatsoever to do with the [plaintiff]," and the few acts that allegedly did cause injury were too remote from that injury. *Id.*

Plaintiffs argue that "Parke-Davis supported numerous CMEs held throughout the country." (Pl. RICO Br. at 19.) But with two exceptions, Plaintiffs do not even claim that any PMG doctors attended the CME programs they describe. For example, Plaintiffs devote several pages of their RICO Evidence brief to the March 1997 ADA Satellite Symposium CME and a follow-up publication mailed to doctors who attended that CME. (*See* Pl. RICO Br. at 21-25.) Plaintiffs do not even claim that any PMG doctor attended this CME or received the follow-up publication. Plaintiffs' assertion that "ordinary physicians" would have been misled by the CME or follow-up publication (Pl. RICO Br. at 23, 25) is both speculative and irrelevant and does not

support their RICO claim. As this Court aptly noted when discussing this CME, "I'm not even sure that counts if there was no one from Kaiser there." (3/19 Tr. (Court) at 219:4-5.)

The only CME series where Plaintiffs did present evidence of attendance by PMG doctors was entitled "New Frontiers in Social Phobia and Bipolar Disorders." (Pl. RICO Br. at 19 & n.68.) But Plaintiffs' only evidence regarding this CME series is a list of venues and attendees. (PX 360.) Plaintiffs presented no evidence regarding what slides were shown, what statements were made, whether Neurontin was even discussed, or whether the content was controlled by Defendants via any purported enterprise. In a classic bait-and-switch maneuver, Plaintiffs introduced a slide deck that was purportedly shown during *a different CME event*, entitled "New Frontiers in Anxiety, Substance Abuse and Bipolar Disorder." (Pl. RICO Br. at 19-20 & n.73 (citing PX63).) Plaintiffs do not claim, and presented no evidence, that any PMG doctors attended that CME event. Plaintiffs also attempted to show that some unspecified number of PMG doctors attended an unspecified "May 1999 CME." (PX286.) Plaintiffs' only evidence is a one-page internal Kaiser Permanente Northwest Division memo stating that new starts of Neurontin increased after this CME. But other than quoting an unknown source stating that "'Neurontin was promoted'" at this CME (PX 286), the memo provides no information whatsoever regarding the CME's content.

Likewise, Plaintiffs attempted to show that one of the allegedly misleading publications they describe was actually distributed to PMG doctors. But this is merely another bait-and-switch maneuver, because the evidence of such distribution relates to *different publications* that were not introduced at trial and were not shown to contain any misleading statements about Neurontin. Plaintiffs cite a March 1999 issue of the publication *Progress in Neurology*, which states that "the TCAs and gabapentin are first line therapy for the treatment of painful peripheral neuropathies." (Pl. RICO Br. at 27 & n.102 (citing PX80).) This was the very first issue from *Progress in Neurology*'s "*initial year of publication*." (PX80 at 2 (emphasis added).) Plaintiffs claim that this issue "was mailed in 4 waves to all neurologists throughout the United States," including PMG doctors. (Pl. RICO Br. at 27 & n.103 (citing PX92).) But Plaintiffs' exhibit

explicitly refers to the mailing of four *different* issues from *Progress in Neurology*'s **"2nd Year"** of publication. (PX92 (emphasis added).) Plaintiffs did not introduce any of these four issues at trial, and did not present any evidence that they contained purportedly misleading statements about off-label Neurontin use. As for the March 1999 issue that they claim is misleading (PX80), Plaintiffs presented no evidence regarding its purported distribution to PMG neurologists or anyone else. Thus, Plaintiffs have failed to establish any legally sufficient nexus between this publication and their claims.

C.     **The Only Direct Contacts Plaintiffs Describe Have No Nexus To Any Pattern Of Racketeering Activity Or To Any Enterprise**

The few sporadic contacts Plaintiffs assert between themselves and Defendants also fail to demonstrate any legally sufficient nexus to any enterprise or pattern of racketeering activity. Indeed, the only representation made directly to either Plaintiff was a 1999 letter to the Drug Information Services ("DIS") of Kaiser Permanente Hospitals, which pre-dated the final report of Dr. Pande's bipolar study and which Plaintiffs claim failed to disclose the negative results of Dr. Pande's study. (3/4 Tr. (Millares) at 67:16-69:5.) To prevail on their RICO claim, Plaintiffs were required to present evidence that this letter was sufficiently related both to the alleged "pattern" of CME and publications activities discussed above and to the alleged enterprise itself. "The requirement of 'relatedness' embodies two different concepts. The racketeering acts must be related to each other ('horizontal' relatedness), and they must be related to the enterprise ('vertical' relatedness)." *United States v. Minicone*, 960 F.2d 1099, 1106 (2d Cir. 1992).

First, the sporadic contacts Plaintiffs assert are not sufficiently related to the alleged "pattern" of CME and publications activities because these activities involved different purposes, methods, participants, and differently situated audiences. According to Plaintiffs, the alleged CME and publications activities were carried out jointly and proactively by Defendants and CDM, and were directed toward the medical community for the purpose of fooling doctors into prescribing Neurontin for the relevant off-label conditions. By contrast, the 1999 letter Plaintiffs cite was issued by Parke-Davis in response to an inquiry by DIS. The letter does not mention the

7

Pande study because that study had not yet been published.  Informational letters sent to PMG doctors shortly thereafter, when the Pande study had been published, clearly disclosed the negative results of Dr. Pande's study.  (3/5 Tr. (Millares) at 72:6-78:1; DX 433, 433A.) Plaintiffs presented no evidence that the 1999 letter to DIS was somehow coordinated with or related to the CME and publications activities they describe.

Plaintiffs argue that these were different facets of a scheme designed to maximize Neurontin's profitability.  However, this is insufficient to satisfy RICO's pattern requirement. For example, in *Ray Larsen Associates v. Nikko Am., Inc.*, No. 89 Civ. 2809, 1996 WL 442799 (S.D.N.Y. Aug. 6, 1996), the plaintiff claimed that the defendants defrauded plaintiff out of commissions due under a marketing agreement, and siphoned funds overseas in violation of tax laws.  *See id.* at *6.  The court held that "defendants' acts of siphoning funds overseas are insufficiently related to the fraud that caused RLA's injury in terms of purpose, victims, and methods of commission."  *Id.*; *see also Vild v. Visconsi*, 956 F.2d 560, 567 (6th Cir. 1992) (explaining that the plaintiff "may not use unrelated predicate acts that allegedly may have harmed ultimate purchasers or other third parties not similarly situated to the plaintiff.").

Second, the sporadic contacts Plaintiffs assert are not sufficiently related to the alleged enterprise.  Plaintiffs were required to produce legally sufficient evidence "that the defendant was enabled to commit the predicate offenses *solely by virtue of his position in the enterprise* or involvement in or control over the affairs of the enterprise, or that the predicate offenses are related to the activities of that enterprise."  *Minicone*, 960 F.2d at 1106 (citation omitted) (internal quotation marks omitted).  There is no evidence, nor any permissible inference, that CDM had any involvement whatsoever in Parke-Davis's response to a drug inquiry made by DIS.  Nor was there any basis for the jury to conclude that Parke-Davis was enabled to send its response solely by virtue of its position or involvement in any enterprise with CDM.  Even if Plaintiffs could show that the 1999 letter to DIS was fraudulent, "it is not enough to control even fraudulent activity that is ancillary to the fraud carried out by the RICO enterprise."  *Dep't of Econ. Dev. v. Arthur Andersen & Co. (U.S.A.)*, 924 F. Supp. 449, 467 (S.D.N.Y. 1996).

In sum, the conduct that Plaintiffs claim harmed them is not a RICO violation, and Plaintiffs cannot overcome this deficiency by asserting unrelated RICO violations not shown to have caused them any harm. *See Nodine v. Textron, Inc.*, 819 F.2d 347, 349 (1st Cir. 1987) ("The RICO Act provides no cause of action to individuals injured by acts other than criminal RICO violations.").

### D.   Plaintiffs' Document Dump Does Not Establish That Defendants' Mere Sponsorship Of Scientific Studies And CMES Was Improper

Plaintiffs' documents do not give rise to any reasonable inference that Pfizer controlled the content of the publications and educational activities Plaintiffs criticize.  FDA regulations permit pharmaceutical companies to provide financial, logistical, and technical support for independent scientific or educational activity where off-label uses of a drug are discussed, so long as the content is controlled by the program provider and characterized by balance, objectivity, scientific rigor, and appropriate disclosure of financial support or conflicts of interests.[6]  In addition, pharmaceutical manufacturers have a First Amendment right to sponsor CME events where the manufacturers' products are discussed, so long as the speech does not promote "'unlawful'" activity and is not "'inherently misleading.'"[7]  The activity allegedly promoted by industry-sponsored educational activity – *i.e.*, off-label prescribing by doctors – is not unlawful.  And Pfizer's mere financial sponsorship of CME events via unrestricted grants cannot be "inherently misleading," which is why the FDA expressly permits such sponsorship.

In attempting to show that Defendants' sponsorship of educational activity was somehow improper, Plaintiffs rely on their counsel's unsupported speculation regarding the meaning of the document dump exhibits.  For example, without eliciting any testimony about it at trial, Plaintiffs cite PX15 as though it were evidence of self-evidently improper marketing.  To the contrary, the

---

[6] *See* Final Guidance on Industry-Supported Scientific and Educational Activities, 62 Fed. Reg. 64,074, 64,084-85 (Dec. 3, 1997); Guidance for Industry-Supported Scientific and Educational Activities, 62 Fed. Reg. 64,093 (Dec. 3, 1997).

[7] *Wash. Legal Found. v. Friedman*, 13 F. Supp. 2d 51, 65, 67 (D.D.C. 1998) (hereinafter *WLF I*) (citations omitted), *amended by* 36 F. Supp. 2d 16 (D.D.C.), *and amended by Wash. Legal Found. v. Henney*, 56 F. Supp. 2d 81 (D.D.C. 1999), *and vacated in part on other grounds sub nom. Wash. Legal Found. v. Henney*, 202 F.3d 331 (D.C. Cir. 2000).

document – which recommended that Parke-Davis sponsor a symposium in conjunction with the American Diabetes Association, to further education aims and spur additional research – is a compelling example of beneficial industry-sponsored educational activity, which is permitted by FDA safe harbors and protected by the First Amendment.

Likewise, Plaintiffs suggest that a Proworx memo regarding an American Psychiatric Association advisory board meeting held in May 1997 demonstrates an objective to engage in improper marketing. (Pl. RICO Br. at 11-12 & n.38-39 (citing PX68).) To the contrary, this Proworx memo demonstrates that the APA member physicians who attended the advisory board meeting – independent of any marketing efforts by Pfizer – were exploring the use of AEDs as therapy for psychiatric disorders, had determined that there was a need for further clinical studies, and had reached a "general consensus that Gabapentin has a positive anxiolytic effect profile, lack of drug-drug interactions, non-addicting hypnotic effects, and overall safety and efficacy." (PX68.) There is no evidence that this "general consensus" was based on any representations or omissions by Pfizer. Instead, the "general consensus" was based on interim data presented by Dr. Frye. (2/24 Tr. (Abramson) at 81:3-85:8.) It is undisputed that Pfizer had no involvement in Dr. Frye's study. (*See* 2/24 Tr. (Abramson) at 80:11-16.)

Other documents confirm that Plaintiffs seek to impose liability based on educational activity permitted by the FDA and protected by the First Amendment. For example, Plaintiffs explicitly rely on publications that Parke-Davis merely "sponsored, through an 'unrestricted educational grant,'" without any evidence that Parke-Davis controlled their content. (*See, e.g.,* Pl. RICO Br. at 27 (quoting PX82).) Likewise, another of the document dump exhibits Plaintiffs quote in their RICO Evidence brief is a CDM memo proposing to disseminate materials on emerging uses "if a favourable outcome results from the [FDA Modernization Act] (i.e. an exemption from filing for an indication in the area being promoted is granted)." (PX83.) Thus, the memo explicitly proposes conduct in accordance with the FDAMA. The emerging uses CDM recommended pursuing include "post-herpetic neuralgia," for which Neurontin is now FDA-approved, and "anxiety [and] social phobia," for which there is Level I evidence of

Neurontin's effectiveness.[8]  (Pl. RICO Br. at 14-15 (quoting PX83).)

In a rare (though unsuccessful) attempt to show that Defendants attempted to control the content of any of the challenged activities, Plaintiffs argue that Defendants "selected" the speakers at a March 1997 Satellite Symposium CME presented at an annual meeting of the American Diabetes Association.  (Pl. RICO Br. at 21.)  Plaintiffs also argue that Defendants planted audience members to influence the presentation given by one of these speakers, Dr. Vera Bril.  (*See id.* at 21-23.)  Plaintiffs rely on PX43, which was admitted over objection as part of Plaintiffs' document dump.  (*See id.* at 21-23 & n.82-84, 86-89.)  PX43 does not state or imply that Defendants selected the speakers at this presentation, as opposed to, at most, recommending possible speakers.  Moreover, PX43 shows that Defendants did not control the presentations' content.  (PX43.)  Upon receipt of Dr. Bril's abstract, Proworx and Parke-Davis had concerns about Dr. Bril's failure to address certain issues, but Proworx addressed these concerns "within the accreditation guidelines."  (*Id.*)  Proworx concluded that "the best option, while not crossing over ACCME guidelines, was to present questions at the Q & A session" following Dr. Bril's presentation.  (*Id.*)  Dr. Bril was given no prior notice of those questions, and her answers were her own.  While the questions were designed to prompt discussion of certain topics, they did not and could not control what Dr. Bril said about those topics.

Plaintiffs also erroneously claim that a sponsored publication entitled "Investigator CME Case Study Series" did not disclose Parke-Davis's financial support.  (Pl. RICO Br. at 25 (citing PX3.)  But the publication clearly states that each faculty member "has reported receiving grants/research support from Parke-Davis."  (PX3.)  Moreover, the publication was mailed to doctors who attended the 1997 ADA Satellite Symposium discussed above, in response to the attendees' expressed interest in further discussion.  (PX3.)

### E.  Plaintiffs Improperly Rely on Evidence Regarding Irrelevant Conditions

Plaintiffs' RICO Evidence brief and document dump improperly seek to impose liability

---

[8] *See* 2/26 Tr. (Barkin) at 52:12-53:4, 70:17-71:4, 75:7-14; *see also* 2/24 Tr. (Abramson) at 100:13-106:2.

based on conduct that specifically relates to conditions not at issue in this case.  In particular, Plaintiffs repeatedly cite documents that address Neurontin use as monotherapy for epilepsy, which is not one of the relevant off-label uses.  (*See, e.g.*, Pl. RICO Br. at 7 (citing PX73), Pl. RICO Br. at 12 (citing PX17), Pl. RICO Br. at 14 (quoting PX86).)  Plaintiffs initially asserted claims regarding monotherapy, but later abandoned those claims.  At trial, Plaintiffs presented no evidence that they were injured by virtue of paying for Neurontin prescriptions for monotherapy.

## F.   Plaintiffs Improperly Rely On Evidence Regarding The Activities Of Companies Not Claimed To Be Part Of Any Enterprise

Plaintiffs cite two exhibits addressing analyses of the Reckless study by a third-party vendor called Global Medical Information ("GMI"), and claim these exhibits show that by July 1998, Parke-Davis and GMI were "already looking for ways to present the results [of certain Neurontin studies] more favorably."  (Pl. RICO Br. at 26 & nn. 98-99 (citing PX107 and PX108).)  These are complex, highly technical documents about which no testimony was presented at trial, and nothing on the face of these documents supports Plaintiffs' lawyers' characterization of them as being in any way improper.  More importantly, the documents pertain to a third-party vendor with no demonstrated connection to any RICO enterprise.

Plaintiffs also cite exhibits addressing a public relations campaign by the third-party vendor Makovsky & Company.  (*See* PX71, 103.)  Plaintiffs claim that Makovsky & Company distributed the Backonja study (945-210) on the use of Neurontin in treating diabetic peripheral neuropathy ("DPN") without disclosing other information purportedly showing that Neurontin was ineffective for DPN.  (*See* Pl. RICO Br. at 26-27.)  And Plaintiffs cite a report stating that "'Makovsky's campaign reached all key U.S. markets, generating in excess of **85 million impressions**.'"  (*Id.* at 27 (quoting PX71).)  However, Plaintiffs presented no evidence that Defendants' retention of Makovsky & Company related in any way to a purported enterprise between Pfizer and either CDM or MAC.  Although Dr. Abramson and Dr. Perry testified briefly about PX71, no witness attempted to relate the exhibit or Makovsky & Company to any RICO enterprise.  Nor did Plaintiffs present any evidence capable of tracing any formulary

recommendations, formulary decisions, or prescription decisions to the activities of CDM or MAC, as opposed to Makovsky & Company.

## II. The Erroneous Admission Of Documents Regarding A Purported MAC Enterprise Requires A New Trial

On the eve of trial, Plaintiffs belatedly requested leave to add an alleged association-in-fact between Defendants and Medical Action Communications (MAC), a medical marketing firm, to the list of alleged RICO enterprises. (Joint Pre-Trial Memorandum [2500-2] at 59-60 n.16.) Although the Complaint was never formally amended to add allegations regarding a MAC enterprise, the Court erroneously allowed Plaintiffs to introduce numerous exhibits in support of the never-before-pled MAC enterprise as part of their RICO document dump.[9] Plaintiffs request should have been denied, and the related documents should have been excluded, for the reasons set forth in Defendants' Objections to Plaintiffs' Proposed Amendments to the Third Amended Complaint [2538].

## III. Other Prejudicial Evidentiary Rulings Require A New Trial

### A. Warner-Lambert's Guilty Plea And Related Government Investigations Or Agreements

The Court erroneously allowed evidence and argument regarding Warner-Lambert Company LLC's guilty plea dated May 13, 2004 (the "Plea").[10] The Plea should have been excluded pursuant to Federal Rules of Evidence 401, 402, 403, and 404 for the reasons set forth in Defendants' Motion in Limine [2301] and supporting memorandum [2302]. As explained more fully therein, evidence of the Plea was irrelevant to this case. Indeed, the Court's rationale for rejecting Defendants' statute of limitations defense confirms that the Plea is not probative of any alleged fraudulent marketing. The Court ruled that Kaiser's awareness of the government's

---

[9] Plaintiffs' RICO evidence brief cites the following document dump exhibits in support of the alleged MAC enterprise: PX111, 122, 125, 126, 129, 130, 135, 136, 137, 138, 141, 143, 163, 164, 165, 166, 168, 169, 170, 173, 175, 178, 190, 196, 206, 208, 209, 210, 217, 219, 228, 238, 251, 254, 255, 258, 259, 260, 261, 262, 263, 265, 266, 1660, 1986. (*See* Pl. RICO Br. at 32-49 nn. 115-202.)

[10] In addition, although the Court initially excluded evidence of the civil settlement with the government (*see* 2/22 Tr. (Court) at 32:7-9 ("what's relevant here is the criminal and not the civil settlement")), the civil settlement was referenced at the trial (*see* 3/15 Tr. (Franklin) at 75:7-76:8).

investigation "may have suggested to Kaiser that defendants were violating FDA rules about off-label promotion," but was notice only of that crime, not fraud. (3/19 Tr. (Court) at 184:18-19.)

Moreover, evidence of the Plea should have been excluded under Rule 403 due to unfair prejudice and undue delay that substantially outweighed its non-existent probative value. The only plausible reason Plaintiffs sought admission of the Plea was as improper character evidence barred by Rule 404(b). Finally, introduction of the Plea resulted in a denial of Pfizer's due process rights. Plaintiffs repeatedly emphasized this prejudicial evidence during opening statements, witness testimony, and closing arguments. (*See* 2/22 Tr. (Greene) at 99:24-100:3; 2/22 Tr. (Nussbaum) at 108:22-109:24; 2/23 Tr. (Kessler) at 54:16-20; 2/26 Tr. (Carrejo) at 128:20-129:11, 129:25-130:6; 3/3 Tr. (Hyatt) at 117:2-19; 3/9 Tr. (Daniel) at 107:20-22; 3/12 (Franklin) at 75:4-9, 100:18-101:1; 3/23 Tr. (Sobol) at 148:6-8; 3/23 Tr. (Nussbaum) at 185:16-186:2.) The Court's erroneous admission of this highly prejudicial evidence requires a new trial.

### B.       July 21, 1999, Email From Christopher Wohlberg

Over Defendants' objection, the Court erroneously admitted as PX479 an internally circulated Pfizer email dated July 21, 1999 – prior to the 2000 merger between Pfizer and Warner-Lambert Company – which contains statements made by Christopher Wohlberg, who was never an employee of Warner-Lambert Company. This email should have been excluded pursuant to Federal Rules of Evidence 401, 402, 403, and 802 for the reasons set forth in Defendants' Memorandum in Support of Objections to Pre-Merger Statements Made by Pfizer Employees [2663]. Plaintiffs repeatedly emphasized this prejudicial exhibit during witness testimony and closing arguments. (*See* 3/12 Tr. (Franklin) at 101:9-13; 3/15 Tr. (Gibbons) at 103:16-104:9; 3/23 Tr. (Sobol) at 146:22-23; 3/23 Tr. (Greene) at 204:4-6.) The Court's erroneous admission of this highly prejudicial evidence requires a new trial.

### C.       Excluded Impeachment Testimony From Dr. Hartman



### D.   Testimony Of David Franklin And Related Evidence

Over Defendants' objection, the Court erroneously admitted testimony from David Franklin and related evidence concerning Mr. Franklin's brief employment by Parke-Davis as a medical liaison in the Northeast Customer Business Unit ("CBU") for four months in 1996. This evidence should have been excluded for the reasons set forth in Defendants' motion in limine. (*See* Mem. Supp. Mot. to Exclude Testimony of Franklin & Related Evid. [2326].)  Mr. Franklin had no first-hand knowledge regarding the activities of medical liaisons outside the Northeast CBU, and was thus not competent to testify about those activities.  Moreover, Mr. Franklin's testimony about the activities of medical liaisons in northeastern states was irrelevant because there was no showing that medical liaisons in states where Plaintiffs operate acted in a substantially similar fashion.  To the contrary, he claims that in 1996, the manager of the West CBU – where Plaintiffs' members overwhelmingly reside – strongly criticized the conduct Mr. Franklin describes and stated that the West CBU's medical liaison program did not engage in any such conduct.  Because the only testimony Mr. Franklin was arguably competent to give was irrelevant and unduly prejudicial, his testimony should have been excluded in its entirety.

---

[11] *See also* 6/26/08 Hartman Dep. (3/9/10 Armstrong Decl. [2648], Exh. 2) at 193:8-22; 1/27/09 Hartman Dep. (3/9/10 Armstrong Decl. [2648], Exh. 3) at 347:16-348:5.

**E.     Testimony From Dr. Curt Furberg, Dr. John Abramson And Related Evidence**

Over Defendants' objection, the Court erroneously admitted testimony from Dr. Curt Furberg and related evidence regarding the alleged relationship between Neurontin and the risk of suicide.  This evidence should have been excluded for the reasons set forth in Defendants' prior motion.  (*See* Mem. Supp. Mot. to Exclude Testimony of Furberg [2601].)  This evidence was inadmissible under Federal Rules of Evidence 401, 402, and 403 because it was irrelevant and unduly prejudicial.   Plaintiffs' allegations concern Neurontin's efficacy for off-label conditions, not its safety.   And any decision by Plaintiffs to expand formulary access to Neurontin had nothing to do with whether there was a suicide warning.  In fact, two of Plaintiffs' proposed alternative drugs are anti-epileptic drugs with the same suicide warning as Neurontin. Plaintiffs' only causation expert, Dr. Rosenthal, did not attempt to measure the impact that a suicide warning would have had on Neurontin prescriptions.  So tangential is the subject of suicide that Plaintiffs did not discuss it in their opening statements.  Plaintiffs' only possibly reason for introducing testimony regarding suicide late in the trial was to confuse the jury into thinking that this case was about something other than a large insurer seeking to recover economic damages.  Such a blatant appeal to prejudice should not have been permitted.

For the reasons stated in Defendants' Motion in Limine to Exclude the Testimony of John Abramson, M.D. [2307, 2308], Defendants' Motion to Strike the Testimony of John Abramson [2586, 2587], and supporting memoranda, the testimony of Dr. John Abramson should have been excluded.  Dr. Abramson's opinions were not reasonably related to the facts of this case or the elements of Plaintiffs' claims, relied upon unfounded assumptions and speculation, did not employ any proper methodology and improperly invaded the province of the jury by summarizing and weighing the evidence.  In addition, Dr. Abramson was improperly allowed to provide opinions regarding efficacy beyond the scope of his expertise and his report.

**F.     Evidence And Argument Regarding Premiums Collected By Kaiser**

During the trial, the Court prevented Pfizer's attorneys from questioning Dr. Carrejo

regarding premiums collected by Kaiser and the fact that Kaiser sets premiums so as to compensate for increases in drug expenditures. (3/3 Tr. (Carrejo) at 21:4-7.) While Dr. Carrejo was not allowed to respond to Pfizer's question, Dr. Carver testified by deposition about how premiums are set and that they increase if drug costs increase. (Carver Dep. 55:22-56:13.) Based upon such testimony, Pfizer's counsel argued to the jury: "[T]o the extent that Kaiser paid more for sugar pills or paid for more Neurontin than it should have, that got passed on to the insureds, presumably years ago." (3/23 Tr. (Defense Closing) 128:12-14.) Sustaining Plaintiffs' objections, the Court instructed the jury to disregard counsel's argument, stating: "[T]here's nothing in the record about whether or not the payment of premiums or increases might have compensated for that, so that would at this point be speculative." (3/23 Tr. 218:5-7.) However, as recently explained by the Eleventh Circuit, the fact that Plaintiffs were able to avoid any actual out-of-pocket losses through increased premiums is evidence that the insurer had no injury at all. *See Ironworkers Local Union 68 v. AstraZeneca Pharmaceuticals, LP*, No. 08-16851, 2011 WL 833222, at *8-9 (11th Cir. Mar. 11, 2011). The jury should have been allowed to consider such evidence and it was error to instruct them otherwise.

## IV.   Failure To Transfer Venue And Preclude Plaintiffs From Presenting Live Testimony By PMG Doctors

This Court's erroneous denial of Defendants' motion to transfer this case to a more convenient forum was an abuse of discretion requiring a new trial. As discussed in prior briefing,[12] all of the convenience factors set forth in 28 U.S.C. § 1404(a) strongly favored transfer to a California venue. Unlike Massachusetts, California had a substantial interest in this litigation. There was no nexus to Massachusetts whatever in this litigation. In addition, the Court's failure to transfer venue allowed Plaintiffs to exploit the unavailability of key witnesses.[13] Permitting Plaintiffs to maintain this action in an inconvenient trial forum and to

---

[12] *See* Defs' Mem. Supp. Mot. to Transfer Venue [2194]; Defs' Reply Mem. Supp. Mot. to Transfer Venue [2257-2].

[13] *See* Defs' Mem. Supp. Mot. to Preclude Pls. from Presenting Live Testimony from PMG Doctors Unless and Until Pls. Make PMG Doctors Available to Defs. For Live Testimony [2315].

selectively procure PMG doctors' trial testimony based on the pretense that Plaintiffs had no "control" over these witnesses was highly prejudicial and deprived Defendants of a fair trial. Further, allowing Plaintiffs to file in an inconvenient forum, only to deny Defendants' motion for transfer pursuant to 28 U.S.C. § 1404, permitted Plaintiffs to circumvent *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998), where the Supreme Court held that 28 U.S.C. § 1407 "limits a transferee court's authority to the conduct of 'coordinated or consolidated' proceedings and to those that are 'pretrial.'" *Lexecon*, 523 U.S. at 33-34. Just as failure to comply with *Lexecon*'s remand requirement can be remedied only by a new trial, *see id.* at 41-43, circumvention of *Lexecon* also requires a new trial.

## V.   Motion To Re-Open Evidence And Admit 2011 Cochrane Review

Plaintiffs argued and elicited testimony that: (1) Defendants withheld negative data from the Cochrane Group regarding Neurontin's efficacy for neuropathic pain; (2) the 2005 Cochrane Review was "irremediably compromised" by the unavailability of this negative data;[14] and (3) Plaintiffs and PMG doctors would have relied on the 2005 Cochrane Review when making formulary and prescription decisions.  New evidence, not previously available, demonstrates that the Cochrane Group has now considered all allegedly withheld information and still concludes that "gabapentin provides pain relief of a high level in about a third of people who take it for painful neuropathic pain," and "is associated with a moderate benefit (equivalent to at least 30% pain relief) in almost one in two patients." (*See* Exh. A, 2011 Cochrane Review.)

Courts possess broad discretion in determining whether to reopen a case so that additional evidence can be submitted.  *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 331 (1971); *Blinzler v. Marriott Int'l, Inc.*, 81 F.3d 1148, 1160 (1st Cir. 1996). "A trial court's decision to reopen is premised upon criteria that are flexible and fact-specific, but fairness is the key criterion." *Blinzler*, 81 F.3d at 1160.  Factors to consider include (1) the probative value of the evidence, (2) the reason it was not introduced earlier, and (3) the

---

[14] 3/1 Tr. (Perry) at 150:4-8.

likelihood of undue prejudice.  *Id.*  All of these factors weigh in favor of admission here.

Plaintiffs' neuropathic pain expert testified that the 2005 Cochrane Review was based on only "14 studies" (3/1 Tr. (Perry) at 147:13-16), and that the Cochrane Group "had no access to the unpublished reports, Reckless and POPP." (*Id.* at 147:17-25; *see also* 2/24 Tr. (Abramson) at 49:7-19.)  But the 2011 Cochrane Review includes "unpublished information made available through litigation." (Exh. A, 2011 Cochrane Review at 2.)  For its 2011 review, the Cochrane Group "looked at evidence from 29 studies" (*id.*), including the now-published POPP study (also known as "Gordh") and the unpublished data from Reckless.  The Cochrane Group also considered the criticisms by its director, Dr. Dickersin, of certain published studies. (Exh. A at 2, 27, 33.)  The Cochrane Group addressed its director's misgivings by carefully assessing the "risk of bias in included studies" and accounting conservatively for any "missing data." (*See* Exh. A, 2011 Cochrane Review at 6.)

The 2011 Cochrane Review defeats Plaintiffs' claims of causation and injury.  Plaintiffs' experts asserted that Cochrane Reviews are a reliable source regarding efficacy (*see, e.g.*, 2/23 (Abramson) at 121:7; 3/1 Tr. (McCrory) at 18:7-14), one that "physicians and health plans like Kaiser would rely upon" (2/25 Tr. (Dickersin) at 72:12-20).  If earlier Cochrane Reviews had looked like the 2011 Cochrane Review, Plaintiffs and prescribing doctors would have seen compelling evidence of efficacy and been guided accordingly.

## VI.  Alternative Or Additional Relief

For the reasons set forth in Defendants' Renewed Motion for Judgment as a Matter of Law and Motion For Amended and Additional Findings, Defendants respectfully request that judgment be entered in their favor and that the Court enter amended Findings of Fact and Conclusions of Law.  As alternative or additional relief, Defendants seek a new trial and/or modification of the judgment in order to correct the numerous errors described in Defendants' Memorandum of Law in Support of Renewed Motion for Judgment as a Matter of Law Memorandum of Points and Authorities in Support of Defendants' Motion for Amended and Additional Findings, including, without limitation, the erroneous admission of Prof. Rosenthal's

and Dr. Hartman's testimony and the erroneous inclusion of prescriptions written by PMGs as to which insufficient evidence was offered, as well as prescriptions paid for by non-party subsidiaries of Kaiser Foundation Health Plan, and the erroneous exclusion of relevant testimony from Albert Carver as set out in Defendants' Offer of Proof [2737]. Defendants also request that Plaintiffs be required to remit any damages awarded by the jury, and trebled by this Court, in excess of that supported by the evidence.

## CONCLUSION

For all of the foregoing reasons, Defendants respectfully request that the Court grant their Motion for New Trial and to Re-Open Evidence or, Alternatively, to Alter or Amend Judgment.

Dated: March 22, 2011

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP

By:    /s/ Mark S. Cheffo
        Mark S. Cheffo
Four Times Square
New York, NY 10036
Tel: (212) 735-3000
Email: Mark.Cheffo@skadden.com

Respectfully submitted,

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP

By:    /s/ Raoul D. Kennedy
        Raoul D. Kennedy
Four Embarcadero Center
San Francisco CA 94111
Tel: (415) 984-6400
Email: Raoul.Kennedy@skadden.com

WHEELER TRIGG O'DONNELL LLP

By:    /s/ James E. Hooper
        James E. Hooper
1801 California Street
Suite 3600
Denver, CO 80202-2617
Tel: (303) 244-1800
Email: hooper@wtotrial.com

*Attorneys for Defendants Pfizer Inc and Warner-Lambert Company LLC*

CERTIFICATE OF SERVICE

    I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on March 22, 2011.

        /s/ Mark S. Cheffo
        Mark S. Cheffo