UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

In re:   NEURONTIN MARKETING, SALES PRACTICES,
AND PRODUCTS LIABILITY LITIGATION

MDL Docket No. 1629

Master File No. 04-10981

THIS DOCUMENT RELATES TO:

KAISER FOUNDATION HEALTH PLAN, et al. v.
PFIZER INC., 04-CV-10739 (PBS)

Judge Patti B. Saris

Magistrate Judge Leo T. Sorokin

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS' MOTION FOR AMENDED AND ADDITIONAL FINDINGS**

Mark S. Cheffo
SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
Four Times Square
New York, NY 10036
Tel:  (212) 735-3000

Raoul D. Kennedy
SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
Four Embarcadero Center
San Francisco CA 94111
Tel:  (415) 984-6400

James E. Hooper
WHEELER TRIGG O'DONNELL LLP
1801 California Street
Suite 3600
Denver, CO 80202-2617
Tel:  (303) 244-1800

*Attorneys for Defendants Pfizer Inc and
Warner-Lambert Company LLC*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... iii

ARGUMENT ....................................................................................................................... 1

I.     The Court's Findings Misstate The Evidence Regarding Plaintiffs' Corporate Structure And Relation To Non-Parties' P&T Committees And Formularies .................. 1

II.    The Court's Findings Regarding The Purported "Marketing Fraud" Relate To Conduct With No Nexus To Plaintiffs' Claims .............................................................. 3

       A.     No Nexus To CME Events ..................................................................... 4

       B.     No Nexus To Publications ..................................................................... 4

       C.     No Nexus To Detailing .......................................................................... 6

III.    The Court's Findings Do Not Adequately Address Plaintiffs' Admissions Regarding Neurontin's Effectiveness .................................................................... 7

IV.    The Court's Causation Findings Are Based On Speculative Inferences That Were Contradicted By The Evidence ........................................................................ 7

       A.     95% Formulary Compliance Does Not Support A Finding Of Causation ............. 7

       B.     The Possibility That DIS Might Have Issued Materially Different Monographs Does Not Support A Finding Of Causation ...................................... 9

       C.     The DRUG/DUAT Initiative Does Not Support A Finding Of Causation .......... 10

V.     The Court Applied the Wrong Standard to Questions of Inefficacy and Injury .............. 10

VI.    The Court's Findings Misstate The Evidence Regarding Neurontin Use By Patients With Bipolar Disorder ....................................................................... 14

       A.     The Court's Findings Do Not Address Plaintiffs' Failure To Prove That Fraudulent Promotion Caused Additional "Bipolar" Prescriptions ..................... 14

       B.     The Court Mistakenly Attributed An Independent, Positive Bipolar Study To Defendants And Disregarded Another Positive Study .................................. 15

VII.   Other Evidence Cited By The Court Was Inadmissible Or Otherwise Failed To Provide A Legally Sufficient Basis For The Court's Findings ....................................... 16

       A.     Opinion Testimony Of Prof. Rosenthal And Dr. Hartman ................................ 16

B.    Warner-Lambert's Guilty Plea And Related Government Investigations Or Agreements ........................................................................................ 17

C.    July 21, 1999, Email From Christopher Wohlberg ............................................ 17

D.    Testimony Of David Franklin And Related Evidence ........................................ 18

E.    Testimony From Dr. Curt Furberg And Related Evidence ................................. 18

VIII.   The Court's Conclusions of Law Should Be Amended To Correct Additional Errors of Law ........................................................................................................... 18

CONCLUSION ...................................................................................................................... 20

# TABLE OF AUTHORITIES

## CASES

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)...................................16, 17

*Laster v. T-Mobile USA, Inc.*, No. 05cv1167,
   2009 WL 4842801 (S.D. Cal. Dec. 14, 2009)....................................................................7

*Ironworkers Local Union 68 v. AstraZeneca Pharmaceuticals, LP*, No. 08 16851,
   2011 WL 833222 (11th Cir. Mar. 11, 2011)............................................................13, 19

*Jamison v. Jamison*, 79 Cal. Rptr. 3d 561 (Ct. App. 2008)..................................................19

*Matthew Bender & Company, Inc. v. West Publishing Co.*, 158 F.3d 674 (2d Cir. 1993)...........12

*McAdams v. Monier, Inc.*, 105 Cal. Rptr. 3d 704 (Ct. App.  2010)...........................................19

*In re Neurontin Marketing & Sales Practices Litigation*,
   244 F.R.D. 89 (D. Mass. 2007) ................................................................................14

*In re Neurontin Marketing, Sales Practices, & Products Liability Litigation*,
   MDL No. 1629, No. 04-10981 (D. Mass. Jan. 31, 2006), ECF No. 269,
   *adopted in relevant part*, 433 F. Supp. 2d 172 (D. Mass. 2006).....................................11

*In re Neurontin Marketing, Sales Practices, & Products Liability Litigation*,
   612 F. Supp. 2d 116 (D. Mass 2009).............................................................................18

*Norwest Mortgage, Inc. v. Superior Court*, 85 Cal. Rptr. 2d 18 (Ct. App. 1999).......................19

*Prohias v. Pfizer, Inc.*, 485 F. Supp. 2d 1329 (S.D. Fla. 2007)....................................................7

*Quezada v. Loan Center of California, Inc.*, No. CIV. 2:08-00177,
   2009 WL 5113506 (E.D. Cal. Dec. 18, 2009)...................................................................7

*Texas A&M Research Foundation  v. Magna Transportation, Inc.*,
   338 F.3d 394 (5th Cir. 2003)........................................................................................12

*United Food & Commercial Workers Central Pennsylvania & Regional
   Health & Welfare Fund v. Amgen, Inc.*, 400 F. App'x 255 (9th Cir. 2010).....................19

*Whalen v. Pfizer, Inc.*, 862 N.Y.S.2d 812 (table), 2005 WL 2875291 (Sup. Ct. 2005)..................7

Defendants Pfizer Inc and Warner-Lambert Company LLC (collectively, "Pfizer" or "Defendants"), respectfully submit this Memorandum of Law in support of their motion, pursuant to Rule 52(b) of the Federal Rules of Civil Procedure, for amendments and additions to the Court's Findings of Fact and Conclusions of Law ("Findings") [3120].[1]

## ARGUMENT

I.      **The Court's Findings Misstate The Evidence Regarding Plaintiffs' Corporate Structure And Relation To Non-Parties' P&T Committees And Formularies**

The Court's Findings fail to take into account critical distinctions between the two Plaintiffs, six non-party subsidiaries of Plaintiff Kaiser Foundation Health Plan, Inc. ("KFHP"), and eight non-party regional Permanente Medical Groups ("PMGs").  Defendants described these distinctions in detail in their proposed findings (Defs' FoF ¶¶ 1-5), and request that the Court adopt these findings.   When properly considered, Defendants' proposed findings demonstrate that Plaintiffs failed to satisfy their burden of proving standing, causation, and injury.

The Court's Findings state that Plaintiff Kaiser Foundation Health Plan, Inc. ("KFHP") is the "parent corporation" of "eight regional Kaiser entities," "each of which has its own Pharmacy and Therapeutics ('P&T') Committees." (Findings at 5.) The Findings also state that PMG doctors "sit as members on the P&T Committee" and "work closely with Kaiser . . . in developing the drug formulary." (*Id.* at 5-6.) This description is incorrect in several important respects.

 First, despite acknowledging the distinction between KFHP and its non-California subsidiaries, the Court does not address the legal import of the subsidiaries' status as distinct entities that are not parties to this case.  Throughout its findings, the Court collectively refers to

---

[1] Defendants hereby incorporate their Proposed Findings of Fact ("Defs' FoF") [2808-1], Proposed Conclusions of Law [2808-2] ("Defs' CoL"), Response to Plaintiffs' Proposed Findings of Fact [2815], and Response to Plaintiffs' Proposed Conclusions of Law [2816].  For the reasons stated therein, Defendants request that the Court amend its findings and conclusions to conform to Defendants' Proposed Findings of Fact and Conclusions of Law.  Defendants further incorporate the arguments set forth in support of their concurrently-filed Renewed Motion for Judgment as a Matter of Law and Motion for New Trial.

KFHP and its subsidiaries as though they were a single entity operating in multiple states.  And the Court awards restitution "to Kaiser Foundation Health Plan" (*Id.* at 113) that includes damages purportedly sustained by its non-party subsidiaries.  But the Court did not discuss Defendants' arguments and authorities demonstrating that KFHP lacks standing to sue on behalf of its non-party subsidiaries.  (*See* Defs' CoL at 1-2 & n.1.)  The Court addressed the issue of standing only with respect to Plaintiff Kaiser Hospitals.  (*See* Findings at 112-113.)  With respect to KFHP's non-California subsidiaries, the Court only addressed Defendants' choice-of-law arguments (*see id.* at 121-26), not their standing arguments.

Second, the Court's reference to "eight regional Kaiser entities" appears to have confused KFHP and its six non-party subsidiaries (*see* Defs' FoF ¶ 1) with the eight regional PMGs, which exist and operate independently from KFHP and its subsidiaries (*see id.* ¶ 2).

Third, the Court's Findings incorrectly state that the regional P&T Committees are part of KFHP and its subsidiaries, and that PMG doctors merely assist and make recommendations to the P&T Committees.  In fact, the P&T Committees were established by, and belong to, the non-party regional PMGs themselves.  (*Id.* ¶¶ 2-3.)  Thus, for example, the Court's references to "Kaiser's P&T Committees" (Findings at 65, 126) are incorrect.  "Kaiser" does not have P&T Committees.

Fourth, and relatedly, the Court's Findings incorrectly state that "Kaiser" maintains its own drug formulary.  (*Id.* at 7 ("Kaiser utilizes a drug formulary"); *id.* at 67 ("Kaiser had multiple lower-cost drug options on its formulary"); *id.* at 70-71 ("[C]ommunications between Pfizer and Kaiser directly affected Kaiser's decisions about Neurontin's placement on its formulary without restrictions").)  In fact, different formularies are established by each P&T Committee of each of the separate non-party PMGs.  (Defs' FoF ¶ 3.)

Fifth, the Court's statement that "Kaiser added Neurontin to the formularies in all its regions by 1994" is also incorrect.  (Findings at 8.)  Initially, as explained above, "Kaiser" did not have a formulary.  And the different regional PMGs added Neurontin to their formularies at different times.  The Northern California PMG ("TPMG"),  Northwest (Oregon and Washington)

PMG ("NWPMG") added Neurontin to their formularies without restrictions in 1994; the Colorado PMG ("CPMG") in 1995; and the Southeast (Georgia) PMG ("SEPMG") in 1996. (3/5 Tr. (Millares) at 12:2-4; DX840, Villaluz Aff. ¶¶ 4, 8, 18.)  The Southern California PMG ("SCPMG") and Ohio PMG ("OPMG") added Neurontin to their formularies in 1994, restricted to neurologists. (DX 528; DX840, Villaluz Aff. ¶¶ 26-27.)  Hawaii did not add Neurontin to formulary until 2000.  (DX840, Villaluz Aff. ¶ 11.)  Plaintiffs presented no evidence regarding when Neurontin was added to the Mid-Atlantic States PMG's formulary or whether there were any restrictions.

The Court's erroneous findings that "Kaiser" has P&T Committees, maintains its own drug formulary, and made decisions regarding Neurontin's formulary status, were central to the Court's equally erroneous conclusions regarding causation and injury.  Plaintiffs presented no evidence that any P&T Committee of any non-party PMG based formulary decisions on any affirmative representation made by Defendants, or that any P&T Committee would have made different formulary decisions had any specified scientific evidence been published or made available earlier.  Instead, between 1994 and 1996, following FDA approval for epilepsy, several PMGs added Neurontin to their formulary both with and without restrictions.  Their separate, respective decisions to do so pre-date the conduct alleged by Plaintiffs to have been wrongful. (Defs' FoF ¶¶ 14-20.)

## II.   The Court's Findings Regarding The Purported "Marketing Fraud" Relate To Conduct With No Nexus To Plaintiffs' Claims

The Court found that "Defendants conducted marketing largely through three tactics: direct marketing to physicians, publication of positive Neurontin articles in medical journals and suppression of negative trials, and the sponsorship of CME events attended by physicians." (Findings at 27.)  To the extent that the Court relied upon evidence admitted over Defendants' objection, as set forth in Defendants' concurrently-filed Motion for New Trial, the Court's findings were erroneous and should be amended.

Further, Plaintiffs presented no evidence that the marketing activities discussed in the

3

Court's Findings had any nexus to their claims.  As discussed more fully in Defendants' Motion for New Trial, Section I.B, the few instances where the Court found such a nexus are unsupported by any evidence.

### A.      No Nexus To CME Events

Out of all the CME events discussed in the Court's Findings, Plaintiffs only attempted to show that two such CME events were attended by PMG doctors.  And Plaintiffs presented no evidence whatsoever regarding the content of those two events.   First, Plaintiffs presented evidence, and the Court found, that 33 PMG doctors attended a CME entitled "New Frontiers in Social Phobia and Bipolar Disorders."  (Findings at 36, 62.)  But Plaintiffs' only evidence regarding this CME series is a list of venues and attendees.  (PX 360.)  Plaintiffs presented no evidence regarding what slides were shown, what statements were made, whether Neurontin was even discussed, or whether the content was controlled by Defendants.

Second, Plaintiffs presented a one-page internal Kaiser Permanente Northwest Division memo stating that new starts of Neurontin increased after an unspecified "May 1999 CME."  (PX 286.)  The Court erroneously cited this memo as support for its finding that Plaintiffs and PMG doctors relied on Defendants' alleged misrepresentations.  (*See* Findings at 69-70.)  But other than quoting an unknown source stating that "'Neurontin was promoted'" (PX 286), the memo provides no information whatsoever regarding the CME's content.  There is no evidence that Neurontin was promoted for off-label uses, that any fraudulent statements or omissions were made, or that Defendants controlled the CME's content.  Nor did Plaintiffs present evidence of how many PMG doctors (if any) attended.  The memo does not state that this CME caused any subsequent increases in Neurontin prescribing, and Plaintiffs provided no basis for any such conclusion.  No expert analyzed the statistics addressed in this memo.  The notion that this "May 1999 CME" involved fraudulent promotion or caused Plaintiffs any injury is pure speculation.

### B.      No Nexus To Publications

Plaintiffs only attempted to show that one of the allegedly misleading publications they describe was actually distributed to PMG doctors.  Plaintiffs argued, and the Court found, that a

March 1999 issue of *Progress in Neurology* (PX80) was mailed "***to all neurologists practicing in the United States***." (Findings at 47 (emphasis in original); *see also id.* at 52, 62-63.) But Plaintiffs' evidence explicitly refers to the mailing of ***four different issues*** of *Progress in Neurology* that were published the following year. (PX92.) Plaintiffs did not introduce any of these four issues at trial, and did not present any evidence that they contained purportedly misleading statements about off-label Neurontin use. As for the March 1999 issue that Plaintiffs claim is misleading (PX80), there is no evidence regarding its purported distribution to PMG neurologists or anyone else.

The Court also found that a supplement titled "'New Treatment Strategies in Psychiatry: Role of Anticonvulsants' . . . was distributed to 43,000 psychiatrists." (Findings at 32-33.) But the only evidence Plaintiffs presented of such distribution was Dr. Barkin's testimony. (*See* 2/26 Tr. (Barkin) at 25:5-7.) Dr. Barkin has no personal knowledge of any such distribution and Plaintiffs presented no documentary evidence to support his testimony. In any event, Plaintiffs did not even attempt to show that the purported distribution included PMG doctors.

In addition, the Court found that Defendants "suppressed" Dr. Pande's negative bipolar study and later engaged in "location bias" by publishing the study in a "'small journal' with a circulation of only 455 physicians." (Findings at 18, 35.) Initially, the evidence did not support Plaintiffs' claim that Defendants suppressed the Pande study. Instead, Dr. Pande presented the results of his study at the Third International Bipolar Conference in June 1999, which was attended by several doctors who prescribed Neurontin to KFHP's insureds. Defendants also disclosed the results of Dr. Pande's study to PMG physicians in informational letters sent in 1999 and 2000. When it was published in 2000, the results were accurately disclosed. (Defs' FoF ¶¶ 29-31.) Not only was there was no evidence that a larger journal would have accepted Dr. Pande's article, Plaintiffs' assertion of publication bias had no conceivable relevance or nexus to their claims. "'[S]mall journal'" or no, DIS clearly had no difficulty obtaining this article, given that its 2002 Neurontin monograph reported the negative Pande bipolar study. (DX630.) And far from prompting any new restrictions on Neurontin prescribing to bipolar

5

patients, DIS's 2002 monograph prompted the Ohio PMG to *expand* formulary restrictions to permit use of Neurontin as a third-line agent in bipolar disorder. (*See id.*)

### C.     No Nexus To Detailing

The Court found that Defendants engaged in fraudulent off-label detailing of Neurontin and referred to such detailing throughout its Findings. (*See, e.g.*, Findings at 1, 31, 35, 39, 53, 59, 77.)  For the reasons set forth in Defendants' prior and contemporaneous submissions, this finding was not supported by the evidence at trial.  While there was evidence of off-label marketing, evidence regarding allegedly fraudulent representations made to physicians came primarily from the testimony of David Franklin, which should have been excluded. *See infra*, Section VII.D.  Indeed, at the hearing on Defendants' Motions for Judgment pursuant to Rule 50(a), the Court observed:  "Your problem is that there's no data about detailing.  I'm not faulting anyone.  There's just no data about detailing.  And so the fraud has to come in terms of the publication fraud and the fraud in CMEs and in teleconferences and in the communications to DIS and DIS's reliance on the publications."  (3/19 Tr. (Court) at 221:5-10.)

Moreover, the Court's statements and findings regarding detailing are simply irrelevant to this case because there is no evidence of any nexus between alleged fraudulent detailing and Plaintiffs' claims.  The Court did not find, and Plaintiffs presented no evidence, that Defendants engaged in fraudulent detailing of a single PMG doctor.  While the Court cites Dr. Carrejo's hearsay testimony that some unspecified detailing occurred at a single Kaiser Hospitals facility in Oakland (*see* Findings at 26 (citing 2/26 Tr. (Carrejo) at 97-98), Dr. Carrejo provided no information regarding what statements were made or whether they concerned off-label uses.  As noted above, the Court has already acknowledged on the record that Plaintiffs presented no evidence of fraudulent or off-label Neurontin detailing to PMG doctors.  The Court should make additional findings clearly stating that no such evidence was presented, and should strike its original findings on the issue of detailing due to the lack of nexus to Plaintiffs' claims.

III.    **The Court's Findings Do Not Adequately Address Plaintiffs' Admissions Regarding Neurontin's Effectiveness**

As detailed in Defendants' Proposed Findings of Fact, Plaintiffs were aware of the lack of DBRCT evidence when SCPMG expanded formulary access to non-neurologists and psychiatrists.  (*See* Defs' FoF ¶¶ 21, 24-28.)  Plaintiffs were also aware of the scientific studies they claim were delayed or manipulated.  (*See id.* ¶¶ 25, 34, 150.)  Despite this knowledge, Plaintiffs' website and the PMGs' formularies and guidelines have permitted and encouraged Neurontin use for the relevant off-label conditions throughout the life of this litigation.  (*See id.* ¶¶ 35, 42-56.)

The Court's Findings virtually ignore this "embarrassing fact" and treat it as relating only to "mitigat[ion]" of damages.  (Findings at 71.)   To the contrary, Plaintiffs' continued acknowledgements of Neurontin's benefits for the relevant conditions, long after learning all the information they contend they once did not know, constitute admissions that rebut Plaintiffs' claims of materiality, reliance and causation.  Evidence that a plaintiff was aware of any alleged fraudulent statements or omissions negates the causal nexus.  *See Quezada v. Loan Ctr. of Cal., Inc.*, No. CIV. 2:08-00177, 2009 WL 5113506, at *5 (E.D. Cal. Dec. 18, 2009); *see also Laster v. T-Mobile USA, Inc.*, No. 05cv1167, 2009 WL 4842801, at *7-8 (S.D. Cal. Dec. 14, 2009) (holding that plaintiff who continued to renew cell phone contracts containing allegedly illegal charges even after filing suit could not show reliance); *Prohias v. Pfizer, Inc.*, 485 F. Supp. 2d 1329, 1336 (S.D. Fla. 2007) (dismissing claims by plaintiffs who continued to take the drug even after filing suit); *Whalen v. Pfizer, Inc.*, 862 N.Y.S.2d 812 (table), 2005 WL 2875291, at *3 (Sup. Ct. 2005) (finding no injury where plaintiff, with knowledge of alleged misrepresentation, continued to use the product).

IV.    **The Court's Causation Findings Are Based On Speculative Inferences That Were Contradicted By The Evidence**

A.    **95% Formulary Compliance Does Not Support A Finding Of Causation**

Plaintiffs' theory of causation required them to prove, *inter alia*, that Neurontin's status on the PMGs' formularies had a direct and measurable impact on off-label prescribing by PMG

doctors. But no expert attempted to measure the impact of Neurontin's formulary status. To the contrary, Plaintiffs' causation expert treated formulary status as irrelevant. (3/8 Tr. (Rosenthal) at 28:3-8.) Moreover, the evidence showed, and the Court found, that PMG doctors are free to prescribe drugs regardless of formulary status, and that KFHP "will pay for off-formulary prescriptions." (Findings at 8; *see also* Defs' FoF ¶¶ 129-31.) Based on this finding and evidence, the Court should have found that Plaintiffs failed to prove that Neurontin's formulary status caused them to sustain any injury.

Instead, the Court relied upon an "internal study" that purportedly concluded "that 95% of prescriptions written by PMG physicians are in compliance with the drug formulary." (Findings at 8.) Plaintiffs did not introduce this "internal study" into evidence and provided no information regarding the study's data, geographical scope, time period, or methodology. No expert testified about the accuracy or reliability of the study's conclusions or how they might apply to the issue of causation. Despite this lack of evidence, the Court made the wholly speculative finding that, "[b]ecause Kaiser has a 95% compliance rate with its formulary, formulary restrictions necessarily affect the number of prescriptions written for any given drug." (*Id.* at 71.) This finding is not only unfounded, but flatly contradicted by the evidence.

Plaintiffs' own witnesses rejected the proposition that one could draw inferences about the impact that formulary restrictions would have on Neurontin prescriptions based upon the 95% figure. In fact, contrasting Southern California with the other regions, Dr. Daniel testified: "They don't use restrictions at all virtually. I've talked – they think we're nuts in Southern California because the restrictions are not enforceable at all, and so they say, Well, it's just, you know, a piece of paper that doesn't mean anything." (3/9 Tr. (Daniel) at 95:1-5.) If almost all drugs are on formulary and unrestricted, the fact that 95% of prescriptions are formulary-compliant is unremarkable. And Plaintiffs' witnesses repeatedly rejected the suggestion that restricting a drug's formulary access would alter physician behavior. (*See id.*; *see also* 3/3 Tr. (Hyatt) at 104:22-105:6, 114:8-15, 139:16-24; 3/9 Tr. (Daniel) 109:22-110:12.) Indeed, this is Plaintiffs' explanation for their failure to recommend, and the PMGs' failure to add, any

formulary restrictions for Neurontin after learning of the alleged fraud and commencing this lawsuit.  As Dr. Hyatt explained, adding formulary restrictions would not have worked because "our physicians have the ability to prescribe drugs that are not on the formulary."  (3/3 Tr. (Hyatt) at 139:16-140:7.)  If the 95% figure actually had the significance the Court attributes to it, then the PMGs could have virtually eliminated off-label Neurontin prescribing by simply adding formulary restrictions,[2] rather than expending "'a lot of resource[s]'" (*see* Findings at 73 (citation omitted)) to purportedly achieve a 34% reduction through initiatives like DRUG/DUAT.

On its face, Plaintiffs' reliance on the 95% figure depends on two mutually exclusive and irreconcilable premises: (1) SCPMG doctors would have strictly adhered to initial formulary restrictions throughout the relevant time period had they not been removed, but (2) PMG doctors in all regions, including SCPMG, would have ignored any new formulary restrictions had they been added during that same time period.  The Court's Findings should be amended to reject Plaintiffs' contradictory logic and their irrelevant 95% figure.

### B.    The Possibility That DIS Might Have Issued Materially Different Monographs Does Not Support A Finding Of Causation

The Court found that PMGs outside Southern California would not have removed or restricted formulary access to Neurontin even if they had known of the alleged fraud.  (*See* Findings at 135.)  But the Court found that "DIS probably would have issued monographs for Neurontin that were materially different and would not have recommended the expanded prescribing of the drug for off-label indications. . . .   The Court is persuaded that PMG physicians would have responded by reducing prescribing of Neurontin to Kaiser members." (*Id.*)  These findings are wholly speculative and contradicted by the evidence.

Initially, Plaintiffs presented no evidence purporting to show that DIS monographs have any measurable impact on PMG doctors' prescribing decisions.  Moreover, in 2002, DIS issued a

---

[2] Even removed from formulary, Neurontin and gabapentin would remain available for on-label uses through the exception process.  (3/10 Tr. (Daniel) at 42:20 43:10; DX515.)

monograph that was "materially different" from its prior monographs in that it noted that there were no DBRCTs establishing Neurontin's efficacy in treating bipolar disorder, and that two DBRCTs (Frye and Pande) were negative. (DX630). Far from "reducing prescribing," the Ohio PMG responded to this monograph by expanding formulary restrictions to permit use of Neurontin as a third-line agent in bipolar disorder. (*Id.*) The same 2002 monograph also was utilized by the Southern California and Northern California PMGs (*id.*), neither of which sought to impose restrictions on Neurontin among psychiatrists. (3/3 Tr. (Carrejo) at 31:11-25.)

      **C.**      **The DRUG/DUAT Initiative Does Not Support A Finding Of Causation**

      Likewise, no inference can be drawn from the 34% reduction in Neurontin prescriptions attributed by Plaintiffs to the Neurontin initiative in 2002. Even assuming that the PMGs might have initiated a similar education program earlier (and there is no reason to believe they would have done so), it would be impossible to extrapolate the 34 percent to earlier years, when Neurontin usage was less. Further, the Neurontin initiative was limited to neuropathic pain and, therefore, is not probative of causation with respect to any other indication. (*See, e.g.*, DX747; 3/3 Tr. (Hyatt) at 105:7-15, 107:6-108:15, 129:21-130:3.)[3]

**V.**      **The Court Applied the Wrong Standard to Questions of Inefficacy and Injury**

      Defendants submitted substantial evidence in support of Neurontin's efficacy for the off-label uses at issue (Defs' FoF ¶¶ 57-113) and, therefore, respectfully submit that the Court's findings to the contrary are erroneous and should be amended. Moreover, the Court's Findings on the question of inefficacy demonstrate that the Court applied the wrong legal standard to this issue and erroneously shifted the burden of proof to Defendants. When deciding whether Plaintiffs satisfied their burden of proving that they sustained an injury by virtue of Neurontin's alleged inefficacy for treating the relevant off-label conditions, the Court applied the same standard used by the FDA when evaluating drugs for on-label indications. As the Court

---

[3] For example, Dr. Hyatt testified that they talked about Neurontin with psychiatry, but "[t]hey felt that at the time they had a good handle on its use and that we should come back to them at a later date, which we were comfortable with because, as I said, we really wanted to go where the most use was and the most opportunity was." (3/3 Tr. (Hyatt) at 106:7-12.)

explained: "The FDA requires two DBRCTs to prove the efficacy of a drug because it is important to be able to duplicate positive results. . . . The Court finds this is a reliable standard followed by the scientific community." (Findings at 81.) The Court found that the scientific evidence did not support efficacy under this standard. For example:

> The Court finds that there is no reliable scientific evidence that Neurontin is effective for bipolar disorder, migraine, or at high doses. With respect to some kinds of neuropathic pain, there is some scientific evidence of efficacy. However, as the FDA found, there is no reliable scientific evidence to support a broad indication of neuropathic pain.

(*Id.* at 80.) Having found that there was insufficient scientific evidence to support on-label indications for the relevant uses, the Court leapt to the unsupported conclusion that Plaintiffs had satisfied their burden of proof.

There are several fundamental problems with the Court's adoption of the FDA's efficacy standard for on-label indications. First, the Court explicitly acknowledged that adopting this standard shifted the burden of proof to Defendants to show that Plaintiffs were uninjured by virtue of Neurontin's efficacy for the relevant conditions.

> Pfizer has taken the position that plaintiffs must prove that the drug is not effective for the treatment of any patient. That is not the standard adopted by the FDA or the standard generally accepted by the scientific community. Accordingly, I reject the proposed standard under *Daubert*.

(*Id.* at 82.) This was incorrect. As the Court previously held, "[i]t is simply not enough to claim that Neurontin had not been proven to be effective; rather, Plaintiffs must allege [and ultimately prove] that it was *ineffective*." Report and Recommendation on Defendants' Motion To Dismiss at 22, *In re Neurontin Mktg., Sales Practices, & Prods. Liab. Litig.*, MDL No. 1629, No. 04-10981 (D. Mass. Jan. 31, 2006), ECF No. 269 (emphasis added), *adopted in relevant part*, 433 F. Supp. 2d 172 (D. Mass. 2006).

Second, the Court brushed aside evidence that it should have recognized as being fatal to Plaintiffs' claims. For example, the Court specifically found that Neurontin is effective in treating relevant off-label conditions in at least some patients.

- "The Court was impressed with Dr. Bird's credentials and *credits his testimony that some patients with neuropathic pain benefit from Neurontin*."  (Findings at 98 (emphasis added).)

- "Like Dr. Bird, Dr. Brenner testified *credibly that Neurontin is an effective, safe, and well-tolerated treatment for some kinds of neuropathic pain in some patients*."  (*Id.* at 100 (emphasis added).)

- "Although *there may be a trend in the direction of increased benefit*, the clinical trials completed to date do not show that Neurontin is effective for migraine prophylaxis under the standard used by the FDA and adopted by this Court for the purposes of this efficacy analysis."  (*Id.* at 104 (emphasis added).)

- "While *it may well be that titrating to effect is the best way to determine the proper dose for an individual patient*, the Court finds the FDA's determination of lack of efficacy at higher doses persuasive."  (*Id.* at 107 (emphasis added).)

Further, the strict regulatory standard that the Court used caused it to disregard evidence probative of Neurontin's efficacy.  For example, when considering Neurontin's efficacy for neuropathic pain, the Court did not consider studies of post-herpetic neuralgia ("PHN").  (Findings at 97.)  However, while the regulatory approach taken by the FDA has been to restrict drug approval to specific types of neuropathic pain, Neurontin has been approved for the broad neuropathic pain indication in over 50 countries.  (3/16 Tr. (Brenner) at 35:2-6.)

The Court also discounted the testimony of Defendant's expert Dr. Brenner because it was based, in part, on the Cochrane meta-analysis.  (Findings at 100-01.)  As discussed in Defendants' Motion for New Trial, the Court should re-open evidence to admit the 2011 Cochrane Review.[4]  This new evidence, not previously available, demonstrates that the Cochrane Group has now considered all allegedly withheld information and still concludes that Neurontin is effective in treating off-label neuropathic pain conditions.  For its 2011 review, the Cochrane Group "looked at evidence from 29 studies" (2011 Cochrane Review at 2), including Reckless and POPP.  The Cochrane Group also reviewed and cited Dr. Dickersin's published findings in this case.  (*See id.* at 2, 27, 33.)  Having considered all of the information Plaintiffs claim was

---

[4] Courts frequently re-open the evidence in cases tried to the bench.  *See, e.g., Texas A&M Research Found. v. Magna Transp., Inc.*, 338 F.3d 394, 401 (5th Cir. 2003); *Matthew Bender & Company, Inc. v. West Publishing Co.*, 158 F.3d 674, 679 (2d Cir. 1993).

previously withheld, the Cochrane Group concluded that Neurontin is effective for neuropathic pain conditions, including off-label conditions such as diabetic peripheral neuropathy. (*Id.* at 2.) With respect to efficacy, the parties agree that the Cochrane Group is a reliable source of information. (*See, e.g.*, 2/23 (Abramson) at 121:7; 3/1 Tr. (McCrory) at 18:7-14; *see also* Findings at 16 n. 4.) Its newly published findings are fatal to the Court's findings of causation and injury as to neuropathic pain.

Having chosen to pursue their claims on an aggregate basis – without presenting any individualized evidence regarding even one prescription written by a single doctor to a single insured – Plaintiffs undertook the heavy burden of proving either (1) that Neurontin is categorically ineffective for all patients, or (2) that cheaper alternative drugs are categorically as effective or more effective with fewer side effects than Neurontin for all patients.[5]   But the Court's own findings indicate that some of Plaintiffs' members likely benefited from off-label Neurontin use.  Plaintiffs provided no evidence capable of determining which or how many members did or did not benefit.  Because of the all-or-nothing approach that Plaintiffs willingly accepted in attempting to prove causation and injury in the aggregate, the fact that at least some of their members derived legitimate benefits from off-label Neurontin use means that Plaintiffs failed to satisfy their burden.

Third, the Court's unfounded presumption that off-label prescriptions would not occur or would not be effective absent positive DBRCTs ignores substantial evidence to the contrary, including evidence demonstrating that: (a) neither DIS nor the regional PMGs require DBRCTs when making formulary recommendations and decisions (Defs' FoF ¶¶ 21, 35, 36; *see also* 3/4 Tr. (Millares) at 113:22-25 ("We don't have a requirement [for DBRCTs].")); (b) physicians consider multiple sources, types, and levels of scientific evidence for purposes of clinical decision-making (Defs' FoF ¶ 60); (c) off-label prescribing – even without sufficient DBRCT

---

[5] For the reasons stated in Defendants' prior submissions, Plaintiffs' "cheaper, alternative" theory was not supported by California law.  *See* Defs' CoL at 14.  Accordingly, Plaintiffs should not have been permitted to recover absent a showing of inefficacy.  *Cf. Ironworkers Local Union 68 v. AstraZeneca Pharm., LP*, No. 08-16851, 2011 WL 833222, at *5-6 (11th Cir. Mar. 11, 2011).

evidence to satisfy the FDA standard for on-label indications – is often the standard of care, especially for certain indications, such as neuropathic pain, for which there are few, if any, FDA-approved medications (*id.* at ¶ 12); (d) the FDA itself recognizes that drugs can be effective in some patients even where evidence sufficient for FDA approval does not exist, and permits physicians to prescribe drugs off-label (*id.* at ¶ 11).

Fourth, the Court's presumption that Neurontin is ineffective for off-label uses unless it meets the regulatory standards for on-label indications is tantamount to creating a private right of action for the marketing and promotion of drugs for indications that have not obtained FDA approval.  No such private right of action exists.  *See In re Neurontin Mktg. & Sale Practices Litig.*, 244 F.R.D. 89, 92 & n.6 (D. Mass. 2007).

## VI.   The Court's Findings Misstate The Evidence Regarding Neurontin Use By Patients With Bipolar Disorder

### A.   The Court's Findings Do Not Address Plaintiffs' Failure To Prove That Fraudulent Promotion Caused Additional "Bipolar" Prescriptions

The Court's Findings fail to address the fact that Plaintiffs' causation and damages evidence was not specific to bipolar disorder, as opposed to other mood disorders for which Plaintiffs presented no evidence of inefficacy or injury.  (*See* Defs' FoF at ¶ 92, 142.)  Plaintiffs' efficacy expert made clear that his opinions were restricted to true bipolar disorder, and not any comorbid conditions or other mood disorders that were included in Prof. Rosenthal's analysis. (2/25 Tr. (Barkin) 125:16-126:2.)   In contrast, the ICD-9 codes used by Prof. Rosenthal to analyze "'bipolar'" prescriptions – which had been provided to her by counsel and not any competent expert – included codes for depression.  She conceded that "bipolar disorder is quite rare," whereas "[d]epression is quite prevalent."  (3/8 Tr. (Rosenthal) at 84:22-85:24; PX405N.) Plaintiffs failed to offer any expert testimony that their categorization of ICD-9 codes actually corresponded to the indications for which they sought to recover in this lawsuit.  Because the Court's Findings do not address this issue at all, they should be amended to incorporate Defendants' proposed findings.  (*See* Defs' FoF at ¶ 92, 142.)

Compounding this error, the Court characterized Dr. Pande's article regarding the use of Neurontin to treat social phobia (TX1324) – a mood disorder that is often comorbid with bipolar (*see* Findings at 34 n.9) – as being fraudulent, when in fact it refutes Plaintiffs' allegations of fraud, causation, and injury.   Plaintiffs' experts concede that Dr. Pande's study is Level I evidence supporting Neurontin's efficacy in treating social phobia.   (*See* 2/26 Tr. (Barkin) at 70:24-71:4; *see also* 2/24 Tr. (Abramson) at 105:10-106:2.)   But the Court found that Dr. Pande's ***social phobia*** article was somehow rendered a "fraudulent half-truth" by not disclosing the negative results of prior ***bipolar*** studies.   (*See* Findings at 35.)   There is no basis whatsoever for this finding.   Though often comorbid, bipolar and social phobia are "distinct" psychiatric disorders.   (*Id.* at 34 n.9.)   Representing (correctly) that Neurontin is an effective treatment for social phobia cannot be construed as a representation that Neurontin is effective in treating bipolar disorder.   And no evidence supports the notion that an article reporting a drug's efficacy in treating one condition must also disclose any negative results of prior studies that addressed different conditions.

Far from constituting evidence of fraud, the Pande social phobia article is evidence that: (1) there are non-fraudulent reasons for discussing Neurontin use with psychiatrists; and (2) there are legitimate scientific reasons for prescribing Neurontin to bipolar patients who also suffer from comorbid social phobia disorder.   Given Plaintiffs' failure to distinguish between prescriptions written for true "bipolar" disorder as opposed to other comorbid mood disorders, the Court should have treated Dr. Pande's social phobia article as additional evidence that Plaintiffs failed to prove fraud, causation, or injury.

**B.      The Court Mistakenly Attributed An Independent, Positive Bipolar Study To Defendants And Disregarded Another Positive Study**

The Court repeatedly refers to the Mokhber trial – which "showed improvements in both mania and depressive symptoms by those patients taking gabapentin" – as a "Pfizer study." (Findings at 29, 86.)   In fact, Mokhber was an independent study performed by physicians at universities in British Columbia and Iran (DX 2004) without any financial sponsorship or other

involvement by Defendants.  This 2008 study was performed long after the Pande and Frye studies were publicized.  By incorrectly attributing the Mokhber trial to Defendants, the Court erroneously disregarded this study's significance as positive, independent scientific evidence that Neurontin can be effective in treating bipolar disorder.

The Court also notes that Mokhber was not placebo controlled (Findings at 86), but that is irrelevant where, as was true in Mokhber, Neurontin's efficacy was compared to active controls, whose efficacy treating bipolar disorder is not disputed.  Indeed, Plaintiffs' own expert endorsed the use of active comparators as one way to minimize the risk of unblinding.  (2/24 Tr. (Abramson) at 19:6-9 ("One [method to reduce unblinding] is to give an active comparator – in other words, another drug that relieves pain that also has side effects . . . .").)

The Court also gave little weight to the Vieta study, which the Court concedes found a "statistically significant difference between Neurontin and placebo in the "per protocol" (PP) subpopulation."  (Findings at 29.)   Contrary to the Court's findings, the exclusion of certain study participants was justified by the study protocol because they did not meet the research criteria at the beginning of the study.  The exclusion of these patients was disclosed in the 2006 peer-reviewed article reporting the study's results.  (3/19 Tr. (Slaby) at 109:8-112:10.)

## VII.   Other Evidence Cited By The Court Was Inadmissible Or Otherwise Failed To Provide A Legally Sufficient Basis For The Court's Findings

### A.     Opinion Testimony Of Prof. Rosenthal And Dr. Hartman

The Court extensively cited and relied upon testimony by Prof. Meredith Rosenthal, who attempted to demonstrate the number of prescriptions caused by off-label promotion for Neurontin.  For the reasons set forth in Defendants' Motion in Limine to Exclude the Testimony of Meredith Rosenthal [2316, 2317]; Motion for Judgment as a Matter of Law Based Upon Lack of Sufficient Evidence of Injury or Causation [2670, 2671]; concurrently-filed Motion for New Trial, Renewed Motion for Judgment as a Matter of Law; and supporting memoranda, Prof. Rosenthal's testimony was inadmissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  Even as admitted, Prof. Rosenthal's testimony does not support the

Court's Findings.

The Court also erroneously cited and relied upon the opinion testimony of Plaintiffs' damages expert Dr. Raymond Hartman. For the reasons set forth in Defendants' Motion in Limine to Exclude the Testimony of Raymond S. Hartman [2319, 2320]; Motion for Judgment as a Matter of Law Based Upon Lack of Sufficient Evidence to Prove Damages [2672, 2673]; concurrently-filed Motion for New Trial; Renewed Motion for Judgment as a Matter of Law; and supporting memoranda, Dr. Hartman's testimony was inadmissible under *Daubert*, 509 U.S. 579. Even as admitted, Dr. Hartman's testimony does not support the Court's Findings.

**B.   Warner-Lambert's Guilty Plea And Related Government Investigations Or Agreements**

The Court's Findings cite and rely upon evidence regarding Warner-Lambert Company LLC's guilty plea dated May 13, 2004 (the "Plea"). Such evidence and argument should have been excluded pursuant to Federal Rules of Evidence 401, 402, 403, and 404 for the reasons set forth in Defendants' Motion in Limine [2301, 2302], concurrently-filed Motion for New Trial, and supporting memoranda. At a minimum, references to this irrelevant and unduly prejudicial evidence should be stricken, as it provides no support for the Court's findings or conclusions regarding fraudulent conduct, causation, and injury.

**C.   July 21, 1999, Email From Christopher Wohlberg**

The Court's Findings quote from an internally circulated Pfizer email dated July 21, 1999 – prior to the 2000 merger between Pfizer and Warner-Lambert Company – which contains statements made by Christopher Wohlberg, who was never an employee of Warner-Lambert Company. (*See* Findings at 1, 18 (citing PX479).) The Court's Findings describe the email as evidence that Neurontin was "[d]ubbed 'snake oil' by Pfizer's own sales team." (*Id.* at 1.) This email should have been excluded pursuant to Federal Rules of Evidence 401, 402, 403, and 802 for the reasons set forth in Defendants' Memorandum in Support of Objections to Pre-Merger Statements Made by Pfizer Employees [2663], concurrently-filed Motion for New Trial, and supporting memoranda. At a minimum, references to this irrelevant and unduly prejudicial email

should be stricken, as it provides no support for the Court's findings or conclusions regarding fraudulent conduct, causation, and injury.

### D.     Testimony Of David Franklin And Related Evidence

The Court's Findings cite and extensively rely upon testimony from David Franklin and related evidence concerning Mr. Franklin's brief employment by Parke-Davis as a medical liaison in the Northeast Customer Business Unit ("CBU") for four months in 1996.   This evidence should have been excluded for the reasons set forth in Defendants' Motion in Limine to Exclude Testimony of Franklin & Related Evidence [2325, 2326], concurrently-filed Motion for New Trial, and supporting memoranda.   At a minimum, references to this evidence should be stricken, as it provides no support for the Court's findings or conclusions regarding fraudulent conduct, causation, and injury.

### E.     Testimony From Dr. Curt Furberg And Related Evidence

The Court's Findings cite and rely upon testimony from Dr. Curt Furberg and related evidence regarding the alleged relationship between Neurontin and the risk of suicide.   This evidence should have been excluded for the reasons set forth in Defendants' Motion to Exclude Testimony of Dr. Curt Furberg [2600, 2601], concurrently-filed Motion for New Trial, and supporting memoranda.   In addition, the nature of the timed trial prevented Defendants from presenting evidence fully addressing the tangential issue of the alleged risk of suicide.[6]   At a minimum, references to this evidence should be stricken, as it provides no support for the Court's findings or conclusions regarding fraudulent conduct, causation, and injury.

## VIII.   The Court's Conclusions of Law Should Be Amended To Correct Additional Errors of Law

The Court's Conclusions of Law regarding violation of the UCL, causation, reliance and injury reflect its misallocation of the burden of proof, admission of erroneous evidence and erroneous factual findings set forth above and should, therefore, be amended.   In addition, the

---

[6] This Court has previously recognized that there is a robust scientific debate regarding the risk of suicide, based on a complex scientific record well beyond the scope of the trial in this case.   *See In re Neurontin Mktg., Sales Practices, & Prods. Liab. Litig.*, 612 F. Supp. 2d 116, 139, 140-41, 149 (D. Mass 2009).

Court held Plaintiffs to a relaxed burden to prove reliance based upon *McAdams v. Monier, Inc.*, 105 Cal. Rptr. 3d 704 (Ct. App.  2010).  (Findings at 130.)  However, *McAdams* addresses the claims of absent class members.  It does not stand for the proposition that named plaintiffs have a relaxed burden of proof.  Further, the Court's conclusion that Defendants owed a duty to disclose to Plaintiffs (Findings at 109-10) has recently been rejected by the Ninth Circuit, which considered similar claims by third-party payors under California's UCL.  *See United Food & Commercial Workers Cent. Pa. & Regional Health & Welfare Fund v. Amgen, Inc.*, 400 F. App'x 255, 257 (9th Cir. 2010) (holding that third-party payors failed to "identify material omissions in derogation of an independent statutory or fiduciary duty to disclose."); *see also Ironworkers Local Union 68 v. AstraZeneca Pharm., LP*, No. 08-16851, 2011 WL 833222, at *8, n.33 (11th Cir. Mar. 11, 2011).

In addition, as discussed *supra* at 1-2, the Court failed to address KFHP's standing to recover on the part of non-party subsidiaries.  Likewise, the Court's conclusions regarding choice of law did not account for the corporate separateness of the non-party Kaiser health plans. (*See supra* at 2.)  As a result, the Court's conclusions are inconsistent with clear California law that precludes non-California residents from recovering under the UCL for conduct that occurred outside California.  *See Norwest Mortgage, Inc. v. Superior Court*, 85 Cal. Rptr. 2d 18,23-25 (Ct. App. 1999) (*See also* Defs' CoL at 1-2; Defs' Resp. to Pls' CoL at 5-7.)

For the reasons set out in Defendants' prior submissions and their contemporaneously filed Renewed Motion for Judgment as a Matter of Law, the Court's findings regarding quantification of prescriptions and the amount of restitution rely upon the flawed testimony of Prof. Rosenthal and Dr. Hartman, which should have been excluded.  *See supra* at 16-17.  In addition, the amount of restitution is excessive because it includes amounts that could have been avoided by KFHP with reasonable effort.  *See supra* at 7.  The Court also erroneously awarded prejudgment interest, contrary to California law, which provides that "prejudgment interest is authorized only if the damages were 'certain, or capable or becoming made certain by calculation.'"  *Jamison v. Jamison*, 79 Cal. Rptr. 3d 561, 567 (Ct. App. 2008) (citing Cal. Civ.

Code § 3287).

For the reasons stated in Defendants' prior submissions (Defs' CoL at 18-20), the Court incorrectly concluded that Plaintiffs' statute of limitations was tolled by the filing of other class actions, was subject to the discovery rule and was tolled by fraudulent concealment.

## CONCLUSION

For all of the foregoing reasons, Defendants respectfully request that the Court amend and make additions to its Findings of Fact and Conclusions of Law.

Dated: March 22, 2011                    Respectfully submitted,

SKADDEN, ARPS, SLATE, MEAGHER            SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP                            & FLOM LLP

By:   /s/ Mark S. Cheffo            By:   /s/ Raoul D. Kennedy
      Mark S. Cheffo                   Raoul D. Kennedy
                                         Four Embarcadero Center
Four Times Square
New York, NY 10036                       San Francisco CA 94111
Tel: (212) 735-3000                      Tel: (415) 984-6400
Email: Mark.Cheffo@skadden.com           Email: Raoul.Kennedy@skadden.com

                                         WHEELER TRIGG O'DONNELL LLP

+-----------------------------------------+
| CERTIFICATE OF SERVICE                  |
|                                         |
|     I hereby certify that this document |
| filed through the ECF system has been   |
| served pursuant to Case Management      |
| Order #3 on March 22, 2011.             |
|                                         |
|              /s/ Mark S. Cheffo         |
|              Mark S. Cheffo             |
|                                         |
+-----------------------------------------+

By:   /s/ James E. Hooper
      James E. Hooper

1801 California Street
Suite 3600
Denver, CO 80202-2617
Tel: (303) 244-1800
Email: hooper@wtotrial.com

*Attorneys for Defendants Pfizer Inc and
Warner-Lambert Company LLC*