UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

In re:   NEURONTIN MARKETING, SALES PRACTICES,
AND PRODUCTS LIABILITY LITIGATION

MDL Docket No. 1629

Master File No. 04-10981

THIS DOCUMENT RELATES TO:

KAISER FOUNDATION HEALTH PLAN, et al. v.
PFIZER INC., 04 CV 10739 (PBS)

Judge Patti B. Saris

Magistrate Judge Leo T. Sorokin

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

Mark S. Cheffo
SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
Four Times Square
New York, NY 10036
Tel:  (212) 735-3000

Raoul D. Kennedy
SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
Four Embarcadero Center
San Francisco CA 94111
Tel:  (415) 984-6400

James E. Hooper
WHEELER TRIGG O'DONNELL LLP
1801 California Street
Suite 3600
Denver, CO 80202-2617
Tel:  (303) 244-1800

*Attorneys for Defendants Pfizer Inc and
Warner-Lambert Company LLC*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ii

INTRODUCTION ..................................................................................1

ARGUMENT ......................................................................................3

I.     Plaintiffs Failed To Present Legally Sufficient Evidence Of Injury ...................................3

        A.     Plaintiffs Failed To Prove That No Patient Received A Benefit From Using Neurontin For The Off-Label Uses At Issue ................................................3

        B.     Plaintiffs Failed To Prove That Cheaper, Alternative Drugs Would Have Been Prescribed Instead Of Neurontin .................................................8

II.    Plaintiffs Failed To Present Legally Sufficient Evidence Of A Direct Injury Or Proximate Causation ......................................................................9

        A.     Plaintiffs Failed To Prove A Direct Relationship Between Their Claimed Injury And The Alleged RICO Violation ...............................................9

        B.     Plaintiffs Offered No Evidence Of Causation For Any Region Other Than Southern California ........................................................................11

        C.     The Testimony Of Plaintiffs' Expert Economist Failed To Satisfy Their Burden Of Proof ........................................................................13

        D.     SCPMG Formulary Decisions Were Not Caused By Any Of The Alleged Wrongful Conduct Attributed To Defendants .........................................16

        E.     Plaintiffs Presented No Other Evidence Of Causation .........................................17

III.   Plaintiffs Failed To Present Legally Sufficient Evidence Of Damages ..........................18

IV.   Plaintiffs Failed To Present Evidence Legally Sufficient To Sustain Their Burden Of Proving Conduct Of An Enterprise Or A Predicate RICO Act ...................................19

V.    Plaintiffs' Claims Are Barred By The Statute of Limitations ..........................................20

## TABLE OF AUTHORITIES

### CASES

*Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008)..................................................11

*Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001) ..........................................3, 4

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).......................................13

*Hemi Group, LLC v. City of New York*, 130 S. Ct. 983 (2010) ........................................ 9, 10, 11

*Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992)....................................9, 11

*Ironworkers Local Union 68 v. AstraZeneca Pharmaceuticals, LP*,
    No. 08-16851, 2011 WL 833222 (11th Cir. Mar. 11, 2011)............................... 3, 4, 6, 17

*Irvine v. Murad Skin Research Laboratories, Inc.*, 194 F.3d 313 (1st Cir. 1999).......................19

*In re Neurontin Marketing & Sales Practices Litigation*,
    677 F. Supp. 2d 479 (D. Mass. 2010)............................................................................12

*In re Neurontin Marketing, Sales Practices & Products Liability Litigation*,
    257 F.R.D. 315 (D. Mass. 2009) ...................................................................................15

*In re Neurontin Marketing, Sales Practices, & Products Liability Litigation*,
    612 F. Supp. 2d 136-37 (D. Mass 2009)..........................................................................8

*PayPhone LLC v. Brooks Fiber Communications of Rhode Island*,
    126 F. Supp. 2d 175 (D.R.I. 2001) ...............................................................................13

*Pharmanetics, Inc. v. Aventis Pharm., Inc.*, No. 5:03-CV-817, 2005 WL
    6000369 (E.D.N.C. May 4, 2005) *aff'd*, 182 F. App'x 267 (4th Cir. 2006).....................19

*Poppell v. City of San Diego*, 149 F.3d 951 (9th Cir. 1998) ......................................................19

*Prohias v. Pfizer, Inc.*, 485 F. Supp. 2d 1329 (S.D. Fla. 2007)..................................................17

*In re Rezulin Products Liability Litigation*, 210 F.R.D. 61 (S.D.N.Y. 2002) .............................11

*Sullivan v. City of Augusta*, 51 F.3d 16 (1st Cir. 2007) ...............................................................3

*Tagliente v. Himmer*, 949 F.2d 1 (1st Cir. 1991).......................................................................17

*UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121 (2d Cir. 2010).........................................9, 14

*United Food & Commercial Workers Central Pennsylvania & Regional
    Health & Welfare Fund v. Amgen, Inc.*, 400 F. App'x 255 (9th Cir. 2010) .................9, 10

*United States v. Shay*, 57 F.3d 126 (1st Cir. 1995)....................................................................15

*Whalen v. Pfizer, Inc.*, No. 600125, 2005 WL 2875291 (N.Y. Sup. Ct. Sep. 22, 2005)..............17

*In re Zyprexa Products Liability Litigation*, 671 F. Supp. 2d 397 (E.D.N.Y. 2009)......................8

Defendants Pfizer Inc and Warner-Lambert Company LLC (collectively, "Pfizer" or "Defendants"), pursuant to Federal Rule of Civil Procedure 50(b), respectfully submit this Memorandum of Law in Support of their Renewed Motion for Judgment as a Matter of Law.[1]

## INTRODUCTION

For the reasons set forth in Defendants' prior Motions for Judgment as a Matter of Law, and as discussed below, Plaintiffs failed to present sufficient evidence to satisfy their burden of proof with respect to several required elements of their claims.[2]

Most significantly, Plaintiffs failed to present sufficient evidence of causation and injury. Not only did the evidence adduced by Plaintiffs at trial fall far short of the proffer that allowed them to survive summary judgment, in many instances it flatly contradicted their prior positions. To support their claims of direct reliance, Plaintiffs contended that they initially restricted Neurontin prescribing to neurologists, but gradually expanded and eventually eliminated those restrictions based on internally-prepared drug monographs that were tainted by misrepresentations made to them by Defendants. But at trial, this "direct reliance" theory fell apart like a house of cards. Plaintiffs' evidence showed that:

- Drug Information Services ("DIS") monographs were prepared by Plaintiff Kaiser Foundation Hospitals, Inc. ("KH"), which sustained no injury and has no standing;

- Formularies were controlled by eight non-party regional Permanent Groups ("PMGs"), whose decisions cannot satisfy RICO's direct injury requirement;

---

[1] Defendants incorporate by reference their prior briefing on these issues, including: Defs' Mem. Supp. Summ. J. [1691] at Section IV; Defs' Reply Mem. Supp. Summ. J. [1785] at Sections III & V; Defs' Mem. Supp. M. Exclude Rosenthal [2317]; Defs' Mem. Supp. M. Exclude Hartman [2320]; Defs' Reply Mem. Supp. M. Exclude Rosenthal & Hartman [2439-2]; Defs' Obj. to Pls' Proposed Amendments to Third Amended Compl. [2538]; Mem. of Law in Support of Defs' M. for J. as a Matter of Law Based Upon Lack of Sufficient Evidence to Prove Conduct of a RICO Enterprise Through a Pattern of Racketeering Activity [2669]; Mem. of Law in Support of Defs' M. for J. as a Matter of Law Based Upon Lack of Sufficient Evidence of Injury or Causation [2671]; Mem. of Law in Support of Defs' M. for J. as a Matter of Law Based Upon Lack of Sufficient Evidence to Prove Damages [2673]; Mem. of Law in Support of Defs' Supp. M. for J. as a Matter of Law Based Upon Lack of Sufficient Evidence of Injury, Causation or Damages [2741]; Mem. of Law in Support of Defs' Supp. M. for J. as a Matter of Law Based Upon RICO Statute of Limitations [2675]; Objection to Pls' Proffer of "Free-Standing" Exhibits [2604], Mem. in Opp. to Pls' M. for Admission of Summ. Evid. [2631], and Mem. in Opp. to Pls' 2d Am. M. for Admission of Summ. Evid. [2658].

[2] Whenever in this memorandum Defendants refer to insufficient evidence, no evidence, or Plaintiffs' failure to present sufficient evidence, Defendants intend to invoke the relevant standard of sufficiency under Rule 50.

- Plaintiffs only attempted (unsuccessfully) to show that one of the eight PMGs expanded formulary restrictions based on DIS monographs; and

- That lone PMG expanded formulary access with knowledge of the lack of double blind placebo controlled trials ("DBRCTs") and even in the face of negative DBRCTs.

Moreover, after previously touting their record of formulary compliance, Plaintiffs completely repudiated the significance of formulary placement. Kaiser witness after Kaiser witness testified that formularies do not restrict PMG doctors' prescribing choices, and Plaintiffs reimburse for prescriptions regardless of formulary status.

This remarkable about face was dictated by Plaintiffs' utter inability to explain why, given their assertion in this lawsuit that Neurontin lacks any efficacy for the off-label uses at issue, they continued to recommend Neurontin for neuropathic pain and other off-label uses on their website and in published guidelines even after filing suit and through trial, they never removed Neurontin from formulary, they never issued new guidelines for Neurontin, and never restricted Neurontin to certain specialists.

To this day, PMG physicians continue to prescribe Neurontin or gabapentin for neuropathic pain and other off-label uses and Plaintiffs continue to willingly pay for such prescriptions. Plaintiffs did not and could not present legally sufficient evidence that Neurontin is ineffective in all patients when prescribed for neuropathic pain, bipolar disorder, or migraine, or when prescribed at doses greater than 1800 mg/day. Plaintiffs' theory assumes, incorrectly, that FDA-approved drugs like Neurontin must be presumed ineffective for off-label uses unless they meet the regulatory standard of efficacy that would be required for an on-label indication for those uses.

That is not how medicine is or should be practiced, nor is it how Plaintiffs conduct their own business. Years after filing this lawsuit, Plaintiffs have continued to allow, reimburse, and even encourage Neurontin prescriptions for relevant off-label conditions. And long after the allegedly suppressed data has been made public, doctors throughout the country continue to recognize Neurontin's benefits for patients suffering from these conditions. Indeed, the well-

respected Cochrane Group recently reaffirmed Neurontin's efficacy for neuropathic pain after reviewing all unpublished data made available through this litigation and after considering the findings of Plaintiffs' expert on publication bias, who is also the Cochrane Group's director.[3] Allowing this judgment to stand would be an unwarranted and unprecedented intrusion into the practice of medicine – tantamount to a finding that PMG physicians commit malpractice every time they prescribe Neurontin for these conditions and that Plaintiffs and the Cochrane Group have continued to condone and promote malpractice.

## ARGUMENT

### I. Plaintiffs Failed To Present Legally Sufficient Evidence Of Injury

#### A. Plaintiffs Failed To Prove That No Patient Received A Benefit From Using Neurontin For The Off-Label Uses At Issue

Proof of inefficacy was essential to Plaintiffs' claims of injury. *See Ironworkers Local Union 68 v. AstraZeneca Pharms., LP*, No. 08-16851, 2011 WL 833222, at *5 (11th Cir. Mar. 11, 2011). Plaintiffs' claim that Neurontin is not effective for the off-label uses at issue depended upon two false premises: (1) That *only* DBRCTs are relevant to the issue of efficacy and (2) that it can prove inefficacy *in all patients* by negative studies. Not only does Plaintiffs' theory impermissibly shift the burden of proof to Defendants,[4] both assertions lack any legal or factual foundation. Kaiser's theory assumes, incorrectly, that FDA-approved drugs like Neurontin must be presumed ineffective for off-label uses unless they meet the regulatory standard of efficacy that would be required for an on-label indication for those uses.[5] But the

---

[3] *See* Exhibit A to Defendants' concurrently filed Motion for New Trial.

[4] "It is plaintiffs' burden to establish injury-in-fact as an essential part of their standing – not the [defendant's] burden to disprove it." *Sullivan v. City of Augusta*, 51 F.3d 16, 29 (1st Cir. 2007). Even though it was not their burden, Defendants presented substantial evidence of efficacy. For example, Defendants presented testimony from two pain specialists, Dr. Shawn Bird and Dr. Gary Brenner, whose opinions that Neurontin is effective to treat neuropathic pain were supported by ten DBRCTs, leading medical texts, a meta-analysis published by the well-respected Cochrane Collaboration and other scientific reviews. (3/19 Tr. (Bird) at 15:23-17:1, 24:20-42:21, 46:25-48:24; 3/16 Tr. (Brenner) at 13:5-14:9; 19:24-21:10, 28:9-19, 62:5-63:17.) DBRCTs also support Neurontin's efficacy in the treatment of bipolar disorder, as well as comorbid conditions associated with bipolar disorder, including anxiety disorders, panic disorders, and social phobia. (3/19 Tr. (Slaby) at 94:2-5, 97:5-22, 100:21-103:6, 106:12-107:1; 107:2-118:14, 119:14-22; DX590, 1305; DX 1865, 2004). *See also* Defendants' Proposed Findings of Fact [2808-1] ¶¶ 99-104 (migraine) and ¶¶ 105-113 (doses >1800 mg/day).

[5] Numerous courts, including the Supreme Court, have rejected such a presumption. *See, e.g., Buckman*

issue here is not whether Neurontin could satisfy United States regulatory standards for approval,[6] but whether there is sufficient evidence to support the decisions of physicians to prescribe Neurontin off-label for the uses at issue.  *See Ironworkers*, 2011 WL 833222, at *6.

As the Eleventh Circuit recently explained:  "The issue of whether prescriptions are medically unnecessary or inappropriate – like most health care delivery questions – depends on the standards of practice in the medical profession." *Id.*  It is not enough that Plaintiffs claim that cheaper alternative drugs were available, *id.* at *5; rather plaintiffs must show that physicians "would not have prescribed the drug under the standards of sound medical practice because the drug actually was unsafe or ineffective in treating the plaintiff's condition." *Id.* at *6.  Plaintiffs did not even attempt to make such a showing in this case.  Instead the evidence showed that physicians continue to prescribe Neurontin and gabapentin for the off-label conditions at issue.[7]

That the standard of proof advocated by Plaintiffs – which ignores the clinical experience of physicians and other non-DBRCT evidence – is inconsistent with the real world practice of medicine was established by evidence of Plaintiffs' own conduct outside the courthouse.  The evidence made clear that neither Plaintiffs nor the Permanente Medical Groups ("PMGs") make formulary decisions based solely on DBRCTs.  To the contrary, the Southern California PMG ("SCPMG") expanded formulary access to Neurontin notwithstanding the lack of DBRCT evidence and even in the face of negative evidence.  (*See infra* Section II.D.)  Further, even after studies that Plaintiffs claim were suppressed were published, neither SCPMG nor any other PMG nor either of the Plaintiffs sought to restrict access to Neurontin or gabapentin by removing them from PMG formularies or restricting their use to certain specialties.  (*See id.*)  Indeed, even

_____

*Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350 (2001).

[6] Although the FDA has not granted a broad neuropathic pain indication to any drug, Neurontin has been approved for the treatment of neuropathic pain in over 50 countries.  (3/16 Tr. (Brenner) at 35:2-6.)  This fact further demonstrates that the standard of proof advocated by Plaintiffs was far narrower than that used by the scientific community at large.

[7] Indeed, even with its educational initiative begun in 2002, Neurontin prescriptions paid for by KFHP and its non-party subsidiaries decreased by only 34%.  Nationwide, Neurontin and gabapentin prescriptions continued to increase years after virtually all marketing by Pfizer stopped in 2004.  (DX863.)

throughout trial, Plaintiffs continued to recommend Neurontin for the treatment of neuropathic pain and other off-label uses on its website and in its published guidelines to physicians. (*See infra* at 16-17.)

In short, Plaintiffs and the PMGs were satisfied by Level II and Level III evidence that off-label prescribing of Neurontin would benefit Kaiser Foundation Health Plan ("KFHP") members. Every attempt by Plaintiffs to explain away these facts was contradicted by the evidence in the record. For example, Plaintiffs argued that the PMGs could not remove Neurontin from formulary because it was approved for certain indications (epilepsy and PHN). Flatly contradicting this assertion, the evidence showed: (1) notwithstanding its approval for epilepsy in 1994, several PMGs did not add Neurontin to formulary at that time,[8] (2) at least one PMG (Northwest) did remove Neurontin from formulary, only to add gabapentin back once a generic became available (DX729, 810), and (3) other anti-epileptic drugs ("AEDs") (including one approved for diabetic peripheral neuralgia ("DPN")) are not on every PMG formulary (3/5 Tr. (Millares) at 26:22-24; DX630.). Plaintiffs clearly could have removed Neurontin from formulary and made it available for on-label uses by the exception process. (3/10 Tr. (Daniel) at 42:20-43:10; DX515.)

Similarly, Plaintiffs offered no explanation for why they could not have restricted Neurontin use by physician specialty. PMGs could have, for example, imposed restrictions that excluded psychiatrists. PMGs also could have issued prescribing guidelines for Neurontin, making it clear that it should not be prescribed for the uses at issue. Not only did Plaintiffs or the PMGs fail to do so, they expressly endorsed Neurontin's use to treat neuropathic pain. (3/4 Tr. (Hyatt) at 13:2-7.) As of the date of trial, Plaintiffs had issued no guidelines against using Neurontin or gabapentin for any of the off-label uses at issue. (3/4 (Millares) at 126:11-126:19).

The fact that Plaintiffs willingly continued to pay for Neurontin and gabapentin prescriptions even after the publication of negative studies and even after this lawsuit was filed

---

[8] Hawaii, for example, did not add Neurontin to formulary until 2000. (Villaluz Aff. ¶ 11, DX840).

dooms their claims.  As the Eleventh Circuit recently explained, where an insurer "ma[kes] the conscious business decision not to require preauthorization review," it "voluntarily assume[s] the risk of paying for all prescriptions . . . , including prescriptions for off-label uses that were medically unnecessary or inappropriate." *Ironworkers*, 2011 WL 833222, at *8.

Plaintiffs tried to explain away the inherent contradiction between their litigation posture and their real world behavior by arguing that they believed Neurontin was effective for Neuropathic pain until an article on publication bias was published in the New England Journal of Medicine ("NEJM"), in November 2009.  (3/3 Tr. (Hyatt) at 16:20-25.)  That this theory was invented for trial is evident from the testimony of Dr. Carrejo, who conceded that as late as 2004, after publication of the negative Pande and Frye studies, there was sufficient evidence of efficacy – ***even as to bipolar disorder*** – to support PMG formulary decisions and prescribing guidelines. (3/3 Tr. (Carrejo) at 138:24-139:8.)[9]  Nothing contained in the NEJM article changes the fact that Plaintiffs came to this conclusion based on Level II and Level III evidence – not DBRCTs.

Further, Plaintiffs' newly hatched theory was patently inconsistent with the allegations made by Plaintiffs when they filed suit (1st Coord. Am. Compl. [31] ¶ 31), as well as the testimony of Plaintiffs' witness Mirta Millares in which she confirmed that, by 2002, Plaintiffs believed that Pfizer had suppressed information regarding the efficacy of Neurontin.  (3/5 Tr. (Millares) at 12:24-14:25.)  In addition, the NEJM article was authored by and based upon the report of Plaintiffs' expert Kay Dickerson, which Plaintiffs received in August 2008.  (2/25 Tr. (Dickerson) at 75:21-23; 3/5 Tr. (Millares) at 17:16-19.)  Even after receipt of Dr. Dickerson's report, Plaintiffs continued to recommend Neurontin for off-label uses.  Finally, as Plaintiffs' witnesses conceded, the NEJM article does not even address the issue of efficacy.  (3/5 Tr. (Millares) at 22:18-23.)

Several PMG physicians admitted at trial that Neurontin's efficacy was supported by

---

[9] Similar testimony was obtained from Albert Carver in July 2007 (Carver Dep. [2738-1 & 2738-2] at 89:14-90:9) and improperly excluded by the Court.  (*See* Defs' Offer of Proof [2737].)

their clinical experience and that they continued to prescribe it even after this lawsuit was filed.[10] Indeed, one of Plaintiffs' experts testified at trial that he continues to prescribe Neurontin to treat DPN.  (3/1 Tr. (McCrory) at 62:15-18.)  Plaintiffs' theory of complete inefficacy, if credited, leads to the implausible conclusion that PMG physicians – as well as Plaintiffs' expert Dr. McCrory – committed (and continue to commit) malpractice every time they prescribe Neurontin or gabapentin to treat, for example, neuropathic pain, and that KFHP knowingly subsidized and continues to subsidize such malpractice.  The public policy implications of Plaintiffs' theory are profound.  Plaintiffs sought to divorce the issues in this case from the real world practice of medicine and urged non-medical triers of fact to second guess the clinical judgment of thousands of treating physicians.  Even the FDA refuses to interfere with the practice of medicine in this fashion.

Of course, this absurd result is reached only by ignoring the fundamental fallacy in Plaintiffs' proof, which relies upon extrapolation from purportedly "negative" studies to the entire patient population.  A "negative" study at most shows that the drug's effectiveness over placebo to treat a given condition in a particular subpopulation when administered using a specified regimen was not statistically significant.  It does not establish the drug's inefficacy for treating the condition in all other patients and circumstances.  (3/1 Tr. (McCrory) at 57:8-15; 3/16 Tr. (Brenner) at 44:15-45:10; 3/19 Tr. (Bird) at 34:21-25.)  As a result, Plaintiffs cannot, by reliance on negative studies, prove that Neurontin was ineffective for the conditions at issue for *all* patients.  Indeed, essentially conceding the limits of negative studies, Dr. Carrejo testified that the negative Pande and Frye studies were not sufficient evidence to allow DIS to reject the recommendations of the chiefs of psychiatry in 2002 that PMG physicians be allowed to prescribe Neurontin for bipolar disorder.  (3/3 Tr. (Carrejo) at 31:11-25.)

---

[10] McCarberg Dep. at 29:16-30:5, 32:20-25, 54:18-25, 97:13-19; Maizels Dep. at 71:6-73:17, 107:9-14, 110:25-111:5, 217:11-23; Danesh Dep. at 12:6-24, 47:20-48:25, 52:10-55:20, 62:2-5; Chandler Dep. at 60:18-65:19, 66:9-73:9, 82:24-83:16, 84:21-85:2, 89:8-11.  Plaintiffs argued that the clinical success of thousands of physicians, including PMG physicians, can be explained by the placebo effect.  However, PMG physicians following formulary guidelines would have prescribed Neurontin only after other treatment options had failed and would have continued to prescribe Neurontin beyond 30 days only if a sustained benefit was seen.  (DX557, 831.)

For similar reasons, Plaintiffs' evidence was insufficient to support their claim that Neurontin is ineffective in all patients for the treatment of migraine.  (*See* Defs' Proposed Findings of Fact ("Defs' FoF") [2808-1] ¶¶ 99-104.)   And Plaintiffs presented no expert evidence supporting their claim that no additional benefit is obtained from Neurontin at doses above 1800 mg/day.  Plaintiffs relied solely on the Neurontin label with respect to their dosing claim.  Due to the different standards employed by the FDA, however, regulatory action or inaction cannot satisfy Plaintiffs' burden of proof.  *See In re Neurontin Mktg., Sales Practices, & Prods. Liab. Litig.*, 612 F. Supp. 2d 116, 136-37 (D. Mass 2009).  Further, the label also contains recommendations for titrating, based on renal function, to doses over 1800 mg/day.  (PX195.)  In addition, Plaintiffs failed to rebut the testimony of Defendants' experts, supported by several DBRCTs.[11]

### B.    Plaintiffs Failed To Prove That Cheaper, Alternative Drugs Would Have Been Prescribed Instead Of Neurontin

Plaintiffs offered no evidence that doctors would have prescribed a drug other than Neurontin, or which drugs physicians would have prescribed, in the absence of the alleged misrepresentations by Defendants.  None of Plaintiffs' medical experts endorsed Plaintiffs' list of alternative drugs.  Nor did either of Plaintiffs' economic experts analyze possible drug substitution by physicians.  Whether proposed alternative drugs were both cheaper than and equally effective as Neurontin requires a complex and individualized determination regarding (1) whether the alternative drugs had already been tried without success in a particular patient, (2) whether the alternative drugs would be as effective for a particular patient, (3) whether the alternative drugs would have been as well tolerated by a particular patient, and (4) what the actual cost (including increased monitoring costs) would have been.  *See In re Zyprexa Prods. Liab. Litig.*, 671 F. Supp. 2d 397, 456-57 (E.D.N.Y. 2009).  Plaintiffs did not, and admitted they could not, offer patient-specific evidence, much less plaintiff-specific and indication-specific

---

[11]  *See* 3/19 Tr. (Bird) at 24:20-26:3, 31:6-23, 35:1-9, 35:20-37:1, 37:20-38:4, 43:12-45:3; 3/16 Tr. (Brenner) at 47:19-54:5, 54:15-55:3; DX1250, 1275, 1488, 1552, 1546, 1683, 2069.

evidence, on each of these issues.  Indeed, Plaintiffs did not attempt to offer even aggregate proof on these issues.

## II.    Plaintiffs Failed To Present Legally Sufficient Evidence Of A Direct Injury Or Proximate Causation

The Supreme Court has made clear that "but for" causation is a necessary, but not sufficient, component of a RICO plaintiff's claim.  The plaintiff must also prove proximate causation, which requires "some direct relation between the injury asserted and the injurious conduct alleged." *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992); *accord Hemi Grp., LLC v. City of New York*, 130 S. Ct. 983, 989 (2010).  "A link that is 'too remote,' 'purely contingent,' or 'indirec[t]' is insufficient." *Hemi Grp.*, 130 S. Ct. at 989 (alteration in original) (quoting *Holmes*, 503 U.S. at 271, 274).  Plaintiffs cannot prove a direct injury with a theory of causation that depends on "separate actions carried out by separate parties" and "[m]ultiple steps . . . separate the alleged fraud from the asserted injury." *Id.* at  992.

### A.    Plaintiffs Failed To Prove A Direct Relationship Between Their Claimed Injury And The Alleged RICO Violation

Applying *Holmes* and *Hemi Group* to claims asserted by TPPs seeking to recover amounts allegedly overpaid for a prescription medicine, the Second Circuit recently explained that a theory of causation similar to Plaintiffs' failed to sufficiently allege proximate cause under RICO.  *See UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 134 (2d Cir. 2010).  As the Second Circuit explained, the theory "skips several steps and obscures the more attenuated link between the alleged misrepresentations made to doctors and the ultimate injury to the TPPs." *Id.*

The Ninth Circuit recently reached the same conclusion when it affirmed dismissal of claims by TPPs in *United Food & Commercial Workers Central Pennsylvania & Regional Health & Welfare Fund v. Amgen, Inc.*, 400 F. App'x 255 (9th Cir. 2010) ("*Amgen*").  The plaintiff TPPs in *Amgen* asserted fraudulent marketing claims under RICO and California's Unfair Competition Law ("UCL") and sought to recover damages based on amounts they had paid for their insureds' off-label prescriptions of the defendant's pharmaceutical products.  The

Ninth Circuit held, *inter alia*, that "the complaint failed to plead a cognizable theory of proximate causation that links Amgen's alleged misconduct to Appellant's alleged injury." *Id.* at 257. The *Amgen* plaintiffs'

> attenuated causal chain . . . involved at least four independent links, namely, (1) the [United States Pharmacopeia-Drug Information's] listing of Aranesp for [the off-label uses], (2) Medicare's decision to cover Aranesp for [these uses], (3) third-party payors' decision to cover Aranesp [and Epogen] for [these uses] . . . and (4) doctors' decisions to prescribe Aranesp and Epogen for these uses. This causal theory is too attenuated to satisfy the Supreme Court's proximate causation requirement in the RICO context.

*Id.* (citing *Hemi Grp.*, 130 S. Ct. at 989).

Plaintiffs attempted to distinguish this case by arguing that they directly relied on Defendants' alleged misrepresentations. Even assuming *arguendo* that Plaintiffs presented sufficient proof that at least one PMG relied upon Defendants' alleged misrepresentations when making formulary decisions (which they did not, *see infra* Sections II.B, II.D), they have nonetheless failed to satisfy RICO's proximate cause requirement.

As the Supreme Court has explained, proximate cause is lacking where a court is required to go beyond the first step in a causal chain and consider the independent decisions and actions of third and fourth parties. *Hemi Grp.*, 130 S. Ct. at 989. That is undoubtedly the case here. KFHP, the entity that paid for Neurontin prescriptions, did not rely upon anything Defendants said or did. And while DIS, a division of KH, claims that it relied upon representations by Defendants, neither DIS nor KH paid for any Neurontin prescriptions.[12] Moreover, Plaintiffs' causal chain does not stop with DIS. Instead, Plaintiffs' theory depends upon the actions of eight non-party PMGs' P&T Committees in eight different regions. (3/2 Tr. (Carrejo) at 149:3-152:16.) Each regional PMG is a separate, autonomous entity that functions independently from KFHP and its subsidiaries, and from the other PMGs, with separate P&T Committees and formularies. (3/3 Tr. (Hyatt) at 127:18-128:5; 2/26 Tr. (Carrejo) at 112:13-16; 3/2 Tr. (Carrejo) at 149:3-152:16.)

---

[12] *See* Plaintiffs' Bench Mem. Clarifying the Relationship Between the Kaiser Plaintiffs [2724] at 3; 3/19 Tr. (Nussbaum) at 191:19 ("It's the Health Plan [not Hospitals] that paid for it.").

Moreover, even if Plaintiffs had proven that one or more third-party PMGs expanded formulary access to Neurontin in reliance on alleged misrepresentations by Pfizer, Plaintiffs' theory of causation still required proof that, as a result, prescribing physicians in that region wrote more off-label Neurontin prescriptions that they would have otherwise. *See In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. 61, 67 (S.D.N.Y. 2002). Numerous courts have recognized that the independent decision of physicians, which may be influenced by numerous factors other than a defendants' marketing, forecloses the direct causal connection required by *Holmes* and *Hemi Group. See supra* at 9-10.

Significantly, notwithstanding the representations made by Plaintiffs to avoid summary judgment, each of Plaintiffs' representatives conceded at trial that a drug's formulary status does not dictate prescribing doctors' prescription decisions or Kaiser's reimbursement of prescriptions. (*E.g.*, Tr. 2/26 (Carrejo) at 108:10-23; 3/3 Tr. (Hyatt) at 100:21-101:4; 3/9 Tr. (Daniel) at 94:10-15; 3/10 Tr. (Daniel) at 48:23-49:11; 3/4 Tr. (Millares) at 119:21-23, 123:4-124:13.) Dr. Daniel unequivocally admitted that Neurontin's formulary status – the fundamental basis of Plaintiffs' entire "direct injury" theory – is irrelevant. (3/9 Tr. (Daniel) at 110:1-10.)

**B.    Plaintiffs Offered No Evidence Of Causation For Any Region Other Than Southern California**

Although the Supreme Court has held that "but for" causation need not always require evidence of first-party reliance, the Court recognized that, in most cases, a plaintiff will have to show either first- or third-party reliance in order to establish "but for" causation. *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 649, 657-58 (2008). In this case, the only causal mechanism that Plaintiffs sought to prove at trial was based upon a chain of first-party and third-party reliance.

Accordingly, even if the Supreme Court's decisions in *Holmes* and *Hemi Group* did not preclude Plaintiffs' from pursuing their attenuated theory of causation (and they do), Plaintiffs would still have to prove each link in their chain of causation. However, Plaintiffs failed to offer *any* competent evidence that any PMG other than SCPMG expanded formulary access in

reliance (direct or indirect) on Defendants' alleged misrepresentations.

Significantly, when this Court denied Defendants' motion for summary judgment as to Plaintiffs, the Court distinguished Plaintiffs from Guardian Life Insurance Company ("Guardian") and Aetna, Inc. ("Aetna"), based on Kaiser's representation that (1) Neurontin was initially restricted to neurologists, (2) that formulary access was expanded based on DIS monographs and (3) P&T members would not have voted for expansion had they been aware of allegedly suppressed scientific data. *See In re Neurontin Mktg. & Sales Practices Litig.*, 677 F. Supp. 2d 479, 486-87 (D. Mass. 2010). Movement from **restricted** status to **unrestricted** status was critical to Plaintiffs' causation theory.[13] At trial, the evidence submitted in support of each of these propositions was limited to the SCPMG.

For example, the first proposition – that formulary access to Neurontin was initially restricted to neurologists – is not true for the Northern California PMG ("TPMG"), Northwest Permanente ("NWPMG"), the Colorado Permanente Medical Group ("CPMG"), or the Southeast Permanente Medical Group ("SEPMG"), each of which added Neurontin to their formularies **without restriction** prior to 1997. (3/5 Tr. (Millares) at 12:2-4; DX840, Villaluz Aff. ¶¶ 4, 8, 18.) Second, the 1997 and 1999 DIS monographs relied on by Plaintiffs for the second, third, and fourth propositions regarding formulary expansion were prepared for SCPMG, and not any other PMG. (DX528, 543, 557.) Not a single voting member of a P&T Committee for any PMG other than SCPMG testified that she read these DIS monographs, relied upon these monographs, or voted to expand formulary access based on these monographs. Indeed, such an assertion could not possibly be true for TPMG, NWPMG, CPMG, or SEPMG, each of which added Neurontin to formulary on an unrestricted basis **before** the 1997 DIS monograph. Witnesses who testified regarding the operations of the Southern California and Northern California PMGs and their P&T Committees emphasized that they could not speak for other regional PMGs or

---

[13] For example, in opposition to Defendants' Motion for Judgment as a Matter of Law Based upon Lack of Sufficient Evidence of Injury or Causation, Plaintiffs argued: "[A]fter Kaiser's Southern California region lifted its remaining restrictions on Neurontin in 1999, Kaiser experienced a dramatic increase in utilization." ([2692] at 5.)

their P&T Committees.  (2/26 Tr. (Carrejo) at 143:20-144:11; 3/3 Tr. (Carrejo) at 26:5-11; (3/10 Tr. (Daniel) at 33:17-22, 45:21-46:9.)  In fact, contrasting Southern California with the other regions, Dr. Daniel testified:  "They don't use restrictions at all virtually.  I've talked – they think we're nuts in Southern California because the restrictions are not enforceable at all, and so they say, Well, it's just, you know, a piece of paper that doesn't mean anything."  (3/9 Tr. (Daniel) at 95:1-5.)  Further, each PMG served different, non-party, separately incorporated subsidiaries of KFHP.  None of the subsidiary health plans has been named as a plaintiff in this action, and KFHP does not have standing to recover on their behalf.  *See PayPhone LLC v. Brooks Fiber Commc'ns of R.I.*, 126 F. Supp. 2d 175, 179 (D.R.I. 2001).

Plaintiffs have conceded, and this Court has recognized, that Plaintiffs cannot prove the damages allegedly sustained by each of the different "Kaiser" companies.[14]  Even if Plaintiffs had presented sufficient evidence as to Southern California, it introduced no evidence that would allow this Court, post-verdict, to isolate prescriptions written by members of the SCPMG.  As a result, Plaintiffs' failure to present evidence of causation as to each Kaiser Permanente region dooms their claim in its entirety.

### C.    The Testimony Of Plaintiffs' Expert Economist Failed To Satisfy Their Burden Of Proof

Plaintiffs also offered testimony from economist Meredith Rosenthal by which they attempted to prove the number of prescriptions caused by off-label promotion for Neurontin.  For the reasons set forth in Defendants' Motion in Limine to Exclude the Testimony of Meredith Rosenthal [2316, 2317]; Defendants' Motion for Judgment as a Matter of Law Based Upon Lack of Sufficient Evidence of Injury or Causation [2670, 2671]; and supporting memoranda, Prof. Rosenthal's testimony failed to satisfy the requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and should have been excluded.

Even as admitted, Prof. Rosenthal's testimony failed to provide any evidence to support causation for the simple reason she did not attempt to measure anything relevant to Plaintiffs'

---

[14] *See* 2/22 Tr. (Sobol) at 25:2-3; 2/22 Tr. (Nussbaum) at 27:2-3; 2/22 Tr. (Court) at 26:5-8.

claims.  First, despite Plaintiffs' insistence throughout this litigation that "Kaiser" is unique among third-party payors in terms of how it manages drug utilization, Prof. Rosenthal relied solely on "national data," and failed to account for regional PMGs' formulary restrictions or guidelines.  (3/5 Tr. (Rosenthal) at 120:1-5; 3/8 Tr. (Rosenthal) at 76:7-77:5,   82:5-8, 96:14-97:13.)  Prof. Rosenthal justified her use of national data by arguing that it provides "the biggest possible picture" (3/8 Tr. (Rosenthal) at 24:17), but it was the breadth of her data that was the problem.  By using national data, Prof. Rosenthal could not possibly account for variables that were unique to Kaiser.  *See UFCW*, 620 F.3d at 136.  If, as the Second Circuit held in *UFCW*, aggregate proof is insufficient to demonstrate causation with respect to an individual TPP when a member of a class action, that same evidence cannot be used to prove causation for a TPP proceeding as an individual plaintiff.

Even assuming that Kaiser's claim that it directly relied upon Pfizer's representations is a plausible basis to distinguish *UFCW*, Prof. Rosenthal did not analyze Kaiser's direct reliance theory or attempt to measure its causal impact on Neurontin prescriptions.  To the contrary, she considered formulary placement – the centerpiece of Kaiser's argument for why its claims should survive summary judgment – irrelevant.  (3/8 Tr. (Rosenthal) at 28:3-8.)  Thus, while Prof. Rosenthal's analysis assumes that formulary placement was automatic and irrelevant, Kaiser's theory of causation expressly depended on Neurontin going from restricted to unrestricted status. (*See supra* at 12.)

Not only was her analysis not specific to Kaiser, it was not specific to the indications at issue in this litigation.  For example, Plaintiffs' efficacy expert made clear that his opinions were restricted to true bipolar disorder, and not any comorbid conditions or other mood disorders that were included in Prof. Rosenthal's analysis.  (2/25 Tr. (Barkin) 125:16-126:2.)  In contrast, the ICD-9 codes used by Prof. Rosenthal to analyze "bipolar" prescriptions – which had been provided to her by counsel and not any competent expert –  included codes for depression.  She conceded that "bipolar disorder is quite rare," whereas "[d]epression is quite prevalent."  (3/8 Tr. (Rosenthal) at 84:22-85:24; PX405N.)  Plaintiffs failed to offer any expert testimony that their

categorization of ICD-9 codes actually corresponded to the indications for which they sought to recover in this lawsuit.

Further, Prof. Rosenthal did not analyze the impact of the conduct at issue in this litigation; that is, Pfizer's alleged delay or distortion of the results of scientific studies published in the literature.[15]  To the contrary, she conceded that she was unable to account systematically for the influence of either published literature or alleged off-label marketing events and campaigns on prescribing. (3/8 Tr. (Rosenthal) at 74:10-18, 79:12, 95:25-96:7.)  She attempted to explain this failure away by alleging that this factor was subsumed within her promotion variable;[16] however, the issue is not whether Prof. Rosenthal accounted for a possible confounder, but whether she measured the variable of interest.  By her own admission the answer to the second question is "No."

In short, Prof. Rosenthal's testimony flunks *Daubert*'s "fit" test, which requires that "a valid connection exist between the expert's testimony and a disputed issue."  *United States v. Shay*, 57 F.3d 126, 133 n.5 (1st Cir. 1995).  Moreover, Prof. Rosenthal's analysis was plagued by numerous other methodological flaws that rendered it too unreliable to have any probative value. First, she used an improper, results-oriented methodology.  For example, she omitted a time trend, did not consistently include a constant, and repeatedly changed her model for each of her indication/specialty pairings until she got the result that she wanted.[17]  Likewise, her "analysis [did] not take into account any other factors that may have led doctors to prescribe Neurontin for off-label indications."[18]  In addition, she used survey data with wide margins of error, sometimes

---

[15] The only things that Prof. Rosenthal purported to measure were the effect of detailing expenditures and journal advertisements.  (3/8 Tr. (Rosenthal) at 74:10-18, 76:10-77:5, 79:12, 82:5-8, 95:25-96:7, 96:14-97:13.) Neither is connected to Plaintiffs' enterprise allegations.  As this Court made clear at the hearing on Defendants' motion for judgment pursuant to Rule 50(a), no evidence of fraudulent detailing to PMG physicians was presented, such that this case was submitted to the jury as a suppression case.  (3/19 Tr. (Court) at 221:5-10.)

[16] In support, Prof. Rosenthal offered only the wholly speculative theory that a sales representative might hand out an article on a detailing visit.  (3/5 Tr. (Rosenthal) at 138:10-11.)

[17] 3/8 Tr. (Rosenthal) at 102:11-12, 105:5-107:14; 3/22 Tr. (Keeley) at 43:8-13.

[18] *In re Neurontin Mktg., Sales Practices & Prods. Liab. Litig.*, 257 F.R.D. 315, 330 (D. Mass. 2009).

15

as high as 60 percent and her calculations included several computational and statistical errors.[19]

### D.   SCPMG Formulary Decisions Were Not Caused By Any Of The Alleged Wrongful Conduct Attributed To Defendants

Even as to SCPMG, Plaintiffs' evidence of causation was insufficient to sustain their burden.  Plaintiffs relied upon three DIS monographs to support their claims of causation:  (1) an April 1997 monograph on Reflex Sympathetic Dystrophy ("RSD") (DX528, 529), (2) a June 1999 monograph on post-herpetic neuralgia ("PHN") and DPN (DX557), and (3) a February 1999 DIS monograph on bipolar disorder (DX543).  Initially, similar evidence was not offered regarding the other indications at issue.  In addition, Plaintiffs' "but for" hypothetical was supported by the testimony of only one voting member of the 1997 and 1999 SCPMG P&T Committee:  Dr. Daniel.

In any event, the evidence at trial negated Plaintiffs' assertion that, with access to different information, DIS would have changed its recommendations and the SCPMG P&T Committee would have made different formulary decisions.  First, with respect to neuropathic pain, the evidence demonstrated that (1) DIS's 1997 recommendation regarding RSD was based on 14 case reports, not DBRCTs,[20] (2) DIS recommended that SCPMG remove restrictions on Neurontin and add guidelines in June 1999, with knowledge of the negative Gorson study and the unblinding issue in Backonja (DX557), (3) until February 9, 2010, even after publication of Reckless, POPP and Serpell, Plaintiffs continued to recommend Neurontin to Kaiser members and PMG physicians as an effective treatment for neuropathic pain (as well as other off-label conditions), stating that "gabapentin and pregabalin are the only drugs that have proved to help relieve some types of chronic pain," that some anticonvulsants have fewer side effects than TCAs, and that "[t]he anticonvulsant gabapentin may be your best bet for safely treating chronic pain because it is not used by the body in the same way as many other medicines,"[21] and (4) after

---

[19]   3/8 Tr. (Rosenthal) at 58:7-60:14; 3/22 Tr. (Keeley) at 49:10-51:4, 53:12-19; 57:24-58:18, 113:21-114:24.

[20]   DX528; 3/3 Tr. (Carrejo) at 23:8-26:8; 3/4 Tr. (Millares) at 111:2-117:22.

[21]   DX 918A, 918.  Even as of the time of trial, the Kaiser Permanente online drug encyclopedia listed only

suit was filed, Plaintiffs recommended generic gabapentin as a preferred, off-label treatment for DPN and fibromyalgia over Lyrica, a drug approved by the FDA for the treatment of those conditions.[22]

With respect to bipolar disorder, the evidence showed that DIS was aware of the negative results of Pande and Frye when, in March 2002, in a classwide monograph on the use of AEDs (including Neurontin) to treat bipolar disorder, it recommended that PMGs "accept the prescribing of gabapentin . . . for psychiatric disorders by Psychiatry specialists." (DX630.)  In spite of the negative DBRCTs, SCPMG made no changes to its formulary in order to preclude psychiatric use of Neurontin or gabapentin.  (*Id.*)  At the time this lawsuit was filed and through the date of trial, no PMG had placed restrictions on Neurontin or gabapentin to preclude prescribing by psychiatrists.[23]

With respect to all indications, at the time this lawsuit was filed and through the date of trial, no PMG had revised its formulary to restrict access to Neurontin for off-label indications (including by issuing new guidelines).  (3/3 Tr. (Hyatt) 139:16-24; 3/4 Tr. (Hyatt) 11:15-12:10).  Where, as here, the evidence contradicts a plaintiff's claims that it would have behaved differently in a hypothetical "but for" world, judgment should be entered in favor of the defendant.  *See, e.g.*, *Ironworkers*, 2011 WL 833222, at *8; *Prohias v. Pfizer, Inc.*, 485 F. Supp. 2d 1329, 1336 (S.D. Fla. 2007); *Whalen v. Pfizer, Inc.*, No. 600125, 2005 WL 2875291, at *4 (N.Y. Sup. Ct. Sep. 22, 2005); *Tagliente v. Himmer*, 949 F.2d 1, 7-8 (1st Cir. 1991).

### E.     Plaintiffs Presented No Other Evidence Of Causation

Neither Plaintiffs' claim that "Kaiser enjoys a 95% compliance rate to its formulary" ([2692] at 5) nor its argument that Neurontin prescriptions were reduced by 34 percent after two

---

Neurontin and generic gabapentin under the heading "Drugs for Managing Pain Originating From a Nerve," and the website stated that "'[g]abapentin may also be used to treat other [off-label] nerve pain conditions such as diabetic neuropathy, peripheral neuropathy, trigeminal neuralgia,'" and that AEDs, including Neurontin, are "often used for pain involving the nerves."  (DX902A; 902B; 3/2 Tr. (Carrejo) at 138:6-139:7.)

[22]  *See* DX798, 820, 828; 2/26 Tr. (Carrejo) at 138:14-141:5, 145:16-149:17; 3/2 Tr. (Carrejo) at 125:10-129:15.

[23]  3/4 Tr. (Millares) 119:7-23, 122:12-17, 124:8-16; 3/3 Tr. (Hyatt) 139:16-24.

California PMGs undertook educational initiatives in 2002 supply the missing link in Plaintiffs' proof of causation.  Significantly, no competent expert testified that one could predict the level of Neurontin prescriptions in Plaintiffs' "but for" world based upon either of these two statistics.  Neither factor was even considered by Kaiser's causation expert.   (3/8 Tr. (Rosenthal) at 53:16-54:1.)

In fact, Kaiser witnesses rejected the proposition that one could draw inferences about the impact that formulary restrictions would have on Neurontin prescriptions based upon the 95% figure.  For example, Dr. Daniel testified that, with the exception of SCPMG, most PMGs do not restrict formulary access to medicines.  (3/9 Tr. (Daniel) at 95:1-5.)  If almost all drugs are on formulary and unrestricted, the fact that 95% of prescriptions are formulary-compliant is unremarkable.  And Kaiser witnesses repeatedly rejected the suggestion that restricting a drug's formulary access would alter physician behavior.[24]

Likewise, no inference can be drawn from the 34% reduction in Neurontin prescriptions attributed by Plaintiffs to the Neurontin initiative in 2002.  Even assuming that the PMGs might have initiated a similar education program earlier (and, as discussed in Section II.D, there is no reason to believe they would have done so), it would be impossible to extrapolate the 34 percent to earlier years, when Neurontin usage was less.  Further, the Neurontin initiative was limited to neuropathic pain and, therefore, is not probative of causation with respect to any other indication.[25]

## III.    Plaintiffs Failed To Present Legally Sufficient Evidence Of Damages

For the reasons discussed above and in Defendants' prior memoranda, Plaintiffs failed to present legally sufficient evidence of damages.  To quantify their damages, Plaintiffs relied upon the testimony of Dr. Raymond Hartman.  Initially, the critical input to Dr. Hartman's purported damages calculation is the number of supposedly fraudulent prescriptions that Prof. Rosenthal's

---

[24] *See* 3/3 Tr. (Hyatt) at 104:22-105:6, 114:8-15, 139:16-24; 3/9 Tr. (Daniel) 95:1-5, 109:22-110:12.

[25] *See, e.g.*, DX747; 3/3 Tr. (Hyatt) at 105:7-15, 107:6-108:15, 129:21-130:3.

model generates. Because Prof. Rosenthal's model is fundamentally flawed, Dr. Hartman's analysis is unreliable and is not legally sufficient evidence of economic damages. And, as discussed above, Dr. Hartman made no attempt to determine whether physicians would have prescribed a drug other than Neurontin or what drugs they would have prescribed. He simply accepted, without scrutiny, Plaintiffs' list of alternative drugs. Dr. Hartman's testimony was based on so many unsupported and incorrect assumptions that his estimate of damages is too speculative to support the judgment in this action. *See Irvine v. Murad Skin Research Labs., Inc.*, 194 F.3d 313, 321 (1st Cir. 1999); *Pharmanetics, Inc. v. Aventis Pharm., Inc.*, No. 5:03-CV-817, 2005 WL 6000369, at *14 (E.D.N.C. May 4, 2005), *aff'd*, 182 F. App'x 267 (4th Cir. 2006).

## IV.   Plaintiffs Failed To Present Evidence Legally Sufficient To Sustain Their Burden Of Proving Conduct Of An Enterprise Or A Predicate RICO Act

For the reasons set forth in Defendants' Motion for Judgment as a Matter of Law Based Upon Lack of Sufficient Evidence to Prove Conduct of a RICO Enterprise Through a Pattern of Racketeering Activity and supporting memorandum [2668, 2669], incorporated herein by reference, Plaintiffs failed to produce sufficient evidence sufficient to meet their burden to establish several additional elements of their RICO claim. More specifically, Plaintiffs failed to present sufficient evidence of conduct through an enterprise distinct from defendants or from the alleged racketeering activity. Likewise, Plaintiffs failed to produce sufficient evidence of a predicate act.

Significantly, Plaintiffs relied upon a massive dump of documents not introduced through any witness to meet their burden to establish both the existence of a RICO enterprise and the required nexus with the conduct alleged. As set forth in Defendants Motion for New Trial, allowing Plaintiffs to introduce documents in this fashion was error. And, as this Court recognized, absent the document dump, Plaintiffs failed to present any other evidence of a RICO enterprise. (3/8 Tr. (Court) at 173:1-5; *see also, e.g.*, 3/8 Tr. (Court) at 174:4-11.) Accordingly, Defendants are entitled to judgment as a matter of law with respect to Plaintiffs' RICO claim. *See. e.g.*, *Poppell v. City of San Diego*, 149 F.3d 951, 968-71 (9th Cir. 1998) (reversing and

ordering entry of judgment as a matter of law for defendant after ruling that stand-alone document was not legally sufficient to support jury's verdict).

## V.    Plaintiffs' Claims Are Barred By The Statute of Limitations

For the reasons set forth in Defendants' Motion for Judgment as a Matter of Law Based Upon RICO Statute of Limitations and supporting memorandum [2674, 2675], incorporated herein by reference, the evidence showed, as a matter of law, that Plaintiffs knew or should have known of their alleged injury more than four year prior to filing this lawsuit.  Accordingly, Plaintiffs' RICO claims are barred by the statute of limitations.

## <u>CONCLUSION</u>

For all of the foregoing reasons, Pfizer respectfully requests that the Court grant its Renewed Motion for Judgment as a Matter of Law and enter judgment in favor of Defendants.

Dated: March 22, 2011

SKADDEN, ARPS, SLATE, MEAGHER
    & FLOM LLP

By:     /s/ Mark S. Cheffo
        Mark S. Cheffo
Four Times Square
New York, NY 10036
Tel:  (212) 735-3000
Email:  Mark.Cheffo@skadden.com

---

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on March 22, 2011.

/s/ Mark S. Cheffo
Mark S. Cheffo

---

Respectfully submitted,

SKADDEN, ARPS, SLATE, MEAGHER
    & FLOM LLP

By:     /s/ Raoul D. Kennedy
        Raoul D. Kennedy
Four Embarcadero Center
San Francisco CA 94111
Tel:  (415) 984-6400
Email:  Raoul.Kennedy@skadden.com

WHEELER TRIGG O'DONNELL LLP

By:     /s/ James E. Hooper
        James E. Hooper
1801 California Street
Suite 3600
Denver, CO 80202-2617
Tel:  (303) 244-1800
Email:  hooper@wtotrial.com

*Attorneys for Defendants Pfizer Inc and Warner-Lambert Company LLC*