UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

In re:   NEURONTIN MARKETING, SALES
           PRACTICES, AND PRODUCTS
           LIABILITY LITIGATION

            MDL Docket No. 1629

            Master File No. 04-10981

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

            Judge Patti B. Saris

THIS DOCUMENT RELATES TO:

AETNA, INC. v. PFIZER INC., 04 CV 10958 (PBS)

            Magistrate Judge Leo T.
            Sorokin

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## DEFENDANTS' OPPOSITION TO AETNA, INC.'S MOTION
## TO ALTER OR AMEND THE JUDGMENT PURSUANT TO FED. R. CIV. P. 59(E)

Mark S. Cheffo
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Four Times Square
New York, NY 10036
Tel:  (212) 735-3000


Lisa M. Ropple
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
Tel:  (617) 951-7000

*Attorneys for Defendants Pfizer Inc and*
*Warner-Lambert Company LLC*

## TABLE OF CONTENTS

SUMMARY OF ARGUMENT ..................................................................................................1

ARGUMENT .......................................................................................................................2

I.     Plaintiffs Cite No New Authority To Support Their Motion For Reconsideration, But Only Re-State Arguments Previously Rejected By This Court....................................2

     A.     Case Law Overwhelmingly Supports The Court's Decision To Grant Defendants' Motion For Summary Judgment As To Aetna...................................2

          1.     This Court's Decision As To Aetna Is Consistent With The Supreme Court's Decision In *Hemi Group*.................................................3

          2.     Decisions By The Second Circuit In *UFCW*, The Ninth Circuit In *Amgen*, And The Northern District Of Illinois In *Yasmin*, Each Decided After *Hemi Group*, Provide Additional Support For This Court's Summary Judgment Decision As To Aetna .................................4

          3.     The Eleventh Circuit's Recent Decision in *Ironworkers* Provides An Independent Basis For Why Summary Judgment As To Aetna Was Proper........................................................................................7

     B.     Aetna Cannot Distinguish This Overwhelming Weight Of Authority .................9

II.     Aetna Has Not Identified Any Newly Discovered Evidence To Demonstrate That This Court's Factual Findings Were Incorrect...............................................................16

CONCLUSION...................................................................................................................20

# TABLE OF AUTHORITIES

## CASES

*In re Actimmune Marketing Litigation*, 614 F. Supp. 2d 1037 (N.D. Cal. 2009)................... 14, 15

*In re Actimmune Marketing Litigation,* No. C 08-02376,
    2009 WL 3740648 (N.D. Cal. Nov. 6, 2009)................................................................ 10

*Bridge v. Phoenix Bond & Indemnity Co.*, 533 U.S. 639 (2008).................................................... 4

*Crawford v. Clarke*, 578 F.3d 39 (1st Cir. 2009)........................................................................ 2

*Desiano v. Warner-Lambert Co.*, 326 F.3d 339 (2d Cir. 2003) .................................................... 8

*District 1199P Health & Welfare Plan v. Janssen, L.P.*, No. 06-3044,
    2008 WL 5413105 (D.N.J. Dec. 23, 2008).......................................................... 10, 15

*Farley Transportation Co. v. Santa Fe Trail Transportation Co.*,
    786 F.2d 1342 (9th Cir. 1985)......................................................................... 12

*Harrington v. City of Nashua*, 610 F.3d 24 (1st Cir. 2010) ........................................................ 2

*Hemi Group, LLC v. City of New York*, 130 S. Ct. 983 (2010) ............................................ 3, 4, 5

*Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992) .............................. 3, 4

*Hood ex rel. Mississippi v. Eli Lilly & Co.* (In re Zyprexa Products Liability
    Litigation), 671 F. Supp. 2d 397 (E.D.N.Y. 2009)..................................... 6, 9, 10, 11, 13

*International Brotherhood of Teamsters Local 734 Health & Welfare
    Trust Fund v. Phillip Morris Inc.*, 196 F.3d 818 (7th Cir. 1999)...................................... 9

*Ironworkers Local Union 68 v. AstraZeneca Pharmaceuticals, LP*, No. 08-16851,
    2011 WL. 833222 (11th Cir. Mar. 11, 2011)...................................................... 7, 8, 9, 10

*Ironworkers Local Union No. 68 v. AstraZeneca Pharmaceuticals LP*,
    585 F. Supp. 2d 1339 (M.D. Fla. 2008)......................................................... 10, 14, 15

*Kansky v. Coca-Cola Bottling Co. of New England*, 492 F.3d 54 (1st Cir. 2007) ........................ 1

*MCI Communications Corp. v. American Telephone & Telegraph Co.*,
    708 F.2d 1081 (7th Cir. 1982).......................................................................... 12

*McLaughlin v. American Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008) .......................................... 8

*In re Neurontin Marketing, Sales Practices & Products Liability Litigation*,
    257 F.R.D. 315 (D. Mass. 2009) ................................................................... 14, 19

*Pagan-Colon v. Walgreens of Puerto Rico, Inc.*, No. 08-2398,
    2010 WL 5072555 (D.P.R. Dec. 7, 2010) ...................................................................... 1

*Palmer v. Champion Mortgage*, 465 F.3d 24 (1st Cir. 2006)........................................................1

*Pennsylvania Employees Benefit Trust Fund v. Astrazeneca Pharmaceuticals LP*,
    No. 6:09-cv-5003, 2009 WL. 2231686 (M.D. Fla. July 20, 2009) ..................................10

*In re Pharmaceutical Industry Average Wholesale Price Litigation*,
    582 F.3d 156 (1st Cir. 2009) ................................................................................. 12, 13

*Phoenix Bond & Indemnity Co. v. Bridge*, Nos. 05 C 4095, 07 c 1367,
    2010 WL 3526469 (N.D. Ill. Sept. 1, 2010) ......................................................................4

*Prescott v. Higgins*, 538 F.3d 32 (1st Cir. 2008) ........................................................................1

*Quaker Alloy Casting Co. v. Gulfco Industrial, Inc.*, 123 F.R.D. 282 (N.D. Ill. 1988)................2

*In re Rezulin Products Liability Litigation*, 392 F. Supp. 2d 597 (S.D.N.Y. 2005) ......................8

*In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*,
    No. 2:06-cv-5774, 2009 WL 2043604 (D.N.J. July 10, 2009) ........................................15

*In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*,
    No. 2:06-cv-5774, 2010 WL. 2346624 (D.N.J. June 9, 2010).........................................10

*Southeast Laborers Health & Welfare Fund v. Bayer Corp.*,
    655 F. Supp. 2d 1270 (S.D. Fla. 2009) ...........................................................................10

*Southern Illinois Laborers' & Employers Health & Welfare Fund v. Pfizer Inc.*,
    No. 08 CV 5175, 2009 WL. 3151807 (S.D.N.Y. Sept. 30, 2009)....................... 10, 14, 15

*System Management, Inc. v. Loiselle*, 303 F.3d 100 (1st Cir. 2002) .............................................3

*UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121 (2d Cir. 2010)....................... 4, 5, 6, 7, 8, 10

*United Food & Commercial Workers Central Pennsylvania &*
    *Regional Health & Welfare Fund v. Amgen, Inc.*, 400 F. App'x 255 (9th Cir. 2010) ....6, 9

*U.S. Football League v. National Football League*, 842 F.2d 1335 (2d Cir. 1988)....................12

*Venegas-Hernandez v. Sonolux Records*, 370 F.3d 183 (1st Cir. 2004).......................................1

*In re Yasmin & Yaz (Drospirenone) Marketing, Sales Practices &*
    *Products Liability Litigation*, MDL No. 2100,
    2010 WL 3119499 (S.D. Ill. Aug. 5, 2010) ..................................................................6, 7

*In re Zyprexa Products Liability Litigation*, 253 F.R.D. 69 (E.D.N.Y. 2008) ............................10

*In re Zyprexa Products Liability Litigation*, 493 F. Supp. 2d 571 (E.D.N.Y. 2007)...................10

Defendants Pfizer Inc and Warner-Lambert Company LLC (collectively, "Pfizer" or "Defendants") hereby respond to Aetna, Inc.'s Motion to Alter or Amend the Judgment Pursuant to Fed. R. Civ. P. 59(e).  For the reasons discussed below, that motion should be denied.

## SUMMARY OF ARGUMENT

On January 8, 2010, this Court granted Pfizer's motion for summary judgment as to Guardian and Aetna.  (Mem. & Order [2309].)  Over a year later, Aetna now asks this Court to reconsider its prior ruling, but raises no legitimate grounds to alter or amend the judgment.  "[R]econsideration is 'an extraordinary remedy which should be used sparingly.'"  *Palmer v. Champion Mortgage*, 465 F.3d 24, 30 (1st Cir. 2006) (citation omitted).  As a result, parties who resort to Rule 59(e) to seek relief from summary judgment or dismissal have an extremely high burden to meet.  A motion to alter or amend the judgment should not be granted unless the movant "demonstrate[s] either that newly discovered evidence (not previously available) has come to light or that the rendering court committed a manifest error of law."  *Id.*; *accord Kansky v. Coca-Cola Bottling Co. of New England*, 492 F.3d 54, 60 (1st Cir. 2007).[1]

In support of its motion to alter or amend the judgment, Aetna does not even attempt to meet this standard.  It identifies no new evidence and presents no new authority demonstrating that this Court committed a manifest error of law.  Instead, Aetna simply re-hashes arguments that this Court has previously rejected.  But, as the First Circuit has made clear, "'[t]he repetition of previous arguments is not sufficient to prevail on a Rule 59(e) motion.'"  *Prescott v. Higgins*, 538 F.3d 32, 45 (1st Cir. 2008) (citation omitted).[2]  Court rulings "are not intended as mere first

---

[1] *Venegas-Hernandez v. Sonolux Records*, 370 F.3d 183 (1st Cir. 2004), cited by Plaintiffs, does not hold that Rule 59(e) may be used to "prevent manifest injustice."  (Pl. Mem. [3323] at 3-4.)  In that case, the First Circuit considered the use of Rule 59(e) to correct a judgment entered by default.  There, as in the cases cited above, the First Circuit stated:  "Rule 59(e) permits an attack on a judgment on the ground that the judgment is based on a manifest error of law."  *Venegas-Hernandez*, 370 F.3d at 189.  As the First Circuit made clear, this standard is more difficult to meet where, as here, judgment was rendered after the issues had been thoroughly briefed by the parties.  *See id.* at 191.  In *Pagan-Colon v. Walgreens of Puerto Rico, Inc.*, No. 08-2398, 2010 WL 5072555 (D.P.R. Dec. 7, 2010), also cited by Aetna, the manifest error of law standard was met.  *See id.* at *3.

[2] Further, "Rule 59(e) 'does not provide a vehicle for a party to undo its own procedural failures, and it certainly does not allow a party to introduce new evidence or advance arguments that could and *(cont'd)*

drafts, subject to revision and reconsideration at a litigant's pleasure." *Quaker Alloy Casting Co. v. Gulfco Indus., Inc.*, 123 F.R.D. 282, 288 (N.D. Ill. 1988).

Instead of presenting new evidence or authority, Aetna attempts to argue that it is just like Kaiser, ignoring the several distinctions that this Court has repeatedly drawn between Kaiser and the other Third Party Payors ("TPPs"), including Aetna. Aetna's legal arguments are completely redundant of prior arguments made by it or other TPPs and which have been rejected by this Court. Not only does Aetna fail to present any new legal analysis or authority, it ignores several more recent cases that support this Court's January 2010 summary judgment decision in Pfizer's favor, including decisions from the Second and Ninth Circuits, and this Court's December 2010 summary judgment decision, entered after the Kaiser trial, dismissing the claims of the Class TPPs.

For the reasons discussed below, this Court's decision granting Pfizer's motion for summary judgment as to Aetna was supported by the facts and consistent with the overwhelming weight of relevant precedent. Aetna's motion to alter or amend the judgment should be denied.

## ARGUMENT

**I.    Plaintiffs Cite No New Authority To Support Their Motion For Reconsideration, But Only Restate Arguments Previously Rejected By This Court**

### A.    Case Law Overwhelmingly Supports The Court's Decision To Grant Defendants' Motion For Summary Judgment As To Aetna

Far from resting on a manifest error of law, "[s]ummary judgment here was not a matter of discretion but, rather, was legally compelled." *Harrington v. City of Nashua*, 610 F.3d 24, 33 (1st Cir. 2010). The relevant jurisprudence overwhelmingly supports this Court's decision to grant Defendants' motion for summary judgment as to Aetna.[3] Indeed, since this Court's

_____
*(cont'd from previous page)*
should have been presented to the district court prior to the judgment.'" *Crawford v. Clarke*, 578 F.3d 39, 44 (1st Cir. 2009) (citation omitted).

[3] Aetna characterizes this Court's decision as a "split-decision" (Pl. Mem. at 4), as if that term has some meaning or significance in this context. It is more accurate to say that this Court granted Defendants' motion as to Aetna, based upon the facts specific to Aetna, and denied the motion as to Kaiser, for reasons that this Court found were specific as to Kaiser.

January 8, 2010 Memorandum and Order [2309], additional support for its ruling as to Aetna has been provided by the United States Supreme Court; the Second, Ninth and Eleventh Circuit Courts of Appeal; and more recent district court opinions.

### 1. This Court's Decision As To Aetna Is Consistent With The Supreme Court's Decision In *Hemi Group*

Initially, as this Court explained, to support its claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), Aetna was required to prove both "but for" and proximate cause. (1/8/10 Mem. at 21.) And, while first-party reliance is not always required under RICO, "a RICO plaintiff who alleges injury 'by reason of' a pattern of mail fraud cannot prevail 'without showing that <u>someone</u> relied on the defendant's misrepresentations.'" (*Id.* at 21-22 (quoting *Bridge v. Phoenix Bond & Indem. Co.*, 128 S. Ct. 2131, 2144 (2008); emphasis in original); *see also Sys. Mgmt, Inc. v. Loiselle*, 303 F.3d 100, 104 (1st Cir. 2002) ("Reliance is doubtless the most obvious way in which fraud can cause harm . . . .").

Shortly after this Court granted Defendants' motion for summary judgment, the Supreme Court issued its decision in *Hemi Group, LLC v. City of New York*, 130 S. Ct. 983 (2010), which confirms the correctness of this Court's decision regarding Aetna's claims. In *Hemi Group*, the Supreme Court reiterated its prior holdings that "but for" causation is a necessary, but not sufficient, component of a RICO plaintiff's claim. *See id.* at 984. The plaintiff must also prove proximate causation, which "requires 'some direct relation between the injury asserted and the injurious conduct alleged.'" *Hemi Group*, 130 S. Ct. at 985 (quoting *Holmes v. Sec. Investor Protection Corp.*, 503 U.S. 258, 268 (1992)). "A link that is 'too remote,' 'purely contingent,' or 'indirec[t]' is insufficient." *Hemi Group*, 130 S. Ct. at 985 (alteration in original) (quoting *Holmes*, 503 U.S. at 271). Significantly, the Supreme Court affirmed that Plaintiffs cannot prove a direct injury with a theory of causation that depends on "separate actions carried out by separate *parties*" and in which "[m]ultiple steps . . . separate the alleged fraud from the asserted injury." *Hemi Group*, 130 S. Ct. at 990, 992. As the Court further explained, "'[t]he general tendency of the law, in regard to damages at least, is not to go beyond the first step.'" *Id.* at 989

3

(alteration in original) (quoting *Holmes*, 503 U.S. at 271-72).   A "theory of causation [that] requires [the Court] to move well beyond the first step . . . cannot satisfy RICO's direct relationship requirement."  *Id.*

In *Hemi Group*, the Supreme Court also distinguished and limited its prior holding in *Bridg*e *v. Phoenix Bond & Indemnity Co.*, 533 U.S. 639 (2008), to a very specific fact pattern not presented here.  As the Supreme Court explained, *Bridge* involved a "zero sum" situation where the defendant's acquisition of liens necessarily reduced the liens available for the plaintiffs to obtain.  *Hemi Group*, 130 S. Ct. at 992.  Thus, there were no independent factors that accounted for the plaintiffs' alleged injury.  *Id.*   Indeed, upon development of a fuller factual record, even the district court in *Bridge* found that the "[p]laintiffs' prior descriptions of the Cook County tax lien sales were inaccurate . . . [and] injected a level of mathematical precision into the auctions that never factually existed."  *Phoenix Bond & Indem. Co. v. Bridge*, Nos. 05 C 4095, 07 C 1367, 2010 WL 3526469, at *6 (N.D. Ill. Sept. 1, 2010).  With the additional guidance from *Hemi Group*, the *Bridge* court granted defendants' motions for summary judgment.  *See id.* at *14.

### 2.   Decisions By The Second Circuit In *UFCW*, The Ninth Circuit In *Amgen*, And The Northern District Of Illinois In *Yasmin*, Each Decided After *Hemi Group*, Provide Additional Support For This Court's Summary Judgment Decision As To Aetna

<u>*UFCW*</u>:  In September of last year, the Second Circuit decided *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121 (2d Cir. 2010) ("*UFCW*").  Applying *Holmes* and *Hemi Group* to claims asserted by TPPs seeking to recover amounts allegedly overpaid for a prescription medicine (Zyprexa), the Second Circuit explained that the plaintiffs' theory of causation – "Lilly distribute[d] misinformation about Zyprexa, physicians rel[ied] upon that misinformation and prescribe[d] Zyprexa for their patients, and then the TPPs overpa[id]" – failed to sufficiently allege proximate cause under RICO.  *Id.* at 134.  As the Second Circuit explained:

> This narrative skips several steps and obscures the more attenuated link between the alleged misrepresentations made to doctors and the ultimate injury to the TPPs. In fact, if plaintiffs' factual allegations are correct, the chain of causation runs as follows:  Lilly distributes misinformation about Zyprexa, physicians rely upon the misinformation and prescribe Zyprexa, TPPs relying on the advice of PBMs and

4

their Pharmacy and Therapeutics Committees place Zyprexa on their formularies as approved drugs, TPPs fail to negotiate the price of Zyprexa below the level set by Lilly, and TPPs overpay for Zyprexa.

*Id.* "Crucially, the TPPs [did] not allege that they relied on Lilly's misrepresentations – the misrepresentations at issue were 'directed through mailings and otherwise at doctors.'" *Id.* (citation omitted). Accordingly, the court found that "Plaintiffs' 'theory of liability rests on the independent actions of third and even fourth parties,' as physicians, PBMs, and PBM Pharmacy and Therapeutics Committees all play a role in the chain between Lilly and TPPs." *Id.* (quoting *Hemi Group*, 130 S. Ct. at 992). As a result, the Second Circuit vacated the district court's denial of summary judgment as to the plaintiffs' pricing effects claim. *See id.* at 136-37.

The Second Circuit found the plaintiffs' "quantity effect" theory to be "in one sense simpler," but nevertheless held that "this theory of causation is interrupted by the independent actions of prescribing physicians." *Id.* at 135. The Second Circuit explained:

Plaintiffs argue that "the ultimate source for the information on which doctors based their prescribing decisions was Lilly and its consistent, pervasive marketing plan." Lilly was not, however, the only source of information on which doctors based prescribing decisions. An individual patient's diagnosis, past and current medications being taken by the patient, the physician's own experience with prescribing Zyprexa, and the physician's knowledge regarding the side effects of Zyprexa are all considerations that would have been taken into account in addition to the alleged misrepresentations distributed by Lilly.

Furthermore, additional variables interfere further with plaintiffs' theory of causation. As the district court noted, the evidence showed that at least some doctors were not misled by Lilly's alleged misrepresentations, and thus would not have written "excess" prescriptions as identified by the plaintiffs. This makes general proof of but-for causation impossible.

*Id.* at 135. Because the plaintiffs' quantity effects theory had not been considered by the district court, the Second Circuit remanded that claim for further consideration. *See id.* at 136. However, the court's reasoning raises substantial doubt about its viability. Moreover, the Second Circuit expressly held that the claim could not be proven by "generalized," "aggregate proof," *id.* at 135, which is all that Aetna offered here.

Indeed, while the Second Circuit merely declined to rule on this issue "in the first

instance" because Judge Weinstein "did not consider individual claims under the quantity effect theory" when he denied summary judgment, *id.* at 136, Judge Weinstein had previously held that an "individual" claim by a TPP in cases like this one is the functional equivalent of a class action, and that if aggregate proof could not be used to establish the claims of individual consumers, then it could not be used to support the aggregation of such claims by a single TPP. *See Hood ex rel. Mississippi v. Eli Lilly & Co.* (In re Zyprexa Prods. Liab. Litig.), 671 F. Supp. 2d 397, 433 (E.D.N.Y. 2009) (Weinstein, J.).

*Amgen*: The Ninth Circuit recently reached the same conclusion when it affirmed dismissal of claims by TPPs in *United Food & Commercial Workers Central Pennsylvania & Regional Health & Welfare Fund v. Amgen, Inc.*, 400 F. App'x 255 (9th Cir. 2010) ("*Amgen*"). The plaintiff TPPs in *Amgen* asserted fraudulent marketing claims under RICO and California's Unfair Competition Law ("UCL") and sought to recover damages based on amounts they had paid for their insureds' off-label prescriptions of the defendant's pharmaceutical products. The Ninth Circuit held, *inter alia*, that "the complaint failed to plead a cognizable theory of proximate causation that links Amgen's alleged misconduct to Appellant's alleged injury." *Id.* at 257. The *Amgen* plaintiffs'

> attenuated causal chain . . . involved at least four independent links, namely, (1) the [United States Pharmacopeia-Drug Information's] listing of Aranesp for [the off-label uses], (2) Medicare's decision to cover Aranesp for [these uses], (3) third-party payors' decision to cover Aranesp [and Epogen] for [these uses], and (4) doctors' decisions to prescribe Aranesp and Epogen for these uses. This causal theory is too attenuated to satisfy the Supreme Court's proximate causation requirement in the RICO context.

*Id.* (citing *Hemi Group*, 130 S. Ct. at 989).

*Yasmin*: Likewise, in *In re Yasmin & Yaz (Drospirenone) Marketing, Sales Practices & Products Liability Litigation*, MDL No. 2100, 2010 WL 3119499 (S.D. Ill. Aug. 5, 2010), TPPs alleged that the defendants "wrongfully promoted [the oral contraceptive] YAZ as safe and effective for unapproved off-label uses and concealed or omitted facts pertaining to YAZ's safety profile." *Id.* at *1. Dismissing the plaintiffs' claims, Judge Herndon of the Southern

District of Illinois explained:

> Applying the proximate cause analysis of *Holmes* and its progeny, this Court is inclined to agree with other district courts that have found direct proximate cause lacking in cases of this nature. In the instant case, multiple steps separate the alleged wrongful conduct (the fraudulent advertising campaign and/or the alleged bribery) and the alleged injuries (paying "too much" for "too many") YAZ prescriptions, including patient preference, the independent judgment of the prescribing physician, and the reimbursement decision rendered by the third party payor and its benefits manager. Thus, the causal link necessarily involves the decision making process of the patient, the prescribing physician, and the third party payor. This demonstrates the attenuation in Plaintiffs' civil RICO claims.

*Id.* at *7 (footnotes omitted).

### 3.   The Eleventh Circuit's Recent Decision in *Ironworkers* Provides An Independent Basis For Why Summary Judgment As To Aetna Was Proper

In *Ironworkers Local Union 68 v. AstraZeneca Pharmaceuticals, LP*, No. 08-16851, 2011 WL 833222 (11th Cir. Mar. 11, 2011) (to be published in F.3d), the Eleventh Circuit affirmed dismissal of similar claims by TPPs, providing an independent basis supporting this Court's summary judgment decision.[4] In *Ironworkers*, plaintiff TPPs sought to recover amounts paid for Seroquel, alleging that the defendants' fraudulent, off-label marketing caused them to pay for Seroquel, rather than cheaper, alternative drugs. *See id.* at *1. Plaintiffs alleged that they had placed Seroquel on their formularies based upon its FDA approved indications, but were required to also pay for off-label uses. In other words, insurers alleged that they "had to pay regardless of the facts surrounding that prescription; they had to pay if the drug was prescribed for an FDA-approved use or an off-label use – even if the prescription was medically unnecessary or inappropriate." *Id.* at *8.

As an initial matter, the Eleventh Circuit rejected Plaintiffs' argument that they could

---

[4] Although the Eleventh Circuit majority reached the same result (dismissal of the TPPs' claims) as the trial court for different reasons, Judge Martin "concur[red] specially to express [her] view that there is a much simpler reason why the appellees should prevail. As the Second Circuit explained in *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121 (2d Cir. 2010), the independent decisions of the physicians and other intermediaries involved in Seroquel's allegedly increased usage and pricing eviscerates the chain of causation necessary to demonstrate a RICO violation." 2011 WL 833222, at *10 (Martin, J., concurring).

recover the difference between the price of Seroquel and cheaper, alternative drugs even if Seroquel was safe and effective for the prescribed use. *Id.* at *5.[5] As the Eleventh Circuit explained, a physician's decision to prescribe a medication is influenced by a number of factors and there is no duty to prescribe the least expensive medicine. *See id.*

> [W]hen a physician's decision to prescribe a drug for a particular use purportedly was caused by false representations concerning the drug's safety and efficacy in that use, a plaintiff must allege that she not only paid for the drug, but also that its prescription was medically unnecessary or inappropriate. To make this showing, the payer-plaintiff must allege a counterfactual: that her physician – had he known all the true information about the medication – would not have prescribed the drug under the standards of sound medical practice because the drug actually was unsafe or ineffective in treating the plaintiff's condition.

*Id.* at *6.

And, while excluding the possibility that the insurers could recover for an effective, though more expensive, drug, the Eleventh Circuit also made clear that allegations of inefficacy or inferiority – which it assumed to be true, *id.* at *10 n.37 – were likewise insufficient to establish injury. Fundamentally, the TPPs' claims ignored the business model according to which almost all insurers operate. A TPP can choose to place restrictions on prescribing in order to manage drug utilization, or it can choose not to. For example, "preauthorization review of drug prescriptions provides insurers with a process to monitor the prescription, dispensing, and use patterns of medications to promote appropriate uses of covered drugs." *Id.* at *8. Where an insurer makes a "conscious business decision not to require preauthorization review in their policies," it "voluntarily assume[s] the risk of paying for all prescriptions of [the drug at issue],

---

[5] Plaintiffs' "cheaper, alternative" theory originated with the Second Circuit's decision in *Desiano v. Warner-Lambert Co.*, 326 F.3d 339 (2d Cir. 2003). The continued viability of *Desiano* in light of the Second Circuit's later decisions in *McLaughlin v. American Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008) and *UFCW* is questionable. In any event, the theory articulated by the *Desiano* court ***always*** depended upon allegations of direct reliance, *see* 326 F.3d at 349, which Aetna failed to prove. *See infra* at Section II. Indeed, after the record was further developed in *Desiano*, it became apparent that the TPPs had not, in fact, made formulary decisions based upon direct representations from the defendant and did not even control their formularies. Thus, their claims were dismissed on summary judgment. *Id.* at *351; see In re Rezulin Prods. Liab. Litig.*, 392 F. Supp. 2d 597, 603-05 (S.D.N.Y. 2005).

The Second Circuit's recent decision in *UFCW* makes clear that, even if *Desiano* is still good law, a TPP asserting such a theory cannot rely on aggregate proof to support it. *See supra* at 4-5.

including prescriptions for off-label uses that were medically unnecessary or inappropriate." *Id.*

Such risks are accounted for by insurers when setting premiums, which are determined by a technical, actuarial process. *See id.* at *7.

> This prediction involves an assessment of (1) the likely number of times a covered event – e.g., a prescription of a covered drug – will occur and (2) the average cost of each covered event. If there is any uncertainty surrounding projected claims, insurers will raise the premium to reflect that uncertainty. The final premium charged consists of this adjusted estimate plus an administrative expenses projection that includes estimates for all those expenses that the insurance company charges that are not for claims, such as overhead.

*Id.* (citation omitted). If the estimates made by insurers when setting premiums exceeded their actual payments for these drugs, they have no out-of-pocket loss. If they underestimated, their actuarial mistake cannot be recharacterized as a direct injury caused by defendants. In either case, a TPP cannot state a cognizable injury. *See id.* at *9.[6]

Further, the Eleventh Circuit rejected the TPPs' argument that they were defrauded by omission based on the defendants' alleged failure to disclose its fraudulent marketing scheme. *See id.* at *8 n.33. "For such a theory based on nonfeasance to prove tenable, the insurers would need to establish that AstraZeneca owed them a legal duty of disclosure. No such duty exists, however, absent a special relationship between the parties. The insurers have failed to allege the presence of a special relationship here – because none existed." *Id.* (citations omitted). Similarly, in *Amgen*, the Ninth Circuit held that Plaintiffs failed to "identify material omissions in derogation of an independent statutory or fiduciary duty to disclose." *See* 400 F. App'x at 257. So, too, in this case, Aetna has not identified any special relationship giving rise to a duty to disclose or any "half truth" allegedly made by Defendants to Aetna.

## B.    Aetna Cannot Distinguish This Overwhelming Weight Of Authority

Claims by TPPs seeking to recover amounts paid for off-label prescriptions have now

---

[6] The Eleventh Circuit relied, in part on the Seventh Circuit's decision in *International Brotherhood of Teamsters Local 734 Health & Welfare Trust Fund v. Phillip Morris Inc.*, 196 F.3d 818, (7th Cir. 1999), where the Seventh Circuit observed that insurers, having collected money from their insureds in the form of premiums to cover predicted risks of smoking, could not then sue tobacco companies. *See id.* at 823.

been rejected by three courts of appeal and seven district courts.[7]  In its attempt to distinguish this legion of on-point cases, Aetna simply repeats the arguments made by the Class Plaintiffs in their Memorandum Regarding *Guardian* Ruling [2473-2], which was filed one month after this Court granted Defendants' motion for summary judgment as to Aetna.  (*Compare* Pl. Mem. at 12-18 *with* Class Pl. Mem. at 3-12.)  Aetna does not even attempt to update the arguments made by the Class Plaintiffs to address more recent authority.  Indeed, as if time had stood still, Aetna cites *Zyprexa* for the proposition that "courts routinely rely on aggregate statistical data to prove causation and damages in pharmaceutical litigation."  (Pl. Mem. at 13.)  The *Zyprexa* citation given for this statement is:  "*In re Zyprexa Prods. Liab. Litig.*, 671 F. Supp. 2d 397, 413 (E.D.N.Y. 2009), *rev'd on other grounds, UFCW Local 1776 v. Eli Lilly and Co.*, 620 F.3d 121 (2d. Cir. 2010)."  (Pl. Mem. at 13 n.5.)  This citation is more than merely incorrect; it is patently misleading.  In *UFCW*, the Second Circuit did ***not*** reverse Judge Weinstein's decision reported at 671 F. Supp. 2d 397.  It reversed *In re Zyprexa Prods. Liab. Litig.*, 253 F.R.D. 69 (E.D.N.Y. 2008) ("*Zyprexa II*") (certifying a class) and vacated in part *In re Zyprexa Prods. Liab. Litig.*, 493 F. Supp. 2d 571 (E.D.N.Y. 2007) ("*Zyprexa I*") (denying summary judgment).  *See UFCW*, 620 F.3d at 137.  And the "other grounds" for the Second Circuit's reversal included its directly on-point holding that aggregate evidence could ***not*** be used to prove either the TPPs' price effects or quantity effects theories of recovery.  *See supra* at 4-6.

---

[7] Plaintiffs' suggestion that this Court's decision was supported by only a "short line of cases" (Pl. Mem. at 12) is disingenuous.  In addition to the cases discussed in section I.A, the following courts have dismissed similar claims by TPPs, either on Rule 12(b)(6) motions or motions for summary judgment. *See In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, No. 2:06-cv-5774, 2010 WL 2346624 (D.N.J. June 9, 2010), *appeal docketed* No. 10-3046 (3d Cir. July 19, 2010); *Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*, Nos. 06-3044, et al., 2008 WL 5413105 (D.N.J. Dec. 23, 2008); *Hood ex rel. Mississippi v. Eli Lilly & Co.* (In re Zyprexa Prods. Liab. Litig.), 671 F. Supp. 2d 397, 433 (E.D.N.Y. 2009); *In re Actimmune Mktg. Litig.*, No. C 08-02376, 2009 WL 3740648 (N.D. Cal. Nov. 6, 2009), *appeal docketed* No. 10-17239 (9th Cir. 2010); *S. Ill. Laborers' & Emp'rs Health & Welfare Fund v. Pfizer Inc.*, No. 08 CV 5175, 2009 WL 3151807 (S.D.N.Y. Sept. 30, 2009); *Se. Laborers Health & Welfare Fund v. Bayer Corp.*, 655 F. Supp. 2d 1270 (S.D. Fla. 2009); *Pa. Emps. Benefit Trust Fund v. Astrazeneca Pharm. LP*, No. 6:09-cv-5003, 2009 WL 2231686 (M.D. Fla. July 20, 2009); *Ironworkers Local Union No. 68 v. AstraZeneca Pharm. LP*, 585 F. Supp. 2d 1339 (M.D. Fla. 2008), *aff'd on other grounds*, 2011 WL 833222 (11th Cir. Mar. 11, 2011).

The *Zyprexa* decision appearing at 671 F. Supp. 2d 397 ("*Zyprexa III*") has never been reversed. Nor does it stand for the proposition cited. To the contrary, Judge Weinstein granted summary judgment dismissing the off-label marketing claims as to a TPP's quantity effects theory, based upon what he described as the "Individualized Proof Rule." *See* 671 F. Supp. 2d at 434. After an extensive review of the relevant case law, Judge Weinstein concluded:

> Together, this large body of case law constitutes a now widely held view of aggregate litigation, particularly in the products liability or fraud context, that statistical proof is in most instances insufficient to show reliance, loss-causation, or injury on the part of individual class members or claimants (the "Individualized Proof Rule").

*Id.* This Court specifically relied upon *Zyprexa III* when it granted Defendants' motion for summary judgment as to Aetna. (1/8/10 Mem. at 26-27.)

Even more incredibly, while Aetna cuts and pastes from the Class Plaintiffs' February 2010 brief, Aetna does not acknowledge that this Court has already considered, and rejected, the Class Plaintiffs' arguments. Ten months after Class Plaintiffs made almost the exact same arguments as Aetna – ***and after the* Kaiser *trial***, this Court granted Defendants' motion for summary judgment as to each of the Class TPPs. (12/10/2010 Mem. [3154]). In doing so, the Court noted:

- "[T]he Class TPP Plaintiffs have put forth no evidence as to which, if any, doctors were tainted by misleading information like 'Dear Doctor' letters or other marketing material. There is no evidence in the record that any of the Class TPP Plaintiffs communicated directly with Pfizer in the development or evaluation of a drug formulary." (*Id.* at 26.)

- "Most courts have rejected such aggregate proof. The Second Circuit recently held, in a class action regarding sales and marketing of the drug Zyprexa, that where '[p]laintiffs allege an injury that is caused by physicians relying on [a pharmaceutical company's] misrepresentations,' the injury cannot be shown by generalized proof." (*Id.* (citing, *inter alia*, *UFCW*).)

- "Because the Class TPP Plaintiffs have not directly relied on misrepresentations by defendants, and because they have presented no evidence as to how many or which physicians who prescribed Neurontin to their members relied on fraud, they cannot establish causation." (*Id.* at 28.)

Defendants have previously responded to these arguments, when made by the Class

Plaintiffs, in Defendants' Memorandum in Opposition to Class Plaintiffs' Motions for Oral Argument and Leave to File Memorandum Regarding "Guardian" Ruling [2539] (Feb. 22, 2010). As explained therein, Aetna's argument relies upon inapposite price inflation and antitrust cases. The use of aggregate proof in those types of cases is not at issue here. Instead, the question before this Court is whether aggregate proof can be used to establish that thousands of physicians based prescribing decisions upon alleged misrepresentations. As the numerous courts to grapple with this issue have concluded, the decision of a physician to prescribe a drug for a patient is too highly individualized and subject to too many different influences to be addressed through aggregate proof. It presents an entirely different question than, for example, whether alleged anti-competitive behavior had an impact on market prices for a commodity.

It is for this reason that Aetna's reliance upon *In re Pharmaceutical Industry Average Wholesale Price Litigation*, 582 F.3d 156 (1st Cir. 2009) ("*AWP*"), a price inflation case, is misplaced.[8] In *AWP*, the plaintiffs' expert established a benchmark that represented "the spread between the published [average wholesale price ("AWP") of a drug] and the actual acquisition costs that the government and the industry expected." *Id.* at 178. The expectations yardstick was used to determine whether Defendants' pricing spreads were fraudulent. *See id.* The same benchmark analysis was used to calculate aggregate damages on behalf of a class. *See id.* at 197. The issue in *AWP* bears no resemblance to the instant case, which involves the thousands of complex prescribing decisions by physicians and a TPP that failed to present any evidence of direct reliance on alleged misrepresentations by the Defendants.

Significantly, in *Zyprexa III*, Judge Weinstein quoted at length from *AWP* and considered whether its reasoning could be extended to a case such as this, where a TPP seeks to recover

---

[8] Aetna also argues that a trio of antitrust cases that this Court cited for the general proposition that a plaintiff must be able to segregate damages due to unlawful conduct (an unassailable proposition) all allowed for the *possibility* that aggregate proof could be sufficient in some situations. (Pl. Mem. at 16-18 (discussing *U.S. Football League v. Nat'l Football League*, 842 F.2d 1335 (2d Cir. 1988); *Farley Transp. Co. v. Santa Fe Trail Transp. Co.*, 786 F.2d 1342 (9th Cir. 1985); and *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081 (7th Cir. 1982)).) Even if true, the use of aggregate damages evidence in antitrust litigation does not support its viability in this case.

based upon physician prescribing decisions.  *See* 671 F. Supp. 2d. at 446-49.  Reconciling *AWP*

with the majority Individualized Proof Rule, Judge Weinstein explained:  "The Court of Appeals

for the First Circuit emphasized that factual inquiries into the circumstances that might have

differentiated class members had revealed little significant difference between them."  671

F. Supp. 2d. at 449.  After analyzing *AWP*, Judge Weinstein nevertheless rejected aggregate

proof of the TPPs' claims:

> All of the theories advanced under both claims have in common that they require a showing of reliance on Lilly's acts or omissions across the heterogeneous population of Mississippi patients and prescribing physicians, either in deciding to purchase Zyprexa at the market price, or in deciding to administer Zyprexa at all.  They are subject to the Individualized Proof Rule regarding proof of reliance by aggregate evidence.  The State offers no separate evidence in support of its fraud and negligence claims distinct from the generalized expert analyses previously discussed.  No individualized evidence is available.

*Id.* at 459-60.[9]

Like Judge Weinstein, this Court has observed that the record does not demonstrate

consistency among the prescribing physicians.[10]  Instead, the testimony of prescribing physicians

has only highlighted individual variations and contradicted the assumptions made by Plaintiffs'

experts.  For example, in denying class certification, this Court observed:

> Significantly, the testimony of the prescribing physicians for the bipolar/mood disorder, nociceptive pain (non-neurologist), and neuropathic pain (non-neurologist) subclass representatives indicates that only one of them, Dr. Gregory A. Rogers, was ever detailed by defendants about Neurontin. . . .
>
> . . . The deposition testimony of the doctors for the bipolar/mood disorder class representatives shows that their decisions to prescribe Neurontin resulted from a wide variety of influences unrelated to the three components of defendants' alleged fraud. . . .

---

[9] The only claim left intact by Judge Weinstein – the plaintiffs' price effects theory – was subsequently rejected by the Second Circuit in *UFCW*.  *See supra* at 4-5.

[10] For purpose of comparing the *AWP* class action to the "structural" class action represented by Aetna's aggregate claims in this case, the absent class members in *In re AWP* occupy the position held by the prescribing physicians here.  It is the third-party reliance of the prescribing physicians upon which the Aetna's claims are based.

The evidence regarding Neurontin prescriptions written by non-neurologists for subclass representatives suffering from neuropathic and nociceptive pain also fails to comport with Professor Rosenthal's assumptions. . . . Rather than being motivated by detailing, Dr. Rogers states that the primary reason he prescribed Neurontin to treat neuropathic pain in patients was his own experience witnessing the drug's efficacy. His treatment of Holloway supports his statement; when after two prescriptions cycles, Neurontin did not appear to reduce Holloway's pain, Dr. Rogers stopped prescribing the drug for her.

*In re Neurontin Mktg., Sales Practices & Prods. Liab. Litig.*, 257 F.R.D. 315, 330 & n.9 (D. Mass. 2009) (citations omitted). Similarly, in its December 10, 2010 summary judgment decision, the Court observed:

The treating physicians for each of the individual consumer plaintiffs have testified that they prescribed Neurontin to the plaintiffs based on their independent medical judgment. Indeed, they deny any unsolicited off-label detailing by defendants' sales representatives and state that their knowledge about Neurontin's efficacy for off-label indications was informed by their clinical experience with the drug along with information received from trusted colleagues.

(12/10/2010 Mem. at 24.)

Aetna's attempt to distinguish the remaining cases relied upon by this Court are also without merit. Aetna argues that *Ironworkers Local Union No. 68 v. AstraZeneca Pharmaceuticals LP*, 585 F. Supp. 2d 1339 (M.D. Fla. 2008) (Seroquel), *aff'd on other grounds*, 2011 WL 833222 (11th Cir. Mar. 11, 2011); *In re Actimmune Marketing Litigation*, 614 F. Supp. 2d 1037 (N.D. Cal. 2009) (Actimmune), *Southern Illinois Laborers' & Employers Health & Welfare Fund v. Pfizer Inc.*, No. 08 CV 5175, 2009 WL 3151807 (S.D.N.Y. Sept. 30, 2009) (Lipitor), should be disregarded because the courts in those cases did not specifically consider the use of a statistical, aggregate model. (Pl. Mem. at 13-15.) Plaintiffs' argument misses the point. The courts did not reach the sufficiency of any statistical model because the cases were dismissed pursuant to Rule 12(b)(6) for failure to *plead* individual causation, injury and reliance.

For example, in *Ironworkers*, the TPPs sought to recover under RICO and the New Jersey Consumer Fraud Act ("NJCFA") for alleged off-label marketing of Seroquel, contending that they would have paid for cheaper alternative drugs absent the defendants' alleged fraud. Dismissing the plaintiffs' claims, the court explained:

14

> [I]n the context of this case, establishing that Plaintiffs' injuries were caused by Defendants' misconduct would require an inquiry into the specifics of each doctor-patient relationship implicated by the lawsuit. In other words, each physician who prescribed Seroquel to an individual consumer or health and welfare fund member would have to be questioned as to whether his or her independent medical judgment was influenced by Defendants' misrepresentations, and to what extent.

*Ironworkers*, 585 F. Supp. 2d at 1344. Likewise, in *Actimmune*, the court explained: "Plaintiffs need to allege what specific information the individual plaintiffs or their physicians had about the drug, the extent to which they relied upon that information, and that the information relied upon was false, misleading or otherwise fraudulent." 614 F. Supp. 2d at 1052. In *Southern Illinois Laborers*, the court also rejected the plaintiffs' claim predicated on physician reliance because the plaintiffs "d[id] not cite a single instance in which a physician received the fraudulent information and decided to prescribe Lipitor based on the information she received." 2009 WL 3151807, at *6. Aetna concedes that yet another court, the District of New Jersey, reached a similar conclusion in *District 1199P Health & Welfare Plan v. Janssen, L.P.*, Nos. 06-3044, et al., 2008 WL 5413105, at *6 (D.N.J. Dec. 23, 2008). (Pl. Mem. at 13 n.6.)

As discussed above, these cases are only part of a now well-developed jurisprudence in which courts reject claims by TPPs similar to those asserted by Aetna. *See supra* at 4-9. That the claims of the TPPs in these cases did not survive even the dismissal stage is hardly a basis for revising this Court's summary judgment decision. The courts' conclusions that injury, causation and reliance had to be *pled* on an individual, physician-by-physician basis necessarily forecloses the argument that they could be *proven* on an aggregate basis.

Plaintiffs concede that the court in *In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, No. 2:06-cv-5774, 2009 WL 2043604 (D.N.J. July 10, 2009), did address the use of statistical models. (Pl. Proposed Mem. [2473-2] at 9.) Plaintiffs' argument that the court failed to explain why aggregate, statistical proof must be rejected is simply wrong. Citing *McLaughlin* and other cases, the court provided a cogent analysis of this issue that is prescient of Judge Weinstein's decision in *Zyprexa III*. *See In re Schering-Plough*, 2009 WL

2043604, at *23-25.

## II.   Aetna Has Not Identified Any Newly Discovered Evidence To Demonstrate That This Court's Factual Findings Were Incorrect

In its January 8, 2010 decision, this Court made the following findings based upon the

summary judgment record:

- "Aetna has a P&T committee that reviews drug classes and makes decisions concerning what is covered on the formulary.  The committee examines the safety, efficacy and labeled indications for a drug, and also looks at available information about a drug's off-label uses."

- "Aetna's formulary is organized by drug class. For example, Neurontin is in the anticonvulsant drug class.  Aetna's focus is on cost-effective therapy, where 'managing' a drug means to 'put a formulary around the drug class and actually have some controls.'"

- "In the case of anticonvulsants like Neurontin, Aetna determined that it would not manage these drugs because a patient's need for treatment may be based on subjective criteria."

- "When Aetna's P&T Committee makes a decision not to manage a drug, the result is that patients do not need pre-authorization to fill a prescription for that drug, and Aetna does not place limits on plan members' access to the drug."

- Aetna decided to manage the entire class of anti-convulsant drugs in 2004 and placed "step-edits" on Neurontin in 2006 because generic versions were becoming available.

(1/8/10 Mem. at 8-9 (citation omitted).)  The Court further found:

> Prior to 2004, Aetna . . . had no formulary controls around Neurontin. Although Neurontin was listed as an antiepileptic drug on Aetna's formulary, *coverage was not restricted to prescriptions by neurologists, for example, as it was on Kaiser's formulary*. . . .  [Aetna] has [not] submitted evidence suggesting that it had direct communications with Pfizer or relied on fraudulent representations in any of the off-label marketing campaigns.

> There is no evidence in the record that . . . Aetna at any point directly relied on Pfizer's "half truths," communicated through its alleged manipulation and withholding of studies that suggested Neurontin's ineffectiveness for off-label indications.  Rather, [Aetna's] causation argument is wholly dependent on individualized proof that [its] members' prescribing physicians relied on defendants' misrepresentations.

(*Id.* at 30-31 (emphasis added).) [11]  Aetna presents no new evidence disputing any of these

---

[11] This Court made similar findings regarding Guardian, which has stipulated to that it will not

*(cont'd)*

findings and admits that it did not rely and could not have relied on anything Defendants said or did when it added Neurontin to formulary in 1994.  (Pl. Mem. at 6.)

Aetna's argument that "we're just like Kaiser" depends on one out-of-context statement from this Court's UCL decision in *Kaiser*:  that "Kaiser added Neurontin to the formularies in all its regions by 1994,"[12] and, therefore, could not "have relied on Defendants' fraudulent marketing."  (*Id.*)  Aetna's argument ignores the prior statements of this Court in which it found that Kaiser presented evidence of direct reliance.[13]  More specifically, when this Court denied Defendants' motion for summary judgment as to Kaiser, the Court distinguished Kaiser from the Guardian and Aetna, finding that Kaiser had created a triable issue of fact with the following summary judgment evidence:

- "[A] 2008 Kaiser internal review found that during the period from 1994-2008, at least 95% of prescriptions written by PMG physicians were in compliance with the Kaiser formulary." (1/8/10 Mem. at 4-5).

- "Neurontin was added to Kaiser's formulary in September 1994 with a restriction limiting its use to, or in consultation with, a PMG neurologist."  (*Id.* at 5.)

- "Neurontin's formulary status was expanded to include prescriptions by PMG pain clinic physicians for the treatment of Reflex Sympathetic Dystrophy."  (*Id.*)

- "In 1999, the P&T committee voted to expand restrictions to include prescriptions by psychiatrists for the treatment of bipolar affective disorder."  *Id.*

- "For each of these three changes to the Kaiser formulary, Kaiser's Drug Information Service ("DIS") prepared monographs summarizing the available studies and other information for Neurontin related to the particular indication in question."  (*Id*)

- In 1998, Parke-Davis responded to a DIS request for information regarding Neurontin and neuropathic pain.  (*Id.* at 6.)

_____

*(cont'd from previous page)*
appeal this Court's entry of judgment as to it.

[12] In fact, not all regions added Neurontin to formulary in 1994.  The evidence at trial showed that different Permanente Medical Groups added Neurontin to formulary at different times.  Some added it on a restricted basis, others on an unrestricted basis.  (*See* Villaluz Aff. [958-2], Kaiser Tr. Exh. DX840.)

[13] Aetna is attempting to bolster its own case by tearing down Kaiser's.  And, while Defendants agree that the evidence submitted by Kaiser fell short of Kaiser's summary judgment proffer, Aetna cannot satisfy its own burden of proof by identifying ways that Kaiser's evidence at trial was insufficient.

- "As of June 2004, Neurontin prescriptions to Kaiser members had dropped by 34% since the DUAT and DRUG initiatives began in mid-2002." (*Id.* at 6-7.)

- "[T]wo PMG physicians stat[ed] that, had they known of Pfizer's allegedly fraudulent marketing practices, they would have acted to change Neurontin's status on the Kaiser formularies." (*Id.* at 7.)

Following the Kaiser trial, the Court again highlighted the factors that distinguished Kaiser's claims from those asserted by other TPPs.  (*See* 11/3/2010 Findings of Fact & Concl. of Law [04-10739 No. 59] at 5-8 (describing Kaiser's "proactive approach to managing drugs prescribed by PMG physicians").)  As in its summary judgment decision, the Court noted Neurontin's initial restriction to neurologists by the Southern California PMG, and later expansion of formulary access.  (*Id.* at 8-9.)  And the Court described specific, direct contacts between Pfizer and Kaiser.  (*Id.* at 25-26, 65-70.)   Finally, the Court again referred to the reduction in Neurontin prescriptions following the 2002 initiative undertaken by Kaiser.  (*Id.* at 72-73.)

In its December 2010 summary judgment decision as to the Class TPPs, the Court again distinguished Kaiser, explaining that the Kaiser "plaintiffs established causation through direct reliance by Kaiser on fraudulent direct misrepresentations as well as fraudulent suppression of studies in the published literature."  (12/10/2010 Mem. at 23.)  Contrasting the Class TPPs with Kaiser, the Court stated:  "There is no evidence in the record that any of the Class TPP Plaintiffs communicated directly with Pfizer in the development or evaluation of a drug formulary."  (*Id.* at 26.)  And the Court once again held that, in the absence of direct reliance, TPPs cannot rely upon the testimony of Prof. Rosenthal alone.  (*Id.* at 26-28.)

Plaintiffs quote from a statement made by the Court at the February 7, 2011 status conference.  (Pl. Mem. at 7.)  Although the Court refers to the Kaiser trial, the Court was describing arguments made by the Class Plaintiffs about formulary management, not Kaiser.  As discussed above, the Court has repeatedly distinguished Kaiser from other TPPs based upon its alleged proactive management of drug utilization.  The Court made similar comments at the October 15, 2009 hearing on Class Plaintiffs' motion for reconsideration, before the *Kaiser* trial.  (10/15/2009 Tr. [2190] at 31:19-34:3.)  And when the Court asked how many TPPs were like

Kaiser in terms of drug management, counsel for the proposed class representatives repeatedly responded that Kaiser is unique. (*Id.* at 19:16-19; 23:8-12; 29:3-4; 50:23-51:1.)

Aetna also cites to this Court's conclusions regarding Prof. Rosenthal in its UCL findings. However, the Court made clear that, while it accepted Prof. Rosenthal's and Dr. Hartman's testimony "for the purpose of quantifying the defendants' fraud," the Court separately "found, that plaintiffs established <u>individualized</u> reliance by Kaiser's DIS on Pfizer's misrepresentations," and distinguished *UFCW* on this basis. (11/3/2010 Findings at 137 (emphasis in original.)[14]   As discussed above, Aetna did not offer comparable evidence of individual reliance.

Aetna argues that had it known earlier of Defendants' allegedly misleading marketing campaign, it would have intervened at an earlier date to curtail usage. (Pl. Mem. at 8-9.) Once again, Aetna simply repeats arguments previously made and rejected, and cites no new evidence sufficient to meet the standards of Rule 59(e). Moreover, it is undisputed that the lack of formulary controls was due to Neurontin belonging to "[t]he anticonvulsant drug class," and that this *entire class* "was not managed by Aetna until 2004." (3/30/09 Decl. of Michael Brodeur [1751] ¶ 7.) Indeed, Aetna admits that it "did not effectively manage **the anticonvulsant drug class**, which includes Neurontin, until 2004." (Pl. Mem. at 10, emphasis added.) This admission is fatal to Aetna's claims, because it precludes Aetna from showing that Neurontin's formulary status had anything to do with "information [Aetna or its] P&T Committee was exposed to regarding Neurontin." *In re Neurontin*, 257 F.R.D. at 333.

Aetna attempts to dispute this admission by pointing to a single conclusory statement made by Mr. Brodeur during his deposition. Mr. Brodeur had previously listed "lots of factors" that go into formulary decisions, one of which was "excessive off-label indications." (Pl. Mem. at 7-8 n.4.) This speculative, equivocal, conclusory statement cannot raise fact questions for trial. Mr. Brodeur never specifically testified that Neurontin was moved to non-preferred status

---

[14] Defendants respectfully disagree with this Court's findings as to Kaiser and intend to appeal.

because of "excessive off-label indications." Notably, Mr. Brodeur's supplemental declaration submitted with Plaintiffs' surreply brief makes no such statement. (See 6/16/09 Decl. of Michael Brodeur [1852].) Mr. Brodeur is apparently unwilling to endorse Plaintiffs' interpretation of his vague, conclusory response to a single deposition question. Nor have Plaintiffs provided any other evidence to support the notion that Neurontin was moved to non-preferred status because of "excessive off-label indications."

Aetna's Rule 30(b)(6) witness could not recall any articles, conference discussions, or communications with Defendants about Neurontin and, because Neurontin was part of a non-managed drug class, he "didn't pay that much attention to [the issue]." (7/26/07 Dep. of Michael Brodeur ("Brodeur Dep.") at 22:1-11, 25:24-26:5, 166:8-19, Ex. 9 to Dkt. 1746, 4/15/09 Decl. of Linda P. Nussbaum ("Nussbaum Decl.").) Moreover, Aetna moved various anticonvulsant drugs, including Neurontin, to non-preferred status in 2004 because they were "adjunct therapy," not because Aetna discovered that it had previously been misled. (*Id.* at 119:21-120:7, 124:15-125:6.) There is no evidence that Aetna's lack of formulary controls for Neurontin had anything to do with alleged (but unspecified) misrepresentations made to Aetna.

## CONCLUSION

For all of the foregoing reasons, Pfizer respectfully requests that the Court deny Aetna's Motion to Alter or Amend the Judgment Pursuant to Fed. R. Civ. P. 59(e).

Dated: March 23, 2011

Respectfully submitted,

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP

By:    /s/ Mark S. Cheffo
       Mark S. Cheffo

Four Times Square
New York, NY 10036
Tel:  (212) 735-3000

-and-

ROPES & GRAY LLP

By:    /s/ Lisa M. Ropple
       Lisa M. Ropple
       BBO # 555401

Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
Tel:  (617) 951-7000
Email:  lisa.ropple@ropesgray.com

*Attorneys for Defendants Pfizer Inc and
Warner-Lambert Company LLC*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on March 23, 2011.

       /s/ Lisa M. Ropple
       Lisa M. Ropple