UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
------------------------------------------------------------------ x
                                                                   )
IN RE NEURONTIN MARKETING AND SALES                                )
PRACTICES LITIGATION                                               )   MDL Docket No. 1629
                                                                   )
------------------------------------------------------------------ x
                                                                   )   Master File No. 04-10981
THIS DOCUMENT RELATES TO:                                          )
                                                                   )   Honorable Patti B. Saris
------------------------------------------------------------------ x   Honorable Leo T. Sorokin
                                                                   )
AETNA, INC. v. PFIZER INC., et al.,                                )
04 CV 10958 (PBS)                                                  )
                                                                   )
------------------------------------------------------------------ x
```

**PLAINTIFF AETNA, INC.'S REPLY MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION TO ALTER OR AMEND THE JUDGMENT
PURSUANT TO FED. R. CIV. P. 59(e)**

## **TABLE OF CONTENTS**

Table of Authorities ................................................................................................................ ii

INTRODUCTION ....................................................................................................................... 1

I.     THE COURT MISTAKENLY DISTINGUISHEDAETNA'S CLAIMS FROM KAISER'S CLAIMS IN A WAY THAT IMPROPERLY ZEROED OUT AETNA'S ENTIRE CLAIM FOR RELIEF............ 3

II.    UNDER SUPREME COURT AND FIRST CIRCUIT PRECEDENT, CONFIRMED BY NEW AUTHORITY FROM THE SEVENTH CIRCUIT, DIRECT COMMUNICATIONS BETWEEN DEFENDANTS AND AETNA ARE NOT REQUIRED FOR AETNA TO PROVE RICO CAUSATION ....................................................... 4

CONCLUSION............................................................................................................. 10

# **TABLE OF AUTHORITIES**

**Cases**

*Anwar v. Fairfield Greenwich Ltd.*,
  728 F. Supp. 2d 354 (S.D.N.Y. 2010).............................................................................. 10

*BCS Services, Inc. v. Heartwood 88, LLC*,
  10-3068, 2011 WL 1045853 (7th Cir. Mar. 24, 2011) .......................................... passim

*Bridge v. Phoenix Bond Indem. Co.*,
  553 U.S. 639 (2008)................................................................................................ passim

*Hemi Group, LLC v. City of New York*,
  130 S. Ct. 983 (2010)................................................................................................... 5-6

*In re Pharmaceutical Industry Average Wholesale Price Litigation*,
  582 F.3d 156 (1st Cir. 2009)........................................................................................... 4

*In re Zyprexa Prods. Liab. Litig.*,
  671 F. Supp. 2d 397 (E.D.N.Y. 2009) .......................................................................... 10

*Ironworkers Local Union 68 v. AstraZeneca Pharmaceuticals, LP*,
  No. 08-16851, 2011 WL 833222 (11th Cir. Mar. 11, 2011)...................................... 8, 9

*Marks v. United States*,
  430 U.S. 188 (1977)........................................................................................................ 6

*Matrixx Initiatives, Inc. v. Siracusano*,
  09-1156, 2011 WL 977060 (U.S. Mar. 22, 2011)........................................................... 4

*Phoenix Bond & Indem. Co. v. Bridge*,
  2010 WL 3526469 (N.D. Ill. Sept. 1, 2010) ................................................................... 1

*UFCW Local 1776 v. Eli Lilly & Co.*,
  620 F.3d 121 (2d Cir. 2010).......................................................................................... 10

*United States v. McMillan*,
  600 F.3d 434 (5th Cir. 2010) .......................................................................................... 8

**INTRODUCTION**

On March 23, 2011, Defendants filed their Opposition to Aetna Inc.'s Motion to Alter or Amend Judgment. (Dkt. No. 3369) ("*Defs. Opp.*"). Defendants argued that "Plaintiffs Cite No New Authority To Support Their Motion" (*id*. at 2); and that since the dismissal of Aetna's claims, RICO proximate causation jurisprudence had virtually eliminated the ability of plaintiffs to prove RICO claims where the defendants' fraudulent communications were not directly made to them, (*id*. at 3-4). To support this argument, Defendants relied on the Illinois District Court's dismissal in September 2010, via summary judgment, of the remanded Supreme Court RICO case *Bridge v. Phoenix Bond*, 553 U.S. 639 (2008). *See Defs. Opp.* at 4, citing and quoting *Phoenix Bond & Indem. Co. v. Bridge*, 2010 WL 3526469 (N.D. Ill. Sept. 1, 2010).

On March 24, 2011, one day after Defendants filed their brief, the Seventh Circuit Court of Appeals did issue important "new authority." The appeals court reversed the district court's grant of summary judgment in *Phoenix Bond* (the decision heralded by Defendants) on grounds directly relevant to this action and this motion. Judge Posner couched RICO proximate causation classically and coherently in terms of foreeseability between a defendant's actions and a plaintiff's injury: "<u>once a plaintiff presents evidence that he suffered the sort of injury that would be the expected consequence of the defendant's wrongful conduct, he has done enough to withstand summary judgment on the ground of absence of causation.</u>" *BCS Services, Inc. v. Heartwood 88, LLC*, 10-3068, 2011 WL 1045853, at \*8 (7th Cir. Mar. 24, 2011) (emphasis added).

In this action, Aetna presented precisely such evidence in opposition to the summary judgment motion. *See* Memorandum of Law in Support of Motion to Alter or Amend Judgment (Dkt. No. 3323) at 7-10 ("*Opening Brf.*") (cataloguing evidence). Like Kaiser, Aetna should be

allowed to have a jury determine whether and the extent to which it was injured by Defendants' illegal marketing of Neurontin.

At its February 2, 2011 conference, the Court candidly acknowledged its earlier misunderstanding concerning how the formulary process worked.[1] For Aetna, as for Kaiser, Neurontin was added to its formulary three years prior to Defendants' promotion of Neurontin for off-label uses. *Id.* at 6. Once on the formulary, Neurontin had its toe permanently inside the door, enabling Defendants to stick Aetna (and Kaiser) with the costs of subsequently over-prescribed off-label Neurontin.

Kaiser won its RICO claims at trial. Aetna was not permitted to try any of its claims, even for periods during which its actions were no different than Kaiser's. Kaiser discovered the over-prescribing earlier than Aetna. That is virtually the only material difference between Kaiser and Aetna for purposes of RICO causation. Defendants' opposition brief ignores (1) the undisputed facts demonstrating Defendants' fraud directed at third party payers generally and Aetna specifically,[2] (2) the similarities of Aetna and Kaiser, and (3) Aetna's ability to use Dr. Rosenthal's analysis to prove how Defendants' behavior was a proximate cause of Aetna's damages, as Kaiser did.

The Court should reconsider its judgment against Aetna, vacate it, and allow Aetna, like Kaiser, to have its claims decided by a jury.

---

[1] "It's clear that in my first motion, I misunderstood a key thing, which is every drug got —every formulary put Neurontin on because it was approved for epilepsy. That was something that I misunderstood from your expert's brief, or either that or he was deliberately not clear. But then the issue is what people did to manage afterwards for off-label uses. That's what the clear difference is. I had thought the management happened before they put it on the formulary and it turns out it went on -- this is what I learned at trial -- everywhere, and it was a question of how many managed it afterwards. So that's something I have to rethink." *Hearing Tr.* (Feb. 2, 2011) at 27 (emphasis added).

[2] Like Kaiser, Aetna also appeared on Defendants' list of "Top 10 HMOs Targeted for Neurontin." *See* Findings of Fact and Conclusions of Law ("*Findings*") at 25 (citing TX 11).

**I.    THE COURT MISTAKENLY DISTINGUISHED AETNA'S CLAIMS FROM KAISER'S CLAIMS IN A WAY THAT IMPROPERLY ZEROED OUT AETNA'S ENTIRE CLAIM FOR RELIEF**

As the Court is now aware, widespread formulary access for Neurontin occurred perforce once the FDA approved Neurontin for epilepsy. *Opening Brf.* at 6. Formulary management only occurred much later once off-label Neurontin use had gone overboard. While Kaiser's staff-model physicians became aware of the Neurontin whistleblower actions earlier than did Aetna, the record is undisputed that Aetna, like Kaiser, began to restrict access to Neurontin shortly after it discovered that Neurontin was being over-prescribed.[3] Defendants criticize Aetna for not uncovering their deceptions earlier, (*Defs. Opp.* at 8-9, 16-19), but the fact that Aetna was slower to act than Kaiser cannot negate Aetna's entire damage claim.[4] Defendants' argument goes to mitigation of damages, not causation.

Furthermore, Aetna's principal witness, Michael Brodeur, testified that had Aetna been aware earlier of the facts concerning the Defendants' misleading marketing campaign, it would have promptly intervened at an earlier date to curtail inappropriate usage through cheaper, more optimal alternatives. June 16, 2009 Brodeur Aff. at ¶ 6 (Dkt. No. 1852). While Defendants dispute this statement, it is for the jury to decide and *must* be credited for summary judgment purposes.

---

[3] "In late 2002, Kaiser learned about the whistle blower suit brought by Dr. Franklin ... At that point, Kaiser escalated its efforts to promote appropriate prescribing of the drug." Findings of Fact and Conclusions of Law at 72-73. In 2003, Aetna took action to begin restricting Neurontin effective January 1, 2004. (April 15, 2009 Nussbaum Decl. Ex. 9, Brodeur at 119:6-20, 149:9-16).

[4] Moreover, at trial the court found Defendants' fraud continued until December 2004. *Findings* at 27.

## II. UNDER SUPREME COURT AND FIRST CIRCUIT PRECEDENT, CONFIRMED BY NEW AUTHORITY FROM THE SEVENTH CIRCUIT, DIRECT COMMUNICATIONS BETWEEN DEFENDANTS AND AETNA ARE NOT REQUIRED FOR AETNA TO PROVE RICO CAUSATION

The first twelve pages of Defendants' Brief focus wholly on out-of-circuit cases whose rationales they would have this Court adopt. However, Supreme Court and First Circuit precedent demands that Aetna's claims proceed to trial.

The out-of-circuit cases ostensibly conclude either (1) that third party payers are too many steps removed from defendants' fraud to prove proximate cause; (2) that aggregate evidence in statistical or sampling form is incompetent to show a causal relationship to a pharmaceutical manufacturer's illegal marketing of unscientific rubbish to increase a drug's sales for unapproved uses; or (3) that health insurers can never be damaged by fraud because fraud assumptions are included in the premiums they charge. But the law only requires that to withstand summary judgment, Aetna produce evidence it suffered the injury that would be the expected consequence of the Defendant's wrongful conduct. S*ee Bridge; In re Pharmaceutical Industry Average Wholesale Price Litigation*, 582 F.3d 156, 160 (1st Cir. 2009); *BCS Services, Inc.*, 2011 WL 1045853.[5]

In its Memorandum Opinion ("*Mem. Op.*") (Dkt. No. 2309) granting summary judgment, the Court distinguished Aetna's claims from Kaiser's, because Aetna did not rely upon direct communications with Defendants. The opposite summary judgment outcome for these two plaintiffs pivoted on whether they could establish that they met with Defendants and considered the fallacious studies in making their formulary decisions. *Mem. Op.* at 30. This was error.

---

[5] Less than two weeks ago, the Supreme Court held unanimously that even less than statistically precise evidence suffices to prove causation: "[a] lack of statistically significant data does not mean that medical experts have no reliable basis for inferring a causal link between a drug and adverse events" noting "that courts frequently permit expert testimony on causation based on evidence other than statistical significance." *Matrixx Initiatives, Inc. v. Siracusano*, 09-1156, 2011 WL 977060, at *9 (U.S. Mar. 22, 2011) (emphasis added).

The Supreme Court in *Bridge* rejected the argument proposed by Defendants that RICO requires first-party reliance to show causation. The Supreme Court held:

> Congress chose to make mail fraud, not common-law fraud, the predicate act for a RICO violation. And "the mere fact that the predicate acts underlying a particular RICO violation happen to be fraud offenses does not mean that reliance, an element of common-law fraud, is also incorporated as an element of a civil RICO claim."

*Bridge,* 553 U.S. at 653 (citations omitted). The Supreme Court went on to hold:

> Having rejected petitioners' argument that reliance is an element of a civil RICO claim based on mail fraud, we see no reason to let that argument in through the back door by holding that the proximate-cause analysis under RICO must precisely track the proximate-cause analysis of a common-law fraud claim.

*Id.* at 655 (holding that a plaintiff can state a RICO claim where it had "never . . . received the misrepresentations").

Defendants incorrectly argue that the Supreme Court's decision in *Hemi Group, LLC v. City of New York*, 130 S. Ct. 983 (2010) limited the holding of *Bridge*. In *Bridge*, the unanimous Court reasoned that the plaintiff's alleged injury was the "result of [the defendant's] fraud" because "[i]t was a <u>foreseeable</u> and natural consequence of" the defendant's scheme. 553 U.S. at 658 (emphasis added). In *Hemi*, the *plurality* opinion disagreed that "RICO's proximate cause requirement [should] turn on foreseeability," without even mentioning *Bridge*. *Hemi*, 130 S. Ct. at 991. However, a plurality opinion cannot alter a prior Supreme Court holding. Justice Ginsburg, who provided the necessary fifth vote supporting the Court's judgment in that case, in her concurring opinion, expressly *declined* to "subscrib[e] to the broader range of the [plurality's] proximate cause analysis," including its views on foreseeability. *Id.* at 995 (Ginsburg, J., concurring in part and concurring in the judgment). And Justice Breyer's dissent, joined by two other justices, advocated the broader foreseeability standard of *Bridge*. Only four

of the eight justices in *Hemi* (Justice Sotomayor, did not participate) subscribed to the argument for a higher proximate cause threshold.  Because Justice Ginsburg "concurred in the judgment[] on the narrowest ground[]," her "position" is best viewed as the "holding of the Court" in *Hemi*.  *Marks v. United States*, 430 U.S. 188, 193 (1977) (internal quotations marks omitted).

The *Hemi* plurality opinion thus could not, and did not overrule *Bridge's* holding that the requirement of proximate cause is met when, as here, the plaintiff's injury is "a foreseeable and natural consequence of" the defendant's misconduct.  *Bridge*, 553 U.S. at 658.  Judge Posner and his fellow judges understood this, which is why the Seventh Circuit held correctly that "once a plaintiff presents evidence that he suffered the sort of injury that would be the expected consequence of the defendant's wrongful conduct, he has done enough to withstand summary judgment on the ground of absence of causation."  *BCS Services*, 2011 WL 1045853, at *8.  The Seventh Circuit held that, notwithstanding the existence of an important but neutral middleman in the chain of causation, the plaintiff bidders' injuries could nonetheless have been proximately caused by the remote bid riggers:

> . . . defendants' aim was to obtain a larger share of tax liens.  The larger share came from other bidders, the bidders we're calling one-armed.  The *only* injury was to those bidders, who included the two plaintiffs….  It was a matter of indifference to the County who bought the tax liens, for whoever it was would have to pay the County taxes on the properties subject to the liens.  The bidders were thus the only victims of the fraud – and the plaintiffs are one-armed bidders.

*BCS Services*, 2011 WL 1045853, at *6. (Emphasis in original).

Aetna here occupies the same role as the *Phoenix Bond* one-armed bidders.  The prescribing doctors whom Defendants argue fatally interrupt the causal chain are indifferent to cost, just like the County in *Phoenix Bond*.  Defendants' two-step fraud was directed to first getting approval for Neurontin, however narrow an indication, which perforce gained Neurontin

access to Aetna's and Kaiser's (and virtually all other health insurers') formularies. Defendants then launched a massive fraudulent "snake oil" marketing campaign to influence the doctors, who are not ethically allowed to consider health insurers' costs when prescribing drugs, to prescribe Neurontin for everything, however baseless the "science" they were fed by Defendants, sticking the Aetnas and Kaisers of the world with the tab. Here, the *only* foreseeable financial injury was to Aetna, Kaiser and other third party payers, just as the "one armed bidders" in *Phoenix Bond* were the only parties foreseeably injured by defendants' bid rigging. Aetna, just like Kaiser, was a *specific target* of Defendants' wildly successful off-label marketing efforts, resulting in an exponential increase in Neurontin prescriptions for useless off-label indications, and causing Aetna's foreseeable resulting overpayments for the over-prescribed Neurontin. Aetna's claims and supporting evidence easily clear the RICO causation hurdle.

Moreover, in *BCS Services*, the Seventh Circuit rejected another argument similar to the one made by Defendants here; that Plaintiffs must bring before the court, one-by-one, the thousands of physicians who prescribed Neurontin for Aena's insureds in order to prove that they were influenced to prescribe Neurontin for unapproved indications as a proximate result of Defendants' fraudulent marketing:

> The plaintiff doesn't have to prove a series of negatives; he doesn't have to "'offer evidence which positively exclude[s] every other possible cause of the accident.'" *Carlson v. Chisholm-Moore Hoist Corp.*, 281 F.2d 766, 770 (2d Cir. (Friendly, J.), quoting *Rosenberg v. Schwartz*, 183 N.E. 282, 283 (N.Y. 1932). In technical legal terms, the burden of proving an "intervening cause" – something which snaps the "causal chain" (that is operates as a "superceding cause," wiping out defendant's liability, see *Restatesment (Second) of Torts* 440 (1965)) that connects the wrongful act to the [plaintiffs] injury – is on the defendant. *Roberts v. Printup*, 595 F.3d 1181, 1189-90 (10th Cir. 2010).

*BCS Services*, 2011 WL 1045853, at *6.  This Court made a similar error by "require[ing] plaintiffs to prove the nonexistence of potential superseding causes, rather than requiring the defendants to present evidence to support their conjectured superseding causes." *Id.* at *7.  To defeat summary judgment, Aetna must only meet the "statistical probabilistic" test, which it did through the same analysis this Court and the jury credited from Dr. Rosenthal in the Kaiser trial. *See Opening Brf.* at 10-12. [6]

Reminiscent of the speculation in *BCS Services* that the "one armed bidders" were too slow or that they chose bad seats, both of which defendants there argued as causes of their injuries, Defendants here say Aetna was just too slow detecting their fraud, and making formulary decisions because it didn't properly babysit doctors who wrote Neurontin prescriptions to understand why.  Judge Posner rightly exposed these causation postulates as defendants "throwing sand in the district judge's eyes":

> <u>Once a plaintiff presents evidence that he suffered the sort of injury that would be the expected consequence of the defendant's wrongful conduct, he has done enough to withstand summary judgment on the ground of absence of causation.</u>  *Liriano v. Hobart Corp.*, 170 F.3d 264, 271-72 (2d Cir. 1999); Kingston v. Chicago & N.W. Ry., 211 N.W. 913, 915 (Wis. 1927); *Martin v. Herzog*, 126 N.E. 814, 816 (N.Y. 1920 (Cardozo, J.) ("evidence of a collision occurring more than an hour after sundown between a car and an unseen buggy, proceeding without lights, is evidence from which a causal connection may be inferred between the collision and the lack of signals").

*BCS Services*, 2011 WL 1045853, at *8**.** (Emphasis added).

Defendants also cite as persuasive the recent opinion of two judges of the Eleventh Circuit in the *Ironworkers Local Union 68 v. AstraZeneca Pharmaceuticals, LP*, No. 08-16851,

---

[6] See also *United States v. McMillan*, 600 F.3d 434, 449 (5th Cir. 2010) ("It is irrelevant for our purposes whether alleged misrepresentations about The Oath's financial condition were made to the state Department of Insurance or directly to the alleged victims of the scheme.  The issue is whether the victims' property rights were affected by the misrepresentations.").

2011 WL 833222 (11th Cir. Mar. 11, 2011) decision (the third judge concurred, but distanced himself from the majority's bizarre opinion).  With all respect due to that court and the advocates before it, that decision has the inner workings of the health care industry dead wrong.

In *Ironworkers*, two judges of the Eleventh Circuit shockingly concluded that "insurers assumed the risk of paying for all prescriptions of drugs covered by their policies, including medically unnecessary or inappropriate prescriptions -- even those caused by fraudulent marketing."  2011 WL 833222, at *7.  Specifically, *Ironworkers* assumed that insurers set premium rates based in part on anticipated acts of fraud.  *Ironworkers,* 2011 WL 833222, at *9.  *Ironworkers'* deeply disturbing holding—that health plans are incapable of suffering a cognizable legal injury under RICO—is based on reasoning that, when taken to its logical conclusion, would strip all insurers (and by extension almost any other victim) of any legal remedy for any fraudulent act committed by any defendant.

Under this *Ironworkers*' logic, a property insurer would not be permitted to recover from an arsonist who torches his failed business because the insurer's actuaries presumably accounted for the potential for such crime when setting premium rates.  Similarly, a retailer would be unable to claim injury from shoplifting or a bank from robbery since their business models should account for such losses in pricing their products and services.

Reduced to its core, *Ironworkers* stands for two central principles: first, that fraud is an accepted practice, and second, that insurers should fund it.  Unless the Court agrees, it should disregard the *Ironworkers* opinion for the anomaly that it is.[7]

---

[7] Defendants also spend almost two pages crying foul at Aetna's footnote string citation to *In re Zypreza Prods. Liab. Litig.*, 671 F. Supp. 2d 397, 413 (E.D.N.Y. 2009), claiming that Aetna has attempted to mislead the Court while omitting recognition of Aetna's parenthetical limiting the citation to the narrow proposition that the court was "acknowledging expert reliance on IMS data," because the Second Circuit reversed the district court's denial of summary judgment, a fact Aetna did not conceal.  However, it is Defendants who have tried to mislead the Court.

**CONCLUSION**

Southern District of New York Judge Marrero recently explained, when analyzing and rejecting the long string of poorly-reasoned cases involving the preemptive effect of New York's Martin Act in *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 354, 357 (S.D.N.Y. 2010), how a bad precedent tree often grows from an aberrant seed:

> [F]lawed or false concepts gain currency in scientific literature, and then become axiomatic through generations of literal repetition in succeeding texts, sometimes long after the rationale for the original proposition has been lost, and even after the theory has been roundly discredited or disproved. The law has its own version of this practice reflected in some judicial opinions.

*Anwar*, 728 F. Supp. 2d at 356.

The out-of-circuit decisions that Defendants urge this Court to follow reiterate a nonsensical premise that the very targets of prescription drug manufacturers' fraud—the health insurer third party payers that pay for the majority of prescriptions in the United States—cannot recover for that fraud.[8] The courts that turn away these claims, build upon the seed of ill-

---

Defendants' block quote from the *Zyprexa* decision on page 11 of *Defs. Opp.* inexplicably omits the key language necessary for context. The quote, fully formed, reads:

> Together, this large body of case law constitutes a now widely held view of aggregate litigation, particularly in the products liability or fraud context, that statistical proof is in most instances insufficient to show reliance, loss-causation, or injury on the part of individual class members or claimants (the "Individualized Proof Rule"). <u>As indicated below this view is far from universal. It has, for example, been rejected by this court in the Zyprexa Third-Party Payors class action, limited by the Supreme Court in *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 128 S.Ct. 2131, 170 L.Ed.2d 1012 (2008), and distinguished by the First Circuit Court of Appeals in *In re Pharmaceutical Industry Average Wholesale Price Litigation*, 582 F.3d 156 (1st Cir. 2009).</u>

671 F. Supp. 2d at 434. (Emphasis added to text that was omitted from Defendants' quote in *Defs. Opp.*).

[8] Furthermore, the issues in those cases are absent here, as Aetna has adequately shown the causal connection between Defendants' fraud and its injury, and Dr. Rosenthal's methodology was already accepted by the Court in its findings during the Kaiser trial as proof of such injury. *See* Opening Brief at 10-12. Therefore, the remaining cases cited by Defendants wherein the court dismissed the plaintiffs' claims because the plaintiffs' theory of causation being dependent on a physician's decision to prescribe, are simply inapposite. See also *United States v. McMillan*, No. 08-31148, 2010 WL 816645, *8 (5th Cir. Mar. 11, 2010) ("It is irrelevant for our purposes whether alleged misrepresentations about The Oath's financial condition were made to the state Department of Insurance or directly

thought, non-precedential decisions of other district courts, for no good reason.  As Judge Posner recently explained, the case for causation is elementary.  Indeed, it is obvious.

      This Court should follow Supreme Court, First Circuit, and its own precedent in this case, grant Aetna relief from judgment, and allow Aetna to proceed to trial as it did with Kaiser.

Dated:  March 30, 2011

                                                        LOWEY DANNENBERG COHEN
                                                          & HART, P.C.

                                        BY:   **/s/ Gerald Lawrence**
                                                Richard W. Cohen
                                                Gerald Lawrence
                                                One North Broadway
                                                White Plains, NY  10601
                                                (914) 997-0500 – Telephone
                                                (914) 997-0035 – Facsimile

                                                *Attorneys for Aetna, Inc.*

---

to the alleged victims of the scheme.  The issue is whether the victims' property rights were affected by the misrepresentations.").

**CERTIFICATE OF SERVICE**

      I hereby certify that this document filed through the ECF system has been served pursuant to Case Management #3 on March 30, 2011.

                                                                /s/ Gerald Lawrence