UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                                          :   MDL Docket No. 1629
In re:  NEURONTIN MARKETING, SALES                        :
        PRACTICES, AND PRODUCTS                           :   Master File No. 04-10981
        LIABILITY LITIGATION                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x   Judge Patti B. Saris
                                                          :
THIS DOCUMENT RELATES TO:                                 :   Magistrate Judge Leo T.
                                                          :   Sorokin
KAISER FOUNDATION HEALTH PLAN, INC., ET AL. V.            :
PFIZER INC, ET AL., 04 CV 10739 (PBS)                     :
                                                          :
                                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
<u>DEFENDANTS' MOTION FOR AMENDED AND ADDITIONAL FINDINGS</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................iii

INTRODUCTION ...................................................................................................... 1

ARGUMENT .............................................................................................................. 1

I.      THE COURT'S FINDINGS FAIRLY REFLECT PLAINTIFFS' CORPORATE
        STRUCTURE AND RELATION TO NON-PARTIES P&T COMMITTEES
        AND FORMULARIES................................................................................................ 2

II.     THE COURT'S FINDINGS REGARDING PFIZER'S MARKETING FRAUD
        ARE GROUNDED IN CONDUCT CLOSELY TIED TO KAISER'S CLAIMS ............ 3

        A.      Pfizer's Sponsorship of CMEs........................................................................ 3

        B.      Pfizer's Publication Strategy.......................................................................... 4

        C.      Physician Detailing ........................................................................................ 5

III.    EVIDENCE REGARDING NEURONTIN'S EFFECTIVENESS DOES NOT
        EVICERATE A CAUSAL NEXUS IN THIS CASE................................................... 5

IV.     THE COURT DREW PROPER CAUSAL INFERENCES THAT SHOULD NOT
        BE OVERTURNED ................................................................................................... 7

        A.      95% Formulary Compliance Supports Causation.................................................... 8

        B.      Pfizer Mischaracterizes The Court's Findings Regarding DIS Monographs ......... 9

        C.      The DRUG/DUAT Initiatives Support A Finding Of Causation............................ 9

V.      THE COURT APPLIED THE CORRECT STANDARD FOR INEFFICACY
        AND INJURY............................................................................................................ 10

VI.     THE COURT'S FINDINGS DEALT CORRECTLY WITH THE BIPOLAR
        EVIDENCE................................................................................................................ 12

VII.    THE COURT PROPERLY CONSIDERED OTHER RELEVANT EVIDENCE ........... 14

        A.      Opinion Testimony of Professor Rosenthal and Dr. Hartman ............................. 14

        B.      The Guilty Plea and Evidence of Related Government Investigations or
                Agreements Were Properly Admitted.................................................................. 15

        C.      The July 21, 1999 "Snake Oil" Email Was Properly Admitted............................ 16

i

D.      Testimony of David Franklin and Related Evidence Was Properly
        Allowed.................................................................................................... 16

E.      Dr. Curt Furberg's Testimony Was Properly Considered .................................... 17

VIII.   THE COURT'S CONCLUSIONS OF LAW SHOULD NOT BE AMENDED.............. 18

CONCLUSION.................................................................................................................... 19

## TABLE OF AUTHORITIES

**Page(s)**

CASES

Daubert v. Merrell Dow Pharms.,
  509 U.S. 579 (1993)......................................................................................................10

Den Norske Bank AS v. First Nat'l Bank of Boston,
  75 F.3d 49 (1st Cir. 1996)..............................................................................................8

Hernandez v. Castillo,
  No. 09-cv-1569, 2010 WL 5072567 (D.P.R. Dec. 8, 2010) ......................................14

Fontenot v. Mesa Petroleum Co.,
  791 F.2d 1207 (5th Cir. 1986) .......................................................................................1

In re Neurontin Marketing & Sales Pracs. Litig.,
  244 F.R.D. 89 (D. Mass. 2006)................................................................................7, 12

Laster v. T-Mobile USA, Inc.,
  No. 05-cv-1167, 2009 WL 4842801 (S.D. Cal. Dec. 14, 2009) ...................................7

McAdams v. Monier, Inc.,
  105 Cal. Rptr. 3d 704 (Ct. App. 2010)........................................................................18

Prohias v. Pfizer, Inc.,
  485 F. Supp 2d 1329 (S.D. Fla. 2007) ...........................................................................7

Quezada v. Loan Ctr. Of Cal., Inc.,
  No. 08-cv-177, 2009 WL 5113506 (E.D. Cal., Dec. 18 2009) .....................................7

United Food & Commercial Workers Cent. Pa. & Regional Health & Welfare Fund v.
  Amgen, Inc., 400 F. Appx. 255 (9th Cir. 2010) .....................................................18, 19

Whalen v. Pfizer, Inc.,
  No. 600125/05, 2005 WL 2875291 (N.Y. Sup. Ct. Sept. 22., 2005)............................7

### STATUTES

Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 331, et seq. .................................15

### OTHER AUTHORITIES

9 Moore's Federal Practice § 52.60 ..................................................................................1

Fed. R. Civ. P. 52(b) ...................................................................................................1, 14

Plaintiffs Kaiser Foundation Health Plan, Inc. and Kaiser Foundation Hospitals (collectively, "Plaintiffs" or "Kaiser") respectfully submit this memorandum of law in opposition to Defendants' Motion for Amended and Additional Findings (cited as "Defs. Mem."),[1] and aver as follows:

## INTRODUCTION

As explained in Plaintiffs' concurrently-filed Opposition to Renewed Motion for Judgment as a Matter of Law, Defendants' Motion of Amended and Additional Findings raises no new issues and is a rehash of prior losing arguments. Defendants cannot meet their substantial burden, and their Motion for Amended and Additional Findings should be denied.

## ARGUMENT

To prevail on a Rule 52(b) motion to amend, the moving party must show that the Court's findings of fact or conclusions of law are not supported by evidence in the record. *See Fontenot v. Mesa Petroleum Co.,* 791 F.2d 1207, 1219 (5th Cir. 1986). A motion to amend or supplement a court's findings of fact under Rule 52(b), like Pfizer's motion here, is meant "to correct, clarify, or amplify the findings [and] is not meant to provide an avenue for relitigating issues on which the moving party did not prevail at trial." 9 Moore's Federal Practice § 52.60. The purpose of Rule 52(b) is, generally, to correct manifest errors of law or fact. *See Fontenot,* 791 F.2d at 1219. Also, a motion to amend should not be employed to introduce evidence that was available at trial, but was not proffered, or to advance new theories. *Id.* Here, Pfizer seeks only to relitigate issues of fact that the Court has properly decided. Pfizer has not proven a manifest error of law by the Court, and therefore Pfizer's motion must fail.

---

[1] Defendants Pfizer, Inc. and Warner-Lambert Company are referenced herein collectively as "Defendants" or "Pfizer."

## I.    THE COURT'S FINDINGS FAIRLY REFLECT PLAINTIFFS' CORPORATE STRUCTURE AND RELATION TO NON-PARTIES P&T COMMITTEES AND FORMULARIES

Pfizer argues that the non-California Kaiser subsidiaries[2] are not themselves parties to this litigation and, therefore, not capable of being adjudged injured or receiving a damages award.  *See* Defs. Mem. at 1-2.  However, as Plaintiffs have previously demonstrated, the named Plaintiffs in this case brought suit on behalf of both parent and subsidiaries.[3]  Indeed, the Complaint itself makes this fact apparent.[4]

Pfizer's second, third, and fourth contentions relating to the Permanente Medical Groups ("PMGs") similarly lack substance.  As previously shown, the named Plaintiffs and the PMGs have an exclusive contractual relationship forming an integrated medical care services program under the trade name "Kaiser Permanente."[5]  Pfizer's arguments that the P&T Committees are part of the PMGs and not Kaiser, and that the PMGs maintained formularies, consequently ring hollow when the relationship between Kaiser and the PMGs is properly considered.

---

[2] The Kaiser subsidiaries operating outside of California are Kaiser Foundation Health Plan of Colorado; Kaiser Foundation Health Plan of Georgia, Inc.; Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc.; Kaiser Foundation Health Plan of the Northwest; and Kaiser Foundation Health Plan of Ohio.

[3] *See* Plaintiff Kaiser's Response to Defendants' Proposed Findings of Fact (Dkt. No. 2814) at ¶ 1.

[4] *See* 3d Am. Compl. (Dkt. No. 583) at ¶ 7 ("As of December 2004, Kaiser Foundation Health Plan, Inc. had over 8.2 million members in nine states and the District of Columbia, with over 6 million members in California.  The remaining members are in Colorado, Georgia, Maryland, Virginia, Oregon, Washington, Hawaii, Ohio and the District of Columbia . . . .  From 1994 to the present, Kaiser Foundation Health Plan, Inc. has paid tens of millions of dollars for excessive prescriptions of Neurontin. . . .").

[5] *See* Plaintiff Kaiser's Response to Defendants' Proposed Findings of Fact (Dkt. No. 2814) at ¶ 2; *see also* 3/3 Tr. (Hyatt) 99:9-102:7; 126:1-126:8; 127:18-23.

II.    **THE COURT'S FINDINGS REGARDING PFIZER'S MARKETING FRAUD ARE GROUNDED IN CONDUCT CLOSELY TIED TO KAISER'S CLAIMS**

Pfizer charges the Court with overlooking the absence of any nexus between Pfizer's fraudulent marketing campaign and Kaiser's injuries.[6]  The Court's finding that Pfizer conducted its fraudulent marketing campaign primarily through sponsored CME events, publication of positive Neurontin studies and suppression of negative scientific trials, and direct marketing to physicians, is grounded in conduct closely tied to Kaiser's injuries.  *See* UCL Findings of Fact and Conclusions of Law ("Findings") (Dkt. No. 3120) at 27.   Sufficient supporting evidence was presented that Pfizer deliberately targeted Kaiser by infiltrating the P&T Committees, Kaiser physicians, DIS, Kaiser research entities, administrative staff, and brokers through its fraudulent marketing campaign.  *See, e.g.*, TX 250.  Of course, Pfizer's central supposition in this argument – that its marketing is *in*effective – is belied by Pfizer's status as one of the most sophisticated marketing companies in the world.

A.    **PFIZER'S SPONSORSHIP OF CMES**

Plaintiffs have presented ample evidence that Pfizer sponsored numerous CME events attended by PMG physicians at which half-truths, misleading claims, and blatant misrepresentations concerning Neurontin were made.  First, Pfizer does not dispute that 33 PMG physicians attended the company-sponsored "New Frontiers in Social Phobia and Bipolar Disorders" event in 1998.  Defs. Mem. at 4; *see also* TXs 360, 923.  Second, Plaintiffs have demonstrated that Pfizer systematically misrepresented Neurontin's efficacy at company-sponsored CMEs.  Plaintiffs produced evidence, for instance, of Pfizer's reference at a November 1998 CME (called "New Options in Bipolar Disorder") to a 15-patient open-label

---

[6] Sections of Pfizer's recycled argument are addressed more fully in response to Pfizer's concurrently-filed Motion for New Trial.  *See* Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants' Motion for New Trial and to Re-open Evidence, or Alternatively, to Alter or Amend Judgment at Section I.

study conducted by Pfizer – *not* described as a small, open-label, company-sponsored study – to support proposition that Neurontin is an effective add-on treatment for bipolar disorders. *See* TX 1197; 2/23 Tr. (Abramson) 116:15-117:13. That presentation deceptively omits any reference to the crucial Pande and Frye studies that were already available, or *any* study that suggests Neurontin may *not* treat bipolar disorders. *Id.* at 117:13. Plaintiffs also demonstrated that a 1999 company-sponsored CME ("New Frontiers in Anxiety, Substance Abuse and Bipolar Disorders") featured materials that intentionally omitted reference, again, to the Pande and Frye studies. *See* TX 63 at 42; 2/26 Tr. (Barkin) 31:23-32:4. This evidence of systematic fraud in CMEs provides the nexus between Pfizer's conduct and Plaintiffs' injuries.

B.    PFIZER'S PUBLICATION STRATEGY

Pfizer attempts to divert the Court's attention from its corruption of science by claiming that Plaintiffs did not firmly establish the distribution of the journals that Pfizer polluted with misinformation. Defs. Mem. at 5. However, Plaintiffs introduced evidence sufficient to support the Court's conclusion that Kaiser's physicians, as practitioners obligated to follow pharmacological developments in their professional fields, would have received the output of Pfizer's misleading publication strategy. *See, e.g.*, 2/25 Tr. (Dickersin) 72:12-73:18.

Pfizer also argues that the evidence did not support the Court's finding that Pfizer intentionally suppressed the Pande study. Defs. Mem. at 5-6. To sustain this strained argument, Pfizer points to Dr. Pande's presentation of his results in June 1999 and the subsequent "accurate[]" publication in 2000. *Id* at 5. This ignores that Pfizer knew the inefficacy of treating bipolar disorders as early as July 1998. *See* TX 301; 3/4 Tr. (Millares) 67:17-69:5; 3/5 Tr. (Millares) 81:14-82:1, 82:16-84:6. Publications from August 1998 up to mid-2000, when the Pande study results were published (and even then, the publication blamed the trial's failure on faulty study design), failed to refer to the Pande study. Moreover, when prompted by Kaiser

employees for information on Neurontin's efficacy for treating bipolar disorders, Pfizer's inquiry service responded with product-boosting information alone. The Pande study (and other negative clinical data) was not disclosed. *See id.* This evidence amply demonstrates a substantial nexus between Pfizer's conduct and Plaintiffs' injuries.

    **C.**    **PHYSICIAN DETAILING**

Pfizer claims the Court was incorrect in finding that it engaged in fraudulent detailing. Defs. Mem. at 6. Pfizer further argues that the testimony of Dr. Ambrose Carrejo, which the Court found credibly conveyed Pfizer's illegal detailing of PMG physicians, is not specific enough to support the Court's finding.[7] *Id.* However, in addition to Dr. Carrejo's adequate description of Pfizer's tactics, there was evidence of Pfizer's nationwide medical liaison training regimen, which encouraged off-label marketing of Neurontin directly to physicians. *See* 3/12 Tr. (Franklin) 55:11-18; *see also* Findings at 30-31. The evidence supports the Court's findings of a nexus between Pfizer's fraudulent detailing and Plaintiffs' injuries.

**III.**    **EVIDENCE REGARDING NEURONTIN'S EFFECTIVENESS DOES NOT EVICERATE A CAUSAL NEXUS IN THIS CASE**

Pfizer argues that the Court erred by failing to address alleged "admissions" regarding Neurontin's effectiveness in its Findings, which destroyed any causal nexus. Defs. Mem. at 7. Pfizer claims that: (1) Plaintiffs "were aware of a lack of DBRCT evidence when SCPMG expanded formulary access to non-neurologists and psychiatrists"; and (2) were "aware of the scientific studies they claim were delayed or manipulated." According to Pfizer, "despite this knowledge Plaintiffs' website and the PMG's formularies and guidelines have permitted and encouraged Neurontin use for the relevant off-label conditions throughout the life of this

---

[7] Pfizer carelessly labels this testimony as hearsay, ignoring both Dr. Carrejo's testimony that he personally was detailed by Pfizer and the Court's determination that his testimony did not constitute hearsay. *See* 2/26 Tr. (Carrejo) 97:17-98:12.

litigation." Defs. Mem. at 7.  In other words, Pfizer believes that simply because Neurontin has benefits for indicated conditions, and Plaintiffs permitted use of Neurontin for indicated conditions, a causal link is destroyed.   Pfizer's argument is flawed because it ignores Plaintiffs' action once they learned the truth.  Kaiser's re-education efforts are well documented.[8]  *See e.g.* Findings at 72.

Moreover, Pfizer misrepresents the evidentiary value of any alleged "admissions" by Plaintiffs.  For example, with regard to Plaintiffs' knowledge of the "delayed or manipulated studies," direct evidence was presented that DIS gave disproportionate weight to Backonja because it was presented as a positive DBRCT in a full article published in a major, peer reviewed journal.  *See* 3/4 Tr. (Millares) 77:11-78:22.  Further, DIS did not give weight to Gorson because it was published as a letter-to-the-editor in a journal that was not peer reviewed.  *See* 3/4 Tr. (Millares) 78:25-79:18;  3/5 Tr. (Millares) 85:7-85:25.  Thus, but for Pfizer's manipulation of studies, Kaiser's 1999 review would have revealed that Neurontin was ineffective for neuropathic pain, since a panel of Pfizer experts later concluded that the evidence did not support a broad neuropathic pain claim.  *See* 2/23 Tr. (Kessler) 44:8-45:6; 2/24 Tr. (Abramson) 38:6-15; 40:5-40:16.

---

[8] The Court's Findings are properly grounded in record facts that support a causal nexus.  Indeed, although the Court found that Pfizer introduced evidence regarding the failure to remove Neurontin from its formulary or impose restrictions, it held that "Pfizer unfairly demeans Kaiser's efforts to mitigate its injury."  *Id* at 71.   This determination by the Court was grounded on the Court's finding that "Kaiser did vigorously pursue an information campaign to reduce off-label prescribing once it became aware of the off-label marketing campaign by Pfizer." Findings at 71-72.   After Kaiser learned of the whistleblower suit brought by Dr. David Franklin, "Kaiser escalated its efforts to promote appropriate prescribing of the drug."  *Id.* at 72-73 (citing trial evidence).  These materials "were shared with all Kaiser regions" and resulted in a 33-34% decrease in new starts of Neurontin, and "a 50% decrease in new starts" in the Southern California region.  *Id.*  Plaintiffs also offered direct evidence that removing Neurontin from Kaiser's formularies or adding restrictions would not have been effective to counteract inappropriate usage, and "[t]he reason that doctors prescribe is not because… it's on or off the formulary, its because they believe that the drug is effective or not effective, and that's created over years of education and training…. So the real thing is you need to educate the physicians, give them the information*." See* 3/9 Tr. (Daniel) 109:9-110:12; 3/3 Tr. (Hyatt) 136:12-137:18; 3/5 Tr. (*Millares*) 93:19-95:14.

Simply put, the alleged "admissions" claimed by Pfizer do not negate any causal nexus in this case.[9]

## IV.  THE COURT DREW PROPER CAUSAL INFERENCES THAT SHOULD NOT BE OVERTURNED

In what amounts to a fourth attack arguing identical points on an alleged lack of causation,[10] Pfizer rehashes the same arguments previously rejected by the Court on two occasions.  *In re Neurontin Mktg. & Sales Practices Litig.*, 677 F. Supp. 2d 479, 496 (D. Mass 2010)(denying summary judgment because a "reasonable inference can be drawn that Kaiser was directly injured by Pfizer's misrepresentations" and "Kaiser directly relied on 'half-truths'"); *see also* Findings at 130-135 ("the fact that there is a 95% compliance rate . . . is proof that PMG physicians would likely have changed their Neurontin prescribing behavior . . .").  Pfizer argues, *inter alia*, that the Court's findings and inferences drawn on causation were "wholly speculative," claiming that the findings are "not only unfounded, but flatly contradicted by the evidence."  Defs. Mem. at 7-10.  Pfizer is incorrect.  It is well settled that "the weight of the

---

[9] Pfizer cites to multiple cases it believes demonstrate a lack of causal nexus.  However, theses cases are inapposite. For example, in *Quezada v. Loan Center Of California., Inc.*, No. 08-cv-177, 2009 WL 5113506 (E.D. Cal., Dec. 18 2009) a mortgage fraud case, the court found that regardless of the accepted version of the facts, there was no proof that the plaintiffs relied upon any misrepresentations and omissions in the loan documents, and the case could not be certified as a class action because the putative class representative was subject to unique defenses, as compared to the present case where reliance on false statements and omissions were proven with direct evidence.  *Laster v. T-Mobile USA, Inc.*, No. 05-cv-1167, 2009 WL 4842801 (S.D. Cal. Dec. 14, 2009), a consumer protection matter, has little application here, but may actually support Plaintiffs' position since the Court noted that "a plaintiff must show that 'in all reasonable probability [he or she] would not have engaged in the injury-producing conduct," precisely what Kaiser proved in this case.  But for the misrepresentations and omissions of Pfizer, Plaintiffs would not have been damaged.  *Id.* at *7.  Further, in *Laster*, there was undisputed testimony by the plaintiff that he would have purchased the phones even if he had known about the misrepresented sales tax charge.  *Id.* at *7.  In *Prohias v. Pfizer, Inc.*, 485 F. Supp 2d 1329, 1334-35 (S.D. Fla. 2007), the Court dismissed the individual plaintiffs' complaint because those individuals continued to pay for Lipitor even though deposition testimony reflected they knew the truth about the alleged lack of benefits for coronary disease, but those same plaintiffs continued to take it for other benefits.  Similarly, *Whalen v. Pfizer, Inc.*, No. 600125/05, 2005 WL 2875291 (Sup. Ct. N.Y. Co. Sept. 22, 2005) has no application to this case because the plaintiff in *Whalen*, seeking damages under New York's General Business Law, continued to use Listerine mouthwash as part of her daily routine with knowledge of the alleged misrepresentation by Pfizer that Listerine was "as effective as floss" and "clinically proven."  *Id.* at *1.

[10] *See* Memorandum of Law in Support of Defendants' Motion for Summary Judgment, Part I (Under Seal per Dkt. No. 1690); Memorandum of Law in Support of Defendants Motion for Judgment As A Matter of Law Based Upon Lack of Sufficient Evidence of Injury or Causation, Part III (Dkt. No. 2671);  Memorandum of Law in Support of Defendants' Motion for Judgment as a Matter of Law, Part II (Dkt. No. 3367).

evidence" is a "matter[] for the factfinder." *Den Norske Bank AS v. First Nat'l Bank of Boston*, 75 F.3d 49, 58 (1st Cir. 1996).  Here, sufficient evidence existed for the Court to find in Plaintiffs' favor.

A.     95% FORMULARY COMPLIANCE SUPPORTS CAUSATION

First, Pfizer ignores evidence presented through trial that, in fact, 95% of the prescriptions were formulary compliant, supporting the Court's findings on causation.  *See* 2/26 Tr. (Carrejo) 103:23-104:14, 108:10-109:3; TX 323.  Pfizer instead only offers argument that such testimony, in combination with testimony regarding adding restrictions to a formulary, is mutually exclusive.  It was proper to infer, as the Court did, that a high compliance rate with the formulary in combination with restrictions would result in a reduction of prescriptions written, even if doctors can prescribe off-formulary.  Moreover, Plaintiffs' witnesses did not repeatedly "reject the suggestion that restricting a drug's formulary access would alter physician behavior" as Pfizer claims.  *See* Defs. Mem. at 8.  For instance, Dr. Hyatt merely testified that "our physicians felt at the time it was in pretty wide use and it would be difficult to restrict the drug that was sort of already out of the gate[.]" *See* 3/3 Tr. (Hyatt) 104-105.  It is reasonable to infer that initial restrictions *do* alter physician's behavior, before the "genie" gets out of the bottle. *See* 2/26 Tr. (Carrejo) 110:24-111:21.

Moreover, Pfizer ignores evidence presented regarding lifting of restrictions on Neurontin.  For instance, the Court determined that "Dr. Millares credibly testified that, had DIS been aware of the undisclosed information . . . it would not have recommended that the P&T Committee lift the restrictions on Neurontin."  Findings at 68.

## B.    PFIZER MISCHARACTERIZES THE COURT'S FINDINGS REGARDING DIS MONOGRAPHS

The Court should disregard Section IV(B) of Pfizer's brief for several reasons.  First, Pfizer intentionally mischaracterizes the Court's findings by arguing that "the Court found that PMGs outside Southern California would not have removed or restricted formulary access to Neurontin even if they had known of the alleged fraud."  *Id.*  Pfizer implies that the Court lacked justification for a finding of causation because Plaintiffs would *not* have acted differently even with knowledge of the fraud.  However, Pfizer ignores the Court's finding that Kaiser "would not have removed Neurontin from the formulary *because it was approved by the FDA for the adjunctive epilepsy treatment, and later, for the treatment of postherpetic neuralgia."*  Findings at 135 (emphasis added).  Thus, the Court concluded that removal from the formulary would not take place because of remaining proper indicated uses approved by the FDA, *not* because Plaintiffs were disregarding the implications of the fraud.

Kaiser presented sufficient evidence that DIS *would* have issued different monographs, had it known of Pfizer's misrepresentations.  *See, e.g.*, 3.4 Tr. (Millares) 53:14-67:11; 69:25-71; 3/9 Tr. (Daniel) 100:7-101:14.  Because of Kaiser's emphasis on evidence-based medicine and the use of and reliance on the DIS monographs by the P&T Committees, their importance cannot be seriously contested.

## C.    THE DRUG/DUAT INITIATIVES SUPPORT A FINDING OF CAUSATION

The decrease in Neurontin prescriptions resulting from DRUG/DUAT initiatives launched in the Southern and Northern California regions following the 2002 press coverage of Pfizer's illegal campaign to promote Neurontin also supports the Court's finding of causation. As discussed above, physicians are not limited by the formulary but give it great weight in making medical decisions.  Physicians prescribe medications that they believe will effectively

treat the patient, and incomplete or inaccurate efficacy information about a drug can dramatically alter a physician's willingness to prescribe that drug.[11]   These initiatives were educational programs designed to inform physicians about the propriety of prescribing Neurontin.   Their success in reducing Neurontin prescriptions by approximately 34% suggests that fewer prescriptions would have been written over the preceding years had physicians not been misled by Pfizer.   In addition, the fact that Kaiser took action swiftly upon learning of Pfizer's illegal activities strongly indicates that Kaiser would have disseminated any evidence of inefficacy, had it not been suppressed by Pfizer.

## V.   THE COURT APPLIED THE CORRECT STANDARD FOR INEFFICACY AND INJURY

Pfizer mischaracterizes the Court's findings in arguing that the Court applied the wrong standard for efficacy.   Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), the Court performed a straightforward analysis to determine a standard for efficacy for off-label uses that is "generally accepted by the scientific community."   Findings at 79-82 (citing *Daubert*).   The Court rightly rejected Pfizer's attempt to create an impossible standard for showing inefficacy – "that plaintiffs must prove that the drug is not effective for the treatment of any patient" (*Id.* at 82) – which would require Kaiser to prove a negative to an absolute certainty. That the generally accepted standard for efficacy in the scientific community dovetails with the FDA's standard does not make it incorrect for the Court to use.

The Court hardly "brushed aside" (Defs. Mem. at 11) Pfizer's attempts to show that Neurontin may have had some efficacy for some patients somewhere at some time during the course of the fraud.   Instead, the Court carefully sifted through the evidence and weighed Pfizer's claims of efficacy, which were often based on anecdote, against the overwhelming

---

[11] 3/9 Tr. (Daniel) 109:9-110:12; 3/3 Tr. (Hyatt) 136:12-137:18; 3/5 Tr. (Millares) 93:19-95:14.

evidence of inefficacy that Kaiser presented.  For example, although Pfizer criticizes the Court

for ignoring Dr. Bird's and Dr. Brenner's accounts of efficacy for neuropathic pain for "some

patients," the Court hardly ignored their testimony.  Instead, it considered it carefully,

identifying, for example, five flaws in Dr. Bird's analysis (*see* Findings at 98-99) and contrasting

both experts' reliance on "anecdotal accounts" with the "lack of DBRCT evidence to support

efficacy in the treatment of neuropathic pain[.]"  *Id.* at 102.  More disturbingly, Pfizer continues

to argue that FDA approval for post-herpetic neuralgia should allow it to make unfounded claims

about efficacy for broad neuropathic pain (Defs. Mem. at 12), even after the Court reviewed the

robust scientific evidence finding no such broader efficacy.  *See* Findings at 94 (discussing

Serpell study).[12]

   Pfizer then criticizes the Court's "presumption that off-label prescriptions would not

occur or would not be effective absent positive DBRCT's" (Defs. Mem. at 13), but does not

point out where the Court stated any such "presumption," because it did not.  Pfizer's argument

that many prescriptions today are written for drugs for which there is not DBRCT support is

beside the point.  The issue that the Court considered was whether Pfizer misrepresented the

scientific evidence about Neurontin's efficacy for off-label uses.  Off-label prescriptions based

on truthful representations about a drug's efficacy – including a lack of DBRCT support for such

prescriptions – are not what this trial was about.  It was about Pfizer's fraud.

   Because the Court's focus was properly on the alleged fraud – on what Pfizer said and

did not say about Neurontin's efficacy for off-label uses – the Court's *Daubert*-based standard

for determining efficacy did not amount to creating a private right of action for violating the

FDA's rules, as Pfizer contends.  Defs. Mem. at 14.  As the Court previously recognized, there is

---

[12] As explained in more detail in Kaiser's opposition to Pfizer's motion for a new trial, the 2011 Cochrane Review
provides no basis for the Court to reconsider its factual findings.

no such private right of action, and Plaintiffs would need to show actual fraud and not just off-label marketing.  *See In re Neurontin,* 244 F.R.D. at 92 n.6.  Kaiser did so.

## VI.   THE COURT'S FINDINGS DEALT CORRECTLY WITH THE BIPOLAR EVIDENCE

The Court found that "Pfizer's failure to disclose the lack of efficacy is particularly outrageous in the area of bipolar disorder where there was not a scrap of evidence supporting efficacy and where there were actual *negative* side effects of depression for certain segments of the population."  Findings at 111 (underline in original).  Despite this sobering finding, Pfizer charges once more up the Neurontin inefficacy mountain hoping to justify a decade's worth of fraudulent marketing with misrepresented findings from fundamentally flawed studies that *post-date* its fraudulent conduct.  As with past forays, this latest push predictably gains not even a toehold.  Most of Pfizer's arguments constitute pure rehash.  And what few "novel" arguments Pfizer posits are premised either on mischaracterized findings or a misrepresentation of the difference between anxiety and mood disorders, not on any real evidence.

Social phobia is *not*, as Pfizer states, a mood disorder; it is an anxiety disorder.  *See* 3/19 Tr. (Slaby) 101:24-102:9.[13]   Kaiser did not, therefore, claim damages for social phobia prescriptions; and its ICD-9 code categorization explicitly excluded codes for social phobia. While Dr. Pande's social phobia article is completely irrelevant to the issue of Neurontin's inefficacy for bipolar mood disorders, it is – as the Court correctly held – a prime example of Pfizer's fraudulent mood disorders marketing through its publication strategy.  The Court did not, as Pfizer claims, find that Pande's social phobia article represented a "fraudulent half-truth" solely because it failed to disclose Pande's earlier bipolar study, in which a placebo

---

[13] A chief Pfizer trial tactic was to conflate bipolar mood disorders with anxiety disorders in the hopes that it could fool the Court and the jury into believing that the requisite "scrap" of efficacy it mistakenly thought would justify its marketing campaign *actually* existed.

outperformed Neurontin.   Rather, the Court held that it represented a fraudulent half-truth because, despite the affirmative statement that "gabapentin produced improvements in mood and general well-being," Pfizer omitted any reference to Dr. Pande's negative bipolar study (as well as the negative Frye and Guille studies).  S*ee* Findings at 34-35.  Furthermore, the only support Pfizer offered for its affirmative statement was the Dimond article, which the Court also correctly concluded omitted the FDA's findings that Neurontin increased the risk of depression with or without suicidal ideation despite basing its conclusions on the very same data set.  S*ee* Findings at 32.

There is no evidence that the Court "disregarded" the Mokhber study in reaching its conclusion that Neurontin was ineffective.   Rather, the Mokhber study was included in the Court's analysis of five DBRCTs.  *See* Findings at 82-89.   Whether the Mokhber study was a Pfizer study was immaterial to the Court's finding that this 2008 Iranian study was not placebo-controlled, a limitation even its authors noted.  *See* Findings at 85.  Also, any positive findings from the Mokhber study are further compromised by the fact that "due to local hospital limitations [in Iran]," comparator blood levels [which must be monitored in order to determine whether therapeutic levels of, for example, carbamazepine have been achieved], could not be monitored. *See* 03/19 Tr. (Slaby) 147:12-25; 03/16 Tr. (Brenner) 56:6-7.

With regard to the Vieta study, multiple experts—both Kaiser's and Pfizer's—testified to the importance of confining a primary analysis to the intention-to-treat ("ITT") population.  The Court correctly found that Neurontin failed to outperform placebo under the ITT analysis and that "reliance on positive results from a secondary measure in the Vieta study is misplaced."  *See* Findings at 85-88.  And the Court also properly noted that Pfizer's published article "falsely stated that the trial showed efficacy in the treatment of bipolar using the ITT population."

Findings at 85. Despite Pfizer's hackneyed assertion to the contrary, there is no evidence that Pfizer's misrepresentation of the results from an artificially enriched subgroup as the ITT analysis is disclosed anywhere in the published article.

Kaiser's causation and damage evidence is specific to bipolar mood disorders. Bipolar disorder is a cyclical mood disorder characterized by two phases (poles), the manic and the depressive phase. *See* Findings at 82. Kaiser's ICD-9 code categorization captured all appropriate bipolar mood disorder codes; Pfizer's stable of litigation experts provided no ICD-9 code classification that it contended was any more appropriate. And, as the court noted, "the 16% bipolar estimate used by Dr. Rosenthal is quite close to Pfizer's own estimate in 2000 (14.7%) of the percentage of Neurontin prescriptions written to treat bipolar disorder." Findings at 76-77 n.19.

The Court, employing scientifically sound methods, properly determined that there simply "is no scientifically acceptable evidence that Neurontin is effective in the treatment of bipolar disorder." Findings at 89.

## VII. THE COURT PROPERLY CONSIDERED OTHER RELEVANT EVIDENCE

Pfizer's conclusory assertions of error as to a litany of evidentiary issues amount to precisely the type of re-litigation of old issues that courts routinely reject on Rule 52(b) motions.

### A. OPINION TESTIMONY OF PROFESSOR ROSENTHAL AND DR. HARTMAN

In arguing that the testimony of Professor Rosenthal and Dr. Hartman was erroneously admitted, Pfizer offers no new arguments, no new evidence, and no attempt whatsoever at showing why amendment of the Court's findings is needed to prevent "manifest injustice" as Rule 52(b) requires. *See, e.g., Hernandez v. Castillo*, No. 09-cv-1569, 2010 WL 5072567, at *2 (D.P.R. Dec. 8, 2010) (quoting 9C Charles Alan Wright & Arthur R. Miller, Federal Practices and Procedure § 582 (3d ed. 2010)). Instead, Pfizer merely cites the numerous briefs that it has

14

filed throughout the case concerning this expert testimony.  Kaiser, in turn, refers to and incorporates its prior briefing on these experts (*see* Dkt. Nos. 2419 (opposition to motions to exclude testimony), 2692 (opposition to motion for judgment as matter of law), and 2693 (opposition to motion for judgment as a matter of law as damages evidence)) and concurrently-filed opposition to Pfizer's motion for a new trial and renewed motion for judgment as a matter of law, as to why their testimony was properly admitted and supports the Court's findings.

> B.     THE GUILTY PLEA AND EVIDENCE OF RELATED GOVERNMENT
>        INVESTIGATIONS OR AGREEMENTS WERE PROPERLY ADMITTED

Pfizer continues to press the remarkable argument that the 2004 guilty plea for violating the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 331, *et seq.* ("FDCA"), is *irrelevant* to this action, even though this action arises out of the same illegal marketing campaign that gave rise to the 2004 guilty plea.  The parties fully briefed the admissibility of the guilty plea prior to trial.  *See* Dkt. Nos. 2302 and 2415.  As Plaintiffs explained then, the guilty plea is directly relevant to Plaintiffs' claims, beginning with its claim under California's Unfair Competition Law, which allows a plaintiff to prove a violation of the statute by showing a violation of a federal statute, including the FDCA.  *See* Dkt. No. 2415, at 7-8.  The guilty plea was also relevant to showing a common purpose to promote Neurontin illegally, a required showing under RICO, and it was directly relevant to showing causation, as Kaiser showed the steps it took to reduce Neurontin prescriptions after information concerning Pfizer's misconduct emerged, including through the guilty plea.  Like Pfizer, Kaiser incorporates its arguments as to why the guilty plea and related evidence were properly admitted and considered as stated in Kaiser's opposition to Pfizer's motion for a new trial.

### C.      THE JULY 21, 1999 "SNAKE OIL" EMAIL WAS PROPERLY ADMITTED

In its Findings of Fact and Conclusions of Law, the Court made two brief references to an email by Dr. Christopher Wohlberg, M.D., Ph.D., a Pfizer employee who had studied Neurontin. *See* Findings at 1 and 18.  Dr. Wohlberg wrote in a 1999 email that Neurontin "is the 'snake oil' of the twentieth century." (TX 479.)  Pfizer argues that the email should have been excluded and elsewhere argues that its admission requires a new trial.  The document is admissible as a business record of a party opponent.  *See* Dkt. No. 2666.  Further, the email, written by a Pfizer employee with extensive familiarity with Neurontin and before Pfizer had a financial interest in advocating Neurontin for off-label uses, is highly probative and not unfairly prejudicial.  *See id.* Thus, Pfizer's challenges under Federal Rules of Evidence 401, 402, 403, and 802 fail.  The email was properly admitted and considered.

### D.      TESTIMONY OF DAVID FRANKLIN AND RELATED EVIDENCE WAS PROPERLY ALLOWED

Although it abandons most of the grounds it asserted in a pretrial motion on this subject (*see* Dkt. No. 2326),[14] Pfizer again argues that David Franklin should not have testified to his firsthand knowledge of Pfizer's fraud.  Pfizer continues to argue that Dr. Franklin lacked firsthand knowledge of the Neurontin fraud outside of the Northeast Customer Business Unit ("CBU").  However, his actual testimony at trial belied Pfizer's pretrial assertions.  For that reason, and for the reasons stated in Kaiser's opposition (Dkt. No. 2406) to Pfizer's motion in limine, the Court properly allowed Dr. Franklin to testify and properly cited his testimony in its Findings of Fact and Conclusions of Law.

Dr. Franklin made it clear the Neurontin fraud was not confined to the Northeast CBU. As the Court correctly noted in its Findings, "[s]oon after Dr. Franklin was hired, he attended a

---

[14] That motion was itself largely a rehash of arguments from its previous unsuccessful attempt to exclude Mr. Franklin's testimony from the *Bulger* trial.  *See* Dkt. No. 1912.

*national* training for *all* Parke-Davis liaisons in Ann Arbor, Michigan." Findings at 20 (emphasis added). There, the medical liaisons were told to disregard FDA regulations regarding off-label marketing and told of the "importance of not creating a paper trail." *Id.* Further, *all* medical liaisons received a voice mail from Phil Magistro, a Parke-Davis employee, telling the medical liaisons "to kick some ass, we want to sell Neurontin on pain. And monotherapy and everything that we can talk about, that's what we want to do." *Id.* at 21. The Court correctly concluded that "his testimony supports the reasonable inference that the same strategy of direct marketing was being employed nationwide." *Id.* at 30-31. Dr. Franklin's testimony was highly probative of Pfizer's misconduct, not confined to a particular region, and properly considered by the Court.

## E.   DR. CURT FURBERG'S TESTIMONY WAS PROPERLY CONSIDERED

Pfizer mischaracterizes the Court's findings concerning Dr. Curt Furberg's testimony as "regarding the alleged relationship between Neurontin and the risk of suicide." Defs. Mem. at 18. In its background section on the FDA's approval of Neurontin as adjunctive therapy for partial seizures, the Court briefly cited Dr. Furberg's testimony concerning the FDA's review of data at the time of FDA approval that showed a significant incidence of depressive side effects with Neurontin use. The Court noted that Dr. Furberg testified that these side effects are relevant to the use and marketing of the drug for bipolar patients. *See* Findings at 10-11. This testimony went to Pfizer's fraudulent conduct in marketing Neurontin to the vulnerable population of bipolar patients and was not unfairly prejudicial. There was no error at all in the Court's brief citation of this evidence, let alone error necessitating amended findings.

## VIII.   THE COURT'S CONCLUSIONS OF LAW SHOULD NOT BE AMENDED

In a final attempt to avoid liability in light of the Court's thorough and well-reasoned conclusions of law, Pfizer identifies a handful of professed errors of law.  None are actually errors.  None justify amending the Court's legal conclusions.

Pfizer claims that the Court relied on the holding in *McAdams v. Monier, Inc*., 105 Cal. Rptr. 3d 704 (Ct. App. Cal. 2010) to determine Kaiser had sufficiently proven reliance under the California Unfair Competition Law ("UCL"), and challenges *McAdam*'s applicability.  Def. Mem. at 18-19, citing Findings at 130.  While the Court did cite *McAdams*, the Court actually relied on the California Supreme Court's explanation of the UCL's reliance requirement in *In re Tobacco II*.  The Court quoted four full paragraphs from that decision, including: "[a UCL plaintiff] is not required to necessarily plead and prove individualized reliance on specific misrepresentations or false statements where, as here, those misrepresentations and false statements were part of an extensive and long-term advertising campaign."

Pfizer asks the Court to amend its findings of fact and conclusions of law as to Pfizer's violations of the UCL because, Pfizer claims, the Ninth Circuit recently held that a drug company has no duty of disclosure to third party payors.  Def. Mem. at 19 (citing *United Food & Commercial Workers Cent. Pa. & Regional Health & Welfare Fund v. Amgen, Inc.*, 400 F.Appx. 255, 257 (9th Cir. 2010)).  Not so.  In *United Food* – an unpublished, non-precedential, out-of-Circuit case – the Ninth Circuit determined that the plaintiffs' *RICO claim* was properly dismissed because the complaint claimed Amgen omitted and concealed adverse test results while promoting Aranesp and Epogen but "did not identify any concealed study results that involved the drugs and uses that Amgen is alleged to have directly promoted, *and Appellants confirmed at oral argument that there were none.*"  *Id.* (emphasis added).  In stark contrast, Kaiser has proven numerous instances where Pfizer withheld study results for indications it was

promoting as well as Kaiser's direct reliance on specific Pfizer omissions and misrepresentations.  In any event, the *United Food* court's reasoning for dismissing a RICO claim has no bearing on this court's conclusions of law about Kaiser's UCL claim.

Finally, Pfizer argues that the Court should not have awarded prejudgment interest.  The parties thoroughly briefed the statutory prejudgment interest issues post trial.  Pfizer argued against an award of prejudgment interest in at least four separate briefs.  *See* Defendant's Response to Plaintiffs' Proposed Conclusions of Law, May 14, 2010 (Dkt. No. 2816); Defendants' Opposition to Plaintiffs' Motion to Admit Tables Showing Damages with Interest into Evidence, July 6, 2010 (Dkt. No. 2882); Defendants' Opposition to Plaintiffs' Motion for Trebled Damages and Prejudgment Interest under RICO and Updated Prejudgment Interest under the UCL, December 24, 2010, (Dkt. No. 3193); Defendants' Motion to file Surreply Regarding Treble Damages and Prejudgment Interest, Jan. 18, 2011, (Dkt. No. 3237).  The Court rejected Pfizer's arguments and awarded interest at the statutory rate of 7% (Findings at 140) and later updated that award, following briefing in which Pfizer did not contest updating the award (January 27, 2011 Order, (Dkt. No. 3268)).  Pfizer's oft-rejected argument does not warrant amending the Court's previous orders.

## CONCLUSION

For all the aforementioned reasons, Plaintiffs respectfully submit that Defendants' Motion for Amended and additional Findings should be denied.

Dated:  April 19, 2011                    Respectfully submitted,


                                          By:     */s/ Linda P. Nussbaum*
                                                  Linda P. Nussbaum

                                          Linda P. Nussbaum, Esq.
                                          John D. Radice, Esq.
                                          GRANT & EISENHOFER, P.A.
                                          485 Lexington Avenue
                                          New York, NY 10017

                                          *Attorneys for Plaintiffs Kaiser Foundation*
                                          *Health Plan, Inc. and Kaiser Foundation*
                                          *Hospitals*

*Of Counsel*

Thomas M. Greene, Esq.
GREENE LLP
33 Broad Street, 5th Floor
Boston, MA 02109

Elizabeth Cabraser, Esq.
LIEFF CABRASER HEIMANN &
  BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339

Thomas M. Sobol, Esq.
HAGENS BERMAN SOBOL
  SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142

## CERTIFICATE OF SERVICE

I hereby certify that on April 19, 2011, I caused a true and correct copy of **Plaintiffs' Memorandum of Law In Opposition to Defendants' Motion for Amended and Additional Findings** to be served upon all known counsel of record by electronic filing using the CM/ECF system.

 /s/ Linda P. Nussbaum_____
Linda P. Nussbaum
