UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                            : MDL Docket No. 1629

In re:  NEURONTIN MARKETING, SALES    :
        PRACTICES, AND PRODUCTS      : Master File No. 04-10981
        LIABILITY LITIGATION         :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x Judge Patti B. Saris
                                              :

THIS DOCUMENT RELATES TO:         : Magistrate Judge Leo T.
                                              : Sorokin

KAISER FOUNDATION HEALTH PLAN, INC., ET AL. V.  :
PFIZER INC, ET AL., 04 CV 10739 (PBS)      :
                                              :
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
<u>DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW</u>**

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................................ ii

INTRODUCTION .................................................................................................................... 1

ARGUMENT .......................................................................................................................... 2

I.     PLAINTIFFS PRESENTED LEGALLY SUFFICIENT EVIDENCE OF INJURY ......... 3

      A.     Plaintiffs Are Not Required to Prove That No Patient Received A Benefit From the Off-Label Uses At Issue ........................................................................ 3

      B.     Plaintiffs Have Sufficiently Demonstrated That Cheaper Alternative Drugs Would Have Been Prescribed Instead Of Neurontin Absent Defendants' Misrepresentations ................................................................................................ 5

II.    PLAINTIFFS SUBMITTED SUFFICIENT EVIDENCE OF DIRECT INJURY AND CAUSATION.......................................................................................................... 6

      A.     Plaintiffs Proved A Direct Relationship Between Their Injury And The RICO Violation.................................................................................................... 6

      B.     Plaintiffs Have Offered Sufficient Evidence Of Causation For All Regions ......... 9

      C.     Professor Rosenthal's Opinion Quantifies the Impact of Pfizer's Fraud.............. 10

      D.     The Jury And This Court Found That The SCPMG and All Of Plaintiffs' Formulary Decisions Were Influenced By Defendants Conduct........................... 11

      E.     Plaintiffs Presented Sufficient Evidence of Causation ......................................... 14

III.   DR. HARTMAN PROPERLY MONETIZED KAISER'S DAMAGES ......................... 16

IV.   KAISER HAS PRESENTED SUFFICIENT EVIDENCE PROVING AN ENTERPRISE AND A PREDICATE RICO ACT........................................................... 16

V.    PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS...................................................................................................... 18

CONCLUSION...................................................................................................................... 18

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<span style="font-variant: small-caps">CASES</span>

*BCS Svcs., Inc. v. Heartwood 88, LLC*,
   Nos. 10-3062, 10-3068, 2011 WL 1045853 (7th Cir. Mar. 24, 2011).......................................7

*Den Norske Bank AS v. First Nat'l Bank of Boston*,
   75 F.3d 49 (1st Cir.1996)...............................................................................................................11

*Hemi Group, LLC v. City of New York*,
   130 S. Ct. 983 (2010)......................................................................................................................7

*Ironworkers Local Union 68 v. AstraZeneca Pharms., LP*,
   No. 08-16851, 2011 WL 833222 (11th Cir. Mar.11, 2011)...................................................4, 13

*Martinez-Serrano v. Quality Health Servs., Inc.*,
   568 F.3d 278 (1st Cir. 2009)........................................................................................................2-3

*Palmer v. Champion Mortgage*,
   465 F.3d 24 (1st Cir. 2006)............................................................................................................2

*Prohias v. Pfizer, Inc.*,
   485 F. Supp 2d 1329 (S.D. Fla. 2007)........................................................................................13

*Tagliente v. Himmer*,
   949 F.2d 1 (1st Cir. 1991)............................................................................................................13

*Trigano v. Bain & Co.*,
   380 F.3d 22 (1st Cir. 2004)..........................................................................................................12

*UFCW Local 1776 v. Eli Lilly & Co.*,
   620 F.3d 121 (2d Cir. 2010)...............................................................................................6, 7, 11

*United Food & Commercial Workers Central Penn. & Regional Health & Welfare Fund
   v. Amgen, Inc.*, 400 Fed. Appx. 255 (9th Cir. Oct. 21, 2010)....................................................7

*Whalen v. Pfizer, Inc.*,
   No. 600125/05, 2005 WL 2875291 (N.Y. Sup. Ct. Sept. 22., 2005).......................................13

## <u><span style="font-variant: small-caps">OTHER AUTHORITIES</span></u>

Fed. R. Civ. P. 50(a) .......................................................................................................................12

Plaintiffs Kaiser Foundation Health Plan, Inc. and Kaiser Foundation Hospitals (collectively, "Plaintiffs" or "Kaiser") respectfully submit this memorandum of law in opposition to Defendants' Renewed Motion for Judgment As A Matter of Law (cited as "Defs. Mem.")[1], and avers as follows:

## INTRODUCTION

Nearly seven years after pleading guilty to multiple felony counts for unlawfully marketing Neurontin for various unapproved uses, six years after Kaiser filed this case, one year after a six week trial in which a unanimous jury found against Pfizer, and nearly five months after this Court issued a comprehensive and exhaustive 141-page Findings of Fact and Conclusions of Law ("Findings") (Dkt. No. 3120) in favor of Kaiser, Pfizer, through docket entries 3362-3370 rehashes numerous arguments already addressed by this Court.  Other than an attempt to improperly introduce meaningless evidence post-trial, ***Pfizer's sixty pages of post-judgment briefing raise no new issues***.  The result should be no different here from numerous prior decisions of this Court: complete denial of Pfizer's motions.[2]

Two points bear special mention here.  First, Pfizer has repeatedly attempted – especially at trial and in this briefing – to blame *Kaiser* for failing to take responsibility for halting *Pfizer*'s admittedly unlawful promotion scheme.  The trial evidence and Pfizer's arguments establish conclusively that Pfizer has never taken responsibility for *its own* misconduct.

Second, Pfizer continues its assault on the well-documented causation in this case in bold, but ultimately unpersuasive language.  Pfizer argues that "[t]he public policy implications

---

[1] Defendants Pfizer, Inc. and Warner-Lambert Company are referenced herein collectively as "Defendants" or "Pfizer."

[2] As the largest pharmaceutical company in the world, Pfizer certainly has the resources to pursue these scorched-earth litigation tactics.  Kaiser respectfully requests that the Court remain mindful of Pfizer's decisions to pour seemingly limitless resources into this case when Kaiser makes its application for attorney's fees following Pfizer's (inevitable) appeal.

of Plaintiffs' theory are profound" and "would interfere with the practice of medicine[.]" Defs.

Mem. at 7.  Yet it is the implication of Pfizer's theory which is truly profound.  Pfizer, even

while this suit was pending, has operated part of its business as an ongoing criminal enterprise.

> Prosecutor Michael Loucks remembers clearly when negotiating their guilty plea
> in the Neurontin case,] lawyers for Pfizer . . . looked across the table and
> promised it wouldn't break the law again. . . . Pfizer's lawyers assured Loucks . . .
> that Pfizer and its units would stop promoting drugs for unauthorized purposes. . .
> . What Loucks . . . didn't know until years later was that Pfizer managers were
> breaking that pledge not to practice so-called off-label marketing even before the
> ink was dry on their plea. . . .  Loucks [said:] "They've repeatedly marketed drugs
> for things they knew they couldn't demonstrate efficacy for.  That's clearly
> criminal."[3]

Under Pfizer's theory, it should be relieved of all responsibility to any private payor for Pfizer's

continued criminal conduct unlawfully promoting medicines.  It is Pfizer's conduct that

"interferes with the practice of medicine," to the harm of Kaiser and patients alike.

Pfizer cannot meet the high standard for judgment as a matter of law.  Kaiser respectfully

requests that Pfizer's motions be denied.

## ARGUMENT

As Pfizer itself previously argued, "reconsideration is 'an extraordinary remedy which

should be used sparingly." *Palmer v. Champion Mortgage,* 465 F.3d 24, 30 (1st Cir. 2006)

(citation omitted). [4]  Further, aside from the extraordinary circumstances under which

reconsideration is to be granted, in this Circuit, "[a] trial court confronted with a motion for

judgment as a matter of law must scrutinize the evidence and the inferences reasonably

extractable therefrom in the light most hospitable to the nonmovant." *Martinez-Serrano v.*

---

[3] David Evans, *Big Pharma's Crime Spree*, BLOOMBERG NEWS, Nov. 09, 2009 (detailing Pfizer's $1.19 billion criminal fine – the largest in U.S. history – to settle cases involving the unlawful promotion of Bextra and three other drugs).

[4] See Defendants' Opposition to Aetna, Inc.'s Motion to Alter Or Amend The Judgment Pursuant to Fed. R. Civ. P. 59(E) (Dkt. No. 3369).

*Quality Health Servs., Inc.*, 568 F.3d 278, 284-285 (1st Cir. 2009) (citations omitted).  "[T]he court must not pass upon the credibility of the witnesses, resolve evidentiary conflicts, or engage in a comparative weighing of the proof.  A motion for judgment as a matter of law may be granted only if the evidence, viewed from this perspective, adumbrates a result as to which reasonable minds could not differ."  *Id*.  Pfizer cannot satisfy either the standard for reconsideration, or the standard for a judgment as a matter of law.[5]

## I.   PLAINTIFFS PRESENTED LEGALLY SUFFICIENT EVIDENCE OF INJURY

### A.   PLAINTIFFS ARE NOT REQUIRED TO PROVE THAT NO PATIENT RECEIVED A BENEFIT FROM THE OFF-LABEL USES AT ISSUE

Kaiser's experts relied on the wealth of gold-standard, double-blind, randomized controlled trials ("DBRCT") studying Neurontin for the off-label indications at issue.  The Court correctly concluded, and Pfizer's experts agree, that DBRCT are the "gold standard" for determining efficacy.  Findings at 80.  Lesser levels of evidence, while useful in formulating the hypotheses that are tested in DBRCT, are "not sufficient to determine efficacy to a reasonable degree of scientific certainty."  *Id.*; *see also* 02/23 Tr. (Kessler) 26:18-27:2.  This Court has previously written on the importance of using DBRCT evidence.  *See, e.g.,* Memorandum and Order re Kaiser's Motions in Limine, Feb. 12, 2010 (Dkt. No. 2488).  Through the gold standard evidence, Kaiser met its burden, proving Neurontin ineffective for the off-label indications at issue.  Findings at 89, 101, 104, 107.

Pfizer continues to argue that the scientific standard under which drugs are determined to be effective or not – a standard of which it is well aware and under which it operates – should not

---

[5] Defendants' incorporation by reference of nearly every motion they previously filed (*see* Defs. Mem. at 1, fn. 1) highlights the outright futility of the Defendants' briefing and the utter failure to meet the standard for reconsideration or judgment as a matter of law.  Defendants' motions are nothing more than last gasp attempts to re-litigate virtually every point previously raised in this litigation.

apply to the question of whether Neurontin is effective for these off-label uses.  It is not the case, as Pfizer argues, that Kaiser's proof of inefficacy relies on an assumption that Neurontin must be presumed ineffective unless proven otherwise.[6]  Rather, Kaiser proved inefficacy through a full, unfettered and accurate read of the dozens of available DBRCTs.  Neurontin has been studied in multiple DBRCTs.  Where there is such an abundance of gold standard evidence there is no reason to stray into the realm of anecdotal evidence, and certainly not to the exclusion of gold standard evidence, as Pfizer advocates.  And, further, Pfizer misstates the central issue here.  The issue is whether, based on the gold standard evidence and held to a reasonable degree of scientific certainty, Neurontin is effective for the off-label indications at issue.  The reliable scientific evidence indicates it is not.  The case law which Pfizer cites is inapposite.  *See Ironworkers Local Union 68 v. AstraZeneca Pharms., LP*, No. 08-16851, 2011 WL 833222 (11th Cir. Mar.11, 2011) (affirming dismissal for plaintiffs' failure to *plead* that a drug was ineffective).  Here, Kaiser has *proven* that Neurontin is ineffective.  The fact that physicians continue to prescribe Neurontin for some of these off-label indications is *not* proof that Neurontin is effective.  Rather it is proof that one jury trial cannot undo over a decade's worth of Pfizer's fraudulent marketing.

Pfizer repeats its straw-man argument that Kaiser must prove Neurontin ineffective in each and every patient.  This is not the standard under which the FDA, the scientific community at-large and even Pfizer operate.  The Court properly rejected this standard under *Daubert*.  *See* Findings at 82.  Pfizer's definition of a negative study (confining the negative results to the patients actually enrolled in the study) reeks of a double standard and does not comport with the

---

[6] Though this is, in fact, the scientific standard.  *See* 03/01 Tr. (McCrory) 59:2-11 (explaining that the null hypothesis is that a drug is ineffective and that a statistically-significant outcome in a DBRCT allows one to reject that hypothesis.)

way the FDA approves drugs, the manner in which Pfizer studies and markets drugs, and the practice of medicine in general.  Given that Pfizer's source of *legal* revenue depends on the extrapolation of data from positive studies, it is obvious that this argument was concocted for this litigation.

**B.**   **PLAINTIFFS HAVE SUFFICIENTLY DEMONSTRATED THAT CHEAPER ALTERNATIVE DRUGS WOULD HAVE BEEN PRESCRIBED INSTEAD OF NEURONTIN ABSENT DEFENDANTS' MISREPRESENTATIONS**

Pfizer argues vainly that Plaintiffs have offered no evidence that doctors would have prescribed alternative drugs rather than Neurontin in the absence of misrepresentations by Defendants.  However, this Court, after reviewing all the evidence, found specifically that "Kaiser has proven that Pfizer's conduct caused it injury in the form of reimbursements for Neurontin prescriptions in excess of payments for alternative prescriptions that would have been made for more or equally effective, but less expensive medicines, in the absence of Pfizer's fraudulent marketing campaign."  *See* Findings at 4.  Further, Plaintiffs have introduced evidence sufficient to show that doctors would have prescribed cheaper alternative drugs rather than Neurontin absent Defendants' misrepresentations.  For instance, Dr. Mirta Millares, chair of Kaiser Health Plan's Drug Information Service ("DIS"), testified that Kaiser had other, significantly less expensive drugs on the formulary that would have been used for indications for which Neurontin was also used.  Dr. Millares testified in particular that Kaiser "had numerous tricyclic antidepressants called TCAs; [ ] had numerous narcotic analgesic agents; [ ] had numerous other anti-epileptic agents including Carbamazepine, Phenytoin, Valproic Acid, Lamotrigine; [ ] had the topical capsaicin cream; [ ] had lidocaine cream and a lidocaine patch called Lidoderm all on the formulary."  Trial Tr. vol. 9, 73:3-9; *see also* TX 327.  Relying on misleading information from a Parke-Davis employee, Kaiser lifted restrictions on Neurontin

that, until that point in 1999, had limited Neurontin's use for off-label indications.[7]  The Court

observed that Dr. Millares "credibly testified that, had DIS been aware of the undisclosed

information about Backonja [one of the clinical trials that was the subject of the misleading

communication], it would not have recommended that the P&T Committee lift the restrictions on

Neurontin."  *See* Findings at 68.  Accordingly, Pfizer's argument that Plaintiffs have failed to

prove that, in the absence of Pfizer's misrepresentations, cheaper alternative drugs would have

been prescribed instead of Neurontin is without merit.

## II. PLAINTIFFS SUBMITTED SUFFICIENT EVIDENCE OF DIRECT INJURY AND CAUSATION

### A. PLAINTIFFS PROVED A DIRECT RELATIONSHIP BETWEEN THEIR INJURY AND THE RICO VIOLATION

In addition to being a pure rehash of its first Rule 50 motion, filed after Kaiser presented

its evidence at trial,[8] Pfizer's lengthy discussion of RICO injury and causation is a sideshow,

perhaps more properly directed at other plaintiffs in other pharmaceutical fraud cases, but not to

Kaiser.  Here, the record is replete with Kaiser's direct reliance on Pfizer's misrepresentations,

rendering Pfizer's discussion of other recent third-party payor cases irrelevant.

Pfizer claims that the plaintiffs in *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121,

134 (2d Cir. 2010) ("*Zyprexa*"), presented a "theory of causation similar to" Kaiser's here.  *See*

Defs. Mem. at 9-10.  Pfizer also cites the Ninth Circuit's *Amgen* decision, reviewing a decision

on a motion to dismiss, where the panel found that the third-party payor plaintiffs had not alleged

direct links between fraudulent misrepresentations and the injury alleged.  *See United Food &*

*Commercial Workers Central Penn. & Regional Health & Welfare Fund v. Amgen, Inc.*, 400

---

[7] In finding that Kaiser suffered a legally-cognizable injury by relying upon Pfizer's intentional misrepresentations and omissions, the Court noted that, "[b]ecause Kaiser has a 95% compliance rate with its formulary, formulary restrictions necessarily affect the number of prescriptions written for any given drug."  Findings at 71.

[8] Kaiser incorporates its opposition to that motion.  *See* Dkt. No. 2692.

Fed. Appx. 255 (9th Cir. Oct. 21, 2010).  But, as this Court remarked, "Pfizer is gilding the *Lilly*."  Findings at 137.  As the Second Circuit stated in *Zyprexa*, "Crucially, the [plaintiff] TPP's do not allege that *they* relied on [defendants'] misrepresentations – the misrepresentations at issue were directed through mailings and otherwise at doctors."  *Zyprexa*, 620 F.3d at 134 (internal quotation omitted) (emphasis in original).  Here, unlike in *Zyprexa*, there is ample evidence of Kaiser's own reliance on Pfizer's misrepresentations.  The Court catalogued some of this evidence in its Findings, including a letter to Kaiser from Parke-Davis with misleading information about two neuropathic pain studies, another letter that omitted mention of the negative Pande study, direct contact between Kaiser and Pfizer through Pfizer's inquiry service, PMG doctors' attendance at CME conferences where Neurontin was promoted for off-label uses, and a letter to a PMG physician concerning Neurontin's use for neuropathic pain and migraine that failed to mention negative results from three migraine studies.  *See* Findings at 69-70.  When it decides it is convenient, Pfizer itself has relied on the fact of Kaiser's record of direct, first-party reliance in contrasting Kaiser to the actions of Aetna, Inc., another plaintiff in this litigation.  *See, e.g.*, Dkt. Nos. 3369, at 16-19 and 3395-1, at 11.

Pfizer ignores this evidence in persisting with its argument that Kaiser's injuries were remote from Pfizer's fraudulent conduct, defeating proximate causation.  Defs Mem. at 9. Pfizer mistakenly relies on the plurality decision from *Hemi Group, LLC v. City of New York*, 130 S. Ct. 983 (2010)[9] in arguing that proximate cause is lacking where a Court must consider independent intervening factors.  Pfizer overstates RICO's proximate cause requirement, which were succinctly explained by the Seventh Circuit only weeks ago in *BCS Svcs., Inc. v. Heartwood 88, LLC*, Nos. 10-3062; 10-3068, 2011 WL 1045853, at *8 (7th Cir. Mar. 24, 2011):

---

[9] Justice Ginsburg concurred in the judgment but explicitly did not join the proximate cause analysis of Chief Justice Roberts' opinion.  *See Hemi Grp.*, 130 S. Ct. at 995.

"Once a plaintiff presents evidence that he suffered the sort of injury that would be the expected consequence of the defendant's wrongful conduct," the requirement is satisfied.  Kaiser's injury was not only the expected consequence of the fraud, it was the intended consequence.  Under any standard, Kaiser's injury was sufficiently directly related to Pfizer's misconduct.

Faced with evidence of direct reliance, Pfizer attempts to introduce a series of artificial separations and breaks within Kaiser, but this too fails.[10]  As the Court noted in its Findings, "the formularies across the Kaiser regions are very similar, and certain formularies, like Kaiser's Medicare formulary, are identical across regions.  All of the P&T committees across Kaiser Permanente rely on the same evidence, rely on the DIS review of that evidence, rely on the same literature, and they make decisions on the products.  This was specifically true concerning Neurontin, which was on-formulary across all Kaiser regions."  Findings at 125.  There are no breaks in the causal chain.

Finally, in addition to showing that Kaiser directly relied on Pfizer's misrepresentations, Kaiser also proved that it was more likely than not that physicians wrote more Neurontin prescriptions than they would have absent the fraud.  As the Court noted in its Findings, Kaiser introduced evidence of its physicians' 95% compliance with the Kaiser formulary, such that a lifting of formulary restrictions on Neurontin usage led to a steady rise in prescriptions, and showed that Kaiser was able to reduce inappropriate Neurontin prescriptions through its DRUG and DUAT campaigns.  *See* Findings at 134-135.  Kaiser proved that with full information

---

[10] Even if there were not substantial evidence of Kaiser's first-party reliance, Kaiser's injuries would still be directly related to Pfizer's fraud.  As this Court has stated, under the clear holding of the Supreme Court's unanimous *Bridge* decision, "'first-party reliance' is not an element of a cause of action under RICO."  Memorandum and Order re Pfizer's Motion for Summary Judgment, Jan. 8, 2010 (Dkt. No. 2309) (citing *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 128 S. Ct. 2131, 2144, 170 L.Ed.2d 1012 (2008)).

concerning Neurontin's inefficacy for the off-label uses at issue, physicians would have written far fewer prescriptions.

### B.   PLAINTIFFS HAVE OFFERED SUFFICIENT EVIDENCE OF CAUSATION FOR ALL REGIONS

Pfizer erroneously charges Plaintiffs with failing to produce any evidence that PMGs other than the Southern California PMG ("SCPMG") lifted formulary restrictions on Neurontin in reliance on Defendants' misrepresentations. On the contrary, Plaintiffs have offered adequate evidence that the other PMGs lifted formulary restrictions on Neurontin in reliance on the misinformation provided by Pfizer to the DIS. While the Medicare formulary is uniform so that there is no issue as to it, Plaintiffs have shown that the regional formularies are "very, very similar"[11] in terms of the decision to add or remove restrictions on drugs. The Court has rightly determined that "Kaiser's DIS relied on Pfizer's direct misrepresentations to it, and on the positive information introduced into the published literature by studies funded by the defendants without the benefit of the negative trials sponsored and suppressed by defendant. This reliance was reflected in the drug monographs prepared by DIS, the direct communications between DIS's inquiry service and PMG physicians, and the communications to the P&T Committees." Findings at 130. There is no credible reason for revisiting this conclusion.

---

[11] *See, e.g.*, 2/26 Tr. (Carrejo) 99:13-102:19 (Northwest region); 110:17-23 (the DIS-prepared monographs are shared throughout Kaiser nationally and "there's monthly teleconferences between the formulary committees, the formulary personnel in each of the regions. Also, that monograph is archived and is available on our internal website"); 112:11-113:1 (Kaiser's "Medicare formulary is a [single] national formulary" and Kaiser's non-Medicare formularies are substantially similar between the Kaiser regions which is unsurprising because "specialists review the evidence in a given region and come to the same conclusion for the most part"); 3/3 Tr. (Hyatt) 103:7-104:1 (explaining how Neurontin P&T Committee information developed in one region was disseminated to other regions and his trips to other regions for this purpose; "The pharmacy and therapeutics chairs and staffs from all of the Kaiser regions meet on a regular basis"); 3/4 Tr. (Millares) 43:21-44:3 (DIS in Downey, CA provides information, monographs, and other services to "all of our Kaiser Permanente regions across the United States. We have mechanisms for doing that. We have also numerous inter-regional committees that meet over teleconference with other regions"); 45:6-25 (same); 3/5 Tr. (Millares) 93:2-18 ("all of the P&T Committees across Kaiser Permanente rely on the same evidence, rely on the Drug Information Services' review of that evidence, rely on the same literature. . . there's nuances that are different and some differences in the formulary status, but it's very, very similar").

### C.   PROFESSOR ROSENTHAL'S OPINION QUANTIFIES THE IMPACT OF PFIZER'S FRAUD

Pfizer attacked Professor Rosenthal's methodology and conclusions numerous times throughout this litigation.   During trial alone, Pfizer filed three briefs challenging Professor Rosenthal's opinions.[12]  Plaintiffs' responded to each attack.[13]  Defendants now repeat arguments that have been repeatedly rejected by the Court.  *See* Order re: Motion in Limine to Exclude the Testimony of Meredith Rosenthal, February 18, 2010, Dkt. No. 2520; *see also* Findings at 75-77.

Pfizer claims Professor Rosenthal is unqualified.  But the Court found otherwise.  At least twice.  Findings at 75 ("I find that she is a qualified expert."); Order re: Motion in Limine to Exclude the Testimony of Meredith Rosenthal, February 18, 2010 ("Dr. Rosenthal is qualified to render an opinion on the fact of harm, and her methodology is reliable.").

Pfizer claims it was inappropriate for Dr. Rosenthal to apply national data to Kaiser.  But the Court found that Dr. Rosenthal used 'gold standard' national data (Findings at 76) and that it was "reasonable for Dr. Rosenthal to apply the national percentages to Kaiser.  Indeed, the 16% bipolar estimate used by Dr. Rosenthal is quite close to Pfizer's own estimate in 2000 (14.7%) of the percentage of Neurontin prescriptions written to treat bipolar disorder."   Findings at 77 (citing TX 143 at 14).

Pfizer criticizes Dr. Rosenthal for not "analyzing" the impact of Pfizer's "delay or distortion of the results of scientific studies published in the literature."  Defs. Mem. at 15.  But

---

[12] *See* Pfizer's Mem. Sup. Motion *In Limine* to Exclude the Testimony of Meredith Rosenthal, January 8, 2010, Dkt. No. 2317; Reply Mem. Supp. Motion to Exclude Rosenthal and Hartman, DATE, Dkt. No.2439-2; Mem. Supp. Motion for Judgment as a Matter of Law Based Upon Lack of Sufficient Evidence of Injury of Causation, March 15, 2010, Dkt. No. 2671 at p. 14-20; Mem. Supp. Motion for Judgment as a Matter of Law Based Upon Lack of Sufficient Evidence to Prove Damages, March 15, 2010, Dkt. No. 2673.

[13] *See* Kaiser's Consolidated Opposition to Defendants' Motions *in limine* to Exclude the Testimony of Meredith Rosenthal and Raymond S. Hartman, January 23, 2010, Dkt. No. 2419; Opp. Motion for Judgment as a Matter of Law Based Upon Lack of Sufficient Evidence to Prove Damages, March 18, 2010, Dkt. No. 2693.

the Court found that "Pfizer designed the national strategy of off-label marketing (by promotional spending on detailing doctors and sponsorship of CME conferences) to implement its fraudulent publication strategy." *See* Findings at 77.  In light of the "compelling evidence in this case," the court concluded that Professor Rosenthal's assumption that promotional spending on off-label marketing was the same as the promotional spending on fraudulent off-label marketing "is reasonable, given the pervasive nature of the publication fraud that infected the nationwide sources of information available to all physicians, including PMG physicians, and to Kaiser's DIS."  Findings at 77.

Finally, Pfizer claims that the Second Circuit's decision in the *Zyprexa* litigation prevents Kaiser from using any form of aggregate proof of causation.  Defs. Mem. at 14, citing *Zyprexa*, 620 F.3d at 121.  But as the Court noted, *Lilly* pertained to the use of aggregate evidence in a class action context, not an individual TPP pursuing only its own claim.   Findings at 137. Accordingly, the Court noted that Professor Rosenthal's and Dr. Hartman's testimony was permitted for, *inter alia*, purposes of quantifying Defendants' fraud.  *Id.*

### D.    THE JURY AND THIS COURT FOUND THAT THE SCPMG AND ALL OF PLAINTIFFS' FORMULARY DECISIONS WERE INFLUENCED BY DEFENDANTS CONDUCT

Pfizer argues that Plaintiffs' evidence of causation was insufficient to sustain their burden because "the evidence at trial negated Plaintiffs' assertion that, with access to different information, DIS would have changed its recommendation and the SCPMG P&T Committee would have made different formulary decisions."  Defs. Mem. at 16.  However, it is well settled a question such as "the weight of the evidence" is a "matter[] for the factfinder." *Den Norske Bank AS v. First Nat'l Bank of Boston*, 75 F.3d 49, 58 (1st Cir. 1996).  Further, judgment as a matter of law is only appropriate if the evidence would preclude a reasonable jury from finding

in favor of the non-moving party.  *See* Fed. R. Civ. P. 50(a); *Trigano v. Bain & Co.*, 380 F.3d 22, 28 (1st Cir. 2004).

Contrary to Pfizer's assertions, Plaintiffs presented direct evidence supporting causation on SCPMG's formulary decisions.  As the Court held, "the Southern California P&T Committee reviewed Neurontin's formulary restrictions three times" and "[p]rior to each review, DIS prepared an updated drug monograph and have a recommendation as to the appropriate prescribing of Neurontin."  *See* Findings at 65.  Further, "Kaiser's P&T Committees and PMG Doctors relied on DIS research."  *Id.*

Pfizer claims the evidence falls in their favor with respect to neuropathic pain because: (1) DIS's 1997 recommendation regarding RSD was based on case reports and not DBRCTs; (2) DIS recommended the removal of restrictions with knowledge of the Gorson study and the unblinding issue in the Backonja trial; (3) Plaintiffs' continued to recommend Neurontin until 2010 even after the publication of the Reckless, POPP, and Serpell trials; and (4) Plaintiffs recommended generic gabapentin as a preferred off-label treatment for DPN and fibromyalgia. Defs. Mem. at 16-17.  Yet this ignores the Court's findings that "in preparing an updated drug monograph and recommending the removal of all restrictions in August of 1999, DIS relied on a communication with a Parke-Davis employee" that "failed to disclose (1) complete information about the negative Gorson trial and (2) complete information about the unblinding of the Backonja trial."   Findings at 67.  Further, the Court held that "Dr. Millares stated that DIS gave the Gorson letter less weight than the Level I evidence presented in the DBRCT" because it "was 'funky'" that it was only published as a letter to the editor and not in a peer-reviewed journal.  *Id.* at 68.  The Court found that "Dr. Millares credibly testified that, had DIS been aware of the undisclosed information about Backojna, it would not have recommended that the P&T

Committee lift the restrictions on Neurontin." *Id.* Dr. Millares's testimony was also supported by Dr. Dale Daniels, the chair of the committee, who testified "that had he known about the withheld information, he would not have voted to lift formulary restrictions." *Id.* This would have included relaxation of restriction on Neurontin "for the treatment of mood disorders, including bipolar disorder." *Id.* at 66.

Pfizer claims that since the time of the lawsuit "no PMG has revised its formulary to restrict access to Neurontin," obviating the need for reversal of the Court's findings and the jury's verdict. Defs. Mem. at 17. Pfizer cites to *Ironworkers* and several other court decisions as support.[14] However, contrary to the "hypothetical 'but for' world" that Pfizer's argument relies upon, in this case, the Court directly addressed the actions of the Plaintiffs with regard to their "DUAT and DRUG Campaigns." Findings at 71. The Court noted that Defendants introduced evidence regarding the failure to remove Neurontin from its formulary or impose restrictions, but held that "Pfizer unfairly demeans Kaiser's efforts to mitigate its injury." *Id.* Contrary to Defendants' argument, "Kaiser did vigorously pursue an information campaign to reduce off-label prescribing once it became aware of the off-label marketing campaign by Pfizer." *Id.* at 71-72. The Court noted the evidence of "making Neurontin a nondetailable product" and the DRUG "campaign to promote appropriate use of the drug." *Id.* at 72. After Kaiser learned of the

---

[14] All cases cited by Defendants are clearly distinguishable from the present matter and have no application here. In *Ironworkers*, *supra*, the evidence reflected that the TPP plaintiffs made the conscious business decision "not to require preauthorization review" in contradiction to the complaint which alleged that the insurers "could have required preauthorization review." *Ironworkers*, 2011 WL 833222 at *8. In *Prohias v. Pfizer, Inc.*, 485 F. Supp 2d 1329, 1334-35 (S.D. Fla. 2007), the court dismissed the individual plaintiffs' complaint because those individuals continued to pay for Lipitor even though deposition testimony reflected they knew the truth about the alleged lack of benefits for coronary disease, but took it for other benefits. Similarly, *Whalen v. Pfizer, Inc.*, No. 600125/05, 2005 WL 2875291 (N.Y. Sup. Ct. Sept. 22., 2005) has no application to this case because the plaintiff, seeking damages under New York's General Business Law, continued to use Listerine mouthwash as part of her daily routine with knowledge of the alleged misrepresentation by Pfizer that Listerine was "as effective as floss" and "clinically proven." Finally, *Tagliente v. Himmer*, 949 F.2d 1, (1st Cir. 1991) has no application here as it pertains to claims alleging fraudulent misrepresentations relating to a sale of a parcel of land, which the court determined were time barred.

whistleblower suit brought by Dr. David Franklin, "Kaiser escalated its efforts to promote appropriate prescribing of the drug." *Id.* at 72-73 (citing trial evidence). These materials "were shared with all Kaiser regions" and resulted in a 33-34% decrease in new starts of Neurontin, and "DRUG reported a 50% decrease in new starts" in the Southern California region. *Id.* This is direct evidence in the record, relied upon by the jury and the Court, of actual, not "hypothetical," behavior by Plaintiffs which was affected by Pfizer's misrepresentations and omissions.

In sum, Pfizer's argument that its conduct could not have caused any change in formulary decisions simply fails. To the contrary, the Court held "plaintiffs have proved that Kaiser relied on Pfizer's misrepresentations and omissions during development of drug monographs[.]" *Id.* at 68-69. As importantly, with regard to the evidence presented, the Court:

> found the testimony of Dr. Millares and Dr. Daniel to be credible. The publication strategies and other communications between Pfizer and Kaiser directly affected Kaiser's decisions about Neurontin's placement on its formulary without restrictions…. I find that Kaiser was injured as a result of its reliance on Pfizer's intentional misrepresentations and omissions.

*Id.* at 70-71. The Court and the jury gave proper weight to the evidence regarding the impact of Pfizer's conduct on Plaintiffs' formulary decisions, and Defendants have offered no proof to the contrary. The result must remain undisturbed.

### E.    PLAINTIFFS PRESENTED SUFFICIENT EVIDENCE OF CAUSATION

On page 18 of their brief, Pfizer argues, incorrectly, that neither "Plaintiffs' claim that 'Kaiser enjoys a 95% compliance rate to its formulary'… nor its argument that Neurontin prescriptions were reduced by 34% after two California PMGs undertook educational initiatives in 2002 supply the missing link in Plaintiffs' proof of causation." This proposition was rejected out of hand by the Court, which stated "the fact that there is a 95% compliance rate among PMG physicians with the Kaiser formulary is proof that PMG physicians would likely have changed their Neurontin prescribing behavior had DIS issued negative monographs and had the P&T

14

Committees made different decisions." *See* Findings at 134. Further, it found that "had DIS and the Southern California P&T committee been aware of the truth about Neurontin, Kaiser would not have removed prescribing restrictions in 1999." *Id.* Also, "based upon the fact that Kaiser did engage in the successful DRUG and DUAT campaigns starting in 2002 when it began to learn about Pfizer's fraudulent marketing, the Court finds that it is more likely true than not true that Kaiser would have taken action to reduce inappropriate Neurontin prescribing if had known the truth earlier by distributing evidence of the suppressed trials (like POPP, Reckless, Pande, and Frye) through its monographs and responses to physicians inquiries." *Id.* at 135. Hence, the Court found appropriate causation, and rejected Pfizer's arguments to the contrary.

Moreover, in addition to ignoring the Court's direct findings on causation, Pfizer mischaracterizes Dr. Rosenthal's testimony when they claim that "neither factor was even considered by Kaiser's causation expert." Defs. Mem. at 18. Indeed, the trial testimony of Dr. Rosenthal states that "to the extent that such initiatives are going on in the context of the physicians prescribing patterns that are captured by the VONA data, they may be in the background there[.]" 3/8 Tr. (Rosenthal) at 53:8-54:1. Thus, impliedly, any reduction would be captured in the national data she used. Further, there is no specific mention by Dr. Rosenthal in testimony cited by Pfizer that she did not consider the 95% factor as claimed.

Had Plaintiffs known the truth, it is more likely than not that prescribing behavior would have changed as a result of the 95% compliance rate with the formulary, and more likely than not that Plaintiffs would have taken action and reduced prescribing behavior, as evidenced by the 34% reduction as a result of Plaintiffs' initiatives starting in 2002 as Pfizer's fraud was exposed.

### III.   DR. HARTMAN PROPERLY MONETIZED KAISER'S DAMAGES

Pfizer criticizes Dr. Hartman's damages figures because they are based on Professor Rosenthal's model.  As discussed above, the Court properly accepted Professor Rosenthal's testimony.

Pfizer also claims that Dr. Hartman made "no attempt to determine whether physicians would have prescribed a drug other than Neurontin or what drugs they would have prescribed." Defs. Mem. at 19.  Pfizer is correct:  Dr. Hartman, an economist, did not offer such an opinion. Instead, he relied on the list of alternative drugs identified by Kaiser's DIS employee Ms. Millares.   The Court found that "Dr. Millares was a reliable source of information about alternative medications."  *See* Findings at 79.

### IV.   KAISER HAS PRESENTED SUFFICIENT EVIDENCE PROVING AN ENTERPRISE AND A PREDICATE RICO ACT

Pfizer recycles four arguments already submitted to this Court in Pfizer's March 15, 2010 Motion for Judgment as a Matter of Law (Dkt. Nos. 2668-2669) that Kaiser failed to prove a RICO enterprise or RICO act.  Pfizer contends:

> (i)    Kaiser failed to present sufficient evidence of conduct through an enterprise distinct from Defendants;
>
> (ii)   Kaiser failed to present sufficient evidence of conduct through an enterprise distinct from the alleged racketeering activity;
>
> (iii)  Kaiser failed to produce sufficient evidence of a predicate act; and
>
> (iv)   Kaiser should not have been allowed to submit a collection of documents to the jury to prove its RICO claim.

Defs. Mem. at 19.  Again, these arguments fail.  First, Kaiser presented evidence that Pfizer was engaged in ongoing enterprise with CDM and MAC and how that enterprise functioned as a

continuing unit.[15]   Second, Kaiser presented evidence of conduct through an enterprise distinct from the alleged racketeering activity because Kaiser showed that CDM and MAC engaged in an "ongoing organization" that constituted more than a series of criminal acts.[16]   Third, Kaiser produced more than sufficient evidence of a predicate act.   Kaiser's proof showed that Pfizer committed these predicate acts through (i) the publication enterprise,[17] (ii) the CDM enterprise,[18] and (iii) Pfizer's fraudulent detailing.[19]

Kaiser has already fully addressed Pfizer's four arguments above in its opposition to Pfizer's original motion for judgment as a matter of law and hereby incorporates the detailed arguments made in its March 18, 2010 memorandum [Dkt. 2694].

Pfizer also incorporates the arguments from its memorandum in support of its motion for a new trial (Dkt. No. 65, Case No. 04-10739).   There, Pfizer expounds on its argument that the collection of documents submitted to the jury during trial was somehow inappropriate.   *See* Defs. Mem. at Sec. I.A – F.   Kaiser addresses Pfizer's recycled arguments in Kaiser's opposition to Pfizer's motion for a new trial, also filed on April 19, 2011, and incorporates those arguments here as well.

---

[15] Crook Tr. at 199:3-200:3, Knoop Tr. at 41:23-43:16, 44:8-18, 37:21-24; 38:3-39:1; 41:23-43:16, Tive Tr. at 573:5-9, Cooper Tr. at 29:2-21, Valerio Tr. at 52:17-53:3, Glanzman Tr. at 182:24-183:15; 184:4-9; 184:17-185:9, Knoop (2002) Tr. at 44:8-18.

[16] Glanzman Tr. at 183:12-15, 184:17-22, Valerio Tr. at 52:17-53:3, Ex. 26 (Slides for "Second Quarter Face-to-Face Meeting"), Knoop Tr. at 41:23-43:16.

[17] Ex. 4 (Parke-Davis "Marketing Assessment Neurontin in Psychiatric Disorders" and cover memorandum), Ex. 7 (Parke-Davis "Marketing Assessment Neurontin in Neuropathic Pain and Spasticity" and cover memorandum), Ex. 216 (Parke-Davis "Marketing Assessment Neurontin in Migraine" and cover memorandum), Abramson Test., Day 3, 34:1-25; Glanzman Tr. at 235:18-236:3, Dickersin Test., Day 4, 63:22-65:11, 66:6-67:4,  48:22-24; 38:7-39:23, 41:10-44:3; 51:18-52:23, 71:7-72:4, 46:7-48:2, 50:3-51:1, Glanzman Tr. at 302:7-17, Abramson Test., Day 2, at 133:21-134:23, 132:10-25.

[18] Ex. 49, Ex. 75, Crook Tr. at 202:24-204:8; 204:16-205:5, Ex. 48, Ex. 100; Ex. 110; Ex. 360; Knoop Tr. at 300:17-302:6, Knoop (2008) Tr. 107:9-108:4, Ex. 68, Ex. 17, Ex. 43, Ex. 41, Ex. 361, Barkin Text., Day 5, 30:16-33:8; Abraham Test., Day 2, at 133:21-134:23, Ex. 100, Perry Test., 3/2/10, at 42:23 to 50:23, Ex. 43.

[19] Rosenthal Test., 3/5/10, at 138:7-10, Franklin Test., 3/12/10, at 64:13-65:1, Barkin Test, 2/26/10, at 29-30, Ex. 92 at WLC_CBU_040569, Exs. 44, 58, 92, 144.

## V.      PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS

Finally, Pfizer resurrects yet another issue already addressed by this Court, claiming that Plaintiffs' RICO claims are barred by the four-year statute of limitations.   In denying Defendants' Motion to Dismiss, the Court held that Kaiser's RICO claim was not barred by the statute of limitations.   *See* Report and Recommendation on Defendants' Motion to Dismiss the Amended Class Complaint and the First Coordinated Amended Complaint [269] at 56; Memorandum and Order [356].   Likewise, on Kaiser's UCL claim, the Court held expressly that Plaintiffs were not put on notice about their injuries until 2002, when the national press picked up a story about Dr. David Franklin's whistleblower suit against Pfizer.   Findings 121.   Plaintiffs will not now belabor the point, which has been fully briefed elsewhere.[20]

## <u>CONCLUSION</u>

For all the aforementioned reasons, Plaintiffs respectfully request that Defendants' Renewed Motion for Judgment as a Matter of Law be denied.

---

[20] *See* Joint Memorandum of Law of the Class and Coordinated Plaintiffs in Opposition to Defendants' Motion to Dismiss (Dkt. No. 101) at 35-39; Kaiser's Opposition to Defendants' Motion for Judgment as a Matter of Law Based Upon RICO Statute of Limitations (Dkt. No. 2695); Plaintiff Kaiser's Reply to Defendant Pfizer's Proposed Conclusions of Law (Dkt. No. 2813) at 15-17.

Dated: April 19, 2011                    Respectfully submitted,


                                         By:    */s/ Linda P. Nussbaum*
                                                Linda P. Nussbaum

                                         Linda P. Nussbaum, Esq.
                                         John D. Radice, Esq.
                                         GRANT & EISENHOFER, P.A.
                                         485 Lexington Avenue
                                         New York, NY 10017

                                         *Attorneys for Plaintiffs Kaiser Foundation*
                                         *Health Plan, Inc. and Kaiser Foundation*
                                         *Hospitals*


*Of Counsel*

Thomas M. Greene, Esq.
GREENE LLP
33 Broad Street, 5th Floor
Boston, MA 02109

Elizabeth Cabraser, Esq.
LIEFF CABRASER HEIMANN &
  BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339

Thomas M. Sobol, Esq.
HAGENS BERMAN SOBOL
  SHAPIRO LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 19, 2011, I caused a true and correct copy of **Plaintiffs' Memorandum of Law In Opposition to Defendants' Renewed Motion for Judgment as a Matter of Law** to be served upon all known counsel of record by electronic filing using the CM/ECF system.

 /s/ Linda P. Nussbaum          
Linda P. Nussbaum