UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:  NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1629 |
| | Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO: | Judge Patti B. Saris |
| KAISER FOUNDATION HEALTH PLAN, et al. v. PFIZER INC., 04 CV 10739 (PBS) | Magistrate Judge Leo T. Sorokin |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS'
RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW**

Mark S. Cheffo
SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
Four Times Square
New York, NY 10036
Tel:  (212) 735-3000

Raoul D. Kennedy
SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
Four Embarcadero Center
San Francisco, CA 94111
Tel:  (415) 984-6400


James E. Hooper
WHEELER TRIGG O'DONNELL LLP
1801 California Street
Suite 3600
Denver, CO 80202-2617
Tel:  (303) 244-1800

*Attorneys for Defendants Pfizer Inc and
Warner-Lambert Company LLC*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ii

ARGUMENT ...................................................................................................................1

I.     Plaintiffs Failed To Present Legally Sufficient Evidence Of Injury ...................................1

        A.     Plaintiffs Failed To Prove That No Patient Received A Benefit From Using Neurontin For The Off-Label Uses At Issue ................................1

        B.     Plaintiffs Failed To Prove That Cheaper, Alternative Drugs Would Have Been Prescribed Instead Of Neurontin ..................................................4

II.    Plaintiffs Failed To Present Legally Sufficient Evidence Of A Direct Injury Or Proximate Causation ...............................................................................5

        A.     Plaintiffs Failed To Prove A Direct Relationship Between Their Claimed Injury And The Alleged RICO Violation ...............................................5

        B.     Plaintiffs Offered No Evidence Of Causation For Any Region Other Than Southern California ..........................................................................8

        C.     SCPMG Formulary Decisions Were Not Caused By Any Of The Alleged Wrongful Conduct Attributed To Defendants .......................................9

        D.     Plaintiffs Presented No Other Evidence Of Causation .......................................10

III.   Defendants' Motion For Judgment Should Be Granted For The Additional Reasons Set Forth In Defendants' Opening Memorandum ............................................10

CONCLUSION................................................................................................................10

## TABLE OF AUTHORITIES

### CASES

*Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006) ...........................................................5, 8

*BCS Services, Inc. v. Heartwood 88, LLC*, ___ F.3d ___,
2011 WL 1045853 (7th Cir. Mar. 24, 2011) ....................................................................7

*Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008)............................................5, 7

*Couch v. Cate*, 379 F. App'x 560 (9th Cir. 2010) ..................................................................5, 8

*DDR Construction Services, Inc. v. Siemens Industries, Inc.*, ___ F. Supp. 2d ___,
2011 WL 982049 (S.D.N.Y. Mar. 22, 2011) ..................................................................6, 8

*District 1199P Health & Welfare Plan v. Janssen, L.P.*,
No. 10-2021, 2011 WL 1086004 (D.N.J. Mar. 21, 2011) ..................................................8

*Hemi Group, LLC v. City of New York*, 130 S. Ct. 983 (2010) .........................................5, 6, 7, 8

*Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992)..........................................5

*Ironworkers Local Union 68 v. AstraZeneca Pharmaceuticals, LP*,
634 F.3d 1352 (11th Cir. 2011).......................................................................................1

*UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121 (2d Cir. 2010)...........................................6

*United Food & Commercial Workers Central Pennsylvania & Regional*
*Health & Welfare Fund v. Amgen, Inc.*, 400 F. App'x 255 (9th Cir. 2010) ......................6

*In re Yasmin & YAZ (Drospirenone) Marketing, Sales Practices & Products Liability*
*Litigation*, MDL No. 2100, 2010 WL 3119499 (S.D. Ill. Aug. 5, 2010) ..........................8

ii

Pursuant to the Second Amended Post-Judgment Schedule [3372], Defendants Pfizer Inc. and Warner-Lambert Company LLC (collectively, "Pfizer" or "Defendants"), respectfully submit this Reply Memorandum of Law in Further Support of Defendants' Renewed Motion for Judgment as a Matter of Law.

## ARGUMENT

### I. Plaintiffs Failed To Present Legally Sufficient Evidence Of Injury

#### A. Plaintiffs Failed To Prove That No Patient Received A Benefit From Using Neurontin For The Off-Label Uses At Issue

As the Eleventh Circuit recently explained, a plaintiff cannot demonstrate an economic injury under the Racketeer Influenced and Corrupt Organizations Act ("RICO") merely by arguing that it "paid for a more expensive drug." *Ironworkers Local Union 68 v. AstraZeneca Pharms., LP*, 634 F.3d 1352, 1363 (11th Cir. 2011). "[W]hen a doctor prescribes a drug, he presumably does so only if, in the exercise of his independent medical judgment, he believes the drug will benefit his patient." *Id.* at 1362. "In light of physicians' exercise of professional judgment," there is no injury unless the prescription was "unnecessary or inappropriate according to sound medical practice – i.e., the drug was either ineffective or unsafe for the prescribed use." *Id.* at 1363. In response, Plaintiffs simply restate their argument that they presented double blind randomized control trials ("DBRCTs") in support of their claims. (Pl. Opp. [3421] at 4.) Plaintiffs fail, once again, to confront the fundamental flaws in their arguments.

Plaintiffs cannot prove inefficacy through reliance on negative DBRCTs because a negative study is only evidence that a drug's effectiveness over placebo or an active control was not statistically significant under the conditions of that study. Its results cannot be extrapolated to the entire patient population. (3/1 Tr. (McCrory) at 57:8-15; 3/16 Tr. (Brenner) at 44:15-45:10; 3/19 Tr. (Bird) at 34:21-25.) Dr. Carrejo conceded as much when he testified that the negative Pande and Frye studies were not sufficient evidence to allow Drug Information Services ("DIS") to reject the recommendations of Permanente Medical Group ("PMG") chiefs of

psychiatry in 2002 that PMG physicians be allowed to prescribe Neurontin for bipolar disorder. (3/3 Tr. (Carrejo) at 31:11-25.)

In response, Plaintiffs urge only that they should not be required to prove that Neurontin was ineffective in every patient for the off-label conditions at issue.  (Pl. Opp. at 4.)  But that is, in fact, Plaintiffs' burden.  It defies common sense for Plaintiffs to be able to recover the cost of a prescription that actually provided a benefit to the patient.  And it is the burden that Plaintiffs undertook when they chose to rely exclusively upon aggregate proof and resisted all attempts by Defendants to obtain and present at trial patient-specific evidence.  Were a Kaiser Health Plan member to bring a medical malpractice action against a PMG physician for prescribing Neurontin to treat neuropathic pain, that PMG physician would certainly defend the case by pointing to the patient's failure to tolerate or respond to other treatments, the patient's improvement on Neurontin, the physician's own clinical experience supporting his or her choice to prescribe Neurontin for the condition at issue, and the fact that Neurontin is routinely prescribed by the relevant medical community for the condition at issue.  Indeed, a claim by a patient seeking to recover for malpractice notwithstanding the fact that prescribing Neurontin was consistent with the standard of care and his condition improved on Neurontin would likely not survive summary judgment.  Yet, Plaintiffs argue in this lawsuit that, under the exact same set of facts, they should be able to recover the amounts paid by them for the Neurontin prescribed to that patient.

Unable to prove that ***none*** of the Neurontin prescriptions for which Plaintiffs seek to recover provided a benefit to ***any*** of the patients for whom they were prescribed, Plaintiffs sought to shift the burden of proof to Pfizer – arguing that only evidence of efficacy sufficient to satisfy FDA regulatory standards for approval could be considered by the Court or the jury.[1]  Not

---

[1] As noted in Defendants' opening memorandum, Defendants presented substantial evidence of efficacy, including DBRCTs, as well as Level II and Level III evidence.  The efficacy of Neurontin to treat neuropathic pain has recently been confirmed by the 2011 Cochrane Review, which looked at the same studies presented in this trial, accounted for any publication bias identified by Dr. Dickersin, and again concluded that there is sufficient evidence of Neurontin's efficacy in treating neuropathic pain.  (*See* Def. New Trial Mem. [3363] at 23-24.)

only was such a burden shift contrary to law, Plaintiffs advocated a standard that was different than the standard used by Plaintiffs and the PMGs when making formulary and reimbursement decisions.  Plaintiffs insisted throughout the trial that they pursue a policy of evidence-based medicine.  At the same time, the evidence made clear that DIS recommended, and the PMGs approved, formulary expansion based upon Level II and Level III evidence, and did so even with knowledge of negative DBRCTs.[2]  Indeed, even after suit was filed, Plaintiffs recommended generic gabapentin as a preferred, off-label treatment for diabetic peripheral neuralgia ("DPN") and fibromyalgia over Lyrica, a drug approved by the FDA for the treatment of those conditions.[3]

And, notwithstanding their litigation position that Neurontin was utterly ineffective for any of the off-label uses at issue in this litigation, neither Plaintiffs nor any PMG took any steps to restrict formulary access to Neurontin or gabapentin for off-label uses, even after this lawsuit was filed.  They did not remove gabapentin from formulary, refuse to reimburse for off-label uses, require pre-authorization, or preclude prescribing by certain specialties, such as psychiatrists.[4]  And even after this lawsuit was filed, Plaintiffs continued to recommend Neurontin to Kaiser members and PMG physicians as an effective treatment for neuropathic pain (as well as other off-label conditions), on Kaiser's website and in published guidelines.[5]  As of the date of trial, Plaintiffs had issued no guidelines against using Neurontin or gabapentin for any of the off-label uses at issue.  (3/4 Tr. (Millares) at 126:11-126:19).  Even the Neurontin initiative did not tell physicians that they should not prescribe Neurontin to treat neuropathic pain.  Instead, it only reiterated guidelines already in effect, that TCAs be tried first (DX557), and acknowledged that Neurontin and TCAs showed comparable efficacy in the treatment of neuropathic pain (DX747).

---

[2] *See, e.g.*, DX528; 3/3 Tr. (Carrejo) at 23:8-26:8; 3/4 Tr. (Millares) at 111:2-117:22; DX557; DX630.

[3] *See* DX798, 820, 828; 2/26 Tr. (Carrejo) at 138:14-141:5, 145:16-149:17; 3/2 Tr. (Carrejo) at 125:10-129:15.

[4] 3/4 Tr. (Millares) 119:7-23, 122:12-17, 124:8-16; 3/3 Tr. (Hyatt) 139:16-24; 3/4 Tr. (Hyatt) 11:15-12:10.

[5] DX 918A, 918; DX902A; 902B; 3/2 Tr. (Carrejo) at 138:6-139:7.

Plaintiffs try to avoid the contradictions between their conduct outside the courtroom and their litigation posture by relegating the inconvenient facts to the issue of mitigation of damages. (Pl. Opp. at 13-14.)  But the evidence that Plaintiffs knowingly and willingly continued to pay for Neurontin off-label prescriptions after filing this lawsuit, and actually recommended Neurontin for the off-label conditions at issue, goes far beyond Plaintiffs' failure to mitigate their damages.  Such evidence represents a real world recognition by Plaintiffs that sufficient evidence exists to support the decisions of PMG physicians to prescribe Neurontin for the off-label uses at issue.  The only other conclusion would be that, even after this lawsuit was filed, Plaintiffs encouraged, condoned and subsidized medical malpractice by PMG physicians.

The disconnect between the result in this litigation and the real world – allowing Plaintiffs to recover amounts paid for a medicine that even today is prescribed by physicians for the off-label uses at issue – was achieved only by employing an inappropriate standard of proof and shifting the burden to Defendants.  The implausible result is one that no reasonable jury could have reached on the evidence presented.

### B.    Plaintiffs Failed To Prove That Cheaper, Alternative Drugs Would Have Been Prescribed Instead Of Neurontin

Plaintiffs' argument that they presented sufficient evidence that cheaper, alternative drugs would have been prescribed (Pl. Opp. at 5-6) also fails, once again, to address their burden of proof.  The question is not whether other medicines were available, but whether other medicines would have been prescribed instead of Neurontin and whether such medicines would have been cheaper than Neurontin, considering not only the cost of the medicine but any additional monitoring costs associated with such drugs.  The testimony of Dr. Millares addressed only availability and, even then, did not identify all available alternatives, including branded drugs that were as expensive as (or more expensive) than Neurontin.  For example, although Plaintiffs cite Dr. Millares' testimony regarding various other drugs on formulary in 1999 to treat neuropathic pain, the only cost figures provided are for generic drugs.  (TX327.)  Even though Exhibit 327 identified Lamotrigine as an alternative treatment for neuropathic pain, and

Dr. Barkin identified it as an FDA-approved treatment for bipolar disorder (2/25 Tr. (Barkin) 125:1-8), no evidence was introduced that Lamotrigine, which was a branded drug during the relevant time frame, would have been cheaper than Neurontin.  In fact, although Dr. Barkin testified that there were ten drugs approved by the FDA for the treatment of bipolar disorder (*id.*), the list of alternative drugs provided by Plaintiffs to Dr. Hartman (TX365, 3/9 Tr. (Hartman) at 3-7) includes only three – all generic.  Lamotrigine is not included.

Further, the mere fact that alternative drugs were available does not mean they would have been prescribed in place of Neurontin.  Plaintiffs' "availability" evidence fails to account for patient and physician specific factors, such as whether certain drugs had previously been prescribed without success or were contraindicated for a particular patient.  Plaintiffs introduced no expert evidence addressing what alternative drugs, if any, would have been prescribed. Instead, Plaintiffs point only to the 1999 DIS monograph prepared for the Southern California PMG ("SCPMG") that recommended lifting formulary restrictions.  (Pl. Opp. at 5-6 (citing TX327).)  However, when formulary restrictions were lifted by SCPMG, prescribing guidelines were added, including that Neurontin should be prescribed only after TCAs, carbamazepine, and topical agents (i.e., lidocaine) had been tried.  (TX327.)  Accordingly, if PMG physicians were compliant with formulary guidelines, the "cheaper, alternative" drugs that Plaintiffs contend were available would have already been tried without success.

## II.  Plaintiffs Failed To Present Legally Sufficient Evidence Of A Direct Injury Or Proximate Causation

### A.  Plaintiffs Failed To Prove A Direct Relationship Between Their Claimed Injury And The Alleged RICO Violation

In *Hemi Group, LLC v. City of New York*, 130 S. Ct. 983 (2010), the Supreme Court reiterated its prior holdings in *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992), and *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006), and clarified the relation between those two decisions and its decision in *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008).  *See Hemi Group*, 130 S. Ct. at 988-94; *see also Couch v. Cate*, 379 F. App'x

560, 565 (9th Cir. 2010) ("The Supreme Court recently clarified that [RICO] proximate cause requires 'some *direct* relation between the injury asserted and the injurious conduct alleged' and explicitly rejected forseeability as a standard for determining proximate causation.") (citations omitted).  As one court recently explained:

> [T]he Supreme Court's January 2010 decision in *Hemi Group* . . . makes absolutely clear what is required to establish proximate cause in the RICO context, and what fails to meet that requirement.
>
> . . . .
>
> . . . *Hemi Group* establishes twin requirements for RICO proximate causation: (1) the injury alleged must, generally, be the "first step" harm caused by the conduct invoked.  [*Hemi Group*, 130 S. Ct.] at 989 (the "general tendency of the law, in regard to damages at least, is *not to go beyond the first step*." (emphasis added)).  And (2) the alleged conduct must be "directly responsible" for the harm alleged rather than simply allowing that harm to come about more easily.  *Id.* at 990.

*DDR Constr. Servs., Inc. v. Siemens Indus., Inc.*, ___ F. Supp. 2d ___, 2011 WL 982049, at *13-14 (S.D.N.Y. Mar. 22, 2011).[6]

Based upon *Holmes* and *Hemi Group*, both the Second and Ninth Circuits have rejected claims comparable to those asserted by Plaintiffs in this case.  *See UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 134 (2d Cir. 2010) ("*UCFW*"); *United Food & Commercial Workers Cent. Pa. & Reg'l Health & Welfare Fund v. Amgen, Inc.*, 400 F. App'x 255, 257 (9th Cir. 2010) ("*Amgen*").  In an attempt to distinguish this case from *UFCW* and *Amgen*, Plaintiffs argue that they presented evidence of direct reliance on Defendants' alleged representations.  (Pl. Opp. at 7.)  However, essentially conceding the insufficiency of direct reliance by either of the Plaintiffs in this case, Plaintiffs refer to attendance by PMG physicians at CME conferences or correspondence to PMG physicians.  (*Id.*)  But neither the thousands of PMG physicians who

---

[6] Plaintiffs argue that, if they present evidence of causation at each step in an attenuated chain, there is no problem of indirectness.  (Pl. Opp. at 8-9.)  Initially, as discussed in Defendants' opening memorandum and *infra*, Plaintiffs failed to present sufficient evidence to establish "but for" causation at every step.  More importantly, Plaintiffs' argument misconstrues *Hemi Group*, which holds that proximate causation may not be predicated on an indirect, attenuated chain of causation, *see* 130 S. Ct. at 989-90, and does not require a court to engage in a sufficiency analysis with respect to each link in the chain.

made the prescribing decisions at issue nor any of the 8 independent PMGs who made formulary decisions regarding Neurontin are parties to this action.   As a result, Plaintiffs' theory of causation depends upon the independent decision-making of third and fourth parties, and is at least as attenuated as that rejected by the courts in *Hemi Group*, *UFCW*, and *Amgen*, if not more so.

Plaintiffs' reliance on *BCS Services, Inc. v. Heartwood 88, LLC*, ___ F.3d ____, 2011 WL 1045853 (7th Cir. Mar. 24, 2011), is misplaced.   *BCS Services* is a later decision in the *Bridge* litigation, which was distinguished by the Supreme Court in *Hemi Group*.   *Bridge/BCS* involved competing bidders at a tax lien auction.   As the Supreme Court explained:

> A losing bidder alleged that a competitor had defrauded the county by employing shadow bidders to secure a greater proportion of liens than it was due. . . .   Because of the zero-sum nature of the auction, and because the county awarded bids on a rotational basis, each time a fraud-induced bid was awarded, a particular legitimate bidder was necessarily passed over.

*Hemi Group*, 130 S. Ct. at 992.   "[T]here were 'no independent factors that account[ed] for [the plaintiff's] injury.'"   *Id.* (second and third alterations in original) (quoting *Bridge*, 553 U.S. at 658).   After remand, the evidence showed that bids were not awarded on a rotational basis, but a random basis.   In *BCS*, the Seventh Circuit concluded that the difference between rotational and random awards of liens did not render the chain of causation indirect.   *See BCS Servs.*, 2011 WL 1045853, at *6.

*BCS* bears no resemblance to the instant case.   Unlike *BCS*, where the Seventh Circuit noted that cause and effect was essentially instantaneous, *see id.* at *1-2, *6, it is undisputed that causation in this case depends on the "independent actions of third and even fourth parties," *Hemi Group*, 130 S. Ct. at 992 – most notably the independent decisions by thousands of physicians to prescribe Neurontin.   As one court recently explained in another case involving a TPP seeking to recover for off-label prescriptions:

> In the instant case, multiple steps separate the alleged wrongful conduct (the fraudulent advertising campaign and/or the alleged bribery) and the alleged injuries (paying "too much" for "too many") YAZ prescriptions, including patient

preference, the independent judgment of the prescribing physician, and the reimbursement decision rendered by the third party payor and its benefits manager.

*In re Yasmin & YAZ (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig.*, MDL No. 2100, 2010 WL 3119499, at *7 (S.D. Ill. Aug. 5, 2010).

And, as Chief Justice Roberts explained in *Hemi Group*, a plaintiff "cannot escape the proximate cause requirement merely by alleging that the fraudulent scheme embraced all those indirectly harmed by the alleged conduct." 130 S. Ct. at 991. Likewise, in *Anza*, the Supreme Court rejected a "target" theory of causation similar to that advanced by Kaiser. *See Hemi Group*, 130 S. Ct. at 991 (observing that the *Anza* plaintiff "could not 'circumvent the proximate-cause requirement simply by claiming that the defendant's aim was to increase market share at a competitor's expense'") (quoting *Anza*, 547 U.S. at 460); *see also Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*, No. 10-2021, 2011 WL 1086004, at *11 (D.N.J. Mar. 21, 2011) (citing *Hemi Group* and observing: "Equally unpersuasive is Plaintiffs' argument [made by third-party payors] that they are the intended, foreseeable victim of Defendants' conduct."). As the Ninth Circuit recently observed: "*Hemi Group* definitively foreclosed RICO liability for consequences that are only foreseeable without some direct relationship." *Couch*, 379 F. App'x at 566; *see also DDR Constr.*, 2011 WL 982049, at *16 (noting that the Supreme Court rejected a foreseeability test in *Hemi Group*).

### B.   Plaintiffs Offered No Evidence Of Causation For Any Region Other Than Southern California

Plaintiffs' argument that they provided evidence of causation as to all regions (Pl. Opp. at 9) relies upon broad generalities insufficient to satisfy Plaintiffs' burden of proof. For example, Plaintiffs contend that "other PMGs *lifted formulary restrictions* on Neurontin in reliance on the misinformation provided by Pfizer to the DIS" (*id.* (emphasis added)), without addressing the fact that, unlike SCPMG, the Northern California PMG ("TPMG"), the Northwest Permanente ("NWPMG"), the Colorado Permanente Medical Group ("CPMG"), and the Southeast Permanente Medical Group ("SEPMG"), all added Neurontin to their formularies

***without restriction*** prior to 1997. (3/5 Tr. (Millares) at 12:2-4; DX840, Villaluz Aff. ¶¶ 4, 8, 18.) And, while Plaintiffs argue generically that DIS monographs were shared (Pl. Opp. at 9 n.11), they cannot escape that fact that not a single voting member of a P&T Committee outside the SCPMG testified regarding any relevant decision made about Neurontin. Other witnesses for the Plaintiffs repeatedly disavowed their ability to speak about decisions by other PMGs. For example, Dr. Carrejo testified:

> THE WITNESS: I don't know the history in the northwest. I didn't attend their P&T committee meetings, but it was never removed in the north or the south, Northern or Southern California.
>
> THE COURT: So, reading this, you don't know one way or another whether it was taken off altogether?
>
> THE WITNESS: I don't. It's speculation on my part.

(2/26 Tr. (Carrejo) at 143:20-144:2); *see also* 3/10 Tr. (Daniel) at 33:17-22 (conceding that to find out what happened in Ohio, testimony from someone on its P&T Committee would be required). The complete dearth of evidence tying formulary decisions by any PMG other than SCPMG to the alleged misrepresentations by Defendants requires that judgment be entered in Defendants' favor.

### C. SCPMG Formulary Decisions Were Not Caused By Any Of The Alleged Wrongful Conduct Attributed To Defendants

Plaintiffs allege that they presented sufficient evidence that formulary decisions would have been different if they had been provided different information when DIS monographs were prepared. (Pl. Opp. at 12-13.) Initially, the evidence that was offered on this issue was restricted to only one PMG (SCPMG), only two off-label uses (neuropathic pain and bipolar disorder) and supported by the testimony of only one voting member of the 1997 and 1999 SCPMG P&T Committee. (Def. Mem. [3367] at 16.) Moreover, the speculative testimony offered by Plaintiffs regarding what the SCPMG would have done with different information was thoroughly rebutted by evidence of what it did do – or failed to do – when it learned of the information allegedly withheld. As discussed in Defendants' opening memorandum, the

evidence showed that the SCPMG expanded formulary access to Neurontin notwithstanding the lack of DBRCT evidence of efficacy and made no attempt to restrict formulary access when presented with negative DBRCTs or after this lawsuit was filed.  Likewise, Plaintiffs took no action to have formulary access to Neurontin restricted.  As courts have repeatedly held, a jury cannot be permitted to speculate regarding what Plaintiffs might have done in a hypothetical "but for" world when such speculation is contradicted by empirical evidence of actual behavior by Plaintiffs.  Plaintiffs attempt to distinguish the cases cited by Defendants simply by describing them (Pl. Opp. at 13 n.14), but fail to address the fact that, in each case, the plaintiffs' conscious decision to continue paying for a product with knowledge of alleged misrepresentations defeated causation.  (Def. Mem. at 24.)

> **D.      Plaintiffs Presented No Other Evidence Of Causation**

The insufficiency of Plaintiffs' remaining evidence of causation, including the testimony of Dr. Rosenthal, the alleged formulary compliance rate, and the results of the Neurontin initiative have been thoroughly addressed in Defendants' prior memoranda.  Plaintiffs restate their prior assertions regarding the adequacy of such evidence without addressing any of the specific arguments raised by Defendants.

**III.   Defendants' Motion For Judgment Should Be Granted For The Additional Reasons Set Forth In Defendants' Opening Memorandum**

As to the additional grounds for this motion set forth in Sections III, IV and V of Defendants' opening brief, Defendants will rest on their opening brief and the related briefing incorporated therein.

<u>CONCLUSION</u>

For all of the foregoing reasons, Pfizer respectfully requests that the Court grant its Renewed Motion for Judgment as a Matter of Law and enter judgment in favor of Defendants.

Dated: May 3, 2011

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP

By:    /s/ Mark S. Cheffo
        Mark S. Cheffo
Four Times Square
New York, NY 10036
Tel:  (212) 735-3000
Email:  Mark.Cheffo@skadden.com

Respectfully submitted,

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP

By:    /s/ Raoul D. Kennedy
        Raoul D. Kennedy
Four Embarcadero Center
San Francisco, CA 94111
Tel:  (415) 984-6400
Email:  Raoul.Kennedy@skadden.com

WHEELER TRIGG O'DONNELL LLP

By:    /s/ James E. Hooper
        James E. Hooper
1801 California Street
Suite 3600
Denver, CO 80202-2617
Tel:  (303) 244-1800
Email:  hooper@wtotrial.com

*Attorneys for Defendants Pfizer Inc and
Warner-Lambert Company LLC*

---

CERTIFICATE OF SERVICE

     I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on May 3, 2011.

           /s/ Mark S. Cheffo
           Mark S. Cheffo

11