UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

In re:  NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION

MDL Docket No. 1629

Master File No. 04-10981

THIS DOCUMENT RELATES TO:

KAISER FOUNDATION HEALTH PLAN, et al. v. PFIZER INC., 04 CV 10739 (PBS)

Judge Patti B. Saris

Magistrate Judge Leo T. Sorokin

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
DEFENDANTS' MOTION FOR AMENDED AND ADDITIONAL FINDINGS**

Mark S. Cheffo
SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
Four Times Square
New York, NY 10036
Tel:  (212) 735-3000

Raoul D. Kennedy
SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
Four Embarcadero Center
San Francisco, CA 94111
Tel:  (415) 984-6400

James E. Hooper
WHEELER TRIGG O'DONNELL LLP
1801 California Street
Suite 3600
Denver, CO 80202-2617
Tel:  (303) 244-1800

*Attorneys for Defendants Pfizer Inc and
Warner-Lambert Company LLC*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................ii

I.     The Court's Findings Misstate The Evidence Regarding Plaintiffs' Corporate
       Structure And Relation To Non-Parties' P&T Committees And Formularies ..................1

II.    The Court's Findings Regarding The Purported "Marketing Fraud" Relate To
       Conduct With No Nexus To Plaintiffs' Claims ...............................................................2

       A.     No Nexus To CME Events Or Publications ...........................................................2

       B.     No Nexus To Detailing ........................................................................................3

III.   The Court's Findings Do Not Adequately Address Plaintiffs' Admissions
       Regarding Neurontin's Effectiveness .............................................................................3

IV.    The Court's Causation Findings Are Based On Speculative Inferences That Were
       Contradicted By The Evidence .......................................................................................4

       A.     95% Formulary Compliance Does Not Support A Finding Of Causation .............4

       B.     The Possibility That DIS Might Have Issued Materially Different
              Monographs Does Not Support A Finding Of Causation ......................................6

       C.     The DRUG/DUAT Initiative Does Not Support A Finding Of Causation ............6

V.     The Court Applied The Wrong Standard To Questions Of Inefficacy And Injury ............7

VI.    The Court's Findings Misstate The Evidence Regarding Neurontin Use By
       Patients With Bipolar Disorder .......................................................................................8

VII.   Other Evidence Cited By The Court Was Inadmissible Or Otherwise Failed To
       Provide A Legally Sufficient Basis For The Court's Findings .......................................10

VIII.  The Court's Conclusions of Law Should Be Amended To Correct Additional
       Errors of Law ...............................................................................................................10

CONCLUSION...................................................................................................................10

## TABLE OF AUTHORITIES

### CASES

*Fisher v. Kadant, Inc.,*
589 F.3d 505 (1st Cir. 2009) ................................................................1

*Laster v. T-Mobile USA, Inc.,*
No. 05cv1167, 2009 WL 4842801 (S.D. Cal. Dec. 14, 2009) ..................4

*McAdams v. Monier, Inc.,*
105 Cal. Rptr. 3d 704 (Ct. App. 2010) ...............................................10

*NSA Investments II LLC, v. SeraNova, Inc.,*
227 F. Supp. 2d 200 (D. Mass. 2002) ....................................................5

*Patriot Cinemas, Inc. v. General Cinemas Corp.,*
834 F.2d 208 (1st Cir. 1987) ..................................................................2

*PayPhone LLC v. Brooks Fiber Communications of Rhode Island,*
126 F. Supp. 2d 175 (D.R.I. 2001) ........................................................1

*Prohias v. Pfizer, Inc.,*
485 F. Supp. 2d 1329 (S.D. Fla. 2007) ..................................................4

*Quezada v. Loan Center of California, Inc.,*
No. CIV. 2:08-00177 WBS KJM, 2009 WL 5113506 (E.D. Cal. Dec. 18, 2009) ..................4

*Taylor v. Town of Freetown,*
479 F. Supp. 2d 227 (D. Mass. 2007) ....................................................5

*United Food & Commercial Workers Central Pennsylvania & Regional Health & Welfare Fund v. Amgen, Inc.,* 400 F. App'x 255 (9th Cir. 2010) ..........................10

*Whalen v. Pfizer, Inc.,*
862 N.Y.S.2d 812 (table), 2005 WL 2875291 (Sup. Ct. 2005) ...............4

### STATUTES

Fed. R. Civ. P. 52(b) ..............................................................................1

### OTHER AUTHORITIES

Report and Recommendation on Defendants' Motion To Dismiss, *In re Neurontin Marketing, Sales Practices, & Products Liability Litigation*, MDL No. 1629, No. 04-10981 (D. Mass. Jan. 31, 2006), ECF No. 269, *adopted in relevant part*, 433 F. Supp. 2d 172 (D. Mass. 2006) ....................................................8

Pursuant to the Second Amended Post-Judgment Schedule [3372], Defendants Pfizer Inc and Warner-Lambert Company LLC (collectively, "Pfizer" or "Defendants"), respectfully submit this Reply Memorandum of Law in Further Support of their motion, pursuant to Rule 52(b) of the Federal Rules of Civil Procedure, for amendments and additions to the Court's Findings of Fact and Conclusions of Law ("Findings") [3120].

## I.   The Court's Findings Misstate The Evidence Regarding Plaintiffs' Corporate Structure And Relation To Non-Parties' P&T Committees And Formularies

As shown in Defendants' opening brief, the Court's Findings fail to address the legal import of the distinction between Plaintiff Kaiser Foundation Health Plan, Inc. ("KFHP") and its non-California subsidiaries, which are not parties to this case.  (*See* Defs' Mem. [3365] at 1-2.) While Plaintiffs argue that they "brought suit on behalf of both parent and subsidiaries" (Pl. Resp. [3420] at 2), they did no such thing.[1]   The non-California subsidiaries are not even mentioned in the complaint.   Instead, Plaintiffs merely cite their allegation that "'As of December 2004, Kaiser Foundation Health Plan, Inc. had over 8.2 million members in nine states and the District of Columbia.'"  (*Id.* at 2 n.4 (quoting Third Coordinated Amended Complaint [583] ¶7).)  It is now undisputed that this allegation is incorrect.  KFHP does not have members outside of California.  (*See, e.g.*, Zatkin Decl. [2724-1] ¶¶ 1-3.)  The non-California members belong to KFHP's non-party subsidiaries.  (*See id.*)  Moreover, and regardless of what the complaint purports to do, Plaintiffs as a matter of law lack standing to bring suit on behalf of KFHP's non-party subsidiaries.  *See, e.g.*, *PayPhone LLC v. Brooks Fiber Commc'ns of R.I.*, 126 F. Supp. 2d 175, 179 (D.R.I. 2001).  Plaintiffs have ignored this argument.

Defendants' opening brief also demonstrated that the Court's Findings fail to address the factual and legal import of the distinction between Plaintiffs and the eight non-party regional Permanente Medical Groups ("PMGs").  (*See* Defs' Mem. at 1-3.)  In particular, the Court's

---

[1] It is now too late for Plaintiffs to move or for the Court to allow them to amend the complaint to add the non-party subsidiaries as additional plaintiffs.  "[O]nce judgment has entered, the case is a dead letter, and the district court is without power to allow an amendment to the complaint because there is no complaint left to amend." *Fisher v. Kadant, Inc.*, 589 F.3d 505, 509 (1st Cir. 2009).

erroneous findings that "Kaiser" has its own Pharmacy and Therapeutics ("P&T") Committees, maintains its own drug formulary, and made decisions regarding Neurontin's formulary status, resulted in the Court's equally erroneous conclusions regarding causation and injury.

Plaintiffs state that these arguments "ring hollow," but they do not seriously dispute them. (Pl. Resp. at 2.)  Instead, they assert that "Plaintiffs and the PMGs have an exclusive contractual relationship forming an integrated medical care services program under the trade name 'Kaiser Permanente.'"  (*Id.*)  This argument is fatally flawed for two reasons.  First, Plaintiffs' attempt to gloss over the PMGs' status as distinct non-party entities contradicts Plaintiffs' prior representation that each Plaintiff and each PMG "maintains full authority over its own work force and operations. . . . [T]hese entities are independent from each other."  (Pls' Opp. to Defs' Mot. to Preclude Live Testimony from PMG Doctors [2392] at 2, 6.)  Having previously asserted the PMGs' independence as the basis for denying Defendants access to critical trial witnesses, Plaintiffs cannot now argue that they and the PMGs form an "integrated" unit.[2]  Second, regardless of contractual relationships or trade names, Plaintiffs cannot establish causation with respect to the various PMGs' independent formulary decisions given that the various PMGs added Neurontin to their formularies both with and without restrictions prior to the conduct alleged by Plaintiffs to have been wrongful.  (Proposed Findings of Fact ("Defs' FoF") [2808-1] ¶¶ 14-20.)

## II.     The Court's Findings Regarding The Purported "Marketing Fraud" Relate To Conduct With No Nexus To Plaintiffs' Claims

### A.     No Nexus To CME Events Or Publications

Most of Plaintiffs' arguments on this issue are addressed in Section IV of Defendants' concurrently-filed reply memorandum in support of their motion for new trial, which Defendants

---

[2] Under the doctrine of judicial estoppel, "where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position."  *Patriot Cinemas, Inc. v. Gen. Cinemas Corp.*, 834 F.2d 208, 212 (1st Cir. 1987).  Judicial estoppel applies where, as here, "a litigant is 'playing fast and loose with the courts,' and when 'intentional self-contradiction is being used as a means of obtaining unfair advantage in a forum provided for suitors seeking justice.'"  *Id.* (citation omitted).

hereby incorporate.   One issue requires additional discussion.   Defendants' opening brief demonstrated that there is no basis for the Court's findings regarding an unspecified May 1999 CME purportedly attended by PMG doctors in the northwest region.   (Findings at 69-70.) Because Plaintiffs have never presented a shred of evidence regarding this CME's content, the notion that it involved fraudulent promotion or caused Plaintiffs any injury is pure speculation. (Defs' Mem. at 4.)   Plaintiffs have offered no response.   Accordingly, all references to this CME should be stricken from the Court's Findings.

> **B.**      **No Nexus To Detailing**

Plaintiffs argue that "[t]he evidence supports the Court's findings of a nexus between Pfizer's fraudulent detailing and Plaintiffs' injuries."  (Pl. Resp. at 5.)  But the Court did not find any such nexus, which is why its findings regarding purported fraudulent detailing to unidentified non-parties are irrelevant and should be stricken.   (*See* Defs' Mem. at 6.)   After Plaintiffs had rested, the Court observed:

> Your problem is that there's no data about detailing.  I'm not faulting anyone.
> There's just no data about detailing.  And so the fraud has to come in terms of the
> publication fraud and the fraud in CMEs and in teleconferences and in the
> communications to DIS and DIS's reliance on the publications.

(3/19 Tr. (Court) at 221:5-10.)  The Court made this observation nearly a month after Dr. Carrejo testified about unspecified detailing at a single Kaiser Hospitals facility in Oakland (*see* 2/26 Tr. (Carrejo) at 98:7-9), belying Plaintiffs' suggestion that Dr. Carrejo's testimony was "adequate" proof of a causal nexus.  (Pl. Resp. at 5.)  Plaintiffs' argument that fraudulent detailing to PMG doctors can be assumed by virtue of a "training regimen" is rank speculation.  (*Id.*)

## III.   The Court's Findings Do Not Adequately Address Plaintiffs' Admissions Regarding Neurontin's Effectiveness

Plaintiffs' continued acknowledgements of Neurontin's benefits for the relevant conditions, long after learning all the information they contend they once did not know, constitute admissions that rebut Plaintiffs' claims of materiality, reliance and causation.  (Defs' Mem. at 7.)  Unable to respond to this argument, Plaintiffs rephrase it as follows:

> In other words, Pfizer believes that simply because Neurontin has benefits *for indicated conditions*, and Plaintiffs permitted use of Neurontin *for indicated conditions*, a causal link is destroyed.

(Pl. Resp. at 6 (emphasis added).)   Plaintiffs' strawman ignores the voluminous evidence showing that they allowed, paid for, and specifically encouraged the use of Neurontin for the *non-indicated* conditions at issue in this case, and continued to do so throughout the life of this litigation.  (*See* Defs' FoF ¶¶ 35, 42-56.)

Plaintiffs also (erroneously) argue that DIS was somehow misled by the purported suppression of the Backonja and Gorson studies.  (Pl. Resp. at 6.)  This misses the point entirely. Plaintiffs attacked the Gorson study in their 2005 first amended complaint [31], and attacked the Backonja study in their 2006 third amended complaint [583], yet they continued recommending Neurontin use for the relevant *non-indicated* conditions through the time of trial in 2010.

As numerous courts have held, Plaintiffs' conduct negates any causal nexus as a matter of law.[3]  Plaintiffs' token effort to distinguish these cases (*see* Pl. Resp. at 7 n.9) is based on circular logic, *i.e.*, the assumption that Plaintiffs herein have proven causation whereas the plaintiffs in these other cases could not.   But Plaintiffs' continued payments for and encouragement of off-label Neurontin prescriptions, years after learning of the allegedly manipulated or suppressed studies, precludes them from proving causation just as similar conduct did in the cases cited by Defendants.  Plaintiffs cite no authority to the contrary.

## IV.   The Court's Causation Findings Are Based On Speculative Inferences That Were Contradicted By The Evidence

### A.   95% Formulary Compliance Does Not Support A Finding Of Causation

Plaintiffs spuriously contend that "Pfizer ignores evidence presented through trial that, in fact, 95% of the prescriptions were formulary compliant."  (Pl. Resp. at 8.)  To the contrary, Defendants demonstrated that Plaintiffs did not present any such evidence.  (*See* Defs' Mem. at

---

[3] *See Quezada v. Loan Ctr. of Cal., Inc.*, No. CIV. 2:08-00177 WBS KJM, 2009 WL 5113506, at *5 (E.D. Cal. Dec. 18, 2009); *Laster v. T-Mobile USA, Inc.*, No. 05cv1167, 2009 WL 4842801, at *7-8 (S.D. Cal. Dec. 14, 2009); *Prohias v. Pfizer, Inc.*, 485 F. Supp. 2d 1329, 1336 (S.D. Fla. 2007); *Whalen v. Pfizer, Inc.*, 862 N.Y.S.2d 812 (table), 2005 WL 2875291, at *3 (Sup. Ct. 2005).

Section IV.A.)  Instead, they produced an internal memo that fleetingly references a never-produced study that purportedly concluded that "formulary compliance by physicians is about 96%."  (PX 323.)  Some of Plaintiffs' witnesses parroted this statistic, but none explained or substantiated it.  Plaintiffs do not dispute that they failed to introduce the underlying study into evidence, failed to provide any information regarding the study's data, geographical scope, time period, or methodology, and failed to present any expert testimony about the accuracy or reliability of the study's conclusions or how they might apply to the issue of causation.

If Defendants had produced internal memos quoting undisclosed internal studies regarding efficacy or marketing issues, Plaintiffs probably would not have viewed such memos as competent or legally sufficient evidence of the matters asserted.  Likewise, conclusory and hearsay statements regarding Plaintiffs' never-produced formulary compliance study cannot satisfy their burden of proving causation.  *See, e.g.*, *Taylor v. Town of Freetown*, 479 F. Supp. 2d 227, 240 (D. Mass. 2007) (Saris, J.) (holding that plaintiff's hearsay statements did not raise questions of fact); *NSA Invs. II LLC, v. SeraNova, Inc.*, 227 F. Supp. 2d 200, 208 (D. Mass. 2002) (Saris, J.) (holding that "a conclusory statement, grounded only in hearsay . . . does not suffice to create a disputed issue of fact").

Even accepting Plaintiffs' 95% figure at face value would not satisfy their burden of proving causation.  Standing alone, that statistic does not prove that PMG doctors even consult the formulary, let alone base prescription decisions on drugs' formulary status.  Given that many PMGs do not even utilize formulary restrictions (*see, e.g.*, 3/9 Tr. (Daniel) at 95:1-5), the asserted fact that 95% of prescriptions are formulary compliant is utterly unremarkable and likely coincidental.

Plaintiffs also fail to explain away the logical contradiction at the heart of their arguments regarding the 95% formulary compliance figure.  Plaintiffs' suggestion that "initial restrictions *do* alter physicians behavior" while subsequent restrictions would have no effect (Pl. Resp. at 8 (emphasis in original)) is self-contradictory because it assumes that PMG doctors comply with formulary restrictions regardless of their independent medical judgment.  If Plaintiffs instead

5

concede that doctors will ignore the formulary when they believe that a non-formulary drug is effective, then formulary status is useless in predicting physician behavior and individualized, doctor-specific evidence is required.  Plaintiffs' argument is also self-defeating because they do not dispute that most regional PMGs initially placed Neurontin on their formularies without restriction prior to any of Defendants' alleged misconduct.  By Plaintiffs' own logic, any subsequent restrictions in these regions would not have curtailed Neurontin prescribing, making Defendants' purported contacts with DIS irrelevant for all regions except Southern California.  In sum, all references to the 95% figure should be stricken from the Court's findings.

**B.      The Possibility That DIS Might Have Issued Materially Different Monographs Does Not Support A Finding Of Causation**

After accusing Defendants of "intentionally mischaracterize[ing]" the Court's findings regarding DIS monographs, Plaintiffs proceed to mischaracterize Defendants' argument.  (Pl. Resp. at 9.)  The issue is not just whether the PMGs would have "removed" Neurontin from their formularies had they received materially different monographs (*id.*), but whether such knowledge would have caused them to "restrict[] formulary access to Neurontin" while keeping the drug on formulary for FDA-approved indications.  (Defs' Mem. at 9.)  The evidence shows that they would not have.  To the contrary, in response to a new monograph stating that that there were no DBRCTs establishing Neurontin's efficacy in treating bipolar disorder, and that two DBRCTs (Frye and Pande) were negative, the Southern California PMG added no new restrictions and the Ohio PMG expanded formulary restrictions to permit the use of Neurontin as a third-line agent in bipolar disorder (DX630) – facts that Plaintiffs utterly fail to address.

In short, there is no evidence that different monographs alone – without any resulting change in formulary status – would have affected PMG doctors' prescribing decisions. Plaintiffs' speculation regarding the purported "importance" of monographs to unidentified non-party PMG doctors (Pl. Resp. at 9) is not evidence of causation.

**C.      The DRUG/DUAT Initiative Does Not Support A Finding Of Causation**

Plaintiffs fail to show that any inference can be drawn from the 34% reduction in

Neurontin prescriptions attributed by Plaintiffs to the Neurontin initiative in 2002, or that the 34 percent figure can be extrapolated to earlier years, when Neurontin usage was less. Notwithstanding Plaintiffs' litigation position that Neurontin was utterly ineffective for any of the off-label uses at issue in this litigation, the Neurontin initiative undertaken in 2002 did not tell physicians that they should not prescribe Neurontin to treat neuropathic pain.  Instead, it only reiterated guidelines already in effect, that TCAs be tried first (DX557), and acknowledged that Neurontin and TCAs showed comparable efficacy in the treatment of neuropathic pain (DX747). After the Neurontin initiative, and even after filing this lawsuit, Plaintiffs continued to recommend Neurontin to Kaiser members and PMG physicians as an effective treatment for neuropathic pain (as well as other off-label conditions), on their website and in published guidelines.[4]  As of the date of trial, Plaintiffs had issued no guidelines against using Neurontin or gabapentin for any of the off-label uses at issue.  (3/4 Tr. (Millares) at 126:11-126:19).  All of these facts show that the Neurontin initiative was cost-driven, not efficacy driven.

## V.    The Court Applied The Wrong Standard To Questions Of Inefficacy And Injury

Plaintiffs do not seriously dispute that the Court evaluated the issue of efficacy in this case by applying the same standard used by the FDA when evaluating drugs for on-label indications.  (*See* Defs' Mem. at Section V.)  They instead claim that the FDA standard – *i.e.*, two positive DBRCTs – "dovetails" with "the generally accepted standard for efficacy in the scientific community."  (Pl. Resp. at 10.)  But Plaintiffs fail to address undisputed evidence to the contrary, which shows that: (a) neither DIS nor the regional PMGs require DBRCTs when making formulary recommendations and decisions; (b) physicians consider multiple sources, types, and levels of scientific evidence for purposes of clinical decision-making; (c) off-label prescribing – even without sufficient DBRCT evidence to satisfy the FDA standard for on-label indications – is often the standard of care, especially for certain indications, such as neuropathic pain, for which there are few, if any, FDA-approved medications; (d) the FDA itself recognizes

---

[4]  DX 918A, 918; DX902A; 902B; 3/2 Tr. (Carrejo) at 138:6-139:7.

that drugs can be effective in some patients even where evidence sufficient for FDA approval does not exist, and permits physicians to prescribe drugs off-label. (Defs' Mem. at 13-14.) Plaintiffs also fail to explain how the FDA standard can be applied to the efficacy issues in this case given that the Cochrane Group has now reviewed the same evidence presented to the Court and jury and has again concluded that Neurontin is an effective treatment for off-label neuropathic pain conditions. (*See* 2011 Cochrane Review [3362-1].)

Plaintiffs argue that "[t]he issue that the Court considered was whether Pfizer misrepresented the scientific evidence about Neurontin's efficacy for off-label uses." (Pl. Resp. at 11.) While that was one issue in the case, Plaintiffs were also required to prove that Neurontin "was ineffective." Report and Recommendation on Defendants' Motion To Dismiss at 22, *In re Neurontin Mktg., Sales Practices, & Prods. Liab. Litig.*, MDL No. 1629, No. 04-10981 (D. Mass. Jan. 31, 2006), ECF No. 269, *adopted in relevant part*, 433 F. Supp. 2d 172 (D. Mass. 2006). They complain that requiring proof of inefficacy for all patients would "create an impossible standard" (Pl. Resp. at 10), but Plaintiffs voluntarily undertook this burden by pursuing their claims on an aggregate basis. The Court found that some patients likely benefited from off-label Neurontin use. (*See* Defs' Mem. at 12.) Plaintiffs produced no evidence capable of determining which or how many of their members did or did not benefit. Because Plaintiffs have the burden of proving causation and injury, this lack of evidence is fatal to their claims.

## VI.   The Court's Findings Misstate The Evidence Regarding Neurontin Use By Patients With Bipolar Disorder

Plaintiffs argue that social phobia is an anxiety disorder and is thus "completely irrelevant to the issue of Neurontin's inefficacy for bipolar and mood disorders." (Pl. Resp. at 12.) Plaintiffs' response ignores the real significance of Neurontin's undisputed efficacy in treating social phobia disorder. This evidence proves that: (1) there are non-fraudulent reasons for discussing Neurontin use with psychiatrists; and (2) there are legitimate scientific reasons for prescribing Neurontin to bipolar patients who also suffer from comorbid social phobia disorder. (*See* Defs' Mem. at 15.) Plaintiffs do not dispute either point.

Plaintiffs also argue that, because the ICD-9 codes Plaintiffs' counsel instructed Prof. Rosenthal to use purportedly "excluded codes for social phobia," it follows that Plaintiffs' "causation and damages evidence is specific to bipolar mood disorders."  (Pl. Resp. at 12, 14.) This strawman response fails for two reasons.  First, Plaintiffs ignore the strong likelihood that some indeterminate number of patients with a primary diagnosis and ICD-9 code of bipolar disorder were prescribed Neurontin to treat comorbid social phobia.  (*See* Findings at 34 n.9 (recognizing that social phobia is "comorbid" with bipolar disorder.).)  Second, Plaintiffs ignore the undisputed fact that their ICD-9 codes included depression and that, whereas "bipolar disorder is quite rare," "[d]epression is quite prevalent."  (3/8 Tr. (Rosenthal) at 84:22-85:24; PX405N.)  Plaintiffs have offered no response to these arguments.  Instead, they inappropriately seek to shift the burden of proof by arguing that "Pfizer's stable of litigation experts provided no ICD-9 code classification that it contended was any more appropriate."  (Pl. Resp. at 14.)  But Plaintiffs, who have the burden of proving causation and injury, presented no expert testimony whatsoever in support of their counsel's selection of ICD-9 codes, and their own experts admitted that Plaintiffs' counsel's selection was over-inclusive.  (*See, e.g.*, 3/9 Tr. (Hartman) at 40:10-12 (testifying that Prof. Rosenthal's estimate "includes conditions other than bipolar").)

Plaintiffs cite the Court's reference to Pfizer's estimate of bipolar utilization in the year 2000.  (*See* Pl. Resp. at 14 (citing Findings at 77 n.19).  However, Pfizer's "14.7%" estimate related to bipolar and "schizoaffective disorders" combined (PX 143 at 14), with bipolar alone accounting for just "12.7%" (*id.* at 15).  Moreover, Prof. Rosenthal's 16% bipolar utilization figure was an average over time; her estimates of bipolar utilization during the year 2000 alone were much higher, at 17.6% when the data from all four quarters are combined.  (PX408F.) While the Court (erroneously) viewed Pfizer's outdated national estimate as supporting Prof. Rosenthal's failure to consider Kaiser's own chart review, which showed just 4% bipolar utilization by Kaiser members (DX 692 at 13), the Court did not suggest that Pfizer's estimate could justify using overly broad ICD-9 codes that include depression and inevitably result in grossly inflated bipolar utilization figures.

**VII.    Other Evidence Cited By The Court Was Inadmissible Or Otherwise Failed To Provide A Legally Sufficient Basis For The Court's Findings**

As to the additional grounds for this motion set forth in Section VII of Defendants' opening brief, Defendants will rest on their opening brief and related briefs incorporated therein.

**VIII.   The Court's Conclusions of Law Should Be Amended To Correct Additional Errors of Law**

The Court incorrectly relied upon *McAdams v. Monier, Inc.*, 105 Cal. Rptr. 3d 704 (Ct. App.  2010), in holding Plaintiffs to a relaxed burden of proof on the essential element of reliance.  (Defs' Mem. at 18-19.)  Plaintiffs do not defend the Court's reliance on *McAdams*, but argue that it is not grounds for relief because the Court "actually relied on the California Supreme Court's explanation of the UCL's reliance requirement in *In re Tobacco II*."  (Pl. Resp. at 18.)  This ignores the issue.  The Court explicitly and erroneously construed *McAdams* as holding that the reliance requirement described in *In re Tobacco II* could be applied "less stringent[ly]" to Plaintiffs herein.  (Findings at 130.)  This was error because *McAdams* addressed the claims of absent class members, not named plaintiffs.  Plaintiffs provide no argument or authority to the contrary.

Plaintiffs also argue that *United Food & Commercial Workers Central Pennsylvania & Regional Health & Welfare Fund v. Amgen, Inc.*, 400 F. App'x 255 (9th Cir. 2010), is inapposite because they purportedly provided evidence of direct promotion and reliance.  (Pl. Resp. at 18-19.)  But despite this attempted factual distinction, Plaintiffs identify no "independent statutory or fiduciary duty to disclose," which the Ninth Circuit held was required.  *United Food*, 400 F. App'x at 257.  Moreover, Plaintiffs presented no evidence that the marketing activities discussed in the Court's Findings had any nexus to their claims (*see* Defs' Mem. at Section II), and cite no authority holding that purported marketing to non-parties triggers an "independent statutory or fiduciary duty to disclose" information to the named plaintiff.

**CONCLUSION**

For all of these reasons, Defendants respectfully request that the Court amend and make additions to its Findings of Fact and Conclusions of Law.

10

Dated: May 3, 2011

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP

By:    /s/ Mark S. Cheffo
        Mark S. Cheffo
Four Times Square
New York, NY 10036
Tel: (212) 735-3000
Email: Mark.Cheffo@skadden.com

Respectfully submitted,

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP

By:    /s/ Raoul D. Kennedy
        Raoul D. Kennedy
Four Embarcadero Center
San Francisco, CA 94111
Tel: (415) 984-6400
Email: Raoul.Kennedy@skadden.com

WHEELER TRIGG O'DONNELL LLP

By:    /s/ James E. Hooper
        James E. Hooper
1801 California Street
Suite 3600
Denver, CO 80202-2617
Tel: (303) 244-1800
Email: hooper@wtotrial.com

*Attorneys for Defendants Pfizer Inc and
Warner-Lambert Company LLC*

---

**CERTIFICATE OF SERVICE**

     I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on May 3, 2011.

               /s/ Mark S. Cheffo
               Mark S. Cheffo