IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


IN RE:                             )
                                   ) CA No. 04-10981-PBS
NEURONTIN MARKETING, SALES PRACTICES,) Pages 1 - 50
AND PRODUCTS LIABILITY LITIGATION    )



MOTION HEARING

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
May 4, 2011, 9:40 a.m.




LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 7200
Boston, MA  02210
(617)345-6787

1    A P P E A R A N C E S:

2

     FOR THE PLAINTIFFS:

3
          THOMAS M. SOBOL, ESQ. and EDWARD NOTARGIACOMO, ESQ.,
4    Hagens Berman Sobol Shapiro, LLP, 55 Cambridge Parkway,
     Suite 301, Cambridge, Massachusetts, 02142.

5
          THOMAS M. GREENE, ESQ. and ILYAS J. RONA, ESQ., Greene, LLP,
6    33 Broad Street, Boston, Massachusetts, 02109.

7

     FOR THE DEFENDANTS:

8
          KATHERINE ARMSTRONG, ESQ., MARK S. CHEFFO, ESQ., and
9    DAVID S. WEINRAUB, ESQ., Skadden, Arps, Slate, Meagher & Flom,
     LLP, Four Times Square, New York, New York, 10036.

10
     ALSO PRESENT:

11
          LINDA P. NUSSBAUM, ESQ., Grant & Eisenhofer, PA,
12   485 Lexington Avenue, 29th Floor, New York, New York, 10017.

13

14

15

16

17

18

19

20

21

22

23

24

25

1             P R O C E E D I N G S

2        THE CLERK:  Court calls civil action 04-10981,

3   In Re:  Neurontin Marketing Hearing.  Could counsel please

4   identify themselves for the record.

5        MR. SOBOL:  Good morning, your Honor.  Tom Sobol for

6   the class plaintiffs.

7        MR. NOTARGIACOMO:  Ed Notargiacomo for the class

8   plaintiffs.

9        MR. GREENE:  Tom Greene for the class plaintiffs.

10        MR. RONA:  Ilyas Rona for the class plaintiffs.

11        MS. ARMSTRONG:  Katherine Armstrong for the

12   defendants.

13        MR. CHEFFO:  Good morning, your Honor.  Mark Cheffo

14   for defendants.

15        MR. KENNEDY:  Good morning, your Honor.  David

16   Weinraub for defendants.

17        THE COURT:  Good.  All right, so one of the last

18   things I have pending in this litigation on the sales and

19   marketing side, I believe, is this motion for reconsideration.

20   I believe at one of our hearings Mr. Sobol urged me to have a

21   hearing on it, or maybe it was Mr. Greene -- I'm not sure who

22   it was -- so I'm doing it.  But the big question at the end of

23   the day is, what's left of this in terms of who would be a

24   class rep and that sort of thing?

25        MR. SOBOL:  Okay.  I'm not going to really rely an

1    awful lot on the slides.  The slides might aid you after the

2    hearing, okay?

3        THE COURT:  Good, thank you.  Actually, I don't know

4    who the people were who slave over these slides.  I actually do

5    look at them as a good synopsis at the end, so I appreciate

6    when people do that.

7        MR. SOBOL:  Mr. Cheffo has wised up to it too, so he

8    has his own slides as well, your Honor.

9        THE COURT:  It's useful while I'm here, but it's also

10   really useful afterwards because sometimes I don't get to it

11   for a month, and it's the main points, so thank you for them.

12       MR. SOBOL:  So procedurally, first, I want to put

13   everything in context to address the question you just asked,

14   what would be left and where are we?  The Kaiser case, as you

15   know, the Kaiser, there are some post-trial/post-judgment

16   motions that are under way.  When, as, and if those are acted

17   upon, if the parties haven't resolved the case, that will go up

18   to the First Circuit.  That resolves the Kaiser matter.

19       There were two other coordinated plaintiffs.  There

20   was Guardian and Aetna.  Judgment dismissing those claims in

21   each of those cases has been entered.  I think that the time

22   clock is actually now running.  I'm not sure, but I think the

23   time clock is running for an appeal to be filed there, if there

24   is to be any appeal, so that's resolved.

25       On the class side, there remains this issue before

1    you, which is the motion for reconsideration on class.

2    Procedurally where we are there is that -- and, by the way, let

3    me put it this way:  I know I have a heavy burden today, right,

4    because I was thinking of this on the way over here.  You've

5    denied class certification twice.  You've entered summary

6    judgment on all the third-party payors on the class side.  You

7    have two jobs in two different cities, both of which are full

8    time, and you're trying to clean off your docket, and so I have

9    a heavy burden.

10           THE COURT:  Although that will not govern the merits.

11           MR. SOBOL:  Thank you very much.

12           THE COURT:  You all have been my top priority actually

13   for a decade, and indeed for Neurontin it goes back to 1996 or

14   so, right?  So it may take me longer, but it will still -- I

15   mean, I'll do what needs to be done by the cases.

16           MR. SOBOL:  And if it were not our firm belief,

17   actually, that this part of the Neurontin case, which I'm going

18   to describe now, what we're actually after should be done, then

19   we would not be before you.

20           So specifically what we're urging you to do is to

21   reconsider so much of your class ruling and summary judgment

22   ruling that would enable certification of the third-party payor

23   class from June, 1998, to the end of 2004 for payments for

24   bipolar and other mood disorders only.  The time period is

25   pegged, obviously, to your rulings.

1          THE COURT:  This is solely for the TPPs?

2          MR. SOBOL:  Solely for third-party payors, and because

3     you have focused on that and because there are arguably some

4     issues that arise on the consumer side, although we think, we

5     honestly think, that as to bipolar, given the breadth of the

6     wrongful conduct and given the heavy scientific position, which

7     is that there was no justifiable basis to prescribe it to begin

8     with, we think that the consumers are harmed, the relief that

9     we're after is third-party payors for that time period for

10    bipolar only.

11          Now, in order for you to get there, we also recognize

12    that there are a couple of things you need to do.  You'd need

13    to reconsider both your class certification ruling, because

14    you've denied it across the board, and you'd also need to

15    reconsider summary judgment as it applied to the three

16    third-party payors as to bipolar only.  And therefore both of

17    those orders would have to be vacated, and there would need to

18    be an entry of a class certification order certifying the class

19    I described.

20          Now, just to finish out procedurally where we would

21    be, if you were to certify that class, then obviously we would

22    ask for a trial date at this Court's earliest convenience.  If

23    the Court were not -- and we go forward with that, and all of

24    the myriad other cases that you have, class actions that you

25    have would remain stayed as they have pending that result.

1    Okay?

2           THE COURT:  All right, I'm not understanding.  What

3    are the myriad of other class actions?

4           MR. SOBOL:  When the MDL was formed, there were

5    about -- I can't remember how many, but it's like twenty or

6    thirty class actions, civil actions that are before you.

7           THE COURT:  Class actions or civil actions?

8           MR. SOBOL:  Class actions, class actions.

9           THE COURT:  Thirty.  Because I was also thinking as I

10   walked in --

11          MR. CHEFFO:  Well, that's true, but they're consumers

12   with the same claims, I mean, that have been litigated.

13          MR. SOBOL:  Yeah, yeah, I'm trying to spell it out.

14   So there are class -- when this MDL was formed, sent to your

15   court were class actions.  The vast majority of them were

16   consumer class actions after economic damages.  There were also

17   a handful of cases that were third-party payor cases, okay?

18   All of those cases, the class actions on the consumer and

19   third-party payor side, have been stayed while we've handled

20   consolidated efforts with respect to some designated consumers

21   and some designated third-party payors.  Okay?  And the reason

22   that all of those consumer and third-party payor class actions

23   were stayed was because, obviously, the consequence of what

24   might happen to them is so heavily dependent upon what happens

25   on the class side for the named consumers and third-party

1   payors for whom we've been proceeding forward, okay?

2        THE COURT:  Well, let me put it this way:  As I did, I

3   let Kaiser go forward because I felt Kaiser had shown, easily

4   shown enough information to show that they relied and were

5   damaged; and I felt for the others, they never had managed the

6   drugs and they just came through.  Are there any other TPPs who

7   under American Pipe would still have a viable cause of action

8   because they relied on something that was said or they've done

9   a survey of their doctors and have specific numbers or anything

10  like that?

11       MR. SOBOL:  So, yes.  First, there is, I think -- we

12  actually prepared a list and we've consulted with counsel, and

13  there's actually a list of all these cases and whether they're

14  consumers or third-party payor cases.  So with respect to the

15  cases that are before you, my recollection is, there's only one

16  other third-party payor case, which is the Assurant group

17  which --

18       THE COURT:  I have not ruled on that?

19       MR. SOBOL:  And you have not ruled on that.  They have

20  a somewhat different kind of claim.  They have both a marketing

21  and an antitrust claim, and their case has been stayed for the

22  past many years, and there has been no ruling, nor even any

23  motions with respect to that, other than I think there was a

24  motion to have it remanded.

25       THE COURT:  Has there been discovery?

1           MR. CHEFFO:  Can I?  I just want to clarify, Tom,

2    because I don't disagree with what he's saying.  I think that,

3    and, you know, we can talk about the Assurant case.  The

4    Assurant case is an individual, not a class action.  I mean, it

5    does have antitrust claims.  There's also an antitrust MDL.

6    Those cases we believe are properly before the antitrust court.

7    There was actually a trial in an MDL --

8           THE COURT:  Judge Hochberg?

9           MR. CHEFFO:  Judge Hochberg, and I wasn't prepared to

10   deal with that today, but certainly we can file in our papers

11   what we think actually in terms of wrapping things up.  You

12   know, we think everything is pretty much governed, and I

13   understood, at least before today, and hopefully today, that

14   really the parties have an understanding that the existing

15   claims, putting Assurant aside for a minute, the existing

16   claims in all of the cases are fairly governed by all of the

17   Court's rulings, you know, one way or the other.  So, in other

18   words, to the extent that they were individual claims or

19   there's class actions, if they get appealed, they're all going

20   to be the same with respect to what the First Circuit does.

21          Assurant is different, and it would be our position as

22   to that, that that's more appropriately -- if the Court would

23   consider transferring that case.  So I'm sorry to interrupt,

24   but --

25          MR. SOBOL:  So as to the cases that are before you, my

1    recollection is, there's one third-party payor case that's not

2    dealt with in terms of the rulings.  There has been "discovery

3    in that case" only in the sense that it participated in the

4    discovery that was going on in the MDL as a whole, this MDL as

5    a whole in terms of marketing, okay?  But because its case was

6    stayed, for instance, Pfizer wasn't seeking discovery from the

7    Assurant Group members, and the Assurant Group members weren't

8    seeking Assurant Group specific discovery, if you will.  That

9    has not occurred, okay?

10          THE COURT:  Well, do we know whether it's more of a

11   Kaiser-type place or more of an Aetna-type place?

12          MR. SOBOL:  I don't want to opine on that.  Because

13   I'm not counsel for the Assurant Group, it would be not

14   appropriate for me to be characterizing it one way or the

15   other, okay?  I just would put it that way.

16          What I would say is that in terms of managing your

17   docket, if you have an issue that you want to address in terms

18   of whether that case should be sticking around here or what

19   should happen with it, you should probably enter an order

20   asking the parties, the Assurant Group people and Pfizer, to

21   meet, confer, and decide whether they can agree or disagree as

22   to what should happen there.

23          THE COURT:  Who's the lawyer for Assurant?

24          MR. SOBOL:  Scott Simmer, S-i-m-m-e-r, and he's at

25   Blank Rome.

4faa1526-3691-465d-9287-1dda8593e917

1          MR. CHEFFO:  There are, I think, and Katherine advises

2     me too, that Assurant is actually, it's not one plaintiff like

3     a Kaiser.  There's actually ten third-party payors in that

4     complaint.

5          MS. ARMSTRONG:  Approximately.

6          MR. CHEFFO:  Approximately.

7          THE COURT:  Well, you probably looked at them.  Are

8     they a group that says, "We'll always pay off label and we're

9     not going to look," or are they a group like Kaiser, like, "We

10    care a lot and we're doing this drug programming and --"

11         MS. ARMSTRONG:  We haven't had discovery in this case.

12    I'm familiar with at least one of the TPPs in that group that

13    is a fairly active -- does -- I can't tell, but I think there's

14    a possibility that it's somewhat active in how it manages drug

15    utilization.  But that's very sort of generic knowledge on my

16    part.

17         THE COURT:  So you're saying it's actually more

18    complicated.  It may be one of the ten is but nine aren't, or

19    we just don't know, or we'd just have to figure it out.

20         MR. CHEFFO:  I think Mr. Sobol's suggestion is a good

21    one, and I think that the Assurant folks, we're happy to do

22    that, talk to them, figure out.  You know, they may say, "You

23    know what, we think we're more like the class, and we're going

24    to deal with those claims and --"

25         THE COURT:  Go up.

4faa1526-3691-465d-9287-1dda8593e917

1      MR. CHEFFO:  "-- and go up, and we don't want to

2   prosecute them," because when we've talked to people

3   individually, a lot of them have said, "At this point we're not

4   in a position, our clients don't want to take on this

5   individually," you know, and some may have a different view.

6   So I think we could do that.

7      MS. ARMSTRONG:  And, your Honor, just in the interest

8   of full disclosure, there's one other TPP case pending on the

9   Court's docket, which is Blue Cross-Blue Shield of Alabama.

10     THE COURT:  Okay.

11     MS. ARMSTRONG:  It's not a class action either, but

12   it's a different docket number than the Assurant.

13     THE COURT:  Has it been briefed?

14     MS. ARMSTRONG:  No.  There's no discovery.  I think

15   there was a motion to remand that's been briefed in that case,

16   and that was it.

17     THE COURT:  Have I ruled on that?

18     MS. ARMSTRONG:  Actually, I don't think you have.

19     THE COURT:  All right, so there's a motion to remand,

20   by which you mean back to the Federal Court in Alabama?

21     MS. ARMSTRONG:  No.  It's a motion to remand to state

22   court.

23     THE COURT:  To state court.

24     MR. SOBOL:  It was originally filed in Alabama and

25   then removed to a Federal Court there and then transferred

1    here.

2              THE COURT:  Sure.

3              MR. SOBOL:  I've spoken to counsel for that too, and I

4    appreciate Ms. Armstrong refreshing my memory.  You probably

5    would want to address the same thing with respect to Blue

6    Cross-Blue Shield of Alabama; i.e., have the parties meet and

7    confer and decide whether something separately should be done

8    with that case or if it should remain stayed with the other

9    matters.

10             MS. ARMSTRONG:  Yes, I think in the status report that

11   Mr. Sobol filed, he said that -- just again hoping to refresh

12   his recollection a little, he said that he had conferred with

13   them, and they were happy to be stayed until the issues got

14   resolved before the First Circuit, that Assurant was the only

15   one that was a little bit unsure because they might want to

16   participate in the antitrust and MDL.

17             THE COURT:  Okay.  All right, so good, that's good,

18   two placeholders.

19             MR. SOBOL:  Sure.  And then as to the balance of the

20   consumer cases, those consumer cases have remained stayed have

21   asked to keep stayed.  I don't think that Pfizer has opposed

22   that while we deal with the cases that are in front of you.

23   And given the nature of the reconsideration that we're pressing

24   before you, which is reconsideration only as to third-party

25   payors, unless you sua sponte decide you also want to

1    reconsider as to consumers when you address these issues,

2    you'll probably enter a final judgment on the consumer claims

3    in accordance with your December, 2010, I think it is, order --

4    maybe that's the wrong date -- but whatever your summary

5    judgment order, so that there can be an order from which we

6    could appeal.

7              THE COURT:  Right.  So whatever happens at the end of

8    this, maybe just to keep this thing moving, you'll both confer

9    and give me forms of judgment.

10             MR. SOBOL:  Right, okay?

11             THE COURT:  So that we can just keep this on a front

12   burner.

13             MR. SOBOL:  Right.

14             THE COURT:  Because I know Kaiser -- actually I don't

15   know this.  So there are motions that are coming in?

16             MS. ARMSTRONG:  We filed the last set of the briefs

17   yesterday, your Honor.

18             THE COURT:  Yes?

19             MS. NUSSBAUM:  The Kaiser motions have been fully

20   briefed now, your Honor.  The replies went in yesterday, so --

21   and according to the schedule, the only thing that would be

22   remaining, which is the fee application under RICO in 17-200,

23   there is no date for that until either the motions are denied,

24   an appeal has been taken, or the time within which the appeal

25   should go is passed.

1          THE COURT:  Can we have an agreement on that?  Is it

2     highly likely it will be appealed if it isn't settled?

3          MS. ARMSTRONG:  It is, and we do have an agreement on

4     the attorneys' fees issue.  It was incorporated in the last

5     scheduling order we gave you.

6          THE COURT:  Right, and we'll just push that off.

7          MS. ARMSTRONG:  Right.

8          THE COURT:  All right, good.  Thank you.

9          MR. SOBOL:  So with all of that, I rest my motion.

10         THE COURT:  Now, Mr. Sobol, all right, now, let's get

11    to the heart of it.  At least our calculation was, there were

12    no remaining class representatives, so it is in fact true that

13    I'd have to reconsider my rulings on those as well.

14         MR. SOBOL:  Correct.  So there are -- I'm going to be

15    very brief because I know that you and your assistants and

16    everybody, you look at the cases very hard, so I'm really just

17    not going to try to argue a lot of cases.  I'm going to put

18    this in context.

19         THE COURT:  Okay.

20         MR. SOBOL:  On the law side, this Court must follow

21    Supreme Court precedent on RICO.  Whatever else might have been

22    said by the Second Circuit, which is not good for us in

23    Zyprexa, or more recently in the Seventh Circuit by

24    Judge Posner regarding RICO, which is good for us, you must

25    follow --

1         THE COURT:  What's the name of that one again?

2         MR. SOBOL:  Please get me the name of that case, okay?

3         MS. ARMSTRONG:  VCF, your Honor.

4         THE COURT:  UCF?

5         MS. ARMSTRONG:  VCF.

6         MR. SOBOL:  VCF, thank you.  One of the few things I

7    didn't check this morning; I knew I was supposed to.

8         In Bridge, the court held that the conduct that causes

9    the harm can be indirect; it doesn't have to be directly to the

10   plaintiff.  In Hemi, the Supreme Court reiterated that the

11   harm, not the conduct but the harm needs to be direct, meaning

12   you're the first and only victim.  In Hemi, the court made

13   clear it was not overruling Bridge.  So the bottom line on RICO

14   from the Supreme Court repeatedly is that if you set in motion

15   a series of things that doesn't happen directly to the

16   plaintiff but happens indirectly, if you know where the harm is

17   going to land and that's where the harm ends, that entity gets

18   to cover.  It's not complicated, although lots of courts seem

19   to get all flummoxed about it, and I'm going to speak fairly

20   frankly about some of these decisions.  The Second Circuit's

21   decision in Zyprexa is completely flummoxed because they don't

22   understand that basic distinction.

23        Now, that distinction has critical meaning in fighting

24   private waste, fraud, and abuse in the healthcare area in the

25   United States because the payors are public or private

1   insurers, Taft-Hartley plans and all the rest of that, and they

2   are the payors, but they don't make the decisions, or at least

3   not all of the decisions.  It's usually made by a physician.

4   So you have a societal and an economic fact, which is that the

5   payors are not always the direct -- conduct is not directed to

6   them.  It's directed to physicians or to P&T committees or to

7   PBMs or what have you, but the harm is visited first and the

8   end and only on the end payors, insurers and consumers in our

9   society.

10          If this Court adopts Pfizer's misconstruction of Hemi,

11  it means that RICO does not apply to United States healthcare,

12  and we submit that it's a wrong ruling.  You must follow those

13  two decisions.

14          The cases that you need not follow are the cases that

15  you have, with all due respect, and appropriately cited to us

16  in two of your decisions.  First when you denied

17  reconsideration -- I mean the second class certification; and

18  also, when you entered summary judgment, you cited to, and

19  completely understandably, an abhorrent trend in the United

20  States jurisprudence.  That abhorrent trend is courts in a

21  unthinking way concluding, without any legal authority, or

22  without any advocacy by the plaintiff lawyers explaining how it

23  is that prescriptions can be measured in an aggregate fashion,

24  conclude blindly that you must prove the impact on prescription

25  writing doctor by doctor.

1              In our motion that we filed for this argument on

2    February 8 of 2010, we spelled out what went wrong in each of

3    these cases.  And one of the first cases, which was a 12(b)(6),

4    the Seroquel case, the Judge simply made up out of thin air the

5    notion that the only way to prove the impact on a doctor is by

6    asking him or her, and put that in a case saying, "You must

7    prove causation doctor by doctor, and you can't get there

8    therefore by aggregate evidence."

9              The plaintiff lawyers, which none of my group were in,

10   did not even bother to advocate or explain to the court how the

11   drug companies or how healthcare science in fact measures these

12   things.  The court had no idea about it.  The court cited

13   nothing and concluded that way.  I'm not going to go through

14   all the cases because I've given you a brief, but we then end

15   up with what I'll suggest is one of the more bizarre end

16   situations where in the Intron/Temodar case, a court there was

17   the only time there's any analysis of aggregate evidence, and

18   the Court there actually cited your decisions in Neurontin

19   saying that, well, yes, there is some case law out there where

20   the courts are appropriately looking at aggregate evidence, and

21   using that in this context.  But then that court there looks to

22   the McLaughlin case in the Second Circuit and cites these other

23   cases that had just made up this issue, and concludes, "I'm not

24   going to use aggregate evidence here.  You have to prove it

25   physician by physician," without distinguishing your case at

4faa1526-3691-465d-9287-1dda8593e917

1   all.  And then the Intron case ends up appearing in your cases,

2   your decisions here, as a basis to deny aggregated evidence,

3   which is what happened in the summary judgment ruling.

4        THE COURT:  See, the issue I've struggled with is,

5   aggregate evidence would be enough to show that there's harm.

6   I think in the class, one could say that it's likely that some

7   doctors prescribed based on a fraudulent marketing.  But how

8   could you assume based on the aggregate evidence that all of

9   the doctors who prescribed did, or even begin -- in other

10  words, aggregate evidence is relevant, it's admissible.  I've

11  allowed it in to show harm.  The evidence was compelling, the

12  graph.  But the issue at the end of the day is, I've also heard

13  from so many doctors who have said, "I would have prescribed

14  anyway."  And as I noticed in those two consumer cases which I

15  did let go forward, I mean, it may be a doctor-by-doctor fact

16  question, but how could I find or how could a jury find that

17  just because the label went up 50 percent, those were all

18  fraudulent, that there was either a reliance or causation?

19  That's where I've struggled.  It isn't that there wasn't some

20  harm, if someone were looking for a preliminary injunction.

21  And that's the hard question which I've not -- it's not like

22  you've done a survey and you can say that 60 percent of doctors

23  wouldn't have prescribed -- I was thinking about this a lot --

24  wouldn't have prescribed if they had known the truth.  You

25  can't even get them to say that in depositions.  It's

1    extraordinary.

2         MR. SOBOL:  So here what we have here -- I'm going to

3    answer that specific question.  Here what you have -- and this

4    is why we've gone to the core of this case and isolated it --

5    with respect to bipolar in this time period and third-party

6    payors -- and you'll see this from the materials also in the

7    slides -- you have appropriately repeatedly concluded that

8    there, there is aggregate evidence from competent regression

9    analysis that shows that over 99 percent of these prescriptions

10   would not have ever been written if Pfizer hadn't done what it

11   did, over 99 percent.

12        Now, that's just one form of the aggregate evidence,

13   but it is compelling.

14        In addition to that, there is the scientific evidence

15   that you have here.

16        THE COURT:  Can I back up.  If I remember, it's

17   99 percent wouldn't have if there hadn't been off-label

18   marketing.

19        MR. SOBOL:  Well, fair enough.  So, yes, that's

20   right --

21        THE COURT:  If I'm remembering, Meredith Rosenthal

22   sort of, like, has lived here, I mean, but I'm remembering she

23   was very carefully limiting it; that she would look at, right,

24   advertising and sales expenditures.  But she said herself --

25   and we all have to concede -- that she can't tell you what was

1   in a doctor's mind.  She doesn't know if they've read anything

2   in the literature.

3          MR. SOBOL:  Well, that's right, but what she does

4   do -- first, let me just say, there's two different issues

5   going on here.  The first is, yes, her analysis is limited to

6   off-label marketing.  But in bipolar, all off-label marketing

7   for bipolar is unlawful, given the time period that we're

8   saying and the failure to disclose the Pande study and the

9   other studies that this company had.  And you had even written

10  before that as to bipolar, the assumption that

11  Professor Rosenthal has, which is that "I'm only modeling

12  off-label promotion, not the illegal off-label promotion," but

13  that the assumption that all of the off-label promotion is in

14  fact illegal applies completely in the bipolar situation.  And

15  that follows, with all due respect, ineluctably from your

16  Kaiser decision and from the jury's decision because --

17         THE COURT:  I agree, that's what makes you very smart

18  to tease in just this one subclass because basically all the

19  information was illegal.  But what do I do with all the doctors

20  who said, "I didn't read it.  I didn't know it.  I tried it.

21  Nothing else was working"?

22         MR. SOBOL:  Sure, so --

23         THE COURT:  You know, so there's no -- so you could

24  draw an inference that virtually all or other than de minimis

25  amounts maybe was illegal off-label marketing, but how do you

4faa1526-3691-465d-9287-1dda8593e917

1    get past -- the thing, it's been since 1996.  I keep putting

2    this dare to Mr. Green:  Find me a doctor who says he would

3    have done --

4              MR. GREENE:  I have an answer for that.

5              THE COURT:  Okay, all right, all right.  How long has

6    it been I keep saying that, "Find me a doctor"?

7              MR. SOBOL:  You know, what you do with that is you

8    say, wait a second, because this is what the issue is, and I

9    just want to put it in its legal construct.  First, the

10   plaintiff has to prove that the defendant's action is a

11   substantial contributing to all or substantially all of the

12   sales.  We can do that.  There's no question about that.

13             You're then asking a question which is sort of, well,

14   wait a second.  Either what about the defenses, or don't I have

15   to look about other causes, other reasons?  And the fact is

16   that on the record that is before you, not a single doctor or

17   any other basis is there an independent reason, an independent

18   source suggesting that you use Neurontin for bipolar.

19             Now, let me just say, we've gone through this in the

20   slides at the causation section toward the end where we rattle

21   off some of the supposed theories that Pfizer has put forward:

22   Well, it's the advance of brain science, or it's, you know,

23   some other source, right?  But wherever the psychiatrist got

24   the idea or the primary care physician got the idea to

25   prescribe this in the first place, you know that it's

4faa1526-3691-465d-9287-1dda8593e917

1    attributable to what Pfizer did because Pfizer is the only

2    source that suggests to use it in the first place.  And that's

3    the whole point of the economic regression is to get rid of the

4    noise about where you have all these other sources coming from.

5            Now, this would be one thing if, for instance, we were

6    asking for one of the other indications where it was 30 or

7    50 percent or 80 percent; but where the result is, first of

8    all, there's no proof that it's good for bipolar, and you've

9    got over 99 percent of the prescriptions never going to be

10   written on the basis of admissible scientific evidence, and

11   where the fact record that we put forward doesn't show any

12   independent source of information that's impinging on this,

13   there's no other independent source.

14           THE COURT:  Well, so several of the doctors, like,

15   take one doctor said, "Well, he was already on it, and he

16   wanted to stay on it," I remember that.  And another doctor I

17   believe said, "I tried everything else and it didn't work, and

18   so I tried it."  In other words, I'm remembering it was very

19   useful actually having individuals go through it.  Or, "I tried

20   it because it worked in another patient."

21           MR. SOBOL:  They thought it worked.

22           THE COURT:  My --

23           MR. SOBOL:  Yes, of course, but why did they try it in

24   the first place?  So why continue it?  Why try it?  "I did

25   this, I did that."  It's like, "Yeah, but why are you doing

1  this?"

2          THE COURT:  Well, for sure I would imagine in these

3  big places, if you interviewed them one by one and showed them

4  the devastating counter-evidence that I saw at trial, a fair

5  number would say, "I wouldn't have done it," but how do I

6  figure out how many?

7          MR. SOBOL:  Well, because here's the thing.  How you

8  figure out how many is, first, you have to look at the -- it's

9  a different question.  It's not, now that it's all out there,

10  how many can we get to unwind what they've been doing?  Right?

11  That's a tough road to hoe because you're going to take

12  physicians and you're going to say, "You've been doing the

13  wrong thing for the past ten years.  Can't we convince you to

14  undo what you've been doing?"  That's one question.  That's the

15  wrong question to ask.

16          The right question to ask is:  At the beginning,

17  ab initio, from 1995 until 1998 when they hatched this plot,

18  and then from '98 forward when they were going forward, how

19  many wouldn't have done it in the first place?  That's the

20  critical question.  And so when you are asking doctors -- and

21  there's literature that we've cited to you in this case too --

22  when you are asking doctors after the fact, after years of

23  habit and all the rest of that, "Gee, why have you been doing

24  what you've been doing and why would you be doing things

25  differently?" you get completely unacceptable information.  You

1   can't rely upon it.  Now, they're not lying, they're not mean

2   people or whatever, but you're trying to question what it is

3   that they've been doing and why they've been doing it, and you

4   don't know what the source of the information that they have.

5   The way you can do it --

6           THE COURT:  Well, that's what makes this so difficult.

7           MR. SOBOL:  It makes it difficult.  Now, in this

8   situation, right --

9           THE COURT:  What made Kaiser easier is because Kaiser

10  was an educated entity that itself received communications and

11  relied on certain things and then took certain actions.  It's

12  just much more difficult when that screen didn't exist.

13          MR. SOBOL:  That screen, that's right, that screen --

14  and I want to make sure I address this because it's a prior

15  concern that you've had -- that screen as we present it with

16  respect to this proposed class of third-party payors did not

17  exist, but that's a common reality, so --

18          THE COURT:  Right, that would be a common question of

19  law.  I mean, I understand that for --

20          MR. SOBOL:  It is common.  It's also common factually,

21  and there's also been no evidence that really any third-party

22  payor in the country between '98 and 2004 even thought about,

23  let alone was trying to actively implement formulary change for

24  Neurontin for bipolar, all right, which is the issue you have.

25  You know, it gets on the formularies because it's an epileptic

1    drug.

2              THE COURT:  Epilepsy.

3              MR. SOBOL:  And then, you know, the fraud starts.  And

4    certainly until the end of 2004 there's no evidence that the

5    broad mass of third-party payors did anything in terms of

6    formulary actions at all.

7              THE COURT:  At least not commonly.  I mean, Kaiser was

8    the exception is what we're seeing now.

9              MR. SOBOL:  Correct.

10             THE COURT:  I mean, there may be others.

11             MR. SOBOL:  There may be others, but we're talking

12   about -- there may be others, but, by the way, there's nothing

13   in the record that shows that there's something other than --

14   well, other than Kaiser.

15             Now, the core issue that you keep on going back to,

16   which is completely appropriate, is, what's the evidence going

17   to be that doctors would not have prescribed this in the first

18   place, okay?  And what I would simply beseech you to do is look

19   at the record for independent reasons why they would when those

20   haven't been provided.  Plus, even if there is an independent

21   reason why they would, has Pfizer shown that that other reason

22   in some way is significant, is something other than de minimis,

23   is something other than amusing -- "Oh, gee, they might have

24   thought this, they might have thought that" -- when we can

25   prove, the reason that they're doing it is because of what

4faa1526-3691-465d-9287-1dda8593e917

1    you're submitting/putting out there in the marketplace?

2         THE COURT:  Well, let me just, and then I have to get

3    to Pfizer because I have a 10:30, but let me -- we can go a

4    little late.  So with respect to the doctor who said, "The

5    reason I did it is because another doctor prescribed it" --

6    we've had several of those -- "and the guy wanted to stay on

7    it" -- we've seen that a couple of times -- would that meet, in

8    your view, the Seventh Circuit test?

9         MR. SOBOL:  Well, I'm not sure what the Second Circuit

10   test --

11        THE COURT:  Seventh.

12        MR. SOBOL:  Oh, the Seventh Circuit.

13        THE COURT:  You said you liked Judge Posner's

14   decision.

15        MR. SOBOL:  It also satisfies, though, the First

16   Circuit test, which you must follow.  In AWP, the First Circuit

17   actually went out of its way to say:  Yeah, this notion of

18   aggregate evidence, particularly as it applies to these

19   third-party payors, and using the class reps as examples, is

20   precisely the kind of thing you're supposed to do in a class

21   action.

22        THE COURT:  But there you had causation as a matter of

23   law, almost, because they were phony prices, and then they paid

24   based on the -- everyone paid based on it.  As a matter of law,

25   you had to, so there was an automatic causation.

1        MR. SOBOL:  Sure, but the question was still, you

2   know, as you and I know better than anybody else, one

3   third-party payor knows this much about AWP, another

4   third-party payor knows that much about AWP.  They tried to

5   create this notion of disparate knowledge all over the place,

6   and the First Circuit actually said:  You can see through those

7   issues by using these as examples, number one; and, number two,

8   looking at the record and find an absence of any other real

9   information that's out there.

10        THE COURT:  I think I know the issue, and thank you.

11   And I just want to make sure that Pfizer has a chance, and did

12   Mr. Greene want to say one thing?

13        MR. GREENE:  Can I just say one thing, Judge?

14        THE COURT:  Yes.

15        MR. GREENE:  And it supports what Mr. Sobol said.  He

16   said there's a hard question here, and you have been struggling

17   with it, and I've been struggling it for a long time thinking

18   about it:  How can you assume all the doctors prescribed it

19   because of the fraud?  And this case today is in a dramatically

20   different position than when we first moved for reconsideration.

21   You asked for a bellwether trial, and we had one, and you found

22   and the jury found that it was ineffective for bipolar

23   disorder.

24        THE COURT:  Right.

25        MR. GREENE:  And you found and the jury found that the

1  fraud here was omission and suppression for the bipolar

2  indication. And there's an easy way or an easier way to

3  address this causation problem/question that you're having.

4  There is a line of cases that establishes, when there's fraud,

5  fraud by omission, and it goes to the very essence or the heart

6  of or the utility of the product, courts will presume

7  causation. And I'm not talking about the securities fraud

8  cases. And we've cited these. I've given you -- we've all

9  given you so much material, but this was briefed in Docket

10  No. 2071.

11        THE COURT: This came up at trial, right?

12        MR. GREENE: I don't believe it did.

13        MR. CHEFFO: I'm not sure exactly where Mr. Greene is

14  going.

15        MR. GREENE: Well, where I'm going with it is, there

16  can be a presumption of causation in this case. It's like the

17  other day I went to the store and I bought some Claritin, and I

18  opened it up and there are yellow pills there. What if the

19  manufacturer put all placebo in there; they had yellow placebo

20  pills that cost them a nickel for 100, and that's what I

21  bought. If we were here trying to certify a class for people

22  that bought placebo, would you even entertain an individual

23  inquiry of why it was prescribed?

24        Well, that's the situation we have now after this

25  trial. You have found and the jury found it's ineffective for

1    bipolar disorder.  No reasonable psychiatrist would have

2    prescribed it for bipolar disorder.  The fraud was perpetrated

3    pervasively across the country; it was nationwide.  All the

4    doctors got the same message because it was omissive.  They

5    suppressed the negative findings.  They suppressed what the FDA

6    found.

7         Professor Rosenthal's report just corroborates this,

8    but the defendant's own documents corroborate this as well.

9    Remember the marketing assessment.  When they looked at bipolar

10   disorder, they showed zero percent market share, and they

11   projected an increase of market share that would show up in '97

12   to '98 that was dependent upon their fraudulent marketing

13   strategy.  So there's three ways to look at causation here:  a

14   presumption of causation because it's ineffective.  This case

15   is not like any --

16        THE COURT:  Has any court ever applied a presumption

17   of causation?

18        MR. GREENE:  Yes.  In Docket No. 2071 there's a case

19   where they -- we've cited four or five cases in there.

20        THE COURT:  Okay, I'll look at it.

21        MR. GREENE:  I'd ask you just to take another look at

22   it, Judge.

23        THE COURT:  I will.  Okay, thank you.  All right, I

24   just need to make sure that Pfizer -- yes?

25        MR. CHEFFO:  I'll just give you these slides, your

1    Honor, and I'm also going to be very quick.

2            THE COURT:  Well, I don't know, I gave them a half an

3    hour.  I mean, I'm --

4            MR. CHEFFO:  Yes.  Well, I think, again, I'm not going

5    to go through each slide, but I would like to kind of quickly

6    go through with you -- I was taking some notes, and I would

7    like to at least react, you know, first.

8            THE COURT:  They were smart to drop all the other

9    ones, so this is the hardest case.

10           MR. CHEFFO:  Well, you know, I mean, it is and it

11   isn't, Judge.  We're still talking about a class action.

12   First, you know, Mr. Sobol had some very harsh words, I think,

13   for the judiciary around the country.  I would take issue with

14   that.  I think courts don't make things up out of thin air, as

15   this court and every other appellate court -- it's the Ninth

16   Circuit, it's the Second Circuit, it's the Seventh Circuit, and

17   I think there will be more circuits -- have looked at these

18   issues.  And I think what we've kind of lost today, and I want

19   to address these points, what we've lost today is, this was

20   supposed to be a motion here to reconsider class action, right?

21   This isn't whether or not there's efficacy, and we're supposed

22   to be talking about can the class be certified, even a smaller

23   class?

24           And we first heard again -- and, you know, you will

25   maybe hear a bit of frustration in my voice today because

1    Mr. Sobol and Mr. Greene have asked for this, and yet, again,

2    the first thing they're saying is, what we need you to do is,

3    first, we want you to reconsider, because we pointed out last

4    month that there's no court -- and you'll see the first ten

5    slides that we have, and there doesn't seem to be a dispute --

6    say, you know, it seems to be pretty clear that if you want a

7    class action, you need a class representative; and we said, you

8    have no class representatives.  It's not -- Blue Cross-Blue

9    Shield you will remember did move to reconsider, right?  That's

10   one of the TPPs.

11          THE COURT:  They all did, didn't they?

12          MR. CHEFFO:  No.  They -- I'm sorry.  They moved to

13   reconsider the summary judgment motion, okay, because,

14   remember, before we get to do we have a class --

15          THE COURT:  I understand, there's no class rep, so,

16   that's right, I could just have simply said "No class rep,

17   denied."  So he's asking me to reconsider all of that.

18          MR. CHEFFO:  But the point is, what I'm saying is,

19   Blue Cross did move to reconsider summary judgment, and you

20   denied that, and the others have never filed a motion even to

21   today.  I mean, all we heard was Mr. Sobol getting up and

22   saying you should reconsider, but, again, I think the time has

23   passed for that, and the one who did move has reconsidered.

24   And you also know that Guardian has not moved to reconsider;

25   and even after judgment was entered, Aetna moved to reconsider

1   to reopen that, and you denied that.  So basically this idea of

2   reconsidering what are essentially, you know -- so other than

3   Kaiser, every single third-party payor who we've done discovery

4   has moved for summary judgment.  They couldn't even get out of

5   the box on summary judgment.  Now they're saying reconsider all

6   of those prior rulings and your class cert ruling, you know, to

7   get to a point of class certification.  So I think what

8   Mr. Sobol is asking for is a pretty Herculean task, really with

9   no papers.

10          So one of the things I absolutely agreed with

11   completely, Mr. Sobol said, you know, this is not about direct

12   contact to third-party payors.  And that's what your Honor has

13   been asking for for years.  You've asked basically for two

14   things:  One is, you know, show me the doctor who says that he

15   or she relied on some kind of false, fraudulent off-label

16   marketing; and if not, show me the third-party payor who relied

17   on this because, you know, we can have Rosenthal, we can have

18   Hartman, and we can have Conti and the rest of them, but what

19   they can do is quantify the damages.  They are not a

20   replacement for causation.  You still have to have some kind of

21   reliance under black letter law, and what we've heard is --

22          THE COURT:  Can you take the -- the thing, I feel like

23   I'm -- remember some Presidential candidate that kept being

24   called the flip-flopper -- I feel like sometimes in my mind I

25   keep flip-flopping on this issue because I view it as so

4faa1526-3691-465d-9287-1dda8593e917

1    difficult.  Let me just say this.

2          MR. CHEFFO:  Sure.

3          THE COURT:  The evidence in some areas, the jury came

4    out against you, but it was less strong, like in the area of

5    neurology or pain.  On this area in bipolar, I can't help but

6    think that if a thinking doctor saw what I saw, they wouldn't

7    prescribe it except maybe as a total last resort.

8          MR. CHEFFO:  Let me address that.  I mean, a few

9    things because, respectfully, I completely disagree with that,

10   but let me talk about three things that I would refresh your

11   recollection on, both on things from the trial and things we've

12   talked about.  The first is, just interestingly, right, you

13   know my favorite documents are Kaiser in the middle of trial,

14   you know, what you said was devastating, they're still dealing

15   with it.  What I've put before you is Cigna.  This would be

16   a --

17         THE COURT:  Don't tell me that Kaiser still has it up

18   in the --

19         MR. CHEFFO:  No, no, Kaiser doesn't but Cigna does,

20   another putative, a major health insurer.  Look at what it says

21   here.  This is print pulled off their website from May 2, 2011,

22   right?  So why would any right-thinking doctor ever in their

23   mind?  It would be malpractice, their expert said, it's

24   completely fraudulent.  It's, you know, on and on and on.  And

25   what it says from -- remember Healthwise, the people who

1   submitted the affidavit?  Oh, we, you know -- this is revised

2   as of May 4, 2010, after the trial, after this devastating

3   evidence that no one would ever prescribe it, and what it

4   says -- of course, this is, I pulled it off for hot flashes,

5   gabapentin for hot flashes.  There's also things, gabapentin

6   for cancer.

7          THE COURT:  Now we're talking.

8          MR. CHEFFO:  What it says is how well it works.  It

9   says that "Why it's used:  Gabapentin may be used to treat hot

10  flashes.  In addition to seizure control, gabapentin is also

11  commonly used --" commonly used -- "to treat chronic pain,

12  migraine headache, panic disorder, and social phobia."

13         Okay, so, you know, the people in the class --

14         THE COURT:  Did it say bipolar?

15         MR. CHEFFO:  But their class is bipolar and mood

16  disorders.  But remember, your Honor, again, taking you back,

17  if you looked at what Dr. Rosenthal did, when it said bipolar,

18  she conceded on the record that basically bipolar wasn't just

19  someone saying bipolar; it included mood disorders.  You will

20  also remember that all of the experts, including Dr. Barkin,

21  said that they have bipolar patients -- and we all know when we

22  go to a doctor -- again, I don't want to get too colloquial --

23  but, you know, a bipolar patient could come in, but what they

24  said is, they'll treat it for some of the symptomatology,

25  anxiety, social phobia, which you'll also remember the Pande

1    study, which all parties agreed was a Level 1 peer-reviewed

2    study with respect to mood disorders, it's used.  So, in other

3    words, a patient who has bipolar, so if we were going to look

4    at coding, it could be a bipolar patient --

5            THE COURT:  Well, could you just define the class as

6    just bipolar?  Would you concede there was no evidence just for

7    bipolar?

8            MR. CHEFFO:  No, no.  First of all, I would not

9    concede that, but here's the issue.  The issue, getting back to

10   class certification, Neurontin did not just spring from the

11   earth as the only AED.  What we heard, not only is that not all

12   doctors were detailed -- certainly they've admitted that -- who

13   do prescribe bipolar.  We've also heard, under their 97 or

14   98 percent, it's completely deceptive because what they've

15   assumed is that if Dr. Armstrong was detailed once, any

16   detailing, any patient she ever talked to and any prescriptions

17   written for the next ten years to Dr. Saris or to anybody else

18   was part of that 98 percent.  So that gets to your point:

19   Well, really, does that satisfy Hemi Group?

20           The other point is that what doctors have testified

21   over and over again -- the record is replete with it -- is that

22   other AEDs were on the market before Neurontin widely

23   prescribed for bipolar.

24           Now, you know, we may take an issue -- and, you know,

25   we're not here to argue it today -- in 2010 whether it's widely

1   prescribed, but what they're talking about is a class from 1996

2   to 2004.  And you'd have to look:  Well, if Dr. Smith was using

3   lamotrigine or one of the other ten, you know, and used it

4   beneficially, and a new drug came on the market, whether or not

5   Pfizer said anything, and the person said, "Well, let me try

6   this new Neurontin drug."

7          Again, these are very realistic fact questions that we

8   would have to get into, and this is why, even with respect to

9   the individuals, Varnum and Wityk, what your Honor said was,

10  "Well, I'm going to deny summary judgment because they got this

11  letter."  But we also know the doctors testified -- I mean,

12  that's the ironic thing.  Every doctor who's testified

13  throughout this litigation -- this is, you know, a hundred

14  million dollar, billion dollar litigation -- you'd think

15  someone would come and say, "My gosh, now that I know," like

16  you said, "now that I've seen all this," because, trust me,

17  they have showed it to them in the depositions.  They're not

18  shy about it:  "Look at the $430 million plea, look at this

19  evidence, this was fraudulent, this was fraudulent," on and on

20  and on for six hours; you know, "Do you now feel duped?  Do you

21  think this was completely whacky that you did it?  Would you

22  agree that your patients got no benefit?"

23          One, we've not seen anybody in, as you said, ten

24  years.  I haven't been around it for ten years, but your Honor

25  has been dealing with this.

1          So the point is, you know, this idea that no one ever

2     received benefit, we saw Kaiser doctor after Kaiser doctor

3     saying on videotape:  They prescribed it.  They thought it was

4     beneficial, not for everybody but for some patients.  And once

5     you get to, you know, "some patients," then the question

6     becomes, individual trials, is this appropriate?  And I agree

7     completely with what Mr. Sobol said, that it's not about how

8     the individual TPPs were necessarily influenced because they've

9     already conceded, "We didn't rely, we didn't change, we didn't

10    do anything."

11         Then the next level becomes the doctors.  And there is

12    no case, no court, not whacky courts, District Courts and

13    Appellate Federal Courts which have said, on the pleading

14    stage, once you have to get to a doctor-by-doctor analysis,

15    that is the paradigm of a non-class action, if you will.

16         So those are just some quick points.

17         THE COURT:  The thing I've struggled with consistently

18    is -- I think you and I have had this discussion before -- you

19    can find a likelihood that the TPP or the TPP class was harmed,

20    that some of the doctors wouldn't have prescribed if they had

21    known the full truth.  The difficulty is quantifying.

22         MR. CHEFFO:  But, again, remember, I was involved in

23    this point.  You said to them, you said, look, the insurance

24    companies typically proceed -- and it's arguments we've made in

25    other courts and against Mr. Sobol's firm -- that typically

1   insurance companies should deal with things under subrogation,

2   right?  You know, so basically you have a house insurance.  The

3   house burns down, and the insurance company pays Mrs. Smith for

4   her house, and they say it's as a result of the toaster oven,

5   and they bring a lawsuit; and they stand in the shoes of the

6   house owner, and it's an individual proof.  And we've asked

7   years ago saying, well, if you're going to say that this doctor

8   prescribed it and Mrs. Smith received it for inefficacy, we

9   want to talk to those people or at least do some sampling; and

10  the Court respectfully said, "No, you can't do that."  But what

11  you did say was, "You kind of live by the sword, die by the

12  sword," my words, not yours; but you said, "Look, if you're

13  going to proceed in an aggregate basis and you're going to try

14  and have some expert come in and try to, you know, prove

15  causation through an aggregate basis, which has never been done

16  in any court ever, then I'm going to hold you to that."  And we

17  said, "Well, they can't do it."  So we proceeded and we've

18  dealt with this for years and years, and now that's where we're

19  at.  I mean, in other words, this idea that we haven't shown

20  that every TPP is not the same or we haven't shown that every

21  doctor prescribed it for a lawful purpose --

22          THE COURT:  It turns out they were actually more right

23  than not on the TPPs.  It turns out that the ones who are

24  actively managing the off-label uses are the exception, and

25  that there is a sort of numerous common class of TPPs who once

1   it got on the formulary have done nothing, basically nothing.

2         MR. CHEFFO:  Well, you know, again, respectfully on

3   that, I would say, how do we know that?  The only reason you

4   know that or we think we know that is because Mr. Sobol has

5   told us that, and I'm not disputing that I think he believes

6   that, but, in other words, there's been no surveys, there's

7   been no discovery.

8         THE COURT:  I've seen the expert reports at this

9   point, and when I went back and reread your expert, I mean, he

10  does mention a few who didn't; but it turns out to be the

11  exception, not the rule.  Most people just allowed, whether

12  it's because the state statute required it or whether it was

13  because they didn't have the resources to manage off-label,

14  they didn't.

15        MR. CHEFFO:  I wouldn't disagree that I think I

16  probably believe factually that there wasn't, but I think --

17  and this is interesting -- there's a recent Eleventh Circuit

18  decision that I don't know if you've seen, I think it's on the

19  supplemental authority, and this even goes a little farther.

20  The District Court dismissed it for all the reasons we know and

21  love on proximate causation.  What the Eleventh Circuit did

22  was, they affirmed but on different grounds.  And what they

23  said was, insurance companies are necessarily -- they deal with

24  actuarials, so basically they assume risk.  And it was really a

25  standing argument.  I know we've raised that, and your Honor

1    said, well, you know, we're kind of past that; but it was an

2    Eleventh Circuit decision recently, and what they said was that

3    because all of these potential risks, the way that they would

4    have dealt with any fraudulent marketing or any earthquake or

5    any tornado is something that they've accounted for and that

6    there is actually no damage.  So they affirmed the dismissal of

7    the case.

8          So it basically goes even a step further, and I think

9    some of those issues apply here, not only on the standing

10   ground, but the point being that whether they did or didn't,

11   right -- in other words, we could argue, or even if there was

12   proof that most didn't -- what other courts have looked at is

13   saying -- and this is what Dr. Bell has said -- I know your

14   Honor has said in the past that, you know, you've taken some

15   issue with Dr. Bell, and, you know, I've kind of gone back and

16   reread his papers, and I think -- and if there was any

17   inaccuracy or -- not inaccuracy -- if there was anything that

18   wasn't as clear to the Court, what I think Dr. Bell was saying

19   was basically --

20         THE COURT:  Maybe I should go back and read it because

21   I clearly came away from it --

22         MR. CHEFFO:  I know you did, your Honor, and, again,

23   I'm kind of apologizing if it wasn't presented right, but I

24   think what Dr. Bell's point, I would say it's still exactly

25   true now.  What he said was:  There are these multiple

4faa1526-3691-465d-9287-1dda8593e917

1    different mechanisms that insurers like TPPs can use, whether

2    it's step, or whether it's prior approval, or whether it's

3    increasing the deductible, different formularies -- you know,

4    there's ten or fifteen different things that insurers can do --

5    and he wasn't basically saying, "I've looked at every single

6    one and they've all done that."  He was giving issues as to why

7    they potentially could be different from a class certification

8    perspective.  But also, more importantly, the question of why

9    an individual insurer did not take those steps is a fact issue,

10   why they put it non-form, because --

11             THE COURT:  Well, they're not even pressing that

12   anymore.  They're basically saying you can do aggregate proof

13   with respect to the doctors.  I mean, can I ask you this:  What

14   was the docket number for Dr. Bell's?  Do you remember?

15             MR. CHEFFO:  I don't know that I have it offhand, but

16   I'll certainly send it to you.

17             THE COURT:  Just if you could e-mail it because it's

18   such a big docket at this point, I may want to go back into it

19   myself.

20             MR. CHEFFO:  Sure, absolutely.

21             THE COURT:  But let me just jump.  I understand you

22   have the case law on your side, you clearly do; but the thing

23   that's been plaguing me a little bit is, here's a big

24   corporation, the largest pharmaceutical company in the world --

25   isn't that right? -- who basically did something wrong here.

1    And at the end of the day, what deters it from doing something

2    like this again?  You know, we had the criminal prosecution,

3    and they paid $450 million, and then we had the Bextra thing

4    follow on; and at the end of the day, that benefits the federal

5    government, but none of these insurers are ever going to get

6    their money back.  That's the issue.  They can't prove it up

7    doctor by doctor ever.  I mean, it's never going to happen.

8    The healthcare industry is too big.  So, I mean, that's what's

9    sort of worrying me where there was such a pervasive problem.

10        MR. CHEFFO:  I would say two things:  First of all,

11   obviously, you know, I didn't represent the company in either

12   of those cases, but I can say clearly, you know, do they get

13   the message, do they understand the severity of it?

14        THE COURT:  Does the CEO and the board care?

15        MR. CHEFFO:  Of course, your Honor, and I think if

16   Pfizer was here today and their senior people, they would tell

17   you the fifty things that they have now done to be kind of

18   better than they were then, so that's clear.  And, you know,

19   those are institutionalized, and I think some of them were

20   things that they volunteered, and some of them are things that

21   the government imposed on them.  But, nonetheless, I firmly

22   believe, and I think they would say, that they are, from an

23   institutional perspective, incredibly focused on these issues

24   because, you know, it has to be top down, and I think that

25   they've dealt with that.

1          THE COURT:  Did the board read -- I mean, it's hard --

2          MR. CHEFFO:  Yes.  Yes, your Honor.

3          THE COURT:  In other words, because I bet you there

4     are well-meaning people there who would be horrified.

5          MR. CHEFFO:  This is not -- it's not business as

6     usual.  But I would say, from a perspective of, you know, where

7     we've kind of lost this a little bit is, these insurers collect

8     premiums, and basically people pay the insurance for these

9     premiums, and they're adjusted, just like our life insurance is

10    adjusted.  So, in other words, this idea that the plaintiffs in

11    this courthouse have not been able to recoup is I think not the

12    right analysis.  But, nonetheless, the real issue is, what

13    they're trying to do is make broad-brush nationwide class

14    actions and essentially under the guise of, you know, every

15    doctor is, my word, you know, a knucklehead, and, you know,

16    where we have to assume no matter what they say or what they

17    do, we know better.  And I think that, you know, again, we saw

18    that in the Kaiser trial, not their saying "We would have done

19    this," but the different formularies, still telling the

20    patients, you know, what they are.  We see it now, you know,

21    with Cigna, one of the class reps.  So this idea that everyone

22    was, you know, gabapentin today -- and, again, I don't want to

23    get too far here, but you've seen probably in your other

24    trials, when you talk to people who are taking medicines, it's

25    still being used for neuropathic pain for all these issues.

4faa1526-3691-465d-9287-1dda8593e917

1          THE COURT:  The prisons use it.

2          MR. CHEFFO:  I'm sorry?

3          THE COURT:  The prisons, "What drug are you on?"

4          MR. CHEFFO:  And they'll say, well, you know -- but

5    anyway, you know, you --

6          THE COURT:  "Don't you feel a little sleepy, a little

7    drowsy?  Can you do your plea colloquy?"

8          MR. CHEFFO:  That we probably would say is a

9    recognized side effect, your Honor.  But, anyway, your Honor

10   has been very respectful of me letting me go on.  I think I'll

11   sit down now.

12         THE COURT:  Well, thank you.  If you want a few

13   minutes and --

14         MR. SOBOL:  Just very briefly, two things, unless

15   Mr. Greene wants to give another impassioned speech, which I

16   loved.

17         MR. GREENE:  I just want to give you the docket

18   number -- I don't know if I gave it correctly to you -- on the

19   presumption of causation memo, Docket No. 2071 filed on

20   August 31, 2009, and the discussion on presumption of causation

21   begins at Page 7, Judge.

22         THE COURT:  All right, we'll go back.

23         MR. SOBOL:  So the three points are this:  First,

24   Neurontin was on the market for two years before there was any

25   perceptible use of Neurontin for bipolar.

Page 46

1          THE COURT:  Right.

2          MR. SOBOL:  Okay?  That shows that there's no

3   predetermined, well, since it's an antiepileptic drug, all

4   these psychiatrists are just going to up and start using it on

5   their own for bipolar.  The record indicates that that's

6   another bugaboo in terms of being an independent cause.

7          The second thing, when you do go back and reread

8   Mr. Bell's declaration, you'll find that his hypotheticals

9   aren't applied to Neurontin.  In the situations where there are

10  actions that are taken, it's typically post-class period,

11  post-December, 2004.

12         Finally, I'm going to say this:  Pfizer does not get

13  it.  First of all, they would chortle at what they were able to

14  get away with here in terms of selling billions of dollars

15  of this drug and having to pay the relatively puny criminal

16  fines.  It's a cost of doing business to them.  Indeed, they

17  don't get it so much that they still deny that they did it.

18  Last year they were here in this court and they were denying

19  they did it.  They denied that they're doing it in these

20  papers.  They won't even have somebody show up in the

21  courtroom, and we're going to listen about how Pfizer really

22  gets it and how it's really changing its ways?  It washed its

23  hands of this thing.  It took the position that when it took

24  over this company in 2000.

25         THE COURT:  It's probably ashamed, it's probably

Page 47

1   ashamed.

2        MR. SOBOL:  Yeah, but when it took it over in 2000, it

3   didn't do anything wrong at all.

4        THE COURT:  Okay, thank you.

5        MR. SOBOL:  Thank you, your Honor.

6        MR. CHEFFO:  Thank you, your Honor.

7        THE COURT:  This is really a very -- the primary

8   reason that I heard this is, as I said, the case law is going

9   against you, but it's a very troubling situation, so --

10        What do I do now?  I'll rule, and then you're going

11   to -- just a follow-up.  One thing you owe me, if you can get

12   me Dr. Bell's, the docket number, to make sure I can find it

13   again.

14        MR. CHEFFO:  Absolutely, your Honor.

15        THE COURT:  Just e-mail it to Mary Ellen, that would

16   be fine.  The second thing is, you're going to get in touch

17   with the Assurant and the Blue Cross-Blue Shield of Alabama and

18   maybe come up with a proposal, what should happen.

19        MR. CHEFFO:  We'll do that as well, your Honor.

20        THE COURT:  And depending on what I do here, is this

21   case over?

22        MR. SOBOL:  Yes.

23        THE COURT:  Those are the three outstanding things:

24   this motion for reconsideration, Blue Cross-Blue Shield of

25   Alabama, the Assurant case, and the motions in the Kaiser case.

1        MR. SOBOL:  Correct.

2        THE COURT:  And are those motions -- I actually

3   haven't seen it -- just along the lines of what to do with

4   interest and that sort of things, or are they --

5        MS. ARMSTRONG:  They are post-trial motions pursuant

6   to Rule 50(b), Rule 59, and Rule 52.

7        THE COURT:  I've recently done a huge opinion in a

8   case called Commonwealth v. Mylan in the AWP side of my

9   multidistrict litigation where there were all these sort of new

10  issues like ex post facto and that sort of thing, or are these

11  mostly sufficiency of the evidence?

12       MS. ARMSTRONG:  These are mostly issues that were

13  raised before.  There's one new issue because there's been some

14  new evidence since the trial that we've raised in --

15       THE COURT:  So there's a newly discovered evidence

16  claim?

17       MS. ARMSTRONG:  It's a new Cochrane meta-analysis, new

18  Cochrane report meta-analysis that we raised in our Rule 59

19  motion for new trial.

20       THE COURT:  All right, so other than that, it's what I

21  will call "is there enough evidence to support this verdict?"

22  rather than some brand-new constitutional issue or new case or

23  that sort of thing.

24       MS. ARMSTRONG:  Yes.  There will be evidentiary issues

25  that were raised before.

1            THE COURT:  Yes, it's sort of like --

2            MR. SOBOL:  We call it a rehash, your Honor.

3            MS. ARMSTRONG:  Well, I think the Supreme Court

4    requires us to give you one more chance before we go up on

5    appeal to address these issues.

6            THE COURT:  I understand.  I'm not faulting anyone,

7    but, truthfully, if it's a rehash or a revisiting -- let's call

8    it a revisiting -- I don't need to write.  You may need to

9    preserve, but I don't need to write.  If it's a brand-new issue

10   like a newly discovered evidence, I need to write.

11           MR. CHEFFO:  The one good news is, you may recall,

12   your Honor, you did press us on some page limits, which we

13   adhered to, so they're shorter than they would otherwise have

14   been.

15           THE COURT:  All right.

16           MR. CHEFFO:  They're still going to be longer, but

17   they're still shorter than what we might have written.

18           THE COURT:  Okay, thank you.

19           MR. GREENE:  Just one last sentence.  Judge, when you

20   look at this presumption of causation argument, we remember

21   that you are in a very unique position.  We've had a trial.  We

22   found the drug was ineffective for Neurontin.  None of the law

23   that looks at this in the aggregate causation --

24           THE COURT:  The drug was ineffective for bipolar.

25           MR. GREENE:  Pardon me?  For bipolar, yes.  None of

Page 50

1    these other cases had a trial and showed that the drugs were

2    ineffective, none of them.  This is a unique situation that you

3    face.

4              THE COURT:  I understand that, and that's why I had

5    this hearing today.  It is a unique situation.  I've got as

6    full a record as you could have, as will an appellate court.  I

7    mean, this tees it up perfectly in ways that other circuits

8    have been more preliminary.  Okay, thank you.  Thank you very

9    much to all of you.

10             THE CLERK:  All rise.

11             THE COURT:  And I just would say, to the extent that

12   you can resolve on paper what I should do with Assurant and

13   Blue Cross, I'm unlikely to have a hearing on it.  If you come

14   up with a stipulation, unless I think it's nuts, which it never

15   is, I mean, I'm likely to go with it.  I also don't know yet

16   whether I should have you in on the newly discovered evidence

17   issue, which sounds like the only thing out there, so maybe

18   I'll read it and set something up if I feel like I need it or

19   not.  Does that sound right to you?

20             MS. NUSSBAUM:  Yes, your Honor, although we think it's

21   addressed adequately in the briefing, and we don't think it's

22   newly discovered evidence; but, in any event, we're always

23   delighted to be here if you think that it would be helpful.

24             THE COURT:  Well, welcome back to the East Coast.

25             (Adjourned, 10:42 a.m.)

Page  51

1                    C E R T I F I C A T E

2

3

    UNITED STATES DISTRICT COURT )
4   DISTRICT OF MASSACHUSETTS    ) ss.
    CITY OF BOSTON               )
5

6

7             I, Lee A. Marzilli, Official Federal Court Reporter,

8   do hereby certify that the foregoing transcript, Pages 1

9   through 50 inclusive, was recorded by me stenographically at

10  the time and place aforesaid in Civil Action No. 04-10981-PBS,

11  In Re:  Neurontin Marketing, Sales Practices, and Product

12  Liability Litigation, and thereafter by me reduced to

13  typewriting and is a true and accurate record of the

14  proceedings.

15      In witness whereof I have hereunto set my hand this 16th

16  day of May, 2011.

17

18

19

20

21             /s/ Lee A. Marzilli
               _____
22             LEE A. MARZILLI, CRR
               OFFICIAL FEDERAL COURT REPORTER
23

24

25