# EXHIBIT C

# UNITED STATES DISTRICT COURT, SOUTH CAROLINA
# COLUMBIA DIVISION

VIRGIL L. ANDERSON;
MELISSA W. BARKLEY;
BETH A. BELLINO; TOSHA R. BEST;
JOE N. BLAKE CARMEN L. BOLTON;
JOY N. BOYER; SUSAN L. BRAZELL;
PATRICIA L. BROCKMAN; ANNE D. BRUCE;
BRYAN E. BURNETT; PAMELA S. CALVERT;          **Jury Trial Demanded**
KIMBERLY A. CAMPBELL-DEAN;
LESTER C. CARR; WILBUR C. CONYERS;
RICHARD A. CROSBY, JR.; JAMES G. DAVENPORT;   **COMPLAINT**
KIMM J. DAVIS; DAVID A. DAY;
ROBERT G. DEVORE; LORETTA V. DREHER;
ALLISON D. DUKES; SHARON K. EMMONS;
HARON Y. FLOYD; GEORGIA M. FLUDD;             **Civil Action No.**
SONYA M. GALLOWAY; MONICA S. GANN;
KAREN J. GREER; CHRISTOPHER L. HALL;
RACHEL A. HASH; DEBBIE R. HIERS;
DONALD A. HILDEBRAND, JR.; AMY S. JAMES;
LATONYA A. JEFFERS; CHERYL W. KIRBY;
DEXTER K. LEE; JANICE W. LEE;
GEORGE B. LEMACKS; STEPHANIE A. LOWE;
DARRIN P. MARLOW; ZINA R. MCCUE;
AUTHERINE MIDDLETON; ISIAH E. MITCHELL, SR.;
JASON M. MITCHELL; LORI L. MOCCI;
ROBERT J. MOSES; EARNESTINE PARKER;
BARBARA T. PAYNE; MARY K. PERRY;
DAVID W. PETTIT; MARY J. PICKETT;
MARY PITTMAN, Individually and as Administratrix
Of the Estate of STACY PITTMAN, Deceased;
CRAIG G. REAVES; WILLIAM J. REED;
JARVIS L. RICHBERG; MONICA RIDGEWAY, Individually
And as Administratrix of the Estate of RONALD RIDGEWAY,
Deceased; JACQUELINE SANDERS;
FLORENCE Y. SEAGRAVES; ROBERT L. SMALL;
KATHALEEN B. SMALLS; DOROTHY E. SMITH;
EARVIN N. SMITH; ROBERT N. ST. HILAIRE;
EZELL SUMMERS; WILLIE R. THAMES;
JOSEPH O. WASHINGTON, III;
EDGAR J. WATSON; DAVID D. WEATHERFORD;
LOUIS M. WEGER; DEXTER P. WIGFALL

Plaintiffs.

vs.

PFIZER, INC. and
WARNER-LAMBERT COMPANY, LLC

       Defendants.

## ORIGINAL COMPLAINT

### PARTIES

NOW INTO COURT comes VIRGIL L. ANDERSON; MELISSA W. BARKLEY; BETH A. BELLINO; TOSHA R. BEST (North Carolina); JOE N. BLAKE;CARMEN L. BOLTON; JOY N. BOYER; SUSAN L. BRAZELL; PATRICIA L. BROCKMAN; ANNE D. BRUCE (Colorado); BRYAN E. BURNETT; PAMELA S. CALVERT; KIMBERLY A. CAMPBELL-DEAN; LESTER C. CARR; WILBUR C. CONYERS; RICHARD A. CROSBY, JR.; JAMES G. DAVENPORT; KIMM J. DAVIS; DAVID A. DAY; ROBERT G. DEVORE; LORETTA V. DREHER; ALLISON D. DUKES; SHARON K. EMMONS; SHARON Y. FLOYD; GEORGIA M. FLUDD; SONYA M. GALLOWAY; MONICA S. GANN; KAREN J. GREER; CHRISTOPHER L. HALL; RACHEL A. HASH (North Carolina); DEBBIE R. HIERS; DONALD A. HILDEBRAND, JR.; AMY S. JAMES; LATONYA A. JEFFERS; CHERYL W. KIRBY; DEXTER K. LEE (North Carolina); JANICE W. LEE; GEORGE B. LEMACKS; STEPHANIE A. LOWE; DARRIN P. MARLOW; ZINA R. MCCUE; AUTHERINE MIDDLETON; ISIAH E. MITCHELL, SR.; JASON M. MITCHELL; LORI L. MOCCI; ROBERT J. MOSES; EARNESTINE PARKER; BARBARA T. PAYNE; MARY K. PERRY; DAVID W. PETTIT; MARY J. PICKETT; MARY PITTMAN, Individually and as Administratrix of the Estate of STACY PITTMAN, Deceased; CRAIG G. REAVES; WILLIAM J. REED; JARVIS L. RICHBERG; MONICA RIDGEWAY, Individually And as Administratrix

of the Estate of RONALD RIDGEWAY, Deceased; JACQUELINE SANDERS; FLORENCE Y. SEAGRAVES; ROBERT L. SMALL; KATHALEEN B. SMALLS; DOROTHY E. SMITH; EARVIN N. SMITH; ROBERT N. ST. HILAIRE (Colorado); EZELL SUMMERS; WILLIE R. THAMES; JOSEPH O. WASHINGTON, III; EDGAR J. WATSON (North Carolina); DAVID D. WEATHERFORD; LOUIS M. WEGER; DEXTER P. WIGFALL, Plaintiffs.

1.   Lead Plaintiff, Virgil L. Anderson, is an adult individual, and a citizen of, South Carolina who resides at 1012 Slash Pine Lane, Columbia, SC 29203.

2.   Defendant, Pfizer, Inc. ("Pfizer") is a foreign corporation operating and existing under the laws of the State of Delaware since June 2, 1942, and licensed to do and doing business in South Carolina.  Its corporate headquarters is located in New York, New York.  On June 19, 2000, Pfizer, Inc. acquired Warner-Lambert Company, including its Parke-Davis division.  The acquisition was accounted for as a pooling of interests.  Pfizer, Inc. restated all of its consolidated financial statements for periods prior to the acquisition to include the results of operations and financial position of Warner-Lambert Company, as if the two companies had always been merged.

3.   Defendant, Warner-Lambert Company, LLC ("Warner-Lambert") is a foreign corporation operating and existing under the laws of the State of Delaware and licensed to do and doing business in South Carolina.  Its principal place of business is Morris Plains, New Jersey. Warner-Lambert's Parke-Davis Division, prior to merger with Pfizer, was engaged in, among other things, the development, manufacture, promotion, sale and interstate distribution of prescription drugs intended for human use in the United States.  Warner-Lambert's

pharmaceutical manufacturing facilities are located in Puerto Rico, from which it ships products to all fifty states and the District of Columbia.

4. Both Pfizer and Warner-Lambert have appointed CT Corporation System, located at 75 Beattie Place, Greenville, Greenville County, South Carolina 29601, as their agent for service of process in South Carolina.

## JURISDICTION AND VENUE

1. This Court has diversity jurisdiction over this action pursuant to 28 U.S.C.A. § 1332 because the parties to this action are citizens of different states, and the amount in controversy exceeds the sum of $75,000.00 for each named Plaintiff, exclusive of interest and costs.

2. Venue is proper pursuant to 28 U.S.C.A. § 1391, because most named Plaintiffs, including lead Plaintiff Virgil L. Anderson, are citizens of South Carolina, and many of the events giving rise to Plaintiffs' claims occurred in this Judicial District.

3. Venue is appropriate in this Judicial District because the Defendants frequently transact business in the South Carolina.

4. Defendants contracted to supply goods and/or services in South Carolina, as well as in the other Plaintiffs states.

## GENERAL ALLEGATIONS

1.    The Parke-Davis division of Warner-Lambert ("Parke-Davis") developed, manufactured, promoted, sold and distributed Neurontin for human use in the United States prior to the acquisition of Warner-Lambert by Pfizer.

2.    Neurontin is, and at all times pertinent to this action, has been, developed, manufactured, promoted, sold and distributed in the United States and South Carolina by Defendants.

3.    Neurontin (generic: gabapentin) is a prescription drug available in capsule, tablet and/or oral solution form.  It is indicated, and FDA-approved, for the treatment of partial seizures associated with epilepsy (as adjunctive therapy), and the management of post-herpetic neuralgia (pain associated with herpes zoster skin rash outbreaks).

4.    Neurontin is not FDA-approved for any other uses and has not been lawfully established to be effective for treatment of other ailments.

5.    Reported side effects of Neurontin include, but are not limited to: suicidal behavior/attempts at suicide, paranoia, memory loss, hostility/rage, unsteadiness, severe mania, severe depression, abnormal thinking, incoordination, dizziness, drowsiness, water retention, nausea and/or vomiting, ataxia (inability to control muscles), fatigue, and/or viral infection.

6.    Because of the expense and time involved with filing a New Drug Application ("NDA") with the FDA (which, if approved, would permit additional uses of Neurontin), and/or conducting clinical trials to prove its safety and efficacy, Defendants never sought FDA approval for the use of Neurontin to treat any other ailments.

7.     Beginning in or about 1995, Defendants began a scheme of promoting and marketing Neurontin to doctors throughout the Unites States, including Plaintiffs and their doctors, through misrepresentations and a series of enticing vacations, lavish dinners, kickbacks and monetary incentives, among other things.

8.     Physicians are permitted to prescribe prescription drugs for unapproved uses. However, under applicable statutes and regulations, the manufacturers of Neurontin were not permitted to promote and/or market prescription drugs for unapproved uses.

9.     Defendants actively and relentlessly promoted and marketed to doctors, including Plaintiffs' doctors, that Neurontin was useful for the treatment of unapproved uses, including: bipolar and other social and mood disorders, pain syndromes, peripheral neuropathy and diabetic neuropathy, treatment of epilepsy alone (monotherapy), reflex sympathetic dystrophy (RSD), attention deficit disorder (ADD), restless leg syndrome (RLS), trigeminal neuralgia, essential tremor, migraines, chronic pain (including knee pain), anxiety and related depression and/or drug and alcohol withdrawal seizures.

10.    In fact, no evidence had been established at the time which legally justified the prescription of Neurontin for these uses, and this was known to the Defendants.

11.    Defendants engaged in various promotional and marketing schemes to realize a quick profit with Neurontin before its patent expired.  Parke-Davis's original patent was set to expire in December of 1998. Once the patent had expired, Defendants would have been forced to share the market with other generic drug companies offering customers a less expensive alternative to Neurontin.

12.    Pursuant to its promotional and marketing schemes, Parke-Davis entered into an agreement with Medical Education Systems (MES), a Delaware Limited Liability Company.  As

a result of said agreement, MES became responsible for research, preparation and publication of numerous scientific articles pertaining to Neurontin and its efficacy for unapproved uses. The content, authors and publication locations of these articles were all subject to approval by Parke-Davis. MES ghostwriters authored much of the contents in the articles and later added a doctor's name. Doctors who agreed to have their names associated with the articles were compensated monetarily.

13. Because of Defendants' marketing and promoting scheme, doctors and patients believed Neurontin could be effective for a number of off-label treatments, and it was prescribed for same.

14. Many patients who ingested Neurontin suffered countless side effects, including attempting suicide, and in some cases, successful suicide.

15. This is an action to recover damages for personal injuries, including wrongful deaths, sustained by the above-named Plaintiffs. Plaintiffs consist of both South Carolina and North Carolina residents.

16. As a direct and proximate result of Defendants' wrongful conduct in labeling, advertising, marketing and promoting the prescription drug Neurontin, Plaintiffs suffered personal injuries as herein expressed more fully.

17. The United States Attorney for the District of Massachusetts ultimately brought criminal charges against Defendants for their misconduct. The Attorneys General from the fifty states also commenced litigation against Defendants under relevant consumer protection statutes of the fifty states. On April 30, 2004, Defendants agreed to plead guilty to two federal criminal charges, and at the same time, entered into a settlement agreement with the Attorneys General and the federal prosecutors.

## SPECIFIC ALLEGATIONS

18.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

### A.    Neurontin and The Off-Label Marketing Scheme

19.     In December 1993, the FDA approved Neurontin as "adjunctive therapy" for the treatment of certain types of seizures in adult patients suffering from epilepsy.   "Adjunctive therapy" means that the drug could not be prescribed by itself for the treatment of epilepsy, but as an add-on drug in the event that a primary anti-epilepsy drug was not successful.  The FDA approved labeling stated that Neurontin is only effective at dosages ranging from 900 to 1800 mg/day.

20.     Defendants' original patent on Neurontin was set to expire in December 1998. This meant that Defendants had exclusive rights to the drug for a mere 5 years.  After the expiration of their Neurontin patent, Defendants would be forced to share the market for Neurontin with generic drug manufacturers.  This would substantially reduce Defendants' profits and their ability to keep Neurontin's retail price high.

21.     At the time Defendants filed their New Drug Application ("NDA") with the FDA, Defendants intended Neurontin to be used for other indications besides epilepsy adjunctive therapy.  In the early to mid 1990's, Defendants even filed patents for Neurontin claiming it to be effective in the treatment of depression, neurogenerative disease, mania, bipolar disease and for anxiety and panic.

22.     Defendants never sought FDA approval, however, for the use of Neurontin to treat the above conditions described in their patent applications.

23.    Defendants' sole purpose was profits.  The market for the off-label uses of Neurontin such as pain management, psychiatric disorders, anxiety and depression, were much larger than the market for epilepsy alone.

24.    Early on, Defendants intended to file supplemental NDAs in order to expand Neurontin's approved indications, including applications for monotherapy and for various psychiatric and neurological indications.  However, by 1995, Defendants came to the conclusion it would be uneconomical to assume the expense necessary to conduct clinical trials necessary to prove that Neurontin was safe and effective for these uses.  Assuming Neurontin could be proved to be safe and effective, the 1998 expiration of the Neurontin patent meant that generic manufacturers of Neurontin would reap much of the reward that comes with proving Neurontin could be safely used for other indications.

25.    After performing extensive economic analysis, senior officials for Defendants determined that it was not sufficiently profitable for Defendants to obtain FDA approval for Neurontin's alternative uses.  Instead, Defendants' officials developed a strategy that would allow Defendants to avoid the costs of proving that Neurontin was safe and effective for these other uses, while allowing Defendants to compete in the lucrative off-label markets.  As one aspect of the scheme, Defendants decided to employ a "publication strategy" that would allow it to promote Neurontin by the massive distribution of publications supposedly written by independent researchers that purportedly described the scientific evaluation of Neurontin.  A clear advantage of this strategy, from Defendants' perspective, was that it could be employed immediately-there would be no need to wait for the results of scientifically conducted clinical trials to determine if Neurontin was actually effective in the treatment of these conditions.

26.     As set forth above, federal regulations did not permit Defendants to promote unapproved uses of Neurontin.  Defendants arguably were allowed, however, to distribute publications created by independent "third parties" that described results of off-label uses of Neurontin as long as these materials were given in response to unsolicited requests from physicians.  Defendants exploited this narrow exception by creating events and programs that would allow their employees and independent contractors to promote off-label uses under circumstances that would allow Defendants the chance to deny, wrongfully, that they had actually promoted and solicited off-label usage.

27.     Marketing executives at Parke-Davis headquarters in Morris Plains, New Jersey and in its five regional business units ("CBUs") selected a marketing strategy which would deliberately lead to increased off-label usage of Neurontin even though Defendants knew that they could not promote Neurontin lawfully for non-approved uses.  These executives knew that Defendants were not supposed to create or design the contents of the communications that would be distributed pursuant to the "publication strategy" or do anything to generate the practicing physicians' interest in receiving such communications.  As demonstrated below, Defendants ignored these legal requirements and, instead, put into effect a pervasive pattern of illegal conduct, lasting from at least 1994 though 1998, and Plaintiff believes, to the present.

28.     Significant ingenuity and resourcefulness was necessary in order to execute this unlawful scheme without detection.  Faced with the fact that their "publication strategy" required publications from independent physicians, when no such publications existed, Defendants hired non-physician technical writers to create articles for medical journals and then paid actual specialists to be the articles' "ghost authors".  Faced with the fact that their normal marketing force could not deliver the off-label message, Defendants trained "medical liaisons", technical

employees who were supposed to provide balanced scientific information to doctors, to sell off-label and solicit interest in off-label uses.  And faced with the fact that in order for a publication strategy to actually increase usage of a drug, Defendants had to have a large group of doctors interested in experimenting on patients, and an even larger group of doctors who were interested in receiving information about those experiments.  Defendants generated both groups by liberally distributing payments to both groups of physicians through "consultants" meetings, speakers' bureaus, medical education seminars, grants, "studies", advisory boards and teleconferences.

29.     Defendants carried out this scheme through the following, among other things:

•     illegal kickbacks to physicians who prescribed large amounts of Neurontin for off-label purposes to patients whose prescriptions were paid for by Plaintiffs;

•     the formation of a nationwide network of employees falsely referred to as "medical liaisons" whose actual assigned duties consisted entirely of conventional direct sales activities and which did not include any legitimate scientific activity;

•     the illegal direct solicitation of physicians for off-label uses;

•     the making of false statements to physicians and pharmacists concerning the efficacy and safety of Neurontin for off-label uses;

•     the payment or offering of gratuities to Defendants' employees in order to procure their silence; and

•     the active training of Defendants' employees in methods of avoiding detection of their activities by the FDA.

**B.     Defendants Used "Medical Liaisons" To Promote Off-Label Use**

30.     Pursuant to federal regulations, Defendants' usual sales force was not permitted to promote off-label uses of Neurontin to their physician customers.  The FDA, however, permitted drug company representatives to provide balanced, truthful information regarding off-label usage

only if (1) specifically requested by a physician and (2) if there was no attempt to solicit such information by the drug company.

31.     Beginning in 1995, Defendants increasingly hired "medical liaisons" and trained them to aggressively solicit requests for off-label information from physicians.  Once this door was open, Defendants trained those medical liaisons to engage in full scale promotion of Neurontin's off-label uses, including repetitive distribution of non-specific, anecdotal information designed to convince physicians that off-label usage of Neurontin was safe and effective.  In effect, Defendants used the medical liaisons as a surrogate sales force that had liberty to solicit physicians regarding off-label uses.  Indeed, medical liaisons were selected and promoted based on their ability to sell.

32.     Defendants knew their use of these medical liaisons was unlawful, but continued the practice.  In fact, the whistleblower, Dr. Franklin, was told by Defendants that the use of medical liaisons, were merely "disguised" ways of getting around the FDA rules.

33.     For example, on April 16, 1996, at a training session for medical liaisons, Defendants' in-house lawyers stopped the video taping of a medical liaison training session to advise the liaisons that notwithstanding formal policies to the contrary, liaisons could "cold call" on physicians so long as they had executed request forms, i.e., forms that supposedly verified that the physician had initiated the meeting, at the end of the call.  The liaisons were informed that the requests forms could be filled out by Defendants' sales' representatives instead of the doctors.  Defendants Company lawyers also informed the liaisons in training that there was no need to present balanced information to the customers and those liaisons should always remember that sales were necessary in order to keep the company profitable.  The liaisons were also informed by the lawyers, off camera, that there really was no definition of "solicitation" and

that there were methods to induce the physicians to inquire about off-label uses. In effect, once the medical liaison got a meeting with a doctor, there were ways to get the information about off-label uses to the doctor even if the physicians had not actually requested off-label information. The lawyers also warned the liaisons that under no circumstances should any information about off-label uses be put in writing.

34. Medical liaisons were instructed in the clearest possible terms that they were to market and sell Neurontin based on its off-label uses. For example, on a teleconference on May 14, 1996, John Ford, a senior marketing executive for Defendants directly informed the medical liaisons that in order to market Neurontin effectively, Neurontin had to be marketed for monotherapy, pain, bipolar disorder, and other psychiatric uses, all of which were off-label. Ford conceded that such marketing had to be primarily performed by the medical liaisons, because they were the only ones who could discuss these matters. At another meeting with the medical liaisons, Ford was even more straightforward. He said:

"...I want you out there every day selling Neurontin. Look this isn't just me, it's come down from Morris Plains that Neurontin is more profitable...We all know Neurontin's not growing adjunctive therapy, beside that is not where the money is. Pain management, now that's money. Monotherapy, that's money. We don't want to share these patients with everybody, we want them on Neurontin only. We want their whole budget, not a quarter, not half, the whole thing...We can't wait for them to ask, we need to get out there and tell them up front...That's where we need to be holding their hand and whispering in their ear, Neurontin for pain, Neurontin for monotherapy, Neurontin for bipolar, Neurontin for everything...I don't want to see a single patient coming off until they have been up to at least 4800mg/day. I don't want to hear that safety crap either, have you tried Neurontin, every one of you should take one just to see there is nothing, it's a great drug..."

35. Medical liaisons were trained with a "pitch" to cold call physicians who saw the most patients in a given specialty, and sell them on the off-label benefits of Neurontin. A key aspect of this scheme was misrepresentation. The first misrepresentation was usually the status of the medical liaisons as they, with the full approval of Defendants' marketing officials such as

John Ford, Phil Magistro, and John Krukar, were routinely introduced as specialists in the specific drug they were presenting at a particular meeting. Medical liaisons were also encouraged to represent themselves as medical researchers, even though they neither conducted medical research nor analyzed medical research performed by others. It was also not uncommon for medical liaisons to be introduced as physicians, even though they had no such qualifications. Sales personnel were instructed to introduce medical liaisons as scientific employees who were given mandatory leave of their academic duties to make an individual appearance.

36.     Other aspects of this pitch (labeled the "Neurontin Cold Call Story") included the following among other aspects:

•       Mention that you are the eyes and ears of Defendants' research and that you are gathering clinical info;

•       Then ask general questions about the nature of the practice;

•       Mention Neurontin and its approved uses, but dismiss them as old news;

•       Ask leading questions about the number of pain patients that the practice sees;

•       Ask a series of questions that determine the practice profile for all of the potential off-label uses;

•       Reveal that Defendants have "a great deal of information about the fantastic response rate of patients on Neurontin in all of these disease states";

•       Move into a discussion of the clinical trials that this information is demanding;

•       And the "90-95% response rate that we are seeing in more than 80% of patients";

•       Present the doctor with any publications that are available and point out that many common drugs for pain treatment are in few if any publications;

- Ask the physician to place some patients on Neurontin and tell them that the medical liaison will stay in touch to help develop any case reports;

- Mention that case reports can be lucrative and can lead to clinical trials;

- Offer to do a presentation and luncheon for the entire practice or a group of his friends that will details all of the "data" we have;

- Invite the physician to consultant meetings in the future and point out that they pay $250 plus a nice trip or meal in the city; and

- If a sales representative is present they should close the sale by asking that the next patient he sees should be put on Neurontin.

37. During a training session for medical liaisons, Dr. Franklin first witnessed the scope of the off-label claims that Defendants intended to market Neurontin. The medical liaisons were provided with new company slides that detailed the method to use to increase the use of Neurontin in several different off-label practice types. The slide show contained a slide that showed the "Anecdotal Uses of Neurontin' including reflex sympathetic dystrophy, peripheral neuropathy, diabetic neuropathy, trigeminal neuralgia, post-herpetic neuralgia, trigeminal neuralgia, post-Herpetic neuralgia, essential tremor, restless leg syndrome, attention deficit disorder, periodic limb movement disorder, migraine, bipolar disorder, Lou Gehrig's Disease, and drug and alcohol withdrawal seizures.

38. Defendants' executives explained that "this list was very important to the company but that it makes Neurontin look like snake oil, so preempt the laughter by telling your physicians that, 'I'm embarrassed to show you the next slide because it makes Neurontin look like snake oil, but the fact is, we are seeing extra-ordinary results, in some cases up to 90% response in all of these conditions, that will get their attention.'" Richard Grady, a medical

liaison, asked if "we have any money to lace studies without big docs". He was instructed to "use the potential of a study to get in the door, even get protocols, but don't waste too much time and don't say you can get them a study, we don't have much money left". He was then told that "if anyone asks for back-up data say we are pulling it together, then suggest that the doc put some of his patients on Neurontin and we will help him publish case reports that could help place a study in his practice. Everybody wins."

39.      Importantly, none of the off-label claims made in the slide had been substantiated let alone approved, by the FDA.

40.      Defendants also made extensive misrepresentations regarding the scientific information concerning ff-label usage of Neurontin. According to Dr. Franklin, the following misrepresentations relating to off-label usage of Neurontin were routinely made to physicians with Defendants' knowledge and consent:

• **Bipolar Disorder**: Medical liaisons informed psychiatrists that early results from clinical trials evaluating Neurontin for the treatment of bipolar disorder indicated a ninety percent (90%) response rate when Neurontin was started at 900 mg/day dosage and increased to a dosage of 4800 mg/day. No such results existed. Nor was any type of clinical trial being conducted other than a pilot study. There were no clinical trials or studies indicating that Neurontin was safe or effective up to 4800 mg/day. Indeed, Defendants were in possession at this time of evidence which showed that a placebo was more effective for bipolar than Neurontin. Any data relating to the use of Neurontin in bipolar disorder was strictly anecdotal and of nominal scientific value. Indeed, most of the published reports on this topic had been written and commercially sponsored by Defendants, although this fact was hidden. Medical liaisons were trained to inform psychiatrists that there were no reports of adverse effects for Neurontin when used for

psychiatric purposes.  In fact, such reports had been reported to Defendants' personnel, but Defendants attempted to hide such reports from physicians.

- **Peripheral Neuropathy, Diabetic Neuropathy, and Other Pain Syndromes:** Medical liaisons were trained and instructed to report that "leaks" from clinical trials demonstrated that Neurontin was highly effective in the treatment of pain was being reported.  No such body of evidence existed.  Nor was there any legitimate pool of data from which a response rate, much less a ninety percent (90%) response rate, could be calculated.  Medical liaisons were trained to claim support for these findings as a result of inside information about clinical trials where such information existed.  The only support for these claims was anecdotal evidence of nominal scientific value.  Many of the published case reports had been created and/or sponsored by Defendants in articles which frequently hid Defendants' involvement in the creation of the article.  Defendants' payment for the creation of these case reports was also hidden from physicians.

- **Epilepsy Monotherapy**: Medical liaisons were strongly encouraged to push neurologists to prescribe Neurontin as the sole medication to treat epilepsy, even though studies only found it safe and effective as adjunctive therapy.  Medical liaisons were trained to inform neurologists that substantial evidence supported Defendants' claim that Neurontin was effective as monotherapy.  In fact, at this time, Defendants knew that clinical trials regarding Neurontin's efficacy as a monotherapy were inconclusive.  One of Defendants' clinical trials demonstrated that Neurontin was not an effective monotherapy agent; the vast majority of patients in the study taking Neurontin were unable to continue with Neurontin alone.  The same study showed that there was no effective difference between administration of Neurontin 600, 1200 or 2400 mg. Notwithstanding this data, Defendants continued to claim that physicians should use Neurontin

as substantially higher doses than indicated by the labeling.  Indeed, although medical liaisons routinely claimed Neurontin to be effective as monotherapy, in 1997, the Food and Drug Administration refused to find Neurontin a safe and effective monotherapy.

- **Reflex Sympathetic Dystrophy ("RSD")**: Medical liaisons informed physicians that extensive evidence demonstrated the efficacy of Neurontin in the treatment of RSD.  The only such evidence that existed was anecdotal reports of nominal scientific value.  Medical liaisons were trained to refer to case reports, most of which had been created or sponsored by Defendants, as "studies".

- **Attention Deficit Disorder ("ADD")**: Medical liaisons were instructed to inform pediatricians that Neurontin was effective for the treatment of ADD.  No data, other than occasional anecdotal evidence, supported this claim.  Nonetheless, the medical liaisons were trained to report that large number of physicians had success treating ADD with Neurontin, when no such case reports existed.

- **Restless Leg Syndrome ("RLS")**: RLS was another condition where Defendants' medical liaisons were trained to refer to a growing body of data relating to the condition, when no scientific data existed.  The only reports were anecdotal, most of which had been created and/or sponsored by Defendants.

- **Trigeminal Neuralgia**: Although medical liaisons represented that Neurontin could treat Trigeminal Neuralgia, again no scientific data supported this claim with the exception of occasional anecdotal reports.  No data demonstrated that Neurontin was as effective as currently available pain killers, most of which were inexpensive.

- **Post-Herpetic Neuralgia ("PHN")**: Medical liaisons were trained to tell physicians that seventy-five percent (75%) to eighty percent (80%) of all PHN patients were successfully treated with Neurontin.  Once again, no clinical trial data supported such a claim.

- **Essential Tremor Periodic Limb Movement Disorder**: Medical liaisons were trained to allege that Neurontin was effective in the treatment of these conditions.  No scientific data supported such claims with the exception of anecdotal reports of nominal scientific value.

- **Migraine**: Claims that Neurontin was effective in the treatment of migraine headaches were made by the medical liaisons and were supposedly based on early results from clinical trials.  Although pilot studies had been suggested and undertaken, no early results of clinical trails existed to support these claims.  Once again, any data relating to treatment of migraines was purely anecdotal and of nominal scientific value.  Most of the case reports were either created or sponsored by Defendants.

- **Drug and Alcohol Withdrawal Seizures**: Medical liaisons suggested that Neurontin be used in the treatment of drug and alcohol withdrawals despite the lack of any data supporting Neurontin as an effective treatment for these conditions.

41.     Defendants knew and intended for physicians to rely on these misrepresentations. These physicians did so and consequently provided inaccurate and untruthful medical advice to their patients.  Regardless, Defendants' personnel routinely made these misrepresentations as part of company policy.  Misrepresentations were made to physicians by Dr. Franklin and other co-employees including Michael Davies, Joseph McFarland, Lisa Kellett, Joseph Dymkowski, Darly Moy, Richard Grady, Ken Lawler and many others.

42.     Dr. Franklin also reported that Defendants were guilty of the following conduct:

- Under order of the company and as a result of training of medical liaisons, Dr. Franklin "deliberately contrived reports to mislead physicians into believing that a body of data existed that demonstrated the effectiveness of Neurontin in the treatment of bipolar disease".

- Dr. Franklin was trained and instructed to actively deceive physicians with contrived data, falsified "leaks" from clinical trials, scientifically flawed reports, or "success stories" that stated Neurontin was highly effective in the treatment of a variety of pain syndromes.  No such body of evidence existed.

- He was instructed to advise physicians that Defendants has developed a large body of data to support the use of Neurontin as monotherapy.  This was an "outright lie" and left patients unknowingly without good seizure control.

- Medical liaisons were instructed to tell physicians that a great deal of data existed that supported the safe use of Neurontin at levels that exceed 4800 mg/day.  However, clinically significant safety data existed at dosing levels at only 1800 mg/day.

- Defendants provided medical liaisons with slides that stated that Neurontin was effective for the treatment of Attention Deficit Disorders but no data existed to support that claim.

C.        **Defendants' Illegal Payments to Doctors**

43.        Defendants' "publication strategy" required physicians and the "medical liaisons" to perform the work normally performed by the company's salesmen in order to promote Neurontin.  Adoption of this strategy required Defendants to make tens of thousands of payments to the physicians who would act as a surrogate sales force was as well as practicing physicians

who would receive the message.  In other words, adoption of the publication strategy required Defendants to make thousands of payments to physicians for the purpose of having those doctors either recommend the prescription of Neurontin or to order Neurontin, in violation of federal kickback regulations.  Defendants were aware that these regulations were violated routinely. The following describes the various programs Defendants used to make these payments to physicians:

**1.      Consultant's Meetings**

44.      Defendant used "consultant meetings" to make illegal payment to physicians to encourage off-label use of Neurontin.  Federal rules prohibit "kickbacks" to physicians and medical care providers in exchange for prescribing a particular drug.  Defendants disguised their kickback as "consultant ships".

45.      Under this guise, Defendants recruited physicians to dinners or conferences and paid them to hear presentations about off-label uses of Neurontin.  Under the fiction that these doctors were acting as consultants, Defendants sometimes (but not always) had the doctors sign sham consulting agreements.  At these meetings, Defendants would give these doctors lengthy presentations relating to Neurontin, particularly regarding off-label usage.  Presentations would be made by Defendants' employees or physician speakers hired by Defendants for the purpose of promoting Neurontin, and attendees' questions relating to the administration of Neurontin use would be solicited and answered.  At some conferences, the sponsoring organization or Defendants intentionally posed questions to the speakers about off-label use to insure that attendees were exposed to such information.

46. At some, but not all, "consultants" meetings a few questions would be posed to the consultants regarding Defendants' marketing of Neurontin or how Defendants sales force could provide better service to the doctors. The consultants' meetings, however, were not held, and the consultants were not paid, for the purpose of providing Defendants with expert, independent advice. Defendants in many cases did not even records the "advice" provided by its consultants and what advice was collected was never acted upon or reviewed.

47. Defendants did, however, routinely analyze whether the consultant's meetings were successful in getting the attendees to change their prescription writing practices. At some meetings, the consultants were directly asked if they would write more Neurontin prescriptions as a result of the meeting. Such a question would have been irrelevant if the actual purpose of the meeting was to receive the consultant's advice. Defendants also routinely tracked consultants' Neurontin prescription writing practices after these meetings. Using market data purchased from third parties, Defendants analyzed whether the doctors they had paid had in fact written more Neurontin prescriptions after the meeting. Again, such data was only relevant if the real purpose of the payments was to influence the doctors to order more Neurontin.

48. A typical consultants' meeting was held in Juniper Beach, Florida for neurologists from the North East CBU during the weekend of April 19-21, 1996. The "consultants" selected for this meeting were not chosen on the basis of their consulting acumen, but because of their potential to write Neurontin prescriptions. In a memorandum announcing the event to Defendants' personnel, the "Neurontin Marketing Team" acknowledged that in order to target neurologists with the greatest potential for writing Neurontin prescriptions, sales personnel must select potential attendees from a list of top prescription writers for anti-epileptic drugs in the Northeast; only persons who fell within this desirable demographic were allowed to be invited.

49.     Qualifying physicians were given round-trip airfare to Florida (worth $800.00), two nights accommodations (worth $340.00), free meals and entertainment, ground transportation and a "consultant's fee" of $250.00.  Ample time was provided so that Defendants' consultants could enjoy the beach resort.  The value of the junket was approximately $2,000.00 per physician.

50.     The Juniper Beach consultants meeting included two half days of presentations by Defendants relating to Neurontin, including extensive presentations relating to off-label uses. Although technically the presentations were provided by an independent company, Proworx, all aspects of the presentation were designed, monitored, and approved by Defendants.  Defendants selected the speakers, picked the presentation topics, and previewed the content of the presentations to make sure that they were acceptable.  Defendants paid all expenses relating to the consultants' meeting including all payments to the attendees and the presenters, all travel, accommodation, meals and entertainment expenses, all presentation expenses, all expenses and fees incurred by Proworx, and the substantial fees paid to the presenting physicians. Notwithstanding the FDA's prohibition regarding the provision of promotional materials on off-label uses, Defendants provided written abstracts of the presentations that detailed off-label use of Neurontin to each of its "consultants".

51.     Defendants made no effort to obtain professional advice at Juniper Beach from the consultants Defendants had entertained during the weekend.  A follow-up memorandum to Defendants' marketing officials noted that "the participants were delivered a hard hitting message about Neurontin" and emphasized that the participants were encouraged to use Neurontin at higher doses.  More importantly, after the conference Defendants generated "trending worksheets" listing the doctors who attended the consultants' meeting.  These

worksheets enabled Defendants to track Neurontin prescription habits of the attendees before and after the consultants' meetings to determine if these "high writing" prescribers wrote more Neurontin after the conference. Persuading these heavy prescribers to order more Neurontin for their patients was, in fact, the sole purpose of the Juniper Beach meeting.

52. Defendants hosted dozens of similar consultants' meetings between late 1995 and 1997 in which the consultants received payments and gratuities as well as presentations on off-label Neurontin use designed to change the physicians' prescription writing habits. Comparable consultants' meeting included, but were not limited to the following:

| Topic | Location | Dates |
|---|---|---|
| Mastering Epilepsy | La Costa Resort, CA | July 20-23, 1995 |
| Mastering Epilepsy | Santa Fe, NM | Nov. 16-19, 1995 |
| Neurontin Consultants Conference | Marco Island, FL | February 2-4, 1996 |
| Pediatric Epilepsy | Hutchinson Island, FL | February 9-11,1996 |
| Mastering Epilepsy | Walt Disney World, FL | February 22-25, 1996 |
| Pediatric Epilepsy | Hutchinson Island, FL | March 8-10, 1996 |
| Mastering Epilepsy | Ritz Carlton, Aspen, CO | April 18-21, 1996 |
| Affective Disorders in Psychiatry | Marco Island, FL | April 20, 1996 |
| Affective Disorder Consultants Conference | Southern Pines, NC | April 27, 1996 |
| Neuropathic Pain Conference | Palm Beach, FL | May 11, 1996 |
| Regional Consultants Conference | Ritz Carlton, Boston MA | May 10-11, 1996 |
| Epilepsy Management Advisors Meeting | Sheraton Grande Torrey Pines, La Jolla, CA | June 21-23, 1996 |
| Epilepsy Management | Rancho Bernardo, CA | June 28-30, 1996 |

24

| Use of Anti-Consultants in Psychiatric Disorders | Short Hills, NJ | October 18-19, 1996 |
| Non-epileptic Uses of Neurontin | Longboat Key, FL | Nov. 6, 1996 |
| Neurological Conditions Conference | Ritz Carlton, Atlanta, GA | Sept. 27-28, 1997 |

Other "consultants' meetings took place at Charleston, SC, Coconut Grove, FL, Naples, FL, Memphis, TN, Louisville, KY, Washington, D.C., Aspen, CO, and other places. Hundreds, if not thousands, of physicians received kickbacks to attend those events.

53. Not all payments to consultants were made at conferences as elaborate as Juniper Beach. Many such meetings consisted of expensive dinners at local restaurants. The emphasis on these meetings was also on off-label uses, and $200 "honorariums" were paid to the physicians who did nothing for the payment, except show up. At none of the events did the consultants provide legitimate consultation to Defendants, but at all of the events the consultants were encouraged to increase their Neurontin prescription writing.

### 2. Medical Education Seminars

54. Another format where Defendants paid kickbacks to physicians to hear off-label promotion of Neurontin were programs billed as Continuing Medical Education seminars ("CME"). These conferences and seminars were set up to appear to qualify for an exception to the FDA's off-label marketing restrictions which permits physicians to learn about off-label uses of pharmaceuticals at independent seminars. Such seminars, however, must be truly independent of the drug companies. The drug companies may make "unrestricted grants" for the purpose of a seminar, but may not be involved in formulating the content of the presentations, picking the speakers, or selecting the attendees. None of these requirements were observed with regard to

the CME seminars sponsored by Defendants for the promotion of off-label uses of Neurontin. While Defendants retained third party organizations, such as Proworx, to present the event seminars, it had control of virtually every aspect of these events, and the seminar companies obtained Defendants' approval for all content presented at the seminars.  Defendants also paid all expenses, including all the seminar companies' fees.

55.     Although the seminar companies acted as the conduit for the payments and gratuities given to the physician attendees, like the Juniper Beach consultants' meetings, Defendants controlled every aspect of the CME programs.  Defendants designed and approved the programs; hand-picked the speakers for the seminars; approved the seminar presentations of the seminars; previewed, in most cases, the contents of the seminars prior to delivery; selected the attendees based on their ability and willingness to prescribe high quantities of Neurontin; evaluated the presentations to make sure Defendants' "message" was appropriately delivered; black-listed presenters whose presentations were not sufficiently pro-Neurontin; and monitored the prescribing patterns of the physicians who attended these conferences to insure the purpose of the conference-increased writing of Neurontin prescriptions-was achieved.  Follow-up reports to marketing executives for Defendants highlighted that the attendees received presentation regarding off-label marketing and recommendations for dosages larger than those labeled effectively by the FDA.  These memoranda also reported to senior executives the pledges made by attendees to order more Neurontin for their patients.

56.     For some seminars, high prescription writing physicians were selected to receive junkets comparable to those Defendants provided to the attendees of the Juniper Beach "consultants" meetings.  Others were less lavish, but physicians received free tuition, free accommodations, free meals and cash.  Frequently the Defendants' CME seminars were

accredited by continuing medical education organizations, which meant that the physicians taking advantage of Defendants' junkets did not have to pay tuition or spend additional time to fulfill their continuing medical education licensure requirements by attending truly independent medical education programs.

57.     Representative CME programs sponsored by Defendants where they paid extensive kickbacks to attending physicians, included, but are not limited to, the following:

| **Seminar** | **Location** | **Date** |
|---|---|---|
| Merritt-Putnam Epilepsy Postgraduate Course | unknown | January 19, 1996 |
| Merritt-Putnam Seminar | Chicago, IL | January 26, 1996 |
| New Frontiers in Anti-Epileptic Drug Use | California | Sept.-Oct. 1996 |
| Diabetic Neuropathy | Ritz Carlton, Boston | June 22-24, 1997 |
| Merritt-Putnam Symposium | Key Biscayne, FL | September 11, 1997 |
| Merritt-Putnam Conference on Monotherapy | Palm Springs, CA | September 9, 1997 |
| Merritt-Putnam Conference on Monotherapy | St. Louis, MO | October 3, 1997 |
| Merritt-Putnam Symposium | Boston, MA | December 5, 1997 |

### 3.     Grants and "Studies"

58.     Defendants also made outright payments, in the form of grants, to reward demonstrated Neurontin believers and advocates. Defendants' sales managers identified key doctors who actively prescribed Neurontin or programs which were willing to host Neurontin

speakers and encouraged such persons or programs to obtain "educational grants" from Defendants.  Under this program of kickbacks Defendants paid:

• $2,000.00 to Berge Ninmpolan, MD, "a great Neurontin believer", to attend a neurology seminar in San Francisco, in March 1996;

• $1,000.00 to the University of Texas at Houston, Department of Neurology to host a symposium where presentations would be made regarding successful off-label treatment with Neurontin;

• $3,000.00 to the University of Texas Medical School to host a conference in August 1996, at which a well known specialist in epilepsy, who prescribed Neurontin, would attend;

• $4,000.00 to pay for a neurologist from the University of Texas at San Antonio to attend the American Epilepsy Society Conference in December 1996, a conference at which Defendants was presenting extensive documentation on off-label uses for Neurontin;

• $2,500.00 to the University of Texas at Houston to bring Dr. B.J. Wilder to the campus to hold a seminar.  Dr. Wilder was one of Neurontin's biggest boosters for off-label indications and had been paid tens of thousands of dollars to promote Neurontin's off-label uses for Defendants across the country;

• $2,500.00 in June 1996 to pay for representatives from the University of Pennsylvania Medical Center to attend a conference in Saint Petersberg, Russia on the utilization of  anti-epileptic drugs, including Neurontin;

• $5,000.00 Dr. Alan B. Ettinger, of Stony Brook, NY in December 1996, a physician who had informed Defendants that he was interested in possibly doing research in Neurontin and maintained a database of patients who were treated with Neurontin;

- $500.00 to Bruce Ehrenberg, of Boston, MA, a leading speaker for Defendants regarding off-label uses of Neurontin, to attend a conference in China;

- $1,000.00 to Israel Abrams, M.D., Paul C. Marshall, M.D., Beth Rosen, M.D. and Spencer G. Weig, M.D., of Worcester, MA., for educational programs in February 1996. According to the local Defendants' representatives requesting the grant, "much of the Neurontin success in Worcester has been attributed to…the 4 pediepileptologists below.";

- $1,400.00 to Dr. Ahmad Beydoun of Ann Arbor, MI for post-graduate training in March 1996. This grant was processed on a quick turnaround, the Defendants representative noting "I realize that this is a very short time line; however, Dr. Beydoun is a very important is a very important customer.";

- $1,500.00 to Jim McAuley, Ph.D. for educational materials relating to epilepsy. Defendants decided to provide the funds because McAuley was an advocate of Neurontin and he was important in getting another Defendants' drug, Cerebyx, accepted on the formulary for Ohio State University; and

- A grant in an unknown amount to University Hospital in Cleveland in exchange for the hosting programs regarding Neurontin's use in treating neuropathic pain at conferences specifically devoted to obtaining referrals from other doctors.

59. These grants, and others, were charged to the Neurontin marketing budget. Each of these grants was made solely because an individual who would receive the money was a large Neurontin supporter or would host a program where a well-known Neurontin supporter would recommend that other physicians increase their prescriptions of Neurontin. Each of these grant awards constituted a reward or kickback for the recipient's advocacy of Neurontin.

60.     Defendants' medical liaisons informed leading Neurontin subscribers that significant advocacy for Neurontin would result in the payment of large grants.  These studies did not involve significant work for the physicians.  Often they required little more than collating and writing up office notes or records.  Indeed, as noted below, Defendants frequently hired technical writers to write the articles for which the "authors" had been given grants.

61.     Defendants were aware that these articles and studies provided minimal scientific benefit.  In a letter to the FDA in June 1997, Defendants submitted a list of "studies relating to pain, pain syndromes and psychiatric disorders" which failed to include any of these numerous studies, purportedly funded by Defendants.  Defendants intentionally neglected to report these "studies" to the FDA and concealed these "studies" from the FDA because they knew the funded "research" had no specific value and would not be deemed to be studies by the FDA.  Payments Defendants made for "studies" included, but were not limited to the following:

| **Funded Project** | **Payee** | **Payment** |
| --- | --- | --- |
| Statistical Analysis of Patients Treated With Neurontin For Pain | Hans Hansen, M.D. Statesville, NC | $7,000.00 |
| Reduction of Sympathetically Medicated Pain and Sudomotor | David R. Longmire, M.D. Russellville, AL | $7,000.00 |
| Data Entry for Neurontin and Pain Analysis | Travis Jackson, M.D., David Meyer, M.D.; Winton-Salem, NC | unknown |
| Trial of Neurontin for distal Symmetric polyneuropathy associated with AIDS | Joseph Weissman, M.D. Atlanta, GA | $20,000.00 |
| Neurontin for neuropathic pain in chronic pain syndromes | Lavern Brett, M.D. Washington, D.C. | $25,000.00 |

| Retrospective chart analysis of Neurontin use with bipolar disorder patients | Ralph S. Rybeck, M.D. | $5,000.00 |
| Retrospective Analysis of Neurontin In the treatment of pain | David R. Longmire, M.D. Russellville, AL | $2,000.00 |
| Retrospective Analysis of Neurontin In the treatment of chronic pain | Don Schanz, D.O. | $8,000.00 |
| Case histories relating to use of Neurontin as an adjuvant analgesic | Elizabeth J. Narcessian, M.D.; W. Orange, NJ | $4,000.00 |

Plaintiffs have reason to believe that other payments were made to physicians for other "studies" of questionable scientific credibility.

62.     One particularly large study conducted by Defendants served as yet another engine to financially reward physicians for prescribing Neurontin.  In 1995 and 1996, Defendants conducted an enormous trial known as STEPS.  Although STEPS took the form of a research clinical trial, it was, in fact, a marketing ploy designed to induce neurologists to become comfortable prescribing Neurontin at a far higher dose than indicated in the FDA approved labeling.  While most clinical studies have a limited number of investigations treating a number of patients qualified for the study, the STEPS protocol called for over 1,200 "investigators" to enroll only a few points each.  The participating physicians were instructed to titrate their patients to higher than labeled dosages of Neurontin to demonstrate that patients could tolerate high dosages of the drug.  Rewarding physicians for prescribing high doses of Neurontin was another way to increase Neurontin sales because higher per patient dosages increased the amount of Neurontin sold.  Additionally, the STEPS study was also designed to habituate physicians to place non-study patients on Neurontin on doses higher than found effective in the clinical trials monitored by the FDA.

63.     Physicians enrolling in the STEPS study were paid for agreeing to participate in the study and for every patient enrolled.  At the conclusion of the study, Defendants offered each of the 1,200 investigators additional cash for each patient the doctor kept on Neurontin after the study ended.  These payments were paid unquestionably kickbacks; each participating doctor was expressly paid for writing Neurontin prescriptions for their patients.  The number of investigators who received such payments are too many for Plaintiff to list.  Additionally, Defendants have exclusive control of the information regarding who received such payments at the conclusion of the STEPS trial.

### 4.     Payments to "Authors" of Ghost Written Articles

64.     Yet another method of rewarding doctors for their advocacy of Neurontin was to pay them honorarium for lending their names to scientific articles which were actually prepared and written by third parties retained by Defendants.   In 1996, Defendants retained AMM/ADELPHI, Ltd. ("AMM") and Medical Education Systems, Inc. ("MES") to prepare no less than twenty (20) articles for publication in various neurology and psychiatry journals.  Most of these articles concerned off-label usage of Neurontin and were generated so that Defendants would have completely controlled publications they could distribute pursuant to their "publication strategy".  The content of these articles were actually written by non-physician technical writers retained by Defendants, and Defendants had the right to control the content of all the articles.   Defendants paid all expenses in connection with the creation of these publications.

65.     Once Defendants and the technical writers conceived the articles, Defendants and their outside firms attempted to find recognized Neurontin prescribers whose names could be

used as the authors of these articles. In some cases, drafts of the articles were completed even before an "author" agreed to place his or her name on the article. This even occurred in connection with case histories that purported to describe the "authors'" personal treatment of actual patients. The "authors" were paid an honorarium of $1,000.00 to lend their names to these articles, and also were able to claim publication credit on their curriculum vitae.

66. Defendants and their outside firms found journals that would publish the articles. Defendants' role in creating, approving and sponsoring the articles was hidden from the public. While the articles might reference that the author received an honorarium from the outside firm, the articles failed to state that the honorarium was paid with money provided by Defendants and that Defendants had approved the content and hired the actual authors. For example, an article created by Medical Education Systems ("MES"), *Gabapentin and Lamotrignine: Novel Treatments for Mood and Anxiety Disorders,* published in CNS Spectrums noted that "an honorarium was received from Medical Education Systems for preparation of this article", but never revealed Defendants' retention and payment of MES or the fact the MES personnel, while under contract to Defendants, wrote the article.

67. Defendants used these publications as part of their publication strategy by presenting the articles as evidence of independent research conducted by persons with no monetary interest in Neurontin. This impression, of course, was false. Defendants created the articles to promote off-label uses for Neurontin, purchased the names and reputations of the authors with kickbacks and controlled the content of the articles.

68. Defendants also found the Speakers' Bureau, another method to make large and numerous payments to physicians who recommended Neurontin at teleconferences, dinner meetings, consultants meetings, educational seminars, and other events. These speakers

repeatedly gave short presentations relating to Neurontin for which they were paid anywhere from $250.00 to $3,000.00 per event. Speakers such as Steven Schachter, B. J. Wilder, Ilo Leppik, Gary Mellick, David Longmire, Gregory Bergey, Michael Merren, David Treiman, Michael Sperling, Martha Morrell, R. Eugene Ramsay, John Pellock, Ahmad Beydoun, Thomas Browne, John Gates, Jeffrey Gelblum, Dennis Nitz, Robert Knobler, and others received tens of thousands of dollars annually in exchange for recommending to fellow physicians that Neurontin be prescribed, particularly for off-label uses. The payments that these doctors received were far in excess of the fair market value of the work they performed for Defendants. Speakers who most zealously advocated Neurontin were hired most frequently for speaking events, notwithstanding the fact that many of these events purported to be independent medical education seminars where independent information was supposed to be delivered. The identity of the doctors in the Speaker's Bureau who received kickbacks through excessive compensation can only be determined after review of the records in the exclusive custody of the Defendant.

69.    Defendants' marketing personnel, including its medical liaison staff, informed physicians of the lucrative rewards of joining the Neurontin Speaker's Bureau. Physicians were informed that it they prescribed enough Neurontin, they, too, could also be eligible for receiving substantial payments just for describing their clinical experience to peers at events dedicated to promoting Neurontin's off-label uses. Defendants' marketing personnel, however, made it clear that the only way the doctors could receive such cash payments was if they prescribed substantial amounts of Neurontin to their patients, preferably for off-label uses.

70.    Defendants either knew that the payments described above constituted kickbacks or acted in reckless disregard of federal laws and regulations that prohibit such kickbacks. They also knew that federal safe harbors did not cover the extensive payments their made to doctors.

Moreover, Defendants were aware that their payments did not comply with the AMA's guidelines for payments to physicians.

71.     In 1997, in the wake of an investigation by the FDA, Defendants conducted a review of their marketing practices in light of existing Federal kickback regulations.  As a result of that review, Defendants determined that none of the programs described above should have been conducted in the manner previously conducted by Defendants.  Defendants issued guidelines to comply with the Federal regulations which essentially prohibited each of the programs described above.  Nonetheless, the payments to physicians for the off-label marketing of Neurontin did not cease and the programs continued at least until 1998.  Defendants' records demonstrate payments of inappropriate kickbacks to doctors through 1998, and perhaps up to the guilty plea in May, 2004.

## CAUSES OF ACTION:

## I. MISREPRESENTATION (FRAUD)

72.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

73.     Defendants, directly or indirectly, made material misrepresentations, or failed to disclose material facts, to Plaintiffs, and their doctors, regarding the efficacy and safety of Neurontin when used for unapproved purposes.  In particular, Defendant engaged in a promotional campaign for Neurontin that encouraged doctors to prescribe the drug for purposes unapproved by the FDA, and for which there was no, or insufficient, proof of safety and/or effectiveness.  Defendants did not warn doctors, and therefore, their patients, about the suicidal side effects associated with ingesting Neurontin.

74.     Defendants, through their experience, were in a position of superiority over Plaintiffs, and their doctors with respect to knowledge of:

        a.   The safety and efficacy of Neurontin for unapproved uses; and

        b.   The side effects of Neurontin in patients taking it for unapproved uses.

75.     Defendants had a duty to disclose these facts to Plaintiffs, and their doctors, and failed to do so.  As such, Defendants misrepresented facts known to them to be deceptive and/or failed to disclose their complete knowledge of the efficacy and safety of Neurontin for unapproved uses.

76.     The material misrepresentations and omissions were, or should have been, known by Defendants to be deceptive and dangerous when made.

77.     Defendants intended, or could reasonably have foreseen or expected, that these material misrepresentations and omissions would influence Plaintiffs, and their doctors, in their decisions to purchase or prescribe Neurontin for unapproved uses, and therefore could lead to the personal injuries described herein.

78.     Plaintiffs, and their doctors in fact relied to their detriment and physical and mental injury upon the deceptive statements of fact made by Defendants.

79.     As a direct and proximate cause of Defendants' conduct, Plaintiffs have suffered actual damages including, and without limitation, medical expenses associated with their personal injuries.

## II. NEGLIGENCE

80.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

81.    Defendants owed a duty to Plaintiffs, and their doctors, to exercise the ordinary care and diligence exercised by a reasonable and prudent manufacturer under the same or similar circumstances.

82.    Defendants owed a duty to Plaintiffs, and their doctors, to provide adequate warnings of the safety and effectiveness of Neurontin.

83.    Defendants owed a duty to Plaintiffs, and their doctors, to ensure that Defendants' marketing and promotional efforts did not weaken or vitiate the safety and effectiveness warnings to Plaintiffs, and their doctors.

84.    Defendants owed a duty to Plaintiffs, and their doctors, to restrict the use of Neurontin if Defendants were on notice that Neurontin was used indiscriminately or in any manner inconsistent with the appropriate safety and effectiveness warnings. Defendants violated the duty owed to Plaintiffs, and their doctors, and were negligent in the following particulars:

      a.   Promoting and marketing Neurontin to doctors, for unapproved uses;

      b.   Failing to warn, upon promotion and marketing of Neurontin, of the negative side effects Neurontin has on patients, including, but not limited to, suicidal ideation, successful suicide and suicide attempt(s);

      c.   Failing to disclose the unlawfulness of promoting Neurontin for unapproved uses.

      d.   Failing to adequately investigate and study the safety usefulness of Neurontin for unapproved uses before advertising, marketing and promoting it for unapproved uses.

      e.   Failing to take reasonable steps to restrict the use of Neurontin.

f.  Upon notice of adverse effects containing suicidal side effects in patients using Neurontin, failing to warn doctors, patients and medical professionals of the dangers.

## III. NEGLIGENCE PER SE

85.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

86.    Defendants'' acts and omissions, as set forth above, violated the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §301 et seq.

87.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered actual damages including, and without limitation, medical expenses associated with their personal injuries.

## IV. BREACH OF EXPRESS WARRANTY

88.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

89.    The different forms of Neurontin (capsules, tablets and oral solution) were "goods" under Article II of the Uniform Commercial Code.

90.    Plaintiffs were "buyers" in that they contracted for and purchased goods manufactured by the Defendants.

91.    Defendants were "merchants" in that they deal in goods of the kind purchased by Plaintiffs and the class members.

92.    Defendants were "sellers" in that they sold or contracted to sell goods.

93.    Plaintiffs received express warranties from Defendants, through their doctors, through MES' publications and through the written materials included with the purchased

Neurontin, that Neurontin was safe, effective, fit and proper for its intended use. These express warranties significantly exaggerated the safety and effectiveness of Neurontin. Plaintiffs do not presently have possession of the written warranties; however, Plaintiffs reasonably expect that those materials will be located during discovery proceedings in this action.

94.     The goods were not in their warranted condition.

95.     Plaintiffs are entitled to incidental and consequential damages, as appropriate, under Article II of the Uniform Commercial Code.

96.     As a direct and proximate result of Defendants' conduct, Plaintiffs and the class members have suffered actual damages including, and without limitation, medical expenses associated with their personal injuries.

## V. STRICT PRODUCT LIABILITY AND PRODUCT LIABILITY

97.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

98.     Defendants are strictly liable by reason of their above actions and omissions. Neurontin in its above "off-label" use(s) was a dangerous and hazardous product as that term is defined by law. Such strict liability and product liabilities are causally related to the above injuries, illnesses, suicidal ideation and suicides themselves.

## VI. PERSONAL INJURIES

99.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

100.    Defendants are liable for the physical and mental injuries associated with the

attempt(s) at suicide and the successful suicide(s) of certain Plaintiffs based on the misconduct herein alleged. Specifically, Defendants are liable for the following personal injuries:

      a.  physical pain and mental anguish in the past; and

      b.  future physical pain and mental anguish; and/or

      c.  loss of past earning; and/or

      d.  loss of the present value of future earnings and earning capacity; and

      e.  the above present value of reasonable, necessary, usual and customary psychiatric, psychological, medical and mental treatment, hospitalization, therapy, which in such medical probability they will incur and sustain; and/or

      f.  past psychological, mental, physical, psychiatric treatments, therapy, medications, hospitalizations they have paid and incurred to the date of trial

## VII. WRONGFUL DEATH ACTIONS AND SURVIVAL ACTIONS

101.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

102.    Wrongful death actions/survival actions are brought under the Constitutions and/or laws of South Carolina, and the other Plaintiffs' states, governing these actions and under their common law.

## **PRAYER FOR RELIEF**

103. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.


**WHEREFORE**, Plaintiffs pray that this Court award each Plaintiff:

1. Actual and compensatory damages for all costs and expenses incurred due to the Plaintiffs' purchase and/or ingestion of Neurontin;

2. Damages for Plaintiffs still living, including but not limited to:

   a. Damages for loss of past and future earnings;

   b. Expenses for past and future medical expenses;

   c. Loss of consortium;

   d. Mental and emotional distress; and

   e. Loss of companionship, love, maintenance, support, services, advice and counsel.

3. Wrongful death/survival damages, including but not limited to:

   a. Loss of Consortium;

   b. Loss of past and future earnings;

   c. Loss of inheritance;

   d. Mental and emotional distress associated with the untimely death of a loved one; and

   e. Loss of companionship, love, maintenance, support, services, advice and counsel.

41

4.      Punitive damages to punish Defendants and deter future misconduct by

Defendants and others.

5.      All prejudgment interest at the maximum rate permitted by law on all actual

damages found and awarded;

6.      All post-judgment interest at the maximum rate permitted by law and on all

damages awarded;

7.      Attorneys' fees and costs; and

8.      All other and further relief for which this Court deems appropriate.

**RESPECTFULLY SUBMITTED,**

**LOCAL COUNSEL FOR PLAINTIFFS:**


_____s/William Green_____

WILLIAM GREEN
*Law Offices of William A. Green, LLC*
South Carolina State Bar No.15265
3511 Rivers Ave
North Charleston, South Carolina 29405
Telephone:     (843)747-2455
Facsimile:      (843)554-4496


**CO-COUNSEL FOR PLAINTIFFS:**

NEWTON B. SCHWARTZ, SR., *Pro Hac Vice*
*Law Offices of Newton B. Schwartz, Sr.*
Texas State Bar No.17869000
1911 Southwest Freeway
Houston, Texas 77098
Telephone:     (713) 630-0708
Facsimile:      (713) 630-0789


JACK W. HARANG, *Pro Hac Vice*
*Law Offices Jack W. Harang, APLC*
Louisiana State Bar No.15083
3500 North Hullen Street

Metairie, Louisiana 70002
Telephone:     (504) 456-8658
Facsimile:     (504) 456-8641


JULIE C. PARKER (Atty. No. 91418)
ANDREW B. SACKS (Atty. No. 41393)
JOHN K. WESTON (Atty. No. 26314)
*Sacks & Weston*
114 Old York Rd.
Jenkintown, Pennsylvania 19046
Telephone:     (215) 925-8200
Facsimile:     (215) 925-0508