UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS


IN RE:                          )
                                )
NEURONTIN MARKETING, SALES      )
PRACTICES AND PRODUCTS          )
LIABILITY LITIGATION            )      Civil Action
                                )      No. 04-10981-PBS
                                )
                                )
                                )
                                )


**MOTION HEARING**


BEFORE THE HONORABLE LEO T. SOROKIN
UNITED STATES MAGISTRATE JUDGE


UNITED STATES DISTRICT COURT
John J. Moakley U.S. Courthouse
1 Courthouse Way
Boston, Massachusetts 02210
April 9, 2012
2:00 p.m.


*   *   *   *


CATHERINE A. HANDEL, RPR-CM, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way
Boston, Massachusetts 02210
(617) 261-0555

1

2       APPEARANCES:

3       For the Plaintiffs:

4
        LAW OFFICE OF NEWTON B. SCHWARTZ
5       By:  Newton B. Schwartz, Sr., Esq.,
             and Jack W. Harang, Esq.
6            1911 Southwest Freeway
             Houston, TX 77098
7

8

9
        For the Defendant Pfizer:
10

11      SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
        By:  Mark S. Cheffo, Esq., and
12           Katherine Arthur Lyon, Esq.
             Four Times Square
13           New York, NY 10036

14

15

16

17

18

19

20

21

22

23

24

25

```
1              P R O C E E D I N G S
2              (The following proceedings were held in open court
3     before the Honorable Leo T. Sorokin, United States Magistrate
4     Judge, United States District Court, District of Massachusetts,
5     at the John J. Moakley United States Courthouse, One Courthouse
6     Way, Boston, Massachusetts, on April 9, 2012.)
7              COURTROOM DEPUTY CLERK SIMEONE:  The case of In Re
8     Neurontin, Civil Action No. 04-10981 will now be heard before
9     this Court.  Counsel, please identify yourselves.
10             THE COURT:  Please be seated.
11             Mr. Schwartz, is that you?
12             MR. SCHWARTZ:  Yes.
13             THE COURT:  Do you want to identify yourself for the
14    record.
15             MR. SCHWARTZ:  Newton Schwartz, Sr., your Honor.
16             THE COURT:  All right.
17             MR. SCHWARTZ:  May I make a statement about my
18    colleague's travel here this morning?  As best I know, since
19    he's not here, I think the Court is entitled to an
20    explanation.
21             THE COURT:  All right.
22             MR. SCHWARTZ:  He was leaving from New Orleans and
23    was to arrive by U.S. Air at Boston ten minutes different than
24    me.  My flight was delayed 20 minutes from the -- my Southwest
25    flight from Chicago got here at 12:30 instead of 12:20.  I had
```

1    emailed him -- my office did -- to wait and meet -- since he

2    was not having luggage, I had to wait for all the -- what you

3    see spread out over here (indicating), luggage, and he was

4    supposed to have met me there.

5          Then we got another email that his flight was

6    delayed.  This is to my secretary in Houston when I got off

7    the plane.  At the same time she told me about two more cases

8    being dismissed, which I'll -- I've told counsel and I'll tell

9    the Court, and that at 12:30 is the last communication I have

10   heard from him.

11         Over the weekend, we had talked.  We both -- we got

12   the Court's transcript Saturday afternoon and emailed him a

13   copy and Mabel Lo and I and Vincent Lo went over it in

14   Houston, but he had a copy, which we appreciate very much the

15   clerk -- the court reporter, Ms. Kline, emailing it to us on a

16   Saturday of a Good Friday, Passover, Easter holiday, above and

17   beyond the call of duty.

18         THE COURT:  Yes.  All right.  So, then --

19         MR. SCHWARTZ:  So, that's the latest as of an hour

20   and a half ago and -- my cell phone doesn't work in this

21   building.  It used to, but it doesn't.  So, I've been

22   incommunicado since I got here roughly an hour ago.

23         THE COURT:  All right.

24         COURTROOM DEPUTY CLERK SIMEONE:  I got a message from

25   him --

1          MR. SCHWARTZ:  I had his cell phone --

2          THE COURT:  Hold on one second.

3          (Discussion off the record at the bench.)

4          THE COURT:  So, he contacted Ms. Simeone and said

5     that his plane was running late and he anticipated being here

6     shortly after 2 o'clock.

7          MR. SCHWARTZ:  He did say that they did give a

8     message that he would be here --

9          THE COURT:  Fine.  I understand.

10          MR. SCHWARTZ:  Yes, your Honor.

11          THE COURT:  He's on his way, and none of us control

12     the airlines.

13          MR. SCHWARTZ:  Mine left at 6:00 on the dot this

14     morning from Houston.

15          THE COURT:  Mr. Cheffo, do you want to identify

16     yourself for the record.

17          MR. CHEFFO:  Yes, your Honor.  Mark Cheffo.  I'm here

18     with Katherine Lyon from Skadden for Pfizer.  Thank you.

19          THE COURT:  So, Mr. Schwartz, let me tell you why I

20     scheduled another hearing.

21          What Ms. Lo requested -- for two reasons I was

22     unhappy.  One is, I didn't think Ms. Lo was, with all due

23     respect -- she handled herself very well at the hearing.  It's

24     not a reflection of her -- wasn't in the position to really

25     address the issue at hand and where the defendants have asked

1    for dismissal of 34 cases and particularly where -- what the

2    response to the issues at hand were, Judge, give us another 90

3    days.  And she conceded that some of the cases had been

4    handled by an associate in your firm who has now left.  And

5    so, she knew something of the status of those, but she didn't

6    supervise him.  So, she really wasn't capable of speaking to

7    those cases quite the way she could speak to the cases that

8    she worked on, but -- so, that wasn't to my satisfaction.  It

9    wasn't good enough.  So, that's why I had another hearing and

10   wanted you and Mr. Harang, who I view as the lead lawyers on

11   these cases, to come.

12          And the fundamental question -- well, the fundamental

13   question I have is:  Are we ever going to do these cases?

14   Because -- just hear me out -- the impression that I have is

15   that these cases just are sitting.  Usually plaintiffs come to

16   the Court and they want to move the cases, because until they

17   get a verdict or a settlement, they don't get any money and

18   usually it's the defendants that are coming up to the Court

19   and saying, Judge, we need a little more on discovery.  We

20   need a little more this.  We need a little more that.  Slow

21   down.  Slow down.  And the plaintiffs want to move it along.

22          But in this case it seems that at every turn, it's

23   either the Court or the defendants who are prompting to move

24   these cases along.  I set schedules, ambitious albeit at

25   times, but schedules to move the cases forward, and they don't

1   seem to be fully met.

2          And then last year when we had -- there were some

3   various pleadings and orders regarding dismissing cases or not

4   dismissing cases.  I won't characterize those documents in any

5   way other than they all exist.  That is, I issued some orders.

6   Judge Saris issued some orders.  You filed some papers.

7          And then what happened is after all that was done,

8   all your cases were pending, and you came to the Court and

9   said, Judge, I want you to stay some of these cases and you

10  identified which ones, because these are cases that we think

11  we, the Schwartz law firm, don't want to pursue anymore.  We

12  think we want to either withdraw as counsel.  We want to

13  dismiss them.  So, we don't want to put ourselves or the

14  defendants or the plaintiff to the burden of further

15  litigation.  Give us a little bit of time.  Give us some time

16  without the litigation, staying the case, to talk to them, to

17  see whether they agree with whatever we might suggest.

18  Perfectly reasonable request, I thought, and I said fine, and

19  I did that, and all I asked of you was to report to me every

20  30 days as to the status of this.

21          So, what I understood from what the request was and

22  from what I would understand from all these other cases and

23  handling cases, that you would write a letter or otherwise

24  communicate orally with the client, explain to them the

25  situation, have a discussion.  It might entail one

1    conversation.  It might entail several.  It might be one

2    meeting.  It might be several.  And then you would reach a

3    conclusion and that conclusion will be one of three things:

4              (A) You dismiss the case, (B) you withdraw the

5    case -- you withdraw as counsel, rather, or (C) you would

6    decide to proceed with the case, representing the person as

7    counsel.

8              From my perspective, any one of those three results

9    would be fine.  They would be the judgment that you and your

10   clients made after conversation about what to do, and in any

11   one of those three circumstances, the stay would be lifted and

12   the cases -- in one form or another, something would happen to

13   the cases.

14             But what never occurred to me would happen is that

15   almost a year later, they would still be stayed and that --

16   and I've gone over this pretty carefully, all the various

17   status reports that your firm has filed recently in response

18   to my orders and it doesn't seem that there's been that much

19   communication until recently.  So, I'm just at a loss as to,

20   frankly, what to do to move these cases forward on any one of

21   those courses.

22             MR. SCHWARTZ:  May I respond?

23             THE COURT:  Yes.

24             MR. SCHWARTZ:  First of all, your Honor, you're

25   absolutely correct.  In 58 years, 53 of it in private practice

```
1    representing plaintiffs exclusively, we don't -- I have to go
2    a step further.  We don't make money until the check clears,
3    which is usually after trials and appeals.
4           Now, I'm not going to go into the various cases that
5    we've had, the classic one being Chick Kam Choo vs. Exxon,
6    where we tried it 22 years after the case was originally filed
7    in federal court.  Ten years later the U.S. Supreme Court
8    reversed the Fifth Circuit and my late cousin, who ruled to
9    dismiss us under the anti-injunction statute, which Chick Kam
10   Choo rode on, which was brought up the first day of the
11   Medicare relief --
12          THE COURT:  I get the point that it took a long time.
13   Some cases take 22 years, but let me ask you this, Mr.
14   Schwartz.
15          MR. SCHWARTZ:  That's the --
16          THE COURT:  During the 22 years that that case was
17   being litigated, how long was it -- was it stayed for the
18   first 21 years and then you litigated it in the last year?
19          MR. SCHWARTZ:  No.
20          THE COURT:  Right.  In fact, you were fighting it
21   most of the 22 years.
22          MR. SCHWARTZ:  It was in the state appellate
23   courts --
24          THE COURT:  Right.
25          MR. SCHWARTZ:  -- the Fifth Circuit twice and the
```

```
1    Supreme Court twice --

2              THE COURT:  Right.

3              MR. SCHWARTZ:  -- before we got to a jury trial.

4              THE COURT:  Right.

5              MR. SCHWARTZ:  That's the classic -- that's like John

6    Dice vs. --

7              THE COURT:  Yes, but you were litigating.

8              MR. SCHWARTZ:  That's correct.

9              Your Honor, we have named two -- I've told counsel

10   again this morning, we have -- our first two selections to get

11   remanded are the Samuel Pastine, deceased, case, which two

12   doctors, prescribing doctors, had been deposed.  We met with

13   Mabel and Vincent Lo Saturday and can't find if they've given

14   us the name of the sales representative, but if it is -- and I

15   talked to Mr. Cheffo about this and counsel this morning --

16   that if that sales representative is no longer in their

17   employee, we'll go search him down and subpoena him.

18   Ethically we can't do that if they're still in their employ,

19   obviously.

20             But I said, furthermore, we can take -- if that sales

21   representative had been deposed previously -- I don't care

22   about what counsel, Finkelstein, London, others I don't know.

23   One in Georgia.  I don't know his name -- we would probably be

24   agreed, for purposes of discovery, to let that be part of a

25   transfer -- what you call transfer, we call remand.  Either
```

```
 1   way, it's sending it back to West Virginia from whence it
 2   came.
 3           And the second case was the Girard case out of
 4   Philadelphia, where I happen to be admitted in Pennsylvania,
 5   and Mr. Harang and I would try that one in West Virginia.  We
 6   have co-counsel who want -- who actually want to try the case
 7   Pastine with us, which is their privilege, obviously.
 8           I've named two more to them -- I've got two more
 9   named that Mabel and Vincent Lo are going to confirm, one in
10   Nevada --
11           THE COURT:  How many pending cases do you have in
12   this MDL appeal?
13           MR. SCHWARTZ:  23 -- you mean pending -- in this MDL?
14           THE COURT:  Yes, pending or stayed that are --
15           MR. SCHWARTZ:  -- is exactly correct.  I think 76
16   whatever -- I've got the figure up in your -- from the hearing
17   that -- the number --
18           THE COURT:  All right.  76 --
19           MR. SCHWARTZ:  Deducting from the 215 -- the 225 that
20   Mr. Cheffo started with nine years ago before I got into the
21   case -- Mr. Harang was originally counsel -- there are 23 left
22   that we want to probably litigate, unless something
23   unforeseen --
24           THE COURT:  That's separate from the 34 that are
25   stayed?
```

```
 1              MR. SCHWARTZ:  That's separate, and the nine.

 2              Now, today this morning in my office we got --

 3              THE COURT:  So, you have three groups:  23 you say

 4   you want to litigate.

 5              MR. SCHWARTZ:  34 --

 6              THE COURT:  34 that are stayed.

 7              MR. SCHWARTZ:  Nine --

 8              THE COURT:  Nine that are --

 9              MR. SCHWARTZ:  Out of those 34, nine --

10              THE COURT:  What's the nine?

11              MR. SCHWARTZ:  We subtract one each today because --

12   and I read into the record -- I'll read into the record the

13   names of the two --

14              THE COURT:  What are the nine cases?  There are nine

15   cases you want to litigate and there are nine cases that are

16   stayed?

17              MR. SCHWARTZ:  I don't think -- right now, from our

18   meeting Saturday, that we want to litigate, the 23.

19              Now, some cases -- one case that we originally valued

20   very highly, Mr. Harang took the deposition with Mr. Steve

21   Malone and it's probably one that Mr. Cheffo mentioned to Ms.

22   Lo after the hearing last Friday, the 30th, that we've given

23   away some good cases.  That case was one of our top three

24   choices until we learned, not in the deposition that they took

25   -- they may have known it and we didn't.  It should have been
```

1    easily known.  It's public record.  That he -- that the son

2    made a substantial six -- high six-figure malpractice

3    settlement with the doctor that prescribed the Neurontin.

4              Now, how that cuts both ways -- it's clearly a credit

5    against any verdict from -- and may have other confounders in

6    there, but there's a case that we -- I valued as one of the

7    three best cases all along, along with Pastine and Mr. Girard.

8              THE COURT:  But I'm not evaluating cases.

9              MR. SCHWARTZ:  I understand.  I'm just saying that we

10   want to try these and we want --

11             THE COURT:  So, the nine cases -- you have 23 you say

12   you want to try.  You have nine cases -- 34 cases that you say

13   are stayed, that are subject to the various stayed orders --

14             MR. SCHWARTZ:  We have to take one away from each of

15   those, because today we're filing a motion to dismiss, not

16   withdraw, Shanna Ericsson-Harkness -- this is one of the 34.

17             THE COURT:  So, the 34 becomes 33.

18             MR. SCHWARTZ:  And Wanda Nichols becomes -- one of

19   the nine becomes now eight.

20             THE COURT:  What do you want to do with the other

21   eight?  Are those cases -- in the world I live in, Mr.

22   Schwartz, that you either dismiss cases or you litigate cases.

23             MR. SCHWARTZ:  Well, you named the correct third

24   alternative in the transcript and again today, your Honor.

25   The third is the ethical constraint we have.  We can't just

```
 1    dismiss a case because it's with prejudice.
 2            THE COURT:  Right.  You don't have authority to
 3    dismiss a case.  I understand that.
 4            MR. SCHWARTZ:  Right.
 5            THE COURT:  So, then you either have to go to the
 6    client -- you either have to litigate the case or you have to
 7    withdraw if you want to ethically -- if you think you can't
 8    litigate.
 9            MR. SCHWARTZ:  Correct.
10            THE COURT:  So, my question is:  In those eight
11    cases, are those cases you want to withdraw from or are those
12    cases you want to litigate?
13            MR. SCHWARTZ:  As of right now, the withdrawal and --
14    withdrawal, not litigate, barring unforeseen last-minute
15    developments or late --
16            THE COURT:  So, you have 34 cases that became 33
17    cases today that you're either going to obtain dismissal or
18    you want to withdraw from.  That's one category.
19            MR. SCHWARTZ:  -- withdraw -- either obtain dismissal
20    if the client consents.
21            THE COURT:  Right, or withdraw.  That's one category.
22            You have eight cases that are not stayed that you
23    wish to do the same thing with.
24            MR. SCHWARTZ:  The Los are evaluating those as we
25    speak and over the weekend to give a --
```

1          THE COURT:  Well, I'm not interested in -- the time

2    for evaluation has passed.  The moment is now to tell me are

3    those eight in the bucket as of right now at this moment,

4    okay, in the bucket of, Judge, I want them stayed because --

5    or I want them in the box of I'm thinking we want to withdraw.

6          MR. SCHWARTZ:  We do want them stayed for final

7    investigation, because the Los are very -- by their ancestry

8    and nature have two assets that I don't have.  One is immense

9    patience --

10          THE COURT:  Based on their what?

11          MR. SCHWARTZ:  Their --

12          THE COURT:  Based on their --

13          MR. SCHWARTZ:  They're not Chinese -- let me say

14    this:

15          One is from Hong Kong, born there.  One is from

16    Macau.  Macau is a Portuguese colony.

17          I've always treated them as People's Republic of

18    China citizens first native born.  They are not -- they are

19    American citizens by virtue of -- not birth right, but

20    following the immigration procedures.  They have two -- one

21    has been with me twelve years, one ten.  They have immense

22    patience that I don't have in dealing with some of these

23    clients who would call weekly and want to talk an hour or two

24    and make repeated -- I'll use the phrase Chinese water

25    torture.  That's maybe not politically correct today, but

```
1    that's -- they have that great asset, that they can hear a
2    client for an hour and a half, patiently.  I'm at age 81 and
3    almost 82 and I don't have that anymore, your Honor.  I just
4    don't have the staying power.  And they are afraid to make a
5    mistake, just like we have made in the past, as Mr. Cheffo
6    told her -- reminded her of it after the hearing last week --
7              THE COURT:  You know what the problem with being a
8    lawyer practicing law is, Mr. Schwartz?
9              MR. SCHWARTZ:  Indecisiveness.
10             THE COURT:  No.  Whatever you do and whatever you
11   don't do, you could make a mistake.  You know, every moment of
12   every day you have a choice, to act in your case or not act in
13   your case.  If you act, you run the risk of committing
14   grievous error.  It's possible.  If you don't act, you run the
15   risk of committing grievous error and --
16             MR. SCHWARTZ:  It's a no-win.
17             THE COURT:  -- you just have to -- you have to -- if
18   you are skilled and experienced and diligent and careful and
19   talk to your client, you do the best you can do and you move
20   forward reasonably, with reasonable dispatch, but, you know, a
21   year -- most people would think a year is -- excessive would
22   be mild, the term that they would suggest, in order to
23   determine whether your client wants to dismiss or withdraw.
24             MR. SCHWARTZ:  It should be.  It should be.  No
25   question about it.  These are not bright-line cases, like
```

```
 1   mesothelioma.

 2             THE COURT:  I didn't say it was easy --

 3             MR. SCHWARTZ:  There -- these are not --

 4             THE COURT:  -- but you just have to meet with a

 5   client, review -- it isn't as if you got these cases a year

 6   ago.

 7             MR. SCHWARTZ:  No.

 8             THE COURT:  Right?  The MDL has been pending --

 9             MR. SCHWARTZ:  Six years, seven years --

10             THE COURT:  Right.

11             MR. SCHWARTZ:  -- I've been in the fight.  I've spent

12   more than a quarter of a million dollars on medical records

13   and they're all incomplete.  We're embarrassed when we get on

14   with the defendant's records or depositions, that they've got

15   more records than we have, even though we're using the same

16   service on some of them now.

17             THE COURT:  Do you even know where all the plaintiffs

18   who are stayed are?

19             MR. SCHWARTZ:  Do I personally know?

20             THE COURT:  Not you personally.

21             MR. SCHWARTZ:  No.

22             THE COURT:  Are you or the members of your law

23   firm --

24             MR. SCHWARTZ:  They know that --

25             THE COURT:  -- able to communicate and receive a
```

1    response from each of the now 33 plaintiffs whose cases are

2    stayed?

3            MR. SCHWARTZ:  Some get out of -- out of

4    communication for weeks and months at a time.  They lose

5    communication.  We lose communication with them.

6            That's true with merchant seamen.  I've represented

7    seamen for 40 some odd years.  They would be out on a ship for

8    six or nine months and you could track them if it were a union

9    ship, but not if it's a -- you know, a pirate ship or it's an

10   off-label --

11           THE COURT:  I'm not sure that pirate ships are

12   covered by the --

13           MR. SCHWARTZ:  Well, that's true.

14           But, no, they -- we always have communication

15   problems with the clients, representing plaintiffs.  We've had

16   that despite the Internet and despite Google and Facebook and

17   all those.

18           THE COURT:  Let me ask Mr. Cheffo something.

19           So, Mr. Cheffo, turning to the 23 which are not the

20   subject of your motion because they're not stayed.

21           MR. CHEFFO:  Correct.

22           THE COURT:  How many of those cases have you taken

23   the depositions you wish to take?

24           MR. CHEFFO:  Well, we've taken -- and now I have to

25   ask counsel.

```
 1              THE COURT:  If you want her to speak, that's fine.

 2              MR. CHEFFO:  She's told me.  So, I think I'll just

 3    tell you and if I get it wrong, she'll correct me, but

 4    we've --

 5              THE COURT:  You can have her talk, too.  I'm

 6    perfectly happy.  I remember your name because you've been

 7    here.

 8              MR. CHEFFO:  Yes, absolutely, your Honor.

 9              We've taken the depositions of all the plaintiffs.

10              THE COURT:  Might be good experience.  I heard this

11    rumor about New York law firms.  I heard this rumor about New

12    York -- it's New York where Skadden, Arps is, right?

13              MR. CHEFFO:  And here, too.

14              THE COURT:  But you're in New York?

15              MR. CHEFFO:  We're in New York.

16              THE COURT:  You're in the New York office.

17              MR. CHEFFO:  I'm going to dispel the rumor.

18              Ms. Lyon is going to address the Court on the statute

19    of -- of the status of where we are.

20              MS. LYON:  Your Honor, we have taken all plaintiff

21    depositions in the Schwartz cases, the 23.  We have not taken

22    all prescriber depositions.  We've taken about half the cases

23    where the depositions -- and, as Mr. Cheffo noted at the last

24    conference, the vast majority of those were noticed by us.

25    There were two cases that the Schwartz firm noticed the
```

1   prescriber depositions in.

2           Part of the process that we've encountered is after

3   taking the plaintiff's deposition and preparing for the

4   prescriber depositions, we have been sending correspondence to

5   the Schwartz firm and at times they've been agreeable to

6   dismissing and withdraw.  So --

7           THE COURT:  So, what you're finding is that as to

8   these 23, they haven't agreed to dismiss, correct?

9           MS. LYON:  As to these 23, not yet.

10          THE COURT:  But as to some of these 23, you are

11  pressing them because, in your judgment, some of them you

12  think -- when I say "you," I mean you and your compatriots --

13  don't believe that they should proceed?

14          MS. LYON:  Correct.  Yes.

15          THE COURT:  So, as to ones which you don't think you

16  have a particularly good argument to make to Mr. Schwartz's

17  law firm to dismiss, you all have already proceeded to take

18  the depositions of the prescribers?

19          MS. LYON:  There are other cases where we will

20  proceed to take the depositions of the prescribers to the

21  extent that they do not agree to dismiss or withdraw because

22  we will want those records.

23          THE COURT:  Right, I understand that.  I assumed

24  you're going to take the deposition of all the relevant

25  prescribers in any case which isn't dismissed.

```
1              MS. LYON:  Yes.
2              THE COURT:  You don't want to leave any stone
3    unturned.
4              So, is it fair to say -- if it isn't, that's okay.
5    I'm just trying to understand.
6              Is it fair to say that all of the cases within the 23
7    for which you have not taken any prescriber depositions,
8    putting aside the two that the Schwartz firm did, if you all
9    noticed before -- not for you, but you had the benefit of
10   notice -- are ones in which you have made requests to the
11   Schwartz law firm to dismiss because, in your judgment, after
12   hearing the plaintiff's deposition, you don't think they have
13   a meritorious case?
14             MS. LYON:  I would say that we have noticed the
15   depositions of all of the prescribers other than those two
16   cases that were discussed last -- at the last hearing, and we
17   intend, if we haven't already, to send them a letter with
18   regard to the others prior to -- we usually set a deposition
19   date after contacting the prescriber and prior to the
20   deposition, in the course of reviewing the records, send
21   correspondence to the Schwartz firm asking for dismissal.
22             THE COURT:  Are there ones that you've asked them to
23   dismiss within the 23 that are just pending response from
24   them?
25             MS. LYON:  No.
```

```
 1            THE COURT:  So, all the ones in the 23 that you think
 2   they should dismiss, you've written to them and they've
 3   responded and said whatever they said.  You don't have to tell
 4   me what they said.
 5            MS. LYON:  Not all of the 23, your Honor.  There
 6   probably are some within that that before the plaintiff
 7   deposition, we wrote to them and asked them to dismiss and we
 8   would probably do that again before we scheduled another
 9   prescriber deposition, but there are some prescriber
10   depositions that we have not requested yet and that we will
11   want to take.
12            (Attorney Harang enters courtroom.)
13            THE COURT:  Okay.  Welcome, Mr. Harang.  I got the
14   message your plane was delayed.
15            MR. HARANG:  I apologize, your Honor.
16            THE COURT:  That's all right.  None of us control the
17   airlines.
18            So, how many -- of the 23 cases, how many prescriber
19   depositions do you think there would be?  Or approximately how
20   many?
21            MS. LYON:  I would say approximately 15 to 20
22   remaining.
23            THE COURT:  15 to 20 prescriber depositions
24   remaining.  So, even in the 23 cases, there might be a couple
25   you need to take prescribers or that might overlap with some
```

1    that you already took?

2          MS. LYON:  Yes.  I would say in -- out of the 23,

3    there are ten that -- ten or eleven that we've already

4    finished the prescriber depositions in.  So, the 15 to 20

5    would be twelve cases.

6          THE COURT:  I see.  So --

7          MS. LYON:  So, that's assuming --

8          THE COURT:  -- all 23 you've taken the plaintiff?

9          MS. LYON:  Yes.

10          THE COURT:  And then of the 23, there's maybe ten to

11    twelve cases in which you haven't taken any prescribers?

12          MS. LYON:  Yes.

13          THE COURT:  And are there any -- so, as to those ten

14    or twelve, you would expect there to be one deposition or

15    maybe more than one?

16          MS. LYON:  Usually it's one to two.

17          THE COURT:  All right.  And in the ones you have

18    taken, at least eight prescribers, do you think there are

19    remaining prescribers to take?

20          MS. LYON:  No.

21          THE COURT:  No?

22          MS. LYON:  Not in our -- except for the Pastine case,

23    there's one remaining prescriber.  We took the two and there

24    was one additional.

25          THE COURT:  That's one of the cases within the 23,

```
 1    but you've already taken the plaintiff and some prescribers?

 2              MS. LYON:  Yes, two prescribers and the -- I think

 3    the third prescriber was difficult to locate and I think

 4    that's the only reason it hasn't been done.

 5              THE COURT:  All right.  After plaintiff and

 6    prescriber, are there any other depositions you wish to take

 7    in the 23?

 8              MS. LYON:  Not usually as a matter of discovery.

 9              THE COURT:  All right.  And so, from your -- Pfizer's

10    position would be as to those 23, your perspective, you're

11    done with what happens in this MDL once you finish those

12    depositions?

13              MR. CHEFFO:  Yes.  The only thing I think that's

14    accurate -- everything that was just said is totally accurate.

15    The only thing would be the sales reps because that's part of

16    the template discovery.  So, our view would be if they say

17    they're either satisfied with the prior transcript or they

18    don't want to take them --

19              THE COURT:  But you don't -- aren't seeking to take

20    those --

21              MR. CHEFFO:  Correct, your Honor.

22              Once we do plaintiff treater -- once we do plaintiffs

23    and prescribers, from our perspective, we're not going to take

24    any more depositions.  To the extent they want the sales

25    reps --
```

```
 1              THE COURT:  Right.  Sales reps are part of the

 2   template discovery we're talking about here, but I assumed

 3   that wasn't the -- you're not going to be taking, as a general

 4   matter -- let me ask you this way:

 5              Are there any sales reps whose depositions you want

 6   to take among the 23, even if they don't take any?

 7              MR. CHEFFO:  No.

 8              THE COURT:  Okay.  That answers that question.  All

 9   right.

10              MR. SCHWARTZ:  Your Honor, we -- if I may add, we

11   discussed this prior to the commencement of the hearing today,

12   that Mr. Cheffo make available the prior depositions that we

13   may well use of the sales representatives to avoid it.  If

14   they were taken by Mr. London or certain other counsel, we

15   will be glad to review them and if this is discovered fully to

16   our satisfaction, why repeat it again, because that's our

17   ticket to getting remand or transfer, but, obviously, we have

18   to have that.

19              THE COURT:  See, that's what I'm trying to do.  What

20   I'm trying to do -- and what I think I've been trying to do

21   for several years -- is print that ticket, the remand ticket.

22   So that to the extent the cases are settled or dismissed,

23   which is, by and large, up to counsel, print the remand ticket

24   and send the cases on their way.

25              Then I think all that remains of the products
```

```
1    liability side of this MDL, for all practical purposes, for

2    the Schwartz law firm cases -- I don't think we really had --

3    there's a few that are not quite -- final judgment hasn't

4    entered because there's a little bit here or there that --

5    paperwork that needs to be done for the settlement process,

6    but they've been represented to the Court it's basically

7    settled, but there is a guardian that needs to be appointed in

8    a probate court proceeding in state court somewhere and that

9    is -- takes time to do that and that's where -- that's what

10   remains in order to finalize the settlement, but only cases

11   that I think I'm aware of that -- there might be one or two

12   more --

13        MR. CHEFFO:  In fact, I probably should have been

14   more prepared the last time to give you specifics had we not

15   had some travel, but I want to update that a little bit,

16   because I think this is instructive for the Court.

17        So, there, in fact, are a number of cases that are

18   now pro se cases.  I think -- based on your prior rulings, I

19   think those will get remanded.  So, there's still -- either

20   probably just needs to be procedurally done.

21        THE COURT:  Right.  So, they're in a separate

22   category.

23        MR. CHEFFO:  There is one -- there are six cases for

24   which the Schwartz firm withdrew as counsel.  So, in my view,

25   they are pro se cases, but what they said was they are cases
```

1   from which we are withdrawing, but local lawyers may be out

2   there, and that's what we talked about.  I don't know who

3   those people may be.  So, as to those --

4           THE COURT:  I decide whether they're pro se based on

5   whether there's a lawyer on the docket who has filed a notice

6   of appearance.  So, if nobody has filed a notice of appearance

7   or no one's name is on the pleading that constitutes a notice

8   of appearance, then they're pro se when everyone withdraws.

9           MR. CHEFFO:  I tend to agree.

10          The only thing I guess I would say is to the extent

11  there are other lawyers and if there are those cases, we

12  should do --

13          COURT REPORTER:  I'm sorry, we should do tier one?

14          MR. CHEFFO:  Sorry, I'll speak slower.

15          -- tier one, track one discovery here.  So, just --

16  this is a little bit of a footnote.  I don't want to get too

17  far astray, but as to those six cases, if the Court were to

18  issue an order -- and we can provide the specific names --

19  just saying to the extent these folks are represented by

20  counsel other than the Schwartz firm, they should file a

21  notice of appearance within, you know, seven days, ten days,

22  whatever the time your Honor thinks is appropriate.  To the

23  extent they're not represented, then I think, consistent with

24  your and Judge Saris' prior rulings, they --

25          THE COURT:  When you say, "tier one," you mean the

```
 1    template paper discovery?
 2              MR. CHEFFO:  Exactly.
 3              THE COURT:  And the three categories of depositions?
 4              MR. CHEFFO:  Exactly.  Exactly.
 5              THE COURT:  Okay.
 6              MR. CHEFFO:  And then if not those cases -- and I
 7    think, then, the only thing that's -- do you want to speak to
 8    -- there's a few other cases.  I think I told you about the
 9    Strickland case and the London cases that were remanded.
10    There's also the Santos case.  Remember, that was the case
11    that's actually a Steven Johnson case where we made a summary
12    judgment motion.  I think either you or Judge Saris said
13    you're going to remand that case.  You're not going to deal
14    with it.  There's actually a few other cases that are out
15    there that are, I'll call, one-off cases, and Katherine can
16    speak to that.
17              MS. LYON:  There's also the Telles case, which is a
18    manufacturing defect case.
19              MR. SCHWARTZ:  I can't hear you.  Can you speak
20    louder, please?
21              MS. LYON:  There's the Telles case, which is just a
22    one-off representative case with a manufacturing-defect
23    injury, and then there are, I believe, two other cases where
24    template discovery has been completed, but those cases are --
25              THE COURT:  And who represents those plaintiffs?
```

1          MS. LYON:  Those are additional one-off attorneys.

2          THE COURT:  Lawyers who have one person -- one or two

3     cases.

4          MS. LYON:  But other than that handful and I believe

5     including the Schwartz plaintiffs, there are 19 pro se.  So,

6     that's it.  Other than the Schwartz cases, that's it.

7          THE COURT:  19 pro se?

8          MS. LYON:  Right.  Well, you've already remanded --

9          THE COURT:  Oh, we remanded all the other pro

10    se cases.

11         MS. LYON:  These are just additional based on the

12    settlement process.

13         THE COURT:  I see.

14         MR. SCHWARTZ:  Your Honor, in that regard, we and

15    other counsel who are not in this case at all got calls during

16    the -- a trial in Minnesota from two people who Finkelstein

17    had -- who had sent cash on their own as pro se.  Of course, I

18    didn't interview them, talk to them, but the other lawyer did

19    and he declined to take the two cases.  I think one was a

20    widow of a doctor, or something.

21         THE COURT:  Yes, I know.  They told me.

22         MR. SCHWARTZ:  You know -- I don't know the

23    particulars, but, you know, those -- obviously, I didn't know

24    how many resulted from Finkelstein's settlement in pro se and

25    some -- sooner or later -- I'm not involved directly, but Mr.

```
 1   London has -- about the Finkelstein financial arrangements and
 2   all that you're approaching now in your discussions of costs
 3   and discovery, which I'm following with great interest as to
 4   the discoverability of the bills, and so forth, but that's
 5   going to be --
 6            THE COURT:  -- with respect to Mr. London's request
 7   to have reimbursement from the common fund.
 8            MR. SCHWARTZ:  The Strickland case, if it wins, it
 9   will create -- as a firm on appeal, it will create some
10   problems, which we don't need -- which you can't approach now.
11            THE COURT:  All right.
12            MR. SCHWARTZ:  It's anticipatory now.
13            THE COURT:  Okay.  So, the 23...
14            I'm sorry, I don't remember your name.
15            MS. LYON:  Katherine Lyon.
16            THE COURT:  Ms. Lyon, with respect to the 34, now 33,
17   stayed cases, where do they stand in terms of, first,
18   plaintiff's depositions?
19            MS. LYON:  The majority of those are likely without
20   any depositions.
21            THE COURT:  All right.
22            MS. LYON:  There may be one or two where there was a
23   plaintiff deposition.  After that point I don't believe --
24            COURT REPORTER:  I'm sorry, I didn't hear you.
25            MS. LYON:  After depositions began, we're less likely
```

```
1   to agree to --
2            THE COURT:  The stay.
3            So, you believe that as to those 33 cases, by and
4   large, no sales reps, no prescribers and no plaintiffs.  There
5   may be a deposition or two here or there that were done, but,
6   by and large, none.
7            MS. LYON:  There are no sales rep depositions in any
8   Schwartz case.
9            THE COURT:  Okay.  And then as to the nine, now
10  eight, cases?
11           MS. LYON:  One of those has a plaintiff deposition.
12  The remainder do not.
13           MR. SCHWARTZ:  If you could speak up.  I must be
14  getting old.  If the court reporter can hear you, that's fine.
15  I'll read her transcript.
16           THE COURT:  She said that as to the nine, now
17  eight -- the category of nine cases, now eight, because you
18  said you dismissed one today, that there was one plaintiff's
19  deposition that's been taken, but, by and large -- but no
20  sales reps and no prescribers and no other plaintiffs --
21           MR. SCHWARTZ:  Thank you, your Honor.
22           THE COURT:  -- depositions.  All right.
23           So, I guess the question either for you, Mr. Cheffo,
24  or Ms. Lyons, if I -- I know you want as to the 34 or 33
25  dismissal.  If they aren't dismissed, what do you want?
```

1          MR. CHEFFO:  Well, you know -- I mean --

2          THE COURT:  I'm not saying I'm not dismissing -- not

3   recommending their dismissal, but I always want to explore all

4   the options.

5          MR. CHEFFO:  Sure.  I mean, in order of preference at

6   this point -- because I don't think these are cases that

7   we're, frankly, not aligned with.  In other words, they've

8   pretty much said we're going to stay them because they think

9   they should be dismissed or we should withdraw from.  So,

10  they've made a determination.

11         As I understand it, that absent some -- you know,

12  some new-found evidence, they're not going to proceed with

13  these cases.  So, then you look at these folks are going to

14  either have cases dismissed of their own volition if they

15  agree to it or they're going to be pro se plaintiffs.

16         So, you know, at this point -- you know, I guess the

17  options would be that you either -- you either do dismiss them

18  or if you're not inclined to dismiss them, that you set them

19  on some type of fast track to get discovery done.  You know,

20  at this point I don't think it makes --

21         THE COURT:  Here's the thing -- I'll be frank with

22  all of you.  As to all of those cases, it's kind of

23  frustrating.  And I'll give you, Mr. Schwartz and Mr. Harang,

24  more opportunity to comment.

25         As to the -- I don't understand why it would take a

1    year to figure out whether people want to -- whether you want

2    to dismiss, withdraw or lift the stay and litigate, any of

3    which, as I said before you came in, Mr. Harang, would have

4    been reasonable outcomes to me.  The one outcome I never

5    anticipated would be -- as to some of these cases, we would be

6    almost a year later and they would be still stayed, with

7    nothing having happened.

8         And to be honest with you, going through the

9    submissions from Ms. Lo and the written documents that I

10   received since the motion has been filed, I really don't get

11   the sense that all that much happened in terms of the stayed

12   process and figuring out the answer to the question of what

13   the plaintiffs wanted to do.

14        And I will tell you, I'm disinclined to say that --

15   though, I'm disturbed that the status reports that I ordered

16   weren't filed.  That is the tail to me wagging the dog of not

17   doing the work that underlies that.  I never anticipated that

18   -- I never thought you would have to file ten status reports

19   because I never thought it would take that long.  I thought

20   you would file two, that in two months it would be resolved

21   one way or the other at the outside and -- but one way or

22   another, these cases have to go forward and these plaintiffs

23   are entitled to either have their cases litigated by the

24   lawyers they retained or have their lawyers say to them, You

25   know what?  We're not litigating these cases because we don't

1    feel in good conscience we can and we're going to seek to

2    withdraw, and then let them, if they can, retain their own

3    counsel, other counsel, or they'll proceed pro se if they

4    wish, but some resolution.

5           So, I'm looking for -- on the other hand, if these

6    are all cases that in plaintiff's counsel's judgment are cases

7    that should be dismissed or at least that in judgment don't

8    want to litigate, which is essentially what I conclude from

9    this motion for stay, I'm disinclined to order everybody to

10   engage in fast track, expedited deposition discovery that

11   imposes thousands of dollars of costs upon the defendants and

12   Pfizer and thousands of dollars in, essentially, unbilled time

13   for plaintiff's counsel.  You're not billing anyone for this

14   time unless you collect later.  And that just seems to me to

15   be an exercise in futility.

16          And so -- on the other hand, I'm not going to say --

17   give you another year and -- or even, to be frank with you,

18   the 90 days Ms. Lo asked for, because it's been more than 90

19   days since the motion was filed.  Even if nothing had

20   happened, I would have thought that when the motion was filed,

21   then the fire would be lit and we could be here and I didn't,

22   you know, impart -- I was waiting for the pleadings to come in

23   and then in looking at them, I thought of other issues.  So, I

24   wanted to develop the record so that the time you came -- all

25   came, I could use your time and my time profitably so you

1    could follow them more so I could understand where things

2    stood, but that also gave you a fair bit of time to put things

3    in order.  So, I truly am asking what do you want me to do?

4            MR. HARANG:  Your Honor, I can address two things.

5    One is that when -- the last time I think we met, that I said

6    I would get letters out and get the fire under some people,

7    and I did not.  The follow-up may have -- no.  The follow-up

8    was -- the follow-up was absolutely inadequate, but since

9    you've had your meeting with Ms. Lo -- and I just got a status

10   report today on the way up here that there are 14 people, I

11   guess, now -- including the one that's already dismissed,

12   there's 14 people that had verbally agreed to dismissals and

13   the paperwork is supposedly following to the office.

14           So, your timetable as far as how long it should have

15   taken probably to have some of that done is probably pretty

16   much on target, your Honor.

17           Do I think that if given a little bit of time, it

18   could be done a little more orderly?  I think you're right

19   about the 90 days, but I think that there's a -- there's a

20   rekindled interest, I guess would be the saying, those people

21   are handling it.

22           THE COURT:  So, one day, a week, 14 days, 21 days?

23           MR. HARANG:  I don't think one day, your Honor, could

24   do it, and I certainly don't think three months is the answer,

25   but I do think probably 30 days, because of the number of

1    people and just the difficulty, if they are -- if those people

2    that are sending out the letters and calling and doing the

3    things back and forth with the -- some of these folks are not

4    easy.  That really is true.  I read the transcript.  It is

5    difficult to --

6              THE COURT:  No.  No.  I understand.  This is a group

7    of people -- you're not representing doctors in private

8    practice who are professionals and have email and are used to

9    communicating and are going to respond to you within a day or

10   two, and the people -- everybody you represent has a mental

11   health problem, by definition.

12             MR. HARANG:  Some of them, it's a different day every

13   day or a different week every day.

14             And, very honestly, your Honor, when we last met I

15   talked -- we were trying to work within the parameters of our

16   referral of relationship with lawyers that had sent us

17   business and to not step on any toes and, unfortunately, some

18   of those toes -- I know some of those --

19             COURT REPORTER:  I'm sorry, I can't hear you.

20             MR. HARANG:  We tried not to step on any toes of the

21   referring lawyers by going directly to the client.  That has

22   not worked in some instances.  So that's what they're doing.

23   They're going directly to the clients and it's, obviously,

24   working.

25             THE COURT:  If you have any hesitation about it,

1      okay, you can tell those lawyers that they have a choice.  All

2      right.  Their choice is if they don't want you talking to the

3      person on whose behalf you filed an appearance in federal

4      court in this MDL, then they can file a motion to -- you can

5      file a motion to withdraw, coupled with their general notice

6      of appearance, and if they wish to do that, fine.  Then they

7      can control the interactions with the client, but you

8      represent them in this case and I don't think they're in the

9      position to filter that and if you need an order from me that

10     you can talk to them directly, absent those people wanting to

11     undertake responsibility for these cases by filing a notice of

12     appearance -- because I don't see any of those people's name

13     on the complaint for any of those people with a notice of

14     appearance.  Am I wrong about that?

15          MR. HARANG:  No, your Honor.  You're absolutely

16     right.  In fact, it's hard find their name on letterheads

17     coming back from the folks.  That's one of the problems.

18          THE COURT:  So, what happens in those -- suppose I

19     gave you 30 days.  Then what?  Putting aside -- if I can

20     overcome, okay, my concern that -- by giving you 30 days, what

21     is different between this -- you know, what Mr. Schwartz might

22     have been saying just on Friday and Saturday night -- I don't

23     if he said this, but if I were to draw an inference just based

24     on the --

25          MR. SCHWARTZ:  I presided, and my seven-year-old

1   granddaughter asked the four questions, only in English.  Only

2   in English.

3          THE COURT:  So, I might have been asking why should

4   this night be different than all other nights?  And so, it

5   comes to mind at this moment as to why should this 30 days be

6   different than all the other 30 days that have preceded?  And

7   that's my concern about the 30 days.  About any period of

8   time.

9          MR. HARANG:  I can only say that the distance between

10  your hearing and today has accomplished about 13 names, I

11  believe, your Honor, which may be an indicia of there is a

12  difference between this night and any other night.

13         THE COURT:  So, second is, at the end of -- if I give

14  you some more time, at the end of that period of time,

15  whatever amount of time it is, as to those -- am I going to

16  know that either there'll be a dismissal or a motion to

17  withdraw or a motion to lift the stay and you want to -- when

18  I say "you," I mean you and Mr. Schwartz -- wish to proceed

19  with the case?

20         MR. HARANG:  Yes.

21         THE COURT:  So, that's it.  Just --

22         MR. HARANG:  Yes.

23         THE COURT:  All right.

24         And is there any reason I should treat the group of

25  nine, now eight, cases different?  Let me just explain -- I

1    can explain to you what those are.

2         MR. HARANG:  I'm sorry, that one skipped me, your

3    Honor.

4         THE COURT:  So, as I understand it, there are three

5    categories of cases that you and Mr. Schwartz have in this

6    MDL.  One is the stayed cases.  That's what we've been talking

7    about now.  34 cases stayed, now down to 33 at the moment

8    because of one dismissal filed today.  That's what we just

9    finished discussing.

10        There's a second category that I was talking to Ms.

11   Lyon about a minute or two ago of 23 cases.  Those are cases

12   that you haven't sought to stay.  And that's fine.  And those

13   are cases that some amount of deposition discovery has taken

14   place in.  You heard what she had to say about --

15        MR. HARANG:  That's primarily the plaintiffs and the

16   prescribers and some of the -- some of the representatives.

17        THE COURT:  Right.  Some of the prescribers.

18        And then the third category is the category that Mr.

19   Schwartz indicated are cases in which they're not stayed, but

20   you and Mr. Schwartz have come to the conclusion that you

21   think you would like to either dismiss or withdraw, but you

22   have to talk to the plaintiffs.  That group of nine is now a

23   group of eight because apparently today there was a

24   stipulation of dismissal filed as to one.  So, I call it the

25   group of eight.

```
 1              They're not in the group of 23 because you and Mr.

 2    Schwartz aren't thinking about wanting to litigate them and

 3    not as much has happened with those group of eight as the

 4    group of 23, but they're not in the group of 34 because they

 5    haven't been stayed.

 6              So, my question is:  What do you want me to do about

 7    those?  If you want to talk to Mr. Schwartz, that's fine.

 8              MR. HARANG:  I think he probably needs to address it

 9    because I don't know how that category has come about.  I know

10    that there are a certain number of cases that we consider to

11    be not wanting to go forward with, but I don't know how that

12    nine got carved out.  I imagine it got carved out of what is

13    now the 23 or 24.

14              THE COURT:  Right.

15              MR. HARANG:  But how that decision --

16              THE COURT:  I'll come back to that in a minute.

17              As to the 23, what I hear Pfizer saying is we're done

18    deposing the plaintiffs.  We're done deposing a lot of the

19    sales reps and --

20              MR. HARANG:  Prescribers.

21              THE COURT:  I'm sorry, not sales reps.  I'm done

22    deposing a lot of the prescribers, but we have ten or twelve

23    prescribers left.  That won't take that long to depose the

24    prescribers, a reasonable period of time.  Various judgments

25    of what's reasonable might differ, but, nonetheless, a
```

```
 1    reasonable period of time.  And those prescribers will be done
 2    and then that group of cases, subject to the sales reps, is
 3    ready to go.
 4              MR. HARANG:  Yes, your Honor.
 5              THE COURT:  What do you see that needs to be done?
 6    How many depositions do you want to take?  How long do you
 7    think those cases need to be ready to go?
 8              MR. HARANG:  That part of doing that -- trying to
 9    organize that stuff is not something I was doing.  I have
10    looked at it some and the -- I know --
11              THE COURT:  So, who bears that responsibility?
12              MR. HARANG:  Who bore the responsibility.  Tray was
13    handling the coordination of those depositions, your Honor.
14              THE COURT:  Okay.
15              MR. HARANG:  And so --
16              THE COURT:  Are you and Mr. Schwartz the same law
17    firm or a different law firm?
18              MR. HARANG:  Different law firm.  I have an office in
19    his law firm, but my primary office is Louisiana.
20              THE COURT:  I see.  You have your own separate
21    practice?
22              MR. HARANG:  Yes, your Honor.
23              THE COURT:  I see.
24              MR. HARANG:  So, the answer is that I can't -- I
25    can't give you an answer, but I can give you an answer -- in
```

```
 1    looking at the number of representatives, I would assume -- I
 2    would guess that we're talking about at least one person per
 3    case and --
 4              THE COURT:  Presumably.
 5              MR. HARANG:  -- and I don't know if the prior
 6    depositions or ones I've read from other cases or if I'm
 7    seeing -- or will be specific enough to the particular doctor.
 8    Maybe so, but --
 9              THE COURT:  So, standing here today, you don't know
10    whether you need to depose 23 sales reps or whether the sales
11    rep depositions are sufficiently specific to these 23
12    plaintiff cases that you only need 21 depositions or nine or
13    all 23?
14              MR. HARANG:  It depends.  That's correct, your Honor.
15              THE COURT:  So, just to -- not to put too fine a
16    point on it, but as to the 23 cases -- I know that it's
17    dislocating to have Tray -- what was his name?
18              MR. HARANG:  Tray Stegall.
19              THE COURT:  -- Tray Stegall leave, but this MDL has
20    been going on for years.  If I recollect -- I don't remember
21    what year it was, but a long time ago I set a schedule of a
22    certain number of depositions a month and to go on, I think,
23    indefinitely until these cases were ready to go.  I know along
24    the way a lot of cases have been dismissed and I presume at
25    least in some of those cases depositions were taken and then
```

1    the cases were dismissed.

2            But when?  If not now, when?  And what -- and who, if

3    not -- I mean, somebody has to step up.  I know Mr. Stegall

4    was an associate of the firm and he's gone.  But who's going

5    to do it if not -- what's going to happen now to these cases?

6            MR. HARANG:  We can have that covered, your Honor.

7    That's not -- the issue of people doing it is there.  We can

8    do it and -- but the individuals -- the identification of the

9    individuals?  We have the sheets.  We know who the prescribers

10   were -- I mean, the reps were.

11           If we can see the other depositions in a reasonably

12   short period of time, that might be -- that might expedite a

13   large number of those depositions.  Might.  It might also

14   reduce the period of time the deposition is going to take to

15   take, because, as I --

16           THE COURT:  There might be --

17           MR. HARANG:  I've seen some of Jack London's

18   depositions of prescribers -- or reps, rather.  They're pretty

19   thorough.  And so, there's a tailoring on some of the -- it

20   would be a case specific or an individual sought a specific

21   kind of thing, but that's --

22           THE COURT:  What do you need to do to find out who

23   took -- whether depositions were taken and you can get the

24   transcripts?

25           MR. HARANG:  And when they -- yes.

```
 1              THE COURT:  Well, what do you need to do that and how

 2    long would it take?

 3              MR. SCHWARTZ:  I think Mr. Cheffo and I have

 4    discussed that before Mr. Harang got here today, to make

 5    available for those -- we can ask from him and Jack London and

 6    anybody that took them and review them and -- you know, we

 7    don't want to plow the same field twice.

 8              MR. HARANG:  The defendant has them all.

 9              MR. SCHWARTZ:  Okay.  Mr. Cheffo has them all, as

10    Jack points out.  Let us see them and -- you know, depends on

11    who took them.  I've often relied on the deposition.  We're

12    relying on their perpetuation and -- from the main three

13    experts in the whole case, the whistler blower and the other

14    two.  So, why would we not on these?  We're not saying we're

15    bound by it, but we would, obviously, review them.  As Mr.

16    Harang pointed out, they at least will shorten the deposition.

17    I always get prior depositions of doctors --

18              THE COURT:  How many depositions have happened since

19    March 2011 in these cases?

20              MR. SCHWARTZ:  Mabel Lo gave you -- because she's in

21    better knowledge.  I think I saw the number 68 or -- maybe

22    opposing counsel, Ms. Lyon, can tell us.

23              THE COURT:  Who is going to take these depositions on

24    plaintiff's side?  To the extent they're -- to the extent you

25    need to take a sales rep's deposition, who will take the
```

1    deposition?

2            MR. SCHWARTZ:  Either Vincent or Mabel Lo, and I'm

3    interviewing lawyers now to replace Mr. Stegall, too, but, of

4    course, to break in a lawyer cold in a case is not the best,

5    even though he's done Neurontin.  I think he's done ten other

6    pharmaceutical cases.  It helps none in Neurontin.

7            THE COURT:  So, not the two of you.  Mabel Lo,

8    Vincent Lo or somebody else in the firm?

9            MR. SCHWARTZ:  Yes.  They're principally assigned to

10   do these cases.

11           MR. HARANG:  Depends.  There may be some that I'm

12   going to take.

13           THE COURT:  All right.

14           MR. CHEFFO:  Your Honor, I want to address a few

15   other points.  I think there's also a little bit of a

16   disconnect here.  We've now talking about sales reps, but I'm

17   going to address that last.

18           First is, as much as I think the points of delay and

19   I think the word "egregious" are accurate, it would be

20   inconsistent with my client's interest if I objected to the

21   fact that they say after 30 days, we're going to dismiss

22   cases.  So, while I think it's gone too late, just to be

23   clear, I certainly would not and do not object to the

24   dismissals.

25           I think with respect to the withdrawal --

1          THE COURT:  Hard to object to dismissals as a

2     defendant.

3          MR. CHEFFO:  It's hard to object to them.

4          THE COURT:  Even though you want to.

5          MR. CHEFFO:  Well, even though I wish I didn't have

6     to come up here ten times to get the dismissals, but, again,

7     that's neither here nor there.  If they dismiss the cases with

8     prejudice, no objection here.

9          With respect to the withdrawal issue, I come back to

10    a few things.  One is, I don't want there to be an opportunity

11    for gamesmanship, frankly, and here's my concern:

12          To the extent that we've had a process in place for a

13    year and all the other lawyers, there's some efficiencies with

14    being here and doing what I'm calling this tier one, this

15    initial discovery.

16          So, to the extent there's some lawyer -- a lot of

17    feet, apparently, that we haven't seen any shoes in the last

18    six years.  To the extent that there's a lawyer who thinks he

19    or she actually represents one of the six that we talked about

20    or if they come to you in 30 days and withdraw as counsel and

21    say, But we're leaving it to these other kind of shoes out

22    there, those folks should be required to kind of de-cloak,

23    come here and say, We are counsel of record.  Because what I

24    don't want to happen is that the cases get sent back to a

25    particular district court judge and then someone says, Oh,

1      I've been representing Mrs. Smith for six years.  Why haven't

2      we done this tier one, track one?  That should be done here.

3             Again, that could be done, I think, very easily by an

4      order of the Court, but to me this idea that we can withdraw,

5      let the cases get remanded, and then someone comes forward and

6      acts like it's a new day, that would, I think, be inherently

7      unfair to us.

8             Then I guess there's two other points --

9             THE COURT:  So, what do you want me to do about that?

10            MR. CHEFFO:  I think two things.  One is, if they're

11     withdrawing and there's a -- either they say they've contacted

12     and there's no other lawyers or just say, you know, within ten

13     days you shall -- counsel representing Mrs. Smith shall file a

14     notice of appearance before this Court.  And then if someone

15     comes forward, then you can basically -- we would do the --

16     what I'm call this tier one, track one discovery here.

17            Now -- and to be clear, because I don't -- I'm not

18     trying to be unreasonable.  If someone is pro se and they go

19     back to another court and they wind up retaining a lawyer,

20     neither you nor I could stop that.  I just don't want a person

21     who says I've been kind of behind the scenes for six years --

22            THE COURT:  I understand what you're saying.

23            MR. CHEFFO:  So, that's that point.

24            And then I guess the two other points where I would

25     have an objection -- your Honor will do what I think what

```
 1    you're inclined to do.

 2              I would object to lifting the stay at this point to

 3    proceed with any of these cases.  I think under the main

 4    issue --

 5              THE COURT:  He's not asking me to lift the stay.

 6              MR. CHEFFO:  Well, I mean, they could come back in 30

 7    days, but I don't think they're going to, but I just want to

 8    be clear on that.  I mean, we've now kind of stood down for a

 9    year.  No one is collecting records.  There's been a huge

10    prejudice here.  So, I think it's either withdraw or

11    dismissal.

12              THE COURT:  Oh, I see.  As opposed to come forward

13    and say --

14              MR. CHEFFO:  Say now we want to go forward with ten

15    cases.  I just want to be clear for your Honor.

16              And let me speak to a minute about the sales rep

17    issue.  I think there's probably just a misconception here.

18    The first is, Pfizer is a pretty big company.  Over the course

19    of the years that Neurontin was sold, there's thousands of

20    sales reps.  So, it's not like there's five guys out there.

21    Here's the transcripts for them.

22              The chances of actually having the same person be

23    deposed, having been deposed, and then talked to one of these

24    specific doctors is just pretty remote.  I'm not saying it's

25    impossible, but just so you understand, there's not this
```

1    collection where you just turn it over and we're all done.

2    That's the first point.

3            The second point is, you set a procedure a year ago

4    for us to do the 15 and then the 30, as you recall, per month.

5    At no point did they ever say, We want to take any of these

6    depositions.  I mean, the time to have asked for these was a

7    year ago, to say, Hey, Mark, Mr. Cheffo, I would like to --

8    here's the 50 names and we would have put them in the queue

9    and actually had them done.

10           So, my view is they've absolutely waived any right to

11   take sales rep deps at this point.  I mean, to come and say,

12   We're now going to extend this for another 90 days and put the

13   burden on us to go and find these people after a year, when

14   what we've been doing for the last year -- even as to the 23,

15   we would have easily had these done and complied, like we did

16   with virtually every other law firm that did what they were

17   supposed to do.

18           THE COURT:  How did the 23 get off track?

19           MR. CHEFFO:  Well, in my view -- you know, that's why

20   there's a little disconnect.  I never really thought that they

21   were off track because -- for two things.  They're able to

22   take these depositions --

23           THE COURT:  Here's what I mean by "off track" --

24           MR. CHEFFO:  Why did we not take them?

25           THE COURT:  Right.  In other words, at some point in

1    time a long time ago -- I haven't gone back over all the

2    orders in this case, but I recall ordering as to the Schwartz

3    and Boone law firms, to do a certain number of depositions

4    every month.

5              MR. CHEFFO:  Right.

6              THE COURT:  And to do the template discovery and

7    eventually the template discovery, or so I thought, was done.

8              MR. CHEFFO:  Right.

9              THE COURT:  And a certain number of depositions every

10   month for each law firm of their cases until it was done.

11             So, I don't have the sense that many depositions have

12   been happening recently, not at the pace of ten or 15 or

13   whatever it was per month I set.

14             MR. CHEFFO:  Exactly.

15             THE COURT:  So, I understand that's part of the

16   waiver argument that you have vis-a-vis then, but what about

17   the prescribers that haven't been done?

18             MR. CHEFFO:  Well, here's the -- let me -- I'll just

19   -- as to the -- you know, just to be clear, the sales reps, my

20   position all along has really been they want them, but they're

21   not a prerequisite.  In other words, you don't need them to

22   get past the summary judgment motion.  They're icing on the

23   cake.

24             You could be, I think, a considered plaintiff's

25   lawyer and decide I'm just not going to take the sales rep and

1    -- in other words, a lot of these cases, when we actually look

2    at the doctors -- let me take a step back so you understand

3    how it works.

4            They get a doctor.  We have to produce cold notes for

5    these folks, right?  To some extent -- someone worked in a

6    hospital that didn't allow detailing or they're a new doctor.

7    They were never prescribed.  There are a number of cases, a

8    large number, where there wouldn't be sales rep depositions

9    because there's no record of a sales rep calling.

10           THE COURT:  There's no sales rep to depose.

11           MR. CHEFFO:  Right.

12           So, the fact that it didn't happen isn't like not

13   taking the plaintiff or the prescriber where you really need

14   that.  So, the fact that they didn't ask for it is, I think,

15   telling.  They certainly could have put their chit down and

16   said, We think we're going to take these.  There are other

17   plaintiffs in other cases where there weren't sales reps.  So,

18   that's the first point.

19           The second point is, you know, as you know from a

20   year ago, there were 80, 90 cases.  You know, we're now at 20.

21   So, you know, we're kind of going through this culling

22   process, and I think that addresses your second issue of the

23   prescribers.  You know, it's -- we go in starts and stops.  We

24   notice prescribers.  Then that case would go on the stayed

25   list or we would talk to them about it.

1          So, the fact that there are still some outstanding

2     prescribers, on this one I'd probably just -- I would take

3     joint -- like, if there are twelve cases or so, that's

4     probably something that collectively between all of us did get

5     off track and we probably should have -- I can't really give

6     you a good example -- explanation as to why as to the twelve

7     they're not done.  They probably should have been.

8          But as to the sales reps, I think at this point, if

9     they want to proceed with these cases, I think that they've

10    waived that right to do that.  I don't think it would be fair

11    at this point, you know, seven years later, never having asked

12    for it, to have to find folks.  Remember, a lot these cases go

13    back to use prior to 2004.

14          THE COURT:  How many sales rep depositions have

15    happened in the MDL on the products side?

16          MS. LYON:  I'm not sure of an exact number, but in

17    the Finkelstein cases there would have been --

18          MR. CHEFFO:  Finkelstein was a matter -- it was like

19    clockwork.  You know, they asked for this -- they asked for, I

20    mean, a lot.

21          MS. LYON:  Maybe 50?

22          THE COURT:  50 in the Finkelstein cases?

23          MR. CHEFFO:  Five zero.

24          MS. LYON:  50 total.  I'm totally guessing, though,

25    your Honor, but usually in the other cases that proceeded

1    through initial discovery, at least one sales rep was deposed.

2         MR. CHEFFO:  Right.

3         THE COURT:  So, most cases -- in most of those cases,

4    a sales rep was deposed?

5         MR. CHEFFO:  Typically, if there was a sales rep,

6    they were deposed.

7         The other complication here -- and I don't want to,

8    you know, have a parade of horribles, but we do feel to the

9    extent that the Court is inclined to allow them to -- you

10   know, to take the sales reps, it's not often a particularly

11   easy situation, where, as I said, some of these people haven't

12   worked for Pfizer or Park Davis for ten years, literally.

13        Second is, as you might imagine how life works,

14   someone can go into a doctor's office -- in other words, there

15   could be five or six different sales reps in some cases per

16   doctor, depending on the usage of time, what product they were

17   detailing, so on, and so forth.  So, it's a time management

18   and case management for the Court to be aware of as well.  To

19   the extent that you allow them to pursue sales reps, it could

20   very substantially increase the amount of time that these

21   cases wind up on your Honor's docket as opposed to being in a

22   remanded court.

23        THE COURT:  Okay.  Anything else?

24        MR. SCHWARTZ:  Your Honor, it's a minor point, but

25   Ms. Lo pointed out before -- they have, in fact -- Mr. Cheffo

1    again repeated --

2         THE COURT:  Excuse me.  Ms. Lyon or Ms. Lo?

3         MR. SCHWARTZ:  No.  Mr. Cheffo at the hearing on the

4    30th and again today said they have not ordered any medical in

5    the stayed cases.  Ms. Lo says that's incorrect because we

6    monitor the same service that they do, in part.  They have

7    ordered -- there's nothing wrong with them ordering it, but to

8    represent to the Court that they have now -- so, the sales

9    reps -- this waiver argument is absurd, your Honor.  The fact

10   that we haven't been given their names -- we can trace them

11   down and will on our -- for example, the two cases we

12   designated immediate candidacy are the Pastine case, which is

13   -- these are all suicides or serious attempts, and the second

14   one is Girard.  We'll have two or three more after Mr. Harang

15   and I meet tomorrow or Wednesday in Houston to go over with

16   Mr. and Mrs. Lo, but it's incredible that he would say we've

17   waived the right to take sales reps because Finkelstein,

18   quote, "did it like clockwork."

19        Now he says there's five or six reps per doctor.  I'm

20   sure that's the high point and not -- a unique situation,

21   although I can understand, you know --

22        THE COURT:  I don't think he's saying -- I don't

23   think his argument is that because Finkelstein and associates

24   or partners deposed people like clockwork, therefore, you

25   should have -- you have forfeited your right.  I don't think

1      it's that cause-and-effect argument he's making.  I think the

2      argument he's making is -- he's contrasting with Finkelstein

3      the cases went like clockwork and all the depositions were

4      noticed and done, and with your law firm that hasn't happened,

5      and that lots and lots of cases were just dismissed.  You

6      started out with 225.  Now we're down to 23 that you indicate

7      you want to proceed on and of those 23, no sales rep

8      depositions have been taken yet, and two prescribers that your

9      firm noticed and a number more that Pfizer has noticed.  And

10     so, I think what he's suggesting is not much has been done,

11     and that given that -- I think the forfeiture argument -- I'm

12     not saying I agree with it, but I think -- just to make it

13     clear, I think the forfeiture argument is -- goes like this:

14            The Court says schedule for depositions in these

15     cases.  It said do this number of depositions every month

16     until you're done.  I think Judge Saris and I made fairly

17     clear that our expectation was to finish all these cases no

18     later than December 31st of 2011.  I don't think that was the

19     first end date that we articulated.  I think we had

20     articulated earlier end dates, perhaps with more aspiration,

21     but -- and that given the amount of time that's gone on and

22     still we come back here, that in that process he's saying you

23     forfeit.  I'm not saying I adopt that argument, but I think

24     that's what he's saying.

25            There is a measure of frustration that I have that I

just want these cases to happen.  I'm happy to do whatever
needs to be done that you people present me to resolve when I
need to resolve things, and I'm sure Judge Saris -- I speak
for her and I'm sure she would do the same.  That what's
frustrating is to continually come back and feel that -- what
I'm hearing is, Judge, we're getting rid of a bunch of our
cases, but we have some cases we really do want to do and we
really will do them in the future, and I feel like I've heard
that song before.  That's what frustrating.  I just want to
see the cases go forward.  I think the plaintiffs are entitled
to that.  Defendants are entitled to that.

          MR. SCHWARTZ:  We'll pick our candidates, your Honor.
We'll have two or three more by the end of the week and our
five of the 23 -- at least we'll know for sure.  Mr. Harang
has been in a trial all last week and hasn't had a chance to
hear our reasoning on those, on that evaluation.

          THE COURT:  Right.  All right.

          So, I'm going to take this under advisement.  I'll
issue a short order shortly addressing -- I'm going to address
all the categories of the cases.  I don't view this as just
the motion with respect to the stayed cases.  I want to get on
top of all these cases.

          I think that -- Mr. Harang, one thing you said has
given me great hope and you've reminded me of something that I
sometimes forget and I thank you for reminding me.  And that

```
 1    is that it does seem that making people appear in front of me
 2    motivates things.  It seems to kindle fires.
 3            And so, you can anticipate that one aspect of
 4    whatever it is I do is I'm going to have another hearing.
 5    You're reminding me that at the beginning of this MDL before
 6    -- I don't recall either of the two of you coming to these
 7    particular hearings regularly and I think it was before Mr.
 8    Cheffo might have been involved and maybe he came to some of
 9    them, but I used to have a hearing every month and it was, at
10    least from my perspective, pretty effective at keeping things
11    on track.  So, I may have further hearings.  If -- or further
12    status conferences to make sure that whatever remains, remains
13    on track.  That will address the three categories of cases.
14            Mr. Cheffo filed yesterday, I think, his submission
15    that I invited regarding a prior hearing.  I will tell you,
16    I'm inclined to award something.  I haven't had a chance to
17    read carefully what his submission is, but I'm -- if you wish,
18    Mr. Schwartz --
19            MR. SCHWARTZ:  I would appreciate it, your Honor.
20            THE COURT:  Sure.
21            MR. SCHWARTZ:  Because I, you know --
22            THE COURT:  That's fine.  You don't have to explain
23    why.  You don't need a --
24            MR. SCHWARTZ:  No.  I want to.
25            The fact of my brother-in-law's death is not any
```

```
 1   basis for that.  He happened to --
 2           THE COURT:  I'm sorry.
 3           MR. SCHWARTZ:  -- young man, died on -- and the
 4   funeral was the 26th, the Monday preceding the Friday hearing.
 5   The burial was Wednesday, but the important thing was that I
 6   and a co-counsel who's having scheduled surgery today in
 7   Houston, the same two lawyers that tried Chick Kam Choo in 19
 8   -- in 2000, the case I referred to that went to the Supreme
 9   Court, the Fifth Circuit twice, the Texas Supreme Court --
10           THE COURT:  Yes, I recall.
11           MR. SCHWARTZ:  He and I were retained on the 12th in
12   a case involving valuable Thailand artifacts and we had some
13   addigation cases in Thailand.  That's our connection.  Plus,
14   we were referred by the widow of a New York Giants' football
15   player of some fame.  He played football with in college
16   and --
17           THE COURT:  If you're trying curry favor with me,
18   that's not --
19           MR. SCHWARTZ:  No.  No.  No.  This is 19 -- this is
20   1950.  Y.A. Tittle, which you've never heard of --
21           COURT REPORTER:  I'm sorry, say that again, please.
22           THE COURT:  Y.A. Tittle.
23           MR. SCHWARTZ:  T-i-t-t-l-e.  He was an end on that
24   team.
25           We got retained involving these artifacts and began
```

```
1    tracing them down and they found that the gem association had

2    shipped them via Federal Express to Wells Fargo and a funny

3    thing happened on the way to the bank.

4              THE COURT:  How does this bear on giving you more

5    time to --

6              MR. SCHWARTZ:  No.  This is my hearing -- this is my

7    temporary restraining order hearing the very morning of March

8    30th, when you were here and why I wasn't here and I want to

9    explain why even a three- or four-hour notice that Ms. Stevens

10   is famous for giving us, I couldn't even given that because of

11   the following circumstances.

12             The Greek doctor whose name I won't --

13             THE COURT:  Do you want to submit something in

14   writing as well on this --

15             MR. SCHWARTZ:  No.  No.  This will do.  This is it.

16             THE COURT:  Do you want to submit anything in

17   writing, Mr. Harang?

18             MR. SCHWARTZ:  I'm sorry?

19             MR. HARANG:  No, your Honor.

20             MR. SCHWARTZ:  That he was dodging service, which is

21   understandable.  He's an international -- you know, I'll --

22   I'm going to keep it non-pejorative.  He had possession of

23   these by the forgoing circumstances of intercepting a shipment

24   to Wells Fargo where he had an account, and we had to act

25   quickly.  The process servers were -- he was evading them,
```

even though three cars in his name where right at his
residence.  So, I used the old fearing -- I fear the Greeks
bearing gifts, 3,000-year-old strategy.  I sent a Houston
police department retired officer with a gift box in a
delivery uniform to bring him a present, which he accepted and
had the subpoena duces tecum for the Friday, March 30th
hearing, same day that I was not here.  This is Wednesday
night.

Thursday he hired a lawyer, which is usually a good
sign.  It's even a better sign that the lawyer was retained.
I said, Is he going to be in court for the hearing at nine --
at 10 o'clock, Friday morning, March 30th, for our TRO to keep
him from removing these artifacts from the Wells Fargo safety
deposit box?

Wells Fargo's position is easy.  He's our customer.
You can't do a thing about it.  We can't do anything unless
you get an injunction, you know, which is where we went to go
get.

He did show up in court Friday.  We had gotten the
TRO agreement to where the -- they're stayed at the bank now
and the hearing is on the temporary injunction.  It's
different than the federal court.  It's this Friday, the 13th,
at nine o'clock -- at eleven -- 10 o'clock in that courtroom,
and that's where I was up to.

Now, why I didn't email Mr. Cheffo hour by hour

```
 1        proceedings out in California or what on that, because I
 2        didn't know if he wasn't going to show up Thursday, you know,
 3        if -- after the service, and his lawyer said he was going to
 4        show up.  I should have called that Thursday night and said,
 5        May we cancel the hearing?  Because it's very important.  You
 6        know, it's a new client referred to by an old --
 7                  THE COURT:  That's fine.
 8                  MR. SCHWARTZ:  -- client and --
 9                  THE COURT:  File a motion to continue.
10                  I'm more concerned, no disrespect to Mr. Cheffo, but
11        with the Court than I am with Mr. Cheffo, and the Court set a
12        hearing.  If you didn't like that date, you could move to
13        change the date.  In my experience in litigation is Pfizer has
14        been pretty reasonable about changing dates and agreeing --
15        assenting to that and, in any event, I can allow the motion
16        over their objection and I would have if it were a reasonable
17        request to change the date to accommodate.
18                  I know you're not from Massachusetts.  So, the travel
19        is more ponderous and more onerous.  I know that both you and
20        Mr. Harang have busy trial schedules and that this isn't your
21        only case.  And so, an important hearing where 34 of your
22        cases are on the line, I would think that if you weren't able
23        to come, that you would just ask for a different date or if
24        you had someone who could come who could handle the whole
25        thing -- no disrespect to Ms. Lo, but she's not in a position
```

1    to address all the issues because she's not responsible for

2    all of them.

3            MR. SCHWARTZ:  Your Honor, with all due respect, I

4    think you've underestimated her and I've spoken her virtues

5    before Mr. Harang got here, which -- you know, he was delayed.

6    The --

7            THE COURT:  I'm not talking about --

8            MR. SCHWARTZ:  The difficulties here, your Honor, are

9    as follows:

10           Once I got the -- no.  I called Mr. Cheffo.  I said,

11   Without admission of any liability and reserving all rights,

12   how much money do you want -- can we agree on to pay and

13   preserve all rights?  He said, I'll submit the $5,000.  All

14   right.  So, he came back 5500.  I said that's fine.  I'll send

15   you the proposed check.  I have the check here now, 5500.

16           I also have a check for $6,809 if the Court orders

17   every penny.  I figure you can't order more than what he's

18   asked for.  I think they're both unreasonable.

19           THE COURT:  Well, I'm not sure you want to --

20           MR. SCHWARTZ:  I'll take that back.

21           THE COURT:  -- test me on that proposition.

22           MR. SCHWARTZ:  You can order anything you want until

23   the Court of Appeals down the hall or Judge --

24           THE COURT:  Saris.

25           MR. SCHWARTZ:  -- Judge Saris says you can't or the

```
 1    U.S Supreme Court.

 2            THE COURT:  I'll tell you I'm not inclined to order

 3    more than Mr. Cheffo asked, but I don't think there's any

 4    limit on my authority.  I don't think that Mr. Cheffo's

 5    request imposes a limit on the Court's authority --

 6            MR. SCHWARTZ:  The moral --

 7            THE COURT:  -- and the Court has -- the Court could

 8    determine that there are consequences separate and apart from

 9    Mr. Cheffo that aren't addressed by his costs.

10            MR. SCHWARTZ:  The long and short of it shows that

11    Mr. Cheffo completely, accurately -- I've seen every lawyer --

12    defense lawyers do it.  He is doing what his client instructs.

13    He's the messenger.  And the fact that we've ruled out any

14    settlement talks ever is fine.  We know we can try them now.

15            Let me, if I may -- I'll just be illustrative a

16    minute.

17            In our MDL case in Mahnomen in Minnesota, federal

18    court, we have tried four of those to a jury.  Complete two-,

19    three-week trials each, not simple, completely unrelated to

20    Neurontin.  It's a different --

21            THE COURT:  Yes.

22            MR. SCHWARTZ:  We have lost three of those four.  In

23    the FEMA trailer cases in Jack's hometown, Eastern District of

24    New Orleans -- Eastern District of Louisiana --

25            MR. HARANG:  He uses the word "we" very, very
```

```
1    loosely, your Honor, because I haven't tried any of those.

2         MR. SCHWARTZ:  Well, he was not in those, but he just

3    tried the third jury case there.

4         Now, we have lost three for three.  After those three

5    losses --

6         THE COURT:  Take any depositions in those cases?

7         MR. SCHWARTZ:  Oh, absolutely.  Absolutely.  About --

8    and the Fifth Circuit ruled -- I'm going to bring to my

9    conclusion real quick, because it will be illustrative to the

10   Court.

11        We have now settled with all but two of the

12   defendants and the last remaining one is Warren Buffet's

13   company.  For having lost every case, there's going to be a

14   mid eight-figure settlement in those cases and a substantial

15   one after losing them.

16        So, the moral of the story is I conclude it doesn't

17   hurt to lose some cases, but Mr. Cheffo is of the scorched-

18   earth policy, which worked very well in Stalinist Russia in

19   1941 --

20        THE COURT:  I think that's a little over the top.

21        MR. SCHWARTZ:  You don't think Russia scorched its

22   earth in 1941?  That much is true.  The analogy may be bad.

23        THE COURT:  Yes.

24        MR. SCHWARTZ:  The analogy may be bad.

25        THE COURT:  I'm not questioning your history.
```

1          MR. SCHWARTZ:  So, with that in mind -- I don't want

2    to be held in contempt, or anything.  Do you want me to tender

3    both of these checks, neither of them, or which or --

4          THE COURT:  No, I don't want any checks.  I don't

5    accept checks.

6          MR. SCHWARTZ:  I've offered to --

7          THE COURT:  I will issue a ruling and then you can

8    respond to the ruling.

9          MR. SCHWARTZ:  And we have not gone into cross-

10   examine his $400 -- I think --

11         THE COURT:  You've answered my question.  My question

12   was simply:  Do you wish to file a written response?  And the

13   answer to that is:  No.  You wish to rely just on what you

14   said in court.  I will consider that, what you said in court.

15         Then with respect to Mr. Cheffo's request in response

16   to my order about the costs and fees related to the prior

17   hearing, I'll issue a brief order about it, but I don't need

18   to wait for you to file something else in writing because I

19   hear you don't want to do that, and that's fine.

20         MR. SCHWARTZ:  One addendum.  Mr. Harang is begging

21   me not to say this.  He made an --

22         THE COURT:  I don't think he's begging you in any

23   regard.

24         MR. SCHWARTZ:  -- six months ago --

25         THE COURT:  He might have learned that it might not

```
 1    matter.
 2            MR. SCHWARTZ:  -- six months ago to set a cap to the
 3    fee, whatever that was.  I thought it was -- his regular rate
 4    may be a thousand, like Judge Chay (phonetic) and his office
 5    is, but he said 350, 400.  You know, they're quibbling over
 6    5,000 versus 5500.  I just want the Court to note --
 7    judicially note what he said he was billing in this case, not
 8    what MD Mass bills, which is -- but what he said he was
 9    billing in this case.
10            THE COURT:  I'm not sure I want to know what he's
11    billing in this case.  I'm not sure that what he's billing --
12    is what he's billing relevant?  I think that -- well, if you
13    think it's relevant, you can address it, Mr. Cheffo.
14            MR. CHEFFO:  I have very little to say.
15            I guess the first thing is I guess if Mr. Schwartz
16    sends me a gift, I know not to open it.
17            But, in all seriousness -- I think most of this is in
18    our papers, but I just want to make sure the record is clear
19    because I -- you know, putting aside -- I think the other day
20    I was being compared to Inspector Javert.  Now it's Stalinist
21    Russia.  I'm not sure what's going to happen in the next
22    papers.
23            But he did ask me to try -- actually, I asked him if
24    we could reach a certain -- I just want to give the Court 30
25    seconds of history.  Rather than to have to file an
```

1   application, I thought it made sense, you know, can we agree

2   on this.  You'll see in our papers, we substantially reduced

3   costs, fees, all of that.  He basically said that makes some

4   sense.  We agreed on $5500.

5           And, frankly, the only reason I didn't accept it was

6   because -- I think you'll see this in our papers, too.  He had

7   this check.  It's kind of a technical miracle how he actually

8   got his secretary to type all of this on the check, but it

9   said, "without reservations of rights, without doing anything

10  wrong, totally against interest in" -- it went on and on.  You

11  should look at the check.  I think it's somewhat actually

12  funny.  Mr. Schwartz says I lack a sense of humor, but that

13  actually I found pretty funny.

14          But, in any event, the point that I didn't accept the

15  check was because, again, I saw this as something that your

16  Honor issued as costs and fees and I just didn't think it was

17  within my ability to accept the check like you would two

18  commercial entities, saying I agreed that there was no

19  wrongdoing or anything else.  So, that's really the story of

20  why we didn't agree.

21          THE COURT:  That's fine.  All right.

22          I will take this under advisement.  I'll issue a

23  short order.

24          Lest anyone be confused, if I schedule another

25  hearing and you have a hearing on a temporary restraining

1    order or preliminary injunction on that day and you think

2    you're the person who has to be here to be able to address

3    whatever the issues are, you can actually file a motion

4    electronically asking for a different day.  Probably Mr.

5    Cheffo will assent to it.  If he doesn't assent to it, you can

6    file it and just say you asked for his consent.  You complied

7    with the local rule as far as conferencing and you can ask the

8    Court to change it to a different date to accommodate your

9    schedule.  I don't imagine if I do set another hearing, that

10   that date itself would be so significant that it could not

11   possibly be moved to address the status of where we are in

12   whatever cases need to be addressed.

13             MR. HARANG:  May I address the Court?

14             THE COURT:  Yes.

15             MR. HARANG:  First off, I do want to apologize for

16   not appearing, okay?

17             THE COURT:  I accept that.

18             MR. HARANG:  And --

19             THE COURT:  Thank you.

20             MR. HARANG:  Number two is, your Honor, in the

21   organization of things and -- and I've literally glanced at

22   the motion.  I'm supposed to be updating it with the process.

23   I had a hearing in front of Judge Africk, a federal judge in

24   New Orleans, and then that Monday -- the following Monday I

25   had a trial that started for the rest of that week.

1          I didn't realize the importance of me personally

2     being here and I apologize again for that, your Honor, and

3     that -- that won't happen again.

4          THE COURT:  Okay.  I accept that.  Thank you very

5     much.  We are adjourned.

6          MR. CHEFFO:  Thank you, your Honor.

7          COURTROOM DEPUTY CLERK SIMEONE:  All rise.  This

8     matter is adjourned.

9          (Adjourned, 3:24 p.m.)

10

11

12

13                     C E R T I F I C A T E

14          I, Catherine A. Handel, Official Court Reporter of

15     the United States District Court, do hereby certify that the

16     foregoing transcript, from Page 1 to Page 69, constitutes to

17     the best of my skill and ability a true and accurate

18     transcription of my stenotype notes taken in the matter of

19     Civil Action No. 04-10981-PBS, In Re Neurontin Marketing Sales

20     Practices and Products Liability Litigation.

21

22     April 13, 2012          /s/ Catherine A. Handel
       Date                    Catherine A. Handel, RPR-CM, CRR
23

24

25