1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS
2

3

4    IN RE:                                    )
                                               ) No. 04-10981-PBS
5    NEURONTIN MARKETING, SALES PRACTICES,  ) MDL No. 1629
     AND PRODUCTS LIABILITY LITIGATION       )
6    ----------------------------------------)
     This document relates to:                )
7    KAISER FOUNDATION HEALTH PLAN, et al,  )
                                               )
8                          Plaintiffs          )
                                               )
9              -V-                             )No. 04-10739-PBS
                                               )Pages 1 - 69
10   PFIZER, INC., et al,                      )
                                               )
11                         Defendants          )

12

13

14                       **CHARGE  CONFERENCE**

15              BEFORE THE HONORABLE PATTI B. SARIS
                   UNITED STATES DISTRICT JUDGE
16

17

18
                            United States District Court
19                          1 Courthouse Way, Courtroom 19
                            Boston, Massachusetts
20                          Monday, March 22, 2010
                            2:41 p.m.
21

22

23                       DEBRA M. JOYCE
                      OFFICIAL COURT REPORTER
24                   United States District Court
                   1 Courthouse Way, Room 7200
25                      Boston, MA  02210
                        (617)345-6787

1   A P P E A R A N C E S

2   FOR THE PLAINTIFFS:

3       THOMAS M. GREENE, ESQ. and ILYAS J. RONA, ESQ.,
    Greene, LLP, 33 Broad Street, 5th Floor, Boston,
4   Massachusetts, 02109.

5       THOMAS M. SOBOL, ESQ. and KRISTEN JOHNSON PARKER, ESQ.,
    Hagens Berman Sobol Shapiro, LLP, 55 Cambridge Parkway,
6   Suite 301, Cambridge, Massachusetts, 02142.

7       LINDA P. NUSSBAUM, ESQ., Kaplan Fox & Kilsheimer, LLP,
    850 Third Avenue, New York, New York, 10022.
8
        DON BARRETT, ESQ., Barrett Law Office,
9   404 Court Square North, P.O. Box 987, Lexington, Mississippi,
    39095.
10
        BARRY HIMMELSTEIN, ESQ., Lieff Cabraser Heimann &
11  Bernstein, Embarcadero Center West, 275 Battery Street,
    San Francisco, California, 94111-3339.
12

13  FOR THE DEFENDANTS:

14      KATHERINE ARMSTRONG, ESQ., MARK S. CHEFFO, ESQ., and
    THOMAS E. FOX, ESQ., Skadden Arps Slate Meagher & Flom, LLP,
15  Four Times Square, New York, New York, 10036.

16      RAOUL D. KENNEDY, ESQ., Skadden Arps Slate Meaher & Flom,
    LLP, Four Embarcadero Center, San Francisco, California, 94111.
17
        JAMES E. HOOPER, ESQ. and ANDREW H. MYERS, ESQ.,
18  Wheeler Trigg Kennedy, LLP, 1801 California Street, Suite 3600,
    Denver, Colorado, 80202.
19

20

21

22

23

24

25

P R O C E E D I N G S

THE COURT:  When did you file something?  Because it wasn't there when I left the bench.

MS. ARMSTRONG:  We filed --

THE COURT:  I can't keep up.

I just sentenced this poor guy to life.

So, in any event -- actually, I need to have someone run upstairs if it's relevant to right now.

MS. ARMSTRONG:  We don't have copies.

We filed an opposition to the plaintiff's request for a curative --

THE COURT:  I got it.  I got that.

MS. ARMSTRONG:  We filed a bench memorandum on the subject of prejudgment interest, which I think you've dealt with already.

THE COURT:  Good.

MS. ARMSTRONG:  At least for purposes of the jury, you've dealt with it.

I have things we have not filed yet, which I think some things will wait.

THE COURT:  How about your --

MS. ARMSTRONG:  And then the plaintiffs filed their indication-specific document, which I don't think we've had a chance to read yet.  Those are the filings that I've gotten in the past, like, half hour or so.

|    |                                                                    |
|----|--------------------------------------------------------------------|
| 1  | THE COURT:  So maybe -- have you seen it, Mr. Sobol?               |
| 2  | MR. SOBOL:  No.                                                    |
| 3  | THE COURT:  Have any of you seen your own submission?             |
| 4  | MR. SOBOL:  I saw a draft of it yesterday.                        |
| 5  | THE COURT:  Mr. Greene?                                            |
| 6  | You know what the problem is, the in-court team and              |
| 7  | the out -- no one is keeping up with another.                     |
| 8  | MR. CHEFFO:  You're not alone; we are not able to keep           |
| 9  | up either with what's been filed.                                 |
| 10 | THE COURT:  Here's my problem.  It's not critical to             |
| 11 | anything except the verdict form with respect to nociceptive.    |
| 12 | I can almost get caught up with it if it's just chopping off a  |
| 13 | year.                                                             |
| 14 | Are you pressing the nociceptive?  Do you know that?            |
| 15 | MR. SOBOL:  Yes, we are.  We are pressing it.  But              |
| 16 | what I suggest we do is, because it doesn't really involve the  |
| 17 | jury instructions, it might affect the verdict slip, I'd like    |
| 18 | to address it tomorrow morning if we need to.                    |
| 19 | THE COURT:  I can't turn it around clerically that             |
| 20 | fast because I'm going to be giving the charge first.  So I do  |
| 21 | need to deal with it.                                             |
| 22 | MR. SOBOL:  All right.                                            |
| 23 | THE COURT:  Does Ms. Nussbaum know what it says?              |
| 24 | MR. SOBOL:  I'm going to have to contact my office,            |
| 25 | contact my office and get a copy of it here.                     |

02:43 (line 10)
02:44 (line 20)

```
 1              We're going to get a copy upstairs.  Has it been filed
 2    or not filed?
 3              MS. ARMSTRONG:  I have it, if you want to just make
 4    copies of it.
 5              THE CLERK:  How many pages?
 6              MS. ARMSTRONG:  Not that long.  It is 11 pages.
 7              THE COURT:  Robert will print it out.
 8              MR. SOBOL:  Great.
 9              THE COURT:  So let's get going --
10              MR. SOBOL:  Can we just take a short break and I'll
11    look it over and then I'll address it?
12              THE COURT:  Let's start going through the jury charge.
13    Famous last words, but I've actually been through a round of
14    excellent comments on both sides.  I've thought about it.  I've
15    read some of the cases.  So I'm not sure this will take that
16    long.  We can take a quick break and then come back and read
17    the document and come back through.
18              So on plaintiff's side, have you had a chance to read
19    the draft I handed out at 11:00?
20              MR. BARRETT:  Yes, ma'am.
21              THE COURT:  We'll start off with you, any objection
22    objections you have.
23              MR. BARRETT:  We have some I guess you call discussion
24    points more than objections.  We have some comments, we'd like
25    to go over them.
```

02:44 (line 10)
02:45 (line 20)

```
 1              THE COURT:  Sure.  Now is the time.
 2              MR. BARRETT:  Okay.  Page 6, instruction number 3.  We
 3    think that there needs to be a sentence added, this would be a
 4    good place to do it, that a juror may draw an inference from
 5    the failure of a party to call a witness.
 6              THE COURT:  So a missing witness instruction.
 7              MR. BARRETT:  Yes, ma'am.  Yes, your Honor.
 8              MR. SOBOL:  He's learning.
 9              MR. BARRETT:  I practiced for a week before I came
10    here.
11              MR. CHEFFO:  I don't know if you want me to address
12    these each one or -- again, I think as we've been through, this
13    is a case where there were lots of witnesses that happened to
14    appear, many of them by deposition, which that's kind of the
15    nature of the beast.  We also filed a 1404 motion, as you know,
16    and things would have been very different if we had an ability
17    to call lots of folks --
18              THE COURT:  Not on the Pfizer front it wouldn't have
19    been.
20              MR. CHEFFO:  That very well may true.  But the point
21    is, they're centered on this Lloyd Knapp issue, but they've
22    taken probably 50 depositions in this case, and they've put
23    forward a lot of different people.
24              THE COURT:  I'm not inclined to give a missing
25    witness, but I am inclined to allow you to argue it to your
```

1   heart's content.

2            MR. BARRETT:  Yes, ma'am.

3            THE COURT:  What's next?

4            MR. BARRETT:  Next, if we could turn to page 23,

5   instruction number 13, that's the curative instruction, your

6   Honor.

7            THE COURT:  Yes.

8            MR. BARRETT:  Pfizer's counsel also stated in their

9   opening that the government made no claim of fraud or

02:47 10  misrepresentation, and that's simply not accurate.  We've

11  discussed that in the information.  And we need the same type

12  of instruction for that.

13           THE COURT:  Under 403, though, I'm not going to get

14  into that.  Because the actual plea was to the off-label

15  marketing.

16       I do agree -- Mr. Sobol has told me, I haven't read

17  it -- Mr. Sobol told me the sentencing memo makes broader

18  claims.  That frequently happens in a sentencing.  They get

19  them to plead to the narrowest and the government says, And

02:47 20  besides these other things happen.  I don't think the Judge

21  made findings on it.

22           MR. BARRETT:  I assume they will not be saying that --

23  making that same representation in their closing.

24           THE COURT:  They will not.

25           MR. CHEFFO:  That's correct, your Honor.

```
 1              MR. BARRETT:  Your Honor, on page 27, instruction
 2     number 16.  That second paragraph really is confusing as
 3     written.  This is not what this case is about.  The enterprise
 4     also can -- may include two companies, two corporations, and
 5     that's what we did here.  The idea of a group of people --
 6              THE COURT:  So how do you want to treat it, for
 7     purpose of an enterprise includes a --
 8              MR. BARRETT:  I would say, For purposes of this case,
 9     an enterprise may include two corporations or companies,
10     instead of a group of people, who have associated together for
11     a common purpose of engaging -- to the end of that sentence.
12              The next sentence, instead of this group of people,
13     saying these two companies, in addition, so forth.
14              And then the next sentence, these two companies,
15     instead of this group of people.
16              THE COURT:  I understand.  So this is standard
17     language, but you're right here, that -- I mean, it's typically
18     the mob or a street gang.
19              MR. BARRETT:  That's right.
20              THE COURT:  Here the argument is it's the two
21     corporations.  So it is confusing to say group of people,
22     although, in fact, corporations consist of people, but --
23              MR. BARRETT:  That's right, it would be confusing if
24     you didn't change it.
25              On page 31 --
```

1          THE COURT:  So can I just hear -- just so I don't lose

2    this track.  Is there a problem with referencing that here the

3    claim is that two corporations formed an enterprise?

4          MR. CHEFFO:  I don't think that's a problem, your

5    Honor, in light of the facts.

6          THE COURT:  Okay.

7          By the way, while I'm at it, Erin, my law clerk, and I

8    have been playing with the agency issue based on Judge Zobel's

9    ruling.  This may be an appropriate point to raise it.

02:50 10          You remember that earlier case that she had, the

11    mirror case.  While this case is not a complete mirror of that

12    one, it actually had some good language that I thought I would

13    pick up that sounded something like this -- and we're playing

14    with it, but while we're on this association in fact.

15          Something like, Pfizer, acting through its employees

16    and agents, is not without more the enterprise under RICO.  To

17    prevail on its RICO claim -- actually, we have copies, don't

18    we?

19          She does it all.

02:50 20          THE COURT:  This is the third paragraph in.

21          MR. SOBOL:  Third paragraph down?

22          THE COURT:  Yes.

23          To prevail on its RICO claim -- this is the new

24    part -- Kaiser must prove that Pfizer as a corporation is

25    sufficiently distinct from Cline, Davis & Mann and MAC in order

1    to be in association with them.  You should consider whether

2    Cline, Davis & Mann and MAC were acting under Pfizer's control

3    or whether they retained autonomy from Pfizer.

4           MR. CHEFFO:  I think that's --

5           THE COURT:  That's not an exact quote, but it's pretty

6    darn close.  I didn't use puppeteer and that sort of thing, but

7    it's --

8           MR. SOBOL:  So I think that's where some rip-off of

9    that might work, your Honor.  If you look at the next

02:51 10    paragraph -- because you're actually anticipating something I

11    was wondering here.

12           THE COURT:  The next paragraph of mine or of Judge

13    Zobel's --

14           MR. SOBOL:  Yours.  So then the next paragraph is

15    dealing with some of the same topic.

16           "The enterprise element is different from the

17    racketeering element, although the proof to establish these

18    elements may overlap, proof of one does not necessarily

19    establish the other."  Then you say, "Rather, the enterprise

02:51 20    must be an entity separate and apart from the racketeering

21    activity in which it engages."

22           Now, that statement in this context is pretty

23    confusing because I'm not sure how you would ever have Pfizer

24    working with CDM or Pfizer working with MAC ever also being the

25    racketeering activity.

1          I think you've addressed that already in the previous

2     paragraph given the agency that you have just done.  So we

3     would want you to actually just strike that sentence of rather,

4     which doesn't get us anything here.

5          THE COURT:  What do you think?

6          MS. ARMSTRONG:  I think you have to have both, because

7     two levels of distinctness from RICO, you have to be distinct

8     from the defendant and you have to be distinct from

9     racketeering activities, so I think you have to instruct them

02:52 10    on both.

11          MR. SOBOL:  But here I'm not sure how the proof ever

12     ends up them being the same is the point.

13          In some situations, like a classic bag man type of

14     situation, you might have somebody who is asked to just bring

15     the drugs across the street or something, and so the

16     association is nothing more than a predicate act; they just

17     took the drugs across the street.

18          THE COURT:  Typically those are charged as the

19     conspiracy that you have abandoned -- you have conspired with

02:53 20    an enterprise if you're not part of it, at least in the

21     criminal context.

22          MR. SOBOL:  Here by definition, if they find they're

23     two separate companies and they have associated for a common

24     purpose, how are they then also going to be the racketeering

25     activity?  It doesn't make sense.

          1              THE COURT:  Play this out.  There's some evidence of

          2    fraudulent representation in a publication.

          3              MR. SOBOL:  Sure.

          4              THE COURT:  So suppose all you had was Pfizer ordering

          5    MAC to include fraudulent material.  That might be relevant to

          6    whether there was an enterprise, but there's got to be more

          7    than that.

          8              MR. SOBOL:  But here the only -- the evidence that we

          9    put forward is different than that, right?  Here the

02:53   10    evidence -- there isn't --

         11              THE COURT:  Anyway, I'm inclined to keep it in, it's

         12    boilerplate law, and I think -- the key is it can't just be the

         13    racketeering act.  It's got to be more than that, some ongoing,

         14    distinct structure here.

         15              You've got evidence to support your claim that's apart

         16    from the racketeering act, or I would have directed this out.

         17    You've got those teams and those memos and those e-mails.  I

         18    mean, you've got stuff, but it can't just be that MAC or Cline

         19    Davis went out as sort of the henchmen and on an occasion did

02:54   20    Pfizer's will.

         21              MR. SOBOL:  Sure.

         22              THE COURT:  I think it's got to be more than that.

         23              MR. SOBOL:  I don't think the evidence went in that

         24    way, but I'm not going to fight you on it.

         25              THE COURT:  Are we done with this enterprise

 1    instruction or not?

 2            MR. SOBOL:  Sorry, no.  The next paragraph, three

 3    lines down -- I think it was a very well-done instruction, by

 4    the way.

 5            Third line down where it says, "Linkage among the

 6    associates."  Again, this is like the group of people thing.

 7    We just --

 8            THE COURT:  Among the companies.

 9            MR. SOBOL:  Right.

02:54 10         THE COURT:  That's fine.

11            MR. SOBOL:  And then on the next page --

12            MS. ARMSTRONG:  Here I think "associates" is the

13    proper word to use for an association-in-fact enterprise.

14    Associates can be a company.

15            THE COURT:  How about the alleged associated

16    companies?

17            MS. ARMSTRONG:  That's fine.

18            THE COURT:  Let me just get this.

19            MR. SOBOL:  And page 29, your Honor, last paragraph.

02:55 20    Second -- first full paragraph, second line.  I think you're

21    trying to get this, but the way I read -- well, the sentence

22    says, "If you find that Kaiser has failed to prove the

23    existence of either enterprise, then there is no liability

24    under RICO."

25            I think what -- the one way to read that is, oh, so if

1    they lose on one, then they lose on both.  I know you say that

2    in the next paragraph.

3            THE COURT:  That's an interesting ambiguity.

4            MR. SOBOL:  If instead you say, If you find that

5    Kaiser has failed to prove the existence of both enterprises,

6    then there is no liability.

7            THE COURT:  An improvement, thank you.

8            MR. SOBOL:  And then, "However, if you find" blah,

9    blah, blah.

02:56 10         THE COURT:  Fine.

11            MR. CHEFFO:  I don't think you need "however."  If you

12   change the first sentence, it's fine.

13            THE COURT:  I think the however --

14            MR. CHEFFO:  I don't feel too strongly, I'm not going

15   to fight you too hard on that.

16            THE COURT:  Don't worry, I'll come back through you

17   for whatever your issues are.

18            Just a practice, I'll go all the way through

19   plaintiffs and then come back for defendants.

02:56 20         MR. CHEFFO:  Sure.

21            MR. BARRETT:  Your Honor, page 31, first line is just

22   a typo, I think.  You say "the fourth element."  It's the third

23   element.

24            THE COURT:  Yes.  What we did there --

25            MR. SOBOL:  Your Honor, I apologize to interrupt.

         1    Apparently one of the Pfizer lawyers has ordered our people out
         2    of the room and told them not to flag any documents, and we're
         3    going to run out of time.
         4             MS. NUSSBAUM:  We would like to start flagging the
         5    documents, otherwise --
         6             (Discussion off the record.)
         7             THE COURT:  All right.
         8             MR. BARRETT:  Next, your Honor, instruction number
         9    25 --
02:57   10             THE COURT:  You're right.  I'm sorry, I should make
        11    this point.  In reviewing the objections over the weekend I
        12    thought Pfizer made an excellent point that we don't actually
        13    need to say that Pfizer is associated with the enterprise if,
        14    in fact, the allegation it is one of the two entities that are
        15    the enterprise.  So I eliminated that.  We missed the
        16    numbering, but that's what's happened here.
        17             MR. BARRETT:  Okay.
        18             THE COURT:  I just want to make sure because you had
        19    to read it fast this morning.  I didn't say that you had to
02:58   20    prove that Pfizer was associated with the enterprise, because
        21    the way this has been charged out it was a fine point.  It is
        22    part of the enterprise.  Fair enough.  So we screwed up on the
        23    numbering because of that.
        24             MR. BARRETT:  Yes.
        25             Okay.  On page 43, instruction number 25 --

         1            THE COURT:  Page 43?

         2            MR. BARRETT:  Yes.

         3            THE COURT:  Okay.

         4            MR. BARRETT:  The last paragraph in the text, "To

         5     establish that Pfizer caused an injury, Kaiser has to prove

         6     that it relied on misrepresentations," and it says, "or that

         7     reliance or misrepresentations by," and it names the medical

         8     group or the P&T committees.  It should also say, first, that

         9     it should rely upon Kaiser's Drug Information Services, which

02:59   10     is really our -- the major thrust --

        11            THE COURT:  I actually have rewritten this paragraph

        12     about four times, and I was reading it last night, your motion

        13     in opposition for directed verdict on it.  I'm not even sure

        14     this is right.

        15            So if I understand it -- so let's go -- you want to

        16     say, Kaiser must prove that its Drug Information Service

        17     relied, is that what you want to say?

        18            MR. BARRETT:  Yes.

        19            MS. NUSSBAUM:  Yes.

02:59   20            THE COURT:  If Drug Information Service --

        21            MR. BARRETT:  What we said was all that reliance on

        22     misrepresentations by Kaiser's Drug Information Services.

        23            MS. NUSSBAUM:  All three we want.

        24            MR. BARRETT:  True.

        25            THE COURT:  Wait.  Kaiser must prove that it relied --

 1    no, you want to say that it's -- and I'm not sure, by the

 2    way -- I listened today, I may revise this again, it's really

 3    the reliance by the P&T committees, not the physicians

 4    directly.

 5         MS. NUSSBAUM:  That's correct, your Honor.  It's

 6    actually three ways, I think.  It's the Drug Information

 7    Service directly, it's the P -- alternatively, it's the P&T

 8    committee.  We had testimony here from Dr. Daniel, the

 9    chairman, saying specifically that he relied, otherwise he

03:00 10    would have voted differently, or the physicians.

 11         THE COURT:  It's the "or physician" -- say it again.

 12         MS. NUSSBAUM:  Or PMG physicians.  We heard testimony

 13    today, there's been other testimony in the case, that they were

 14    detailed regularly from '94 to 2004.  So it's all three.

 15         THE COURT:  All right.  This is what I'm going to rule

 16    as a matter of law.  I haven't heard enough information about

 17    detailing directly to the physicians and what they did or

 18    didn't receive or what they did or didn't rely on.

 19         But I do think it's -- I should add specifically by

03:01 20    reliance by DIS or by the physicians on -- I think there's a

 21    typo here.  Instead of saying "or P&T," it's "the physicians on

 22    the P&T committees," because I think we have heard testimony

 23    about the physicians on the P&T committees.

 24         MS. NUSSBAUM:  If I might, your Honor, in addition to

 25    that, there is evidence and there will be discussed further,

1    for example, of what are the CMEs, the social phobia CME, 33

2    physicians, PMG physicians, are on the attendee list and

3    attended that.  They all relied on that fraud.  That's very

4    specific.  It's the CME, it's the name of the physicians, it's

5    what region they practice in.  That's direct reliance by those

6    33 physicians.

7         We have had testimony in the case from both

8    Dr. Carrejo, who definitively said, Yes, he was personally

9    detailed by Pfizer or Neurontin and he knows physicians were.

03:02 10   We heard testimony today from Al Carver that it was a

11   detailable product at Kaiser.

12        So I think that there is also sufficient evidence that

13   PMG physicians were detailed, and we have their own document,

14   their 2004 Pfizer's operating plan with respect to Kaiser, and

15   in addition to all the general material, under Neurontin it

16   says, Continue to support the field detailing efforts with

17   respect to Neurontin.  So I think that there's enough on

18   detailing.

19        And then, in addition to that, there's physicians who

03:02 20   attended CMEs, we have deposition testimony about that; and, of

21   course, the publication.  The physicians who received and read

22   and relied upon the publication.

23        THE COURT:  I don't know if I'm going to say that.  I

24   will say that DIS and the PMG and physicians on the P&T

25   committees.

1          MR. SOBOL:  I want to make sure you understand the

2     plaintiff's position on this.

3          There is overwhelming evidence in this record that the

4     medical literature, the articles, everything that doctors rely

5     upon in terms of medical information, the reliable scientific

6     evidence was corrupted by the defendants.  And there's more

7     than enough evidence to go to the jury that -- and we took

8     pains to do this, to say this was out there all over the

9     country, that all the doctors relied upon the same body of

03:03 10   information, whether they're from California or from Georgia or

11    from Washington or whatever.

12         Dr. Abramson went on and on about how it is that this

13    is what doctors rely upon, regardless of where they're from,

14    that's what Dr. Dickersin said, what Dr. Barkin said.

15         The nature of the publication fraud is one that is

16    national, going to all physicians.

17         And we even put on testimony, again, from Rosenthal

18    and Hartman on this, too.

19         So, you know, the jury must get an instruction that it

03:03 20   would be either, you know, one component of Kaiser or another

21    component of Kaiser, or the jury may conclude that PMG

22    physicians also were misled, period.

23         THE COURT:  It's his turn now.

24         MR. CHEFFO:  What they're arguing, I think your

25    Honor's instincts are exactly correct.  All we've heard now is

1    fraud on the market theory.  I don't think we're here to

2    basically tailor these to the specific facts of the case, as

3    Ms. Nussbaum was talking about.  I think what we're talking

4    about what the general application of law should be.

5         And first is -- I won't go through it again -- but

6    under the Hemi Group, I think what we are talking about is the

7    fact that there has to be reliance on more than just DIS.  And

8    here we haven't heard anything from any PMG doctor in Ohio or

9    Hawaii, that's a whole other issue --

03:04 10        THE COURT:  No, but we heard enough -- we've heard

11   enough to say that the Drug Information Service always sits

12   with the P&T committee, that they share across teleconferences

13   to know if, in fact, there's misinformation given to DIS,

14   that's enough to be proximate cause with respect to P&T

15   committees.

16        My concern, and it's intellectually been a struggle

17   for me throughout this litigation, is I agree that you could

18   find by preponderance of the evidence that some doctors relied

19   on the publication fraud.  What becomes impossible is coming up

03:05 20   with a damage theory based on the information that you've given

21   me.

22        So it's not so much whether it caused injury, I just

23   haven't heard a damage theory because we don't have numbers on

24   detailing.  We don't have numbers on nine CME physicians, or

25   whatever it was, went in there -- how many?

1          MS. NUSSBAUM:  Thirty-three, that's just one CME.

2          MR. CHEFFO:  Out of 25,000.

3          THE COURT:  I just don't think I've heard yet a viable

4    damage theory.

5          Yes, I think you can infer causation, but I've heard

6    very viable damage theories with respect to DIS and the P&T

7    committees.

8          I have not yet seen numbers that would let me conclude

9    how many doctors relied on the fraud.  In general, 25,000 -- I

03:06 10   can -- I've had this go-around with Mr. Cheffo.  I could find

11   easily by a preponderance of the evidence that there was injury

12   among the 25,000, that some did.  But who and how many and what

13   proportion, I just don't have --

14         MR. SOBOL:  If the jury concludes by a preponderance

15   of the evidence that if for, as an example, bipolar that there

16   is no reliable scientific evidence upon which a prescription

17   would be written, and if the jury believes one of the witnesses

18   said no reasonable psychiatrist would ever write any

19   prescription for bipolar for this drug, then the jury does not

03:06 20   need an expert to do the causation or the damages.  They would

21   simply tally up how much was paid by Kaiser for bipolar.

22         THE COURT:  I have to agree that is your strongest

23   case.  The other cases are hopeless.

24         MR. CHEFFO:  First of all, that's not true --

25         THE COURT:  You know what, I understand the debate.  I

1    don't think we need to hear any -- it is the single hardest

2    issue I have worked on.  We've had that issue from day one

3    throughout this case.

4         At the very least, it's quite clear that Kaiser has a

5    cause of action with respect to DIS' reliance and the P&T

6    Committee's reliance.  And whether or not I can find a viable

7    damage theory based on the detailed information -- detailing

8    information, actually, lack of detailing information I've got,

9    it's very difficult for me.  And without any survey of the

03:07 10   physicians or something that would give me some way of

11   understanding how many people got it via word of mouth, how

12   many people got it via reading a publication, how many people

13   got it because they -- the prior patient wanted it -- from a

14   prior doctor.  I don't know.

15        So I'm not inclined to give it.  I think you'll have

16   to preserve your rights on it.  It's a darn good issue.  I'm

17   still struggling with whether I should grant the motion for

18   reconsideration on the bipolar, and I will think again about

19   that.  It's your strongest case because the scientific evidence

03:08 20   is so weak.

21        MR. CHEFFO:  I'm sorry, your Honor, I don't want to

22   snatch -- the only thing I would say --

23        MR. SOBOL:  Go for it, Mark, you can do it.

24        MR. CHEFFO:  I've done it before, thanks, Tom.

25        The only thing I would just say, because I think is

1    critically important, we didn't choose this theory of damages,

2    the plaintiffs did.  They have basically got up and everyone

3    said it would be wacky for us to talk to individual doctors, do

4    X and Y and Z.

5         They put this in motion.  Throughout discovery process

6    they have forcibly objected to any individualized doctor or

7    patient discovery throughout this for years and years and

8    years, and they've essentially made an all-or-nothing approach,

9    that essentially is we're just going to go on these aggregate

03:08 10   models.

11        I think at this point the Court needs to be governed

12   by all the things that have happened in discovery, our

13   inability as well, and it's their theory on the aggregate

14   proof.

15        THE COURT:  I am not talking anymore about it, because

16   I have to get through it, and I have a meeting at 4:30.  We can

17   come back to it possibly.  At least you know you've got the P&T

18   committees and the DIS.

19        Is there anything else?

03:09 20   MR. BARRETT:  Yes, on page 45 --

21        THE COURT:  Page 4 and 5?  Page what?

22        MR. BARRETT:  45.

23        THE COURT:  Oh, 45.  Yes.

24        MR. BARRETT:  When you talk about awarding,

25   speculating, guessing about damages, you have this sentence,

24

1    which is good, "If plaintiffs prove a fraud, they need not

2    prove damages with mathematical precision."  We would like to

3    add a sentence, which is the law that's been given in other

4    cases.  That plaintiffs are permitted to use estimates and

5    analysis to calculate a reasonable approximation of their

6    damages.  That's straight out of In Re: Loeb.

7            THE COURT:  Do you have a cite?

8            MS. NUSSBAUM:  Yes, 306 F.3d 469 at 493, Judge Wood.

9            THE COURT:  306 F.3d --

03:10 10           MR. BARRETT:  469 at 493.

11           THE COURT:  I'll do something like that.

12           MR. SOBOL:  Your Honor, we missed something on page

13   41, instruction 24.  Are you there, your Honor?

14           THE COURT:  Yes.

15           MR. SOBOL:  So I think that while some of this

16   language at the beginning, a sentence or two to make clear to

17   the jury that proving off-label is not proof of mail fraud, of

18   an intent, a scheme to defraud is fine.  So one or two

19   sentences.  The balance of everything else is completely

03:10 20  irrelevant because we're not trying to figure out what is

21   off-label or what is not off-label lawfully or not in the case

22   that's going to the jury.

23           The only thing the jury needs to find and that the

24   entire instruction intellectually is irrelevant, because if

25   they find that there's a scheme to defraud, i.e., that there

1    were material misstatements or omissions, things that would

2    have a tendency to mislead, then by definition they're going to

3    be actionable and outside of some safe harbor that the

4    defendants might otherwise have had.

5         So while I understand that given the nature of the

6    case you might want to caution them, just don't -- you know, if

7    something is off-label doesn't mean it's a scheme to defraud,

8    leave it at that.

9         The whole balance of the discussion ends up being a

03:11 10    problem.

11         THE COURT:  Unless you tell me it's legally wrong, I'm

12    going to keep it in there.

13         So let's -- anything else at this point from the

14    plaintiffs?

15         (Discussion off the record.)

16         MR. BARRETT:  Your Honor, on the statute of

17    limitations, page 48.  We should get the benefit of tolling

18    from the file in the class case in 2000.

19         THE COURT:  Good, good.  We've been struggling with

03:12 20    American Pipe.  So our current view of the law is this:  The

21    majority of circuits -- and Erin can list them for you -- say

22    that you get the benefit of the earlier filing date.  The 6th

23    Circuit has gone the other way.  The 1st Circuit has never

24    addressed it head on, but there's some troublesome language for

25    the plaintiffs but in a different context.

 1          I'm sure you know which case I'm referring to, I can

 2    probably find it here.

 3          MS. ARMSTRONG:  It's Glater.

 4          THE COURT:  Yes.  But it was not directly on point.

 5    It had to do at what point you decide what point someone's

 6    residency is for purposes of personal jurisdiction.

 7          I think the better view of the case law is where the

 8    majority of the circuits are going.  I agree with the

 9    plaintiffs on that, and I think that the 1st Circuit didn't

03:13 10   have the benefit of that line of cases and it was a different

11    factual situation.

12          That having been said, let me look at you.

13          I don't think it matters.  I can't think of why it

14    would matter, and I don't know why there should be that appeal

15    issue.

16          Let me look at you.  I think your view of the law is

17    the better one.  Do you care?

18          MR. SOBOL:  Guys?

19          No, your Honor.

03:13 20   THE COURT:  Now, is there anything else?

21          MR. BARRETT:  Small point.  The last point to

22    instruction -- on page 46 on the mitigation of damages.  The

23    most important sentence there is down at the bottom.  Your

24    Honor states, "It is the defendant's burden of proving that

25    damages reasonably could have been avoided."  Because the

1    evidentiary burden everywhere else is on us, we think that that

2    sentence ought to be emphasized by placing it at the first of

3    the -- at the first of this instruction.  It sort of gets lost,

4    and it's really important.

5            THE COURT:  Okay.  Put burden in beginning.

6            Okay.  All right.  Defendant's turn.  Although you

7    can't have much more left from what you put in that series of

8    objections.

9            MS. ARMSTRONG:  Well, those were comments because it

03:14 10  was a draft, and I don't want to seem rude, but if my comments

11   could be construed as objections, I think I do have to make

12   them objections in order to preserve them for appeal.

13           THE COURT:  Well, I think Mr. Sobol knows this for

14   sure, but the 1st Circuit is brutal on this.  You have to

15   preserve them anyway, everything, after the instruction.

16   Nothing we do here is going to preserve anything.  Just for

17   that matter.  You have to sit and go through them again at the

18   close of the instructions.

19           Let me just say this to you, also, because I'm, for

03:15 20  the first time in my life since 1986, it's a long time,

21   charging the jury before I'm having closing arguments, I

22   propose that I say something like the following, which is, I

23   may have a few additional comments to you after the closing

24   arguments, in case there's some either a curative instruction

25   that's necessary or something I hadn't thought of; and then

```
 1   also at that later point, take the objections to the charge,

 2   not have them sit there before the closing arguments.

 3           Does that sound like an okay procedure for all of your

 4   point of view?  This is a new thing for me.

 5           MR. CHEFFO:  There are no surprises here, so I think

 6   that makes a lot of sense, your Honor.

 7           THE COURT:  There could be something that came up --

 8   sometimes things do.  At this point -- so you'll preserve it

 9   all then.

10           MR. CHEFFO:  Are you planning on giving a copy to the

11   jurors?

12           THE COURT:  I'll give them a transcript.

13           All right.  So is there something --

14           MS. ARMSTRONG:  Page 20.  The scales analogy.  I'm

15   guessing this is not going be the first time you heard a

16   defendant say this.  Our viewpoint is that the scales start

17   like this (indicating) and the analogy may be confusing to the

18   jurors.

19           THE COURT:  I have been giving this exact charge since

20   1986 --

21           MS. ARMSTRONG:  It's the hands.  It starts here.

22   They've got to move it all the way to the middle and then

23   further.  And then a little bit further.

24           THE COURT:  I won't use the hands.

25           MR. SOBOL:  She's already used the hands.
```

```
 1            MR. CHEFFO:  This wasn't an opportunity.

 2            MR. SOBOL:  You could have stood up and said

 3       "objection."

 4            MR. CHEFFO:  Sure.

 5            MS. ARMSTRONG:  Yes, that's what we were going to do.

 6            I'm flipping through these pages really fast.

 7            I think that on page 39, the participation of the

 8       scheme to -- with an intent to defraud, that is part of the

 9       mail fraud.  You have added some language, "If you find that

03:17 10   the defendants consciously avoided determining the accuracy of

11       the statements."  We think an addition to the Pattern jury

12       instruction, you deleted the language about good faith from the

13       Pattern jury instruction --

14            THE COURT:  I added it at the end.

15            MS. ARMSTRONG:  Oh, I didn't see that, I apologize.

16            THE COURT:  You were absolutely right.  We looked up

17       the law, but also willful blindness is part of the law, too.

18            MS. ARMSTRONG:  On page 41, there is a typo, the third

19       line up on the last paragraph should be wire fraud.

03:17 20        On -- we had in our original proposed instruction on

21       off-label use of medications also included some language about

22       the FDA's safe harbors for communications -- or for sponsorship

23       of educational activities and for responding to unsolicited

24       requests from physicians.  And we would ask that that be

25       included in here as well.  That was our original proposed
```

```
 1    instruction number 19.
 2            THE COURT:  Do you remember what --
 3            MS. ARMSTRONG:  It was instruction 19.
 4            THE COURT:  We'll look at that.  CMEs and --
 5            MS. ARMSTRONG:  And responding to unsolicited
 6    requests.
 7            THE COURT:  Okay.
 8            MS. ARMSTRONG:  Now, on page 43, the RICO causation.
 9    We would ask where you are discussing the requirement of
10    directness that you add that -- that if the causation depends
11    upon contingent or independent acts of third persons, that it's
12    not sufficiently direct.  That's from Hemi Group and that was
13    included from our proposed instruction 20.
14            THE COURT:  Help me with this.  I remember Mr. Cheffo
15    drawing me a little picture.  Like what?
16            MS. ARMSTRONG:  Like the physicians would be the main
17    ones.  From our perspective they made this point about the P&T
18    committees being autonomous.  You've got several links in the
19    chain away from DIS, and each of those are independent actors.
20            THE COURT:  That's a different -- that's a factual
21    question.
22            MS. ARMSTRONG:  But if the jury is going to find that
23    factual question, they have to have an instruction on it.
24            THE COURT:  So if you find --
25            MS. ARMSTRONG:  If the -- I can find my exact
```

           1   language.

           2           THE COURT:  I added in a lot of words about directness

           3   out of Hemi --

           4           MR. SOBOL:  You already did.

           5           THE COURT:  What's it called now, Hemi Group?

           6           MR. SOBOL:  You distincted and you independented it.

           7   I don't know how that comes out in the transcript but --

           8           MS. ARMSTRONG:  A link that is too remote -- that's

           9   not it -- "If the plaintiff's injuries depend upon the

03:19     10   contingent and independent actions of other persons and the

          11   harm is not sufficiently direct and is not the proximate cause

          12   of injuries claimed by the plaintiffs."

          13           THE COURT:  That's out of Hemi?

          14           MS. ARMSTRONG:  It's based on Hemi, I don't know if

          15   that's a direct quote.

          16           THE COURT:  That's in your objections?

          17           MS. ARMSTRONG:  It's in our original proposed

          18   instruction number 20.

          19           THE COURT:  Okay.

03:20     20           MS. ARMSTRONG:  Then the other comment that we had

          21   here is where you say the defendant is liable if its acts are a

          22   substantial factor in causing the plaintiff's injury, which I

          23   think is the cause and fact prong of RICO, and I think cause

          24   and --

          25           THE COURT:  Say it again.

```
 1            MS. ARMSTRONG:  In considering the question of
 2    causation, I think this is the point -- I think what before was
 3    proximate causation, that's directness, and I think here you're
 4    dealing with cause and fact, where I think the standard under
 5    RICO is but for causation and not substantial causation.
 6            THE COURT:  I think we got substantial factor --
 7            MS. ARMSTRONG:  I'm not sure that I saw but for
 8    causation in here anywhere.
 9            MR. SOBOL:  Look at page 43 of your instructions, your
10    Honor.  The last sentence of the first paragraph we think
11    accurately captures what the Supreme Court has repeatedly said
12    is the in fact causation prong, which is that it should only be
13    a substantial factor, and it has repeated that time and time
14    again.
15            MS. ARMSTRONG:  That is not correct.  It is said in
16    Hemi Group, it is said in Bridge, it is said in Holmes, it's
17    but for causation.
18            THE COURT:  Those are not inconsistent.
19            MS. ARMSTRONG:  It's a little bit inconsistent.
20            THE COURT:  No, they're not.
21            MR. SOBOL:  The issue ends up being whether or not --
22    but for causation sometimes sounds like it has to be the only
23    cause, which is why the defendants like --
24            THE COURT:  It does not have to be the sole cause.
25            MR. SOBOL:  Exactly.
```

1          MS. ARMSTRONG:  But it has to be something that would

2     not have happened --

3          THE COURT:  That's your contention intervening, which

4     we'll add in, and I think that takes care of it.

5          MS. ARMSTRONG:  I think they're different issues.

6          THE COURT:  Do you remember if that <u>First National</u>

7     <u>Bank</u> is a RICO case?

8          LAW CLERK:  Yes.

9          THE COURT:  I think it is.  We've typically charged

03:21 10     this as substantial factors.  We'll put a question mark, but I

11     think your contingent thing takes care of that.

12          My biggest problem on causation is the one I've been

13     plagued with from day one, which is, what to do particularly on

14     bipolar when everything out -- the science will support it for

15     social phobia, maybe some of the mood disorders, but not

16     bipolar.

17          MS. ARMSTRONG:  We raised that, actually, in our Rule

18     50 motion.  It becomes even more compounded based upon the

19     evidence in this case.  I mean, you heard Mr. Greene

03:22 20     cross-examine our expert witnesses by saying, Well, you realize

21     we're not seeking damages for social phobia, you realize we're

22     not seeking damages for panic disorder.  They're also not

23     seeking damages for depression, and, yet, they have experts on

24     depression.

25          THE COURT:  Of all the things I've seen, the most

```
 1   horrible has been the bipolar.
 2            MS. ARMSTRONG:  But that's --
 3            THE COURT:  There's no science to support it.  There's
 4   nothing to support it.  I'm just telling you my personal
 5   reaction.
 6            MS. ARMSTRONG:  I understand that, your Honor, I've
 7   heard that from your Honor before.
 8            My point is that Professor Rosenthal, Professor --
 9   Dr. Hartman and their damages expert didn't restrict themselves
10   to bipolar and haven't demonstrated they can back out bipolar.
11   So they mushed all this stuff together.
12            THE COURT:  I understand.
13            There is no scientific evidence to support the use of
14   this for pure --
15            MS. ARMSTRONG:  We disagree with that --
16            MR. CHEFFO:  There are two DBRCTs, Vieta and Mokhber,
17   that you've heard on bipolar, your Honor.
18            THE COURT:  Tell it to the jury.  I'm not directing a
19   verdict on it.  I just say of all the things that are
20   troubling -- I understand with neuropathic there just aren't a
21   lot good medications and people try different things.  I didn't
22   hear one psychiatrist come up here and say I would try that as
23   my first line.  Not one.  People would do it if it's a comorbid
24   condition.
25            Putting that aside, this is going to the jury.  The
```

1    causation issue is the hardest with respect to the general

2    detailing because I don't have information, through no fault of

3    the plaintiffs, as to who was detailed and how many and what

4    percentage and even a survey of what percentage of doctors

5    actually read these publications.  I mean, I'm struggling with

6    that now.

7            But, in any event, that's -- what else?

8            MS. ARMSTRONG:  On page 44 -- not trying to get into

9    an argument on this or have a full-blown argument on this, but

03:24 10   I just want to say, for the record, I think we've previously

11   briefed it, that we don't agree these are the correct measures

12   of damages.

13           THE COURT:  What are the correct --

14           MS. ARMSTRONG:  Again, we submitted instructions.  We

15   think that they have to show more than just here's this list of

16   drugs that we would have prescribed.  Instead they have to show

17   these are the things that the doctors would have actually

18   prescribed, they would have been effective, they would have

19   been well-tolerated.

03:24 20           THE COURT:  There has been testimony on that.  I

21   disagree with you.  There has been.  In fact, I think the jury

22   is probably baffled why we're talking about TCA as much as we

23   are.  I think the bulk of the testimony is that it would be

24   equivalent, and it's cheaper.

25           MR. CHEFFO:  For half of the people who have heart

```
 1    disease, you can't give it to them.  That's the issue.  Their
 2    point is everybody would have gotten a TCA when their own
 3    doctors say if you have glaucoma, if you're old, if you have
 4    heart disease you can't get TCAs.
 5            THE COURT:  Tell it to the jury.
 6            MR. SOBOL:  We missed two additions, your Honor.
 7            THE COURT:  Let them finish their side.
 8            MS. ARMSTRONG:  Page 48, on the statute of
 9    limitations, the big paragraph in the middle, starting around
10    the middle where says, "Even if diligent investigation would
11    have revealed nothing," and then it goes on to talk about
12    fraudulent concealment.  We believe that's incorrect, that's
13    inconsistent with the 1st Circuit's decision in Rakes.  What
14    the 1st Circuit said in Rakes was --
15            THE COURT:  Can I say something?  I agree that Rakes
16    creates ambiguity where before there was none, but I almost
17    verbatim quoted Rakes.
18            MS. ARMSTRONG:  Okay.
19            THE COURT:  So --
20            MS. ARMSTRONG:  I do not have my copy of Rakes with me
21    during the break, but I'll take another look at it.
22            THE COURT:  I come close to plagiarizing it.  So I
23    don't 100 percent understand what Rakes was trying to say
24    whether, in fact, the doctrine of fraudulent concealment is
25    dead, or whether it's not much aid to anybody because you have
```

 1    to also reasonably investigate.  In other words, it's not a

 2    silver bullet.

 3              In any event, I think I've copied the language.  And

 4    if you think I haven't, tell me tomorrow, because it's darn

 5    close.

 6              Is there anything else?

 7              MS. NUSSBAUM:  Very briefly, your Honor.

 8              THE COURT:  She's not quite done yet.

 9              MS. ARMSTRONG:  On page 51, the fraudulent conduct

03:26 10    defined under the UCL for the reasons that we discussed earlier

11    about detailing, we believe that you should delete "and a

12    reasonable physician who treats a health plan's member."  They

13    should be restricted to --

14              THE COURT:  No, because all those doctors on the P&T

15    committee.

16              MS. ARMSTRONG:  Well, I think that's different -- I

17    think that's confusing.  I think they're going to think a

18    treating physician rather than a doctor on a P&T committee

19    who --

03:27 20              THE COURT:  It's interesting, as I was doing the work

21    for the first time really over the weekend on the UCL, I

22    realized how much broader it was than RICO actually on a point

23    that's key to the defendants -- excuse me, plaintiffs.

24              They could win this if there's a finding of fraud even

25    if you can't prove physician by physician what statement they

1    relied on, which may be what defeats the RICO.  So it's a much

2    broader statute.

3         MS. ARMSTRONG:  Don't necessarily agree with it, but

4    I'm not sure this is the right time for argument on it.

5         THE COURT:  I think there's a stronger argument for

6    grabbing all the physicians under UCL than there is under RICO.

7    But I would have to grant the Tobacco II, which is written in

8    the context of a class action.  It's not a hundred percent

9    clear how it affected Kaiser here, but it is clear you don't

03:28 10   have all the traditional fraud concepts.

11        MS. ARMSTRONG:  I agree that it's different than a

12   straightforward, traditional fraud, but I think that the effect

13   of proposition 64 is that they have to show direct reliance and

14   injury.  They can't just carry --

15        THE COURT:  And I think I've got that in here.

16        MS. ARMSTRONG:  Again, the same reason why you deleted

17   the physicians from the earlier instruction --

18        THE COURT:  I think I'm not going to here.  Here it's

19   just what's fraudulent.  It's just in the concept of fraud, and

03:28 20   we at least have the doctors on the P&T committee.

21        MS. ARMSTRONG:  On page 52, the reliance -- first

22   paragraph, the reliance by plaintiff with all reasonable

23   probability would not have paid for off-label Neurontin

24   prescriptions.  I'm not sure that that captures sufficiently

25   the fact that the plaintiffs needed to do something to change

1    their position.  I mean, they could have -- there could be

2    passive things going on here, whereas I think reliance requires

3    that they actively changed their behavior in some way and

4    that's what led to their damages.

5         THE COURT:  It's 3:30, and I'm sure I'm late in the

6    day.  I have no idea what you just said.

7         MS. ARMSTRONG:  Okay.

8         THE COURT:  What's wrong with this?

9         MS. ARMSTRONG:  I think would not have paid for

03:29 10  off-label Neurontin prescriptions.

11        THE COURT:  What do you want me to say?

12        MS. ARMSTRONG:  The plaintiffs would have -- the

13   Kaiser or plaintiffs would have changed their behavior and as a

14   result -- or changed their conduct and as a result would not

15   have paid for off-label prescriptions.

16        THE COURT:  I think -- I guess I don't understand.  So

17   I don't know why paid for doesn't do it.

18        MR. SOBOL:  Would not have paid for.

19        THE COURT:  Would not have permitted.

03:30 20   MS. ARMSTRONG:  I just think some -- I would have

21   changed their behavior, would have changed their conduct, would

22   have done something differently.

23        THE COURT:  I think that's the same thing.

24        MS. ARMSTRONG:  Okay.

25        On page -- the bottom of this paragraph, the last

1    three paragraphs where you're discussing the rebuttable

2    presumption, the availability of alternative information, I

3    think it's the advertising.  I think that these are concepts.

4    I recognize that they are -- they have been adopted by the

5    California courts, but I think they have been adopted in cases

6    involving consumers or involving cases where there -- maybe I'm

7    skipping ahead -- I think these have been involved in cases

8    involving consumers, and I'm not sure the same assumptions are

9    applicable where you have a sophisticated plaintiff like

03:30 10    Kaiser.

11              MR. SOBOL:  I think the Tobacco II is pretty clear

12    about that, right, long-term campaign.

13              THE COURT:  She's right that that was a consumer case.

14              MR. SOBOL:  Sure.

15              THE COURT:  On the other hand, they must have said

16    four times they were sticking with that comment.  So I think

17    this is the classic.

18              MS. ARMSTRONG:  On page 54, instruction number 32, the

19    last sentence, "A duty to disclose where one party to a

03:31 20    transaction has sole knowledge and access to material facts."

21              I believe this statement is really describing a

22    transaction involving privity, where you're dealing one on one

23    with each other and, you know, I know my house is infested by

24    termites and I'm not telling you.  I don't think it really

25    applies to the kind of misrepresentation case the plaintiffs

```
 1    have alleged here.

 2              THE COURT:  Aren't they buyer and seller?

 3              MS. ARMSTRONG:  No, not really.

 4              THE COURT:  I mean, buyer and reimburser.  Excuse me,

 5    seller and reimburser.

 6              MS. ARMSTRONG:  There's pharmacies in between, there's

 7    all sorts of --

 8              MS. NUSSBAUM:  They own the pharmacies.

 9              MS. ARMSTRONG:  I'm not claiming that they have to
03:31 10    show privity in order --

11              THE COURT:  I'm not going to change it.

12              (Discussion off the record.)

13              MS. ARMSTRONG:  On the restitution instruction, when

14    you -- this ties into the verdict form.  I believe the damages,

15    just so that it's clear and since the jury is sitting as an

16    advisory jury, I think the damages need to be tied to the RICO

17    claim.  And if that's the case, then you don't need to give a

18    restitution instruction.

19              THE COURT:  What if they find there is no enterprise?
03:32 20    It's a different measure of damages.  Like I think you have an

21    excellent argument, that you should go with that alternative

22    damage theory, as I thought about it.  I mean, if it were

23    reliable -- but restitution, because that's how they were

24    actually damaged.  Restitution has an equitable theory, which

25    is give back what you have been unjustly enriched.  It's just a
```

 1    different theory.  So I'm going to stick with restitution

 2    there.

 3              Anything else?  You said you forgot a couple.

 4              Are you okay?  Why don't you stay seated.  Are you

 5    getting worse with your back?

 6              Are you better seated or standing?

 7              MR. SOBOL:  Yes.  Change helps.

 8              (Discussion off the record.)

 9              MR. SOBOL:  I apologize that I forgot to raise this

03:33 10    earlier, but in your instruction number 16, beginning at page

11    27, which, of course, is the definition of the enterprise.  If

12    you go to the next page, page 28, the middle paragraph where

13    you're going through the -- you know, the laundry list of

14    things that a jury can consider in connection with whether the

15    two companies had a common purpose.

16              And I don't think anywhere in this instruction you've

17    touched upon the important part of a prior ruling that you had

18    in this case, which was that if two companies share as the

19    common purpose to promote off-label, then that might be

03:34 20    considered by the jury in determining whether or not they were

21    associated for a common purpose for the purposes of a RICO

22    enterprise.

23              There's specific language we drafted on this, which

24    I'll tell you right now, if that -- I don't think I've missed

25    that concept -- I don't think I saw that concept anywhere in

```
 1    your instructions here, and I think it was important.  It was a
 2    part of your prior ruling.
 3              THE COURT:  Give me a suggestion.
 4              MR. SOBOL:  Sure.  To prove enterprise here, Kaiser
 5    need not show that Pfizer and CDM and/or MAC formed an
 6    association to market Neurontin fraudulently.  Instead, if you
 7    conclude that the defendant or that Pfizer joined with CDM or
 8    MAC for the purposes of promoting Neurontin off-label, you may
 9    find that an enterprise exists.
03:35 10              THE COURT:  Something like that makes sense.
11              MS. ARMSTRONG:  I think that veers out of instructing
12    on the law and commenting on the weight of the evidence.
13              THE COURT:  Just give me a proposal, and I'll think
14    about that one.
15              MR. SOBOL:  Thank you, your Honor.
16              And the other thing that Ms. Nussbaum asked me to
17    address -- I'm going to stand up, I feel more comfortable doing
18    it that way -- I think it's important, I think, that we stick
19    to -- unlike what I said, we want to have the jury instructed
03:35 20    on the tolling.  We don't want to be in a situation where we
21    haven't reviewed something with the client, Kaiser, and have
22    already waived their rights.
23              THE COURT:  As I see the law, unless you give it to me
24    differently, four circuits go your way, 2nd -- which ones?
25              LAW CLERK:  10th, 9th -- I gave it to you -- 9th, 2nd,
```

1     10th or 11th.

2          THE COURT:  About four circuits went one way, one went

3     the other way.  Four circuits went with you, one went against

4     you.  The 1st Circuit has bad language for you but in a

5     completely different context.  That's how we see it.  We did

6     two hours' worth of research on it.

7          MS. ARMSTRONG:  That's accurate.  And I think it's

8     2nd, 9th, and 10th.  The other way.

9          THE COURT:  So she's been spending all morning on it.

03:36 10    So that's the issue.  So tee it up.  I don't know that

11    anything -- I imagine from your point of view it wouldn't if

12    anything fell by way of it.  Whether it matters, I think it's a

13    year, 2000 or 2001 is what we're talking about, right?

14         MS. NUSSBAUM:  Well, the class complaint was filed in

15    May of 2004.  So it is a year, and then, also, your Honor --

16         THE COURT:  But what happened in that year?  I mean,

17    why does it matter?

18         MS. NUSSBAUM:  Well, it matters to push it back.

19         THE COURT:  Like why?  Don't just tell me it matters.

03:36 20    What's in and what's out?

21         MS. NUSSBAUM:  Damages --

22         THE COURT:  No, it doesn't, this is a question whether

23    the cause of action is barred altogether.

24         MS. NUSSBAUM:  I understand that.  What you're saying

25    here is that if they had a reasonable duty to investigate and

 1   didn't as of February 1, 2001, then their entire claim is

 2   barred.

 3           THE COURT:  Right.  As opposed to 2000.  So the

 4   question is, there's something in that one year difference that

 5   makes a difference, where they could have been on inquiry

 6   notice.

 7           MS. NUSSBAUM:  Yeah, I think, although defendants

 8   originally opened, Mr. Kennedy, their original chart was that

 9   nothing was unsealed, we couldn't have known anything since

03:37 10   2002.  They then raised that pink sheet issue.  I have no idea

11   what they're going to close on --

12           THE COURT:  The pink sheet was just --

13           MS. NUSSBAUM:  But that was in 2000, and if somebody

14   gets it wrong in their head, our claim potentially is barred.

15           MR. CHEFFO:  The pink sheet wouldn't have anything to

16   do with it.

17           MS. NUSSBAUM:  The pink sheet was in 2000.  That's

18   what happened in that period of time.

19           THE COURT:  When was it, April instead of May?

03:38 20           All right.  Fair.  So you pointed to something.  So

21   you got to weigh the risks and benefits that if I go with the

22   majority of the circuits, which is your way, and I actually

23   find more persuasive reasoning having reread American Pipe this

24   morning, I think you have the better argument, hands down, I'll

25   give it to you.

1          MS. NUSSBAUM:  Thank you.

2          THE COURT:  However, understand that if the 1st

3    Circuit says, No, Saris, we mean what we say, we said what we

4    meant, reversed, you're all in front of some other judge.  And

5    that's the question:  Do you care enough?

6          MR. SOBOL:  Let me just complicate the issue a little

7    bit, your Honor.

8          It is my understanding -- well, my understanding is

9    that you also have to look at when the cause of action accrues.

03:38 10   So if -- regardless of whether you're looking at the case being

11   filed in 2004 or 2005, the payments made for the four preceding

12   years aren't going to be barred regardless of anything.  That's

13   the consequence that should be here.

14         MR. CHEFFO:  That's not true.

15         MR. SOBOL:  If I know there was a fraud in -- let's

16   say if I knew --

17         THE COURT:  1995.

18         MR. SOBOL:  Well, I knew there was a fraud in 2002,

19   that's a theory that the defendants have here, right?  And I

03:39 20   could have brought a claim at that -- or 2000, rather, okay?  I

21   could have brought the claim then, okay?  It's too early for me

22   to bring my damages for claim that occur in 2003.  I can't.  My

23   cause of action hasn't accrued yet.  In other words, if

24   defendants do something--

25         THE COURT:  You're right if there's a brand new fraud,

1    but not if it's the same old fraud.

2              MR. CHEFFO:  It's a RICO case.

3              MR. SOBOL:  It's the same thing that happened in the

4    AWP case.

5              THE COURT:  You know what, I'm not starting with that

6    right now.  I don't need to get into that right now.

7              You all make a decision about what you want to do,

8    because you create an appeal issue.  I do think -- I will give

9    it to you, you have the better view of the law --

03:39 10             MR. SOBOL:  Can we consult with the client?

11             THE COURT:  Absolutely.  But just let me know.

12             MS. NUSSBAUM:  Can we have 30 more seconds?

13             THE COURT:  No, I have to read the memo that I just

14   got and I have to be at a meeting at 4:30.  What's the other

15   issue?

16             MS. NUSSBAUM:  When you talk about detailing, we

17   haven't put on evidence which doctors were detailed and when, I

18   just want to say we had early on talked about spoliation of

19   evidence here and the fact that that evidence was not produced

03:40 20   by the defendant made it impossible to put that on.

21             MR. CHEFFO:  Your Honor --

22             THE COURT:  Maybe that's true, and that's why I'm not

23   ruling in this case for all cases.  I still have pending a

24   motion for reconsideration on the class.  That may be true and

25   it may be a way there's a way you can somehow get around it.

1    Right now I have zero information other than the fact that

2    there were -- there was detailing to Kaiser.  I think you've

3    got that -- you can argue it, of course there was detailing, no

4    one's denied that.  But I don't know how many, I don't know

5    which indications, I don't know how many went to CMEs other

6    than the one CME you've got.  It's too sparse.

7           So I just can't -- while I do believe you can find by

8    preponderance of the evidence that there was injury, I don't

9    think that these damage models can flow from what we know about

03:41 10    that.  That's my biggest concern.  It may be even enough,

11    frankly, under the UCL.

12           MS. NUSSBAUM:  Thank you, very much.

13           MR. SOBOL:  Can we get a copy of our filing, Mr. Alba?

14           MR. CHEFFO:  Your Honor, do you want to deal with the

15    verdict sheet today or do you want to have an opportunity --

16    because I just had one or two kind of quick things or --

17           THE COURT:  You know what, I need to read this memo

18    and so do you.  Because the verdict slip -- I don't know yet

19    whether I'm going to include nociceptive.

03:41 20           MR. CHEFFO:  And you don't have to decide, I just want

21    to flag it.  I have two quick issues.

22           The first is, has Kaiser proved that Pfizer violated

23    RICO with respect to its off-label promotion of Neurontin?  I

24    don't really think -- I don't see why we have to have this

25    off-label promotion.  It's very confusing.

49

               The real issue here, has Kaiser proven that Pfizer

 2    violated RICO with respect to Neurontin, or sale of Neurontin,

 3    or promotion?  By interjecting the off-label in the question I

 4    think it's unnecessary and it's very prejudicial.

 5             THE COURT:  Why?  There's no dispute about that.

 6    Everyone agrees with that.

 7             MR. CHEFFO:  Because the issues here what is off-label

 8    promotion?  In other words, there's been a huge dispute under

 9    the First Amendment is giving out reprints, is that promotion?

10             THE COURT:  I see what you mean.  So you mean it's

11    the --

12             MR. CHEFFO:  They want to include everything.  They

13    want to include all the promotion.  I think by characterizing

14    it off-label and the jury doesn't understand the First

15    Amendment issue --

16             THE COURT:  It's undisputed that some of it was

17    off-label.  What you are saying is some of it was not.

18             MR. CHEFFO:  Some of it may not be.

19             They include everything your Honor is not going to

20    keep out and have determine --

21             THE COURT:  We'll strike off-label.

22             What's the next thing?

23             MR. CHEFFO:  The only other thing is just -- this is

24    really just so people don't get confused, maybe your Honor will

25    instruct them on this.  But basically if you go to Q1 and they

1    were to answer no to, let's say, bipolar, it says go to Q2.  I

2    think they'd have to then for bipolar do NA.

3              THE COURT:  Right.

4              MR. CHEFFO:  Again, that --

5              THE COURT:  I don't figure out how else to do it.

6    Otherwise I'm afraid it gets too confusing.

7              MR. CHEFFO:  Maybe you can tell them so there's no

8    confusion about it.

9              THE COURT:  I want to know they've gone through each

03:43 10   one.

11             MS. ARMSTRONG:  We have no problem with the NA, just

12   whether they need some explanation of what to do with the NA.

13             THE COURT:  Yeah, yeah.

14             MS. ARMSTRONG:  If you answer no to this question,

15   answer NA in the following questions.

16             I have just a couple of issues, I'll be really, really

17   fast.

18             You've got an instruction saying don't think about

19   this, racketeering has a special meaning, don't think about

03:43 20   what you think about racketeering.  Some of the witnesses talk

21   about a partnership.  We would like a similar kind of

22   instruction saying partnership is a legal term, doesn't

23   necessarily mean the same thing, that people might use it

24   colloquially.

25             And the other thing we would ask for is for the Court

             1    to take judicial notice of when the <u>Franklin</u> case was unsealed.

             2    It may relate to the statute of limitations of what was

             3    discoverable, because they have made -- there's been testimony,

             4    there's been statements made in oral argument that they didn't

             5    know about the <u>Franklin</u> case until 2002, when it was, in fact,

             6    a matter of public record in 2000.

             7            MR. SOBOL:  No.

             8            THE COURT:  I think there's evidence of it, you can

             9    argue when it was unsealed.

    03:44   10            MR. SOBOL:  I think it would be very prejudicial for

            11    you to be coming down one way or another on that issue in your

            12    instructions.  There's been plenty of --

            13            THE COURT:  I don't remember when I ordered it

            14    unsealed.

            15            MS. ARMSTRONG:  You ordered it in, I believe, December

            16    of 1999, and in January of --

            17            THE COURT:  A little bit of the problem, maybe

            18    Mr. Greene remembers back in the day.

            19            I think I did order it unsealed.  On the other hand,

    03:44   20    there were huge battles, I mean huge, about which documents

            21    could go into the public record and which ones weren't,

            22    couldn't go into the public record.  The New York Times --

            23    didn't they actually file a motion to compel the production?

            24    It was a big deal.

            25            MR. GREENE:  To refresh your memory, you ordered it

1    unsealed in December of 1999, it was unsealed in January.  That

2    was the first complaint, which was very, very different than

3    subsequent amended complaints.

4         You remember all those documents were under seal.

5    They remained under seal and didn't come out until March of

6    2002 when the first article appeared, I think, in The New York

7    Times.

8         MS. ARMSTRONG:  And we're not saying they can't argue

9    that, we just want the fact of unsealing to be in the record.

03:45 10         THE COURT:  You can -- it's evidence, argue it.

11         MS. ARMSTRONG:  Okay.

12         THE COURT:  I'm not inclined to get into the

13    partnership thing either.  But I am inclined to get into

14    reading this memo.

15         You need to read this memo, and then, hopefully, we'll

16    be back here in 15 minutes.  Because I do have a meeting at

17    4:30, which is a problem.

18         MR. SOBOL:  Thank you, your Honor.

19         THE COURT:  Let me just put it this way:  Did you

03:45 20    agree that anything came out like the year 1995, anything?

21         MR. SOBOL:  Yes, there are a couple -- I have to read

22    it, but having done the analysis with everybody, there are some

23    damage periods early, early on that might be shaved off.

24         THE COURT:  Have you talked with them how you're going

25    do that?  In other words, you're going to have a new chart for

```
 1    the jury so they don't have the wrong information?

 2             MR. SOBOL:  What I was going to do in the closing was

 3    to cross off actually parts of that.  We can talk about it.

 4             THE COURT:  Why don't you discuss it with them so

 5    they're not surprised and they're up there saying you're

 6    looking for a gazillion dollars and, in fact, it's not.

 7             So let me read it, and then we'll come back in.

 8             (Discussion off the record.)

 9             THE COURT:  Can I say something?  There's something

10    confusing on the flagging issue, stickies.  As far as I can --

11             THE CLERK:  One party flags.

12             MR. FOX:  We just wanted to know whether folks are

13    flagging any documents they want or whether you're just

14    flagging your own documents that you --

15             THE COURT:  Any documents you want.  And I imagine --

16    my biggest concern is so much is flagged that you might as well

17    not have anything.  So if I look in there and -- it's become

18    ridiculous, I'll limit people.  But, you know -- to one flag

19    per document or something.  But do it in a reasonable way.

20             MS. NUSSBAUM:  That's how we directed our team, your

21    Honor.  That's what they're doing.

22             Thank you.

23             (Recess taken.)

24             THE COURT:  So I've had a chance to quickly read

25    through this.
```

1          So what were you planning on changing before I even

2      get into this?

3          MR. SOBOL:  I meant to tell Mark, but I'm trying to

4      piece this all together.

5          So, of course, we take indication at a time.

6          So for bipolar, the damages would begin after the --

7      after the third quarter in 1995.

8          THE COURT:  So I need to see that exhibit.

9          MR. SOBOL:  Yes.  So it's -- it's going to be

04:03 10   Plaintiff's Exhibit 408-I.  And what I'll do is I'll submit a

11     version of this that has the lines drawn through them.  You

12     know what I'm talking about, Ray Hartman's -- Dr. Hartman's

13     analysis.

14         THE COURT:  I'm sorry, I said it incorrectly.  I

15     don't -- trial Exhibit 209-6, I couldn't tell what it was or

16     when it was.

17         MR. SOBOL:  I'm sorry, what are you referring to?

18         MR. CHEFFO:  In your brief.

19         THE COURT:  In your memo, it's clear there's a cause

04:03 20   of action beginning with the Dimond article.  That's 1996

21     August, but I don't know how you get back to the third quarter

22     of 1995.

23         MR. SOBOL:  Because they were starting the

24     teleconferences in late '95 and early' '96.

25         THE COURT:  And so -- I don't have the time, it wasn't

1        transparent here.  So that's how you get to the third quarter.

2                  MR. SOBOL:  Yes.

3                  THE COURT:  That's when the teleconferences on bipolar

4        begin.

5                  MR. GREENE:  Yes.

6                  THE COURT:  All right.  I just want to --

7                  Go ahead.

8                  MR. CHEFFO:  I don't know if you want me to wait.

9                  Again, I think on your Honor's prior rulings, you're

04:04 10        not going to have to tether the Kaiser to the specific -- to

11        the Dimond article, things like that.  With teleconferences,

12        again with no proof or evidence, it's one conference or anyone

13        ever attended it.  It's just up fair --

14                  THE COURT:  Was it just one teleconference?

15                  MR. GREENE:  A series of them --

16                  MR. CHEFFO:  Even so, that's --

17                  THE COURT:  Tell you what, you could have produced

18        someone from Pfizer who said we didn't do it on the west coast.

19        The inference is there is a national marketing campaign.

04:04 20                  MR. CHEFFO:  They have to prove that someone actually

21        went to it.  Whether we prove that it was national or not, if

22        no one ever went to it or relied on it, the fact that it

23        happened, that there was just a conference, after this

24        month-long trial, they haven't had someone yeah --

25                  THE COURT:  What do you say to that?  Is there any

```
 1    evidence that anyone from Kaiser ever went to one of these
 2    teleconferences?
 3              MR. SOBOL:  I have to go back and check, but I'm
 4    pretty sure there is evidence these are national
 5    teleconferences, and lots of teleconference occurring in
 6    locations where there's lots of Kaiser physicians.
 7              THE COURT:  I'll tell you what, if you hook it up to
 8    something on the west coast, then I'll allow you to use the
 9    third quarter.  Otherwise use 1996.  Let's not just play around
10    with numbers.  Just see what you -- if you can get that.
11              MR. SOBOL:  Okay.
12              THE COURT:  Neuropathic pain, damages start when?
13              MR. SOBOL:  So there's -- you had combined a
14    suppression and then an affirmative.
15              So our position is that with respect to neuropathic
16    pain, they -- the affirmative acts begin with the Mellick
17    articles in early 1995.  So it would be the second quarter of
18    1995.  But to make sure that we're complete with you on this,
19    your Honor, the results of Gorson, the first of the neuropathic
20    pain studies, did not come back or available to Gorson until we
21    say the second quarter of 1997.
22              THE COURT:  So that --
23              MR. SOBOL:  So if we're stuck with only a suppression
24    case and not an affirmative case --
25              THE COURT:  I've never said that.  It can be an
```

1      affirmative misrepresentation, I'm just not sure what it is.

2              MR. SOBOL:  Well, the affirmative misrepresentation is

3      by the Mellick articles representing that it works for pain

4      when they know that they don't have any reliable science that

5      indicates --

6              MR. CHEFFO:  Mellick, we've heard a million times

7      about this.  Mellick wrote two letters to the editor, we've

8      heard about it, he said we need to have more RSD reports.

9              Their only beef with Mellick is he somehow didn't

04:06 10   disclose he made a few hundred dollars at a case report.

11             There's never been a shred of evidence that the actual

12     participants in the case report, there's anything false or

13     fraudulent about the case reports.

14             MR. SOBOL:  Actually, what the testimony from the

15     Kaiser witness herself was that if Mellick and Pfizer had

16     disclosed that this guy was getting paid, that they wouldn't

17     have relied upon it to begin with.

18             MR. CHEFFO:  That's certainly not enough to move this

19     entire back a year.

04:06 20           THE COURT:  Start this in --

21             MR. SOBOL:  '97 with Gorson, second quarter.

22             THE COURT:  And I'm not limiting you to a suppression

23     case.  There's evidence of some affirmative misrepresentations.

24     But Mellick isn't one of them.

25             MR. SOBOL:  I was just drawing -- seeing how it plays

1   out.

2        THE COURT:  Second quarter, however you can do it

3   fairly.  That sounds great.

4        Migraine, is that 6/99?

5        MR. SOBOL:  Yes.

6        THE COURT:  Fine.

7        Doses above 1,800, is that 1997?

8        MR. SOBOL:  Yes.

9        THE COURT:  Good.

04:07 10        Nociceptive.

11        MR. SOBOL:  Wait, I'm sorry, those should be -- what

12   is that, June '97?

13        THE COURT:  Okay.  Nociceptive.

14        MR. SOBOL:  Nociceptive is -- the latest it can begin

15   would be 1999.  Hold on, I'm having a hard time reading this.

16        Our position on nociceptive is that broad statements

17   about pain preceding -- let me just give this date -- I

18   apologize -- preceding the fourth quarter of 1998 should still

19   be included for nociceptive.  And the reason for that is

04:08 20   because there's evidence that there's confusion among medical

21   professionals as to whether it's nociceptive or neuropathic and

22   broad statements being made by Pfizer pre that time period that

23   I just mentioned they knew that it was going to end up being

24   used for nociceptive pain, that they were trying to have broad

25   claims of pain.  And -- and the Backonja article that did come

out, that's what this is, the bottom ultimately with the

publication of Backonja and with the non-disclosure of Gorson

Backonja basically coming out and saying --

THE COURT:  But those are neuropathic pain.

MR. SOBOL:  No.  What Backonja actually ends up saying

is it's effective for a broad range of pain activity.

MR. CHEFFO:  The key issue is we have sat through a

month-long trial, not one person, videotape, testimony, the

Carrejo chart, the other chart we've talked about, there's not

been one person in the entire litigation who said, I even know

of someone who prescribed it for nociceptive pain.

This is an entirely different animal.  At least there

were people we talked to we can quibble about why they

prescribed for neuropathic, bipolar, what the issues are, but

they basically have no evidence, one, of nociceptive pain; two,

these are issues that are clearly neuropathic pain.  They can't

have it both ways.

THE COURT:  And the time chart, claims of efficacy for

neuropathic pain was excellent that Abramson put together

refers to Backonja.  It's different for nociceptive.  There

just isn't enough evidence.

MR. SOBOL:  But what the --

MS. NUSSBAUM:  I just wanted to correct one thing

Mr. Cheffo said.  Something like degenerative joint disease,

which is the third-largest use on the charts that you keep on

1  referring to, that is nociceptive pain.  So it doesn't say the

2  word "nociceptive pain," instead it has categories of that.

3       MR. CHEFFO:  Are you testifying?  No one has testified

4  to that.  And you tell me that's garbage, or your witness has

5  told the Court it as garbage.

6       MS. NUSSBAUM:  Not the indication.  The indication

7  document.

8       THE COURT:  Actually, I don't think it is garbage,

9  that chart, because it's the closest thing we have to someone

04:10 10  actually walking through Kaiser's numbers, and it never says

11  nociceptive pain.  I went back and looked at it again.  There's

12  nothing in there that talks about nociceptive pain, and it's

13  been a confusing concept.  I guess I don't think that you've --

14  I think there's no evidence that it works for nociceptive.  I

15  think you can argue nociceptive, but I don't think there's

16  enough evidence of what the damages would be for nociceptive

17  because it is so confusing and no one's really teased it out

18  for us.

19       MR. SOBOL:  What the Backonja article said, and we

04:10 20  know the Backonja article was Pfizer driven and worked through

21  with them, was that Neurontin has been shown in a wide range of

22  case reports to be effective for a myriad of pain syndromes,

23  pain syndromes, quote-unquote.  Pfizer then purchased --

24       THE COURT:  Does it use the word "nociceptive" once in

25  Backonja?

1          MR. SOBOL:  No, it doesn't have to.  If I may, your

2     Honor, the way you can market something as effective for

3     nociceptive pain, if that's going to throw up a signal is to

4     say, no, it's good for a wide range of pain syndromes, and

5     then, as our memo even points out, then you buy 300,000 copies

6     of the Backonja article and you go and you detail it all across

7     the country.

8          THE COURT:  I don't even have -- I don't have

9     evidence -- I agree that could be possible, but I don't have

04:11 10   evidence of details for nociceptive.

11          MR. SOBOL:  There's evidence that there's 300,000

12     reprints that are purchased.

13          THE COURT:  How do I know it's not for neuropathic?

14          MR. SOBOL:  Because this is the reprint of the

15     Backonja article that's saying it's effective for, quote,

16     treatment of pain syndrome.

17          MR. CHEFFO:  It's neuropathic pain, though, that's

18     what all the experts said.

19          THE COURT:  Excuse me.  At this point I'm directing

04:12 20   out nociceptive, but I think you can argue about nociceptive in

21     the way they've marketed pain for neuropathic.  It's confusing,

22     there's overlap.  There's just not enough evidence that Kaiser

23     itself even teased out nociceptive.  No evidence from any

24     experts that Backonja was perceived in the profession as being

25     about nociceptive, at least I'm not remembering it.

```
  1          MR. SOBOL:  I think it's there in the record, it
  2   should at least go to the jury.  If the jury disagrees with
  3   it -- rather than creating a situation where you direct it out
  4   before the jury gets to hear it.  There's no prejudice for the
  5   jury to hear it.
  6          MR. CHEFFO:  Of course there's prejudice.
  7          THE COURT:  I'm not sure it helps you, because I'm
  8   going to back it out because I don't think there's enough
  9   evidence.
04:12 10          I suppose -- let me look at you -- does it make some
 11   sense to do that and then have me back it out and you can leave
 12   it for the 1st Circuit?
 13          MR. CHEFFO:  No.  I think at this point there's enough
 14   confusion.  I think at this point I'm -- I don't want to pound
 15   the table on this one, I'm very comfortable on this issue
 16   having sat through a month-long trial that there's no evidence,
 17   they've had an opportunity to put all these experts on, certain
 18   pain experts, they could have asked them one question:  Tell me
 19   about nociceptive.
04:13 20          To answer your question directly, no, I think there's
 21   enough confusion, there's enough studies, enough issues for
 22   this jury to deal with, that throwing in the issue of
 23   nociceptive -- you said they can comment on it for other
 24   purposes, but I think your Honor should direct it out so we can
 25   have much cleaner issues for the jury to decide.
```

         1          MR. SOBOL:  Having gone through a month-long trial and

         2    to direct it out with the possibility there was sufficient

         3    evidence doesn't make much sense.

         4          THE COURT:  How much money is at stake with

         5    nociceptive?

         6          MR. SOBOL:  It's about a fifth or so of our damages.

         7          THE COURT:  It's a really weak claim.  I don't know.

         8    I'll think about it.  You're both welcome to argue it.

         9          MR. SOBOL:  It's $17 million, your Honor, of $83

04:13  10    million.

        11          THE COURT:  Can I say, it was a really poorly put in

        12    aspect of your case as opposed to some of the other ones.  I do

        13    think there's not a shred of evidence to say it works for

        14    nociceptive, but I don't have any evidence that it was marketed

        15    for nociceptive.

        16          MS. ARMSTRONG:  That's the room you put us in, is they

        17    get the benefit having no evidence or weak evidence of efficacy

        18    but then they don't have to prove marketing, and they sort of

        19    mush it in with all of the other stuff.

04:14  20          THE COURT:  Well, they --

        21          MR. CHEFFO:  That's the problem.  If you in the

        22    beginning of the trial you would have said, Cheffo, are you

        23    going to say this works for nociceptive?  I would have been

        24    like, No, your Honor, because no one uses for nociceptive.

        25    That's what we heard.  And they basically said, They concealed

1    this study of nociceptive pain, they didn't disclose it.  Yeah,

2    because no one was marketing it for nociceptive pain.

3              I don't want to quibble about what happened in the

4    past --

5              THE COURT:  Where did the damage figures come from?

6              MR. SOBOL:  Hundreds and hundreds of millions --

7              THE COURT:  Where do they come from?  Is it --

8              MS. ARMSTRONG:  From Professor Rosenthal.

9              THE COURT:  Dr. Rosenthal just saying it was promoted

04:14 10    for nociceptive?  How did she get that number that was promoted

11    for nociceptive?

12              MS. ARMSTRONG:  She takes the specialties and then

13    basically allocates them --

14              MR. SOBOL:  How Professor Rosenthal and Dr. Hartman

15    calculated damages for nociceptive pain is they take the ICD-9

16    codes that are associated with nociceptive pain and they

17    calculate the damages that are associated with that.

18              MS. ARMSTRONG:  If you look at those ICD-9 codes,

19    there's about 20 of them, there's been no evidence in this case

04:15 20    that those ICD-9 codes that Professor Rosenthal used are even

21    nociceptive pain.

22              THE COURT:  All right.  I'm torn.  I don't think

23    there's enough evidence of marketing.  On the other hand, I

24    don't want to retry this case.

25              So the issue is really going to be:  Do I let it go to

1   the jury and then take it out later or not?  That's really --

2   it's not really that prejudicial to you if I back it out later.

3         MS. ARMSTRONG:  I think it's prejudicial because I

4   think it affects -- they know they don't have a nociceptive

5   marketing case, we know we don't have a good effectiveness case

6   on it, but what they're hoping is that it will color the jury's

7   perception of the other indications where they have bad case --

8   where they don't have a strong case on efficacy if they have

9   had nociceptive case in there.

04:16 10         MR. CHEFFO:  We think it's very prejudicial.  We're in

11   the position of -- the rest of it we're going to argue efficacy

12   on everything, including bipolar, but on nociceptive, it does

13   put us in a bind because it's kind of an apples-to-apples

14   argument.

15         They've had every opportunity, again, to bring these

16   witnesses --

17         THE COURT:  Your argument on marketing is they

18   distributed the Backonja article, is that it basically?

19         MR. SOBOL:  And also, frankly, now that you've raised

04:16 20   this issue of getting ready to direct the verdict out, I'm

21   going to have somebody go back and look at all of Dr. Perry's

22   testimony, Dr. Dickersin, Dr. Abramson to be able to make sure

23   that we comb the records so you get educated as to what exactly

24   is in this record before you direct anything out before the

25   jury gets a chance.

1          THE COURT:  And don't forget, I'm completely with you

2     on the fact it's ineffective for nociceptive.  I'm not sure

3     those doctors will give it to you.  The issue is was it

4     marketed for that.  In other words, did it touch the

5     marketplace for those indications?  It's clear they were

6     flirting with the idea because you see nociceptive mentioned in

7     various of the marketing documents.  But what I don't have, as

8     I do with all the other ones, was an actual affirmative

9     publication or an affirmative CME on it or an affirmative

04:17 10    teleconference on it or an affirmative detailing on it.  That's

11    what I don't have.  You've given it to me in everything else.

12    You're firmly in the ballpark of enough evidence on everything

13    else.

14          I'm not sure those doctors as much as some evidence

15    that it was actually marketed for nociceptive.  I think handing

16    out Backonja doesn't help because that's primarily a

17    neuropathic argument, if not overwhelmingly neuropathic.

18          MR. CHEFFO:  The only thing I would say, again, we're

19    on the eve of this, that's what this document was supposed to

04:17 20    be.

21          THE COURT:  I understand, but I've skimmed it in 30

22    seconds, I'm giving you a 30-second preview.  We're all tired.

23    I have a 4:30 meeting.  We've got to get that jury charge

24    going.  You all have to put pebbles in your mouth and practice

25    tonight.

1               Who is doing the closing?

2               MR. SOBOL:  Everybody on our side.

3               THE COURT:  Really?

4               MR. SOBOL:  We're going to split it.

5               MR. CHEFFO:  I was going to ask you, I think on this

6      one you say it's our two hours, but I'm not going to be doing

7      it, but I think what we would start with is we may start with

8      Mr. Kennedy and have Mr. Hooper do a section --

9               THE COURT:  I just figured you two would be the

04:18 10   ringers.

11              MR. CHEFFO:  Call us in later?

12              MS. ARMSTRONG:  I only get to talk in front of you.

13              THE COURT:  As soon as the jury leaves, we get to open

14     our mouths.

15              I assume your Honor has no problem, as long as we're

16     in the two hours, it's okay with your Honor.

17              THE COURT:  Fine.  Three is fine.  But I will give you

18     the hook at two hours.  People stop listening, and I'd really

19     appreciate, actually, if it were an hour and a half or an hour

04:18 20   and 45 minutes.  I do understand it's been a month-long trial.

21              MR. CHEFFO:  Your instructions will help, I think

22     reading before will actually be very helpful to us.

23              MR. SOBOL:  Yes.

24              THE COURT:  So let me just ask you this.  You won't

25     believe this, but I committed to giving a breakfast for the

1    Federal Bar Association tomorrow morning at 8:00 on class

2    actions, like that panel that you and I were on sometime back.

3    So I'm not going to be able to get down here until about

4    quarter of nine.  So if there's -- I think I'm going to prepare

5    the jury verdict form and alternative forms, one with

6    nociceptive and one without, so that if you come up with

7    evidence that it was actually being marketed, I keep it in.

8              So you'd need to let me know.  I mean, I don't -- I

9    don't need a brief even, just the two documents that do it kind

04:19 10    of thing.

11             You think it's not there, right?

12             MR. CHEFFO:  It's not there, certainly not enough to

13    get past Rule 50.

14             THE COURT:  I don't know.  It was mentioned in some of

15    the marketing plans, you know, as something to do, but I don't

16    know I have any evidence -- but you can comb the record and see

17    if you've got it kind of thing.

18             MR. CHEFFO:  I don't want to keep belaboring.  I

19    think, unlike the others, the one real difference, there's no

04:20 20    evidence it was used for bipolar, neuropathic, above 1,800,

21    that's unquestionable, by Pfizer.

22             We're have not heard anybody, and Carver said today on

23    videotape on nociceptive, I've never heard of anyone

24    prescribing for it.

25             This one it really is in the proof.  The issues, the

1    marketing, but there has to be some connection.  You can't just

2    assume when there hasn't been any evidence.

3          THE COURT:  I think they have a point there's some

4    overlap there.  They can consider what happened in nociceptive

5    in deciding whether there was fraudulent promotion with respect

6    to pain in the neuropathic category.

7          MR. CHEFFO:  All we've heard -- again --

8          THE COURT:  There is some overlap.

9          MR. SOBOL:  Come on, you're beating this dead horse.

04:20 10          THE COURT:  I'm tired, you're tired, good-bye.

11          See you tomorrow morning.  Come by for breakfast.

12          (Court adjourned at 4:22 p.m.)

13                    - - - - - - - - - -

14                    CERTIFICATION

15          I certify that the foregoing is a correct transcript

16    of the record of proceedings in the above-entitled matter to

17    the best of my skill and ability.

18

19

20    /s/Debra M. Joyce                    March 22, 2010
      Debra M. Joyce, RMR, CRR            Date
21    Official Court Reporter

22

23

24

25