UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---------------------------------------------------------------------X
In re:  NEURONTIN MARKETING,                       :  MDL Docket No. 1629
       SALES PRACTICES, AND                        :
       PRODUCTS LIABILITY LITIGATION     :  Master File No. 04-10981
                                                            :
---------------------------------------------------------------X  Judge Patti B. Saris
                                                           :
THIS DOCUMENT RELATES TO:                        :  Magistrate Judge Leo T. Sorokin
                                                           :
PLAINTIFFS' PRODUCTS LIABILITY GROUP        :
---------------------------------------------------------------------X

**MEMORANDUM IN SUPPORT OF APPLICATION OF JACK W. LONDON and
ARCHIE CARL PIERCE FOR AWARD OF EXPENSES
FROM COMMON BENEFIT FUND**

To the Honorable Court:

       Jack W. London, a member of the Plaintiffs' Products Liability Steering Committee

herein, and Archie Carl Pierce, each of whom has paid approximately fifty percent of the

expenses described below, make application to the Court for expenses incurred for expert

witnesses whose work has benefited MDL and remanded plaintiffs in the past (both pro se and

represented plaintiffs) and is available to benefit the remaining plaintiffs' products liability cases,

as set out below.

**I.**

**Common Benefit Fund**

       The Plaintiffs' Product Liability Common Benefit Fund was created pursuant to this

Court's Order granting *Motion to Establish A Common Benefit Fund* (Document 1129, February

14, 2008).  Pursuant to the Manual For Complex Litigation (4th Ed. 2004), the fund was

established to compensate and reimburse attorneys for services performed and expenses incurred for the common benefit of MDL 1629 personal injury plaintiffs.

As of the date of filing this Application, the funds that are in the account and those likely to be deposited in the account in the near future are from allocations ordered by the Court to be withheld from settlement recoveries.   These include a large number of cases that were settled at or after a mediation that was arranged by undersigned attorney Jack London, acting for the Steering Committee, in April 2011, and cases that were settled after remand to the originating courts from this Court.   In addition, there remain a number of products liability cases in dispute, both represented and pro se cases.  The expenses for which reimbursement are sought were incurred for the benefit of all the above-described cases.

## II.

### Amount Sought

**A.** <u>Undersigned counsel requests approval of payment of $55,930.00 for expert witness services for Dr. Jack Fincham.</u>

After completion of the three Track One bellwether cases, *Bulger v Pfizer, Shearer v Pfizer, and Smith v Pfizer*, marketing expert Dr. John King retired and declined to continue as an expert witness.   Undersigned counsel consulted a number of potential substitutes before engaging Dr. Fincham.

Dr. Fincham was Dean of the University of Kansas School of Pharmacy from 1994 - 2004.  He is currently a professor of public affairs and administration in the University of Missouri – Kansas City, School of Pharmacy, Division of Pharmacy Practice and Administration.   He is experienced in and a peer-reviewed author in the subject of off-label marketing and promotion of prescription medicine.   His declaration and CV are attached to this application as Exhibits A and B.  His bills are attached as Exhibit C.

2

This application is limited solely to the request for reimbursement for money spent for Dr. Fincham's fees that did benefit or would benefit all Neurontin product liability cases in which marketing and promotion of Neurontin off-label was or is an issue.  This application does not seek reimbursement for any of Dr. Fincham's fees that were solely related to case-specific analysis and opinions in *Barlow v Pfizer.*

In order for Dr. Fincham to work it was necessary to provide to him, under confidentiality order, the marketing materials that had been obtained in discovery.  He reviewed over forty thousand pages of records concerning the marketing and promotion of Neurontin at the national and CBU levels, including marketing directly to physicians, clinics and hospitals, marketing through publication of articles concerning Neurontin in peer-reviewed and reprinted publications, and in continuing medical education events such as seminars, dinner programs, and thought leader meetings.   He studied Neurontin marketing, promotion, prescription practices, continuing medical education programs, and the increase in Neurontin prescriptions by indication (illness) before, during, and after the sale of Warner-Lambert, LLC, to Pfizer, Inc.

Dr. Fincham was then asked to express opinions that would be relevant to both general and specific marketing and promotion of Neurontin in the remanded case of *Barlow v Pfizer*. Dr. Fincham spent two hundred thirty-eight hours in his study, including a report and deposition. Dr. Fincham wrote a report that is some ninety-six pages in length, including graphics and references.  The report concerned all Neurontin marketing generally for the first seventy-five pages; the report was specific as to Barlow for approximately thirteen pages.

It is his opinion that approximately sixty-eight  per cent of his work based on the volume of documents and the report, including time spent and fees paid, would be applicable to all

Neurontin product liability cases in which the marketing and promotion of Neurontin is relevant. It is his opinion that approximately thirty-two percent of his work was specific to the *Barlow* case in particular and would not benefit other Neurontin cases. Dr. Fincham's total billing was $83,018.00. Sixty-eight per cent of his billing, the amount requested herein, is $55,930.00.

Dr. Fincham is willing to be consulted by the remaining plaintiffs and is willing to do so pursuant to the confidentiality orders of this court and of any court in which he accepts engagement.

**B.** Undersigned counsel requests approval of payment of $63,517.00 for expert witness services for Dr. Michael Freeman.

Dr. Freeman holds a Ph.D and M.P.H. in epidemiology and biostatistics. He is an Affiliate Professor of Epidemiology and Psychiatry at Oregon Health Sciences University School (OHSU) of Medicine and is a candidate for the M.D. degree. His declaration and CV are attached as Exhibits D and E; his bills are attached as Exhibit F.

Dr. Freeman was engaged after the conclusion of the three Track One bellwether cases, all of which were death cases, and after the settlement of the Finkelstein & Partners cases, because the remaining cases included many that were different from those cases. These remaining cases included cases in which there was not a death and in which the primary reason for a prescription was a psychiatric disorder rather than for pain, and there had been no significant epidemiology analysis of those kinds of cases on behalf of the plaintiffs.

Dr. Freeman performed an independent analysis of two databases, being one database of 47,918 living bipolar patients who took any of the eleven anti-epileptic drugs studied by the FDA plus lithium and one database of 131,178 living gabapentin (Neurontin) patients of hospital and clinic patient records between 2000 and 2006, to determine whether those databases showed an

4

increased risk of suicide events among psychiatric and mood disorder patients.  He performed time to analysis studies from that database, studies comparing Neurontin patients to patients who took no drug to treat their condition, and comparisons of patients before and after taking Neurontin.  He also studied the FDA meta-analysis of anti-epileptic drugs, the published literature regarding anti-epileptic drugs and Neurontin, and all peer-reviewed literature that was published on the subject after completion of the last bellwether (*Smith v Pfizer*) case in 2010, and he studied the Pfizer documents that were submitted to the FDA regarding Neurontin risks and challenge/dechallenge experiences.  He prepared charts showing his opinions regarding Neurontin risks and challenges and statistical significance.

Dr. Freeman and his employees spent approximately one hundred seventy-five hours in his study, including two reports and a deposition.  Of the forty-six pages of his two reports combined, only six pages were case-specific to the *Barlow* case.

It is his opinion that at least 90 % of his work, including time spent and fees paid, would be applicable to all Neurontin product liability cases in which it is relevant whether there is epidemiology evidence of increased risk of suicide.  It is his opinion that no more than 10% of his work was specific to the *Barlow* case in particular and would not benefit other Neurontin cases.  Dr. Freeman's total billing was $70,575.00.  Ninety per cent of his billing, the amount requested herein, is $63,517.00.

Dr. Freeman is willing to be consulted by the remaining plaintiffs and is willing to do so pursuant to the confidentiality orders of this court and of any court in which he accepts engagement.

**C.** Undersigned counsel requests approval of payment of $13, 582.41 for expert witness services for Professor Michael Trimble.

      This portion of the application follows-up the orders regarding Professor Trimble's bills for the preservation deposition, Docket Number ECF 3975.  In that order the court approved Professor Trimble's bill for three days of service (two travel, one in deposition) but required additional documentation before approval of the remaining two days reflected in his bill.  The court also disallowed Professor Trimble's first class air fare but authorized refundable coach class air fare, which will be addressed below.

      Professor Trimble's preservation deposition took place on August 4, 2011, in New York City, where he had traveled from his home in England.  Counsel requested that Professor Trimble be present two days in advance of his deposition in order for undersigned counsel and Mr. Gene Brooks to meet with and prepare Professor Trimble for his preservation deposition.  Counsel met with Professor Trimble on both August 2 and August 3 at the Law Office of Mark Lanier in New York and spent the two days preparing the witness.  Attached to this Application is the Declaration of Jack W. London and also a copy of Mr. London's airline ticket to and from New York, arriving August 1, 2011, for that purpose.

      While it is true that Mr. Brooks and Mr. London had met with Professor Trimble previously, counsel would show that the earlier time spent with Professor Trimble was to learn from him the science applicable to the case in order for counsel to be able to commence preparation for his preservation deposition.  Mr. Brooks had not been involved in the MDL previously and Mr. London's duties on the steering committee had been on other topics rather than the science of neuroanatomy, the mechanism of action of increased brain GABA acting on the alpha 2 delta receptor and on extrasynaptic spaces, reduction of serotonin levels, and measurement of levels of HT5AA as shown on various laboratory tests, topics in which

Professor Trimble is an acknowledged expert.  See Judge Saris's Memorandum and Order, May 9, 2009, denying Defendant's *Daubert* challenge to Professor Trimble, including fn 7 in which the Court summarizes his credentials and experience in this field.   After that initial meeting it was necessary for counsel to determine the best manner to present Professor Trimble's complicated evidence, to review literally thousands of pages of confidential material that had been provided to Professor Trimble in discovery, to select exhibits, and to arrange the particulars of the deposition.

At the two days of meetings in New York before Professor Trimble's preservation deposition, which are the basis of this Application, counsel and Professor Trimble went through approximately forty technical exhibits, rejecting some, connecting others to particular science questions, and organizing them for the deposition.  Counsel and Professor Trimble also spent that time reviewing two bankers' boxes of material, one brought by Professor Trimble and one that counsel brought to the meeting, that contained most of Pfizer's expert Dr. Charles Taylor's deposition testimony and exhibits, Dr. Taylor's articles and inter-company confidential materials, Dr. Taylor's testimony in the bellwether case *Smith v Pfizer*, and Professor Trimble's own deposition testimony in four days of MDL deposition and two days of deposition in *Smith v Pfizer*, in addition to the testimony and exhibits that both Professor Trimble and Dr. Taylor had presented during this court's *Daubert*  hearings in June and July, 2008.  In short, counsel and Professor Trimble worked hard for two full days in New York before the deposition and would have done more if there had been more time.  Counsel believes and states as an officer of the Court and in discharge of his duty to the Steering Committee that Professor Trimble's time was critical, well-spent in necessary preparation, and essential to counsel for the competent performance of the task of taking his preservation deposition.  Accordingly, counsel asks the

Court to approve the reimbursement payment to counsel for the two additional days reflected in Professor Trimble's bill, a total of $10,000.00.

Finally, the Court disapproved payment of first class air fare for Professor Trimble but informed counsel that the court would approve a reasonable air fare for travel between London Heathrow and New York area airports in regular (coach) class of service on a refundable ticket. See ECF Docket Number 3975, page 2.   Counsel herewith requests payment in the amount of $3582.41 for such airfare.

This request has been delayed in part because of the fluctuation of exchange rates and airfares among competing airlines, including American Airlines and British Airways, with whom Professor Trimble traveled.  At the time tickets were purchased for the deposition the exchange rate was $1.6133 to the Great Britain pound.  By the time the Court had reviewed the original request, March 2012, the exchange rate had changed to $1.56666 and the air fares were in different season rates.  Counsel has done his best to observe exchange rates to enable him to price classes of service for comparable travel periods ('high summer').  Based on his study, the below table reflects the price of travel at refundable coach rates during a 'high summer' period when the exchange rate was 1.6133.

| Airline | Airports | Price | U.S.Dollars |
|---|---|---|---|
| British Airways | Heathrow JFK | 2196 GBP | $3582.41 |
| American Airlines | Heathrow JFK | | $2194.00 |
| Virgin Atlantic | Heathrow JFK | 2349 GBP | $3789.64 |

Counsel requests approval for payment in the amount of $3582.41.  While that is higher than the amount that would have been charged by American Airlines, Professor Trimble lives in England and his airline of choice from the British hub is British Airways, which provided more

frequent and convenient flight schedules for Professor Trimble, and that is the airline on which he actually flew.

The total request, then, for Professor Trimble pursuant to this Court's order of May 29, 2012, is two days of fees that have been paid by counsel at $5,000 per day, and airfare reimbursement for $3582.41, for a total of $13,582.41.

Professor Trimble's preservation deposition has been provided to each pro se plaintiff and represented plaintiff who has requested it and is available on request to all pro se plaintiffs and represented plaintiffs.

### III.

### Appropriate to Approve Application for Common Benefit Fund Expenses

It is appropriate to award fees and expenses from a common benefit fund for work that has been and is complex and strenuous.  See, e.g., *Bowling v Pfizer*, 102 F.3d 777 (6th Cir. 1996).

### <u>Consultation:   Counsel believes this motion is unopposed.</u>

Counsel has discussed this motion with opposing counsel.  It is believed that this motion is unopposed.

WHEREFORE, PREMISES CONSIDERED, Jack W. London prays the Court approve this Application and authorize payment from the Common Benefit Fund to Jack W. London and Carl Pierce, jointly, in the amounts of $55,930.00 paid for services by Dr. Fincham, of $63,500.00 paid for services by Dr. Freeman, and separately to Jack W. London in the amount of $13,582.41 for services by and travel expenses of Professor Trimble.

Respectfully submitted,


LAW OFFICES OF JACK W LONDON
3701 Bee Cave Rd., Suite 200
Austin, TX 78746
512-478-5858 (telephone)
512-479-5934 (facsimile)

By: _____
      Jack W. London
      State Bar No. 12512500

ON BEHALF OF THE APPLICANTS



<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that this document filed through the ECF system has been served
pursuant to Case Management Order No. 3 on _25 April 2013_ .

_____
      Jack W. London, Esquire

10