1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MASSACHUSETTS
2

3

4    IN RE:                              )
                                         ) MDL No. 04-10739-PBS
5                                        ) CA No. 04-10981-PBS
     NEURONTIN MARKETING, SALES PRACTICES,) Pages 1 - 32
6    AND PRODUCTS LIABILITY LITIGATION    )

7

8

9                        **STATUS CONFERENCE**

10
              BEFORE THE HONORABLE PATTI B. SARIS
11            UNITED STATES CHIEF DISTRICT JUDGE

12

13

14

15                          United States District Court
                            1 Courthouse Way, Courtroom 19
16                          Boston, Massachusetts
                            June 13, 2013, 10:11 a.m.
17

18

19

20

21

22

23                    LEE A. MARZILLI
                   OFFICIAL COURT REPORTER
24              United States District Court
              1 Courthouse Way, Room 7200
25                Boston, MA  02210
                    (617)345-6787

1    A P P E A R A N C E S:

2

       FOR THE CLASS PLAINTIFFS:
3
          ELIZABETH J. CABRASER, ESQ., Lieff Cabraser Heimann &
4    Bernstein, 275 Battery Street, 29th Floor, San Francisco,
     California, 94111-3339.
5
          MICHAEL TABB, ESQ., One Liberty Square, Suite 1200,
6    Boston, Massachusetts, 02109.

7         DON BARRETT, ESQ., Barrett Law Group,
     404 Court Square North, Lexington, Missouri, 39095.
8
          JOHN R. DUGAN, II, ESQ., The Dugan Law Firm,
9    One Canal Place, 365 Canal Place, Suite 1000, New Orleans,
     Louisiana, 70130.
10
          THOMAS M. SOBOL, ESQ., Hagens Berman Sobol Shapiro, LLP,
11   One Main Street, Cambridge, Massachusetts, 02142,
     for the Class Plaintiffs.
12

13   FOR THE DEFENDANTS:

14        LINDA P. NUSSBAUM, ESQ., Grant & Eisenhofer P.A.,
     485 Lexington Avenue, New York, New York, 10017, for Kaiser
15   Foundation Health Plan.

16        MARK CHEFFO, ESQ. and DAVID S. WEINRAUB, ESQ.,
     Quinn Emanuel Urquhart & Sullivan, LLP, 51 Madison Avenue,
17   22nd Floor, New York, New York, 10010, for Pfizer, Inc.

18        PETER D. ST. PHILLIP, JR., ESQ. and RICHARD W. COHEN, ESQ.,
     Lowey Dannenberg Cohen & Hart, P.C., One North Broadway,
19   White Plains, New York, 10601-2310, for Aetna, Inc.

20        GERALD LAWRENCE, ESQ., Lowey Dannenberg Cohen & Hart, P.C.,
     Four Tower Bridge, 200 Barr Harbor Drive, Suite 400, West
21   Conshohocken, Pennsylvania, 19428-2977, for Aetna, Inc.

22

23

24

25

1                    P R O C E E D I N G S

2          THE CLERK:  Court calls MDL 04-10739, In Re:  Neurontin.

3   Could counsel please identify themselves for the record.

4          MR. TABB:  Michael Tabb, your Honor, for the class

5   plaintiffs.

6          MR. COHEN:  Richard Cohen from Lowey Dannenberg Cohen

7   & Hart for Aetna.

8          MR. ST. PHILLIP:  Peter St. Phillip, also from Lowey

9   Dannenberg for Aetna.

10          MS. NUSSBAUM:  Linda Nussbaum for Kaiser.

11          THE COURT:  Thank you.

12          MS. CABRASER:  Good morning.  Elizabeth Cabraser, Lief

13   Cabraser Heimann & Bernstein, for class plaintiffs.

14          MR. SOBOL:  Good morning, your Honor.  Tom Sobol for

15   the class plaintiffs.

16          MR. CHEFFO:  Good morning, your Honor.  Mark Cheffo

17   with David Weinraub for the defendants.

18          THE COURT:  I just am having difficulty focusing on

19   the two of you at the same table.

20          (Laughter.)

21          MR. CHEFFO:  It's the olive branch for the first five

22   minutes of the hearing.

23          MR. DUGAN:  Good morning, your Honor.  James Dugan on

24   behalf of the class plaintiffs.

25          MR. BARRETT:  And I'm Don Barrett on behalf of the

1    class plaintiffs.  Good morning, your Honor.

2           THE COURT:  Good morning.

3           MR. LAWRENCE:  Good morning, your Honor.  Gerald

4    Lawrence for Aetna.

5           THE COURT:  All right, welcome home.

6           (Laughter.)

7           THE COURT:  I think we've all gotten old together.

8    I'm about to close out AWP on Friday, if I don't get an

9    objection.  It's been 13 years, which is my other MDL.  Can I

10   just start out by asking, since it's not so clear to me from

11   the Aetna letter, what is the status of the case right now?  Is

12   it at the Supreme Court?  Maybe you can answer, Mr. Cheffo.

13          MR. CHEFFO:  Sure.  So the decisions came down,

14   obviously, from the First Circuit.  We are contemplating in all

15   of the decisions filing cert petitions or a hold petition, but

16   I think it's fair to say that our expectation is to file a cert

17   petition, and that's actually not due until the beginning of

18   July.  And obviously the Court will do with it what it does.

19   It is July, right?

20          MR. WEINRAUB:  July 2.

21          MR. CHEFFO:  July 2 is the current deadline.

22          THE COURT:  So I think I've received mandate in

23   everything.  I'm not an appellate lawyer, so it's technically

24   back with me.  But if you apply for cert, does that affect my

25   jurisdiction?

1          MR. CHEFFO:  So we sought to stay the mandate.   The

2     First Circuit denied that.   We sought to stay the judgment at

3     the Supreme Court level.   That was denied.   So essentially, my

4     understanding is, you have jurisdiction.   I mean, our view is,

5     from a case management efficiency, we have some suggestions

6     that I'm not sure that the plaintiffs will agree with in terms

7     of waiting and seeing what the Supreme Court does, but I'm not

8     going to tell that you can't do exactly what you --

9          THE COURT:  Okay, so I have jurisdiction.   So unless I

10    hear to the contrary, even if you seek cert, apply for cert,

11    I'm going to move forward.   And so would it be on all three?   I

12    mean, the cutting-edge issue -- I know you probably won't agree

13    with this -- was this causation issue, which was the difficult

14    issue.   A lot of the other stuff was factual.   So what would

15    the cert be in Kaiser?   I don't even know why Kaiser is here.

16         MR. CHEFFO:  So, first of all, we've actually --

17    sorry, I'm going to smack my defense counsel today.   So

18    essentially you'll hear, I think, from Ms. Nussbaum that we're

19    pretty much working out the basics of just paying the judgment,

20    and that will be done.   And then there is an issue of

21    attorneys' fees that I think both sides --

22         THE COURT:  I see.

23         MR. CHEFFO:  -- agree actually to stay your

24    determination of hearing that.   Again, that's my understanding.

25    They may have a different view of this.   So I think for the

```
 1   most part, Kaiser is an appellate issue in terms of the

 2   underlying issues.  The situation is a little --

 3             THE COURT:  Say that again.  Kaiser is a --

 4             MR. CHEFFO:  Sorry?

 5             THE COURT:  What did you just say?

 6             MR. CHEFFO:  It's an appellate issue.  You know, in

 7   other words, there's a final judgment.  It will have been paid.

 8   So in terms of, I think you had asked, is there anything else

 9   to do?  I think there is an issue of attorneys' fees, but other

10   than that, it will be that the Supreme Court will either accept

11   cert or they won't and rule on some of those issues.  Then

12   there's the class plaintiffs' issues, and then there's the

13   Aetna issues.

14             THE COURT:  Which it's primarily about causation at

15   this point.

16             MR. CHEFFO:  Yeah, I think there's -- well, I mean,

17   our view is, I think that's generally right.  There's "but for"

18   proximate, and then there's also kind of the aggregate proof

19   issue.  Those are the issues that we've --

20             THE COURT:  Right, that was the difficult issue.  That

21   was the issue.  It was crosscutting against the three cases,

22   but Kaiser was unique in the way they centralized things.  So I

23   don't know what other issues you would appeal on cert, but, I

24   mean, that seems pretty final at this point.  Maybe I'm wrong.

25             MR. CHEFFO:  I would agree.
```

1          THE COURT:  Whereas, the Supreme Court has been so

2     active in the class issue, that might come up in a different

3     way.  I mean, in other words, they may actually be interested

4     in looking at it.  But let me just start from I have

5     jurisdiction, which is the key number one issue.  And so now I

6     understand from Aetna, which actually triggered this hearing,

7     so thank you for sending me the letter, is you think -- and

8     I've been thinking a lot about this because I haven't looked at

9     issue preclusion for a very long time -- you think that the

10    right step to begin is at least what issues are precluded from

11    being relitigated?

12         MR. ST. PHILLIP:  Yes, that's right, your Honor,

13    because I think that will crosscut, again, against all the

14    remaining, the class proceedings and Aetna's proceedings.  I

15    mean, what we will need to know is what the law allows us to

16    shortcut in terms of the findings from Kaiser's trial.  We

17    believe there's a number of --

18         THE COURT:  Like what?  I haven't spent much attention

19    on it, and I do agree with you that that's an important area

20    that we could spend the time before you're deciding whether to

21    file.  It sounds like you're going to.  I mean, you know by

22    now.  It's June 13, so --

23         MR. CHEFFO:  No, we're absolutely going to file.  My

24    only thing I just want is --

25         THE COURT:  You're absolutely?

```
 1              MR. CHEFFO:  We're going to file a --

 2              THE COURT:  All right.

 3              MR. CHEFFO:  The only question was whether in one,

 4    two, or three cases, and that was really --

 5              THE COURT:  I can see that.  I can see you

 6    differentiating among them.  I mean, so --

 7              MR. ST. PHILLIP:  First, there's a whole -- the

 8    historical facts as to when the marketing occurred, what

 9    happened, what the clinical trials were, whether Pfizer was

10    indeed an enterprise, because law and facts can be precluded,

11    all the things that were fully litigated and decided in your

12    Honor's findings of fact.  There will be some Aetna-specific

13    issues that relate to the formulary management.  If you recall

14    at trial, that was an issue with Kaiser.  Aetna's damages

15    presentation are going to be different.

16              THE COURT:  Well, damages is huge.  I mean, that won't

17    be issue preclusion, will it?

18              MR. ST. PHILLIP:  No.

19              THE COURT:  I mean, that's huge.  That's the issue.

20              MR. ST. PHILLIP:  That's right, that's right.  And so

21    once we understand, you know, with specificity what findings

22    from your April, 2011 findings of fact and conclusions of law

23    are properly precluded, then we'll have an understanding --

24              THE COURT:  Can I ask you, can you use my 93A to

25    preclude a jury judgment?
```

1          MR. ST. PHILLIP:  I believe you can.  I know you can

2     with respect to arbitration awards, and, yes, I think that's

3     correct.

4          THE COURT:  I was trying to think all this through

5     because a jury with -- well, you'll have to go back and look at

6     the Kaiser verdict, but Kaiser was such a unique animal in how

7     they managed their formularies.

8          MR. ST. PHILLIP:  Yes, and what we propose to do is to

9     brief this issue for you.

10         THE COURT:  Yes, and I think that's one hundred

11    percent a correct approach to this.  Does anyone disagree with

12    that?

13         MR. CHEFFO:  You know, we'll be governed by whatever

14    your Honor thinks.  I mean, our view is, we're going to know

15    relatively quickly about whether the court is going to seek

16    cert; and to the extent that these are issues that are wrapped

17    up, you know, we would have an issue of saying it's a timing

18    issue, we should do this after we find out, because essentially,

19    you know, what they're arguing in many respects I believe will

20    be interrelated with some of the issues.  But, again, this is

21    kind of what your Honor feels most appropriate for efficiency.

22    I mean, I would argue we should just wait to find out what the

23    Supreme Court does; and if they take one, none, or all of the

24    issues, then I think we would want to be governed by those

25    issues.  I think we'll know that in a reasonably short period

1    of time.  So before we kind of embark on an entire effort on

2    collateral estoppel briefing and motion practice before the

3    Court, it seems since it's so close -- your Honor certainly has

4    many other things -- you know, not that you wouldn't certainly

5    be willing to entertain --

6         THE COURT:  Me?  I have nothing to do.

7         MR. CHEFFO:  I know, you have nothing to do.

8         (Laughter.)

9         MR. CHEFFO:  So, you know, we're happy to do this

10   issue, but we think that, like all of these, if we were to come

11   back in, you know, 60 days and basically then find out where we

12   were, we think that would be a more efficient use --

13        THE COURT:  Well, since I know you're going to --

14   what's the correct word? -- seek cert -- isn't that how --

15        MR. CHEFFO:  File petition.

16        THE COURT:  -- seek, file petition for cert, but

17   you're not sure which ones, it strikes me we should get going

18   as soon as you find out -- I think we can wait two weeks to

19   find out if you're seeking cert in Kaiser, but still, even if

20   you do, is there going to be a big attorneys' fees battle?

21        MS. NUSSBAUM:  We have a suggestion for that, your

22   Honor.  The parties have already agreed that on June 21, the

23   judgment will be paid, and we're very close to pennies on what

24   the amount of the judgment is with post-judgment interest, and

25   we will get to your Honor fairly shortly a proposed stipulation

1    to be so ordered with respect to the process on the judgment.

2        We then have the issue of attorneys' fees and costs

3    under RICO.  Our suggestion would be that we do a briefing

4    schedule, that we fully brief the matter, but that your Honor

5    does not make any determination until after, assuming they do

6    petition for cert in the Kaiser case, there's a determination

7    as to whether or not cert will be granted, and if cert is

8    granted, there is a determination by the Court.  But by doing

9    the briefing now and letting Pfizer have all of the records

10   that they would be entitled to under a fee petition under

11   RICO --

12        THE COURT:  Well, how much are you looking for?

13        MS. NUSSBAUM:  We're looking for the reasonable costs

14   of Kaiser --

15        THE COURT:  I get that.

16        MS. NUSSBAUM:  -- in litigating the case, plus the

17   appeal, which, you know, RICO would permit this.

18        THE COURT:  So how much are you looking for?

19        MS. NUSSBAUM:  Your Honor, I don't have those numbers

20   at this time.

21        THE COURT:  Ballpark?

22        MS. NUSSBAUM:  In terms of attorneys' fees?  It's

23   millions and millions of dollars, your Honor.

24        THE COURT:  How much?  Five, one?

25        MR. SOBOL:  It is in excess of five.  I mean, there is

1    a lot of time that went into this case, that went into the

2    trial, and costs.  And we had proposed to Pfizer that we get

3    them the time and the cost; that as part of this briefing

4    process, that they go through it; that we see if we could

5    mediate it and perhaps agree upon what a reasonable number is.

6    We have discussed with them the areas that they believe are the

7    more sensitive areas in such an application.  They do not deny

8    that we are entitled to fees and costs, and perhaps the Court

9    would never have to deal with it.

10           THE COURT:  That makes sense.  I mean --

11           MR. CHEFFO:  I mean, just, you know, I'm not prepared

12   to argue the specifics.  I think where we came out -- so

13   there's a lot of agreement on this.  I think really the

14   disagreement -- it seems a little bit the cart before the

15   horse -- they're essentially saying, "Let's do all this work

16   right now, but let's not submit it to the Court, and let's try

17   and work it out until after we find out what happens with the

18   *Kaiser* case," and our view is, you know, similarly, you know,

19   there are other things --

20           THE COURT:  Maybe I'm -- obviously, you know, this

21   friend of mine who used to be a judge, who's since deceased,

22   said, "The great thing about appeals is that by the time they

23   get resolved, you hardly remember the case."  But I do have

24   some memory, though, of that difficult causation issue, but I

25   also thought that most of what happened in *Kaiser* was factual,

1    so not the kind of things they typically take cert on.  I mean,

2    maybe I'm misremembering key legal issues that would be Supreme

3    Court-worthy.  I --

4         MR. CHEFFO:  I think you're right.  I mean, I don't

5    there's a big surprise here.  I mean, this isn't our question

6    presented, but I think the general real issues are, you know,

7    RICO proximate cause, as your Honor -- you know, we've talked

8    about this before, and there's the *Hemi Group* case, and there's

9    also, in our view, at least, there's the Second Circuit *Lilly*

10   decision, and then there's the Ninth Circuit *Amgen* decision

11   that we've had together that we believe --

12        THE COURT:  The causation issue.

13        MR. CHEFFO:  Exactly right.  And then also

14   subsequently with some Supreme Court decisions on class actions

15   and issues with the *Comcast* case and use of what's called

16   aggregate proof or models for damages, we're evaluating whether

17   those in fact create an issue.  But you're absolutely right:

18   This is not about he said/she said or specific factual issues.

19   These are, to the extent that we believe there's a Circuit

20   split, we would --

21        THE COURT:  But why would that apply to *Kaiser*?

22   That's the thing that maybe you're struggling with yourself.

23        MR. CHEFFO:  Oh, no, no, because I think the *Kaiser*

24   issue, particularly like, for example, on the proximate cause

25   issue, you remember that we talked about the *Hemi Group* case

1     and the decisions.  Like, so, in other words, the *Lilly*

2     decision and the Ninth Circuit *Amgen* decision dealt with

3     third-party payors; and the issue was whether, when you had

4     these multiple steps in the chain, that is a "but for"

5     proximate cause analysis that --

6               THE COURT:  I see.  So it's basically a causation

7     issue with *Kaiser?*

8               MR. CHEFFO:  It's with everybody.

9               THE COURT:  That's the issue?

10              MR. CHEFFO:  Yes.

11              THE COURT:  I see.

12              MR. CHEFFO:  And also the use of what we're calling

13    this aggregate proof, the Rosenthal model to try and

14    differentiate --

15              THE COURT:  I get it, but it's causation/damages under

16    the aggregate.  It's not all the what you're going to, any

17    res judicata kinds of issues.  So that issue wouldn't be

18    affected one way or another by how the Supreme Court came out,

19    other than they could wipe out, I suppose, cut the whole thing

20    off at the --

21              MR. CHEFFO:  Well, if it's not causation, then, you

22    know, everything else kind of falls by the wayside.

23              THE COURT:  It's just that *Kaiser* is so different.

24    But, anyway, let me say this:  I'm inclined to get this going.

25    I was actually, I think, within months away from finishing up

 1    the rest of Neurontin.  There's a brand-new motion that was

 2    just filed.  I'm like within spitting distance.  I will close

 3    out AWP on Friday, and I think Neurontin, other than this --

 4    "Other than that, Mrs. Lincoln" -- but other than this, about

 5    to finish off the rest of Neurontin.  So if cert is denied, and

 6    I have no way of understanding whether it would be granted or

 7    not, if it's denied -- most things are denied -- then what I'd

 8    want to do is at least be ready to jump on it.

 9            So I think I'm not feeling very strongly about

10    speed -- in other words, I'm not here to destroy anyone's

11    summer vacation -- but I do think you have both sought two

12    separate issues and go on separate tracks, one is the

13    attorneys' fees and one is the res judicata issue, and then

14    we'll see where things are.  I would be inclined, if they took

15    cert, just to put a hold on everything.

16            MR. ST. PHILLIP:  Right, and the way that, you know,

17    the proposal as to the briefs, I think, is that we get it ready

18    for you --

19            THE COURT:  Yes.

20            MR. ST. PHILLIP:  -- and so that we don't waste the

21    interim period.  The way that we tracked it out, it appears

22    that there will be action late October or early November.

23            MS. NUSSBAUM:  Excuse me.  That's when the Supreme

24    Court will decide whether or not they're taking it.

25            MR. ST. PHILLIP:  Will decide the certiori.

1          THE COURT:  You know, that's not always the case.

2     That's not always the case.  You know, not that I've been

3     following the judges' salary decisions, but in the *Beer* case,

4     which is that, it took almost an entire year for them to decide

5     whether to take cert.  So, I mean, sometimes you don't know,

6     you don't know.

7          MR. ST. PHILLIP:  Right, that's right.  I mean, I

8     think that's earliest.

9          MR. CHEFFO:  So here's the current schedule, and then,

10    you know, if your Honor decides that you want to kind of keep

11    things moving, I think what I would propose is, we'll then with

12    that guidance talk to counsel and figure out a schedule that --

13          THE COURT:  That's fine.

14          MR. CHEFFO:  Or submit competing schedules.  So the

15    rules provide our application is due on June.  It's customary

16    that you can -- oh, I'm sorry, July 2 -- you can seek a 30- or

17    60-day extension of an ability to -- so I just wanted to make

18    sure the Court is aware of that.

19          THE COURT:  Oh.

20          MR. CHEFFO:  I mean, our client may say, "We'd like to

21    consider this.  We're going to seek a 60-day extension of the

22    cert petition as well --"

23          THE COURT:  Sure.

24          MR. CHEFFO:  -- which would then bring us to August or

25    September for the cert petition.  So I just wanted your Honor

 1      to be aware of that in evaluating how you want to proceed.

 2              And the last thing I would just say is, you know, this

 3      may or may not be something that you want to consider first,

 4      but just so we're not later here of waiver, at least as to

 5      Harden, we do think we have a 1404 transfer motion because

 6      they're not a Massachusetts company, and, you know --

 7              THE COURT:  What happened with that on appeal?

 8              MR. SOBOL:  You're going to try to transfer the case

 9      away from Judge Saris after 13 years?

10              THE COURT:  No, that's not Neurontin.

11              MR. CHEFFO:  The Court I think has said several times

12      that at some point, you know, these cases are going to get --

13      you guys have all sought remand on all these other cases, so

14      I'm not clear --

15              THE COURT:  Wait, wait, wait.  Was the issue about

16      whether I had venue vetted up in the First Circuit?

17              MR. CHEFFO:  The only time that we raised -- we raised

18      the *Kaiser* 1404 prior to trial, and your Honor determined that

19      that -- you said that that was a premature issue.  We had our

20      view.  I'm not going argue that again.  And that was --

21              THE COURT:  Well, whether it's me or another judge, it

22      doesn't matter, someone is going to have to resolve this issue,

23      so we might as well brief the thing and --

24              MR. SOBOL:  If I may, your Honor?

25              THE COURT:  Yes.

1           MR. SOBOL:  In light of last night's triple overtime

2    loss by the Bruins, may I defer at first for Mr. Tabb to

3    address the class issues, then I might throw something else in?

4    I think we need to put those on the table too.

5           THE COURT:  Sure.  Is there another issue?

6           MR. TABB:  Well, there is, your Honor.  Michael Tabb

7    here.  And, your Honor, before I get started, Mr. Greene was

8    planning to handle this conference.  He had a death in the

9    family last night.

10          THE COURT:  I'm terribly sorry.

11          MR. TABB:  So he could not be here, so he asked me to

12   try and cover for him.

13          Clearly in the class case, your Honor, there's the

14   issue of class certification.  The class certification

15   decision, as your Honor is probably aware, was vacated; and so

16   we think in the class case, that's the next thing that has to

17   be decided before we go on to further things.  And we, similar

18   to Aetna, we would like to have those issues briefed for your

19   Honor so that once the cert petition hopefully is denied, your

20   Honor will be ready to decide those and --

21          THE COURT:  Did I deny it only on causation?

22          MR. TABB:  Well, as we read the opinion, your Honor --

23          THE COURT:  I don't remember.

24          MR. TABB:  -- and that is an issue, as we read it, you

25   denied it on damages.  You found that in fact on all liability

```
 1    issues, that the common issues predominated.

 2           THE COURT:  Right.

 3           MR. TABB:  You said the difficult issue is related to

 4    damages, and that is where you denied the class certification.

 5    In connection with the First Circuit opinion now and their

 6    rulings on the admissibility of the Rosenthal evidence in that

 7    position, your Honor may wish to review those.

 8           THE COURT:  So the answer is -- I know they said it

 9    wasn't fraud on market.  It sounded like fraud on the market.

10    So I guess --

11           MR. ST. PHILLIP:  We'll brief it.

12           THE COURT:  We'll have to figure that out because it

13    would make a huge issue on class cert, right, if it was

14    essentially fraud on the market, that you could use the

15    Meredith Rosenthal analysis for each one of the -- as opposed

16    to a separate analysis of what that person's damages were?  I

17    mean, I suppose that's the issue, right?

18           MR. CHEFFO:  The other issues I think are -- you know,

19    obviously there was a fair amount of questions and colloquy,

20    and one of the issues also, which, you know, again, at the

21    appropriate time we'd like an opportunity to address with you

22    was, you know, the questions of, okay, if they produce this,

23    certainly you'll have an opportunity to question it and to

24    counter this.  And I think one of the issues that we had, your

25    Honor, and this is going back --
```

1          THE COURT:  We did a *Daubert* hearing with Meredith --

2          MR. CHEFFO:  Not *Daubert,* not *Daubert*, your Honor.

3  But basically there is -- and we're getting into probably a

4  little more detail than I thought we were going to, but there

5  was a ruling early on as to kind of individual proof in terms

6  of discovery, a discovery issue about whether you could take

7  individual proof, and they said, "No, no, no, we're going to

8  use the model."  And so there was some dialogue and I think

9  some questioning and some concern by the court, the Circuit

10 Court, about the ability to counter this type of proof.  So to

11 the extent that we are going to be briefing and addressing some

12 of these issues, we think that the Court should also have

13 before it, you know, what we would need; in other words, having

14 now gone through this process and seen these reports, what we

15 would need, both for Aetna and for the class, to basically

16 properly evaluate and counter that type of evidence.

17         THE COURT:  Fine, but what you're persuading me is, I

18 need three sets of schedules:  one on the class, one on Aetna,

19 and one on the attorneys' fees/costs issues.

20         MR. SOBOL:  That's correct, your Honor.

21         THE COURT:  So on costs, like, no first-class planes.

22 You know, I've done so many of these opinions, I just don't

23 want to be sidetracked on the exorbitant xerox costs, you know,

24 that kind of thing.

25         MS. NUSSBAUM:  Your Honor, we have read your opinions.

1    We are fully aware of them, and we intend to file something

2    that will be fully compliant with your prior opinions, both

3    with respect to attorneys' fees and with respect to costs.

4         THE COURT:  And I'm not sure whether core or non-core

5    applies here in this circuit.  It does for 1983 suits.  I can't

6    remember whether it applies for racketeering, but I do look

7    tougher on "three hours attorney conference" with nothing else,

8    you know.  So I think you just need to sort of start -- I don't

9    want to have it be what they say, what's it, the second round

10   of litigation?  And hopefully maybe even Eric Green -- he's

11   probably missing you all -- could maybe even mediate the

12   attorneys' fees.

13        MS. NUSSBAUM:  Your Honor, none of us want to, you

14   know, have a situation with attorneys' fees where there is

15   anything presented to the Court that we don't think is

16   reasonable and necessary, and we have clearly been in the

17   process of reviewing very closely all of the time records, all

18   of the costs, to make certain that whatever is given to the

19   Court is reasonable, necessary, and would pass the purview of

20   both this Court and the First Circuit.

21        Our thought, in terms of teeing this up sooner rather

22   than later, is that we then give them to Pfizer, Pfizer has

23   sufficient time to review them; and then we would be amenable

24   certainly to going to Eric Green or another mediator, if that

25   were acceptable to Mr. Cheffo and his client.  We don't want to

1    burden you or your clerks with having to go through stacks of

2    papers.  We're doing that now.  It's a very tedious task.

3           THE COURT:  Or maybe you could agree to consent to a

4    magistrate judge for purposes of the -- or a private master.

5    That may overwhelm -- is it Judge Sorokin who's been handling

6    it?  It just may be just too overwhelming for anybody if

7    there's line-by-line edits.

8           MR. CHEFFO:  I mean, from our perspective, I think all

9    those suggestions make sense.  And although we haven't seen

10   them, I think they'll be guided, I guess, by what the Court's

11   rulings are.  Just one of the issues again, having not seen

12   what they're talking about, is, you know, the question really I

13   think will be that we'll all talk about is what level of work

14   prior to this that other folks are going to be, you know, the

15   class people, is going to be attributed to the *Kaiser* case and

16   what's not so there's no double-dipping.  But I do think, to

17   extent that they were to prepare something, we could look at it

18   in the first instance.  I'll talk to our client, but I would be

19   surprised if they had an objection about, you know, considering

20   going to a mediator to try and work it out.

21          THE COURT:  Or a master or the magistrate judge, you

22   know.  But let me ask you this other question:  Let's assume

23   for a minute they denied cert on all or any one of them, would

24   you be interested in trying to mediate the rest of it, or is

25   this going to be whole hog again?

```
 1            MR. CHEFFO:  I'm not sure I can tell you that this

 2     second on the record right now.  I certainly will, you know,

 3     discuss it with our client.  I think it will depend, I guess,

 4     on what the plaintiffs' view is as well.  So, you know, I think

 5     the folks in this room know that we've worked together on this

 6     litigation and other litigations and for this client, and

 7     sometimes there's an ability to talk about things.  Right here

 8     right now, I'm not sure I can --

 9            THE COURT:  Because my guess is -- well, of course,

10     with Kaiser it's already done.  With Aetna my guess is, you

11     pretty much have a sense as to -- what do you think your

12     damages were?  Let's take the Meredith Rosenthal model as your

13     model for the moment.

14            MR. ST. PHILLIP:  The single damages were approximately

15     $95 million.

16            THE COURT:  Okay.  And you might disagree with that,

17     and how much, I forget, I don't even remember, what was your

18     single damages?

19            MR. ST. PHILLIP:  $95 million.

20            THE COURT:  No, I mean, what was Kaiser's?

21            MS. NUSSBAUM:  Our treble damages are $142 million,

22     your Honor.

23            MR. CHEFFO:  I think at trial they were asking for

24     $200 million trebled.

25            THE COURT:  I see, all right.  But, anyway, those are
```

1    at least defined numbers.  What do you think the class number

2    is?  It's a national class, right?

3              MR. CHEFFO:  I'd better sit down for this one.

4              MR. SOBOL:  Yes, you'd better.  It's $590 million,

5    approximately, $560 million for bipolar only for the nationwide

6    class, mandatory trebling.  $1.5 billion judgment we'd be

7    seeking.

8              THE COURT:  So I had forgotten that.  I had forgotten

9    one key thing is, you're only going for the national class on

10   bipolar?

11             MR. SOBOL:  Correct.  So the appeal was limited to

12   bipolar only for the class.  The class that we'd be seeking

13   before you when we do the briefing is going to be bipolar only.

14             THE COURT:  I had forgotten that.

15             MR. SOBOL:  The single damages, my memory is about

16   $560 million single damages, but that's under RICO, so that

17   would be trebled.

18             THE COURT:  So --

19             MR. SOBOL:  I'm glad Mr. Cheffo sat down.

20             MR. CHEFFO:  I think that may answer some of your

21   questions about -- you know, that's instructive, but, you know,

22   with those types of numbers, obviously it's --

23             THE COURT:  What a trial.

24             MR. SOBOL:  Yeah.

25             MR. ST. PHILLIP:  Your Honor, just so that you're

1    clear, the Aetna appeal was all indications, so there was a

2    difference in terms of what we brought up.  And so what's

3    brought back down is the same trial essentially as *Kaiser* had

4    for Aetna.  However, the cross --

5            THE COURT:  I'll be interested to find out.  Actually,

6    as I was writing it, I didn't think about, because I thought

7    the causation thing was dispositive, so I didn't think about,

8    interesting, the res judicata effects.  So you're trying to

9    take --

10           MR. ST. PHILLIP:  It's a lot for us to think about in

11   briefing that as well.

12           THE COURT:  Yes, on both sides, really.

13           MR. CHEFFO:  You know, obviously we'll brief it if

14   they do.  There are a lot, we believe a lot of issues.

15           THE COURT:  Are there things I found for you, though,

16   it wouldn't be a two-way street because they weren't involved

17   or represented, so that would be an issue, right?  Are there

18   the same lawyers and --

19           MR. ST. PHILLIP:  We get the benefit.

20           MR. CHEFFO:  Yeah, I don't think our view is going to

21   be their preclusion under collateral estoppel.  I mean, I

22   think, you know, again, just as a minor one, you've heard us

23   say, I mean, you can still go to our friends at Aetna's

24   website, and they'll be telling you that you should use

25   Neurontin for neuropathic pain as opposed to the actual

1    medications that it's indicated for.  So to basically come and

2    say -- you know, *Kaiser* said, "Well, it was a slow ship, we

3    couldn't change it," but you can go and figure it out today.

4    Aetna and virtually all of the other third-party payors are

5    still regularly using Neurontin.  In fact, it's the first-line

6    drug of choice for neuropathic pain in particular.  So we think

7    those will --

8         THE COURT:  Because my findings are the most difficult

9    in that particular area.  We struggled the most with that one,

10   but not for bipolar.

11        MS. NUSSBAUM:  Your Honor, when you set the *Kaiser*

12   case down for trial, you did that as a bellwether case, and I

13   have not fully reviewed your opinions or the transcript of that

14   today because I did not know that was going to be an issue, but

15   you have already written to a certain extent on the use that

16   the other plaintiffs could make of ultimately the decisions of

17   a jury or your decisions in the *Kaiser* case, and that was in

18   your order when you set that down as a bellwether trial.

19        MR. CHEFFO:  Suffice it to say that I strenuously

20   disagree, but I think what I heard, first of all, today was, we

21   wanted a status conference, and there was no agenda.  So I've

22   now heard that they say that there was a letter, in fairness to

23   Aetna.

24        THE COURT:  Did you not see --

25        MR. CHEFFO:  No, no, no, no, absolutely, we knew that

1    we -- but I think what we're all asking for is not to

2    necessarily, you know, argue the issue of collateral estoppel.

3              THE COURT:  No, but it's very useful to flush it all

4    through because my thought was, "Good, I have an answer on

5    causation."  But now you're telling me that that's not --

6    there's a lot more.  There's class cert, there's attorneys'

7    fees.  I think for Aetna, though, it's pretty straightforward.

8    It's just what's precluded or not precluded and then goes to

9    trial.

10             MR. TABB:  That's correct.

11             THE COURT:  With the other two.  All right, so you all

12   will get together.  Can you within the next two weeks come up

13   with proposed schedules for the briefing?

14             MR. CHEFFO:  Yes.

15             MR. TABB:  Absolutely, your Honor.

16             THE COURT:  All right.  And the reality is, we'll get

17   it briefed.  And then by the time it's briefed, I may well know

18   which cases you've sought cert on and whether or not they've

19   taken cert possibly by the time you've -- right?  So let's say

20   the primary briefs come in within a month, the opposing briefs,

21   the reply, the surreply, the hearing takes us into mid fall

22   actually.  We should know a lot by then, right?

23             MR. CHEFFO:  I think, unless we get an extension, but

24   I think we'll know -- you'll certainly know at least what's

25   been framed, what we've moved on, so I think that that's right,

1    your Honor.

2         THE COURT:  Is there some chance you would just go up

3    on the class case?

4         MR. CHEFFO:  There is.  I mean, I think --

5         THE COURT:  That's the one I --

6         MR. CHEFFO:  *Kaiser* and the class probably raise the

7    issues that are most -- I think those are the ones that are

8    most likely.  I think the Aetna has underlying issues that are

9    cross-cutting as well, but the procedural posture of the case

10    may make it such that, you know, we don't.  But I don't want

11    to, you know, be heard to say --

12         THE COURT:  Who's handling the appeal for you,

13    Kathleen Sullivan?

14         MR. CHEFFO:  Kathleen is involved, yes.

15         THE COURT:  And who's going to handle the appeal at

16    your end?

17         MS. NUSSBAUM:  David Frederick.

18         THE COURT:  I wonder if it's unseemly for the District

19    Court judge to go and listen.

20         (Laughter.)

21         THE COURT:  It's so interesting, people from --

22         MR. SOBOL:  You can see it online.

23         MR. CHEFFO:  You can file an amicus petition

24    requesting that they --

25         THE COURT:  No.

1          MR. CHEFFO:  No, I'm just joking, your Honor.

2          THE COURT:  All right.  Okay, so there we are.  By the

3     end of two weeks, why don't we say by the 4th, you know, you'll

4     give me a schedule that you've all agreed on.  I'm going to

5     lose my seventh Neurontin clerk anyway by the time this is --

6     so we'll be on to another one.  But let me just ask you this

7     because, Mr. Cheffo, I know that you're following the other,

8     the product liability Neurontin cases, really within a month or

9     two, right?

10          MR. CHEFFO:  I think that's right.  I think the only

11    cases that are left are pro se cases, which they have indicated

12    that they want to proceed, and I believe that those cases are

13    all subject to -- will be subject to remand.  There may be a

14    few exceptions, like, the Finkelstein firm I know has sought

15    extensions with agreement by us because they're trying to work

16    through things like estates; but for the most part, my

17    understanding is, all of the personal injury cases should be

18    done within the next few months.

19          THE COURT:  All right.  Pfizer doesn't want to just

20    put this whole case behind them and do some sort of global

21    settlement discussion?

22          MR. SOBOL:  No.

23          THE COURT:  No?

24          MR. SOBOL:  No, they don't.

25          MR. CHEFFO:  Well, I think you've heard some of the

1   numbers.  That's not true, and you know that's not true, Tom,

2   because I think you've been talking to them about it, but --

3   but I think again --

4          THE COURT:  It's not worth sending this whole thing to

5   Eric Green right now?  I know Kaiser is in a different

6   position.  They won their battle, but --

7          MR. SOBOL:  Well, just to answer your question

8   directly, your Honor, I think that Mr. Cheffo hit the nail

9   right on the head.  The lawyers who are involved in this case

10  work with each other not only in this case but in other cases.

11  We communicate with one another.  We have a very good sense

12  about when it makes sense for us to just talk, when it makes

13  sense to get a mediator involved.

14         THE COURT:  So your answer is "no"?

15         MR. SOBOL:  So the answer right now is "no," but we're

16  very mindful of the issue.

17         THE COURT:  And so if you were a betting person --

18         MR. SOBOL:  If I were a betting person, and I am a

19  betting person, I would bet that this case does not settle

20  until there's a class that's certified and there's a decision

21  on collateral estoppel and we're moving towards a trial.

22         THE COURT:  Right.

23         MR. COHEN:  Your Honor, just for the record, and Aetna

24  is not part of a class.  It's a commercial enterprise motivated

25  by commercial concerns.  It's an ongoing business partner with

1    Pfizer.

2             THE COURT:  Well, have you tried to settle with them?

3             MR. COHEN:  Mr. Cheffo lost my phone number, I'm

4    afraid.  He's been very busy, though, we know.

5             THE COURT:  Well, I'm happy to refer you to Eric Green

6    if it's ripe.  I imagine first job, to see whether they've

7    applied for cert.  I think the signal is, they may not with

8    you, and at which point they may be willing to talk.  Is that

9    right?

10            MR. CHEFFO:  Again, I just want to be very -- yes, I

11   will convey it back.  I am not the ultimate decision-maker,

12   frankly, at this point on what we apply for cert or don't.  I

13   just wanted to be candid with the Court that each of these are

14   individual determinations.  My expectation is that a cert

15   petition will be filed in at least one case.  Whether it's one,

16   two, or three, exactly what those issues, you know, I think

17   we'll all have to stay tuned on that as we work through them.

18   But it is possible that cert is not filed in the Aetna case,

19   and I will take up his offer -- I do know where to find him --

20   and we will continue the dialogue.

21            THE COURT:  All right.

22            MR. WEINRAUB:  Your Honor, I would just add that

23   should we choose not to file a cert petition in Aetna, that

24   should not be regarded as throwing in the towel because we

25   believe Aetna --

```
 1              THE COURT:  I know Pfizer fights to the last penny.  I

 2    get it.

 3              (Laughter.)

 4              THE COURT:  I of all people am a percipient witness.

 5    So that's fine.

 6              MR. WEINRAUB:  We would be governed the Supreme Court

 7    determination --

 8              THE COURT:  I know, but if you don't apply for cert,

 9    I'm likely to chug right along with whatever case is fully and

10    fairly in front of me.  Okay, all right, thank you.  Good to

11    see you all again.

12              THE CLERK:  All rise.

13              (Adjourned, 10:46 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25
```

1                            C E R T I F I C A T E

2


3
     UNITED STATES DISTRICT COURT )
4    DISTRICT OF MASSACHUSETTS     ) ss.
     CITY OF BOSTON                )
5

6


7            I, Lee A. Marzilli, Official Federal Court Reporter,

8    do hereby certify that the foregoing transcript, Pages 1

9    through 32 inclusive, was recorded by me stenographically at

10   the time and place aforesaid in Civil Action No. 04-10981-PBS,

11   In Re:  Neurontin Marketing, Sales Practices, and Product

12   Liability Litigation, and thereafter by me reduced to

13   typewriting and is a true and accurate record of the

14   proceedings.

15        In witness whereof I have hereunto set my hand this 26th

16   day of June, 2013.

17

18

19

20

21            /s/ Lee A. Marzilli
              _____
22            LEE A. MARZILLI, CRR
              OFFICIAL FEDERAL COURT REPORTER
23

24

25