# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:  NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No.  1629<br><br>Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO:<br><br>HARDEN MANUFACTURING CORPORATION; LOUISIANA HEALTH SERVICE INDEMNITY COMPANY, d/b/a BLUE CROSS/BLUE SHIELD OF LOUISIANA; ASEA/AFSCME LOCAL 52 HEALTH BENEFITS TRUST; JAN FRANK WITYK; and GARY VARNAM, on behalf of themselves and all others similarly situated,<br><br>      Plaintiffs,<br><br>v.<br><br>PFIZER INC. and WARNER-LAMBERT COMPANY,<br>      Defendants. | Judge Patti B. Saris<br><br>Mag. Judge Leo T. Sorokin |

## MEMORANDUM OF LAW IN SUPPORT OF CLASS PLAINTIFFS' POST-MANDATE MOTION FOR CLASS CERTIFICATION

# TABLE OF CONTENTS

I.     A CLASS SHOULD BE CERTIFIED UNDER RULE 23(b)(3) WHEN THE
       PLAINTIFFS CAN PROVE THEIR CASE WITH COMMON EVIDENCE ......1

II.    ONLY ONE QUESTION REMAINS REGARDING CLASS CERTIFICATION:
       WHETHER THE CLASS PLAINTIFFS CAN ESTABLISH THE EXTENT OF
       THE HARM SUFFERED AS A RESULT OF PFIZER'S FRAUD THROUGH
       COMMON EVIDENCE..............................................................................2

III.   THE FIRST CIRCUIT HAS AUTHORIZED THIS COURT TO ACCEPT THE
       CLASS PLAINTIFFS' EXPERT REPORTS AS EVIDENCE OF THE EXTENT
       OF THE HARM CAUSED BY PFIZER'S MARKETING.............................4

       A.   Notwithstanding the Authority Cited by Pfizer, the Aggregate Evidence
            Offered by the Class Plaintiffs is Admissible in this Action..................4

       B.   Dr. Rosenthal's Assumption That There Was No Distinction between
            Off-Label Promotion and Fraudulent Promotion Is Justified, and
            Supported by Other Evidence.............................................................8

       C.   The First Circuit Has Left No Doubt That the Class Plaintiffs Can Prove
            All Aspects of Their Case With Common Evidence.............................10

IV.    PFIZER'S DEFENSE THAT SOME DOCTORS DID NOT RELY ON
       FRAUDULENT REPRESENTATIONS DOES NOT DEFEAT
       PREDOMINANCE ...............................................................................12

       A.   Pfizer Cannot Defeat Class Certification Simply by Arguing It Wishes to
            Adduce Individual Evidence in Its Defense at Trial ..........................13

       B.   Pfizer Can Defend Itself On An Aggregate Basis..............................15

       C.   Pfizer's Evidence of Individual Transactions Would Not Be Admissible
            in a Non-Class Proceeding..............................................................16

       D.   Class Certification Cannot Be Defeated By Gossamer Strands of
            Speculation and Surmise.................................................................17

V.     THE SUPREME COURT CASES RAISED BY PFIZER SUPPORT THE
       CERTIFICATION OF A CLASS IN THIS PROCEEDING..........................19

VI.    A CLASS ACTION WILL BE MANAGEABLE AND SUPERIOR TO OTHER
       AVAILABLE METHODS IN DECIDING PLAINTIFFS' CLAIMS FAIRLY
       AND EFFICIENTLY .............................................................................23

VII.   CONCLUSION.....................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

<u>Aetna, Inc. v. Pfizer, Inc. (In re Neurontin Marketing and Sales Practices Litig.</u>,
712 F.3d 51 (1st Cir. 2013)….……………………………….………..……6

<u>Amchem Prods., Inc. v. Windsor</u>, 521 U.S. 591 (1997)………………………………..15, 25

<u>Amgen Inc. v. Connecticut Ret. Plans & Trust Funds</u>, 133 S. Ct. 1184 (2013)…………..20

<u>Beattie v. CenturyTel, Inc.</u>, 511 F.3d 554 (6th Cir. 2007) …………………………………20

<u>BCS Servs. Inc. v. Heartwood 88, LLC</u>, 637 F.3d 750 (7th Cir. 2011), <u>cert. denied</u>,
132 S. Ct. 253 (2011) ………………………..……………………………..10, 14

<u>Blue Cross Blue Shield of Massachusetts v. AstraZeneca Pharmaceuticals LP (In re
Pharmaceutical Industry Average Wholesale Price Litig.</u>), 582 F. 3d 156
(1st Cir. 2009) ("<u>AWP</u>") ……………………………………………………...7, 13

<u>Butler v. Sears Roebuck & Co.</u>, ___ F.3d ___, 2013 WL 4478200 (7th Cir. August 22,
2013)…………………………………………………………………………….21, 22

<u>Comcast Corp. v. Behrend</u>, 133 S. Ct. 1426 (2013)………………………………...…19–21

<u>Gintis v. Bouchard Transp. Co.</u>, 596 F.3d 64 (1st Cir. 2010) ……...………..........2, 13, 14, 25

<u>Glazer v. Whirlpool Corp.</u>, ___ F.3d ___, 2013 WL 3746205 (6th Cir. July 18, 2013)
……………………………………………………………………….……….. 19, 20

<u>Harden Manufacturing Corp. v. Pfizer, Inc. (In re Neurontin Marketing and Sales
Practices Litigation</u>), 712 F. 3d 60 (1st Cir. 2013) ("<u>Harden</u>")……...1, 4, 7, 8, 11, 23

<u>Harris v. comScore, Inc.</u>, 2013 WL 1339262 (N.D. Ill. Apr. 2, 2013) ………………..........21

<u>In re Community Bank of Northern Virginia Mortgage Lending Practices Litig.</u>,
2013 WL 3972458 (W.D. Pa. June 27, 2013)…………………………………… 19, 20

<u>In re Ins. Brokerage Antitrust Litig.</u>, 579 F.3d 241 (3d Cir. 2009)…………………….…2

<u>In re Neurontin Mktg. and Sales Practices Litig.</u>, 2011 WL 1882870 (D. Mass. May 17,
2011) ("<u>Reconsideration Ruling</u>")………………….………………..………2, 3, 7, 8, 9, 17

<u>In re Neurontin Mktg. and Sales Practices Litig.</u>, 244 F.R.D. 89 (D. Mass. 2007)…..……..2

In re Neurontin Mktg., Sales Practices and Prods. Liab. Litig., 257 F.R.D. 315
 (D. Mass. 2009) ("2nd Class Ruling")……………………………………….. 2, 3, 7

In re New Motor Vehicles Canadian Exp. Antitrust Litig., 522 F.3d 6 (1st Cir. 2008)
 ………………………………………………………………………………….1

In re U.S. Foodservice Inc. Pricing Litig., ___ F.3d ___, 2013 WL 4609219
 (2nd Cir. Aug. 20, 2013) …………………………………………………..19, 22

Kaiser Found. Health Plan, Inc. v. Pfizer, Inc. (In re Neurontin Mktg. and Sales Practices
 Litig.), 2011 WL 3852254 (D. Mass., Aug. 31, 2011) ("Kaiser Findings")
 ………………………………………………………………….....3, 9, 11, 21

Kaiser Found. Health Plan, Inc. v. Pfizer, Inc. (In re Neurontin Marketing and Sales
 Practices Litig.), 712 F. 3d 21 (1st Cir. 2013) ("Kaiser") ………4–8, 10, 11, 14–16, 22

Klay v. Humana, Inc., 382 F.3d 1241 (11th Cir. 2004)……………………….……..…23

Leyva v. Medline Indus. Inc., 716 F.3d 510 (9th Cir. 2013)……….…………………19, 21

Mid–Am. Tablewares, Inc. v. Mogi Trading Co., 100 F.3d 1353 (7th Cir. 1996) ………...10

Ocean Spray Cranberries, Inc. v. PepsiCo, Inc., 160 F.3d 58 (1st Cir. 1998) ……………10

Smilow v. Sw. Bell Mobile Sys., Inc., 323 F.3d 32 (1st Cir. 2003)……………………...13, 25

Sullivan v. DB Investments, Inc., 667 F.3d 273 (3d Cir. 2011) ……………………………...1

Tait v. BSH Home Appliances Corp., 289 F.R.D. 466 (C.D. Cal. 2012) …………………..19

Wallace v. Powell, 2013 WL 2042369 (M.D. Pa. May 14, 2013) ..………………………19, 20

Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541 (2011) ……………………………19, 20, 22

Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288 (1st Cir. 2000) ………….12, 18, 19

**Rules**

Fed R. Civ. P. 23(a) ……………………………………………………………...1, 3

Fed R. Civ. P. 23(b)(3) …………………………………………..1, 13, 15, 19–21, 24, 25

**Treatises**

Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 10.5, at 483–86 ed. 2002
 ………………………………………………………………….…….........13

**MEMORANDUM OF LAW IN SUPPORT OF CLASS PLAINTIFFS' POST-MANDATE MOTION FOR CLASS CERTIFICATION**

On April 3, 2013, the First Circuit reversed this Court's grant of summary judgment against the three plaintiffs who sought to bring class claims against Pfizer, Inc. and Warner-Lambert Company, LLC (collectively, "Pfizer") for their deceptive marketing of Neurontin as a treatment for bipolar disorder.  Harden Manufacturing Corp. v. Pfizer, Inc. (In re Neurontin Marketing and Sales Practices Litigation), 712 F. 3d 60 (1st Cir. 2013) ("Harden").  The First Circuit also vacated this Court's class certification rulings, holding that the Class Plaintiffs could present their aggregate statistical evidence as proof of causation and damages.  Id. at 70.  The First Circuit's rulings leave no doubt that a class of the third party payors should be certified.

**I.      A CLASS SHOULD BE CERTIFIED UNDER RULE 23(b)(3) WHEN THE PLAINTIFFS CAN PROVE THEIR CASE WITH COMMON EVIDENCE**

Under Rule 23(b)(3), a class should be certified when the moving party has established the four prerequisites set forth in Rule 23(a), has demonstrated that questions of law and fact common to class members predominate over questions affecting only individual members, and has shown that a class action is the superior method of adjudicating the controversy.  In re New Motor Vehicles Canadian Exp. Antitrust Litig., 522 F.3d 6, 18 (1st Cir. 2008).

The "predominance" requirement has been the principal concern of this Court's class certification analyses.  The focus of the predominance inquiry is on: (1) whether the defendant's conduct was common as to all of the class members, and (2) whether all of the class members were harmed by the defendant's conduct.  Sullivan v. DB

1

Investments, Inc., 667 F.3d 273, 298 (3d Cir. 2011).  The predominance requirement is satisfied when the proposed class representative can establish liability through proof common to the class.  Gintis v. Bouchard Transp. Co., 596 F.3d 64, 67 (1st Cir. 2010).  In a RICO case such as the one brought by the Class Plaintiffs, certification is appropriate when the plaintiffs have presented a plausible theory for proving a class-wide injury as a result of the racketeering activities of the alleged enterprises at issue.  In re Ins. Brokerage Antitrust Litig., 579 F.3d 241, 270 (3d Cir. 2009).  The Class Plaintiffs' claims therefore warrant class certification because all members of the proposed class were harmed by Pfizer's conduct, because Pfizer's conduct was common as to all class members, and because the First Circuit has ruled that the Class Plaintiffs' class-wide evidence can be used as proof of causation and damages.

II.     **ONLY ONE QUESTION REMAINS REGARDING CLASS CERTIFICATION: WHETHER THE CLASS PLAINTIFFS CAN ESTABLISH THE EXTENT OF THE HARM SUFFERED AS A RESULT OF PFIZER'S FRAUD THROUGH COMMON EVIDENCE**

This is the fourth occasion in which this Court has reviewed the Class Plaintiffs' request to certify a class of third party payors who paid for Neurontin prescriptions.[1] The prior rulings obviate the need for the Class Plaintiffs to reestablish that they meet

---

[1] In 2007, the Court denied, without prejudice, the Class Plaintiffs' first motion for class certification.  In re Neurontin Mktg. and Sales Practices Litig., 244 F.R.D. 89 (D. Mass. 2007).  In May 2009, it denied the Class Plaintiffs' renewed motion for class certification, finding class members may have treated Neurontin differently when they placed and maintained Neurontin on their formularies.  In re Neurontin Mktg., Sales Practices and Prods. Liab. Litig., 257 F.R.D. 315, 332-33 (D. Mass. 2009) ("2nd Class Ruling").  The Class Plaintiffs moved for reconsideration, limiting their claim to payment for bipolar prescriptions.  After agreeing to reconsider, the Court found that there were no significant differences between class members' treatment of Neurontin, but it ultimately denied certification because a class trial would be unmanageable due to the need to go doctor by doctor.  In re Neurontin Mktg. and Sales Practices Litig., 2011 WL 1882870 (D. Mass. May 17, 2011) ("Reconsideration Ruling").  The Class Plaintiffs incorporate by reference arguments and evidence submitted in connection with prior class certification briefing.

every requirement of Rule 23.  This Court has previously found that the Class Plaintiffs have satisfied the numerosity, commonality, typicality and adequate representation requirements of Rule 23(a).  2nd Class Ruling, 257 F.R.D. at 318-22.  It has found that Neurontin is a totally ineffective bipolar treatment, Kaiser Found. Health Plan, Inc. v. Pfizer, Inc. (In re Neurontin Mktg. and Sales Practices Litig.), 2011 WL 3852254 at *54 (D. Mass., Aug. 31, 2011) ("Kaiser Findings"), and that Pfizer intentionally engaged in a fraudulent nationwide marketing campaign regarding Neurontin, Id. at *13, *17.  It has recognized that but for Pfizer's fraud, doctors would not have prescribed Neurontin for bipolar disorder, and that a trier of fact could find that class members were more likely than not harmed by Pfizer's fraudulent conduct. Reconsideration Ruling, 2011 WL 1882870 at *12.  These factual findings led the Court to conclude that "with respect to liability, the Court finds that the common issues predominate over individual TPP issues."  Id. at *7.

Only a single reservation prevented this Court from granting class certification: whether common evidence could establish the extent of the harm caused by Pfizer's fraud.  Although it held that the Class Plaintiffs had "proved that it is more likely than not likely that they were harmed by Pfizer's conduct," the Court determined that a question remained whether the Class Plaintiffs could satisfy predominance "with respect to damages."  Id. at *12.  In this Court's view, the Class Plaintiffs could therefore only prove damages through "a granular doctor by doctor" analysis.  Id. at *11.

In support of their claims, the Class Plaintiffs presented an expert report by Dr. Meredith Rosenthal, a healthcare economist from the Harvard School of Public Health.

3

Dr. Rosenthal's report showed that Pfizer's fraudulent marketing caused 99.4% of

Neurontin prescriptions for bipolar disorder, but the Court believed that Dr.

Rosenthal's regression analysis could not be used as common evidence for two reasons.

First, relying on several out of circuit cases, the Court doubted that Dr. Rosenthal's

aggregate statistical evidence was sufficient to establish damages in a pharmaceutical

fraudulent marketing case.  Id. at *8-*9, *11.   Second, the Court was troubled that Dr.

Rosenthal did not determine how many doctors relied on "run of the mill" off-label

marketing, instead assuming all of Pfizer's off-label marketing was fraudulent.  Id. at *9.

The First Circuit's decisions in Harden and in Kaiser Found. Health Plan, Inc. v.

Pfizer, Inc. (In re Neurontin Marketing and Sales Practices Litigation), 712 F. 3d 21

(1st Cir. 2013) ("Kaiser") mandate a different conclusion.  Dr. Rosenthal's testimony was

not only admissible in this case, but compelling evidence necessarily common to the

class.  A review of the First Circuit decisions demonstrates definitively that the extent of

the harm caused by Pfizer can be proven by common evidence and that the requested

class should now be certified.

## III. THE FIRST CIRCUIT HAS AUTHORIZED THIS COURT TO ACCEPT THE CLASS PLAINTIFFS' EXPERT REPORTS AS EVIDENCE OF THE EXTENT OF THE HARM CAUSED BY PFIZER'S MARKETING

### A. Notwithstanding the Authority Cited by Pfizer, the Aggregate Evidence Offered by the Class Plaintiffs is Admissible in this Action

The First Circuit analyzed the admissibility and the credibility of the Class

Plaintiffs' economic experts at length in its Kaiser opinion, which is referenced

throughout its Harden decision.  Its analysis is particularly applicable here because the

4

parties briefed, and the First Circuit decided, whether the RICO and UCL verdicts were sufficiently supported by Kaiser's evidence that Pfizer's false representations caused doctors to prescribe worthless Neurontin for the off-label conditions—the exact causation theory that has been put forward by the Class Plaintiffs.  The First Circuit was uncertain whether this Court had relied upon the Rosenthal report as proof of causation or only to quantify damages, and therefore examined whether Professor Rosenthal's testimony was sufficient to prove both.  Kaiser, 712 F. 3d at 40, fn. 14.  It determined that the Rosenthal report was competent to prove but-for causation and to quantify damages.  Id. at 41-47.

The First Circuit found the admissibility of Dr. Rosenthal's testimony under Fed. R. Ev. 702 to be a simple question.  Id. at 42.  Dr. Rosenthal plainly possessed the requisite expertise and her opinion would clearly assist the trier of fact.  As to her methodology, the Court stated that "regression analysis is a well recognized and scientifically valid approach to understanding statistical data, and courts have long permitted parties to use statistical data to establish causal relationships."  Id.  The Court cataloged numerous types of disputes where regression analyses had been recognized as competent proof of causation.  Id.

The First Circuit rejected Pfizer's objections that Dr. Rosenthal's methodology rendered her work unreliable, finding that Pfizer's criticisms of her work were precisely the type of disagreement which warranted testing by the adversarial process.  Id. at 43-44.  In addition, the Court found that Professor Rosenthal's statistical analysis was sufficient proof that Pfizer's misconduct was a but-for cause of the damages suffered by

a third party payor.  According to the Court, it was immaterial that Professor Rosenthal

did not take into account "idiosyncratic" decisions made by individual doctors:

> The existence of some doctors who purportedly were not influenced by
> Pfizer's misinformation would not defeat the inference that this
> misinformation had a significant influence on prescribing decisions which
> injured Kaiser. Indeed, Dr. Rosenthal noted the scientific invalidity of
> looking to physician-by-physician accounts of their prescribing decisions.
> Weighing the individual testimony presented by Pfizer against the
> aggregate evidence presented by Kaiser was a task for the jury and district
> court.

Id. at 45-46; see also, Aetna, Inc. v. Pfizer, Inc. (In re Neurontin Marketing and Sales

Practices Litig., 712 F.3d 51, 58, n.3 (1st Cir. 2013) (holding that reliance on physicians'

individual recollections as to their prescribing decisions might be unreliable).

Most importantly, the First Circuit found that other pharmaceutical marketing

cases in which aggregate evidence had not been accepted had no bearing on whether

such evidence was admissible in this dispute.  Kaiser at 46.  The Court found several

differences between the other decisions and the present case, including the significant

difference between misrepresentations about whether a drug was more cost effective

and misrepresentations that a drug was efficacious.  Id. at 46, 47.  The Court also

distinguished the out of circuit cases because the quality of the aggregate evidence

presented was significantly different from that of Dr. Rosenthal's statistical analysis,

which was based on contemporaneous "gold standard" spending and prescribing data.

Id. at 46.

In its prior class certification decisions, this Court felt constrained by the out of

circuit case law from accepting aggregate evidence as proof of but-for causation.  This

Court should consider those cases persuasive no longer.  The First Circuit found all of

Pfizer's authority to be either inapposite, or to actually support the use of aggregate

evidence in this controversy.  Id. at 46.  Consistent with its holding in AWP, the First

Circuit left no doubt that there is no blanket rule barring aggregate evidence in

marketing fraud actions, even when the misrepresentations are made to physicians:

> Courts' treatment of aggregate evidence is not as Pfizer represents. Earlier
> we cited to the use of such aggregate evidence to show causation under
> several causes of action. We see no reason to reach a different conclusion
> for the specific subset of RICO claims based on fraudulent marketing.

Id. at 47; see Blue Cross Blue Shield of Massachusetts v. AstraZeneca Pharmaceuticals

LP (In re Pharmaceutical Industry Average Wholesale Price Litig.), 582 F. 3d 156, 197-98

(1st Cir. 2009) ("AWP").

In its review of this case, the First Circuit ruled that it was error not to consider

the Class Plaintiffs' aggregate evidence as competent proof of causation.  "We conclude

here, as we did [in Kaiser], that the Rosenthal report is capable of providing proof of

but-for causation."  Harden, 712 F.3d at 68.  The Court also rejected Pfizer's contention

that physicians' testimony must be the primary evidence of causation.  Anecdotal

evidence that some doctors may not have relied on Pfizer marketing "does not defeat

the implication—clearly presented through Dr. Rosenthal's regression analysis—that

Pfizer's misinformation had a significant influence on thousands of other prescribing

decisions."  Id. at 68-69.  It also expressly found that the cases cited by this Court in the

2nd Class Ruling and the Reconsideration Ruling should not have constrained this

Court's analysis.  "To the extent that some district courts in other circuits may have

endorsed Pfizer's position that aggregate evidence is legally insufficient to prove but-for causation, we disagree, at least on the facts of this case." <u>Id.</u> at 69.

The First Circuit could not have stated it more clearly.  In this action, there is no barrier to this Court relying upon the aggregate evidence submitted by the Class Plaintiffs' experts in analyzing whether the Class Plaintiffs can prove causation or the extent of damages on a class-wide basis.

> **B.**   **<u>Dr. Rosenthal's Assumption That There Was No Distinction between Off-Label Promotion and Fraudulent Promotion Is Justified, and Supported by Other Evidence</u>**

In its <u>Reconsideration Ruling</u>, this Court expressed a second reservation regarding the Rosenthal Report:  it observed that Rosenthal, on the instruction of Class Plaintiffs' counsel, had assumed all off-label marketing for bipolar was fraudulent.  2011 WL 1882870 at *9.  This Court observed that not all off-label marketing was necessarily fraudulent and was concerned that Dr. Rosenthal's model could not distinguish between "the extent of the harm caused by the fraud, as opposed to run-of-the-mill off-label detailing."  <u>Id.</u>  It concluded that a doctor by doctor analysis was the only way to determine if fraudulent or non-fraudulent factors caused the prescriptions at issue.

Pfizer raised this argument in defense of its positions on appeal, and the First Circuit rejected it.  The First Circuit observed that there was nothing unusual or improper when a damages expert assumes that all of the conduct examined in a damages analysis is unlawful.  "Such an approach to proving injury from an underlying assumption of unlawful behavior (*to be proven to the fact-finder*) is well accepted in the antitrust context from which RICO has drawn many of its causation principles." <u>Kaiser,</u>

712 F. 3d at 44 (emphasis added).  The critical factor is whether the proponent of the testimony can prove to the jury that the assumption is appropriate – at trial.

Here, of course, the Class Plaintiffs can offer evidence that all off-label marketing for bipolar was fraudulent.  In fact, this Court ruled that such an assumption was reasonable during the Kaiser trial, when a number of off-label indications were at issue in addition to bipolar:

> Defendants criticize Professor Rosenthal's analysis because it assumes that the promotional spending on off-label marketing was the same as the promotional spending on *fraudulent* off-label marketing.  This leap is less obvious because, in some circumstances, off-label marketing can be truthful. However, based on the compelling evidence in this case, I conclude that the assumption is reasonable, given the pervasive nature of the publication fraud that infected the nationwide sources of information available to all physicians. . . . I find that Pfizer designed the national strategy of off-label marketing (by promotional spending on detailing doctors and sponsorship of CME conferences) to implement its fraudulent publication strategy.

Kaiser Findings, 2011 WL 3852254 at *33.

This Court has repeatedly found that there is *no* scientifically acceptable evidence that Neurontin is effective as a treatment for bipolar.  See e.g. Kaiser Findings, 2011 WL 3852254 at *35 - *38 aff'd, 712. F.3d at 47-49; Reconsideration Ruling, 2011 WL 1882870 at *11-12.  Non-fraudulent off-label promotion of Neurontin as a bipolar treatment would therefore be impossible; one cannot truthfully promote an ineffective drug.  This Court held that Pfizer had an affirmative duty "to disclose scientific data demonstrating the lack of efficacy of Neurontin for off-label uses" if it was going to promote the drug for off-label uses.  Kaiser Findings at *47.   It is inconceivable that Pfizer would have attempted to convince physicians to prescribe Neurontin while at the same time

admitting there was no scientific evidence that it had any effect on bipolar disorder and that a placebo was a more effective medication.  Given Neurontin's proven inefficacy for bipolar, Dr. Rosenthal's presumption is not only justified, but the only possible conclusion.

One additional point made by the First Circuit merits discussion here.  The First Circuit noted that even if Dr. Rosenthal's assumption was challengeable, the objection did not go to the admissibility of the report as proof of causation, but only to the calculation of damages.  Kaiser, 712 F.3d at 45.  This is significant, because, as the First Circuit pointed out:

> The burden of proof as to damages is lower than that for causation, and the factfinder is afforded a greater deal of freedom to estimate damages where the defendant, as here, has created the risk of uncertainty. See Ocean Spray Cranberries, Inc. v. PepsiCo, Inc., 160 F.3d 58, 63 (1st Cir. 1998). The damages inquiry does not allow a defendant to benefit from the scope of its wrongdoing; this is why "[e]ven 'speculation has its place in estimating damages, and doubts should be resolved against the wrongdoer.' "

Id. at 50-51, quoting BCS Servs. Inc. v. Heartwood 88, LLC, 637 F.3d 750, 759 (7th Cir. 2011), cert. denied, 132 S. Ct. 253 (2011) (Posner, J., quoting Mid–Am. Tablewares, Inc. v. Mogi Trading Co., 100 F.3d 1353, 1365 (7th Cir. 1996)).  The First Circuit makes it clear that the Rosenthal report merits consideration by the trier of fact on the issue of how much damage Pfizer's fraudulent conduct caused.

### C.  The First Circuit Has Left No Doubt That the Class Plaintiffs Can Prove All Aspects of Their Case With Common Evidence

The First Circuit ruled that the Class Plaintiffs' expert testimony is competent evidence sufficient to allow the trier of fact to find causation and calculate damages.

Harden, 712 F.3d at 67, 70.  This ruling leads to the inexorable conclusion that common questions predominate.  Dr. Rosenthal's regression analysis demonstrates that the entire class has suffered as a result of Pfizer's fraud, and Dr. Hartman's testimony permits the calculation of damages for both the class as a whole and each individual member.[2] There is no need for individual determinations for any of the individual class members, as this Court has already ruled with respect to liability.

The First Circuit's analysis of the Class Plaintiffs' aggregate evidence applies to both summary judgment and class certification.  Indeed, it was because the two questions were so closely linked that the Court of Appeals was compelled to vacate the class certification decisions.

> [T]he district court's denials of the Harden plaintiffs' second motion for class certification and motion for reconsideration pivoted on the determination that the Rosenthal report could not provide proof of causation or damages. This conclusion is what led the court to decide that a class action would be "unmanageable" due to the requirement of a "granular doctor-by-doctor analysis." The legal requirements to establish proximate and but-for causation under RICO were key factors across both the summary judgment and class certification decisions, and in both instances the district court relied on many of the same decisions from other circuits that we have found to be inapposite for the case at hand.

Harden, 712 F. 3d at 70 (citations omitted).  In other words, even under the deferential abuse of discretion standard, the First Circuit vacated the class rulings because this Court's analysis of the proffered aggregate evidence led to untenable conclusions

---

[2] The Court will recall that Dr. Rosenthal and Dr. Hartman calculated Kaiser's damages based on national sales and marketing data, not data specific to Kaiser.  This Court approved such an approach, based on the assumption that Kaiser data would be comparable to national data, Kaiser Findings, 2011 WL 3852254 at *32, and the First Circuit affirmed the methodology, Kaiser, 712 F.3d at 44.  National sales data clearly applies to a national class of third party payors, and the same methodology used to calculate Kaiser's damages can be applied to any class member.

regarding the need for individual determinations and the manageability of a class proceeding.  There is no longer any question: the Class Plaintiffs' evidence can prove all aspects of their claims.  Because liability, causation and damages can be proven through common evidence, Class Plaintiffs' Post-Mandate Motion for Class Certification should be granted.

## IV.   PFIZER'S DEFENSE THAT SOME DOCTORS DID NOT RELY ON FRAUDULENT REPRESENTATIONS DOES NOT DEFEAT PREDOMINANCE

Pfizer has argued that even if the Class Plaintiffs' claims can be proven through common evidence, common issues still do not predominate because its primary defense—that individual physicians relied on something other than its false representation of efficacy when they prescribed Neurontin—necessarily raises individual issues.

This argument disintegrates upon any critical review for several reasons.  First, Pfizer's preference to defend the case on a piecemeal basis cannot trump the right of the Class Plaintiffs to bring a class action if they can prove their case with common evidence.  Second, Pfizer can, in fact, defend itself without resorting to a doctor by doctor, prescription by prescription review.  Third, the cumulative evidence of dubious reliability that doctor by doctor testimony would produce would never be admissible in a non-class proceeding.  And fourth, Pfizer cannot defeat class certification by raising a wholly speculative defense—no actual witnesses support its claim that doctors would knowingly prescribe a worthless medication.  See Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 298 (1st Cir. 2000) (holding that arguments "woven entirely out

of gossamer strands of speculation and surmise" will not be allowed "to tip the decisional scales in a class certification ruling").

A.   **Pfizer Cannot Defeat Class Certification Simply by Arguing It Wishes to Adduce Individual Evidence in Its Defense at Trial**

Pfizer has contended that it has a right to defend itself by inquiring into individual prescription decisions, and that this right automatically defeats class certification.  But this is not the law.  In this Circuit, class certification is not defeated simply because a defendant argues it may wish to defend the case by contesting individual claims on a case by case basis.  See AWP at 197-98 ("Challenges that such aggregate proof affects substantive law and otherwise violates the defendant's due process or jury trial rights to contest each member's claim individually, will not withstand analysis," quoting 3 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 10.5, at 483–86 (4th ed. 2002)).

Justice Souter confirmed this point (as a First Circuit panel member) in the Gintis decision, where he observed that if a defendant was entitled to defeat class certification by arguing it wished to defend against each class member's claims individually, "the point of the Rule 23(b)(3) provision for class treatment would be blunted beyond utility."  596 F. 3d at 66; see Smilow v. Sw. Bell Mobile Sys., Inc., 323 F.3d 32, 37 (1st Cir. 2003) (possible existence of affirmative defenses is not generally a ground for defeating predominance).  Thus, when examining a Rule 23(b)(3) certification request, "the focus will be on the plaintiffs' claim that common evidence will suffice to prove injury,

causation and compensatory damages for at least a very substantial proportion of the claims that can be brought by putative class members." Gintis, 596 F.3d at 67.

This is particularly true when one recognizes that Pfizer's "non-fraudulent representation" defense does not, in fact, address whether Pfizer violated RICO or engaged in lawful conduct, but only concerns the extent of damages it caused.  Pfizer seeks to examine individual physicians to refute Dr. Rosenthal's conclusion that Pfizer is liable for 99.4% of all Neurontin bipolar prescriptions—it wants the jury to believe its representations are responsible for a lesser percentage.

The expert evidence offered by the Class Plaintiffs makes calculation of damages relatively straight forward in this case.  But even if damages were difficult to calculate here, it is Pfizer's fraudulent and illegal promotion of Neurontin which creates the difficulty.  If the impact of Pfizer's fraud cannot be measured precisely, it should not escape a class remedy simply for that reason. In Kaiser, the First Circuit held that RICO victims do not have to prove their damages with "mathematical certainty" because if that were the rule, the more grievous the wrong done, the less likelihood there would be of recovery.  712 F.3d at 49.  See also, BCS Servs. Inc. v. Heartwood 88, LLC, 637 F. 3d at 759.  The same principles preclude a defendant from demanding "mathematical certainty" through individual claim resolution when such a demand will defeat the only practical method of assessing damages against a class-wide tortfeasor.  Complex damage calculations necessitated by a defendant's deliberate misconduct cannot be a basis for avoiding a class judgment.

Further, it should be recalled that the purpose of Rule 23(b)(3) is to ensure that

14

the proposed class is sufficiently cohesive.  <u>Amchem Prods., Inc. v. Windsor</u>, 521 U.S.

591, 623 (1997).  Pfizer argues that if doctors used Neurontin to treat bipolar for

different reasons, that would create a non-cohesive class—but cohesiveness is

determined by whether the class members' claims are sufficiently similar, and the class

members are payors, not doctors.  Pfizer has not presented a scrap of evidence that

some plans' doctors were more likely to knowingly prescribe an ineffective medication

than others.  Thus, even if there is variation among prescribers, it is doubtful that there

is significant variation in the frequency of harm to the plans that paid for the

prescriptions.

Pfizer's individual doctor defense goes merely to the certainty of quantifying

harm caused by Pfizer's misconduct—it does not demonstrate that the class is disparate.

As <u>Kaiser</u> demonstrates, difficulties of determining the extent of damages are not so

onerous as to allow Pfizer to avoid the consequences of its fraud.  And as demonstrated

below, they are no more onerous in a class proceeding than they would be in a case

brought by an individual health insurer.

**B.**   <u>**Pfizer Can Defend Itself On An Aggregate Basis**</u>

If a class is certified, Pfizer may still avail itself of several basic tools of the

adversarial process to rebut the Class Plaintiffs' aggregate evidence.  Pfizer will still

have the opportunity to cross examine Dr. Rosenthal to reveal the errors and

inconsistencies which it claims make her analysis non-credible.  Just as it did in the

<u>Kaiser</u> trial, Pfizer may present its own expert econometrician to rebut her testimony.

Pfizer is also free to present anecdotal evidence from representative doctors to establish

that some doctors were not influenced by its marketing, just as it did in the <u>Kaiser</u> trial. Assuming such testimony would pass <u>Daubert</u>, a fifth way it could defend against the Class Plaintiffs' aggregate evidence would be to present a marketing expert who could testify regarding the effectiveness of drug marketing and what doctors rely upon in writing a bipolar prescription.

Every day, hundreds of marketing employees at Pfizer and every other multinational corporation evaluate the effectiveness of marketing campaigns—without polling every single person who was exposed to the campaign or who purchased the product.  Hundreds of universities teach thousands of courses on these evaluation techniques, and Pfizer is only one company among many in the business world to employ them.  If academia and industry can regularly and routinely measure the effect of marketing without a purchaser by purchaser analysis, federal courts and triers of fact should be able to do so too.  To require far more extensive (and far less credible) evidence cannot be mandated by Pfizer.

C.   **Pfizer's Evidence of Individual Transactions Would Not Be Admissible in a Non-Class Proceeding**

Pfizer's claim that it can only defend itself if it is free to call all physicians who prescribed Neurontin for bipolar is also belied by an examination of the type of evidence it would be allowed to present in a non-class proceeding.  As both the First Circuit and this Court have noted, physician recollection of the factors that influenced their prescription decisions is notoriously unreliable.  <u>Kaiser</u>, 712 F. 3d at 30 (summarizing social science research demonstrating "the well-recognized unreliability"

16

of asking physicians about factors that influenced off-label prescribing);

Reconsideration Ruling, 2011 WL 1882870 at *5 (physician testimony regarding what influenced their Neurontin prescribing was "not entirely credible").  This is particularly true because the class period terminates in 2004, and Pfizer would be asking physicians to testify about prescriptions they wrote more than a decade ago.

Moreover, even if the testimony were credible, this Court would never allow such a parade of witnesses in a proceeding for a single health insurer; Fed. R. Ev. 403 would undoubtedly be invoked to reject the cumulative testimony Pfizer intends to proffer.  The recent Kaiser trial is the model.  There this Court permitted representative physicians to testify that they did not rely on the fraudulent marketing, but it would not allow testimony from each and every Kaiser prescriber.  Because this Court would certainly never allow Pfizer to present testimony from each and every prescriber in cases for individual health insurers, Pfizer cannot defeat class certification claiming that testimony in a class setting would be treated differently.[3]

### D.   Class Certification Cannot Be Defeated By Gossamer Strands of Speculation and Surmise

Pfizer seeks to prevent class certification by arguing that many physicians relied upon non-fraudulent off-label promotion when prescribing Neurontin for bipolar, or that many physicians did not rely on any misrepresentations of Neurontin's efficacy. But assertions by defendants that individual circumstances mandate a case-by-case

---

[3] It is also worth noting that this Court barred Pfizer from taking discovery of individual patients for the precise reason that the case would not be tried on an individual basis.  Given that ruling, Pfizer cannot defeat class certification based on an expectation that witnesses it was not allowed to depose would be able to testify at trial.

review must be critically scrutinized, and neither of these speculative hypotheses can defeat the certification of a class. Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d at 298.

Pfizer's argument that Neurontin prescribers relied on non-fraudulent information rests on two completely unproven assumptions. The first is that non-fraudulent off-label promotion of a non-efficacious drug is possible. Pfizer has had the incentive and opportunity to put forward examples of non-fraudulent promotion in this proceeding and in the Kaiser trial, but has never done so. There is no record evidence that Pfizer informed a single psychiatrist to whom they detailed or marketed that placebo was a better treatment than Neurontin, and no reason to believe that Pfizer would have expended resources on such a marketing campaign. Because the argument that some doctors may have relied on "run of the mill" non-fraudulent promotion is not only imaginary but unsupported and unsupportable, it should not be permitted to tip the decisional scales of class certification.

Pfizer's second unproven assumption is that physicians would still have prescribed Neurontin had they known the truth. As this Court has recognized, however, it is difficult to believe that a trained, independent physician would knowingly prescribe a medication that is less effective than placebo and which has significant side effects. To prescribe such a medication would be to leave patients suffering from a serious mental illness essentially untreated. Indeed, with the exception of Pfizer's paid expert, there is no evidence in the record of this case or of Kaiser that any doctor who knew about the negative clinical trial results initiated such therapy.

18

Denial of a class of TPPs on these grounds would therefore constitute an improper

denial based upon "arguments woven entirely out of gossamer strands of speculation

and surmise."  Mowbray, 208 F.3d at 298.

## V.      THE SUPREME COURT CASES RAISED BY PFIZER SUPPORT THE CERTIFICATION OF A CLASS IN THIS PROCEEDING

In its stay petitions and at the recent status conference before this Court, Pfizer

indicated it believes that the recent Wal-Mart and Comcast decisions prevent the

certification of a class. [4]  Neither Wal-Mart nor Comcast changes Rule 23(b)(3) law,

however, nor do the cases apply their holdings to civil RICO or state claims like those

asserted here.  In fact, a number of courts have considered the impact of both Wal-Mart

and Comcast on ongoing class actions, upholding Rule 23(b)(3) class certification in

several decisions,[5] including in the civil RICO context.[6]  The argument forecast by Pfizer

that Wal-Mart or Comcast offer new reasons to reject the certification of a class in this

case must therefore be rebuffed for several reasons.

First, the Supreme Court cases referred to by Pfizer do not alter class certification

principles in any way applicable to this case; they are "premised on existing class-action

jurisprudence."  Glazer, 2013 WL 3746205, *50.  Comcast merely restates well-

established class certification principles and does not articulate any new generally

---

[4] Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541 (2011); Comcast Corp. v. Behrend, 133 S. Ct. 1426 (2013).
[5] Leyva v. Medline Indus. Inc., 716 F.3d 510, 514 (9th Cir. 2013); Tait v. BSH Home Appliances Corp., 289
F.R.D. 466 (C.D. Cal. 2012), 23(f) denied, No. 13-80000 (9th Cir. April 1, 2013) (denying review after
Comcast), recons. denied, No. 13-80000 (9th Cir. April 23, 2013); Glazer v. Whirlpool Corp., ___ F.3d ___,
2013 WL 3746205 (6th Cir. July 18, 2013) (reaffirming class certification on remand for reconsideration
under Comcast).
[6] In re U.S. Foodservice Inc. Pricing Litig., ___ F.3d ___, 2013 WL 4609219 (2nd Cir. Aug. 20, 2013)
(affirming certification of a class); In re Community Bank of Northern Virginia Mortgage Lending
Practices Litig., 2013 WL 3972458 (W.D. Pa. June 27, 2013) (civil RICO class certified); Wallace v. Powell,
2013 WL 2042369 (M.D. Pa. May 14, 2013) (civil RICO class certified).

applicable rule of predominance.   See Comcast, 133 S. Ct. at 1433 ("This case thus turns

on the straightforward application of class-certification principles."); see also id. at 1436

(Ginsburg and Breyer, JJ., dissenting) ("[T]he opinion breaks no new ground on the

standard for certifying a class action.").[7]  Moreover, in the other 23(b)(3) decision from

the Supreme Court's 2013 term, a six-justice majority held that "Rule 23(b)(3) . . . does

*not* require a plaintiff seeking class certification to prove that each 'elemen[t] of [her]

claim [is] susceptible to classwide proof.'"   Amgen Inc. v. Connecticut Ret. Plans &

Trust Funds, 133 S. Ct. 1184, 1196 (2013). (emphasis in original).  And in Wal-Mart

Stores, Inc. v. Dukes, the Supreme Court stated expressly that "individualized monetary

claims belong in Rule 23(b)(3)." 131 S. Ct. 2541, 2558 (2011).

Second, courts applying Wal-Mart, Comcast, and Amgen to civil RICO claims,

with the benefit of a developed record, have reaffirmed that predominance is satisfied

when "all plaintiffs' claims arise from the same alleged fraudulent scheme."

Community Bank, 2013 WL 3972458, *8-9; Wallace v. Powell, 2013 WL 2042369, *4-20

(comprehensive analyses of predominance and superiority under Comcast).  That is

clearly the case here; this Court has already found that the strategy Pfizer designed to

---

[7] As the Sixth Circuit in Glazer v. Whirlpool observed, the Comcast dissent also notes other class action
principles that remain unchanged post-Wal-Mart and Comcast.   For example, "[W]hen adjudication of
questions of liability common to the class will achieve economies of time and expense, the predominance
standard is generally satisfied even if damages are not provable in the aggregate."  133 S. Ct.  at 1437.  A
class may be divided into subclasses, Fed. R. Civ. P. 23(c)(4)-(5), or "a class may be certified for liability
purposes only, leaving individual damages calculations to subsequent proceedings."  Id. at 1437 n.*.
Because "[r]ecognition that individual damages calculations do not preclude class certification under
Rule 23(b)(3) is well nigh universal," *id*. at 1437 (citing, among other cases, Beattie v. CenturyTel, Inc.,
511 F.3d 554, 564-66 (6th Cir. 2007)), in "the mine run of cases, it remains the 'black letter rule' that a class
may obtain certification under Rule 23(b)(3) when liability questions common to the class predominate
over damages questions unique to class members.")  Id.  See Glazer, 2013 WL 3746205 at *18.

implement its fraudulent publication scheme was "national."  Kaiser Findings, 2011 WL
3852254 at *33.

Third, when defendants have raised the argument that liability-only class
applications (or Rule 23 (c)(4) issue clauses) are no longer appropriate after Comcast,
they have done so only through a misreading of that case.  The courts that have
examined this argument in post-Comcast cases have rejected it.  See Harris v. comScore,
Inc., 2013 WL 1339262, at *10 n.9 (N.D. Ill. Apr. 2, 2013) ("The Supreme Court's holding
[in Comcast] came from its assumption, uncontested by the parties, that Rule 23(b)(3)
requires that damages must be measurable based on a common methodology applicable
to the entire class in antitrust cases."); see also Leyva, 716 F.3d at 513.  After Comcast, it
is still true that "a class action limited to determining liability on a class-wide basis,
with separate hearings to determine – if liability is established – the damages of
individual class members, or homogenous groups of class members, is permitted by
Rule 23(c)(4) and will often be the sensible way to proceed."  Butler v. Sears Roebuck &
Co., ___ F.3d ___, 2013 WL 4478200 at *4 (7th Cir. August 22, 2013).

Most importantly, class certification in this case does not founder on the shoals of
a mismatch of proof in the manner it did in Comcast.  In that case, the only expert
methodology proffered to show classwide impact did not match the theory on which
the class had been certified; the regression model relied on by the expert did not isolate
damages resulting from the one classwide theory from the other three theories of
antitrust impact that were *not* susceptible to proof on a classwide basis.  Comcast, 133 S.
Ct. at 1430.  As Comcast concluded, unremarkably, "a model purporting to serve as

evidence of damages in this class action must measure only those damages attributable to that theory." Id. at 1433.  As Judge Posner explained in Butler, while Comcast stands for the proposition that a class damages model must match the class injury theory, courts may nonetheless continue to certify classes as to liability questions.  Butler at *3.

The Class Plaintiffs' proof exactly matches their class injury theory in a way that has permitted class certification in the post-Comcast context.  In Butler, there was "a single, central, common issue of liability: whether the Sears washing machine was defective." Butler at *5; see U.S. Foodservice, 2013 WL 4609219 at *12, n.8 (holding that because the proposed measure of damages was directly linked to the underlying theory of classwide liability, certification of a class was in accord with Comcast).  In the present case, the only issues of liability pursued by the Class Plaintiffs are all common to the class; the First Circuit has confirmed such a match of causation theory and damage analysis, in the Kaiser decision.  732 F.3d at 43-45.  The First Circuit has already tested the Class Plaintiffs' expert's methodology for its viability as classwide proof at trial, with the benefit of an actual trial record on the claims that are the subject of class certification here.  In so doing, the First Circuit conducted the very same analysis that the Supreme Court conducted in Comcast, although the difference in the facts between the two cases merited different results.

Wal-Mart and Comcast have been read to require a merits showing at the class certification stage akin to that required to withstand summary judgment.  Whether such an expansive reading is the correct one, here there is no question that the Class Plaintiffs' RICO claims have run that gauntlet – they have done so at the appellate level,

resulting in a post-Wal-Mart, post-Comcast decision analyzing the merits of the Class

Plaintiffs' aggregate causation proof.  Again, as Harden holds, "[w]e conclude here . . .

that the Rosenthal report is capable of providing proof of but-for causation.  The

Harden plaintiffs need not prove causation through the testimony of individual doctors.

The combination of aggregate evidence and the circumstantial evidence was enough for

the Harden plaintiffs to overcome summary judgment."  712 F.3d at 68.  That is also

enough, under the most stringent reading of any class certification precedent, to enable

the Class Plaintiffs to proceed to their proof at trial as a class.

## VI.     A CLASS ACTION WILL BE MANAGEABLE AND SUPERIOR TO OTHER AVAILABLE METHODS IN DECIDING PLAINTIFFS' CLAIMS FAIRLY AND EFFICIENTLY

The First Circuit recognized that this Court's manageability finding was based

on this Court's erroneous belief that the Rosenthal Report could not provide proof of

causation or damages.  Harden, 712 F. 3d at 70.  It remanded because of doubts as to

whether such a conclusion was viable in light of its rulings on the admissibility of the

Rosenthal Report.  Id.  It should now be clear that no concerns about the manageability

of this action preclude certification.

The manageability inquiry is fundamentally comparative and inherently

relativistic, involving an examination of the manageability of a class trial and that of

available alternatives.  Klay v. Humana, Inc., 382 F.3d 1241, 1272-73 (11th Cir. 2004).

Here, a class trial would be eminently manageable.  In fact, it would closely resemble

the Kaiser trial, only simpler, because it will not involve multiple off-label indications.

The Class Plaintiffs can present the same witnesses who testified at the Kaiser trial to

prove that Pfizer violated RICO through its fraudulent promotion of Neurontin.  The same expert witnesses that established that Kaiser was damaged through false representations to its physicians will prove that the TPP class was damaged through repetition of the same messages to their doctors.  The same data and methodology found reliable in <u>Kaiser</u> will be used to establish the damages suffered by the class and its members here, and because national data was found sufficient to establish Kaiser's damages, the sufficiency of national data to quantify the damages suffered by a national class should be certain.  Nor will there be any focus in a class trial on what the individual plans did or did not do with regard to information relating to Neurontin—the plans themselves are not claiming that they relied on representations regarding Neurontin.  Rulings regarding the applicability of collateral estoppel with regard to factual findings from the Kaiser trial will also simplify and streamline any subsequent class trial.

A series of individual trials, which is the alternative, would be significantly less manageable, and not just because of the potential that liability and damages would be re-litigated thousands of times.  Even if Pfizer wishes to call a multitude of physicians to testify, it is important to note that the same doctors might be called to testify in dozens of trials; most of the physicians who prescribed Neurontin for bipolar have patients covered by several third party payors, which would necessitate their testimony in each of several trials.  The litigation of liability and damages in a class trial might be demanding, but re-litigation of the same issues in thousands of individual trials would be exponentially more onerous.

In its Reconsideration decision, this Court did not consider several of the factors in the Rule 23(b)(3) superiority weighing test.  The most notable of those factors is the interest of the individual class members in controlling the litigation.  This factor is critical, because the purpose of Rule 23(b)(3) is to vindicate the rights of those who, individually, would be without effective strength to bring their opponents into court at all.  See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 617 (1997); Smilow, 323 F.3d at 41.  As Justice Souter observed in Gintis, the question of whether individual plaintiffs are likely to sue lies at the very heart of why Rule 23 was created: "to make room for claims that plaintiffs could never afford to press one by one." 596 F.3d at 67-68.  Here, it is unlikely that many of the 1,875 Taft-Hartley funds or 9,895 self-insured employers in the proposed class would pursue individual claims, even though the harm they have suffered is no less real than that of Kaiser, Aetna, or other large health insurance plans.

## VII.   CONCLUSION

Measured against the realistic alternatives, a class action is clearly the superior method of adjudicating the Class Plaintiffs' claims.  This Court has previously ruled that as to liability, common issues predominate over individual issues.  And as to predominance with respect to damages, the First Circuit has now removed the only bar this Court found against proceeding on a class-wide basis by ruling that the Class Plaintiffs' circumstantial and aggregate evidence can be used as proof of causation and damages.  For the reasons stated above and in the Motion to which this Memorandum is attached, this Court should certify a class of the Class Plaintiffs' claims as requested in their Post-Mandate Motion for Class Certification.

Dated:  September 3, 2013                 Respectfully Submitted,

By:

/s/ Thomas M. Greene
Thomas M. Greene, BBO # 210020
Greene LLP
One Liberty Square, 12th Floor
Boston, MA 02109
tgreene@greenellp.com

/s/ Don Barrett
Don Barrett
Barrett Law Office
404 Court Square North
P.O. Box 987
Lexington, MS 39095
dbarrett@barrettlawgroup.com

/s/ Daniel Becnel
Daniel Becnel, Jr.
Law Offices of Daniel Becnel, Jr.
106 W. Seventh Street
P.O. Drawer H
Reserve, LA 70084
dbecnel@becnellaw.com

/s/ Elizabeth J. Cabraser
Elizabeth J. Cabraser
Lieff Cabraser Heimann &
  Bernstein, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339
ecabraser@lchb.com

/s/ James Dugan
James Dugan
The Dugan Law Firm
One Canal Street
365 Canal St., Suite 1000
New Orleans, LA 70131
jdugan@dugan-lawfirm.com

/s/ Thomas M. Sobol
Thomas M. Sobol
Hagens Berman Sobol Shapiro LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA  02142
tom@hbsslaw.com

**Members of the Class Plaintiffs'
Steering Committee**

## CERTIFICATE OF SERVICE

I, Thomas M. Greene, hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on September 3, 2013.

Dated: September 3, 2013                    /s/ Thomas M. Greene
                                            Thomas M. Greene