## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: NEURONTIN MARKETING AND SALES PRACTICES LITIGATION | MDL DOCKET No. 1629 |
| | MASTER FILE No. 04-10981-PBS |
| THIS DOCUMENT RELATES TO: | THE HONORABLE PATTI B. SARIS |
| AETNA, INC., | |
| Plaintiff, | |
| -vs- | |
| PFIZER, INC. and WARNER LAMBERT CO., LLC. | |
| Defendants. | |

## AETNA INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO PRECLUDE RELITIGATION OF ISSUES AND FACTS DETERMINED BY THE *KAISER* TRIERS OF FACT AT TRIAL

## TABLE OF CONTENTS

I.   INTRODUCTION ..................................................................................................1

II.  RELEVANT PRIOR PROCEEDINGS ............................................................1

III. SUMMARY OF ARGUMENT .........................................................................4

IV. LEGAL STANDARD..........................................................................................6

    A.  The Requirements for Offensive Collateral Estoppel .................................6

        i.   Issue Identity ...................................................................................7

        ii.  Actually Litigated ............................................................................7

        iii. Valid and Binding Final Judgment .................................................8

        iv.  Necessary to the Judgment..............................................................8

V.  ARGUMENT .......................................................................................................9

    A.  The Facts and Issues For Which Aetna Seeks Preclusion Satisfy the
        Requirements for Offensive Non-Mutual Collateral Estoppel ...................9

    B.  The Jury's RICO Findings .......................................................................10

    C.  The Court's Bench Findings .....................................................................12

        i.   Fraudulent Marketing Findings....................................................13

        ii.  Findings of Percentages of Off-Label Neurontin Prescriptions
           Written Nationally, Resulting from Pfizer's Marketing Fraud......14

        iii. Inefficacy Findings .....................................................................16

VI. CONCLUSION...................................................................................................17

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Ashe v. Swenson*,
  397 U.S. 436 (1970)...................................................................................... 9

*Commercial Associates v. Tilcon Gammino, Inc.*,
  998 F.2d 1092 (1st Cir.1993)........................................................................ 8

*Dennis v. Rhode Island Hospital Trust National Bank*,
  744 F.2d 893 (1st Cir. 1984)............................................................... 7, 8, 12

*Hoult v. Hoult*,
  157 F.3d 29 (1st Cir. 1998)........................................................................... 8

*In re Kane*,
  254 F.3d 325 (1st Cir. 2001)......................................................................... 8

*In re Neurontin Antitrust Litig.*,
  MDL 1479, 2013 WL 4042460 (D.N.J. Aug. 8, 2013).................................. 5

*In re Neurontin Mktg. and Sales Practices Litig.*,
  712 F.3d 21 (1st Cir. 2013)................................................................... passim

*In re Neurontin Mktg. and Sales Practices Litig.*,
  712 F.3d 51 (1st Cir. 2013)................................................................... passim

*In re Neurontin Mktg. and Sales Practices Litig.*,
  712 F.3d 60 (1st Cir. 2013) .......................................................................... 4

*In re Neurontin Mktg. and Sales Practices Litig.*,
  799 F. Supp. 2d 110 (D. Mass. 2011) ......................................................... 13

*In re Neurontin Mktg. and Sales Prac. Litig.*,
  No. 04-cv-10739-PBS, 2011 WL 3852254 (D. Mass. Aug. 31, 2011).......... 2

*In re Neurontin Mktg., Sales Practices and Products Liab. Litig.*,
  257 F.R.D. 315 (D. Mass. 2009).............................................................. 1, 4

*In re Sonus Networks, Inc. Shareholder Derivative Litig.*,
  499 F.3d 47 (1st Cir. 2007)......................................................................... 13

*Keystone Shipping Co. v. New England Power Co.*,
  109 F.3d 46 (1st Cir. 1997)........................................................................... 7

*Manganella v. Evanston Ins. Co.*,
  700 F.3d 585 (1st Cir. 2012).............................................................. 6, 7, 15

*Montana v. United States*,
   440 U.S. 147 (1979) .................................................................................................. 6

*Parklane Hosiery Co. v. Shore*,
   439 U.S. 322 (1979) .................................................................................... 5, 6, 7, 10

*Pure Distributors, Inc. v. Baker*,
   285 F.3d 150 n.5 (1st Cir. 2002) ............................................................................. 8

*Rodriguez-Garcia v. Miranda-Marin*,
   610 F.3d 756 (1st Cir. 2010) .................................................................................... 6

## **<u>Statutes</u>**

18 Pa. C. S. § 4117 ......................................................................................................... 3

18 U.S.C. § 1962(c) .................................................................................................... 3, 4

Cal. Bus. & Prof. Code § 17200 ..................................................................................... 3

## I.      INTRODUCTION

Aetna, Inc. ("Aetna") moves for a collateral estoppel order to preclude relitigation of issues and facts determined by the finders of fact at the trial of *Kaiser Foundation Health Plan, Inc., et al. v. Pfizer, et al.*, No. 04-10739-PBS (the "Kaiser Trial").

## II.     RELEVANT PRIOR PROCEEDINGS

In its May 13, 2009 Order denying certification of a class of third party payers ("TPPs") in the *Harden Manufacturing* case, the Court stated:

> This denial of class certification does not preclude individual TPPs from bringing suit on their own behalf, as many well-heeled TPPs have already done. . . . **Any liability findings** in favor of these plaintiffs (i.e., whether there was a fraud), **will have issue preclusion effects** for smaller TPPs and other consumers with fewer resources.

*In re Neurontin Mktg., Sales Practices & Products Liab. Litig.*, 257 F.R.D. 315, 333 (D. Mass. 2009) (emphasis added).[1]

On September 18, 2009, the Court re-emphasized the issue preclusion point, indicating a one-TPP "bellwether" trial would produce findings of fact that would be applicable to claims of other parties.  *See* Transcript of September 18, 2009 Oral Argument on Defendants' Motion for Summary Judgment ("SJ Transcript") (Dkt. No. 2114).[2]

The Kaiser Trial was the bellwether trial.  From February 22, 2010 to March 25, 2010, Kaiser's RICO claims were tried to a jury, and Kaiser's California UCL claims

---

[1] While Aetna is not a "smaller TPP" than Kaiser, its size is irrelevant to the issue preclusion analysis.

[2] "THE COURT: Why don't I do one TPP first, my own little bellwether TPP case…. I was thinking one TPP and all the indications really soon, and I just get some findings, just some findings…. Either way I go, it will probably go up on appeal.  *I want to just get some findings.  I want something that will bring you all to a jury*, and that's my instinct for the whole thing."  SJ Transcript at 89-91 (emphasis added).

were tried to the Court, as the respective fact finders.  Twenty-one witnesses testified live, eighteen witnesses testified by deposition, and 421 exhibits were admitted.

On March 25, 2010, the Jury found that "Pfizer violated RICO with respect to its promotion of Neurontin for (a) Bipolar (b) Migraine . . . (d) Neuropathic pain (e) Neurontin in doses greater than 1800mg."  Special Verdict Form, Part I, Q.1 (Dkt. No. 2760) ("Verdict").  The Jury awarded Kaiser $47,363,092, which, under RICO's mandatory trebling provision, was increased to $142,089,276.  *See id.*

On November 3, 2010, the Court issued its own Findings of Fact and Conclusions of Law.  Dkt. No. 3120.  On August 31, 2011, the Court amended these findings and conclusions.  Dkt. No. 3602, *In re Neurontin Mktg. and Sales Practices Litig.*, No. 04-cv-10739-PBS, 2011 WL 3852254 (D. Mass. Aug. 31, 2011) (the "*Bench Findings*").[3]  The Bench Findings replicated the Jury's fact findings concerning Pfizer's fraudulent off-label marketing, *id.* at *2, and made additional findings of (1) no scientific evidence of efficacy of Neurontin for each off-label use (*id.* at *34-46), (2) the periods during which Pfizer fraudulently marketed Neurontin for each such use, respectively (*id.* at *12-28), and (3) the percentage of off-label prescriptions nationally that resulted from Pfizer's fraudulent off-label marketing (*id.* at *32-33, 58).  The Court found Pfizer liable under the California Unfair Competition Law for restitution of $95,286,518.

The Jury's and Court's findings were the bases of the February 2011 Final Judgment for Kaiser for $142,089,276.  Dkt. No. 3326 (the "Kaiser Final Judgment").[4]

---

[3] References in this brief to "*Bench Findings*" refer to the amended document, Dkt. No. 3602.  Pfizer amended its Notice of Appeal to make the amended *Bench Findings* part of the record on appeal.  Dkt. No. 3634.

[4] The Court did not add the $95,286,518 UCL restitution award to the $142,089,276 RICO verdict, because the UCL judgment was for "the same damage claims encompassed by the jury [RICO] claim."  *Bench Findings* at *60 n.25.

Until January 2010, when the Court granted Pfizer's summary judgment motion against Aetna (Dkt. No. 2309), Aetna and Kaiser prosecuted their claims jointly,[5] conducted discovery jointly, and jointly opposed summary judgment with the same evidence and briefs.  *See e.g.*, Coordinated TPP Plaintiffs' Memoranda of Law in Opposition to Defendants' Motion for Summary Judgment (Dkt. Nos. 1744, 1843); Coordinated Plaintiffs' Rule 56.1 Counterstatement of Undisputed & Disputed Facts in Opposition to Defendants' Motion for Summary Judgment, Dkt. Nos. 1745, 1844; Trial Plan, Dkt. No. 2118.  Final Judgment against Aetna was entered in February 2011,[6] after the Kaiser Trial proceedings had concluded, consistent with the Court's bellwether trial plan which anticipated the judgments in all actions would be appealed.[7]

The Kaiser Final Judgment was affirmed by the United States Court of Appeals for the First Circuit.  *In re Neurontin Mktg. and Sales Practices Litig.*, 712 F.3d 21 (1st Cir. 2013).  On appeal, Pfizer challenged only causation and damages, not the trial findings regarding its liability:

---

[5] In 2006, Aetna, and Kaiser jointly filed a Third Coordinated Amended Complaint, Dkt. No. 583, asserting joint claims for relief under RICO, 18 U.S.C. § 1962(c) (Counts I-X); under unfair competition statutes of other states (Count XII); and for unjust enrichment (Count XIV).  Aetna and Kaiser separately asserted claims for relief under their home state statutes, Aetna under the Pennsylvania Insurance Fraud Statute ("PIFS"), 18 Pa. C. S. § 4117 (Count XIII), and Kaiser under the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 ("Cal. UCL") (Count XI).

[6] Dkt. No. 3285 (Final Judgment for Pfizer against Aetna); Dkt. No. 3326 (Final Judgment for Kaiser against Pfizer).

[7] The Guardian Life Insurance Co. of America ("Guardian") litigated its claims jointly with Aetna and Kaiser from 2004 until 2010, when its claims were dismissed on summary judgment in the same order dismissing Aetna's claims.  Dkt. No. 2309.  In October 2010, Guardian stipulated with Pfizer that it would not appeal, and agreed to dismissal of its claims with prejudice, in consideration for Pfizer not seeking costs. Dkt. No. 3102.  Harden Manufacturing Corporation, which prosecuted RICO claims on behalf of a putative TPP class on a parallel track with Aetna and Kaiser, also had its claims dismissed by summary judgment. Dkt. No 3154.  As it did with Aetna, the Court entered final judgment against Harden Manufacturing only after the Kaiser Trail proceedings had concluded.  Dkt. No. 3519 (Final Judgment for Pfizer against Harden Manufacturing).

> Pfizer does not challenge the conclusions of the Jury and
> district court that it engaged in a fraudulent scheme with
> respect to its promotion of Neurontin for off-label uses.

*Id.* at 33.

The same day the First Circuit affirmed the Kaiser Final Judgment, it also reversed the Court's Judgment dismissing Aetna's RICO claims and remanded Aetna's case. *In re Neurontin Mktg. and Sales Practices Litig.*, 712 F.3d 51 (1st Cir. 2013).[8]

### III.    SUMMARY OF ARGUMENT

Consistent with the Court's pre-Kaiser Trial admonition that "(a)ny liability findings in favor of these plaintiffs, (*i.e.*, whether there was a fraud) will have issue preclusion effects," *In re Neurontin,* 257 F.R.D. at 333, the Court should preclude relitigation in Aetna's case of the following issues concerning Pfizer's liability, all of which were decided at the Kaiser Trial:

- <u>RICO Enterprise</u>  Regarding off-label marketing of Neurontin, the Jury necessarily found Defendants were "persons employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity" 18 U.S.C. § 1962(c).  *See Verdict*, Part I, Q.1; Trial Tr., Vol. 20 pp. 44-45 (Jury Instruction), Mar. 23, 2010 (Dkt. No. 3491).

- <u>Mail and Wire Fraud</u>   The Jury necessarily found the Enterprise's marketing of Neurontin was fraudulent for (1) bipolar disorder; (2) neuropathic pain; (3) migraine; and (4) doses greater than 1800mg/day. *See Verdict*, Part I, Q.1; Trial Tr., Vol. 20 pp. 53-57 (Jury Instruction). These were the Court's findings as well.  *Bench Findings*, at Sections II.B, II.D.1-II.D.3, II.D.5, and III.B.2.ii.

- <u>Off-Label Use Prescriptions, By Condition, Attributable to Fraudulent Off-Label Marketing, Nationally</u>  The Court specifically found the percentages of all U.S. Neurontin prescriptions attributable to the Enterprises' fraudulent marketing of Neurontin were (1) bipolar: 99.4%;

---

[8] The First Circuit also reversed the judgment against Harden Manufacturing and remanded its case.  *In re Neurontin Mktg. and Sales Practices Litig.*, 712 F.3d 60 (1st Cir. 2013).

(2) neuropathic pain: 70%; (3) migraine: 27.9%; (4) doses over 1800mg/day: 37.5%." *Bench Findings* at \*32-33, 58.

- <u>Efficacy of Neurontin By Off-Label Condition</u>  The Jury and the Court found Neurontin was not effective for the four off-label indications for which liability was imposed. *See In re Neurontin*, 712 F.3d at 33; *Bench Findings*, at Section II.H (the "Inefficacy Findings").

- <u>Dates of Marketing Fraud</u>  The Court found (*Bench Findings*, at \*30) that the marketing fraud began and ended for each off-label indication as follows:

| INDICATION | TIME PERIOD |
|---|---|
| Bipolar Disorder | July 1998 – Dec. 2004 |
| Neuropathic Pain | Nov. 1997 – Dec. 2004 |
| Migraine | Apr. 1999 – Dec. 2004 |
| Doses greater than 1800mg/day | Nov. 1997 – Dec. 2004 |

- The Jury found that Kaiser's RICO claims (filed after Aetna) were not time-barred.  Verdict, Part I, Q.3.

Pfizer vigorously defended each of these issues through what Pfizer's counsel aptly promised would be, a "very expensive, very lengthy trial."  *See* SJ Transcript at 90. Each issue was decided at the Kaiser Trial by the Jury, by the Court, or in many cases by both.  Pfizer lost at trial, appealed, and lost again.[9]

All requirements for "non-mutual offensive issue preclusion" with respect to these issues have been satisfied.  *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979).[10]

Pfizer was (or should have been) aware of the high financial stakes involved, Aetna's

---

[9] Pfizer has petitioned the United States Supreme Court for a writ of certiorari in Aetna's and Kaiser's (and Harden Manufacturing's) cases.  *Pfizer Inc.,* and *Warner-Lambert Company, LLC,* Petitioners, *v. Kaiser Foundation Health Plan, et. al, Harden Manufacturing  Corporation. et al., and Aetna, Inc.*, Respondents, Case No. 13-289 (Aug. 30, 2013).

[10] Recently, in a related Neurontin lawsuit, the United States District Court for the District of New Jersey gave preclusive effect to this Court's *Bench Findings.  See In re Neurontin Antitrust Litig.*, MDL 1479, 2013 WL 4042460, at \*7 (D.N.J. Aug. 8, 2013) ("Defendants are precluded from denying those findings of fact in Judge Saris's opinion that govern the nature and scope of Pfizer's off-label marketing.").

(and Harden's) probable appeals if Kaiser won, and the potential collateral estoppel risks to it from the Kaiser Trial.  Before Pfizer went to trial against Kaiser, the Court warned it of the issue preclusion risks it would face in other actions.  There is no reason to permit relitigation of these issues in Aetna's case.  All that should remain for Aetna to prove its RICO claims are its damages that were proximately caused by the actions for which Pfizer has already been found liable.

## IV.     LEGAL STANDARD

### A.  The Requirements for Offensive Collateral Estoppel

In *Parklane Hosiery*, the Supreme Court gave trial judges broad discretion to employ non-mutual offensive collateral estoppel, concluding that arguments in favor of mutuality seldom "justify reluctance to allow the offensive use of collateral estoppel." 439 U.S. at 331.  Issue and claim preclusion are "central to the purpose for which civil courts have been established, the conclusive resolution of disputes within their jurisdictions . . . ."  *Montana v. United States*, 440 U.S. 147, 153 (1979).

Preclusion of issues and facts is appropriate when "(1) the issues raised in the two actions are the same; (2) the issue was actually litigated in the earlier action; (3) the issue was determined by a valid and binding final judgment; and (4) the determination of the issue was necessary to that judgment."  *Manganella v. Evanston Ins. Co.*, 700 F.3d 585, 591 (1st Cir. 2012).  (citations omitted).  "The doctrine applies to issues of fact as well as those of law . . . and can apply where the subsequent proceeding involves a cause of action different from the first . . . ."  *Id*.  The central question is "whether a party has had a full and fair opportunity for judicial resolution of the same issue."  *Rodriguez-Garcia v. Miranda-Marin*, 610 F.3d 756, 771 (1st Cir. 2010).

*Parklane Hosiery* teaches that non-mutual offensive issue preclusion is appropriate, except where (1) plaintiff had an incentive to adopt a "wait and see" approach hoping a prior action results in favorable rulings; or (2)(a) the defendant had little incentive to defend the prior action vigorously or the prospect of future litigation was unforeseen; (b) the adverse judgment conflicts with other favorable judgments; or (c) the defendant has procedural opportunities previously unavailable to it that could lead to differing results.  *Parklane Hosiery*, 439 U.S. at 330-31.  Finding none of these concerns present, the *Parklane Hosiery* Court approved of the offensive use of collateral estoppel in a private securities action that followed a judgment for the SEC.  *Id.* at 331-32.[11]

### i.  Issue Identity

"The identity of the issues need not be absolute; rather, it is enough that the issues are in substance identical."  *Manganella*, 700 F.3d at 591 (citation omitted); *accord, Keystone Shipping Co. v. New England Power Co.*, 109 F.3d 46, 51 (1st Cir. 1997) ("[t]he principle of collateral estoppel, or issue preclusion . . . bars relitigation of any factual or legal issue that was actually decided in previous litigation between the parties, whether on the same or a different claim") (internal quotation marks and citations omitted).

### ii.  Actually Litigated

"An issue may be 'actually' decided [for collateral estoppel purposes] even if it is not explicitly decided, for it may have constituted, logically or practically, a necessary component of the decision reached."  *Dennis v. Rhode Island Hospital Trust National*

---

[11] *Parklane Hosiery* also rejected the defendant's claim that estoppel violated its Seventh Amendment jury trial right.  439 U.S. at 334-35 ("an equitable determination can have collateral estoppel effect in a subsequent legal action and [t]his estoppel does not violate the Seventh Amendment").

*Bank*, 744 F.2d 893, 899 (1st Cir. 1984).  "'[A]ctual litigation and determination'"

involves something more than having an issue 'resolved' as a result of some

determinative legal doctrine that short-circuits the merits."  *In re Kane*, 254 F.3d 325, 329

(1st Cir. 2001).  Examples of issues not litigated, are "situations where a matter is

stipulated, admitted without controversy, or determined by default leading to the entry of

judgment."  *Id.* (citing RESTATEMENT (SECOND) OF JUDGMENTS § 27 comment e (1982)).

### iii.   Valid and Binding Final Judgment

"Finality" for issue preclusion is "broadly" understood as "any prior adjudication

of an issue in another action that is determined to be sufficiently firm to be accorded

preclusive effect."  *Pure Distributors, Inc. v. Baker*, 285 F.3d 150, 157 n.5 (1st Cir. 2002)

(citing RESTATEMENT (SECOND) OF JUDGMENTS § 13 (1982)).  Issue preclusion applies

"even where the first, or issue preclusive, judgment is still on appeal . . . ."  *In re Kane*,

254 F.3d 325, 328 (1st Cir. 2001).

### iv.   Necessary to the Judgment

"[A] finding is 'necessary' if it was central to the route that led the fact finder to

the judgment reached, even if the result "could have been achieved by a different, shorter

and more efficient route."  *Hoult v. Hoult*, 157 F.3d 29, 32 (1st Cir. 1998) (citing

*Commercial Associates v. Tilcon Gammino, Inc.*, 998 F.2d 1092, 1097 (1st Cir. 1993)).

"[I]n deciding whether the Jury did make and rest centrally upon a finding not expressly

made, it is proper to consider . . . not only what was 'logically' but also what was

'practically' a 'necessary component of the decision reached.'"  *Id.* (quoting *Dennis*, 744

F.2d at 899).  "The court in the second case may examine the full record in the earlier one

to decide 'whether a rational jury could have grounded its verdict upon an issue other

than that which the [moving party] seeks to foreclose from consideration.'" *Id.* (quoting *Ashe v. Swenson*, 397 U.S. 436, 444 (1970) (alteration in original)).

## V.   ARGUMENT

### A.  The Facts and Issues For Which Aetna Seeks Preclusion Satisfy the Requirements for Offensive Non-Mutual Collateral Estoppel

This is as strong a case as one could imagine for non-mutual offensive collateral estoppel.  The issues for which Aetna seeks collateral estoppel were fully litigated in a fair trial, decided (sometimes twice decided) by jury and/or judge, and affirmed by the court of appeals.  The jury's RICO verdict necessarily comprises findings that Pfizer's conduct satisfied each RICO liability element, and the Court's 144-page *Bench Findings* augments the Jury's findings with its own detailed findings that it made in its capacity as finder of fact on the California UCL claim.

None of the *Parklane Hosiery* exceptions apply here.

<u>First</u>, Aetna did not "wait and see" whether Kaiser would secure a favorable judgment.  Aetna sued Pfizer before Kaiser.  After Kaiser joined the case, Aetna and Kaiser prosecuted their claims jointly for several years.  Their paths diverged only by virtue of the Court's summary judgment decision.

<u>Second</u>, Pfizer defended Kaiser's claims vigorously at trial and on appeal, as merited by Kaiser's claims seeking almost $100 million of single damages and RICO's mandatory trebling.  Future litigation from Aetna and others was foreseeable.  Aetna was virtually certain to appeal, as was Harden, if Kaiser won its trial.

<u>Third</u>, the adverse judgment against Pfizer in the Kaiser Trial does not conflict with any judgments favorable to Pfizer.

Fourth, Pfizer has no "procedural opportunities previously unavailable" of the type identified in *Parklane Hosiery*, where the Supreme Court warned against situations where the "defendant in the first action was forced to defend in an inconvenient forum and therefore was unable to engage in full scale discovery or call witnesses." *Id.* at 331 n.15. Aetna's case will be tried to the same Court as Kaiser's.

## B. The Jury's RICO Findings

In the Special Verdict Form, the *Kaiser* Jury was asked: "Has Kaiser proven that Pfizer violated RICO with respect to its promotion of Neurontin?"  Verdict, Part I, Q.1. With respect to bipolar, migraine, neuropathic pain, and Neurontin in dosages over 1800mg/day, the Jury answered "Yes." *Id.*[12]

Prior to its deliberations, the Court charged the Jury with each element of the RICO statute.  Trial Tr., vol. 20, pp. 23-57 (Court's jury instruction), Mar. 23, 2010 (Dkt. No. 3491):

> To establish that Pfizer has violated RICO . . . Kaiser must prove each of the following elements by a preponderance of the evidence.  First, that an enterprise existed.  Second, that the enterprise affected interstate or foreign commerce. Third, that Pfizer engaged in a pattern of racketeering activity.  Fourth, that Pfizer conducted or participated in the conduct of that enterprise through that pattern of racketeering activity.  Fifth, that the RICO violation … caused an injury to Kaiser's business or property.[13]
>                           * * *
> The plaintiff has alleged that there are two enterprises in this case.  The first is what they call a Publication/Marketing Enterprise, made up of defendants and Cline Davis Mann.  The second alleged enterprise is

---

[12] The jury determined that Pfizer did not violate RICO with respect to its promotion of Neurontin for nociceptive pain.  *Id.*  The Court made the same findings with respect to the California UCL claim.  *Bench Findings* at *25-26.

[13] The fifth element constituted a separate jury question in the Special Verdict Form.  Verdict, Part I, Q.2.

the Medical Education/Marketing Enterprise, made up of defendants and Medical Action Communications.

\* \* \*

Kaiser can establish common purpose if it proves that the defendants and Cline Davis Mann and/or MAC shared the common purpose of promoting Neurontin for off-label indications.

\* \* \*

Kaiser must prove that Pfizer engaged in a pattern of racketeering activity. This element requires that plaintiffs prove that Pfizer committed at least two predicate acts of racketeering activity…. In this case, the plaintiffs have alleged that defendants committed racketeering acts through the use of the mail and interstate wires.

\* \* \*

To establish a pattern of racketeering activity, there must also be a nexus between the predicate acts, … and the enterprise.

\* \* \*

To satisfy [] the [fourth] element, the plaintiff must establish either that the defendants' position in the enterprise facilitated the commission of those alleged illegal acts, and that the racketeering acts had some impact or effect on the enterprise, that the acts were in some way related to the affairs of the enterprise, or that the defendants were able to commit the act by virtue of their position or involvement in the affairs of the enterprise.

*Id.* at 44-52.

In its finding in Part I, Q.1 of the Verdict that "Pfizer violated RICO with respect to its promotion of Neurontin" for the four indications, the Jury necessarily found that each of the first four RICO liability elements was proven by a preponderance of the evidence. If required to re-try these already-decided issues, Aetna's trial evidence would be the same as Kaiser's.

Pfizer vigorously defended itself against Kaiser's RICO allegations during trial. Pfizer's defenses to the RICO claims were identified and argued extensively in its closing to the Jury and the Court, Trial Tr. vol. 20, pp. 116-23 (Pfizer closing argument), Mar. 23,

2010 (Dkt. No. 3491), and in its Rule 50(a) Memorandum of Law in Support of Motion

for Judgment as a Matter of Law Based Upon Lack of Sufficient Evidence to Prove

Conduct of a RICO Enterprise or Pattern of Predicate Acts, Dkt. No. 2669.  Pfizer argued

that there was no fraud, that enterprises and the predicate acts had not been proven, and

there was an insufficient nexus between the predicate acts and the alleged racketeering

activity.  *See* Trial Tr., vol. 20, pp. 116-23 (Pfizer closing argument); Rule 50(a)

Memorandum of Law at 3-8.

     The Jury's and the Court's verdicts for Kaiser were affirmed by the First Circuit.

*In re Neurontin*, 712 F.3d 21.  The Jury's findings that Defendants participated in an

enterprise that engaged in mail and wire fraud to promote Neurontin for off-label uses

were necessary to its RICO verdict.  The Jury's findings that Neurontin was ineffective

for the four off-label uses for which it held Pfizer liable, was also "logically or practically,

a necessary component of the decision reached."  *See Dennis v. Rhode Island Hospital,*

254 F.3d at 329.  The First Circuit noted this logically necessary finding:

> Pfizer argued to the jury that Neurontin was effective for
> the off-label uses at issue, and that as a result, [] Pfizer's
> promotional campaign involved no misrepresentations
> about Neurontin's effectiveness . . . .  The jury rejected
> Pfizer's arguments. . . .

*In re Neurontin Mktg.,* 712 F.3d at 33.

Aetna is entitled to issue preclusion on the Jury's RICO liability findings.

### C.  The Court's Bench Findings

     The Court's *Bench Findings* concerning the marketing fraud periods, off-label use

by condition, and Neurontin's inefficacy for four off-label indications were "legally or

practically" necessary components of its judgment of Pfizer's liability under the

California's UCL.  Pfizer did not appeal these findings.  *In re Neurontin*, 712 F.3d at 33 ("Pfizer does not challenge the conclusions of the jury and district court that it engaged in a fraudulent scheme with respect to its promotion of Neurontin for off-label uses").

### i.   Fraudulent Marketing Findings

In its *Bench Findings*, the Court augmented the jury's conclusions with its own detailed findings, citing the trial record, and describing Pfizer's fraudulent marketing of Neurontin, the same findings that underlie Pfizer's predicate RICO acts of mail and wire fraud.  *See Bench Findings* at Sections II.B, II.D.1-II.D.3, II.D.5, and III.B.2.ii.  Among these *Bench Findings* are:

- "Beginning in July 1998 when Parke–Davis obtained (and began to suppress) the negative results of the Pande trial, the defendants engaged in the fraudulent marketing of Neurontin for the treatment of bipolar disorder. In addition to fraudulent detailing, Pfizer sponsored at least two fraudulent supplements, engaged in a fraudulent publication strategy by publishing only positive information and suppressing negative; conducted at least two fraudulent continuing medical education programs; and made a fraudulent misrepresentation, through a half-truth, to the Cochrane Review."[14]  *Id.* at *17.

- "Beginning in November 1997 with the publication of the Internal Medicine supplement, defendants engaged in the fraudulent marketing of Neurontin for the treatment of neuropathic pain through the sponsorship of fraudulent publications."  *Id.* at *23.

---

[14] After the Kaiser Trial, on March 22, 2011, Pfizer moved for a new trial in part citing supposedly "new" evidence—a 2011 meta-analysis conducted by the Cochrane Group reporting findings based on documents discovered— concerning the efficacy of Neurontin for one of the four off-label indications, neuropathic pain.  *See* Memorandum of Law in Support of Defendants' Motion for a New Trial and to Re-Open Evidence or, Alternatively, to Alter or Amend Judgment ("Motion for New Trial") at 18-19 (Dkt. No. 3363).  The Court denied the motion because "Pfizer itself did not provide the Cochrane Group with all available studies prior to the trial because it fraudulently suppressed these studies."  *In re Neurontin Mktg. and Sales Practices Litig.*, 799 F. Supp. 2d 110, 115 (D. Mass. 2011).  The First Circuit approved of this reason for denying Pfizer's motion for a new trial in the *Kaiser* case.  *In re Neurontin*, 712 F.3d at 51. Pfizer should not be permitted to relitigate the neuropathy efficacy findings in the Aetna trial for the same reason.  *In re Sonus Networks, Inc. Shareholder Derivative Litig.*, 499 F.3d 47, 63 (1st Cir. 2007) (holding that a party cannot escape preclusion to offer supposedly new facts that were previously available to it) (citations omitted).

- "[B]eginning in April 1999, the defendants engaged in fraudulent marketing of Neurontin for migraine prophylaxis through the sponsorship of a CME that included a fraudulent statement and the sponsorship of the misleading Mathew article in 2001.  Parke–Davis medical liaisons also made misrepresentations regarding the efficacy of Neurontin in treating migraines in detail visits to physicians as early as April 1996."  *Id.* at *26 (citing Trial Tr., vol. 15, pp. 63–64).

- "[B]eginning in November 1997 with the publication of the Internal Medicine supplement, defendants engaged in fraudulent marketing of Neurontin at doses greater than 1800mg/day through the sponsorship of four publications and two continuing medical education programs that contained fraudulent statements about Neurontin's efficacy."  *Id.* at *27.

None of these issues is Kaiser-specific.  Aetna's trial evidence relating to the fraudulent marketing of Neurontin would be the same as Kaiser's.

### ii.   Findings of Percentages of Off-Label Neurontin Prescriptions Written Nationally, Resulting From Pfizer's Marketing Fraud

Over two days of testimony at trial,[15] Kaiser offered the testimony of Professor Meredith Rosenthal quantifying the impact of Pfizer's promotion of Neurontin on the units of Neurontin sold nationwide.  "Dr. Rosenthal used the 'gold standard' national data on Neurontin and other anti-epileptic drugs from IMS Health and Verispan" to "link[] national data on Pfizer's promotional spending with sales."  *Bench Findings* at *32.  Her "method of analysis 'looks at patterns of actual behavior, aggregate patterns of promotion, and makes the connection between the two, both to assess whether there was exposure and its impact.'"  *Id.* at 17 (quoting Trial Tr., vol. 11, p. 17).  "Using these methods, she 'estimate[d] and calculate[d] a time series model that . . . quantif[ied] the specific contribution of promotion to sales.'"  *Id.* at 17 (quoting Trial Tr., vol. 10, p. 144).

---

[15] Trial Tr., vol. 10 pp. 102-46, Mar. 5, 2010 (Dkt. No. 2654) & Trial Tr., vol. 11 pp. 15-129, Mar. 9, 2010 (Dkt. No. 2764).

> Based on the regression analyses, Dr. Rosenthal concluded that the following numbers represented the percentage of Neurontin prescriptions that were caused by Pfizer's fraudulent marketing of Neurontin: (1) bipolar: 99.4%; (2) neuropathic pain: 70%; (3) migraine: 27.9%; (4) doses over 1800mg/day: 37.5%.

*Id.* at *33 (citing trial exhibit 405-K). Dr. Rosenthal testified it was her opinion "to a reasonable degree of scientific certainty that these calculations are the best way to estimate the number of prescriptions and the share of prescriptions that were affected by the alleged misconduct."[16] Trial Tr., vol. 11 p. 30. Pfizer challenged these findings through cross-examination, argument, and testimony by its own expert. *See, e.g.,* Trial Tr. vol. 11 pp. 48-112, 125-26; Trial Tr. vol. 19 pp. 21-63, 112-20, (Keeley testimony) Mar. 22, 2010 (Dkt. No. 2771); Trial Tr. vol. 20, pp. 129-34, (Pfizer closing argument) After all of the evidence was presented, the Court adopted Dr. Rosenthal's conclusions. *Bench Findings* at *32-33.

Aetna is entitled to issue preclusion on these findings, none of which is Kaiser-specific. *See Manganella*, 700 F.3d at 591 (stating that issue preclusion applies even "where the subsequent proceeding involves a cause of action different from the first") (citing *Comm'r v. Sunnen*, 333 U.S. 591, 601(1948)).

At trial, Aetna will present evidence and argument in support of the correlation of these national percentages to its Neurontin purchases, and Pfizer will be free to present evidence and argue that Aetna's circumstances merit a downward departure from these national percentages. However, Pfizer should not be permitted to relitigate the Court's

---

[16] Aetna's summary judgment evidence shared this precise testimony and its trial evidence of Dr. Rosenthal's analysis would be identical to Kaiser's. Aetna and Kaiser co-sponsored Dr. Rosenthal's expert report. *See* August 11, 2008 Declaration of Meredith Rosenthal at 1 n.1. Dkt. No. 1450-7.

findings of percentages of Neurontin off-label prescriptions, by indication, caused by Pfizer's fraud nationally.

### iii.    Inefficacy Findings

As the First Circuit noted, "[a]t trial Kaiser produced expert witnesses and evidence showing that Neurontin was no more effective than placebo for the indications at issue—*i.e.*, that it was ineffective.  Pfizer then produced its own evidence to attempt to rebut Kaiser's evidence."  *In re Neurontin*, 712 F.3d at 48 ("Pfizer argued that it had not committed fraud because Neurontin was effective for the off-label uses at issue.  The jury and court rejected the argument.") (citing *Bench Findings* at *34-35).[17]

After analyzing the various drug trials and expert testimony with regard to each off-label indication (*Bench Findings* at *35-46):

> The Court finds that there is no reliable scientific evidence that Neurontin is effective for bipolar disorder, migraine, or at high doses.  With respect to some kinds of neuropathic pain, there is some scientific evidence of efficacy. However, as the FDA found, there is no reliable scientific evidence to support a broad indication of neuropathic pain. Defendants do not contend that Neurontin is effective for nociceptive pain.

*Id.* at *34; *see also, id*. at *54 ("The Court has found that plaintiffs proved Neurontin was totally ineffective in treating certain off-label condition . . . .").  These *Bench Findings* articulated forcefully the jury's implicit identical findings of inefficacy.  *See infra* Point V.B.

Aetna's and Kaiser's trial evidence of inefficacy would be identical.

---

[17] Pfizer's "primary theories of defense is that [it] made no material misrepresentations because Neurontin is actually effective for the off-label indications at issue in this case: bipolar disorder, neuropathic pain, migraine, and doses over 1800mg/day."  *Bench Findings* at *34; *see also* Trial Tr., vol. 20, pp. 94-114, (Pfizer closing argument).

In finding for Kaiser on the California UCL claim, the Court necessarily rejected Pfizer's arguments that Neurontin was effective for these indications and that no fraud was committed.  Moreover, the Court affirmatively found that Neurontin was *not* effective for these indications.  *See Bench Findings* at *34-45.

## VI.        CONCLUSION

In his closing argument in the Kaiser Trial, Pfizer's counsel succinctly summarized the liability questions before the jury:

> MR. KENNEDY:  So the question in this case is: Did Pfizer or Parke-Davis do something that causes doctors to prescribe these drugs for off-label purposes where they didn't do any good and Kaiser actually bought sugar pills?

Trial Tr. vol. 20, p. 118 (Pfizer closing argument).

The Jury answered "yes."  The Court seconded the jury's findings in its *Bench Findings*.  The questions with regard to Pfizer's actions have been answered and should not be relitigated.  All that remains for Aetna to prove are that Aetna-specific version of the final part of the above question (*i.e.*, whether Aetna "actually bought sugar pills?"), and if the answer is "yes," the quantification of its injury.  The Court should advise the jury of the precluded facts at the outset of the trial and limit the trial issues to whether and to the extent to which Pfizer's misconduct caused Aetna's injury—or as the Court of Appeals put it: "whether, absent Pfizer's fraud, [Aetna] would have paid for fewer off-label Neurontin prescriptions."  *See In re Neurontin*, 712 F.3d at 57 (citing *In re Neurontin*, 712 F.3d at 33-34).

The Court should grant Aetna's motion for preclusion of issues and facts determined by the triers of fact at the Kaiser Trial.

17

Dated: September 13, 2013
      White Plains, New York

LOWEY DANNENBERG COHEN
   & HART, P.C.


BY:   **/s/ Richard W. Cohen**
    Richard W. Cohen
    Peter D. St. Phillip
    Gerald Lawrence
    Uriel Rabinovitz
    One North Broadway
    White Plains, NY  10601
    (914) 997-0500
    rcohen@lowey.com

    ***Attorneys for Aetna, Inc.***

## **CERTIFICATE OF SERVICE**

I certify this document filed through the ECF system has been served pursuant to

Case Management #3 on September 13, 2013.


    /s/ Peter St. Phillip