**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| In re:  NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1629<br><br>Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO:<br><br>AETNA, INC.,<br>        Plaintiff,<br>v.<br>PFIZER INC. et al.,<br>        Defendants. | Chief Judge Patti B. Saris<br>Magistrate Judge Leo T. Sorokin |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO**
**AETNA'S MOTION TO PRECLUDE RELITIGATION OF ISSUES AND FACTS**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ....................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT ..............................................................................................................................3

I.     Applicable Standards .......................................................................................................3

II.    Fundamental Differences Between Kaiser's and Aetna's Liability Theories
       Render The Issues Of Fraud And Causation Non-Identical ...................................4

       A.     The Findings Regarding Nationwide Fraudulent Marketing Were Not
              Essential to the *Kaiser* Judgment ....................................................................5

       B.     The Findings Regarding Percentages Of Prescriptions Caused by Fraud
              Are Inextricably Intertwined With Kaiser's Direct Reliance Theory .....................8

       C.     Pfizer's Right To A Jury Trial Weighs Against Applying Offensive Issue
              Preclusion To This Court's Bench Findings .........................................................10

III.   Defense Evidence Specific to Aetna Regarding Causation Renders the Issues
       Non-Identical for Purposes of Collateral Estoppel ...........................................................11

       A.     Aetna's Website Contains Admissible Statements Relevant to Rebutting
              Aetna's Claims of Causation ...............................................................................11

       B.     Pfizer's Right to Present Individualized Rebuttal Evidence on Causation
              Renders the Issues Non-Identical for Purposes of Collateral Estoppel ................13

IV.    New Scientific Evidence Emerging Since the *Kaiser* Trial Renders Collateral
       Estoppel Improper as to the Court's Findings of Inefficacy .............................................15

CONCLUSION...........................................................................................................................20

# TABLE OF AUTHORITIES

**Page**

## Cases

*Acevedo-Garcia v. Monroig*,
  351 F.3d 547 (1st Cir. 2003)............................................................................1, 3, 8, 9

*Aetna, Inc. v. Pfizer, Inc. ("Aetna Opinion")*,
  712 F.3d 51 (1st Cir. 2013).......................................................................................4, 8

*Allen v. McCurry*,
  449 U.S. 90 (1980)........................................................................................................4

*In re Bextra & Celebrex Marketing Sales Practices & Product Liability Litigation*,
  524 F. Supp. 2d 1166 (N.D. Cal. 2007) ...................................................................17

*Carr v. District of Columbia*,
  646 F.2d 599 (D.C. Cir. 1980) ..................................................................................16

*Clark v. Smithkline Beecham*,
  2006 WL 3329141 (M.D. Ga. Nov. 15, 2006)......................................................19, 20

*Coburn v. Smithkline Beechman Corp.*,
  174 F. Supp. 2d 1235 (D. Utah 2001) ..................................................................15, 19

*In re Dow Corning Corp.*,
  244 B.R. 634 (Bankr. E.D. Mich. 1999), *aff'd*, 255 B.R. 445 (E.D. Mich. 2000),
  *aff'd and remanded*, 280 F.3d 648 (6th Cir. 2002).................................................19

*Ezaqui v. Dow Chemical Corp.*,
  598 F.2d 727 (2d Cir. 1979)......................................................................................19

*Grisham v. Philip Morris, Inc.*,
  670 F. Supp. 2d 1014 (C.D. Cal. 2009) ................................................................7, 11

*Hawksbill Sea Turtle v. FEMA*,
  126 F.3d 461 (3d Cir. 1997)......................................................................................20

*Heindel v. Pfizer, Inc.*,
  381 F. Supp. 2d 364 (D.N.J. 2004) ...........................................................................13

*Hoult v. Hoult*,
  157 F.3d 29 (1st Cir. 1998)..................................................................................3, 6, 9

*Jack Faucett Associates, Inc. v. AT&T Co.*,
  744 F.2d 118 (D.C. Cir. 1984) ....................................................................................3

*Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*,
  458 F.3d 244 (3d Cir. 2006)........................................................................................3

*Kaiser Foundation Health Plan, Inc. v. Pfizer, Inc.*,
 712 F.3d 21 (1st Cir. 2013) ........................................................................................13

*Kaiser Foundation Health Plan, Inc. v. Pfizer, Inc.*,
 799 F. Supp. 2d 110 (D. Mass 2011) ................................................15, 16, 18, 19, 20

*In re Light Cigarettes Marketing Sales Practices Litigation*,
 691 F. Supp. 2d 239 (D. Me. 2010) ......................................................3, 4, 7, 9, 11

*Lindsey v. Normet*,
 405 U.S. 56 (1972)........................................................................................13, 14

*Manganella v. Evanston Insurance Co.*,
 700 F.3d 585 (1st Cir. 2012).........................................................................................8

*McCrory v. Spigel*,
 260 F.3d 27 (1st Cir. 2001)..........................................................................................8

*In re Microsoft Corp. Antitrust Litigation*,
 355 F.3d 322 (4th Cir. 2004) .......................................................................................7

*Montana v. United States*,
 440 U.S. 147 (1979)....................................................................................................15

*In re Neurontin Antitrust Litigation*,
 2013 WL 4042460 (D.N.J. Aug. 8, 2013) .................................................................10

*In re Neurontin Marketing & Sales Practices Litigation ("Amended Findings")*,
 No. 04-cv-10739-PBS, 2011 WL 3852254 (D. Mass. Aug. 31, 2011)........................ *passim*

*In re Neurontin Marketing & Sales Practices Litigation*,
 754 F. Supp. 2d 293 (D. Mass. 2010) .......................................................................2, 4

*In re Neurontin Marketing & Sales Practices Litigation ("SJ Decision")*,
 677 F. Supp. 2d 479 (D. Mass. 2010) ....................................................................2, 4, 9

*In re Neurontin Marketing, Sales Practices & Products Liability Litigation*,
 257 F.R.D. 315 (D. Mass. 2009).................................................................................2

*NYNEX Corp. v. FCC*,
 153 F.R.D. 1 (D. Me. 1994) .........................................................................................4

*O'Toole v. Northrop Grumman Corp.*,
 499 F.3d 1218 (10th Cir. 2007) .................................................................................13

*In re Paoli Railroad Yard PCB Litigation*,
 916 F.2d 829 (3d Cir. 1990).......................................................................................17

*Parklane Hosiery Co. v. Shore*,
 439 U.S. 322 (1979)........................................................................1, 4, 10, 11, 14

*Pooshs v. Philip Morris USA, Inc.*,
 904 F. Supp. 2d 1009 (N.D. Cal. 2012) ..................................................................7, 11

*Estate of Portnoy v. Cessna Aircraft Co.*,
   612 F. Supp. 1147 (S.D. Miss. 1985)................................................................................3

*Prohias v. Pfizer, Inc.*,
   485 F. Supp. 2d 1329 (S.D. Fla. 2007) ...........................................................................13

*Rodriguez-Garcia v. Miranda-Marin.*,
   610 F.3d 756 (1st Cir. 2010)..............................................................................................1

*Rogers v. Ford Motor Co.*,
   925 F. Supp. 1413 (D. Ind. 1996) ...................................................................................19

*Rye v. United States Steel Mining Co.*,
   856 F. Supp. 274 (E.D. Va. 1994)..............................................................................16, 17

*Sarvis v. Polyvore, Inc.*,
   2013 U.S. Dist. LEXIS 112539 (D. Mass. Aug. 9, 2013), *adopted by*,
   2013 U.S. Dist. LEXIS 135054 (D. Mass. Sept. 19, 2013) ............................................13

*Shaffer v. R.J. Reynolds Tobacco Co.*,
   860 F. Supp. 2d 991 (D. Ariz. 2012) ...........................................................................7, 11

*Smith v. Ortho Pharmaceutical Corp.*,
   770 F. Supp. 1561 (N.D. Ga. 1991)...........................................................................19, 20

*In re Sonus Networks, Inc., Shareholder Derivative Litigation*,
   499 F.3d 47 (1st Cir. 2007)..............................................................................................17

*United States v. Armour & Co.*,
   402 U.S. 673 (1971)..........................................................................................................14

*Van Dyke v. GlaxoSmithKline*,
   No. 05-153 (D. Wyo. Nov. 1, 2006) ...............................................................................19

*Vincent v. Thompson*,
   50 A.D.2d 211 (N.Y. App. Div. 1975) ......................................................................15, 20

*Winters v. Diamond Shamrock Chemical Co.*,
   149 F.3d 387 (5th Cir. 1998) .............................................................................................3

*Zweig v. E.R. Squibb & Sons, Inc.*,
   536 A.2d 1280 (N.J. Super. Ct. App. Div. 1988)......................................................15, 19

## Statutes

Fed. R. Evid. 201, 801 ....................................................................................................13

## Miscellaneous

Federal Judicial Center, *Reference Manual on Scientific Evidence* (3d ed. 2011).........................17

Restatement (Second) of Judgments (1982) ..................................................................16

*Manual for Complex Litigation* (4th ed. 2013)...............................................................2

## PRELIMINARY STATEMENT

Aetna's motion requests non-mutual offensive issue preclusion with respect to virtually all liability issues and argues that Aetna's burden at trial should be limited to proving "its damages that were proximately caused by [Pfizer's marketing]." (Aetna's Mem. of Law [4163] ("Pl. Mem.") at 6.)   "'Nonmutual issue preclusion is not available as a matter of right.'" *Rodriguez-Garcia v. Miranda-Marin*, 610 F.3d 756, 772 (1st Cir. 2010) (citation omitted).  As the United States Supreme Court and the First Circuit have cautioned, this form of preclusion raises special concerns regarding both fairness and judicial economy. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 330-31 (1979); *Acevedo-Garcia v. Monroig*, 351 F.3d 547, 574 (1st Cir. 2003).  Here, applying offensive issue preclusion would be manifestly unfair to Pfizer and would not promote judicial economy.  In contrast, no prejudice or unfairness to Aetna would result if the Court denies collateral estoppel.  Rather, both parties would have a full and fair opportunity to present their cases at trial.

For numerous reasons, Aetna has failed to satisfy its burden of proving that essential prerequisites for non-mutual offensive issue preclusion are satisfied in this case.

*First*, the Court's extensive findings regarding Pfizer's alleged nationwide fraudulent marketing scheme were not essential to the judgment in *Kaiser* and cannot be given preclusive effect here.  Because Aetna asserts a fundamentally different theory of causation that depends on fundamentally different marketing conduct, it cannot use the *Kaiser* judgment to evade its burden of proving the essential elements of its claims in this case.  *See infra* Section II.A.

*Second*, non-mutual offensive collateral estoppel cannot be applied to the Court's findings in *Kaiser* regarding the percentages of fraudulently induced prescriptions because Aetna's liability theory raises fundamentally different factual issues regarding causation and damages.  *See infra* Section II.B.  Moreover, the jury's verdict indicates that it made findings markedly different from the Court's findings on this issue, confirming that this issue should not be fixed for all time and barred from reexamination in the trial of this case.  *See id.*

*Third*, offensive collateral estoppel should not be applied to prevent Pfizer from

1

presenting evidence that refutes causation as to Aetna and is different and more compelling than the evidence in *Kaiser*.   As shown below, Aetna's website continues to include explicit statements recommending Neurontin for uses at issue in this case.  This evidence, which Pfizer intends to introduce at trial, significantly undercuts Aetna's claims of causation.  *See infra* Section III.A.   In addition, in contrast to the *Kaiser* trial, because Aetna does business in Massachusetts, Pfizer has the ability to subpoena Aetna physicians to testify live at trial.  *See infra* Section III.B.  In combination with the Aetna website evidence, this Aetna-specific physician testimony will significantly impact the issue of causation, making the application of collateral estoppel unfair and impermissible.

<u>Fourth</u>, new scientific evidence emerging since the *Kaiser* trial renders collateral estoppel improper as to the Court's findings concerning the efficacy of Neurontin for neuropathic pain and other conditions.  Indeed, as discussed below, numerous courts in pharmaceutical and other cases have held that collateral estoppel is inappropriate where, as here, subsequent scientific developments cast doubt on the factual findings in an earlier case.  *See infra* Section IV.

Aetna's motion relies heavily on *dicta* from the Court's second decision denying class certification in which the Court suggested that "'liability findings in favor of [large TPPs] (i.e., whether there was a fraud), will have issue preclusion effects for smaller TPPs . . . with fewer resources.'"  (Pl. Mem. at 1 (quoting *In re Neurontin Mktg., Sales Practices & Prods. Liab. Litig.*, 257 F.R.D. 315, 329 (D. Mass. 2009).)[1]  Even as phrased, these remarks do not apply to Aetna (which is not a "smaller TPP") and do not contemplate granting preclusive effect to findings regarding causation or efficacy issues, as Aetna now requests.  More importantly, these

---

[1]   Aetna also argues that *Kaiser* was a "bellwether" trial designed to generate findings that would have preclusive effect in subsequent trials.  (Pl. Mem. at 1.)  To the contrary, while this Court did initially express interest in conducting a "bellwether" trial (*see* 9/18/09 Tr. [2114] at 89:5-6), the *Kaiser* trial occurred at a time when no subsequent trials were contemplated because the Court had already granted summary judgment against Aetna based on a causation standard neither Aetna nor any of the Class TPPs could survive.  *See In re Neurontin Mktg. & Sales Practices Litig.* ("*SJ Decision*"), 677 F. Supp. 2d 479, 496-97 (D. Mass. 2010); *see also In re Neurontin Mktg. & Sales Practices Litig.*, 754 F. Supp. 2d 293, 310-11 (D. Mass. 2010) (granting summary judgment against Class TPPs based on same causation standard).  Moreover, to produce reliable information, a "bellwether" trial must be "representative of the range of cases." *Manual for Complex Litigation* § 22.315, at 620 (4th ed. 2013).  As discussed *infra* Section II, Kaiser's direct reliance theory and evidence made its claims unique and thus unrepresentative.

remarks were made without the benefit of briefing or analysis of the principles articulated by the Supreme Court, First Circuit, and other authorities discussed herein that prohibit application of offensive issue preclusion in this case.

## ARGUMENT

### I.       Applicable Standards

"[N]on-mutual offensive collateral estoppel," which Aetna seeks to invoke (Pl. Mem. at 6), is the most "detailed, difficult, and potentially dangerous" form of preclusion, *Jack Faucett Assocs., Inc. v. AT&T Co.*, 744 F.2d 118, 124 (D.C. Cir. 1984), and "presents a unique potential for unfairness," *Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 248 (3d Cir. 2006).   Non-mutual offensive collateral estoppel is thus "viewed with stricter scrutiny" than other forms of estoppel,[2] "the restrictions on the use of the doctrine are more stringent,"[3] and its application requires safeguards "'a cut above'" the norm.[4]

As the party seeking preclusion, Aetna bears the burden of establishing that all of the elements of the doctrine are satisfied.   *Hoult v. Hoult*, 157 F.3d 29, 31-32 (1st Cir. 1998).   To meet its burden, Aetna must demonstrate that each finding for which it seeks preclusion satisfies each of the following basic criteria:

> (1)  an *identity of issues* (that is, that the issue sought to be precluded is the same as that which was involved in the prior proceeding),
>
> (2)  *actuality of litigation* (that is, that the point was actually litigated in the earlier proceeding),
>
> (3)  *finality* of the earlier resolution (that is, that the issue was determined by a valid and binding final judgment or order), and
>
> (4)  the *centrality of the adjudication* (that is, that the determination of the issue in the prior proceeding was *essential* to the final judgment or order).

*Acevedo-Garcia*, 351 F.3d at 575-76 (emphasis added) (citations omitted).

These elements are required for all forms of preclusion.  "For non-mutual offensive issue preclusion, however, these traditional elements are necessary but not sufficient."  *In re Light*

---

[2]    *Estate of Portnoy v. Cessna Aircraft Co.*, 612 F. Supp. 1147, 1150 (S.D. Miss. 1985).
[3]    *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 395 n.9 (5th Cir. 1998).
[4]    *Jack Faucett,* 744 F.2d at 125 (citation omitted).

*Cigarettes Mktg. Sales Practices Litig.*, 691 F. Supp. 2d 239, 243 (D. Me. 2010). The doctrine does not apply when the party against whom the earlier decision is asserted had no "'full and fair opportunity'" to litigate the claim. *Allen v. McCurry*, 449 U.S. 90, 95 (1980) (citation omitted). Moreover, where "the application of offensive estoppel would be unfair to a defendant, a trial judge . . . should not allow the use of offensive collateral estoppel." *Parklane,* 439 U.S. at 331.

Finally, even if all these prerequisites are met, courts have broad discretion not to apply offensive preclusion. *Id.* at 331-32. *See also NYNEX Corp. v. FCC*, 153 F.R.D. 1, 2 n.2 (D. Me. 1994) (exercising "broad discretion" in denying non-mutual offensive issue preclusion).

## II.   Fundamental Differences Between Kaiser's and Aetna's Liability Theories Render The Issues Of Fraud And Causation Non-Identical

Throughout its brief, Aetna erroneously asserts that "[its] trial evidence would be the same as Kaiser's." (Pl. Mem. at 11; *see also id.* at 3, 14, 15 n.16, 16.) In reality, Kaiser survived summary judgment and proceeded to trial based on assertions that it had directly relied on communications with Pfizer when making formulary decisions. *See In re Neurontin Mktg. & Sales Practices Litig.* ("*SJ Decision*"), 677 F. Supp. 2d 479, 496-97 (D. Mass. 2010). Kaiser's trial evidence in support of its direct reliance theory represented a significant part of its case and of this Court's findings.[5] Likewise, this Court instructed the jury that "Kaiser must prove that *it relied* on misrepresentations by Pfizer." (3/23/10 Tr. [2772] at 59:7-12 (emphasis added).)

By contrast, this Court held that Aetna cannot present legally sufficient evidence of direct reliance, *see SJ* Decision, 677 F. Supp. 2d at 497, and the First Circuit did not hold otherwise, *see Aetna, Inc. v. Pfizer, Inc.* ("*Aetna Opinion*"), 712 F.3d 51, 57 n.1 (1st Cir. 2013). Although the First Circuit held that Aetna can proceed to trial without proof of direct reliance, *see Aetna Opinion*, 712 F.3d at 58, this does not mean the *Kaiser* findings can be retroactively severed from Kaiser's direct-reliance theory and grafted onto Aetna's claims. Because Aetna's liability

---

[5]     *See In re Neurontin Mktg. & Sales Practices Litig.* (*"Amended Findings"*), No. 04-cv-10739-PBS, 2011 WL 3852254 (D. Mass. Aug. 31, 2011), at Section II.A (discussing Kaiser's structure, its "Proactive Drug Management," and its formulary decisions concerning Neurontin); Section II.C (discussing Kaiser-specific marketing strategies); Section II.E (discussing "Kaiser's Reliance on Pfizer's Misrepresentations"); and Section II.F (discussing "Kaiser's DUAT and DRUG Campaigns").

theory raises fundamentally different factual issues regarding fraud, causation, and damages, the *Kaiser* findings cannot be given preclusive effect as to these issues.[6]

A.      **The Findings Regarding Nationwide Fraudulent Marketing Were Not Essential to the *Kaiser* Judgment**

In *Kaiser*, this Court issued more than 50 pages of findings regarding Pfizer's alleged nationwide fraudulent marketing scheme.  *See Amended Findings*, 2011 WL 3852254, at Sections II.B., II.D.1-3, II.D.5, and III.B.2.ii.   These findings overwhelmingly addressed promotion to the medical community at large via numerous journal articles, CME events, and detailing visits to physicians throughout the country.  *See id.*  Aetna's motion requests issue preclusion with respect to *all* of these findings.  (*See* Pl. Mem. at 4, 13-14.)  Likewise, Aetna requests issue preclusion based on the jury's bare conclusion that "Pfizer violated RICO" (Verdict [2760] at 1), which Aetna construes to embody comparably extensive findings that were merely "augmented" by this Court's more "detailed" UCL findings.  (Pl. Mem. at 13.)

Aetna's request must be denied because it has not met its burden of showing that the Court's extensive findings of fraudulent marketing were essential to the *Kaiser* judgment.  The *Kaiser* fact-finders did not need to find that Pfizer engaged in anything resembling the nationwide fraudulent marketing scheme detailed over 50 pages by this Court.  Instead, the fact-finders could have found—and did find—that Kaiser was injured as a result of its direct reliance on a series of discrete communications with Pfizer.[7]  Specifically, Kaiser alleged and this Court found that Kaiser's Drug Information Service ("DIS") relied on certain communications with Pfizer when it prepared drug monographs and made formulary recommendations.  *See Amended Findings*, 2011 WL 3852254, at *28-29.  The Court further found that "[b]ecause Kaiser has a 95% compliance rate with its formulary, formulary restrictions necessarily affect the number of

---

[6]     As discussed in Pfizer's pending certiorari petition, Aetna's third-party reliance theory and Kaiser's direct reliance theory raise similar *legal* issues regarding RICO's proximate causation requirement and the sufficiency of aggregate proof.  But as discussed herein, Aetna's third-party reliance theory raises fundamentally different *factual* issues for the jury that either were not or did not need to be decided by the finders of fact in *Kaiser*.

[7]     Pfizer maintains that the evidence was legally insufficient to sustain these findings for the reasons set forth in its First Circuit appellate briefs and pending certiorari petition.

prescriptions written for any given drug." *Id.* at *30. Based on these findings, the Court concluded that "Kaiser was injured as a result of *its reliance* on Pfizer's intentional misrepresentations and omissions." *Id.* (emphasis added).[8] Likewise, the Court instructed the jury that "Kaiser must prove that *it relied* on misrepresentations by Pfizer." (3/23/10 Tr. [2772] at 59:7-12 (emphasis added).) Accordingly, the jury need only have found that "Pfizer violated RICO" with respect to those particular communications.

Because Kaiser's direct reliance theory did not depend on fraudulent marketing to the medical community at large, the Court's findings regarding such marketing were not "central to the route that led the factfinder to the judgment reached." *Hoult*, 157 F.3d at 32. As the First Circuit made clear in *Hoult*, estoppel can be applied "only where it is certain that the issue has already been decided in a prior case" and must be denied where "'a rational jury could have grounded its verdict upon an issue other than that which the [moving party] seeks to foreclose from consideration.'" *Id.* (citation omitted) (alteration in original). Where the issues sought to be precluded were "the centerpiece" of the prior case, mere speculation regarding possible alternative grounds for a verdict is not enough to defeat collateral estoppel. *Id.* at 32-33. But the record clearly shows that "the centerpiece" of Kaiser's case was direct reliance on discrete communications with Pfizer. Therefore, Aetna cannot meet its burden of proving that findings in *Kaiser* regarding marketing to the medical community "'constituted, logically or practically, a necessary component of the decision reached.'" *Id.* at 32 (citation omitted).

Even assuming *arguendo* that the Court's findings of nationwide fraudulent marketing provided relevant background or lent support to its UCL judgment, this would not suffice. Issue preclusion cannot be applied to findings merely "supportive of," "consistent with," or "'relevant'

---

[8]   Although this Court also found that "communications to [Permanente Medical Group] physicians caused Kaiser injury," *Amended Findings*, 2011 WL 3852254, at *30, this was not the theory submitted to the jury and was not essential to the judgment. Moreover, the Court found that PMG physicians were exposed to only a tiny subset of the publications and CME events that comprised the alleged nationwide marketing fraud, namely:  the "New Frontiers in Social Phobia and Bipolar Disorders" CME, attended by 33 PMG physicians, *id.* at *16, *27; a March 1999 supplement to *Progress in Neurology*, mailed to all neurologists in the United States, *id.* at *22, *27; an unidentified "May 1999 CME" as to which there was no evidence—and thus no findings—of fraud, *id.* at *30; and various "response letters," *id.* at *29.

to the prior judgment." *In re Microsoft Corp. Antitrust Litig.*, 355 F.3d 322, 327-28 (4th Cir. 2004). For this reason, courts have consistently refused to grant preclusive effect to extensive findings of fact entered in a RICO case against tobacco manufacturers whom the prior court found to have engaged in a nationwide fraudulent marketing scheme.[9]

Like Aetna, the plaintiffs in those cases broadly cited hundreds and even thousands of the prior court's findings, but failed to meet their burden of proving which particular findings "were outcome determinative in the previous action." *Grisham*, 670 F. Supp. 2d at 1032.[10] As the District of Maine recognized, the sheer volume of the prior court's findings "belies th[e] conclusion" that *all* such findings were "central" to the judgment. *Light Cigarettes*, 691 F. Supp. 2d at 250. In particular, issue preclusion could not be applied when many of the prior findings were entered merely to demonstrate "'how massive the case is against the Defendants,'" rather than "because the facts were critical to [the court's] conclusion." *Id.* (citation omitted).

Here, notwithstanding the Court's extensive findings of fraudulent marketing, the only such findings that could be deemed "essential" to the judgment are those that concern Pfizer's direct communications with Kaiser. These findings have no relevance to Aetna's claims, particularly given Aetna's counsel's admission that Pfizer made no such direct misrepresentations to Aetna. (9/18/09 Tr. [2114] at 49:15-50:9.) Accordingly, collateral estoppel cannot be applied to these findings. *See Light Cigarettes*, 691 F. Supp. 2d at 250 ("[T]here is no identity of issues for findings that are irrelevant to the pending action.").

In sum, the Court's extensive findings in *Kaiser* regarding Pfizer's alleged nationwide fraudulent marketing scheme cannot be given preclusive effect here. Because Aetna asserts a fundamentally different theory of causation that depends on fundamentally different marketing conduct, it cannot use the *Kaiser* judgment to evade its burden of proving the essential elements

---

[9]   *See, e.g.*, *Light Cigarettes*, 691 F. Supp. 2d at 250-51; *Grisham v. Philip Morris, Inc.*, 670 F. Supp. 2d 1014, 1032-33 (C.D. Cal. 2009); *Shaffer v. R.J. Reynolds Tobacco Co.*, 860 F. Supp. 2d 991, 997-98 (D. Ariz. 2012); *Pooshs v. Philip Morris USA, Inc.*, 904 F. Supp. 2d 1009, 1034 (N.D. Cal. 2012).
[10]   *See also Shaffer*, 860 F. Supp. 2d at 997 ("Other than referencing and string citing approximately 749 findings of fact from the DOJ Case, Plaintiff [failed to explain how findings] were actually necessary to the final judgment"); *Light Cigarettes*, 691 F. Supp. 2d at 250 ("Plaintiffs . . . do not attempt to explain *how* the findings were central.").

7

of its claims.

**B.     The Findings Regarding Percentages Of Prescriptions Caused by Fraud Are Inextricably Intertwined With Kaiser's Direct Reliance Theory**

For purposes of determining the amount of restitution in *Kaiser*, this Court "accept[ed] Dr. Rosenthal's analysis of the percentage of Neurontin prescriptions caused by defendants' off-label promotion." *Amended Findings*, 2011 WL 3852254, at *58. Aetna's request for "issue preclusion on these findings" (Pl. Mem. at 15) must be rejected because this Court's findings addressed causation and damages issues fundamentally different from those presented by Aetna's third-party reliance theory. Although collateral estoppel can in principle be applied to different theories or causes of action, the underlying issues must be "in substance identical." *Manganella v. Evanston Ins. Co.*, 700 F.3d 585, 591 (1st Cir. 2012) (cited in Pl. Mem. at 15). That is not the case here. To illustrate:

- In *Kaiser*, the fact-finders needed to decide whether and to what extent Pfizer's alleged misrepresentations ***to Kaiser, a TPP with uniquely pro-active drug management and 95% formulary compliance***, caused physicians affiliated with that TPP to prescribe Neurontin off-label to its members. *See Amended Findings*, 2011 WL 3852254, at *58. (*See also* 3/23/10 Tr. [2772] at 59:7-12.)

- Here, a jury would need to decide whether and to what extent Pfizer's alleged misrepresentations ***to the medical community*** caused physicians to prescribe Neurontin off-label to Aetna's members. *See Aetna Opinion*, 712 F.3d at 60.

As a result, Aetna cannot satisfy its burden of proving "that the issue sought to be precluded is the same as that which was involved in the prior proceeding." *Acevedo-Garcia*, 351 F.3d at 575. *See also, e.g.*, *McCrory v. Spigel*, 260 F.3d 27, 34-35 (1st Cir. 2001) (prior finding that defendant's misrepresentations to third parties had exposed plaintiffs to liability could not be given preclusive effect on the different issue of whether plaintiffs' harm "'ar[ose] as a direct result'" of those same misrepresentations (citation omitted)).

Aetna incorrectly contends that the findings in question are not "Kaiser-specific." (Pl. Mem. at 15.) To the contrary, although Prof. Rosenthal's *opinions* may not have been "Kaiser-specific," this Court's *findings* are inextricably intertwined with Kaiser's direct reliance theory.

Indeed, this Court explicitly adopted Prof. Rosenthal's opinions "for the purpose of quantifying the defendants' fraud" based on the theory of "*individualized* reliance by Kaiser's DIS." *Amended Findings*, 2011 WL 3852254, at *58. The Court emphasized that Kaiser's evidence of direct reliance "eliminat[ed] the concerns . . . about the many variables that affect an individual physician's prescriptions," *Amended Findings*, 2011 WL 3852254, at *58, which was one of Pfizer's principal challenges to Prof. Rosenthal's opinions. Plainly, Kaiser's direct reliance theory had a substantial impact on the relative weight this Court, as finder of fact, assigned to Prof. Rosenthal's aggregate analysis and to the individual physicians' testimony proffered by Pfizer in rebuttal. There is no basis for Aetna's unstated speculation that the Court would have made the same findings had Kaiser not presented evidence of direct reliance.

Unlike in *Kaiser*, Aetna cannot present evidence of direct reliance and instead proffers Prof. Rosenthal's analysis to show that "prescribing physicians relied on defendants' misrepresentations." *SJ Decision*, 677 F. Supp. 2d at 496-97. No such theory was submitted to or decided by the *Kaiser* fact-finders. *See Amended Findings*, 2011 WL 3852254, at *58. (*See also* 3/23/10 Tr. [2772] at 59:7-12.) Even if such a theory had been considered in *Kaiser*, it would not have been essential to the judgment because third-party reliance by physicians was not "central to the route that led the factfinder to the judgment reached." *Hoult*, 157 F.3d at 32.

Aetna effectively concedes these findings are not preclusive by stating that "Pfizer will be free to present evidence and argue that Aetna's circumstances merit a downward departure from these national percentages." (Pl. Mem. at 15.) Establishing such a "downward departure" would require Pfizer to present rebuttal evidence and cross-examine Prof. Rosenthal regarding whether and to what extent her opinions can be applied to Aetna. The need to present "'some of the same evidence pertinent to the estopped issues,'" would thus negate any "efficiency gains." *Acevedo-Garcia*, 351 F.3d at 577; *see also Light Cigarettes*, 691 F. Supp. 2d at 251 (rejecting collateral estoppel where "proving causation and reliance might also involve the introduction of evidence that duplicates [prior order's] basic findings, negating efficiency benefits").

In addition, the Court's findings cannot be given preclusive effect because they are

inconsistent with the jury's findings regarding the percentages of Neurontin prescriptions caused by the alleged fraudulent marketing.   In determining the amount of restitution, this Court accepted Prof. Rosenthal's figures:  99.4% bipolar; 70% neuropathic pain; 27.9% migraine; and 37.5% doses above 1800 mg/day.  *See Amended Findings*, 2011 WL 3852254, at *58.  But the jury's damages award was significantly lower than this Court's restitution award.  (*See* Verdict [2760] at 2-3.)   Because the amount of damages is closely related to the percentages of prescriptions attributable to the alleged fraud, *see Amended Findings*, 2011 WL 3852254, at *33, we can readily infer that the jury made the following markedly different findings regarding the applicable percentages:   83.45% bipolar; 50.41% neuropathic pain; 19.78% migraine; and 29.82% doses above 1800 mg/day.[11]  This discrepancy renders issue preclusion inappropriate. *Cf. Parklane*, 439 U.S. at 330 ("Allowing offensive collateral estoppel may . . . be unfair to a defendant if the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant.").

In sum, non-mutual offensive collateral estoppel cannot be applied to the Court's findings in *Kaiser* regarding the percentages of fraudulently induced prescriptions because Aetna's liability theory is fundamentally different from Kaiser's and raises fundamentally different factual issues regarding causation and damages.   That the two *Kaiser* fact-finders—this Court and the jury—made markedly different findings in the same case confirms that this is not an issue that should be fixed for all time and barred from reexamination in the trial of this case.[12]

## C.   Pfizer's Right To A Jury Trial Weighs Against Applying Offensive Issue Preclusion To This Court's Bench Findings

Non-mutual offensive issue preclusion is particularly unwarranted because this Court's UCL findings in *Kaiser* were the result of a bench trial concerning equitable relief, whereas

---

[11]   Exhibit A to the accompanying Declaration of Mark S. Cheffo ("Cheffo Decl.") demonstrates how these figures are derived.

[12]   Pfizer submits that *In re Neurontin Antitrust Litigation*, 2013 WL 4042460 (D.N.J. Aug. 8, 2013), cited by Aetna (Pl. Mem. at 5 n.10), was wrongly decided and is legally and factually distinguishable from the present case. That case was an antitrust case, and the court did not provide a thorough analysis of the estoppel issue and did not address significant legal and factual issues raised by Pfizer in this memorandum that preclude the application of non-mutual offensive collateral estoppel in this case.

Pfizer will be entitled to a jury trial on Aetna's RICO claims in this case.[13]   Although *Parklane*
held that the fact that findings were not made by a jury in the first action did not automatically
bar offensive issue preclusion, 439 U.S. at 332 n.19, many courts have subsequently exercised
their "broad discretion," *id* at 331, and "given weight to the deprivation of a jury trial" in
refusing to apply preclusion.  *Light Cigarettes*, 691 F. Supp. 2d at 251 (citing cases).   Here,
Pfizer "has a right to a jury trial and has affirmatively asserted its right to a jury trial in this
case," and the absence of a jury trial as to the Court's UCL findings therefore "weighs against
applying offensive nonmutual issue preclusion in this case." *Shaffer*, 860 F. Supp. 2d at 998;
*accord Pooshs*, 904 F. Supp. 2d at 1034; *Grisham*, 670 F. Supp. 2d at 1036.

## III. Defense Evidence Specific to Aetna Regarding Causation Renders the Issues Non-Identical for Purposes of Collateral Estoppel

Causation issues are not identical for the further reason that Pfizer has different, more
compelling evidence to refute causation as to Aetna than it did for Kaiser.  As shown below,
Aetna's website continues to include numerous statements recommending Neurontin for the uses
at issue, which Pfizer plans to introduce at trial and which substantially undercut Aetna's claims
of causation.   In addition, in contrast to the *Kaiser* trial, because Aetna does business in
Massachusetts, Pfizer has the ability to subpoena Aetna physicians to testify live at trial.  In
combination with the Aetna website evidence, this Aetna-specific physician testimony will
significantly impact the issue of causation, rendering collateral estoppel improper.

### A. Aetna's Website Contains Admissible Statements Relevant to Rebutting Aetna's Claims of Causation

A substantial portion of the *Kaiser* trial was devoted to Kaiser's admissions regarding
Neurontin's efficacy for the relevant conditions, including "the embarrassing fact that favorable
information about Neurontin for the treatment of neuropathic pain stayed on the Kaiser website
until the week before trial." *Amended Findings*, 2011 WL 3852254, at *30.  This evidence was

---

[13]   On the issue of fraudulent marketing, Aetna relies primarily on this Court's extensive UCL findings and merely
speculates that the jury's RICO verdict embodies similar findings.  *See supra* Section II.A.  On the issue of whether
and to what extent Pfizer's marketing caused additional Neurontin prescriptions, Aetna relies entirely on this Court's
findings and ignores the jury's markedly different findings.  *See supra* Section II.B.

relevant to determine essential elements of Kaiser's claims.   Aetna has also made — and continues to make — admissions regarding the propriety of Neurontin use for many of the conditions at issue, and Aetna's admissions are far stronger evidence to negate Aetna's claims of causation than the admissions Kaiser made.   Moreover, although Kaiser argued that it had not had time to correct its website because it had not "learned about the scope of defendants' fraud [until] . . . the publication of Dr. Kay Dickersin's article in the New England Journal of Medicine in November 2009," *Amended Findings*, 2011 WL 3852254, at \*31, Aetna has no such excuse. The fact that Aetna continues to recommend and in some cases require off-label Neurontin use nearly a decade after filing this lawsuit and nearly four years after Dr. Dickersin's article was published is not merely "embarrassing," but significantly impairs Aetna's claims of causation.

Accordingly, Pfizer is entitled to present its case-specific evidence of Aetna's admissions to the jury, to be weighed against Aetna's purported aggregate evidence of causation, injury, and damages.  The crucial admissions from Aetna's website[14] include the following:

- "It [sic] addition to seizure control, gabapentin is also commonly used to treat chronic pain, migraine headache, panic disorder, and social phobia."

- "There are many other medications available to reduce nerve pain. These include: . . . Gabapentin (Neurontin)"

- "Conventional therapies of diabetic peripheral neuropathy include . . . gabapentin (Neurontin) . . . ."

- "In patients with a history of cardiovascular disorders, glaucoma, and urine retention, gabapentin and pregabalin are emerging as first-line treatment for neuropathic pain.  In addition these anti-epileptic drugs have a favorable safety profile with minimal concerns regarding drug interactions and showing no interference with hepatic enzymes."

- Aetna's step therapy criteria require that, before trying Botox for migraine prevention, patients must try other classes of "migraine headache prophylaxis medications," including "Anti-epileptic drugs (e.g., gabapentin . . .)."

- "A quantity of these medications will be considered medically necessary . . . Neurontin; gabapentin . . . 3600 mg / in divided doses daily."

Aetna's publicly available statements on its website (and the fact that Aetna even now

---

[14]   The relevant pages of Aetna's website are attached as Exhibit B to Mark Cheffo's declaration.

continues to make these statements) are subject to judicial notice and admissible as party admissions,[15] and are fatal to Aetna's attempt to establish cause-in-fact.[16]  This critical evidence is specific to Aetna, and the statements at issue and timing of those statements are different from the evidence put forth in *Kaiser*, such that the issues of causation are not identical in these two cases.  It would be unfair and unreasonable for Aetna to exploit the findings in *Kaiser* that Neurontin is ineffective for the indications at issue, while at the same time continuing to pay for and *recommend* treatment with Neurontin for those very indications.  Such a result would improperly permit Aetna to use collateral estoppel to escape the significant weaknesses of its own case by piggybacking on evidence and findings specific to the *Kaiser* case.

> **B.**   **Pfizer's Right to Present Individualized Rebuttal Evidence on Causation Renders the Issues Non-Identical for Purposes of Collateral Estoppel**

The issue of causation is non-identical for purposes of collateral estoppel for the additional reason that Pfizer intends to present testimony of Aetna physicians on causation that is significantly different from the evidence available to Pfizer in *Kaiser*.  Although the First Circuit held that Kaiser's direct reliance evidence, in connection with Prof. Rosenthal's report, was sufficient evidence of causation to support the verdict, it also recognized that Pfizer had the right "to rebut this causal inference" by presenting the testimony of individual prescribing physicians and that it was for the jury to weigh such testimony.  *Kaiser Found. Health Plan, Inc. v. Pfizer, Inc.*, 712 F.3d 21, 45 (1st Cir. 2013); *see also id.* at 45-46 ("Weighing the individual testimony presented by Pfizer against the aggregate evidence presented by Kaiser was a task for the jury and district court.").  Pfizer's right to present individual testimony by physicians under the Aetna plan is an essential part of Pfizer's due process right to mount a defense.  *See Lindsey v. Normet*,

---

[15]   *See* Fed. R. Evid. 201, 801; *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007) ("district court abused its discretion by failing to take judicial notice" of information on party's website); *Sarvis v. Polyvore, Inc.*, 2013 U.S. Dist. LEXIS 112539, at *8, *11 n.3 (D. Mass. Aug. 9, 2013) (judicial noticing "information publicly displayed on a party's own website"), *adopted by*, 2013 U.S. Dist. LEXIS 135054 (D. Mass. Sept. 19, 2013).

[16]   Indeed, it is axiomatic that a plaintiff cannot claim injury caused by an alleged misrepresentation when the plaintiff fails to alter its actions after it learns of the falsity of the representation it purportedly relied upon.  *See, e.g.*, *Prohias v. Pfizer, Inc.*, 485 F. Supp. 2d 1329, 1334-35, 1337-38 (S.D. Fla. 2007); *Heindel v. Pfizer, Inc.*, 381 F. Supp. 2d 364, 381 (D.N.J. 2004).

405 U.S. 56, 66 (1972) (due process mandates "'an opportunity to present every available defense.'"); *United States v. Armour & Co.*, 402 U.S. 673, 682 (1971) (similar).

Here, Pfizer's evidence will include individual physicians' testimony regarding their prescribing decisions.  Collateral estoppel would unfairly restrict Pfizer's defense, binding Pfizer to the deposition testimony of the Kaiser doctors that it was able to present in *Kaiser*.  The physicians who prescribed Neurontin off-label to Aetna plan members are not the same physicians who provided deposition testimony in *Kaiser*, and Pfizer is entitled to present evidence that these Aetna physicians did not rely on the alleged misrepresentations and instead based their prescribing decisions on independent considerations.  Aetna manifestly cannot meet its burden of showing that the issues of causation among these different physicians are identical. Accordingly, limiting Pfizer to the testimony presented in *Kaiser* would be arbitrary and unfair.

Moreover, Pfizer's opportunity to offer the testimony of Aetna physicians in this case is a "procedural opportunit[y] unavailable in the first action that could readily cause a different result," rendering collateral estoppel unfair and improper.  *See Parklane*, 439 U.S. at 330-31.  In *Kaiser*, Pfizer was limited to offering *deposition* testimony by Kaiser physicians because Kaiser does not operate in Massachusetts and Pfizer's motion to transfer to California, where the court would have had subpoena power over those and many more physicians, was denied.  In contrast, because Aetna operates in Massachusetts and its neighboring states, Pfizer will be able to subpoena *trial* testimony from Aetna physicians to rebut Aetna's purported aggregate proof.  Significantly, the Supreme Court described a very similar scenario in *Parklane*, explaining that where "the defendant in the first action was forced to defend in an inconvenient forum and therefore was unable to . . . call witnesses, application of offensive collateral estoppel may be unwarranted."  *Id.* at 331 n.15.  As the Supreme Court stated, "[t]he problem of unfairness [in this situation] is particularly acute in cases of offensive estoppel, . . . because the defendant against whom estoppel is asserted typically will not have chosen the forum in the first action."  *Id.*   This unfairness would be compounded if collateral estoppel were applied in this case, given that Pfizer unsuccessfully moved for a transfer of venue in *Kaiser* for the purpose of

14

being able to present trial testimony by physicians of the kind it intends to present at trial here. (*See* Defs' Mot. to Transfer Venue [2193].)[17]  Pfizer should not be deprived of its right to present such testimony in this case through application of collateral estoppel.

## IV. New Scientific Evidence Emerging Since the *Kaiser* Trial Renders Collateral Estoppel Improper as to the Court's Findings of Inefficacy

"[C]hanges in facts essential to a judgment will render collateral estoppel inapplicable in a subsequent action raising the same issues." *Montana v. United States*, 440 U.S. 147, 159 (1979).  Therefore, "[l]ater scientific discoveries that cast doubt on prior findings of scientific facts deprive those earlier findings of collateral estoppel effect." *Zweig v. E.R. Squibb & Sons, Inc.*, 536 A.2d 1280, 1283 (N.J. Super. Ct. App. Div. 1988).  In such circumstances, offensive estoppel would deny a pharmaceutical manufacturer "a complete and fair opportunity to litigate." *Vincent v. Thompson*, 50 A.D.2d 211, 221 (N.Y. App. Div. 1975).  "[I]t would be unjust to freeze in time the answers to [scientific] questions when the resolution of these questions is very time-dependent" and the "relevant scientific knowledge" continues to evolve and improve. *Coburn v. Smithkline Beechman Corp.*, 174 F. Supp. 2d 1235, 1240-41 (D. Utah 2001).

Here, Aetna seeks to have collateral estoppel applied to the Court's findings in *Kaiser* that Neurontin was not effective for treating, *inter alia*, off-label neuropathic pain.  (Pl. Mem. at 5, 16-17.)  However, after the *Kaiser* trial, the Cochrane Collaboration issued a new scientific study confirming Neurontin's efficacy for off-label neuropathic pain.  (*See* 2011 Cochrane Review [3362-1].)  The Cochrane Collaboration, "an international nonprofit organization," is widely recognized as an extremely reputable and "reliable" source, *Kaiser Found. Health Plan, Inc. v. Pfizer, Inc.*, 799 F. Supp. 2d 110, 113 (D. Mass. 2011), that "physicians and health plans like Kaiser [and, presumably, Aetna] would rely upon" (2/25 Tr. [2594] at 72:12-20).  In its new report, the Cochrane Collaboration concluded that "gabapentin [Neurontin] provides pain relief

---

17    This Court denied Pfizer's motion to transfer venue in *Kaiser* based upon its purported lateness and the Court's "unique expertise from the MDL," stating the parties would "just have to live with the inconvenience."  (2/26/10 Tr. [2595] at 97:8-12.)  There was no dispute that trying the case in this forum deprived Pfizer of PMG physicians' trial testimony.  (*See* Kaiser's List of Witnesses to Be Presented at Trial [2179] at 1 n.2 (prescribing physicians in California "are not under the control of Kaiser and cannot be compelled to participate in trial").)

of a high level to about a third of the people who take it for neuropathic pain," and "is associated with a moderate benefit (equivalent to at least 30% pain relief) in almost one in two patients." (2011 Cochrane Review [3362-1] at 2.)

In denying Pfizer's new trial motion in *Kaiser*, the Court acknowledged that Neurontin's efficacy for "neuropathic pain 'was a closer call' when compared to the three other indications," 799 F. Supp. 2d at 114, and that if this unbiased report had been available prior to the trial, it "may have tipped the balance in favor of Pfizer on the issue of neuropathic pain." *Id.* at 115. Clearly, this report is available for use in the trial of the present case. Moreover, Aetna does not dispute the report's accuracy in its moving papers. It was one thing for the Court to deny Pfizer post-judgment relief from the neuropathic pain finding in *Kaiser*, where a five-week trial had already been completed and the findings had already been entered. It would be something else entirely if the Court were to give preclusive effect in this case to that finding, which has been independently shown by this new report to be incorrect or, at minimum, highly questionable.

The standard governing non-mutual offensive issue preclusion is materially different from the standard for determining whether to order a new trial based on newly discovered evidence, which this Court applied in *Kaiser*. As this Court stated, an essential requirement for a new trial is that "'[t]he evidence could not by due diligence have been discovered earlier by the movant.'" 799 F. Supp. 2d at 113 (citation omitted). In contrast, with respect to non-mutual offensive issue preclusion, "[i]t is unnecessary that the party seeking to avoid preclusion show, as he must in seeking to set aside a judgment, that the evidence could not have been discovered with due diligence; the question is not whether a prior determination should be set aside but whether it should be treated as conclusive for further purposes." Restatement (Second) of Judgments § 29 cmt. j (1982). As now-Justice Ruth Ginsburg stated in *Carr v. District of Columbia*, 646 F.2d 599 (D.C. Cir. 1980), "newly discovered evidence, even if insufficient to justify setting aside a judgment, may warrant refusal to give the judgment preclusive effect in other actions." *Id*. at 606 n.35; *see also Rye v. United States Steel Mining Co.*, 856 F. Supp. 274, 279 (E.D. Va. 1994) ("party seeking to avoid issue preclusion does *not* have to show that the new

evidence could not have been discovered had it exercised due diligence") (emphasis in original).

Aetna incorrectly relies on *In re Sonus Networks, Inc., S'holder Derivative Litig.*, 499 F.3d 47 (1st Cir. 2007), in asserting that "a party cannot escape preclusion to offer supposedly new facts that were previously available to it." (Pl. Mem. at 13 n.14.) In *Sonus*, the "new" facts used to oppose preclusion were publicly available SEC filings issued *before* the dismissal of the earlier lawsuit and allegations in another lawsuit that had been filed *before* dismissal. *Sonus*, 499 F.3d at 63. The instant case, in contrast, involves a meta-analysis issued by the Cochrane Collaboration *after* the end of the *Kaiser* trial on which Aetna bases its claim of preclusion.

A meta-analysis, such as that done by the Cochrane Collaboration in 2011, is not simply a compendium of "old facts" from earlier studies. As the Federal Judicial Center's *Reference Manual on Scientific Evidence* (3d ed. 2011) ("Manual") states, meta-analysis is a "regularly used scientific technique." Manual at 581 n.89 (citing *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 856-57 (3d Cir. 1990)). The Manual defines meta-analysis as a "technique used to combine the results of several studies to enhance the precision of the estimate of the effect size and reduce the plausibility that the association found is due to random sampling error." *Id.* at 624. In the "hierarchy" of "medical evidence," "[w]hen ordered from strongest to weakest, systematic review of randomized trials (meta-analysis) is at the top, followed by single randomized trials, systematic reviews of observational studies, single observational studies, physiological studies, and unsystematic clinical observations." *Id.* at 723-24; *see also In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1177 (N.D. Cal. 2007) (similar). "Cumulative meta-analysis of treatments enables the accumulation of randomized trial evidence to examine trends in efficacy or risks, overcoming issues of underpowered trials that have insufficient numbers of patients enrolled to reliably detect a benefit." Manual at 725. Thus, "[i]n principle, the power of the collective results will be greater than the power of each study." *Id.* at 254 n.107. Accordingly, meta-analysis is a recognized technique for resolving inconsistent results among randomized studies and providing more "definitive conclusions." *Id.* at 607.

17

In short, a meta-analysis is not simply a regurgitation of prior studies.  It provides new information, findings and conclusions.  Contrary to the Court's view in *Kaiser*, a meta-analysis is not merely a "scholarly article" or "expert opinion."  799 F. Supp. 2d at 115.  Rather, as discussed above, meta-analysis is recognized by courts and scientists as medical evidence, and meta-analyses of randomized studies are considered as the strongest category of medical evidence.  Here, the 2011 Cochrane meta-analysis combines data from 29 randomized studies, nearly doubling the number of randomized studies aggregated in the 2005 Cochrane meta-analysis.  The 2011 meta-analysis is new evidence that was not available for the trial in *Kaiser*, and it changes the weight and balance of the scientific evidence that was available in that trial.[18]

In addition to the 2011 Cochrane Collaboration meta-analysis, Neurontin's efficacy for off-label neuropathic pain conditions is supported by clinical trials, meta-analyses, expert consensus statements, and review articles published after the *Kaiser* trial.  (*See* 10/14/13 Declaration of Gary Brenner, M.D. and exhibits thereto.)  As Dr. Brenner concludes, this "compilation of evidence . . . supports the hypothesis that gabapentin has efficacy for the treatment of forms of neuropathic pain other than post-herpetic neuralgia."  (*Id.* at 1.)  Likewise, studies conducted after the *Kaiser* trial provide support regarding Neurontin's efficacy for migraine prevention and acute bipolar mania.[19]

This Court, in denying a new trial in *Kaiser*, explained that the outcome of a trial "'must turn upon the teachings of science as understood *at the time of trial* . . . .'"  799 F. Supp. 2d at

---

[18]    At the *Kaiser* trial, Plaintiffs argued and elicited testimony that: (1) Defendants withheld negative data from the Cochrane Collaboration regarding Neurontin's efficacy for neuropathic pain; (2) the 2005 Cochrane Review was "irremediably compromised" by the unavailability of this negative data (3/1/10 Tr. [2650-1] at 150:4-8); and (3) Plaintiffs and PMG doctors would have relied on the 2005 Cochrane Review when making formulary and prescribing decisions.  As discussed above, in 2011, following the trial, the Cochrane Collaboration issued a new meta-analysis of gabapentin studies, having expressly considered all allegedly withheld information as well as other additional studies.  The Cochrane Collaboration also carefully assessed the "risk of bias in included studies" and accounted conservatively for any "missing data."  (2011 Cochrane Review [3362-1] at 6.)

[19]    A randomized, open-label comparator-controlled trial conducted in 2011 found that gabapentin and topiramate "were equally effective in migraine prophylaxis."  S. Zain et al., *Comparison of efficacy and safety of topiramate with gabapentin in migraine prophylaxis: randomized open label control trial*, 63(1) Journal of Pakistan Medical Association, Jan. 31, 2013 (Cheffo Decl., Ex. C).  A randomized open-label comparator-controlled trial completed in October 2010 and published in 2012 concluded that "[a]djunctive treatment with gabapentin is effective for controlling symptoms of acute mania."  A. Astaneh & O. Rezaei, *Adjunctive treatment with gabapentin in bipolar patients during acute mania*, 43(3) Int'l J. Psychiatry in Med., 2012, at 261, 261 (Cheffo Decl., Ex. D).

116 (emphasis added; citation omitted).  That ruling implicitly recognizes the time-dependent nature of scientific and medical issues, which renders collateral estoppel on such issues improper.  Thus, in declining to impose non-mutual offensive collateral estoppel in pharmaceutical cases, courts have emphasized that, because medical and science issues are always changing and "very time-dependent," "the evidence is likely to be different at a later trial."  *Coburn*, 174 F. Supp. 2d at 1240.

Indeed, numerous courts have refused to apply collateral estoppel where, as here, subsequent scientific developments cast doubt on the factual findings in an earlier case. In *Clark v. Smithkline Beecham*, 2006 WL 3329141, at *3 (M.D. Ga. Nov. 15, 2006), the court rejected collateral estoppel against a pharmaceutical manufacturer because it would not be "wise" to use preclusion "to freeze science in place from a [previous] verdict without taking into account subsequent advances."  Similarly, in *Ezaqui v. Dow Chemical Corp.*, 598 F.2d 727 (2d Cir. 1979), the court held that prior verdicts finding a vaccine to be defective could not be given preclusive effect where "new scientific evidence" had since emerged that "cast doubt" on the theory of defect in those earlier cases.  *Id*. at 732.  Likewise, in *Rogers v. Ford Motor Co.*, 925 F. Supp. 1413 (D. Ind. 1996), the court denied collateral estoppel because "additional evidence" in the form of a new study "undermined" the prior verdict (which found the seat belt at issue to be defective) and "conceivably could lead to a different result."  *Id*. at 1419.  The court concluded that the new study was sufficient to defeat preclusion because "[c]onfidence in the correctness of the early determination is fundamental to the principles of collateral estoppel."  *Id*; *see also, e.g.*, *Zweig*, 536 A.2d at 1283 (declining to apply collateral estoppel to finding in prior case that drug caused limb reduction because scientific studies conducted after the earlier verdict disproved such causation); *Coburn,* 174 F. Supp. 2d at 1240 (rejecting collateral estoppel against pharmaceutical manufacturer because medical and scientific issues are always evolving and must be decided "upon the basis of the scientific knowledge as it exists at the time of trial"; "the

evidence is likely to be different at a later trial").[20]

As this well-reasoned body of authority makes clear, fundamental fairness requires that Aetna not be allowed to use offensive estoppel to impose enormous liability on Pfizer by "freez[ing] science in place from [the *Kaiser* trial] without taking into account subsequent" developments in scientific knowledge. *Clark*, 2006 WL 3329141, at *3. Aetna's attempt to apply collateral estoppel to the Court's findings in *Kaiser* regarding Neurontin's efficacy for neuropathic pain and other conditions should therefore be rejected.[21] In addition, the need to litigate efficacy issues in a trial of Aetna's claims provides a further basis for denying issue preclusion as to this Court's findings of fraudulent marketing in *Kaiser* because those findings were predicated on Neurontin's purported inefficacy for the relevant conditions.

## CONCLUSION

For all the foregoing reasons, Aetna's motion should be denied in its entirety.

---

[20] Many other courts have also rejected collateral estoppel in pharmaceutical and other cases because of the availability of new scientific studies or analyses that cast doubt on the findings in an earlier case. *See, e.g.*, *Van Dyke v. GlaxoSmithKline*, No. 05-153, slip op. at 12 (D. Wyo. Nov. 1, 2006) (declining to apply collateral estoppel against pharmaceutical manufacturer because, since the earlier verdict, new scientific evidence had become available); *In re Dow Corning Corp.*, 244 B.R. 634, 655 (Bankr. E.D. Mich. 1999) (collateral estoppel would be improper where, since the prior verdict, "there have been new developments in science that tend to negate the case that silicone gel causes the diseases alleged by [plaintiffs];" even plaintiffs' counsel acknowledged that in a subsequent trial, the defendant pharmaceutical manufacturer "would be entitled to present this new scientific evidence to the jury"), *aff'd*, 255 B.R. 445 (E.D. Mich. 2000), *aff'd and remanded*, 280 F.3d 648 (6th Cir. 2002); *Smith v. Ortho Pharm. Corp.*, 770 F. Supp. 1561, 1562-63 (N.D. Ga. 1991) (rejecting collateral estoppel on issue of causation in pharmaceutical case because of the availability of new scientific data); *Vincent*, 50 A.D.2d at 221 (denying collateral estoppel based on earlier case partially because of the purported discovery of new scientific evidence); *see also Hawksbill Sea Turtle v. FEMA*, 126 F.3d 461, 477 (3d Cir. 1997) ("when significant new facts grow out of a continuing course of conduct the issues in a successive suit may fail to constitute the same 'issue' so as to merit preclusive effect").

[21] The Court in *Kaiser* asserted that "even if the 2011 Cochrane report did tip the balance in favor of Pfizer on the issue of efficacy, it would only do so with respect to [post-herpetic neuralgia and diabetic neuropathy]." 799 F. Supp. 2d at 116. However, the 2011 report makes clear that Neurontin "is a reasonably effective treatment for a variety of neuropathic pain conditions" and that positive "[r]esults were consistent across the major neuropathic pain conditions tested." (2011 Cochrane Review [3362-1] at 25.) Therefore, collateral estoppel should not be applied as to Neurontin's efficacy regarding any kind of neuropathic pain.

Dated:  October 15, 2013                     Respectfully submitted,

                                             QUINN EMANUEL URQUHART
                                               & SULLIVAN, LLP

                                             By:  /s/ Mark S. Cheffo
                                                  Mark S. Cheffo

                                             51 Madison Avenue, 22nd Floor
                                             New York, NY  10010
                                             (212) 849-7000
                                             Email:  markcheffo@quinnemanuel.com

                                             *Attorneys for Defendants Pfizer Inc. and*
                                             *Warner-Lambert Company LLC*

## CERTIFICATE OF SERVICE

I, Mark S. Cheffo, hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF (NEF) on October 15, 2013.

Dated:  October 15, 2013                     /s/ Mark S. Cheffo
                                             Mark S. Cheffo