# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:   NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No.  1629<br><br>Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO:<br><br>HARDEN MANUFACTURING CORPORATION; LOUISIANA HEALTH SERVICE INDEMNITY COMPANY, d/b/a BLUE CROSS/BLUE SHIELD OF LOUISIANA; ASEA/AFSCME LOCAL 52 HEALTH BENEFITS TRUST; JAN FRANK WITYK; and GARY VARNAM, on behalf of themselves and all others similarly situated,<br><br>      Plaintiffs,<br><br>v.<br><br>PFIZER INC. and WARNER-LAMBERT COMPANY,<br>      Defendants. | Judge Patti B. Saris<br><br>Mag. Judge Leo T. Sorokin |

## CLASS PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF THEIR POST-MANDATE MOTION FOR CLASS CERTIFICATION

## TABLE OF CONTENTS

I.  PLAINTIFFS CAN ESTABLISH CLASSWIDE INJURY NOTWITHSTANDING SOME CLASS MEMBERS PURCHASED MORE NEURONTIN THAN OTHERS .................................................................................................................1

II.  ANY DISPUTE AS TO THE ADMISSIBILITY OF PROFESSOR ROSENTHAL'S REGRESSION ANALYSIS, TO THE EXTENT IT HAS NOT ALREADY BEEN DECIDED AGAINST PFIZER, IS AN ISSUE COMMON TO THE ENTIRE CLASS ....................................................................................................................3

III.  PFIZER'S DESIRE TO PRESENT THE TESTIMONY OF INDIVIDUAL DOCTORS DOES NOT NEGATE THE PREDOMINANCE OF COMMON ISSUES .................................................................................................................6

A.  Pfizer Does Not Have a Right to Defend Claims Individually When the Class Can Prove Its Claims with Aggregate Evidence....................................................6

B.  There is No Material Variation in the Misrepresentation to Physicians or Degrees of Reliance by Those Physicians Who Prescribed.................................9

C.  Testimony From Individual Doctors Regarding Individual Patients is of Marginal Relevance and The Court Can Properly Limit It...............................10

IV.  THERE IS NO EVIDENTIARY SUPPORT FOR PFIZER'S ARGUMENT THAT SOME TPPs KNEW OR SHOULD HAVE KNOWN OF PFIZER'S FRAUD ..........11

V.  THE NEW JERSEY CONSUMER FRAUD ACT MAY BE APPLIED TO ALL CLASS MEMBERS ...........................................................................................13

VI.  A CLASS PROCEEDING IS SUPERIOR........................................................14

VII.  DISCOVERY SHOULD NOT BE REOPENED ...............................................15

CONCLUSION .......................................................................................................15

**TABLE OF AUTHORITIES**

**Cases**

Astiana v. Kashi Co., ___ F.R.D. ___, 2013 WL 3943265 (S.D. Cal., July 30, 2013) ................... 5

Blue Cross Blue Shield of Massachusetts v. AstraZeneca Pharmaceuticals LP (In re
    Pharmaceutical Industry Average Wholesale Price Litig.), 582 F. 3d 156 (1st Cir. 2009) ..... 8

Butler v. Sears, Roebuck and Co., 727 F.3d 796 (7th Cir. 2013) ................................................. 3, 6

Catholic Healthcare West v. US Foodservice Inc. (In re U.S. Foodservice Inc. Pricing Litig.),
    ___ F. 3d ___, 2013 WL 4609219 (2d Cir., August 30, 2013) ...................................................... 5

Comcast Corp. v. Behrend, 133 S. Ct. 1426 (2013) ................................................................. 3, 4, 6

Gintis v. Bouchard Transp. Co., 596 F.3d 64 (1st Cir. 2010) ........................................................ 8

Glazer v. Whirlpool Corp., 722 F. 3d 838 (6th Cir. 2013) .............................................................. 6

Guido v. L'Oreal USA, Inc., 2103 WL 3353857 (C.D. Cal., July 1, 2013) ..................................... 5

Harden Mfg. Corp. v. Pfizer, Inc. (In re Neurontin Marketing and Sales Practices Litig.), 712
    F. 3d 60 (1st Cir. 2013) ................................................................................................................ 9

In re Cathode Ray Tube (CRT) Antitrust Litig., 2013 WL 5391159 (N.D. Cal., Sept 19, 2013) . 5

In Re Diamond Foods, Inc. Securities Litig., ___F.R.D. ___, 2013 WL 1891382 (N.D. Cal., May
    6, 2013) .......................................................................................................................................... 5

In re Mercedes-Benz Tele-Aid Contract Litig., 257 F.R.D. 46 (D.N.J. 2009) ....................... 13, 14

In re Neurontin Marketing & Sales Practices Litig., 2011 WL 3852254 (D. Mass., Aug. 31,
    2011) .......................................................................................................................................... 1, 4

In re Neurontin Marketing & Sales Practices Litig., 754 F. Supp. 2d 293 (D. Mass. 2010) ....... 9

In Re Neurontin Marketing and Sales Practices Litig., 799 F. Supp. 2d 110, 119-20 (D. Mass.
    2011) ............................................................................................................................................ 12

In re Neurontin Mktg. & Sales Practices Litig., 244 F.R.D. 89 (D. Mass. 2007) ......................... 9

In re Neurontin Mktg. and Sales Practices Litig., 2011 WL 1882870 (D. Mass. May 17, 2011)
    .................................................................................................................................................... 11

In re St. Jude Medical, Inc., 522 F.3d 83 (8th Cir. 2008) .............................................................. 8

In re TJX Cos. Retail Sec. Breach Litig. 246 F.R.D. 389 (D. Mass. 2007) ...................................... 8

Int'l Union of Op. Eng'rs Local No. 68 v. Merck & Co., Inc., 192 N.J. 372 (N.J. 2007)............13

Ironworkers Local Union 68 v. AstraZeneca Pharms. L.P., 634 F. 3d 1352 (11th Cir. 2011)...12

Jacob v. Duane Reade, Inc., ___ F.R.D. ___, 2013 WL 4028147 (S.D.N.Y. August 8, 2013) .......6

Kaiser Found. Health Plan, Inc. v. Pfizer, Inc. (In re Neurontin Marketing and Sales
    Practices Litig.), 712 F. 3d 21 (1st Cir. 2013) ......................................................1, 4, 9

Levin v. Dalva Bros., 459 F.3d 68 (1st Cir. 2006) .........................................................14

Maniscalco v. Brother Int. (USA) Corp. 709 F.3d 202 (3d Cir. 2013)...............................14

Munoz v. PHH Corp., 2013 WL 2146925 (E.D. Cal., May 15, 2013) ...............................5

Six Mexican Workers v. Arizona Citrus Growers, 904 F. 2d 1301 (9th Cir., 1990)....................2

Smilow v. Sw. Bell Mobile Sys., Inc., 323 F.3d 32 (1st Cir. 2003) ..................................8

UFCW Local 1776 v. Eli Lilly & Co., 620 F.3d 121 (2d Cir. 2010) ................................9

Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541 (2011)..............................................6, 7

Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288 (1st Cir. 2000) ....................12

**Statutes**

N.J.S.A. 56:8-1 ............................................................................................13

**Rules**

Fed. R. Civ. P. 23(b)(3) .............................................................................8, 15

Fed. R. Civ. P. 23(c)(4)...............................................................................6

**Other Authorities**

Restatement (Second) of Conflict of Laws, § 148..................................................13, 14

iii

I.      **PLAINTIFFS CAN ESTABLISH CLASSWIDE INJURY NOTWITHSTANDING
        SOME CLASS MEMBERS PURCHASED MORE NEURONTIN THAN OTHERS**

In its opposition, Pfizer revives its argument that the Class Plaintiffs are unable to

prove class wide injury.  Pfizer now claims that individual issues will predominate because

some third-party payors are so small that they may not have paid for bipolar Neurontin

prescriptions during the multi-year class period.  It does not deny that if the Class Plaintiffs'

evidence is accepted, all plans that paid for bipolar Neurontin have been harmed.  Nor does

it deny that Class Plaintiffs have quantified the total amount of harm suffered by all of the

plans that did pay for Neurontin.[1]  Instead, Pfizer merely suggests that if all TPPs were

included in the class, the class might be over-inclusive because some TPPs might not have

made the requisite purchases.

Pfizer's argument lands far wide of the mark because the class sought by Plaintiffs

includes TPPs if *but only if* they paid for Neurontin prescriptions for bipolar.  The class to be

certified is defined as:

> All private, non-governmental entities in the United States and its territories
> *that paid or reimbursed* all or part of the cost of Neurontin prescribed,
> provided, or administered to natural persons covered by any contract, policy,
> or plan, for bipolar and other mood disorders from November 1995 through
> December 2004.  (emphasis added)

By definition, every plan that is within the class *did* pay for Neurontin for bipolar and even

if a class member only reimbursed a single bipolar prescription, it is far more likely than

---

[1] In his expert report, Dr. Raymond Hartman quantified the class wide damage (excluding Kaiser and the other consolidated plaintiffs) to be $623,312,892.  This Court approved Dr. Hartman's methodology for quantifying damages in its Kaiser trial findings of fact and conclusions of law.  In re Neurontin Marketing & Sales Practices Litig., 2011 WL 3852254 at *33, *59 (D. Mass., Aug. 31, 2011) ("Kaiser Findings"), affirmed, Kaiser Found. Health Plan, Inc. v. Pfizer, Inc. (In re Neurontin Marketing and Sales Practices Litig.), 712 F. 3d 21, 49-50 (1st Cir. 2013) ("Kaiser").

not—99.4% to 0.6%—that the prescription was induced by fraud.[2]  As Pfizer notes, Dr.

Conti did expect that 13,070 TPPs likely paid for off-label Neurontin.  But it does not matter

whether some did not actually reimburse any of the 11,710,680 fraudulent bipolar

prescriptions[3] — if they did not, they are not in the class.

      Pfizer has confounded proof of membership in the class with proof of class wide

injury.  Pfizer's argument puts the cart before the horse; class representatives need not

identify each and every member of a proposed class before it can be certified.  As the Court

will recall from the AWP class action, the trier of fact only determines damages owed to the

class, not the amounts owed to each and every class member.  While small TPPs may

ultimately have to prove they paid for bipolar Neurontin, that requirement only arises as

part of the claims process, which itself can only occur after a class has been certified, Pfizer

has been found liable, and there is a recovery to allocate.[4]

      Pfizer claims the Plaintiffs' damages analysis is only valid for large TPPs like Kaiser

and Aetna.  The essence of Pfizer's argument is that predominance does not exist because

some TPPs suffered greater damages than others.  But that should never be the basis for

---

[2] Pfizer calculates that if 0.6% of the bipolar prescriptions were written independent of its fraud, a proposed class could not recover for 70,688 prescriptions.  It is extremely unlikely that these prescriptions will make the class of TPPs over-inclusive.  Accordingly, Pfizer's argument that it should be relieved of liability for the 11,640,000 bipolar prescriptions which resulted from fraud is ridiculous on its face.

[3] Notwithstanding Pfizer's rhetoric, it is extremely unlikely that Plaintiff Harden Manufacturing Corp. ("Harden") is one of the TPPs that did not pay for bipolar Neurontin.  Dr. Conti found that there was an 88% likelihood that Harden had paid for Neurontin for bipolar, and calculated that it had likely spent over $1,000 on those prescriptions.  Declaration of Rena Conti, Ph.D. in Support of Plaintiffs' Renewed Motion for Class Certification, ¶¶ 60-61.  Moreover, although Harden had just shy of the 499 employees necessary for there to have been a 90% likelihood of purchasing Neurontin for bipolar, under Dr. Conti's methodology, a plan more likely than not (50.2%) reimbursed a bipolar Neurontin prescription if it only covered 151 lives, a number Harden greatly exceeds.

[4] Another reason why the claims process does not impact the predominance inquiry is that given RICO's deterrent purposes no portion of a class judgment would likely revert back to Pfizer.  Six Mexican Workers v. Arizona Citrus Growers, 904 F. 2d 1301, 1307-08 (9th Cir., 1990) (reversion is only appropriate when deterrence is not a goal of the statute; "[w]here the only question is how to distribute the damages, the interests affected are not the defendant's but rather those of the silent class members.")

denying class certification, as Judge Posner recently ruled in <u>Butler v. Sears, Roebuck and Co.</u>, 727 F.3d 796, 801 (7th Cir. 2013):

> It would drive a stake through the heart of the class action device, in cases in which damages were sought rather than an injunction or a declaratory judgment, to require that every member of the class have identical damages. If the issues of liability are genuinely common issues, and the damages of individual class members can be readily determined in individual hearings, in settlement negotiations, or by creation of subclasses, the fact that damages are not identical across all class members should not preclude class certification. Otherwise defendants would be able to escape liability for tortious harms of enormous aggregate magnitude but so widely distributed as not to be remediable in individual suits.

Pfizer's objection is as misguided as that in <u>Butler</u>.  If some TPPs paid less than would have been expected statistically, others will be found to have paid more.  The distribution is not significant so long as compensation is paid for all of the fraudulent prescriptions and all plans affected have an opportunity to recoup their damages.  A national class of TPPs will, by definition, be sufficiently large to reflect national statistical averages.

## II.   ANY DISPUTE AS TO THE ADMISSIBILITY OF PROFESSOR ROSENTHAL'S REGRESSION ANALYSIS, TO THE EXTENT IT HAS NOT ALREADY BEEN DECIDED AGAINST PFIZER, IS AN ISSUE COMMON TO THE ENTIRE CLASS

Pfizer implies that the First Circuit did not consider <u>Comcast Corp. v. Behrend</u>, 133 S. Ct. 1426 (2013), before it issued its opinions.  But Pfizer brought the case to the First Circuit's attention by filing a letter describing the opinion and its purported relevance pursuant to Fed. R. App. P. 28(j), a copy of which is attached as Exhibit A.  The First Circuit declined to discuss <u>Comcast</u> or revise its opinions not because it did not have the opportunity, but because <u>Comcast</u> has no application to this controversy.

As noted in the Class Plaintiffs' principal brief, <u>Comcast</u> sensibly precludes class certification when the class representative's damages theory does not match its theory of

3

liability.  135 S. Ct. at 1430.  Thus, if Class Plaintiffs urged the Court to base liability on the theory that Pfizer's misrepresentations caused physicians to write worthless prescriptions, but Professor Rosenthal estimated damages on a fraud on the market theory of excessive price, Comcast would apply.  But here, of course, liability theory and damage theory are wholly consistent: Class Plaintiffs claim that Pfizer conducted a knowingly false marketing campaign, and their damages are based on quantifying the amount of the worthless prescriptions paid for as a result of the fraudulent marketing.

Pfizer makes a half-hearted mismatch argument, claiming that the Class Plaintiffs assert that the fraudulent marketing was accomplished through publications and continuing legal education programs while Professor Rosenthal primarily analyzed data relating to detailing expenditures.  But Pfizer mischaracterizes the Class Plaintiffs' liability theory—the plaintiffs allege that *all* facets of Pfizer's off label marketing campaign, including detailing, were fraudulent.  In Kaiser, this Court agreed that Pfizer's "direct marketing to physicians" was fraudulent.  Kaiser Findings, 2011 WL 3852254 at *2.

Pfizer's mismatch argument merely rehashes its previous arguments that Professor Rosenthal's conclusions are not sufficiently supported by the data she relied upon.  But this Court and the First Circuit have ruled that such critiques are for the trier of fact to evaluate, and only go to the weight of her testimony, not its admissibility.   Kaiser Findings at *33; Kaiser, 712 F. 3d at 44.  The First Circuit conclusively established that the testimony could properly be found both admissible and persuasive.[5]

---

[5] The First Circuit held it was reasonable to use promotional spending as a variable because the money spent on promotion "helped to implement the fraudulent publication strategy".  There was no need "to quantify the 'publication strategy' as distinct from other promotion activities in order to effectively model the causal relationship."  Kaiser, 712 F. at 44.

Pfizer cites a number of cases that condition class certification on the plaintiff's presentation of a methodology capable of measuring damages on a class wide basis – but it fails entirely to examine whether the Class Plaintiffs have presented such a methodology. As the Kaiser trial makes clear, they have. Dr. Hartman calculated Kaiser's damages using national data. Using the same formulas and analysis, he will be able to calculate damages for the class as a whole and for each member. Pfizer has wholly failed to identify individual factors among class members that would prevent him from doing so.[6]

Pfizer relies almost entirely upon employment and consumer class cases where each individual's personal circumstances require a personalized damages determination. Much more relevant are the cases in which damages are measured by comparing a purchase price with the economic value a class member actually received or was supposed to receive. When damages are based upon payment of an improper purchase price, ordinarily the harm suffered by each class member and the class as a whole can be readily determined through a series of mathematical calculations. Courts have routinely held in these cases that a methodology for class wide damage determination exists, and individual damage issues do not predominate.[7] The Class Plaintiffs present such a case.

---

[6] At pages 11 and 12 of its memorandum, Pfizer claims the trier of fact had to consider issues individual to Kaiser to determine damages. But most of these issues concern whether national data should be applied to Kaiser's specific case—a factor that does not apply when dealing with a national class; or concern Kaiser's unique theory of direct reliance; or have nothing to do with damages calculation.

[7] See, e.g., Catholic Healthcare West v. US Foodservice Inc. (In re U.S. Foodservice Inc. Pricing Litig.), ___ F. 3d ___, 2013 WL 4609219 at *12 (2d Cir., August 30, 2013)(invoice fraud; where damages would be determined by calculating the difference between the purchase price and the price customers should have paid, injury is "straightforward" and can be readily calculated for the class and class members); In re Diamond Foods, Inc. Securities Litig., ___F.R.D. ___, 2013 WL 1891382 (N.D. Cal., May 6, 2013) (securities); Astiana v. Kashi Co., ___ F.R.D. ___, 2013 WL 3943265 at *10-11 (S.D. Cal., July 30, 2013)(false advertising); In re Cathode Ray Tube (CRT) Antitrust Litig., 2013 WL 5391159 (N.D. Cal., Sept 19, 2013) at *5-7 (antitrust price fixing); Guido v. L'Oreal USA, Inc., 2103 WL 3353857 at *14-15 (C.D. Cal., July 1, 2013)(false advertising); Munoz v. PHH Corp., 2013 WL 2146925 at *23-25 (E.D. Cal., May 15, 2013) (RESPA violations).

Finally, if the Court disagrees with Class Plaintiffs and finds that damage determinations would cause individual claims to predominate, this Court can still certify liability only under Rule 23(c)(4).  Numerous post-Comcast cases recognize this is an appropriate course, when, as here, there are strong common issues relating to liability.  See, e.g. Butler, 727 F. 3d at 800; Glazer v. Whirlpool Corp., 722 F. 3d 838, 860-61 (6th Cir. 2013); Jacob v. Duane Reade, Inc., ___ F.R.D. ___, 2013 WL 4028147 at *6-*10 (S.D.N.Y. August 8, 2013).  Although the Class Plaintiffs raised this option in their initial memorandum, Pfizer failed to address why a liability-only certification would not comply with Rule 23.

## III. PFIZER'S DESIRE TO PRESENT THE TESTIMONY OF INDIVIDUAL DOCTORS DOES NOT NEGATE THE PREDOMINANCE OF COMMON ISSUES

Confronted with aggregate evidence that not only survives Daubert, but has been found to be both reliable and credible by a judge, a jury and a federal appellate court, Pfizer claims it is entitled to scuttle a class proceeding because it has an unlimited right to present cumulative evidence of dubious credibility from unidentified witnesses.  This cannot be the law and, unsurprisingly, it is not.

### A. Pfizer Does Not Have a Right to Defend Claims Individually When the Class Can Prove Its Claims with Aggregate Evidence

Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541 (2011), does not grant a defendant a right to rebut valid aggregate evidence with personalized evidence regarding individual claims and thereby defeat common issue predominance at will.  In Wal-Mart, the plaintiffs' regression analyses were proffered to prove that the defendant had engaged in unlawful conduct, *not* to establish that already-proven misconduct had caused harm.  There, the plaintiffs could not show that Wal-Mart had adopted any company wide policies or

practices that would have caused disparate treatment of female employees.  The statistical

analyses were supposed to show that disparities between men and women were so

widespread that they had to be intentional; statistics were introduced as a substitute for any

other evidence that Wal-Mart had practiced discrimination.  131 S. Ct. at 2555.

      Here, the Class Plaintiffs are not using statistics to prove that Pfizer engaged in

unlawful conduct.  They are not, for example, claiming that from data reflecting the steep

increase in off-label bipolar prescriptions a jury can infer that Pfizer misrepresented clinical

trials.  Instead, they can prove directly with other evidence that Pfizer misrepresented

clinical trials.  Class Plaintiffs have only introduced statistics for the purpose for which they

have traditionally been used in complex cases: to prove the extent of the harm caused by

the defendants' misconduct.

      Wal-Mart's prohibition against "trial by formula" does not extend to all statistical

proof of damages.  The Supreme Court applied the "trial by formula" epithet to a

questionable sampling model, where the trial court had determined class wide damages by

reviewing a limited number of unrepresentative cases and then extrapolating the results to

the nationwide class as a whole, without any proof that such a technique produced valid

results.[8]  131 S. Ct. at 2561.  The Class Plaintiffs' experts have not extrapolated the effects of

fraud on a few class members to reach conclusions about the whole class; they have

determined the effects of the fraud on the whole class in a way that allows a fact-finder to

---

[8] The Supreme Court also criticized sampling to derive a class wide back pay award in Wal-Mart because such a technique frustrated the unique remedial scheme mandated in Title VII litigation which requires individual damage determinations and also provides unique statutory defenses to individual claims. Wal-Mart at 2560-61.  Pfizer cannot point to any specific statutory language in RICO that mandates individual damage determination or provides defendants with unique statutory defenses.  Any right Wal-Mart had to have an individual determination of each employee's monetary damages was unique to Title VII litigation, not a general statement applicable to all class action defendants.

reach conclusions about individual members.  The Class Plaintiffs' experts embraced all available data regarding all marketing expenditures and all physicians' prescribing – that is the exact opposite of creating a formula through sampling and then extrapolating from that formula for an entire class.

Pfizer cites two other cases for the proposition that it has a right to present unlimited individualized evidence regardless of the ability of class plaintiffs to prove causation through aggregate evidence: In re St. Jude Medical, Inc., 522 F.3d 836, 840 (8th Cir. 2008) and In re TJX Cos. Retail Sec. Breach Litig. 246 F.R.D. 389, 396 (D. Mass. 2007).  Both cases are wholly inapposite because in both, the plaintiffs were completely unable to use common evidence to prove that the defendants' misrepresentations caused class wide injury. Neither court was confronted with a defendant who could defend against aggregate evidence but wanted to contest claims individually to defeat class certification.

In contrast, when a plaintiff has been able to prove its case with common evidence, the First Circuit has repeatedly ruled that a defendant's preference to contest the claims on an individualized basis is not a valid ground for denying class certification.  Gintis v. Bouchard Transp. Co., 596 F.3d 64, 67 (1st Cir. 2010) (Souter, J.); Blue Cross Blue Shield of Massachusetts v. AstraZeneca Pharmaceuticals LP (In re Pharmaceutical Industry Average Wholesale Price Litig.), 582 F. 3d 156, 197-98 (1st Cir. 2009); Smilow v. Sw. Bell Mobile Sys., Inc., 323 F.3d 32, 37 (1st Cir. 2003).  Were it otherwise, "the point of the Rule 23(b)(3) provision for class treatment would be blunted beyond utility."  Gintis, 596 F. 3d at 66. Gintis and AWP control here.

**B.** **There is No Material Variation in the Misrepresentation to Physicians or Degrees of Reliance by Those Physicians Who Prescribed**

Pfizer again argues that the misrepresentations at issue are not sufficiently uniform to permit class wide adjudication.  This Court rejected that argument long ago in 2007:

> Plaintiffs have met their burden of demonstrating that the "key messages" of efficacy and clinical evidentiary support disseminated by [Pfizer], coupled with the suppression or misrepresentation of unfavorable data, are materially uniform per indication. [Citation omitted]. They have alleged several instances where defendants suppressed or misrepresented the results of negative data and numerous examples of defendants' dissemination of materially uniform misrepresentations related to Neurontin's efficacy for each of the off-label indications. Accordingly, minor, immaterial variations among the alleged oral misrepresentations will not defeat certification.

In re Neurontin Mktg. & Sales Practices Litig., 244 F.R.D. 89, 109 (D. Mass. 2007).

There is also no material variation in the degrees of reliance of the class members. As the First Circuit recognized, misrepresentations that a drug is effective (when it is not) are significantly different than the misrepresentations in other pharmaceutical marketing cases concerning a drug's comparative efficacy.  Kaiser, 712 F. 3d at 46-47.  In those cases, any statistical damages analysis is confounded by the fact that some physicians who did not believe the misrepresentation might still have prescribed – because the medication had *some* efficacy for the condition treated.  Cf. UFCW Local 1776 v. Eli Lilly & Co., 620 F.3d 121, 135 (2d Cir. 2010).  In contrast, if a physician did not believe Pfizer's representation that Neurontin had efficacy as a bipolar treatment, the physician would not have prescribed it for bipolar; physicians do not prescribe drugs they do not believe will treat the patient's condition.  See In re Neurontin Marketing & Sales Practices Litig., 754 F. Supp. 2d 293, 310 (D. Mass. 2010) rev'd by Harden Mfg. Corp. v. Pfizer, Inc. (In re Neurontin Marketing and Sales Practices Litig.), 712 F. 3d 60 (1st Cir. 2013).  Although it is possible that some doctors

prescribed bipolar Neurontin for reasons other than Pfizer's representations of efficacy, Class Plaintiffs' damages model takes that possibility into account and can quantify it on a class wide basis using common evidence. Thus, there is no variation in representation or reliance that precludes class certification.

**C.**   **Testimony From Individual Doctors Regarding Individual Patients is of Marginal Relevance and The Court Can Properly Limit It**

Class Plaintiffs do not argue that Pfizer has no right to call individual doctors to testify, but it is clear that such testimony is of limited value, and that the relevant evidence that might be derived from such testimony does not defeat predominance. Although Pfizer attempts to focus the Court's attention on individual physician decisions, the issue before the trier of fact is not why Dr. Smith prescribed Neurontin to bipolar patient Jones on a particular date. The actual issue for a jury is what *percentage* of the Neurontin bipolar prescriptions would have occurred but for Pfizer's fraudulent promotion. Individual prescribers shed little light on what the trier of fact must decide in either a class proceeding or an individual TPP trial, particularly if the physician's recollection is hazy.

Thus, any trial judge would almost certainly limit the amount of individual testimony permitted—as this Court did, without objection, in the Kaiser trial. Pfizer claims that had it had the ability to subpoena more physicians, more individual physician testimony would have been presented. This is not true. The Court, without objection, limited the time each side had to present evidence, and Pfizer used almost every minute allotted to it. It jettisoned the testimony of important liability witnesses in order to get its

most relevant evidence before the jury.[9]  The number of testifying physicians cannot defeat class certification because that number would be capped regardless of whether or not the Class Plaintiffs proceed as a class.

Pfizer does not argue that it cannot defend against the Class Plaintiffs' aggregate evidence with the type of limits on individual physician testimony this Court imposed in the Kaiser trial.  It would simply prefer not to.  But Rule 23 cannot be interpreted to give a defendant a veto over the ability to utilize class proceedings when the plaintiff has established that it can prove liability and damages on evidence common to the class.  Given the marginal utility of the evidence, it cannot be a basis for denying certification.

## IV. THERE IS NO EVIDENTIARY SUPPORT FOR PFIZER'S ARGUMENT THAT SOME TPPS KNEW OR SHOULD HAVE KNOWN OF PFIZER'S FRAUD

This Court has rejected Pfizer's prior arguments that differences in the way various TPPs managed Neurontin create individual issues precluding certification.  Indeed, after closely scrutinizing the declaration submitted by Pfizer's expert on TPP formulary management, Gregory Bell, the Court found that TPPs "did not actively manage Neurontin during the class period or directly rely on any Pfizer misrepresentations in making formulary or drug management decisions."  In re Neurontin Mktg. and Sales Practices Litig., 2011 WL 1882870 at *3 (D. Mass. May 17, 2011).  That determination led this Court to conclude that common issues predominate in this case with respect to liability.  Id.

Pfizer now speculates that it might have a defense to some TPPs claims because some plans might have had a duty to employ formulary restrictions during the class

---

[9] See Trial Transcript, Day 19, March 22, 2010 [Dkt. #2771] at 125:8-12, where Pfizer announced that due to time constraints, it would not introduce testimony from Dr. Atul Pande, the Pfizer researcher who conducted the failed Pande bipolar clinical trial, or Dr. Nicolas Weider, the Kaiser physician who sat on the committee that lifted Neurontin restrictions on the Kaiser formulary.

period.  There is zero evidentiary support for this theoretical defense.  This Court has already found that TPPs were not managing Neurontin's off-label use during the class period, so the TPPs had no duty to discover obscure medical literature that Neurontin was ineffective for bipolar disorder.  Nor does Pfizer present any expert testimony that TPPs should have known Neurontin was ineffective.  Indeed, such testimony would contradict Pfizer's principal defense that Neurontin was an effective treatment.

Nor does Pfizer possess any evidence that any TPPs had actual knowledge during the class period.  What the class members may have learned after the end of the class period is irrelevant because, unlike Kaiser, the Class Plaintiffs do not contend that TPPs relied on Pfizer's representations.  In the Kaiser trial, what Kaiser did (or failed to do) after it learned of Neurontin's inefficacy was relevant to Pfizer's defense that Kaiser did not rely on its misrepresentations.  Here, what would be relevant is whether the physicians knew the truth about Neurontin's failed clinical trials.  But as the Class Plaintiffs have previously pointed out, there is no evidence that Pfizer told physicians the truth or that any physician would have prescribed Neurontin had he or she known it had failed every single clinical trial.

As the Class Plaintiffs pointed out in their opening brief, arguments "woven entirely out of gossamer strands of speculation and surmise [may not] tip the decisional scales in a class certification ruling."  Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 298 (1st Cir. 2000).  Pfizer's most recent conjecture is another example.[10]  Without

---

[10] Yet another example is their supposition that some class members may not have cared if they were defrauded and simply intended to recoup their losses through premium increases.  Cf. Ironworkers Local Union 68 v. AstraZeneca Pharms. L.P., 634 F. 3d 1352 (11th Cir. 2011).  This Court has previously rejected Pfizer's urgings to apply the Eleventh Circuit's theory of lack of damage to the Neurontin litigation, In Re Neurontin Marketing and Sales Practices Litig., 799 F. Supp. 2d 110, 119-20 (D. Mass. 2011), and it should do so again, if only because there is no factual support for any claim that class members willingly assumed all risk of loss from fraud and fully recouped any losses through premium increases.

evidence to support these theories, Pfizer cannot speculate its way around class

certification.

## V.     THE NEW JERSEY CONSUMER FRAUD ACT MAY BE APPLIED TO ALL CLASS MEMBERS

Pfizer's assertion that Class Plaintiffs' claim under the New Jersey Consumer Fraud

Act, N.J.S.A. 56:8-1 et seq. ("NJCFA") raises choice-of-law issues that defeat predominance

must fail.  Class Plaintiffs have proceeded only under the NJCFA because the fraudulent

marketing scheme was initiated and implemented from Parke-Davis' New Jersey

headquarters.  In an extensive choice-of-law analysis that applied the same test that Pfizer

agrees is applied under Massachusetts choice-of-law rules, another court found, under

similar facts, that the NJCFA may be applied to a nationwide class.  See In re Mercedes-

Benz Tele-Aid Contract Litig., 257 F.R.D. 46, 80 (D.N.J. 2009) (applying § 148 of Restatement

(Second) of Conflict of Laws.  The Third Circuit Court of Appeals denied Mercedes-Benz's

petition for leave to appeal that decision.  2009 U.S. App. LEXIS 12478 (3d Cir. Jun. 4, 2009).

Pfizer overstates outcome-determinative differences among the states' consumer

protection laws that relate to the NJCFA claim. See Williams v. Astra USA, 68 F. Supp. 2d

29, 36 (D. Mass. 1999) (actual conflict must exist).[11]  However, even assuming differences,

application of Section 148's factors would produce the same outcome as in Tele-Aid –

application of the NJCFA nationwide.  Where a marketing fraud originated and was

implemented from New Jersey (as it was in Tele-Aid), and the only variance among class

---

[11] For example, Pfizer identifies varying reliance requirements among state laws (Br. at 22), but the NJCFA does not require a showing of reliance.  See Int'l Union of Op. Eng'rs Local No. 68 v. Merck & Co., Inc., 192 N.J. 372, 389 (N.J. 2007).

members is where they paid for Neurontin, there is little question that New Jersey has the most significant relationship to this fraud.

This result is in accord with decisions before and since <u>Tele-Aid</u>. For example, in <u>Levin v. Dalva Bros.</u>, 459 F.3d 68, 74-75 (1st Cir. 2006), the First Circuit affirmed the use of Restatement § 148 to apply New York law to a fraud claim where the misrepresentations were made in New York, but the plaintiff resided in Massachusetts.  The case Pfizer relies upon, <u>Maniscalco v. Brother Int. (USA) Corp.</u> 709 F.3d 202, 209-11 (3d Cir. 2013), applied the same analysis conducted in <u>Tele-Aid</u>, but distinguished it because in <u>Tele-Aid</u> (and this case), none of the alleged misrepresentations were made in New Jersey.   No other state's interest in this fraud approaches that of New Jersey's.  Under Massachusetts' choice-of-law rules, the Court should apply the NJCFA to the entire class.

## VI.    A CLASS PROCEEDING IS SUPERIOR

Pfizer contends that RICO's potentially lucrative remedies obviate the need for a class proceeding because any injured class member will be adequately compensated for its efforts when it recovers on its individual suit.  If this were the law, RICO class actions could never be certified.

Moreover, until Pfizer is willing to admit liability, there is no likelihood that any TPP will recover or will be willing to risk the expense and uncertainty of an individual suit.[12] The Court has before it Kaiser's fee petition.  It can judge for itself whether plans substantially smaller than Kaiser would expend even a fraction of what Kaiser has had to

---

[12] The Court will observe that one of the original consolidated plaintiffs, The Guardian Life Insurance Company of America, decided not to continue to bear the expenses of this litigation, notwithstanding the possibility of a sizable RICO recovery and payment of its attorneys' fees. It dismissed its claim while these cases were on appeal. Guardian is one of the largest national TPPs, providing health insurance for over 6,000,000 employees.

devote to this litigation.  Even trebled, there is no possibility that all or even most TPPs would attempt to recover without a class proceeding.

Pfizer also contends that individual trials would be more manageable, despite the fact that numerous physicians would have to testify repeatedly because most psychiatrists treat patients who are insured by several TPPs.  Without any factual or evidentiary support it claims that most TPPs might only deal with a single psychiatrist who wrote Neurontin for bipolar.  Pfizer's assertion also neglects the fact that most of the litigation would likely concern larger plans that filled large numbers of Neurontin prescriptions.  For the reasons described above, most of the smaller plans would not bother to seek compensation.  Where the practical alternative to a class proceeding is no proceeding, a class action is superior.

## VII.   DISCOVERY SHOULD NOT BE REOPENED

On the same page of its memorandum that bluntly declares "discovery from Pfizer is completed," Pfizer seeks leave from the Court to take exhaustive additional discovery from the Class Plaintiffs and other class members.  Audacity has never been Pfizer's weak suit.

Pfizer claims the need to perform a "rigorous analysis" of a class certification motion should permit class certification discovery to be co-extensive with merits discovery.  But both types of discovery were closed years ago.  During the many years it had to conduct discovery, Pfizer could have investigated all of the topics identified in its memorandum.  The lead case was filed more than nine years ago.  It is time to conclude the litigation.

## CONCLUSION

For the reasons stated above and in Class Plaintiffs' motion and its supporting memorandum, this Court should certify the requested class under Fed. R. Civ. P. 23(b)(3).

Dated:  October 21, 2013   Respectfully Submitted,

       By:

       */s/ Thomas M. Greene*
       Thomas M. Greene, BBO # 210020
       Greene LLP
       One Liberty Square, 12th Floor
       Boston, MA 02109
       tgreene@greenellp.com

       */s/ Don Barrett*
       Don Barrett
       Barrett Law Office
       404 Court Square North
       P.O. Box 987
       Lexington, MS 39095
       dbarrett@barrettlawgroup.com

       */s/ Daniel Becnel*
       Daniel Becnel, Jr.
       Law Offices of Daniel Becnel, Jr.
       106 W. Seventh Street
       P.O. Drawer H
       Reserve, LA 70084
       dbecnel@becnellaw.com

       */s/ Elizabeth J. Cabraser*
       Elizabeth J. Cabraser
       Lieff Cabraser Heimann &
         Bernstein, LLP
       Embarcadero Center West
       275 Battery Street, 30th Floor
       San Francisco, CA 94111-3339
       ecabraser@lchb.com

_/s/ James Dugan_
James Dugan
The Dugan Law Firm
One Canal Street
365 Canal St., Suite 1000
New Orleans, LA 70131
jdugan@dugan-lawfirm.com

_/s/ Thomas M. Sobol_
Thomas M. Sobol
Hagens Berman Sobol Shapiro LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA  02142
tom@hbsslaw.com

**_Members of the Class Plaintiffs'_**
**_Steering Committee_**

## CERTIFICATE OF SERVICE

I, Thomas M. Greene, hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on October 21, 2013.

Dated: October 21, 2013                    _/s/ Thomas M. Greene_
                                          Thomas M. Greene