UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1629<br><br>Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO:<br><br>HARDEN MANUFACTURING CORPORATION; LOUISIANA HEALTH SERVICE INDEMNITY COMPANY, d/b/a BLUECROSS/BLUESHIELD OF LOUISIANA; ASEA/AFSCME LOCAL 52 HEALTH BENEFITS TRUST; JAN FRANK WITYK; and GARY VARNAM, on behalf of themselves and all others similarly situated,<br><br>　　　Plaintiffs,<br><br>v.<br><br>PFIZER INC. and WARNER-LAMBERT COMPANY,<br><br>　　　Defendants. | Chief Judge Patti B. Saris<br>Magistrate Judge Leo T. Sorokin |

**SURREPLY MEMORANDUM OF LAW IN FURTHER OPPOSITION TO
CLASS PLAINTIFFS' POST-MANDATE MOTION FOR CLASS CERTIFICATION**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

ARGUMENT ..................................................................................................................... 1

I.   Common Issues Do Not Predominate Because Injury, Causation And Damages Cannot Be Proven Classwide .............................................................................. 1

    A.   Professor Rosenthal's Analysis Cannot Establish Classwide Injury For A Putative Class Composed Primarily Of Small TPPs ................................. 1

    B.   Professor Rosenthal's Analysis Cannot Establish Classwide Damages ................. 4

    C.   Individual Issues Regarding Physicians' Prescribing Decisions Predominate Over Any Common Questions ............................................. 9

    D.   Individual Issues Regarding TPPs' Formulary And Reimbursement Decisions Predominate Over Any Common Questions ....................................... 12

II.  Significant Conflicts Between The States' Laws Preclude Certification Of Plaintiffs' NJCFA Claim ............................................................................. 12

III. A Class Proceeding Would Not Be Superior To Individual Proceedings ........................ 14

CONCLUSION ................................................................................................................. 15

## TABLE OF AUTHORITIES

**Page**

### Cases

*In re Bank of America Home Affordable Modification Program (HAMP) Contract Litigation*,
  M.D.L. No. 10-2193-RWZ, 2013 WL 4759649 (D. Mass. Sept. 4, 2013)...............................7

*In re Baycol Products Litigation*,
  218 F.R.D. 197 (D. Minn. 2003)..........................................................................................7

*Blain v. Smithkline Beecham Corp.*,
  240 F.R.D. 179 (E.D. Pa. 2007)............................................................................................7

*Castano v. American Tobacco Co.*,
  84 F.3d 734 (5th Cir. 1996) ..................................................................................................7

*Cimino v. Raymark Industries, Inc.*,
  151 F.3d 297 (5th Cir. 1998) .............................................................................................7, 9

*Clark v. Prudential Insurance Co. of America*,
  Civ. No. 08-6197 (DRD), 2013 WL 1694451 (D.N.J. Apr. 18, 2013).....................................8

*Comcast Corp. v. Behrend*,
  133 S. Ct. 1426 (2013).............................................................................................. 4, 5, 7

*Dungan v. Academy at Ivy Ridge*,
  249 F.R.D. 413 (N.D.N.Y. 2008), *aff'd*, 344 F. App'x 645 (2d Cir. 2009)...........................8

*Harden Manufacturing Corp. v. Pfizer, Inc. ("Harden Opinion")*,
  712 F.3d 60 (1st Cir. 2013)......................................................................................4, 9, 10, 11

*Harding v. Tambrands Inc.*,
  165 F.R.D. 623 (D. Kan. 1996)..............................................................................................7

*Hart v. Secretary of Department of Health & Human Services*,
  60 Fed. Cl. 598 (2004) ......................................................................................................2, 3

*Kaiser Foundation Health Plan, Inc. v. Pfizer, Inc. ("Kaiser Opinion")*,
  712 F.3d 21 (1st Cir. 2013).....................................................................................................6

*Krim v. pcOrder.com., Inc.*,
  402 F.3d 489 (5th Cir. 2005) .............................................................................................2, 3

*Levin v. Dalva Bros., Inc.*,
  459 F.3d 68 (1st Cir. 2006)...................................................................................................13

*Lindsey v. Normet*,
  405 U.S. 56 (1972)................................................................................................................10

*Maniscalco v. Brother International (USA) Corp.*,
  709 F.3d 202 (3d Cir. 2013).................................................................................................13

*Marcus v. BMW of North America, LLC*,
    687 F.3d 583 (3d Cir. 2012)..................................................................................................12

*Mazzei v. Money Store*,
    288 F.R.D. 45 (S.D.N.Y. 2012) ..............................................................................................2

*McLaughlin v. American Tobacco Co.*,
    522 F.3d 215 (2d Cir. 2008)....................................................................................................8

*In re Mercedes-Benz Tele Aid Contract Litigation*,
    257 F.R.D. 46 (D.N.J. 2009)..................................................................................................13

*Moeller v. Taco Bell Corp.*,
    No. C 02-5849 PJH, 2012 WL 3070863 (N.D. Cal. July 26, 2012) .........................................8

*Napert v. Government Employees Insurance Co.*,
    No. 13-10530-FDS, 2013 WL 3989645 (D. Mass. Aug. 1, 2013)............................................7

*Neale v. Volvo Cars of North America, LLC*,
    No. 2:10-CV-4407 (DMC)(MF), 2013 WL 1223354 (D.N.J. Mar. 26, 2013), *reconsideration denied*, 2013 WL 5674355 (D.N.J. Oct. 16, 2013)...................................................................13

*In re Neurontin Marketing & Sales Practices Litigation*,
    244 F.R.D. 89 (D. Mass. 2007)..............................................................................................11

*In re Neurontin Marketing, Sales Practices & Products Liability Litigation*,
    257 F.R.D. 315 (D. Mass. 2009)...............................................................................2, 10, 11

*In re Neurontin Marketing & Sales Practices Litigation*,
    754 F. Supp. 2d 293 (D. Mass. 2010) .....................................................................................5

*In re Neurontin Marketing & Sales Practices Litigation ("Amended Findings")*,
    No. 04-cv-10739-PBS, 2011 WL 3852254 (D. Mass Aug. 31, 2011)..........................6, 12, 14

*In re Neurontin Marketing & Sales Practices Litigation*,
    No. 04-cv-10981-PBS, 2011 WL 1882870 (D. Mass. May 17, 2011) ....................................8

*In re New Motor Vehicles Canadian Export Antitrust Litigation*,
    522 F.3d 6 (1st Cir. 2008).................................................................................................3, 4

*Randleman v. Fidelity National Title Insurance Co.*,
    646 F.3d 347 (6th Cir. 2011) ..................................................................................................1

*Rink v. Cheminova, Inc.*,
    203 F.R.D. 648 (M.D. Fla. 2001)............................................................................................8

*Smith v. Rapid Transit, Inc.*,
    58 N.E.2d 754 (Mass. 1945) ...................................................................................................3

*In re St. Jude Medical, Inc.*,
    522 F.3d 836 (8th Cir. 2008) ................................................................................................10

*In re TJX Companies Retail Security Breach Litigation*,
    246 F.R.D. 389 (D. Mass. 2007)...........................................................................................10

*UFCW Local 1776 v. Eli Lilly & Co.*
  620 F.3d 121 (2d Cir. 2010)..................................................................................................12

*United States v. Armour & Co.*,
  402 U.S. 673 (1971)...........................................................................................................10

*Wal-Mart Stores, Inc. v. Dukes*,
  131 S. Ct. 2541 (2011).............................................................................................6, 9, 10

## **Rules**

Fed. R. Civ. P. 23 ............................................................................................5, 7, 8, 11, 16

Fed. R. Civ. P. 23(a) ..................................................................................................................7

Fed. R. Civ. P. 23(b)(3)..................................................................................................4, 7, 9

Fed. R. Civ. P. 23(c)(4)..............................................................................................................7

## **Miscellaneous**

Joseph M. McLaughlin, *McLaughlin on Class Actions* § 5:54 (9th ed. 2012) ...............................11

**ARGUMENT**

I. **COMMON ISSUES DO NOT PREDOMINATE BECAUSE INJURY, CAUSATION AND DAMAGES CANNOT BE PROVEN CLASSWIDE**

   A. **Professor Rosenthal's Analysis Cannot Establish Classwide Injury For A Putative Class Composed Primarily Of Small TPPs**

Plaintiffs argue that "Pfizer has confounded proof of membership in the class with proof of class wide injury." (Reply Mem. in Supp. of Post-Mandate Mot. For Class. Cert. [4179] ("Pl. Reply") at 2.) To the contrary, Pfizer identified these as related, but distinct issues. To determine membership under their proposed class definition, Plaintiffs would need to demonstrate that each putative class member insured at least one patient who was prescribed Neurontin for bipolar disorder during the relevant time period. (*See* Post-Mandate Mot. for Class Cert. [4153] ("Pl. Mot.") at 2.) To determine injury, Plaintiffs would need to prove, *inter alia*, that each putative class member paid for at least one such prescription as a result of fraudulent marketing. As set forth in Pfizer's opposition brief (at 6-9), Plaintiffs' own experts' analyses demonstrate that many putative class members likely paid only for non-fraudulently-induced bipolar prescriptions and, thus, suffered no injury whatsoever. Plaintiffs' reply fails to meet the substance of this argument.

It is Plaintiffs who attempt to conflate class membership and injury by arguing that any TPPs who "did not actually reimburse any of the 11,710,680 fraudulent bipolar prescriptions . . . are not in the class." (Pl. Reply at 2.) To the contrary, Plaintiffs' proposed class definition also includes TPPs who paid for the more than 70,000 bipolar prescriptions that Prof. Rosenthal concedes were not caused by fraud (*see* Mem. in Opp. to Post-Mandate Mot. For Class. Cert. [4168] ("Pfizer Opp.") at 8 n.7), and for the nearly 2 million bipolar prescriptions that the *Kaiser* jury found were not caused by fraud (*see id.* at 9 & Exhibit A). Plaintiffs' belated attempt to exclude such uninjured TPPs from their class definition would result in an improper "fail-safe" class in which "[e]ither the class members win or, by virtue of losing, they are not in the class and, therefore, not bound by the judgment." *Randleman v. Fid. Nat'l Title Ins. Co.*, 646 F.3d

347, 352 (6th Cir. 2011).  Beyond being fundamentally unfair to defendants, a fail-safe class "is unmanageable because the members of the class could only be known after a determination of liability."  *Mazzei v. Money Store*, 288 F.R.D. 45, 55 (S.D.N.Y. 2012).

Plaintiffs attempt to dodge these problems by stating that "most of the litigation would likely concern larger plans that filled large numbers of Neurontin prescriptions," and by denying that there is "any factual or evidentiary support" for the notion that "most TPPs might only deal with a single psychiatrist who wrote Neurontin for bipolar."  (Pl. Reply at 15.)  These conclusory assertions directly contradict Plaintiffs' own expert, Dr. Rena Conti, who declared that the vast majority of putative class members—9,895 out of a total of 13,070 TPPs—fall within the "smallest category of payer," *i.e.*, self-insured employers like Harden.  (Revised Conti Decl. [1142] ¶¶ 57-58.)  These TPPs' membership in the putative class depends on Dr. Conti's opinion—expressed with as little as "~88%" confidence—that they insured a *single consumer* who took Neurontin for bipolar disorder.  (*Id.* ¶¶ 54, 60.)  Plaintiffs fail to explain how such small TPPs are any different from the consumer plaintiffs, as to whom this Court denied class certification in a ruling Plaintiffs have not appealed or otherwise challenged.  *See In re Neurontin Mktg., Sales Practices & Prods. Liab. Litig.*, 257 F.R.D. 315, 331 (D. Mass. 2009).

Plaintiffs argue that "even if a class member only reimbursed a single bipolar prescription, it is far more likely than not—99.4% to 0.6%—that the prescription was induced by fraud."  (Pl. Reply at 1-2)  But the "preponderance" standard of proof is not satisfied by naked statistical probabilities untethered to the particular occurrence or transaction on which a plaintiff's claim is based.  *See, e.g.*, *Krim v. pcOrder.com., Inc.*, 402 F.3d 489 (5th Cir. 2005); *Hart v. Sec'y of Dep't of Health & Human Servs.*, 60 Fed. Cl. 598 (2004).  In *Krim*, a putative class of investors brought securities fraud claims under a statute that afforded standing only to plaintiffs who could trace their "aftermarket" shares back to the relevant public offering.  *See* 402 F.3d at 491-92.  The named plaintiffs had bought their shares from pools composed of as much as 99.85% public offering stock.  *See id.* at 492.  Much like Plaintiffs here, the plaintiffs in *Krim* argued that these statistics "indicat[ed] a high mathematical probability, based on the

2

number of shares purchased by each individual and the number of PO shares in the market, that at least some of their shares were issued pursuant to the challenged registration statement." *Id.* at 494. But the Fifth Circuit affirmed the dismissal of their claims, observing that "under [plaintiffs'] view, in any case where more than 50% of the available shares are issued pursuant to an allegedly false registration statement, all shareholders would have standing." *Id.* at 496 n.36. The Fifth Circuit rejected this argument because it would impermissibly confer standing on plaintiffs who had not been injured. *See id.* at 496-97. As the Fifth Circuit explained, "[Plaintiffs'] evidence merely demonstrates the probability that *anyone* with *x* number of shares will possess some tainted shares. It says nothing about the shares that one particular individual actually owns." *Id.* at 501 (emphasis in original). *See also, e.g., Hart*, 60 Fed. Cl. at 607 ("[C]orroborating, non-statistical evidence is demanded . . . to ensure that general probability evidence based upon the relative frequency of various events in one population is truly transferable to prove the occurrence of a prior event relevant to the case before the court.").[1]

As in *Krim*, Plaintiffs cannot use naked statistics to circumvent their burden of proving "that each member of the class was in fact injured." *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 28 (1st Cir. 2008). Plaintiffs do not dispute that, even if Prof. Rosenthal's 99.4% figure were accepted, this would leave more than *70,000 bipolar prescriptions* written for independent reasons. (*See* Pfizer Opp. at 8 n.7.) Plaintiffs cannot ignore the undisputed reality of such prescriptions by arguing that, statistically, each prescription was more likely than not caused by fraud. *See Krim*, 402 F.3d at 496-97 & n.36. Moreover, in erroneously treating Prof. Rosenthal's 99.4% figure as a given, Plaintiffs' reply ignores their

---

[1] The fundamental fallacy of Plaintiffs' argument is well known to courts and scholars and is often addressed by reference to the "blue bus hypothetical," in which a plaintiff is struck by an unidentified bus on a road where the defendant Blue Bus Company accounts for 80% of all bus traffic. "[E]ven assuming a [preponderance of the evidence] standard of proof ..., the plaintiff does not discharge that burden by showing simply that four-fifths, or indeed ninety-nine percent, of all blue buses belong to the defendant." *Krim*, 402 F.3d at 497 n.40 (citation omitted; alternations in original). Such naked probabilities do not allow the jury to "make anything other than a bet on the evidence. Because the judicial system strives to project an acceptable account about what happened, then, the plaintiff's evidence is insufficient, notwithstanding the high probability of its accuracy." *Id.* (citation omitted). *See also, e.g., Smith v. Rapid Transit, Inc.*, 58 N.E.2d 754, 755 (Mass. 1945) (holding that, under preponderance standard, "it is 'not enough that mathematically the chances somewhat favor a proposition to be proved'").

previous admission that a jury could find a "lesser percentage" of fraudulently-induced prescriptions than Prof. Rosenthal found. (Mem. in Supp. of Post-Mandate Mot. for Class. Cert. [4154] ("Pl. Mem.") at 14.) In particular, Plaintiffs ignore the *Kaiser* jury's finding that nearly *2 million bipolar prescriptions* were written for independent reasons. (*See* Pfizer Opp. at 9 & Exhibit A.)

In short, because so many plans paid for so few prescriptions, there is no basis for Plaintiffs' presumption that "all plans that paid for bipolar Neurontin have been harmed." (Pl. Reply at 1.) Nor have Plaintiffs offered any means of determining through common evidence which or how many putative class members paid only for non-fraudulently-induced prescriptions. Plaintiffs speculative, conclusory assertion that "[i]t is extremely unlikely" that any putative class members did so (Pl. Reply at 2 n.2) cannot satisfy their burden under *New Motor Vehicles*. Instead, answering these questions would require individualized inquiries that would defeat predominance and render the proposed class unmanageable.

### B. Professor Rosenthal's Analysis Cannot Establish Classwide Damages

Plaintiffs' opening brief erroneously argued that, despite the Supreme Court's recent decision in *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013),[2] a class can be certified under Rule 23(b)(3) even where damages cannot be determined on a class-wide basis. (Pl. Mem. at 19-20.) Plaintiffs' reply appears to abandon this argument, and instead asserts that they "have presented such a methodology" for determining class-wide damages. (Pl. Reply at 5.) This argument must be rejected.

Initially, Plaintiffs' reply fails to address the mismatch of proof between their liability theory and their aggregate damages analysis, which precludes class certification under *Comcast*. *See* 133 S. Ct. at 1433. Plaintiffs concede that Prof. Rosenthal "primarily analyzed data relating

---

[2] Plaintiffs speculate that "[t]he First Circuit declined to discuss *Comcast* . . . because *Comcast* has no application to this controversy." (Pl. Reply at 3.) In reality, the First Circuit did not need to address the Supreme Court's recent class certification decisions, including *Comcast*, because it expressly did not reach the issue of class certification. *See Harden Mfg. Corp. v. Pfizer, Inc.* ("Harden Opinion"), 712 F.3d 60, 70 (1st Cir. 2013) ("We express no view as to whether the plaintiffs can, on remand, meet the requirements of Rule 23.").

to detailing expenditures," but contend that this presents no mismatch with their liability theory because "the plaintiffs allege that *all* facets of Pfizer's off label marketing campaign, including detailing, were fraudulent." (Pl. Reply at 4.) But regardless of what Plaintiffs "allege," they have failed to present evidence of fraudulent detailing to their members' physicians. *See, e.g.*, *In re Neurontin Mktg. & Sales Practices Litig.*, 754 F. Supp. 2d 293, 310 (D. Mass. 2010) ("[T]here is no evidence as to what the detailers said to any of the doctors."). For example, there is no evidence that sales representatives told Plaintiffs' members' physicians that Neurontin was effective for bipolar disorder rather than for comorbid anxiety disorders, as to which Neurontin's efficacy is supported by Level I evidence. Instead, Plaintiffs' purported evidence of fraudulent promotion concerns publications and CME events, the impact of which Prof. Rosenthal did *not* measure. Because Prof. Rosenthal fails to measure damages resulting from the particular types of marketing for which Plaintiffs have proffered evidence of fraud, common issues do not predominate. *See Comcast*, 133 S. Ct. at 1433 (holding that common issues did not predominate where regression analysis "failed to measure damages resulting from the particular antitrust injury on which petitioners' liability in this action is premised"). Plaintiffs offer no response to these points.

Plaintiffs' remaining arguments fail to establish that common issues predominate as to damages. Plaintiffs argue that this case is analogous to excess price cases "in which damages are measured by comparing a purchase price with the economic value a class member actually received or was supposed to receive." (Pl. Reply at 5 & n.7.) But Plaintiffs have repeatedly disavowed any such excess price theory. (*See, e.g.*, Harden Respondents' Brief in Opp. to Pet. for Cert., *Pfizer, Inc. v. Kaiser Found. Health Plan, Inc.*, No. 13-289, at 22 (S. Ct. Nov. 4, 2013) ("[R]espondents have never contended that they overpaid for Neurontin.").) And applying an excess *price* damages model to Plaintiffs' excess *prescriptions* liability theory would create a mismatch under *Comcast*. Indeed, on the preceding page of their reply, Plaintiffs argued that if they *had* asserted a "theory of excessive price, *Comcast* would apply" and would preclude class certification. (Pl. Reply at 4.) Nor is this the damages analysis applied by this Court in *Kaiser*.

5

Because Plaintiffs instead assert an excess prescriptions theory, the fundamental damages question is not the difference in value between an effective and an allegedly ineffective drug, but rather, the number of prescriptions for which TPPs paid due to the alleged fraudulent promotion. Determining whether and to what extent Prof. Rosenthal's opinions on this issue can be applied to putative class members will require litigation of numerous TPP-specific issues, including whether Plaintiffs' members' physicians attended CME events where misrepresentations were allegedly made, *see In re Neurontin Mktg. & Sales Practices Litig. ("Amended Findings")*, No. 04-cv-10739-PBS, 2011 WL 3852254, at *16, *30 (D. Mass Aug. 31, 2011); whether off-label prescribing increased following physicians' attendance at those CME events, *see id.* at *30; which alternative drugs would likely have been prescribed by physicians had Neurontin not been prescribed, *see id.* at *33; and what steps putative class members took (or failed to take) to mitigate their damages, *see id.* at *30. Plaintiffs' suggestion that these issues "have nothing to do with damages calculation" is incorrect. (Pl. Reply at 5 n.6.) They are part of Pfizer's challenges to Prof. Rosenthal's analysis, which, the First Circuit held, present "a question of damages." *Kaiser Found. Health Plan, Inc. v. Pfizer, Inc. ("Kaiser Opinion")*, 712 F.3d 21, 45 (1st Cir. 2013). Nor are any of these issues confined to "Kaiser's unique theory of direct reliance," as Plaintiffs argue without explanation or support. (Pl. Reply at 5 n.6.)

Plaintiffs similarly provide no support for their contention that the need to determine whether Prof. Rosenthal's national data can be applied to a particular TPP's claim—as was required in *Kaiser*—"does not apply when dealing with a national class." (Pl. Reply at 5 n.6.) To the contrary, Plaintiffs' evidence regarding the essential elements of causation, injury, and damages depends upon Prof. Rosenthal's analysis. Accordingly, each putative class member's claim depends, *inter alia*, upon establishing the applicability of Prof. Rosenthal's analysis and the national data on which her analysis is based. Because TPPs would undisputedly need to prove such applicability in individual actions in order to sustain their burden of proof, they cannot avoid this burden simply because they purport to litigate their claims as part of a class action. *See, e.g.*, *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2561 (2011) ("[T]he Rules

6

Enabling Act forbids interpreting Rule 23 to 'abridge, enlarge or modify any substantive right.'" (citation omitted)); *Cimino v. Raymark Indus., Inc.*, 151 F.3d 297, 312 (5th Cir. 1998) ("[U]se of Rule 23(b)(3) . . . does not alter the required elements which must be found to impose liability and fix damages (or the burden of proof thereon).").

As a fall-back argument, Plaintiffs belatedly request that the Court certify a liability-only class under Rule 23(c)(4). (Pl. Reply at 6.) While Plaintiffs suggest that they requested this relief in their opening brief, they did no such thing. Plaintiffs' motion explicitly requests class certification only under "[Rules] 23(a) and 23(b)(3)." (Pl. Mot. at 1.) Although Plaintiffs' opening brief referenced Rule 23(c)(4) classes in its discussion of *Comcast* (Pl. Mem. at 20 n.7, 21), Plaintiffs never previously requested that the Court certify such a class here. "Where, as here, a moving party raises an argument for the first time in a reply brief, that argument is waived." *Napert v. Gov't Emps. Ins. Co.*, No. 13-10530-FDS, 2013 WL 3989645, at *2 n.4 (D. Mass. Aug. 1, 2013).

Beyond being waived, Plaintiffs' request for a liability-only class is meritless. Although the issue remains open in the First Circuit, the Fifth Circuit has held that "'a cause of action, as a whole, must satisfy the predominance requirement' in order for plaintiffs to certify a class on any issue." *In re Bank of Am. Home Affordable Modification Program (HAMP) Contract Litig.*, M.D.L. No. 10-2193-RWZ, 2013 WL 4759649, at *9 (D. Mass. Sept. 4, 2013) (quoting *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 n.21 (5th Cir. 1996)). And even if otherwise available, "[c]ertification under [Rule 23(c)(4)] should be denied when the noncommon issues are inextricably entangled with the common issues or when the noncommon issues are too predominant to handle on a class basis." *Harding v. Tambrands Inc.*, 165 F.R.D. 623, 632 (D. Kan. 1996).[3]

---

[3]  *See also, e.g.*, *Blain v. Smithkline Beecham Corp.*, 240 F.R.D. 179, 190 (E.D. Pa. 2007) (holding that judicial economy concerns often cited in favor of limited-issue Rule 23(c)(4) classes "have always been trumped when 'the common issues are inextricably tied to the individual issues.'" (citation omitted)); *In re Baycol Prods. Litig.*, 218 F.R.D. 197, 209 (D. Minn. 2003) ("[C]ertification in this case under subdivision (c)(4) is not appropriate because the individual issues are inextricably intertwined with the common issues.").

This principle applies in cases where, as here, "damages . . . are inextricably intertwined with individualized liability questions." *Moeller v. Taco Bell Corp.*, No. C 02-5849 PJH, 2012 WL 3070863, at *5 (N.D. Cal. July 26, 2012); *accord Clark v. Prudential Ins. Co. of Am.*, Civ. No. 08-6197 (DRD), 2013 WL 1694451, at *6 (D.N.J. Apr. 18, 2013) ("[T]he individualized issues which arise in the calculation of [liability] and damages in fact are so inextricably linked that bifurcation would be judicially inefficient").  In this case, a liability-only class verdict would require juries in hundreds or thousands of subsequent mini-trials on damages to determine the number of bipolar prescriptions each TPP paid for as a result of the alleged fraud.  *Cf. Rink v. Cheminova, Inc.*, 203 F.R.D. 648, 652 (M.D. Fla. 2001) (denying issue certification where subsequent mini-trials would be required to apportion fault).  In addition to being unwieldy and unmanageable, such proceedings would negate any efficiency benefits of a liability-only class because, in order to make such individual damages determinations, these juries would need to consider much of the same evidence of fraud, causation, and injury, as well as additional TPP-specific evidence.  *See, e.g.*, *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 234 (2d Cir. 2008) ("Certifying, for example, the issue of defendants' scheme to defraud, would not materially advance the litigation because it would not dispose of larger issues such as reliance, injury, and damages."); *Dungan v. Acad. at Ivy Ridge*, 249 F.R.D. 413, 417 (N.D.N.Y. 2008) (holding that "issue certification . . . would not meaningfully reduce the range of issues in dispute and promote judicial economy and will lead to potential confusion and redundancy in the presentation of proof"), *aff'd*, 344 F. App'x 645 (2d Cir. 2009).

In sum, this Court correctly ruled that "complex issues related to calculating damages make the class unmanageable." *In re Neurontin Mktg. & Sales Practices Litig.*, No. 04-cv-10981-PBS, 2011 WL 1882870, at *6 (D. Mass. May 17, 2011).  The Court should therefore reinstate its prior denials of class certification.

### C. Individual Issues Regarding Physicians' Prescribing Decisions Predominate Over Any Common Questions

Plaintiffs argue without support that, although the Supreme Court's decision in *Dukes* does not allow a statistical trial by formula with respect to a defendant's alleged wrongful conduct, it does allow such trial by formula as to causation, injury, and damages. (*See* Pl. Reply at 6-8.) This superficial distinction cannot obscure the fundamental identity of the issues in *Dukes* and the present case. Establishing class-wide discrimination could not be accomplished through statistical regression in *Dukes* because that issue depended on employment decisions made by store managers who exercised broad discretion. *See* 131 S. Ct. at 2547. Accordingly, the Supreme Court held that that the defendant would have the right to present testimony from individual store managers to explain their decisions and rebut the plaintiffs' statistical evidence—defeating commonality and, *a fortiori*, predominance. *Id.* at 2555.

Likewise, in this case, the essential elements of causation, injury, and damages depend on discretionary decisions by thousands of physicians, and the First Circuit has held that Pfizer has a right to present "individual testimony" from such physicians to rebut Prof. Rosenthal's statistical analysis. *Harden Opinion*, 712 F.3d at 69. Thus, in the *Kaiser* trial, Pfizer was allowed to present testimony from individual physicians who prescribed Neurontin to Kaiser's members.[4] Plaintiffs cannot deprive Pfizer of this recognized right simply because they purport to litigate their claims as part of a class action. *See, e.g.*, *Dukes*, 131 S. Ct. at 2561 ("[T]he Rules Enabling Act forbids interpreting Rule 23 to 'abridge, enlarge or modify any substantive right.'" (citation omitted)); *Cimino*, 151 F.3d at 312 ("[U]se of Rule 23(b)(3) . . . does not alter the required elements which must be found to impose liability and fix damages (or the burden of proof thereon)."). And Plaintiffs do not dispute that admitting testimony from even one physician for each of the 13,070 putative class members would defeat predominance and render the class unmanageable.

---

[4] Plaintiffs repeat their incorrect assertion that the Court "limit[ed]" such individual physician testimony in the *Kaiser* trial "without objection." (Pl. Reply at 10.) They offer no citation for any such ruling, which never occurred, and ignore the real reason for the limited physician testimony in *Kaiser*, which is that the Kaiser physicians resided beyond the Court's subpoena power. (*See* Pfizer Opp. at 17 & n.15.)

Plaintiffs' additional attempts to distinguish *Dukes* are also unavailing. For example, Plaintiffs argue that that a class proceeding here would not involve an improper extrapolation of representative findings to the entire class because Prof. Rosenthal's analysis addresses all prescribing nationwide. (Pl. Reply at 7-8.) But the regression analyses in *Dukes* were also based on "national data." 131 S. Ct. at 2555. What *Dukes* forbids is a procedure in which the defendant's ability to present individualized defenses in response to such regression analyses is restricted to a representative sample that is then extrapolated to the class. *See id.* at 2560-61. That is precisely what Plaintiffs propose here by arguing that Pfizer should only be allowed to present testimony from "representative doctors" (Pl. Mem. at 15) who did not even prescribe Neurontin to putative class members' insureds. Likewise, Plaintiffs' argument that Pfizer does not have a right to individualized defenses comparable to the defendant's right in *Dukes* is meritless. (*See* Pl. Reply at 7 n.8.) The First Circuit recognized Pfizer's right to present "individual testimony" from a TPP's insured's prescribing physicians to rebut that TPP's aggregate evidence of causation, injury, and damages. *See Harden Opinion*, 712 F.3d at 69. Moreover, due process mandates that Pfizer be given "'an opportunity to present every available defense'" to each TPP's claim. *Lindsey v. Normet*, 405 U.S. 56, 66 (1972) (citation omitted); *see also United States v. Armour & Co.*, 402 U.S. 673, 682 (1971) (the "right to litigate the issues raised" in a case is "a right guaranteed . . . by the Due Process Clause").

Plaintiffs' attempt to distinguish *In re St. Jude Med., Inc.*, 522 F.3d 836 (8th Cir. 2008), and *In re TJX Cos. Retail Sec. Breach Litig.*, 246 F.R.D. 389 (D. Mass. 2007), is also without merit. Plaintiffs argue that both cases are distinguishable because "the plaintiffs were completely unable to use common evidence to prove that the defendants' misrepresentations caused class wide injury." (Pl. Reply at 8.) But this Court has already correctly construed both cases to hold that even if the plaintiffs *could* present such class-wide evidence of causation and injury, a class could not be certified if the result would be to deprive defendants of the right "to present [individualized] evidence that their alleged fraud did not cause a particular plaintiff's injury." *In re Neurontin*, 257 F.R.D. at 331 (discussing "*St. Jude, and TJX*"). Here, because most putative

10

class members' claims depend on prescribing decisions made by as few as one physician, Pfizer cannot be deprived of the right to present the testimony of such physicians to show that "[the] alleged fraud did not cause a particular [TPP's] injury." *Id.*

Pfizer's opening brief cited numerous authorities for the proposition that RICO and other fraud-based claims are unsuitable for class treatment "[i]f there is any material variation in the representations made, or in the degrees of reliance thereon."  Joseph M. McLaughlin, *McLaughlin on Class Actions* § 5:54 (9th ed. 2012).  (*See* Pfizer Opp. at 13-14 & n.12.) Plaintiffs do not dispute this point, nor do they address Pfizer's authorities or cite contrary authorities.  Instead, Plaintiffs simply offer the conclusory assertion that "there is no variation in representation or reliance that precludes class certification."  (Pl. Reply. at 10.)

Plaintiffs' argument is demonstrably false.  Plaintiffs cite dicta from this Court's denial of their first class certification motion suggesting that "'minor, immaterial variations among the alleged oral misrepresentations will not defeat certification.'"  (Pl. Reply at 9 (quoting *In re Neurontin Mktg. & Sales Practices Litig.*, 244 F.R.D. 89, 109 (D. Mass. 2007)).)  But the Court subsequently found, based on record evidence, that "many doctors were not detailed" and that even those who were gave varying explanations for their subsequent prescribing decisions.  *In re Neurontin*, 257 F.R.D. at 330-31.  That Plaintiffs and Prof. Rosenthal do not believe these witnesses does not dispense with the need for individual physicians' testimony, which the First Circuit held Pfizer has the right to present.  *See Harden Opinion*, 712 F.3d at 69.

Plaintiffs' argument is also self-contradictory.  Plaintiffs once again ask for a presumption of reliance based on their assertion that no physician would prescribe an allegedly worthless drug except in reliance on fraudulent promotion.  (Pl. Reply at 9.)  But Plaintiffs contradict this argument in their very next breath by conceding the "possib[ility] that some doctors prescribed bipolar Neurontin for reasons other than Pfizer's representations of efficacy." (*Id.* at 9-10.)  Prof. Rosenthal opines that physicians actually did so on more than 70,000 separate occasions (*see* Pfizer Opp. at 8 n.7), and the *Kaiser* jury found that physicians actually did so on nearly 2 million separate occasions (*see id.* at 9 & Exhibit A).  Accordingly, Plaintiffs' assertions

11

of total inefficacy do not dispense with the need for individual physicians' testimony and do not distinguish Pfizer's authorities holding that material variations in representations and reliance preclude certification of a fraud-based class action.

### D. Individual Issues Regarding TPPs' Formulary And Reimbursement Decisions Predominate Over Any Common Questions

Plaintiffs' reply merely repeats their argument that, because they have disavowed a direct reliance theory of causation, putative class members' formulary and reimbursement decisions are irrelevant. (Pl. Reply at 11-12.) But as set forth in Pfizer's opposition brief, evidence that a putative class member may have chosen not to restrict psychiatrists' ability to prescribe Neurontin even after learning of negative bipolar studies would weigh against findings of causation and injury. *See Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 607 (3d Cir. 2012) (vacating class certification); *see also UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 136 (2d Cir. 2010) (observing that "[e]ven now, TPPs pay for Zyprexa and for the most part have not implemented close control or review of Zyprexa prescriptions"). The issue is not whether putative class members had a "duty" to monitor the scientific literature (Pl. Reply at 12); it is whether they in fact did so and what, if anything, they did in response. The reason for the current lack of evidence on this point is that Pfizer has not yet been allowed to obtain discovery on these issues from absent class members.

### II. SIGNIFICANT CONFLICTS BETWEEN THE STATES' LAWS PRECLUDE CERTIFICATION OF PLAINTIFFS' NJCFA CLAIM

Plaintiffs' reply confirms that their NJCFA claim raises choice-of-law issues that defeat predominance and would render a class unmanageable. Most significantly, Plaintiffs make no attempt to reconcile their argument that the NJCFA can be applied to the claims of all TPPs nationwide with this Court's ruling in *Kaiser* that the applicable law was that of California, the state where Kaiser is based, where most of its members and their physicians are located, and where most of the prescriptions in question were filled. *Amended Findings*, 2011 WL 3852254, at *53. The clear import of this ruling is that each TPP's claim would likely be governed by the

law of that TPP's home state. Plaintiffs offer no response to this argument, which was prominently set forth in Pfizer's opposition brief. (*See* Pfizer Opp. at 18-22.)

Contrary to Plaintiffs' characterizations (Pl. Reply at 14), the Third Circuit's decision in *Maniscalco v. Brother Int'l (USA) Corp.*, 709 F.3d 202 (3d Cir. 2013), unambiguously rejected the reasoning of *In re Mercedes-Benz Tele Aid Contract Litigation*, 257 F.R.D. 46 (D.N.J. 2009)—Plaintiffs' sole authority for nationwide application of the NJCFA.[5] The Third Circuit held that the *Mercedes* court's rationale would improperly "open[] the floodgates to nation-wide consumer fraud class actions brought by out-of-state plaintiffs involving transactions with no connection to New Jersey other than the location of the defendant's headquarters." 709 F.3d at 210. The Third Circuit went on to explain that "even were we to find the reasoning of the [*Mercedes*] court persuasive"—which it clearly did not—"the case before us is distinguishable" because the *Mercedes* court was bound to accept as fact allegations "that *all* of the misconduct took place in New Jersey." *Id.* at 210-11 (emphasis added). By contrast, in *Maniscalco*, the Third Circuit "[a]ccept[ed] [plaintiff's] premise that there were actionable omissions by [the defendant] at its headquarters in New Jersey," *id.* at 208, but also found that "at least some of the allegedly wrongful conduct" occurred elsewhere, *id.* at 211. The Third Circuit explained that, where misrepresentations are made "in two or more states," the fact that some were made in New Jersey "does not weigh strongly in favor of applying New Jersey law." *Id.* at 211. The same principle applies squarely to this case, in which Plaintiffs allege that Pfizer made misrepresentations and omissions during detailing visits and CME events throughout the country.

Plaintiffs' reliance on *Levin v. Dalva Bros., Inc.*, 459 F.3d 68 (1st Cir. 2006), is likewise misplaced. There, the First Circuit held that New York law applied because the New York-based defendant had made representations to the plaintiffs' agent in New York. *See id.* at 74.

---

[5] "*Mercedes* has been criticized, minimized, and rejected by a number of courts. Most recently, *Mercedes* was criticized by the Third Circuit in *Maniscalco* . . . . *Maniscalco* is controlling authority and requires application of the law of each putative class member's home state to that class member's claims." *Neale v. Volvo Cars of N. Am., LLC*, No. 2:10-CV-4407 (DMC)(MF), 2013 WL 1223354, at *6, *8 (D.N.J. Mar. 26, 2013) (denying certification of nationwide NJCFA class), *reconsideration denied*, 2013 WL 5674355 (D.N.J. Oct. 16, 2013).

Although the plaintiffs claimed they had received and relied on the defendant's representations in Massachusetts, this did not affect the choice-of-law analysis because the plaintiffs were "undisclosed principals" whose existence and identify were unknown to the defendant. *Id.* Here, Plaintiffs allege that Pfizer not only knew of, but specifically targeted non-New Jersey physicians and TPPs. This Court has already held that such claims require application of a TPP's home state's laws. *Amended Findings*, 2011 WL 3852254, at *53.

Plaintiffs do not seriously dispute that there are significant, outcome-determinative differences between the NJCFA and other states' consumer protection laws. Plaintiffs suggest that Pfizer "overstates" these differences, but the only example they provide directly contradicts their point by arguing that New Jersey law *differs* from other states' laws regarding whether "a showing of reliance" is required. (Pl. Reply at 13 & n.11.) Plaintiffs do not address the numerous other outcome-determinative differences identified in Pfizer's opposition brief, which include: the availability and scope of a private cause of action; whether a TPP's expenditures for prescription drugs qualify as "consumer" transactions; pre-suit notice requirements; and whether consumer fraud claims can be asserted as part of a class action. (*See* Pfizer Opp. at 20-22.) Nor do Plaintiffs address any of Pfizer's authorities holding that such outcome-determinative differences preclude certification of a nationwide statutory consumer fraud class. (*See id.* at 19 & n.17 (citing cases).)

### III.  A CLASS PROCEEDING WOULD NOT BE SUPERIOR TO INDIVIDUAL PROCEEDINGS

As set forth in Pfizer's opposition brief (at 23), Plaintiffs cannot satisfy Rule 23's superiority requirement because they seek substantial awards under RICO, which provides for treble damages and attorney's fees. In reply, Plaintiffs offer the curious argument that TPPs smaller than Kaiser would never "risk the expense and uncertainty of an individual suit." (Pl. Reply at 14.) But the named Plaintiffs themselves are three such plans, none of whom appear hesitant to press forward with their individual claims should class certification be denied. Plaintiffs further argue that Kaiser's fee petition—which requests an award of $10,906,001.53 in

attorneys' fees and $1,536,891.50 in expenses—demonstrates that individual TPPs and their lawyers do not have adequate incentive to sue.  Pfizer submits that this argument is self-refuting.

## CONCLUSION

For the reasons set forth above and in Pfizer's opposition brief, Class Plaintiffs' post-mandate motion for class certification should be denied.

Dated:  November 12, 2013

Respectfully submitted,

QUINN EMANUEL URQUHART
  & SULLIVAN, LLP

By: /s/ Mark S. Cheffo
      Mark S. Cheffo

51 Madison Avenue, 22nd Floor
New York, NY  10010
(212) 849-7000
Email:  markcheffo@quinnemanuel.com

*Attorneys for Defendants Pfizer Inc. and Warner-Lambert Company LLC*

## CERTIFICATE OF SERVICE

I, Mark S. Cheffo, hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF (NEF) on November 12, 2013.

Dated:  November 12, 2013

/s/ Mark S. Cheffo
Mark S. Cheffo