# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: NEURONTIN MARKETING AND SALES PRACTICES LITIGATION | MDL DOCKET No. 1629 |
| THIS DOCUMENT RELATES TO: | MASTER FILE No. 04-10981-PBS |
| AETNA, INC., | THE HONORABLE PATTI B. SARIS |
| Plaintiff, | |
| -vs- | |
| PFIZER, INC. and WARNER LAMBERT CO., LLC. | |
| Defendants. | |

**AETNA INC.'S REPLY MEMORANDUM OF LAW IN SUPPORT OF
ITS MOTION TO PRECLUDE RELITIGATION OF ISSUES AND FACTS
DETERMINED BY THE *KAISER* TRIERS OF FACT**

# TABLE OF CONTENTS

I.  INTRODUCTION ...............................................................................................1

II.  SUMMARY OF ARGUMENT .............................................................................1

III.  ARGUMENT ......................................................................................................3

    A. Differences Between Aetna and Kaiser Are Immaterial and
       Have No Bearing on This Motion.....................................................................4

       i.   The Fraudulent Marketing Findings ............................................................4

       ii.  The Court's National Off-Label Percentage Findings ................................7

    B. Granting Aetna's Motion Does Not Prevent Pfizer From Presenting Rebuttal
       Evidence on Causation.......................................................................................9

    C. The "New" Scientific Studies Supposedly Showing Efficacy
       Are No Different Than the Same "Old" Scientific Studies Offered
       to the Jury at the *Kaiser* Trial ........................................................................10

       i.   The Court's New Trial Motion Ruling That Pfizer Suppressed
            the Data Underlying the 2011 Cochrane Review Prevents
            Relitigation of Neurontin's Neuropathic Pain Efficacy...........................10

       ii.  Pfizer's "New Studies" Fail to Meet the Evidence Criterion
            Required at the Kaiser Trial.....................................................................12

       iii. The Other "New" Studies Dr. Brenner Cites Do Not Materially
            Differ From Those He Presented at the Kaiser Trial ................................13

IV.  CONCLUSION..................................................................................................16

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*DeCosta v. Viacomm Intern., Inc.*,
   981 F.2d 602 (1st Cir. 1992) .................................................................................. 12

*Grisham v. Philip Morris, Inc.*,
   670 F. Supp. 2d 1014 (C.D. Cal. 2009) .................................................................... 6

*Hoult v. Hoult*,
   157 F.3d 29 (1st Cir. 1998) .............................................................................. 2, 5, 7

*In re Light Cigarettes Mktg. Sales Practices Litig.*,
   691 F. Supp. 2d 239 (D. Me. 2010) ......................................................................... 6

*In re Microsoft Corp. Antitrust Litig.*,
   355 F.3d 322 (4th Cir. 2004) .................................................................................... 6

*In re Neurontin Mktg. & Sales Practices Litig.*,
   712 F.3d 21 (1st Cir. 2013) ............................................................................... 11, 12

*In re Neurontin Mktg. & Sales Practices Litig.*,
   712 F.3d 51 (1st Cir. 2013) .................................................................................. 4, 5

*In re Neurontin Mktg. and Sales Prac. Litig.*,
   799 F. Supp. 2d 110 (D. Mass. 2011), *aff'd*, 712 F.3d 21 (1st Cir. 2013) ........................ 10, 11

*In re Neurontin Mktg. and Sales Practices Litig.*,
   No. 04-cv-10739-PBS, 2011 WL 3852254 (D. Mass. Aug. 31, 2011) ............................. passim

*In re Sonus Networks, Inc., S'holder Derivative Litig.*, 499 F.3d 47 (1st Cir. 2007) .................... 12

*Manganella v. Evanston Ins. Co.*,
   700 F.3d 585 (1st Cir. 2012) .................................................................................... 7

*Pignons S.A. de Mecanique v. Polaroid Corp.*,
   701 F.2d 1 (1st Cir. 1983) ................................................................................. 13, 18

*Parklane Hosiery Co. v. Shore*,
   439 U.S. 322 (1979) ............................................................................................. 2, 9

*Shaffer v. R.J. Reynolds Tobacco Co.*,
   860 F. Supp. 2d 991 (D. Ariz. 2012) ........................................................................ 6

## I.     INTRODUCTION

On September 13, 2013, Aetna moved for a collateral estoppel order to preclude relitigation of six matters decided either by the jury in its 2010 trial verdict or by the Court in its 2011 post-trial *Bench Findings*[1] following the five week trial in *Kaiser Foundation Health Plan, Inc., et al. v. Pfizer, et al.*, No. 04-10739-PBS (the "Kaiser Trial").  Dkt. Nos. 4162, 4163 (collectively, the "Preclusion Issues"):

> (1)     RICO Enterprise;
>
> (2)     Mail and Wire Fraud;
>
> (3)     Percentages of Off-Label, By Condition, Attributable to Fraudulent Off-Label Marketing, Nationally;
>
> (4)     Inefficacy of Neurontin for Three Off-Label Indications and in Mega-Doses;
>
> (5)     Dates of Marketing Fraud; and
>
> (6)     Statute of Limitations on the RICO claims.

On October 15, 2013, Pfizer filed its Opposition Brief.  Dkt. No. 4171 ("Opp. Br.").  This is Aetna's reply.

## II.     SUMMARY OF ARGUMENT

Predictably, Pfizer argues *any* collateral estoppel would be "manifestly unfair to Pfizer and would not promote judicial economy," and "Aetna's motion should be denied in its entirety." *Id*. at 1, 20.  Pfizer argues alternatively that collateral estoppel cannot be applied to the Preclusion Issues because the jury's and the Court's findings were "not essential to the judgment." *Id.* at 5-8.  All three arguments are unpersuasive.

---

[1]     *In re Neurontin Mktg. and Sales Practices Litig.*, No. 04-cv-10739-PBS, 2011 WL 3852254 (D. Mass. Aug. 31, 2011) (the "*Bench Findings*") Dkt. No. 3602.

1.      *Issue Preclusion is Fair*

Pfizer went into the Kaiser Trial with eyes wide open.

First, offensive collateral estoppel has been a known trial risk since the Supreme Court

approved it in *Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979).  The First Circuit has

employed the practice.  *See, e.g., Hoult v. Hoult*, 157 F.3d 29, 32 (1st Cir. 1998).

Second, the Court had advised Pfizer that one purpose of the first trial would be to find

facts that would not require retrial, particularly concerning whether Pfizer fraudulently marketed

Neurontin for off-label use.  *See* Transcript of September 18, 2009 Oral Argument on Defendants'

Motion for Summary Judgment at 89-91 ("SJ Transcript"), Dkt. No. 2114.

Third, Pfizer has repeatedly argued Kaiser's and Aetna's claims and proofs are materially

indistinguishable when seeking dismissal of Kaiser's claims.[2]

Pfizer had fair opportunity to fully litigate the six Preclusion Issues at trial.

Unremarkably, Pfizer complains "it's unfair" that it cannot call "let" and have a full do-over of

its loss.  *See Opp. Br.* at 1, 2, 10, 13, 14.  There is nothing unfair about applying established law

to accomplish the purposes for which it was established.

2.      *The Preclusion Issues Were Essential to the Kaiser Judgment*

Pfizer treats the Kaiser jury's verdict and the Court's 144-page *Bench Findings* as if they

were irrelevant to their respective conclusions.  Aetna has limited its collateral estoppel motion

to issues concerning Pfizer's conduct that were essential to the Kaiser jury's liability findings

and others found specifically by the Court that were central linchpins of its separate findings.

All six Preclusion Issues concern Pfizer's conduct in marketing Neurontin off-label generally,

---

[2]      *See generally* Petition for Writ of Certiorari, *Pfizer Inc., and Warner-Lambert Company, LLC v. Kaiser Foundation Health Plan, et. al, Harden Manufacturing Corporatio,. et al., and Aetna, Inc.*, Case No. 13-289 (Aug. 30, 2013); *see also* Brief for Defendants-Appellants at 9-12, *In re Neurontin Mktg., Sales Practices & Prods. Liab. Litig.*, Nos. 11-1904, 11-2096 (1st Cir. filed July 19, 2012) (Aetna "opposed summary judgment with the same aggregate causation evidence (the testimony of Professor Rosenthal) relied upon by [Kaiser] in the trial below.")

analysis of Neurontin prescription data, or the efficacy of Neurontin for the relevant off-label uses. Those facts do not vary with the identity of the economic victim. Aetna will still be required to prove Pfizer's marketing fraud was a proximate cause of its harm and its damages.

       *3.*      *Issue Preclusion Will Promote Judicial Economy*

The principal aim of issue preclusion is judicial economy. A retrial of these Preclusion Issues would waste judicial time and resources. Pfizer's half-hearted argument that collateral estoppel would not streamline Aetna's trial is spurious.

## III.    ARGUMENT

What Pfizer has *not* challenged is noteworthy. Pfizer makes no directed argument against preclusion of the jury's findings that: (1) Pfizer engaged in a RICO enterprise that, (2) used mail and wire fraud to promote Neurontin for off-label uses of (i) bipolar disorder; (ii) neuropathic pain; (iii) migraine; and (iv) doses greater than 1800mg/day. *See* Special Verdict Form, Part I, Q.1 (Dkt. No. 2760) ("Verdict"). Further, the jury's Verdict that Pfizer's conduct violated RICO necessarily includes findings that Kaiser's RICO claims were not time-barred.[3] The Court supplemented the Verdict with its own specific findings that included the time periods Pfizer's marketing fraud began and ended for each of the four off-label uses or dosages. *Bench Findings,* at *30. Pfizer made no arguments against preclusion of these issues.

Instead, Pfizer spends most of its brief arguing about Kaiser-specific reliance facts, and continuing to conflate reliance with proximate cause. But reliance—as the First Circuit clarified—is not a RICO element. Once the "reliance" clutter is swept away, it becomes plain that the targeted preclusion Aetna seeks is appropriate. Aetna acknowledges it will need to offer proof that Pfizer's conduct was the proximate cause of its economic injury. Aetna does not seek

---

[3]     Aetna sued before Kaiser.

in this motion to preclude Pfizer from presenting "rebuttal evidence on causation." *See Opp. Br.* at 13.

### A. Differences Between Aetna and Kaiser Are Immaterial and Have No Bearing on This Motion

#### i. The Fraudulent Marketing Findings

Pfizer argues that "Aetna's liability theory raises fundamentally different factual issues regarding fraud, causation, and damages" from Kaiser's. *Id.* at 4-5. Pfizer lost this fight in the First Circuit. *See In re Neurontin Mktg. & Sales Practices Litig.* ("*Aetna Opinion*"), 712 F.3d 51, 52-53 (1st Cir. 2013) ("The arguments presented in *Kaiser* … on most issues are the same as or parallel to those presented in this appeal, which concerns the claims of Aetna, Inc. ("Aetna") against Pfizer.  Many of the arguments made by Pfizer against Aetna in this case were rejected in *Kaiser*.").

Yet Pfizer vainly persists in arguing that the jury's and the Court's findings were limited to "Kaiser [being] injured as a result of its direct reliance on a series of discrete communications with Pfizer," *Opp. Br*. at 5, and that "notwithstanding the Court's extensive evidence of fraudulent marketing, the only such findings that could be deemed 'essential' to the judgment are those that concern Pfizer's direct communications with Kaiser." *Id*. at 5, 7.  Pfizer virtually ignores the law of the case.  If anything was "unnecessary" to the jury's or Court's findings, it was the victim's reliance.  *See Aetna Opinion* at 58 ("Aetna did not have to show direct reliance to establish proximate or but-for causation.").

In its detailed *Bench Findings*, the Court meticulously described Pfizer's fraudulent marketing scheme.  *See Bench Findings* at Sections II.B, II.D.1-II.D.3, II.D.5, and III.B.2.ii. Pfizer's fraud indiscriminately targeted health insurers.  Which insurer was paying was unimportant; the fraud extracted money from them all in the same way.  *See id., passim.*  Pfizer's

acts of marketing fraud and the inherent properties of Neurontin were constant, regardless of

who (Aetna, Kaiser, or any other health insurer) footed the bill.  That "scheme to defraud,"[4]

remained the same—a broad attack aimed at all U.S. health insurers that "ultimately paid for

most prescriptions of Neurontin."  *Aetna Opinion*, 712 F.3d at 58.

Pfizer's argument also inverts the sequence of the jury's deliberations.  The jury had to

find Pfizer engaged in the RICO predicate acts of mail and/or wire fraud <u>before</u> it could

determine whether the fraud caused Kaiser's injury or the amount of damages that resulted.

These liability findings are precluded despite Pfizer's lukewarm view that the Court's lengthy

findings of Pfizer's fraud (*Bench Findings* at Sections II.B and II.D) were unnecessary to its

conclusions.  *See Opp. Br.* at 5 (there was no "need to find that Pfizer engaged in anything

resembling the nationwide fraudulent marketing scheme detailed over 50 pages by this Court").

Pfizer's opposition requires the Court to narrowly interpret First Circuit collateral

estoppel law concerning which findings are "necessary for judgment" beyond the point of

practicality.  A "finding is necessary if central to the route that led the factfinder to the judgment,

even if the result could have been achieved by a different, shorter and more efficient route."

*Hoult*, 157 F.3d at 32 (quotation omitted).

In *Hoult*, Jennifer Hoult sued her father and won a jury verdict on claims of assault and

battery, intentional infliction of emotional distress, and breach of fiduciary duty.  *Id.* at 30.

Jennifer had alleged her father sexually abused, raped, and threatened her.  *Id.*  After the verdict,

Jennifer's father sued her for defamation after she published letters claiming he raped her.  *Id.*

The district court granted Jennifer's motion to dismiss on the grounds of issue preclusion.  *Id.*

---

[4]      Section II.B of the Bench Findings is titled "Marketing of Neurontin," Section II.D is titled "The Marketing Fraud."  The Court mentions Kaiser twice in those sections; both references in passing.  The Court's Kaiser specific findings are contained in Section II.E, titled "Kaiser's Reliance on Pfizer's Misrepresentations."

On appeal, the First Circuit affirmed despite that "the jury made no explicit finding that rapes occurred." *Id.* at 32. The Court reasoned that the fact of sexual assault had been "actually decided [for collateral estoppel purposes] even [though it was] not *explicitly* decided" because the fact of the rape "may have constituted, logically or practically, a necessary component of the decision reached." *Id.* (quotations omitted). The First Circuit directed that the precluding court "may examine the full record" in the prior case to decide whether the jury resolved the issue to be precluded or some other question. *Id.* (citations omitted).[5] Here, the jury necessarily—and this Court explicitly—found the facts and resolved the issues Aetna seeks to preclude.

Aetna's motion does not seek blunderbuss estoppel of 1,083 findings (*In re Light Cigarettes Mktg. Sales Practices Litig.*, 691 F. Supp. 2d 239 (D. Me. 2010)), 749 findings (*Shaffer v. R.J. Reynolds Tobacco Co.*, 860 F. Supp. 2d 991, 997 (D. Ariz. 2012)), or 2,666 findings (*Grisham v. Philip Morris, Inc.*, 670 F. Supp. 2d 1014 (C.D. Cal. 2009)). *See Opp. Br.* at 7-9 (citing these cases). Aetna seeks only to avoid relitigation of the 6 distinct Preclusion Issues actually and necessarily decided by the Kaiser fact-finders.[6]

---

[5]   The Fourth Circuit described *Hoult* as concluding "that a finding need not be indispensable to a prior judgment in order to be deemed 'necessary' to that judgment." *In re Microsoft Corp. Antitrust Litig.*, 355 F.3d 322, 331 (4th Cir. 2004).

[6]   Pfizer analogizes this motion to tobacco litigation where "courts have consistently refused to grant preclusive effect to extensive findings of fact entered in a RICO case against tobacco manufacturers whom the prior court found to have engaged in in a nationwide fraudulent marketing scheme." *Opp. Br.* at 7 & n.9 (citation omitted). Inconsistent tobacco verdicts rendered preclusion inappropriate in those cases. *See Shaffer*, 860 F. Supp. 2d at 996 (citing several instances where the tobacco manufacturer secured favorable verdicts). Further, the "light cigarette litigation is a distinct subset within tobacco litigation as a whole, and the extent to which the [previous decision] separately considered issues unique to light cigarettes is unclear." *In re Light Cigarettes*, 691 F. Supp. 2d at 249; *see also id.* at 250 ("liability in [the first judgment] was based on fraudulent activity that took place throughout the past fifty years, [whereas m]any of the proposed class periods for the pending cases [] are limited to fraudulent activity occurring within a more circumscribed time") (citation omitted); *Grisham v. Philip Morris, Inc.,* 670 F. Supp. 2d 1014, 1032 (C.D. Cal. 2009) ("a significant number [of plaintiff's 'essential' findings] relate specifically to non-parties"). None of these preclusion impediments applies here.

### ii.   The Court's National Off-Label Percentage Findings

The benchmark nationwide impact of "the pervasive nature of the publication fraud that infected the nationwide sources of information available to all physicians" has been litigated, tried, and decided by the Court.  *See Bench Findings* at *33 ("Dr. Rosenthal concluded that the following numbers represented the percentage of Neurontin prescriptions that were caused by Pfizer's fraudulent marketing of Neurontin: (1) bipolar: 99.4%; (2) neuropathic pain: 70%; (3) migraine: 27.9%; (4) doses over 1800 mg/day: 37.5%.").

"Dr. Rosenthal used the 'gold standard' national data on Neurontin and other anti-epileptic drugs from IMS Health and Verispan" to "link[] national data on Pfizer's promotional spending with sales."  *Id.* at *32.  Pfizer argues that the "Court's *findings* are inextricably intertwined with Kaiser's direct reliance theory."  *Opp. Br.* at 8 (emphasis in original).  That is wishful thinking on Pfizer's part.  No aspect of Dr. Rosenthal's IMS analysis was Kaiser-specific.

Dr. Rosenthal looked at national Neurontin prescriptions, and calculated the effect of Pfizer's fraud across the nationwide population of third party payers.  *Bench Findings* at *32.  This "intermediate finding" is properly precluded.  *See Manganella v. Evanston Ins. Co.*, 700 F.3d 585, 591 (1st Cir. 2012) ("For issue preclusion to apply … the issue need not have been the ultimate issue decided by the arbitration; issue preclusion can extend to necessary intermediate findings.") (citations omitted).

The Court carefully considered Dr. Rosenthal's testimony concerning the percentages of off-label Neurontin prescriptions that Pfizer's unlawful marketing caused and adopted her conclusions in its *Bench Findings*.  Pfizer tries to misdirect the Court by suggesting that the Court weighed this evidence along with Kaiser-specific reliance.  *Opp. Br.* at 9.  It demonstrably

did not; rather all Kaiser-specific damage issues were presented at trial by Dr. Hartman. *Bench Findings* at *32.

At trial, the parties will undoubtedly dispute the applicability of the national findings to Aetna's Neurontin prescriptions, and Pfizer may try to show that Aetna is an outlier for whom these findings should not apply for purposes of proximate causation and damages.[7]  However, Pfizer's request to re-argue its "rebuttal evidence and cross-examine of Dr. Rosenthal," *Opp. Br.* at 9, regarding the *national* impact of its fraud would be a repetitive waste of the judicial resources.  The Court has already heard and rejected Pfizer's arguments and expert testimony attacking Dr. Rosenthal's nationwide percentage calculations.  *See Bench Findings* at *32-33.

Grasping to discredit these findings and their preclusive effect, Pfizer argues that the Court's national prescription percentage findings "cannot be given preclusive affect because they are inconsistent with the jury's findings regarding the percentages of Neurontin prescriptions caused by the alleged fraudulent marketing." *Opp. Br.* at 9-10.  Pfizer here is simply speculating about the nature of the jury's damages award.  *See* Cheffo Decl., Exh. A. (Dkt. No. 4173-1); Verdict, Part III.  The jury's damages math—which is irrelevant to this motion—reflects unquantifiable factors, one of which may be its partial acceptance of Pfizer's mitigation defenses. *See, e.g.,* Trial Tr., vol. 20, p. 62 (Court's jury instruction), Mar. 23, 2010 (Dkt. No. 3491) ("defendants have asserted a concept known as 'mitigation of damages.'  You've heard evidence about that."); *id.* p. 136-38 (Pfizer's closing argument) ("there comes a point where Kaiser can no longer say they were our victim").  Pfizer may be able to reargue mitigation at Aetna's trial.[8]

---

[7]     Pfizer's contention that introduction of such evidence will necessarily require relitigating every issue *ab initio* is a frontal attack on the concept of collateral estoppel.  *See Opp. Br.* at 9.  The Court (and the Coordinated Plaintiffs at summary judgment) analyzed first Dr. Rosenthal's percentage findings and separately applied those findings, via Dr. Hartman's testimony, to monetize Kaiser's damages.  *See Bench Findings* at *32-34.

[8]     Pfizer argues against precluding portions of the Court's *Bench Findings* at Aetna's trial because it will deny Pfizer its right to a trial by jury.  *Opp. Br.* at 10-11.  As Pfizer itself acknowledges (*id.* at 11), the Supreme Court

However, nothing the jury did on Kaiser's damage award undercuts the finality and collateral estoppel power of the Court's meticulously detailed findings of the percentage of off-label prescriptions affected nationally by Pfizer's fraud.

      **B.  Granting Aetna's Motion Does Not Prevent Pfizer From Presenting Rebuttal Evidence on Causation**

Pfizer next argues that it has "more compelling evidence to refute causation as to Aetna than it did for Kaiser." *Opp. Br.* at 11.  If true, it may win at trial.  But Pfizer's out-of-context snippets from Aetna's website where gabapentin—the much cheaper generic version of Neurontin—is associated with some off-label indications at issue do not impact this motion.  *See id.* at 11-13.[9]  Collateral estoppel for the Preclusion Issues would not prevent Pfizer from presenting this "compelling" evidence at Aetna's trial (just as it did at Kaiser's trial[10]).  As Pfizer argues, such evidence can be "weighed against Aetna's purported aggregate evidence of *causation*, *injury* and *damages*."  *Id.*  at 12 (emphasis added).

Pfizer also argues that collateral estoppel is inappropriate because Pfizer "intends to present testimony of Aetna physicians on causation that is significantly different from the evidence available to Pfizer in [the] *Kaiser* [trial]."  *Id.* at 13.  Aetna, unlike Kaiser, does not employ physicians.  Regardless, Pfizer does not explain how collateral estoppel precluding relitigation of Pfizer-specific issues already decided by the *Kaiser* fact finders would impair it from presenting Aetna-specific evidence at the next trial.

---

rejected this very argument in *Parklane Hosiery*.  439 U.S. at 332 n.19 ("the presence or absence of a jury as factfinder is basically neutral").

[9]      Pfizer fails to mention that the statements appear after cheaper generic versions of Neurontin became available.  The minimal cost of generic gabapentin makes it cost-effective for Aetna to simply add them to its formulary for multiple indications, as opposed actively managing use of expensive brand name drug.

[10]     *See* Trial Tr., vol. 1, pp.121-24, 146-47 (Pfizer's opening statement), Feb. 22, 2010 (Dkt. No. 2591); Trial Tr., vol. 20, pp. 84, 89-90 (Pfizer's closing argument).

### C. The "New" Scientific Studies Supposedly Showing Efficacy Are No Different Than the Same "Old" Scientific Studies Offered to the Jury at the *Kaiser* Trial

Pfizer also wants to relitigate off-label efficacy issues definitively decided by the Court in its *Bench Findings*. Pfizer cites two categories of supposedly "new" scientific evidence: (1) the 2011 Cochrane Collaboration meta-analysis and (2) a hodge-podge of mainly open-label, small, and ambiguous clinical studies. *Opp. Br.* at 15-20. Because, as the Court has previously ruled, the data underlying the Cochrane Review was suppressed by Pfizer, it cannot serve as qualifying "new evidence" sufficient to avoid preclusion. Further, the other cited clinical studies—where only a few meet the Court's Double-Blind Randomized Controlled Trials ("DBRCT") standard—synopsized by Dr. Brenner in an October 2013 declaration (Dkt. No. 4172), are simply cumulative of the very similar evidence that Dr. Brenner presented to the Kaiser jury at trial.

#### i. The Court's New Trial Motion Ruling That Pfizer Suppressed the Data Underlying the 2011 Cochrane Review Prevents Relitigation of Neurontin's Neuropathic Pain Efficacy

In 2011, Pfizer filed a motion for a new trial based on what it called newly discovered evidence—the 2011 Cochrane Review's meta-analysis concerning neuropathic pain. Dkt. No. 3362. This Court, on July 27, 2011, issued an extensive decision denying that motion. *In re Neurontin Mktg. and Sales Prac. Litig.*, 799 F. Supp. 2d 110 (D. Mass. 2011), *aff'd*, 712 F.3d 21 (1st Cir. 2013). The Court's core conclusion was that the 2011 Cochrane Review was not newly discovered evidence. *Id.* at 116 ("The Court concludes that the opinion offered in the Cochrane report is a new expert opinion about known pre-existing facts as opposed to newly discovered evidence."). The Court ruled Pfizer could have replicated this meta-analysis of scientific studies "most of which were available during trial" and used the results at trial. *Id.* at 114. Plaintiff's

expert, Dr. Thomas Perry, performed such a study for use in Kaiser's trial and Pfizer's expert, Dr. Robert Gibbons, performed a similar meta-analysis for use in the related products liability cases to rebut plaintiffs' evidence that Neurontin caused suicides and suicidal ideation. *Id.*

Moreover, the Court concluded that Pfizer's argument "displays a certain amount of chutzpah" because it was Pfizer's suppression of data that prevented the Cochrane Collaboration from timely evaluating Neurontin's neuropathic efficacy. *Id.* at 115. Pfizer's fraud, the Court held, delayed the reporting of the results until after Kaiser's trial. The First Circuit affirmed this reasoning. *In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 21, 51 (1st Cir. 2013) ("[t]hat reason was sufficient").[11]

In the face of this ruling, Pfizer contends the standards differ for issue preclusion as compared with an application for a new trial. *Opp. Br.* at 16. Specifically, Pfizer argues it does not have to show that the supposedly "new" evidence "could not have been discovered with due diligence." *Id.* (citation omitted). But Pfizer's "due diligence" or lack thereof had nothing to do with the Court's ruling. This Court found—and the First Circuit affirmed—that it was Pfizer's *fraud*, not its lack of diligence, which prevented the 2011 study from being issued earlier.

Pfizer simply cannot rely on its own fraud to get a second chance at the decided issue of Neurontin's neuropathic pain efficacy. "[C]ollateral estoppel implements the principal that one opportunity to litigate an issue fully and fairly is enough." *Pignons S.A. de Mecanique v. Polaroid Corp.*, 701 F.2d 1, 2 (1st Cir. 1983) (Breyer, J.) (quotation omitted) (finding that the "new" advertisements and products did not "differ in any significant respect" from those in prior

---

[11]    This Court also concluded that the law's interest in certainty from trials militates against reopening verdicts based on new scientific evidence. *In re Neurontin*, 799 F. Supp. 2d at 116. Moreover, it concluded that Pfizer could not demonstrate that the 2011 Cochrane Review "is of such nature that it would probably change the result if a new trial is granted" because Kaiser's damages were based on the existence of "cheaper and more optimal drugs" that would have been prescribed had doctors been aware of Pfizer's fraudulent suppression of adverse clinical trial results. *Id.* Each of these observations is reason enough to prevent relitigation of neuropathic pain efficacy in Aetna's trial.

litigation, applying collateral estoppel); *DeCosta v. Viacomm Intern., Inc.*, 981 F.2d 602, 611

(1st Cir. 1992) (same, holding that there was no reason why evidence of the same type "could

not have been provided the first time").  "[A] party who has litigated an ultimate fact may not

bring forward different evidentiary facts in order to relitigate the finding."  *In re Sonus Networks,*

*Inc., S'holder Derivative Litig.*, 499 F.3d 47, 63 (1st Cir. 2007) (citing, *inter alia*, Restatement

(Second) of Judgments, § 27 cmt. c).[12]

### ii.  Pfizer's "New Studies" Fail to Meet the Evidence Criterion Required at the Kaiser Trial

"The FDA requires two DBRCTs to prove the efficacy of a drug because it is important

to be able to duplicate positive results."  *Bench Findings* at *35.  The Court found this "a reliable

standard followed by the scientific community."[13] This standard was approved by the First

Circuit.  *In re Neurontin Mktg.*, 712 F.3d at 48-49 ("Randomized controlled studies like

DBRCTs are widely accepted as 'ideally suited' for showing causation and as a 'good measure

of the treatment effect.'  Where, as here, numerous DBRCTs indicate that a drug is ineffective,

that provides powerful scientific evidence of inefficacy, particularly as compared to anecdotal

experiences, which can be tainted by the placebo effect.") (quoting D. Kaye & D. Freedman,

*Reference Guide on Statistics*, in *Federal Judicial Center, Reference Manual on Scientific*

*Evidence* at 211, 218, 220 (3d ed. 2011)).  Pfizer's "new evidence" fails to meet this standard

and thus does not prevent preclusion of the inefficacy findings.

---

[12]       Putting aside that it was Pfizer's fraud that prevented the Cochrane Collaboration from previously including data in its 2005 review, Pfizer's lengthy discourse (*Opp. Br.* at 17-18) regarding the benefits and persuasiveness of meta-analysis approach of the Cochrane Collaboration is directly contradicted by its own expert's trial testimony.  *See* Trial Tr., vol. 16, pp. 76-77 (Gibbons testimony), Mar. 15, 2010 (Dkt. No. 2769) ("personally I think that the Cochrane Collaboration uses some of the wrong statistical models").

[13]       "These types of trials are considered to be the 'gold standard' in the medical and scientific communities.  Other types of trials (open or unblinded trials, or trials not controlled by placebo), in addition to anecdotal evidence (case reports, case series, or clinical experience), can be useful to physicians in making prescribing decisions, but are not sufficient to determine efficacy to a reasonable degree of scientific certainty."  *Bench Findings*  at *34.

As "new" science for migraine treatment, all Pfizer can point to is one Journal of Pakistan Medical Association "randomized open-label comparator-controlled trial conducted in 2011" to attempt to undermine the Court's lack of efficacy ruling concerning migraine prophylaxis. *Opp. Br.* at 18 n.19. This scientific evidence, like the clinical trials reviewed by Pfizer's trial migraine expert, Dr. Robert Gibbons, does not "show that Neurontin is effective for migraine prophylaxis under the standard used by the FDA and adopted by the Court for the purposes of its efficacy analysis." *Bench Findings* at *44. Moreover, the study itself recognized that its "small sample size" (80 patients) limited its utility and the need for "further large double blind, placebo-controlled studies" to "establish the results in a large population." *See* S. Zain et al., *Comparison of Efficacy and safety of Topiramate with Gabapentin in Migraine Prophylaxis: Randomized Open Label Control Trial*, 63(1) JOURNAL OF PAKISTAN MEDICAL ASSOCIATION (Jan. 31, 2013) at 6, annexed to Cheffo Decl. (Dkt. No. 4173) as Exhibit C.

The open label mania study Pfizer cites (*Opp. Br.* at 18 n.19) was even smaller than the population analyzed in the Zain Study—it involved a mere 60 patients over only a 6-week period. *See* Astaneh & O. Rezaei, *Adjunctive Treatment With Gabapentin in Bipolar Patients During Acute Mania*, 43(3) INT'L J. PSYCHIATRY IN MED., 2012, Cheffo Decl., Ex. "D". Again, this study does nothing to undermine the Court's inefficacy findings after reviewing the five DBRCTs studying bipolar disorder treatment. *See Bench Findings* at *35-38.

### iii.  The Other "New" Studies Dr. Brenner Cites Do Not Materially Differ From Those He Presented at the Kaiser Trial

"After a review of 12 DBRCTs studying the use of Neurontin in the treatment of neuropathic pain, and a careful consideration of the expert testimony, the Court finds that there is no generally accepted scientific evidence that Neurontin is effective in the treatment of neuropathic pain as a broad category or indication." *Id.* at *43. The "new" scientific literature

on gabapentin's efficacy for neuropathic pain, submitted with Pfizer's opposition in the form of a declaration from Dr. Brenner, one of Pfizer's neuropathic pain trial witnesses, does not move the needle on the Court's original conclusion.

Dr. Brenner outlines eighteen clinical studies, meta-analyses and reviews conducted since March 2010.[14]  Four of these are DBRCT studies.  Three purport to demonstrate efficacy for certain conditions: (1) a Sandercock, *et al*. 2012 study (*Brenner Decl*. Ex. A) of diabetic neuropathic pain; (2) a Mishra, *et al*. 2012 study (*id.* Ex. C) of cancer-associated neuropathic pain; and (3) an Amr, *et al*. study (*id.* Ex. E) of spinal cord injury pain.  One, a Hui, et al. 2011 study (*id.* Ex. R), found **no** evidence of efficacy for carpal tunnel syndrome.  Notably, Dr. Brenner cautions the Court that "[t]here may be other publications (clinical trials, systematic reviews, consensus statements, et al.) which also have concluded that gabapentin is not effective for the treatment of forms of neuropathic pain."  *Brenner Decl*. at 6.  He also admits that there are unmentioned systemic reviews which have concluded that there is insufficient evidence that gabapentin is or is not efficacious for a studied pain problem.  *Id*.

Dr. Brenner's three "positive" DBRCT studies should give the Court déjà vu.  Dr. Brenner testified about similar "positive" studies for these same conditions.  Trial Tr., vol. 17, p. 40 (Brenner testifying as to studies of gabapentin use for "painful diabetic neuropathy"); *id.* (same as to studies of gabapentin use for "neuropathic pain associated with cancer"); *id.* at 42 (same as to studies of gabapentin use for "spinal cord injury"); *see also* Trial Tr., vol. 18, pp. 37-38 (Dr. Bird testimony), Mar. 19, 2010 (Dkt. No. 2770) (testifying as to 2 DBRCT studies finding positive effect of gabapentin for spinal cord injury).  Moreover, the conclusions of the

---

[14]        At trial, Dr. Brenner testified that "there are literally, just talking about Neurontin, there are thousands of papers related to Neurontin." Trial Tr., vol. 17, p. 19 (Brenner testimony), Mar. 16, 2010 (Dkt. No. 3558).  *See also id.* at 68 (Brenner admitting that "[d]ue to the large number of studies of gabapentin and neuropathic pain, it would be extremely cumbersome to address the primary medical literature in its entirety.").

Sandercock 2012 study (*Brenner Decl.* Ex. A) were previously published in February 2009,

***before*** the Kaiser Trial.  *See* David Sandercock, MD, et al., *Gabapentin Extended Release for the*

*Treatment of Painful Diabetic Peripheral Neuropathy*, DIABETES CARE, Vol. 32 No. 2 (Feb.

2009), *available at* http://care.diabetesjournals.org/content/32/2/e20.full.pdf+html (summarizing

the results of the same clinical trial).  The "new" evidence Pfizer submits is a re-run of the "old"

evidence it offered at trial.

      Aetna looked at the medical literature to find the post-March 2010 DBRCT studies Dr.

Brenner failed to mention in his new declaration.  Six omitted studies (in addition to the Hui

study) concluded gabapentin had no efficacy for neuropathic conditions:

- James E. Paul MD, et al., *Gabapentin Does Not Improve Multimodal Analgesia Outcomes for Total Knee Arthroplasty: A Randomized Controlled Trial,* CANADIAN JOURNAL OF ANESTHESIA, Volume 60, Issue 5, pp. 423-431 (May 2013), *available at* http://www.ncbi.nlm.nih.gov/pubmed/23479393;

- N.T. Siddiqui, et al., *Effect of a Preoperative Gabapentin on Postoperative Analgesia in Patients with Inflammatory Bowel Disease Following Major Bowel Surgery: A Randomized, Placebo-Controlled Trial*, PAIN PRACTICE (April 2013), *available at* http://www.ncbi.nlm.nih.gov/pubmed/23560500;

- L. Wibbenmeyer, et al., *Gabapentin is Ineffective as an Analgesic Adjunct in the Immediate Postburn Period*, J. BURN CARE RES. (Mar. 18, 2013), *available at* http://www.ncbi.nlm.nih.gov/pubmed/23511293;

- M. Panah Khahi, et al., *Postoperative Gabapentin to Prevent Postoperative Pain: A Randomized Clinical Trial*, ANESTHESIOLOGY AND PAIN MEDICINE (2012), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3821121/pdf/aapm-02-77.pdf;

- D. Spence, et al., *Perioperative Administration of Gabapentin For Shoulder Arthroscopy: A Prospective, Randomized, Double-Blind, Placebo-Controlled Study*, AMERICAN ASSOCIATION OF NURSE ANESTHETISTS JOURNAL (Aug. 2011), *available at* http://www.ncbi.nlm.nih.gov/pubmed/22403966;

- Rapchuk, et al., *Effect of Gabapentin on Pain After Cardiac Surgery: A Randomized, Double-Blind, Placebo-Controlled Trial*, ANESTHESIA & INTENSIVE CARE 445 (May 1, 2010), *available at* 2010 WLNR 25944421.

The efficacy of Neurontin for treatment of neuropathic pain has already been tried and should not be relitigated.  Any "new" evidence—on both sides of the argument—is just more of the same evidence previously presented to the Court when it made its findings.  Pfizer's request to reopen the trial door for cumulative evidence like this is exactly what collateral estoppel is designed to prevent.  *See Pignons S.A.*, 701 F.2d at 2 (applying collateral estoppel where the "new" facts are not materially different from the "old" facts).

## IV.    CONCLUSION

The Court should grant Aetna's preclusion motion.


Dated: November 21, 2013
       White Plains, New York

                                        LOWEY DANNENBERG COHEN
                                          & HART, P.C.


                                        BY:    /s/ Richard W. Cohen
                                               Richard W. Cohen
                                               Peter D. St. Phillip
                                               Gerald Lawrence
                                               Uriel Rabinovitz
                                               One North Broadway
                                               White Plains, NY  10601
                                               (914) 997-0500
                                               rcohen@lowey.com

                                        *Attorneys for Aetna Inc.*

## CERTIFICATE OF SERVICE

I certify this document filed through the ECF system has been served pursuant to Case

Management #3 on November 21, 2013.


/s/ Peter St. Phillip