# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1629<br><br>Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO:<br><br>KAISER FOUNDATION HEALTH PLAN, INC., et al.,<br><br>        Plaintiffs,<br><br>v.<br><br>PFIZER INC. et al.,<br><br>        Defendants. | Chief Judge Patti B. Saris<br>Magistrate Judge Leo T. Sorokin |

## DEFENDANTS' SUR-REPLY MEMORANDUM OF LAW IN FURTHER OPPOSITION TO KAISER'S MOTION FOR ATTORNEYS' FEES

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................... 1

ARGUMENT ........................................................................................................ 3

I.      KAISER'S PROFFERED HOURLY RATES ARE UNREASONABLE ........................ 3

        A.      Kaiser's Rate Request Ignores Controlling First Circuit Law ................................ 3

        B.      Kaiser's Out-of-Town Attorneys Did Not Charge Prevailing Boston Rates .......... 5

                1.      Kaiser's Two Cases Are Both Outliers and Inapposite ............................ 5

                2.      Kaiser's Other Materials Rebut Its Claimed Rates .................................... 7

II.     KAISER MISUNDERSTANDS PFIZER'S BLOCK-BILLING ARGUMENTS ............. 9

III.    KAISER CANNOT RECOVER FEES FOR WORK UNRELATED TO RICO ............ 10

        A.      Kaiser Is Not Entitled to Fees for Its UCL Claim ................................................ 10

        B.      Kaiser Is Not Entitled to Fees for Unsuccessful Contentions ............................. 11

        C.      Kaiser Is Not Entitled to Fees for Pursuing Settlement and Mediation ............... 13

        D.      Kaiser Fails to Justify Other Work Unrelated to Its Prevailing Claims ............... 13

IV.     EVEN KAISER'S COMPENSABLE WORK IS EXCESSIVE ..................................... 14

        A.      Kaiser's Reply Underscores Its Vague and Non-Contemporaneous Billing ........ 14

        B.      Kaiser Doubles Down on Its Excessive and Duplicative Billing ......................... 16

V.      NUMEROUS KAISER EXPENSES ARE NON-REIMBURSABLE ............................ 18

        A.      Expert Fees Are Not Permitted Under RICO ....................................................... 18

        B.      Kaiser Submits Additional Improper Expenses on Reply ................................... 19

CONCLUSION .................................................................................................... 20

## **TABLE OF AUTHORITIES**

### **CASES**

*Ackerley Commc'ns of Mass., Inc. v. City of Somerville*,
  901 F.2d 170 (1st Cir. 1990) ................................................................17

*Alfonso v. Aufiero*,
  66 F. Supp. 2d 183 (D. Mass. 1999) ..........................................9, 15, 17

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany
  & Albany Cnty. Bd. of Elections*,
  522 F.3d 182 (2d Cir. 2008) .................................................................5

*Bingham v. Zolt*,
  823 F. Supp. 1126 (S.D.N.Y. 1993) .....................................................10

*Blum v. Stenson*,
  465 U.S. 886 (1984) ..........................................................................4, 7

*Bonilla v. Trebol Motors Corp.*,
  No. 92-1795 (JP), 1997 WL. 178861 (D.P.R. Mar. 27, 1997), *rev'd in part on other
  grounds, Bonilla v. Volvo Car Corp.*, 150 F.3d 88 (1st Cir. 1998) .........................19

*Burr by Burr v. Sobol*,
  748 F. Supp. 97 (S.D.N.Y. 1990) ..........................................................6

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
  973 P.2d 527 (Cal. 1999) ...................................................................10

*Chambless v. Masters, Mates & Pilots Pension Plan*,
  No. 80 CIV. 4258 (RLC), 1988 WL. 80170 (S.D.N.Y. July 21, 1988), *aff'd in part,
  rev'd in part on other grounds*, 885 F.2d 1053 (2d Cir. 1989)................................6

*In re Chrysler Motors Corp. Overnight Evaluation Program Litig.*,
  736 F. Supp. 1007 (E.D. Mo. 1990)........................................................7

*Conservation Law Found., Inc v. Patrick*,
  767 F. Supp. 2d 244 (D. Mass. 2011) ....................................................5

*Coutin v. Young & Rubicam Puerto Rico, Inc.*,
  124 F.3d 331 (1st Cir. 1997) ...........................................................11, 13

*Davis v. Footbridge Eng'g Servs., LLC*,
  No. 09cv11133-NG, 2011 WL. 3678928 (D. Mass. Aug. 22, 2011)...........................6, 7, 17

*DiFiore v. Am. Airlines, Inc.*,
　　No. 07-10070-WGY, 2010 WL 623635 (D. Mass. Feb. 18, 2010), *rev'd on other
　　grounds*, 646 F.3d 81 (1st Cir. 2011)......................................................................12

*Entergy Nuclear Vermont Yankee, LLC v. Shumlin*,
　　No. 1:11-99, Dkt. No. 229 (D. Vt. Oct. 31, 2013)...................................................5

*Fox v. Vice*,
　　131 S. Ct. 2205 (2011)..............................................................................................1

*Grendel's Den, Inc. v. Larkin*,
　　749 F.2d 945 (1st Cir. 1984).............................................................................16, 18

*Guckenberger v. Boston Univ.*,
　　8 F. Supp. 2d 91 (D. Mass. 1998)...................................3, 5, 9, 12, 13, 16, 17

*Hermida v. Archstone*,
　　No. 10-12083-WGY, 2013 WL 2896806 (D. Mass. June 14, 2013).......................7

*Huynh v. City of Worcester*,
　　No. 08-40240-TSH, 2010 WL 5376863 (D. Mass. Dec. 20, 2010).........................5

*In re Ins. Brokerage Antitrust Litig.*,
　　No. 04-cv-0518, 2013 U.S. Dist. LEXIS 108042 (D.N.J. Aug. 1, 2013)...............19

*Kennedy v. Town of Billerica*,
　　No. 04-12357-PBS, 2008 WL 2945436 (D. Mass. July 24, 2008),
　　*vacated on other grounds*, 617 F.3d 520 (1st Cir. 2010)......................................12

*Lipsett v. Blanco*,
　　975 F.2d 934 (1st Cir. 1992)..............................................................................4, 10

*Marrotta v. Suffolk Cnty.*,
　　726 F. Supp.  2d 1 (D. Mass. 2010)......................................................................17

*Martino v. Massachusetts Bay Transp. Auth.*,
　　230 F. Supp. 2d 195 (D. Mass. 2002)......................................................................6

*Nelson v. Hecker*,
　　No. 09-10513-JLT, 2010 WL 1741072 (D. Mass. Apr. 28, 2010).........................5

*In re Neurontin Mktg. & Sales Practices Litig.*,
　　No. 04-cv-10739-PBS, 2011 WL 3852254 (D. Mass Aug. 31, 2011)...................12

*In re Neurontin Prods. Liab. Litig.*,
　　No.  04-10981-PBS, 2011 WL 1326407 (D. Mass. Apr. 5, 2011)..........................4

*New Eng. Reg'l Council of Carpenters v. Kinton*,
    284 F.3d 9 (1st Cir. 2002) ..................................................................................13

*Norkunas v. HPT Cambridge, LLC*,
    No. 11-12183-WGY, 2013 WL. 5229838 (D. Mass. Sept. 18, 2013) ...................20

*Phoenix Bond & Indem. Co. v. Bridge*,
    2012 U.S. Dist. LEXIS 173721 (N.D. Ill. Dec. 7, 2012) ...............................10, 19

*Reiter v. Metro. Transp. Auth. of New York*,
    No. 01 CIV.2762(GWG), 2004 WL. 2072369 (S.D.N.Y. Sept. 10, 2004) ...............6

*Sys. Mgmt., Inc. v. Loiselle*,
    154 F. Supp. 2d 195 (D. Mass. 2001) ..............................................................8, 17

*Tri-City Cmty. Action Program, Inc. v. City of Malden*,
    680 F. Supp. 2d 306 (D. Mass. 2010) ..................................................................5

*Tuli v. Brigham & Women's Hosp., Inc.*,
    No. 07-12338, 2009 U.S. Dist. LEXIS 129768 (D. Mass. June 8, 2009) .......6, 7, 13

*Uniroyal Goodrich Tire Co. v. Mut. Trading Corp.*,
    No. 90-c-2370, 1994 U.S. Dist. LEXIS 15757 (N.D. Ill. Oct. 31, 1994) ..............10

*Uniroyal Goodrich Tire Co. v. Mut. Trading Corp.*,
    63 F.3d 516 (7th Cir. 1995) ...............................................................................18

*Walsh v. Boston Univ.*,
    661 F. Supp. 2d 91 (D. Mass. 2009) ....................................................................5

*West Virginia University Hospitals, Inc. v. Casey*,
    499 U.S. 83 (1991) ............................................................................................18

*Williams v. Poulos*,
    54 F.3d 764 (1st Cir. 1995) (table, decision at 1995 WL 281451) ........................3

## STATUTES

815 ILCS 505/10a(c) ...............................................................................................10

## ARTICLES

ALM Legal Intelligence, *Billing Rates & Practices: A Study of the Billing Rates and Billing
    Practices of Attorneys in Small and Midsize Firms* 36 (Jan. 2013) ..........................6

Brandon Gee, *The going rate(s): 2013 "Real Rate Report" reveals who's charging what in the legal community*, Mass. Lawyers Weekly (Oct. 11, 2013)..............................................5, 8, 9

Kit Chellel, *In downturn, no break on legal fees*, The Boston Globe (Jan. 16, 2010)....................9

Lisa van der Pool, *Alternatives step-up competition for Boston's white-shoe law firms*, Boston Bus. J. (May 27, 2011)..............................................................................................................9

## PRELIMINARY STATEMENT

Kaiser's attempt to defend its claim to out-of-town rates is beset by contradiction.  To obtain out-of-town rates, First Circuit law requires Kaiser to show that there were no other attorneys in the forum capable of handling its case.  Kaiser dismisses this controlling standard, without analysis, as a "red herring" and argues that what really matters "is the sophistication of the practice and of the matter." (Reply at 2.)  Apart from its disregard of First Circuit law, this proposition is at odds with this Court's decisions in this litigation, which awarded local rates to Pfizer's elite New York-based counsel notwithstanding the sophistication of the matter.  Indeed, by arguing that "sophistication" warrants rates well in excess of the local benchmark, Kaiser effectively requests a prohibited success-based enhancement to the lodestar and not a "conservative" application of rates.

Kaiser's reply brief alternatively argues, for the first time, that its requested rates are actually consistent with Boston norms, contradicting its previous statements that it should not "be limited to [the rates] charged in this forum."  (Pls. Mem. at 12-13.)  This new approach fails for numerous reasons:  (a) Kaiser's argument is based on the rates currently charged by certain large Boston firms, whereas Kaiser's counsel consist entirely of small and mid-size firms; and (b) Kaiser cannot justify its purported "historical" rates by reference to 2013 rates, since the majority of the hours in this 8-year-old case were billed before trial began.  Any claim that such rates reflect the "historical" market is refuted by Kaiser's own materials, which show that even large-firm Boston rates vary widely, have increased drastically in the last few years, and were *below* the levels proposed by Pfizer around the time this case commenced.  Kaiser also purports to rely on class-action settlement cases that have approved its attorneys' rates, but such reliance is misplaced because fees in those cases derive from common-fund principles, not fee-shifting statutes.   Ultimately, Kaiser's arguments are mere distractions because the underlying issue has already been resolved.  This Court in this litigation has already awarded large, out-of-state firms a local rate at the levels Pfizer proposes here.

Kaiser's reply is similarly deficient with regard to its requested hours and expenses.  Kaiser repeats its plea, based on a mistaken reading of *Fox v. Vice*, 131 S. Ct. 2205, 2216 (2011) (*see* Opp. at 3), that close scrutiny of its fee petition would amount to prohibited "green eyeshade" review.

(Reply at 3-4.)  Kaiser chides Pfizer for its use of "extensive research" and "elaborate multi-level spreadsheets" (*id.* at 1), which it variously describes as "a convoluted line-by-line forensic review of Kaiser's counsels' time records" (*id.* at 3) and a system "created out of whole cloth . . . for scoring counsels' time, compounding a seemingly unending series of objections."  (*Id.* at 4.)  To the contrary,  Pfizer's spreadsheet carefully organizes Kaiser's disparate fee submissions in a single document that allows the parties and the Court to consistently evaluate the fee request under a variety of different metrics, which are carefully drawn from the precedents of the First Circuit and this Court.  Notably, if the Court accepts Pfizer's legal arguments, it may simply follow the spreadsheet and adopt Pfizer's proposed award, since Kaiser challenges Pfizer's objection coding in the spreadsheet in only a handful of instances (which Pfizer has addressed in Exhibits R and S).[1]

Pfizer's careful analysis has revealed, more than ever, the need for close scrutiny of Kaiser's fee petition.  That analysis showed numerous defects in Kaiser's petition, including vague, non-contemporaneous, and wasteful billing, numerous bills that had not been limited as represented by Kaiser, and many luxurious travel expenses, such as manicures and guided tours.  While Kaiser's reply withdraws a handful of the more egregious items, it then criticizes Pfizer for having conducted the analysis and insists the Court need look no further.  Striking the most egregious entries does not end the inquiry—that so many were included in this supposedly "conservative" fee petition casts a pall over the entire submission and vindicates Pfizer's approach.

Further, while Kaiser dismisses Pfizer's objections to certain egregious expenses as "a tempest in a teapot" (Reply at 20), its reply unreasonably asks the defense to pay for over-the-top bills.  Indeed, the supplemental expense submission by Hagens Berman contains new in-room entertainment charges, restaurant bills primarily for alcoholic drinks, and a $974 bar tab the day the verdict issued.  RICO may award treble damages and fees, but it does not provide that the loser buys drinks.  And while Kaiser withdraws some egregious expenses, it doubles down on others.  For

---

[1]   Exhibits R and S to the Supplemental Declaration of Mark Cheffo show Pfizer's adjustments to proposed fees and expenses, respectively, based on Kaiser's reply.  These exhibits include both new deductions due to Kaiser's concessions, as well as withdrawal of objections based on new documentation or analysis provided by Kaiser.  An Excel file containing a revised master spreadsheet and revised Exhibits A through Q will be separately provided.

example, Kaiser submits sworn declarations denying that it double-counted $82,500 in expert fees, but provides no substantive response to Pfizer's analysis showing that such double-counting did, in fact, occur. Kaiser likewise refuses to withdraw its improper request for reimbursement of overhead expenses.

For these reasons and those set forth in Pfizer's opposition brief, any award of attorneys' fees and expenses should be limited as set forth below and in the attached materials.

## ARGUMENT

I.   **KAISER'S PROFFERED HOURLY RATES ARE UNREASONABLE**

A.   **Kaiser's Rate Request Ignores Controlling First Circuit Law**

Kaiser's reply fails to even address, let alone satisfy, the controlling law of this Circuit governing requests for out-of-town rates. As this Court has held and Pfizer amply demonstrated in its opposition brief, it is well-settled that "the proper rate to apply to the work of out-of-town counsel is that of the forum community, rather than that which the attorney charges in the community in which she practices." *Williams v. Poulos*, 54 F.3d 764 (1st Cir. 1995) (table, text at 1995 WL 281451, at *4) (quotation omitted); *accord, e.g.*, *Guckenberger v. Boston Univ.*, 8 F. Supp. 2d 91, 103 (D. Mass. 1998) (Saris, J.) (recognizing the "presumption that local Boston rates apply"). Reimbursement at an out-of-town rate is appropriate only "if the complexities of a particular case *require* the particular expertise of non-local counsel, . . . *or* when the case is an undesirable one which capable attorneys within the forum community are not willing to prosecute or defend." *Williams*, 1995 WL 281451, at *4 (quotation omitted). Kaiser cannot satisfy this standard, having averred that its Boston attorneys were critical to its case. (*See* Pl. Mem. at 2-3.)

Kaiser nevertheless insists that "[t]he local/out-of-town dichotomy Pfizer proffers is a red herring," because "[t]he key consideration here is the sophistication of the practice and of the matter." (Reply at 2.) Initially, Pfizer did not proffer the local/out-of-town dichotomy—Kaiser itself raised the distinction in its petition, arguing it should recover "the prevailing rates from the various forums in which Kaiser's attorneys are based" and not "be limited to those charged in this forum." (Pls. Mem. at 12-13.)

3

Nor can Kaiser so casually dismiss the controlling law of the First Circuit, which specifically limits attorneys' fees to local rates absent proof of a standard that Kaiser does not even attempt to meet. Kaiser's request for out-of-town rates due to "the sophistication of the practice and of the matter" is effectively a request for an enhancement of the lodestar, which Kaiser specifically denies seeking. (Reply at 2, 9-10.) Indeed, the award of the lodestar local rate is presumed to reflect the sophistication of the matter and the degree of success obtained, and the Supreme Court has rejected requests for enhancement on those grounds. *See Blum v. Stenson*, 465 U.S. 886, 898-900 (1984); *Lipsett v. Blanco*, 975 F.2d 934, 942-43 (1st Cir. 1992).

Kaiser then argues that its out-of-town rates should apply because Pfizer itself retained New York-based counsel who bill at rates comparable to those requested by Kaiser. (Reply at 6-7.) This is an incredible assertion, given that Pfizer's New York-based counsel submitted a fee petition in this litigation and was awarded local, rather than actual, rates. *In re Neurontin Prods. Liab. Litig.*, No. 04-10981-PBS, 2011 WL 1326407, at *7 (D. Mass. Apr. 5, 2011).[2] Even more boldly, Kaiser argues that while it was appropriate for Pfizer's attorneys to recover a fraction of their actual rates in this litigation, its own attorneys should not bear the same consequence. (Reply at 2.) Making this remarkable claim requires Kaiser to temporarily abandon its arguments that the work of Pfizer's attorneys was analogous to its own (and therefore supports similar actual rates), and to argue instead that the work underlying Pfizer's fee petition is wholly distinguishable from Kaiser's counsel (of course, only to the extent it would result in an award of lower rates). (*See id.*) Kaiser cannot have it both ways, and in any event, its purported distinctions are without merit. The work underlying Pfizer's fee petition was no simple matter, but rather involved a complex collaborative process among several large law firms to prepare a single, cohesive motion to compel relating to discovery deficiencies in 214 different products liability cases within tight deadlines. (*See* Cheffo Decl. in

---

[2] Just as the rates charged by Pfizer's New York counsel are irrelevant to determining relevant Boston rates here, Kaiser's request for discovery of Pfizer's counsel's rates is irrelevant. Initially, Kaiser's request for discovery on reply conflicts with its opening brief's claim that "no discovery or protracted proceedings will be required" to resolve this motion. (Pls. Mem. at 2, 7 n.4 (referring to a "legion of authority" denying such requests).) Moreover, as Pfizer noted in its response to Kaiser's request for discovery, Pfizer's attorneys' rates are "not at issue" since "Pfizer readily conceded that its counsel's rates exceed the rates recoverable in this jurisdiction." (*See* Pls. Ex. R.)

Supp. of Attorneys' Fees [3218] ¶¶ 4-8.)  The Court awarded Boston rates for that undertaking by Pfizer's premier defense firms and it should do likewise here.[3]

### B.    Kaiser's Out-of-Town Attorneys Did Not Charge Prevailing Boston Rates

Kaiser's opening brief acknowledged that it was seeking fees in excess of local Boston rates, arguing that the rates awarded should not "be limited to those charged in this forum."  (Pls. Mem. at 12.)  Indeed, as Kaiser's own authorities show, "[l]ocation is the single most important factor in determining what lawyers charge per hour."[4]  In reply, however, Kaiser argues that its out-of-town attorneys' rates are actually the same as prevailing Boston rates.  (Reply at 8.)  This abrupt reversal does not withstand scrutiny.

### 1.    Kaiser's Two Cases Are Both Outliers and Inapposite

Kaiser totally ignores the numerous decisions from this district cited by Pfizer that have awarded attorneys' fees in the range of $250 to $350 per hour in analogous cases.[5]  Notwithstanding those decisions, Kaiser bluntly asserts that "Courts in this District" have awarded purportedly local

---

[3]   In the same vein, Kaiser argues that its counsels' actual rates should apply because Quinn Emanuel, one of the firms retained by Pfizer here, may seek to recover its actual rates in connection with a fee application it has submitted on behalf of another client in the District of Vermont.  (Reply at 7 n.27 (citing Supp. Mem. in Support of Mot. for Attys. Fees, *Entergy Nuclear Vermont Yankee, LLC v. Shumlin*, No. 1:11-99, Dkt. No. 229 (D. Vt. Oct. 31, 2013)).)  This argument misses the mark because the Second Circuit applies a different standard to such requests.  While the First Circuit authorizes out-of-town rates only if "the subject of the litigation is so unusual or *requires* such special skills that *only* an out-of-state lawyer possesses," *Guckenberger*, 8 F. Supp. 2d at 103, the Second Circuit allows out-of-town rates "if it is clear that a reasonable, paying client would have paid those higher rates."  *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany & Albany Cnty. Bd. of Elections*, 522 F.3d 182, 191-93 (2d Cir. 2008) ("[A] district court should consider the rate reasonable, paying client would pay, and use that rate to calculate the presumptively reasonable fee.").  That standard will be readily satisfied in the *Entergy* matter, which involves a complex constitutional law dispute regarding nuclear power plants, pending in a much smaller legal market than Boston.

[4]   Brandon Gee, *The going rate(s): 2013 "Real Rate Report" reveals who's charging what in the legal community*, Mass. Lawyers Weekly (Oct. 11, 2013), *available at* http://masslawyersweekly.com/2013/10/11/the-going-rates/.

[5]   *See, e.g.*, *Hermida v. Archstone*, No. 10-12083-WGY, 2013 WL 2896806, at *10 (D. Mass. June 14, 2013) (approving fees in complex consumer class action at "$350 hourly rate for the work performed by the lead attorneys, $275 per hour for an associate, and $125 per hour for administrative work"); *Nelson v. Hecker*, No. 09-10513-JLT, 2010 WL 1741072, at *1 (D. Mass. Apr. 28, 2010) (approving rates of $275 per hour for associates and $350 for lead counsel, "an active and experienced lawyer in consumer matters"); *Conservation Law Found., Inc v. Patrick*, 767 F. Supp. 2d 244, 257 (D. Mass. 2011) (awarding rates for attorneys from $175 to $310 per hour); *Tri-City Cmty. Action Program, Inc. v. City of Malden*, 680 F. Supp. 2d 306, 315-16 (D. Mass. 2010) (finding rates of $350 per hour for partner, $275 per hour for senior associate, and $225 per hour for junior associates reasonable); *Huynh v. City of Worcester*, No. 08-40240-TSH, 2010 WL 5376863, at *2 (D. Mass. Dec. 20, 2010) (finding $275 per hour reasonable for senior associate and $200 per hour a reasonable rate for a junior associate); *Walsh v. Boston Univ.*, 661 F. Supp. 2d 91, 111-12 (D. Mass. 2009) (awarding partner $350 per hour, senior associate $275 per hour, and junior associate $175 per hour).

rates at the much higher levels it seeks.  (Reply at 4.)  This claim is based entirely on opinions by
one judge in two inapposite cases.

*First*, Kaiser cites a 2009 decision that relied solely on state-court precedents and awarded
rates up to $735 an hour as appropriate for "the rates of large law firms," there, Brown Rudnick.
*Tuli v. Brigham & Women's Hosp., Inc.*, No. 07-12338, 2009 U.S. Dist. LEXIS 129768, at *7 (D.
Mass. June 8, 2009) (Gertner, J.).  Initially, this outlier holding is no use to Kaiser, since *this*
Court in *this* litigation has already considered the fees appropriate for large, New York firms and awarded
the local rates proposed by Pfizer here.  Moreover, the rates charged by a large firm like Brown
Rudnick are not analogous to this case, since none of the firms that represented Kaiser is a large
firm—they are all small or midsize firms, for which the average rate for commercial litigation in
Boston is $285 per hour.[6]  The "appropriate comparison for [Kaiser's counsel] is not, as plaintiff
appears to believe, to a large law firm, which because of increased overhead, charges higher rates,
but to a small or medium-sized firm." *Chambless v. Masters, Mates & Pilots Pension Plan*, No. 80
CIV. 4258 (RLC), 1988 WL 80170, at *10 (S.D.N.Y. July 21, 1988) (quotation omitted), *aff'd in
part, rev'd in part on other grounds*, 885 F.2d 1053 (2d Cir. 1989); *accord Martino v. Massachusetts
Bay Transp. Auth.*, 230 F. Supp. 2d 195, 205-06 (D. Mass. 2002); *Reiter v. Metro. Transp. Auth. of
New York*, No. 01 CIV.2762(GWG), 2004 WL 2072369, at *7 (S.D.N.Y. Sept. 10, 2004) (collecting
cases).  As another court observed, even assuming plaintiff's counsel performed "at Cravath's level,
. . . this does not necessarily mean that plaintiff is entitled to Cravath rates," since "Cravath has
much higher overhead than plaintiff's lawyers, including luxury office space, 24 hour staffing, and a
host of other amenities, which is reflected in the rate charged per hour." *Burr by Burr v. Sobol*, 748
F. Supp. 97, 102 (S.D.N.Y. 1990).  A contrary holding would confer a windfall on Kaiser.

*Second*, Kaiser cites *Davis v. Footbridge Eng'g Servs., LLC*, No. 09cv11133-NG, 2011 WL

---

[6]  (*See* Ex. B, ALM Legal Intelligence, *Billing Rates & Practices: A Study of the Billing Rates and Billing Practices of
Attorneys in Small and Midsize Firms* 36 (Jan. 2013).)  Kaiser incorrectly argues that Pfizer's authorities relate to rates
"for different kinds of lawyers in different kinds of cases, and akin to the rates of lawyers who defend individual personal
injury cases."  (Reply at 2.)  These rates are not confined to personal injury or insurance defense cases, and they relate to
the relevant market here: commercial litigation practice by small and mid-size firms.

3678928 (D. Mass. Aug. 22, 2011) (Gertner, J.), where the court extended its reasoning in *Tuli* and held that large-firm rates may also be appropriate for national class actions, which also involve large overhead. *Id.* at *4. But just as *Tuli* was inapposite because Kaiser's attorneys are not large firms, *Davis* is inapposite because *this is not a class action*. Moreover, *Davis* involved a highly unique situation where the parties had executed a settlement of class claims that provided that, if they were unable to agree on a fee award for class counsel, "the Court will determine reasonable fees under the usual lodestar approach." *Id.* at *3. *Davis* thus has little relevance to this case, where the fee petition is before the Court pursuant to a prevailing-party fee-shifting statute, not a settlement.[7] In contrast to *Davis* is *Hermida*, a recent class action in this district where the fee award was based on a fee-shifting statute, rather than a settlement. 2013 WL 2896806, at *10. There, significantly, the court approved rates that are nearly identical to what Pfizer proposes here: "$350 hourly rate for the work performed by the lead attorneys, $275 per hour for an associate, and $125 per hour for administrative work." *Id.*

## 2.   Kaiser's Other Materials Rebut Its Claimed Rates

Kaiser also cites a slew of materials, including articles and bankruptcy court fee approvals, for the proposition that rates charged by certain large Boston firms are consistent with the rates it seeks here. These materials are inapposite and undermine Kaiser's claims.

*First*, as expressed above, Kaiser relies on the wrong comparator. The rates for large defense firms are simply not analogous to Kaiser's counsel, a consortium of small and midsize plaintiff firms. Notably, the materials that Kaiser cites for large firm rates also provide relevant data for small and mid-size firms. That data is fatal to Kaiser's request for enhanced rates, since even in

---

[7] For related reasons, the other class-action settlement decisions cited by Kaiser are even more inapposite. (*See* Reply at 6.) That those decisions approved the rates of Kaiser's attorneys is immaterial, since those rates were submitted in the context of a common-benefit fund application where the lodestar simply served as a cross-check for the total amount of the award. *See Blum*, 465 U.S. at 900 n.16 ("Unlike the calculation of attorney's fees under the 'common fund doctrine,' where a reasonable fee is based on a percentage of the fund bestowed on the class, a reasonable fee under [the civil rights fee-shifting statute] reflects the amount of attorney time reasonably expended on the litigation."); *see also In re Chrysler Motors Corp. Overnight Evaluation Program Litig.*, 736 F. Supp. 1007, 1012 (E.D. Mo. 1990) (noting that *Blum* "expressly recognized the distinction between common fund and statutory fee cases, and the mechanism for awarding fees in those different types of cases").

2012, the rates for small and mid-size Boston firms are *lower* than the rates that Pfizer has proposed: in firms with 1 to 50 attorneys, the average litigation partner bills $247.78 and the average associate bills $188.75; and in firms with 51 to 100 attorneys, the average litigation partner bills $255.43 and the average litigation associate bills $163.54.  *See* Gee, note 4, *supra*.[8]

*Second*, Kaiser looks to the wrong timeframe.  While Kaiser repeatedly refers to its request for purported "historical" rates as evidence of the conservatism of its fee petition, the materials it cites cannot prove "historical" rates, since they relate only to rates from January 2010 onward.  Significantly, in this case, more than half of Kaiser's total hourly bills were incurred from the beginning of the representation in 2004 up to the commencement of trial on February 27, 2010.  (Ex. U, Kaiser's Hours by Year.)  And Kaiser's own authority shows that rates for Boston firms have drastically increased in the last few years—indeed, one survey showed that the rates for litigation associates billed to corporate clients increased by almost 30% from 2010 to 2012.  *See* Gee, note 4, *supra*.  Moreover, another fee award case that Kaiser cites found that average rates for all attorneys in the largest Boston firms ranged from $223 to $302 around the time of the commencement of this case—again, lower than the rates that Pfizer proposed here.  *Sys. Mgmt., Inc. v. Loiselle*, 154 F. Supp. 2d 195, 210 (D. Mass. 2001).

*Third*, Kaiser draws the wrong conclusions from its materials.  Kaiser's materials concerning the top rates charged by large Boston defense firms do not even suggest, much less show, that those rates represent the average in the market for similar services.  For example, Kaiser selectively quotes a line from a 2011 Boston Business Journal article stating that "Partners at Boston's largest law firms charge anywhere from $600 per hour, up to $1,000 per hour" (Reply at 3), but the very next sentence in that article explains that a competitor firm performing the same kind of work for the same clientele does so at "rates that are up to half off big firm rates."[9]   Indeed, the whole point of

---

[8]  Kaiser quotes this article for the proposition that the average rates for Boston partners is $598.69 and for associates $388.21 (Reply at 3 n.7), but this generalized information about rates for corporate clients is irrelevant when the article shows specifically that the rates for small and mid-size firms like Kaiser's counsel are lower than Pfizer's proposed rates.

[9]  *See* Lisa van der Pool, *Alternatives step-up competition for Boston's white-shoe law firms*, Boston Bus. J. (May 27, 2011),                    http://www.bizjournals.com/boston/print-edition/2011/05/27/alternatives-step-up-competition-for.html?surround=etf&ana=e_article.

that article was to analyze the wide range in rates for high-end legal services in Boston, as is clear from its title: "Alternatives step-up competition for Boston's white-shoe law firms." Kaiser cites another article for the point that the cost of "the most experienced partners at elite Boston firms can be as high as $700 to $900 an hour" (*id.*), but that article similarly notes that these high rates may make clients "more likely to turn to smaller, boutique law firms, where the cost of legal advice is much lower, or to large firms offering innovative billing methods."[10]   Kaiser's claim to out-of-market rates wholly fails.

## II.    KAISER MISUNDERSTANDS PFIZER'S BLOCK-BILLING ARGUMENTS

Kaiser's reply brief takes on a straw man by vociferously defending itself from purported attacks on the practice of block-billing.  (*See* Reply at 10-11.)  Pfizer did not attack block-billing as a practice, it simply acknowledged that block-billed entries are difficult to evaluate because it is impossible to tell how much of the time set forth in the entry was allocated to each task.  Pfizer thus did not seek to penalize Kaiser for the mere fact of block-billing if all the work described was unobjectionable.  However, where some tasks were objectionable, Pfizer sought to craft rules that could reasonably and without significant difficulty compute appropriate deductions.  Following this Court's precedents, where one task "involved one of the enumerated uncompensable categories," Pfizer "allocated fifty percent of the hours in that entry to the category in question."  *See Alfonso v. Aufiero*, 66 F. Supp. 2d 183, 192 (D. Mass. 1999) (Saris, J.); *accord Guckenberger*, 8 F. Supp. 2d at 102; *see also* (Cheffo Decl. ¶¶ 14-15.)  And in the more complicated situation involving legitimate work and two or more objectionable tasks, Pfizer gave Kaiser the favorable inference and *still* allocated 50% of the total hours to Kaiser while discounting the remainder according to the applicable objections.  (Cheffo Decl. ¶ 16.)

Kaiser does not challenge the reasonableness of any of these proposed rules.  Instead, consistent with its theme of dismissing Pfizer's careful analysis of the defects in its petition as

---

[10]      *See* Kit Chellel, *In downturn, no break on legal fees*, The Boston Globe (Jan. 16, 2010), http://www.boston.com/business/articles/2010/01/16/in_downturn_no_break_on_legal_fees/?s_campaign=8315. Another of Kaiser's articles confirmed this spread, showing vast disparities from $169 to $400 for litigation associates and $198 to $580 for litigation partners between the first and third quartiles.  *See* Gee, note 4, *supra*.

"green eyeshades" analysis, Kaiser asserts that its billing entries "should not be sliced and diced and subject to compounded objections as Pfizer proposes." (Reply at 10-11.)[11] But since Kaiser has the burden of proving entitlement to fees, the alternative to these block-billing rules is not to grant a permissive wave-through of Kaiser's application, but to strike entire entries that contain objectionable work, without providing credit for those that contain some compensable work. Kaiser's objections to these block-billing rules should be rejected.

## III.   KAISER CANNOT RECOVER FEES FOR WORK UNRELATED TO RICO

### A.   Kaiser Is Not Entitled to Fees for Its UCL Claim

Kaiser argues that "Pfizer does not—because it cannot—argue that the UCL claim is severable within the meaning of this Circuit's precedents" and therefore does not warrant an award of attorneys' fees. (Reply at 13.) To the contrary, Pfizer does not argue severability because that standard applies only to *unsuccessful* claims, not *successful* claims for which fees are not authorized, like the UCL. *See Lipsett*, 975 F.2d at 940. Here, the California Supreme Court has made perfectly clear that "[p]laintiffs may not receive . . . attorney fees" on a UCL claim. *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527, 539 (Cal. 1999). Even though the proof for the UCL claim and the RICO claim overlapped in many respects, Kaiser's own authority recognizes that "time spent on the state law claims *exclusively* is not compensable under RICO." *Phoenix Bond & Indem. Co. v. Bridge*, 2012 U.S. Dist. LEXIS 173721, at *23 (N.D. Ill. Dec. 7, 2012) (emphasis added). Pfizer does not seek to strike work that supported both the RICO claim and the UCL claim,[12] but rather to eliminate work that would not have been performed but for the UCL claim—for example, entries that specifically refer to UCL-specific issues, or post-trial work relating to the Court's findings of

---

[11]   Kaiser cites only two examples of block-billed entries to which Pfizer objected, which involved an average 53% proposed reduction. (Reply at 10.) Kaiser fails to note that the number of objections they count include not only objections that are specific to these entries, but also overarching objections including nociceptive pain and retention of new appellate counsel.

[12]   This is consistent with *Bingham v. Zolt*, cited by Kaiser, where the court awarded fees on non-RICO claims that "involved a common nucleus of facts and were based on related legal theories." 823 F. Supp. 1126, 1137 n.9 (S.D.N.Y. 1993). Kaiser's reliance on *Uniroyal Goodrich Tire Co. v. Mutual Trading Corp.* is misplaced, since the state-law claim there, unlike here, specifically authorized attorneys' fees. No. 90-c-2370, 1994 U.S. Dist. LEXIS 15757, at *1-3 (N.D. Ill. Oct. 31, 1994) (citing 815 ILCS 505/10a(c)).

fact and conclusions of law, which pertained only to the UCL claim.  (Ex. D.)   Kaiser's own authority teaches that this exclusion is wholly proper.  *Bridge*, 2012 U.S. Dist. LEXIS 173721, at *23 (excluding "the time needed to prepare and file pleadings that asserted only state-law claims, or to respond to motions directed exclusively to those claims.").[13]

## B.   Kaiser Is Not Entitled to Fees for Unsuccessful Contentions

Kaiser argues for fees for unsuccessful contentions under the framework set forth in the First Circuit's decision in *Coutin v. Young & Rubicam Puerto Rico, Inc.*, 124 F.3d 331 (1st Cir. 1997).  Kaiser argues that no deduction is warranted because, under *Coutin*, it was "'successful on all (or substantially all) of [its] claims, and receive[d] complete (or near-complete) relief.'"  (Reply at 11 (quoting *Coutin*, 124 F.3d at 339).)  Kaiser characterizes Pfizer as arguing that Kaiser "prevailed on only an 'insubstantial subset of [its] interrelated claims and obtain[ed] only limited relief.'"  (*Id.* at 12 (quoting *Coutin*, 124 F.3d at 339).)

Kaiser ignores Pfizer's actual arguments.  Indeed, *Coutin* specifically recognized a reduction in fees for unsuccessful contentions under the same circumstances presented here:  where "a plaintiff prevails on only some of multiple claims" that "are not interconnected" with the unsuccessful claims.  *Coutin*, 124 F.3d at 339 ("Attorneys' fees normally should not be awarded for time spent in litigating (or preparing to litigate) unsuccessful, severable claims.").  That standard disallows fees for Kaiser's unsuccessful claims for nociceptive pain.

Kaiser further contends that its unsuccessful nociceptive pain claim is inseparable from the successful claims and therefore warrants a fee award.  (Reply at 13-14.)  To the contrary, Kaiser proffered distinct evidence in support of its nociceptive pain claim.  (*See* Mem. re Indication-Specific Suppression Evid. [2728] at 7-8.)  Based on this proffer, the Court submitted the claim to the jury.  (*See* 3/23/10 Tr. [2772] at 4:1-7.)  Kaiser's unsuccessful claim was based on:  (a) the false

---

[13]   Kaiser argues that Pfizer's half deduction for work directed at "causation," which could refer to either the RICO or the UCL claim shows that those two claims are so interrelated as to be indistinguishable.  (Reply at 13.)  To the contrary, these entries simply show that Kaiser's billing records are insufficiently specific, since the RICO and UCL claims each raise unique causation issues under their authorizing statutes that can be and should have been segregated by billing attorneys.

premise that marketing for "pain" was, *ipso facto*, marketing for *nociceptive* "pain," and (b) "internal discussions" regarding the possibility "that Neurontin 'may be effective in more than neuropathic pain.'" *See In re Neurontin Mktg. & Sales Practices Litig.*, No. 04-cv-10739-PBS, 2011 WL 3852254, at *25-26 (D. Mass Aug. 31, 2011). Both the Court and jury found that such "internal discussions and use of imprecise language" were not proof of fraudulent marketing. *Id.* at *26. Kaiser is not entitled to fees for pursuing this separately presented, separately rejected claim.

Next, after criticizing Pfizer's spreadsheet analysis as too particularized, Kaiser then, like Goldilocks, quarrels with Pfizer's proffered across-the-board deduction for nociceptive pain as being too generalized. In so doing, Kaiser ultimately quarrels with this Court, which has used the very same approach to account for lack of complete success on a given claim by "reduc[ing] the bill (as adjusted for core and non-core claims) by a multiple." *Kennedy v. Town of Billerica*, No. 04-12357-PBS, 2008 WL 2945436, at *3 (D. Mass. July 24, 2008) (Saris, J.), *vacated on other grounds*, 617 F.3d 520 (1st Cir. 2010). Such a deduction is appropriate here because Kaiser's bills, unlike the trial record and the findings of the jury, are not separated by indication. Since it is Kaiser's burden to prove entitlement to fees, the cost of this lack of specificity should be borne by Kaiser, not Pfizer. A 20.44% deduction, for the percentage of Kaiser's claimed damages attributable to nociceptive pain, is fully warranted.

Kaiser's efforts to salvage its fees for other unsuccessful contentions—its motions for pre-judgment interest and to compel the deposition of Carol Janney—are doubly flawed. First, Kaiser erroneously asserts that Pfizer's authorities "refer to a district court's discretion to reduce a fee award for unsuccessful *claims*, not unsuccessful *motions*." (Reply at 15.) To the contrary, the authorities cited by Pfizer, including a decision of this Court, *specifically rejected* fees for unsuccessful motions, thus flatly refuting Kaiser's contention that this standard is in any way "novel." *See Guckenberger*, 8 F. Supp. 2d at 103 ("[T]he Court eliminated all legal fees for post-judgment motions and matters . . . *because none was successful*." (emphasis added)); *DiFiore v. Am. Airlines, Inc.*, No. 07-10070-WGY, 2010 WL 623635, at *2 (D. Mass. Feb. 18, 2010) ("[A]ll time attributed to the motion for class certification, which was denied by the Court, must be subtracted."),

*rev'd on other grounds*, 646 F.3d 81 (1st Cir. 2011).  Second, Kaiser argues that these two motions were not actually unsuccessful because they "did not reduce the damages Kaiser won." (*Id.* at 15.) Although mere denial of a motion is plainly sufficient to render it "unsuccessful," *see Guckenberger*, 8 F. Supp. 2d at 103, Pfizer notes that the denial of Kaiser's request for prejudgment interest did in fact reduce the RICO award by several million dollars.

### C.  Kaiser Is Not Entitled to Fees for Pursuing Settlement and Mediation

Kaiser does not cite a single case authorizing fees for settlement and mediation efforts. Instead, Kaiser grossly misconstrues *Coutin*'s holding that a rejection of a lower settlement offer does not authorize a reduction in a fee award as somehow standing for the proposition that all hours devoted to unsuccessful settlement are therefore recoverable in fee-shifting.  Yet even successful settlement negotiations cannot support a fee award since they do not entail a "judicially sanctioned change in the legal relationship of the parties." *New Eng. Reg'l Council of Carpenters v. Kinton*, 284 F.3d 9, 30 (1st Cir. 2002) (quotation omitted).  An unsuccessful attempt to settle thus cannot support a fee award, since it has no impact on the results at trial.

### D.  Kaiser Fails to Justify Other Work Unrelated to Its Prevailing Claims

To defend work challenged as relating to other cases, Kaiser vaguely asserts that it needed "to coordinate with class counsel or products counsel or others or become familiar with a factual or legal issue in one of the related cases." (Reply at 16.)  But keeping abreast of the issues in related litigation is one thing, and seeking fees for work shared with other cases, in which the plaintiffs have not yet prevailed, is quite another.  Moreover, many of Kaiser's entries clearly go far beyond mere coordination because they involve issues with no overlap in this case, such as "research discovery of absent class members," "[r]eview draft of class brief—circulate comments," and "attend to depositions in suicide cases." (Ex. G.)

Kaiser also takes on a straw man with respect to Pfizer's "Client Relations" objection by arguing that "'the notion of spending "excessive time" with one's client is incoherent.'" (Reply at 16 (quoting *Tuli*, 2009 U.S. Dist. LEXIS 129768, at *9 n.5).)  Pfizer does not seek to penalize Kaiser's attorneys for spending time with their client, but submits that the administrative matters

associated with negotiation of a retention agreement, transitioning files between firms, staffing of associates, and unspecified discussion of "finances" do not relate to prevailing party status.

Kaiser further argues that it is entitled to fees for its non-legal billers, including Dr. Palko Goldman and other unspecified "analysts," who it asserts can simply be treated as paralegals (Reply at 16), which would entitle them to no more than $100 per hour.   Yet these individuals are manifestly not paralegals—Dr. Goldman, for example, billed out at a rate higher than even the associates at his firm, routinely corresponded with retained experts regarding scientific issues  (Pl. Ex. H, Greene Decl., Ex. 1 at 1), and is described in the biographical statement furnished with Kaiser's fee application "[a]s one of the country's foremost experts on the intersection of law and medicine."  (*Id.*, Ex. 2.)  To the extent that the cases cited by Kaiser allowed fees for such experts and analysts, they did not involve RICO claims, where expert fees are non-recoverable.

## IV.   EVEN KAISER'S COMPENSABLE WORK IS EXCESSIVE

### A.   Kaiser's Reply Underscores Its Vague and Non-Contemporaneous Billing

Kaiser's revelation that it submitted duplicative billing statements for Charles Barrett is concrete proof of non-contemporaneous billing.  Kaiser submitted the same hours by the same biller through two different firms, but with different descriptions for each entry that vary significantly in detail. (Ex. T.)  Don Barrett asserts that this resulted from "a change in time-keeping methods in 2010" (Pl. Ex. S, Don Barrett Decl. ¶ 2), but he does not explain how that change in methods would have resulted in different descriptions of the exactly same work by two different firms.  There is in fact only one logical explanation for this variance:  the vague entries submitted by Barrett Law Group reflect Charles Barrett's original billing entries, which Charles Barrett obtained in connection with this fee petition, revised after the fact to add more detail, and submitted separately through his own firm.  Kaiser's agreement to withdraw this duplicative billing, while necessary, is not sufficient, as it prompts much greater concerns about the accuracy of Kaiser's counsel's sworn declarations of contemporaneous billing and the thoroughness of the preparation of the fee petition.  (*See* Ex. T (entries beginning at 2/22/10).)  Pfizer requests that *all* of Charles Barrett's time be stricken.

Pfizer's opposition brief also identified numerous billers who billed almost exclusively in

14

full-hour and half-hour increments, suggesting that their time was not recorded contemporaneously. (Opp. at 14-15.)  In response, Kaiser attempts to shift the burden of proof to Pfizer, arguing that "Pfizer can't tell whether certain entries were rounded up or down or rounded at all," and that "it is likely that numerous entries do not reflect the full amount of work that Kaiser's counsel put into each workday." (Reply at 18.)  These assertions show it is Kaiser, not Pfizer, who is engaged in speculation—the possibility that these bills reflect rounding is not supported by any declaration of any of the billers in question and, in any event, is to no avail where the attorneys purported to submit bills in increments smaller than hour and half-hour.  Nor does Kaiser offer any factual support for its claim that its bills reflect less, rather than more, than the hours actually worked.  Pfizer's proposed 10% reduction for these billers is wholly proper.

Kaiser further argues that its vague billing descriptions consisting solely of items such as "trial preparation," which "might have been more descriptive in hindsight," are in fact entirely proper in the heat of trial. (Reply at 17 (citing *Bridge*, 2012 U.S. Dist. LEXIS 173721, at *27 n.5).)  Once again, however, Kaiser ignores that this standard comes not from Pfizer, but from this Court, which has previously stricken entries consisting of "only vague descriptions such as 'Drafting documents,' 'Reviewing documents,' 'Case planning,' or 'Trial planning/Trial preparations.'" *Alfonso*, 66 F. Supp. 2d at 194.  Moreover, even to the extent Kaiser were correct on the law—and it is not—that principle would not justify its repeated 16-hour-a-day bills for "Trial Work" when actual trial in this case was conducted in half-day sessions. (*See* Ex. K.)

In addition, Pfizer's opening brief showed that, notwithstanding Kaiser's denial that it was seeking fees "for read and review of routine ECF notices" (Pl. Mem. at 14), the submissions by the Shapiro and Dugan firms contain numerous quarter-hour and third-hour entries for precisely that. (*See* Ex. J.)  In reply, Kaiser claims that while routine ECF review was included on the face of the bills submitted by the Shapiro firm, it had actually been excluded from the amount requested. (Reply at 18 (citing Pl. Ex. G, Shapiro Decl. ¶¶ 4-5).)  But Mr. Shapiro's declaration itself shows that this gloss is incorrect—Mr. Shapiro claimed to have excluded ECF review *prior* to proffering the bill he submitted with Kaiser's application. (Pl. Ex. G, Shapiro Decl. ¶ 4.)  Kaiser also claims

that the Dugan firm's entries "are not for ECF review" but rather "for substantive review of court papers by counsel who was very involved in the case." (Reply at 18.)  But Kaiser fails to explain how these quarter and half-hour docket review entries contributed anything substantively to the case when the billing records show no subsequent action based on that review.  Indeed, the Dugan firm's bills consist *almost entirely* of this routine ECF review, often with identical entries for both its attorneys, plus a few days for travel for deposition designations.  (*See* Pl. Ex. M.)[14]  This fact either belies Kaiser's contention that the Dugan firm was "very involved" in the case or suggests that its bills were concocted *post hoc* by reference to the trial docket and travel receipts.

### B.     Kaiser Doubles Down on Its Excessive and Duplicative Billing

Pfizer's opposition submitted that the use of 33 attorneys and 26 law clerks/paralegals during the immediate pre-trial and trial period constituted overstaffing (Opp. at 16), consistent with this Court's admonition that "just as there can be too many cooks in the kitchen, there can be too many lawyers on a case."  *Guckenberger*, 8 F. Supp. 2d at 101.  In reply, Kaiser labels this objection "absurd" and refuses to concede any waste or duplication of effort in its trial staffing.  Kaiser offers only the conclusory assertion that "lawyers and paralegals in the courtroom  played a vital role in the case and their presence in the Court was crucial to their continuing work out of Court, which itself was crucial for those who did have speaking roles at trial." (Reply at 16-17.)  But this bald assertion is insufficient without concrete evidence on the efficiency of its staffing or the role that each of these 59 individuals served.[15]  Indeed, the First Circuit has expressly approved deductions for attorneys with non-speaking roles.  *Grendel's Den, Inc. v. Larkin*, 749 F.2d 945, 952-53 (1st Cir. 1984).

Kaiser also objects to Pfizer's proposed deductions for "non-core" work billed at attorney

---

[14]  Mr. Dugan asserts that the 7-hour discrepancy between his recorded and claimed hours identified in Kaiser's brief resulted from his failure to include travel time from New Orleans.  (Pl. Ex. Z, Dugan Decl. ¶ 5.)  Aside from the conspicuous *post hoc* addition of this entry, it is nevertheless incompensable because there is no indication Mr. Barrett was working during travel.

[15]  Pfizer's opposition also argued that the billing of 427 hours in one month by an unnamed associate constituted evidence of wasteful and duplicative billing.  (Opp. at 16.)  Kaiser misinterprets this assertion as an attack on that associate's credibility (Reply at 17 n.63), and, naming her specifically, submits a declaration stating that she billed at least 427 hours during that period and, if anything, billed more.  (Pl. Ex. Y, J-P Decl.)  This declaration has the opposite of its intended effect, as allowing a single associate to work, let alone bill, an unheard-of 427+ hours a month is all-but conclusive evidence of wasteful effort due to fatigue.

rates, relying on Judge Young's RICO fee decision in *Loiselle* for the proposition that the core/non-core distinction is inappropriate in the mandatory fee-shifting context. (Reply at 9.)  But *Loiselle*'s rejection of the core/non-core distinction had nothing to do with the fact that fee-shifting was mandatory.  Rather, *Loiselle* held that after establishing the lodestar, applying the core/non-core distinction would serve to "double count some factors."  154 F. Supp. 2d at 209.  Likewise, while Kaiser cites a string of cases that have rejected the core/non-core distinction, all but one were decided by Judge Young, who in this regard departs from the rest of the judges in the district, including this Court.  *See, e.g.*, *Alfonso*, 66 F. Supp. 2d at 196; *Guckenberger*, 8 F. Supp. 2d at 101.  Moreover, as one of Kaiser's own cases recognizes, the core/non-core distinction leads to double-counting only if the court addresses the problem of attorneys billing for low-level work by "fold[ing] this analysis into [the] determination of the reasonable hourly fee," which neither Kaiser nor Pfizer has proposed here.  *Davis*, 2011 WL 3678928, at *5 (citing *Marrotta v. Suffolk Cnty.*, 726 F. Supp. 2d 1, 5 (D. Mass. 2010) (Young, J.)).[16]

Kaiser also objects to the proposed deduction for retention of new appellate counsel, arguing that since Pfizer itself retained additional appellate counsel, Kaiser "should hardly be faulted" for doing likewise. (Reply at 17.)  But this is not a question of fault, it is a question of fairness—as the First Circuit has held, it is not "appropriate to charge [a defendant] with the costs associated with [the plaintiff's] decision to switch on appeal from competent local counsel to the more expensive and distant Washington, D.C. firm."  *Ackerley Commc'ns of Mass., Inc. v. City of Somerville*, 901 F.2d 170, 171 (1st Cir. 1990).  Pfizer should not be charged "'with the time necessary for replacement appellate counsel to reach the level of familiarity with the case for which trial counsel had already been compensated.'"  *Id.* (citation omitted.)  Moreover, Pfizer does not assert, as Kaiser suggests, that Kaiser should not be reimbursed for "the work of putting together the record" (Reply at 17 n.65), but rather that a reduction is warranted because the excessive time spent on this task was due

---

[16]  Kaiser's objection to treating conferencing as non-core misses the mark.  Pfizer does not treat conferencing as non-core because it is non-substantive, but because, as this Court held in *Guckenberger*, in cases involving multiple, out-of-town counsel, "[e]xcessive telephone calls and conferences represent a duplication of effort for which less than full fare should logically be charged for all participants."  8 F. Supp. 2d at 100-01.

to Kaiser's failure to properly preserve the trial record.

Finally, although Kaiser claimed in its petition not to have submitted bills for non-working travel time (Pl. Mem. at 14), it reluctantly concedes in a footnote to its reply that a large amount of its bills did just that.  (Reply at 19 n.70.)  Pfizer submits that Kaiser's concession does not go far enough.  Kaiser's hearsay declarations that certain attorneys maintained a practice of working during travel does not satisfy the First Circuit's requirement for contemporaneous billing.  *See Grendel's Den*, 749 F.2d at 952 ("[H]enceforth, . . . the absence of detailed contemporaneous time records, except in extraordinary circumstances, will call for a substantial reduction in any award or, in egregious cases, disallowance.").  In addition to the withdrawn entries identified by Kaiser, the Court should strike all of the other non-working travel time as identified in Pfizer's Exhibit P.[17]

## V.     NUMEROUS KAISER EXPENSES ARE NON-REIMBURSABLE

### A.     Expert Fees Are Not Permitted Under RICO

Kaiser's request for almost $1 million in expert expenses relies primarily on the Seventh Circuit's decision in *Uniroyal Goodrich Tire Co. v. Mut. Trading Corp.*, 63 F.3d 516 (7th Cir. 1995), which held expert fees recoverable under RICO.  However, Kaiser's block quotation of that opinion contains a conspicuous ellipsis for the language containing the court's reasoning.  (Reply at 19.)  In that omitted section, the Seventh Circuit agreed with the trial court's conclusion regarding expert fees, which "relied on civil rights cases in which provisions which allow the award of a 'reasonable attorney's fee' are construed to include the costs of expert witnesses." *Id.* at 526.  This language shows that *Uniroyal* was wrongly decided, because the Civil Rights Act is not analogous to RICO in this regard.  Indeed, the Civil Rights Act, unlike RICO, was amended to expressly allow expert fees following the decision in *West Virginia University Hospitals, Inc. v. Casey*, 499 U.S. 83 (1991), where the Supreme Court held that  expert fees are not recoverable unless specifically authorized by the fee-shifting statute. *Id.* at 88-92.  Since no similar amendment occurred for RICO, it is plain that

---

[17]   While acknowledging certain entries were improper, Kaiser fails to deduct the full amounts associated with them, since it calculates its deduction for certain attorneys based on an arbitrarily assigned rate of $500 per hour, rather than the rates that each attorney actually purported to charge. (*See* Pl. Ex. BB.)  To compute an appropriate deduction using the revised master spreadsheet, Pfizer has set the hours for each withdrawn entry to zero.

"Congress did not wish to shift expert witness fees in RICO," and Kaiser's request for same must be denied. *Bonilla v. Trebol Motors Corp.*, No. 92-1795 (JP), 1997 WL 178861, at *11 (D.P.R. Mar. 27, 1997), *rev'd in part on other grounds*, *Bonilla v. Volvo Car Corp.*, 150 F.3d 88 (1st Cir. 1998).[18]

Apart from the fact that expert fees are disallowed under RICO, Pfizer's opposition showed several other problems with Kaiser's expert fee submission, including that Kaiser double-counted $82,500 in fees. The PSC stated it was deducting $50,000 from its fee request to account for fees separately requested by Kaplan Fox, but Kaplan Fox in fact requested reimbursement for $132,500. (Pl. Ex. D, Kilsheimer Decl. Ex. 4 at 1; Pl. Ex. Q, Sobol Decl. ¶ 9.) Kaiser purports to addresses this discrepancy in reply by furnishing new declarations for the PSC and Kaplan Fox that simply deny any double-counting occurred. (Pl. Ex. V, Kilsheimer Decl. ¶ 13; Pl. Ex. X, Sobol Decl. ¶ 23.) The lack of meaningful explanation for this discrepancy shows that Pfizer's objection was proper.

### B. Kaiser Submits Additional Improper Expenses on Reply

While some of Kaiser's new expense documentation addresses Pfizer's objections (*see* Ex. S), much raises grave questions of Kaiser's thoroughness and credibility in preparing this submission. For example, Kaiser's support for the previously undocumented Hagens Berman expenses submits items such as a $974 bar tab on the day of the verdict. (Ex. X, Sobol Decl., Ex. A at 23h.) Hagens Berman also submits new in-room entertainment charges and almost $600 in meals on days when the submitting attorney billed *no hours* to this case. (*Id.* at 1, 14, 16c, 21a.) In addition, while most of Hagens Berman's meal receipts, which range as high as $390, do not itemize what was ordered, for the two itemized receipts submitted, the vast majority is alcohol (*see id.* at 23e (receipt for *Joe's American Bar & Grill*), 23f (receipt for *The Barking Crab*)), giving rise to serious suspicions about un-itemized bills. Pfizer thus submits that a 50% deduction for Hagens Berman's meal expenses is proper. Moreover, Kaiser's disclosure that Don Barrett's wife was responsible for the improper manicure and guided tour charges raises new questions about other potential charges

---

[18]   Kaiser's two remaining cases are inapposite. One was a RICO *and antitrust* award, and the other is from the Seventh Circuit, which allows RICO expert fees under the erroneous *Uniroyal* decision. *See In re Ins. Brokerage Antitrust Litig.*, No. 04-cv-0518, 2013 U.S. Dist. LEXIS 108042 (D.N.J. Aug. 1, 2013); *Phoenix Bond*, 2012 U.S. Dist. LEXIS 173721.

incurred by Mrs. Barrett, such as room service bills for a $53.41 breakfast and a $170 dinner on trial days.  (*See* Ex. J, Don Barrett Decl., Ex. 3.)

With regard to remaining expenses, Kaiser's reply brief does not challenge Pfizer's request that its travel bills be cut in half due to waste, which should be entered as unopposed.  In addition, Kaiser insists that it be reimbursed for in-house copying and long-distance charges, despite that such work constitutes firm overhead.  *Norkunas v. HPT Cambridge, LLC*, No. 11-12183-WGY, 2013 WL 5229838, at *11 (D. Mass. Sept. 18, 2013).  Kaiser's cases allowing such expenses do not indicate that those charges were internal or that they were ever challenged as overhead.  (Reply at 20 n.75 (citing cases).)  In addition, the cost of running heating systems, even on the weekend, is manifestly an overhead expense, and that fact cannot be changed with a sworn declaration to the contrary.  (Pl. Ex. X, Sobol Decl. ¶ 12.)  Nor can such costs be charged to Pfizer on the ground that trial required office work on the weekend.  (*See id.* ¶¶ 10-11.)  Weekend work is part and parcel to trial.

## CONCLUSION

For the foregoing reasons and those set forth in its opening brief, Pfizer submits that any award to Kaiser should be capped at **$3,256,675** in attorneys' fees and **$404,618** in expenses.

Dated:  November 25, 2013

Respectfully submitted,

QUINN EMANUEL URQUHART
  & SULLIVAN, LLP

By: /s/ Mark S. Cheffo
    Mark S. Cheffo

51 Madison Avenue, 22nd Floor
New York, NY  10010
(212) 849-7000
Email:  markcheffo@quinnemanuel.com

*Attorneys   for   Defendants   Pfizer   Inc.   and Warner-Lambert Company LLC*

20

## <u>CERTIFICATE OF SERVICE</u>

I, Mark S. Cheffo, hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF (NEF) on November 25, 2013.

Dated:  November 25, 2013              <u>/s/ Mark S. Cheffo</u>
                                        Mark S. Cheffo