UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:  NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1629<br><br>Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO:<br><br>HARDEN MANUFACTURING CORPORATION; LOUISIANA HEALTH SERVICE INDEMNITY COMPANY, d/b/a BLUE CROSS/BLUE SHIELD OF LOUISIANA; ASEA/AFSCME LOCAL 52 HEALTH BENEFITS TRUST; JAN FRANK WITYK; and GARY VARNAM, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>PFIZER INC. and WARNER-LAMBERT COMPANY,<br>    Defendants. | Judge Patti B. Saris<br><br>Mag. Judge Leo T. Sorokin |

**CLASS PLAINTIFFS' REPLY TO PFIZER'S SURREPLY MEMORANDUM OF LAW
IN FURTHER OPPOSITION TO CLASS PLAINTIFFS' POST-MANDATE MOTION
<u>FOR CLASS CERTIFICATION</u>**

Instead of clarifying the issues which the Court must address to decide the pending motion for class certification, Pfizer's Memorandum of Law In Further Opposition obfuscates them, seemingly intentionally.  It not only mischaracterizes the class plaintiffs' positions, it misleadingly cites inapposite authority and misrepresents the holdings of relevant precedent.  The Class Plaintiffs therefore believe that this brief memorandum is necessary to address some of Pfizer's misrepresentations.

I. PFIZER CONTINUES TO DISTORT THE PREVALENCE AND SIGNIFICANCE OF THIRD PARTY PAYORS WHO MAY NOT HAVE PAID FOR A SINGLE FRAUDULENTLY INDUCED BIPOLAR DISORDER

Pfizer has adopted a "kitchen sink" approach in its efforts to defeat class certification.  In its sur-reply – for the first time – Pfizer accuses the Class Plaintiffs of seeking to certify a "fail safe class," a class that is defined in a manner "that precludes membership unless the liability of the defendant is established."  Campbell v. First American Title Ins. Co., 269 F.R.D. 68, 73-74 (D. Me. 2010).  But the Class Plaintiffs have not based their class definition on fraud; they have based it on whether or not a TPP has reimbursed prescriptions for Neurontin for bipolar.  Had the Class Plaintiffs sought to define the class as "third party payors who reimbursed Neurontin prescriptions that had been fraudulently induced," a charge that that class was a "fail safe class" might have validity, since such a class could only exist if Pfizer had been found to have engaged in fraudulent promotion.  But, of course, that is not the class for which

certification is sought.[1]  All third party payors who reimbursed Neurontin bipolar prescriptions shall be bound regardless of Pfizer's ultimate liability, eliminating any "fail safe" problem.

Pfizer implies that the Court could be faced with 9,875 class members[2] that only reimbursed for a single Neurontin bipolar patient, and that a number of those plans only paid for non-fraudulently induced Neurontin.  In fact, the number of uninjured members of the proposed class is much lower, probably approaching zero.  Pfizer's implication that there are multiple ill-fitting plans is several steps away from accurate because 1) the vast majority of those plans are so large that they almost certainly reimbursed prescriptions for multiple patients,[3] and it is virtually impossible that plans that paid for more than one patient's Neurontin bipolar prescriptions constitute uninjured members of the proposed class;[4] 2) very few of even the smaller plans are

---

[1] The proposed class definition is:

> All private, non-governmental entities in the United States and its territories that paid or reimbursed all or part of the cost of Neurontin prescribed, provided, or administered to natural persons covered by any contract, policy, or plan, for bipolar and other mood disorders from November 1995 through December 2004.

[2] This number is derived from the number of self-insured employers Dr. Conti estimated to have been large enough to have almost certainly paid for at least one patient's bipolar Neurontin prescriptions. Declaration Of Rena Conti, Ph.D. In Support Of Plaintiffs' Renewed Motion For Class Certification, ¶¶ 55-58.  During the relevant period, any self-insured employer who covered more than 499 beneficiaries paid for at least one Neurontin bipolar patient's prescriptions, to a 90% certainty.  Id at ¶ 54.

[3] The more members in a health plan, the more likely the plan paid for more than one patient's bipolar Neurontin prescriptions.  According to the United States Census Bureau, of firms with 500 employees or more, less than 33% had between 500 to 750 employees; 16% had between 750 and 1,000 employees; and more than 50% had more than 1,000, with more than 10% of those employers having more than 5,000 employees.  See "Statistics about Business Size (including Small Business) from the U.S. Census Bureau," Table 2b "Employment Size of Employer and Nonemployer Firms, 2007, at http://www.census.gov/econ/smallbus.html

[4] For plans that only covered two Neurontin bipolar patients, the odds are 0.000036 (3.6 out of 100,000!) that both patients' prescriptions were not induced by fraud.

2

likely to have paid for prescriptions for only a single patient;[5] and 3) since 99.4% of the prescriptions were fraudulently induced, even if there are a handful of "single patient" plans, only 0.6% of that handful of plans would be uninjured members of the proposed class.[6]

In theorizing that there are uninjured plans within the proposed class definition, Pfizer weaves an argument from gossamer strands of speculation and surmise. See Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 298 (1st Cir. 2000). Pfizer does not identify any such plan or confirm that one exists—it merely rests on the statistical possibility that one might exist. The identification of categories of TPPs that "*potentially* could be uninjured members of the putative class" cannot defeat class certification. In re Nexium (Esomeprazole) Antitrust Litigation, 2013 WL 6019287, *9 (D. Mass. Nov. 14, 2013) (emphasis in original) (noting that defendants had not "establish[ed] the actual existence of uninjured TPP groups"). And many courts have concluded that even "the inclusion of uninjured class members is not fatal to class certification." Id. at *11.

## II. PFIZER DISTORTS THE CLASS PLAINTIFFS' ARGUMENTS IN OPPOSITION TO ITS POSITION THAT DR. ROSENTHAL'S REPORT CANNOT ESTABLISH CLASSWIDE DAMAGES

In their reply, Class Plaintiffs pointed out that personalized damage calculations are not usually necessary, and therefore not a ground for finding a lack of

---

[5] As noted in the Reply Memorandum, the 500 member threshold is more than one factor away from the 151 member threshold at which a plan more likely than not reimbursed for at least a single prescription. Thus, plans that just barely met Dr. Conti's threshold of 500 members likely covered two or more patients that took Neurontin for bipolar disorder. See Reply Memorandum, 1-2 and note 2.

[6] Even if all 9,875 of the plans reimbursed for only a single patient, the percentage of those plans who were uninjured by Pfizer's fraud would be a *de minimis* 0.6%.

predominance, when damages are to be calculated based on the amount class members wrongfully paid. (Reply at 5). In its sur-reply, Pfizer argues that such an observation is inconsistent with the Class Plaintiffs' disavowal of their intent to recover on an excess price theory. The fact that the class is not contending that their damages were caused by an improperly inflated drug price does not mean that calculation of class damages is not keyed to the amount the class paid for fraudulently promoted Neurontin. A critical step of any damage analysis is to determine what the class (or any class member) paid for Neurontin that was used to treat bipolar disorder. Once that is determined, Dr. Rosenthal's and Dr. Hartman's formulas can readily be applied to determine the damages of the class as a whole and/or the individual members.

The only reason Dr. Rosenthal's and Dr. Hartman's analysis could not be applied would be if Dr. Rosenthal's national data was inapplicable. But Pfizer fails to explain how national data would not be applicable to a national class which comprises all TPPs in the country except those very few insurers that have filed their own actions. Pfizer does not identify any class member to whom Dr. Rosenthal's data would not apply, it just postulates that some might exist. Again, conjecture, speculation or surmise are insufficient to deny the certification of a class under Rule 23(b)(3), particularly given this Court's earlier factual finding that there were no significant differences among the TPP class members, and that common issues predominate with respect to liability.

Pfizer also incorrectly asserts that the Class Plaintiffs never addressed the possibility of this Court certifying a liability only class under Rule 23(c)(4). While this mode of proceeding is not the Class Plaintiffs' first choice, they clearly raised the

4

possibility at pages 20-21 of their primary memorandum. It would make no sense for the Class Plaintiffs to argue that Pfizer was erroneously claiming that the Court could no longer certify a "liability only" class after Comcast, or to favorably cite cases that held that "liability only" classes were appropriate, if the Class Plaintiffs were not arguing that the Court could certify a liability class if it felt constrained from certifying a class for damages. The Class Plaintiffs fully preserved their right to make such an argument.

### III.    THE KRIM AND HART CASES RAISED BY PFIZER HAVE NO RELEVANCE TO THE ISSUE OF CLASS CERTIFICATION IN THIS CASE

Pfizer argues that class members should not be allowed to rely on statistical evidence to establish their damages, relying heavily on Krim v. pcOrder.com, Inc., 402 F.3d 489 (5th Cir. 2005). But Krim concerned putative class representatives, not class members, and it has no direct relevance to Rule 23 issues.[7]  Krim was a standing decision, decided under Section 11 of the Securities Act of 1933, a statute that offers an automatic refund remedy to a very narrowly defined class of securities purchasers. The Fifth Circuit recognized that if the lead plaintiffs' statistical argument was accepted, the restrictions on the remedy Congress intended would be impermissibly expanded. Id. at 497. Thus, the Fifth Circuit did not intend Krim to signify a widespread restriction on

---

[7] Significantly, although it is more than eight years old, the Fifth Circuit's holdings on the use of statistical evidence has never been cited in cases other than securities actions discussing the contour of Section 11 and comparable remedies. It has certainly never before been used as the basis of finding a lack of predominance under Rule 23(b)(3). And no Court has ever ruled that as a prerequisite to certification, a putative class representative must identify each and every class member and establish their entitlement to damages. Pfizer's insistence that class members must be identified before a class can be certified is outlandish at best. See Reply Memorandum, 2.

the use of statistical evidence to prove damages; it expressly stated "we cast no shadow on the use of statistical evidence in general." Id. at 501.

The Court of Claims case relied upon by Pfizer, Hart v. Sec'y of Dep't of Health & Human Services, 60 Fed. Cl. 598 (2004), is another non-class action decision that does not support Pfizer's position. In Hart, the petitioner sought recovery under the National Childhood Vaccine Injury Act of 1986, which compensates families whose children are injured or killed by reactions to vaccines. After the petitioner submitted evidence that the infant's death from hemophagocytic lymphohistiocystosis (HLH) was caused by a reaction to a measles, mumps and rubella immunization, the respondent attempted to avoid payment by arguing that it was the Epstein-Barr virus, not the vaccine, that caused the death. The principal evidence was that because medical articles indicated that most cases of HLH were caused by Epstein-Barr virus, it was statistically more likely that Epstein-Barr killed the child.

But the Court of Claims considered such a haphazard collection of occurrence rates to be "naked statistics" that were unacceptable proof, noting the lack of an "actual factual foundation" for a connection to the case before it. It also noted the lack of any analysis that could eliminate or explain any confounding factors. 60 Fed. Cl. at 607-08. The regression analysis in this case is therefore quite different from the "naked statistics" in Hart – the Class Plaintiffs have other evidence supporting an actual factual finding for the connection, and at its core, the purpose of regression analysis is to eliminate or explain any confounding factors. Given the First Circuit rulings that the Class Plaintiffs' regression analysis was permissible evidence of causation, Hart has no

6

bearing on whether a trial on liability and damages can be done on a class basis. See Harden, 712 F.3d 60, 69 (1st Cir. 2013).

### IV. PFIZER HAS DISTORTED THE EVIDENCE AND HOLDINGS IN COMCAST V. BEHREND AND DUKES V. WAL-MART

In its sur-reply, Pfizer contends that the Class Plaintiffs have argued "erroneously" that a class can be certified despite Comcast v. Behrend, 133 S. Ct. 1426 (2013), and that the Class Plaintiffs have "appear[ed] to abandon" that argument by asserting that their class-wide evidence of damages is a match for the liability theory. Sur-Reply at 4. These ideas are certainly compatible; Comcast does not preclude class certification here precisely *because* the Class Plaintiffs' evidence is an exact match for the liability theory. "Comcast simply requires the moving party to present a damages model that directly reflects and is linked to an accepted theory of liability under Rule 23(b)(3);" the decision "has not changed the rule on what is required for damages models in establishing Rule 23(b)(3) predominance." Nexium at *14.

Pfizer contends that there is a mismatch because of Dr. Rosenthal's use of detailing expenditures in her analysis. This is an argument they raised before the First Circuit. In its Kaiser decision, the First Circuit specifically addressed five objections raised by Pfizer "[a]s to the 'fit' between Dr. Rosenthal's model and the facts at issue in the case."[8] The First Circuit dismissed these very same objections:

> None of these arguments demonstrate that the district court abused its discretion under the "fit" criterion in admitting Dr. Rosenthal's

---

[8] Rather than arguing that Dr. Rosenthal only looked at detailing expenditures, as it has done in its sur-reply, before the First Circuit Pfizer phrased it in the obverse, instead listing things that Dr. Rosenthal did not consider. It is the same objection.

7

>testimony…The analysis did not require Kaiser to quantify the "publication strategy" as distinct from other promotional activities in order to effectively model the causal relationship.  In fact, if publications and CME events did exert an effect independent of detailing…the model would have underestimated the impact of the fraud.

Kaiser, 712 F.3d 21, 44 (1st Cir. 2013).  Although it did not do so in specific reference to Comcast, the First Circuit has already determined that the nature of the information relied on by Dr. Rosenthal in her analysis does not make the regression analysis a mismatch with the Class Plaintiffs' liability theory.

In adherence to its "kitchen sink" approach, Pfizer turns from its Comcast argument to refocus on an argument that permitting Dr. Rosenthal's testimony in a class trial would violate the Supreme Court's admonition against "trial by formula."  It urges this Court to disregard the fact that a properly performed regression analysis which was derived from all available marketing and sales data is the polar opposite of the damage extrapolation proposed in Wal-Mart, by noting that "the regression analyses in [Wal-Mart] were also based on 'national data.'"  Sur-reply at 10.  Pfizer, perhaps deliberately, confuses the regression analyses in Wal-Mart—which was offered as circumstantial evidence of liability—and the damages extrapolation—which the Supreme Court deemed to be an improper "trial by formula."

There were two distinct statistical analyses to be performed by the plaintiffs' experts that were discussed in Wal-Mart.  Unable to find any corporate policies or practices to explain Wal-Mart's alleged discrimination, the plaintiffs in Wal-Mart obtained regression analyses which evidenced statistically significant employment disparities between men and women at Wal-Mart.  The plaintiffs wanted the trier of fact

8

to infer from the statistical analysis that Wal-Mart had been discriminating, but the court determined that regression analysis was an improper substitute for evidence of misconduct. Here, as previously discussed, the Class Plaintiffs are not using statistics to prove that Pfizer engaged in fraudulent conduct. The Class Plaintiffs have plenty of non-statistical evidence to that end, including Pfizer's grand publication strategy—the equivalent of the corporate policies missing in Wal-Mart.

Additionally, to calculate a back-pay award for a putative class certified under Rule 23(b)(2), the Wal-Mart plaintiffs proposed that damages for a sample set of class members would be determined by a master and from those findings a class-wide back-pay award would be extrapolated. It was this proposed procedure—not the use of regression analysis—that was condemned by the Supreme Court as an improper "trial by formula" because it bypassed statutory defenses specifically granted to defendants under the Civil Rights Act. Thus, Wal-Mart did not hold that the use of a properly conducted regression analysis constituted a "trial by formula" or could never be employed to determine collective damages. It held that an unscientific sampling technique could not be used to determine class wide damages where a federal statute gave the defendant an explicit right to individual damage determinations. No such technique is being urged here, and no section of RICO gives Pfizer the same rights to individual damage determinations.

WHEREFORE, for the reasons set forth above and in the prior memoranda submitted by the Class Plaintiffs, the requested class should be certified pursuant to

Rule 23(b)(3). Alternatively, a liability class should be certified pursuant to Rule 23(c)(4).

Dated: December 10, 2013                     Respectfully Submitted,

                                             By:

                                             */s/ Thomas M. Greene*
                                             Thomas M. Greene, BBO # 210020
                                             Greene LLP
                                             One Liberty Square, 12th Floor
                                             Boston, MA 02109
                                             tgreene@greenellp.com

                                             */s/ Don Barrett*
                                             Don Barrett
                                             Barrett Law Office
                                             404 Court Square North
                                             P.O. Box 987
                                             Lexington, MS 39095
                                             dbarrett@barrettlawgroup.com

                                             */s/ Daniel Becnel*
                                             Daniel Becnel, Jr.
                                             Law Offices of Daniel Becnel, Jr.
                                             106 W. Seventh Street
                                             P.O. Drawer H
                                             Reserve, LA 70084
                                             dbecnel@becnellaw.com

                                             */s/ Elizabeth J. Cabraser*
                                             Elizabeth J. Cabraser
                                             Lieff Cabraser Heimann &
                                               Bernstein, LLP
                                             Embarcadero Center West
                                             275 Battery Street, 30th Floor
                                             San Francisco, CA 94111-3339
                                             ecabraser@lchb.com

>*/s/ James Dugan*
>James Dugan
>The Dugan Law Firm
>One Canal Street
>365 Canal St., Suite 1000
>New Orleans, LA 70131
>jdugan@dugan-lawfirm.com
>
>*/s/ Thomas M. Sobol*
>Thomas M. Sobol
>Hagens Berman Sobol Shapiro LLP
>55 Cambridge Parkway, Suite 301
>Cambridge, MA  02142
>tom@hbsslaw.com
>
>*Members of the Class Plaintiffs'*
>*Steering Committee*

## CERTIFICATE OF SERVICE

I, Thomas M. Greene, hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on December 10, 2013.

Dated: December 10, 2013                    */s/ Thomas M. Greene*
                                                                    Thomas M. Greene