# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:  NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1629 <br><br> Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO: <br><br> HARDEN MANUFACTURING CORPORATION; LOUISIANA HEALTH SERVICE INDEMNITY COMPANY, d/b/a BLUECROSS/BLUESHIELD OF LOUISIANA; ASEA/AFSCME LOCAL 52 HEALTH BENEFITS TRUST; JAN FRANK WITYK; and GARY VARNAM, on behalf of themselves and all others similarly situated, <br><br>    Plaintiffs, <br><br> v. <br><br> PFIZER INC. and WARNER-LAMBERT COMPANY, <br><br>    Defendants. | Chief Judge Patti B. Saris <br> Magistrate Judge Leo T. Sorokin |

**MEMORANDUM OF LAW IN OPPOSITION TO CLASS PLAINTIFFS'
MOTION FOR LEAVE TO FILE A SECOND REPLY BRIEF IN SUPPORT
OF THEIR FOURTH MOTION FOR CLASS CERTIFICATION**

**PRELIMINARY STATEMENT**

After hearing proposals from both sides, this Court adopted Plaintiffs' proposed briefing schedule regarding their post-appeal motion for class certification. (*See* Electronic Order of 7/9/13 [4142], as amended by Electronic Order of 7/9/13 [4144].) Pursuant to that schedule, each party filed two briefs on pre-established dates, culminating in Pfizer's surreply brief dated November 12, 2013. (*Id.*) Nearly a month later, Plaintiffs request leave to file a second reply brief in response to Pfizer's surreply. Leave to file should be denied.

When Plaintiffs filed their post-appeal motion for class certification, they erroneously assumed that the First Circuit had already decided all class certification issues in their favor. (*See* Pl. Mem. [4154] at 1, 11.) As a result, Plaintiffs spent most of their opening brief simply reciting the procedural history of this case and the details of the First Circuit's holdings. Pfizer's principal opposition brief showed that numerous issues unresolved by the First Circuit and unaddressed by Plaintiffs require that class certification be denied. (*See* Pfizer Opp. [4168].) These issues include, *inter alia*, Plaintiffs' inability to prove classwide injury and damages through aggregate evidence (*see id.* Section II.A-B), and Pfizer's right to present individual testimony from at least some members' prescribing physicians for each of the 13,070 putative TPP class members (*see id.* Section II.C). In reply, Plaintiffs belatedly and unsuccessfully attempted to overcome these obstacles. (*See* Pl. Reply [4179] Sections I-III.) However, as shown in Pfizer's surreply, Plaintiffs ultimately failed to meet the substance of Pfizer's arguments. (*See* Pfizer Surreply [4191] Sections I.A-C.)

In a tacit acknowledgment that their prior briefs lack merit, Plaintiffs now ask for another bite of the apple. (*See* Motion for Leave [4197].) Plaintiffs' various grounds for this requested relief are spurious and should be rejected. First, Plaintiffs contend that Pfizer's surreply "made several points for the first time . . . that the Class Plaintiffs have not yet had a chance to address." (*Id.* ¶ 1.) In reality, all arguments in Pfizer's surreply were either introduced in Pfizer's principal opposition or were made in response to new arguments improperly raised for the first time in Plaintiffs' reply. *See infra* Section I. Second, Plaintiffs argue that Pfizer's surreply made

various "misrepresentations." (Motion for Leave ¶¶ 2-3.) To the contrary, as discussed below, Pfizer's surreply accurately characterized and directly quoted the arguments and authorities discussed therein. Neither Plaintiffs' constantly shifting positions, *see infra* Section I, nor their disagreement with Pfizer's analysis of case law, *see infra* Section III, warrants granting Plaintiffs leave to rehash issues that have been fully briefed. Third, Plaintiffs' reference to inapposite new authority (Motion for Leave ¶ 4) does not warrant a second reply. *See infra* pp. 7, 8-9.

Leave to file should also be denied because it is Plaintiffs, not Pfizer, who have improperly attempted to inject new issues and arguments in their proposed second reply. *See infra* Section II. Moreover, Plaintiffs' new arguments are meritless and would not have supported class certification even had they been timely raised. *See id.*

## ARGUMENT

### I. Pfizer's Surreply Did Not Introduce Any New Issues

The only "new" argument in Pfizer's surreply brief concerns the issue of a fail-safe class. (Proposed Second Reply [4197-1] at 1.) Pfizer raised this issue because Plaintiffs argued in their reply that even though at least 70,000 bipolar prescriptions were not fraudulently induced, any TPPs that "did not actually reimburse any of the 11,710,680 *fraudulent* bipolar prescriptions . . . *are not in the class*." (Pl. Reply at 2 (emphasis added).) In other words, Plaintiffs argued that to the extent any TPPs paid only for bipolar prescriptions not induced by fraud, those TPPs would not be class members. This is a textbook example of a fail-safe class. *See, e.g.*, *Randleman v. Fid. Nat'l Title Ins. Co.*, 646 F.3d 347, 352 (6th Cir. 2011) (defining "fail-safe" class as one in which "[e]ither the class members win or, by virtue of losing, they are not in the class and, therefore, not bound by the judgment."). Plaintiffs do not argue otherwise. Rather than defending their above-quoted argument, Plaintiffs pretend they never made it.

> Had the Class Plaintiffs sought to define the class as 'third party payors who reimbursed Neurontin prescriptions that had been fraudulently induced,' a charge that that class was a 'fail safe class' might have validity . . . . But, of course, that is not the class for which certification is sought.

(Proposed Second Reply at 1-2.)  Plaintiffs' protests notwithstanding, this is precisely the argument made in Plaintiffs' reply and refuted in Pfizer's surreply.  Plaintiffs' desire to present a moving target of constantly shifting positions does not warrant granting them leave to file yet another class certification brief.

## II. Plaintiffs' Proposed Second Surreply Improperly Raises New Arguments And Mischaracterizes Their Own Experts' Opinions

Pfizer's principal opposition brief argued that Plaintiffs cannot establish classwide injury, as required by *In re New Motor Vehicles Canadian Export Antitrust Litigation*, 522 F.3d 6, 28 (1st Cir. 2008), because most putative class members are small self-insured employers that likely paid for no more than a handful of bipolar prescriptions issued by as few as one doctor.  (*See* Opposition at Section II.A.)  Plaintiffs unsuccessfully attempted to refute this argument in their reply (at 1-3).  They now improperly attempt to do so again by making different arguments.  Plaintiffs' new arguments should be rejected as untimely and waived.  Moreover, even if these arguments had been timely raised, they are meritless.

Plaintiffs argue that "the vast majority of . . . plans are so large that they almost certainly reimbursed prescriptions for multiple patients."  (Proposed Second Reply at 2.)  Plaintiffs' only ostensible support for this argument consists of employment statistics never previously cited by Plaintiffs or their expert, Dr. Rena Conti.  (*See id.* at 2 n.3.)  Plaintiffs offer no excuse for failing to cite these statistics in their opening brief or reply.  Should the Court decide to entertain Plaintiffs' arguments regarding these belatedly-cited employment statistics, Pfizer should be permitted to cross-examine Dr. Conti about them and retain its own expert to address them.

Moreover, Plaintiffs' statistics are from the year *2007* (beyond the class period) and provide generalized information regarding *all employers* in the United States (not just self-insured employers) that have 500 or more employees.[1]  Whereas Dr. Conti estimates that there are a total of 13,070 putative class members, including insurance companies, union health benefit

---

[1] According to Dr. Conti, only "56% of employers with 500 or more employees were self-insured." (Revised Conti Decl. [1142] ¶ 57.)

funds, and self-insured employers (Revised Conti Decl. [1142] ¶ 58), Plaintiffs' statistics reference 18,311 employers alone.  Thus, on their face, Plaintiffs' statistics are over-inclusive and inapposite.  Even if this were not so, these statistics confirm that class certification must be denied.  The following table summarizes these statistics as they relate to Dr. Conti's analysis:

| Firms with 500 Employees or More (2007)[2] | | | |
| --- | --- | --- | --- |
| **Number of Employees** | **Number of Firms** | **Percentage of Total Firms (18,311)** | **Number of Employees Who Received Bipolar Prescriptions**[3] |
| 500-749 | 6,094 | 33.28%[4] | 0 to 1 |
| 750 to 999 | 2,970 | 16.22% | 0 to 2 |
| 1,000 to 1,499 | 2,916 | 15.93% | 1 to 3 |
| 1,500 to 1,999 | 1,542 | 8.42% | 1 to 4 |
| 2,000 to 2,499 | 942 | 5.15% | 2 to 5 |
| 2,500 to 4,999 | 1,920 | 10.49% | 2 to 10 |
| 5,000 or More | 1,927 | 10.52% | 5 or more |

Assuming *arguendo* that these statistics could be directly applied to the putative self-insured employer class members referenced by Dr. Conti, it would follow that:

- 79% of self-insured employers covered no more than 5 consumers who took Neurontin for bipolar disorder.

- 73.85% of self-insured employers covered as few as 1 such consumer.

- nearly half of self-insured employers may not have covered *any* such consumers.

---

[2]   Source: "Statistics about Business Size (including Small Business) from the U.S. Census Bureau," Table 2b, "Employment Size of Employer and Nonemployer Firms, 2007, *available at* http://www.census.gov/econ/smallbus.html.

[3]   Dr. Conti opines with 90% confidence that 1 out of every 496 insured patients received Neurontin for bipolar disorder, and opines with 99% confidence that 1 out of every 992 insured patients received Neurontin for bipolar disorder.  (Revised Conti Decl. ¶ 54.)  Pfizer does not concede the accuracy or admissibility of Dr. Conti's calculations.  However, these figures can be used to provisionally illustrate, for each category of employer, the minimum and maximum number of employees who potentially received bipolar Neurontin prescriptions.

[4]   Plaintiffs erroneously report this percentage as "less than 33%."  (Proposed Second Reply, at 2 n.3.)

This begs the question repeatedly posed by Pfizer: *how are such TPPs any different from the consumer plaintiffs, as to whom this Court denied class certification in a ruling Plaintiffs have not appealed or otherwise challenged?*  Not one of Plaintiffs' three post-appeal briefs provides any response.  Instead, Plaintiffs' proposed second reply attempts to avoid this insurmountable obstacle by mischaracterizing and even contradicting their own experts' opinions.  For example, Plaintiffs argue that "very few of even the smaller plans are likely to have paid for prescriptions for only a single patient." (Proposed Second Reply at 2-3 & n.5.)  Plaintiffs base this argument on their citation-free assertion that, "under Dr. Conti's methodology, a plan more likely than not (50.2%*)* reimbursed a bipolar Neurontin prescription if it only covered 151 lives." (Pl. Reply at 2 n.3.)  However, no such conclusion appears in Dr. Conti's declaration.  To the contrary, Plaintiffs' assertion represents a gross distortion of Dr. Conti's methodology and conclusions.

Dr. Conti calculated "the number of members necessary to assure with *99%, 95%, and 90% probability* respectively that a TPP has at least one member in a particular sub-class." (Revised Conti Decl. ¶ 54 (emphasis added).)  These are standard confidence levels used in statistical analysis. (*See* 2/12/08 Conti Deposition [1175-12] at 321:14-21 (explaining that "90 to 95 percent confidence all the way through 99 percent confidence . . . is what would typically be reported . . . in any . . . general paper").)  Dr. Conti used them in order "for the Court to be confident that the payer covered at least one patient in the Class." (Revised Conti Decl. at Attachment E.)  Applying Dr. Conti's minimum confidence level of 90%, a self-insured employer would have to have at least 496 employees to have reimbursed bipolar Neurontin prescriptions. (Revised Conti Decl. ¶ 54.)  In arguing instead for a 50.2% confidence level, Plaintiffs improperly attempt to move the goalposts by contradicting their own expert under the guise of applying her "methodology."

Likewise, Plaintiffs argue without citation that Professor Rosenthal's opinion that 99.4% of bipolar prescriptions nationwide were caused by fraud means the probability that small TPPs are uninjured is just .006 for TPPs who paid for one consumer's bipolar prescriptions, and just

5

.000036 for TPPs who paid for two consumers' bipolar prescriptions.  (*See* Proposed Second Reply at 2-3 & n.4.)  Initially, Plaintiffs err by treating Professor Rosenthal's 99.4% figure as a given despite Plaintiffs' prior admission that a jury could find a "lesser percentage" of fraudulently-induced prescriptions than Prof. Rosenthal found (Pl. Mem. at 14), and despite the *Kaiser* jury's implicit finding that only 83.45% of bipolar prescriptions were caused by fraud.  (Pfizer Opp. at 8-9 & Ex. A.)   Moreover, Plaintiffs' argument is unsupported by expert testimony.  Professor Rosenthal's opinions purport to address the impact of the alleged fraudulent marketing on the putative class as a whole and on large insurers like Aetna.  (*See* 8/11/08 Rosenthal Decl. [1457-7] at ¶ 9.)  Professor Rosenthal has not specifically opined on the probability that a small self-insured employer that paid for only one or two consumers' bipolar prescriptions did so as a result of fraud.

Plaintiffs' assumption that nationwide statistics can prove what caused one or two consumers' prescriptions runs afoul of the "blue bus" hypothetical described in Pfizer's surreply, in which a plaintiff is struck by an unidentified bus on a road where the defendant Blue Bus Company accounts for 80% of all bus traffic.  "[E]ven assuming a [preponderance of the evidence] standard of proof . . . , the plaintiff does not discharge that burden by showing simply that four-fifths, or indeed ninety-nine percent, of all blue buses belong to the defendant." *Krim v. pcOrder.com, Inc.*, 402 F.3d 489, 497 n.40 (5th Cir. 2005) (citation omitted; alterations in original).  Such naked probabilities do not allow the jury to "make anything other than a bet on the evidence.  Because the judicial system strives to project an acceptable account about what happened, then, the plaintiff's evidence is insufficient, notwithstanding the high probability of its accuracy." *Id.* (citation omitted).

Plaintiffs' attempts to distinguish *Krim* are unavailing.  Pfizer did not cite *Krim* for the proposition that statistics cannot be used to establish "damages" or that "class members must be identified before a class can be certified." (Proposed Second Reply at 5 & n.7.)  Instead, *Krim* holds that a plaintiff who purchased after-market securities from a pool composed of both fraudulently and non-fraudulently issued shares cannot establish injury or standing based solely

6

on the naked statistical probability that his particular shares were tainted by fraud.  *See* 402 F.3d at 496-97 & n.36.  The same is true of Plaintiffs' attempt to use naked statistics to determine whether the handful of Neurontin prescriptions reimbursed by a small TPP was tainted by fraud.  The *Krim* court's analysis is not limited to securities cases, as its discussion of the well-known and broadly applicable "blue bus" hypothetical makes clear.  And while *Krim* addressed the claims of named class representatives, Rule 23 likewise requires proof "that each *member* of the class was in fact injured."  *New Motor Vehicles*, 522 F.3d at 28 (emphasis added).

To the extent the district court held otherwise in *In re Nexium (Esomeprazole) Antitrust Litigation*, Civ. A. No. 12-md-02409-WGY, 2013 WL 6019287 (D. Mass. Nov. 14, 2013), such holding is in direct conflict with the First Circuit's controlling decision in *New Motor Vehicles*.  Moreover, *Nexium* is distinguishable because it involved antitrust overpricing claims in which "all class members have been exposed to purchasing or paying for [the product] at supracompetitive prices."  *Id.* at *8.  There is no comparable evidence that "all" physicians who prescribed Neurontin to each TPPs' members were exposed to fraudulent marketing.  Indeed, as discussed *supra* page 4, Plaintiffs' statistics do not even establish that "all" putative class members actually paid for bipolar Neurontin prescriptions.  Furthermore, while some TPPs in *Nexium* might have been uninjured due to their use of rebates and fixed-price contracts, *see* 2013 WL 6019287, at *8, such TPPs could presumably be readily identified at a later stage of the litigation.  By contrast, in this case, there is no way to identify uninjured TPPs without conducting individualized inquiries into the prescriptions (if any) paid for by each TPP, which would overwhelm any common questions and render the proposed class unmanageable.

Likewise, Plaintiffs' argument that their statistics are more robust than those addressed in *Hart v. Sec'y of the Dep't of Health & Human Servs.*, 60 Fed. Cl. 598 (2004), ignores that court's holding that "corroborating, *non-statistical* evidence is demanded . . . to ensure that general probability evidence based upon the relative frequency of various events in one population is truly transferable to prove the occurrence of a prior event relevant to the case before the court."  *Id.* at 607 (emphasis added).  Even assuming *arguendo* that Professor Rosenthal's analysis could

provide reliable and accurate conclusions regarding the percentage of nationwide prescriptions caused by fraud, they tell us nothing about any particular prescription. Like consumers, small TPPs do not reimburse enough prescriptions to simply presume that some must have been fraudulently induced. Plaintiffs' unexplained assertion that they have "other evidence supporting an actual factual finding for the connection" (Proposed Second Reply at 6) fails to explain how—other than through naked statistics—they intend to prove that small TPPs that reimbursed prescriptions written by a single doctor did so because of fraud.

### III. Plaintiffs' Arguments Regarding *Dukes* and *Comcast* Have Already Been Fully Briefed And Are Meritless

Both parties have extensively briefed the Supreme Court's decisions in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), and *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013). (*See* Pl. Mem. at 19-23; Pfizer Opp., *passim*; Pl. Reply at 3-4, 6-7; Pfizer's Surreply at 4-7, 9-10.) Plaintiffs now attempt to re-brief these decisions by claiming that Pfizer "misrepresent[ed] the[ir] holdings." (Proposed Second Reply at 1.) Rather than respond with similar invective, Pfizer will merely show, once again, that Plaintiffs' reading of these cases is incorrect.

Plaintiffs argue that *Comcast* is inapplicable because the First Circuit held there was no mismatch between Kaiser's liability and damages theories. (*See* Proposed Second Reply at 8.) But as Plaintiffs concede, the First Circuit did not cite or discuss *Comcast*. (*See id.*) This is because the First Circuit did not reach the issue of class certification. *See Harden Mfg. Corp. v. Pfizer, Inc. ("Harden Opinion")*, 712 F.3d 60, 70 (1st Cir. 2013) ("We express no view as to whether the plaintiffs can, on remand, meet the requirements of Rule 23."). *Kaiser* was a single-TPP, non-class proceeding in which the jury heard extensive individualized evidence regarding Kaiser's claims. Much of that evidence concerned Kaiser's theory of direct reliance, which Plaintiffs in this case have disavowed. That the First Circuit considered Professor Rosenthal's analysis to be sufficient evidence of Kaiser's individual damages in those circumstances in no way implies that her analysis can serve as evidence of classwide damages under *Comcast*.

Plaintiffs also cite *Nexium* for the proposition that *Comcast* "'has not changed the rule on what is required for damages models in establishing Rule 23(b)(3) predominance.'" (Proposed Second Reply at 7 (quoting *Nexium*, 2013 WL 6019287, at *14).) However *Nexium* is distinguishable. *See supra* p. 7. And to the extent *Nexium* construes *Comcast* as not requiring class-wide proof of damages, it is inconsistent with *Comcast*'s express holding and with numerous other cases construing *Comcast*. *See Comcast*, 133 S. Ct. at 1433 (holding that, without a methodology to measure damages on a class-wide basis, a plaintiff "cannot show Rule 23(b)(3) predominance"); *see also, e.g.*, *In re BP p.l.c. Sec. Litig.*, MDL No. 10-MD-2185, 2013 WL 6388408, at *17 (S.D. Tex. Dec. 6, 2013) (holding that "*Comcast* signals a significant shift in the scrutiny required for class certification" and requires "that damages be measurable on a class-wide basis"). (*See also* Pfizer Opp. at 10-11 & n.10 (collecting cases).)

Plaintiffs alternatively argue that the Court should certify a liability-only class under Rule 23(c)(4). This argument is waived. (*See* Pfizer's Surreply at 7.) Plaintiffs insist they "fully preserved their right to make such an argument" (Proposed Second Reply at 5), but they do not deny that their motion requests class certification only under "[Rules] 23(a) and 23(b)(3)." (Pl. Mot. [4153] at 1.) Regardless, Plaintiffs fail to respond to Pfizer's argument that a liability-only class could not be certified in this case because non-common damages issues are inextricably entangled with any common liability issues. (*See* Pfizer's Surreply at 7 & n.3 (citing cases).)

Plaintiffs' attempts to distinguish *Dukes* are likewise invalid. Plaintiffs quibble with Pfizer's use of the phrase "trial by formula" to describe certain aspects of the *Dukes* opinion. (*See* Proposed Second Reply at 8.) But the fundamental fact remains that the Supreme Court rejected the plaintiffs' attempt to establish class-wide discrimination through a statistical regression model that, like Professor Rosenthal's analysis, was based on "national data." *Dukes*, 131 S. Ct. at 2555. It did so because that issue depended on employment decisions made by store managers who exercised broad discretion, and the defendant had a right to present individualized testimony by these store managers. *See id.* at 2547. The same is true of Plaintiffs' statistical evidence of causation, injury, and damages, and of Pfizer's recognized right

9

to present "individual testimony" by prescribing physicians. *Harden Opinion*, 712 F.3d at 69. Plaintiffs likewise argue that the *Dukes* Court's rejection of the Ninth Circuit's approach to claims for backpay—trying a "sample set" of class members' claims and extrapolating the results to the remaining class members, *see* 131 S. Ct. at 2560-61—has no application here.  (Proposed Second Reply at 9.)  But they fail to explain how this is any different from a procedure in which Pfizer would only be allowed to present testimony from a sample set of "representative doctors" (Pl. Mem. at 15) who did not even prescribe Neurontin to putative class members' insureds.

## CONCLUSION

Plaintiffs' motion for leave to file a second reply should be denied. Moreover, for the reasons set forth above and in Pfizer's prior briefs, Plaintiffs' proposed second reply does not support class certification. Should the Court grant Plaintiffs' motion for leave, Pfizer reserves the right to: (1) seek leave to file a supplemental surreply to more fully address Plaintiffs' new arguments; (2) submit an expert report regarding what impact, if any, Plaintiffs' belatedly-cited statistics have on the issues of class membership and injury; (3) conduct a deposition of Dr. Rena Conti, regarding what impact, if any, Plaintiffs' belatedly-cited statistics have on her opinions in this case; and (4) conduct a deposition of Dr. Meredith Rosenthal, regarding her assessment of Plaintiffs' arguments concerning the probability of injury to a small TPP that paid for only one or two consumers' bipolar prescriptions.

Dated:  December 23, 2013                     Respectfully submitted,

                                              QUINN EMANUEL URQUHART
                                                & SULLIVAN, LLP

                                              By: /s/ Mark S. Cheffo
                                                  Mark S. Cheffo

                                              51 Madison Avenue, 22nd Floor
                                              New York, NY  10010
                                              (212) 849-7000
                                              Email:  markcheffo@quinnemanuel.com

                                              *Attorneys for Defendants Pfizer Inc. and Warner-Lambert Company LLC*

10

**CERTIFICATE OF SERVICE**

    I, Mark S. Cheffo, hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF (NEF) on December 23, 2013.

Dated:  December 23, 2013          <u>/s/ Mark S. Cheffo</u>
                                                         Mark S. Cheffo