1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS

2

3

4  IN RE:                         )
                              ) CA No. 04-10981-PBS

5  NEURONTIN MARKETING, SALES PRACTICES,) Pages 1 - 49
  AND PRODUCTS LIABILITY LITIGATION    )

6

7

8

9                     **MOTION HEARING**

10           BEFORE THE HONORABLE PATTI B. SARIS
           UNITED STATES CHIEF DISTRICT JUDGE

11

12

13

14

15                        United States District Court
                        1 Courthouse Way, Courtroom 19

16                        Boston, Massachusetts  02210
                        February 24, 2014, 9:09 a.m.

17

18

19

20

21

22

23                     LEE A. MARZILLI
                 OFFICIAL COURT REPORTER

24             United States District Court
           1 Courthouse Way, Room 7200

25                Boston, MA  02210
                (617)345-6787

1   A P P E A R A N C E S:

2

3   FOR THE PLAINTIFFS:

4       THOMAS M. GREENE, ESQ., RYAN P. MORRISON, ESQ.,
    and MICHAEL TABB, ESQ., Greene, LLP, One Liberty Square,
5   Suite 1200, Boston, Massachusetts, 02109.

6       DON BARRETT, ESQ., Barrett Law Group, P.A.,
    404 Court Square North, Lexington, Mississippi, 39095.

7       THOMAS M. SOBOL, ESQ., Hagens Berman Sobol Shapiro, LLP,
    55 Cambridge Parkway, Suite 301, Cambridge, Massachusetts,
8   02142.

9       DANIEL E. SELTZ, ESQ., Lieff Cabraser Heimann & Bernstein,
    LLP, 250 Hudson Street, 8th Floor, New York, New York,
10  10013-1413.

11  FOR THE DEFENDANTS:

12      JOHN H. BEISNER, ESQ. and GEOFFREY M. WYATT, ESQ.,
    Skadden, Arps, Slate, Meaher & Flom, LLP, 1440 New York Avenue,
13  N.W., Washington, D.C., 20005.

14      MARK S. CHEFFO, ESQ., Quinn, Emanuel, Urquhart & Sullivan,
    LLP, 51 Madison Avenue, New York, New York, 10010.

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2          THE CLERK:  Court calls Civil Action 04-10981,

3    In Re:  Neurontin.  Could counsel please identify themselves.

4          MR. GREENE:  Good morning, your Honor.  Tom Greene for

5    the plaintiffs.

6          THE COURT:  Thank you.

7          MR. MORRISON:  Ryan Morrison for the plaintiffs.

8          MR. SOBOL:  Good morning, your Honor.  Tom Sobol for

9    the class plaintiffs.

10          MR. SELTZ:  Daniel Seltz for the plaintiffs.

11          MS. BARRETT:  Don Barrett for the plaintiffs.  Good to

12    see you, your Honor.

13          MR. TABB:  Michael Tabb, class plaintiffs.

14          MR. CHEFFO:  Good morning, your Honor.  Mark Cheffo

15    for Pfizer.

16          MR. BEISNER:  Good morning, your Honor.  John Beisner

17    for Pfizer.

18          MR. WYATT:  Good morning, your Honor.  Geoff Wyatt for

19    Pfizer.

20          THE COURT:  Okay, welcome back.

21          MR. SOBOL:  Slightly older.

22          THE COURT:  I'm not answering that on the grounds I

23    may incriminate myself.  We all look older.  I started with

24    Mr. Greene what year?

25          MR. GREENE:  1996, your Honor, August, 1996.

```
 1          THE COURT:  That's really pathetic for both of us.
 2   That's a long time running here.  But let me just start off by
 3   saying that as far as I could tell from the papers, no one is
 4   contesting the 23(a) factors, so that I think we don't need
 5   argument on that.  Is that right?
 6          MR. GREENE:  Correct, your Honor.
 7          MR. BEISNER:  Correct, your Honor.
 8          THE COURT:  All right, so this is primarily about
 9   predominance, manageability, and superiority.  Is that right?
10          MR. BEISNER:  Yes, your Honor.
11          THE COURT:  Okay, so when I write this up -- it didn't
12   go up on appeal on that issue.  I've ruled like a thousand
13   times that it meant numerosity, typicality, adequacy,
14   commonality, et cetera.  So I don't think we need argument on
15   that, and we'll start off with the predominance.  And I also
16   wanted to ask plaintiffs, because you didn't really press it,
17   whether 23(b)(3) was primarily the grounds upon which you were
18   certifying or whether there was another ground.
19          MR. GREENE:  It's primarily the grounds, your Honor.
20          THE COURT:  So you're not pressing other grounds at
21   this point?
22          MR. GREENE:  No.
23          THE COURT:  Okay.  So who's arguing?
24          MR. GREENE:  I am, your Honor.  Thank you.
25          MR. SOBOL:  I did so poorly last time, Greene is
```

```
 1   now --
 2            THE COURT:  Well, now you have an easier task.
 3            MR. GREENE:  Your Honor, this is the fourth time we're
 4   asking you to certify a class of TPPs who paid for Neurontin
 5   prescriptions for bipolar.
 6            THE COURT:  Can I stop you right there.
 7            MR. GREENE:  Yes.
 8            THE COURT:  Is it just bipolar, or is it other mood
 9   disorders?
10            MR. GREENE:  It's bipolar and mood disorder.
11            THE COURT:  It wasn't always clear whether it was
12   bipolar and other mood disorders, which is a minor distinction
13   but still one I wanted to be clear of because it doesn't say
14   that in the -- am I right, that that's the subcategory?
15            MR. GREENE:  It's bipolar and mood disorder.  That's
16   what we tried in the Kaiser case, and that's what our class
17   definition is seeking, bipolar and other mood disorders.
18            THE COURT:  Okay.
19            MR. GREENE:  As I was saying, your Honor, this is the
20   fourth time we've asked for certification.  Last time we did
21   was three years ago in the Motion for Reconsideration, and in
22   your reconsideration decision, you ruled that there was
23   predominance with respect to liability for a class of TPPs
24   because you found them homogenous.  You also ruled in your
25   decision that we could not use our aggregate evidence,
```

1    Professor Rosenthal's regression analysis, as proof of

2    causation and damages; and you ruled that a class would not be

3    superior to a series of individual trials on manageability

4    grounds.

5            Now, when the First Circuit reversed the entry of

6    summary judgment against us, they ruled that we could use our

7    aggregate evidence as proof of causation and damages.

8            THE COURT:  I think specifically -- I don't remember

9    exactly how I worded it -- I thought you could prove aggregate

10   harm but not TPP by TPP whether or not they were harmed; in

11   other words, harm to the class as a whole but not necessarily

12   to individual TPPs.

13           MR. GREENE:  Are you talking about your decision?

14           THE COURT:  Excuse me?

15           MR. GREENE:  Excuse me.  Are you talking about your

16   decision?

17           THE COURT:  Yes.

18           MR. GREENE:  Yes.

19           THE COURT:  So what I was trying to think through --

20   and I don't know whether it's more accurately placed as a

21   manageability or a predominance issue -- is, let's assume,

22   which I've always found, that you could prove causation to the

23   class as a whole because you have that 99 percent figure in

24   there.

25           MR. GREENE:  Right.

1          THE COURT:  So you have the individual TPP, the

2     Taft-Hartley plan, say, in Nebraska, where only one doctor

3     prescribed, how would it look in the -- in other words, when

4     you went to the claims administrator or we went to the damages

5     phase, would you just assume that he was damaged, that

6     particular TPP, or would you say that they have to disprove it?

7          MR. GREENE:  Here's the way I think I can help you

8     with this.

9          THE COURT:  Tell me how it would work.

10         MR. GREENE:  I think this will help.  If you think of

11    the class of TPPs, of every TPP that paid for Neurontin

12    bipolar, there are two categories of TPPs within that class:

13    There are what I call the multi-patient TPPs, and there are the

14    single-patient TPPs.  We know based on the only evidence before

15    the Court, our evidence, that 99.4 percent of all the

16    prescriptions are the product of a fraud.  So if you look for a

17    moment at the multi-patient TPPs, they're all injured because

18    the likelihood -- if they paid only for two patients' bipolar

19    prescriptions, the likelihood that both patients were

20    non-fraudulent prescriptions is astronomically low because

21    of -- it's actually 0.0036.  So all the multi-patient TPP

22    plans, and we believe those are most of the plans in the class,

23    have been injured.

24          What Pfizer has raised in their new arguments are

25     there may be some one-patient TPPs.  Again the evidence is that

```
 1    all of the one-patient TPPs, 99.4 percent of them are injured.
 2    So what we're really looking at are those single-patient TPPs,
 3    the Nebraska plan you referenced, that may not be injured that
 4    falls into the subset of a subset; 0.06 percent of the scripts
 5    are not the product of the fraud, and that's the very
 6    definition of de minimis.  And remember too --
 7            THE COURT:  No, but help me.  Okay, let's assume for a
 8    minute that's the case, at least under Dr. Rosenthal's
 9    regression analysis.  So do you say that I automatically order
10    payment of that plan because statistically the odds are, that
11    plan paid for a fraudulent one, or is there a little trial
12    where the doctor gets on the stand?
13            MR. GREENE:  No.  No, no, no.
14            THE COURT:  What happens at the end?
15            MR. GREENE:  Our liability model, our damage models
16    allow the jury -- you saw this in Kaiser for a single TPP -- to
17    calculate damages in the aggregate.
18            THE COURT:  I agree.  I've never had a problem with
19    that.  So let's assume that that's -- what would you say, what
20    do you think your aggregate damages are?
21            MR. GREENE:  $624 million.
22            THE COURT:  All right, let's assume it's $624 million.
23    Let's assume that that's right for a minute.  Is that the
24    99 percent statistic?
25            MR. GREENE:  Yes.
```

1          THE COURT:  Okay.  And then we get to the point where

2     the TPP who's part of the class comes in.

3          MR. GREENE:  Well, then we have some type of claims

4     process where --

5          THE COURT:  A claims process.

6          MR. GREENE:  -- where they come forward with their --

7     they say, "We paid for Neurontin prescriptions."

8          THE COURT:  Now, is at that point Pfizer allowed to

9     say --

10          MR. GREENE:  Pfizer doesn't care.  Once liability has

11     been determined and once aggregate damages have been determined

12     by the jury, they're out of the picture.  They're out of the

13     picture.  We're just going to pay claims now.  So now the TPPs

14     will come --

15          THE COURT:  All right.  So, now, in your view, the TPP

16     wouldn't have to demonstrate to the claims administrator that

17     the doctor was somehow exposed to fraudulent marketing?

18          MR. GREENE:  No, not at all.  Liability has been

19     determined.  We're saying 99.4 percent.  That's the percent you

20     found for bipolar in the *Kaiser* trial.  The jury happened to

21     find a lesser percent.  We don't know what the jury will do in

22     this case.

23          THE COURT:  Well, whatever they find is the aggregate,

24     everyone just comes in, and let's assume it's a lower number

25     like they say, say 80 percent, at that point, once the TPP

1   comes in, in your view, they don't have to then prove up that a

2   particular doctor was exposed?

3          MR. GREENE:  No.

4          THE COURT:  Now, at trial what they've argued is --

5   not "they" -- Pfizer has argued is that they are allowed to

6   come in and prove up that a huge percentage of these were

7   single third-party payor plans whose doctors were never, A,

8   detailed, B, went to a CME, or, C, somehow read the ad

9   articles, the tainted articles.

10          MR. GREENE:  Let me address that question.

11          THE COURT:  And so I think that they want to do that.

12   Now, I don't know whether they're going to be able to do it

13   from all 50 states, but, you know, they're going to put in a

14   good chunk of evidence.  Maybe they'll have an expert come on

15   after doing a survey or something.  So what happens?

16          MR. GREENE:  The First Circuit said that the aggregate

17   proof could be used by Harden, a small plan; ASEA, a medium-

18   size plan; and Blue Cross-Blue Shield of Louisiana, a large

19   plan, all right.  So when you had the *Kaiser* trial -- what if

20   we started Blue Cross Louisiana tomorrow?  You wouldn't allow

21   Pfizer to bring in all the prescribing physicians to rebut our

22   aggregate proof.  The First Circuit said they can use some

23   individual testimony to rebut the aggregate proof.

24          THE COURT:  I don't know what I would have done.  In

25   point of fact, they put on a certain number of doctors; you put

1   on a certain number of doctors.  I don't know -- I mean, I

2   don't think I'd allow a seven-year trial, like a seven-year

3   war, I mean, but I think that there would be some discretion I

4   would use.  But I would allow them to put on some, right?

5           MR. GREENE:  Sure you would, but you're not going to

6   allow cumulative testimony.  You didn't allow it in *Kaiser*.

7           Now, keep in mind, the TPPs don't have doctors.  The

8   doctors don't work for one TPP.  A doctor treats many different

9   patients that belong to different plans, all right.  So when

10  they're trying to say that there might be some difference

11  between a small plan, they might be more like a consumer.  It's

12  not that small plans have their own doctors that are

13  prescribing for their members.  They don't.  Your doctor might

14  prescribe for a small plan member.

15          THE COURT:  But suppose a certain number of doctors,

16  as I said, never were touched by the fraudulent promotion plan.

17          MR. GREENE:  Well, you've already found the national

18  fraud.

19          THE COURT:  No, I have.  I get it.  It's commonality.

20  I'm all through 23(a), common questions.  In fact, I think

21  there are huge and strong res judicata issues here.  I'm not

22  even sure we're going to retry this case.  It's going to be a

23  causation case and a damages case.  But I'm just trying to

24  understand how this looks.  And I imagine what they're going to

25  do is say that at least with respect to the smaller plans,

1      there's no evidence of causation.

2            MR. GREENE:  Well, there is.

3            THE COURT:  Excuse me.  I'm going to allow them to

4      argue it.  The First Circuit allowed them to argue it.  So I'm

5      trying to figure out how that looks, whether or not it

6      becomes the damages phase, if they reduce it down to, say,

7      80 percent rather than 99.6 percent, how I adjust for that.

8            MR. GREENE:  The jury makes that calculation --

9            THE COURT:  Right.

10            MR. GREENE:  -- just as they did in *Kaiser*.

11            THE COURT:  Right.  And then when you win, let's say,

12      but the number is at 80 percent, let's just -- I just want to

13      play out how it looks -- their number is at 80 percent, so the

14      aggregate is what, 80 percent of 600 --

15            MR. GREENE:  $480 million, roughly.

16            THE COURT:  Yes, so it's like $480 million.  So then

17      your view is that every third-party payor gets to collect, even

18      if that third-party payor can't show at the individual level

19      that that person was harmed.

20            MR. GREENE:  Right, exactly.  We're determining

21      damages in the aggregate.  They come forward.  They show that

22      they paid for Neurontin, they paid for a certain percentage.

23      You know, Professor Rosenthal has got the percentages of

24      Neurontin.  She said 17.2 percent of all the scripts are

25      Neurontin.  Pfizer said 14.7 of the scripts are Neurontin for

1    bipolar, both for bipolar.  And then they get their

2    proportionate share of the aggregate total.  Pfizer is not even

3    involved in that.  Pfizer goes home after the trial, just like

4    they did in *Kaiser*.

5           They do get to present individual testimony.  There's

6    no question they get to defend themselves.  They've taken

7    multiple definitions of each of the class rep TPPs.  They have

8    individual testimony.  They have Ragothaman and Arness, the two

9    physicians, the physicians who treated the bipolar consumer

10   reps.  That testimony can be played as rebuttal evidence.  That

11   will happen in the trial when damages are set by the jury, but

12   they're going to set it in the aggregate.

13          THE COURT:  All right, I have to think about that.

14   Would you have a case like this at the back end?  Let's say

15   there are a certain number of doctors who come forward and say,

16   "I've tried it on bipolar, it works on bipolar, and I would

17   have prescribed it anyway," and they write primarily for some

18   TPPs, you're saying that Pfizer doesn't get permitted to --

19          MR. GREENE:  I would say, Judge, if you think of it

20   just as the *Kaiser* trial for a moment, there were more than a

21   thousand prescribing physicians in *Kaiser*.  We didn't parade

22   them in.  That would have been cumulative.  You allowed a

23   certain amount of testimony.

24          THE COURT:  *Kaiser* was different.  *Kaiser* was the

25   strongest possible case.  In my view, it was a very strong

1   plaintiffs' case.  I found that, and the jury found that.  But

2   it was a little different because decisions were made more

3   centrally by one TPP.

4        But, anyway, all right, I get your position.  My

5   concern at the end of the day, suppose in the *Dukes* case,

6   instead of decentralized hiring, you had a centralized hiring

7   process, and let's suppose there was a criterion there that was

8   discriminatory against women and they found aggregate damages

9   of X, at the end of the day, doesn't each woman have to come

10  in, though, and say, "I applied for a promotion and I would

11  have gotten it.  It's not that I was sort of -- showed up late

12  eighteen times"?

13        MR. GREENE:  No.  Let me say two things about *Dukes*.

14  Remember, they had no evidence of discrimination.  They were

15  using the regression analysis to prove the very existence of

16  discrimination.  We have a mountain of evidence showing

17  Pfizer's fraud.  Remember also, the trial by formula applied to

18  the -- they picked a sample set of claims, and they wanted to

19  extrapolate damages from there.  We're not doing an

20  extrapolation here.  But most importantly, in response to the

21  question you just asked, they had a statutory right under the

22  Civil Rights Act to defend those claims individually.  There's

23  no such right under RICO.  They don't have a right to defend

24  these claims individually.

25        THE COURT:  Who doesn't?

1          MR. GREENE:  Pfizer.  They don't have a right -- they

2     had a right to contest damages individually in *Wal-Mart*, a

3     statutory right.  They have a right to defend themselves, but

4     they don't have a statutory right under the RICO statute.

5          THE COURT:  I don't know the answer to what happens at

6     the end.  Let me just say that.  And it may just be that it's

7     still manageable and still superior, but I'm not convinced that

8     there isn't some right at the end of the rainbow, if they lose

9     everything else, to say this TPP wasn't harmed.  I don't know.

10         MR. GREENE:  Let me see if I can help a little bit.

11    The First Circuit made it clear, even though they were talking

12    about the Harden plaintiffs here, that our aggregate proof

13    could be used to prove causation and damages.  They said very

14    clearly in those opinions, and they said it in *Kaiser* too, they

15    said:  All right, you went direct reliance, but you didn't have

16    to.  You could have used Rosenthal on the *Kaiser* facts to prove

17    causation and damages in the aggregate.  They say clearly in

18    the opinion --

19         THE COURT:  They didn't address what to do at the end.

20         MR. GREENE:  Well, they didn't address --

21         THE COURT:  They didn't address what to do at the end.

22    I'm just asking how it plays out.  The AWP cases were easy

23    because it was a sheer economic analysis, and everyone did

24    because there's a central book.  You know, the -- what was it

25    called? -- the Red Book, there was a central book everyone

```
 1    used, so it was easy.

 2            So, anyway, I get your position.  I get your position.

 3    Let me ask you the one other question that I have which is the

 4    New Jersey fraud statute.  What does that give you that RICO

 5    doesn't?

 6            MR. GREENE:  I don't think it gives us anything that

 7    RICO doesn't, to answer your question.  That never got briefed

 8    on summary judgment.  And I think there's one question that's a

 9    common question, it applies to all the plans:  Does it apply to

10    only consumers, or would it apply to plans?  And a second

11    question, does it apply to out-of-state defendants?  That's a

12    common question.  But, again, you haven't had the briefing of

13    that in summary judgment, and that's why the First Circuit

14    didn't touch it and sent it back.

15            THE COURT:  So how am I going to certify a class on it

16    then?

17            MR. GREENE:  If you found that it applied to

18    businesses --

19            THE COURT:  So at this point you're saying, don't put

20    my stake in the ground as to -- the Third Circuit --

21            MR. GREENE:  That's exactly what I'm saying.

22            THE COURT:  The Third Circuit seemed to discredit the

23    Mercedes-Benz case, which is the one people rely on, and I was

24    just trying to figure out, it is a different analysis than

25    Kaiser, no doubt about it.
```

1          MR. GREENE:  I don't think you have to answer that

2     question today, whether the statute applies or not.  It hasn't

3     been briefed.  They didn't move for summary judgment on it.

4     The question for today, is it a common issue?  And it would be

5     a common issue.  Does it apply or doesn't it?  Does it apply to

6     the plans?  Does it apply to out-of-state defendants?

7          THE COURT:  No, I think the central issue is conflict

8     of our laws right now, whether I apply New Jersey or home state

9     under the Restatement of Conflicts.  And under *Kaiser* it was as

10    simple a question as you could get because *Kaiser* was sole

11    located in California, and the damages were there, and the

12    reliance was there and everything was there, decision-making,

13    and the only thing that wasn't was Pfizer's headquarters.  This

14    is a little harder because, for example, for the third-party

15    payors, they actually never relied on them because it's a very

16    different case than *Kaiser*.  They just approved everything,

17    right?  So the damages are in the home state of the TPP, but

18    sometimes the doctors might not have been who were targeted.

19    It's hard for me to say.  I'm wondering whether -- it's just a

20    different analysis, and I didn't know if you were pressing it.

21    You didn't spend much time with it, and I don't know what it

22    gives you that RICO doesn't give you.

23          MR. GREENE:  And I think I said I agree.  I agree with

24    you, Judge.

25          THE COURT:  And I'm sort of a little worried that if I

1    do it or I don't do it and I'm wrong, I've got to start all

2    over again.  So let me --

3              MR. GREENE:  Can I just come back to one point that

4    seemed to be troubling you?

5              THE COURT:  Yes.

6              MR. GREENE:  The evidence before the Court today is

7    that 99.4 percent of the scripts are the product of the fraud;

8    but that would mean that if there are uninjured plans, if they

9    paid for scripts that were not the product of the fraud, they

10   would be de minimis.

11             THE COURT:  Let me just say, let's assume for a minute

12   you're right, but let's say they bring down the causation

13   number to 80 percent.

14             MR. GREENE:  You'd still have a de minimis number

15   because what you're thinking of, Judge, you're thinking like

16   consumers, that they're consumers, and is the class going to be

17   overinclusive?

18             THE COURT:  No, no, I'm not worried about

19   overinclusive because you've defined it a certain way.  I know

20   the First Circuit said it wasn't fraud on the market, but

21   that's what it feels like to me.  Essentially the assumption

22   is, with 99 percent statistics, it's basically a fraud on the

23   entire market.  Maybe I was too much in the weeds of the

24   doctors I'd been listening to, but a fair number say, "I was

25   never detailed.  I didn't read anything.  Nothing else was

1  working, so I tried it."  I mean, that was sort of the gist in

2  all the indications.

3         MR. GREENE:  And that's some good rebuttal testimony,

4  but we're not going to have cumulative testimony on --

5         THE COURT:  So if you win on 99.6 percent, I think

6  you'd have a fair argument, and maybe that's all I go with,

7  that at the damages side, everybody gets it.  But if they win,

8  let's say -- I'm going to do res judicata on some of this --

9  but let's say that they win and they get it down to 80 percent,

10  that's the question that kept haunting me over the weekend is,

11  what do I do with that?

12         MR. GREENE:  Well, still, the percentage of TPPs is

13  going to be higher.  And once we get to trial and we get a

14  verdict like *Kaiser* -- let's take the *Kaiser*.  They came back

15  and found a different number.  They didn't find a percentage.

16  The defendants suggest it's 80 or 85 percent.  I don't know how

17  they arrived at that.  We do know the number.  We do know it

18  was less than the number that you arrived at.  The only

19  percentage number that we have that we know for a fact is the

20  one you found:  99.4 percent of the bipolar scripts caused by

21  the fraud.  But once we try it, we get a percentage, if it's a

22  lesser percentage, the damages are lesser.  Now we're on to

23  administrative process.  Pfizer goes home, you know, after all

24  the appeals and everything, Pfizer goes home, and those just

25  get paid.  We don't --

```
 1              THE COURT:  So you're just saying at that point it's a

 2       rubber-stamp --

 3              MR. GREENE:  It is a rubber stamp, your Honor.

 4              THE COURT:  -- for a claims administrator.  At

 5       99.6 percent, you may be right.  At 80 percent, I'm less --

 6              MR. GREENE:  At 80 percent it is.  After we've had a

 7       trial, after we've had the determination of liability by the

 8       jury, damages are set, it's over.

 9              THE COURT:  All right, that's your position.  I get

10       it.  And you're not so worried about this point about

11       New Jersey which --

12              MR. GREENE:  No, I'm not.

13              THE COURT:  -- is a hard issue actually.

14              MR. GREENE:  I'm not.

15              THE COURT:  So it doesn't give or not give as --

16              MR. GREENE:  No.  And I know you referenced this

17       before, but we are going to have issue preclusion here.

18              THE COURT:  Oh, we absolutely are going to have issue

19       preclusion.  We are not retrying this case from the get-go.

20       And, unfortunately, I already had started researching this

21       before you settled -- what was it, the Aetna case?  What case

22       did you settle?  Whatever.  We started researching it before

23       you settled it, and so there will be some but probably not on

24       the key question we're talking about here today.  It's more on

25       the liability end.  So, anyway, but I'll leave that for another
```

1    day.

2              So let me ask you this:  You lost on appeal.

3              MR. BEISNER:  Yes, your Honor.

4              THE COURT:  And with 99.6 percent as the number,

5    doesn't it fit within the -- other than that one little

6    end-of-the-day kind of statistic I'm worried about, under their

7    theory, doesn't it meet the predominance?

8              MR. BEISNER:  No, your Honor, not at all.  First of

9    all, just one technicality.  I have a motion to appear

10   pro hac vice before you, your Honor, which I don't think you've

11   had an opportunity to grant on, so before I speak, I want to

12   make sure that's permissible.

13             MR. GREENE:  We want Mr. Cheffo.

14             THE COURT:  What firm are you with?

15             MR. BEISNER:  I'm with Skadden Arps, your Honor.

16             THE COURT:  And you're with Quinn Emanuel now, right?

17             MR. CHEFFO:  Yes, your Honor.  John is my former

18   partner.

19             THE COURT:  When did you switch?

20             MR. CHEFFO:  I left Skadden in -- I guess almost a

21   year ago in end of March.

22             THE COURT:  Do you live in California now?

23             MR. CHEFFO:  No, no, no.  I'm in New York.  I'm in

24   New York.

25             THE COURT:  Never change from being a New Yorker, all

```
 1   right.
 2              MR. CHEFFO:  No, your Honor.
 3              THE COURT:  All right.
 4              MR. BEISNER:  In any event, your Honor --
 5              THE COURT:  Yes, you're admitted.
 6              MR. BEISNER:  Thank you.
 7              THE COURT:  Welcome.
 8              MR. BEISNER:  Thank you very much.
 9              THE COURT:  Welcome to this interesting and
10   never-ending case.
11              MR. BEISNER:  Thank you, your Honor.  Here's, I think,
12   the problem with that number.  The plaintiffs haven't been
13   granted summary judgment that that's the right number.  The
14   First Circuit said:  Okay, you put on that number.  They said
15   it's evidence, but the court was very clear that we could use
16   individual testimony to contest it.
17              THE COURT:  Well, can I back up.  I forget.  You know,
18   I'm getting older.  We're all ten years older.  Did I have a
19   Daubert hearing on Rosenthal's -- I don't think it was
20   challenged through Daubert, was it?
21              MR. GREENE:  It was.
22              THE COURT:  Was it?  Was there a Daubert proceeding on
23   this --
24              MR. SOBOL:  You didn't have evidence, but there was a
25   Daubert motion.
```

```
 1          THE COURT:  Oh, all right.  So I scrutinized it
 2    already, so why wouldn't that be admissible from the
 3    plaintiffs' end?
 4          MR. BEISNER:  I'm not saying it's not admissible, your
 5    Honor.  I think that's what the First Circuit said.
 6          THE COURT:  Right.
 7          MR. BEISNER:  It was admissible, but we have the right
 8    to contest it.
 9          THE COURT:  Sure.
10          MR. BEISNER:  And the jury, as you said, may well find
11    a number of 80 percent, 50 percent.  It could be substantially
12    lower.  And so you can't proceed to certify a class on the
13    assumption that their number will prevail.  That's a triable
14    issue.
15          THE COURT:  Yes, I can.  In other words, I go on a
16    "more likely true than not."  I mean, that's the one thing that
17    came out of Dukes and Comcast is I have to find more likely
18    true than not true.  I've already made that finding.
19          MR. BEISNER:  No, your Honor, because that just
20    assumes they are correct.
21          THE COURT:  Yes, because I did Kaiser.
22          MR. BEISNER:  Well, and let me explain why, though,
23    your Honor, that is a problem.  Let's take what would happen if
24    we tried one of these cases individually.  I think that's what
25    the court under Dukes and Comcast need to look at:  What would
```

1    that case look like?  And let's take Harden, for example, just

2    since they're a class representative here.  What would that

3    trial look like?  So they presumably would call Dr. Rosenthal,

4    and she would testify that, in her view, the prescriptions in

5    that case were all the result of fraud.  Keep in mind that

6    there's only twenty patients who were prescribed Neurontin for

7    that particular named plaintiff, and only a very small

8    percentage of those would have been for bipolar, which is what

9    we have at issue here.

10          So Dr. Rosenthal would testify.  We presumably would

11   cross-examine her, and we would say, "Well, have you ever

12   spoken to any of these physicians who prescribed for the Harden

13   patients?

14          "No.

15          "So you don't know if they actually heard anything

16   about these alleged fraudulent representations?

17          "No, I don't.  I haven't spoken to them to know that.

18          "So you don't know if they ever received any of this

19   information?

20          "No.

21          "You don't know why they prescribed it, whether they

22   relied on any fraudulent information?

23          "No, I don't know that."

24          And so we would conclude by asking her, "So you want

25   the jury to believe that even though you haven't spoken to any

1    of these physicians and have no idea if they received any of

2    this information, that all of these prescriptions were

3    fraudulently written, that what is alleged here that Pfizer did

4    caused injury to Harden?"  And she would say "Yes."

5          And we would then call the one or two physicians to

6    the stand and ask them about the prescriptions.  And your Honor

7    knows from what you've seen in dealing with the consumer cases

8    and with *Kaiser* that they are likely to say, "I never saw any

9    of this information.  I was never detailed."  Or, if they were,

10   they might well say, "I didn't rely on any of this.  This was

11   based on my own judgment or consultation with other physicians."

12         So then the jury would sit there with this

13   mathematical evidence and the testimony of two live physicians --

14   what's that?

15         THE COURT:  Maybe you'd win because that's a --

16         MR. BEISNER:  Well, but that's the point, your Honor,

17   and that's where the *Dukes* Rules Enabling Act problem comes in.

18         THE COURT:  *Dukes* was a commonality issue, and that's

19   why I started where we started, which is whether there was a

20   challenge to commonality.

21         MR. BEISNER:  Okay, but it mushrooms into predominance

22   through *Comcast*.  I mean, you didn't have predominance at issue

23   but --

24         THE COURT:  *Comcast* was mismatched.  I spent the

25   weekend, it was fun, reading --

1          MR. BEISNER:  But, your Honor, the point there is --

2     you're correct, commonality is what was at issue there, but it

3     translates here into the predominance part of this, I mean,

4     because it's an even more stringent standard than commonality

5     is here.

6          THE COURT:  I don't have so much experience with class

7     actions.  Most of mine settle.  So I'm asking you the

8     end-of-the-day question:  Let's assume the jury accepts

9     Professor Rosenthal's theory and finds, A, causation of harm to

10    the class, and, B, not that it's 99 percent but you've brought

11    it down to 80 percent, what does the claims process look like?

12         MR. BEISNER:  Well, your Honor, here's the problem:

13    You can't get to the claims process because you can't get --

14         THE COURT:  Can I say, you lost on appeal, and as far

15    as I'm concerned, that is dispositive.

16         MR. BEISNER:  But, your Honor, here is the problem:

17    We did not lose on the question whether we can contest this,

18    and here's --

19         THE COURT:  Of course you can contest it.

20         MR. BEISNER:  But, your Honor, let's look at the

21    Harden case.  You've acknowledged the jury in that case may

22    well say "no liability."  And that's 75 percent of the class

23    members we're talking about are those small companies.  We may

24    win some of those; we may lose some of those.

25         THE COURT:  You lost on appeal.  You lost before the

1   Supreme Court.  I was persuaded by that argument.  I was

2   overturned.  As far as I'm concerned, it's a strong argument,

3   one that I was sympathetic to, but it's over.

4          MR. BEISNER:  But, your Honor, you were not

5   reversed -- you were reversed only on the question of whether

6   that evidence was admissible.  The Court was very clear that

7   you're absolutely right that we can defend ourselves; we can

8   present individual evidence.

9          THE COURT:  Right, I'll let you do that.

10         MR. BEISNER:  Okay, but that individual evidence

11  doesn't work in a class trial, okay?  Let's say we took that

12  little Harden case and put it on in the middle of the class

13  action trial, we used Harden as an example --

14         THE COURT:  -- credibility, and they'd find no

15  causation.

16         MR. BEISNER:  Yes, but the jury may sit there and say,

17  "My God, Harden wasn't injured."  How does the jury say that?

18  They can't say that.

19         THE COURT:  Did the fraud cause damages?  No.

20         MR. BEISNER:  They can say that with respect to

21  Harden, but what if XYZ Company, the doctors come in and say,

22  "Oh, yeah, we saw that information that they say was

23  fraudulent, and we relied on that"?

24         THE COURT:  Past is future.  Those doctors aren't

25  there.  I mean, the issue is essentially a fraud on the market,

```
 1   and maybe there will be one or two doctors who come in for
 2   them; maybe there will be a hundred that come in for you
 3   through maybe depositions or whatever.  I'm assuming you're not
 4   going to bring --
 5              MR. BEISNER:  But, your Honor, it wouldn't be fraud.
 6   The court was not looking at it --
 7              THE COURT:  There was fraud here, and it caused harm
 8   to the class.  The question is how you figure out --
 9              MR. BEISNER:  But, your Honor, there is not -- this is
10   the problem:  The court said, the First Circuit said we could
11   put on individualized evidence.
12              THE COURT:  Sure.
13              MR. BEISNER:  And it may result in, if we were allowed
14   to present these and the jury was able to check boxes and say
15   how this plaintiff should be treated and that plaintiff should
16   be treated, they would come out differently.  That's the point.
17   And the court didn't address this issue.  It simply said their
18   evidence was admissible.  It didn't overrule you on the problem
19   that they still had to prove this with respect --
20              THE COURT:  I didn't say it was inadmissible.  I said
21   that it wasn't sufficient because of the issues that you've
22   raised.  But let me ask you this.  I think in fact I've held it
23   is admissible and it passed *Daubert* standards apparently.  I
24   didn't remember that.  It's been a long time ago.
25              MR. BEISNER:  Right, your Honor.
```

1          THE COURT:  I mean, I thought she was a terrific

2     witness.  The question was whether it was sufficient.  And so

3     the question that I have is, at the end of the day, let's

4     assume you get the statistic, you get it down, and it's not

5     99.6 percent, it's 80 percent, what does the claims process

6     look like?  Do you agree that it's just basically everybody

7     gets paid but just a lesser amount?

8          MR. BEISNER:  It is.  Then there's a Rules Enabling

9     Act violation because you are then, as a result of the

10    verdict -- and that's the problem I'm raising -- you are paying

11    parties that are not entitled to relief because they weren't

12    injured.

13         THE COURT:  I'm just struggling with trying to find a

14    comparison.  An AWP case, which is my most recent experience,

15    or antitrust cases aren't the same because that creates a -- I

16    don't know if there are cases that are similar in the

17    pharmaceutical world or wherever where someone has grappled

18    with this because I feel as if I'm on a little bit of new turf

19    here.

20         MR. BEISNER:  The problem is, your Honor, is if there

21    is a reduction from their number, and we're saying there is.

22    There was in the *Kaiser* case, as we noted.  You have a large

23    number --

24         THE COURT:  What's a Rules Enabling Act problem?  You

25    mean the basic Article III issue?

1          MR. BEISNER:  Yes, because if we were allowed to try

2    these cases individually, there would be a number of the class

3    members as to whom we may well prevail because of the scenario

4    I just talked about.

5          THE COURT:  Why didn't the Supreme Court take cert on

6    it then?  I sort of thought they would.  They've been sort of

7    active --

8          MR. BEISNER:  This wasn't a class issue.  The class

9    part wasn't taken up.

10          THE COURT:  Let me ask you this:  If I certify a

11    class, you're going to probably take it up again to the First

12    Circuit?

13          MR. BEISNER:  I assume so, your Honor.

14          THE COURT:  Yes, I assumed you would too.

15          MR. BEISNER:  Because our position would be that we're

16    not being allowed to defend these cases individually as *Dukes*

17    requires.

18          THE COURT:  So I'm trying to understand, didn't this

19    come up last time and you argued it?

20          MR. BEISNER:  No, your Honor.  All that was before the

21    court was the question of the admissibility of the evidence.

22    The court said you get over the summary judgment hump, but it

23    put it back to you on the class certification issues.  And

24    you've repeatedly ruled, and the First Circuit didn't touch it,

25    that we have a right to put on our individual defenses.  I

1   mean --

2          THE COURT:  No one is touching that now.  So the

3   answer at the end of the day on a verdict form would be, no,

4   you haven't proved causation, or, yes, but you proved it in a

5   lesser percentage, and so --

6          MR. BEISNER:  But, your Honor, if we proved it in a

7   lesser percentage, that is a Rules Enabling Act violation

8   because at that point you have a verdict form -- you're

9   forced --

10          THE COURT:  Can I decertify at that point?

11          MR. BEISNER:  You could.

12          THE COURT:  In other words, it strikes me, if it's

13   99.6 and they weren't worried in the First Circuit about the

14   whatever it is -- it's a tiny percentage -- the .04 percent or

15   whatever it was that didn't have it, if at the end of the day

16   there's a dramatically reduced percentage that was harmed,

17   couldn't I at that point decertify and send everybody out to

18   the field to prove up whether they were one of the ones that

19   was hurt or not?

20          MR. BEISNER:  But, your Honor, the problem is, at that

21   point you have an improper verdict.  You'd have to throw the

22   verdict out because you have a verdict at that point which you

23   would be acknowledging covers people who had no claim.

24          THE COURT:  Does anyone have a case like this?

25          MR. BEISNER:  Your Honor, I think *Dukes* is the case.

 1          THE COURT:  *Dukes* is not the case.  It was so

 2    different.  Every little Wal-Mart was making their own

 3    decisions, you know.  It's not even the dissent, the so-called

 4    dissent was fighting for it because they thought it was a

 5    predominance issue, not a commonality problem.  But it was not

 6    a -- it wasn't a good case for you because here there is a

 7    centralized decision-making about the fraudulent --

 8          MR. BEISNER:  Well, that was alleged in *Dukes* as well,

 9    but they said:  There's more to the story than that.  You've

10    got to go out and look at the individual stores.  And what

11    we're saying here -- and, your Honor, I'm not saying *Dukes* is

12    the same case.  Please don't misunderstand me to say that.  But

13    what the court was saying is, there were individual defenses in

14    the case that were at a unit-by-unit level, and that's what

15    we're talking about here; that if we tried these cases

16    individually, there would be a number of TPPs, a large number

17    of TPPs where the jury may well say:  "No injury.  You're not

18    entitled to anything."  But if you do this on --

19          THE COURT:  That's certainly what worried me last

20    time, and I was reversed, so --

21          MR. BEISNER:  But, your Honor --

22          THE COURT:  So I'm not so -- it's not like I have a

23    total tin ear to it.  It's just the First Circuit saw it

24    differently.

25          It's clear to me that the common issues predominate

1   over the uncommon ones in terms of this case as a whole.  What

2   happens if they substantially discount what the plaintiffs say?

3   Can't I deal with it at a later point in time?

4        MR. BEISNER:  Your Honor, I don't think you can

5   because at that point you have a completely faulty verdict on

6   the issue.  You've got a verdict where the jury -- you're

7   dealing with a verdict where they say there's liability to all

8   of these people.  How can you go back through an administrative

9   process and take that back?

10       THE COURT:  Well, you're both agreeing I can't.

11   You're both agreeing that at the administrative -- at what I'll

12   call phase two, the jury decides to say $400 million rather

13   than $600 million, and at that point what you're all saying is

14   that I can't do that in Part B.  I'm not so sure about that,

15   whether I couldn't just hold a series of trials if you say

16   there are specific one-party TPPs where -- I don't know the

17   answer to that.  No one has given me cases on what to do.

18       MR. BEISNER:  Well, your Honor, if that's the

19   direction, then there shouldn't be a class in the first place

20   because --

21       THE COURT:  Well, what if 90 percent of them are large

22   and have multi- -- I don't know, what percentage would you say?

23       MR. BEISNER:  75 percent of them are like Harden, what

24   I just decided, according to their expert Conti.  They're small

25   units.  That's the vast majority of the class that we're

1    talking about, and that's totally unmanageable.

2         MR. GREENE:  He's not telling you the rest of the

3    opinion.  Let's assume that that fact is true.  Even if they

4    are single-patient TPPs, the evidence right now, 99.4 percent

5    of them are damaged.  Many of them are multi-patient TPPs.  He

6    uses Harden as an example.  Harden paid for over $1,000 worth

7    of bipolar prescriptions; Blue Cross-Blue Shield shield of

8    Louisiana, $1.2 million for bipolar prescriptions; and ASEA,

9    about $43,000 for bipolar prescriptions.

10         You asked about, what if the jury finds 80 percent or

11   a lesser number?  That's not reducing the number of TPPs that

12   are injured to 80 percent.  Most of these TPPs, the small ones,

13   the self-insureds, are still multiple-patient TPPs.  And once

14   they're a multiple-patient TPP, the chance that, if it's as

15   little as two, that both patients are uninjured, I mean, are

16   non-fraudulent scripts, that's really astronomically low.

17         THE COURT:  What about if it's two patients but one

18   doctor?

19         MR. GREENE:  It doesn't matter.

20         THE COURT:  I don't know.  Anyway, it's the doctor

21   who's the person who's the prescribing entity, so if the doctor

22   wasn't tainted --

23         MR. GREENE:  But you're getting hung up on -- you're

24   still thinking of proving causation doctor by doctor.  The

25   First Circuit said, no, we don't have to do it.  They can

```
 1    rebut.  They can bring in some individual evidence to rebut,

 2    but you're still getting hung up on that.  That's not the way

 3    we're going to prove this case.  We're proving it in the

 4    aggregate.  The First Circuit said we could.

 5          THE COURT:  And I get that.  If it's 99.6 percent,

 6    that's what I would do is --

 7          MR. GREENE:  Yes, but if they came back and it was

 8    80 percent --

 9          THE COURT:  I'm less sure about it.

10          MR. GREENE:  -- it's 80 percent, but don't be thinking

11    that that reduces the injured TPPs down to 80 percent.  It

12    doesn't?  There is no evidence here, just surmise and

13    conjecture, that there's a substantial number of uninjured

14    TPPs.  And the First Circuit has said you can't let surmise and

15    conjecture tip the decisional scales.  And Justice Souter said

16    in Gintis that this argument that they get a right to

17    individually defeat it, if that were true, it would blunt

18    Rule 23 beyond utility.

19          THE COURT:  Okay, I get the debate.  I am, let me just

20    say this, likely to certify a class because essentially the

21    point of view that you're espousing, that I shared, was

22    reversed.  And it may be that the First Circuit didn't play out

23    the effect of what was going to happen.  I am likely to grant,

24    but I am going to write it up, so it will not happen

25    immediately.  Let me ask you this:  In your view, does the
```

1    New Jersey consumer fraud statute make any difference here?

2            MR. BEISNER:  I defer to plaintiffs' counsel on that.

3    I don't think it adds anything here, and --

4            THE COURT:  Or detracts.

5            MR. BEISNER:  And, as your Honor suggested earlier, I

6    think there are substantial problems with that proposed class

7    because the *Tele Aid* case I think that plaintiffs rely on for

8    recertification of the choice-of-law issue is out the window.

9            THE COURT:  The *Mercedes-Benz* case?

10           MR. BEISNER:  Yes.  I'm sorry.

11           THE COURT:  But, anyway, I actually thought that would

12   be an easier issue than it is because in *Kaiser* I certainly

13   ruled a particular way by the home state, but it was a very in

14   fact situation.  And then I was thinking *Mercedes-Benz* split in

15   District Court, but then the Third Circuit reversed it.  It's

16   actually a pretty close call, and on a close call, I'm not sure

17   what I should do with it.

18           MR. GREENE:  Well, again, you know, it hasn't been

19   briefed.  They didn't move for summary judgment on it.

20           THE COURT:  It is in the sense that it's been briefed

21   extensively on which choice of law I pick.  That's what I've

22   got to decide:  Do I pick New Jersey, or do I take the home

23   state of the third party?  That's all I'm doing right now.  You

24   see, it's not whether I'm going to say it's a viable cause of

25   action.  It's --

```
 1              MR. GREENE:  Well, then that's a common question.
 2              THE COURT:  Excuse me?
 3              MR. GREENE:  That's a common question then.
 4              THE COURT:  Right, the common question is whether I
 5    apply the home state rule for the corporate headquarters or
 6    whether I apply the -- I went through this in AWP -- I always
 7    look at Tom Sobol because I went through this with him -- it
 8    sort of came up again in other contexts -- or whether I apply
 9    the home state for the consumer product laws.  And it's
10    actually, when you go through the multifactorial things, it's
11    harder here because you don't care about reliance, so there's
12    no reliance factor.  You don't care about -- about three or
13    four of the other factors drop out.  So there's the home state
14    versus the state where the damages were caused are the really
15    two poignant factors.  So then I've got to go into the
16    secondary factors.  And so it's not so easy, it's not so
17    straightforward, especially when the Third Circuit ruled the
18    way the Third Circuit did.  So I don't know what to do there,
19    but let me say this:  I will write it up.
20              And that said, you said in a motion that you were
21    going into settlement discussions.  Now, let me just say this:
22    I love it when you all settle things, but when you settle it at
23    the last minute like you did on Friday afternoon, we put a huge
24    amount of my court resources into studying it, drafting
25    opinions.  I had one of my poor law clerks spend at least the
```

```
 1    first, like, five weeks on it.  I spent myself several days on
 2    it, on the attorneys' fees thing.  I don't like hearing at
 3    4:00 o'clock the afternoon before the Monday morning at 9:00.
 4    So let me just say, before I spend a lot of time writing this
 5    up -- let's go off the record for a minute.
 6              (Discussion off the record.)
 7              MR. SOBOL:  Two things, your Honor, very briefly?
 8              THE COURT:  Let's go back on the record or off?
 9              MR. SOBOL:  Probably on the record.
10              THE COURT:  Okay, go ahead.
11              MR. SOBOL:  I would be remiss to not bring to your
12    attention two points about your questions on the administrative
13    mechanisms, particularly given the experience we had in AWP.  I
14    just wanted to make clear.  Your question about so-called
15    80 percent has an impact on three different aspects of the case
16    that you need to separate quite distinctly.  The four out of
17    five prescriptions affected by the fraud has an impact on the
18    calculation of damages.  It has an impact on who may or may not
19    be in the class, and it has an impact on the administrative
20    mechanisms for allocating money once a judgment on behalf of
21    the class has been received by settlement or trial.  The
22    calculation of the damages, the first thing, that's simple.
23    You simply take fourth-fifths of the low that would be
24    available if you're calculating aggregate damages.  That's
25    easy.
```

1          If you turn to the end on administrative mechanisms,

2     once there is a judgment on behalf of a class in terms of an

3     amount of money, either by settlement or by litigation, the

4     allocation of that judgment, as Mr. Greene aptly put it, is

5     allocated between the class according to however the class

6     wants it allocated.  So, for instance, in AWP, although there

7     might have been issues of differing third-party knowledge or

8     when people bought, we actually allocated amounts on the basis

9     of proxy periods, not for the whole eight years.

10          THE COURT:  It's not you.  I decided that.

11          MR. SOBOL:  You did, that's right, that's right.  It

12     was Court approved.  There was notice that goes out to the

13     class.  And so there are equitable measures that the Court

14     looks into that allocates that amount.

15          So then there's the middle issue, which, of course,

16     Mr. Greene and Mr. Beisner brought up:  What impact, if any,

17     does a four out of five prescriptions of Neurontin were caused

18     by the fraud for bipolar have on who is in the class?  Now, as

19     to that, I think Mr. Greene's position is correct:  If four out

20     of five prescriptions for bipolar are affected by the fraud,

21     the vast majority, leaving only a de minimis number of the

22     class members, will have not been impacted by the fraud, right?

23          THE COURT:  I think you may have said that wrong.

24          MR. SOBOL:  I may have said it the opposite way, but I

25     think you know where I'm trying to go.

1          Now, in theory, if a jury were to come back and say,

2     "No.  We only think that half of the Neurontin prescriptions

3     for bipolar were affected by the fraud," which, by the way, is

4     a fact that we think has already been determined by the prior

5     jury, and we'll try to do -- you know, the 99 percent will be a

6     fact that actually ends up being precluded, but assuming you

7     deny that and assuming a jury comes back and says only half,

8     that at that point a court has discretion to take that --

9          THE COURT:  Did the jury find that, or did I?

10          MR. GREENE:  You did.

11          THE COURT:  I did.

12          MR. SOBOL:  You did in your California decision.

13          THE COURT:  In my California decision.

14          MR. SOBOL:  Which is still a judgment against them.

15     So if half are only affected by the fraud under this notion

16     that we even go down this road, the Court has discretion to

17     recast the scope of the class to make sure that it's still

18     defined by people who more likely than not would have purchased

19     an affected prescription of Neurontin.  And I think that's the

20     framework under which, you know, your question applies.  It

21     applies intellectually to those three discrete issues.

22          THE COURT:  Are you possibly thinking of subclasses or

23     different priorities among the --

24          MR. SOBOL:  We think that the jury is going to

25     conclude, as Mr. Greene put, that 99.4 percent of all the

 1    prescriptions were caused by the fraud; and every witness that

 2    Mr. Beisner or Mr. Cheffo put on the stand of a doctor isn't

 3    going to admit that they were prescribing something that they

 4    didn't think worked.  They're going to think that it worked,

 5    and the only way that they thought it worked was because of

 6    *Kaiser*.

 7          THE COURT:  You know, I was amazed in the

 8    New York Times two weekends ago -- I think this is right --

 9    maybe anybody noticed it -- there was an article on itching.

10    Did anyone see this?

11          MS. BARRETT:  An article on what?

12          THE COURT:  Itching and how there's all this new

13    research in itching.  I may have the wrong article, but I know

14    something like this.  And so they don't know what causes it,

15    blah-blah.  And then they said, "So doctors try various

16    things," and they came up with gabapentin.

17          (Laughter.)

18          THE COURT:  So, you know, the issue that I have is,

19    what happens is, it's the go-to drug sometimes when nothing

20    else works.  And you can call it snake oil or last resort,

21    whatever you want to call it; it's not an addictive, so people

22    try it.  I mean, that's what's happening here.  And I sat and

23    went, "Oh, my God, I wonder what the Crawford report would have

24    said about that."  It may not have been itching.  It may have

25    been something else.  I think that's what it was, but it did

```
 1    remind me.  Did anyone see this?  Am I the only one who read

 2    about it?  But that's the issue here.

 3              MR. BEISNER:  And, your Honor, if I may respond

 4    briefly to that, you know, your Honor asked earlier if we're

 5    aware of precedent for a situation like this.  I'd be

 6    interested if there is precedent for this post-verdict

 7    redefinition of a class, but if you think about it, your Honor,

 8    you'd certify all classes then.  You'd put it before the jury,

 9    and if you got what you wanted, then, okay, it's fine.  If not,

10    you change the verdict?  The court reaches in and tells a bunch

11    of the class members "You're out" when that really wasn't put

12    before the jury to start with?  How are you going to figure out

13    who's in and who's out?  You're going to have to have mini-

14    trials to make that determination.

15              THE COURT:  But could you, what happens is essentially

16    find -- and I could almost do this on summary judgment, part of

17    it -- but, anyway, the liability, causation, and then you just

18    send people out to do the damage phase?  I mean --

19              MR. BEISNER:  But, you know, even as we showed in our

20    papers, even at 98, 99 percent, and particularly at 80 percent,

21    you're going to have a substantial number of class members who

22    have no liability, even though you let the jury make a

23    liability finding with respect to them on a class basis.

24              THE COURT:  I would be less persuaded at 99.6.

25              MR. BEISNER:  Well, and again, your Honor, the First
```

1    Circuit made no ruling that that's the right number, and --

2          THE COURT:  Pretty close.  They came pretty close to

3    saying that it's enough to get you past this stage.

4          MR. BEISNER:  Well, your Honor, let me just -- and,

5    I'm sorry, you've indicated what you're going to do --

6          THE COURT:  You can't get a chance for a second bite

7    at the apple to see them.

8          MR. BEISNER:  But here is the point:  The Court was

9    dealing with these three cases.  You had *Kaiser* where the

10   question was, was that evidence properly admitted?  They said

11   "yes."  But you don't have the issues you have here.  There's

12   only one defendant, and the jury had all the evidence and made

13   the decision about liability.  In *Aetna* you had this issue, and

14   there they said the evidence is admissible.  We had the right

15   to refute it, fine; but at the end of the day, you don't have

16   the problem of whether there is liability because the jury is

17   able without differentiation, having to differentiate to say

18   there's liability or there's not.

19         All they said with respect to this case was that this

20   evidence was admissible and got them over the summary judgment

21   hump.  They threw the class issues back in your lap.  They

22   never disagreed with you at all that there was substantial

23   individual evidence.  Indeed, they acknowledged that by saying

24   we can put that in.  But they didn't wrestle with the hard

25   issue as to whether, unlike those first two cases, you can just

1    put all this before the jury.

2         THE COURT:  I did in my opinion.  I did.  I mean, I

3    wrestled with this, and I wrestled with it four times, and they

4    didn't agree with me.  So at the end of the day, maybe they

5    weren't wrestling with it and they'll be able to wrestle on the

6    fifth time around, but the reality is, I don't see them saying

7    that.  Now, I don't -- I just don't --

8         MR. GREENE:  They didn't say that, Judge.  They didn't

9    say you could call all physicians.  They said --

10        THE COURT:  I'm not deciding that now, but they are

11   going to be able to call some physicians.

12        MR. GREENE:  They can.

13        MR. CHEFFO:  I think we need to look at the record.

14   The issue, this 96 was bipolar.  Remember there was some

15   testimony, bipolar?  You asked the question earlier, you know,

16   was it other mood disorders?  It's not quite as clear.  So now

17   they said it includes all other mood disorders.  I would just

18   highlight that for your Honor that I think that their proposed

19   class is broader than the 96 percent.

20        And the other thing I would just say in response to

21   Mr. Sobol is, this is not AWP in terms of this just methodical

22   calculation, I think, and you've highlighted that in your prior

23   decisions.

24        THE COURT:  Okay, and I was reversed.  So it isn't

25   AWP.  I think we all agree.  That was just pure algorithm.

1   This is not a pure algorithm, but it is in many ways a harder

2   case in terms of class.

3          However, I will take this under advisement.  We will

4   write an opinion.  I will assume it will go up again, and so

5   therefore I will not set a trial date.  Is that correct?  Do

6   you want me to set a trial date, Mr. Sobol?

7          MR. SOBOL:  Yes, please, very much.  It's the only way

8   these cases move.  You've learned that over the past twelve

9   years.

10         THE COURT:  All right, just pick, but let's assume --

11         MR. SOBOL:  October.

12         THE COURT:  Let me just say something.  Let's assume

13   for a moment I certify a class, it doesn't settle, they go up

14   on appeal.

15         MR. SOBOL:  You've learned from AWP and --

16         THE COURT:  It takes about three months on appeal?

17         MR. SOBOL:  At most.  You've learned from *AWP* and

18   *McKesson* that they've denied these 23(f)s or allowed them, and

19   they're done in a matter of a few months.  We're ready for

20   October.

21         THE COURT:  So let's say maybe October?  Does that

22   make sense?

23         MR. SOBOL:  Yes.

24         MR. CHEFFO:  Well, again, it depends on -- there's a

25   fair amount of work that's going to have to be done.  You know,

 1    if you're going to set the date, you know, your Honor will pick

 2    it if it makes sense, but there are a number of individual

 3    issues --

 4         THE COURT:  It's the one that jumps out.  We've

 5    started doing the work on that in Aetna.  We always start doing

 6    the work on it, which is why I like to know when things settle

 7    right away.  But, in any event, there will be res judicata on

 8    liability.  I don't know that there will be on causation.  In

 9    other words, the 99 percent figure, I don't know that I will.

10    That said, the First Circuit seemed to anticipate some ability

11    to challenge that.  The res judicata issue wasn't squarely

12    presented to them either, so --

13         MR. SOBOL:  October.

14         THE COURT:  October.  And then I will have a status

15    conference, if you don't settle it, right afterwards to figure

16    out if --

17         MR. SOBOL:  In April?

18         THE COURT:  I'm worried about the New Jersey thing.  I

19    don't know what the right answer to that is.  You know, I don't

20    know that it matters, though.  You're both telling me it

21    doesn't matter, right?

22         MR. SOBOL:  We are.

23         THE COURT:  Is there a different state interest?  It's

24    not like Massachusetts?

25         MR. SOBOL:  No.

1           MR. GREENE:  I'm sorry, I didn't hear your question,

2    your Honor.

3           THE COURT:  Like in Massachusetts the interest rate is

4    12 percent, and the federal is --

5           MR. GREENE:  No, no.

6           THE COURT:  It's not that in New Jersey?

7           MR. GREENE:  No.

8           THE COURT:  So I'm not figuring out what the

9    difference is.

10          Let me just say, going forward on attorneys' fees, to

11   the extent that you're going to do it, I do look at local

12   rates, so that a would be relevant to me, not the national

13   rates.  And I will be looking at -- and this would probably be

14   a percentage of the fund so it isn't so palpable, but I was

15   trying to think whether it would matter under New Jersey law

16   whether experts were covered or not because that's a little

17   vague under RICO, but we couldn't find a clear answer under

18   New Jersey law either, so I'm not sure it matters.  So would

19   you both at least talk and see whether you care?

20          MR. SOBOL:  Yes.

21          THE COURT:  And let us know within a few days whether

22   you care.  We were trying to look at -- we couldn't find a

23   difference in the interest rate.  We couldn't find a difference

24   in the clarity with respect to experts.  I didn't know whether

25   there was anything else that I was sort of missing.  And it

 1   would be a hard sell for me on res judicata because I'd have

 2   to, I think, reach -- and is it bench trial versus jury?  Does

 3   anyone know?

 4           MR. GREENE:  New Jersey is jury.

 5           THE COURT:  Jury, so it doesn't give you that second

 6   bite.  I'm not sure what it gives you, and it's a very close

 7   legal --

 8           MR. GREENE:  I was looking for that.

 9           THE COURT:  What?

10           MR. GREENE:  I was looking for that.

11           THE COURT:  Yes.  So why don't you all just let me

12   know Friday whether or not you're pressing the New Jersey one,

13   okay?

14           THE CLERK:  Set a trial date?

15           THE COURT:  Yes, in October sometime.

16           THE CLERK:  Okay, so the first week in October,

17   October 6?

18           MR. SOBOL:  Great.

19           THE CLERK:  And we'll do a pretrial on the 26th,

20   Friday, September 26 at 2:30.

21           THE COURT:  And if you don't settle it, if you

22   could -- well, never mind.  I'll just have a status because

23   then it's going to go up on appeal, and I don't know how long

24   it's going to take me to write it up and that sort of thing.

25   Okay, thank you.

1           MR. GREENE:  Thank you, your Honor.

2           MR. BEISNER:  Thank you, your Honor.

3           THE COURT:  Welcome back.

4           (Adjourned, 10:13 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                       C E R T I F I C A T E

2


3
    UNITED STATES DISTRICT COURT )
4   DISTRICT OF MASSACHUSETTS    ) ss.
    CITY OF BOSTON               )
5


6


7            I, Lee A. Marzilli, Official Federal Court Reporter,

8   do hereby certify that the foregoing transcript, Pages 1

9   through 49 inclusive, was recorded by me stenographically at

10  the time and place aforesaid in Civil Action No. 04-10981-PBS,

11  In Re:  Neurontin Marketing, Sales Practices, and Product

12  Liability Litigation, and thereafter by me reduced to

13  typewriting and is a true and accurate record of the

14  proceedings.

15       Dated this 25th day of February, 2014.

16

17

18

19

20            /s/ Lee A. Marzilli
              _____
21            LEE A. MARZILLI, CRR
              OFFICIAL FEDERAL COURT REPORTER
22

23

24

25