# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:  NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1629<br><br>Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO:<br><br>HARDEN MANUFACTURING CORPORATION; LOUISIANA HEALTH SERVICE INDEMNITY COMPANY, d/b/a BLUECROSS/BLUESHIELD OF LOUISIANA; ASEA/AFSCME LOCAL 52 HEALTH BENEFITS TRUST; JAN FRANK WITYK; and GARY VARNAM, on behalf of themselves and all others similarly situated,<br><br>      Plaintiffs,<br><br>v.<br><br>PFIZER INC. and WARNER-LAMBERT COMPANY,<br><br>      Defendants. | Chief Judge Patti B. Saris<br>Magistrate Judge Leo T. Sorokin |

## PFIZER'S POST-HEARING BRIEF IN OPPOSITION TO MOTION FOR CLASS CERTIFICATION

Defendant Pfizer Inc. ("Pfizer") respectfully submits this supplemental brief to address a few issues raised by the Court at oral argument on plaintiffs' motion for class certification.

*First*, the Court asked a critical question: would a classwide verdict be valid if the jury finds that less than 99.4% of the Neurontin prescriptions at issue were affected by the alleged fraud? (*See, e.g.*, Feb. 24, 2014 Mot. Hr'g Transcript ("Tr.") 9:23-10:2; 12:3-7.) By way of example, the Court posited a scenario in which the jury concludes that 80% of the prescriptions at issue were the result of alleged fraud, and asked plaintiffs' counsel how that would affect Pfizer's liability to the proposed class. (*Id.* 12:3-14.) Pfizer believes that this question goes to

the heart of why a class trial of this matter would violate the Rules Enabling Act and basic notions of fairness.

As the Court has noted, the jurors in *Kaiser* were presented with "the strongest possible case." (Tr. 13:24-14:3.)  Nonetheless, they appear to have found that 83.45% (and not 99.4%) of the prescriptions at issue were caused by fraudulent activity.  By contrast, here, the *Harden* plaintiffs and class members did not have "central[ized]" decision-making.  (*Id.* 13:24-14:3)  Thus, as the Court has repeatedly noted, in order to prove causation and damages, the *Harden* plaintiffs must show that prescribing physicians received and relied upon misrepresentations.  *See, e.g.*, *In re Neurontin Mktg. & Sales Pracs. Litig.*, No. 04-cv-10981-PBS, 2011 WL 1882870, at *5 (D. Mass. May 17, 2011) ("where the TPPs did not directly rely on misrepresentations, 'plaintiffs must show that the defendants' alleged fraud caused the treating physician to prescribe Neurontin when he or she otherwise would have used alternative treatments'") (quoting *In re Neurontin Mktg. & Sales Practices Litig.*, 754 F. Supp. 2d 293, 309 (D. Mass. 2010)).  Most prescribing physicians, however, are likely to testify – in the Court's words – "'I was never detailed.  I didn't read anything.  Nothing else was working, so I tried it.'" (Tr. 18:23-19:2; *see also id.* 19:3 (MR. GREENE: "And that's some good rebuttal testimony . . . .").)[1]  Thus, there is every reason to believe that the jury in *Harden* would come back with a much more conservative figure.

At oral argument, plaintiffs' counsel told the Court that it does not matter what verdict the jury renders, because the Court can simply reduce the damages figure accordingly.  But that position is badly misguided.  After all, more than 75 percent of class members are small payors

---

[1]   To be sure, Prof. Rosenthal will testify that virtually all prescriptions resulted from fraud, but she will have to acknowledge that she has not spoken to any of the doctors, has no idea what (if any) allegedly fraudulent information they received, and has no direct knowledge of why any of the physicians wrote Neurontin prescriptions.

who covered a limited number of Neurontin prescriptions generally, and even fewer for bipolar patients.  (Tr. 33:23-34:1.)  Moreover, Dr. Conti's analysis and plaintiffs' own proffered statistics suggest that 73.85% of self-insured employers – 7,307 putative class members – covered as little as one such patient.  (*See* Pfizer's Mem. of Law in Opp. to Class Pls.' Mot. for Leave to File Second Reply Brief at 4, ECF No. 4205.)  If that prescription was not caused by fraud, the TPP is not entitled to any damages at all, and ***in an individual trial, it would go home empty-handed***.

The fundamental lesson of the Rules Enabling Act is that the class action device cannot be used to turn what would normally be a verdict against an individual plaintiff into a victory, simply because that plaintiff got lost in the mix of a class action.  *See*, *e.g.*, *Corder v. Ford Motor Co.*, 283 F.R.D. 337, 343 (W.D. Ky. 2012) (the Rules Enabling Act, just like due process, mandates "a full litigation of [each] element of the cause of action, and for each putative class member no less"); *Franco v. Conn. Gen. Life Ins. Co.*, 289 F.R.D. 121, 140 (D.N.J. 2013) (classwide entitlement to relief "cannot be achieved at the expense of precision or of actual proof of an individual class member's legal right to a damages award" under the Rules Enabling Act).[2]

Nor can the Court, as it suggested at the hearing, take a wait-and-see approach by holding a classwide trial first and then having follow-up trials for individual TPPs if the verdict requires a different approach.  (*See* Tr. 31:12-19 (COURT: "[I]f at the end of the day there's a dramatically reduced percentage that was harmed, couldn't I at that point decertify and send everybody out to

---

[2] At another point in the hearing, the Court suggested that it can certify a class based on the belief that it is "more likely than not" the jury will agree with Dr. Rosenthal's 99.4 percent figure.  But the caselaw does not suggest that a court can compromise procedural rights simply because it believes that the jury is likely to side with plaintiffs.  The "more likely than not" standard requires the Court to consider whether it is "more likely than not" that individual issues will predominate at trial – not to predict which side has the better case at trial.  *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 318 (3d Cir. 2008) ("When a district court properly considers an issue overlapping the merits in the course of determining whether a Rule 23 requirement is met, it does not do so in order to predict which party will prevail on the merits"); *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 754 (5th Cir. 1996) ("the strength of a plaintiff's claim should not affect the certification decision").

the field to prove up whether they were one of the ones that was hurt or not?").) Such a proposed solution would simply create another problem – a violation of the Seventh Amendment.  Under the Seventh Amendment, "the findings of one jury are not to be reexamined by a second, or third, or *n*th jury."  *In re Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293, 1303 (7th Cir. 1995); *Castano*, 84 F.3d at 750 ("The Seventh Amendment entitles parties to have fact issues decided by one jury, and prohibits a second jury from reexamining those facts and issues.").  In the class action context, this means it would be improper to hold a class trial to decide so-called common issues of liability and then allow those findings to be reexamined in "individual follow-on litigation by class members" seeking to prove that they are entitled to recovery.  *Rhone-Poulenc*, 51 F.3d at 1303; *see also Blyden v. Mancusi*, 186 F.3d 252, 268 (2d Cir. 1999) (class trial cannot be bifurcated where the result is that a "given issue" will "be tried by different, successive juries").  This is so because the follow-up trials envisioned by the Court would impermissibly address the same question as the first trial:  whether Neurontin prescriptions for bipolar conditions were caused by fraud.  *See In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F. 2d 1144, 1183 (3d Cir. 1993) (where liability questions including fact of injury are determined in a first phase, the Seventh Amendment requires that a second-phase jury be "limited to determining the amount of damages . . . incurred").

   *Second*, the Court mentioned at oral argument that it was concerned about how a class trial in this case would "look" given Pfizer's entitlement to present individualized evidence at trial that the physicians who prescribed Neurontin to the TPPs' beneficiaries did not rely on any alleged fraudulent misstatements by Pfizer.  (*See, e.g.*, Tr. 11:22-12:1.)

   The Court's concern is well founded.  As the Supreme Court has recognized, a "class cannot be certified on the premise that [a defendant] will not be entitled to litigate its . . .

4

defenses to individual claims." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2561 (2011).[3] This pronouncement is consistent with the long-recognized notion that class certification is only appropriate where "the addition or subtraction of any of the plaintiffs to or from the class [w]ould not have a substantial effect on the substance or quantity of evidence offered." *See, e.g.*, *Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1170 (11th Cir. 2010) (internal quotation marks and citation omitted). By contrast, class certification is generally inappropriate "where resolution of a matter related to one plaintiff would not resolve that issue with respect to a second plaintiff," absent additional evidence. *McDaniel v. Qwest Commc'ns Corp.*, No. 05 C 1008, 2006 WL 1476110, at *14 (N.D. Ill. May 23, 2006).

Here, there is no question that an individual trial of one TPP's claims would involve individualized evidence related to the reasons why each insured's doctor prescribed Neurontin. In fact, for a significant majority of the putative class members, such a trial could well feature the testimony of every relevant prescribing physician. If the parties were to try any one of these cases separately, the key evidence in the case would be the testimony of the prescribing physicians regarding their exposure – if any – to statements by Pfizer and how those statements affected their prescribing decisions. By comparison, "addi[ng]" one more TPP would require testimony not only from the prescribing physicians who wrote prescriptions covered by the first TPP but also the physicians who wrote prescriptions covered by the second – and so forth. And because the jury could easily conclude – based on the testimony of individual prescribers – that

---

[3] At the hearing, plaintiffs' counsel sought to distinguish *Dukes* on the ground that it considered Wal-Mart's right to raise statutory defenses (Tr. 14:20-24), but there is no justification for such a limited reading of *Dukes*. Pfizer has as much a right to litigate common-law defenses or individualized evidence undermining the elements of plaintiffs' causes of action. *See, e.g.*, *Loef v. First Am. Title Ins. Co.*, No. 2:08-cv-311-GZS, 2012 WL 6113844, at *5 (D. Me. Dec. 10, 2012) (granting motion to decertify in part because *Dukes* was decided after certification and made clear that a "defendant retains a right to litigate defenses to individual claims under Rule 23").

some TPPs paid for Neurontin prescriptions that were affected by the alleged fraud while others did not, it would be impossible for the jury to render a single classwide verdict.

## CONCLUSION

For all of these reasons, and all of the other reasons discussed in Pfizer's briefing in opposition to class certification and raised at oral argument, class certification should be denied.

Dated: March 3, 2014

Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By: /s/ Mark S. Cheffo
Mark S. Cheffo
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
Email: markcheffo@quinnemanuel.com

John H. Beisner
Jessica Davidson Miller
Geoffrey M. Wyatt
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Ave., N.W.
Washington, D.C. 20005
(202) 371-7000

*Attorneys for Defendants Pfizer Inc. and Warner-Lambert Company LLC*