# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:  NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No.  1629 <br><br> Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO: <br><br> HARDEN MANUFACTURING CORPORATION; LOUISIANA HEALTH SERVICE INDEMNITY COMPANY, d/b/a BLUE CROSS/BLUE SHIELD OF LOUISIANA; ASEA/AFSCME LOCAL 52 HEALTH BENEFITS TRUST; JAN FRANK WITYK; and GARY VARNAM, on behalf of themselves and all others similarly situated, <br><br>　　　Plaintiffs, <br><br> v. <br><br> PFIZER INC. and WARNER-LAMBERT COMPANY, <br>　　　Defendants. | Judge Patti B. Saris <br><br> Mag. Judge Leo T. Sorokin |

## MEMORANDUM OF LAW IN SUPPORT OF CLASS PLAINTIFFS' MOTION TO PRECLUDE RELITIGATION OF ISSUES AND FACTS DETERMINED BY THE *KAISER* TRIERS OF FACT AT TRIAL

## I.    INTRODUCTION

Harden Manufacturing Corp., ASEA/AFSCME Local 52 Health Benefits Trust, and Louisiana Health Service Indemnity Company, d/b/a Blue Cross/Blue Shield of Louisiana (together, the "Class Plaintiffs") move for a collateral estoppel order, on behalf of a certified class of themselves and all others similarly situated, to preclude relitigation of issues and facts determined by the finders of fact at the trial of *Kaiser Foundation Health Plan, Inc., et al.,* No 04-10739-PBS (the "Kaiser Trial").

On no less than three occasions preceding the Kaiser Trial, this Court made it clear that issue preclusion effect with respect to at least some issues was anticipated. In a May 13, 2009 Order denying certification requested by the Class Plaintiffs, the Court stated that "[a]ny liability findings in favor of [the Class Plaintiffs] (i.e., whether there was a fraud), will have issue preclusion effects for smaller TPPs and other consumers with fewer resources." *In re Neurontin Mktg., Sales Practices & Products Liab. Litig.*, 257 F.R.D. 315, 333 (D. Mass. 2009) (parenthesis in original). This Court then indicated that a one-TPP "bellwether" trial would serve to produce findings of fact that would be applicable to claims of other parties.[1] *See* Transcript of September 18, 2009 Oral Argument on Defendants' Motion for Summary Judgment ("SJ Transcript") (Dkt. No. 2114).

After Kaiser was selected for that bellwether trial, this Court could not have been clearer about the intended issue preclusion effect of at least some issues. This Court ordered that "the Court will issue special jury instructions on fact issues *so that the findings will have preclusive effect on subsequent litigation*." Procedural Order of

---

[1] "THE COURT: Why don't I do one TPP first, my own little bellwether TPP case…I was thinking one TPP and all the indications really soon, and I just get some findings, just some findings…Either way I go, it will probably go up on appeal. I want to just get some findings. I want something that will bring you all to a jury, and that's my instinct for the whole thing." SJ Transcript at 89-91.

November 12, 2009 (Dkt. No. 2172) (emphasis added). All parties were on notice as to the intention for findings of preclusive effect, and this Court ordered counsel to "explore options for resolving all cross-cutting issues through the Kaiser trial." Indeed, counsel for Class Plaintiffs did participate in the preparation and prosecution of Kaiser's claims.

On March 25, 2010, the jury for the Kaiser Trial found that "Pfizer violated RICO with respect to its promotion for (a) Bipolar…"[2] Special Verdict Form, Part I, Q. 1 (Dkt. No. 2760 ("Verdict"). On November 3, 2010, the Court issued its own extremely thorough Findings of Fact and Conclusions of Law. Dkt. No. 3120. On August 31, 2011, the Court amended the Findings of Fact and Conclusions of Law (the "*Kaiser Findings*"). Dkt. No. 3602, *In re Neurontin Mktg. and Sales Practices Litig.*, No. 04-cv-10739-PBS, 2011 WL 3852254 (D. Mass. Aug. 31, 2011). After judgment, the United States Court of Appeals for the First Circuit affirmed. *In re Neurontin Mktg. and Sales Practices Litig.*, 712 F.3d 21 (1st Cir. 2013), *cert. denied*, 134 S. Ct. 786 (2013) ("*Kaiser*"). On appeal, Pfizer specifically did not challenge the findings from the Kaiser Trial "that it engaged in a fraudulent scheme with respect to its promotion of Neurontin for off-label uses." *Id.* at 33.

Before the Court is now a motion, brought by the Class Plaintiffs on behalf of themselves and all others similarly situated, requesting a collateral estoppel order for those and other specific findings. It is well-established that preclusion via offensive collateral estoppel is available to this Court, that it comports with due process, and that this Court has broad discretion to determine its application. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331 (1979).

---

[2] For the sake of clarity and to stay consistent with the abbreviation used within the Special Verdict form and the *Kaiser Findings*, the term "bipolar" will be used throughout as a shorthand for "bipolar and other mood disorders."

## II.    SUMMARY OF ARGUMENT

As to the Class Plaintiffs, this Court should preclude relitigation of several groupings of judgments, holdings or findings concerning Pfizer's liability, all of which were decided at the Kaiser Trial. These groupings relate to (A) RICO findings, including the enterprise and pattern of predicate acts findings; (B) the nationwide fraudulent marketing scheme; (C) the percentage of prescriptions attributable to promotion; (D) the percentage of prescriptions attributable to *fraudulent* promotion; and (E) Neurontin's inefficacy as a treatment for bipolar. The specific findings for which preclusive effect is sought are set forth in the Motion which this memorandum supports.

Pfizer was put on notice of the probable preclusive effects of findings from the Kaiser Trial, and vigorously defended each of the above issues through what Pfizer's counsel aptly promised would be a "very expensive, very lengthy trial." *See* SJ Transcript at 90. Each issue was decided at the Kaiser Trial by the jury, by this Court, or in many cases by both. Pfizer lost at trial, appealed, lost again, and had a petition for certiorari denied.

All requirements for "non-mutual offensive issue preclusion" with respect to these issues have been satisfied. *See Parklane Hosiery*, 439 U.S. at 326-31 (1979). A Federal District Court has already found many of the relevant findings preclusive.[3] And Pfizer cannot argue that it didn't contest these issues, which were critical in the Kaiser Trial; Pfizer was specifically put on notice by this Court that preclusive effect was not just possible or likely, but intended. The plan of conducting a grueling bellwether trial with cross-cutting issues was intended to promote judicial economy. And after specifically

---

[3] The United States District Court for the District of New Jersey gave preclusive effect to this Court's *Kaiser Findings. See In re Neurontin Antitrust Litig.*, MDL 1479, 2013 WL 4042460, at *7 ("Defendants are precluded from denying those findings of fact in Judge Saris's opinion that govern the nature and scope of Pfizer's off-label marketing.").

articulating that findings would have preclusive effect, following through with that plan would be manifestly fair.

### III.   LEGAL STANDARD

In *Parklane Hosiery*, the Supreme Court gave trial judges broad discretion to employ non-mutual offensive collateral estoppel, concluding that arguments in favor of mutuality seldom "justify reluctance to allow the offensive use of collateral estoppel." 439 U.S. at 331. Issue and claim preclusion are "central to the purpose for which civil courts have been established, the conclusive resolution of disputes within their jurisdictions…" *Montana v. United States*, 440 U.S. 147, 153 (1979).

Preclusion of issues and facts is appropriate when "(1) the issues raised in the two actions are the same; (2) the issue was actually litigated in the earlier action; (3) the issue was determined by a valid and binding final judgment; and (4) the determination of the issue was necessary to that judgment." *Manganella v. Evanston Ins. Co.*, 700 F.3d 858, 591 (1st Cir. 2012) (citations omitted). "The doctrine applies to issues of fact as well as those of law…and can apply where the subsequent proceeding involves a cause of action different from the first…" *Id.* The central question is "whether a party has had a full and fair opportunity for judicial resolution of the same issue." *Rodriguez-Garcia v. Miranda-Marin*, 610 F.3d 756, 771 (1st Cir. 2010).

*Parklane Hosiery* teaches that non-mutual offensive issue preclusion is appropriate, except where (1) plaintiff had an incentive to adopt a "wait and see" approach hoping a prior action results in favorable rulings; or (2)(a) the defendant had little incentive to defend the prior action vigorously or the prospect of future litigation was unforeseen; (b) the adverse judgment conflicts with other favorable judgments; or (c) the defendant has procedural opportunities previously unavailable to it that could lead to differing results. *Parklane Hosiery*, 439 U.S. at 330-31. Availability of a jury as

4

factfinder for findings made in a bench trial does not qualify as a procedural opportunity previously unavailable. *Id.* at 353-54.[4]

### 1.  Issue Identity

"The identity of the issues need not be absolute; rather, it is enough that the issues are in substance identical." *Manganella*, 700 F.3d at 591 (citation omitted); *accord*, *Keystone Shipping Co. v. New England Power Co.*, 109 F.3d 46, 51 (1st Cir. 1997) ("[t]he principle of collateral estoppel, or issue preclusion…bars relitigation of any factual or legal issue that was actually decided in previous litigation between the parties, whether on the same or a different claim" (internal quotation marks and citations omitted)).

### 2.  Actually Litigated

"An issue may be 'actually' decided [for collateral estoppel purposes] even if it is not explicitly decided, for it may have constituted, logically or practically, a necessary component of the decision reached." *Dennis v. Rhode Island Hospital Trust National Bank*, 744 F.2d 893, 899 (1st Cir. 1984). "'[A]ctual litigation and determination' involves something more than having an issue 'resolved' as a result of some determinative legal doctrine that short-circuits the merits." *In re Kane*, 254 F.3d 325, 329 (1st Cir. 2001). Examples of issues not litigated are "situations where a matter is stipulated, admitted without controversy, or determined by default leading to the entry of judgment." *Id.* (citing Restatement (Second) of Judgments § 27 comment e (1982)).

### 3.  Valid and Binding Final Judgment

"Finality" for issue preclusion is "broadly" understood as "any prior adjudication of an issue in another action that is determined to be sufficiently firm to be

---

[4] In *Parklane*, the Supreme Court affirmed the preclusive effect of a district court's bench trial findings, made in an SEC action, that the defendant's proxy statement was materially false and misleading. Shareholders used that finding in a subsequent class action to obtain summary judgment. Defendants were held collaterally estopped to re-litigate the issues resolved against them in the SEC suit, and summary judgment was affirmed.

accorded preclusive effect." *Pure Distributors, Inc. v. Baker*, 285 F.3d 150, 157 n.5 (1st Cir. 2002) (citing Restatement (Second) of Judgments § 13 (1982)). Issue preclusion applies "even where the first, or issue preclusive, judgment is still on appeal…" *In re Kane*, 254 F.3d 325, 328 (1st Cir. 2001).

### 4. Necessary to the Judgment

"[A] finding is 'necessary' if it was central to the route that led the fact finder to the judgment reached, even if the result 'could have been achieved by a different, shorter and more efficient route.'" *Hoult v. Hoult*, 157 F.3d 29, 32 (1st Cir. 1998) (citing *Commercial Associates v. Tilcon Gammino, Inc.*, 998 F.2d 1092, 1097 (1st Cir. 1993)). "[I]n deciding whether the Jury did make and rest centrally upon a finding not expressly made, it is proper to consider…not only what was 'logically' but also what was 'practically' a 'necessary component of the decision reached.'" *Id.* (quoting *Dennis*, 744 F.2d at 899). "The court in the second case may examine the full record in the earlier one to decide 'whether a rational jury could have grounded its verdict upon an issue other than that which the [moving party] seeks to foreclose from consideration.'" *Id.*, *quoting Ashe v. Swenson*, 397 U.S. 436, 444 (1970) (alteration in original). Through one manner or another, for non-mutual offensive collateral estoppel, a party must demonstrate that the determination of issues in a prior proceeding was essential to the final judgment or order. *Acevedo-Garcia v. Monroig*, 351 F.3d 547, 576 (1st Cir. 2003).

## IV. ARGUMENT

The findings for which the Class Plaintiffs seek preclusion meet each of the requirements for non-mutual offensive collateral estoppel, and none of the *Parklane Hosiery* exceptions apply. Whether the Class Plaintiffs had an incentive to adopt a "wait and see" approach hoping the Kaiser verdict resulted in favorable rulings is entirely irrelevant; the Class Plaintiffs had filed their claims several years before the *Kaiser*

6

proceeded to trial. Indeed, the existence of the Class Plaintiffs' claims may have spurred this Court to hold a bellwether trial in the first place. Pfizer had great incentive to defend the *Kaiser* case vigorously given the stakes, and given this Court's notice as to planned preclusive effect of findings. Pfizer cannot argue that the prospect of future litigation was unforeseen, because it was already in motion, and, again, the Court had issued an order that "findings will have preclusive effect on subsequent litigation." Procedural Order of November 12, 2009 (Dkt. No. 2172).

The jury and bench findings for which the Class Plaintiffs seek non-mutual offensive collateral estoppel are identical to elements of their own case; they were actually litigated in *Kaiser*; and they are valid, binding judgments for which Pfizer has exhausted all avenues for appeal. The findings for which the Class Plaintiffs seek preclusion can be traced exactly to this Court's instructions to the jury, the special jury verdict form, or to the *Kaiser Findings*. Just as Pfizer is now armed with a jury's finding of no RICO liability with respect to nociceptive pain prescriptions, the Class Plaintiffs and other litigants are armed with conclusive findings for each of the six categories below.

The findings for which the Class Plaintiffs seek collateral estoppel were absolutely "essential" to final judgment in the *Kaiser* case. *See Acevedo-Garcia*, 351 F.3d at 576. With respect to all of the RICO findings in the first category below (section A), if those elements were not satisfied, Kaiser would not have recovered. With respect to the final category below (Neurontin's efficacy, section E), without those findings, Kaiser could not have been awarded damages. And with respect to the nationwide fraud findings (section B) and the findings with regard to 99.4% of bipolar prescriptions (sections C and D), **this Court would not have awarded Kaiser damages for 99.4% of bipolar prescriptions without them**. It is true that Kaiser proceeded on a direct reliance

theory, whereas the Class Plaintiffs proceed on the theory that doctors relied on Pfizer's misrepresentations, causing them to pay for fraudulent prescriptions. But this Court did not award damages based on direct reliance (the compliance rate of Kaiser's doctors with its formulary was 95%). Instead, it based damages on what *doctors* did, making the underlying findings about national fraud and percentage of fraudulent prescriptions both necessary to the Kaiser judgment and "substantively identical" to the Class Plaintiffs' claims. *See Manganella*, 700 F.3d at 591.

### A.  Jury's RICO Findings

This Court ruled that it would issue jury instructions "so that the findings will have preclusive effect on subsequent litigation." (Dkt. No. 2172). The jury's finding with respect to the first question in the Special Verdict Form about whether Pfizer violated RICO, therefore, may be broken into constituent parts. Before the jury found that "Pfizer violated RICO with respect to its promotion of Neurontin" for bipolar (Verdict, Part I, Q. 1), the Court issued these instructions ("Trial Transcript," vol. 20, pp. 23-57, March 23, 2010 (Dkt No. 3491)):

> To establish that Pfizer has violated RICO…Kaiser must prove each of the following elements by a preponderance of the evidence. First, that an enterprise existed. Second, that the enterprise affected interstate or foreign commerce. Third, that Pfizer engaged in a pattern of racketeering activity. Fourth, that Pfizer conducted or participated in the conduct of that enterprise through that pattern of racketeering activity. Fifth, that the RICO violation…caused an injury to Kaiser's business or property."

Trial Transcript, at 44 (repetitions omitted). The fifth of these points concerns harm to Kaiser specifically, and the answer to that question was broken out for the jury separately on the Special Verdict Form (Verdict, Part I Q. 2). It is the first four which have application to the Class Plaintiffs' case.

As counsel for Pfizer aptly put it, Pfizer "can't violate RICO by ourself. [They]'ve got to be part of an enterprise to violate RICO." Trial Transcript, vol. 20, p. 120. Existence of an enterprise is a threshold issue in RICO cases, and whether Pfizer formed RICO enterprises with Cline Davis Mann and Medical Action Communications[5] would need to be litigated, in exactly the same manner, should collateral estoppel not apply. The same is true for the other RICO issues put to the jury, including the issue of whether Pfizer engaged in a pattern of racketeering activity and the issue of whether Pfizer conducted or participated in the conduct of an enterprise through the pattern of racketeering activity.[6]

The RICO issues from *Kaiser* are not just "substantively identical" to those for the Class Plaintiffs; they are exactly identical. Because this Court also instructed the jury that enterprise, interstate effect of enterprise, pattern of racketeering activity, and Pfizer's participation in that conduct were necessary elements of a RICO violation finding, this Court can be certain that all four of those elements were "actually litigated" as that principle was articulated by *Parklane* and *Dennis*.[7] And as for whether the RICO issues identified in this Court's jury instructions were necessary to the judgment, we believe Pfizer agrees; as its counsel stated to the jury in its closing

---

[5] As this Court instructed the jury, Kaiser alleged that there were two enterprises. The first was the "Publication/Marketing Enterprise, made up of [Pfizer] and Cline Davis Mann." The second was the "Medical Education /Marketing Enterprise, made up of [Pfizer] and Medical Action Communications." Trial Transcript, vol. 20, p. 46.

[6] This Court elaborated on that requirement in its instructions to the jury, stating that the pattern element "requires that plaintiffs prove that Pfizer committed at least two predicate acts of racketeering activity," and that Kaiser had "alleged that defendants committed racketeering acts through the use of the mail and interstate wires." *Id.* at 49, 50. To find a pattern, the jury was also required to find that racketeering acts "extended over a substantial period of time, or that the acts constituted a pattern of more than limited duration that posed a threat of continuing racketeering activity into the future." *Id.* at 50. Finally, the jury was also required to find "a nexus between the predicate acts…and the enterprise." *Id.*

[7] In its closing argument, Pfizer specifically argued that enterprises had not been proven. *See* Trial Transcript, vol. 20, pp. 120-23.

9

argument, "if you conclude there's no enterprise, that's also the end of the analysis, because RICO requires all five of these things to come together. And if you don't have all five of them, you don't have a RICO endeavor." Trial Transcript, vol. 20, p. 123.

### B. Nationwide Fraudulent Marketing Scheme

In the *Kaiser Findings*, this Court found that Pfizer intentionally engaged in a fraudulent nationwide marketing campaign regarding Neurontin. *Kaiser Findings* at *13, *17. The existence of the scheme was also, both "logically" and "practically," a necessary component of the jury's finding that Pfizer violated RICO with respect to its promotion of Neurontin for bipolar. On appeal, Pfizer did "not challenge the conclusions of the jury and district court that it engaged in a fraudulent scheme with respect to its promotion of Neurontin for off-label uses." *Kaiser*, 712 F.3d at 33. In fact, Pfizer did not appeal any of the findings with respect to the nationwide fraudulent marketing scheme. The fact that Pfizer did engage in such a scheme may be law of the case at this juncture. *See Reconsideration Decision* 2011 WL 1882870 at *12 (holding that "Pfizer did engage in a nationwide fraudulent marketing campaign...").

This Court made detailed findings describing fraudulent marketing of Neurontin.[8] Those findings are collected in Part B of the motion to which this memorandum is attached. As noted *supra*, Pfizer was on notice that such findings were intended to have preclusive effect. The fact that the nationwide fraud issue for Kaiser is identical to the nationwide fraud issues for the Class Plaintiffs is particularly obvious; a nationwide fraudulent marketing campaign is an exact match for plaintiffs that have

---

[8] In finding that Pfizer engaged in the fraudulent marketing of Neurontin for the treatment of bipolar disorder, this Court ruled that: "[i]n addition to fraudulent detailing, Pfizer sponsored at least two fraudulent supplements, engaged in a fraudulent publication strategy by publishing only positive information and suppressing negative; conducted at least two fraudulent continuing medical education programs; and made a fraudulent representation, through a half-truth, to the Cochrane Review." *Kaiser Findings* at *17.

already been found "typical" of a nationwide class.[9] The extent of the nationwide fraudulent marketing campaign was vigorously litigated. And but for the nationwide fraud findings, this Court would not have awarded Kaiser damages for 99.4% of its prescriptions – they were absolutely necessary to the judgment.

### C.  Bipolar Prescriptions Attributable to Pfizer's Promotion

Over two days of testimony at trial, Kaiser offered the testimony of Professor Meredith Rosenthal to quantify the impact of Pfizer's promotion of Neurontin on the units of Neurontin sold nationwide. "Dr. Rosenthal used 'gold standard' national data on Neurontin and other anti-epileptic drugs from IMS Health and Verispan" to "link[] national data on Pfizer's promotional spending with sales." *Kaiser Findings* at *32. Her "method of analysis 'looks at patterns of actual behavior, aggregate patterns of promotion, and makes the connection between the two, both to assess whether there was exposure and its impact.'" *Id.* at *17 (quoting Trial Transcript, vol. 11, p. 17). "Using these methods, she 'estimate[d] and calculate[d] a time series model that…quantif[ied] the specific contribution of promotion to sales.'" *Id.* at *17 (quoting Trial Transcript, vol. 10, p. 144).

Only after Dr. Rosenthal's percentage of bipolar prescriptions attributable to Pfizer's promotional efforts were subjected to cross-examination and competing testimony by Pfizer's expert did this Court adopt her conclusions. *Kaiser Findings* at *32-33. This 99.4% figure has been fully litigated, and was necessary to the *Kaiser* judgment. The percentage of bipolar prescriptions caused by Pfizer's promotion is also an issue in the Class Plaintiffs' case – and as this Court found, Dr. Rosenthal's analysis was based

---

[9] *See* Fed. R. Civ. P. 23(a) rulings in *In re Neurontin Mktg., Sales Practices and Prods. Liab. Litig.*, 257 F.R.D. 315, 318-322 (D. Mass. 2009). NB: Class Plaintiffs have expressly requested that the motion for which this memorandum is support not be decided until after a class has been certified; nonetheless, Pfizer no longer contests the Fed. R. Civ. P. 23(a) factors, including typicality.

on "'gold standard' national data on Neurontin." *Kaiser Findings* at \*32. Only after finding that the "assumption that Kaiser's patient population and physician distribution are similar to the national mix" was "reasonable" did this Court find that 99.4% of the bipolar prescriptions were caused by Pfizer's promotion. *Id.* at \*32. The Class Plaintiffs are also similar to the national mix, but, should a national class of TPPs be certified, that national class (sans Kaiser) would also reflect the national mix. Accordingly, the 99.4% percentage of bipolar prescriptions caused by Pfizer's promotion should have preclusive effect in the Class Plaintiffs' case, as well as this Court's rulings in the *Kaiser Findings* which support that conclusion (included in Part C of the motion to which this memorandum is attached).[10]

Even more importantly, the First Circuit has already signed off on the use of the 99.4% evidence for a national class, because Pfizer objected to its use for Kaiser, a single TPP. In response to Pfizer's challenge, the First Circuit ruled that "the use of national drug data was reasonable." *Kaiser*, 712 F.3d at 44. But it also ruled that the finding that Pfizer caused 99.4% of bipolar prescriptions of Neurontin through its promotion "applied to Kaiser **as well as all other payors across the country**." *Id.* at 30, n. 5 (emphasis added).

---

[10] Pfizer will doubtless argue that one of the *Parklane* exceptions applies with respect to the 99.4% figure, because they believe that the jury award (83.45%, according to Pfizer) is a conflicting judgment. But the jury was not instructed that its award should have reflected a percentage of prescriptions, and it could have taken anything into account – including Pfizer's failure to mitigate evidence, particularly considering the unique control exerted by Kaiser over its own physicians (very few TPPs employ their own physicians). Indeed, Pfizer specifically argued in its closing argument that if the jury were to award damages, the damages should be lessened by Pfizer's mitigation arguments, and because Dr. Hartman had a column in his analysis about interest. *See* Trial Transcript, vol. 20, 136-38. Only one *Kaiser* finder of fact  -- this Court -- specifically found a figure with respect to a percentage of bipolar prescriptions caused by fraud. The singular finding with respect to the percentage of prescriptions caused by Pfizer's promotion is within the *Kaiser Findings*.

**D.  Bipolar Prescriptions Attributable to Pfizer's Fraudulent Promotion**

The Court did not stop at finding the percentage of bipolar prescriptions caused by Pfizer's promotion. After consideration of all of the evidence and finding that Pfizer engaged in a nationwide fraudulent promotion scheme (*see* Motion, Part D), this Court determined that 99.4% of bipolar prescriptions were caused by *fraudulent* promotion:

> Defendants criticize Professor Rosenthal's analysis because it assumes that the promotional spending on off-label marketing was the same as the promotional spending on fraudulent off-label marketing. This leap is less obvious because, in some circumstances, off-label marketing can be truthful. However, based on the compelling evidence in this case, I conclude that the assumption is reasonable, given the pervasive nature of the publication fraud that infected the nationwide sources of information available to all physicians.

*Kaiser Findings* at *33. This Court then went on to adopt Dr. Rosenthal's conclusion that 99.4% of bipolar prescriptions "were caused by Pfizer's fraudulent marketing of Neurontin." *Id.*

The *Kaiser* holding that 99.4% of prescriptions were caused by Pfizer's fraudulent promotion is not clear only from these explicit findings; the holding was also "logically or practically, a necessary component of the decision reached," because one cannot truthfully promote an ineffective drug,[11] and because this Court awarded Kaiser damages for 99.4% of its bipolar prescriptions. *See Dennis*, 254 F.3d at 329. The holding that 99.4% of bipolar prescriptions were caused by fraud was vigorously defended by Pfizer, and, based on national data, it is in substance identical to the issue of how many

---

[11] It would be difficult to push a drug for a particular condition without stating or implying that the drug worked as a treatment for that condition. "Despite the fact that the scientific evidence…did not support the use of Neurontin for the treatment of bipolar disorder, defendants nonetheless marketed the drug for that indication. Parke-Davis medical liaisons were trained to tell physicians that Neurontin was 'highly effective' for bipolar disorder, and they failed to disclose both that there was no scientific support for that indication and that the FDA had found an associated increased risk of suicide and depression for Neurontin bipolar." *Kaiser Findings* at *13.

of the Class Plaintiffs' bipolar prescriptions were caused by Pfizer's fraudulent

promotion. *See Manganella*, 700 F.3d at 591. The fact that Kaiser's lead liability theory

was a direct reliance theory does not matter; with respect to the *Kaiser Findings*, this

Court awarded damages not according to the direct reliance theory (which would have

reflected the 95% formulary compliance rate), but according to a theory that doctors

were affected directly (hence awarding damages for 99.4% of all bipolar prescriptions).

### E.  Neurontin's Efficacy for Bipolar

There were two types of findings made by this Court with respect to Neurontin's

efficacy for bipolar: the appropriate standard by which efficacy should be determined,

and whether the scientific evidence met that standard. With respect to the standard

itself, Pfizer argued, unsuccessfully, that Kaiser should be required to prove that

Neurontin was not effective for the treatment of any relevant patient. But this Court

held that such a standard was not "adopted by the FDA or the standard generally

accepted by the scientific community." For those reasons, it "reject[ed] [Pfizer's]

proposed standard under Daubert." *Kaiser Findings* at *35. Instead, this Court adopted

the standard proffered by Kaiser: "two DBRCTs to prove the efficacy of a drug because

it is important to duplicate results." *Id.* Accordingly, the Court found that Kaiser's

proposed standard was "a reliable standard followed by the scientific community." *Id.*

The standard by which efficacy was then determined was clearly litigated and

necessary to the determination of efficacy, which was itself at the core of the *Kaiser*

litigation – just as it is for the Class Plaintiffs.

As to Neurontin's efficacy for bipolar, this Court did find that the scientific

evidence did not meet the adopted standard. It held that of the "numerous scientific

studies" conducted by Pfizer, "none…provided evidence that Neurontin was effective

for treating bipolar." *Id.* at *12. It specifically found that "there is no reliable scientific

14

evidence that Neurontin is effective for bipolar disorder…" *Id.* at *34. And after a thorough examination of each of the individual DBRCTs that had been misrepresented or suppressed by Pfizer, the Court found "that there is no scientifically acceptable evidence that Neurontin is effective in the treatment of bipolar disorder." *Id.* at *38. A full list of the efficacy findings for which the Class Plaintiffs seek preclusion is included in Part E of the motion to which this memorandum is attached. These findings were necessary to the *Kaiser* judgment, and they were, logically or practically, a necessary component of the jury's liability finding.

In the absence of a collateral estoppel ruling, the Neurontin efficacy issues will need to be relitigated by the Class Plaintiffs, using identical evidence. And Pfizer cannot argue that these issues were not fully litigated, either; Pfizer's counsel specifically put the question to the jury.[12] As the First Circuit acknowledged, Kaiser produced efficacy evidence, and "Pfizer then produced its own evidence to attempt to rebut Kaiser's evidence." *Kaiser*, 712 F.3d at 48. Pfizer's problem is not that it didn't litigate the efficacy issues, but that "[t]he jury and court rejected [its] argument." *Id.*

## V.    CONCLUSION

As to the five groups of issues identified by the Class Plaintiffs, the merits of a collateral estoppel order could not be more compelling. These very same issues were the necessary foundation of Kaiser's case against Pfizer before *two* fact finders, and the foundation of the Class Plaintiffs' case is substantively identical. And gone is any concern about the valid or binding nature of these findings, as Pfizer has now exhausted all efforts to appeal.

---

[12] "So *the question in this case* is: Did Pfizer or Parke-Davis do something that causes doctors to prescribe these drugs for off-label purposes *where they didn't do any good and Kaiser actually bought sugar pills*? Trial Transcript, vol. 20, p. 118 (Pfizer closing argument) (emphasis added).

Pfizer vigorously, fully and actually litigated these issues in an unusually thorough five-week trial. Pfizer not only had a full opportunity to defend itself on these issues; it was on actual prior notice that the Kaiser Trial could decide these issues for good. This Court could not have been clearer that findings from the bellwether Kaiser Trial would have application to subsequent litigation. Accordingly, this Court should grant the Class Plaintiffs' Motion to Preclude Litigation of Issues and Facts Determined by the *Kaiser* Finders of Fact at Trial.

Dated:  April 3, 2014                              Respectfully Submitted,

                                                  By:

                                                  /s/ Thomas M. Greene
                                                  Thomas M. Greene, BBO # 210020
                                                  Greene LLP
                                                  One Liberty Square, 12th Floor
                                                  Boston, MA 02109
                                                  tgreene@greenellp.com

                                                  /s/ Don Barrett
                                                  Don Barrett
                                                  Barrett Law Office
                                                  404 Court Square North
                                                  P.O. Box 987
                                                  Lexington, MS 39095
                                                  dbarrett@barrettlawgroup.com

                                                  /s/ Daniel Becnel
                                                  Daniel Becnel, Jr.
                                                  Law Offices of Daniel Becnel, Jr.
                                                  106 W. Seventh Street
                                                  P.O. Drawer H
                                                  Reserve, LA 70084
                                                  dbecnel@becnellaw.com

<u>/s/ Elizabeth J. Cabraser</u>
Elizabeth J. Cabraser
Lieff Cabraser Heimann &
  Bernstein, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339
ecabraser@lchb.com

<u>/s/ James Dugan</u>
James Dugan
The Dugan Law Firm
One Canal Street
365 Canal St., Suite 1000
New Orleans, LA 70131
jdugan@dugan-lawfirm.com

<u>/s/ Thomas M. Sobol</u>
Thomas M. Sobol
Hagens Berman Sobol Shapiro LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA  02142
tom@hbsslaw.com

*Members of the Class Plaintiffs'*
*Steering Committee*

## CERTIFICATE OF SERVICE

I, Thomas M. Greene, hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on April 3, 2014.

Dated: April 3, 2014                    <u>/s/ Thomas M. Greene</u>
                                        Thomas M. Greene