**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| In re: NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1629<br><br>Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO:<br><br>HARDEN MANUFACTURING CORPORATION; LOUISIANA HEALTH SERVICE INDEMNITY COMPANY, d/b/a BLUE CROSS/BLUE SHIELD OF LOUISIANA; ASEA/AFSCME LOCAL 52 HEALTH BENEFITS TRUST; JAN FRANK WITYK; and GARY VARNAM, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>PFIZER INC. and WARNER-LAMBERT COMPANY,<br>Defendants. | Judge Patti B. Saris<br><br>Mag. Judge Leo T. Sorokin |

**CLASS PLAINTIFFS' RESPONSE TO PFIZER'S POST HEARING SUBMISSION**

Class Plaintiffs respond to four points raised in Pfizer's post hearing submission.

**A. Plaintiffs need not prove that every single class member is damaged.**

**1. Class Plaintiffs bear no obligation to prove that the class is devoid of uninjured members at the class certification stage.**

Pfizer effectively argues that if even a single class member were not actually injured by Pfizer's rampant fraud, then a class cannot be certified. But this is not the law: "[T]he inclusion of uninjured class members is not fatal to class certification."[1] The First Circuit said as much in *Gintis*.[2] *Wal-Mart* itself did not require that *every* class member be injured.[3] In fact, a class "will often include persons who have not been injured by the defendant's conduct… [s]uch a possibility or indeed inevitability does not preclude class certification."[4] Even after *Wal-Mart*, many courts have concluded that the presence of some small number of potentially uninjured class members is irrelevant to class certification.[5] Plaintiffs need not identify every potential class member before certification.[6]

---

[1] *In re Nexium Antitrust Litig.*, 2013 WL 6019287, *11 (D. Mass. Nov. 14, 2013) (Young, J.) (*citing DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1198 (10th Cir. 2010); *Mims v. Stewart Title Guar. Co.*, 590 F.3d 298, 308 (5th Cir. 2009); *In re Flonase Antitrust Litig.*, 284 F.R.D. 207, 226-27 (E.D.Pa. 2012) (post *Wal-Mart*); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2013 WL 5391159, *6 (N.D.Ca. Sept. 24, 2013) (post *Wal-Mart*, plaintiffs "need not prove, at the class certification stage, that every single class member was in fact injured in a specific way"); *see also* Reply at p. 1-3.

[2] *Gintis v. Bouchard Transp. Co., Inc.*, 596 F.3d 64, 66-67 (1st Cir. 2010) (Souter, A.J., sitting by designation) ("[T]he focus will be on the plaintiffs' claim that common evidence will suffice to prove injury, causation and compensatory damages for at least *a very substantial proportion* of the claims that can be brought by putative class members.") (emphasis added).

[3] The *Wal-Mart* Court stated that commonality could have been met via a showing that "95 percent of the employment decisions" at issue were infected by stereotyping – the Court did not say 100%. *Wal-Mart* at 2553.

[4] *Kohen v. Pacific Inv. Management Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009); *see Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 305 (3d Cir. 2011) (en banc); *In re Neurontin Antitrust Litig.*, 2011 U.S. Dist. LEXIS 7453, *36-37 n.23 (D.N.J. Jan. 25, 2011) ("widespread injury to the class" sufficient).

[5] *See, e.g., In re Whirlpool Corp. Front-Loading Washer Prods. Liability Litig.*, 722 F.3d 838, 855 (6th Cir. 2013); *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 798-99 (7th Cir. 2013); *K-Dur*, 686 F.3d at 222; *In re Cathode Ray Tube (CRT) Antitrust Litig.*, MDL 1917, 2013 WL 5391159, at *5 (N.D. Cal. Sept. 24, 2013); *George v. Nat'l Water Main Cleaning Co*., 286 F.R.D. 168, 181-83 (D. Mass. 2012).

[6] *See* Class Plaintiffs' Reply Memorandum in Support of Their Post-Mandate Motion for Class Certification, 04-cv-10981, ECF No. 4179 (Oct. 21, 2013) ("Pfizer's argument puts the cart before the horse; class representatives need not identify each and every member of a proposed class before it can be certified.").

As the Supreme Court pointed out in *Amgen* – decided after *Wal-Mart* – the mere chance that some class members' claims may ultimately fail does not prevent class certification.[7] In a case decided earlier this year, Judge Posner of the Seventh Circuit explained why this is the case, rejecting an argument that a class could not be certified because it included uninjured members:

> To require the district judge to determine whether each of the 150 members of the class has sustained an injury – on the theory that if 140 have not, and so lack standing, and so should be dropped from the class, certification should be denied and the remaining plaintiffs be forced to sue (whether jointly or individually) – would make the class certification process unworkable; the process would require, in this case, 150 trials before the class could be certified. The defendants are thus asking us to put the cart before the horse. How many (if any) of the class members have a valid claim is the issue to be determined *after* the class is certified.[8]

The procedure anticipated by Judge Posner in *Parko* is also appropriate here. Overinclusiveness should not be a problem for the Class Plaintiffs, because they have defined the proposed class a certain way. But should there be more than a *de minimis* number of TPPs within the class definition that are not injured, the class can simply be redefined later, as appropriate.

**2. Pfizer will not face any additional liability if the class includes one or two members who were not injured by Pfizer's fraud.**

We now turn from the class certification phase to trial. Pfizer insists that permitting hypothetical uninjured class members to be swept up into a class trial would result in class members recovering who would otherwise have "go[ne] home empty handed" in an individual trial. But Pfizer has not actually identified an uninjured class member, they merely surmise that they might exist; undiscovered but possibly lurking out there somewhere … like Sasquatch,

[7] *See Amgen Inc. v. Conn. Retirement Plans and Trust Funds,* 133 S.Ct. 1184, 1196 (2013) ("[plaintiffs] need not, at that [class certification threshold], prove that the predominating question will be answered in their favor.").

[8] *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1084-85 (7th Cir. 2014), *reh'g denied* (Mar. 10, 2014) (Posner, J.) (emphasis in original).

leprochauns, or a tasty vegan muffin. Arguments woven from gossamer strands of speculation and surmise cannot tip the decisional scales of class certification.[9]

More to the point, the presence of these mythical uninjured class members *makes no difference to Pfizer's total potential exposure.* Here, the total amount of damages to the TPP bipolar class is $623,312,892. Dr. Hartman calculated that total amount of damages to the TPP bipolar class in the aggregate, based on Professor Rosenthal's percentages. The amount of damages to the class caused by Pfizer's fraudulent conduct – or, better to say, the ceiling on the total amount of single damages that Pfizer could ever have to pay in the class case – will not change depending on whether a particular TPP is included in the class or not. The presence of an uninjured TPP will not expose Pfizer to so much as one additional dollar of liability beyond that aggregate number.

This resolves Pfizer's professed concern that mythical uninjured class members will subject it to any additional liability. We address below how this total damages figure can be adjusted to reflect the presence of any uninjured class members.

**B. The Supreme Court held that Rule 23 does not violate the Rules Enabling Act.**

Pfizer next argues that certifying a class that includes uninjured members will violate the Rules Enabling Act. Pfizer is wrong.

The Supreme Court held in *Shady Grove Orthopedic Associated, P.A. v. Allstate Ins. Co* that whether a Federal Rule violates the Rules Enabling Act is assessed "by consulting the Rule itself, and not its effects in individual applications."[10] A Rule is *not* "valid in some cases and invalid in others."[11]

---

[9] *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 298 (1st Cir. 2000).

[10] *Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 410 (2010).

[11] *Id.* at 409.

The Court explained that the validity of a Rule is independent of whether it affects a party's substantive rights:

> The test is not whether the rule affects a litigant's substantive rights; most procedural rules do. What matters is what the rule itself regulates: If it governs only the matter and means by which the litigants' rights are enforced, it is valid; if it alters the rules of decision by which the court will adjudicate those rights, it is not.[12]

The Court concluded that Rule 23 falls within the Rules Enabling Act's authorization.[13]

Pfizer cites *Corder v. Ford Motor Co.* and *Franco v. Conn. Gen. Life Ins. Co.*, both of which decline to certify classes of purchasers for the very reasons rejected by the First Circuit here: a perceived need for individualized inquiries.[14] Both cases make only passing references to the Rules Enabling Act, citing dicta from *Wal-Mart Stores, Inc. v. Dukes*.[15] Whatever the *Wal-Mart* majority may have intended to convey with its off-hand comment, it very likely did not intend to overturn *Shady Grove* or the substantial body of earlier case law interpreting the Rules Enabling Act (as evidenced by its failure to refer to any of those earlier cases).[16]

---

[12] *Id.* at 407.

[13] *Id.* at 408.

[14] *Compare Corder v. Ford Motor Co.*, 283 F.R.D. 337 (2012) ("the need to determine the primary purpose for each customer's purchase requires an individualized inquiry that threatens to overwhelm any trial on the matter") and *Franco v. Conn. Gen. Life Ins. Co.*, 289 F.R.D. 121, 136 (2013) ("the Court is still left with the question of how Subscriber Plaintiffs could establish abuse of discretion based on common evidence;" "a proper review must take into consideration the unique facts and circumstances of each benefits determination.") *with In re Neurontin Marketing and Sales Practice Litigation*, 712 F.3d 60, 68-69 (2013) ("*Harden*") ("The Harden plaintiffs need not prove causation through the testimony of individual doctors. The combination of the aggregate evidence and the circumstantial evidence was enough for the Harden plaintiffs to overcome summary judgment;" "Ultimately, it is a jury's task to weigh the individual testimony presented by Pfizer against the aggregate and circumstantial evidence presented by the Harden plaintiffs.").

[15] *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) (stating, in its entirety, "[b]ecause the Rules Enabling Act forbids interpreting Rule 23 to 'abridge, enlarge or modify any substantive right,' 28 U.S.C. § 2072(b); see *Ortiz*, 527 U.S., at 845, 119 S.Ct. 2295, a class cannot be certified on the premise that Wal-Mart will not be entitled to litigate its statutory defenses to individual claims," citing not other Supreme Court case law addressing the Rule Enabling Act). Of course here, in contrast to *Wal-Mart*, plaintiffs fully acknowledge that Pfizer is entitled to defend itself by presenting some individual evidence. *See infra.*

[16] *See also* Class Plaintiffs' Memorandum of Law in Support of Class Plaintiffs' Post-Mandate Motion for Class Certification, 04-cv-10981, ECF No. 4154 (Sept. 3, 2013) at p. 19-23.

### C. What if the jury determines that Pfizer's fraud caused some amount *less* than 99.4% of bipolar prescriptions?

In briefing and at oral argument, Pfizer has argued that the *Kaiser* jury awarded damages for just 83.45% of Neurontin bipolar prescriptions. That's not true: they awarded a damages number lower than that requested by Kaiser, but may have agreed with Kaiser's evidence regarding the percentage of prescriptions influenced by Pfizer's misrepresentations before lowering the damages figure due to Pfizer's affirmative defenses.[17] Nonetheless, if the question is put to a jury, the percentage of prescriptions found by the jury to have been caused by fraud could be lower than 99.4%.

The Court posed a spot-on hypothetical during oral argument: what happens if the jury determines that "only" 80% of bipolar prescriptions were caused by Pfizer's fraud? Pfizer argues that such a result would violate the Constitution and Acts of Congress; we dispensed with those arguments above. In reality, that scenario affects three aspects of the case: (i) calculation of damages, (ii) allocation of money after there is a judgement or settlement for the class, and (iii) class membership. All three aspects can be tailored to accommodate the Court's concern.[18]

*Calculation of damages.* The total damages amount put forward by Class Plaintiffs' expert for the TPP bipolar class is $623,312,892. If the jury finds that Pfizer is liable for a lesser

---

[17] The jury was asked to write down a dollar figure, not determine the percentage of prescriptions caused by fraud. *See* Special Jury Verdict Form, 04-cv-10981, ECF No. 2760 (Mar. 25, 2010). As this Court expressly instructed the jury, they were free to "offset" damages by the cost of cheaper alternative medications or deny recovery for damages Kaiser could have avoided had they taken reasonable efforts to mitigate damages. *See* Trial Transcript, vol. 20, pp. 62-63, March 23, 2010 (ECF No. 3491). In fact, counsel for Pfizer echoed these instructions in closing argument. *See id.*, pp. 136-38. We cannot know what was in the mind of the jury, or whether they determined that 99.4% of the prescriptions were caused by fraud before offsetting damages. But we need not guess at the Kaiser figure, because we know this Court's ruling: "the Court accepts Dr. Rosenthal's analysis of the percentage of Neurontin prescriptions caused by defendants' off-label promotion. By indication, those percentages are as follows: (1) bipolar disorder: 99.4%..." Findings of Fact and Conclusions of Law (the "*Kaiser Findings*"), 04-cv-10739, ECF No. 3602, 2011 WL 3852254, *58 (D. Mass. Aug. 31, 2011). *See* Memorandum of Law in Support of Class Plaintiffs' Motion to Preclude Relitigation of Issues and Facts Determined by the *Kaiser* Triers of Fact at Trial, pp. 11-14, 04-cv-10981, ECF No. 4242 (Apr. 3, 2014).

[18] We note, though, that class counsel believes that the Court's earlier determination that 99.4% of all bipolar prescriptions were caused by Pfizer's fraud precludes such a scenario.

percentage of prescriptions, it will reduce its damages award. Supposing that the jury concludes that "only" eight out of ten prescriptions paid for by TPP class members were caused by Pfizer's fraud, the aggregate damages amount will be reduced by 20%. If the jury concludes that "only" 50% of prescriptions paid for by TPP class members were caused by Pfizer's fraud, then the aggregate damages amount will be reduced by 50%. Pfizer will pay in proportion to the injuries it actually caused.

*Allocation of damages.* How the aggregate amount of damages awarded by the jury is actually allocated among class members is a different matter. There, once a jury found that it was more likely than not that Pfizer's fraud caused bipolar prescriptions and an aggregate damages award is made, the class can use simple statistics to allocate the damages award fairly and to significantly reduce the likelihood that an uninjured class member will recover.[19]

*Class membership.* If the jury finds that only 80% of bipolar prescriptions were caused by fraud, the implications on damages and allocation of damages are very straightforward. How a lower fraud percentage would affect class membership is also not complicated, however. A reduction in fraudulent prescriptions to 80% will *not* mean that 20% of TPPs in the class will be uninjured; many if not most TPPs in the class reimbursed for enough patients' prescriptions to be injured anyway.[20] TPPs with multiple patients who were prescribed Neurontin for bipolar

[19] Class plaintiffs wonder why, given that Pfizer's total exposure is capped and that the actual damages award will be adjusted in proportion to Pfizer's liability, Pfizer would have any stake in how that total damage amount is allocated among class members. We leave that question for another day.

[20] At hearing, this Court voiced a concern that if a TPP had three patients, this type of analysis could be complicated if the prescriptions for all three patients were written by the same doctor. In other words, this Court appears to be concerned that some multi-patient TPPs could end up being similar to single-patient TPPs, which would be important if all prescriptions were written by a single prescriber who was not affected by Pfizer's fraudulent marketing scheme. But it is *extremely* unlikely that a multi-patient TPP would have all of the prescriptions it reimbursed written by a single doctor, because the class TPPs do not employ their own doctors (unlike Kaiser). In the three-patient scenario, it is extremely likely that each of the three patients had a different doctor. The three patients would be no more likely to have the same doctor than three people covered by separate TPPs in the same geographic area, because just as most doctors prescribe for patients covered by a variety of TPPs, patients covered by a particular TPP will be treated by a variety of doctors.

("multi-patient TPPs") will always be more likely to be injured than the fraud percentage; at 80% of precriptions caused by fraud, even a TPP with just two Neurontin bipolar patients will have a 96% likelihood of being injured.[21] Should the jury return a fraud percentage of 80%, therefore, the Court may still find that the number of uninjured TPPs within the proposed class definition is *de minimis*.

But even if the jury decided that the percentage of prescriptions caused by fraud was lower, the class could simply be redefined to ensure that the number of uninjured TPPs in the redefined class was still *de minimis*.[22] The class could be redefined using a covered lives threshold high enough to make it very likely that all TPPs who stood to recover were almost certainly injured. Given that Pfizer has not, to date, presented any evidence that any significant number of TPPs within the proposed class definition are uninjured, there appears to be very little risk that this will come to pass.

**D. Pfizer's math doesn't add up.**

During oral argument, and again in their post-hearing brief, Pfizer claimed that 73.85% of self-insured employers covered as little as only one bipolar patient. Pfizer's math is simply wrong, *and* based on the wrong data. The parties can disagree about the facts of the law, but there is no basis to disagree on simple arithmetic. Three errors were made with regard to the table on page 4 of the Memorandum of Law in Opposition to Class Plaintiffs' Motion for Leave

---

[21] This is because there would be an 80% chance that *each* patient's prescriptions were caused by fraud. One can calculate the odds that a single patient's prescriptions were caused by fraud at 80%. If the TPP with two Neurontin bipolar patients has their first patient fall in the other 20%, they still get to roll the die a second time for their second patient, meaning 80% of the 20% are still injured (96% overall). Note that we're not saying a TPP rolls the die for each individual *prescription*, as the prescriptions could be written for a single patient by a single doctor. Instead, when we discuss single-patient TPPs or multi-patient TPPs, we're discussing the fact that a TPP that reimbursed prescriptions for multiple *patients* almost certainly was harmed by Pfizer's fraud, as each patient almost certainly had their own doctor.

[22] For this purpose, a special jury verdict form could be crafted to include a percentage or number of Neurontin bipolar prescriptions caused by fraud.

to File a Second Reply Brief in Support of Their Fourth Motion for Class Certification (Dkt. No. 4205), on which this 73.85% figure appears to be based.

First, Pfizer used the number of *all* self-insured employers above 500 covered lives (18,311) as a starting point, crediting Dr. Conti. But Dr. Conti did *not* say that all self-insured employers above 500 covered lives were injured; in fact, she said just 9,875 were injured. In other words, *the 73.85% figure includes 8,436 zero-patient TPPs who aren't in the class*, and given that Pfizer's starting point was 18,311, removing the 8,436 zero-patient (non-class-member) TPPs causes Pfizer's percentage to drop precipitously. Because they used 18,311 as a starting point rather than 9,875, Pfizer's percentage is grossly overstated.[23]

Second, Pfizer did its math incorrectly. A group of TPPs with an average of one Neurontin bipolar patient will not *all* have exactly one Neurontin bipolar patient – some will have zero (and not be in the class), and some will have two or more (and will therefore definitely be injured). Pfizer presents the right column of its chart as if it shows ranges, but they are averages.[24] And assuming all members of a group with an average of one will have exactly one is junk math that improperly inflates the number of possible single-patient TPPs.[25]

---

[23] This is particularly apparent from the table itself, which separates self-insured employers into tiers based on number of covered lives. Both of the first two tiers suggest that at least some of the self-insured employers included could have "0" bipolar patients. Self-insured employers with zero Neurontin bipolar patients are, by definition, not in the proposed class.

[24] The tiers of covered lives in Pfizer's census data didn't quite match the tiers that Dr. Conti came up with, so Pfizer resorted to giving ranges, and Pfizer's chart makes it look like all self-insured employers in a given bracket of covered lives are within that range (e.g., "1 to 3"). But they are not ranges --it is absolutely possible that some self-insured employers between 1,000 and 1,499 covered lives will have greater than 3 Neurontin bipolar patients. Instead, they are averages, presented improperly as ranges, and Pfizer does not account for the fact that some TPPs will have a greater-than-average number of Neurontin bipolar patients.

[25] Moreover, Pfizer did not even properly calculate the averages they purport to depict, because while they claim to have based their calculations on the data of Class Plaintiffs' expert Dr. Rena Conti, they misused those calculations. In Table 2, at page 24 of her report, Dr. Conti reports that the incidence of a patient being treated for bipolar with Neurontin during the period of her data is 0.5%. This is the same as 1 out of 200. Thus, self-insured employer plans covering between 500-750 lives, on average had between 2 to 4 patients who were prescribed Neurontin for bipolar, not 0 to 1 as Pfizer claims in its intentionally misleading chart. Indeed, when the chart is calculated with the proper incidence of Neurontin's bipolar use, it is clear that the vast majority of the very smallest

Third, Pfizer's maximum number is not a realistically possible number. Pfizer says 73.85% TPPs have "as few as one" patient (or "as little as one"). Yet, we can know that the actual number is much lower, for a third reason that could be termed a "lottery phrasing error." The odds of winning the Powerball grand prize are about 1 in 175 million. What if 200 million people entered? It would be true to say that there might be "as many as" 200 million winners – yet we can know with certainty that there will not be. Similarly, if the maximum percentage of single-patient TPPs were 73.85% (it's lower than that, for the two reasons above), it would be technically true but *highly misleading* to imply that there's a realistic chance that *all* of those TPPs were single-patient TPPs. If 73.85% of self-insured employers have a *chance* of being a single-patient TPP, that doesn't mean there is any realistic chance that *all* will be single-patient TPPs – and this "lottery phrasing error" is a third reason why the true percentage of single-patient TPPs is much lower.

Pfizer's post hearing submission goes a step further than earlier briefs and argument; Pfizer now uses its flawed 73.85% number to come up with the claim that "7,307 putative class members [] covered as little as one [bipolar] patient."[26] It now abandons the "as many as" language from the earlier brief, presenting its total as a true percentage, rather than a maximum (i.e., assuming all of the TPPs which won the "lottery" had had exactly one Neurontin bipolar patient). But the 73.85% figure was based on a starting point that included *all* TPPs of a certain size, many of which are not within the class definition because they had no Neurontin bipolar patients. Put differently, Pfizer came up with a (flawed) percentage by using self-insured employers, but then went back and applied that (flawed) percentage to our approximate number of total self-insured employers in the class.

---

plans identified by Pfizer, those between 500 and 750 members, had multiple Neurontin bipolar patients, and were therefore were almost certainly injured. Pfizer's "73.85%" is the product of cynical statistical manipulation.

[26] Pfizer Br. at p. 3.

Pfizer has done its math improperly in several meaningful ways in arrive at this 73.85 percentage, which it has the gall to credit to Class Plaintiffs' expert. The fact that it had to make so many meaningful errors in arriving at that number is telling. The true percentage of single-patient TPPs is much, much lower, and for all its errors, Pfizer's bad math should be discounted.

Dated: April 9, 2014

Respectfully Submitted,

By:

/s/ Thomas M. Sobol
Thomas Sobol, BBO No. 471770
Hagens Berman Sobol Shapiro LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
Tel. (617) 482-3700
Fax (617) 482-3003
tom@hbsslaw.com

/s/Don Barrett
Don Barrett
Barrett Law Office
404 Court Square North
P.O. Box 987
Lexington, MS 39095
dbarrett@barrettlawgroup.com

/s/ Thomas M. Greene
Thomas M. Greene
Green LLP
One Liberty Square, 12th Floor
Boston, MA 02109
tgreene@greenellp.com

/s/Daniel Becnel
Daniel Becnel, Jr.
Law Offices of Daniel Becnel, Jr.
106 W. Seventh Street
P.O. Drawer H
Reserve, LA 70084
dbecnel@becnellaw.com

/s/Elizabeth J. Cabraser
Elizabeth J. Cabraser
Lieff Cabraser Heimann & Bernstein, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339
ecabraser@lchb.com

/s/James Dugan
James Dugan
The Dugan Law Firm
One Canal Street
365 Canal Street, Suite 1000
New Orleans, LA 70131
jdugan@dugan-lawfirm.com

**CERTIFICATE OF SERVICE**

I, Thomas M. Sobol, hereby certify that Class Plaintiffs' Response to Pfizer's Post Hearing Submission was filed through the CM/ECF system, sent electronically to the registered participants as identified on the Notice of Electronic Filing on April 9, 2014.

/s/ Thomas M. Sobol