UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE NEURONTIN MARKETING AND SALES PRACTICES LITIGATION | ) ) ) | MDL DOCKET NO. 1629 MASTER CIVIL ACTION NO. 04-10981 |
| THIS DOCUMENT RELATES TO:  ALL ACTIONS | ) ) ) ) ) ) ) | HONORABLE PATTI B. SARIS, UNITED STATES DISTRICT JUDGE |

**SUPPLEMENTAL MEMORANDUM IN SUPPORT OF PRELIMINARY APPROVAL OF SETTLEMENT AND IN RESPONSE TO THE COURT'S ORDER OF JULY 2, 2014**

This memorandum responds to the order of this Court dated July 2, 2014.  The class plaintiffs, along with the plaintiffs in *Assurant Health, Inc., et al. v. Pfizer Inc., et al.*, No. 05-10535-PBS (D. Mass.) (the "Assurant plaintiffs[1]"), briefly describe (i) the damage theories of the fraudulent marketing claims and the Assurant plaintiffs' antitrust claims, (ii) the lack of any relationship between the proposed settlement of the Assurant plaintiffs' claims (as part of the proposed settlement before this Court) and the entirely separate settlement reached between Pfizer and a class of direct purchasers in the Neurontin Antitrust MDL in the District of New Jersey, and (iii) how the proposed settlement here provides all settling parties with procedural safeguards and substantive fairness.[2]

---

[1] The Assurant Plaintiffs include:  Assurant Health, Inc.; Blue Cross and Blue Shield of Florida, Inc.; Louisiana Health Service & Indemnity Company; Blue Cross Blue Shield of Massachusetts; Blue Cross Blue Shield of Michigan; Blue Cross Blue Shield of Minnesota; CareFirst, Inc.; Excellus Health Plan, Inc.; Federated Mutual Insurance Company; Group Health Service of Oklahoma, Inc.; Health Care Service Corporation; Mutual of Omaha Insurance Company; Trustmark Insurance Company; Wellchoice, Inc. and Wellchoice Insurance of New Jersey, Inc. (now part of WellPoint, Inc.).

[2] *In re Neurontin Antitrust Litigation*, MDL No. 1479 (D.N.J.) (Hochberg, J.) (the "N.J. Antitrust MDL").

1

A.      **Procedural background of the Assurant plaintiffs' claims**

We start by providing the procedural background.  At bottom, all third party payor cases

against Pfizer for economic claims involving Neurontin have been pending in this Court,

including all of the claims made by the Assurant plaintiffs.[3]

On November 24, 2004, the Assurant plaintiffs filed their complaint against Pfizer, Inc.

and its wholly owned subsidiary, Warner-Lambert Company (collectively, "Pfizer") in the

Superior Court of New Jersey.  The Assurant plaintiffs' complaint alleged an over-arching

scheme involving unlawful marketing (of the type that this Court is familiar) *coupled with* claims

that Pfizer committed unlawful anticompetitive actions.

On January 5, 2005, Pfizer removed the action to the United States District Court for the

District of New Jersey, and subsequently a motion was filed with the Judicial Panel on Multi-

District Litigation to transfer the Assurant case.  Although the Assurant action asserted both

marketing and antitrust claims, and although an MDL was pending in the District of New Jersey

related to direct purchaser antitrust claims against Pfizer for Neurontin, the JPML chose *not* to

split the claims between the marketing claims in the MDL before this Court and the antitrust

claims pending before the district court in New Jersey (which claims at that time and all later

times only included direct purchaser matters).  Instead, on March 15, 2005, the JPML transferred

the Assurant case *in its entirety* to this Court for inclusion in the Marketing and Sales MDL.

In the spring of 2005, Pfizer moved in this Court for a stay of the Assurant case.  At that

time this Court already had under its supervision the sweeping class claims seeking relief for

claims of unlawful marketing of Neurontin, and those claims certainly encompassed the

_____

[3] The only exception to this are the claims of the Travellers group, whose claims are pending in federal court in
Connecticut.  The Travellers group claims fall within the scope of the proposed settlement class.  It is not known at
this time whether this group will opt out of the proposed settlement.

fraudulent marketing aspects of the Assurant case.  At the urging of this Court, the Assurant action was stayed by stipulation of the parties.

The Assurant case (including all aspects of its claims, including the antitrust portion) remained stayed for over 8 years.  The stay was not to be lifted until all appeals of claims of the MDL class plaintiffs were exhausted, including any petition before the United States Supreme Court.

Although the stay on the Assurant plaintiffs' case has been in effect since 2005, the class plaintiffs' counsel coordinated with counsel for the Assurant plaintiffs over the years, and Assurant counsel were active in discovery and later settlement efforts on behalf of the Assurant group.  No discovery or other proceedings were conducted that specifically addressed the Assurant plaintiffs' antitrust claims (although as we will see information about the general nature of antitrust claims against Pfizer for Neurontin could be gleaned seeing how the separate prosecution on behalf of a separate, non-overlapping group of direct purchasers in the New Jersey proceedings unfolded).

**B.      The antitrust theory of damages**

The Assurant plaintiffs' marketing allegations were essentially the same as those originally filed by the class plaintiffs.  They alleged Pfizer engaged in an unlawful off-label marketing campaign, creating a robust off-label market for Neurontin through encouraging the drug's use for the treatment of pain, bipolar disorder, migraines, dosing over 1800 mg, and other unapproved uses.

In addition to allegations of fraudulent marketing of Neurontin, the Assurant plaintiffs' complaint also alleged that Pfizer engaged in unlawful conduct intended to delay the entry of generic gabapentin.  The Assurant plaintiffs alleged that Pfizer delayed the entry of generic

Neurontin by procuring two patents related to Neurontin that it improperly listed in the FDA's

Orange Book, manipulated the patent approval process so that a third patent could delay generic

entry, and then filing multiple sham patent infringement actions against would-be generic

competitors over the patents.  The details of the claimed wrongdoing appear in the footnote

below.[4]

The Assurant plaintiffs alleged that if Pfizer had not delayed generic entry of Neurontin,

less expensive generic products would have entered the market before the 2004 date of actual

generic entry, perhaps as much as four years earlier.  They alleged that, under the laws of states

that provide for damages claims for indirect purchasers, their payments for Neurontin in those

states between as early as 2000 until 2004 (when Neurontin in fact went generic) would have

---

[4] First, the Assurant Plaintiffs allege Pfizer improperly listed three different patents in the FDA's Orange Book.

- The '476 Patent covered gabapentin monohydrate, a different formulation of gabapentin and not the formulation approved by the FDA and used for Neurontin.

- The '479 Patent claimed to cover the use of Neurontin for pain and neurodegenerative disorders, none of which were or are FDA-approved uses of Neurontin.

- The '482 Patent covered a low lactam or virtually impurity-free formulation of gabapentin.  This, like the subject of the '476 Patent, was a different formulation of gabapentin and not the formulation approved by the FDA and used for Neurontin.

Second, when potential competitors filed Abbreviated New Drug Applications ("ANDAs") with the FDA seeking to manufacture and market generic versions of Neurontin, Pfizer accused them of infringing the improperly-listed patents and filed patent litigation Pfizer knew to be without merit against the generic manufacturers.  Pfizer knew that by operation of FDA regulations, filing the patent litigation, regardless of its merit, would trigger an automatic thirty-month stay of the FDA's approval of any generic Neurontin and thereby postpone generic competition.

Third, Pfizer used the off-label market it had created by its fraudulent marketing of Neurontin in defense of its sham patent litigation.  Pfizer argued that generic competitors would violate one of its improperly-listed patents by inducing physicians to prescribe generic gabapentin for the off-label uses claimed by the '479 Patent – and for which Pfizer actively promoted.

Sham patent infringement litigation on this issue kept generic manufacturers tied up until the beginning of 2003, approximately two and a half years beyond the time when generic manufacturers could have entered the market.  By early 2003, however, Pfizer was already asserting that generic manufacturers would violate the '482 Patent, and continued to bind the hands of generic competitors until late 2004, when one generic manufacturer decided to bring its product to market even without a final decision on the '482 Patent claims.

been less, i.e., the difference between what was paid for Neurontin and what would  have been

paid for generic gabapentin.

        **C.**        **There is no overlap between the antitrust claims asserted by the Assurant Plaintiffs and those asserted by direct purchaser plaintiffs in the New Jersey antitrust MDL**

The Assurant plaintiffs are end-payor purchasers of prescription drugs.  As insurers who

reimburse for the provision of medications to their insureds, third-party payors are the last

entities in the chain of payment and distribution for pharmaceuticals.  They do not purchase

drugs directly from manufacturers like Pfizer.

A number of suits alleging antitrust claims against Pfizer relating to Neurontin were

transferred to and centralized in the Neurontin Antitrust MDL pending in New Jersey.  There, a

class action on behalf of indirect purchasers was voluntarily dismissed in April 2009.  Thereafter,

the New Jersey Antitrust MDL only involved antitrust claims on behalf of direct purchasers –

those entities who purchased Neurontin directly from Pfizer and who were the first entities in the

chain of sales and distribution.

On April 21, 2014, it was announced that Pfizer had entered into a $190 million

settlement in principle with a class of direct purchasers to resolve these claims.[5]  This proposed

settlement with a class of *direct* purchasers (essentially drug wholesalers) does not involve,

impact, or affect the Assurant plaintiffs (or any of the third party payors in the proposed

settlement class before this Court).  The litigation and subsequent settlement of direct purchaser

antitrust claims in the New Jersey Antitrust MDL thus has no effect on the claims of indirect

purchasers.  No overlap exists between the claims of the direct purchasers in the New Jersey

Antitrust MDL and the antitrust claims of the Assurant plaintiffs.  No third-party payor claims

---

[5] *See* Lawson, "Pfizer Strikes $190M Deal To Settle Neurontin Antitrust MDL,"
http://www.law360.com/m/classaction/articles/530226.

were included in the settlement reached between Pfizer and the class of direct purchasers in the

New Jersey Antitrust MDL.

> **D.** **Antitrust damages asserted by the Assurant Plaintiffs are broader than those resulting from a fraudulent marketing theory**

As part of the proposed settlement in this matter, Pfizer sought to resolve all claims

pending in this Court.  To have an effective release of those claims, Pfizer (understandably)

insisted that the settlement be structured to insure that the release covered all third party payor

claims, including those of the Assurant plaintiffs.[6]   This presented the not uncommon challenge

of structuring a settlement where, while the claims of all members of the proposed class share

significant commonality, some claims of some members of the class differ from those of other

members of the class.

Here, the claims of the Assurant plaintiffs overlap significantly with the rest of the class.

They alleged the same marketing fraud, and sought recovery for that fraud through overpayments

for Neurontin.  And even the Assurant plaintiffs' antitrust damage relief overlaps with the

damage relief sought for marketing fraud.  Both claims assert recovery for the units of Neurontin

purchased prior to 2004, while differing slightly in the measure:  on the fraud claim, recovery is

sought for either full purchase price paid on a Neurontin unit or for the difference between what

was paid and what would have been spent on less expensive but more effective medication[7]; on

---

[6] The release included in the Settlement Agreement, which includes a release of antitrust claims, applies to all class members not just the Assurant Subclass.  As a practical matter, because the Assurant Plaintiffs are the only third-party payors with non-time barred antitrust claims, the release of antitrust claims affects only the Assurant Plaintiffs.

[7] For purposes of determining the damages suffered by the Assurant Plaintiffs as a result of the fraudulent marketing of Neurontin for "off-label" indications, the Assurant Plaintiffs apply Dr. Rosenthal's regression analysis and Dr. Hartman's damages methodology to the expenditure data of the Assurant Plaintiffs.  The measure of damages, as with other third-party payors with claims in the Sales and Marketing MDL, is measured in one of two ways.  Either the third-party payors' damages include the entire purchase price paid for all units of Neurontin for fraudulently induced prescriptions for "off label" uses, or damages are measured by the difference in price between Neurontin and other less costly alternative treatments for the same indications.  In either case, damages under the marketing theory are limited to those units of Neurontin that were fraudulently induced by Pfizer's marketing efforts and which were written only for certain off-label indications

6

the antitrust claim, the difference between what was paid and what would have been spent on

generic gabapentin.[8]

There are, however, several differences in the relief that is now potentially available to

Assurant that is generally not available to the class.

First, the Assurant plaintiffs' suit is the only one still pending in which third-party payors

allege antitrust claims related to Pfizer's patent infringement scheme.  While the claims of the

class must stand or fall on the basis of a single theory (marketing fraud), the Assurant plaintiffs

have an additional line of attack not generally available to the class.  And while the Assurant

plaintiffs' antitrust claims have not been developed through discovery over the years, the nearly

identical liability issues have been litigated in the separate direct purchaser New Jersey actions

(thereby enabling one to "handicap" the strengths and weaknesses of those claims for other

purchaser groups).

Second, the Assurant plaintiffs' marketing claims are not limited to units of Neurontin

that were paid for by reason of the bipolar (and other mood disorder) fraud.  As the Court is

aware, the appeal prosecuted by class counsel narrowed the class claims to the bipolar case.  This

strategic decision worked; it provided the most compelling case for class certification (and other)

purposes to the First Circuit.  But the non-class marketing case of the Assurant plaintiffs remains

intact, and so the Assurant plaintiffs' marketing claims are for all fraudulently induced

prescriptions of Neurontin, and are therefore (at least in theory) broader than those of the class.

Recognizing these differences, class counsel (along with lawyers for many of the larger

members of the proposed settlement class), undertook an arm's length negotiation to reach a

---

[8] With respect to antitrust damages, the measure of damages is the difference between the price paid for
Neurontin (for any indication whatsoever) and the price that should have been paid for a cheaper generic alternative
that would have been available in the absence of Pfizer's alleged anticompetitive scheme.  The antitrust damages
are, however, only available in states that provide indirect purchasers a damages remedy.

quantitative method by which to treat both the general class members and the Assurant sub-class

members fairly.  The process assured separate representation on both sides, and was truly

exhaustive of the issues between them.  The result is also substantively fair, as it provides a

multiplier on the claims submitted by Assurant sub-class members[9] that, while somewhat

diluting the funds available to the other class members, is acceptable to those other class

members as a necessary and appropriate condition for achieving an overall settlement.


Dated:  July 7, 2014                                    Respectfully submitted,

**/s/ W. Scott Simmer**                                 **/s/ Thomas M. Sobol**
W. Scott Simmer                                         Thomas M. Sobol, BBO No. 471770
Blank Rome LLP                                          Kristen Johnson Parker, BBO 667261
Watergate 600 New Hampshire Avenue NW                   Hagens Berman Sobol Shapiro LLP
Washington, DC  20037                                   55 Cambridge Parkway, Suite 301
Phone:  202.772.5967                                    Cambridge, MA 02142
Fax:     202.572.8412                                   Tel. (617) 482-3700
simmer@blankrome.com                                    Fax (617) 482-3003
                                                        tom@hbsslaw.com
*Counsel for Plaintiffs Assurant Health, Inc., Blue*    kristenj@hbsslaw.com
*Cross and Blue Shield of Florida, Inc., Louisiana*
*Health Service & Indemnity Company, Blue*
*Cross Blue Shield of Massachusetts, Blue Cross*
*Blue Shield of Michigan, Blue Cross Blue Shield*
*of Minnesota, CareFirst, Inc., Excellus Health*
*Plan, Inc., Federated Mutual Insurance*
*Company, Group Health Service of Oklahoma*
*Inc., Health Care Service Corporation, Mutual of*
*Omaha Insurance Company, Trustmark*
*Insurance Company, Wellchoice, Inc. and*
*Wellchoice Insurance of New Jersey, Inc.*

---

[9] In recognition of the fact that members of the subclass will be releasing a separate theory of recovery not available to members of the general class and will be relinquishing a potentially broader measure of damages than members of the general class, the parties have agreed to provide claims by members of the subclass a multiplier of 0.8 on their submitted claims.  Purchases submitted by the Assurant Plaintiffs as part of the claims process will be multiplied by 1.8.  The resulting figure will be used to calculate each Assurant plaintiff's relative share of the overall net settlement fund.

Don Barrett
Barrett Law Office
404 Court Square North
P.O. Box 987
Lexington, MS 39095
dbarrett@barrettlawgroup.com

Thomas M. Greene
Green LLP
One Liberty Square, 12th Floor
Boston, MA 02109
tgreene@greenellp.com

Daniel Becnel, Jr.
Law Offices of Daniel Becnel, Jr.
106 W. Seventh Street
P.O. Drawer H
Reserve, LA 70084
dbecnel@becnellaw.com

Elizabeth J. Cabraser
Lieff Cabraser Heimann & Bernstein, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339
ecabraser@lchb.com

James Dugan
The Dugan Law Firm
One Canal Street
365 Canal Street, Suite 1000
New Orleans, LA 70131
jdugan@dugan-lawfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 7, 2014, I filed the foregoing document via this Court's

CM/ECF system, which caused notice of filing to be sent electronically to counsel of record for

all ECF-registered parties, in accordance with Case Management Order No. 3 (Mar. 18, 2005).


/s/ Thomas M. Sobol
Thomas M. Sobol

10