1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MASSACHUSETTS
2

3

4    IN RE:                              )
                                         ) CA No. 04-10981-PBS
5    NEURONTIN MARKETING, SALES PRACTICES,) Pages 1 - 40
     AND PRODUCTS LIABILITY LITIGATION   )
6

7

8

9                    **SETTLEMENT CONFERENCE**

10          BEFORE THE HONORABLE PATTI B. SARIS
                UNITED STATES DISTRICT JUDGE
11

12

13

14
                        United States District Court
15                      1 Courthouse Way, Courtroom 19
                        Boston, Massachusetts  02210
16                      July 7, 2014, 4:17 p.m.

17

18

19

20

21

22
                        LEE A. MARZILLI
23                   OFFICIAL COURT REPORTER
                   United States District Court
24                 1 Courthouse Way, Room 7200
                        Boston, MA  02210
25                       (617)345-6787

```
 1   A P P E A R A N C E S:

 2
     FOR THE PLAINTIFFS:
 3
          THOMAS M. GREENE, ESQ., Greene, LLP, One Liberty Square,
 4   Suite 1200, Boston, Massachusetts, 02109.

 5        DON BARRETT, ESQ., Barrett Law Group, P.A.,
     404 Court Square North, Lexington, Mississippi, 39095.
 6
          THOMAS M. SOBOL, ESQ., Hagens Berman Sobol Shapiro, LLP,
 7   55 Cambridge Parkway, Suite 301, Cambridge, Massachusetts,
     02142.
 8
          ELIZABETH J. CABRASER, ESQ., Lieff Cabraser Heimann &
 9   Bernstein, Embarcadero Center West, 275 Battery Street,
     30th Floor, San Francisco, California, 94111-3339.
10
          DANIEL E. BECNEL, ESQ., Law Office of Daniel E. Becnel, Jr.,
11   106 W. Seventh Street, PO Drawer H, Reserve, Louisiana, 70084.

12        DON BARRETT, ESQ., Barrett Law Office,
     404 Court Square North, PO Box 987, Lexington, Missouri, 39095.
13
          RICHARD W. COHEN, ESQ., Lowey Dannenberg Bemporad &
14   Slelinger, P.C., One North Broadway, Suite 509, White Plains,
     New York, 10601-1714.
15
          W. SCOTT SIMMER, ESQ., Blank Rome, LLP,
16   500 New Hampshire Avenue, NW, Washington, D.C., 20037.

17
     FOR THE DEFENDANTS:
18
          KATHERINE ARMSTRONG, ESQ. and DAVID WEINRAUB, ESQ.,
19   Quinn Emanuel Urquhart & Sullivan, LLP, 51 Madison Avenue,
     New York, New York, 10010.
20

21

22

23

24

25
```

```
1                    P R O C E E D I N G S

2            THE COURT:  Good afternoon.

3            MR. GREENE:  Good afternoon, your Honor.

4            MR. SIMMER:  Good afternoon.

5            THE COURT:  All right, so counsel please identify

6    themselves for the record.

7            MR. SOBOL:  Good afternoon, your Honor.  Tom Sobol for

8    the class plaintiffs.

9            MR. GREENE:  Good afternoon, your Honor.  Tom Greene

10   for the class plaintiffs.

11           MR. SIMMER:  Good afternoon, your Honor.  Scott Simmer

12   for the Assurant plaintiffs.

13           MR. COHEN:  Good afternoon, your Honor.  Richard

14   Cohen, Steering Committee member for the plaintiffs.

15           MS. BARRETT:  Good afternoon.  Don Barrett for the

16   plaintiffs.

17           MR. BECNEL:  Good afternoon.  Daniel Becnel for the

18   plaintiffs.

19           MS. CABRASER:  Good afternoon, your Honor.  Elizabeth

20   Cabraser for class plaintiffs.

21           MS. ARMSTRONG:  Good afternoon, your Honor.  Katherine

22   Armstrong for Pfizer.

23           MR. WEINRAUB:  Good afternoon, your Honor.  David

24   Weinraub for Pfizer.

25           THE COURT:  Let me start off with Ms. Armstrong.  Are
```

1    you also involved with the New Jersey action?

2          MS. ARMSTRONG:  No, we're not.  I'm a little bit

3    familiar with it, but we're not the counsel to Pfizer in that

4    action.

5          THE COURT:  Well, let me ask this:  I still don't

6    understand, and maybe are the Assurant -- Mr. Sobol I know --

7    who here is involved with the New Jersey settlement?

8          MR. SOBOL:  No one.

9          THE COURT:  The memo wasn't that helpful because I

10   don't know the law that well or the differences.  I did call

11   the judge down there.

12         MR. SOBOL:  Judge Hochberg.

13         THE COURT:  Hochberg, I called her, and she and I were

14   trying to figure out the differences.  You're assuming more

15   knowledge in this memo than I have.  So let me just start from

16   baseline.  When you say direct and indirect purchasers, is that

17   as a result of the Supreme Court case *Illinois Brick*?

18         MR. SOBOL:  Yes.

19         MS. ARMSTRONG:  Yes, your Honor.

20         THE COURT:  You're assuming so much more knowledge

21   than I have, okay?  All right, now --

22         MR. SOBOL:  So let me take a step back then and try

23   to -- because I did make certain assumptions about what the

24   Court may or may not be familiar with, so would it be helpful

25   if I do that because I am very familiar with what's going on

1   there?  I know the lawyers.  I've spoken to them about it.

2   I've known about it over the years, and indeed I was even doing

3   an indirect purchaser case there for several years, so I'm very

4   familiar with those proceedings.  Just maybe I made too many

5   assumptions about what you --

6           THE COURT:  And I've talked to the judge down there at

7   this point.

8           MR SOBOL:  Right.

9           THE COURT:  And there's a fairness hearing coming up

10  at the end of July on that.  So what I would like to

11  understand, so we're indirect up here -- let's start with

12  basics -- so people who didn't purchase directly?

13          MR. SOBOL:  Yes, so let me explain that so it's clear,

14  okay?  In antitrust law, when private litigants bring claims

15  for damages, the Supreme Court decision in *Illinois Brick* holds

16  that under federal law, only the direct purchaser from the

17  wrongdoer may collect.  Those purchasers further on down the

18  stream cannot collect damages under federal law.  As a result,

19  when people bring federal claims in pharmaceutical matters,

20  wholesalers, primarily wholesalers, those direct purchasers,

21  the entities that purchased directly from the drug manufacturer

22  bring claims, seek to have a class certified of the direct

23  purchasers, which are essentially wholesalers.  And in the

24  United States, for the time periods that we're talking about,

25  that class is typically about 25 to 80 wholesalers in the

```
 1    United States.  Those wholesalers or major retailers in the
 2    market, now that we talk about it, resell the products that
 3    they buy to other wholesalers further on down the line, or to
 4    pharmacies, or to mail order houses, and sometimes even to some
 5    larger third-party payors.  Those sellers sell it to somebody
 6    else.  Eventually --
 7              THE COURT:  Let me stop you there.
 8              MR. SOBOL:  Yes.
 9              THE COURT:  So doing AWP, I have some sense of the
10    drug pipeline.  In what sense -- and maybe it's obvious -- in
11    what sense is the insurance company that's reimbursing a
12    purchaser?
13              MR. SOBOL:  So to finish the story about the antitrust
14    area, the health plans and the consumers are what are called
15    end payors or indirect purchasers, meaning they're at the very
16    end of the line.
17              THE COURT:  Are reimbursers considered purchasers?
18              MR. SOBOL:  For purposes of state laws, yes.
19              THE COURT:  And how many state laws provide coverage
20    for indirect?
21              MR. SOBOL:  Okay, so when you're bringing a state law,
22    when you're bringing claims on behalf of end payors, indirect
23    purchasers, what we'll try to do in those situations is that
24    they'll bring claims on behalf of the 22 or 23 states under
25    which the state law, the state antitrust laws permit by statute
```

1  purchasers' damage claims to be made.  In addition, the end

2  payors also try to argue that either unjust enrichment laws or

3  certain other laws, even if you're in the jurisdiction that

4  does not have what's called an *Illinois Brick* repealer statute,

5  meaning a state legislature has stepped in and said, "We want

6  our --"

7          THE COURT:  So are the damages calibrated by the fact,

8  how many were purchased in states that permit it?

9          MR. SOBOL:  So when indirect purchaser cases are

10  litigated, which I've done and Mr. Simmer has done many times,

11  and as Mr. Cohen, what you do is, you have your damages state

12  by state by state.  And so if you're able to recover under

13  North Carolina and Illinois and New York, you're able to

14  recover for the purchases in those states, and if you're not

15  able to recover somewhere else, you can't.

16          THE COURT:  And the recovery is based on the fact that

17  you should have been paying for a generic, like, say, 10 cents

18  on the dollar, rather than the brand, right?

19          MR. SOBOL:  That's correct.  At the final level, it's

20  the delta between what you paid for the brand product and what

21  you would have otherwise paid at that final level for the

22  generic product.

23          THE COURT:  And that's for bona fide prescriptions,

24  even on-label prescriptions.

25          MR. SOBOL:  That's for any kind of prescriptions at

1     all.

2             THE COURT:  It's for the, if you excuse my expression,

3     the good prescriptions where it's full and fair, whether it was

4     shingles or epilepsy or --

5             MR. SOBOL:  Correct, so --

6             THE COURT:  So when you came up with this damage -- it

7     strikes me that we have apples and oranges here.  There's a

8     certain bucket of prescriptions which were rotten; they were

9     for bipolar or for diseases where there's no indication --

10    that's a bad word -- there's no medical support for use for

11    that kind of disease, for that indication.  And then there's

12    another bucket where it was fully and fairly prescribed, but

13    you should have been paying --

14            MR. SOBOL:  For epilepsy.

15            THE COURT:  -- for a gabapentin rather than a

16    Neurontin, a branded good, right?  And they're completely

17    different.  They're not overlapping.

18            MR. SOBOL:  On the marketing side, that's correct.

19            THE COURT:  So what I'm trying to get a handle on for

20    damages is, I understand that Assurant and all these groups

21    have damages that fall into both buckets, but they don't

22    overlap.  So this is what I'm fundamentally not understanding.

23            MR. SOBOL:  Everybody wants to stand up, so I'll sit

24    down, your Honor.  I'm trying to answer your questions, but,

25    you know --

```
 1              THE COURT:  Yes.
 2              MR. SIMMER:  Your Honor, I represent the Assurant
 3    plaintiff, Scott skimmer.  There is one small overlap.  One of
 4    the three patents at issue in the New Jersey case was the '479
 5    patent, was a use patent Pfizer got to patent two of the
 6    off-label uses that became at issue in this case.  To that
 7    extent, the evergreening of that patent did overlap in some of
 8    the damage areas in this case as well.  So there is a minor
 9    degree of overlap in the damages between the two.
10              MR. SOBOL:  If I may, your Honor, I'm sorry, but if
11    people could please sit down and I'll finish this with the
12    Court, please, all right?
13              THE COURT:  So --
14              MR. SOBOL:  Let me explain it, your Honor, okay?
15              THE COURT:  All right.
16              MR. SOBOL:  In the antitrust case for end payors, the
17    damages are different than in the marketing case, but there's
18    also overlap, and let me explain why that's the case.  In the
19    Assurant complaint, the end payors would be theoretically
20    entitled to the difference.  In those states where they are
21    successful, not all states, unlike our broad RICO case in the
22    marketing area, in those states where they are successful, they
23    sought damages, the longest period is between 2000 and 2004 for
24    their payments of Neurontin; and the difference would be the
25    difference between what they paid for Neurontin and what they
```

1    otherwise would have paid for a generic, if the generic had

2    been available.

3              THE COURT:  For what?  This is for the antitrust?

4              MR. SOBOL:  That's on the antitrust side, okay?

5              THE COURT:  And those are for good prescriptions?

6              MR. SOBOL:  It's for any kind of prescription at all.

7              THE COURT:  The way you described the damages -- this

8    is why I just got totally -- the way you described it is, there

9    are two alternative damage models.  One was, you shouldn't pay

10   anything for the rotten prescription, or you should have had to

11   pay for an effective alternative treatment.

12             MR. SOBOL:  That's on the marketing side.  That's why

13   I might have confused you in the brief, so let me draw a

14   distinction.  In the antitrust world, we're talking about all

15   prescriptions of Neurontin that were paid for during a time

16   period in those states and the difference between --

17             THE COURT:  So whether they were proper prescriptions

18   or improper?

19             MR. SOBOL:  It does not matter.  It's completely --

20             THE COURT:  And did you carve those out because --

21             MR. SOBOL:  Well, you're trying to jump ahead.  First,

22   let me describe the differences and the similarities and then

23   how we addressed it, okay?  So in the antitrust world -- let me

24   finish this -- in the antitrust world, it's all prescriptions

25   of Neurontin regardless of the use, ultimate use of Neurontin,

1    good or bad or whatever.  So in that sense, it's broader than

2    the marketing case.  It's for the time period theoretically of

3    2000 to 2004.  The marketing side was '96 to 2004.  So the

4    antitrust claim is in a sense time different than the marketing

5    case also, okay?  The way you measure the difference on the

6    antitrust side is the difference between the brand drug and the

7    generic drug.  That's on the antitrust side.  It's still for

8    prescriptions of Neurontin sold in those states for those time

9    periods, okay?

10            Now, we go over here to the marketing side.  On the

11   marketing side, as you know, our damages we claimed were from

12   '96 to 2004.  So there's a difference there.  It's broader.

13   However, we're not trying to recover for all the prescriptions

14   of Neurontin now on the class side.  We're only trying to

15   recover those prescriptions of Neurontin that were ultimately

16   used for purposes of bipolar or other mood disorder, so it's

17   only a segment of the overall utilization of Neurontin.

18            Also, the way that we would have measured damages or

19   were measuring damages in the marketing side is, we had an

20   alternative:  Either we want just the payment of what we paid

21   for the drug, for Neurontin, period, because it was a fraud and

22   you should get back the money you paid for the product; and if

23   that didn't fly, then we want the money that we paid for the

24   product less what would have been paid for an effective but

25   less expensive bipolar prescription.  Okay?

1           So it is, you're right, it is apples and oranges in

2      the sense that both cases have different time periods; they are

3      applying to a different base of the Neurontin prescriptions.

4      But there is substantial overlap.  Why?  Because in the

5      marketing side, if one were litigating both of these cases at

6      the same time, you couldn't recover the difference between a

7      bipolar prescription on the marketing side for that time period

8      and also recover for the same bipolar prescription on the

9      antitrust side.  You'd be duplicating your damages.  So to the

10     extent that on the marking side we're after bipolar

11     prescriptions between 2000 and 2004 that turned out also, in

12     those states, that turned out also to be caused by an antitrust

13     violation, that would have been completely duplicative.

14           THE COURT:  So what's the measurement there?

15           MR. SOBOL:  The measurement there would have been

16     the -- if you recovered under both, it would be simply the

17     difference between -- actually, it would be the antitrust

18     analysis -- well --

19           THE COURT:  Why?

20           MR. SOBOL:  It wouldn't.  If you won on the marketing

21     side, you get your money back for the full prescription,

22     period.  Then that would be the highest amount that you will

23     recover for that prescription, and that's it, and the damages,

24     the antitrust damages for that unit wash out because you'd be

25     duplicating damages on that side.

```
 1              THE COURT:  Exactly, so it is apples and oranges.  So
 2     the only ones -- well, first of all, the class is broader than
 3     just bipolar, right?
 4              MR. SOBOL:  Yes.
 5              THE COURT:  The class you're asking me for, and I'm
 6     assuming the damages therefore, is everything.
 7              MR. SOBOL:  Yes, so that's a different issue in the
 8     settlement.
 9              THE COURT:  No.  This is the whole class.
10              MR. SOBOL:  Yes.
11              THE COURT:  So it's for every indication other than
12     the ones that were approved by the FDA, right, or not?
13              MR. SOBOL:  Yes, yes.
14              THE COURT:  So they're looking for additional money,
15     as I'm understanding it.
16              MR. SOBOL:  Yes.
17              THE COURT:  They're looking for additional money that
18     covers --
19              MR. SOBOL:  Yes.
20              THE COURT:  -- proper prescriptions of Neurontin.
21              MR. SOBOL:  Correct.
22              THE COURT:  Am I right that we're only looking at
23     improper ones in the big class?
24              MR. SOBOL:  No.  Well, here's the thing:  When we were
25     litigating the case, we carved our case back to bipolar only in
```

1    the class side.  There are still civil actions that are on file

2    on your docket, your Honor, that technically judgments have not

3    entered in those, okay?  In order to make sure when we were

4    negotiating the settlement, although the class is still

5    pursuing bipolar only, because you still have civil actions on

6    your docket that haven't had judgments enter, Pfizer's position

7    is, we need a global release of everything.

8           THE COURT:  So that the damages cover everything.

9           MR. SOBOL:  So damages cover everything.  But the

10   damages in our negotiation obviously differs between the fact

11   that the bipolar case is much stronger than everything else

12   which really isn't being pursued and we haven't gotten a class

13   for, so each individual third-party payor would have to pursue

14   those other claims.

15          THE COURT:  Just let -- the fact that you thought I

16   could do this on the papers...  As I understand it, you're

17   seeking to have me certify a class, as I'm reading it, of

18   everybody who has reimbursed for Neurontin or gabapentin at any

19   time from the first sale through the affected date.

20          MR. SOBOL:  So long as they're an end payor, that's

21   right, for purposes other than resale.

22          THE COURT:  So even for proper prescriptions?

23          MR. SOBOL:  Correct.

24          THE COURT:  Why on earth would I do that?

25          MR. SOBOL:  Well, I guess the best way to put this is,

1    in order to be able to buy peace, in order to get a release and

2    discharge all of the cases that are out there, which have not

3    yet been resolved, that's a requirement of what Pfizer had.

4            THE COURT:  It's got to at least be what was alleged

5    in the complaint.  Now, I understand the release may be

6    broader, but people shouldn't be able to come in and file

7    claims for someone who prescribed for epilepsy.

8            MR. SOBOL:  No, and they won't.

9            THE COURT:  Well, how do I know they won't?  It

10   doesn't say that.  They're members of the class, now that I'm

11   focusing on what you're telling me.

12           MR. SOBOL:  Well, I guess put it this way:  Here's the

13   way that the claims process will work.  Theoretically, in the

14   background, that might happen, but it's not going to be

15   material, and let me explain why.  The third-party payors are

16   going to be applying for a portion of the $325 million pot.

17   During the eight or whatever, during the multiple years that

18   we're talking about here, the size of the claims that will be

19   filed, the total dollars paid are going to be in the billions

20   of dollars, literally in the billions of dollars.  So the issue

21   between the third-party payors that they've cared about in this

22   settlement is not whether or not they're going to be able to

23   make it to the $325 million, but whether as between one

24   third-party payor to another to another, they are treated

25   fairly when they're making their applications to the pot.  Hear

1    me out.

2            Now, if there is a third-party -- most of the

3    third-party payors that are applying here won't know what they

4    paid for in terms of why they were paying for Neurontin.

5    Remember, that was a whole part of the underlying problem in

6    the case.  Third-party payors will come in:  "I know I paid

7    $150 million for Neurontin during this time period, but I don't

8    know what it was used for."  Now, we're not going to require

9    the class members to tell us, and we think it's unfair to have

10   them figure something out that they haven't been able to figure

11   out historically.  We do know this, though:  The amount of

12   money that was spent by the third-party payors for epilepsy is

13   a drop in the bucket compared to what they were paying for all

14   the off-label uses that we do know because, remember, the

15   epilepsy was in the single digits, if I recall correctly,

16   during this time period, right?  And all the other uses were

17   being, you know, for bipolar, and for pain this and for pain

18   that, and for restless leg syndrome, and all the other snake

19   oil purposes.  So these third-party payors when they're trying

20   to figure out, when we even did this settlement and we were

21   trying to figure out, how was this fairly going to be allocated

22   among themselves, the way that they concluded -- and it's not

23   just the class lawyers making this up -- that's why I brought

24   Richard Cohen, who is the Aetna guy and the Cigna guy and the

25   United guy and that kind of thing -- not Aetna in this case

1    because they've settled separately -- what they decided is fair

2    is:  We will provide our claims data that we have for a proxy

3    period of time, and we're going to divide up the spoils that

4    way, which is something we've done in many other cases before.

5    They actually file their electronic claims information with the

6    claims administrator.  The claims administrator gets that.  And

7    if there are aberrations, if there are things that stand out,

8    we take a look at it; and if we have to bring it to your

9    attention, we do, and typically we don't.

10          THE COURT:  So you're asking me to certify a class of

11   all third-party payors for all Neurontin, regardless of whether

12   it was illegally prescribed or not, and the rationale for that

13   is because the third-party payors can't figure it out, which is

14   consistent with the evidence that some of them couldn't, so I

15   understand that, but I've just never -- I'm now focusing on it.

16          Now, let's assume for a minute its every single

17   prescription under the face of the sun, okay, because you're

18   saying they can't figure it out, do we know that's true of

19   every third-party payor, or should we have that as a basis for

20   the --

21          MR. SOBOL:  I think we'll provide it for the final

22   approval hearing, to be sure, and we can do it now if you need

23   that, but what we will be doing is providing you the proofs

24   that we had earlier.

25          What we also say, by the way, when you say regardless

1   of whether it was illegally prescribed or not, we have alleged

2   that well over 90 percent of the prescriptions for Neurontin

3   that were ever sold during this time period were illegal.

4          THE COURT:  Absolutely correctly, but the ten percent

5   when we're talking about this billion-dollar drug is a lot of

6   money.  Ten percent is still a lot of money.

7          MR. SOBOL:  That's correct.

8          THE COURT:  But let me just say, so the reason why

9   you're saying -- I'm starting to get a figure -- why there's a

10  little disagreement here about whether the antitrust overlaps a

11  lot or a little is because if you define the class the way

12  you've defined it, it picks up all of your stuff.

13         MR. SOBOL:  Yes.

14         THE COURT:  That's where I just need to understand it.

15  If you're only talking about what actually happened, they

16  should only be able to get antitrust damages for the ones that

17  were lawfully prescribed.

18         MR. SOBOL:  Were lawfully prescribed in the states

19  that they're able to prove it, and et cetera, et cetera.

20         THE COURT:  For a limited time period.  So this isn't

21  all described this way, but I'm starting to understand it.  So

22  now the issue is, from a damage model point of view, assume for

23  a minute only ten percent of these prescriptions were lawful

24  prescriptions -- I'll take your number -- it sounds roughly

25  right -- I don't know if you do but --

```
 1            MR. SOBOL:  My memory right now is that it was single

 2   digit for --

 3            THE COURT:  Whatever, some percentage.  I remember the

 4   graph from Meredith Rosenthal, tiny numbers.

 5            MR. SOBOL:  Right.

 6            THE COURT:  So why aren't those tiny numbers the only

 7   numbers for which there's a possibility of antitrust damages?

 8            MR. SOBOL:  Because there are two significant

 9   differences between the Assurant non-class claims and the class

10   claims.  The first is the difference that I've just told you

11   about, that they have an antitrust claim.  Their antitrust

12   claim, by the way, differs not just in terms of what their

13   damages are, but they get a second bite at the apple, if you

14   will.  Let's say that the marketing case goes down the tubes,

15   they still have an antitrust claim that they can have for

16   everything, all right?

17            THE COURT:  But they're getting 1.8, 1.8, 80 percent

18   more than other people.

19            MR. SOBOL:  Correct.

20            THE COURT:  And just you haven't explained to me where

21   that came from.

22            MR. SOBOL:  Oh, okay, fine.  So here's where it came

23   from.

24            THE COURT:  They should be getting just --

25            MR. SOBOL:  No, no, no, no.  If I may, here's where it
```

```
1    comes from.  The other difference is -- and I'll tell you about
2    the process in a second -- the other difference is, the
3    Assurant group brought claims under all indications.
4             THE COURT:  I understand that, yes.
5             MR. SOBOL:  Okay.  So although we're doing a release
6    for everybody --
7             THE COURT:  We're doing it all.  We're capturing
8    everybody.
9             MR. SOBOL:  We're doing it all, and there is overlap.
10   But who's kidding who?  At some point, right, if the class went
11   forward in the whole rest of the case, we would have been going
12   just bipolar, all right?
13            Here's the process that we set up back in January or
14   February, whenever we started this process:  We made the
15   decision that it made sense.  We had the Assurant issue that's
16   out there.  Pfizer is asking us for a broad release.  There are
17   procedural safeguards that have to be set up.  So what are the
18   procedural safeguards?  Well, first, the Assurant group has
19   Mr. Simmer and Steve Weiss as their separate counsel, and
20   they're going to do arm's length negotiations.  And who did
21   they do the negotiations with?  They did them with the class
22   lawyers who are here, right, who we have an interest in having
23   them get as little as they possibly can, right?  And we also
24   have Mr. Cohen, who represents the big, you know, Humana,
25   United, Cigna, who are unnamed but very large players in this
```

1    deal.

2              THE COURT:  They don't get anything out of this class,

3    right?

4              MR. SOBOL:  Their damages are diluted by the fact that

5    the Assurant group is going to be getting a multiplier, and

6    yet --

7              THE COURT:  Are they part of the class?

8              MR. SOBOL:  They are part of the class.

9              THE COURT:  Let me ask you this:  I could look at it a

10   different way, and this is meant with no disrespect, so I'm

11   playing another -- it could be a holdup potential, which is

12   that Pfizer won't settle unless it's global, and they're

13   saying, "We're not going to agree unless we get this huge piece

14   of the pot," and you all are sick of it, as I am, as these

15   people are.

16             MR. SOBOL:  No.

17             THE COURT:  Maybe everybody is maybe earning their

18   college tuitions, as I think Mr. Greene and I are going on

19   20 years.

20             MR. SOBOL:  There are all those dynamics.

21             THE COURT:  So I need some principled way other than

22   the fact that this was the deal that you struck.  I understand

23   you put in procedural safeguards, but I also want to understand

24   why all these third-party payors, people who got really --

25   well, I don't know, the word that comes to mind is not a legal

```
 1   term, but got hurt in this process, why the antitrust claims
 2   which were dismissed in New Jersey and which largely involved
 3   only ten percent of the market, which were only the properly
 4   prescribed, where you should have, at least under the way that
 5   it went -- and I have no idea on the merits, but I'm not even
 6   getting to the merits, whether they could win or not -- why
 7   they're getting so much more if it's such a tiny piece of the
 8   market; as you said, single digits.
 9           MR. SOBOL:  Right.
10           THE COURT:  So I just need --
11           MR. SOBOL:  The principled position is this.  I would
12   simply go back to, what are the requirements at this stage?
13   You're going to want there to be principled in terms of
14   procedure, and you're going to want there to be principled in
15   terms of the substance of the results.
16           THE COURT:  I believe you that it's principled in
17   terms of the procedure.  I want the substance, why does it make
18   sense?
19           MR. SOBOL:  So from my perspective, okay -- and I
20   think that Mr. Simmer and Mr. Cohen should speak on this also
21   because they were parties to this overall intramural
22   negotiation -- but as lead counsel, I thought it was principled
23   because I thought the maximum amount that should go theoretically
24   to the Assurant group would be 2.0.  It turns out that they
25   were at 1.8.  Why did I reach that conclusion?  It's for the
```

1    following reasons:  First, they get two bites at the apple, not

2    just one.  If they lose the marketing case, they get to come

3    back again on the antitrust case.  And their claims are not

4    limited to just epilepsy at that point.  If their marketing

5    case went kaput, they could go after the damages on the

6    difference between -- on the antitrust side.  Now, you're --

7        THE COURT:  I'm looking at that because, as far as I

8    can tell, no one has ever adjudicated the antitrust.  I read

9    Judge Hochberg's opinion on the direct purchasers on the

10   summary judgment, and I do understand that motion for summary

11   judgment was denied on the direct purchasers.

12       MR. SOBOL:  Right.

13       THE COURT:  That's on the direct purchasers.  But I've

14   heard no one vet the indirect purchaser case, and she never

15   even got there.  That's why I keep saying, what's happening in

16   New Jersey?  Was it the same damage model?

17       MR. SOBOL:  It's the same liability issue, first.

18   Okay, there's liability, and then there's causation, and

19   there's damages.  The antitrust claim in New Jersey is in

20   liability purposes identical to what end payors would litigate:

21   Was there fraudulent procurement of patents?  Was there

22   fraudulent listing of the patents in a book that would prevent

23   or abate, you know, make more difficult generic's ability to

24   get market?  Was there fraudulent litigation on it?

25       THE COURT:  She ruled that there was.

1          MR. SOBOL:  Well, no, she denied summary judgment, and

2     they settled for $190 million on the direct --

3          THE COURT:  That's what I want to understand.  That's

4     why I asked the question.  I'm now very focused on it.  So I'd

5     like to know how much damages were likely to be able to be

6     recovered on an antitrust cause of action that aren't covered

7     already by the marketing case.

8          MR. SOBOL:  I believe Mr. Zimmer has estimated it

9     about $400 million single damages.

10         THE COURT:  That are not covered by the marketing

11    case.

12         MR. SOBOL:  Well, then it depends upon whether you win

13    the marketing case or not and how much of the marketing case

14    you would win.  That's why I'm fighting you on this.

15         THE COURT:  But this is what wasn't in this memo, and

16    then I come here really --

17         MR. SOBOL:  Everybody else thought the memo was good,

18    your Honor.

19         (Laughter.)

20         THE COURT:  Because it glossed over all this.  I mean,

21    I feel like I know as much as anyone in the world about the

22    sales and marketing side of it.

23         MR. SOBOL:  You do.

24         THE COURT:  I feel as if I know less than everybody

25    else about the antitrust.  And while I'm as disposed as

1    everybody else is to try and get this behind us, my sense of

2    outrage, if I can use that word, about what happened in the

3    sales and marketing side is so strong that it is hard for me to

4    give 1.8 to people on the antitrust side, which is, you know,

5    almost double what people are going to get on the sales and

6    marking side out of a limited pot of money, unless I understand

7    it.

8            MR. SOBOL:  Fair enough.  And then on the substantive

9    side -- I'm just answering the question -- on the substantive

10   side, I thought that 1.8 as a result, even as much as 2.0,

11   would have been fair because they get two bites at the apple,

12   number one; and, number two, their marketing case is not

13   limited to bipolar.  Now, that's critical.

14           THE COURT:  No, it isn't because of the way you've

15   defined the class.

16           MR. SOBOL:  Well, with all due respect, your Honor,

17   you're not being practical in terms of what would have happened

18   if we had gone forward because we, the class, were only going

19   forward on the bipolar case this fall, and our damages as a

20   practical matter were going to be limited to that.  And there

21   was a question, when we went forward with that bipolar case,

22   how much of our great evidence about nociceptive pain and

23   neuropathic pain and --

24           THE COURT:  It wasn't so great.  The stuff on bipolar

25   was knock-dead.  So the bipolar you blew out of the water, and

1    so --

2          MR. SOBOL:  It was more of a gestalt, your Honor.  We

3    blew them out of the water on everything, but without that

4    everything, who knew?  I would have much rather been in a

5    position of representing the Assurant plaintiffs and be able to

6    try all the indications again to be able to have that.

7          THE COURT:  All the indications are covered.  Let me

8    ask you this:  Is there a way of -- maybe one of the other

9    attorneys can do this -- is there a damage model, a model that

10   gets -- like, Mr. Sobol is so experienced here that he has his

11   gut check at 2.  1.8 he thought was, like, an absolute bargain.

12   So now I'm trying to figure out, is there a way that I can, at

13   least from a preliminary approval point of view to see if I

14   can, you know, see if we have objections?  I don't need

15   persuasive proof but just something and the dollar numbers.

16         MR. SOBOL:  We're going to need $6 billion -- she

17   won't let me say it now, but it's $6 billion spent between 2000

18   and 2004 and what the percentage of that would have been,

19   right?

20         MR. SIMMER:  Well, his point is that this drug during

21   the four years of antitrust damages was making close to

22   $2 billion a year, so that in and of itself tells you we're in

23   the right range.  But we do have an exhaustive damage model for

24   both antitrust and for the marketing claims that we did for the

25   Assurant plaintiffs.  You use Hartman's and Rosenthal's

```
1    analysis, but we also eliminated the double counting, and we
2    did it indication by indication because, again, to Mr. Sobol's
3    point, the Assurant plaintiffs, it's not just the antitrust
4    claim which your Honor is focusing on, the Assurant plaintiffs
5    are much more -- they're like Kaiser claims:  They didn't
6    narrow their claims to bipolar only.  They have all of these
7    other indications.  So when we were negotiating this with the
8    class and with Mr. Cohen, the point was, yes, we have antitrust
9    claims that no other payors have, but we also have marketing
10   claims that no other payors have as well.
11           The other point, your Honor, and it's --
12           THE COURT:  But can I say, I know about all these
13   other indications.
14           MR. SIMMER:  I know you do.
15           THE COURT:  So I have a sense of likelihood of
16   success, both in terms of my own rulings and in terms of a jury
17   call on it.  So while I understand you still have them, it's
18   been up and down the chain, so I'm just trying to get a sense.
19   Do you have a way -- I don't want to sit and read an entire
20   expert report -- where you could just submit to me as a
21   supplemental what the theory was that got you to such a larger
22   percentage of this pot than the other class members?
23           MR. SIMMER:  I meant to point out too, the 1.8 is a
24   little deceiving in one regard because it is a multiplier for
25   all of the Assurant plaintiff's claims, but that additional
```

```
 1    amount gets added to the denominator for every payor, so it
 2    ends up being more like 1.4 or 1.5 in terms of the multiplier.
 3              THE COURT:  Say that again.
 4              MR. SIMMER:  Mathematically, the way this works is,
 5    you don't just increase the Assurant client's claims.  You also
 6    increase -- that increase gets added to the total for all
 7    payors in the denominator, so it dilutes the enumerator effect
 8    as well.  So it actually ends up being more like a multiplier
 9    of 1.4 to 1.5, in that neighborhood.  I can show you the math
10    on that too.
11              THE COURT:  So was the 1.8 number the one negotiated
12    with Pfizer, or they gave you a pot of money, and then you
13    figured out the percentages?
14              MR. SIMMER:  We negotiated it with the client.
15              THE COURT:  So it was a pot of money that Pfizer
16    offered?
17              MR. SIMMER:  Right.  Mr. Cohen.
18              MR. COHEN:  Your Honor, I was the loser in these
19    negotiations, so perhaps I could speak to how we got there.
20              MS. ARMSTRONG:  Can I just clarify that Pfizer was not
21    a part of those negotiations.
22              THE COURT:  No, you gave them a total dollar --
23              MS. ARMSTRONG:  We gave them a total amount, and then
24    they were the ones who negotiated among themselves as to --
25              MR. SOBOL:  Right, it's our problem, not yours.
```

1          MS. ARMSTRONG:  That's not what I'm saying, Tom.  I'm

2     just trying to clarify.

3          THE COURT:  Did you include in it the dollar amount in

4     it, what you thought your exposure was in an antitrust?

5          MS. ARMSTRONG:  We based our exposure based upon all

6     of the claims that were still out there, which included the

7     Assurant claims.  So we were evaluating all of the claims

8     because this doesn't just derive from the way in which the

9     class is defined.  There's overlap in terms of the factual

10    allegations as well.  The antitrust plaintiffs, in addition to

11    having their marketing allegations, they also rely upon those

12    marketing allegations to support their antitrust claims because

13    their argument is that Pfizer grew the market, and that's why

14    their damages were as much as they are.  And they moved for

15    collateral estoppel before Judge Hochberg so that we were

16    collaterally estopped from denying your rulings in the *Kaiser*

17    case, and they won that motion.  So it's not like the marketing

18    allegations are completely independent of the antitrust

19    allegations.

20         THE COURT:  Of course not.

21         MS. ARMSTRONG:  So that's why we wanted them included

22    in the settlement.

23         THE COURT:  But the antitrust covers -- in other

24    words, in some ways the marketing gives you more damages

25    because by the fraud gets you down to zero unless there's an

1    equivalent treatment.

2              MR. SOBOL:  Right.

3              MS. ARMSTRONG:  On that point, I'm going to let

4    Mr. Sobol speak.

5              THE COURT:  All right, it gets you better damages,

6    so --

7              MR. SOBOL:  Sometimes yes and sometimes no.

8              THE COURT:  Right.

9              MR. COHEN:  Your Honor, you asked if there is a damage

10   model, and, yes, there is, a very simple damage model.  The

11   Assurant plaintiff's claims are virtually indistinguishable

12   from Kaiser's claims except they're three to four times the

13   size of Kaiser's claims.  Mr. Simmer and his clients had every

14   claim that Kaiser took to trial -- nociceptive pain,

15   neuropathic pain, migraine, bipolar, overdosage -- plus they

16   had antitrust claims with respect to legal prescriptions; and

17   if any of those indications, for instance, the jury did not

18   find any damages for nociceptive pain, they would still have

19   the antitrust damages for them.  Believe me, I represent most

20   of the major insurers, probably who will take a majority of the

21   proceeds of this settlement, and we fought hard to try to get

22   Pfizer to settle with us and leave Mr. Simmer aside.

23   Understandably, they wouldn't, so we had to engage in a

24   negotiation to bring in his claims, or we were going to end up

25   without anything, and all we had -- well, we would have ended

1    up with a yet-to-be-decided class certification motion on one

2    indication only, which is bipolar.

3            With that, we entered into arm's length negotiations.

4    Of course I fought to bring it closer to 1.0, and Mr. Simmer

5    fought to bring it to 3.0, and Mr. Sobol tried to mediate a

6    2.0, and we ended up at 1.8.  And what Mr. Simmer said about

7    the mechanism where we add his client's claims to both the

8    enumerator and the denominator is true.  I don't believe it's

9    as dilutive as he said.  I think we calculated it will come out

10   to about 1.6-ish.  My clients, who are all sophisticated

11   clients -- Aetna and Cigna and Humana and WellPoint -- well,

12   Aetna is out -- I represented Aetna -- they accept this as a

13   necessary element of getting this to settlement.

14           THE COURT:  So what's the damage model?

15           MR. COHEN:  The damage model is *Kaiser*.

16           THE COURT:  No, but how does it get -- I get that, and

17   I agree with that because that's at least how I was persuaded,

18   but what gets them to 1.6 or 1.8?

19           MR. COHEN:  Okay, the only claims that the class had

20   going forward, including the Assurant claimants, if they were

21   going to just fold into a class, was for bipolar; and the

22   single damages there, as your Honor heard at class

23   certification hearings, I believe was somewhere in the

24   neighborhood of 500 and some million dollars, single damages.

25   Mr. Simmer's clients, had they gone to trial like Kaiser did,

1    if you're going to use Kaiser as a yardstick -- and I can't

2    think of a better yardstick in these circumstances when we're

3    trying to do these types of negotiations -- well, Kaiser's

4    single damages were $47.5 million trebled to -- $47.5 million.

5    As said before, Mr. Simmer's clients accounted for three to

6    four times the purchasers of Kaiser.  Maybe Mr. Simmer will

7    disagree and tell me it's four to five, but we know generally

8    the market share of his clients.  They're substantial clients.

9         So there you have it, your Honor.  If you're looking

10   at perhaps a model, take him out of the class on bipolar, and

11   maybe the bipolar size is $450 million, and his client's claims

12   are worth $200 million.  The 1.8 was a reasonable arm's length

13   negotiated, grudgingly accepted but we believe reasonable

14   multiplier.

15        THE COURT:  Let me ask.  A, I'm exhausted because I've

16   been in court all day, so I'm starting to phase out on you a

17   little bit, but let me say this:  If I put this out and then I

18   hear objections, or I have my own second doubts, is it within

19   the terms of the settlement that I readjust the percentages,

20   1.8, 1.6, 1.4?

21        MR. SOBOL:  No.

22        THE COURT:  In other words, it wouldn't affect --

23   Pfizer is putting in the pot of money, but -- or if I end up

24   rejecting the 1.8 after I see objections, does that scuttle the

25   whole deal?

1          MR. SOBOL:  Yes, it does.

2          THE COURT:  Why?

3          MR. SOBOL:  Because the Assurant group's agreement to

4   proceed forward was based upon its agreement with the class and

5   with Mr. Cohen's group; that is, receiving the multiplier that

6   it has.  So we would need to go back to the drawing board at

7   that point.  Put differently --

8          THE COURT:  You might have to.  Let me say this, let

9   me say this:  Typical of these cases, because they are so

10  complex, this is highly complex, and I am not sure.  I want to

11  think about it a little bit.  I completely didn't understand

12  the memo.  I'm sort of coming to understand.  So you want a

13  class that includes all purchasers of Neurontin.  For most of

14  these purchasers, it's either they should have had to pay zero,

15  or they should have had to pay for an effective treatment.

16  There's a certain group of prescriptions which were lawful

17  where they could have very big, as I read Judge Hochberg's

18  opinion, potential damages on the lawful prescriptions, if I

19  can call them that.  And somehow, based on the lawful

20  prescriptions, you believe, perhaps correctly, they get a

21  bigger piece of the pie.  That makes sense to me, so I don't

22  have a problem with them getting a bigger piece of the pie.

23          What I'm not understanding is the 1.8.  I understand

24  that they started with 3, and you started with 1, and it all

25  sounds Solomonic, okay?  It's just, frankly, likely how this

```
 1   happened.  But I'm not convinced in my gut that 1.8 seems fair
 2   because I'm not persuaded in my gut yet whether or not the
 3   antitrust cases are worth that much, since it's a more limited
 4   time period, and it's only half of the states, and because I
 5   have no sense of the merits, I don't know whether you would
 6   have won.  I don't know.
 7        So I think what would be helpful to me is if you could
 8   give me from the Assurant group your sense of how you got to --
 9   why you think 1.8 is fair.  That would be useful to me.  What
10   I'm likely to do is to send this thing out, but I am not
11   positive.  But I view myself as at a preliminary approval
12   stage, not a final fairness hearing.  And I'd also love a
13   transcript of whatever happens in New Jersey because they must
14   have -- I'm not even sure under my understanding of AWP and WAC
15   and all of those things, I'm not even understanding why the
16   wholesalers had damages, since they tend to pass things down
17   the chain, so I --
18             MR. SOBOL:  On that, if I may?
19             THE COURT:  Yes.
20             MR. SOBOL:  The other side of the *Illinois Brick*
21   decision is that under its ruling, direct purchasers are
22   entitled to their overcharge, meaning the difference between
23   what they paid and what they otherwise would have paid,
24   regardless of whether or not they passed the charge further on
25   down the line.  So it's a legal issue there under federal
```

```
1    antitrust law to have direct purchasers simply get --
2            THE COURT:  I actually think they probably got a
3    windfall based on my knowledge of the industry, which is now
4    profound, which was at the time they got a percentage, right?
5    So the higher the price -- if they were only gabapentin, they
6    wouldn't have gotten squat level.  They would have gotten
7    the -- I forget how they did it -- the median above the -- you
8    taught me too well -- the spreads.  I mean, I do agree that
9    it's the indirect purchasers, consumers and the health plans
10   who got -- I'll use the word "screwed" in this.  But what I
11   want to make sure of is that it's not a disproportionate piece
12   of this pool.
13           MR. SOBOL:  Sure.
14           THE COURT:  And it helps me that you're all here,
15   you're all backing this.  And I think the answer to my concerns
16   is, we're only at the preliminary approval; but I'm telling you
17   that if I got some serious objections here, I would take them
18   seriously, not on the dollar amount but on how you distribute
19   internally.  Do you know whether there are any people
20   objecting?  Have you heard from people?
21           MR. SOBOL:  We have not heard from anybody.  We don't
22   expect any third-party payors to object unless they're --
23           THE COURT:  No Commonwealth of Pennsylvania zooming
24   in?
25           MR. SOBOL:  No.  I mean, frankly, the kind of
```

1    objectors I expect, frankly, are the kind of objectors that are

2    going to be looking to be paid an attorney's fee, the issues

3    that we've had in other cases that --

4            THE COURT:  That's for another day.

5            MR. SOBOL:  Right.

6            THE COURT:  But I remember in the *Merck* settlement --

7    I've been getting so many of these -- in the *Merck* one, we had

8    states object, and that is not the issue here?  There are no

9    states --

10           MR. SOBOL:  We don't expect -- there are no states

11   that are involved in it.  There is no -- that issue is not

12   here.

13           THE COURT:  All right.  All right, so you'll whenever

14   you get, within the next week or two, get me the supplement,

15   and then we'll move.  I may have had other questions, but all

16   of them can probably wait till the end.

17           MR. SOBOL:  Do you want us to also resend a proposed

18   order so that we can deal with the dates?

19           THE COURT:  That would be very useful.  And I guess I

20   was going to ask, are there any cy pres orders in here?  I

21   didn't see one.

22           MR. SOBOL:  There's no cy pres order.  What may happen

23   is that at the end of the day, there might be some extremely

24   small amount of money from uncashed checks that we need to deal

25   with, but apart --

```
 1              THE COURT:  Just come back to me for that?

 2              MR. SOBOL:  And we come back to you for that.

 3              THE COURT:  That's fine.  And the other thing is, on

 4    attorneys' fees, do they pay -- I don't know this -- is it

 5    one-third, and you'll distribute them?

 6              MR. SOBOL:  Yes, I'll take care of it.

 7              (Laughter.)

 8              THE COURT:  But it's among this crew.  So we had

 9    problems in the AWP case with Mr. Berman, if you remember

10    correctly.  So, for example, if someone gets a bigger piece of

11    the pie, do they pay a bigger piece of the attorneys' fees?

12              MR. SOBOL:  That hasn't been decided yet.

13              THE COURT:  Not pay.  I shouldn't have --

14              MR. SOBOL:  The fees that are contemplated in this

15    settlement, the fee award is going to apply at the top, meaning

16    that all participants in the settlement will be paying the same

17    amount of a fee.  There is one wrinkle in connection with that.

18    Is that the question you're asking?

19              THE COURT:  Everyone gets paid the same amount of

20    fees.

21              MR. SOBOL:  Oh, you're talking about the distribution

22    of the fees to the lawyers themselves.

23              THE COURT:  Yes.  Am I going to get caught up in what

24    I got caught up in the AWP case?

25              MR. SOBOL:  I certainly hope not, your Honor.
```

1              THE COURT:  All right, well, we'll leave that.

2          Did Pfizer want to say anything?

3          MS. ARMSTRONG:  No, your Honor.

4          THE COURT:  You're happy to be sitting here?  Would

5    you send me whatever happens in New Jersey?

6          MS. ARMSTRONG:  I will, your Honor.  And I will say

7    that we did review the settlement with Pfizer's New Jersey

8    counsel to make sure that there was no overlap between what was

9    happening here and what was happening in New Jersey.

10         THE COURT:  It's not so much the overlap, which I sort

11   of got after talking to Judge Hochberg.  It's more whether the

12   damages model make it consistent because my overarching concern

13   here is that the Assurant people, because of your insistence

14   that it be global, not get a disproportionately large amount of

15   the pie here.  And I do agree that they deserve more of the

16   pie.  I totally agree with that.  But I don't know enough to

17   know whether it's 1.2, 1.4, 2.0.  I don't feel like -- it's

18   hard for me to say that's fair when I don't understand it.

19   That's the piece.

20         So thank you all for coming.  I'm going to go back and

21   have a --

22         MR. SOBOL:  If I may, your Honor?  So I'm going to

23   prepare a proposed order that has dates.  The dates are

24   typically based upon when we expect you're going to be entering

25   your order.  So should I assume maybe ten days out from now,

1    and then I'll tailor it to that?  I'm not trying to rush you.

2    I just want to have a sense.

3           THE COURT:  It depends really when this affidavit

4    comes in or -- it doesn't even need to be an affidavit.  It can

5    be like a supplemental memo, you know, just a theory, and --

6           MR. SOBOL:  I'll gauge it from that.

7           THE COURT:  The reason I don't buy the two bites at

8    the apple so much is because at this point it's just such a

9    clear winner on some of these indications.  So we know, the lay

10   of the land is now very carved, and so the second antitrust

11   bite, eh.  Okay.

12          MR. SOBOL:  I liked it.

13          MS. ARMSTRONG:  If I might, your Honor, your Honor in

14   your decision did say that neuropathic pain was a close call,

15   which is the biggest chunk of all of the prescriptions.

16          THE COURT:  I kept expecting it to be approved for

17   that.  The FDA still hasn't done it.

18          MR. SOBOL:  No.

19          THE COURT:  You know, it's funny, this case I'm doing

20   right now -- I shouldn't even tell you about it -- if you

21   listened long enough, you would have heard that a lot of

22   doctors are prescribing Neurontin, not because -- well, I don't

23   know why they're doing it but in lieu of opioids.  And this

24   case I'm sitting on right now is about OxyContin, so, I mean,

25   I'm seeing -- but given how much Neurontin is being prescribed

1    to avoid the Oxycodone problem, I still haven't seen it be

2    approved by the FDA.

3           MS. ARMSTRONG:  Well, it won't once it goes generic.

4    Nobody is going to seek --

5           THE COURT:  Still not there.  So, I mean, that's

6    what's fascinating.  Everyone says, "And that's off-label,

7    isn't it?"  And I feel like I can testify.  But there we go.

8           THE CLERK:  All rise.

9           (Adjourned, 5:05 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                     C E R T I F I C A T E

2

3

      UNITED STATES DISTRICT COURT )
4     DISTRICT OF MASSACHUSETTS    ) ss.
      CITY OF BOSTON               )
5

6

7          I, Lee A. Marzilli, Official Federal Court Reporter,

8     do hereby certify that the foregoing transcript, Pages 1

9     through 40 inclusive, was recorded by me stenographically at

10    the time and place aforesaid in Civil Action No. 04-10981-PBS,

11    In Re:  Neurontin Marketing, Sales Practices, and Product

12    Liability Litigation, and thereafter by me reduced to

13    typewriting and is a true and accurate record of the

14    proceedings.

15         Dated this 14th day of July, 2014, at Boston,

16    Massachusetts.

17

18

19

20

21               /s/ Lee A. Marzilli

22         _____
                 LEE A. MARZILLI, CRR
23               OFFICIAL FEDERAL COURT REPORTER

24

25