UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE NEURONTIN MARKETING AND SALES PRACTICES LITIGATION | ) ) ) | MDL DOCKET NO. 1629 MASTER CIVIL ACTION NO. 04-10981 |
| THIS DOCUMENT RELATES TO:  ALL ACTIONS | ) ) ) ) ) ) ) | HONORABLE PATTI B. SARIS, UNITED STATES DISTRICT JUDGE |

**SUPPLEMENTAL MEMORANDUM BY THE ASSURANT PLAINTIFFS IN SUPPORT
OF PRELIMINARY APPROVAL OF THE PROPOSED SETTLEMENT**

In response to the July 7, 2014 request of the Court, the Assurant Plaintiffs Subclass ("the Assurant Plaintiffs") submits this brief memorandum addressing the Court's questions concerning the application of a 1.8 multiplier to the claims of the Assurant Plaintiffs in the claims administration process of the proposed settlement.

The Assurant Plaintiffs stand in a formidable and unique position.  Unlike all other members of the Class, the Assurant Plaintiffs have two independently viable theories of recovery against Pfizer.  **First**, the scope of their fraudulent marketing claims is expansive, and the single damages resulting from those claims are $275,403,196.[1]  *See* Simmer Declaration at 5.  **Second**, they are the only third-party payors with non-time-barred antitrust claims, and the damages resulting from those claims are $231,931,324, or $180,581,883 if double-counting for the off-label promotion is eliminated.[2]  *Id.* at 10.

---

[1] These nominal damages are exclusive of prejudgment interest, trebling and discounting to that awarded to the plaintiff in *Kaiser Found. Health Plan, Inc. v. Pfizer, Inc.,* No. 05-10739-PBS (D. Mass.) ("*Kaiser*").

[2] These damages are exclusive of trebling or prejudgment interest.

129889.00601/36386405v.1

In the *Harden* action, the remaining fraudulent marketing claims of the putative Class are limited to prescriptions for bipolar and mood disorder indications, which (according to Class experts) total some $624M for all remaining TPP Class members.  In contrast, the fraudulent marketing claims of the Assurant Plaintiffs include prescriptions for bipolar and mood disorder indications as well as prescriptions for migraine, neuropathic pain, nociceptive pain, and fraudulent doses greater than 1800 mg per day.  From prescriptions for bipolar and mood disorder indications, the Assurant Plaintiffs have some $81,206,826[3] in damages.   For all other "off-label" indications, the Assurant Plaintiffs have an additional $201,838,596[4] in marketing damages.  *Id.* at 5, 7.  In light of these substantial damages, the Assurant Plaintiffs' off-label claims are more than three times the size of the damages *Kaiser* submitted to the jury.  *See* Kaiser Trial Exhibit 408-F (total marketing damages were $90.1M for all indications).

Moreover, if they were so inclined, the Assurant Plaintiffs could have eschewed their fraudulent marketing claims against Pfizer altogether, and instead proceeded solely on their state law claims for $231,931,324 in antitrust damages.   *See* Simmer Declaration at 10.  In such a suit, the direct injury suffered by the Assurant Plaintiffs as the result of Pfizer's anticompetitive conduct (i.e., that they were forced to absorb the increased costs of branded Neurontin rather than pay for a much cheaper generic) renders nugatory any causation challenge by Pfizer that the Assurant Plaintiffs might encounter in their marketing suit (i.e., under the "learned intermediary doctrine," individual physician prescribing decisions infect the causation element in off-label drug cases).

---

[3] This total is exclusive of rebates, prejudgment interest, trebling, and discounting to that awarded to the plaintiff in *Kaiser*.
[4] This total is exclusive of rebates, prejudgment interest, trebling, and discounting to that awarded to the plaintiff in *Kaiser*.

But in their action against Pfizer, the Assurant Plaintiffs proceed on *both* the fraudulent marketing and the antitrust theories.  Even when double-counting is eliminated, and the damages are discounted on the basis of the *Kaiser* verdict, the Assurant Plaintiffs' nominal damages total in excess of $410M, or well more than half as large as the total bipolar-only claims for the remaining Class.

Given the strength and viability of Assurant Plaintiffs' qualitatively distinct claims, and the substantial damages that flow from those claims, no other Class member stands on equal footing.  Therefore, and as set forth in additional detail below, the stipulated 1.8 multiplier to be applied to the claims of the Assurant Plaintiffs, which was arrived at between the parties through months of arm's length negotiations, is fair, reasonable and adequate.[5]

## A.      Assurant Plaintiffs' Antitrust Claims

Business entities such as the Assurant Plaintiffs often bear the full financial brunt of anticompetitive activity.  Unless they purchased goods or services directly from the alleged antitrust violators, however, they are "indirect purchasers" who lack standing to bring suit for damages under the federal antitrust laws. *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).  In

---

[5] "'At the preliminary approval stage, the judge must either approve or disapprove the proposed settlement.  [The Court] cannot rewrite the agreement.'" *In re Lupron Mktg. & Sales Practices Litig.*, 345 F. Supp. 2d 135, 137 n.4 (D. Mass. 2004) (Stearns, J.) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998)).  Additionally, at this juncture, the Court's obligation is not to make a final determination regarding the fairness, reasonableness and adequateness of a proposed settlement.  Instead, on this Motion for Preliminary Approval of the Settlement, "the Court need only determine whether it falls within the range of possible approval." *In re Puerto Rican Cabotage Antitrust Litig.*, 269 F.R.D. 125, 140 (D.P.R. 2010); *In re M3Power Razor Sys. Mktg. & Sales Practice Litig.*, 270 F.R.D. 45, 52 (D. Mass. 2010) (Woodlock, J.) (citing *Manual for Complex Litigation (Fourth)* (2004) § 21.632) (in preliminary examination, court called upon only to evaluate whether settlement has "obvious deficiencies" in determination of whether settlement "is in the range of fair, reasonable, and adequate.").  Because it falls well within the relevant range, both Class Counsel and counsel for the Assurant Plaintiffs respectfully submit that the proposed Settlement satisfies the applicable criteria for preliminary approval.

*California v. ARC America Corp.*, 490 U.S. 93 (1989), the Supreme Court held that *Illinois Brick* interpreted federal antitrust law only and states could allow indirect purchasers to seek damages under state law.  The majority of states and the District of Columbia reaffirmed an indirect purchaser's right to recover damages by passing "*Illinois Brick* repealer" statutes that expressly allow for indirect purchaser actions.  Even where no "repealer" statute has been enacted, some state courts have interpreted their state's antitrust or consumer protection laws to allow for indirect purchaser standing.  *See, e.g.*, *Comes v. Microsoft Corp.*, 646 N.W.2d 440 (Iowa 2002); *Bunker's Glass Co. v. Pilkington PLC*, 75 P.3d 99 (Ariz. 2003).

State law indirect purchaser actions are an important component of antitrust enforcement. Multiple health plan antitrust actions alleging drug company anticompetitive conduct have been filed and settled in courts around the country.[6]

### B.    Assurant Plaintiffs' Antitrust Claims

Antitrust claims were brought by direct purchasers against Pfizer in MDL No. 1479: *In re Neurontin Antitrust Litigation*, pending in the District of New Jersey.  On August 8, 2013, Judge Hochberg denied Pfizer's motion for summary judgment.  In doing so, she adopted this Court's findings related to the off-label promotion of Neurontin, holding Pfizer was "precluded from denying those findings of fact in Judge Saris's opinion that govern the nature and scope of Pfizer's off-label marketing."  *In re Neurontin Antitrust Litig.*, 2013 U.S. Dist. LEXIS 111587,

---

[6] Class counsel in this MDL have substantial experience successfully prosecuting prescription drug antitrust cases.  For example, Hagens Berman is one of the court-appointed lead counsel in numerous such matters, including *In re Skelaxin Antitrust Litigation, In re Nexium Antitrust Litigation, In re Lipitor Antitrust Litigation, In re Effexor Antitrust Litigation,* and *In re Wellbutrin XL Antitrust Litigation*.  Counsel for the Assurant Plaintiffs similarly have substantial experience in these types of cases, having filed, settled and tried to verdict numerous pharmaceutical antitrust actions.  Representative cases include *In re Synthroid, In re Coumadin, In re Relafen, In re Buspar, In re Taxol, In re Lorezapam and Clorazepate, In re Paxil,* and *In re Terazosin Antitrust Litig.*

*25 (D.N.J. Aug. 8, 2013).  On April 21, 2014, the parties announced they had reached a $190M settlement of the claims of a Class of direct purchasers.

Although the Assurant Plaintiffs' antitrust claims were never part of the Neurontin Antitrust MDL, along with alleging clams related to Pfizer's off-label marketing scheme, the Assurant Plaintiffs have asserted indirect purchaser claims throughout this litigation that are very similar to those brought by the direct purchasers in the Antitrust MDL.  The Assurant Plaintiffs' antitrust allegations and theory of the case mirror the claims brought by the direct purchasers in that Antitrust MDL – with the exception that the Assurant Plaintiffs, as "indirect" purchasers, brought state law claims and not federal antitrust claims.  The crux of these claims is that Pfizer unlawfully engaged in so-called sham patent litigation, which is an abuse of the Hatch-Waxman act, a statute that was intended to foster competition.[7]

Although the Assurant Plaintiffs as indirect purchasers have no federal remedy, the same conduct and scheme alleged by the direct purchasers caused them to pay for branded versions of Neurontin, for both approved and unapproved uses, when they could have and should have been paying for generic gabapentin. This conduct gives rise to causes of action for the Assurant Plaintiffs under the laws of the *Illinois Brick* repealer states pled in the Assurant complaint as well as other statutory and common law claims.[8]  All of the Assurant Plaintiffs have pled indirect purchaser and/or other statutory or common law claims.  *See* Simmer Decl. ¶ 20, Table of the Assurant Plaintiffs' claims, attached as Exhibit G.

---

[7] A master Class action complaint filed on behalf of a Class of indirect purchasers was voluntarily dismissed in February 2009.  In the meantime, since its initial transfer in 2004 to the Marketing and Sales MDL, the Assurant Plaintiffs' original complaint has been stayed by stipulation, at the direction of the Court.  That stay required all appeals to be exhausted, including any petition before the Supreme Court, before it could be lifted.

[8] Many of these statutes provide for treble damages, pre- and post-judgment interest, attorneys' fees and costs.

In their Neurontin complaint, the Assurant Plaintiffs' antitrust claims alleged that Pfizer had engaged in a multi-pronged strategy designed to forestall generic competition for its brand drug Neurontin – and successfully did so until late 2004, more than four years beyond the date at which generic Neurontin, or gabapentin, should have and could have entered the market.

**First**, Pfizer obtained patents that falsely purportedly to cover Neurontin, and then improperly listed these three different patents with the FDA as covering Neurontin:

- The '476 Patent covered gabapentin monohydrate, a different formulation of gabapentin and not the formulation approved by the FDA and used for Neurontin.

- The '479 Patent claimed to cover the use of Neurontin for pain and neurodegenerative disorders, none of which were or are FDA-approved uses of Neurontin.

- The '482 Patent covered a low lactam or virtually impurity-free formulation of gabapentin. This, like the subject of the '476 Patent, was a different formulation of gabapentin and not the formulation approved by the FDA and used for Neurontin.

**Second**, Pfizer knew that listing improper patents with the FDA would trigger Hatch-Waxman provisions requiring generic manufacturers to notify Pfizer of their intent to manufacture and market generic versions of Neurontin.   The notification by the generic manufacturers then allowed Pfizer to file suit accusing potential generic competitors of infringing on the improperly listed patents, even though Pfizer knew the patent litigation was without merit.  But Pfizer also knew that by merely filing the sham patent litigation, those suits would trigger Hatch-Waxman's required thirty-month "stay" on FDA action to approve generic gabapentin.  Litigation on these issues kept generic manufacturers tied up for over four years.

Pfizer's unlawful anticompetitive conduct including improper patent listings and sham patent litigation caused a substantial delay in the ability of generic manufacturers to market generic gabapentin, keeping them off of the market illegally for as long as four years.  Throughout this time, the Assurant Plaintiffs could have and should have been paying for generic gabapentin, but instead paid supracompetitive prices for expensive brand Neurontin, resulting in the "but for" overpayments detailed below in Section D.

        C.      **Assurant Plaintiffs' Marketing Damages.**

During the relevant time period defined by the Settlement Agreement, the Assurant Plaintiffs' Neurontin payments totaled some $601M.  *See* Simmer Decl. ¶ 5, Exhibit A.  In order to determine their marketing damages, the Assurant Plaintiffs have used the regression analyses performed by Dr. Meredith Rosenthal to quantify the portion of total Neurontin prescriptions that resulted from Pfizer's fraudulent promotional practices with respect to five off-label indications: bipolar disorder, migraines, neuropathic pain, nociceptive pain, and doses in excess of 1800 mg/day.  *See* Decl. of Meredith Rosenthal (Aug. 11, 2008).[9]  The following table provides a summary of the Assurant Plaintiffs' off-label damages:

| | Bipolar ($) | Migraine ($) | Neuropathic Pain ($) | Nociceptive Pain ($) | Doses >1800 mg/day ($) | Damages Pre-Rebates | Total Damages |
|---|---|---|---|---|---|---|---|
| Nominal Damages | 81,206,826 | 4,015,063 | 133,837,824 | 51,214,519 | 12,771,191 | 283,045,422 | 275,403,196 |

*See* Simmer Declaration, Exhibit A.  Of the Assurant Plaintiffs' total Neurontin payments, the off-label uses represent the following percentages:  bipolar (13%); migraine (.7%); neuropathic pain (22%); nociceptive pain (8%); doses > 1800 mg/day (2%); damages pre-rebates (47%); and total damages (46%).  This demonstrates:

---

[9] *See* Simmer Decl. ¶ 4.

- **First**, that the Assurant Plaintiffs' marketing claims represented under half (47%) of their total Neurontin payments during the Class period, leaving significant Neurontin payments as potential non-duplicative antitrust damages;

- **Second**, that the Assurant Plaintiffs' bipolar damages represent only 29% of their total marketing damages; and

- **Third**, that the Assurant Plaintiffs' $275M marketing damages are more than three times Kaiser's $90M marketing damages submitted to the jury, which resulted in an award of $47M.

    **D.**    **Assurant Plaintiffs' Antitrust Damages.**

The Assurant Plaintiffs have also calculated their antitrust damages for the period of the 2000-2004 delay during which they should have been paying for the cheaper generic gabapentin. *See* Simmer Decl. at ¶ 8.  Based on this model, the Assurant Plaintiffs' but-for damages related to Pfizer's anti-competitive conduct (taking out double-counting from the off-label marketing claims) totaled some $181M (adjusted to the Kaiser verdict).  A few points concerning the Assurant Plaintiffs' antitrust damages bear mention:

- **First**, the Assurant Plaintiffs made most of their Neurontin payments during the core antitrust damages years of 2000-2004.  Of the Assurant Plaintiffs' total $601M in Neurontin payments, some $430M (over 70%) occurred during the time period during which Pfizer had blocked generic entry; and

- **Second**, to the extent that the Court or a jury were to limit in any way the Assurant Plaintiffs' marketing claims (e.g., by eliminating off-label indications as the Kaiser jury did with the nociceptive claims), for all claims eliminated the Assurant Plaintiffs' antitrust claims would have increased accordingly.

129889.00601/36386405v.1

**E.      Assurant Plaintiffs' Claims Warranted the 1.8 Multiplier.**

In comparison to other Class members, the Assurant Plaintiffs' remaining Neurontin claims were considerably more valuable, and warranted at least a 1.8 multiplier that the parties arrived at in their arm's length negotiations.

**First**, compared to the Class, which had voluntarily narrowed its claims to the bipolar indication (which represented only 29% of the Assurant Plaintiffs' five off-label marketing damages), the Assurant Plaintiffs still had some 71% of their additional marketing damages remaining, or (without taking into account the relative strength of these claims) marketing claims which on their face were worth 3.44 times more than their bipolar-only claims.  Even factoring in concerns regarding the relative strength of the non-bipolar claims (on all of which except for nociceptive pain the Kaiser jury awarded damages), the value of these remaining marketing claims alone would warrant the 1.8 multiplier.

**Second**, the Assurant Plaintiffs also have non-time-barred antitrust claims, which no other Class members have.  These antitrust claims were of considerable value to the Assurant Plaintiffs.  For example, their $181M in antitrust damages were worth 2.2 times more than their bipolar-only claims ($81M) were worth, suggesting that the Assurant Plaintiffs would have been entitled to a 2.2 multiplier based on the value of these antitrust claims alone.

**F.      The 1.8 Multiplier Calculation is Effectively Less Than 1.8**

One of the Court's concerns raised during the preliminary approval hearing was that, in relation to the other Class members' claims, the Assurant Plaintiffs' multiplier could be unfairly high, and suggested a multiplier more in the range of 1.5 as being fair.  However, based on how the Assurant Plaintiffs' multiplier is to be calculated, the value of the Assurant Plaintiffs' 1.8 multiplier is actually worth less than 1.8 times the value of their total claims in relation to the value of the other Class members' claims.  Under the final agreed formula, the 1.8 times

9

multiplier is applied to increase the dollar value of the Assurant Plaintiffs' claims submitted to the settlement from which their pro rata award is determined.  Although the Assurant Plaintiffs claim amount is enhanced 1.8 times the submitted amount, the denominator used to calculate the Assurant Plaintiffs' pro rata share of the settlement (the dollar value of all submitted Class claims) is correspondingly increased as well, thus diluting the 1.8 times enhancement.

To illustrate (and for ease of calculation only), assume a net distributable amount to the Class of $100M after fees and expenses.  Also assume that the total amount of all claims by the Class and the Assurant Plaintiffs equal $100M -- with the Assurant Plaintiffs representing 25%[10] ($25 million) and the other Class members representing 75% ($75 million) of the total amount of claim. Without the application of a multiplier to their claims, the Assurant Plaintiffs, in total, would be entitled to $25M (25% of $100M).  Applying the negotiated formula, the $25 million in Assurant Plaintiffs' claims will be multiplied by 1.8, resulting in a $45 million valuation to be used to determine the pro-rata portion of the settlement fund distributed to the Assurant Plaintiffs (i.e., a $20 million increase above the Assurant Plaintiffs' base claims of $25 million). Although, in the example, the Assurant Plaintiffs' enhanced claim amount is $45 million (the numerator), the total claim pool for claim valuation purposes is similarly increased by $20 million, to $120 million (the denominator), to account for the $20 million Assurant Plaintiff enhancement (i.e., the $45M Assurant Plaintiffs claim plus the $75 million in non-Assurant claims).  In this example, the Assurant Plaintiffs would therefore be entitled to 37.5% of the settlement fund (i.e., $45 million of claims out of a total of $120 million claims), which would

---

[10] This 25% figure is consistent with the Assurant Plaintiffs' covered lives in relation to the total covered lives of the Subclass and Class.  That is, with Kaiser, Aetna, and BCBS of Alabama having settled, the Assurant Plaintiffs' covered lives are approximately 25% of the remaining unsettled Class and Subclass.

result in a $37.5 million award to the Assurant Plaintiffs from the $100 million in distributable funds.[11]

In our assumption, the Assurant Plaintiffs' recognized claims would increase in value to $37.5 million of the total from its base claim of $25 million.  Put another way, the actual premium that would be paid to the Assurant Plaintiffs in this example is $12.5 million, or 50% of the base claim of $25 million, rather than the 80% that the 1.8 times multiplier would suggest.[12]

### G.    Assurant Plaintiffs' Arm's Length Negotiations of the 1.8 Multiplier

As part of the preliminary approval required under Rule 23, the court is to determine whether:  (1) the negotiations occurred at arm's length; and (2) the proponents of the settlement are experienced in similar litigation.  *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 785 (3d Cir. Pa. 1995); *In re Lupron Mktg. & Sales Practices Litig.,* 345 F. Supp. 2d 135 (D. Mass. 2004).

The Assurant Plaintiffs' premium was the product of months of arm's length negotiations, involving experienced and sophisticated counsel representing very sophisticated business entities.  *See* Simmer Decl. at ¶ 11.   At no time did Pfizer condition that it would only settle with the Class if the Assurant Plaintiffs were included.  During this time, the Class and the

---

[11] Formulaically, the following depicts the Assurant Plaintiffs' recognized claims in our example (taking into account the 1.8 multiplier):

$$\frac{25\% \times 1.8}{100\% + (25\% \times .8)} = 37.5\%$$

[12] It should be noted that the actual Assurant Plaintiffs' percentage increase related to the 1.8 multiplier will depend on the size of their claims in relation to the total Class recognized claims. The greater the Assurant Plaintiffs' claims, the lower the percentage increase in relation to the Class, and vice versa.  For example, if the Assurant Plaintiffs' claims are 20% of the total recognized claims, their effective increase would be 1.55 – i.e., (20% x 1.8) ÷ 100% + (20% x .8) = 55%.  Likewise,  if the Assurant Plaintiffs' claims are 40% of the total recognized claims, their effective increase would be 36%  -- i.e., (40% x 1.8) ÷ 100% + (40% x .8) = 36%.  In any case, the Assurant Plaintiffs' effective increase will always be less than 1.8.

Assurant Plaintiffs had separately been engaged in negotiations with Pfizer.  Indeed, until they had reached an agreement conditioned on the 1.8 multiplier, the Class Counsel and the Assurant Plaintiffs had made clear their intention that they would each continue to negotiate separately with Pfizer (which had repeatedly expressed its willingness to do).  *Id.* at 12.

The strength of the Assurant Plaintiffs' marketing and antitrust claims, and the determination of the damages flowing from those claims, were the source of considerable discussion during the course of these settlement efforts.  During these intensive, arm's length negotiations, very experienced and sophisticated counsel – and their equally experienced and sophisticated TPP clients – made rational and reasonable assessments regarding the Assurant Plaintiffs' claims and damages and the appropriateness of a 1.8 multiplier.  *Id.* at 17.  The value of the Assurant Plaintiffs' claims, as compared to the value of the claims of the remaining Class members, was the subject of considerable negotiations among Class Counsel, counsel for the Lowey/Rawlings group (who represent some 70% of the TPP Class), and counsel for the Assurant Plaintiffs.  *Id.* at 11.

The Assurant Plaintiffs' 1.8 multiplier was thus the product of many months of arm's length negotiations first with counsel for the Class and then later with counsel for the Lowey/Rawlings TPPs.  The Class Counsel and the Lowey/Rawlings Counsel are some of the most experienced and sophisticated counsel in litigating TPP claims, including litigation of TPP marketing claims and antitrust claims.  They not only knew well the strengths and weaknesses of the Assurant Plaintiffs' marketing and antitrust claims, they had every incentive to negotiate as small a multiplier allocation to the Assurant Plaintiffs as possible.[13]

---

[13] It is useful to note that prior to the consummation of negotiations between and among Pfizer, Class Counsel and Assurant Plaintiffs' counsel, Lowey Dannenberg Cohen & Hart, P.C., elected to enter into separate settlement negotiations with Pfizer on behalf of its client, Aetna.  Such

As such, the arm's length nature of the negotiations by experienced counsel over many months provides the requisite assurances at the preliminary approval stage that the 1.8 multiplier was fair, reasonable, and adequate.  *In re M3 Power Razor Sys.,* 270 F.R.D. at 62; *see also Federal Judicial Center, Manual For Complex Litigation* § 21.632 (4th ed. 2004).

### H.     Conclusion

For all the reasons stated herein, and in the papers submitted by the Class to the Court in support thereof, the Assurant Plaintiffs Subclass respectfully requests that the Court preliminarily approve the proposed settlement.

Dated:  July 15, 2014                              Respectfully submitted,


                                                          /s/ W. Scott Simmer
                                                          W. Scott Simmer
                                                          **Blank Rome LLP**
                                                          Watergate 600 New Hampshire Avenue NW
                                                          Washington, DC  20037
                                                          Phone:  202.772.5967
                                                          Fax:     202.572.8412
                                                          Email:  simmer@blankrome.com

                                                          *Counsel for Plaintiffs Assurant Health, Inc.,*
                                                          *Blue Cross and Blue Shield of Florida, Inc.,*
                                                          *Louisiana Health Service & Indemnity*
                                                          *Company, Blue Cross Blue Shield of*
                                                          *Massachusetts, Blue Cross Blue Shield of*
                                                          *Michigan, Blue Cross Blue Shield of*
                                                          *Minnesota, CareFirst, Inc., Excellus Health*
                                                          *Plan, Inc., Federated Mutual Insurance*
                                                          *Company, Group Health of Oklahoma,*
                                                          *Health Care Service Corporation, Mutual of*
                                                          *Omaha Insurance Company, Trustmark*
                                                          *Insurance Company, Wellchoice, Inc. and*
                                                          *Wellchoice of New Jersey, Inc.*

---

negotiations resulted in a separate, confidential settlement between Aetna and Pfizer.  Thus, Lowey Dannenberg was armed with the Aetna settlement metrics during its negotiation with the Assurant Plaintiffs and prior to blessing the Assurant Plaintiffs' premium.

129889.00601/36386405v.1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 15, 2014, I filed the foregoing document via this Court's

CM/ECF system, which caused notice of filing to be sent electronically to counsel of record for

all ECF-registered parties, in accordance with Case Management Order No. 3 (Mar. 18, 2005).

<u>/s/ W. Scott Simmer</u>