UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE NEURONTIN MARKETING AND  )<br>SALES PRACTICES LITIGATION           )<br>                                                              )<br>THIS DOCUMENT RELATES TO:  ALL )<br>ACTIONS                                             )<br>                                                              )<br>                                                              )<br>                                                              )<br>                                                              )<br>                                                              ) | MDL DOCKET NO. 1629<br>MASTER CIVIL ACTION NO. 04-10981<br><br><br>HONORABLE PATTI B. SARIS,<br>UNITED STATES DISTRICT JUDGE |

**DECLARATION OF W. SCOTT SIMMER IN FURTHER
SUPPORT OF PRELIMINARY APPROVAL OF SETTLEMENT**

I, W. Scott Simmer, declare and state as follows:

1. I am a partner with the law firm of Blank Rome LLP.

2. In *Assurant Health, Inc., et al. v. Pfizer Inc., et al.*, No. 05-10535-PBS (D. Mass.), Blank Rome LLP is counsel for the Subclass of TPPs which brought antitrust claims against Pfizer, including plaintiffs and their self-funded employer plans: Assurant Health, Inc., Blue Cross and Blue Shield of Florida, Inc., Louisiana Health Service & Indemnity Company, Blue Cross Blue Shield of Massachusetts, Blue Cross Blue Shield of Michigan, Blue Cross Blue Shield of Minnesota, CareFirst, Inc., Excellus Health Plan, Inc., Federated Mutual Insurance Company, Group Health Service of Oklahoma Inc., Health Care Service Corporation, Mutual of Omaha Insurance Company, Trustmark Insurance Company, Wellchoice, Inc. and Wellchoice Insurance of New Jersey, Inc. (collectively, the "Assurant Plaintiffs").

3. In order to determine their marketing damages, the Assurant Plaintiffs have used the regression analyses performed by Dr. Meredith Rosenthal to quantify the portion of total Neurontin prescriptions that resulted from Pfizer's fraudulent promotional practices with respect to five off-label indications: bipolar disorder, migraines, neuropathic pain, nociceptive pain, and

doses in excess of 1800 mg/day.  *See* Decl. of Meredith Rosenthal (Aug. 11, 2008).  *See* Assurant Plaintiff's Off-Label Damages, attached hereto as Exhibit A.

4. The framework for the Assurant Plaintiffs' marketing damages model follows the one constructed by Dr. Raymond Hartman, which formed the basis for the calculation of the $142 million Kaiser judgment.  *See* Decl. of Dr. Raymond S. Hartman (Aug. 11, 2008).  Like Dr. Hartman, the Assurant Plaintiffs use Dr. Meredith Rosenthal's econometric analysis quantifying the national effect of Pfizer's fraudulent off-label promotion to quantify fraudulent prescriptions reimbursed by individual third party payors.  In her econometric analysis, Dr. Rosenthal regressed aggregate data of the quantity of Neurontin prescribed on a set of explanatory variables that included Pfizer's expenditures promoting Neurontin, among others.  *See* Decl. of Dr. Meredith Rosenthal (Aug. 11, 2008).  Doing so allowed her to measure the impact of Pfizer's fraudulent promotion on prescribing of Neurontin with respect to five off-label uses—namely, bipolar disorder, migraines, neuropathic pain, nociceptive pain, and doses in excess of 1800 mg/day.  For each of these indications, Dr. Rosenthal calculated both the absolute number of prescriptions and the percentage of prescriptions of Neurontin that resulted from Pfizer's fraudulent promotion.  The Assurant Plaintiffs' damages model takes as its starting point the percentage of total Neurontin prescriptions that Dr. Rosenthal determined to have been induced by Pfizer's fraudulent promotion.  The figures are then calculated by dividing the number of prescriptions that Dr. Rosenthal determined to be fraudulent with respect to that particular indication, by the total number of prescriptions.

5. Exhibit A identifies the fraudulent marketing damages suffered by the Assurant Plaintiffs during the time period of 1996-2004 for which they seek recovery in this litigation, revealing in pertinent part as follows:

129889.00601/36385813v.1

| | Bipolar ($) | Migraine ($) | Neuropathic Pain ($) | Nociceptive Pain ($) | Doses >1800 mg/day ($) | Damages Pre-Rebates | Total Damages |
|---|---|---|---|---|---|---|---|
| Nominal Damages[1] | 81,206,826 | 4,015,063 | 133,837,824 | 51,214,519 | 12,771,191 | 283,045,422 | 275,403,196 |

6. As Exhibit A indicates, the Assurant Plaintiffs' marketing damages for bipolar and mood disorder indications is $81,206,826.[2]

7. As Exhibit A further indicates, the Assurant Plaintiffs' marketing damages for all other off-label indications is $201,838,597.[3] If the *Harden* putative class action proceeds to trial, the remaining Class members will not have the ability to pursue damages of this nature in that litigation.

8. The Assurant Plaintiffs have also calculated their antitrust damages for the period of the 2000-2004 during which they should have been paying for the cheaper generic gabapentin. *See* Assurant Plaintiffs' Antitrust Damages, attached hereto as Exhibit B. This calculation uses the national average third-party payor net price calculated by Dr. Hartman to determine the number of remaining prescriptions subject to antitrust analysis. The model assumes that, but for their fraudulent exclusion by Pfizer, generic competitors would have entered the market on July 16, 2000, when the pediatric exclusivity period for Neurontin ended. The but-for generic price is based on data on average generic pricing following initial generic entry presented in a National Bureau of Economic Research working paper. *See* Ernst R. Berndt & Murray L. Aitken, Brand Loyalty, Generic Entry and Price Competition in Pharmaceuticals in the Quarter Century After the 1984 Waxman-Hatch Legislation (Nat'l Bureau Econ. Res., Working Paper No. 16431,

---

[1] These nominal damages are exclusive of prejudgment interest, trebling, and discounting to that awarded to the plaintiff in *Kaiser Found. Health Plan, Inc. v. Pfizer, Inc.,* No. 05-10739-PBS (D. Mass.) ("*Kaiser*").
[2] This total is exclusive of rebates, prejudgment interest, trebling, and discounting to that awarded to the plaintiff in *Kaiser*.
[3] This total is exclusive of rebates, prejudgment interest, trebling, and discounting to that awarded to the plaintiff in *Kaiser*.

129889.00601/36385813v.1

2010). The but-for generic efficiency rate—i.e., the portion of gabapentin prescriptions during a given quarter that would have been filled by a generic—was likewise derived from the NBER paper. But-for generic expenditures were then calculated as the product of the total number of prescriptions, the but-for efficiency rate, and the but-for generic price. But-for branded expenditures (accounting for branded Neurontin that Plaintiffs would nonetheless have purchased following generic entry) are calculated by multiplying the average third party payor net price by one minus the but-for generic efficiency rate. Damages were then calculated by subtracting these but-for generic and branded expenditures from the Assurant Plaintiffs' actual expenditures.

9. Exhibit B identifies $231,931,324 as the nominal amount of the antitrust single damages suffered by the Assurant Plaintiffs from the third quarter of 2000 to the third quarter of 2004.[4] If the *Harden* putative class action proceeds to trial, the remaining Class members will not have the ability to pursue antitrust damages of this nature in that litigation.

10. This $231,931,324 figure is reduced when one eliminates double-counting resulting from the Assurant Plaintiffs' off-label marketing claims; when one so eliminates, the but-for damages related to Pfizer's anti-competitive conduct totals $180,581,883 (adjusted to the *Kaiser* verdict). *See* Exhibit C.

11. The negotiation of the Assurant Plaintiffs' 1.8 multiplier took place over many months. The negotiations of the 1.8 multiplier included intensive negotiations conducted at arm's length with counsel for Defendants Pfizer, Inc. and Warner-Lambert Company LLC (collectively, "Pfizer"). They also included intensive negotiations conducted at arm's length with Plaintiffs' Liaison Counsel and with members of the Class Plaintiffs' Steering Committee

---

[4] These nominal damages are exclusive of prejudgment interest, trebling, and discounting to that awarded to the plaintiff in *Kaiser*.

(collectively, "Class Counsel"), in their role as counsel for the putative class in Harden Manufacturing Corp. v. Pfizer, Inc., et al., No. 04-10981-PBS (D. Mass.) ("Harden"), and with counsel for class members in the Lowey/Rawlings Group of clients (who represented some 70% of the total Class).

12. Throughout, the Assurant Plaintiffs' counsel negotiated directly with counsel for Pfizer, Class Counsel, and counsel for the Lowey/Rawlings Group. At no time did Pfizer condition settlement solely on the Assurant Plaintiffs' being part of the Class. To the contrary, up until shortly before the mediation began on March 25, 2014, both the Assurant Plaintiffs and the Class Counsel had made clear that (unless the parties had reached an agreement) they each would separately negotiate with Pfizer.

13. On March 24, 2014, the Assurant Plaintiffs and the Class entered into an agreement whereby they would jointly enter into mediation with Pfizer in an attempt to resolve their claims. *See* Agreement between Blank Rome LLP and Neurontin Class Counsel, attached hereto as Exhibit D. In recognition of the strength of their additional claims, under the agreement, Assurant Plaintiffs would receive a 1.95 multiplier. Later, after additional negotiations, on April 14, 2014, the Assurant Plaintiffs and counsel for the Lowey/Rawlings Group of TPPs agreed that this would instead be reduced to a 1.8 multiplier. *See* April 15, 2014 email from Scott Simmer, attached hereto as Exhibit E.

14. Counsel for Pfizer, Class Counsel, counsel for the Lowey/Rawlings Group, and counsel for the Assurant Plaintiffs participated in full-day, in-person mediation that occurred on March 25, 2014, and April 13, 2014, before the Honorable Layn Phillips, a retired federal district court judge. On April 14, 2014, the Parties agreed to settle for $325 million.

15. Further, with the goal of achieving an agreement in principle, we participated in numerous interim phone calls and correspondence with the Parties in order to resolve the issues necessary to reach the $325 million settlement.

16. As a result of these various efforts, the parties were able to agree upon the terms of the $325 million settlement that they presented to the Court for preliminary approval.

17. The strength of the Assurant Plaintiffs' marketing and antitrust claims, and the determination of the damages flowing from those claims, were the source of considerable discussion during the course of these settlement efforts. During these intensive, arm's length negotiations, in arriving at the 1.8 multiplier, very experienced and sophisticated counsel – and their equally experienced and sophisticated TPP clients – made rational and reasonable assessments regarding the Assurant Plaintiffs' claims and damages.

18. The value of the Assurant Plaintiffs' claims, as compared to the value of the claims of the remaining Class members, was the subject of considerable, arm's length negotiations among Class Counsel, counsel for the Lowey/Rawlings group (*see* Table of Lowey/Rawlings' Clients, attached hereto as Exhibit F), and counsel for the Assurant Plaintiffs.

19. The end result of that intensive process was the parties' agreement that the fair, reasonable and appropriate valuation of those claims entitled the Assurant Plaintiffs to a multiplier of 1.8.

20. Attached hereto as Exhibit G is a table of the indirect purchaser and common law claims asserted by the Assurant Plaintiffs in their Complaint.

Signed under the penalties of perjury this 15th day of July 2014.

Dated: July 15, 2014  /s/ W. Scott Simmer
W. Scott Simmer

129889.00601/36385813v.1

**CERTIFICATE OF SERVICE**

I hereby certify that on July 15, 2014, I filed the foregoing document via this Court's CM/ECF system, which caused notice of filing to be sent electronically to counsel of record for all ECF-registered parties, in accordance with Case Management Order No. 3 (Mar. 18, 2005).

/s/ W. Scott Simmer