UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:  NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No.  1629<br><br>Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO:<br><br>CLASS ACTION | Judge Patti B. Saris<br>Mag. Judge Leo T. Sorokin |

**MEMORANDUM IN SUPPORT OF MOTION**
**FOR FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT**

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................. 1

II.    HISTORY OF THE LITIGATION ...................................................................... 2

III.   THE SETTLEMENT ........................................................................................... 8

    A.     The Settlement Class and Subclass........................................................ 8

    B.     The Settlement Fund. .............................................................................. 9

    C.     Plan of Distribution............................................................................... 10

    D.     Scope of the Release. ............................................................................ 10

    E.     Court-Approved Notice Has Been Provided to the Class....................... 11

IV.    THE SETTLEMENT CLASS MERITS CERTIFICATION UNDER
    RULES 23(a), 23(b)(3) and (23(g) ................................................................ 12

V.     THE SETTLEMENT SHOULD BE APPROVED............................................. 12

    A.     The Presumption In Favor of Settlements Applies. ............................... 13

    B.     The Relevant Factors Weigh in Favor of Final Approval...................... 14

        1.     Comparison With Likely Result of Further Litigation. .............. 14

        2.     Stage of Litigation and Amount of Discovery Completed. ......... 15

        3.     Reaction of the Class. ................................................................ 16

        4.     Quality of Counsel. .................................................................... 16

        5.     Conduct of the Negotiations. ..................................................... 17

        6.     Risks, Complexity, Expense, and Duration of the
        Litigation................................................................................... 17

VI.    CONCLUSION................................................................................................. 19

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Amchem Prods. v. Windsor*,
   521 U.S. 591 (1997)...................................................................................................... 11

*Assurant Health, Inc., et al. v. Pfizer Inc., et al.*,
   No. 05-10535-PBS (D. Mass.)........................................................................................ 3

*Bussie v. Allmerica Fin. Corp.*,
   50 F. Supp. 2d 59 (D. Mass. 1999) .............................................................................. 13

*City P'ship Co. v. Atl. Acquisition Ltd. P'ship*,
   100 F.3d 1041 (1st Cir. 1996)......................................................................... 11, 12, 13

*Exxon Shipping Co. v. Baker*,
   554 U.S. 471 (2008).................................................................................................... 15

*Giusti-Bravo v. U.S. Veterans Admin.*,
   853 F. Supp. 34 (D.P.R. 1993)............................................................................... 14, 16

*In re Compact Disc Minimum Advertised Price Litig.*,
   216 F.R.D. 197 (D. Me. 2003) ............................................................................... 13, 14

*In re Elec. Carbon Prods. Antitrust Litig.*,
   447 F. Supp. 2d 389 (D.N.J. 2006) .............................................................................. 18

*In re Global Crossing Sec. & ERISA Litig.*,
   225 F.R.D. 436 (S.D.N.Y. 2004) .................................................................................. 16

*In re Lorazepam & Clorazepate Antitrust Litig.*,
   205 F.R.D. 369 (D.D.C. 2004) ..................................................................................... 14

*In re Lupron Marketing and Sales Pracs. Litig.*,
   2005 U.S. Dist. LEXIS 17456 (D. Mass. Aug. 17, 2005) ........................................... 18

*In re Michael Milken & Assocs. Sec. Litig.*,
   150 F.R.D. 57 (S.D.N.Y. 1993) .................................................................................... 15

*In re NASDAQ Market-Makers Antitrust Litig.*,
   187 F.R.D. 465 (S.D.N.Y. 1998) .................................................................................. 14

*In re Neurontin Marketing, Sales Pracs. & Prods. Liab. Litig.*,
   244 F.R.D. 89 (D. Mass. 2007) ................................................................................ 6, 17

*In re Neurontin Marketing, Sales Pracs. & Prods. Liab. Litig.*,
   257 F.R.D. 315 (D. Mass. 2009).............................................................................. 4, 6

*In re Neurontin Marketing, Sales Pracs. & Prods. Liab. Litig.*,
   433 F. Supp. 2d 172 (D. Mass. 2006) ........................................................................... 5

# TABLE OF AUTHORITIES
## (continued)

Page

*In re Neurontin Marketing, Sales Pracs. & Prods. Liab. Litig.*,
   712 F.3d 60 (1st Cir. 2013) .................................................................... 7

*In re Neurontin Marketing, Sales Pracs. & Prods. Liab. Litig.*,
   754 F. Supp. 2d 293 (D. Mass. 2010) ...................................................... 6

*In re Nucoa Real Margarine Litig.*,
   2012 U.S. Dist. LEXIS 189901 (C.D. Cal. June 12, 2012) .................... 15

*In re Relafen Antitrust Litig.*,
   231 F.R.D. 52 (D. Mass. 2005) .................................................. 11, 13, 14, 16

*Kaiser Found. Health Plan v. Pfizer, Inc.*,
   748 F. Supp. 2d 34 (2010) ......................................................................... 6

*Lazy Oil Co. v. Wotco Corp.*,
   95 F. Supp. 2d 290 (W.D. Pa. 1997) ...................................................... 15

*Mathewson Corp. v. Allied Marine Indus., Inc.*,
   827 F.2d 850 (1st Cir. 1987) .................................................................. 17

*New England Carpenters Health Benefits Fund v. First Databank, Inc.*,
   602 F. Supp. 2d 277 (D. Mass. 2009) ............................................... 12, 13

*Pfizer, Inc., et al. v. Harden Manufacturing Corp., et al.*,
   134 S. Ct. 786 (2013) ............................................................................... 7

*Rolland v. Cellucci*,
   191 F.R.D. 3 (D. Mass. 2000) ................................................................ 16

*Strube v. Am. Equity Inv. Life Ins. Co.*,
   226 F.R.D. 688 (M.D. Fla. 2005) ........................................................... 14

*Sutton v. Medical Serv. Ass'n*,
   No. 92-4787, 1994 U.S. Dist. LEXIS 7512
   (E.D. Pa. June 8, 1994) ........................................................................... 18

*TBK Partners, Ltd. v. Western Union Corp.*,
   675 F.2d 456 (2d Cir. 1982) ................................................................... 11

*U.S. v. DiBiase*,
   45 F.3d 541 (1st Cir. 1995) .................................................................... 17

**Rules**

Fed. R. Civ. P. 23(c)(2)(B) ......................................................................... 11

Fed. R. Civ. P. 23(e) .................................................................................... 11

Fed. R. Civ. P. 23(e)(2) ............................................................................... 12

## I.   __INTRODUCTION__

Class Plaintiffs[1] respectfully submit this Memorandum of Law in Support of Their

Motion for Final Approval of Proposed Settlement.  The proposed settlement which provides for

the payment of $325 million to settle the claims of third-party payors of Neurontin is

unquestionably fair, reasonable, and adequate.  It is the result of more than a decade of hard-

fought litigation, involving the assimilation and review of a massive amount of information

adduced during years of discovery, motion practice, and appeals, followed by intensive arms-

length negotiation between experienced and knowledgeable counsel under the guidance of a

well-respected and highly sophisticated mediator.  The settlement eliminates further delay and

risk in the litigation, eliminating the time, risk and costs of trial and appeal, in favor of a "mega-

fund" settlement now, offers substantial and long-awaited benefits to thousands of class

members who paid for Neurontin, and is deserving of final approval.

The $325 million class settlement is one of the very largest purchase claim settlements

ever obtained, in an era of increased challenges in class action and purchase claim litigation.

This case held no settlement value or interest on the part of defendant unless and until the

recurring barriers to class certification were eliminated, the denial of class certification was

vacated and summary judgment reversed, and the path toward trial was cleared.  These were the

necessary conditions for any settlement.  At this point, intensive, hard-fought, thoroughly

informed negotiations produced the optimum settlement under the circumstances: the maximum

possible recovery available at this stage of the litigation was obtained.

Plaintiffs' counsel then faced a crucial decision.  We were finally in a position to deliver

substantial – indeed, extraordinary – relief to class members now, without delay, without risk.  In

---

[1] Class Plaintiffs are Harden Manufacturing Corporation, Louisiana Blue Cross/Blue Shield, and
ASEA/AFSCME Local 52 Health Benefits Trust.

- 1 -

the alternative, we could reject the settlement, in favor of a further appellate challenge to the class certification the court indicated it was leaning toward granting, followed by (we hoped) victory in defending the class against Rule 23(f) challenge; followed by a trial, and an appeal from any verdict favoring plaintiffs.

Even assuming minimal risk at every stage of this added litigation, and confident of the merits of our claims and of our ability to prove them, confident of the propriety of class certification, and confident that, at the end of these additional years, we would have a plaintiffs' judgment to show for it, we could not reasonably represent to the class, or to the Court, that this was a superior, or even a reasonable choice.  Knowing when to resolve a long and hard-fought case is an art, not a science.  With due deliberation, we chose to settle optimally, when the case was on an upward trajectory – the best time to maximize and monetize its value.  We respectfully submit that the Court's evaluation of this settlement's fairness, adequacy and reasonableness does and should involve the same considerations.  Doing so results, we submit, in one conclusion:  the best interests of the class are promoted and vindicated by the final approval of the proposed settlement.  Accordingly, Class Plaintiffs, pursuant to Federal Rule of Civil Procedure 23, respectfully request that the Court grant final approval to the proposed settlement.[2]

## II.    HISTORY OF THE LITIGATION

The Court is familiar with the history of this litigation, and the Declaration of Thomas M. Greene In Support of Final Approval of Class Settlement ("Greene Decl."), filed contemporaneously with this Memorandum, provides a complete recounting of the progress of this case from its inception to proposed settlement.  A summary of the litigation follows below.

In May 2004, defendant Warner Lambert, later acquired by defendant Pfizer, settled

---

[2] Class Plaintiffs submitted a proposed order granting approval of the proposed settlement on May 30, 2014 (Dkt. No. 4260-3).

criminal and civil claims relating to the off-label marketing of Neurontin, including a *qui tam* action brought by David Franklin.  Warner Lambert also pleaded guilty to a violation of the Food, Drug & Cosmetic Act.  In the wake of that settlement and guilty plea, numerous class actions were brought by payors of Neurontin, alleging economic harm stemming from payments for Neurontin.  Greene Decl. ¶¶ 7-8.  These complaints were centralized for pretrial proceedings before this Court as Multidistrict Litigation No. 1629.

On December 16, 2004, the Court entered an order, establishing, among other things, the Plaintiffs' Steering Committee and delineating its responsibilities for the management of the consolidated actions.  *See* Dkt. No. 15.  Class Plaintiffs filed a consolidated class action complaint on February 1, 2005 (Dkt. No. 30), asserting violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 ("RICO") and other statutory and common law claims.  Other third-party payor plaintiffs filed separate individual cases against Defendants asserting substantially the same claims, as well as state antitrust and state consumer protection claims, including a group of payors referred to here and in the settlement agreement as the Assurant Plaintiffs.[3]  *See* Settlement,[4] at 1-2; *Assurant Health, Inc., et al. v. Pfizer Inc., et al.*, No. 05-10535-PBS (D. Mass.).

In their complaint, Class Plaintiffs alleged that Defendants engaged in a fraudulent

---

[3] The Assurant Plaintiffs include:  Assurant Health, Inc.; Blue Cross and Blue Shield of Florida, Inc.; Louisiana Health Service & Indemnity Company; Blue Cross Blue Shield of Massachusetts; Blue Cross Blue Shield of Michigan; Blue Cross Blue Shield of Minnesota, CareFirst, Inc., Excellus Health Plan, Inc.; Federated Mutual Insurance Company; Group Health of Oklahoma, Health Care Service Corporation; Mutual of Omaha Insurance Company; Trustmark Insurance Company; Wellchoice, Inc. and Wellchoice of New Jersey, Inc. (now part of WellPoint, Inc.).

[4] The Settlement Agreement was attached as Exhibit A to Class Plaintiffs' Memorandum of Law In Support of Motion for Preliminary Approval (Dkt. No. 4259).  The Settlement Agreement was also available on the website dedicated to this Settlement and to class members who requested it by phone or mail.

- 3 -

scheme to market and sell Neurontin for a variety of uses for which it was neither approved by the Food and Drug Administration ("FDA") nor medically efficacious. Although the FDA approved Neurontin for a relatively narrow indication – as adjunctive therapy for adult epilepsy, and later, for treatment of post-herpetic neuralgia – Class Plaintiffs alleged that Defendants sought to market Neurontin for several off-label uses in a variety of false or misleading ways, including through statements to physicians at conferences and medical education events, directly to physicians through sales representatives, and in medical publications.  As the Court summarized Class Plaintiffs' allegations, "plaintiffs allege[d] that defendants' off-label promotion scheme constituted a pervasive fraud designed to saturate the medical community with false information about Neurontin's efficacy for several highly profitable off-label indications."  *In re Neurontin Marketing, Sales Pracs. & Prods. Liab. Litig.*, 257 F.R.D. 315 (D. Mass. 2009).  Importantly, Class Plaintiffs' claims were based on a different legal theory than the one underlying the *qui tam* action, requiring evidence not only of off-label marketing, but of fraud.  *See* Greene Decl. ¶¶ 11-12.

The Assurant Plaintiffs' case, filed on November 24, 2004 as an individual action against Pfizer in state court in New Jersey, was removed by Pfizer to federal court and ultimately transferred to the Marketing and Sales MDL in the District of Massachusetts.  Since its initial transfer in 2004 to the Marketing and Sales MDL, the Assurant Plaintiffs' original complaint has been stayed by stipulation, at the direction of the Court.  That stay required all appeals to be exhausted, including any petition before the Supreme Court, before it could be lifted.  The Assurant Plaintiffs' claims were described in detail in a memorandum submitted to the Court in connection with preliminary approval of the Settlement.  *See* Dkt. No. 4273.

Meanwhile, litigation continued apace in the Neurontin MDL.  Defendants moved to

dismiss Class Plaintiffs' consolidated complaint.  The Court referred the motion to Magistrate

Judge Sorokin, whose Report and Recommendation stated, in part, that Plaintiffs' RICO claims

should be dismissed.  After a second round of briefing on the parties' objections to the Report

and Recommendation, the Court granted in part Defendants' motion to dismiss Class Plaintiffs'

complaint, *see In re Neurontin Marketing, Sales Pracs. & Prods. Liab. Litig.*, 433 F. Supp. 2d

172 (D. Mass. 2006), allowed amendment, and allowed Plaintiffs' RICO claims to proceed.

Pfizer unsuccessfully attempted to dismiss Plaintiffs' next complaint (Dkt. No. 379), and

Plaintiffs ultimately filed a third and fourth amended complaint.  *See* Dkt. Nos. 580 and 3373.

     MDL fact discovery commenced on March 18, 2005, moved forward on a sustained and

intensive pace, and ended four and a half years (millions of documents and approximately 150

depositions) later, on December 18, 2009.  Over those years,  Defendants produced 212,823

documents comprising 3,388,576 pages, as well huge proprietary databases which described

Pfizer's sales force detailing, physician contacts, and sales information, and its New Drug

Application file for Neurontin, which included voluminous materials on clinical studies of

Neurontin.  Greene Decl. ¶¶ 30, 32.  In addition, third parties produced 138,000 documents

comprising close to one million pages.  *Id.* ¶ 31.  Deposition testimony was equally intensive,

involving 121 depositions of 79 fact witnesses, and 27 depositions of thirteen experts.  *Id.* ¶¶ 34-

35.  Counsel for the Assurant Plaintiffs worked actively and in coordination with Class Counsel

and counsel for the Coordinated Plaintiffs (Kaiser Foundation Health Plan and Kaiser

Foundation Hospitals, Guardian Life Insurance Company, and Aetna, Inc.) on document

discovery and fact and expert depositions.  Counsel's efforts uncovered strong evidence that

Defendants engaged in fraud in the marketing of Neurontin.  *See id.* ¶ 43.

     The parties heavily litigated class certification.  Class Plaintiffs' first class certification

- 5 -

motion was briefed, heard, and denied without prejudice in 2007.  *See In re Neurontin Marketing, Sales Pracs. & Prods. Liab. Litig.*, 244 F.R.D. 89 (D. Mass. 2007).  Plaintiffs renewed their motion for class certification, which the Court denied after further briefing and hearing, in 2009.  *In re Neurontin Marketing, Sales Pracs. & Prods. Liab. Litig.*, 257 F.R.D. 315 (D. Mass. 2009).  Class Plaintiffs moved for reconsideration of the Court's denial of their renewed motion for class certification and proposed a narrower class, consisting of TPPs who paid for Neurontin prescriptions for bipolar disorder.  Again, after more briefing and consideration, the Court denied that motion in 2011.  *See In re Neurontin Marketing, Sales Pracs. & Prods. Liab. Litig.*, 2011 U.S. Dist. LEXIS 61636 (D. Mass. May 17, 2011).  Prior to this motion for reconsideration, the Court granted Defendants' summary judgment motion as to all plaintiffs except two consumer class representatives.  *In re Neurontin Marketing, Sales Pracs. & Prods. Liab. Litig.*, 754 F. Supp. 2d 293 (D. Mass. 2010).

At the hearing on summary judgment in September 2009, the Court told the parties that it believed a trial would be beneficial to the Court's understanding of the marketing fraud claims and causation issues.  Greene Decl. ¶ 87.  The Court then requested that Kaiser, a coordinated non-class plaintiff, proceed with a bellwether trial, and Kaiser requested that members of the Class Plaintiffs' Steering Committee serve as co-counsel for that trial.  *Id.* ¶¶ 87-88.  The Kaiser trial resulted in a substantial jury verdict in favor of Kaiser on its RICO claims and the Court's detailed Amended Findings of Fact and Conclusions of Law, in which the Court held that Defendants had violated California's Unfair Competition Law in its marketing of Neurontin.  *See Kaiser Found. Health Plan v. Pfizer, Inc.*, 748 F. Supp. 2d 34 (2010).[5]  Nearly all of the trial

---

[5] As the Greene Declaration explains, Class Counsel have been separately compensated for their work for Kaiser, and the accompanying motion for an award of attorneys' fees excludes time devoted to those services.  *See* Greene Decl. ¶ 88; Sobol Decl. ¶ 21.

exhibits submitted to prove Pfizer's liability (except for Kaiser-specific ones) were exhibits to Class Plaintiffs' summary judgment opposition, and all but one of Class Plaintiffs' experts testified for Kaiser, reflecting the intensively detailed, trial-ready record developed in the class case.  Greene Decl. ¶ 90.

Class Plaintiffs timely appealed the Court's decisions on summary judgment and class certification.  In 2013, the First Circuit Court of Appeals reversed the grant of summary judgment and vacated the denial of class certification.  *See In re Neurontin Marketing, Sales Pracs. & Prods. Liab. Litig.*, 712 F.3d 60 (1st Cir. 2013).  Pfizer petitioned the United States Supreme Court for a writ of certiorari, which Class Plaintiffs opposed and which the Supreme Court denied on December 9, 2013.  *See Pfizer, Inc., et al. v. Harden Manufacturing Corp., et al.*, 134 S. Ct. 786 (2013).  Upon remand, Class Plaintiffs again renewed their motion for class certification (Dkt. No. 4153), and Pfizer again opposed the motion (Dkt. No. 4168).  The Court held a hearing on that motion on February 24, 2014, and set trial to begin in October 2014.  On April 4, 2014, class counsel filed a Motion to Preclude Relitigation of Issues and Facts Determined by the *Kaiser* Triers of Fact (Dkt. No. 4242), seeking to streamline the upcoming trial.

While the most recent class certification motion was pending, the parties began intensive arms-length negotiations aimed at resolving all pending claims, including those asserted by the Class Plaintiffs and by the Assurant Plaintiffs.  The parties engaged a highly experienced and universally respected mediator, Hon. Layn Phillips, a retired federal district court judge, and held a full-day, in-person mediation on March 25, 2014.  A second in-person, full-day mediation on April 13, 2014 followed, with numerous interim phone calls and correspondence between the parties and their counsel, resulting in an agreement in principle.  Counsel submits that their

thorough knowledge of the applicable substantive and class action law, the facts adduced through

extensive discovery and the experience of the Kaiser RICO trial, and the assistance and acumen

of the mediator, known for his sophistication and familiarity with the dynamics  and risks of

complex economic litigation, combined to produce an optimal settlement.  Class Plaintiffs filed

their motion for preliminary approval of the proposed settlement on May 30, 2014, which the

Court granted on July 25, 2014.  Notice has been given to the Class, and the Plaintiffs most

familiar with the litigation have indicated their wholehearted support for this resolution.

## III.   THE SETTLEMENT

### A.   The Settlement Class and Subclass.

In its order granting preliminary approval to this proposed settlement, this Court certified

the following class:

> All third-party payors ("TPPs") in the United States and its
> territories who purchased, paid for, administered, and/or
> reimbursed all or any portion of the price for Neurontin or for
> gabapentin sold by Greenstone LLC at any time from their first
> sale in the United States through the Effective Date for purposes
> other than resale.  The TPPs in the Class include, but are not
> limited to, insurance companies, healthcare benefit providers,
> health maintenance organizations, union health and welfare plans,
> self-funded health and welfare plans, and any other health benefit
> provider and/or entity that contracts with a health insurance
> company or other entity to serve as a third-party claims
> administrator to administer their prescription drug benefits, entities
> that may provide prescription drug benefits for current or former
> public employees and/or retirees, and private entities that provide
> pharmacy benefits for a state Medicaid program or Medicare Part
> D to the extent such entities are at risk for the payment of the cost
> of Neurontin prescriptions for their insureds; provided that the
> following TPPs are excluded from the Class:  Kaiser Foundation
> Health Plan, Inc. and its subsidiaries; Aetna, Inc.; Blue Cross and
> Blue Shield of Alabama; Municipal Workers Compensation Fund,
> Inc.; and Union of Operating Engineers, Local No. 68 Welfare
> Fund.

Dkt. No. 4277, at 2-3.  The Court's preliminary approval order also set out, in addition to

certain named TPPs, the following exclusions from the class: (a) the Defendants and their

officers, directors, management, employees, predecessors-in-interest, successors-in-interest,

assignees or affiliates, and subsidiaries; (b) the United States and/or State governments and their

agencies and department, except to the extent they purchased branded Neurontin or its generic

equivalents for their employees or others covered by a government employee health plan; and (c)

any judge or special master who has presided over the Actions.

> The Court's order also certified the following Subclass:

>> All indirect purchasers in the Class who, on or before
>> December 31, 2008, commenced a lawsuit alleging that the
>> Defendants violated state antitrust laws by delaying the entry of
>> generic gabapentin into the marketplace and which was still
>> pending as of May 13, 2014.

>> Subclass A includes the plaintiffs in *Assurant Health, Inc., et al. v.
>> Pfizer, Inc., et al.*, 04-cv-10981-PBS identified as Assurant Health,
>> Inc.; Blue Cross and Blue Shield of Florida, Inc.; Louisiana Health
>> Service & Indemnity Company; d/b/a Blue Cross Blue Shield of
>> Louisiana; Blue Cross Blue Shield of Massachusetts; Blue Cross
>> Blue Shield of Michigan; Blue Cross Blue Shield of Minnesota;
>> CareFirst, Inc.; Blue Cross Blue Shield of Delaware, Inc.; Excellus
>> Health Plan, Inc.; Federated Mutual Insurance Company; Group
>> Health of Oklahoma, Health Care Service Corporation, Mutual of
>> Omaha Insurance Company, Trustmark Insurance Company,
>> WellChoice, Inc. and WellChoice of New Jersey, Inc. as well as
>> their subsidiaries and affiliates named in the Assurant Action and
>> self-insured customers on whose behalf they had authority to
>> pursue claims in the Assurant Action.

> *Id.* at 3.

**B.     The Settlement Fund.**

The Settlement provides for the creation of a $325,000,000 fund to settle the claims of

Class and Subclass members.  Those funds will be used to pay valid claims submitted by class

members pursuant to the Plan of Distribution (attached as Exhibit C to the Settlement),

compensation to the class members and reasonable attorneys' fees and expenses approved by this

Court[6], and the costs of administration of the Settlement, including costs associated with notice.

C.      **Plan of Distribution.**

The Settlement incorporates a Plan of Distribution, which was attached as Exhibit C to the Settlement and sets forth the process by which Class Members may submit claims to payment from the Settlement Fund, including required documentation, and the method of calculation of settlement payments that the Court-appointed Claims Administrator, Rust Consulting ("Rust") will employ in administering claims from Class Members and Subclass Members.

As the Plan of Distribution explains to Class and Subclass members, properly supported claim amounts from the Class, as accepted by the Settlement Administrator will receive a value of 1.0.  Subclass members are given a value of 1.8 on properly supported claims, reflecting the fact that Subclass members filed and litigated claims not asserted by Class Plaintiffs.  All claims are added together, and all Class members receive a pro rata share of the net fund.  In response to the Court's questions about this aspect of the Plan of Distribution, the Assurant Plaintiffs submitted a detailed memorandum with further explanation of the claims of the Subclass and estimated damages.  Dkt. No. 4273.

D.      **Scope of the Release.**

The Settlement provides that Class Members and the Subclass Members will release Defendants from any claims they may have related to the issues in this litigation.  (Settlement ¶ 11.)  Although Class Plaintiffs focused their claims later in the litigation to those involving prescriptions for bipolar and other mood disorders, the release will encompass all claims and all indications that were or could have been asserted in the MDL.  "It is well-settled that 'in order to

---

[6] Class Plaintiffs' request for reasonable attorneys' fees, reimbursement of expenses, and compensation for the Class Plaintiffs is the subject of a separate motion, filed contemporaneously with this one.

achieve a comprehensive settlement that would prevent relitigation of settled questions at the core of a class action, a court may permit the release of a claim based on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented and might not have been presentable in the class action.'" *City P'ship Co. v. Atl. Acquisition Ltd. P'ship*, 100 F.3d 1041, 1044 (1st Cir. 1996) (quoting *TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456, 460 (2d Cir. 1982)); *see also In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 73 (D. Mass. 2005).

## E.    Court-Approved Notice Has Been Provided to the Class.

Under Rule 23(e), this Court must direct notice in a reasonable manner to Class Members who would be bound by the proposed class settlement.  *See* Fed. R. Civ. P. 23(e).  Rule 23(c)(2)(B) requires "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B); *see also Amchem Prods. v. Windsor*, 521 U.S. 591, 617 (1997).  Plaintiffs submitted a notice plan whose content and means of dissemination were designed in consultation with the uniquely experienced and respected notice experts at Kinsella/Rust.  In its order preliminarily approving this proposed settlement, the Court approved the proposed plan and form of notice, finding that they met the requirements of due process and Rule 23(c) and (e).  *See* Dkt. No. 4267, at 6-7.

Pursuant to that order, Class Counsel, through the Court-appointed claims administrator, Rust, implemented the plan of notice.  As the accompanying Declaration of Elizabeth Levine, a project manager at Rust, sets forth, notices have been individually mailed to class members, using Rust's database of more than 40,000 third-party payor addresses.  Levine Decl. ¶ 4.  The summary notice has been published in both the *Wall Street Journal* and *National Underwriter: Life & Health Magazine*.  A website and toll-free telephone line was established to provide

complete documentation and information to class members concerning the settlement and the process for submitting claims from the settlement fund. *Id.* ¶¶ 9-11.

## IV. THE SETTLEMENT CLASS MERITS CERTIFICATION UNDER RULES 23(a), 23(b)(3) and (23(g)

This Court is intimately familiar with the factual allegations in this case, the substantive law that applies to them, the relevant appellate decisions on class action jurisprudence generally, and in this case. As such, the Court is in a thoroughly informed position, previously held preliminarily that the requirements of Rule 23(a) and Rule 23(b)(3) are satisfied for both the Class and Subclass, and that class counsel also satisfy the requirements of Rule 23(g). *See* Dkt. No. 4277 (granting preliminary approval of proposed settlement). The Court can and should make the same findings for purposes of confirming settlement-purposed class certification, and granting final approval of the proposed settlement.

## V. THE SETTLEMENT SHOULD BE APPROVED

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, the Court may approve a proposed class action settlement "after a hearing and on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). "When sufficient discovery has been provided and the parties have bargained at arms-length, there is a presumption in favor of the settlement." *City P'shp. Co. v. Atlantic Acquisition Ltd. P'shp.*, 100 F.3d 1041, 1043 (1st Cir. 1996). "[T]he First Circuit has not established a fixed test for evaluating the fairness of a settlement." *New England Carpenters Health Benefits Fund v. First Databank, Inc.*, 602 F. Supp. 2d 277, 280 (D. Mass. 2009) (citation omitted). However, Courts in this Circuit have applied a variety of factors, including "(1) comparison of the proposed settlement with the likely result of litigation; (2) reaction of the class to the settlement; (3) stage of the litigation and the amount of discovery completed; (4) quality of counsel; (5) conduct of the negotiations; and (6) prospects of the case,

including risk, complexity, expense and duration." *In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 72 (D. Mass. 2005) (citing *In re Compact Disc Minimum Advertised Price Litig.*, 216 F.R.D. 197, 206 (D. Me. 2003)).  The Court's determination "is not based on a single inflexible litmus test but, instead, reflects [the court's] studied review of a wide variety of factors bearing on the central question of whether the settlement is reasonable in light of the uncertainty of litigation." *New England Carpenters*, 602 F. Supp. 2d at 280 (quoting *Bussie v. Allmerica Fin. Corp.*, 50 F. Supp. 2d 59, 72 (D. Mass. 1999)).

A.     **The Presumption In Favor of Settlements Applies.**

This settlement came about after years of intensely fought litigation, including five years of fact and expert discovery, a bellwether trial, an appeal to the First Circuit and a writ of certiorari to the United States Supreme Court, and remand to the district court for trial preparation.  It followed two days of in-person arms-length negotiations under the supervision of an experienced and well-respected mediator, plus interim communications between the parties. *See* Declaration of Thomas M. Sobol ("Sobol Decl.") ¶¶ 16-17.  There can be no question that counsel fully developed this case, or that the negotiations were anything but at arm's length. Under these circumstances, the Court can and should presume that the proposed settlement is fair, reasonable, and adequate. *See City P'shp. Co.*, 100 F.3d at 1043.

The increasing challenge to, and appellate scrutiny, class certification decisions and trial outcomes amplifies the long-established presumption in favor of settlement.  Class certification, once granted, is far from secure, as the ultimate fate of the *Wal-Mart* class illustrates.  As advocates, Class Counsel are confident of the merits of their class and the merits of the Class' case.  But serving as Class Counsel demands fiduciary restraint as well as zealous advocacy, and the responsibility to seek and deliver a fair recovery in a reasonable time warrants – indeed compels – their request and recommendation for settlement approval.

**B.    The Relevant Factors Weigh in Favor of Final Approval.**

**1.    Comparison With Likely Result of Further Litigation.**

In applying this factor, the Court asks "how the value of the settlement compares to the relief the plaintiffs might recover after a successful trial and appeal, discounted for risk, delay, and expense." *In re Compact Disc*, 216 F.R.D. at 207; *see also Giusti-Bravo v. U.S. Veterans Admin.*, 853 F. Supp. 34, 36 (D.P.R. 1993) (noting that if settlement were rejected, "plaintiffs could very well face a long and winding road toward trial and almost unsurmountable obstacles in attempting to obtain a more comprehensive relief than the one provided").  In making this assessment, a court is not to "decide the merits of the case or resolve unsettled legal questions," *Giusti-Bravo* at 36, but instead should limit its inquiry to "whether the possible rewards of continued litigation with its risks and costs are outweighed by the benefits of the settlement." *Strube v. Am. Equity Inv. Life Ins. Co.*, 226 F.R.D. 688, 697 (M.D. Fla. 2005) (internal citation and quotation omitted).

This is among the largest of purchase claims class settlements, providing substantial benefits to Class members. The potential for a larger recovery at trial certainly exists, but it is far outweighed by the immediate and sizeable benefits that can begin flowing to Class members. *See In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 66 (D. Mass. 2005) ("Although fully litigating the claims through trial could possibly result in a higher recovery, the settlement represents a necessary compromise between inherent risks of doing so and a guaranteed cash recovery." *quoting In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 394 (D.D.C. 2004)).

Of course, trial is always very risky, particularly in a case like this one involving highly technical material as to causation and damages.  *See In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 476 (S.D.N.Y. 1998) (observing that "[d]amages at trial would inevitably involve a 'battle of the experts'" and noting that it is "difficult to predict with any certainty

which testimony would be credited").  Although class counsel were and remain willing and able to proceed to trial, "no matter how confident one may be of the outcome of litigation, such confidence is often misplaced." *Lazy Oil Co. v. Wotco Corp.*, 95 F. Supp. 2d 290, 337 (W.D. Pa. 1997) (internal quotation and citation omitted) (citing cases in which settlements were disapproved and plaintiffs subsequently lost at trial).  Among us, we have tried many cases, both in class cases and in individual cases.  We have seen class trial victories of this settlement's magnitude, and larger, be overturned, or severely reduced, on appeal.  The ill-fated odyssey of the *Exxon-Valdez* litigation, in which a $5 billion class verdict was reduced, after 14 years of appeals, to one-tenth of that amount by the Supreme Court, is but one example from this experience.[7]  This does not cause us to shy away from trial.  In the absence of a reasonable settlement, it is the only course.  Here, hard-fought pretrial and appellate efforts provided substantial settlement value, which intensive negotiations have delivered, and which, once approval is final, will never be at risk of evaporation.

Moreover, a verdict in favor of the class would undoubtedly – given Pfizer's size and resources and the likely size of such a verdict – prompt lengthy appeals.  *See In re Michael Milken & Assocs. Sec. Litig.*, 150 F.R.D. 57, 65 (S.D.N.Y. 1993) (noting that "[i]t must also be recognized that victory even at the trial stage is not a guarantee of ultimate success" and citing a case where a multimillion dollar judgment was reversed).  "Estimates of what constitutes a fair settlement figure are tempered by factors such as the risk of losing at trial, the expense of litigating the case, and the expected delay in recovery (often measured in years)."  *In re Nucoa Real Margarine Litig.*, 2012 U.S. Dist. LEXIS 189901, at *46 (C.D. Cal. June 12, 2012).

### 2.      Stage of Litigation and Amount of Discovery Completed.

This factor is designed to determine whether the parties have developed the case such that

---

[7] For an account of the litigation, *see Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008).

"an accurate assessment of each party's chances at trial" is possible. *Giusti-Bravo*, 853 F. Supp. at 38. To satisfy this requirement, even "[f]ormal discovery is not a prerequisite; the question is whether the parties had adequate information about their claims." *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 458 (S.D.N.Y. 2004).

As the Court is aware, the parties developed this case over five years of discovery, through a bellwether trial, and in preparation for an October class trial. Discovery included the review and analysis of millions of pages of documents from Defendants and third parties, more than one hundred depositions, extensive expert discovery, dozens of discovery motions, and a summary judgment determination. *See* Greene Decl. ¶¶ 24-35; 45-65. Plainly, "[t]his is not a case where the bulk of the attorneys' time was spent on negotiations." *In re Relafen*, 231 F.R.D. at 62. Rather, the parties fully vetted and litigated this case, and were prepared to bring the case to a jury (and indeed, had done so once, serving as counsel in the Kaiser trial). This factor weighs heavily in favor of approval of the settlement.

### 3.  Reaction of the Class.

Fifteen days remain before the deadline to opt-out or object to the Settlement, but the reaction from the Class as of the filing of this motion has been overwhelmingly positive. To date, of the more than 40,000 class members who received direct notice of the Settlement, not one has opted out of the Settlement. One has filed an objection (Dkt. No. 4277), which class counsel will address prior to the hearing on final approval, along with other objections, if any.

### 4.  Quality of Counsel.

"When the parties' attorneys are experienced and knowledgeable about the facts and claims, their representations to the court that the settlement provides class relief which is fair, reasonable, and adequate should be given significant weight." *Rolland v. Cellucci*, 191 F.R.D. 3, 10 (D. Mass. 2000). This Court has held that class counsel are "experienced and highly-

qualified." *In re Neurontin Marketing, Sales Pracs. & Prods. Liab. Litig.*, 244 F.R.D. 89 (D. Mass. 2007).

        5.        **Conduct of the Negotiations.**

As the accompanying Sobol Declaration details, the parties' settlement negotiations were intensive and conducted at arm's length.  The negotiations, which began after the Court held a hearing on Class Plaintiffs' post-remand motion for class certification, were supervised by Hon. Layn Phillips, a retired federal judge and highly experienced mediator, over two in-person sessions, interim correspondence and teleconferences, and subsequent efforts over more than a month to finalize the agreement.

The negotiations themselves were attended by multiple plaintiffs' representatives who were intimately familiar with the case, including counsel primarily responsible for discovery and briefing, counsel with extensive class action experience, counsel involved in other class-related issues at the Circuit and Supreme Court levels, counsel who had tried third-party payor and other class action cases, and counsel thoroughly familiar with contemporary class settlement approval criteria.  Thorough written and oral presentations were exchanged and made to the mediator. Extensive background materials were available.  The mediation process included nights and weekends, and were informed by the certain knowledge, on both sides, that if a satisfactory settlement could not be reached, the litigation would continue apace, with risks and costs to both sides unabated.

        6.        **Risks, Complexity, Expense, and Duration of the Litigation.**

This factor captures the "prudential policy favoring settlement as a preferred alternative to costly, time-consuming litigation." *Mathewson Corp. v. Allied Marine Indus., Inc.*, 827 F.2d 850, 852 (1st Cir. 1987); *U.S. v. DiBiase*, 45 F.3d 541, 546 (1st Cir. 1995) ("[S]ettlements reduce excessive litigation expenses and transaction costs.").  This case presented enormous risks

throughout, and continued to present genuine risk even after remand from the First Circuit.  The only certainty going forward to trial (which was scheduled to begin in October 2014) was that counsel would continue to incur expenses and expend time on this litigation, and whatever uncertain recovery class members would potentially realize would be delayed to an uncertain date.

At the time that the parties entered mediation, both sides faced substantial risk and uncertainty.  The Court had not yet granted class certification.  Class Plaintiffs would have had to survive a Rule 23(f) petition and then proceeded to trial.  Trial itself would have been extremely risky, particularly proving damages, which can be, as one court has noted, "an esoteric exercise with unpredictable results." *In re Elec. Carbon Prods. Antitrust Litig.*, 447 F. Supp. 2d 389, 401 (D.N.J. 2006). *See also Sutton v. Medical Serv. Ass'n*, No. 92-4787, 1994 U.S. Dist. LEXIS 7512, at *18 (E.D. Pa. June 8, 1994) (granting final approval, noting that "even assuming that plaintiffs ultimately would have prevailed on liability, they faced the risk that they could not establish damages . . . that is achieved by this Settlement Agreement"); *In re Lupron Marketing and Sales Pracs. Litig.*, 2005 U.S. Dist. LEXIS 17456, at *16 (D. Mass. Aug. 17, 2005) ("History is replete with cases in which plaintiffs prevailed at trial on issues of liability, but recovered little or nothing by way of damages.").

Plaintiffs' counsel negotiated this settlement in an attitude of confidence, borne of familiarity with the facts, that they would prevail on class certification, and (if class certification were upheld on a Rule 23(f) challenge), would prevail at trial.  They recognized, however, that even a victory at trial and ultimately prevailing on appeal would have associated costs, with compensation to Class members pushed off potentially by years, and the possibility of new and negative decisions on class certification and RICO.  Pfizer, in turn, faced the possibility of a

- 18 -

published opinion granting class certification, and a class trial in which Class Plaintiffs may have

had the benefit of an order from the Court precluding Pfizer from re-arguing certain issues

decided by the Kaiser jury.

In sum, the risks of the litigation have been extreme throughout the ten years this case has

been pending, and continuing to litigate also posed substantial risk.

**VI.    CONCLUSION**

This outstanding settlement reflects more than ten years of intensely fought litigation and

an arms-length negotiation between counsel on both sides who are experienced, zealous, and

committed advocates, and who fully understood the strengths, weaknesses, and risks of

continuing to litigate.  From such crucibles are fair, adequate, and reasonable class settlement

forged.  Class Plaintiffs respectfully request that the Court certify the Settlement Class and

Subclass and grant final approval of this proposed settlement, and confirm its settlement-

purposes class certification.


Dated:  September 15, 2014                 Respectfully Submitted,



                                 By:     */s/ Thomas M. Greene*
                                         Thomas M. Greene
                                         tgreene@greenellp.com
                                         Greene LLP
                                         One Liberty Square, Ste. 1200
                                         Boston, MA 02109


                                 By:     */s/ Thomas M. Sobol*
                                         Thomas M. Sobol
                                         Hagens Berman Sobol Shapiro LLP
                                         One Main Street, 4th Floor
                                         Cambridge, MA  02142
                                         Boston, MA 02110

By:      */s/ Elizabeth J. Cabraser*
         Elizabeth J. Cabraser
         Lieff Cabraser Heimann &
            Bernstein, LLP
         275 Battery Street, 29th Floor
         San Francisco, CA 94111-3339

By:      */s/ Don Barrett*
         Don Barrett
         Barrett Law Office
         404 Court Square North
         P.O. Box 987
         Lexington, MS 39095

By:      */s/ Daniel Becnel*
         Daniel Becnel, Jr.
         Law Offices of Daniel Becnel, Jr.
         106 W. Seventh Street
         P.O. Drawer H
         Reserve, LA 70084

By:      */s/ James Dugan*
         James R. Dugan, II
         The Dugan Law Firm
         365 Canal Street, Suite 1000
         New Orleans, LA 70131

         ***Members of the Class Plaintiffs'***
         ***Steering Committee***

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served on

September 15, 2014.

                    */s/ Thomas M. Greene*
                    Thomas M. Greene