# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1629<br><br>Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO:<br><br>HARDEN MANUFACTURING CORPORATION; LOUISIANA HEALTH SERVICE INDEMNITY COMPANY, d/b/a BLUECROSS/BLUESHIELD OF LOUISIANA; ASEA/AFSCME LOCAL 52 HEALTH BENEFITS TRUST; JAN FRANK WITYK; and GARY VARNAM, on behalf of themselves and all others similarly situated,<br><br>  Plaintiffs,<br><br>v.<br><br>PFIZER INC. and WARNER-LAMBERT COMPANY,<br><br>  Defendants. | Chief Judge Patti B. Saris<br>Magistrate Judge Leo T. Sorokin |

## DECLARATION OF ELIZABETH LEVINE
## RE: MAILING AND PUBLICATION OF NOTICE TO THE CLASS

The undersigned, Elizabeth Levine, hereby states that:

1. I am a Project Manager for Rust Consulting, Inc. ("Rust").  I am over 21 years of age and am not a party to this action.  I have personal knowledge of the facts set forth herein and, if called as a witness, could and would testify competently thereto.

2. I submit this Declaration in order to provide the Court and the parties to the above-captioned action with information regarding the mailing and publication of Notice to potential Class Members.

### MAILING OF THE NOTICE

3.      Rust was appointed Claims Administrator, pursuant to ¶ 11 of the Order Granting Preliminary Approval of the Class Action Settlement Agreement and Release, Directing Notice to the Class, and Scheduling Fairness Hearing dated July 25, 2014 (the "Preliminary Approval Order"). The Claims Administrator, among other things, shall: (a) establish a post office box and toll-free phone number for purposes of communicating with Class Members; (b) establish and maintain a website for purposes of posting the Settlement Notice, the Settlement Agreement and related documents; and (c) accept and maintain electronic data and paper documents sent from Class Members relating to claims administration.

4.      Pursuant to ¶¶ 8 and 9 of the Declaration of Daniel Coggeshall in Support of Proposed Settlement Notice Program, Form of Notice and Appointment of Notice Administrator dated May 21, 2014 ("Coggeshall Declaration", Dkt. No. 4260-1), Rust maintains a separate and distinct database ("TPP Mailing Database") containing over 40,000 potential TPP Class Members to be used for mailing purposes.

5.      On August 5, 2014, pursuant to ¶ 10 of the Preliminary Approval Order, Rust sent the Postcard Notice via first class United States mail, in the form approved by the Court (*see* ¶ 12, Coggeshall Declaration) to 42,420 potential Class Members, using the TPP Mailing Database. A copy of the Postcard Notice, as mailed, is attached hereto as Exhibit A.

6.      Rust leases and maintains a case-dedicated Post Office Box (Neurontin Settlement Claims Administrator, P.O. Box 1906, Faribault, MN 55021-7161) for the receipt of all undeliverable mail and written communications necessary to implement the Notice Program.

7.      As of September 14, 2014, the United States Postal Service ("USPS") has returned a total of 156 Postcard Notices as undeliverable with a forwarding address. Rust, during the normal

course of business, will re-mail the Postcard Notices to each address provided by the USPS.  In addition, the USPS had returned 4,741 Postcard Notices as undeliverable without forwarding addresses. Rust utilized the services of an address database service, to which Rust subscribes, to seek updated addresses.  As a result, Rust received 457 updated addresses, and during the normal course of business, Rust will mail the 457 TPP Postcard Notices to the updated addresses.

8.      Through September 14, 2014, an aggregate of 42,893 Postcard Notices had been mailed, pursuant to the Preliminary Approval Order.

## PUBLICATION OF THE SUMMARY NOTICE

9.      Pursuant to ¶ 10 of the Preliminary Approval Order, Rust, in consultation with Kinsella Media, LLC, caused the Summary Notice to be published in the *Wall Street Journal* on August 25, 2014 and in the September 2014 issue of *National Underwriter: Life & Health Magazine.* (S*ee* ¶¶13-14, Coggeshall Declaration).   Attached hereto as Exhibits B and C, respectively, are true and correct copies of the Summary Notice published in the *Wall Street Journal* and *National Underwriter: Life & Health Magazine*.

## SETTLEMENT WEBSITE

10.     Pursuant to ¶ 11 of the Preliminary Approval Order, Rust established and maintains a settlement website, www.NeurontinSettlement.com, which went "live" on June 9, 2014.  The website contains basic information about the Settlement, and links to important documents, such as the Long-Form Notice, Summary Notice, Frequently Asked Questions ("FAQs"), Court documents, including, amongst others, the Preliminary Approval Order and Settlement Agreement, and Contact Information.  Copies of the Long-Form Notice and Summary Notice are annexed hereto as Exhibits D and E, respectively.  The links permit any person, including

potential Class Members with internet access, to view, download, and print a copy of the Notice and file a Claim Form online, thereby providing potential Class Members with information about the Settlement at their convenience.  Since the website went live, it has been visited approximately 4,534 times.  A screen shot of the website homepage is attached hereto as Exhibit F.

### TOLL-FREE TELEPHONE HOTLINE

11.     Rust also established a toll-free telephone hotline (1-855-793-1372) which allows the caller to listen to a pre-recorded brief summary of the action.  The caller is then prompted to press the appropriate telephone keypad number to speak with a live "telephone representative" or request a notice.  As of September 14, 2014, 128 callers have called the pre-recorded message, of which 49 callers have been transferred to a live telephone representative.

### RECEIPT OF REQUESTS FOR EXCLUSION, OBJECTIONS AND CLAIM FORMS TO DATE

12.     Pursuant to ¶ 12 of the Preliminary Approval Order, Requests for Exclusion from the Class were required to be mailed to the Claims Administrator and postmarked no later than September 30, 2014.  As of September 14, 2014, Rust has not received any Requests for Exclusion.

13.     Pursuant to ¶ 12 of the Preliminary Approval Order, objections to the settlement were required to be filed and received on or before September 30, 2014.  As of September 14, 2014, Rust has not received any objections.

14.     Pursuant to ¶ 16 a. of the Preliminary Approval Order, Claim Forms must be electronically submitted by October 15, 2014.  As of September 14, 2014, Rust has received 98 Claim Forms.

15.     I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 15th day of September, 2014 in Palm Beach Gardens, Florida.

_____/s/ Elizabeth Levine___
Elizabeth Levine

# EXHIBIT A



PRESORTED
FIRST-CLASS MAIL
U.S. POSTAGE
PAID
Rust Consulting, Inc.

**Important Notice About Neurontin Settlement**



*CLMNT IDXE* - <<SEQ>>

<<NAME1>>
<<NAME2>>
<<ADDRESS1>>
<<ADDRESS2>>
<<CITY>> <<STATE>> <<ZIP>>
<<COUNTRY>>

*Court-Ordered Legal Notice*

NEURONTIN SETTLEMENT
CLAIMS ADMINISTRATOR
PO BOX 1906
FARIBAULT, MN 55021-7161

Legal Notice

## If You Purchased, Paid for, Administered and/or Reimbursed for Branded or Generic Gabapentin Sold by Pfizer and Its Subsidiaries

*A Class Action Settlement Could Affect You*

A proposed Settlement has been reached in a class action lawsuit against Pfizer Inc. and Warner-Lambert Company LLC (collectively "Defendants") regarding the marketing of the prescription drug Neurontin. The lawsuit claims that Defendants' marketing of the drug Neurontin violated federal law. Defendants deny they have done anything wrong. Both sides have agreed to the Settlement to resolve the controversy and to avoid the cost and expense of further litigation. The lawsuit is not about the safety of Neurontin.

**Who is included?** Third-Party Payors ("TPPs") in the United States and its territories who purchased, paid for, administered, and/or reimbursed for Neurontin sold by Defendants or gabapentin sold by Greenstone LLC at any time from their first sale in the United States through the Effective Date of the Settlement for any purpose other than resale.

**What does the Settlement provide?** Defendants will pay $325 million into a Settlement Fund to settle TPP claims. Class Counsel will ask for attorneys' fees in an amount not to exceed one-third of the Settlement Fund, plus interest, litigation expenses and compensation awards to the Class Representatives. After these deductions, the remainder of the Settlement Fund will be distributed proportionally to Class Members based on the amount of purchases claimed.

**What can I get from the Settlement?** The amount of money you are eligible to receive will depend on how much you paid and/or reimbursed for Neurontin (or gabapentin sold by Greenstone LLC) and on how much other Class Members paid and/or reimbursed. Some members of the Class who belong to a subclass of TPPs will be paid at a 1.80 multiplier of actual purchases in recognition of the fact that members of this subclass timely filed claims against Defendants that were not asserted in the class lawsuit.

**How do I get a payment?** You must submit a Claim Form electronically at www.NeurontinSettlement.com by **October 15, 2014** to get a payment. Class Members submitting claims for purchases over $300,000 must provide documentation with their Claim Form. Visit the website for more details on submitting a claim.

**What are my other rights?** If you do not want to be legally bound by the Settlement, you must exclude yourself from the Settlement. The exclusion deadline is **September 30, 2014**. If you stay in the Settlement you will not be able to sue the Defendants for any claims relating to the Settlement. You will be bound by all the Court's orders. However, if you stay in the Settlement, you may object to all or part of it by **September 30, 2014** and you may appear at the hearing described below in support of your objection.

The Court will hold a hearing on **October 22, 2014 at 3:00 p.m.** to consider whether to approve the Settlement and a request for attorneys' fees. The Court has appointed attorneys to represent the Class. You may also hire your own attorney, at your own expense.

**For more information or a Claim Form:   1-855-793-1372    www.NeurontinSettlement.com**

# EXHIBIT B

# MEDIA & MARKETING

## CMO TODAY

### Are Mobile Games the Next Great Ad Medium?

Americans are spending inordinate amounts of time flinging angry birds, crushing candy, and finding numerical patterns on their mobile phones. In other words, mobile games are exploding. So are mobile games destined to become the next great ad medium?

Talk to executives from both the online ad industry and the mobile-games sector and you'll find opinions are sharply divided on this issue. You'll hear sentiments ranging from "this is the future of advertising" to "this is never going to happen."

**Google** Inc., at least, seems to believe there is potential in mobile-game advertising. The company is building out a technical infrastructure aimed at establishing a standard ad product for the burgeoning medium, hoping to attract big advertisers, say people familiar with the matter.

Why would Google bother? Consider this data **comScore** Inc. says that more than half of the total time spent with digital media is being spent with apps. And 32% of time spent with apps is spent on games, according to an April report from the mobile analytics firm Flurry, which **Yahoo** Inc. recently agreed to acquire. What is more, both of those numbers are headed upward.

"I think it could be the techpin…for the future of advertising," said Greg March, chief executive of the digital agency Ikon3.

But Chris DeWolfe, CEO of SGN, a social-games company and a former Myspace executive, takes a diametrically opposing viewpoint. "I'm not bullish on ads in mobile games," he says. "Game developers make so much money on virtual goods, that they fiercely protect the user experience."

King Digital ditched advertising last year, and said in a filing that it has little interest in the business. King, like other top mobile game companies, employs what is often referred to as a "free-mium" business model. People can start playing these games free of charge, and are frequently offered chances to buy virtual goods—like better weapons or energy that help improve their chances of advancing in these games.

However, game industry veterans note that the vast majority of mobile-game players decline to spend any money in these games,

meaning that most games make money from a small percentage of their audiences.

—*Mike Shields*

### Twitter's New Video Ads Impress Marketers

Early grades on **Twitter** Inc's new video ad product are in—and they're positive. Twitter's new "promoted video" ad product, which it recently began testing across its platform, allows marketers to insert video clips into users' feeds and only pay when users tap or click to watch them.

So far the new format has performed extremely well, according to advertising firms involved in the early tests. Users have shown a high propensity to watch the ads, and in some instances they've proved considerably cheaper than buying video views on video-centric sites such as YouTube, ad firms say.

"We're seeing very good engagement rates; the preliminary results are very strong," explained Amy Peterman, from digital agency 360i, which has already tested video ads for some of its CPG and entertainment clients.

"We're really shocked at how well it's performed," said Jeremy Leon, a social strategist at social-media agency Laundry Service.

Prior to "promoted video," marketers that wanted to include video in their Twitter ads had no choice but to embed content from third-party sites such as YouTube, which required users to tap multiple times to actually view the content.

The new "native" video functionality means users need only tap once to set video in motion, which Mr. Leon said is already boosting view rates considerably.

So far Twitter's video ads have also proved extremely cost effective, agencies report, although that is partly due to the fact they're currently only available to a select number of clients, which means competition for ad space is limited.

Nonetheless, Mr. Leon conducted a second test in which he compared the performance of promoted video tweets with You-Tube pre-roll video ads. The average cost per view on Twitter netted out at 1 cent per view, he said, compared with 10 cents on YouTube. He attributed the difference in cost to the fact that on Twitter, users began sharing it with their own followers—boosting its exposure.

—*Jack Marshall*



Space adventure 'Guardians of the Galaxy' passed 'Transformers' to become the summer's biggest domestic hit with a total of $252 million

## 'Guardians' Is Summer's Star

*Season's Top-Grossing Movie Knocks Out 'Turtles' for No. 1 Spot at Box Office*

Associated Press

"Guardians of the Galaxy" became the summer's top-grossing movie at the North American box office that narrowly bested the young-adult melodrama "If I Stay," while the long-delayed "Sin City" sequel, "A Dame to Kill For" flopped.

With an estimated $17.6 million in its fourth weekend of release, the Marvel space adventure passed "Transformers: Age of Extinction" to become the summer's biggest domestic hit with a cumulative total of $252 million. The film, released by **Walt Disney** Co., was an unlikely August sensation (late summer is usually an afterthought in Hollywood's lucrative summer season) that helped the box office rebound somewhat after big-budget sequels like "The Amazing Spider-Man 2" and "How To Train Your Dragon 2" failed to ignite the multiplexes.

"This movie just couldn't have come at a better time," said Paul

Dergarabedian, senior media analyst for box-office tracker **Rentrak.**

"When we were really down and out in the summer box office—at one point down 20% from last year—'Guardians' came along and injected life. What is surprising is that it was a film launched in August," he said.

The Warner Bros. tear-jerker "If I Stay" failed to top the box office with a weekend haul of $16.4 million, according to stu-

### Estimated Box-Office Figures, Through Sunday

| | | SALES, IN MILLIONS | | |
|---|---|---|---|---|
| FILM | DISTRIBUTOR | WEEKEND | CUMULATIVE | % CHANGE |
| **1. Guardians of the Galaxy** | Disney | $17.6 | $251.9 | -30% |
| **2. Teenage Mutant Ninja Turtles** | Paramount | $16.8 | $145.6 | -41% |
| **3. If I Stay** | Warner Bros. | $16.4 | $16.4 | — |
| **4. Let's Be Cops** | 20th Century Fox | $11 | $45.2 | -38% |
| **5. When the Game Stands Tall** | Sony | $9.1 | $9.1 | — |

*Friday, Saturday and Sunday*    Source: Rentrak

dio estimates on Sunday. In the film, a co-production between MGM and New Line Cinema, Chloe Grace Moretz stars as a teen in a coma after a car accident. It came in third place behind the reptile reboot "Teenage Mutant Ninja Turtles," which made $16.8 million in its third weekend.

Dan Fellman, head of domestic distribution for **Time Warner** Inc.'s Warner Bros. said the studio was pleased with the perfor-

mance of "If I Stay" considering its $11 million production budget. Advance tracking on the film had forecast a box office-topping result, but tracking had also expected the Weinstein Co.'s "Sin City: A Dame to Kill For" to open in the midterms. It made just $6.5 million.

"This is a complete miss," said Erik Lomis, Weinstein's distribution chief. "Obviously, we're very, very disappointed in the numbers. We definitely did not see it coming in like this."

The hurt was particularly acute, Mr. Lomis said, because it happened with a longtime Weinstein collaborator, director Robert Rodriguez. He helmed the first "Sin City" film, which opened with $29.1 million in 2005 and made $159 million globally.

But nine years is a long time to wait for a sequel, and clearly the novelty of the film's digital adaptation of Frank Miller's black-and-white graphic novel wore off with both moviegoers and critics.

---

## Amazon Can't Cage 'Goldfinch' Publisher

Continued from page B1

fighting, so it benefited from the online retailer's support. Last November, as the holiday selling season was about to get underway, Amazon gave "The Goldfinch" a huge boost by naming it the best book of the year. The novel, Amazon's editorial team said, was "an emotionally trenchant masterpiece."

And unlike many new Hachette titles caught in the crossfire of the e-book dispute, "The Goldfinch" is being offered at a significant discount on Amazon. As of Sunday the online retailer was selling the hardcover edi-

tion for $18, a 40% discount from the cover price, and shipping it immediately. The Kindle e-book was priced at $6.99. Both were cheaper than the same editions offered at Barnes & Noble's online store.

An Amazon spokeswoman declined to discuss the retailer's pricing approach to "The Goldfinch."

Amazon's early support isn't the only factor in the book's success. Independent booksellers, which also gave the title strong early support, say demand for "The Goldfinch" has been steady. "We've sold a ton of her books,"

said Gayle Shanks, a co-owner of Changing Hands Bookstore, which has two locations in Arizona. "People were waiting for the next great thing from her, and they weren't disappointed."

It helps that people are talking about it. "It's like 'The Help' and 'Gone Girl' in that you feel you have to read it in order to be part of the national conversation," said Reagan Arthur, publisher of Hachette's Little, Brown & Co., which published "The Goldfinch."

Ms. Arthur said that Ms. Tartt helped her cause by touring in support of her book, including

an appearance prior to publication at Book Expo America, the industry's big trade show. And while Ms. Tartt has limited social-media presence—she uses neither Twitter nor Facebook to promote her work—Little Brown launched an aggressive online and print advertising effort to get sales rolling.

Ms. Arthur said that the book got a second wind in April when it was awarded the 2014 Pulitzer Prize for fiction, with Judges praising its "exquisitely drawn characters."

"The Pulitzer Prize meant sales never flagged," said Ms. Arthur.



A user plays King Digital's 'Candy Crush Saga' game on an iPhone.

---

## CORPORATE WATCH

### ENDO INTERNATIONAL
**SALE OF MEDICAL-DEVICE UNIT MAY FETCH $2 BILLION**

Endo International PLC has put its medical-device unit up for sale, according to people familiar with the matter, just three years after buying the business.

The Minnetonka, Minn.-based business, known as AMS, supplies devices to treat pelvic disorders such as incontinence and recorded $250 million in revenues in the six months ended June 30. That was 19% of Endo's total revenue in the period.

AMS, which has attracted interest from private-equity firms and other health-care companies, could fetch about $2 billion in a sale, the people said.

That is less than the $2.9 billion Endo paid for the business in 2011. Endo in April agreed to pay roughly $830 million to settle claims that vaginal mesh inserts sold by AMS led to injuries. It isn't clear why Endo is putting the business up for sale now.

—*Gillian Tan and Dana Cimilluca*

### CARGILL
**FORMER EXECUTIVE IS SUED OVER SECRETS THEFT**

Cargill Inc. sued a former executive of its meatpacking division, alleging he stole trade secrets before resigning to join rival **JBS** SA this month.

Cargill, in a lawsuit filed Thursday in the U.S. District Court in Denver, accused Jason Kuan of downloading hundreds of confidential and proprietary

files detailing the agricultural conglomerate's meat-processing operations.

Mr. Kuan couldn't be reached for comment and no lawyer was listed on a federal-court docket as representing him in the case. JBS representatives didn't respond to requests for comment.

"We are taking all appropriate actions to protect Cargill's proprietary information," said Michael Martin, spokesman for Cargill, which is based in suburban Minneapolis.

—*Jacob Bunge*

### UNITEDHEALTH
**INSIDER LOOKING TO EXPAND INTO 24 STATES**

UnitedHealth Group Inc. has applied to sell plans in 24 states' health-law consumer marketplaces next year, including major markets such as Texas and Pennsylvania.

The company's insurance arm, which is the biggest U.S. insurer by number of people covered, had previously said it would expand to "as many as two dozen" states' individual-plan exchanges. Its moves are being closely watched by competitors and analysts, partly because the insurer's footprint will grow so much. This year, UnitedHealthcare sold health-law plans in just four states.

Jeff Lucht, a senior vice president at UnitedHealthcare who oversees its public exchange strategy, said that in addition to Texas and Pennsylvania, the new states are expected to include Florida,

North Carolina, Louisiana, Mississippi and Alabama. Among the other new states are Michigan, Georgia, Indiana and Ohio, according to a list compiled by analyst Scott Fidel of **Deutsche Bank.** The four states where UnitedHealthcare currently sells exchange plans are New York, Nevada, Maryland and Colorado.

UnitedHealthcare chose the new markets based on "a combination of the growth opportunity...and the extent to which we thought we could offer a competitive product in the market," Mr. Lucht said.

—*Anna Wilde Mathews*

### DEERE
**EQUIPMENT MAKER TO LAY OFF 460 WORKERS IN IOWA**

Deere & Co. said Friday that it plans to lay off about 460 employees at its flagship farm tractor plant in Waterloo, Iowa, as the company throttles back production in response to falling demand for farm machinery.

Deere said the layoffs would take effect Oct. 20. Waterloo Works is the company's primary production site for large, high-horsepower tractors used in North America grain farming. The announcement comes a week after the company said it would lay off more than 600 workers at other plants in Iowa, Illinois and Kansas. The Moline, Ill., company also said it would start seasonal shutdowns and temporary layoffs at several of its factories to slow down production.

—*Bob Tita and Erin McCarthy*

---

Legal Notice

### If You Purchased, Paid for, Administered and/or Reimbursed for Branded or Generic Gabapentin Sold by Pfizer and Its Subsidiaries

#### A Class Action Settlement Could Affect You

A proposed Settlement has been reached in a class action lawsuit against Pfizer Inc. and Warner-Lambert Company LLC (collectively "Defendants") regarding the marketing of the prescription drug Neurontin. The lawsuit claims that Defendants' marketing of the drug Neurontin violated federal law. Defendants deny they have done anything wrong. Both sides have agreed to the Settlement to resolve the controversy and to avoid the cost and expense of further litigation. The lawsuit is not about the safety of Neurontin.

#### Who is included?

Third-Party Payors ("TPPs") in the United States and its territories who purchased, paid for, administered, and/or reimbursed for Neurontin sold by Defendants or gabapentin sold by Greenstone LLC at any time from their first sale in the United States through the Effective Date of the Settlement for any purpose other than resale.

#### What does the Settlement provide?

Defendants will pay $325 million into a Settlement Fund to settle TPP claims. Class Counsel will ask for attorneys' fees in an amount not to exceed one-third of the Settlement Fund, plus interest, litigation expenses, and compensation awards to the Class Representatives. After these deductions, the remainder of the Settlement Fund will be distributed proportionally to Class Members based on the amount of purchases claimed.

#### What can I get from the Settlement?

The amount of money you are eligible to receive will depend on how much you paid and/or reimbursed for Neurontin (or gabapentin sold

by Greenstone LLC) and on how much other Class Members paid and/or reimbursed. Some members of the Class who belong to a subclass of TPPs will be paid at a 1.80 multiplier of actual purchases in recognition of the fact that members of this subclass timely filed claims against Defendants that were not asserted in the class lawsuit.

#### How do I get a payment?

You must submit a Claim Form electronically at www.NeurontinSettlement.com by **October 15, 2014** to get a payment. Class Members submitting claims for purchases over $300,000 must provide documentation with their Claim Form. Visit the website for more details on submitting a claim.

#### What are my other rights?

If you do not want to be legally bound by the Settlement, you must exclude yourself from the Settlement. The exclusion deadline is **September 30, 2014.** If you stay in the Settlement you will not be able to sue the Defendants for any claims relating to the Settlement. You will be bound by all the Court's orders. However, if you stay in the Settlement, you may object to all or part of it by **September 30, 2014** and you may appear at the hearing described below in support of your objection.

The Court will hold a hearing on **October 22, 2014** at **3:00 p.m.** to consider whether to approve the Settlement and a request for attorneys' fees. The Court has appointed attorneys to represent the Class. You may also hire your own attorney, at your own expense.

### For more information or a Claim Form: 1-855-793-1372
### www.NeurontinSettlement.com

# EXHIBIT C



cter's possessions. Tom had not done that. He had just logged out like he might have done any other night.

I thought that would be the end of it. I knew where Meester was. I knew where a little piece of Tom was. And that should have been enough. But it wasn't. Soon I felt like I needed to have possession of the character, even though was not a real, physical thing. I wanted to make sure that Meester was safe and sound — which meant porting the character to my own Warcraft account. That character has suddenly become very precious to me.

I contacted Tom's wife to make sure it was alright; and he graciously agreed. To be honest, she was dealing with far, far bigger problems than I was. Her fortitude, and the ability with which she has served her family since then is nothing less than a testament to her strength.

The next step was the actual character transfer process. You must understand that World of Warcraft has created its own shadow economy. People get so nuts playing this game that if they want more loot or gold for their character, they will actually pay other people to "farm" such stuff and then give it to their character, for a price. This is illegal within the game, but people do this and all kinds of other dodgy stuff with their accounts, anyway. Blizzard Enter-

tainment — the company that publishes and runs World of Warcraft — works nonstop to keep this kind of thing in check. They also have in place very specific rules for getting a dead person's account transferred over to you.

I followed the rules to the letter. I got a copy of Tom's death certificate from Georgia. I sent a copy of that plus other documents to Blizzard, to justify the transfer of Tom's account over to my own. All I needed was Tom's login and password. And those, I did not have.

More importantly, Blizzard would not give them to me. Account information is the single most valuable resource Blizzard handles. They simply cannot afford to let customers' account info out into the open because other players might take over the accounts and plunder them. I understood that, but I also felt that at this point, I had come too far to be stopped now. After all, how was I supposed to have gotten Tom's login and password when he was alive?

I called Blizzard's customer service desk, which is staffed by young-sounding people whom I am sure deal with a lot of really rude, really irate 15-year-olds wondering why the hell their account got suspended, or why they got reported for repugnant behavior in-game, or whatever other problems plague the conscience of high-strung

Legal Notice

## If You Purchased, Paid for, Administered and/or Reimbursed for Branded or Generic Gabapentin Sold by Pfizer and Its Subsidiaries

### A Class Action Settlement Could Affect You

A proposed Settlement has been reached in a class action lawsuit against Pfizer Inc. and Warner-Lambert Company LLC (collectively "Defendants") regarding the marketing of the prescription drug Neurontin. The lawsuit claims that Defendants' marketing of the drug Neurontin violated federal law. Defendants deny they have done anything wrong. Both sides have agreed to settle the controversy and to avoid the cost and expense of further litigation. The lawsuit is not about the safety of Neurontin.

#### Who is included?

Third-Party Payors ("TPPs") in the United States and its territories who purchased, paid for, administered, and/or reimbursed for Neurontin sold by Defendants or gabapentin sold by Greenstone LLC at any time from their first sale in the United States through the Effective Date of the Settlement for any purpose other than resale.

#### What does the Settlement provide?

Defendants will pay $325 million into a Settlement Fund to settle TPP claims.

Class Counsel will ask for attorneys' fees in an amount not to exceed one-third of the Settlement Fund, plus interest, litigation expenses, and compensation awards to the Class Representatives. After these deductions, the remainder of the Settlement Fund will be distributed proportionally to Class Members based on the amount of purchases claimed.

#### What can I get from the Settlement?

The amount of money you are eligible to receive will depend on how much you paid and/or reimbursed for Neurontin (or gabapentin sold by Greenstone LLC) and on how much other Class Members paid and/or reimbursed. Some members of the Class who belong to a subclass of TPPs will be paid at a 1.80 multiplier of actual purchases in recognition of the fact that members of this subclass timely filed claims against Defendants that were not asserted in the class lawsuit.

#### How do I get a payment?

You must submit a Claim Form electronically at www.NeurontinSettlement.com by October 15, 2014 to get a payment. Class Members

submitting claims for purchases over $300,000 must provide documentation with their Claim Form. Visit the website for more details on submitting a claim.

#### What are my other rights?

If you do not want to be legally bound by the Settlement, you must exclude yourself from the Settlement. The exclusion deadline is September 30, 2014. If you stay in the Settlement you will not be able to sue the Defendants for any claims relating to the Settlement. You will be bound by all the Court's orders. However, if you stay in the Settlement, you may object to all or part of it by September 30, 2014 and you may appear at the hearing described below in support of your objection.

The Court will hold a hearing on October 22, 2014 at 3:00 p.m. to consider whether to approve the Settlement and a request for attorneys' fees. The Court has appointed attorneys to represent the Class. You may also hire your own attorney, at your own expense.

**For more information or a Claim Form: 1-855-793-1372    www.NeurontinSettlement.com**

# EXHIBIT D

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

# If You Purchased, Paid for, Administered and/or Reimbursed for Branded or Generic Gabapentin Sold by Pfizer and Its Subsidiaries,

## A Class Action Settlement Could Affect You.

*A court authorized this notice. This is not a solicitation from a lawyer.*

- A proposed Settlement has been reached in a class action lawsuit against Pfizer Inc. and Warner-Lambert Company LLC (collectively "Defendants") regarding the marketing of the prescription drug Neurontin. The lawsuit claims that Defendants' marketing of the drug Neurontin violated federal law. Defendants deny they have done anything wrong. Both sides have agreed to the Settlement to resolve the controversy and to avoid the cost and expense of further litigation. The lawsuit is not about the safety of Neurontin.

- Defendants have agreed to settle the claims of Third-Party Payors ("TPPs") in the lawsuit for a total of $325 million (the "Settlement Fund").

- You may be included in the Class if you are a TPP that paid for or reimbursed all or part of the cost of branded Neurontin for your members, employees, plan participants, beneficiaries, or insureds during the period from January 1, 1994 to the Effective Date of the Settlement *(see* Question 5 for details).

- You may also be included in Subclass A if you are a TPP that, on or before December 31, 2008, commenced a lawsuit alleging that the Defendants violated state antitrust laws by delaying the entry of generic gabapentin into the marketplace, and if that lawsuit was still pending as of May 13, 2014 *(see* Question 6 for details).

- Your legal rights are affected whether you act or don't act. Please read this notice carefully.

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS LAWSUIT | |
|---|---|
| **FILE A CLAIM BY OCTOBER 15, 2014** | The only way to get a payment from the Settlement. |
| **EXCLUDE YOURSELF BY SEPTEMBER 30, 2014** | Get no benefits from the Settlement. This is the only option where you keep your right to sue Defendants at your own expense over the claims resolved by this Settlement. |
| **OBJECT BY SEPTEMBER 30, 2014** | Write to the Court about what you think about the Settlement. |
| **GO TO A HEARING ON OCTOBER 22, 2014** | Ask to speak in Court about the fairness of the Settlement. |
| **DO NOTHING** | Get no payment. Remain in the Class and give up any rights to sue Defendants on your own about the same legal claims in these lawsuits. |

- Your options are explained in more detail in this notice. To be excluded, you must act before **September 30, 2014**.

**Questions? 1-855-793-1372   www.NeurontinSettlement.com**

| WHAT THIS NOTICE CONTAINS |
|---|

**BASIC INFORMATION** .................................................................... **PAGE 3**
1. Why was this Notice issued?
2. What are the lawsuits about?
3. What is a class action?

**WHO IS IN THE CLASS AND THE SETTLEMENT** .......................... **PAGE 4**
4. What is a TPP?
5. How do I know if I am part of the Class and the Settlement?
6. How do I know if I am part of Subclass A?
7. What if I am still not sure if I am included in the Class?

**THE SETTLEMENT'S BENEFITS** ...................................................... **PAGE 5**
8. What does the Settlement provide?
9. What do I have to do to get a payment?
10. How much will my payment be?

**EXCLUDING YOURSELF FROM THE SETTLEMENT** ...................... **PAGE 6**
11. How do I get out of the Settlement?
12. If I don't exclude myself from the Settlement, can I sue Defendants for the same thing later?
13. If I exclude myself, can I still get a payment from the Settlement?
14. What happens if I do nothing and stay in the Settlement?

**THE LAWYERS REPRESENTING YOU** ............................................ **PAGE 8**
15. Do I have a lawyer in this case?
16. How will the lawyers be paid?

**OBJECTING TO THE SETTLEMENT** ................................................ **PAGE 9**
17. How do I tell the Court what I think about the Settlement?
18. What's the difference between objecting and excluding?

**THE FINAL APPROVAL HEARING** .................................................... **PAGE 10**
19. When and where will the Court decide whether to approve the Settlement?
20. Do I have to come to the Hearing?
21. May I speak at the Hearing?

**GETTING MORE INFORMATION** ........................................................ **PAGE 11**
22. Where can I get more information?

**Questions? 1-855-793-1372   www.NeurontinSettlement.com**

## BASIC INFORMATION

| **1. Why was this Notice issued?** |
| --- |

A Court authorized this notice because you have a right to know about the Settlement of a class action lawsuit and about all of your options before the Court decides whether to give final approval to the Settlement.  This notice explains the lawsuit, the Settlement, and your legal rights.

U.S. District Court Judge Patti B. Saris of the U.S. District Court for the District of Massachusetts is overseeing the case.  The litigation is known as *Harden Manufacturing Corp. v Pfizer Inc. (In re Neurontin Marketing Products Liability and Sales Practices Litigation)*, No. 04-10981-PBS, MDL Docket No. 1629 ("the lawsuit").  The lawsuit involves purchases of branded Neurontin in the United States and its territories.  The TPPs who sued are called "plaintiffs," and the companies they sued are called the "defendants," which in this case are Pfizer,Inc. ("Pfizer") and Warner-Lambert Company LLC ("Warner-Lambert").

| **2. What is the lawsuit about?** |
| --- |

The lawsuit relates to Defendants' prescription drug Neurontin.  The lawsuit claims that Defendants' marketing violated the law by promoting the use of Neurontin for various uses and to treat various conditions for which it was: (1) not approved by the U.S. Food and Drug Administration ("FDA") and (2) was not effective.  The lawsuit is not about the safety of Neurontin.  The lawsuit alleges that, although the FDA approved Neurontin for a relatively narrow indication – as adjunctive therapy for adult epilepsy, and later, for treatment of post-herpetic neuralgia – Defendants sought to market Neurontin for several off-label uses in a variety of ways, including through false or misleading statements to physicians at conferences and medical education events, directly to physicians through sales representatives, and in medical publications.  Plaintiffs also claim that Class Members were injured by paying more for Neurontin than they would have paid otherwise.  A copy of the Plaintiffs' Fourth Amended Consolidated Class Action Complaint, filed March 24, 2011, is available at www.NeurontinSettlement.com.

Defendants deny these claims, and deny they did anything wrong.  Defendants have agreed to the Settlement solely to avoid further expense, inconvenience, and the burden of this litigation. The Settlement Agreement is available for review at www.NeurontinSettlement.com.

| **3. What is a class action?** |
| --- |

In a class action, one or more persons or entities, called "class representatives," sue on behalf of those who have similar claims.  All these persons or entities are a "class" or "class members."  One court resolves the issues for all class members, except for those who exclude themselves from the class.

## WHO IS IN THE CLASS AND THE SETTLEMENT

### 4.  What is a TPP?

TPPs (Third-Party Payors) are all insurance companies, healthcare benefit providers, health maintenance organizations, union health and welfare plans, self-funded health and welfare plans, and any other health benefit provider and/or entity that contracts with a health insurance company or other entity to serve as a third party claims administrator to administer their prescription drug benefits.  These payors also include entities that may provide prescription drug benefits for current or former public employees and/or retirees and private entities that provide pharmacy benefits for a state Medicaid program or Medicare Part D, but only to the extent that the entity was at risk for the cost of the payment(s).

### 5.  How do I know if I am part of the Class and the Settlement?

You are a Class Member if you are a TPP in the United States and its territories that purchased, paid for, administered, and/or reimbursed all or any portion of the price for Neurontin or for gabapentin sold by Greenstone LLC at any time from their first sale in the United States through the Effective Date of the Settlement for any purpose other than resale.

Excluded from the Class are:
1. The Defendants and their officers, directors, management, employees, predecessors-in-interest, successors-in-interest, assignees or affiliates, and subsidiaries;
2. The United States and/or State governments and their agencies and department, except to the extent they purchased branded Neurontin or its generic equivalents for their employees or others covered by a government employee health plan;
3. Any judge or special master who has presided over the lawsuit; and
4. Kaiser Foundation Health Plan, Inc. and its subsidiaries; Aetna, Inc.; Blue Cross and Blue Shield of Alabama; Municipal Workers Compensation Fund, Inc.; and Union of Operating Engineers, Local No. 98 Welfare Fund.  These TPPs have previously resolved claims against the Defendants.

### 6.  How do I know if I am part of Subclass A?

Subclass A includes Assurant Health, Inc.; Blue Cross and Blue Shield of Florida, Inc.; Louisiana Health Service & Indemnity Company d/b/a Blue Cross Blue Shield of Louisiana; Blue Cross Blue Shield of Massachusetts; Blue Cross Blue Shield of Michigan; Blue Cross Blue Shield of Minnesota; CareFirst, Inc.; Blue Cross Blue Shield of Delaware, Inc.; Excellus Health Plan, Inc.; Federated Mutual Insurance Company; Group Health Service of Oklahoma d/b/a Blue Cross Blue Shield of Oklahoma; Health Care Service Corporation; Mutual of Omaha Insurance Company; Trustmark Insurance Company and WellChoice, Inc. and WellChoice Insurance of New Jersey, Inc. (the "Assurant group").  Members of the Assurant group have filed a separate suit against Defendants alleging, among other things, that Defendants' marketing and other conduct regarding the drug Neurontin violated state antitrust and consumer protection statutes.  The lawsuit involving these claims is *Assurant Health, Inc., v. Pfizer Inc. (In re Neurontin Marketing Products Liability and Sales Practices Litigation)*,

No. 05-10535-PBS (D. Mass.).  In recognition of the fact that members of the Assurant group have timely filed claims against Defendants that were not asserted in the class lawsuit, the payment amount of any valid claim submitted by members of the Assurant group will be calculated by multiplying their actual amount of Neurontin purchases by 1.80. This figure, if properly supported and accepted by the Claims Administrator, will be used for purposes of calculating the payment made to each member of the Assurant group, as in the example below.

If a member of the Assurant group filed a claim for $10,000 of Neurontin purchases that number would be multiplied by 1.8 and $18,000 will be used to calculate the TPPs *pro rata* portion of the settlement proceeds.

Exhibit C to the Settlement Agreement available, at www.NeurontinSettlement.com describes the claims process for Class Members in detail.

---

**7.  What if I am still not sure I am included in the Class?**

---

If you are still not sure whether you are included, you can get more information at www.NeurontinSettlement.com, or get free help by calling or writing the lawyers in this case, at the phone number or address listed in Question 15.

## THE SETTLEMENT'S BENEFITS

---

**8. What does the Settlement provide?**

---

Defendants will pay $325 million into a Settlement Fund to settle all TPP claims.  Attorneys' fees and expenses, the cost of administering the proposed Settlement, and the Class Representative compensation awards will also be deducted from the $325 million.  The remaining amount will be distributed proportionally among Class Members based on the size of their claims according to the Plan of Distribution (*see* Question 10).

More details are in the Settlement Agreement, available at www.NeurontinSettlement.com.

---

**9.   What do I have to do to get a payment?**

---

To be eligible to receive a payment if the Court approves the Settlement, you must fill out and submit a valid electronic Claim Form online at www.NeurontinSettlement.com by **October 15, 2014**.  Read the instructions carefully.  Fill out the form and include all the information the form requests.

Class Members are required to provide the amount of branded Neurontin they purchased from January 1, 2003 to June 30, 2004.  The purchase amount during this "proxy period" is being substituted for the amount of Neurontin purchased during the full class period because many TPPs may have difficulty accessing older claims data that may not be kept electronically or on current electronic systems.  This "proxy period" will be used to determine the payments made to each Class Member as described in Question 10.

Class Members with claimed purchases for Neurontin during the proxy period that are more than $300,000 must submit electronic claims documentation with their electronic claim. Those Class Members whose claimed purchases are $300,000 or less do not need to submit documentation with their electronic claim but must provide this claims documentation upon request of the Claims Administrator.

## 10. How much will my payment be?

The Settlement Fund will be distributed based on valid claims submitted on time by Class Members, as allowed by the Claims Administrator and approved by the Court. The amount of money you get will depend on how much you paid and/or reimbursed for Neurontin and on how much other Class Members paid and/or reimbursed. Distributions will be calculated as follows:

(a) All attorneys' fees, expenses, and compensation awards awarded by the Court, and all costs of Settlement Notice and administration, will be deducted from the Settlement Fund; and

(b) The Claims Administrator will determine each Class Member's "Recognized Claim." These amounts will be calculated according to a Plan of Distribution that is available at www.NeurontinSettlement.com; then

(c) The remaining Settlement Fund will be distributed proportionally to each Class Member by (1) multiplying the amount of the remaining Settlement Fund by each Class Member's Recognized Claim, and then, (2) dividing by the total amount of all Recognized Claims of all Class Members.

## EXCLUDING YOURSELF FROM THE SETTLEMENT

If you don't want a payment from the Settlement, and you want to keep the right to sue Defendants on your own about the legal issues in this case, then you must take steps to get out of the Settlement. This is called excluding yourself from – or "opting out" of – the Class.

## 11. How do I get out of the Settlement?

To exclude yourself from the Settlement, you must send a letter that includes:
- The full name of your entity (including any predecessor entities from January 1, 2004 forward), Employer Identification Number ("EIN"), and address;
- A statement saying that your entity wants to be excluded from the Settlement in *Harden Manufacturing Corp. v Pfizer Inc. (In re Neurontin Marketing Products Liability and Sales Practices Litigation)*, No. 04-10981-PBS, MDL Docket No. 1629;
- Your signature on behalf of the entity;
- If your entity claims to have authority to exclude a Class Member in a representative capacity, you must provide all information requested above for that Class Member, and provide written evidence of your entity's authority to exclude the Class Member in a representative capacity. For example, your entity must provide a list of all self-funded

healthcare plans ("SFPs") or other entities (if any), for which it is authorized to opt out of the Settlement, including the name and EIN of each entity on whose behalf your entity is authorized to act; and

- The amount of Neurontin your entity (or the entity or entities you are authorized to act for) purchased during the period of January 1, 1994 to the Effective Date of the Settlement. A list of relevant National Drug Codes ("NDCs") associated with Neurontin to be used for this purpose is available at www.NeurontinSettlement.com.

Your request for exclusion must also include a signed certification containing the following language:

> The undersigned individual hereby represents that he/she has authority to sign and submit this notice of exclusion on behalf of the above-named entity falling within the definition of the Class. The undersigned also certifies that he/she has not received any advice from the parties to this litigation or their attorneys concerning his/her or the fiduciary obligations of the entity seeking exclusion from the Class under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1100, *et seq.,* or other laws governing their obligations to any class member. The undersigned understands that by submitting this notice of exclusion, the entity identified above will not be entitled to receive any proceeds of the class Settlement Fund. By affixing my signature below, I certify under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

The request for exclusion must be postmarked no later than **September 30, 2014**, and mailed to:

Neurontin Settlement Claims Administrator
P.O. Box 1906
Faribault, MN 55021-7161

## 12. If I don't exclude myself from the Settlement, can I sue Defendants for the same thing later?

No. Unless you exclude yourself, you give up the right to sue Defendants for the claims that the Settlement resolves. If you have a pending lawsuit against Defendants that involves the claims resolved by the Settlement, speak to your lawyer in that lawsuit immediately. You must exclude yourself from the Settlement Class to continue your own lawsuit.

## 13. If I exclude myself, can I still get a payment from the Settlement?

No. You will not get any money if you exclude yourself from the Settlement.

## 14. What happens if I do nothing and stay in the Settlement?

If you remain in the Settlement, you will be bound by the Court's decisions.  Unless you exclude yourself, you won't be able to start a lawsuit, continue a lawsuit, or be part of any other lawsuit against Defendants about the legal issues in this case, ever again.

You will also be bound by all terms of the Settlement Agreement, including, among other things, the Release and Discharge provision.  This means that if the Settlement becomes final, you will be releasing any claims you have against Defendants as described in Section 11 of the Settlement Agreement.  The Settlement Agreement is available at www.NeurontinSettlement.com or by calling 1-855-793-1372.


# THE LAWYERS REPRESENTING YOU

## 15. Do I have a lawyer in this case?

Yes.  The Court has appointed the following attorneys to represent you and other Class Members as "Class Counsel":

| | |
|---|---|
| Thomas M. Sobol<br>HAGENS BERMAN SOBOL SHAPIRO LLP<br>55 Cambridge Parkway, Suite 301<br>Cambridge, MA 02142 | Thomas M. Greene<br>GREENE LLP<br>One Liberty Square, 12th Floor<br>Boston, MA 02109 |
| Don Barrett<br>BARRETT LAW OFFICE<br>404 Court Square North<br>PO Box 987<br>Lexington, MS 39095 | Elizabeth J. Cabraser<br>LIEFF CABRASER HEIMANN & BERNSTEIN, LLP<br>275 Battery Street, 29th Floor<br>San Francisco, CA 94111-3339 |
| James R. Dugan II<br>THE DUGAN LAW FIRM, LLC<br>One Canal Place – Suite 1000<br>365 Canal Street<br>New Orleans, LA 70130 | Daniel Becnel, Jr.<br>LAW OFFICES OF DANIEL BECNEL, JR.<br>106 W. Seventh Street<br>PO Drawer H<br>Reserve, LA 70084 |

The Court has appointed the following attorney to represent members of Subclass A:

| | |
|---|---|
| W. Scott Simmer<br>BLANK ROME LLP<br>Watergate 600 New Hampshire Ave. , NW.<br>Washington, DC 20037 | |

In addition, the following law firms, which have represented TPP interests in numerous prescription drug class action cases, have worked with the above-listed law firms:

| | |
|---|---|
| Richard W. Cohen<br>LOWEY DANNENBERG COHEN &<br>    HART, P.C.<br>One North Broadway, Suite 509<br>White Plains, NY 10601 | Mark D. Fischer<br>RAWLINGS & ASSOCIATES, PLLC<br>One Eden Park<br>LaGrange, KY 40031 |

You won't be charged personally for these lawyers, but they will ask the Court to award them a fee that will be paid out of the Settlement Fund.

## 16. How will the lawyers be paid?

Class Counsel will ask the Court for an award from the Settlement Fund for attorneys' fees in an amount not to exceed one-third of the Settlement Fund, plus interest. This request will cover all professional services already provided in this lawsuit, as well as all future services. Class Counsel's request for fees and expenses will be filed with the Clerk of the Court on or before **September 15, 2014**, and be posted at www.NeurontinSettlement.com.

At the Final Approval Hearing, Class Counsel will also ask the Court for compensation awards from the Settlement Fund of up to $25,000 each for the Class Representatives in recognition of their efforts on behalf of the Class. This request will be filed with the Clerk of the Court on or before **September 15, 2014**, and posted at www.NeurontinSettlement.com.

### OBJECTING TO THE SETTLEMENT

If you do not exclude yourself, you can tell the Court that you don't agree with the Settlement or part of it.

## 17. How do I tell the Court what I think about the Settlement?

If you have comments about, or disagree with any aspect of the Settlement, including the requested attorneys' fees, you may express your views to the Court by writing to the address below. To comment, or object, you must submit a letter that includes:

- The name of your entity, address, and telephone number;
- A statement saying that the entity objects to the Settlement in *Harden Manufacturing Corp. v. Pfizer Inc. (In re Neurontin Marketing Products Liability and Sales Practices Litigation)*, No. 04-10981-PBS, MDL Docket No. 1629;
- The specific legal and/or factual reasons for your objections, including any briefs and evidentiary materials you want the Court to consider;
- Proof that the entity is a Class Member; and
- Your signature or the signature of a person with the authority to make the objection on the entity's behalf, along with a statement of the basis for that authority.

The response must be filed with the Court, and received by Counsel, on or before **September 30, 2014** at the following addresses:

| COURT CLERK | CLASS COUNSEL | DEFENSE COUNSEL |
|---|---|---|
| Clerk of Court<br>United States District Court<br>1 Courthouse Way<br>Boston, MA 02210 | Thomas M. Sobol<br>Edward Notargiacomo<br>HAGENS BERMAN SOBOL<br>SHAPIRO LLP<br>55 Cambridge Parkway,<br>Suite 301<br>Cambridge, MA 02142<br><br>Thomas M. Greene<br>GREENE LLP<br>One Liberty Square, 12th Floor<br>Boston, MA 02109 | David Weinraub<br>QUINN EMANUEL URQUHART<br>& SULLIVAN, LLP<br>51 Madison Avenue, 22nd Floor<br>New York, NY  10010 |

## 18. What's the difference between objecting and excluding?

Objecting is simply telling the Court that you don't like something about the Settlement.  You can object to the Settlement only if you do not exclude yourself from it.  Excluding yourself from the Settlement is telling the Court that you don't want to be part of it.  If you exclude yourself from the Settlement, you have no basis to object because it no longer affects you.

## THE FINAL APPROVAL HEARING

The Court will hold a hearing to decide whether to approve the Settlement and any requests for fees, expenses, and compensation awards to the Class Representatives.  You may attend and you may ask to speak, but you don't have to.

## 19. When and where will the Court decide whether to approve the Settlement?

The Court will hold a Final Approval Hearing on **October 22, 2014 at 3:00 p.m.** at the United States District Court, 1 Courthouse Way, Boston, MA 02210 to: (1) determine whether the Settlement should be approved as fair, reasonable, and adequate; and (2) consider the award of attorneys' fees, reimbursement of expenses, and compensation awards to the TPP Class Representatives.  If there are objections or comments, the Court will consider them at this time. The hearing may be moved to a different date or time without additional notice, so it is a good idea to check www.NeurontinSettlement.com for updated information.

## 20. Do I have to come to the Hearing?

Attendance is not required, even if you properly mailed a written comment or objection. If you file an objection, you may appear at the hearing and present evidence and argument in support of your objection.  In order to speak at the hearing, you must file a Notice of Intention to Appear described below.

Class Counsel is prepared to answer the Court's questions. If you or your personal attorney want to attend the hearing, you are more than welcome at your expense. As long as your objection was received before the deadline, the Court will consider it.

## 21. May I speak at the Hearing?

If you want to speak or want your own lawyer instead of Class Counsel to speak at the Final Approval Hearing, you must give the Court a paper that is called a "Notice of Intention to Appear." The Notice of Intention to Appear should include the following:

- Your name and address;
- A statement of your position to be asserted at the Final Approval Hearing and the grounds for your objections;
- Copies of any supporting papers or briefs;
- Your signature or the signature of your attorney.

The Notice of Intention to Appear must be filed with the Court on or before **September 30, 2014** at the addresses in Question 17.

## GETTING MORE INFORMATION

## 22. Where can I get more information?

If you want more detailed information, you may visit the website www.NeurontinSettlement.com where you will find the important case-related documents. You may also call toll-free at 1-855-793-1372 for more information, or write to Neurontin Settlement Administrator, P.O. Box 1906, Faribault, MN 55021-7161.

# EXHIBIT E

Legal Notice

# If You Purchased, Paid for, Administered and/or Reimbursed for Branded or Generic Gabapentin Sold by Pfizer and Its Subsidiaries

## *A Class Action Settlement Could Affect You*

A proposed Settlement has been reached in a class action lawsuit against Pfizer Inc. and Warner-Lambert Company LLC (collectively "Defendants") regarding the marketing of the prescription drug Neurontin. The lawsuit claims that Defendants' marketing of the drug Neurontin violated federal law. Defendants deny they have done anything wrong. Both sides have agreed to the Settlement to resolve the controversy and to avoid the cost and expense of further litigation. The lawsuit is not about the safety of Neurontin.

### Who is included?

Third-Party Payors ("TPPs") in the United States and its territories who purchased, paid for, administered, and/or reimbursed for Neurontin sold by Defendants or gabapentin sold by Greenstone LLC at any time from their first sale in the United States through the Effective Date of the Settlement for any purpose other than resale.

### What does the Settlement provide?

Defendants will pay $325 million into a Settlement Fund to settle TPP claims. Class Counsel will ask for attorneys' fees in an amount not to exceed one-third of the Settlement Fund, plus interest, litigation expenses, and compensation awards to the Class Representatives. After these deductions, the remainder of the Settlement Fund will be distributed proportionally to Class Members based on the amount of purchases claimed.

### What can I get from the Settlement?

The amount of money you are eligible to receive will depend on how much you paid and/or reimbursed for Neurontin (or gabapentin sold by Greenstone LLC) and on how much other Class Members paid and/or reimbursed. Some members of the Class who belong to a subclass of TPPs will be paid at a 1.80 multiplier of actual purchases in recognition of the fact that members of this subclass timely filed claims against Defendants that were not asserted in the class lawsuit.

### How do I get a payment?

You must submit a Claim Form electronically at www.NeurontinSettlement.com by **October 15, 2014** to get a payment. Class Members submitting claims for purchases over $300,000 must provide documentation with their Claim Form. Visit the website for more details on submitting a claim.

### What are my other rights?

If you do not want to be legally bound by the Settlement, you must exclude yourself from the Settlement. The exclusion deadline is **September 30, 2014**. If you stay in the Settlement you will not be able to sue the Defendants for any claims relating to the Settlement. You will be bound by all the Court's orders. However, if you stay in the Settlement, you may object to all or part of it by **September 30, 2014** and you may appear at the hearing described below in support of your objection.

The Court will hold a hearing on **October 22, 2014** at **3:00 p.m.** to consider whether to approve the Settlement and a request for attorneys' fees. The Court has appointed attorneys to represent the Class. You may also hire your own attorney, at your own expense.

## For more information or a Claim Form: 1-855-793-1372
## www.NeurontinSettlement.com

# EXHIBIT F

*Neurontin*
*Marketing Sales*
*Practices And*
*Products Liability*
*Settlement*

**CLASS ACTION LAWSUIT**

*Last Updated: 8/05/2014*

HOME

NOTICE

FILE A CLAIM

COURT DOCUMENTS

FREQUENTLY ASKED QUESTIONS

CONTACT INFORMATION

**DOWNLOAD ACROBAT READER**

Adobe Reader is free and is required to view and print documents on this site.

A A A

## Welcome

If You Purchased, Paid for, Administered and/or Reimbursed for Branded or Generic Gabapentin Sold by Pfizer and Its Subsidiaries A Class Action Settlement Could Affect You

A proposed Settlement has been reached in a class action lawsuit against Pfizer Inc. and Warner-Lambert Company LLC (collectively "Defendants") regarding the marketing of the prescription drug Neurontin.  The lawsuit claims that Defendants' marketing of the drug Neurontin violated federal law. Defendants deny they have done anything wrong.  Both sides have agreed to the Settlement to resolve the controversy and to avoid the cost and expense of further litigation.  The lawsuit is not about the safety of Neurontin.

**Who is included?** Third-Party Payors ("TPPs") in the United States and its territories who purchased, paid for, administered, and/or reimbursed for Neurontin sold by Defendants or gabapentin sold by Greenstone LLC at any time from their first sale in the United States through the Effective Date of the Settlement for any purpose other than resale.

**What does the Settlement Provide?**  Defendants will pay $325 million into a Settlement Fund to settle TPP claims. Class Counsel will ask for attorneys' fees in an amount not to exceed one-third of the Settlement Fund, plus interest, litigation expenses and compensation awards to the Class Representatives. After these deductions, the remainder of the Settlement Fund will be distributed proportionally to Class Members based on the amount of purchases claimed.

**What can I get from the Settlement?**  The amount of money you are eligible to receive will depend on how much you paid and/or reimbursed for Neurontin (or gabapentin sold by Greenstone LLC) and on how much other Class Members paid and/or reimbursed. Some members of the Class who belong to a subclass of TPPs will be paid at a 1.80 multiplier of actual purchases in recognition of the fact that members of this subclass timely filed claims against Defendants that were not asserted in the class lawsuit.

**How do I get a payment?** You must submit a Claim Form electronically on this website by **October 15, 2014** to get a payment. Class Members submitting claims for purchases over $300,000 must provide documentation with their Claim Form.

**What are my other rights?** If you do not want to be legally bound by the Settlement, you must exclude yourself from the Settlement. The exclusion deadline is **September 30, 2014**. If you stay in the Settlement you will not be able to sue the Defendants for any claims relating to the Settlement. You will be bound by all the Court's orders. However, if you stay in the Settlement, you may object to all or part of it by **September 30, 2014** and you may appear at the hearing described below in support of your objection.

The Court will hold a hearing on **October 22, 2014 at 3:00 p.m.** to consider whether to approve the Settlement and a request for attorneys' fees. The Court has appointed attorneys to represent the Class. You may also hire your own attorney, at your own expense.

**DISCLAIMER**

This website is supervised by counsel and the Court and is controlled by Rust Consulting, the Settlement Administration firm that handles all aspects of notice and claim processing. This is the only authorized website for this litigation. Please do not rely on other sites that set out different and unauthorized information. If you have any questions, please contact the Settlement Administrator.

View the **Privacy Policy**