UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1629<br><br>Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO:<br><br>CLASS ACTION | Judge Patti B. Saris<br>Mag. Judge Leo T. Sorokin |

## MEMORANDUM OF LAW IN SUPPORT OF APPLICATION FOR ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND COMPENSATION TO CLASS PLAINTIFFS

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ................................................................................................. 1

II.     THE HISTORY OF THIS LITIGATION DEMONSTRATES THE
        REASONABLENESS OF CLASS COUNSEL'S FEE APPLICATION. ............ 4

III.    CLASS COUNSEL'S REQUEST FOR FEES IS REASONABLE. .................... 5

        A.      Class Counsel is Entitled to Reasonable Compensation for
                Creating, Under Challenging Circumstances, a Substantial
                Common Fund for the Class. ........................................................... 5

        B.      The Percentage of the Fund Methodology is the Nationally
                Prevailing Method for Calculating a Reasonable Class Counsel
                Fee. ................................................................................................... 5

        C.      The Requested Fee is Well Within the Normal Range of Awards
                for Settlements of This Size. ........................................................... 7

        D.      Application of Relevant Factors Amply Supports the Requested
                Fee. ................................................................................................... 9

                1.      The Size of the Fund is Significant and Number of Persons
                        Benefited is Large, and the Recovery is Substantial. ................... 10

                2.      The Skill, Experience, and Efficiency of the Attorneys
                        Involved, as Demonstrated in Their Work Before This
                        Court, Justifies the Requested Fee. ............................................... 10

                3.      The High Degree of Complexity and the Prolonged
                        Duration of this Litigation Support the Requested Fee. .............. 11

                4.      The Risks of this Litigation Also Support the Fee. ...................... 12

                5.      The Amount of Time Devoted to this Case by Counsel was
                        Substantial. ................................................................................... 13

                6.      The Requested Fee is Reasonable When Compared to
                        Awards in Similar Cases. .............................................................. 14

                7.      Public Policy Considerations Fully Support the Requested
                        Fee. ................................................................................................ 15

        E.      The Lodestar Cross-Check Confirms the Reasonableness of the
                Fee Request. .................................................................................... 16

IV.     SERVICE PAYMENTS TO THE CLASS REPRESENTATIVES ARE
        APPROPRIATE. ............................................................................................... 17

V.      REIMBURSEMENT OF CLASS COUNSEL'S LITIGATION
        EXPENSES, INCLUDED WITHIN THE REQUESTED ONE-THIRD
        AWARD, IS APPROPRIATE. .......................................................................... 19

VI.     CONCLUSION ................................................................................................. 19

# TABLE OF AUTHORITIES

Page

## Cases

*Allapattah Servs., Inc. v. Exxon Corp.*,
454 F. Supp. 2d 1185 (S.D. Fla. 2006) ................................................................ 7, 8

*Boeing Co. v. Van Gemert*,
444 U.S. 472 (1980) .................................................................................................. 5

*Brotherton v. Cleveland*,
141 F. Supp. 2d 907 (S.D. Ohio 2001) ................................................................ 18

*Bussie v. Allmerica Fin. Corp.*,
1999 U.S. Dist. LEXIS 7793 (D. Mass. May 19, 1999) ................................... 6, 17

*Conley v. Sears, Roebuck & Co.*,
222 B.R. 181 (D. Mass. 1998) .............................................................................. 17

*Craft v. County of San Bernardino*,
624 F. Supp. 2d 1113 (C.D. Cal. 2008) .............................................................. 17

*Denney v. Jenkens & Gilchrist*,
230 F.R.D. 317 (S.D.N.Y.  2005) ......................................................................... 17

*Gaskill v. Gordon*,
160 F.3d 361 (7th Cir. 1998) ................................................................................. 9

*Goldberger v. Integrated Res.*,
209 F.3d 43 (2d Cir. 2000) ............................................................................ 10, 15

*In re Buspirone Antitrust Litig.*,
2003 U.S. Dist. LEXIS 26538 (S.D.N.Y. Apr. 11, 2003) ..................................... 7

*In re Checking Account Overdraft Litig.*,
830 F. Supp. 2d 1330 (S.D. Fla. 2011) ................................................................. 8

*In re Combustion, Inc.*,
968 F. Supp. 1116 (W.D. La. 1997) ...................................................................... 8

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*,
216 F.R.D. 197 (D. Me. 2003) .............................................................................. 16

*In re Continental Illinois Securs. Litig.*,
962 F.2d 566 (7th Cir. 1992) ................................................................................. 9

*In re Elec. Carbon Prods. Antitrust Litig.*,
447 F. Supp. 2d 389 (D.N.J. 2006) ...................................................................... 13

*In re Enron Corp. Securs. Litig.*,
586 F. Supp. 2d 732 (S.D. Tex. 2008) ................................................................... 8

# TABLE OF AUTHORITIES
## (continued)

Page

*In re Fidelity/Micron Securs. Litig. v. Fidelity Magellan Fund*,
   167 F.3d 735 (1st Cir. 1999) ................................................................... 19

*In re High Sulfur Content Gasoline Prods. Liab. Litig.*,
   384 Fed. App'x. 299 (5th Cir. 2010) ......................................................... 5

*In re Initial Pub. Offering Sec. Litig.*,
   671 F. Supp. 2d 467 (S.D.N.Y. 2009) ...................................................... 8

*In re Linerboard Antitrust Litig.*,
   2004 U.S. Dist. LEXIS 10532 (E.D. Pa. June 2, 2004) .................... 7, 8, 18

*In re Lorazepam & Clorazepate Antitrust Litig.*,
   205 F.R.D. 369 (D.D.C. 2002) ................................................................ 17

*In re Lupron Marketing and Sales Prac. Litig.*,
   2005 U.S. Dist. LEXIS 17456 (D. Mass. Aug. 17, 2005) ............ 10, 13, 15

*In re Lupron Marketing and Sales Prac. Litig.*,
   228 F.R.D. 75, 98 (D. Mass. 2005) .......................................................... 17

*In re Metlife Demutualization Litig.*,
   689 F. Supp. 2d 297 (E.D.N.Y. 2010) ..................................................... 11

*In re Puerto Rican Cabotage Antitrust Litig.*,
   815 F. Supp. 2d 448 (D.P.R. 2011) ................................................. 5, 6, 10

*In re Relafen Antitrust Litig.*,
   231 F.R.D. 52 (D. Mass. 2005) ........................................................ passim

*In re Remeron Direct Purchaser Antitrust Litig.*,
   2005 U.S. Dist. LEXIS 27013 (D.N.J. Nov. 9, 2005) .............................. 18

*In re Revco Securs. Litig.*,
   1992 U.S. Dist. LEXIS 7852 (N.D. Ohio May 6, 1992) ........................... 18

*In re Rite Aid Corp. Sec. Litig.*,
   396 F.3d 294 (3d Cir. 2005) .............................................................. 16, 17

*In re RJR Nabisco Inc. Securs. Litig.*,
   1992 U.S. Dist. LEXIS 12702 (S.D.N.Y. Aug. 24, 1992) .......................... 9

*In re Synthroid Marketing Litig.*,
   264 F.3d 712 (7th Cir. 2001) .................................................................... 8

*In re Thirteen Appeals Arising out of the San Juan Dupont Plaza Hotel Fire Litig.*,
   56 F.3d 295 (1st Cir. 1995) ............................................................. passim

*In re Tricor Direct Purchaser Antitrust Litig.*,
   2009 U.S. Dist. LEXIS 133251 (D. Del. Apr. 23, 2009) ............................ 8

**TABLE OF AUTHORITIES**
(continued)

Page

*In re Tyco Int'l Ltd. Multidistrict Litig.*,
 535 F. Supp. 2d 249 (D.N.H. 2007) ........................................................ 17

*In re Vitamins Antitrust Litig.*,
 2001 U.S. Dist. LEXIS 25067 (D.D.C. July 16, 2001) .............................. 7

*Lipsett v. Blanco*,
 975 F.2d 934 (1st Cir. 1992) ................................................................... 16

*Marsh ERISA Litig.*,
 265 F.R.D. 128 (S.D.N.Y. 2010) ............................................................ 11

*New England Carpenters Health Benefits Fund v. First DataBank, Inc.*,
 2009 U.S. Dist. LEXIS 97364 (D. Mass. Oct. 20, 2009) .................... 6, 15

*New England Carpenters Health Benefits Fund*,
 2009 U.S. Dist. LEXIS 68419 (D. Mass. Aug. 20, 2009) ....................... 17

*Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*,
 2005 U.S. Dist. LEXIS 9705 (E.D. Pa. May 19, 2005) ............................ 8

*Sutton v. Medical Serv. Ass'n*,
 No. 92-4787, 1994 U.S. Dist. LEXIS 7512 (E.D. Pa. June 8, 1994) ...... 13

*Trombley v. Bank of Am. Corp.*,
 2013 U.S. Dist. LEXIS 130550 (D.R.I. Sept. 12, 2013) ........................... 9

*Union Asset Mgmt. Holding A.G. v. Dell, Inc.*,
 669 F.3d 632 (5th Cir. 2012) ................................................................... 6

*Vizcaino v. Microsoft Corp.*,
 290 F.3d 1043 (9th Cir. 2002) ................................................................ 17

**Treatises**

4 *Newberg on Class Actions* § 14-6 (Supp. June 2014) ............................... 6

4 *Newberg on Class Actions* § 14-7 (Supp. June 2014) ............................. 17

*Manual for Complex Litigation 4th* § 14.121 ............................................. 6

**Other Authorities**

Charles Silver, *Due Process and the Lodestar Method: You Can't Get There From Here*, 74
 Tulane L. Rev. 1809 (2000) ...................................................................... 6

S. Swaroop Vedula, Tianjing Li, Kay Dickersin, *Differences in Reporting of Analyses in Internal
 Company Documents Versus Published Trial Reports: Comparisons in Industry-Sponsored
 Trials in Off-Label Uses of Gabapentin*, PLoS Medicine (2013) ............................................ 15

*Third Circuit Task Force Report*, 208 F.R.D. 340 (Jan. 15, 2002) ............................... 8

I.      **INTRODUCTION**

Class Plaintiffs[1] respectfully submit this Memorandum of Law in Support of their

Petition for Award of Attorneys' Fees, Reimbursement of Expenses, and Compensation to their

Class Counsel.  Class Plaintiffs request that this Court award fees and expenses of $108.33

million, or one-third (33 1/3%) of the settlement fund of $325 million, the percentage included in

the Court-approved notice to the Class.  Class Counsel have agreed to forgo a separate request

for reimbursement of litigation-related expenses.  Instead, they request that the Court include, in

the one-third award, compensation of both fees and expenses.  Under the common benefit

doctrine, the requested award will compensate all plaintiffs' counsel in this litigation: not only

the undersigned members of the Plaintiffs' Steering Committee, but also the approximately two

dozen firms who have contributed their time and energy to this case, as well as counsel for the

individual plaintiffs who have litigated their cases alongside the Class Plaintiffs.

Throughout the decade in which applicants prosecuted this *Neurontin* litigation, the

challenges imposed by an ever-more-restrictive procedural jurisprudence – including the higher

hurdles to class certification imposed by *Wal-Mart* and *Comcast* – added to the time, effort,

creativity, and tenacity needed to transform meritorious legal theories and supporting facts into

claims that could survive the pretrial gauntlet, prevail at trial, and withstand appeals.  That the

dedicated efforts of applicants succeeded in meeting these challenges is demonstrated, first and

foremost, by the fact and magnitude of the settlement itself.  In a decade in which many

meritorious cases could not be certified on a class basis, this litigation survived repeated setbacks

to generate substantial recovery of sums lost by health care payors to Pfizer in its masterful –

albeit deceitful – marketing of Neurontin.

Class Counsel persevered and surmounted those obstacles, and through their efforts,

created a record that laid bare pharmaceutical marketing practices that are often shrouded in

technical and little-understood terms, despite their impact on our economy.  This revelation will

---

[1] Class Plaintiffs are Harden Manufacturing Corporation, Louisiana Blue Cross/Blue Shield, and
ASEA/AFSCME Local 52 Health Benefits Trust.

bring lasting benefits to the health care industry and the public itself, as well as to class members. Applicants' steadfast work in this case exposed a massive marketing fraud by the world's largest drug company.

In addition to this Memorandum and the accompanying Declarations of Thomas M. Greene and Thomas M. Sobol, Class Counsel's request is supported by the Affidavit of Professor Arthur Miller, which reviews the major pleadings, briefs, and opinions generated in this case, evaluates the quality of counsel's efforts, and surveys and applies the prevailing jurisprudence that has developed under Rule 23 to determine what constitutes a reasonable fee. Professor Miller, drawing on his more than fifty years of experience and specific expertise in class actions and fee jurisprudence, opines that the requested one-third fee is reasonable and "amply justified."

This case took on the extraordinary commercialization of the pharmaceutical industry, in which the measure of a drug's effect lies not in its ability to cure disease, alleviate symptoms, or ease pain, but in its "blockbuster" potential. As promoted by Pfizer, Neurontin indisputably achieved blockbuster status on the merits of its marketing – but not corresponding to its actual value for many of the indications for which it was promoted to the medical community. Class Counsel showed that Pfizer hid first-level scientific evidence of Neurontin's lack of efficacy for neuropathic pain, bipolar disorder, migraine, and higher doses, and barraged the medical community with distorted and biased evidence of Neurontin's efficacy for those uses. When this case began, relatively little was known about Neurontin's efficacy for off-label uses. Through an exacting and dogged review of the internal research reports and data produced in discovery, Class Counsel showed not only that publications that Pfizer touted as supporting Neurontin's efficacy were deceptive and misleading, but that Pfizer had suppressed the results of several negative clinical trials while continuing to claim Neurontin's efficacy for those indications. Years of discovery revealed  that Pfizer had manipulated and misrepresented virtually every clinical trial ever conducted on an off-label indication for Neurontin.

The meticulous construction of a record of marketing fraud was only part of Class Counsel's task. Class Counsel had to show Neurontin's complete inefficacy for off-label uses,

and to prove causation – that Pfizer's misrepresentations and omissions, and not some other factor, caused treating physicians to prescribe Neurontin.  Class Counsel had to do this without a high-level whistleblower and without the support of treating physicians, specialists who were loath to admit that they had been duped and who could offer anecdotal evidence of individual patients obtaining relief after being prescribed Neurontin.  Class Counsel worked with indication-specific experts for each off-label use to develop proof of inefficacy, and with Dr. Meredith Rosenthal, of the Harvard School of Public Health, to develop a regression analysis that could show the relationship between Pfizer's marketing and sales of Neurontin.

The remedy available to Class members for Pfizer's conduct presented yet more challenges.  The federal RICO statute sets forth demanding and complex requirements to establish liability, including proof of an enterprise.  Class Counsel successfully developed proof that Pfizer controlled two different RICO enterprises, covering two different time periods.

A four-week jury trial, on Kaiser's claims against Pfizer, tested Class Counsel's theories and the facts they had developed to support them.  With Class Counsel serving as co-counsel for Kaiser at Kaiser's request, a jury found that the largest pharmaceutical company in the world had violated RICO in its marketing of Neurontin.  That jury verdict, and the First Circuit's refusal to disturb it (and its decision to vacate and remand this Court's denial of class certification) created substantial momentum towards the resolution of this case.  Class Counsel had shown that the record of marketing fraud that they had created was persuasive and complete.

Class Counsel recognize that they are requesting a large fee.  While Class Counsel have devoted extraordinary amounts of uncompensated time and resources to this litigation over the more than ten years that it has been pending (efforts that have been at the expense of other opportunities), it is more than the duration of the case and the sheer volume of time and money that Class Counsel have expended that justify their fee request.  This litigation required careful, tenacious, and creative advocacy at every stage, a high volume of work, done under demanding circumstances and at high risk of non-recovery.  The resulting settlement will bring substantial and immediate relief to class members, and it reflects Class Counsel's unique accomplishment in

shepherding relentlessly challenged claims to the eve of trial in the face of an aggressive defense. The requested fee is particularly reasonable in comparison to fees awarded in cases that yielded smaller recoveries, faced fewer obstacles, and demanded a lesser investment of time and cost. Professor Miller's affidavit places the instant request in this comparative context.

Class Counsel also request that the Court approve compensation from the Settlement Fund to the Class Plaintiffs, who have devoted significant time and effort to this case in service of class members who will benefit as a result. The requested compensation of $25,000 for each Class Plaintiff is also supported by ample authority within and beyond this Circuit.

## II. THE HISTORY OF THIS LITIGATION DEMONSTRATES THE REASONABLENESS OF CLASS COUNSEL'S FEE APPLICATION

The Court is familiar with the long history of this intensively fought litigation and of Class Counsel's efforts over the ten years of its pendency to bring the case to a successful resolution. That history is spelled out in detail in the accompanying Declaration of Thomas M. Greene ("Greene Declaration"), in the memorandum of law in support of Class Plaintiffs' motion for preliminary approval of the proposed settlement [Dkt. No. 4260], and in the memorandum of law supporting Class Plaintiffs' motion for final approval.

Unlike most class actions that ultimately yield settlements, this case involved multiple class certification defeats, renewed class certification efforts, a completed trial, and both merits and class appeals to the First Circuit, as well as Pfizer's unsuccessful petitions for Supreme Court review. The degree of challenge was of the highest magnitude, making the outcome – a settlement among the very largest of drug purchaser claims litigation – all the more extraordinary. The efforts Class Counsel tenaciously dedicated to the outcome are worthy, we submit, of a reasonable percentage-of-recovery award.

**III.**   **CLASS COUNSEL'S REQUEST FOR FEES IS REASONABLE**

    **A.**   **Class Counsel is Entitled to Reasonable Compensation for Creating, Under Challenging Circumstances, a Substantial Common Fund for the Class.**

"In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement."  Fed. R. Civ. P. 23(h). Under well-established principles of equity, lawyers who create a common fund are entitled to compensation.  *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) (holding that common-fund doctrine "rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense" (citations omitted); *In re Thirteen Appeals Arising out of the San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 306 n.6 (1st Cir. 1995) ("[t]he common fund doctrine is founded on the equitable principle that those who have profited from the litigation should share its costs."); *In re High Sulfur Content Gasoline Prods. Liab. Litig.*, 384 Fed. App'x. 299, 302 (5th Cir. 2010) (per curiam) ("It is well established that federal courts, through the exercise of their equity powers, may call upon a group that benefits from litigation efforts to share the costs of litigation, including attorneys' fees.") (citations omitted).  Here, the efforts of Class Counsel over more than ten years have resulted in the creation of a common fund of $325 million.

    **B.**   **The Percentage of the Fund Methodology is the Nationally Prevailing Method for Calculating a Reasonable Class Counsel Fee.**

As the Miller affidavit discusses, the "percentage of the fund" methodology is the prevailing contemporary judicial method to evaluate and award fees under Rule 23(h) in class action settlements.  Courts in this District, along with courts throughout the country, have endorsed and applied the percentage-of-the-fund method in calculating attorneys' fees, rather than the lodestar method.  "The percentage of the fund method applies a certain percentage to the settlement fund whereas the lodestar method multiplies the number of hours class counsel worked on a case by a reasonable hourly billing rate for such services."  *In re Puerto Rican Cabotage Antitrust Litig.*, 815 F. Supp. 2d 448, 457-458 (D.P.R. 2011) (internal citation

omitted).  As this Court has held, "the weight of the caselaw … approves of percentage of the fund as the methodology for determining attorneys' fees, with a lodestar calculation as a pragmatic cross-check."  *New England Carpenters Health Benefits Fund v. First DataBank, Inc.*, 2009 U.S. Dist. LEXIS 97364, at *7 (D. Mass. Oct. 20, 2009) (collecting authorities).[2]  "From a public policy standpoint, the [percentage of the fund] method of calculating fees more appropriately aligns the interests of the class with the interests of Class Counsel -- the larger the value of the settlement, the larger the value of the fee award."  *Bussie v. Allmerica Fin. Corp.*, 1999 U.S. Dist. LEXIS 7793, at *5 (D. Mass. May 19, 1999) (internal quotation and citation omitted).

This Court's practice conforms to that of every other Circuit in the country.  With the issuance of its opinion in *Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 643 (5th Cir. 2012), in which the Fifth Circuit Court of Appeals endorsed the percentage method, all circuit courts now approve of or direct the percentage method of assessing fee applications.  *See id.* at 643.  *See also Manual for Complex Litigation 4th* ("MCL") § 14.121, at 187 (gathering cases from circuits); 4 *Newberg on Class Actions* § 14-6, n.7.30 (Supp. June 2014) ("The percentage method is strongly preferred in common fund class actions; indeed, one commentator has argued that Due Process concerns require utilization of the percentage method.") (citing Charles Silver, *Due Process and the Lodestar Method: You Can't Get There From Here*, 74 Tulane L. Rev. 1809 (2000)).  Professor Miller's accompanying affidavit sets forth the scholarly consensus that has developed around the use of the percentage method, and the rationale that has informed the strong jurisprudential preference, on grounds of policy, equity, and practicality, for the percentage approach.  *See* Miller Aff. ¶¶ 38-39.  Consistent with this Court's past practices, as well as those of other courts in and outside of this Circuit, this Court should apply the percentage-of-the-fund methodology to this fee request.

---

[2] Although often conducted, a lodestar cross-check is not required.  *See In re Puerto Rican Cabotage*, 815 F. Supp. 2d at 464 (citing *In re Thirteen Appeals*, 56 F.3d at 307).

C.     **The Requested Fee is Well Within the Normal Range of Awards for Settlements of This Size.**

Class Counsel's requested fee of one-third of the settlement fund – in compensation for both the time and expenses invested in this litigation – is consistent with a host of cases in which courts have approved similar requests.  Such an award would place it among a large group of cases that have approved similar fee percentages in cases where an outstanding settlement has been reached, particularly where the litigation has traveled a long and tortuous road, as has the Neurontin litigation.  The requested fee is intended, consistent with the equitable principles of the common benefit doctrine, to compensate *all* plaintiffs' attorneys who have performed work in connection with the sales and marketing litigation, including those of the Assurant Plaintiffs and of a large group of third-party payors.[3]

The requested one-third award is consistent with many recent awards in settlements of a similar degree of magnitude, the so-called "mega-fund" cases: those generating common funds of more than 100 million.

There are a legion of class action fee opinions from across the country in mega-fund cases, awarding fees in the 30-35% range.  *See Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1210 (S.D. Fla. 2006) (awarding fees equaling 31.33 percent of settlement fund of $1.075 billion) (citing, *inter alia*, *In re Relafen Antitrust Litig.*, 231 F.R.D. 52 (D. Mass. 2005) (awarding 33 percent on $175 million); *In re Vitamins Antitrust Litig.*, 2001 U.S. Dist. LEXIS 25067, at *72-73 (D.D.C. July 16, 2001) (34.6 percent of settlement fund of $365 million); *In re Buspirone Antitrust Litig.*, 2003 U.S. Dist. LEXIS 26538, at *11 (S.D.N.Y. Apr. 11, 2003) (33.3 percent on $220 million settlement); and *In re Linerboard Antitrust Litig.*, 2004 U.S. Dist. LEXIS 10532, at *52 (E.D. Pa. June 2, 2004) (30 percent fee on $202 million fund)); *see also In re Tricor Direct Purchaser Antitrust Litig.*, 2009 U.S. Dist. LEXIS 133251, at *17 (D. Del. Apr.

---

[3] As stated in the memorandum in support of Class Plaintiffs' motion for preliminary approval of the proposed settlement and explained in further detail in the accompanying Sobol Declaration, Class Counsel have entered into separate agreements concerning attorneys' fees with the Assurant Plaintiffs and their counsel, as well as with a large group of third party payors represented by the law firms of Lowery Dannenbery Cohen & Hart, P.C. and Rawlings & Associates, PLCC, which includes many of the largest TPPs in the United States.

23, 2009) (awarding one-third fee on recovery of $250 million); *In re Combustion, Inc.*, 968 F.

Supp. 1116 (W.D. La. 1997) (36 percent on recovery of approximately $128 million); *In re*

*Thirteen Appeals*, 56 F.3d at 308 (approving fees of 30 percent of $220 million fund); *In re*

*Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 516 (S.D.N.Y. 2009) (awarding fees of

$170 million, or one-third of a recovery of more than $500 million); *In re Checking Account*

*Overdraft Litig.*, 830 F. Supp. 2d 1330, 1367 (S.D. Fla. 2011) (awarding fee of 30 percent on

$410 million settlement).  The requested award falls squarely in the mainstream of these mega-

fund awards.

It was formerly held in some quarters (at least in theory), that as settlements grow, the

percentage awarded should fall.  But experience, reality, and sound policy have defeated that

theory.  Larger settlements often require more work and more risk and are achieved in cases of

longer duration.  Indeed, as numerous recent cases illustrate, courts that have presided over cases

that ultimately generated mega-fund settlements have rejected the view that, as the size of a

common fund increases, the percentage of the fund awarded as fees should fall.  *See, e.g., In re*

*Enron Corp. Securs. Litig.*, 586 F. Supp. 2d 732, 753-54 (S.D. Tex. 2008); *Allapattah*, 454 F.

Supp. 2d at 1212-13; *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, 2005 U.S.

Dist. LEXIS 9705, at *9-10 (E.D. Pa. May 19, 2005).  These cases have followed the reasoning

of the Third Circuit Task Force Report, which stated, "[t]he goal of appointment [of Class

Counsel] should be to maximize the net recovery to the class and to provide fair compensation to

the lawyer, not to obtain the lowest attorney fee.  The lawyer who charges a higher fee may earn

a proportionately higher recovery for the class than the lawyer who charges a lesser fee."  *Third*

*Circuit Task Force Report*, 208 F.R.D. 340 (Jan. 15, 2002).  As Judge Easterbrook wrote in his

influential decision in *In re Synthroid Marketing Litigation*, "Private parties would never

contract for … an arrangement" in which contingent fee percentages drop as recoveries increase,

because it would create incentives for lower-value settlements.  *In re Synthroid Marketing Litig.*,

264 F.3d 712, 718 (7th Cir. 2001).  *See also In re Linerboard.*, 2004 U.S. Dist. LEXIS 10532, at

*52 (endorsing Seventh Circuit's view in *Synthroid* that "reducing fees for large awards is economically irrational" and awarding 30% fee on $202 million recovery).

The awards of percentage fees ranging from 30 percent and higher in so-called "mega-fund" cases also reflect and track the private market for legal services, which many courts have held to be a primary purpose of reasonable fee awards.  In Judge Posner's words, a fee award is intended "to give the lawyer what he [or she] would have gotten in the way of a fee in an arm's-length negotiation, had one been feasible.  In other words, the object is to simulate the market where a direct market determination is infeasible." *In re Continental Illinois Securs. Litig.*, 962 F.2d 566, 572 (7th Cir. 1992).  *See also In re RJR Nabisco Inc. Securs. Litig.*, 1992 U.S. Dist. LEXIS 12702, at *20 (S.D.N.Y. Aug. 24, 1992) (holding that "class counsel are entitled to the fee they would have received had they handled a similar suit on a contingent fee basis, with a similar outcome, for a paying client.").  Courts have recognized that market rates for contingent fee cases typically equal or exceed 33 percent.  *See Relafen*, 231 F.R.D. at 81 n.22 (citing expert declaration stating that "one-third is the benchmark for privately negotiated contingent fees"); *see also, e.g.*, *Gaskill v. Gordon*, 160 F.3d 361, 362 (7th Cir. 1998) (approving 38 percent fee and noting typical contingent fee contracts of 33 to 40 percent).

For all these reasons, Courts in the First Circuit have also repeatedly approved fees in the one-third range in large-fund class action settlements.  *See, e.g., In re Thirteen Appeals*, 56 F.3d at 308 (30 percent); *In re Relafen*, 231 F.R.D. at 97 (one-third fee); *Trombley v. Bank of Am. Corp.*, 2013 U.S. Dist. LEXIS 130550, at *24-25 (D.R.I. Sept. 12, 2013) (30 percent).

### D.   Application of Relevant Factors Amply Supports the Requested Fee.

The First Circuit has not prescribed a particular set of factors to be considered in assessing an application for attorneys' fees, but instead allowed district courts to exercise their wide discretion in applying appropriate factors.  Factors typically applied by the district courts include: (1) the size of the fund and the number of persons benefitted; (2) the skill, experience, and efficiency of the attorneys involved; (3) the complexity and duration of the litigation; (4) the

risks of the litigation; (5) the amount of time devoted to the case by counsel; (6) awards in similar cases; and (7) public policy considerations, if any. *See In re Puerto Rican Cabotage*, 815 F. Supp. 2d at 457-458; *In re Lupron Marketing and Sales Prac. Litig.*, 2005 U.S. Dist. LEXIS 17456, at *12 (D. Mass. Aug. 17, 2005) (same).[4]  Applying these factors, the requested fee amount in this case is fair and reasonable.

### 1.   The Size of the Fund is Significant and Number of Persons Benefited is Large, and the Recovery is Substantial.

The $325 million fund created by this settlement will provide immediate and significant benefits to the thousands of class members across the country who paid for Neurontin.  The beneficiaries of this settlement range from very small Taft-Hartley funds to large payors. Because the settlement benefits have recognized value to class members, the net fund will be fully subscribed and distributed.

### 2.   The Skill, Experience, and Efficiency of the Attorneys Involved, as Demonstrated in Their Work Before This Court, Justifies the Requested Fee.

"[T]he quality of representation is best measured by results," *Goldberger v. Integrated Res.*, 209 F.3d 43, 55 (2d Cir. 2000), and the results in this case are outstanding.  Class Counsel's efforts led to the creation of a $325 million fund.[5]  Class Counsel were uniquely situated to litigate and to persevere in this case, as they brought to the case deep experience in pharmaceutical litigation specifically and class actions generally, along with knowledge of Defendants' marketing of Neurontin from the *qui tam* litigation.  Class Counsel worked efficiently, marshaling the resources of numerous additional law firms to conduct discovery and develop the factual record, while a core group of attorneys efficiently handled briefing, expert

---

[4] *See also In re Relafen*, 231 F.R.D. at 79 (listing similar factors, including "(1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases.").
[5] Class Counsel were also instrumental in obtaining the crucial jury verdict in favor of Kaiser. *See* Greene Decl. ¶¶ 87-92.

work, and appearances before the Court.  As a result of Class Counsel's efforts, a substantial

fraud, wholly unknown and unsuspected by the medical community and the public, was brought

to light and remedied.

Additionally, "[t]he quality of the opposition should be taken into consideration in

assessing the quality of the plaintiffs' counsel's performance." *In re Metlife Demutualization

Litig.*, 689 F. Supp. 2d 297, 362 (E.D.N.Y. 2010).  Class Counsel faced defense counsel at the

top of their profession, and who were able to draw on vast resources.  *See Marsh ERISA Litig.*,

265 F.R.D. 128, 148 (S.D.N.Y. 2010) ("The high quality of defense counsel opposing Plaintiffs'

efforts further proves the caliber of representation that was necessary to achieve the

Settlement.").

### 3.     The High Degree of Complexity and the Prolonged Duration of this Litigation Support the Requested Fee.

The complexity and duration of the litigation weigh heavily in favor of the requested fee

award.  As the accompanying Greene Declaration details, Class Counsel developed and

synthesized a massive factual record, drawn from millions of pages of documents, testimony

from more than 140 depositions (taken in 14 states from Massachusetts to Alaska) and a dozen

experts, and voluminous third-party discovery.  The evidence was highly technical, as much of

the key issues in this case turned on the proper interpretation of complex clinical trials, each

directed at a different indication (*e.g.*, bipolar disorder, neuropathic pain, migraine).  Class

Counsel's close analysis of the internal research reports and data underlying publications of

clinical trials uncovered manipulation and misrepresentation of purportedly positive clinical

trials, and suppression of negative ones.  This was a painstaking effort that required intensive

work with a host of indication-specific experts.

The legal theories advanced by Class Counsel were novel and challenging, and required

navigation of a shifting legal terrain for class actions and civil RICO.  During this litigation, class

action jurisprudence grew more challenging, adding hurdles and barriers to class certification

that had not previously existed, and adding substantially to the quality and quantity of work

required of plaintiffs' counsel.  *See* Greene Decl. ¶ 22.  Class Counsel developed proof of violations of RICO, including of two separate enterprises, and worked with Dr. Rosenthal to create a regression analysis that the First Circuit held could establish proof of causation of Neurontin prescriptions.  Not only were these legal issues briefed and argued at the First Circuit, but Defendants petitioned the United States Supreme Court for a writ of certiorari, with support from five national organizations who submitted amicus briefs in support of Pfizer's petition. Despite these obstacles, Class Counsel were able to achieve a historically large settlement on behalf of the class.

### 4.        The Risks of this Litigation Also Support the Fee.

Although this case began on the heels of a settlement of federal and state claims relating to the marketing of Neurontin, it presented enormous risks throughout, and Class Counsel continued to face genuine risk even after remand from the First Circuit and as they prepared for trial (which the Court set to begin in October 2014).

First, as the Greene Declaration explains in detail (*see* ¶¶ 9-12), Warner Lambert's settlement of the False Claims Act litigation and its very narrow guilty plea for violating the Food, Drug & Cosmetic Act provided no guarantee that private payors could recover in civil litigation their payments for Neurontin.  Class Counsel had to develop a new theory of liability based on fraud, rather than simply off-label marketing, and needed to develop evidence to support those theories.  The hurdles to developing that record were many, including, as the Greene Declaration details: the need to show Neurontin's complete inefficacy; the fact that inefficacy could only be shown through clinical trials; the lack of a high-level whistleblower; no support from treating physicians; a broad time frame and geographic scope; and in particular, difficult causation issues, as Class Counsel would need to establish that doctors across the country wrote prescriptions for Neurontin because of Defendants' misrepresentations.  *Id.* ¶ 21. Further, Class Counsel had to develop this record as courts in other circuits issued numerous

negative decisions in arguably analogous cases, involving, in part, aggregate evidence of a pharmaceutical marketing fraud.  *Id.* ¶ 79.

Even as Class Counsel overcame hurdle after hurdle, great risk remained at the time of mediation.  Although the Court had indicated its inclination to grant the post-remand motion for class certification, the plaintiffs would have had to survive a Rule 23(f) petition and then proceeded to trial.  Trial itself would have been extremely risky, particularly with respect to proving damages, which can be, as one court has noted, "an esoteric exercise with unpredictable results."  *In re Elec. Carbon Prods. Antitrust Litig.*, 447 F. Supp. 2d 389, 401 (D.N.J. 2006).  *See also Sutton v. Medical Serv. Ass'n*, No. 92-4787, 1994 U.S. Dist. LEXIS 7512, at *18 (E.D. Pa. June 8, 1994) (granting final approval, noting that "even assuming that plaintiffs ultimately would have prevailed on liability, they faced the risk that they could not establish damages . . . that is achieved by this Settlement Agreement"); *see also In re Lupron*, 2005 U.S. Dist. LEXIS 17456, at *16 ("History is replete with cases in which plaintiffs prevailed at trial on issues of liability, but recovered little or nothing by way of damages.").  Even a victory at trial and ultimately prevailing on appeal would have associated costs, with compensation to Class members pushed off potentially by years, and the possibility of new and negative decisions on class certification and RICO.

In sum, the risks of the litigation have been extreme throughout the ten years this case has been pending, and continuing to litigate also posed substantial risk.

**5.      The Amount of Time Devoted to this Case by Counsel was Substantial.**

The amount of time and labor devoted to this case was highly unusual, and weighs in favor of the requested fee award.  In *In re Relafen*, the Court, in approving a one-third fee request that it noted was at the "high end" of fee requests, took special note of the "mass of discovery" adduced in that case.  The Court pointed to "hundreds of hours" spent with experts, and the review of "hundreds of boxes of documents."  *In re Relafen*, 231 F.R.D. at 80.  The time and labor expended in this case dwarfs that of *Relafen*, where the Court awarded a one-third fee.

Fact discovery alone consumed four and a half years. Pfizer produced, and Class Counsel reviewed and analyzed, more than 212,000 documents comprising more than 3.38 million pages. *See* Greene Decl. ¶ 30. Third parties, from whom evidence concerning a RICO enterprise was crucial, produced an additional 138,000 documents comprising nearly one million pages. Greene Decl. ¶ 31. Class Counsel attended (and were usually the primary questioning or defending attorney at) 121 depositions of 79 fact witnesses and an additional 26 expert depositions. Greene Decl. ¶ 34-35. Class plaintiffs were involved in 45 contested discovery motions, and appeared before the Court 26 times. Greene Decl. ¶ 27. These efforts were in addition to multiple rounds of class certification briefing, summary judgment briefing, appellate briefing and argument before the First Circuit, and a successful opposition to Pfizer's petition for a writ of certiorari to the United States Supreme Court. Greene Decl. ¶¶ 66-86, 93-109. In all, using current and customary rates, Class Counsel expended more than $27 million of time value to this case. *See* Declaration of Thomas M. Sobol ("Sobol Declaration") ¶ 16.

During these years of intensive effort, Class Counsel had every incentive to work efficiently, and the time expended is not at all surprising given the aggressive defense put on by Pfizer, appeals that reached the Supreme Court, and a factual record that lasted years and spanned this country.

### 6.      **The Requested Fee is Reasonable When Compared to Awards in Similar Cases.**

As set forth above, courts in this Circuit and across the country have repeatedly approved fee requests comparable to the one made here in cases that have resulted in similarly large recoveries. *See supra* § III(C). The request in this case is thus fully supported by these "comparables." We respectfully add that however "comparable" those other cases are in terms of the recovery and the fee percentage, none appear comparable in terms of the time, effort, and risk that went into their prosecution and resolution, none lasted as long as this one did, and none required the same navigation of extremely complex factual issues and challenging legal claims.

Class Counsel's tenacity and unremitting devotion of time and effort, always under daunting circumstances of challenge and risk, supports the requested fee.

### 7.   Public Policy Considerations Fully Support the Requested Fee.

Public policy considerations also support the requested fee award.  First, the requested fee furthers, as do other fee awards in class actions aggregating the claims of those who could not litigate on their own, the public policy goal of "providing lawyers with sufficient incentive to bring common fund cases that serve the public interest." *Goldberger*, 209 F.3d at 51.

Second, this litigation itself furthered "significant societal interest in obtaining redress for prescription drug consumers whose harms could not, given the cost of litigation, be pursued on an individual basis. The public interest is also served by the defendants' disgorgement of the proceeds of predatory marketplace behavior."  *In re Lupron*, 2005 U.S. Dist. LEXIS 17456, at *22-23.  In particular, the record that Class Counsel created in this litigation exposed a host of pharmaceutical marketing practices, and alerted scientists, medical researchers, doctors, and patients to the variety of ways that off-label marketing, and deceptive marketing, may occur. The litigation has advanced the medical community's understanding of how to weigh marketing claims from companies such as Pfizer.  *See, e.g.*, S. Swaroop Vedula, Tianjing Li, Kay Dickersin, *Differences in Reporting of Analyses in Internal Company Documents Versus Published Trial Reports: Comparisons in Industry-Sponsored Trials in Off-Label Uses of Gabapentin*, PLoS Medicine (2013).  We respectfully submit that the manner in which this case was prosecuted, tried, appealed, and ultimately resolved provides benefits to the health care community far beyond the dollars generated, in terms of prescriber and consumer education, the promotion of integrity in drug marketing, and the deterrence of misleading marketing techniques. For these reasons, the public policy factor weighs in favor of the reasonableness of Class Counsel's request.

E.       **The Lodestar Cross-Check Confirms the Reasonableness of the Fee Request.**

This Court has endorsed the use of the "lodestar calculation as a pragmatic cross-check."

*See New England Carpenters Health Benefits Fund*, 2009 U.S. Dist. LEXIS 97364 at *8 (citing

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 215-16 (D. Me.

2003); *In re Thirteen Appeals*, 56 F.3d at 307; and *MCL* § 14.122 ("the lodestar is . . . useful as a

cross-check on the percentage method by estimating the number of hours spent on the litigation

and the hourly rate, using affidavits and other information provided by the fee applicant. The

total lodestar estimate is then divided into the proposed fee calculated under the percentage

method.  The resulting figure represents the lodestar multiplier to compare to multipliers in other

cases.")).  "The lodestar cross-check calculation need entail neither mathematical precision nor

bean-counting."  *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306-07 (3d Cir. 2005).  As

Professor Miller emphasizes, if the Court decides in its discretion to perform the lodestar cross-

check, it need not undertake a detailed review of time expended; the term, as Professor Miller

writes, "speaks of an abbreviated quick look."  Miller Aff. ¶ 60.  Use of the lodestar cross-check

confirms the reasonableness of the requested fee.

The total lodestar accumulated by Class Counsel, including both that of the Steering

Committee and supporting law firms, is approximately $27.4 million.[6]  Additionally, Class

Counsel has expended approximately $4.38 million in litigation-related expenses.  Class Counsel

have submitted declarations with this motion that explain how Class Counsel tracked and

controlled time and expenses spent on this case.  *See Rite Aid*, 396 F.3d at 306-07 ("The district

courts may rely on summaries submitted by the attorneys and need not review actual billing

---

[6] That amount excludes all time spent in connection with the Kaiser trial, including preparation
and post-trial briefing.  *See* Sobol Declaration ¶ 21.  It also reflects a careful internal audit of
time submitted by all firms who have worked on the plaintiffs' behalf, which Class Counsel
undertook to weed out duplicative or inefficient billing.  *Id.* ¶¶ 19-22.  Consistent with First
Court jurisprudence, the lodestar figure is expressed in terms of current rates because of the
delay in payment of fees for the services provided.  *See Lipsett v. Blanco*, 975 F.2d 934, 942-43
(1st Cir. 1992).

records.").  The requested fee of $108.33 million, representing one-third of the settlement fund and inclusive of expenses, yields a multiplier on Class Counsel's lodestar of 3.97.[7]

This multiplier is well within the range of those accepted by this Court and others in similar complex and long-running litigation.  *See New England Carpenters Health Benefits Fund*, 2009 U.S. Dist. LEXIS 68419, at *10 (D. Mass. Aug. 20, 2009) (awarding multiplier of 8.3 and citing *Conley v. Sears, Roebuck & Co*., 222 B.R. 181, 182 (D. Mass. 1998) (approving multiplier of 8.9); and *In re Rite Aid Corp. Securs. Litig*.., 146 F. Supp. 2d 706, 736 n.44 (E.D. Pa. 2001) (holding that multiplier between 4.5 to 8.5 was "unquestionably reasonable")); *In re Tyco Int'l Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249, 271 (D.N.H. 2007) (multiplier of 2.697); *Bussie*, 1999 U.S. Dist. LEXIS 7793, at *10 (multiplier of 3.3); *Craft v. County of San Bernardino*, 624 F. Supp. 2d 1113, 1123 (C.D. Cal. 2008) (multiplier of 5.2).  In *Vizcaino v. Microsoft Corp*., 290 F.3d 1043, 1051 n.6 (9th Cir. 2002), the Court created an appendix of fee awards and multipliers on 24 cases from 1996-2001, and noted that twenty of those cases awarded multipliers from 1.0-4.0, and eight indicated multipliers of 3.0 or higher. *See also* 4 *Newberg on Class Actions* § 14-7 (Supp. June 2014), at 166. ("Generally, multipliers from 1-3 are the norm, though higher multipliers are not unusual and may well be warranted in certain circumstances.").  The lodestar cross-check reveals the extent of the work that was required to generate this result, and confirms the reasonableness of a one-third fee here.

## IV.  SERVICE PAYMENTS TO THE CLASS REPRESENTATIVES ARE APPROPRIATE

Class Plaintiffs also request that the Court award the Class Representatives compensation for their service to the Class and for the time they expended in prosecuting this case.

"Incentive awards are recognized as serving an important function in promoting class action settlements, particularly whereas here, the named plaintiffs participated actively in the litigation."  *In re Lupron Marketing and Sales Prac. Litig.*, 228 F.R.D. 75, 98 (D. Mass. 2005)

---

[7] As the requested award includes litigation expenses in the amount of $4.38 million, which Class Counsel will absorb, the multiplier is effectively less – 3.79.

(citing *Denney v. Jenkens & Gilchrist*, 230 F.R.D. 317 (S.D.N.Y.  2005)).  *See also In re Relafen*, 231 F.R.D. at 82 (awarding incentive payments of $14,000 to third-party payor plaintiffs).  Payments such as the ones requested here also serve "to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation."  *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 400 (D.D.C. 2002).  As "a named plaintiff is an essential ingredient of any class action, an incentive award can be appropriate to encourage or induce an individual to participate in the suit."  *In re Relafen*, 231 F.R.D. at 82 (internal quotation and citation omitted).

Class Plaintiffs here actively and effectively fulfilled their obligations as representatives for the Class. Each of the Class Plaintiffs searched for and produced documents, responded to written discovery, and sat for depositions.  Representatives of the Class Plaintiffs sat for a total of eight days of deposition, an unusually heavy burden for class representatives. Class Plaintiffs went above and beyond the call of duty in complying with demands placed upon them during this litigation.  Moreover, Class Plaintiffs offered invaluable assistance in the investigation and prosecution of this matter.  Class Plaintiffs examined, organized, and produced a significant amount of data and other material regarding their Neurontin purchases; this work required substantial time and energy beyond their already significant responsibilities. Furthermore, each of the Class Plaintiffs monitored the case and discussed its progress with Class Counsel over the many years that it has been pending.

Class Plaintiffs' active and prominent role in this litigation more than justifies the requested compensation.  Courts have awarded compensation of the requested amount and larger than the amounts that Class Plaintiffs request.  *See, e.g.*, *In re Remeron Direct Purchaser Antitrust Litig.*, 2005 U.S. Dist. LEXIS 27013, at *52 (D.N.J. Nov. 9, 2005) ($60,000 award to two named plaintiffs); *In re Linerboard Antitrust Litig.*, 2004 U.S. Dist. LEXIS 10532, at *58 (approving $25,000 to each representative of the classes and gathering authorities approving similar and larger awards); *In re Revco Securs. Litig.*, 1992 U.S. Dist. LEXIS 7852, at *22 (N.D.

Ohio May 6, 1992) (awarding $200,000 to a named plaintiff); *Brotherton v. Cleveland*, 141 F. Supp. 2d 907, 914 (S.D. Ohio 2001) (awarding $50,000 to the class representative).

Finally, the Notice to the Class advised Class members that Class Counsel would apply for such compensation, and no Class member has, to date, objected to such an award.

For these reasons, Class Counsel submit that the requested compensation to the named Plaintiffs are both appropriate and reasonable.

## V.   REIMBURSEMENT OF CLASS COUNSEL'S LITIGATION EXPENSES, INCLUDED WITHIN THE REQUESTED ONE-THIRD AWARD, IS APPROPRIATE

In addition to reasonable attorneys fees, it is well-settled that attorneys who have created a common fund can also "recover from the fund, as a general matter, expenses, reasonable in amount, that were necessary to bring the action to a climax." *In re Fidelity/Micron Securs. Litig. v. Fidelity Magellan Fund*, 167 F.3d 735, 737 (1st Cir. 1999). "[D]istrict courts enjoy wide latitude in shaping the contours of" award of expenses. *Id.* at 736. As explained in the accompanying Sobol Declaration, Class Counsel have expended more than $4.38 million in litigation expenses, and will incur more in connection with the implementation of the proposed settlement. These are expenses necessary for the successful prosecution of the litigation and customarily would be billed to paying clients in the marketplace, but Class Counsel have agreed to forgo a separate request for expenses. Instead, they request that the Court's award of a percentage of the fund cover both fees and expenses.

## VI.   CONCLUSION

For the foregoing reasons, Class Plaintiffs respectfully request that the Court grant the application for attorneys' fees, reimbursement of litigation expenses, and compensation to the named Class Plaintiffs.

Dated:  September 15, 2014                Respectfully Submitted,


                                   By:     */s/ Thomas M. Greene*
                                           Thomas M. Greene
                                           tgreene@greenellp.com
                                           Greene LLP
                                           One Liberty Square, Ste. 1200
                                           Boston, MA 02109


                                   By:     */s/ Thomas M. Sobol*
                                           Thomas M. Sobol
                                           Hagens Berman Sobol Shapiro LLP
                                           One Main Street, 4th Floor
                                           Cambridge, MA  02142
                                           Boston, MA 02110


                                   By:     */s/ Elizabeth J. Cabraser*
                                           Elizabeth J. Cabraser
                                           Lieff Cabraser Heimann &
                                              Bernstein, LLP
                                           275 Battery Street, 29th Floor
                                           San Francisco, CA 94111-3339


                                   By:     */s/ Don Barrett*
                                           Don Barrett
                                           Barrett Law Office
                                           404 Court Square North
                                           P.O. Box 987
                                           Lexington, MS 39095


                                   By:     */s/ Daniel Becnel*
                                           Daniel Becnel, Jr.
                                           Law Offices of Daniel Becnel, Jr.
                                           106 W. Seventh Street
                                           P.O. Drawer H
                                           Reserve, LA 70084

By:      /s/ James Dugan
         James R. Dugan, II
         The Dugan Law Firm
         365 Canal Street, Suite 1000
         New Orleans, LA 70131

**Members of the Class Plaintiffs'
Steering Committee**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that this document filed through the ECF system has been served on

September 15, 2014.

                         /s/ Thomas M. Greene
                         Thomas M. Greene