# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:  NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No.  1629<br><br>Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO:<br><br>HARDEN MANUFACTURING CORPORATION; LOUISIANA HEALTH SERVICE INDEMNITY COMPANY, d/b/a BLUE CROSS/BLUE SHIELD OF LOUISIANA; ASEA/AFSCME LOCAL 52 HEALTH BENEFITS TRUST; JAN FRANK WITYK; and GARY VARNAM, on behalf of themselves and all others similarly situated,<br><br>     Plaintiffs,<br><br>v.<br><br>PFIZER INC. and WARNER-LAMBERT COMPANY,<br>     Defendants. | Judge Patti B. Saris<br><br>Mag. Judge Leo T. Sorokin |

**AFFIDAVIT OF THOMAS M. GREENE IN SUPPORT OF CLASS PLAINTIFF COUNSEL'S MOTION FOR AN AWARD OF ATTORNEY'S FEES, REIMBURSEMENT OF EXPENSES, AND COMPENSATION AWARDS TO CLASS REPRESENTATIVES**

TABLE OF CONTENTS

Initiation Of The Litigation And The Relationship Of The Class Litigation To The Neurontin False Claims Act Litigation ................................................................................... 5

Class Counsel Establishes That RICO May Be Available To Remedy Claims Of Fraudulent Promotion By Drug Companies ............................................................................ 9

The Unprecedented Nature Of The Class Claims And The Risks Faced By Class Counsel ....................................................................................................................................... 13

Class Counsel Engages In Several Years Of Discovery ....................................................... 16

Class Counsel Uncovers Extensive Publication Fraud ........................................................ 21

The First Effort At Class Certification ..................................................................................... 38

The District Court Denies The Renewed Motion For Class Certification ......................... 40

Class Counsel Convinces The District Court That Its Basis For Denying Class Certification Is Erroneous ........................................................................................................... 45

The Evidence And Expert Testimony Developed By Class Counsel Convince A Jury And The District Court That Pfizer Has Engaged In Fraudulent Promotion That Caused Physicians Across The Country To Prescribe Worthless Neurontin Prescriptions .......... 48

Notwithstanding The Result In Kaiser, The District Court Denies Class Certification A Third Time And Dismisses The Class' Claims ..................................................................... 51

Class Counsel's Successful Appeal ........................................................................................... 53

Post-Appeal, The District Court Indicates That It Will Certify A Class Of Third Party Payors And Preclude Pfizer From Re-Litigating Factual Issues Determined In The Kaiser Trial ..................................................................................................................................... 57

The Settlement And Its Benefits To Class Members ............................................................ 60

The Requested Award Of Attorneys Fees And Expenses And The Lodestar Cross Check
.................................................................................................................................................. 63

**Exhibit A To Declaration Of Thomas Greene** ..................................................................... 68

I, Thomas M. Greene, hereby state and declare, as follows:

1.      I am an attorney licensed to practice in the Commonwealth of Massachusetts and a member of the bar of the Federal District Court of the District of Massachusetts.  I am the founding partner of the law firm of Greene LLP.  I submit this affidavit in support of the application of the class counsel for an award of attorneys' fees and reimbursement of expenses from the proposed settlement of the class action claims against Pfizer, Inc. and Warner-Lambert Co. (collectively, "Pfizer") in connection with Pfizer's marketing of the drug Neurontin.  The facts set forth herein are true and correct to the best of my knowledge and belief, and I could testify competently to the matters described below if called to do so.

2.      I was one of the six attorneys appointed by this Court to serve on the Plaintiff's Steering Committee (the "PSC") in connection with the class claims brought against Pfizer relating to its sales and marketing of the prescription drug Neurontin. Shortly after the Committee was organized, my colleagues elected me to act as chairman.  I have served in this capacity for almost a decade.  I therefore am well qualified to describe the extraordinary efforts taken by class counsel to achieve the

settlement we are requesting the Court to approve.  This case was fraught with legal and factual difficulties and on more than one occasion it appeared that the class could not recover for the wrongful behavior we had uncovered.  Yet class counsel persevered for more than a decade and ultimately achieved an unprecedented settlement for an unprecedented claim.  The amount Pfizer will pay to compensate the members of the class will be sizable, and class counsel, who could point to no comparable successful cases when they initiated this lawsuit, are clearly entitled to the award they have requested.

3.      The purpose of this affidavit is to review for the Court the decade of effort it took to bring this litigation to fruition, outlining the legal, factual, procedural and practical difficulties class counsel have overcome in order to return hundreds of millions of dollars to the class members who were defrauded.  In addition to describing the evidence of wrongdoing that the class lawyers uncovered, I will review the evolution of the successful, but unprecedented, legal claims for relief we brought on behalf of the class; the extraordinary amount of discovery that had to be conducted and reviewed; the development of the scientific testimony that established that Neurontin was an ineffective medication; the development of the econometric expert testimony necessary to support proof of causation; our ongoing efforts to obtain class certification; our successful appeal of adverse District Court decisions; the post-appeal efforts; and the successful mediation and proposed settlement of the litigation.  In addition I will generally describe class counsel's time and expenses in support of this litigation.

## INITIATION OF THE LITIGATION AND THE RELATIONSHIP OF THE CLASS LITIGATION TO THE NEURONTIN FALSE CLAIMS ACT LITIGATION

4.      My law firm and I have been involved in litigation concerning Pfizer's marketing of Neurontin since 1996.  I was the attorney for David Franklin who brought a *qui tam* action under the False Claims Act alleging that Warner Lambert caused false claims to be submitted to federal health care programs (including Medicare and Medicaid) through its off-label promotion of Neurontin for off-label uses, because off-label Neurontin was ineligible for federal reimbursement.  Had federal health care programs known Neurontin was being used for off-label indications, they would not have paid for it.  We argued that Warner Lambert knew that the programs could not distinguish an off-label prescription from a prescription for an approved indication and therefore the drug company's off-label promotional campaigns knowingly caused federal health care programs to pay for "false" claims.

5.      A second theory we presented in the False Claims Act case was that Warner Lambert caused false claims by making false statements to physicians regarding Neurontin's efficacy for some of the promoted off-label uses.  Specifically, we learned in discovery that Warner Lambert was aware of at least two clinical trials that established that Neurontin was not an effective treatment for bipolar disorder.  We also uncovered evidence that it had misrepresented the results of at least one clinical trial for neuropathic pain.  This evidence was used by us to defeat a motion for summary judgment.

6.      The <u>Franklin</u> case was the first case that alleged that a drug company's intentional marketing of its pharmaceuticals off-label could constitute a violation of the False Claims Act.  We filed the case in 1996, and it was under seal for several years while the United States investigated our claims.  In 1999, the United States declined to intervene and for more than four years, we litigated alone against the world's largest drug company.  During that time we defeated a motion to dismiss, which established for the first time that the False Claims Act could be employed when drug companies deliberately marketed off-label. We also conducted extensive discovery, including a review of high level corporate marketing documents.  From those documents we learned the decision to market off-label was made at the highest levels of the corporation and that from the beginning, Warner Lambert intended to market based on studies and clinical trials it released, but it planned to publish only studies with favorable results.  Given that the FDA did not oversee or review studies for uses that were never submitted for its approval, these policies made it likely that there were negative studies concerning the off-label usage of Neurontin that were known only to the company.  Failure to disclose these negative studies also meant that any promotion done by Warner Lambert or Pfizer was misleading; the medical community was given favorable evidence of Neurontin's uses for unapproved conditions, but it was never told about the studies Pfizer deliberately suppressed.

7.      In May 2004, Pfizer, which had acquired Warner Lambert in the course of the FCA litigation, agreed to pay $430 million to settle criminal and civil claims relating to its off-label marketing of Neurontin, including the qui tam action we had brought.

6

Approximately $152 million of the settlement was directed toward reimbursing state and federal Medicaid programs for ineligible purchases of Neurontin.  As part of the settlement Warner Lambert pleaded guilty to two counts of violating the Food, Drug & Cosmetic Act through misbranding.  Importantly, neither Pfizer nor Warner Lambert conceded, then or now, that they had misled physicians or had otherwise engaged in fraudulent marketing.

8.      The May 2004 settlement only resolved federal and state governmental claims relating to the marketing of Neurontin, but it received significant publicity.  Shortly thereafter, numerous lawsuits were filed on behalf of private payors alleging that they had also been economically injured by Pfizer's off-label marketing.  Most of these lawsuits asserted class claims.

9.      While some of the suits filed initially sought relief on the same basis that the United States and states had used to recover in the False Claims Action, it was readily apparent that such a theory could not succeed.  Unlike the United States, private parties cannot bring suit under the FDCA or attempt to enforce it.  Moreover, it was unlawful to encourage doctors who treated patients covered by federal health care programs to prescribe Neurontin off label because a statute prohibited Medicare from paying for most off-label indications; a drug company that encouraged such prescriptions was violating congressional intent.  But no statute prohibits private insurers or consumers from paying for off-label prescriptions.  Indeed, the law explicitly allows physicians to prescribe off-label if they elect to do so.

7

10.     Similarly, the fact that Warner Lambert had pleaded guilty to two counts of misbranding did not mean that Pfizer had any civil liability to private parties. Warner Lambert pleaded guilty to very narrow violations of the statute, conceding only that it had engaged in specified misconduct in very narrow circumstances. It did not concede that it had engaged in widespread illegal marketing. Nor did it concede that it made any false or misleading misrepresentations.

11.     Accordingly, any recovery for third party payors would have to be based on a completely different theory, and different evidence than simple off-label marketing. Our alternative theory in the <u>Franklin</u> case, however, was a possible ground for recovery. We had discovered evidence that much of the off-label marketing Warner Lambert had done was not truthful. Physicians had not been told about negative clinical trials that established that Neurontin was not an effective medication for bipolar disorder, neuropathic pain, and migraine. We also learned that the FDA had refused to approve higher dosages of Neurontin because there was no scientific evidence that higher dosing had increased effectiveness. Physicians and the rest of the medical community were not told about this negative information; in fact they were barraged by numerous publications created by Pfizer and its vendors that said the opposite—that Neurontin was in fact efficacious for these uses. In our view, this evidence was not only biased, it was virtually worthless. Second and third level medical evidence that was favorable was disseminated while first level evidence that conclusively established Neurontin's inefficacy was suppressed. Moreover, the misrepresented positive information was massively publicized, creating a market for Neurontin where none had

8

previously existed.  Our theory was this: if a massive promotional campaign premised upon deceptive publications had caused physicians to write worthless Neurontin prescriptions, then, in fact, the persons who paid for the prescriptions were harmed. Simple off-label marketing may not have been actionable, but fraudulent off-label marketing certainly was.

12.     Thus, class counsel quickly realized that any claims brought on behalf of a TPP class or a consumer class would have to be based in fraud.  The federal RICO statute potentially provided a national remedy for a pattern of fraudulent conduct. Similarly, some states' consumer protection or "little FTC" statutes which prohibited unfair and deceptive trade practices might also cover the conduct.  These claims were substantially different from the claims brought in the <u>Franklin</u> case.  Class counsel thus had to develop new legal theories of liability, and then develop new evidence to support those theories.

**CLASS COUNSEL ESTABLISHES THAT RICO MAY BE AVAILABLE TO REMEDY CLAIMS OF FRAUDULENT PROMOTION BY DRUG COMPANIES**

13.     On October 26, 2004, the Judicial Panel on Multidistrict Litigation transferred all cases concerning Neurontin marketing and sales practices to this Court for consolidated or coordinated pre-trial proceedings.  On December 17, 2004, this Court entered an order establishing a Class Plaintiffs' Steering Committee to manage the case on behalf of the proposed class plaintiffs and appointing the Committee's six members.

14.     On February 1, 2005, class counsel filed a 121-page, 322-paragraph Amended Class Complaint on behalf of 4 TPPs and two consumers.  The five count complaint alleged claims for violation of RICO, conspiracy to violate RICO, violation of the New Jersey Consumer Fraud Act, common law fraud and unjust enrichment.  The Amended Class Complaint alleged that Pfizer controlled an enterprise comprised of medical communications firms and physicians who had created an association in fact for the purpose of illegally promoting Neurontin for nine off-label indications.  The enterprise, in turn, had engaged in a pattern of racketeering conduct of mail and wire fraud through numerous false and misleading statements Pfizer knew to be false and misleading about Neurontin's efficacy for the off-label conditions.  The promotional campaigns were alleged to have misrepresented the results of clinical studies that established that Neurontin was ineffective for some of the identified off-label indications, suppressed or failed to identify negative clinical studies that contradicted the publicized anecdotal evidence of efficacy, and promoted off-label efficacy for various indications when the company had no scientific evidence to support such claims.  To comply with Rule 9(b)'s strict pleading standards, the complaint contained pages of detail identifying false statements made by each of the identified enterprise participants relating to each of the nine off-label uses whose efficacy was claimed to be misrepresented.

15.     Pfizer was given leave to file an overlong memorandum and moved to dismiss the Amended Class Complaint on numerous grounds, including (1) that the class plaintiffs did not adequately plead scienter; (2) that the class plaintiffs could not

10

prove causation; (3) that the class plaintiffs had not suffered a cognizable injury; (4) that a RICO enterprise had not been sufficiently alleged; (5) that Pfizer's control over the enterprise was insufficiently alleged; (6) that RICO predicate acts were not adequately pleaded; (7) that all state claims were pre-empted by the FDCA; (8) that the class plaintiffs did not meet the specificity standards of Rule 9(b); (9) that the representations alleged to be fraudulent or misleading were not actionably false; (10) that the acts alleged were not covered by the New Jersey Consumer Fraud Statute; (11) that non-New Jersey plaintiffs had no claim under the NJCFS; (12) that the class plaintiffs had failed to plead claims for common law fraud or unjust enrichment; (13) that the alleged false statements were protected by the First Amendment; and (14) that the class plaintiffs' claims were barred by the statute of limitation. Given the multitude of grounds for dismissal, both sides submitted extensive briefing.

16.     The District Court referred the Motion to Dismiss to Magistrate Judge Sorokin, who heard oral argument on July 18, 2005. On January 31, 2006, he issued a 58 page report and recommendation which denied most of Pfizer's grounds for dismissal, including its argument that the class plaintiffs could not prove, as a matter of law, that Pfizer's representations to third party physicians caused the class members harm. Magistrate Sorokin did, however, rule that the class could not plead a viable RICO claim because the class did not plead that the members of the alleged enterprises (other than Pfizer) intended to disseminate false information. He also narrowed the class claims to misrepresentations (or omissions) relating to specific clinical trials, holding

that the class could not allege that Pfizer's claims of efficacy were false where clinical trials disproving efficacy had not been performed.

17.     Had the Magistrate's ruling been allowed to stand, all RICO claims would have been out of the case, and the ability to certify a class would have been seriously impaired.  Without a federal cause of action applicable to all class claimants, the class plaintiffs would face greater challenges in establishing that common questions of law predominated over individual issues.  One and a half years into the litigation, it looked like it might be impossible to obtain a recovery for the injured class members.

18.     Class counsel appealed the magistrate's Report and Recommendation to the District Court, resulting in a second round of briefing.  After hearing oral argument on May 3, 2006, the Court issued an opinion declining to accept the Magistrate's Report and Recommendation on the class plaintiffs' RICO claims.  *Harden Mfg. Corp. v. Pfizer, Inc. (In Re Neurontin Marketing, Sales Practices, and Products Liability Litg.,* 433 F. Supp. 2d 172 (D. Mass. 2006).  Class counsel convinced the District Court that Pfizer (and Magistrate Sorokin) had conflated the existence of an enterprise with proof of engaging in a pattern of racketeering activity.  An enterprise merely had to have a common purpose, and in the course of the common purpose the defendant had to have harmed the plaintiff by engaging in a pattern of racketeering activity.  But the enterprise itself did not have to be organized to perform racketeering conduct.  *Id*. at 179-81. Pfizer could be held liable even if it was the only member of the enterprise that realized the enterprise was engaging in fraudulent conduct; the class plaintiffs did not have to prove the medical marketing firms also intended to defraud.  (In fact, the class plaintiffs were

12

subsequently able to prove that the medical communications firms knew they were publishing false and misleading papers; but the class plaintiffs did not possess such evidence at the pleading stage.)

19.     This Court's June 12, 2006 Memorandum and Order was the first published opinion that resulted from the class litigation.  It would not be the last. Nor did the June 12, 2006 opinion conclude the pleading stage of the litigation.  The Court granted the class plaintiffs leave to file more detailed allegations relating to the RICO enterprises Pfizer allegedly controlled and to further specify how Pfizer misrepresented or failed to disclose clinical trials.  A Second Amended Class Complaint, comprising 136 pages and 347 paragraphs, was filed on June 30, 2006.  Pfizer again attempted to dismiss.  After a hearing, on September 27, 2006, the District Court denied Pfizer's second motion to dismiss in its entirety.

20.     On December 4, 2006, more than 2 ½ years after the initial complaint was filed, Pfizer filed an answer to the class plaintiffs' allegations.

### THE UNPRECEDENTED NATURE OF THE CLASS CLAIMS AND THE RISKS FACED BY CLASS COUNSEL

21.     By the time the pleadings phase of the case was concluded, the difficulties and risks of prolonged litigation with the world's largest drug company were clear to class counsel.  The factual issues were daunting.  These included:

- **The class plaintiffs' claims were limited to misrepresentation of clinical trials:**
  The Court refused to permit the Class Plaintiffs to proceed on the theory that Pfizer could be held liable for representing Neurontin to be effective when such assertions were only based on non-scientific anecdotal evidence.  Instead the case was limited to misrepresenting clinical trial evidence.  At the time the Amended Class Complaint was filed, the class plaintiffs were only aware of a handful of

clinical trials that Pfizer had misrepresented or hidden.  Only after years of discovery did the class plaintiffs uncover that Pfizer had manipulated and misrepresented virtually every clinical trial ever conducted on an off-label indication for Neurontin.

- **The class plaintiffs had to establish complete inefficacy:**  The class plaintiffs' theory of damages, as well as it theory of common issue predominance, was premised upon the fact that none of the persons who were prescribed Neurontin for the off-label indications at issue received any benefit from the medication. They had to prove that the drug was wholly ineffective and that no reasonable physician would have prescribed it for those uses had the truth been disclosed. Given the number of physicians who had willingly and repeatedly prescribed Neurontin, this was an exceptionally difficult task.  Moreover, Pfizer had thousands of loyal physicians, many of whom had received substantial compensation from Pfizer over the years, who could claim to have witnessed patient improvement with Neurontin.  Class Plaintiffs had to be able to overcome substantial anecdotal claims of efficacy.

- **No high level employees of Pfizer would testify for the class plaintiffs:** Corporate wrongdoing is often proven through the testimony of former insiders whose sense of moral integrity overcomes the corporate culture of silence and denial.  Although former medical liaison David Franklin confirmed some of the class plaintiffs' claims of misconduct, Dr. Franklin was a Parke-Davis employee for a short period of time and worked in a local office; he had limited exposure to national marketing personnel and no contact with the senior management who initiated and maintained the scheme.

- **No support from treating physicians:**  The class plaintiffs' theory was based on the premise that misrepresentations to physicians caused thousands of worthless Neurontin prescriptions to be filled.   Although the physicians could not be expected to see through a drug company's deliberate misrepresentation of clinical trials, no doctor was willing to admit that he or she wrote a useless prescription; particularly when a number of physicians had mercenary reasons for currying favor with Pfizer's sales force.  Yet even where there was no ulterior reason for prescribing off-label Neurontin, class counsel recognized that few if any physicians were willing to admit they had been influenced by drug company marketing.  Class counsel was fully aware that they were very vulnerable to Pfizer's rhetorical claim that none of the persons who had allegedly been duped—the doctors--were willing to support the class plaintiffs' claims of deception.

- **Broad time frame and geographic scope:**  By the time the pleadings were settled in early 2007, more than 12 years had elapsed since the misconduct had been

initiated.  Moreover, Warner-Lambert had been merged into Pfizer six years earlier, so many of the key witnesses had long departed.  The case concerned a nationwide marketing scheme concerning hundreds of sales and marketing employees contacting thousands of physicians.  Further, the misconduct had occurred across the country.  The breadth of discovery, and the expense of conducting it, was breathtaking.

- **Exceptionally difficult causation proof:**  From the earliest hearings, the District Court informed us that we had particularly difficult causation problems.  We had to prove that physicians across the country were caused to prescribe Neurontin because of the false representations we identified.  So, not only did we have to prove that each prescribing doctor somehow received Pfizer's false information, but that it was the misrepresentation (or omission) that caused the physicians to prescribe instead of some other factor.  Moreover, it is well known that physicians prescribe various medications for their patients for a host of different reasons.  To be able to prove that all (or virtually all) of the treating physicians across the country, for a 6 to 7 year period, prescribed Neurontin for bipolar because of Pfizer's misconduct—sounds almost impossible in retrospect.

22.     Difficult as the factual challenges were, the legal challenges were even

greater.  No one had ever successfully established that a drug company had violated

RICO through deceptive drug marketing.  Further, there was a long list of cases, which

grew longer during the pendency of the litigation, that held that a class action could not

be premised upon drug marketing fraud.  Even in cases where it was theoretically

possible to prove that an ultimate payor had been harmed when drug company

promotion caused a physician to prescribe a drug that would not have been otherwise

chosen, no court had ever allowed such an action to be prosecuted as a class action.  As

noted above, in other cases, there were a variety of reasons why a physician might use a

particular drug for a particular patient; in such cases it was deemed impractical to

establish that a particular factor caused all of the class members to suffer provable

losses.  Further, many of these cases indicated that aggregate evidence, which class

counsel intended to rely upon to prove causation, was not permissible in litigation concerning the independent judgment physicians presumably applied when making prescription decisions.  During much of the litigation period, this line of precedent appeared to be an insuperable barrier to recovery.

23.    Finally, one of the greatest risks to litigating against the world's largest drug company is that our adversary was the world's largest drug company.  Pfizer not only had specialized expertise in this area, it had practically unlimited resources.  It retained three of the most prestigious law firms in the country to defend it:  Davis Polk and Wardwell, Skadden, and Quinn Emmanuel.  It fully litigated every contestable issue.  Moreover, the consequences of successful prosecution of the class plaintiffs' claims not only affected its profits from the sale of Neurontin, but potentially jeopardized revenues Pfizer had received from many other drugs it markets.  It had every reason to contest the claim to its conclusion.  Although class counsel never dreamed it would take more than a decade to conclude the litigation, they knew it would likely take many years.  They were not mistaken.

## CLASS COUNSEL ENGAGES IN SEVERAL YEARS OF DISCOVERY

24.    Discovery commenced on March 18, 2005, just one month after the Amended Class Complaint was filed, when the Class Plaintiffs served their First Request for Production of Documents requesting 252 categories of documents.  It concluded on December 18, 2009, more than 4 ½ years later, with the deposition of David Franklin, the whistleblower whose qui tam lawsuit initiated the litigation regarding the unlawful marketing of Neurontin in 1996.  In between, Class Counsel

16

reviewed millions of pages of documents, attended 132 depositions, and litigated dozens of discovery motions.

25.    Discovery was not supposed to last nearly five years.  On February 24, 2005, the Court issued Case Management Order No. 2 [Dkt #47], which called for Class Discovery to be completed by October 1, 2005, fact discovery completed by January 30, 2006 and expert discovery to be concluded by June 1, 2006.  None of these deadlines came close to being met.  For example, on December 8, 2006, six months after all discovery was to have been completed, Class Counsel reported to the Court that 2 ½ years into the litigation Pfizer had still not yet produced any documents to Class Plaintiffs other than those produced in the *Franklin* litigation.

26.    Discovery was particularly contentious.  Discovery disputes arose as early as 2005, when the Class Plaintiffs attempted to authenticate documents produced by Pfizer through requests for admissions.  Between 2004 and 2009, Pfizer (or third party medical communications firms who worked closely with Pfizer) tried to block the class plaintiffs' discovery efforts by filing 10 motions for protective orders.  On another ten occasions, the class was forced to move to compel.  They also sought sanctions twice for Pfizer's (or subpoenaed witnesses') failure to comply with discovery orders or valid subpoenas.  On six occasions class counsel had to defend against motions to compel brought by Pfizer, and twice they successfully defeated motions for sanctions based on alleged failures to comply with discovery obligations.  In addition to these disputes over specific discovery requests, an additional 18 contested motions concerned the conduct of discovery—mostly relating to timing, scope and format of depositions.

27.     In total, between 2004 and 2008, class plaintiffs were involved in 45 contested motions relating to the conduct of discovery.[1] The parties' discovery disputes were so contentious, Magistrate Sorokin scheduled monthly discovery hearings so the Court could stay on top of the disputes and keep the litigation moving.  During this period, class counsel appeared before the Court on 26 occasions, nine before the District Court and seventeen before the Magistrate.  The vast majority of these appearances were necessitated by contested motions that were argued at these hearings.

28.     While some of the discovery disputes were the types of disagreements to be expected in litigation of this magnitude, some were quite important to the course of the litigation.  Class plaintiffs sought only a single protective order, [Dkt. #267], but that motion was directed at Pfizer's efforts to obtain individual TPP patients' medical records and individual physicians' prescribing records, which Pfizer claimed would prove that some patients had benefited from the prescription of off-label Neurontin. Although Magistrate Sorokin reduced the scope of Pfizer's requests, in Discovery Order #4 he ordered extensive medical records and prescribing records to be produced by all of the TPP plaintiffs.  Class counsel appealed the order to the District Court, which granted the protective order sought by the Class.  This Court made it clear that anecdotal evidence was not relevant in determining drug efficacy and that the case would be decided on aggregate, statistical evidence.  Although the Court's ruling at that time only concerned the type of proof that would be used to determine whether

---

[1] This total does not include discovery disputes that related solely to the products liability plaintiffs or discovery solely addressed to the claims brought by the Coordinated plaintiffs (Aetna, Kaiser and Guardian).  Nor does it include objections to discovery orders entered by Magistrate Judge Sorokin that were appealed to the District Court.

Neurontin was effective for certain off-label uses, it set the stage for subsequent rulings that the class could use aggregate, statistical evidence to prove critical issues in the litigation.

29.     Another contested discovery matter was sufficiently serious to merit a published opinion.  Cline, Davis & Mann, one of the medical marketing firms that this Court later found to have engaged in a partnership with Pfizer to market Neurontin off label, contested the right of the class plaintiffs to serve it with a subpoena duces tecum and the District of Massachusetts' jurisdiction to enforce the subpoena.  In *In re Neurontin Marketing, Sales Practices and Products Liability Litig.*, 245 F.R.D. 55, 57-58 (D. Mass 2007), Judge Sorokin confirmed the authority of an MDL host jurisdiction to resolve all discovery disputes arising out of the MDL, including out-of-forum document disputes involving a non-party.  Judge Sorokin agreed with Class Counsel and overruled the objections of Cline Davis & Mann.

30.     Although it was not until the end of the discovery period, Pfizer ultimately produced a flood of documents.  The Court's final deadline for Pfizer to produce documents was April 16, 2007.  By June 30, 2006, 27 months into the litigation, Pfizer had produced only 614 new documents comprising of 8,711 pages.  Commencing in September 2006, Pfizer began to produce responsive documents in earnest, producing in excess of 100,000 pages of documents each month (with one exception) through April 2007.  In February 2007, over 103,000 documents comprising more than 1.46 million pages were produced.  Nonetheless, Pfizer was unable to meet the court imposed deadline.  After the deadline, Pfizer produced an additional 28,000 documents

19

which contained an additional half million pages.  Ultimately, Pfizer produced copies of 212,823 documents comprising 3,388,576 pages.

31.     The Class Plaintiffs' RICO case depended upon evidence that Pfizer conducted an enterprise with medical communications firms.  Accordingly, much of class counsel's discovery efforts were focused on third party discovery from the firms with whom Pfizer had conspired to market Neurontin off-label.  From these entities class counsel received another 138,000 documents comprising close to one million pages.  Overall, class counsel obtained through discovery 361,935 documents comprising 4,240,178 pages.

32.     In addition to these materials, class counsel also received Pfizer's complete NDA file for Neurontin—which comprised tens of thousands of pages;  5 DVDs containing the research reports on all of the clinical studies Pfizer conducted on off-label indications; Pfizer databases identifying details by the sales force relating to off-label marketing and direct communications with physicians who were sent off-label prescribing information; and commercial databases that tracked sales of Neurontin nationwide and physician prescribing habits.

33.     Needless to say, this massive amount of material could not be reviewed or digested by the six attorneys on the Plaintiffs' Steering Committee.  Class counsel organized teams of lawyers to review and analyze the documents Pfizer produced. Coding instructions were given to these teams so they could identify, classify and segregate documents that were important to various issues needed to be proven.  A review center was set up in Nashville, Tennessee so that counsel reviewing documents

20

could work together and bring all questions to centralized PSC leadership.  Hundreds

of hours of attorney time was necessary for document review.

34.     Class counsel attended 121 depositions of 79 fact witnesses between

October 2005 and December 2009.  In the vast majority of these depositions, class

counsel was either the primary interrogating attorney or had the responsibility for

preparing and representing the deponent.  As the discovery deadline approached, on

several days as many as three different depositions were conducted on the same day in

different locations.  Most of the depositions were taken in New York, where none of the

attorneys of the Plaintiffs' Steering Committee were based.  Depositions, however, were

also taken in Alabama, Alaska, California, Connecticut, Indiana, Maryland, Louisiana,

Minnesota, New Jersey, Oklahoma, Ohio, Texas and Washington as well as Boston,

Massachusetts.

35.     Class counsel identified 12 expert witnesses, all of whom were deposed

during the course of the litigation.  Twenty six expert depositions were taken from these

witnesses, all of whom were prepared and represented by class counsel.  Class counsel

only deposed one of Pfizer's identified expert witnesses.  That deposition took place

over two days.

## CLASS COUNSEL UNCOVERS EXTENSIVE PUBLICATION FRAUD

36.     Class counsel recognized very early in the litigation that the success of the

case turned on proving that Neurontin was wholly ineffective for the off-label uses for

which it had been promoted.  Neurontin's efficacy was not an issue in the False Claims

Act litigation.  Indeed, Class counsel were unaware of any prior litigation where a

plaintiff attempted to prove that a medication marketed by a legitimate pharmaceutical company did not work for the conditions promoted.  Compelling proof of inefficacy, however, was critical in this case for at least four reasons.

37.     First, there were no damages unless Neurontin did not work for the promoted use.  Even if Pfizer misrepresented Neurontin's advantages or hid evidence of its risks, if the patients who had been prescribed Neurontin received a medication that could treat their condition, they received a benefit.  Unlike other cases that tried to recover economic damages for misrepresentations made by drug companies, class counsel here never relied on a fraud-on-the-market theory, or claimed that purchasers should have paid less for Neurontin because the drug was not as beneficial as its manufacturer claimed.  The class claim was always premised on the fact that Neurontin was worthless and all money expended on Neurontin for the designated uses was wasted.

38.     Second, class recovery depended upon all prescribing physicians receiving the same misrepresentation.  A message as fundamental as Neurontin is effective for bipolar disorder or neuropathic pain is the only misrepresentation the class could be certain that each prescriber received.  Clearly, no physician would prescribe Neurontin to a bipolar patient unless he or she had received information that this particular anti-epileptic drug could also be used to treat an unrelated psychiatric condition.  All prescribers had clearly been informed that Neurontin was effective, and proof of inefficacy demonstrated that all of the prescribers had been deceived.

39.     Similarly, proof of inefficacy was instrumental in proving causation on a class wide basis.  No reasonable physician would prescribe a prescription medication that could not possibly treat a patient's condition.  If a doctor knew Neurontin was ineffective for the uses at issue, Neurontin would never have been prescribed.  Every prescriber implicitly or explicitly relied upon the misrepresentation of efficacy, and consequently causation could be established on a class wide basis.

40.     Finally, knowing promotion of an ineffective drug was culpable misconduct that Pfizer could never justify.  Much drug company behavior that appears unsavory falls within a gray zone; and the apparent misconduct can be spun before a trier of fact to appear reasonable or at least non-tortious.  But nothing excuses the promotion of snake oil.  Further, many of Pfizer's defenses were anchored in public policy concerns and the societal benefits of giving pharmaceutical companies breathing room to develop potentially life-saving drugs.  However, no public policy justifies quackery.  By proving that Neurontin was ineffective for the uses at issue, the class would establish that Pfizer had engaged in serious misconduct that necessitated a remedy.

41.     Yet at the time the Amended Class Complaint was filed, there was little evidence of Neurontin's inefficacy for off-label indications.  Very little of Pfizer's clinical testing of Neurontin for unapproved uses had been made public. Class counsel was aware of two clinical trials that found that Neurontin was not an effective bipolar medication (the Pande and Frye trials); a single clinical trial for pain, the results of which Pfizer had misrepresented (the Gorson trial); an early clinical trial for migraine

that was negative (trial 879-200), and the fact that the FDA had rejected Pfizer's request to approve dosages above 1800mg/day.  They were also aware of one apparently successful clinical trial for neuropathic pain (the Backonja trial), the results of which had been published in the *Journal of the American Medical Association*, and had been highly publicized by Pfizer.  Prior to discovery in this action, class counsel had not had access to the Neurontin NDA, clinical trials that Pfizer had not elected to make public, or the raw data from those clinical trials Pfizer had released.

42.     In fact, there were numerous clinical trials conducted by Pfizer on the off-label indications at issue in this case of which class counsel had no knowledge prior to discovery.  There were not just five clinical trials that were relevant to the contested off-label uses, but more than twenty.  The reason class counsel was initially unaware of most of these trials is because Pfizer had deliberately suppressed their negative results.  Further, when class counsel received Pfizer's internal research reports, class counsel determined that many of the clinical reports that were reported to have positive results were actually negative.  None of this information had been assembled before.  Nor did any insider or witness direct class counsel where to look.  Class counsel uncovered all of this damming evidence through their own investigation of the materials produced in discovery.

43.     Below is a summary of the research fraud, previously unknown, that class counsel uncovered in discovery:

- **Bipolar Disorder**—In addition to the Pande and Frye trials, there were two other clinical trials of Neurontin conducted on bipolar patients.  The Guille trial was yet another negative trial, but Pfizer never cited it in any of its publications or

24

communications relating to Neurontin's use in bipolar patients.  The Vieta trial was also negative, but one would have never known that if one read the published results of the study.  Pfizer misrepresented the results of the study and falsely stated that the drug was effective on the "intent to treat" population when it was not.  The published results contradicted the results set forth in Pfizer's internal research report and Pfizer failed to report the negative result of the primary outcome of the study.  Results were clearly manipulated in order for Pfizer to report a positive result.

- **Suppressed Negative Clinical Trials**—Pfizer intentionally suppressed negative clinical trials results relating to neuropathic pain and migraine.  The Reckless trial and the POPP study examined Neurontin's efficacy as a treatment for painful diabetic neuropathy and nerve injury pain.  Both were negative and the Reckless results directly contradicted the favorable results of the Backonja trial.  Pfizer deliberately refused to release the results of these studies, in part because such results would contradict Pfizer's pain marketing.  Similarly, Trial 945-217 was a negative migraine study.  Pfizer also refused to release its results, but continued to claim Neurontin was an effective migraine treatment.

- **Misrepresented Clinical Trials**—Pfizer also falsely reported failed clinical trials as having positive results.  An article describing the results of the Serpell trial falsely reported that Neurontin was effective in the treatment of all neuropathic pain syndromes.  In fact, when post herpetic neuralgia patients were removed from the analysis, Neurontin had no effect on the study patients' symptoms.  Similarly, the results of the Matthew migraine clinical trial were negative, but Pfizer published an article in *Headache* claiming positive results, by manipulating the population of study patients examined and by focusing on a secondary outcome instead of the study's primary outcome.  The negative primary outcome was never disclosed.

- **Improper Manipulation Of *Backonja* data**—The positive Backonja trial, which was published in JAMA in 1998 and widely circulated by Pfizer, acknowledged the possibility that unblinding had occurred (which would have vitiated the study's results) due to sleepiness and dizziness experienced by many of the participants who received Neurontin as the study medication.  However, the authors claimed that when the patients experiencing the central nervous system side effects were removed from the study, the results were still statistically significant.  However, Pfizer manipulated the statistical analyses when it looked at potential unblinding.  When the analysis was performed properly and all patients were properly classified, there was no statistical significance or clinical benefit.  Only the improper manipulation of the study population allowed Pfizer to claim the study had positive results.

- **Widespread Publication Bias—**Astonished by the data manipulation they observed when they compared published articles to Pfizer's research reports, class counsel retained a leading expert on publication bias, Kay Dickersin, MA, Ph.D., a professor at Johns Hopkins Bloomberg School of Public Health to compare all of Pfizer's research reports to published medical articles to see if the results of the clinical trials had been properly reported to the medical community.  Dr. Dickersin examined 21 clinical trials and found that almost every study had serious publication bias problems that resulted in the improper and untrustworthy reporting of the results to the medical community.  The results of Dr. Dickersin's analysis were published in the *New England Journal of Medicine.*

44.      All of this evidence was assembled and developed by class counsel in this action.

**DEVELOPMENT OF THE EXPERT SCIENTIFIC AND ECONOMIC TESTIMONY**

45.      Class Plaintiffs' case was proven almost exclusively through Pfizer's (and the medical marketing firms') documents and expert testimony.  Given that no Pfizer witnesses cooperated with class counsel, all evidence relating to Pfizer's misconduct would have been presented at trial through deposition testimony and the live testimony of the class plaintiffs' experts.  In such circumstances, development of the expert testimony was crucial to class counsel's ability to prove the case.

46.      Class counsel retained 12 experts and worked closely with each of them. Nine of the experts prepared testimony on the scientific, medical and regulatory issues. Three experts were retained for causation and damage analysis purposes.  With the exception of some damages testimony prepared by Ray Hartman for the Coordinated plaintiffs, all of the expert testimony was developed by class counsel, and class counsel was solely responsible for reviewing and overseeing the expert reports.  Class counsel

was also responsible for preparing these experts for their depositions. Class counsel

expended in excess of $2.1 million to retain and compensate these experts.[2]

Approximately $533,000 of this amount was reimbursed by the Coordinated Plaintiffs.

### The Scientific/Medical/Regulatory Experts

47.     John Abramson, M.D. is a physician and a clinical instructor at the

Harvard Medical School. His expertise is in commercial bias in the scientific literature

relied upon by physicians, and the influence that literature and commercial marketing

has on clinical practice, in particular the prescription of drugs. Dr. Abramson provided

opinions about Pfizer's campaign to promote Neurontin for bipolar disorder, migraine,

neuropathic and nociceptive pain and in dosages above 1800 mg/day, whether those

campaigns disseminated accurate and complete information consistent with scientific

literature, and the effect of those campaigns on physician prescribing. Dr. Abramson

was the only expert who discussed the promotional campaigns across various

disciplines and his testimony was comprehensive. His final report was 123 pages. He

relied upon dozens of articles and hundreds of documents produced in discovery.

Class counsel worked closely with Dr. Abramson, and reviewed several drafts of his

report. He was deposed for two days in January 2009 and was prepared for his

deposition by class counsel.

48.     Brian Alldredge, Pharm D, is a Professor of Clinical Pharmacy and an

Associate Dean at the University of California, San Francisco School of Pharmacy. He is

also a Health Sciences Clinical Professor of Neurology at UCSF's School of Medicine.

---

[2] This amount does not include any of the expert expenses that were paid in connection with the Kaiser trial.

He examined Neurontin's effectiveness in dosages above the maximum approved by
the FDA and provided opinions that Neurontin has no additional effect above the
approved maximum dosage, that Pfizer encouraged physicians to prescribe dosages
above the FDA maximum, that its campaign to encourage such prescriptions was
incomplete and misleading and that the campaign increased Neurontin sales at the
expense of payors and patients.  Dr. Alldredge was not an experienced expert witness
and had not testified or been retained as an expert within four years of the submission
of his report.  He worked closely with class counsel, and relied upon hundreds of
documents provided to him by class counsel.  Class counsel reviewed several drafts of
his expert report and provided him with guidance regarding the provision of expert
testimony.  He was deposed for one day in March 2009 and was prepared for his
deposition by class counsel.

     49.     Dr. Jeffrey Barkin, M.D. is a practicing psychiatrist in Portland Maine who
has served as an assistant professor of psychiatry at the University of Massachusetts
Medical Center.  Dr. Barkin reviewed the clinical trial evidence and other evidence
regarding the use of Neurontin as a treatment for bipolar disorder, and expressed
opinions that Neurontin was not an effective bipolar medication, that Pfizer promoted it
as a bipolar treatment through false and misleading representations, and that the
marketing campaign resulted in many patients being inappropriately treated with
Neurontin and receiving no benefit from the medication.  Dr. Barkin also provided
rebuttal testimony to points raised by Pfizer's psychiatry expert, Dr. Slaby.  Although
Dr. Barkin had occasionally provided medical testimony in court cases, this was the first

time he had ever acted as an expert witness in a case against a pharmaceutical company.  He worked closely with class counsel, and relied upon dozens of documents provided to him by class counsel.  Class counsel reviewed drafts of his expert report and provided him with guidance regarding the provision of expert testimony.  He was deposed for two days in January 2009 and was prepared for his deposition by class counsel.

50.     Dr. Kay Dickersin, MA, Ph.D, is a Professor of Epidemiology at the Johns Hopkins University Bloomberg School of Public Health, and the Director for the Bloomberg School's Center for Clinical Trials.  She was a founding member of the Cochrane Collaboration and the Director of the US Cochrane Center.  She is the recipient of numerous honors as well as presidential appointments.  Her major field of interest is the methodology of clinical trial, systematic reviews and publication bias.  She reviewed numerous publications prepared by Pfizer relating to clinical trials of Neurontin for non-approved uses.  She discovered "a clear and deliberate pattern of reporting biases" which rendered "information about Neurontin's effectiveness, as disseminated in the published literature . . . untrustworthy and invalid."  As noted above, an article describing her investigation and her findings was published in the *New England Journal of Medicine*.  Although frequently requested to provide expert testimony, Dr. Dickersin had never previously agreed to do so.  After class counsel demonstrated to her the nature of the distortions contained in the literature Pfizer created and disseminated, she agreed to provide testimony in this case without personal

compensation[3] because she believed that such egregious conduct contaminated the

medical literature.  Having no experience as an expert witness, she worked closely with

class counsel and class counsel reviewed drafts of her 52 page report.  Dr. Dickersin was

deposed for a single day in January 2009 and was prepared for her deposition by class

counsel.

51.     Dr. Curt Daniel Furberg is a Professor of Public Health Sciences and

Senior Advisor to the Dean for Health Services Research and Health Policy at Wake

Forest University School of Medicine.  He is an expert in clinical trial design and is the

co-author of the leading text book on the subject *Fundamentals of Clinical Trials*.  He has

served as the Principal Investigator and/or on the Data Safety Monitoring Committee

of dozens of clinical trials.  He had previously testified on behalf of drug companies in

pharmaceutical litigation, including as an expert for Wyeth, which is now a subsidiary

of Pfizer.  He reviewed the FDA's 1992 medical statistical review of Neurontin to

examine the risks it posed of depression with or without suicidal ideation, whether

Pfizer had a duty to disclose the risks identified by the FDA, and whether Pfizer's

subsequent promotion of Neurontin was consistent with the FDA's analysis of

Neurontin and depression.  He determined that Pfizer had failed to disclose critical

safety information and that the FDA's finding contradicted claims of beneficial effects

made by Pfizer.  Dr. Furberg worked with class counsel to identify documents relevant

to his investigation and submitted drafts of his report to class counsel.  He was deposed

---

[3] Instead of receiving compensation, Dr. Dickersin requested that class counsel make a payment to Johns Hopkins University.

by Pfizer for a single day in March 2009 and was prepared for his deposition by class counsel.

52.     Nicholas Jewell, Ph.D is biostatistician who holds the position of Professor of Biostatistics in the School of Public Health and the Department of Statistics at the University of California, Berkeley.  Dr. Jewell reviewed the Backonja clinical trial to determine whether the authors of the trial properly performed analyses to determine whether the possible unblinding of subjects distorted the results of the clinical trial.  He determined that the authors' simple test for effects of unblinding was incomplete and incorrect.  He reanalyzed the data and determined that when properly analyzed there was no statistical difference between the diabetic neuropathy patients who received Neurontin and those who received a placebo.   Dr. Jewell had experience as an expert witness, but worked closely with class counsel to develop his testimony and co-ordinate it with the opinions of Dr. Perry.  Class counsel reviewed drafts of his expert report.  He was deposed in January 2009 and was prepared for his deposition by class counsel.

53.     David Kessler, M.D., J.D. was the Commissioner of the United States Food and Drug Administration from 1990 to 1997 and a former professor of Food and Drug Law at Columbia University School of Law.  Dr. Kessler was retained to explain the FDA regulatory process to the jury, including how drugs are determined to be effective, and why drugs effective for one use may not be safe or effective for another.  He also reviewed the regulatory history of Neurontin including the unsuccessful effort to expand Neurontin's approved usages and why approvals were denied.   Dr. Kessler does not commonly testify in private litigation and had not testified in pharmaceutical

31

litigation within four years of submitting his expert report.  He worked closely with class counsel in developing his testimony.  He was deposed by Pfizer for a single day in January 2009 and was prepared for his deposition by class counsel.

54.     Douglas McCrory, M.D., M.H.S., is an Associate Professor of Medicine in the Division of General Medicine and Research Fellow in the Center for Clinical Health Policy Research at Duke University and a Research Associate in the Center for Health Services Research in Primary Care at the Durham Veterans Affairs Medical Center. Trained as an internist, Dr. McCrory has particular expertise in migraine and headache treatment.  He is the lead editor for headache reviews in Cochrane Collaborative Review Group on Pain, Palliative and Supportive Care.  Dr. McCrory reviewed all available clinical studies of Neurontin as a migraine treatment and performed a meta-analysis of the data.  His review demonstrated a lack of efficacy as a migraine treatment.  He also reviewed Pfizer's marketing of Neurontin as a migraine treatment and determined that Pfizer had suppressed studies that established that Neurontin was ineffective while making misleading representations of efficacy.  Further, he found Pfizer misrepresented one of its studies to make Neurontin appear to be an efficacious treatment.  He also critiqued the analysis provided by Pfizer's migraine expert, Alan Rappaport.  Dr. McCrory does not regularly testify as an expert and worked closely with class counsel to develop his expert testimony.  Class counsel reviewed drafts of Dr. McCrory's testimony and class counsel prepared Dr. McCrory for his deposition which was taken for two days in January 2009.

55.     Thomas L. Perry, M.D, is a practicing internist specializing in the outpatient treatment of chronic pain, who also teaches medicine and clinical pharmacology at the University of British Columbia Faculty of Medicine.  Dr. Perry reviewed the numerous Neurontin clinical trials that investigated its use as a neuropathic pain medication and Pfizer's marketing of Neurontin for that use.  He determined that Neurontin is not an effective treatment for pain, that its reputation as a pain treatment was based solely on Pfizer's promotion instead of medical or scientific evidence, and that Pfizer marketed the drug as a pain treatment through misleading statements that "transcended any reasonable bounds of evidence and succeeded principally by withholding the unpublished data which were well known to Parke-Davis/Pfizer."  In Dr. Perry's opinion Pfizer "crafted an elaborate campaign to 'pull the wool over the eyes' of practicing doctors."  To reach his conclusions Dr. Perry assembled an extensive meta-analysis of all Neurontin pain clinical trials.  Dr. Perry was yet another physician who did not ordinarily provide expert opinion and worked very closely with class counsel to draft a comprehensive and erudite 83 page expert report. Dr. Perry prepared a several hundred page appendix to support his conclusions and relied upon numerous documents and studies which he obtained from class counsel. Class counsel reviewed several drafts of his report and appendices and prepared him for his first experience with the U.S. legal system.  Class counsel prepared Dr. Perry for his deposition, which was taken for two days in January 2009.

**Econometric/Causation/Damages Experts**

56.     Just as important to the case as the scientific and medical experts were the causation and damages experts. In order to certify a class, class counsel had to prove that Pfizer's misrepresentations had damaged the class members on an aggregate basis. Such damage could not be proven patient by patient without having individual issues predominate over common issues.  Class counsel determined that a rigorously executed statistical analysis could provide the necessary proof, but such evidence required expert statistical analysis, and necessarily required experts.

57.     Class counsel retained Dr. Meredith Rosenthal, Ph.D., an assistant professor of Health Economics and Policy at the Harvard School of Public Health, to perform a regression analysis which would investigate the relationship between Pfizer's promotional efforts and off-label sales.  In her preliminary report, dated August 5, 2005, Dr. Rosenthal, after reviewing the relevant literature, was of the opinion that Pfizer had an incentive to market unlawfully as alleged by the class, that relevant literature confirmed that the class could well have been harmed in the manner alleged by the class, and that it was possible to employ statistical analysis, in particular a regression analysis, to quantify how much economic impact Pfizer's improper marketing caused. Dr. Rosenthal also opined that data was available from public and private sources to perform the regression analysis that she proposed.

58.     Pfizer and its experts vigorously opposed Dr. Rosenthal's position that the effect of its marketing on physician prescribing could be accurately and fairly quantified.  It submitted declarations from three experts who raised a panoply of

reasons why the proposed analysis could not succeed or return reliable results.  Class

counsel reviewed the objections with Dr. Rosenthal, and worked with her to craft a 22

page reply report which demonstrated that Pfizer's concerns were either unfounded or

able to be addressed through well recognized procedures.  In its first opinion

addressing class certification, the Court rejected Pfizer's objections to Dr. Rosenthal's

proposed study.  It found her methodology to be "a plausible way of determining

aggregate class-wide liability" and that Pfizer had not identified any fundamental

flaws.  *In re Neurontin Marketing and Sales Practices Litig.*, 244 F.R.D. 89, 111 (D. Mass.

2007).

      59.    Dr. Rosenthal's regression analysis required considerable data relating to

physician prescribing, promotion by Pfizer and other drug companies and many other

factors in order to perform the analysis.  Much of this data had to be obtained from

Pfizer through discovery.  Class counsel worked closely with Dr. Rosenthal throughout

the entire discovery period to ensure that they obtained the information she needed to

run her model.  Other data had to be obtained from third party commercial services.

This data either had to be purchased or obtained through subpoenas on third parties.

Where possible, class counsel purchased the data to ensure its quality, even when the

acquisition cost was high. Much time was devoted to trying to figure out what data was

available and whether the available data could be used in the proposed analysis.

      60.    Dr. Rosenthal's final report, issued in August 2008, described her

completed regression analysis, which found a strong correlation between Pfizer's

marketing campaigns and sales of off-label Neurontin for the indications at issue.  Her

analysis found that 99.4% of all Neurontin bipolar prescriptions were caused by Pfizer's off-label promotion for that use. Similarly 70% of neuropathic pain prescriptions, 37.5% of high dosage prescriptions and 27.9% of migraine prescriptions were caused by the off-label marketing. Dr. Rosenthal presented this same analysis at the Kaiser trial in March 2010, which this Court accepted and relied upon in determining liability and damages. Dr. Rosenthal's regression analysis, however, was originally created for the class under the direction of class attorneys.

61.     Additional work Dr. Rosenthal preformed for the class included a declaration which rebutted a Pfizer expert's contention that individual medical records were necessary to determine the quantity of Neurontin off-label usage as well as the drug's efficacy for off-label uses [Dkt # 463]. Three depositions, lasting five days, were taken of Dr. Rosenthal in this litigation, in October 2006, March 2007 and January 2009. On each of these occasions Dr. Rosenthal was prepared for her deposition by class counsel and class counsel defended the deposition.

62.     Class counsel also retained Raymond Hartman, Ph.D. to quantify the loss to the class caused by Pfizer's misrepresentations. Dr. Hartman submitted a preliminary report in August 2005 that concluded that class damages could be calculated using standard formulaic methodologies that are accepted in the field and in forensic work, and that the calculations can be made based on available data. He defended these conclusions against objections lodged by Pfizer's experts in a reply declaration he prepared (under the direction of class counsel) in February 2007. After Dr. Rosenthal completed her regression analysis, Dr. Hartman used her conclusions to

determine class wide damages, which he set forth in a report prepared in August 2008. Dr. Hartman used the same methodology to determine Kaiser's damages when he testified in the Kaiser trial in March 2010, and the Court accepted his methodology in its findings of fact in that action.

63.    Dr. Hartman calculated the loss suffered by the class (excluding the coordinated plaintiffs) to be in excess of $623 million due to Pfizer's fraudulent promotion of Neurontin as a bipolar medication.  Dr. Hartman was deposed on three occasions in this litigation, each time for one day, in December 2006, March 2007 and January 2009.  On each occasion class counsel prepared him for his deposition and defended his deposition.

64.    Class counsel also retained Dr. Rena Conti, Ph.D. to address matters of concern to the Court that had been raised in the class certification decisions or in the certification hearings.  The Court had expressed concern about certifying a consumer class that included patients who would have received off-label Neurontin regardless of Pfizer's promotional campaigns, unless the number of such class members was de minimis.  Dr. Conti analyzed off-label Neurontin usage trends for the indications at issue to establish that for these uses almost no Neurontin had been prescribed prior to Pfizer's fraudulent promotional campaigns.  The extensive non-use established that virtually no one would have received off-label Neurontin prescriptions but for the fraud—virtually all patients had been injured by the fraudulent marketing campaign. Dr. Conti also established that the number of consumers who paid for their off-label Neurontin prescriptions was sufficient to meet Rule 23(a)'s numerosity requirement and

that the three TPP class representatives were sufficiently large to have likely paid for

off-label Neurontin for each of the uses at issue.  Because all of these issues addressed

by Dr. Conti were initially raised by the Court in response to class counsel's initial

motion for class certification, class counsel worked closely with Dr. Conti to direct her

research and ensure her declarations addressed the issues raised by the Court.

65.     As with Dr. Rosenthal's and Dr. Hartman's initial reports, Pfizer's experts

relentlessly attacked Dr. Conti's opinions, necessitating a rebuttal declaration to parry

Pfizer's experts' objections.  The rebuttal declaration was filed in March 2008.  Dr. Conti

was deposed for two days in February 2013.  Class counsel prepared her for deposition

and defended the deposition.

**THE FIRST EFFORT AT CLASS CERTIFICATION**

66.     Class counsel moved for class certification on four occasions and five

hearings were devoted to these motions.  Class counsel filed its first motion for

certification in August 2005, before any ruling on Pfizer's initial motion to dismiss.  The

motion was supported by Dr. Rosenthal's and Dr. Hartman's preliminary reports,

which were summarized above.  After Pfizer sought several extensions for the conduct

of class representative discovery, it filed its initial opposition in February 2007,

including 2,500 pages of exhibits and declarations from seven experts who opposed

certification.  The Court permitted a second round of briefing that was completed by

April 2007 and a hearing was held in May 2007.

67.     As noted above, in its August 29, 2007 decision, *Neurontin II,* the Court

preliminarily accepted the feasibility of proving class wide causation through the

38

regression analysis proposed by Dr. Rosenthal.  But the Court had several other reservations about the ability of class counsel to meet the requirements of Fed. R. Civ. P. 23(a) and 23(b)(3).

68.     First, the Court ruled that class counsel could not simply prove a plan to fraudulently promote for off-label uses generally; they had to prove fraudulent misrepresentation for each off-label use alleged.  Further, a class representative was required for each specific off-label use.  A patient who had been prescribed and purchased Neurontin for neuropathic pain was not typical of class members who had been harmed by purchasing Neurontin to treat migraines.  Only two class representatives had been proposed, and while they were typical representatives of consumers who had used Neurontin for neuropathic pain and migraine, class counsel would have to find additional consumer class representatives if they wished to pursue other uses.

69.     The Court found that the class had also failed to show typicality for the proposed TPP representatives.  There was an insufficient showing as to whether the proposed representatives had actually purchased Neurontin for the uses at issue, or whether they were sufficiently large to have likely paid for such subscribers.  The Court also found there was an insufficient showing of numerosity—there was no proffer as to how common Neurontin usage was for many of the off-label indications at issue.

70.     But the Court's most serious concern related to common proof that all class members had been injured by Pfizer's conduct.  The Court presumed that some patients had been prescribed Neurontin by physicians who had not been influenced by

Pfizer's false marketing or who had received truthful, as opposed to fraudulent, off-label promotion.  If that were the case, that meant that some patients had received off-label Neurontin from physicians who had not been  affected by the fraud, and those patients had not been harmed by Pfizer's misconduct—presumably they would have been in the same position if Pfizer had done nothing.  The Court was concerned that it could not certify a class where some persons had not been injured and it was impossible or impractical to identify those class members.  Only if

> a de minimis number of doctors prescribed Neurontin for an off-label condition, and then off-label prescriptions skyrocketed after a fraudulent campaign for that indication (i.e., migraines or bipolar),[would] the Court [] consider statistical proof as sufficient to demonstrate that most purchasers in that period were injured. At present, however, the record does not contain such a proffer.  *Id.* at 114.

71.     The Court also cautioned that a TPP class may not be viable due to TPPs' inability to distinguish between on label and off-label Neurontin prescriptions, or to determine the indications for which Neurontin was prescribed.  These data problems could preclude a TPP class from proving damages.  *Id.* at 115.

72.     The Court then provisionally denied the certification motion but granted class counsel leave to renew the motion in a limited time window if class counsel could remedy the numerous problems identified.

## THE DISTRICT COURT DENIES THE RENEWED MOTION FOR CLASS CERTIFICATION

73.     More than three years into the litigation, the Court's August 2007 decision did not definitively foreclose a recovery, but it made it even clearer that class counsel

faced substantial hurdles to a recovery.  While some of the Rule 23(a) factors could be

corrected through a more thorough evidentiary showing, the Court did not indicate that

a class could ultimately be certified.  The difficulties of proving causation and

identifying which class members were injured were serious problems that might be able

to be overcome by a showing of de minimis prior use, or they might not.  The Court

appeared to sympathize with the class—it considered the use of a national marketing

scheme to promote a fraud "troubling," and was concerned that without a class remedy

the wrongdoers might get off "scot free".  But even with the Court's empathy, no clear

path to class certification was illuminated.

74.     Nonetheless, class counsel took advantage of the Court's invitation to

reapply for certification with an augmented record.  As recorded above, Dr. Conti was

retained by class counsel to address the infirmities identified by the Court, including

proof that only a de minimis number of patients received Neurontin irrespective of the

Pfizer promotional campaigns.  She produced powerful statistical evidence that

demonstrated that there had been minimal off-label use for the relevant indications

before the promotional campaign, followed by sky-rocketing usage shortly after the

marketing campaigns commenced—just as the Court had surmised.

75.     Class counsel also identified four additional consumer representatives to

represent patients who had been prescribed Neurontin for bipolar condition,

nociceptive pain and in dosages in excess of 1800 mg/day.  They sought to add these

individuals as class representative plaintiffs.  Class counsel's renewed motion hewed

closely to the factual deficiencies identified in the August 27, 2009 decision.  Including

41

all charts, appendices and notes to the Conti expert report, class counsel added only 112 pages to the record.

76.     In response to the Renewed Motion, Pfizer once again pulled out all the stops to try to defeat the certification motion.  It filed hundreds of pages of exhibits in opposition to the motion and filed four new expert affidavits in opposition to the motion, two from new experts who had not previously been heard from.  The Court again permitted the submission of two briefs from each side.  The Court heard oral argument on the renewed motion on April 16, 2008.  Post-argument memoranda were submitted by both sides after the hearing.

77.     In the midst of the briefing of the renewed motion for class certification, Pfizer filed a motion for summary judgment.  It sought to have the class case dismissed on four grounds: (1) that the class plaintiffs could not prove inefficacy of the indications at issue; (2) that there was insufficient evidence of Pfizer's scienter; (3) that the TPP plaintiffs did not have standing to recover for their payment of prescriptions written by the allegedly defrauded physicians; and (4) that class plaintiffs had provided no evidence of causation.  In support of the causation argument, Pfizer argued that the class had not presented any evidence that individual physicians had relied on Pfizer's alleged misrepresentations and that what caused physicians to write Neurontin prescriptions could not be proven by aggregate evidence.

78.     Class counsel recognized that in the event the motion for summary judgment were successful, the entire record of Pfizer misconduct had to be before the First Circuit so the appellate court could see for itself the extent of the misconduct and

42

the strong evidentiary record the class plaintiffs had assembled.  They prepared a

statement of facts in opposition to the motion for summary judgment (the "Statement")

that set forth the entire case and all of the misconduct relating to all of the indications.

The Statement of Facts was 314 pages long comprising 805 numbered paragraphs.  687

exhibits supported the facts set forth in the Statement.  The assembly of the Statement of

Facts was a herculean task, yet it was completed in six weeks.  It is a massive record of

ten years of deliberate deceit and intentional misconduct designed to circumvent the

Food and Drug Administration regulatory scheme.  All of the evidence used to prove

Pfizer's misconduct in the Kaiser case was set forth in the Statement.

79.     The District Court did not decide the renewed motion for class

certification until May 13, 2009, when it was outright denied.  *In re Neurontin Marketing,*

*Sales Practices and Products Liability Litig.,* 257 F.R.D. 315 (D. Mass. 2009) (*Neurontin III*).

The Court found that class counsel had satisfied the requirements of Rule 23(a) through

their additional submissions, and the addition of separate consumer representatives for

the five off-label indications remaining in the case.  The Court, however, held that

neither the consumer nor the TPP classes could satisfy Rule 23(b)(3)'s predominance

requirement.  The Court retreated from its position that classwide causation could be

established if the Rosenthal analysis and other evidence could establish that all or

virtually all of the prescriptions for a specific indication were caused by the fraudulent

marketing.  The Court interpreted a number of decisions that had been handed down

since its prior class certification decision as precluding the use of aggregate evidence to

establish whether fraudulent representations caused physician prescribing decisions.

The Court believed that Dr. Rosenthal's analysis did not take into account other non-fraudulent reasons a physician may have prescribed, and could not identify which doctors had been exposed to Pfizer marketing. The Court was uncomfortable with the presumption that all off-label marketing was necessarily fraudulent, with the possible exception of promotion for bipolar, where the Court acknowledged the existence of compelling evidence of inefficacy. Given the limitations of Dr. Rosenthal's analysis, the Court determined that individual issues predominated in all of the proposed consumer classes, and no consumer class could be certified.

80. The Court had a separate ground for denying certification of a TPP class. Relying on the declaration of one of Pfizer's experts, Gregory Bell, the Court understood that different considerations led the different TPPs to place Neurontin on their formularies. Accepting this representation, the Court understood that different TPPs may have been influenced by different representations in their decision to reimburse Neurontin for the uses at issue, and some TPPs (or their Pharmacy Benefit Managers) may not have relied upon the fraudulent misrepresentations. Because each TPP's decision to pay for Neurontin was based upon individual factors, the Court believed common issues could not predominate. The Court ruled that a TPP class also could not be certified.

81. Unlike the earlier decision, the Court's opinion in *Neurontin III* was not provisional; it was a final decision against the plaintiffs. At that point, the only recourse available to class counsel that could lead to a successful resolution of the proposed class claims was the appeal process.

44

## CLASS COUNSEL CONVINCES THE DISTRICT COURT THAT ITS BASIS FOR DENYING CLASS CERTIFICATION IS ERRONEOUS

82.     After reviewing *Neurontin III*, class counsel noticed the opinion contained factual and legal errors, especially in regard to the bipolar disorder subclass.  For example, the opinion indicated that only one of the treating physicians who prescribed Neurontin to the six proposed consumer class representatives had had any exposure to Pfizer's off-label marketing.  But, in fact, class counsel had presented evidence that the physicians who prescribed Neurontin to the bipolar class representatives had been detailed extensively, and that it was only after the initiation of such detailing that those psychiatrists commenced prescribing Neurontin for their bipolar patients.  The fact that these physicians, when deposed, had forgotten about their contacts with Pfizer (or had failed to admit to them) was important proof that Dr. Rosenthal's regression analysis was far more trustworthy evidence of the effect of Pfizer marketing on off-label Neurontin prescribing than the testimony of individual doctors taken years after the fact.

83.     Even more important, the District Court did not recognize that the Bell Affidavit that it had relied upon in denying certification of a TPP class, misled the Court regarding the supposed disparity of TPP's treatment of Neurontin on their formularies.  Although Bell did set forth examples of different TPP's making different rules regarding Neurontin reimbursement, neither he nor Pfizer made it clear to the Court that the differing conduct occurred *after* the class period, subsequent to the settlement of the *Franklin* case which alerted the medical community of Pfizer's abusive off-label

marketing.  In fact during the class period, extensive internal Pfizer evidence demonstrated that TPPs uniformly placed Neurontin on their formularies and reimbursed for it without any conditions or prior authorizations.  Neither Bell nor Pfizer brought this information to the Court's attention either.

84.     With regard to the negative precedents that had been handed down in other courts since the District Court's opinion in *Neurontin II*, the Court did not distinguish between fraud claims based on misrepresentation of safety as opposed to those premised upon the misrepresentation of efficacy.  Where one drug has a different safety profile than another, physicians must balance the risks versus the potential benefits.  When a drug is ineffective, however, there is no reason to prescribe it; in these circumstances a trier of fact could properly infer that physicians relied upon the false representation of efficacy.  The inference was strongest in connection with prescriptions for bipolar disorder, because, as the District Court itself recognized, there was no scientific rationale for using Neurontin as a bipolar treatment and it was reasonable to believe that physicians would not have prescribed it had they know the truth about the suppressed bipolar studies.

85.     Class counsel decided to move for reconsideration of the class certification opinion.  In order to simplify the case for certification, counsel decided to narrow the claim to bipolar use, which the Court had previously recognized as the strongest claim.  On May 28, 2009, within the jurisdiction period for a motion for reconsideration, class counsel filed a 31-page motion to reconsider the Court's denial of certification to TPPs

and consumers who had paid for Neurontin bipolar disorder prescriptions.  Class counsel was aware the odds of having the Court reconsider its opinion were low.

86.     On September 19, 2009, the Court held a hearing on Pfizer's motion for summary judgment.  During the course of the hearing the Court stated that although it was unlikely to change its decision to certify a consumer class, it had examined the reconsideration papers closely and had doubts that the categories of TPPs were as disparate as depicted by Pfizer.  The Court informed the parties that it intended to hold a hearing on the reconsideration motion.  At that hearing, on October 15, 2009, the Court told class counsel that their brief in support of reconsideration was "excellent" and the high quality of the argument was the reason the Court was willing to reconsider its ruling in *Neurontin II*.  The Court appeared to have also been impressed with the substance of the brief.  Re-reviewing the Bell Affidavit with class counsel's critique in mind the Court stated in open court that it found the affidavit misleading. Bell, the Court observed, described differences between TPP formulary decisions in general, but could not substantiate that there were any distinctions, other than Kaiser, regarding how TPPs treated Neurontin.  The Court did not indicate either way whether it would ultimately certify a TPP class, but did indicate that the grounds for denial set forth in *Neurontin II* might not have been correct.  At the conclusion of the reconsideration hearing a possibility existed that the class case could be resurrected.

**THE EVIDENCE AND EXPERT TESTIMONY DEVELOPED BY CLASS COUNSEL CONVINCE A JURY AND THE DISTRICT COURT THAT PFIZER HAS ENGAGED IN FRAUDULENT PROMOTION THAT CAUSED PHYSICIANS ACROSS THE COUNTRY TO PRESCRIBE WORTHLESS NEURONTIN PRESCRIPTIONS**

87.     At the September 2009 summary judgment hearing the Court informed the parties that it believed an actual trial would help it to understand the marketing fraud claims and to determine whether it was possible to prove on an aggregate basis that fraudulent marketing caused off-label prescribing.  The Court asked the parties to submit trial plans for a bellwether trial and on November 12, 2009, and it issued an order setting a February 2012 date for Kaiser's claim to be tried.  The Court specifically noted in its order that the trial would be structured so that fact findings "will have preclusive effect on subsequent litigation."  The Court asked the parties to "explore options for resolving all cross-cutting issues through the Kaiser trial."

88.     Shortly thereafter, Kaiser requested members of the Plaintiffs' Steering Committee to act as co-counsel for the Kaiser trial, and the Plaintiffs' Steering Committee signed a fee agreement with Kaiser's counsel.  Thereafter, through the District Court's issuance of the Amended Findings of Fact and Conclusions of Law, the members of the Plaintiffs' Steering Committee and certain of class counsel acted as co-trial counsel for Kaiser.  The law firms that performed this work have been compensated from proceeds of the Kaiser judgment, and the lodestar cross check calculations that have been submitted in support of this fee petition do not include the time any of class counsel devoted to the Kaiser trial.

48

89.     The Kaiser trial resulted in a substantial verdict that Pfizer had violated
RICO in connection with its off-label marketing of Neurontin for bipolar disorder,
neuropathic pain, migraine and for dosages in excess of 1800 mg/day.  Kaiser's claim
for violation of California's Unfair Competition Law resulted in findings of fact that
Pfizer had engaged in fraudulent and misleading marketing of Neurontin for the same
uses, that Neurontin was ineffective for each of those uses and Kaiser suffered more
than $95 million in damage because physicians relied upon Pfizer's marketing, which
caused them to write millions of dollars of worthless Neurontin prescriptions that
Kaiser paid for.  *Kaiser Found. Health Plan v. Pfizer, Inc., (In Re Neurontin Mktg. & Sales
Litig)*, 748 F. Supp. 2d 34 (D. Mass. 2010).

90.     Two points need to be made regarding class counsel's contribution to the
Kaiser verdict and judgment, and how those contributions subsequently benefited the
class.  First, all of the evidence used to prove that Pfizer and the enterprises it controlled
had engaged in mail and wire fraud, as well as all of the evidence used to show
Neurontin's inefficacy, had been assembled by class counsel before this Court set the
Kaiser case for trial.  The evidence of Pfizer wrongdoing and Neurontin inefficacy
tracked class counsel's statement of fact in opposition to the motion for summary
judgment.  Almost all of the trial exhibits that were submitted to prove Pfizer's liability
(except those documents specific to Kaiser) were also exhibits to class counsel's
opposition to the motion for summary judgment.  With the exception of Dr. Conti, all of
the class plaintiffs' experts testified on behalf of Kaiser.  None of these experts prepared

a separate report for Kaiser—they testified on the matters and opinions that had been developed by class counsel years before the Kaiser trial.

91.     Second, although Kaiser argued it directly relied upon the misrepresentations Pfizer made to its P&T Committees, it sought damages based on the prescriptions Pfizer caused due to its misrepresentations to doctors.  Kaiser's damage theory required it to prove, in the aggregate, that Pfizer's misrepresentations caused Kaiser's doctors to write a substantial quantity of Neurontin prescriptions that would never have been otherwise written.  This, of course, is the same damage theory, and the same evidence, that class plaintiffs developed in support of their cases.  In fact, proof of damages in Kaiser demonstrated that damages could be proven on a class wide basis using Dr. Rosenthal's analysis.

92.     Further, to calculate Kaiser's monetary damages, particularly regarding the amount paid for unnecessary Neurontin, the experts relied upon the national statistics that class counsel developed for use in the class case.  The percentages of Neurontin purchased for the relevant off-label uses, as well as the percentages of fraudulent scripts written for those uses, were calculated based on class numbers, on the "reasonable" assumption that Kaiser's usage was comparable to national averages.  Without the work class counsel performed, Kaiser could not have proven its damages case.

## NOTWITHSTANDING THE RESULT IN KAISER, THE DISTRICT COURT DENIES CLASS CERTIFICATION A THIRD TIME AND DISMISSES THE CLASS' CLAIMS

93.     After the District Court issued its Findings of Fact and Conclusions of Law in *Kaiser* in November 2010, the District Court could return its attention to the class claims.  On December 10, 2010 it decided Pfizer's March 2009 summary judgment motion.  Relying on the materials submitted in opposition to summary judgment as well as the evidentiary record in *Kaiser*, the Court accepted Dr. Rosenthal's report and found that her analysis "demonstrates the likelihood of some injury, particularly in the area of bipolar."  *Harden Mfg. Corp. v. Pfizer, Inc. (In re Neurontin Mktg & Sales Litig.),* 754 F. Supp. 2d 293, 310 (D. Mass. 2010) (*Neurontin IV*).  Nonetheless, the Court ruled that "because the Class TPP Plaintiffs have not directly relied on misrepresentations by defendants, and because they have presented no evidence as to how many or which physician who prescribed Neurontin to their members relied on fraud," the TPP class could not prove causation.  With the exception of the bipolar class representatives' claims, where evidence existed that prescribing physicians had directly relied on Pfizer misrepresentations, it dismissed all class representatives' claims, including all TPP claims.

94.     Six and a half years into the litigation, almost all of class counsel's clients had been tossed from the litigation.

95.      At a status conference on February 7, 2011, the Court acknowledged that it had intentionally reserved ruling on the motion to reconsider class certification until after the Kaiser trial and its post-trial proceedings were completed.  It acknowledged

51

that its original basis for denying certification for the TPP class was flawed, but informed counsel that it had not worked through all of the issues at that time. Class counsel suggested that a second oral argument might assist the Court, focusing on how the Court's *Kaiser* findings affected the class certification issues. The Court agreed that additional argument would be helpful and held a second hearing on the reconsideration motion on May 4, 2011. At oral argument, class counsel orally requested the Court to reconsider its grant of summary judgment against the TPP class representatives, noting that any finding that the class could prove causation through aggregate evidence would contradict the earlier ruling that the TPPs had failed to establish causation.

96.     The District Court ruled on the reconsideration motion on May 17, 2011. *In re Neurontin Mktg & Sales Practices Litig.*, 2011 WL 1882870 (D. Mass. May 17, 2011) ("*Neurontin V*"). Consistent with the comments it had made in earlier hearings, the Court recognized that its prior basis for denying certification of a TPP class was incorrect—there was no significant distinction between how members of the TPP class treated Neurontin for formulary and reimbursement purposes. Indeed, it expressly found that with regard to liability, "common issues predominate over individual TPP issues." *Id.* at *3. Turning to damages, the Court credited Dr. Rosenthal's expert report, stated that her opinion "demonstrates the likelihood of injury to TPPs from fraudulent promotion," and found that class counsel had proven that "it is more likely than not likely that [the class was] harmed by Pfizer's conduct." *Id.* at *4, *5. But the Court felt that the Rosenthal report "does not suffice to demonstrate the harm caused by the

fraud, as opposed to run-of-the-mill off-label detailing." *Id.* at *4.  It believed a fact finder would have to distinguish those prescriptions caused by fraud from those attributable to non-fraudulent off-label marketing, which could only be done after a "granular doctor-by-doctor analysis." *Id.* at *5.  Such a proceeding would be unmanageable, the Court determined, ruling that a class proceeding was not a superior method of resolving the disputes. *Id.* at *6.  The Court once again refused to certify.

97.     After seven years of litigation, class counsel had reached the end of the line before the District Court.  Class certification had been denied, repeatedly, and most of their clients' claims had been dismissed.  On June 28, 2011, a final judgment was entered against the TPP class representatives and the non-bipolar consumer representatives pursuant to Rule 54(b).  Class counsel appealed on behalf of these clients on July 7, 2011.

## CLASS COUNSEL'S SUCCESSFUL APPEAL

98.     The appeal of the District Court's summary judgment and class certification rulings squarely put before the First Circuit the question of whether statistical evidence could be used to prove on an aggregate basis that a drug company's false marketing had caused physicians to write prescriptions that would have never otherwise been written.  According to Pfizer, six federal circuit courts and at least nine District Courts had ruled that such evidence was improper.  Class counsel could not cite to a single pharmaceutical case where such evidence had been accepted.  On its face, the appeal did not look promising.

99.     Yet class counsel remained convinced that notwithstanding the legion of
negative precedents in other jurisdictions, their clients' claims were meritorious and
capable of being tried as a class action.  Seeking to turn the tide, class counsel began
work on the opening brief in earnest in September 2011, filing a finished product in
June 2012 after dozens of drafts and revisions and over 1,500 hours in attorney time.
Class counsel also worked diligently in August and September 2012 on a formidable
reply brief.  On appeal, class counsel focused on two issues.

100.     First, class counsel argued that once the District Court found that the
plaintiffs had established that they had been more likely than not harmed by Pfizer's
false marketing, the analysis was complete for summary judgment purposes; the class
did not have to establish which doctors' prescriptions were caused by fraudulent
marketing as opposed to other non-fraudulent causes.  Once class counsel submitted
sufficient evidence that Pfizer caused the unnecessary prescribing, it believed, it was
Pfizer's burden to prove its affirmative defense that the prescriptions were actually
caused by some other non-tortious factor.  Indeed, to establish causation for summary
judgment purposes, class counsel argued that it did not even have to present the
Rosenthal regression analysis; evidence that only after Pfizer commenced its fraudulent
marketing campaign did the plaintiffs begin to pay for significant amounts of bipolar
Neurontin was, by itself, sufficient to prove TPPs were harmed by Pfizer's false
marketing.  The First Circuit agreed with all of these arguments.  *Harden Manfg. Corp. v.
Pfizer, Inc. (In re Neurontin Marketing & Sales Practices Litig.)*, 712 F. 3d 60, 68-69 (1st Cir.

2013) ("*Harden*"); *Kaiser Found. Health Plan, Inc. v. Pfizer, Inc. (In re Neurontin Mrktg. & Sales Practices Litig.)*, 712 F. 3d 21, 45-46 (1st Cir. 2013) ("*Kaiser II*").

101.    Second, class counsel focused on the rationale for not permitting the Rosenthal report to be used as evidence of causation or damages once the Court had determined that it was admissible and reliable.  Class counsel demonstrated that properly performed regression analyses had been widely accepted by federal courts as proof of causal relationships in many kinds of litigation.  Class counsel argued that if the analysis was found sufficiently reliable to pass a *Daubert* challenge—as was the case with the Rosenthal analysis—there was no reason why such evidence would suddenly become incompetent in drug litigation.  Class counsel believed that there was no reason to accept Pfizer's argument that only direct evidence of physician reliance was admissible here, particularly after class counsel had established that anecdotal physician testimony regarding prescribing decisions was likely to be highly unreliable.

102.    The First Circuit also accepted each of these arguments.  As it stated in its opinion in *Harden*, at 69, "regression analysis is a widely accepted method of showing causation under several causes of action, and we see no reason to reach a different conclusion for a specific subset of RICO claims based on fraudulent pharmaceutical marketing."  *See also Kaiser II*, at 41-42, 46-47.  The First Circuit left no doubt that statistical aggregate proof can be used in class action litigation, so long as the evidence is sufficiently rigorous and reliable.  It distinguished the legion of cases relied upon by Pfizer (and the District Court).  *Harden*, at 69; *Kaiser II*, at 46-47.

103.    Technically, many of the issues determinative of the class members'
appeal were first addressed by the First Circuit in its *Kaiser II* decision, which the First
Circuit heard and decided on the same day as the class appeal.  Yet the briefing makes it
clear that the First Circuit was responding to, and adopting, the arguments that were
made by class counsel.  In the Kaiser appeal, Kaiser's appellate counsel did not dispute
the District Court's belief that aggregate statistical evidence was only admissible where
the plaintiff had directly relied on the allegedly false representations, but was not
admissible in indirect reliance cases such as the one brought by class counsel.  Thus,
before the First Circuit, the class members were the only ones asking the Court to
address the nature of the evidence sufficient to prove causation when the plaintiff did
not directly rely on the misrepresentations.  Many of the important issues addressed in
the *Kaiser II* opinion were decided by the First Circuit because class counsel, not Pfizer
or Kaiser, brought them to the First Circuit's attention.

104.    The First Circuit reversed the District Court's entry of summary judgment
against the proposed TPP class representatives.[4]  It did not formally decide the appeal
of the District Court's class certification decisions except to vacate them, but noted that
the summary judgment and class certification decisions had been decided on essentially
the same grounds: specifically, the District Court's decision not to consider the
Rosenthal report as evidence of causation and damages.  In light of the Court's reversal
of the summary judgment decision and its discussion of the evidence necessary to

---

[4] The non-bipolar disorder class representatives dismissed their appeal shortly after the appeal was docketed.

establish RICO causation, the First Circuit vacated the class certification decision and
remanded it for the District Court.  Although the First Circuit did not state so expressly,
its opinion that the Rosenthal analysis was sufficient proof of damages and causation
made it clear that class counsel could prevail based on common evidence, making it
likely that class counsel could satisfy Rule 23(b)(3)'s predominance requirement.

105.    Class counsel's appellate labors did not end at the conclusion of the First
Circuit appeal.  On August 30, 2013, Pfizer filed a writ of certiorari with the United
States Supreme Court, requesting the court to review the First Circuit's *Harden* and
*Kaiser II* decisions, as well as the First Circuit's decision in the related case brought by
Aetna, Inc.  Pfizer asked the Supreme Court to review the First Circuit's decisions that
the class claims (and the other Neurontin marketing plaintiffs' claims) met RICO's
proximate causation requirements, and that causation and damages could be proven
through aggregate statistical analysis.  Shortly thereafter, the Washington Legal
Foundation, the Allied Educational Foundation, the Pharmaceutical Research and
Manufacturers of America and the Biotechnology Industry Organization filed amicus
briefs in support of Pfizer's writ.  Class counsel prepared its own opposition for the
class and filed a 40-page opposition brief to the certiorari petition on November 4, 2013.
On December 9, 2013, the Supreme Court denied the petition for writ of certiorari.

**POST-APPEAL, THE DISTRICT COURT INDICATES THAT IT WILL CERTIFY A
CLASS OF THIRD PARTY PAYORS AND PRECLUDE PFIZER FROM RE-
LITIGATING FACTUAL ISSUES DETERMINED IN THE KAISER TRIAL**

106.    After the case was remanded for further proceedings in the District Court,
the first battle fought by class counsel was over Pfizer's request to reopen discovery on

potential defenses it had not previously pursued when fact discovery closed five years earlier, on February 14, 2008.  The District Court declined to reopen discovery on July 11, 2013.

107.     On September 3, 2013, while briefing before the Supreme Court was still ongoing, class counsel filed Class Plaintiffs' Post-Mandate Motion for Class Certification, its fourth request to certify a class pursuant to Rule 23(b)(3).  Its supporting memorandum traced the history of efforts to certify a class in the litigation and how the class had met and overcome each of the objections previously posed by Pfizer and the District Court.  It discussed how the First Circuit's recent decision had effectively overturned the District Court's grounds for refusing to certify a class in *Neurontin V*, and why case law the Court had previously believed would constrain it was no longer persuasive in light of the First Circuit's controlling decision.

108.     As in previous rounds of briefing relating to class certification, the District Court permitted both sides to submit two briefs on the merits in support or opposition of Class Plaintiffs' Post-Mandate Motion for Class Certification. For the most part, Pfizer did not disagree with class counsel's analysis in its opposition.  Although it did revive its position that the class would be unable to prove class wide injury, Pfizer's arguments in its opposition were comprised principally of new arguments against certification that it had failed to present in its previous oppositions.  Despite a First Circuit ruling that the class's aggregate statistical evidence should be accepted, Pfizer's principal arguments in its opposition were that it had a right to present as much individualized evidence of doctor testimony as it wished, that such a filibuster should

defeat class certification, and that the proposed class definition was over-inclusive. When class counsel refuted those arguments in their reply brief, Pfizer propounded additional objections to class certification in its sur-reply memorandum. Class counsel was forced to seek leave to file a reply to the sur-reply to rebut Pfizer's new objections.

109.    On February 24, 2014, the District Court held a hearing on the Post-Mandate Motion for Class Certification.  After listening to both sides, the District Court informed the parties that it was "likely to certify a class," noting that the First Circuit had reversed her and disagreed with her reasons why a class action should not go forward.  The Court also informed the parties that many of the findings from the *Kaiser* trial would be binding upon them.  As the Court informed the parties:  "Oh, we absolutely are going to have issue preclusion. We are not retrying this case from the get-go."  Finally, at class counsel's request, the Court set the case for trial on Monday October 6, 2014, with a final pretrial conference on Friday, September 26 at 2:30 p.m.

110.    In anticipation of the upcoming trial, class counsel filed a Motion to Preclude Relitigation of Issues and Facts Determined By The *Kaiser* Triers of Fact on April 4, 2014.  The motion sought a ruling that Pfizer was collaterally estopped from relitigating 27 issues determined by the jury or the District Court in its *Kaiser* decision. The issues sought to be precluded covered five basic areas: (1) RICO findings concerning Pfizer's conduct in a RICO enterprise; (2) the existence of a nationwide fraudulent marketing scheme relating to the marketing of Neurontin as a bipolar treatment; (3) the number of bipolar prescriptions attributable to Pfizer's promotional scheme; (4) the number of bipolar prescriptions attributable to Pfizer's fraudulent

59

promotion; and (5) Neurontin's inefficacy as a bipolar medication.  Were the Court to grant class counsel's requests for preclusive findings—most of which came directly from the *Kaiser* findings of fact—the case would have been little more than a damages trial.

### THE SETTLEMENT AND ITS BENEFITS TO CLASS MEMBERS

111.    With the certification of a TPP class imminent and the near certainty that it would be precluded from contesting many of the unfavorable findings of fact determined in *Kaiser*, in February 2014 Pfizer agreed to mediate the case before former federal judge Layn Phillips in New York City on March 25, 2014.

112.    The mediation sought to end all of the sales and marketing litigation regarding Neurontin, not just the class plaintiffs' claims.  While all of the Coordinated Plaintiffs had settled their claims with Pfizer (or, in Kaiser's case, obtained a judgment), a group of 15 TPPs who had filed their own action, the Assurant Plaintiffs, still had outstanding claims. The Assurant plaintiffs still had claims against Pfizer for all off-label indications, not just bipolar, and they also had antitrust claims under state laws related to Pfizer's effort to block generics.  In the Kaiser judgment, the majority of its recovery was for marketing fraud other than bipolar misrepresentations.  Thus the value of the Assurant plaintiffs' claims might be much higher than the other class members.  Prior to mediation, counsel for Assurant Plaintiffs and class counsel negotiated how a global settlement could be divided between the class members and the Assurant Plaintiffs.  Arms-length negotiations resulted in an agreement that the Assurant Plaintiffs would submit claims in the settlement and their purchases would

receive a multiplier of 1.8.  The resulting figure would be used to calculate the Assurant Plaintiffs' share of the total distributable funds in the settlement.    The Assurant plaintiffs, if successful, were likely to receive a proportionately greater recovery than the remaining TPP class members.  Some of the largest TPP class members were consulted regarding this allocation, and they have agreed.  On information and belief, the largest TPPs, who would be the most affected by this allocation, will not contest it.

113.    The March 25, 2014 mediation was intensive.  Although the parties were able to reach agreement on most non-monetary terms, it took several lengthy sessions, and interim discussions, to reach ultimate agreement.

114.    There was time pressure on all parties to complete a deal.  The District Court had requested to be kept abreast of all settlement discussions.  In order to keep the October trial date, it needed to issue its class certification opinion reasonably quickly in order to allow the First Circuit to do a Rule 23(f) review if it believed such a review was merited.  At the same time, the Court did not want to issue a class certification opinion if it were unnecessary.  Pfizer also wished to avoid any precedent which could be used against it in any future pharmaceutical fraud litigation.  The number of parties and the fact that Judge Phillips's schedule was usually booked months in advance created scheduling challenges.  The only available date that fit the parties' schedules was Palm Sunday, April 13, 2014 in New York City.

115.    At the end of that day, the parties were able to agree on a global settlement of $325 million for all TPPs who reimburse Neurontin.  Pursuant to the proposed allocation plan, all TPPs will submit claims based on the amount of Neurontin

they purchased during a proxy period.  A claims administrator will collect all claims and review them.  After all claims are submitted and verified, the settlement pool, after payment of all litigation expenses (including counsel's fee), will be divided pro rata among all claimants.

116.    The amount of the recovery is remarkable.  Not only is this one of the largest class action recoveries of any kind, it is certainly the largest class recovery against a drug company for marketing fraud.  It may be the only one.

117.    A comparison with the False Claims Act recovery is not inappropriate.  In 2004, the United States, with far more statutory remedies, far more resources, a parallel criminal investigation, the ability to debar Pfizer from participating  in any federal health care program and a far easier claim to prove, settled all civil claims against Pfizer for all off-label marketing of Neurontin for $152 million.  Here, the class is obtaining a recovery 2 ½ times as large for a far smaller percentage of off-label Neurontin prescriptions.  Moreover, the hurdles the class had to overcome to recover are greater and the incentives Pfizer has to settle with the class are far weaker than its incentive to settle with the United States in 2004.  Absent a settlement, the challenges the class would continue to face would be formidable: more Rule 23(f) petitions from a class certification ruling; the need to win on the merits at trial and to survive years of inevitable appeals; and ever-present risks of changing jurisprudence on Civil RICO and other issues, over which the parties and Court in this action have no control. The class can neither take criminal action against Pfizer nor preclude it from participating in

Medicare or Medicaid.  Given these considerations "extraordinary" is not an inappropriate characterization of the result that class counsel has achieved.

### THE REQUESTED AWARD OF ATTORNEYS FEES AND EXPENSES AND THE LODESTAR CROSS CHECK

118.    Class Counsel seek an award equal to a 33.33% of the Settlement FundThis award will cover all compensation to be paid to class counsel.  Although class counsel are entitled to seek an award of their reasonable expenses, the requested award will also cover all expenses incurred by class counsel.  Class counsel estimates approximately $4.38 million have been spent by class counsel to date in connection with the class action.

119.    This case was prosecuted by a unique team of litigators who had not all previously worked together, but who were able to bring disparate skills together to achieve an unparalleled result.  Attorneys with expertise in Neurontin and Pfizer's marketing schemes pooled their knowledge with lawyers with extensive knowledge of healthcare economics and the marketing of pharmaceuticals, as well as seasoned class action counsel with extensive experience in complex class action litigation.  This combination of skills allowed the team to do an unprecedented factual investigation while also being able to address the legal and practical challenges of prosecuting a case of this size and scope.  They also had the financial strength to pursue the case.

120.    The quantity of work performed is apparent from the preceding narrative. The quality of the work is reflected in the exceptional recovery, as well as class counsel's demonstrated tenacity: the ability to persevere in the face of daunting

precedent and a long series of adverse decisions.  Less visible but just as indicative of

the quality of their work is the praise class counsel received from the Court for their

efforts.  The Court repeatedly complimented class counsel (and their adversaries) on the

quality of their submissions, their mastery of the material, the novelty and creativity of

their arguments and their professional demeanor.  By the result they have achieved and

the consistent quality of the work they produced in the decade of pitched litigation,

class counsel believe they have proved themselves at least as qualified and competent

as any plaintiffs' counsel practicing in this area.

121.    Even more important than the quality of our work was the creativity and

legal imagination we brought to this case.  It cannot be over-emphasized that there was

no template for this case.  The False Claims Act action involved completely different

legal theories, and its favorable result had little relevance as to whether a recovery

could be obtained in this action.  New legal theories and new factual evidence had to be

uncovered by class counsel; there was no road map.  Indeed, given the fact that most

other pharmaceutical fraud cases were dismissed on legal grounds—often at the

pleading stage—there was no prototype class counsel could consider or follow.  It just

had not been done before, and so class counsel had to invent how to do it.  And because

the closest comparisons had been failures, much of the time it appeared that this case

would also fail.

122.    Pfizer was represented at all times by firms of the highest quality and

ability.  Most of the defense was handled by Davis Polk & Wardwell and Skadden,

Arps, Slate, Meagher & Flom, two of the largest and most highly respected New York

litigation firms.  At the tail end of the litigation, the Skadden team transferred to Quinn

Emanuel Urquhart & Sullivan, LLP, another highly respected and qualified firm.  Each

of these firms were very skillful and were given large working budgets by Pfizer.  They

hired competent and capable experts to defend their client.  Moreover, as the preceding

narrative demonstrates, they contested just about every aspect of the case.

123.    Although class counsel expected the case would take time, none of the

Plaintiffs' Steering Committee would ever have guessed that the case would take more

than a decade to resolve.  Yet class counsel never abandoned the case or took shortcuts,

even when recovery seemed remote.

124.    Class counsel took this complex case on a contingent fee basis knowing

there was no guarantee that they would be paid for their time or even that they would

recover their expenses.  Class counsel was aware that any fee and expense award they

might receive would come only from this Court.  They also knew that many proposed

class actions never resulted in any kind of recovery, particularly those alleging drug

company frauds.  Class counsel recognized that the nature of this case posed an

enormous amount of risk.

125.    Class counsel was also aware that this case would be expensive.  To

finance this case, all participating attorneys were asked to contribute to a common fund.

Members of the Plaintiffs Steering Committee were asked to provide the bulk of the

litigation financial support.  During the ten years of the litigation the common fund

spent in excess of $2,660,000.  Most of this expense was for experts, in excess of $2.1

million.  A breakdown of the expenditures by the Neurontin common fund is set forth

65

on Exhibit A attached.  The amounts described in Exhibit A are after receipt of any reimbursements, including contributions towards experts we received from the Coordinated Counsel and counsel representing the Assurant Plaintiffs.

126.    In addition to the common fund, all class counsel paid for many expenses out of their own pocket, such as travel costs, conference call expenses, copying etc.  All class counsel have submitted declarations setting forth how much money they expended and what it was spent on.  The total amount of expenses claimed by individual class counsel law firms which has not been reimbursed by the common fund is in excess of $1.7 million.  The total amount of claimed expenses in this litigation is no less than $4.38 million.

127.    Each law firm that provided services to the class was required to keep track of all hours they expended on the litigation, and keep track of the services they have performed.  In the course of preparing this fee application, members of the Plaintiffs' Steering Committee have reviewed the time records of each firm to ensure that all time was properly recorded to the class action (as opposed to work on the Kaiser trial), to eliminate any charges for duplicated efforts, and to ensure hourly rates charged by each firm were reasonable.  After review of each firm's records, the Plaintiffs' Steering Committee made certain adjustments downward from the reported time to derive a conservative estimate of the total lodestar expended by the firms in this matter. The Plaintiffs' Steering Committee received affidavits and supporting material that indicates the firms expended almost 79,000 hours of professional time from the inception of this case to date.  Billed at those firms' current reasonable billing rates, this

66

time amounted to a total lodestar of approximately $36.8 million.  After our review, however, to eliminate duplication of effort, and to only consider time that was appropriately billed to the class action, the Plaintiffs' Steering Committee conservatively estimates the loadstar of the work performed by all counsel to be $27.4 million.

128.    None of the time described above was submitted in support of the attorneys' fee award requested by Kaiser at the successful conclusion of the Kaiser trial.  Similarly, class counsel has not submitted any expenses for which they received reimbursement from Kaiser.

129.    Conservatively, the total lodestar for all counsel is $27,400,000.  The fee requested by counsel, 33.33% of the common fund, is $108.33 million.  Accordingly, the fee requested under the percentage of the fund method amounts to a multiplier of 3.97.

Signed and sworn under the pains and penalties of perjury this 15th day of September in Boston, Massachusetts

/s/ *Thomas M. Greene*
Thomas M. Greene

**Exhibit A to Declaration of Thomas Greene**

**Unaudited Breakdown of Expenses Paid by the Plaintiffs' Steering Committee in Connection with <u>Harden Manufacturing Corp. v. Pfizer, Inc.</u>**

| | |
|---|---:|
| **Travel & Lodging** | $4,875.41 |
| **Meals** | $545.66 |
| **Photocopies** | $27,457.86 |
| **FedEx/Messengers/Postage** | $1,618.60 |
| **Transcripts** | $211,835.48 |
| **Experts** | $2,176,650.77 |
| **Committee Meeting Expenses** | $5,709.28 |
| **Discovery Document Processing and Review** | $102,587.34 |
| **Hardware and Software for Document Database** | $95,954.40 |
| **Mediation Expenses** | $17,875.00 |
| **Appellate Expenses** | $8,432.46 |
| **Miscellaneous Expenses** | $7,613.57 |
| | $2,661,165.83 |