## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: NEURONTIN MARKETING AND SALES PRACTICES LITIGATION | MDL Docket No.  1629 <br> MASTER CIVIL ACTION NO. 04-10981 |
| THIS DOCUMENT RELATES TO: CLASS ACTION | **Honorable Patti B. Saris** <br> **United States District Judge** |

### AFFIDAVIT OF ARTHUR R. MILLER CONCERNING
### THE REASONABLNESS OF COUNSEL FOR THE CLASS PLAINTIFFS'
### REQUEST FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES

I, Arthur R. Miller, declare under penalty of perjury under the laws of the United States as follows:

### Introduction

1.      I have been asked by counsel representing class plaintiffs in this matter (collectively, "class counsel"), to offer my professional opinion as to the reasonableness of the requested attorneys' fee and expenses to be awarded in connection with the Settlement Agreement reached with the defendants in this case.  The District Court has preliminarily approved the settlement, and class counsel have moved for final approval contemporaneously with the filing of class counsels' petition for an award of attorneys' fees and expenses.

2.      After careful review of the record, and based on my experience as described more fully below, it my opinion that an award of attorneys' fees and expenses in the total amount of $108.33 million, or 33.3% of the $325 million settlement fund, inclusive of reimbursement of the expenses of litigation totaling approximately $4.38 million, is fair and reasonable, particularly in light of counsels' hard-fought effort over a ten-year period to secure a substantial cash recovery

1

for the class, as well as the innovative action by class counsel in uncovering evidence of defendants' fraud.

## Professional Qualifications

3.      Since July, 2007, I have been a University Professor at New York University. Between 1972 and 2007, I was the Bruce Bromley Professor of Law at Harvard Law School and a Professor of Law at Harvard Law School, after serving as a Visiting Professor of Law at Harvard Law School from 1971 to 1972. Prior to that, I was a Professor at the Universities of Michigan and Minnesota, and a practicing lawyer in New York City. I recently was appointed the Executive Director of the newly created NYU Tisch Institute of Sports Management, Media, and Business.

4.      Attached hereto as Exhibit A is a copy of my resume.

5.      Among other matters, my research and teaching interests for more than fifty years have focused on Civil Procedure and Complex Litigation, including aggregate actions, class actions, and mass tort litigation, particularly in the federal courts.

6.      I am the author or co-author of more than forty books and treatises, including *Federal Practice and Procedure*, the leading multi-volume treatise on practice in the Federal Courts, and *New York Civil Practice*, a leading multi-volume treatise on New York jurisdiction and procedure. I also am the author or co-author of at least thirty law review and other articles and monographs on a range of subjects including United States constitutional law, federal court litigation, class actions, attorneys' fees, transnational procedure, intellectual property issues, legal aspects of computer technology, and the right of privacy.

7.      Additionally, among other positions, I have served as the Reporter for and member of the Advisory Committee on Civil Rules of the Judicial Conference of the United States (by appointment of Chief Justices Burger and Rehnquist).

8.     I have served as the Reporter to the Task Force to Study Court Awarded Attorneys' Fees established by the United States Court of Appeals for the Third Circuit and published at 108 F.R.D. 237 (1985).

9.     I was a Member of the Special Advisory Group to the Chief Justice of the United States Supreme Court on Federal Civil Litigation (by appointment of Chief Justice Burger).

10.     I have served as a Special Advisor for the Board of Editors for the original Manual on Complex Litigation and the second edition thereof.

11.     I have served as the Reporter for the American Law Institute's Complex Litigation Project, which led to the adoption and publication by the Institute of *Complex Litigation: Statutory Recommendations and Analysis with Reporter's Study* (1994).

12.     I have served as the Reporter for the Advisory Group on Civil Justice of the United States District Court for the District of Massachusetts (and named *Amicus Curiae* by the Court's members).

13.     I have served as a Member of the American Bar Association Special Committee on Complex and Multidistrict Litigation.

14.     I have served as a Member of the Board of Overseers of the RAND Institute for Civil Justice, which completed an in-depth study of class actions.

15.     I have participated in close to 100 class actions over the past 40 years as a lawyer or as an expert.  I have appeared on behalf of both plaintiffs and defendants on issues relating to the propriety of class certification, the fairness, reasonableness, and adequacy of settlements, attorneys' fees, subject matter and personal jurisdiction, discovery, choice of law, preemption, jury trial, and appealability.  Those cases have involved a range of substantive contexts, such as mass disasters, product defects, toxic substances, various invasions of personal rights, antitrust,

3

security frauds, consumer deception, consumer financing, RICO, mail fraud, and wire fraud. This experience has included oral argument before the United States Supreme Court, all of the United States Courts of Appeals, numerous United States District Courts, and a number of state trial and appellate courts.

16.     I served as an advisor to the American Law Institute's Project on Aggregate Litigation.  The project's *Principles of Aggregate Litigation* was published by the Institute in 2010 and has become an influential guide to courts and counsel on procedural, policy, and ethical issues relating to the prosecution and resolution of class and mass actions.

17.     I was one of the draftsman of the Uniform Interstate and International Procedure Act.  I have testified before numerous subcommittees of the United States Senate and House of Representatives on constitutional, procedural, privacy, and other issues.

18.     I am, accordingly, familiar with the nature of mass tort and class actions along with the procedural and practical issues involved in the litigation and settlement of such cases.

19.     I am familiar with and have expertise in the legal and ethical standards applicable to attorneys' fees in circumstances such as those at bar.  I am also familiar with the precepts and concepts behind what is known as the "common fund doctrine" and with the standards courts apply in evaluating fee requests.

20.     Throughout my years in academe, I have maintained my contact with the Bench and the practicing Bar in order to understand the actual operation and functioning of the civil justice system.  Thus, I have participated in countless judicial conferences in the various federal circuits and in educational programs conducted by the Federal Judicial Center and state judicial organizations as a lecturer or a discussion leader on a wide variety of subjects, including many on class actions, attorneys' fees, and complex litigation.

21.     Specifically with regard to attorneys' fees, I was requested in or about 1976 by the Federal Judicial Center to study and prepare a comprehensive monograph on all aspects of attorneys' fee awards in the federal courts.  The result of that work was published in or about 1978 by the Center and made available to judges and lawyers; it has been utilized by many state and federal courts.  A few years later I was asked by Chief Judge Aldisert of the United States Court of Appeals for the Third Circuit to serve as the Reporter for a special Task Force consisting of distinguished judges and practitioners.  Our charge was to survey and analyze fee award practices under various judicial methodologies, particularly the then-prevalent lodestar method.  The group's work produced a document, *Court Awarded Attorney Fees*, Report of the Third Circuit Task Force, October 8, 1985, reprinted at 108 F.R.D. 237 (1985), which has been cited frequently and has been instrumental in encouraging many state and federal courts to continue their use of percentage fee awards or to abandon the lodestar method.

22.     Throughout the past thirty years I have participated as counsel or expert in many, many fee proceedings.  In a number of instances I have argued fee matters in state and federal trial and appellate courts throughout the country in cases that have proven significant with regard to attorney fee jurisprudence.

23.     I also have been the host of several television programs that have won a variety of awards from media organizations, including an Emmy, and several from the American Bar Association for promoting public understanding of the law.

**Materials Provided**

24.     Materials that I have been provided in connection with this litigation are as follows:

- Amended Class Complaint, dated February 1, 2005;

- Opening Brief for Harden Manufacturing, *et al.*, to First Circuit Court of Appeals, dated June 11, 2012;

- Appellants' Reply Brief to the First Circuit Court of Appeals, dated September 18, 2012;

- Class Plaintiffs' statement of disputed and undisputed facts in opposition to summary judgment, dated April 16, 2009;

- Memorandum of Law in Support of Class Plaintiffs' Post-Mandate Motion for Class Certification, dated October 21, 2013;

- Class Plaintiffs' Reply Memorandum In Support of Their Post-Mandate Motion for Class Certification, dated October 21, 2013;

- Class Plaintiffs' Motion to Preclude Relitigation of Issues and Facts Determined by the *Kaiser* Triers of Fact at Trial, dated April 3, 2014;

- Memorandum of Law In Support of Class Plaintiffs' Motion to Preclude Relitigation of Issues and Facts Determined by the *Kaiser* Triers of Fact at Trial, dated April 3, 2014;

- Opposition to Petition for Writ of Certiorari, dated November 4, 2013;

- *In re Neurontin Marketing and Sales Practices Litig.*, 712 F.3d 60 (1st Cir. 2013) (regarding class certification and summary judgment);

- *In re Neurontin Marketing and Sales Practices Litig.*, 712 F.3d 21 (1st Cir. 2013) (regarding Kaiser trial);

- *Kaiser Found. Health Plan v. Pfizer, Inc.*, 2011 WL 3852254 (D. Mass. Aug. 31, 2011) (Amended Findings of Fact and Conclusions of Law);

- *In Re Neurontin Marketing, Sales Practices, and Products Liability Litg.*, 433 F. Supp. 2d 172 (D. Mass. 2006) (District Court decision on motion to dismiss);

- *In re Neurontin Marketing and Sales Practices Litig.*, 244 F.R.D. 89, 111 (D. Mass. 2007) (District Court decision on first class certification motion);

- *In re Neurontin Marketing, Sales Practices and Products Liability Litig.*, 257 F.R.D. 315 (D. Mass. 2009) (District Court decision on second class certification motion);

- *In re Neurontin Mktg & Sales Litig.*, 754 F. Supp. 2d 293 (D. Mass. 2010) (District Court decision on summary judgment);

- *In re Neurontin Mktg & Sales Practices Litig.*, 2011 WL 1882870 (D. Mass. May 17, 2011) (District Court decision on third class certification motion);

- Fourth Amended Class Action Complaint, dated March 24, 2011;

- Draft Affidavit of Thomas M. Greene in Support of Class Plaintiffs' Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Expenses;

- Draft Affidavit of Thomas M. Sobol in Support of Class Plaintiffs' Counsel's Motion for Award of Attorneys' Fees and Reimbursement of Expenses; and

- Class Plaintiffs' Motion for Preliminary Approval and supporting materials.

**Background of the Neurontin Litigation**

25.     For purposes of the opinions that I provide in this case, I assume the truth of the statements made in the materials provided to me.  I also recognize that this Court obviously has a far more extensive and detailed familiarity with the proceedings and factual development of this case than I.

26.     The procedural background and factual development of the litigation are well chronicled in previous decisions of this court concerning class certification, the First Circuit Court of Appeals' decision on class certification and summary judgment, and the submissions in connection with the proposed settlement.  I do not repeat that background here.  I do note several aspects of this case, and class counsel's efforts, that strike me as particularly important for purposes of evaluating their fee application.

27.     *First, class counsel have deep experience with cases involving pharmaceutical marketing, complex litigation, and unique experience from their involvement in the Franklin* qui tam *action.*  Class counsel's accumulated expertise and tenacity made them uniquely qualified to prosecute this case and bring this settlement to fruition.

28.     *Second, this case was extremely complicated and challenging.*  It required class counsel to synthesize and understand highly technical material (scientific evidence of a drug's efficacy for multiple indications), and to translate that understanding into viable legal claims, all in a challenging and changing landscape for class actions, mostly particularly class cases involving aggregate proof.

29.     *Third, the efforts of class counsel have effectuated not only significant monetary relief, but also shone a bright light on drug industry practices not well understood by the courts, the medical community, and the public.*  Tenaciously constructing a record of the marketing of a

7

narrowly approved drug that came to be a blockbuster, class counsel have provided the type of service to the public that complex cases, when they are fully litigated, can allow – a better understanding of corporate practices in an important part of our economy.

30.     *Fourth, this litigation presented risks that are seldom found in even major, complex civil class litigation.*  Not only did class counsel have no roadmap from other pharmaceutical marketing cases, they persevered for a decade through numerous litigation setbacks throughout the years.  This background makes a settlement of this magnitude a remarkable achievement.

**Common Benefit Doctrine**

31.     The common benefit doctrine applies in this context.  The doctrine, which was recognized by the United States Supreme Court almost a century before present Rule 23's promulgation, ensures that those who do work – in this case, class counsel – that creates a recovery for others are entitled to fair recompense and compensation for their efforts, a point underscored by the contingent and risky nature of the work undertaken in a case like this.

32.     The jurisprudence concerning common benefit recoveries by contingent fee lawyers has been very extensive and advanced.  By virtue of years of refinement, practical experience, and exhaustive academic and judicial consideration (some of which I was involved with, most notably, perhaps, the Report of the Task Force to Study Court Awarded Attorneys' Fees in Class Actions established by the United States Court of Appeals for the Third Circuit) certain principles have become well established.

33.     Most significantly, the interests of all involved -- the parties, particularly claimants, but even defendants and the court system -- are most efficiently and effectively advanced by awarding common benefit attorneys an amount based upon a percentage of the recovery obtained and made available to claimants.  The primary alternative measure, looking to

hours employed (the "lodestar" method), is defective and undesirable because it places plaintiffs and their counsel at cross purposes by creating a disincentive for plaintiffs' counsel to settle cases until they had expended more hours on the matter than may have been necessary, encouraged excessive time expenditures and unproductive activities by counsel, and ultimately may have led plaintiffs' counsel to engage in practices that often did not further the resolution of the litigation.

34.    The percentage method of awarding attorneys' fees puts the lawyer and the client on a plane of common direction, and, from an efficiency and rationality perspective, lines up the interests of both of them, by trying to replicate the legal marketplace relating to compensating contingent fee lawyers.  In setting a fee for a common benefit effort, it also is important, as many courts have stated, to attempt to replicate the legal marketplace and, in part, to mirror a reasonable relationship between attorney and client.  In my experience of testifying and lawyering regarding fee matters, in a contingency fee personal injury case, whether mass tort or otherwise, the marketplace contingency fee contract generally would be a third or forty percent and could be even higher.

35.    Since the time of the 1985 Third Circuit Task Force Report, there effectively has been a revolution across the country with a clear majority of circuit courts of appeals, a majority of the federal district courts in the circuits, and a vast majority of state courts, returning to or revalidating the longstanding percentage approach to awarding attorneys' fees for common benefit work that antedated the emergence of the relatively short-lived lodestar method.  As the Federal Judicial Center's *Manual for Complex Litigation, Fourth* ("*Manual*"), summarized, "After a period of experimentation with the lodestar method … the vast majority of courts of

appeals now permit or direct district courts to use the percentage-fee method in common fund cases." § 14.121 (2004) (citations omitted).

36.     Beginning with the publication in 1985 of the *Third Circuit Task Force on Court Awarded Attorney Fees Report*, the lodestar approach has been rejected by the vast majority of courts in the country that have dealt with the questions of fee calibration or at most used as a "cross-check" on the proposed percentage.  There has come to be a recognition that the lodestar method "is a source of many problems and has been widely condemned."  Charles Silver, *Unloading the Lodestar: Toward a New Fee Award Procedure*, 70 Texas L. Rev. 865, 867 (1992).  The Third Circuit Task Force described the lodestar method as a "cumbersome, enervating and often surrealistic process of preparing and evaluating fee petitions that now plagues the Bench and Bar" and criticized it for being "insufficiently objective," for "encouraging lawyers to engage in duplicative and unjustified work, [to] inflate their 'normal' billing rate[s], and [to] include fictitious hours," for "creat[ing] a disincentive for early settlement of cases," and for being confusing and unpredictable.  *Third Circuit Task Force, Court Awarded Attorney Fees* 8-20 (Oct. 8, 1985), reprinted at 108 F.R.D. 237, 241-258 (1985).

37.     The prestigious Federal Courts Study Committee reiterated these complaints, stating that the lodestar method "unduly burdens judges" by forcing them to act as regulators and by encouraging litigation over alleged fee-padding.  *Report of the Federal Courts Study Committee* 104 (April 2, 1990).  The *Manual for Complex Litigation Fourth* (2004), which distills the experience federal judges have had managing difficult cases, states that " [i]n practice, the lodestar method is difficult to apply, time-consuming to administer, inconsistent in result, and capable of manipulation to reach a predetermined result" and "creates inherent incentive to prolong the litigation until sufficient hours have been expended."  *Manual*, § 14.121.  As an

alternative to the lodestar method, the Federal Courts Study Committee recommended that

judges explore the possibility "of basing fee awards . . . on a percentage of the recovery

obtained." *Report of the Federal Courts Study Committee*, at 105. The Third Circuit Judicial

Conference, in *Update on Third Circuit Fee Task Force Report on Court Awarded Attorneys*

*Fees* 10 (Sept. 13, 1991) (quoted in A. Conte, *Attorney Fee Awards* § 2.07, at 44-45 (Supp.

1996)), made the same recommendation the following year, stating that:

> [t]he percentage method clearly has a number of advantages,
> including that it is relatively objective, can be easily administered
> by the courts, will simplify the fee setting process, and will not
> place a possible premium on running the hourly meter. It better
> aligns the financial interest of the client with that of the lawyer. It
> uses economic based incentives, rather than court-imposed, after-
> the-fact controls to regulate fees.

38.     This view has been widely endorsed by courts. For example, in *Bussie v.*

*Allmerica Fin. Corp.*, 1999 U.S. Dist. LEXIS 7793 (D. Mass. May 19, 1999), the Court held that

the percentage "method of calculating fees more appropriately aligns the interests of the class

with the interests of class counsel -- the larger the value of the settlement, the larger the value of

the fee award." *Id.* at *5 (internal quotation and citation omitted); *see also Kirchoff v. Flynn*, 786

F.2d 320, 325-326 (7th Cir. 1986) (holding that the percentage method "automatically aligns

interests of lawyer and client, rewards exceptional success, and penalizes failure"). In contrast,

as the Second Circuit noted, "district courts found that [the lodestar method] created a temptation

for lawyers to run up the number of hours for which they could be paid.... created an

unanticipated disincentive to early settlements.... [and] resurrected the ghost of Ebenezer

Scrooge, compelling district courts to engage in a gimlet-eyed review of line-item fee audits."

*Goldberger v. Integrated Res.*, 209 F.3d 43, 48-49 (2d Cir. 2000) (internal citations omitted).

*See also In re Unisys Corp. Retiree Medical Benefits ERISA Litig.*, 886 F. Supp. 445, 457-460

(E.D. Pa. 1995) (criticizing lodestar method, and stating preference for fee to be established at

the outset of the litigation to "infuse simplicity, certainty, and fairness into the attorneys' fee

process"). In 2012, the Fifth Circuit Court of Appeals explicitly endorsed the percentage

method, bringing all of the Courts of Appeals into unanimity on this approach. *See Union Asset*

*Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 643 (5th Cir. 2012).

39.     Moreover, every leading scholar of the economics of litigation who has studied

the matter has condemned the lodestar approach. As summarized by highly regarded Professor

John C. Coffee, Jr., the percentage method is the ***only*** reasonable way to measure fees:

> If one wishes to economize on the judicial time that is today
> invested in monitoring class and derivative litigation, the highest
> priority should be given to those reforms that restrict collusion and
> are essentially self-policing. The percentage of the recovery fee
> award formula is such a "deregulatory" reform because it relies on
> incentives rather than costly monitoring. Ultimately, this
> "deregulatory" approach is the only alternative.

Coffee, *Understanding the Plaintiffs' Attorney: The Implications of Economic Theory for Private*

*Enforcement of the Law through Class and Derivative Actions*, 86 Colum. L. Rev. 669, 724-725

(1986). *See also* Jonathan R. Macy & Geoffrey P. Miller, *The Plaintiffs' Attorney Role in Class*

*Action and Derivative Litigation, Economic Analysis and Recommendations for Reform*, 58 U. of

Chi. L. Rev. 1, 4, 59-61 (1991); Silver, *supra*, at 868ff. (citing authorities); Charles Silver, *Due*

*Process and the Lodestar Method: You Can't There From Here*, 74 Tulane L. Rev. 1809 (2000).

40.     The "use of the percentage of fund method in common fund cases is the

'prevailing praxis' in [the First] Circuit for awarding attorneys' fees and permits the Court to

focus on a showing that the fund conferring a benefit on the class resulted from the lawyers

efforts." *In re Relafen Antitrust Litig.*, 2004 U.S. Dist. LEXIS 28801, at 20 (D. Mass., April 9,

2004), citing *In re Thirteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litig.*,

56 F. 3d 295 (1st Cir. 1995). Thus, the First Circuit and several district courts in this Circuit

have approved the use of the percentage of fund method in common fund cases when a pool of

money is to be divided among class members. *Id.* at 307 (approving the percentage of fund approach as an acceptable method); *In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 78-79 (D. Mass. 2005) (approving use of percentage of fund and collating cases); *In re Lupron Marketing and Sales Practices Litig.*, 2005 U.S. Dist. LEXIS 17456 (D. Mass. Aug. 17, 2005) (approving pharmaceutical settlement and fee based on percentage of the fund); *New Eng. Carpenters Health Benefits Fund v. First Databank*, 2009 U.S. Dist. LEXIS 68419 (D. Mass. Aug. 3, 2009) (same); *Bussie v. Allmerica Fin. Corp.*, 1999 U.S. Dist. LEXIS 7793 (D. Mass. May 19, 1999) (Gorton, J.); *In re Centennial Techs. Litig.*, 20 F. Supp. 2d 119 (D. Mass. 1998) (Keeton, J.). In *In re Thirteen Appeals*, 56 F.3d 295, the First Circuit held that "in a common fund case the district court, in the exercise of its informed discretion, may calculate counsel fees either on a percentage of the fund basis or by fashioning a lodestar." 56 F.3d at 307 (noting that "in complex litigation -- and common fund cases, by and large, tend to be complex -- the [percentage of fund] approach is often less burdensome to administer than the lodestar method" and recognizing that "using the [percentage of fund] method in a common fund case enhances efficiency, or, put in the reverse, using the lodestar method in such a case encourages inefficiency" because "attorneys . . . have a monetary incentive" to bill as many hours as possible, and there is "a strong disincentive to settlement").

### A One-Third Fee Is Squarely Within the Range of Comparable Fee Awards

41.     Particularly for a case of this duration and complexity, an award of one-third of the common fund would represent no departure from the range of fee awards in comparable cases.

42.     In 1996, the Federal Judicial Center studied all class actions resolved or settled over a two-year period in four selected federal district courts (the Eastern District of Pennsylvania, the Northern District of California, the Southern District of Florida, and the

Northern District of Illinois). These districts were chosen because each had substantial experience with, and a high volume of, class actions. The Study found: "Median rates ranged from 27% to 30%. Most fee awards in the study were 20% and 40% of the gross monetary settlement." There was little variation among the district courts; each seemed to award counsel fees within the same 20% to 40% band.

43.    The results of other empirical studies have led to similar conclusions. The Eisenberg and Miller study of class actions, citing a study of 656 shareholder class actions that were settled, dismissed, or resolved by a jury verdict, noted a "remarkable uniformity in [fee] awards between roughly 30% to 33% of the settlement amount." *See* Theodore Eisenberg & Geoffrey Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 Journal of Empirical Legal Studies 27, 31 (2004), at p. 33. Updating their study in 2010 to include class action settlements from 1993-2008, Professors Eisenberg and Miller found that the mean percentage fee awarded in high-risk consumer class actions during this time period was 31.8%. *See Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008*, 7 Journal of Empirical Legal Studies 248, 265 (2010).

44.    In *In re: Lucent Technologies, Inc., Securities Litig.*, 327 F. Supp. 2d 426, 441 (D.N.J. 2004), the court set forth a table citing twelve federal case orders in which recoveries ranged from $104 million to $193 million, and the fee awards ranged from 25% to 36%. 327 F. Supp. 2d at 441. *See also Vizcaino v. Microsoft Corp.*, 290 F.3d 1043 (9th Cir. 2002) (collecting percentage fee awards in common fund cases ranging from $50-$200 million, and affirming the district court's award of 28% fee on $96.8 million common fund).

45.    Common benefit fees higher than 30%, even in large dollar cases, are many. A few examples would include the following:

| CASE | FUND VALUE | PERCENTAGE AWARD |
|---|---|---|
| Allapattah[1] | $1.065 billion | 31.33% |
| IPO[2] | $510 million | 33.33% |
| Overdraft Litigation (Bank of America)[3] | $410 million | 30% |
| Vitamins[4] | $365 million | 34.6% |
| Buspirone[5] | $220 million | 33.33% |
| HealthNet[6] | $215 million | 32% |
| Linerboard[7] | $202.5 million | 30% |
| Petroleum Products[8] | $140 million | 30% |
| Informix[9] | $132 million | 30% |
| Combustion[10] | $125 million | 36% |

46.     A requested 33 1/3 "percent of fee award is well within the applicable range of percentage fund awards" in this district. *In re Relafen Antitrust Litig.*, 2004 U.S. Dist. LEXIS 28801, at *21 (D. Mass.  Apr. 9, 2004) (citing *Mowbray v. Waste Management Holdings*, C.A. No. 98-11534-WGY (D. Mass. August 2, 2001) (awarding 33 1/3%)).

47.     Indeed, Massachusetts district courts, including in pharmaceutical matters, have awarded percentage fee amounts identical or similar to the one being requested in this case.

**Massachusetts Fee Cases**

| CASE | FUND VALUE | PERCENTAGE AWARD |
|---|---|---|
| San Juan duPont Fire Litig.[11] | $220 million | 30% |

[1] *Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006).
[2] *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467 (S.D.N.Y. 2009).
[3] *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330 (S.D. Fla. 2011).
[4] *In re Vitamins Antitrust Litig.*, 2001 U.S. Dist. LEXIS 25067 (D.D.C. July 16, 2001).
[5] *In re Buspirone Antitrust Litig.*, 2003 U.S. Dist. LEXIS 26538 (S.D.N.Y. Apr. 11, 2003).
[6] *McCoy v. HealthNet, Inc.*, 569 F. Supp. 2d 448 (D.N.J. 2008).
[7] *In re Linerboard Antitrust Litig.*, 2004 U.S. Dist. LEXIS 10532 (E.D. Pa. June 2, 2004).
[8] *In re: Coordinated Pretrial Proceedings in Petroleum Products Litig.*, MDL-150 AWT, 1994 WL 675265 (C.D. Cal. Aug. 11, 1994).
[9] *In re Informix Corp. Secs. Litig.*, 1999 U.S. Dist. LEXIS 23579 (N.D. Cal. Nov. 23, 1999).
[10] *In re Combustion, Inc.*, 968 F. Supp. 1116 (W.D. La. 1997).

| CASE | FUND VALUE | PERCENTAGE AWARD |
|------|-----------|------------------|
| Relafen Direct Rx Purchaser Action[12] | $175 million | 33 1/3% (plus $1.7 million expenses) |
| Relafen Indirect Rx Purchaser Action[13] | $67 million | 33 1/3% (plus $1.3 million expenses) |
| Lupron Class Endpayor Rx Litigation[14] | $95 million | 30% (inclusive of expenses) |
| AWP GSK Action[15] | $70 million | 33% (inclusive of expenses) |

48.     I am aware of the argument that fee recoveries in "mega-fund" matters should decline as the size of the fund increases above a certain point. In my view, this argument should be rejected for the following reasons:

(a)     In today's world, recovery of $325 million on a claim intensely litigated for over many years at great risk is not properly categorized -- let alone deprecated -- as a "mega-fund" for purposes of determining what is a proper fee award. That is far too simplistic. The only rational basis for reducing percentages at the top ends of very high recoveries is the avoidance of a windfall because a case had relatively little risk or counsel invested comparatively modest time and effort. There simply can be no windfall in the case before the Court. Accordingly, the so-called "mega-fund" approach is not appropriate for this case;

(b)     There is no rule of law in this Circuit, or elsewhere, requiring that a district court reduce fee petitions simply because there is a large award. The cases I have cited all involve substantial amounts of money, but they resulted in fee awards comparable to that sought in this case.

---

[11] *In re Thirteen Appeals Arising Out of the San Juan duPont Fire Litig.*, 56 F.3d 295 (1st Cir. 1995).
[12] *In re Relafen Antitrust Litig.*, 231 F.R.D. 52 (D. Mass. 2005) (Young, J.).
[13] *Id.*
[14] *In re Lupron Marketing and Sales Practices Litig.*, No. 01-10861-RGS (D. Mass. Aug. 17, 2005). (Stearns, J.) [Doc. No. 455].
[15] *In re Pharm. Indus. Average Wholesale Price Litig.*, No. 01-12257-PBS (D. Mass. Aug. 7, 2007) (Saris, J.) [Doc. No. 4619].

(c)    The size of the settlement, logically and pragmatically, should not be an indicator of whether a percentage common benefit fee is appropriate since it is not an index of the risks assumed by the attorneys, the rigors of the case, or the quality of the results achieved for the benefit of the claimants. In numerous cases there have been large settlements in which the fees awarded are in the 30% to 36% range. In fact, this is so even when there have been recoveries in the hundreds of millions of dollars, as the cases I list above demonstrate.

(d)    The Manual for Complex Litigation does not advocate for any particular approach to common fund cases; instead, it chronicles the approaches of various courts in fee decisions in common fund cases, and in doing so observed that in the Third Circuit mega-fund matters might warrant a reduction of the percentage of fee. However, the Third Circuit more recently observed that "district courts in this Circuit have declined to follow this court's statement of the range in In re Prudential, stating that 'the cases cited in [*In re Prudential*] were all decided at least thirteen years ago.'" *Welch & Forbes, Inc. v. Cendant Corp.* (*In re Cendant Corp. Prides Litig.*), 243 F.3d 722, 736 (3d Cir. 2001), quoting *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 196 (E.D. Pa. 2000) and citing *In re Orthopedic Bone Screw Prod. Liab. Litig.*, 2000 U.S. Dist. LEXIS 15980, 2000 WL 1622741, at *7 (E.D. Pa. Oct. 23, 2000). The Third Circuit also observed that "in another *Cendant* opinion dealing with attorneys' fees, this same District Court stated that, in cases surveyed by lead counsel, 'awards . . . ranged from a low of 20% in the case with a $200 million recovery to a high of 33.3% for cases with recoveries of $77.5 million and $110 million.'" *Welch & Forbes, Inc.*, at 726, citing *In re Cendant Corp. Sec. Litig.*, 109 F. Supp. 2d 285, 290 (D.N.J. 2000). The Third Circuit's position therefore is best stated in these terms: "[t]hese varying ranges of attorneys' fees confirm that a district court

may not rely on a formulaic application of the appropriate range in awarding fees but must consider the relevant circumstances of the particular case." *Id.*

        (e)     The recent trend appears to be away from reducing the fee percentage when there is a very large recovery. Many courts consider it a disincentive to plaintiffs to push harder or litigate longer to obtain the largest recovery they can for their clients. Examples are: *In re Linerboard Antitrust Litig.*, 2004 WL 1221350 (E.D. Pa. 2004) (granting a flat 30% fee based on a recovery of $202 million; finding that ". . . the sliding scale approach is economically unsound"; and agreeing with the Seventh Circuit that "reducing fees for large awards is economically irrational"); *In re Ikon Office Solutions, Inc. Securities Litig.*, 194 F.R.D. 166 (E.D. Pa. 2000) (awarding a flat fee of 30% of a $111 million common fund and finding that diminishing fee percentages on increasing recoveries "tends to penalize attorneys who recover large settlements"); *Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1213 (S.D. Fla. 2006) (awarding a 31 1/3% fee of a recovery of $1.065 billion, and holding: "While some reported cases have advocated decreasing the percentage awarded as the gross class recovery increases, that approach is antithetical to the percentage of the recovery method adopted by the Eleventh Circuit in Camden, the whole purpose of which is to align the interests of the Class Counsel and the Class by awarding counsel in proportion to the results obtained ...."); and *In re Synthroid Marketing Litig.*, 264 F.3d 712 (7th Cir. 2001) (reversing as economically irrational a fee award that applied the reduced rate to the entire recovery, not just the portion above a "mega-fund" benchmark).

        (f)     Decreasing percentages as awards increase is a disincentive for plaintiffs' counsel to obtain the highest possible recovery. Indeed, it makes more sense to increase fee percentages as the awards increase; certainly in a negotiated situation, common sense indicates it

is far easier to recover the first settlement dollar than the last dollar -- and I think that dollar will be recovered for plaintiffs by diligent, tenacious, and talented counsel and the fee award should reflect that.

### Cross Check To Other Factors

49.     Although the First Circuit has not endorsed a specified set of factors to be used in determining whether a fee request is reasonable, courts in this district have used a familiar litany of factors. *In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 79 (D. Mass. 2005); *In re Lupron Marketing and Sales Practices Litig.*, 2005 U.S. Dist. LEXIS 17456 (D. Mass. Aug. 17, 2005) (Stearns, J.). Those factors include (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases. *Id.*

50.     *The size of the fund created and the number of persons benefited.*  The efforts of class counsel have created a $325 million fund in this case.  Health benefit providers (i.e., the third-party payor entities) have been provided written, direct notice using the notice administrator's proprietary database that has been developed over several notice programs in other third-party payor litigation.

51.     *The presence or absence of substantial objections by members of the class.*  I understand that each class member received written, direct notice of the settlement, including its provision enabling class counsel to seek a fee up to one-third of the settlement fund, and that the deadline for class members to object to this settlement is just over two weeks away.  I understand that to date, of the approximately 40,000 direct notices to class members, only a single class member has submitted an objection.  I understand that objection relates not to the reasonableness

of the settlement or any request for attorneys' fees, but to a specific issue concerning the claims procedures in this matter.

52.     *The skill and efficiency of the attorneys involved.*  Class counsel in this case have handled many other pharmaceutical litigation class action matters, including those overseen by this Court.  Because these lawyers are steeped in the area of pharmaceutical marketing, complex litigation generally, and the marketing of Neurontin specifically, this team of lawyers – which include some who are at the apex of this part of the profession  – was best positioned to work efficiently, and their collective skills are reflected in the size of this settlement.

53.     *The complexity and duration of the litigation.*  I have reviewed, among other materials, this Court's meticulous recounting and analysis of the complex and layered facts and legal theories at issue in its decisions on class certification, summary judgment, and after the Kaiser trial.  These decisions demonstrate the unquestionable complexity of this case.  Moreover, its duration, stretching over ten years, is extraordinary.  It exceeds – by a large margin – the median and mean ages of cases in Professor Fitzpatrick's study, from 2010, of 688 class action settlements filed in 2006 and 2007.  *See* Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 Journal of Empirical Legal Studies 816, 820 (2010).

54.     *The risk of non-payment.*  Class counsel faced off against the largest pharmaceutical company in the world, which had several incentives to fight this case through trial and appeals.  The risk of non-payment before the case began, and during the litigation, after negative rulings from the magistrate judge (on the motion to dismiss) and this Court (on class certification) was genuine and substantial.

55.     *The amount of time devoted to the case.*  The First Circuit does not require a court to cross check the percentage of fund against the lodestar in its determination of the

20

reasonableness of the requested fee. *In re Thirteen Appeals*, 56 F.3d at 307. *See also Vizcaino*, 290 F.3d at 1050 ("While the primary basis of the fee award remains the percentage method, the lodestar may provide a useful perspective on the reasonableness of a given percentage award."); *Manual for Complex Litigation* § 14.122 ("The lodestar is . . . useful as a cross-check on the percentage method by estimating the number of hours spent on the litigation and the hourly rate, using affidavits and other information provided by the fee applicant. The total lodestar estimate is then divided into the proposed fee calculated under the percentage method. The resulting figure represents the lodestar multiplier to compare to multipliers in other cases."). Since it is an optional measure, a lodestar cross check should not become the tail wagging the dog. *See* Theodore Eisenberg & Geoffrey Miller, *Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008*, 7 Empirical Legal Stud. 248, 250 (2010) (recommending that "the overwhelmingly important determinant of the fee is simply the size of the recovery obtained by the class").

56.     In this case, I am advised that class counsel, at usual and customary rates, expended in excess of $27.3 million in time value. I am also advised that the expenses are approximately $4.38 million. A 33.33% fee of $325 million amounts to the fee request of $108.33 million (inclusive of expenses). Using only the time value of the attorneys, this results in a multiplier of 3.97. In reality, the multiplier is somewhat smaller because class counsel will absorb the $4.38 million expended in litigation costs. If this investment is added to the overall lodestar, the multiplier is approximately 3.42.

57.     A multiplier of 3.97 (adjusted to 3.42 for absorbing litigation expenses) is squarely within the range approved by this and other courts. *See Stop & Shop Supermarket Co. v. Smithkline Beecham Corp.*, 2005 U.S. Dist. LEXIS 9705, at *61 (E.D. Pa. May 19, 2005)

(awarding a fee that lodestar cross-checked at higher than 15, but which was reasonable given the overwhelming acceptance by the class); *Vizcaino*, 290 F.3d at 1051 n.6 (charting attorney's fees awards and multipliers in common fund cases of $ 50-$ 200 million from 1996-2001, and noting "a range of 0.6-19.6 with most (20 of 24, or 83%) from 1.0- 4.0 and a bare majority (13 of 24, or 54%) in the 1.5-3.0 range"); *Conley v. Sears Roebuck and Co.*, 222 B.R. 181 (D. Mass. 1998) (awarding multiplier of 8.9).

| CASE | FUND VALUE | MULTIPLIER |
|---|---|---|
| Paxil[16] | $100 million | 15.6 |
| Buspirone[17] | $220 million | 8.46 |
| Cardinal Health[18] | $600 million | 5.9 |
| Roberts (Texaco)[19] | $115 million | 5.5 |
| Enron[20] | $7.2 billion | 5.2 |
| Rite Aid[21] | $193 million | 4.07 |
| WorldCom[22] | $6.133 billion | 4.0 |
| Tricor[23] | $250 million | 3.93 |

58.     The 3.97 multiplier is only a mathematical expression of two positive features of this case -- the efficiency of these lawyers working a demanding, complex matter over a long period, coupled with their extraordinary results of a $325 million fund.

---

[16] *Stop & Shop Supermarket Co. v. Smithkline Beecham Corp.*, 2005 U.S. Dist. LEXIS 9705, at *61 (E.D. Pa. May 19, 2005).
[17] *In re Buspirone Antitrust Litig.*, No. 01-MD-1410 (S.D.N.Y. Apr. 11, 2003).
[18] *In re Cardinal Health Inc. Sec. Litigs.*, 528 F. Supp. 2d 752, 768 (S.D. Ohio 2007).
[19] *Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 198 (S.D.N.Y. 1997).
[20] *Newby v. Enron Corp.*, 586 F. Supp. 2d 732, 791 (S.D. Tex. 2008).
[21] *In re Rite Aid Corp. Sec. Litig.*, 269 F. Supp. 2d 603, 611 (E.D. Pa. 2003).
[22] *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 359 (S.D.N.Y. 2005).
[23] *In re Tricor Direct Purchaser Antitrust Litig.*, 2009 U.S. Dist. LEXIS 133251, at *17 (D. Del. Apr. 23, 2009).

59.     When all this is taken into consideration, and compared with cases of less complexity or achievement but which resulted in multipliers larger than that sought in this case, this fee application cross checks well.

60.     It bears emphasizing that a lodestar "cross check" is just that: an abbreviated effort of looking at an estimate of the time and expenses put into the matter in order to determine whether there would be some gross aberration in the use of the percentage of the fund requested. As I have articulated at length earlier in this declaration, numerous courts have withdrawn from the use of a detailed lodestar analysis, and gravitated towards the percentage fund approach. They have done so precisely because of the problems that might arise if a detailed, rigid lodestar analysis were applied.  In this case, a lodestar cross check -- a term that itself speaks of an abbreviated quick look -- yields results that may be at the higher level as compared to the usual, run of the mill run of cases, but that is lower than some others, and given the unique features of this case, the lodestar cross check in no way calls into question the reasonableness and fairness of the one-third requested award.  In short, a lodestar cross check is intended to be a snapshot to avoid a gross windfall; it is not an invitation to pull out the green eye shades.  It simply seeks to avoid a highly embarrassing disparity between the quality of work and results achieved in light of the number of hours worked.  It is not intended to revive the discredited lodestar method that existed for only a decade.

## Summary of Opinions

61.     I am of the opinion, for the reasons noted above, that the fee for which class counsel seeks approval is reasonable, reflects the marketplace for the services rendered and result achieved, and is fully justified by the jurisprudence governing court awarded fees and matters such as this.  A 33.33% fee of the $325 million fund is particularly reasonable in light of the circumstances of this case.

62.     It seems to me critical for the Court to take into account the risks and front-end investment assumed by plaintiffs' counsel, their willingness to put their own financial resources (to date approximately $4.38 million) on the line with absolutely no guarantee of reimbursement, let alone a fee for their services, and that this element of risk particularly is critical in a case of this magnitude and complexity and duration, in which expenditures of time, money, and other resources obviously are greater.  These magnified risks and the quality of the services performed should be reflected in the fee award when counsel's efforts produce significant benefits for the class, which they unquestionably have.

63.     I also would point out that in setting the fee percentage, the Court also should be cognizant of the effect judicial awards of fees may have on the incentives and predilections of members of the profession who are asked to litigate cases like the one before the Court, and recognize the importance of truly competent plaintiffs' counsel being available to represent and protect the next class of citizens, and the class after that.  Unless marketplace compensation is provided for successful attorneys, the truly competent professional talent will employ their skills in other ways.  There is an obvious truth about the economics of contemporary litigation: The vast majority of Americans and third-party payor entities simply cannot afford to pay for representation on an hourly basis, especially in extremely difficult pharmaceutical cases such as this one, that require the expenditure of enormous time and financial resources to explore the facts and retain relevant experts that are needed to understand a complex and technical matter and therefore, in order to ensure our courts are open to all Americans, the fee award system must protect the contingency fee process.  Similarly, lawyers often cannot assume the incredible risks and make the enormous resource commitments on behalf of individual citizens and most third-party payors, and thus must aggregate claims as was done in this case.

64.    I understand that the settlement dialogue and details from inception to conclusion were supervised by a mediator, and fully disclosed to the Court. I have no reason to think that this settlement was anything other than ethically negotiated and structured and that it is consistent with the ethical guidance provided by the applicable provisions of the Manual for Complex Litigation and instructive jurisprudence such as *White v. New Hampshire*, 455 U.S. 445 (1982).

65.    The procedural history of this litigation shows that class counsel achieved a remarkable result by overcoming numerous obstacles over the years. In short, class counsel's petition for a fee of 33.33% of the $325 million amount recovered is amply justified.

Executed this 12th day of September, 2014

ARTHUR R. MILLER