# EXHIBIT C

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:   NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1629<br><br>Master File No. 04-10981 |

THIS DOCUMENT RELATES TO:

HARDEN MANUFACTURING CORPORATION; LOUISIANA HEALTH SERVICE INDEMNITY COMPANY, d/b/a BLUECROSS/BLUESHIELD OF LOUISIANA; ASEA/AFSCME LOCAL 52 HEALTH BENEFITS TRUST; JAN FRANK WITYK; and GARY VARNAM, on behalf of themselves and all others similarly situated,

     Plaintiffs,

v.

PFIZER INC. and WARNER-LAMBERT COMPANY,

     Defendants.

Chief Judge Patti B. Saris
Magistrate Judge Leo T. Sorokin

## <u>DECLARATION OF BRIAN T. FITZPATRICK</u>

I, Brian T. Fitzpatrick, declare under penalty of perjury under the laws of the United States as follows:

I. <u>Background and qualifications</u>

1.      My name is Brian Fitzpatrick and I am a Professor of Law at Vanderbilt University in Nashville, Tennessee. I joined the Vanderbilt law faculty in 2007, after serving as the John M. Olin Fellow at New York University School of Law in 2005 and 2006. I graduated from Harvard Law School in 2000. After law school, I served as a law clerk to The Honorable Diarmuid O'Scannlain on the United States Court of Appeals for the Ninth Circuit and to The

Honorable Antonin Scalia on the United States Supreme Court.  I also practiced law for several years in Washington, D.C., at Sidley Austin LLP.  My C.V. is attached as Exhibit 1.

2.       Like my research at New York University before it, my teaching and research at Vanderbilt have focused on class action litigation.  I teach the Civil Procedure, Federal Courts, and Complex Litigation courses at Vanderbilt.  In addition, I have published a number of articles on class action litigation in such journals as the University of Pennsylvania Law Review, the Journal of Empirical Legal Studies, and the Vanderbilt Law Review.  My work has been cited by numerous courts, scholars, and popular media outlets (such as the New York Times, USA Today, and Wall Street Journal), and I have been invited to speak at a broad range of symposia about class action litigation.

3.       In December 2010, I published an article in the Journal of Empirical Legal Studies entitled *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud. 811 (2010) (hereinafter "Empirical Study").  This article is what I believe to be the most comprehensive examination of federal class action settlements and attorneys' fees that has ever been published.  Unlike other studies of class actions, which have been confined to securities cases or have been based on samples of cases that were not intended to be representative of the whole (such as settlements approved in published opinions), my study attempted to examine *every* class action settlement approved by a federal court over a two-year period, 2006-2007.  *See id*. at 812-13.  As such, not only is my study an unbiased sample of settlements, but the number of settlements included in my study is several times the number of settlements per year that has been identified in any other empirical study of class action settlements: over this two-year period, I found 688 settlements, including 33 from the First

Circuit alone.  *See id*. at 817.  This study has been relied upon by a number of courts, scholars, and testifying experts.[1]

4.      I have been asked to examine whether the attorneys' fees requested by class counsel are supported by the existing data on fee awards in other class action cases.  In order to formulate my opinion, I reviewed a number of documents provided to me by class counsel.[2]  As I explain, based on my own empirical study of settlements across the country as well as other empirical studies of class action settlements, I believe the request here is supported by the data.

II. <u>Case background</u>

5.      This lawsuit was brought some ten years ago on behalf of third parties (such as insurance companies) who paid for a pharmaceutical product manufactured by the defendant called Neurontin.  The lawsuit alleges that the defendant fraudulently induced doctors to prescribe Neurontin in violation of the federal RICO statute and state fraud laws.  The lawsuit was denied class certification and largely dismissed on summary judgment, but, after the U.S. Court of Appeals for the First Circuit reversed these decisions, the parties reached a settlement

---

[1] *See*, *e.g.*, *Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956, 958 (7th Cir. 2013) (relying on article to assess fees); *Tennille v. W. Union Co.*, 2014 WL 4723805, at *3 (D. Colo., Sept. 23, 2014) (same); *In re Colgate-Palmolive Co. Erisa Litig.*, 2014 WL 3292415, at *4 (S.D.N.Y., July 8, 2014) (same); *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 2014 WL 92465, at *5-*6 & n.8 (E.D.N.Y., Jan. 10, 2014) (same); *In re Federal National Mortgage Association Securities, Derivative, and "ERISA" Litigation*, 2013 WL 6383000, *11-*12 (D.D.C., Dec. 6, 2013) (same); *In re Vioxx Products Liability Litigation*, 2013 WL 5295707, at *3-4 (E.D. La., Sep. 18, 2013) (same); *In re Black Farmers Discrimination Litigation*, 953 F.Supp.2d 82, 98-99 (D.D.C. 2013) (same); *In re Southeastern Milk Antitrust Litigation*, 2013 WL 2155387, at *2 (E.D. Tenn., May 17, 2013) (same); *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1081 (S.D. Tex. 2012) (same); *Pavlik v. FDIC*, 2011 WL 5184445, at *4 (N.D. Ill. Nov. 1, 2011) (same); *In re Black Farmers Discrimination Litig.*, 856 F. Supp. 2d 1, 40 (D.D.C. 2011) (same); *In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*, 792 F. Supp. 2d 1028, 1033 (N.D. Ill. 2011) (same); *In re MetLife Demutualization Litig.*, 689 F. Supp. 2d 297, 359 (E.D.N.Y. 2010) (same).

[2] These included: the settlement agreement, the memoranda of law in support of the motion for final approval of the settlement and the application for attorneys' fees, the affidavits of Arthur R. Miller, Thomas M. Sobol, and Thomas M. Greene in support thereof, the court's findings of fact and conclusions of law from the bellwether trial, and the two First Circuit opinons.

for $325 million in cash.  On July 25, 2014, the court preliminarily approved the settlement and certified both a settlement class and a settlement subclass.  The class has now moved the court for an award of fees equal to 33.33% of the settlement (inclusive of $4.38 million of expenses).

III. Assessment of the reasonableness of the request for attorneys' fees

6.      I've been advised by class counsel that the court at the fairness hearing orally endorsed the so-called "percentage" method to award fees in this case.  I believe that this reflects sound judgment.  In common fund class actions like this one, the percentage method has now overwhelmingly replaced the lodestar method as the preferred approach to awarding fees, *see* Fitzpatrick, *Empirical Study*, *supra*, at 832 (finding the lodestar method used in only 12% of all settlements and usually in fee-shifting cases), and it is perfectly consistent with First Circuit law, *cf. In re Thirteen Appeals Arising out of the San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295 (1995).

7.      Under the percentage approach, courts select a percentage that they believe is fair to class counsel, multiply the settlement amount by that percentage, and then award class counsel the resulting product.  When deciding what percentage they believe is fair, courts are essentially trying to assess what class members would want if class members were in a position to negotiate fees with class counsel.  *See, e.g., In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001) ("[T]he district court must estimate the terms of the contract that private plaintiffs would have negotiated with their lawyers . . . .").  One way courts have looked at this endeavor is as an attempt to mimic the market for attorneys' fees.  *See id.*  In most cases—cases where class members have only very little at stake individually—I am pessimistic about the ability of courts to mimic the market because there is no market of small claims to mimic, and, even if there was one, no easy way to assess how to discount rates in the individual market for the economies of

scales that exist in class actions.  Moreover, in these cases class members have so little at stake that they cannot be expected to voice their views on the matter when they are given the chance to object at the settlement stage.  In most cases, then, courts usually go on to consider other factors altogether when deciding what percentage they believe is fair.  *See* Fitzpatrick, *Empirical Study, supra*, at 832.  In this case, however, I think it is possible to know what sort of attorneys' fees class members would negotiate because this is not a small-stakes class action; it is a big-stakes class action comprised of some of the largest insurance companies in the United States.  Many of these class members negotiated their own fees arrangements in this case and I understand from class counsel that these arrangements are in line with the percentage class counsel requested here (indeed, in the case of the Assurant Plaintiffs, I understand the agreements call for attorneys' fees of 30% even if the court awards a lower percentage).  *See In re Synthroid Mktg. Litig.*, 264 F.3d at 719-20 (instructing district court to consider the retainer agreements between large third-party payer class members and their attorneys).  Moreover, all of these class members were given a right to object to the fee requested here, and, despite having every incentive to do so, none has. In these circumstances, I think the court is perfectly justified in deferring to the opinion of the large, sophisticated class members here that 33.33% is acceptable.  Courts are instructed to do the same with regard to the large, sophisticated pension fund lead plaintiffs in securities fraud class actions.  *See, e.g., In re Cendant Corp. Litig.*, 264 F.3d 201, 282 (3d Cir. 2001) ("[U]nder the PSLRA, courts should accord a presumption of reasonableness to any fee request submitted pursuant to a retainer agreement that was entered into between a properly-selected lead plaintiff and a properly-selected lead counsel.").

8.      Class counsel have nonetheless asked me to examine how the fee request in this case compares to fee percentages awarded in similar cases, even cases without large,

sophisticated class members like this one.  When courts in the First Circuit do go on to consider other factors under the percentage method, this is often one of them.  *See, e.g., In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 79 (D. Mass. 2005) (examining "awards in similar cases").  As I explain, I believe the data on fee percentages in similar cases supports the 33.33% request here.

9.      As a first cut, let me begin with the broadest universe of similar cases: all class action cases.  In my study,[3] nearly two-thirds of class action fee awards using the percentage method fell between 25% and 35%, with the most common percentages equal to 25%, 30%, and 33%.  *See* Fitzpatrick, *Empirical Study, supra,* at 833-34, 838.  The award requested here is in line with these numbers.[4]  This is depicted graphically in Figure 1, which shows the distribution of all of the percentage-method fee awards in my study.  In particular, the figure shows what fraction of settlements (y-axis) had fee awards within each five-point range of fee percentages (x-axis).  As the figure shows, the most populous range—the one comprising over thirty percent (i.e., .3) of all settlements—included fee awards that fell between 30% (inclusive) and 35%.

---

[3] Unless I note otherwise, all of the numbers from my study that I report in this declaration are consistent with the two other large-scale academic studies of fee awards.  *See* Theodore Eisenberg and Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. Empirical Legal Studies 27 (2008); Theodore Eisenberg & Geoffrey P. Miller, *Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. Empirical L. Stud. 248 (2010).

[4] Indeed, it is even slightly more in line with these numbers than it may at first appear because the fee percentage numbers in my study were calculated *exclusive* of expenses; by contrast, the 33% request here is *inclusive* of expenses.  As a percentage of the settlement exclusive of expenses, class counsel here are requesting approximately 32% in fees.

**Figure 1: Percentage-method fee awards among all federal courts, 2006-2007**



10.       It should be noted that, although over thirty percent of all fee awards fell between 30% and 35% in my study, the mean and median awards were 25.4% and 25%, respectively. (The numbers for fee awards only from the First Circuit were similar, with a mean of 27% and a median of 25%, *see* Fitzpatrick, *Empirical Study, supra*, at 836.)   The request in this case exceeds both the mean and the median.  Does that suggest it is unsupported by the data?  I do not think so.  As Figure 1 shows, the data on fee percentages is distributed over a broad range. Although the mean and median are very useful tools for characterizing some types of information about a distribution of data, they are woefully incomplete.  (For example, radically different data distributions could have the exact same means and medians.)

11.     Another tool that scholars use to more completely characterize data is the standard deviation.  The standard deviation can provide some sense of how "close" a given point is to the mean—whether a given point is within the same statistical "ballpark" as the mean, so to speak. For example, empirical legal scholars have subscribed to the following rules of thumb for fee percentages in class action cases:

> [F]ee requests falling within one standard deviation above or below the mean should be viewed as generally reasonable and approved by the court unless reasons are shown to question the fee.  Fee requests falling within one and two standard deviations above or below the mean should be viewed as potentially reasonable but in need of affirmative justification.  Fee requests falling more than two standard deviations above or below the mean should be viewed as presumptively unreasonable; attorneys seeking fees above this amount should be required to come forward with compelling reasons to support their request.

Theodore Eisenberg and Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. Empirical Legal Studies 27, 74 (2004).  In my empirical study, the standard deviation for all percentage-method fee awards was 7.5%.  (For First Circuit cases alone, it was 6.0%.)  The fee request here is therefore within one standard deviation of the mean, and, therefore, under the Eisenberg-Miller model, should be seen as presumptively reasonable.  As I saw nothing in the materials that I reviewed for this case to give me any reason to question the quality of this settlement and the work class counsel performed to deliver it—indeed, as I explain below, quite the contrary—the fee request here is supported by the first cut of the data.

12.     But suppose we wanted to drill down and find the universe of cases that are even more similar to the case here in order to make the comparison under the percentage method. How might we do that?  It is not obvious.  As everyone learns in the first year of law school, cases are both similar to one another and different from one another in any number of ways.  One cannot separate the relevant similarities from the irrelevant ones without interjecting value judgments about what should be important to fee awards and what should not.  For example, we

might look for all other RICO class actions; all class actions against pharmaceutical companies; all class actions as risky as this one; all class actions as hard fought as this one; all class actions as successful as this one; all class actions with all these qualities or all class actions with some combination of them.  Or we might look for cases with another set of similarities altogether.  The answer depends on what we want fee awards to accomplish.

13.     In my opinion, when we cannot or do not wish to recreate the market, we should set fee awards in order to provide class action lawyers with the best incentives to maximize value for the class.  It is the lawyers who solely determine whether or not to assume the risks of filing and going forward in any particular case and we should set fee awards to make sure they make good decisions for the class.  Accordingly, in my opinion, the most important similarity to focus upon when building a universe of similar cases is how successful class counsel were for the class.  Did class counsel sell out the class or fight for every last dollar?  The better deal class counsel won for the class in light of the risks of going forward, the better the share of the deal class counsel should receive.  This gives class action lawyers the right incentives: they know the better job they do for the class, the better compensated they will be.  Unfortunately, however, it is difficult to compare cases along this metric.  I know of no way to quantify the risks class counsel faced in any given case.  Moreover, although it would be possible to quantify how much of the class's damages class counsel recovered in any given case, I did not make such calculations in my empirical study (although, as I explain below, I went back to my data to try to make as many of them as I could in order to aid the court here).  Indeed, I know of only one set of studies (albeit non-academic) that does report this data: the studies of securities fraud class actions by NERA Consulting.  According to these studies, *see, e.g., Recent Trends in Securities Class Action Litigation: 2013 Full-Year Review*, *available at* http://www.nera.com/content/dam/

nera/publications/archive2/PUB_2013_Year_End_Trends_1.2014.pdf, the median securities fraud class action between 1996 and 2013 settled for between 1.3% and 7.0% of investor losses (an admittedly imperfect measure of damages, *see id.* at 8) depending on the year, *see id.* at 33. The recovery in this settlement is over 50% of the class's damages as calculated by the class's expert Raymond Hartmann. As such, it obviously compares exceptionally well to the NERA studies. Indeed, in my own experience as an expert (which is almost entirely outside securities fraud cases) the percentage recovery in this case is unusually high.

14.     An indirect way to get at whether class counsel sold out the class or fought for every last dollar is to look at how much time and effort class counsel put into the case before settling. I think courts should be careful not to emphasize these factors too much because they can give class action lawyers incentives to inefficiently litigate cases instead of maximizing recovery for the class (or, conversely, penalize lawyers for an exceptional yet quick settlement), but I believe some ways of doing this are better than others and the better ones can be a useful way to compare cases. For example, I usually shy away from considerations of class counsel's lodestar because it incentivizes class action lawyers to manipulate the numbers, hire contract attorneys, and inefficiently staff cases, but I am less concerned with looking at how long class counsel litigated a case before settlement (because contingency-fee lawyers are not keen on delaying the point at which they will get paid) and at what types of litigation events took place (discovery, trials, appeals, etc.) to get a sense of what sort of advocate class counsel was in any given case. I did not record the latter information in my empirical study (although, as I explain below, I went back to my underlying data to try to do so in an effort to aid the court here), but I did record the former information. Yet again, this case compares exceptionally well to most other class action cases: class counsel fought this case for over 10 years before settling, whereas

the lawyers in the average and median cases in my study did so for only 3 years.  *See* Fitzpatrick, *Empirical Study, supra*, at 820.  Indeed, *of all 688 class action settlements* in my study, only *three* lasted as long as this one has.

15.       It should be noted that judges more often examine something else when they try to identify the universe of similar cases under the percentage method: the dollar magnitude of the settlement.  Courts rarely explain why they do this, but I think it is because they are concerned about the public perception of big fee awards.  Accordingly, on average, courts tend to award smaller fee percentages in larger settlements.  *See* Fitzpatrick, *Empirical Study, supra*, at 837-38.  My own wish is that courts would not do this any longer (and instead focus, as I did above, on the dollar magnitude of the settlement as a percentage of the class's damages—big settlements can be very good or very bad depending on how much the class lost in the first place) because it creates terrible incentives for class action lawyers: if class action lawyers believe they will receive a smaller share of larger settlements, then it can be entirely rational to undersettle cases.  Consider the following example: suppose class counsel could settle a case for $200 million and receive a 33% fee award or settle a case for $300 million but receive a 20% fee award.  Class counsel would rather settle such a case for $200 million (and a $66 million fee award) than $300 million (and a $60 million fee award).  That is the very definition of perverse incentives.  Perhaps class counsel would have the resolve never to put their own interests before the class's like this.  Or perhaps courts would always stop them if they did.  But I think it is easy to see why it would be better for everyone involved (except, perhaps, defendants) if class counsel never had this temptation in the first place.  I am happy to say that in all of the settlements for which I have served as an expert, courts have been persuaded not to lower the fee percentage because the

settlement was a big one.  Instead, the courts focused on what fraction of the class's damages the settlement recovered.[5]

16.     But class counsel here have asked me to examine their fee request in light of the data on large settlements in particular.  I have done so, and I still think the fee request here is supported by the data.  As I reported in my empirical study, for settlements between $250 million and $500 million, the mean fee award in cases using the percentage method was 17.8% and the standard deviation 7.9%.  *See* Fitzpatrick, *Empirical Study, supra*, at 839.  Although the fee request here therefore exceeds the mean for settlements of this dollar range and is greater than one standard deviation from the mean, it is within two standard deviations from the mean.  As such, according to Eisenberg-Miller model, the fee request here is neither presumptively reasonable nor presumptively unreasonable.  Rather the fee request here can be supported if the settlement here is better than most other large cases.

17.     How do we decide whether the fee request is better than most other large cases?  I would fall back on the consideration I discussed above: what kind of deal did class counsel win for the class in light of the risks presented?  Using the metrics I identified above—recovery percentage, duration of litigation, and litigation events—I believe it would be reasonable to conclude the result here is more impressive than in any of the settlements between $250 million

---

[5] *See, e.g., In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1367 (S.D. Fla. 2011) ("While some reported cases have advocated decreasing the percentage awarded as the gross class recovery increases, that approach is antithetical to the percentage of the recovery method . . ., the whole purpose of which is to align the interests of Class Counsel and the Class by rewarding counsel in proportion to the result obtained. By not rewarding Class Counsel for the additional work necessary to achieve a better outcome for the class, the sliding scale approach creates the perverse incentive for Class Counsel to settle too early for too little." (quoting *Allapattah Servs. Inc. v. Exxon Corp.,* 454 F.Supp.2d 1185, 1213 (S.D.Fla.2006))); *In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liability Litigation*, No. 8:10ML-02151-JVS, at 17 n.16 (C.D. Cal., Jun. 17, 2013) ("The Court also agrees with Plaintiffs' expert . . . and other courts, e.g., *Allapattah Servs*., 454 F. Supp. 2d at 1213, which have found that decreasing a fee percentage based only on the size of the fund would provide a perverse disincentive to counsel to maximize recovery for the class.").

and $500 million in my study.  In Table 1, I list these settlements.[6]  (One of the settlements in the table was included in my study but not in its fee analysis because the fees had not yet been awarded at the time I collected my data;[7] I also exclude from the table two settlements in my study that were comprised largely of non-cash relief.[8])  For the seven remaining cases, wherever possible, I went back to court's fee order and case docket to extract information on what portion of the class's damages had been recovered by the settlement and whether there had been both a bellwether trial and litigated appeal before settlement.  As can be seen from the table, no case in this range of dollar magnitude lasted nearly as long as this one or involved both a bellwether trial and appeal.  Unfortunately, I could not find much data in the court's fee orders about the percentage of the class's recovery in these settlements, but, in the ones where I could find it, they paled in comparison to this case.  Based on what information we have about these cases, I think it would be reasonable to conclude that the fee percentage in this case should be higher than any of them.  Indeed, even looking quickly at the settlements above $500 million in my study, I think there may be only one that is more impressive than this one: *Allapattah Servs. Inc. v. Exxon Corp.*, 454 F.Supp.2d 1185 (S.D.Fla. 2006).  That case lasted 15 years, involved two class trials, led to an appeal before both the Eleventh Circuit and the U.S. Supreme Court, and netted a what I understand to be a recovery of 92% of the class's damages.  Accordingly, class counsel were awarded 31.33% in fees.  That might counsel in favor of granting class counsel a lower percentage here but for the fact that the settlement there was $1.075 billion—more three times

---

[6] It should be noted that both of the tables in this declaration include only class action fee awards.  They do not include common benefit fee awards in MDL cases that were not resolved as Rule 23 class actions.  (Common benefit fee awards are an entirely different animal; they reallocate among the lawyers representing individual clients in an MDL the contingency fees those lawyers collected from their clients.)

[7] *In re Healthsouth Corporation Securities Litigation*, No. CV-03-BE-1500-S (N.D.Ala., Feb. 12, 2008).

[8] *Turner v. Murphy Oil USA, Inc.*, No. 2:05-cv-04206 (E.D. La. Jan. 30, 2007); *Townes v. Trans Union LLC*, No. 04-cv-1488 (D. Del. Sep. 1, 2007).

greater than the settlement here.  If one subscribes to the philosophy that bigger settlements should be awarded smaller percentages, then I think it would be reasonable to award a similar fee percentage in this case.

### Table 1: Percentage-method fee awards between $250M and $500M, 2006-2007

| Case | Settlement Amount | % Recovery | Duration | Trial & Appeal? | Fee Award |
|---|---|---|---|---|---|
| Hillenbrand Antitrust[9] | $468 million | Unknown | 3.1 years | NO | 25% |
| Adelphia Communications Securities[10] | $460 million | 8.3% | 3.3 years | NO | 21.4% |
| HealthSouth Securities[11] | $445 million | Unknown | 2.4 years | NO | 18% |
| Freddie Mac Securities[12] | $410 million | Unknown | 3.4 years | NO | 20% |
| Qwest Securities[13] | $400 million | "relatively small" | 5.2 years | NO | 15% |
| Williams Securities[14] | $311 million | Unknown | 5 years | NO | 25% |
| Rubber Chemicals Antitrust[15] | $250 million | Unknown | 1.7 years | NO | 19% |

---

[9] *Spartanburg Regional Health Service District, Inc. v. Hillenbrand Industries, Inc.*, No. 7:03-2141-HFF (D.S.C., Aug. 15, 2006).

[10] *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 2006 WL 3378705 (S.D.N.Y. Nov. 16, 2006).

[11] *In re Healthsouth Corporation Securities Litigation*, No. CV-03-BE-1500-S (N.D.Ala., Feb. 12, 2008).  It is difficult to calculate the fee percentage awarded by the court in *Healthsouth* because the court awarded different percentages out of different segments of the settlement, but some of the filings in the case suggest that the total fee award was around 18% of the settlement. *See id.* (awarding 17.5% and another 4% to attorneys for the Stockholder Class and 10% to the attorneys for the Bondholder Class); Bondholder Lead Counsel's Memorandum in Support of Application for An Award of Attorneys' Fees and Litigation Expenses and Reimbursement of Costs to Class Representatives 5 n. 5 (Jan. 24, 2008).

[12] *Ohio Public Employees Retirement System, et al. v. Freddie Mac, et al.*, No. 1:03-cv-04261 (S.D.N.Y. Oct. 27, 2006).

[13] *In re Qwest Communications Int'l Securities Litigation*, No. 01-cv-01451 (D. Colo. Sep. 29, 2006).

[14] *In re Williams Securities Litigation*, No. 4:02-cv-00072 (N.D. Okla. Feb. 12, 2007).

[15] *In re Rubber Chemicals Antitrust Litigation*, No. 3:04-md-01648 (C.D. Cal. Sep. 12, 2006).

18.      The data from my empirical study is now some seven or eight years old. Moreover, as I noted, there were only two cases in the $250-500 million range where I could readily find data on what percentage of the class's damages the settlement recovered, which, as I have said, is the most important metric on which to judge these cases.  As a result, class counsel asked me to evaluate their fee request in light of more recent data points.  Unfortunately, no one has done a comprehensive empirical study of class action fees more recently than I have. Nonetheless, in order to try to aid the court as best I can, in Table 2, I listed all of the class action settlements over $250 million of which I am aware approved since my study closed in 2007.  I cannot promise that I am aware of all of the big settlements since my study ended, but I can promise that I have listed every one of them of which I am aware; no case of which I am aware has been omitted.  Much like it did with respect to the cases in my study, the settlement here compares very favorably to the more recent cases, too.  In particular, although I could find data on the class's recovery rate in only a minority of settlements, none of the ones I found were more successful than the settlement here—and, indeed, many were much, much less successful (including the IPO Securities case, where class counsel was awarded the same fee requested here despite a 2% recovery rate for the class).   In the three settlements with recovery rates approaching the one here (TFT-LCD, Toyota, and Bank of America), the courts awarded fees right in line with the request here (28.6%, 26.4%, and 30%, respectively).  (And all three of these settlements were larger than the one here; thus, again, if one follows the bigger-should-be-smaller philosophy, it suggests the fee percentage in this case should be higher than in these cases.)  Moreover, only one of the more recent cases lasted as long as this one has and none of them involved a bellwether trial and appeal like this one has.  (Although the other 10-year case— the Native American Farmers case—saw a much smaller fee percentage awarded, both that case

and the Black Farmers case are very unique cases; they were filed against the U.S. government and could only be settled with legislation—something, the courts acknowledged, class counsel could not claim full credit for.)  In short, I think it would be reasonable for the court to conclude that the results in this case have been superior—often far superior—to the results in other large cases, and that class counsel should be compensated accordingly.  In other words, class counsel should receive a high-end fee award for high-end results.

### Table 2: Percentage-method fee awards above $250M, 2008-present

| Case | Settlement Amount | % Recovery | Duration | Trial & Appeal? | Fee Award |
|------|------------------|-----------|----------|----------------|-----------|
| Payment Card Interchange Fees Antitrust (2014)[16] | $5.7 billion | Unknown | 8 years | NO | 9.56% |
| Bank of America Securities (2013)[17] | $2.4 billion | Unknown | 4 years | NO | 6.5% |
| Black Farmers Discrimination (2013)[18] | $1.2 billion | Unknown | 3.2 years | NO | 7.4% |
| TFT-LCD Antitrust (2013)[19] | $1.1 billion | 50% | 6 years | NO | 28.6% |
| AT&T Sales Tax (2011)[20] | $956 million (max) | Unknown | 2.2 years | NO | 20% |
| UnitedHealth Securities (2009)[21] | $926 million | Unknown | 9.5 years | NO | 7% |
| Native American Farmers Discrimination (2011)[22] | $760 million | Unknown | 10 years | NO | 8% |
| Toyota Unintended Acceleration (2013)[23] | $757 million (cash) $1.6 billion (est. total) | 25%-42% | 3.3 years | NO | 26.4% (cash) 12.3% (total) |
| Citigroup Bond Securities (2013)[24] | $730 million | Unknown | 4.5 years | NO | 16% |
| Citigroup Mortgage Securities (2013)[25] | $590 million | 9.4% | 5 years | NO | 12% |
| IPO Securities | $510 million | 2% | 8 years | NO | 33.33% |

---

[16] *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 2014 WL 92465 (E.D.N.Y., Jan. 10, 2014).

[17] *In re Bank of America Corp. Securities, Derivative and ERISA Litigation*, No. 9-MD-2058-PKC (S.D.N.Y., Apr. 8, 2013).

[18] *In re Black Farmers Discrimination Litigation*, 953 F.Supp.2d 82 (D.D.C. 2013).

[19] *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 WL 1365900 (N.D. Cal., Apr. 3, 2013).

[20] *In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*, 792 F. Supp. 2d 1028, 1033 (N.D. Ill. 2011) (same).

[21] *In re UnitedHealth Grp. Inc. PSLRA Litig.*, 643 F. Supp. 2d 1094 (D. Minn. 2009).

[22] *Keepseagle v. Vilsack,* No. 99–cv-3119 (D.D.C. Mar. 9, 2012).

[23] *In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liability Litigation*, No. 8:10ML-02151-JVS (C.D. Cal., Jun. 17, 2013).

[24] *In re Citigroup Inc. Bond Litig.*, 988 F. Supp. 2d 371 (S.D.N.Y. 2013).

[25] *In re Citigroup Inc. Sec. Litig.*, 965 F. Supp. 2d 369 (S.D.N.Y. 2013).

| (2009)[26] | | | | | |
|---|---|---|---|---|---|
| Bank of America Overdraft Fraud (2011)[27] | $410 million | 9%-45% | 2.5 years | NO | 30% |
| AWP Fraud (2008)[28] | $350 million | Unknown | 3 years | NO | 20% |
| Merrill Lynch Securities (2012)[29] | $315 million | Unknown | 3.5 years | NO | 17% |
| Bear Stearns Antitrust (2013)[30] | $295 million | 11% | 4.2 years | NO | 12% |
| Tricor Antitrust (2009)[31] | $250 million | Unknown | 4 years | NO | 33% |

19.      For all these reasons, it is my opinion that the data on fee awards suggests it would be reasonable to award class counsel 33.33% in this case.

Nashville, TN

October 27, 2014

Brian T. Fitzpatrick

---

[26] *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp.2d 467 (S.D.N.Y. 2009).

[27] *See, e.g., In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330 (S.D. Fla. 2011).

[28] *New England Carpenters Health Benefits Fund v. First Databank, Inc.*, 2009 WL 2408560 (D. Mass. Aug. 3, 2009).

[29] *Public Employees' Retirement System of Mississippi v. Merrill Lynch & Co. Inc.*, No. 1:08-cv-10841-JSR (S.D.N.Y., May 8, 2012).

[30] *In re Bear Sterns Companies, Inc. Securities, Derivative and ERISA Litig.*, No 08-MD-1963 (S.D.N.Y., Nov. 9, 2012).

[31] *In re Tricor Direct Purchaser Antitrust Litig.*, C.A. No. 05-340-SLR (ECF No. 543) (D. Del. April 23, 2009).

**EXHIBIT A**

# BRIAN T. FITZPATRICK

Vanderbilt University Law School
131 21st Avenue South
Nashville, TN 37203
(615) 322-4032
brian.fitzpatrick@law.vanderbilt.edu

## ACADEMIC APPOINTMENTS

**VANDERBILT UNIVERSITY LAW SCHOOL**, *FedEx Research Professor*, 2014 to present
- *Professor*, 2012-present; *Associate Professor*, 2010-2012; *Assistant Professor*, 2007-2010
- Classes: Civil Procedure, Federal Courts, Complex Litigation
- Hall-Hartman Outstanding Professor Award, 2008-2009
- Vanderbilt's Association of American Law Schools Teacher of the Year, 2009

## EDUCATION

**HARVARD LAW SCHOOL**, J.D., *magna cum laude*, 2000
- Fay Diploma (for graduating first in the class)
- Sears Prize, 1999 (for highest grades in the second year)
- *Harvard Law Review*, Articles Committee, 1999-2000; Editor, 1998-1999
- *Harvard Journal of Law & Public Policy*, Senior Editor, 1999-2000; Editor, 1998-1999
- Research Assistant, David Shapiro, 1999; Steven Shavell, 1999

**UNIVERSITY OF NOTRE DAME**, B.S., Chemical Engineering, *summa cum laude*, 1997
- First runner-up to Valedictorian (GPA: 3.97/4.0)
- Steiner Prize, 1997 (for overall achievement in the College of Engineering)

## CLERKSHIPS

**HON. ANTONIN SCALIA**, Supreme Court of the United States, 2001-2002

**HON. DIARMUID O'SCANNLAIN**, U.S. Court of Appeals for the Ninth Circuit, 2000-2001

## EXPERIENCE

**NEW YORK UNIVERSITY SCHOOL OF LAW**, Feb. 2006 to June 2007
*John M. Olin Fellow*

**HON. JOHN CORNYN**, United States Senate, July 2005 to Jan. 2006
*Special Counsel for Supreme Court Nominations*

**SIDLEY AUSTIN LLP**, Washington, DC, 2002 to 2005
*Litigation Associate*

**ACADEMIC ARTICLES**

*The End of Class Actions?*, 57 Ariz. L. Rev. (forthcoming 2015)

*The Constitutionality of Federal Jurisdiction-Stripping Legislation and the History of State Judicial Selection and Tenure*, 98 VA. L. REV. 839 (2012)

Twombly *and* Iqbal *Reconsidered*, 87 NOTRE DAME L. REV. 1621 (2012)

*An Empirical Study of Class Action Settlements and their Fee Awards*, 7 J. EMPIRICAL L. STUD. 811 (2010) (selected for the 2009 Conference on Empirical Legal Studies)

*Do Class Action Lawyers Make Too Little?*, 158 U. PA. L. REV. 2043 (2010)

*Originalism and Summary Judgment*, 71 OHIO ST. L.J. 919 (2010)

*The End of Objector Blackmail?*, 62 VAND. L. REV. 1623 (2009) (selected for the 2009 Stanford-Yale Junior Faculty Forum)

*The Politics of Merit Selection*, 74 MISSOURI L. REV. 675 (2009)

*Errors, Omissions, and the Tennessee Plan*, 39 U. MEMPHIS L. REV. 85 (2008)

*Election by Appointment: The Tennessee Plan Reconsidered*, 75 TENN. L. REV. 473 (2008)

*Can Michigan Universities Use Proxies for Race After the Ban on Racial Preferences?*, 13 MICH. J. RACE & LAW 277 (2007)

**BOOK CHAPTERS**

*Civil Procedure in the Roberts Court* in BUSINESS AND THE ROBERTS COURT (Jonathan Adler, ed., Oxford University Press, forthcoming 2014)

*Is the Future of Affirmative Action Race Neutral?* in A NATION OF WIDENING OPPORTUNITIES: THE CIVIL RIGHTS ACT AT 50 (Ellen Katz & Samuel Bagenstos, eds., Michigan University Press, forthcoming 2014)

**ACADEMIC PRESENTATIONS**

*Compensation in Consumer Class Actions: Data and Reform*, Conference on The Future of Class Action Litigation: A View from the Consumer Class, NYU Law School, New York, New York (Nov. 7, 2014)

*The Future of Federal Class Actions: Can the Promise of Rule 23 Still Be Achieved?*, Northern District of California Judicial Conference, Napa, California (panelist) (Apr. 13, 2014)

*The End of Class Actions?*, Conference on Business Litigation and Regulatory Agency Review in the Era of Roberts Court, Institute for Law & Economic Policy, Boca Raton, Florida (Apr. 4, 2014)

*Should Third-Party Litigation Financing Come to Class Actions?*, University of Missouri School of Law (Mar. 7, 2014)

*Should Third-Party Litigation Financing Come to Class Actions?*, George Mason Law School (Mar. 6, 2014)

*Should Third-Party Litigation Financing Come to Class Actions?*, Roundtable for Third-Party Funding Scholars, Washington & Lee University School of Law (Nov. 7-8, 2013)

*Is the Future of Affirmative Action Race Neutral?*, Conference on A Nation of Widening Opportunities: The Civil Rights Act at 50, University of Michigan Law School (Oct. 11, 2013)

*The Mass Tort Bankruptcy: A Pre-History*, The Public Life of the Private Law: A Conference in Honor of Richard A. Nagareda, Vanderbilt Law School (Sep. 28, 2013) (panelist)

*Rights & Obligations in Alternative Litigation Financing and Fee Awards in Securities Class Actions*, Conference on the Economics of Aggregate Litigation, Institute for Law & Economic Policy, Naples, Florida (Apr. 12, 2013) (panelist)

*The End of Class Actions?*, Symposium on Class Action Reform, University of Michigan Law School (Mar. 16, 2013)

*Toward a More Lawyer-Centric Class Action?,* Symposium on Lawyering for Groups, Stein Center for Law & Ethics, Fordham Law School (Nov. 30, 2012)

*The Problem: AT & T as It Is Unfolding*, Conference on *AT & T Mobility v. Concepcion*, Cardozo Law School (Apr. 26, 2012) (panelist)

*Standing under the Statements and Accounts Clause,* Conference on Representation without Accountability*,* Fordham Law School Corporate Law Center (Jan. 23, 2012)

*The End of Class Actions?*, Washington University Law School (Dec. 9, 2011)

*Book Preview Roundtable: Accelerating Democracy: Matching Social Governance to Technological Change*, Searle Center on Law, Regulation, and Economic Growth, Northwestern University School of Law (Sep. 15-16, 2011) (participant)

*Is Summary Judgment Unconstitutional?  Some Thoughts About Originalism*, Stanford Law School (Mar. 3, 2011)

*The Constitutionality of Federal Jurisdiction-Stripping Legislation and the History of State Judicial Selection and Tenure*, Northwestern Law School (Feb. 25, 2011)

*The New Politics of Iowa Judicial Retention Elections: Examining the 2010 Campaign and Vote,* University of Iowa Law School (Feb. 3, 2011) (panelist)

*The Constitutionality of Federal Jurisdiction-Stripping Legislation and the History of State Judicial Selection and Tenure*, Washington University Law School (Oct. 1, 2010)

4

Twombly *and* Iqbal *Reconsidered,* Symposium on Business Law and Regulation in the Roberts Court, Case Western Reserve Law School (Sep. 17, 2010)

*Do Class Action Lawyers Make Too Little?*, Institute for Law & Economic Policy, Providenciales, Turks & Caicos (Apr. 23, 2010)

*Originalism and Summary Judgment*, Georgetown Law School (Apr. 5, 2010)

*Theorizing Fee Awards in Class Action Litigation*, Washington University Law School (Dec. 11, 2009)

*An Empirical Study of Class Action Settlements and their Fee Awards*, 2009 Conference on Empirical Legal Studies, University of Southern California Law School (Nov. 20, 2009)

*Originalism and Summary Judgment*, Symposium on Originalism and the Jury, Ohio State Law School (Nov. 17, 2009)

*An Empirical Study of Class Action Settlements and their Fee Awards*, 2009 Meeting of the Midwestern Law and Economics Association, University of Notre Dame Law School (Oct. 10, 2009)

*The End of Objector Blackmail?*, Stanford-Yale Junior Faculty Forum, Stanford Law School (May 29, 2009)

*An Empirical Study of Class Action Settlements and their Fee Awards*, University of Minnesota School of Law (Mar. 12, 2009)

*The Politics of Merit Selection*, Symposium on State Judicial Selection and Retention Systems, University of Missouri Law School (Feb. 27, 2009)

*The End of Objector Blackmail?*, Searle Center Research Symposium on the Empirical Studies of Civil Liability, Northwestern University School of Law (Oct. 9, 2008)

*Alternatives To Affirmative Action After The Michigan Civil Rights Initiative*, University of Michigan School of Law (Apr. 3, 2007) (panelist)

## OTHER PUBLICATIONS

*Lessons from Tennessee Supreme Court Retention Election*, THE TENNESSEAN (Aug. 20, 2014)

*Public Needs Voice in Judicial Process*, THE TENNESSEAN (June 28, 2013)

*Did the Supreme Court Just Kill the Class Action?*, THE QUARTERLY JOURNAL (April 2012)

*Let General Assembly Confirm Judicial Selections*, CHATTANOOGA TIMES FREE PRESS (Feb. 19, 2012)

*"Tennessee Plan" Needs Revisions*, THE TENNESSEAN (Feb. 3, 2012)

*How Does Your State Select Its Judges?*, INSIDE ALEC 9 (March 2011) (with Stephen Ware)

*On the Merits of Merit Selection*, THE ADVOCATE 67 (Winter 2010)

*Supreme Court Case Could End Class Action Suits,* SAN FRANCISCO CHRONICLE (Nov. 7, 2010)

*Kagan is an Intellect Capable of Serving Court*, THE TENNESSEAN (Jun. 13, 2010)

*Confirmation "Kabuki" Does No Justice*, POLITICO (July 20, 2009)

*Selection by Governor may be Best Judicial Option*, THE TENNESSEAN (Apr. 27, 2009)

*Verdict on Tennessee Plan May Require a Jury*, THE MEMPHIS COMMERCIAL APPEAL (Apr. 16, 2008)

*Tennessee's Plan to Appoint Judges Takes Power Away from the Public*, THE TENNESSEAN (Mar. 14, 2008)

*Process of Picking Judges Broken*, CHATTANOOGA TIMES FREE PRESS (Feb. 27, 2008)

*Disorder in the Court*, LOS ANGELES TIMES (Jul. 11, 2007)

*Scalia's Mistake*, NATIONAL LAW JOURNAL (Apr. 24, 2006)

*GM Backs Its Bottom Line*, DETROIT FREE PRESS (Mar. 19, 2003)

*Good for GM, Bad for Racial Fairness*, LOS ANGELES TIMES (Mar. 18, 2003)

*10 Percent Fraud*, WASHINGTON TIMES (Nov. 15, 2002)

## OTHER PRESENTATIONS

*Hedge Funds + Lawsuits = A Good Idea?*, Vanderbilt University Alumni Association, Washington, DC (Sep. 3, 2014)

*Judicial Selection in Historical and National Perspective*, Committee on the Judiciary, Kansas Senate (Jan. 16, 2013)

*The Practice that Never Sleeps: What's Happened to, and What's Next for, Class Actions*, ABA Annual Meeting, Chicago, IL (Aug. 3, 2012) (panelist)

*Life as a Supreme Court Law Clerk and Views on the Health Care Debate*, Exchange Club of Nashville (Apr. 3, 2012)

*The Tennessee Judicial Selection Process—Shaping Our Future*, Tennessee Bar Association Leadership Law Retreat, Dickson, TN (Feb. 3, 2012) (panelist)

*Reexamining the Class Action Practice*, ABA National Institute on Class Actions, New York, NY (Oct. 14, 2011) (panelist)

*Judicial Selection in Kansas*, Committee on the Judiciary, Kansas House of Representatives (Feb. 16, 2011)

*Judicial Selection and the Tennessee Constitution*, Civil Practice and Procedure Subcommittee, Tennessee House of Representatives (Mar. 24, 2009)

*What Would Happen if the Judicial Selection and Evaluation Commissions Sunset?*, Civil Practice and Procedure Subcommittee, Tennessee House of Representatives (Feb. 24, 2009)

*Judicial Selection in Tennessee*, Chattanooga Bar Association, Chattanooga, TN (Feb. 27, 2008) (panelist)

*Ethical Implications of Tennessee's Judicial Selection Process*, Tennessee Bar Association, Nashville, TN (Dec. 12, 2007)

**PROFESSIONAL ASSOCIATIONS**

Referee, Journal of Empirical Legal Studies
Reviewer, Oxford University Press
Reviewer, Supreme Court Economic Review
Member, American Bar Association
Member, Tennessee Advisory Committee to the U.S. Commission on Civil Rights
Board of Directors, Tennessee Stonewall Bar Association
American Swiss Foundation Young Leaders' Conference, 2012
Bar Admission, District of Columbia

**COMMUNITY ACTIVITIES**

Board of Directors, Nashville Ballet; Nashville Talking Library for the Blind, 2008-2009