1                 IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MASSACHUSETTS

2

3

4  IN RE:                           )
                              ) CA No. 04-10981-PBS

5  NEURONTIN MARKETING, SALES PRACTICES,) Pages 1 - 45
  AND PRODUCTS LIABILITY LITIGATION    )

6

7

8

9                          **HEARING**

10            BEFORE THE HONORABLE PATTI B. SARIS
            UNITED STATES CHIEF DISTRICT JUDGE

11

12

13

14

15                       United States District Court
                     1 Courthouse Way, Courtroom 19

16                     Boston, Massachusetts  02210
                     October 22, 2014, 3:13 p.m.

17

18

19

20

21

22

23                    LEE A. MARZILLI
                OFFICIAL COURT REPORTER
             United States District Court

24            1 Courthouse Way, Room 7200
               Boston, MA  02210

25                (617)345-6787

1    A P P E A R A N C E S:

2

     FOR THE PLAINTIFFS:
3

          THOMAS M. GREENE, ESQ., Greene, LLP, One Liberty Square,
4    Suite 1200, Boston, Massachusetts, 02109.

5         THOMAS M. SOBOL, ESQ. and EDWARD NOTARGIACOMO, ESQ.,
     Hagens Berman Sobol Shapiro, LLP, 55 Cambridge Parkway,
6    Suite 301, Cambridge, Massachusetts, 02142.

7         ELIZABETH J. CABRASER, ESQ., Lieff Cabraser Heimann &
     Bernstein, Embarcadero Center West, 275 Battery Street,
8    30th Floor, San Francisco, California, 94111-3339.

9         JAMES R. DUGAN, II, ESQ., The Dugan Law Firm,
     365 Canal Street, Suite 1000, New Orleans, Louisiana, 70130.
10
          DANIEL E. BECNEL, ESQ., Law Office of Daniel E. Becnel, Jr.,
11   106 W. Seventh Street, PO Drawer H, Reserve, Louisiana, 70084.

12        RICHARD W. COHEN, ESQ., Lowey Dannenberg Cohen & Hart,
     P.C., White Plains Plaza, One North Broadway, White Plains,
13   New York, 10601-1714.

14        W. SCOTT SIMMER, ESQ., Blank Rome, LLP,
     500 New Hampshire Avenue, NW, Washington, D.C., 20037.
15

16   FOR THE DEFENDANTS:

17        KATHERINE ARMSTRONG, ESQ. and DAVID WEINRAUB, ESQ.,
     Quinn Emanuel Urquhart & Sullivan, LLP, 51 Madison Avenue,
18   New York, New York, 10010.

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2            THE CLERK:  Court calls Civil Action 04-10981, Harden
 3     v. Pfizer.  Could counsel please identify themselves for the
 4     record.
 5            MR. SOBOL:  Good afternoon, your Honor.  Tom Sobol for
 6     the class plaintiffs.
 7            MR. GREENE:  Good afternoon, your Honor.  Tom Greene
 8     for the class plaintiffs.
 9            MS. CABRASER:  Good afternoon, your Honor.  Elizabeth
10     Cabraser for the class plaintiffs.
11            MR. NOTARGIACOMO:  Good afternoon, your Honor.  Ed
12     Notargiacomo for the plaintiffs.
13            MR. DUGAN:  Good afternoon.  James Dugan for the class
14     plaintiffs.
15            MR. BECNEL:  Daniel E. Becnel for the class
16     plaintiffs.
17            MR. COHEN:  Richard Cohen, your Honor, for the
18     Plaintiffs' Steering Committee.
19            THE COURT:  For the?
20            MR. COHEN:  I'm on the Plaintiffs' Steering Committee.
21            MR. SIMMER:  Your Honor, Scott Simmer on behalf of the
22     Assurant subclass.
23            MS. ARMSTRONG:  Good afternoon, your Honor.  Katherine
24     Armstrong on behalf of Pfizer.
25            MR. WEINRAUB:  Good afternoon, your Honor.  David
```

1    Weinraub for Pfizer.

2            THE COURT:  Thank you.  Is anyone here for the

3    objector?

4            MR. COHEN:  No, your Honor.  I spoke with the

5    objector, and he will not be here to appear.  He's hoping that

6    your Honor will grant the motion to have his objection

7    withdrawn.

8            THE COURT:  Yeah, but I've got big problems, so I was

9    hoping he'd be here.  So the problem, as I understand the

10   objector, so let's just start with that, there are two big

11   issues I need to resolve today other than a final approval,

12   which is, one is the objection, and second is attorneys' fees.

13   Is there anything else that anyone knows of other than

14   approving the settlement?  We've had no objections as to the

15   amount of the settlement, I believe, and I think that after

16   I've read everything, the amount is fair.  And I am concerned

17   about the objection, though, because it's giving favored

18   treatment to one entity, and there may be lots of entities who

19   fall in the same situation, where they couldn't prove it up in

20   the proxy year but they can in another year.

21           So I first wanted to find out -- and I'm not sure who

22   would be the right person, someone from Rust here -- if there

23   were other people who tried to submit claims but didn't have

24   documents from the proxy year, which is what, 2003 to 2004

25   something like that?

```
 1            MR. SOBOL:  Sure.  If I may, your Honor?

 2            THE COURT:  Yes.

 3            MR. SOBOL:  Let me address the question first

 4    globally, and then also my partner, Mr. Notargiacomo, who

 5    handles this matter for this and for other similar cases, will

 6    address any other issues you have.

 7            So in this settlement as well as in other pharma cases

 8    like this for third-party payors, we have used this proxy

 9    period approach, rather than requiring proof from the whole

10    claims period, as an efficiency device for the claims, for the

11    filers.  There have been occasions in other cases where there

12    are people who don't have the right data for the right year,

13    and what we've done uniformly in those situations is, we work

14    out accommodations with them so that whatever kind of

15    information they do have we provide as acceptable to the claims

16    administrator.  The claims administrator works that out, and we

17    address the issue.  I guess, as that applies in this particular

18    situation, I think I would turn it over to Mr. Notargiacomo to

19    report to you.

20            THE COURT:  Well, then why didn't they just work it

21    out?  In other words, here's my problem:  I don't have a

22    problem in general with the concept that if someone doesn't

23    have documents from 2003 to 2004, we accommodate them with

24    another window.  I just can't give it to one person if all

25    these other people might similarly have documents for the
```

1    earlier --

2            MR. SOBOL:  So let me answer that question.

3            THE COURT:  Yes.

4            MR. SOBOL:  This one is being treated differently

5    simply because this is the only time somebody has filed a

6    formal objection.  In other words, people usually bring this

7    issue up.  They file a claim.  They don't have it for the right

8    period.  We just deal with it through the claims

9    administration.

10           THE COURT:  Well, did that happen here,

11   Mr. Notargiacomo?

12           MR. NOTARGIACOMO:  No.  No other class members came

13   forward and said that they did not have the data for that proxy

14   period.  As Mr. Sobol said, we usually deal with that, and in

15   fact the claims procedures that your Honor approved as part of

16   the preliminary approval process provided for the situation

17   where a class member may not have the data for the proxy period

18   but might be able to provide a different proxy period, and to

19   allow the claims administrator to accept that.  The problem

20   here with this objector is that --

21           THE COURT:  Well, why don't you work it out with him

22   under that procedure?

23           MR. NOTARGIACOMO:  Well, that's exactly where I'm

24   going.  It's not just that he doesn't have the data for the

25   proxy period.  He also doesn't have the data for the period for

1    which he did make the purchases.  So unlike the exception that

2    we built into the process, the entity making the claim in that

3    instance would have to prove up a different proxy period using

4    the documentation that's required.  Here, he both has a

5    recollection of making the purchases outside the proxy period

6    but also doesn't have the requisite data to support the

7    purchases during that period either.

8         THE COURT:  Then why should I give him anything?  Why

9    are we treating him better than we're treating anyone else in

10   that situation?  In other words, I don't have a problem with

11   what you're saying.  You have a proxy period.  I get that.

12   Maybe it benefits Blue Cross-Blue Shield, maybe it doesn't, but

13   certainly accommodating people who have a different period.  I

14   get that.  But if we have a rule about documentation and we've

15   applied it to everybody else under the sun, why should I

16   accommodate them?  Why don't I just deny the objection?

17        MR. COHEN:  Your Honor, as the person who dealt with

18   Mr. Martinez, if I may reply.

19        THE COURT:  I wish he were here.  Why doesn't he just

20   opt out?  Why don't I give him a chance to opt out, and if he

21   wants to sue Pfizer separately, all power to you.

22        MR. COHEN:  Your Honor --

23        THE COURT:  I know that you're really eager not to

24   lose this case and just have it keep going but --

25        (Laughter.)

1          THE COURT:  -- Ms. Armstrong.  I mean, I could either

2    allow -- that's why I wish he was here.  I don't think it's

3    unreasonable to require a third-party payor to provide some

4    form of documentation.  I do think it's unreasonable to pick

5    one period if somebody has only got another, but you say you

6    accommodate those people.  So I don't know why I should give

7    him a penny.

8          MR. COHEN:  Well, your Honor, you asked initially why

9    we didn't just deal with him or people who have that grievance,

10   and only one person had that grievance.  And, unfortunately,

11   instead of calling us with that grievance and being able to

12   work it out as the settlement agreement we believe provides, he

13   filed an objection first, so --

14         THE COURT:  Who is the "he"?  Who is he?

15         MR. COHEN:  Dan Martinez.

16         THE COURT:  Who is he?

17         MR. COHEN:  The CEO of -- what's his company called?

18   ICC is the acronym.  Insurance Claims Consultants.  So he filed

19   the objection, so we had to deal with it as an objection.  The

20   class claims procedures --

21         THE COURT:  Would anybody here object to him opting

22   out if that's what he wanted?

23         MR. COHEN:  He doesn't want to opt out, though.

24         THE COURT:  Did we give anyone else the option of

25   having part of the class without any paper?

```
 1              MR. COHEN:  No one else asked, your Honor.

 2              MR. SOBOL:  No, we have not.

 3              THE COURT:  No, but it didn't come up.  It's not like

 4       we gave -- so why should I just not deny the objection?

 5              MR. COHEN:  Well, your Honor, the only edge, the only

 6       difference between his and anyone else's claim is that the

 7       claims procedures provide specifically that if you're filing

 8       proof of claim for $300,000 or less, you do not need to provide

 9       any documentation.

10              THE COURT:  So why doesn't he just do it for under

11       that?

12              MR. COHEN:  He has, he has.

13              THE COURT:  And did you deny it?

14              MR. SOBOL:  No.

15              MR. COHEN:  No.  His claim is going to be for $150,000

16       for an out-of-time proxy period.

17              THE COURT:  But what I can't do is give him

18       Most-Favored-Nation Status.  I think I'd be reversed.  Somebody

19       else would come along and say, "I was the same situation, and I

20       didn't get it.  I didn't even submit a claim."

21              MR. COHEN:  Except that the settlement agreement

22       specifically provides that we can make accommodations.

23              MR. SOBOL:  May I?  May I?

24              THE COURT:  Let me put it this way:  What is it that

25       he can do without any paperwork?
```

1           MR. SOBOL:  This is not an exception to the rule.

2     This is within the terms of the --

3           THE COURT:  Well, then it's not an objection.  Then

4     it's denied and deal with it within the terms of the class

5     action.

6           MR. SOBOL:  Very good.  Thank you.  Fine.

7           THE COURT:  Tell him to submit a claim.  Whatever is

8     appropriate is appropriate.  And then if he disagrees with what

9     the settlement administrator says, then I suppose he could

10    challenge that.  We've sometimes had that come up.  I deny the

11    objection.  To the extent that it's within the four corners of

12    the settlement the way you describe, let him submit the claim,

13    and you work it out with the settlement administrator, because

14    I cannot give him better terms than everybody else in the

15    class.  He's not here.  He hardly briefed it at all.  I didn't

16    even understand it, really.  This wasn't even something you

17    flagged for me in the settlement papers originally when I gave

18    the preliminary approval.  This was a nonissue.  If he falls

19    within the ballpark of what the claims administrator feels that

20    he can accommodate, in the dollar framework you were just

21    talking about -- under $300,000, you don't need paperwork?  Is

22    that what it was? -- then deal with it.

23          MR. COHEN:  Your Honor, he submitted the objection

24    post-preliminary approval, so we couldn't have dealt with it

25    then.

```
 1              THE COURT:  No, I'm just saying he can just -- it's an
 2    untimely claim, right?  But I'll allow an untimely claim to be
 3    made.  And if it's within the four corners of the settlement,
 4    so be it, and if it isn't, it isn't.  And if you have a
 5    disagreement about it, he'll appeal.  But I deny the objection
 6    to change the proxy period, and I deny the objection to change
 7    the terms of it now just for him.  So I think we can handle
 8    him.  Work it out with him.
 9              MR. SOBOL:  So if that's the only issue you have, your
10    Honor, I'm ready to leave.
11              THE COURT:  No.  Attorneys' fees.
12              (Laughter.)
13              THE COURT:  Now, before I get to attorneys' fees, is
14    there any other objector out there?
15              MR. SOBOL:  No.
16              THE COURT:  I think I've seen the one objection?
17              MR. COHEN:  Your Honor, the only thing I just want to
18    add to that is that by so doing, it will actually be a windfall
19    for him if he puts in a $150,000 proof of claim.  Part of the
20    settlement was, it capped his recovery at $10,000.
21              THE COURT:  I cannot give him -- so whatever you work
22    out, you work out.  I just can't give him different terms than
23    anyone else, as long as what you work out is within, as you
24    say, the four corners of what the claims administrator can do.
25              MR. COHEN:  All right, thank you, your Honor.
```

1      THE COURT:  If he gets a windfall, he -- it doesn't

2  sound like a windfall to me if he actually is entitled to more.

3  Maybe he is.  The one thing I am allowing is for him to file a

4  late claim because we've been on notice of this situation.

5      Now, on attorneys' fees, I know Mr. Greene submitted

6  an affidavit and I know there's a brief on it, but where I'm

7  now getting confused, and so help me out, I went and looked at

8  what I paid for the *Kaiser* case, and I couldn't tell how much

9  of that was duplicative when you talk about $4 million in

10  expenses, half of which, by the way, were for experts, I

11  noticed.  Is that other examples of the amount of time in the

12  lodestar?  Was that stuff I've already paid for for a lot of

13  you people in the *Kaiser* prep, in the prep leading up to the

14  *Kaiser* case?  Not the trial itself.  I'm talking about the

15  discovery.  It's very confusing to me.  I'm not talking about

16  the whistleblower, which I view as truly unique.  There may be

17  some overlap there, but that wasn't the gravamen of the case.

18  The hard part of this case wasn't even the legal issues.  It

19  was the profound and difficult scientific issues, which I

20  imagine you needed huge expertise on and that sort of thing.

21      So when you say $4 million for the experts, for example,

22  didn't that come into the *Kaiser* settlement, all those experts?

23      MR. SOBOL:  The answer is "no," but let me explain to

24  you exactly what happens so that you understand it.  There was

25  a point in time, I believe it was November of 2009, when what

1    we did -- in November of 2009, that's on or about the time that

2    the Court ordered the scheduling of the *Kaiser* trial to go to

3    trial.  The time that all the class lawyers, these lawyers

4    here, put into the *Kaiser* trial, from that point in time on

5    through the whole *Kaiser* case, as well as any post-trial work

6    that we did for the *Kaiser* matter, was all separately kept.

7    All the time was separately kept.  In addition, all of the

8    expenses that we incurred with respect to the *Kaiser* trial,

9    from that point in time going forward with respect to the

10   *Kaiser* trial, were also separately kept, okay?  As a result,

11   when Kaiser resolved the matter with Pfizer after the appeal

12   was concluded and there was money that transpired from Pfizer

13   to Kaiser --

14          THE COURT:  How much in attorneys' fees for the

15   *Kaiser-Pfizer*?  The request was in the vicinity of $10 million?

16          MR. SOBOL:  Well, I honestly -- I in part don't know

17   because it was a private agreement between Kaiser and the other

18   lawyers who were in the *Kaiser* case, but they did pay a portion

19   of that fee and expenses to us to reimburse us solely for the

20   time and the expenses that we put into the *Kaiser* trial only.

21          Now, the materials that are before you here today in

22   connection with this matter contain no time and no expenses

23   that were incurred for the *Kaiser* trial.

24          THE COURT:  Excuse me.  But I've been involved a long

25   time, as have you.  So I know that, let's even assume that

1     that's completely true and that all the expert expenses at

2     trial were taken care of separately, this case began a decade

3     ago.

4            MR. SOBOL:  Exactly.

5            THE COURT:  So there was 2004 to 2009 where there was

6     overlapping discovery that went to the merits; you know,

7     nociceptive, neuropathic, bipolar, migraine, ya-da-da.  I

8     thought when -- I don't know because I only saw the request

9     from Kaiser from the attorneys' fees, and I don't think I

10    actually had to rule on it because I think it was settled, if

11    I'm remembering correctly.  I think that that was from the

12    beginning of time through -- I mean, discovery, they didn't

13    charge discovery, Kaiser?

14            MR. SOBOL:  If I may, if I may, the answer is "no."

15    The application that was made by Kaiser for fees and expenses,

16    for the *Kaiser* lawyers only -- the *Kaiser* lawyers are not

17    before you here today -- for the *Kaiser* lawyers only, meaning

18    Ms. Nussbaum and her firm, they would have put in time and

19    expenses from the time they originally filed the case for

20    Kaiser all the way through the present.  So for those lawyers,

21    they put in the full amount.  For the class lawyers who are

22    here before you today, the submission only included time and

23    expenses that began on that date in November of 2009 going

24    forward.  So we made absolutely sure, because we were prescient

25    of this issue, that when the fee application was being made in

1    the *Kaiser–Pfizer* matter, that the class lawyers in this case

2    were only submitting that portion of their time and expenses

3    that was attributable solely to the *Kaiser* trial.

4            THE COURT:  Well, how about the experts throughout the

5    discovery process, all those really outstanding Cochrane Group

6    lady, Meredith Rosenthal, the doctors, the neuropathic experts?

7    I mean, they all were deposed, et cetera.

8            MR. SOBOL:  Right.

9            THE COURT:  And so who paid for them?

10            MR. SOBOL:  So from the beginning of the case through

11    to November of 2009, the class lawyers paid and developed all

12    of the experts in the case.

13            THE COURT:  And I never reimbursed?  They didn't get

14    reimbursed for that?  That's hard to believe --

15            MR. SOBOL:  We have paid them.  We have not been

16    reimbursed for ten years for them, but *Kaiser* --

17            THE COURT:  So the $2 million you put down for experts

18    is --

19            MR. SOBOL:  Is pre-November of 2009 or is the small

20    amount, which is post the *Kaiser* resolution forward.  It's like

21    it's almost nothing relatively.

22            THE COURT:  That's actually nothing, yes.

23            MR. SOBOL:  Yeah.  So if you understand it, if you get

24    the idea, from the beginning of this case all the way until

25    November of 2009, all those experts, all that discovery, all

1   those documents, all that general liability stuff we put

2   together, we were not paid for our fees on it, we weren't paid

3   for our expenses on it, and Kaiser actually got the benefit of

4   it because what we did is, we let Kaiser then -- from November

5   of 2009 through the *Kaiser* trial, that was something that we

6   were going to have attributed to the *Kaiser* trial.

7            THE COURT:  Because I do agree that -- well, my

8   perception is that Ms. Nussbaum, while she was a full

9   participant, you were driving the case.

10           MR. SOBOL:  Yes.

11           THE COURT:  I mean, not just you, the Greene and

12  Sobol --

13           MR. SOBOL:  This team right here.

14           THE COURT:  I mean, she was involved, but if I

15  remember correctly, you were the lead -- it's been such a long

16  case -- both of you through most of the case.  So I just want

17  to make sure that somehow, since I didn't have access to the

18  *Kaiser* papers as to what got paid and for what -- were you

19  involved, Ms. Armstrong, then?

20           MS. ARMSTRONG:  Mr. Weinraub was more closely with

21  those --

22           THE COURT:  Oh, good, so --

23           MS. ARMSTRONG:  But there is confidentiality

24  provisions because the attorneys' fees issue was resolved.

25           THE COURT:  Well, you could give me an ex parte

 1    affidavit.

 2              MS. ARMSTRONG:  Yes.

 3              THE COURT:  I'm not here to put it on a public record,

 4    but it was resolved, it was settled.  But I have to be assured

 5    in my mind, because I have a fiduciary duty to the class, since

 6    they don't really know what was paid for, these experts aren't

 7    going to get a double payment kind of thing.

 8              MS. ARMSTRONG:  Mr. Weinraub did scrutinize our

 9    response to the attorneys' fee application, so he can at least

10    speak to that much of it which is public.

11              MR. WEINRAUB:  Your Honor, we went through the *Kaiser*

12    fee submission with a fine-tooth comb and submitted extremely

13    voluminous exhibits outlining by category what all of our

14    issues with the submission were.  One of the things that I was

15    specifically looking for was overlap between work that could be

16    attributed to the class versus being attributed to Kaiser, and

17    it really wasn't an issue.  We had a lot of other issues.  We

18    didn't have that issue.

19              THE COURT:  Well, that's very helpful.

20              MR. WEINRAUB:  So I do not believe -- now, I can't

21    speak to what's before you now in terms of what expenses and

22    what fees are being claimed, but I can tell you with some

23    comfort that what was submitted with the *Kaiser* fee application

24    did not involve overlap with non-*Kaiser*-related issues.  If it

25    had, it would be in the briefing that you saw.

```
 1            THE COURT:  But that's a little bit of a different

 2     question.  So take Meredith Rosenthal, right?  She was critical

 3     throughout, throughout.  So when you settled that --

 4            MR. WEINRAUB:  Kaiser had not requested fees or

 5     expenses relating to the development of Meredith Rosenthal as

 6     an expert up until November, 2009.

 7            THE COURT:  Okay.

 8            MR. WEINRAUB:  As Mr. Sobol said --

 9            THE COURT:  Okay, I just wanted -- you're key to this.

10     That was my key question.  I wanted to understand what the

11     relationship was because literally half of your expenses, I

12     think, were experts.

13            MR. SOBOL:  Oh, yeah.  Oh, yeah.

14            THE COURT:  So, okay.  All right, thank you.

15            MR. SOBOL:  You don't have to tell us, your Honor.

16            (Laughter.)

17            THE COURT:  I didn't ask about first-class plane

18     tickets or the like because you're subsuming them, so I don't

19     feel I have to do a full audit.

20            Now, on the percentage, as you know, I typically on

21     what I'll call a "mega case" will not give 33.3 percent.  I

22     didn't in AWP.  I noticed Professor Miller's brief with great

23     care, but he's not tracking what's happening now in the mega

24     case.  There have been various articles written, multidistrict

25     litigation conferences on what's happening, and on -- this is a
```

1    what, $350 million case, something like that? -- those kinds of

2    fees are the outliers.  So I'm trying to figure out where to go

3    and how to peg it.

4        And I do think that, as always, the kind of work was

5    outstanding, but I do think that once *Kaiser* was won, there was

6    an important legal issue outstanding that you went up to the

7    Circuit on, but that the hard laboring oar on the facts was

8    going to be -- there was going to be issue preclusion, there

9    just was, and I was going to give it to you.  And so we weren't

10   going to retry the whole thing.  We were going to basically

11   have res -- what do they call it now? -- issue preclusion on

12   all the factual findings and on the claims, and the key issue

13   ended up being causation.  You won it on appeal.  You actually

14   moved the law, in my opinion, on appeal.  And so there's some

15   credit that goes there, and that bodes against the low end.

16       By the way, the low end in cases of this amount is

17   quite low.  You'd probably have cardiac arrest and I'd have to

18   call the nurse.  But, I mean, if you look at the kinds of

19   charts as to what happens in these huge cases, I mean, it goes

20   down into the teens and single digits on these huge, huge

21   cases.

22       So I'm trying to figure out what I've done in the

23   past.  It won't be 33.3 percent and it won't be in the teens,

24   so I'm sort of playing in the vicinity of 20 to 25 percent.

25            MR. SOBOL:  May I be heard?

 1          THE COURT:  Yes.  *AWP*, what was I typically doing?

 2          MR. SOBOL:  You were at 25 percent.  We were at

 3   25 percent for *AWP*, although sometimes the multiplier was much

 4   lower -- I mean much higher at times in *AWP*, which --

 5          THE COURT:  But only -- I hope you'll tell

 6   Professor Miller, who was my Civil Procedure professor, so I've

 7   got a great fondness for him -- everything I know about civil

 8   procedure comes from him -- but his numbers are old.  And also,

 9   when he only cherry-picks, the GSK settlement in *AWP* was the

10   first one and had a different -- so it makes me worry that the

11   others are cherry-picked too.

12          MR. SOBOL:  I'm not sure if there's really -- you

13   know, candidly, I don't think there's an awful lot of

14   cherry-picking going on.  I mean, we could submit that to you.

15   But let me address your concerns because the question is, how

16   does this case stack up to what you've done before, and how

17   does this case stack up to some of the other cases you're going

18   to be looking top in the MDL area, okay?

19          So, first, let me start at this:  Your role as a

20   fiduciary is a very important one.  I think it's also

21   important, when you're exercising that role as a fiduciary, to

22   look against the background of, what kind of class am I acting

23   as a fiduciary for, and what has that class told me?  So that's

24   a first place to start.

25          So in this case, we know that the settlement that's

1    before you is on behalf of only third-party payors, meaning

2    there are no consumers in this class.  You have no consumers

3    that you need to be the vanguard for in terms of protecting

4    their interests in terms of whether the fees are appropriate or

5    not in this circumstance.

6            Now, you know better than probably almost any other

7    jurist in the country what the complexion is, what the

8    demographics are of the third-party payors in the country,

9    right?  But we do know that the vast majority of those

10   third-party payors, in terms of at least the number of the

11   claims, fall within, you know, a couple of a dozen or so larger

12   institutions.  You certainly don't need to protect the

13   interests of the Aetna and the Humana, the WellPoint, Cigna,

14   that kind of thing, if they haven't objected, and the fact that

15   they're here affirmatively supporting the settlement.

16           So instead, you know, although you would still have a

17   role -- you know, again, the question is, what am I doing in

18   terms of protecting, and who am I protecting? -- really the

19   interest then would be, you know, there are other payors that

20   are out there in the country, and are the lawyers getting too

21   much money for this case, and do I need to protect them?

22           Now, we also know that after notice has gone out in

23   this case, you have the affirmative support through the opt-out

24   groups, the usual opt-out groups, that they are behind the

25   settlement, that they are fully supportive of the settlement,

1    they haven't objected to the fee.  So the vast majority of the

2    money from whom this money, if you don't give it to us,

3    frankly, where will it go?  It will go to Cigna, Humana,

4    WellPoint, that kind of thing, even though they haven't

5    objected to our getting the money.

6         And so the practical then question will be, "Okay, as

7    I'm sitting here and I'm trying to figure out the fees, how am

8    I protecting some people who have not objected, have not voiced

9    a concern but who have gotten notice?"  So that's one thing

10   just to be thinking about.

11        So then the second thing I think to think about is,

12   all right, how does this case stack against a lot of those

13   other mega cases that are out there?  Okay?  Well, you've got

14   obviously the time period that we've been doing the case.  That

15   either tells you that we've been very inefficient in managing

16   the case, or it just took us an awful long period of time,

17   right?  But, also, it is extraordinarily rare -- you know

18   this -- that you're going to have a trial in any kind of a

19   class action case.  And you also know that when you have that

20   trial, how many RICO verdicts are there against pharmaceutical

21   companies in the United States?  I think it's one, as near as

22   we count.  This is the only time --

23        THE COURT:  But that's the *Kaiser* case, see, so --

24        MR. SOBOL:  But hear me out on that, okay?  Sure,

25   that's the *Kaiser* case in terms of the trial, but you said it

1  yourself before you came here:  The development of the *Kaiser*

2  case occurred in the years before November of 2009.  That's

3  what I'm talking about.  The *Kaiser* trial wouldn't have been

4  anything if it hadn't have been for the -- what is it? -- five

5  years of developing the Meredith Rosenthals, you know, the John

6  Abramsons, all of the indication people, the Johns Hopkins

7  people who, you know, came up.  So all of that is what we're

8  here today to get paid for, right?  Who's kidding who?  The

9  civil RICO verdict against Pfizer doesn't happen unless we do

10  that.

11        Now, there's also something, and this doesn't deal

12  with any of my lawyering, frankly, but if you want to really

13  honestly look at this case in terms of how it gets set apart,

14  it's what Tom Greene's office did under Tom Greene's leadership

15  in terms of saying, "You know what?  We're going to do amazing

16  forensic lawyering in this case, and what we're going to do is,

17  we're not going to look at the published study that Pfizer

18  publishes.  We're not going to look at the draft of that study

19  that they give us.  We're going to go behind all of that and

20  find out the real truth about what really happened."  That was

21  an enormous undertaking.  There hasn't been any lawyering

22  undertaken in any of the pharmaceutical marketing cases that I

23  know of where the private lawyers went into the interstices of

24  an Ann Arbor, pulled out the drafts of the reports, and found

25  out the lies from a pharmaceutical company.  That took years of

1    effort.  It was an amazing achievement.  And in all those mega

2    deals where you've got the securities lawyers getting, you

3    know, a 20 percent or 22 percent fee on a settlement a couple

4    of years into things with the massive lawyers, that's just a

5    bunch of lawyers doing that kind of thing, frankly.  This is a

6    remarkable achievement by this man and his firm.  It really is.

7           So this case is not like any of those other cases.

8    And this isn't just an impassioned plea for money, frankly.  I

9    honestly believe that in all those other MDLs cases that you

10   have, there are, from my experience, there are two amazing

11   achievements:  One is this case, and one is the *McKesson* case

12   that was in front of you, because you know that for *McKesson*,

13   what stood out in *McKesson* was that the lawyers figured out the

14   manipulation about what had been going on in *McKesson*, and we

15   created it, so let's compare to how this case stacks up to

16   *McKesson*.

17          In *McKesson*, the settlement was $350 million.  You

18   gave a fee of $70 million.  Actually, I think it was a little

19   bit more than that, right?  But the multiplier that was

20   provided for the lawyers there as a result --

21          THE COURT:  So that was?

22          MR. SOBOL:  Is that number really right?

23          THE COURT:  So it was 20 percent.  Yes, that's right,

24   it was a 20 percent in --

25          MR. SOBOL:  It was a 20 percent, okay.  So then the

```
 1   multiplier that we got in that case was 8.3, meaning --
 2            THE COURT:  Yes, and I --
 3            MR. SOBOL:  Because that's --
 4            THE COURT:  And I -- first of all, it was 20 percent,
 5   and I worried about the 8, if you remember correctly.
 6            MR. SOBOL:  Sure.
 7            THE COURT:  I worried about it.  But it was still only
 8   20 percent.
 9            MR. SOBOL:  Fair enough, it's 20 percent.  But we
10   don't look at the percentage.  Why would we care about the
11   percentage?  We want to know not the percentage, but of the
12   time and the money and the opportunity costs that we put into
13   the case, how are we getting rewarded?  That's the reality of
14   the economics, and I'll turn to it in a second, but just
15   imagine putting yourself in our situation.  You're going to be
16   hiring the lawyers.  If you're going to do what this group did
17   for all those years, you're not thinking about what the
18   percentage is going to be at the end.  You're wondering, "Well,
19   if I'm putting my law firm at jeopardy and paying these lawyers
20   for the next five years, and spending millions of dollars on
21   those experts, what's going to be my rate of return on my time
22   and the money that I put into the case?"  That's what you're
23   thinking about.  That's your mindset.
24            Now, in McKesson -- and fair enough, and you did, and
25   I'm not begrudging it -- in fact, you know, it was much
```

```
 1    appreciated, and I also think it was fair and appropriate under
 2    the circumstances -- the multiplier there was somewhat higher
 3    than 8.
 4          Now, in this case, if a one-third fee would be
 5    awarded, the return on the lawyering here would be half of that
 6    in McKesson.  So that's the way that we would see it, frankly.
 7          Now, I know that, you know, judges might say, "Well,
 8    we're looking at percentages, not the multiplier," but the
 9    multiplier is a part of the analysis.  So I don't think that
10    Neurontin, frankly, is worth half the return on investment that
11    McKesson is worth, but that would be the result of a one-third
12    fee, is that we would be getting literally paid one-half of the
13    return of our investment.
14          And of reality, also, part of that, honestly, is that
15    this case took longer, right?  It ended up with more time and
16    more money, therefore, involved in it, right?  Therefore, your
17    return on your investment is going to be lower, we recognize.
18          Now, having said all that, I would make a different
19    suggestion to you then, your Honor, which is this:  If you were
20    to award a 30 percent fee across the board, right, then that
21    30 percent fee would result in -- I need to see my math here --
22    a gross fee of $97,000,500.  The multiplier is going to go
23    down.  Our multiplier is going to end up being in the low 3s at
24    that point.  We will be getting paid much less than half our
25    investment as compared to McKesson, but in that situation, you
```

1   still would be fairly rewarding the lawyers at that level.

2           THE COURT:  So let me ask you this:  I never did get a

3   true lodestar here, right?  I mean, you just gave me the bottom

4   line?

5           MR. SOBOL:  I'm sorry?

6           THE COURT:  I don't have a way myself of calculating

7   the lodestar, do I?

8           MR. SOBOL:  Yes, you do.

9           THE COURT:  Where is that?

10          MR. SOBOL:  Well, in Mr. Greene's affidavit, you have

11  our estimate of the most conservative, meaning the lowest

12  amount of time and time value --

13          THE COURT:  But do I have your hourly rates and all

14  that kind of thing in Mr. Greene's?  I didn't remember that.  I

15  didn't see it.

16          MR. SOBOL:  I think that you do have -- I would need

17  to actually check Mr. Greene's affidavit.  What we did with the

18  time in the case is, we made sure that we were giving you --

19  well, what we did was, we looked at all the lawyers' time.  We

20  then went through it, and we said, "Okay, we want to make sure

21  that we give the Court not what our highest inflated time value

22  would be so that makes our multiplier look low."  Instead, what

23  we did is, we did an analysis of the time, and we said, "What

24  is the smallest, most reasonable number that we could provide?"

25  And that's what is in Mr. Greene's affidavit.  And in

```
 1    connection --

 2              THE COURT:  Well, how much were you all billing out

 3    at, like $1,000 an hour?

 4              MR. SOBOL:  No, we were not.

 5              THE COURT:  See, those are the things I don't have.

 6    But apart from that, I believe in the percentage-of-the-fund

 7    approach to this; and while the lodestar can be a cross-check,

 8    I'm not going to be here to sit and say you should have spent

 9    these hours versus these hours or this amount on expenses or

10    those amounts.  It is a cross-check, but I don't know that I

11    have -- and I should go back and look -- anything other than

12    the bottom line, so the --

13              MR. GREENE:  Your Honor, we didn't provide you with

14    the various hourly rates for the --

15              THE COURT:  I don't think so, yes.

16              MR. GREENE:  In my affidavit, we gave you the total

17    conservatively estimated lodestar, as Mr. Sobol just explained,

18    which is I think 27.4.

19              THE COURT:  Right, you gave me the bottom line.

20              MR. SOBOL:  Correct.  I mean, obviously we could

21    provide you the backup with that, and we will if that's the

22    what you'd like.

23              MR. GREENE:  I might just point out to you that that

24    lodestar represents the work of thirty-two law firms that

25    totals 79,000 hours over a ten-year period.
```

```
 1              THE COURT:  Well, no, because you've carved out four
 2    years, right?
 3              MR. GREENE:  Well, the litigation started in 2004, and
 4    if you take it through the appeals and --
 5              MR. SOBOL:  No, she's talking about Kaiser.
 6              MR. GREENE:  Oh, okay, yes, yes.
 7              THE COURT:  You need to carve out the -- and also,
 8    frankly, after Kaiser, the amount of -- it's just minimal.  The
 9    buildup was the big --
10              MR. GREENE:  Well, that was a lot, but also the
11    appellate work was --
12              THE COURT:  But that was, like, $80,000.  I'm just
13    saying compared to the real expense, at least I'm following
14    some of this here, but the real expense was the building up of
15    the case.
16              MR. GREENE:  Well, you know, Tom did some comparisons,
17    but we're talking about 79,000 hours that were expended by this
18    group as compared to 18,653 hours that were expended by the
19    attorneys in McKesson.  That's over four times the amount of
20    work that was done by the attorneys in this case.
21              MR. SOBOL:  Not including --
22              THE COURT:  Well, and you're getting paid fully for
23    that at top dollar, so, I mean, no one's trying to take that
24    away from you.
25              MR. GREENE:  Well, when you say we're getting paid
```

1  fully, when you're talking about percentages that are down

2  below 30 percent, I don't think we're getting paid fully.

3        THE COURT:  You know something?  You're actually

4  wrong.  We've gone through -- my law clerk has gone through

5  almost every case we could find in the country on the mega

6  cases, not to mention my own, and not to mention Law Review

7  articles, and not to mention what they're telling us at

8  multidistrict litigation conferences.  Thirty-three percent is

9  really the top end of what people are giving in the mega cases,

10  and this is a mega case.  So I forget, I mean, we went through

11  all the cases.  You know, we were sort of checking them off.

12  So that's why a third is -- really, we could only find like one

13  case or two cases in the country in the last ten years that

14  were giving those kinds of --

15        MR. SOBOL:  Oh, well, that's --

16        THE COURT:  In terms of published cases.

17        MR. SOBOL:  Oh, well, I will tell you, your Honor,

18  then -- and we're going to do the research for you, okay -- I

19  personally have been involved in several mega cases, if you

20  call something over $50 million or $100 million --

21        THE COURT:  But this is $350 million.  I'm talking

22  about magnitudes like this.  We're trying to find benchmarks

23  because --

24        MR. SOBOL:  Sure.  Well, I mean, I just know, I know

25  personally of cases where they're one-third repeatedly in cases

1    that are over $300 million; and if you're not finding them, we

2    can find them for you, frankly.

3            THE COURT:  They're not in the cases that we've

4    surveyed.  Let's put it that way.  Or in the -- what was the

5    name of that Law Review article?  There's a Law Review article

6    that does empirical analysis of whatever.  I'm just saying that

7    I will think about this.  I will take this under advisement,

8    taking into account all that we've had to say.  It's my least

9    favorite task of this because I have a duty to the class, but

10   nothing that I do in any way detracts from the excellence of

11   the lawyering here, and I've never had a criticism.

12           Did you have one other thing to say?

13           MR. SOBOL:  If I may, just if it's all right with you,

14   your Honor, then by Monday we'll also just provide you a

15   supplemental authority regarding what we think are some of the

16   other mega-fund cases in case --

17           THE COURT:  But as long as it's not cherry-picked.

18           MR. SOBOL:  I'm not going to cherry-pick it, no.  No,

19   we're going to find the mega-pay cases, and we're going to give

20   them to you, and we're not going to give you just the ones that

21   are the high.

22           THE COURT:  So the question that I have is, so as we

23   went through them -- I can go through the list of them that we

24   could find -- we found one, two of the -- we looked at nineteen

25   cases, and of those, some of them were actually as low as 4 to

```
1    7 percent, 6 percent, 9 percent.  I'm not going to do that to

2    you.  I'm not saying that I am.  The highest we found was one

3    that was 32 percent at $215 million and one that was

4    33 percent at $586 million and one that was 31 percent at

5    $1 billion, but those were the three outliers of the group.

6    I'm just saying, when you look at what's happening in the

7    country, mega cases are not being treated the same, and this is

8    a mega case.  And so that's true in the Multidistrict

9    Litigation Manual and my law clerk's survey.  You're welcome

10   to, if you want to -- as I said, I'm sort of not going to do

11   low end for you because I thought you had such spectacular

12   success, but neither are you getting 33 percent.

13           MR. SOBOL:  Sure.  So just to make sure that our

14   research hits the kind of research that you want, from your

15   point of view, a mega fund --

16           THE COURT:  I'm not asking for the research.  We've

17   done --

18           MR. SOBOL:  Well, then we want to provide you, okay,

19   because --

20           THE COURT:  That's fine, that's fine.

21           MR. SOBOL:  What range?  Is it like $200 million and

22   above?  Is it $100 million and above?

23           THE COURT:  It's up to you whatever a mega case is.

24           MR. SOBOL:  Fair enough, okay.

25           THE COURT:  I mean, it's not the -- I'm just simply,
```

1    when you go through it, the other -- there's a Law Review

2    article that was given to us, and maybe there's another one.

3             MR. SOBOL:  Who's the author?

4             THE COURT:  I'm trying to find it.  Brian T.

5    Fitzpatrick, "An Empirical Study of Class Action Settlements

6    and Their Fee Awards," 7J Empirical Legal Studies 811 from

7    2010.  I think the study -- I'm just looking at a slide -- says

8    that both the mean and the median is about 25 percent.

9             MR. SOBOL:  Okay, so we'll address it.  Thank you.

10            THE COURT:  And so I'm looking to stay current, but I

11   know for a fact that it's a difficult decision.  I don't mean

12   to detract from it.  I do think that the attorneys here,

13   particularly Mr. Greene, has been well paid in this case, both

14   through the False Claims Act case and through the *Kaiser* case.

15   True for you, Mr. Sobol, probably in the *Kaiser* case.  The

16   results were excellent, and in several areas you moved the law,

17   and I think you made an important contribution.  Hopefully

18   Pfizer won't be doing the off-label stuff anymore.  Who knows?

19   So I think, just in looking at all the factors, it's a lot of

20   money that you're asking for.

21            MR. SIMMER:  Your Honor, I just may, you know, add a

22   point here because we negotiated or I negotiated with my

23   fifteen clients in this case eleven years ago a 30 percent fee

24   agreement, which reflected an arm's length negotiation with

25   very sophisticated companies that gave us a 30 percent

1    contingent fee agreement to represent them in this case, so --

2         THE COURT:  Well, can I just say, from your point of

3    view, I don't want to call you a free rider, but this was a

4    great deal for you, okay?  It was a great deal for you.  I

5    balked a little at the 1.8.  I was sort of persuaded.  I got no

6    objections.  This is a great deal.

7         Now, if -- you know, you couldn't have been promised

8    that as in a class action fee because you can't promise

9    something that you didn't know what I was going to do, and my

10   history in this case, in the *AWP* and *McKesson,* has been not to

11   give that kind of fee.  I think I did in *GSK* because it was the

12   first out of the gate, and I thought that your firm took huge

13   courage in taking that case, but that's different than the --

14   by the last one down the gate, what was I doing, 25, 20?

15        MR. SOBOL:  25.

16        THE COURT:  25.  That's where I tend to go.

17        MR. DUGAN:  Can I say one thing, your Honor.  James

18   Dugan on behalf of the class plaintiffs.  In addition to having

19   the honor of being appointed by you to serve on this class

20   committee, I also represented Blue Cross of Louisiana.  And at

21   that particular time ten years ago, I was a young lawyer, and

22   the lawyer that was my mentor and I had worked for for ten

23   years -- his name was Wendell Gauthier -- he was a pioneer in

24   the mass tort and class action area, so I met Elizabeth

25   Cabraser and Don Barrett and all these other fine people.  I

1    was, you know, 34 years old at the time and started my own firm

2    with two or three lawyers.  And so I took on the risk at that

3    particular time, and had a longstanding relationship with Blue

4    Cross of Louisiana, to come up here and to continue to fight

5    with the big boys against the big boys.  And I still continue

6    my firm to this day.  We're still small.  We work well with the

7    other large firms.  We've been working this case for ten years.

8    We had minimal involvement in the *Kaiser* trial.  One of our

9    biggest contributions is that I'd had a longstanding

10   relationship with Dr. David Kessler.  He was the first witness

11   in the *Kaiser* --

12            THE COURT:  I remember him.  He's excellent.

13            MR. DUGAN:  Yes, he's excellent.  And, you know, Blue

14   Cross has, I think, served well as a class rep.  I was paid

15   very minimal in the *Kaiser* trial, but I had a lot of time on

16   the class side.  So I have not been compensated in the past

17   fully for my work in this time.

18            Lastly, I would say, I have been fortunate to be

19   involved in these class action cases, and Blue Cross of

20   Louisiana supports the third fee or somewhere in the

21   30 percent, in that range.  As Mr. Sobol alluded to in his

22   first argument, this is a particular class that they're going

23   to be getting a tremendous benefit from the work of these

24   lawyers, and it is absolutely not out of the ordinary for class

25   counsel to have a third fee.

```
 1              THE COURT:  Are you involved in the Vioxx litigation?

 2              MR. DUGAN:  I was involved in the Vioxx.  I'm from New

 3    Orleans.  I was actually, along with Ms. Cabraser, cochair of

 4    the Third-Party Payor Committee.  Mr. Sobol was involved in

 5    that case with us also.

 6              THE COURT:  Because it says here, I mean, I don't

 7    know, but that Vioxx gave it a 6 percent.

 8              MR. SOBOL:  Oh, this -- your Honor --

 9              MR. DUGAN:  It was an assessment.

10              MR. SOBOL:  If I may, your Honor?

11              THE COURT:  Yes, that was something else?

12              MR. SOBOL:  If I may?

13              THE COURT:  Yes.

14              MR. SOBOL:  If you are looking at common benefit fee

15    assessments, then you are looking at a very, very, very

16    different apple.

17              THE COURT:  So how much was the thing in Vioxx?

18              MR. SOBOL:  So the common benefit fee assessment is an

19    amount of money that goes to the PSC for doing mass tort work.

20              THE COURT:  Yes, I'm seeing the Fitzpatrick article is

21    about fee awards percentages, and that was a fee assessment.

22    So tell me, what was the Vioxx?  Do you know?

23              MR. SOBOL:  In Vioxx, there was no class, so you need

24    to understand you're looking at a very different model, okay?

25    So in mass tort cases, your Honor, sometimes the court will
```

1    impose a percentage of a common fund that's created to go to

2    some of the lawyers who have been doing common benefit work in

3    that mass tort.  The money, the fees still are assessed

4    according to the private contracts that the lawyers have with

5    their clients at rates of anywhere between 25 and 40 percent.

6          Now, there was in the mass tort area, sometimes the

7    mass tort judges, the MDL judges, impose a fee cap on the

8    private fee contracts with their thousands of mass tort

9    clients; and in *Vioxx*, I think that Judge Fallon did a limit of

10   what, Elizabeth?

11         MR. BECNEL:  32 percent because he took 4 percent from

12   the -- Daniel Becnel, your Honor.  I argued the MDL in *Vioxx*.

13         THE COURT:  So there was no class in *Vioxx* at all?

14         MR. BECNEL:  Not technically a class.

15         THE COURT:  Oh, I didn't know that.

16         MR. BECNEL:  It was a negotiated settlement in front

17   of the judge --

18         THE COURT:  Okay, that's useful.

19         MR. BECNEL:  -- with the defendants and the

20   plaintiffs.

21         MS. CABRASER:  Your Honor, Elizabeth Cabraser.  I'm on

22   the Plaintiffs' Steering Committee in *Vioxx*.

23         THE COURT:  Well, if there was no class, it's

24   irrelevant.

25         MS. CABRASER:  That's right, and the problem, your

1    Honor, is, when academics are looking at fee awards in mass

2    torts and class actions, they sometimes confuse a back-end

3    contingent common benefit assessment in a non-class mass tort

4    action with a class counsel fee.  As Mr. Sobol noted, they're

5    completely different animals.  What you would look at for

6    comparison in *Vioxx*, if you were truly trying to compare that

7    case with this, would be the cap that Judge Fallon placed on

8    the private contingent fees of the underlying tort lawyers.

9    That cap was 32 percent.

10         What we will do in the research that you have

11   graciously allowed us to give you is make sure that we explain

12   those differentials and focus only on the class action fee

13   awards in class cases.

14         THE COURT:  I'm quite certain, when my law clerk went

15   through this, that she was only looking at percentage, so --

16         MS. CABRASER:  I'm sure that's right, your Honor.

17         THE COURT:  So that's interesting.  I thought Vioxx --

18   I was asking from Louisiana.  When you mentioned it, *Vioxx*

19   popped to mind.  So *Vioxx*, was there an MDL class action at

20   all?

21         MS. CABRASER:  Eventually there was, your Honor --

22         THE COURT:  I thought there was, yes.

23         MS. CABRASER:  -- with respect to the consumer claims,

24   which were a very small part of that case.  Third-party payor

25   claims were resolved on a nonclass basis because of the small

1    number of large payors there.

2           THE COURT:  So what did he do on the class action with

3    the consumers?  Does anyone remember?

4           MS. CABRASER:  I recall that the Court --

5           THE COURT:  I could call him.

6           MS. CABRASER:  The Court-awarded fee on the

7    third-party payors was $15 million.

8           THE COURT:  It was a smaller --

9           MS. CABRASER:  It was a smaller settlement, much

10   smaller settlement in that case.  The Court hasn't decided the

11   attorneys' fee on the consumer class action settlement.  That's

12   still in claims administration.  Again, it's a smaller

13   settlement.

14          THE COURT:  So it's not comparable?

15          MS. CABRASER:  Not comparable to this, no.

16          THE COURT:  I just thought of Louisiana just because

17   you said you were from there, so --

18          MR. BECNEL:  Your Honor, may I address Court?

19          THE COURT:  Yes.  Mr. Sobol, why don't you sit down --

20          MR. SOBOL:  Yes, I'm sorry.

21          THE COURT:  -- because either I'm short or you're

22   tall, but I can't see him.

23          MR. SOBOL:  I didn't know he was up.

24          MR. BECNEL:  What the Court doesn't realize in making

25   these analyses is things that we do.  For example, in

 1    Louisiana, after Katrina, I represented 61,000 people pro bono

 2    all the way through the Supreme Court of the United States and

 3    lost, and probably spent $4 million to $5 million of my money.

 4    I've just confected a settlement of $50 million for people in

 5    the flood and charged no fee whatsoever.  In the *Deepwater*

 6    *Horizon* case, I only charged 10 percent, even though the court

 7    said I could charge 25 percent.

 8            It depends on the lawyers, but if you cut our throats

 9    in one case, how can we ever do -- and I've been doing this for

10    46 years --

11            THE COURT:  But at the end of the day, I gave you

12    25 percent.  I mean, that's really where the people -- how much

13    money was at stake in the *Deepwater Horizon*?

14            MR. BECNEL:  Oh, they're still gone.  They --

15            THE COURT:  So what was the 25 percent?

16            MR. BECNEL:  No, no.  The court, Judge Barbier said he

17    was going to cap the fee for private lawyers to 25 percent.

18            THE COURT:  So that was another one like *Vioxx* with

19    the --

20            MS. CABRASER:  Yes, your Honor.  Elizabeth Cabraser.

21    I'm also on the PSC in *Deepwater*.  The 25 percent that

22    Mr. Becnel refers to is a cap on the contingent fees of private

23    lawyers who are helping class members make claims.

24            THE COURT:  I see, so it's like the *Vioxx*.

25            MS. CABRASER:  It's like *Vioxx*.  The Court has not

1    decided the attorneys' fees in the *Deepwater Horizon* class

2    action settlement yet.  That has to await the close of the

3    claims period and the total amount of the --

4         THE COURT:  Okay.  Well, listen, I think I've heard

5    enough.  I always feel as if at the end of these cases, they

6    sort of end on not the biggest upbeat note because I end up on

7    attorneys' fees.  You'll submit something on Monday, but mostly

8    what I'd like to say is congratulations to the plaintiffs' side

9    on the case.  It's been a decade that we've been together.

10   This is the end of both of my MDLs.  I've been doing both of

11   them simultaneously for a decade or more; actually, since 2001

12   if I take both cases.

13        And on Pfizer, I'm very pleased that you've settled

14   this case and hopefully put it behind you.  And I must say, of

15   concern to me about Pfizer is that there have been several of

16   these, and I'm hoping that the handwriting is on the wall that

17   they've really got to be more careful about how they market

18   these products.  And I'm sure the Board is aware of it.  And

19   how many of these have there been?  Because I know there was

20   another case, two other cases I think in Massachusetts of

21   off-label, not the RICO cases, the False Claims Act cases,

22   right?  I think there have been other cases involving Pfizer,

23   and I'm hoping that with this behind them, they just basically

24   get the signal that it doesn't pay.

25        I say that because I remember when we imposed a fine

1   on the False Claims Act case that Mr. Greene had, I later read

2   in a book that Judge Saris essentially imposed chump change on

3   Pfizer.  What was the name, Jerry Avorn, who writes about the

4   pharmaceutical industry?  Which made me feel bad because the

5   reality is, I thought it was a lot of money; and I think, at

6   the end of the day, this was such a super drug that it could

7   just be viewed as a cost of doing business.  And I, as you

8   know, was appalled at what happened when I did the *Kaiser* case.

9   So I'm hoping it's the end of it, Pfizer goes on and invents

10   great cures for lots of problems, but that they're just more

11   honest in how they do their scientific research.

12          MR. GREENE:  Judge Saris, can I say just one thing in

13   closing?

14          THE COURT:  Yes.

15          MS. CABRASER:  We've been on this case for ten years

16   and almost eight on *Franklin* prior to that.  And you said

17   things don't end on an up beat sometimes when you're talking

18   about attorneys' fees, but we've talked about all the work we

19   did in this case, and I think we have to acknowledge all the

20   work that you did in this case as well over this ten-year

21   period.  You know, we had so many contested motions, so many

22   hearings you gave us, and the opinions you spent so much time

23   crafting and were well reasoned.  We might have disagreed with

24   some of them, but I think --

25          THE COURT:  Not most.

1          MR. GREENE:  -- for all of us here, that we appreciate

2     the time the Court gave us.

3          THE COURT:  Well, thank you very much.  And so this is

4     it.  It's the end of my multidistrict litigations with you for

5     a while.

6          MR. SOBOL:  We'll get you another one real soon, your

7     Honor.

8          (Laughter.)

9          THE COURT:  I know.  I thought you gave me some other

10    one.  I can't remember what it was.  But, anyway, thank you

11    very much.

12         MR. COHEN:  Your Honor, could I just change the topic

13    for one second?  Since my daughter was eight years old, I've

14    been trekking up from New York on *AWP* and this case and other

15    cases, and she's been hearing for all these years, "Where are

16    you going?"  I said, "I'm back in front of Judge Saris, I'm

17    back in front of Judge Saris, I'm back in front of Judge

18    Saris."

19         This morning I had the privilege of sitting in on her

20    1-L civil procedure course with Bill Rubenstein, and my

21    daughter, Ella Cohen, has come to see who Judge Saris is and

22    what this is all about, so a future member of the Bar.

23         THE COURT:  Good to see you.  I hate to ask how old

24    you were when this case started, but just to round it out, I

25    had my first grandson, my first grandchild this week, so --

```
 1              MR. SOBOL:  Congratulations, your Honor.

 2              MR. COHEN:  Congratulations.

 3              MS. ARMSTRONG:  Congratulations.

 4              THE COURT:  So we all go generationally.  Thank you.

 5              MS. CABRASER:  Thank you so much, your Honor.

 6              THE CLERK:  All rise.

 7              THE COURT:  Oh, can I just say, on logistics, you need

 8     to give me an order that actually certifies the class, sticks

 9     in the exact numbers.  So if you could fill everything out, and

10     except the percentage, that would be great when you submit it

11     on Monday.

12              MR. SOBOL:  Sure.  We could do that for you too, if

13     you'd like, but --

14              THE COURT:  And I have officially certify the class

15     still, which I think is fair and reasonable, right?

16              MR. SOBOL:  Yes.

17              MS. ARMSTRONG:  Actually, no, I think the class is

18     certified.  Isn't it in the preliminary approval order?

19              MR. SOBOL:  It has to be confirmed in the final order.

20     We'll do that.

21              THE COURT:  Don't I have to confirm it?

22              MS. ARMSTRONG:  Confirm it, yes, but I think there's a

23     certification --

24              THE COURT:  A preliminary order, or did I --

25              MS. ARMSTRONG:  It's certified in the preliminary
```

1    approval order because that triggers the opt-out right.  The

2    opt-out right is past if there's a class, but it is customary

3    to confirm it in the final order.

4            THE COURT:  Yes, I think that's right, and you'll just

5    make sure we have a final judgment that you're all happy with,

6    and I hope I catch you all in the next.  And even though I

7    didn't always agree with Pfizer's positions, you did excellent

8    representation of them.

9            MS. ARMSTRONG:  Thank you, your Honor.  Even though we

10   didn't always agree with your rulings, you were an excellent

11   judge.

12           (Adjourned, 4:11 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3
UNITED STATES DISTRICT COURT )
4   DISTRICT OF MASSACHUSETTS    ) ss.
CITY OF BOSTON                )
5

6

7           I, Lee A. Marzilli, Official Federal Court Reporter,

8   do hereby certify that the foregoing transcript, Pages 1

9   through 45 inclusive, was recorded by me stenographically at

10  the time and place aforesaid in Civil Action No. 04-10981-PBS,

11  In Re:  Neurontin Marketing, Sales Practices, and Product

12  Liability Litigation, and thereafter by me reduced to

13  typewriting and is a true and accurate record of the

14  proceedings.

15       Dated this 3rd day of November, 2014.

16

17

18                    /s/ Lee A. Marzilli
                    _____
19                    LEE A. MARZILLI, CRR
                    OFFICIAL FEDERAL COURT REPORTER
20

21

22

23

24

25