**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE NEURONTIN MARKETING AND SALES PRACTICES LITIGATION | MDL DOCKET NO. 1629 |
| | MASTER CIVIL ACTION NO. 04-10981 |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION**
**TO REALLOCATE ATTORNEYS' FEES**
**AND FOR DISCOVERY IN SUPPORT OF REALLOCATION**

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................... i

INTRODUCTION .................................................................................................................1

BACKGROUND ....................................................................................................................2

    A.    Bernstein Liebhard's Role in the Case......................................................................2

    B.    PSC Tells The Court That It Conducted A Fee Audit Before
Hearing, And Tells Bernstein Liebhard That It Was Not Impacted ......................3

    C.    PSC Concedes That It Never Performed A Fee Audit Before the Hearing............4

    D.    PSC's Disparate Treatment of Bernstein Liebhard After Fee Approved ...............4

DISCUSSION ........................................................................................................................8

    A.    The Court Must Ensure That Fee Allocations are Fair and Reasonable.................8

    B.    The Court Must Closely Scrutinize a Committee Tasked to Allocate Fees ...........9

        1.    The PSC is Conflicted and Should Not Be Given Deference...................10

    C.    The PSC's Lack of Transparency Also Necessitates the Court's Scrutiny ..........11

        1.    The PSC Reduced Fees Arbitrarily............................................................12

        2.    The PSC Made Arbitrary Lodestar Adjustments
to Bernstein Liebhard's Time to Reward PSC Members..........................13

        3.    The Opacity Here Impels the Court to Review the Reasonableness
of the PSC's Other Questionable Actions in Allocating Fees ..................14

    D.    The Court Should Exercise Its Continuing Jurisdiction Over Fee
Allocations .............................................................................................................15

CONCLUSION....................................................................................................................17

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Carlson v. Xerox Corp.*,
    596 F. Supp. 2d 400(D. Conn.), *aff'd*, 355 F. App'x 523 (2d Cir. 2009) ........................... 5

*In re Copley Pharm., Inc. "Albuterol" Prod. Liab. Litig.,*
    50 F. Supp. 2d 1141 (D. Wyo. 1999), *aff'd*, 232 F.3d 900 (10th Cir. 2000) ................ 9, 14

*In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prod. Liab. Litig.*,
    401 F.3d 143 (3d Cir. 2005)...................................................................... 10, 11

*In re Domestic Air Transp. Antitrust Litig.*,
    148 F.R.D. 297 (N.D. Ga. 1993)....................................................................... 8

*In re High Sulfur Content Gasoline Products Liab. Litig.*,
    517 F.3d 220 (5th Cir. 2008), *appeal after remand*,
    384 F. App'x 299 (5th Cir. 2010) ......................................................... 9, 10, 11

*In re Indigo Sec. Litig.*,
    995 F. Supp. 233 (D. Mass. 1998) .................................................................. 9

*In re Nineteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*,
    982 F.2d 603 (1st Cir. 1992)........................................................................ 16

*In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*,
    56 F.3d 295 (1st Cir. 1995)..................................................................... 12, 16

*In re Vitamins Antitrust Litig.*,
    398 F. Supp. 2d 209 (D.D.C. 2005) .............................................................. 13

*In re Volkswagen and Audi Warranty Extension Litig.*,
    No. 07-md-01790-WGY, 2015 WL 848312 (D. Mass. Feb. 10, 2015).................... 10, 15

*Turner v. Murphy Oil USA, Inc.*,
    582 F. Supp. 2d 797(E.D. La. Oct. 6, 2008), *appeal dismissed*,
    442 F. App'x 117 (5th Cir. 2011)................................................................ 8, 9

**RULES**

Federal Rule of Civil Procedure 23 ...................................................................... 9

*Manual for Complex Litigation* § 14.11 (4th ed. 2004)................................................ 9

## INTRODUCTION

The Plaintiffs' Steering Committee ("PSC") in this case was entrusted by the Court to allocate attorneys' fees in a fair, reasonable, and transparent fashion.  Unfortunately, the PSC instead employed an arbitrary, capricious, and largely concealed process to rationalize cuts to the lodestar of only certain firms—Bernstein Liebhard LLP by far the most—to enrich itself.  The PSC even set aside $24.5 million in a so-called bonus pool—in truth, a slush fund—the vast majority of which it awarded to itself without disclosing the criteria for awards or which firms received awards.

Bernstein Liebhard, which saw the PSC cut its reported lodestar by more than 50%, has time and again implored the PSC to shed light on its allocation process and to provide documentation to support its decisions, but to little avail.  In fact, while discussions about the PSC's allocation process remained ongoing, and the PSC was fully aware that Bernstein Liebhard might seek judicial intervention on the matter, the PSC distributed its allocations in a blatant effort to frustrate this Court's duty to supervise the allocation of fees.  Furthermore, the PSC pressed Bernstein Liebhard to make a stark choice: take the unfair allocation offered and forfeit the right to seek judicial review of its allocation process, or risk getting less than the minimum fair and reasonable allocation that the PSC already admitted that the firm deserves.

Bernstein Liebhard wished to mediate this dispute, but the PSC refused two reasonable pre-conditions: 1) that the parties inform the Court that there is a dispute prior to meditation; and 2) that the PSC pay Bernstein Liebhard the minimum fair allocation that it conceded in writing was due.  The PSC instead withheld the allocation to Bernstein Liebhard and threatened an even smaller allocation in an effort to prevent Bernstein Liebhard from bringing this matter to light.

This Court expressly retained "exclusive jurisdiction over  . . . any issues concerning attorneys' fees and expenses" in this action.  Mem. and Order at 11 (ECF No. 4303).  Therefore,

for the reasons discussed, Bernstein Liebhard respectfully requests that the Court direct the PSC to: 1) immediately pay Bernstein Liebhard the minimum amount that the PSC has already acknowledged was a reasonable and fair allocation and which is not in dispute—$4,882,614; and 2) treat Bernstein Liebhard's lodestar as it treated its own—applying no downward adjustments whatsoever—and to pay the firm the same multiplier as the PSC awarded itself.  Bernstein Liebhard further requests that the Court direct the PSC to disclose all of the time records submitted by all of the firms and the PSC's work product for allocating the $91 million fee award, so that both counsel and the Court may assess the fairness and reasonableness of the allocation.

## BACKGROUND

### A.      Bernstein Liebhard's Role in the Case

Bernstein Liebhard served as co-chair of the discovery committee in this litigation, expending 8,900 hours for a total lodestar of $5,273,035—a commitment greater than all but one other firm, including the PSC.  Among other things, Bernstein Liebhard took, attended and defended depositions, handled discovery disputes with defense counsel, conducted document review, contributed to PSC litigation strategy sessions, coordinated discovery between all of the varying plaintiff groups, and contributed to the litigation fund.   In terms of risks taken and work contributed, Bernstein Liebhard performed a role equivalent to a PSC member.  Almost all of Bernstein Liebhard's work was tallied before 2008.  Following this Court's denial of class certification, the PSC stopped assigning work.  Bernstein Liebhard has yet to be compensated for any of the work it performed in this litigation.

**B.     PSC Tells The Court That It Conducted A Fee Audit Before Hearing, And Tells Bernstein Liebhard That It Was Not Impacted**

In September 2014, the PSC moved for an award of attorneys' fees on behalf of all class counsel. In its brief in support of the motion, which was not shared with other class counsel pre-filing, the PSC stated that it performed "a careful audit of time submitted by all firms who have worked on the plaintiffs' behalf, which Class Counsel undertook to weed out duplicative or inefficient billing." Mem. in Supp. of Motion for an Award of Attorney's Fees, Reimbursement of Expenses, and Compensation Awards to Class Representatives (ECF No. 4288) at 16, n. 6. The PSC further represented that it applied downward adjustments to the firms' lodestar to reduce the total from $36.8 million to $27.4 million. Aff. of Thomas M. Greene in Supp. of Class Plaintiff Counsel's Motion for an Award of Attorney's Fees, Reimbursement of expenses, and Compensation Awards to Class Representatives (ECF No. 4289) (Greene Aff.).

Upon first learning of the PSC's audit, Bernstein Liebhard immediately contacted Greene to assess whether the firm needed to make a separate submission to protect its interests in the litigation. Greene told Bernstein Liebhard that the firm's time and expenses were not individually impacted by the audit. In reliance on this representation, which still concealed the criteria used for the audit and the audit's true impact on each firm's allocation, Bernstein Liebhard did not make a separate fee submission at that time.

In November 2014, the Court granted the PSC's fee request, awarding 28% of the common fund, with a multiplier of 3.32 instead of the requested 3.9. In so doing, the Court noted that the PSC has "not provided detailed information regarding hours worked, hourly rates charged, or expenses charged, rendering it impossible for the court to perform a proper lodestar

cross-check. . . ."  Mem. and Order at 8-9 (ECF No. 4303).  The Court, nevertheless, directed the

PSC to "allocate the fees and expenses among Class Counsel in a reasonable fashion."[1]

In February 2015, the PSC informed Bernstein Liebhard of its allocation, but continued

to conceal the process employed to calculate that allocation.  As set forth herein, the PSC

allocated Bernstein Liebhard a 1.468 mutiplier to a downwardly adjusted lodestar—essentially

no multiplier at all on the firm's actual lodestar.

### C.  PSC Concedes That It Never Performed A Fee Audit Before the Hearing

Bernstein Liebhard promptly objected to the fairness of the PSC's allocation, and

attempted to uncover how the allocation was derived.  On February 23, 2015, the firm requested

work product supporting the PSC's audit and its fee and expense allocation.  *See* Exhibit A

annexed to the Declaration of Sandy A. Liebhard In Support of Motion for the Court to

Reallocate Attorneys' Fees ("Liebhard Decl.").  The PSC was not forthcoming about these

requests.  On February 25, 2015, the PSC informed Bernstein Liebhard that no audit had been

conducted prior to the fee hearing.  *See* Liebhard Decl. Exhibit B.  Instead, the PSC had made

one across-the-board downward adjustment to the total fee request.  Liebhard Decl. Exhibit B.

### D.  PSC's Disparate Treatment of Bernstein Liebhard After Fee Approved

The PSC's February 25, 2015 correspondence, which barely began to shed some light on

the PSC's allocation process, further revealed that the PSC made a series of disparate downward

adjustments to Bernstein Liebhard's lodestar, adjustment it would later be revealed they did not

apply to themselves.  For example, the PSC reduced Bernstein Liebhard's lodestar 1) by $1.1

---

[1] During the hearing on the motion for attorneys' fees, the Court noted that many of the attorneys on the PSC, especially Greene and Sobol, had already been compensated for much of the risk, having been "well paid in this case, both through the False Claims Act case and through the *Kaiser* case."  Hr'g Tr. 10/22/14 at 33.

million by excluding all time performed by contract attorneys[2]; 2) by another $200,000 by excluding largely unspecified "unnecessary or undetermined matters";  3) by another $28,000 by reducing hourly rates of paralegals to the "upper end of paralegal rates in Boston ($175 an hour)"; and  4) by another nearly $1 million by reducing the hourly rate of Ronald Aranoff (the day-to-day attorney on the case for Bernstein Liebhard) to a "reasonable Boston junior partner's rate supposedly commensurate with his experience at the time his work on the case was complete in 2008." *Id.*  Bernstein Liebhard's lodestar, after all of these unreasonable reductions were applied, was $3,020,199.

The PSC also indicated that other reductions to Bernstein Liebhard were considered but not adopted, and that ultimately the PSC determined that it was fair and reasonable to simply adjust Bernstein Liebhard's lodestar to exactly $3,000,000—more than $2.2 million less than Bernstein Liebhard's submitted lodestar.

On February 26, 2015, Bernstein Liebhard reiterated its earlier request for information so that the firm could assess whether its allocation was in fact fair and reasonable.  *See* Liebhard Decl. Exhibit C.  One week later, on March 3, 2015, the PSC gave Bernstein Liebhard some additional superficial information.  *See* Liebhard Decl. Exhibit D.  The PSC, however, did not provide any meaningful details regarding its standards for allocating fees, whether or how those standards were uniformly applied, or the lodestar for the third party payer counsel.

---

[2] Notably, the PSC had never informed Bernstein Liebhard that contract attorney time would be disallowed.  In fact, contract attorney lodestar is typically treated the same as permanent attorney lodestar in fee awards.  *See, e.g*., *Carlson v. Xerox Corp*., 596 F. Supp. 2d 400, 403 (D. Conn.), *aff'd*, 355 F. App'x 523 (2d Cir. 2009).  This is appropriate since a rational firm would not expend hundreds of thousands of dollars on legal personnel merely for the chance to recover those expenses dollar for dollar, or in this case, not at all. Furthermore, not only was the PSC aware that Bernstein Liebhard had hired contract attorneys to perform specific functions requested by the PSC, but in December 2006 an attorney from Greene LLP personally worked with Ronald Aranoff to train the Bernstein Liebhard contract attorneys in New York to perform the tasks.

In fact, the new information that the PSC disclosed only further supports that its fee allocation process was biased. For example, the PSC provided the "current hourly rates reported by each firm that were used to calculate their reported lodestar." *See* Liebhard Decl. Exhibit D. Boston hourly rates were not applied across the board, according to the PSC. In fact, the PSC did apply Boston rates to a large chunk of Bernstein Liebhard time, yet not at all to the PSC firms outside Boston. *Id*. No detail was given on when and why such adjustments were made, and on which lawyers or firms they were imposed, other than that they were used to reduce Bernstein Liebhard's lodestar.

In addition, the PSC noted that the tentative allocation it provided did not include any so-called "bonus awards" from the $24.5 million "bonus pool" that was created. *Id*. at 2. Except to hint that it intended to divvy the vast majority of that bonus pool amongst its members, the PSC did not disclose (and to this day has still not disclosed) to which firms it allocated its bonus pool or how much of a bonus each firm received.

Furthermore, the PSC provided charts that summarize each firm's reported lodestar and "current tentative adjusted lodestar," which further evidence the disparate treatment of non-PSC members like Bernstein Liebhard and the need for greater transparency here:

| PSC Firm | Submitted Lodestar | Adjusted Lodestar per 3/3/15 Sobol Letter |
|---|---|---|
| Barrett Law Office PA | $1,449,411.00 | $1,477,821.00 |
| Greene LLP | $8,515,720.50 | $8,513,039.50 |
| Hagens Berman Sobol | $3,160,930.75 | $3,160,930.75 |
| Lieff Cabraser | $3,361,631.00 | $3,361,631.00 |
| Daniel E. Bechnel, Jr. | $746,932.50 | $746,932.50 |

| Dugan Law Firm[3] | $2,026,149.51 | $1,000,000.00 |
|---|---|---|

As the chart above clearly demonstrates, after the PSC employed its mysterious process for adjusting lodestar, non-PSC firms saw their aggregate lodestar reduced by approximately 27% (from roughly $12.9 million to roughly $9.4 million), while PSC members (except Dugan) saw their lodestar actually *increase* by $25,729.  Astoundingly, Bernstein Liebhard's reduction alone amounted to about 63% of the aggregate non-PSC downward adjustment.

On March 5, 2015, Bernstein Liebhard once again appealed to the PSC to lift the veil on its allocation process.  *See* Liebhard Decl. Exhibit E.  This time Bernstein Liebhard requested from the PSC 1) the underlying time records of the PSC members and the co-discovery chair firm; 2) the underlying time records for the third party payer counsel that accounted for $19 million of the total fee distributed; 3) the names of contract attorneys employed by other firms; and 4) the "bonus pool" allocation plan.  But the PSC ignored Bernstein Liebhard's request.

On March 17, 2015, Bernstein Liebhard again urged the PSC for transparency.  The PSC replied that it had "made no final decisions" and "did not know timing at this point" to make final decisions.  *See* Liebhard Decl. Exhibit F.  About two weeks later, on March 30, 2015, Bernstein Liebhard made a final request for disclosure, and advised the PSC that it should not distribute any allocation because the firm was prepared to seek judicial intervention, if necessary. *See* Liebhard Decl. Exhibit G.  On April 1, 2015, the PSC responded by email that despite the pending requests for information and the ongoing dispute, it had already issued instructions to the escrow agent to distribute the allocation.  *See* Liebhard Decl. Exhibit H.

---

[3] Much of Dugan's lodestar reduction was due to the fact that much of its time was allocated to another firm.

In a letter received April 2, 2015, the PSC stated that it had determined that a fair and reasonable allocation to Bernstein Liebhard was $4,882,614. *See* Liebhard Decl. Exhibit I. The PSC then offered Bernstein Liebhard $5,651,214.85, as long as the firm did not seek judicial intervention to review the fairness of the allocation process.

Bernstein Liebhard subsequently endeavored to reach an agreement with the PSC, through Sobol, to privately mediate this dispute on two conditions: 1) that it be permitted to cash a check in the amount of the minimum fair and reasonable allocation—$4,882,614—without prejudice, and 2) that the parties inform the Court that a dispute exists and that private mediation is being tried to resolve it. The PSC rejected both conditions and then capriciously threatened that even the $4,882,614 allocation would be off-the-table if Bernstein Liebhard sought judicial intervention into the fairness of the PSC's fee allocation process.

This application followed.

## DISCUSSION

### A.    The Court Must Ensure That Fee Allocations are Fair and Reasonable

The allocation of attorneys' fees in the settlement of a class action is ideally a private matter to be handled by class counsel. *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 357 (N.D. Ga. 1993). This is so because generally class counsel are better positioned than the presiding district court to evaluate the weight and merit of each other's contributions to the litigation. *Turner v. Murphy Oil USA, Inc.*, 582 F. Supp. 2d 797, 808 (E.D. La. Oct. 6, 2008), *appeal dismissed*, 442 F. App'x 117 (5th Cir. 2011). Unfortunately, class counsel do not always agree on a fee allocation. Under such circumstances, which are regrettably present here, judicial intervention is required to ensure that the allocation of attorneys' fees to all class counsel is appropriate, and based on a fair and transparent process. *Id.* at 805. At least one judge in this district has stated it plainly: "[a]ny counsel who is dissatisfied with the allocation made by lead

counsel may apply to the Court for relief." *In re Indigo Sec. Litig.*, 995 F. Supp. 233, 235 (D. Mass. 1998).

Furthermore, notwithstanding any conflict, the district court also has an independent duty under Federal Rule of Civil Procedure 23 to the class and to the public to ensure that the attorneys' fees are divided fairly among plaintiffs' counsel. *See, e.g., In re High Sulfur Content Gasoline Products Liab. Litig.*, 517 F.3d 220, 227 (5th Cir. 2008), *appeal after remand*, 384 F. App'x 299 (5th Cir. 2010); *Manual for Complex Litigation* § 14.11 (4th ed. 2004) ("The court must distribute the [fee award] among the various plaintiffs' attorneys, which may include class counsel, court-designated lead and liaison counsel, and individual plaintiff's counsel."). Accordingly, a district court should always "take[] seriously its responsibility to closely scrutinize the attorneys' fee allocation." *Turner*, 582 F. Supp. 2d at 808. "The work that an attorney devotes to a class action is generally the principal factor by far in determining the attorneys' portion of the common benefit fee." *Id.* at 810. Therefore, a district court's "apportionment [of attorneys' fees] is largely dependent on an analysis of the amount, nature, and significance of the work of each counsel and how it relates to the work of the other counsel." *Id.* at 812 (citing *High Sulfur*, 517 F.3d at 232; *In re Copley Pharm., Inc. "Albuterol" Prod. Liab. Litig.*, 50 F. Supp. 2d 1141, 1149 (D. Wyo. 1999), *aff'd*, 232 F.3d 900 (10th Cir. 2000)).

### B.    The Court Must Closely Scrutinize a Committee Tasked to Allocate Fees

Enlisting a committee of firms to allocate the awarded fee to plaintiffs' counsel, which is certainly within the discretion of a district court, does not absolve the district court of its duty to ensure that the proposed fee allocation is fair and reasonable. *See High Sulfur,* 517 F.3d at 227 ("[T]he appointment of a committee does not relieve a district court of its responsibility to closely scrutinize the attorneys' fee allocation, especially when the attorneys recommending the allocation have a financial interest in the resulting awards"). As one judge in this District

9

recently stressed, nothing—including a proposed allocation made by lead counsel—can "displace the Court's judgment.  It remains the Court's responsibility meaningfully to review all . . . fee petitions and . . . comments and to make independent determinations as to what [allocation] is fair and reasonable." *In re Volkswagen and Audi Warranty Extension Litig.*, No. 07-md-01790-WGY, 2015 WL 848312, at *22 (D. Mass. Feb. 10, 2015).

In fact, the duty of a district court to scrutinize the allocation of attorneys' fees is sometimes even greater where a committee is tasked to allocate fees because such "counsel have inherent conflicts."  *Volkswagen*, 2015 WL 848312, at *23 (citing *In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prod. Liab. Litig.,* 401 F.3d 143, 173 (3d Cir. 2005) (Ambro, J., concurring)).  Judge Ambro articulated these inherent conflicts in *Diet Drugs,* explaining that "[counsel tasked with allocating fees] make recommendations on their own fees and thus have a financial interest in the outcome.  How much deference is due the fox who recommends how to divvy up the chickens?" *Diet Drugs,* 401 F.3d at 173.  Numerous other courts have echoed these concerns, including the Fifth Circuit, which observed that:

> It is one thing for all attorneys to come to an agreement about dividing up fees, and quite another for five attorneys to declare how an award will cover themselves and seventy-four other attorneys with no meaningful judicial supervision or review.

*High Sulfur,* 517 F.3d at 234.

## 1.    The PSC is Conflicted and Should Not Be Given Deference

The District Court, in its final approval order, tasked the PSC to allocate the awarded attorneys' fee to plaintiffs' counsel, presumably because it believed that the PSC could do so fairly.  Unfortunately, the temptation to reward its own members proved too great for the PSC. In that regard, there is no question that the PSC is conflicted here, and therefore, the District Court should not give deference to the PSC's proposed fee allocation.  The members of the PSC

"had a direct conflict of interest: they were suggesting to the District Court how to proceed on matters near and dear—dividing a limited fund among themselves and other firms.  Such a direct conflict of interest strongly suggests that affording substantial deference is inappropriate."  *Diet Drugs,* 401 F.3d at 173-74.  Even if the PSC's fee allocation here "may ultimately be [deemed] fair [after a thorough review by the District Court], careful attention must [nevertheless] be paid to the procedures by which the allocation is set."  *Id.* at 173.  If a district court "chooses to rely on the recommendations of a committee of interested attorneys [to allocate fees], it then becomes necessary to scrutinize more closely those recommendations."  *Id.*

### C.    The PSC's Lack of Transparency Also Necessitates the Court's Scrutiny

The District Court's scrutiny into the PSC's fee allocations is further necessitated by the complete lack of transparency into the process applied by the PSC to allocate fees here.  It is axiomatic that any proper fee allocation must have a sound factual basis, and apply a fair standard of allocation equally when valuing each firm's contributions.  *High Sulfur,* 517 F.3d at 230, 232.  Transparency into these matters is widely regarded as highly beneficial to both the class and the courts.  "Attorneys' fees, after all, are not state secrets that will jeopardize national security if they are released to the public ... From the perspective of class welfare, publicizing the process leading to attorneys' fee allocation may discourage favoritism and unsavory dealings among attorneys even as it enables the court better to conduct oversight of the fees."  *Id.* at 230.  Logically, therefore, a lack of transparency into this process, as is the case here, raises the specter of self-dealing.  *Id.* at 229 ("The lack of transparency about the individual fee awards supports a perception that many of these attorneys were more interested in accommodating themselves than the people they represent").

The PSC has been deliberately opaque about its process for allocating fees, and has actively denied Bernstein Liebhard's reasonable requests for information about that process.  As

11

such, there is no way—absent discovery into the PSC's conduct—to confirm whether the PSC's fee allocation is actually fair and reasonable.

The First Circuit has recognized that firms that object to a fee allocation have a due process right to the "raw material that they need[] to sift through the particulars of the PSC's fee application," including "access to all the data reasonably necessary to formulate their objections, including all of the PSC members' time-and-expense submissions, summaries thereof, detailed accounts of the procedures used by the PSC to gather, review, and audit time records, and the working papers, correspondence, and documentation generated by the PSC's accountants during the compilation process." *In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 303 (1st Cir. 1995). The PSC has provided no such information to Bernstein Liebhard to date. Nevertheless, the limited information available to Bernstein Liebhard about the PSC's process already demonstrates that the process was capricious, arbitrary, and even punitive, and that it in no way supports that the fee allocation here was fair and reasonable.

### 1.     The PSC Reduced Fees Arbitrarily

In support of its September 15, 2014 fee application, the PSC purportedly performed "a careful audit of time submitted by all firms who have worked on the plaintiffs' behalf, which Class Counsel undertook to weed out duplicative or inefficient billing." Mem. in Supp. of Motion for an Award of Attorney's Fees, Reimbursement of Expenses, and Compensation Awards to Class Representatives (ECF No. 4288) at 16, n. 6. Approximately three months following the Court's approval of the PSC's fees, in February 2015, the PSC informed Bernstein Liebhard of its proposed fee allocation.

12

Bernstein Liebhard objected to its allocation and promptly requested information from the PSC to independently assess whether the allocation was fair and reasonable. The information requested included work product supporting the audit performed by the PSC, and work product supporting the PSC's fee allocation. No such information was ever turned over to Bernstein Liebhard. Instead, on February 25, 2015, the PSC informed Bernstein Liebhard by letter correspondence that it had not performed a detailed audit prior to the fee hearing. Instead, the PSC had simply made a single arbitrary across-the-board downward adjustment to the total fee request. Any purported "audit" performed by the PSC afterwards was only used to justify the arbitrary downward adjustment made by the PSC.

> **2.    The PSC Made Arbitrary Lodestar Adjustments
>            to Bernstein Liebhard's Time to Reward PSC Members**

Scrutiny into the PSC's downward "lodestar adjustments" made to Bernstein Liebhard likewise demonstrates that the fee allocation here was neither fair nor reasonable. For example, the PSC cut the rate of Mr. Aranoff to reflect a Boston-rate supposedly commensurate with Mr. Aranoff's experience level in 2008, which is when the PSC ceased giving Bernstein Liebhard work. This one adjustment alone resulted in a reduction of nearly $1,000,000 to Bernstein Liebhard's lodestar. An examination of the hourly rates charged by the PSC, however, show that the PSC's members were not subjected to any similar rate reductions.

The foregoing demonstrates that the members of the PSC arbitrarily applied different standards of allocation to reward themselves to the detriment of non-members of the PSC like Bernstein Liebhard. In so doing, they have undeniably abused their power and betrayed the Court's trust. *See In re Vitamins Antitrust Litig.*, 398 F. Supp. 2d 209, 234 (D.D.C. 2005) ("The commitment to lead counsel of the responsibility of apportioning the fee among itself and other firms is a fundamental exercise of trust by the court. Implicit in that delegation is the requirement

that lead counsel apply a universally fair standard of allocation to all participants, including itself."). Moreover, in refusing to meaningfully respond to Bernstein Liebhard's reasonable requests for information, the PSC has deliberately shrouded its allocation process from scrutiny, giving a strong impression that it has forsaken fairness in favor of self-dealing.

> ### 3.     The Opacity Here Impels the Court to Review the Reasonableness of the PSC's Other Questionable Actions in Allocating Fees

Given the opacity of the fee allocation process in this matter, the Court might reasonably question other matters that have gone unverified. For instance, it is striking that virtually no PSC time was adjusted downward as a result of the supposed "detailed audit" conducted by the PSC. Indeed, Bernstein Liebhard alone suffered more than half of the lodestar reduction presented to the Court. Bernstein Liebhard understands that the allocations to opt-out counsel were unconscionably excessive relative to their lodestar, but has been denied access to any information regarding the matter. Likewise, the PSC has claimed that all time from the related *Kaiser* matter has been scrubbed from the submissions to the Court, but only the PSC knows for sure. Given that no detailed audits were conducted prior to the hearing on fees, and there has been no opportunity for any review, there is no way for a non-PSC firm or the Court to verify that assertion.

Further evidencing that the PSC has not allocated fees here in a fair and reasonable manner is the fact that the PSC has now dangled conflicting fee allocations before Bernstein Liebhard. Importantly, however, none of these fee allocations are tied to the value of Bernstein Liebhard's contributions to this litigation, as they should be. *See Copley*, 50 F. Supp. 2d at 1149 ("The Court's research reveals that courts unanimously make allocations based "upon the quantity and quality of effort expended by the attorneys in obtaining the common fund"). Instead, they depend entirely on whether Bernstein Liebhard seeks this Court's review of the

allocation process.  First, in the April 2, 2015 letter, the PSC stated that it had determined that Bernstein Liebhard should receive $4,882,614 in total payments, covering fees and expenses, for the firm's contributions to this litigation but offered (and enclosed a check in for) an allocation of $5,651,214.85 instead, so long as Bernstein Liebhard did not seek judicial intervention to review the fairness of the PSC's fee allocation.  Then, when Bernstein Liebhard wished to mediate this dispute, the PSC refused two reasonable pre-conditions: 1) that the parties inform the Court that there is a dispute prior to meditation; and 2) that the PSC pay Bernstein Liebhard the minimum fair allocation that it conceded in writing was due.  The PSC instead withheld the allocation to Bernstein Liebhard and threatened an even smaller allocation in an effort to prevent Bernstein Liebhard from bringing this matter to light.

If the PSC truly calculated that $5.6 million is a fair and reasonable fee for Bernstein Liebhard, the PSC is now unreasonably conditioning that fee on the firm not seeking judicial oversight into the fairness of the allocation.  Further, the threat that the $4.8 million fee, which the PSC claims was "fairly" calculated, could somehow be reduced if Bernstein Liebhard appeals to the Court is both absurd and alarming.  The PSC cannot arbitrarily and punitively reduce Bernstein Liebhard's contribution to this litigation simply because the firm contests the fairness of the PSC's allocation process.  In light of the foregoing, the PSC's conduct here clearly demonstrates that the PSC is not acting as it should, *i.e.* by making fair and reasonable fee allocations based on each firm's respective contributions to the litigation.  *Volkswagen*, 2015 WL 848312, at *22 (holding that "a reasonable fee reflects work that resulted in benefits inuring to the class").

### D.     The Court Should Exercise Its Continuing Jurisdiction Over Fee Allocations

The First Circuit has emphasized that not only must a district court ensure that a common fund fee allocation is fair and reasonable, it also must ensure that all counsel with an interest in

the fee have "the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"
*Thirteen Appeals,* 56 F.3d at 301. "[W]hen a judge constructs a process for setting fees, the
process must contain at least the procedural minima that the Due Process Clause requires; and,
moreover, those procedures must apply in a fair and evenhanded manner to the parties in interest,
without preferring one group of disputants over another." *In re Nineteen Appeals Arising Out of
San Juan Dupont Plaza Hotel Fire Litig.*, 982 F.2d 603, 614-15 (1st Cir. 1992). This can include
"a viable means (comparable to the means afforded the PSC) of describing their contribution to
the litigation, contrasting their contribution with the PSC's contribution, and questioning the PSC
members regarding their work." *Id.* at 615.

Here, the PSC deliberately frustrated Bernstein Liebhard's right to petition the Court.
While Bernstein Liebhard endeavored to learn more about the allocation process, including the
PSC's supposed audit, the PSC stonewalled the firm, denied access to much of the requested
information, and in a shocking disregard for this Court's appropriate role in supervising fee
allocations and resolving fee disputes among attorneys, and Bernstein Liebhard's right to petition
for redress, distributed the allocation and failed to inform Bernstein Liebhard of the fact until
after it had already occurred.

## CONCLUSION

Bernstein Liebhard respectfully requests that the Court direct the PSC to 1) immediately
pay Bernstein Liebhard the minimum amount it has already acknowledged was a reasonable and
fair allocation—$4,882,614; and 2) treat Bernstein Liebhard's lodestar just as it treated its own-
applying no downward adjustments whatsoever-and pay it the same multiplier as awarded to the
PSC. Additionally, Bernstein Liebhard requests that the PSC disclose to all counsel all time

records, and its allocation of all $91 million of the fee award so that both counsel and the Court

may assess the fairness of the allocation.

**Pursuant to Local Rule 7.1(2), Bernstein Liebhard LLP hereby certifies that it has**

**conferred with counsel for the PSC and has attempted in good faith to resolve or narrow**

**the issues raised in this motion.**

DATED:  May 7, 2015                              Respectfully submitted,

                                                 /s/*Andrew Good*
                                                 GOOD SCHNEIDER CORMIER
                                                 83 Atlantic Avenue
                                                 Boston, Massachusetts 02110
                                                 Tel: (617) 523-5933
                                                 Email: ag@gscboston.com

                                                 *Counsel for Bernstein Liebhard LLP*


                                                 BERNSTEIN LIEBHARD LLP

                                                 Stanley D. Bernstein
                                                 Sandy A. Liebhard
                                                 Ronald J. Aranoff
                                                 Christian Siebott
                                                 10 East 40th Street
                                                 New York, New York 10016
                                                 Tel: (212) 779-1414

                                                 *On the brief*

## CERTIFICATE OF SERVICE

I, Andrew Good, hereby certify that this document filed through the CM/ECF system will be sent
electronically to the registered participants as identified on the NEF (NEF) on May 7, 2015. I
further certify that I have sent a copy of the foregoing to Plaintiff pro se Janet Hargett at her
address registered with the Court.

                                                 /s/*Andrew Good*

DATED: May 7, 2015