UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:  NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No.  1629<br><br>Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO:<br><br>CLASS ACTION | Judge Patti B. Saris |

**DECLARATION OF THOMAS M. SOBOL IN OPPOSITION TO MOTION TO REALLOCATE ATTORNEY'S FEES**

I, Thomas M. Sobol, declare under penalty of perjury under the laws of the United States as follows:

1.      I submit this declaration in opposition to the Motion to Reallocate Attorneys' Fees (the "Motion") filed by the firm of Bernstein Liebhard LLP ("Bernstein").  The declaration seeks to provide the Court with the facts of the steps taken by the Plaintiffs' Steering Committee ("PSC") to review the time and expense records of each firm involved in this litigation – both for purposes of the application for an award of fees and expenses from the Court, as well as for purposes of determining a fair and equitable allocation of the awarded funds among the participating plaintiff firms.  I also provide the facts as to how the PSC arrived at an allocation of funds amongst class counsel, including Bernstein.  This declaration also describes the communications with Bernstein that preceded the filing of the motion.

**A.      PSC's review of time and expense records in preparation for application to the Court for award of fees and expenses**

2.      In connection with Class Plaintiffs' Motion for Final Approval of Settlement, Award of Attorneys' Fees and Expenses, and Compensation to Named Class Representatives,

my co-counsel Mr. Thomas Greene and I both submitted declarations (Dkt. Nos. 4286 and  4289) that explained, among other things, the time and expenses incurred by Class Counsel during this litigation, and the review that the PSC undertook of those records in connection with the application for fees and reimbursement of expenses.

3.     As our declarations explained, subsequent to the Court's order preliminarily approving the proposed settlement, the PSC undertook the task of reviewing all of the detailed time and expense records submitted by all class counsel from the inception of the litigation.  I provide the background below.

4.     Shortly after being appointed in 2004, the PSC appointed one firm to collect and maintain, on a monthly basis, all time and expenses claimed by each Class Counsel.  The lawyer assigned this duty then sent each of the firms participating in the litigation a letter setting forth billing guidelines and informing participating firms of the requirement to keep (and submit) contemporaneous and detailed time records that was established by the Court in its original Case Management Order.  The volume of the time and expense materials covering the 10 years of hard fought litigation is quite large.

5.     The PSC obtained and reviewed all such records in order to identify and eliminate any potential overcharges due to inefficiency, duplication of effort, excessive hourly rates, or record keeping discrepancies.

6.     One issue that needed to be addressed was the hours and expenses from 2009 through 2010 that were incurred in connection with the Kaiser claims and trial by those class counsel who worked on that case.  We wished to make sure that all that time and expenses for the Kaiser matter were entirely separate from the time and expense for the class proceeding.  We did so.  As a result, class counsel who participated in the Kaiser trial submitted their time and

expense records to Kaiser in connection with Kaiser's motion for an award of attorney's fees under RICO, and all of that time and expense did not include any of the class time and expense. (When Pfizer paid the judgment, participating class counsel were paid a portion of the fees that Ms. Nussbaum had contracted with Kaiser to be paid. Kaiser and Ms. Nussbaum have informed class counsel that Kaiser considers the total amount of settlement and any fees paid to its counsel to be confidential, and that such information may not be publicly disclosed. Accordingly, we are prohibited from revealing the extent of compensation class counsel received on account of the Kaiser litigation. Of course, if the Court believes such information is relevant, we believe this Court should be able to obtain that information after providing sufficient notice to Kaiser).

7.     Counsel also paid particular care to ensure that any time and expenses related to the Kaiser litigation were not included in any lodestar or expense calculation for purposes of its fee application in the class case. My previous declaration explained that all time and expenses reported for purposes of Class Counsel's motion for fees in this matter were exclusive of the time and expenses associated with the Kaiser trial, including any preparation and post-trial briefing associated with that trial. That representation was accurate and remains accurate in connection with the discussion of fees and expenses described herein.

8.     In addition to review of the previously submitted time and expense reports, at the time of the settlement proceedings for this case class counsel asked each firm to provide two affidavits, one attesting to the firm's time records and the other its expenses. Each firm was asked to attest to the accuracy of their contemporaneously kept time and expense records and to provide any missing backup to support their claimed time and expenses. The time and expenses of any firm who failed to provide an affidavit was not considered in the PSC's calculation of lodestar and expenses.

9.      The total unaudited lodestar reported by all class counsel in this process, was $36.8 million.  Having reviewed each firm's detailed contemporaneous records, and having reduced the reported time to account for identified instances of inefficiency in billing, duplication of effort, and some instances where the work performed was related to claims by Kaiser rather than the Class, the PSC conservatively estimated the lodestar of all class counsel at $27.4 million.  This represented an approximately 26% reduction from the raw time reported by all class counsel.

10.      At that time we had provided the Court with the $27.4 million lodestar estimate, the PSC had not determined which firm's requested lodestars would be reduced, or the amount of any reductions.  In order to avoid delaying the issuance of the final settlement approval due to issues regarding any specific firm's reported hours or rates, the PSC decided to wait until after the Court had entered a fee award to make determinations on a firm by firm basis of the need to adjust reported lodestars to assure fair comparisons amongst firms.

11.      As my declaration in support of the fee award explained, the purpose of our original review was to provide an estimate of Class Counsel's total lodestar so that the Court could perform a lodestar cross-check.  Using the requested fee of $108.33 million, the conservative lodestar estimate of $27.4 million yielded a multiplier on Class Counsel's adjusted time of 3.97.  (The multiplier would have been lower if class counsel was seeking an additional award of litigation expenses, which we did not).

12.      With respect to expenses, the funds spent by the PSC from the PSC's litigation fund totaled over $3.3 million.  The vast majority of these funds were used to pay for the expenses associated with experts, transcripts, and document management.  The litigation fund also received contributions from coordinated plaintiffs, including Aetna and Kaiser, as well as a

reimbursement of some funds as a result of the award of expenses associated with the Kaiser

trial.  Subtracting these amounts, the unreimbursed amount PSC spent from its litigation fund

was in excess of $2.66 million.  In addition, class counsel reported an additional $1.762 million

in out-of-pocket expenses associated with each firm's individual expenses, outside of their

contributions to the litigation fund.  These expenses included items such as travel expenses,

copying costs and telephone charges.  The total reported expenses of class counsel, including the

litigation fund and out-of-pocket expenses, totaled no less than $4.38 million.  Class counsel did

not seek a separate award of expenses and sought only an award of one-third of the total

settlement amount in compensation for *both* their time and expenses.

13.    Along with my declaration, Mr. Greene's declaration addressed, among other

things, the PSC's review of Class Counsels' time and expenses up to that date.  Mr. Greene

stated:

> In the course of preparing this fee application, members of the
> Plaintiffs' Steering Committee have reviewed the time records of
> each firm to ensure that all time was properly recorded to the class
> action (as opposed to work on the Kaiser trial), to eliminate any
> charges for duplicated efforts, and to ensure hourly rates charged
> by each firm were reasonable.  After review of each firm's records,
> the Plaintiffs' Steering Committee made certain adjustments
> downward from the reported time to derive a conservative estimate
> of the total lodestar expended by the firms in this matter. The
> Plaintiffs' Steering Committee received affidavits and supporting
> material that indicates the firms expended almost 79,000 hours of
> professional time from the inception of this case to date.  Billed at
> those firms' current reasonable billing rates, this time amounted to
> a total lodestar of approximately $36.8 million.  After our review,
> however, to eliminate duplication of effort, and to only consider
> time that was appropriately billed to the class action, the Plaintiffs'
> Steering Committee conservatively estimates the lodestar of the
> work performed by all counsel to be $27.4 million.
>
> None of the time described above was submitted in support of the
> attorneys' fee award requested by Kaiser at the successful
> conclusion of the Kaiser trial.  Similarly, class counsel has not

submitted any expenses for which they received reimbursement
from Kaiser.

Dkt. No. 4289.

14.     On November 7, 2014, the Court entered a Final Order and Judgment Granting

Final Approval of the Class Settlement [Dkt. No. 4302].  On the same date, the Court entered a

Memorandum and Order awarding Class Counsel 28% of the common settlement fund for both

fees and expenses. [Dkt. No. 4303].   That order also stated that "(t)he Plaintiffs Steering

Committee shall allocate the fees and expenses  among Class Counsel in a reasonable fashion."

**B.     The PSC's review of time and expense records to determine the allocation of
awarded fees and expenses among plaintiff firms**

15.     After the Court entered a final judgment (thus triggering the ability to release

settlement funds to the class members and counsel), the PSC undertook its court appointed

obligation to allocate fees and expenses to counsel in a fair and appropriate manner.  This

process took over three months to accomplish and involved many scores of hours of review,

analysis and research.  The full committee met twice in person, in Boston in early January 2015

and in New Orleans in late February, 2015.  In addition there were a number of conference calls

where the members of the PSC established guidelines for fee and expense review, discussed

submissions of various firms and decided disputed items, and conferred about how to handle

comments and complaints with firms that were unhappy with allocation decisions.

16.     The PSC appointed a review committee -- a small group of lawyers from the PSC

firms -- to review in detail, on a firm-by-firm basis, the reported hours and rates and work

reportedly undertaken by all professionals.  Members of the review committee examined each

firm's fee and expense submission, and then conferred among themselves as to whether any

adjustment to the reported time or expenses was appropriate.  The review committee then made

its recommendations for adjustments to the PSC members.  The PSC thereafter reviewed each recommended adjustment as well as the firms' submissions to be confident that the time considered for *allocation* purposes would permit an apples-to-apples comparison between and among the 40 participating firms.

17.     Our goal was to arrive at allocations that appropriately reflected and compensated not only the quantity of work reported by the various law firms, but also evaluated the quality and contributory value of work performed over more than a decade.  Each of the PSC members had been actively involved in the litigation from its inception to its conclusion, knew what work that was necessary to obtain the favorable resolution and knew the quality of the work provided by the various participants.  While the level of participation in the review varied amongst the members of the PSC, as a whole the Committee undertook its task seriously and sought to be fair to all firms, including those law firms that did not participate in the allocation decision-making. We believe that the fact that every firm other than Bernstein has accepted our allocation—even those whose time required more extensive adjustment than Bernstein—demonstrates that we achieved our goal.

18.     The review process started shortly after the aggregate fee award was entered, with the appointment of the review committee and the initial review of the submissions.  The review committee flagged common issues that were relevant to many of the firms' applications and the full PSC held an in-person meeting in Boston, to decide several general principles that would be applied uniformly to all firms' lodestars.  Among the issues we identified were (i) rates far in excess of customary rates, particularly where the rate or rates were clearly in excess of Boston rates could be appropriately reduced; (ii) billing rates for lawyers who had departed firms or whose status had changed would be billed at such lawyers' rates at the time of departure from his

or her firm; (iii) firms that retained temporary contract attorneys to review documents  could bill the amount they expended as reimbursable expenses, but they could not bill those contractors as professionals or include the contractors' "professional time" in lodestar (iv) excessive "read and review" entries, where the need to read and review seemed unnecessary or excessive, particularly where the firm had not been charged by the PSC to provide common benefit work in the form of simply reading docket entries, would not be accepted; and (v) appropriate adjustments to lodestar would be made where the firm failed to regularly submit time pursuant to the Court's Case Management Order [Dkt. No. 15] , and/or failed to itemize entries, or performed work that was not assigned by the PSC, or submitted reconstructed or non-contemporaneous time.

19.     The review committee spent a significant amount of time reviewing each one of the approximately 40 law firms' lodestar reports.  Of the 40 or so firms who submitted time, the review committee recommended downward adjustments to 13 of those firms, including one of the members of the PSC.  The PSC reviewed each recommendation individually and decided that downward adjustments were appropriate in each case, although it occasionally disagreed with the amount of the adjustment.

20.     The forty firms submitted declarations with billing record backup, which reported that their collective lodestar was $32,375,909.05.[1]  As part of its allocation process and after the individual firm-by-firm adjustments,  the collective lodestar was reduced to $27,111,394.25, a reduction of 16%.  The lodestars requested by forty firms and the "reasonable lodestars,"

---

[1] This figure differs from the unaudited lodestar amount identified to the Court the original fee request, described above in ¶ 9, because those figures included the lodestar and expenses incurred by attorneys representing the Assurant Plaintiffs.  Counsel for the Assurant Plaintiffs received their share of the fee award pursuant to an arm's length agreement approved by the Court as part of the final settlement, and therefore the PSC did not have to allocate any amount to those attorneys for compensation or expenses.

determined by the PSC for each firm is set forth in the chart attached as Attachment 1 to this declaration.

21.     Bernstein contends that the PSC singled its submission out for particularly harsh treatment.  The PSC did not single that firm out, although its reported lodestar did require a significant adjustment.  But downward adjustments were made to multiple firms, and for some of them the downward adjustment exceeded, on a percentage basis, the reduction made to the Bernstein time.  The PSC ultimately determined that the Bernstein lodestar should be reduced from $5,273,035 to $2,494,103, a reduction of 53%.  However the PSC reduced the requested lodestar of Bruno & Bruno by 95%, and the lodestar of the Law Office of Ronnie G. Penton by 76%.  The Dugan Law Firm, which was a member of the PSC, had its lodestar reduced by 51%, a percentage comparable to the reduction of the Bernstein lodestar.

22.     The PSC's treatment of the Dugan Law Firm submission demonstrates that the PSC would apply its oversight responsibilities as rigorously in connection with its own members as it did against non-PSC members.  While Bernstein correctly notes that some of the reduction of the Dugan Law Firm lodestar resulted from the fact that another law firm claimed the time of an attorney whose time was submitted by the Dugan Firm, most of the reduction was because the hours of the two largest billers were adjusted downward by the PSC by 25%, and the rate of one of the attorneys was reduced from $600 per hour to $400 per hours for the years between 2004 and 2010.

23.     Of the 40 firms who were involved in this litigation, including those that had percentage reductions in their lodestar greater than that of Bernstein, *only* Bernstein Liebhard objects to the fee and expense allocation.  The others have agreed to the allocation made by the PSC.

24.     Each firm was expected to contribute to a Litigation Fund which paid for common expenses such as experts, deposition transcripts and document processing.  Most firms were assessed $5,000 in 2004 and an additional $5,000 in 2005.  The discovery co-chairs, Bernstein and Cohen & Malad, were assessed $125,000.  The remainder of the Litigation Fund was contributed by the members of the PSC.  Each of the PSC firms were responsible for contributing at least $360,000 to the Litigation Fund,[2] and some contributed more than their share.  The forty firms contributed a total of $2,765,000 to the Litigation Fund.

25.     In addition to Litigation Fund contributions, the class counsel firms also incurred out of pocket expenses (such as travel expenses, telephone bills, copying costs and similar expenses) that were also recoverable from the fee and expense award.  Firms' requests for reimbursement of their expenses went through a process similar to the PSC's review of their lodestar requests.  Requested reimbursements were initially examined by the review committee and the review committee's recommendations were independently reviewed by the PSC.  Ultimately, the PSC authorized reimbursement of $1,445,968 of out of pocket expenses.

26.     The PSC determined that under the circumstances of this case costs incurred for the retention of temporary contract attorneys for document review should be considered reimbursable expenses, as opposed to professional time that could be added to lodestar.  Pfizer produced millions of pages of documents in the course of the litigation that required review.  Although some firms committed full time attorneys to the culling and coding projects, many firms were unable or unwilling to provide lawyers and additional resources were needed to review the production.  Working with an agency in New York City, we learned that we could retain contract attorneys for $48 an hour to perform the necessary review.  Bernstein, Cohen &

---

[2] The Law Office of Don Barrett and Lieff Cabraser Heimann & Bernstein agreed to pay all Litigation Fund contributions assessed to Greene LLP.

Malad, and the Law Offices of Don Barrett, a PSC member, each agreed to obtain and pay for temporary, document review attorneys through the agency.  Cohen & Malad and Barrett Law Offices, P.A. reported their temporary contract attorney expenditures as out of pocket expenses. In contrast, Bernstein attempted to add the hours of these temporary document reviewers as attorneys to add to their lodestar, billing the temporary contractors out at rates between $295 per hour and $425 per hour.

27.     The amount each firm contributed to the Litigation Fund and the amount of out of pocket expenses for each firm approved by the PSC is set forth in Attachment 1.  The total of Litigation Fund contributions and out of pocket expenses approved by PSC for all firms is $4,210,968.12.  The chart below sets forth the total amount of Litigation Fund Contributions, Approved Expenses, Total Funding and Approved Lodestar, after all adjustments, found by the PSC for the PSC members, Bernstein and all other law firms involved in the Litigation.[3]  Total Funding for the purpose of this chart, is the sum of the amounts paid for Litigation Fund contributions and out of pocket expenses.

|  | Contributions | Expenses | Total Funding | Lodestar |
|---|---|---|---|---|
| PSC | $2,260,000 | $962,492 | $3,222,492 | $18,260,085 |
| Bernstein | $127,500 | $88,368 | $215,868 | $2,494,104 |
| All Others | $377,500 | $395,108 | $772,608 | $6,357,207 |
| Totals | $2,765,000 | $1,445,968 | $4,210,968 | $27,111,395 |

**C.     The PSC's method of allocating funds among class counsel**

28.      Once the PSC had determined reasonable adjusted lodestars for all firms, it set out to determine a fair way of allocating the total fee award to each participating firm.  In

---

[3] For the purposes of this chart, Litigation Fund contributions and expenses contributed by The Murray Firm while PSC member James Dugan was a member of the Murray Firm have been attributed to the PSC.  Mr. Dugan, as a member of the PSC was responsible for those expenditures and the Murray Firm paid them on his behalf.

February of 2015, the PSC reached a tentative approach to the allocation of fees and expenses. The goal, of course, was to reach a fair and just allocation to all firms based on the work they performed, the value they created for the class, and the financial contributions made to shoulder the expense of litigation. The usual tension in these matters is between raw time (and rates) reported versus efficiently performed and/or extraordinary value created. The PSC determined that it was not appropriate to have, as the sole method of allocation, the simple division of the award proportionally by adjusted lodestar after expenses had been repaid. Among other problems, such an approach does not account for quality or importance of the work, and it penalizes the most experienced lawyers (and firms) that perform their work efficiently.

29.     The PSC determined that not all contributions to the litigation were fairly captured by a firm's lodestar and that not all time expended on the litigation was equal. Some of the discovery conducted was routine, and some of it did not have any effect on the ultimate outcome of the litigation. The consumer cases, and even some of the off-label indications, were ultimately not meritorious. And as the case went on, year after year, the risks substantially increased. After class certification was denied and summary judgment was granted on some of the coordinated plaintiffs' claims, the prospects for class recovery were bleak and many firms were unwilling to commit more resources.

30.     There were competing goals the PSC believed a fair allocation had to accomplish. Given the length of time of the litigation, the PSC members believe that there should some return on the investment in the Litigation Fund to which most class counsel had contributed. Also, given the favorable outcome, we believed that a reasonable multiplier should be paid on all class counsel's adjusted lodestar, even if the work performed by the firm was routine. At the same time, firms that had contributed truly important work that made the recovery possible (especially

when the battle appeared lost), or whose experience in technical issues enabled them to work quite efficiently, should be fairly compensated for that contribution and efficiency.

31.     After considerable thought and identification of other approaches, the PSC determined that a simplistic lodestar-only formula for distribution would be unfair, and that instead a blended approach of 2/3 lodestar and 1/3 bonus pot made the most sense.  And so after considerable discussion and argument, the PSC developed the following methodology.

32.     First, we identified the funds available to class counsel for fee and expenses for the total 28% awarded by the Court.  This required a calculation of the payments to class members in the settlement who were separately represented by counsel, such as the Assurant Plaintiffs, and determining what fee was due these counsel based on previously disclosed contractual arrangements (discussed in the my previous declaration submitted with the motion for attorneys' fees).   After accounting for fees to these counsel, it was determined that approximately $74.25 million in fees was available to be distributed to all Class Counsel.

33.     Second, the PSC determined that reimbursements would be made for expenses by each firm on a dollar for dollar basis with no multiplier.  This assured that all firms got repaid the reasonable expenses they incurred.  (As with submitted time, these records were also reviewed and appropriate adjustment made and certain expenses disallowed.)  The PSC authorized the repayment of approximately $1.45 million for out-of-pocket expenses (not including litigation fund expenses).

34.     Third, litigation fund contributions made by the firms, including Bernstein's, would be paid back double the amount of the original contribution.  The notion here was that some firms had made significant investments of cash contributions to pay many experts and other hard costs, and that receiving two times would help (but not make totally up for) the time

13

value of money.  So all firms were treated ratably the same for cash contributions.  The firms that made payments to the Litigation Fund recovered $ 5.53 million

35.     Fourth, the funds remaining after paying expenses and litigation fund contributions were separated into two buckets: a Lodestar Pool (with 66% of the distributable funds) and a Bonus Pool (comprised of the remaining 34%).  Approximately $48.8 million was attributed to the Lodestar Pool and $25.45 million was assigned to the Bonus Pool.

36.     Fifth, all payments relating to the Litigation Fund and the repayment of expenses would be paid from the Lodestar Pool.  The remaining funds in the Lodestar Pool would be distributed pro rata to the forty firms, based on each firm's proportion of the adjusted lodestar. This distribution resulted in each of the 40 firms in the case would receiving the same multiplier, 1.514039, on their adjusted lodestars.  Every firm received, at a minimum, 150% of its adjusted lodestar.  The amounts each firm received from the Lodestar Pool are set forth in Attachment 1 to this declaration.

37.     Sixth, from the bonus pool, the PSC reviewed many different possibilities in an effort to reward efficiency, results, and extraordinary contributions to the litigation, based on criteria that included the representation of class representatives, the performance of critical work of extraordinary quality at important junctures, and the performance of substantial work on the case after the point at which the risk associated with the litigation had escalated.

38.     The PSC was mindful to assure both appearance and reality of not self-dealing. The PSC, therefore, examined a series of metrics to determine whether an excessive amount of the fee award was being paid to itself.  The PSC examined what it called "Return on Investment."  It added the amounts of each firm's Litigation Fund contributions, out of pocket expenses and lodestar, and then divided that sum by the total amount the firm received in the

litigation.  The figure gave the multiplier a firm received on all its contributions to the litigation.  None of the PSC firms received a return on investment (or a multiplier) above 2.85 on the funds it was awarded by the PSC.[4]

39.    The PSC made 11 awards from the Bonus Pool.  The firms that received those awards, the rational for the awards, the amount of the bonus paid and the Return on Investment received by that firm are set forth below:

(a)    Barrett Law Office, P.A. ("Barrett") —Barrett participated in the litigation from its inception until the very end, over ten years, and made the largest financial contribution of any firm in the litigation, contributing almost $1.75 million in Litigation Fund contributions and out of pocket expenses, including its retention of numerous contract attorneys.  Barrett also played an important role in the strategic decisions in the litigation.  Barrett was responsible for the Litigation Fund. Barrett was awarded a bonus of $2,000,000 and its return on investment was 2.45.

(b)    Bernstein—Bernstein participated in the case in the early years, but was not involved at all for the past 7 years or so.  Bernstein's role as Discovery co-chair is described below.  It was granted an award of $750,000 for its work as discovery co-chair.  At the time this work was performed, the case risk was relatively low.  Bernstein made a contribution to the litigation and the quality of its work was good.   The bonus awarded to Bernstein, along with the comparable bonus paid to Cohen and Malad, was the largest allocated to a firm not actively involved in the case for the entire duration of the litigation.  Bernstein's return on investment, based on a reasonable lodestar of $2,494,102.75, is 1.82.

---

[4] The Law Offices of Daniel E Becnel, Jr., who had financial arrangements with some of the firms in the case, made agreements with some of those firms to reduce the amounts those firms would have received from the PSC.  The difference was then paid to the Becnel firm.  These private transactions were not considered in calculating Return on Investment for the Becnel firm.

(c)     Cohen & Malad—Cohen & Malad also served as Discovery co-chair and its work is described below.  The PSC decided to award it a bonus of $750,000 for the same reasons such an award was given to Bernstein.  Its return on investment was 1.83.

(d)     The Dugan Firm—The Dugan Firm participated in the litigation from its inception until the very end, over ten years, and represented Louisiana Health Services Indemnity Co. a/k/a Blue Cross/Blue Shield of Louisiana, the largest TPP to act as a class representative.  This client insured that the class had a representative that was large enough to have paid for any of Neurontin's off-label uses, and was representative of indemnity health plans.  The Dugan Firm also developed the testimony of David Kessler, the former commissioner of the FDA, who was an expert for the class.  The Dugan Firm, or attorneys affiliated with it, covered 24 depositions and was involved in the mediation and settlement of the case..  The Dugan Firm was awarded a bonus of $1.35 million and had a return of investment of 2.84.

(e)     Greene LLP ("Greene") –Greene participated in the litigation from its inception until the very end, over ten years, and served as the chair of the PSC and was instrument in almost every aspect of the litigation.  Among other accomplishments, it developed the legal and factual bases of the fraud claims against Pfizer; it had a primary responsibility for drafting the Consolidated Class Complaint; it was responsible for mustering the facts and evidence in support of virtually every pleading and memoranda; it handled many of the most important depositions; it created the record in opposition to the motion for summary judgment, which became the roadmap for proof of the fraud in the Kaiser trial and the upcoming class trial; it recruited and prepared all of the scientific experts; it assisted the preparation of the economic experts; it had primarily responsibility for the final motion for class certification; it prepared the successful appeal of the district court's dismissal of the action and argued the appeal before the

First Circuit; it was instrumental in the mediation and the settlement negotiations, and it had

extensive oversight and coordination duties in its capacity as PSC chair.  It devoted more hours

and lodestar to the litigation than any other firm, and its resource commitments included

retaining a medical doctor as a full time employee to work on the case.  It argued many of the

motions before the Court.  In the opinion of the other members of the committee, Greene

performed critical work of extraordinary quality at all phases of the litigation. Greene was

awarded a bonus of $10.4 million and its return on investment was 2.70.

      (f)    Hagens Berman Sobol Shapiro LLP ("Hagens Berman).  Hagens Berman

participated in the litigation from its inception until the very end, over ten years, and was Liaison

counsel for the class, and handled the argument of many of the important motions in the

litigation.  It had important responsibilities in the class certification motions, and all dispositive

motions.  It was co-chair of the Expert Committee and had primary responsibility for developing

the economic and causation expert testimony.  It represented class representative Harden

Manufacturing Corp.  It provided substantial assistance in the successful appeal to the First

Circuit.  Due to its knowledge and experience it was able to negotiate extremely favorable

agreements relating to the distribution of class funds, fees and expenses with the law firm

representing the Assurant Plaintiffs and potential opt outs.  It played a very important role in the

mediation and settlement phases of the case and was critical in obtaining approval of the

settlement and its ultimate distribution.  In the opinion of its fellow committee members, Hagens

Berman performed critical work of outstanding quality in all phases of the litigation.  Hagens

Berman was awarded a bonus of $4.45 million and had a return of investment of 2.72.

      (g)    Law Office of Daniel Becnel, Jr. ("Becnel")—Becnel participated in the

litigation from its inception until the very end, over ten years, and was co-chair of the Expert

Committee and responsible for bringing many of the class counsel into the case.  Becnel represented numerous consumers who had paid for Neurontin and played an important role in locating and recruiting appropriate class representatives when the Court ruled that the class had to have a class representative for each indication alleged to have been fraudulently marketed. Becnel provided significant financial support for the litigation throughout its entire course, paying more than its proportionate share of the Litigation Fund.  Becnel represented the class in numerous depositions and played an important role in the mediation and settlement phases of the litigation.  Becnel was awarded a bonus of $1.35 million and had a return of investment of 2.83.

> (h)  Lieff Cabraser Heimann & Bernstein ("Lieff Cabraser")—Lieff Cabraser participated in the litigation from its inception until the very end, over ten years, and chaired the Pleadings Committee and had primarily responsibility for preparation of almost all pleadings, memoranda, oppositions and motions.  It bore the initial brunt of responding to the flurry of motions made by Pfizer as well as resisting its efforts to avoid producing discovery.  It had participation in all legal aspects of the case, was responsible for getting the Court to reconsider its second decision to deny class certification and handled much of the drafting of the class certification motions and the opposition to summary judgment.  It helped develop the novel causation arguments that ultimately succeeded.  It also participated in numerous depositions and all strategic decisions in the litigation.  It was involved in all phases of the litigation and did not reduce its commitment during the periods it appeared that the case could not succeed.   It assisted in the successful prosecution of the appeal and played an important role in mediation, settlement and allocation of the fee award.  In the opinion of its fellow committee members Lieff Cabraser performed critical work of outstanding quality in all phases of the litigation.  Lieff Cabraser was awarded a bonus of $3.7 million and had a return of investment of 2.44.

(i)     Lowe Mobley & Lowe—Lowe, Mobley & Lowe were responsible for representing Harden Manufacturing and recruiting it as a class representative.  It participated in helping respond to discovery propounded on Harden and in preparing Harden's representatives for deposition in the case.  It was awarded a bonus of $250,000 and had a return of investment of 4.09.

(j)     Seeger Weiss—Seeger Weiss was responsible for class counsel's retention of Professor Brian T. Fitzpatrick, who provided an expert report in support of the class counsel's request for a high percentage award from the settlement fund.  In the opinion of the PSC, the Fitzpatrick Report likely increased the fee award, and Seeger Weiss' work was instrumental in obtaining that increase.  The PSC awarded Seeger Weiss a bonus of $200,000 and it had a return of investment of 2.01.

(k)     Tousley Brain—Tousley Brain was responsible for the obtaining ASEA as a class representative.  It participated in helping respond to discovery propounded on ASEA and in preparing ASEA's representatives for deposition in the case.  It was awarded a bonus of $250,000 and had a return of investment of 2.33.

### D.     Review and recommendations related to Bernstein Liebhard

40.     In early 2005, the PSC requested Bernstein and the law firm of Cohen & Malad, of Indianapolis, IN, to act as the discovery co-chairs for this litigation.  Bernstein is a New York City law firm whose partners have experience in class action litigation, principally in the securities area.  They filed a purported class action on behalf of Lorraine Kopa, a consumer purchaser of Neurontin, in the Southern District of New York.  Ms. Kopa was selected to act as the neuropathic pain consumer class representative, but this court ultimately dismissed her case on summary judgment.  She did not pursue an appeal in the First Circuit.

41.     As discovery co-chairs, Bernstein and Cohen & Malad were assigned the role of coordinating written and deposition discovery under the direction of the PSC.  They reported to the chairman of the PSC, Thomas Greene.  The discovery co-chairs were not expected to conduct all discovery, but they were in charge of administratively making sure all discovery events were covered, keeping track of responses to discovery requests, drafting and serving deposition and document subpoenas, and communicating with opposing counsel regarding scheduling and disputed matters.  The co-chairs were expected to assist with discovery motions and briefing regarding such motions, but the PSC had primary responsibility for briefing and arguing discovery motions.  Similarly, the discovery co-chairs attended and occasionally conducted depositions, but most depositions were taken or defended by members of the PSC.

42.     Given the extent of discovery, the PSC believed that two co-chairs were desirable.  Neither was intended to have a larger role than the other, and in the opinion of the PSC the work was evenly distributed between them.  There is no reason work assigned to Bernstein would have taken more hours to perform than the work assigned to Cohen & Malad.  Mr. Greene and others monitored the work conducted by both co-chairs.

43.     Bernstein assigned the vast bulk of the work it performed in this action to associates.  This is borne out by the Bernstein billing records, a copy of which is attached as Exhibit 1—over 85% of the work performed by full time Bernstein attorneys—more than 4,800 hours—was handled by its associates.  The principal Bernstein attorney assigned to the case was Ron Aranoff, who was 9 years out of law school when the case commenced.  He was made a partner in Bernstein in December 2008, but by that time Bernstein had largely ceased to do work on the case.  Mr. Aranoff billed less than 10 hours to the case after he was made a partner.  According to Bernstein's billing records, Mr. Aranoff's billing rates between 2004 and 2008, the

years Bernstein actively worked on the case, were between $425 and $650 per hour. Mr. Aranoff was assisted by three Bernstein associates who were 1995, 1997 and 2003 law school graduates, according to biographical material Bernstein provided to the PSC, a copy of which is attached as Exhibit 2.

44.     The Bernstein billing records reflect 521.75 hours of partner time billed to the Neurontin litigation but the PSC is unaware of any substantive contribution made by any of the Bernstein partners.  They did not participate in the drafting of any of the pleadings, or the briefing of any motions or oppositions.  They did not appear in court.  They did not take or defend any depositions.  Occasionally a Bernstein partner traveled to a meeting, but they did not provide any special expertise or contribution that can now be recalled.

45.     Bernstein's role was limited to discovery co-ordination.  It did not participate in the drafting of substantive pleadings.  Nor did it have primary responsibility for drafting motions, memoranda or oppositions, even those relating to discovery.  It did not participate in the class certification briefing or the pre-discovery investigation of Pfizer's fraudulent scheme.  It had no participation in the expert process.  It did not assist in the opposition to Pfizer's motion for summary judgment and had no role in the successful appeal.  It had no participation in mediation or settlement.  Attorneys from Bernstein did attend 12 deposition sessions, but in seven of those depositions its attorneys merely witnessed the proceedings, they did not conduct an examination or defend the witness.  They did participate in five depositions of four witnesses.  In contrast, Cohen & Malad participated in 20 depositions of 17 witnesses.  They were present at one other deposition where the Cohen & Malad attorney neither interrogated or defended the witness.

46.     This Court is likely not familiar with Bernstein, at least not from its participation in this litigation.  Bernstein did not file any motions or memoranda with this Court.  Its attorneys

never appeared before the Court.  Mr. Aranoff did appear at two hearings before Magistrate

Sorokin but only made a substantive contribution in one of those.   Bernstein stopped performing

services in early spring 2008, before Pfizer moved for summary judgment and while the class

plaintiffs' renewed motion for class certification was pending.

   47. Bernstein's reported lodestar was a significant challenge to the PSC, and the PSC

spent more time addressing the Bernstein submission than any other fee application before it.

Bernstein claimed its lodestar was worth $ 5,273,035.  However, the firm had been functionally

out of the case since March 2008, and its reported lodestar (i) exceeded by two and a half times

the lodestar reported by the firm that served as its co-chair of discovery, and (ii) exceeded the

amount of every other firm in the litigation, except the chair of the PSC.   It claimed it had spent

more time in three years as a discovery co-chair than the firms that had repeatedly briefed and

argued major motions before this court, had conducted dozens of important depositions, had

developed critical expert testimony, had negotiated a multi-million dollar settlement, and had

been involved in every step of the litigation for more than a decade.

   48. As it had done with other firms, the review committee applied several of the

PSC's general lodestar principles to adjust Bernstein's lodestar.

   49. An overriding problem with Bernstein time reports (to a degree making it

qualitatively different than all other participating firms) was the extent to which it "block billed"

large segments of hours.  There were hundreds of days where Bernstein attorneys, particularly

Mr. Aranoff and the other Bernstein associates, reported multiple tasks conducted within three to

thirteen hours, making it impossible to corroborate whether a reasonable amount of work was

performed for a reasonable amount of time.  The opposite was true of the time reported by the

Bernstein partners—almost no detail was reported.  There are dozens of entries of conferences

with Mr. Aranoff or other Bernstein attorneys with no detail of what was discussed or why a meeting was necessary.   These conferences allegedly lasted between one to four hours.   The PSC still has no clue as to how these meetings advanced the litigation or benefited anyone other than Bernstein.  While some other firms time entries were occasionally vague or unspecific, the numerous lengthy days reported by the Bernstein for which it was impossible to confirm the reasonableness of the task hampered the PSC from applying several of the general principles to the firm's time in the manner they were applied to other firms.

50.     Second, Bernstein sought to add 3,277 hours of temporary contract attorney time to its lodestar.  Assuming these persons actually spent this time that Bernstein reported for them (Bernstein never provided the invoices and they reported longer hours expended by their contractors than those retained by the other firms) they sought to increase their lodestar by more than $1.1 million for an outlay of approximately $157,000.  The review committee rejected these hours, reducing Bernstein's lodestar by $1,129,968.

51.     Third, a review of total time submitted by Bernstein, as against the benchmark we had of the other co-discovery chair, Cohen & Malad, showed that significant amounts of time were recorded for unnecessary or undetermined matters.  The PSC was unable to determine, from either the billing records or their collective contact with Bernstein in the course of the litigation, what the Bernstein partners contributed to the litigation.  The review committee recommended that the Bernstein partners' hours be reduced by 50%, reducing the firm's lodestar by about $200,000 to $3,959,662.

52.     Fourth, Bernstein time included 130 hours billed by a paralegal who read and summarized a book by Marcia Angell entitled "The Truth About the Drug Companies."  The PSC never requested this work, and it had no benefit.  The review committee disallowed these

hours.  The rates billed by Bernstein paralegals were also reduced to the upper end of paralegal rates in Boston ($175 an hour), further reducing lodestar to $3,931,000.

53.     Fifth, Bernstein claimed a billing rate of $900 per hour for Mr. Aranoff, who was not even a partner when virtually all of his work was performed.  It was recommended that Ron Aranoff's billing rate of $900 per hour be reduced to a reasonable Boston junior partner's rate— $600 per hour—commensurate with his experience at the time his work on the case was complete in 2008.  This reduced Bernstein's lodestar to $3,020,199.  The review committee also recommended that the billing rates for the other Bernstein associates, who had limited experience but were billed at hourly rates of $575, $550 and $525, be reduced to $500 (which is still high in the Boston context).  Those adjustments reduced the lodestar to $2,927,474.

54.     Finally the review committee recommended a 30% reduction to the hours of Bernstein associates (including Ron Aranoff) because much the time claimed for the work was excessive.  This would have reduced the Bernstein lodestar to $2,306,392.  However, the PSC did not accept this recommendation.  Although the PSC was able to determine that some time was clearly excessive[5], due to the block billing it was difficult to establish the appropriate reduction percentage. Guided by Judge Young's decision in *Volkswagen*[6] and other cases which authorized a 20% reduction solely for block billing, the PSC decided that a 20% reduction was more appropriate and well within reason under the circumstances. A 20% adjustment reduced the

---

[5] For example, Aranoff and another associate spent as much as 170 hours preparing for a deposition of Chris Pacella, a Pfizer witness with expertise in labeling whose testimony was noticed by the Products Liability plaintiffs (not the class attorneys), and whose deposition was ultimately assigned to Cohen & Malad.  *See* Ex. 1, pp 33, 105-106.
[6] *In re: Volkswagen and Audi Warranty Extension Litig.*, 2015 U.S. Dist. LEXIS 16646, at *55 (D. Mass. Feb. 10, 2015). "When confronted with block billing, courts will apply a 'global reduction to lodestar hours,' and this 'reduction is applied after the specific deductions.'" *Id.*, citing *Norkunas v. HPT Cambridge, LLC,* 969 F. Supp. 184, 196-97 (D. Mass. 2013) (emphasis added).

Bernstein lodestar to $2,384,059.38 – a figure close to (but still higher than) Cohen & Malad's adjusted lodestar.

55.     The differential between Cohen & Malad and Bernstein was quite important to the PSC in determining the proper adjustment to the Bernstein lodestar.  Cohen & Malad and Bernstein had worked closely (and well) together and shared much of the discovery work.  Cohen & Malad, unlike Bernstein, assigned partners to handle much of its workload and those attorneys performed their jobs efficiently and appropriately.  The PSC saw no valid reason why one co-chair should be paid significantly more than the other.  The fact that one co-chair had accepted $4.44 million for its work established a signpost as to what constituted fair compensation for the work Bernstein had performed.

56.     Although the PSC was confident that its adjustment of Bernstein's lodestar to $2,384,059.38 was not only defensibly but eminently just, it recognized that Bernstein might not agree with its position.  Accordingly, when the PSC made its initial determination of Bernstein's lodestar during a February conference call, it also authorized Tom Greene and I to approach Bernstein and see if such an adjustment would be accepted.  At that time the PSC had not concluded its analysis and Bernstein's comments might lead the PSC to reconsider its position.  To avoid having to bring this matter before the Court, Tom Greene and I were given authority to offer Bernstein a $3,000,000 lodestar if that would lead to Bernstein's agreement to an award.  The PSC wanted to provide a proposed lodestar that would be so overtly fair to Bernstein that no reasonable attack could be made on it.  To that end the PSC was willing to compromise on $3 million lodestar even though that such a figure, for no valid reason, exceeded Cohen & Malad's lodestar by close to $800,000.

E.     **Communications with Bernstein Liebhard concerning the PSC's allocation decision**

57.     On February 19, 2015, Mr. Greene and I informed Mr. Aranoff and two other Bernstein partners of the PSC's tentative, proposed allocation over the telephone. We had further phone discussions the following day.  Thereafter a series of letters followed between Bernstein, Mr. Greene and me.  Those letters are attached as Exhibit A-I to the Liebhard declaration that Bernstein has filed in support of its motion.

58.     For the most part it is not necessary to comment upon the correspondence, which is self-explanatory.  To the extent the Court believes the communications have relevance the Court must keep in mind that most of the correspondence occurred before the PSC had finalized its allocation determinations.  Although the PSC had made an initial determination of a reasonable lodestar for Bernstein when we first contacted Bernstein in February 2015, it had not decided how much would be included in any bonus pool nor had it decided how such a pool would be distributed.  Further, due to my firm's close monitoring of the division of claims between class members represented by class counsel and those represented by independent counsel, it turned out there was more money available for distribution than initially anticipated.  Further, the allocation scheme was a dynamic process.  Different firms had different interests and demands, and the PSC was required to be sensitive to all firms' concerns.  Amounts acceptable to certain firms, or demanded by others, could affect distribution to yet other law firms.  In the discussions between Mr. Greene, Bernstein and me, different proposals were contemplated because the PSC was still in the process of deciding how the funds would ultimately be distributed.

59.     Mr. Greene and I wanted to enter into a dialog with Bernstein to see if an agreement could be reached with Bernstein regarding adjustments to its lodestar.  After setting

forth at length why we had made our cuts and why such adjustments were supported by First

Circuit law, we asked for a response from Bernstein.  On March 5, 2015 we received it—a

demand for a $ 10.5 million, with no response to our proposed lodestar adjustments.

60.      By late March, the PSC had concluded its work, and fully developed its allocation

plan.  It decided that both Bernstein and Cohen & Malad deserved bonuses of $750,000 from the

bonus pool.  It also took one last look at the Bernstein lodestar.  In one last effort to insure it was

not being unduly harsh to Bernstein, it adjusted the lodestar upward.  It decided to only reduce

the Bernstein's partner's recorded time by 20%, not 50% as originally proposed.  The PSC felt

that a 20% adjustment, under *Volkswagen* could not be found to be unreasonable given the state

of the Bernstein billing records.  This adjustment increased the lodestar to $2,494,102.75, and

entitled Bernstein to receive, under the PSC's allocation methodology a total award of

$4,882,614.

61.      The PSC set forth its final position in a letter dated March 26, 2015 from Mr.

Greene to Bernstein, a copy of which is attached as Exhibit C.  In that letter Mr. Greene rejected

Bernstein Liebhard's $10.5 million demand.  He explained that the PSC had determined that a

reasonable adjusted lodestar for Bernstein Liebhard was  $2,494,102.75 and that in addition to its

reimbursement of expenses of $88,367.84, and the doubling of its $127,500 contribution to the

litigation fund, the PSC determined to award an additional $750,000 bonus to the firm.  The total

allocation to Bernstein Liebhard would total $4,882,614 .

62.      Mr. Greene's letter went on to note that Bernstein Liebhard's compensation was

in line with that received by Cohen & Malad, the other discovery co-chair.  "It too contributed

$127,500 to the litigation fund.  Its adjusted lodestar is $2,199,584.05, and its out of pocket

expenses were $105,166.18.  Cohen & Malad's award will be $4,451,955.38, which also

includes a $750,000 discretionary bonus from the PSC.  The PSC has reviewed the division of

the work between the two discovery co-chairs and remains convinced that there is no good

reason why one of the co-chairs should be paid significantly more than the other."  Mr. Greene's

letter concluded,

> [S]olely for the purpose of attempting to reach an amicable
> resolution without incurring the delay and expense of going before
> the District Court, the PSC is willing to calculate Bernstein
> Liebhard's compensation based upon an adjusted lodestar of $3
> million.  Such an adjustment would increase Bernstein Liebhard's
> total award to $5,651,214.85.
>
> The purpose of this adjustment is to reach a resolution, not start a
> negotiation.  A check for that amount is enclosed with this letter.
> If Bernstein Liebhard elects to cash the check, such action will
> evidence your agreement that the amount the PSC has tendered is
> full and complete payment for all work performed by Bernstein
> Liebhard LLP in connection with the Neurontin litigation and
> reimbursement of all expenses in connection with that litigation.
> In the event that you reject this tender, the PSC will defend its
> decision that the reasonable amount of compensation and
> reimbursement payable to Bernstein Liebhard LLP in connection
> with the Neurontin litigation is $4,882,614.

63.     On April 20, 2015, Bernstein rejected the PSC's proposed allocation.

64.     On April 23, 2015, I emailed members of Bernstein and suggested that the parties

explore mediation before bringing a dispute to the Court.

65.     On April 27, 2015, Mr. Bernstein called me and stated that Bernstein would

engage in mediation on the condition that it be permitted to cash its check for $5,651,214.85

prior to mediating.  The PSC rejected this condition.  Mr. Bernstein then proposed that the PSC

pay Bernstein $4,882,614 as a condition for its agreement to participate in a mediation.  Since

the PSC had not agreed to provide any funds as a condition of mediation, I rejected this condition

as well.  I informed Mr. Bernstein that given Bernstein's position that the entire distribution

scheme should be reviewed *de novo*, the PSC should have the ability to establish that under any

alternative scheme Bernstein should receive less than what the PSC would have paid it under its model.

66.     Of course, at no time have the PSC or I rejected the notion that this Court be advised of the parties proceeding to mediate.  The statement in the Bernstein declaration suggesting the contrary is false.


Executed this 21st day of May, 2015 in Cambridge, Massachusetts.


                              _____/s/ Thomas M. Sobol_____
                              THOMAS M. SOBOL

### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served on May 21, 2015.

                              */s/  Thomas M. Greene*
                              Thomas M. Greene

## Attachment 1

Litigation Fund Contributions, Expenses, Requested and Adjusted Lodestars, and Lodestar Pool Awards for all Class Counsel

| Firm | Cash Contributions | Expenses | Reported Lodestar | Reasonable Lodestar | Lodestar Pool Award |
|---|---|---|---|---|---|
| **Group 1: Co-Leads** | | | | | |
| Barrett Law Office, P.A. | $582,500.00 | $239,006.19 | $1,477,821.00 | $1,477,821.00 | $3,641,484.44 |
| Dugan Law Firm | $0.00 | $15,632.02 | $2,026,150.00 | $1,000,000.00 | $1,529,670.76 |
| Greene LLP | $0.00 | $167,491.80 | $8,513,039.50 | $8,513,039.50 | $13,056,563.41 |
| Hagens Berman Sobol | $360,000.00 | $217,783.52 | $3,160,930.75 | $3,160,930.75 | $5,723,555.13 |
| Lieff Cabraser | $577,500.00 | $228,692.00 | $3,361,361.00 | $3,361,361.00 | $6,472,922.78 |
| Daniel E. Becnel, Jr. | $380,000.00 | $27,191.42 | $746,932.50 | $746,932.50 | $1,918,076.16 |
| **Group 2: Discovery Chairs** | | | | | |
| Bernstein Liebhard & Lifshitz | $127,500.00 | $88,367.84 | $5,273,035.00 | $2,494,102.75 | $4,132,614.00 |
| Cohen and Malad | $127,500.00 | $105,166.18 | $2,589,670.30 | $2,199,584.05 | $3,690,421.65 |
| **Group 3: Co-Counsel** | | | | | |
| Barrett & Associates, P.A. | $0.00 | $1,053.61 | $424,892.50 | $245,807.50 | $373,215.69 |
| Branch Law Firm | $5,000.00 | $0.00 | $0.00 | $0.00 | $10,000.00 |
| Bruno & Bruno | $10,000.00 | $10,592.99 | $280,987.50 | $12,893.75 | $50,114.63 |
| Charfoos | $10,000.00 | $1,477.12 | $78,250.00 | $78,250.00 | $139,950.65 |
| Climaco Lefkowitz | $10,000.00 | $134.41 | $21,836.25 | $21,836.25 | $53,195.34 |
| Cunard Law Firm | $10,000.00 | $22,102.86 | $297,850.00 | $297,850.00 | $493,059.30 |
| Dane S. Ciolino | $10,000.00 | $638.66 | $15,735.00 | $15,735.00 | $44,462.06 |
| Dodson & Steadman | $10,000.00 | $1,109.00 | $180,540.00 | $111,290.00 | $189,606.37 |
| Finkelstein | $0.00 | $0.00 | | $0.00 | $0.00 |
| Foote Meyers | $10,000.00 | $15,351.48 | $38,690.00 | $38,690.00 | $93,929.64 |

1

| Firm | Cash Contributions | Expenses | Reported Lodestar | Reasonable Lodestar | Lodestar Pool Award |
|---|---|---|---|---|---|
| Goldenberg, Heller | $10,000.00 | $11,084.12 | $141,289.00 | $141,289.00 | $245,001.14 |
| Herman, Herman | $10,000.00 | $0.00 | $0.00 | $0.00 | $20,000.00 |
| Innelli, LLC | $0.00 | $11,596.52 | $66,195.00 | $66,195.00 | $111,818.31 |
| Lovelace Law Firm, P.A. | $35,000.00 | $16,547.17 | $385,765.00 | $289,323.75 | $524,594.54 |
| Lowe Mobley & Lowe | $5,000.00 | $5,477.01 | $86,456.00 | $86,456.00 | $146,374.74 |
| Mary Stoll, PLLC | $0.00 | $0.00 | $58,162.80 | $58,162.80 | $88,060.73 |
| Murray Law Firm | $10,000.00 | $9,240.50 | $477,841.25 | $258,141.25 | $420,076.35 |
| Neblett Beard & Arsenault | $10,000.00 | $16,702.22 | $250,681.25 | $250,681.25 | $416,243.34 |
| Robert M. Becnel | $10,000.00 | $0.00 | $0.00 | $0.00 | $20,000.00 |
| Ronnie G. Pendton | $5,000.00 | $7,266.38 | $357,750.00 | $86,625.00 | $148,419.99 |
| Sacks & Weston | $10,000.00 | $0.00 | | $0.00 | $20,000.00 |
| Sadin Law | $0.00 | $0.00 | $9,937.50 | $9,937.50 | $15,045.76 |
| Seeger Weiss | $20,000.00 | $38,254.59 | $372,450.70 | $326,457.63 | $572,524.09 |
| Spector Roseman Kodroff | $0.00 | $2,746.26 | $120,973.75 | $100,819.52 | $155,390.92 |
| Taylor Martino | $10,000.00 | $18,009.64 | $354,817.00 | $214,788.00 | $363,206.99 |
| Thompson | $0.00 | $0.00 | $64,278.75 | $64,278.75 | $97,320.52 |
| Thrash Law Firm | $0.00 | $8,934.37 | $242,125.00 | $242,125.00 | $375,521.00 |
| Tousley Brain | $0.00 | $12,907.53 | $283,949.00 | $283,949.00 | $442,817.32 |
| Vroon Crongeyer | $5,000.00 | $0.00 | $16,580.00 | $16,580.00 | $35,102.76 |
| Weisman Kennedy | $10,000.00 | $6,936.32 | $0.00 | $0.00 | $26,936.32 |
| Zimmerman Reed | $25,000.00 | $20,308.42 | $598,935.75 | $492,810.75 | $816,442.99 |
| Montgomery Firm | $0.00 | $51,471.00 | | | $51,471.00 |
| Disputed Between Murray and Dugan Firms | $360,000.00 | $66,694.97 | | $346,650.00 | $1,311,536.50 |