UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:  NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No.  1629<br><br>Master File No. 04-10981 |
| | Judge Patti B. Saris<br>Mag. Judge Leo T. Sorokin |
| THIS DOCUMENT RELATES TO:<br><br>CLASS ACTION | **LEAVE TO FILE OVERSIZED MEMORANDUM GRANTED ON MAY 22, 2015, Dkt #4347** |

<u>**MEMORANDUM IN OPPOSITION**</u>
<u>**TO MOTION TO REALLOCATE ATTORNEYS' FEES**</u>

# TABLE OF CONTENTS

Page

I.    FACTUAL BACKGROUND .................................................................................. 3

A.    The PSC Develops a Reasonable Methodology for Allocating the Fee Award ..... 3

1.    Recognizing that the initial lodestar requests submitted by some class counsel were likely inflated, the Court tasks the PSC with allocating the fee award on a reasonable basis .................................................................... 3

2.    After extensive review, the PSC adjusts the requested lodestars of several class firms. ....................................................................................................... 4

3.    The PSC determines that a two pool compensation approach is the fairest way to compensate the firms that created the most value for the class and who shouldered the financial burden of the litigation. ........................................ 5

4.    The PSC's methodology resulted in a reasonable and fair distribution of the award .......................................................................................................... 8

B.    Bernstein's Role in the Neurontin Litigation ............................................. 9

C.    Bernstein's Inflated Lodestar ...................................................................... 10

II.   ARGUMENT ...................................................................................................... 17

1.    The PSC's Allocation Is Reviewed Deferentially. ............................................ 17

2.    Bernstein's Allocation Is Appropriate. .............................................................. 19

3.    The PSC's Process Was Fair, Reasonable, and Transparent. .......................... 21

4.    Bernstein's Requested Relief Should Be Denied .............................................. 22

III.  CONCLUSION .................................................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Hensley v. Eckerhart,*
461 U.S. 424 (1983) ............................................................................................22

*In re Copley Pharm., Inc., Albuterol Prods. Liab. Litig.,*
50 F. Supp. 2d 1141(D. Wyo. 1999) ...................................................................18

*In re Indigo Securs. Litig.,*
995 F. Supp. 233 (D. Mass. 1998).......................................................................17

*In re Initial Pub. Offering Secs. Litig.,*
No. 21 MC 92(SAS), 2011 U.S. Dist. LEXIS 76067, 2011 WL 2732563
(S.D.N.Y. July 8, 2011) ......................................................................................18

*In re Linerboard Antitrust Litig.,*
2004 U.S. Dist. LEXIS 10532 (E.D. Pa. Oct. 3, 2004)......................................18

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.,*
2013 U.S. Dist. LEXIS 123298 (C.D. Cal. July 24, 2013)................................18

*In re Tyco Int'l Ltd. Multidistrict Litig.,*
2010 U.S. Dist. LEXIS 142865 (D.N.H. Dec. 3, 2010).....................................18

*In re Vitamins Antitrust Litig.,*
398 F. Supp. 2d 209 (D.D.C. 2005).....................................................................18

*In re Warfarin Sodium Antitrust Litig.,*
212 F.R.D. 231(D. Del. 2002) .............................................................................18

*In re: Volkswagen and Audi Warranty Extension Litig.,*
2015 U.S. Dist. LEXIS 16646 (D. Mass. Feb. 10, 2015) ...........................12, 18

*Norkunas v. HPT Cambridge, LLC,*
969 F. Supp. 2d 184 (D. Mass 2013)...................................................................16

*Torres-Rivera v. O'Neill-Cancel,*
524 F.3d 331 (1st Cir. 2008)................................................................................16

*Victor v. Argent Classic Convertible Arbitrage Fund L.P.,*
623 F.3d 82 (2d Cir. 2010 ...................................................................................18

Alone among forty law firms who received fees for their work on this litigation, Bernstein Liebhard LLP ("Bernstein") objects to its allocation of more than $4.8 million. Bernstein's objections are without merit.

The Court directed the Plaintiffs Steering Committee ("PSC") to allocate its fee award to class counsel "in a reasonable fashion." Memorandum and Order dated November 10, 2014 [Dkt. No. 4303] (the "Fee Order"), at 11. Bernstein's allocation is the fifth-largest among all participating firms, the highest of any non-PSC firm, and is significantly higher than the awards made to several PSC members. It is also significantly higher than the fees awarded to Bernstein's discovery co-chair, which performed similar work over the same period of time. Its allocation reflects the solid but unremarkable work that Bernstein performed during the time that it worked on this case (ending in 2008), and follows a detailed review that found dozens upon dozens of hopelessly vague and apparently inflated time entries, often for work that was neither assigned by the PSC nor provided any common benefit to the Class. Even as it seeks additional fees, Bernstein conspicuously chose not to attach its records to its petition, presumably because it knows that vast portions of the time claimed are not even arguably compensable.

The fact that Bernstein stands alone as the only objector among dozens of firms reflects the fairness of the process that the PSC developed and the care with which it applied it. To perform its Court-ordered duty to allocate fees in a reasonable fashion, the PSC carefully reviewed the time and expense records of each of the firms that contributed to this litigation, applying a set of guidelines that it developed as a committee and that it explained to Bernstein. For final allocations, the PSC applied its collective knowledge and insight about the work in this litigation to appropriately reflect and compensate not only the actual quantity, but also the true quality and contributory value of work performed by many lawyers over ten and more years.

1

This Court awards fees based on the percentage of the recovery method in order to reward and incentivize the dedication of skill, effort, efficiency, experience, and expertise to the difficult, risky, and often protracted undertaking of complex class litigation.  This Court, like others, also utilizes a generalized lodestar crosscheck to avoid windfalls in such circumstances. The whole point of a percentage of recovery award is that time logged creates no entitlement to compensation, and all time is not created equal.  Thus, the internal allocation of an aggregate percentage award must likewise reflect the values and functions of the percentage system.  What happened here was precisely that.  The PSC engaged in the laborious process of making a fair allocation of the percentage fee among the numerous firms who worked on this case at various points in its lifespan, and the few who prosecuted it from beginning to end.  The process recognized real time, spent in an efficient manner, on authorized and necessary tasks; quality and effectiveness was rewarded; and no firm's claimed time went unreviewed, unevaluated, or accepted at face value.

A great many attorneys and law firms contributed to the successful settlement of this litigation.  Bernstein was one such firm, but only one.  It stands to be extremely well compensated for doing a workmanlike job on discovery tasks over a limited period of time.  Yet, its time records reflect either wildly inefficient law practice, or grossly inflated billing, and it seeks to be rewarded on a scale far beyond the many other law firms who contributed to the result in this case, and at the expense of those other firms.  Its unjustified yearnings cannot trump a thoughtful and rational process which resulted in a reasonable allocation.

# I.     FACTUAL BACKGROUND

### A.     The PSC Develops a Reasonable Methodology for Allocating the Fee Award

1.     Recognizing that the initial lodestar requests submitted by some class counsel were likely inflated, the Court tasks the PSC with allocating the fee award on a reasonable basis

At the time the PSC requested an award of fees and expenses from this Court, the Plaintiffs' Steering Committee reported to the Court that forty law firms had claimed a collective lodestar of $36.8 million.  The PSC represented to the Court, however, that after reviewing those submissions, it had identified instances of inefficiency in billing, duplication of effort and other inappropriate billing practices that led it to believe that the total claimed lodestar was inflated.  Without performing a comprehensive audit of any of the individual submissions, the PSC conservatively estimated that the appropriate lodestar of all class counsel was $27.4 million, a reduction of approximately 26% from the unaudited time.  Declaration of Thomas Sobol in Opposition to the Motion for Reallocation of Attorneys' Fees ("Sobol Aff."), ¶ 9.

In its Fee Order, the Court recognized that class counsel was entitled to a "considerable" fee award considering the excellent results achieved and risks undertaken.  Fee Order at 7.  However the Court noted that had it calculated the lodestar, "it is quite likely that the court would have reached a lower lodestar figure by imposing hourly rate caps to better reflect the Boston market, and the legal market generally post-2008."  The Court favorably cited a 2013 Massachusetts Superior Court decision that held that $590 per hour was a reasonable rate for a senior partner in a medium to large Boston firm.  Fee Order at 9 and fn. 3.  The Court, however, made it clear that it did not wish to involve itself in such calculations; after deciding the amount of the fee award it stated that "[t]he Plaintiffs Steering Committee shall allocate the fees and expenses among Class Counsel in a reasonable fashion."  Fee Order at 10.

2.      After extensive review, the PSC adjusts the requested lodestars of several class firms.

The PSC devoted more than three months to devising a reasonable method of allocating the award among Class Counsel.  Sobol Aff. ¶ 15.  Its process began by reviewing the Court's instructions regarding timekeeping that were included in the first Class Management Order [Dkt No. 15], executed on December 16, 2004. The Order required each class counsel to keep contemporaneous, itemized billing records for each activity performed, and warned that "failure to maintain such records may be grounds for denying court-awarded fees."[1]

The PSC next developed a set of guiding principles to be applied in the review of individual firm submissions.  For example, the PSC determined that adjustments to lodestar would be appropriate if firms failed to itemize entries, performed work that was not assigned by the PSC, or included excessive read and review time.  Sobol Aff. ¶ 18.  The PSC also decided that temporary contract attorney hours should not be considered part of lodestar, but amounts expended on temporary contract attorneys would be reimbursed as expenses.  *Id*.

A review committee appointed by the PSC reviewed the individual submissions and made recommendations for adjustments to the full committee.  Sobol Aff. ¶ 16, 19.  After a review of time and expense records for forty law firms, the review committee recommended to the PSC that the requested lodestars of thirteen firms be reduced.  Taking these recommendations into account, the PSC made final determinations of each firm's lodestar and allowed expenses.  *Id.* at ¶ 16.  Ultimately, the PSC reduced the reasonable lodestar of all of class counsel from

---

[1] Class counsel were also required by the Court to submit regular reports to liaison counsel "summarizing according to *each separate activity* the time and reasonable and necessary expenses spent." Corrected Case Management Order at 12 (emphasis added). The PSC notified all class counsel of these guidelines by letter on June 3, 2005. Sobol Aff., ¶ 4.

$32,375,909.05[2] to $27,111,394.25, accepting most, but not all, of the review committee's recommendations.  *Id*. at ¶¶ 19, 20.  Class counsel's claimed expenses, which included contributions to a Litigation Fund[3] and out-of-pocket expenses,[4] went through a similar process. *Id.* at ¶¶ 24-25.  Ultimately the PSC allowed total expenses of $4,210,968.12.  *Id.* at ¶ 27.

   The following chart[5] identifies how much attorney time and money the PSC, Bernstein and the remaining firms had contributed to the litigation after all adjustments by the PSC.  *Id.*

|  | Lit. Fund Payments | % | Expenses | % | Total Funding | % | Lodestar | % |
|---|---|---|---|---|---|---|---|---|
| PSC | $2,260,000 | 81.7% | $962,492 | 66.6% | $3,222,492 | 76.5% | $18,260,085 | 67.4% |
| Bernstein | $127,500 | 4.6% | $88,368 | 6.1% | $215,868 | 5.1% | $2,494,104 | 9.2% |
| Others | $377,500 | 13.7% | $395,108 | 27.3% | $772,608 | 18.3% | $6,357,207 | 23.4% |

   3.   The PSC determines that a two pool compensation approach is the fairest way to compensate the firms that created the most value for the class and who shouldered the financial burden of the litigation.

   Given the extraordinary length of time involved in the case, the financial burden incurred in carrying the case for so many years, and the fact that much of the work that resulted in the extraordinary result was not adequately reflected in the usual metric employed to measure lawyer

---

[2] This figure differs from the unaudited lodestar amount presented to the Court in connection with the original fee request, because the unaudited fee request numbers included the lodestar and expenses incurred by attorneys representing the Assurant Plaintiffs.  The fees and expenses paid to those attorneys were established by an arm's length negotiation that was approved by the Court as part of its approval of the class action settlement agreement. Sobol Aff. ¶ 20, fn. 1.

[3] All class counsel were expected to contribute to a Litigation Fund, which paid common expenses such as expert fees, deposition transcript costs, and data and document processing expenses.  Most firms paid $10,000 into the fund.  The two firms that chaired the Discovery Committee, Bernstein and Cohen & Malad, were assessed $125,000 each.  The members of the PSC were expected to contribute all other amounts as necessary during the course of the litigation.  Ultimately, each member of the PSC was responsible for contributing $360,000 to the Litigation Fund, and some firms contributed more.  Sobol Aff. ¶ 24.

[4] Travel expenses, copying costs, telephone bills and similar expenses, including the cost of any temporary contract attorneys hired, were expected to be borne by the firms, subject to reimbursement at the end of the litigation.  Sobol Aff. ¶ 25.

[5] In the chart, "Lit. Fund Payments" equals the money contributed the Litigation Fund; "Expenses" equals the amount of out of pocket expenses paid in addition to Litigation Fund contributions and "Total Funding" equals the sum of Lit. Fund Payments and Expenses paid. Sobol Aff. ¶ 27.

value—billable hours—the PSC decided it would not be appropriate to distribute compensation merely by paying firms based on their percentage of total lodestar.  Such an approach unfairly advantaged overbilling and penalized firms whose experience enabled them to perform their work more efficiently and thus record fewer hours.  Sobol Aff. ¶ 28.

Moreover, not all hours worked had an equal contribution to the end result.  The initial scope of discovery was large, and as the case was narrowed, some of the discovery was not instrumental in the final resolution.  The consumer cases ultimately fell by the wayside, as did many of the off-label indications.  And while many firms were excited by the size of the original government settlement concerning the off-label marketing of Neurontin, as the difficulty of proving widespread fraudulent conduct by the world's largest drug company became evident, and as negative court rulings began to mount, most firms lost interest.  Sobol Aff. ¶ 29.

The PSC recognized that those firms that had contributed money deserved a return, and that work that was necessary but routine deserved some kind of multiplier given the overall result.  It also recognized that firms that had contributed truly important work, especially when the battle appeared lost, also had to be justly compensated.  Sobol Aff. ¶ 30.  To address these disparate goals, the PSC adopted the following allocation methodology:

- First, from the roughly $91 million award made by the District Court, the amounts owed to the attorneys representing the Assurant Plaintiffs and other class members who were independently represented was calculated.  These amounts had been previously negotiated and the Court had approved this division of fees and expenses when it approved the Settlement Agreement.  After these amounts were paid, approximately $74.25 million was available to be allocated among class counsel for compensation and expenses.  Sobol Aff. ¶ 32.

- Second, the PSC decided that firms would receive twice the amount they contributed to the Litigation Fund, enabling them to receive some return on the money they had invested in the litigation—much of which had been contributed a decade earlier.  Sobol Aff. ¶ 34.  These payments totaled $5.53 million.

- Third, the PSC approved repayment of approved out-of-pocket expenses—for items such as travel expenses, copying, legal research, court fees and payment of temporary contract attorneys. These expenses would be reimbursed on a dollar by dollar basis with no multiplier. Sobol Aff. ¶ 33. The PSC authorized repayment of approximately $1.45 million.

- Fourth, the PSC decided that the class counsel award would be split into two buckets—a larger "lodestar pool" of 66% of the distributable funds, and a smaller "bonus pool," composed of the remaining 34%. The amount allocated to the Lodestar Pool was approximately $48.8 million, and $25.45 million was assigned to the Bonus Pool. Sobol Aff. ¶ 35.

- The PSC decided that all payments relating to the Litigation Fund and repayment of expenses were to be paid from the Lodestar Pool. The remaining funds in the Lodestar Pool, approximately $35.8 million, would then be distributed pro rata to all forty firms, based on each firm's proportion of the adjusted lodestar. This proportional distribution meant that each firm would receive the same multiplier on this portion of the compensation: approximately 1.51 on its adjusted lodestar. Sobol Aff. ¶ 36.

- The Bonus Pool was intended to reward efficiency, unusually significant commitment of resources, and other extraordinary contributions to the litigation not represented in lodestar. Among the criteria that the PSC considered in making bonus determinations was representation of successful class representatives; performance of critical work of extraordinary quality at important junctures; and performance of substantial work, or commitment of substantial resources, after the risk associated with the litigation had escalated—i.e. after class certification had been denied and summary judgment in favor of Pfizer had been granted in this case and the companion actions. Sobol Aff. ¶ 37.

The PSC awarded $750,000 of the Bonus Pool to each of the discovery committee co-chairs (i.e. Bernstein and Cohen & Malad); $700,000 to three non-leadership firms and the remainder to members of the PSC.[6] Sobol Aff. ¶ 39.

---

[6] A complete description of the Bonus Pool awards, and the rationale for each is set forth in the Sobol Affidavit at ¶¶ 37-39.

4.      The PSC's methodology resulted in a reasonable and fair distribution of
the award

The PSC determined that the forty class law firms had properly expended slightly more than $4.2 million on the litigation, including all Litigation Fund contributions and approved out-of-pocket expenses.  Sobol Aff. ¶ 27.  After payment of the fees and expenses owed to the Assurant counsel and other counsel representing individual class members, this left approximately $70 million in compensation to be allocated among the forty law firms.  *Id.,* ¶ 41.  Under the PSC's methodology, the compensation[7] has been distributed as set forth below.  The percentage of available compensation received by each relevant constituency has also been set forth below, in addition to the percentage of that group's contribution to the Litigation Fund, to Total Funding[8] and to Adjusted Lodestar.  *Id.*

|           | Compensation  | % of Compensation | % of Lit. Fund | % of Total Funding | % of Lodestar |
|-----------|---------------|-------------------|----------------|--------------------|---------------|
| PSC       | $52,369,781   | 74.8%             | 81.7%          | 76.5%              | 67.4%         |
| Bernstein | $4,666,746    | 6.7%              | 4.6%           | 5.1%               | 9.2%          |
| Others    | $12,992,122   | 18.5%             | 13.7%          | 18.3%              | 23.4%         |

The PSC's allocation of part of the fees through a bonus process did not significantly alter the balance of compensation among these constituencies.  Although the PSC did not receive compensation equivalent to its financial and resource contribution, it did receive slightly more than it would have received had all compensation been distributed strictly by lodestar.  A strict lodestar distribution, however, would not have reflected that the major accomplishments in this litigation that created a settlement fund to begin with—the factual investigation that discovered

---

[7] Compensation is defined here as the amount of money returned in excess of firms' Litigation Fund contributions and out of pocket expenses.
[8] Total Funding is the sums of the firms' Litigation Fund contributions and out of pocket expenses.

8

the publication fraud; the innovative RICO pleading and pioneering class certification arguments; the development of the expert scientific and economic witnesses; and, not least of all, the successful appeal after the case had been lost.  Given the numerous ways the fund could have been distributed, the amounts awarded to the PSC (and Bernstein) are reasonable, even if a different decision maker might have chosen a somewhat different scheme.

B.      Bernstein's Role in the Neurontin Litigation

Bernstein is a New York City law firm with a class action practice and some expertise in securities litigation.  In June 2004, Bernstein filed a purported class action on behalf of Lorraine Kopa, who had been prescribed Neurontin for pain she suffered after an automobile accident.  Ms. Kopa was later selected to act as the neuropathic pain consumer class representative.  Sobol Aff. ¶ 40.

Bernstein was selected to act as discovery co-chair in early 2005 and performed services in that capacity through early 2008.  It did not participate in any other significant way throughout the course of the litigation.  Sobol Aff. ¶ 45.  Its work was performed almost exclusively by associates (or temporary contract attorneys).  The principal Bernstein attorney in the litigation was Ronald Aranoff, who was nine years out of law school when he filed Ms. Kopa's complaint.  His contemporary billing rates, according to reports Bernstein filed with the PSC, were between $425 and $650 per hour.  He became a partner at Bernstein in December 2008, approximately six months after Bernstein stopped performing regular work for the PSC.  At least three less experienced associates reported to Mr. Aranoff; they were 1995, 1997 and 2003 law school graduates.  Sobol Aff. ¶ 45.  A number of Bernstein partners billed time to the case, but made no substantive contribution.  None filed any pleadings or memoranda, argued any motions, conducted any depositions or provided any special expertise or contribution.  Sobol Aff. ¶ 44.

Bernstein was one of two firms selected by the PSC to act as Discovery Co-Chairs. The discovery co-chairs were assigned the role of coordinating written and deposition discovery under the direction of the PSC. The discovery chairs reported to the chairman of the PSC, Thomas Greene. The discovery co-chairs were not expected to conduct all discovery, but they were in charge of making sure all discovery events were covered, keeping track of responses to discovery requests, drafting and serving deposition and documents subpoenas and communicating with opposing counsel regarding scheduling and disputed matters. The co-chairs were expected to assist with discovery motions and briefing regarding such motions, but the PSC had primary responsibility for briefing and arguing discovery motions. Similarly, the discovery co-chairs attended and occasionally conducted depositions, but most were taken or defended by members of the PSC. Sobol Aff. ¶ 41.

Bernstein's co-chair was the law firm of Cohen & Malad, from Indianapolis, Indiana. The PSC monitored the work performed by both co-chairs, and in the opinion of the PSC, the work was evenly divided between the two firms. There was no reason the work assigned to Bernstein should have taken more hours than that performed by Cohen & Malad. Sobol Aff. ¶ 42. Cohen & Malad did assign a substantial amount of the work it performed to its partners. *Id.*, ¶ 55. Cohen & Malad conducted 20 days of deposition of 16 witnesses, while Bernstein attorneys conducted 5 days of deposition of 4 witnesses. (Attorneys from Bernstein attended an additional 7 depositions, but played no role in interrogating or defending the witness). *Id.*, ¶ 48.

Apart from attending two hearings before Magistrate Judge Sorokin, no Bernstein attorney ever appeared before this Court. Bernstein did not file or write any motions, memoranda or pleadings. Sobol Aff. ¶ 46.

C.      Bernstein's Inflated Lodestar

When the PSC reviewed Bernstein's time records at the conclusion of the litigation, it

10

was quickly apparent that Bernstein's time was an outlier among the many firms with time in the case. It only worked on the case between 2004 and 2008, yet it reported a lodestar of $5,273,035, more than any other firm in the litigation save one, including the firms that worked continuously on this case for more than a decade. It was also more than twice the reported lodestar of Cohen & Malad. Upon closer review, it became clear that the reason that Bernstein's time was an outlier was because it was inflated in several significant ways.

*First*, the Bernstein time included scores of entries detailing work that was neither assigned by the PSC nor provided any common benefit to the class. For example, Bernstein seeks fees for 130 hours, at $175 per hour, that a paralegal spent reading and summarizing a book by Marcia Angell. Sobol Aff. ¶ 52. *See also* Bernstein Leibhard LLP billing record, attached as Exhibit 1 to the Sobol Aff. ("Billing Records"), at 4-6. Mr. Aranoff claims up to 80 hours of preparation, [9] and a second associate billed for an additional 90 hours, for a deposition that another firm handled.[10] Sobol Aff. ¶ 54; Billing Records at 33, 105-06. Even time claimed for reviewing others' work product, such as class certification briefing, was excessive. For example, Aranoff also claimed up to nineteen hours of time spent reviewing a class certification brief authored by others. *See* Billing Records at 120-21 (Aranoff entries of 12/13/07, 12/18/07, and 12/20/07).

*Second*, Bernstein's rates were unusually high. For example, Ron Aranoff, an associate at the time he worked on this case, reported spending 3,038 hours on this case, and claimed a rate

---

[9] As explained in further detail below, due to Bernstein's block billing practices, it is impossible to determine how much of those 80 hours were spent on deposition preparation, as opposed to other tasks.

[10] The deposition, in fact, had no relevance to the class litigation. The witness (Chris Pacella) was a Pfizer employee with expertise in labeling whose testimony had been noticed by the products liability plaintiffs. Sobol Aff. ¶ 54, fn. 5.

of $900 per hour. [11]  That rate is higher than any attorney's in the litigation other than Elizabeth Cabraser's, a nationally recognized class action practitioner with more than 35 years of experience, and who teaches advanced civil procedure at Columbia University Law School.[12] The $900 rate is also inconsistent with the apparent need for his firm to supervise and monitor his activities in the case, which also drove up Bernstein's lodestar.  *See, e.g.,* Billing Records at 37-47, 50-53 (showing regular meetings between Aranoff and Bernstein partners Fleischman and Lifshitz).  In addition, three Bernstein associates with very limited experience were billed at hourly rates of $575, $550 and $525. Sobol Aff. at ¶ 53.

*Third*, Bernstein's time records were overwhelmingly in block-billed form.  This is, as Judge Young recently explained, "the time-keeping method by which an attorney lumps together the total daily time spent working on a case, rather than itemizing the time expended on specific tasks."  *In re: Volkswagen and Audi Warranty Extension Litig.*, 2015 U.S. Dist. LEXIS 16646, at *55 (D. Mass. Feb. 10, 2015).[13]  Although block-billing may not have raised red flags by itself, it was problematic when combined with the extraordinarily high number of hours claimed by Bernstein, as block-billing made it impossible for the PSC to verify the time claimed on any particular task.  Mr. Aranoff, who claimed more hours than any other Bernstein attorney, submitted almost exclusively block-billed time.

A typical entry from Mr. Aranoff lists a number of tasks for a certain day – predominantly phone calls – and a large total number of hours.  The following are examples, of which there are dozens:

---

[11] In contrast, Tom Greene and Tom Sobol have both billed at $700 per hour for their time.

[12] Ms. Cabraser submitted far fewer hours than Mr. Aranoff, and unlike Mr. Aranoff, did not block bill, but did participate in class certification and appellate briefing and strategy, as well as settlement negotiations, all of which contributed to the settlement outcome.

[13] As previously noted, block billing was in contravention of this Court's first case management order.

- On April 29, 2005, Mr. Aranoff claims five hours for the following: "Review draft third party subpoenas from Jeff Gibson [of Cohen & Malad], telephone conference with Jeff Gibson, Irwin Levin [Cohen & Malad] and K. Fleischman [Bernstein]."  According to Cohen & Malad's time records, that phone call took 0.40 hours, or about 25 minutes, leaving about four and a half hours for Mr. Aranoff purportedly to review subpoenas drafted by another firm.  Mr. Fleischman also billed five hours that day, including for review of the same subpoenas.  Billing Records at 65; Declaration of Michael Tabb in Opposition to Motion to Reallocate Attorneys' Fees ("Tabb Aff."), Exhibit A.

- On May 14, 2007, Mr. Aranoff claims almost nine hours on the following tasks: "Conferences with Richard Shevitz and Jeff Gibson, Ken Fromson and Ilyas Rona and Tom Greene re: deposition issues, teleconferences with [defense counsel], draft email to PSC and all Plaintiffs Counsel, conferences with Greg E[gleston, a Bernstein Associate]."[14] According to Mr. Shevitz's records, his phone call with Mr. Aranoff took 0.60 hours, or about 35 minutes.  Tabb Aff. Exhibit B.  Mr. Rona's time shows his call with Mr. Aranoff took 30 minutes.  Tabb Aff. Exhibit C.  Mr. Egleston records his meeting with Mr. Aranoff taking 1 ¼ hours. Billing Records at 12.  So, Mr. Aranoff purports to have spent more than six and a half hours on a draft email, and one or two other phone calls with defense counsel.

- On June 7, 2007, Mr. Aranoff claims *12 hours and 45 minutes* on the following tasks: "Handle scheduling issues with all Plaintiffs counsel, teleconferences with [defense counsel], several teleconferences with Tom Greene, Barry Himmelstein re: extension of discovery period; meet and confer with [defense counsel] re: the same."  Billing Records at 102-04.

[14] Even in the rare instances where time was not block-billed, the time appeared inflated.  For example, Ron Aranoff claimed four hours on "Review discovery motion filings."  Billing Records at 98.

> Mr. Himmelstein's records show 30 minutes worth of phone calls with Mr. Aranoff.  Tabb
> Aff. Exhibit D.  Mr. Greene's time also shows 30 minutes worth of calls with Mr. Aranoff,
> Mr. Himmelstein, and defense counsel, leaving the PSC to guess at what Mr. Aranoff was
> doing with the remaining 12 hours he has claimed for that day, and why it should be
> compensated.  Tabb Aff. Exhibit C.

Entry after entry from Mr. Aranoff contains similar lists of phone calls and emails, an additional task or two, and an implausibly high total number of hours, as do entries from several other Bernstein attorneys.

   *Fourth*, Bernstein claimed massive amounts of time for work whose purpose the PSC could not determine.  Numerous attorneys' time entries consist of little more than meetings with Mr. Aranoff, with no indication of the substance or purpose of the meeting.  *See, e.g.,* entries of Robert Berg, Mel Lifshitz, and Francis Karam.  Billing Records at 7-9, 50-53 and 58-59. One Bernstein partner, Keith Fleishman, lists more than twenty entries labeled only, "Meetings with Ron Aranoff," "Conferences with R. Aranoff," "Teleconference with R. Aranoff," or similarly vague entries.  This is in addition to numerous entries from Mr. Fleishman with even less explanation, such as "Conference Call" (2/15/05), "meetings," (five times in June 2005, totaling ten hours), and "Investigation of status and" [*sic*] (September 2006, for two hours).  *Id.* at 37-47. Bernstein seeks compensation for Mr. Fleishman's time at $695 per hour.

   Based on these recurring issues, which, in terms of their pervasiveness and the overall distorting effect they had on Bernstein's lodestar, were unique to that firm, the review committee recommended several adjustments to Bernstein's lodestar:

- The 130 hours billed by a paralegal who read and summarized Marcia Angell's book should be cut.  Sobol Aff. ¶ 52.

- Consistent with the principles that the PSC adopted, Bernstein's temporary contract attorney time should be removed.[15]   Sobol Aff. ¶ 50

- Ron Aranoff's billing rate should be reduced to a reasonable Boston junior partner's rate commensurate with his experience at the time his work on the case was complete in 2008. Sobol Aff. ¶53

- The rates billed by Bernstein paralegals should be reduced to the upper end of paralegal rates in Boston ($175 an hour).  Sobol Aff. ¶ 52.

- Hours claimed by Bernstein associates should be cut by 30% because they appeared excessive and could not be verified due to block billing. Sobol Aff. ¶ 54

- Hours claimed by Bernstein partners while Ron Aranoff was completing work on behalf of the PSC should be halved, because they did not appear to be necessary to work assigned by the PSC and, because they were not properly documented, the nature of that work was not possible to determine. Sobol Aff. ¶ 51.

Applying all of these adjustments, Bernstein's lodestar would have been reduced to $2,306,392, an amount comparable to, but higher than, Cohen & Malad's adjusted lodestar, $2,199,584.  The PSC did not accept all of its review committee's recommendations, deciding, based on Judge Young's recent *Volkswagen* opinion, that a reduction of the associates' lodestar by 20%, due to block billing, was more appropriate and could not be contested.  This resulted in a lodestar determination of $2,384,059.   Sobol Aff. ¶ 54.

In late February 2015, the PSC reached out to Bernstein to inform it that it intended to reduce Bernstein's lodestar.  Sobol Aff. ¶ 57.  Bernstein had previously been notified that there were serious problems with its time submission.  In June 2014, months before the PSC filed its attorneys' fee motion, Don Barrett had informed Ron Aranoff that the Bernstein time submission was way out of line with those submitted by other firms and recommended that the Bernstein firm reconsider its billed hours and rates.  *See* Declaration of Don Barrett in Opposition to

---

[15] Along with some of the PSC firms and Cohen & Malad, who utilized the same temporary attorney agency, Bernstein paid $48 an hour for temporary contract attorneys.  Sobol Aff. ¶ 26.  It seeks to bill those attorneys, for lodestar purposes, at rates between $295 per hour to $425 per hour, and then obtain a substantial multiplier on that lodestar.

Motion to Reallocate Attorneys' Fees, ¶¶ 3-5.  Bernstein failed to respond to the suggestion.

It was no more responsive to the PSC's formal request in late February.  In phone calls and letters the PSC identified its problems with the Bernstein submission.  Notwithstanding the Fee Order, which identified a rate of $590 per hour as appropriate for a senior partner, or the extensive block billing, which under First Circuit authority authorizes a significant reduction in lodestar independent of all other adjustments, *Torres-Rivera v. O'Neill-Cancel*, 524 F.3d 331 (1st Cir. 2008); *Norkunas v. HPT Cambridge, LLC*, 969 F. Supp. 2d 184, 196-97 (D. Mass 2013), Bernstein issued a blanket demand for receiving a high multiplier on its inflated lodestar. Sobol Aff. ¶¶ 57, 59.

After its initial discussions with Bernstein, the PSC re-examined its adjustments to Bernstein's lodestar with the goal of attempting to avoid a dispute that would be brought before the Court.  Although it believed the adjustments made by the review committee were entirely defensible, it decided to reduce the adjustments to Bernstein.  Ultimately the PSC only made four adjustments: (1) it eliminated Bernstein's effort to include temporary contract attorney hours in its lodestar, instead later increasing Bernstein's lodestar by $600,000 largely for that reason; (2) it eliminated the time its paralegal spent reviewing the Marcia Angell book; (3) it reduced the hourly rates charged for Mr. Aranoff, the other Bernstein associates and the Bernstein paralegals to rates consistent with Boston rates;[16] and (4) all remaining Bernstein time was reduced by 20% on account of block billing. This resulted in a final lodestar of $2,494,102.75.  Sobol Aff. ¶ 60.

Pursuant to the PSC's methodology, Bernstein's lodestar was increased by the same multiplier all firms received on their Lodestar Pool payments, and it was entitled to receive the

---

[16] Mr Aranoff's hourly rate was reduced from $900 per hour to $600 per hours.  The other associates were billed at $500 per hour.  The paralegals were billed at $175 per hour.

return of its expenses, and double the amount of its contributions to the Litigation Fund.  This

entitled it to a payment of $4,132,614 from the Lodestar Pool.  Sobol Aff. Attachment 1.The

PSC also awarded Bernstein $750,000 from the Bonus Pool, the same amount it awarded the co-

chair Cohen & Malad, raising the total amount awarded to Bernstein to $4,882,614.  Sobol Aff. ¶

39 (b).  In contrast, Cohen & Malad's total award from the PSC was $4,440,421.65, based on an

adjusted lodestar of $2,199,584.05 out-of-pocket expenses of $105,166.18, and Litigation Fund

contributions of $125,500.  Sobol Aff. ¶ 39 (c) and Attachment 1.

Moreover, in a final effort to avoid the need to bring this matter before the Court, the

PSC informed Bernstein that it would be willing to increase Bernstein's adjusted lodestar to $3

million, which would increase its award to $5,635,484.06, on the condition that Bernstein accept

the award as total compensation.  The PSC sent Bernstein a check for this amount with the

legend that cashing the check would constitute acceptance of the proposed compromise.  Sobol

Aff. ¶¶ 61, 62.  Bernstein's response was that it would be willing to mediate the dispute if the

PSC was willing to let it cash the check first.  Sobol Aff. 65. The PSC is willing to mediate the

dispute, but it cannot agree to a precondition that, as a starting point, gives Bernstein well in

excess of what Bernstein would achieve through court intervention.  Bernstein seeks a de novo

review of what the PSC awarded it.  If that is the case, the Court may well find that Bernstein is

entitled to far less than the amount the PSC offered to obviate the need for the Court's

intervention.

## II.     <u>ARGUMENT</u>

1.     The PSC's Allocation Is Reviewed Deferentially.

The Court's delegation to the PSC to allocate fee amounts based on participating firms'

relative contributions to a case is well-accepted practice.  *In re Indigo Securs. Litig.*, 995

F. Supp. 233, 235 (D. Mass. 1998) ("The Court sees no reason why it should not, as it has done

in the past, award attorney fees and costs to all class counsel, to be distributed among the participating counsel based on their respective contributions to the litigation, according to the discretion of lead counsel."). *See also, e.g., In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 262 (D. Del. 2002) ("The court determines a reasonable award to the class counsel in the aggregate, and the counsel then determine how to allocate the award among themselves."); *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*, 2013 U.S. Dist. LEXIS 123298, at *316 (C.D. Cal. July 24, 2013) (approving plan for class counsel to allocate fees "in a manner that they believe, in good faith, reflects the contributions of counsel to the prosecution and settlement of the claims," as "class counsel are the most familiar with the amount of work actually contributed by each of the 31 firms").

Because, as courts have held, fee allocation in class cases is "a private matter for the attorneys to resolve," *In re Warfarin*, 212 F.R.D. at 262, courts treat lead counsel's assessment of the contributions of other firms with "substantial deference." *Volkswagen*, 2015 U.S. Dist. LEXIS 16646, at *63.[17]  Courts apply this deferential standard to lead counsel's allocation decisions because lead counsel is "better able to describe the weight and merit of each counsel's contribution." *In re Vitamins Antitrust Litig.*, 398 F. Supp. 2d 209, 224 (D.D.C. 2005) (alteration omitted) (citing *In re Linerboard Antitrust Litig.*, 2004 U.S. Dist. LEXIS 10532 (E.D. Pa. Oct. 3, 2004).  *See also In re Tyco Int'l Ltd. Multidistrict Litig.*, 2010 U.S. Dist. LEXIS 142865, at *37 (D.N.H. Dec. 3, 2010) (holding that deferential standard adopted by the *Vitamins* court is

---

[17] Judge Young cited to several decisions holding similarly.  *Id.* at *63-64 (citing *Victor v. Argent Classic Convertible Arbitrage Fund L.P.*, 623 F.3d 82, 90 (2d Cir. 2010) ; *In re Initial Pub. Offering Secs. Litig.*, No. 21 MC 92(SAS), 2011 U.S. Dist. LEXIS 76067, 2011 WL 2732563, at *7 (S.D.N.Y. July 8, 2011) ("Based on lead counsel's familiarity with the underlying litigation, fee allocation proposals are often afforded substantial deference."); *In re Copley Pharm., Inc., Albuterol Prods. Liab. Litig.*, 50 F. Supp. 2d 1141, 1149 (D. Wyo. 1999) ("[The Court] necessarily gave substantial deference to Lead Counsel's proposed allocation. In a case of this magnitude, the assistance of Lead Counsel on matters such as this is especially invaluable.") (internal citations omitted).

majority approach).

2.     Bernstein's Allocation Is Appropriate.

The PSC's allocation of more than $4.8 million to Bernstein generously compensated the firm.  It is the largest allocation – by a substantial margin – to any non-PSC firm, larger than those of some members of the PSC, and larger than the allocation to discovery co-chair Cohen & Malad.  Nonetheless, Bernstein, the only objector among forty firms, wants more, and at the expense of all of the other non-objecting firms.  It should not get it.

The Court tasked the PSC with making a reasonable allocation among Class Counsel. The PSC took this direction seriously, and developed a process that included two parts.  First, the PSC examined each firm's time and expenses using a consistent set of rules, allowing for appropriate adjustments and an apples-to-apples comparison of lodestar figures among firms. Second, it recognized particular contributions to the litigation.  If the PSC reasonably adjusted Bernstein's lodestar, and then awarded it a reasonable amount from the bonus pool, there is nothing for the Court to do and no further oversight is necessary.

First, the downward adjustments that the PSC applied to Bernstein's lodestar are appropriate under the rules that the PSC adopted before looking at any particular firm's time and that are consistent with guidance from the courts on these issues.  As set forth above, Bernstein's time consisted of page after page of entries for unassigned work and for activities whose purpose to this day is unknown, in part because they resulted in no work product.  Even the work that Bernstein did perform that could fairly be described as common benefit work was overstated in its records; its time is replete with entries that show hours and hours of time for phone calls that, according to others' records (and based on the PSC's collective experience with the practice of law) took a fraction of the time claimed.  Further, its block billing practices frustrated any attempt to verify the work claimed, and made the astronomical number of hours reported that

19

much more implausible.  The PSC could have reduced Bernstein's lodestar for excessive billing and then taken a further deduction for block billing.  Simply applying the penalty percentage usually used in this District for block billing is clearly reasonable.

Similarly, allowing a senior associate to be billed at a rate higher than the rate this Court found appropriate for a senior partner in a medium to large size Boston firm is also more than reasonable.  Indeed the adjustment of Aranoff's hourly rate to $600 per hour is still generous for an attorney whose records reflect a highly inefficient practice.  Another reasonable decision by the PSC was to not allow temporary contract attorneys' hours to be included in lodestar—a decision that affected members of the PSC as much as Bernstein. And, finally, the amount offered and accepted by the discovery co-chair, Cohen & Malad, is incontrovertible proof of the reasonableness of the PSC's positions.  Cohen & Malad had the same job and the same work load as Bernstein.  Yet, they were paid 10 percent less than Bernstein was offered for no valid reason.  Bernstein should not be rewarded for charging excessive rates or indulging in sloppy billing practices.

Second, Bernstein's allocation from the Bonus Pool reflects its limited contribution to the successful prosecution of this case.  Notably, Bernstein devotes a single paragraph to its role in the case, and describes it in entirely conclusory terms.  Br. at 2.  Although Bernstein played an important role during discovery, much of that work consisted of liaising among the parties and did not develop the case in any substantive way.  Bernstein did not write a brief on a dispositive motion (its brief asking for more fees is the first it filed in this litigation), did not discover any of the evidence that would support Plaintiffs' claims, did not work with any experts, did not represent any of the class representatives eligible to represent the bipolar TPP class, and did not take any particularly important depositions.  It had nothing to do with bringing the case back to

life in the First Circuit and afterward, nothing to do with the settlement negotiations, and nothing to do with the approval and implementation of the settlement.  Bernstein's belief that it "performed a role equivalent to a steering committee member" (Br. at 2) borders on the delusional.  Any number of firms could have done the work that it did.  Bernstein performed a support role, adequately.  An award of $750,000 from the Bonus Pool—the exact amount that was paid to its co-chair—is, once again, indisputably within reason.

3. The PSC's Process Was Fair, Reasonable, and Transparent.

This memorandum has described at length the process the PSC used to determine allocations to class counsel.  Further detail is set forth in the Sobol Affidavit.  These descriptions make it clear that the PSC plan of distribution was anything but arbitrary.  Given the length of time of the litigation and the number of firms who participated, the PSC had to address several factors in coming up with an allocation methodology.  They may not have chosen the same methodology that Bernstein, or even this Court, would have chosen—but they clearly fulfilled the Court's mandate to allocate the fees and expenses among class counsel in a reasonable fashion.  Bernstein cannot point to any improper considerations motivating the PSC's choice of methodology.

Bernstein insinuates that the PSC improperly enriched itself by over allocating to its members.  Yet the Court (and Bernstein) can review the figures.  Although the members of the PSC were responsible for every achievement that led to the ultimate success—from discovering the illicit scheme to negotiating a resolution on very favorable terms—they are retaining less than three quarters of the compensation, less than the percentage of financial and resource support necessary to carry this action for more than a decade.  While other firms had the luxury of moving on to more profitable endeavors once it appeared that causation was an insuperable barrier, the PSC members continued to pour resources into an action that appeared hopeless.

21

Any reward the PSC is receiving for its efforts is readily apparent; its percentage of the compensation is not significantly more than its proportionate share of the collective lodestar. The PSC has not unfairly appropriated the work of the non-PSC firms.

Bernstein also contends the PSC unfairly singled out Bernstein's lodestar for cuts.  To the extent that it has been singled out, it is only because of its singular billing practices.  Moreover, twelve other firms had their lodestars reduced as part of the allocation process, and two firms had a greater percentage decrease than Bernstein.  Sobol Aff. ¶ 21.  Contrary to Bernstein's assertions, the PSC applied the same scrutiny to its own members, substantially adjusting the requested lodestar of the Dugan Firm.  The hours of the Dugan Firm's two largest billers were reduced by 25%, a greater percentage deduction than was assessed against any of the Bernstein attorneys.  The attorney who billed the highest number of hours also had his hourly rate reduced from $600 an hour to $400 an hour for the period between 2004 and 2010.  This is comparable to the reduction of Ron Aranoff's rate from $900 an hour to $600 an hour during the years Aranoff was an associate at Bernstein.[18]  Sobol Aff. ¶ 22.

### 4.    Bernstein's Requested Relief Should Be Denied.

The PSC offered $5.6 million to Bernstein precisely to avoid a "second major litigation" that results when Court are forced to review fees.  *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983).  The appropriate allocation to Bernstein was no more than $4,882,614.  This reflects a lodestar of $2,494,102.75 and the same multiplier applied to all other firms (1.51), reimbursement of expenses and litigation fund assessments in the identical manner as all other firms, and a discretionary bonus of the same amount awarded to Bernstein's discovery co-chair.

The relief that Bernstein seeks is neither warranted nor coherent.  It asks that "no

---

[18] The Dugan Firm's lodestar was also reduced because another firm claimed some of the hours of one of the associates.  However, the bulk of the adjustment was for the reasons identified above.  Sobol Aff. ¶ 22.

downward adjustments whatsoever" be made to its time – even to the facially improper entries that the PSC pointed out – and with the "same multiplier as awarded to the PSC."  And it demands $10.5 million, which is more money than any firm in this litigation, save one, received.

Bernstein's request for discovery should also be denied.  It is unnecessary.  If the PSC distributed the fees and expenses in a reasonable manner, there is no controversy before the Court.  The materials before the Court already permit the Court to draw such a conclusion.  The only documentary evidence that the Court may need to decide this motion is Bernstein's own time and expense records, which it tellingly failed to provide to the Court.  Those records, should the Court deem it necessary to review them, will confirm that Bernstein should be paid no more than $4,882,614 in fees and expenses.

The PSC made a proposal to Bernstein of over $5.6 million to avoid the need for intervention from this Court.  Bernstein's response was that it take that proposed settlement allocation, then ask for more, without any downside, all the time imposing yet more time on the allocation process.  The PSC has already expended many hours over many months – for which it seeks no reimbursement – to arrive at a fair and equitable allocation of costs and fees.  Although it would be appropriate, the PSC does not seek reduction of Bernstein's allocation for the fees and costs expended for this response, mindful of the Court's repeated desires that fee disputes not be exalted into collateral litigation.

Bernstein purports simultaneously to speak for and burden the many other law firms who have now moved on from this litigation.  It seeks disclosure "to all counsel" of "all time records" (Br. at 16-17), and a reassessment of an allocation to which only Bernstein has objected.  The other firms have accepted the PSC's allocation.  Bernstein's request for relief on their behalf should be denied.

23

III.    <u>CONCLUSION</u>

It is not surprising that Bernstein Liebhard LLP bore the brunt of a large portion of the

downward adjustments that the PSC made; it reflects its status as an extreme outlier among the

forty firms with time in this litigation.  Its allocation is still generous given the state of its

timekeeping, the exorbitant rates it claims, and the many other issues with its billing submission.

The Court should deny Bernstein's motion.


Dated:  May 22, 2015                          Respectfully Submitted,

                                              By:     /s/ Thomas Greene_____
                                                      Thomas Greene
                                                      Greene LLP
                                                      One Liberty Square, Ste. 1200
                                                      Boston, MA 02109

                                              By:     /s/ Thomas M. Sobol_____
                                                      Thomas M. Sobol
                                                      Hagens Berman Sobol Shapiro LLP
                                                      55 Cambridge Parkway, #301
                                                      Cambridge, MA  02141

                                              By:     /s/ Elizabeth J. Cabraser_____
                                                      Elizabeth J. Cabraser
                                                      Lieff Cabraser Heimann &
                                                         Bernstein, LLP
                                                      275 Battery Street, 29th Floor
                                                      San Francisco, CA 94111-3339

                                              By:     /s/ Don Barrett_____
                                                      Don Barrett
                                                      Barrett Law Office
                                                      404 Court Square North
                                                      P.O. Box 987
                                                      Lexington, MS 39095

By:    */s/ Daniel Becnel*

Daniel Becnel, Jr.
Law Offices of Daniel Becnel, Jr.
106 W. Seventh Street
P.O. Drawer H
Reserve, LA 70084

By:    */s/ James Dugan*

James R. Dugan, II
The Dugan Law Firm
365 Canal Street, Suite 1000
New Orleans, LA 70131

***Members of the Class Plaintiffs'***
***Steering Committee***

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served on

May 22, 2015.

*/s/  Thomas Greene*

Thomas Greene

25